**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1-26,<br><br>    *Plaintiffs,*<br><br>    **v.**<br><br>ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICES, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY,<br><br>    *Defendants.* | **Case No. 25 cv-\_\_\_\_\_-\_\_\_\_** |

**COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, J. Doe 1-23,[1] by and through their attorneys, hereby bring this Complaint against Elon Musk, in his official capacity, as well as the United States DOGE Services and the Department of Government Efficiency (collectively "DOGE"). In support thereof, upon personal knowledge as well as information and belief, Plaintiffs allege the following:

**NATURE OF THE ACTION**

Defendant Elon Musk has an office in the White House, no supervising official, and a team of individuals with wide-ranging government access whom he directs. Defendant Musk was the driving force behind the creation of DOGE and acts as the *de facto* DOGE Administrator, despite the lack of any formal announcement by President Donald J. Trump or any public process affiliated with the selection of that position.

In his government role, Defendant Musk exercises an extraordinary amount of power.

---

[1] Plaintiffs are filing a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses and to permit Plaintiffs to proceed under pseudonyms.

Indeed, the scope and reach of his executive authority appears unprecedented in U.S. history. His power includes, at least, the authority to cease the payment of congressionally approved funds, access sensitive and confidential data across government agencies, cut off systems access to federal employees and contractors at will, and take over and dismantle entire independent federal agencies.

Recent weeks demonstrate that Defendant Musk follows a predictable and reckless slash-and-burn pattern:

1. Identify a federal program target, often relying on information posted on his privately owned social media platform, X, to pick them.

2. Attempt to install his DOGE team—which largely consists of former employees from across a variety of Defendant Musk's businesses—within the agency or agencies that administer those programs.

3. Attempt to gain access to the agency's core operating systems—often demanding access that is forbidden by privacy and security laws for individuals who have no clearance to access that information.

4. If resistance is met by the duly appointed officers or regular staff, threaten and/or ensure that any personnel roadblocks are placed on leave or otherwise removed. Perhaps amplify threats against staff on X, heightening the risk of third-party harassment.

5. Use the agency's internal technology and information systems—again, without proper legal authorization—to identify personnel for termination and contracts for freezing.

6. Begin dismantling the agency from within by severely disrupting or crippling operations.

7. Post about his actions either on his personal X account or the official DOGE X account, or both.

In the case of USAID in particular, Defendant Musk's actions were far ahead of other members of the Trump Administration including (in that case) duly confirmed cabinet members like Secretary of State Marco Rubio.

It is clear, however, that the duties Defendant Musk and the DOGE team he directs have performed thus far—and the new duties he is now undertaking, such as starting to dismantle the Department of Education—represent "the performance of [] significant governmental dut[ies]" that may be "exercised only by persons who are 'Officers of the United States,'" and duly appointed pursuant to the U.S. Constitution's Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 141 (1976).

But Defendant Musk has not been nominated by President Trump and confirmed by the U.S. Senate, as Article II of the United States Constitution requires. Moreover, even if Defendant Musk qualified only as an inferior officer (a dubious proposition, given his sweeping powers), Congress has not vested "by Law" the authority to appoint him in the President alone, without the advice and consent of the Senate. Finally, even if Defendant Musk could somehow be considered a mere "employee" rather than an "officer" of the United States, his exercise of "significant," seemingly unfettered authority constitutes a grave violation of the separation-of-powers.

Questions regarding Defendant Musk's and DOGE's role, scope of authority, and proper appointment processes are not merely academic. Plaintiffs—among countless other American individuals and entities—have had their lives upended as a result of the actions undertaken by Defendants Musk and DOGE. Not only have Defendants pulled the rug out from under Plaintiffs professionally and financially, but they have repeatedly publicly besmirched the good names of

these dedicated, loyal civil servants in order to justify their unconstitutional power grab—causing reputational injury to Plaintiffs that will threaten their ability to obtain future employment. Upon information and belief, Defendants still have full access to the digital infrastructure of Plaintiffs' agency, causing continued disruptions and maintaining access to Plaintiffs' (sometimes highly sensitive) personnel files. More broadly, the reckless disregard with which Defendants have exercised their unconstitutional authority has unlawfully disrupted contracts of the United States—some of which are signed by individual Plaintiffs—undermined national security, and put American lives at risk abroad.

For all of these reasons, Plaintiffs respectfully request permanent and preliminary injunctive relief from this Court, enjoining Defendant Musk and his DOGE subordinates from performing their significant and wide-ranging duties unless and until Defendant Musk is properly appointed pursuant to the U.S. Constitution.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201.

2. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e), including because at least one of the Plaintiffs resides in this district.

## PARTIES

3. Plaintiffs J. Does 1-26 are current and former employees or contractors of the U.S. Agency for International Development ("USAID").

   a. J. Doe 1 is a professional services contractor ("PSC") who has been with USAID since 2017. Their role is to coordinate humanitarian assistance. Their main duties

include managing a portfolio of partners and providing guidance to junior staff. Through work with USAID, they have deployed into dangerous areas around the world, including Pakistan. Under their contract, in order to end the contract in the middle of the contractual period, the government is required to provide 15 days notice. As a result of Defendants' unlawful actions, J. Doe 1 was cut off from access to their work email without any advanced notice. As of February 12, 2025, J. Doe 1 has been given access to their USAID email but not to other critical USAID systems. Upon information and belief, DOGE staff have been given full access to USAID systems, which includes personnel information. As a result of the dangerous nature of J. Doe 1's job, specifically their deployment into conflict zones, their personnel and security clearance files contains highly sensitive personal information—social security number, passport information, personal references, foreign contacts, previous addresses, financial records, tattoo descriptions, a safety pass phrase, and their family members' information. J. Doe 1 is worried that Defendants do not have the security clearance or training needed to handle this type of extremely confidential information, and will use it to J. Doe 1's detriment.

b.  J. Doe 2 is a USAID employee and has been with the agency for over 10 years. Their main duties include technological responsibilities related to cybersecurity and privacy. On January 30, 2025, J. Doe 2 was working from the USAID office when they were told to provide access to individuals from DOGE. J. Doe 2 conducted research and determined that the people who were trying to get access

to these crucial systems were "hackers." J. Doe 2 was alarmed and raised this issue with their supervisors, indicating that the DOGE personnel should not obtain access. However, J. Doe 2 thereafter discovered that the DOGE personnel had already been given access. Furthermore, they were given *root access* to these systems, the highest level of access one can obtain and which allows a person to take over a system. This includes the ability to modify, add, delete data, and create users accounts. On Feb 1, 2025, DOGE personnel who did not have a security clearance, used their administrative rights to grant themselves access to restricted areas requiring security clearance. It is unclear what the DOGE personnel did with that access. DOGE personnel have also taken over delegate rights to every USAID mailbox. With this they have the ability to see every email, delete, and send email on behalf of every user within USAID.  J. Doe 2 is also aware that there is rapid preparation to tear down the USAID network to create a condition where USAID employees will not have access to any facilities nor computing environment.

On February 4, 2025, J. Doe 2 was put on administrative leave and lost all access to USAID systems. On February 10, 2025, J. Doe 2 was allowed back into the USAID system, apparently pursuant to a temporary restraining order in a separate lawsuit between different parties.

