IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

J. DOE 1, *et al.*,
                *Plaintiffs*

           v.                             **Case No. 8:25-cv-00462-TDC**

ELON MUSK, *et al.*,

                *Defendants.*

MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION ORDER

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

LEGAL STANDARD .......................................................................................................... 6

ARGUMENT ..................................................................................................................... 6

    I. Plaintiffs are likely to succeed on the merits of their Appointments Clause claim. ................ 6

        A. The Appointments Clause was enacted to maximize public accountability and prevent abuse of the appointments power. ......................................................................................... 7

        B. Contemporary case law underscores that Defendant Musk can only exercise his expansive power pursuant to the processes set forth by the Appointments Clause. ................ 9

    II. Plaintiffs are likely to succeed on the merits of their Separation of Powers claim. ............. 14

    III. Plaintiffs will suffer immediate, irreparable injury absent an injunction. .......................... 17

        A. Physical peril and severe emotional and psychological distress ...................................... 18

        B. Defendants' access to and control of Plaintiffs' sensitive information ............................ 20

        C. Reputational injuries ....................................................................................................... 26

        D. Constitutional injuries ..................................................................................................... 27

    IV. The balance of equities and the public interest favor Plaintiffs. ....................................... 28

PRAYER FOR RELIEF ...................................................................................................... 29

## INTRODUCTION

An unelected, unappointed individual—Defendant Elon Musk—is rapidly exercising a breathtaking amount of authority across multiple federal agencies. Despite wielding more power than any other member of the Executive Branch outside of the President himself, Defendant Musk has never been nominated and confirmed as required by Article II's Appointments Clause. Moreover, Defendant Musk employs his vast unconstitutional power by overseeing and directing the United States DOGE Service and/or the Department of Government Efficiency (collectively "DOGE") which, as structured and implemented, operates far beyond the bounds of any proper executive authority. DOGE's usurpation of legislative authority violates the Constitution's carefully calibrated system of separation of powers.

These structural violations are not merely of academic concern. The 26 individual plaintiffs here, represented as J. Does ("Plaintiffs"), are current and recently terminated employees or contractors[1] of the U.S. Agency for International Development ("USAID"). They have been and will continue to be injured by Defendants' unconstitutional power grab, including in ways that are irreparable. *See generally* Compl. ¶¶ 3-13, 66 (ECF No. 14).[2] Defendants retain full access to and control over the digital and operational infrastructure of USAID, allowing unauthorized access to Plaintiffs' (sometimes highly sensitive) personnel files and communications, disrupting all normal operations, controlling the flow of finances, and making it effectively impossible for the agency to function.

Moreover, the relief sought here is distinct from that sought or granted in other pending cases. In *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-00352 (D.D.C. 2025), Judge Nichols

---

[1] Contractor Plaintiffs are categorized as a personal services contractor ("PSC").
[2] For the Court's convenience, and in the spirit of the Case Management Order (ECF. No. 6), Ex. 1 contains a copy of all Internet sources cited in the Complaint.

issued a temporary restraining order ("TRO") on February 7, 2025 preventing USAID from placing employees on administrative leave or involuntarily evacuating them from countries where they have been posted for service (expiring on February 21). And on February 13, 2025, a joint TRO was issued in *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 1:25-cv-00400 (D.D.C. 2025) and *Glob. Health Council v. Trump*, No. 1:25-cv-00402 (D.D.C. 2025), in which Judge Ali preserved the *status quo* with respect to the state of affairs at USAID as they pertained to foreign-assistance funds in connection with "any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025." *AIDS Vaccine* and *Global Health Council* (D.D.C. Feb. 13, 2025) (slip op. at 14).

However, those orders have delivered only partial or no relief for Plaintiffs. As shown below and in the Complaint, despite the existence of those orders, Defendants Musk and DOGE have continued to interfere with USAID's provision of foreign assistance by locking USAID personnel out of their critical systems, deleting emails, physically barring employees from USAID headquarters and other facilities, and preventing compliance with contractual obligations of the United States. The Defendants here—whose unconstitutional exercise of authority gives rise to the injuries in this case—are not named as defendants in any of the cases related to USAID activity. The relief sought by Plaintiffs in the instant case is not being granted in related cases, and the TROs in those other cases (all of which expire soon) fail to directly enjoin the primary authors of the harm in those cases and this one.

Below, Plaintiffs establish they are suffering irreparable harm resulting from Defendants' unquestionably unconstitutional actions. Conversely, Defendants cannot credibly claim that they will suffer extraordinary or irreversible harm by the granting of this expedited preliminary injunction—an injunction would simply revert circumstances back to the long-held *status quo*,

which is defined as "the last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012) (internal citations and quotation marks omitted). If Defendants ultimately prevail on the merits, they will have suffered nothing more from a Preliminary Injunction than a temporary pause on their activities. *Cf. Dellinger*, Order at 11-12.

Finally, while this Motion and the immediate relief requested are focused on USAID, the harm caused by Defendants is by no means confined to one agency. Defendants have deployed their familiar play-book—embedding DOGE within agencies, taking over digital and operational infrastructure, and dismantling or seriously disrupting the entity from the inside—in several agencies, including the Departments of Treasury, Health and Human Services, Education, and the Consumer Financial Protection Bureau. *See generally* Compl. ¶¶ 20-22, 25, 27-35, 50-54. Public reports from recent days, recounted below, highlight new targets and still-developing exercises of authority: the Department of Energy, the Federal Aviation Administration and the IRS. At any rate, the serious problem of "what appears to be the unchecked authority of an unelected individual and an entity that was not created by Congress and over which it has no oversight," requires the relief sought as to USAID in this Motion. Order at 9, *New Mexico v. Musk*, No. 1:25-cv-00429 (D.D.C. Feb. 18, 2025) (slip. op.).[3]

## BACKGROUND

This Motion incorporates the factual allegations of Plaintiffs' Complaint which describes in detail the unprecedented power Defendant Musk is now exercising and the memorandum filed

---

[3] On the afternoon of February 18, Judge Tanya Chutkan issued an order in a similar case, denying a motion for a TRO due to the plaintiffs' failure to show imminent harm. Notably, acknowledged the genuine legal questions raised by the Appointments Clause claims, and expressed skepticism for the government's position on the merits. She also suggested that a case featuring "specific individuals" *could* warrant injunctive relief. *Id.*

in support of Plaintiffs' Motion to Proceed under Pseudonyms ("Pseudonyms Mem.") which describes security threats created by Defendant Musk in particular. *See* Compl. ¶¶ 17-65; ECF No. 3-1.

