# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 1, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 8:25-cv-00462-TDC |
| ELON MUSK, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

    A.    The Executive Branch's Authority and Discretion to Set Foreign Aid ................. 2

    B.    USAID ................................................................................................................ 5

    C.    The United States DOGE Service ........................................................................ 6

STANDARD OF REVIEW ................................................................................................. 8

ARGUMENT ...................................................................................................................... 8

I.    PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS ............................ 9

    A.    Plaintiffs Fail to Demonstrate Standing for the Relief They Seek......................... 9

        1.    Plaintiffs' speculative fears about possible misuse of USAID data
            do not create cognizable injury-in-fact ....................................................... 9

        2.    Plaintiffs' other claimed injuries are neither caused by the
            Defendants nor redressable by the relief they seek................................... 10

    B.    Plaintiffs Are Not Likely To Prevail On Their Constitutional Claims ................. 13

        1.    Plaintiffs' Appointments Clause Claim (Count I) Lacks Merit ............... 13

        2.    Plaintiffs' Separation of Powers Claim (Count II) Lacks Merit .............. 22

II.    PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM
     WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION .......... 24

    A.    Fear and Emotional Distress ................................................................................ 24

    B.    Access to Sensitive Information ........................................................................... 26

    C.    Reputational and Constitutional Injuries ............................................................. 27

III.    THE BALANCE OF EQUITIES, INCLUDING THE PUBLIC INTEREST,
     DOES NOT FAVOR A PRELIMINARY INJUNCTION ............................................... 28

IV.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS ........... 29

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

**CASES**

*AFL-CIO v. Dep't of Labor,*
No. 1:25-cv-339, 2025 WL 542825 (D.D.C. Feb. 14, 2025) .................................................. 10

*Alavarez v. Becerra,*
No. 21-2317, 2023 WL 2908819 (4th Cir. Apr. 12, 2023) ...................................................... 12

*Alpine Sec. Corp. v. FINRA,*
121 F.4th 1314 (D.C. Cir. 2024) ............................................................................................. 28

*Am. Foreign Serv. Ass'n v. Trump,*
No. 1:25-cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025) ........................... 20, 21, 22, 25, 28

*Am. Ins. Ass'n v. Garamendi,*
539 U.S. 396 (2003) ........................................................................................................... 23, 24

*Andrade v. Regnery,*
824 F.2d 1253 (D.C. Cir. 1987) .......................................................................................... 18, 19

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton,*
997 F.2d 898 (D.C. Cir. 1993) ........................................................................................... 15, 16

*Auffmordt v. Hedden,*
137 U.S. 310 (1890) .................................................................................................................. 21

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................................ 11, 12

*Braidwood Mgmt., Inc. v. Becerra,*
104 F.4th 930 (5th Cir. 2024), *cert. granted,* 604 U.S. --- (Jan. 10, 2025) ........................ 14, 17

*Church v. Biden,*
573 F. Supp. 3d 118 (D.D.C. 2021) ......................................................................................... 28

*City of N.Y. v. U.S. Dep't of Def.,*
913 F.3d 423 (4th Cir. 2019) .................................................................................................... 23

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................................................................................... 9, 10

*Dall. Safari Club v. Bernhardt,*
453 F. Supp. 3d 391 (D.D.C. 2020) ......................................................................................... 24

*Dalton v. Specter,*
511 U.S. 462 (1994) ............................................................................................................ 22, 23

*Defy Ventures, Inc. v. U.S. Small Bus. Admin.*,
  469 F. Supp. 3d 459 (D. Md. 2020) ....................................................... 25

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ............................................................................. 15

*Di Biase v. SPX Corp.*,
  872 F.3d 224 (4th Cir. 2017)................................................................. 24

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991)................................................................. 26

*Disability Rts. S.C. v. McMaster*,
  24 F.4th 893 (4th Cir. 2022)................................................................. 11

*Doe v. Va. Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013)........................................................... 10, 11

*Ekagra Partners, LLC v. United States*,
  170 Fed. Cl. 1 (2024) ........................................................................... 26

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) ............................................................................... 9

*Frank Krasner Enters., Ltd. v. Montgomery Cnty.*,
  401 F.3d 230 (4th Cir. 2005)................................................................. 11

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) ............................................................................. 13

*Freytag v. Comm'r*,
  501 U.S. 868 (1991) ....................................................................... 13, 14

*Hess v. Hughes*,
  500 F. Supp. 1054 (D. Md. 1980) ........................................................ 30

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ................................................................................. 29

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) .............................. 29

*Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*,
  48 F.4th 1236 (11th Cir. 2022)............................................................. 10

*I.C. v. Zynga, Inc.*,
  600 F. Supp. 3d 1034 (N.D. Cal. 2022) ............................................... 10

*Kim v. FINRA,*
   698 F. Supp. 3d 147 (D.D.C. 2023),
   *appeal dismissed*, 2025 WL 313965 (D.C. Cir. Jan. 25, 2025).........................................28, 29

*League of Women Voters of N.C. v. North Carolina,*
   769 F.3d 224 (4th Cir. 2014).....................................................................................8

*Lewis v. Casey,*
   518 U.S. 343 (1996) ...............................................................................................30

*Lucia v. SEC,*
   585 U.S. 237 (2018) ...............................................................................17, 21, 22

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ...............................................................................................30

*MicroStrategy Inc. v. Motorola, Inc.,*
   245 F.3d 335 (4th Cir. 2001).....................................................................................8

*Morrison v. Olson,*
   487 U.S. 654 (1988) ...............................................................................................22

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ...............................................................................11, 12, 30

*Nken v. Holder,*
   556 U.S. 418 (2009) ...............................................................................................28

*Sampson v. Murray,*
   415 U.S. 61 (1974) .................................................................................................25

*Scotts Co. v. United Indus. Corp.,*
   315 F.3d 264 (4th Cir. 2002)...................................................................................24

*Simmons v. Poe,*
   47 F.3d 1370 (4th Cir. 1995)...................................................................................27

*Teva Pharms. USA, Inc. v. Azar,*
   369 F. Supp. 3d 183 (D.D.C. 2019) ........................................................................12

*Together Emps. v. Mass Gen. Brigham Inc.,*
   32 F.4th 82 (1st Cir. 2022)...............................................................................24, 25

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .........................................................................................9, 10

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021)...........................................................................................14, 17

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ................................................................ 24, 28, 29

*United States v. Donziger*,
  38 F.4th 290 (2d Cir. 2022) .............................................................. 21

*United States v. Germaine*,
  99 U.S. 508 (1878) .............................................................................. 21

*United States v. Hartwell*,
  73 U.S. (6 Wall.) 385 (1867) .............................................................. 21

*United States v. Maurice*,
  26 F. Cas. 1211 (C.C.D. Va. 1823) .................................................... 21

*Univ. of Cal. Student Ass'n v. Carter*,
  No. 25-cv-354-RDM, 2025 WL 542586 (D.D.C. Feb. 17, 2025) ............ 26

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ........................................................................ 8, 25, 28

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ...................................................................... 23, 24

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015) ................................................................................ 23

**STATUTES**

5 U.S.C. § 104 ........................................................................................ 3

5 U.S.C. § 704 ...................................................................................... 23

5 U.S.C. § 3161 ...................................................................................... 6

18 U.S.C. § 202 .................................................................................... 21

22 U.S.C. § 2151b .................................................................................. 3

22 U.S.C. § 2291 .................................................................................... 3

22 U.S.C. § 2346 ................................................................................ 3, 4

22 U.S.C. § 2347 .................................................................................... 3

22 U.S.C. § 2348 .................................................................................... 3

22 U.S.C. § 2349aa ................................................................................ 3

22 U.S.C. § 2382 ................................................................................................. 3

22 U.S.C. § 2601 ................................................................................................. 3

22 U.S.C. § 6563 ................................................................................................. 3

22 U.S.C. § 6592 ................................................................................................. 4

Migration and Refugee Assistance Act of 1962,
    Pub. L. No. 87-510, 76 Stat. 121 ................................................................. 3

