## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 1, et al.,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>ELON MUSK, *et al.*,<br><br>     *Defendants*. | Case No. 8:25-cv-00462-TDC |

### Exhibit Index

**Exhibit 25:** OPM Memorandum, Guidance on Probationary Periods, Administrative Leave & Details (Jan. 20, 2025), https://perma.cc/4QGN-XZLP..................................................................398–401

**Exhibit 26:** Declaration of Peter Marocco with Exhibits.........................................402–422

**Exhibit 27:** Declaration of Joshua Fisher.................................................423–425

# EXHIBIT 25



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**
Washington, DC 20415

# MEMORANDUM

| | |
|---|---|
| **TO:** | Heads and Acting Heads of Departments and Agencies |
| **FROM:** | Charles Ezell, Acting Director, U.S. Office of Personnel Management |
| **DATE**: | January 20, 2025 |
| **RE**: | Guidance on Probationary Periods, Administrative Leave and Details |

---

The U.S. Office of Personnel Management (OPM) is providing the following guidance to agencies regarding critical potential personnel actions.  Specifically, this memorandum deals with 1) probationary periods, and 2) administrative leave and details.

## I.    Probationary Periods

Probationary periods are an essential tool for agencies to assess employee performance and manage staffing levels.[1] Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB).[2]

Generally, employees in the competitive service with less than one year of service, and in the excepted service with less than two years of service, can be terminated without triggering MSPB appeal rights.[3]  This applies to temporary employees on appointments "not to exceed" a date certain.[4]

No later than January 24, 2025, agencies should identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees to employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.  In addition, agencies should promptly determine whether those employees should be retained at the agency.

## II.    Administrative Leave and Details

---

[1] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005), https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

[2] *Starkey v. Dep't of Hous. and Urban Dev.*, 2024 MSPB 6, ¶ 16; *Marynowski v. Dep't of the Navy*, 2012 MSPB 82, ¶ 4 (2012).

[3] *Forest v. Merit Sys. Prot. Bd,* 47 F.3d 409, 412 (Fed. Cir. 1995); *Holmes v. Merit Sys. Prot. Bd*., 655 F. App'x 816, 818 (Fed. Cir. 2016); see also 5 U.S.C. §§ 7511(a)(1)(A), (C).

[4] *See Forest,* 47 F.3d at 410*; Holmes,* 655 F. App'x at 816.

"Federal agencies have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so."[5] The flexibility given to agencies in using paid administrative leave reflects the fact that "heads of Executive agencies have broad authority to manage their organizations, including the authority to grant administrative leave, unless prohibited by law."[6]

OPM regulations note four pertinent areas where paid administrative leave is appropriate: (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," or (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole."[7] "An agency must retain the discretion to grant or not grant administrative leave in any circumstance based on agency judgments regarding mission needs."[8]

Placing an employee on paid administrative leave may be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment. It also may be appropriate when a new agency manager determines that the absence of the employee from the office "is in the interest of the agency or of the Government as a whole."[9] Agencies are encouraged to use flexibilities associated with paid administrative leave as they implement agency restructuring initiatives or determine the best ways to manage agency components going forward.

In addition, agency heads have broad discretion to detail employees "among the bureaus and offices of [their] department[s]" for up to 120 days by written order.[10] An agency may temporarily detail an employee to "unclassified duties."[11] Such details may provide additional

---

[5] *Administrative Leave, Investigative Leave, and Notice Leave*, 89 Fed. Reg. 10,2256-01 (Dec. 17, 2024).

[6] U.S. Office of Personnel Management, *Fact Sheet: Administrative Leave*, https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/administrative-leave/.

[7] 5 C.F.R. § 630.1403(a)(1).

[8] 5 C.F.R. § 630.1403(a)(4). OPM reiterates that while "[t]he effective date for these regulations addressing administrative leave (subpart N) and investigative and notice leave (subpart O) is 30 days after the date of publication," nonetheless "the compliance date is set as 270 days after the date of publication." 89 Fed. Reg. at 10,2257. That is, agencies must " revise and implement their internal policies consistent with the Act within 270 calendar days from the date OPM prescribes the regulations," and "[a]gencies are responsible for compliance with time limits provided for in the Act, these OPM regulations, and any related guidance." *Id.* OPM thus believes that agencies are not required to comply with the administrative leave rule and new regulations until September 13, 2025, the deadline for agencies to issue their own implementing regulations. **OPM requests that agencies not issue any agency-specific rules until such rules have been reviewed and approved by OPM.**

[9] 5 C.F.R. § 630.1403(a)(1).

