**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1, *et al.*,

                  *Plaintiffs*

                  v.

ELON MUSK, *et al.*,

                  *Defendants*

Case No. 8:25-cv-00462-TDC

**<u>PLAINTIFFS' REPLY IN SUPPORT OF A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

ADDITIONAL DEVELOPMENTS ...................................................... 2

ARGUMENT ...................................................................................... 10

    I. The facts show that Defendant Musk is a principal officer exercising significant cross-agency authority and directing DOGE subordinates, who answer to him rather than agency staff. ................................................................................................ 10

        A. Defendant Musk's actions extend far beyond merely offering advice. ........ 10

        B. Defendants exert direct and coercive control over agency systems and operations, and their relevant actions at USAID were not directed by the agency. ................ 14

        C. Even if Pete Marocco agrees post-facto with DOGE's actions, his dubious rubber stamp could not cleanse the constitutional violations at issue here. .............. 15

    III. Defendants' actions violate basic Separation of Powers requirements. ...... 17

    IV. Irreparable Harm ......................................................................... 22

        Plaintiffs demonstrate that irreparable injury will result absent an injunction. ... 22

        B. Defendants' access to and control of Plaintiffs' sensitive information ........ 24

        C. Reputational injuries ............................................................. 26

        D. Constitutional injuries ........................................................... 27

V. The equities favor Plaintiffs, their requested relief is proper, and Defendants request to consolidate a final determination on the merits is premature given the need for discovery. .... 28

CONCLUSION .................................................................................. 30

**INTRODUCTION**

In their opposition, Defendants make the incredible assertion that Defendant Elon Musk "has no actual or formal authority to make government decisions himself." Resp. at 1. This claim is flatly contradicted by an overwhelming body of evidence detailed in Plaintiffs' filings and further in this reply below. Defendant Musk's powers include seizing control of government computer systems and infrastructure, having unprecedented control over sensitive information, firing federal employees, terminating leases and contracts, canceling grants, suspending funding, and dismantling agencies. *See, e.g.,* Compl. ¶ 33; Mem. of Law in Supp. of Pls. Mot. for Prelim. Inj. ("PI Mem.") at 9-11.

Defendants next attempt to characterize the events at USAID as distinct from their own actions, yet they fail to answer most of the Court's questions from last week regarding Defendant Musk's responsibilities, the basic operations of DOGE, and who is formally making agency-wide decisions, and they fail to provide any paper trial of documentation. In this reply, we present even more late-breaking evidence demonstrating the massive breadth of Defendants' authority and, specific to the narrow relief requested here, that the actions attributed to USAID were, in fact, taken by Defendants themselves.

Defendants also argue that Plaintiffs lack standing, but this claim too is baseless. Plaintiffs have clearly established ongoing harms that persist to this day, leaving no doubt as to their standing. Even without the transparency that Defendant Musk has publicly championed, the court has an ample record on which to rule, at this preliminary stage, that Defendants' conduct violates the Appointments Clause and fundamental separation of powers principles, to justify relief Plaintiffs filed their opening brief, multiple courts have recognized the seriousness of the Appointments Clause issues raised by this case, further underscoring the gravity of the claims before this Court. *See, e.g., Alliance for Retired Americans v. Bessent*, No. 1:25-cv-313 (D.D.C.),

Tr. of Prelim. Inj. Hr'g at 60:24-70:10 (Feb. 24, 2025), Ex. 60 at J.R. 762-63; *State of N.M. v. Musk*, No. 25-0429 (D.D.C. Feb. 26, 2025), Tr. of TRO Mot. Hr'g at 3:21-23.

## ADDITIONAL DEVELOPMENTS

### A. Treatment of evidence at the preliminary injunction stage.

As detailed below, the record for this case is continually developing as Defendants make more public admissions and new facts, which could be known only to them, come to light. It is therefore worth noting that "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). "Therefore, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 706 (D. Md. 2021) (citations and internal quotation marks omitted), *aff'd sub nom. Just Puppies, Inc. v. Brown*, 123 F.4th 652 (4th Cir. 2024). Moreover, courts are "permitted to consider the well-pleaded allegations of [the] complaint and the uncontroverted affidavits submitted in support of a motion for preliminary injunction." *Boyapati v. Loudon Cnty. Sch. Bd.*, No. 1:20-CV-01075, 2020 WL 6797365, at *3 (E.D. Va. Oct. 7, 2020) (citing *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976)).

In this case, Defendant Musk himself has repeatedly asserted that he is, in fact, exercising authority far past that of a typical advisor. Mr. Musk has done so in writing, via published statements on his social media page on X, and orally, through publicized speeches. These statements, made by Defendant Musk himself, are *per se* exempt from the rule against hearsay and can thus be accepted by this Court for the truth of the matter asserted. *See* F.R.E. 801(d)(2). On top of that, President Donald Trump has made numerous admissions about Defendant Musk's

authority in his capacity as President and chief executive. These too should be considered admissions. In contrast, despite this Court's request during the parties' status conference for "facts on the ground" and the Court's recognition that Plaintiffs "have fewer facts at their disposal," Case Mgmt. Conf. Tr. at 24:15-25:11, ECF No. 16. Defendants provided this Court with scant documentary evidence and just two witness declarations.

**B. Factual Developments Since Plaintiffs' Motion was Filed.**

Plaintiffs have worked diligently to develop the most comprehensive record possible without having access to critical information in the government's possession. Plaintiffs provide additional facts with this Reply, including Defendant Musk's own admissions and President Trump's public admissions about Defendants' authority and duties. Also included is first-hand witness testimony demonstrating that Defendants continue to exercise unprecedented control over the digital infrastructure and agency decisionmaking at USAID. Further first-hand evidence shows how DOGE supplants normal agency chain-of-command throughout the Executive Branch— either directly or through coercive tactics—with examples from Office of Personnel Management ("OPM") and Federal Emergency Management Agency ("FEMA"). Recent days have yielded new damning information in related lawsuits. Finally, the press continues to release important investigative reports. The most important developments are summarized below, included as Exhibits, and incorporated into Plaintiffs' arguments.

### i. Admissions by Musk and President Trump of Defendants' Authority and Duties

Defendant Musk and President Donald Trump have repeatedly identified Defendant Musk as the person in charge of DOGE and, in that position, one of the most important people charged with implementing the President's agenda. On February 19, for instance, President Trump told a crowd at the Future Investment Summit in Miami: "I signed an order creating the Department of

Government Efficiency and put a man named Elon Musk in charge." Andrea Shalal & Nandita Bose, *Trump appears to contradict White House, says Elon Musk in charge of DOGE*, Reuters (Feb. 20, 2025), Ex. 43 at J.R. 567 On February 18, during a joint interview of President Trump and Defendant Musk by Sean Hannity, Defendant Musk described his role as "making sure that the presidential executive orders are actually carried out" through DOGE. The White House, *Interview of President Trump and Elon Musk by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025), Ex. 38 at J.R. 475. The President agreed, explaining how Defendant Musk directs agency action:

> [Musk] said, "You know, when you sign these executive orders, a lot of them don't get done, and maybe the most important ones," and he would take that executive order that I'd signed, and he would have those people go to whatever agency it was — "When are you doing it? Get it done. Get it done." And some guy that maybe didn't want to do it, all of a sudden, he's signing.

