# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **J. DOE 1,** *et al.,*<br><br>*Plaintiffs*<br><br>v.<br><br>**ELON MUSK,** *et al.,*<br><br>*Defendants* | **Case No. 8:25-cv-00462-TDC** |

## COVER SHEET FOR EXHIBITS

Exhibits cited in Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Preliminary

Injunction are numbered as follows:

28. Second Declaration of J. Doe 1, J.R. 426-428

29. Second Declaration of J. Doe 2, J.R. 429-431

30. Second Declaration of J. Doe 9, J.R. 432-434

31. Declaration of J. Doe 8, J.R. 435-436

32. Declaration of J. Doe 20, J.R. 437-438

33. Declaration of J. Doe 21, J.R. 439-455

34. Declaration of J. Doe 22, J.R. 456-457

35. Declaration of Ann Lewis, J.R. 458-461

36. Declaration of Mary Comans, J.R. 462-465

37. Declaration of John Cheston, J.R. 466-468

38. The White House, *Interview of President Trump and Elon Musk by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025), J.R. 469-535

39. Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House, Feb 19, 2025, J.R. 536-542

40. DOGE Website Redacted, J.R. 543-547

41. Zoë Schiffer, *DOGE Puts $1 Spending Limit on Government Employee Credit Cards*, Wired (Feb. 20, 2025),  J.R. 548-558

42. Meredith Lee Hill, *The private GOP panic over the slash-and-burn DOGE firings*, Politico (Feb. 20, 2025), J.R. 559-566

43. Andrea Shalal & Nandita Bose, *Trump appears to contradict White House, says Elon Musk in charge of DOGE*, Reuters (Feb. 20, 2025), J.R. 567-570

44. Matt Bai, *The Blinding Contempt of the DOGE Bros*, Wash. Post (Feb. 24, 2025), J.R. 571-576

45. Jeff Stein et al, *Musk's blitzkrieg is unnerving many of Trump's senior advisers,* Wash. Post (Feb. 21, 2025)*,* J.R. 577-583

46. Rachel Treisman, *The USDA fired staffers working on bird flu. Now it's trying to reverse course*, NPR (Feb. 19, 2025), J.R. 584-599

47. Elon Musk (@elonmusk) X, (Feb 21, 2025, 2:43 AM), J.R. 600

48. Eli Stokkols & Daniel Lippman, *Musk's 'What Did You Do Last Week?' Email Hits a Million Replies*, Politico (Feb. 25, 2025), J.R. 601-606

49. Lindsay Whitehurst & Chris Megerian, *Trump backs Musk as he roils the federal workforce with demands and threats*, A.P. (Feb. 24, 2025), J.R. 607-613

50. Kaitlan Collins & Tierney Sneed, *White House reveals who DOGE acting administrator is*, CNN (Feb. 25, 2025), J.R. 614-622

51. Alexandra Alper and Raphael Satter, *Staffer with Elon Musk's DOGE amplified white supremacists online*, Reuters, (Feb. 7, 2025), J.R. 623-634

52. Marcia Brown, *DOGE staffer Gavin Kliger arrives at USDA*, Politico, (Feb. 19, 2025), J.R. 635-636

53. Shannon Bond, *et al*, *Who is part of Elon Musk's DOGE, and what are they doing?*, NPR, (Feb. 7, 2025),J.R. 637-659

54. Jacob Bogage & Jeff Stein, *Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS*, Washington Post, (Updated Feb. 16, 2025),  J.R. 660-662

55. Declaration of J. Roe 1 (filed under seal; motion forthcoming)

56. Declaration of J. Roe 3 (filed under seal; motion forthcoming)

57. Declaration of J. Roe 4 (filed under seal; motion forthcoming)

58. Selected Elon Musk X Posts, J.R. 663-701

59. Elon Musk (@elonmusk) X (Feb. 22, 2025, 2:46 PM), J.R. 702

60. *Alliance for Retired Americans v. Bessent*, Transcript of Preliminary Injunction Hearing (Feb. 23, 2025), J.R. 703-843

61. *AIDS Vaccine Advocacy Coalition v. United States Dep't of Def.*, Transcript of Motion Hearing (Feb. 25, 2025), J.R. 844-903

62. Donald Trump (@Realdonaldtrump), Truth Social (Feb. 22, 2025, 8:04 AM), J.R. 904

63. Faiz Siddiqui, Joseph Menn and Jacob Bogage, *DOGE's grab of personal data stokes privacy and security fears,* Washington Post, (Feb. 25, 2025, Updated 6:02 PM EST), J.R. 905-910

64. Declaration of J. Doe 11, J.R. 911-913

# EXHIBIT XXVII

Docusign Envelope ID: 236EF7CA-FDD9-4388-814D-FC8F05262DD0

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| J. DOE 1, *et al.*, | |
| **Plaintiffs** | **Case No. 25 8:25-cv-00462-TDC** |
| **v.** | |
| ELON MUSK, *et al.*, | |
| **Defendants** | |

## <u>SECOND DECLARATION OF J. DOE 1</u>

I, J. Doe 1, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 1" in the complaint.

2. This is my second declaration.

3. I am a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and have been with the agency since 2017.

4. My contract was terminated on February 19, 2025, with my last day of employment listed as March 6, 2025. I received a generic letter of termination that I was blind carbon copied on. It does not contain my name or contract number. I believe that the generic nature of this letter, if intended for me, will prevent my ability to apply for unemployment benefits, as they will be unable to confirm that this letter was intended for me personally. I also believe that the generic nature of the letter indicates that my contract was not fully reviewed and selected for termination, but was batch terminated, which goes against the provisions of my contract.

5. I know that DOGE has administrative access to our email system, which means that they can send emails under our email addresses. As a result, I do not know if the termination notice sent to me, but signed by a CO that did not send it, was truly sent by the person shown on the email, or if the CO who signed the generic letter even knew who it was being sent to.

6. I have continued to receive emails that come from outside my office that are unsigned and do not follow our communications guidelines. This is not typical procedure as, to the best of my recollection, all other communications with agency supervisors that I have received were signed or, at minimum, indicated from whom the email/communication was sent.

7. In addition, the agency website is being edited to give directives to staff, which are also unattributed and not in line with our expectations of official communications to staff.

8. Valid payments have continued to be held up by persons unknown, which is preventing our partners with exemptions or waivers from carrying out their work, due to lack of funds. Payments to myself for valid work expenses also continue to go unpaid due to lack of access to systems by trained and proven USAID staff.

9. The terminated contracts of my colleagues have been posted to the DOGE website. As we are PSC contractors without a contracting company to work under, our contracts include personally identifying information, such as our home address and phone number. These were not redacted for my colleagues. I have a genuine fear that in time, my own terminated contract will be posted on the DOGE website and since the president and Elon Musk have worked to demonize USAID and our work among the American public

through their lies and insinuations, that someone will use this information to physically

harm me or my family. I have already planned to stop inviting others to my home after

the information is posted due to this fear, which will likely isolate me further from my

support systems.


I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**


**J. Doe 1**

Signed by:
J. Doe 1
CBE933701EB74AB...

**Signature**

# EXHIBIT XXIX

Docusign Envelope ID: 5B68CC3F-1E22-470D-9F2C-A19B6A8110F8

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 1, *et al.*,<br><br>**Plaintiffs**<br><br>**v.**<br><br>ELON MUSK, *et al.*,<br><br>**Defendants** | **Case No. 25 8:25-cv-00462-TDC** |

## SECOND DECLARATION OF J. DOE 2

I, J. Doe 2, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.   I am a plaintiff in this litigation, identified as "J. Doe 2" in the complaint.

2. This is my second declaration.

3. I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for over 10 years.

4. My main duties include technological responsibilities related to cybersecurity and privacy. My position involves extensive interaction with USAID's information technology ("IT") infrastructure, including its data security systems.

5. On February 23, 2025, Gavin Kliger, a DOGE member, created the user account hr_announcements@usaid.gov. A screenshot of the ticket that was generated as a result of a new user being added to the system is attached to this declaration.

6. As referenced in my first declaration, DOGE's continued access to USAID systems makes those systems vulnerable because the DOGE personnel with complete control of

the systems do not have the full knowledge of the systems nor have they received the proper training for such access.  This amounts to a massive breach since USAID has lost all control of its systems and data to DOGE, including removing the ability for cyber and other security professionals to monitor the actions DOGE has performed within the systems. This brings me great distress on an emotional and professional level as I have a total inability to protect USAID's data, including that of mine and my colleagues' extremely sensitive data. I have not had any rest since DOGE came into USAID  and I have a sense of helplessness.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

                                                          **J. Doe 2**

                                                          Signed by:

                                                          *J. Doe 2*
                                                          ─────────────
                                                          DA0F4EA99FCF449...

                                                          **Signature**



# EXHIBIT XXX

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 1, *et al.*,<br><br>    *Plaintiffs*<br><br>v.<br><br>ELON MUSK, *et al.*,<br><br>    *Defendants* | **Case No. 25 8:25-cv-00462-TDC** |

## SECOND DECLARATION OF J. DOE 9

I, J. Doe 9, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 9" in the complaint.

2. This is my second declaration.

3. I am a personal services contractor ("PSC") offshore at the United States Agency for International Development ("USAID").

4. I am in a high-risk area in the Middle East.

5. On Monday, February 3, 2025, I tried to login to my USAID email account but was locked out. I received no warning or notification in advance of being shut out of USAID's systems. My supervisor and Head of Mission were not informed in advance of the cutoff.

   a. All of the contacts and the safety and security applications, including the SCRY application used to monitor and account for overseas personnel, were removed remotely from my USAID work phone. The SCRY application is the safety and security mechanism by which federal government staff overseas in dangerous areas indicate that they are in a dangerous situation and access help.

6. On the afternoon of February 19, 2025, 16 days after being cut off from all USAID systems, I obtained access to *some* of my USAID systems. The renewed access included email and USAID applications but not the Scry application.

7. On February 24, 2025, 21 days after being cut off from all USAID systems, I was able to get the Scry application and my work contacts back on my phone.

8. As of February 25, 2025, I am still employed with USAID and have not received an email informing me that I have been put on administrative leave or terminated. However, since the situation is changing so quickly each day, I wake up each day expecting the worst, including once again suddenly losing my access to critical safety tools without warning.  As I explained more fully in my first declaration, I am extremely worried about (1) my and my family's safety, (2) my child(ren)'s ability to continue in the school they are enrolled in, and (3) my ability to go on necessary medical leave soon.

9. I am distraught over how things are unfolding with respect to USAID and the treatment we continue to endure. In addition to what I noted in my prior declaration (and summarized in paragraph 8 of this declaration), I have psychological distress over the false accusations about USAID's work, which were started by Defendants and others in Washington DC, and have since been picked up by local media outlets. These claims have a direct negative impact on the perception of USAID where I work and I am concerned about the safety and security of myself, my family, and colleagues in a context where misinformation and disinformation about our work is spreading rapidly. We have no ability to counter these claims, since the statements are made by high ranking US officials, including Defendant Musk.

10. Based on what has happened within the agency as well as my understanding of what is happening at other agencies, I believe my personally identifiable information is being misused, activity on my government-furnished devices is being tracked by unauthorized, unvetted individuals, including noting down passwords and other sensitive information. In the high-risk country where I am stationed, our team deals with information and topics that are highly sensitive in nature.

11. I have a deep concern because I know that DOGE's team has full access to USAID systems and the work performed, for life-saving missions, can and has been taken out of context by DOGE and used against the USAID staff members performing the work.

12. Additionally, I am concerned that information related to these sensitive topics is in danger of being leaked, along with personal information connecting certain individuals to certain work products. This is causing me deep anxiety.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 26th day of February, 2025.**

**J. Doe 9**



**Signature**

# EXHIBIT XXXI

Docusign Envelope ID: 562B9D8E-87BA-4BA1-8C0A-B812759831C4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 1, *et al.*, | |
| **Plaintiffs** | **Case No. 25 8:25-cv-00462-TDC** |
| **v.** | |
| ELON MUSK, *et al.*, | |
| **Defendants** | |

## DECLARATION OF J. DOE 8

I, J. Doe 8, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 8" in the complaint.

2. I am a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and have been with the agency for over 7 years.

3. My first top secret security clearance took over 9 months to process and colleagues have informed me that theirs took even longer. Considering this administration has only been on the job for about one month and DOGE personnel were not prior federal workers, I do not believe they have any level of clearance or a "need to know" such information.

4. I received a termination email on Friday evening, Feb 21, 2025. The letter was not addressed to me and did not contain my contract number or any additional personally identifiable information. The letter indicated my last day of employment to be March 10, 2025.

000435

5. As a recently-terminated PSC, I am concerned about the misuse of my own personally identifiable information, including misuse by DOGE personnel since they have posted personally identifiable information of other PSCs whose contracts have been terminated on the DOGE website.

6. I am also concerned about not being paid for the remainder of my unused annual leave balance as there is hardly anyone left in the agency to process these payments.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 8**

Signed by:

**Signature**

# EXHIBIT XXXII

Docusign Envelope ID: 4594D980-CB00-4089-8429-54DB8667FC55

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1, *et al.*, <br><br> *Plaintiffs* <br><br> v. <br><br> ELON MUSK, *et al.*, <br><br> *Defendants* | **Case No. 25 8:25-cv-00462-TDC** |

## DECLARATION OF J. DOE 20

I, J. Doe 20, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 20" in the complaint.

2.      I was a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and was with the agency for almost 3 years.

3.      My contract with USAID was recently terminated.

4.      My PSC contract is one of the ones featured on the DOGE website with some of my personal information included.

5.      Additionally, all of the Contracting Offices and Contracting Officer Representatives that I and my PSC colleagues have been communicating with regarding our termination and offboarding processes have been placed on administrative leave. This means there is currently no way for terminated PSCs like myself to proceed with offboarding, finalizing contract modifications, or receiving payment for our accrued annual leave.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 20**

Signed by:

J. Doe 20

F3A439601DB3437...

**Signature**

# EXHIBIT XXXIII

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1, *et al.*,

*Plaintiffs*

v.

ELON MUSK, *et al.*,

*Defendants*

Case No. 25 8:25-cv-00462-TDC

## DECLARATION OF J. DOE 21

I, J. Doe 21, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 21" in the complaint.

2. I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for 16 years.

3. I was initially locked out of my access to USAID systems on February 3, 2025, along with many of my colleagues. There was no advance notice given before I lost system access.  HCTM-ELR (USAID's human resources team) replied to my outreach on February 4, letting me know that they thought I was on administrative leave, but could not confirm at that time.

4. On February 10, 2025, apparently in response to a former TRO issued in a different case, I regained  access to USAID systems.

5. On February 18, I and other staff noticed that all outgoing emails are now labeled SBU (sensitive but unclassified), without regard to the actual sensitivity of the contents.

6. On Saturday, February 22, I received from hr@opm.gov an email titled "What did you do last week?" The body of the email, in its entirety, said: "Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager. Please do not send any classified information, links, or attachments. Deadline is this Monday at 11:59pmEST." That email is attached to this declaration as Appendix A.

7. On Sunday, February 23, I received a broad notice advising that virtually all staff would be placed on administrative leave effective 11:59 pm the same day. That notice is attached to this declaration as Appendix B.

8. A few hours later on February 23, I received a Reduction in Force ("RIF") notice from hr_announcements@usaid.gov.

9. The RIF document was an unsigned form letter from "Acting Deputy Administrator" Peter Marocco with my information filled into the blanks attached to a brief, generic email. The RIF document is attached to this declaration as Appendix C.

10. Also on February 23, I contacted HCTM-ELR via email to HCTM-ELR@usaid.gov, as the RIF letter suggested.

    a. In the email, I asked whether the RIF notices were sent by HCTM.

    b. At first, I received an auto-reply to my email. A screenshot of that reply is attached to this declaration as Appendix D.

    c. I then received a reply from HCTM-ELR confirming that they did not send the RIF notices and they lacked any additional information on next steps.

11. As of the evening of February 24, 2025, despite the seemingly contrary indication within the notice in Attachment 2 that "most personnel will continue to have access to USAID systems," I have been locked out of USAID systems.

12. On February 24, upon losing system access, I wrote to the CIO Helpdesk to ask if this was a change of policy from the previously provided notice, and received a form reply. The form reply is attached at Appendix E.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 21**

Signed by:

*J. Doe 21*

B17735A5CB6604CD...

**Signature**

# Appendix A



---

## What did you do last week?

---

**HR** <hr@opm.gov>                                                    Sat, Feb 22, 2025 at 5:36 PM
Reply-To: "HR@opm.gov" <hr0@opm.gov>

   Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager.

   Please **do not send** any classified information, links, or attachments.

   Deadline is this Monday at 11:59pmEST.

# Appendix B





### SBU: Notification of Administrative Leave

**USAID Office of the Administrator** <usaid_fo@subscribe.usaid.gov>          Sun, Feb 23, 2025 at 3:42 PM
To:

# SENSITIVE BUT UNCLASSIFIED



Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC
2/24/25, 6:02 AM                    USAID Mail – SBU: Notification of Administrative Leave

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 30 of 528

As of 11:59 p.m. EST on Sunday, February 23, 2025, all USAID direct hire personnel, with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally.

Most personnel will continue to have access to USAID systems and should continue to monitor email for further guidance. Employees on administrative leave, however, are not authorized to conduct Agency business or to download or access official USAID files without the express permission of Agency leadership.

Concurrently, USAID is beginning to implement a Reduction-in-Force that will affect approximately 2,000 USAID personnel with duty stations in the United States.

Individuals that are impacted will receive specific notifications on February 23, 2025, with further instructions and information about their benefits and rights.

Designated essential personnel who are expected to continue working will be informed by Agency leadership February 23, 2025, by 5 p.m. EST.

For overseas personnel, USAID intends a voluntary Agency-funded return travel program and other benefits. USAID is committed to keeping its overseas personnel safe. Until they return home, personnel will retain access to Agency systems and to diplomatic and other resources.

In the coming week, we will provide details on how to retrieve personal items from the former USAID workspaces at the Ronald Reagan Building for current and former USAID staff who previously had a workspace at RRB.

Additional guidance is forthcoming, and all future updates/notices will continue to be communicated through official USAID channels and posted on USAID.gov for those without access to USAID systems.

---

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.

---

This email was sent to tthwing@usaid.gov using govDelivery Communications Cloud on behalf of: United States Agency for International Development · 1300 Pennsylvania Avenue NW · Washington, DC · 20004



# Appendix C

MEMORANDUM FOR:   ██████  ████████         ████████
                  _____ ██████ _____   _____

FROM:             Peter Marocco
                  Acting Deputy Administrator, USAID

DATE:             February 23, 2025

SUBJECT:          Specific Notice of Reduction in Force

I regret to inform you that you are affected by a Reduction in Force (RIF) action. This RIF is necessary to restructure USAID's operations to better reflect Agency priorities and the foreign policy priorities of the United States.

This is your specific notice of RIF. In accordance with RIF procedures specified in Title 5, Code of Federal Regulations, Part 351, you are being released from your competitive level because your competitive area is being eliminated. Consequently, you will be separated from the Federal service effective April 24, 2025. In the event you are qualified and have assignment rights to a position that becomes available during the notice period, you will be informed via a specific, subsequent RIF notice. Should the circumstances of the RIF otherwise change, this notice may be withdrawn.

**RIF Package**

Each employee impacted by RIF has access to documents that outline applicable benefits for which you may be eligible or entitled as appropriate. These documents will be provided to you by Human Capital and Talent Management (HCTM) within fourteen (14) days of this communication. To obtain paper copies of the documents or ask for additional information, you may make an appointment by contacting HCTM at HCTM-ELR@usaid.gov or 202-712-1234. In addition, the websites to certain relevant external benefits provided by other entities are found immediately below.

For training benefits under the Workforce Improvement Act of 1998, please see www.careeronestop.org.

For unemployment compensation benefits, please refer to the Department of Labor website at www.dol.gov.

For general information on transition assistance, please refer to the Office of Personnel Management website at www.opm.gov.

**Appeal and Grievance Rights**

U.S. Merit Systems Protection Board (MSPB)
If you believe your rights have been violated, you may appeal this action to the MSPB. You may file your appeal with the MSPB's Washington Office, 1615 M Street, NW, Washington, DC

20419. Your appeal must be in writing and may be filed any time after the effective date of the action being appealed until <u>no later than 30 calendar days</u> after the effective date. Failure to file an appeal within the time limit may result in dismissal of the appeal as untimely filed. More information on filing appeals is included in your RIF package. You may also access the MSPB website at www.mspb.gov for additional and further detailed information on the appeal process.

<u>Equal Employment Opportunity (EEO)</u>
If you believe this personnel action is based in whole or in part on discrimination based on your race, color, religion, sex, national origin, age or handicap, you may file a complaint with the Agency's Office of Civil Rights (OCR) at 202-712-1110 or OCRDlist@usaid.gov. You must contact OCR no <u>later than 45 calendar days</u> of the effective date of the action, specifically, your separation from Federal service. You may also file with MSPB as noted above and raise discrimination as an affirmative defense. However, you may not proceed through both forums; you must elect one or the other.  You may also access the U.S. Equal Employment Opportunity Commission (EEOC) website at www.eeoc.gov for additional and further detailed information on the Federal sector EEO process.

<u>Office of Special Counsel</u>
You may also seek corrective action before the U.S. Office of Special Counsel (OSC). Visit the OSC e-filing system web site at www.osc.gov, to access the online application. However, if you do so, you will be limited to whether the agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures. If you choose to file an action with OSC, you will be foregoing your right to otherwise challenge the basis for this personnel action.

**Employee Information**

The following information was collected regarding your employment with USAID in connection with this RIF action:



Competitive Area:
Type of Service:
Work
Title:
Grade and Level:
Tenure Group:
Service Date:
Veterans' Preference:
Last Three Performance Ratings:

The above information did not affect your standing or treatment in this RIF action, which eliminated your entire competitive area. Nonetheless, please contact HCTM if you believe any of

the above information is incorrect and would like to request an update to your profile in USAID's HR systems.

**Conclusion**

This action is being taken in accordance with the applicable civil service RIF regulations. Included in your RIF package is a copy of the Office of Personnel Management (OPM) retention regulations, 5 C.F.R. Part 351. Further and detailed information about the RIF regulations may also be accessed on OPM website, Reductions in Force. You may make an appointment to review and obtain a copy of the RIF regulations and/or records pertaining to you by contacting HCTM.

In addition, our USAID StaffCare team is available to provide support to you and your families. The USAID Staff Care Center resources are available for virtual consultations and referrals. The entire USAID workforce, regardless of staffing mechanism, and their family members can access the Staff CareCenter services 24 hours a day, 7 days a week, 365 days a year. Services are free and confidential.

Contact Staff Care:

- Free phone: +1 (877) 988-7243
- Direct dial: +1 (919) 645-4960
- Global direct dial: +44 (208) 987-6200
- Email: staffcarecenter@usaid.gov
- Website: Staff Care Center (Registration code: USAID)

Because you are being separated through a RIF action, you are eligible for career transition and placement assistance. Your RIF package includes further information on these programs.

Please be advised that an early resignation may affect your eligibility for placement assistance and your appeal rights. It may also impact your ability to qualify for unemployment compensation and training benefits provided under WIA. You are encouraged to contact your State's Department of Labor and Employment for any questions regarding unemployment compensation. You are also encouraged to contact HCTM at HCTM-ELR@usaid.gov or 202-712-1234 to determine how an early resignation may affect your benefits.

This RIF action does not reflect directly on your service, performance, or conduct. It is being taken solely for the reasons stated above. Leadership at USAID thank you for your service to our Agency and the nation.

**Attachments (6)**
1. Acknowledgment of Receipt
2. MSPB Appeal Information
3. OPM Retention Regulations
4. Unemployment Insurance and State Workforce Programs

5.  Authorization for Release of Employment Information
6.  CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

# Appendix D



HCTM.ELR <hctm.elr+noreply@usaid.gov>
to me

Thank you for contacting Employee and Labor Relations. In light of the most recent actions (2/23/25), please note that ELR only has a skeleton staff at this point and may not be able to respond to everyone individually.  Please see the responses below for answers to our most common questions and thank you for your patience as we are currently dealing with a heavy load of emails.

We cannot currently provide information about your individual status. Per the notices that went out last night, if you are a direct hire and received an email stating that you are "essential" you should be working.  Otherwise, if you are direct hire, per the notice posted on the usaid.gov website, you have been placed on administrative leave. Contractors should contact their COs for further guidance.

We do not have any additional information to provide at this point regarding those who elected DRP and also received the RIF notice. If you have questions or need corrections or documentation, please submit them to hr-helpdesk@usaid.gov as we are tracking them there and are working on putting together a FAQ.

If you need IT assistance, please contact the IT helpdesk at cio-helpdesk@usaid.gov  or at 202-712-1234, Press 1.

For HR related questions, including retirement, VERA, and deferred resignation, please email hr-helpdesk@usaid.gov. For payroll questions, please reach out to payroll@usaid.gov.

I am sorry we are not able to provide you with more guidance at this time. Thank you for your patience as we all try to work through this situation.

# Appendix E

 Gmail

# Service Request INC████████ has been resolved

1 message

**USAID Service Central Ticketing System** <usaidsnts@usaid.gov>                    Mon, Feb 24, 2025 at ████
Reply-To: USAID Service Central Ticketing System <usaidsnts@usaid.gov>
To: ████████████████

Service Request ticket INC████████ has been resolved and will be closed in 5 business days.

Short description: Lost systems access

Resolution notes: Hello,

Thank you for contacting the USAID IT Service Desk.

At this time, both the CIO Service Desk and HCTM are not able to validate the disablement of USAID accounts or restore them without authorization from political leadership.
In the event that a user is no longer able to access their USAID account, please have the user's mission/bureau career leadership work with their political leadership to request confirmation of the action.

Any questions regarding Administrative Leave Status should be directed to hctm.elr@usaid.gov.

As we have referred you on who to contact, we will now be resolving this ticket.

Regards,

████████████
USAID Service Desk Analyst
U.S. Agency for International Development (USAID)

Ref:████████████

# EXHIBIT XXIV

Docusign Envelope ID: 30742D02-232B-49F6-B2C2-672ABCBD2A25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|   |   |
|---|---|
| J. DOE 1, *et al.*,<br><br>           *Plaintiffs*<br><br>                **v.**<br><br>ELON MUSK, *et al.*,<br><br>           *Defendants* | **Case No. 25 8:25-cv-00462-TDC** |

## DECLARATION OF J. DOE 22

I, J. Doe 22, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 22" in the complaint.

2. I am an employee at the United States Agency for International Development ("USAID") and have been with the agency since 2020.

3. I am in a high-risk area in Central America.

4. On February 23rd, 2025, I was placed on administrative leave. Aside from a public announcement on the USAID website, the only indication I have that I have been placed on leave is an informal email from my Mission director. I did not receive a formal notice of being placed on leave.

5. The people that appear to be tasked with getting us home seem very unaware as to how to access normal information about personnel such as staffing patterns and family composition. My colleagues and I have received strange google forms asking for our family information when all of that information is in our OF-126 (a form/file within USAID systems).

6. Because DOGE has shut down USAID's payment system (Phoenix), our housing electricity and the electricity in our USAID building have not been paid for. Mission leadership has informed us that the only reason our electricity is on is because we've asked for an extension from the electric company. The Mission asked for a waiver but because our payment system is down, the Treasury has no way to issue money to USAID and State Department representatives here are hesitant to make payments on our behalf for fear of not being reimbursed.

7. Once the electricity goes out in our homes, we lose access to our security cameras and radios. Again, I live in a high-risk post, so access to security systems is very important to me.

8. I have been told by Mission leadership that the cell phone and internet bills are due this week with no way to pay them. This is despite the so-called "waiver" process that has been allegedly implemented to preserve such access.

9. Our cell phones and radios are also the only way to communicate with the Regional Security Office about security threats. We have access to no other USAID security systems.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 22**

Signed by:

*J. Doe 22*

470070FBBA2146F

**Signature**

# EXHIBIT XXV

Docusign Envelope ID: 9636C979-D932-4908-83DD-56785282B9C8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 1, *et al.*, | |
| **Plaintiffs** | |
| **v.** | **Case No. 25 8:25-cv-00462-TDC** |
| ELON MUSK, *et al.*, | |
| **Defendants** | |

## <u>DECLARATION OF ANN LEWIS</u>

I, Ann Lewis,  pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am the former Director of the Technology Transformation Services ("TTS") within the U.S. General Services Administration.

2. I have a degree in computer science from Carnegie Mellon University. I have worked in tech for over 20 years, and as a technology leader for over 12 years, including roles as Chief Technology Officer at a national nonprofit organization, and as a software engineer for a multi-billion dollar company.

3. I have read public reporting as well as declarations in this lawsuit which discuss the level of access that members of DOGE have within the USAID systems.

4. I understand that DOGE has "root access" (sometimes called "administrator access" or more colloquially "God Mode") to all USAID technology systems.

5. Administrator access is defined by CISA (Cybersecurity and Infrastructure Security Agency) as "elevated system privileges that allow a user to install software, change security settings, manage accounts, and configure system settings." Administrator access is generally understood by the tech industry and by IT professionals as the highest and most powerful level of access to any system. Administrator access to a system gives the user the ability to create, read, update, and delete/destroy any and all data and code within the system. This can include modifying or deleting website content, reading another user's emails, sending email on behalf of every user, adding or removing code to change the behavior of the system, granting other users any level of access (including additional administrator access), revoking access from any user, updating data, deleting data, and extracting all data including sensitive data and the Personal Identifying Information of users.  Administrator access not only allows the user to delete critical data owned by and affecting other users, but it also allows the user to disable, modify, or destroy data backups and audit trails used to conduct forensic analysis, and it allows the user to take system components fully offline.

6. Through my work leading TTS, I became aware of the Federal Information Security Management Act (FISMA) https://www.congress.gov/bill/113th-congress/senate-bill/2521/text , and NIST's SP 800-53 Security and Privacy Controls for Information Systems and Organizations https://csrc.nist.gov/pubs/sp/800/53/r5/upd1/final.

7. FISMA is a US law that protects government information and operations, and NIST 800-53 is a cybersecurity framework that provides a comprehensive set of security and privacy controls for federal information systems and organizations.

8. The Principle of Least Privilege is a fundamental cybersecurity concept and best practice that states that users should have only the minimum rights, roles and permissions required to perform their roles and responsibilities. This protects access to high-value data and critical assets, and helps prevent unauthorized access, accidental damage from user errors, and malicious actions. The Principle of Least Privilege applies to all aspects of system and software management, including access control, user roles in systems, software, databases, applications, service accounts, APIs, and automated processes.

9. FISMA Section 3544 (Management of Information Security Risk) states that the head of each agency shall be responsible for complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines, including information security standards promulgated under section 11331 of title 40. And section 11331 of title 40 states that the National Institute of Standards and Technology (NIST) prescribes standards and guidelines pertaining to Federal information systems.

10. NIST 800-53 AC-6 lists The Principle of Least Privilege as a key security control:

    https://csrc.nist.gov/CSRC/media/Projects/risk-management/800-53%20Downloads/800-53r5/SP_800-53_v5_1-derived-OSCAL.pdf

11. NIST 800-53 defines "administrator access" as a privileged role that allows users to perform security-relevant functions that are not typically available to ordinary users

12. Granting DOGE engineers administrator access to all USAID systems is a clear violation of the Principle of Least Privilege, and at odds with cyber security best practices federal agencies are required to follow, as specified by NIST SP 800-53.

13. Granting administrator access to any system opens up new fraud vectors and new cyber security risks. As a technology professional and former government employee, I believe that **every cyber security risk is also a national security risk**. At present, every hacker in the world knows there are a small number of people new to federal service who hold the keys to access all US government payments, contracts, civil servant personal info, and more. When sensitive data exists within government security boundaries, we can audit and track it, but after it leaves, we can't know where it goes or what it's being used for.  Anyone with administrator access to a system can not only export all data, but can also disable tracking and audit logging critical to forensic analysis.

14. The costs of cyber security incidents are high, not just to the agency or breached system, but especially to the users whose Personal Identifying Information was leaked, shared without their permission, or stolen. Stolen PII can't be easily changed or drawn back, and the damage to the individual can last a lifetime. A user's stolen PII can be sold, used to commit fraud, used for scams, harassment, and identity theft.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**Ann Lewis**



**Signature**

# EXHIBIT XXVI

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1, *et al.*,

*Plaintiffs*

v.

ELON MUSK, *et al.*,

*Defendants*

**Case No. 25 8:25-cv-00462-TDC**

<u>**DECLARATION OF MARY COMANS**</u>

I, Mary Comans, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.  From March 2017 until February 2025, I served as the Chief Financial Officer for the Federal Emergency Management Agency ("FEMA"). I have been a member of the Senior Executive Service for nearly one decade. From January 20 – 26, 2025, I served as the Senior Official Performing the Duties of FEMA Deputy Administrator. I previously served in numerous positions across the Department of Homeland Security ("DHS").

2.  On or around February 5, 2025, I participated in an in-person meeting with leadership of FEMA and DHS, to include Acting DHS General Counsel Joseph Mazzara, and two DOGE team members: Brad Smith and John Burham. Another DOGE team member, Kyle Schutt, participated by phone.

3.  The DOGE team members said they were embedded at U.S. Department of Health and Human Services but were there to help as the DHS DOGE members onboarded. Specifically, they wanted to ensure that FEMA was not sending money to non-

governmental organizations ("NGOs") that aided undocumented immigrants through the "Shelter and Services Program" grant that FEMA administers for U.S. Custom and Border Protection.

4.    Mr. Smith, one of the DOGE members, asked FEMA's leadership team whether they had stopped all payments to NGOs. A FEMA representative who oversees grants confirmed that they had. Mr. Smith then asked about payments to state and local governments. The FEMA representative said those payments were being continued. Wagging his finger for emphasis, Mr. Smith affirmed, "that's the right answer."

5.    The next day, on Thursday, February 6, 2025, FEMA, DHS leadership and DOGE had a follow up meeting, which I attended, to ensure FEMA was providing the system access needed.  Initially, DOGE asked for elevated system administrator privileges to FEMA's Grant Management system, which manages the life-cycle of all FEMA grant programs, to include grant awards. This request was granted by the executive officer that oversees the Grant Directorate.  At this time, DOGE's also asked for read-only access to the FEMA financial system, and I granted that request.

6.    Recognizing the potential audit and internal control risk, I asked my supervisor, the Acting FEMA Administrator, to obtain a written directive from DHS leadership directing expanded access to FEMA's grant management system. I asked for the written directive in order to protect FEMA from liability. Additionally, I knew, for instance, that the code in our financial system is proprietary and therefore access is supposed to be strictly limited. DHS never issued this written directive; instead, on February 10, 2025, the

Acting FEMA Administrator signed a memo that I executed to grant DOGE full system administrative right to FEMA's financial system.

7.    As I understand it, on Sunday, February 9, 2025, around 5:00 PM, a DOGE team member embedded at the Treasury Department flagged that FEMA had recently paid New York City tens of millions of dollars. This payment was under the Shelter and Service Program to reimburse New York City for eligible expenses incurred for the care and sheltering services the City had provided to migrants following their release from DHS custody. I spent the entire evening analyzing the amount of funds paid and in what manner. I was also directed by DHS Deputy Chief of Staff Troup Hemenway to grant Mr. Schutt, a DOGE representative, full system access to FEMA's financial system, and I did so.

8.    I became aware that Elon Musk posted on X (formerly Twitter) at 4:03AM on February 10, 2025, that "The @DOGE team just discovered that FEMA sent $59M LAST WEEK to luxury hotels in New York City to house illegal migrants. Sending this money violated the law and is in gross insubordination to the President's executive order. That money is meant for American disaster relief and instead is being spent on high end hotels for illegals! A clawback demand will be made today to recoup those funds."[1]

9.    I spent all day on Monday, February 10, 2025, recouping the funds from New York City, which ultimately totaled $80 million dollars. On Monday, February 10, 2025, at 3:45PM, FEMA's Acting Administrator sent an email to DHS confirming that the process to claw

---

[1] Elon Musk (@elonmusk), X (Feb. 10, 2025, 4:03 AM), https://x.com/elonmusk/status/1888891512303263815.

000464

back funding was occurring. At 5:29PM, I reported to my leadership that I had

successfully coordinated with Treasury and the funds were being returned.

10.    Based on my experience and the interactions I witnessed, there was a sudden policy

change concerning whether FEMA could send resources to state and local governments. I

know the changed policy was not a decision made by FEMA leadership. Upon

information and belief, I believe that this decision was made by Mr. Musk and/or DOGE.

11.    On Tuesday, February 11, 2025, I was terminated from federal employment.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th day of February 2025.


_____
Mary Comans

# EXHIBIT XXVII

Docusign Envelope ID: B3B243E9-F335-469F-91BA-1C606AAE4735

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 1, *et al.*,

**Plaintiffs**

**v.**

ELON MUSK, *et al.*,

**Defendants**

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF JOHN B. CHESTON

I, John B. Cheston, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.    I am a research assistant for Marziani, Stevens & Gonzalez PLLC, counsel for Plaintiffs in this case.

2.    I combined the video attached to this Declaration as Appendix A.

3.    I created this video from the publicly available sources listed below, all of which I understand are being separately entered into the record in this case. Those sources are:

   a.   The White House, *President Trump Participates in the FII PRIORITY Summit,* YouTube 16:00 (Feb. 19, 2025) https://www.youtube.com/watch?v=11CnoIJidr8

   b.   ALX (@alx), *ELON MUSK: "We need to delete entire agencies…"* (Feb. 13, 2025), X, https://x.com/alx/status/1889912783627825445

   c.   Sean Hannity, *Interview with President Donald Trump and Elon Musk*, Fox News (Feb. 19, 2025)

   https://nation.foxnews.com/watch/1ebe75d66f1b33d8943a0be8a14222b8/

    d.   CSPAN (@cspan), *"President Trump on DOGE emails…"* (Feb. 24 2025), X,

         https://x.com/cspan/status/1894095758686634306/video/1

4.       I used iMovie to create the video.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

                                                 **John B. Cheston**

                                                 **Signature**

# Appendix A

https://drive.google.com/file/d/1v7KT8SzA_HsuJNrrXaa7VLL38m7rDflg/view

# EXHIBIT XXVIII

Menu



Search

REMARKS

# INTERVIEW OF PRESIDENT TRUMP AND ELON MUSK BY SEAN HANNITY, "THE SEAN HANNITY SHOW"

February 18, 2025

Roosevelt Room

11:48 A.M. EST

000469

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 59 of 528

Q   Mr. President, great to see you again.

THE PRESIDENT:  Thank you very much.  Thank you.

Q   How are you?

THE PRESIDENT:  Thank you.

Q   Elon Musk.

MR. MUSK:  Hi.

Q   Great to see you.

MR. MUSK:  Thanks.  Thanks for having me.

Q   I've been reading a lot about you.  I've got to start with this.  So, he's working for free with DOGE.  He's — he's kind of put a lot of his life on hold, and you sued Twitter a number of years ago.  You just made him pay you $10 million?

THE PRESIDENT:  That's right.  That's right.

Q   That's — that's right.  (Laughs.)

THE PRESIDENT:  Well, I sued — I sued from long before he had it.

MR. MUSK:  Yeah.  Yeah.  (Inaudible.)

THE PRESIDENT:  And, I mean, they really did a number on me, you know.  And I sued, and they had to pay.  You know, they paid $10 million settlement.

000470

Q   You're okay with that?

MR. MUSK:  I mean, I left it up to the lawyers and, you know, the team running Twitter.  So, I said, "You guys do what you think is the right — makes sense."

Q   I think it's funny.

THE PRESIDENT:  I think —

Q   Because —

THE PRESIDENT:  — it's a very low — I was looking to get much more money than that.

Q   So, you gave him a discount w- — in the lawsuit?

THE PRESIDENT:  He got — oh, he got a big discount.  I don't think he even knows about it.

Q   He's become one of your — if you read and believe the media — he's become one of your best friends.  He's working for free for you.  He's —

MR. MUSK:  Well, I love the president.  I just want to be clear about that.

Q   You don't care about that?

MR. MUSK:  I — no, I love the pr- — I —

Q   You love the president?

MR. MUSK: I think — I think President Trump is a good man, and — and he's, you know — I — I —

THE PRESIDENT: That's the way he said that. You know, there's something nice about. (Laughter.)

MR. MUSK: No, it is. I, you know —

THE PRESIDENT: It is.

MR. MUSK: Because, I mean, the president has been so — so unfairly attacked in the media. It's truly outrageous. And I've sp- — at this point, spent a lot of time with the president, and not once have I seen him do something that was mean or cruel or — or wrong. Not once.

Q   You know, I've known him for 30 years.

MR. MUSK: Yeah.

Q   And I've never seen anybody take as much as he's taken.

MR. MUSK: Yeah.

Q   And we've discussed this. And I'm like, "How do you deal with it?"

THE PRESIDENT: Did have a choice? (Laughs.) I didn't have a choice.

Q   Well, you would say that to me. I'm like, "What — what am I going to do? Worry about it?"

THE PRESIDENT:  That's the only thing I can say.

Q    And, you know — and then culminating in two assassination attempts, which resulted in your endorsement.

MR. MUSK:  Well, I was going to do it anyway, but that was —

Q    That was it?

MR. MUSK:  — a precipitating event, yeah.

THE PRESIDENT:  That speeded it up a little bit?

MR. MUSK:  Yeah.  Yeah.

Q    The day of the assassination?

THE PRESIDENT:  Nice.  I didn't know that.

MR. MUSK:  Yeah, it just — it sped it up, but I was going to do it anyway.

Q    Mr. President, with your indulgence, I'm convinced that people only know a little bit about Elon.  I don't think they know everything about Elon, because as I studied for and prepared for this interview, I learned a lot about you that I didn't know.  I think people will think about Tesla.  Democrats are demonizing you and — and trying to make the country hate you.

I just want people to understand you a little bit better, and the person that you've gotten to know and have now put a lot of trust in.

000473

THE PRESIDENT:  Sure.

Q   And, you know, just — let's go over a little bit of your bio, starting —

MR. MUSK:  Ah, okay.

Q   — with PayPal and how you became involved in Tesla and SpaceX and Neuralink —

MR. MUSK:  This — this could take a while.

Q   — and all these —

MR. MUSK:  I mean, you know, I — I think the way you think of me is, like, I'm a technologist and I try to make technologies that improve the world and make life better.

Q   You can show them your shirt.

MR. MUSK:  Yeah, and that's why, like, my t-shirt says "tech support" — (laughter) — because I'm here to provide the president with — with technology support.

And now, that — that may seem, like, well, is that a silly thing?  But actually, it's a very important thing, because the president will make these executive orders, which are very sensible and good for the country, but then they don't get implemented, you know?

So, if you take the — for example, all the funding for the migrant hotels, the

president issued an executive order: Hey, we need to stop taking taxpayer money and — and paying for luxury hotels for illegal immigrants —

Q   It's crazy.

MR. MUSK:  — which makes no sense.  Like, obviously, people do not want their tax dollars going to — to fund high-end hotels for — for illegals.  And yet, they were still doing that, even as late as last week.

And so, you know, we went in there, and we were like, "This is in violation of the presidential executive order.  It needs to stop."

So — so, what we're — what we're doing here is — is — one of the biggest functions of the DOGE team is just making sure that the presidential executive orders are actually carried out.  And this is — I just want to point out, this is a very important thing, because the president is the elected representative of the people, so he's representing the will of the people.  And if the bureaucracy is fighting the will of the people and preventing the pres- — the president from implementing what the people want, then what we live in is a bureaucracy and not a democracy.

Q   Yeah.  You — you're both aware — you have to be keenly aware that the media and — and the punditry class — not that — you know, I think you've proven they have no power anymore, because they threw everything they had at you, and they didn't win.  And that was, you know, the New York Times, Washington Post, three networks, every late-night comedy show, two cable channels — they — they just threw — they threw everything — lawfare, weaponization.

THE PRESIDENT:  It's true.

Q    And now I see they want you two to start — they want a divorce.  They want you two to start hating each other.  And they try — "Oh, President Elon Musk," for example.  You do know that they're doing that to you?

THE PRESIDENT:  Oh, I see it all the time.  They tried it, then they stopped.  That wasn't — they have many different things of hatred.

Actually, Elon called me.  He said, "You know they're trying to drive us apart."  I said, "Absolutely."

You know, they said, "We have breaking news: Donald Trump has ceded control of the presidency to Elon Musk.  President Musk will be attending a Cabinet meeting tonight at 8 o'clock."  (Laughter.)  And I say — it's just so obvious.  They're so bad at it.

I used to think they were good at it.  They're actually bad at it, because if they were good at it, I'd never be president because I — I think nobody in history has ever gotten more bad publicity than me.

I could do the greatest things; I get 98 percent bad publicity.  I could do — outside of you and a few of your very good friends.  It's, like, the craziest thing.

But you know what I have learned, Elon?  The people are smart.  They get it.

MR. MUSK.  Yeah.  They do, actually.  Yeah.

THE PRESIDENT:  They get it.  They really see what's happening.

MR. MUSK:  Yes.

000476

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 66 of 528

Q   And at the end of this interview, I — what I would like is, I — I want people to know the relationship and know more about you.

What is the relationship, Mr. President?

THE PRESIDENT:  Well, I respect him.  I've always respected him.  I never knew that he was right on certain things, and I'm usually pretty good at this stuff.  He did Starlink.  He did things that were so advanced and nobody knew what the hell they were.

I can tell you, in North Carolina, they had no communication.  They were wiped out.  Those people were — you know, they had rivers in between — land that never saw water, all of a sudden, there was a river and a vicious — like, rapids.  People were dying all over.  They had no communication.

They said, "Do you know Elon Musk?"   And they didn't really know I knew him.  I said, "Yeah."  They said, "Could you get Starlink?"  It's, like, the first time I ever heard of it.  I said, "What's Starlink?"  "A communication system that's unbelievable."

Q   I have it.

THE PRESIDENT:  And he — yeah.  And he said — I called him, and I said, "Listen, they really need it."  And he got, like, thousands of units of this communication, and it saved a lot of lives.  He got it immediately.  And you can't get it.  I mean, you have to wait a long time to get it.  But he got it to him immediately.

And I said, "That's pretty amazing."  And I didn't even know he had it.

We watch the rocket ships, and we watch Tesla.

I think, you know, something that had an effect on me was when I saw the rocket ship come back and get grabbed like you grab a beautiful little baby. You grab your baby. It just —

MR. MUSK: Just hug the rocket.

THE PRESIDENT: I'd never seen —

MR. MUSK: Everyone — right. Everyone needs (inaudible) —

Q   You hug the rocket. You hug the rocket.

MR. MUSK: — (inaudible) rockets.

THE PRESIDENT: Yeah. No, but — and he said, "You know, you can't really have a rocket program if you're going to dump a billion dollars into the ocean every time you fly. You have to save it." And he saved it. First time —

Q   That's ever been done.

THE PRESIDENT: — I've ever seen that done. Now nobody else can do it.

If you look at the U.S., Russia, or China, they can't do it, and they won't be able to do it for a long time. He has the technology. So, you learn — I wanted somebody really smart to work with me, in terms of the country — a very important aspect. Because, I mean, he doesn't talk about it. He's actually a very good businessman. And when he talks about the executive orders — and this is

000478

probably true for all presidents: You write an executive order and you think it's done, you send it out; it doesn't get done. It doesn't get implemented. They don't implement it.

They — maybe they're from the last administration — and they are, in some cases. You try and get them out as fast as you can. But I could — as soon as he said that, I said, "You know, that's interesting." You write a beautiful executive — and you sign it and you assume it's going to be done, but it's not. What he does is he takes it, and with his hundred geniuses — he's got some very brilliant young people working for him that dress much worse than him, actually —

MR. MUSK: Yeah, they do.

THE PRESIDENT: — they dress in just t-shirts. (Laughter.) You wouldn't know they have 180 IQ.

Q    Wait. Wait. So, what — he's — he's your tech support?

MR. MUSK: I —

THE PRESIDENT: No, no. He is —

MR. MUSK: I actually virtually am tech support.

THE PRESIDENT: He's much more than that.

MR. MUSK: I actually am tech support, though. But that's —

THE PRESIDENT: But he gets it done. He's a leader. He really is a — he gets it done. You get a lot of tech people, and you have people, they're good with tech,

but they — he gets it done.

You know, I said, in real estate, you had guys that would draw beautiful renderings of a building, and they'd draw the rendering, it would be great, and you'd say, "Great. When are you starting?" But they were never able to get it built. They couldn't get the finances. They couldn't get the approvals. It would never get done. And then you have other guys that are able to get it done. You know, they could just get it done.

I was in real estate. Same thing in this. He gets it done.

So, when he said that — he said, "You know, when you sign these executive orders, a lot of them don't get done, and maybe the most important ones," and he would take that executive order that I'd signed, and he would have those people go to whatever agency it was — "When are you doing it? Get it done. Get it done." And some guy that maybe didn't want to do it, all of a sudden, he's signing — he just doesn't want to bothered.

Q   Does — do a lot of those executive orders have to be codified into law to — do you need the Republican Congress to follow up?

THE PRESIDENT:  Yeah, and they will.  A lot of them will be.  Yeah.

Q   They will?

THE PRESIDENT:  Look, in the meantime, we have four years.  The beauty is, we have four years.  That's why I like doing it right at the beginning.  Because an executive order is great.  I mean, the one problem — it's both good and bad, because when they did all these executive orders, I've canceled most of them. They were terrible.  I mean, we were going to go radical left, communist, okay?

000480

It was crazy.  Their —

MR. MUSK:  Really crazy.

THE PRESIDENT:  — executive orders were so bad, if they ever got them codified, you'd never be able to break them.  So, the damage that Biden has done to this country — and it's not even Biden; it's the people that circled him in the Oval Office, okay? — but the damage they did to this country, in terms of, let's say, open borders — you know, there's so many things, but open borders, where millions of people poured into our country, and hundreds of thousands of those people are criminals.  They're murderers.  They're drug dealers.  They're gang members.  They're people from prisons from all over the world.

And we have a great guy, Tom Homan, and he is doing so incredibly.  You saw the numbers.  They're down like 96 percent.

Q   Ninety–five percent.

THE PRESIDENT:  He is a phenomenal guy.  And Kristi Noem is doing an unbelievable job.  And he wanted her.  He said, "She's so tough."  And I said, "I don't think of her as that way.  You know, she's very nice."  He said, "No, she's so tough."  And she is.  I see her with the horses.  She's riding the horse.  Let's — (laughter) — she's great.

But the team we have is — is really unbelievable.

But those executive orders, I sign them, and now they get passed on to him and his group and other people, and they're all getting done.  We're getting them done.

Q   Let me go back a little bit to your background, because —

MR. MUSK:  Sure.

Q   — it's beyond impressive.  You were the chief engineer, for example — you were an early believer in Tesla.  You became the CEO and — and then the chief engineer, which was phenomenal.  SpaceX, same thing, which is unbelievable.

I mean, you were the first company — private company to send astronauts successfully into — into space, first private company to send astronauts into orbit.

MR. MUSK:  Yeah.

Q   That's — that's pretty deep.

THE PRESIDENT:  He's going to go into orbit soon.

Q   Okay.

MR. MUSK:  (Laughs.)  Yeah.

THE PRESIDENT:  No, he's going to go to Mars.  He's going to fly on his —

Q   Starlink.

MR. MUSK:  At some point, yeah.

Q   As in (inaudible) —

MR. MUSK:  But they say — they always ask me, like, "Do you want to die on Mars?"  And I say, "Well, yes, but not on impact."  (Laughter.)

Q    Star- — Starlink is in 100 countries.

This is going to be hard.  I feel like I'm interviewing two brothers here.

MR. MUSK:  You go ahead.

Q    Starshield, which could be used for national defense.

MR. MUSK:  Yeah, it is already being used for national defense.

Q    Then you have a — what is it called?  Optimus, a part of Tesla.

MR. MUSK:  They're a robot, yeah.

Q    A robotic arm.  Then you have an AI arm.  And then you have something that really fascinated me, and it's called Neuralink.

MR. MUSK:  Yes.

Q    You might help the blind to see and people with spinal cord injuries that they — that they can recover, where in the past — how close is that to becoming a success?

MR. MUSK:  At Neuralink we're — we've ha- — we've implanted Neuralink in three patients so far, who are quadriplegics, and it allows them to directly control their phone and computer just using their mind, just by thinking.  It's like

— so, we call this product Telepathy, so you control your computer and phone just by thinking, and it's possible to actually control the computer and phone faster than someone who has working hands.

Then the next step would be to add a second Neuralink implant past the point where these — the neurons are damaged, so that somebody can walk again and so the pe- — they can have full-body functionality restored.  And —

THE PRESIDENT:  And you like Bobby, right?

MR. MUSK:  I like Bobby, actually.  Yeah.  I — I supported Bobby Kennedy.  I think he — you know, he's unfairly maligned as someone who is anti-science. But I think he — he isn't.  He just wants to question the science, which is the essence of the science — the scientific method, fundamentally, is about always questioning the science.

Q    Well, they didn't tell us the truth about COVID.

MR. MUSK:  Correct.

Q    That's for sure.

MR. MUSK:  Yes.

Q    And we learned a lot with the Twitter files.  And that just, then, raises a question.  You're the richest man in the world.  You may not like that part.

THE PRESIDENT:  Yeah.

Q    You're pretty competitive.

MR. MUSK:  I mean, it's neither here nor there.

Q   I've known you a long time.

MR. MUSK:  I don't think it matters.

Q   But —

THE PRESIDENT:  That's why I became president.

Q   — he's on your team.

THE PRESIDENT:  (Inaudible) —

Q   Well, that's true.  He can't top that.

THE PRESIDENT:  He's good.  You know, I wanted to find somebody smarter than him.  I searched all over.  I just couldn't do it.  I couldn't.  I couldn't.

Q   You really tried hard.

THE PRESIDENT:  I couldn't find anyone smarter, right?  So, we had to — we had to, for the country.

Q   But this is the thing —

THE PRESIDENT:  So, we settled on — we settled on this guy.

MR. MUSK:  Well, thanks for having me.

THE PRESIDENT:  (Laughs.)  Yeah.

Q   So —

MR. MUSK:  I'm just trying to be useful here.

Q   But this is the interesting — but this is where we are as a so- — a society. And I — I hate to do this to you, but I'm going to do it anyway.  You're doing all of these things.  At DOGE, nobody at DOGE gets paid a penny, correct?

MR. MUSK:  Well, actually, some people are federal employees, so they do.

Q   Oh, okay.

MR. MUSK:  Yeah.  They're (inaudible).  But it's fair to say that the software engineers at DOGE could be earning millions of dollars a year and instead of earning a small fraction of that as federal employees.

Q   Okay.  So, just —

THE PRESIDENT:  And they're very committed people.

MR. MUSK:  Yes.

Q   So — you're — you're committed to helping the blind see, people with spinal cord injuries recover.

MR. MUSK:  Yes.

Q   You're committed to getting to Mars.  You're committed to rescue — you're going to help rescue, next month, two astronauts that I think were abandoned.  They — they dispute that in an interview.

THE PRESIDENT:  When are you — when are you getting them?

MR. MUSK:  At the — at the president's request, we — or instruction, we are accelerating the return of the astronauts, which was postponed, kind of, to a ridiculous degree.

THE PRESIDENT:  They got left in space.

Q   They've been there.  They were supposed to be there eight days.  They're there almost 300.

THE PRESIDENT:  Biden.

MR. MUSK:  They were put —

Q   Yeah.

MR. MUSK:  Yes, they were left up there for political reasons, which is not good.

Q   Okay, it's not good.  Now, if I had the weight and pressure of doing that successfully on my shoulders, I think I'd be, you know — but you — when we spoke before we did this interview, you were very confident.  You think this will be a successful mission.

MR. MUSK:  Well, we don't want to be complacent, but we have brought

astronauts back from the space station many times before, and always with success.  So, as long as we're not complacent —

THE PRESIDENT:  When are they — when are you going to launch?

MR. MUSK:  I think it's about — about four weeks to bring them back.

Q   About four weeks?

MR. MUSK:  Yeah.

THE PRESIDENT:  And you have the go-ahead.

MR. MUSK:  We're being extremely cautious.

Q   Yeah.

THE PRESIDENT:  You now have the go-ahead.

MR. MUSK:  Yes.  Well, thanks to you —

THE PRESIDENT:  They didn't have the go-ahead with Biden.

Q   What's that?

THE PRESIDENT:  He was going to leave him in space.  I think he was going to leave them in space.

Q   Well, it's like the (inaudible) —

000488

THE PRESIDENT:  He considered it a —

Q   — growing up, lost in space.

THE PRESIDENT:  Yeah, he didn't want the publicity.  Can you believe it?

Q   Unbelievable.  And so —

MR. MUSK:  Yeah.

Q   — I want to echo something that the president said and then ask an overarching question.  So, people in — get hit with Hurricane Helene, they have no communication with the outside world.  You come to the rescue.  You donated that, I believe?

MR. MUSK:  Yes.  Yes.

Q   You donated to the people of —

THE PRESIDENT:  He saved a lot of lives.  In North Carolina, he saved a lot of lives.

Q   And California, after the wildfires?

THE PRESIDENT:  California.  But, I mean, in North Carolina, where they were really in trouble, they had no communication, people were dying.

Q   Nothing.

THE PRESIDENT:  They were dying of starvation.  He saved a lot of lives in North Carolina.

Q   Okay.  Now you're going to rescue astronauts.  And now — again, you do — you do all of this — I would think liberals would love the fact that you have the biggest electric vehicle company in the world.

MR. MUSK:  Yeah.  I mean, I used to be adored by the left, you know.

Q   Not anymore.

MR. MUSK:  Le- — less so these days.

Q   He killed that, huh?

MR. MUSK:  I mean, less —

THE PRESIDENT:  I really (inaudible) —

MR. MUSK:  Well, I mean, this — this whole sort of, like, you know — it was — they call it, like, "Trump derangement syndrome."  And I didn't — you know, you don't realize how real this is until, like, it's — you can't reason with people.

So, like, I was at a friend's birthday party in L.A., just a birthday dinner, and it was, like, a nice, quiet dinner, and everything was — everyone was behaving normally.  And then I happened to mention — this was before the election, like a month or two before — I happened to mention the president's name, and it was like they got shot with a dart in the jugular that contained, like, the methamphetamine and rabies.  Okay?  (Laughter.)

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 80 of 528

And they're like, "Whyy?"  And I'm, like, "What is wrong — like, guys, like" — you just can't have, like, a normal conversation.  And it's like — it's like they become completely irrational.

Q   He — he has no idea, if you're friends with him —

MR. MUSK:  Yeah.

Q   — you pay a price.  You know, it's like, I walk into a restaurant in New York, and it's like half the room gets daggers and they want to —

MR. MUSK:  The eye-daggers — eye-daggers level is insane.  (Laughter.)

I mean, there was, like — I had, like, some — some invitation because — so, I got invited to, like, so- — basically, a big, sort of, damn — damn event like that was — but I'd received the invitation, like, the beginning of last year and then — and I still attended, even after I'd endorsed President Trump, and I didn't realize how profoundly that would affect, you know, how I was received.  (Laughter.)

I mean, I walk into the room and I'm getting just the dirty looks from — from everyone.  Like, if looks could kill, I would have been dead several times over.

Q   But that was not — (laughter) — before Trump

MR. MUSK:  (Inaudible) —

Q   Before Trump: "BC" —

MR. MUSK:  — ashes on the floor.  (Laughs.)

Q   — or "BT." Before Trump, that never happened.  Right?

MR. MUSK:  No.

Q   No.  So —

MR. MUSK:  I — I just — doesn't seem strange?  Like, what — what is up with this total, like, madness?

Q   You're smarter than me.  Can you — I actually think that there's a level of irrationality.  It's almost like a trigger and —

MR. MUSK:  It totally triggers.

Q   And it's like — look, I — I've been on TV — this is my 29th year.  I've been on radio 35 years.  I will — I've gone hard in the paint to — for candidates that lost.

MR. MUSK:  Yeah.

Q   And guess what?  I get over it.

MR. MUSK.  Sure.  Yeah, yeah.

Q   And I just keep doing my show, and I just — you know, I come back to fight another day.

So, here's the big — then this is the million dollar or billion dollar — I'm among billionaires — question.  So, you have all this going on and you stop, in a way — you're still doing it — and you partner with him.  And this is what you get for it from the Democrats.  You get "nobody voted for Elon."  Well, nobody voted for

any of your Cabinet nominees. Okay? "People are dying because of DOGE cuts." I'll give you a chance to respond to all that. "What DOGE is doing is illegal." "Elon Musk is" — more street vernacular for a male body part. "It's a constitutional crisis."

MR. MUSK: How c- — why — why are they reacting like this?

Q   Well, first of all, do you give a flying rip? Number one. And —

MR. MUSK: Well, I guess we must be — if we're the target, we're doing something right. You know, if — like, they wouldn't be complaining so much if they — we weren't doing something useful, I think.

What — all we're really trying to do here is restore the will of the people through the president. And — and what we're finding is there's an unelected bureaucracy. Speaking of unelected, there's a — there's a vast federal bureaucracy that is implacably opposed to the — the president and the Cabinet.

And you look at, say, D.C. voting. It's 92 percent Kamala. Okay, so we're in 92 percent Kamala. That's a lot.

Q   Yeah. They don't like me here either.

MR. MUSK: I think about that number a lot. I'm like, 92 percent. That's, basically, almost everyone. And so — but if — but how can you — if — if the will of the president is not implemented, and the president is representative of the people, that means the will of the people is not being implemented, and that means we don't live in a democracy, we live in a bureaucracy.

000493

And so, I think what we're seeing here is the — sort of, the thrashing of the bureaucracy as we try to restore democracy and the will of the people.

Q   You —

MR. MUSK:  Is this making sense?  I mean — sorry.

Q   Y- — no, of course it does.  I mean, to me, if you look at our framers and our founders — and you've really become a student of history, Mr. President, and we've ta- — we've had conversations both on air and off air — and if we talk about constitutional order or transformational change, nobody can argue that what's happening here is going at the speed of light.

But however, what were the principles of our framers and our founders?  They wanted limited government, greater freedom for the people — and we'll get to the specific cutting of waste, fraud, and abuse.  That — that is your goal, is it not?

THE PRESIDENT:  Yeah.  And my goal was to get great people.  And when you look at what this man has done, I mean, it was something — I knew him a little bit through the White House. Originally, I'd see him around a little bit.  I didn't know him before that, and I respected what he did.  And he fought hard.  You know, he was a — he was maybe questioned for a while.  He was having some difficulties. It was not easy doing what he did.

I mean, how many people have started a car company and made it really successful and made a better car where it's, you know, beating these big companies that that's all they do is cars?  I mean, it's really amazing the things that he's done.

But I didn't know it as much then as now.  I mean, the fruits have sort of taken hold.

But I wanted great people, and he's a great person. He's an amazing person. He's also a caring person. You know, he uses the word "care."

So, they sign a contract in a government agency, and it has three months. And the guy leaves that signed the contract, and nobody else is there, and they pay the contract for 10 years.

So, the guy is getting checks for years and years and years, and he's telling his family, obviously — maybe it was crooked, maybe he paid to get the contract, or maybe he paid that they didn't terminate him. But, you know, we have contracts that go forever, and they've been going for years, and they're supposed to end in three months or five months or two years or something, and they go forever. So, the guy is either crooked — you know, where he knew this was going to happen — or he's crooked because he's getting payments that he knows he shouldn't be getting.

MR. MUSK: Yeah.

THE PRESIDENT: But they're finding things like that. They're finding things far worse than that. And they're finding billions — and it will be hundreds of billions of dollars' worth of fraud. I say waste and abuse, but fraud, waste, and abuse. And he's doing an amazing job.

And he attracts a young, very smart type of person. I call them high-IQ individuals, and they are. They're very high Q and — high IQ. And when they go in to see the people and talk to these people — you know, the people think they're going to pull it over. They don't. These guys are smart, and they love the country. You know, there's a certain something.


But he uses the word "care." So, people have to care. Like, when I bought Air Force One —

MR. MUSK: Exactly.

THE PRESIDENT: — I negotiated the price. It was $5.7 billion, and I got it — I got them down $1.7 billion. Now they're not building the plane fast enough. I mean, they're actually in default — Boeing. They're supposed to —

000495

Q   When is it —

THE PRESIDENT:  They've been building this thing forever.  I don't know —

Q   This is the new Air Force One?

THE PRESIDENT:  — what's going on.

MR. MUSK:  Yeah.

THE PRESIDENT:  We don't build the way we used to build.  You know, we used to build like a ship a day, and now to build a ship is, like, a big deal, and we're going to get this country back on track.  We could do it, but so many things — it takes so long to get things built and get things done.

And a lot of it could be something we've been discussing.  The regulators go in and they make it impossible to build.  They make it very difficult to build anything, whether it's a ship, a plane, or a building or anything.  And some of them do it because they want to show how important they are.  Some of them do it maybe because they think they're right.  They use the environment to stop progress and to stop things.  It's always the environment.  "It's an environmental problem."  It's not an environmental problem at all.  But they do a lot of things.

And, by the way, speaking of that, Lee Zeldin is going to be fantastic in the position.  So important.  He could take 10 years to approve or disapprove something, or he could do it in a month.  You know, just as good.

Q   Sure.

THE PRESIDENT:  And I think you're going to see some fantastic — a fantastic job done by him.  He's a tremendous guy.

Q   Newt — you echoed something when I had just met you, and it was very similar to what Newt has been saying, that we're — he brought this country to the dance.  This is the opportunity to be transformational, and to have, I would argue, a — the most consequential presidency if we — if we'd really dig down and do something that had never been done before, and that is get rid of this bureaucracy.  And I'm going —

MR. MUSK:  Yes.

Q   — to get to specifics.  You say the same thing.  It's not done yet.

MR. MUSK:  Absolutely.

Q    And what did you mean by that?

MR. MUSK:  Well, I mean the — w- — winning the election is really the opportunity to fix the system.  It is not fixing the system itself.  So, it's an opportunity to fix the system and to restore the power of democracy.

And, you know, people — like, it's funny how — how often it — you — when these attacks occur, the thing that they're accusing the administration of is what they are guilty of.  They're saying that things are — are being done are unconstitutional, but what they are doing is unconstitutional.  They are guilty of the crime of which they accuse us.

THE PRESIDENT:  That's always the first thing they do.

MR. MUSK:  Yeah.

THE PRESIDENT:  "He's in violation of the Constitution."  They don't even know what they're talking — well, they know.

MR. MUSK:  It's absurd.

THE PRESIDENT:  It's just a con job.  It's a big con job.  And they're so bad for the country, so dangerous and so bad.

And the media is so bad.  When I watch MSNBC, which I don't watch much, but you have to watch the enemy on occasion, the level of arrogance and — and cheating and — they're just horrible people.  These are horrible people.

Q    They lie.

THE PRESIDENT:  These are horrible people.

Q    They tell conspiracy theories.

THE PRESIDENT:  They lie, and they start up with the Constitution.  They couldn't care less about the Constitution.

CNN, likewise.  I mean, I watched them asking questions with, you know, the hatred with the — why — I said, "What are you asking the question with such anger?  You're asking me a normal question."  But you see the bias.  The bias is so incredible.  Those two are bad.

PBS is bad.  AP is bad.  CBS is terrible.

I mean, CBS now — they changed an answer in Kamala. They asked her some questions. She answered them like, you know, a low-IQ person. The opposite of him — the absolute opposite. But she gave a horrible answer. They took the entire answer out, and they put another answer that she gave 20 minutes later into the — in- — as the answer.

Q    It was part of her word salad.

THE PRESIDENT:  I've never even heard of that be- — I thought I heard of it all.

MR. MUSK:  Right.


Q    That wh- — "60 Minutes" once — one — wanted to do an interview with me, and I said, "Live to tape."

MR. MUSK:  Yeah, exactly.

Q    They said, "No."  And I said, "No" —

MR. MUSK:  Right.

Q    — "No deal."

MR. MUSK:  Exactly.  They can- —

Q    Like, this interview will —

THE PRESIDENT:  I've never even heard — you know, I've seen where they take a sentence off or something and they'll do — but they —

Q    Sometimes you cut for time o- —

THE PRESIDENT:  No, no.  They took the entire — this long, terrible statement that she made and put another.

Nobody's ever seen what's happening.  And, you know, the people that do all this complaining, they're very dishonest people.

MR. MUSK:  Yeah.


Q    Yeah.  I — I'm going to, just for the sake of saving time —

THE PRESIDENT:  Yeah.

Q    — because I could spend — and I've done this on radio and TV, I — I can spend an hour finding the outrageous amounts of money being spent abroad,

000498

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 88 of 528

like USAID.

MR. MUSK: Sure.

Q   And I do want to mention a couple, but I'm going to —

MR. MUSK: Yeah.

Q   — scroll it and —

MR. MUSK: Well — well, I guess, at a high level, I think it's what the president mentioned earlier, which is that in order to save taxpayer money, it comes down to two things: competence and caring. And —

THE PRESIDENT: That's right.

MR. MUSK: — and when — when president was shown the outrageous bill for the new Air Force One and — and then negotiated it down, if he had — if the president had not applied competence and caring, the price would have been 50 percent higher — literally, 50 percent higher. The president cared. The president was competent. The price was not 50 percent higher as the result.

And so, when you add more competence and caring, you get a better deal for the American people.

THE PRESIDENT: But we could take — we were talking about this yesterday. I could take — give me thousands of bills — any — I could pick any one of them, and I could —

MR. MUSK: Yes, exactly.

THE PRESIDENT: — take all thousand. And let's say it's a bill for $5,000 — just $5,000, and it's done by some bureaucrat. And if he would say, "I'll give you three. I don't want to pay you five. It's too high. I'll give you three." But they don't do that. If a guy sends in a bill for $5,000, they pay $5,000. They expect to be cut. Everybody expects to be cut. When you send in a bill, you expect to be cut. They send in the bill higher, for the most part. This is true with lawyers, legal fees. When they send in legal fees, you — I can cut — I wish I had the time, I would save so — but I could cut these bills in half — much better than half.

But you offer people a much lower number because you know they — they actually put fat — I'm not even saying it's — it's like a way of business. They put

more on because they expect to be negotiated.  When you send in a bill to the government, there's nobody to negotiate.

MR. MUSK:  Yes.

THE PRESIDENT:  You send it a bill for $10,000, and they send you a check back for $10,000.  If you would call them and said, "We'll give you five."  "No, no, no.  I need more than five."  "We'll give you a five."  "I'm not going to pay any more than five."  "Make it six."  "No, I'm not going to make it six."  And you'll settle for $5,500.  You've just cut the bill almost in half, and it took, like, two minutes.  When did that stop?  But —

Q   (Inaudible) the art of the deal?

THE PRESIDENT:  — that's caring.  No, it's not even the art of the deal.  It's caring.  He uses the word —

MR. MUSK:  It's — it's competence and caring.

THE PRESIDENT:  — it's caring.

Q   Yeah.

THE PRESIDENT:  It's — it's a certain competence, but I think it's more caring.

MR. MUSK:  I — if you —

THE PRESIDENT:  (Inaudible.)

MR. MUSK:  Actually, if you add either ingredient — either competence or caring — you'll — you'll get a better outcome.  But it stands to reason —

Q   Right.  People don't want to do this (inaudible.)

MR. MUSK:  — that's the reason that if you don't have competency and you don't have caring, you're going to get a terrible deal.  And the problem is that the American taxpayer has been — been getting a terrible deal, because — look at the last administration.  Can you — can anyone — can any reasonable person say that last administration was either competent or caring?

Q   But they lied to us and said that Joe didn't have a cognitive decline.

MR. MUSK:  They fully lied.

Q   They said the borders were closed.  They said that the borders were secure.  They said that —

MR. MUSK:  Right.

Q    You know, they said Obamacare would save —

MR. MUSK:  They flat out lied.

Q    They flat out lied —

MR. MUSK:  It was insane.

Q    — on many occasions.

MR. MUSK:  Yes.

Q    I tell my audience all the time: Don't trust government.

MR. MUSK:  Yes.

Q    So, the — I want — as I scroll this information, and it's — it's — I'll scroll a lot more than I'll mention to both of you, and this is the cost savings.  I want you — I want people at home to understand this part: The average American makes $66,000 a year.

MR. MUSK:  Yeah.

Q    Okay?  We have $37 trillion in national debt.

MR. MUSK:  Yes.

Q    Now, all the money I'm about to mention and what we're going to scroll on our screen — and all of this is going to foreign countries.  It is not being spent here in America —

MR. MUSK:  Yes.

Q    — for better schools, law and order.

MR. MUSK:  I — I think the average taxpaying American should be mad as hell because their tax money is being poorly spent.

Q    I'm mad.  It's stealing from —

MR. MUSK:  It's a — it's an outrage —

Q    — our kids and grandkids.

MR. MUSK:  Yes, and the — and people —

THE PRESIDENT:  And a lot of fraud, Sean.  A lot of fraud.

Q    Yes.

THE PRESIDENT:  And a lot of kickbacks.

000501

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 91 of 528

They're sending money out. They're not that stupid. These people aren't that stupid. They're sending for transgender — something having to do with the opera, and they're sending out $7 million —

MR. MUSK: (Laughs.) Literally.

THE PRESIDENT: — $7 million. (Inaudible) —

Q   You just stole my next line. I can't believe that.

THE PRESIDENT: No, it's incredible.

Q   I was going to mention that.

THE PRESIDENT: No, but it's incredible: $7 million.

Now, you know they — they're not so stupid. They're sending all this money. They expect to get a lot of it back. And that's what happens.

Q   Okay. So, let's go through it.

MR. MUSK: Yes, they're — a bunch of —

Q   So, for the average person at home —

MR. MUSK: — this stuff is round-tripping. To the president's point, they'll — they'll make it sound like it's going to help some people in a foreign country, but then they — then they get kickbacks.

Q   All right. Let me go to the ne- — to the fir- —

MR. MUSK: Yeah.

Q   — to the second question first. I want to know, because people like Joni Ernst, and — and House —

MR. MUSK: Yeah, Joni — Joni Ernst has been —

Q   They tried to get —

MR. MUSK: — has tried for a long time, and she's actually got a lot of good data. Senator Ernst has been really helpful, actually.

Q   Okay, but they — they actually hide what the real purpose of the spending is.

MR. MUSK: That's true.

Q   In other words, they — and — and h- — this is a question: How did you decipher? It will say, "Humanitarian blah, blah, blah in Serbia or Afghanistan."

000502

2/25/25, 8:13 PM   Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House

Case 8:25-cv-00462-TDC  Document 36  Filed 02/26/25  Page 92 of 528

We've been giving money to China for crying out loud, which I think is nuts.

MR. MUSK:  Well, we're giving money to the Taliban.

Q Money to the Taliban?

MR. MUSK:  Like a lot.

Q All right.  So —

MR. MUSK:  (Laughs.)  I'm like, for what?

Q But they —

MR. MUSK:  I — I want to see pictures of what they did.

Q But they try to obscure it, and — and — but then you got to the bottom line, which is what I'm now scrolling on the screen —

MR. MUSK:  Yes.

Q — and that is: $20 million on a Sesame Street show in Iraq; $56 million to boost tourism in Tunisia and Egypt; $40 million to build schools in Jordan; $11 million to tell the Vietnamese to stop burning trash; $45 million for DEI scholarships in Burma; $520 million for consultant-driven ESG investments in Africa; DEI programs in Serbia; the president's favorite — I'm sure you — you love that taxpayer money was spent on a DEI musical in Ireland or a chan- — transgender opera in Colombia or a —

MR. MUSK:  If I could, like, it sounds like —

Q — transgender comic book in Peru.

MR. MUSK:  It sounds like — it sounds like how can these things be real?  But this is actually what was done.

Q Okay.  The — I —

MR. MUSK:  It — it sounds like a comedy sketch or something.  It's like —

Q I have 20 pages of this.

MR. MUSK:  Right.  It's not — the list is a mile long.

THE PRESIDENT:  The one thing you didn't mention, the media.  The media is getting millions of dollars.

MR. MUSK:  Yes.

THE PRESIDENT:  Now, they say Politico, which is a radical left —

Q   Subscriptions.

THE PRESIDENT:  — you know, garbage magazine or — or program.  I guess they have magazine and they have some — some media of all types.  $8 million.

I hear the New York Times got a lot.  I hear they get subscriptions — where they have subscriptions but maybe the paper is not sent.  I have no idea if that's true or not, but it's — they call it subscriptions.  Lots of subscri- — to different media, not just the Times — maybe the Times, and maybe not the Times.

Q   A million dollars in subscriptions is a lot.

THE PRESIDENT:  Well — but — but millions of dollars going to media that's radical-left, crooked, dishonest media.

MR. MUSK:  Well — well, Reuters — this is actually really wild: Reuters got like — something like $10 million for something that was literally titled "mass disinformation campaign."

Q   Well —

MR. MUSK:  That was on the purchase order.  Well, I — I thought that was a little bold.  (Laughs.)

Q   I will tell you what was bold is when you released —

MR. MUSK:  I'm like —

Q   — the Twitter files.

MR. MUSK:  — shouldn't you at least try to call it something else?  (Laughs.)

Q   The Twitter files — how they targeted him; how Twitter, at the time, worked closely with the FBI, the CIA; and, even before the release of Hunter's very real laptop, they were feeding them disinformation.  That —

MR. MUSK:  Absolutely.

Q   — you found all that out.

MR. MUSK:  Well, I think —

Q   That's called transparency, right?

THE PRESIDENT:  The FBI has to be rehabbed.  The FBI —

MR. MUSK:  Yeah.

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 94 of 528

THE PRESIDENT:  What's happened with the FBI and the DOJ is just — their — their stock has gone way down.  I mean, their reputation is shot.

Q    And intelligence.

THE PRESIDENT:  And I think Pam is going to do great.  I think Kash is going to do great.  I think they have to do great or we have a problem.

But when you look at what they did, the raid of Mar-a-Lago — the raid of Mar-a-Lago — you look at what they did, their reputation is shot.

Q    It is.

What — you were going to say, Elon?

MR. MUSK:  Well, no, I was going to say that I think probably a — like, a lot of people still —

Q    How — how did you find (inaudible)?

MR. MUSK:  — still believe, like, the Russia hoax, even though you've done a lot to combat that.  The — you know, the — the Steele dossier was an incre- — a massive scam that was concocted by Hillary Clinton and her — her campaign.

Q    She bought and paid it — for it —

MR. MUSK:  Right.

Q    — Russian disinformation.

MR. MUSK:  There was — it was — the — people still think the — the Russia hoax is real.  Like a lot of people s- — because they never — they never heard the counterpoint.  I mean — I mean, a bunch of people should be in prison for that.  That was a — that was outrageous election interference, creating a fake Russia hoax.

Q    How much — if you had to put a number on it, how much do you think you've identified waste, fraud, abuse, corruption at this point?  And again, we've been — we're going to be scrolling this throughout the program.

MR. MUSK:  Well, the — the overall goal is to try to get a trillion dollars out of the deficit.  And if we — if we — if the deficit is not brought under control, America will go bankrupt.  This is a very important thing for people to

understand.  A country is no different from an individual, in that if an individual overspends, an individual can go bankrupt, and so can a country.

And — and the out- — the massive waste, fraud, and abuse that has been going on, which is leading to a $2-trillion-a-year deficit, that — that's what the president was handed on Jan. 20th, a $2 trillion deficit.  It's insane.

Q    For this fiscal year?

THE PRESIDENT:  Two trill- — yeah.  We inherited it.

MR. MUSK:  Two —

THE PRESIDENT:  Yeah.  And inflation is back.  I'm only here for two and a half weeks.

Q    That was January —

THE PRESIDENT:  Inflating is back —

Q    — you were there for a week.

THE PRESIDENT:  No, think of it, inflation is back.  And they said, "Oh, Trump infla-" — I had nothing to do with it.  These people have — have run the country.  They spent money like nobody has ever spent.  They were — they were given $9 trillion to throw out the window — $9 trillion, and they spent it on the Green New Scam, I call it.  It's the greatest scam in the history of the country.  One of them.  We have a lot of them, I guess.  But one of them.

Q    Well —

THE PRESIDENT:  Dollar-wise, probably —

Q    — and DEI —

THE PRESIDENT:  — it is.

Q    — and wokeism —

THE PRESIDENT:  Yeah, yeah.

Q    — and transgenderism —

THE PRESIDENT:  Well, that's all part of it.  Yeah.

Q    — and LGBTQ+.

MR. MUSK:  Yes.

Q    And, by the way, not in America — other countries, not here.

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 96 of 528

THE PRESIDENT:  You know, the amazing thing is when you see, like, the teaching of DEI: $9 million.  How do you spend $9 million to teach no matter what it is?

MR. MUSK:  Right.

THE PRESIDENT:  You could teach physics.

MR. MUSK:  Exactly.  Totally.

THE PRESIDENT:  You could go to MIT for a lot less.

MR. MUSK:  It's (inaudible) expensive.  (Laughs.)  Expensive.

THE PRESIDENT:  Yeah, the teaching —

MR. MUSK:  Expensive BS.

THE PRESIDENT:  — of DEI.

Q   Well, I think it would be better spent on —

THE PRESIDENT:  No, it's a kickback.  It's got to be a kickback.  Nobody is that — nobody could do that.  Nobody is —

Q   Well, it —

THE PRESIDENT:  Nobody is giving — to assess the dialog of an audience coming out of a theater: $4 million.

Q   How much do you believe, Elon, you've identified in — in waste, fraud, abuse, corruption now?  And how much —

MR. MUSK:  Well —

Q   — do you anticipate you will?

MR. MUSK:  Sure.  Well, the — I — I think —

THE PRESIDENT:  One percent.

MR. MUSK:  (Laughs.)

THE PRESIDENT:  No, because it's so massive.  It's — this is —

MR. MUSK:  Yeah, exactly.

THE PRESIDENT:  — huge money.  Huge money.  Look —

Q   So, what we've found now is one percent?

MR. MUSK:  Well, we've j- — we've just gotten started here.

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 97 of 528

THE PRESIDENT: As good as they are, they're not going to find some contract that was crooked — you know, crooked as hell. And, I mean, there's going to be so much that isn't found. But what is found — I think he's going to find a trillion dollars.

MR. MUSK: Yeah, I think so.

THE PRESIDENT: But I think it's a very small percentage compared to what it is. I mean, he could tell you about treasuries; he could tell you about a woman that worked for Biden that became a very wealthy woman while she was working for him. Right?

MR. MUSK: Yeah.

Q    Yeah, I know who you're talking about.

MR. MUSK: I mean, there are some strange situations where people — where, you know, someone's working for the government earning $200,000 a year, and then, suddenly, they're worth tens of millions of dollars within a few years. Where'd the money come?

Q    How'd they earn it?

MR. MUSK: Yeah.

Q    They have a private company on the side?

MR. MUSK: We're just curious. Like, can you —

THE PRESIDENT: While they were working.

MR. MUSK: Can you show us — because, like, in order to be worth tens of millions of dollars, you'd have to start a company, or you've got to get some kind — the compensation has got to come from somewhere. So, how does a civil servant with — earning $200,000 a year suddenly, within a span of a few years, be worth tens of millions dollars?

Q    W- —

MR. MUSK: So, I just want to connect the dots here.

Q    All right, s- —

MR. MUSK: Maybe there's a legitimate explanation, but I don't think so. (Laughter.)

000508

Q   So, you know, and this gets to kind of the heart of where I am.  I — I looked at your work, and I look at this amount of money, and I get angry.  And I don't get v– — I'm not an angry person.

MR. MUSK:  Sure.

Q   I don't get angry.  I get a- — I get annoyed sometimes, but I don't get angry.  And I did live paycheck to bay- — paycheck a part of my life.  And I think of, you know, the working men and women in this country that the — 56 percent of which cannot afford a $1,000 emergency after four years of Harris and Biden.

MR. MUSK:  Sure.

Q   Okay?  That is serious, you know, financial trouble.  Or they're putting bare necessities on credit cards.

And I'm looking at this and I'm thinking, well, how much — when we — when all is said and done, we could have written a check or cut the taxes or fixed our schools —

MR. MUSK:  Yes.  Yes.

Q   — or deported these illegals that we keep finding, known terrorists, cartel members, gang members.

MR. MUSK:  Yeah.

Q   And — and we're not doing it.

THE PRESIDENT:  Sean, the saddest thing is they don't talk about the individual lines.  I could go on your show right now,  I could get a list that I have on the beautiful Resolute Desk in the Oval Office, and it's got 40 points, and all they are is the heading of what this money is.

You don't have to go deep into it, and you see it's, you know, all different things and it's so ridiculous.

I mean, normally, when you look for fraud, you're looking for one thing out of a hundred.  Here, out of a hundred, 95 are going to be bad.  I mean, they're — and they're so obvious just by the heading.

But they never mention that.  They only mention, "This is a violation of our Constitution.  This is a" — the word they give, you know, it's like a sound bite —

000509

"constitutional crisis." It's a new thing, "constitution-" — But they never mention about where the money is going.

MR. MUSK: Yes. Exactly.

THE PRESIDENT: And when people hear that — I had a very smart man, John Kennedy — he's actually a very smart man. He said, "Sir, you should just go on television and just read the name of the topic that you're giving all the money — just the topic that you're giving this money to, and don't say anything more," and he's right.

MR. MUSK: Yeah.

THE PRESIDENT: And I'll do it at some point, you know, when —

But they never talk about where the money is going. They just talk about, "It's a constitutional crisis."

It's so sad. And honestly, I think they're bad people. I used to give them the benefit of the doubt, but you almost think they hate the country. I think they hate the country. They're sick people.

Q   Remember, what they can't — what they couldn't accomplish at the ballot box, what they can't accomplish legislatively, now they're using the courts.

MR. MUSK: Yes.

Q   And they c- — they're trying to bury you in lawsuits.

THE PRESIDENT: That's right. You know the good news, though? They've lost their confidence. They're not the same people.

Q   I think you're right.

THE PRESIDENT: They're — they're not the same people.

This election was brutal for them. We won every swing state. We won by millions and millions of votes. We won everything. We — all 50 states went up — all 50. It's never happened.

Q   Popular vote.

THE PRESIDENT: Every one. All 50 states went up.

They've lost their confidence. I see it. And they're — they're just swirling and twirling. They don't know what the hell is happening. They're much different.

They're just as mean, but they're not getting to the point.

Q   Why do you invite them into the Oval Office nearly every day?

MR. MUSK: (Laughs.)

THE PRESIDENT: Well, the media — you're talking about the media.

Q   Yeah, your friends in the media.

THE PRESIDENT: The media — no, they're — you know, the anger that — they ask questions so angry — a question — a normal question. I give them an answer. They — but they — I say, "Why are you so angry when you ask a question?" Just a standard question. And, I don't know, there's something —

Q   They haven't had a- — they haven't been allowed in that office for the last four years, and here you're giving them access.

Let me go to an area that I think is key, and — and you talked about this in recent interviews, and that is: We don't need a Department of Education. Okay. And what some people are trying to do is stoke fears that, "Oh, my gosh, my kid is not going to get the money for education."

THE PRESIDENT: (Laughs.) Yeah.

Q   Or "grandma's Social Security and Medicare." This was a big promise of yours on the campaign trail.

THE PRESIDENT: Yeah. Yeah.

Q   So, I really want to give you both an opportunity to assure the American people you will keep — that money will be allocated for students, but with higher standards. For example, I would assume associated with monies given or vouchers.

THE PRESIDENT: (Inaudible) so much and — and then Elon goes. But, look, Social Security won't be touched —

Q   Won't be touched.

THE PRESIDENT: — other than if there's fraud or something — we're going to find it; it's going to be strengthened — but won't be touched. Medicare, Medicaid, none of that stuff is going to be touched. It's just —

Q   Nothing. I want you to —

000511

THE PRESIDENT:  (Inaudible) don't have to.

Now, if there are illegal migrants in the system, we're going to get them out of the system, and all of that fraud.  But it's not going to be touched.

School — I want to bring school back to the states, so that Iowa, Indiana — all these places — Idaho, New Hampshire — there's so many places, the states.  I figure 35 really run well.

And right now, it's Norway, Sweden, Denmark, Finland, China — China, can you imagine? — has top — top schools.  We're last.

So, they have a list of 40 countries.  We're number 40.  Usually we're 38, 39, but last time, we were number 40.  And what I say is you've got to give it back.

So, it doesn't work.

I'll tell you what we're number one in: cost per pupil.  We spend more money than any other country by far — it's not even close — per pupil.  Okay?  So, we know it doesn't work.

So, we spend the most and we have the worst — right? — the worst result.

When we give that — when we give that back to Indiana, when we give that b- — back to Iowa and back to a lot of the states that run well — they run well, a lot of them — 35, 37, 38 — now, you're going to have 10 laggards, but you're going to have 5 real laggards, but that's going to be okay.

Take New York — you give it to Westchester County, you give it to Suffolk County, you give it to Upstate New York, and you give it to Manhattan — but you give it to four or five subsections.  Same thing in California.  Los Angeles is going to be a problem, but you're going to give it to places that run well.  We can change education

Now, school choice is important, but that will get care — taken care of automatically.

We want to bring education back to the states.  You will spend half the number.  And I'm not even doing this —

Q   So, you're leaning more towards grants not vouchers, like to parents?

THE PRESIDENT: I'm not even — I'm not even doing this to save, but you will save. It will cost you much less money. You get a much better education. If you go to some of these states, you'll be the equivalent of Norway, Sweden, Denmark — places that really have a good school system. You'll have — those places will be the equivalent, and your overall numbers will get so much better.

Q   Do you want standards associated with the money?

THE PRESIDENT: The only thing I want to do from — from Washington, D.C., is make sure they're teaching English, reading, writing —

Q   Math and science.

THE PRESIDENT: — and arithmetic. Okay?

Q   Science? Science might help.

THE PRESIDENT: Okay. A little science. You know —

Q   Computers.

THE PRESIDENT: — you're not going to have much of a problem with that, but that's it.

Do you know, we have half the buildings — I mean, you look at Department of Education —

MR. MUSK: It's empty.

THE PRESIDENT: Look at the real estate and the —

MR. MUSK: Yeah.

THE PRESIDENT: — the level. For what? To — to — I mean, for — what do they do?

We have really bad educa- — the teachers — I love teachers. I respect teachers. And, by the way, there's no reason why teachers can't form a union. They can do whatever they want to do, if it's back in the states. So, we're not looking to hurt the teacher — I'm — I'm going to help the teachers. I think the teachers should be incentivized, because a good teacher is like a good scientist, is like a great doctor.

MR. MUSK: Sure.

THE PRESIDENT: It's a valuable commodity.

000513

MR. MUSK:  Yeah.

THE PRESIDENT:  I think they should be incentivized.

MR. MUSK:  Yes.

THE PRESIDENT:  So, I'm totally for the teachers.

MR. MUSK:  Absolutely.

Q   I interview a guy a lot on radio.  He's from Wichita, Kansas.  And he started —

THE PRESIDENT:  Right.

Q   — as a medical doctor.  Started Atlas.MD, and he's now — he's rolled it out nationwide.  Concierge care, $50 a month, 24-hour access to a doctor.

THE PRESIDENT:  Right.

Q   You know, they use a lot of telemedicine now as part of it — very innovative. He negotiates directly with pharmaceutical companies.  People — if they have high blood pressure, they walk out with their medicine.  They have high cholesterol, they walk out with their medicine.  And they pay pennies on the dollar.

You mentioned —

THE PRESIDENT:  By the way, forms of that could be done.

Q   Forms of that?

THE PRESIDENT:  Forms of that could be done.

Q   Innovation.

THE PRESIDENT:  We got hurt when we didn't get the vote on Obamacare.  I made Obamacare — I had a choice: I could let it rot and win a point, or I could do the best you could do with it.  And that's what I did.  We did a great job with it, and we made it sort of work, but it's lousy.  We could do so much better. And when you say — you go to certain areas, they — they have doctors round the clock.  They have great medical care for a fraction of what we're paying right now.

There are things we could do.

But, look, just overall, this man has been so valuable.  I hate to see the way they go after him.  They go after him.  It's so unfair.  He doesn't need this.  He wants to

000514

do this.

First of all, this is bigger than anything he's ever done.  He's done great companies and all, but this is much — you know, this is trillion — everything's trillions, right?

MR. MUSK:  Yeah.  The numbers are crazy.

Q   To go back to my original point —

THE PRESIDENT:  He can save —

MR. MUSK:  Yeah.

Q   But let me — give him his $10 million back.

MR. MUSK:  Well — well — I — no.  So, people ask me, like, "What's — what's the — what's the — what's, like, the — what's your biggest surprise in — in D.C.?"  And I'm like, "The sheer scale."

Q   It's massive.  So, you love the challenge?

MR. MUSK:  Well, I mean, to —

THE PRESIDENT:  He'll never do anything bigger.

MR. MUSK:  To the president's point —

THE PRESIDENT:  That's the only thing you can say, "He'll never do anything" —

MR. MUSK:  But, I mean, you do something slightly better, and you save billions of dollars for the American taxpayer — just slightly better.  Slightly.  (Laughs.)

Q   When you say "tech support" —

MR. MUSK:  You go one percent better, and it's, like, you know, tens of billions of dollars saved to the American taxpayer.

Now, if I may address the point that you — the question you asked earlier, which is, you know, how do we assure people that —

Q   They want to know.

MR. MUSK:  Yeah, how do we assure people that we're going to do the right thing, that their — that their Social Security benefits will be there, that their — the medical care will be good and s- — and — in fact, how do we make it —

ensure that there's better medical care in the future? How do we improve their benefits? How do we make sure that their Social Security check goes further than it did in the past and not — it doesn't get weakened by inflation?

So, the — if we — if we address the — the massive deficit spending, the sort of — the — the waste in the government, then — then we can actually address inflation.

So, provided the economy grows faster than the money supply, which means you stop the government overspending and the waste, and the output of real useful goods and services exceeds the increase in the money supply, you have no inflation.

Q    Yeah.

MR. MUSK:  And — and you also drop the — the interest payments that people pay, because if the government keeps —

Q    Way too high.

MR. MUSK:  Yes.  The — the reason the interest payments are so high is because the — the national debt keeps increasing.  So, the — the government is competing for — to sell debt with — for — with — with the private citizens.  This drives up the interest rate.

So, if you have a — if you have a — if you cut back on the deficit, you actually have an amazing situation for people, because you get r- — you get rid of inflation and you drop the interest rates.  And that means people's mortgage payments go down, their credit card payments go down, their car payments go down, their student loans go down.  Everything — their — their life becomes more affordable and they're standard of living improves.

Q    How quickly?  Because I think people are suffering now.  We're still living under the Biden-Harris economy.

THE PRESIDENT:  But, Sean, you have states right now —

Q    Yeah.

THE PRESIDENT:  You have some states that operate that way.  They operate as well as any corporation.  They really operate well.

000516

MR. MUSK:  Yeah.

Q   Florida.

THE PRESIDENT:  They have surpluses.  They ha- — they don't —

MR. MUSK:  Texas is — has a surplus, for example.

Q   Yeah.

THE PRESIDENT:  When they — when they look at New York and — and California and some of these places that should have an advantage — I mean, there's a big advantage — or Pritzker does such a bad job in Illinois; it's horrible how bad he is — and they don't have that advantage.

You know, New York has stock exchange and a lot of things.  And California has the weather and the beautiful water and all the thing- —

MR. MUSK:  California has — has great weather.  The most expensive weather on Earth.

THE PRESIDENT:  Yeah.  (Laughter.)  But — but —

Q   I like Florida.

MR. MUSK:  Yeah.

THE PRESIDENT:  But some states operate the way he's talking about.

Q   Efficiently.

THE PRESIDENT:  When you go into some of these states, you're going to find very little.  You're going to find almost nothing.  They really operate well — big surpluses, low taxes.  And —

Q   You know, my taxes went up the first time you were president, because you took away the SALT deduction —

THE PRESIDENT:  I — well, I did.

Q   — which, by the way, I thought was the right decision.

THE PRESIDENT:  It was the right decision — in fact, Reagan tried to do it — because it rewards badly run states.

But at the same time, it's a tough — it was — it's tough for the states.  I mean, it really is tough for the states.

The sad part is it rewards really badly run states.

Q   Yeah.

THE PRESIDENT:  And Reagan tried to do it.  He was unable to do it.  I got it done.

Q   You got it done, and —

THE PRESIDENT:  And now we're going to give some back.

Q   A little bit.

THE PRESIDENT:  Because you know what?  We've got to help them.

Q   It's only a little.

THE PRESIDENT:  We've got to help.

Q   Because otherwi- — we're encouraging people to elect high taxes, spen- —

THE PRESIDENT:  Nobody had any idea it would be that devastating.  I did the right thing.  I got something that Reagan couldn't do.  I got it done, where everybody is — are the same.  But you know what?  We've got to help them out.

Q   Reagan had the Grace Commission, some of the best business minds in the country.

THE PRESIDENT:  Right.

Q   And they came up with recommendations.  Congress adopted none of them, and none of them were implemented.

I've got to ask this question, because the media is obsessed about it: What — what if there is a conflict?  In other words, because you do business — it was funny, when it came out the other day, that there was going to be, I think, $400 million — billio- — I don't know if it was millions or billions — a lot of money on Teslas that Joe Biden's administration w- — did with Tesla, and —

MR. MUSK:  I'm not familiar with that.

Q   You're not even familiar with it?  But —

MR. MUSK:  I — I don't think — are you talking about, like, the Inflation Reduction Act stuff or —

Q   It was some — it was a purchase order of Tesla vehicles.

MR. MUSK:  Oh.  Oh, that was — that was incorrect.  There was s- — like, there's some sort of — the media claim that there was, like, $400 million worth of

000518

Cybertrucks —

Q    That was it.

MR. MUSK:  — being bought by the DOD.

Q    And that he gave it to you.

MR. MUSK:  No — well, first of all, that was —

THE PRESIDENT:  No, actually, it was —

MR. MUSK:  Th- — it was fa- —

THE PRESIDENT:  It was Biden.

Q    It was Biden.

THE PRESIDENT:  And you know Biden wouldn't give him much.

MR. MUSK:  But — but it wasn't even — it was fake news, six weeks to Sunday. Tesla is not getting $400 million for Cybertrucks.  And the — and the — and this alleged —

Q    That's what it was, Cybertrucks.

MR. MUSK:  This — yeah.  This alleged award occurred in December, before the president took office.  So, it's — it's fake on multiple levels.  There i- — Tesla isn't getting $400 million.  And even if it — even if it was, which it isn't, it was awarded during the Biden administration.

Q    Okay, but you're — you — you —

MR. MUSK:  It's total fake news.

Q    There — there is —

MR. MUSK:  It's fake on, like — it's like multiple leverals —

Q    There is some integration —

MR. MUSK:  — multiple layers of fake.

Q    So, you're — you're tasked now — and I pray to God this is successful.  I really do.  I wish you Godspeed.

MR. MUSK:  Yeah.

Q    You know, "Godspeed, John Glenn."

THE PRESIDENT:  It's — it's going to be, by the way.  I really believe it's going to be.

Q   But — but there —

MR. MUSK:  Oh, yeah.

Q   But there are legitimate areas —

THE PRESIDENT:  Because the country is going to do well beside this. This is cutting.  We're only talking about cutting.

We're also going to make a lot of money.  We're g- — we're taking in so much money.

Q   But what about his business?  What if — if there is —

THE PRESIDENT:  Then we won't let him do it.

Q   — a contract he would otherwise get?

THE PRESIDENT:  We're not going to let him do it.  He — if —

Q   You're not going to let him do it?

THE PRESIDENT:  If he's got a conflict — I mean, look — he —

Q   Y- — now y- —

THE PRESIDENT:  He's in certain areas — I mean, I see this morning — I didn't — I didn't know, but I said, "Do the right thing" — where they're cutting way back on the electric vehicle subsidies.

MR. MUSK:  Yes.

THE PRESIDENT:  They're cutting back.

Q   You're losing —

THE PRESIDENT:  Not only cutting back —

Q   It hurts you.

MR. MUSK:  Correct.

THE PRESIDENT:  Yeah.

Now, I will tell you —

Q   You don't care?

MR. MUSK:  Well —

THE PRESIDENT:  He's probably not that happy with it, but that would have been one thing he would have come to me and said, "Listen, you got to do me a favor.

This is crazy." (Laughter.) But this was in the tax bill. They're cutting back on the subsidies.

I didn't — I wasn't involved in it. I said, "Do what's right, and you get" — and they're coming up with the tax, but it's just preliminary.

But I mean, if he were involved, wouldn't you think he'd probably do that? Now, maybe he does better if you cut back on the subsidies. Who knows. Because he figures — he does think differently. He thinks he has a better product, and as long as he has a level playing field, he doesn't care what you do —

MR. MUSK: Exactly.

THE PRESIDENT: — which he's very — he's told me that.

MR. MUSK: Yeah. I mean, I haven't asked the president for anything ever.

THE PRESIDENT: It's true.

Q    And if it comes up, how — how will you handle it? (Inaudible.)

THE PRESIDENT: He won't be involved.

MR. MUSK: Yeah, I'll — I'll re- — I'll recuse myself if it is a conflict.

THE PRESIDENT: If there's a conflict, he won't be involved.

MR. MUSK: Yeah.

THE PRESIDENT: I mean, I wouldn't want that, and he won't want it.

MR. MUSK: Right. And — and also, I'm getting a — sort of a daily proctology exam here. You know, it's not like I'll be getting away from something in the dead of night.

Q    Welcome to D.C. If you want a friend, get a dog.

MR. MUSK: Well, I do have a dog, but I also have friends. (Laughter.) My dog loves me, poor little creature.

THE PRESIDENT: You know the truth was —

MR. MUSK: I need to bring him to D.C.

THE PRESIDENT: He's — I know every businessman. I know the — the good ones, the bad ones, the smart ones, the lucky ones. I know them all. This guy is a ver- — he's a brilliant guy. He's a great guy. He's got tremendous imagination and scientific imagin- — far beyond — you know, you keep talking about a technologist and all, but you're much more than a technologist. You are that. But he's also a good person. He's a very good person, and he wants to see the country do well.

And I know a lot of great businesspeople, really great business people, but, you know, they're not really, in some cases, very good people. And I know people that would try and take advantage of the situation.

This guy is somebody that really cares for the country, and I saw that very early on. I saw it, really, a long time ago when I got to know him. He's a very different kind of a character.

That's why — you know who loves him: young people that are very smart and that love the country. He's got, like, a tremendous following, because that's what he's — he's a good person.

And he doesn't need this. He didn't need this, and he's doing this to help the country. If I didn't win this election, this country was — I don't think it could have made it. I don't — I mean, we're allowing criminals — millions of criminals into our country, where everything is transgender, it's men playing in women's sports.

I mean, none of this stuff — you could go — I could give you a hundred things. It's almost like they're trying to destroy the fabric of — of the country, of the world, because the world was following us. Now the world is following us out of this pit.

We've done a lot. I'll tell you what, in three weeks, we've done more — I think we've done more — in — in terms of meaningful, not just dollars — than maybe any president ever. And a lot of people are saying that.

Q   Shock — it's been shock and awe.

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 112 of 528

THE PRESIDENT:  I mean, if we can keep it going at this level, this country is going to be at a level that it's never seen before.

Q   You know one of the things you did that I really thought was pretty clever and smart and fair, and that was reciprocal tariffs.

THE PRESIDENT:  Yeah, reciprocal.

Q   Ta- — I didn't know India charged so much.  I didn't know the European Union to charge them.

MR. MUSK:  Yeah, totally.

Q   I didn't know Canada was charging us.

THE PRESIDENT:  Everybody.  Everybody.  Everybody but us.

Q   Brazil, why?

THE PRESIDENT:  And I was doing it — you know, I charged China tariffs.  I took in hundreds of billions of dollars, and I was doing that.  But when we got — we had the greatest economy in history.  But then we got hit with COVID, and we had to solve that problem, because I was doing it — and now I said, I want to come back and do the recipri- — because every country in the world almost — we have a deficit with almost every country — not every one, but just about, pretty close.

And — but every country in the world takes advantage of us, and they do it with tariffs.  They makes — make it — it's impossible for him to sell a car, practically, in, as an example, India.  I don't know if that's true or not, but I think —

MR. MUSK:  The tariffs are like 100 percent import duty.

THE PRESIDENT:  The tariffs are so high —

MR. MUSK:  Yeah.

THE PRESIDENT:  — they don't want to — now, if he built the factory in India, that's okay, but that's unfair to us.  It's very unfair.

And I said, "You know what we do?"  I told Prime Minister Modi yesterday — he was here.  I said, "Here's what you do.  We're going to do — be very fair with you."  They charge the highest tariffs in the world, just about.

Q   36 percent?

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 113 of 528

THE PRESIDENT:  Oh, much — much higher.

MR. MUSK:  It's 100 percent on — auto imports are 100 percent.

THE PRESIDENT:  Yeah, that's peanuts.  So, much higher.  And — and others too.  I said, "Here's what we're going to do: reciprocal.  Whatever you charge, I'm charging."  He goes, "No, no, I don't like that."  "No, no, whatever you charge, I'm going to charge."  I'm doing that with every country.

MR. MUSK:  It seems fair.

Q   Don't you —

THE PRESIDENT:  (Laughs.) It does.

MR. MUSK:  It's — it's like fair is fair.

THE PRESIDENT:  Nobody can argue with me.  You know, the media can't argue — I said — they said, "Tariffs — you're going to charge tariffs?"  You know, if I said, like, 25 percent they'd say, "Oh, that's terrible."  I don't say that anymore —

Q   Can I — (inaudible) —

THE PRESIDENT:  — because I say, "Whatever they charge, we'll charge."  And you know what?

Q   They stop.

THE PRESIDENT:  They — then they say, "Oh, that sounds fair."

MR. MUSK:  All the president is saying is that —

Q   (Inaudible.)

MR. MUSK:  — it needs to be at a level playing field and — and fair and square.

Q   Yeah.  And how does — how —

THE PRESIDENT:  And we're going to make a lot of money and a lot of businesses are going to come pouring in.

MR. MUSK:  How can you argue with a fair and square situation?

Q   Don't — don't you think most of them will look at the — the — for example, without America, China's economy will tank.  They need our business.

THE PRESIDENT:  They do.  Everybody needs us.

Q   Everybody needs it.

THE PRESIDENT:  And you know what?

Q   Do- — don't you think they'll stop?

THE PRESIDENT:  We only have so long left where we're in this position.  We're the bank, and the bank is getting smaller and smaller and smaller.  We — we're the bank.  We got to do this now.  We can't wait another 10 years and have a shell of a country left, because that's what was going to happen.

Q   Mr. President —

THE PRESIDENT:  This country — if I didn't win this election and have people like this man right here that really do care, because that's the other word — if you don't care, you could be the smartest guy in the world, it's not going to matter.  But if we didn't win this election, I'm telling you, we would not have had a country for very long.

Q   How quickly —

MR. MUSK:  May I say —

Q   — do you balance the budget and — and when do we start paying down that debt?

THE PRESIDENT:  Well, potentially, very quickly, between what he's doing and with income coming in from tariffs and other things.  I mean, I hope we can — I don't want to give a date, because then these people are going to say, "Oh, well, he didn't make the date."  But I think we can do it very quickly.

We would have never done it if this didn't happen.  Never.  It would have never been — it would only get worse and worse, and ultimately, it would have exploded.

This country was headed down a very bad track.  And the whole DEI thing, that was — that was a trap.  That was a sick trap.

Q    (Inaudible.)

MR. MUSK:  (Inaudible.)

THE PRESIDENT:  And, you know, we've destroyed that.  That's gone.  That's pretty much gone.

Q    I agree.

MR. MUSK:  (Inaudible) —

Q    We're not — we're not funding it.

MR. MUSK:  If — I really want to — I really want to emphasize to people that — this is a very important point — if we don't solve the deficit, there won't be money for medical care.  There won't be money —

THE PRESIDENT:  Right.

MR. MUSK:  — for Social Security.  We either solve the deficit or all we'll be doing is paying debt.

Q    Nobody —

MR. MUSK:  It's — it's got to be solved, or there's no medical care, there's no Social Security, there's no nothing.  That's got to be solved.  It's not optional.  America will go bankrupt if this is not done.  That's why I'm here.

Q    The president's —

THE PRESIDENT:  Europe takes advantage of us.

MR. MUSK:  And — and I'd like to also just send a message — like, because, as the president said, like, this — there's a lot of rich people out there.  They should be caring more about the country because — the reason they should be caring about — more about country is: America falls, what do you think is going to happen to your business?  What do — what do you think — do you think you're be going to be okay if — if the ship of America sinks?  Of course not.  Like, what — what I'm doing here, what the president is doing is it's just long-term thinking.  The ship of America must be strong.  The ship of America

cannot sink. If it sinks, we all sink with it.

THE PRESIDENT: Sean, you're a —

Q    This is what — this is what drives you?

MR. MUSK: Yes.

Q    This is important. It says "tech support." So, you're not trying to be president, as the media suggests. You are really here because your heart and your passion is this. And the president described you as being — this is the biggest thing you ever done. Now you trying to bring sight to —

THE PRESIDENT: There could be nothing bigger. There's nothing —

Q    You're sending ships up to Mars — you know, spaceships up in the sky all the time —

THE PRESIDENT: That's peanuts.

Q    — and saving astronauts. That's pretty big.

THE PRESIDENT: That's peanuts compared to what we're talking about.

Q    It's peanuts?

THE PRESIDENT: Yeah.

Q    Do you agree with that?

MR. MUSK: Well, it's esse- — it's essential that America be healthy, that America's economy be strong. And — and if that — if — basically, like, my concern is like, if — if — America is the central pillar holding up Western civilization. That pillar must be strong. If that pillar falls, the whole roof comes crashing down.

THE PRESIDENT: Including his ships.

MR. MUSK: There's no place to hide.

THE PRESIDENT: Including his ships going up.

MR. MUSK: There's no place to run.

THE PRESIDENT: Nothing. There's nothing left.

Q    Why — why, if this is your goal, your motivation, you're losing money in the process, you're offeri- — you do all these nice things for people for free; you're trying to solve, you know, blindness; you're going to rescue astronauts; you help

000527

the people in North Carolina, California; you're cutting money that was sent abroad that's not helping the American people, then why the rage —

MR. MUSK:  Actually, I think it was like —

Q    But why this rage?

MR. MUSK:  — it was not helping the American people and hurting people overseas, to be clear.

Q    Why this rage against you now?  First, they hated him.  Now they hate both of you.

MR. MUSK:  Well, I think we're seeing an antibody reaction from — from those who are receiving the — the wasteful and fraudulent money.

Q    They're being exposed.

MR. MUSK:  Yes.

Q    Nobody wants to be exposed when you're corrupt.

MR. MUSK:  I'll — I'll tell you a lesson I learned at PayPal.  You know who complained the loudest — the quickest and the loudest and with the most amount of righteous indignation?  The fraudsters.  That's who complained first, loudest, and — and they would generally have this immense overreaction.  That's how we knew there were the fraudsters.  That's how we knew.  There's a tell.

Q    What di- — I've never — I've never met you before today.

MR. MUSK:  Yeah.

Q    And it's nice to meet you, by the way.  Thank — thank you for doing this.  You guys are really friends.  I could s- — you guys — I could see you kicking up your shoes.

THE PRESIDENT:  Well, he doesn't do this kind of thing.  And the way I figured that you'd get to know him is if I did it with him.  I said, "Come on, let's do it together."  He doesn't do this.

I think he's smarter not doing it, overall. Because, you know, I mean, he's done very well without doing it. But he doesn't feel it's really worthwhile. He wants the product to speak for itself, or whatever he does speak for itself. But he views it as — you know, does it matter?

And I'm doing this with you today because I wanted to have people understand him. And I think it's very important — I disagree with him. I think it's very important that they do understand him.

He doesn't need this. He doesn't need it. Now, I happen to think it's made him very popular. I think it — he's more popular now because there are so many people — you know, you're talking about the radical left — they have the lowest ratings. MSNBC is dying. CNN is dying. They're all dying. The New York Times is doing lousy. The Washington Post is doing horribly. They're all doing badly because people don't buy it anymore.

But I think it was important that he do this one interview. You've been a very fair guy. I think you were the right guy to do it. If we could get some radical left guy — and he'd do just as well, frankly, because it's all about common sense.

Q    They would attack him —

THE PRESIDENT:  But this — Sean —

Q    — as being unconstitutional, not — a fascist.

THE PRESIDENT:  — to me this was a — it was important for people to understand, he's doing a big job. He's doing a very thankless job. He's doing a thankless job, but he's helping us to save our country.

Our country was in serious trouble, and I had to get the best guy, somebody with credibility, because if he were just a regular, good — very good, solid businessman, he wouldn't have the credibility. He's got the best credibility for this.

And people also know he's an honest guy. He's an honest guy. He's just a very, very smart guy who's done amazing things. And this will be the biggest thing he's ever done, because, you know, his companies are all great. But if this country goes bad — I guess where he is a little selfish is this. He knows one

thing and probably doesn't think — but if his — if this country goes bad, his stuff is not going to be worth very much, I can tell you.

MR. MUSK:  Well, I'd say, if the — if the ship of America sinks, we're all go- — going down with it.  You know, this idea that people can escape to New Zealand or some other place is false.  If the central pillar of Western civilization that is America falls, the whole roof comes crashing down and there is no escape.

Q   It's amazing, since you've been elected, to watch Canada, Mexico, Venezuela, Colombia — I — I was shocked at the statements that Vladimir Putin made about you.  I — I was shocked at the hostage release.  I was shocked that Venezuela had done it — had done it.  Zelenskyy wants a deal.  Putin wants a deal.

THE PRESIDENT:  All good statements.

Q   King Abdullah was interested.

THE PRESIDENT:  You mean by that all good statements.  Look, they respect the president of this country.  They respect — they did not respect the last president.  They laughed at him, and they laughed at our country, and he's done great damage to our country.

Q   Have foreign leaders told you what they thought of Biden?

THE PRESIDENT:  Yeah, they have, but I'd rather not say.  They — they have.  It's not — it — look —

Q   It's the obvious.

THE PRESIDENT:  He was not George Washington, let's put it that way.

MR. MUSK:  (Inaudible.)

THE PRESIDENT:  Not the greatest.

Q   Sorry, if that's (inaudible).

THE PRESIDENT:  He's done a tremendous disservice.

Q   Will you be here —

THE PRESIDENT:  And, by the way, the Democrats have done a great disservice, and they ought to get their act together and use a little judgment, and they ought to work with us on straightening out this mess that —

Q   Who?  John Fetterman?

THE PRESIDENT:  — a lot of people have —

Q    Maybe?  Who — what Democrat is not radicalized?

THE PRESIDENT:  Actually, you mention John.

Q    John Fetterman.

THE PRESIDENT:  He's become the best voice in the Democrat party.  You know, I had lunch with him, and I thought he was terrific, but he's a much different man than he was before he had this difficulty.  He used to be radical left, and I think he became much smarter, actually.  He's really — he's really a voice of reason.  But the Democrats have to get together.  They have to get their act together, because the stuff they — they talk about makes no sense.  It makes — none whatsoever.  And they must know it.  They must know.

MR. MUSK:  Yeah.  I mean, like, the country has spoken very clearly and rejected the core tenets of the Demo- — Democratic Party.  The country voted t- — fo- — I mean, the country made the — America has made its vote clear.  The president won the popular vote decisively.  The Republicans won the House.  Repub- — Republicans won the Senate.  What more do you need?  The Democratic Party needs to take a hard look in the mirror and — and change their ways.

Q    I think they went from shock, denial, into the depression stage of grief, and now they're in the rage stage, where I anticipate they'll stay for four years, and if they get the chance, they'll want to impeach him 10 times.  Do you anticipate you'll be here in four years?  My last question.

MR. MUSK:  I'll — I'll be as helpful as long as I can be helpful.

THE PRESIDENT:  That's a good question.  I mean, I was thinking about that just now.  I said, "I wonder how long he's going to be doing it."  You can't get somebody like this.  He cares, and he's brilliant, and he's got energy.  You need energy, also, in addition to those other things.

You know, I have a lot of guys that are very smart, but they have no energy.  They want to sleep all day long.  You need a lot of energy.  He's got a lot of energy.  He's doing a great job.

If there's any conflict, he — he will stop it. But if he didn't, I'd stop it. I'd see if there's a conflict. I mean, we're talking about big stuff.

But he's under a pretty big microscope.

MR. MUSK: Yeah, seriously.

THE PRESIDENT: I mean, everybody is watching him. If there's a conflict, you're going to be reading about it within about two minutes after the conflict.

MR. MUSK: Exactly. There — there's — the possibility of me getting away with something is 0 percent — 0.0. I — I'm scrutinized to a ridiculous degree.

And — and the other thing is that we — you know, what — what's — you know what's better than saying "trust — trust me" is just full transparency. So, what we're doing with — with the DOGE — DOGE dot — just go to DOGE.gov. You can see every single action that's being taken.

And now –and I want to be clear, we are going to make some mistakes. We're not going to be perfect. Nobody bats a thousand. But we're going to fix the mistakes very quickly. That's what matters: not that you don't make mistakes, but that you fix the mistakes very fast.

THE PRESIDENT: And you're going to ask the other side, when they talk about, "This is a constitutional crisis," you got to a- — what are they paying for? Where are those tax — because when you read off the list of things, it's a big con job. See, when they talk Constitution —

MR. MUSK: Totally.

THE PRESIDENT: — it's a total con job.

MR. MUSK: Yes.

THE PRESIDENT: They never talk — and I watch some of the shows —

MR. MUSK: It's specifics — they avoid specifics.

THE PRESIDENT: Yeah, when you start talking about how did — how come they spent money on transgender here and transgender there —

MR. MUSK: Yeah, totally.

THE PRESIDENT: — and all the stuff in some country that nobody ever heard of, they don't want to talk about it. They just talk about, "This is a

constitutional crisis."

Q   It shocks the conscious.

THE PRESIDENT:  The money is being squandered purposely — tremendous theft, tremendous kickbacks, everything — and we're straightening it out.  And thank goodness.  I look up, and I say, "Thank you," because I think if it went on for four more years, it would not be salvageable.  You wouldn't be able —

MR. MUSK:  Absolutely.

THE PRESIDENT:  You wouldn't be able to save it.

Q   You believe, too, that when you were in Butler, came within a millimeter being assassinated —

THE PRESIDENT:  Yeah.

Q   The day you endorsed him, that was that day.

MR. MUSK:  Yes.

Q   But you had been planning on it?

MR. MUSK:  Yeah.

Q   Pretty — I think everybody will never forget that iconic blood on your face. "Fight, fight, fight."  I actually was afra- — watching it and thought you might drop again.  You know, I didn't know if it had hit you.  You can sometimes get up and then the blood starts to accumulate.  It was scary — pretty scary.

MR. MUSK:  Well, I mean, th- — this is how you know someone's true character, because everyone can say they're brave, but the president was actually shot. Okay?  Courage under fire.  "Fight, fight, fight," blood streaming down the face. That's true courage.  You can't fake that.

Q   Yeah.  Thank you both.


    Mr. President, thank you, sir.

THE PRESIDENT:  Thank you very much.

Q   Appreciate it.  Elon, thank you for your time.  Really nice to meet you.

             END              1:01 P.M. EST

News

Administration

Issues

Contact

Visit

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 124 of 528

Copyright

Privacy

# EXHIBIT XXXIX

2/24/25, 1:16 PM    Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 126 of 528

Menu



Search

PRESIDENTIAL ACTIONS

# ENSURING LAWFUL GOVERNANCE AND IMPLEMENTING THE PRESIDENT'S "DEPARTMENT OF GOVERNMENT EFFICIENCY"

2/24/25, 1:16 PM          Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 127 of 528

# DEREGULATORY INITIATIVE

EXECUTIVE ORDER

February 19, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  It is the policy of my Administration to focus the executive branch's limited enforcement resources on regulations squarely authorized by constitutional Federal statutes, and to commence the deconstruction of the overbearing and burdensome administrative state.  Ending Federal overreach and restoring the constitutional separation of powers is a priority of my Administration.

Sec. 2.  Rescinding Unlawful Regulations and Regulations That Undermine the National Interest.  (a)  Agency heads shall, in coordination with their DOGE Team Leads and the Director of the Office of Management and Budget, initiate a process to review all regulations subject to their sole or joint jurisdiction for consistency with law and Administration policy.  Within 60 days of the date of this order, agency heads shall, in consultation with the Attorney General as appropriate, identify the following classes of regulations:

(i)   unconstitutional regulations and regulations that raise serious

2/24/25, 1:16 PM                    Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 128 of 528

constitutional difficulties, such as exceeding the scope of the power vested in the Federal Government by the Constitution;

(ii)   regulations that are based on unlawful delegations of legislative power;

(iii)  regulations that are based on anything other than the best reading of the underlying statutory authority or prohibition;

(iv)   regulations that implicate matters of social, political, or economic significance that are not authorized by clear statutory authority;

(v)    regulations that impose significant costs upon private parties that are not outweighed by public benefits;

(vi)   regulations that harm the national interest by significantly and unjustifiably impeding technological innovation, infrastructure development, disaster response, inflation reduction, research and development, economic development, energy production, land use, and foreign policy objectives; and

(vii)  regulations that impose undue burdens on small business and impede private enterprise and entrepreneurship.

(b)  In conducting the review required by subsection (a) of this section, agencies shall prioritize review of those rules that satisfy the definition of "significant regulatory action" in Executive Order 12866 of September 30, 1993 (Regulatory Planning and Review), as amended.

(c)  Within 60 days of the date of this order, agency heads shall provide to the Administrator of the Office of Information and Regulatory Affairs (OIRA) within the Office of Management and Budget a list of all regulations identified by class as listed in subsection (a) of this section.

(d)  The Administrator of OIRA shall consult with agency heads to develop a Unified Regulatory Agenda that seeks to rescind or modify these regulations, as appropriate.

Sec. 3.  Enforcement Discretion to Ensure Lawful Governance.  (a)  Subject to their paramount obligation to discharge their legal obligations, protect public safety, and advance the national interest, agencies shall preserve their limited

enforcement resources by generally de-prioritizing actions to enforce regulations that are based on anything other than the best reading of a statute and de-prioritizing actions to enforce regulations that go beyond the powers vested in the Federal Government by the Constitution.

(b)  Agency heads shall determine whether ongoing enforcement of any regulations identified in their regulatory review is compliant with law and Administration policy.  To preserve resources and ensure lawful enforcement, agency heads, in consultation with the Director of the Office of Management and Budget, shall, on a case-by-case basis and as appropriate and consistent with applicable law, then direct the termination of all such enforcement proceedings that do not comply with the Constitution, laws, or Administration policy.

Sec. 4.  Promulgation of New Regulations.  Agencies shall continue to follow the processes set out in Executive Order 12866 for submitting regulations for review by OIRA.  Additionally, agency heads shall consult with their DOGE Team Leads and the Administrator of OIRA on potential new regulations as soon as practicable.  In evaluating potential new regulations, agency heads, DOGE Team Leads, and the Administrator of OIRA shall consider, in addition to the factors set out in Executive Order 12866, the factors set out in section 2(a) of this order.

Sec. 5.  Implementation.  The Director of the Office of Management and Budget shall issue implementation guidance, as appropriate.

Sec. 6.  Definitions.  (a)  "Agency" has the meaning given to it in 44 U.S.C. 3502, except it does not include the Executive Office of the President or its components.

(b)  "Agency head" shall mean the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director.

(c)  "DOGE Team Lead" shall mean the leader of the DOGE Team at each agency as described in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d)  "Enforcement action" means all attempts, civil or criminal, by any agency to deprive a private party of life, liberty, or property, or in any way affect a private party's rights or obligations, regardless of the label the agency has historically placed on the action.

(e)  "Regulation" shall have the meaning given to "regulatory action" in section 3(e) of Executive Order 12866, and also includes any "guidance document" as defined in Executive Order 13422 of January 18, 2007 (Further Amendment to Executive Order 12866 on Regulatory Planning and Review).

(f)  "Senior appointee" means an individual appointed by the President, or performing the functions and duties of an office that requires appointment by the President, or a non-career member of the Senior Executive Service (or equivalent agency system).


Sec. 7.  Exemptions.  Notwithstanding any other provision in this order, nothing in this order shall apply to:

(a)  any action related to a military, national security, homeland security, foreign affairs, or immigration-related function of the United States;

(b)  any matter pertaining to the executive branch's management of its employees; or

(c)  anything else exempted by the Director of the Office of Management and Budget.


Sec. 8.  Severability.  If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 9. General Provisions. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department, agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

    February 19, 2025.

News

Administration

Issues

Contact

Visit

2/24/25, 1:16 PM      Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 132 of 528

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

# EXHIBIT XL



**$0**

OE INTERNATIONAL PROJECT FINANCE ASSOCIATE – PSC

View on FPDS    Close



2/25/25, 6:17 AM

FPDS-NG : ICDUSER [ Award ]

New    Save Draft    Validate    Reparent    Correct    Modify    Save Tmpl    Delete    Print

Close Out    Help

**Transaction Information**

| Award Type: | Definitive Contract | Prepared Date: | 01/08/2025 11:30:00 | Prepared User: | DUSTIN.MONEYPENNY@DFC.GOV |
| Award Status: | Final | Last Modified Date: | 01/21/2025 10:30:04 | Last Modified User: | SAMUEL.DUSTIN@DFC.GOV |
| Closed Status: | No | Closed Status Date: | | Closed By: | |
| | | Approved Date: | 01/21/2025 10:30:04 | Approved By: | SAMUEL.DUSTIN@DFC.GOV |

**Document Information**

|  | Agency | Procurement Identifier | | Modification No | | Trans No |
| Award ID: | 7700 | 77344424C0012 | | P00001 | | 0 |
| Referenced IDV ID: | | | | | | |
| Reason For Modification: | TERMINATE FOR CONVENIENCE (COMPLETE OR PARTIAL) | | | | | |
| Solicitation ID: | 77344423Q0049 | | | | | |

|  | Agency Identifier | Main Account | Sub Account | | Initiative | |
| Treasury Account Symbol: | | | | | Select One | |

**Dates**                                               **Amounts**

| | | | Current | Total |
| Date Signed *(mm/dd/yyyy)* : | 01/21/2025 | | | |
| Period of Performance Start Date *(mm/dd/yyyy)* : | 08/05/2024 | Action Obligation: | $0.00 | $124,478.14 |
| Completion Date *(mm/dd/yyyy)* : | 01/21/2025 | Base And Exercised Options Value: | $0.00 | $124,478.14 |
| Est. Ultimate Completion Date *(mm/dd/yyyy)* : | 01/21/2025 | Base and All Options Value (Total Contract Value): | $0.00 | $265,257.96 |
| Solicitation Date *(mm/dd/yyyy)* : | 06/02/2023 | Fee Paid for Use of IDV: | $0.00 | |

**Purchaser Information**

| Contracting Office Agency ID: | 7700 | Contracting Office Agency Name: | UNITED STATES INTERNATIONAL DEVELOI |
| Contracting Office ID: | 773444 | Contracting Office Name: | OFFICE OF ACQUISITION |
| Funding Agency ID: | 7700 | Funding Agency Name: | UNITED STATES INTERNATIONAL DEVELOI |
| Funding Office ID: | 773444 | Funding Office Name: | OFFICE OF ACQUISITION |
| Foreign Funding: | Not Applicable | | |

**Entity Information**

| FAR 4.1102 Exception: | | Remove Exception |

| Unique Entity ID: | RYL8TC5L5H36 | Street: | | RD |
| Legal Business Name: | | Street2: | | |
| DBAN: | | City: | | |
| CAGE Code: | 9VTC9 | State: | | Zip: | |

https://www.fpds.gov/common/jsp/LaunchWebPage.jsp?command=execute&requestid=240651167&version=1.5          1/4



2/25/25, 6:17 AM                                                FPDS-NG · ICDUSER [ Award ]

| | | |
|---|---|---|
| Product/Service Code: | R497 ⋯ | Description: SUPPORT- PROFESSIONAL: PERSONAL SERVICES C |
| Principal NAICS Code: | 541611 ⋯ | Description: ADMINISTRATIVE MANAGEMENT AND GENERAL MAN |
| Bundled Contract: | Not Bundled | |
| DOD Acquisition Program: | ⋯ | Description: |
| Country of Product or Service Origin: | USA ⋯ | UNITED STATES |
| Place of Manufacture: | Not a manufactured end product | |
| Domestic or Foreign Entity: | U.S. Owned Business | |
| Recovered Materials/Sustainability: | No Clauses Included and No Sustainability Included | OMB Policy on Sustainable Acquisition |
| Information Technology Commercial Category: | Select One | |
| Claimant Program Code: | ⋯ | Description: |
| Sea Transportation: | Select One | |
| GFP Provided Under This Action: | Transaction does not use GFP | |
| Use Of EPA Designated Products: | Not Required | |
| Description Of Requirement: (Limit 250 characters) Current: 119 | The purpose of this modification is to terminate the PSC pursuant to FAR 52.249-12 with an end date of 10 January 2025. | |

### Competition Information

| | |
|---|---|
| Extent Competed For Referenced IDV: | |
| Extent Competed: | Full and Open Competition |
| Source Selection Process: | Trade-off |
| Solicitation Procedures: | Negotiated Proposal/Quote |
| IDV Type Of Set Aside: | |
| Type Of Set Aside: | No set aside used |
| Type Of Set Aside Source: | This Action |
| Evaluated Preference: | No Preference used |
| SBIR/STTR: | Select One |
| Fair Opportunity/Limited Sources: | Select One |
| Other Than Full And Open Competition: | Select One |
| Local Area Set Aside: | No |
| Contract Opportunities Notice: | No |
| A76 Action: | Select One |
| Commercial Products and Services Acquisition Procedures: | Commercial Products/Services |
| IDV Number of Offers: | |
| Number Of Offers Received: | 3    Number of Offers Source: This Action |
| Small Business Competitiveness Demonstration Program: | |

https://www.fpds.gov/common/jsp/LaunchWebPage.jsp?command=execute&requestid=240651167&version=1.5                     3/4

FPDS-NG : ICDUSER | Award |



**Simplified Procedures for Certain Commercial Products and Commercial Services:** No

**Preference Programs / Other Data**

**Contracting Officer's Business Size Selection:** Other than Small Business

**Subcontract Plan:** Plan Not Required

**Price Evaluation Percent Difference:** 0 %

# EXHIBIT XLI

ZOË SCHIFFER    **BUSINESS**    FEB 20, 2025 11:57 AM

# DOGE Puts $1 Spending Limit on Government Employee Credit Cards

The restrictions are already in place at the General Services Administration along with several other agencies. Soon they'll roll out to most of the federal government, sources say.



PHOTOGRAPH: GETTY IMAGES

000548



Elon Musk's so-called Department of Government Efficiency put a $1 spending limit on most credit cards belonging to employees and contractors of the General Services Administration—a critical agency that manages IT and office buildings for the US government—along with at least three other federal agencies. Similar restrictions are expected to roll out to the entire government workforce soon, according to several sources familiar with the matter.

"Effective immediately, all GSA SmartPay Travel and Purchase Cards issued to GSA employees and contractors are being paused and will not be available for use except in very limited circumstances," GSA wrote in a memo to staff Thursday morning viewed by WIRED. The memo later stated that for "up to 0.1% of the GSA workforce, requests may be made for certain individual purchase charge card spend thresholds be set above $1. Please provide the rationale for all such deviations on an employee-by-employee basis along with the proposed increased threshold."

## AI Lab Newsletter by Will Knight

WIRED's resident AI expert Will Knight takes you to the cutting edge of this fast-changing field and beyond—keeping you informed about where AI and technology are headed. Delivered on Wednesdays.

SIGN UP

By signing up, you agree to our user agreement (including class action waiver and arbitration provisions), and acknowledge our privacy policy.

The GSA, one of the first agencies that Musk allies infiltrated after DOGE was established, manages the SmartPay program for more than 250 federal agencies and organizations. The SmartPay website claims it is "the world's largest government charge card and commercial payment solutions program."

000549

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 142 of 528

The spending freeze comes after DOGE posted on X earlier this week that it was working to "simplify" the government credit card program and "reduce costs."

The restrictions immediately apply to GSA, the Office of Personnel Management, the Consumer Finance Protection Bureau, and the United States Agency for International Development, according to a source with direct knowledge of the project. All four of the agencies have been prominent targets of DOGE in recent weeks. Employees who spoke with WIRED say the changes will result in enormous complications to their existing workflows and that excessive or fraudulent spending is rare. Those who've already received approval for travel expenses (and may currently be traveling) have to request a temporary spending limit increase, the sources say.

One important reason that federal employees typically put expenses on special government-issued credit cards is to ensure they avoid paying state sales tax on things like hotels and rental cars, which federal agencies are supposed to be exempt from. The GSA's website states that the state sales tax exemption is "determined by method of payment," not by the employee's ability to prove they work for the federal government.

---

**Got a Tip?**

Are you a current or former government employee who wants to talk about what's happening? We'd like to hear from you. Using a nonwork phone or computer, contact the reporter securely on Signal at zoeschiffer.87.

---

As DOGE attempts to cut billions of dollars from the federal budget, Elon Musk has been posting examples of alleged "fraud" his team has uncovered to his over 218 million followers on X. In some cases, reporting from WIRED and other outlets suggests DOGE may be misinterpreting or misrepresenting what they've found.

For example, Musk has falsely claimed that 150-year-olds were receiving Social Security benefits. Experts told WIRED that DOGE likely overlooked a quirk in the payments system that doles out these benefits, which automatically sets a person's birthday to May 20, 1875 if the real date is unknown, making these individuals appear to be 150 in the system.

000550

The new spending restrictions apply to both SmartPay travel and purchase cards. Travel cards are widely used across the government (for example, most army reservists have these cards). The government tracks travel expenses, like hotel and airline fees, through software tools like Concur. The GSA already requires receipts for any purchase that its employees make over $75. "The system is a pain in the ass and requires authorization from a supervisor before any money can be spent," says a current GSA employee.

Once a trip is done, employees have to submit a voucher that matches the approved expenses. Expenses are scrupulously tracked—employees are told to minimize ATM withdrawals to avoid unnecessary fees, according to a current GSA employee, who like the others in this story, spoke to WIRED on the condition of anonymity because they were not authorized to speak publicly. They say misusing a card is already grounds for disciplinary action, including termination.

Purchase cards are more rare and are used for work expenses under $10,000; anything above this amount requires a formal government contract. They're used for office supplies, IT equipment, and trainings, among other things. If employees want to spend money on a purchase card, they have to submit a form, which then needs to be approved and signed by a supervisor. When that's done, the form is submitted for approval to the approving office, with the name of the person who wants to make the purchase, a description of the item, the estimated price, an accounting code, and the date when the goods or services are needed.

Once the payment is approved, it's assigned a purchase request number. Only then can the employee actually spend money. If they spend 10 percent more than the approved amount, they need written approval again. At the GSA, each purchase is tracked through a program called Pegasys, which requires a separate form to access. Pegasys has two sides: The purchase side, which shows the money that was spent, and the reconciliation side. The card holder has to match these two sides, cent for cent, using the request number.

"To commit fraud, you'd have to have the employee, supervisor, and likely someone in finance in on it," says another current GSA employee. "It's not as easy as [DOGE is] claiming."

000551

# You Might Also Like …

- **In your inbox:** Upgrade your life with <u>WIRED-tested gear</u>
- Musk takeover: <u>DOGE's race to the bottom</u>
- **Big Story:** <u>The bust that took down Durov and upended Telegram</u>
- WIRED's favorite <u>'buy it for life' gear</u>
- **Event:** Join us for <u>WIRED Health</u> on March 18 in London

---

<u>Zoë Schiffer</u> oversees coverage of business and Silicon Valley at WIRED. She was previously managing editor of Platformer and a senior reporter at The Verge. … <u>Read more</u>

DIRECTOR, BUSINESS AND INDUSTRY

---

TOPICS   DOGE    GOVERNMENT    ELON MUSK    FINANCE    CREDIT CARDS

---

# AI Lab Newsletter by Will Knight

WIRED's resident AI expert Will Knight takes you to the cutting edge of this fast-changing field and beyond—keeping you informed about where AI and technology are headed. Delivered on Wednesdays.

SIGN UP

---

READ MORE

---

## Early Investors in Donald Trump's Memecoin May Have Been Tipped Off, Experts Claim

Within moments of Donald Trump announcing his new coin, traders made high-value bets that quickly paid off. Did they have an edge?

JOEL KHALILI

000553

## DOGE Put Him in the Treasury Department. His Company Has Federal Contracts Worth Millions

Experts say the conflicts posed by Tom Krause's dual roles are unprecedented in the modern era.

PARESH DAVE

## A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System

The Bureau of the Fiscal Service is a sleepy part of the Treasury Department. It's also where, sources say, a 25-year-old engineer tied to Elon Musk has admin privileges over the code that controls Social Security payments, tax returns, and more.

VITTORIA ELLIOTT

## Government Tech Workers Forced to Defend Projects to Random Elon Musk Bros

A recent high school graduate and former Neuralink intern has joined meetings to review lines of code and other work history of career public servants, sparking chaos at a major government agency.

MAKENA KELLY

## The GSA Plans to Sell Hundreds of Its Federal Government Buildings

The General Services Administration, staffed at its upper levels by Elon Musk associates, plans to sell 500-plus buildings—some of which house government agencies and the offices of US senators.

LEAH FEIGER

## Chokepoint 2.0: An Investigation Promises the Truth About Crypto's Biggest Conspiracy

Did bureaucrats in the US plot to cut the crypto industry out of the banking system? An investigation begins.

JOEL KHALILI

## The Collapse of USAID Is Already Fueling Human Trafficking and Slavery at Scammer Compounds

The dismantling of USAID by Elon Musk's DOGE and a State Department funding freeze have severely disrupted efforts to help people escape forced labor camps run by criminal scammers.

MATT BURGESS

# No, 150–Year–Olds Aren't Collecting Social Security Benefits

Elon Musk claims to have found rampant fraud in the Social Security Administration. There's a much simpler explanation.

DAVID GILBERT

**WIRED**

**Gift WIRED for**
~~$30~~ **$12**

GIVE A GIFT

🗹 PRIVACY CONFIGURATIONS

# EXHIBIT XLII

# POLITICO



**AGRICULTURE**

## The private GOP panic over the slash-and-burn DOGE firings

White House aides are inundated with congressional calls as Republicans fret.



Kansas Sen. Jerry Moran is among the Republicans concerned about Trump administration cuts affecting

✕

## Thanks for signing in

Enjoy unlimited access to POLITICO.com

⌄

A growing number of congressional Republicans are desperately trying to back-channel with White House officials as President Donald Trump's Department of Government Efficiency ramps up its slash-and-burn firings of federal workers.

GOP lawmakers unleashed a frantic flurry of calls and texts after federal agencies undertook the latest firings this past weekend, with Republicans particularly worried about cuts affecting public safety and health roles. Trump's legislative affairs team, headed by former JD Vance aide James Braid, took the brunt of the frenetic fallout, according to four Republicans granted anonymity to discuss the conversations.

Advertisement

For the most part, Republican members are publicly cheering the administration's push to slash the federal government, which is being led by billionaire tech mogul Elon Musk with Trump's blessing. But privately, many are feeling helpless to counter the meat-ax approach that has been embraced so far, with lawmakers especially concerned about the dismissal of military veterans working in federal agencies as well as USDA employees handling the growing bird flu outbreak affecting poultry and dairy farms.

×

## Thanks for signing in

Enjoy unlimited access to POLITICO.com

⌄

2/25/25, 9:42 PM
The private GOP panic over the slash-and-burn DOGE firings - POLITICO
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 154 of 528

White House spokesperson Anna Kelly said the administration's efforts are "already uncovering waste, fraud, and abuse across federal agencies and ensuring better stewardship of taxpayer dollars, including for American farmers and families." The president, she said, will eventually "cut programs that do not serve the interests of the American people and keep programs that put America First."

Republican lawmakers are growing particularly uneasy with cuts impacting veterans, who are given preference in the federal hiring process and have been disproportionately affected by the dismissals. GOP members are also concerned that federal services for veterans could be affected.

Republicans have quietly warned the White House to reinstate many of the 1,000 employees at the Department of Veterans Affairs who have been dismissed in recent days.

Senate Veterans Affairs Chair Jerry Moran (R-Kan.) said in an interview that he and his staff have been communicating their concerns with the White House legislative affairs team, along with Veterans Affairs Secretary Doug Collins.

"Certainly on the veterans side, we're asking for information from the administration," Moran said. "We are being reassured that no one at the VA who has any direct care responsibilities are being terminated or laid off, and we're just looking for the positions and circumstances in which it's occurring."

Other Republicans consider federal agency officials powerless to call off DOGE. They're instead focusing their efforts on the White House as their offices are inundated with calls from frantic constituents.

Advertisement

×

**Thanks for signing in**

Enjoy unlimited access to POLITICO.com

AD

Their strategy to back-channel with any White House official who will pick up the phone has yielded some small, scattered successes. The Agriculture Department said Monday it would reverse some of the firings impacting the bird flu response after GOP lawmakers complained to the White House legislative affairs team and other Trump officials.

📣 Want more POLITICO? Download our mobile app to save stories, get notifications and more. In iOS or Android.

The fears of Republican lawmakers in rural districts go deeper, though. They're also worried about the long-term fallout of Trump's moves as the federal government struggles to hire the next generation of federal employees who will keep farm and public health programs running across rural America.

×

## Thanks for signing in

Enjoy unlimited access to POLITICO.com

⌄

2/25/25, 9:42 PM
The private GOP panic over the slash-and-burn DOGE firings - POLITICO
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 156 of 528

"I worry what his plans are," said one Republican lawmaker who questioned whether cuts would be limited to waste, fraud and abuse or would curtail benefits for legitimate program participants. House GOP leaders are separately pushing for major Medicaid cuts to help pay for Trump's legislative agenda.

While the DOGE buzz saw continues to spin, many GOP lawmakers from leadership to the rank and file have settled on a strategy of keeping a careful eye on Musk's team while refraining from public criticism.

Senate Majority Leader John Thune told reporters Wednesday that GOP lawmakers will intervene with the Trump administration "if there are things that we think that need to be addressed" or if there are issues "perhaps they're not considering when they make these decisions."

Thune added he thought it was key "that we don't undermine important services," including health and safety. But he put his support behind the administration's efforts to give the federal government a careful "scrub" with the goal of a more limited presence.

Many other Republicans are praising efforts to slash federal funding. Sen. Rand Paul of Kentucky said he suggested to Vance during Senate Republicans' private lunch this week that Congress should codify the DOGE cuts, so that they "become real."

Speaking to the Conservative Political Action Conference on Thursday, Speaker Mike Johnson praised DOGE: "What Elon and the team are doing is what Congress has not had the ability to do. ... They are exposing this massive fraud, waste and abuse that we have not been unable to uncover because the deep state has hidden it from us."

✕

**Thanks for signing in**

Enjoy unlimited access to POLITICO.com

⌄

"Happy to do that once we balance the budget," Sen. Ron Johnson (R-Wis.)
posted on X.

**FILED UNDER:** REPUBLICANS, RAND PAUL, DONALD TRUMP, JERRY MORAN, ELON MUSK, 



# West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time
by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and
the Google Privacy Policy and Terms of Service apply.

**SIGN UP**

Advertisement

AD

Advertisement

✕

## Thanks for signing in

Enjoy unlimited access to POLITICO.com

⌄

**SPONSORED CONTENT**



### Why Canada should join the EU

The Economist



### Elon Musk vows to cancel grants after gaining...

Financial Times

### Look like a legit logo designer.

Create a professional logo as unique as your business with...

Godaddy



### New York Will Cover the Cost to Install Solar if Y...

Find out if you qualify. Get your free quote today!

EasySolar



### Special prices from NYC to Italy!

Discover all the special offers, fly non-stop to Rome with ITA...

ITA Airways



### Should Married Couples File Jointly or...

TurboTax

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition



Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

———————————

© 2025 POLITICO LLC

**Thanks for signing in**

Enjoy unlimited access to POLITICO.com

# EXHIBIT XLIII

Learn more about **LSEG**

## Trump appears to contradict White House, says Elon Musk in charge of DOGE

By **Andrea Shalal** and **Nandita Bose**

February 20, 2025 12:27 PM EST · Updated 5 days ago

  



While Elon Musk is playing a central role in the U.S. government as head of President Donald Trump's task force to slash government spending, the world's richest person has also weighed in prominently on politics in Germany.

### Companies


Tesla Inc

Follow

MIAMI/WASHINGTON Feb 19 (Reuters) - U.S. President Donald Trump on Wednesday said he has put billionaire Elon Musk in charge of the Department of Government Efficiency, appearing to contradict the White House over who runs the cost-cutting program.

The White House said in a court filing on Monday that Musk's role in the Trump administration was that of a White House employee and senior adviser to the president, and that he had no authority over DOGE and was not an employee of the program.

Advertisement · Scroll to continue



Report this ad

The White House declared this to a judge in a case filed by Democratic attorneys general against Musk and DOGE.

Trump appeared to contradict at least part of the White House assertion on Wednesday.



Elon Musk listens to U.S. President Donald Trump speak in the Oval Office of the White House in Washington, D.C., U.S., February 11, 2025. REUTERS/Kevin Lamarque/File Photo Purchase Licensing Rights ⧉

"I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge," Trump told an audience of investors and company executives in Miami.

The President has repeatedly talked about Musk as the functional leader of DOGE, which is not a cabinet-level department, featuring him in a news conference at the White House this month to answer questions about the program.

Advertisement · Scroll to continue

Trump on his first day in office set up the cost-cutting body in an executive order that did not say who its "administrator" would be. White House officials this week have not answered repeated requests to identify the administrator.

DOGE has swept through federal agencies since Trump began his second term as president last month. Musk, chief executive of carmaker Tesla (TSLA.O) ⧉ , was put in charge of rooting out what the White House calls wasteful spending as part of a dramatic overhaul of government that has included thousands of job cuts.

Advertisement · Scroll to continue

Musk has been accused of a host of conflicts of interest between his business interests and his efforts to cut costs for the federal government. The White House has said the billionaire will recuse himself if any conflicts of interest arise.

## Sponsored Content

Dianomi ▷



**Leverage a powerful platform designed for self-directed traders.**

Sponsored by
TradeStation



**Caregivers need care too. Read our self-care tips. Learn more**

Sponsored by
Guardian Life



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**

Sponsored by
WalletJump

Get weekly news and analysis on U.S. politics and how it matters to the world with the Reuters Politics U.S. newsletter. Sign up here.

Reporting by Andrea Shalal in Miami and Nandita Bose in Washington; Editing by Tom Hogue

Our Standards: The Thomson Reuters Trust Principles. ⧉

Suggested Topics:

000569

United States    Donald Trump

Purchase Licensing Rights

## Read Next

United States
**US House Republicans advance Trump's tax cut plan**
2:24 AM UTC

---

United States
**Trump blocked from imposing sweeping federal funding freeze**
1:01 AM UTC

---

United States
**Musk's new ultimatum spurs fresh confusion among US government workers**
12:59 AM UTC

---

United States
**White House takes control of the press pool covering Trump**
ago

 REUTERS PLUS™

**AI Frontiers**
Sponsored by KPMG

LSEG Workspace    The next-generation human interface for financial professionals.

Feedback

# EXHIBIT XLIV



**Opinion**
Matt Bai

# The blinding contempt of the DOGE bros

Terrorizing USAID isn't reform. Here's an inside story of Elon Musk's takeover.

Today at 6:15 a.m. EST

🎧 14 min    ↗    🔖    💬 1339

(Illustration by David Plunkert/For The Washington Post)

More often than not, when conquering armies storm across borders or into rebel strongholds, they set about finding ways to humiliate the people they find there. They are capricious and cruel. They want their enemies to understand their own insignificance.

In Elon Musk's siege on Washington, the first village taken was the U.S. Agency for International Development, which dispensed roughly $32 billion in foreign aid last year (or less than half a percent of the federal budget). And for four weeks now, his U.S DOGE Service has made a chilling example of the people who served there.

I recently had a series of conversations with a senior USAID staff member who witnessed the agency's takeover from the inside. (I'd love to have asked DOGE, which stands for Department of Government Efficiency, about these events, but despite Musk's grand claim of historic transparency, his department has no contact with the media beyond self-serving social media posts.)

A DOGE official first arrived at USAID's offices on Jan. 27, a week after Donald Trump's inauguration. Late that night, a group of senior employees was hastily summoned to a teleconference with the two men who were to become their DOGE-era overlords: Luke Farritor and Gavin Kliger.

Farritor, 23, is a former SpaceX intern and University of Nebraska dropout who became famous in the tech world for having been part of a team that decoded an ancient Roman scroll. Kliger, 25, is a deep-state conspiracist on social media who, according to Wired, attended Berkeley and worked for an AI start-up. (He's also the guy Musk has now installed at the Treasury Department.)

Farritor and Kliger appeared to USAID staff as remote figures on a computer screen, bringing to mind the "Wizard of Oz." They wore T-shirts and polos and seemed to be Zooming from their offices in the Eisenhower Executive Office Building, next to the White House. They were unfailingly civil but not much for listening.

The first thing they did was to go through the emails and documents they gathered information about how the agency's bills were paid and where the data was stored. They demanded and were given access to the payment system, but only on what you might think of as a "read only" basis; according to the official I talked to, who spoke on condition of anonymity to avoid retribution, they could not, initially, alter any transactions. Trump had decreed a freeze on all USAID spending five days earlier, and the two DOGE bros, as the staff would come to call them, wanted to make sure that order was being followed.

The cordial atmosphere darkened three days later, on Jan. 30, when White House officials learned that some USAID grantees overseas had somehow gotten paid through the Health and Human Services Department *after* Trump issued his order. The White House team believed USAID had been secretly funneling money through fellow bureaucrats in the labyrinth of deep-state agencies. This is what Marco Rubio, the secretary of state and nominal head of USAID, was talking about when he told reporters traveling with him in Panama that the agency's staff had been "insubordinate" and needed to be brought to heel.

In fact, the explanation here, like the explanations for most things in government, was pretty mundane. It turns out that most of the government's humanitarian *grants* — as opposed to contractor *payments* — are administered through HHS. (Ironically, this is an efficiency measure, because it creates a central storehouse for multiple agencies' grants.) USAID staff wasn't going behind anyone's back to disburse the grant money; it's just that no one had told HHS to shut off the spigot.

You can imagine, though, that DOGE didn't have much use for the boring government realities here. Musk's team needed a pretext for gutting the agency, and they decided they had one.

The White House immediately decapitated the agency, putting 65 senior staff members on administrative leave. In internal conversations with senior staff, Farritor and Kliger demanded that all senior managers be stripped of their power to authorize payments — and that they alone become the authorizers.

The most public clash at USAID revolved around DOGE officials who showed up at USAID headquarters at the Ronald Reagan Building and demanded access to its sensitive compartmented information facility, or SCIF, where confidential records are stored; three officials who refused to let them in were either fired or resigned. Out of view, though, the agency's most essential humanitarian programs overseas became the object of a weeks-long standoff between the State Department and DOGE.

Rubio had decreed that certain critical programs — such as aid to Ukraine and Syria and costs related to the PEPFAR program to combat HIV in Africa — would continue to be funded. Several times, USAID managers prepared packages of these payments and got the agency's interim leaders to sign off on them with support from the White House.

But each time one of these bookkeeping powers smuggled away from Musk or one of his lieutenants, Farritor and Kliger would veto the payments — a process that required them to manually check boxes in the payment system one at a time, the same tedious way you probably pay your bills online. Meanwhile, AIDS clinics shuttered and staff found themselves stranded in unstable countries like Congo. A pregnant woman in an undisclosed country has sued the Trump administration because she was denied a Medevac helicopter. In another case, I was told, an employee in southern Africa who needed chemotherapy was also denied a chopper because no one would authorize the money.

One night, as staff tried yet again to assemble a list of necessary payments, the agency's computer network went down for two hours. When it came back on, members of the IT team whispered to colleagues to be wary; during the outage, they believed, spyware had been installed on the network to monitor communication among employees.

Finally, on the second Saturday in February, the two IT guys from DOGE shut everyone else out of the payment system entirely. They were now the only people who could even see the payments waiting to be approved. Hardly any of the essential funding promised by Rubio had been processed as of last week.

All this rigmarole over paying bills probably seems arcane compared with, say, mass firings or forced resignations at the Justice Department. But if you step back for a moment, what's happened at USAID over the past couple of weeks is unfathomable. A $50 billion agency — funded by taxpayers, empowered by Congress and employing something like 11,000 people around the world — is now tightly controlled by a handful of 20-something software engineers who have never worked a day in government. They disregard promises from the American secretary of state while agonized policy experts stand by helplessly.

In the coming weeks, courts will have to decide if those engineers and their billionaire boss had the right to fire pretty much everybody who worked at USAID. If I were betting (admittedly, this would have to be one very un-fun gambling site), I would wager that a year from now the agency itself will have disappeared, with much of its programs and staff continuing on at State. All of which probably could have been achieved in a more orderly and humane way had the agency been allowed to wind down more gradually under Rubio's supervision.

Maybe this unsettles Farritor and Kliger on some level — maybe they toss and turn on leather couches in the Eisenhower Building, troubled by a suspicion that Musk has them doing things they will one day regret. But I doubt it. Like young revolutionaries everywhere, Musk's former interns are probably swept up in the cause, reveling in the power to torture a bureaucracy they've been taught to loathe. Humiliating career public servants isn't some accidental by-product of the quest for efficiency. It seems to be the point of the exercise.

The swift sacking of USAID shook official Washington and set the tone for how DOGE would attack the rest of the government, starting with the Education Department and the Consumer Financial Protection Bureau. For me, it raises a fundamental question about Musk's work, and I don't think I'm alone in asking it. Is it what Musk is trying to do that makes me recoil — or is it the way in which he's doing it? Is it even possible to separate the substance here from the style?

After all, in theory, anyone who believes in a leaner, more solid government — an I am one of them — would be open to bold moves like folding USAID into the State Department or padlocking the Education Department. If anything, as I've written, I'd like to see Musk take on even more controversial fights, like modernizing the entitlement programs that are the drivers of unsustainable debt or overhauling the corrupt and outdated system by which the Pentagon gets its weapons. You don't have to work hard to convince me that we have too many agencies and too many low-impact programs.

But does this really need to be done — can it be done effectively at *all* — by branding lifelong public servants as "criminals" and making them suffer for sport? What's the perverse joy to be had in making some of the foremost experts in their fields prostrate themselves before a couple of grad-school-level coders who probably couldn't find Congo on a map?

Here's a thought exercise: Let's imagine for the moment that Kamala Harris had won the presidency, and she had immediately gone out and recruited, say, Mark Cuban to reprise Al Gore's old mission of "reinventing government." Let's imagine that Cuban brought with him to Washington a cadre of young, idealistic MBAs, and in the first week they held meetings at some small agency and very respectfully asked for their personnel and payment records, so they could suggest some meaningful reforms. And let's say the agency told them to go to hell.

Would all of us who believe in the value of government service be jumping up and down and screaming about breaches of protocol and congressional prerogative? Or would we be saying: Who are these bureaucrats to think they can deny the president access to *anything*?

The problem isn't that Musk has been given a brief to reassess program and budgets; it's that he evinces no real intellectual interest in any of these things. Musk — who, according to biographer Walter Isaacson, calls other people "stupid" the way most of us say "please" or "thank you" — seems to have chosen his hires not for any remotely relevant experience but rather to send a message about how little respect he has for public service generally. *A couple of my interns can do this better than all of you*. Posting on X, Musk said it was time for USAID to die and crowed about feeding it to a wood chipper. It's impossible to overstate the level of his contempt.

You can ascribe that contempt to right-wing or libertarian political ideology, but I'm guessing it has at least as much to do with the tech industry generally. From the moment Silicon Valley exploded in the 1990s, and probably before that, its leading denizens have subscribed to a kind of techno-chauvinism — a belief that only engineers know how to solve the problems of humankind, and if you work for the government, then you can't be very smart, so you must be doing everything wrong.

Rep. Ro Khanna (D-California), whose district includes legendary tech meccas like Cupertino and Sunnyvale, expressed it to me this way: "They have this view that they have more knowledge, more *chutzpah*, that they are the ones who are moving civilization forward and building new things, that they're entitled to rule or govern, and that they do a better job of it than democracy."

No one embodies this contempt more fully than Musk. You can almost imagine a theory that the federal government is just some legacy company they acquired for not very much (with Trump as their front man), and now they're going to shutter it. They marched into USAID as you would march into any newly owned subsidiary on the verge of bankruptcy. They see themselves, I'm sure, as selfless; they could be back west plotting new start-ups and reaping untold billions, but they've decided to save their country from mentally challenged bureaucrats instead.

You have to wonder, though, if all that contempt is blinding Musk to the obvious ways in which government agencies aren't — and shouldn't be — analogous to bloated companies at all. For one thing, the goal of any company, when you get past all the Messianic blather about changing the world, is to make money for its investors — period. The more efficient you are, the more money everybody makes.

The central goal of government, on the other hand, is to protect its citizens and enforce its laws — and to address the imbalances that a free market can't. Efficiency is desirable and often lacking for no good reason — but it is not an end in itself.

Why does it take multiple people and several days just to authorize a batch of payments at USAID? Because every agency has a system of checks and balances to make sure the taxpayers aren't being cheated. Government always trades off some efficiency to safeguard the integrity of the system.

And when you buy a failing company, you own it outright, whereas, in government, Congress is a permanent and coequal board of directors that can't just be ignored. This is why DOGE's ransacking of departments has already drawn a raft of legal challenges, some of which will probably be sustained, though that could take months if not longer. Musk's unelected engineers are unilaterally unmaking decisions that only Congress has the constitutional power to undo.

It would have been easy enough for Trump's White House to go to its sheep-like caucuses in Congress and ask them to eliminate a bunch of agencies in the next budget. But Trump and Musk wanted the immediate gratification of a blitzkrieg instead, which means they may well end up having to give back some of the territory they so triumphantly seized.

You could argue, and I'm sure Musk would, that such a view is hopelessly naive — that a government that's been spreading its tentacles slowly for 100-plus years can only be hacked back viciously and all at once, without all the legal niceties that entrenched bureaucracies are adept at exploiting. But my instinct, having been around Washington a lot longer than anyone at DOGE, is that most of what's done here thoughtlessly and by fiat is generally undone by someone at some point.

Terrorizing an agency really isn't the same thing as permanently reforming it. Although to Musk and his band of engineers, it might be a lot more fun.

---

**What readers are saying**

The comments overwhelmingly criticize Elon Musk's approach to restructuring government agencies like USAID, describing it as cruel, chaotic, and driven by personal vendettas rather than genuine

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT XLV

*Democracy Dies in Darkness*

**National**

# Musk's blitzkrieg is unnerving many of Trump's senior advisers

Officials have been blindsided by DOGE's actions. But the president's strong support of the group means other advisers have limited options.

February 21, 2025

🎧 15 min     ✧     ↗     🔖     💬 2414

By Jeff Stein, Jacqueline Alemany, John Hudson, Laura Meckler and Dan Diamond

Top treasury officials have complained about disruption. The secretary of state has pushed back on staff cuts. Inside the Education and Health and Human Services departments, political appointees have been informed — not consulted — about canceled grants and contracts, sometimes learning about decisions from the media.

Elon Musk's aggressive tactics to reshape the federal government have irritated and blindsided many senior officials in the Trump administration, including those tasked with running Cabinet departments being squeezed by his U.S. DOGE Service, according to interviews with more than 30 current and former officials and their advisers, many of whom spoke on the condition of anonymity to discuss internal matters. Amid these bubbling tensions, White House Chief of Staff Susie Wiles personally asked Musk last week to better coordinate on DOGE's sweeping actions.

The broad goals of Musk's team at DOGE, which stands for the Department of Government Efficiency, are shared not just by President Donald Trump but also by most of his senior advisers, who also want to shrink the government through unilateral cuts. And yet agency heads whom Trump chose are finding themselves caught off guard by DOGE's actions and forced to reverse, mitigate or answer for some of its most disruptive moves. While working to win Senate confirmation to be health and human services secretary, for instance, Robert F. Kennedy Jr. had to reassure GOP senators he would reexamine DOGE-driven cuts to the National Institutes of Health. Linda McMahon, Trump's nominee for education secretary, told senators that she, too, would investigate cuts at her department.

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises, his picks for key roles and legal challenges to his executive orders and actions.

DOGE's blitzkrieg across the federal government has sparked deep concern among civil servants, who have been targeted for layoffs and required to implement policies they see as unwise, <u>if not illegal</u>. But Trump's political appointees are quietly expressing unease with Musk as well.

"Basically every Cabinet member is sick of him, but nobody feels like they're in a position to do anything about it," said one person who spoke on the condition of anonymity to describe private conversations with several incoming secretaries or their staffs. "People are afraid to cross him even as he's wreaking havoc on their agencies."

Trump, though, has made clear that he supports Musk. And none of the tensions with other appointees seem significant enough to block DOGE's work.

In a joint interview aired on Fox News on Tuesday, Trump lavished praise on the billionaire and said Musk was ensuring his orders were not watered down by federal workers.

One of Trump's few known complaints about Musk came after an Oval Office session last week to which Musk brought his toddler, who interrupted and gestured playfully while the men spoke with reporters, two people familiar with the matter said.

"When you sign these executive orders, a lot of them don't get done," Trump said on Fox. He said Musk would make sure they are implemented as intended: "Some guy that maybe didn't want to do it, all of a sudden, he's signing."

The 78-year-old president and 53-year-old magnate have been seen together constantly since Trump's victory in November. Musk has interviewed Cabinet picks, taken questions from reporters alongside the president and even joined Trump's calls with world leaders. And he has made powerful allies in Stephen Miller, Trump's deputy chief of staff, and his wife, Katie Miller, who has worked on behalf of DOGE.

In court filings, the White House has stated that Musk has no "actual or formal" authority to make decisions and is not a DOGE employee. In practice, however, DOGE's ability to act even without prior approval from Cabinet secretaries illustrates how much power Musk has accrued.

"If you're a generic Cabinet secretary, you might not be excited if DOGE is all over your agency, or feel you'll look like a fool if you say X and DOGE does Y. You might find that annoying, and that's understandable," said Avik Roy, president of the Foundation for Research on Equal Opportunity, a think tank that promotes free markets. "But Trump likes the fact that these Cabinet heads don't have carte blanche to do whatever they want and that Musk gives them another set of eyes at the agencies. That's what the president wants, and he's entitled to run the executive branch that way."

But the extent of Musk's ability to execute sweeping changes without approval or input from department heads appears to be unprecedented — and unsettling for the Cabinet.

"Why do you want to be a Cabinet secretary if you can't run your own agency and the president and Elon Musk run your agency for you? That doesn't seem like a great job to me. It's very unusual. We've never seen anything like this," said Doug Holtz-Eakin, president of the American Action Forum, a right-leaning think tank. "These uncoordinated efforts have downsides — you have the secretaries and DOGE at cross-purposes, and that doesn't serve anyone well."

A White House spokesman said there's no tension between Musk and other officials, and other Trump officials downplayed any disagreement.

"The entire Trump administration is aligned on delivering on President Trump's agenda to streamline our bloated government and make it more efficiently serve the American people," spokesman Kush Desai said in a statement. "DOGE is working hand in hand with the White House and federal agencies to identify and slash waste, fraud, and abuse at lightning speed. Any unfounded rumors peddled by anonymous sources simply do not have any clue what's happening or are actively working against the President's agenda and the will of the American people."

# DOGE clashes with agencies

Almost as soon as Treasury Secretary Scott Bessent took office, the DOGE team thrust his department into the spotlight.

David A. Lebryk, the most senior career official at Treasury, had clashed with DOGE allies who demanded access to sensitive payment systems that disburse more than $5 trillion annually so they could unilaterally terminate foreign aid payments. Lebryk thought that was illegal and resigned.

Just a few days after being sworn in, Bessent began to hear from peers about how valuable Lebryk was. In a call, Federal Reserve Board Chair Jerome H. Powell, a former treasury official himself, extolled Lebryk as a valuable public servant, two people said, although that was not the primary purpose of the conversation. Several other former senior treasury officials made similar points in separate calls with Bessent's deputies around the same time, two other people said. The incident touched off broad alarm among the Treasury civil staff whom secretaries depend on to manage their agencies, and even among Republicans who had served in the department.

The controversy also underscored the power of the work that risks undercutting the treasury secretary's credibility as well. Bessent later told congressional Republicans that Musk's team did not control the payment systems, and department officials said in a public statement that DOGE staffers had "read-only" access. An affidavit filed in federal court from a senior career treasury staffer said 25-year-old Marko Elez had, in fact, been granted editing permissions that were later revoked. Top treasury officials later expressed frustration to confidants that the matter weakened their standing with the department, two people familiar with those comments said.

"It undermined him with the treasury staff and made him look like he was not in control," one former Trump administration official said.

On Bloomberg News on Thursday, Bessent compared Musk to star athletes Michael Jordan and Lionel Messi and praised DOGE's work, which Treasury has said publicly it is supporting.

"He is focused, and his energy level is unbelievable," Bessent said of Musk. "He has gotten to where he has because everything is on the table."

Bessent is not the only Trump Cabinet secretary to have to manage fallout from Musk's aggressive approach. Other political appointees have been left in the dark about key initiatives in their own departments — or forced to try to reverse Musk's maneuvers.

During Secretary of State Marco Rubio's first official foreign trip, DOGE representatives in Washington presented a plan to eliminate almost all of USAID, which Rubio was nominally running as acting administrator. The plan proposed cutting the 10,000-person agency to roughly 290, a staffing level so low that experts said it would be impossible to administer the tens of billions of dollars in foreign aid approved by Congress every year.

Rubio and his aides, who during his trip to Central America vowed that foreign aid would continue, advocated for more USAID officials to keep their jobs, resulting in 600 workers being deemed essential — roughly double what the DOGE team originally proposed.

But the Trump administration's aid freeze still left chaos across the agency, the world's largest provider of food assistance. In public, Rubio forcefully defended Musk and blamed USAID officials for "insubordination" in DOGE's effort to audit the agency. But in more private settings with U.S. officials, Rubio has acknowledged that it's much easier to smash things than put them back together, a point underscored by nonprofit groups that have struggled through the freeze to protect programs the Trump administration says it still supports, said current and former U.S. officials.

A spokeswoman for the State Department did not respond to requests for comment.

"The secretary is trying to make foreign aid work better, but much of the current DOGE actions inside and outside of Foggy Bottom are focused on ending it," said Matthew Bartlett, a political appointee at the State Department during Trump's first term.

# A seized office and a white noise machine

In the first days after Trump's inauguration, the offices on the seventh floor of the Education Department were mostly empty, waiting for senior political officials who require Senate confirmation to arrive. But at least one political appointee had found an office and started to settle in, said one person with knowledge of the situation.

Then, the DOGE team that arrived at the agency Jan. 31 abruptly commandeered that office. DOGE staffers refused to interact with others — declining even to return pleasantries or acknowledge greetings — and got into at least one altercation with a political appointee, this person said. The DOGE team also took possession of the large, windowed corner office meant for the agency's undersecretary, dragging extra desks and chairs in to set up a war room. Also set up: white noise machines, to prevent others from hearing their conversations.

The DOGE team has made almost all of the decisions about what grants and contracts to cancel and which employees to put on leave, without seeking or considering input from political appointees on-site, people familiar with the situation said.

In many cases, political appointees are hearing about cuts at the same time as the public is — via DOGE or Musk posts on X, the social media network the billionaire owns.

The political appointees "had a plan in place for how they wanted the first couple of weeks or months to go, and this is just derailing it," one person said. The team's members, this person said, did not realize that they would have to "fight this battle."

DOGE's decisions included putting employees on leave because of alleged ties to diversity, equity and inclusion initiatives — even if all they did was participate in a DEI program that had been endorsed by the first Trump administration. DOGE also canceled contracts for functions mandated by law and killed others in which the agency had already paid out most of the money. Many contracts will need to be rebid — a time-consuming and avoidable process, people familiar with the situation said.

McMahon, who is still awaiting Senate confirmation, has heard these complaints from political staff and has been frustrated by the situation, according to someone close to her.

"She's frustrated because she's going to have to come in and clean up a big mess," this person said. He expects McMahon will tell DOGE to operate differently, saying she would probably explain: "Make recommendations, and then I will decide. You can no longer come in and cut and strike and delete."

Asked for comment, an Education Department spokeswoman provided a statement from the agency's chief of staff, Rachel Oglesby, who said DOGE team members were a valuable part of the department's work. "We all serve at the pleasure of President Trump and are working to implement his agenda together," she said. "Any reports to the contrary are inaccurate, unnecessary and unhelpful to accomplishing our shared goals."

DOGE also deployed to the Department of Health and Human Services 23 embedded consultants in what it says is an effort to root out waste and fraud in the agency's nearly $2 trillion budget. Musk's team has repeatedly surprised political officials who weren't aware of DOGE's plans or the extent of the group's planned cuts, and they have sometimes learned of actions only from news reports.

Some Trump appointees were caught off guard by a Friday night announcement on Feb. 7, driven by DOGE, that the National Institutes of Health would cut billions of dollars in payments to universities and research organizations, said two people familiar with the matter. That move also prompted complaints from GOP leaders worried about the impact on higher education and jobs in their states — leading Kennedy, who had not yet been confirmed as HHS secretary, to assure GOP senators he would review the policy.

The White House declined to comment on whether officials were briefed on DOGE's specific actions such as NIH funding cuts.

# 'DOGE is by definition disruptive'

Many of these complaints have found their way to the White House. But Trump has made clear his support for DOGE, limiting the options for constraining Musk's power.

Last week, Wiles, the chief of staff, spoke privately with Musk near the East Room of the White House, two people familiar with the exchange said. But Wiles did not reprimand Musk or give him a list of demands — she just asked for improved coordination between DOGE and White House staff, people familiar with the conversation said. Some details of that talk were previously reported by Reuters.

A White House official said that lines of communication between the two have already improved. Musk traveled with Trump during a leg of his trip to Florida last weekend, and on the plane, Musk ran things by Wiles and didn't go into Trump's office without letting her know.

"To be crystal clear, DOGE is by definition disruptive, so it's normal and expected for Wiles to have some back and forth with Musk as he goes along," said a senior administration official.

Democrats have long predicted a split between Musk and Trump, arguing that a falling-out between such large personalities is inevitable. Even many of Trump's aides have wondered when or if the president will tire of sharing the spotlight with Musk, the richest person in the world.

"The conversation at Mar-a-Lago in late December was already, 'Why is DOGE getting all this attention and credit?'" one person familiar with the dynamic said.

But others emphasize the men's shared personal and ideological affinity. On Fox News, Trump referred to Musk as "brilliant" and marveled at his "tremendous imagination." Musk was similarly complimentary of Trump: "Not once have I seen him do something that was mean or cruel or — or wrong. Not once."

Nonpublic polling has shown Americans' opinions of DOGE aren't affecting Trump's numbers, according to a White House official. A Washington Post-Ipsos poll found that 43 percent of Americans support what Trump has done in his first month, while 48 percent oppose it. But Musk's polling is worse: Only 34 percent approve of how he's handling his job, while 49 percent disapprove.

Allies say Trump believes Musk played a crucial role in the 2024 presidential election, especially turning out voters in key states, and is doing necessary work to weaken the federal civil service that has resisted Trump's agenda. While DOGE has irritated Trump aides by generating nearly daily chaos in the capital, the president sees that disruption as a strength, not a weakness. Musk, meanwhile, has said Trump offers a generational opportunity to save the American government — and pave the way for his goal of getting to Mars.

"Trump understands that you can't take on the establishment with a scalpel. If you take on the system with a scalpel, the system will break you," said Newt Gingrich, who served as speaker of the House in the 1990s and is a Trump ally. "Trump understands he needs a sledgehammer. Elon is that sledgehammer."

---

**What readers are saying**

The comments express strong disapproval of Elon Musk's aggressive tactics in reshaping the federal government, with many seeing it as a power grab that undermines democracy. Commenters criticize Musk's influence over Trump, suggesting that Musk is effectively running the... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

---

# EXHIBIT XLVI





**DONATE**

POLITICS

# The USDA fired staffers working on bird flu. Now it's trying to reverse course

FEBRUARY 19, 2025 · 1:02 PM ET

By Rachel Treisman



The U.S. Department of Agriculture says it is taking steps to optimize its workforce and reduce its spending — but is now trying to rescind the firing of some employees.

*J. David Ake/Getty Images*

The U.S. Department of Agriculture says it is trying to reverse the firing of staffers who worked on the government's response to bird flu, amidst growing concerns about its spread.

Tens of thousands of workers across the federal government have been told they are losing their jobs, and more layoffs and firings are in the works. The USDA is among multiple health agencies that have faced mass firings.

On Friday, the USDA publicly touted what it called "the first tranche in a series of bold reforms," including "an aggressive plan to optimize its workforce by eliminating positions that are no longer necessary," in line with the efforts of the Department of Government Efficiency (DOGE).

**Sponsor Message**



**PUBLIC HEALTH**

**After delay, CDC releases data signaling bird flu spread undetected in cows and people**

Within days, however, the agency sought to reverse some of those firings — particularly those related to its handling of the highly pathogenic avian influenza (HPAI).

"Although several positions supporting HPAI were notified of their terminations over the weekend, we are working to swiftly rectify the situation and rescind those letters," a spokesperson wrote in a statement shared with NPR. It was first reported by NBC News on Tuesday.

The agency continues to prioritize its response to bird flu, the spokesperson added.

000585

Several job categories — including veterinarians and animal health technicians — have been "exempted from the recent personnel actions" to support those efforts. The USDA also says it is "continuing to hire the workforce necessary to ensure the safety and adequate supply of food to fulfill our statutory mission."



**PUBLIC HEALTH**

**FDA staff handling drug safety for pets and livestock lost jobs in Trump firings**

The H5 bird flu is widespread in wild birds globally, causing outbreaks in poultry and U.S. dairy cows. Many Americans are now feeling the impact, with egg prices high and supply low. The outbreak has also gotten some people sick.

There have been 68 confirmed U.S. cases of bird flu since 2024, according to the Centers for Disease Control and Prevention (CDC). There has been one confirmed death, of a person in Louisiana, in January. The CDC says the "current public health risk is low."



**PUBLIC HEALTH**

**On the frontline against bird flu, egg farmers fear they're losing the battle**

However, the Trump administration's efforts to slash the federal workforce — including at numerous health agencies — and restrict public health communications have been cause for concern to many in those fields, as NPR has reported.

The first bird flu study from the CDC published under the Trump administration — released after a delay last week — suggested that some spillovers from dairy cattle into veterinarians who worked with them have gone undetected.

## This isn't the only department trying to reverse firings

Several Democratic lawmakers were quick to lay the blame for the bird flu firings on DOGE and Elon Musk, who effectively runs it.

"This is what happens when you let a bunch of inexperienced hacks tear down vital government agencies and services," tweeted Sen. Chris Van Hollen of Maryland. "Elon Musk and the DOGE boys are playing with people's lives and our national security, and we need to shut them down."

Sen. Amy Klobuchar of Minnesota also amplified reports of USDA's efforts to rehire staffers working on bird flu, writing, "They were 'accidentally' fired by the administration."



PUBLIC HEALTH

**Health agencies lose staff members in key areas as Trump firings set in**

Amidst mass layoffs across the entire federal government, the USDA isn't the first federal agency that has reversed course on certain terminations.

Last week, chaos unfolded at the National Nuclear Security Administration (NNSA) — the civilian agency that oversees the U.S. nuclear weapons stockpile — where officials were given hours to fire hundreds of employees as part of broader Department of Energy layoffs on Thursday.

The process sparked confusion among employees and concern from lawmakers, given the national security implications. Some critics suggested the Trump administration had carried out the layoffs without understanding the scope of the NNSA's work.

POLITICS


**Trump firings cause chaos at agency responsible for America's nuclear weapons**

"The DOGE people are coming in with absolutely no knowledge of what these departments are responsible for," Daryl Kimball, executive director of the Arms Control Association, told the Associated Press. "They don't seem to realize that it's actually the department of nuclear weapons more than it is the Department of Energy."

On Friday, the NNSA director issued a memo rescinding the firings of all but some two dozen employees, according to the AP.

The story didn't end there, however. Citing an internal NNSA email, NBC News reported that agency officials struggled over the weekend to contact some of those employees to inform them about their reinstatement, since they had lost access to their government email accounts after being fired.


**POLITICS**

**A federal judge has denied states' bid to halt DOGE and Musk's work**

When asked on Tuesday if he had any concerns about how the NNSA firings had been handled, President Trump told reporters, "No, not at all, I think we have to just do what we have to do."

"It's amazing what's being found right now — it's amazing," Trump added. "Some, if we feel that, in some cases, they'll fire people and then they'll put some people back, not all of them, because a lot of people were let go."

bird flu    usda    doge    trump administration

000588



## Can't keep up? We've got you.

Let the NPR Politics newsletter keep you up to speed and break it
all down in one email.

| Email address |   | **SUBSCRIBE** |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy.
NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR



POLITICS

**Federal agencies still can't agree on 'What did you do last week?' email**

000589

2/26/25, 9:45 AM
USDA seeks to undo firings of bird flu officials : NPR
Case 8:25-cv-00462-TDC    Document 38    Filed 02/26/25    Page 187 of 528



**POLITICS**

## Reconciliation is the key to unlocking Trump's agenda. Here's how it works



**LAW**

## Supreme Court orders new trial for death row inmate in Oklahoma

2/26/25, 9:45 AM
USDA seeks to undo firings of bird flu officials : NPR
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 188 of 528



POLICY-ISH

**Some Trump voters want him to rein in health care costs. It's unclear if he will**



ANALYSIS

**Trump White House seeks tighter grip on message with new limits on press**



**POLITICS**

**Trump introduces a green card for the rich: the gold card**

## Popular on NPR.org



**POLITICS**

## House Republicans pass budget resolution, clearing a key early test for Trump agenda



**POLITICS**

## 21 DOGE staffers resign, saying they won't help 'dismantle' public services



**POLITICS**

**6 federal workers get their jobs back in 1st successful challenge to Trump's firings**



GOATS AND SODA

**Judge tells Trump administration it has less than 2 days to resume USAID funding**



LIVING BETTER

**A break from your smartphone can reboot your mood. Here's how long you need**



**UKRAINE INVASION — EXPLAINED**

**Top Ukrainian official says Kyiv will refuse any 'bad' peace deal**

**NPR Editors' Picks**



RELIGION

**Christianity declines among U.S. adults while "religiously unaffiliated" grows, study says**



ENVIRONMENT

**Meet the 'wooly devil,' a new plant species discovered in Big Bend National Park**



MIDDLE EAST CRISIS — EXPLAINED

**Israelis hold a mass funeral for Shiri Bibas and her two sons killed in Gaza**



UP FIRST NEWSLETTER

**For Women's History Month, NPR wants to know who has made an impact in your life**



**SHOTS - HEALTH NEWS**

**Tablets for tots? Survey says kids watch videos on their own devices by age 2**



**SCIENCE**

**Lunar Trailblazer sets out to find water on the moon**

**READ & LISTEN**

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

**CONNECT**

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2025 npr

# EXHIBIT XLVII



← **Post**

**Elon Musk** ✓ ✕
@elonmusk

**Subscribe**

Restoring solvency to America is essential to protect Social Security & medical care

🎧 **ELON CLIPS** ✓ @ElonClipsX · Feb 20

Elon Musk: DOGE will save Medicare and Social Security.

"The actions that we're taking [with DOGE] with the support of the President and the support of the agencies are what will save Medicare, what will save Social Security. Because if the country goes insolvent—if all the ...
Show more

with the support of the President

2:43 AM · Feb 21, 2025 · **5.7M** Views

💬 4.8K        ⇄ 8.1K        ♡ 42K        🔖 733

# EXHIBIT XLVIII



POLITICO



**WHITE HOUSE**

## Musk's 'what did you do last week?' email hits a million replies

About one-third of the federal workforce replied to the demand.



Elon Musk's ongoing purge of the federal workforce has drawn legal challenges and, in multiple instances, unthinkingly fired employees critical to national security and public safety that agencies then sought to quickly rehire. | Francis Chung/POLITICO



By **ELI STOKOLS** and **DANIEL LIPPMAN**
02/25/2025 01:44 PM EST

000601

controversial email — amplified by Elon Musk in a threatening post on X — demanding a list of five things they did on the job last week.

The White House, eager to present the email demand as part of its coordinated attempt to dramatically scale down the size of the federal government, made that announcement at Tuesday's press briefing.

Advertisement

"All federal workers should be working at the same pace as President Trump is working and moving," Leavitt said. "This is to ensure that federal workers are not ripping off American taxpayers, that they are showing up to the office and that they are doing their jobs. And it's a very simple task to complete."

That amounts to roughly a third of the federal workforce, which numbers about 3 million.

Leavitt's announcement was, to a large degree, a response to several days of confusion following the Saturday evening email, which Musk said required a response from all federal workers and that failing to reply would be viewed as a resignation.

Many federal agencies, especially those in the national security space, quickly

000602

in their termination.

>  Want more POLITICO? Download our mobile app to save stories, get notifications and more. In iOS or Android.

But the relatively high response rate suggests many workers, amid the conflicting guidance, decided to err on the side of compliance to avoid the chance they might lose their jobs.

The news from the White House also came just hours after 21 people working for Musk's Department of Government Efficiency resigned, reportedly no longer willing to use their technical expertise to "dismantle critical public services." The Associated Press was first to report on the resignations.

Although Musk's ongoing purge of the federal workforce has drawn legal challenges and, in multiple instances, unthinkingly fired employees critical to national security and public safety that agencies then sought to quickly rehire, Trump and allies remain committed to the efforts broadly and believe that there is strong public support for shrinking government.

Presidential counselor Alina Habba, speaking to reporters Tuesday morning outside the West Wing, suggested that the outcry over DOGE's efforts, specifically the email asking employees to demonstrate productivity to their superiors, was "ridiculous."

"Look at all of you standing here asking me why people are upset to answer to their boss, the American people and the president of the United States, what you've done at work," Habba said. "What a ridiculous thing."

**FILED UNDER:** WHITE HOUSE, FEDERAL EMPLOYEES, DONALD TRUMP, DOGE

⌄

000603

**West Wing Playbook: Remaking Government**
Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

**JOB TITLE**

Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

Advertisement

AD

Advertisement

AD

**SPONSORED CONTENT**

˅







### Look like a social media savant.

Spin up slick social posts, plus monthly calendars and full...

Godaddy

### Kathleen Kennedy to Step Down at Lucasfilm

Puck

### Wall St. Legend Reveals:"Strange Days...

Hedge funds and billionaires are already moving their money. Bi...

Vision







### New York Will Cover the Cost to Install Solar if Y...

Find out if you qualify. Get your free quote today!

EasySolar

### This Spring Break leave New York behind

This Spring Break, leave New York behind and book your hot...

Barceló Hotel Group

### Small Prefab Houses For Seniors At Lowest Price...

PopularSearchNow | Search Ads

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

000605

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

_____

© 2025 POLITICO LLC



000606

# EXHIBIT XLIX

ADVERTISEMENT

AP SETS THE STANDARD FOR POLITICAL REPORTING.        DONATE
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.



Live: Budget plan     Stock market today     Pope Francis     Congo mystery illness     Diana Taurasi

POLITICS

# Trump backs Musk as he roils the federal workforce with demands and threats

BY LINDSAY WHITEHURST AND CHRIS MEGERIAN

Updated 9:06 PM EST, February 24, 2025

WASHINGTON (AP) — President Donald Trump backed Elon Musk's demand that federal employees explain their recent accomplishments by the end of Monday or risk getting fired, even as government agency officials were told that compliance with Musk's edict was voluntary.

Confusion and anger over the situation spawned new litigation and added to turmoil within the federal workforce.

"What he's doing is saying, 'Are you actually working?'" Trump said in the Oval Office during a meeting with French President Emmanuel Macron. "And then, if you don't answer, like, you're sort of semi-fired or you're fired, because a lot of people aren't answering because they don't even exist."

The Republican president said Musk's Department of Government Efficiency has found "hundreds of billions of dollars in fraud" as he suggested that federal paychecks are going to nonexistent employees. He did not present evidence for his claims.



**AP AUDIO: Trump backs Musk as he roils the federal workforce with demands and threats**

000607

AP Washington correspondent Sagar Meghani reports on a lawsuit over Elon Musk's demand that federal workers detail what they did last week.

Even as Trump and Musk pressed their case, the Office of Personnel Management informed agency leaders that their workers were not required to respond by the deadline of 11:59 p.m. EST Monday, according to a person with knowledge of the conversation who requested anonymity to discuss internal matters.

**RELATED STORIES**



**DOGE notches courtroom wins as Elon Musk crusades to slash federal government**



000608



**Musk gives federal workers 48 hours to say what they did last week**

**White House says Elon Musk is not in charge at DOGE, but is advising the president**

The conflicting directives led to varying advice for federal employees, depending on where they work. Some were told to answer the request for a list of five things that they did last week, others were informed it was optional, and others were directed not to answer at all.

Musk bristled at resistance, saying federal workers "hate even the tiniest amount of accountability." He continued to threaten firings hours after employees were told that they didn't need to comply with his demands.

"Subject to the discretion of the President, they will be given another chance," he posted on X, his social media platform. "Failure to respond a second time will result in termination."

Attorneys representing unions, businesses, veterans and conservation organizations filed an updated lawsuit in federal court in California on Monday, arguing Musk had violated the law by threatening mass firings.

The lawsuit, spearheaded by the State Democracy Defenders Fund, called it "one of the most massive employment frauds in the history of this country."

Anna Kelly, a White House deputy press secretary, criticized the litigation by saying "in the time it took these employees on taxpayer-funded salaries to file a frivolous lawsuit, they could have briefly recapped their accomplishments to their managers, as is common in the private sector, 100 times over."

Musk is leading Trump's efforts to overhaul and downsize the federal government. They've urged employees to resign, directed agencies to lay off probationary workers and halted work at some agencies altogether.

There has been pushback in protests around Washington and from within the government. The Office of Special Counsel, a watchdog for the federal workforce, said Monday that the firing of several probationary workers may be illegal. Trump is trying to fire the office's leader, Hampton Dellinger, in a case that has reached the U.S. Supreme Court.

000610

Dellinger asked the U.S. Merit Systems Protection Board to stop layoffs of six employees, but suggested that many more workers should also be protected from losing their jobs.

There are also signs Musk is testing the limits of his influence. Some administration officials — including some of Trump's most strident allies, such as FBI Director Kash Patel — have told employees not to respond to the email requesting five things they did, citing privacy or security concerns and noting that agencies have their own processes for evaluating employees.

"When and if further information is required, we will coordinate the responses. For now, please pause any responses," Patel wrote in an email.

It has been the most significant public divergence between the billionaire entrepreneur and Senate-approved Cabinet leaders who have otherwise been enthusiastic about fulfilling Musk's objectives.

Trump dismissed the idea there was any kind of split involving his most powerful adviser.

"They don't mean that in any way combatively with Elon," he said, adding that "everyone thought it was a pretty ingenious idea."

The latest turbulence began over the weekend, when Trump posted on his social media website, "ELON IS DOING A GREAT JOB, BUT I WOULD LIKE TO SEE HIM GET MORE AGGRESSIVE."

Musk followed by saying "all federal employees will shortly receive an email requesting to understand what they got done last week," and he claimed "failure to respond will be taken as a resignation." The directive echoed how he has managed his own companies.

The Office of Personnel Management, or OPM, sent out its own request afterward.

"Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager," the message said. However, it said nothing about the potential for employees being fired

000611

There was swift resistance from several key U.S. agencies led by the president's loyalists — including the State Department, Homeland Security and the Pentagon — which instructed their employees over the weekend not to respond. Lawmakers in both major political parties said Musk's mandate may be illegal.

Justice Department employees were told in an email Monday morning that they don't need to respond to the request "due to the confidential and sensitive nature of the Department's work."

But employees in the U.S. attorney's office in Washington were instructed to respond "in general terms," leaving out case-specific or otherwise sensitive information. In an email viewed by The Associated Press, attorneys were provided with guidance about how to respond about the number of court hearings they attended, defendants they charged, cases they resolved or other tasks.

The Department of Health and Human Services told staff that "there is no HHS expectation that HHS employees respond." If anyone wanted to write back, they were directed to be vague.

"Assume that what you write will be read by malign foreign actors and tailor your response accordingly," said an email to employees.

Education Department workers were directed to comply on Monday morning. "The email is legitimate and employees should respond," wrote Rachel Oglesby, chief of staff at the department. She added that "frontline supervisors will evaluate responses and non-responses."

Charles Ezell, the acting director of OPM, suggested that Musk's request may lead to new expectations for employees. Officials "may consider incorporating an expectation that employees submit weekly accomplishments bullets," he wrote in an email to staff.

Thousands of government employees have already been forced out of the federal workforce — either by being fired or through a "deferred resignation" offer — during the first month of Trump's second term. There's no official figure available for the total firings or layoffs, but the AP has tallied hundreds of thousands of workers who are being affected. Many work outside Washington.

———

Associated Press writers Steve Peoples in New York, Eric Tucker, Amanda Seitz, Byron Tau, Ellen Knickmeyer, Matthew Perrone, Alanna Durkin Richer and Tara Copp in Washington and Valerie Gonzalez in McAllen, Texas, contributed to this report.



**LINDSAY WHITEHURST**
Whitehurst covers the Supreme Court, legal affairs and criminal justice for The Associated Press in Washington, D.C. Past stops include Salt Lake City, New Mexico and Indiana.
𝕏 ✉



**CHRIS MEGERIAN**
Megerian covers the White House for The Associated Press. He previously wrote about the Russia investigation, climate change, law enforcement and politics in California and New Jersey.
𝕏 ✉



**000612**

2/25/25, 9:44 PM
Trump backs Musk as he roils the federal workforce with demands and threats | AP News
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 213 of 528

**MOST READ**



1    Pennsylvania's governor says the Trump administration has unfrozen billions in grants and loans

2    Joy Reid is leaving MSNBC as the network cancels her evening show

3    US refuses to blame Russia for Ukraine war, splitting with European allies in UN votes

4    Trump backs Musk as he roils the federal workforce with demands and threats

5    Idaho town hall meeting turns chaotic after woman is forcibly removed for shouting at speakers



000613

# EXHIBIT L

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 215 of 528

 **Politics**

Subscribe        **Sign in**

# administrator is

By Kaitlan Collins and Tierney Sneed, CNN

🕐 2 minute read · Updated 8:15 PM EST, Tue February 25, 2025



This undated photo from LinkedIn shows Amy Gleason. From Amy Gleason/LinkedIn

**(CNN) —** Amy Gleason is the acting administrator of the US DOGE Service, the agency that houses the temporary Department of Government Efficiency, a White House official told CNN on Tuesday.

The announcement, after weeks of questions about Elon Musk's official role and authority over DOGE, reveals the technical leader of the Musk-driven initiative tasked with reconfiguring the federal government.

Advertisement

Gleason has a background in health care and previously worked at the US Digital Service, an office created by President Barack Obama and most recently named after DOGE. Her position with DOGE was first reported by the Washington Examiner.



**RELATED ARTICLE**
How DOGE cracked Washington: A focus on arcane agencies gave Musk and his allies swift control of government nerve centers

She also worked in President Donald Trump's first term, including being placed on the White House Coronavirus Task Force's data team because of her technology background. That team was led by Dr. Deborah Birx.

Despite pledging full transparency, the White House has refused or been unable to identify the administrator of DOGE, including during Tuesday's press briefing. While Musk has served as the initiative's public face and continues to issue social-media directives to government workers, the White House has maintained that his status is one of a special government employee, and not a full-time worker.

"So, the president tasked Elon Musk to oversee the DOGE effort," press secretary Karoline Leavitt said earlier Tuesday when asked directly who was administering the initiative. "There are career officials and there are political appointees who are helping run DOGE on a day-to-day basis."

Advertisement

000616

Justice Department attorneys were grilled in a court appearance Monday about who the administrator was, but none were able to say then, either.

"Who's involved? Who's in charge? Who's giving them direction?" Judge Colleen Kollar-Kotelly asked government attorneys at the hearing, which examined DOGE's access to sensitive data systems at the Treasury Department.

Judges, including Kollar-Kotelly, have raised the lack of clarity around DOGE's structure as impeding their ability to decide the emergency disputes before them.

She and others have raised possible constitutional issues, depending on the chain of command at DOGE and who is behind the sweeping decisions that have the upended federal government's operations in recent weeks.

The White House official did not say how long Gleason has been the acting adminstrator.

*CNN's Michael Williams contributed to this report.*

## ▌MORE FROM CNN

 How DOGE cracked Washington: A focus on arcane agencies gave Musk and his allies swift control of government nerve centers

 'No legitimate rationale': Lawmakers raise concerns over what NASA won't say about DOGE

 Republicans press House leadership for help as they face pressure over

000617

DOGE cuts at home

## NEWS & BUZZ



Johnson and Trump pull off surprising win to advance GOP agenda after vote whiplash in the House



Trump says US will sell $5 million 'gold card' to wealthy foreigners



A nascent backlash against Musk sharpens risk for Trump and GOP

---

| Search CNN... | 🔍 |

Subscribe

Sign in

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

CNN Underscored

Games

About CNN

## Politics

### FOLLOW CNN POLITICS

   

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Subscribe    Newsletters

Transcripts    Help Center

000619

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

000620

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 222 of 528

2/26/25, 9:47 AM
Amy Gleason: White House reveals who DOGE acting administrator is | CNN Politics
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 223 of 528

000622

# EXHIBIT LI

Learn more about 



 

# Staffer with Elon Musk's DOGE amplified white supremacists online

By **Alexandra Alper** and **Raphael Satter**

February 7, 2025 7:07 PM EST · Updated 19 days ago

  



Elon Musk walks on Capitol Hill on the day of a meeting with Senate Republican Leader-elect John Thune (R-SD), in Washington, U.S. December 5, 2024. REUTERS/Benoit Tessier/File Photo Purchase Licensing Rights

WASHINGTON, Feb 7 (Reuters) - One of the people working with billionaire Elon Musk in his efforts to overhaul the U.S. government is a Berkeley-educated computer scientist who has boosted white supremacists and misogynists online.

Gavin Kliger lists his job on LinkedIn as "Special Advisor to the Director" at the Office of Personnel Management, which has been spearheading Musk's efforts to shrink the federal workforce. His USAID email address was copied on a message reviewed by Reuters that was sent to staffers at the international aid agency on Monday. It urged them to stay home while the agency was being shut down.

He graduated in 2020 from the University of California, Berkeley with a 3.95 grade point average and degrees in Electrical Engineering and Computer Science, according to his LinkedIn profile. Reuters confirmed his attendance at Berkeley, but was unable to verify other details in his profile.

Kliger is one of about a dozen men identified by Reuters and other news outlets who have been recruited by Musk and his DOGE office to reshape the federal government. Reuters could not determine the importance of Kliger's role at OPM.

In social media posts between October 2024 and January, Kliger has voiced controversial views and reposted content from white supremacist Nick Fuentes and self-described misogynist Andrew Tate.

An OPM spokeswoman declined to comment on Kliger's posts. Kliger did not respond to multiple requests for comment via email and text. Following Reuters' request for comment on Thursday evening, public access to Kliger's X account was blocked.

In response to a post about New York Mayor Eric Adams possibly shutting down a migrant shelter in November, Kliger wrote: "Just leave them be for a few more months. Will be much more convenient to deport them all if they are in one spot."

Kliger has reposted comments from white supremacist Fuentes, who has at times been banned from social media platforms including Facebook, YouTube and Twitter for hate speech.

Kliger shared a December 4 post from Fuentes' X account. Kliger has since unshared the post, but Reuters examined a copy of the original repost via the Internet Archive.

In the post on X, Fuentes mocks a post praising a photo of an apparently white couple pictured with two light-skinned children and a dark-skinned baby. In his post Fuentes referred to "adopted Black kids", denigrating the apparent interracial adoption. He also used the word "huzz", a pejorative term for women. Reuters could not immediately establish the identity or ethnicity of the people depicted. Fuentes did not respond to a request for comment on the post by email.

Kliger has also reposted social media influencer and self-described misogynist Andrew Tate.

The British-American former kickboxer is being investigated by Romanian prosecutors for human trafficking, trafficking of minors, sexual intercourse with a minor and money laundering and has since founded a nativist British political party. Tate has denied wrongdoing.

The post, shared by Kliger, exhorts foreigners to "respect British culture, standards of hygiene and social norms. You operate within our parameters ... Problem? leave ... Multiple complaints of the contrary? Visa revoked."

Another Department of Government Efficiency staffer, Marko Elez, quit on Thursday amid questions from the Wall Street Journal about links to a deleted social-media account that advocated for racism and eugenics, according to the Journal's subsequently published story. Reuters could not determine how Elez, Kliger, or any of the individuals working with Musk to slash government and staffing, were selected for their jobs.

Trump and Vice President JD Vance on Friday said Elez should get his job back.

Also on Friday, the ex-employer of Edward Coristine, another member of the DOGE team, disclosed that Coristine had been fired from a previous job amid a leak investigation.

In a statement in a response to a query from Reuters on Coristine's employment, Arizona-based network monitoring company Path Network said it could confirm that Coristine's "brief contract" had been "terminated after the conclusion of an internal investigation into the leaking of proprietary company information that coincided with his tenure."

Coristine didn't immediately respond to a request seeking comment. His dismissal from Path was first reported by Bloomberg.

A White House official told Reuters on Wednesday that Musk and his engineers have appropriate security clearances and are operating in "full compliance with federal law, appropriate security clearances, and as employees of the relevant agencies, not as outside advisors or entities."

Get weekly news and analysis on U.S. politics and how it matters to the world with the Reuters Politics U.S. newsletter. Sign up here.

Reporting by Alexandra Alper and Raphael Satter; Additional reporting by Tim Reid in Washington and Julia Harte in New York; Editing by Chris Sanders, Daniel Wallis and Rosalba O'Brien

Our Standards: **The Thomson Reuters Trust Principles.** ⧉

Suggested Topics:

United States   Donald Trump   Human Rights

Purchase Licensing Rights



**Raphael Satter**
Thomson Reuters

Reporter covering cybersecurity, surveillance, and disinformation for Reuters. Work has included investigations into state-sponsored espionage, deepfake-driven propaganda, and mercenary hacking.

   

## Read Next

United States

**Musk to attend Trump cabinet meeting as workers brace for more uncertainty**

ago

---

Legal

**'Where is Mr. Musk in all of this?' Judges question secrecy of DOGE's activities**

11:11 AM UTC

---

Legal

**Straight woman's claim of discrimination heads to US Supreme Court**

11:09 AM UTC

---

**Trump administration loophole snags US research grants from Lyme to lung disease**

11:15 AM UTC

## Sponsored Content

Dianomi



**Solidify Your Liquidity Strategy With Lessons From the Tech Industry**

Sponsored by
Bank of America



**Schwab's Weekly Market Outlook**

Sponsored by
Charles Schwab



**What Declining Interest Rates Could Mean for You**

Sponsored by
Charles Schwab

Feedback

**Sponsored Content**

Dianomi ▷

**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump


**3 Clean Energy and Vehicle Tax Credits**
Sponsored by Charles Schwab


**Weekly Trader's Stock Market Outlook**
Sponsored by Charles Schwab


**'DOGE' to unleash America's biggest financial transformation?**
Sponsored by Altimetry


**Today's Markets: What Investors Should Know Now**
Sponsored by Charles Schwab


**Know the Cyber Risks of AI for Your Business**
Sponsored by Bank of America


World ›

Feedback

# Ukraine says it has agreed minerals deal with US

World · February 26, 2025 · 9:40 AM EST · 7 min ago

Ukraine said it had reached a "preliminary" deal to hand revenue from some of its mineral resources to the United States, before an expected trip to Washington by President Volodymyr Zelenskiy on Friday.

World

**Putin hosts Guinea-Bissau leader as Russia builds Africa ties**

12 min ago

---

**Read the full deal document**

17 min ago

---

Cybersecurity

**Belgian prosecutor probes alleged Chinese hacking of intelligence service**

18 min ago

---

**Ukraine outlines US minerals deal, document has no concrete security guarantees**

19 min ago

## Sponsored Content

Dianomi ▷

**Know the Cyber Risks of AI for Your Business**
Sponsored by Bank of America


**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump


**A Look at What's Impacting Futures Markets**
Sponsored by Charles Schwab


**8 Ways to Prepare for Tax Filing Season**
Sponsored by Charles Schwab


**'DOGE' to unleash America's biggest financial transformation?**
Sponsored by Altimetry


**7 Wealth Tips Once Your Portfolio Reaches $1 Million**
Sponsored by Fisher Investments


## Sponsored Content

Dianomi ▷

**Leverage a powerful platform designed for self-directed traders.**
Sponsored by TradeStation

**8 Dumbest Things Smart People Waste Money On**
Sponsored by FinanceBuzz

**Don't Borrow From The Bank If You Own A Home, Borrow From Yourself**
Sponsored by Lendgo

**Start a Schwab financial plan today and help get more from your money.**
Sponsored by Charles Schwab

**Schwab's Take on Market Volatility**
Sponsored by Charles Schwab

**Learn how to think differently, innovate, and be a game-changer. Go.**
Sponsored by HBS Executive Education

Feedback

---

Latest

Home

Authors

Topic Sitemap

Browse

World

Business

Markets

Archive

Article Sitemap

Sustainability

Legal

Breakingviews

Media

Technology

Videos

Investigations

Pictures

Sports

Graphics

Science

Podcasts

Lifestyle

About Reuters

About Reuters ⧉

Advertise with Us ⧉

Careers ⧉

Reuters News Agency ⧉

Brand Attribution Guidelines ⧉

Reuters and AI ⧉

Reuters Leadership ⧉

Reuters Fact Check

Reuters Diversity Report ⧉

Stay Informed

Download the App (iOS) ⧉

Download the App (Android) ⧉

Newsletters

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

Thomson Reuters Products

**Westlaw** ⧉

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**ONESOURCE** ⧉

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⧉

The industry leader for online information for tax, accounting and finance professionals.

LSEG Products

**Workspace** ⧉

000628

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**DataCatalogue** ↗

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**World-Check** ↗

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

---

**Advertise With Us** ↗     **Advertising Guidelines**     **Purchase Licensing Rights** ↗

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ↗     **Terms of Use**     **Privacy** ↗     **Digital Accessibility** ↗     **Corrections**     **Site Feedback** ↗

© 2025 Reuters. All rights reserved

Feedback

000630

2/26/25, 9:48 AM
Staffer with Elon Musk's DOGE amplified white supremacists online | Reuters
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 233 of 528

000631

2/26/25, 9:48 AM
Staffer with Elon Musk's DOGE amplified white supremacists online | Reuters
Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 234 of 528

2/26/25, 9:48 AM
Staffer with Elon Musk's DOGE amplified white supremacists online | Reuters
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 236 of 528

000634

# EXHIBIT LII

archive.today
webpage capture

Saved from https://subscriber.politicopro.com/article/2025/02/doge-staffer-gavin-kliger-ar    search

All snapshots from host subscriber.politicopro.com    no other snapshots from this url

24 Feb 2025 21:55:38 UTC

Webpage   Screenshot

share   download .zip   report bug or abuse

PRO        Search all of POLITICO Pro...   ⏎      ⓘ      Need Help?

**POLITICO**PRO                                          Gift article 🎁

# DOGE staffer Gavin Kliger arrives at USDA

He was also part of the team that overhauled USAID and is trying to access data at the IRS.

BY: **MARCIA BROWN** | 02/19/2025 11:26 AM EST



The U.S. Department of Agriculture building is shown in Washington, D.C., on July 21, 2007.| Saul Loeb/AFP via Getty Images

Gavin Kliger, a software engineer turned staffer for Elon Musk's so-called Department of Government Efficiency, is working to slash contracts and staffing at the Agriculture Department, three people familiar with the matter told POLITICO.

Kliger was also part of the DOGE team that worked to overhaul the U.S. Agency for International Development, and he's currently trying to gain access to sensitive taxpayer data at the Internal Revenue Service.

A DOGE USDA account on X is asking public input on which programs, services and contracts it should cancel first.

Kliger has also reportedly shared white supremacist content on social media, such as posts from Nick Fuentes, according to Reuters.

Spokespeople for USDA and the White House did not immediately respond to requests for comment.

In her first speech to staff last Friday, USDA Secretary Brooke Rollins welcomed DOGE into the department, saying that it will make USDA "stronger" and "more efficient." She said that DOGE had already been at USDA for some time, but did not share who was leading its work within the department.

TOPICS IN THIS ARTICLE

Follow topics to receive email news alerts and see updates on the homepage. Manage topics

**Agriculture**

Follow +

# EXHIBIT LIII

2/26/25, 9:49 AM
Who is part of Elon Musk's DOGE, and what are they doing? : NPR
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 241 of 528






HOURLY NEWS

LISTEN LIVE

PLAYLIST

DONATE

POLITICS

# Who is part of Elon Musk's DOGE, and what are they doing?

FEBRUARY 7, 2025 · 4:23 PM ET

HEARD ON ALL THINGS CONSIDERED

By Shannon Bond, Stephen Fowler, Bobby Allyn

**4-Minute Listen**                    PLAYLIST    TRANSCRIPT



Elon Musk at the inauguration of President Trump on Jan. 20 in Washington, D.C. Trump tasked Musk with dramatically slashing government via the Department of Government Efficiency team. Its work has been secretive and controversial and has created chaos throughout the federal workforce.

*Pool/Getty Images*

000637

The DOGE effort helmed by Elon Musk appears to be focusing on technology and personnel in its stated goal to cut government spending. Staffers connected to DOGE and often to Musk's companies, including SpaceX and Tesla, are fanning out across federal agencies, where they are gaining access to sensitive systems and information on government payments and employees.

The scope of DOGE's work and the identities of the people carrying it out isn't fully clear — leaving agencies in chaos and government workers alarmed.

"One of the reasons we can't tell what's going on and what power they have is because they haven't really made what they're doing public at all," said Deborah Pearlstein, a constitutional scholar who directs the program in law and public policy at Princeton University.



**POLITICS**

**Elon Musk is barreling into government with DOGE, raising unusual legal questions**

Musk is using his platform X to claim DOGE victories, including feeding the U.S. Agency for International Development (USAID) "into the wood chipper" and "shutting down" what he described as "illegal payments" from the Department of Health and Human Services to nonprofit groups.

000638

# Who is part of DOGE and what are they doing?

One set of Musk-connected figures have been named to senior roles at agencies. That includes Tom Krause, CEO of the Cloud Software Group, who on Friday was put in charge of the Treasury Department's system that processes trillions of dollars in payments every year. Musk has posted on X about shutting off foreign aid payments as part of his DOGE cost-cutting.



**GOATS AND SODA**

**Why is the Trump administration targeting USAID?**

Amanda Scales, who worked for Musk at xAI, has been named chief of staff at the Office of Personnel Management (OPM), essentially the government's HR department.

Riccardo Biasini, who worked at Musk's Tesla and the Boring Company, is senior adviser to the director at OPM, and was listed as the point of contact for a new government-wide email system the Trump administration is using.

Former Tesla software engineer Thomas Shedd is now running the General Services Administration's Technology Transformation Services unit, which develops tech for the government.

000639



A file photo of the Treasury Department headquarters in Washington, D.C., where billionaire Elon Musk has installed an ally to oversee a key payment system as part of his cost-cutting efforts.
*Chip Somodevilla/Getty Images*

Many DOGE-affiliated staffers are young male software engineers from the tech world. That includes Marko Elez, a 25-year-old Rutgers University graduate who worked at Musk's SpaceX and X. Elez was a temporary appointee at Treasury who was granted access to the Treasury payment system, alongside Krause. Elez resigned from the Treasury Department on Thursday after the Wall Street Journal identified now-deleted racist social media posts.

000640

Vice President Vance on Friday said he disagrees with Elez's posts but that "stupid social media activity" should not "ruin a kid's life," he wrote on X. "So I say bring him back," which President Trump said he would support. Musk replied with: "He will be brought back. To err is human, to forgive divine."



**POLITICS**

**Member of Elon Musk's DOGE team resigns after racist posts resurface**

Other Silicon Valley engineers have popped up across agencies, including Gavin Kliger, who worked at Twitter in 2019 and, most recently, as a senior software engineer at the data analytics company Databricks. Kliger's LinkedIn page describes him as "special advisor to the director" at OPM. He also has an email address at USAID, which appeared on a message sent to staff this week about the agency's headquarters closing.

On Thursday evening, Kliger's name appeared in the Consumer Financial Protection Bureau's internal staff directory along with two other DOGE-connected staffers, according to the union representing CFPB workers.

At the General Services Administration (GSA), which manages federal real estate and technology, DOGE-connected individuals have interviewed software engineers about their work. In some cases, they have only provided their first names to the federal employees they spoke to, according to GSA staffers who spoke to NPR on condition of anonymity because they aren't authorized to speak publicly and fear retaliation in their jobs.

It's not consistently clear what the employment status of DOGE-connected staff is. Musk, Krause and Elez were made "special government employees," federal officials have said. That's a temporary role that limits them to working no more than 130 days in a year.

As an unpaid special government employee who is not a commissioned officer, Musk will file a confidential financial disclosure report, a White House official said on Friday, speaking on condition of anonymity because they were not

000641

authorized to talk about personnel matters publicly. Musk also received an ethics briefing, and other DOGE staff will be treated the same, the official said.

Historically, SGEs have been outside experts who serve on federal advisory boards, though recent administrations have used the designation for senior advisors within the executive branch.

Speaking Friday at the White House, Trump said he is not concerned about the security of personal information and other data accessed by DOGE, adding he was "very proud of the job that this group of young people" are doing. Trump added that his administration's cost-cutting focus would also soon turn to the Education Department and Pentagon, where he suggested without evidence there could be "trillions" of dollars in wasted spending within the $6.75 trillion the federal government spent in fiscal year 2024.

"We're going to be looking at tremendous amounts of money, Peter, being spent on things that bear no relationship to anything and have no value," Trump said in response to a reporter's question.

## What is DOGE supposed to be doing?

While DOGE has aggressively sought to retool the federal government to the liking of Musk and Trump, the executive order creating the entity spells out a much more limited role than how it has been deployed in some agencies so far. A

000642

preexisting office called the United States Digital Service was renamed the "United States DOGE Service," moving from the Office of Management and Budget to report to the White House chief of staff.

---



**POLITICS**

**With a new home for DOGE in the White House, here's what you need to know**

The earlier incarnation of the USDS acted as a sort of digital strike team to partner with federal agencies on targeted projects to improve software, websites and technology infrastructure. Within the new USDS, there is also now a "U.S. DOGE Service Temporary Organization" that has a mandate to advance Trump's "18-month DOGE agenda" of cutting costs and streamlining the government's operations.



People protest against President Trump and Elon Musk's Department of Government Efficiency (DOGE) near the U.S. Capitol in Washington, D.C., on Feb. 5, 2025.
*Drew Angerer/AFP*

2/26/25, 9:49 AM
Who is part of Elon Musk's DOGE, and what are they doing? : NPR
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 248 of 528

Trump's order also directs the USDS to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." To do so, each federal agency head is supposed to establish a DOGE team of at least four employees — which may include special government employees — to coordinate with the DOGE entity on cutting back spending.

DOGE employees have also reportedly taken wide latitude with the type of information and systems they have sought access to, as the order also says the USDS "has full and prompt access to all unclassified agency records, software systems, and IT systems." DOGE representatives gained access to classified material at USAID over the objections of the agency's security officials, the Associated Press reported.

The deployment of DOGE staffers and reported actions they have taken within several federal agencies paint a different picture than the expectations of the executive order.

Much of the early work, especially with DOGE-affiliated employees in the Office of Personnel Management, has focused on efforts to reduce the headcount of federal workers, whose salaries typically comprise about 5% of the overall budget, and on cutting programs and priorities that Trump and Musk disagree with, like USAID.

Mimicking a similar offer Musk made to Twitter employees when he took over the social media company, OPM sent a mass email to more than two million federal

000644

employees Jan. 28 titled "Fork in the Road," which offered a "deferred resignation" to employees with a promise of pay and benefits through the end of September. On Thursday, a federal judge paused the offer's deadline until Monday in response to a lawsuit from labor unions arguing the proposal was unlawful and unenforceable.

---



**POLITICS**

**Federal judge pauses deadline for Trump administration's 'Fork' resignation offer until Monday**

Meanwhile, there are lingering issues with the government's software and IT infrastructure that need addressing. A new Government Accountability Office report says the federal government spends more than $100 billion on IT, but agencies have failed to implement what the report describes as critical changes to how technology is acquired, managed and implemented.

## Is there oversight of DOGE?

DOGE is operating under the direction of President Trump, who has committed to policing any conflicts encountered by Musk, who operates six companies, including SpaceX and Tesla.

000645

"When we think there's a conflict or a problem, we won't let him go near it," Trump said on Monday.

When pressed on this at the White House recently, Press Secretary Karoline Leavitt said she is confident Musk would "excuse himself" if any of DOGE's work intersected with his companies.

Former White House ethics lawyers have told NPR even special government employees must comply with conflict of interest laws that prohibit working on any U.S. government matters that could have an effect on financial holdings.

That should, experts told NPR, force Musk to either divest in any financial interests that create a conflict, or recuse himself from government work that could involve something like a federal contract, or investigation, tied to one of his companies.

"That's exactly the kind of law that was passed to make sure that what you're doing is not treating the government as your own personal piggy bank, but treating it as a tool to be used in the interest of achieving what the American people elected you to go do," Pearlstein said.

Congress has so far not challenged any of DOGE's work. Republicans control both chambers in Washington, and they have already blocked an attempt by Democrats to subpoena Musk for questioning about possible conflicts.



**POLITICS**

**Republicans in Congress mostly shrug as Musk and DOGE set sights on spending**

Some members of Congress have written letters to Musk companies demanding answers about whether the tech billionaire is engaging in self-dealing, though, again, without support from Republicans, the letter-writing is not likely to lead to public hearings.

## How might lawsuits affect their work?

The lawsuits aimed at DOGE came fast.

2/26/25, 9:49 AM
Who is part of Elon Musk's DOGE, and what are they doing? : NPR
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 251 of 528

Within minutes of Trump being sworn in, the first lawsuit against DOGE was filed alleging that the team is illegal, since it gave private individuals roles in government decision-making, though this was before the White House clarified that some DOGE workers are special government employees.

Since then, DOGE's work has prompted numerous suits, including one on Thursday from unions representing employees at USAID. Musk has railed against the humanitarian assistance agency as a "criminal organization. The Trump administration plans to reduce its staff to fewer than 300 from more than 13,000.



**POLITICS**

**USAID unions sue Trump administration to halt 'unconstitutional and illegal' cuts**

Another legal battle launched by unions representing Treasury workers led to a federal judge issuing an order on Wednesday limiting what kind of access DOGE employees can have to highly sensitive systems that process trillions of dollars in government payments every year.

And on Friday, the University of California student government sued to stop DOGE from gaining access to data on the millions of student borrowers who have federal government loans.

000647

Legal experts say the scope of DOGE's work is likely to hinge on the outcome of what could become dozens of lawsuits challenging the unit's power. Some of those cases could end up being decided by the Supreme Court.

*NPR's Chris Arnold contributed reporting.*

doge    elon musk    treasury department    donald trump

---



## Can't keep up? We've got you.

Let the NPR Politics newsletter keep you up to speed and break it all down in one email.

| Email address |                | SUBSCRIBE |

[See more subscription options](#)

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR



POLITICS

**Federal agencies still can't agree on 'What did you do last week?' email**



POLITICS

**Reconciliation is the key to unlocking Trump's agenda. Here's how it works**



**LAW**

## Supreme Court orders new trial for death row inmate in Oklahoma



**POLICY-ISH**

## Some Trump voters want him to rein in health care costs. It's unclear if he will



ANALYSIS

**Trump White House seeks tighter grip on message with new limits on press**



POLITICS

**Trump introduces a green card for the rich: the gold card**

## Popular on NPR.org



POLITICS

**House Republicans pass budget resolution, clearing a key early test for Trump agenda**



2/26/25, 9:49 AM
Who is part of Elon Musk's DOGE, and what are they doing? : NPR
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 257 of 528

POLITICS

## 21 DOGE staffers resign, saying they won't help 'dismantle' public services



GOATS AND SODA

## Judge tells Trump administration it has less than 2 days to resume USAID funding



POLITICS

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 258 of 528

**6 federal workers get their jobs back in 1st successful challenge to Trump's firings**



LIVING BETTER

**A break from your smartphone can reboot your mood. Here's how long you need**



UKRAINE INVASION — EXPLAINED

**Top Ukrainian official says Kyiv will refuse any 'bad' peace deal**

## NPR Editors' Picks



RELIGION

**Christianity declines among U.S. adults while "religiously unaffiliated" grows, study says**



ENVIRONMENT

**Meet the 'wooly devil,' a new plant species discovered in Big Bend National Park**



MIDDLE EAST CRISIS — EXPLAINED

**Israelis hold a mass funeral for Shiri Bibas and her two sons killed in Gaza**



UP FIRST NEWSLETTER

**For Women's History Month, NPR wants to know who has made an impact in your life**



SHOTS - HEALTH NEWS

**Tablets for tots? Survey says kids watch videos on their own devices by age 2**



SCIENCE
**Lunar Trailblazer sets out to find water on the moon**

**READ & LISTEN**

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

**CONNECT**

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

**ABOUT NPR**

**Overview**

**Diversity**

**NPR Network**

**GET INVOLVED**

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

000658

**Accessibility**

**Ethics**

**Finances**

**NPR Shop**

**NPR Events**

**NPR Extra**

---

terms of use

privacy

your privacy choices

text only

© 2025 npr

# EXHIBIT LIV

*Democracy Dies in Darkness*

# Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS

The unusual request could put sensitive data about millions of American taxpayers in the hands of Trump political appointees.

Updated February 16, 2025

🎧 5 min      ↗      🔖      💬 8712

By Jacob Bogage and Jeff Stein

Elon Musk's U.S. DOGE Service is seeking access to a heavily guarded Internal Revenue Service system that includes detailed financial information about every taxpayer, business and nonprofit in the country, according to three people familiar with the activities, sparking alarm within the tax agency.

Under pressure from the White House, the IRS is considering a memorandum of understanding that would give officials from DOGE — which stands for Department of Government Efficiency — broad access to tax-agency systems, property and datasets. Among them is the Integrated Data Retrieval System, or IDRS, which enables tax agency employees to access IRS accounts — including personal identification numbers — and bank information. It also lets them enter and adjust transaction data and automatically generate notices, collection documents and other records.

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises, his picks for key roles and legal challenges to his executive orders and actions.

According to a draft of the memorandum obtained by The Washington Post, DOGE software engineer Gavin Kliger is set to work at the IRS for 120 days, though the tax agency and the White House can renew his deployment for the same duration. His primary goal at the IRS is to provide engineering assistance and IT modernization consulting.

The agency would require Kliger to maintain confidentiality of the information from unauthorized access and destroy any such information shared with him upon the completion of his IRS deployment.

IDRS access is extremely limited — taxpayers who have had their information wrongfully disclosed or even inspected are entitled by law to monetary damages — and the request for DOGE access has raised deep concern within the IRS, according to three people familiar with internal agency deliberations who, like others in this report, spoke on the condition of anonymity to discuss private conversations.

Kliger had not been granted IDRS access as of Sunday evening, according to a person with firsthand knowledge of his movement and access at the tax agency, as acting IRS commissioner Doug O'Donnell had yet to finalize the memorandum that would permit him to do more detailed work.

O'Donnell's predecessor, Danny Werfel, resigned on Jan. 20, after Trump announced plans to replace him with former congressman Billy Long (R-Missouri). Long has not yet been confirmed by the Senate.

The news comes as roughly 150 million taxpayers prepare to file returns by the April 15 deadline. In his first term, Trump openly mused about sending IRS agents after political opponents, leaving agency officials on edge about the IRS's independence.

The tax agency's systems are widely considered antiquated — many were built using computer coding language from the 1960s — and overhauling the agency's IT is in line with DOGE's mandate to modernize government technology. IRS contractors are generally provided system access to repair or maintain IDRS and similar data systems.

But it's highly unusual to grant political appointees access to personal taxpayer data, or even programs adjacent to that data, experts say. IRS commissioners traditionally do not have IDRS access. The same goes for the national taxpayer advocate, the agency's internal consumer watchdog, according to Nina Olson, who served in the role from 2001 to 2019.

"The information that the IRS has is incredibly personal. Someone with access to it could use it and make it public in a way, or do something with it, or share it with someone else who shares it with someone else, and your rights get violated," Olson said.

A Trump administration official said DOGE personnel needed IDRS access because DOGE staff are working to "eliminate waste, fraud, and abuse, and improve government performance to better serve the people."

The official said the "DOGE mission ... to bring much-needed efficiency to our bureaucracy" is being carried out "legally and with the appropriate security clearances."

A security clearance is not a sufficient credential for access to taxpayer systems, according to IRS procedures. IDRS access is governed by compelling needs for tax administration, not national security.

In a statement, White House spokesman Harrison Fields told The Post: "Waste, fraud and abuse have been deeply entrenched in our broken system for far too long. It takes direct access to the system to identify and fix it. DOGE will continue to shine a light on the fraud they uncover as the American people deserve to know what their government has been spending their hard earned tax dollars on."

Representatives from the Treasury Department and IRS did not immediately respond to requests for comment.

Kliger arrived unannounced at IRS headquarters on Thursday and was named senior adviser to the acting commissioner. IRS officials were told to treat Kliger and other DOGE officials as contractors, two people familiar said.

A White House official said Sunday, however, that DOGE personnel at the IRS were full agency employees and not contractors.

Kliger met with Ken Corbin, the IRS's chief of taxpayer services, and Heather Maloy, the agency's top enforcement official, during his first day at the agency's headquarters, according to several of the people familiar with the meetings. The agency is preparing for Trump-ordered layoffs, as soon as this week, that could hit roughly 10,000 probationary employees. Kliger has not returned to IRS headquarters since those initial meetings.

**What readers are saying**

The comments express strong opposition to DOGE gaining access to the IRS's Integrated Data Retrieval System, highlighting concerns about privacy invasion, misuse of data, and potential authoritarian control. Many commenters fear that this access could lead to political... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT LV

(filed under seal)

# EXHIBIT LVI

(filed under seal)

# EXHIBIT LVII

(filed under seal)

# EXHIBIT LVIII



← **Post**    Reply

**Elon Musk** ✔ 🅇
@elonmusk    Subscribe  🅇  …

According to the Social Security database, these are the numbers of people in each age bucket with the death field set to FALSE!

Maybe Twilight is real and there are a lot of vampires collecting Social Security 🤣🤣

| Age Range | Count |
|-----------|------:|
| 0-9       | 38,825,456 |
| 10-19     | 44,326,480 |
| 20-29     | 47,995,478 |
| 30-39     | 52,106,915 |
| 40-49     | 47,626,581 |
| 50-59     | 45,740,805 |
| 60-69     | 46,381,281 |
| 70-79     | 33,404,412 |
| 80-89     | 15,165,127 |
| 90-99     | 6,054,154 |
| 100-109   | 4,734,407 |
| 110-119   | 3,627,007 |
| 120-129   | 3,472,849 |
| 130-139   | 3,936,311 |
| 140-149   | 3,542,044 |
| 150-159   | 1,345,083 |
| 160-169   | 121,807 |
| 170-179   | 6,087 |
| 180-189   | 695 |
| 190-199   | 448 |
| 200-209   | 879 |
| 210-219   | 866 |
| 220-229   | 1,039 |
| 240-249   | 1 |
| 360-369   | 1 |

11:55 PM · Feb 16, 2025 · **93.7M** Views

000663



← **Post**

**Elon Musk** ✓ ⓧ
@elonmusk

Subscribe

Major improvement in Treasury payment integrity going live!

This was a combined effort of @DOGE, @USTreasury and @FederalReserve. Nice work by all.

⑤ **Department of Government Efficiency** ✓ @DOGE · Feb 17

The Treasury Access Symbol (TAS) is an identification code linking a Treasury payment to a budget line item (standard financial process).

In the Federal Government, the TAS field was optional for ~$4.7 Trillion in payments and was often left blank, making traceability almost

Show more

5:58 PM · Feb 17, 2025 · **14.6M** Views

💬 3.6K          ↻ 17K          ♡ 95K          🔖 1.9K          ↑





← **Post**

**Elon Musk** ✔ 𝕏
@elonmusk

[Subscribe]  [𝕏ᴵ]  ···

There ARE good people in the government who want to eliminate fraud & waste.

Amazingly, Leland was fired by Social Security Administration upper management for helping @DOGE find taxpayer savings. Can you believe that??

Thanks to President Trump, Leland was brought back right away and now HE is upper management 😎

Promote good players, exit bad players. That's the right thing to do.

> **Luke Rosiak** ✔ @lukerosiak · Feb 19
>
> At 4:30pm, Leland Dudek's boss put him on leave for helping DOGE find fraud. "They want to fire me," he wrote. "I confess. I helped DOGE understand SSA."
>
> Within hours, it was his boss who was fired, and the longtime SSA waste-watcher was elevated to lead the whole agency.
>
> ---
>
> **DAILYWIRE**
>
> — INVESTIGATION —
>
> ## Almost Fired For Working With DOGE, Social Security Fraud Expert Now Leads The Agency
>
> **'I confess. I helped DOGE understand SSA': Inside a dramatic reversal at the Social Security Administration.**
>
> By Luke Rosiak  Feb 19, 2025  DailyWire.com   6 Comments

10:18 PM · Feb 19, 2025 · **35.8M** Views

000666







← **Post**

**Elon Musk** ✓ |X̄
@elonmusk

Subscribe

Legacy media are mostly just puppets, with massive influence by the state.

The amount of money that @DOGE is discovering going from government to fake "independent" media is shocking.

**Glenn Greenwald** ✓ ▶ @ggreenwald · Feb 20

People in corporate media have zero -- I mean, zero -- knowledge of pre-2017 US history.

Do they not know the US has long allied with, funded and installed many of the planet's most repressive tyrants: Saudi, Egypt, Indonesia, etc?...

Show more

⇄ Lessig 🟦 reposted

**Julia Ioffe** ✓ @juliaioffe · 17h

The fact of the matter is that America, as embodied by this administration, is no longer allies with our traditional allies. That is over. America's allies are now Putin, the AfD, Viktor Orban, and other far-right, fascist regimes.

♡ 140          ⇄ 770          ♡ 2.6K          ılıl 86K

9:20 AM · Feb 20, 2025 · **7.8M** Views



← **Post**

 **ELON CLIPS** ✓
@ElonClipsX

Subscribe   ···

**Elon Musk: I wasn't really interested in politics, but at a certain point I had no choice.**

"I would say I was politically neutral for quite a while, leaning a little Democrat. But then, there was this whole cancel culture, trying to stop freedom of speech and infringe upon people's personal freedoms.

They want state control of what you say. They want to take away your guns, so there's nothing you can do to oppose them.

We just need to restore the fundamental elements of what made America great, which is freedom and opportunity.

I really just wanted to do useful things, provide products and services that are good. I wasn't really that interested in being political. It's just that, at a certain point, there was no choice."

CPAC, February 20, 2025



2:19 PM · Feb 21, 2025 · **1.2M** Views

 519     2K     42K     598    

800671



← **Post**

**Eric Daugherty** ✔
@EricLDaugh

Subscribe

🚨 BREAKING: Trump just told a group of governors - Democrats included - they need to switch to paper ballots in their elections and same-day voting.

He also said to verify citizenship to vote and voter ID, and that Elon Musk supports this.

"It's called 'watermark.' It's impossible to copy, impossible to cheat... highly sophisticated."

"Those 4 things... if you did 2-day or 3-day voting, [fine]... Other states too, they were weeks after the election. [Imagine] if it were a close election."

"I did ask @ElonMusk - he said, 'Computers are not meant for voting. Too many transactions taking place.'"

"Paper ballots - I hope, certainly the Republican governors... it'll cost you 8% of what the costs are now."

3:48

1:57 PM · Feb 21, 2025 · **4.8M** Views

💬 2.2K    ⟲ 11K    ♡ 52K    🔖 2.4K    ↥



















← **Post**    Reply ⇄

Elon Musk ✓ 🗙
@elonmusk    Subscribe  𝕏  ⋯

The Biden Administration stole FEMA money that was meant for American hurricane victims and spent it on luxury hotels for illegals in New York!

This is deeply morally wrong and a criminal action.

🟦 **Mario Nawfal** ✓ 🔲 @MarioNawfal · Feb 21
🚨🇺🇸 BREAKING: NYC SUES TRUMP ADMIN OVER $80M MIGRANT FUNDING CLAWBACK

New York City is suing Trump and federal agencies after FEMA reclaimed $80 million originally allocated for migrant services....
Show more



4:24 AM · Feb 22, 2025 · **8.2M** Views

000682



← **Post**

**Elon Musk** ✔ ✕
@elonmusk

Subscribe

The executive branch must necessarily be subject to the will of the President, given that he is the elected representative of the people.

Otherwise, we do not live in a DEMOcracy, but rather a BUREAUcracy.

**Shylock Holmes** ✔ @shylockh · Feb 21

Every day for the past month, I've been reminded that for my entire life up to 2024, I was assured that it was impossible to fire civil servants in any meaningful quantity, that government departments couldn't ever be closed down.

...

Show more

4:12 AM · Feb 22, 2025 · **11.6M** Views

○ 4.7K        ⟲ 9.2K        ♡ 52K        🔖 1K



000684











← **Post**

**Elon Musk** ✓ 🅧
@elonmusk

[ Subscribe ]  [ 🅧 ]  ⋯

This email is a very basic pulse check

**Tesla Thomas** ✓ @MrTeslaTom · Feb 23

Proud to say I once had to send Elon an email detailing what I had done and was planning to do. His reply was "sounds good, carry on".

It ain't that hard. Send the e-mail.

← **Post**    🅧 ⋯

**Elon Musk** ✓ 🅧
@elonmusk

[ Subscribe ]

Consistent with President @realDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last week.

Failure to respond will be taken as a resignation.

2:46 PM · 2/22/25 · **4.9M** Views

💬 7.2K    ↻ 13K    ♡ 68K    🔖 3.5K    ↑

8:45 AM · Feb 23, 2025 · **13.4M** Views

💬 5.8K    ↻ 13K    ♡ 103K    🔖 1.5K    ↑



← **Post**

**Elon Musk** ✓ ✕
@elonmusk

Subscribe

The reason this matters is that a significant number of people who are supposed to be working for the government are doing so little work that they are not checking their email at all!

In some cases, we believe non-existent people or the identities of dead people are being used to collect paychecks. In other words, there is outright fraud.

**Libs of TikTok** ✓ @libsoftiktok · Feb 23
Literally takes 2 minutes to respond.

Reporting to your boss about what you accomplished at work is very standard.

Why is this so controversial?

What did you do last week?  ❗

H  **HR** @                              4:46 PM
❗  ···
☺

Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager.

Please **do not send** any classified information, links, or attachments.

Deadline is this Monday at 11:59pmEST.

8:43 AM · Feb 23, 2025 · **36.2M** Views

💬 30K      🔁 53K      ♡ 250K 000690      🔖 10K      ⬆





← Post

**Elon Musk** ✓ 𝕏
@elonmusk

Follow

Subject to the discretion of the President, they will be given another chance.

Failure to respond a second time will result in termination.

> **Matt Walsh** ✓ @MattWalshBlog · Feb 24
> Fire any federal worker who didn't answer the email. Fire any who complained publicly about the email. Fire any who complained privately about the email. Fire any who did anything but cheerfully and promptly answer it.

7:06 PM · Feb 24, 2025 · **22.5M** Views

💬 9.7K          ⟲ 14K          ♡ 98K          🔖 2.7K          ⬆



← **Post**

**Elon Musk** ✔ X
@elonmusk

Follow

The email request was utterly trivial, as the standard for passing the test was to type some words and press send!

Yet so many failed even that inane test, urged on in some cases by their managers.

Have you ever witnessed such INCOMPETENCE and CONTEMPT for how YOUR TAXES are being spent?

Makes old Twitter look good. Didn't think that was possible.

> **Matt Walsh** ✔ @MattWalshBlog · Feb 24
>
> I already had a low opinion of many federal workers but now that I've seen them all meltdown and cry because they're expected to provide the faintest evidence that they're actually accomplishing anything with the taxpayer funded job we've given them, I realize that my opinion of
> Show more

6:51 PM · Feb 24, 2025 · **29.3M** Views

💬 20K    🔁 35K    ♡ 184K    🔖 5.4K    ⬆



← **Post**

**Elon Musk** ✓ 𝕏
@elonmusk

Follow

Those who ignored President Trump's executive order to return to work have now received over a month's warning.

Starting this week, those who still fail to return to office will be placed on administrative leave.

> **Rep. Ralph Norman** ✓ 🚩 @RepRalphNorman · Feb 24
>
> Not a single government agency is occupying even HALF of their office space. Their checks come from WE THE PEOPLE..
>
> Welcome back to work, folks.

**LIVE**

**FOX NEWS** 0:34    ▶ RALPH NORMAN (R-SC) | HOUSE FINANCIAL SERVICES COMMITTEE
**TODAY: FEDERAL WORKERS FACE DEADLINE TO DOCUMENT WORK OR RESIGN**
FOX & FRIENDS
MIKE WALTZ
NATIONAL SECURITY ADVISOR
COMING UP

6:18 AM · Feb 24, 2025 · **17.2M** Views



← **Post**

**Elon Musk** ✔ X
@elonmusk

[Subscribe] [X] ···

This was made using @Grok.

The standard @DOGE is asking for in a response is literally this low.

EXTREMELY troubling that some parts of government think this is TOO MUCH!!

What is wrong with them??

---

🅧 **Elon Musk** ✔ X @elonmusk · Feb 23

@realDonaldTrump

From Elon...

> Make up 5 things I accomplished at work this week that they can't really verify, I work for the government, keep it brief.

1. Streamlined a filing process, cutting retrieval time by 20%.

2. Briefed a senior official on a classified project, earning a nod of approval.

3. Debugged an internal database glitch that was slowing queries.

4. Drafted a memo that sparked a new interdepartmental initiative.

5. Conducted a discreet security audit, flagging three overlooked risks.

5:31 PM · Feb 23, 2025 · **19.6M** Views

💬 12K     🔁 8.1K     ♡ 42K     000695  🔖 1.7K     ⬆



**Post**

**Elon Musk** ✓ 🅧
@elonmusk

Follow

This is an amazing story and exactly what @DOGE aims to do!

The federal government has a MUCH larger amount of WASTE & FRAUD than a local or state government could ever have, because it can always print more money.

Unfortunately, there is no free lunch and that extra money becomes inflation, which is a tax on those who can least afford it.

> **Thomas Massie** ✓ 🟥 @RepThomasMassie · 11h
> When I was County Judge Executive in Lewis County Kentucky, I was responsible for signing the check that paid for every phone landline and cellphone billed to the county.
>
> At first it seemed impossible to ferret out the waste, fraud, and abuse for the...
> Show more

10:31 AM · Feb 25, 2025 · **5.2M** Views

💬 2.4K    ⟲ 8.4K    ♡ 42K    🔖 1.2K    ⬆



← **Post**

**Elon Musk** ✔ X
@elonmusk

Follow

This is our one & only chance to restore democracy from the dictatorship of the bureaucracy.

It is now or never.

It must be now.

> 🧑 **Jeffrey A Tucker** ✔ BI @jeffreyatucker · Feb 23
>
> I'm  concerned that many people do not understand the historical and institutional context in which the DOGE labor reforms are unfolding. They look at this as if these are some random, chaotic, arbitrary, strange, and even cruel measures to impose on a devoted civil service.
> Show more

4:27 AM · Feb 25, 2025 · **8.9M** Views

💬 5.2K        ⟲ 16K        ♡ 80K        🔖 2K        ↥





 **Aaron Rupar**
@atrupar.com



 Johnson: "Elon's cracked the code. He's now inside these agencies. He's created these algorithms that are constantly crawling through the data & as he told me in his office, data doesn't lie. We're gonna be able to get the information. We're gonna be able to transform the way federal govt works."



February 24, 2025 at 12:35 PM · Everybody can reply

**472** reposts   **1.2K** quotes   **1.8K** likes



← **Post**

**Marcus House** ✔ @MarcusHouse · Sep 17, 2024

Reading the details, it is pretty clear that #SpaceX wish to upgrade and move faster than the FAA can approve. It causes constant tension. This fine is almost a rounding error, but that isn't the point.

What do you think, and what is the solution? 🤷
faa.gov/newsroom/faa-p…

**Federal Aviation Administration**

## FAA Proposes $633,009 in Civil Penalties Against SpaceX

Tuesday, September 17, 2024

WASHINGTON — The Federal Aviation Administration (FAA) proposes $633,009 in civil penalties against Space Exploration Technologies Corp (SpaceX) for allegedly failing to follow its license requirements during two launches in 2023, in accordance with statutorily-set civil penalty guidelines.

"Safety drives everything we do at the FAA, including a legal responsibility for the safety oversight of companies with commercial space transportation licenses," said FAA Chief Counsel Marc Nichols. "Failure of a company to comply with the safety requirements will result in consequences."

💬 275        ⟲ 126        ♡ 1.4K        ili 483K        🔖  ⬆

**Elon Musk** ✔ 𝕏 👤  Subscribe  𝕏
@elonmusk

The fundamental problem is that humanity will forever be confined to Earth unless there is radical reform at the FAA!

7:15 PM · Sep 17, 2024 · **68.5K** Views

# EXHIBIT LIX



← **Post**

**Elon Musk** ✔ 𝕏
@elonmusk

Subscribe

Consistent with President @realDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last week.

Failure to respond will be taken as a resignation.

𝕏 Directive's alignment with Trump's orders?

2:46 PM · Feb 22, 2025 · **96.6M** Views

💬 29K          ⇄ 58K          ♡ 375K          🔖 18K          ↥

# EXHIBIT LX

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2                                 ---

 3

     ALLIANCE FOR RETIRED            )
 4   AMERICANS, et al.,              )
                                     )
 5                                   )  CIVIL NO. 25-313
                Plaintiffs,          )
 6                                   )
     v.                              )  February 24, 2025
 7                                   )
     SCOTT BESSENT, et al.,          )  2:03 p.m. - 5:01 p.m.
 8                                   )
                                     )
 9              Defendants.          )
     _____ )
10

11                TRANSCRIPT OF PRELIMINARY INJUNCTION

12          BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                    UNITED STATES DISTRICT JUDGE
13
                                   ---
14
     APPEARANCES:        PUBLIC CITIZEN LITIGATION GROUP
15                       BY:  Nandan M. Joshi
                              Allison Marcy Zieve
16                            Norman Eisen
                         1600 20th Street, NW
17                       Washington, DC 20009
                         (202) 588-1000
18                       Email: njoshi@citizen.org
                                azieve@citizen.org
19
                         For the Plaintiffs
20

21                                 ---

22

23


24   COURT REPORTER:     CHANDRA R. KEAN, RMR
                         Official Court Reporter
25                       333 Constitution Avenue, NW
                         Washington, DC 20001
```

1    APPEARANCES CONT'D:

2

3                              U.S. DEPARTMENT OF JUSTICE
                              BY:  Bradley Humphreys
                                   Elizabeth Shapiro
14:04:31   4                       Christopher Healy, Treasury
                              1100 L Street, NW
5                              Washington, DC 20005
                              (202) 305-0878
6                              Email: Bradley.humphreys@usdoj.gov

7

8                              For the Defendants

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | **PROCEEDINGS**                                            |
| 13:23:01 | 2  | (Court called to order at 2:03 p.m.)                       |
| 14:03:21 | 3  | DEPUTY COURTROOM CLERK:  Civil case 25-313,                |
| 14:03:25 | 4  | Alliance for Retired Americans et al., versus Scott        |
| 14:03:29 | 5  | Bessent.                                                    |
| 14:03:29 | 6  | Counsel, would you please identify yourself for the        |
| 14:03:31 | 7  | record, starting with the plaintiff.                       |
| 14:03:34 | 8  | THE COURT:  When you speak, you can take the               |
| 14:03:35 | 9  | masks off, because otherwise we really can't get a         |
| 14:03:41 | 10 | record, so that's not a problem.  And I would ask that     |
| 14:03:43 | 11 | you come to the podium.  It just makes it easier.          |
| 14:03:46 | 12 | We do have a public access line so those others can        |
| 14:03:52 | 13 | hear what's going on.  So it's important that you speak     |
| 14:03:56 | 14 | clearly into the microphone, not only for me to hear it    |
| 14:04:01 | 15 | but for others as well.                                    |
| 14:04:03 | 16 | All right.                                                 |
| 14:04:03 | 17 | MR. JOSHI:  Thank you, Your Honor.  Nandan                 |
| 14:04:05 | 18 | Joshi with Public Citizens Litigation Group for            |
| 14:04:07 | 19 | plaintiffs.                                                |
| 14:04:07 | 20 | With me at counsel table is Allison Zieve with             |
| 14:04:11 | 21 | Public Citizens Litigation Group and Norm Eisen with       |
| 14:04:16 | 22 | State Democracy Defender's Fund.                           |
| 14:04:16 | 23 | THE COURT:  All right.  Good afternoon.                    |
| 14:04:19 | 24 | MR. HUMPHREYS:  Good afternoon, Your Honor.                |
| 14:04:20 | 25 | Bradley Humphreys for the Department of Justice on         |

4

14:04:23   1      behalf of the defendants.  I also have with me Elizabeth

14:04:27   2      Shapiro of the Department of Justice and Christopher

14:04:33   3      Healy of the Treasury Department.

14:04:35   4              Thank you, Your Honor.

14:04:43   5              THE COURT:  All right.  So we're here on a

14:04:46   6      hearing on the preliminary injunction.  You should make

14:04:49   7      an assumption that I've read the briefs, the affidavit,

14:04:52   8      and the other materials that have been provided, as well

14:04:54   9      as the opinions that have been coming down.  Although

14:04:58  10      not all of the opinions I've -- some of them, if they've

14:05:01  11      been out of our circuit, I had less of a chance to

14:05:06  12      really study them carefully but -- other than the New

14:05:09  13      York one.

14:05:10  14              Obviously, the issues are complex and some may

14:05:14  15      even -- can be considered novel.

14:05:15  16              So I have a series of questions.  So I'm going to

14:05:19  17      have the plaintiffs get up, and you're going to be

14:05:20  18      answering questions.

14:05:22  19              If my question goes to something that somebody else

14:05:25  20      that's standing here -- one of your other attorneys is

14:05:28  21      better suited to answer, that's fine.  Just let them

14:05:31  22      come up.  Whoever it is that's versed in whatever I'm

14:05:34  23      asking you, I don't have any problem with your switching

14:05:37  24      around and having different people make arguments.  And

14:05:40  25      same thing, of course, for the defendants.

14:05:43  1          So I have questions both -- for the plaintiffs,

14:05:44  2     then I'll have questions for the defendants.

14:05:47  3          I'll let the plaintiffs come back, and if you want

14:05:50  4     to respond to something the defendants have raised, you

14:05:52  5     can do so since it is your burden.

14:05:57  6          I will let you make -- once we've gone through that

14:06:00  7     process, make any additional arguments that do not

14:06:05  8     correspond with what we've already talked about through

14:06:07  9     my questions.  But if there's something additional you

14:06:10  10    want to bring to my attention, I don't have any problem

14:06:13  11    with that.

14:06:14  12         And then at the end, we'll discuss sort of moving

14:06:16  13    forward and next steps in terms of what we should do.

14:06:26  14         So I'm sure everybody is aware that Judge Vargas in

14:06:32  15    New York granted a preliminary injunction for the

14:06:34  16    Treasury Department, although the issues were slightly

14:06:37  17    different and some arguments were different, but

14:06:40  18    basically it's the same preliminary injunction that was

14:06:45  19    filed in this particular case.  Although I think the

14:06:48  20    relief is probably perhaps a little broader than

14:06:51  21    requested.

14:06:51  22         So let me just ask at the outset before we go

14:06:55  23    through all of this:  Given Judge Vargas's ruling in the

14:06:58  24    Southern District of New York, why is an injunction from

14:07:02  25    this Court necessary to prevent irreparable harm?

14:07:10  1          So, Plaintiff, you're up.

14:07:11  2          MR. JOSHI:  Thank you, Your Honor.

14:07:12  3          Yes, the injunction in New York is -- would protect

14:07:18  4     us, but the -- I think the -- this case, as you note, is

14:07:25  5     on -- has some slightly different claims to it,

14:07:28  6     especially under the Privacy Act, that the action at

14:07:32  7     issue is in violation of the requirements of the Privacy

14:07:36  8     Act and the Internal Revenue Code.  The Court in New

14:07:39  9     York did not reach those because the state's interests

14:07:43  10    were different.

14:07:44  11         The -- I think that just simply as a matter of

14:07:47  12    course, the injunction may or may not last in New York.

14:07:51  13    I don't know yet if the government will appeal that

14:07:53  14    injunction.  In addition, the Court there provided an

14:07:56  15    opportunity for the government to come back with some

14:07:59  16    more information which may modify the injunction.

14:08:03  17         And rather than having us come back if something

14:08:07  18    changes in New York, I think -- or have a triggering

14:08:12  19    preliminary injunction here, it makes more sense for the

14:08:15  20    Court to address the issues presented in the motions.

14:08:20  21         THE COURT:  All right.  I expected that answer,

14:08:21  22    which is why I prepared my questions, but I thought you

14:08:24  23    should be asked at least at the outset.

14:08:26  24         So let me start with standing.  And let me just put

14:08:31  25    a little bit of background to it.

14:08:34  1          To secure a preliminary injunction, plaintiffs must

14:08:37  2     show a substantial likelihood of standing under the

14:08:40  3     heightened standard for evaluating a motion for summary

14:08:43  4     judgment, and you have to rely on affidavits or other

14:08:46  5     credible evidence to do so.

14:08:47  6          So there's three elements of what I assume you're

14:08:50  7     raising, which is association with standing.

14:08:54  8          Plaintiffs' members could use on their own -- could

14:08:58  9     sue -- I'm sorry -- on their own.  The interests

14:09:01 10     plaintiffs seek to protect are germane to the

14:09:03 11     organizational purposes.  Neither the claim asserted or

14:09:06 12     relief requested requires participation of individual

14:09:11 13     members.

14:09:12 14          And then there's three elements of regular

14:09:15 15     standing, which is concrete injury-in-fact, causation,

14:09:18 16     and redressability.

14:09:19 17          So am I correct that you're only advancing a theory

14:09:23 18     of associational standing, and you're bringing these

14:09:26 19     claims on behalf of your members, not under a theory of

14:09:30 20     organizational standing that the plaintiffs organization

14:09:33 21     are injured as well?

14:09:34 22          Is that correct?

14:09:36 23          MR. JOSHI:  That's correct, Your Honor.

14:09:37 24          THE COURT:  Okay.  So your briefing on standing

14:09:40 25     focuses exclusively on the first requirement of

14:09:44  1    associational standing that plaintiffs' members could

14:09:46  2    sue on their own.  But I obviously have to make findings

14:09:50  3    on all three elements.

14:09:52  4        The second one:  Why are the interests that

14:09:56  5    plaintiffs are seeking to protect germane to the

14:09:58  6    organizations' purposes?

14:10:00  7        Where in the record can I see that?

14:10:02  8        And the third:  Do individual members need to

14:10:05  9    participate in this lawsuit?  And if not, why not?

14:10:08 10        So if you can answer those two, you know, whatever

14:10:10 11    arguments you have.  And you can do these in summary

14:10:12 12    form.  You obviously have written --

14:10:14 13             MR. JOSHI:  Sure.  We have declarations from

14:10:16 14    the organizational leaders attached to our motion.  I

14:10:21 15    think that's the best place to find the discussion of

14:10:24 16    germaneness.

14:10:25 17        As to the need for individual plaintiffs to

14:10:29 18    participate -- individual members to participate, since

14:10:32 19    this is an APA case, this is not the typical type of

14:10:35 20    case where the members themselves have information that

14:10:41 21    would -- that require their presence in a court.

14:10:44 22             THE COURT:  Okay.  So in terms of the

14:10:46 23    injury-in-fact requirement as to -- relates to the

14:10:50 24    individual members and the first prong of associational

14:10:54 25    standing, can you succinctly state the injury-in-fact

14:10:58  1    here?

14:10:59  2         MR. JOSHI:  The injury-in-fact is the removal

14:11:01  3    of protections that are guaranteed by law to the

14:11:08  4    security of information -- personal, sensitive

14:11:11  5    information stored in the Bureau's systems.

14:11:14  6         We do not have the -- there's been no

14:11:17  7    administrative record filed in this case, and we do not

14:11:20  8    have the contours of the Secretary's changes to the

14:11:23  9    access procedures at the Bureau.  But we -- based on the

14:11:30  10   information we have been provided, in -- through the

14:11:34  11   declarations of the Bureau, it does appear that

14:11:37  12   significant changes have been made to the level of

14:11:41  13   access given to personal information in those systems.

14:11:48  14        And this is a -- this is a request for injunctive

14:11:54  15   relief, and so the harm here is, under TransUnion,

14:11:59  16   different than -- it's a different analysis than you

14:12:04  17   might have in a particular data breach case where a

14:12:07  18   plaintiff is seeking damages.

14:12:08  19        And I think Judge Vargas in New York explained that

14:12:11  20   pretty well in her decision, citing various courts that

14:12:16  21   have recognized that injunctive relief can prevent harm

14:12:22  22   caused by the loss of security is sufficient to show

14:12:28  23   harm for -- injury for purposes of injunctive relief.

14:12:33  24        THE COURT:  Okay.  So the defendants argue that

14:12:34  25   there's no standing under TransUnion, a case we all

14:12:39  1   know, without a public disclosure.  And your response

14:12:41  2   was that disclosure is not required by analogy to the

14:12:44  3   tort of intrusive -- intrusion upon seclusion.

14:12:49  4       Now, why isn't public disclosure of private facts a

14:12:53  5   better analog?  TransUnion mentions that tort as well.

14:12:57  6       And let me just run through the questions and then

14:12:59  7   you can decide how you want to formulate it.

14:13:02  8       Does TransUnion give me guidance about how I'm

14:13:05  9   supposed to decide which tort -- "intrusion upon

14:13:08  10  seclusion" or "public disclosure of private facts" --

14:13:11  11  provides the best or maybe the most relevant analog?

14:13:14  12      And intrusion on seclusion imposes liability on the

14:13:18  13  person who does the intruding not the steward of the

14:13:22  14  private information who allows the intrusion to happen?

14:13:26  15      Is that a problem in this case?

14:13:28  16      So if you could address them, and you can do them

14:13:30  17  in whatever order you want.

14:13:32  18          MR. JOSHI:  Sure.  The lack of standing in

14:13:39  19  TransUnion, that case focused on a damages claim.  And

14:13:43  20  the Court was very clear there that when you're seeking

14:13:47  21  damages based on an action that poses a risk of harm,

14:13:52  22  you have to show a little bit more to get -- bring --

14:13:56  23  get some type of monetary relief.

14:13:59  24      And they distinguish that from the injunctive

14:14:03  25  situation involving an injunction where the whole

14:14:05  1    purpose is to prevent a harm.

14:14:07  2        So, for example, if the government issued a

14:14:11  3    regulation saying no one could use passwords on their

14:14:14  4    system, that doesn't produce an immediate harm until

14:14:17  5    someone's information is stolen.  But I think under

14:14:21  6    TransUnion, and under other cases involving injunctive

14:14:25  7    relief, someone who wanted to use a password to protect

14:14:30  8    their privacy would be able to bring an APA claim.  And

14:14:33  9    we've suffered immediate injury from the loss of that

14:14:35  10    protection.

14:14:36  11        And it really doesn't matter whether that

14:14:37  12    information is on their personal laptop, in the cloud,

14:14:40  13    or on the government systems.  Their interest in

14:14:44  14    protecting personal, private information from being

14:14:52  15    unprotected is one -- I think as you alluded to, akin to

14:14:57  16    the interest in a protection -- intrusion on seclusion,

14:15:04  17    which is that there are certain pieces of information

14:15:06  18    that the law protects against being intruded upon by

14:15:14  19    third parties against the plaintiff's consent.

14:15:16  20        And here you have two statutes, the Privacy Act and

14:15:19  21    the Internal Revenue Code, that specifically provide

14:15:23  22    plaintiff -- individuals the right to consent before

14:15:28  23    their information is disclosed, absent falling into one

14:15:32  24    of the expressed statutory exclusions.

14:15:34  25        And so that's the situation we have here.

14:15:38   1          And I -- you know, the actual decision in

14:15:43   2    TransUnion, because that involved a damages claim, I

14:15:45   3    don't think is directly applicable.  But I think the

14:15:49   4    distinction the Court drew there between injunctive

14:15:52   5    relief and damages action in analyzing standing is

14:15:54   6    relevant.

14:15:55   7          THE COURT:  So your view is the intrusion on

14:15:57   8    seclusion as the better -- is the better argument from

14:16:00   9    your perspective?

14:16:02   10         MR. JOSHI:  It's the most analogous to the

14:16:04   11   common law -- traditional common law torts.

14:16:07   12         Now, I will say here, even if you have a

14:16:10   13   publication -- if you look to the other courts that

14:16:15   14   require publication, here you do have the threat of

14:16:17   15   publication outside the Treasury Department.  And

14:16:21   16   Congress, in both of the statutes that are at issue

14:16:26   17   here, did seek to protect information from being

14:16:28   18   shuttled throughout the Federal Government and is

14:16:31   19   meant -- the protections are meant to confine personal

14:16:38   20   information to the agency that holds the data for the

14:16:41   21   agency purposes.

14:16:42   22         And so here you have a risk -- you have a directive

14:16:44   23   from the President that says agencies should give the

14:16:50   24   U.S. DOGE Service prompt -- full and prompt access to

14:16:54   25   all unclassified information on their systems.  That's

13

14:16:57  1    in the DOGE Executive Order.  And that would -- if that

14:17:04  2    were implemented, if the courts were to lift their

14:17:08  3    order -- if this Court were to lift its order and the

14:17:11  4    New York Court were to lift its order and the Executive

14:17:14  5    Order were implemented, that would entail sharing of

14:17:17  6    personal information outside the Bureau to the Executive

14:17:19  7    Office of the President.

14:17:27  8            THE COURT:  Okay.  Do you want to add any

14:17:30  9    additional arguments to my third sort of question, which

14:17:33  10    was the intrusion on seclusion liability on the person

14:17:36  11    who does the intruding not the steward of the

14:17:38  12    information, as to whether there's, you know, a problem

14:17:41  13    in this particular case?

14:17:43  14            MR. JOSHI:  Well, here if you take the

14:17:45  15    government's theory, the steward and the person doing

14:17:47  16    the intruding are the Federal Government, right?

14:17:48  17        It's one part of the Federal Government holds the

14:17:51  18    information and another part of the Federal Government,

14:17:53  19    the Executive Office of the President, the U.S. DOGE

14:17:58  20    Service, wants access to it.

14:18:01  21        So it's -- beyond that, I think the -- I mean, the

14:18:06  22    common law analogs to Article III injury don't have to

14:18:10  23    be perfect.  They don't have to line up element by

14:18:15  24    element.  They simply -- you look to the common law to

14:18:18  25    determine whether the type of injury that the plaintiff

14:18:21  1    would suffer is the type that was protected at common

14:18:25  2    law.  And here, we are talking about a massive loss of

14:18:28  3    privacy just like in any -- any type of situation where

14:18:33  4    personal information is held in the trust of someone

14:18:36  5    else, whether it's your bank or your creditor company or

14:18:41  6    here, your government.

14:18:42  7        And so it's -- or if it's -- even if it's just held

14:18:46  8    in, you know, in your own home, if there's an invasion

14:18:50  9    of that privacy by itself is -- the type of injury that

14:18:54  10   was reflected in common law and that's protected by

14:18:58  11   federal law and gives rise to an Article III injury.

14:19:02  12           THE COURT:  Well, if we look at the other

14:19:04  13   elements in terms of -- you're looking at the

14:19:07  14   injury-in-fact, what's the fairly traceable connection

14:19:09  15   between the members' injuries and the defendants'

14:19:12  16   conduct, as you see it.

14:19:17  17       You've gone to some of it, but if there's anything

14:19:19  18   else you want to add.

14:19:21  19           MR. JOSHI:  Right.  The traceability is if -- I

14:19:23  20   mean, it's the change in policy that is effectuated at

14:19:27  21   Treasury to implement the President's DOGE Executive

14:19:33  22   Order that changed the security that was -- that

14:19:38  23   protected plaintiffs' members' information.  And we

14:19:42  24   already have, even in one week since the -- that change

14:19:47  25   was implemented, we have a potential data breach that

14:19:51  1    still hasn't been fully resolved with Mr. Elez's perhaps

14:19:55  2    sending emails out of the Treasury into presumably

14:20:00  3    somewhere else in the Federal Government.

14:20:02  4        And I don't think they have provided information

14:20:03  5    about where --

14:20:05  6            THE COURT:  I'm going to be asking -- that's in

14:20:07  7    Judge Vargas's opinion, and hopefully --

14:20:10  8            MR. JOSHI:  That's something that could not --

14:20:12  9    would not have happened before -- before this change

14:20:17  10   that took place at Treasury to accommodate the Executive

14:20:21  11   Order.

14:20:21  12           THE COURT:  So you view it as a new policy or

14:20:22  13   as a change in the policy?

14:20:24  14           MR. JOSHI:  Yes.  Certainly, the information we

14:20:27  15   have was that up until Secretary Bessent took office,

14:20:32  16   career staff did not adhere to their old security

14:20:37  17   policy, and that there was a change when he took office

14:20:40  18   on January -- I think 28th was the exact date; that he

14:20:47  19   removed the career head of the Bureau and allowed the

14:20:54  20   DOGE team at the Treasury to access what Mr. Gioeli

14:21:03  21   called "broader access than has ever been granted

14:21:06  22   before."

14:21:07  23       And so that is -- I think that is a change in

14:21:09  24   policy just as if they had, you know, changed their

14:21:13  25   regulation to change their -- a regulation to change the

14:21:17  1    security that they use to protect their systems.

14:21:19  2            THE COURT:  All right.  And why is it likely

14:21:21  3    that your requested relief will redress members'

14:21:24  4    injuries, which is the last one.

14:21:25  5        You've discussed it to some degree.  Anything you

14:21:28  6    want to add to that?

14:21:29  7            MR. JOSHI:  No, Your Honor.  We're looking to

14:21:31  8    maintain the status quo to the extent possible with

14:21:35  9    respect to the old policy until this Court can issue a

14:21:41  10   final judgment.  And so that's -- our plaintiffs'

14:21:45  11   members' information would be protected from DOGE under

14:21:47  12   the old policy that was in place.

14:21:50  13           THE COURT:  All right.  Let me move to some

14:21:52  14   questions about subject matter jurisdiction under APA

14:21:59  15   702.

14:21:59  16       So APA Section 702 waives sovereign immunity for

14:22:04  17   suit seeking relief other than money damages against an

14:22:07  18   agency or officer.  But it conditions that waiver,

14:22:10  19   quote, "Nothing herein confers authority to grant relief

14:22:14  20   if any other statute that grants consent to suit

14:22:17  21   expressly or impliedly forbids the relief which is

14:22:22  22   sought."

14:22:23  23       "Impliedly forbids" is part of the issue.

14:22:25  24       The Court lacks subject matter jurisdiction if

14:22:27  25   another statute forbids the injunctive relief plaintiffs

14:22:31   1    seek here.

14:22:32   2        So both the Privacy Act and Internal Revenue Code,

14:22:36   3    which are the ones you're relying on, provide damage

14:22:39   4    remedies for unlawful disclosures.  Neither provides

14:22:42   5    injunctive relief against improper disclosure.

14:22:47   6        Why shouldn't I read that as impliedly by

14:22:49   7    implication forbidding injunctive relief for unlawful

14:22:52   8    disclosures?

14:22:54   9        MR. JOSHI:  I think you need something more

14:22:55  10    than a damages remedy.  Congress can always supplement

14:22:58  11    the APA with additional remedies, but if you don't have

14:23:01  12    anything more than -- even for an implied restriction,

14:23:09  13    if you don't have anything more than the existence of a

14:23:11  14    damages remedy, then you're simply saying that

14:23:14  15    supplementing the APA's remedies with something else

14:23:18  16    automatically forecloses the APA remedy.

14:23:22  17        And I don't think that's -- the courts have applied

14:23:25  18    702 that strictly.  I'm pretty sure they haven't.  The

14:23:29  19    Supreme Court in *Doe v. Chao* seem to recognize that the

14:23:32  20    Privacy Act and the APA can exist side by side.  The

14:23:37  21    Privacy Act for damages remedies, but the APA for

14:23:40  22    injunctive relief for policymaking decisions that affect

14:23:45  23    individual privacy.

14:23:48  24        The Court's decision last year in *USDA v. Kirts*

14:23:53  25    also recognized that the Privacy Act was not an

14:23:55  1    exclusive remedy that forecloses other statutes that

14:23:59  2    might provide a remedy against the Federal Government

14:24:03  3    for violations.

14:24:05  4        That case involved two statutes involving damages

14:24:08  5    remedy.  But I think the situation is even starker here

14:24:13  6    where you have two statutes citing the APA and the

14:24:16  7    Privacy Act.  They really go after two different

14:24:20  8    things.

14:24:20  9        I think the -- if the Privacy Act and the Internal

14:24:24  10   Revenue Code had specific methods for injunctive relief,

14:24:29  11   its own separate track for seeking review of

14:24:32  12   policymaking decisions, then you'd have a stronger

14:24:35  13   argument that Congress meant individuals to go through

14:24:37  14   that route rather than the APA.  But as it stands, you

14:24:41  15   don't have that sort of disconnect between the remedies

14:24:49  16   under the Privacy Act and the IRC versus the APA type of

14:24:54  17   remedy for unreasonable or unlawful policymaking

14:24:59  18   decisions.

14:25:03  19           THE COURT:  But doesn't *Match-E-Be-Nash* say

14:25:05  20   that when Congress intends a remedy to be exclusive the

14:25:08  21   APA can't undo that judgment?

14:25:09  22       Isn't that what you're asking for here?

14:25:11  23           MR. JOSHI:  No, I think once again, there's no

14:25:15  24   exclusivity indicated in either of the other statutes.

14:25:17  25   They are simply remedial statutes for certain types of

14:25:21  1    economic harm.

14:25:22  2        The Privacy Act involves economic harm, I should

14:25:25  3    say, but the -- for certain types of violations, but

14:25:28  4    they are supplementary and really go after damages

14:25:33  5    caused by violation as opposed to -- what the APA is

14:25:38  6    about was to ensure that aggrieved persons can seek

14:25:42  7    redress for violations of agency actions that are

14:25:47  8    contrary to law or arbitrary.

14:25:50  9        THE COURT:  So does it matter that the Privacy

14:25:52  10   Act does provide for injunctive relief for other things,

14:25:55  11   like correcting records, forcing an agency to provide

14:25:58  12   access to records about the individual person but not

14:26:03  13   for the remedy that you're requesting?

14:26:08  14       MR. JOSHI:  No.  In fact, I think it would go

14:26:10  15   the other way.  If an individual tried to get APA relief

14:26:14  16   for things that the Privacy Act -- injunctive relief

14:26:20  17   that the Privacy Act called for, that might be a better

14:26:23  18   argument for preclusion, but not a damages remedy.

14:26:26  19       And the courts have done the same thing in the FOIA

14:26:29  20   context, where the courts have said the fact that

14:26:34  21   individuals seeking records should proceed under FOIA

14:26:36  22   rather than the APA because they provide the same type

14:26:39  23   of relief: access to records.

14:26:41  24       But that doesn't preclude someone from using the

14:26:44  25   APA to file a reverse FOIA action.  The fact that FOIA

20

14:26:49  1    exists doesn't mean a reverse FOIA action is somehow

14:26:52  2    precluded under the APA.  Courts hear those all the time

14:26:58  3    because those involve a different type of remedy and

14:27:04  4    action than the FOIA itself -- than is implicated by

14:27:11  5    FOIA itself.

14:27:12  6          THE COURT:  So what's your best precedent

14:27:15  7    supporting your argument that APA relief, the injunctive

14:27:18  8    relief which we're talking about, is available here and

14:27:21  9    not under APA Section 702, "impliedly" forbidden by the

14:27:26  10   Privacy Act or the Internal Revenue Code?

14:27:29  11         MR. JOSHI:  We cited *Bowen v. Massachusetts*.  I

14:27:32  12   think that's more of a 704 case, but it seems like that

14:27:35  13   would also apply to 702.

14:27:39  14     It seems odd that if you can sue in the Court of

14:27:41  15   Claims for damages, that precludes -- that somehow

14:27:43  16   doesn't waive the government's sovereign immunity for

14:27:46  17   the -- under the APA.

14:27:55  18         THE COURT:  All right.  Let me move to -- and

14:27:56  19   I'll get back to that particular case, but I'll take it

14:27:59  20   at a later point.

14:28:01  21     Adequate Alternative Remedies Under APA 704.

14:28:05  22     So the D.C. Circuit said in Garcia that an

14:28:10  23   alternative remedy can be, quote, "adequate" and bar an

14:28:14  24   APA suit even if it's not identical to the injunctive

14:28:17  25   relief that would be available under the APA.

14:28:19  1        And what's your response to that in terms of

14:28:23  2   Garcia?

14:28:23  3        MR. JOSHI:  Well, I agree it doesn't have to be

14:28:25  4   identical, but it does have to be adequate.  So if

14:28:30  5   there's a -- once again, I go back to the FOIA example.

14:28:34  6   A FOIA suit for records might not be exactly the same as

14:28:38  7   an APA suit, but they involve the same type of remedy,

14:28:43  8   which is getting access to records.

14:28:46  9        You don't have that situation here.  The Privacy

14:28:51  10  Act and the Internal Revenue Code do not care about

14:28:54  11  agency policymaking.  They don't care if the agency's

14:28:57  12  decisions are arbitrary and capricious.  They are simply

14:29:00  13  not grounded in those types of harms.

14:29:03  14       The APA is the only remedy that's available for

14:29:07  15  this sort of policymaking decision that was made here,

14:29:10  16  which was to change the security that applies to

14:29:18  17  information held in the Bureau's systems.

14:29:21  18       And so it's -- there's no, I think, sense that

14:29:30  19  the -- that somehow a private suit under -- for damages

14:29:34  20  under either of the statutes can address the situation

14:29:39  21  we have here where we're trying to restore the

14:29:45  22  protections that were previously afforded to this

14:29:48  23  information.

14:29:50  24       THE COURT:  Both sides cite to *Cell Associates*.

14:29:55  25  Why does that decision help you more than the

14:30:00  1    defendants?

14:30:01  2         MR. JOSHI:  I know we addressed it in our

14:30:07  3    brief, Your Honor.  I'm sorry, I'm blanking on *Cell*

14:30:10  4    *Associates*.

14:30:10  5         THE COURT:  From *Cell Associates:*  Congress,

14:30:12  6    quote, "linked particular violations of the Act to

14:30:15  7    particular remedies in a specific and detailed manner,"

14:30:18  8    which "points to a conclusion that Congress did not

14:30:21  9    intend to authorize the issuance of other injunctions."

14:30:27  10        MR. JOSHI:  I believe that was -- yes, I

14:30:29  11   believe that case involved a claim under the Privacy

14:30:32  12   Act.  And so this -- if this were a claim under the

14:30:35  13   Privacy Act, we would be limited to Privacy Act remedies

14:30:37  14   and not other remedies the Court could fashion.

14:30:40  15       That has nothing to do with the question of whether

14:30:41  16   the -- a suit under the APA allows for APA remedies --

14:30:47  17   the Court to award APA remedies.

14:30:53  18        THE COURT:  Okay.  Can you point me to some of

14:30:55  19   the best cases supporting the proposition that damages

14:30:59  20   under the Privacy Act are an inadequate remedy for the

14:31:03  21   injury that you're asserting and also in the Internal

14:31:07  22   Revenue Code?

14:31:07  23        MR. JOSHI:  I don't have any -- haven't seen

14:31:09  24   any cases under the Internal Revenue Code.  Once I

14:31:13  25   mentioned *Doe v. Chao*, albeit that's dicta, but that's

14:31:17   1      at 540 --

14:31:18   2                  THE COURT:  That's in your brief, right?

14:31:20   3                  MR. JOSHI:  That's in our brief, yes.

           4                  THE COURT:  Right.

14:31:23   5                  MR. JOSHI:  Note 1 talks about the coexistence

14:31:25   6      of the Privacy Act with the APA.  And of course, we do

14:31:29   7      have -- I'll mention again, those are -- the D.C.

14:31:33   8      Circuit's case, *Doe v. Stephens*, also cited our brief,

14:31:39   9      does engage in APA review of a Privacy Act-related

14:31:45  10      action.

14:31:45  11          It's a -- it was a combination of the Privacy Act

14:31:48  12      of, I believe, a veteran statute.  And once again, *Bowen*

14:31:53  13      *v. Massachusetts* is -- squarely addresses the issue of

14:31:57  14      damages versus APA relief.

14:31:59  15                  THE COURT:  You raised *Bowen* so let me get to

14:32:03  16      that one.

14:32:04  17          Isn't that more about the inadequacy of review in

14:32:07  18      the Federal Court of Claims -- which isn't obviously an

14:32:10  19      Article III court and might not have subject matter

14:32:12  20      jurisdiction over the relevant claims in the first

14:32:15  21      place.

14:32:15  22          So how does that case extend here?  Where can you

14:32:20  23      bring a damages suit in District Court?

14:32:22  24                  MR. JOSHI:  It does -- it does talk about that,

14:32:25  25      but it also talks about the fact that the damages are

24

14:32:30    1    simply not the type -- a damages remedy is simply not

14:32:35    2    the type of remedy that is sufficient by itself to

14:32:40    3    displace injunctive relief under the APA.

14:32:43    4        So I don't think it's solely about the venue at

14:32:47    5    issue with respect to the ability to sue.  It's -- it

14:32:56    6    does have a discussion about the remedies -- the

14:33:00    7    distinction between the remedies.

14:33:01    8            THE COURT:  So that's where you would have me

14:33:03    9    focus in terms of looking at the case?

14:33:05   10            MR. JOSHI:  Yes.

14:33:07   11            THE COURT:  All right.  Let me move to final

14:33:10   12    agency action.

14:33:12   13        APA Section 704 limits judicial review to, quote,

14:33:18   14    "final agency action" only.  And the action is final

14:33:24   15    when it marks the consummation of an agency

14:33:27   16    decision-making process.  It's one by which rights or

14:33:30   17    obligations have been determined or from which legal

14:33:32   18    consequences will flow.

14:33:35   19        So to show final agency action you seem to focus on

14:33:38   20    the implementation of a, quote, "new policy," end

14:33:43   21    quote -- which is what you mentioned earlier -- about

14:33:45   22    who can access the BFS systems.  But as you discuss in

14:33:50   23    your brief, this access was part of a, quote, "payment

14:33:53   24    process engagement plan" that was approved by the

14:33:58   25    Treasury Secretary.

14:33:59  1        Isn't the better argument that the approval of the

14:34:02  2   engagement plan was a final agency action?

14:34:06  3        I'm trying to get at what your -- what the new

14:34:11  4   policy is.  I mean, isn't it basically putting in place

14:34:14  5   the engagement plan?

14:34:17  6            MR. JOSHI:  Well, once again, we don't have a

14:34:19  7   record, but based on what we've seen so far --

14:34:20  8            THE COURT:  Well, we don't know what it is.

14:34:22  9   I'll agree with you on that.

14:34:25  10           MR. JOSHI:  Yes.  There were what seems to be a

14:34:29  11  series of steps that were taken shortly after Secretary

14:34:32  12  Bessent was sworn in.  The first was changing the

14:34:35  13  policies that had prevented the DOGE team from accessing

14:34:39  14  the data.  It appears then -- or around the same time

14:34:44  15  there was some negotiation that occurred between the

14:34:47  16  DOGE team and agency staff about this engagement plan,

14:34:52  17  as well as so-called mitigation measures to protect

14:34:58  18  information that was at risk because of this new access

14:35:01  19  policy.

14:35:02  20       And my understanding is Secretary Bessent either

14:35:06  21  directly or through his Chief of Staff approved all of

14:35:10  22  these changes.  So I can't segregate out the first

14:35:15  23  change from the subsequent implementation of the new

14:35:21  24  policy that occurred within a matter of a few days.  But

14:35:25  25  I think all together they add up to final agency action

26

14:35:31  1    that's at issue -- the final agency action that's at

14:35:34  2    issue in this case.

14:35:35  3        It has been consummated, and I don't think -- as I

14:35:39  4    read the defendants' brief, they don't challenge the

14:35:41  5    fact that there was agency action.  They simply say it's

14:35:44  6    not final.

14:35:44  7        But it's been done.  It's been implemented.  And it

14:35:48  8    changes the legal protections that plaintiffs' members

14:35:56  9    have with respect to the -- their personal data that's

14:35:59  10   in the Bureau systems.

14:36:01  11       So I'm not sure what else would be needed to make

14:36:04  12   the action final at this point.

14:36:08  13       THE COURT:  Okay.  Well, the engagement plan,

14:36:10  14   as I understood it, seems to have provided for a new

14:36:13  15   protocol for tagging BFS payment systems with symbols

14:36:21  16   and codes to categorize particular payments, which it

14:36:24  17   would appear had not been done before.

14:36:27  18       MR. JOSHI:  No, I -- my understanding --

14:36:30  19       THE COURT:  Unprecedented access by one person

14:36:31  20   to multiple sensitive databases.

14:36:36  21       MR. JOSHI:  Yeah, my understanding is there

14:36:38  22   were two different things that were going on.

14:36:40  23       The first was the attempt early on by the DOGE team

14:36:44  24   to implement the President's freeze on foreign aid

14:36:48  25   assistance.  And they went in and either attempt --

27

14:36:51  1    started to make some changes or made some changes to the

14:36:57  2    way the Bureau processes those payments in order to

14:37:02  3    implement the foreign aid Executive Order -- the foreign

14:37:05  4    aid freeze in the Executive Order.

14:37:09  5        Separate from that, there's this engagement plan

14:37:13  6    which is supposedly -- is supposed to last between four

14:37:15  7    to six weeks, by which the DOGE team will learn how the

14:37:19  8    Bureau's systems operate for some -- various purposes.

14:37:33  9        It's not clear -- we know from the President's

14:37:34  10   Executive Order that DOGE -- the USDS DOGE framework

14:37:45  11   lasts until July 2026.  What we don't know for Treasury

14:37:50  12   is after this engagement plan is completed in four to

14:37:53  13   six weeks what's next on the horizon for them.

14:37:56  14       But I think the engagement plan is different from

14:37:59  15   the procedures they implemented -- to implement the

14:38:03  16   Executive Order -- the foreign aid freeze Executive

14:38:08  17   Order.

14:38:08  18           THE COURT:  So would you rely on both of them

14:38:09  19   in your argument about a final agency action?

14:38:12  20           MR. JOSHI:  We're focused more on just the

14:38:14  21   access, which I think is represented more by the

14:38:17  22   engagement plan than the freeze order.  At least as I

14:38:22  23   understand it, that involved payments to grantees,

14:38:30  24   perhaps abroad, and if that's the case, that would

14:38:35  25   implicate the privacy interest of plaintiffs' members.

14:38:40  1            THE COURT:  Okay.  So what in terms of -- I'm

14:38:42  2    looking for precedent for some of these.

14:38:44  3        What's your best precedent for the proposition that

14:38:47  4    an agency's decision about how to manage and share

14:38:50  5    information within the Federal Government is a final

14:38:54  6    agency action, something that's more specific than what

14:38:58  7    I have at this point?

14:38:59  8            MR. JOSHI:  I do have the D.C. Circuit's

14:39:02  9    decision, *Doe v. Stephens*, that involved the routine use

14:39:06  10   exception.  But it did involve submitting information to

14:39:10  11   a grand jury.

14:39:10  12       To be honest, Your Honor, I think this type of --

14:39:14  13   what's going on now is pretty unprecedented, so I don't

14:39:17  14   know if I have anything that's squarely on point --

14:39:21  15           THE COURT:  Okay.

14:39:24  16           MR. JOSHI:  -- for this type of radical change

14:39:26  17   in how agencies manage their computer systems.

14:39:31  18           THE COURT:  Okay.  As I said, some of these

14:39:33  19   things are novel, so part of it is to find out whether

14:39:37  20   you have -- what you would focus on as precedent or if

14:39:40  21   there is actually any.

14:39:43  22       So let me move in terms of the merits, the

14:39:45  23   violation of the Privacy Act.

14:39:49  24       Obviously, the Privacy Act broadly prohibits

14:39:52  25   agencies from disclosing records to any person or any

14:39:54  1     other agency, but the Act also provides exceptions that

14:39:59  2     allow disclosure.  And there are two exceptions that are

14:40:02  3     relevant.

14:40:05  4          First, the Act allows disclosures to, quote, "those

14:40:08  5     officers and employees of the agency which maintains the

14:40:12  6     record who have a need for the record in the performance

14:40:15  7     of their duties."

14:40:16  8          And the second one is the Act allows disclosures,

14:40:19  9     quote, "for a routine use" that's identified in a

14:40:23  10    Systems of Record, without citing to the statute.

14:40:26  11         So the disclosure to employees exception, reading

14:40:32  12    their papers, you appear to -- I won't use speculate --

14:40:37  13    but to propose that Mr. Krause might be an employee of

14:40:40  14    USDS, which is not part of Treasury -- although we have

14:40:45  15    some issues with the organizations -- in addition to his

14:40:48  16    role as a Treasury employee and leader of the Treasury

14:40:52  17    DOGE team.

14:40:53  18         So can you point to anything in the record that

14:40:56  19    substantiates that, if I've read it correctly?

14:41:00  20              MR. JOSHI:  Well, we have Mr. Krause's

14:41:03  21    declaration, which says he does meet with USDS and gets

14:41:08  22    direction from them.  We accept that the declaration

14:41:12  23    says that Mr. Krause and formerly Mr. Elez, and I

14:41:15  24    believe they have a new person now, have job titles with

14:41:22  25    -- from the Treasury Department.

14:41:25  1          But I think there's still some ambiguity as to

14:41:29  2   whether they operate with two masters.  They are part of

14:41:32  3   the DOGE team.  The DOGE team was a creation of the

14:41:35  4   President's Executive Order.  There is some relationship

14:41:38  5   between the DOGE team at the agencies and USDS and the

14:41:44  6   Executive Office of the President that is not exactly

14:41:46  7   clear.

14:41:50  8          So if there were a chance for discovery on an

14:41:54  9   administrative record, it would be useful to have that

14:41:55  10  information, but at this -- based on what we have --

14:42:01  11  based on what we have now, I think there's at least some

14:42:04  12  ambiguity as to whether the DOGE team wears two hats.

14:42:08  13         And if they are doing that, then even when they're

14:42:12  14  getting information as employees -- officers or

14:42:17  15  employees of the Treasury, they are also getting

14:42:19  16  information -- the same information wearing that other

14:42:22  17  hat at the same time.

14:42:24  18         So that's our concern there.  It could be a back

14:42:26  19  door around the -- there's supposed to be a limited

14:42:32  20  exception to the nonconsensual nondisclosure requirement

14:42:37  21  if they're in fact sort of wearing two hats.

14:42:41  22         I think it would be the same thing of giving an

14:42:44  23  employee the job title of sharing information with

14:42:48  24  DOGE -- with USDS.  I don't think an agency would just

14:42:52  25  give a job title to their employees and say, well,

14:42:55  1    therefore, we can get around the Privacy Act limitations

14:42:57  2    that way.

14:42:58  3        So that's -- that's our concern with Mr. Krause, as

14:43:03  4    well as the other members of the DOGE team.

14:43:05  5        THE COURT:  I'm going to be asking the

14:43:07  6    defendant some questions relating to that.

14:43:09  7        So let's assume Mr. Krause is an employee of USDS.

14:43:15  8    Would that be a problem if he's only an employee of USDS

14:43:19  9    in the Executive Office of the President?  Because as I

14:43:21  10   understand it, USDS is an Executive Office of the

14:43:24  11   President.  Or do you think that Mr. Krause holding a

14:43:28  12   role in USDS is problematic even if he's both an

14:43:33  13   employee of Treasury and of USDS?

14:43:37  14       I'm giving different possibilities here.  We'll

14:43:40  15   hear from defendant hopefully a little more

14:43:43  16   specifically, but to ask you.

14:43:44  17       MR. JOSHI:  I think it's problematic if, once

14:43:48  18   again, he has two masters, in which case you're not

14:43:52  19   sealing off the information in the Bureau's records from

14:43:58  20   being disclosed outside the Bureau without the consent

14:44:00  21   of the individual involved.

14:44:03  22       It would be the same situation on the technical

14:44:08  23   side if you somehow connected the Bureau's computers

14:44:11  24   with the White House's computers and said that's all one

14:44:16  25   computer system.  I don't think you can do that to get

14:44:19  1    around the Privacy Act.  The same way I don't think you

14:44:21  2    can have an employee that has two masters, if you will,

14:44:25  3    and say that we're only disclosing information --

14:44:31  4    private information to the employee wearing hat A and

14:44:36  5    not hat B, especially in a situation where we know

14:44:40  6    they're working together for a common objective of some

14:44:44  7    sort.

14:44:44  8            THE COURT:  Who is the "they"?

14:44:46  9            MR. JOSHI:  USDS and the Treasury DOGE team.

14:44:50  10           THE COURT:  So is this "two hat" problem really

14:44:55  11   in terms of the Treasury USDS or -- I mean, the one --

14:44:57  12   you know, the two hats he clearly is is he's a Treasury

14:45:00  13   employee, at least at this point, but he's also the CEO

14:45:04  14   of Cloud Software Group.  That's the "two hat" question.

14:45:08  15           MR. JOSHI:  We have concerns about that.  We

14:45:09  16   don't have information at this point about what he's

14:45:13  17   doing with respect to his private CEO work as it relates

14:45:18  18   to what he's doing at the Treasury.

14:45:20  19       We don't have enough of a basis to make an

14:45:22  20   allegation with respect to those two roles he has.  I

14:45:26  21   think it's a concern.  I just don't know yet if it's a

14:45:32  22   legal claim.

14:45:33  23           THE COURT:  You don't -- I agree, at least I

14:45:35  24   don't see any information that was provided that tells

14:45:38  25   us exactly what he is or is not doing as the CEO.  But

14:45:42 1    my understanding is he at the same time as -- his

14:45:49 2    employment at this point is the government employment --

14:45:52 3    well, you have to be careful about how you term these.

14:45:55 4        Anyway, that he is the CEO of Cloud Software Group

14:46:01 5    at the present time.

14:46:02 6        Now, whether he's doing anything, I'm not -- I'm

14:46:05 7    not positive about it, but that seems to be a two hat --

14:46:09 8    more of a "two hat" issue than the other one.

14:46:12 9        MR. JOSHI:  No, I agree, Your Honor.  And to my

14:46:14 10    knowledge, the government has not taken the position

14:46:16 11    that Mr. Krause or anyone else can transfer the

14:46:20 12    Treasury's data to cloud computing legally.

14:46:24 13        I think they are taking the position that it is

14:46:29 14    okay and lawful for Treasury to --

14:46:33 15        THE COURT:  To have him have both positions.

14:46:36 16    But I agree, I don't think they're saying he can

14:46:39 17    transfer it but --

14:46:39 18        MR. JOSHI:  Well, I think they are taking the

14:46:41 19    position they can transfer it within the Federal

14:46:43 20    Government freely.

14:46:43 21        THE COURT:  Right.

14:46:44 22        MR. JOSHI:  But I don't think they're taking

14:46:45 23    the position they can transfer to a private --

14:46:48 24        THE COURT:  Right.  And that, I understand.  I

14:46:49 25    wasn't suggesting that they were doing that.  I think

14:46:51  1      they're aware that he has the two positions.

14:46:54  2           MR. JOSHI:  Yeah.

14:46:54  3           THE COURT:  Not that the information

14:46:56  4      necessarily gets -- the information gets transferred but

14:47:01  5      it does provide him, at this point at least, with access

14:47:05  6      to the information.

14:47:08  7           Does the timeline of Mr. Krause's employment status

14:47:12  8      matter for purposes of the preliminary injunction?

14:47:16  9           There have been obviously some irregularities which

14:47:20  10     have now been corrected about his onboarding process --

14:47:23  11     without getting into all the dates, which I will at one

14:47:26  12     point -- and some confusion by the government about what

14:47:29  13     role he had at various times.

14:47:32  14          I ask that because at least at one point in

14:47:35  15     their -- in the time frame, the engagement plan was

14:47:39  16     produced before he actually, I think, became a Treasury

14:47:44  17     employee.

14:47:45  18          So I'm curious as to whether you think the

14:47:50  19     employment, you know -- the changes in his employment

14:47:54  20     status have created any issues as far as you're

14:48:01  21     concerned.

14:48:02  22          MR. JOSHI:  There's some murkiness in the sense

14:48:07  23     that he -- according to the declarations, he became an

14:48:13  24     employee on January 23rd.  I believe his paperwork

14:48:17  25     initially said February 9th.  And then there was a

14:48:20  1    declaration that says that was in error and was

14:48:22  2    corrected.

14:48:23  3        So he -- if true, if that's true, then he became --

14:48:27  4    he started working at the Treasury Department on

14:48:30  5    January 23rd, which was before Secretary Bessent

14:48:34  6    actually was sworn in.

14:48:38  7        It's not clear from the record who he was reporting

14:48:42  8    to during that period since there was no -- I don't

14:48:45  9    believe there was a Treasury Secretary or even an acting

14:48:50  10   named during that time, so I think there was some

14:48:52  11   confusion there.

14:48:57  12       We have taken it that -- based on the reporting and

14:49:00  13   based on the information in the record, that when

14:49:02  14   Secretary Bessent came in, that's when Mr. Krause and

14:49:07  15   the DOGE team were granted full access to the Bureau's

14:49:11  16   systems.  I don't think they had that before, based on

14:49:15  17   the policy that was in place and being enforced by the

14:49:19  18   prior career staff.

14:49:22  19       THE COURT:  I'm going to ask the defendants in

14:49:24  20   terms -- there's a whole bunch of different dates, which

14:49:26  21   I won't go through now, but the engagement plan was

14:49:30  22   agreed to on January 26th, so part of it is to figure

14:49:35  23   out what position he actually was in at the point that

14:49:39  24   they came to that specific agreement, which I don't know

14:49:43  25   the answer to, but I assume you don't either.  And I

14:49:49    1    need to ask the defendants.

14:49:50    2              MR. JOSHI:  Yeah, I think that's right.  I

14:49:53    3    guess, as I understand it, they -- Mr. Krause came in.

14:49:57    4    Mr. Elez was already there on January 21st.  They had

14:50:04    5    this plan in place that they want to implement.  They

14:50:06    6    were not able to, by the way, because of the policy

14:50:10    7    enforced by the career staff.

14:50:11    8         Then Secretary Bessent was sworn in, and then the

14:50:14    9    policy changed.  And they were able to start

14:50:17   10    implementing the plan until the -- this Court's order,

14:50:21   11    and the court order in New York, at least, limited their

14:50:25   12    ability to access the systems directly.

14:50:30   13              THE COURT:  Okay.  The defendants seem to say

14:50:38   14    that Mr. Krause has a "need to know" information in BFS

14:50:44   15    systems because of his role in the payment processing

14:50:47   16    and the engagement plan.

14:50:49   17         Do you dispute that?

14:50:50   18              MR. JOSHI:  We have job descriptions for

14:50:55   19    Mr. Krause that are provided in the declarations.

14:51:01   20    They -- our concern with them is that they seem very

14:51:04   21    capacious, which is -- the "need to know" provision of

14:51:17   22    the Privacy Act is supposed to be about actual need to

14:51:22   23    know.  And it seems to me they draw this line between a

14:51:26   24    very broad description over IT improvements, basically,

14:51:30   25    to say he needs access to everything at all times upon

14:51:34  1    request, as far as I can -- as far as I see.

14:51:37  2        I think that could -- it could be a circumvention

14:51:41  3    around the Privacy Act limitations if, once again, they

14:51:45  4    had said his job description was to sell private data --

14:51:49  5    sell data in the private market.

14:51:51  6        That's not a reason to get around the Privacy Act.

14:51:55  7    You can't use the job description to do whatever you

14:51:57  8    want.

14:51:58  9        And so -- and that's our concern with what's been

14:52:04  10   put into the record so far, is that there's no apparent

14:52:09  11   cabining of his ability to access private data with

14:52:14  12   respect to how broadly they have defined his role.

14:52:20  13           THE COURT:  Okay.  Because their argument is

14:52:21  14   that the need to know -- they tie it together with his

14:52:23  15   role in the -- which we've talked about, which obviously

14:52:27  16   needs some more elucidation -- but the payment process,

14:52:30  17   the engagement plan, basically.

14:52:32  18       So it's not clear to me whether your -- you

14:52:35  19   obviously have concern broader than that in terms of

14:52:38  20   whether he's -- what his role is in the engagement plan

14:52:42  21   and some other aspects to it.  But do you see some

14:52:46  22   connection between "need to know" and this agreement

14:52:49  23   that they have, the engagement plan?

14:52:51  24           MR. JOSHI:  We don't have the contents of the

14:52:53  25   engagement plan.

14:52:54  1          As far as I understand it, the engagement plan says

14:52:57  2     they want to make improvements to the systems to spot

14:53:02  3     waste and abuse.  And they are going to look at

14:53:07  4     everything and, therefore, they need access to

14:53:09  5     everything without any sort of -- at least not that's in

14:53:13  6     the record -- any sort of detail as to how that will be

14:53:16  7     structured.

14:53:20  8          It's basically a roving charge to find fraud and

14:53:25  9     therefore they have access to whatever they want.

14:53:27  10         Mr. Gioeli called it broader than access -- you

14:53:30  11    know, "a broader level of access than has ever been

14:53:35  12    given before," I believe.  And I don't think the record

14:53:39  13    that they've put in place -- first of all, the record

14:53:42  14    they put in has nothing by the official decision-makers,

14:53:47  15    like Secretary Bessent, in terms of what he was

14:53:50  16    considering when he was structuring this plan.  So I

14:53:57  17    think it's deficient in that regard.

14:54:00  18         But if we had a statement, if we had some sort of

14:54:03  19    reasoned decision-making, we would have perhaps an

14:54:04  20    analysis of why everything -- all the data in the Bureau

14:54:08  21    systems would be open to the DOGE team seemingly upon

14:54:13  22    request.

14:54:14  23         THE COURT:  Okay.  Let me move to the routine

14:54:18  24    use in Paragraph 17 of the payment record, the SORN, in

14:54:25  25    terms of why it wouldn't apply here.

14:54:27  1          And as I understand it, Paragraph 17 allows

14:54:30  2     disclosures to a, quote, "federal or state agency, its

14:54:34  3     employees, agents, or contractors for the purpose of

14:54:37  4     identifying, preventing, or recouping improper payments

14:54:41  5     to an applicant for, or recipient of, federal funds."

14:54:49  6          So why doesn't that apply?  Why wouldn't you think

14:54:52  7     of it applying?

14:54:53  8          And let me add the next question, which is -- you

14:54:56  9     don't address this, I believe, because the defendants

14:55:00  10    only invoked the routine use exception as disclosures

14:55:04  11    made to State and Interior at the point that they did

14:55:08  12    that, not disclosures to USDS or Treasury DOGE team

14:55:13  13    personnel, or other reasons.

14:55:19  14         So is there a reason for not discussing this?  Is

14:55:22  15    it because they haven't brought it up as --

14:55:25  16         MR. JOSHI:  They didn't defend on that basis.

14:55:28  17    And I think -- the way I read that exception, it's for

14:55:31  18    actual fraud investigations.  For example, it includes

14:55:34  19    state agencies.

14:55:34  20         I don't think the Bureau would say, We can open up

14:55:37  21    our systems to states wholesale because there might be

14:55:40  22    fraud in our systems and therefore the states might be

14:55:43  23    able to help find that.

14:55:45  24         I read that exception for -- to allow for sort of

14:55:48  25    bona fide individualized fraud investigations, not to --

14:55:52   1    not for systematic technical changes to the system to

14:55:59   2    detect fraud.

14:56:00   3            THE COURT:  But you didn't really address it,

14:56:03   4    unless I missed it somehow.

14:56:04   5            MR. JOSHI:  No, we did not address it in our

14:56:07   6    reply brief because --

14:56:08   7            THE COURT:  Do you want to address it now?

14:56:09   8            MR. JOSHI:  I think that exception doesn't

14:56:11   9    apply --

14:56:11   10           THE COURT:  Is it what you just said?

14:56:12   11           MR. JOSHI:  Yeah.

14:56:13   12           THE COURT:  Okay.

14:56:14   13           MR. JOSHI:  It's -- I read that exception to

14:56:16   14    apply for particularized investigations.

14:56:22   15       So for example, they had an instance where an

14:56:24   16    account -- let's say the DOJ was conducting a fraud

14:56:28   17    investigation for illegal payments.  They might use the

14:56:30   18    Bureau.  They might coordinate with state agencies

14:56:35   19    about, you know, looking at payment transfers to

14:56:38   20    bringing a criminal action against a particular group of

14:56:42   21    entities.

14:56:43   22       I think that's what that exception is.  That's how

14:56:45   23    I read that exception to apply.

14:56:46   24           THE COURT:  Okay.

14:56:47   25           MR. JOSHI:  Which is why it has such a broad

14:56:52  1    category of recipients of information, not -- it's not

14:56:58  2    the type of thing where -- I think Mr. Krause is focused

14:57:02  3    on, according to his declaration, in improving the fraud

14:57:08  4    detection capabilities of the Bureau's payment systems.

14:57:13  5         THE COURT:  Okay.  So let me move just to the

14:57:17  6    Internal Revenue Code in terms of violation of that.

14:57:20  7         The Internal Revenue Code requires that, quote,

14:57:23  8    "returns and return information shall be confidential.

14:57:26  9    No one shall disclose any return or return information."

14:57:31  10   It does provide a whole bunch of exceptions to that

14:57:35  11   general rule.  They focus on -- defendants focus on one

14:57:39  12   exception which, quote, "allows disclosure to certain

14:57:43  13   federal officers and employees for purposes of tax

14:57:45  14   administration."

14:57:46  15        So why doesn't the tax administration exception

14:57:48  16   apply to any disclosures to the Treasury DOGE team?

14:57:54  17        MR. JOSHI:  I don't think there's enough

14:57:57  18   information that they put in that they're engaged in tax

14:58:00  19   administration.  They're looking -- if you take them at

14:58:05  20   their word, they're looking for making -- looking to

14:58:08  21   make systemic changes to the computer systems at the

14:58:13  22   Bureau, to perhaps detect tax information.

14:58:19  23        There's no sense of why they would need to look at

14:58:26  24   specific individualized tax return information of

14:58:29  25   individuals to engage in that activity.

14:58:32  1          I would note, I think there was recent reporting

14:58:35  2     that with respect to the DOGE team at the IRS, they're

14:58:38  3     not going to look at individualized tax information.

14:58:41  4     That was the representation made recently that was

14:58:42  5     reported in the media.

14:58:44  6          So I think there's a disconnect between sort of the

14:58:46  7     broad charge that the DOGE team has and the specific

14:58:53  8     exception for tax administration purposes that the

14:58:57  9     Internal Revenue Code provides for.

14:59:00  10          THE COURT:  All right.  Let me get into -- I

14:59:02  11     just have one question about the -- in terms of, again,

14:59:08  12     the merits, the arbitrary and capricious.

14:59:12  13          APA requires agencies engaged in reasoned

14:59:16  14     decision-making.  And the Court could set aside agency

14:59:20  15     action if it was arbitrary and capricious.

14:59:24  16          So the defendant's declaration suggests that

14:59:26  17     they're aware of the security, the operational risks

14:59:29  18     associated with the access they've provided to the

14:59:32  19     Treasury DOGE team.  They appear to have taken several

14:59:36  20     measures in response to those risks, which was in the

14:59:39  21     materials.

14:59:40  22          In your view, what factors or alternatives did they

14:59:43  23     fail to consider?

14:59:45  24          What should they have done differently, if you want

14:59:48  25     to address that.

14:59:48  1           MR. JOSHI:  Well, the first thing they could

14:59:50  2      have done, which is not in the record, is make

14:59:52  3      absolutely crystal clear that they cannot share any

14:59:56  4      personal data that's stored in the Bureau systems

14:59:58  5      outside the Bureau, especially to the Executive Office

15:00:01  6      of the President, because that's what's required under

15:00:03  7      the Executive Order, the DOGE Executive Order.  They

15:00:07  8      could have said, you know what, the DOGE Executive Order

15:00:10  9      says we have to follow all laws.  We need to make

15:00:13  10     crystal clear all of the data in our systems remain in

15:00:16  11     our systems.

15:00:17  12           Mr. Krause, the other members of the DOGE team, can

15:00:19  13     do their analysis, assuming everything else is lawful,

15:00:23  14     but they have to do it in-house.  They can't be sharing

15:00:27  15     that information outside of the agency.

15:00:30  16           So that's not in the record right now.

15:00:35  17           Beyond that, there's no real explanation of -- by a

15:00:40  18     decision-maker, especially Mr. Bessent, about what he

15:00:44  19     considered in implementing this particular system.  We

15:00:48  20     know it's failed already in the one week it was --

15:00:54  21     Mr. Elez was working under it.  And we don't have -- we

15:01:00  22     don't have a consideration of alternatives.  We don't

15:01:01  23     have any discussion of how they view the Privacy Act and

15:01:05  24     the Internal Revenue Code as limiting their discretion.

15:01:10  25           The Treasury has a privacy policy in place that is

15:01:16  1      supposed to implement the Privacy Act, and I don't think

15:01:18  2      there's any discussion about how their new system

15:01:23  3      comports with what they have articulated in that privacy

15:01:27  4      policy.

15:01:27  5          And so it's -- all that's missing.  For such a

15:01:31  6      pretty significant and unprecedented change in how the

15:01:35  7      Bureau has done -- has operated throughout its history.

15:01:40  8      I -- what we have is some contours of the end result of

15:01:44  9      the decision but not really an explanation and a

15:01:47  10     reasoned analysis for the decision.

15:01:49  11             THE COURT:  Okay.  So irreparable harm, which

15:01:54  12     I'll be frank, I think is your weakest link in terms of

15:01:59  13     discussing it.

15:02:00  14         Do you see precedent, which I would say is stricter

15:02:03  15     in a higher standard than New York, reading the cases

15:02:08  16     from Judge Vargas about --

15:02:10  17         Anyway, the D.C. Circuit precedent sets a very

15:02:13  18     "high standard" for the showing of "irreparable harm"

15:02:17  19     that is necessary to support the preliminary

15:02:20  20     injunction.

15:02:20  21         The threatened injury must be, quote, "beyond

15:02:24  22     remediation" and "injunctive relief" -- this is again a

15:02:27  23     quote -- "will not be granted against something merely

15:02:31  24     feared is liable to occur at some indefinite time," nor

15:02:35  25     will such relief be granted against an injury that's

15:02:38  1    merely theoretical, which is not simple.

15:02:43  2         Applying the standards, certainly a number of the

15:02:48  3    judges in this district have declined to issue TROs and

15:02:53  4    preliminary injunctions against, for instance, the high

15:02:57  5    stakes project like the oil pipeline when plaintiffs

15:03:01  6    have been unable to show that they've threatened harm,

15:03:05  7    oil spills is likely.

15:03:06  8         So what's your best precedent from this circuit for

15:03:10  9    the proposition that an uncertain or unmeasurable risk

15:03:16  10   of future harm satisfied, quote, "the likelihood of

15:03:20  11   irreparable harm" requirement for a preliminary

15:03:23  12   injunction?

15:03:24  13        And let me go to the second part, and you can

15:03:26  14   answer both together.

15:03:27  15        How do you distinguish cases in which judges in

15:03:29  16   this district have declined to find a likelihood of

15:03:32  17   irreparable harm, say, for example, from the permitting

15:03:36  18   of major oil pipeline projects based on a risk of future

15:03:42  19   harm, despite the opinions recognized that an oil spill

15:03:45  20   would be an enormous harm if it occurred?

15:03:49  21        Anything you can say on this point would be most

15:03:52  22   helpful.

15:03:53  23        MR. JOSHI:  Well, I agree the precedents are

15:03:55  24   mostly pretty recent because I don't think agencies have

15:03:58  25   been in the habit on a policy-making level of not

15:04:02  1    guarding their data pretty vigilantly.

15:04:04  2        I will say in terms of imminence, I would once

15:04:09  3    again go back to the Executive Order which says -- I'll

15:04:11  4    just read it.  This is what it requires:

15:04:14  5        "Agency heads shall ensure that USDS -- and that's

15:04:21  6    in the Executive Office of the President" --

15:04:23  7            THE COURT:  Right.

15:04:23  8            MR. JOSHI:  -- "has full and prompt access to

15:04:25  9    unclassified agency records."

15:04:28  10       And so in terms of imminence, but for this Court's

15:04:32  11   order and the Court order in New York, if Treasury is

15:04:35  12   going to comply with this Executive Order, and we have

15:04:39  13   no indication that they're not, they're going to share

15:04:43  14   data as soon as the courts allow them to.

15:04:46  15       And I don't think there's any --

15:04:48  16           THE COURT:  Share data with whom in terms of --

15:04:51  17           MR. JOSHI:  USDS.

15:04:52  18           THE COURT:  Okay.

15:04:53  19           MR. JOSHI:  USDS.  Share it outside of the

15:04:56  20   four -- the walls of the Bureau -- or the Treasury

15:04:58  21   Department.

15:04:58  22       And if -- if this were a situation where it was

15:05:02  23   just a piece of paper going from one agency into

15:05:06  24   another, that's something that can be clawed back.  I

15:05:09  25   think that -- in situations like that, you might find no

15:05:13  1    irreparable harm because you can sort of fix the problem

15:05:15  2    if the Court later determines that the plaintiff should

15:05:18  3    prevail.

15:05:20  4        But here, we're talking about a trove of

15:05:26  5    information in a database that will be transferred

15:05:30  6    wholesale if the Executive Order is to be taken on its

15:05:33  7    word, which talks about interoperability of systems and

15:05:37  8    data synchronization.

15:05:39  9        So once you transfer that database, and I don't

15:05:43  10   think there's any dispute of this either in this case or

15:05:47  11   any other cases, that can't be fixed.  You can't go back

15:05:51  12   to the status quo ante if you allow any kind of

15:05:55  13   wholesale database transfer of millions of records

15:05:58  14   containing personal information.  It's going to be mixed

15:06:01  15   up with other records, presumably from other agencies,

15:06:04  16   if this order is carried out.  And I think it's

15:06:07  17   impossible to disaggregate that.

15:06:14  18        That's why the preliminary injunction is so

15:06:16  19   important in this case, is to make sure that the

15:06:20  20   integrity of the data stays in place until this Court

15:06:23  21   can determine in a final decision whether in fact what

15:06:27  22   they're doing is lawful and permissible.  And -- because

15:06:34  23   once it's gone, it's a fait accompli.

15:06:38  24        And I think one of the things that perhaps I

15:06:42  25   disagree with some of the other decisions that have come

15:06:45  1   down --

15:06:46  2              THE COURT:  Please.

15:06:47  3              MR. JOSHI:  -- is they accept -- well, there's

15:06:48  4   a factual distinction and a legal error, in my view.

15:06:51  5       The factual distinction is in some of the other

15:06:53  6   cases, I believe there are actual declarations providing

15:06:58  7   the Court some assurance that no data would be shared if

15:07:02  8   it weren't for the Court's order.

15:07:03  9       You don't have that here.  There was no -- there's

15:07:06  10  no promise of not sharing data.

15:07:09  11             THE COURT:  In terms of -- if you can be more

15:07:11  12  specific about your concern of what -- sharing it with

15:07:14  13  whom?  Because I mean, you can do it within Treasury or

15:07:17  14  others.

15:07:17  15      So you're talking about USDS presumably or

15:07:20  16  something else?

15:07:21  17             MR. JOSHI:  Well, the Executive Order mentions

15:07:25  18  USDS, but to be honest, the whole DOGE thing is sort of

15:07:27  19  squirrely, because there's this USDS and there's this

15:07:31  20  USDS Temporary Organization that sits under it.  Then

15:07:35  21  there's the DOGE teams at each agency.  And then we

15:07:39  22  don't know Elon Musk's status.

15:07:42  23      The President said he was running DOGE, but there

15:07:44  24  was a filing in another case that said he was not the

15:07:47  25  USDS administrator.

15:07:50  1          So even though the Executive Order talks about

15:07:53  2     USDS, I think if it leaves the Treasury, if the

15:07:59  3     information we're worried about --

15:07:59  4          THE COURT:  So as long as it -- once it leaves

15:08:01  5     Treasury to --

15:08:02  6          MR. JOSHI:  Yeah.

15:08:03  7          THE COURT:  Okay.

15:08:03  8          MR. JOSHI:  And obviously, the DOGE network is

15:08:06  9     throughout the Federal Government at this point.  So

15:08:08  10    it's unclear what's happening behind their scenes with

15:08:10  11    respect to the computer networks.  But, right, Your

15:08:14  12    Honor, once the information leaves, it's not coming

15:08:17  13    back.  And that's gone forever.

15:08:20  14        And so that -- I think -- the legal error I think

15:08:26  15    from some of the other decisions is they seem to treat

15:08:34  16    intra-agency transfers as not public transfers.

15:08:37  17        And the Privacy Act says something different.  The

15:08:39  18    Internal Revenue Code says something different.

15:08:42  19        When you transfer information from one agency to

15:08:44  20    another, that's the equivalent, legally, of transferring

15:08:48  21    information from the agency to a private party.  They

15:08:53  22    are both, you know, unlawful unless they fall into an

15:08:58  23    exception that's specified in the statute.

15:09:00  24          THE COURT:  But this -- it does say -- in terms

15:09:05  25    of -- the other opinions sort of view it as it's not a

15:09:09  1    problem because it's an intra-agency sort of -- is that

15:09:11  2    your argument?  That an intra-agency transfer -- or

15:09:17  3    you're viewing it as not falling into that bucket, that

15:09:20  4    it's -- because it's a USDS and it's an entity that

15:09:22  5    is -- well, one we don't know totally how it's

15:09:25  6    formulated.  But that that's really the problem?

15:09:28  7        Do I understand your argument or not?

15:09:30  8        MR. JOSHI:  Maybe that's a distinction.  I

15:09:33  9    don't think -- going back to the standing argument, I

15:09:36  10   don't think publication is necessarily required, but to

15:09:41  11   the extent there is publication in violation of the

15:09:43  12   statute, the Court should treat -- respect Congress's

15:09:48  13   judgment that intra-agency transfers are the equivalent

15:09:53  14   of transfers to any other third party.

15:09:56  15       THE COURT:  Okay.  All right.

15:09:57  16   I missed your argument there.  Okay.

15:10:00  17   All right.  Anything else?  Because I think of the

15:10:03  18   arguments that I've gone through, and I haven't made a

15:10:05  19   final decision -- I wanted to hear from all of you -- I

15:10:11  20   think is the weakest link, to be frank with you.

15:10:14  21   So if there's any other argument that you want to

15:10:15  22   make on this, please go ahead.  I mean, I've focused on

15:10:19  23   certain things, but anything else you want to add at

15:10:21  24   this point would be welcome.

15:10:23  25       MR. JOSHI:  I think I'm good right now.  I

15:10:26  1    might add some more on rebuttal.

15:10:28  2                    THE COURT:  Okay.

15:10:28  3                    MR. JOSHI:  Thank you.

15:10:29  4                    THE COURT:  The other thing is the balance of

15:10:31  5    equities in public interest.

15:10:33  6         Can you just give a short summary what you view

15:10:37  7    that as?

15:10:38  8                    MR. JOSHI:  Oh, sure.  Once again, I think it

15:10:39  9    goes back to the immense harm that would happen if this

15:10:43  10   data was compromised versus I think very little effect

15:10:48  11   on the government's ability to do what it wants to do.

15:10:52  12        For example, if the DOGE team at Treasury can

15:10:56  13   undertake the reforms using Treasury career staff, I

15:11:03  14   don't -- I don't think the showing has been made that

15:11:06  15   the individual -- the two or three individuals who end

15:11:10  16   up being on the DOGE team need to look through and

15:11:14  17   process individualized personal information in order to

15:11:19  18   see the structure of the Treasury systems -- if that's

15:11:23  19   what they're interested in -- and how they work, and be

15:11:31  20   able to propose reforms to the way Treasury processes

15:11:35  21   data.

15:11:39  22        There's -- they say they need access to the

15:11:41  23   individual information.  It's not clear why -- there's

15:11:45  24   been no showing as to why that is the case, and what

15:11:49  25   harm would happen if they walled off from the personal

52

15:11:59  1    information while this case is pending -- what harm

15:12:07  2    would happen.

15:12:07  3        So I think the -- if you get to the balance of the

15:12:09  4    equities, it's pretty lopsided in favor of protecting

15:12:13  5    the individual privacy interests.

15:12:17  6        THE COURT:  All right.  Anything else you want

15:12:18  7    to make a particular point of?  Or anything that's new?

15:12:22  8    This is sort of an evolving case in terms of different

15:12:25  9    affidavits and material coming out.

15:12:27  10        And I was unable to get a copy of a transcript from

15:12:35  11    the New York case so I don't know whether something came

15:12:37  12    out of -- anything else other than what Judge Vargas put

15:12:41  13    in her opinion that came out in the, you know, in the

15:12:44  14    hearing.  But if you know of anything else that I should

15:12:49  15    know, please bring it to my attention.

15:12:50  16        MR. JOSHI:  I don't know of anything new.  I do

15:12:52  17    want to emphasize one thing about data security and

15:12:59  18    irreparable harm, which is we know about the breach with

15:13:01  19    respect to Mr. Elez's access.  We know he had wide

15:13:07  20    access, and we also know he sent emails out that they

15:13:12  21    still haven't tracked down.

15:13:14  22        And I would just point out that this was a very

15:13:18  23    minor breach, if the declarations are accurate.  And

15:13:24  24    yet, a week later, ten days later, we still don't know

15:13:26  25    the full scope of, you know, the harm or the level of

15:13:30  1    breach.  And once again --

15:13:33  2            THE COURT:  Excuse me.  When you say the --

15:13:36  3    this is what came out of the preliminary injunction

15:13:38  4    hearing, is that correct?

15:13:39  5            MR. JOSHI:  Yes.

15:13:40  6            THE COURT:  In New York.  I just want to make

15:13:41  7    sure.

15:13:41  8            MR. JOSHI:  Well, they put the information --

15:13:43  9    they have some declarations in here as well --

15:13:44  10           THE COURT:  Right.  Okay.

15:13:45  11           MR. JOSHI:  -- about the breach, but the

15:13:47  12   forensic analysis that they're going -- they're

15:13:50  13   undertaking for that minor breach is still not

15:13:53  14   completed.

15:13:53  15       And so I just think it -- it emphasizes that if

15:13:57  16   there's a wholesale compromise of the information issue,

15:14:04  17   if it gets transferred out, it's not going to be

15:14:06  18   repaired.

15:14:10  19           THE COURT:  Okay.  All right.

15:14:11  20       I don't have anything else.  So let me hear from

15:14:16  21   the defendants.  If they can wait one second and let me

15:14:19  22   get my papers together here.

15:15:39  23           MR. HUMPHREYS:  Thank you, Your Honor.

15:15:40  24           THE COURT:  So I have some questions, and most

15:15:43  25   of them are focused to bring some clarity -- my initial

15:15:48  1    ones at least -- on the organizational structure of DOGE

15:15:51  2    and USDS, et cetera, since there's some -- it's rather

15:15:57  3    opaque, at least from taking a look at it.

15:16:01  4        So let me start with the Executive Trump's --

15:16:06  5    President Trump's Executive Order and go through it.

15:16:08  6        So President Trump's Executive Order regarding the

15:16:12  7    U.S. DOGE Service -- which I'm going to call USDS, it's

15:16:16  8    just easier -- did three things, as I understand it.

15:16:18  9        It renamed the U.S. Digital Service.  It required

15:16:23  10   that the administrator of the U.S. DOGE Service report

15:16:26  11   to the White House Chief of Staff, so it moved it into

15:16:28  12   the Chief Executive Office.  And it created the U.S.

15:16:35  13   DOGE Service Temporary Organization.

15:16:37  14       So let me ask you some questions about those

15:16:39  15   actions.

15:16:40  16       So on January 19th of this year, where was USDS

15:16:46  17   located within the federal bureaucracy?  Was it a

15:16:50  18   component -- and I'll go through my questions, then you

15:16:52  19   can answer.

15:16:53  20       Was it a component of OMB?

15:16:55  21       And at that time the administrator of the USDS was

15:16:59  22   a Schedule C government employee; is that correct?

15:17:02  23       And that administrator reported to or was

15:17:06  24   supervised by the deputy director of management at OMB,

15:17:10  25   if that's correct.

15:17:11   1      And then the deputy Director of OMB is an officer

15:17:15   2   nominated by the President and confirmed by the Senate,

15:17:18   3   if that's correct.

15:17:18   4      And then the deputy director is supervised by the

15:17:21   5   Director of OMB, if that's correct.  And the director is

15:17:24   6   a principal officer nominated by the President and

15:17:28   7   confirmed by the Senate, if that's correct.

15:17:30   8      So let me go through each one of these.

15:17:33   9      This is January 19th of this year.  Where was USDS

15:17:39   10   located within the federal bureaucracy?

15:17:41   11      Was it a component of OMB, as I understand it?

15:17:45   12         MR. HUMPHREYS:  Your Honor --

15:17:46   13         THE COURT:  In its early stages.

15:17:47   14         MR. HUMPHREYS:  I apologize.  I may have to

15:17:49   15   confer with my colleagues.  I don't think that these

15:17:52   16   issues are directly presented in the plaintiffs' motion

15:17:54   17   or, you know, the structure before the Executive Order.

15:17:56   18      So on these specific questions about sort of the

15:17:59   19   USDS --

15:18:00   20         THE COURT:  Well, they do make a difference

15:18:02   21   ultimately, and I can get to that, but it does make a

15:18:06   22   difference in terms of where they are organizationally

15:18:08   23   and who the individuals are involved with as to whether

15:18:12   24   or not they have -- should have access to some of this

15:18:15   25   material, which is certainly at issue here.

15:18:17  1          So I mean, it's a road to get there, and some of

15:18:21  2     this is obviously factual information that I would hope

15:18:26  3     the government would know.  If there's somebody else who

15:18:29  4     has more knowledge about this, I'd appreciate it.

15:18:32  5          MR. HUMPHREYS:  I can check on that, Your

15:18:33  6     Honor.  I will say, I think this case, as plaintiffs

15:18:36  7     have pleaded it, is very simple in that the individuals

15:18:40  8     who have ever had access before this Court's

15:18:44  9     injunction --

15:18:44  10          THE COURT:  You need to move the microphone

15:18:46  11     over a little.

15:18:46  12          MR. HUMPHREYS:  Yes, Your Honor.

15:18:48  13          And that the specific individuals who had access

15:18:49  14     before this Court's injunction have and are and always

15:18:53  15     have been -- except that Mr. Wunderly has replaced

15:18:58  16     Mr. Elez -- but Treasury Department employees.

15:19:00  17          THE COURT:  Okay.  Let me go through this --

15:19:03  18     let me go through it in my way, if you don't mind.

15:19:06  19          MR. HUMPHREYS:  Yes, of course, Your Honor.

15:19:07  20          THE COURT:  Because it's particular time

15:19:09  21     periods and different decisions that were made along the

15:19:12  22     way.  And it does make a difference in terms of the

15:19:14  23     Privacy Act and various other things as to what category

15:19:17  24     they were in and where the organizations were, which is

15:19:21  25     why I'm starting with some sort of basic information

15:19:25  1     that cumulatively will answer some questions that I

15:19:31  2     have.  Okay?

15:19:32  3               MR. HUMPHREYS:  Of course, Your Honor.

15:19:32  4               THE COURT:  So let me get back to, do you know

15:19:35  5     where it was located on January 19th?

15:19:38  6         Was it a component of OMB, which I believe it was,

15:19:41  7     but I want to make sure that I'm correct.

15:19:44  8               MR. HUMPHREYS:  I also believe that's correct,

15:19:46  9     Your Honor.

15:19:46  10              THE COURT:  You do not?

15:19:47  11              MR. HUMPHREYS:  I do believe that's correct.

15:19:49  12              THE COURT:  You do.  Okay.

15:19:50  13        So it was a component of OMB.  And the

15:19:53  14    administrator of USDS at that point was a Schedule C

15:19:58  15    government employee, is that correct, based on the fact

15:20:00  16    that it's in OMB?

15:20:03  17              MR. HUMPHREYS:  I don't know the answer to

15:20:04  18    that, Your Honor.

15:20:05  19              THE COURT:  Okay.  USDS.

15:20:09  20        So do you know any -- in terms of who it is that

15:20:13  21    was in charge of the -- while it was sitting in OMB?

15:20:18  22              MR. HUMPHREYS:  No, Your Honor.

15:20:19  23              THE COURT:  For instance, administrator

15:20:22  24    reported to, supervised by the deputy director, which

15:20:25  25    are -- and some of these people are nominated by the

15:20:27  1    President, confirmed by them.  So the deputy director is

15:20:33  2    supervised by the Director of OMB, and some of these

15:20:37  3    people are -- as I said, are nominated by the President,

15:20:41  4    confirmed by the Senate, which puts them in different

15:20:45  5    categories.

15:20:45  6         So do you know any of that information?

15:20:47  7              MR. HUMPHREYS:  That information is knowable.

15:20:49  8    I'm sure the government does know it.  I just don't have

15:20:52  9    it at my fingertips.

15:20:54  10             THE COURT:  Okay.  Anybody at the table know?

15:20:57  11        Really, what I'm getting at is I understand it was

15:21:00  12   a component of OMB at that point.  And then I take it

15:21:02  13   nobody knows what the structure was as to who -- since

15:21:05  14   at this point there doesn't appear to be an

15:21:09  15   administrator, but I'll get to that.

15:21:11  16        So when it was with OMB, I take it it did have an

15:21:14  17   administrator who was a Schedule C government employee,

15:21:18  18   so you would be a government employee at that -- you

15:21:20  19   don't know that?

15:21:22  20             MR. HUMPHREYS:  I don't have that information.

15:21:23  21   I don't know at this time, you know, just here at the

15:21:26  22   lectern, Your Honor, about the structure before the

15:21:28  23   President's EO, but certainly we can get you that

15:21:35  24   information to confirm.

15:21:36  25             THE COURT:  Okay.  Anybody else know at the

15:21:38  1    table?

15:21:44  2         And this would have been before it was relocated to

15:21:46  3    the Executive Office of the President.

15:21:49  4              MR. HUMPHREYS:  We do not have that

15:21:52  5    information, Your Honor.  It did have --

15:21:52  6              THE COURT:  Okay.  Let me move on, then.

15:21:55  7              MR. HUMPHREYS:  Sorry.

15:21:56  8              THE COURT:  That's okay.  I realize that you

15:21:58  9    may not have come prepared for this, but I hoped you'd

15:22:02  10   know.

15:22:02  11        So now USDS has been renamed and it has been

15:22:06  12   relocated out of OMB to the Executive Office of the

15:22:09  13   President.  And an administrator of USDS reports to the

15:22:14  14   White House Chief of Staff.

15:22:14  15        Is that correct, at this point?

15:22:19  16             MR. HUMPHREYS:  That is the terms of the

15:22:21  17   Executive Order, that the administrator will report to

15:22:23  18   the Chief of Staff.

15:22:23  19             THE COURT:  Okay.  Is the position of

15:22:25  20   administrator of USDS still a Schedule C employee

15:22:29  21   position?

15:22:29  22             MR. HUMPHREYS:  I don't know.  If it's --

15:22:31  23   technically goes within Schedule C, Your Honor.

15:22:34  24             THE COURT:  Okay.  So what is the U.S. DOGE

15:22:37  25   Service Temporary Organization?

15:22:39  1          How is it different from USDS, and why are there

15:22:42  2     two versions of it?

15:22:46  3          Does that still exist or was that simply stored?

15:22:49  4          What's the --

15:22:50  5          MR. HUMPHREYS:  As the Executive Order

15:22:51  6     explains, it was renamed from U.S. Digital Service to

15:22:54  7     U.S. DOGE Service.

15:22:57  8          The second part of the question --

15:22:58  9          THE COURT:  What happened with the DOGE Service

15:23:00  10    Temporary Organization?

15:23:03  11         MR. HUMPHREYS:  I think for our purposes and

15:23:06  12    effectively the relationship between USDS and agencies,

15:23:08  13    that USDS and the USDS Temporary Organization are one in

15:23:14  14    the same.

15:23:15  15         THE COURT:  Okay.  So it's just two different

15:23:17  16    names for the same organization?  Or is one under the

15:23:20  17    other or what?

15:23:22  18         MR. HUMPHREYS:  One within the other.  I

15:23:24  19    believe there may be some internal reasons why there's a

15:23:28  20    separate organization.  But as for the interface with

15:23:30  21    Treasury, for example, as relevant here, there's not a

15:23:32  22    distinction.

15:23:34  23         THE COURT:  Okay.  Well, we move on, then.

15:23:42  24         Now, in the complaint, in the motion and

15:23:45  25    affidavits, it's obvious that the plaintiffs and their

15:23:49  1    members seem particularly concerned with the disclosures

15:23:52  2    that have been made to Elon Musk.

15:23:55  3        So on February 17th, the Department of Justice

15:23:58  4    represented to Judge Chutkan in 25-CV-429 that Mr. Musk,

15:24:05  5    quote, "is not an employee of USDS or the USDS Temporary

15:24:10  6    Organization," unquote.  And that Mr. Musk is not the

15:24:14  7    USDS administrator.

15:24:15  8        Is that all correct?

15:24:17  9            MR. HUMPHREYS:  That is correct, Your Honor.

15:24:18  10           THE COURT:   Okay.  Let me go through -- cite to

15:24:27  11   some other representations that had been made in terms

15:24:29  12   of balancing this out and considering what was said to

15:24:33  13   Judge Chutkan and what else has come out.

15:24:35  14       So this was -- she made those statements on

15:24:39  15   February -- the Department of Justice made those

15:24:41  16   statements on February 17th.

15:24:42  17       So the White House Press Secretary at -- on

15:24:47  18   February 3rd, said, quote, "President Trump tasked

15:24:50  19   Mr. Musk with starting up DOGE, and he has already done

15:24:54  20   that," unquote.

15:24:55  21       Mr. Musk issued a statement on February 8th:

15:25:00  22   Quote, "To be clear, what the DOGE team and Treasury

15:25:03  23   have jointly agreed makes sense is the following."

15:25:07  24       And then he lists a series of policy changes the

15:25:11  25   Treasury DOGE team is purportedly implementing.

15:25:14  1    Now, in his February 12th declaration, Mr. Krause

15:25:18  2 said that, quote, "In January, USDS recommended to me

15:25:22  3 that Mr. -- is it Elez?

15:25:28  4    MR. HUMPHREYS:  Elez, I believe, Your Honor.

15:25:29  5    THE COURT:  Elez be selected for a role at

15:25:32  6 Treasury because of experience as, quote, "a highly

15:25:36  7 qualified software engineer who previously worked at

15:25:40  8 several of Elon Musk' companies, including SpaceX and

15:25:44  9 X."

15:25:44  10   The President in a February 19th speech -- so this

15:25:48  11 is two days after Judge Chutkan -- at the Future

15:25:52  12 Investment Initiative Forum said, quote, "I signed an

15:25:55  13 order creating the Department of Government Efficiency

15:25:58  14 and put a man named Elon Musk in charge," unquote.

15:26:03  15   Two days ago, the acting U.S. Attorney for the

15:26:06  16 District of Columbia issued a statement about -- that's

15:26:10  17 about that OPM email -- to federal employees that they

15:26:14  18 received, and it says, "DOGE and Elon are doing great

15:26:19  19 work," unquote.

15:26:20  20   So if I have to decide at some point whether

15:26:23  21 Mr. Musk has a role at USDS, what representation do I

15:26:30  22 rely on?  He's not the administrator.  He obviously has

15:26:36  23 a role in all of this in terms of it, so what is his

15:26:41  24 position?  I mean, the different positions would suggest

15:26:43  25 that he has a greater role, although none of them --

15:26:46   1     some of them are not exact, but certainly they associate

15:26:49   2     USDS with Mr. Musk, but he's not the administrator.  And

15:26:56   3     he's not, as I understand it, an employee of USDS, but

15:27:01   4     he does seem to be speaking on behalf of USDS -- or

15:27:04   5     everybody seems to say so.

15:27:05   6          So my point is, if I have to decide -- if it's

15:27:10   7     important to decide what his role is, what

15:27:14   8     representation do I rely on?  These are all different.

15:27:19   9     Some before what was said to Judge Chutkan, and some

15:27:23  10     afterwards.  But they all seem to indicate a greater

15:27:26  11     role than not being the administrator of USDS or an

15:27:34  12     employee of USDS.

15:27:35  13          So can you tell me what his role is, and what I can

15:27:39  14     rely on?

15:27:40  15              MR. HUMPHREYS:  And Your Honor, with just a

15:27:42  16     caveat --

15:27:43  17              THE COURT:  I don't mean to put you -- you

15:27:44  18     know, pin you to the wall.  And I realize that you can

15:27:47  19     only say what you've been told.  So understanding that,

15:27:50  20     you're the messenger.

15:27:51  21              MR. HUMPHREYS:  And with the caveat, Your

15:27:53  22     Honor, that I don't believe that issue is presently

15:27:56  23     presented in plaintiffs' briefs or pleadings.  But with

15:27:59  24     that caveat, I mean, my understanding is Mr. Musk is a

15:28:03  25     close adviser to the President.

15:28:05   1          However, for our purposes, the authority flows from

15:28:08   2   the President to USDS and then -- or excuse me -- well,

15:28:13   3   for our purposes the authority flows from the President

15:28:16   4   to the Secretary of the Treasury, who then oversees

15:28:19   5   through the Chief of Staff, Mr. Krause, who then would

15:28:24   6   manage --

15:28:24   7          THE COURT:  Right.  Okay.  But where is

15:28:26   8   Mr. Musk in all of this?  Since he seems to be giving,

15:28:30   9   you know -- being involved in the operation of USDS or

15:28:34  10   the ideas or what they're implementing.  So what is his

15:28:39  11   role?

15:28:39  12      Is he in the -- is he sort of a separate adviser?

15:28:42  13      Is he in the Chief Executive Office of the

15:28:45  14   President?  I mean, what is he?

15:28:48  15          MR. HUMPHREYS:  I don't have any further

15:28:49  16   information beyond a close adviser to the President,

15:28:51  17   which then, under the President's authority, goes to the

15:28:53  18   Secretary of Treasury and then down to the Treasury, the

15:28:58  19   DOGE team.

15:28:59  20          THE COURT:  But that -- I understand that.

15:28:59  21   That goes from the President to the Secretary of the

15:29:04  22   Treasury.  And then we can get into what else is doing

15:29:08  23   there.

15:29:08  24      But Mr. Musk at this point, you don't know what

15:29:11  25   role -- you can't tell me what role he has.

15:29:15  1          MR. HUMPHREYS:  My understanding is what I just

15:29:17  2    said.  As an adviser to the President, Your Honor.

15:29:18  3          THE COURT:  Okay.  And so as an adviser would

15:29:21  4    he be in some category that -- in terms of some, you

15:29:30  5    know, employment category as an adviser?

15:29:32  6          MR. HUMPHREYS:  I -- I'm not aware, Your Honor.

15:29:34  7          THE COURT:  Okay.

15:29:38  8     All right.  So is there an administrator of USDS at

15:29:44  9    the present time?

15:29:44  10          MR. HUMPHREYS:  I don't know the answer to that

15:29:46  11    either, Your Honor.

15:29:56  12          THE COURT:  So let me -- we're at a point where

15:29:58  13    we don't know whether there is an administrator.

15:30:01  14     Is that what you're saying to me?

15:30:03  15          MR. HUMPHREYS:  I'm saying I don't know, Your

15:30:05  16    Honor.

15:30:05  17          THE COURT:  Okay.  Everybody speak up over

15:30:07  18    there, if you know anything else at the table.

15:30:15  19     So if you don't know -- I mean, I have to say the

15:30:18  20    government represented to Judge Alston in the Eastern

15:30:21  21    District of Virginia that there is, quote, "Acting USDS

15:30:25  22    administrator" -- and this was at Page 2 of his

15:30:27  23    opposition to the motion for TRO.  And obviously the

15:30:32  24    Executive Order creating USDS says, "There shall be a

15:30:36  25    USDS administrator, and that the USDS Temporary

15:30:39  1    Organization shall be headed by the USDS

15:30:44  2    administrator."

15:30:44  3         So isn't there some problem if there's no

15:30:50  4    administrator as to how USDS functions, who supervises

15:30:55  5    them, how they come up with ideas?  I mean, if you've

15:30:58  6    got employees working with USDS that are working with

15:31:00  7    Treasury, who's telling them what to do if there's no

15:31:03  8    administrator?

15:31:05  9              MR. HUMPHREYS:  I can't opine on that.  I would

15:31:06  10   have to evaluate it in terms of the specific legal

15:31:10  11   claim.  I don't think plaintiffs have challenged --

15:31:12  12             THE COURT:  Well, it does make a difference

15:31:14  13   ultimately.  I'm getting there, but I need to know some

15:31:17  14   facts before I get there in terms of -- but, you know,

15:31:20  15   obviously, if USDS employees are involved in this

15:31:25  16   engagement plan or whatever, I would think that somebody

15:31:30  17   would be telling them what to do, supervising their work

15:31:32  18   or doing something.

15:31:34  19        And as I understand it, you don't know how that's

15:31:36  20   operating?

15:31:38  21             MR. HUMPHREYS:  Again, as I mentioned, Your

15:31:39  22   Honor, Mr. Krause reports to the Treasury -- reports to

15:31:44  23   the Treasury Chief of Staff, who reports to the Treasury

15:31:46  24   Secretary.  And USDS is not part of that chain of

15:31:49  25   command.

67

```
15:31:49   1                THE COURT:  Okay.  So it's not -- but that's
15:32:01   2        the whole point.  Mr. Krause doesn't seem to me -- he's
15:32:04   3        part of the USDS team or the DOGE team, but is he -- who
15:32:08   4        is telling him what the priorities or anything else is?
15:32:13   5                MR. HUMPHREYS:  Well, the Executive Order sets
15:32:14   6        out, you know, high-level priority for modernization.
15:32:20   7                THE COURT:  So he -- whatever the Executive
15:32:21   8        Order is, which is fairly broad, that -- he's to decide
15:32:24   9        how that is to be implemented?
15:32:26  10            I mean, is that the answer?
15:32:28  11                MR. HUMPHREYS:  I --
15:32:29  12                THE COURT:  As you know?
15:32:30  13                MR. HUMPHREYS:  As otherwise directed by the
15:32:32  14        Chief of Staff of Treasury and the Treasury
15:32:34  15        Department -- Treasury Secretary.
15:32:37  16                THE COURT:  But they're not -- they're not part
15:32:40  17        of USDS or the DOGE team, so are they -- what's the
15:32:45  18        relationship, then, between the Secretary and Mr. Krause
15:32:49  19        in terms of their relationship on this issue of, you
15:32:54  20        know, the implementation of the DOGE priorities?
15:32:58  21                MR. HUMPHREYS:  Again, as a formal matter, I
15:32:59  22        don't think there is a relationship, Your Honor.  The
15:33:02  23        relationship is through the Executive Order, and I can't
15:33:05  24        say that discussions, you know, don't happen between
15:33:09  25        USDS and Mr. Krause.  I believe they do.  But in terms
```

15:33:11   1    of authority and who has the decision-making -- again,

15:33:14   2    it's the chain of command that I discussed.

15:33:16   3         THE COURT:  Well, the Executive Order states

15:33:20   4    that agency heads, and that would be Secretary

15:33:22   5    Bessent -- I'm not sure I'm pronouncing that

15:33:24   6    correctly -- shall select the DOGE team members in

15:33:27   7    consultation with the USDS administrator.

15:33:30   8         So there's no administrator to consult with.  Who

15:33:37   9    did he consult with when he hired Mr. Krause?  This is

15:33:40   10   the Executive Order that says this.

15:33:44   11        And the Executive Order states, "the USDS

15:33:47   12   administrator shall commence a software modernization

15:33:51   13   initiative."

15:33:54   14        Has the initiative been commenced?  By whom?

15:33:58   15        If there's no administrator, who did it?

15:34:00   16        MR. HUMPHREYS:  Well, yes, Your Honor.  I mean,

15:34:01   17   as we described, the team is going about modernizing and

15:34:04   18   improving the legacy systems at BFS consistent with the

15:34:09   19   direction --

15:34:09   20        THE COURT:  Okay.  What team?

15:34:12   21        MR. HUMPHREYS:  When I say the Treasury DOGE

15:34:14   22   team, I'm referring to Mr. Krause, previously Mr. Elez,

15:34:18   23   but now Mr. Wunderly.  But of course, they have not been

15:34:21   24   conducting work beyond --

15:34:22   25        THE COURT:  Okay.  And who is, who is -- I

69

15:34:24  1    mean, Mr. Krause, it looks like, hasn't been -- there's

15:34:27  2    no administrator telling him anything.  So it's -- I'm

15:34:35  3    still having trouble grasping how they're going out as

15:34:38  4    the team if nobody is telling them what to do, other

15:34:41  5    than the Executive Order, if that's -- as you

15:34:44  6    understand, and I realize that you -- it doesn't sound

15:34:47  7    like you were prepared for these questions, which is

15:34:52  8    unfortunate, but I will get to the point in a moment is

15:34:55  9    why I'm asking these.  But as I understand it, there's

15:35:00  10   no administrator.

15:35:02  11       So what the Executive Order says the administrator

15:35:05  12   is suppose to be doing at USDS is not happening.  And at

15:35:08  13   this point, we don't know who is actually doing these

15:35:10  14   things that the administrator was supposed to do.

15:35:14  15       Would that be fair?

15:35:15  16           MR. HUMPHREYS:  I don't think that's fair, Your

15:35:17  17   Honor.

15:35:17  18       Again, the mission of the Executive Order was to

15:35:19  19   modernize the technology --

15:35:21  20           THE COURT:  Right.

15:35:21  21           MR. HUMPHREYS:  -- of the agency.

15:35:22  22           THE COURT:  But who decides what's

15:35:24  23   modernization or what to do with the modernization?

15:35:26  24           MR. HUMPHREYS:  Well, as we described in the

15:35:27  25   declaration, Mr. Krause was selected because he has a

15:35:31  1    wealth of experience --

15:35:33  2              THE COURT:  Selected by whom?

15:35:34  3              MR. HUMPHREYS:  Well, was appointed by the

15:35:36  4    Treasury Department in conjunction with USDS officials

15:35:38  5    there.

15:35:39  6              THE COURT:  Right.  And who at USDS, since

15:35:41  7    there's no administrator?

15:35:43  8              MR. HUMPHREYS:  I -- I don't know specifically

15:35:45  9    the person who consulted with Mr. -- with the Secretary

15:35:51  10   to appoint him.

15:35:52  11             THE COURT:  Let me get to my reason for asking

15:35:55  12   these, which I think you indicated you thought they were

15:35:59  13   sort of outside of what -- the complaint.  But I'll tell

15:36:01  14   you why I think it's important.

15:36:04  15        Based on the limited record I have before me, I

15:36:06  16   have some concerns about the constitutionality, frankly,

15:36:09  17   of USDS's structure and operations.

15:36:14  18        USDS seems to be taking actions, like entering into

15:36:16  19   the payment process engagement plan.  That plan appears

15:36:20  20   to bind a federal agency, the Treasury Department.

15:36:23  21        The Appointments Clause of the Constitution

15:36:26  22   requires that principal officers be nominated by the

15:36:30  23   President and confirmed by the Senate.  Employees and

15:36:33  24   inferior officers need to be supervised by principal

15:36:37  25   officers to comply with the Appointments Clause.

15:36:39   1          So I want to ask a few questions -- and I have

15:36:42   2     been -- about the status of the people acting in

15:36:46   3     official capacities at USDS.  It appears to me that the

15:36:50   4     people within USDS could be exercising authority as

15:36:54   5     officers of the United States, including by supervising

15:36:57   6     and directing Treasury employees, like Mr. Krause,

15:37:01   7     without complying with the Appointments Clause, so --

15:37:07   8     which I think is something that the Court can certainly

15:37:09   9     note may be a problem.  It may not.  But at least on

15:37:14  10     this record, we certainly don't have enough information

15:37:16  11     in terms of who is supervising and whether they're in a

15:37:19  12     position to make the --you know, make these

15:37:22  13     arrangements, et cetera.

15:37:25  14          At Paragraph 4 of the February 12th declaration,

15:37:29  15     Mr. Krause said that, quote, "He coordinates with

15:37:32  16     officials at USDS DOGE, provides them with regular

15:37:40  17     updates about the team's progress, and receives

15:37:44  18     high-level policy direction from those officials."

15:37:45  19          Now, officials are not just employees.  So

15:37:49  20     officials are people that -- principal officers,

15:37:57  21     officials.  They're in a different category than regular

15:38:00  22     employees.

15:38:01  23          So my question is:  Who are the officials who give

15:38:04  24     Mr. Krause direction?  Are any of them -- well, they're

15:38:09  25     not going to be the USDS administrator.

15:38:14  1          What are their titles?  Do they work only for USDS?

15:38:17  2          In *Lucia*, the Supreme Court held that "government

15:38:21  3  officials," which we're talking about, are officers,

15:38:23  4  rather than employees, subject to the Appointments

15:38:27  5  Clause when they exercise "significant authority" and

15:38:30  6  "significant discretion."  When USDS officials provide

15:38:34  7  "high-level policy direction" to a high-ranking employee

15:38:38  8  at Treasury, are they exercising significant authority

15:38:42  9  and discretion?

15:38:45  10         If yes, does that make them officers under the

15:38:51  11  Appointments Clause as interpreted by the Supreme Court?

15:38:52  12         Were they nominated by the President and confirmed

15:38:55  13  by the Senate?

15:38:56  14         Does the statute provide for their appointment by

15:38:58  15  some other means?

15:38:59  16         So that's why I'm asking these questions.  And

15:39:02  17  based on the fact that there's a lack of information

15:39:04  18  about all this, how this is all connected and

15:39:10  19  structured.

15:39:10  20         Do you understand my concern?

15:39:13  21            MR. HUMPHREYS:  I believe I understand your

15:39:14  22  concern, Your Honor, although not how it relates to the

15:39:17  23  Appointments Clause.

15:39:17  24            THE COURT:  Well, it does if USDS is not acting

15:39:19  25  constitutionally.

15:39:20  1          Wouldn't that be irreparable harm?

15:39:23  2               MR. HUMPHREYS:  No, Your Honor, for many

15:39:24  3    reasons we can discuss.  These particular plaintiffs

15:39:27  4    don't have standing.

15:39:28  5               THE COURT:  Well, if you are asking, wouldn't

15:39:30  6    it be ultra vires -- potentially ultra vires in terms of

15:39:37  7    the -- if they're taking direction or doing things where

15:39:40  8    they do not have this authority under the Appointments

15:39:43  9    Clause or something else?

15:39:46  10              MR. HUMPHREYS:  I'm just not prepared to opine

15:39:49  11   on issues the plaintiffs have not briefed and are not in

15:39:52  12   their complaint, Your Honor.  I mean, there is --

15:39:53  13              THE COURT:  Okay.  But I'm raising an issue for

15:39:55  14   you, and part of it is some knowledge, hopefully, that

15:39:58  15   you all will learn as to how these -- who's involved,

15:40:02  16   who's in charge, who's giving them direction, which I

15:40:09  17   think is key to making some decisions here about what

15:40:15  18   exactly their authority is to make these decisions,

15:40:18  19   engage in the plan, and do other things.

15:40:20  20        So at this point it would appear that you're not in

15:40:22  21   a position to answer them.

15:40:23  22        Would that be accurate?

15:40:24  23              MR. HUMPHREYS:  I'm not, Your Honor.  I know we

15:40:26  24   do have Appointments Clause litigation.  I'm happy to

15:40:29  25   consult, and we can update the Court.

15:40:36  1              THE COURT:  Okay.  So let me move on to some

15:40:39  2    other areas.

15:40:40  3         But I'll finish this whole thing so that you have

15:40:42  4    some idea of what I'm getting that.  I may need to have

15:40:48  5    additional information provided.

15:40:49  6         For instance, in *Free Enterprise Fund*, a Supreme

15:40:53  7    Court case in *Edmond* -- they're back -- one is 2010.

15:40:56  8    The other is 1997 -- the Supreme Court held that

15:40:59  9    inferior officers are officers whose work is supervised

15:41:03  10   by other officers nominated by the President, confirmed

15:41:06  11   by the Senate.

15:41:07  12        So, again, are the USDS officials, which have not

15:41:12  13   been identified, the ones who give direction to

15:41:16  14   Mr. Krause, supervised by an officer nominated by the

15:41:19  15   President and confirmed by the Senate?

15:41:22  16        I would point out that the White House Chief of

15:41:23  17   Staff is not such an officer.

15:41:30  18        So what I'm getting at, does it mean that USDS

15:41:32  19   officials that Mr. Krause identified -- well, he didn't

15:41:35  20   identify principal officers within the meaning of the

15:41:40  21   Appointments Clause interpreted by the Supreme Court --

15:41:43  22   who are they?  Do they give direction to Mr. Krause?

15:41:46  23   Were they nominated by the President and confirmed by

15:41:49  24   the Senate?

15:41:51  25        It does seem to me that if you have people that are

15:41:58  1   not authorized to carry out some of these functions that

15:42:00  2   they're carrying out, that that does raise an issue.

15:42:06  3        I would hope that by now we would know the

15:42:10  4   structure.  Who's the administrator?  Who's acting as

15:42:15  5   the administrator?  Who is providing some of this

15:42:17  6   information?  What authority do they have within

15:42:19  7   Treasury or within, frankly, USDS?

15:42:27  8        MR. HUMPHREYS:  Yes, Your Honor, we can report

15:42:28  9   back on that, except just to point out one more time,

15:42:32  10  that Mr. Krause is overseen by a Senate-confirmed

15:42:38  11  official, who is Secretary Bessent.  But we understand

15:42:39  12  the Court has additional questions, and we can report

15:42:43  13  back.

15:42:43  14        THE COURT:  Okay.  Let me move on to some other

15:42:45  15  issues.

15:42:46  16       In terms of standing, as to associational standing,

15:42:51  17  which is what they have focused on, your briefing

15:42:55  18  focuses exclusively on their point that plaintiffs'

15:43:02  19  members would have standing to sue on their own.

15:43:03  20       Are you disputing whether the interests plaintiffs

15:43:06  21  seek to protect are germane to their organizational

15:43:09  22  interest or are you disputing whether the individual

15:43:11  23  members have to participate in this suit?

15:43:14  24       It wasn't clear to me.

15:43:15  25        MR. HUMPHREYS:  On the second point, we would

15:43:16    1    not dispute that the interests are germane to the

15:43:20    2    organization.

15:43:21    3              THE COURT:  Okay.

15:43:21    4              MR. HUMPHREYS:  However, we do think, for

15:43:23    5    reasons that are also tied up with adequate alternative

15:43:26    6    remedies, the 702 issue, that this case really should be

15:43:29    7    brought as either an individual Privacy Act claim or

15:43:34    8    individual Internal Revenue Code claim if it ever came

15:43:37    9    to pass that there was actual harm for the purposes of

15:43:41    10    standing to bring this claim in the first place.  But we

15:43:45    11    don't think that that has occurred.

15:43:47    12         Certainly, plaintiffs have not provided any reason

15:43:50    13    whatsoever that -- to think that there -- specific

15:43:55    14    members' data has ever been viewed much less disclosed

15:43:58    15    to a third party.

15:43:59    16              THE COURT:  So you're disputing whether the

15:44:01    17    individual members have to participate in this suit, as

15:44:03    18    opposed to the association.

15:44:05    19              MR. HUMPHREYS:  Well, I do think -- so, Your

15:44:09    20    Honor, because in order -- you know, it goes sort of to

15:44:12    21    the -- whether there's a final agency action.

15:44:15    22         Plaintiffs contend -- although we would dispute --

15:44:20    23    that there was a change in policy that allowed access

15:44:26    24    for these individuals to occur.

15:44:27    25         As Mr. Gioeli explains in his declaration, there is

15:44:30  1    no such change in policy.  These are Treasury employees

15:44:32  2    and properly have authorized access.

15:44:34  3        So if there's any actual claim --

15:44:36  4            THE COURT:  Who are the Treasury employees that

15:44:39  5    you're talking about?

15:44:41  6            MR. HUMPHREYS:  Mr. Krause and now

15:44:44  7    Mr. Wunderly, Your Honor.

15:44:45  8            THE COURT:  Okay.

15:44:46  9            MR. HUMPHREYS:  And so if that is the change in

15:44:47  10   policy that they're challenging, that does not go to

15:44:50  11   show, nor would a record reveal, whether or not

15:44:53  12   individuals in any specific instance were harmed such

15:44:57  13   that they could maintain suit.  And I think that goes to

15:45:00  14   show, Your Honor, why this case is not an appropriate

15:45:02  15   vehicle for the Administrative Procedure Act.

15:45:05  16       If and when plaintiffs' members' actual data is

15:45:08  17   ever released and they suffer, you know, actual harm --

15:45:12  18   injury-in-fact for the purposes of Article III, there's

15:45:15  19   a remedy under the Privacy Act or under the Internal

15:45:18  20   Revenue Code for damages.

15:45:21  21            THE COURT:  So is that sort of your argument as

15:45:23  22   well about the injury-in-fact requirement?

15:45:29  23       Is that what you're getting at?

15:45:31  24            MR. HUMPHREYS:  Yeah, I think that they're

15:45:32  25   similar, but it goes to show why, again, this is not a

15:45:36  1     proper vehicle for an Administrative Procedure Act.

15:45:38  2         But I do think you're right, Your Honor.  The focus

15:45:39  3     of our briefing was on injury-in-fact, and that is a

15:45:42  4     very clear reason why plaintiffs don't have standing

15:45:45  5     here.

15:45:45  6         THE COURT:  So let me just clarify a couple of

15:45:46  7     other -- in terms of the elements, do you dispute that

15:45:47  8     the members' injury is fairly traceable to defendants'

15:45:50  9     alleged conduct?

15:45:54  10        MR. HUMPHREYS:  Well, given that there's no

15:45:55  11    injury, yes, absolutely, Your Honor.

15:45:57  12        THE COURT:  Okay.  And do you dispute that

15:46:00  13    their injury would be redressed by the requested

15:46:04  14    injunctive relief?

15:46:05  15        MR. HUMPHREYS:  Yes, Your Honor, given that

15:46:06  16    there's no injury.

15:46:10  17        THE COURT:  Okay.  In your opposition you argue

15:46:12  18    that, quote, "an exchange of protected records internal

15:46:14  19    to the federal government is insufficient to establish

15:46:18  20    standing and the plaintiffs' need to show a public

15:46:20  21    disclosure."  So let me just ask a couple questions.  I

15:46:24  22    know that that's your position.

15:46:27  23        So just as an example, Congress is part of the

15:46:31  24    federal government.  Would disclosing an individual's

15:46:35  25    tax returns to a Congressional committee cause an injury

15:46:38  1    sufficient to create standing, as an example?

15:46:44  2         MR. HUMPHREYS:  In the hypothetical, Your

15:46:45  3    Honor, it may be that there's a routine use that permits

15:46:48  4    the disclosure under the relevant SORN, and so there may

15:46:54  5    not even be a bare statutory violation in that instance.

15:46:58  6         So therefore not --

15:46:58  7         THE COURT:  So if there was a routine use that

15:47:03  8    could be given, so -- a record could be given to

15:47:06  9    Congress, a congressional committee?

15:47:09  10        Is that what you're saying?

15:47:10  11        MR. HUMPHREYS:  My understanding, Your Honor,

15:47:11  12   is, yes, that there are routine uses that allow for the

15:47:15  13   disclosure of information to Congress.

15:47:17  14        THE COURT:  That allow disclosures to Congress?

          15        MR. HUMPHREYS:  Or in some instances.

15:47:19  16        THE COURT:  Or just in general allow

15:47:21  17   disclosures in certain circumstances?

15:47:23  18        MR. HUMPHREYS:  Well, one would have to look at

15:47:24  19   the specifics of the Systems of Record Notice, but many

15:47:26  20   of them do, based on my understanding, allow disclosures

15:47:30  21   to Congress by agencies in certain circumstances.

15:47:34  22        So that may not violate the Privacy Act at all,

15:47:38  23   much less -- there are two separate issues, but there

15:47:42  24   may also be no -- probably likely -- well, it would

15:47:45  25   depend, but there wouldn't -- may not be injury-in-fact.

15:47:47  1          THE COURT:  Okay.  Let me try a different

15:47:49  2    hypothetical.

15:47:52  3          The White House political director is a member, of

15:47:54  4    course, of the Executive Office of the President in the

15:47:58  5    executive branch.  If the Secretary of the Treasury sent

15:48:03  6    that person the tax returns of a first term President's

15:48:06  7    opponent in a primary, would that cause an injury

15:48:09  8    sufficient to create standing?  Just as a hypothetical.

15:48:13  9          MR. HUMPHREYS:  Yes, Your Honor.  Assuming

15:48:14  10   there were no routine use that allowed for such, I think

15:48:19  11   that is probable, although I don't know if a routine use

15:48:22  12   would apply but, again, one would have to look at the

15:48:29  13   SORN, the Systems of Record Notice.

15:48:32  14          THE COURT:  All right.  Mr. Krause is the CEO

15:48:34  15   of a software company as well as the employee of the

15:48:38  16   executive branch.  If he accessed the sensitive

15:48:42  17   financial disclosures of a competing firm, would that

15:48:45  18   firm have standing?

15:48:47  19          These are all standing questions.

15:48:50  20          MR. HUMPHREYS:  In his role as a Treasury

15:48:54  21   Department employee --

15:48:54  22          THE COURT:  Yeah, he's an employee of Treasury.

15:48:56  23   He's also the CEO of this company, software company.

15:49:01  24          So if he accessed the sensitive financial

15:49:04  25   disclosure information -- he's a competing firm, okay,

15:49:08  1    so we're talking about access -- would that -- would the

15:49:11  2    firm have standing?

15:49:13  3                 MR. HUMPHREYS:  I think that --

15:49:15  4                 THE COURT:  The competing firm.

15:49:16  5                 MR. HUMPHREYS:  That would be up to the "need

15:49:18  6    to know" issue, I believe, Your Honor.  I mean, if he

15:49:20  7    accessed that information properly as part of his

15:49:25  8    duties, no, I don't think there would even be a bare

15:49:28  9    statutory violation.  And of course, in TransUnion, the

15:49:31  10   Court says that for standing there has to be something

15:49:33  11   even more than a bare statutory violation, some concrete

15:49:37  12   harm.

15:49:38  13       So if he exercised, you know -- if he were to view

15:49:42  14   information on a competitor, it would depend for what

15:49:46  15   purpose I think he accessed it.  But it may qualify into

15:49:50  16   the intra-agency exception within the Privacy Act but,

15:49:57  17   again, the plaintiff in that case, the litigant, would

15:49:59  18   have to show some concrete injury in order to have a

15:50:04  19   viable claim.

15:50:05  20       As they said in TransUnion:  No concrete injury, no

15:50:09  21   standing.  So --

15:50:17  22                 THE COURT:  So if -- would you agree that there

15:50:18  23   can be a case where there's an injury sufficient to

15:50:22  24   create standing in an information access case, like the

15:50:27  25   one -- the examples that I've been giving you, without a

15:50:31  1     public disclosure?

15:50:32  2           MR. HUMPHREYS:  No, Your Honor, I wouldn't

15:50:33  3     agree with that.  I think under that hypothetical, you

15:50:35  4     know, the information --

15:50:36  5           THE COURT:  Under a couple of hypotheticals

15:50:40  6     I've given you.

15:50:41  7           MR. HUMPHREYS:  Yes, Your Honor.  The one I'm

15:50:42  8     speaking of --

15:50:42  9           THE COURT:  I would point out that I think, you

15:50:43  10    know, at least one hypothetical, although it's not

15:50:46  11    perfect, would certainly be the *Mazars,* M-A-Z-A-R-S,

15:50:56  12    President Trump case relating to the committee.  But at

15:50:58  13    any rate, it's your view -- well, let me not say what

15:51:03  14    your view is.  You tell me as to whether there would be

15:51:05  15    an issue in terms of whether you could in a particular

15:51:08  16    case have standing, where it's an information access

15:51:14  17    case such as the one I just gave you, without public

15:51:18  18    disclosure.

15:51:19  19          MR. HUMPHREYS:  No, Your Honor.  I think public

15:51:20  20    disclosure is required for standing.  And I think in

15:51:22  21    that instance, the hypothetical where Mr. Krause saw the

15:51:26  22    information, I think the outside disclosure there would

15:51:28  23    be to, you know, his company --

15:51:31  24          THE COURT:  But isn't the disclosure -- you're

15:51:34  25    basically having, you know, somebody who is competing

15:51:36  1      with the information that he has.  Wouldn't the fact

15:51:41  2      that he just got the information give him an advantage?

15:51:45  3      He wouldn't have a -- you know, he would not be privy to

15:51:48  4      this information under other circumstances.

15:51:51  5          This is in my hypothetical.  I'm not saying

15:51:53  6      Mr. Krause would do this.  But in my hypothetical, in

15:51:56  7      terms of just the fact that he would have access to the

15:51:59  8      information that is a competing -- you know, competing

15:52:02  9      firm in terms of, you know, just getting the

15:52:09  10     information.

15:52:09  11          MR. HUMPHREYS:  No, Your Honor.  I think that

15:52:10  12     is still a public disclosure with respect to

15:52:13  13     Mr. Krause's company.  I mean, I think there has to be

15:52:17  14     something more than Mr. Krause knowing it in his mind.

15:52:19  15     He has to use it for some other reason to create, again,

15:52:23  16     hypothetically, a competitive advantage.

15:52:28  17          In all the cases plaintiffs cite, I believe, there

15:52:32  18     is some publication that requires -- in the data access

15:52:37  19     case that was essentially -- in TransUnion, in order for

15:52:43  20     there to be standing, there had to be disclosure of the

15:52:45  21     information to another party, which was through the

15:52:48  22     credit reporting.

15:52:49  23          I mean, in that case, the plaintiffs there had

15:52:51  24     actually been designated in the defendant's system as

15:52:55  25     either potentially a terrorist or a drug trafficker.

15:52:58  1    But the Court still said where the information hadn't

15:53:01  2    left the agency that there's no standing and therefore

15:53:05  3    dismissed the claim as to the people -- where there had

15:53:09  4    been no publication.

15:53:10  5         THE COURT:  TransUnion talks about, you know,

15:53:13  6    different competing common law harms.  And you had

15:53:21  7    focused on the public disclosure of private facts rather

15:53:26  8    than intrusion upon seclusion, which is what the

15:53:35  9    plaintiffs have focused on.  So tell me why that doesn't

15:53:37  10   work in terms of their theory, not the one you brought

15:53:39  11   up.

15:53:40  12        MR. HUMPHREYS:  Yes, Your Honor.  Plaintiffs do

15:53:42  13   point to intrusion upon seclusion.

15:53:45  14     TransUnion didn't mention that as a potential

15:53:47  15   analog that could create standing; however, I think if

15:53:49  16   you look at the cited case in that case --

15:53:52  17        THE COURT:  I'm sorry, what didn't they -- I

15:53:53  18   missed what they didn't specifically bring up.

15:53:55  19        MR. HUMPHREYS:  They did list intrusion upon

15:53:58  20   seclusion among the list of historic analogs that may

15:54:03  21   give rise to standing.

          22        THE COURT:  Okay.  I see.

15:54:04  23        MR. HUMPHREYS:  However, the case cited, the

15:54:07  24   Seventh Circuit case the Supreme Court cited in

15:54:10  25   TransUnion, shows that the facts are very different from

85

15:54:14  1    the circumstance here.

15:54:16  2         There, the Court addressed text messages that were

15:54:18  3    being received on the plaintiff's phone, and the Court

15:54:22  4    compared that to receiving unwanted phone calls at your

15:54:27  5    house.  And there, I think the comparison -- or the

15:54:32  6    analogy to an intrusion upon the home is much clearer

15:54:37  7    here, where the information before the Court is that

15:54:40  8    these are Treasury systems that have data and the

15:54:45  9    Treasury Department is giving access to its own

15:54:49  10   employees, access to that data.

15:54:51  11        And we just don't think that the analogy to

15:54:53  12   intrusion upon seclusion at all works, unlike a case

15:54:57  13   like Gadelhak that the Supreme Court cited in the

15:55:01  14   TransUnion situation.

15:55:03  15        THE COURT:  Okay.  So let me move to APA 702,

15:55:09  16   which as I indicated when I was talking to the

15:55:12  17   plaintiffs, that waives sovereign immunity for suits

15:55:15  18   seeking relief other than money damages against an

15:55:17  19   agency or officer.  But it conditions that waiver,

15:55:21  20   quote, "Nothing herein confers authority to grant relief

15:55:25  21   if any other statute that grants consent to suit

15:55:28  22   expressly or impliedly forbids the relief which is

15:55:33  23   sought."

15:55:33  24        And the Court lacks subject matter jurisdiction if

15:55:36  25   another statute forbids the injunctive relief plaintiffs

15:55:41    1    seek here.

15:55:41    2            You rely on *Match-E-Be-Nash*.

15:55:47    3            I'll give the court reporter what that cite is.

15:55:52    4            And there, the Supreme Court held that the Quiet

15:55:55    5    Title Act forbids the relief the plaintiffs sought under

15:55:58    6    the APA.  But the Quiet Title Act had an explicit

15:56:03    7    exception to its waiver of sovereign immunity.  Anything

15:56:07    8    similar to that in the Privacy Act or Internal Revenue

15:56:13    9    Code?

15:56:13    10           MR. HUMPHREYS:  No, Your Honor, not explicitly.

15:56:15    11   I think our point is that Congress has devised a very

15:56:18    12   specific scheme both with respect to the Privacy Act and

15:56:21    13   the Internal Revenue Code.  And as Your Honor pointed

15:56:23    14   out, has in the Privacy Act injunctive relief for

15:56:26    15   certain types of claims and monetary relief for others.

15:56:30    16   And we think that the, you know, the upshot of that

15:56:34    17   carefully crafted scheme with respect to both the

15:56:36    18   Privacy Act and the Internal Revenue Code, is that

15:56:40    19   prospective relief through the Administrative Procedure

15:56:42    20   Act should not be -- should not be permitted.

15:56:45    21           And, again, I think it helps to focus on what a

15:56:51    22   plaintiff might need to show in order to make out a

15:56:54    23   Privacy Act or Internal Revenue claim, which is that

15:56:58    24   their particular information was disclosed, not that

15:57:00    25   employees of the Treasury Department were given access

15:57:03  1    to a Treasury Department system.

15:57:08  2              THE COURT:  Okay.  Any other precedents holding

15:57:12  3    that the Privacy Act or Internal Revenue Code forbid

15:57:17  4    relief such that Section 702 doesn't waive sovereign

15:57:22  5    immunity?  Anything else?

15:57:23  6              MR. HUMPHREYS:  No, Your Honor.  Although I

15:57:24  7    think the 702 claim is what -- part and parcel to the

15:57:27  8    704 claim.

15:57:28  9              THE COURT:  Okay.

15:57:29  10             MR. HUMPHREYS:  If the Court created a

15:57:30  11   statutory scheme and impliedly meant to preclude review

15:57:33  12   for the APA, there's another alternative remedy.

15:57:37  13             THE COURT:  All right.

          14             MR. HUMPHREYS:  So we would also rely on the

          15   cases in that --

15:57:41  16             THE COURT:  Yeah.  The plaintiffs also bring up

15:57:43  17   *Agriculture v. Kirtz.*  So didn't the Supreme Court

15:57:47  18   indicate in that particular case that the Privacy Act is

15:57:50  19   not the kind of legislation that occupies the field of

15:57:54  20   privacy remedies and forbids relief under other

15:57:59  21   statutes, if you're familiar with the case?

15:58:03  22        It's K-I-R-T-Z, *Agriculture v. Kirtz.*  I'm sorry, I

15:58:11  23   didn't write down the page number.

15:58:20  24             MR. HUMPHREYS:  Yes, Your Honor, but I don't --

15:58:23  25   I don't have -- I acknowledge the Court said that.

15:58:26  1          Yeah, I don't have nothing else to add.

15:58:28  2          THE COURT:  Okay.  Let me move to final agency

15:58:30  3    action.  This is obviously 704, and -- judicial review

15:58:38  4    is limited to final agency action.  And that "agency

15:58:43  5    action is final when it marks the consummation of an

15:58:45  6    agency's decision-making process.  It's one by which

15:58:49  7    rights or obligations have been determined or for which

15:58:53  8    legal consequences flow."

15:58:54  9          Your supplemental memoranda stated that, quote,

15:58:58  10   "there's no waiver of sovereign immunity under the APA

15:59:01  11   because plaintiffs have not identified a final agency

15:59:03  12   action."  But the D.C. Circuit in *Trudeau* stated that

15:59:13  13   the APA's final agency action requirement is not

15:59:17  14   jurisdictional.

15:59:19  15         Should I interpret your argument as really going to

15:59:22  16   the merits and not jurisdiction?

15:59:24  17         MR. HUMPHREYS:  Yes, that's fair, Your Honor.

15:59:26  18         THE COURT:  Okay.  Just to make sure.

15:59:27  19         But you argue that there's no final agency action

15:59:30  20   because decisions about access to records are a routine

15:59:33  21   matter; part of Treasury's day-to day operations.

15:59:38  22         That's your argument, principal one; correct?

15:59:44  23         MR. HUMPHREYS:  Yes, Your Honor.

15:59:45  24         THE COURT:  Okay.  Well, the USDA issues

15:59:47  25   thousands of licenses per year.  Is the issuance of a

15:59:50  1    license by, say, USDA a final agency action even though

15:59:56  2    they do it every day?

15:59:57  3         So does the APA define final agency action by

16:00:02  4    reference to how routine or important the agency action

16:00:04  5    is?

16:00:06  6              MR. HUMPHREYS:  Yes, Your Honor.  There can be

16:00:07  7    actions that happen frequently that are also final

16:00:11  8    agency actions.  We don't believe that's the case here.

16:00:14  9              THE COURT:  Why not?

16:00:17  10             MR. HUMPHREYS:  Well, because, again, the

16:00:17  11   decision of whether or not to give a particular employee

16:00:20  12   within the Treasury Department access to some of -- data

16:00:26  13   which is housed within the agency is the sort of routine

16:00:30  14   or ministerial agency decision that should not be

16:00:34  15   subject to APA review.

16:00:36  16        And I would point the Court to the Supreme Court's

16:00:38  17   decision in *Norton v. Southern Utah Wilderness*

16:00:48  18   *Association* for the point that such ministerial actions

16:00:51  19   aren't subject to APA review.

16:00:55  20        In other words, because there is no policy that

16:00:56  21   requires the denial of access as to the Treasury DOGE

16:01:02  22   team, it's not reviewable under the APA.

16:01:05  23             THE COURT:  Wouldn't the, you know, payment

16:01:07  24   process engagement plan, the engagement plan, be a final

16:01:11  25   agency action?  It's an agreement that they reached in

16:01:13  1  terms of how things were to be done?

16:01:15  2      MR. HUMPHREYS:  I mean, there is a decision

16:01:16  3  there, Your Honor, to give employees access to BFS

16:01:20  4  systems, but I don't think that any legal consequences

16:01:24  5  flow from that decision with respect --

16:01:26  6      THE COURT:  Well, isn't it a different decision

16:01:28  7  from what -- it changes what has been the policy in the

16:01:31  8  past in terms of -- I mean, we don't have the engagement

16:01:35  9  plan so it's a little difficult to do it, but my

16:01:37 10  understanding is that there was a change in terms of

16:01:41 11  access that had not been provided in the past.  And that

16:01:44 12  was the purpose of part of the plan, if I understood

16:01:48 13  the -- as I understood it correctly.

16:01:51 14      MR. HUMPHREYS:  Well, the purpose of the plan

16:01:53 15  is to give the Treasury DOGE team access, but we dispute

16:01:55 16  that there's any change in policy.  And that's actually

16:01:58 17  in our declaration.

16:01:59 18      THE COURT:  Well, ordinarily somebody in that

16:02:02 19  position would not have -- as I understand it, would not

16:02:05 20  have had access to it.  So wouldn't that make it a

16:02:09 21  change?

16:02:10 22      MR. HUMPHREYS:  Again, I don't think that's the

16:02:12 23  sort of -- there's no legal consequences, which is the

16:02:15 24  analysis of what the final agency action that flow from

16:02:18 25  the decision to allow a particular employee access to

16:02:22  1    one system or two or three.  And I don't think that

16:02:26  2    changes the analysis just because a prior employee may

16:02:31  3    never have had the same access.

16:02:33  4        There are no legal consequences that flow.  The

16:02:36  5    Privacy Act and the Internal Revenue Code still apply.

16:02:40  6    And to the extent there is ever hypothetically a

16:02:43  7    violation of one of those statutes, that can be brought

16:02:45  8    through a separate claim individually as opposed to

16:02:50  9    through broad APA review.

16:02:53  10        THE COURT:  I'll leave that one alone.  If the

16:02:57  11   plaintiffs want to respond, I'll let them do that.

16:02:59  12        You also argue that the Treasury decisions here,

16:03:02  13   particular ones in, say, the engagement plan among other

16:03:06  14   things, have no effect on rights or obligations.  But

16:03:10  15   isn't this -- you know, if you look under the Privacy

16:03:15  16   Act of right against disclosure without consent, if

16:03:17  17   you're disclosing protected records to persons who might

16:03:20  18   not have lawful access, wouldn't that affect that right?

16:03:24  19        MR. HUMPHREYS:  No, Your Honor.  Because they

16:03:25  20   do have lawful access.  They are employees with a need

16:03:28  21   to know.  So therefore fall within, for the Privacy Act,

16:03:32  22   552(a)(B) --

16:03:34  23        THE COURT:  Well, we don't know that they're

16:03:36  24   all employees.  Part of the problem I think is in terms

16:03:38  25   of precisely what categories they are in.

16:03:40  1          MR. HUMPHREYS:  Well, I think we do, Your

16:03:42  2    Honor.  Mr. Krause and Mr. Wunderly are both employees,

16:03:45  3    so therefore they're covered by 552(a)(B)(1).

16:03:51  4        To the extent that information were to go outside

16:03:54  5    of the Treasury Department, it would only be able to do

16:03:56  6    so subject to a routine use, and therefore, one would

16:03:59  7    look at the relevant SORN.

16:04:05  8        There's no broad policy here of allowing sharing

16:04:08  9    outside of the department just to employees within the

16:04:11  10   Treasury DOGE team who have access, who have authorized

16:04:14  11   access, and therefore fall within the Privacy Act's

16:04:17  12   parameters.

16:04:25  13       So no, Your Honor, we would not say -- we would

16:04:26  14   strongly disagree that there's any unlawful access

16:04:30  15   because the employees themselves have a need to know and

16:04:33  16   fall within a 552(a)(B)(1).  And if information is going

16:04:39  17   outside of the Treasury Department, it would only do so

16:04:42  18   pursuant to a routine use, as in the case with the State

16:04:45  19   Department with Routine Use 17 of the SORN at issue for

16:04:49  20   that systems --

16:04:58  21          THE COURT:  Okay.  You also argued in the

16:04:59  22   supplemental memorandum, "there's no waiver of sovereign

16:05:01  23   immunity because adequate alternate remedies preclude

16:05:05  24   APA review."  And then you -- the D.C. Circuit held in

16:05:08  25   *Perry Capital,* "there is no textual or logical basis for

16:05:12  1     construing 704 to condition of waiver sovereign immunity

16:05:16  2     on the absence of an adequate remedy."

16:05:21  3          So wouldn't, again, this go to merits rather than

16:05:25  4     jurisdiction?

16:05:27  5               MR. HUMPHREYS:  I do think it goes to the

16:05:28  6     merits, Your Honor, but the merits question is -- there

16:05:30  7     must be a final agency action for plaintiffs to be able

16:05:33  8     to prevail on the merits of an APA claim.

16:05:35  9          Again, they could bring -- their members could

16:05:39  10    bring a Privacy Act claim or an Internal Revenue Act

16:05:42  11    claim if there is ever a disclosure of their information

16:05:46  12    that harms them.

16:05:47  13         But in order to give the sort of broad programmatic

16:05:51  14    review of the APA, they must show final agency action.

16:05:55  15    And given the Congressional remedies that have been

16:05:58  16    carefully created, we don't think that final -- excuse

16:06:00  17    me, that -- excuse me -- we do think that there is other

16:06:03  18    alternate remedies available here.

16:06:06  19              THE COURT:  Okay.  You argue that the Privacy

16:06:10  20    Act creates a "detailed remedial scheme," a specific one

16:06:13  21    regarding violations of its prohibitions against

16:06:16  22    disclosures.  But the damages remedy for disclosure is

16:06:20  23    in a catch-all provision for failure to, quote, "comply

16:06:23  24    with any other provision of this section."

16:06:26  25         So should that affect my thinking about how

16:06:29  1    detailed and comprehensive the remedial scheme is?  Why

16:06:34  2    shouldn't I be able to conclude that the scheme is

16:06:36  3    detailed as to actions for correction of records as

16:06:39  4    opposed to actions regarding disclosure?

16:06:43  5        Isn't most of the statute about that rather than

16:06:46  6    disclosure?

16:06:48  7        MR. HUMPHREYS:  I don't think how Congress --

16:06:51  8    where within the statute it organized remedies makes a

16:06:55  9    difference.  I mean, the reality is that plaintiffs may

16:06:59  10   bring a claim for monetary damages through the Privacy

16:07:02  11   Act, and plaintiffs often do.  Congress provided that

16:07:06  12   avenue for them.  I don't think the organizational

16:07:08  13   structure there matters, Your Honor.

16:07:12  14       THE COURT:  Okay.  Now, you cite a number of

16:07:14  15   cases from this district where courts held that a

16:07:18  16   plaintiff cannot use the APA to duplicate the injunctive

16:07:22  17   relief provided by the Privacy Act.

16:07:24  18      Can you point me to any precedent from the circuit

16:07:28  19   where a court has concluded that the damages remedy is

16:07:31  20   an adequate alternative for an APA injunction?

16:07:36  21       MR. HUMPHREYS:  Not specifically, Your Honor,

16:07:38  22   beyond the cases we cited.  I think the *Cell Associates*

16:07:41  23   case about the availability of injunctive remedy is

16:07:45  24   probably our best case.

16:07:47  25       THE COURT:  So do you think that when Congress

16:07:49  1    created the damages remedy in the Privacy Act it had in

16:07:52  2    mind a challenge to a policy of allegedly unlawful

16:07:57  3    disclosures?  As opposed to sort of one-off

16:08:00  4    retrospective challenges to unlawful disclosures of an

16:08:04  5    individual plaintiff's records?

16:08:06  6        So one is really more in the context of a policy as

16:08:09  7    opposed to individuals.

16:08:13  8            MR. HUMPHREYS:  I think that the same analysis

16:08:15  9    applies, Your Honor, and it kind of goes back to the

16:08:18  10   standing requirement, which is incorporated within the

16:08:21  11   Privacy Act as an adverse consequence.

16:08:23  12       I mean, I don't -- Congress required an adverse

16:08:26  13   consequence before one can bring a Privacy Act claim.

16:08:32  14   And that means that they thought there should be an

16:08:36  15   individualized showing of harm before money damages can

16:08:41  16   attach.  And I think in order to allow sort of

16:08:45  17   programmatic review through the APA would upend that

16:08:49  18   system and root out the adverse consequences portion of

16:08:57  19   the statute.

16:09:00  20           THE COURT:  Okay.  So in terms of the arbitrary

16:09:03  21   and capricious, if I disagree with your threshold

16:09:07  22   arguments and reach the merits, how should I assess

16:09:11  23   whether Secretary Bessent considered the relevant

16:09:13  24   factors and alternatives when deciding to give the

16:09:17  25   Treasury DOGE team access to the BFS records?

16:09:20  1          Should I order you to produce a complete

16:09:23  2    administrative record?

16:09:24  3          Should I allow plaintiffs to obtain limited

16:09:26  4    discovery from the Secretary?

16:09:30  5          I mean, how would I know whether -- you know, what

16:09:35  6    the Secretary considered in doing -- in making this

16:09:40  7    decision so -- to determine whether the decision was --

16:09:44  8    the reasonable decision-making was arbitrary and

16:09:46  9    capricious?

16:09:46  10         Where would it fit with the administrative record

16:09:49  11   and potential discovery which plaintiffs have asked for?

16:09:53  12         MR. HUMPHREYS:  Well, for the reasons stated in

16:09:54  13   our supplemental memorandum, Your Honor, we think the

16:09:56  14   Court can and should decide this motion on the

16:10:00  15   information already before the case -- excuse me, before

16:10:03  16   the Court.

16:10:04  17         And that is because, as the D.C. Circuit has

16:10:07  18   explained, the Court can evaluate jurisdictional

16:10:10  19   questions, like whether plaintiffs have suffered any

16:10:12  20   injury-in-fact without resorting to the administrative

16:10:17  21   record.

16:10:17  22         If the Court believes at this juncture that more

16:10:20  23   information is required, we do believe that an

16:10:22  24   administrative record is the appropriate way for the

16:10:26  25   Court to proceed.

97

16:10:27  1          Plaintiffs have opted to bring this claim as in --

16:10:31  2    their claims under the APA.  And as your Court

16:10:35  3    indicated, the general rule for APA review is the

16:10:38  4    administrative record.

16:10:39  5          We don't think that discovery would be appropriate.

16:10:42  6    Again, had plaintiffs chosen to plead this case through

16:10:45  7    the Privacy Act showing harm based on an individualized

16:10:50  8    disclosure, there may be discovery there.  But

16:10:53  9    plaintiffs have chosen the APA, and we think they should

16:10:57  10   be held to their choice.

16:10:58  11          THE COURT:  Okay.  Let me move to what Judge

16:11:01  12   Vargas did.  She concluded the plaintiffs in the case

16:11:04  13   before her were likely to succeed in showing that

16:11:07  14   Treasury's decision to give, quote, "the Treasury DOGE

16:11:10  15   team access to critical BFS payment systems with full

16:11:15  16   knowledge of the serious risks that access entailed was

16:11:19  17   arbitrary and capricious."

16:11:20  18          And she cited the inexplicable urgency and time

16:11:25  19   constraints under which this access was granted, which

16:11:28  20   she concluded, quote, "all but ensured that the launch

16:11:32  21   of the Treasury DOGE team was chaotic and haphazard,"

16:11:36  22   unquote.

16:11:37  23          Give me a reason why I should think differently.

16:11:41  24          MR. HUMPHREYS:  Well, we disagree, Your Honor.

16:11:44  25   As set forth in the EO, it is a priority of the

16:11:47  1    President to modernize agency systems, certainly

16:11:50  2    reasonable for the agency to act swiftly to implement

16:11:53  3    the President's priorities to combat waste, fraud, and

16:11:57  4    abuse and to modernize government systems.

16:12:00  5        Also I think the declaration, particularly the

16:12:04  6    Gioeli declaration, makes clear that the agency thought

16:12:06  7    this through.  There were risks identified and measures

16:12:08  8    put in place to combat that risk.

16:12:10  9        The fact that things moved quickly does not suggest

16:12:14  10   arbitrary and capriciousness, and we would disagree with

16:12:17  11   the characterization, Your Honor, that the rollout was

16:12:22  12   haphazard.

16:12:29  13            THE COURT:  Okay.  Let me -- and hopefully we

16:12:32  14   can move through this a little more -- I'm getting to

16:12:35  15   the end -- but a little more quickly.

16:12:38  16       In terms of Mr. Krause's employment status, he

16:12:42  17   started working -- he, Mr. Krause, started working at

16:12:45  18   Treasury on January 23rd.  He took the oath, was

16:12:50  19   onboarded, but his actual employment paperwork was not

16:12:54  20   processed until February 3rd.  And the paperwork

16:12:57  21   originally identified Mr. Krause's start date as

16:13:00  22   February 9th, which is more than two weeks after he

16:13:03  23   began working at the Treasury Department.

16:13:04  24       So on February 10th, the appointing official

16:13:08  25   executed a revised appointment documentation for

16:13:11  1    Mr. Krause, retroactively stating that his appointment

16:13:14  2    began on January 23rd.

16:13:17  3        On February 5th, the Secretary delegated to

16:13:20  4    Mr. Krause the duties of the Fiscal Assistant Secretary,

16:13:24  5    which is a leadership role with the responsibility for

16:13:26  6    BFS.  But between January 23rd and February 13th,

16:13:32  7    Mr. Krause was nominally a, quote, "consultant" for

16:13:37  8    Treasury.

16:13:38  9        A consultant cannot perform managerial or

16:13:42  10   supervisory work except as team leader or director of

16:13:45  11   the specific project for which he's been hired.  And a

16:13:48  12   consultant also cannot make final decisions on

16:13:52  13   substantive policies or otherwise function in the agency

16:13:55  14   chain of command.

16:13:58  15       Because of these restrictions, as I understand it,

16:14:01  16   the defendants represent that Mr. Krause did not, quote,

16:14:04  17   "assume the duties of the Fiscal Assistant Secretary

16:14:07  18   until he was appointed as a temporary transitional

16:14:11  19   Schedule C on February 13th."

16:14:14  20       Now, there are a couple other questions about, you

16:14:16  21   know, what his status was in the meantime.

16:14:19  22       The Payment Process Engagement Plan was entered

16:14:24  23   into in terms of the agreement on January 26th.  So did

16:14:29  24   he have the authority at that point to do so?  And if

16:14:36  25   not, who did?  Because in terms of February 26, which

16:14:42  1  would be between January 23rd and February 3rd, the date

16:14:51  2  they processed his appointment paperwork, so he seems to

16:14:56  3  have been a consultant from January 23rd to

16:15:00  4  February 13th, which would cover the period of the

16:15:03  5  January 26th.

16:15:04  6      So if he was a consultant, what was his authority?

16:15:08  7      Consultants don't have the authority to do

16:15:10  8  policymaking and a bunch of other things to have done

16:15:12  9  the engagement plan?  Or did somebody else have the

16:15:15  10  authority?

16:15:16  11          MR. HUMPHREYS:  No, correct, Your Honor.  He

16:15:17  12  was a consultant and working under the Secretary's Chief

16:15:24  13  of Staff, and therefore he exercised that authority, not

16:15:27  14  independent policymaking authority.

16:15:28  15          THE COURT:  So who -- but as I understand it,

16:15:32  16  he was involved in the -- unless I'm wrong, and correct

16:15:36  17  me -- I'll call it, for shorthand, the "engagement

16:15:40  18  plan," in terms of it being established and agreed to at

16:15:42  19  that point, he wouldn't have had authority as a

16:15:45  20  consultant.  So who basically did the agreement from the

16:15:50  21  perspective of presumably the DOGE team or whatever?

16:15:57  22          MR. HUMPHREYS:  I think the engagement plan

16:16:01  23  sets out the terms that Mr. Krause was going to be

16:16:05  24  performing.  It doesn't suggest that there's any

16:16:08  25  policymaking authority on his part, Your Honor.

16:16:10  1                THE COURT:  I thought that the engagement plan

16:16:12  2   had not only discussions of Mr. Krause but had

16:16:20  3   basically, you know -- you don't view them as the

16:16:22  4   changes, but the plaintiff does -- affecting access,

16:16:26  5   I'll put it that way -- in terms of who would be getting

16:16:29  6   access to the system.  I don't think it was the BFS

16:16:33  7   system.  It was another system.

16:16:35  8        But it went beyond just talking about Mr. Krause,

16:16:38  9   right?

16:16:39  10                MR. HUMPHREYS:  Well, yes, Your Honor.  And I

16:16:40  11   meant by "Mr. Krause," him and the Treasury DOGE team.

16:16:44  12   And, yes, it sets out the -- essentially the scope of

16:16:49  13   work that they will be performing, but, again, I don't

16:16:51  14   think that suggests that Mr. Krause had any policymaking

16:16:55  15   role at that time.

16:16:57  16        And the -- sorry.

16:16:59  17                THE COURT:  Go ahead.

16:17:01  18                MR. HUMPHREYS:  And of course, Your Honor, we

16:17:02  19   do disagree that there's any change in policy.  And

16:17:05  20   there's nothing -- plaintiffs had mentioned several

16:17:06  21   times about --

16:17:07  22                THE COURT:  Okay.

16:17:08  23                MR. HUMPHREYS:  Sure.

16:17:09  24                THE COURT:  So let's -- looking at the time

16:17:10  25   between January 23rd and February 9th, for Privacy Act

16:17:16  1    purposes, was he an officer, employee, or federal agency

16:17:19  2    during that time?

16:17:21  3              MR. HUMPHREYS:  Yes, Your Honor.  A consultant

16:17:22  4    is an employee for --

16:17:23  5              THE COURT:  As a consultant?

16:17:25  6              MR. HUMPHREYS:  Yes, Your Honor.

16:17:26  7              THE COURT:  And what confidentiality

16:17:28  8    obligations did Mr. Krause owe to the federal government

16:17:30  9    during those particular times?

16:17:34  10             MR. HUMPHREYS:  Those of any other employee, is

16:17:36  11   my understanding, Your Honor.  He was advised of his

16:17:39  12   need to keep information confidential.

16:17:41  13             THE COURT:  And what remedies would have been

16:17:43  14   available to enforce those obligations as a consultant?

16:17:51  15             MR. HUMPHREYS:  Well, he's a consultant on

16:17:53  16   behalf of the agency, Your Honor, so if he had --

16:17:55  17             THE COURT:  In terms of Treasury?

16:17:58  18             MR. HUMPHREYS:  What remedies --

16:18:00  19             THE COURT:  He was a consultant on "the

16:18:04  20   agency."

16:18:04  21        What did you mean by that?

16:18:05  22             MR. HUMPHREYS:  He's a consultant of the agency

16:18:07  23   and an employee --

16:18:09  24             THE COURT:  The agency being --

16:18:11  25             MR. HUMPHREYS:  The Treasury Department, Your

16:18:14  1  Honor.

16:18:14  2          THE COURT:  Okay.  That's what I'm trying to

16:18:15  3  get at.  Okay.

16:18:18  4      So he didn't assume the duties of Fiscal Assistant

16:18:24  5  Secretary until February 13th when he was appointed as a

16:18:27  6  temporary Schedule C employee rather than a consultant.

16:18:31  7      So how would you describe his duties before

16:18:34  8  February 13th?

16:18:34  9          MR. HUMPHREYS:  As a consultant providing

16:18:36  10  expertise on modernization and integration of systems,

16:18:43  11  which is the work that the Treasury DOGE did.

16:18:44  12          THE COURT:  Was he supervising or managing

16:18:48  13  anybody before February 13th that we know?

16:18:51  14          MR. HUMPHREYS:  He is the -- was the team

16:18:54  15  leader of the Treasury DOGE team, and so to some degree

16:18:57  16  at least, Mr. Elez, when he was at the Treasury

16:19:01  17  Department, worked under him.  But I don't -- in terms

16:19:08  18  of his direct supervisor, I don't believe so.

16:19:10  19          THE COURT:  Well, wouldn't he have been

16:19:12  20  supervising Mr. Elez?

16:19:15  21      I'm mispronouncing it, I'm sorry.

16:19:18  22          MR. HUMPHREYS:  No, Your Honor, I think you're

16:19:19  23  doing well.

16:19:22  24      In the sense that he is the team leader of the

16:19:25  25  Treasury Department -- excuse me, of the Treasury DOGE

16:19:26  1    team, I think he's providing direction to the team,

16:19:28  2    although I don't -- I don't know if he was his direct

16:19:32  3    supervisor.  I think the fact that he was a consultant

16:19:34  4    suggests not.  He was certainly the team leader

16:19:39  5    directing the team's work within the agency.  The agency

16:19:42  6    being Treasury.

16:19:46  7            THE COURT:  Okay.  Let me move back to

16:19:47  8    something I had talked to you earlier.

16:19:49  9        Let's assume hypothetically that the Treasury

16:19:53  10   Department disclosed records to Mr. Krause, and he was

16:19:54  11   acting in his capacity as the CEO of the software

16:20:01  12   company.  I take it you would agree that that would

16:20:04  13   violate the Privacy Act?  I mean, he has two hats.

16:20:08  14           MR. HUMPHREYS:  Yeah, if -- if the purpose of

16:20:10  15   providing him with the records was for his work in

16:20:14  16   his --

16:20:15  17           THE COURT:  Well, he's acting -- Mr. Krause

16:20:18  18   is -- my hypothetical has him acting in his capacity as

16:20:21  19   the CEO of a software company, and he is provided these

16:20:27  20   records not as for USDS.

16:20:32  21           MR. HUMPHREYS:  I think the Court should look

16:20:33  22   to the Privacy Act in 552(a)(B)(1), which talks about

16:20:38  23   whether or not there's a need for the record in the

16:20:41  24   performance of the duties.

16:20:43  25       So if there was no need for the records in the

16:20:46  1    performance of the duties, it would fall outside the

16:20:49  2    scope of that exception.

16:20:52  3            THE COURT:  But that doesn't fit my

16:20:54  4    hypothetical, does it?

16:20:59  5        I mean, I'm talking about him being the CEO of the

16:21:02  6    company, and he's in that capacity and he gets records.

16:21:05  7            MR. HUMPHREYS:  Right.  So in that -- I believe

16:21:07  8    in your hypothetical, Mr. Krause would be wearing his

16:21:09  9    hat as the --

16:21:10  10           THE COURT:  The CEO.

16:21:12  11           MR. HUMPHREYS:  The CEO.

16:21:13  12           THE COURT:  So would --

16:21:13  13           MR. HUMPHREYS:  And therefore --

16:21:14  14           THE COURT:  -- you would agree that it would

16:21:15  15   violate the Privacy Act?

16:21:17  16           MR. HUMPHREYS:  If he is not wearing his

16:21:18  17   Treasury Department hat?

16:21:19  18           THE COURT:  Right, right.

16:21:20  19           MR. HUMPHREYS:  Then, yes, I would agree with

16:21:22  20   that.

16:21:22  21           THE COURT:  Okay.  Because he's got two hats.

16:21:24  22   He's Treasury and then he's also the CEO of this other

16:21:30  23   company.

16:21:35  24        All right.  One last area.  Mr. Elez's

16:21:46  25   communications potentially outside the Treasury

1    Department.

16:21:50  2        Judge Vargas of the Southern District of New York

16:21:54  3    found based on representations during a PI hearing --

16:21:57  4    and of course I don't have the transcript, but she put

16:21:59  5    it in her opinion -- that was on February 14th -- that

16:22:03  6    Mr. Elez sent emails to USDS personnel outside the

16:22:07  7    Treasury Department.

16:22:10  8        That information is not in the record in this case;

16:22:13  9    however, it is consistent with the declaration of Joseph

16:22:17  10   Gioeli, which states that BFS officials, quote, "have

16:22:24  11   found no indication that Mr. Elez used his BFS's laptop

16:22:30  12   to share any BFS payment systems data outside the U.S.

16:22:38  13   Government."

16:22:38  14       "Mr. Elez had the ability to copy sensitive payment

16:22:41  15   data from BFS databases onto his BFS laptop."

16:22:48  16       Now, outside the U.S. Government, but would

16:22:53  17   there -- he didn't share it, but -- outside of the

16:22:57  18   Treasury Department, so who did he share it --

16:23:01  19   presumably, at some other government agency, but is

16:23:04  20   it --

16:23:05  21            MR. HUMPHREYS:  Well, we know, Your Honor, that

16:23:07  22   Mr. Elez shared information with the State Department as

16:23:10  23   part of the process to review payments in conjunction

16:23:15  24   with the President's Executive Order on foreign

16:23:19  25   assistance.  And there is a specific routine use for

16:23:21  1    that, number 17 of the applicable SORN.

16:23:25  2         THE COURT:  So that's the forensic analysis

16:23:27  3    that's been shown that it's the material from the State

16:23:31  4    Department?  That's not -- I wasn't at the hearing so

16:23:32  5    obviously I can't say, but that's not the impression

16:23:34  6    that I had that they were referring to that.

16:23:37  7         MR. HUMPHREYS:  I wasn't finished, Your Honor.

16:23:39  8    I wasn't at the hearing either and have been unable to

16:23:41  9    get a transcript, but I am aware of the quote that Judge

16:23:45  10   Vargas has in her opinion.

16:23:47  11        There is, for one, the State Department sharing of

16:23:51  12   information that we described in our declarations.  So

16:23:55  13   that would be one instance of --

16:23:56  14        THE COURT:  Is there anything else, though?  I

16:23:58  15   mean, the State Department we already know in terms of

16:24:00  16   their, you know, having looked at particular payments

16:24:03  17   that were being made, et cetera.  And then they may have

16:24:07  18   set up a different system where the State Department

16:24:09  19   looked at it before it got, you know, it got -- the

16:24:13  20   Treasury got involved and changed their procedures.  But

16:24:17  21   was there any other contact outside of the Treasury

16:24:27  22   Department other than the State Department, or do --

16:24:28  23        In other words, has the forensic analysis actually

16:24:30  24   been completed about all of it or not?

16:24:32  25        MR. HUMPHREYS:  The forensic analysis has not

16:24:34  1    been complete.  We are not aware of another sharing

16:24:39  2    currently.

16:24:40  3        I will note that -- I think it's important, Your

16:24:41  4    Honor, that the mere fact that information -- if we

16:24:44  5    later learn that information went to another federal

16:24:48  6    government agency, that does not necessarily mean that

16:24:50  7    anything improper happened.  Because just as with the

16:24:53  8    State Department sharing information, there may be a

16:24:56  9    routine use that would cover it, therefore, making it

16:25:02  10   completely lawful under the Privacy Act.

16:25:04  11        THE COURT:  But it does make a difference in

16:25:06  12   terms of who outside of the -- even if it's within the

16:25:08  13   government, who outside of the Treasury Department he

16:25:11  14   communicated with, you know, in terms of any

16:25:14  15   confidentiality requirements that bind the recipients of

16:25:17  16   them, in terms of, you know, any of the recipients, were

16:25:22  17   they employed by the Executive Office of the President.

16:25:25  18        Does the Privacy Act actually apply to them?  And

16:25:30  19   more pointedly, is the USDS an agency for purposes of

16:25:33  20   the Privacy Act?

16:25:34  21        So it does make a difference in terms of how the

16:25:44  22   information is shared with others outside of Treasury

16:25:51  23   but still within the government.

16:25:52  24        MR. HUMPHREYS:  Well, yes, Your Honor.  And if

16:25:54  25   it were discovered that there was a disclosure outside

16:25:58  1       of the Treasury Department and --

16:26:00  2               THE COURT:  Just with State, as far as you

16:26:02  3       know.

16:26:02  4               MR. HUMPHREYS:  No, the only one that I'm aware

16:26:04  5       of is the State Department, Your Honor.

16:26:05  6               THE COURT:  I'm sorry?

16:26:06  7               MR. HUMPHREYS:  The only one that I'm aware of,

16:26:08  8       information-sharing, is with the State Department.  But

16:26:11  9       I mean, my point is if there is -- if there were such a

16:26:13  10      disclosure, plaintiffs, if harmed, could bring a

16:26:17  11      challenge regarding that disclosure and seek monetary

16:26:22  12      damages.

16:26:22  13              THE COURT:  Okay.  So let me just ask.  You're

16:26:26  14      arguing that -- let's assume that they disclosed the

16:26:29  15      payment records to the State Department.  And they

16:26:32  16      didn't violate the Privacy Act because they were

16:26:36  17      complying with the routine use exception.  And you

16:26:39  18      invoke Routine Use 17 which allows disclosures for

16:26:42  19      purposes of identifying, preventing, and recouping, say,

16:26:46  20      improper payments.

16:26:47  21          I believe that's what you argued, am I correct?

16:26:49  22              MR. HUMPHREYS:  That's correct, Your Honor.

16:26:51  23              THE COURT:  Okay.  Why were those payments

16:26:52  24      improper within the meaning of the Routine Use 17?

16:26:57  25          Is it because they were improper because they were

16:27:00  1      inconsistent with the President's Executive Order

16:27:03  2      purporting to pause foreign aid payments that are not

16:27:07  3      aligned with the foreign policy?

16:27:09  4          Is there any other reason they were improper?

16:27:11  5          I mean, there's no allegation that they were

16:27:14  6      fraudulent or not duly authorized by Congress, correct?

16:27:19  7              MR. HUMPHREYS:  Well, I'm not saying they were

16:27:20  8      or weren't improper, Your Honor.  My understanding is

16:27:22  9      that all those payments were ultimately approved, only

16:27:25  10     that the sharing of information in order to determine,

16:27:26  11     in conjunction with the State Department, whether or not

16:27:29  12     they are proper is a permitted routine use in the

16:27:33  13     published SORN.

16:27:36  14             THE COURT:  But it's all based on it being

16:27:39  15     improper, right, in terms of not some other

16:27:43  16     fraudulent --  or whatever.  So let me test this with

16:27:51  17     another one of these hypotheticals.

16:27:54  18         The President can't just decide that something is

16:27:57  19     improper through an Executive Order and then remove the

16:28:00  20     Privacy Act protections.  Let's assume that the

16:28:04  21     President decides there's a policy that elected

16:28:07  22     officials shouldn't voluntarily take itemized tax

16:28:11  23     deductions and should take the standard deductions.

16:28:16  24         Would a tax refund to a politician's itemized

16:28:20  25     deductions be improper within the routine use?  And

16:28:24  1    would Mr. Krause be complying with Routine Use 17 if he

16:28:27  2    went through the Treasury database, identified tax

16:28:32  3    returns for members of Congress who took itemized

16:28:35  4    deductions and then reported them as improper payments,

16:28:40  5    using my hypothetical?

16:28:41  6              MR. HUMPHREYS:  If I understand it correctly,

16:28:43  7    Your Honor, for the purposes of the Privacy Act alone,

16:28:46  8    if there were a question about whether or not any

16:28:51  9    particular payment were proper, it would be permissible

16:28:57  10   to share the information from the Treasury Department

16:29:00  11   to, in this instance, the consulting agency to determine

16:29:05  12   whether or not those payments are proper or not.

16:29:08  13        And so I --

16:29:12  14             THE COURT:  But they would be improper based on

16:29:15  15   the Executive Order, as I understand it, not on

16:29:18  16   something else -- at least as I understood it from the

16:29:21  17   State Department.

16:29:23  18        So I gave you a -- you know, another hypothetical

16:29:27  19   why it's -- you know, in terms of its -- there's nothing

16:29:31  20   fraudulent or anything about these, particularly in

16:29:34  21   terms of -- but it's strictly that it's based on an

16:29:40  22   Executive Order that came down that's made it improper.

16:29:44  23             MR. HUMPHREYS:  I think it would depend, Your

16:29:46  24   Honor, on -- in the context of that hypothetical what

16:29:48  25   else Congress restrictions had established and whether

16:29:51  1    or not the Executive Order conflicted with them.  And I

16:29:55  2    don't think we have anything present as to the State

16:29:59  3    Department that would impose those same sort of

16:30:02  4    restrictions.  But, again, I think sharing information,

16:30:06  5    just to determine whether or not something is improper

16:30:09  6    or to ask the opinion of another agency, as permitted

16:30:14  7    explicitly by the SORN, falls within the scope of Number

16:30:23  8    17.

16:30:23  9          THE COURT:  Okay.  So my last question really

16:30:26  10   gets to the irreparable harm in terms of the sharing

16:30:43  11   outside of the federal government.  Obviously, we'd

16:30:47  12   agree with that, that that's irreparable harm.  The

16:30:51  13   question is whether outside of the Treasury Department

16:30:52  14   whether that's an issue.

16:30:54  15       Have there been steps taken to mitigate risks of

16:30:58  16   harm at this point or in the future in terms of making

16:31:02  17   sure that the mistakes that were made with Mr. Elez

16:31:05  18   have -- don't get repeated?

16:31:08  19          MR. HUMPHREYS:  I'm not sure I agree with the

16:31:09  20   premise to start, Your Honor.

16:31:10  21       I mean, the only mistake that I'm aware of, and I

16:31:14  22   believe our Treasury is aware of, with respect to

16:31:17  23   Mr. Elez is the short period of time in which he was

16:31:20  24   given write access in addition to read access.

16:31:29  25       Write, W-R-I-T-E.

16:31:29  1          THE COURT:  Well, I'm just saying though, a

16:31:30  2     mistake is a mistake.  And the point I'm getting at is:

16:31:33  3     Has that made it clear to Treasury that maybe they need

16:31:36  4     better procedures or training or whatever, as Judge

16:31:39  5     Vargas had indicated?

16:31:40  6          MR. HUMPHREYS:  Your Honor, well -- the agency

16:31:42  7     has --

16:31:43  8          THE COURT:  That -- she's going to require it.

16:31:45  9     She made some findings.  I take it you disagree with

16:31:47  10    them, but has the Treasury done anything to implement

16:31:51  11    it, even before she did her order?

16:31:54  12          MR. HUMPHREYS:  Well, with the read/write

16:31:59  13    error, the access that Mr. Elez very briefly had, the

16:32:03  14    agency became aware of it and corrected it before

16:32:06  15    Mr. Elez, we believe, ever knew about his write access

16:32:09  16    in order -- or ever logged into the system.

16:32:11  17       So, yes, that was a mistake, but the agency found

16:32:14  18    it out on its own accord and, yes, has corrected that,

16:32:17  19    and I'm sure will be very aware to make sure that, you

16:32:20  20    know, the proper access is granted going forward.

16:32:23  21          THE COURT:  So will there be any kind of

16:32:25  22    procedures, if you know, by the defendants who are

16:32:30  23    logging or monitoring the activities of the Treasury

16:32:34  24    DOGE team members when they interact with the BFS

16:32:37  25    systems?

16:32:38  1           MR. HUMPHREYS:  Yes, Your Honor, as

16:32:39  2  described --

16:32:39  3           THE COURT:  In terms of doing some -- to make

16:32:41  4  sure -- especially if it goes outside of the Treasury

16:32:46  5  Department?

16:32:48  6           MR. HUMPHREYS:  Excuse me, Your Honor.

16:32:48  7      Yes, Your Honor.  The Gioeli declaration explains

16:32:53  8  many steps that were taken to mitigate risks with

16:32:55  9  respect to members of the Treasury --

16:32:57  10          THE COURT:  So there will be -- what I'm asking

16:33:01  11  is, is there a system of monitoring and logging in so

16:33:03  12  that you can keep track of where information goes, if it

16:33:06  13  goes outside of Treasury?

16:33:07  14          MR. HUMPHREYS:  Yes, Your Honor.

16:33:08  15          THE COURT:  Okay.  All right.  It's gotten

16:33:11  16  late.  My questions took longer, but let me take -- I

16:33:16  17  take it back.  I have one last question, which I forgot,

16:33:21  18  and then we'll take a break.

16:33:23  19      And at this point if there's something additional

16:33:25  20  you want to raise for me, that's fine, you know, that I

16:33:28  21  should be focused on.  If not, we'll move to next

16:33:33  22  steps.

16:33:34  23      So let me -- let's make an assumption here that

16:33:36  24  there was a disclosure from Treasury to USDS.

16:33:43  25      Now, any harm from that disclosure might be mooted

16:33:47  1    if the Privacy Act prohibits further disclosures by USDS

16:33:51  2    employees.  But the Privacy Act applies only to

16:33:54  3    government agencies, and the agencies adopt the FOIA's

16:33:59  4    definition of what it means to be a government agency.

16:34:03  5        And is USDS an agency within the meaning of FOIA,

16:34:08  6    which means the Privacy Act applies?

16:34:13  7            MR. HUMPHREYS:  We've not briefed that issue in

16:34:14  8    this case.  I know some of my colleagues have and have

16:34:17  9    taken a position that it is not.

16:34:20 10            THE COURT:  So it's -- well, they've indicated

16:34:25 11    that it's a government agency, correct, USDS?  Or not?

16:34:31 12            MR. HUMPHREYS:  I don't know the answer to

16:34:33 13    that, Your Honor.

16:34:33 14            THE COURT:  I'm sorry?

16:34:34 15            MR. HUMPHREYS:  I don't know the answer to

16:34:35 16    that.  It's not been presented.

16:34:38 17            THE COURT:  Would you agree that if it was -- I

16:34:40 18    mean, if it was an agency, it has to follow the

16:34:42 19    definition of FOIA, which means you would be subject to

16:34:44 20    FOIA as well?

16:34:47 21        You don't know one way or the other?

16:34:51 22            MR. HUMPHREYS:  No, my understanding is it's a

16:34:52 23    complicated body of law out there.

16:34:53 24            THE COURT:  No, no, no, I'm just asking you

16:34:55 25    whether -- if USDS is an agency, using the FOIA

16:35:01  1    definition, then that's what I'm asking you:  Is USDS

16:35:05  2    a -- an agency, and what's required is that you use the

16:35:09  3    definition that happens to be in the FOIA statute, which

16:35:12  4    would seem to assume that you would then be subject to

16:35:15  5    FOIA.  But that's not -- I'm not getting into FOIA.  I'm

16:35:19  6    just asking you whether USDS is an agency.

16:35:20  7                MR. HUMPHREYS:  I don't -- that hasn't been

16:35:22  8    presented in this case, Your Honor.

16:35:24  9                THE COURT:  Okay.  Let me take a break at this

16:35:26  10   point and -- I'm assuming we've covered everything, but

16:35:31  11   if there's something you want to bring up, plaintiff,

16:35:33  12   I'll let you -- get me to focus on something that you

16:35:36  13   think based on the answers that would be -- you want to

16:35:41  14   bring up, and then we'll move forward to what we need to

16:35:44  15   do next steps, no matter what I do with the PI.

16:35:49  16        So let me -- so it should be a short conversation.

17        (Pause)

16:36:18  18                THE COURT:  The court reporter has kindly said

16:36:20  19   ten minutes, so about a quarter to 5:00, and we should

16:36:24  20   be done by 5:00.  So let's take a quick break.

16:51:45  21        (Court in recess at 4:36 p.m.)

16:51:45  22        (After recess, 4:51 p.m.)

16:51:52  23                THE COURT:  Okay.  I do have one additional

16:51:54  24   question, defense counsel.

16:52:03  25        So the President's Executive Order establishing the

16:52:06  1    U.S. DOGE Service provides in Section 4(b), and I'm

16:52:12  2    going to read exactly what it says:

16:52:13  3        "Agency heads shall take all necessary steps in

16:52:19  4    coordination with the USDS administrator and to the

16:52:25  5    maximum extent consistent with law to ensure that USDS

16:52:29  6    has full and prompt access to all unclassified agency

16:52:33  7    records, software systems, and IT systems.  USDS shall

16:52:43  8    adhere to rigorous data protection standards."

16:52:43  9        Based on the Executive Order, which I've just read,

16:52:46  10   what is the defendant's position on the extent to which

16:52:49  11   it would be quote, "consistent with law," unquote, to

16:52:52  12   provide USDS with full and prompt access to BFS payment

16:52:58  13   systems as directed by the Executive Order?

16:53:01  14             MR. HUMPHREYS:  Our position, Your Honor, is

16:53:03  15   that the "consistent with law" phrase there incorporates

16:53:06  16   or refers to also the Privacy Act and the Internal

16:53:10  17   Revenue Code.

16:53:11  18       So sharing information from Treasury to USDS would

16:53:15  19   only be permissible as authorized by those specific

16:53:20  20   statutes, including whatever restrictions --

16:53:23  21             THE COURT:  So in the absence of an injunction

16:53:25  22   from this Court or the Southern District of New York,

16:53:31  23   you would give access to USDS officials based on the

16:53:37  24   Executive Order.

16:53:37  25       Do I understand that correctly?

16:53:40  1              MR. HUMPHREYS:  No, Your Honor.  I did not mean

16:53:41  2    to say that at all.  Only to the extent that the Privacy

16:53:44  3    Act or the Internal Revenue Code allowed so -- because

16:53:50  4    plaintiffs are claiming here an APA violation based on a

16:53:52  5    violation of the Privacy Act or the Internal Revenue

          6    Code.

16:53:55  7         What I'm saying is that the defendants, the

16:53:57  8    Treasury Department, would not share information with

16:54:00  9    USDS unless it were authorized by the Privacy Act or the

16:54:05 10    Internal Revenue Code.

16:54:06 11         So, for example, with the Privacy Act, there would

16:54:10 12    need to be a routine use published in the Systems of

16:54:13 13    Record Notice and applied and allowed for under the

16:54:18 14    Privacy Act the sharing of that information.

16:54:19 15              THE COURT:  So from your perspective, the

16:54:22 16    Executive Order would not authorize them to go forward

16:54:29 17    and provide USDS with access; is that what you're

16:54:34 18    saying?

16:54:34 19              MR. HUMPHREYS:  Not in all circumstances.

16:54:35 20    There would have to be a reason consistent with the

16:54:37 21    Privacy Act that allowed for the sharing of that

16:54:39 22    information, which is what the "consistent with law"

16:54:42 23    means there.

16:54:43 24         If it would violate the Privacy Act, then the

16:54:45 25    defendants would not share that information, or the

16:54:47  1      Internal Revenue Code --

16:54:59  2              THE COURT:  Okay.  I'm obviously going to take

16:55:01  3      this under advisement.  At this point I'm inclined to

16:55:03  4      conclude that plaintiffs do have standing.  So we'll be

16:55:07  5      moving forward and the Court will be taking it under

16:55:09  6      advisement.

16:55:11  7          D.C. Circuit case law requires that I have the

16:55:14  8      administrative record to rule on the merits, and many of

16:55:18  9      the arguments from the defendants today appear to boil

16:55:22  10     down to an argument on the merits.  So I'm inclined at

16:55:25  11     this point to conclude that the plaintiffs do have

16:55:29  12     standing and that I do need the administrative record.

16:55:32  13         So when can you produce it?  What kind of a

16:55:37  14     timeline do you have?

16:55:40  15         Hopefully somebody has thought about it?

16:55:47  16             MR. HUMPHREYS:  May I confer for just a moment

16:56:07  17     with my colleagues?

16:56:08  18             THE COURT:  Sure.

16:56:09  19         (Counsel conferring)

16:56:14  20             MR. HUMPHREYS:  Thank you, Your Honor.

16:56:16  21         We'd ask for two weeks.  If there's any way we can

16:56:20  22     file it sooner than that, we certainly will.

16:56:23  23             THE COURT:  Sure.  Can you give me a date?

16:56:25  24         Let me just look.

16:56:30  25         So March 10th?  That's two weeks.

16:56:32  1          MR. HUMPHREYS:  Yes, Your Honor.

16:56:34  2          THE COURT:  Okay.  Has anybody thought about

16:56:36  3  what's going to happen next or what you're proposing

16:56:39  4  next?  Motions or whatever else, if anybody's got ideas?

16:56:46  5      I mean, this is the time to say something.

16:56:49  6          MR. HUMPHREYS:  Since I'm here --

          7          THE COURT:  Plaintiffs or defendants?

16:56:49  8          MR. HUMPHREYS:  -- we would propose a motion to

16:56:52  9  dismiss, Your Honor.

16:56:56 10          THE COURT:  Okay.  Anything from the plaintiff?

16:56:58 11  I'm trying to set a schedule while everybody is here

16:57:01 12  instead of trying to do it at a later point.

16:57:03 13          MR. JOSHI:  Yes.  If they are proceeding with a

16:57:05 14  motion to dismiss, we would proceed with a cross-motion

16:57:07 15  for summary judgment, but the record would be helpful in

16:57:12 16  that process.

16:57:13 17          THE COURT:  I'm sorry, I missed the last part.

16:57:16 18          MR. JOSHI:  The record, having the

16:57:18 19  administrative record --

16:57:21 20          THE COURT:  The administrative record, okay.

          21          MR. JOSHI:  -- and seeing what that consists --

16:57:22 22          THE COURT:  I don't know whether today you're

16:57:24 23  in a position to give me a schedule or you need to

16:57:26 24  confer among yourselves and with opposing counsel and

16:57:30 25  propose one for the motion to dismiss or the

16:57:32  1    cross-motion.

16:57:36  2          I'm sorry, I was talking while you all were

16:57:39  3    conferring.  Let me let you confer.

          4          (Counsel conferring)

16:57:42  5          THE COURT:  Okay.  So what I was going to do is

16:57:45  6    suggest a schedule for the motion to dismiss, and if

16:57:47  7    they file them, cross-motion.

16:57:49  8          In terms of a schedule, we can either set it now or

16:57:53  9    if you need to confer and talk to each other and propose

16:57:57  10   a schedule, I can, you know, wait, and you can give it

16:58:02  11   to me tomorrow.

16:58:02  12         I don't know whether you all have thought about it

16:58:04  13   already and -- or you can have a quick discussion or --

16:58:09  14         I'll give you a few minutes to talk, if you want.

16:58:19  15         (Counsel conferring)

16:58:48  16         THE COURT:  One question, obviously, is whether

16:58:52  17   I should resolve the PI before briefing on the motion to

16:58:55  18   dismiss or -- resolve it or hold it in abeyance.

16:59:01  19         I don't know what people's positions are.

16:59:05  20         MR. HUMPHREYS:  May I make a point on that,

16:59:07  21   Your Honor?

16:59:07  22         THE COURT:  Sure.

16:59:07  23         MR. HUMPHREYS:  So the government respectfully

16:59:11  24   asks that the Court would decide the PI motion before

16:59:12  25   briefing on the motion to dismiss.

16:59:13    1          Our agreement to an order in this case to maintain

16:59:16    2    the status quo is premised on an understanding that that

16:59:19    3    agreed-upon order would last for only a very short

16:59:22    4    period of time.  And defendants believe --

16:59:26    5          THE COURT:  Well, I understand that the PI

16:59:31    6    would end when the -- I mean, the agreement would end

16:59:36    7    once the Court issued whatever I did on the PI,

16:59:41    8    depending on what you're doing with the motion to

16:59:43    9    dismiss.

16:59:44   10       What's your schedule for that?

16:59:47   11          MR. HUMPHREYS:  We are going to confer on that,

16:59:49   12    Your Honor.

16:59:49   13          MR. JOSHI:  Yes.

16:59:50   14          THE COURT:  Do you have a date?

16:59:51   15       Tell me what the dates are.

16:59:53   16          MR. HUMPHREYS:  We were hoping to confer off

16:59:57   17    line and touch base with our clients --

17:00:01   18          THE COURT:  I'm sorry?

           19          MR. HUMPHREYS:  We were hoping to confer also

17:00:00   20    with our clients and then file something.

17:00:01   21          THE COURT:  And then come back?  Okay.

17:00:03   22       Plaintiffs, in terms of holding off or not holding

17:00:05   23    off?

17:00:06   24          MR. JOSHI:  We would just -- we would ask the

17:00:11   25    Court to determine the PI.  We have this consent order

17:00:15   1     in place but it's reached by agreement.

17:00:18   2          We would point out on the irreparable harm the

17:00:21   3     Treasury officials' brief that talks about how things --

17:00:29   4     how it worked at the Treasury and the harms that would

17:00:31   5     result in changes, but we would -- I think the decision

17:00:34   6     on the PI would help --

17:00:38   7               THE COURT:  So at this point I should go ahead

17:00:39   8     and make the decision on the PI separate from whatever

17:00:42   9     you come up with for the motion to dismiss, if I

17:00:45   10    understand you correctly?

17:00:46   11              MR. JOSHI:  That's our preference.

17:00:48   12              THE COURT:  Okay.  So you both have the same

17:00:50   13    view, it sounds like?

17:00:53   14              MR. HUMPHREYS:  Yes, Your Honor.  We agree.

17:00:54   15              THE COURT:  Okay.  All right.

17:01:00   16         Then obviously, confer with your clients.  If you

17:01:01   17    can get back -- why don't you file a proposed schedule?

17:01:06   18    We don't need to discuss it again.  And I'll issue an

17:01:09   19    order in terms of, you know, how the motions are to be

17:01:14   20    filed and whatever, you know, conditions, et cetera, are

17:01:18   21    done.

17:01:19   22         Okay.  So March 10th is the administrative record,

17:01:24   23    and then the Court will go forward with making a

17:01:27   24    decision on the PI and the motion to dismiss, you know,

17:01:31   25    you'll give me a briefing.  Motion to dismiss and

17:01:35  1    cross-motion for summary judgment.

17:01:38  2         Okay.  Anything else at this point?

17:01:40  3         Plaintiffs?

17:01:40  4              MR. JOSHI:  No, Your Honor.

17:01:41  5              THE COURT:  Defendants?

17:01:43  6              MR. HUMPHREYS:  No, Your Honor.

17:01:46  7              THE COURT:  All right.  The parties are

17:01:47  8    excused.  Take care.

17:01:48  9         (Court adjourned 5:01 p.m.)

17:01:54  10

         11                         - - - - -

         12

         13

         14

         15                    CERTIFICATE

         16

         17    I, Chandra Kean, RMR, certify that the foregoing is

         18    a correct transcription from the record of proceedings

         19    in the above-titled matter.

         20

         21    _____        February 25, 2025
                 Chandra Kean, RMR                   DATE
         22

         23

         24

         25

## 1

**1** [1] - 23:5
**10th** [3] - 98:24, 119:25, 123:22
**12th** [2] - 62:1, 71:14
**13th** [6] - 99:6, 99:19, 100:4, 103:5, 103:8, 103:13
**14th** [1] - 106:5
**17** [8] - 38:24, 39:1, 92:19, 107:1, 109:18, 109:24, 111:1, 112:8
**17th** [2] - 61:3, 61:16
**1997** [1] - 74:8
**19th** [4] - 54:16, 55:9, 57:5, 62:10

## 2

**2** [1] - 65:22
**2010** [1] - 74:7
**2025** [1] - 124:21
**2026** [1] - 27:11
**21st** [1] - 36:4
**23rd** [8] - 34:24, 35:5, 98:18, 99:2, 99:6, 100:1, 100:3, 101:25
**25** [1] - 124:21
**25-313** [1] - 3:3
**25-CV-429** [1] - 61:4
**26** [1] - 99:25
**26th** [3] - 35:22, 99:23, 100:5
**28th** [1] - 15:18
**2:03** [1] - 3:2

## 3

**3rd** [3] - 61:18, 98:20, 100:1

## 4

**4** [1] - 71:14
**4(b** [1] - 117:1
**4:36** [1] - 116:21
**4:51** [1] - 116:22

## 5

**540** [1] - 23:1
**552(a)(B** [1] - 91:22
**552(a)(B)(1** [1] - 104:22
**552(a)(B)(1)** [2] - 92:3, 92:16
**5:00** [2] - 116:19, 116:20
**5:01** [1] - 124:9
**5th** [1] - 99:3

## 7

**702** [9] - 16:15, 16:16, 17:18, 20:9, 20:13, 76:6, 85:15, 87:4, 87:7
**704** [2] - 20:12, 20:21, 24:13, 87:8, 88:3, 93:1

## 8

**8th** [1] - 61:21

## 9

**9th** [3] - 34:25, 98:22, 101:25

## A

**abeyance** [1] - 121:18
**ability** [5] - 24:5, 36:12, 37:11, 51:11, 106:14
**able** [8] - 11:8, 36:6, 36:9, 39:23, 51:20, 92:5, 93:7, 94:2
**above-titled** [1] - 124:19
**abroad** [1] - 27:24
**absence** [2] - 93:2, 117:21
**absent** [1] - 11:23
**absolutely** [2] - 43:3, 78:11
**abuse** [2] - 38:3, 98:4
**accept** [2] - 29:22, 48:3
**access** [71] - 3:12, 9:9, 9:13, 12:24, 13:20, 15:20, 15:21, 19:12, 19:23, 21:8, 24:22, 24:23, 25:18, 26:19, 27:21, 34:5, 35:15, 36:12, 36:25, 37:11, 38:4, 38:9, 38:10, 38:11, 42:18, 46:8, 51:22, 52:19, 52:20, 55:24, 56:8, 56:13, 76:23, 77:2, 81:1, 83:18, 85:9, 85:10, 86:25, 88:20, 89:12, 89:21, 90:3, 90:11, 90:15, 90:20, 90:25, 92:10, 92:11, 92:14, 95:25, 97:15, 97:16, 97:19, 101:4, 101:6, 112:24, 113:13, 113:15, 113:20,

117:6, 117:12, 117:23, 118:17
**accessed** [4] - 80:16, 80:24, 81:7, 81:15
**accessing** [1] - 25:13
**accommodate** [1] - 15:10
**accompli** [1] - 47:23
**accord** [1] - 113:18
**according** [2] - 34:23, 41:3
**account** [1] - 40:16
**accurate** [2] - 52:23, 73:22
**acknowledge** [1] - 87:25
**act** [1] - 98:2
**Act** [87] - 6:6, 6:8, 11:20, 17:2, 17:20, 17:21, 17:25, 18:7, 18:9, 18:16, 19:2, 19:10, 19:16, 19:17, 20:10, 21:10, 22:6, 22:12, 22:13, 22:20, 23:6, 23:9, 23:11, 28:23, 28:24, 29:1, 29:4, 29:8, 31:1, 32:1, 36:22, 37:3, 37:6, 43:23, 44:1, 49:17, 56:23, 76:7, 77:15, 77:19, 78:1, 79:22, 81:16, 86:5, 86:6, 86:8, 86:12, 86:14, 86:18, 86:20, 86:23, 87:3, 87:18, 91:5, 91:16, 91:21, 93:10, 93:20, 94:11, 94:17, 95:1, 95:15, 95:13, 97:7, 101:25, 104:13, 104:22, 105:15, 108:10, 108:18, 108:20, 109:16, 110:20, 111:7, 115:1, 115:2, 115:6, 117:16, 118:3, 118:5, 118:9, 118:11, 118:14, 118:21, 118:24
**Act's** [1] - 92:11
**Act-related** [1] - 23:9
**acting** [8] - 35:9, 62:15, 71:2, 72:24, 75:4, 104:11, 104:17, 104:18
**Acting** [1] - 65:21
**action** [34] - 6:6, 10:21, 12:5, 19:25, 20:1, 20:4, 23:10, 24:12, 24:14, 24:19, 25:2, 25:25, 26:1,

26:5, 26:12, 27:19, 28:6, 40:20, 42:15, 76:21, 88:3, 88:4, 88:5, 88:12, 88:13, 88:19, 89:1, 89:3, 89:4, 89:25, 90:24, 93:7, 93:14
**actions** [8] - 19:7, 54:15, 70:18, 89:7, 89:8, 89:18, 94:3, 94:4
**activities** [1] - 113:23
**activity** [1] - 41:25
**actual** [9] - 12:1, 36:22, 39:18, 48:6, 76:9, 77:3, 77:16, 77:17, 98:19
**add** [8] - 13:8, 14:18, 16:6, 25:25, 39:8, 50:23, 51:1, 88:1
**addition** [3] - 6:14, 29:15, 112:24
**additional** [8] - 5:7, 5:9, 13:9, 17:11, 74:5, 75:12, 114:19, 116:23
**address** [8] - 6:20, 10:16, 21:20, 39:9, 40:3, 40:5, 40:7, 42:25
**addressed** [2] - 22:2, 85:2
**addresses** [1] - 23:13
**adequate** [7] - 20:21, 20:23, 21:4, 76:5, 92:23, 93:2, 94:20
**adhere** [2] - 15:16, 117:8
**adjourned** [1] - 124:9
**administration** [4] - 41:14, 41:15, 41:19, 42:8
**administrative** [12] - 9:7, 30:9, 96:2, 96:10, 96:20, 96:24, 97:4, 119:8, 119:12, 120:19, 120:20, 123:22
**Administrative** [3] - 77:15, 78:1, 86:19
**administrator** [35] - 48:25, 54:10, 54:21, 54:23, 57:14, 57:23, 58:15, 58:17, 59:13, 59:17, 59:20, 61:7, 62:22, 63:2, 63:11, 65:8, 65:13, 65:22, 65:25, 66:2, 66:4, 66:8, 68:7, 68:8, 68:12, 68:15, 69:2,

69:10, 69:11, 69:14, 70:7, 71:25, 75:4, 75:5, 117:4
**adopt** [1] - 115:3
**advancing** [1] - 7:17
**advantage** [2] - 83:2, 83:16
**adverse** [2] - 95:11, 95:12, 95:18
**advised** [1] - 102:11
**advisement** [2] - 119:3, 119:6
**adviser** [4] - 63:25, 64:12, 64:16, 65:2, 65:3, 65:5
**affect** [3] - 17:22, 91:18, 93:25
**affecting** [1] - 101:4
**affidavit** [1] - 4:7
**affidavits** [3] - 7:4, 52:9, 60:25
**afforded** [1] - 21:22
**afternoon** [2] - 3:23, 3:24
**afterwards** [1] - 63:10
**agencies** [13] - 12:23, 28:17, 28:25, 30:5, 39:19, 40:18, 42:13, 45:24, 47:15, 60:12, 79:21, 115:3
**agency** [84] - 12:20, 12:21, 16:18, 19:7, 19:11, 21:11, 24:12, 24:14, 24:15, 24:19, 25:2, 25:16, 25:25, 26:1, 26:5, 27:19, 28:6, 29:1, 29:5, 30:24, 39:2, 42:14, 43:15, 46:5, 46:9, 46:23, 48:21, 49:16, 49:19, 49:21, 50:1, 50:2, 50:13, 68:4, 69:21, 70:20, 76:21, 81:16, 84:2, 85:19, 88:2, 88:4, 88:11, 88:13, 88:19, 89:1, 89:3, 89:4, 89:8, 89:13, 89:14, 89:25, 90:24, 93:7, 93:14, 98:1, 98:2, 98:6, 99:13, 102:1, 102:16, 102:20, 102:22, 102:24, 104:5, 106:19, 108:6, 108:19, 111:11, 112:6, 113:6, 113:14, 113:17, 115:4, 115:5, 115:11, 115:18, 115:25,

116:2, 116:6, 117:3, 117:6
**agency's** [3] - 21:11, 28:4, 88:6
**agents** [1] - 39:3
**aggrieved** [1] - 19:6
**ago** [1] - 62:15
**agree** [15] - 21:3, 25:9, 32:23, 33:9, 33:16, 45:23, 81:22, 82:3, 104:12, 105:14, 105:19, 112:12, 112:19, 115:17, 123:14
**agreed** [4] - 35:22, 61:23, 100:18, 122:3
**agreed-upon** [1] - 122:3
**agreement** [8] - 35:24, 37:22, 89:25, 99:23, 100:20, 122:1, 122:6, 123:1
**Agriculture** [2] - 87:17, 87:22
**ahead** [3] - 50:22, 101:17, 123:7
**aid** [5] - 26:24, 27:3, 27:4, 27:16, 110:2
**akin** [1] - 11:15
**al** [1] - 3:4
**albeit** [1] - 22:25
**aligned** [1] - 110:3
**allegation** [2] - 32:20, 110:5
**alleged** [1] - 78:9
**allegedly** [1] - 95:2
**Alliance** [1] - 3:4
**Allison** [1] - 3:9
**allow** [11] - 29:2, 39:24, 46:14, 47:12, 79:12, 79:14, 79:16, 79:20, 90:25, 95:16, 96:3
**allowed** [6] - 15:19, 76:23, 80:10, 118:3, 118:13, 118:21
**allowing** [1] - 92:8
**allows** [7] - 10:14, 22:16, 29:4, 29:8, 39:1, 41:12, 109:18
**alluded** [1] - 11:15
**alone** [2] - 91:10, 111:7
**Alston** [1] - 65:20
**alternate** [2] - 92:23, 93:18
**Alternative** [1] - 20:21
**alternative** [4] - 20:23, 76:5, 87:12, 94:20
**alternatives** [3] -

42:22, 43:22, 95:24
**ambiguity** [2] - 30:1, 30:12
**Americans** [1] - 3:4
**analog** [3] - 10:5, 10:11, 84:15
**analogous** [1] - 12:10
**analogs** [2] - 13:22, 84:20
**analogy** [3] - 10:2, 85:6, 85:11
**analysis** [11] - 9:16, 38:20, 43:13, 44:10, 53:12, 90:24, 91:2, 95:8, 107:2, 107:23, 107:25
**analyzing** [1] - 12:5
**answer** [13] - 4:21, 6:21, 8:10, 35:25, 45:14, 54:19, 57:1, 57:17, 65:10, 67:10, 73:21, 115:12, 115:15
**answering** [1] - 4:18
**answers** [1] - 116:13
**ante** [1] - 47:12
**anyway** [2] - 33:4, 44:17
**APA** [53] - 8:19, 11:8, 16:14, 16:16, 17:11, 17:16, 17:20, 17:21, 18:6, 18:14, 18:16, 18:21, 19:5, 19:15, 19:22, 19:25, 20:2, 20:7, 20:9, 20:17, 20:21, 20:24, 20:25, 21:7, 21:14, 22:16, 22:17, 23:6, 23:9, 23:14, 24:3, 24:13, 42:13, 85:15, 86:6, 87:12, 88:10, 89:3, 89:15, 89:19, 89:22, 91:9, 92:24, 93:8, 93:14, 94:16, 94:20, 95:17, 97:2, 97:3, 97:9, 118:4
**APA's** [2] - 17:15, 88:13
**apologize** [1] - 55:14
**apparent** [1] - 37:10
**appeal** [1] - 6:13
**appear** [7] - 9:11, 26:17, 29:12, 42:19, 58:14, 73:20, 119:9
**applicable** [2] - 12:3, 107:1
**applicant** [1] - 39:5
**applied** [2] - 17:17, 118:13
**applies** [4] - 21:16,

95:9, 115:2, 115:6
**apply** [10] - 20:13, 38:25, 39:6, 40:9, 40:14, 40:23, 41:16, 80:12, 91:5, 108:18
**applying** [2] - 39:7, 45:2
**appoint** [1] - 70:10
**appointed** [3] - 70:3, 99:18, 103:5
**appointing** [1] - 98:24
**appointment** [4] - 72:14, 98:25, 99:1, 100:2
**Appointments** [9] - 70:21, 70:25, 71:7, 72:4, 72:11, 72:23, 73:8, 73:24, 74:21
**appreciate** [1] - 56:4
**appropriate** [3] - 77:14, 96:24, 97:5
**approval** [1] - 25:1
**approved** [3] - 24:24, 25:21, 110:9
**arbitrary** [8] - 19:8, 21:12, 42:12, 42:15, 95:20, 96:8, 97:17, 98:10
**area** [1] - 105:24
**areas** [1] - 74:2
**argue** [5] - 9:24, 78:17, 88:19, 91:12, 93:19
**argued** [2] - 92:21, 109:21
**arguing** [1] - 109:14
**argument** [16] - 12:8, 18:13, 19:18, 20:7, 25:1, 27:19, 37:13, 50:2, 50:7, 50:9, 50:16, 50:21, 77:21, 88:15, 88:22, 119:10
**arguments** [8] - 4:24, 5:7, 5:17, 8:11, 13:9, 50:18, 95:22, 119:9
**arrangements** [1] - 71:13
**Article** [4] - 13:22, 14:11, 23:19, 77:18
**articulated** [1] - 44:3
**aside** [1] - 42:14
**aspects** [1] - 37:21
**asserted** [1] - 7:11
**asserting** [1] - 22:21
**assess** [1] - 95:22
**assistance** [2] - 26:25, 106:25
**Assistant** [3] - 99:4, 99:17, 103:4
**associate** [1] - 63:1

**associated** [1] - 42:18
**Associates** [4] - 21:24, 22:4, 22:5, 94:22
**Association** [1] - 89:18
**association** [2] - 7:7, 76:18
**associational** [4] - 7:18, 8:1, 8:24, 75:16
**assume** [9] - 7:6, 31:7, 35:25, 99:17, 103:4, 104:9, 109:14, 110:20, 116:4
**assuming** [3] - 43:13, 80:9, 116:10
**assumption** [2] - 4:7, 114:23
**assurance** [1] - 48:7
**attach** [1] - 95:16
**attached** [1] - 8:14
**attempt** [2] - 26:23, 26:25
**attention** [2] - 5:10, 52:15
**Attorney** [1] - 62:15
**attorneys** [1] - 4:20
**authority** [20] - 16:19, 64:1, 64:3, 64:17, 68:1, 71:4, 72:5, 72:8, 73:8, 73:18, 75:6, 85:20, 99:24, 100:6, 100:7, 100:10, 100:13, 100:14, 100:19, 100:25
**authorize** [2] - 22:9, 118:16
**authorized** [6] - 75:1, 77:2, 92:10, 110:6, 117:19, 118:9
**automatically** [1] - 17:16
**availability** [1] - 94:23
**available** [5] - 20:8, 20:25, 21:14, 93:18, 102:14
**avenue** [1] - 94:12
**award** [1] - 22:17
**aware** [12] - 5:14, 34:1, 42:17, 65:6, 107:9, 108:1, 109:4, 109:7, 112:21, 112:22, 113:14, 113:19

---

**B**

**background** [1] - 6:25

**balance** [2] - 51:4, 52:3
**balancing** [1] - 61:12
**bank** [1] - 14:5
**bar** [1] - 20:23
**bare** [3] - 79:5, 81:8, 81:11
**base** [1] - 122:17
**based** [22] - 9:9, 10:21, 25:7, 30:10, 30:11, 35:12, 35:13, 35:16, 45:18, 57:15, 70:15, 72:17, 79:20, 97:7, 106:3, 110:14, 111:14, 111:21, 116:13, 117:9, 117:23, 118:4
**basic** [1] - 56:25
**basis** [3] - 32:19, 39:16, 92:25
**became** [4] - 34:16, 34:23, 35:3, 113:14
**began** [2] - 98:23, 99:2
**behalf** [4] - 4:1, 7:19, 63:4, 102:16
**behind** [1] - 49:10
**believes** [1] - 96:22
**Bessent** [12] - 3:5, 15:15, 25:12, 25:20, 35:5, 35:14, 36:8, 38:15, 43:18, 68:5, 75:11, 95:23
**best** [7] - 8:15, 10:11, 20:6, 22:19, 28:3, 45:8, 94:24
**better** [7] - 4:21, 10:5, 12:8, 19:17, 25:1, 113:4
**between** [16] - 12:4, 14:15, 18:15, 24:7, 25:15, 27:6, 30:5, 36:23, 37:22, 42:6, 60:12, 67:18, 67:24, 99:6, 100:1, 101:25
**beyond** [7] - 13:21, 43:17, 44:21, 64:16, 68:24, 94:22, 101:8
**BFS** [15] - 24:22, 26:15, 36:14, 68:18, 90:3, 95:25, 97:15, 99:6, 101:6, 106:10, 106:12, 106:15, 113:24, 117:12
**BFS's** [1] - 106:11
**bind** [2] - 70:20, 108:15
**bit** [2] - 6:25, 10:22
**blanking** [1] - 22:3
**body** [1] - 115:23

**boil** [1] - 119:9
**bona** [1] - 39:25
**Bowen** [3] - 20:11, 23:12, 23:15
**Bradley** [1] - 3:25
**branch** [2] - 80:5, 80:16
**breach** [7] - 9:17, 14:25, 52:18, 52:23, 53:1, 53:11, 53:13
**break** [3] - 114:18, 116:9, 116:20
**brief** [8] - 22:3, 23:2, 23:3, 23:8, 24:23, 26:4, 40:6, 123:3
**briefed** [2] - 73:11, 115:7
**briefing** [6] - 7:24, 75:17, 78:3, 121:17, 121:25, 123:25
**briefly** [1] - 113:13
**briefs** [2] - 4:7, 63:23
**bring** [17] - 5:10, 10:22, 11:8, 23:23, 52:15, 53:25, 76:10, 84:18, 87:16, 93:9, 93:10, 94:10, 95:13, 97:1, 109:10, 116:11, 116:14
**bringing** [2] - 7:18, 40:20
**broad** [7] - 36:24, 40:25, 42:7, 67:8, 91:9, 92:8, 93:13
**broader** [5] - 5:20, 15:21, 37:19, 38:10, 38:11
**broadly** [2] - 28:24, 37:12
**brought** [4] - 39:15, 76:7, 84:10, 91:7
**bucket** [1] - 50:3
**bunch** [3] - 35:20, 41:10, 100:8
**burden** [1] - 5:5
**Bureau** [15] - 9:9, 9:11, 13:6, 15:19, 26:10, 27:2, 31:20, 38:20, 39:20, 40:18, 41:22, 43:4, 43:5, 44:7, 46:20
**Bureau's** [7] - 9:5, 21:17, 27:8, 31:19, 31:23, 35:15, 41:4
**bureaucracy** [2] - 54:17, 55:10

**C**

**cabining** [1] - 37:11

**cannot** [4] - 43:3, 94:16, 99:9, 99:12
**capabilities** [1] - 41:4
**capacious** [1] - 36:21
**capacities** [1] - 71:3
**capacity** [3] - 104:11, 104:18, 105:6
**Capital** [1] - 92:25
**capricious** [6] - 21:12, 42:12, 42:15, 95:21, 96:9, 97:17
**capriciousness** [1] - 98:10
**care** [3] - 21:10, 21:11, 124:8
**career** [3] - 15:16, 15:19, 35:18, 36:7, 51:13
**careful** [1] - 33:3
**carefully** [3] - 4:12, 86:17, 93:16
**carried** [1] - 47:16
**carry** [1] - 75:1
**carrying** [1] - 75:2
**case** [59] - 3:3, 5:19, 6:4, 8:19, 8:20, 9:7, 9:17, 9:25, 10:15, 10:19, 13:13, 18:4, 20:12, 20:19, 22:11, 23:8, 23:22, 24:9, 26:2, 27:24, 31:18, 47:10, 47:19, 48:24, 51:24, 52:1, 52:8, 52:11, 56:6, 74:7, 76:6, 77:14, 81:17, 81:23, 81:24, 82:12, 82:16, 82:17, 83:19, 83:23, 84:16, 84:23, 84:24, 85:12, 87:18, 87:21, 89:8, 92:18, 94:23, 94:24, 96:15, 97:6, 97:12, 106:8, 115:8, 116:8, 119:7, 122:1
**cases** [11] - 11:6, 22:19, 22:24, 44:15, 45:15, 47:11, 48:6, 83:17, 87:15, 94:15, 94:22
**catch** [1] - 93:23
**catch-all** [1] - 93:23
**categories** [2] - 58:5, 91:25
**categorize** [1] - 26:16
**category** [5] - 41:1, 56:23, 65:4, 65:5, 71:21
**causation** [1] - 7:15
**caused** [2] - 9:22, 19:5
**caveat** [1] - 63:16,

63:21, 63:24
**Cell** [4] - 21:24, 22:3, 22:5, 94:22
**CEO** [12] - 32:13, 32:17, 32:25, 33:4, 80:14, 80:23, 104:11, 104:19, 105:5, 105:10, 105:11, 105:22
**certain** [8] - 11:17, 18:25, 19:3, 41:12, 50:23, 79:17, 79:21, 86:15
**certainly** [12] - 15:14, 45:2, 55:25, 58:23, 63:1, 71:8, 71:10, 76:12, 82:11, 98:1, 104:4, 119:22
**CERTIFICATE** [1] - 124:15
**certify** [1] - 124:17
**cetera** [4] - 54:2, 71:13, 107:17, 123:20
**chain** [3] - 66:24, 68:2, 99:14
**challenge** [3] - 26:4, 95:2, 109:11
**challenged** [1] - 66:11
**challenges** [1] - 95:4
**challenging** [1] - 77:10
**chance** [2] - 4:11, 30:8
**Chandra** [2] - 124:17, 124:21
**change** [19] - 14:20, 14:24, 15:9, 15:13, 15:17, 15:23, 15:25, 21:16, 25:23, 28:16, 44:6, 76:23, 77:1, 77:9, 90:10, 90:16, 90:21, 101:19
**changed** [4] - 14:22, 15:24, 36:9, 107:20
**changes** [5] - 6:18, 9:8, 9:12, 25:22, 26:8, 27:1, 34:19, 40:1, 41:21, 61:24, 90:7, 91:2, 101:4, 123:5
**changing** [1] - 25:12
**Chao** [2] - 17:19, 22:25
**chaotic** [1] - 97:21
**characterization** [1] - 98:11
**charge** [5] - 38:8, 42:7, 57:21, 62:14, 73:16
**check** [1] - 56:5

**Chief** [11] - 25:21, 54:11, 54:12, 59:14, 59:18, 64:5, 64:13, 66:23, 67:14, 74:16, 100:12
**choice** [1] - 97:10
**chosen** [2] - 97:6, 97:9
**Christopher** [1] - 4:2
**Chutkan** [4] - 61:4, 61:13, 62:11, 63:9
**Circuit** [7] - 20:22, 44:17, 84:24, 88:12, 92:24, 96:17, 119:7
**circuit** [3] - 4:11, 45:8, 94:18
**Circuit's** [2] - 23:8, 28:8
**circumstance** [1] - 85:1
**circumstances** [4] - 79:17, 79:21, 83:4, 118:19
**circumvention** [1] - 37:2
**cite** [5] - 21:24, 61:10, 83:17, 86:3, 94:14
**cited** [8] - 20:11, 23:8, 84:16, 84:23, 84:24, 85:13, 94:22, 97:18
**citing** [3] - 9:20, 18:6, 29:10
**Citizens** [2] - 3:18, 3:21
**civil** [1] - 3:3
**claim** [24] - 7:11, 10:19, 11:8, 12:2, 22:11, 22:12, 32:22, 66:11, 76:7, 76:8, 76:10, 77:3, 81:19, 84:3, 86:23, 87:7, 87:8, 91:8, 93:8, 93:10, 93:11, 94:10, 95:13, 97:1
**claiming** [1] - 118:4
**Claims** [2] - 20:15, 23:18
**claims** [5] - 6:5, 7:19, 23:20, 86:15, 97:2
**clarify** [1] - 78:6
**clarity** [1] - 53:25
**Clause** [9] - 70:21, 70:25, 71:7, 72:5, 72:11, 72:23, 73:9, 73:24, 74:21
**clawed** [1] - 46:24
**clear** [13] - 10:20, 27:9, 30:7, 35:7, 37:18, 43:3, 43:10, 51:23, 61:22, 75:24,

78:4, 98:6, 113:3
**clearer** [1] - 85:6
**clearly** [2] - 3:14, 59:25
**CLERK** [1] - 3:3
**clients** [3] - 122:17, 122:20, 123:16
**close** [2] - 63:25, 64:16
**Cloud** [2] - 32:14, 33:4
**cloud** [2] - 11:12, 33:12
**Code** [25] - 6:8, 11:21, 17:2, 18:10, 20:10, 21:10, 22:22, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:20, 86:9, 86:13, 86:18, 87:3, 91:5, 117:17, 118:3, 118:6, 118:10, 119:1
**codes** [1] - 26:16
**coexistence** [1] - 23:5
**colleagues** [3] - 55:15, 115:8, 119:17
**Columbia** [1] - 62:16
**combat** [2] - 98:3, 98:8
**combination** [1] - 23:11
**coming** [3] - 4:9, 49:12, 52:9
**command** [2] - 66:25, 68:2, 99:14
**commence** [1] - 68:12
**commenced** [1] - 68:14
**committee** [3] - 78:25, 79:9, 82:12
**common** [8] - 12:11, 13:22, 13:24, 14:11, 14:10, 32:6, 84:6
**communicated** [1] - 108:14
**communications** [1] - 105:25
**companies** [1] - 62:8
**company** [10] - 14:5, 80:15, 80:23, 82:23, 83:13, 104:12, 104:19, 105:6, 105:23
**compared** [1] - 85:4
**comparison** [1] - 85:5
**competing** [7] - 80:17, 80:25, 81:4, 82:25, 83:8, 84:6
**competitive** [1] - 83:16
**competitor** [1] - 81:14

**complaint** [3] - 60:24, 70:13, 73:12

**complete** [2] - 96:1, 108:1

**completed** [3] - 27:12, 53:14, 107:24

**completely** [1] - 108:10

**complex** [1] - 4:14

**complicated** [1] - 115:23

**comply** [3] - 46:12, 70:25, 93:23

**complying** [3] - 71:7, 109:17, 111:1

**component** [6] - 54:18, 54:20, 55:11, 57:6, 57:13, 58:12

**comports** [1] - 44:3

**comprehensive** [1] - 94:1

**compromise** [1] - 53:16

**compromised** [1] - 51:10

**computer** [4] - 28:17, 31:25, 41:21, 49:11

**computers** [2] - 31:23, 31:24

**computing** [1] - 33:12

**concern** [9] - 30:18, 31:3, 32:21, 36:20, 37:9, 37:19, 48:12, 72:20, 72:22

**concerned** [2] - 34:21, 61:1

**concerns** [2] - 32:15, 70:16

**conclude** [3] - 94:2, 119:4, 119:11

**concluded** [3] - 94:19, 97:12, 97:20

**conclusion** [1] - 22:8

**concrete** [4] - 7:15, 81:11, 81:18, 81:20

**condition** [1] - 93:1

**conditions** [3] - 16:18, 85:19, 123:20

**conduct** [2] - 14:16, 78:9

**conducting** [2] - 40:16, 68:24

**confer** [9] - 55:15, 119:16, 120:24, 121:3, 121:9, 122:11, 122:16, 122:19, 123:16

**conferring** [4] - 119:19, 121:3, 121:4, 121:15

**confers** [2] - 16:19, 85:20

**confidential** [2] - 41:8, 102:12

**confidentiality** [2] - 102:7, 108:15

**confine** [1] - 12:19

**confirm** [1] - 58:24

**confirmed** [10] - 55:2, 55:7, 58:1, 58:4, 70:23, 72:12, 74:10, 74:15, 74:23, 75:10

**conflicted** [1] - 112:1

**confusion** [2] - 34:12, 35:11

**Congress** [19] - 12:16, 17:10, 18:13, 18:20, 22:5, 22:8, 78:23, 79:9, 79:13, 79:14, 79:21, 86:11, 94:7, 94:11, 94:25, 95:12, 110:6, 111:3, 111:25

**Congress's** [1] - 50:12

**Congressional** [2] - 78:25, 93:15

**congressional** [1] - 79:9

**conjunction** [3] - 70:4, 106:23, 110:11

**connected** [2] - 31:23, 72:18

**connection** [2] - 14:14, 37:22

**consent** [7] - 11:19, 11:22, 16:20, 31:20, 85:21, 91:16, 122:25

**consequence** [2] - 95:11, 95:13

**consequences** [6] - 24:18, 88:8, 90:4, 90:23, 91:4, 95:18

**consider** [1] - 42:23

**consideration** [1] - 43:22

**considered** [4] - 4:15, 43:19, 95:23, 96:6

**considering** [2] - 38:16, 61:12

**consistent** [7] - 68:18, 106:9, 117:5, 117:11, 117:15, 118:20, 118:22

**consists** [1] - 120:21

**Constitution** [1] - 70:21

**constitutionality** [1] - 70:16

**constitutionally** [1] - 72:25

**constraints** [1] - 97:19

**construing** [1] - 93:1

**consult** [3] - 68:8, 68:9, 73:25

**consultant** [16] - 99:7, 99:9, 99:12, 100:3, 100:6, 100:12, 100:20, 102:3, 102:5, 102:14, 102:15, 102:19, 102:22, 103:6, 103:9, 104:3

**consultants** [1] - 100:7

**consultation** [1] - 68:7

**consulted** [1] - 70:9

**consulting** [1] - 111:11

**consummated** [1] - 26:3

**consummation** [2] - 24:15, 88:5

**contact** [1] - 107:21

**containing** [1] - 47:14

**contend** [1] - 76:22

**contents** [1] - 37:24

**context** [3] - 19:20, 95:6, 111:24

**contours** [2] - 9:8, 44:8

**contractors** [1] - 39:3

**contrary** [1] - 19:8

**conversation** [1] - 116:16

**coordinate** [1] - 40:18

**coordinates** [1] - 71:15

**coordination** [1] - 117:4

**copy** [2] - 52:10, 106:14

**correct** [24] - 7:17, 7:22, 7:23, 53:4, 54:22, 54:25, 55:3, 55:5, 55:7, 57:7, 57:8, 57:11, 57:15, 59:15, 61:8, 61:9, 88:22, 100:11, 100:16, 109:21, 109:22, 110:6, 115:11, 124:18

**corrected** [4] - 34:10, 35:2, 113:14, 113:18

**correcting** [1] - 19:11

**correction** [1] - 94:3

**correctly** [6] - 29:19, 68:6, 90:13, 111:6, 117:25, 123:10

**correspond** [1] - 5:8

**counsel** [6] - 3:6, 3:20, 116:24,

119:19, 120:24, 121:15

**Counsel** [1] - 121:4

**couple** [4] - 78:6, 78:21, 82:5, 99:20

**course** [4] - 4:25, 6:12, 23:6, 56:19, 57:3, 68:23, 80:4, 81:9, 101:18, 106:4

**court** [7] - 8:21, 23:19, 36:11, 86:3, 94:19, 116:18, 116:21

**Court** [58] - 3:2, 5:25, 6:8, 6:14, 6:20, 10:20, 12:4, 13:3, 13:4, 16:9, 16:24, 17:19, 20:14, 22:14, 22:17, 23:18, 23:23, 42:14, 46:11, 47:2, 47:20, 48:7, 50:12, 71:8, 72:2, 72:11, 73:25, 74:7, 74:8, 74:21, 75:12, 81:10, 84:1, 84:24, 85:2, 85:3, 85:7, 85:13, 85:24, 86:4, 87:10, 87:17, 87:25, 89:16, 96:14, 96:16, 96:18, 96:22, 96:25, 97:2, 104:21, 117:22, 119:5, 121:24, 122:7, 122:25, 123:23, 124:9

**COURT** [227] - 3:8, 3:23, 4:5, 6:21, 7:24, 8:22, 9:24, 12:7, 13:8, 14:12, 15:6, 15:12, 16:2, 16:13, 18:19, 19:9, 20:6, 20:18, 21:24, 22:5, 22:18, 23:2, 23:4, 23:15, 24:8, 24:11, 25:8, 26:13, 26:19, 27:18, 28:1, 28:15, 28:18, 31:5, 32:8, 32:10, 32:23, 33:15, 33:21, 33:24, 34:3, 35:19, 36:13, 37:13, 38:23, 40:3, 40:7, 40:10, 40:12, 40:24, 41:5, 42:10, 44:11, 46:7, 46:16, 46:18, 48:2, 48:11, 49:4, 49:7, 49:24, 50:15, 51:2, 51:4, 52:6, 53:2, 53:6, 53:10, 53:19, 53:24, 55:13, 55:20, 56:10, 56:17, 56:20, 57:4, 57:10, 57:12, 57:19, 57:23,

58:10, 58:25, 59:6, 59:8, 59:19, 59:24, 60:9, 60:15, 60:23, 61:10, 62:5, 63:17, 64:7, 64:20, 65:3, 65:7, 65:12, 65:17, 66:12, 67:1, 67:7, 67:12, 67:16, 68:3, 68:20, 68:25, 69:20, 69:22, 70:2, 70:6, 70:11, 72:24, 73:5, 73:13, 74:1, 75:14, 76:3, 76:16, 77:4, 77:8, 77:21, 78:6, 78:12, 78:17, 79:7, 79:14, 79:16, 80:1, 80:14, 80:22, 81:4, 81:22, 82:5, 82:9, 82:24, 84:5, 84:17, 84:22, 85:15, 87:2, 87:9, 87:13, 87:16, 88:2, 88:18, 88:24, 89:9, 89:23, 90:6, 90:18, 91:10, 91:23, 92:21, 93:19, 94:14, 94:25, 95:20, 97:11, 98:13, 100:15, 101:1, 101:17, 101:22, 101:24, 102:5, 102:7, 102:13, 102:17, 102:19, 102:24, 103:2, 103:12, 103:19, 104:7, 104:17, 105:3, 105:10, 105:12, 105:14, 105:18, 105:21, 107:2, 107:14, 108:11, 109:2, 109:6, 109:13, 109:23, 110:14, 111:14, 112:9, 113:1, 113:8, 113:21, 114:3, 114:10, 114:15, 115:10, 115:14, 115:17, 115:24, 116:9, 116:18, 116:23, 117:21, 118:15, 119:2, 119:18, 119:23, 120:2, 120:7, 120:10, 120:17, 120:20, 120:22, 121:5, 121:16, 121:22, 122:5, 122:14, 122:18, 122:21, 123:7, 123:12, 123:15, 124:5, 124:7

**Court's** [7] - 17:24,

36:10, 46:10, 48:8, 56:8, 56:14, 89:16

**COURTROOM** [1] - 3:3

**courts** [9] - 9:20, 12:13, 13:2, 17:17, 19:19, 19:20, 20:2, 46:14, 94:15

**cover** [2] - 100:4, 108:9

**covered** [2] - 92:3, 116:10

**crafted** [1] - 86:17

**create** [5] - 79:1, 80:8, 81:24, 83:15, 84:15

**created** [5] - 34:20, 54:12, 87:10, 93:16, 95:1

**creates** [1] - 93:20

**creating** [2] - 62:13, 65:24

**creation** [1] - 30:3

**credible** [1] - 7:5

**credit** [1] - 83:22

**creditor** [1] - 14:5

**criminal** [1] - 40:20

**critical** [1] - 97:15

**cross** [4] - 120:14, 121:1, 121:7, 124:1

**cross-motion** [4] - 120:14, 121:1, 121:7, 124:1

**crystal** [2] - 43:3, 43:10

**cumulatively** [1] - 57:1

**curious** [1] - 34:18

## D

**D.C** [8] - 20:22, 23:7, 28:8, 44:17, 88:12, 92:24, 96:17, 119:7

**damage** [1] - 17:3

**damages** [27] - 9:18, 10:19, 10:21, 12:2, 12:5, 16:17, 17:10, 17:14, 17:21, 18:4, 19:4, 19:18, 20:15, 21:19, 22:19, 23:14, 23:23, 23:25, 24:1, 77:20, 85:18, 93:22, 94:10, 94:19, 95:1, 95:15, 109:12

**data** [31] - 9:17, 12:20, 14:25, 25:14, 26:9, 33:12, 37:4, 37:5, 37:11, 38:20, 43:4, 43:10, 46:1, 46:14, 46:16, 47:8, 47:20,

8:7, 48:10, 51:10, 51:21, 52:17, 76:14, 77:16, 83:18, 85:8, 85:10, 89:12, 106:12, 106:15, 117:8

**database** [4] - 47:5, 47:9, 47:13, 111:2

**databases** [2] - 26:20, 106:15

**DATE** [1] - 124:21

**date** [5] - 15:18, 98:21, 100:1, 119:23, 122:14

**dates** [3] - 34:11, 35:20, 122:15

**day-to** [1] - 88:21

**days** [4] - 25:24, 52:24, 62:11, 62:15

**decide** [9] - 10:7, 10:9, 62:20, 63:6, 63:7, 67:8, 96:14, 110:18, 121:24

**decides** [2] - 69:22, 110:21

**deciding** [1] - 95:24

**decision** [32] - 9:20, 12:1, 17:24, 21:15, 21:25, 24:16, 28:4, 28:9, 38:14, 38:19, 42:14, 43:18, 44:9, 44:10, 47:21, 50:19, 68:1, 88:6, 89:11, 89:14, 89:17, 90:2, 90:5, 90:6, 90:25, 96:7, 96:8, 97:14, 123:5, 123:8, 123:24

**decision-maker** [1] - 43:18

**decision-makers** [1] - 38:14

**decision-making** [6] - 24:16, 38:19, 42:14, 68:1, 88:6, 96:8

**decisions** [12] - 17:22, 18:12, 18:18, 21:12, 47:25, 49:15, 56:21, 73:17, 73:18, 88:20, 91:12, 99:12

**declaration** [14] - 29:21, 29:22, 35:1, 41:3, 42:16, 62:1, 69:25, 71:14, 76:25, 90:17, 98:5, 98:6, 106:9, 114:7

**declarations** [8] - 8:13, 9:11, 34:23, 36:19, 48:6, 52:23, 53:9, 107:12

**declined** [2] - 45:3,

45:16

**deductions** [4] - 110:23, 110:25, 111:4

**defend** [1] - 39:16

**defendant** [2] - 31:6, 31:15

**defendant's** [3] - 42:16, 83:24, 117:10

**defendants** [20] - 4:1, 4:25, 5:2, 5:4, 9:24, 22:1, 35:19, 36:1, 36:13, 39:9, 41:11, 53:21, 99:16, 113:22, 118:7, 118:25, 119:9, 120:7, 122:4, 124:5

**defendants'** [3] - 14:15, 26:4, 78:8

**Defender's** [1] - 3:22

**defense** [1] - 116:24

**deficient** [1] - 38:17

**define** [1] - 89:3

**defined** [1] - 37:12

**definition** [4] - 115:4, 115:19, 116:1, 116:3

**degree** [2] - 16:5, 103:15

**delegated** [1] - 99:3

**Democracy** [1] - 3:22

**denial** [1] - 89:21

**Department** [52] - 3:25, 4:2, 4:3, 5:16, 12:15, 29:25, 35:4, 46:21, 56:16, 61:3, 61:15, 62:13, 67:15, 70:4, 70:20, 80:21, 85:9, 86:25, 87:1, 89:12, 92:5, 92:17, 92:19, 98:23, 102:25, 103:17, 103:25, 104:10, 105:17, 106:1, 106:7, 106:18, 106:22, 107:4, 107:11, 107:15, 107:18, 107:22, 108:8, 108:13, 109:1, 109:5, 109:8, 109:15, 110:11, 111:10, 111:17, 112:3, 112:13, 114:5, 118:8

**department** [1] - 92:9

**deputy** [5] - 54:24, 55:1, 55:4, 57:24, 58:1

**DEPUTY** [1] - 3:3

**describe** [1] - 103:7

**described** [4] - 68:17,

69:24, 107:12, 114:2

**description** [3] - 36:24, 37:4, 37:7

**descriptions** [1] - 36:18

**designated** [1] - 83:24

**despite** [1] - 45:19

**detail** [1] - 38:6

**detailed** [4] - 22:7, 93:20, 94:1, 94:3

**detect** [2] - 40:2, 41:22

**detection** [1] - 41:4

**determine** [7] - 13:25, 47:21, 96:7, 110:10, 111:11, 112:5, 122:25

**determined** [2] - 24:17, 88:7

**determines** [1] - 47:2

**devised** [1] - 86:11

**dicta** [1] - 22:25

**difference** [5] - 55:20, 55:22, 56:22, 66:12, 94:9, 108:11, 108:21

**different** [28] - 4:24, 5:17, 6:5, 6:10, 9:16, 18:7, 20:3, 26:22, 27:14, 31:14, 35:20, 49:17, 49:18, 52:8, 56:21, 58:4, 60:1, 60:15, 62:24, 63:8, 71:21, 80:1, 84:6, 84:25, 90:6, 107:18

**differently** [2] - 42:24, 97:23

**difficult** [1] - 90:9

**Digital** [2] - 54:9, 60:6

**direct** [2] - 103:18, 104:2

**directed** [2] - 67:13, 117:13

**directing** [2] - 71:6, 104:5

**direction** [10] - 29:22, 68:19, 71:18, 71:24, 72:7, 73:7, 73:16, 74:13, 74:22, 104:1

**directive** [1] - 12:22

**directly** [4] - 12:3, 25:21, 36:12, 55:16

**director** [7] - 54:24, 55:4, 55:5, 57:24, 58:1, 80:3, 99:10

**Director** [3] - 55:1, 55:5, 58:2

**disaggregate** [1] - 47:17

**disagree** [7] - 47:25, 92:14, 95:21, 97:24,

98:10, 101:19, 113:9

**disclose** [1] - 41:9

**disclosed** [6] - 11:23, 31:20, 76:14, 86:24, 104:10, 109:14

**disclosing** [4] - 28:25, 32:3, 78:24, 91:17

**disclosure** [31] - 10:1, 10:2, 10:4, 10:10, 17:5, 29:2, 29:11, 41:12, 78:21, 79:4, 79:13, 80:25, 82:1, 82:18, 82:20, 82:22, 82:24, 83:12, 83:20, 84:7, 91:16, 93:11, 93:22, 94:4, 94:6, 97:8, 108:25, 109:10, 109:11, 114:24, 114:25

**disclosures** [18] - 17:4, 17:8, 29:4, 29:8, 39:2, 39:10, 39:12, 41:16, 61:1, 79:14, 79:17, 79:20, 80:17, 93:22, 95:3, 95:4, 109:18, 115:1

**disconnect** [2] - 18:15, 42:6

**discovered** [1] - 108:25

**discovery** [5] - 30:8, 96:4, 96:11, 97:5, 97:8

**discretion** [3] - 43:24, 72:6, 72:9

**discuss** [4] - 5:12, 24:22, 73:3, 123:18

**discussed** [2] - 16:5, 68:2

**discussing** [2] - 39:14, 44:13

**discussion** [5] - 8:15, 24:6, 43:23, 44:2, 121:13

**discussions** [2] - 67:24, 101:2

**dismiss** [10] - 120:9, 120:14, 120:25, 121:6, 121:18, 121:25, 122:9, 123:9, 123:24, 123:25

**dismissed** [1] - 84:3

**displace** [1] - 24:3

**dispute** [7] - 36:17, 47:10, 76:1, 76:22, 78:7, 78:12, 90:15

**disputing** [3] - 75:20, 75:22, 76:16

**distinction** [6] - 12:4,

24:7, 48:4, 48:5, 50:8, 60:22
**distinguish** [2] - 10:24, 45:15
**District** [6] - 5:24, 23:23, 62:16, 65:21, 106:2, 117:22
**district** [3] - 45:3, 45:16, 94:15
**documentation** [1] - 98:25
**Doe** [4] - 17:19, 22:25, 23:8, 28:9
**DOGE** [67] - 12:24, 13:1, 13:19, 14:21, 15:20, 16:11, 25:13, 25:16, 26:23, 27:7, 27:10, 29:17, 30:3, 30:5, 30:12, 30:24, 31:4, 32:9, 35:15, 38:21, 39:12, 41:16, 42:2, 42:7, 42:19, 43:7, 43:8, 43:12, 48:18, 48:21, 48:23, 49:8, 51:12, 51:16, 54:1, 54:7, 54:10, 54:13, 59:24, 60:7, 60:9, 61:19, 61:22, 61:25, 62:18, 64:19, 67:3, 67:17, 67:20, 68:6, 68:21, 71:16, 89:21, 90:15, 92:10, 95:25, 97:14, 97:21, 100:21, 101:11, 103:11, 103:15, 103:25, 113:24, 117:1
**DOJ** [1] - 40:16
**done** [12] - 19:19, 26:7, 26:17, 42:24, 43:2, 44:7, 61:19, 90:1, 100:8, 113:10, 116:20, 123:21
**door** [1] - 30:19
**down** [7] - 4:9, 48:1, 52:21, 64:18, 87:23, 111:22, 119:10
**draw** [1] - 36:23
**drew** [1] - 12:4
**drug** [1] - 83:25
**duly** [1] - 110:6
**duplicate** [1] - 94:16
**during** [5] - 35:8, 35:10, 102:2, 102:9, 106:3
**duties** [8] - 29:7, 81:8, 99:4, 99:17, 103:4, 103:7, 104:24, 105:1

## E

**early** [2] - 26:23, 55:13
**easier** [2] - 3:11, 54:8
**Eastern** [1] - 65:20
**economic** [2] - 19:1, 19:2
**Edmond** [1] - 74:7
**effect** [2] - 51:10, 91:14
**effectively** [1] - 60:12
**effectuated** [1] - 14:20
**Efficiency** [1] - 62:13
**Eisen** [1] - 3:21
**either** [11] - 18:24, 21:20, 25:20, 26:25, 35:25, 47:10, 65:11, 76:7, 83:25, 107:8, 121:8
**elected** [1] - 110:21
**element** [2] - 13:23, 13:24
**elements** [5] - 7:6, 7:14, 8:3, 14:13, 78:7
**Elez** [18] - 29:23, 36:4, 43:21, 56:16, 62:3, 62:4, 62:5, 68:22, 103:16, 103:20, 106:6, 106:11, 106:14, 106:22, 112:17, 112:23, 113:13, 113:15
**Elez's** [3] - 15:1, 52:19, 105:24
**Elizabeth** [1] - 4:1
**Elon** [5] - 48:22, 61:2, 62:8, 62:14, 62:18
**elucidation** [1] - 37:16
**email** [1] - 62:17
**emails** [3] - 15:2, 52:20, 106:6
**emphasize** [1] - 52:17
**emphasizes** [1] - 53:15
**employed** [1] - 108:17
**employee** [31] - 29:13, 29:16, 30:23, 31:7, 31:8, 31:13, 32:2, 32:4, 32:13, 34:17, 34:24, 54:22, 57:15, 58:17, 58:18, 59:20, 61:5, 63:3, 63:12, 72:7, 80:15, 80:21, 80:22, 89:11, 90:25, 91:2, 102:1, 102:4, 102:10, 102:23, 103:6
**employees** [27] - 29:5, 29:11, 30:14, 30:15,

30:25, 39:3, 41:13, 56:16, 62:17, 66:6, 66:15, 70:23, 71:6, 71:19, 71:22, 72:4, 77:1, 77:4, 85:10, 86:25, 90:3, 91:20, 91:24, 92:2, 92:9, 92:15, 115:2
**employment** [8] - 33:2, 34:7, 34:19, 65:5, 98:16, 98:19
**end** [7] - 5:12, 24:20, 44:8, 51:15, 98:15, 122:6
**enforce** [1] - 102:14
**enforced** [2] - 35:17, 36:7
**engage** [2] - 23:9, 41:25, 73:19
**engaged** [2] - 41:18, 42:13
**engagement** [27] - 24:24, 25:2, 25:5, 25:16, 26:13, 27:5, 27:12, 27:14, 27:22, 34:15, 35:21, 36:16, 37:17, 37:20, 37:23, 37:25, 38:1, 66:16, 70:19, 89:24, 90:8, 91:13, 100:9, 100:17, 100:22, 101:1
**Engagement** [1] - 99:22
**engineer** [1] - 62:7
**enormous** [1] - 45:20
**ensure** [3] - 19:6, 46:5, 117:5
**ensured** [1] - 97:20
**entail** [1] - 13:5
**entailed** [1] - 97:16
**entered** [1] - 99:22
**entering** [1] - 70:18
**Enterprise** [1] - 74:6
**entities** [1] - 40:21
**entity** [1] - 50:4
**EO** [2] - 58:23, 97:25
**equities** [2] - 51:5, 52:4
**equivalent** [2] - 49:20, 50:13
**error** [4] - 35:1, 48:4, 49:14, 113:13
**especially** [5] - 6:6, 32:5, 43:5, 43:18, 114:4
**essentially** [2] - 83:19, 101:12
**establish** [1] - 78:19
**established** [2] -

100:18, 111:25
**establishing** [1] - 116:25
**et** [5] - 3:4, 54:2, 71:13, 107:17, 123:20
**evaluate** [2] - 66:10, 96:18
**evaluating** [1] - 7:3
**evidence** [1] - 7:5
**evolving** [1] - 52:8
**exact** [2] - 15:18, 63:1
**exactly** [5] - 21:6, 30:6, 32:25, 73:18, 117:2
**example** [10] - 11:2, 21:5, 39:18, 40:15, 45:17, 51:12, 60:21, 78:23, 79:1, 118:11
**examples** [1] - 81:25
**except** [2] - 56:15, 75:9, 99:10
**exception** [18] - 28:10, 29:11, 30:20, 39:10, 39:17, 39:24, 40:8, 40:13, 40:22, 40:23, 41:12, 41:15, 42:8, 49:23, 81:16, 86:7, 105:2, 109:17
**exceptions** [3] - 29:1, 29:2, 41:10
**exchange** [1] - 78:18
**exclusions** [1] - 11:24
**exclusive** [2] - 18:1, 18:20
**exclusively** [2] - 7:25, 75:18
**exclusivity** [1] - 18:24
**Excuse** [1] - 114:6
**excuse** [6] - 53:2, 64:2, 93:16, 93:17, 96:15, 103:25
**excused** [1] - 124:8
**executed** [1] - 98:25
**executive** [2] - 80:5, 80:16
**Executive** [58] - 13:1, 13:4, 13:6, 13:19, 14:21, 15:10, 27:3, 27:4, 27:10, 27:16, 30:4, 30:6, 31:9, 31:10, 43:5, 43:7, 43:8, 46:3, 46:6, 46:12, 47:6, 48:17, 49:1, 54:4, 54:5, 54:6, 54:12, 55:17, 59:3, 59:12, 59:17, 60:5, 64:13, 65:24, 67:5, 67:7, 67:23, 68:3, 68:10, 68:11,

69:5, 69:11, 69:18, 80:4, 106:24, 108:17, 110:1, 110:19, 111:15, 111:22, 112:1, 116:25, 117:9, 117:13, 117:24, 118:16
**exercise** [1] - 72:5
**exercised** [2] - 81:13, 100:13
**exercising** [2] - 71:4, 72:8
**exist** [2] - 17:20, 60:3
**existence** [1] - 17:13
**exists** [1] - 20:1
**expected** [1] - 6:21
**experience** [2] - 62:6, 70:1
**expertise** [1] - 103:10
**explained** [2] - 9:19, 96:18
**explains** [3] - 60:6, 76:25, 114:7
**explanation** [2] - 43:17, 44:6
**explicit** [1] - 86:6
**explicitly** [2] - 86:10, 112:7
**expressed** [1] - 11:24
**expressly** [2] - 16:21, 85:22
**extend** [1] - 23:22
**extent** [7] - 16:8, 50:11, 91:6, 92:4, 117:5, 117:10, 118:2

## F

**fact** [24] - 7:15, 8:23, 8:25, 9:2, 14:14, 19:14, 19:20, 19:25, 23:25, 26:5, 30:21, 47:21, 57:15, 72:17, 77:18, 77:22, 78:3, 79:25, 83:1, 83:7, 96:20, 98:9, 104:3, 108:4
**factors** [2] - 42:22, 95:24
**facts** [5] - 10:4, 10:10, 66:14, 84:7, 84:25
**factual** [3] - 48:4, 48:5, 56:2
**fail** [1] - 42:23
**failed** [1] - 43:20
**failure** [1] - 93:23
**fair** [3] - 69:15, 69:16, 88:17
**fairly** [3] - 14:14, 67:8,

78:8
**fait** [1] - 47:23
**fall** [5] - 49:22, 91:21, 92:11, 92:16, 105:1
**falling** [2] - 11:23, 50:3
**falls** [1] - 112:7
**familiar** [1] - 87:21
**far** [7] - 25:7, 34:20, 37:1, 37:10, 38:1, 109:2
**fashion** [1] - 22:14
**favor** [1] - 52:4
**feared** [1] - 44:24
**February** [24] - 34:25, 61:3, 61:15, 61:16, 61:18, 61:21, 62:1, 62:10, 71:14, 98:20, 98:22, 98:24, 99:3, 99:6, 99:19, 99:25, 100:1, 100:4, 101:25, 103:5, 103:8, 103:13, 106:5, 124:21
**Federal** [10] - 12:18, 13:16, 13:17, 13:18, 15:3, 18:2, 23:18, 28:5, 33:19, 49:9
**federal** [14] - 14:11, 39:2, 39:5, 41:13, 54:17, 55:10, 62:17, 70:20, 78:19, 78:24, 102:1, 102:8, 108:5, 112:11
**few** [3] - 25:24, 71:1, 121:14
**fide** [1] - 39:25
**field** [1] - 87:19
**figure** [1] - 35:22
**file** [5] - 19:25, 119:22, 121:7, 122:20, 123:17
**filed** [3] - 5:19, 9:7, 123:20
**filing** [1] - 48:24
**final** [30] - 16:10, 24:11, 24:14, 24:19, 25:2, 25:25, 26:1, 26:6, 26:12, 27:19, 28:5, 47:21, 50:19, 76:21, 88:2, 88:4, 88:5, 88:11, 88:13, 88:19, 89:1, 89:3, 89:7, 89:24, 90:24, 93:7, 93:14, 93:16, 99:12
**financial** [2] - 80:17, 80:24
**findings** [2] - 8:2, 113:9

**fine** [2] - 4:21, 114:20
**fingertips** [1] - 58:9
**finish** [1] - 74:3
**finished** [1] - 107:7
**firm** [6] - 80:17, 80:18, 80:25, 81:2, 81:4, 83:9
**first** [11] - 7:25, 8:24, 23:20, 25:12, 25:22, 26:23, 29:4, 38:13, 43:1, 76:10, 80:6
**Fiscal** [3] - 99:4, 99:17, 103:4
**fit** [2] - 96:10, 105:3
**fix** [1] - 47:1
**fixed** [1] - 47:11
**flow** [5] - 24:18, 88:8, 90:5, 90:24, 91:4
**flows** [2] - 64:1, 64:3
**focus** [8] - 24:9, 24:19, 28:20, 41:11, 78:2, 86:21, 116:12
**focused** [9] - 17:20, 41:2, 50:22, 53:25, 75:17, 84:7, 84:9, 114:21
**focuses** [2] - 7:25, 75:18
**FOIA** [16] - 19:19, 19:21, 19:25, 20:1, 20:4, 20:5, 21:5, 21:6, 115:5, 115:19, 115:20, 115:25, 116:3, 116:5
**FOIA's** [1] - 115:3
**follow** [2] - 43:9, 115:18
**following** [1] - 61:23
**forbid** [1] - 87:3
**forbidden** [1] - 20:9
**forbidding** [1] - 17:7
**forbids** [7] - 16:21, 16:23, 16:25, 85:22, 85:25, 86:5, 87:20
**forcing** [1] - 19:11
**forecloses** [2] - 17:16, 18:1
**foregoing** [1] - 124:17
**foreign** [7] - 26:24, 27:3, 27:16, 106:24, 110:2, 110:3
**forensic** [4] - 53:12, 107:2, 107:23, 107:25
**forever** [1] - 49:13
**forgot** [1] - 114:17
**form** [1] - 8:12
**formal** [1] - 67:21
**formerly** [1] - 29:23
**formulate** [1] - 10:7

**formulated** [1] - 50:6
**forth** [1] - 97:25
**Forum** [1] - 62:12
**forward** [5] - 5:13, 113:20, 116:14, 118:16, 119:5, 123:23
**four** [3] - 27:6, 27:12, 46:20
**frame** [1] - 34:15
**framework** [1] - 27:10
**frank** [2] - 44:12, 50:20
**frankly** [2] - 70:16, 75:7
**fraud** [8] - 38:8, 39:18, 39:22, 39:25, 40:2, 40:16, 41:3, 98:3
**fraudulent** [3] - 110:6, 110:16, 111:20
**Free** [1] - 74:6
**freely** [1] - 33:20
**freeze** [4] - 26:24, 27:4, 27:16, 27:22
**frequently** [1] - 89:7
**full** [7] - 12:24, 35:15, 46:8, 52:25, 97:15, 117:6, 117:12
**fully** [1] - 15:1
**function** [1] - 99:13
**functions** [2] - 66:4, 75:1
**Fund** [2] - 3:22, 74:6
**funds** [1] - 39:5
**Future** [1] - 62:11
**future** [3] - 45:10, 45:18, 112:16

## G

**Gadelhak** [1] - 85:13
**Garcia** [2] - 20:22, 21:2
**general** [3] - 41:11, 79:16, 97:3
**germane** [4] - 7:10, 8:5, 75:21, 76:1
**germaneness** [1] - 8:16
**Gioeli** [5] - 15:20, 38:10, 76:25, 98:6, 106:10, 114:7
**given** [11] - 5:23, 9:13, 38:12, 78:10, 78:15, 79:8, 82:6, 86:25, 93:15, 112:24
**Government** [12] - 12:18, 13:16, 13:17, 13:18, 15:3, 18:2, 28:5, 33:20, 49:9,

62:13, 106:13, 106:16
**government** [29] - 6:13, 6:15, 11:2, 11:13, 14:6, 33:2, 33:10, 34:12, 54:22, 56:3, 57:15, 58:8, 58:17, 58:18, 65:20, 72:2, 78:19, 78:24, 98:4, 102:8, 106:19, 108:6, 108:13, 108:23, 112:11, 115:3, 115:4, 115:11, 121:23
**government's** [3] - 13:15, 20:16, 51:11
**grand** [1] - 28:11
**grant** [2] - 16:19, 85:20
**granted** [7] - 5:15, 15:21, 35:15, 44:23, 44:25, 97:19, 113:20
**grantees** [1] - 27:23
**grants** [2] - 16:20, 85:21
**grasping** [1] - 69:3
**great** [1] - 62:18
**greater** [2] - 62:25, 63:10
**grounded** [1] - 21:13
**group** [1] - 40:20
**Group** [4] - 3:18, 3:21, 32:14, 33:4
**guaranteed** [1] - 9:3
**guarding** [1] - 46:1
**guess** [1] - 36:3
**guidance** [1] - 10:8

## H

**habit** [1] - 45:25
**haphazard** [2] - 97:21, 98:12
**happy** [1] - 73:24
**harm** [34] - 5:25, 9:15, 9:21, 9:23, 10:21, 11:1, 11:4, 19:1, 19:2, 44:11, 44:18, 45:6, 45:10, 45:11, 45:17, 45:19, 45:20, 47:1, 51:9, 51:25, 52:1, 52:18, 52:25, 73:1, 76:9, 77:17, 81:12, 95:15, 97:7, 112:10, 112:12, 112:16, 114:25, 123:2
**harmed** [2] - 77:12, 109:10
**harms** [4] - 21:13,

84:6, 93:12, 123:4
**hat** [9] - 30:17, 32:4, 32:5, 32:10, 32:14, 33:7, 33:8, 105:9, 105:17
**hats** [5] - 30:12, 30:21, 32:12, 104:13, 105:21
**head** [1] - 15:19
**headed** [1] - 66:1
**heads** [3] - 46:5, 68:4, 117:3
**Healy** [1] - 4:3
**hear** [6] - 3:13, 3:14, 20:2, 31:15, 50:19, 53:20
**hearing** [6] - 4:6, 52:14, 53:4, 106:3, 107:4, 107:8
**heightened** [1] - 7:3
**held** [9] - 14:4, 14:7, 21:17, 72:2, 74:8, 86:4, 92:24, 94:15, 97:10
**help** [3] - 21:25, 39:23, 123:6
**helpful** [2] - 45:22, 120:15
**helps** [1] - 86:21
**herein** [2] - 16:19, 85:20
**high** [6] - 44:18, 45:4, 67:6, 71:18, 72:7
**high-level** [3] - 67:6, 71:18, 72:7
**high-ranking** [1] - 72:7
**higher** [1] - 44:15
**highly** [1] - 62:6
**hired** [2] - 68:9, 99:11
**historic** [1] - 84:20
**history** [1] - 44:7
**hold** [1] - 121:18
**holding** [4] - 31:11, 87:2, 122:22
**holds** [2] - 12:20, 13:17
**home** [2] - 14:8, 85:6
**honest** [2] - 28:12, 48:18
**Honor** [109] - 3:17, 3:24, 4:4, 6:2, 7:23, 16:7, 22:3, 28:12, 33:9, 49:12, 53:23, 55:12, 56:6, 56:12, 56:19, 57:3, 57:9, 57:18, 57:22, 58:22, 59:5, 59:23, 61:9, 62:4, 63:15, 63:22, 65:2, 65:6, 65:11,

65:16, 66:22, 67:22, 68:16, 69:17, 72:22, 73:2, 73:12, 73:23, 75:8, 76:20, 77:7, 77:14, 78:2, 78:11, 78:15, 79:3, 79:11, 80:9, 81:6, 82:2, 82:7, 82:19, 83:11, 84:12, 86:10, 86:13, 87:6, 87:24, 88:17, 88:23, 89:6, 90:3, 91:19, 92:2, 92:13, 93:6, 94:13, 94:21, 95:9, 96:13, 97:24, 98:11, 100:11, 100:25, 101:10, 101:18, 102:3, 102:6, 102:11, 102:16, 103:1, 103:22, 106:21, 107:7, 108:4, 108:24, 109:5, 109:22, 110:8, 111:7, 111:24, 112:20, 113:6, 114:1, 114:6, 114:7, 114:14, 115:13, 116:8, 117:14, 118:1, 119:20, 120:1, 120:9, 121:21, 122:12, 123:14, 124:4, 124:6
**hope** [2] - 56:2, 75:3
**hoped** [1] - 59:9
**hopefully** [5] - 15:7, 31:15, 73:14, 98:13, 119:15
**hoping** [2] - 122:16, 122:19
**horizon** [1] - 27:13
**house** [2] - 43:14, 85:5
**House** [5] - 54:11, 59:14, 61:17, 74:16, 80:3
**House's** [1] - 31:24
**housed** [1] - 89:13
**HUMPHREYS** [149] - 3:24, 53:23, 55:12, 55:14, 56:5, 56:12, 56:19, 57:3, 57:8, 57:11, 57:17, 57:22, 58:7, 58:20, 59:4, 59:7, 59:16, 59:22, 60:5, 60:11, 60:18, 61:9, 62:4, 63:15, 63:21, 64:15, 65:1, 65:6, 65:10, 65:15, 66:9, 66:21, 67:5, 67:11, 67:13, 67:21,

68:16, 68:21, 69:16, 69:21, 69:24, 70:3, 70:8, 72:21, 73:2, 73:10, 73:23, 75:8, 75:25, 76:4, 76:19, 77:6, 77:9, 77:24, 78:10, 78:15, 79:2, 79:11, 79:15, 79:18, 80:9, 80:20, 81:3, 81:5, 82:2, 82:7, 82:19, 83:11, 84:12, 84:19, 84:23, 86:10, 87:6, 87:10, 87:14, 87:24, 88:17, 88:23, 89:6, 89:10, 90:2, 90:14, 90:22, 91:19, 92:1, 93:5, 94:7, 94:21, 95:8, 96:12, 97:24, 100:11, 100:22, 101:10, 101:18, 101:23, 102:3, 102:6, 102:10, 102:15, 102:18, 102:22, 102:25, 103:9, 103:14, 103:22, 104:14, 104:21, 105:7, 105:11, 105:13, 105:16, 105:19, 106:21, 107:7, 107:25, 108:24, 109:4, 109:7, 109:22, 110:7, 111:6, 111:23, 112:19, 113:6, 113:12, 114:1, 114:6, 114:14, 115:7, 115:12, 115:15, 115:22, 116:7, 117:14, 118:1, 118:19, 119:16, 119:20, 120:1, 120:6, 120:8, 121:20, 121:23, 122:11, 122:16, 122:19, 123:14, 124:6
**Humphreys** [1] - 3:25
**hypothetical** [14] - 79:2, 80:2, 80:8, 82:3, 82:10, 82:21, 83:5, 83:6, 104:18, 105:4, 105:8, 111:5, 111:18, 111:24
**hypothetically** [3] - 83:16, 91:6, 104:9
**hypotheticals** [2] - 82:5, 110:17

112:5
**improvements** [2] - 36:24, 38:2
**improving** [2] - 41:3, 68:18
**in-house** [1] - 43:14
**inadequacy** [1] - 23:17
**inadequate** [1] - 22:20
**inclined** [2] - 119:3, 119:10
**includes** [1] - 39:18
**including** [2] - 62:8, 71:5, 117:20
**inconsistent** [1] - 110:1
**incorporated** [1] - 95:10
**incorporates** [1] - 117:15
**indefinite** [1] - 44:24
**independent** [1] - 100:14
**indicate** [2] - 63:10, 87:18
**indicated** [6] - 18:24, 70:12, 85:16, 97:3, 113:5, 115:10
**indication** [2] - 46:13, 106:11
**individual** [17] - 7:12, 8:8, 8:17, 8:18, 8:24, 17:23, 19:12, 19:15, 31:21, 51:15, 51:23, 52:5, 75:22, 76:7, 76:8, 76:17, 95:5
**individual's** [1] - 78:24
**individualized** [6] - 39:25, 41:24, 42:3, 51:17, 95:15, 97:7
**individually** [1] - 91:8
**individuals** [11] - 11:22, 18:13, 19:21, 41:25, 51:15, 55:23, 56:7, 56:13, 76:24, 77:12, 95:7
**inexplicable** [1] - 97:18
**inferior** [2] - 70:24, 74:9
**information** [114] - 6:16, 8:20, 9:4, 9:5, 9:10, 9:13, 10:14, 11:5, 11:12, 11:14, 11:17, 11:23, 12:17, 12:20, 12:25, 13:6, 13:12, 13:18, 14:4, 14:23, 15:4, 15:14, 16:11, 21:17, 21:23,

**I**

**idea** [1] - 74:4
**ideas** [3] - 64:10, 66:5, 120:4
**identical** [2] - 20:24, 21:4
**identified** [7] - 29:9, 74:13, 74:19, 88:11, 98:7, 98:21, 111:2
**identify** [2] - 3:6, 74:20
**identifying** [2] - 39:4, 109:19
**III** [4] - 13:22, 14:11, 23:19, 77:18
**illegal** [1] - 40:17
**immediate** [2] - 11:4, 11:9
**immense** [1] - 51:9
**imminence** [1] - 46:2, 46:10
**immunity** [8] - 16:16, 20:16, 85:17, 86:7, 87:5, 88:10, 92:23, 93:1
**implement** [8] - 14:21, 26:24, 27:3, 27:15, 36:5, 44:1, 98:2, 113:10
**implementation** [3] - 24:20, 25:23, 67:20
**implemented** [6] - 13:2, 13:5, 14:25, 26:7, 27:15, 67:9
**implementing** [4] - 36:10, 43:19, 61:25, 64:10
**implicate** [1] - 27:25
**implicated** [1] - 20:4
**implication** [1] - 17:7
**implied** [1] - 17:12
**impliedly** [5] - 16:21, 17:6, 20:9, 85:22, 87:11
**Impliedly** [1] - 16:23
**important** [6] - 3:13, 47:19, 63:7, 70:14, 89:4, 108:3
**impose** [1] - 112:3
**imposes** [1] - 10:12
**impossible** [1] - 47:17
**impression** [1] - 107:5
**improper** [15] - 17:5, 39:4, 108:7, 109:20, 109:24, 109:25, 110:4, 110:8, 110:15, 110:19, 110:25, 111:4, 111:14, 111:22,

25:18, 28:5, 28:10, 30:10, 30:14, 30:16, 30:23, 31:19, 32:3, 32:4, 32:16, 32:24, 34:3, 34:4, 34:6, 35:13, 36:14, 41:1, 41:8, 41:9, 41:18, 41:22, 41:24, 42:3, 43:15, 47:5, 47:14, 49:3, 49:12, 49:19, 49:21, 51:17, 51:23, 52:1, 53:8, 53:16, 56:2, 56:25, 58:6, 58:7, 58:20, 58:24, 59:5, 64:16, 71:10, 72:17, 74:5, 75:6, 79:13, 80:25, 81:7, 81:14, 81:24, 82:4, 82:16, 82:22, 83:1, 83:2, 83:4, 83:8, 83:10, 83:21, 84:1, 85:7, 86:24, 92:4, 92:16, 93:11, 96:15, 96:23, 102:12, 106:8, 106:22, 107:12, 108:4, 108:5, 108:8, 108:22, 109:8, 110:10, 111:10, 112:4, 114:12, 117:18, 118:8, 118:14, 118:22, 118:25
**information-sharing** [1] - 109:8
**initial** [1] - 53:25
**initiative** [2] - 68:13, 68:14
**Initiative** [1] - 62:12
**injunction** [20] - 4:6, 5:15, 5:18, 5:24, 6:3, 6:12, 6:14, 6:16, 6:19, 7:1, 10:25, 34:8, 44:20, 45:12, 47:18, 53:3, 56:9, 56:14, 94:20, 117:21
**injunctions** [2] - 22:9, 45:4
**injunctive** [22] - 9:14, 9:21, 9:23, 10:24, 11:6, 12:4, 16:25, 17:5, 17:7, 17:22, 18:10, 19:10, 19:16, 20:7, 20:24, 24:3, 44:22, 78:14, 85:25, 86:14, 94:16, 94:23
**injured** [1] - 7:21
**injuries** [2] - 14:15, 16:4
**injury** [28] - 7:15, 8:23,

8:25, 9:2, 9:23, 11:9, 13:22, 13:25, 14:9, 14:11, 14:14, 22:21, 44:21, 44:25, 77:18, 77:22, 78:3, 78:8, 78:11, 78:13, 78:16, 78:25, 79:25, 80:7, 81:18, 81:20, 81:23, 96:20

**injury-in-fact** [10] - 7:15, 8:23, 8:25, 9:2, 14:14, 77:18, 77:22, 78:3, 79:25, 96:20

**instance** [9] - 40:15, 45:4, 57:23, 74:6, 77:12, 79:5, 82:21, 107:13, 111:11

**instances** [1] - 79:15

**instead** [1] - 120:12

**insufficient** [1] - 78:19

**integration** [1] - 103:10

**integrity** [1] - 47:20

**intend** [1] - 22:9

**intends** [1] - 18:20

**interact** [1] - 113:24

**interest** [5] - 11:13, 11:16, 27:25, 51:5, 75:22

**interested** [1] - 51:19

**interests** [6] - 6:9, 7:9, 8:4, 52:5, 75:20, 76:1

**interface** [1] - 60:20

**Interior** [1] - 39:11

**Internal** [27] - 6:8, 11:21, 17:2, 18:9, 20:10, 21:10, 22:21, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:19, 86:8, 86:13, 86:18, 86:23, 87:3, 91:5, 93:10, 117:16, 118:3, 118:5, 118:10, 119:1

**internal** [2] - 60:19, 78:18

**interoperability** [1] - 47:7

**interpret** [1] - 88:15

**interpreted** [2] - 72:11, 74:21

**intra** [5] - 49:16, 50:1, 50:2, 50:13, 81:16

**intra-agency** [5] - 49:16, 50:1, 50:2, 50:13, 81:16

**intruded** [1] - 11:18

**intruding** [3] - 10:13, 13:11, 13:16

**intrusion** [12] - 10:3, 10:9, 10:12, 10:14, 11:16, 12:7, 13:10, 84:8, 84:13, 84:19, 85:6, 85:12

**intrusive** [1] - 10:3

**invasion** [1] - 14:8

**investigation** [1] - 40:17

**investigations** [3] - 39:18, 39:25, 40:14

**Investment** [1] - 62:12

**invoke** [1] - 109:18

**invoked** [1] - 39:10

**involve** [3] - 20:3, 21:7, 28:10

**involved** [12] - 12:2, 18:4, 22:11, 27:23, 28:9, 31:21, 55:23, 64:9, 66:15, 73:15, 100:16, 107:20

**involves** [1] - 19:2

**involving** [3] - 10:25, 11:6, 18:4

**IRC** [1] - 18:16

**irregularities** [1] - 34:9

**irreparable** [1] - 5:25, 44:11, 44:18, 45:11, 45:17, 47:1, 52:18, 73:1, 112:10, 112:12, 123:2

**IRS** [1] - 42:2

**issuance** [2] - 22:9, 88:25

**issue** [23] - 6:7, 12:16, 16:9, 16:23, 23:13, 24:5, 26:1, 26:2, 33:8, 45:3, 53:16, 55:25, 63:22, 67:19, 73:13, 75:2, 76:6, 81:6, 82:15, 92:19, 112:14, 115:7, 123:18

**issued** [4] - 11:2, 61:21, 62:16, 122:7

**issues** [10] - 4:14, 5:16, 6:20, 29:15, 34:20, 55:16, 73:11, 75:15, 79:23, 88:24

**IT** [2] - 36:24, 117:7

**itemized** [3] - 110:22, 110:24, 111:3

**itself** [4] - 14:9, 20:4, 20:5, 24:2

**J**

**January** [17] - 15:18, 34:24, 35:5, 35:22,

36:4, 54:16, 55:9, 57:5, 62:2, 98:18, 99:2, 99:6, 99:23, 100:1, 100:3, 100:5, 101:25

**job** [6] - 29:24, 30:23, 30:25, 36:18, 37:4, 37:7

**jointly** [1] - 61:23

**Joseph** [1] - 106:9

**JOSHI** [74] - 3:17, 6:2, 7:23, 8:13, 9:2, 10:18, 12:10, 13:14, 14:19, 15:8, 15:14, 16:7, 17:9, 18:23, 19:14, 20:11, 21:3, 22:2, 22:10, 22:23, 23:3, 23:5, 23:24, 24:10, 25:6, 25:10, 26:18, 26:21, 27:20, 28:8, 28:16, 29:20, 31:17, 32:9, 32:15, 33:9, 33:18, 33:22, 34:2, 34:22, 36:2, 36:18, 37:24, 39:16, 40:5, 40:8, 40:11, 40:13, 40:25, 41:17, 43:1, 45:23, 46:8, 46:17, 46:19, 48:3, 48:17, 49:6, 49:8, 50:8, 50:25, 51:3, 51:8, 52:16, 53:5, 53:8, 53:11, 120:13, 120:18, 120:21, 122:13, 122:24, 123:11, 124:4

**Joshi** [1] - 3:18

**Judge** [15] - 5:14, 5:23, 9:19, 15:7, 44:16, 52:12, 61:4, 61:13, 62:11, 63:9, 65:20, 97:11, 106:2, 107:9, 113:4

**judges** [2] - 45:3, 45:15

**judgment** [6] - 7:4, 16:10, 18:21, 50:13, 120:15, 124:1

**judicial** [2] - 24:13, 88:3

**July** [1] - 27:11

**juncture** [1] - 96:22

**jurisdiction** [6] - 16:14, 16:24, 23:20, 85:24, 88:16, 93:4

**jurisdictional** [2] - 88:14, 96:18

**jury** [1] - 28:11

**Justice** [4] - 3:25, 4:2, 61:3, 61:15

**K**

**Kean** [2] - 124:17, 124:21

**keep** [2] - 102:12, 114:12

**key** [1] - 73:17

**kind** [5] - 47:12, 87:19, 95:9, 113:21, 119:13

**kindly** [1] - 116:18

**Kirts** [1] - 17:24

**Kirtz** [2] - 87:17, 87:22

**KIRTZ** [1] - 87:22

**knowable** [1] - 58:7

**knowing** [1] - 83:14

**knowledge** [4] - 33:10, 56:4, 73:14, 97:16

**knows** [1] - 58:13

**Krause** [50] - 29:13, 29:23, 31:3, 31:7, 31:11, 33:11, 35:14, 36:3, 36:14, 36:19, 41:2, 43:12, 62:1, 64:5, 66:22, 67:2, 67:18, 67:25, 68:9, 68:22, 69:1, 69:25, 71:6, 71:15, 71:24, 74:14, 74:19, 74:22, 75:10, 77:6, 80:14, 82:21, 83:6, 83:14, 92:2, 98:17, 99:1, 99:4, 99:7, 99:16, 100:23, 101:2, 101:8, 101:11, 101:14, 102:8, 104:10, 104:17, 105:8, 111:1

**Krause's** [5] - 29:20, 34:7, 83:13, 98:16, 98:21

**L**

**lack** [2] - 10:18, 72:17

**lacks** [2] - 16:24, 85:24

**laptop** [3] - 11:12, 106:11, 106:15

**last** [9] - 6:12, 16:4, 17:24, 27:6, 105:24, 112:9, 114:17, 120:17, 122:3

**lasts** [1] - 27:11

**late** [1] - 114:16

**launch** [1] - 97:20

**law** [12] - 9:3, 11:18, 12:11, 13:22, 13:24, 14:2, 14:10, 14:11, 19:8, 84:6, 115:23, 117:5, 117:11,

117:15, 118:22, 119:7

**lawful** [6] - 33:14, 43:13, 47:22, 91:18, 91:20, 108:10

**laws** [1] - 43:9

**lawsuit** [1] - 8:9

**leader** [5] - 29:16, 99:10, 103:15, 103:24, 104:4

**leaders** [1] - 8:14

**leadership** [1] - 99:5

**learn** [3] - 27:7, 73:15, 108:5

**least** [15] - 6:23, 27:22, 30:11, 32:13, 32:23, 34:5, 34:14, 36:11, 38:5, 54:1, 54:3, 71:9, 82:10, 103:16, 111:16

**leave** [1] - 91:10

**leaves** [3] - 49:2, 49:4, 49:12

**lectern** [1] - 58:22

**left** [1] - 84:2

**legacy** [1] - 68:18

**legal** [10] - 24:17, 26:8, 32:22, 48:4, 49:14, 66:10, 88:8, 90:4, 90:23, 91:4

**legally** [2] - 33:12, 49:20

**legislation** [1] - 87:19

**less** [3] - 4:11, 76:14, 79:23

**level** [7] - 9:12, 38:11, 45:25, 52:25, 67:6, 71:18, 72:7

**liability** [2] - 10:12, 13:10

**liable** [1] - 44:24

**license** [1] - 89:1

**licenses** [1] - 88:25

**lift** [3] - 13:2, 13:3, 13:4

**likelihood** [3] - 7:2, 45:10, 45:16

**likely** [4] - 16:2, 45:7, 79:24, 97:13

**limitations** [2] - 31:1, 37:3

**limited** [6] - 22:13, 30:19, 36:11, 70:15, 88:4, 96:3

**limiting** [1] - 43:24

**limits** [1] - 24:13

**line** [4] - 3:12, 13:23, 36:23, 122:17

**link** [2] - 44:12, 50:20

**linked** [1] - 22:6

**list** [2] - 84:19, 84:20
**lists** [1] - 61:24
**litigant** [1] - 81:17
**Litigation** [2] - 3:18, 3:21
**litigation** [1] - 73:24
**located** [3] - 54:17, 55:10, 57:5
**logged** [1] - 113:16
**logging** [2] - 113:23, 114:11
**logical** [1] - 92:25
**look** [15] - 12:13, 13:24, 14:12, 38:3, 41:23, 42:3, 51:16, 54:3, 79:18, 80:12, 84:16, 91:15, 92:7, 104:21, 119:24
**looked** [2] - 107:16, 107:19
**looking** [9] - 14:13, 16:7, 24:9, 28:2, 40:19, 41:19, 41:20, 101:24
**looks** [1] - 69:1
**lopsided** [1] - 52:4
**loss** [3] - 9:22, 11:9, 14:2
**Lucia** [1] - 72:2

**M**

**maintain** [3] - 16:8, 77:13, 122:1
**maintains** [1] - 29:5
**major** [1] - 45:18
**maker** [1] - 43:18
**makers** [1] - 73:4
**man** [1] - 62:14
**manage** [3] - 28:4, 28:17, 64:6
**management** [1] - 54:24
**managerial** [1] - 99:9
**managing** [1] - 103:12
**manner** [1] - 22:7
**March** [2] - 119:25, 123:22
**market** [1] - 37:5
**marks** [2] - 24:15, 88:5
**masks** [1] - 3:9
**Massachusetts** [2] - 20:11, 23:13
**massive** [1] - 14:2
**masters** [3] - 30:2, 31:18, 32:2
**Match** [2] - 18:19, 86:2
**Match-E-Be-Nash** [2] - 18:19, 86:2
**material** [3] - 52:9,

55:25, 107:3
**materials** [2] - 4:8, 42:21
**matter** [13] - 6:11, 11:11, 16:14, 16:24, 19:9, 23:19, 25:24, 34:8, 67:21, 85:24, 88:21, 116:15, 124:19
**matters** [1] - 94:13
**maximum** [1] - 117:5
**Mazars** [1] - 82:11
**MAZARS** [1] - 82:11
**mean** [39] - 13:21, 14:20, 20:1, 25:4, 32:11, 48:13, 50:22, 56:1, 62:24, 63:17, 63:24, 64:14, 65:19, 66:5, 67:10, 68:16, 69:1, 73:12, 74:18, 81:6, 83:13, 83:23, 90:2, 90:8, 94:9, 95:12, 96:5, 102:21, 104:13, 105:5, 107:15, 108:6, 109:9, 110:5, 112:21, 115:18, 118:1, 120:5, 122:6
**meaning** [3] - 74:20, 109:24, 115:5
**means** [6] - 72:15, 95:14, 115:4, 115:6, 115:19, 118:23
**meant** [5] - 12:19, 18:13, 87:11, 101:11
**meantime** [1] - 99:21
**measures** [3] - 25:17, 42:20, 98:7
**media** [1] - 42:5
**meet** [1] - 29:21
**member** [1] - 80:3
**members** [21] - 7:8, 7:13, 7:19, 8:1, 8:8, 8:18, 8:20, 8:24, 26:8, 27:25, 31:4, 43:12, 61:1, 68:6, 75:19, 75:23, 76:17, 93:9, 111:3, 113:24, 114:9
**members'** [7] - 14:15, 14:23, 16:3, 16:11, 76:14, 77:16, 78:8
**memoranda** [1] - 88:9
**memorandum** [2] - 92:22, 96:13
**mention** [2] - 23:7, 84:14
**mentioned** [4] - 22:25, 24:21, 66:21, 101:20
**mentions** [2] - 10:5,

48:17
**mere** [1] - 108:4
**merely** [2] - 44:23, 45:1
**merits** [10] - 28:22, 42:12, 88:16, 93:3, 93:6, 93:8, 95:22, 119:8, 119:10
**messages** [1] - 85:2
**messenger** [1] - 63:20
**methods** [1] - 18:10
**microphone** [2] - 3:14, 56:10, 123:19
**might** [15] - 9:17, 18:2, 19:17, 21:6, 23:19, 29:13, 39:21, 39:22, 40:17, 40:18, 46:25, 51:1, 86:22, 91:17, 114:25
**millions** [1] - 47:13
**mind** [3] - 56:18, 83:14, 95:2
**ministerial** [2] - 89:14, 89:18
**minor** [2] - 52:23, 53:13
**minutes** [2] - 116:19, 121:14
**mispronouncing** [1] - 103:21
**missed** [4] - 40:4, 50:16, 84:18, 120:17
**missing** [1] - 44:5
**mission** [1] - 69:18
**mistake** [4] - 112:21, 113:2, 113:17
**mistakes** [1] - 112:17
**mitigate** [2] - 112:15, 114:8
**mitigation** [1] - 25:17
**mixed** [1] - 47:14
**modernization** [5] - 67:6, 68:12, 69:23, 103:10
**modernize** [3] - 69:19, 98:1, 98:4
**modernizing** [1] - 68:17
**modify** [1] - 6:16
**moment** [2] - 69:8, 119:16
**monetary** [4] - 10:23, 86:15, 94:10, 109:11
**money** [3] - 16:17, 85:18, 95:15
**monitoring** [2] - 113:23, 114:11
**mooted** [1] - 114:25
**most** [5] - 10:11, 12:10, 45:21, 53:24,

94:5
**mostly** [1] - 45:24
**motion** [21] - 7:3, 8:14, 55:16, 60:24, 65:23, 96:14, 120:8, 120:14, 120:25, 121:1, 121:6, 121:7, 121:17, 121:24, 121:25, 122:8, 123:9, 123:24, 123:25, 124:1
**motions** [3] - 6:20, 120:4, 123:19
**move** [18] - 16:13, 20:18, 24:11, 28:22, 38:23, 41:5, 56:10, 59:6, 60:23, 74:1, 75:14, 85:15, 88:2, 97:11, 98:14, 104:7, 114:21, 116:14
**moved** [2] - 54:11, 98:9
**moving** [2] - 5:12, 119:5
**MR** [223] - 3:17, 3:24, 6:2, 7:23, 8:13, 9:2, 10:18, 12:10, 13:14, 14:19, 15:8, 15:14, 16:7, 17:9, 18:23, 19:14, 20:11, 21:3, 22:2, 22:10, 22:23, 23:3, 23:5, 23:24, 24:10, 25:6, 25:10, 26:18, 26:21, 27:20, 28:8, 28:16, 29:20, 31:17, 32:9, 32:15, 33:9, 33:18, 33:22, 34:2, 34:22, 36:2, 36:18, 37:24, 39:16, 40:5, 40:8, 40:13, 40:25, 41:17, 43:1, 45:23, 46:8, 46:17, 46:19, 48:3, 48:17, 49:6, 49:8, 50:8, 50:25, 51:3, 51:8, 52:16, 53:5, 53:8, 53:11, 53:23, 55:12, 55:14, 56:5, 56:12, 56:19, 57:3, 57:8, 57:11, 57:17, 57:22, 58:7, 58:20, 59:4, 59:7, 59:16, 59:22, 60:5, 60:11, 60:18, 61:9, 62:4, 63:15, 63:21, 64:15, 65:1, 65:6, 65:10, 65:15, 66:9, 66:21, 67:5, 67:11, 67:13, 67:21, 68:16, 68:21, 69:16, 69:21, 69:24,

70:3, 70:8, 72:21, 73:2, 73:10, 73:23, 75:8, 75:25, 76:4, 76:19, 77:6, 77:9, 77:24, 78:10, 78:15, 79:2, 79:11, 79:15, 79:18, 80:9, 80:20, 81:3, 81:5, 82:2, 82:7, 82:19, 83:11, 84:12, 84:19, 84:23, 86:10, 87:6, 87:10, 87:14, 87:24, 88:17, 88:23, 89:6, 89:10, 90:2, 90:14, 90:22, 91:19, 92:1, 93:5, 94:7, 94:21, 95:8, 96:12, 97:24, 100:11, 100:22, 101:10, 101:18, 101:23, 102:3, 102:6, 102:10, 102:15, 102:18, 102:22, 102:25, 103:9, 103:14, 103:22, 104:14, 104:21, 105:7, 105:11, 105:13, 105:16, 105:19, 106:21, 107:7, 107:25, 108:24, 109:4, 109:7, 109:22, 110:7, 111:6, 111:23, 112:19, 113:6, 113:12, 114:1, 114:6, 114:14, 115:7, 115:12, 115:15, 115:22, 116:7, 117:14, 118:1, 118:19, 119:16, 119:20, 120:1, 120:6, 120:8, 120:13, 120:18, 120:21, 121:20, 121:23, 122:11, 122:13, 122:16, 122:19, 122:24, 123:11, 123:14, 124:4, 124:6
**multiple** [1] - 26:20
**murkiness** [1] - 34:22
**Musk** [2] - 61:2, 62:14
**musk** [9] - 61:4, 61:6, 61:19, 61:21, 62:21, 63:2, 63:24, 64:8, 64:24
**Musk'** [1] - 62:8
**Musk's** [1] - 48:22
**must** [4] - 7:1, 44:21, 93:7, 93:14

**N**

**named** [2] - 35:10, 62:14
**names** [1] - 60:16
**Nandan** [1] - 3:17
**Nash** [2] - 18:19, 86:2
**necessarily** [3] - 34:4, 50:10, 108:6
**necessary** [3] - 5:25, 44:19, 117:3
**need** [34] - 8:8, 8:17, 17:9, 29:6, 36:1, 36:14, 36:21, 36:22, 37:14, 37:22, 38:4, 41:23, 43:9, 51:16, 51:22, 56:10, 66:13, 70:24, 74:4, 78:20, 81:5, 86:22, 91:20, 92:15, 102:12, 104:23, 104:25, 113:3, 116:14, 118:12, 119:12, 120:23, 121:9, 123:18
**needed** [1] - 26:11
**needs** [2] - 36:25, 37:16
**negotiation** [1] - 25:15
**network** [1] - 49:8
**networks** [1] - 49:11
**never** [1] - 91:3
**new** [10] - 15:12, 24:20, 25:3, 25:18, 25:23, 26:14, 29:24, 44:2, 52:7, 52:16
**New** [16] - 4:12, 5:15, 5:24, 6:3, 6:8, 6:12, 6:18, 9:19, 13:4, 36:11, 44:15, 46:11, 52:11, 53:6, 106:2, 117:22
**next** [7] - 5:13, 27:13, 39:8, 114:21, 116:15, 120:3, 120:4
**nobody** [2] - 58:13, 69:4
**nominally** [1] - 99:7
**nominated** [9] - 55:2, 55:6, 57:25, 58:3, 70:22, 72:12, 74:10, 74:14, 74:23
**nonconsensual** [1] - 30:20
**nondisclosure** [1] - 30:20
**none** [1] - 62:25
**Norm** [1] - 3:21
**Norton** [1] - 89:17
**note** [5] - 6:4, 23:5,

42:1, 71:9, 108:3
**Nothing** [2] - 16:19, 85:20
**nothing** [5] - 22:15, 38:14, 88:1, 101:20, 111:19
**Notice** [3] - 79:19, 80:13, 118:13
**novel** [2] - 4:15, 28:19
**number** [4] - 45:2, 87:23, 94:14, 107:1
**Number** [1] - 112:7

**O**

**oath** [1] - 98:18
**objective** [1] - 32:6
**obligations** [5] - 24:17, 88:7, 91:14, 102:8, 102:14
**obtain** [1] - 96:3
**obvious** [1] - 60:25
**obviously** [19] - 4:14, 8:2, 8:12, 23:18, 28:24, 34:9, 37:15, 37:19, 49:8, 56:2, 62:22, 65:23, 66:15, 88:3, 107:5, 112:11, 119:2, 121:16, 123:16
**occupies** [1] - 87:19
**occur** [2] - 44:24, 76:24
**occurred** [4] - 25:15, 25:24, 45:20, 76:11
**odd** [1] - 20:14
**Office** [13] - 13:7, 13:19, 30:6, 31:9, 31:10, 43:5, 46:6, 54:12, 59:13, 62:2, 64:13, 80:4, 108:17
**office** [2] - 15:15, 15:17
**officer** [7] - 16:18, 55:1, 55:6, 74:14, 74:17, 85:19, 102:1
**officers** [14] - 29:5, 30:14, 41:13, 70:22, 70:24, 70:25, 71:5, 71:20, 72:3, 72:10, 74:9, 74:10, 74:20
**official** [4] - 38:14, 71:3, 75:11, 98:24
**officials** [14] - 70:4, 71:16, 71:18, 71:19, 71:20, 71:21, 71:23, 72:3, 72:6, 74:12, 74:19, 106:10, 110:22, 117:23
**officials'** [1] - 123:3

**often** [1] - 94:11
**oil** [4] - 45:5, 45:7, 45:18, 45:19
**old** [3] - 15:16, 16:9, 16:12
**OMB** [13] - 54:20, 54:24, 55:1, 55:5, 55:11, 57:6, 57:13, 57:16, 57:21, 58:2, 58:12, 58:16, 59:12
**onboarded** [1] - 98:19
**onboarding** [1] - 34:10
**once** [16] - 5:6, 18:23, 21:5, 22:24, 23:12, 25:6, 31:17, 37:3, 46:2, 47:9, 47:23, 49:4, 49:12, 51:8, 53:1, 122:7
**one** [62] - 4:13, 4:20, 8:4, 11:3, 11:15, 11:23, 13:17, 14:24, 16:4, 23:16, 24:16, 26:19, 29:8, 31:24, 32:11, 33:8, 34:11, 34:14, 41:9, 41:11, 42:11, 43:20, 46:23, 47:24, 49:19, 50:5, 52:17, 53:21, 55:8, 60:13, 60:16, 60:18, 74:7, 75:9, 79:18, 80:12, 81:25, 82:7, 82:10, 82:17, 84:10, 88:6, 88:22, 91:1, 91:7, 91:10, 92:6, 93:20, 95:3, 95:6, 95:13, 105:24, 107:11, 107:13, 109:4, 109:7, 110:17, 114:17, 115:21, 116:23, 120:25, 121:16
**one-off** [1] - 95:3
**ones** [4] - 17:3, 54:1, 74:13, 91:13
**opaque** [1] - 54:3
**open** [2] - 38:21, 39:20
**operate** [2] - 27:8, 30:2
**operated** [1] - 44:7
**operating** [1] - 66:20
**operation** [1] - 64:9
**operational** [1] - 42:17
**operations** [2] - 70:17, 88:21
**opine** [2] - 66:9, 73:10
**opinion** [5] - 15:7, 52:13, 106:5, 107:10, 112:6

**opinions** [4] - 4:9, 4:10, 45:19, 49:25
**OPM** [1] - 62:17
**opponent** [1] - 80:7
**opportunity** [1] - 6:15
**opposed** [6] - 19:5, 76:18, 91:8, 94:4, 95:3, 95:7
**opposing** [1] - 120:24
**opposition** [2] - 65:23, 78:17
**opted** [1] - 97:1
**order** [29] - 3:2, 10:17, 13:3, 13:4, 27:2, 27:22, 36:10, 36:11, 46:11, 47:16, 48:8, 51:17, 62:13, 76:20, 81:18, 83:19, 86:22, 93:13, 95:16, 96:1, 110:10, 113:11, 113:16, 122:1, 122:3, 122:25, 123:19
**Order** [44] - 13:1, 13:5, 14:22, 15:11, 27:3, 27:4, 27:10, 27:16, 27:17, 30:4, 43:7, 43:8, 46:3, 46:12, 47:6, 48:17, 49:1, 54:5, 54:6, 55:17, 59:17, 60:5, 65:24, 67:5, 67:8, 67:23, 68:3, 68:10, 68:11, 69:5, 69:11, 69:18, 106:24, 110:1, 110:19, 111:15, 111:22, 112:1, 116:25, 117:9, 117:13, 117:24, 118:16
**ordinarily** [1] - 90:18
**organization** [4] - 7:20, 60:16, 60:20, 76:2
**Organization** [7] - 48:20, 54:13, 59:25, 60:10, 60:13, 61:6, 66:1
**organizational** [6] - 7:11, 7:20, 8:14, 54:1, 75:21, 94:12
**organizationally** [1] - 55:22
**organizations** [2] - 29:15, 56:24
**organizations'** [1] - 8:6
**organized** [1] - 94:8
**originally** [1] - 98:21
**otherwise** [3] - 3:9,

67:13, 99:13
**outset** [2] - 5:22, 6:23
**outside** [26] - 12:15, 13:6, 31:20, 43:5, 43:15, 46:19, 70:13, 82:22, 92:4, 92:9, 92:17, 105:1, 105:25, 106:6, 106:12, 106:16, 106:17, 107:21, 108:12, 108:13, 108:22, 108:25, 112:11, 112:13, 114:4, 114:13
**overseen** [1] - 75:10
**oversees** [1] - 64:4
**owe** [1] - 102:8
**own** [8] - 7:8, 7:9, 8:2, 14:8, 18:11, 75:19, 85:9, 113:18

**P**

**p.m** [4] - 3:2, 116:21, 116:22, 124:9
**page** [1] - 87:23
**Page** [1] - 65:22
**paper** [1] - 46:23
**papers** [2] - 29:12, 53:22
**paperwork** [4] - 34:24, 98:19, 98:20, 100:2
**Paragraph** [3] - 38:24, 39:1, 71:14
**parameters** [1] - 92:12
**parcel** [1] - 87:7
**part** [23] - 13:17, 13:18, 16:23, 24:23, 28:19, 29:14, 30:2, 35:22, 45:13, 60:8, 66:24, 67:3, 67:16, 73:14, 78:23, 81:7, 87:7, 88:21, 90:12, 91:24, 100:25, 106:23, 120:17
**participate** [5] - 8:9, 8:18, 75:23, 76:17
**participation** [1] - 7:12
**particular** [21] - 5:19, 9:17, 13:13, 20:19, 22:6, 22:7, 26:16, 40:20, 43:19, 52:7, 56:20, 73:3, 82:15, 86:24, 87:18, 89:11, 90:25, 91:13, 102:9, 107:16, 111:9
**particularized** [1] - 40:14
**particularly** [3] - 61:1,

98:5, 111:20
**parties** [2] - 11:19, 124:7
**party** [4] - 49:21, 50:14, 76:15, 83:21
**pass** [1] - 76:9
**password** [1] - 11:7
**passwords** [1] - 11:3
**past** [2] - 90:8, 90:11
**pause** [1] - 110:2
**Pause** [1] - 116:17
**payment** [15] - 24:23, 26:15, 36:15, 37:16, 38:24, 40:19, 41:4, 70:19, 89:23, 97:15, 106:12, 106:14, 109:15, 111:9, 117:12
**Payment** [1] - 99:22
**payments** [13] - 26:16, 27:2, 27:23, 39:4, 40:17, 106:23, 107:16, 109:20, 109:23, 110:2, 110:9, 111:4, 111:12
**pending** [1] - 52:1
**people** [8] - 4:24, 57:25, 58:3, 71:2, 71:4, 71:20, 74:25, 84:3
**people's** [1] - 121:19
**per** [1] - 88:25
**perfect** [2] - 13:23, 82:11
**perform** [1] - 99:9
**performance** [3] - 29:6, 104:24, 105:1
**performing** [1] - 100:24, 101:13
**perhaps** [6] - 5:20, 15:1, 27:24, 38:19, 41:22, 47:24
**period** [4] - 35:8, 100:4, 112:23, 122:4
**periods** [1] - 56:21
**permissible** [3] - 47:22, 111:9, 117:19
**permits** [1] - 79:3
**permitted** [3] - 86:20, 110:12, 112:6
**permitting** [1] - 45:17
**Perry** [1] - 92:25
**person** [9] - 10:13, 13:10, 13:15, 19:12, 26:19, 28:25, 29:24, 70:9, 80:6
**personal** [12] - 9:4, 9:13, 11:12, 11:14, 12:19, 13:6, 14:4, 26:9, 43:4, 47:14,

51:17, 51:25
**personnel** [2] - 39:13, 106:6
**persons** [2] - 19:6, 91:17
**perspective** [3] - 12:9, 100:21, 118:15
**phone** [2] - 85:3, 85:4
**phrase** [1] - 117:15
**PI** [10] - 106:3, 116:15, 121:17, 121:24, 122:5, 122:7, 122:25, 123:6, 123:8, 123:24
**piece** [1] - 46:23
**pieces** [1] - 11:17
**pin** [1] - 63:18
**pipeline** [2] - 45:5, 45:18
**place** [13] - 8:15, 15:10, 16:12, 23:21, 25:4, 35:17, 36:5, 38:13, 43:25, 47:20, 76:10, 98:8, 123:1
**Plaintiff** [1] - 6:1
**plaintiff** [11] - 3:7, 9:18, 11:22, 13:25, 47:2, 81:17, 86:22, 94:16, 101:4, 116:11, 120:10
**plaintiff's** [3] - 11:19, 85:3, 95:5
**plaintiffs** [47] - 3:19, 4:17, 5:1, 5:3, 7:1, 7:10, 7:20, 8:5, 8:17, 16:25, 45:5, 56:6, 60:25, 66:11, 73:3, 73:11, 75:20, 76:12, 76:22, 78:4, 83:17, 83:23, 84:9, 84:12, 85:17, 85:25, 86:5, 87:16, 88:11, 91:11, 93:7, 94:9, 94:11, 96:3, 96:11, 96:19, 97:1, 97:6, 97:9, 97:12, 101:20, 109:10, 118:4, 119:4, 119:11, 122:22, 124:3
**Plaintiffs** [1] - 120:7
**plaintiffs'** [11] - 7:8, 8:1, 14:23, 16:10, 26:8, 27:25, 55:16, 63:23, 75:18, 77:16, 78:20
**plan** [34] - 24:24, 25:2, 25:5, 25:16, 26:13, 27:5, 27:12, 27:14, 27:22, 34:15, 35:21, 36:5, 36:10, 36:16,

37:17, 37:20, 37:23, 37:25, 38:1, 38:16, 66:16, 70:19, 73:19, 89:24, 90:9, 90:12, 90:14, 91:13, 100:9, 100:18, 100:22, 101:1
**Plan** [1] - 99:22
**plead** [1] - 97:6
**pleaded** [1] - 56:7
**pleadings** [1] - 63:23
**podium** [1] - 3:11
**point** [55] - 20:20, 22:18, 26:12, 28:7, 28:14, 29:18, 32:13, 32:16, 33:2, 34:5, 34:12, 34:14, 35:23, 39:11, 45:21, 49:9, 50:24, 52:7, 52:22, 57:14, 58:12, 58:14, 59:15, 62:20, 63:6, 64:24, 65:12, 67:2, 69:8, 69:13, 73:20, 74:16, 75:9, 75:18, 75:25, 82:9, 84:13, 86:11, 89:16, 89:18, 94:18, 99:24, 100:19, 109:9, 112:16, 113:2, 114:19, 116:10, 119:3, 119:11, 120:12, 121:20, 123:2, 123:7, 124:2
**pointed** [1] - 86:13
**pointedly** [1] - 108:19
**points** [1] - 22:8
**policies** [2] - 25:13, 99:13
**policy** [32] - 14:20, 15:12, 15:13, 15:17, 15:24, 16:9, 16:12, 24:20, 25:4, 25:19, 25:24, 35:17, 36:6, 36:9, 43:25, 44:4, 45:25, 61:24, 71:18, 72:7, 76:23, 77:1, 77:10, 89:20, 90:7, 90:16, 92:8, 95:2, 95:6, 101:19, 110:3, 110:21
**policy-making** [1] - 45:25
**policymaking** [9] - 17:22, 18:12, 18:17, 21:11, 21:15, 100:8, 100:14, 100:25, 101:14
**political** [1] - 80:3
**politician's** [1] - 110:24

**portion** [1] - 95:18
**poses** [1] - 10:21
**position** [16] - 33:10, 33:13, 33:19, 33:23, 35:23, 59:19, 59:21, 62:24, 71:12, 73:21, 78:22, 90:19, 115:9, 117:10, 117:14, 120:23
**positions** [4] - 33:15, 34:1, 62:24, 121:19
**positive** [1] - 33:7
**possibilities** [1] - 31:14
**possible** [1] - 16:8
**potential** [4] - 14:25, 84:14, 96:11
**potentially** [4] - 73:6, 83:25, 105:25
**precedent** [8] - 20:6, 28:2, 28:3, 28:20, 44:14, 44:17, 45:8, 94:18
**precedents** [2] - 45:23, 87:2
**precisely** [1] - 91:25
**preclude** [3] - 19:24, 87:11, 92:23
**precluded** [1] - 20:2
**precludes** [1] - 20:15
**preclusion** [1] - 19:18
**preference** [1] - 123:11
**preliminary** [11] - 4:6, 5:15, 5:18, 6:19, 7:1, 34:8, 44:19, 45:4, 45:11, 47:18, 53:3
**premise** [1] - 112:20
**premised** [1] - 122:2
**prepared** [4] - 6:22, 59:9, 69:7, 73:10
**presence** [1] - 8:21
**present** [3] - 33:5, 65:9, 112:2
**presented** [5] - 6:20, 55:16, 63:23, 115:16, 116:8
**presently** [1] - 63:22
**President** [37] - 12:23, 13:7, 13:19, 30:6, 31:9, 31:11, 43:6, 46:6, 48:23, 54:5, 54:6, 55:2, 55:6, 58:1, 58:3, 59:3, 59:13, 61:18, 62:10, 63:25, 64:2, 64:3, 64:14, 64:16, 64:21, 65:2, 70:23, 72:12, 74:10, 74:15, 74:23, 80:4, 82:12, 98:1,

108:17, 110:18, 110:21
**President's** [11] - 14:21, 26:24, 27:9, 30:4, 58:23, 64:17, 80:6, 98:3, 106:24, 110:1, 116:25
**Press** [1] - 61:17
**presumably** [5] - 15:2, 47:15, 48:15, 100:21, 106:19
**pretty** [7] - 9:20, 17:18, 28:13, 44:6, 45:24, 46:1, 52:4
**prevail** [2] - 47:3, 93:8
**prevent** [3] - 5:25, 9:21, 11:1
**prevented** [1] - 25:13
**preventing** [2] - 39:4, 109:19
**previously** [3] - 21:22, 62:7, 68:22
**primary** [1] - 80:7
**principal** [6] - 55:6, 70:22, 70:24, 71:20, 74:20, 88:22
**priorities** [3] - 67:4, 67:20, 98:3
**priority** [2] - 67:6, 97:25
**privacy** [9] - 11:8, 14:3, 14:9, 17:23, 27:25, 43:25, 44:3, 52:5, 87:20
**Privacy** [78] - 6:6, 6:7, 11:20, 17:2, 17:20, 17:21, 17:25, 18:7, 18:9, 18:16, 19:2, 19:9, 19:16, 19:17, 20:10, 21:9, 22:11, 22:13, 22:20, 23:6, 23:9, 23:11, 28:23, 28:24, 31:1, 32:1, 36:22, 37:3, 37:6, 43:23, 44:1, 49:17, 56:23, 76:7, 77:19, 79:22, 81:16, 86:8, 86:12, 86:14, 86:18, 86:23, 87:3, 87:18, 91:5, 91:15, 91:21, 92:11, 93:10, 93:19, 94:10, 94:17, 95:1, 95:11, 95:13, 97:7, 101:25, 104:13, 104:22, 105:15, 108:10, 108:18, 108:20, 109:16, 110:20, 111:7, 115:1, 115:2, 115:6, 117:16, 118:2,

118:5, 118:9, 118:11, 118:14, 118:21, 118:24

**private** [13] - 10:4, 10:10, 10:14, 11:14, 21:19, 32:4, 32:17, 33:23, 37:4, 37:5, 37:11, 49:21, 84:7

**privy** [1] - 83:3

**probable** [1] - 80:11

**problem** [13] - 3:10, 4:23, 5:10, 10:15, 13:12, 31:8, 32:10, 47:1, 50:1, 50:6, 66:3, 71:9, 91:24

**problematic** [2] - 31:12, 31:17

**Procedure** [3] - 77:15, 78:1, 86:19

**procedures** [5] - 9:9, 27:15, 107:20, 113:4, 113:22

**proceed** [3] - 19:21, 96:25, 120:14

**proceeding** [1] - 120:13

**PROCEEDINGS** [1] - 3:1

**proceedings** [1] - 124:18

**process** [11] - 5:7, 24:16, 24:24, 34:10, 37:16, 51:17, 70:19, 88:6, 89:24, 106:23, 120:16

**Process** [1] - 99:22

**processed** [2] - 98:20, 100:2

**processes** [2] - 27:2, 51:20

**processing** [1] - 36:15

**produce** [3] - 11:4, 96:1, 119:13

**produced** [1] - 34:16

**programmatic** [2] - 93:13, 95:17

**progress** [1] - 71:17

**prohibitions** [1] - 93:21

**prohibits** [2] - 28:24, 115:1

**project** [2] - 45:5, 99:11

**projects** [1] - 45:18

**promise** [1] - 48:10

**prompt** [5] - 12:24, 46:8, 117:6, 117:12

**prong** [1] - 8:24

**pronouncing** [1] - 68:5

**proper** [5] - 78:1, 110:12, 111:9, 111:12, 113:20

**properly** [2] - 77:2, 81:7

**propose** [5] - 29:13, 51:20, 120:8, 120:25, 121:9

**proposed** [1] - 123:17

**proposing** [1] - 120:3

**proposition** [3] - 22:19, 28:3, 45:9

**prospective** [1] - 86:19

**protect** [8] - 6:3, 7:10, 8:5, 11:7, 12:17, 16:1, 25:17, 75:21

**protected** [6] - 14:1, 14:10, 14:23, 16:11, 78:18, 91:17

**protecting** [2] - 11:14, 52:4

**protection** [3] - 11:10, 11:16, 117:8

**protections** [5] - 9:3, 12:19, 21:22, 26:8, 110:20

**protects** [1] - 11:18

**protocol** [1] - 26:15

**provide** [12] - 11:21, 17:3, 18:2, 19:10, 19:11, 19:22, 34:5, 41:10, 72:6, 72:14, 117:12, 118:17

**provided** [14] - 4:8, 6:14, 9:10, 15:4, 26:14, 32:24, 36:19, 42:18, 74:5, 76:12, 90:11, 94:11, 94:17, 104:19

**provides** [6] - 10:11, 17:4, 29:1, 42:9, 71:16, 117:1

**providing** [5] - 48:6, 75:5, 103:9, 104:1, 104:15

**provision** [3] - 36:21, 93:23, 93:24

**public** [12] - 3:12, 10:1, 10:4, 10:10, 49:16, 51:5, 78:20, 82:1, 82:17, 82:19, 83:12, 84:7

**Public** [2] - 3:18, 3:21

**publication** [7] - 12:13, 12:14, 12:15, 50:10, 50:11, 83:18, 84:4

**published** [2] - 110:13, 118:12

**purportedly** [1] - 61:25

**purporting** [1] - 110:2

**purpose** [6] - 11:1, 39:3, 81:15, 90:12, 90:14, 104:14

**purposes** [17] - 7:11, 8:6, 9:23, 12:21, 27:8, 34:8, 41:13, 42:8, 60:11, 64:1, 64:3, 76:9, 77:18, 102:1, 108:19, 109:19, 111:7

**pursuant** [1] - 92:18

**put** [12] - 6:24, 37:10, 38:13, 38:14, 41:18, 52:12, 53:8, 62:14, 63:17, 98:8, 101:5, 106:4

**puts** [1] - 58:4

**putting** [1] - 25:4

**Q**

**qualified** [1] - 62:7

**qualify** [1] - 81:15

**quarter** [1] - 116:19

**questions** [3] - 4:16, 4:18, 5:1, 5:2, 5:9, 6:22, 10:6, 16:14, 31:6, 53:24, 54:14, 54:18, 55:18, 57:1, 69:7, 71:1, 72:16, 75:12, 78:21, 80:19, 96:19, 99:20, 114:16

**quick** [2] - 116:20, 121:13

**quickly** [2] - 98:9, 98:15

**Quiet** [2] - 86:4, 86:6

**quo** [3] - 16:8, 47:12, 122:2

**quote** [34] - 16:19, 20:23, 22:6, 24:13, 24:20, 24:21, 24:23, 29:4, 29:9, 39:2, 41:7, 41:12, 44:21, 44:23, 45:10, 61:5, 61:18, 61:22, 62:2, 62:6, 62:12, 65:21, 71:15, 78:18, 85:20, 88:9, 93:23, 97:14, 97:20, 99:7, 99:16, 106:10, 107:9, 117:11

**R**

**radical** [1] - 28:16

**raise** [1] - 75:2, 114:20

**raised** [2] - 5:4, 23:15

**raising** [2] - 7:7, 73:13

**ranking** [1] - 72:7

**rate** [1] - 82:13

**rather** [9] - 6:17, 18:14, 19:22, 54:2, 72:4, 84:7, 93:3, 94:5, 103:6

**reach** [2] - 6:9, 95:22

**reached** [2] - 89:25, 123:1

**read** [12] - 4:7, 17:6, 26:4, 29:19, 39:17, 39:24, 40:13, 40:23, 46:4, 112:24, 117:2, 117:9

**read/write** [1] - 113:12

**reading** [2] - 29:11, 44:15

**real** [1] - 43:17

**reality** [1] - 94:9

**realize** [2] - 59:8, 63:18, 69:6

**really** [14] - 3:9, 4:12, 11:11, 18:7, 19:4, 32:10, 40:3, 44:9, 50:6, 58:11, 76:6, 88:15, 95:6, 112:9

**reason** [9] - 37:6, 39:14, 70:11, 76:12, 78:4, 83:15, 97:23, 110:4, 118:20

**reasonable** [2] - 96:8, 98:2

**reasoned** [3] - 38:19, 42:13, 44:10

**reasons** [5] - 39:13, 60:19, 73:3, 76:5, 96:12

**rebuttal** [1] - 51:1

**received** [2] - 62:18, 85:3

**receives** [1] - 71:17

**receiving** [1] - 85:4

**recent** [2] - 42:1, 45:24

**recently** [1] - 42:4

**recess** [2] - 116:21, 116:22

**recipient** [1] - 39:5

**recipients** [3] - 41:1, 108:15, 108:16

**recognize** [1] - 17:19

**recognized** [3] - 9:21, 17:25, 45:19

**recommended** [1] - 62:2

**Record** [4] - 29:10, 79:19, 80:13, 118:13

**record** [37] - 3:7, 3:10, 8:7, 9:7, 25:7, 29:6,

**raising** [2] - 7:7, 73:13

29:18, 30:9, 35:7, 35:13, 37:10, 38:6, 38:12, 38:13, 38:24, 43:2, 43:16, 70:15, 71:10, 77:11, 79:8, 96:2, 96:10, 96:21, 96:24, 97:4, 104:23, 106:8, 119:8, 119:12, 120:15, 120:18, 120:19, 120:20, 123:22, 124:18

**records** [24] - 19:11, 19:12, 19:21, 19:23, 21:6, 21:8, 28:25, 31:19, 46:9, 47:13, 47:15, 78:18, 88:20, 91:17, 94:3, 95:5, 95:25, 104:10, 104:15, 104:20, 104:25, 105:6, 109:15, 117:7

**recouping** [2] - 39:4, 109:19

**redress** [2] - 16:3, 19:7

**redressability** [1] - 7:16

**redressed** [1] - 78:13

**reference** [1] - 89:4

**referring** [2] - 68:22, 107:6

**refers** [1] - 117:16

**reflected** [1] - 14:10

**reforms** [2] - 51:13, 51:20

**refund** [1] - 110:24

**regard** [1] - 38:17

**regarding** [4] - 54:6, 93:21, 94:4, 109:11

**regular** [2] - 7:14, 71:16, 71:21

**regulation** [3] - 11:3, 15:25

**related** [1] - 23:9

**relates** [3] - 8:23, 32:17, 72:22

**relating** [2] - 31:6, 82:12

**relationship** [6] - 30:4, 60:12, 67:18, 67:19, 67:22, 67:23

**released** [1] - 77:17

**relevant** [8] - 10:11, 12:6, 23:20, 29:3, 60:21, 79:4, 92:7, 95:23

**relief** [40] - 5:20, 7:12, 9:15, 9:21, 9:23, 10:23, 11:7, 12:5,

16:3, 16:17, 16:19, 16:21, 16:25, 17:5, 17:7, 17:22, 18:10, 19:10, 19:15, 19:16, 19:23, 20:7, 20:8, 20:25, 23:14, 24:3, 44:22, 44:25, 78:14, 85:18, 85:20, 85:22, 85:25, 86:5, 86:14, 86:15, 86:19, 87:4, 87:20, 94:17
**relocated** [2] - 59:2, 59:12
**rely** [7] - 7:4, 27:18, 62:22, 63:8, 63:14, 86:2, 87:14
**relying** [1] - 17:3
**remain** [1] - 43:10
**remedial** [3] - 18:25, 93:20, 94:1
**remediation** [1] - 44:22
**Remedies** [1] - 20:21
**remedies** [20] - 17:4, 17:11, 17:15, 17:21, 18:15, 22:7, 22:13, 22:14, 22:16, 22:17, 24:6, 24:7, 76:6, 87:20, 92:23, 93:15, 93:18, 94:8, 102:13, 102:18
**remedy** [24] - 17:10, 17:14, 17:16, 18:1, 18:2, 18:5, 18:17, 18:20, 19:13, 19:18, 20:3, 20:23, 21:7, 21:14, 22:20, 24:1, 24:2, 77:19, 87:12, 93:2, 93:22, 94:19, 94:23, 95:1
**removal** [1] - 9:2
**remove** [1] - 110:19
**removed** [1] - 15:19
**renamed** [3] - 54:9, 59:11, 60:6
**repaired** [1] - 53:18
**repeated** [1] - 112:18
**replaced** [1] - 56:15
**reply** [1] - 40:6
**report** [4] - 54:10, 59:17, 75:8, 75:12
**reported** [4] - 42:5, 54:23, 57:24, 111:4
**reporter** [2] - 86:3, 116:18
**reporting** [4] - 35:7, 35:12, 42:1, 83:22
**reports** [3] - 59:13, 66:22, 66:23
**represent** [1] - 99:16

**representation** [3] - 42:4, 62:21, 63:8
**representations** [2] - 61:11, 106:3
**represented** [3] - 27:21, 61:4, 65:20
**request** [3] - 9:14, 37:1, 38:22
**requested** [4] - 5:21, 7:12, 16:3, 78:13
**requesting** [1] - 19:13
**require** [3] - 8:21, 12:14, 113:8
**required** [8] - 10:2, 43:6, 50:10, 54:9, 82:20, 95:12, 96:23, 116:2
**requirement** [7] - 7:25, 8:23, 30:20, 45:11, 77:22, 88:13, 95:10
**requirements** [2] - 6:7, 108:15
**requires** [8] - 7:12, 41:7, 42:13, 46:4, 70:22, 83:18, 89:21, 119:7
**resolve** [2] - 121:17, 121:18
**resolved** [1] - 15:1
**resorting** [1] - 96:20
**respect** [16] - 16:9, 24:5, 26:9, 32:17, 32:20, 37:12, 42:2, 49:11, 50:12, 52:19, 83:12, 86:12, 86:17, 90:5, 112:22, 114:9
**respectfully** [1] - 121:23
**respond** [2] - 5:4, 91:11
**response** [3] - 10:1, 21:1, 42:20
**responsibility** [1] - 99:5
**restore** [1] - 21:21
**restriction** [1] - 17:12
**restrictions** [4] - 99:15, 111:25, 112:4, 117:20
**result** [2] - 44:8, 123:5
**Retired** [1] - 3:4
**retroactively** [1] - 99:1
**retrospective** [1] - 95:4
**return** [4] - 41:8, 41:9, 41:24
**returns** [4] - 41:8, 78:25, 80:6, 111:3
**reveal** [1] - 77:11

**Revenue** [27] - 6:8, 11:21, 17:2, 18:10, 20:10, 21:10, 22:22, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:20, 86:8, 86:13, 86:18, 86:23, 87:3, 91:5, 93:10, 117:17, 118:3, 118:5, 118:10, 119:1
**reverse** [1] - 19:25, 20:1
**review** [14] - 18:11, 23:9, 23:17, 24:13, 87:11, 88:3, 89:15, 89:19, 91:9, 92:24, 93:14, 95:17, 97:3, 106:23
**reviewable** [1] - 89:22
**revised** [1] - 98:25
**rights** [3] - 24:16, 88:7, 91:14
**rigorous** [1] - 117:8
**rise** [2] - 14:11, 84:21
**risk** [6] - 10:21, 12:22, 25:18, 45:9, 45:18, 98:8
**risks** [6] - 42:17, 42:20, 97:16, 98:7, 112:15, 114:8
**RMR** [1] - 124:17, 124:21
**road** [1] - 56:1
**role** [20] - 29:16, 31:12, 34:13, 36:15, 37:12, 37:15, 37:20, 62:5, 62:21, 62:23, 62:25, 63:7, 63:11, 63:13, 64:11, 64:25, 80:20, 99:5, 101:15
**roles** [1] - 32:20
**rollout** [1] - 98:11
**root** [1] - 10:18
**route** [1] - 18:14
**routing** [20] - 28:9, 29:9, 38:23, 39:10, 79:3, 79:7, 79:12, 80:10, 80:11, 88:20, 89:4, 89:13, 92:6, 92:18, 106:25, 108:9, 109:17, 110:12, 110:25, 118:12
**Routine** [4] - 92:19, 109:18, 109:24, 111:1
**roving** [1] - 38:8
**rule** [3] - 41:11, 97:3, 119:8
**ruling** [1] - 5:23

**run** [1] - 10:6
**running** [1] - 48:23

### S

**satisfied** [1] - 45:10
**saw** [1] - 82:21
**scenes** [1] - 49:10
**schedule** [7] - 120:11, 120:23, 121:6, 121:8, 121:10, 122:10, 123:17
**Schedule** [7] - 54:22, 57:14, 58:17, 59:20, 59:23, 99:19, 103:6
**scheme** [6] - 86:12, 86:17, 87:11, 93:20, 94:1, 94:2
**scope** [4] - 52:25, 101:12, 105:2, 112:7
**Scott** [1] - 3:4
**sealing** [1] - 31:19
**seclusion** [10] - 10:3, 10:10, 10:12, 11:16, 12:8, 13:10, 84:8, 84:13, 84:20, 85:12
**second** [6] - 8:4, 29:8, 45:13, 53:21, 60:8, 75:25
**Secretary** [27] - 15:15, 24:25, 25:11, 25:20, 35:5, 35:9, 35:14, 36:8, 38:15, 61:17, 64:4, 64:18, 64:21, 66:24, 67:15, 67:18, 68:4, 70:9, 75:11, 80:5, 95:23, 96:4, 96:6, 99:3, 99:4, 99:17, 103:5
**Secretary's** [2] - 9:8, 100:12
**section** [1] - 93:24
**Section** [5] - 16:16, 20:9, 24:13, 87:4, 117:1
**secure** [1] - 7:1
**security** [8] - 9:4, 9:22, 14:22, 15:16, 16:1, 21:16, 42:17, 52:17
**see** [8] - 8:7, 14:16, 32:24, 37:1, 37:21, 44:14, 51:18, 84:22
**seeing** [1] - 120:21
**seek** [7] - 7:10, 12:17, 17:1, 19:6, 75:21, 86:1, 109:11
**seeking** [7] - 8:5, 9:18, 10:20, 16:17, 18:11, 19:21, 85:18

**seem** [11] - 17:19, 24:19, 36:13, 36:20, 49:15, 61:1, 63:4, 63:10, 67:2, 74:25, 116:4
**seemingly** [1] - 38:21
**segregate** [1] - 25:22
**select** [1] - 68:6
**selected** [2] - 62:5, 69:25, 70:2
**sell** [2] - 37:4, 37:5
**Senate** [9] - 55:2, 55:7, 58:4, 70:23, 72:13, 74:11, 74:15, 74:24, 75:10
**Senate-confirmed** [1] - 75:10
**sending** [1] - 15:2
**sense** [6] - 6:19, 21:18, 34:22, 41:23, 61:23, 103:24
**sensitive** [5] - 9:4, 26:20, 80:16, 80:24, 106:14
**sent** [3] - 52:20, 80:5, 106:6
**separate** [6] - 18:11, 60:20, 64:12, 79:23, 91:8, 123:8
**Separate** [1] - 27:5
**series** [3] - 4:16, 25:11, 61:24
**serious** [1] - 97:16
**Service** [11] - 12:24, 13:20, 54:7, 54:9, 54:10, 54:13, 59:25, 60:6, 60:7, 60:9, 117:1
**set** [5] - 42:14, 97:25, 107:18, 120:11, 121:8
**sets** [4] - 44:17, 67:5, 100:23, 101:12
**Seventh** [1] - 84:24
**several** [3] - 42:19, 62:8, 101:20
**shall** [9] - 41:8, 41:9, 46:5, 65:24, 66:1, 68:6, 68:12, 117:3, 117:7
**Shapiro** [1] - 4:2
**share** [11] - 28:4, 43:3, 46:13, 46:16, 46:19, 106:12, 106:17, 106:18, 111:10, 118:8, 118:25
**shared** [3] - 48:7, 106:22, 108:22
**sharing** [16] - 13:5, 30:23, 43:14, 48:10,

48:12, 92:8, 107:11,
108:1, 108:8, 109:8,
110:10, 112:4,
112:10, 117:18,
118:14, 118:21
**short** [4] - 51:6,
112:23, 116:16,
122:3
**shorthand** [1] -
100:17
**shortly** [1] - 25:11
**show** [12] - 7:2, 9:22,
10:22, 24:19, 45:6,
77:11, 77:14, 77:25,
78:20, 81:18, 86:22,
93:14
**showing** [6] - 44:18,
51:14, 51:24, 95:15,
97:7, 97:13
**shown** [1] - 107:3
**shows** [1] - 84:25
**shuttled** [1] - 12:18
**side** [3] - 17:20, 31:23
**sides** [1] - 21:24
**signed** [1] - 62:12
**significant** [5] - 9:12,
44:6, 72:5, 72:6,
72:8
**similar** [1] - 77:25,
86:8
**simple** [2] - 45:1, 56:7
**simply** [9] - 6:11,
13:24, 17:14, 18:25,
21:12, 24:1, 26:5,
60:3
**sits** [1] - 48:20
**sitting** [1] - 57:21
**situation** [10] - 10:25,
11:25, 14:3, 18:5,
21:9, 21:20, 31:22,
32:5, 46:22, 85:14
**situations** [1] - 46:25
**six** [2] - 27:7, 27:13
**slightly** [2] - 5:16, 6:5
**so-called** [1] - 25:17
**Software** [2] - 32:14,
33:4
**software** [7] - 62:7,
68:12, 80:15, 80:23,
104:11, 104:19,
117:7
**solely** [1] - 24:4
**someone** [3] - 11:7,
14:4, 19:24
**somewhere** [1] - 15:3
**soon** [1] - 46:14
**sooner** [1] - 119:22
**SORN** [8] - 38:24,
79:4, 80:13, 92:7,
92:19, 107:1,

110:13, 112:7
**sorry** [12] - 7:9, 22:3,
59:7, 84:17, 87:22,
101:16, 103:21,
109:6, 115:14,
120:17, 121:2,
122:18
**sort** [28] - 5:12, 13:9,
18:15, 21:15, 30:21,
32:7, 38:5, 38:6,
38:18, 39:24, 42:6,
47:1, 48:18, 49:25,
50:1, 52:8, 55:18,
56:25, 64:12, 70:13,
76:20, 77:21, 89:13,
90:23, 93:13, 95:3,
95:16, 112:3
**sought** [3] - 16:22,
85:23, 86:5
**sound** [1] - 69:6
**sounds** [1] - 123:13
**Southern** [4] - 5:24,
89:17, 106:2, 117:22
**sovereign** [8] - 16:16,
20:16, 85:17, 86:7,
87:4, 88:10, 92:22,
93:1
**SpaceX** [1] - 62:8
**speaking** [2] - 63:4,
82:8
**specific** [17] - 18:10,
22:7, 28:6, 35:24,
41:24, 42:7, 48:12,
55:18, 56:13, 66:10,
76:13, 77:12, 86:12,
93:20, 99:11,
106:25, 117:19
**specifically** [5] -
11:21, 31:16, 70:8,
84:18, 94:21
**specifics** [1] - 79:19
**specified** [1] - 49:23
**speculate** [1] - 29:12
**speech** [1] - 62:10
**spill** [1] - 45:19
**spills** [1] - 45:7
**spot** [1] - 38:2
**squarely** [2] - 23:13,
28:14
**squirrely** [1] - 48:19
**staff** [5] - 15:16,
25:16, 35:18, 36:7,
51:13
**Staff** [9] - 25:21,
54:11, 59:14, 59:18,
64:5, 66:23, 67:14,
74:17, 100:13
**stages** [1] - 55:13
**stakes** [1] - 45:5
**standard** [4] - 7:3,

44:15, 44:18, 110:23
**standards** [2] - 45:2,
117:8
**standing** [38] - 4:20,
6:24, 7:2, 7:7, 7:15,
7:18, 7:20, 7:24, 8:1,
8:25, 9:25, 10:18,
12:5, 50:9, 73:4,
75:16, 75:19, 76:10,
78:4, 78:20, 79:1,
80:8, 80:18, 80:19,
81:2, 81:10, 81:21,
81:24, 82:16, 82:20,
83:20, 84:2, 84:15,
84:21, 95:10, 119:4,
119:12
**stands** [1] - 18:14
**starker** [1] - 18:5
**start** [5] - 6:24, 36:9,
54:4, 98:21, 112:20
**started** [4] - 27:1,
35:4, 98:17
**starting** [3] - 3:7,
56:25, 61:19
**state** [4] - 8:25, 39:2,
39:19, 40:18
**State** [17] - 3:22,
39:11, 92:18,
106:22, 107:3,
107:11, 107:15,
107:18, 107:22,
108:8, 109:2, 109:5,
109:8, 109:15,
110:11, 111:17,
112:2
**state's** [1] - 6:9
**statement** [3] - 38:18,
61:21, 62:16
**statements** [2] -
61:14, 61:16
**States** [1] - 71:5
**states** [5] - 39:21,
39:22, 68:3, 68:11,
106:10
**stating** [1] - 99:1
**status** [9] - 16:8, 34:7,
34:20, 47:12, 48:22,
71:2, 98:16, 99:21,
122:2
**statute** [13] - 16:20,
16:25, 23:12, 29:10,
49:23, 50:12, 72:14,
85:21, 85:25, 94:5,
94:8, 95:19, 116:3
**statutes** [11] - 11:20,
12:16, 18:1, 18:4,
18:6, 18:24, 18:25,
21:20, 87:21, 91:7,
117:20
**statutory** [5] - 11:24,

79:5, 81:9, 81:11,
87:11
**stays** [1] - 47:20
**Stephens** [2] - 23:8,
28:9
**steps** [7] - 5:13, 25:11,
112:15, 114:8,
114:22, 116:15,
117:3
**steward** [3] - 10:13,
13:11, 13:15
**still** [12] - 15:1, 30:1,
52:21, 52:24, 53:13,
59:20, 60:3, 69:3,
83:12, 84:1, 91:5,
108:23
**stolen** [1] - 11:5
**stored** [3] - 9:5, 43:4,
60:3
**stricter** [1] - 44:14
**strictly** [2] - 17:18,
111:21
**stronger** [1] - 18:12
**strongly** [1] - 92:14
**structure** [8] - 51:18,
54:1, 55:17, 58:13,
58:22, 70:17, 75:4,
94:13
**structured** [2] - 38:7,
72:19
**structuring** [1] - 38:16
**study** [1] - 4:12
**subject** [10] - 16:14,
16:24, 23:19, 72:4,
85:24, 89:15, 89:19,
92:6, 115:19, 116:4
**submitting** [1] - 28:10
**subsequent** [1] -
25:23
**substantial** [1] - 7:2
**substantiates** [1] -
29:19
**substantive** [1] -
99:13
**succeed** [1] - 97:13
**succinctly** [1] - 8:25
**sue** [5] - 7:9, 8:2,
20:14, 24:5, 75:19
**suffer** [2] - 14:1, 77:17
**suffered** [2] - 11:9,
96:19
**sufficient** [5] - 9:22,
24:2, 79:1, 80:8,
81:23
**suggest** [4] - 62:24,
98:9, 100:24, 121:6
**suggesting** [1] - 33:25
**suggests** [3] - 42:16,
101:14, 104:4
**suit** [12] - 16:17,

16:20, 20:24, 21:6,
21:7, 21:19, 22:16,
23:23, 75:23, 76:17,
77:13, 85:21
**suited** [1] - 4:21
**suits** [1] - 85:17
**summary** [5] - 7:3,
8:11, 51:6, 120:15,
124:1
**supervised** [7] -
54:24, 55:4, 57:24,
58:2, 70:24, 74:9,
74:14
**supervises** [1] - 66:4
**supervising** [5] -
66:17, 71:5, 71:11,
103:12, 103:20
**supervisor** [2] -
103:18, 104:3
**supervisory** [1] -
99:10
**supplement** [1] -
17:10
**supplemental** [3] -
88:9, 92:22, 96:13
**supplementary** [1] -
19:4
**supplementing** [1] -
17:15
**support** [1] - 44:19
**supporting** [2] - 20:7,
22:19
**suppose** [1] - 69:12
**supposed** [6] - 10:9,
27:6, 30:19, 36:22,
44:1, 69:14
**supposedly** [1] - 27:6
**Supreme** [11] - 17:19,
72:2, 72:11, 74:6,
74:8, 74:21, 84:24,
85:13, 86:4, 87:17,
89:16
**swiftly** [1] - 98:2
**switching** [1] - 4:23
**sworn** [3] - 25:12,
35:6, 36:8
**symbols** [1] - 26:15
**synchronization** [1] -
47:8
**system** [15] - 11:4,
31:25, 40:1, 43:19,
44:2, 83:24, 87:1,
91:1, 95:18, 101:6,
101:7, 107:18,
113:16, 114:11
**systematic** [1] - 40:1
**systemic** [1] - 41:21
**systems** [38] - 9:5,
9:13, 11:13, 12:25,
16:1, 21:17, 24:22,

26:10, 26:15, 27:8, 28:17, 35:16, 36:12, 36:15, 38:2, 38:21, 39:21, 39:22, 41:4, 41:21, 43:4, 43:10, 43:11, 47:7, 51:18, 68:18, 85:8, 90:4, 92:20, 97:15, 98:1, 98:4, 103:10, 106:12, 113:25, 117:7, 117:13

**Systems** [4] - 29:10, 79:19, 80:13, 118:12

**T**

**table** [4] - 3:20, 58:10, 59:1, 65:18
**tagging** [1] - 26:15
**talks** [7] - 23:5, 23:25, 47:7, 49:1, 84:5, 104:22, 123:3
**tasked** [1] - 61:18
**tax** [12] - 41:13, 41:15, 41:18, 41:22, 41:24, 42:3, 42:8, 78:25, 80:6, 110:22, 110:24, 111:2
**team** [49] - 15:20, 25:13, 25:16, 26:23, 27:7, 29:17, 30:3, 30:5, 30:12, 31:4, 32:9, 35:15, 38:21, 39:12, 41:16, 42:2, 42:7, 42:19, 43:12, 51:12, 51:16, 61:22, 61:25, 64:19, 67:3, 67:17, 68:6, 68:17, 68:20, 68:22, 69:4, 89:22, 90:15, 92:10, 95:25, 97:15, 97:21, 99:10, 100:21, 101:11, 103:14, 103:15, 103:24, 104:1, 104:4, 113:24
**team's** [2] - 71:17, 104:5
**teams** [1] - 48:21
**technical** [2] - 31:22, 40:1
**technically** [1] - 59:23
**technology** [1] - 69:19
**temporary** [2] - 99:18, 103:6
**Temporary** [7] - 48:20, 54:13, 59:25, 60:10, 60:13, 61:5, 65:25
**ten** [2] - 52:24, 116:19
**term** [2] - 33:3, 80:6
**terms** [67] - 5:13, 8:22, 14:13, 21:1, 24:9,

28:1, 28:22, 32:11, 35:20, 37:19, 38:15, 38:25, 41:6, 42:11, 44:12, 46:2, 46:10, 46:16, 48:11, 49:24, 52:8, 55:22, 56:22, 57:20, 59:16, 61:11, 62:23, 65:4, 66:10, 66:14, 67:19, 67:25, 71:11, 73:6, 75:16, 78:7, 82:15, 83:7, 83:9, 84:10, 90:1, 90:8, 90:10, 91:24, 95:20, 98:16, 99:23, 99:25, 100:18, 100:23, 101:5, 102:17, 103:17, 107:15, 108:12, 108:14, 108:16, 108:21, 110:15, 111:19, 111:21, 112:10, 112:16, 114:3, 121:8, 122:22, 123:19
**terrorist** [1] - 83:25
**test** [1] - 110:16
**text** [1] - 85:2
**textual** [1] - 92:25
**THE** [227] - 3:8, 3:23, 4:5, 6:21, 7:24, 8:22, 9:24, 12:7, 13:8, 14:12, 15:6, 15:12, 16:2, 16:13, 18:19, 19:9, 20:6, 20:18, 21:24, 22:5, 22:18, 23:2, 23:4, 23:15, 24:8, 24:11, 25:8, 26:13, 26:19, 27:18, 28:1, 28:15, 28:18, 31:5, 32:8, 32:10, 32:23, 33:15, 33:21, 33:24, 34:3, 35:19, 36:3, 37:13, 38:23, 40:3, 40:7, 40:10, 40:12, 40:24, 41:5, 42:10, 44:11, 46:7, 46:16, 46:18, 48:2, 48:11, 49:4, 49:7, 49:24, 50:15, 51:2, 51:4, 52:6, 53:2, 53:6, 53:10, 53:19, 53:24, 55:13, 55:20, 56:10, 56:17, 56:20, 57:4, 57:10, 57:12, 57:19, 57:23, 58:10, 58:25, 59:6, 59:8, 59:19, 59:24, 60:9, 60:15, 60:23, 61:10, 62:5, 63:17, 64:7, 64:20, 65:3, 65:7,

65:12, 65:17, 66:12, 67:1, 67:7, 67:12, 67:16, 68:3, 68:20, 68:25, 69:20, 69:22, 70:2, 70:6, 70:11, 72:24, 73:5, 73:13, 74:1, 75:14, 76:3, 76:16, 77:4, 77:8, 77:21, 78:6, 78:12, 78:17, 79:7, 79:14, 79:16, 80:1, 80:14, 80:22, 81:4, 81:22, 82:5, 82:9, 82:24, 84:5, 84:17, 84:22, 85:15, 87:2, 87:9, 87:13, 87:16, 88:2, 88:18, 88:24, 89:9, 89:23, 90:6, 90:18, 91:10, 91:23, 92:21, 93:19, 94:14, 94:25, 95:20, 97:11, 98:13, 100:15, 101:1, 101:17, 101:22, 101:24, 102:5, 102:7, 102:13, 102:17, 102:19, 102:24, 103:2, 103:12, 103:19, 104:7, 104:17, 105:3, 105:10, 105:12, 105:14, 105:18, 105:21, 107:2, 107:14, 108:11, 109:2, 109:6, 109:13, 109:23, 110:14, 111:14, 112:9, 113:1, 113:8, 113:21, 114:3, 114:10, 114:15, 115:10, 115:14, 115:17, 115:24, 116:9, 116:18, 116:23, 117:21, 118:15, 119:2, 119:18, 119:23, 120:2, 120:7, 120:10, 120:17, 120:20, 120:22, 121:5, 121:16, 121:22, 122:5, 122:14, 122:18, 122:21, 123:7, 123:12, 123:15, 124:5, 124:7
**themselves** [2] - 8:20, 92:15
**theoretical** [1] - 45:1
**theory** [4] - 7:17, 7:19, 13:15, 84:10
**therefore** [13] - 31:1,

38:4, 38:9, 39:22, 79:6, 84:2, 91:21, 92:3, 92:6, 92:11, 100:13, 105:13, 108:9
**they've** [5] - 4:10, 38:13, 42:18, 45:6, 115:10
**thinking** [1] - 93:25
**third** [5] - 8:8, 11:19, 13:9, 50:14, 76:15
**thousands** [1] - 88:25
**threat** [1] - 12:14
**threatened** [2] - 44:21, 45:6
**three** [6] - 7:6, 7:14, 8:3, 51:15, 54:8, 91:1
**threshold** [1] - 95:21
**throughout** [3] - 12:18, 44:7, 49:9
**tie** [1] - 37:14
**tied** [1] - 76:5
**timeline** [1] - 34:7, 119:14
**Title** [2] - 86:5, 86:6
**title** [2] - 30:23, 30:25
**titled** [1] - 124:19
**titles** [2] - 29:24, 72:1
**today** [2] - 119:9, 120:22
**together** [5] - 25:25, 32:6, 37:14, 45:14, 53:22
**tomorrow** [1] - 121:11
**took** [6] - 15:10, 15:15, 15:17, 98:18, 111:3, 114:16
**tort** [3] - 10:3, 10:5, 10:9
**torts** [1] - 12:11
**totally** [1] - 50:5
**touch** [1] - 122:17
**traceability** [1] - 14:19
**traceable** [2] - 14:14, 78:8
**track** [2] - 18:11, 114:12
**tracked** [1] - 52:21
**traditional** [1] - 12:11
**trafficker** [1] - 83:25
**training** [1] - 113:4
**transcript** [3] - 52:10, 106:4, 107:9
**transcription** [1] - 124:18
**transfer** [8] - 33:11, 33:17, 33:19, 33:23, 47:9, 47:13, 49:19, 50:2

**transferred** [3] - 34:4, 47:5, 53:17
**transferring** [1] - 49:20
**transfers** [5] - 40:19, 49:16, 50:13, 50:14
**transitional** [1] - 99:18
**TransUnion** [14] - 9:15, 9:25, 10:5, 10:8, 10:19, 11:6, 12:2, 81:9, 81:20, 83:19, 84:5, 84:14, 84:25, 85:14
**Treasury** [115] - 4:3, 5:16, 12:15, 14:21, 15:2, 15:10, 15:20, 24:25, 27:11, 29:14, 29:16, 29:25, 30:15, 31:13, 32:9, 32:11, 32:12, 32:18, 33:14, 34:16, 35:4, 35:9, 39:12, 41:16, 42:19, 43:25, 46:11, 46:20, 48:13, 49:2, 49:5, 51:12, 51:13, 51:18, 51:20, 56:16, 60:21, 61:22, 61:25, 62:6, 64:4, 64:18, 64:22, 66:7, 66:22, 66:23, 67:14, 67:15, 68:21, 70:4, 70:20, 71:6, 72:8, 75:7, 77:1, 77:4, 80:5, 80:20, 80:22, 85:8, 85:9, 86:25, 87:1, 89:12, 89:21, 90:15, 91:12, 92:5, 92:10, 92:17, 95:25, 97:14, 97:21, 98:18, 98:23, 99:8, 101:11, 102:17, 102:25, 103:11, 103:15, 103:16, 103:25, 104:6, 104:9, 105:17, 105:22, 105:25, 106:7, 106:18, 107:20, 107:21, 108:13, 108:22, 109:1, 111:2, 111:10, 112:13, 112:22, 113:3, 113:10, 113:23, 114:4, 114:9, 114:13, 114:24, 117:18, 118:8, 123:3, 123:4
**Treasury's** [3] - 33:12, 88:21, 97:14
**treat** [2] - 49:15, 50:12
**tried** [1] - 19:15

**triggering** [1] - 6:18
**TRO** [1] - 65:23
**TROs** [1] - 45:3
**trouble** [1] - 69:3
**trove** [1] - 47:4
**Trudeau** [1] - 88:12
**true** [2] - 35:3
**Trump** [2] - 61:18, 82:12
**Trump's** [3] - 54:4, 54:5, 54:6
**trust** [1] - 14:4
**try** [1] - 80:1
**trying** [5] - 21:21, 25:3, 103:2, 120:11, 120:12
**two** [31] - 8:10, 11:20, 18:4, 18:6, 18:7, 26:22, 29:2, 30:2, 30:12, 30:21, 31:18, 32:2, 32:10, 32:12, 32:14, 32:20, 33:7, 33:8, 34:1, 51:15, 60:2, 60:15, 62:11, 62:15, 79:23, 91:1, 98:22, 104:13, 105:21, 119:21, 119:25
**type** [15] - 8:19, 10:23, 13:25, 14:1, 14:3, 14:9, 18:16, 19:22, 20:3, 21:7, 24:1, 24:2, 28:12, 28:16, 41:2
**types** [4] - 18:25, 19:3, 21:13, 86:15
**typical** [1] - 8:19

## U

**U.S** [13] - 12:24, 13:19, 54:7, 54:9, 54:10, 54:12, 59:24, 60:6, 60:7, 62:15, 106:12, 106:16, 117:1
**ultimately** [3] - 55:21, 66:13, 110:9
**ultra** [2] - 73:6
**unable** [3] - 45:6, 52:10, 107:8
**uncertain** [1] - 45:9
**unclassified** [3] - 12:25, 46:9, 117:6
**unclear** [1] - 49:10
**under** [49] - 6:6, 7:2, 7:19, 9:15, 9:25, 11:5, 11:6, 16:11, 16:14, 18:16, 19:21, 20:2, 20:9, 20:17, 20:25, 21:19, 21:20,

22:11, 22:12, 22:16, 22:20, 22:24, 24:3, 43:6, 43:21, 48:20, 60:16, 64:17, 72:10, 73:8, 77:19, 79:4, 82:3, 82:5, 83:4, 86:5, 87:20, 88:10, 89:22, 91:15, 97:2, 97:19, 100:12, 103:17, 108:10, 118:13, 119:3, 119:5
**Under** [1] - 20:21
**understood** [4] - 26:14, 90:12, 90:13, 111:16
**undertake** [1] - 51:13
**undertaking** [1] - 53:13
**undo** [1] - 18:21
**unfortunate** [1] - 69:8
**United** [1] - 71:5
**unlawful** [7] - 17:4, 17:7, 18:17, 49:22, 92:14, 95:2, 95:4
**unless** [4] - 40:4, 49:22, 100:16, 118:9
**unlike** [1] - 85:12
**unmeasurable** [1] - 45:9
**unprecedented** [2] - 26:19, 28:13, 44:6
**unprotected** [1] - 11:15
**unquote** [6] - 61:6, 61:20, 62:14, 62:19, 97:22, 117:11
**unreasonable** [1] - 18:17
**unwanted** [1] - 85:4
**up** [22] - 4:17, 4:22, 6:1, 13:23, 15:15, 25:25, 39:15, 39:20, 47:15, 51:16, 61:19, 65:17, 66:5, 76:5, 81:5, 84:11, 84:18, 87:16, 107:18, 116:11, 116:14, 123:9
**update** [1] - 73:25
**updates** [1] - 71:17
**upend** [1] - 95:17
**upshot** [1] - 86:16
**urgency** [1] - 97:18
**USDA** [3] - 17:24, 88:24, 89:1
**USDS** [97] - 27:10, 29:14, 29:21, 30:5, 30:24, 31:7, 31:8, 31:10, 31:12, 31:13, 32:9, 32:11, 39:12,

46:5, 46:17, 46:19, 48:15, 48:18, 48:19, 48:20, 48:25, 49:2, 50:4, 54:2, 54:7, 54:16, 54:21, 55:9, 55:19, 57:14, 57:19, 59:11, 59:13, 59:20, 60:1, 60:12, 60:13, 61:5, 61:7, 62:2, 62:21, 63:2, 63:3, 63:4, 63:11, 63:12, 64:2, 64:9, 65:8, 65:21, 65:24, 65:25, 66:1, 66:4, 66:6, 66:15, 66:24, 67:3, 67:17, 67:25, 68:7, 68:11, 69:12, 70:4, 70:6, 70:18, 71:3, 71:4, 71:16, 71:25, 72:1, 72:6, 72:24, 74:12, 74:18, 75:7, 104:20, 106:6, 108:19, 114:24, 115:1, 115:5, 115:11, 115:25, 116:1, 116:6, 117:4, 117:5, 117:7, 117:12, 117:18, 117:23, 118:9, 118:17
**USDS's** [1] - 70:17
**useful** [1] - 30:9
**uses** [1] - 79:12
**Utah** [1] - 89:17

## V

**Vargas** [8] - 5:14, 9:19, 44:16, 52:12, 97:12, 106:2, 107:10, 113:5
**Vargas's** [2] - 5:23, 15:7
**various** [4] - 9:20, 27:8, 34:13, 56:23
**vehicle** [2] - 77:15, 78:1
**venue** [1] - 24:4
**versed** [1] - 4:2
**versions** [1] - 60:2
**versus** [4] - 3:4, 18:16, 23:14, 51:10
**veteran** [1] - 23:12
**viable** [1] - 81:19
**view** [12] - 12:7, 15:12, 42:22, 43:23, 48:4, 49:25, 51:6, 81:13, 82:13, 82:14, 101:3, 123:13
**viewed** [1] - 76:14
**viewing** [1] - 50:3

**vigilantly** [1] - 46:1
**violate** [5] - 79:22, 104:13, 105:15, 109:16, 118:24
**violation** [11] - 6:7, 19:5, 28:23, 41:6, 50:11, 79:5, 81:9, 81:11, 91:7, 118:4, 118:5
**violations** [5] - 18:3, 19:3, 19:7, 22:6, 93:21
**vires** [1] - 73:6
**Virginia** [1] - 65:21
**voluntarily** [1] - 110:22

## W

**W-R-I-T-E** [1] - 112:25
**wait** [2] - 53:21, 121:10
**waive** [2] - 20:16, 87:4
**waiver** [6] - 16:18, 85:19, 86:7, 88:10, 92:22, 93:1
**waives** [2] - 16:16, 85:17
**wall** [1] - 63:18
**walled** [1] - 51:25
**walls** [1] - 46:20
**wants** [2] - 13:20, 51:11
**waste** [2] - 38:3, 98:3
**weakest** [2] - 44:12, 50:20
**wealth** [1] - 70:1
**wearing** [5] - 30:16, 30:21, 32:4, 105:8, 105:16
**wears** [1] - 30:12
**week** [3] - 14:24, 43:20, 52:24
**weeks** [5] - 27:7, 27:13, 98:22, 119:21, 119:25
**welcome** [1] - 50:24
**whatsoever** [1] - 76:13
**White** [6] - 31:24, 54:11, 59:14, 61:17, 74:16, 80:3
**whole** [6] - 10:25, 35:20, 41:10, 48:18, 67:2, 74:3
**wholesale** [4] - 39:21, 47:6, 47:13, 53:16
**wide** [1] - 52:19
**Wilderness** [1] - 89:17
**word** [2] - 41:20, 47:7

**words** [2] - 89:20, 107:23
**works** [1] - 85:12
**worried** [1] - 49:3
**write** [4] - 87:23, 112:24, 112:25, 113:15
**written** [1] - 8:12
**Wunderly** [4] - 56:15, 68:23, 77:7, 92:2

## Y

**year** [4] - 17:24, 54:16, 55:9, 88:25
**York** [16] - 4:13, 5:15, 5:24, 6:3, 6:9, 6:12, 6:18, 9:19, 13:4, 36:11, 44:15, 46:11, 52:11, 53:6, 106:2, 117:22
**yourself** [1] - 3:6
**yourselves** [1] - 120:24

## Z

**Zieve** [1] - 3:20

# EXHIBIT LXI

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
AIDS VACCINE ADVOCACY          .
COALTION, et al.,              .
                              .
        Plaintiffs,            .
                              .  CA No. 25-0400 (AHA)
    v.                         .
                              .
UNITED STATES DEPARTMENT OF    .
STATE, et al.,                 .
                              .
        Defendants.            .
. . . . . . . . . . . . . . . .
                              .
GLOBAL HEALTH COUNCIL,         .
et al.,                        .
                              .
        Plaintiffs,            .  CA No. 25-0406 (AHA)
                              .
    v.                         .
                              .
DONALD J. TRUMP, et al.,       .  Washington, D.C.
                              .  Tuesday, February 25, 2025
        Defendants.            .  11:00 a.m.
. . . . . . . . . . . . . . . .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE AMIR H. ALI
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For Plaintiffs                 LAUREN BATEMAN, ESQ.
Case No. 25-0400:              Public Citizen Litigation Group
                               1600 20th Street NW
                               Washington, DC 20009


For Plaintiffs                 STEPHEN K. WIRTH, ESQ.
Case No. 25-0406:              Arnold & Porter Kaye Scholer LLP
                               601 Massachusetts Ave. NW
                               Washington, DC 20001


For Defendants:                INDRANEEL SUR, ESQ.
                               U.S. Department of Justice
                               1100 L St. NW
                               Washington, DC 20530

Court Reporter:                           BRYAN A. WAYNE, RPR, CRR
U.S. Courthouse, Room 4704-A
333 Constitution Avenue NW
Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1              P R O C E E D I N G S

2              (Via Telephone Conference)

3         THE DEPUTY CLERK:  We're here today for a motion

4    hearing in civil action 25-400, Aids Vaccine Advocacy

5    Coalition, et al., versus the United States Department of

6    State, et al., as well as civil action 25-402, Global Health

7    Council, et al., versus Donald Trump, et al.

8      Beginning with counsel for the plaintiff in case 25-400,

9    please state your name for the record.

10        MS. BATEMAN:  Hi.  My name is Lauren Bateman with

11   Public Citizen Litigation Group.  I represent plaintiffs in

12   case 400.

13        THE DEPUTY CLERK:  And defense?

14        MR. SUR:  Good morning.  This is Indraneel Sur at

15   the United States Department of Justice for the defendants.

16        THE DEPUTY CLERK:  Thank you.  And counsel for

17   plaintiffs in case 402?

18        MR. WIRTH:  Good morning.  This is Stephen Wirth

19   from Arnold & Porter on behalf of all plaintiffs in case 402.

20        THE DEPUTY CLERK:  And counsel for defense.

21        MR. SUR:  In case 402, this is Indraneel Sur for the

22   United States Department of Justice for the defendant.

23        THE DEPUTY CLERK:  Thank you all.

24        THE COURT:  All right.  Thanks, everyone.  Good

25   morning.  We've got two cases here called.  The Court has

4

1    received the new emergency motion to enforce in the Global

2    Health Council case, No. 402.  Called this hearing quickly

3    in the interest of hearing from the parties on it.  And given

4    the overlap in the AIDS vaccine case, which is the 400 case,

5    I'll hear from plaintiffs in that case too.

6        I understand, Mr. Sur, you'll be representing the

7    defendants in both of those cases.

8        Couple of things at the outset.  In terms of protocol

9    today, I'm going to start by hearing from plaintiffs in the

10    Global Health 402 case, given they have the pending motion.

11        Counsel for plaintiffs in 400, the AIDS vaccine case, I do

12    anticipate hearing from you briefly only to the extent that

13    you have a difference with or something to supplement what

14    you've heard from counsel in 402 in the interest of not just

15    having repetitive argument.

16        I'll then hear from counsel for the defendant, Mr. Sur,

17    and if I have questions after that, I'll let you all know.

18        You know, probably clear, but my main interest here is

19    what's happening on the ground as it relates to the pending

20    motion to enforce my temporary restraining order.  This is not

21    an opportunity to relitigate the TRO itself, which remains in

22    effect, has not been stayed, and must be followed by the

23    parties.

24        If I can, I'll resolve the pending motion orally today

25    so that the parties in the case can move forward.  But the

1    parties do remain under the obligation to file the joint

2    status report I've asked for tomorrow.  And if there's more I

3    want included in that, at the end of this hearing I'll let you

4    know that too.

5        All right.  With that, counsel for plaintiffs in the Global

6    Health Council case, 402, you've got the floor.

7        MR. WIRTH:  Good morning, Your Honor.  Stephen Wirth

8    from Arnold & Porter.  To begin, I just want to thank the

9    Court for promptly convening this hearing.  As we said in our

10    motion, we don't make this request lightly, and we deeply

11    appreciate the Court's continued attention to this case.

12        I'd like to start briefly by addressing the harms at

13    issue here.  You have our briefing and the declarations that

14    we filed yesterday.  I think you can tell from those that the

15    harms here are extremely immediate and need to be remedied

16    within hours, days at the most, or else my clients will face

17    truly irreparable harms to their businesses.  They're in the

18    midst of shuttering -- they're about to sign usurious loan

19    documents.  This is truly an emergency, and that is why we

20    filed this motion.

21        But I also wanted to raise to the Court's attention the

22    fact that our named plaintiffs are not the only plaintiffs

23    here who are suffering.  We represent two associations and the

24    members of those associations are suffering very similar harms

25    as our named individual organizational plaintiffs.  I'll just

1    give one example for the Court's attention.

2        I was recently given a message from one of the

3    organizations who's a member of SBAIC, and this woman owns a

4    small business.  She's owed almost a million dollars from the

5    government.  And she wrote to me:  "The impact on me is that

6    my business will not only close, but at 60 years old I will

7    have to go and keep working into old age to make up for that

8    $1 million loss which is backed by my personal wealth.  And I

9    will have almost no assets on which to live."

10        These are real harms to real people, and they go very deep.

11    And so I want to make sure that the Court is aware of them.

12    Not to mention, though, the truly disastrous humanitarian

13    effects that are happening right now all around the world.

14    So unless the Court has specific questions about the harms,

15    I would like to turn to what we understand is happening on

16    the ground with respect to payments.

17        THE COURT:  This may connect, and you can feel free

18    to tell me you're going to explain it in the context of

19    discussing what's going on on the ground, that's fine, but I

20    do have a question.  Obviously, it does seem like these harms

21    are very much the same type of harms that were briefed and

22    evidence was provided at the TRO consideration phase.  So

23    it's concerning that they've continued.

24        I just want to clarify, the harms you referred to, whether

25    it be the example you just gave or really hopefully all of

1    them, are you speaking specifically and exclusively as to

2    nonpayment for work that has already been completed or that

3    had already been completed before the TRO, for instance, or

4    are you speaking of money owed under, you know, agreements

5    projecting them into the future?

6         MR. WIRTH:  Yes, Your Honor.  Again, Stephen Wirth.

7    We are speaking about money owed for work that was completed

8    prior to the TRO.  There are also harms related to failure to

9    release money that is obligated going forward, and some of my

10   clients were unable to draw down money from funds that have

11   already been obligated.

12      But we're primarily talking today, the examples that we

13   gave in our declarations, for example, this is all for money

14   that is presently owed for past work and that our clients need

15   access to immediately in order to continue surviving as

16   ongoing concerns.  So we are talking about primarily past

17   work.

18        THE COURT:  Got it.  All right.  Why don't you go ahead

19   and continue where you were headed, and I'm sure I'll have

20   some clarification questions.

21        MR. WIRTH:  Absolutely.  So what we understand, and

22   what I know from my clients, is that they are not being paid

23   for all of this work that's already been done.  Since the

24   government has -- since the Court entered the TRO and

25   repeatedly reaffirmed it over the last few days, there have

1    been -- payments have essentially slowed to, from our

2    understanding, complete standstill.  The government said last

3    week in the -- in its status report that some $250 million had

4    been slated to be disbursed last week.  We've seen no evidence

5    of that.  Certainly, to the extent there have been any

6    payments at all, they've been a very, very, very small

7    fraction of that.

8         And it's our understanding that those payments are being

9    stopped by new procedures that these defendants have begun

10   imposing on the approval process at these agencies, at USAID

11   and at the State Department.

12        And our understanding is they're requiring new

13   justifications for invoices that have already been approved,

14   that have already gone through the entire approval process,

15   and that they have added a new level of approval at the very

16   top that requires the sign-off of a single person; and they're

17   at the point now where that person needs to individually approve

18   every single line item, and there are so many line items that

19   it's simply impossible.

20        I'll be very interested to hear what the government

21   represents as to what's happening on the ground, but these

22   representations that I'm making today are based on

23   conversations that I've had with numerous people at all levels

24   within both agencies, and my understanding is that this is a

25   policy choice that has been made at the highest levels, that

1    it is in furtherance of the same policy choices that were made

2    pursuant to the executive order that this Court has already

3    temporarily restrained.  And we believe that the government

4    has taken essentially no action to make prompt payments under

5    the TRO.

6        THE COURT:  Mr. Wirth, can I ask you, you referred to a

7    new level of approval at the top requiring the sign-off of a

8    single person.  Is that at one of the agencies in particular

9    that you're speaking or is that at both?

10       MR. WIRTH:  So my understanding, Your Honor, is that

11   the State Department has essentially subsumed many of the

12   functions of USAID, and several people are functioning in

13   roles at both agencies.

14     I'm sorry to sort of interrupt this colloquy, but I'm

15   getting word from my client that the public line is not --

16       THE DEPUTY CLERK:  Your Honor, this is the courtroom

17   deputy.

18     (Simultaneous speaking.)

19       THE DEPUTY CLERK:  Good morning.  This is the courtroom

20   deputy.  We are aware of the issues with the public line.

21   There is nothing that I can do about it at this moment, but

22   the IT staff is aware and they're about to come up here and

23   try to work on it.  But there is nothing that the Court can do

24   at this moment.  It's up to His Honor if he wants to continue

25   or wait until they can try to fix it.  Thank you.

1          THE COURT:  Okay.  Do you have an ETA on what the

2     timeline would be to fix it?

3          THE DEPUTY CLERK:  Your Honor, I do not.  I'm sorry.

4     I just called them about two minutes ago.

5          THE COURT:  Okay.  Do the parties have a position on

6     whether they'd like to pause for a moment?

7          MR. WIRTH:  Your Honor, we're happy to proceed if the

8     Court is comfortable proceeding, but we're also happy to take

9     a brief recess if you would like.

10          THE COURT:  Mr. Sur?

11          MR. SUR:  Same for us, Your Honor.  At your discretion.

12     Thank you.

13          THE COURT:  Yeah.  Why don't we go ahead, then, if

14     both parties, at least on the instant motion, are comfortable

15     proceeding.  I appreciate you letting me know about the issue,

16     and I appreciate the work the courtroom deputy and the IT

17     staff are doing to get the public line up.

18        So can you continue your answer to my question.  You were

19     saying that the State Department under your understanding has

20     subsumed, but I guess I'm wondering -- it sounds like the

21     answer to my question is yes, that there is a single person as

22     to both the State Department and as to USAID?

23          MR. WIRTH:  I believe that's true.  I'm not a hundred

24     percent certain who that person is or whether it's the same

25     person.  But my understanding is -- and the government

1    obviously has far more visibility into the agency than I do.

2    But my understanding is that Ken Jackson at USAID is in charge

3    of all approvals coming up through the agency.  And I'm not

4    sure if he's also in charge of the approvals out of the State

5    Department, but that would potentially also be Pete Marocco,

6    who submitted the declaration in support of the government's

7    status report last week.

8        THE COURT:  All right.  Mr. Sur, I'll expect you to

9    clarify that, but for the moment, that's helpful.

10       Did you have more you wanted to offer before I get to my

11   questions, Mr. Wirth?

12       MR. WIRTH:  No, Your Honor.  Happy to answer any

13   questions that you have.

14       THE COURT:  Okay.  So I know at the past hearing

15   which took place just a day after the TRO motion itself, you,

16   and I think the government also, wasn't able to provide much

17   specificity on the details of how these payments actually

18   work.  I take it some time has passed, and based on the

19   motions, that you all maybe know a lot more about that.

20       So could you walk me through that?  I mean, your motion

21   refers to invoices, reimbursement requests, access to letter

22   of credit facilities and I think drawdowns of those, and then

23   other payment management systems for grants.  It would just be

24   helpful to hear your understanding of the differences between

25   these things and how they all apply to the pending motion you

1    filed and to the TRO.

2         MR. WIRTH:  Yes, Your Honor.  So the way that these

3    agencies operate is largely through two different -- two

4    different large sort of categories:  Their acquisition funds,

5    their acquisition contracts, which operate sort of like a

6    normal government contract.  These are essentially, you know,

7    payments for specific services.  That is generally done

8    through a contract and then the contractors submit vouchers

9    for payment for services rendered.

10        And that is submitted to lower-level agency staff who are

11    responsible for processing the vouchers, ensuring that the

12    work was in fact completed, that all other, you know, aspects

13    of the contract have been honored.  And then the -- that goes

14    into a payment management system at USAID, it's called

15    Phoenix.

16        Once all the approvals are taken care of and the agency

17    has assured itself that the payment is proper, then it is

18    processed and funds are disbursed from the Treasury.  That's

19    sort of the typical process.

20        The other type of general category is assistance

21    agreements.  And these are in the form of grants or

22    cooperative agreements.  And oftentimes these sorts of awards

23    are managed through a letter of credit facility.  And so the

24    funds are made available, and then the awardee can draw down

25    funds from the award to pay for expenses on an ongoing basis.

1    And it's generally important in a variety of circumstances,

2    but oftentimes these implementing partners need to have

3    immediate access to funds, so within certain parameters

4    they're able to access funds immediately.  And then those

5    drawdowns are subject to a variety of audits.

6        And so my understanding is that on sort of both sides of

7    the equation, things have been broken.  The Phoenix payment

8    system for vouchers, generally for past work, has been --

9    access to that by staff, by agency personnel, has been

10   severely limited, and so -- I'm sorry.  Am I still on the

11   line?

12            THE COURT:  I can still hear you.

13            MR. WIRTH:  Okay.  Good.  I'm sorry.  I heard a noise,

14   and I thought I might have been disconnected.

15       All right.  So as I was saying, my understanding is that

16   agency staff no longer have the access that they used to to

17   the system, which means that approvals are being done by only

18   a very small group of people, at sort of the lower and mid

19   levels, and then everything is being funneled up to a single

20   approver, and this has created a huge backlog for past

21   vouchers and the like.

22       On the other side of the equation, so letter of credit and

23   other payment management systems --

24            THE COURT:  I think we're getting the public line

25   connected, so let's pause and I'll ask the deputy to let us

1    know when we should restart.

2         THE DEPUTY CLERK:  Apologies, Your Honor.  We're trying

3    to get it connected again now.

4      (Pause.)

5         THE DEPUTY CLERK:  Okay.  Your Honor, we're reconnected

6    again.  I'm going to have to test it out on my cell phone.  If

7    you guys can continue speaking.  You can hear me?  OIT says

8    they can hear me.  They're testing it out.  So hopefully now

9    it'll work.

10         THE COURT:  Okay, great.  Mr. Wirth, you were just in

11    the middle of discussing how in practice things have, on your

12    understanding, have been frozen in the context of both the

13    acquisition contracts and the assistance agreements.  So

14    please continue.

15         MR. WIRTH:  Absolutely, Your Honor.  So with respect to

16    the assistance agreements, my understanding is that access to

17    the payment management systems and letter of credit facilities

18    was shut off sometime the week of January 20, and it has not

19    been -- access has not been resumed since then.

20      Just a few days ago -- and this is in an attachment to the

21    Northrip declaration that we filed on Monday -- we had a email

22    from a government official that said USAID facilities -- or

23    payments are not going out from the agency.  And that's

24    consistent with our experience.  From what we can tell --

25         THE COURT:  Let me clarify that.  Mr. Wirth, when you

1    say that access was shut off and has not been restored, is

2    that on the agency's side, meaning it's not been restored

3    to the people on the agency who would ordinarily access the

4    system?  Or is it in some way shut down on the receiver's

5    side?  Or tell me if that question doesn't make sense.

6         MR. WIRTH:  I think that question makes sense.

7    My understanding is that on the receiver side, everything has

8    been shut down and they're not able to access funds.  Normally

9    what happens is when a person wants to draw on one of these

10   letter of credit facilities, they go into the payment management

11   system or the facility that they use to make these types of

12   draws, they put in a request for a specific amount.  So long as

13   it meets parameters, it is disbursed generally within 24 hours.

14      And what my clients have been seeing on the ground is that

15   when they make these requests, the disbursement date -- it says

16   that the request has been processed but then the disbursement

17   date is set for almost a year from now, which makes no sense.

18      And so when they have inquired with agency personnel as to

19   what's happening, the answer is that no payments are going out

20   from the agency right now.

21      I'm not sure to what extent the agency personnel themselves

22   have lost access to these systems.  My understanding is that for

23   some time period potentially there was access to Phoenix that

24   was shut off.  I think that some personnel currently have access

25   to Phoenix, and in fact, have made all of the normal approvals

1    through the system that is -- that they normally do, and that

2    right now the thing that is stopping the payments from going out

3    is this final level of approval.

4        THE COURT:  Okay.  Understood.  And just to make sure

5    I'm still clear on this, obviously the invoices that are being

6    submitted on the side of the acquisition contracts is for work

7    that has already been completed, and the focus right now is on

8    work that was completed prior to February 13, the date of the

9    Court's TRO.  And the same in the context of the assistance

10   agreements and the letter of credit facilities as you

11   described them.

12       In other words, the drawdown, when it comes to the letter

13   of credit, is not a drawdown for something that happened

14   yesterday or today, but at least the focus right now is a

15   drawdown for something that happened prior to February 13.

16   Is that right?

17       MR. WIRTH:  Yes.  That's the focus right now.

18       THE COURT:  Okay.  So I'm looking at your proposed

19   order.  Do you have that in front of you, counsel?

20       MR. WIRTH:  I do, Your Honor.

21       THE COURT:  Can you walk me through the first two

22   components of that and just connect it to what you were

23   saying?  It may be obvious, but I want to make sure I fully

24   understand --

25       (Simultaneous speaking.)

1    THE COURT:  -- pay all invoices, and then permit and

2    promptly pay.  I just want to understand exactly what those

3    two are getting at.

4    MR. WIRTH:  Absolutely, Your Honor.  I don't think

5    these are obvious.  These are complicated, and I will admit

6    I'm not a government contracts expert, so I've been learning

7    this very quickly over the last couple of weeks as well.

8    So my understanding is that currently my clients have

9    numerous invoices that they've already submitted and that

10   they believe have already been approved through the normal

11   processes at USAID and potentially also at the State

12   Department, though I think State Department normally operates

13   on grants, not on contracts, but I can't make any specific

14   representations as to that.

15   So take the first of these instances, the pay all invoices

16   and letter of credit drawdown request, this would be for

17   acquisition contracts and specifically mentions work completed

18   prior to the entry of the Court's TRO.  So this would be sort

19   of typical government contracts type payments.

20   I understand that in like a small number of cases these are

21   not done through invoices but they're done through letter of

22   credit drawdown requests, which I think is unusual, but my

23   clients say that both of them need to be represented.

24   With respect to the second prong, so this is for grants and

25   assistance agreements, and these agreements permit drawdowns

1    on an ongoing basis and also, you know, for both past work and

2    for future work.  And in order to continue to do work under

3    the contracts that are currently in operation, the grants and

4    agreements that are currently in operation, they need to make

5    drawdowns on an ongoing and regular basis.  And so this is to

6    ensure that they are permitted to access those letter of

7    credit facilities and other payment management systems.

8            THE DEPUTY CLERK:  Are the parties still here?

9    Testing one, two, three.  Can you hear us?

10           MR. WIRTH:  I'm here.

11           THE DEPUTY CLERK:  Okay.

12           MR. SUR:  This is counsel for the government.

13           THE DEPUTY CLERK:  I think we lost --

14           THE COURT:  My apologies.  Judge Ali is here, and I

15   was asking a question but I was on mute.

16           THE DEPUTY CLERK:  Oh, okay.  My apologies, Your Honor.

17   Thank you.

18           THE COURT:  Thank you.  Mr. Wirth, because we're here

19   on a motion to enforce the TRO, can you make the connection,

20   then -- connect the dots as you see it between the relief

21   you're asking for -- and I'm really focused on the first two

22   points for now because I think the other ones are self-

23   explanatory about just following the order -- connect those

24   first two to the TRO itself for me.

25           MR. WIRTH:  So the TRO specifically ordered the

1    government to not take any actions to pause the disbursement

2    of foreign assistance funds, and these two components of

3    the proposed order go directly to the government's -- to

4    the temporary restraining order insofar as it orders the

5    government to stop any pause of disbursement of foreign

6    assistance funds.

7        THE COURT:  Right.  And is one way to look at how you

8    drafted here the first point we were talking about that begins

9    "Pay out all invoices and letter of credit," that's looking at

10   funds from before February 13, before the date of the TRO, and

11   the second one is looking at drawdowns in the future?  Tell me

12   if I'm --

13       MR. WIRTH:  No, not necessarily --

14       THE COURT:  -- oversimplifying.

15       MR. WIRTH:  I'm sorry.  No, Your Honor, it's not that

16   simple.  So my understanding is that these drawdown requests

17   can also be for past work.  So it's not as simple as saying

18   that it's only for past or only for future.  It depends on the

19   specific language of the grants and the assistance agreements

20   and what those funds are going to be used for.

21       THE COURT:  Okay.  So try again.  Tell me again what

22   that second point adds that's not already in the first point.

23       MR. WIRTH:  Well, the first point is specific to

24   acquisition contracts, and the second point is with respect to

25   grants and assistance agreements.  These are all the -- these

1    are all the --

2        THE COURT:  I see.  I see.  Okay.  Thank you.  That's

3    helpful.  I'm sorry to interrupt you.  So the key difference

4    is later in the sentence where it says "on contracts for work"

5    in the first one, and in the second one it says "for

6    reimbursement on grants and assistance agreements."  That's

7    the focus?

8        MR. WIRTH:  Yes.  Exactly, Your Honor.  And I think the

9    distinction is important because, with respect to sort of

10    vouchers that are submitted for work on contracts, I think my

11    understanding is those are all sort of retrospective for past

12    work, but that on grants and assistance agreements, draw-down

13    requests can be both retrospective and prospective, and so

14    this covers the waterfront, so to speak.

15        THE COURT:  Understood.  When it came to the meaning of

16    the second one, at least again as to the focus of your motion

17    which is for, you know, I don't think a significant amount but

18    it's for work completed prior to the entry of the TRO, if the

19    second paragraph included that qualification at the end, in

20    other words that the focus is for work completed prior to the

21    entry of the Court's TRO?

22        MR. WIRTH:  I -- I do worry that that would

23    unnecessarily limit the scope of the Court's TRO which

24    specifically refers to all disbursements of foreign assistance

25    funds.  Some of my clients receive drawdowns on an ongoing

1    basis, and I do worry that this would cut them off from credit

2    in a way that would perpetuate the irreparable harms they are

3    currently facing.

4         THE COURT:  Understood.  Fair point.  I think that

5    would be narrower than the TRO itself.  I'm just trying to

6    understand exactly the narrow focus -- or at least the highest

7    priority if that makes sense, of what's been enjoined.

8      Let me ask you a different question:  Can you give me

9    plaintiffs' position on the main regulation that defendants

10   have cited as authorizing suspension and termination?  And I'm

11   not trying to get ahead and hear your argument on the PI

12   necessarily.  I know you all still have time to get your brief

13   on file under the briefing schedule that's been entered, but

14   specifically as it relates to the present motion to enforce

15   the TRO, what is the place that the regulation that -- I think

16   it's 2 C.F.R. § 700.14 -- how does that relate to the present

17   TRO and your motion to enforce?

18        MR. WIRTH:  So my answer to that is that the Court has

19   already ordered the government to make payments and to stop

20   pausing the disbursement of foreign assistance funds.  Whether

21   the government can terminate contracts really is not relevant

22   to that specific question that we are seeking the Court --

23   seeking to enforce right now.

24     As the Court is aware, we are preparing our reply brief

25   which directly deals with the sort of subject matter question,

1    subject matter jurisdiction question the government has

2    raised.  We believe that we have strong arguments that there

3    is jurisdiction under the APA and that we absolutely can bring

4    exactly these types of claims because they are based on --

5              THE COURT:  Understood.  I'm sorry, counsel, this is

6    probably my fault.  I don't want to push you ahead to your PI

7    arguments.  I think the first part of your answer does the

8    trick for me.

9       And then I guess -- again, jumping ahead a little bit, and

10   this may be jumping into the PI, might be jumping ahead to

11   beyond the PI, but not in terms of merits argument.  I guess

12   I'm just interested, Counsel, in, for lack of a better way to

13   put it, what do you see as the ultimate end game here

14   realistically?

15      And let's just posit that it seems like -- and this does

16   not go to necessarily the compliance with the TRO, which is

17   the question before the Court right now, but clearly the

18   administration is signalling that it does not want to contract

19   with your clients, and you all satisfied your burden to show

20   irreparable harm and a likelihood of success on the merits was

21   done, and the government needs to comply with the Court's

22   order -- and I'm going to talk to the government soon -- and

23   that includes unfreezing payments, as I've said and

24   reiterated, and I'll come to that, but I guess I'm just -- do

25   you see a path to this actually leading to the reinstatement

1   of long-term contracts with your clients?

2   MR. WIRTH:  Yes, Your Honor.  So first of all, just to

3   be very clear, what we're here today for is so that we can

4   even get to the PI hearing.  The clients need to get to the PI

5   hearing in order to then be able to craft an order that will

6   be able to protect them going forward, a preliminary

7   injunction that protects their rights.

8   But we do see a path forward here.  The government has said

9   that they have the authority to cancel all these contracts.

10  If that's in fact true, then they will have to go through the

11  proper processes to cancel contracts.  What they can't do is

12  do what they've done here.  So, you know, our understanding is

13  that many of these contracts do serve the national interest,

14  and if they were actually going through these contracts and

15  evaluating them, that they would not cancel these contracts,

16  even if they had the ultimate authority to do so.

17  And beyond that, I think there's a couple of other issues

18  at issue here.  We're not saying the government has to spend

19  these foreign assistance funds to operate specific contracts.

20  But we are saying that the government can't unlawfully impound

21  all of these funds and make no foreign assistance obligations

22  going forward.

23  So what we would want going forward is not necessarily that

24  our clients' specific contracts will be kept in perpetuity.

25  That may not be possible.  And in fact, the government may

1    have the ability to cancel some of them.  But they can't do

2    this wholesale cancelation of all of their contracts all at

3    once.  They have to actually follow the law when canceling or

4    terminating agreements or grants.  And they actually have to

5    spend these foreign assistance funds that have been

6    appropriated by Congress, that have specific statements as to

7    how they are to be spent.  And the Executive Branch --

8        THE COURT:  Thank you.  I think that answers my

9    question.  I promised I wouldn't force you to argue the PI on

10   the spot.  That's helpful enough as you've answered it.  I

11   appreciate that.

12       So why don't I hear from counsel for the plaintiffs in the

13   AIDS vaccine case, 400.  Again, my interest would be anything

14   in your position based on your clients that differs from what

15   I've just heard from Mr. Wirth, or anything you can offer that

16   would supplement that, what I've just heard.

17       MS. BATEMAN:  Thank you so much, Your Honor.  This is

18   Lauren Bateman for plaintiffs in 25-cv-400.  I'm grateful for

19   the opportunity to speak and will remain mindful of this

20   Court's direction to only note areas where plaintiffs'

21   positions are different and to provide only additive

22   information.

23       We agree entirely with plaintiffs in 25-cv-402 about the

24   extent of noncompliance, but as we see it, the question before

25   the Court is not whether to enforce one part of the TRO; the

1    question is whether defendants are complying or violating the

2    TRO.  And they appear to be violating it in all respects.

3        So plaintiffs in 25-cv-400 would renew their motion to

4    enforce and motion for civil contempt, seeking enforcement of

5    the entire TRO, and we urge the Court not to enter relief that

6    would narrow the relief that the Court has already now thrice

7    granted.

8        I have a couple of factual additions that I'd like to add

9    to supplement Mr. Wirth's portrayal of the situation:  First,

10   we know that defendants have initiated new terminations in the

11   last couple of days explicitly on the bases forbidden by the

12   TRO.  On February 23 --

13           THE DEPUTY CLERK:  Counsel, the court reporter needs

14   you to slow down a moment.  And also, Your Honor, we're going

15   to attempt to reconnect the system one more time.

16           THE COURT:  Okay.  Apologies, Ms. Bateman.  We'll go

17   ahead and pause until the deputy confirms that we're

18   reconnected.

19           MS. BATEMAN:  Thank you, Your Honor.  My apologies.

20           THE DEPUTY CLERK:  Okay.  Pause for one moment.  We're

21   going to try this again.

22       Okay, Your Honor.  Back on the record.

23           THE COURT:  Okay.  Go ahead, Ms. Bateman.

24           MS. BATEMAN:  Thank you.  I was just indicating that

25   our understanding is that defendants have initiated new

1    terminations explicitly on the bases forbidden by the TRO in

2    the last couple of days.  On February 23 a notice was issued

3    to contracting officers to terminate a new tranche of awards.

4    And that notice made clear that the authority to do so came

5    from Secretary Rubio with the explicit instruction that those

6    terminations were implementing the executive order.

7        And then subsequently, at approximately 4:30 p.m.

8    yesterday, contracting officers received an email from Adam

9    Cox, whose title is acting deputy director of foreign

10    operations.  That email indicated that they were instructed by

11    DOGE to terminate several awards that same night, and also

12    indicated that many -- and "many" is capitalized in that

13    email -- more terminations are coming and that Foreign Service

14    officers were authorized for overtime to effectuate those

15    terminations.

16        We understand that the government now says oh, it was a

17    mistake for us to say that the executive order was the basis

18    for those terminations, but -- and that emails with the agency

19    claim that Secretary Rubio individually reviewed all of the

20    terminations and decided on his own to terminate those awards,

21    but that's frankly a fantastical claim.  Given the number and

22    complexity of the awards at issue, it's implausible on its

23    face, and it's also worth considering the implausibility of

24    that claim given Secretary Rubio's travel schedule from

25    February 13 to 19.  He was in Germany, then Israel, and then

1    Saudi Arabia and the United Arab Emirates.

2        So the key in plaintiffs' view is not whether defendants

3    can conjure some alternative pretextual basis for their

4    actions.  And the Supreme Court has been very clear about

5    this.  In *Department of Commerce v. New York*, that's the

6    census case before the Supreme Court, Chief Justice Roberts

7    wrote for the Court and said that when a court receives an

8    explanation for agency action that is incongruent with what

9    the record reveals about the agency's priorities and

10   decisionmaking process --

11       (Simultaneous speaking.)

12       THE DEPUTY CLERK:  Counsel, please watch your speed.

13   Counsel, please watch your speed for the benefit of the court

14   reporter.  Thank you.

15       MS. BATEMAN:  My apologies.  Thank you.

16       In closing on that point, courts are not required to

17   exhibit a naïveté from which ordinary --

18       THE COURT:  Understood.  Yeah, I certainly have that

19   point, and it's been something I've reiterated each time any

20   sort of clarification has been sought.  That this is not

21   about, you know, continuing to suspend funds while the

22   government can come up with post hoc rationalization or a

23   pretextual basis for the action that I think I deemed likely

24   to be arbitrary and capricious in the first place.

25       And I'm familiar with the *Department of Commerce* case,

1      which I think was cited in the Court's last order.

2           Tell me anything else that you would supplement the prior

3      argument on or differ from.

4           MS. BATEMAN:  Thank you, Your Honor.  Two other points,

5      and I'll make them briefly.  On the subject of personnel

6      access to payment processing systems, on February 23, USAID

7      began to implement reductions of force that likewise appeared

8      tailored to circumvent the Court's orders.  Our understanding

9      is that those RIFs include financial management staffers, so

10     those are the people who would actually do the disbursement of

11     awards to implementing partners.

12          Our understanding is that before February 23 defendants

13     blocked those staffers from access to payment systems, but

14     after February 23, there's hardly anyone at the agency who has

15     those jobs.  And without those people, the funds can't move,

16     so there can't be compliance with the Court's order.

17          Defendants either know that or they're acting with such

18     ignorance and haste that they don't know what they're breaking

19     as they're breaking it.

20          Also included in that RIF were employees who interact on a

21     day-to-day basis with recipients of foreign aid assistance.

22     Those are the people who would theoretically get these

23     programs back up and running after a suspension is lifted.

24     And those people likewise have largely been terminated or

25     placed on administrative leave.

1       One other point for Your Honor's consideration.  To add

2   supplemental information to Mr. Wirth's discussion of the

3   problem of bottleneck at individual approval -- for individual

4   approval of line items, I wanted to call this court's

5   attention to reporting in *The Washington Post* in the last

6   couple of days.  That reporting details how Elon Musk and two

7   DOGE employees took over the USAID payment processing system,

8   stopping payments entirely and making the supposed waivers

9   issued by Secretary Rubio completely ineffectual.

10      That reporting indicates that USAID managers prepared

11  packages of payments that should have ostensibly been covered

12  by waivers and got the agency's interim leaders to sign off on

13  those packages, but each time Musk and one or two other

14  employees of DOGE would veto the payments.

15      That reporting is consistent with what I've gleaned in

16  speaking to people from within the agency.  My understanding

17  is that bureaus have flagged that they don't have access to

18  payment systems to effectuate the TRO, but the agency just has

19  not responded to those requests.

20      Just to take one example, nobody in the entire Global

21  Health Bureau, which among other things drives PEFPAR

22  programs, has access to the payment systems at all.  It's just

23  two 20-somethings and Elon Musk.  So essentially no funds are

24  being distributed.

25      THE COURT:  Can you clarify that statement?  The

1   systems you're referring to, are those USAID systems to

2   approve and put the payments forward, or are they

3   Treasury-side systems?

4         MS. BATEMAN:  Our understanding is that Phoenix is a

5   USAID-side system through which USAID employees can actually

6   approve disbursement of payments.

7         THE COURT:  And that's the system you're saying DOGE is

8   now controlling?

9         MS. BATEMAN:  That's right.

10        THE COURT:  Okay.  Understood.

11        MS. BATEMAN:  Thank you, Your Honor.

12        THE COURT:  Anything else?

13        MS. BATEMAN:  Nothing else.  We'd just conclude by

14  reiterating that we seek enforcement of the TRO in its

15  entirety.  Thank you.

16        THE COURT:  Okay.  Mr. Sur, I'll hear from you on

17  behalf of the defendants in both cases now.

18        MR. SUR:  Good morning, Your Honor.  Indraneel Sur from

19  the Department of Justice for the defendants.

20    I guess I will begin by noting that the defendants have

21  been focusing their efforts on preparation of the submissions

22  for the compliance and joint status report, working under the

23  Court's order with the due date for tomorrow, and that has

24  been the focus of the significant energy.

25    So when the plaintiffs in No. 402 early yesterday morning

1    raised this prospect of a renewed motion, there was failure of

2    time essentially for me to find anything.  I did -- and the

3    defendants do now have -- received plaintiffs' invoices and

4    are analyzing them.  But as for much of the assertions about

5    the facts, insofar as any of them are in the record at all,

6    we've not had the opportunity to respond to that.

7         And so at the outset, the Court noted the submissions for

8    tomorrow, and I think the Court also suggested that it might

9    provide guidance on what might be the appropriate content of

10   that submission.  So in that respect I might respectfully

11   submit that it would be appropriate to give the defendants an

12   opportunity to address some of what's been asserted here about

13   the facts.

14        But -- Mr. Wirth made certain assertions.  He did have the

15   benefit of pointing to the record on the previous motion, but

16   the dilemma is that the previous motion was denied, right,

17   albeit without prejudice for its renewal, but the renewal

18   papers didn't --

19             THE COURT:  Mr. Sur, let me maybe direct you to

20   something --

21             MR. SUR:  Sure.

22             THE COURT:  -- that would be helpful at this point.

23   I take your point that a motion was filed while the joint

24   status report was pending, but I'll remind you the government

25   also filed Friday, around midnight if I recall, its own

1    version of that after the joint status report was ordered as

2    well.

3        And so, you know, right now the Court has before it a

4    motion to enforce.  I've been clear that this is not going to

5    become -- well, certainly not intended to ever become a review

6    of individual contract determinations.  You're bringing it

7    down to that level right now, and I don't want to as the

8    court.

9        I think there are some basic questions that have been

10   posed here, and while you may not have reviewed those specific

11   invoices, the TRO has been in effect for now 12 days, since

12   February 13, and there are some just basic questions.

13       So let me just ask you, you know, the TRO was clear and the

14   Court has said it was clear that defendants could not continue

15   the blanket suspension of foreign aid funds pending a review.

16   And that was based on a finding that the plaintiffs had shown

17   irreparable harm.  It sounds like there's evidence right now

18   that it's deepened.

19       And to be honest -- obviously there's the PI motion pending

20   and briefing which the Court will consider, but at the TRO

21   phase I don't take the government really to have ever rebutted

22   that irreparable harm.  And there was a likelihood of success

23   that at least under the APA, for failing to consider that

24   irreparable harm, that the plaintiffs were likely to prevail.

25       And so the plaintiffs seem to be saying that the blanket

1    pause was not lifted in any meaningful sense.  I'd like you

2    to tell me in simple terms what action you are aware of that

3    the agency has lifted the blanket pause.

4           MR. SUR:  So to begin with, I think that after the

5    TRO -- and this was provided in the February 18 status report,

6    that after the TRO, the agencies gave instructions about the

7    TRO and notice to the funding recipients and to the officers

8    who managed the grants.  And the Court heard this morning

9    assertions about subsequent terminations, but -- and actually,

10   we had an exchange with plaintiffs Sunday night about that.

11      But the subsequent terminations have been, as I understand

12   it, grounded in individualized review which was consistent

13   with clauses in the Court's TRO distinguishing the blanket

14   from the individualized review.

15          THE COURT:  Let's just break this down a little bit.

16   So why don't we focus on two different periods.  Let's focus

17   on before February 13, the date of my TRO, and after February

18   13 separately.  So let's just focus on the period before

19   February 13.

20      There were suspensions pursuant to the EO in the

21   implementing orders that were enjoined by my TRO, and there

22   may have even been a series of suspensions and terminations

23   communicated during that window between January 19 and

24   February 13.

25      Are you contending that those suspensions and terminations

1    that would have occurred during that period remain valid and

2    should be given effect?

3          MR. SUR:  No, we understand the TRO to foreclose those.

4    I think that's clear.

5          THE COURT:  So that's helpful.  I appreciate that.  And

6    I appreciate you being candid about that.

7       So then, are you aware of steps that the agencies here have

8    taken to actually unpause the disbursement of funds as to

9    agreements that fall within that category or work done before

10   February 13?

11         MR. SUR:  So let me focus on that last point, if I

12   might, about the work done before February 13.

13         THE COURT:  Well, I actually want to focus on my

14   question, which is -- you just said to me that you understand

15   that any of the suspensions and terminations that took place

16   before February 13 are invalid and can't be given effect under

17   the TRO.  I do want to hear your full answer, but has the

18   government began -- has the government unfrozen disbursements

19   as to those contracts or assistance agreements for those --

20   for at least that period?

21         MR. SUR:  So for the -- the period before the TRO --

22   this is going back to February 18 joint status report, the

23   plaintiffs' characterization of some of those decisions --

24   and there's a wide variety, right, of grants and foreign

25   assistance arrangements, contracts -- was that all of them

1    were under the same challenged authority, and the government

2    explained in the status report that there were

3    contract-specific categories.

4        So where there were contracts that resumed and they had

5    claims for work done, there actually was a process for that.

6    The Secretary of State's memorandum, which was published at

7    page 2586828 [sic] of paragraph 12(d) provided for legitimate

8    expenses incurred prior to the date of that -- it's called an

9    ALDAC -- under existing awards or legitimate expenses

10   associated with stop-work orders.

11       So there was a process -- the legitimate expense waivers.

12   And that hasn't been disputed in the complaint, that that is

13   there for the work that has been done.

14           THE COURT:  Hey.  I guess I'm not sure why I can't

15   get a straight answer from you on this.  Are you aware of an

16   unfreezing of the disbursement of funds for those contracts

17   and agreements that were frozen before February 13?  And

18   you've acknowledged that under the TRO any of the terminations

19   or suspensions that took place before February 13 are

20   foreclosed, they're invalid and shouldn't be given effect.

21   Are you aware of steps taken to actually release those funds?

22           MR. SUR:  I'm not in a position to answer that.  I

23   think we will be in a position to answer that in the joint

24   status report.

25           THE COURT:  Well, we're 12 days into the TRO, and

1    you're here representing the government.  You had represented

2    in the initial February -- it wasn't a joint status report,

3    to be clear, to correct you, it was a status report from the

4    government, from the defendant, and, you know, made issue of

5    that it had been five days and there had been a holiday

6    weekend, but we're now 12 days in and you can't answer me

7    whether any funds that you've kind of acknowledged are covered

8    by the Court's order have been unfrozen?

9        MR. SUR:  All I can do really is say that the

10   preparations are underway for the joint status report on

11   compliance due tomorrow, and --

12       THE COURT:  It's not really [indiscernible] to a joint

13   status report, right?  The joint status report was something

14   I asked for.  And I'm asking you right now what you are aware

15   of.  Sounds like the answer is no.  If the answer's no, you

16   can say no, that you're not aware of any actions to unfreeze.

17       MR. SUR:  As I said, there was a legitimate expense

18   waiver process that is in place.  Beyond its presence, I can't

19   really go beyond that.

20       THE COURT:  But that's not referred to the TRO.  You're

21   citing back to the implementing regulation that's a part of

22   it, of the same implementing regulation that the TRO enjoins.

23   But I'm asking you -- this hearing is about enforcing the TRO

24   and compliance with the TRO.

25       MR. SUR:  So I do understand that.  I do also

1   understand the motion before the Court, the motion to enforce

2   to actually seek relief that is somewhat different in

3   character and is explicitly monetary.  And if the Court would

4   allow, I would appreciate the chance to elaborate a little bit

5   on that part of it.

6          THE COURT:  On which part of it?

7          MR. SUR:  That the relief before the Court as requested

8   in the present motion to enforce actually goes beyond the TRO

9   in that it is even more expressly of a monetary character and

10  therefore raises a serious problem of sovereign immunity.

11         THE COURT:  Well, yeah.  We can come to that.  I mean,

12  I don't understand the argument.  It seems like what you're

13  saying is instead of unfreezing or unpausing the funds, as the

14  TRO required, you just won't because of immunity.  If you want

15  to brief that at the PI stage, I suppose you can.  It's not an

16  argument that you all raised at the TRO phase.

17       Let me just ask you, though, here, because I think this is

18  important:  I have from you an acknowledgement that

19  suspensions or terminations from before February 13 are

20  invalid under the TRO.  And I appreciate that.  I just want to

21  be clear here --

22         MR. SUR:  I'm sorry --

23         THE COURT:  Let me just finish my question.  I just

24  want to be clear here.  So I understand that there is a review

25  of the agency's legal authorities and contractual terms, but I

1     assume then that you understand that it's not enough to just

2     go ahead and come up with a legal authority or contractual

3     term that would have justified a termination before February

4     13.  So an agency could be free to do that with independent

5     justification and legal authority in the future, but that

6     wouldn't justify or give effect to the terminations that

7     actually were communicated before February 13.

8         I assume you would agree with that given that you agreed

9     that it would violate the TRO to give those effect.

10        MR. SUR:  Where I'm having difficulty is that I think

11    as the February 18 report explained, the authorities for the

12    terminations and suspensions were up -- as best as we know,

13    part of these various contracts, grants and cooperative

14    agreements all along.

15        THE COURT:  Yeah.  I mean, I think that's kind of the

16    point, Counsel, right?  The TRO didn't say that there's no

17    underlying authority; that the agency is, you know, not acting

18    pursuant to the scope of its typical authority.  The TRO very

19    clearly, and it now has been reiterated, that the plaintiffs

20    were likely to succeed, at least for now, under the APA.

21        And so it wasn't about whether there was an underlying

22    authority.  For example, the Court didn't get to the

23    separation of powers problem.  The question was about the

24    failure to consider the irreparable harm here and the massive

25    reliance interest.  And finding new authorities does nothing

1    to do that, to address that.

2        So, you know, I think that it's explicit in the TRO but

3    it's also just illogical to say, well, we found some

4    authorities.  Again, the government has its authorities going

5    forward, but I think the point I'm trying to make, and this is

6    the point about not just coming up with a pretextual basis for

7    what has been held to likely be arbitrary and capricious and

8    enjoined -- I guess I'm not understanding where there is any

9    confusion here.  It seems kind of clear as day to me.

10        MR. SUR:  So, Your Honor, I think I would only be

11    reiterating what we've said in our previous filings, which is

12    that the Court's TRO we think appropriately recognized that

13    there were authorities that were located in contracts and

14    grants, and that the enforcement of those agreements at the

15    agreement-specific level was appropriate.  So -- and that I --

16        (Simultaneous speaking.)

17        THE COURT:  I take your point -- I understand the

18    government's position that it was appropriate.  I'm sorry,

19    counsel.  You're saying that -- I guess I'm hearing you say

20    two things.  One, it sounds like you're saying that the

21    termination of grants was appropriate.  Clearly, you prefer

22    not to have been enjoined.  But I also heard you say that you

23    understand that terminations and suspensions prior to February

24    13 were in fact enjoined.  I think the language you used was

25    foreclosed by the Court's TRO.

1          MR. SUR:  I think to that point insofar as -- I'm sorry

2     to interrupt.  But as I understood it to be insofar as it was

3     a blanket, I thought I was responding -- I'm sorry if I wasn't

4     clear.  I thought I was responding to the Court's question

5     about the concept of a blanket.

6          THE COURT:  Well, before February 13, everything was

7     proceeding pursuant to the blanket directive to terminate and

8     suspend.  That's what the directive was, implementing the

9     executive order.

10          MR. SUR:  So this is in the February 18 status report

11     as well, that following the TRO the agencies reviewed and

12     concluded that those suspensions and terminations were

13     consistent with terms of the contracts or grants or

14     cooperative agreements.  So maybe that's where I'm having

15     the -- in that --

16          THE COURT:  How is that different from just being a

17     post hoc rationalization kind of piece by piece of the kind of

18     en masse suspension that was deemed arbitrary and capricious?

19     I guess I can't tell whether you're just restating a position

20     that you want to preserve because you disagree with the TRO,

21     or there's actually some degree of confusion to begin with.

22     It seems clear to me, plaintiffs have articulated here in a

23     clear way as well.

24          So to the extent it's just a policy disagreement in terms

25     of the outcome of the TRO, that's fine, but I'd appreciate you

1    just being candid about that.

2    MR. SUR:  Um, well, I'm not certain if I would use the

3    term "confusion" so much as that the Court we think in the

4    original TRO in some sense recognized that there are

5    contract-level authorities and didn't foreclose that.  So --

6    you know, the government's subsequent filings I think have

7    sought to explain how those contract-level authorities have

8    been working.

9    THE COURT:  Okay.  All right.  We're going to move on

10   from that.  Why don't we focus on -- I'm not sure I understand

11   that point insofar as it deals with anything before February

12   13, because at that time, and I made clear that it's not just

13   about finding a contract term or a legal authority that

14   applies, but it cannot be taking place pursuant to the same

15   action here, which was a general directive to pause.  And so

16   everything before February 13 clearly was under that general

17   directive.

18   Let me turn you to the other period I mentioned, post

19   February 13, so after the TRO.  I want you to tell me again

20   what actions you understand have been taken -- aside from

21   mailing the notice, mailing a copy of the TRO and saying

22   further guidance would be provided, I want to know what

23   actions have been taken, including whether funds have been

24   unfrozen based on the TRO, and if so, what funds have and what

25   funds have not.

1          MR. SUR:  These would be I think the logical subjects

2     of the joint status report that is underway.  I don't have the

3     ability to recite those particular facts at this hearing.

4          THE COURT:  Twelve days into the TRO, you can't give me

5     any facts about funds being unfrozen based on the TRO?

6          MR. SUR:  I can -- I mean, there is this waiver

7     process.  And --

8          THE COURT:  Which was part of -- my TRO didn't have a

9     waiver process in it.  I'm asking about in response to my TRO.

10         MR. SUR:  Right.  So the TRO didn't enjoin paragraph

11    12(d) of the memorandum we were talking about, so that process

12    for approval of waivers of the pause --

13         THE COURT:  Counsel, is your answer then that the only

14    funds that have been reinstated are the ones that could have

15    been reinstated under the initial implementation of the TRO,

16    meaning only if they went through the waiver process?  That

17    sounds to me like you're just operating under the procedures

18    of the implementation.

19         MR. SUR:  So I'm offering that as one example.

20         THE COURT:  Can you give me other examples?

21         MR. SUR:  So in the joint status report -- I'm sorry.

22    I have incorrectly referred to it as the joint status report.

23    This is actually the February 18th status report -- there are

24    additional examples in that report and the supporting

25    declaration.

1    THE COURT:  Of funds being unfrozen in response to the

2    TRO?

3    MR. SUR:  I can only give you what the description here

4    is, authorization and requested disbursement of foreign

5    assistance funding.

6    THE COURT:  Okay.  All right.  Can you tell me -- look,

7    I'm interested in what the general directives have been since

8    the TRO.  So your clients, the heads of these agencies, issued

9    directives before the TRO.  These are the ones that were

10    restrained by the TRO that implemented the blanket suspension

11    of funds pending their review.  So that was enjoined.  After

12    the TRO, did they issue new directives walking that back?

13    MR. SUR:  Some of -- my understanding is we described

14    that in the February 18th status report.

15    THE COURT:  Can you describe it for me now, because I

16    didn't see that.

17    (Pause.)

18    Are you aware of directives from your clients or other

19    senior officials at the agencies that walked back the initial

20    general directive to suspend and terminate funds?

21    MR. SUR:  When you say "walked back," I think there

22    were notices of the TRO.  This is -- they stated -- if I

23    may --

24    THE COURT:  Go ahead.

25    MR. SUR:  -- for example, in the declaration that

1        supported the February 18th status report, paragraph 5, the

2        notice to the acquisition and assistance staff at USAID stated

3        that until further notice the contracting and agreement

4        officers should not enforce any agency directive issued under

5        Executive Order 14169 and the Secretary's implementing

6        memorandum that requires the generalized stop-work, suspension

7        or pause of agency contracts, grants or other federal

8        assistance awards.

9            That was exhibit -- sorry, this was paragraph 5 of the

10       declaration, and then it pointed to Exhibit C.

11           THE COURT:  Counsel, I hope you understand why this

12       is important as the attorney who's presumably advising your

13       clients and you're here representing them.  The Court's been

14       clear and, you know, as recent as when the government came on

15       Friday night and asked for further clarification, the Court

16       said that the qualification about when there are terms in the

17       contract or other legal authorities which allow termination

18       applies, but not when the terminations are still deriving from

19       a general directive to suspend aid.  That's repeated

20       throughout the document we filed.  I haven't seen the

21       emergency appeal you had referred to in that document be

22       filed, and the TRO is still in effect.

23           So if I were you, you know, I would think it would be

24       very important to point to some sort of directive that --

25       or something that indicates that the suspensions that are

1    happening under lawful authority, whether it be a regulation

2    or the terms of the contract or otherwise, is not still just

3    deriving from a general direction to suspend aid from the

4    agency, because that, again, is the very action that was held

5    to be likely arbitrary and capricious, that general directive.

6    And I don't even take the defendants to have ever disputed

7    that at the TRO stage.  Maybe I'll -- you know, I'll look

8    closely at your PI briefing.

9        So I'll leave it at that, but I would think it would be

10    important for you to be able to explain that to your clients

11    and to point to that.

12        MR. SUR:  I realize I've said this before, but if I may

13    say it one more time, I do think that the submissions that are

14    underway now offered for tomorrow will help.

15        THE COURT:  Okay.  I appreciate that.  I'm going to

16    take that to mean that you're still in conversations with your

17    clients, and that's what your inability to give a clear answer

18    to the Court is today.  You can correct me if I'm wrong on

19    that.

20        MR. SUR:  Yeah, I would have to go back to the clients.

21        THE COURT:  Yeah.  Understood.  Okay.

22        So let me just see if I have any other questions for you,

23    Mr. Sur.

24        MR. SUR:  May I ask, would the Court permit me to

25    briefly address some of the points that are specific to the

1    monetary character of the relief sought on this particular

2    motion?

3              THE COURT:  Well, maybe.  Yes, but to this extent:

4    I said at the outset that the purpose of this hearing is to

5    understand and to hear arguments on the motion to enforce the

6    TRO.  It is not an opportunity to relitigate the TRO.  So if

7    there are arguments that you want to make that limit the scope

8    of injunctive relief, the place for that would have been in

9    your PI briefing.

10      So I hope any argument you're going to make about that is

11   in your PI briefing.  But if you want to make arguments about

12   what the scope of the TRO actually was, then those arguments

13   are welcome.

14             MR. SUR:  Right.  So I mean, again, I'll try to be very

15   brief.  But the sovereign immunity question is brought into

16   particular focus by the proposed order, including the clauses

17   that the Court discussed with counsel for plaintiffs in

18   No. 402 earlier this morning, because they have an explicitly

19   monetary character, demanding compensation for past work and

20   including relief that addresses the letters of credit.

21      As the Court notes, in the PI briefing we did address this

22   question of sovereign immunity, and the APA sovereign immunity

23   waiver not covering monetary claims premised on contracts.

24   But I do think it's helpful to understand in the particular

25   context of this morning's discussion that the particular

1    motion by the GHC plaintiffs is again framed in terms of

2    compensation for past work under contract and letters of

3    credit, very explicitly of a monetary character, the nature of

4    that relief.  And sort of an even sharper focus than some of

5    the other elements of the preliminary injunction bringing this

6    question.

7        So here again, there would be, for contract by the

8    government, remedies that are described in our PI motion under

9    the Contract Dispute Act that would proceed maybe in the Court

10   of Federal Claims but not as part of the APA's waiver of

11   sovereign immunity which is for nonmonetary relief.

12       THE COURT:  Understood.  I appreciate that.  I do have

13   that argument.  I have it in your preliminary injunction

14   briefing.  It's not something that's come up in your TRO

15   briefing until today, or TRO arguments or submissions until

16   today.  And as I said, this is not an opportunity to

17   relitigate the TRO.  The TRO is in effect, it hasn't been

18   stayed or overturned in any sort of way.  I do want to make

19   that clear.

20       So let me ask you about some particular things in the

21   record following the TRO that stood out to me.  I'm going to

22   give you one example.  I'm looking at ECF 29-1.  This is an

23   attachment to -- I'm sorry.  I should clarify.  This is in the

24   Global Health Council case, No. 402, the same case that has

25   the pending motion to enforce.

And as I understand it, ECF 29-1 is a declaration from someone who describes an email from a State Department official on February 18. So this is five days after the Court's TRO. And the email apparently said, "Secretary Rubio has implemented a 15-day disbursement pause on all 15.9 billion worth of grants at the State Department."

And apparently the same email directed personnel in a particular bureau to undertake an assessment of all grants at the post and then still said, "Review the President's executive orders and recommend termination of grants that do not comply with those orders."

So this is five days after the TRO. I understand that Ms. Bateman, counsel in the 400 case, AIDS vaccine, referred to other instances in which guidance sent after February 13, after the emergency relief, also are referring to review pauses of disbursements and reviews pursuant to the implementation that's been enjoined by the Court.

Can you provide any context for me on that that might be helpful?

MR. SUR: If I may just go back one step. So this is in case No. 402, this is document 29-1, just to catch up to where you were.

THE COURT: Yes.

MR. SUR: And was it a particular exhibit, or was it a declaration matter?

1          THE COURT:  Dunn-Georgiou declaration.  It is paragraph

2     3 where it starts to --

3          MR. SUR:  Okay.  I might briefly be able to address

4     this point about the executive orders.  And if I understand

5     that correctly -- I apologize for not seeing the quote here as

6     I'm scrolling through the PDF.  But the reference to executive

7     orders I think does not encompass the order that is challenged

8     in this action.  If there were a number of other executive

9     orders that announced various policies of the administration

10    including as to foreign assistance -- so I take the reference

11    to executive orders to be -- to those other, unchallenged for

12    purposes of this case, policies.  But again, because I'm not

13    seeing the quote, I'm not able to put that in the proper

14    context.

15          THE COURT:  Okay.  I can tell you exactly where it is.

16    It's document 29-1.  It's the first page.

17          MR. SUR:  Uh-huh.

18          THE COURT:  And you can see in paragraph 3 it quotes

19    the email from the State Department official that says

20    "Colleagues, Secretary Rubio has implemented" -- I won't read

21    it all again, but it should be right there in front of you.

22          MR. SUR:  I'm sorry, yes.  So I take the discussion to

23    be about the executive orders that I was talking about earlier

24    that are not the executive order that's challenged here.  But

25    that is pointing out that some grants are not, you know,

1    consistent with some of the other executive orders.

2        THE COURT:  Well, can you clarify the color on that

3    first sentence, that's again five days after the TRO, says

4    there's the implementation of a 15-day disbursement pause on

5    all 15 billion worth of grants at the State Department?

6        MR. SUR:  I don't actually have anything further beyond

7    what's on the text here.  I don't know the underlying --

8        THE COURT:  Okay.  Mr. Sur, I appreciate it.  Is there

9    any other thing you'd like to clarify, particularly if you

10    have any information about the kind of on-the-ground how these

11    grants work?  Mr. Wirth provided I think a helpful explanation

12    of the two categories, the contracts versus the assistance

13    agreements and the differences between invoices and lines of

14    credit.

15     No worries if that's clear, but I wanted to give you the

16    opportunity to clarify anything that he might have gotten

17    wrong about how that works.

18        MR. SUR:  Beyond understanding the lines of credit to

19    be a particularly sharp instance of the monetary character of

20    the relief sought, I don't actually have a further

21    understanding of those.  So I wouldn't be able to comment on

22    that.

23     I do in that respect just want to go back to another point,

24    which was that the legitimate expense provisions that we were

25    talking about earlier, they remain open, including to the

1    plaintiffs who are before the Court today.  So there has been

2    no, you know, final decision on these particular plaintiffs'

3    claims as to those, you know, expenses.  And I don't think it

4    would be arbitrary to make a determination on legitimate

5    expenses.

6        So again, just focusing on the particular motion that's

7    before the Court with that proposed order, the availability

8    of the legitimate expense provision, where it has not yet been

9    determined to be applied, I don't think would be --

10       THE COURT:  Can you clarify what you mean by

11   "legitimate expense"?  Is it kind of a repackaging of the

12   fraud argument that was raised in the Friday filing?

13       MR. SUR:  I don't think so.  I think it's a distinct

14   process that was built into the Secretary of State's

15   memorandum.

16       THE COURT:  Okay.  And is -- just a moment.

17       Okay.  Actually, I don't have any more questions for you,

18   Mr. Sur.

19       Mr. Wirth, I'll give you the chance to respond briefly to

20   anything critical here.

21       MR. WIRTH:  Yes, Your Honor.  I'll be brief.  I think

22   what the Court's colloquy with the government has revealed is

23   that the government has done nothing to make the flow of

24   payments happen, or at least that government counsel's is

25   aware of nothing the government has done, and certainly can't

1    contradict my clients' experiences that they've received no

2    payments that they are owed.

3        As far as we're aware, there's been zero directives from

4    the agency with respect to the unfreezing of funds.  There

5    have been, you know, some statements with respect to

6    suspensions and terminations, which is a separate question

7    entirely.  With respect to the unfreezing of funds, we're

8    aware of no directives from leadership whatsoever since the

9    Court's TRO over -- almost two weeks ago.

10       The government refers to the legitimate expense waiver, but

11   that was a waiver that was included in the -- a waiver to the

12   provisions that this court has already enjoined.  And even if

13   the invoices at issue here were subject to that waiver, no

14   payments have been made.  So the waiver is illusory.  So the

15   government's invocation of the waiver makes no sense two times

16   over.

17       And I just want to be very clear, there was some discussion

18   of terminations.  Terminations are a separate question.  But

19   the key point here is that even on contracts that have been

20   terminated, whether or not those terminations remain in effect

21   or not or have been re-upped or not, the government still has

22   to make payments that are owed regardless of whether the

23   government decides to terminate contracts.

24       The government referred to contract-level authorities.

25   They've cited no contract-level authorities for the

1    proposition that the government can refuse to pay its debts,

2    much less refuse to give meaning to the Court's TRO.  I do

3    want to focus very carefully on the language of the TRO here,

4    which specifically directed the government to stop suspending,

5    pausing or otherwise preventing the obligation or disbursement

6    of appropriated foreign assistance funds.

7        And I think what's crucial here and what's been

8    demonstrated by the government in this colloquy is that

9    they've done absolutely nothing to give meaning to that

10   provision of the TRO.

11       The government briefly mentioned the monetary nature of the

12   relief here.  I want to be very clear, the order that we put

13   forward sets out relief that is necessary to give effect to

14   the TRO.  We are going to fully brief the APA issues in our

15   reply brief.  But to be clear, the APA permits injunctive

16   relief that has the effect of causing the government to make

17   out payments.  There's case after case after case for that

18   proposition.  There's nothing stopping the Court from ordering

19   the relief that we've requested.  And to be clear, this is

20   relief that is necessary to give meaning to the TRO.  This is

21   not separate relief.

22       Finally, I do want to correct some either misunderstandings

23   or misstatements from the government with respect to the

24   terminations here.  The government has said that the

25   terminations prior to February 13 are currently invalid.  Our

1    understanding is that the government has decided that every

2    single termination that it effected prior to the Court's TRO

3    remains in effect.  They were never rescinded, they were never

4    taken off the books, they simply added a post hoc

5    rationalization for every single one of those.  That includes

6    all four tranches of the terminations that occurred in the

7    days around when we filed our complaint.

8         But we're here right now primarily discussing the failure

9    of the government to do anything whatsoever with respect to

10   the freeze of foreign assistance funds.  They still have done

11   nothing to stop the pause.  And to be clear, they still owe

12   that money even on terminated contracts, even if those

13   terminations are ultimately deemed to be valid, which we do

14   not believe they are.

15        So that's all I have to say.  Thank you.

16             THE COURT:  Thanks, Mr. Wirth.

17        Okay.  So the Court's going to take about a 15-minute

18   recess.  And I'll honor that.  If folks need to get up for 15

19   minutes and return to the phone in about 15 minutes, you have

20   my word I won't come back before that.  I also don't

21   anticipate coming back much after that.  But I do want to take

22   some time to consider the arguments and see what clarity I can

23   offer here orally.

24        So I will be back.  Appreciate it.

25             THE DEPUTY CLERK:  This honorable court is in a brief

1    recess.

2         (Recess from 12:31 p.m. to 1:01 p.m.)

3         THE DEPUTY CLERK:  Good afternoon.  Counsel for

4    plaintiffs in the 400 case, are you present?

5         MS. BATEMAN:  Yes.  Lauren Bateman for the plaintiffs

6    is present.

7         THE DEPUTY CLERK:  Thank you.  And defense?

8         MR. SUR:  Yes, I am.  This is Indraneel Sur for the

9    Department of Justice for the defendants.

10         THE DEPUTY CLERK.  Thank you.  And plaintiffs in the

11    402 case, are you present?

12         MR. WIRTH:  Yes.  This is Stephen Wirth on behalf of

13    plaintiffs.

14         THE DEPUTY CLERK:  All right.  Your Honor, we're ready.

15         THE COURT:  All right.  Thanks, everyone.  I appreciate

16    your patience.  And I wish I could say I'll give you that 15

17    minutes back, but I don't have a way of doing that.

18      The Court is prepared to rule on plaintiffs' written motion

19    to enforce in 402 and plaintiffs' oral motion to enforce in

20    400.

21      The Court makes clear at the outset that this ruling is

22    taking place in the context of enforcing specific aspects of

23    the Court's TRO, those that have been the focus of today's

24    hearing.  And accordingly, I'm making clear that in enforcing

25    specific components of the TRO, the Court is in no way

1    limiting the scope of the TRO or modifying its terms.

2        In granting the temporary restraining order, the Court

3    made clear that the restrained defendants were enjoined from

4    "suspending, pausing, or otherwise preventing the obligation

5    or disbursement of appropriated foreign assistance funds in

6    connection with any contracts, grants, cooperative agreements,

7    loans, or other federal foreign assistance award that was in

8    existence as of January 19, 2025."

9        And in granting the subsequent motion to enforce, the Court

10    made clear that, "To the extent defendants have continued the

11    blanket suspension, they are ordered to immediately cease it

12    and to take all necessary steps to honor the terms of

13    contracts, grants, cooperative agreements, loans, and other

14    federal foreign assistance awards that were in existence as of

15    January 19, 2025, including but not limited to disbursing all

16    funds payable under those terms."  That's the Court's February

17    20th order.

18        Counsel for defendants today have acknowledged that the

19    Court's TRO forecloses giving effect at least to any

20    suspension or termination which took place before the Court's

21    temporary restraining order on February 13, 2025.

22        Plaintiffs have submitted evidence that defendants have not

23    lifted the suspension or freeze of funds as the TRO required.

24    Defendants have not rebutted that evidence, and when asked

25    today, defendants were not able to provide any specific

1    examples of unfreezing funds pursuant to the Court's TRO.

2    At the hearing today, defendants did for the first time, at

3    least as it relates to the TRO, argue that monetary relief

4    cannot be a consequence of the TRO under the APA due to

5    sovereign immunity.  The Court notes this is a further example

6    of the shifting ground that's taken place at the TRO phase and

7    that the argument's not sufficiently developed to be

8    considered today.

9    I do understand that defendants have included this argument

10   in their briefing at the preliminary injunction stage, and the

11   Court will of course give it due consideration at that stage.

12   And as the Court has noted several times, once the parties

13   complete their briefing schedule at the preliminary injunction

14   phase, the Court stands prepared to hold a hearing and resolve

15   the preliminary injunction as expeditiously as possible.

16   In the meantime, the motion to enforce the TRO is the issue

17   before the Court.  And the very point of a TRO is to prevent

18   irreparable harms in the course of considering a preliminary

19   injunction.

20   So, for these reasons, the Court is going to grant

21   plaintiffs' motion to enforce and finds that the relief

22   requested by plaintiffs in their proposed order is

23   appropriate.  So to be clear and to give effect to the Court's

24   TRO, the Court orders as follows:

25   By 11:59 p.m. on February 26, 2025, the restrained

1    defendants shall pay all invoices and letter of credit

2    drawdown requests on all contracts for work completed prior to

3    the entry of the Court's TRO on February 13.

4        They shall permit and promptly pay letter of credit

5    drawdown requests and requests for reimbursements on grants

6    and assistance agreements -- this is also for the purpose of

7    this motion to enforce, for work completed prior to the entry

8    of the Court's TRO on February 13.

9        And defendants shall take no actions to impede the prompt

10   payment of appropriated foreign assistance funds and shall

11   take all necessary action to ensure the prompt payment of

12   appropriated foreign assistance funds.

13       I'm reiterating that this relief takes place in the context

14   of a specific request to enforce the TRO.  This in no way

15   narrows the scope of the TRO itself.

16       That's the Court's ruling.

17       I do want to turn to the joint status report on compliance

18   that -- I'll be clear that the parties remain under an order

19   to file that joint status report by noon tomorrow.

20       Obviously, the required disbursements pursuant to this

21   motion to enforce that the Court has granted may still be

22   underway when the status report is filed; however, the report

23   shall confirm what steps have been taken by that time and that

24   such disbursements will be made by 11:59 p.m. tomorrow.

25       And in the interest of ensuring compliance with the Court's

1    order, as I previously ordered, to the extent there remain any

2    disputes as to compliance -- and here I'm speaking of the

3    whole TRO, not just the present motion to enforce.  To the

4    extent there remain disputes as to compliance, the parties

5    shall identify agency officials, employees, or other witnesses

6    who can testify under oath as to those disputes.

7        Finally, based on the discussion at today's hearing, I'm

8    also ordering defendants to provide the Court and plaintiffs

9    any directives or guidance that defendants or their agents

10   have sent since the Court's TRO on February 13 which pertain

11   to the implementation of the TRO or the suspension or

12   termination of agreement, and any directive or guidance after

13   the Court's TRO on February 13 which pertain to the

14   implementation of the TRO or the suspension or termination

15   of agreement.  And I want those by noon tomorrow as well.

16       And just in the interest of being clear, that would include

17   any directives or guidance that defendants or their agents

18   send through tomorrow, up until -- so even if it follows the

19   discussions we've had at the hearing today.  And I want those

20   documents by noon tomorrow.

21       With that, we can adjourn for the day.  I appreciate

22   everyone's time.

23           THE DEPUTY CLERK:  All right.  Thank you all.  This

24   honorable court is adjourned.

25       (Proceedings adjourned at 1:09 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

# EXHIBIT LXII

**TRUTH.**

← **Truth Details**
4585 replies

 **Donald J. Trump** ✓
@realDonaldTrump

ELON IS DOING A GREAT JOB, BUT I WOULD LIKE TO SEE HIM GET MORE AGGRESSIVE. REMEMBER, WE HAVE A COUNTRY TO SAVE, BUT ULTIMATELY, TO MAKE GREATER THAN EVER BEFORE. MAGA!

**12.3k** ReTruths   **66k** Likes       Feb 22, 2025, 8:04 AM

🔍 Reply       🔁 ReTruth       ♡ Like

### Continue the conversation
Join Truth Social to get the full story and details.

Log in

Sign up

000904

# EXHIBIT LXIII

*Democracy Dies in Darkness*

# DOGE's grab of personal data stokes privacy and security fears

Twenty-one staffers of the U.S. DOGE Service announced their resignations Tuesday citing, among other worries, "mishandling sensitive data."

Updated yesterday at 6:02 p.m. EST

🎧 10 min      ⤴      🔖      💬 1811

By Faiz Siddiqui, Joseph Menn and Jacob Bogage

Deputies of Elon Musk have sought access to massive amounts of information across the federal government, much of it personal and highly revelatory in its insights into the lives of everyday Americans.

They justify their work for the U.S. DOGE Service as a dogged quest for government efficiency. But people with deep knowledge of federal data systems and cybersecurity say they're skirting guardrails meant to protect sensitive data from misuse.

Before DOGE launched, most of the records at issue were kept in the hands of a select few officials to preserve privacy and avoid crossing legal red lines. Now Musk's group is seeking often-unfettered access, citing suspicion of fraud and waste. In addition to concerns about exposing private information, some critics fear that handing all the data to DOGE could enable bad actors to leak sensitive information to compromise political adversaries, act on personal vendettas or stir up online mobs against opponents.

This article is based on interviews with more than a dozen current or former government employees and officials with knowledge of government databases and systems, many of whom spoke on the condition of anonymity for fear of retribution.

A senior White House official said those working with Musk are following federal law and have appropriate security clearances as employees of relevant agencies. "The ongoing operations of DOGE may be seen as disruptive by those entrenched in the federal bureaucracy, who resist change," the official said. "While change can be uncomfortable, it is necessary and aligns with the mandate supported by more than 77 million American voters."

> **Trump presidency**
>
> Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises, his picks for key roles and legal challenges to his executive orders and actions.



Musk presides over DOGE from a command center in a room of the old secretary of war's suite in the Eisenhower Executive Office Building, where rainbow-colored lights emanate from the tower and keyboard of the powerful gaming computer he uses to conduct government business. A "Make America Great Again" hat and a placard reading "D.O.G.E." sit on a large wooden desk, and cords snake across the carpet into a surge protector.

Within the White House complex, the WiFi permissions — meant to bolster security by prompting users to log in frequently — were recently changed to allow guests to remain logged in for a year, up from seven days, because so many personal devices are newly in use.

Already, DOGE associates have been granted access to sensitive material, having targeted federal payment portals and other huge datasets on government expenditures. Those included Treasury Department payment systems, which green-light federal dollars headed out of government accounts, and highly guarded systems at the IRS and the Social Security Administration that include detailed financial and medical information.

Last week, the lead engineer for a government text-messaging service resigned over a DOGE ally's request for access to data including personal identifying information about many Americans. On Tuesday, 21 staffers of the U.S. DOGE Service, the entity formed as the U.S. Digital Service under President Barack Obama and renamed in Trump's Day 1 executive order establishing DOGE, or the Department of Government Efficiency, announced their resignations in protest. The group — consisting of engineers, designers, product managers, and IT and operations staff — said they had been subjected to questions about "political loyalty" as part of a DOGE interview process that introduced "significant security risks." DOGE's actions, they wrote, have included "mishandling sensitive data" and "breaking critical systems" in ways that are incompatible with the original USDS mission.

"We will not use our skills as technologists to compromise core government systems, jeopardize Americans' sensitive data, or dismantle critical public services," the departing staffers said in the letter, written on official letterhead and addressed to White House Chief of Staff Susie Wiles. "We will not lend our expertise to carry out or legitimize DOGE's actions."

Among its initial actions, DOGE has posted classified information on its website, sharing the budget and staffing level of the National Reconnaissance Office, a spy agency.

Allowing Musk and his team to see some records isn't illegal. Because they're designated as "special government employees" and many are senior advisers at Cabinet agencies, they are entitled to much of the access they have sought, and some judges have declined to kick them out while hearing more evidence.

**Help us report on the U.S. DOGE Service**

The Washington Post wants to hear from people affected by the DOGE/Service activities at federal agencies. You can contact our reporters by email or Signal encrypted message.

Faiz Siddiqui: faiz.siddiqui@washpost.com or 513-659-9944 on Signal.

Joseph Menn: joseph.menn@washpost.com or joemenn.01 on Signal.

Jacob Bogage: jacob.bogage@washpost.com or jacobbogage.87 on Signal.

Read more about how to use Signal and other ways to securely contact The Post.

But they need a reasonable basis to peruse files and databases, experts said, and a procedure for ensuring precautions are followed. And the people with access must be vetted and trained, said Brad Moss, an attorney representing plaintiffs in one of more than a dozen lawsuits contesting DOGE's handling of data.

Limiting entry to sensitive systems guards against any one federal worker gaining too much access, protecting both the data and the overall system, said Terry Lutes, who served as IRS associate chief information officer from 2003 to 2006. Lutes said even the most experienced employees are given only partial access to the IRS's Integrated Data Retrieval System, or IDRS.

DOGE last week sought access to that system, which would have provided the ability to see, and in some cases edit, detailed records — including bank accounts, payment balances, Social Security and other personal identification numbers, and, in some instances, medical information — for virtually every individual, business and nonprofit in the country.

"If anybody actually understood how all these pieces work together, we'd have to shoot them. They'd be too dangerous," Lutes said. "And I'm only halfway joking."

Access to the IDRS, in particular, would pose an enormous risk, he said. Entry to the system is so protected, "I would have fired anyone who tried to give me access."

An agreement between the White House and the Treasury Department limited DOGE to anonymized data, the same visibility that some academic researchers get.

Concerns about how Musk's team could use data stretch beyond the IRS and into other agencies that collect information that workers fear could be exploited.

One employee of the U.S. Digital Service started seeing his work differently once Musk took the reins of the renamed agency.

The person, who was involved in a government program that includes a database of addresses, has been grappling with the implications of work he had felt proud of — but which he suddenly fears could be used to go after people for purposes such as immigration enforcement.

"Now I feel like a little bit of an enabler," said the person, speaking on the condition of anonymity to discuss sensitive information. "I feel like I've been a part of creating a trap for people."

Clashes over DOGE's request to access eSOA are common. One designated Treasury Department's highest-ranking career official left in late January after a dispute over access to payment systems. Earlier this month, the Social Security Administration's acting commissioner departed after a disagreement over DOGE's attempts to access sensitive data.

At the IRS, taxpayers whose information is wrongfully disclosed or even inspected are entitled by law to monetary damages. Social Security employees who violate privacy laws could face stiff fines and jail time.

DOGE could use protected personal information at the Social Security Administration — including the world's largest repository of medical information — to search for improper payments, but it wouldn't amount to much return on investment, according to former senior agency officials, who spoke on the condition of anonymity to discuss internal conversations.

For years, officials there have studied the threshold at which detecting improper payments becomes unprofitable. The agency has repeatedly explored building more robust systems to ferret out over- and underpayments, which accounted for 0.3 percent of the more than $1.3 trillion in payments in fiscal 2024, adding up to roughly $4 billion, according to federal data. But it could cost more than that to track all the money down, the former officials said.

The prospect of highly protected information being misused is alarming some people outside government.

Kristofer Goldsmith, an Iraq War veteran who tracks and reports violent right-wing extremists, said he has grown worried for his safety since learning that some of the DOGE members had frequented internet groups popular with criminal hackers or espoused extremist views.

After letting his guard down, he said, he has gone back to wearing a gun in his home.

"I'm very concerned that the entire federal government is being compromised by people who want to target, harass and maybe even kill me," Goldsmith said. He is a plaintiff in a lawsuit over DOGE's access to personal records that led to a temporary restraining order Monday against the government.

Researchers have raised red flags about some of DOGE's team. They include Edward Coristine, a 19-year-old former Musk company intern who posted in channels associated with the Com, a loose network including many young criminals. An online handle he used once solicited an illegal denial-of-service attack. Coristine now has an email address at the Cybersecurity and Infrastructure Security Agency, which is in charge of defending federal agencies and essential private industries from cyberattacks. Coristine didn't respond to emailed requests for comment.

Another DOGE worker, Gavin Kliger, who sought access to records at the IRS, has retweeted white nationalist Nick Fuentes and written of being inspired by media criticism from a Holocaust denier. "I am Jewish and any insinuation of support for 'white nationalism' or 'anti-semitism' is false and defamatory," Kliger told The Washington Post.

Musk has a track record of violating privacy norms. When he took over X, then known as Twitter, his deputies publicly posted some private communications of former employees, alleging that they were proof of a liberal censorship conspiracy inside Twitter.

A group of FBI agents in recent suits over Jan. 6 comment on the Capitol riot also raised concern that government records showing what they did in those cases could be used for harassment.

Moss, their attorney, is trying to stop further dissemination of their names, arguing that any list being compiled would be used not to probe wrongdoing but "to dox and expose the identities of federal officials, which would ordinarily be respected."

Moss and others say sweeping Washington agencies for data runs afoul of the Privacy Act, the Watergate-era reform law that limits what officials can do with information on Americans, not just federal workers.

Searching for fraud, waste and abuse, as well as trying to develop more efficient government systems, could be valid reasons for DOGE to access the data, several lawyers opposing DOGE say. Feeding data into artificial-intelligence programs, which The Post and others have reported the Education Department is doing, and is suspected by employees elsewhere, may also be legal if the move involves closely guarded, in-house programs.

But such actions increase the chances of inappropriate access, intentional or not, said Alan Butler, executive director of the Electronic Privacy Information Center, a nonprofit based in D.C. that advocates for privacy protections.

"It's pretty clear they want to use matching type systems to find payments they claim are fraudulent, and matching against datasets or key terms would be anathema to the Privacy Act if done on a whim or without limits," said Butler, whose group is suing DOGE and the Office of Personnel Management claiming privacy and data security violations on behalf of itself and an unnamed federal employee.

---

### What readers are saying

The comments express significant concern over the potential privacy risks associated with DOGE's access to sensitive government data. Many commenters fear that this access could lead to data breaches, misuse of personal information, and even national security threats. There is a... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT LXIV

Docusign Envelope ID: 5CEF C-345D-4EDE-8F85-01568B68F18D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 1, *et al.*,<br><br>**Plaintiffs**<br><br>**v.**<br><br>ELON MUSK, *et al.*,<br><br>**Defendants** | **Case No. 25 8:25-cv-00462-TDC** |

## DECLARATION OF J. DOE 11

I, J. Doe 11, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 11" in the complaint.

2. I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for over 14 years. I am a GS 15 supervisor.

3. On February 3, 2025, one of the DOGE personnel (Gavin Kliger), apparently accidentally, left his name on the bottom of an email sent out to USAID staff telling us to stay away from the Ronald Reagan Building.

4. At or around this same time, there were reports that DOGE personnel tried to get into a Sensitive Compartmented Information Facility ("SCIF") where classified material can be accessed by those with a security clearance and approval to enter. These DOGE personnel did not have such clearance or approval.

5. On Sunday, February 23, 2025, I received an administrative leave notice.

6.  At 10:35 pm, also on Sunday, February 23, I received a Reduction in Force ("RIF") notice from hr_announcements@usaid.gov.

7.  The "specific notice of RIF" I received has an error in my type of service, listing me as Senior Executive Service (SES), which I am not.

8.  I understand that RIF notices have been riddled with errors for others, have gone out to those who accepted the "fork" offer and to those who began the process for voluntary early retirement.

9.  I understand that HCTM (our human resources office) was not aware of these notices before they were sent out and received notices themselves.

10. The RIF notices seem to have been sent in batches, starting with the hiring mechanism (Foreign service in DC was first and civil service was next) and then by "competitive area" (bureau/office). Foreign service officers who are overseas have begun to receive the notices too, with a termination date of May 24.  Communications about the RIF have not come from HCTM. The process overall seems to have little, if any, human review, which is inconsistent with HCTM's past practices. The RIF notices were sent in a large batch and included errors because of the wide coverage. Now it appears they are going through with more targeted scripts to terminate more specific classes of employees or to correct errors, like for people who took the "fork."

11. On February 24, 2025, termination letters were sent to "probationary" employees who had received the RIF notice on February 23.

Docusign Envelope ID: 5CEF C-345D-4EDE-8F85-01568B68F18D

12. The specific RIF notices contain information that indicates the senders have significant access to our human resources files (via our Launchpad system), which contains sensitive personal information.

13. Two weeks ago, I froze my credit with the three credit agencies over concerns that DOGE has access to my personal information through accessing USAID systems.

14. However, now I can see that DOGE has my personal information. They are clearly running programs to extract my data to fill out standard RIF forms.

15. I do not know the security of the systems they are using and therefore the security of my information. They do not have security clearance or training in protecting PII (personal identifying information), for which we all receive annual training. As such, I do not know if they are using secure hardware and software according to USG standards.

16. I have served in dangerous conditions in foreign countries. I have been prepared to serve through hurricanes, riots, and rockets, but I remain unprepared for the fear and chaos of DOGE's takeover of USAID.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 26th day of February, 2025.**

**J. Doe 11**

Signed by:

J. Doe 11

B20456BDCBF5423...

**Signature**