J. Doe 2 understands that the DOGE personnel had administrative privileges into all the USAID systems and tools and that DOGE personnel took information out of the agency and sent it elsewhere. DOGE's actions have caused J. Doe 2 emotional injury, as J. Doe 2 is aware of the extent of confidential information that has been

6

breached and the privacy laws broken.

J. Doe 2 also understands the USAID buildings have been given to other agencies for other purposes, including allowing the breaking down of offices and cubicles. USAID staff and contractors who worked in the USAID buildings are not allowed inside, even to obtain personal belongings.

c.  J. Doe 3 is a PSC who has been with USAID, in the Bureau of Humanitarian Assistance, since 2017. They are a part of the Support Relief Group (SRG), a group of staff who fill regular staffing shortages in DC and the field, as well as surge to support BHA disaster responses worldwide. They are a former Army officer and an engineer with a high level security clearance. They have filled roles in grant programming and operations, both in DC and in the field.  They have also worked on more than a dozen response teams.

As a result of Defendants' unlawful actions, J. Doe 3 has been locked out of their email account and other systems (including time cards, vouchers, etc.) since February 2, 2025. J. Doe 3 has received no communication about the status of their contract or employment. J. Doe 3 has over $15,000 worth of travel vouchers that should be paid by the agency but have not been paid thus far.

 J. Doe 3 has spent 20 years working in the humanitarian field. J. Doe 3 does not know what they will do if they lose this job and there is no prospect of getting comparable employment, especially if the entire humanitarian aid sector collapses due to the huge cuts in US funding. Further, J. Doe 3 is worried about what will

happen if there is a humanitarian emergency that J. Doe 3's bureau (and USAID more broadly) would typically respond to and they will not be there to provide support; this concern is shared by other USG agencies that support USAID personnel during responses.

d.  J. Doe 4 has dedicated over 10 years of their life in service at USAID. On February 4, 2025, as a result of Defendant's illegal conduct, J. Doe 4 was cut off from accessing USAID email and other systems. J. Doe 4 has witnessed the negative impacts of USAID's stop-work order on the partners and beneficiaries of USAID, some of the most vulnerable people on the planet, whom they have worked with directly in implementing USAID programs.  Additionally, J. Doe 4 experienced the harm of seeing years of their efforts and U.S. taxpayer dollars wasted, as current USAID leadership unlawfully discards investments to design and implement effective USAID programs without a fair assessment of their merit or impact.  J. Doe 4 has also witnessed the harm of colleagues around them, including a fellow whom J. Doe 4 had arranged to join the agency; the fellow was *en route* to their first day when notified the position was eliminated. Finally, J. Doe 4 experienced direct personal harm, as the President of the United States and Defendant Musk label civil servants  "lunatics" and threaten to end their employment at a whim, even though J. Doe 4's work has been supported by bipartisan appropriations bills and is based on systematic analysis.

e.  J. Doe 5 is a PSC who has been with USAID for almost 3 years. They support the agency's efforts to combat human trafficking. For instance, at the end of February,

they were scheduled to travel to Southeast Asia to help design new activities that would have worked to strengthen the U.S. government's ability to respond to trafficking rings in Asia that impact U.S. security interests. They lost access to their email Sunday, February 2, without explanation. When that shut down, they also lost the ability to finalize a report on USAID's counter-trafficking efforts, as required by 22 U.S.C. § 7103(d)(7). The loss of email access also prohibited them from being able to respond to an active GAO audit, titled "Combating Human Trafficking During Armed Conflicts." When they regained email access on February 9, there were no emails in their inbox from the previous week, even though they had repeatedly copied their work email address when trying to communicate with their contracting officer about their employment status between February 2 and February 9.  They remain confused and anxious about the status of their employment—to date no one at the agency has provided guidance on whether or not they were on administrative leave but, pursuant to their employment contract, only their contracting officer has authority to end the contract. There has also been no guidance on if or how they should finalize the report, audit and other activities they were working on for the agency.

f.  J. Doe 6 is a PSC who has been with USAID for several years and has worked for over 25 years in this field. They are a subject matter expert whose main duties include working on supporting independent media, advocating for digital rights, and promoting information integrity, including working on countering authoritarianism and foreign malign influence which undermines US national

security. Under their contract, in order to end the contract in the middle of the contractual period, the government is required to provide 15 days notice. J. Doe 6 was in Africa for work with USAID when the stop work order came out. They traveled back home to the United States and have thousands of dollars of travel costs reimbursement that is supposed to be covered by USAID. As a result of Defendants' unlawful actions, J. Doe 6 lost access to their work email and USAID systems on February 2. J. Doe 6 has received no formal communication about their situation. J. Doe 6's insurance is covered to a large degree by USAID and they do not know if the insurance will be covered.   As of February 12, 2025, J. Doe 6's access has not been restored. J. Doe 6's livelihood is severely jeopardized by Defendants' illegal activity.

g.   J. Doe 7 is a Civil Service Excepted ("CSE") employee who has been with USAID for over 10 years. They work in a department focused on disaster response.  On Sunday, February 2, 2025, USAID personnel were cut off from accessing USAID systems in droves. On Monday, February 3, 2025, more USAID personnel were cut off from accessing systems. That morning, J. Doe 7 spoke with the information technology ("IT") personnel in their building. The IT person shared that representatives from DOGE had access to all systems. The IT personnel knew this because they were required to help the DOGE representatives obtain access. On the morning of February 3, 2025, J. Doe 7 was contacted by USAID personnel overseas who were stranded without access to government phone, laptop, and systems, including AtHoc and Scry, the apps used to disseminate emergency safety

and security information/direction to colleagues. The systems to help the USAID people overseas were shut down and so J. Doe 7 could not assist them.

On Tuesday, February 4, 2025, J. Doe 7 went into the office and was eventually informed by colleagues that they and other personnel had to leave the building. J. Doe 7 then went home to keep working. That evening, as a result of Defendants' unlawful actions, J. Doe 7 was told they were put on administrative leave via an email from the USAID press email address, sent from one of DOGE's representatives. Shortly after receiving this notice, J. Doe 7 lost access to USAID systems. On Sunday, February 9, 2025, apparently in response to a temporary restraining order issued in another lawsuit, J. Doe 7 was given access to USAID systems.