In short, DOGE was Defendant Musk's brainchild, Compl. ¶¶ 18-25, and he has acted as its *de facto* Administrator since the first day of President Trump's new administration, *id*. ¶¶ 14, 27-29. Defendant Musk has an office in the White House and he reports directly to the President. *Id*. ¶¶ 28-29.[4] In his wide-ranging role, Defendant Musk meets with foreign leaders seemingly as a representative of the U.S. Government, including meeting with Prime Minister Narendra Modi of India last week in the President's ceremonial guest house, Blair House.[5] Defendant Musk's power includes, at least, the authority to cease the payment of congressionally approved funds, access sensitive and confidential data across government agencies, cut off systems access to federal employees and contractors at will, and take over and dismantle entire independent federal agencies. *See, e.g.*, Compl. ¶¶ 33-41 (power across agencies); ¶¶ 42-46 (power within Treasury); ¶¶ 47-59 (power within USAID); ¶¶ 60-65 (power within Consumer Financial Protection Bureau). Similarly, although the stated purpose of DOGE was "modernizing Federal technology and software to maximize governmental efficiency and productivity," *see id.* ¶ 5, Defendants have exercised executive power far beyond that limited scope, including making personnel decisions, directing agency operations, and effectively closing Congressionally-created agencies. *See generally id.* ¶¶ 23-55, 63-64.

Since Plaintiffs initiated this case, additional facts have come to light evidencing

---

[4] Indeed, on February 14, Defendant Musk used his X account to profile a video of President Trump saying "I am personally checking to make sure there is no conflict. He answers to me." In response, Defendant Musk posted "true." Elon Musk (@ElonMusk), X (Feb. 13, 2025, 11:35 PM), Ex. 10.

[5] Amazingly, after that meeting, "Trump admitted that he wasn't sure if Musk was there as a representative of the U.S. government or as an American C.E.O. "I don't know," he said. "They met, and I assume he wants to do business in India." Maureen Dowd, *Who Will Stand Up to Trump at High Noon*, N.Y. TIMES (Feb. 15, 2025), Ex. 11.

Defendants' ongoing, "super-cabinet" level authority across the federal government. For example, on February 13, 2025, during a remote address to the World Government Summit in Dubai, Defendant Musk said (and then publicized), "We do need to delete entire agencies as opposed to leave [sic] them behind." @ALX, X (Feb. 13, 2025, 12:41 AM), Ex. 12. On the same day, DOGE staff directed the firing of roughly 2,000 Department of Energy employees, including hundreds of individuals from the National Nuclear Security Administration (NNSA), which oversees the U.S. nuclear weapons programs. The Trump Administration quickly reversed the NNSA firings, in another example of Defendants acting with unchecked authority outside of agency command chains. Tara Copp & Anthony Izaguirre, *Trump Administration Fires, Then Rescinds, Firing of Nuclear Weapons Workers*, TIME (Feb. 16, 2025), Ex. 13.

On February 14, 2025, hundreds of Federal Aviation Administration ("FAA") employees received termination notices from an "ASK_AHR_EXEC_ Orders@usfaa.mail.outlook.com" email address rather than an official FAA address. Tara Copp, *Trump Begins Firings of FAA Air Traffic Control Staff Just Weeks After Fatal DC Plane Crash*, A.P. (Feb. 15, 2025), Ex. 14. One terminated FAA employee, Charles Spitzer-Stadtlander, stated that he had recently criticized Defendant Musk on Spitzer-Stadtlander's personal Facebook account, after which the "official DOGE Facebook page started harassing" him on social media. He added: "When DOGE fired me, they turned off my computer and wiped all of my files without warning." *Id.* Shortly thereafter, it was reported that "[p]ersonnel from Elon Musk's government downsizing team DOGE" would be visiting the FAA's Air Traffic Control command center on Monday, February 17 to implement further changes at the agency. David Shepardson, *Musk's DOGE Team To Visit US FAA Command Center on Monday*, REUTERS (Feb. 16, 2025), Ex. 15.

As of 10:00 p.m. on February 16, 2025, DOGE officials were seeking access to the IRS database that contains detailed financial information—including personal identification numbers and bank information—about every taxpayer, business, and nonprofit organization in the

5

country. Jacob Bogage & Jeff Stein, *Musk's DOGE seeks Access to Personal Taxpayer Data, raising alarm at IRS*, WASHINGTON POST (Feb. 16, 2025), Ex. 16. DOGE engineer Gavin Kliger will reportedly work at the IRS for the coming months, "to provide engineering assistance and IT modernization consulting," after initially arriving unannounced on Thursday of last week. *Id*. Mr. Kliger was previously embedded within USAID, and used that position to gain control of USAID's digital infrastructure and operations on behalf of DOGE, under Defendant Musk's direction. Compl. ¶¶ 54-56.

## LEGAL STANDARD

"The traditional office of a preliminary injunction is to protect the *status quo* and to prevent irreparable harm during the pendency of a lawsuit." *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). "The *status quo* to be preserved by a preliminary injunction, however, is not the circumstances existing at the moment the lawsuit or injunction request was actually filed, but the last uncontested status between the parties which preceded the controversy." *Aggarao*, 675 F.3d at 378 (internal citations and quotation marks omitted). A party seeking a preliminary injunction must show "(1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the party's favor; and (4) an injunction is in the public interest." *N. Virginia Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025). An injury is irreparable "when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal citations and quotation marks omitted).

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits of their Appointments Clause claim.

The Appointments Clause prescribes "the exclusive means of appointing 'Officers.'" *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 244 (2018). It requires that:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., Art. II, § 2. Both the historical understanding of the Appointments Clause as well as its application by courts confirm that Defendant Musk is unconstitutionally exercising the powers of a principal officer without having been properly appointed to an office created by law, thereby violating the "significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997).

### A. The Appointments Clause was enacted to maximize public accountability and prevent abuse of the appointments power.

While the President is ultimately "responsible for the actions of the Executive Branch," the Framers recognized that, as a practical matter, "no single person could fulfill that responsibility alone." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (citations and quotation marks omitted). Our country's Framers specifically considered—and rejected—the notion that the President should be able to unilaterally hire those powerful officers who would be necessary to assist the President in performing the "great business of the State." Akhil Reed Amar, *America's Constitution* 193 (2006) (quoting George Washington). Their solution was the Appointments Clause, which is carefully calibrated to both maximize public accountability for executive decision-making and to ensure that the public can rely upon those entrusted with executive power. *See* David A. Strauss & Cass R. Sunstein, *The Senate, the Constitution, and the Confirmation Process*, 101 YALE L. J. 1491, 1500 (1992) ("The Convention debates afford no basis for the view

that the Senate's role [in the appointments process] was designed to be meager.").

Under the Appointments Clause, the President alone can appoint executive officers, whose "legitimacy and accountability to the public" is derived from their "chain of dependence . . . on the President, and the President on the community." *Arthrex*, 594 U.S. at 11 (quoting James Madison in 1 *Annals of Cong.* 499 (1789)). "Assigning the nomination power to the President guarantees accountability for the appointees' actions because the 'blame of a bad nomination would fall upon the president singly and absolutely.'" *Id.* (quoting THE FEDERALIST NO. 77, at 517 (J. Cooke ed. 1961)).