Support for East European Democracy Act of 1989,
    Pub. L. No. 101-179, 103 Stat. 1298 ........................................................... 3

Foreign Affairs Reform and Restructuring Act of 1998,
    Pub. L. No. 105-277, 112 Stat. 2681 (1998) ............................................... 3

## U.S. CONSTITUTION

U.S. Const. art. I, § 6 ....................................................................................... 16

U.S. Const. art. II, § 2 ...................................................................................... 13

## RULES

Fed. R. Civ. P. 65 ............................................................................................ 30

## REGULATIONS

*Administration of Foreign Assistance & Related Functions*,
    Exec. Order No. 10,973, 26 Fed. Reg. 10,469 (Nov. 3, 1961) ................... 3

*Establishing & Implementing the President's "Department of Government Efficiency*,"
    Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ..................... 6, 7, 20, 26

*Reevaluating & Realigning United States Foreign Aid,*
    Exec. Order 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ........................... 4, 29

*Implementing the President's "Department of Government Efficiency" Workforce*
    *Optimization Initiative,*
    Exec. Order 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ........................... 7

## OTHER AUTHORITIES

*Administration of the Ronald Reagan Centennial Commission*,
    34 Op. O.L.C. 174 (2010) ........................................................................... 17

*Appointments to the Commission on the Bicentennial of the Constitution*,
    8 Op. O.L.C. 200 (1984) ............................................................................. 16, 17

*Designation of Acting Director of the Office of Management & Budget*,
   27 Op. O.L.C. 121 (2003) ........................................................................................ 14

Margaret MacMillan, *Paris 1919* (2001) ..................................................................... 16

Memorandum, Guidance on Probationary Periods, Administrative Leave & Details
   (Jan. 20, 2025), https://perma.cc/4QGN-XZLP ...................................................... 4, 5

*Special Government Employee Serving as Paid Consultant to Saudi Company*,
   40 Op. O.L.C. 1 (2016) ............................................................................................ 22

## INTRODUCTION

Plaintiffs, twenty-six current and former U.S. Agency for International Development ("USAID") employees and contractors, seek the extraordinary remedy of a preliminary injunction to unwind a host of actions at that agency (who is not named as a defendant) on the ground that those acts are somehow attributable to Elon Musk exercising powers in violation of the Appointments Clause. Plaintiffs' motion rests on misunderstandings of both law and fact.

Foremost, Plaintiffs conflate influence with legal authority. As detailed below, and as Plaintiffs do not contest, Mr. Musk is a Senior Advisor to the President. Critically, in that role he has no actual or formal authority to make government decisions himself; rather he can only advise the President and communicate the President's directives. That is dispositive. Of course, Mr. Musk may carry sway or influence within the Executive Branch, even significant influence. But the same is true for the Chief of Staff, White House Counsel, or a number of other senior aides. And nobody has ever suggested that those persons are "officers" of the United States. Such is the case here: Because Mr. Musk does not occupy an office that is itself entrusted with any actual sovereign power, he is not an "officer" at all and cannot be working in violation of the Appointments Clause. By a similar token, as a non-career Special Government Employee ("SGE"), Mr. Musk's position is personal to him and lacks the duration characteristic of an "office" under the Appointments Clause.

All of this is reflected in the reality of what has actually happened at USAID. While the Plaintiffs base their claims largely on high-level "information and belief," the evidence is undisputed that the actions alleged in Plaintiffs' motion were directed by USAID senior officials wielding their own independent power—not Mr. Musk or the USDS. And nowhere do Plaintiffs claim that those USAID officials lacked the authority to take those actions. Thus, one way or another, their Appointments Clause claim fails. And for many of the same reasons, Plaintiffs'

derivative separation-of-powers claim fails.

But the Court should not even reach the merits of Plaintiffs' claims, as they lack Article III standing and have failed to allege redressable injury traceable to Defendants—let alone irreparable harm. Plaintiffs' claimed fears about the potential use of data accessed by certain individuals are far too speculative to constitute a cognizable Article III injury, as other courts have recognized. And the other injuries they claim are not even caused by Defendants. Rather, the undisputed evidence reflects that USAID leadership—not Defendants—are responsible for the actions Plaintiffs contest. Accordingly, Plaintiffs cannot establish *any* injuries caused by Defendants that could be redressed here.

In addition, the balance of the equities plainly favors Defendants. Plaintiffs' preliminary injunction seeks to strike at the heart of the President's Article II foreign affairs powers. President Trump has made the judgment that the United States foreign aid industry and bureaucracy are not aligned with America's interests and, accordingly, that the activities of USAID need to be assessed; an assessment that Plaintiffs seek to enjoin. Balanced against this undoubtedly weighty interest is Plaintiffs' claim that Defendants have acted unconstitutionally—a claim which lacks merit.

At bottom, Plaintiffs have failed to establish any of the four prerequisites for obtaining a preliminary injunction, and their motion should be denied.

## BACKGROUND

### A.    The Executive Branch's Authority and Discretion to Set Foreign Aid

Under the statutory regime governing foreign assistance, and consistent with his responsibilities regarding the conduct of U.S. foreign affairs, the President has broad discretion to set the terms and conditions on which the United States provides such assistance. Many of the

authorities provided under the Foreign Assistance Act of 1961 ("FAA"), and similar statutes, explicitly allow for the provision of assistance "on such terms and conditions as [the President] may determine."  *See*, *e.g.*, section 104(c)(1) of the FAA (22 U.S.C. § 2151b(c)(1)) (health assistance); section 481(a)(4) of the FAA (22 U.S.C. § 2291(a)(4)) (counternarcotics and anti-crime assistance); section 531 of the FAA (22 U.S.C. § 2346) (assistance to promote economic or political stability); section 541(a) of the FAA (22 U.S.C. § 2347) (International Military Education and Training assistance); section 551 of the FAA (22 U.S.C. § 2348) (Peacekeeping Operations); section 571 of the FAA (22 U.S.C. § 2349aa) (anti-terrorism assistance); *see also* section 2(c)(1) of the Migration and Refugee Assistance Act of 1962, Pub. L. No. 87-510, 76 Stat. 121 (22 U.S.C. § 2601(c)(1)); section 201 of the Support for East European Democracy Act of 1989, Pub. L. No. 101-179, 103 Stat. 1298 (amending the FAA by inserting, *inter alia*, § 498b(i)).

The FAA delegates some of this authority.  For example, Section 622(c) of the FAA provides that the Secretary of State, under the direction of the President, "shall be responsible for the continuous supervision and general direction of economic assistance, military assistance, and military education and training programs . . . to the end that such programs are effectively integrated both at home and abroad and the foreign policy of the United States is best served thereby."  22 U.S.C. § 2382(c).

In 1961, President Kennedy issued Executive Order 10973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development."  *Administration of Foreign Assistance & Related Functions*, Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961).  Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, 112 Stat. 2681 (1998), ("FARRA") recognized USAID as an "independent establishment."  *See* 22 U.S.C. § 6563; 5 U.S.C. § 104.

Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592. And several types of foreign assistance are jointly administered by the Department of State and USAID. *See*, *e.g.*, *id.* § 6563; *id.* § 2346(b) (economic support funds).