[10] 5 U.S.C. § 3341.

[11] *Frankel v. Dep't of Educ.*, 17 M.S.P.R. 453, 455–56 (1983).

flexibilities to agencies during the transition period and as agencies undertake reorganization efforts and close offices.

Please do not hesitate to contact OPM if you have any questions regarding these matters at employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors

# EXHIBIT 26

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 8:25-cv-00462-TDC |
| ELON MUSK, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF PETER MAROCCO**

I, Peter Marocco, pursuant to 28 U.S.C. 1746, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2. Since Thursday, January 30, 2025, I have performed the duties and functions of Deputy Administrator of the United States Agency for International Development (USAID). Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State (State). Previously, I served as a U.S. Marine and a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

3. On January 20, 2025, President Trump issued an Executive Order—"Reevaluating

1

and Realigning United States Foreign Aid"—directing a 90-day pause in foreign development assistance, to allow for an "assessment of programmatic efficiencies and consistency with United States foreign policy." *See* Executive Order, *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), attached as Exhibit A. Further, on January 24, 2025, Secretary of State Rubio, consistent with that Executive Order, directed a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." *See Secretary of State* ALDAC *re Executive Order on Review of Foreign Assistance Programs*, 25 STATE 6528 (Jan. 24, 2025), attached as Exhibit B.

4. In both my role as the Director of Foreign Assistance, which oversees USAID's delivery of foreign aid, and now in my role managing USAID's operations, my primary focus has been to develop a tracking system to achieve greater accountability of USAID's human resources and capital outlays across its global footprint. Accountability and effective controls are essential to ensuring that USAID's programs further, rather than undermine, the foreign policy and national interests of the United States.

5. To that end, beginning shortly after the President's Executive Order directed the 90-day foreign assistance pause on January 20, 2025, I made numerous requests for information about USAID's operations, programs, and compliance with the President's directives. In both of my roles, I have consistently found USAID's senior staff were unwilling or unable to provide basic compliance and oversight information. For example, senior professionals in USAID's Bureaus and finance, legal, and human capital groups were not able to identify who, when, and why dozens of specific, multi-

million-dollar payments were approved or disbursed in the days following the President's and Secretary's directives to pause most USAID disbursements and programs. USAID senior staff were not able to explain whether USAID's payments system contained any controls to ensure compliance with those directives and, if so, how those processes worked. After the Secretary approved waivers to permit specific programs or activities to continue, USAID staff have been consistently unable to identify which specific payments were affected by the waivers and should be released for disbursement. It took more than two days for USAID senior staff to produce a list of overseas personnel and their physical location despite repeated and direct requests.

6. This lack of clear or timely information sharing caused grave concern about whether USAID was faithfully following the President's and Secretary's directives. Those concerns were amplified when, in the days just before and following Secretary Rubio's directive, USAID leadership became aware that a group of USAID employees were not complying with the President's Executive Order and the Secretary's order and continued to permit new funding obligations paused by those directives. In the days following the Secretary's order, USAID leadership conducted a review of USAID operations and identified certain employees who were responsible, directly or indirectly, for permitting the unauthorized flow of funds in violation of these Presidential and Secretarial directives.

7. Moreover, the noncompliance identified by USAID leadership raised serious, systemic concerns about the management and processes governing USAID. As articulated by Secretary Rubio, and consistent with the views of the President, USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of

3

the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and Secretary. Many of USAID's programs substantially overlap, conflict, or duplicate functions at the Department of State, which often leads to discord in the President's ability to carry out foreign relations with one voice. Furthermore, many of USAID's pre-existing programs were in conflict with the directives and priorities of the President and Secretary, and therefore were inconsistent with the public interest and foreign policy judgments of the Executive Branch. Given the scale of these programs, an *ad hoc* review of these conflicting programs would unduly burden the execution of the President's other foreign policy priorities. A blanket pause with a waive-in process was the more efficient and effective path.