*Id*. at J.R. 480. For the Court's convenience, Plaintiffs compiled recent video clips of Defendant Musk and President Trump making these admissions. Cheston Decl., App. A, Ex. 37 at J.R. 466-67.

A recent, widely-publicized incident provides yet another admission that Defendant Musk exercises substantial control over the federal government. On Saturday, February 22, President Trump posted to his Truth Social account that "ELON IS DOING A GREAT JOB, BUT I WOULD LIKE TO SEE HIM GET MORE AGGRESSIVE." @Realdonaldtrump, Truth Social (Feb. 22, 2025, 8:04 AM), Ex. 63 at J.R. 904. Musk responded on X, saying, "Consistent with President @realDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last week. Failure to respond will be taken as a resignation." Elon Musk (@elonmusk) X (Feb. 22, 2025), Ex. 59 at J.R. 702. That evening, employees throughout the federal government received an email with the subject line "What did you do last

week?" instructing employees to provide a five bullet point summary of what they accomplished in the week prior. J. Doe 21 Decl., App. A (email), Ex. 33 at J.R. 443. It was sent by an email address controlled by DOGE. J. Roe 1 Decl. ¶ 32, Ex. 55. As of Tuesday evening, one million employees had responded to the request. Eli Stokkols & Daniel Lippman, *Musk's 'What Did You Do Last Week?' Email Hits a Million Replies*, Politico (Feb. 25, 2025), Ex. 48 at J.R. 601. "[T]he relatively high response rate suggests many workers, amid the conflicting guidance, decided to err on the side of compliance to avoid the chance they might lose their jobs," because Defendant Musk has the power to force terminations, at least in some agencies, according to President Trump. *Id.*

Despite statements like these, the Government has persisted in its position that Defendant Musk does *not* wield significant power, even within DOGE. In the past week alone, multiple judges have noted a lack of detail, and perhaps even candor, from the Government on this topic. On February 17, 2025, the Government stated in a separate matter that "[n]either of the President's Executive Orders regarding 'DOGE' contemplate—much less furnish—the power to make personnel decisions at individual agencies." Notice of Supplemental Information at 2, *State of N.M. v. Musk*, No. 1:25-CV-00429 (D.D.C. Feb. 17, 2025), ECF No. 24. In an opinion issued the following day, Judge Chutkan noted that the plain language of the Executive Orders does (at a minimum) contemplate DOGE having such powers, and reminded the government of its duty of candor to the court. *State of N.M. v. Musk*, No. 1:25-CV-00429, slip op. at 2 n.1 (D.D.C. Feb. 18, 2025). On February 24, in a hearing in *Alliance for Retired Americans v. Bessent*, Judge Kollar-Kelley (D.D.C.) extensively probed the Government on the topic of what role Defendant Musk and his DOGE affiliates play within the federal government. Ex. 60 at J.R. 762-63 (Tr. at 60:24-70:10). After the Government failed to provide satisfactory answers, Judge Kollar-Kelley expressed concerns that the actions of DOGE affiliates within the Treasury Department may

violate the Appointments Clause. *Id.* at J.R. 765-776 (Tr. at 70:11-75:13).

### ii.    *DOGE Continues to Exert Significant Control at Agencies*

Recent developments show that Defendant Musk and his subordinates continue to exert significant control over systems and operations within USAID and other agencies. At USAID, newly uncovered evidence has revealed that on February 1, DOGE affiliate Gavin Kliger wrote to senior USAID information staff demanding a wide array of access to USAID's systems. J. Roe 3 Decl. 4, Ex. 56. This included "full administrative access to the contracting software, including the ability to cancel contracts for convenience" and "full administrative access to [the building and physical access system], including the ability to view a list of administrators and *revoke the access of other administrators*." *Id.* ¶¶ 4-5 (emphasis added). He also sought the highest level of access to USAID technology systems, enabling him to send systemwide emails, grant and revoke access to any USAID systems, modify or delete website content, and extract data of users, including Personal Identifying Information. *Id.*  Importantly, individuals with this level of access possess the technological capability to take any of these actions without seeking approval from anyone within USAID (hence the access level's colloquial name, "God-mode"). Lewis Decl. ¶¶ 4-5, Ex. 35 at J.R. 458-59; *see also* J. Roe 3 Decl. ¶ 6, Ex. 56. Shortly after Mr. Kliger's request, he and fellow DOGE affiliate Luke Farritor gained the access they requested. J. Roe 3 Decl. ¶¶ 4-5, Ex. 56. With this comprehensive systems access, between February 1 and February 3, DOGE was able to render USAID inoperable, essentially shutting it down, as Defendant Musk later boasted. Compl. ¶¶ 47-59. Most Plaintiffs were, without warning, shut out of their USAID systems during DOGE's weekend takeover and the ensuing week. *See, e.g.,* J. Doe 6 Decl. ¶ 6, Ex. 4 at J.R. 234, J. Doe 7 Decl. ¶ 4, Ex. 5 at J.R. 236, J. Doe 9 Decl. ¶ 4, Ex. 6 at J.R. 241, J. Doe 12 Decl. ¶ 4, Ex. 7 at J.R. 245-46, J. Doe 19 Decl.  5, Ex. 8 at J.R. 252, J. Doe 26, Decl. ¶ 3, Ex. 9 at J.R. 255, J. Doe 1 Decl.

¶ 6, Ex. 28 at J.R. 427; J. Doe 21 Decl. ¶ 3, Ex. 33 at J.R. 439 J. Doe 11 Decl. ¶ 3, Ex. 64 at J.R. 911

DOGE continues to have systems access to and control over USAID digital infrastructure. *See* J. Doe 2 Second Decl ¶¶ 5-6, Ex. 29 at J.R. 429-30; J. Roe 3 Decl ¶¶ 5-8, Ex. 56. As a recent, concrete, and telling example, on Sunday, February 23, Gavin Kliger *created* the user account hr_announcements@usaid.gov,[1] which was used a short time later to email hundreds of USAID employees announcing a "Reduction in Force." J. Doe 2 Second Decl ¶ 5, Ex. 29 at J.R. 29; J. Doe 21 Decl ¶ 8, Ex. 33 at J.R. 440; J. Doe 11 Decl ¶ 6, Ex. 64 at J.R. 912. USAID's Human Resources department—Office of Human Capital and Talent Management, Employee and Labor Relations Division—was not responsible for the email. J. Doe 21 Decl. ¶ 10, Ex. 33 at J.R. 440. It is difficult to credit the notion that USAID staff were responsible for this personnel action, when it did not come through ordinary USAID personnel channels and came from an email address established by a DOGE affiliate.

Moreover, in a February 25, 2025 hearing in *AIDS Vaccine Advocacy Coalition v. Trump et al.*, No. 25-0400, the court expressed repeated concern that the Government defendants had not complied with a previous order to cease implementation of a sudden funding freeze at USAID. Counsel for one of the plaintiff groups first explained to the court that:

> [A]t approximately 4:30 p.m. yesterday, contracting officers received an email from Adam Cox, whose title is acting deputy director of foreign operations [at USAID]. That email indicated that they were instructed by DOGE to terminate several awards that same night, and also indicated that many—and "many" is capitalized in that email—more terminations are coming and that Foreign Service officers were authorized for overtime to effectuate those terminations.