J. Doe 7 understands that the DOGE representatives have access to their personnel, medical, and security clearance files. These files have extremely sensitive information about J. Doe 7 and their family members, including information that could subject them to harassment by DOGE members and/or by third parties. J. Doe 7 is extremely worried about this prospect. Some of J. Doe 7's colleagues have been doxxed and so this concern is especially heightened.

h.  J. Doe 8 is a PSC who has worked for the federal government for almost 16 years. They are part of a team that provides emergency aid during humanitarian disasters and crises. They have worked as an emergency responder across the globe, including back-to-back deployments in Armenia, Gaza, and Ukraine, as well as

other crisis areas as a part of their work for USAID.  As a result of Defendants' unlawful actions, on February 3, 2025, J. Doe 8 was locked out of USAID systems, including their email access. They received no communication about why access was stopped. On Monday, February 10, 2025, J. Doe 8 was able to access their USAID email. There has still been no communication from USAID about why access was cut off in the first place. About half of J. Doe 8's immediate team colleagues still do not have access.

i.    J. Doe 9 is a PSC offshore, in a high-risk area in the Middle East. On Monday, February 3, 2025, J. Doe 9 tried to login to their USAID email account but was locked out. J. Doe 9 received no warning or notification in advance from being shut out of USAID's systems. Their supervisor and head of mission were not informed in advance of the cutoff. All of the contacts and the safety and security applications from J. Doe 9's USAID work phone were removed remotely. The safety and security application is the mechanism by which federal government staff overseas in dangerous areas indicate that they are in a dangerous situation and access help. J. Doe 9 lives with their family in the foreign country in which they are stationed and is concerned for their safety. If there is an emergency, J. Doe 9 hopes they will be able to get out and be taken care of by USAID, but there is no guarantee as over the last few weeks, nothing done within USAID by Defendants has been according to protocol or implemented in a methodical, safe manner.  J. Doe 9 has no idea what their status is each day. They continue to come into the

12

office in order to execute their duties to the best of their ability despite not having access to any of the tools and resources required to do so. As of February 12, 2025, they are still locked out of all USAID systems, including email. They have tried numerous times to reach out to different helpdesk lines in Washington, DC. The only response J. Doe 9 has received is a message that the helpdesk confirms J. Doe 9's account is disabled but that they cannot provide further information.

j.  J. Does 10, 12, 14, 16, 17, 19, 20, 23, and 25 are PSCs or other contractors who, as a result of Defendant's unlawful actions, have all lost access to USAID systems with only some of them obtaining access on or about February 10, 2025, and remain in limbo as to whether the terms of their employment contracts will be honored. J. Does 10, 12, 14, 17, 20, 21, 23 25 are employees who, as a result of Defendant's unlawful actions, have all lost access to USAID systems; some of the employees have regained access to USAID systems apparently in response to a temporary restraining order granted in another case.

4.  Defendant Musk is, according to White House spokespeople, an unpaid "special government employee" pursuant to 18 U.S.C. § 202. Upon information and belief, Defendant Musk acts as the *de facto* DOGE Administrator. *See* Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" 90 FR 8441 (2025) ("There shall be a USDS Administrator established in the Executive Office of the President who shall report to the White House Chief of Staff."). In his role, Defendant Musk oversees a DOGE team, including a "DOGE Team Lead"

embedded within each federal agency. *See id*. at Sec. 3(c).

5.  Defendant United States DOGE Service was established on January 20, 2025 by Executive Order 14158. DOGE's stated purpose is to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id*. at Sec. 1. "DOGE…shall terminate on July 4, 2026" but that termination "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id*. at Sec. 3(b).

6.  On information and belief, Defendant United States DOGE Service is in a transitional state and not fully formed, but there is a web of government employees working at the direction of Defendant Musk which is referred to as the Department of Government Efficiency, or DOGE. Defendant United States DOGE Services as well as the network of personnel working at the direction of Defendant Musk are referred to collectively herein as "DOGE."

## FACTS

### *Before January 20, 2025: DOGE's Origin and Defendant Musk's Role*

7.  In addition to his government role, Defendant Musk serves as the Chief Executive Officer of automaker Tesla and of rocket manufacturer Space X. He also owns the social media company X, formerly known as Twitter. Additionally, he co-founded Neurolink, a neurotechnology startup, and founded xAI, an artificial intelligence company. Defendant Musk's estimated wealth is $379 billion dollars,[2] and he was the largest contributor of the

---

[2]  *Bloomberg Billionaires Index*, BLOOMBERG (Feb. 11, 2025),
https://www.bloomberg.com/billionaires/profiles/elon-r-musk.

2024 election cycle, contributing $288 million to support President Trump and other Republican candidates.[3]

8. In August 2024, Defendant Musk proposed the idea of a "government efficiency commission" in a podcast interview with Lex Fridman. As recounted by *Forbes Magazine*, "When Fridman said he wished Musk 'could go into Washington for a week and be the head of the committee for making government smaller,' the billionaire said he has 'discussed with Trump the idea of a government efficiency commission, and I would be willing to be part of that commission.'"[4]

9. After that, on August 12, 2024, Defendant Musk interviewed then former President Trump on X. Defendant Musk proposed the creation of a "government efficiency commission" that would ensure "taxpayers money . . . is spent in a good way." President Trump expressed support for the idea and indicated that he would consider appointing Defendant Musk to lead such a commission if re-elected.[5]

10. On September 5, 2024, in a speech to the Economic Club of New York, President Trump announced his plans to establish a "government efficiency commission" that would be "tasked with conducting a complete financial and performance audit of the entire federal

---

[3] Trisha Thanadi et al., *Elon Musk Donated $288 Million in 2024 Election, Final Tally Shows*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/politics/2025/01/31/elon-musk-trump-donor-2024-election.
[4] Siladitya Ray, *Trump Backs Idea Of Musk Joining 'Government Efficiency Commission' If He Wins Second Term*, FORBES (Aug. 13, 2024), https://www.forbes.com/sites/siladityaray/2024/08/13/trump-backs-idea-of-musk-joining-government-efficiency-commission-if-he-wins-second-term.
[5] Siladitya Ray, *Trump Backs Idea Of Musk Joining 'Government Efficiency Commission' If He Wins Second Term*, FORBES (Aug. 13, 2024), https://www.forbes.com/sites/siladityaray/2024/08/13/trump-backs-idea-of-musk-joining-government-efficiency-commission-if-he-wins-second-term.

government, and making recommendations for drastic reforms." President Trump also stated that Defendant Musk had agreed to lead this commission.[6]

11.  At the time of the 2024 election, Defendant Musk's companies had more than $15 billion in contracts with the United States government with nine cabinet departments and three federal agencies. His companies were the subject of at least 20 recent investigations or reviews by five cabinet departments and six independent agencies.[7]

12.  On November 12, 2024, President-elect Trump announced that "the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy will lead the Department of Government Efficiency ('DOGE')." The announcement further stated that: "Together, these two wonderful Americans will pave the way for my Administration to dismantle Governmental Bureaucracy, slash excess regulations, cut waste expenditures, and restructure Federal Agencies—Essential to the 'Save America' Movement." "This will send shockwaves through the system, and anyone involved with Government waste, which is a lot of people!" stated Defendant Musk.[8] Defendant Musk posted this same statement to X and then reposted it as the first X post from the Department of Government Efficiency.[9]

---

[6] Nick Robins-Early, *Trump Announces Plan for Elon Musk-Led 'Government Efficiency Commission,'* THE GUARDIAN (Sep. 5, 2024),
https://www.theguardian.com/us-news/article/2024/sep/05/trump-musk-efficiency-commission.
[7] Eric Lipton et al., *U.S. Agencies Fund, and Fight With, Elon Musk. A Trump Presidency Could Give Him Power Over Them*, N.Y. TIMES (Oct. 21, 2024),
https://www.nytimes.com/2024/10/20/us/politics/elon-musk-federal-agencies-contracts.html.
[8] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov 12, 2024, 7:46 PM),
https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.
[9] Department of Government Efficiency (@DOGE), X,
https://web.archive.org/web/20241115012406/https://x.com/doge (last accessed Feb. 12, 2025).