But, as Gouverneur Morris explained in the moments before the Constitutional Convention approved the Appointments Clause in its final form, "as the President was to nominate, there would be responsibility, and as the Senate was to concur, there would be security." 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, 539 (Max Farrand ed., 1966). Indeed, the Senate's critical role as a bulwark against abuse of the appointment power was emphasized time and again by the Framers:

- To James Madison, Senate confirmation guards against "any incautious or corrupt nomination" to critically important offices, *Id.* at 43;

- To Thomas Jefferson, the Senate's role in the appointments process would "see that no unfit person be employed," 16 THE PAPERS OF THOMAS JEFFERSON 378, 379 (Julian P. Boyd ed., 1961);

- And, as Alexander Hamilton explained at length in THE FEDERALIST NO. 76 (Alexander Hamilton), at 514 (J. Cooke ed. 1961) Senate confirmation creates a "check upon a spirit of favoritism in the President, and would tend greatly to prevent the appointment of unfit characters. . . . It will readily be comprehended, that a man who had himself the sole disposition of offices, would be governed much more by his private inclinations and interests, than when he was bound to submit the propriety of his choice to the discussion and determination of a different and independent body."

With this historical context in mind, the U.S. Supreme Court has time and again refused to "cast aside the separation of powers and the Appointments Clause's important check on executive power

for the sake of administrative convenience or efficiency." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 316–17 (2017) (Thomas, J., concurring).

### B. Contemporary case law underscores that Defendant Musk can only exercise his expansive power pursuant to the processes set forth by the Appointments Clause.

"*[A]ll* officers of the United States are to be appointed in accordance with the [Appointments] Clause. . . . No class or type of officer is excluded because of its special functions." *Buckley v. Valeo*, 424 U.S. 1, 132 (1976) (emphasis in original). The President must appoint "principal officers" with the advice and consent of the Senate. *Morrison v. Olson*, 487 U.S. 654, 670–71 (1988) (quoting *Buckley*, 424 U.S. at 132). Similarly, the President must appoint "inferior officers" with the advice and consent of the Senate, until and unless Congress "by Law" vests that appointment power in the President alone without the Senate's consent, or in courts of law, or in heads of departments. *Id.*

The "basic framework for distinguishing between officers and employees" has two "requirement[s]": to be an officer, a governmental official must (1) "exercis[e] significant authority pursuant to the laws of the United States" and (2) "occupy a 'continuing' position" in the federal government. *Lucia*, 585 U.S. at 245 (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879), and *Buckley*, 424 U.S. at 126). Defendant Musk satisfies both requirements.

### 1. Defendant Musk exercises significant executive authority.

Defendant Musk's extraordinary power over numerous executive departments—indeed, it appears that his authority spans across the entire Executive Branch—far exceeds the "significant authority" exercised by others recognized by the U.S. Supreme Court as "officers." "[T]he Court has declined to articulate the precise metes and bounds of 'significant authority,' opting instead to leave the inquiry largely 'unadorned,' [but] judicial opinions stretching back to the mid-nineteenth century make clear that the focus of the inquiry is the nature and relative importance of an

individual's functions." Office of Legal Counsel, Memorandum Opinion for the General Counsels of the Executive Branch, *The Test for Determining "Officer" Status Under the Appointments Clause*, 49 Op. O.L.C. ___ (Jan. 16, 2025) ("2025 OLC Opinion") (quoting *Lucia*, 585 U.S. at 246, and citing *United States v. Maurice*, 26 F. Cas. 1211, 1214 (Marshall, Circuit Justice, C.C.D. Va. 1823) (No. 15,747)).

Defendant Musk has engaged in, or directed DOGE employees to engage in, numerous actions which could lawfully be performed, if at all, only by the Senate-confirmed head of the agencies or departments he has targeted, who are quintessential principal officers. Those actions include unilaterally cancelling nearly a billion dollars in contracts with private parties, Compl. ¶¶ 34, 39; commandeering the Bureau of Fiscal Services to "rapidly shut[] down" allegedly "illegal payments," *id.* ¶ 35; similarly commandeering the payments and contracting systems at the Center for Medicare and Medicaid Services, *id.* ¶ 40; locking properly authorized agency workers at Office of Personnel Management out of their computer systems and commandeering the systems;[6] causing the Acting Secretary of the Department of Treasury to be placed on administrative leave when that official resisted Defendant Musk's request to access confidential computer systems, *id.* ¶ 42; using that access as a means to freeze payments to USAID, *id.* ¶ 43; consulting directly with the President to reach an agreement that "we should shut it [*i.e.*, USAID] down," *id.* ¶ 47; directing senior USAID officials to grant DOGE subordinates access to classified computer systems for which they lacked required security clearances and threatening to enlist the U.S. Marshals to force access when the officials resisted, *id.* ¶¶ 48-49; causing those officials to be placed on administrative leave due to that resistance, *id.*; shutting down the USAID website and blocking email and computer system access for hundreds if not thousands of USAID employees, *id.* ¶¶ 50-

---

[6] Tim Reid, *Musk Aides Lock Government Workers out of Computer Systems at US Agency, Sources Say*, Reuters (Jan. 31, 2025), Ex. 17.

51; and directing a DOGE subordinate to close USAID headquarters, *id.* ¶ 54. Defendant Musk
has publicly taken responsibility for these actions stating, for instance, that he and his DOGE
subordinates "spent the weekend feeding USAID into the wood chipper." *Id.* ¶ 55.

This degree and breadth of control over Executive Branch operations is unprecedented.
Prior cases in which the Supreme Court has held that an official wielded "significant authority"
and therefore qualified as a principal officer involved dramatically narrower exercises of power.
For example, the *Buckley* Court held that the members of the Federal Election Commission
qualified as "officers" under the Appointments Clause because the Commission exercised the
"significant authority" through its "enforcement power, exemplified by its discretionary power to
seek judicial relief." 424 U.S. at 138. That enforcement power, however, is limited to ensuring that
specific parties comply with specific statutory or regulatory requirements. If the members of the
Commission had instead opted to place all staff on administrative leave and terminate nearly all
the Commission's activities—in other words, taken actions like Defendants—that would have
constituted a much ***greater*** exercise of "significant authority" than their individual enforcement
actions. *See Andrade v. Regnery*, 824 F.2d 1253, 1256 (D.C. Cir. 1987) (holding that an Acting
Administrator of a Department of Justice component had authority to discharge employees because
he was properly appointed as Deputy Administrator, an "officer" under the Appointments Clause).