Consistent with this authority, President Trump promptly acted to ensure that the United States' provision of foreign aid is aligned with American interests. Upon taking office on January 20, 2025, President Trump instituted a ninety-day pause in foreign development assistance to allow his administration to assess programmatic efficiencies, and to ensure that all foreign aid aligns with U.S. foreign policy. *See Reevaluating & Realigning United States Foreign Aid,* Exec. Order 14,169, 90 Fed. Reg. 8619 (Jan. 20, 2025). Secretary of State Marco Rubio implemented this Executive Order on January 24, 2025, by directing a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." *See* Decl. of Peter Marocco ¶ 3 ("Marocco Decl."), Ex. 26 at J.R. 403–05, 418. Secretary Rubio also approved waivers, including for foreign military financing for Israel and Egypt, emergency food expenses, administrative expenses, legitimate expenses incurred before the pause went into effect, and a waiver on the pause for life-saving humanitarian assistance during the review. Ex. 26 ¶ 10 at J.R. 408.

Not only is the Administration reviewing foreign aid for programmatic inefficiencies, it is taking steps to eliminate inefficiencies within the federal workforce. On January 20, the Office of Personnel Management issued a guidance memorandum as to probationary periods and administrative leave. Memorandum, Guidance on Probationary Periods, Administrative Leave & Details (Jan. 20, 2025), https://perma.cc/4QGN-XZLP, Ex. 25 at J.R. 399–401. That guidance reinforced that agencies had the authority to place employees on paid administrative leave "when

it is in their best interest to do so," including when (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole." *Id.* at 400. The guidance further explained that administrative leave may "be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment." *Id.*

### B.    USAID

On January 30, President Trump designated Secretary Rubio as Acting Administrator of USAID. Ex. 26 ¶ 8 at J.R. 406. Secretary Rubio, consistent with the President's views, concluded that USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of USAID-funded programs neither substantially benefit the American people nor reflect administration priorities. *Id.* ¶ 7 at J.R. 405–06. Thus, Secretary Rubio sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.* ¶ 8 at J.R. 406–07.

USAID leadership ultimately determined that placing a substantial number of USAID personnel on paid leave was the only effective way "to pause operations, faithfully implement the pause, and conduct a full and unimpeded audit of USAID's operations and programs, consistent with the President's and Secretary's directives." *Id.* ¶ 12 at J.R. 409. The decisions to place certain USAID employees on leave and to terminate personal service contractors ("PSCs") were taken by

Secretary Rubio or Mr. Marocco, or by USAID employees at their direction. *Id.* ¶ 23 at J.R. 412. By February 7, 2025, approximately 2,140 employees had been placed on administrative leave. *Id.* ¶ 12 at J.R. 409. USAID leadership also approved the termination of nearly 800 PSCs working in the United States or high- or upper-middle-income countries, as defined by the World Bank. *Id.* ¶ 15 at J.R. 410.

When employees are placed on paid administrative leave, they may lose access to certain USAID systems, including their USAID email. *Id.* ¶ 14 at J.R. 410. This is done to ensure the security of internal systems and to allow the "pause" on agency operations to truly go into effect. *Id.* USAID is unaware of any employee in a dangerous location such as Syria whose access to USAID's digital systems was shut off. *Id.* In addition, USAID has either preserved or restored access to the overwhelming majority of overseas PSCs; to the best of its knowledge, this includes all PSCs working in dangerous locations or frontline aid delivery countries. *Id.* ¶ 15 at J.R. 410. USAID will diligently work to restore access to any employee or PSC whose access was terminated in error. *Id.*

### C.     The United States DOGE Service

On January 20, President Trump signed Executive Order 14,158, which directs changes to the United States Digital Service to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology ('IT') systems." *Establishing & Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, § 4, 90 Fed. Reg. 8,441 (Jan. 20, 2025) ("USDS E.O."). The USDS E.O. also redesignated the United States Digital Service as the Department of Governmental Efficiency Service ("USDS"). *Id.* § 3(a). And under 5 U.S.C. § 3161, it established a "U.S. DOGE Service Temporary Organization" within the Executive Office of the President, to terminate on

July 4, 2026. *Id.* § 3(b). It also required agency heads to establish DOGE Teams within their agencies, which may include Special Government Employees ("SGEs"). *Id.* § 3(c).

The USDS E.O. directs USDS to collaborate with Executive agencies to modernize the government's technology and software infrastructure to increase efficiency and productivity and ensure data integrity. *Id.* § 4. To do so, the USDS E.O. directs USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the USDS E.O. instructs, USDS must "adhere to rigorous data protection standards." *Id.*

USAID established a "DOGE Team," *see* Ex. 26 ¶ 26 at J.R. 412–13 (citing USDS E.O., § 3(c)), comprising members detailed to USAID from other federal agencies, not USDS. *Id.* USAID DOGE Team members are treated as USAID employees, and report to USAID leadership, including Secretary Rubio and Acting Deputy Administrator Marocco. *Id.*

Elon Musk is an employee of the White House Office as a non-career SGE. *See* Decl. of Joshua Fisher ¶ 3 ("Fisher Decl."), Ex. 27 at J.R. 424. Mr. Musk is not an employee of the USDS or U.S. DOGE Service Temporary Organization and does not serve as the USDS Administrator, *id.* ¶ 6 at J.R. 425, but as a Senior Advisor to President Trump, *id.* ¶ 4 at J.R. 424. As a Senior Advisor, Mr. Musk has no greater authority than other senior White House advisors, *id.* ¶ 5 at J.R. 424–25, and like them, has no actual or formal authority to make government decisions himself; he can only advise the President and communicate the President's directives, *id.*

Consistent with section 3 of the USDS E.O., Acting Deputy Administrator Marocco sometimes consults or coordinates with USDS officials. Ex. 26 ¶ 25 at J.R. 412; *see Implementing the President's "Department of Government Efficiency" Workforce Optimization* Initiative, Exec. Order 14,210, 90 Fed. Reg. 9669, 9670 (Feb. 11, 2025). But he reports to Secretary Rubio and

President Trump, not Elon Musk or USDS.  Ex. 26 ¶ 25 at J.R. 412.  In addition, consistent with the USDS E.O., he consults with the DOGE Team on certain matters, including personnel.  *Id.* ¶ 27 at J.R. 413.  But along with Secretary Rubio, he retains ultimate authority over these decisions, and the DOGE Team "cannot legally direct [him] to do anything regarding personnel, funding, or the like."  *Id.*

Neither Mr. Musk nor USDS has any formal authority over Acting Deputy Administrator Marocco.  *See id.* ¶ 24 at J.R. 412.  Neither has the legal authority to direct him or anyone at USAID "regarding access to USAID data or systems; to alter or restore email communications; to manage personnel or take personnel actions; to take any action with respect to grants, contracts, and other agreements; or to take any other similar governmental actions."  *Id.*

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and is "to be granted only sparingly and in limited circumstances," *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).  To demonstrate entitlement to this "extraordinary remed[y]," the movant must make a "clear showing" that "(1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (*Winter*, 555 U.S. at 20).

## ARGUMENT

Plaintiffs have failed to meet their burden to obtain preliminary injunctive relief because (1) they have shown no likelihood of success on the merits of their claims because the Court lacks jurisdiction to hear them, and they are unlikely to succeed on the merits; (2) they have shown no

irreparable harm, as any alleged injuries are remediable following judgment; and (3) the balance of the equities and public interest favor Defendants because the public has an interest in ensuring that the Executive is allowed to take decisive action in the realm of foreign affairs. For these reasons, the Court should deny Plaintiffs' preliminary injunction motion.