8. In light of these problems, on January 30, President Trump directed Secretary of State Rubio to perform the functions and duties of the Administrator of USAID in an acting capacity; the prior Acting Administrator returned to his prior position as Chief Information Officer. Several days later, Secretary Rubio sent a letter to Congress, formally notifying them, consistent with applicable law, including sections 7063 and 7015 of the Department of State, Foreign Operations, and Relation Programs Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), of "our intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world through [USAID]," including the review and potential reorganization of USAID and the potential absorption by the Department of State of certain bureau, offices, and mission of USAID. *See* February 3, 2025 Letter to the Chairs and Ranking Members of the House Committee on Foreign Affairs, the Senate Committee on Foreign

4

Relations, and the House and Senate Committees on Appropriations, attached as Exhibit C. The letter further stated that Secretary Rubio had delegated to me the duties of Deputy Administrator of USAID, "to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.*

9. The first step of this review, in essence, involved the majority of USAID pausing a substantial portion of its ongoing work—going "pencils down"—so that the Secretary and USAID leadership could gain control of an organization that included some employees who had refused to comply with lawful directives by the President and the Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States. The pause of ongoing work and use of paid administrative leave enabled USAID leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former USAID leadership and management undermining those priorities. Pausing a majority of USAID's work was, and remains, necessary to continue this thorough review into the noncompliance issues first identified, as well as to continue to examine USAID's processes and the manner by which USAID funds its programs. Only by engaging in this audit and review, can USAID leadership and the Secretary ensure that USAID's funding decisions aligned with the foreign policy priorities of the United States. This audit and review would have been ineffective and would have been inconsistent with the public interest if USAID's then extant operations remained unchecked. Indeed, our experience with widespread noncompliance with initial stop-work directives raised serious doubt about

5

whether USAID leadership would have received necessary information in a timely manner and also whether directives of USAID leadership would be promptly and faithfully complied with.  Instead, the best course was an across-the-board pause, where USAID leadership could then determine on a more targeted basis which programs continued to make sense for the American people, and which did not.

10. At the time the general pause on foreign aid was issued, Secretary Rubio issued four waivers for:  foreign military financing for Israel and Egypt, emergency food assistance, related administrative expenses, and legitimate expenses incurred before the pause went into effect.  In the days following the general pause on foreign aid, Secretary Rubio adopted a waiver process to ensure that important aid programs within the national interest would be able to continue during the period of review.  For instance, on January 28, Secretary Rubio issued an emergency humanitarian waiver for life-saving humanitarian assistance programs.  Along with this general waiver, the State Department issued case-by-case waivers, based on specific programs.  Consistent with this approach to foreign assistance administered by the State Department, a similar pause and waiver process applied to USAID's operations to ensure they too are aligned with the President's and Secretary's priorities.  And the humanitarian waiver just noted (among others) applied in full measure to USAID programs.

11. There are 4,765 direct hire full-time equivalent employees at USAID.  USAID identified an initial set of 58 employees who were placed on paid administrative leave on Monday, January 27, 2025.  This group included senior staff who engaged in non-compliance vis-à-vis the funding pause and stop-work orders or other acts of insubordination or questionable contracting practices or who were charged with

6

managing and administering initiatives no longer deemed to be in the national interest (*e.g.,* DEI programs). On Saturday, February 1, 2024, an additional 57 employees were placed on administrative leave, many of whom engaged in similar acts of insubordination, deceit, or non-compliance with Executive Orders or USAID leadership directives.

12. USAID leadership ultimately determined that the placement of a substantial number of USAID personnel on paid administrative leave was the only effective way to pause operations, faithfully implement the pause, and conduct a full and unimpeded audit of USAID's operations and programs, consistent with the President's and Secretary's directives. Accordingly, on Monday, February 3, 2025, USAID placed an additional 606 employees on paid administrative leave; on Tuesday, February 4, 2025, another 1,416 employees were placed on paid administrative leave. On February 7, 2025, before the court in *American Foreign Service Assoc., et al. v. President Donald Trump, et al.*, No. 1:25-cv-00352-CJN (D.D.C.), issued a temporary restraining order, approximately 2,140 total USAID U.S. direct hires were on paid administrative leave. To the best of my knowledge, none of these employees were located in high-risk countries, such as Syria.