---

[1] Mr. Kliger also instructed USAID IT staff to delete the shared mailbox for the account he created, and then recreate the mailbox themselves. J. Roe 3 Decl ¶ 8, Ex. 56. Deleting the mailbox prevents others from being able to see actions taken while the mailbox was operable. *Id.*

Ex. 61 at J.R. 869 (Tr. at 26:7-15). Plaintiffs' counsel went on to explain that the February 23 "Reduction in Force" efforts included "the people who would actually do the disbursement of awards to implementing partners," demonstrating that DOGE remains behind decisionmaking regarding personnel reductions *and* financial systems. *Id.* at J.R. 871 (Tr. at 28:8-16); *see also id.* at J.R. 872 (Tr. at 29:10-24) ("[B]ureaus have flagged that they don't have access to payment systems to effectuate the TRO . . . to take one example, nobody in the entire Global Health Bureau . . . has access to the payment systems at all. It's just two 20-somethings and Elon Musk.").

DOGE's patterns are similar across at least the agencies it infiltrated in its initial days. The Declaration of J. Roe 1 describes DOGE affiliates coming into OPM on January 20, pushing out the Chief Information Officer, and obtaining administrative access over all OPM systems, including IT, internal communications, and backend operations. J.Roe 1 Decl. ¶¶ 5, 7, 9, Ex. 55. This first-hand account makes clear that DOGE affiliates were making significant decisions about personnel matters and program reductions, for instance requiring every OPM department to prepare presentations for executing 70% cuts across teams and to do so over a single weekend. *Id.* ¶ 18. Ultimately, despite being a high-ranking federal employee, Declarant was given an ultimatum by a DOGE affiliate to either accept an immediate demotion and reassignment outside the agency or else be placed on administrative leave. *Id.* ¶ 27. Based on their first-hand experience, Declarant believes that these personnel decisions at OPM were in fact made by DOGE affiliates and not agency leadership. *Id.* ¶ 29.

The Declaration of J. Roe 1 also describes how DOGE affiliate Greg Hogan obtained early access to the Enterprise Human Resources Integration system (EHRI), apparently so that DOGE could send emails across the federal workforce. *Id.* ¶ 10. Declarant believes that DOGE retains complete systems access to OPM systems. This gives them access to the personnel files and

personal data of every federal worker. Additionally, this access allows DOGE to send out mass emails seemingly from OPM to the entire federal government workforce, including the recent "What Did You Do Last Week" email. *Id.* ¶ 31; J. Doe 21 Decl. ¶ 6, Ex. 33 at J.R. 440.

Mary Comans, the former Chief Financial Officer for the Federal Emergency Management Agency ("FEMA"), provides another first-hand account of the ways in which Defendant Musk and DOGE exert control over federal spending, even overriding agency decisionmaking. Ms. Comans describes how FEMA had released funds to New York City upon express orders of agency leadership to continue funding local and state-based programs (and, ironically, after confirming their understanding with DOGE). Comans Decl. ¶¶ 3-4, Ex. 36 at J.R. 462-463. At some point on Sunday, February 9, however, a DOGE affiliate flagged the grant, and Ms. Comans and other agency personnel were told to immediately claw the money back. *Id.* ¶ 7. At 4:03AM on February 10, Defendant Musk took credit for the reversal, stating: "The @DOGE team just discovered that FEMA sent $59M LAST WEEK to luxury hotels in New York City to house illegal migrants. Sending this money violated the law and is in gross insubordination to the President's executive order. That money is meant for American disaster relief and instead is being spent on high end hotels for illegals! A clawback demand will be made today to recoup those funds." *Id.* ¶ 8 (citing Elon Musk (@elonmusk), X (Feb. 10, 2025, 4:03 AM)). Ms. Comans concluded that this "sudden" policy change was not a decision made by FEMA leadership but instead a decision made by Defendant Musk and DOGE. *Id.* ¶ 7.

### iii.    *Other notable press reports*

Several other recent press reports highlight the extent of Defendant Musk and DOGE's control over the federal government and the widespread fallout from DOGE's cuts:

- On February 21 and 24, *The Washington Post* reported that members of Trump's cabinet had grown frustrated with Defendant Musk making cuts within their departments without their

approval. In the case of USAID, DOGE affiliates used backdoor access to the agency's systems to unilaterally veto the disbursement of foreign aid, *even in instances where the Secretary of State himself had ordered disbursements be made.* Jeff Stein et al, *Musk's blitzkrieg is unnerving many of Trump's senior advisers,* Wash. Post *(Feb. 21, 2025),* Ex. 45 at J.R. 577-583; Matt Bai, *The Blinding Contempt of the DOGE Bros*, Wash. Post (Feb. 24, 2025), Ex. 44 at J.R. 571-572.

- On February 20, *Politico* reported that congressional Republicans had started to backchannel with the White House, noting that some Republicans "consider federal agency officials powerless to call off DOGE." Meredith Lee Hill, *The private GOP panic over the slash-and-burn DOGE firings*, Politico (Feb. 20, 2025), Ex. 42 at J.R. 559-564.

- On February 20, *Wired* reported that DOGE had placed a $1 spending limit on most employee credit cards at the General Services Administration, with intent to expand the plan to other agencies in the future. Zoë Schiffer, *DOGE Puts $1 Spending Limit on Government Employee Credit Cards*, Wired (Feb. 20, 2025), Ex. 41 at J.R. 548-552.

- On February 19, NPR reported that the Department of Agriculture was working to rescind the firings of multiple employees working to stop the outbreak of bird flu in the United States. This followed "an aggressive plan to optimize its workforce by eliminating positions that are no longer necessary in line with the efforts of [DOGE]." Rachel Treisman, *The USDA fired staffers working on bird flu. Now it's trying to reverse course*, NPR (Feb. 19, 2025), Ex. 46 at J.R. 584-588.

## ARGUMENT

### I. The facts show that Defendant Musk is a principal officer exercising significant cross-agency authority and directing DOGE subordinates, who answer to him rather than agency staff.

The parties agree about one key point: "Defendants lack authority to '*legally* direct'" USAID or any other agency to take actions. Resp. at 12 (quoting Ex. 26 ¶27 at J.R. 413, emphasis added). But, as Galileo reportedly muttered after being forced to renounce the Earth revolving around the Sun, "*eppur si muove*" (yet it moves). Fundamentally, the parties have only a factual disagreement regarding Defendants' exercise of *actual* authority.

### A. Defendant Musk's actions extend far beyond merely offering advice.

Defendants' counsel would have the Court believe that Defendant Musk is an ordinary advisor and that DOGE is a team of assistants effectively picking up technological dry cleaning at the behest of proper agency officials. But it is simply not credible to assert that "Mr. Musk has no greater authority than other senior White House advisors." J.R. 424. The record in this case bears "witness to a different genealogy," *Int'l Refugee Assistance Project v. Trump*, 265 F. Supp. 3d 570, 628 (D. Md. 2017) (procedural history omitted): one in which the President himself has repeatedly told the American people that Defendant Musk "answers to him" and is one of, if not ***the***, primary person assigned to ensuring that the President's agenda is executed. And Defendant Musk has repeatedly emphasized the scope of his authority. As a result, the public widely views Defendant Musk as "***leading*** Trump's efforts to overhaul and downsize the federal government." Lindsay Whitehurst & Chris Megerian, *Trump backs Musk as he roils the federal workforce with demands and threats*, A.P. (Feb. 24, 2025), Ex. 49 at J.R. 607-612.