13. Defendant Musk and Mr. Ramaswamy made similar points on November 20, 2024 in a *Wall Street Journal* opinion editorial, emphasizing that DOGE would "cut the federal government down to size," through three types of reform: "regulatory rescissions, administrative reductions and cost savings." They criticized "rules and regulations" issued by "millions of unelected, unappointed civil servants (from) within government agencies who view themselves as immune from firing thanks to civil service protections." They said that DOGE will identify the minimum number of employees required at agencies to perform their "constitutionally permissible and statutorily mandated functions" and then reduce agency staff in proportion to the number of regulations that are cut. Defendant Musk and Mr. Ramaswamy claimed that they would co-lead DOGE as "outside volunteers" and stressed the importance of public support and transparency.[10]

14. On December 4, 2024, President Trump announced that the "team of incredible pioneers at DOGE" would "rebuild a U.S. Government that truly serves the People."[11]

15. On January 8, 2024, Defendant Musk stated that DOGE would seek to cut $2 trillion in government spending with $1 trillion as a realistic goal, and that reducing spending within the federal government would provide a "target rich environment."[12]

---

[10] Elon Musk & Vivek Ramaswamy, *Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government*, WALL ST. J. (Nov. 20, 2024), https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020.

[11] Statement by President-elect Donald J. Trump Announcing the Appointment of David A. Warrington as Assistant to the President and Counsel to the President (Dec. 04, 2024), https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-the-appointment-david-warrington.

[12] Live (@Live), Interview by Mark Penn with Elon Musk, X (Jan 8, 2025, 10:46 PM), https://x.com/Live/status/1877200335443304685.

*After January 20, 2025: The Creation, Mission, and Staffing of DOGE*

16. President Trump created the United States DOGE Service in the Executive Office of the President on January 20, 2025, in one of his first acts as President. Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency'" 90 FR 8441 (2025). In pursuit of the stated mission "to implement the President's DOGE Agenda," the order:

   a. Creates DOGE teams within each federal agency, including an embedded "DOGE Team member" who can only be hired by the agency "in consultation with" the DOGE Administrator, *id*. at Sec. 3(c);

   b. Orders the DOGE Administrator to commence "a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote interoperability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization," *id*. at Sec. 4(a).;

   c. Directors agency leaders to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems," *id*. at Sec. 4(b).

17. According to the *New York Times*, "In November, Mr. Trump initially said the group would provide outside advice as it worked closely with White House budget officials. The

18

president's order, however, brings the group inside the federal government. The order also follows a major shake-up in leadership. Elon Musk will be its sole leader after Vivek Ramaswamy bowed out of the project."[13]

18. The details of Defendant Musk's employment, including whether he has been formally named as the DOGE administrator, have not been shared with the public. However, a White House official has stated that Defendant Musk was classified as a "special governmental employee," has a governmental email, and an office at the White House.[14]

19. Upon information and belief, Defendant Musk reports directly to President Trump, and often acts unilaterally in directing DOGE operations. The *New York Times* has stated that "Senior White House staff members have at times also found themselves in the dark, according to two officials, who spoke on the condition of anonymity to describe sensitive discussions. One Trump official, who was not authorized to speak publicly, said (Defendant) Musk was widely seen as operating with a level of autonomy that almost no one can control."[15] President Trump has repeatedly praised Defendant Musk, and indicated that President Trump supervises Defendant Musk himself. For instance, President Trump

---

[13] Madeleine Ngo & Theodore Schleifer, *How Trump's Department of Government Efficiency Will Work*, N.Y. TIMES (Jan. 21, 2025),
https://www.nytimes.com/2025/01/21/us/politics/doge-government-efficiency-trump-musk.html.
[14] Ty Roush, *White House Says Elon Musk Trusted To Claim His Own Conflicts Of Interest As 'Special Government Employee'—Here's What That Means*, FORBES (Feb. 5, 2025),
https://www.forbes.com/sites/tylerroush/2025/02/05/white-house-says-elon-musk-trusted-to-claim-his-own-conflicts-of-interest-as-special-government-employee-heres-what-that-means/; Kaitlan Collins & Tierney Sneed, *Elon Musk Is Serving As A 'Special Government Employee,' White House Says,* CNN (Feb. 3, 2025),
https://www.cnn.com/2025/02/03/politics/musk-government-employee/index.html.
[15] Jonathan Swan et al., *Inside Musk's Aggressive Incursion Into the Federal Government*, N.Y. TIMES (Feb. 4, 2025),
https://www.nytimes.com/2025/02/03/us/politics/musk-federal-government.html.

recently stated, referring to Defendant Musk, "He's a very talented guy from the standpoint of management and costs, and we put him in charge of seeing what he can do with certain groups and certain numbers."[16] And also that, "I told him, do that and then I'm going to tell him very soon—like, maybe in 24 hours—to go check the Department of Education."[17]

20. Public reporting has filled in some of the gaps in official announcements from the White House. *Pro Publica* tracked DOGE-affiliated individuals working within DOGE as well as within other agencies. It shows some DOGE team members within DOGE itself (seemingly as employees of the Executive Office of the President), as well as embedded within numerous agencies, including the Office of Personnel Management ("OPM"), General Services Administration, Treasury Department, Department of Health and Human Services, Environmental Protection Agency, FBI, Social Security Administration, and USAID. Most of the individuals affiliated with DOGE have had prior professional relationships with Defendant Musk, including previously working at one or more of his companies.[18]

21. For instance, on January 23, 2025, the OPM announced it was testing a new capability to communicate with all civilian federal employees. From on or about January 23 through January 26, 2025, OPM sent numerous requests to various federal agencies to collect

---

[16] Justin Elliott et al., *The Elite Lawyers Working for Elon Musk's DOGE Include Former Supreme Court Clerks*, PROPUBLICA (Feb. 7, 2025),
https://www.propublica.org/article/elon-musk-doge-lawyers-supreme-court.
[17] Bret Baier (@BretBaier), Interview with Donald Trump, X (Feb. 9, 2025, 9:16 AM),
https://x.com/BretBaier/status/1888592903666029042.
[18] Avi Asher-Schapiro et al., *Elon Musk's Demolition Crew*, PROPUBLICA (Feb. 11, 2025),
https://projects.propublica.org/elon-musk-doge-tracker.

information on government employees and about diversity, equity and inclusion initiatives that are now barred. Amanda Scales was listed as the contact for questions. Until recently, Ms. Scales worked in human resources at xAI, a private corporation of which Defendant Musk is the Chief Executive Officer. *Pro Publica* reports that she is now Chief of Staff at OPM, although it is unclear whether she held that role at the time she was collecting such sensitive information, or whether she was still at xAI.[19]

22. The *Washington Post* reports that "[i]n federal directories, DOGE staffers are sometimes listed at multiple different agencies, making the full nature of their roles within the government unclear." One young team member—Edward Coristine, a 19-year-old recent college graduate and former Neuralink intern —is reported to have positions at DOGE, OPM, USAID and at the State Department. "The unusual appointment reflects how Musk's DOGE has deployed some of its personnel to multiple agencies at once, giving young and relatively inexperienced — and largely unvetted — individuals unprecedented visibility into the workings of government."[20]

***After January 20, 2025: Defendant Musk's and DOGE's Unlawful Actions across Agencies***

23. Upon information and belief, the structure of DOGE, including specifically creating and embedding DOGE teams within each administrative agency, has allowed Defendant Musk to amass an unprecedented amount of power. He has access to sensitive information across