Defendant Musk's role also exceeds the power of the Director of the Office of Management
and Budget ("OMB"), whom the Office of Legal Counsel has concluded is a principal officer. *See*
Office of Legal Counsel, *Designation of Acting Director of Office of Management and Budget*, 27
Op. O.L.C. 121 (2003). The Office explained that, like Defendant Musk, the Director "is subject
to removal by no one except the President." *Id.* at 123 (citing *Keim v. United States*, 177 U.S. 290,
293 (1900) ("[i]n the absence of specific provision to the contrary, the power of removal from

11

office is incident to the power of appointment")). And like Defendant Musk, the Director's "responsibilities cover a wide range of fiscal and management matters, reach throughout the Executive Branch, and permit him to make policy of the greatest importance." *Id.* (citing 31 U.S.C. §§ 502(a), 503, 504). Finally, like Defendant Musk, the Director "is to administer OMB '[u]nder the direction of the President,' rather than some official below the President." *Id.* (quoting 31 U.S.C. § 502(a)). Indeed, Congress has required appointment by and with consent of the Senate for dozens of other officers within the Executive Office of the President. *See* Ex. 18 (list of officers within the Executive Office of the President requiring Senate consent). Accordingly, like the Director of the OMB (and his deputies), Defendant Musk is a "principal officer" who must be appointed pursuant to the Appointments Clause.

While no bright-line test distinguishes between principal and inferior offices, the Supreme Court in *Morrison* sets forth considerations that have guided subsequent cases: "that the [inferior officer] was subject to removal by a higher officer . . . that she performed only limited duties, that her jurisdiction was narrow, and that her tenure was limited." *Edmond*, 520 U.S. at 661. Here, the record evidence makes it implausible that Defendant Musk could be properly characterized as an "inferior officer," including because there is no evidence his "work is directed and supervised . . . by others who were appointed by Presidential nomination with the advice and consent of the Senate," *id.* at 663, and because he exercises "unreviewable executive power," *see Arthrex, Inc.*, 594 U.S. at 18. Regardless, even if Defendant Musk were found to be an "inferior officer," no law exists that has properly vested the appointment of his novel, powerful position in the President alone.

Even less plausible is Defendants' contention that Mr. Musk, in fact, "has no greater authority than other senior White House advisors," and can merely "advise the President and

communicate the President's directives." *See* Decl. of Joshua Fisher, *New Mexico v. Musk,* No. 1:25-cv-00429 (D.D.C. filed Feb. 17, 2025). The public record solidly refutes this claim for all of the reasons set forth above and in the Complaint. Moreover, it is well established that Defendants cannot evade the Appointment Clause just because the President has not formally given Defendant Musk an officer title. *See, e.g.*, Office of Legal Counsel, *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 117 (2007) ("2007 OLC Opinion") ("[One] could not evade the Appointments Clause by, for example, the artifice of authorizing a contract for the supervision of the Justice Department, on the ground that no "office" of Attorney General would be created by law.") (citing *United States v. Maurice*, 26 F. Cas. at 1214, 1219 (C.C.D. Va. 1823)). Instead of focusing on titles, the proper inquiry focuses "on the extent of power an individual wields in carrying out his assigned functions." *Lucia*, 585 U.S. at 245.

### 2. **Defendant Musk occupies a continuing position.**

In the founding era, "[t]he ordinary meaning of 'officer' was anyone who performed a continuous public duty," clearly encompassing persons such as Defendant Musk with ongoing federal government duties. *Lucia*, 585 U.S. at 254 (Thomas, J., concurring). Consistent with this early understanding, **"**the Supreme Court's approach to assessing the 'continuing' nature of a position has been a holistic one" that—rather than turn on any particular time period—has distinguished positions that are merely fleeting or incidental to government operations from ones with some duration and ongoing duties. *See* 2025 OLC Opinion at 3-5; *see also United States v. Germaine*, 99 U.S. 508, 512 (1878) (distinguishing between continuing duties and ones that "*are* occasional and intermittent"). Thus, a position may be finite or nonpermanent but qualify as an "officer." *Cf. Morrison*, 487 U.S. at 671 n.12 (holding that an "independent counsel" was an "officer" despite serving for a time-limited period). Again, Defendant Musk acts as the *de facto*

13

DOGE Administrator, Compl. ¶ 14, a position that involves wide-ranging, ongoing duties meant to have lasting impact. Indeed, though the initial temporary USDS expires in 2026, the President's Executive Order provides that the 2026 date "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id*. ¶15.

**II. Plaintiffs are likely to succeed on the merits of their Separation of Powers claim.**

The Supreme Court has consistently given effect to "the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty." *Mistretta v. United States*, 488 U.S. 361, 380 (1989). Indeed, "[n]o political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty." THE FEDERALIST NO. 47 (James Madison), at 324 (J. Cooke ed. 1961). Within that separation of powers, "[t]he Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 589 (1952). Therefore, "[n]o matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (citing *Youngstown*, 343 U.S. at 585). When the Executive Branch oversteps its constitutional authority, "the courts may say so." *Id.* at 608 (citing *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)).

Defendants' collective actions—which include the unlawful obstruction of congressionally appropriated funds, interference with statutorily mandated agency functions, and a general disdain for the carefully crafted legislative requirements that govern access to every American's most sensitive data—infringe upon Congress's exclusive domain. This overreach subverts the constitutional distribution of power, consolidating authority in the hands of an individual who is neither elected by the people nor confirmed by the Senate. Even the President himself could not properly wield the power that Defendant Musk, working with and through DOGE, has wielded.

Hour-by-hour, Defendants are annihilating the Separation of Powers principles that have been the bedrock of the nation since its inception.

As an initial matter, the *de facto* creation of a new principal office in and of itself constitutes a fundamental encroachment on legislative power given that "Congress has plenary control over the salary, duties, and even existence of executive offices." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 500 (2010); *see also Trump*, 603 U.S. at 645 (Thomas, J. concurring) ("Although the Constitution contemplates that there will be 'other Officers of the United States, whose Appointments are not herein otherwise provided for,' it clearly requires that those offices "shall be established by Law."); 2007 OLC Opinion at 117 ("The Appointments Clause [provides] that offices not recognized by the Constitution itself 'shall be established by Law,' thus lodging in Congress ultimate authority over the creation of most offices.") (citations omitted). As such, in addition to violating the Appointments Clause, it violates basic separation of powers principles for a "mere employee" to exercise the "significant authority" of an officer when no such position has been "established by Law—that is, by statute." *Lucia*, 585 U.S. at 241, 245; *id.* at 254 (Thomas, J., concurring).

Moreover, specifically as it relates to this narrow PI sought by Plaintiffs, Congress has provided for USAID and its operations by statute, and Defendants have no executive branch authority to subvert Congressional will. The Foreign Affairs Reform and Restructuring Act of 1998 set the framework for USAID's operation as an independent agency, distinct from the Department of State. *See* 22 U.S.C. § 6563 ("there is within the Executive branch of Government the United States Agency for International Development"). Under that statute, the President was granted a limited 60-day period to submit a written "reorganization plan and report" for USAID to Congress, a process that allowed for options to "provide for the abolition" of USAID, to transfer its functions to the Department of State, or to propose a plan for the "transfer to and consolidation" of certain functions along with "additional consolidation, reorganization, and streamlining" of the

15

agency. 22 U.S.C. § 6601(a)-(d). President Bill Clinton's report, submitted on December 30, 1998, clearly confirmed that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Report at § V, (last revised March 1999), Ex. 19. Once that 60-day period concluded and the report was submitted, the unilateral power to reorganize or abolish USAID expired, returning that authority solely to Congress.