## I.     PLAINTIFFS ARE NOT LIKELY TO PREVAIL ON THE MERITS

### A.     Plaintiffs Fail to Demonstrate Standing for the Relief They Seek

Plaintiffs lack Article III standing to obtain the relief they seek. Their speculative fears that individuals alleged to be affiliated with USDS or Mr. Musk will misuse their authorized access to data housed in USAID's information systems present no cognizable injury, and the remaining contract decisions and employment actions made by USAID officials—who again, are not defendants in this suit against whom the Court could issue any order—are neither fairly traceable to Defendants' conduct nor redressable by the relief they seek.

### 1.     Plaintiffs' speculative fears about possible misuse of USAID data do not create cognizable injury-in-fact

Plaintiffs must show that they have suffered an injury-in-fact—"actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). If the injury has not materialized, it must be "certainly impending," "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). It also must be "concrete—that is, real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (citations omitted).

Plaintiffs argue that certain individuals have access to "private, sensitive information" housed within USAID's information technology systems and that this creates an injury in fact. PI Mem. at 21–23. As another Court has recognized, however, "DOGE Team members are federal government employees . . . who have a need for the" data they have been granted access "in the

performance of their duties." *AFL-CIO v. Dep't of Labor*, No. 1:25-cv-339, 2025 WL 542825, at *2 (D.D.C. Feb. 14, 2025); *see also* Ex. 26 ¶ 24 at J.R. 412. And Plaintiffs have not explained how that access is unauthorized or otherwise unlawful. Plaintiffs instead assert, without more, that this *authorized* access to USAID data increases the risk that their personal data housed on those systems will be misused *in the future*. *See* PI Mem. at 20–23. That is insufficient.

To be sure, "disclosure of private information" may cause cognizable harms. *TransUnion*, 594 U.S. at 425. But to show standing, Plaintiffs still must establish "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American courts" from that disclosure. *Id.* at 427. Here, Plaintiffs' failure to show disclosure of any private information held by USAID IT systems defeats standing because "the common law private torts of disclosure of private facts" requires "publicity." *See I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1048 (N.D. Cal. 2022); *see also TransUnion*, 594 U.S. at 434 n.6; *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1240, 1245–50 (11th Cir. 2022) (en banc).

Plaintiffs' speculative fear that Defendants might misuse data is not a cognizable injury either. As the Supreme Court has made clear, fear of future harm does not suffice for Article III standing where that harm is not certainly impending. *Clapper*, 568 U.S. at 416.

### 2. Plaintiffs' other claimed injuries are neither caused by the Defendants nor redressable by the relief they seek

Plaintiffs also cannot show standing because their other alleged harms—the effects of USAID contract, personnel, and grant decisions—are traceable only to the independent decisions of governmental actors not before the Court and not redressable through the relief Plaintiffs seek against Defendants here. "Traceability is established if it is likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (citation omitted).

And redressability requires that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (citation omitted). Both "become problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Id.* Nor is the Government a monolith for these purposes. *See Murthy v. Missouri*, 603 U.S. 43, 69 (2024). Instead, traceability is not present where injuries are traceable to independent third-party government actors. *See Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022).

Here, Plaintiffs' claimed injuries were caused by independent actions authorized by USAID and its leadership wielding their own power. Although Plaintiffs cite supposed actions across the whole of government, they are "current and former employees or contractors of" USAID and claim injury only from actions related to that agency. Compl. ¶ 3 (ECF No. 14); *see id.* ¶ 66; PI Mem. at 18–28. Yet every action cited was authorized by State or USAID officials, not by any Defendant here. Ex. 26 ¶¶ 22–23 at J.R. 412. Those independent acts of Secretary Rubio or Mr. Marocco—that is, authorizing and ordering the actions at issue—preclude standing. *See Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 235–36 (4th Cir. 2005).

To be sure, a plaintiff might show standing to challenge an intermediary actor if that actor's conduct creates a "determinative or coercive effect upon the action of someone else" who made the final decision but is not before the court. *Bennett v. Spear*, 520 U.S. 154, 169 (1997). *Bennett* held that a Biological Opinion issued by the Fish and Wildlife Service was likely to injure the plaintiffs, even though the actual decision-making agency—the Bureau of Reclamation—was "technically free to disregard the Biological Opinion and [to] proceed with [the] proposed action" albeit "at its own peril." *Id.* at 170. Fundamental to causation and redressability was the fact that the Biological Opinion "alter[ed] the legal regime to which the agency action is subject," and disregarding that opinion would have exposed the Bureau to "substantial civil and criminal

penalties." *Id.* at 169–70; *see Teva Pharms. USA, Inc. v. Azar*, 369 F. Supp. 3d 183, 200 (D.D.C. 2019). But Plaintiffs do not even attempt to show such a dynamic here. *See Alavarez v. Becerra*, No. 21-2317, 2023 WL 2908819, at *3 (4th Cir. Apr. 12, 2023) (unpublished opinion). Nor would they appear able to do so: Again, neither Mr. Musk nor USDS has any formal legal authority to direct actions at USAID; and so long as those USAID actions are the product of independent decisionmakers making their own decisions, then Plaintiffs cannot satisfy causation.

Similarly, the relief Plaintiffs seek against Mr. Musk and USDS would not redress any claimed injury. To make that finding, the Court need only look to the requested relief, which asks it to have Defendants direct USAID to reverse data access decisions; prevent destruction of property at USAID offices; prevent USAID from acting on any USAID "contracts, grants, cooperative agreements, loans, or other federal foreign assistance award"; and rescind other unspecified USAID actions. *See* PI Mem. at 29–30. Yet Defendants lack authority to "legally direct" USAID to do any of those acts. Ex. 26 ¶ 27 at J.R. 413. Should this Court order Defendants to "direct" something at USAID, Plaintiffs have offered "no reason" why USAID leadership would "be obliged to honor" those directives that hold no force. *Murthy*, 603 U.S. at 73 (citation omitted).

Finally, Plaintiffs' assertion of reputational injury from public statements about USAID operations and federal employees more generally satisfies neither causation nor redressability. *See* PI Mem. at 26–27; Compl. ¶ 66(d). Plaintiffs fail to link those harms to their claim that any Defendant is improperly exercising executive power. Nor do they explain how an order enjoining Mr. Musk or other USDS personnel from allegedly exercising such power would remedy any reputational harm. Indeed, Plaintiffs fail to establish that their requested relief with respect to Mr. Musk—a public figure whose large audience predates his government service—would have any effect on the reach or impact of his public statements.

12

**B.    Plaintiffs Are Not Likely To Prevail On Their Constitutional Claims**

**1.    Plaintiffs' Appointments Clause Claim (Count I) Lacks Merit**

The Appointments Clause of the Constitution prescribes the method for appointing officers of the United States.  U.S. Const. art. II, § 2, cl. 2.  Principal officers must be appointed by the President with Senate confirmation, while inferior officers may be appointed by the President alone, the courts of law, or the heads of Executive departments.  *Id.*  Individuals are officers, and thus must receive a constitutional appointment, when they occupy a continuing position that is vested with the authority to "exercis[e] significant authority pursuant to the laws of the United States."  *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010) (citation omitted).  Federal employees who do not meet these criteria "need not be selected in compliance with the strict requirements of Article II."  *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991).

Plaintiffs' contention that Elon Musk is exercising powers reserved for principal officers is incorrect.  As the declaration of the Director of the Office of Administration Joshua Fisher explains, Mr. Musk is employed by the White House Office as a Special Government Employee who serves as a "Senior Advisor to the President."  Ex. 27 ¶¶ 3–5 at J.R. 424–25.  He wields *influence*, not *authority*—much like a Chief of Staff, White House Counsel, or any other such advisor.  And like any of those figures, he is simply not an "officer" at all.