13. Approximately 98% of the 2,140 employees on paid administrative leave as of February 7, 2025, were physically located within the Continental United States, with the remaining located in developed counties like the United Kingdom or Hungary where employees face little risk of physical danger and where USAID has little to no mandate. USAID did not intentionally place any employee in a high-risk location on paid administrative leave. Upon being informed that several employees might have

temporarily been in high-risk locations, USAID immediately removed those employees from administrative leave and fully restored their preexisting access to all USAID and other government systems.

14. As is customary, each of the employees placed on administrative leave had their access restricted to USAID digital systems, including their USAID-sponsored email accounts. Given the sensitivity of government information systems, the need to protect sensitive government information, to avoid the risk of data breach, and to maintain the integrity of the ongoing pencils down review, USAID leadership thought it prudent to restrict access for those employees temporarily removed from their regular duties by being placed on paid administrative leave. As noted, these were employees physically located in the United States or other safe, developed nations where restricting their access to USAID systems posed minimal risk of danger. I am unaware of any employee in a dangerous location such as Syria whose access was impacted.

15. During this same period, and following the same principles, USAID leadership approved the termination of nearly 800 personal service contractors (PSCs), who performed work in the United States or high- or upper-middle-income countries, as defined by the World Bank. USAID has either preserved or restored access to the overwhelming majority of overseas PSCs—and to the best of my knowledge, all PSCs who may be in dangerous locations or frontline aid delivery countries. USAID will diligently work to restore access to any employee or PSC whose access was terminated in error.

16. As part of this effort to pause work at USAID, USAID leadership also conducted a review of its employees to identify which employees were essential—*i.e.*, those who

8

are responsible for mission-critical functions, core leadership, and those who work on specially designated programs—and who should not be placed on administrative leave.

17. Over the course of the first week in February, USAID leadership initially determined that approximately 611 employees qualified as essential to perform USAID's required duties and to facilitate orderly contingency and audit operations.  For example, many employees in the travel office were deemed essential because they would be responsible for helping USAID employees abroad come home to the United States, if they wished to do so.  Essential personnel also included subject matter experts from most parts of USAID such as the regional bureaus; a large contingent of personnel administering and overseeing emergency humanitarian, food, and medical assistance; information systems managers; security officers; legal counsel; the Chief Human Capital Officer and other human resources employees, contracting officers and others. The process of selection included senior political and career leaders who carefully contemplated an essential staff level.

18. As part of its efforts to pause work and facilitate an audit of USAID's operations, USAID had planned to place another approximately 2,104 employees on paid administrative leave beginning on 11:59 p.m. on Friday, February 7, 2025.

19. Following the D.C. District Court's February 7, 2025 Order, however, USAID did not place any additional employees on administrative leave, and reinstated all employees previously placed on any form of administrative leave.  Moreover, USAID restored access to email, payment, and security notification systems to those employees whose access was previously limited or shut off.

20. Before the D.C. District Court's February 7, 2025 Order, USAID's website indicated that all non-essential employees would be placed on administrative leave that evening. After this Court's Order, however, USAID removed that message from its website. Moreover, USAID sent an email notice of the Order to all USAID employees.

21. On Thursday, February 13, a different judge on the District of Columbia District Court issued a temporary restraining order blocking certain foreign aid determinations.

22. On Friday, February 21, the District Court in *American Foreign Service Assoc., et al.*, denied a motion for further injunctive relief, and let its prior temporary restraining order expire.

23. All of the actions described above at USAID were taken by Secretary Rubio or myself, or USAID employees at one of our directions.

24. Neither Elon Musk nor USDS has any formal authority over me. Neither has the independent legal authority to direct me or anyone at USAID regarding access to USAID data or systems; to alter or restore email communications; to manage personnel or take personnel actions; to take any action with respect to grants, contracts, and other agreements; or to take any other similar governmental action.