Accordingly, and contrary to Defendants' assertion that "Plaintiffs do not contest" that Defendant Musk is merely "a Senior Advisor," Resp. at 1, Plaintiffs contend (and the facts establish) that Mr. Musk is in fact the "*de facto* DOGE Administrator," Compl. at 1, which is a "super-cabinet level" position overseeing a metastatic entity whose power spans "across agencies." PI Mem. at 4. Again, President Trump has plainly stated: "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge." *Supra*, Ex. 43 at J.R. 568. Likewise, last week during a live TV interview with President Trump, Defendant Musk explained "what we're doing here" and said "one of the biggest functions of the DOGE team is just making sure that the presidential executive orders are actually carried out." S*upra*, Ex. 38 at J.R. 475. He later encouraged viewers to "just go to DOGE.gov," to see proof of the work he was directing. *Id*. Defendant Musk's own statements about his actual authority

should be considered more compelling evidence than a declaration created for a separate case altogether that provides nothing more than "Mr. Musk's employment status" as a "Special Government Employee." Ex. 27 at J.R. 424-425. Indeed, until Tuesday, February 25, colleagues of Defendants' counsel at the Department of Justice have repeatedly failed to identify anyone else who serves in the critical role of DOGE Administrator, even when pressed by federal judges. It was just yesterday afternoon that President Trump revealed Amy Gleason to be the acting administrator of the U.S. DOGE Service. Kaitlan Collins & Tierney Sneed, *White House reveals who DOGE acting administrator is*, CNN (Feb. 25, 2025), Ex. 50 at J.R. 615-17.

Regardless of Defendant Musk's precise title, he carries out "important functions" of the Trump Administration and exercises "significant discretion" in doing so, which are the hallmarks of officer designation. *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 247 (2018). Defendant Musk has described his own important duties as including: ensuring implementation of President Trump's executive orders; forcing return to work policies; evaluating the sufficiency of federal employees' recent accomplishments; and reducing the national debt and ensuring the country's solvency by reducing spending. *See generally*, The White House, *Interview of President Trump and Elon Musk by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025), Ex. 38 at J.R. 469-535; Elon Musk (@elonmusk) X (Feb. 22, 2025), Ex. 59 at J.R. 702; Elon Musk (@elonmusk) X (selection of tweets), Ex. 58 at J.R. 663-701; J. Cheston Decl., App. A (video clip), Ex. 37 at J.R. 468. Defendant Musk relies on DOGE in part to execute his "significant discretion," as he and President Trump explained in that recent live TV interview, and his discretion includes the power to cancel government contracts, terminate personnel, control agency data systems, and dismantle independent agencies. *See generally* Compl. ¶¶ 33-55. All together, this quintessential executive function—namely, the wide-ranging administration and enforcement of the President's

agenda—may "be exercised only by persons who are 'Officers of the United States.'" *Buckley v. Valeo*, 424 U.S. 1, 141 (1976); *see also* PI Mem. at 11-12.

No doubt recognizing this reality, Defendants fall on a form-over-substance argument, asserting that the Appointments Clause is only concerned with the "formal powers vested in an office," rather than the authority an individual wields. Resp. at 14. But the plain text of Article II speaks of "Officers"—not "offices." Const. art. II § 2. *Cf. INS v. Chadha*, 462 U.S. 919, 958 (1983) (relying upon text and "express procedures" in the Constitution to maintain separation of powers). The "fair import" of the constitutional language is thus clear: "***any appointee*** exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States.'" *Buckley*, 424 U.S. at 126 (emphasis added). As a result, it is the "exercise of 'significant authority'" which marks "the line between officer and nonofficer," not a job title. *Edmond v. United States*, 520 U.S. 651, 662 (1997) (quoting *Buckley*, 424 U.S. at 126).

Defendants' argument that Defendant Musk does not occupy a "continuing office" fails for similar reasons. *See* Resp. at 21. First, as explained above, regardless of title, Defendant Musk serves as the *de facto* DOGE Administrator, which is clearly a continuing office. But more importantly, Defendant Musk's duties are pervasive and expansive—a far cry from, for instance, the discrete role of the "merchant appraiser" with no "general functions" in *Auffmordt v. Hedden*, 137 U.S. 310, 326–27 (1890) or the "civil surgeon" in *United States v. Germaine*, who "may make fifty [] examinations in a year, or none." 99 U.S. 508, 511–12 (1878).

Nor are these issues merely semantic. Allowing the President to evade the requirement for Senate confirmation by avoiding certain magic words connecting a powerful officer to an existing office would render the Appointments Clause meaningless and destroy the constitutional bulwark it was intended to be. *See, e.g.*, Office of Legal Counsel, Officers of the United States

Within the Meaning of the Appointments Clause, 31 Op. O.L.C. 73, 117-19 (2007). The Fourth

Circuit has made clear that "an Appointments Clause violation is 'no mere technicality or quaint

formality' that can so easily be overlooked, in that such a violation 'weakens our constitutional

design.'" *Brooks v. Kijakazi*, 60 F.4th 735, 743 (4th Cir. 2023) (quoting *Cody v. Kijakazi*, 48

F.4th 956, 960 (9th Cir. 2022)).

### B. Defendants exert direct and coercive control over agency systems and operations, and their relevant actions at USAID were not directed by the agency.

Despite sometimes being stationed within a particular agency, DOGE team members are

still "principally working on the President's DOGE agenda" as U.S. District Judge Deborah

Boardman recently explained. *American Federation of Teachers v. Bessent*, No. 25-CV-00430,

Mem. Op. & TRO Order at 5, fn. 2 (filed Feb. 24, 2025) (granting TRO as to DOGE affiliates,

among others). Those DOGE affiliates have and continue to exert significant control over agency

systems and operations. They do so both directly—through back-end control of digital and

operational systems—and indirectly—through various coercive practices. Their actual practices

vary from agency to agency. As the Court in *AFL-CIO v. Department of Labor* recently concluded,

DOGE's activities are "not the stuff of mere advice and assistance." *Am. Fed. of Labor and

Congress of Industrial Organizations v. Dept. of Labor*, No. 25-0339, Mem. Op. at 7 (Feb. 14,

2025) (internal citations omitted).[2]

Moreover, contrary to Pete Marocco's assertions, DOGE members working inside USAID

are not similar to employees of USAID. *See* Marocco Decl. ¶ 26, Ex. 26 at J.R. 412-13. On the

contrary, at least one DOGE member, Gavin Kliger, who still exercises systems-level access

---

[2] For this same reason, DOGE teams cannot be considered proper inter-agency assignees under the Economy Act, which prohibits the requesting agency from relinquishing "ultimate control" over any agency actions. 3 U.S. Gen. Acct. Off., GAO-08-987SP, Principles of Fed. Appropriations Law 12-71 (3d ed. 2008).