---

[19] *Id.*; Complaint–Class Action at   15-23, Jane Does 1-2 v. Off. Personnel Mgmt., No. 1:25-cv-00234 (D.D.C. Jan 27, 2025).
[20] Faiz Siddiqui et al., *19-Year-Old Musk Surrogate Takes On Roles at State Department and DHS*, Wash. Post (Feb 10, 2025),
https://www.washingtonpost.com/business/2025/02/10/musk-doge-state-department-surrogate.

agencies, and control over the computer systems and digital data of numerous agencies. He authorizes and oversees terminating employees and contractors, canceling government grants and contracts, terminating leases, and removing the name from the front of USAID's building.[21]

24. DOGE routinely posts on its X account about the trans-agency activities it undertakes. For example, on February 3 and 4, DOGE posted the following:



25. Defendant Musk often uses his personal X account to identify changes that he wishes to implement across various agencies, and then promptly executes those changes through his role leading DOGE. For example, on February 2, 2025—the day he and his DOGE team gained access to the Bureau of Fiscal Service's payment systems—Defendant Musk responded to an X post about certain federal program grants awarded by the Department

---

[21] *See, e.g.*, Department of Governmental Efficiency (@DOGE), X, https://x.com/DOGE/.

of Health and Human Services by stating: "The @DOGE team is rapidly shutting down these illegal payments"[22]:



26. Similarly, on February 5, 2025, Defendant Musk responded to a post from X user @libsoftiktok that identified a government website containing diversity, equity, inclusion, and accessibility ("DEIA") language, to which Defendant Musk responded that "Doge will fix it."[23] Shortly after Defendant Musk's promise that "Doge will fix it," the "DOGE Commerce team" searched the agency website and executed changes to it:[24]

---

[22] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM),
https://x.com/elonmusk/status/1885964969335808217
[23] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:47 AM),
https://x.com/elonmusk/status/1885973321595928862.
[24] Department of Governmental Efficiency (@DOGE), X (Feb 5, 2025, 11:12 PM),
https://x.com/DOGE/status/1887353683970535877.



27. On February 3, Defendant Musk posted on X that President Trump would succeed in dismantling the Education Department.

28. Since then, numerous DOGE staffers have been installed at the Department of Education. According to *NBC News*, by February 7, DOGE members Akash Bobba and Ethan Shaotran had obtained administrator-level status in the Department of Education's computer systems with potential access to sensitive information. Shaotran had accessed the back end of the ed.gov website that day. DOGE staff sent a directive to Department staff instructing them to not include "extraneous information, including gender identifying

pronouns, motivational quotes, and GIFs" in their email signature blocks.[25]

29. On February 10, 2025, DOGE announced that it had cut $881 million in Department of Education contracts, including 170 contracts for the Department's Institute of Education Sciences.[26]

30. On or around February 5, 2025, members of DOGE were on site at Centers for Medicare and Medicaid Services ("CMS") and had gained access to key payment and contracting systems.[27] The representatives were looking at the systems' technology, spending, organizational design, and staffing. In response to reporting on DOGE's access to CMS, Defendant Musk posted on X "Yeah, this is where the big money fraud is happening."[28]

31. As reported in the *New York Times*, "Mr. Musk's aides have been conducting 15-minute video interviews with federal workers. Some of their questions have been pointed, such as

---

[25] Tyler Kingkade & Natasha Korecki, *Inside DOGE's Takeover of the Education Department*, NBC NEWS (Feb 8, 2025),
https://www.nbcnews.com/news/us-news/elon-musk-doge-team-education-department-rcna191244.

[26] Rebecca Carballo & Juan Perez Jr., *DOGE Announces $881 Million in Cuts for Education Department Contracts*, POLITICO (Feb. 10, 2025),
https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494.

[27] Molly Bohannon & Derek Saul, *Trump Signs Executive Order Instructing Government To Work With Musk's DOGE—Here's What To Know*, FORBES (Feb. 11, 2025),
https://www.forbes.com/sites/mollybohannon/2025/02/08/heres-what-to-know-about-elon-musks-doges-judge-blocks-treasury-access.

[28] Elon Musk (@elonmusk), X (Feb. 5, 2025, 12:01 PM),
https://x.com/elonmusk/status/1887184902543577590.

querying employees about whom they would choose to fire from their teams if they had to pick one person."[29]

*After January 20, 2025: United States Department of Treasury*

32. DOGE has trained a particular focus on the Treasury Department, apparently because federal payments are made through the Department's electronic system. David Lebryk, a decades-long non-political employee of the Department, was named Acting Secretary by President Trump and served in that role until Scott Bessent was confirmed as Treasury Secretary on January 27. On or around January 25, allies of Defendant Musk's began asking Mr. Lebryk about source code information related to the nation's payment system on behalf of DOGE. Mr. Lebryk denied those requests, and was put on administrative leave shortly thereafter.[30]

33. In seeking access to Treasury systems, Defendants Musk and DOGE initially stated that their goal was merely to undertake a general review of the system and observe its operations without interfering with disbursements. However, a January 24, 2025 email exchange revealed that the DOGE push for access to the Treasury payment system was actually intended to "receive access to the closely held payment system so that the

---

[29] Theodore Schleifer et al., *Young Aides Emerge as Enforcers in Musk's Broadside Against Government*, N.Y. TIMES (Feb. 7, 2025),
https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.
[30] Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. TIMES (Jan. 31, 2025),
https://www.nytimes.com/2025/01/31/us/politics/david-lebryk-treasury-resigns-musk.html.

Treasury could freeze disbursements to [USAID]."[31]

34. On or around January 31, 2025, Treasury Secretary Scott Bessent gave DOGE members full access to the U.S. Treasury's federal payment system that manages the finances of the United States Government, which in fiscal year 2024 involved nearly $5 trillion in receipts and $6.7 trillion in outlays.[32]

35. At least initially, DOGE team members gained administrator-level privileges, including the ability to write code to the Treasury's secure payment system. On information and belief, a DOGE team member named Marko Elez made changes to the code base for the payment systems related to blocking payments and making the blocked payments less visible.[33] Mr. Elez's post-college work experience prior to DOGE was at two companies owned by Defendant Musk, SpaceX and X. Mr. Elez had been given administrator-level access to the Payment Automation Manager and Secure Payment System at the Treasury's Department's Bureau of the Fiscal Service. "Housed on a secure mainframe, these systems control, on a granular level, government payments that in their totality amount to more

---

[31] Andrew Duehren et al., *Treasury Sought to Freeze Foreign Aid Payments, Emails Show*, N.Y. TIMES (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/trump-musk-usaid.html; Fatima Hussein, *DOGE Was Tasked With Stopping Treasury Payments To USAID*, AP sources say, ASSOCIATED PRESS (Feb. 6, 2025), https://apnews.com/article/treasury-doge-musk-read-only-access-489231c6db1a9f07fc68f9f08803 f815.