Since that time, Congress has reinforced USAID's independent status through repeated appropriations, as recently evidenced by the Further Consolidated Appropriations Act, 2024. Pub. L. 118-47, 138 Stat 460 (2024). This Act expressly prohibits the use of "[f]unds appropriated by this Act, prior Acts making appropriations for the Department of State, foreign operations, and related programs, or any other Act" for "a reorganization, redesign, or other plan" by the Department of State, USAID, or any other federally funded entity, "without prior consultation by the head of such department, agency, or organization with the appropriate congressional committees." *Id.* at § 7063(a). A reorganization, redesign, or other plan includes a plan to:

> (1) expand, eliminate, consolidate, or downsize covered departments, agencies, or organizations, including bureaus and offices within or between such departments, agencies, or organizations, including the transfer to other agencies of the authorities and responsibilities of such bureaus and offices;
>
> (2) expand, eliminate, consolidate, or downsize the United States official presence overseas, including at bilateral, regional, and multilateral diplomatic facilities and other platforms; or
>
> (3) expand or reduce the size of the permanent Civil Service, Foreign Service, eligible family member, and locally employed staff workforce of the Department of State and USAID from the staffing levels previously justified to the Committees on Appropriations for fiscal year 2024.

*Id. at* § 7063(b). Moreover, it restricts financial commitments to "suspend or eliminate a program, project, or activity," or to "create, close, reorganize, downsize, or rename bureaus, centers, or offices" unless such actions are "previously justified to the Committees on Appropriations or such

Committees are notified 15 days in advance of such obligation." *Id.* § 7015(a).

Thus, there is no "act of Congress or [provision in] the Constitution itself" which delegates the legislative power to accomplish the wholesale dismantling of USAID to any executive branch official, much less an unlawful official. *Trump v. United States*, 603 U.S. at 607 (quoting *Youngstown*, 343 U.S. at 585). To the contrary, Congress has expressly prohibited such a dismantling. Defendants Musk and DOGE "feeding USAID into the wood chipper" therefore plainly encroaches on Congress's domain. Compl. ¶ 55; *see also*, *id.* ¶¶ 43-45; *see generally* Compl. ¶¶ 47-59. Defendant Musk publicly boasted about how he and DOGE closed and renamed the USAID headquarters, in direct conflict with Congress's restriction that the executive branch cannot "create, close, reorganize, downsize, or rename bureaus, centers, or offices" unless such actions are "previously justified to the Committees on Appropriations or such Committees are notified 15 days in advance of such obligation." Compl. ¶ 33. After initially attempting to shutter USAID through the Treasury payment system, Compl. ¶¶ 43-45, Defendant Musk directed DOGE to seize control of USAID's digital and physical infrastructure—ordering the shutdown of employee email systems and the forcible closure of offices—actions that left hundreds of USAID civil servants without notice or recourse. Compl. ¶¶ 47-49. Certainly, a rogue, unelected billionaire cannot constitutionally accomplish what the President himself has no authority to do. Courts have the power to stop what is perhaps the most outrageous concentration of legislative and executive power in an unelected, unappointed individual in our nation's history. *See generally Youngstown Sheet & Tube Co.*, 343 U.S. 579.

### III. Plaintiffs will suffer immediate, irreparable injury absent an injunction.

Plaintiffs are suffering and will continue to suffer irreparable injury if Defendants' blatantly unconstitutional acts proceed unfettered. An "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Coreas v. Bounds*, 451 F. Supp. 3d

407, 428 (D. Md. 2020) (internal citation and quotation marks omitted). Here, Plaintiffs suffer a variety of injuries for which monetary damages are unavailable or inadequate, each of which is sufficient to demonstrate the likelihood of continued irreparable harm.

### A. Physical peril and severe emotional and psychological distress

Defendants' sudden, unconstitutional takeover and routing of an agency that performs highly sensitive, life-saving humanitarian aid in extreme circumstances around the globe has left numerous Plaintiffs to fear for their physical safety. In addition to leaving certain Plaintiffs physically vulnerable, Defendants' actions have inflicted upon all Plaintiffs severe emotional distress that cannot be compensated by damages. *Cf. Sanchez v. McAleenan*, No. CV GLR-19-1728, 2024 WL 1256264 at *14 (D. Md. Mar. 25, 2024) (finding that the "emotional harm" of being separated from family members qualified as irreparable injury); *Cano v. S.C. Dep't of Corr.*, No. 9:22-CV-04247-DCC, 2024 WL 1005553, at *4 (D.S.C. Jan. 30, 2024) (finding irreparable injury where Plaintiff "will continue to suffer from severe emotional distress"); *See, e.g., Calvillo Manriquez v. Devos*, 345 F. Supp. 3d 1077, 1106 (N.D. Cal. 2018) (finding "emotional distress" from disclosure and misuse of personal information was irreparable).

For instance, J. Doe 9, a PSC, is currently in a high-risk area in the Middle East with their family, including their child(ren), as part of a USAID mission. *See* J. Doe 9 Decl. ¶¶ 4, 6, Ex. 6. With no advance warning or explanation, J. Doe 9 lost access to their email and to all USAID systems on February 3, 2025, including all "contacts and the safety and security applications, including the SCRY application used to monitor and account for overseas personnel." *Id.* ¶ 5. As of February 17, J. Doe 9 remains locked out of USAID systems, and is unable to reach any person within the government who has definitive answers about their systems access or job status. *Id.* ¶ 8. J. Doe 9 describes being under "an incredible amount of emotional and psychological distress,"

18

including due to concerns about their family's safety after losing system access, the acute uncertainty surrounding their job status, and fears of being suddenly uprooted and what that means for their child(ren). *Id*. ¶ 10. This anxiety is exacerbating the effects of an underlying medical condition. *Id*.

J. Doe 19, also a PSC, has been on an assignment with USAID in Asia since 2023 and remains there today with their family. J. Doe 19 Decl. ¶¶ 2, 4, Ex. 8. J. Doe 19 also lost access to their email and all USAID systems on February 3, 2025, remains locked out of all devices as of February 17, and has received no information about their employment status. *Id*. ¶¶ 5, 6, 7, 8. J. Doe 19 is "emotionally and psychologically harmed" by Defendants' actions. *Id*. ¶ 9. As J. Doe 19 explains, "I am the sole breadwinner for my family and the uncertainty surrounding my access to USAID systems and my employment weighs on me heavily." *Id*.