At bottom, the Appointments Clause governs formal, not colloquial, power; and where someone does not occupy an office equipped with actual authority, he cannot be an "officer" of the United States.  An advisor does not become an officer, simply because the officer listens to his advice.  Once that premise is removed, Plaintiffs' constitutional claim collapses—as confirmed by the actual facts regarding USAID, which is the central focus of Plaintiffs' motion.

**a.**  An officer must exercise "significant authority pursuant to the laws of the United States."  *Freytag*, 501 U.S. at 881 (citation omitted).  But as the Fisher Declaration explains, Mr.

Musk is employed by the White House Office as an SGE who serves as a "Senior Advisor to the President." Ex. 27 ¶¶ 3–5 at J.R. 424–25.  In that role, Mr. Musk "has no actual or formal authority to make government decisions himself" and "can only advise the President and communicate the President's directives."  *Id.*; *see id.* ¶ 6 at J.R. 425 (explaining that Mr. Musk is not the USDS Administrator or an employee of USDS or the U.S. DOGE Service Temporary Organization).

For Appointments Clause purposes, that ends the inquiry.  The Appointments Clause is concerned with the formal powers vested in an office, not an individual's perceived informal influence.  *See*, *e.g.*, *Freytag*, 501 U.S. at 881 (looking to statute for office's "duties," and noting that court-appointed special masters are not officers in part because their "duties and functions are not delineated in a statute").  That a President's senior staff will often be able to influence policy, or that their views will command respect even from cabinet secretaries, has never been thought to transform them into principal officers requiring Senate confirmation.  That holds as true when an advisor's portfolio covers "DOGE" as it does with respect to immigration, homeland security, or the economy.

Mr. Musk's purely advisory role to the President falls far short of what is required for the "significant authority" prong of officer status.  Mr. Musk does not, for example, possess statutory or regulatory authority to issue "final decision[s]" that "bind[] the Executive Branch."  *United States v. Arthrex, Inc.*, 594 U.S. 1, 23 (2021); *see also*, *e.g.*, *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 955 (5th Cir. 2024) (finding members of the U.S. Preventive Services Task Force to be principal officers when their recommendations carry "legally binding" effect by statute), *cert. granted*,  604 U.S. --- (Jan. 10, 2025).  Nor can he "make policy" for the Executive Branch by virtue of any statutory or regulatory authority.  *Designation of Acting Director of the Office of Management & Budget*, 27 Op. O.L.C. 121, 123 (2003).  Indeed, Plaintiffs cite no statutory or

14

regulatory authority—none—granting binding legal effect to any recommendations made by Mr. Musk without the further approval and action of executive officers.

That is fatal.  Indeed, across contexts, federal courts consistently have held that those acting in a purely advisory role do not exercise "significant authority" and do not qualify as officers.

Foremost, courts have long recognized that the President is entitled to his choice of senior advisors—who can help him execute his agenda—without having to seek approval from Congress. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993).  The President can of course direct duly appointed officers of the United States (including Senate-confirmed Department Heads) to take all manner of actions permitted under their relevant statutory authorities.  "Agency policymaking is not a rarified technocratic process, unaffected by political considerations or the presence of Presidential power."  *Department of Commerce v. New York*, 588 U.S. 752, 781 (2019).  And in doing so, the President may choose to rely on a close advisor to identify actions for these officers to take.  The President's choice to rely on such advice before making an ultimate decision does not transform an advisor into an officer of the United States who exercises "significant authority" in his own right.  And, likewise, the President may act through his advisors and other non-officers when communicating his decisions.

This tracks longstanding historical practice.  Since at least the time of President Andrew Jackson, "Presidents have created advisory groups composed of private citizens . . . to meet periodically and advise them (hence the phrase 'kitchen cabinets')." *Ass'n of Am. Physicians*, 997 F.2d at 908.  President Lyndon Johnson, for instance, "often sought advice" from both private citizens and sitting Supreme Court Justice Abe Fortas "on matters concerning the Vietnam War."

*Id.* at 908 n.8.  Similarly, Edward House served as a close advisor to President Woodrow Wilson for many years, serving as the President's right hand both before and after the First World War and—as Wilson himself stated—being "the only person in the world with whom I can discuss everything."  Margaret MacMillan, *Paris 1919*, at 17–18 (2001).

Likewise, when President Bill Clinton established a task force on health care reform, the D.C. Circuit had little trouble concluding that the First Lady "[wa]s not a government official" despite her role on the task force—she was instead one of the President's "closest advisers."  *Ass'n of Am. Physicians*, 997 F.2d at 910.  Judge Buckley elaborated on that conclusion, explaining that the First Lady did not serve as a constitutional officer under Article II.  *Id.* at 920 (Buckley, J., concurring in the judgment).  Although the Presidents' spouses have provided "undoubted value" in advising the Presidents, "it cannot be said that they have occupied an office with duties," and in this case the First Lady's actions "carrie[d] none of the indicia of a federal officer."  *Id.*  Thus, under "any fair interpretation of the term, Mrs. Clinton [wa]s not an officer of the United States," despite her influential role as an advisor.  *Id.*

More broadly, drawing on the same principles, it has long been understood that those who occupy advisory roles do not wield "authority" in a manner that could make them an officer.  For instance, when Congress created the Commission on the Bicentennial of the Constitution, it allowed the President to appoint several officers to that Commission, but Congress "specifically designate[d]" two of its members to serve on the Commission as well.  *Appointments to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 200 (1984) ("*Bicentennial Appointments*").  That structure raised constitutional concerns, as members of Congress may not "be appointed to any civil Office under the Authority of the United States."  U.S. Const. art. I, § 6, cl. 2.  The Reagan Administration's Department of Justice explained that the practical solution to

this concern would be to establish "an executive committee" composed of the Commission's properly appointed executive officers who could approve "binding regulations, sign[] legal instruments," and otherwise "discharg[e] the purely executive functions of the Commission." *Bicentennial Appointments*, 8 Op. O.L.C. at 207. The congressional members of the Committee would be limited to "advisory functions" that would allow them to participate in designing "programs that would be technically approved and executed by non-congressional members." *Id.* By limiting the congressional members to a purely advisory role, they would not thereby become "'officers' of the United States." *Id.*

The Obama Administration re-affirmed this constitutional understanding in 2010, explaining that congressional members on a similar commission could serve an advisory role to properly appointed officers, who would then "technically approve[] and execute[]" the Commission's functions. *Administration of the Ronald Reagan Centennial Commission*, 34 Op. O.L.C. 174, 175 (2010). Here, the Fisher Declaration confirms that Mr. Musk serves in a similar capacity: The President and other executive officers may "choose to consult with and receive advice from" Mr. Musk, but the President and constitutionally appointed officers "alone would be responsible for exercising significant executive authority." *Id.* at 180.

In short, the Appointments Clause turns exclusively on hard—not soft—power. But here, Mr. Musk has "no actual or formal authority to make government decisions himself." Ex. 27 ¶ 5 at J.R. 424–25. Instead, he "can only advise the President and communicate the President's directives." *Id.* Mr. Musk thus lacks any of the comparable authority wielded by constitutional officers, *cf. Lucia v. SEC*, 585 U.S. 237, 248 (2018); *Arthrex*, 594 U.S. at 23; *Braidwood*, 104 F.4th at 955, and merely serves in an advisory role as is permitted by non-officers such as Members of Congress and close advisors to the President. Because Mr. Musk does not exercise authority—

let alone "significant authority"—he is not a constitutional officer and Plaintiffs' Appointments Clause claim fails.