25. Consistent with the President's Executive Order, E.O. 14158, Sec. 3(c), 90 Fed. Reg. 8441 (Jan. 20, 2025), I sometimes consult or coordinate with policymakers and others at USDS. But I am entitled to disregard their suggestions. I report to Secretary Rubio and President Trump, not Elon Musk or USDS.

26. Following the President's Executive Order, but before Secretary Rubio was designated as Acting Administrator and delegated to me the duties of Deputy Administrator, the Agency established a "DOGE Team" at USAID. E.O. 14158, Sec. 3(c). All Team

10

members have been detailed to USAID from other federal agencies, not USDS. They are treated as employees of USAID, and report to USAID leadership including Secretary Rubio and me, with supervisory duties assigned to the White House Liaison, when performing USAID duties.

27. Following the President's Executive Order, I consult with the DOGE Team on certain matters, including personnel. E.O. 14210, Sec. 3(b)(ii), 90 Fed. Reg. 9669 (Feb. 14, 2025). But Secretary Rubio and I have ultimate authority over those decisions; the DOGE Team cannot legally direct me to do anything regarding personnel, funding, or the like.

Executed this 22nd day of February, 2025

/s/ Peter Marocco

_____

PETER MAROCCO

11

# EXHIBIT A


# Presidential Documents

**Executive Order 14169 of January 20, 2025**

### Reevaluating and Realigning United States Foreign Aid

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1.** *Purpose.* The United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries.

**Sec. 2.** *Policy.* It is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States.

**Sec. 3.** (a) *90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy.* All department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order. The Office of Management and Budget (OMB) shall enforce this pause through its apportionment authority.

(b) *Reviews of United States foreign assistance programs.* Reviews of each foreign assistance program shall be ordered by the responsible department and agency heads under guidelines provided by the Secretary of State, in consultation with the Director of OMB.

(c) *Determinations.* The responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State.

(d) *Resumption of paused development assistance funding.* New obligations and disbursements of foreign development assistance funds may resume for a program prior to the end of the 90-day period if a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form. Additionally, any other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB.

(e) *Waiver.* The Secretary of State may waive the pause in Section 3(a) for specific programs.

**Sec. 4.** *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

**8620**    **Federal Register** / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02091

Filed 1–29–25; 11:15 am]

Billing code 3395–F4–P

# EXHIBIT B

State Seal

Action Office:    ALDACs, ECON, OECD

Info Office:

| | |
|---|---|
| MRN: | 25 STATE 6828    Reply |
| Date/DTG: | Jan 24, 2025 / 241600Z JAN 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| E.O.: | 13526 |
| TAGS: | PREL, AID, EAID |
| Subject: | Executive Order on Review of Foreign Assistance Programs |

1. (U) Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, this ALDAC pauses all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID.

2. (U) Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy. The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments. Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

**ACTIONS TO BE TAKEN**

3. (U) Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository.

4. (U) Within eighty-five (85) days of this ALDAC, the government-wide comprehensive review of all foreign assistance shall be completed, and a report shall be produced to the Secretary of State for his consideration and recommendation to the President.

5. (U) In keeping with one voice of American foreign policy, the United States government, through any department, agency or entity, shall not provide foreign assistance funded by or through the Department and USAID without the Secretary of State's authorization or the authorization of his designee.

6. (U) All U.S. foreign assistance shall be aligned under the Secretary of State's coordination, direction, and supervision, as appropriate, consistent with section 622(c) of the Foreign Assistance Act of 1961 and section 1523 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) within 180 days.

7. (U) Effective immediately, Assistant Secretaries and Senior Bureau Officials shall ensure that, to the maximum extent permitted by law, no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review. For existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review. Decisions whether to continue, modify, or terminate programs will be made following this review.

8. (U) Effective immediately, pending a review of foreign assistance programs: no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with the President's policy; no further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery /indefinite quantity (IDIQ) contracts.

9. (U) Effective immediately, I am suspending the review process for proposals for new foreign assistance grants, subgrants, contracts, or subcontracts. No new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with the President Trump's agenda.