within USAID, also operates extensively in other agencies across the federal government. Indeed, over the course of the five-and-a-half weeks since DOGE was created, Mr. Kliger has been variously identified as Special Advisor to the Director of OPM, Special Advisor Technology for OPM, has worked within the United States Department of Agriculture ("USDA"), the Consumer Financial Protection Bureau ("CFPB"), and at the Internal Revenue Service ("IRS"). *See, e.g.,* Alexandra Alper and Raphael Satter, *Staffer with Elon Musk's DOGE amplified white supremacists online*, Reuters, (Feb. 7, 2025), Ex. 51 at J.R. 623-634; J. Roe 1 Decl. App. 1, Ex. 55; Marcia Brown, *DOGE staffer Gavin Kliger arrives at USDA*, Politico, (Feb. 19, 2025), Ex. 52 at J.R. 635-636; Shannon Bond, *et al*, *Who is part of Elon Musk's DOGE, and what are they doing?*, NPR, (Feb. 7, 2025), Ex. 53 at J.R. 637-648. As of February 16, the IRS was in negotiations to provide Mr. Kliger, who has been named "senior advisor" to the acting director of the IRS, access to sensitive IRS systems. Jacob Bogage & Jeff Stein, *Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS*, Washington Post, (Updated Feb. 16, 2025), Ex. 54 at J.R. 660-62. Just days later, on February 23, Mr. Kliger was back at USAID—where he, through his systems-level access, created the account used to send Reduction in Force ("RIF") notices to hundreds of USAID employees. *See* J. Doe 2 Second Decl.¶ 5, Ex. 29 at J.R. 429; J. Doe 21 Decl., ¶ 8, Ex. 33 at J.R. 440.

### C. Even if Pete Marocco agrees post-facto with DOGE's actions, his dubious rubber stamp could not cleanse the constitutional violations at issue here.

To counter the mountain of evidence demonstrating Defendant Musk's authority, Defendants point to an unadorned declaration of Pete Marocco accompanied by little of the "paper trail" this Court requested in the status conference.[3] However, even if one were to ignore the well-

---

[3] Although Defendants allude to discrete "legal actions effectuated by identifiable legal instruments," they fail to produce any of those instruments. Resp. at 18.

documented reality described here and in Plaintiffs' other filings, Pete Marocco's declaration would hardly absolve Defendants of their constitutional transgressions.

First, in arguing that "the actions alleged in Plaintiffs' motion were directed by USAID senior officials wielding their own independent power," Resp. at 1, Defendants conveniently ignore the fact that Pete Marocco's acting as Deputy Administrator of USAID violates the Federal Vacancies Reform Act of 1998 ("FVRA"). As USAID's internal regulations confirm, Pete Marocco's Deputy Administrator position is one that must be Presidentially-appointed and Senate-confirmed ("PAS"). USAID Automated Directives System § 103.3.1.2 ("The USAID PAS positions are the Administrator, *Deputy Administrator* … Assistant Administrators … and the Inspector General") (emphasis added).  Under the FVRA, when such positions are vacant, only the agency head or individuals properly appointed under FVRA provisions may perform non-delegable functions. 5 U.S.C. § 3348(b).  Actions taken by improperly appointed officials "shall have no force or effect" and "may not be ratified" after the fact. 5 U.S.C. § 3348(d).

Pete Marocco fails to satisfy any of the statutory categories for temporary PAS appointments: He was not the "first assistant" to the former Deputy Administrator (§ 3345(a)(1)); he does not hold another Senate-confirmed position and was not directly appointed by the President (§ 3345(a)(2)); and he lacks the required senior agency service and tenure (§ 3345(a)(3)). Nevertheless, as Pete Marocco's own declarations in this case clearly demonstrate, he has exercised significant authority in clear violation of one of Congress' primary means of enforcing the Appointments Clause's core principles. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 29 (D.D.C. 2020) ("Congress enacted the FVRA, in large part, to reclaim its Appointments Clause power") (internal citations and quotation marks omitted).

Defendants' characterization of Pete Marocco as merely exercising "delegated duties"

rather than being appointed to his position cannot cure this defect. The FVRA specifically addresses this type of workaround in section 3348, which restricts who may perform functions or duties that are assigned by statute or regulation to a specific office—limiting such authority to properly serving acting officials or department heads. The applicable USAID regulation defines the duties of the Deputy Administrator in terms that almost *perfectly* mirror Pete Marocco's own description of duties that have been delegated to him. *Compare* USAID Automated Directives Sys. § 101.2(a)-(b) ("responsible for . . . reducing wasteful or ineffective programs") *with* Marocco Decl. ¶ 8, Exs. 26 at J.R. 406, 26C at J.R. 422 ("reorganization . . . to maximize efficiency."). Accordingly, Pete Marocco's actions violate the FVRA and are void *ab initio* under section 3348(d). More to the point, Defendants' unconstitutional actions at USAID cannot be cured by retroactively asserting that Pete Marocco or unnamed 'USAID leadership' agreed with them. The proper remedy is to reverse the actions taken by Defendants at USAID.

### III. Defendants' actions violate basic Separation of Powers requirements.

"No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (citing *Youngstown Sheet & Tube Co.*, 343 U.S. 579, 585 (1952). Here, Defendants' conduct infringes on Congress's exclusive province under Article I in two distinct ways. **First**, in addition to violating the Appointments Clause, the sprawling amorphous entity that is DOGE, which exercises jurisdiction over every federal agency with Defendant Musk acting as a *de facto* super-cabinet official overseeing it, eviscerates the separation of powers in which "each Branch of government would confine itself to its assigned responsibility." *INS*, 462 U.S. at 951; *cf. Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241 (2018) (Thomas, J., concurring) (the exercise of "significant authority" by a "mere employee" violates basic separation of powers principles when

no such authority has been established by law). **Second**, by disregarding appropriations, interfering with USAID's congressionally-mandated operations, and effectively dismantling the agency, Defendants are "tak[ing] measures incompatible with the expressed or implied will of Congress." *Youngstown,* 343 U.S. at 637.

Defendants misunderstand Plaintiffs' causes of action and the nature of the constitutional violations. Rather than addressing the merits of the separation of powers claim, Defendants contend that it is legally "inseparable" from the Appointments Clause claim and therefore "fails for the same reasons." Resp. at 22. Although the facts underlying the two causes of action overlap considerably, there are two distinct constitutional violations: (1) Defendant Musk's significant authority without having been nominated and confirmed is a clear violation of the Appointments Clause. (2) Additionally, Defendants Musk and DOGE are operating in a manner that invades Congressional authority in violation of the carefully calibrated system of separation of powers, including the Vesting Clauses (Article I, Section 1; and Article II, Section 1), the Take Care Clause (Article II, Section 3), and the Nondelegation doctrine (*see, e.g., A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). President Trump *could* nominate and the Senate *could* confirm Defendant Musk as DOGE's Administrator, and that still would not give Defendant Musk or DOGE the legal authority to make and dictate agency-level decisions at *other* agencies, or to ignore, repeal, or otherwise violate laws passed by Congress.

Historically, Appointments Clause violations involve a person occupying an actual office created by Congress and performing defined duties. Again, the facts here are unprecedented: an unelected, unappointed individual exercising monstrous authority across the federal government, and only in a way that is tangentially related to an actual agency created for a narrow, information-technology purpose. Compl. ¶ 15. Thus, were the Court to accept Defendants' representation that

18

Defendant Musk can only be a mere employee because his title on paper is "Special Government Employee," Resp. at 13-14—although the factual record demonstrates his actual authority—that does not resolve DOGE's constitutional infractions. *See generally* Compl. ¶¶ 30-65. Courts have seldom if ever been confronted with the circumstance where the President attempts to imbue a mere employee with the powers of a principal officer while still titling them as a lesser functionary on paper, but to the extent that does not violate the Appointments Clause directly, it certainly fundamentally encroaches on the Legislature's exclusive domain given that the Constitution "clearly requires that [] offices "shall be established by Law." *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J. concurring).