[32] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

[33] Matt Shuham, *DOGE Aide Has Full Access to The Top Government Payment System: Reports*, HUFFPOST (Feb. 4, 2025), https://www.huffpost.com/entry/elon-musk-doge-aide-treasury-payments-administrative-privilege s_n_67a25541e4b042f60737bd47.

than a fifth of the US economy."[34]

36. On February 6, Mr. Elez resigned after the *Wall Street Journal* published a story about his racist and pro-eugenic posts on social media. On February 7, Defendant Musk initiated a poll on X asking users whether Mr. Elez should be reinstated. Later that day, Defendant Musk rehired Mr. Elez, illustrating that Defendant Musk holds and exercises control over the DOGE team members embedded in agencies.[35]

***After January 20, 2025: USAID***

37. Upon information and belief, between roughly January 30 and February 3, Defendant Musk directed DOGE to take control of USAID employee email accounts and all digital infrastructure and to shut down the same; he also directed DOGE to shut down USAID's offices and force employees to work remotely. Indeed, Defendant Musk recounted on the morning of February 3 that "With regards to the USAID stuff, I went over it with (the president) in detail and he agreed that we should shut it down."[36]

38. Upon information and belief, on or around January 30, Defendants began instructing USAID employees to give them access to USAID technology systems. Employees raised

---

[34] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, WIRED (Feb. 4, 2025),
https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system.
[35] Jason Abbruzzese, *Elon Musk Says DOGE Staffer Who Resigned for Racist X Posts Will Be Brought Back*, NBC NEWS (Feb. 7, 2025),
https://www.nbcnews.com/politics/jd-vance/bring-back-vance-says-supports-rehiring-doge-staffer-resigned-racist-s-rcna191224.
[36] Jennifer Hansler et al., *Elon Musk Said Donald Trump Agreed USAID Needs to Be 'Shut Down'*, CNN (Feb. 3, 2025),
https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge/index.html.

concerns with their supervisors because the DOGE staff was attempting to access critical systems that contained sensitive information which Defendants were not legally authorized to access.

39. Continuing into February 1, Defendants demanded access to classified USAID systems without the required security clearances. This included Defendant Musk making direct calls to USAID's leadership and security officials in which he demanded that DOGE team members receive access to private data and restricted areas. Defendant Musk threatened to call the U.S. Marshals service to gain access.[37] USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill attempted to block the DOGE team's access and in turn were placed on administrative leave.

40. On or around February 1, DOGE personnel gained access to the USAID computer systems. They obtained root access to these systems, the highest level of access one can obtain, which allows complete control over a system. DOGE began blocking USAID employees from accessing their systems. Immediately thereafter, hundreds of USAID civil servants lost access to their emails without prior notification.[38]

41. That same day, USAID.gov went offline, showing an error message that read "server IP

---

[37] Andrew Roth, *DOGE v USAID: How Elon Musk Helped His Acolytes Infiltrate World's Biggest Aid Agency*, THE GUARDIAN (Feb. 5, 2025),
https://www.theguardian.com/us-news/2025/feb/05/musk-doge-takeover-usaid;
Margaret Brennan, *Two Top Security Officials at USAID Placed on Leave, Sources Say*, CBS NEWS (Feb. 3, 2025),
https://www.cbsnews.com/news/usaid-dramatic-changes-security-officials-on-leave.
[38] Rebecca Heilweil, *USAID Website Goes Dark, Staff Emails Deactivated Amid DOGE Takeover, Source Says*, FEDSCOOP (Feb. 2, 2025),
https://fedscoop.com/usaid-website-goes-dark-staff-emails-deactivated-amid-doge-takeover-source-says.

address could not be found."[39]

42. The next morning, in response to an X post describing Mr. Vorhees and Mr. McGill's placement on leave, Defendant Musk posted "USAID is a criminal organization. Time for it to die."[40]

43. Later on February 2, in the "First DOGE 𝕏 Spaces Conversation," Defendant Musk said, "So to be clear, in shutting down, which we're in the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, maybe you can take the worm out, but if you've got actually just a ball of worms, it's hopeless. And USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically get rid of the whole thing . . .  That is why



---

[39] Edward Helmore, *USAID Website Offline as Trump Moves to Put Agency under State Department*, THE GUARDIAN (Feb. 1, 2025), https://www.theguardian.com/us-news/2025/feb/01/usaid-website-offline-trump.
[40] Elon Musk (@elonmusk), X (Feb 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414194835755.

it's got to go, it's beyond repair." [41]

44. At 12:42 AM on February 3, Gavin Kliger, a DOGE team member, sent an email to all USAID staff telling them to work remotely that Monday, as USAID headquarters would be closed. The email purported to be from "USAID Press" and stated that the directive was "At the direction of Agency leadership" but listed Mr. Kliger on reply. On information and belief, Mr. Kliger gained access to the USAID computer systems as part of the infiltration of digital assets described above and issued to himself an agency email address, gkilger@usaid.gov.



---

[41] Department of Governmental Efficiency (@DOGE), X (Feb 2, 2025, 12:25 AM), https://x.com/DOGE/status/1886284966855647234.
[42] Sam Stein (@samstein), X (Feb 3, 2025, 7:37 AM), https://x.com/samstein/status/1886393465870676475.

45. Immediately after Mr. Kliger sent that email, Defendant Musk posted on X at 12:54AM that "We spent the weekend feeding USAID into the wood chipper."[43]

46. On information and belief, Defendant Musk, assisted by his subordinates on DOGE staff, has exercised and continues to exercise control over USAID systems—including restricted systems and locations that house sensitive data which the DOGE staff does not have clearance to legally access—and systematically blocked access to all systems by USAID personnel.

47. The impact of this unauthorized dismantling of USAID has had disastrous consequences for the American and global public, effectively paralyzing operations that delivered life‑saving aid across more than 100 countries. Critical humanitarian programs—such as HIV treatment initiatives, malaria prevention efforts, clinical trials, and infectious disease strategies that prevent the transnational spread of disease—were shut off from the U.S. Government with no warning and no explanation, as Plaintiffs and other USAID staff suddenly lost access to their USAID systems. Vulnerable communities were left in the lurch, without essential medical care or other necessities, exposing them to preventable harm, including death. Moreover, billions of dollars in development projects—ranging from significant support for Ukrainian security infrastructure to programs aimed at supporting education for girls in repressive regimes—are at risk of collapse, a disruption that not only undermines decades of progress in global health and economic stability but also diminishes U.S. power and strategic influence abroad.

---

[43] Elon Musk (@elonmusk), X (Feb 3, 2025, 1:54 AM), https://x.com/elonmusk/status/1886307316804263979.

48. In a joint press conference with President Trump on February 11, 2025, Defendant Musk made clear that he and his DOGE team directly control the levers of funding at USAID. A journalist asked Defendant Musk: "USAID has been one of your main targets. Are you concerned at all that some of the cuts, or shutting an agency altogether, may lead to disease or other bigger problems starting in other countries that then come to the United States?" In his response, Defendant Musk, referring to DOGE, stated, "we have turned on funding for Ebola prevention and for HIV/PR prevention. And yes, we are moving fast. We will make mistakes, but we'll fix them very quickly."[44]

49. Also at the February 11  joint press conference, Defendant Musk said, "there are quite a few people in bureaucracy who have ostensibly a salary of a few hundred thousand dollars but have somehow manage[d] to accrue tens of millions of dollars of net worth, uh, while in that position, which is what happened at USAID . . . ."[45] On information and belief, Defendants Musk and DOGE have unprecedented and illegal access to thousands of federal government employee records, including security clearance files *which contain the net worth of those employees*. On information and belief, Defendant Musk has used his illegal access to personnel and security clearance files to the detriment of those individuals by disclosing the contents of those files.