J. Does 6 and 12 are PSCs who are still locked out of USAID systems. J. Doe 6 Decl. ¶¶ 6, 7, Ex. 4; J. Doe 12 Decl. ¶¶ 4, 5, Ex. 7. J. Doe 12 believes they "still have access to the emergency notification systems ("ENS"), because [J. Doe 12] had previously approved ENS alerts to be sent to [their] personal account" but building closure announcements typically come through the ENS system and J. Doe 12 has not received such a notification since February 6. *Id*. ¶ 7. It is important that J. Doe 12 be able to verify with USAID personnel whether they still have access to the ENS system as that is the system through which safety updates are provided. *See Id.*

In addition, Defendants' public disparagement of USAID has predictably incited third-party animus against its workers. Defendants are now actually *publishing the personal information of terminated USAID PSCs, including links to their addresses*, on a DOGE-specific page taking credit for "fraud detection/deletion." *Savings*, Department of Government Efficiency (last visited Feb. 17, 2025), Ex. 20. This intrusive, targeted public identification combined with Defendant

Musk leveraging his social media posts and public appearances to reach tens of millions of viewers in branding Plaintiffs "criminals" and "worms," *see* Pseudonyms Mem., has led Plaintiffs to fear for their safety and the safety of their families. Further, Defendant Musk has already proven his willingness to retaliate against federal government workers and others who he sees as critical of him or otherwise standing in the way of DOGE's agenda. *See, e.g.*, Pseudonyms Mem. at 8; Tara Copp, *Trump Begins Firings of FAA Air Traffic Control Staff*, *supra*, Ex. 14. As a result of the "public smear campaign by Defendant Musk against USAID," J. Doe 26, a 13-year agency veteran, reasonably feels unsafe. J. Doe 26 Decl. ¶¶ 2, 11, Ex. 9.

On top of Plaintiffs' physically precarious positions, Defendants' egregious conduct in shutting USAID workers out of their offices with no notice or opportunity to collect personal belongings is causing irreparable harm. J. Doe 1, for instance, has "cherished personal items including personal photos [and] mementos from [their] time and work abroad, which represent memories of major life experiences." J. Doe 1 Decl. ¶ 7, Ex. 2. They are unable to retrieve or even confirm the existence of their belongings. *Id.* After DOGE physically infiltrated USAID headquarters, Defendant Musk declared the building is now occupied and being used by Customs and Border Protection.  Elon Musk (@elonmusk), X (Feb 7, 2025, 4:10 PM), Ex. 21. There is no way to compensate J. Doe 1, or other similarly situated USAID workers, for their personal belongings that have non-monetary sentimental value.

### B. Defendants' access to and control of Plaintiffs' sensitive information

#### i. Description of Plaintiffs' injuries

As a direct result of their unconstitutional exercise of authority, Defendants continue to have controlling access to Plaintiffs' private, sensitive information. *See* Compl. ¶¶ 33, 56; J. Doe 2 Decl. ¶¶ 6, 8, 13, Ex. 3; J. Doe 7 Decl. ¶ 15, Ex. 5; J. Doe 12 Decl. ¶11, Ex. 7. Indeed, J. Doe 2

is an employee with USAID who works with USAID's information technology ("IT") infrastructure, including its data security systems, primarily focusing on technological responsibilities related to cybersecurity and privacy. J. Doe 2 Decl. ¶¶ 2, 3, Ex. 3. On Thursday, January 30, J. Doe 2 was asked to provide systems access to DOGE personnel. *Id.* ¶ 4. J. Doe 2 conducted their own research and "determined that the individuals from DOGE who were trying to get access to these crucial systems have a history of issues with data misuse." *Id.* ¶ 5. J. Doe 2 "was alarmed and raised this issue with my supervisors, indicating that the DOGE personnel should not obtain access." *Id.* Despite that, J. Doe 2 soon found out that DOGE personnel were "given *root access* to USAID systems, the highest level of access one can obtain and which allows a person to take over a system." *Id.* ¶ 6. This type of access "includes the ability to modify, add, delete data, and create user accounts." *Id.* Further, DOGE personnel have "delegate rights to every USAID mailbox. ***With this they have the ability to see every email, delete, and send email on behalf of every user within USAID***." *Id.* ¶ 8 (emphasis added). As an example of misuse of the access the DOGE personnel have, on February 1, "DOGE personnel who did not have a security clearance, used their administrative rights to grant themselves access to restricted areas requiring security clearance." *Id.* ¶ 7. J. Doe 2 "understand[s] that DOGE personnel have administrative privileges into all the USAID systems and tools and that DOGE personnel took information out of the agency and sent it elsewhere." *Id.* ¶ 12. As a result of DOGE's conduct, J. Doe 2 has experienced emotional injury as J. Doe 2 is "aware of the extent of confidential information that has been breached by DOGE, including confidential information of USAID personnel, and the privacy laws broken." *Id.* ¶ 13.

J. Doe 1, a PSC with USAID, works on humanitarian assistance, including previous deployments to dangerous locations around the world. J. Doe 1 Decl. ¶¶ 2, 3, Ex. 2. J. Doe 1's job

can be dangerous, especially when they have been deployed to conflict zones. *Id.* ¶ 9. Their "personnel and security clearance files contai[n] highly sensitive personal information—social security number, passport information, personal references, foreign contacts, previous addresses, financial records, tattoo descriptions, a safety pass phrase, and [J. Doe 1's] family members' information." *Id.* J. Doe 1 is aware that some of their colleagues have become "public targets" and "have been subject to doxxing, threats, and other harms." *Id.* They are fearful that Defendants' lack of "security clearance or training needed to handle this type of extremely confidential information" means this information will be used to J. Doe 1 and/or their family's detriment. *Id.*

J. Doe 7 is an employee at USAID who focuses on disaster response. J. Doe 7 Decl. ¶¶ 2, 3, Ex. 5. On Monday, February 3, J. Doe 7 found out that "representatives from DOGE had access to all systems." *Id.* ¶ 5. J. Doe 7 "understands that the DOGE representatives have access to my personnel, medical, and security clearance files." *Id.* ¶ 15. Those files contain "extremely sensitive information" about J. Doe 7 and their family members, "including information that could subject [J. Doe 7's] to harassment by DOGE members and/or by third parties." *Id.* J. Doe 7 is "extremely worried about this prospect" and since they know that some of their colleagues have been doxxed, this concern is "especially heightened." *Id.*

J. Doe 12 is a PSC who focuses on humanitarian assistance and responding to disasters. J. Doe 12 Decl. ¶¶ 2, 3, Ex. 7. J. Doe 12 is "deeply concerned about [their] cybersafety and identity. Based on DOGE's access to information, [they] believe[s] that there is a credible threat to the security of individuals that speak out against the actions of Defendants Musk and/or DOGE." *Id.* ¶ 11. J. Doe 12 "perceive[s] a credible threat of being doxxed by Defendants Musk and DOGE, and fear that [their] family would also be implicated in a doxx." *Id.* ¶ 11.