**b.**  Plaintiffs' primary response is that Mr. Musk has "directed" certain actions at various agencies, and that he must be an officer, because those individuals allegedly listened to him, and wielded their power accordingly.  *See* PI Mem. at 10–11, 13.  But that is flawed at every turn.

Again, Mr. Musk does not have—and Plaintiffs have cited no source showing—any independent legal authority to command anyone to do anything.  Accordingly, *even if* Mr. Musk advised, recommended, or indeed "directed" certain actions across multiple agencies, that still would not give rise to an Appointments Clause problem.  That is because the actual legal authority for such actions is not vested in Mr. Musk, but instead in the actual decisionmakers making those decisions.  The *sine qua non* of an Appointments Clause challenge is a governmental action taken by a governmental actor without proper authority.  But here, Plaintiffs have not identified a single example fitting this mold.  All of the actions that they generally complain about—*e.g.*, firings, grant terminations, dispositions of government property—involve discrete legal actions effectuated by identifiable legal instruments and approved by agency officials.  Put simply, what is needed for an Appointments Clause challenge is an argument that the signature at the bottom of one of those instruments is from someone who *lacked the authority* to make that decision.  Plaintiffs offer none.

Indeed, one of Plaintiffs' own cited cases underscores their claim's core defects.  In *Andrade v. Regnery*, the D.C. Circuit rejected an Appointments Clause challenge asserted in an employment removal action.  824 F.2d 1253, 1256–57 (D.C. Cir. 1987).  The plaintiffs argued that an official not validly appointed as an officer of the United States "had complete responsibility for crafting and executing" their terminations.  *Id.* at 1257.  The court explained that, even if true, that

fact was irrelevant: "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." *Id.* That principle applies here: Even assuming that Mr. Musk or USDS employees "conceive[d of] and even carr[ied] out policies" to which Plaintiffs object, there is no Appointments Clause violation because duly appointed agency heads ultimately "take official responsibility" for those actions. *Id.* Mr. Musk does not have formal decision-making authority, and thus political accountability for those actions lies with the individuals authorized to undertake them.

Once more, an Appointments Clause challenge involves a discrete legal wrong: Someone using the powers of an office, without proper appointment. Plaintiffs do not identify a single example of that. Of course, they insist that a number of governmental actions were done *for the wrong reasons—i.e.*, at the pressure of Elon Musk, or some amorphous "DOGE" entity. But even if that were true, such actions do not violate the Appointments Clause. Plaintiffs' claim is essentially that USAID decisionmakers were influenced by external pressures, not that those decisionmakers lacked the power to take the challenged actions in the first place. That claim states no constitutional defect.

**c.** The Plaintiffs' claim thus rests on a fundamental misunderstanding of the Appointments Clause, which is more than enough to reject it. But it also rests on a fundamental misunderstanding of the facts on the ground in connection with USAID.

Plaintiffs' motion focuses specifically on USAID. *See* PI Mem. at 3. Marocco has been performing the duties and functions of the Acting Deputy Director of USAID since January 30, 2025. Ex. 26 ¶ 2 at J.R. 403. The Marocco Declaration reviews various USAID actions that allegedly have injured Plaintiffs, including the revoking or granting of access to USAID property and systems and decisions whether to terminate or retain employees, and it explains that each was

taken by or at the direction of Secretary Rubio (serving as Acting USAID Administrator) or Marocco himself. *Id.* ¶¶ 10–23 at J.R. 408–12. Mr. Marocco explains that neither Mr. Musk nor USDS has any formal authority over him and neither has the legal authority to direct him or anyone at USAID regarding access to USAID data or systems; to manage personnel or take personnel actions; to take any action with respect to grants, contracts, and other agreements; or to take any other similar governmental action. *Id.* ¶ 24 at J.R. 412.

Mr. Marocco further explains that the DOGE Team within USAID are not employed by USDS. *Id.* ¶ 26 at J.R. 412–13; *see* USDS E.O. § 3(c) (making each "Agency Head" responsible for "establish[ing] within their respective Agencies a DOGE Team" and directing that each Agency Head "shall select the DOGE Team members" in consultation with the USDS Administrator). Rather, members of the DOGE Team within USAID have each been detailed to USAID from other federal agencies (not USDS) and are subject to the supervision and control of USAID's politically accountable leadership in the performance of their USAID duties. Ex. 26 ¶ 26 at J.R. 412–13. The complained-of actions within USAID have been taken by USAID's leadership in the exercise of that agency's organic authorities. *Id.* ¶ 23 at J.R. 412; *see also* USDS E.O. § 5(a) (specifying nothing in the USDS E.O. shall "impair or otherwise affect" the "authority granted by law to an executive department or agency, or the head thereof"). DOGE Team Leads within agencies, including USAID, "coordinate their work" with USDS and "advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* § 3(c).

In short, the ultimate authority for actions within USAID rests with USAID leadership; and the actions that Plaintiffs complain about here were the product of those leaders exercising their own authority. Plaintiffs may object to those actions, or insist they violate some other legal limit. But whatever the merit of those objections (*contra Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-

20

cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025)), those are not problems sounding in the Appointments Clause.

**d.**  Plaintiffs' claim also fails for an independent reason: They have not shown that Mr. Musk occupies any continuing office.  *See Lucia*, 585 U.S. at 245 ("[A]n individual must occupy a 'continuing' position established by law to qualify as an officer.").  The Supreme Court has explained that the term "office" "embraces the ideas of tenure, duration, emolument, and duties." *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867); *accord United States v. Germaine*, 99 U.S. 508, 511–12 (1878); *Auffmordt v. Hedden*, 137 U.S. 310, 326–27 (1890).  Those factors show that Mr. Musk's position as a "Senior Advisor to the President" is not a continuing office.

To be a continuing office, the position must not be "personal to a particular individual." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022).  Here, there is no indication that Mr. Musk's role as a "Senior Advisor to the President" will outlast his tenure.  *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (Marshall, Circuit Justice) (explaining that an office has "duties [that] continue, though the person be changed").  Indeed, Presidents have long selected advisors based on their "identity"—and thus "who cannot simply be replaced" by others— precisely because the President depends on those advisors' personalized advice and judgment. *Donziger*, 38 F.4th at 297.  That makes Mr. Musk's advisory role *personal*, not *permanent*.  *Cf. Germaine*, 99 U.S. at 512 (holding that a civil surgeon was not an officer in part because he served at his superior's pleasure "to procure information needed to aid in the performance of his own official duties," and the superior could "appoint one or a dozen persons to do the same thing").

Moreover, Mr. Musk is a non-career SGE, Ex. 27 ¶ 3 at J.R. 424, a status that lacks the duration characteristic of an office.  As defined by statute, SGEs are necessarily time-limited in their service.  *See* 18 U.S.C. § 202.  That stands in contrast to the administrative law judges in

*Lucia*, for example, who "receive[d] a career appointment." 585 U.S. at 248 (citation omitted). While some nonpermanent positions can qualify as offices, *see Morrison v. Olson*, 487 U.S. 654, 671 n.12 (1988), the limited duration of Mr. Musk's SGE status indicates that his position is not an office. *Cf. Special Government Employee Serving as Paid Consultant to Saudi Company*, 40 Op. O.L.C. 1, 8–9 (2016) (SGE "d[id] not appear to hold the essential features of a federal office— in particular, 'tenure,' 'duration,' and 'continuous duties'"). Plaintiffs have failed to establish that Mr. Musk's position falls within the bounds of an office under the Appointments Clause.

### 2.    Plaintiffs' Separation of Powers Claim (Count II) Lacks Merit

Plaintiffs argue that Defendants' supposed "collective actions" violated the principle of the separation of powers. PI Mem. at 14–17. Much of that claim is inseparable from Plaintiffs' Appointments Clause claim and thus fails for the same reasons. *See supra* Section I.B.1.