10. (U) Within thirty (30) days of the issuance of the review standards in paragraph 4, every Bureau, agency office and entity providing any type of foreign assistance shall produce to F for review a list of all active, pending, or proposed grants, subcontracts, contracts, or subcontracts, and provide a clear and concise statement explaining if and how the current or proposed use of obligated funds advances President Trump's policy.

11. (U) The spokesperson will also release a public statement to this effect.

12. (U) The Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance.

DEFINITIONS

13. (U) Only for purposes of this ALDAC, foreign assistance means assistance funded from accounts in titles III and IV and from International Organizations and Programs in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

| | |
|---|---|
| Signature: | RUBIO |
| Drafted By: | S/TT:Marocco, Peter |
| Cleared By: | S/TT:Holler, Daniel |
| | L:Visek, Richard |
| | L:Dorosin, Joshua |
| | S/TT:Anton, Michael |
| | C:Needham, Michael |
| Approved By: | S: Rubio, Marco |
| Released By: | POEMS_P:Acker, Vanessa G |
| Info: | IO COLLECTIVE *Immediate* |
| XMT: | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

# EXHIBIT C



**THE SECRETARY OF STATE**
WASHINGTON

February 3, 2025

The Honorable James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Jeanne Shaheen, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Brian Mast, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Gregory Meeks, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Tom Cole, Chairman
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Rosa DeLauro, Ranking Member
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Susan Collins, Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

The Honorable Patty Murray, Vice Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Chairman Risch, Mast, Cole, Collins, Ranking Members
Shaheen, Meeks, DeLauro, and Vice Chairwoman Murray:

Consistent with applicable law, including sections 7063 and 7015 of the
Department of State, Foreign Operations, and Related Programs
Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the
Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), this letter provides
notice and advises you of our intent to initiate consultations with you
regarding the manner in which foreign aid is distributed around the world
through the United States Agency for International Development ("USAID").
Current foreign assistance processes are severely inefficient and do not
substantially benefit the American people.  USAID has numerous conflicting,
overlapping, and duplicative functions that it shares with the Department of
State.  Additionally, USAID's systems and processes are not well synthesized,
integrated, or coordinated, and often result in discord in the foreign policy
and foreign relations of the United States.  This undermines the President's
ability to carry out foreign relations.

I have authorized Peter W. Marocco, the Director of Foreign Assistance, and the individual to whom I have delegated authority to perform the duties of the Deputy Administrator of USAID, to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest.  This review and potential reorganization will substantially further the foreign relations of the United States, and may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.

The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID.  Such consultation shall occur on behalf of the heads of such entities, as directed by the President.
In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

Sincerely,

Marco Rubio
Secretary of State

EXHIBIT 27

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW MEXICO, et al.

    *Plaintiffs,*

    v.

ELON MUSK, in his official capacity, et al.,

    *Defendants.*

Case No. 1:25-cv-00429

## DECLARATION OF JOSHUA FISHER

I, Joshua Fisher, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1.    I make these statements based on personal knowledge and knowledge obtained in the course of my official duties.

2.    I am the Director of the Office of Administration. I have held that position since January 20, 2025. In that capacity, I am personally involved in the appointment of special government employees. I have personal knowledge of Mr. Elon Musk's employment status with the federal government.

3.    Mr. Musk is an employee of the White House Office. He holds that position as a non-career Special Government Employee ("SGE").

4.    In that job, Mr. Musk is a Senior Advisor to the President. It is not uncommon for the President to have Senior Advisors who are SGEs. For instance, Anita Dunn was an influential Senior Advisor to President Biden, while serving as an SGE.

5.    In his role as a Senior Advisor to the President, Mr. Musk has no greater authority than other senior White House advisors. Like other senior White House advisors, Mr. Musk has no

actual or formal authority to make government decisions himself. Mr. Musk can only advise the President and communicate the President's directives.

6.      The U.S. DOGE Service is a component of the Executive Office of the President. The U.S. DOGE Service Temporary Organization is within the U.S. DOGE Service. Both are separate from the White House Office. Mr. Musk is an employee in the White House Office. He is not an employee of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization. Mr. Musk is not the U.S. DOGE Service Administrator.

Dated: Washington, D.C.
        February 17, 2025

_____
Joshua Fisher
Director
Office of Administration