Defendants' contention that Plaintiffs have impermissibly converted a claim that the Executive Branch exceeded its statutory authority into a constitutional violation is likewise mistaken. As Plaintiffs articulated in seeking the preliminary injunction, "the *de facto* creation of a new principal office in and of itself constitutes a fundamental encroachment on legislative power . . . " PI Mem. at 15. Although Defendants' conduct with respect to USAID violates multiple federal statutes, PI Mem. at 15-17, the basic fact of Defendants Musk and DOGE having significant authority over federal agencies flouts separation of powers principles.

Defendants' reliance on *Dalton v. Specter* is misplaced. Resp. at 22-23. *Dalton* recognized the difference between constitutional violations and claims of exceeding statutory authority, but in so doing it distinguished between executive action in the "absence of any statutory authority" versus executive abuse of discretion in violation of a particular statute. 511 U.S. 462, 473-74 (1994). The *Dalton* Court found that a claim involving a "want of power," as opposed to "a mere excess or abuse of discretion in exerting a power given," is judicially reviewable. *Id.* at 474 (quoting *Dakota Central Tel. Co. v. South Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)). Here,

there is no statutory authority for Defendants Musk or DOGE. Their existence and (unlawful) authority stem from an executive order, not an Act of Congress, and Defendants concede that Defendant Musk has no "actual or formal authority" whatsoever. Ex. 27 ¶ 5 at J.R. 424-25. This is precisely the type of executive action in the absence of authority that comprises a constitutional violation appropriate for judicial review.

Defendants' overarching unconstitutional conduct justifies the declaratory and injunctive relief requested in Plaintiffs' complaint. Compl. ¶ 82. Additionally, for purposes of the narrower relief sought by this preliminary injunction, Defendants' structure and operation amount to systemic separation of powers violations specifically as it pertains to USAID, an independent agency created and provided for by multiple acts of Congress. To wit: closing and renaming headquarters; cutting off funding; seizing control of the digital infrastructure; closing email accounts; gaining access to critical systems, including root access and employees' sensitive personal information; and, as Defendant Musk described it, "shutting down USAID." Compl. ¶¶ 33, 43, 47-50, 53. Additionally, Defendants' conduct violates the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) and the Further Consolidated Appropriations Act, 2024 (FCCA). PI Mem. at 15-17.

Defendants attempt to excuse these statutory violations by claiming the President has "tremendous discretion over foreign affairs." Resp. at 23-24. This argument fails for two reasons. First, none of the cases cited by Defendants supports the idea that the President can ignore or contradict federal law in the foreign policy area. To the contrary, those cases each support Plaintiffs' position. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("*Congress* holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers" and that the President has "a *degree* of independent authority" to act, such as

entering "executive agreements" and the "settlement of claims.") (emphasis added); *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 320 (1936) (in evaluating a Congressional resolution authorizing the President to assess the effect of a Bolivian arms embargo, the Court found the President must be afforded "a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved" but that such authority "must be exercised in subordination to the applicable provisions of the Constitution."); *Youngstown,* 343 U.S. at 635-636, n.2 ("It was intimated that the President might act in external affairs without congressional authority, but not that he might act contrary to an Act of Congress."). And second, although the President himself also does not have the authority to "feed[] USAID into the wood chipper," Compl. ¶ 55, the gravamen of Plaintiffs' claim is not what the President can do but what Defendants Musk and DOGE have done.

Even if one were, *arguendo*, to analyze this case under the second *Youngstown* category due to the President's generalized "discretion over foreign affairs," Resp. at 23-24, here Congress has shown no "inertia, indifference or quiescence," that could justify the President invoking "independent powers" to dismantle an entire agency. *Youngstown*, 343 U.S. at 637 (Jackson, J. concurring). To the contrary, Congress just recently appropriated money with stringent strings attached for the continued operations of USAID. *See* PI Mem. at 16. Nor can Secretary Rubio's vague notice to Congress of a "review and *potential* reorganization," which came several days after DOGE had *already* dismantled the agency, satisfy the Further Consolidated Appropriations Act of 2024's detailed 15-day notice requirement. *Id.*

Defendants do not deny that a separation of powers claim can arise from the Executive usurping legislative authority but contend Plaintiffs only allege "what amounts to" an APA claim. Resp. at 23. They cite *City of N.Y.*, which found courts lack APA jurisdiction "to adjudicate

generalized grievances asking us to improve an agency's performance or operations." *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019). But Plaintiffs do not seek to compel action that risks "injecting the judge into day-to-day agency management." *Id.* (internal citations and quotation marks omitted). Instead, they allege a broader Constitutional violation, reviewable by this Court. *See, e.g., Trump*, 603 U.S. at 608 (citing *Youngstown*, 343 U.S. at 655 (Jackson, J., concurring)) (When a President "exercises mere 'individual will' and 'authority without law,' the courts may say so."); *Franklin v. Mass.*, 505 U.S. 788, 801 (1992) (President's actions "may still be reviewed for constitutionality"); *Leedom v. Kyne*, 358 U.S. 184 (1958) ("This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers."). Because Plaintiffs challenge Defendant Musk and DOGE, Defendants agree the APA is not proper. Resp. at 23.

### IV. Irreparable Harm

***Plaintiffs demonstrate that irreparable injury will result absent an injunction.***

Contrary to Defendants' assertions, Plaintiffs are suffering and will continue to suffer irreparable injury if Defendants' blatantly unconstitutional acts proceed unfettered. They have made a clear showing that they are likely to suffer irreparable harm without injunctive relief. Defendants' actions have placed Plaintiffs in severe risk, and their actions and access are ongoing. There is no reason to believe Defendants' actions will end given the government believes their access is appropriate. *See* Resp. at 30 ("the USDS E.O. directs Defendants to be given full access to U.S. government systems and data").

Defendants contend that Plaintiffs' physical and emotional distress amount to employment troubles. *Id.* at 24. But Defendants' actions have inflicted severe physical danger and emotional distress effecting, *inter alia*, a deprivation of basic resources in dangerous and remote locations,

wholly unrelated to employment status. *See, e.g.*, *IRAP*, 265 F. Supp. 3d at 629 ("absence of a family member cannot be cured through a later payment of money damages") (rev'd on other grounds, 883 F.3d 233 (4th Cir. 2018)); *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) ("strand[ing] the States' residents abroad" is substantial and irreparable); PI Mem. at 18.

Contrary to Pete Marocco's declaration, staff within dangerous countries were impacted by the loss of systems access and, despite his assurances that USAID "restored access to email, payment, and security notification systems to those employees access was previously limited or shut off," USAID staff in countries overseas were still shut out of USAID systems at the time he signed his declaration on February 22. Marocco Decl. ¶ 18, Ex. 26 at J.R. 411, *compare with* J. Doe 9 Second Decl. ¶¶ 4-8., Ex. 30 at J.R. 432-33;  J. Doe 19 Decl. ¶ 5, Ex. 8 at J.R. 252. More are being added to this list all of the time with the new round of administrative leave and PSC firings. *See, e.g.*, J. Doe 9 Second Decl., ¶¶ 4-8, Ex. 30 at J.R. 432-33, J. Doe 22 Decl., ¶¶ 6-9, Ex. 34 at J.R. 457.