---

[44] Chris Megerian, *WATCH: Trump Makes Appearance With Musk, Signs Executive Order Downsizing Federal Workforce*, PBS NEWS (Feb. 11, 2025), https://www.pbs.org/newshour/politics/watch-trump-makes-appearance-with-musk-signs-executive-order-downsizing-federal-workforce.
[45] *Id.*

*After January 20, 2025: Consumer Financial Protection Bureau*

50. Defendant Musk's and DOGE's latest target has been the Consumer Financial Protection Bureau ("CFPB"). Upon information and belief, Defendant Musk, as the *de facto* DOGE Administrator, is intimately and actively involved in the efforts targeting each agency, including CFPB. As a result of his involvement in CFPB, Defendant Musk will have easy access to non-public information to business competitors.

51. On or around Thursday, February 6, "four young staffers working under Musk" at DOGE—Gavin Kliger, Luke Farritor, Nikhil Rajpal and Jordan Wick—arrived at the CFPB's offices. As *Bloomberg News* reports, "the DOGE staffers were granted access to all of CFPB's data systems, including sensitive bank examination and enforcement records, according to five people familiar with the matter and emails seen by *Bloomberg News*. The people asked not to be identified, citing concerns over potential retribution. By Sunday, the agency was a skeleton, with its funding limited and activities suspended." [46] Reporting by *Wired* confirms the same—"On Friday, [February 7], staff for Elon Musk's Department of Government Efficiency shut down a portion of the agency's homepage after a day of struggling to obtain access to the CMS and other systems. . . [T]hree DOGE staffers, including Gavin Kliger and Nikhil Rajpal were given access to CFPB's HR,

---

[46] Jason Leopold, et al., *DOGE-BACKED HALT at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet*, Bloomberg (Feb. 10. 2025), https://www.bloomberg.com/news/features/2025-02-10/doge-backed-halt-at-cfpb-comes-amid-musk-s-plans-for-x-digital-wallet?embedded-checkout=true

procurement, and financial infrastructure."[47]

52. On Monday, February 10, OMB issued a memo for all CFPB employees to "Stand down from performing any work task," while DOGE's investigation of internal agency records continued.[48]

53. On Tuesday, February 11, many workers at CFPB were "informed that they had been fired with a frenetic email" some of which were not addressed to the individual employee but rather were "addressed as [EmployeeFirstName][EmployeeLastName], [Job Title], [Division]."[49]

54. Defendant Musk has a direct business connection to CFPB. "Just nine days before his DOGE team visited CFPB, Musk's X—the former Twitter—announced that it had struck a deal with Visa to process peer-to-peer payments. Musk has publicly mused about expanding into payment-services since he first took control of X in 2022. Entering that business could bring CFPB oversight under rules the agency finalized in November. The records DOGE can now access would include sensitive and potentially competitive information."[50]

---

[47] Makena Kelly et al*., Dozens of CFPB Workers Fired in After-Hours Blitz*, Wired (Feb 11. 2025),https://www.wired.com/story/dozens-of-cfpb-workers-terminated-in-after-hours-firing-blitz/.
[48] Tim Dickinson & Andrew Perez, *Inside Trump and Musk's War on the Consumer Financial Protection Bureau*, ROLLING STONE (Feb. 10, 2025), https://www.rollingstone.com/politics/politics-features/trump-musk-cfpb-consumer-financial-protection-bureau-1235262743/.
[49] Makena Kelly, Dhruv Mehrotra, *Dozens of CFPB Workers Fired in After-Hours Blitz*, WIRED (Feb. 11, 2025), https://www.wired.com/story/dozens-of-cfpb-workers-terminated-in-after-hours-firing-blitz/.
[50] Jason Leopold & Evan Weinberger, *DOGE-Backed Halt at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet*, BLOOMBERG (Feb. 10, 2025),

55. On February 5, 2025, in the wake of questions regarding Defendant Musk's possible conflicts of interest due to his extensive business interests, White House Press Secretary Katherine Leavitt stated that Defendant Musk will determine for himself whether he has any conflicts that would preclude him from engaging on any particular matter.

***Plaintiffs' injuries***

56. Plaintiffs have suffered and continued to suffer myriad injuries as a result of Defendant Musk and DOGE's unconstitutional actions. These include but are not limited to:

   a. **Financial injuries as a direct result of losing access to their personal email accounts and other digital records.** Plaintiffs lost access to timesheets, reimbursement records, and health benefits, seriously threatening their ability to recoup those resources. J. Doe 3, for instance, unexpectedly and suddenly lost access to over $15,000 worth of travel vouchers. J. Doe 6 has hundreds of dollars in travel costs to be reimbursed and has still not been able to access the relevant system.

   b. **Uncertain employment status as a direct result of losing access to their personal email accounts and other digital records and Defendants' other actions.**

      i. Plaintiff PSCs, after suddenly losing access to email and other communication devices, have no way to confirm the status of their contracted employment with the agency. Many were prevented, as a

---

https://www.bloomberg.com/news/features/2025-02-10/doge-backed-halt-at-cfpb-comes-amid-musk-s-plans-for-x-digital-wallet.

practical matter, from discussing their status with their contracting officer during the black-out period. If USAID provided them with the 15-day notice prior to termination during that time period—as required by every PSC contract—they have no way to know. J. Doe 5 noticed, upon regaining access to their email, a complete lack of emails in their inbox, even though they had copied their work email address while sending multiple emails to their contracting officer from their personal email address.

ii.  Moreover, if the various legal actions pausing USAID's demise are not successful, and Plaintiffs are terminated, they face bleak employment prospects because the dismantling of USAID has had disastrous consequences for the humanitarian infrastructure around the world, leading to widespread layoffs and organizational closures.

c.  **Potential legal liability as a direct result of losing access to their specific USAID email accounts, other digital records, and inability to comply with legally required reporting requirements.** Some Plaintiffs are authorized to sign grant awards and other contracts on behalf of USAID and, by signing their name, pledge to perform ongoing diligence and other acts. They have been prevented from performing their contractual obligations. A multi-day period where professional emails were blocked and seemingly wiped out, without any error message or other indication to the other party, raises serious questions about what lost work product, contacts, and other professionally critical assets Plaintiffs may have lost during that period. Additionally, because USAID is an organization

provided for by law, some USAID personnel, such as J. Doe 5, have various reporting responsibilities laid out in statute and are unable to comply with those requirements due to Defendants' actions.

d. **Reputational injuries resulting from Defendant Musk leveraging the vast power of his unconstitutional position to disparage USAID and Plaintiffs.** For instance, on February 2, 2025 Defendant Musk, through his social media platform, X, accused Plaintiffs of belonging to "a criminal organization" and described them as "a ball of worms." In response, his X followers responded with strings of vitriol aimed at USAID and its employees, including accusing USAID employees of "funneling money into the hands of Hamas terrorists."[51] In a February 11 press conference joint press conference by Defendant Musk and President Trump, Defendant Musk accused USAID employees of "getting wealthy at taxpayer expense." President Trump added "But USAID is really corrupt. I'll tell you, it's corrupt, it's incompetent." As a group, Plaintiffs are deeply concerned that their professional experience at USAID is forever publicly tarnished. Due to the resulting online threats and harassment following such heated language from Defendant Musk and President Trump, Plaintiffs also fear for their personal safety.