Defendant Musk's own conduct demonstrates the likelihood that this sensitive information could become public, or otherwise used to Plaintiffs' detriment. He has displayed extraordinary animosity toward USAID. *See* Pseudonyms Mem. at 1-3 (describing how Defendant Musk has repeatedly demonized USAID and those who work with the agency). "Defendant Musk has gone so far as to publicly name and threaten with impeachment federal judges who he perceives to be impeding DOGE's work on his social media platform, X[.]" Pseudonyms Mem. at 8. Indeed, in the days since this lawsuit was filed, Defendant Musk has repeatedly publicized false and disparaging statements about one of Plaintiffs' attorneys, identifying him by name and photo, and attracting tens of millions of views. *See, e.g.*, Elon Musk (@ElonMusk), X (Feb. 17, 2025 6:31PM), Ex. 22.[7]

Moreover, third-party actors have already displayed a willingness to target those associated with USAID. Pseudonyms Mem. at 2. And, sadly, in this political environment, there are ever-more examples of third parties who gain access to federal government employee information and use that information to publicly disparage and harass individuals who they deem to be not sufficiently aligned with the current Trump administration. *See, e.g.,* DEI Watchlist, www.deiwatchlist.com (last visited Feb. 17, 2025) (including names, titles and photographs of former government "DEI" employees), Ex. 23; Biden's Basement, www.insidebidensbasement.org (last visited Feb. 17, 2025) (providing search tool for "keeping track of Biden administration alumni and where they land" in hopes of preventing those individuals from future employment), Ex. 24.

---

[7] In this post, published last night, Defendant Musk highlighted with exclamation marks a post claiming (without evidence), "They used USAID to change the judiciary in Brazil, Romania, Ukraine, Israel and now they are working on doing it in the United States. NGOs, Internews global media cartel, the ABA, street protests . . . it is all intrinsically linked. . . . Norm Eisen literally wrote the book on this."

*ii. These injuries constitute irreparable harm.*

Federal courts have recognized at least three legally cognizable irreparable injuries from the informational harm Plaintiffs are suffering. **First**, even the **risk** of data breach or data misappropriation can constitute irreparable injury; here, where Defendants themselves have unlawfully breached USAID systems and misappropriated Plaintiffs' information, their continued access causes irreparable injury to Plaintiffs. In *Oak Grove Techs., LLC v. Attwa*, No. 5:23-CV-334-BO-RN, 2024 WL 84703, at *1 (E.D.N.C. Jan. 8, 2024), the defendant obtained approximately 98,000 emails from plaintiffs through discovery in a separate proceeding. The emails included personally identifying information of plaintiffs employees, "including full copies of passports and social security numbers; [a plaintiff's] own sensitive and personal financial documents and tax information; as well as confidential information of third-parties." *Id.* at *2. The court granted a preliminary injunction ordering the defendant to destroy its copy of these emails due to the "the risk that the security of the data could be breached while in [defendant's] possession." *Id.* Here, the security risk to Plaintiffs is even greater, as the breach was effectuated directly by Defendants outside of legal processes, at least some of DOGE members have a "history of data misuse" and DOGE personnel have used their "administrative privileges into all the USAID systems and tools" to take "information out of the agency and [send] it elsewhere." J. Doe 2 Decl. ¶¶ 5, 12, Ex. 3. Further, DOGE has already demonstrated their incompetence in handling technical systems. *See* J. Doe 26 Decl. ¶¶ 5-6, Ex. 9 (describing repercussions of DOGE breaking the USAID Phoenix financial system). And finally, since Defendants began hacking apart USAID, there has been an over 100% "increase in the total number of security incidents flagged" by internal USAID IT controls. J. Doe 2 Decl. ¶ 14, Ex. 3. "This has overwhelmed the IT team responsible for responding to these incidents" which "is a security issue in and of itself as the IT team is stretched

thin" and thus cannot maintain their focus on high level threats. *See id.*

**Second**, where access to sensitive personal information causes harm over and above available monetary damages, such harm is irreparable. Unauthorized access to private information can cause non-monetary harm. *See, e.g.*, *Rodriguez v. FastMed Urgent Care, P.C.*, 741 F. Supp. 3d 352, 361 (E.D.N.C. 2024) (collecting cases and holding that "[Defendant's] disclosure need not have harmed Rodriguez financially."); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021) (finding injury where Defendant "provided third parties with credit reports . . . that labeled the class members as potential terrorists."). As relevant here, when unlawfully accessed personal data is used in a way that causes severe emotional distress, such injuries are not compensable in actions against the government, and are therefore irreparable. *See, e.g.*, *Calvillo Manriquez*, 345 F. Supp. 3d at 1106 (N.D. Cal. 2018) ("Where sovereign immunity bars certain types of damages, those damages can constitute irreparable harm. . . . Thus, the emotional distress that Plaintiffs are suffering from the violation of the Privacy Act is irreparable, and an injunction is warranted.").

**Finally**, the public disclosure of confidential information is irreparable. "The Fourth Circuit has long recognized a right to privacy in personal information. The constitutional right to privacy protects '[p]ersonal, private information in which an individual has a reasonable expectation of confidentiality.'" *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 750 (D. Md. 2012) (internal citations and quotation marks omitted). Grounded in this constitutional interest as well as the unavailability of adequate monetary damages, "the public disclosure of confidential information is irreparable. *Id.* at 755.

Here all three harms are at issue: the combination of unlawful access and control over personal data used to Plaintiffs' detriment, as well as Defendants' pattern of disclosing confidential information and defaming Plaintiffs constitutes irreparable injury.

### C. Reputational injuries

"[C]ircumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020), as amended (Jan. 14, 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 91–92 n.68 (1974)). For example, public disparaging statements combined with adverse employment actions can constitute irreparable harm. *See, e.g.*, *Faulkner v. N. Carolina Dep't of Corr.*, 428 F. Supp. 100, 104 (W.D.N.C. 1977) ("In this case, Mr. Faulkner's honesty and integrity have been publicly disparaged. An award of money damages at a later date, even if permissible against these defendants, cannot compensate for the continuing loss of reputation."). Similarly, arbitrarily taking adverse employment actions against a person for a reason that "bears no relationship to their ability to perform their jobs," particularly when compounded by attaching "stigma" to the employee can constitute irreparable injury. *Roe*, 947 F.3d at 229 (internal citations, quotation marks, and alterations omitted).