Plaintiffs' argument that USAID actions pausing foreign aid, placing employees on administrative leave, or terminating personal service contractors violate separations of powers principles relies entirely on an alleged conflict with statutes. *See* PI Mem. at 15–17 (citing Foreign Service Reform and Restructuring Act of 1998 and Further Consolidated Appropriations Act of 2024). But Plaintiffs cannot turn an otherwise straightforward claim that the Executive Branch has exceeded its statutory authority into a constitutional issue merely by asserting that an alleged failure to adhere to a statute encroaches on Congress's Article I powers. *See Am. Foreign Serv. Ass'n*, 2025 WL 573762, at *11 (denying preliminary injunction in "challenge [to] a sweeping scheme to dismantle an entire agency" where "their only ripe theories of harm fundamentally rely on their members' employment relationship with USAID"). As the Supreme Court explained in *Dalton v. Specter*, permitting a plaintiff to assert a separation-of-powers claim in such a case would "eviscerate[e]" the well-established "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution." 511

U.S. 462, 474 (1994).  The Court in *Dalton* thus squarely rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine."  *Id.* at 471.

Nor can Plaintiffs evade the threshold requirements of what amounts to an Administrative Procedure Act ("APA") claim that a government actor has exceeded statutory authority by recasting it as a constitutional challenge.  Plaintiffs do not invoke the APA, because it authorizes a challenge only to "final agency action," 5 U.S.C. § 704, not "a 'broad programmatic attack'" on the way the Executive Branch conducts its operations.  *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (citation omitted).  That limitation is itself "vital to the APA's conception of the separation of powers" because courts "are woefully ill-suited" to "adjudicate generalized grievances asking [them] to improve an agency's performance or operations" or "to engage in day-to-day oversight of the executive's administrative practices."  *Id.*  Yet that is precisely what Plaintiffs' separation-of-powers claim contemplates.  *See* Compl. ¶¶ 80–82.

More, USAID is not even a party to this case against whom a remedy can run.  But in any case, USAID's pause on foreign aid and the other actions complained of fit well within the President's Article II authority.  Contrary to Plaintiffs' arguments, *see* PI Mem. at 17, Article II and existing law grants the President authority to review foreign aid and government operations to ensure that the United States' provision of foreign aid is consistent with its policy values and conducted efficiently.  *See supra* pp. 2–5.  While the Executive is "not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue," *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015), the "historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations,'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting

23

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11 (1952) (Frankfurter, J., concurring)). Thus, "in foreign affairs the President has a degree of independent authority to act." *Id.*; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (The President's power in the field of international relations "does not require as a basis for its exercise an act of Congress."); *Youngstown*, 343 U.S. at 635–36, n.2 (the President can "act in external affairs without congressional authority"). The upshot is that Article II affords the President tremendous discretion over foreign affairs, including with respect to the actions at issue here.

## II. PLAINTIFFS FAIL TO DEMONSTRATE THAT IRREPARABLE HARM WOULD RESULT IN THE ABSENCE OF A PRELIMINARY INJUNCTION

Even if Plaintiffs could show likelihood of success, their motion should be denied because they cannot show irreparable harm absent preliminary relief. A party moving for a preliminary injunction must show not "just a 'possibility' of irreparable harm[,]" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017), but harm that is likely and "neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002).

### A. Fear and Emotional Distress

Plaintiffs first assert that Defendants' actions have "left numerous Plaintiffs to fear for their physical safety" and "inflicted upon all Plaintiffs severe emotional distress . . ." PI Mem. at 18. Plaintiffs' declarations describe their anxiety surrounding their employment status and physical safety. But Plaintiffs' "claimed emotional injuries, as presented, do not rise to the level of irreparable harm." *See Dall. Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 399 (D.D.C. 2020). First, their emotional-injury claims stem substantially from their employment status. Ex. 6 at J.R. 243 ("I am distressed that I may lose my job without access to my salary, healthcare, and housing."). But "the fact that an employee may be psychologically troubled by an adverse job action does not usually constitute irreparable injury warranting injunctive relief." *Together Emps.*

*v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 86 (1st Cir. 2022) (citation omitted).  That is because "[t]he possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  Some Plaintiffs allude to emotional distress due to "Defendants' egregious conduct in shutting USAID workers out of their offices with no notice or opportunity to collect personal belongings . . ."  PI Mem. at 20.  They contend that "[t]here is no way to compensate J. Doe 1 . . . for their personal belongings that have non-monetary sentimental value." *Id.*  But even if this is more than just recast employment-related harms, Plaintiffs make no showing that such harms are genuinely irreparable, or that they are both "certain and great." *Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, 469 F. Supp. 3d 459, 480 (D. Md. 2020).

Second, certain Plaintiffs' subjective fears about their physical safety fare no better. Although J. Does 6 and 12 claim that they are locked out of USAID systems, PI Mem. at 19, neither articulates any specific threat to their physical safety. *See generally* Ex. 4 at J.R. 233–34, Ex. 7 at J.R. 245–49.  Indeed, J. Doe 12's declaration indicates that they still have access to USAID's emergency notification system through a personal account.  Ex. 7 at J.R. 246.  And USAID has stated that it will work to restore access to any employee or PSC whose access was terminated in error.  Ex. 26 ¶ 15 at J.R. 410; *see Am. Foreign Serv. Ass'n*, 2025 WL 573762, at *5–6.  Plaintiffs also assert that "Defendants' public disparagement of USAID has predictably incited third-party animus against its workers[,]"  PI Mem. at 19, further alleging that "Defendants are now actually *publishing the personal information of terminated USAID PSCs, including links to their addresses*, on a DOGE-specific page." *Id.* (citing Ex. 20 at J.R. 381).  But no Plaintiff claims that their own personal information has been published.  And these fears of third-party animus are plainly too speculative to give rise to irreparable harm because Plaintiffs provide no

evidence of any credible safety risk.  *See Winter*, 555 U.S. at 22; *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991).  Moreover, the website that Plaintiffs cite, *see* Ex. 20 at J.R. 381, appears to publish publicly available information from the Federal Procurement Data System ("FPDS") website.  *See Ekagra Partners, LLC v. United States*, 170 Fed. Cl. 1, 42 (2024) ("FPDS is a comprehensive, web-based tool for agencies to report contract actions and remains the authoritative source for procurement data.").

### B.    Access to Sensitive Information

Next, Plaintiffs claim irreparable harm from Defendants' alleged access to sensitive information including their "personnel, medical, and security clearance files."  PI Mem. at 22. Plaintiffs speculate that Defendants could release this sensitive information to the public to threaten or harass Plaintiffs.  *Id*. at 22–23.

Those contentions fall well short of showing irreparable harm.  At the outset, Plaintiffs' assertion that Defendants "have unlawfully breached USAID's systems and misappropriated Plaintiffs' information," *Id.* at 24, is wrong.  The USDS E.O. authorizes USDS to receive "full and prompt" access to USAID's systems.  USDS E.O. § 4(b); *see also* Ex. 26 ¶ 26 at J.R. 412–13. Moreover, the D.C. District Court recently denied a TRO in a similar case involving DOGE Team access to agency data because assertions of potential future misuse of such data were "entirely conjectural."  *Univ. of Cal. Student Assoc.* ("*UCSA*") *v. Carter*, No. 25-cv-354-RDM, 2025 WL 542586, at *6 (D.D.C. Feb. 17, 2025).  As the court observed, the plaintiffs provided no evidence "beyond sheer speculation, that would allow the Court to infer that [the agency] or DOGE [Team] will misuse or further disseminate this information."  *Id*.  So too here.  Plaintiffs chiefly protest Defendants' alleged unrestricted access to USAID's systems.  PI Mem. at 24. But that is not enough for irreparable harm.  *See UCSA*, 2025 WL 542586, at *6 ("UCSA . . . cites no authority

for the proposition that mere 'access' to personal data by government employees who are not formally authorized to view it, without more, creates an irreparable injury.").