Further, J. Does 9, 19, and 22 are PSCs and employees of USAID, currently in high-risk areas in the Middle East, Asia and Central America with their families, including their child(ren), as part of USAID missions. *See* J. Doe 9 Second Decl. ¶ 4, Ex. 30 at J.R. 432; J. Doe 19 Decl. ¶¶ 2, 4, Ex. 8. at J.R. 251; J. Doe 22 Decl. ¶ 3, Ex. 34 at J.R. 456. These Plaintiffs are at risk of being without access to critical communication and safety systems putting them at extreme risk of irreparable harm. *See* J. Doe 9 Second Decl. ¶ 8, Ex. 30 at J.R. 433; J. Doe 19 Decl. ¶¶ 2, 4, Ex. 8 at J.R. 251; J. Doe 22 Decl.¶ 6-9, Ex. 34 at J.R. 457.

Additionally, DOGE has shut down USAID's payment system, preventing the electricity payments for both J. Doe 22's individual housing and the USAID building. J. Doe 22 Decl. ¶ 6, Ex. 34 at J.R. 457. DOGE personnel have restricted access to this payment system so severely that

Mr. Kliger and Mr. Farritor of DOGE) are able to veto payments unilaterally. *Id.* Absent a request from their local Mission, and an extension from the electric company, J. Doe 22's electricity would have been terminated before now. *Id.* It will likely be cut off soon because the payment system is still not accessible, and local State Department representatives "are hesitant to make payments on [J. Doe 22's Mission's] behalf for fear of not being reimbursed." *Id.* ¶ 7.

Because DOGE locked the payment system, J. Doe 22 will lose both cell phone and internet access this week. *Id.* ¶ 8. Even with the current "waiver" process, there seems to be no vehicle or method to pay these bills. *See id.* ¶¶ 6-8. Moreover, once the electricity is off in J. Doe 22's home they lose access to security cameras and radios. *Id.* ¶ 7. This will cause significant safety concerns as they live in a high-risk post and their cell phones are the only way they can communicate with the Regional Security Office about security threats, and they will no longer have the necessary protection of the security cameras. *Id.* ¶¶ 7, 9.

Further, USAID PSC contracts have recently been posted to the DOGE website. J. Doe 1 Second Decl. ¶ 9, Ex. 28 at J.R. 427-28. These contracts include personally identifying information, such as home address and phone number. *Id*. DOGE posted this information on a public website with this information unredacted. *Id.* This has left J. Doe 1 and others in genuine fear that in time, their personal information will be posted on the DOGE website. *See id*. Indeed, J. Doe 20's PSC contract is featured on the DOGE website with some of their personal information included. J. Doe 20 Decl. ¶ 4, Ex. 32 at J.R. 437. Given the statements about USAID by both President Trump and Defendant Musk, Plaintiffs remain in fear that someone will use this information to physically harm them or their family.

### B. Defendants' access to and control of Plaintiffs' sensitive information

Plaintiffs continue to suffer injuries for which monetary damages are inadequate, each of

which is sufficient to demonstrate the likelihood of continued irreparable harm absent an order from this court for injunctive relief. Defendants continue to have ongoing access to and control of a trove of records that contain some of the Plaintiffs' most sensitive information. *See* Compl. ¶¶ 33, 56; J. Doe 2 Decl. ¶¶ 6, 8, 13, Ex. 3 at J.R. 228-29; J. Doe 7 Decl. ¶ 15, Ex. 5 at J.R. 239; J. Doe 12 Decl. ¶ 11, Ex. 7 at J.R. 246-47; J. Doe 2 Second Decl. ¶ 6, Ex. 29 at J.R. 429-30; J. Doe 8 Decl. ¶ 5, Ex. 31 at J.R. 436; J. Doe 11 Decl. ¶¶ 13-15, Ex. 64 at J.R. 913. This continuing access of Plaintiffs' sensitive personal information by Defendants and their affiliates is irreparable harm that money damages cannot rectify.

Moreover, Defendants conflate mere access to data with DOGE's unconstitutional access, and ignore DOGE's record of data misuse. Indeed, this week, this District granted a TRO based on such access, finding that the "continuing, unauthorized disclosure of the plaintiffs' sensitive personal information to DOGE affiliates is irreparable harm that money damages cannot rectify." *AFT v. Bessent*, No. 8:2025-cv-00430 at 30 (D. Md. Feb. 24, 2025). Moreover, the breach of data and its misuse in this case is far from speculative. Defendants claim there is "no evidence to show that Defendants publicly disclosed or otherwise misused any of their information." Resp. at 27. Yet J. Doe 20's contract is publicly available on the DOGE website. J. Doe 20 Decl.¶ 4, Ex. 32 at J.R. 437. And lest Defendants argue that they are no longer posting information, a recent posting on the DOGE website includes a different (non-party) PSC's contracting information embedded within it, including full name, address, and phone number. Ex. 40 at J.R. 543-47. Such "public disclosure of confidential information is irreparable" because "publication of … information is a bell that one cannot unring." *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) (internal citations and quotation marks omitted). In *Senior Executives Ass'n*, the court granted a preliminary injunction two weeks prior to a law's passage that would require

publication of confidential information. *Id*. Here the data breaches and disclosures have already commenced and remain ongoing on an unpredictable cadence. USDS-proper employees have resigned en masse, publicly attesting to how DOGE's activities include "mishandling sensitive data, and breaking critical systems." Faiz Siddiqui, et al, *DOGE's grab of personal data stokes privacy and security fears,* Washington Post (Feb. 25, 2025), Ex. 63 at J.R. 906.

Where access to sensitive personal information causes harm over and above available monetary damages, such harm is irreparable. *See* PI Mem. at 25 (collecting cases). As an example, J. Doe 2, suffers from restlessness, feelings of helplessness, and extreme distress. J. Doe 2 Second Decl.¶ 6, Ex. 29 at J.R. 429-30. As someone who previously engaged with USAID's information technology ("IT") infrastructure, the total inability to protect USAID's data, including J. Doe 2's extremely sensitive data has resulted in extreme distress. J. Doe 2 Decl. ¶¶ 4, 6, Ex. 3 at J.R. 227-28.  Plaintiffs are deeply concerned with the potential that DOGE will misuse their data. *See* J. Doe 1 Second Decl. ¶¶ 5-9, Ex. 28 at J.R. 427-28, J. Doe 2 Second Decl. ¶ 6, Ex. 29 at J.R. 429-30, J. Doe 7 Decl. ¶ 5, Ex. 5 at J.R. 236-37, J. Doe 8 Decl. ¶ 5, Ex. 31 at J.R. 436, J. Doe 11 Decl. ¶¶ 13-15, Ex. 64 at J.R. 911.