e. **Severe emotional distress due Defendant Musk and DOGE having access to extremely sensitive personal information.** For instance, as a result of the dangerous nature of J. Doe 1's job, specifically their deployment into conflict

---

[51] The Conservative Alternative (@OldeWorldOrder), X (Feb. 2, 2025, 12:23 PM), https://x.com/OldeWorldOrder/status/1886103036889559417.

zones, their personnel and security clearance files contain highly sensitive personal information —including, social security number, passport information, personal references, foreign contacts, previous addresses, financial records, descriptions of their tattoos, a safety pass phrase, and intimate information about their extended family members. J. Doe 1 is extremely concerned that Defendants do not have the security clearance or training needed to handle this type of extremely confidential, and will use it to the detriment of J. Doe 1 and/or their loved ones. Defendant Musk provided evidence of the abuse of his and DOGE's illegal access to personnel and security clearance files this week when he indicated Defendants are examining the net worth of federal employees, including those at USAID.

f. **Severe emotional distress stemming from the first-hand knowledge of what the sudden disruption of grants and USAID services means for vulnerable populations globally.** After 10 years of USAID service, J. Doe 4 has been devastated to witness the negative impacts of USAID's stop-work order and sudden disengagement with partners and beneficiaries of USAID, some of the most vulnerable people on the planet, whom they have worked with directly in implementing USAID programs. J. Doe 10 is a nutrition advisor for clinics in Africa, including Somalia. When they suddenly lost the ability to contact these partners, they suffered extreme distress in being suddenly prevented from communicating with their overseas partners who depend on J. Doe 10 and USAID to fund programs that keep children from starving. J. Doe 10 is a parent and knows clinics are in danger of shutting down, leaving malnourished children in grave

danger.

## COUNT ONE:
## VIOLATION OF THE APPOINTMENTS CLAUSE
## OF THE UNITED STATES CONSTITUTION

57. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

58. The Appointments Clause of the U.S. Constitution states, in relevant part, that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

59. There are two important aspects of the Appointments Clause implicated by Defendants' attempted government takeover. *First*, it establishes that Congress is the sole body with constitutional authority to create Officers of the United States. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J. concurring) ("Although the Constitution contemplates that there will be 'other Officers of the United States, whose Appointments are not herein otherwise provided for,' it clearly requires that those offices "shall be established by Law."); Office of Legal Counsel, *The Test for Determining "Officer" Status Under the Appointments Clause*, 49 Op. O.L.C. __ (Jan. 16, 2025) ("The Appointments Clause [provides] that offices not recognized by the Constitution itself 'shall be

established by Law,' thus lodging in Congress ultimate authority over the creation of most offices.") (citing U.S. Const. art. II, § 2, cl. 2; *United States v. Maurice*, 26 F. Cas. 1211, 1213-14 (C.C.D. Va. 1823); Office of Legal Counsel, *Limitations on Presidential Power to Create a New Executive Branch Entity to Receive and Administer Funds Under Foreign Aid Legislation*, 9 Op. O.L.C. 76, 77–78 (1985)).

60. *Second*, it lays out the framework for how officers must be appointed to office. Based on the Appointments Clause, there is a tripartite classification of federal government workers. They are either (1) principal officers; (2) inferior officers; or (3) lesser functionaries ("mere employees"). *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241, 245, n.3 (2018).

61. Principal officers must always be appointed "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2.

62. Inferior officers may be appointed directly by the President, but only when Congress has "by Law vest[ed] the Appointment of such inferior Officers" in the President. *Id*.

63. As the facts alleged above demonstrate, Defendant Musk and his DOGE team are exercising an unprecedented level of control over the federal government—one which spans agencies and seems to know no bounds absent federal court orders restricting it. Moreover, upon information and belief, Defendant Musk reports directly to President Trump. Such authority can only be considered that of a principal officer.

64. Defendants have not been appointed with the advice and consent of the Senate. Even if Defendants were to be considered inferior officers (which is highly doubtful given their unfettered control over multiple agencies), Congress has not "by Law" vested the authority to appoint these new-fangled inferior officers "in the President alone." Nor can

the President evade the requirements of the Constitution by vesting the powers of an officer in a mere employee; this is all the more true when those powers are unbounded and include control over every possible aspect of every federal agency. *See Maurice*, 26 F. Cas. at 1214 (an office must be "established by law" and "exist with ascertained duties."). As detailed above, Defendants have exercised executive power far beyond the scope of any legally authorized appointment, engaging in personnel decisions, directing agency operations, and overriding executive branch officials.

## COUNT TWO:
## VIOLATION OF SEPARATION OF POWERS

65. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

66. In addition to violating the Appointments Clause of the Constitution, Defendants have violated and stand to continue to violate fundamental Separation of Powers principles by repeatedly subverting the Congress.

67. The United States Constitution establishes a system of separated powers, ensuring that legislative power is vested in Congress (Article I), executive power is vested in the President (Article II), and judicial power is vested in the courts (Article III).

68. This constitutional structure is designed to prevent any single individual or entity from amassing unchecked governmental authority and to preserve the fundamental principle that each branch of government operates within its designated sphere.

69. DOGE itself, as structured and implemented, operates beyond the bounds of any proper executive power. Despite purporting to be an efficiency initiative, DOGE wields coercive

power over federal agencies, including the ability to mandate staffing changes, conduct unauthorized audits, override agency decision-making, implement new policies with regulatory effect, and, importantly, freeze congressionally appropriated funds.

70. The creation of "DOGE teams" embedded within executive agencies, reporting not to agency heads but to an unappointed and unconfirmed individual—Defendant Musk—effectively creates a shadow chain of command that undermines statutory delegation, and allows for countless ethics, privacy, and other regulatory statutes to be wholesale ignored with absolutely no accountability. This far exceeds any previously known or acceptable exercise of executive power.

71. The lack of any formal appointment, congressional authorization, or duties that are clearly defined in law renders Defendants' government takeover a direct affront to the Constitution's structural safeguards against tyranny.

**PRAYER FOR RELIEF**

72. WHEREFORE, Plaintiffs request that this Court:

   a. Declare Defendants Musk and DOGE, as currently operating, to be acting in violation of the United States Constitution;

   b. Declare unlawful and set aside any actions taken under the color of law by Defendant Musk, his subordinates, Defendant DOGE, and any person working on behalf of or at the direction of DOGE or its team or staff;

   c. Enjoin Defendant Musk and his DOGE subordinates from performing their significant and wide-ranging duties unless and until Defendant Musk is properly

appointed pursuant to the U.S. Constitution; *and*

    d.  Award such other relief as the Court deems just.

Dated: February 13, 2025

Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen, [9112170186]
Tianna J. Mays, [1112140221]
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani**
Rebecca (Beth) Stevens**
Joaquin Gonzalez**
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway, Suite 102-402
San Antonio, TX 78218
Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com

*Attorneys for Plaintiffs*

**Application for admission or admission pro hac vice forthcoming.