As a direct result of Defendants' unconstitutional conduct, Plaintiffs face significant reputational harm. *See* Pseudonyms Mem. (detailing online attacks by Defendant Musk against USAID and its personnel). Because of the situation inflicted by Defendants Musk and DOGE, J. Doe 9 expects to be terminated. *See* J. Doe 9 Decl. ¶ 9, Ex. 6. J. Doe 12 fears that "Defendant Musk's statements about USAID and federal workers have caused irreparable harm" and that "[d]ue to the actions of Musk and DOGE, the humanitarian industry/professional community are severely damaged." Doe 12 Decl. ¶ 12, Ex. 7. As J. Doe 12 puts it, "Defendant Musk and his team have disparaged USAID workers and stained our reputation." *Id*. J. Doe 12 has "personally heard remarks that explicitly and implicitly accused USAID workers of being 'corrupt' and 'stealing from the American people.'" *Id.* Their family has reported fielding questions from other people in

their community "based on the comments that Defendant Musk has made about the Agency and its staff." *Id.* J. Doe 12 is "afraid that nearly a decade of service to [their] country is being devalued and smeared in civil discourse." *Id.*

It is not necessary for Defendant Musk to single out specific Plaintiffs by name in his digital diatribes—his baseless but "official" declarations of corruption and criminality leveled against *all* USAID personnel are sufficient to permanently stain the employment record of these Plaintiffs. Moreover, if Defendants are allowed to consummate their desired adverse employment actions against USAID workers, these workers will have no prospect of "compensat[ion] for the continuing loss of reputation" they will have to overcome when seeking new employment. *Faulkner*, 428 F. Supp. at 104. Defendants' extreme public conduct with regards to USAID workers "so far depart[s] from the normal situation" that Plaintiffs deserve interim relief until the scope of Defendants' constitutional authority can be fully adjudicated. *Roe*, 947 F.3d at 229.

### D. Constitutional injuries

Being "subject[] to an unconstitutionally structured decision making process" itself constitutes an irreparable injury that can warrant preliminary injunctive relief. *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 192 (2023); *see also Space Expl. Techs., Corp. v. Bell*, 701 F. Supp. 3d 626, 634 (S.D. Tex. 2023) (being subject "to unconstitutional agency authority" constitutes irreparable harm). Although *Axon* and *Space Exploration Technologies* dealt with adjudicatory proceedings, Plaintiffs' fate of having their future arbitrarily decided by an unconstitutionally installed officer ("led by an illegitimate decisionmaker") presents precisely the same type of irreparable harm. *Axon Enter., Inc.*, 598 U.S. 175, 191. Here, Plaintiffs have had their lives entirely upended by the whims of an unelected billionaire conducting a team with questionable skills and a checkered history. *See* J. Doe 2 Decl. ¶ 5 Ex. 3; J. Doe 26 Decl. ¶ 8, Ex.

9. Defendants' dismantling of USAID—which to date has only been temporarily and incompletely slowed by court orders—is at least as onerous and injurious as the processes at issue in an agency adjudicatory proceeding. In neither case does the availability of possible judicial review after-the-fact adequately compensate for the "here-and-now" constitutional grievance. *Axon Enter., Inc.*, 598 U.S. at 191 (2023); *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 212 (2020) ("when such a provision violates the separation of powers it inflicts a 'here-and-now' injury on affected third parties that can be remedied by a court"). And in this case, as opposed to a case with only a third-party entity such as a State or organization, the "here-and-now" effects of the constitutional injury are extremely personal.

### IV. The balance of equities and the public interest favor Plaintiffs.

It is well-settled that "the Government is in 'no way harmed by issuance of a preliminary injunction which prevents it from enforcing restrictions likely to be found unconstitutional. If anything, . . . the system is improved by such an injunction.'" *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 603 (4th Cir.), as amended (June 15, 2017), vacated as moot sub nom. *Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017) (quoting *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013)). Further, the "public 'undoubtedly has an interest in seeing the governmental institutions follow the law and treat [its] employees in reasonable, nonarbitrary ways.'" *Roe v. Department of Defense*, 947 F.3d at 230 (quoting *Roe v. Shanahan*, 359 F. Supp. 3d 382, 421 (E.D. Va. 2019). In *Roe v. DoD*, the Fourth Circuit upheld the public interest in following the law over the government's stated countervailing interest in national security and military readiness. *Id.* Here, Defendants have no countervailing interest—they have no proper authority to take their wide-ranging actions. Nor would Defendants suffer any harm from the

requested TRO, as it reverts circumstances to the *status quo*, that is to say the last uncontested status.

## PRAYER FOR RELIEF

To prevent continued and future irreparable harm, Plaintiffs respectfully request a preliminary injunction. Requests 1-6 are for the narrow emergency relief that was to be the subject of Plaintiffs' planned TRO motion discussed at today's case management conference. As discussed at that conference, Plaintiffs immediately reached out to Defendants' counsel this afternoon to attempt to discuss these emergency measures to provide relief. Defendants' counsel responded this evening and the parties plan to convene tomorrow, February 19, 2025.

1. Enjoining Defendants from accessing, utilizing, distributing, sharing, or otherwise disclosing Plaintiffs' sensitive information outside of USAID, including all information in USAID employees', PSCs', and other contractors' personnel files as well as other non-public information that Defendants unlawfully accessed or to which they have access;

2. Directing Defendants to reinstate access to email, payment, security notification, and other systems for all USAID current employees and PSCs within 24 hours;

3. Directing Defendants to restore email communications that were deleted when access was removed for all USAID current employees and PSCs;

4. Enjoining Defendants from destroying or otherwise mislaying the personal belongings of USAID employees and contractors who have been restricted from accessing their offices;

5. Enjoining Defendants from "[i]ssuing, implementing, enforcing, or otherwise giving effect to terminations, suspensions, or stop-work orders in connection with any contracts, grants, cooperative agreements, loans, or other federal foreign assistance award that was in existence as of January 19, 2025," similar to the relief granted against the Department of State in *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Order at 14, No. 25-CV-00400 (D.D.C. Feb. 13, 2025) (ECF No. 21), and clarifying that the relief extends to USAID PSCs.

6. Directing Defendants to confirm in a written status report filed with the Court within 24 hours that the steps set out above have been implemented and specifically confirm application as to all USAID PSCs.

In addition, given the ever-changing, ever-expanding nature of the facts on the ground, Plaintiffs respectfully request that this Court also enter a Preliminary Order:

29

7. Setting aside as unlawful any actions undertaken or directed by Defendants in connection with USAID.

8. Enjoining Defendants from undertaking or directing any further action in connection with USAID unless and until Defendant Musk is properly appointed pursuant to the Appointments Clause and provided that such action conforms with the Constitutional Separation of Powers and federal statutes, including the Foreign Affairs Reform and Restructuring Act of 1998 and the Further Consolidated Appropriations Act of 2024.

9. Enjoining Defendants from undertaking or directing any further action in connection with USAID that exceeds DOGE's stated mission of "modernizing Federal technology and software," pursuant to Executive Order 14158, unless and until Defendant Musk is properly appointed pursuant to the Appointments Clause and provided that such action conforms with the Constitutional Separation of Powers and applicable federal statutes.

Respectfully Submitted,


*/s/ Norman L. Eisen*
Norman L. Eisen, [9112170186]
Tianna J. Mays, [1112140221]
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani**
Rebecca (Beth) Stevens**
Joaquin Gonzalez**
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway, Suite 102-402
San Antonio, TX 78218
Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com
*Attorneys for Plaintiffs*

**Application for admission *pro hac vice* pending