Critically, Plaintiffs cite no evidence to support their allegation that Defendants have purloined sensitive USAID information for nongovernmental purposes. Plaintiffs' allegations that Defendants are *likely* to misuse USAID's sensitive information—such as by releasing it to the public for the purpose of threatening or harassing Plaintiffs—are entirely speculative. Although Plaintiffs cite to various declarations to show their fear and anxiety of "doxxing" threats, PI Mem. at 22–23, they fail to provide any evidence of a *likelihood* of such a threat and further fail to draw a connection to Defendants' access to USAID's systems. *See Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995) ("a future or conjectural threat of injury is insufficient to justify injunctive relief").

Finally, Plaintiffs cite to some cases that purport to stand for the proposition that the breach, misappropriation, or disclosure of personal data can constitute irreparable harm. PI Mem. at 24–25. Those cases are inapposite because there is no merit to the premise that Defendants unlawfully breached USAID's system. As noted, the USDS E.O. directs Defendants to be given full access to U.S. government systems and data. And, again, Plaintiffs provide no evidence to show that Defendants publicly disclosed or otherwise misused any of their information.

### C.    Reputational and Constitutional Injuries

Plaintiffs assert that, "[a]s a direct result of Defendants' unconstitutional conduct, Plaintiffs face significant reputational harm." PI Mem. at 26. But they show no evidence of actual—or likely—reputational injury. No Plaintiff testifies that they have personally suffered—or will likely suffer—any reputational harm. Seemingly recognizing this hurdle, Plaintiffs insist, without legal support, that "[i]t is not necessary for Defendant Musk to single out specific Plaintiffs by name in his digital diatribes," and argue that such reputational harms "leveled against *all* USAID personnel

are sufficient to permanently stain the employment record of these Plaintiffs." *Id*. at 27.  But those reputational harms are clearly connected to "standard employment harms" and, therefore, are insufficient to demonstrate irreparable injury.  *Am. Foreign Serv. Ass'n*, 2025 WL 573762, at \*5. Moreover, Plaintiffs' argument that a collective reputational injury suffices here is at odds with decisions that have held that harms to third parties do not satisfy the irreparable harm requirement. *See*, *e.g.*, *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021).

Finally, Plaintiffs contend that the claimed Appointments Clause violation, standing alone, constitutes irreparable harm.  PI Mem. at 27.  But the D.C. Circuit has squarely rejected that claim. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1334 (D.C. Cir. 2024) ("an unconstitutionally appointed officer is not, without more, an injury that necessitates preliminary injunctive relief. And Alpine has not asserted anything more." (citation omitted)).

## III.    THE BALANCE OF EQUITIES, INCLUDING THE PUBLIC INTEREST, DOES NOT FAVOR A PRELIMINARY INJUNCTION

The final two factors, balance of equities and the public interest, also favor Defendants. *See Nken v. Holder*, 556 U.S. 418, 434–435 (2009).  Plaintiffs make no serious effort to explain otherwise, but collapse their arguments into the merits, positing that the public interest cuts against the government sustaining unlawful action.  *See* PI Mem. at 28.  Defendants' actions are *not* unlawful.  Regardless, the Supreme Court has made clear that considering only likelihood of success is insufficient to justify emergency injunctive relief.  *See*, *e.g.*, *Winter*, 555 U.S. at 23–24. Rather, it is Plaintiffs' proposed injunction that would harm the public interest.  *See Kim v. FINRA*, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) ("[A] court can deny preliminary injunctive relief solely on the balance of equities and public interest factors even in cases, like this, involving constitutional claims."), *appeal dismissed*, 2025 WL 313965 (D.C. Cir. 2025).  The public has an interest in permitting the President to take decisive action when it comes to foreign affairs.  *Curtiss-*

*Wright*, 299 U.S. at 319–20.  Here, the President has determined that the "foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values," and that such work "serve[s] to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries."  *See* Exec. Order 14,169, § 1, 90 Fed. Reg. 8619.  Preliminary relief would displace and frustrate the President's decision about how to best address that threat to foreign affairs, and the Court must give deference to the Executive Branch's "evaluation of the facts" and the "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), including "the timing of those . . . decisions."  *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).  Preliminary relief would also raise serious separation-of-powers concerns by impeding the President's ability to rely on non-officer advisors.  Because the public has an interest in the executive branch effectuating foreign affairs, and in the President being able to rely on advisors, this final factor tips in favor of Defendants.  *See Kim*, 698 F. Supp. 3d at 172.

## IV.    ANY INJUNCTIVE RELIEF SHOULD BE LIMITED TO THE PLAINTIFFS

Even if Plaintiffs could satisfy the preliminary injunction factors, the nationwide relief they seek would be inappropriate.  Plaintiffs are certain unidentified USAID employees, PSCs, and other contractors, yet they seek a nationwide preliminary injunction that would apply to all USAID employees and PSCs—including those not represented in this case.  *See, e.g.*, Pls' Proposed Order ¶ 2 (directing Defendants to "reinstate access to email, payment, security notification, and other systems for *all* USAID employees and PSCs within 24 hours") (emphasis added).

Both constitutional and equitable principles require that injunctive relief be limited to redressing Plaintiffs' own cognizable injuries.  Article III demands that "'plaintiffs must

demonstrate standing for each claim that they press,' against each defendant, 'and for each form of relief that they seek." *Murthy*, 603 U.S. at 61 (citation omitted). "The remedy" sought must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose . . . . of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Accordingly, any injunctive relief in this case should be limited to addressing only the claims of the Plaintiffs and go no further.

Were the Court inclined to grant Plaintiffs' requested relief, Defendants request that (1) pursuant to Fed. R. Civ. P. 65(a)(2), the Court consolidate the preliminary injunction motion with a final determination on the merits, *see Hess v. Hughes*, 500 F. Supp. 1054, 1056 (D. Md. 1980); (2) any injunctive relief be stayed pending the disposition of any appeal that is authorized, or at minimum be administratively stayed for a period of seven days to allow the Defendants to seek an emergency, expedited stay from the court of appeals, if an appeal is so authorized; and (3) any injunctive relief accompany a bond under Fed. R. Civ. P. 65(c). Requiring Plaintiffs to post security for any taxpayer funds wrongfully distributed during the pendency of any preliminary relief is appropriate here given that such relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be denied.

Dated: February 24, 2025          Respectfully submitted,

                                  YAAKOV M. ROTH
                                  Acting Assistant Attorney General

                                  DIANE KELLEHER
                                  Director, Federal Programs Branch

                                  CHRISTOPHER R. HALL
                                  Assistant Branch Director, Federal Programs Branch

                                  JOSHUA E. GARDNER (FL Bar No. 302820)
                                  *By Special Appearance*
                                  Special Counsel

                                  */s/Jacob S. Siler*
                                  JACOB S. SILER (DC Bar No. 1003383)
                                  *By Special Appearance*
                                  Trial Attorney
                                  U.S. Department of Justice
                                  Civil Division, Federal Programs Branch
                                  1100 L Street NW
                                  Washington, DC 20005
                                  Phone: (202) 353-4556
                                  Email: jacob.s.siler@usdoj.gov

                                  *Attorneys for Defendants*