### C. Reputational injuries

Taking adverse employment actions against a person for a reason that "bears no relationship to their ability to perform their jobs," particularly when compounded by attaching "stigma" to the employee can constitute irreparable injury. *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020). Designation on a list of disfavored entities is sufficient for long-term reputational harm. *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174 at 179 (D.D.C. 2021) (finding that placing a company on a government list of Chinese military companies caused reputational irreparable harm sufficient for a preliminary injunction). Plaintiffs' personal information is posted

26

on the DOGE site, which Defendants promote, listing their affiliation with USAID, which Defendants villainize. J. Doe 20 Decl. ¶ 4 These are the type of "circumstances surrounding an employee's discharge, [that] together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found." *Roe*, 947 F.3d at 229, as amended (Jan. 14, 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 91–92 n.68 (1974)); *see* PI. Mem. at 26-27.

Defendants liken their characterization of USAID as a "criminal organization" that creates "bioweapon research" to a third party reputational harm. Resp. at  28. Elon Musk (@ElonMusk), X (Feb. 2, 2025), Ex. 58 at J.R. 698; Elon Musk (@ElonMusk), X (Feb. 2, 2025), Ex. 58 at J.R. 699. However, the D.C. District court recently drew a direct contrast between a "'harm that might befall unnamed third parties'" and "extreme harm to the individual employees[.]" *State v. Musk*, No. 25-CV-429 (TSC), 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025). It is not necessary for Defendant Musk to single out specific Plaintiffs by name in his digital diatribes—his baseless but "official" declarations of criminality leveled USAID personnel are sufficient to permanently stain the employment record of each Plaintiff.

### D. Constitutional injuries

"[T]he individual interest in the . . . protections guaranteed by the Appointments Clause is high," and there is an "important individual liberty safeguarded by the Appointments Clause.'" *Probst v. Saul*, 980 F.3d 1015, 1023 (4th Cir. 2020) (internal citations and quotation marks omitted). Here, Defendants' Appointments Clause violation dramatically infringes that individual liberty. Such "loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citing *Elrod*, 427 U.S. at 373). And that is why the Supreme Court has recognized that enduring an

Appointments Clause violation can subject individuals to irreparable "here-and-now" constitutional injuries. *See* PI Mem. at 28 (collecting cases). Defendants mistakenly parallel immediate threats to individual constitutional rights by government actors with a review process conducted by a "private, self-regulatory membership organization." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1336 (D.C. Cir. 2024). Here, the individual constitutional interests at stake more closely resemble the cases cited in the PI Memorandum and are more dramatic in terms of practical impact and constitutional implications.

**V. The equities favor Plaintiffs, their requested relief is proper, and Defendants request to consolidate a final determination on the merits is premature given the need for discovery.**

Because Defendants concede that they have no proper legal authority to take the actions Plaintiffs allege, then, *a priori*, an injunction ordering them to temporarily cease the activities they have no authority to conduct cannot harm them. It is also important to recognize that the "irreparable" in "irreparable injury" is a qualitative rather than quantitative requirement, and the quantitative analysis is done in the balancing of harms. *Cf. Legend Night Club v. Miller*, 637 F.3d 291, 302 (4th Cir. 2011) ("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. . . . [M]onetary damages are inadequate to compensate for the loss of First Amendment freedoms."); *Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966) (Friendly, J.) ("[a] plaintiff asking an injunction . . . is not required to show that otherwise rigor mortis will set in forthwith; all that 'irreparable injury' means in this context is that unless an injunction is granted, the plaintiff will suffer harm which cannot be repaired."). Thus, although here Plaintiffs' injuries are in fact severe, *any* showing of irreparable injury would in fact be enough to offset Defendants' nonexistent harms.

Defendants also object to the scope of Plaintiffs' requested injunction in that it would affect USAID "employees and PSCs" who are not parties to this action. However, "[a]n injunction . . .

is not prohibited merely because it confers benefits upon individuals who [a]re not plaintiffs." *Evans v. Harnett Cnty. Bd. of Educ.*, 684 F.2d 304, 306 (4th Cir. 1982). "Indeed, in some cases, the only way to vindicate an individual plaintiff's rights is by fashioning equitable relief that will necessarily be far-reaching." *Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 703 (M.D.N.C. 2023) (internal citations and quotation marks omitted). And, "[i]n the classic case where we are talking about an individual harmed by an executive policy, a successful case on the merits often entitles the plaintiff to no less." *Id.* (citation omitted). Further, because the Appointments Clause acts to "preserve[ ] . . . the Constitution's structural integrity by preventing the diffusion of the appointment power . . . 'remedies with bite' should be applied to appointments that run afoul of [it]." *Brooks*, 60 F.4th at 740 (internal quotation marks and citations omitted). Here, Defendants are exercising *actual* control over all USAID systems, and *they* themselves are the ones publicly disparaging and identifying USAID workers both collectively and individually. Individually identifying these Plaintiffs to these Defendants would defeat the purpose of seeking relief that protects the individuals *from* the Defendants. Nor would such relief even begin to address the root cause of their irreparable injury: Defendants' ongoing unconstitutional exercise of authority over them. It is patently absurd to order that an agency "not be dismantled" only as to a handful of individuals.[4]

Finally, Defendants' request that if the Court grants an injunction, it should be consolidated with a final determination on the merits is premature. Resp. at 30. The Court has a sufficient factual record for a preliminary injunction given the evidentiary standards. However, it should have a complete record before reaching a final determination on the merits. Granting expedited discovery

---

[4] Relatedly, Defendants suggestion that Plaintiffs post bond, Resp. at 30, makes no sense because Plaintiffs are only suing Elon Musk and DOGE, neither of whom stands to suffer any monetary loss from refraining from the challenged activities.

will provide the Court a thorough record of admissible evidence on which to rule and assist the Court's fact-finding function to assess the veracity and reliability of positions.

## CONCLUSION

Though courts have previously enforced the Appointments Clause, the present circumstances are quite literally without precedent. The richest man on earth, who was also the largest financial contributor to the President's reelection campaign, is dismantling the Executive Branch limb-by-limb. This is the *precise* fear that animated the Framer's Separation of Powers principles which form our national identity in a constitutive way—that is to say, the principles that constitute us. In order to prevent "a spirit of favoritism" from resulting in "unfit characters" exercising too much authority, the Framers required powerful men to be nominated by the President *and* confirmed by the Senate. And, of course, the Framers carefully divided responsibility between the branches, with the Executive Branch existing solely to *execute* the Legislature's will within the framework established by Congress and the Constitution.

And so it does not take attorneys, briefs, and arguments to look around and realize that our fundamental constitutional structure is buckling. Courts, whose language only has meaning within that very structure, might understandably struggle to grapple with the scope and pace of this unraveling. However, it is squarely within this Court's power to identify that Defendants' actions are not contemplated by our Constitution. As the record demonstrates, these actions are causing real, immense, and immediate harm to the Plaintiffs here and countless other Americans for which money damages will never make them whole. Indeed, it is in part because Defendants' actions ***so*** far transcend the constitutional framework, which provides for the legal system itself, that an equitable, rather than a legal, remedy is required at this time.

Respectfully submitted,

*s/ Norman L. Eisen*
Norman L. Eisen, [9112170186]
Tianna J. Mays, [1112140221]
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani**
Rebecca (Beth) Stevens**
Joaquin Gonzalez**
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway, Suite 102-402
San Antonio, TX 78218
Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com
*Attorneys for Plaintiffs*

**Application for admission *pro hac vice* pending