# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **J. DOE 1,** *et al.*, | |
| *Plaintiffs* | |
| **v.** | Case No. **8:25-cv-00462-TDC** |
| **ELON MUSK,** *et al.*, | |
| *Defendants.* | |

## JOINT RECORD INDEX

| Exhibit Number | Exhibit Title | Beginning J.R. Number | ECF No. |
|---|---|---|---|
| 1 | Internet Sources from Plaintiffs' Complaint | J.R. 4 | ECF No. 25-1 |
| 2 | J. Doe 1 Declaration | J.R. 222 | ECF No. 25-1 |
| 3 | J. Doe 2 Declaration | J.R. 227 | ECF No. 25-1 |
| 4 | J. Doe 6 Declaration | J.R. 233 | ECF No. 25-1 |
| 5 | J. Doe 7 Declaration | J.R. 236 | ECF No. 25-1 |
| 6 | J. Doe 9 Declaration | J.R. 241 | ECF No. 25-1 |
| 7 | J. Doe 12 Declaration | J.R. 245 | ECF No. 25-1 |
| 8 | J. Doe 19 Declaration | J.R. 251 | ECF No. 25-1 |
| 9 | J. Doe 26 Declaration | J.R. 255 | ECF No. 25-1 |
| 10 | Elon Musk (@ElonMusk), X (Feb. 13, 2025, 11:35 PM) | J.R. 259 | ECF No. 25-1 |
| 11 | Maureen Dowd, *Who Will Stand Up to Trump at High Noon*, N.Y. TIMES (Feb. 15, 2025) | J.R. 261 | ECF No. 25-1 |
| 12 | @ALX, X (Feb. 13, 2025, 12:41 AM) | J.R. 268 | ECF No. 25-1 |
| 13 | Tara Copp & Anthony Izaguirre, *Trump* | J.R. 270 | ECF No. 25-1 |

| | | | |
|---|---|---|---|
| | *Administration Fires, Then Rescinds, Firing of Nuclear Weapons Workers*, TIME (Feb. 16, 2025) | | |
| 14 | Tara Copp, *Trump Begins Firings of FAA Air Traffic Control Staff Just Weeks After Fatal DC Plane Crash*, AP (Feb. 15, 2025) | J.R. 275 | ECF No. 25-1 |
| 15 | David Shepardson, *Musk's DOGE Team To Visit US FAA Command Center on Monday*, Reuters (Feb. 16, 2025) | J.R. 283 | ECF No. 25-1 |
| 16 | Jacob Bogage & Jeff Stein, *Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS*, Washington Post (Feb. 16, 2025) | J.R. 290 | ECF No. 25-1 |
| 17 | Tim Reid, *Musk Aides Lock Government Workers out of Computer Systems at US Agency, Sources Say*, Reuters (Jan. 31, 2025) | J.R. 294 | ECF No. 25-1 |
| 18 | List of officers in Executive Office of the President who are appointed by Senate consent | J.R. 303 | ECF No. 25-1 |
| 19 | Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998 (last revised March 1999) | J.R. 305 | ECF No. 25-1 |
| 20 | *Savings*, Department of Government Efficiency (last visited Feb. 17, 2025) | J.R. 381 | ECF No. 25-1 |
| 21 | Elon Musk (@elonmusk), X (Feb 7, 2025, 4:10 PM) | J.R. 383 | ECF No. 25-1 |
| 22 | Elon Musk (@ElonMusk), X (Feb. 17, 2025, 6:31PM) | J.R. 385 | ECF No. 25-1 |
| 23 | DEI Watchlist, www.deiwatchlist.com (last visited Feb. 17, 2025) | J.R. 388 | ECF No. 25-1 |
| 24 | Biden's Basement, www.insidebidensbasement.org (last visited Feb. 17, 2025) | J.R. 395 | ECF No. 25-1 |

| 25 | OPM Memorandum, Guidance on Probationary Periods, Administrative Leave & Details (Jan. 20, 2025), https://perma.cc/4QGN-XZLP | J.R. 399 | ECF No. 28-2 |
|----|----|----|----|
| 26 | Declaration of Peter Marocco with Exhibits | J.R. 403 | ECF No. 28-2 |
| 27 | Declaration of Joshua Fisher | J.R. 424 | ECF No. 28-2 |
| 28 | Second Declaration of J. Doe 1 | J.R. 426 | ECF No. 36 |
| 29 | Second Declaration of J. Doe 2 | J.R. 429 | ECF No. 36 |
| 30 | Second Declaration of J. Doe 9 | J.R. 432 | ECF No. 36 |
| 31 | Declaration of J. Doe 8 | J.R. 435 | ECF No. 36 |
| 32 | Declaration of J. Doe 20 | J.R. 437 | ECF No. 36 |
| 33 | Declaration of J. Doe 21 | J.R. 439 | ECF No. 36 |
| 34 | Declaration of J. Doe 22 | J.R. 456 | ECF No. 36 |
| 35 | Declaration of Ann Lewis | J.R. 458 | ECF No. 36 |
| 36 | Declaration of Mary Comans | J.R. 462 | ECF No. 36 |
| 37 | Declaration of John Cheston | J.R. 466 | ECF No. 36 |
| 38 | The White House, *Interview of President Trump and Elon Musk by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025) | J.R. 469 | ECF No. 36 |
| 39 | Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House, Feb 19, 2025 | J.R. 536 | ECF No. 36 |
| 40 | DOGE Website Redacted | J.R. 543 | ECF No. 36 |
| 41 | Zoë Schiffer, *DOGE Puts $1 Spending Limit on Government Employee Credit Cards*, Wired (Feb. 20, 2025) | J.R. 548 | ECF No. 36 |
| 42 | Meredith Lee Hill, *The private GOP panic over the slash-and-burn DOGE firings*, Politico (Feb. 20, 2025) | J.R. 559 | ECF No. 36 |

| 43 | Andrea Shalal & Nandita Bose, *Trump appears to contradict White House, says Elon Musk in charge of DOGE*, Reuters (Feb. 20, 2025), | J.R. 567 | ECF No. 36 |
|----|----|----|----|
| 44 | Matt Bai, *The Blinding Contempt of the DOGE Bros*, Wash. Post (Feb. 24, 2025) | J.R. 571 | ECF No. 36 |
| 45 | Jeff Stein et al, *Musk's blitzkrieg is unnerving many of Trump's senior advisers*, Wash. Post (Feb. 21, 2025) | J.R. 577 | ECF No. 36 |
| 46 | Rachel Treisman, *The USDA fired staffers working on bird flu. Now it's trying to reverse course*, NPR (Feb. 19, 2025) | J.R. 584 | ECF No. 36 |
| 47 | Elon Musk (@elonmusk) X, (Feb 21, 2025, 2:43 AM) | J.R. 600 | ECF No. 36 |
| 48 | Eli Stokkols & Daniel Lippman, *Musk's 'What Did You Do Last Week?' Email Hits a Million Replies*, Politico (Feb. 25, 2025) | J.R. 601 | ECF No. 36 |
| 49 | Lindsay Whitehurst & Chris Megerian, *Trump backs Musk as he roils the federal workforce with demands and threats*, A.P. (Feb. 24, 2025) | J.R. 607 | ECF No. 36 |
| 50 | Kaitlan Collins & Tierney Sneed, *White House reveals who DOGE acting administrator is*, CNN (Feb. 25, 2025) | J.R. 614 | ECF No. 36 |
| 51 | Alexandra Alper and Raphael Satter, *Staffer with Elon Musk's DOGE amplified white supremacists online*, Reuters, (Feb. 7, 2025) | J.R. 623 | ECF No. 36 |
| 52 | Marcia Brown, *DOGE staffer Gavin Kliger arrives at USDA*, Politico, (Feb. 19, 2025) | J.R. 635 | ECF No. 36 |
| 53 | Shannon Bond, et al, *Who is part of Elon Musk's DOGE, and what are they doing?*, NPR, (Feb. 7, 2025) | J.R. 637 | ECF No. 36 |
| 54 | Jacob Bogage & Jeff Stein, *Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS*, Washington Post, (Updated Feb. 16, 2025) | J.R. 660 | ECF No. 36 |
| 55 | Declaration of J. Roe 1 (filed under seal; | | ECF No. 36 |

| | motion forthcoming) | | |
|---|---|---|---|
| 56 | Declaration of J. Roe 3 (filed under seal; motion forthcoming) | | ECF No. 36 |
| 57 | Declaration of J. Roe 4 (filed under seal; motion forthcoming) | | ECF No. 36 |
| 58 | Selected Elon Musk X Posts | J.R. 663 | ECF No. 36 |
| 59 | Elon Musk (@elonmusk) X (Feb. 22, 2025, 2:46 PM) | J.R. 702 | ECF No. 36 |
| 60 | *Alliance for Retired Americans v. Bessent*, Transcript of Preliminary Injunction Hearing (Feb. 23, 2025) | J.R. 703 | ECF No. 36 |
| 61 | *AIDS Vaccine Advocacy Coalition v. United States Dep't of Def.*, Transcript of Motion Hearing (Feb. 25, 2025) | J.R. 844 | ECF No. 36 |
| 62 | Donald Trump (@Realdonaldtrump), Truth Social (Feb. 22, 2025, 8:04 AM) | J.R. 904 | ECF No. 36 |
| 63 | Faiz Siddiqui, Joseph Menn and Jacob Bogage, *DOGE's grab of personal data stokes privacy and security fears*, Washington Post, (Feb. 25, 2025) | J.R. 905 | ECF No. 36 |
| 64 | Declaration of J. Doe 11 | J.R. 911 | ECF No. 36 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**J. DOE 1-26,**

        *Plaintiffs*

        v.

**ELON MUSK, in his official capacity,
UNITED STATES DOGE SERVICE, *and*
the DEPARTMENT OF GOVERNMENT
EFFICIENCY,**

        *Defendants*

**Case No. 8:25-cv-00462-TDC**

## COVER SHEET FOR EXHIBITS

Exhibits cited in Plaintiffs' Motion for Temporary Restraining Order are numbered as follows:

1. Internet sources from Plaintiffs' Complaint

2. J. Doe 1 Declaration

3. J. Doe 2 Declaration

4. J. Doe 6 Declaration

5. J. Doe 7 Declaration

6. J. Doe 9 Declaration

7. J. Doe 12 Declaration

8. J. Doe 19 Declaration

9. J. Doe 26 Declaration

10. Elon Musk (@ElonMusk), X (Feb. 13, 2025, 11:35 PM)

11. Maureen Dowd, Who Will Stand Up to Trump at High Noon, N.Y. TIMES (Feb. 15, 2025)

12. @ALX, X (Feb. 13, 2025, 12:41 AM)

13. Tara Copp & Anthony Izaguirre, Trump Administration Fires, Then Rescinds, Firing of Nuclear Weapons Workers, TIME (Feb. 16, 2025)

14. Tara Copp, Trump Begins Firings of FAA Air Traffic Control Staff Just Weeks After Fatal DC Plane Crash, AP (Feb. 15, 2025)

15. David Shepardson, Musk's DOGE Team To Visit US FAA Command Center on Monday, Reuters (Feb. 16, 2025)

16. Jacob Bogage & Jeff Stein, Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS, Washington Post (Feb. 16, 2025)

17. Tim Reid, Musk Aides Lock Government Workers out of Computer Systems at US Agency, Sources Say, Reuters (Jan. 31, 2025)

18. List of officers in Executive Office of the President who are appointed by Senate consent

19. Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998 (last revised March 1999)

20. *Savings,* Department of Government Efficiency (last visited Feb. 17, 2025)

21. Elon Musk (@elonmusk), X (Feb 7, 2025, 4:10 PM)

22. Elon Musk (@ElonMusk), X (Feb. 17, 2025, 6:31PM)

23. DEI Watchlist, www.deiwatchlist.com (last visited Feb. 17, 2025)

24. Biden's Basement, www.insidebidensbasement.org (last visited Feb. 17, 2025)

# EXHIBIT 1

# TABLE OF CONTENTS

**Footnotes 2**
**Footnote 3**
**Footnote 4**
**Footnote 6**
**Footnote 7**
**Footnote 8**
**Footnote 9**
**Footnote 10**
**Footnote 11**
**Footnote 13**
**Footnote 14**
**Footnote 14 contd.**
**Footnote 15**
**Footnote 16**
**Footnote 18**
**Footnote 20**
**Footnote 22**
**Footnote 23**
**Footnote 24**
**Footnote 25**
**Footnote 26**
**Footnote 27**
**Footnote 28**
**Footnote 29**
**Footnote 30**
**Footnote 31**
**Footnote 32**
**Footnote 32 contd.**
**Footnote 33**
**Footnote 34**
**Footnote 35**
**Footnote 36**
**Footnote 37**
**Footnote 38**
**Footnote 39**
**Footnote 40**
**Footnote 41**
**Footnote 43**
**Footnote 44**
**Footnote 45**
**Footnote 47**
**Footnote 48**
**Footnote 49**
**Footnote 51**
**Footnote 52**

Subscribe

# Bloomberg Billionaires Index

View profiles for each of the world's 500 richest people, see the biggest movers, and compare fortunes or track returns.

**As of February 17, 2025**

The Bloomberg Billionaires Index is a daily ranking of the world's richest people. Details about the calculations are provided in the net worth analysis on each billionaire's profile page. The figures are updated at the close of every trading day in New York.

| Rank | Name | Total net worth | $ Last change | $ YTD change | Country / Region | Industry |
|---|---|---|---|---|---|---|
| 1 | Elon Musk | $398B | -$379M | -$34.1B | United States | Technology |
| 2 | Mark Zuckerberg | $259B | +$2.83B | +$52.0B | United States | Technology |
| 3 | Jeff Bezos | $248B | -$1.26B | +$9.58B | United States | Technology |

000005

# Elon Musk donated $288 million in 2024 election, final tally shows

The official count of Musk's donations further cemented him as the country's largest — and most prominent — donor.

January 31, 2025

🎧 4 min     ↗     🔖     💬 399

By <u>Trisha Thadani</u>, <u>Clara Ence Morse</u> and <u>Maeve Reston</u>

Billionaire Elon Musk spent at least $288 million to help elect President Donald Trump and other Republican candidates, according to a Washington Post analysis of new Federal Election Commission filings that offered an end-of-year snapshot of what was spent during the 2024 election cycle.

Friday's FEC filings cement Musk's status as the <u>biggest political donor</u> of the recent presidential cycle at a moment when he has amassed an extraordinary amount of power as a member of Trump's inner circle — and as he is decried by critics as a de facto, unelected co-president. He is also a driving force behind the effort to shrink the federal workforce, helping to engineer a <u>controversial offer</u> this week to hundreds of thousands of career civil servants to quit their jobs and get paid through September.

The staggering 2024 political spending by Musk and the extent of his influence over Trump, as well as the levers of the federal government, cap a remarkable transformation for the richest man in the world, who had only dabbled in politics before being welcomed into Trump's inner orbit last year.

After the election, the then-president-elect tapped Musk to lead the newly formed "Department of Government Efficiency," which he tasked with cutting federal spending and regulation. The loosely defined role could give Musk the ability to influence policy and spending decisions that directly impact his companies, such as Tesla and SpaceX.

Musk helped form America PAC last year to support Trump in part by targeting lower-propensity voters with an expansive canvassing operation across key swing states. Because of an obscure FEC ruling in March that relaxed some of the rules for contact between campaigns and super PACs, America PAC and other outside groups were able to closely coordinate their messaging and plans for canvassing with Trump's top campaign lieutenants.

Ultimately, America PAC became one of the most prominent get-out-the-vote efforts for the Republican candidate, raising $263 million. The group was seeded with donations not just from the SpaceX CEO but also many of his close allies, including Tesla board member Antonio Gracias, Palantir co-founder and Austin-based tech investor Joe Lonsdale, and Sequoia Capital investor Shaun Maguire.

In the report filed Friday covering the period from Nov. 26 to the last day of December, Musk reported making an $11.2 million in-kind contribution on Dec. 31 to America PAC for what was described as "petition incentives."

In late October, Musk said he would hand out $1 million daily in a lottery for registered swing-state voters who signed a petition as part of his super PAC's voter recruitment drive. He said at the time that America PAC would give away "$1M to someone in swing states who signed our petition to support free speech & the right to bear arms."

An earlier FEC filing showed that Musk made an in-kind contribution of nearly $40.5 million for petition incentives on Nov. 25 — meaning that he spent at least $51.7 million on payments for petition signatories last year. The payments were processed through a company known as United States of America Inc.

The program was limited to registered voters in Pennsylvania, Georgia, Nevada, Arizona, Michigan, Wisconsin and North Carolina. Those who signed the petition were encouraged to refer the form to other swing-state voters. Individuals could receive $47 for each valid referral to a registered voter in a swing state, and the incentives were higher in certain states such as Pennsylvania.

Democrats immediately questioned the legality of the move. Legal experts pointed out that federal law prohibits paying Americans to register to vote. And former GOP lawmakers and Justice Department officials wrote a letter to then-Attorney General Merrick Garland and Pennsylvania state officials asking them to review the legality of the group's payments.

Musk has said America PAC is "going to aim to weigh in heavily" on the 2026 congressional midterm elections. He also has said he plans to get involved in local races against liberal district attorneys. Like Trump, he has argued that some of those officeholders are too lenient on crime and directly responsible for theft and other quality-of-life issues in cities across the country.

The billionaire's investment in the 2024 election has already paid off enormously, as his personal wealth has soared since Trump's victory in November. Musk's wealth is largely tied up in Tesla stock, which has seen massive gains in value since the election. Investors and analysts expect the electric vehicle company will benefit significantly from streamlined regulation on autonomous driving during the new administration.

**CORRECTION**

A previous version of this article incorrectly said that Elon Musk spent at least $52.7 million on payments for swing-state voters who signed petitions last year. The correct figure is $51.7 million. The article has been corrected.

FORBES > BUSINESS

**BREAKING**

# Trump Backs Idea Of Musk Joining 'Government Efficiency Commission' If He Wins Second Term

**Siladitya Ray** Forbes Staff

*Siladitya Ray is a New Delhi-based Forbes news team reporter.*

 Follow

  0          Aug 13, 2024, 12:15am EDT

Updated Aug 13, 2024, 07:38am EDT

**TOPLINE**  Former President Donald Trump signaled his willingness to offer Elon Musk a role in his administration in a proposed "government efficiency commission" if he wins the presidential election in November, during a live chat on Musk's X platform on Monday night that was marred by technical glitches.

000009



Former President Donald Trump enthusiastically backed the idea of Musk joining a "Government ... [+]    PA IMAGES VIA GETTY IMAGES

## KEY FACTS

- The interview on X Spaces focused on the recent assassination attempt against Trump and his complaints about immigration, while offering little details about Trump's plans for a second term if he won.

- One of the policy topics raised by Musk was his idea of creating a "government efficiency commission" that would ensure "taxpayers money...is spent in a good way"—something the billionaire has spoken about previously.

- Musk added he would be "happy to help out on such a commission," prompting an enthusiastic response from Trump, who said he'd "love" it.

- Although Musk did not specifically mention cutting government jobs, during the interview both he and Trump criticized government

000010

"overspending."

- Trump then used the example of cuts to the state made by Argentinian President Javier Milei, saying he "ran on MAGA and I hear he is doing really terrific;" Milei, who has expressed fondness towards Trump, announced plans earlier this year to slash 24,000 government jobs in a move that sparked nationwide protests in Argentina.

- Trump reiterated his plan to shut down the Department of Education if elected, saying he wants to "move education back to the states" and adding that he believes at least 35 of the 50 states "would do great" in such a scenario.

***Get Forbes Breaking News Text Alerts:*** *We're launching text message alerts so you'll always know the biggest stories shaping the day's headlines. Text "Alerts" to (201) 335-0739 or sign up here.*

**CRUCIAL QUOTE**

After hailing Musk as the "greatest cutter," Trump said: "You walk in, you just say 'You want to quit?' They go on strike—I won't mention the name of the company—but they go on strike. And you say: 'That's okay, you're all gone.'" Trump appeared to be referencing jobs cuts at Tesla's Gigafactory 2 in Buffalo, New York, last February.

**KEY BACKGROUND**

Musk raised the idea of a government efficiency commission in an interview with podcast host Lex Fridman earlier this month. When Fridman said he wished Musk "could go into Washington for a week and be the head of the committee for making government smaller," the billionaire said he has "discussed with Trump the idea of a government

000011

efficiency commission, and I would be willing to be part of that commission." When asked how hard such an operation would be, Musk said: "The antibody reaction would be very strong. You're attacking the Matrix at that point. The Matrix will fight back."

**TANGENT**

Musk and Trump's discussion was marred by several technical glitches that delayed its start by nearly 45 minutes. When users tried to access the chat's audio streaming link shared on Trump's X account, they were met with a "details not available" message. Users who had managed to access the X Spaces link were greeted with hold music. Musk blamed the disruption on a "massive DDOS [distributed denial of service] attack on X." However, no verified evidence of such an attack has emerged yet and the rest of the website remained accessible at the time.

**FURTHER READING**

Musk-Trump X Interview: Trump Takes Friendly Questions From Musk After Glitch-Plagued Start (Forbes)

---

**Exclusive Invitation: Save up to 60% on a Forbes Membership**

| Email address | Get Offer |
|---|---|

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement. Forbes is protected by reCAPTCHA, and the Google Privacy Policy and Terms of Service apply.

---

*Follow me on Twitter. Send me a secure tip.*

 **Siladitya Ray**

Follow

Siladitya Ray is a reporter on the Forbes news team who covers major world news stories

**US elections 2024**

🕐 This article is more than **5 months old**

# Trump announces plan for Elon Musk-led 'government efficiency commission'

**Tech billionaire has been pushing ex-president to take on policy idea, which would walk back government regulations**

**Nick Robins-Early** *in New York*

Thu 5 Sep 2024 14.27 EDT



📷 Donald Trump speaks at the Economic Club of New York on 5 September 2024. Photograph: Alex Brandon/AP

Donald Trump announced in a speech on Thursday that, if elected, he would form a government efficiency commission, a policy idea that Elon Musk has been pushing him to take on. The former president claimed the tech billionaire had agreed to lead the commission.

Trump made the attention-grabbing announcement during a campaign event at the Economic Club of New York, but gave no specific details about how the commission would operate.

He reiterated Musk's argument that such a commission would cut unnecessary spending, while also saying that he would massively walk back government regulations.

"I will create a government efficiency commission tasked with conducting a complete financial and performance audit of the entire federal government, and making recommendations for drastic reforms," Trump told the crowd.

Musk and Trump have forged an increasingly close alliance over the past year, as the SpaceX and Tesla CEO has thrown his full support behind Trump's presidential campaign. Musk's backing of Trump has consequently given the world's richest man a direct line to influence Republican policy - and, if Trump were to actually create an efficiency commission, sweeping powers over federal agencies.

Musk's potential involvement in Trump's proposed commission would create obvious conflicts of interest, as his businesses, such as SpaceX and Neuralink, are both regulated by, and have business with, numerous government agencies.

Musk reposted news of Trump's plans on X, the platform formerly known as Twitter, which he bought for $44bn, and suggested he would accept such a position. "I look forward to serving America if the opportunity arises," Musk

**Most viewed**



Jewish man
Israeli touri
Palestinians
on them in I



The new wo
exactly wha
Are we to f
to name it?
Zoe William



'This is a cou
Musk's purg
more than c

posted. "No pay, no title, no recognition is needed."

Musk raised the idea of an efficiency commission with Trump during their interview on X last month, with Musk offering to "help out on such a commission". Musk has frequently pushed for deregulation and opposed government oversight into his businesses, while at the same time facing investigations and lawsuits over a range of allegations including breaking labor laws, violating animal-welfare protections and engaging in sexual harassment.

Although Musk and Trump formerly had an acrimonious relationship - Trump once referred to Musk as a "bullshit artist", while Musk said Trump was too old to run for president - the two have formed a symbiotic relationship in recent months.

### Sign up to This Week in Trumpland

✉ Free newsletter

A deep dive into the policies, controversies and oddities surrounding the Trump administration

**Enter your email address**

[                                                    ]    Sign up

**Privacy Notice:** Newsletters may contain info about charities, online ads, and content funded by outside parties. For more information see our Privacy Policy. We use Google reCaptcha to protect our website and the Google Privacy Policy and Terms of Service apply.

Musk, who frequently engages with far-right activists on X and promotes anti-immigration content, has attacked Kamala Harris, the Democratic presidential nominee, as a communist, while his allies in the tech community have poured money into a Super Pac backing Trump.



Trump adm... hundreds o... despite fou... in four week...



At least 18 i... plane crash... landing in T...

## Most viewed

000014

*The New York Times*

https://www.nytimes.com/2024/10/20/us/politics/elon-musk-federal-agencies-contracts.html

# U.S. Agencies Fund, and Fight With, Elon Musk. A Trump Presidency Could Give Him Power Over Them.

000015

Elon Musk, the richest man in the world, will be a major political player no matter who wins the presidential election.  Haiyun Jiang for The New York Times

 **Listen to this article · 12:08 min**  <u>Learn more</u>

---

**By Eric Lipton, David A. Fahrenthold, Aaron Krolik and Kirsten Grind**

Published Oct. 20, 2024   Updated Oct. 21, 2024

Elon Musk's influence over the federal government is extraordinary, and extraordinarily lucrative.

Mr. Musk's rocket company, SpaceX, effectively dictates NASA's rocket launch schedule. The Defense Department relies on him to get most of its satellites to orbit. His companies were promised $3 billion across nearly 100 different contracts last year with 17 federal agencies.

### FEDERAL CONTRACTS

Two of Elon Musk's companies account for at least $15.4 billion in government contracts over the past decade.

At least
**$352,000**
in contracts

*Federal contracts*

**CABINET DEPARTMENTS**

**Energy**
$7,000

**State**
$440,000

**Commerce**
$1.9 million

**Veterans Affairs**
$463,000

**Interior**
$138,000

**Homeland Security**
$359,000

000016

Agriculture
$120,000

Transportation
$21,000

Defense
$3.6 billion

**INDEPENDENT AGENCIES**

General Services
Administration
$352,000

Environmental
Protection Agency
$30,000

NASA
$11.8 billion

At least
**$15.4 billion**
in contracts

By Jonathan Corum

His entanglements with federal regulators are also numerous and adversarial. His companies have been targeted in at least 20 recent investigations or reviews, including over the safety of his Tesla cars and the environmental damage caused by his rockets.

**INVESTIGATION AND OVERSIGHT**

Mr. Musk's companies are increasingly facing **regulatory battles** and overlapping **federal investigations** from all corners of the government.

**CABINET DEPARTMENTS**

Transportation

*Investigations*
*Investigations*
*OSHA violations*
*Oversight*

Justice

Labor

000017

*Lawsuit*
*Enforcement*

*Investigation*

Interior

Agriculture

*Violations, fines*

*Discrimination suit*

*OSHA violations*

*Starbase review*

*Violation*

*Oversight,
rejected subsidies*

**INDEPENDENT AGENCIES**

National Labor
Relations Board

Equal Employment
Opportunity Comm.

Environmental
Protection Agency

*Violations, fines*

*Investigation*

Securities and
Exchange Comm.

Federal
Communications
Comm.

Federal Trade
Comm.

*Investigations,
court order*

*Oversight,
consent decree*

By Jonathan Corum

Given Mr. Musk's immense business footprint, he will be a major player no matter who wins the election.

But he has thrown his fortune and power behind former President Donald J. Trump and, in return, Mr. Trump has vowed to make Mr. Musk head of a new "government efficiency commission" with the power to recommend wide-ranging cuts at federal agencies and changes to federal rules.

That would essentially give the world's richest man and a major government contractor the power to regulate the regulators who hold sway over his companies, amounting to a potentially enormous conflict of interest.

000018

Case 3:25-cv-00441-TLC    Document 371    Filed 02/20/25    Page 24 of 959

Through a review of court filings, regulatory dockets and government contracting data, The New York Times has compiled an accounting of Mr. Musk's multipronged business arrangements with the federal government, as well as the violations, fines, consent decrees and other inquiries federal agencies have ordered against his companies. Together, they show a deep web of relationships: Instead of entering this new role as a neutral observer, Mr. Musk would be passing judgment on his own customers and regulators.

Already, Mr. Musk has discussed how he would use the new position to help his own companies.

He has questioned a rule that required SpaceX to obtain a permit for discharging large amounts of potentially polluted water from its launchpad in Texas. He also said that limiting this kind of oversight could help SpaceX reach Mars sooner — "so long as it is not smothered by bureaucracy," he wrote on X, his social-media platform. "The Department of Government Efficiency is the only path to extending life beyond Earth."

Earlier this month, he attacked the Federal Communications Commission, which oversees the internet satellites that SpaceX launches. He suggested on X that if the commission hadn't "illegally revoked" more than $886 million worth of federal funding the company had sought to deliver internet access to rural areas, satellite kits would "probably have saved lives in North Carolina" after a hurricane devastated parts of the state.

A spokesman for the commission said it didn't award the money because the company was proposing to provide services in some areas that weren't actually rural, including the Newark Liberty International Airport.

000019

Mr. Musk and SpaceX did not respond to requests for comment for this article. Brian Hughes, a spokesman for Mr. Trump, declined to directly address questions about the potential for a conflict of interest, if Mr. Musk takes on this new role.

"Elon Musk is a genius, an innovator, and has literally made history by building creative, modern and efficient systems," Mr. Hughes said in a statement.

Regardless of who is elected president, the deep ties between Mr. Musk and the U.S. government are unlikely to change anytime soon, with agencies becoming increasingly reliant on the vehicles, rockets, internet and other services his companies provide.

What he delivers to the U.S. government is sprawling, according to federal contract data:

**ROCKETS, CARS AND SATELLITES**

Some examples of the services that Mr. Musk's companies provide to the U.S. government.

Energy

State

Commerce

Veterans Affairs

Interior

Homeland Security

Agriculture

Transportation

000020

Defense

$2.2 billion

G.S.A.

E.P.A.

NASA

**SpaceX** was hired to design, build and test a space landing system for astronauts.

000021

Elon Musk's Big Business and Conflicts of Interest With the U.S. Government - The New York Times
Case 3:25-cv-00442-LLC Document 371 Filed 02/28/25 Page 272 of 959
2/17/25, 6:59 PM

**SpaceX** sold Starlink satellite internet to the U.S. embassy in Ashgabat, Turkmenistan, providing access to U.S. officials in a country that severely censors online activity.

000022

**Tesla** provided a tactical vehicle to the U.S. embassy in Iceland.

And the U.S. Forestry Service used **Starlinks** to connect emergency responders battling wildfires in remote parts of California.

000023

By Jonathan Corum

The idea for an efficiency commission originated with Mr. Musk. When he interviewed Mr. Trump on X in August, Mr. Musk brought it up three times — returning to the topic when Mr. Trump digressed into other subjects.

"I think it would be great to just have a government efficiency commission that takes a look at these things and just ensures that the taxpayer money — the taxpayers' hard-earned money — is spent in a good way," Mr. Musk said the third time. "And I'd be happy to help out on such a commission."

"I'd love it," Mr. Trump finally replied. "Well, you, you're the greatest cutter."

000024

Maya MacGuineas, president of the nonpartisan Committee for a Responsible Federal Budget, applauded the idea of an efficiency commission, and said that Mr. Musk's experience in business could be good preparation to lead it.

She said Mr. Musk's formal power would most likely be limited. Previous presidents, going back to Theodore Roosevelt, have tried using committees of business-minded outsiders to rethink government. For their ideas to become law, Congress has to agree. Usually, she said, it does not.

But a suggestion from Mr. Musk could still be damaging to an agency, if he singled it out to Mr. Trump as an example of waste or mismanagement.

Legal experts who have studied federal ethics rules and the use of outside business executives as government advisers said Mr. Musk's interactions with the federal government are so broad it might not be possible for him to serve as a prominent adviser to the president without creating major conflicts of interest.

Mr. Musk "has had very contentious interactions and entanglements with regulators," said Kathleen Clark, an ethics lawyer who has served as an adviser to the District of Columbia Attorney General's office. "It is entirely reasonable to believe that what he would bring to this federal audit is his own set of biases and grudges and financial interests."

Mr. Musk and his companies often question federal regulations — particularly when they threaten to slow plans to further expand his operations.

One such example was the test launch this month of Starship, SpaceX's newest rocket. NASA has agreed to pay the company as much as $4.4 billion to take astronauts to the surface of the moon on two future missions — although the dates will depend on when all the equipment is ready. So far, Starship has not flown any humans.

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/28/25   Page 31 of 959

But the Federal Aviation Administration held up this most recent test launch for weeks, in part because of questions about harm SpaceX has caused to wildlife near its Texas launch site, a delay that infuriated Mr. Musk.

"We continue to be stuck in a reality where it takes longer to do the government paperwork to license a rocket launch than it does to design and build the actual hardware," SpaceX said in a statement.

Last month, the F.A.A. started the process to fine SpaceX $633,009 for disregarding license requirements related to two of its Florida launches last year that may have compromised safety, the agency said.

This was a shift for the F.A.A., which in past instances had not imposed fines when SpaceX ignored the agency's direct orders. Marc Nichols, the F.A.A.'s chief counsel, said in a statement last month that "failure of a company to comply with the safety requirements will result in consequences."

Mr. Musk responded on his social media site: "SpaceX will be filing suit against the FAA for regulatory overreach." The company followed up with a four-page letter to Congress complaining about the F.A.A. which it said had been "unsuccessful in modernizing and streamlining its regulations."

The list of clashes by Mr. Musk's companies extends to many other federal agencies.

**FINES AND FIGHTING**

Several examples of clashes between U.S. agencies and Mr. Musk's companies.

**CABINET DEPARTMENTS**

Transportation

Justice

000026

Labor

Interior

Agriculture

**INDEPENDENT AGENCIES**

N.L.R.B.

E.E.O.C.

E.P.A.

S.E.C.

F.C.C

F.T.C.

The **National Highway Traffic Safety Administration** has opened five investigations of Tesla, including for complaints of unexpected braking, loss of steering control and crashes while cars were in "self-driving" mode.

000027

Tesla has tried to block at least two rulings from the **National Labor Relations Board**, including one punishing Mr. Musk for tweeting that factory workers would lose stock options if they joined a union.

Neuralink, Mr. Musk's brain-implant company, was fined for violating **Transportation Department** rules regarding the movement of hazardous materials.

000029

The **Justice Department** sued SpaceX, arguing that the company refused to hire refugees and people granted asylum because of their citizenship status.

By Jonathan Corum

Mr. Musk in recent years has particularly attacked the Securities and Exchange Commission, which in 2018 charged him with securities fraud for a series of false and misleading tweets related to taking Tesla private. Mr. Musk had posted on Twitter that he had planned to take the company private at $420 a share, and

000030

that he had "funding secured" for a transaction. As part of a later settlement with the S.E.C., he stepped down as Tesla's chairman and Tesla paid a $20 million fine.

In a 2022 TED Talk, Mr. Musk lambasted regulators, calling them "bastards."

Even before getting a formal role in the federal government, Mr. Musk has repeatedly called for a broad effort to strike or weaken federal regulations, and to slash federal spending. "If Trump wins, we do have an opportunity to do kind of a once in a lifetime deregulation and reduction in the size of the government," Mr. Musk said at a conference in Los Angeles last month.

If Mr. Musk were to get a senior advisory role in a Trump administration, regulators might have to consider how taking action against one of Mr. Musk's companies might affect their budget or regulatory authority, even if he did not directly push those agencies to back down, Ms. Clark said.

The federal government has rules intended to prevent such conflicts. There are 1,019 advisory committees with more than 60,000 members, opining on everything from how pesticides are used on farms to how wild horses in the United States are managed. But these committees each have very narrow jurisdiction, compared to a governmentwide "efficiency" review that Mr. Musk would lead.

Another criminal law prohibits federal employees and outside advisers who are sometimes considered "special government employees" from "participating personally and substantially in any particular matter that affects your financial interests, as well as the financial interests of your spouse, minor child, general partner, an organization in which you serve as an officer."

000031

Case 8:25-cv-00464-TDC   Document 57-1   Filed 02/20/25   Page 37 of 959

But that has often not prevented problems with outside advisers — even those with much less complicated portfolios than Mr. Musk's. Pharmaceutical industry advisers to the Food and Drug Administration, various studies have shown, often appear to have made recommendations that benefit their corporate interests, as have military contractors tapped to advise the Pentagon.

Mr. Musk has hinted at one government efficiency he would like to see: killing NASA's Starliner contract with Boeing, his main industry competitor.

"The world doesn't need another capsule," he wrote earlier this year, referring to the long-delayed Boeing system, which returned empty this month, after encountering trouble on its first human test flight. (He has not addressed if the proposed efficiency committee would take this up.)

Mr. Trump has previously faced accusations that he created conflicts when he named certain business executives as advisers.

That included his appointment of Carl Icahn, the billionaire investor, as a special adviser on regulatory matters in 2017, even as Mr. Icahn was lobbying federal regulators to revamp a rule that would allow a Texas oil refinery he partly owned to save hundreds of millions of dollars. Mr. Icahn ended up stepping down from the unpaid role only months after he was appointed, after broad criticism of the arrangement.

Richard Briffault, a Columbia University professor of law who has served as chair of the New York City Conflicts of Interest Board, said that there might be an advantage to having Mr. Musk as a formal adviser to Mr. Trump — because that would at least require some disclosure of the advice he was offering.

000032

"Having this in public as opposed to having Elon Musk calling up the White House and saying, 'Hey, this agency is coming down hard on me. Get them to back off,' — is that even worse?" Mr. Briffault said. "It's an open question."

## Methodology

The New York Times analyzed transaction-level contract and grant data from usaspending.gov between the 2013 and 2023 fiscal years, calculating total obligated dollars by funding agency for businesses founded by Elon Musk. The Times consulted experts at The Pulse, a federal research and advisory firm, and the Center for Strategic and International Studies, a Washington think tank, to review the methodology.

---

Kitty Bennett contributed research.

**Eric Lipton** is an investigative reporter, who digs into a broad range of topics from Pentagon spending to toxic chemicals. More about Eric Lipton

**David A. Fahrenthold** is an investigative reporter writing about nonprofit organizations. He has been a reporter for two decades. More about David A. Fahrenthold

**Kirsten Grind** is an investigative business reporter writing stories about companies, chief executives and billionaires across Silicon Valley and the technology industry. More about Kirsten Grind

---

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Musk the Contractor vs. Musk the U.S. Adviser

**Donald J. Trump** ✓
@realDonaldTrump

I am pleased to announce that the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy, will lead the Department of Government Efficiency ("DOGE")....

18.4k ReTruths    80.8k Likes

Nov 12, 2024 at 7:46 PM

Reply    ReTruth    Like

**Continue the conversation**

Join Truth Social to get the full story and details.

Log in

Sign up



⤺ **Department of Government Efficiency** reposted

 **Elon Musk** ✓ ✖ @elonmusk · Nov 12                    · · ·



— November 12, 2024 —

### STATEMENT FROM PRESIDENT DONALD J. TRUMP

I am pleased to announce that the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy, will lead the Department of Government Efficiency ("DOGE"). Together, these two wonderful Americans will pave the way for my Administration to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies - Essential to the "Save America" Movement. "This will send shockwaves through the system, and anyone involved in Government waste, which is a lot of people!" stated Mr. Musk.

It will become, potentially, "The Manhattan Project" of our time. Republican politicians have dreamed about the objectives of "DOGE" for a very long time. To drive this kind of drastic change, the Department of Government Efficiency will provide advice and guidance from outside of Government, and will partner with the White House and Office of Management & Budget to drive large scale structural reform, and create an entrepreneurial approach to Government never seen before.

I look forward to Elon and Vivek making changes to the Federal Bureaucracy with an eye on efficiency and, at the same time, making life better for all Americans. Importantly, we will drive out the massive waste and fraud which exists throughout our annual $6.5 Trillion Dollars of Government Spending. They will work together to liberate our Economy, and make the U.S. Government accountable to "WE THE PEOPLE." Their work will conclude no later than July 4, 2026 - A smaller Government, with more efficiency and less bureaucracy, will be the perfect gift to America on the 250th Anniversary of The Declaration of Independence. I am

💬 46K          ⤺ 126K          ♡ 866K          ▮▮▮ 91M                    🔖  ⬆

Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government - WSJ
Case 3:25-cv-00446-TLTC Document 23-1 Filed 02/28/25 Page 41 of 959
2/17/25, 7:04 PM

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law.
For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020

**OPINION**  **COMMENTARY**  Follow

# *Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government*

Following the Supreme Court's guidance, we'll reverse a decadeslong executive power grab.

By Elon Musk and Vivek Ramaswamy

Nov. 20, 2024 at 12:33 pm ET



ILLUSTRATION: DAVID GOTHARD

Our nation was founded on the basic idea that the people we elect run the government. That isn't how America functions today. Most legal edicts aren't laws enacted by Congress but "rules and regulations" promulgated by unelected bureaucrats—tens of thousands of them each year. Most government enforcement decisions and discretionary expenditures aren't made by the democratically elected president or even his political appointees but by millions of unelected, unappointed civil servants within government agencies who view themselves as immune from firing thanks to civil-service protections.

This is antidemocratic and antithetical to the Founders' vision. It imposes massive direct and indirect costs on taxpayers. Thankfully, we have a historic opportunity to solve the

000036

problem. On Nov. 5, voters decisively elected Donald Trump with a mandate for sweeping change, and they deserve to get it.

President Trump has asked the two of us to lead a newly formed Department of Government Efficiency, or DOGE, to cut the federal government down to size. The entrenched and ever-growing bureaucracy represents an existential threat to our republic, and politicians have abetted it for too long. That's why we're doing things differently. We are entrepreneurs, not politicians. We will serve as outside volunteers, not federal officials or employees. Unlike government commissions or advisory committees, we won't just write reports or cut ribbons. We'll cut costs.

We are assisting the Trump transition team to identify and hire a lean team of small-government crusaders, including some of the sharpest technical and legal minds in America. This team will work in the new administration closely with the White House Office of Management and Budget. The two of us will advise DOGE at every step to pursue three major kinds of reform: regulatory rescissions, administrative reductions and cost savings. We will focus particularly on driving change through executive action based on existing legislation rather than by passing new laws. Our North Star for reform will be the U.S. Constitution, with a focus on two critical Supreme Court rulings issued during President Biden's tenure.

In *West Virginia v. Environmental Protection Agency* (2022), the justices held that agencies can't impose regulations dealing with major economic or policy questions unless Congress specifically authorizes them to do so. In *Loper Bright v. Raimondo* (2024), the court overturned the *Chevron* doctrine and held that federal courts should no longer defer to federal agencies' interpretations of the law or their own rulemaking authority. Together, these cases suggest that a plethora of current federal regulations exceed the authority Congress has granted under the law.

DOGE will work with legal experts embedded in government agencies, aided by advanced technology, to apply these rulings to federal regulations enacted by such agencies. DOGE will present this list of regulations to President Trump, who can, by executive action, immediately pause the enforcement of those regulations and initiate the process for review

000037

and rescission. This would liberate individuals and businesses from illicit regulations never passed by Congress and stimulate the U.S. economy.

When the president nullifies thousands of such regulations, critics will allege executive overreach. In fact, it will be *correcting* the executive overreach of thousands of regulations promulgated by administrative fiat that were never authorized by Congress. The president owes lawmaking deference to Congress, not to bureaucrats deep within federal agencies. The use of executive orders to substitute for lawmaking by adding burdensome new rules is a constitutional affront, but the use of executive orders to roll back regulations that wrongly bypassed Congress is legitimate and necessary to comply with the Supreme Court's recent mandates. And after those regulations are fully rescinded, a future president couldn't simply flip the switch and revive them but would instead have to ask Congress to do so.

A drastic reduction in federal regulations provides sound industrial logic for mass head-count reductions across the federal bureaucracy. DOGE intends to work with embedded appointees in agencies to identify the minimum number of employees required at an agency for it to perform its constitutionally permissible and statutorily mandated functions. The number of federal employees to cut should be at least proportionate to the number of federal regulations that are nullified: Not only are fewer employees required to enforce fewer regulations, but the agency would produce fewer regulations once its scope of authority is properly limited. Employees whose positions are eliminated deserve to be treated with respect, and DOGE's goal is to help support their transition into the private sector. The president can use existing laws to give them incentives for early retirement and to make voluntary severance payments to facilitate a graceful exit.

Conventional wisdom holds that statutory civil-service protections stop the president or even his political appointees from firing federal workers. The purpose of these protections is to protect employees from political retaliation. But the statute allows for "reductions in force" that don't target specific employees. The statute further empowers the president to "prescribe rules governing the competitive service." That power is broad. Previous presidents have used it to amend the civil service rules by executive order, and the

000038

Supreme Court has held—in *Franklin v. Massachusetts* (1992) and *Collins v. Yellen* (2021) that they weren't constrained by the Administrative Procedures Act when they did so. With this authority, Mr. Trump can implement any number of "rules governing the competitive service" that would curtail administrative overgrowth, from large-scale firings to relocation of federal agencies out of the Washington area. Requiring federal employees to come to the office five days a week would result in a wave of voluntary terminations that we welcome: If federal employees don't want to show up, American taxpayers shouldn't pay them for the Covid-era privilege of staying home.

Finally, we are focused on delivering cost savings for taxpayers. Skeptics question how much federal spending DOGE can tame through executive action alone. They point to the 1974 Impoundment Control Act, which stops the president from ceasing expenditures authorized by Congress. Mr. Trump has previously suggested this statute is unconstitutional, and we believe the current Supreme Court would likely side with him on this question. But even without relying on that view, DOGE will help end federal overspending by taking aim at the $500 billion plus in annual federal expenditures that are unauthorized by Congress or being used in ways that Congress never intended, from $535 million a year to the Corporation for Public Broadcasting and $1.5 billion for grants to international organizations to nearly $300 million to progressive groups like Planned Parenthood.

The federal government's procurement process is also badly broken. Many federal contracts have gone unexamined for years. Large-scale audits conducted during a temporary suspension of payments would yield significant savings. The Pentagon recently failed its seventh consecutive audit, suggesting that the agency's leadership has little idea how its annual budget of more than $800 billion is spent. Critics claim that we can't meaningfully close the federal deficit without taking aim at entitlement programs like Medicare and Medicaid, which require Congress to shrink. But this deflects attention from the sheer magnitude of waste, fraud and abuse that nearly all taxpayers wish to end—and that DOGE aims to address by identifying pinpoint executive actions that would result in immediate savings for taxpayers.

000039

With a decisive electoral mandate and a 6-3 conservative majority on the Supreme Court, DOGE has a historic opportunity for structural reductions in the federal government. We are prepared for the onslaught from entrenched interests in Washington. We expect to prevail. Now is the moment for decisive action. Our top goal for DOGE is to eliminate the need for its existence by July 4, 2026—the expiration date we have set for our project. There is no better birthday gift to our nation on its 250th anniversary than to deliver a federal government that would make our Founders proud.

*Mr. Musk is CEO of SpaceX and Tesla. Mr. Ramaswamy, a businessman, is author, most recently, of "Truths: The Future of America First" and was a candidate for the 2024 Republican presidential nomination. President-elect Trump has named them co-heads of the Department of Government Efficiency.*

*Appeared in the November 21, 2024, print edition as 'The DOGE Plan to Reform Government'.*

## Videos

000040

Case 3:25-cv-04321-LHC   Document 257-1   Filed 02/20/25   Page 46 of 959

## The American Presidency Project (https://www.presidency.ucsb.edu/)



### DONALD J. TRUMP (2ND TERM) (/PEOPLE/PRESIDENT/DONALD-J-TRUMP-2ND-TERM)

**Statement by President-elect Donald J. Trump Announcing the Appointment of David A. Warrington as Assistant to the President and Counsel to the President**

December 04, 2024

I am proud to announce the appointment of David A. Warrington to serve as Assistant to the President and Counsel to the President. Dave will lead the Office of White House Counsel, and serve as the top attorney in the White House. Dave has represented me well as my personal attorney, and as General Counsel for my Presidential Campaign. He is an esteemed lawyer and Conservative leader. Dave is currently a Partner at the Dhillon Law Group, and a former President of the Republican National Lawyers Association. Dave is a Veteran of the United States Marine Corps, and a Magna Cum Laude Graduate of Georgetown University, and the George Mason University School of Law.

Additionally, I have asked William Joseph McGinley to serve as Counsel to the Department of Government Efficiency ("DOGE"), something he is very passionate about. Bill will work with Elon Musk, Vivek Ramaswamy, and their team of incredible pioneers at DOGE, to rebuild a U.S. Government that truly serves the People. Bill will play a crucial role in liberating our Economy from burdensome Regulations, excess spending, and Government waste. He will partner with the White House and the Office of Management and Budget to provide advice and guidance to end the bloated Federal Bureaucracy. Bill is a great addition to a stellar team that is focused on making life better for all Americans. He will be at the forefront of my Administration's efforts to make our Government more efficient and more accountable.

Congratulations to Dave and Bill!

---

Donald J. Trump (2nd Term), Statement by President-elect Donald J. Trump Announcing the Appointment of David A. Warrington as Assistant to the President and Counsel to the President Online by Gerhard Peters

000041

How Will DOGE Work? What to Know About Trump's Government Efficiency Department - The New York Times

Case 3:25-cv-00445-TLTC    Document 371    Filed 02/25/25    Page 47 of 959          2/17/25, 7:06 PM

# *How Trump's Department of Government Efficiency Will Work*

The structure and goals of the cost-cutting effort have changed over the past 10 weeks. Here's how.

 **Listen to this article · 6:36 min**   Learn more

  **By Madeleine Ngo and Theodore Schleifer**
Reporting from Washington

Jan. 21, 2025

With the official establishment on Monday of President Trump's closely watched effort to slash federal spending — which he has called the Department of Government Efficiency — some key information was revealed, including details about how the group will be structured and a new focus on modernizing technology.

But a number of critical questions have not yet been answered.

Mr. Trump's executive order creating the group underscores how much the idea has been worked through over the past few weeks.

In November, Mr. Trump initially said the group would provide outside advice as it worked closely with White House budget officials. The president's order, however, brings the group inside the federal government. The order also follows

How Will DOGE Work? What to Know About Trump's Government Efficiency Department - The New York Times

2/17/25, 7:06 PM

Case 3:25-cv-00462-TLTC   Document 37-1   Filed 02/22/25   Page 48 of 597

a major shake-up in leadership. Elon Musk will be its sole leader after Vivek Ramaswamy bowed out of the project.

## How will the group be structured?

The order essentially means that the group will be an official unit within the executive office of the president. The so-called "United States DOGE Service" will take over the United States Digital Service, which was created in 2014 by former President Barack Obama to improve government services through the use of technology.

The order also created a temporary organization within the larger service that will end on July 4, 2026. It is unclear how its mission will differ from that of the broader U.S. DOGE Service, although its deadline is the same one that Mr. Trump originally set for the group to provide recommendations to drive out "waste and fraud" within the federal budget.

There will also be "DOGE teams" embedded within federal agencies that can consist of special government employees, a specific category of temporary workers who can only work for the federal government for 130 days or less in a 365-day period. Mr. Musk himself may be one of them, but the executive order did not make that clear.

## How will the "DOGE teams" work?

Each team will be made up of at least four employees, who are expected to include a team lead, engineer, human resources specialist and attorney. Agency heads will select team members in consultation with the U.S. DOGE Service.

000043

Case 3:25-cv-00446-TLC  Document 37-1  Filed 02/20/25  Page 49 of 957

Team leads will coordinate with the U.S. DOGE Service and provide advice to agency heads, who must ensure that the group "has full and prompt access to all unclassified agency records, software systems and IT systems" to the "maximum extent consistent with law."

Mr. Trump's order does not lay out specific tasks for the teams, other than "implementing the president's DOGE agenda." But the teams are expected to identify potential spending cuts and regulations that could be slashed.

The order did not specify a budget for the group. It is also unclear how much those working for the service will be paid, although some are expected to be volunteers.

## What are its goals?

In November, Mr. Trump laid out several ambitious goals for the group, including to "dismantle government bureaucracy, slash excess regulations, cut wasteful expenditures and restructure federal agencies."

Mr. Trump's order on Monday did not explicitly mention efforts to slash the budget or overhaul federal regulations. Instead, it said the group would advance the "president's DOGE agenda" by "modernizing federal technology and software to maximize governmental efficiency and productivity." The group's head will carry out an initiative that aims to improve government software, network infrastructure and information technology systems, the order said.

In recent weeks, the group's leaders have scaled back some of the initial goals. During Mr. Trump's campaign, Mr. Musk said the effort could result in "at least $2 trillion" in cuts from the $6.75 trillion federal budget. But in an interview earlier this month, Mr. Musk downplayed the total potential savings.

000044

Case 8:25-cv-00462-TDC   Document 71   Filed 02/20/25   Page 50 of 959

"We'll try for $2 trillion — I think that's like the best-case outcome," Mr. Musk said. "You kind of have to have some overage. I think if we try for $2 trillion, we've got a good shot at getting one."

## Who are the group's leaders?

Mr. Trump initially said that Mr. Musk and Vivek Ramaswamy would lead the cost-cutting effort together. But on the first day of the Trump administration, a White House spokeswoman confirmed that Mr. Ramaswamy would quit.

Mr. Ramaswamy, who is expected to announce his bid for governor of Ohio next week, left DOGE after encountering turbulence in Mr. Trump's orbit with both Mr. Trump and Mr. Musk.

There are some big questions remaining. Mr. Trump's order said the U.S. DOGE Service would have an "administrator" who will report to the White House chief of staff. But it did not say who the administrator would be, and representatives of the group did not return requests for clarification.

Possibilities would include Mr. Musk or the two people who have largely been running the group during the presidential transition: Steve Davis, a trusted aide to Mr. Musk, or Brad Smith, a health care entrepreneur and former top health official in Mr. Trump's first White House who is close with Jared Kushner.

## Will Mr. Musk have an office in the White House?

While signing executive orders on Monday, Mr. Trump said that Mr. Musk would have an office in the White House with about 20 people, but it is unclear whether it will be in the West Wing.

000045

The New York Times reported on Monday afternoon that Mr. Musk is likely to have office space in the West Wing, but when Mr. Trump was asked that evening to confirm that, he said Mr. Musk would not.

Mr. Musk had been expected to be situated in the White House complex and has a government email address. He has spent the last several weeks working out of SpaceX's Washington headquarters, joined by a team of engineers and aides, some of whom carry navy blue mesh baseball caps in all-white capital letters reading "DOGE."

## Will the work of the group be subject to public information requests?

That, too, is unclear. The unit previously known as the U.S. Digital Service existed within the Office of Management and Budget, which is subject to the federal Freedom of Information Act, which provides for the release of information upon request that has not been made public, unless it falls under an exemption. But if the unit gets moved elsewhere within the executive office of the president, it could be exempt from the act.

The work of the "DOGE teams" could be subject to the act, though, because they would be embedded within federal agencies.

**Madeleine Ngo** covers U.S. economic policy and how it affects people across the country. More about Madeleine Ngo

**Theodore Schleifer** is a Times reporter covering campaign finance and the influence of billionaires in American politics. More about Theodore Schleifer



G  Sign in with Google                                    ✕

Use your Google Account
to sign in to CNN

No more passwords to
remember. Signing in is fast,
simple and secure.

Continue

≡  CNN Politics                          Subscribe    **Sign in**

# Elon Musk is serving as a 'special government employee,' White House says

By <u>Kaitlan Collins</u> and <u>Tierney Sneed</u>, CNN

🕐 3 minute read · Updated 8:12 PM EST, Mon February 3, 2025





000047

Elon Musk arrives to the inauguration of President-elect Donald Trump in the Rotunda of the US Capitol on January 20 in Washington, DC. Chip Somodevilla/Pool/Reuters

**Washington (CNN)** — Elon Musk is officially serving under President Donald Trump as a special government employee, according to a White House official.

That designation means Musk – the billionaire tech entrepreneur who has been a force within the new Trump administration – is not a volunteer but also not a full-time federal employee.

According to a Justice Department summary, a special government employee is "anyone who works, or is expected to work, for the government for 130 days or less in a 365-day period." Musk is not being paid, a person familiar with his employment told CNN.

Musk has a top secret security clearance, an official familiar with the matter tells CNN.

Musk, who is the world's richest man and became an ardent supporter of Trump's during the campaign, has an office on the White House campus. Within weeks of Trump taking office, Musk has shown he has a broad mandate to carry out his government efficiency initiative known as DOGE.

On Monday, Trump confirmed Musk has access to the Treasury Department's critical payment system, which sends out money on behalf of the entire federal government. Federal unions and others on Monday sued the Treasury Department over the access.

Treasury Secretary Scott Bessent was inside the Oval Office as Trump commented on Musk's purview.

"Elon can't do and won't do anything without our approval. And we'll give him the approval where appropriate. Where not appropriate, we won't," the president said.

Musk's business success has been partly fueled by federal money, and SpaceX has received billions of dollars in direct government contracts.

As a special government employee, Musk is covered by a federal conflicts-of-interest statute that prohibits government employees from participating in matters that would affect their financial interests. That law can be enforced criminally or in the civil context, but it can only be enforced by the Justice Department.

"We are relying on the Justice Department for enforcement of the financial conflict-of-interest standards against Elon Musk and everyone else, and there is a reason to doubt that the Trump Justice Department will enforce any statutes, including criminal statutes, against a Trump ally," said Kathleen Clark, a Washington University law professor who specializes in government ethics.

The designation also makes Musk subject to many government ethics standards, but not all of them.

It remains to be seen if Musk's designation requires him to file a financial disclosure that will be made public.

According to the DOJ summary, special government employees "may be required to submit a financial disclosure report within 30 days of assuming your position. If you are paid above the rate paid to a GS-15 and expected to serve for more than 60 days, you are required to submit a report that is made available to the public. If you are paid at or below that level, you must file a report on a confidential basis if your decision making could have an economic effect on a non-federal entity."

Musk's link to Trump's agenda is affecting his outside business. After Trump announced he would impose a 25% tariff on Canada starting at midnight Tuesday, the Canadian province of Ontario said it was canceling a contract with Starlink, Musk's satellite internet service.

*This story has been updated with additional details.*

000049

FORBES  >  BUSINESS

**BREAKING**

# White House Says Elon Musk Trusted To Claim His Own Conflicts Of Interest As 'Special Government Employee'—Here's What That Means

**Ty Roush** Forbes Staff

*Ty Roush is a breaking news reporter based in New York City.*

  2

Feb 5, 2025, 04:19pm EST

**TOPLINE** Elon Musk will work under President Donald Trump as a "special government employee," designating Musk as an unpaid employee of the federal government with fewer restrictions than full-time employees, according to the White House, as Musk's so-called Department Of Government Efficiency has involved itself in multiple federal agencies in recent days.

Elon Musk's Official Title Is 'Special Government Employee.' Here's What That Means.

Case 3:25-cv-00442-TDC    Document 37-1    Filed 02/28/25    Page 56 of 959

2/17/25, 7:07 PM



The Tesla CEO was tapped by President Donald Trump to lead the Department of Government Efficiency. ... [+]  GETTY IMAGES

## KEY FACTS

- Musk was named a "special government employee" and has received a government email address and office space within the White House, a White House official told multiple outlets including the Associated Press, though it's not immediately clear when Musk received the designation (the White House did not immediately respond to a request for comment).

- Musk will not be paid while working for the government, a person familiar with his employment told CNN, which may help Musk avoid having to fill out financial disclosure forms; a public financial disclosure report is only required if an employee is paid and serves more than 60 days, according to the Department of Justice.

*Get Forbes Breaking News Text Alerts: We're launching text*

Elon Musk's Official Title Is 'Special Government Employee.' Here's What That Means.

Case 3:25-cv-00426-TLC   Document 131   Filed 02/28/25   Page 57 of 959

2/17/25, 7:07 PM

*message alerts so you'll always know the biggest stories shaping the day's headlines. Text "Alerts" to (201) 335-0739 or sign up here.*

### WHAT ARE SPECIAL GOVERNMENT EMPLOYEES?

A special government employee is anyone working or expecting to work for the federal government for up to 130 days, according to Justice Department guidelines. The role is subject to most rules and guidelines that apply to full-time employees, though they are often "less restrictive" because their roles are temporary, including fewer restrictions on conflicts of interests, the agency noted. Special government employees are prohibited from participating in matters that may feature financial conflicts of interest, including matters that could affect an organization or company they work for. The employees are also prevented from using their role to influence or interfere with an election or engage in political activity while on duty.

### DOES ELON MUSK HAVE CONFLICTS OF INTEREST AS A FEDERAL EMPLOYEE?

It's not immediately clear whether Musk, whose SpaceX holds federal contracts worth billions of dollars, violates ethics agreements for federal employees. The U.S. Agency for International Development, which Musk has criticized and called to abolish, holds two active contracts with Musk's satellite internet firm Starlink, though funds from those contracts have been spent. Ann Skeet, director of leadership ethics at Santa Clara University's Markkula Center, suggested to the Associated Press that Musk was "in a position to try and curry favor" for his companies, including possible incentives for his social media platform X, Tesla, his AI startup xAI and brain implant maker Neuralink. Trump said Monday that Musk would be kept away from interacting with aspects of government that could be a conflict of interest, saying if "there's a problem, we won't

000052

let him go near it." However, White House press secretary Karoline Leavitt said Tuesday that Musk would be trusted with calling out his own conflicts of interest. If the tech billionaire encounters a conflict of interest with his companies' contracts and the funding overseen by DOGE, "then Elon will excuse himself from those contracts," Leavitt said.

## KEY BACKGROUND

Musk's role in the Trump administration followed months of his support for Trump's campaign, during which the world's richest man gave more than $200 million toward pro-Trump efforts. Trump announced Musk would lead his administration's cost-cutting efforts as head of the newly-created Department of Government Efficiency, a task force-like department which Musk vowed would cut government spending and align federal agencies' work with his ideological beliefs. The Trump administration has also reportedly granted Musk and his DOGE team control of the Treasury Department's payment system, which disburses funds throughout the federal government. DOGE has tried to make other changes to the federal government in recent weeks: team members tried to enter offices for USAID—an agency that provides humanitarian relief to foreign countries—over the weekend, as Musk tweeted it was time for the agency "to die."

## FURTHER READING

AP NEWS

**Musk is a 'special government employee,' the White House confirms**

000053

# *Inside Musk's Aggressive Incursion Into the Federal Government*

The billionaire is creating major upheaval as his team sweeps through agencies, in what has been an extraordinary flexing of power by a private individual.

Empowered by President Trump, Elon Musk is waging a largely unchecked war against the federal bureaucracy.  Kenny Holston/The New York Times

▶ **Listen to this article · 20:45 min**  Learn more

     

**By Jonathan Swan, Theodore Schleifer, Maggie Haberman, Kate Conger, Ryan Mac and Madeleine Ngo**

Published Feb. 3, 2025   Updated Feb. 4, 2025

In Elon Musk's first two weeks in government, his lieutenants gained access to closely held financial and data systems, casting aside career officials who warned that they were defying protocols. They moved swiftly to shutter specific programs — and even an entire agency that had come into Mr. Musk's cross

000054

hairs. They bombarded federal employees with messages suggesting they were lazy and encouraging them to leave their jobs.

Empowered by President Trump, Mr. Musk is waging a largely unchecked war against the federal bureaucracy — one that has already had far-reaching consequences.

Mr. Musk's aggressive incursions into at least half a dozen government agencies have challenged congressional authority and potentially breached civil service protections.

Top officials at the Treasury Department and the U.S. Agency for International Development who objected to the actions of his representatives were swiftly pushed aside. And Mr. Musk's efforts to shut down U.S.A.I.D., a key source of foreign assistance, have reverberated around the globe.

Mr. Musk, the world's richest man, is sweeping through the federal government as a singular force, creating major upheaval as he looks to put an ideological stamp on the bureaucracy and rid the system of those who he and the president deride as "the deep state."

The rapid moves by Mr. Musk, who has a multitude of financial interests before the government, have represented an extraordinary flexing of power by a private individual.

The speed and scale have shocked civil servants, who have been frantically exchanging information on encrypted chats, trying to discern what is unfolding.

Senior White House staff members have at times also found themselves in the dark, according to two officials, who spoke on the condition of anonymity to describe sensitive discussions. One Trump official, who was not authorized to speak publicly, said Mr. Musk was widely seen as operating with a level of autonomy that almost no one can control.

Mr. Musk, the leader of SpaceX, Tesla and X, is working with a frantic, around-the-clock energy familiar to the employees at his various companies, flanked by a cadre of young engineers, drawn in part from Silicon Valley. He has moved beds into the headquarters of the federal personnel office a few blocks from the White House, according to a person familiar with the situation, so he and his staff, working late into the night, could sleep there, reprising a tactic he has deployed at Twitter and Tesla.

This time, however, he carries the authority of the president, who has bristled at some of Mr. Musk's ready-fire-aim impulses but has praised him publicly.

"He's a big cost-cutter," Mr. Trump told reporters on Sunday. "Sometimes we won't agree with it and we'll not go where he wants to go. But I think he's doing a great job. He's a smart guy."

000055

Case 3:25-cv-00442-TLC   Document 23-1   Filed 02/23/25   Page 61 of 959



Mr. Trump has given Mr. Musk vast power over the bureaucracy that regulates his companies and awards them contracts. Haiyun Jiang for The New York Times

Mr. Musk, who leads a cost-cutting initiative the administration calls the Department of Government Efficiency, boasted on Saturday that his willingness to work weekends was a "superpower" that gave him an advantage over his adversary. The adversary he was referring to was the federal work force.

"Very few in the bureaucracy actually work the weekend, so it's like the opposing team just leaves the field for 2 days!" Mr. Musk posted on X.

There is no precedent for a government official to have Mr. Musk's scale of conflicts of interest, which include domestic holdings and foreign connections such as business relationships in China. And there is no precedent for someone who is not a full-time employee to have such ability to reshape the federal work force.

000056

The historian Douglas Brinkley described Mr. Musk as a "lone ranger" with limitless running room. He noted that the billionaire was operating "beyond scrutiny," saying: "There is not one single entity holding Musk accountable. It's a harbinger of the destruction of our basic institutions."

Several former and current senior government officials — even those who like what he is doing — expressed a sense of helplessness about how to handle Mr. Musk's level of unaccountability. At one point after another, Trump officials have generally relented rather than try to slow him down. Some hoped Congress would choose to reassert itself.

Mr. Trump himself sounded a notably cautionary note on Monday, telling reporters: "Elon can't do and won't do anything without our approval. And we'll give him the approval where appropriate, where not appropriate, we won't."

"If there's a conflict," he added, "then we won't let him get near it."

However, the president has given Mr. Musk vast power over the bureaucracy that regulates his companies and awards them contracts. He is shaping not just policy but personnel decisions, including successfully pushing for Mr. Trump to pick Troy Meink as the Air Force secretary, according to three people with direct knowledge of his role.

Mr. Meink previously ran the Pentagon's National Reconnaissance Office, which helped Mr. Musk secure a multibillion-dollar contract for SpaceX to help build and deploy a spy satellite network for the federal government.

Part of SpaceX's Starship rocket in Boca Chica, Texas, last year. Mr. Musk is shaping both policy and personnel decisions that could benefit his companies.  Meridith Kohut for The New York Times

Since Mr. Trump's inauguration, Mr. Musk and his allies have taken over the United States Digital Service, now renamed United States DOGE Service, which was established in 2014 to fix the federal government's online services.

They have commandeered the federal government's human resources department, the Office of Personnel Management.

They have gained access to the Treasury's payment system — a powerful tool to monitor and potentially limit government spending.

Mr. Musk has also taken a keen interest in the federal government's real estate portfolio, managed by the General Services Administration, moving to terminate leases. Internally, G.S.A. leaders have started to discuss eliminating as much as 50 percent of the agency's budget, according to people familiar with the conversations.

Perhaps most significant, Mr. Musk has sought to dismantle U.S.A.I.D., the government's lead agency for humanitarian aid and development assistance. Mr. Trump has already frozen foreign aid spending, but Mr. Musk has gone further.

"We spent the weekend feeding USAID into the wood chipper," Mr. Musk gloated on X at 1:54 a.m. Monday. "Could gone to some great parties. Did that instead."

Mr. Musk's allies now aim to inject artificial intelligence tools into government systems, using them to assess contracts and recommend cuts. On Monday, Thomas Shedd, a former Tesla engineer who has been tapped to lead a technology team at G.S.A., told some staff members that he hoped to put all federal contracts into a centralized system so they could be analyzed by artificial intelligence, three people familiar with the meeting said.

Mr. Musk's actions have astounded and alarmed Democrats and government watchdog groups. They question if Mr. Musk is breaching federal laws that give Congress the final power to create or eliminate federal agencies and set their budgets, require public disclosure of government actions and prohibit

000058

individuals from taking actions that might benefit themselves personally.

At least four lawsuits have been filed in federal court to challenge his authority and the moves by the new administration, but it remains to be seen if judicial review can keep up with Mr. Musk.

The New York Times spoke to more than three dozen current and former administration officials, federal employees and people close to Mr. Musk who described his expanding influence over the federal government. Few were willing to speak on the record, for fear of retribution.

"Before Congress and the courts can respond, Elon Musk will have rolled up the whole government," said one official who works inside an agency where representatives from Mr. Musk's cost-cutting initiative have asserted control.

Mr. Musk says he is making long overdue reforms. So far, his team has claimed to help save the federal government more than $1 billion a day through efforts like the cancellation of federal building leases and contracts related to diversity, equity and inclusion, although they have provided few specifics.

## Controlling the Pipes

Workers in the Eisenhower Executive Office Building, which housed some operations for the United States Digital Service, arrived the day after Mr. Trump's inauguration to find a sticky note with "DOGE" on a door to a suite once used as a work space for senior technologists at the agency.

It was one of the first signs that Mr. Musk's team had arrived. Inside, black backpacks were strewed about, and unfamiliar young men roamed the halls without the security badges that federal employees typically carried to enter their offices.

Mr. Musk and his team have set up shop in the Eisenhower Executive Office Building.  Eric Lee/The New York Times

The quick takeover was similar to the playbook Mr. Musk has used in the private sector, where he has been a ruthless cost cutter, subscribing to the philosophy that it is better to cut too deeply and fix any problems that arise later. He routinely pushes his employees to ignore regulations they consider "dumb." And he is known for taking extreme risks, pushing both Tesla and SpaceX to the brink of bankruptcy before rescuing them.

In his current role, Mr. Musk has a direct line to Mr. Trump and operates with little if any accountability or oversight, according to people familiar with the dynamic. He often enters the White House through a side entrance, and drops into meetings. He has a close working relationship with Mr. Trump's top policy adviser, Stephen Miller, who shares Mr. Musk's contempt for much of the federal work force.

At one point, Mr. Musk sought to sleep over in the White House residence. He sought and was granted an office in the West Wing but told people that it was too small. Since then, he has told friends he is reveling in the trappings of the opulent Secretary of War Suite in the Eisenhower Executive Office Building, where he has worked some days. His team is staffed heavily by engineers — at least one as young as 19 — who have worked at his companies like X or SpaceX, but have little if any experience in government policy and are seeking security clearances.

Officially, Mr. Musk is serving as a special government employee, according to the White House press secretary, Karoline Leavitt. This is a status typically given to part-time, outside advisers to the federal government who offer advice based on private sector expertise.

The White House declined to say if Mr. Musk had been granted a waiver that allowed him to get involved in agencies whose actions could affect his own personal interests. And even if he had been given such a waiver, four former White House ethics lawyers said they could not envision how it could be structured to appropriately cover the range of the work Mr. Musk is overseeing.

In a statement, Ms. Leavitt said that "Elon Musk is selflessly serving President Trump's administration as a special government employee, and he has abided by all applicable federal laws."

000060

Mr. Musk has told Trump administration officials that to fulfill their mission of radically reducing the size of the federal government, they need to gain access to the computers — the systems that house the data and the details of government personnel, and the pipes that distribute money on behalf of the federal government.

Mr. Musk has been thinking radically about ways to sharply reduce federal spending for the entire presidential transition. After canvassing budget experts, he eventually became fixated on a critical part of the country's infrastructure: the Treasury Department payment system that disburses trillions of dollars a year on behalf of the federal government.

Mr. Musk has told administration officials that he thinks they could balance the budget if they eliminate the fraudulent payments leaving the system, according to an official who discussed the matter with him. It is unclear what he is basing that statement on. The federal deficit for 2024 was $1.8 trillion. The Government Accountability Office estimated in a report that the government made $236 billion in improper payments — three-quarters of which were overpayments — across 71 federal programs during the 2023 fiscal year.

The push by Mr. Musk into the Treasury Department led to a months-in-the-making standoff last week when a top career official, David Lebryk, resisted giving representatives from the cost-cutting effort access to the federal payment system. Mr. Lebryk was threatened with administrative leave and then retired. Treasury Secretary Scott Bessent subsequently approved access for the Musk team, as The Times previously reported.

Treasury Secretary Scott Bessent approved the Musk team's access to the Treasury payments system shortly after he was confirmed. Haiyun Jiang for The New York Times

The Treasury Department's proprietary system for paying the nation's financial obligations is an operation traditionally run by a small group of career civil servants with deep technical expertise. The prospect of an intrusion into that system by outsiders such as Mr. Musk and his team has raised alarm among current and former Treasury officials that a mishap could lead to critical government obligations going unpaid, with consequences ranging from missed benefits payments to a federal default.

Ms. Leavitt said the access they were granted so far was "read only," meaning the staff members could not alter payments.

Democrats on Monday said they would introduce legislation to try to bar Mr. Musk's deputies from entering the Treasury system. "The Treasury secretary must revoke DOGE's access to the Treasury payment system at once," said Senator Chuck Schumer, Democrat of New York and the minority leader. "If he does not, Congress must act immediately."

Another key pipeline is the government's personnel database, run out of the Office of Personnel Management, where Mr. Musk has quickly asserted his influence. At least five people who have worked for Mr. Musk in some capacity now have key roles in the office, according to people familiar with their roles.

Last week, the personnel agency sent an email to roughly two million federal workers offering them the option to resign but be paid through the end of September. The email's subject line, "Fork in the Road," was the same one that Mr. Musk used in an email he sent to Twitter employees offering them severance packages in late 2022. Since then, Mr. Musk has promoted the offer on social media and called it "very generous."

Mr. Musk is also studying the workings of the G.S.A., which manages federal properties. During a visit to the agency last week, accompanied by his young son, whom Mr. Musk named "X Æ A-12," and a nanny, he spoke with the agency's new acting administrator, Stephen Ehikian.

After the meeting, officials discussed a plan to eliminate 50 percent of expenditures, according to people familiar with the discussions. And Mr. Ehikian told staff members in a separate meeting that he wanted them to apply a technique called "zero based budgeting," an approach that Mr. Musk deployed during his Twitter takeover and at his other companies. The idea is to reduce spending of a program or contract to zero, and then argue to restore any necessary dollars.

## Inflicting Trauma

Russell T. Vought, who served in Mr. Trump's first administration and is his choice again to lead the Office of Management and Budget, has spoken openly about the Trump team's plans for dismantling civil service.

"We want the bureaucrats to be traumatically affected," Mr. Vought said in a 2023 speech. "When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains."

000063

"We want the bureaucrats to be traumatically affected," Russell T. Vought, Mr. Trump's pick to lead the Office of Management and Budget, said in a 2023 speech.   Tom Brenner for The New York Times

Mr. Musk, who pushed Mr. Vought for the budget office role, for which he is awaiting Senate confirmation, has echoed that rhetoric, portraying career civil servants and the agencies they work for as enemies.

U.S.A.I.D., which oversees civilian foreign aid, is "evil," Mr. Musk wrote in numerous posts on Sunday, while "career Treasury officials are breaking the law every hour of every day," he said in another post.

Mr. Musk used the same tactic during his 2022 takeover of Twitter, in which he depicted the company's previous management as malicious and many of its workers as inept and oppositional to his goals. In firing Twitter executives "for cause" and withholding their exit packages, Mr. Musk accused some of them of corruption and attacked them personally in public posts.

The tactics by Mr. Musk and his team have kept civil servants unbalanced, fearful of speaking out and uncertain of their futures and their livelihoods.

On Jan. 27, members of the team entered the headquarters and nearby annex of the aid agency in the Ronald Reagan Building in downtown Washington, U.S. officials said.

The team demanded and was granted access to the agency's financial and personnel systems, according to two U.S. officials with direct knowledge of the activity and the agency's inner workings. During this period, an acting administrator at the agency put about 60 senior officials on paid leave and issued stop-work orders that led to the firing of hundreds of contractors with full-time employment and health benefits.

000064

People delivering food aid in U.S.A.I.D. bags in South Sudan. By Monday, the agency was effectively paralyzed. Jim Huylebroek for The New York Times

By Saturday, the agency's website vanished. And when the two top security directors tried to stop members of the team from entering a secure area that day to get classified files, they were placed on administrative leave.

Katie Miller, a member of the Musk initiative, said on X that "no classified material was accessed without proper security clearances."

By Monday, U.S.A.I.D. was effectively paralyzed. In a live broadcast on his social media platform early Monday, Mr. Musk said the president agreed "that we should shut it down."

## A Culture of Secrecy

Mr. Musk's team has prioritized secrecy, sharing little outside the roughly 40 people who, as of Inauguration Day, had been working as part of the effort. The billionaire has reposted messages accusing people of trying to "dox," or publish private information about, his aides when their names have been made public, claiming it is a "crime" to do so.

The opacity has added to the anxiety within the civil service. A number of the employees across the government said they had been interviewed by representatives of Mr. Musk who had declined to share their surnames. Mr. Musk's aides have declined to answer questions themselves, consistently describing the sessions as "one-way interviews."

Some workers who sat for interviews were asked what projects they were working on and who should be fired from the agency, people familiar with the conversations said.

"My impression was not one of support or genuine understanding but of suspicion, and questioning," one General Services Administration employee wrote in an internal Slack message to colleagues, describing the interview process.

000065

A protest outside the Office of Personnel Management headquarters on Sunday. Mr. Musk has quickly asserted his influence at the agency. Kent Nishimura/Reuters

Some of the young workers on Mr. Musk's team share a similar uniform: blazers worn over T-shirts. At the G.S.A., some staff members began calling the team "the Bobs," a reference to management consultant characters from the dark comedy movie "Office Space" who are responsible for layoffs.

Many of Mr. Musk's lieutenants are working on multiple projects at different agencies simultaneously, using different email addresses and showing up at different offices.

One example is Luke Farritor, a 23-year-old former SpaceX intern, who was among the workers given access to U.S.A.I.D. systems, according to people familiar with his role. He is also listed as an "executive engineer" in the office of the secretary of health and human services, and had an email account at the G.S.A., records show. Mr. Farritor did not respond to requests for comment.

Mr. Musk's aides, including Mr. Farritor, have requested access to Centers for Medicare and Medicaid Services systems that control contracts and the more than $1 trillion in payments that go out annually, according to a document seen by The Times.

000066

The team reports to a longtime Musk adviser, Steve Davis, who helped lead cost-cutting efforts at X and SpaceX, and has himself amassed extraordinary power across federal agencies.

In private conversations, Mr. Musk has told friends that he considers the ultimate metric for his success to be the number of dollars saved per day, and he is sorting ideas based on that ranking.

"The more I have gotten to know President Trump, the more I like him. Frankly, I love the guy," Mr. Musk said in a live audio conversation on X early Monday morning. "This is our shot. This is the best hand of cards we're ever going to have."

Reporting was contributed by Erica L. Green, Alan Rappeport, Andrew Duehren, Eric Lipton, Charlie Savage, Edward Wong, Sarah Kliff and Karoun Demirjian.

Mr. Musk, the world's richest man, is looking to put an ideological stamp on the bureaucracy and rid the system of those who he and the president deride as "the deep state."  Haiyun Jiang for The New York Times

**Jonathan Swan** is a White House reporter covering the administration of Donald J. Trump. More about Jonathan Swan

**Theodore Schleifer** is a Times reporter covering billionaires and their impact on the world. More about Theodore Schleifer

000067

**ProPublica**

**Trump Administration**

# The Elite Lawyers Working for Elon Musk's DOGE Include Former Supreme Court Clerks

Much attention has been paid to the young Silicon Valley engineers working for Musk's Department of Government Efficiency, but the group has also hired high-powered legal talent.



Elon Musk at the 2025 inauguration   Pool/Getty Images

**by Justin Elliott, Avi Asher-Schapiro and Andy Kroll**
Feb. 7, 2025, 5:25 p.m. EST

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

As members of Elon Musk's Department of Government Efficiency have fanned out across the government in recent days, attention has focused on the young Silicon Valley engineers who are wielding immense power in the new administration.

But ProPublica has identified three lawyers with elite establishment credentials who have also joined the DOGE effort.

Two are former Supreme Court clerks — one clerked for Chief Justice John Roberts, another for Justice Neil Gorsuch — and the third has been selected to be a Gorsuch clerk for the 2025-2026 term.

Two of the lawyers' names have not been previously reported as working for DOGE.

All three — Keenan Kmiec, James Burnham and Jacob Altik — have DOGE email addresses at the Executive Office of the President, according to records reviewed by ProPublica. Altik was recently an attorney at the firm Weil, Gotshal & Manges, but his bio page is now offline. Neither the White House nor any of the three lawyers immediately responded to requests for comment about their roles.

Referring to DOGE work, the White House told ProPublica in a statement earlier this week that, "Those

leading this mission with Elon Musk are doing so in full compliance with federal law."

However, DOGE's aggressive actions across the government have already drawn lawsuits contending that the group has broken the law.

The legal challenges brought by several groups <u>could ultimately reach</u> the Supreme Court. This week, for example, more than a dozen Democratic attorneys general said they would sue to block DOGE's access to the Treasury Department's payment systems, and <u>federal employee unions sued</u> to challenge the DOGE-led dismantling of the U.S. Agency for International Development.

"What's striking is how contemptuous the administration seems to be of traditional administrative law limitations — in ways that might get them into trouble," said Noah Rosenblum, a law professor at New York University. "When this stuff goes to the courts, one important question is going to be: How well-lawyered was it?"

Trump formally created DOGE with an executive order on the first day of his administration. The order describes teams of at least four people — a leader, a lawyer, a human resources professional and an engineer — who would be detailed to government agencies. Exactly how DOGE is currently structured is not clear, nor are the specific assignments of each of the DOGE lawyers identified by ProPublica.

Trump has granted Musk, the world's richest man, vast powers to seize control of government agencies, their offices and staff. "He's a very talented guy from the standpoint of management and costs, and we put him in charge of seeing what he can do with certain groups and certain numbers," Trump said of Musk on Monday, adding that "Elon can't do and won't do anything without our approval."

The Trump administration has declined to provide information on who is working in Musk's DOGE group. <u>More than two dozen members</u> of the effort have been identified, and ProPublica is compiling them as part of an ongoing reporting project.

A bit more about the three DOGE lawyers most recently identified by ProPublica:

James Burnham, whose title at DOGE is listed internally as general counsel, is a prominent lawyer in conservative legal circles. In Trump's first term, <u>Burnham said</u> he was brought to the White House counsel's office by the office's top lawyer, Don McGahn. He said he worked on the administration's judicial selection process, including Gorsuch's appointment to the high

## What We're Watching

During Donald Trump's second presidency, ProPublica will focus on the areas most in need of scrutiny. Here are some of the issues our reporters will be watching — and how to get in touch with them securely.



<u>**Learn more about our reporting team.**</u> We will continue to share our areas of interest as the news develops.

**Robert Faturechi**

I have been reporting on Trump Media, the parent company of Truth Social. I'm also reporting on the Trump administration's trade policies, including tariffs.

**Signal    WhatsApp    Email**

**Mark Olalde**

I'm interested in Trump's and his allies' promises to dismantle the federal bureaucracy and laws that protect the environment.

**Email    Signal**

Case 8:25-cv-00462-TDC Document 57-1 Filed 02/20/25 Page 75 of 959

court. He went on to work in the Trump Justice Department and clerk for Gorsuch in 2020.

"He's a smart guy, and a very conservative lawyer," Ty Cobb, a lawyer in the first Trump White House, said of Burnham in an interview.

Burnham later launched a boutique law firm and a litigation finance fund that seeks to "ensure righteous lawsuits never falter for lack of financial resources," according to its website. Burnham was also helping DOGE with legal matters before Trump's inauguration, The New York Times reported in January.

Keenan Kmiec's career veered from elite law to, more recently, crypto. After clerking for then-Judge Samuel Alito on a federal circuit court, he clerked on the Supreme Court for Roberts in the 2006-2007 term, according to his LinkedIn. He did a stint at a corporate law firm and had his own firm focused on insider-trading litigation.

Kmiec appears to have become interested in crypto long before it went mainstream. A friend wrote an essay published online recalling meeting Kmiec at an Irish pub in Washington's Dupont Circle in the mid-2010s, where the men spoke about "the errors of central banks, the libertarian movement, and Bitcoin."

In 2021, Kmiec began working for a Swiss foundation that promotes a blockchain called Tezos, according to his LinkedIn. He then served for nine months as CEO of a now-defunct startup called InterPop, which described itself as "forging the future of digital fandom with comic, game, and collectible NFTs minted responsibly on the Tezos blockchain." A former staffer at InterPop described the company in an interview as a refinement of the Magic: The Gathering card game. But the former staffer added, "We ran out of money and the game failed."

There's little in the public domain about Kmiec's political views. In 2009, he wrote a column for Politico critiquing the widespread use of the term "judicial activism," which he called an ill-defined "empty epithet." The previous year, he gave $500 to Barack Obama's campaign, according to federal election records. Kmiec's father, Douglas Kmiec, a former Reagan administration lawyer and prominent conservative law professor, also made headlines for endorsing Obama. (Obama later named Douglas Kmiec ambassador to Malta.)

DOGE lawyer Jacob Altik is a 2021 graduate of the University of Michigan Law School. Altik was selected to clerk for Gorsuch at the Supreme Court in the term that starts this summer, according to an announcement by his law school that was confirmed by a Supreme Court spokesperson.



**Sharon Lerner**

I cover health and the environment and the agencies that govern them, including the Environmental Protection Agency.

Signal    Email    Phone

**Maryam Jameel**

I'm an engagement reporter interested in immigration, labor and the federal workforce.

Phone    Signal    Email



If you don't have a specific tip or story in mind, we could still use your help. Sign up to be a member of our **federal worker source network** to stay in touch.

We're trying something new. Was it helpful?

000070

These Are Some of the Lawyers Working for Elon Musk's DOGE — ProPublica
Case 8:25-cv-00462-TDC   Document 37-1   Filed 02/28/25   Page 76 of 959
2/17/25, 7:08 PM

Altik recently worked as a corporate litigation associate at Weil and previously clerked for D.C. Circuit Court of Appeals Judge Neomi Rao, a Trump appointee known for critiquing the administrative state. He also interned at a nonprofit called the New Civil Liberties Alliance, which has been at the forefront of legal efforts to rein in the power of federal agencies.

We've added these names — along with more than 20 others — to ProPublica's ongoing project tracking DOGE members.

*We are still reporting. Do you have information about any of the people listed below? Do you know of any other Musk associates who have entered the federal government? You can reach our tip line on Signal at 917-512-0201. Please be as specific, detailed and clear as you can.*

Kirsten Berg, Christopher Bing and Annie Waldman contributed reporting.

---

**Justin Elliott**   f   X   🦋   in

I am a ProPublica reporter covering business and politics.

MORE STORIES    HAVE A TIP FOR A STORY?



---

**Avi Asher-Schapiro**

Avi Asher-Schapiro is a Reporter at ProPublica.

MORE STORIES



---

**Andy Kroll**   f   X   🦋   ⓖ   in

I cover justice and the rule of law, including the Justice Department, U.S. attorneys and the courts.

MORE STORIES    HAVE A TIP FOR A STORY?

Send me tips and documents about changes in administration policy, political interference, conflicts of interest and abuses of power inside the DOJ, OMB, the White House and other law enforcement agencies.

000071

Case 3:25-cv-00442-TLT    Document 23-1    Filed 02/28/25    Page 77 of 959

☰    **ProPublica**    Donate



# Elon Musk's Demolition Crew

by Avi Asher-Schapiro, Christopher Bing, Annie Waldman, Brett Murphy, Andy Kroll, Justin Elliott, Kirsten Berg, Sebastian Rotella, Alex Mierjeski, Pratheek Rebala and Al Shaw

Feb. 6, 2025 • Updated: Feb. 11, 2025

On President Donald Trump's authority alone, Elon Musk, the world's richest man, has been unleashed on federal agencies. Employees from Musk's companies and those of his allies, as well as young staffers he's recruited, are wresting authority from career workers and commandeering computer systems.

While some have been public about their involvement, others have attempted to keep their roles secret, scrubbing LinkedIn pages and other sources of data. With little information from the White House, ProPublica is attempting to document who is involved and what they are doing.

Musk's team, known as the Department of Government Efficiency, has already thrown entire swaths of the federal government and its programs into disarray — programs that serve millions of Americans.

000072

Case 3:25-cv-04622-DMC Document 25-1 Filed 02/28/25 Page 78 of 959

Musk himself has made no secret of his intentions, saying that DOGE is a "wood chipper for bureaucracy" and that he is "deleting" agencies.

A White House spokesperson wrote, "Those leading this mission with Elon Musk are doing so in full compliance with federal law, appropriate security clearances, and as employees of the relevant agencies, not as outside advisors or entities." None of the people identified responded to requests for comment.

---

*We are still reporting. Do you have information about any of the people listed below? Do you know of any other Musk associates who have entered the federal government? You can reach our tip line on Signal at 917-512-0201. Please be as specific, detailed and clear as you can.*

---

**Sort by** [ Most recently added ] [ Alphabetical ]

---



### Jennifer Balajadia, 36

**Connected to:** Executive Office of the President

**Musk link:** Worked at The Boring Company

Balajadia, who also goes by "Jehn," is an official member of the DOGE team, according to federal records viewed by ProPublica. She worked as an operations coordinator at The Boring Company for seven years, according to her LinkedIn page. Recent media reports have described her as Musk's assistant and close confidant, traveling with him and assisting with scheduling and daily tasks.

*Added Feb. 11, 2025*

---



### Alexandra T. Beynon, 36

**Connected to:** Executive Office of the President

Beynon is an official member of the DOGE team, according to federal records viewed by ProPublica and media reports. According to her LinkedIn page, she most recently worked as the head of engineering at her husband's startup, Mindbloom, which provides "guided at-home ketamine therapy." She previously worked as a software developer at investment banking company Goldman Sachs. When reached by ProPublica and asked about her involvement in the new administration and DOGE, she said, "I have no idea what you are talking about." She did not respond to additional requests for comment.

*Added Feb. 11, 2025*

000073

Case 8:25-cv-00442-TDC Document 37-1 Filed 02/20/25 Page 79 of 959



### Nicole Hollander, 42



**Connected to:** General Services Administration

**Musk link:** Worked at X

Hollander is [working](#) at the GSA. She most recently [worked](#) at X, where she [handled](#) the company's [real estate](#). She is [married](#) to longtime Musk lieutenant Steve Davis, according to media reports.

*Added Feb. 11, 2025*



### Kendall M. Lindemann, 24

**Connected to:** Executive Office of the President

Lindemann is an official member of the DOGE team, according to federal records viewed by ProPublica. According to her LinkedIn page, she most recently worked as an [associate](#) at Russell Street Ventures, a health care firm [founded](#) by fellow DOGE associate Brad Smith. She also previously worked as a business analyst at McKinsey & Company.

*Added Feb. 11, 2025*



### Adam Ramada, 35

**Connected to:** Executive Office of the President

**Musk link:** Previously part of an investment firm with links to a SpaceX alumnus

Ramada is an official member of the DOGE team, according to federal records viewed by ProPublica. He previously [worked](#) for Spring Tide Capital, a venture capital company. Spring Tide Capital previously [invested](#) in Impulse Space, an aerospace company [founded](#) in 2021 by Tom Mueller, a founding [member](#) of SpaceX. Ramada has reportedly appeared at the Energy Department and General Services Administration, according to [E&E News](#).

*Added Feb. 11, 2025*



### Ryan Riedel, 37

Chief Information Officer

**Connected to:** Department of Energy

**Musk link:** Worked as SpaceX network security engineer

Riedel emerged in early February as the new chief information officer at the Department of Energy. His position was confirmed in a [LinkedIn post](#) by the former CIO, Ann Dunkin, who wrote, "Handing the keys over to you, virtually." Riedel, who now lists [himself online](#) as the department's CIO, has worked at SpaceX since 2020. He previously served in the U.S.

000074

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/20/25   Page 80 of 959

Army Cyber Command.

*Added Feb. 11, 2025*

---

 ## Kyle Schutt, 37 

**Connected to:** General Services Administration

Schutt is a DOGE software engineer working at the GSA. He was previously the chief technology officer at Revv, an online fundraising platform that's a frequent vendor for the Republican Party. According to his recently deleted LinkedIn profile, Schutt led the development and launch of WinRed, the GOP's major online fundraising platform, which helped raise $1.8 billion for Republicans in the 2024 election cycle.

*Added Feb. 11, 2025*

---

 ## Ethan Shaotran, 22 

**Connected to:** General Services Administration

**Musk link:** Participated in a hackathon organized by Musk's artificial intelligence company xAI

Shaotran is part of the DOGE team. He recently attended Harvard University and studied computer science. He founded Spark, a scheduling assistant startup, for which he said he received a $100,000 grant from OpenAI. He was a member of a team that was a finalist in a hackathon organized by xAI, Musk's artificial intelligence company. Shaotran's name first came to light in an article by Wired magazine about a group of young software engineers recruited by Musk to analyze internal government data and technology programs.

*Added Feb. 11, 2025*

---

 ## Jordan M. Wick, 28 

**Connected to:** Executive Office of the President

Wick is an official member of the DOGE team, according to federal records viewed by ProPublica. According to his personal website, which has recently been taken offline, he graduated from the Massachusetts Institute of Technology and recently worked at autonomous car company Waymo as a software engineer. Before joining the government, Wick was listed as the co-founder of an e-commerce startup named Intercept, which is affiliated with the California-based tech incubator Y Combinator. The incubator has featured speaker events with Musk and other AI leaders.

*Added Feb. 11, 2025*

000075

 ## Jacob Altik, 32

Lawyer

**Connected to:** Executive Office of the President



Altik is a 2021 graduate of the University of Michigan Law School. He clerked for D.C. Circuit Court of Appeals Judge Neomi Rao, a Trump appointee known for critiquing the administrative state. For the last year and a half, he worked as a corporate litigation associate at Weil, where he co-authored a detailed legal analysis on administrative law jurisprudence at the Supreme Court. Last year, he was selected to begin a clerkship for Supreme Court Justice Neil Gorsuch in the 2025 term, which is set to begin this summer.

*Added Feb. 7, 2025*

 ## James Burnham, 41

General Counsel

**Connected to:** Executive Office of the President

Burnham is a former litigation partner at Jones Day and a high-ranking Justice Department and White House official from the first Trump administration. The New York Times first reported his involvement with DOGE as a lawyer in January. His title at DOGE is listed internally as general counsel, according to records reviewed by ProPublica. Burnham previously served as a clerk to Supreme Court Justice Neil Gorsuch. On a website for one of his past companies, Burnham is described as having played a "central role" in the selection and confirmation processes for Gorsuch, Justice Brett Kavanaugh and then-Judge Amy Coney Barrett.

*Added Feb. 7, 2025*

 ## Keenan D. Kmiec, 45

Lawyer

**Connected to:** Executive Office of the President

Keenan Kmiec's career veered from elite law to, more recently, crypto. After clerking for then-Judge Samuel Alito on a federal circuit court, he clerked on the Supreme Court for Chief Justice John Roberts in the 2006-2007 term, according to his LinkedIn. He did a stint at a corporate law firm and had his own firm focused on insider-trading litigation. In 2021, Kmiec began working for a Swiss foundation that promotes a blockchain called Tezos, according to his LinkedIn. He then served for nine months as CEO of a now-defunct startup called InterPop, which described itself as "forging the future of digital fandom with comic, game, and collectible NFTs minted responsibly on the Tezos blockchain."

*Added Feb. 7, 2025*

000076

Case 3:25-cv-00442-LLC   Document 37-1   Filed 02/20/25   Page 82 of 959



## Anthony Armstrong, 57

Senior Adviser to the Director

**Connected to:** Office of Personnel Management

**Musk link:** Worked on Musk's purchase of Twitter



Armstrong is a technology banker at Morgan Stanley who worked on Musk's $44 billion acquisition of Twitter — since rebranded as X — in 2022. He has been given an influential role at OPM, which handles personnel issues across the federal government. Since Trump took office, OPM has spearheaded the new administration's efforts to dramatically reduce the federal workforce and roll back telework and remote work policies.

*Added Feb. 6, 2025*



## Riccardo Biasini, 39

Senior Adviser to the Director

**Connected to:** Office of Personnel Management

**Musk link:** Former engineer at Tesla, executive at the Boring Company

Biasini is an engineer and former executive who has worked at two of Musk's companies, the Boring Company and Tesla. He has also taken a high-ranking role at OPM. Biasini was listed as the contact person for the government-wide email system put in place by the Trump administration and used to send messages directly from OPM to millions of federal workers across the government, according to a [recent court filing](#).

*Added Feb. 6, 2025*



## Brian Bjelde, 44

Senior Adviser

**Connected to:** Office of Personnel Management

**Musk link:** Vice president of people operations at SpaceX

Bjelde is a longtime SpaceX employee who's spent more than 20 years at the company, according to his LinkedIn profile, where he's had a variety of jobs, including as managing director of the "food services group." He previously worked for NASA's Jet Propulsion Laboratory. He's been referred to in press reports as a "top DOGE Lieutenant," working at OPM to slash head count. CNN [previously](#) revealed that Bjelde had informed OPM staff of a plan to cut 70% of the agency's workforce. The New York Times [reported](#) that Bjelde helped Musk cut staff at Twitter following its takeover.

*Added Feb. 6, 2025*

000077

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/20/25   Page 83 of 959



## Akash Bobba, 21

Senior Adviser to the Director

**Connected to:** Office of Personnel Management



Bobba was named by Wired magazine as part of a team of six young engineers picked by Musk for his DOGE team. A recent graduate of the University of California, Berkeley, Bobba worked as an intern at Meta, the social media company, and at Palantir, the software and data analytics firm that is a major defense contractor. Bobba is listed in personnel records as an "expert" at OPM, where he has reportedly been able to access internal databases. He graduated from high school in 2021; in his graduation speech, featured in the Spotlight New Jersey newspaper, he told his fellow graduates that, in life, the "answers we deserve demand discomfort."

*Added Feb. 6, 2025*



## Nate Cavanaugh, 28

**Connected to:** General Services Administration



Cavanaugh is an entrepreneur who has founded companies focused on intellectual property management and small-business finance. He has been interviewing staffers at the GSA as part of the DOGE team, according to those who have spoken with him. GSA procures technology tools, real estate, and other services for federal government agencies. In published interviews, Cavanaugh has expressed an admiration for tech luminaries, including Peter Thiel, Elon Musk, and Mark Zuckerberg, and has said he is "very interested in crypto."

*Added Feb. 6, 2025*



## Edward Coristine, 19

Expert

**Connected to:** Office of Personnel Management

**Musk link:** Interned at Neuralink



Coristine is a recent undergraduate student at Northeastern University and part of the group of young DOGE staffers detailed to OPM, the government's human resources office. Wired reported that Coristine interned at Neuralink, Musk's brain-computer interface company. Friends of Coristine told Northeastern University's independent student newspaper that Musk was one of Coristine's idols and that while he finished the fall 2024 semester, he did not return to school for the spring term. According to CBS News, Coristine has been seeking access to the Small Business Administration's internal records on behalf of DOGE.

*Added Feb. 6, 2025*

000078

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/21/25   Page 84 of 959



## Steve Davis, 45



**Connected to:** Executive Office of the President

**Musk link:** Longtime Musk lieutenant, CEO of the Boring Company

Davis has been a senior executive and close associate of Musk's for over two decades, working with him at SpaceX, X and the Boring Company. He was one of the first people to be associated with the DOGE effort last year. The New York Times reported he was on early calls with Musk as they conceived of the DOGE effort and explored ways to cut federal programs. Bloomberg reported that Davis has helped recruit staffers for DOGE.

*Added Feb. 6, 2025*

---



## Marko Elez, 25

**Connected to:** Treasury Department

**Musk link:** Worked as an engineer at X and SpaceX



Elez works at the Treasury Department, a staffer at the office of the Secretary of Treasury confirmed in a call with a ProPublica reporter. Wired reported Feb. 4 that Elez, who graduated from Rutgers in 2021 and studied computer science, has gained access to the highly sensitive payment systems of the U.S. Treasury Department. According to Elez's LinkedIn bio, which was recently deleted, he was most recently an engineer at X in New York for roughly a year and an engineer at SpaceX in the Los Angeles area for around three years before that. Elez reportedly resigned Feb. 6 after The Wall Street Journal reported that he has links to a social media account that posted racist comments online. Musk said publicly he planned to rehire the engineer, saying that "to err is human, to forgive divine."

*Added Feb. 6, 2025*

---



## Luke Farritor, 23

Executive Engineer in the Office of the Secretary

**Connected to:** Department of Health and Human Services

**Musk link:** Former SpaceX intern

Farritor works as an executive engineer at the HHS, according to agency data. He studied computer science at the University of Nebraska-Lincoln and interned at SpaceX, working on its Starlink Wi-Fi team and Starship launchpad software, according to his Linkedin profile. In March 2024, he received a Thiel fellowship, a two-year program founded by billionaire tech entrepreneur Peter Thiel that awards a $100,000 startup grant to students who drop out of college.

*Added Feb. 6, 2025*

000079



### Stephanie Holmes, 43

Human Resources

**Connected to:** Executive Office of the President



Holmes is running human resources at DOGE, according to government workers who have been in meetings with her. A former lawyer with Jones Day, a firm that frequently represents Trump, she was previously the chief people officer at Oklo, a nuclear energy company chaired by OpenAI CEO Sam Altman. She also ran her own HR consulting firm, BrighterSideHR, which advised companies to pursue "non-woke" approaches to diversity and inclusion in the workplace.

*Added Feb. 6, 2025*



### Gautier "Cole" Killian, 24

Federal Detailee

**Connected to:** Environmental Protection Agency



Killian works at the EPA, according to agency data. His position is a federal detail, which typically allows government employees to transfer between agencies for temporary roles. He studied math and computer science at McGill University, where he conducted blockchain-related research. He recently worked as an engineer at Jump Trading, an algorithmic financial trading company, and is a member of the DOGE team, according to recent media reports.

*Added Feb. 6, 2025*



### Gavin Kliger, 25

Senior Adviser to the Director

**Connected to:** U.S. Agency for International Development, Office of Personnel Management



Kliger is a senior adviser at OPM, according to his LinkedIn profile. He spent nearly five years as a software engineer at Databricks, a cloud-based AI company. He is widely reported to be part of Musk's DOGE team. On his personal Substack, he wrote an essay titled "Why I gave up a seven-figure salary to save America," according to press reports, and described failed U.S. attorney general nominee Matt Gaetz, who withdrew from Congress amid allegations of sexual misconduct, as a "victim" of the deep state. On Feb. 3, workers at USAID received an email announcing that their Washington offices would be closed that day. Replies to the email were directed to Kliger at a USAID email address.

*Added Feb. 6, 2025*

000080



## Tom Krause, 47

Expert

**Connected to:** Treasury Department



Krause is a part of DOGE's efforts to gain access to sensitive federal payment systems as part of Musk's larger effort to root out spending perceived as wasteful. According to the Treasury Department, Krause leads a team of people who have been granted "read-only" access to the code for the agency's Fiscal Service payment system, which processes payments for major programs such as Social Security and Medicare. The department has clarified he is designated as a "special government employee." The New York Times reported that Krause is affiliated with Musk's DOGE team.

*Added Feb. 6, 2025*



## Katie Miller, 33

Spokesperson

**Connected to:** Executive Office of the President

In December, during the transition, Trump named Miller, who served in the first administration as a press secretary to Vice President Mike Pence, as one of the first members of DOGE. She is the wife of White House deputy chief of staff Stephen Miller. After reports that DOGE personnel accessed internal USAID data, Katie Miller defended the group, saying that "no classified material was accessed without proper security clearances."

*Added Feb. 6, 2025*



## Justin Monroe, 36

Adviser

**Connected to:** FBI

**Musk link:** Senior director for security at SpaceX

Monroe is working as an adviser within the office of the director of the FBI, according to three people familiar with the matter. NBC News previously reported that an unnamed SpaceX employee has been placed in the FBI director's office but said it could not confirm the individual's identity. Monroe is a seasoned information security professional who previously served in the U.S. Navy as an information warfare officer.

*Added Feb. 6, 2025*

000081



## Nikhil Rajpal, 30

Expert

**Connected to:** Office of Personnel Management

**Musk link:** Former Twitter employee



Rajpal is listed as an "expert" now working for OPM. An archived version of his personal website from 2018 lists his job title as an engineer at Twitter. Rajpal has extensive access to sensitive personnel data used by OPM, according to a source familiar with his role. Wired reported Feb. 5 that Rajpal also sought and was later granted access to data at the National Oceanic and Atmospheric Administration. Wired magazine reported that he is part of the DOGE team.

*Added Feb. 6, 2025*



## Rachel Riley, 33

Senior Adviser in the Office of the Secretary

**Connected to:** Department of Health and Human Services

Riley works as a senior adviser at HHS, according to agency data. She previously worked for consultancy firm McKinsey & Company for about eight years, most recently as a partner leading teams advising the company's state and federal government clients. She has been working closely with Brad Smith, a former health official in Trump's first administration who ran DOGE during the transition period, according to media reports.

*Added Feb. 6, 2025*



## Michael Russo, 67

Chief Information Officer

**Connected to:** Social Security Administration

**Musk link:** Former chief technology officer of Starlink payment processor Shift4 Payments

Russo is a top-ranking technology official at the SSA, which disburses over $1.5 trillion in benefits annually. Russo spent over seven years as an executive and senior adviser with Shift4 Payments, a payment processing company that is both an investor in SpaceX and a payment processor for StarLink, according to his Linkedin. The CEO of Shift4 Payments, Jared Isaacman, has been nominated by Trump to lead NASA and is a friend of Musk's who has purchased multiple spacewalks with Musk's SpaceX company. Russo's office will oversee the SSA's over $2 billion IT budget.

*Added Feb. 6, 2025*

000082



## Amanda Scales, 34

Chief of Staff

**Connected to:** Office of Personnel Management

**Musk link:** Previous employee of xAI



Scales' name came to light in the first week of the Trump administration as federal employees received a memo putting them on notice that diversity, equity, inclusion and accessibility initiatives in the federal government were now barred through an executive order — and to report efforts to conceal them. The message listed Scales as the point of contact for questions. Scales worked in the human resources department at xAI, Musk's artificial intelligence company, prior to OPM. Before that, she worked in recruiting at ridesharing company Uber. She is reportedly an integral part of OPM's sweeping efforts to restructure the federal workforce.

*Added Feb. 6, 2025*



## Thomas Shedd, 28

Federal Acquisition Service Deputy Commissioner and Director of Technology Transformation Services

**Connected to:** General Services Administration

**Musk link:** Software engineer at Tesla



Shedd's work at Tesla focused on building software that operates vehicle and battery factories, according to a GSA [press release](). The office Shedd runs, known as TTS, helps federal agencies improve their tech practices. GSA leaders have told employees they plan to cut 50% of the budget. Shedd has told colleagues he plans to run TTS like a "startup software company," according to [Wired magazine](), which will [reportedly]() involve the use of artificial intelligence to analyze government contracts.

*Added Feb. 6, 2025*



## Brad Smith, 42

**Connected to:** Executive Office of the President



Smith was among the earliest names associated with DOGE outside of its founder. The New York Times reported he was helping lead the group. He served in a series of health-related policy roles during the first Trump administration, including being part of the board of Operation Warp Speed, the historic COVID-19 vaccine development program. According to The New York Times, which first reported Smith's involvement in DOGE, he is a friend of Jared Kushner, Trump's son-in-law.

*Added Feb. 6, 2025*



# Christopher Stanley, 33



**Connected to:** Executive Office of the President

**Musk link:** Senior director for security engineering at X and principal engineer at SpaceX

Stanley is an experienced information security professional who has worked at multiple Musk-related companies. He is reportedly an aide to Musk at DOGE, according to The New York Times, and has a role at the White House. He was part of the initial transition team after Musk purchased Twitter in 2022, according to his LinkedIn profile. On inauguration day, Stanley assisted in the release of individuals associated with the Jan. 6 riots, he wrote on X.

*Added Feb. 6, 2025*

---

*We are still reporting. Do you have information about any of the people listed above? Do you know of any other Musk associates who have entered the federal government? You can reach our tip line on Signal at 917-512-0201. Please be as specific, detailed and clear as you can.*

---

*Lead image: Photo illustration by Alex Bandoni/ProPublica. Source images: Kent Nishimura/Bloomberg, Boris Zhitkov, Rudy Sulgan, Sergio Flores, and Smith Collection/Gado/Getty Images.*

*Headshots: Altik via his previous bio page at Weil, Gotshal and Manges; Balajadia via Patrick T. Fallon/Bloomberg/Getty Images; Beynon via Linkedin profile; Biasini via Silicon Valley Study Tour; Bjelde via LinkedIn profile; Burnham via King Street Legal, a previous firm; Cavanaugh via the University of Nebraska; Hollander via ULI Learning; Killian via McGill Artificial Intelligence Society; Kliger via his personal website; Kmiec via Justia Lawyers bio page; Krause via LinkedIn profile; Lindemann via Linkedin profile; Miller via Paul Morigi/Stringer/Getty Images; Monroe via LinkedIn profile; Riley via LinkedIn profile; Russo via LinkedIn profile; Scales via Human Capitol, a previous employer; Shedd via Instagram profile; Shaotran via Harvard University; Shutt via Github profile; Stanley via LinkedIn profile.*

000084

Case 3:25-cv-00446-TLC  Document 37-1  Filed 02/20/25  Page 90 of 959

# 19-year-old Musk surrogate takes on roles at State Department and DHS

The move illustrates that Elon Musk's U.S. DOGE Service aides are being asked to fulfill multiple posts at once.

Updated February 10, 2025

🎧 6 min     ↗     🔖          💬 1545

By Faiz Siddiqui, John Hudson and Isaac Stanley-Becker

A 19-year-old acolyte of Elon Musk known online as "Big Balls" has taken on new roles as a senior adviser at the State Department and at the Department of Homeland Security, raising concerns among some diplomats and others about his potential access to sensitive information and the growing reach of his tech billionaire boss into America's diplomatic apparatus, said U.S. officials familiar with the matter who spoke on the condition of anonymity to discuss a sensitive issue.

Edward Coristine, who briefly worked for Musk's brain chip start-up Neuralink, was recently posted to the State Department's Bureau of Diplomatic Technology, a critical hub for data both sensitive and nonsensitive, officials said. Coristine, who also holds positions at the U.S. DOGE Service and the Office of Personnel Management, has attracted significant attention across Washington for his edgy online persona and the relative lack of experience he brings to his new federal roles.

000085

But his new position — and similar roles at DHS and other agencies — could give him visibility into far more than just tech.

Some U.S. officials expressed alarm about Coristine's new perch at the bureau, which serves as the IT department for Washington's diplomatic apparatus. All of the department's IT and data management functions were centralized at the bureau during an overhaul before President Donald Trump returned to office, making it a treasure trove of information.

"This is dangerous," said one of the U.S. officials, noting Coristine's age and a report by Bloomberg News that he was fired for leaking a data security firm's information to a competitor.

A State Department official said Coristine's position probably would not be confined to the Bureau of Diplomatic Technology.

The unusual appointment reflects how Musk's DOGE has deployed some of its personnel to multiple agencies at once, giving young and relatively inexperienced — and largely unvetted — individuals unprecedented visibility into the workings of government. Musk prioritized the hiring of software engineers for the initiative, which aims to cut $1 trillion in federal spending as it works out of the office of the former U.S. Digital Service, which has been renamed the U.S. DOGE Service (the initials stand for Department of Government Efficiency).

Nowhere have the group's tactics played out more visibly than at the Treasury Department, where 25-year-old DOGE staffer Marko Elez was posted before leaving the administration last week after the Wall Street Journal surfaced racist online posts. Musk, with the support of Trump and Vice President JD Vance, vowed to bring Elez back. When they arrived at the agency as DOGE representatives, Elez and Silicon Valley executive Tom Krause were at the center of a dispute over whether DOGE should have access to a sensitive Treasury payments system; Krause now formally oversees that system as an assistant treasury secretary.

Elsewhere, DOGE staff members have been assigned to the Office of Personnel Management and the General Services Administration, both of which are carrying out work related to key focuses of Musk's: reducing the federal workforce, shrinking the government's real estate footprint and modernizing its outdated technology.

In federal directories, DOGE staffers are sometimes listed at multiple different agencies, making the full nature of their roles within the government unclear.

A directory also lists Coristine as having a position at the U.S. Agency for International Development, the world's largest provider of food assistance, which Musk has underlined boasted of destroying and which the Trump administration plans to drastically downsize from 10,000 employees to roughly 600. Coristine's job at USAID is listed in the Bureau for Management in the chief information officer's office.

Many diplomats looked with trepidation at the hollowing out of USAID, hoping the State Department would be spared a similar fate, given its status as the federal government's first executive department, established in 1789. But the emergence of DOGE personnel in the halls of Foggy Bottom has heightened fears.

Coristine is also a senior adviser at both the Department of Homeland Security and FEMA, which is part of DHS, according to screenshots of an online DHS directory obtained by The Washington Post. He has email addresses associated with both entities, the screenshots show.

A DHS official said DOGE's apparent inroads into the agency "may have significant national security implications," given DHS's mandate over border security, disaster response and counterterrorism, among other areas.

"They're basically touching and breaking things without knowing what they are," the official added, speaking on the condition of anonymity to discuss a sensitive topic.

While Coristine's role at the State Department remains unclear, officials noted that his position at the technology bureau could give him a foothold for obtaining unauthorized access to classified material and to compromising information on other countries and foreign activities.

In addition to Coristine, a 23-year-old colleague of his, former SpaceX intern Luke Farritor, is also listed in the State Department's directory as working at the Bureau of Diplomatic Technology.

Coristine and Farritor are among a group of six engineers 25 or younger whom The Post has identified as working on behalf of DOGE.

Katie Miller, a spokeswoman for DOGE, did not immediately respond to a request for comment, nor did the State Department or Coristine or Farritor.

Another person who knows one of the DOGE engineers personally, speaking on the condition of anonymity to protect that relationship, said that while the engineers' technical ability is not in question, the amount of power the DOGE team has amassed in a short span is a concern.

Case 3:25-cv-00462-TLC   Document 37-1   Filed 02/20/25   Page 93 of 959

"It's not like they have a history of informed political opinion," the person said. "They're just in it for solving hard problems: It's like, 'Oh, a big challenge, it's a big puzzle.' I'm sure he just grew up solving puzzles and doing hard problems, and this is just another one and also has the perk of being around the president and billionaires.

"That is such a narrow view of the world," the person said of the engineer's tech background. "It's not at all appropriate, I don't think, for something with such a broad impact."

000088









EXCLUSIVE

U.S. NEWS

# Inside DOGE's takeover of the Education Department

Staffers at the Department of Education worry the Department of Government Efficiency is accessing sensitive information and spreading confusion.



House Democrats denied entry to the Department of Education

01:38

Get more news LIVE on NBC NEWS NOW ›

Feb. 8, 2025, 6:00 AM EST

**By Tyler Kingkade and Natasha Korecki**

Members of Elon Musk's Department of Government Efficiency team have obtained "administrator" email accounts at the Department of Education, just as President Donald Trump announced that the billionaire will soon be examining the agency closely.

The rapid deployment of Musk's aides across multiple agencies has raised concern from federal officials, lawmakers and watchdog groups that his team has gained access to sensitive information and is leading a purge of government workers.

When NBC News asked Trump at a White House press conference Friday about allegations that Musk and DOGE's widespread staff cuts might be unlawful, Trump defended the approach, noting that the Education Department was high on Musk's list of targets. "He will be looking at education pretty quickly," Trump said.



Trump Says Musk Will Look At Cutting Pentagon And Education Spending

03:40



NBC News verified that Akash Bobba and Ethan Shaotran, both 22 years old and identified as members of DOGE, have administrator-level status in the department's email system, allowing them to potentially access sensitive information. Two sources currently employed at the department also said that Shaotran had accessed the back end of the ed.gov website on Friday.

Three employees of the department emphasized it is highly unusual for anyone from another government agency to get ed.gov emails. The Department of Education did not respond to requests for comment on Friday.

Tension is high at the Education Department, where leadership announced earlier this week that staff who take the deferred resignation package offered to much of the federal workforce would waive their right to sue if the government fails to uphold the offer. The employee union urged them not to take the deal, worried that it's "eerily similar to the situation at Twitter" during Musk's takeover, in which employees did not get the severance they expected.

One longtime employee at the Department of Education who spoke on the condition of anonymity to describe internal sentiments said there is an urgent and deep worry sweeping across the agency's career staff as DOGE sets its sights on them.

000094



— President Trump has announced plans to shrink – or potentially dismantle – the U.S. Department of Education. *Alex Wong / Getty Images*

The person said they were especially concerned that Musk and his team would use information from the national student loan database to target Americans, push career employees out and hamper the federal government's ability to collect on federal loans.

The New York Times reported that as many as 16 DOGE team members are now listed in the Education Department directory, and according to The Washington Post, they have fed sensitive personal and financial data from the department into artificial intelligence software.

On Friday morning, a group of House Democrats attempted to enter the Education Department headquarters to meet with acting Education Secretary Denise Carter after 95 signed a letter expressing concern about the administration's plans to possibly try to close the department. The representatives were stopped by security and denied entry, sparking a chaotic scene as lawmakers clamored to get in.

"They are blocking members of Congress from entering the Department of Education! Elon is allowed in and not the people? ILLEGAL," Rep. Maxwell Frost, D-Fla., posted on X, formerly known as Twitter.

Also on Friday, the watchdog group Public Citizen sued the department on behalf of the University of California Student Association, a group of student government representatives, seeking an injunction to block DOGE staff from accessing "sensitive personal and financial information." The suit cites reporting that DOGE-affiliated individuals accessed the department's internal systems containing federal student aid information.

"The scale of the intrusion into individuals' privacy is enormous and unprecedented," the suit states.

"The personal data of over 42 million people lives in these systems."

Adding to the bedlam this week, a new memo that went out across the department called for a sweeping review of all grants that "promote or take part in diversity, equity, and inclusion" initiatives. The goal, it states, is rooting out "discriminatory practices – including in the form of DEI – that are either contrary to law or to the Department's policy objectives," according to the memo obtained by NBC News.

It isn't unusual for a new administration to set priorities with how the billions of dollars in grants are doled out. What is unusual, and could bring a torrent of legal challenges, is the potential to reopen grants that were already awarded, said a former senior education official. Aside from legal repercussions, the official said that suddenly canceling grants could cause great disruption to communities that are relying on the money for resources like more teachers and tutors. Long-standing federal grants have also funded magnet schools, if the schools demonstrate that they have a desegregation plan in place.

Now, officials at the department say they are still unclear on how the administration is interpreting DEI – whether it includes services for students with disabilities, for instance, or those learning English as a second language.

"I don't know how you eliminate DEI without attacking the special needs programs," a current administration official said.

Madison Biedermann, an Education Department spokeswoman, said the review is to ensure grant programs are in compliance with civil rights laws, "i.e., that they are not supporting discriminatory practices on the basis of race, national origin, or other protected characteristics."

"The Department manages important grant programs that Congress has established to support schools that serve specific populations, and will be careful in the review to ensure that these grants are both in line with Administration priorities while serving the specific populations," Biedermann said.

The rapid clip of changes has outpaced the confirmation process for department leadership.

Linda McMahon, Trump's nominee for education secretary, is scheduled to appear in a confirmation hearing before the Senate Health, Education, Labor and Pensions committee on Feb. 13. McMahon, the former CEO of World Wrestling Entertainment, is currently chairperson of the America First Policy Institute, a 4-year-old Trump-aligned think tank. Four of the top officials already appointed at the Education Department worked for the think tank.

000096

Trump's nominee for education secretary, Linda McMahon, will face a confirmation hearing next week. Valerie Plesch / Bloomberg via Getty I

One current Department of Education official, a military veteran, described a scene of confusion and demoralization as Trump and Musk portray federal workers as lazy. Others are digging in their heels because they feel as if they're being bullied.

"There are people who are panicking. There are people who are eligible for retirement and still say, 'I'm not going anywhere. I'm not going to voluntarily give in to the pressure and the intimidation.' That's all this really is."

Since Trump's inauguration, the department has already demonstrated a notable shift in priorities.

Earlier this week, it announced plans to launch Title IX investigations into two universities and one athletic association for violating the administration's executive order banning transgender women's participation in sports, and opened an inquiry into Denver Public Schools for changing a single girl's bathroom into a gender-neutral one. The department said that it would revert to enforcing the Title IX regulation imposed during the first Trump administration, rather than the Biden-era rules. And it canceled 11 investigations into school districts over book bans – opened due to complaints that the schools targeted titles by LGBTQ authors and people of color – and called the complaints a "hoax."

Department staff also received a directive this week to ensure their email signature blocks do not include "extraneous information, including gender identifying pronouns, motivational quotes, and GIFs." The email was marked "high importance."

000097

Tyler Kingkade

Tyler Kingkade is a national reporter for NBC News, based in Los Angeles.

Natasha Korecki

Natasha Korecki is a senior national political reporter for NBC News.

Yamiche Alcindor and Garrett Haake contributed.

000098



# POLITICO

**EDUCATION**

## DOGE announces $881 million in cuts for Education Department contracts

About 170 contracts for the Institute of Education Sciences were targeted.



DOGE announces $881 million in cuts for Education Department contracts - POLITICO

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/20/25   Page 105 of 959
2/17/25, 4:18 PM

The Education Department also terminated 29 training grants for diversity, equity and inclusion that total $101 million, according to an announcement from the Department of Government Efficiency. | Kayla Bartkowski/Getty Images

By **REBECCA CARBALLO** and **JUAN PEREZ JR.**
02/10/2025 09:04 PM EST
Updated: 02/10/2025 09:56 PM EST

Education Department funds for diversity programs and research initiatives will dry up, according to a series of announcements Monday night about the agency's future.

The department terminated 89 contracts, worth $881 million, according to an X post from the Department of Government Efficiency, but DOGE did not say which contracts were ended. In a separate post, DOGE said the department also terminated 29 training grants for diversity, equity and inclusion that total $101 million. One of the grants sought to train teachers to "help students understand / interrogate the complex histories involved in oppression, and help students recognize areas of privilege and power on an individual and collective basis," according to the post.



Top Stories from POLITICO

Read More

00:00                                                                      02:00

The Trump administration is halting about 170 contracts for the Education Department's Institute of Education Sciences, according to two people familiar

000100

with the decisions.

000101

The cuts comes as the president is expected to issue an executive order this month to wind down the department, and Education Secretary nominee Linda McMahon gets ready to testify before Congress on Thursday.

The American Institutes for Research, a nonprofit organization that conducts behavioral and social science research, confirmed it received multiple notices of terminations on Monday for several IES contracts. IES is a nonpartisan research arm of the department that studies special education and student learning outcomes, among other topics.

"The money that has been invested in research, data, and evaluations that are nearing completion is now getting the taxpayers no return on their investment," Dana Tofig, an AIR spokesperson, said in a statement Monday. "If the point of this exercise is to make sure taxpayer dollars are not wasted and are used well, the evaluation and data work that has been terminated is exactly the work that determines which programs are effective uses of federal dollars, and which are not."

The department and DOGE did not immediately respond to requests for comment.

**FILED UNDER:** RESEARCH, DEPARTMENT OF EDUCATION, DOGE

FORBES  >  BUSINESS

**BREAKING**

# Trump Lawyer Downplays Elon Musk's Authority In Court Hearing —Here's What To Know About DOGE

**Molly Bohannon** Forbes Staff

*Molly Bohannon has been a Forbes news reporter since 2023.*

**Derek Saul** Forbes Staff

*Derek Saul has covered markets for the Forbes news team since 2021.*

   21                    Feb 17, 2025, 12:34pm EST

**TOPLINE**  A Trump administration lawyer claimed Monday billionaire Elon Musk isn't exercising any "authority" over the federal government, after 14 states sued Musk's Department of Government Efficiency, or DOGE, arguing the alleged "unlawful delegation of executive power" to Musk has "caused widespread disruption"—as criticism of Musk's increasingly powerful agency builds.

Case 8:25-cv-00462-TDC   Document 71   Filed 02/20/25   Page 109 of 959



Tesla and SpaceX CEO Elon Musk, joined by his son X, delivers remarks alongside U.S. President ... [+] GETTY IMAGES

**TIMELINE**

- **Feb. 17**

    U.S. District Judge Tanya Chutkan held a court hearing over Democratic state attorneys general's request for the court to immediately stop DOGE from accessing data and firing federal workers—because they argue Musk is an "agent of chaos" unlawfully influencing the federal government— with a lawyer for the Trump administration arguing the states don't have a case because he claimed Musk doesn't have "any formal or actual authority to make any government decisions himself."

- Chutkan has not yet ruled on the states' request but said she thought the government's claims defending Musk went "too far"—noting Musk is a private citizen whose organization has essentially been granted access to the "entire workings of the federal government"—and also chastised the Trump administration after its lawyers could not confirm how many federal employees DOGE had recently fired.

- **Feb. 17**

  DOGE is seeking access to a critical Internal Revenue Service system, the Integrated Data Retrieval System (IDRS), that could give the Musk-led agency the ability to see financial details of every taxpayer and business in the country, with CNN reporting Monday morning a DOGE official is expected to be "imminently" granted access.

- On its X account, DOGE also said it is "looking into" a purported anomaly in the Social Security system that lists millions of Americans over the age of 110—which Musk implied was an example of "vampire" recipients for Social Security assistance.

- **Feb. 13**

  Attorneys general from New Mexico, Arizona, Michigan and 11 other states sued Musk, DOGE and President Donald Trump alleging Musk's "virtually unchecked authority" is unconstitutional, saying Trump "transformed a minor position that was formerly responsible for managing government websites into a designated agent of chaos without limitation."

- **11:40 p.m EST, Feb. 12**

  DOGE tweeted out that its official site was live, though the site only had a feed of what the agency had been tweeting on X, a page for people apply to work with DOGE, a chart explaining the breakdown of government employees, and a savings page that read: "Receipts coming soon, no later than Valentine's day 💘."

- In the post announcing the website—which went live almost 24 hours after Musk told ABC News all of DOGE's actions were being posted to the

website to increase transparency—the department said it "will constantly be working to maximize the site's utility and transparency."

- **5:45 p.m. EST, Feb. 11**

  Trump issues an executive order directing government agencies to consult with DOGE on hiring approvals, hiring ratios and hiring plans aimed at slashing the federal workforce and "eliminating waste, bloat, and insularity."

- The order calls for massive cuts in the federal workforce, including a directive "that each agency hire no more than one employee for every four employees that depart," with certain exceptions like the military and law enforcement.

- **4:30 p.m. EST, Feb. 11**

  Speaking in the Oval Office with Trump, Musk defended DOGE's cuts, saying they've done them transparently by posting their actions on X and on the DOGE website, and he said he is trying to implement "common-sense controls that should be present that haven't been present" to federal spending.

- "We had no idea we were going to find this much," Trump said of DOGE's work so far, adding: "We're finding tremendous fraud and tremendous abuse."

- When asked how he responds to people saying he is taking over the government in a non-transparent way, Musk said, "the people voted for major government reform, there should be no doubt about that ... they'll get what they voted for ... and that's what democracy is all about."

- **3:41 p.m. EST, Feb. 11**

  Trump's press secretary Karoline Leavitt posted on X, formerly known as Twitter, that Musk and Trump were in the Oval Office to "give the TRUTH about DOGE!"

- **Feb. 11**

  Hegseth told reporters "there's plenty of places where we want the keen eye of DOGE" to look for efficiency measures, but he said "we'll do it in coordination, we're not going to do things that are to the detriment of American operational or tactical capabilities," multiple outlets reported (it's unclear what kinds of cuts DOGE could target, or how large they'll be, especially since members of both parties have historically been reluctant to cut defense spending).

- **Feb. 8**

  U.S. District Judge Paul Engelmayer issued an order early Saturday blocking Musk's government efficiency agency from accessing Treasury payments, citing an increased risk of hacking of sensitive information, and ordered those who are now prohibited from accessing these systems to destroy any information downloaded since Jan. 20.

- **8:00 p.m. EST, Feb. 7**

  Some 19 Democratic state attorneys-general are suing Trump and Treasury Secretary Scott Bessent for letting DOGE access the government's payment systems, alleging the move violates the law, endangers personal information and could open the door to DOGE unconstitutionally slashing spending that's already been greenlit by Congress.

- **3:13 p.m. EST, Feb. 7**

  Marko Elez—a DOGE staffer who resigned Thursday after the Wall Street

000107

Journal uncovered numerous offensive comments from the self-proclaimed "racist"—is coming back to work for the agency, Musk posted to X, commenting, "To err is human, to forgive divine" (hours earlier, he polled X users on whether Elez should return).

- Musk's announcement on the 25-year-old Elez was in response to Vance's support of the return.

- **2:55 p.m. EST, Feb. 7**

  Forbes resurfaces a number of problematic social media posts by 25-year-old DOGE emissary Gavin Kliger, including one calling former Democratic presidential candidate Hillary Clinton "retarded" and a bevy of anti-immigration posts.

- **2:41 p.m. EST, Feb. 7**

  Bloomberg reports 19-year-old DOGE agent Edward Coristine was fired from a previous internship for leaking sensitive company information to a competitor.

- **11:26 a.m. EST, Feb. 7**

  Vance posted to "bring [Elez] back," referring to Elez, who resigned after The Wall Street Journal reported on his prior social media activity (a White House official confirmed to Forbes that Elez resigned, but did not comment on the reason for his departure).

- "I obviously disagree with some of Elez's posts, but I don't think stupid social media activity should ruin a kid's life," explained Vance.

- Vance said he "obviously disagree[s] with some of Elez's posts," which included a call to "normalize Indian hate" (Vance's wife Usha Vance is the

Case 8:25-cv-00446-TDC    Document 73-1    Filed 02/28/25    Page 114 of 959

daughter of Indian immigrants).

- **9:14 a.m. EST, Feb. 7**

  Musk appeared to test public opinion about Elez on his X social media site, putting out a poll asking if the administration should "bring back @DOGE staffer who made inappropriate statements via a now deleted pseudonym"—and more than 80% of respondents supported Elez's return.

- Musk, who did not reference Elez by name, whitewashed the posts as "inappropriate," though Elez self-identified as "racist," supported "eugenic immigration policy" and slammed interracial marriage.

- "True," Musk responded to an X user calling for Musk to "have a talk to about the racist stuff. Not cool."

- **8:09 p.m. EST, Feb. 6**

  Rep. Val Hoyle, D-Ore., one of the two Democratic members on the 29-person DOGE panel, announced her resignation from the caucus in a statement highly critical of "unelected billionaire Elon Musk."

- Musk and his "lackeys" are set on "burning down the government—and the law—to line his own pockets and rip off Americans across the country who depend on government services to live with dignity," according to Hoyle, who slammed DOGE's "corrupt" access to Treasury Department payments data and the use of "intimidation tactics to terrorize" government workers.

- **4 p.m. EST, Feb. 6**

  Elez, one of the two primary DOGE emissaries embedded in the Treasury

Department, resigned from the Musk-led agency, the White House told The Wall Street Journal, after the publication uncovered Elez's ties to a since-deleted X account with racist posts including calling for "eugenic immigration policy" and to "normalize Indian hate."

- The 25-year-old Elez previously worked for Musk's X and SpaceX, according to the Journal.

- A White House official confirmed Elez's resignation to Forbes, declining to comment on the circumstances of his exit.

- **2 p.m. EST, Feb. 6**
  Treasury Secretary Scott Bessent told Bloomberg DOGE is not "tinkering" with the government payment systems the agency has access to, and Musk's agency is conducting an "operational review" of government payments, not an "ideological review" (Musk's statements have often veered toward the latter, calling the U.S. Agency for International Development a "criminal organization.")

- "Elon and I are completely aligned in terms of cutting waste and increasing accountability and transparency for the American people," Bessent added.

- **Feb. 6**
  People with ties to DOGE are using AI—accessed via Microsoft's Azure service—to sort through Education Department data with "personally identifiable information for people who manage grants, as well as sensitive internal financial data" while they look for ways to save the government money across departments, The Washington Post reported, citing two unnamed people (a department spokesperson told the Post

000110

they're looking for efficiencies, and there's "nothing inappropriate or nefarious").

- **Feb. 6**

  Judge Colleen Kollar-Kotelly approved an agreement that grants Tom Krause and Marko Elez—two Musk associates working as special government employees—the ability to see Treasury Department data "as needed" on a read-only basis.

- The agreement is a temporary fix that will remain in place until Kollar-Kotelly makes a further judgment on the lawsuit, which was brought by nonprofits and unions seeking to limit DOGE's access to the Treasury Department's private financial data.

- **8:40 a.m. EST, Feb. 6**

  DOGE workers have access to employee data from the Office of Personnel Management, essentially the federal government's human resources arm, The Washington Post reported Thursday, citing four anonymous U.S. officials—the data includes addresses, demographics and Social Security numbers, and DOGE's access includes the ability to edit employee records (there's no evidence DOGE staff have edited any records).

- **Feb. 5**

  Justice Department lawyers agreed Wednesday to a proposal that would limit DOGE's access to the critical Treasury payment system following a lawsuit, with only two Musk associates now permitted to have "read-only" access.

- **Feb. 5**

  The Centers for Medicare and Medicaid Services released a statement on its collaboration with DOGE and said two senior agency veterans are

000111

working with DOGE and they are "taking a thoughtful approach to see where there may be opportunities for more effective and efficient use of resources in line with meeting the goals of President Trump."

- **12:01 p.m. EST, Feb. 5**

  Musk quote-tweeted a post on X, formerly known as Twitter, with a screenshot of The Wall Street Journal's reporting on DOGE being at Medicare and said, "Yeah, this is where the big money fraud is happening."

- **11 a.m. EST, Feb. 5**

  DOGE team members were onsite at the Centers for Medicare and Medicaid Services to look for fraud or waste, Bloomberg and The Wall Street Journal reported, citing people familiar with the matter who said DOGE representatives had access to payment and contracting systems.

- **5:40 p.m. EST, Feb. 4**

  The Treasury sent a letter to Congress stating it is "committed to safeguarding the integrity and security of the system" and the "Fiscal Service is confident those protections are robust and effective," adding that Tom Krause, who is affiliated with DOGE but is a Treasury employee, has "read-only access to the coded data of the Fiscal Service's payment systems" in an effort to review efficiency.

- **4 p.m. EST, Feb. 4**

  Sens. Elizabeth Warren, D-Mass., and Ron Wyden, D-Ore., requested the Government Accountability Office investigate Bessent's "decision to grant access to sensitive government payment systems to Elon Musk and other" DOGE employees, specifically asking them to identify if there are guardrails in place to protect "economic and national security and

000112

Americans' privacy" and ensure there are no conflicts of interest with Musk.

● **3:45 p.m EST, Feb. 3**

Senate Democrats held a news conference at which they expressed their concern about Musk getting access to the federal payment system, with Senate Minority Leader Chuck Schumer, D-N.Y., saying "an unelected shadow government is conducting a hostile takeover of the federal government," and Sen. Patty Murray, D-Wash., saying Musk was "hijacking our nation's most sensitive financial systems and its checkbook."

● **Feb. 3**

The American Federation of Government Employees and other unions sued the Treasury Department in an effort to reduce DOGE's access to Treasury data.

● **Feb. 1**

The Associated Press and The New York Times reported Bessent granted DOGE access to the sensitive Treasury data, giving Musk a "powerful tool to monitor and potentially limit government spending," according to the Times.

***Get Forbes Breaking News Text Alerts:*** *We're launching text message alerts so you'll always know the biggest stories shaping the day's headlines. Text "Alerts" to (201) 335-0739 or sign up here.*

## WHAT IS DOGE?

Musk floated the idea of DOGE in September before Trump was elected, and shortly after, Trump said he would create it and have Musk lead it. After he won the election, Trump appointed Musk and Vivek Ramaswamy to lead the

commission and advised them to "slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." DOGE was officially created via an executive order on Trump's first day in office that restructured an existing entity, the U.S. Digital Service, to be the U.S. DOGE Service. It is not a new federal agency or department, and many members of the team are designated as "special government employees," according to the Congressional Research Service.

### WHAT AUTHORITY DOES DOGE HAVE?

There is no clear outline in the executive order establishing DOGE about what authority it has. Per the order, the role of it is "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." The order said the DOGE administrator will work with agency heads to improve the efficiency of software and how agencies work with each other and collect data. DOGE officials have reportedly been gaining access to sensitive data and information upon request.

### DOES ELON MUSK WORK FOR THE GOVERNMENT?

Musk is a "special government employee." The Justice Department defines the role as any employee expected to work for the federal government for up to 130 days, and they are prohibited from participating in matters that may have financial conflicts of interest or from using their role to influence an election or engage in political activity while on duty. The role of a special government employee is subject to most rules and guidelines that apply to federal employees, but they can be "less restrictive" because the role is temporary. Musk is reportedly not being paid for his work in the White House.

---

**Exclusive Invitation: Save up to 60% on a Forbes Membership**

By signing up, you agree to receive this newsletter, other updates about Forbes and its affiliates' offerings, our Terms of Service (including resolving disputes on an individual basis via arbitration), and you acknowledge our Privacy Statement.

Get Offer

---

## WHO IS WORKING FOR DOGE?

It's unclear who works for DOGE. On Nov. 14, 2024, DOGE's account on X asked people to direct message the account with their resumes if they were "super high-IQ small-government revolutionaries willing to work 80+ hours per week on unglamorous cost-cutting." On Feb. 2, Wired published an article alleging they were able to identify six engineers between the ages of 19 and 24 working for DOGE who had ties to other Musk companies or billionaire Peter Thiel. Katie Drummond, Wired's global editorial director, told CNN "it's a little bit difficult to ascertain exactly what they are doing," but Wired was able to determine they are "working at the behest of Musk … on a number of engineering related tasks." But, in a letter sent from eight Senate Democrats to White House Chief of Staff Susie Wiles requesting more information on what DOGE is doing, the lawmakers said "no information has been provided to Congress or the public as to who has been formally hired under DOGE."

## WHAT DEPARTMENTS IS DOGE WORKING IN?

DOGE has appeared to so far do most of its work with the USAID, which Musk has said—without evidence—is "incredibly politically partisan" and a "radical-left political psy op." Since Musk began discussing USAID on Monday, the agency has placed direct hire personnel globally on administrative leave, with few exceptions, and some USAID employees were seen clearing out their desks. Beyond that, DOGE said on Jan. 24 that in its first 80 hours of operating, it canceled "approx $420M of current/impending contracts" and two leases while focusing "mainly on DEI contracts and unoccupied buildings." On Thursday, The Washington Post reported DOGE was analyzing the Education Department's spending using artificial intelligence. It's suspected Musk was involved in the Office of Personnel Management's buyout offer to all federal employees, and he previously suggested the government should close the Consumer Financial Protection Bureau, which was directed earlier this week to pause its work, Reuters reported.

## WHAT ARE DEMOCRATS DOING TO STOP DOGE?

On Tuesday, more than 1,000 protesters gathered outside the Treasury
building in Washington, D.C., to protest DOGE's actions, and more than two
dozen Democratic lawmakers spoke at the gathering, the Associated Press
reported. Democrats also teased the "Stop the Steal" Act on Tuesday, which
House Minority Leader Hakeep Jeffries, D-N.Y., said would "prevent
[DOGE's] unlawful access from taking place." Democrats tried to subpoena
Musk on Wednesday to get more information on his actions and DOGE's
work, but congressional Republicans blocked the subpoena, ABC News
reported. The top Democrat on the House Oversight Committee, Rep.
Gerald Connolly, D-Va., said Musk's role is "puzzling" for many people,
adding: "Who is this unelected billionaire that he can attempt to dismantle
federal agencies, fire people, transfer them, offer them early retirement and
have sweeping changes to agencies without any congressional review,
oversight or concurrence?" Democrats have limited power in opposing
DOGE, or Trump's actions more broadly, though, as Republicans control the
House and Senate.

### FURTHER READING

Unions Sue To Stop Elon Musk's DOGE From Accessing Treasury
Department Data (Forbes)

Elon Musk's Team Now Has Access to Treasury's Payments System (New
York Times)

Elon Musk's DOGE Team Mines for Fraud at Medicare and Medicaid Agency
CMS (Bloomberg)

What Is Elon Musk's Role, Exactly? White House Calls Him 'Special
Government Employee'—Here's What That Means (Forbes)

 **Molly Bohannon**    [ Follow ]

Molly Bohannon is a reporter on the news team, where she covers a range of breaking news
stories including politics, foreign and national news, and the... **Read More**

000116



### Derek Saul

Derek Saul is a New Jersey-based Senior Reporter on Forbes' news team. He graduated in 2021 from Duke University, where he majored in Economics and served... **Read More**

Editorial Standards                                    Forbes Accolades

ADVERTISEMENT

One Community. Many Voices. Create a free account to share your thoughts. Read our community guidelines [here](#).

🔔   Log in

> What do you think?

Sort by **Best** ⌄

**LH**   **Lois H.**                                    ⋯
6 February, 2025

An individual with the power that Musk has must be approved by Congress. There is something very wrong with this and it seems unconstitutional. There is too much central power at this point, and the power is not restricted in any way by any part of the government.

Reply   ·   👍 29   ·   Share

**MU**   **MyForbes User**                              ⋯
6 February, 2025

Stop calling DOGE an agency.  It is NOT an agency and has none of the authority to do anything that it is doing right now.  I hope the courts set in before permanent damage it done

Reply   ·   👍 25   ·   Share

**LH**   **Lois H.**                                    ⋯
7 February, 2025

That's something that absolutely
must be addressed in the courts.

Reply   ·   👍 3   ·   Share

---

**JA**  **Julie A.**                              ···

6 February, 2025

Musk should be brought up on charges of
espionage and identity theft/fraud. He has
no right nor was he elected to any office in
our government.

Reply   ·   👍 27   ·   Share

**HP**  **Holly P**                              ···

13 February, 2025

I don't think you understand what
espionage is dear, but I do believe
you and many others in this thread
should be brought up on charges of
sedition.

Reply   ·   👍 2   ·   Share

---

Show More Comments

---

Powered by  ⚙ OpenWeb        Terms  |  Privacy  |  Feedback



Case 3:25-cv-00426-TLT    Document 37-1    Filed 02/26/25    Page 125 of 959

# *Young Aides Emerge as Enforcers in Musk's Broadside Against Government*

Much of the billionaire's handiwork — gaining access to internal systems and asking employees to justify their jobs — is being driven by a group of engineers operating in secrecy.

---

 Listen to this article · 13:45 min   Learn more

    **By Theodore Schleifer, Nicholas Nehamas, Kate Conger and Ryan Mac**

Feb. 7, 2025

At the end of his third week bulldozing through the federal government, Elon Musk sat down to give Vice President JD Vance a 90-minute briefing on his efforts to dismantle the bureaucracy. Mr. Musk was not alone.

Invited to join him on Thursday morning in Mr. Vance's stately ceremonial office suite in the Eisenhower Executive Office Building, next to the White House, were a clutch of young aides whose presence at federal agencies has served as a harbinger of the upheaval that would follow them.

Across the federal government, civil servants have witnessed the sudden intrusion in the last two weeks of these young members of the billionaire's team, labeled the Department of Government Efficiency. As Mr. Musk traipses through

000120

Case 3:25-cv-00446-TLLC   Document 25-1   Filed 02/28/25   Page 126 of 959

Washington, bent on disruption, these aides have emerged as his enforcers, sweeping into agency headquarters with black backpacks and ambitious marching orders.

While Mr. Musk is flanked by some seasoned operatives, his dizzying blitz on the federal bureaucracy is, in practice, largely being carried out by a group of male engineers, including some recent college graduates and at least one as young as 19.

Unlike their 20-something peers in Washington, who are accustomed to doing the unglamorous work ordered up by senior officials, these aides have been empowered to break the system.

Of the roughly 40 people on the team, just under half of them have some previous ties to the billionaire — but many have little government experience, The New York Times found. This account of their background and activities is based on public records, internal government databases and more than 20 people familiar with their roles, who spoke on the condition of anonymity out of fear of retaliation.

Some on the Musk team are former interns at his companies. Others are executives who have served in his employ for as long as two decades. They all appear to have channeled his shoot-first, aim-later approach to reform as they have overwhelmed the bureaucracy.

A 23-year-old who once used artificial intelligence to decode the word "purple" on an Ancient Greek scroll has swiftly gained entree to at least five federal agencies, including the Centers for Medicare and Medicaid Services, where he has been seeking access to sensitive databases. He was part of a group that helped effectively shutter the United States Agency for International

000121

Development, joined by the 19-year-old, a onetime Northeastern student who was fired from a data security firm after an investigation into the leaking of internal information, as Bloomberg first reported.

The United States Agency for International Development is one of several federal agencies that young representatives of Mr. Musk's team have been tasked to root out what he perceives as wasteful spending and left-wing ideology. Haiyun Jiang for The New York Times

In the past week, his aides have descended upon the Education, Energy, Housing and Urban Development, Health and Human Services, Transportation and Veterans Affairs Departments, along with the National Oceanic and Atmospheric Administration, the Federal Emergency Management Agency and the Consumer Financial Protection Bureau, according to people familiar with their activities.

000122

Mr. Musk has praised his team as talented and relentless, defending its work as crucial to rooting out what he perceives as wasteful spending and left-wing ideology in the federal government.

"Time to confess," he wrote on X this week. "Media reports saying that @DOGE has some of world's best software engineers are in fact true."

Mr. Musk did not respond to a request for comment.

On Friday, Mr. Trump told reporters that he was "very proud of the job that this group of young people, generally young people, but very smart people, they're doing.

"They're doing it at my insistence," he added. "It would be a lot easier not to do it, but we have to take some of these things apart to find the corruption."

Even as Mr. Musk's team members upend the government, their identities have been closely held, emerging only piecemeal when the new arrivals press career officials for information and access to agency systems.

The opacity with which they are operating is highly unusual for those working in government. Aside from those conducting classified or intelligence work, the names of public employees are not generally kept secret.

Harrison Fields, a White House spokesman, said the cost-cutting team has gone through the same vetting as other federal employees, but declined to say what the vetting consisted of or whether Mr. Musk's aides have security clearances.

The Times identified members of Mr. Musk's initiative through internal emails identifying their roles and interviews with employees across the government who have interacted with them. None of the Musk aides responded to requests for comment.

000123

The secrecy, Musk allies have said, is necessary so the team members do not become targets.

Several of Mr. Musk's aides have resisted being listed in government databases out of fear of their names leaking out, according to people familiar with the situation. Others have worked to remove information about themselves from the internet, scrubbing résumés and social media accounts.

When their names have been made public by news organizations such as Wired, they have been scrutinized by online sleuths. Mr. Musk has asserted, falsely, that the exposure of their roles is a "crime," and X has removed some posts and issued suspensions to those who publicize their identities.

One Musk aide whose name surfaced, Marko Elez, a 25-year-old former employee of X, resigned on Thursday, according to a White House official, after The Wall Street Journal revealed that he had made racist posts on X, writing in one message that "you could not pay me to marry outside of my ethnicity." Mr. Elez, a former employee at both X and xAI, Mr. Musk's artificial intelligence company, was one of two staff members affiliated with Mr. Musk's team who had gained access to the Treasury Department's closely held payment system.

Mr. Elez was among those who had been invited to attend Mr. Musk's meeting with the vice president before he resigned, according to documents seen by The Times. On Friday, Mr. Musk called for The Journal reporter to be fired and said he was reinstating Mr. Elez, a move that both the president and the vice president said they supported. "We shouldn't reward journalists who try to destroy people," Mr. Vance posted on X.

A spokesman for Mr. Vance declined to comment.

Young Aides Emerge as Enforcers in Musk's DOGE Team Efforts - The New York Times
Case 8:25-cv-00444 TDC Document 25-1 Filed 02/22/25 Page 130 of 959
2/17/25, 4:23 PM

Some of Mr. Musk's top advisers are more seasoned. Senior players include Brad Smith, a health care entrepreneur and an official during President Trump's first term; Amy Gleason, a former U.S. Digital Service official who has been helping at the Centers for Medicare and Medicaid Services; and Chris Young, a top Republican field operative whom Mr. Musk hired as a political adviser last year. Others bring extensive private sector backgrounds, including from firms like McKinsey and Morgan Stanley.

Brad Smith, left, was a health care official during President Trump's first term and now is counted among the top advisers to Mr. Musk. Doug Mills/The New York Times

But Washington is a town where much is run by twentysomethings. And much of Mr. Musk's handiwork — gutting federal websites, demanding access to internal systems, sending late-night all-staff emails and asking veteran employees to

000125

2/17/25, 4:23 PM

justify their jobs — is being executed by young aides, some of them pulling all-nighters as they burrow into agencies.

Last week, young representatives of Mr. Musk's team with backpacks stuffed with a half-dozen laptops and phones arrived at the headquarters of U.S.A.I.D., demanding access to financial and personnel records. On Friday, a dozen stayed into the night, powered by a bulk order of coffee. The next day, the agency's website went dark.

At the Education Department alone, as many as 16 team members are listed in an employee directory, including Jehn Balajadia, who has effectively served as Mr. Musk's assistant for years.

Jehn Balajadia, who has long worked for Mr. Musk, is now listed in the Education Department's employee directory.

Patrick T. Fallon/Bloomberg

000126

At the Office of Personnel Management, the nerve center of the federal government's human resources operation, a small group of coders on Mr. Musk's team sometimes sleep in the building overnight. They survive on deliveries of pizza, Mountain Dew, Red Bull and Doritos, working what Mr. Musk has described as 120-hour weeks.

At the General Services Administration, another central hub for Mr. Musk's aides, beds have been installed on the sixth floor, with a security guard keeping people from entering the area.

While most senior employees wear suits, the aides favor jeans, sneakers and T-shirts, sometimes under a blazer, with one sporting a navy-blue baseball cap with white lettering reading "DOGE."

The culture clash is evident. Perhaps unsurprisingly, career employees who have worked for decades in the government have bristled at taking orders from the young newcomers. One coder has openly referred to federal workers as "dinosaurs." Some staff members at the personnel office, in turn, derisively call the young men "Muskrats."

As they assess the workings of the government, Mr. Musk's aides have been conducting 15-minute video interviews with federal workers. Some of their questions have been pointed, such as querying employees about whom they would choose to fire from their teams if they had to pick one person. At times, the aides have not turned on their cameras or given their last names, feeding suspicion.

In one video interview heard by The Times, a young team representative who introduced himself by his first name said he was an "adviser" to government leadership and a startup founder. He pressed the interviewee to describe their contributions with "highest impact" and to list any technical "superpowers."

000127

It is not always clear which employees are formally part of the team. Even the putative head of the department, Steve Davis, a decades-long lieutenant of Mr. Musk who has accompanied the billionaire on his meetings in Washington, has not been formally announced.

Steve Davis, right, has been a decades-long lieutenant of Mr. Musk and now seemingly has a leadership role in his Department of Government Efficiency. Patrick Fallon/Zuma, via Alamy

Many of Mr. Musk's aides, including Mr. Davis, hold multiple roles simultaneously, working for one of the team's central hubs — the personnel office or the General Services Administration — while also maintaining email addresses and offices at other agencies.

000128

Luke Farritor, who won the award for using artificial intelligence to decipher an ancient scroll, joined Mr. Musk's initiative after dropping out of the University of Nebraska-Lincoln to pursue a fellowship funded by the billionaire PayPal founder Peter Thiel. A former SpaceX intern, Mr. Farritor, in preparation to join the team, started learning COBOL, a coding language considered retrograde in Silicon Valley but common in government.

Luke Farritor, a former University of Nebraska-Lincoln student and SpaceX intern, is one of many of Mr. Musk's aides who hold multiple roles simultaneously, working for one of the team's central hubs while also maintaining email addresses and offices at other agencies.
University of Nebraska-Lincoln

He and Rachel Riley, a former McKinsey consultant who works closely with Mr. Smith, are now both listed as employees in the Office of the Secretary at the Department of Health and Human Services. This week, they requested access to payment systems at the Medicare agency, according to a document seen by The Times.

000129

Case 8:25-cv-00446-TDC   Document 25-1   Filed 02/20/25   Page 135 of 959

Mr. Farritor, who also has email accounts at the General Services Administration, the Education Department and the Centers for Disease Control and Prevention, was at the Energy Department on Wednesday, and has told others that he is getting deployed to additional agencies. He is one of about a half-dozen aides who are holed up in a corner around the G.S.A. administrator's offices, interviewing tech staff members about their work.

The General Services Administration has served as a central hub for Mr. Musk's aides, with beds installed on the sixth floor and a security guard to keep people from entering.  Graeme Sloan/Sipa, via AP Images

Other figures often on hand include Ethan Shaotran and Edward Coristine, who have been accompanying a top Musk ally, Thomas Shedd, who oversees the agency's tech division. Mr. Shaotran, a 22-year-old Harvard student, was part of a team that was the runner-up in a hackathon competition run by xAI last year.

000130

Case 8:25-cv-00044 TDC    Document 71    Filed 02/22/25    Page 136 of 959

Mr. Coristine, 19, graduated from high school in Rye, N.Y., last year, according to a school magazine that noted his outstanding performance on the Advanced Placement exams. Nowadays, he has an email address at the Education Department.

Before joining the government, Mr. Coristine was fired in June 2022 from an internship at Path, an Arizona-based data security company, after "an internal investigation into the leaking of proprietary company information that coincided with his tenure," the company said in a statement Friday.

One Musk acolyte has leaned into his new status as a Washington celebrity.

Gavin Kliger, a newly minted senior adviser at the personnel office, wrote a Substack post this week titled "Why DOGE: Why I gave up a seven-figure salary to save America" — and asked users to pay a $1,000-per-month subscription fee to read it.

The post behind the paywall appeared to have been left intentionally blank, according to users who saw it.

Mr. Kliger, 25, a software engineer, amplified a message posted on X in December by Nick Fuentes, one of the country's most prominent young white supremacists, which mocked those who celebrate their interracial families. The post was removed from Mr. Kliger's page after The Times inquired about it. He did not respond to requests for comment.

Mr. Kliger and Mr. Farritor were among those who obtained access to U.S.A.I.D. websites and tried to get into a secure area at the agency before being turned away by security last week, according to people familiar with the matter. After

000131

midnight on Monday, Mr. Kliger sent an email from a U.S.A.I.D. email account informing thousands of staff members that the agency's headquarters would be closed.

On X, Mr. Kliger has defended cuts to the agency. He also responded to one person who criticized him as "one of the men carrying out Musk's coup."

"A 'coup' is when a duly elected president wins a democratic election and delivers on campaign promises," Mr. Kliger wrote on X on Monday. "Got it."

Reporting was contributed by Maggie Haberman, Mattathias Schwartz, Edward Wong, Erica L. Green, Madeleine Ngo, Zach Montague, Christopher Flavelle, Andrew Duehren, Brad Plumer, Kellen Browning and Aric Toler. Kitty Bennett contributed research.

**Theodore Schleifer** is a Times reporter covering billionaires and their impact on the world. More about Theodore Schleifer

**Nicholas Nehamas** is a Times political reporter covering the presidential campaign of Vice President Kamala Harris. More about Nicholas Nehamas

**Kate Conger** is a technology reporter based in San Francisco. She can be reached at kate.conger@nytimes.com. More about Kate Conger

**Ryan Mac** covers corporate accountability across the global technology industry. More about Ryan Mac

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Young Enforcers Carry Out Blitz On Bureaucracy

Case 3:25-cv-00426-TLC    Document 25-1    Filed 02/28/25    Page 138 of 597

# Treasury Official Quits After Resisting Musk's Requests on Payments

Elon Musk's cost-cutting team sought access to the government's vast payment system, part of its bid to choke off federal funding.

    

**By Andrew Duehren, Alan Rappeport, Theodore Schleifer, Jonathan Swan and Maggie Haberman**
Reporting from Washington

Jan. 31, 2025

The Trump administration pushed out a top Treasury Department official this week after he refused to give Elon Musk's cost-cutting team access to the government's vast payment system, part of a bid by the so-called Department of Government Efficiency to choke off federal funding.

David Lebryk, a career civil servant who oversaw the more than one billion payments that the federal government makes every year, was placed on administrative leave this week after resisting requests from Mr. Musk's lieutenants, according to people familiar with the circumstances, who spoke on the condition of anonymity to describe sensitive internal dynamics.

On Friday, Mr. Lebryk — who had briefly served as acting Treasury secretary until the confirmation of Scott Bessent this week — told colleagues that he would retire after more than 35 years of working for the government.

000133

Mr. Lebryk's abrupt departure raises questions about whether Mr. Musk will now gain control of the payment system — and, if so, how he could use it. His exit also underscores the extraordinary amount of power that Mr. Musk, whose current employment status inside the federal government remains unclear, is accumulating at the opening of the second Trump administration.

Mr. Musk, a billionaire, has dispatched aides across the bureaucracy to try to radically reduce spending. He has told Trump administration officials that he aims to take control of the Treasury computers used to complete payments in order to identify fraud and abuse, according to three people familiar with his remarks.

The Treasury Department executes payments on behalf of agencies across the government, disbursing $5.4 trillion, or 88 percent of all federal payments, in the last fiscal year. The system is run out of the Bureau of the Fiscal Service, a little-known but critical office that is responsible for getting money to Social Security recipients, government employees, contractors and others.

Former Treasury officials said they were not aware of a political appointee ever seeking access to details of the payment system, which includes reams of sensitive personal information about American citizens. Control of the system could give Mr. Musk's allies the ability to unilaterally cut off money intended for federal workers, bondholders and companies, and open a new front in the Trump administration's efforts to halt federal payments.

"The fiscal service performs some of the most vital functions in government," Mr. Lebryk wrote to his colleagues in an email announcing his retirement on Friday, according to a copy of the email viewed by The New York Times. "Our work may be unknown to most of the public, but that doesn't mean it isn't exceptionally important." He did not respond to requests for comment.

000134

The White House and a representative of Mr. Musk's Department of Government Efficiency did not return requests for comment.

A spokesman for the Treasury Department declined to comment.

The departure of Mr. Lebryk, which was reported earlier by The Washington Post, and the potential for interference with the nation's payment systems comes at a precarious moment for the U.S. economy. The Treasury Department had to begin using so-called extraordinary measures last week to prevent a government default after a suspension of the debt limit expired. The ability to use those accounting tools could expire as soon as this summer, and it will be critical for the department to accurately track federal expenditures.

Mr. Musk has told senior administration officials that he believes the federal government is sending out hundreds of billions to people who either do not exist or are fraudsters, according to people familiar with his remarks. The Government Accountability Office estimated in a report that the government made $236 billion in improper payments — three-quarters of which were overpayments — across 71 federal programs during the 2023 fiscal year.

Mr. Musk has been fixated on the Treasury system as a key to cutting federal spending. Representatives from his government efficiency initiative began asking Mr. Lebryk about source code information related to the nation's payment system during the presidential transition in December, according to three people familiar with the conversations.

Mr. Lebryk raised the request to Treasury officials at the time, noting that it was the type of proprietary information that should not be shared with people who did not work for the federal government. Members of the departing Biden

000135

administration were alarmed by the request, according to people familiar with their thinking. The people making the requests were on the Trump landing team at the Treasury Department, according to a current White House official.

The inquiries into the Treasury Department's payment processes have been led by the Musk allies Baris Akis and Tom Krause. Mr. Akis, a relative newcomer to Mr. Musk's circle, is a venture capitalist who during the transition has focused on the Treasury and the Internal Revenue Service.

Last weekend, Mr. Krause, the chief executive of a Silicon Valley company, Cloud Software Group, again pressed Mr. Lebryk for access to the system, according to two people familiar with the request. Mr. Lebryk declined, the people said.

Mr. Akis and Mr. Krause did not respond to requests for comment.

After the request, Mr. Lebryk sought meetings with Mr. Bessent, the agency's new secretary, and the Treasury Department's new chief of staff, Dan Katz, to discuss the situation, according to the people familiar with the matter.

After meetings with Mr. Katz and Mr. Bessent, Mr. Lebryk was placed on administrative leave, two people said. Other career officials will oversee the payment processes after Mr. Lebryk's departure.

"For many years, Dave Lebryk's leadership has helped to make our payment systems reliable and trusted at home and abroad," said Jacob Lew, a Treasury secretary under President Barack Obama. "The American people should not have to worry about political interference when it comes to receiving Social Security and other payments the fiscal service makes."

Mr. Akis has made similar inquiries at the I.R.S. about its information technology as part of an effort to automate tax collection, according to people familiar with the matter. During the transition, Mr. Akis asked to visit a major fiscal service

center in Kansas City, but was rejected by agency officials, one of the people said.

It is not clear if Mr. Akis has an official government role.

Mr. Krause is now working at the Treasury Department and has an employee badge, according to three people familiar with the matter. Mr. Krause has also led interviews of current U.S. Digital Service employees, many of whom are expecting to be laid off after the technology unit was renamed the U.S. DOGE Service.

The decision by Mr. Musk's efficiency team to integrate into the federal government, rather than set up an outside body, has been driven by its view that burrowing into the existing U.S. Digital Service will give it greater visibility into federal spending. That, Mr. Musk's team believes, could give it the ability to take drastic action over spending by giving it access to computer systems across the government.

During last year's presidential campaign, Mr. Musk pledged to secure about $2 trillion in spending cuts. More recently, he has halved that goal. On Thursday evening, Mr. Musk claimed on X that cutting $1 trillion "would mean no inflation" because of anticipated economic growth. "Super big deal," he said.

**Andrew Duehren** covers tax policy for The Times from Washington. More about Andrew Duehren

**Alan Rappeport** is an economic policy reporter, based in Washington. He covers the Treasury Department and writes about taxes, trade and fiscal matters. More about Alan Rappeport

**Theodore Schleifer** is a Times reporter covering billionaires and their impact on the world. More about Theodore Schleifer

**Jonathan Swan** is a White House reporter covering the administration of Donald J. Trump. More about Jonathan Swan

000137

Case 8:25-cv-00442-LLC   Document 371   Filed 02/28/25   Page 143 of 959

**Maggie Haberman** is a White House correspondent, reporting on the second, nonconsecutive term of Donald J. Trump. More about Maggie Haberman

---

A version of this article appears in print on , Section A, Page 13 of the New York edition with the headline: Official Leaving After Refusing Access To Musk on Treasury Payment System

000138

POLITICS

## DOGE was tasked with stopping Treasury payments to USAID, AP sources say



— 

— 

Delta flight incident    Captain America soars    Extreme cold    "SNL 50"    Paquita La Del Barrio dies

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE



BY FATIMA HUSSEIN
Updated 5:18 PM EST, February 6, 2025

WASHINGTON (AP) — Officials working with Elon Musk's Department of Government Efficiency sought access to the U.S. Department of Treasury payment system to stop money from flowing to the U.S. Agency for International Development, according to two people familiar with the matter.

DOGE's efforts to stop USAID payments undermine assurances that the department gave to federal lawmakers in a Tuesday letter that it sought only to review the integrity of the payments and had "read-only access" to the system as part of an audit process.

The two people familiar with the matter spoke Thursday to The Associated Press on condition of anonymity for fear of retaliation.

The actions by DOGE, a Trump administration effort to find ways to reduce the federal workforce, cut programs and slash federal regulations, have raised concerns among civil servants, Democratic lawmakers and others that Musk's team is withholding funds appropriated by Congress to suit the president's political

000139

agenda.

ADVERTISEMENT

USAID, a federal agency charged with delivering humanitarian assistance overseas, has been a particular target of President Donald Trump and Musk, both of whom have argued that much of the agency's spending is wasteful. Supporters of the agency, however, say that it is essential for national security, helping counter Russian and Chinese influence while providing humanitarian assistance across the globe.

**RELATED STORIES**



**USAID security chiefs put on leave after trying to keep DOGE from classified info**

000140



**Judge orders Trump administration to temporarily allow USAID funds**



**Groups representing federal workers file suit to stop Trump's shutdown of USAID**

A judge on Thursday sided with advocates and federal workers unions who sought to stop the department from giving DOGE and Musk access to the payment systems. U.S. District Judge Colleen Kollar-Kotelly restricted DOGE's read-only access to Tom Krause, a software CEO, and Marko Elez, who reported to Krause but has since left his role at Treasury. The White House did not immediately respond to a request for

000141

DOGE was tasked with stopping Treasury payments to USAID, sources say | AP News
Case 8:25-cv-00430-DLC   Document 25-1   Filed 02/20/25   Page 147 of 959
2/17/25, 4:28 PM

comment.

The Treasury Department's Fiscal Service conducts over 1.2 billion transactions annually and accounts for 90% of federal disbursements, including for Social Security and Medicare.

ADVERTISEMENT



Krause, who is listed online as the CEO of Cloud Software Group, works at the department as a special government employee and is subject to less stringent rules on ethics and financial disclosures than other federal workers.

The department's acting deputy secretary, David Lebryk, retired after more than 30 years of service when Krause and DOGE requested access to sensitive data, the two people told The AP.

Trump ordered a funding freeze at USAID his first day in office, saying, "the United States foreign aid industry" was "not aligned with American interests." The funding freeze and subsequent stop-work orders shuttered most U.S. programs, which are worth billions of dollars and are in more than 100 countries.

While the funding freeze is supposed to last for as little as 90 days, aid workers say the damage done to aid work globally would require extensive investment and rebuilding to mend. Musk has tweeted repeated criticisms and unsubstantiated accusations about USAID as his DOGE crew dismantles much of the agency.

ADVERTISEMENT

"Spent the weekend feeding USAID into the wood chipper," Musk tweeted early this week.

The news that the department was trying to stop foreign aid payments was first reported by The New York Times.

———

Associated Press writers Ellen Knickmeyer and Lindsay Whitehurst contributed reporting from Washington.

DOGE was tasked with stopping Treasury payments to USAID, sources say | AP News

2/17/25, 4:28 PM



**FATIMA HUSSEIN**

Hussein reports on the U.S. Treasury Department for The Associated Press. She covers tax policy, sanctions and any issue that relates to money.





PAID FOR BY HOME INSURANCE

**Residents In These Zipcodes Get Huge Home Insurance Reduction** ↗

Reduce Your Home Insurance Bill If You Live In These Zip Codes



ADVERTISEMENT

**MOST READ**

# Treasury Sought to Freeze Foreign Aid Payments, Emails Show

Trump administration appointees and allies of Elon Musk wanted to use the Treasury's sensitive payment system to block disbursements.

   **By Andrew Duehren, Alan Rappeport and Theodore Schleifer**

Feb. 6, 2025

In the days after President Trump took office, as Elon Musk's team began pressing for access to the Treasury Department's payments system, officials repeatedly said that their goal was to undertake a general review of the system. They said they would observe, but not stop money from going out the door.

But emails reviewed by The New York Times show that the Treasury's chief of staff originally pushed for Tom Krause, a software executive affiliated with Mr. Musk's so-called Department of Government Efficiency, to receive access to the closely held payment system so that the Treasury could freeze disbursements to the U.S. Agency for International Development.

In a Jan. 24 email to a small group of Treasury officials, the chief of staff, Dan Katz, wrote that Mr. Krause and his team needed access to the system so they could pause U.S.A.I.D. payments and comply with Mr. Trump's Jan. 20 executive order to halt foreign aid.

000144

"To the extent permitted by law, we would like to implement the pause as soon as possible in order to ensure that we are doing our role to comply with the E.O.," Mr. Katz wrote.

The emails viewed by The Times undercut the Treasury's explanation for why Mr. Krause and his team had been given access to the payment system last week. That system disburses more than $5 trillion in funding on behalf of much of the federal government.

The department, now led by Secretary Scott Bessent, has said that Mr. Krause, a Treasury staff member, and his team are conducting an "operational efficiency assessment" that does not involve blocking agency payments.

The possibility of systems at the Treasury's little-known Bureau of the Fiscal Service being used to stop congressionally authorized spending has stoked alarm among Democrats, who have called for investigations and led protests at the Treasury building.

David Lebryk, formerly the top career official at the Treasury, rebuffed the request to grant access and pause the aid payments.

"I don't believe we have the legal authority to stop an authorized payment certified by an agency," he wrote to the group on Jan. 24. Mr. Lebryk, who had been a federal employee for more than 35 years, was pushed out of his job days later for refusing to give Mr. Krause access to the system. Late on Jan. 31, a Friday, Mr. Bessent authorized entry for a team led by Mr. Krause after Mr. Lebryk's departure.

On Jan. 25, Mr. Krause responded to Mr. Lebryk and said the department should also weigh the legal consequences of the Treasury's disbursing payments in violation of the executive order.

000145

"I think this deserves serious consideration as well. I believe we can all feel more comfortable that we hold payment at least to review the underlying payment requests from U.S.A.I.D. now so that we can be given time to consult State," Mr. Krause wrote, referring to the State Department.

The Trump administration has said the access for Mr. Krause and his team is limited. On Tuesday, the Treasury Department sent a letter to Congress stating that "currently," Mr. Krause and his team "will have read-only access, " meaning they could not change anything. After public sector unions sued over the issue, a Justice Department lawyer said in court on Wednesday that only Mr. Krause and Marko Elez, another Treasury employee, had been given access to information in the system, which they had not shared outside the Treasury.

Mr. Elez, a former employee of Mr. Musk's at both X and xAI, resigned on Thursday, according to a White House official, after The Wall Street Journal revealed that he had made racist posts on X.com. Mr. Elez did not return requests for comment.

Mr. Elez, was one of several staffers that Mr. Musk's team planned to install at the Treasury. They also include Mr. Krause, a well-established Silicon Valley software executive; Aram Moghaddassi, who has worked for both X and Mr. Musk's Neuralink; and Michael Russo, a Silicon Valley executive who has since been named chief information officer of the Social Security Administration.

Mr. Bessent, in an interview on Wednesday with Larry Kudlow on the Fox Business Network, defended the Musk initiative's work and dismissed the suggestion that the Treasury's payment system had been compromised.

"Our payment system is not being touched," he said, adding that the Treasury was studying how to improve accountability, accuracy and the ability to trace where money is going. Mr. Bessent said that any stoppage of payments would

happen "upstream," within agencies.

Mr. Bessent also described Mr. Musk as the greatest entrepreneur of his generation and said that the backlash over his actions was happening because he was shaking up the federal bureaucracy.

"They are moving a lot of people's cheese here in the capital," Mr. Bessent said. "And when you hear you hear this squawking, then some status quo interest is not happy."

The push for access to the Treasury system came as the Trump administration moved to dismantle U.S.A.I.D., the government's lead agency for providing humanitarian assistance globally. Much of the agency's work force will be put on leave this week, and contracts have been halted.

Agencies across the government send files of sensitive data to the Bureau of the Fiscal Service, directing it to send money to individual Americans, contractors or state governments. Treasury officials conduct a final round of checks on the files, including by scanning them to see if any recipients are barred from receiving government funds, before authorizing the payments, which are then made by the Federal Reserve.

Because the process includes sensitive information about Americans, such as bank account numbers, a relatively small number of Treasury officials are typically involved.

Democrats have questioned whether Mr. Musk's team in fact has only "read-only" access to the payment system. In a post on X, Senator Sheldon Whitehouse, a Rhode Island Democrat, wrote that Mr. Musk's team could "manipulate data, steal data, and leave back doors. Your privacy gone."

000147

"The intern running Sheldon's social media account seems very upset," Mr. Musk responded, adding a crying laugh emoji.

On Thursday, before news of Mr. Elez's resignation, Judge Colleen Kollar-Kotelly of the Federal District Court in Washington issued a temporary restraining order in a suit challenging his and Mr. Krause's access to the system. The agreement with the Justice Department allowed Mr. Elez and Mr. Krause to have access to the system but barring them from disclosing it to anyone outside of the Treasury Department, including Mr. Musk.

Charlie Savage contributed reporting.

**Andrew Duehren** covers tax policy for The Times from Washington. More about Andrew Duehren

**Alan Rappeport** is an economic policy reporter, based in Washington. He covers the Treasury Department and writes about taxes, trade and fiscal matters. More about Alan Rappeport

**Theodore Schleifer** is a Times reporter covering billionaires and their impact on the world. More about Theodore Schleifer

---

A version of this article appears in print on , Section A, Page 19 of the New York edition with the headline: Treasury Officials Sought to Freeze Foreign Aid Payments, Emails Show

Case 3:25-cv-00462-TLT   Document 25-1   Filed 02/28/25   Page 154 of 959

# Elon Musk's Team Now Has Access to Treasury's Payments System

Treasury Secretary Scott Bessent gave Mr. Musk's representatives at the so-called Department of Government Efficiency a powerful tool to monitor and potentially limit government spending.

   

**By Andrew Duehren, Maggie Haberman, Theodore Schleifer and Alan Rappeport**

Feb. 1, 2025

Treasury Secretary Scott Bessent gave representatives of the so-called Department of Government Efficiency access to the federal payment system late on Friday, according to five people familiar with the change, handing Elon Musk and the team he is leading a powerful tool to monitor and potentially limit government spending.

The new authority follows a standoff this week with a top Treasury official who had resisted allowing Mr. Musk's lieutenants into the department's payment system, which sends out money on behalf of the entire federal government. The official, a career civil servant named David Lebryk, was put on leave and then suddenly retired on Friday after the dispute, according to people familiar with his exit.

000149

Case 8:25-cv-00442-TDC Document 57-1 Filed 02/20/25 Page 155 of 959

The system could give the Trump administration another mechanism to attempt to unilaterally restrict disbursement of money approved for specific purposes by Congress, a push that has faced legal roadblocks.

Mr. Musk, who has been given wide latitude by President Trump to find ways to slash government spending, has recently fixated on Treasury's payment processes, criticizing the department in a social media post on Saturday for not rejecting more payments as fraudulent or improper.

The Musk allies who have been granted access to the payment system were made Treasury employees, passed government background checks and obtained the necessary security clearances, according to two people familiar with the situation, who requested anonymity to discuss internal arrangements. While their access was approved, the Musk representatives have yet to gain operational capabilities and no government payments have been blocked, the people said.

Mr. Musk's initiative is intended to be part of a broader review of the payments system to allow improper payments to be scrutinized and is not an effort to arbitrarily block individual payments, the people familiar with the matter said. Career Treasury Department attorneys signed off on granting the access, they added, and any changes to the system would go through a review process and testing.

The Department of Government Efficiency, or DOGE, is not a government department, but a team within the administration. It was put together at Mr. Trump's direction by Mr. Musk to fan out across federal agencies seeking ways to cut spending, reduce the size of the federal work force and bring more efficiency to the bureaucracy. Most of those working on the initiative were recruited by Mr. Musk and his aides.

000150

Case 8:25-cv-00441-TDC    Document 571    Filed 02/28/25    Page 156 of 959

Similar DOGE teams have begun demanding access to data and systems at other federal agencies, but none of those agencies control the flow of money in the way the Treasury Department does.

One of the people affiliated with DOGE who now has access to the payment system is Tom Krause, the chief executive of a Silicon Valley company, Cloud Software Group, according to one of the people familiar with the situation .

Last weekend, Mr. Krause had pushed Mr. Lebryk for entry into the system. Mr. Lebryk refused and then was subsequently put on administrative leave, according to people familiar with the matter.

A Treasury Department spokesman, a spokeswoman for DOGE and the White House did not respond to requests for comment.

In a process typically run by civil servants, the Treasury Department carries out payments submitted by agencies across the government, disbursing more than $5 trillion in fiscal year 2023. Access to the system has historically been closely held because it includes sensitive personal information about the millions of Americans who receive Social Security checks, tax refunds and other payments from the federal government.

Former officials said the onus was on individual agencies to ensure their payments are proper, not the relatively small staff at the Treasury Department, which is responsible for making more than one billion payments per year.

Mr. Lebryk, the career Treasury official who retired on Friday, had resisted requests from members of Mr. Trump's transition team for access to the data last month. After Mr. Trump took office, the White House indicated that he should be removed from the job and, according to a person familiar with the matter, Mr. Bessent suggested putting him on leave.

Democrats raised alarm this week that the Trump administration and Mr. Bessent, who was just confirmed by the Senate this week, were compromising the federal government's payments system.

"To put it bluntly, these payment systems simply cannot fail, and any politically motivated meddling in them risks severe damage to our country and the economy," Senator Ron Wyden of Oregon, the top Democrat on the Senate Finance Committee, wrote in a letter to Mr. Bessent on Friday. "I can think of no good reason why political operators who have demonstrated a blatant disregard for the law would need access to these sensitive, mission-critical systems."

On Saturday, Mr. Wyden expressed concern that access to the payment system had been granted and pointed out Mr. Musk — a billionaire with a vast portfolio — has potential conflicts of interest.

"Social Security and Medicare benefits, grants, payments to government contractors, including those that compete directly with Musk's own companies. All of it," he wrote on social media.

During the transition, Mr. Musk vocally opposed Mr. Bessent being picked as Mr. Trump's Treasury secretary. Mr. Musk, then just an empowered adviser to Mr. Trump, went public with his opinion that he preferred Howard Lutnick, a Wall Street executive, for the role because Mr. Bessent was "a business-as-usual choice." Mr. Lutnick became Mr. Trump's choice for Commerce secretary.

**Andrew Duehren** covers tax policy for The Times from Washington. More about Andrew Duehren

**Maggie Haberman** is a White House correspondent, reporting on the second, nonconsecutive term of Donald J. Trump. More about Maggie Haberman

**Theodore Schleifer** is a Times reporter covering billionaires and their impact on the world. More about Theodore Schleifer

**Alan Rappeport** is an economic policy reporter, based in Washington. He covers the Treasury Department and writes about taxes, trade and fiscal matters. More about Alan Rappeport

A version of this article appears in print on , Section A, Page 18 of the New York edition with the headline: Musk's Efficiency Team Gains Full Access to Treasury's Federal Payments System

000153

 **HUFFPOST**  Log In    GO AD-FREE

Become A HuffPost Member Today — And Go Ad Free!   See More

POLITICS    DONALD TRUMP    ELON MUSK    UNITED STATES DEPARTMENT OF THE TREASURY

# DOGE Aide Has Full Access To The Top Government Payment System: Reports

The system is responsible for trillions in government payments annually.

 **By Matt Shuham**

Feb 4, 2025, 01:28 PM EST

      928 COMMENTS





An aide to Elon Musk has administrative privileges in the Treasury Department's payment system, according to [two separate](#) [news reports](#) — something the White House has denied.

Musk is in charge of the so-called Department of Government Efficiency, or DOGE, which is a "temporary organization" President Donald Trump [created via executive order](#) rather than an official department.

ADVERTISEMENT

## FROM OUR PARTNER

Get Results: Complain Constructively



Within the organization, a [coterie of young aides with no government background](#) have glommed onto a number of key choke points in the federal government, including the [Office of Personnel Management](#), the [General Services Administration](#) and the [Treasury Department](#). The offices, respectively, are responsible for the federal government's workforce, its real estate, and its payment of a wide variety of funds, including Social Security benefits and tax returns.

The career civil servant who oversaw the Treasury Department's sensitive payment system [recently retired](#) after being put on administrative leave; he had unsuccessfully tried to resist DOGE's efforts



**Enlarged Prostate Has Nothing To Do With Age: Just Stop Doing This One**

Natural Healthy Way | Paid



☰ ▌▌ **DOGE Aide Has Full Access To The Top Government Payment System: Report** <span style="color:teal">Go Ad-Free</span>

systems responsible for "nearly all payments made by the US government," in the report's words.

ADVERTISEMENT



Two unnamed sources told the publication that Elez had many administrator-level privileges, including the ability to write code on the Payment Automation Manager and the Secure Payment System.

Between them, PAM and SPS are responsible for actual payment of money through the Federal Disbursement Services, which is housed within the Treasury Department's Bureau of the Fiscal Service. Federal Disbursement Services paid out $5.45 trillion in fiscal year 2024.

"You could do anything with these privileges," one unnamed source with knowledge of the system told Wired. Someone with the level of access Elez has would typically be able to change user permissions or delete or modify files, according to the report.

ADVERTISEMENT

## HUFFPOST SHOPPING'S BEST FINDS



**Podiatrists Shared The Best Tips To Make Walking More Comfortable — And It's Genius**



**These Reusable Swedish Dishcloths Saved Me A Bundle On Paper Towels**



**Cat Trees Are Actually Really Important For Cats' Well-Being, According To A Behaviorist**



**34 Things You Can Buy Online For Problems You'd Rather Not Broadcast**



**This Backpack Has A Secret Feature — And It's The TSA Hack You Never Knew You Needed**

Politics

Sign up for HuffPost's Politics email to get our top stories straight in your inbox.

address@email.com                    SIGN UP

By entering your email and clicking Sign Up, you're agreeing to let us send you customized marketing messages about us and our advertising partners. You are also agreeing to our Terms of Service and Privacy Policy.

Josh Marshall of Talking Points Memo confirmed Wired's reporting, writing that Elez not only had admin privileges but "has already made extensive changes" to the code base for the payments systems. The changes appeared to be related to potentially blocking payments and potentially leaving less visibility into what has been blocked.

Elez received full admin-level access Friday, according to the report. He has been working with some existing programming and engineering staff at the department who appeared to want to prevent damage to the systems, according to the report.

**Go Ad-Free — And Protect The Free Press**

The next four years will change America forever. But HuffPost won't back down when it comes to providing free and impartial journalism.

For the first time, we're offering an ad-free experience to qualifying contributors who support our fearless newsroom. We hope you'll join us.

SUPPORT HUFFPOST

Already contributed? Log in to hide these messages.

"Phrases like 'freaking out' are, not surprisingly, used to describe the reaction of the engineers who were responsible for maintaining the code base until a week ago," Marshall wrote.

1,847

Comments posted on **HuffPost** today

Comment



Wealthfront

AdChoices ▷                    Sponsor

000157

ADVERTISEMENT

Neither the Treasury Department nor Leavitt immediately responded to HuffPost's questions about the reports.

## RELATED

DONALD TRUMP    ELON MUSK    UNITED STATES DEPARTMENT OF THE TREASURY    DOGE

**Elon Musk Has A 'Special' New Job Title**

**U.S. Lawyer Vows To Protect DOGE Staff Amid Elon Musk's Government Takeover**

**USAID Staffers Told To Stay Out Of Washington HQ After Musk Said Trump Agreed To Close It**

**Elon Musk Suggests Getting Rid Of All Regulations In Midnight Call**

    ← GO TO HOMEPAGE    VIEW 928 COMMENTS

Suggest a correction    |    Submit a tip

000158

VITTORIA ELLIOTT    DHRUV MEHROTRA    LEAH FEIGER    TIM MARCHMAN

POLITICS    FEB 4, 2025 1:02 AM

# A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System

**The Bureau of the Fiscal Service is a sleepy part of the Treasury Department. It's also where, sources say, a 25-year-old engineer tied to Elon Musk has admin privileges over the code that controls Social Security payments, tax returns, and more.**

000159

A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System | WIRED
Case 8:25-cv-00462-TDC    Document 37-1    Filed 02/25/25    Page 165 of 959
2/17/25, 4:44 PM



year-old engineer named Marko Elez, who previously worked for two Musk companies, has direct access to Treasury Department systems responsible for nearly all payments made by the US government, three sources tell WIRED.

Two of those sources say that Elez's privileges include the ability not just to read but to write code on two of the most sensitive systems in the US government: the Payment Automation Manager and Secure Payment System at the Bureau of the Fiscal Service (BFS). Housed on a secure mainframe, these systems control, on a granular level, government payments that in their totality amount to more than a fifth of the US economy.

Despite reporting that suggests that Musk's so-called Department of Government Efficiency (DOGE) task force has access to these Treasury systems on a "read-only" level, sources say Elez, who has visited a Kansas City office housing BFS systems, has many administrator-level privileges. Typically, those admin privileges could give someone the power to log in to servers through secure shell access, navigate the entire file system, change user permissions, and delete or modify critical files. That could allow someone to bypass the security measures of, and potentially cause irreversible changes to, the very systems they have access to.

"You could do anything with these privileges," says one source with knowledge of the system, who adds that they cannot conceive of a reason that anyone would need them for purposes of simply hunting down fraudulent payments or analyzing disbursement flow.

000160

Case 8:25-cv-00046-LDC   Document 571   Filed 02/28/25   Page 166 of 959

"Technically I don't see why this couldn't happen," a federal IT worker tells WIRED in a phone call late on Monday night, referring to the possibility of a DOGE employee being granted elevated access to a government server. "If you would have asked me a week ago, I'd have told you that this kind of thing would never in a million years happen. But now, who the fuck knows."

A source says they are concerned that data could be passed from secure systems to DOGE operatives within the General Services Administration. WIRED reporting has shown that Elon Musk's associates—including Nicole Hollander, who slept in Twitter's offices as Musk acquired the company, and Thomas Shedd, a former Tesla engineer who now runs a GSA agency, along with a host of extremely young and inexperienced engineers—have infiltrated the GSA and have attempted to use White House security credentials to gain access to GSA tech, something experts have said is highly unusual and poses a huge security risk.

Elez, according to public databases and other records reviewed by WIRED, is a 25-year-old who graduated Rutgers University in 2021 and subsequently worked at SpaceX, Musk's space company, where he focused on vehicle telemetry, starship software, and satellite software. Elez then joined X, Musk's social media company, where he worked on search AI. Public Github repositories show years of software development, with a particular interest in distributed systems, recommendation engines, and machine learning. He does not appear to have prior government experience.

Elez did not immediately respond to a request for comment. The White House and Musk did not immediately respond to requests for comment.

000161

**Got a Tip?**

*Are you a current or former employee at the Treasury or Bureau of the Fiscal Service? Or other government tech worker? We'd like to hear from you. Using a nonwork phone or computer, contact the reporters securely on Signal at velliott88.18, dmehro.89, leahfeiger.86, and timmarchman.01.*

Broadly speaking, the US government pays out money in one of two ways. Agencies like the Department of Defense and the US Postal Service are legally authorized to originate, certify, and issue payments on their own. The vast majority of payments, though—including federal tax returns, Social Security benefits, Supplemental Security Income benefits, and veteran's pay —flow through the Federal Disbursement Services, which according to Treasury records paid out $5.45 trillion in fiscal year 2024. The Bureau of the Fiscal Service, a nonpartisan body, is charged with directing this money appropriately, moving it from government accounts to recipients. The Payment Automation Manager and the Secure Payment System are the mechanisms through which the money is paid out.

Control of those mechanisms could allow someone to choke off money to specific federal agencies or even individuals, a fear that Democrats have expressed about DOGE. On Monday, Senate Democrats warned of DOGE's encroachment into the payment system. "Will DOGE cut funding to programs approved by Congress that Donald Trump decides he doesn't like," said Senator Chuck Schumer of New York. "What about cancer research? Food banks? School lunches? Veterans aid? Literacy programs? Small business loans?"

The fight over whether DOGE could access Treasury systems led to a

000162

previously reported standoff between acting Treasury secretary David Lebryk and Musk's associates. Lebryk was placed on administrative leave last week and subsequently resigned.

"Lebryk's resignation set an example," a source tells WIRED. "Any idea of resistance or noncompliance seems to be fading in the wake of that, and everything I have heard from leadership suggests they intend to give the 'DOGE' operatives what they are asking for."

*Updated, 2/4/2025, 11:45 AM EDT: WIRED has updated the article to clarify on which mainframe the systems are housed.*

---

## You Might Also Like …

- **In your inbox:** WIRED's most ambitious, future-defining stories
- Musk takeover: The US government is not a startup
- **Big Story:** The bust that took down Durov and upended Telegram
- WIRED's favorite 'buy it for life' gear
- **Love Bytes:** The

000163

JD VANCE

# Elon Musk says DOGE staffer who resigned for racist X posts will be brought back

Marko Elez resigned after The Wall Street Journal reported he had posted racist messages to X that included "normalize Indian hate."



— Elon Musk in the U.S. Capitol on Dec. 5, 2024.

Tom Williams / CQ-Roll Call, Inc via Getty Images file

Feb. 7, 2025, 1:30 PM EST / Updated Feb. 7, 2025, 3:21 PM EST

000164

**By Jason Abbruzzese**

Elon Musk said Friday that he will bring back a DOGE staff member who resigned after it was found that he had previously made racist remarks online.

"To err is human, to forgive divine," Musk said in a repost to X of a post from Vice President JD Vance that also supported the staffer's reinstatement.



ADVERTISING

**Acquire Australian Residence**

Henley & Partners – Sponsored

**Contact Us**

The staff member, 25-year-old Marko Elez, resigned from the Department of Government Efficiency (DOGE) Thursday after The Wall Street Journal reported that he had made comments online that included supporting racism and eugenics. The White House confirmed to NBC News that Elez had resigned.

Earlier Friday, Vance said that he would support Elez's rehiring.

Vance made the comments on X, reposting a poll from DOGE head Elon

000165

Elon Musk says DOGE staffer who resigned for racist X posts will be brought back
Case 8:25-cv-00044271 DLC   Document 25-71   Filed 02/2/0255   Page 171 of 9597
2/17/25, 4:45 PM

Musk asking if the staff member should be brought back.

"I obviously disagree with some of Elez's posts, but I don't think stupid social media activity should ruin a kid's life," Vance wrote. "We shouldn't reward journalists who try to destroy people. Ever."

"So I say bring him back," Vance continued. "If he's a bad dude or a terrible member of the team, fire him for that."

President Donald Trump, when asked about Vance's response during a news conference, said, "I'm with the vice president."



000166

Read 21.1K replies

A Vance spokesperson declined to elaborate on the VP's post.

The Wall Street Journal said it reviewed archived posts from a deleted X account used by Elez in which he posted messages such as "Just for the record, I was racist before it was cool" and, "You could not pay me to marry outside of my ethnicity." "Normalize Indian hate," he wrote in another post. NBC News has not seen or verified those posts.

The Journal reported that the posts were made by an account, @nullllptr, that previously went by @marko_elez, and that the account said they were an employee at SpaceX and Starlink, matching Elez's experience posted on his personal website.

A text message and phone call to a number associated with Elez were not immediately returned, and he did not comment to the Journal.

The incident comes as Musk's DOGE has embarked on a wide-ranging effort to slash the government's workforce. The Trump administration has also sought to eliminate roles focused on social justice initiatives.

Elez was one of a cadre of young Musk hires who joined DOGE as part of what Musk has said is an effort aimed at "dismantling the radical-left shadow government." That has included tech-focused personnel with no government experience, some of whom have left behind considerable social media footprints.

Gavin Kliger, another DOGE staffer, was reported by Rolling Stone to have previously reposted content from Nick Fuentes, a white nationalist who has dined with President Donald Trump.

Kliger did not immediately respond to requests for comment sent via

000167

LinkedIn and email.

Rep. Ro Khanna, D-Calif., posted on X asking Vance if he'd tell Elez to apologize for his anti-Indian post, noting that both their families' children share Indian heritage. Vance's wife, Usha, is the daughter of Indian immigrants.

Vance fired back on X, charactizing Elez as a "kid" and saying that Khanna was engaging in "emotional blackmail pretending to be concern."

"You disgust me," Vance [wrote](#).

---

Jason Abbruzzese

Jason Abbruzzese is the assistant managing editor of tech and science for NBC News Digital.

---

Henry J. Gomez, Peter Alexander and Katherine Doyle contributed.

---

000169



☰   CNN Politics                                      Subscribe        Sign in

# Elon Musk said Donald Trump agreed USAID needs to be 'shut down'

By Jennifer Hansler, Alex Marquardt and Lex Harvey, CNN

🕐 5 minute read · Updated 7:48 AM EST, Mon February 3, 2025

   

000170

Video Ad Feedback

Alex Marquardt reports two top USAID security officials on leave amid dispute over DOGE access

03:18 - Source: CNN

**See More Videos**

**(CNN)** — Elon Musk said President Donald Trump agreed the US Agency for International Development needs to be "shut down," following days of speculation over the future of the agency after its funding was frozen and dozens of its employees were put on leave.

"With regards to the USAID stuff, I went over it with (the president) in detail and he agreed that we should shut it down," Musk said in a X Spaces conversation early Monday.

Musk said he checked with Trump "a few times" and Trump confirmed he wants to shut down the agency, which dispenses billions in humanitarian aid and development funding annually. CNN has reached out to the White House and USAID for comment.

Sunday evening, before the X Spaces conversation, when asked for comment on USAID, Trump told reporters: "It's been run by a bunch of radical lunatics, and we're getting them out, and then we'll make a decision" on its future.

Elon Musk said Donald Trump agreed USAID needs to be 'shut down' | CNN Politics
Case 8:25-cv-00445-LKG   Document 157-1   Filed 02/28/25   Page 177 of 959
2/17/25, 4:46 PM

Musk's comments come after two top security officials at USAID were put on administrative leave Saturday night for refusing members of the Department of Government Efficiency access to systems at the agency, even when DOGE personnel threatened to call law enforcement, multiple sources familiar with the situation told CNN.

Around 60 senior USAID staff were put on leave last week on accusations of attempting to circumvent Trump's executive order to freeze foreign aid for 90 days. Another senior official was put on leave for trying to reverse that move after finding no evidence of wrongdoing.

In the X Spaces conversation early Monday, which he co-hosted with Republican Sen. Joni Ernst of Iowa and Vivek Ramaswamy – who was initially named co-chair of DOGE with Musk but has since left – the X owner called USAID "incredibly politically partisan" and said it has been supporting "radically left causes throughout the world including things that are anti-American."



**LIVE UPDATES**
Trump signs tariffs on top trade partners as he enacts 'America First' agenda

Musk said USAID is "beyond repair," among other attacks he made against the agency created by Congress as an independent body.

We don't have "an apple with a worm in it," he said. "We have a ball of worms."

"USAID is a ball of worms."

USAID was established in 1961 under President John F. Kennedy's administration and is the US government's humanitarian arm. It dispenses billions of dollars annually across the world in an effort to alleviate poverty, treat diseases, and respond to famines and natural disasters. It also promotes democracy building and development by supporting non-government organizations, independent media and social initiatives.

USAID is a key soft power tool of the US to foster relations with communities around the world, officials say, noting that US national security is approached with the "three D" pillars: defense, diplomacy and development, led, respectively, by the Defense Department, State

Department and USAID.

# DOGE personnel gained access to USAID files, sources say

According to sources, personnel from the Musk-created office first physically tried to access the USAID headquarters in Washington, DC, and were stopped. The DOGE personnel demanded to be let in and threatened to call US Marshals to be allowed access, two of the sources said.

The DOGE personnel wanted to gain access to USAID security systems and personnel files, three sources said. Two of those sources also said the DOGE personnel wanted access to classified information, which only those with security clearances and a specific need to know are able to access.

Three sources told CNN that in the end, the DOGE personnel were eventually able to access the headquarters.

The incident, which had not been previously reported, is the latest showdown as the Trump-affiliated DOGE seeks to exert increasing authority over the federal government as it aims to slash spending.

In a letter to Secretary of State Marco Rubio Sunday, Democratic members of the US Senate Foreign Relations Committee requested "an immediate update about the access of USAID's headquarters, including whether the individuals who accessed the headquarters were authorized to be there and by whom."

"The potential access of sensitive, even classified, files, which may include the personally identifiable information (PII) of Americans working with USAID, and this incident as a whole, raises deep concerns about the protection and safeguarding of matters related to U.S. national security," the letter said.

The Senators also wrote that "any effort to merge or fold USAID into the Department of State should be, and by law must be, previewed, discussed and approved by Congress.

Katie Miller, whom Trump named to DOGE in December, on Sunday appeared to confirm that DOGE personnel had accessed classified information.

"No classified material was accessed without proper security clearances," she posted on X.

On Sunday, in response to CNN's report about the incident, Musk said that "USAID is a criminal organization."

"Time for it to die," he posted on X.

> **RELATED ARTICLE**
> USAID website goes offline amid Trump administration's freeze on foreign aid

Other top Trump officials, such as Stephen Miller, who serves as deputy chief of staff for policy at the White House, have also taken aim at USAID, accusing its workforce of being overwhelmingly Democrats.

On Saturday, USAID's website went dark and a new page for the agency appeared on the State Department website. USAID's X account also went offline Saturday.

A source told CNN that the entire USAID public affairs office was put on leave and locked out of their systems.

Shortly after being sworn in last month, Trump issued a sweeping executive order pausing all foreign aid for 90 days, leading to widespread confusion, layoffs and program shutdowns.

USAID Director of Security John Voorhees and his deputy are among dozens of USAID officials who have been put on leave amid fears that the agency is being intentionally dismantled — a move that some aid officials argue would have massive negative implications.

Aid officials argue the State Department isn't equipped to take over and sustain USAID's vast number of development projects. It would also erase, they argue, unique and essential soft power that can't be replicated.

The State Department doesn't "have the capacity, the expertise, the training to do that kind

000174

The State Department doesn't "have the capacity, the expertise, the training to do that kind of work. It is a completely separate line of effort that is undertaken on the ground," a former senior USAID official said.

"The one element of the US government bureaucracy on the ground in foreign places that has been able to get out beyond the wire and actually have a deeper understanding of the places in which we work is USAID," the former official continued, requesting anonymity due to growing and widespread fears of being targeted by the Trump administration.

"That ability to work in that way, that culture — and it is a culture I think — gets lost. And with it, I think we lose an enormous, incredibly valuable tool of US foreign policy. We're basically going to be punching with one arm behind our back," the person said.

*This story and headline have been updated with additional reporting.*

**PAID CONTENT**

## Urologist: Frequent Urination & Weak Stream? Do this Before Bed

Sponsored: Natural Healthy Way

## Costco Shoppers Say This Wrinkle Cream Is "Absolutely Worth It"

You won't see a product rescue aging skin quite like this serum.

Sponsored: seniorskinsolutions.com

Latest    Local News    Live    Shows

U.S.    World    Politics    HealthWatch    MoneyWatch    Entertainment    Crime    Sports

POLITICS

# Two top security officials at USAID placed on leave, sources say

By **Margaret Brennan**, Sophia Barkoff, **Jennifer Jacobs**, Sara Cook

Updated on: February 3, 2025 / 12:15 PM EST / CBS News

## More from CBS News

**Trump administration fires over 400 DHS employees as mass**



**CDC's "disease detectives" halved as part of DOGE cuts at**



**Thousands of probationary federal health workers fired by**



**Musk's DOGE is at the IRS, raising concerns about taxpayer data**



Two top security officials at the U.S. Agency for International Development have been placed on administrative leave, the latest in a series of suspensions and layoffs at the American government's

000176

Two top security officials at USAID placed on leave, sources say - CBS News
Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/28/25   Page 182 of 959
2/17/25, 5:01 PM

primary humanitarian aid agency.

President Trump is considering dramatic changes to USAID, as advisers examine where there's overlap with other agencies or where its spending runs counter to the president's stances.

USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill were put on leave Saturday night, two sources confirmed to CBS News.

Multiple sources confirmed to CBS News that the two top security officials were fired for attempting to block the Elon Musk-run Department of Government Efficiency's (DOGE) access to classified material in restricted areas. The reason for the firing was first reported by the Associated Press.

DOGE spokesperson Katie Miller did not respond to requests for comment, but did repost the AP article on X with the comment, "No classified material was accessed without proper security clearances."

**AD**




TruHeight Vitamins
**25% off your first subscription!**
Maximize your growth potential with TruHeight Kids.

Shop Now!



Matt Hopson, who was recently appointed USAID chief of staff by Mr. Trump, resigned Sunday, according to two current USAID

000177

staffers. There was no mass email about it. The staffers said it happened after his involvement, alongside the two other security staffers, in blocking DOGE officials from getting access over the weekend.

Vice President JD Vance is in charge of figuring out next steps for USAID reform, per one person familiar with Trump's decision. A spokesperson for Vance declined to comment.

Mr. Trump told reporters Sunday night upon returning to Washington, D.C., from Palm Beach, Florida, that USAID has been run by "a bunch of radical lunatics."

"We're getting them out," he said, "and then we'll make a decision."

No executive order was imminent – officials are still in the planning phase, sources said last week. But the president is interested in reforming the agency, they said.

One option is to possibly fold it into the State Department, but other possibilities are on the table, two sources told CBS News.

Republican Rep. Brian Mast, chairman of the House Foreign Affairs Committee, which provides oversight of the State Department, said Sunday on "Face the Nation with Margaret Brennan" that USAID is "likely going to be rolled more closely under Secretary Rubio." USAID already reports to the Secretary of State but the Trump administration is looking at ways to combine it or fold it into the State Department.

On Monday, USAID employees were instructed to stay out of headquarters, and staffers who came by the agency's annex to get their belongings found that turnstiles had been turned off and they were escorted from the building.

Mast did not detail what specific changes will be made but indicated that he intends to initiate changes via Congress as well. USAID was established in 1961 by an act of Congress.

000178

"I would be absolutely for, if that's the path we go down, removing USAID as a separate department, and having it fall under whether the other parts of the United States, Department of State, because of its failure," Mast claimed on "Face the Nation."

CBS previously reported that the person heading up the efforts to reshape USAID is Pete Marocco, a former deputy assistant secretary of African Affairs at the Pentagon. Marocco is now serving in a senior directing role in the State Department's Foreign Assistance Office, which oversees foreign assistance programs administered by the State Department and USAID.

Freezing foreign aid was a Trump campaign promise to only support efforts that serve America's national security interest and to cut costs. However, foreign aid makes up just 1% of the federal budget.

U.S. foreign aid agencies almost never directly implement aid programs, choosing to partner with non-governmental organizations, public international organizations, and sometimes foreign governments to carry them out. The Trump administration's 90-day freeze on almost all foreign aid means that these contractors are not being paid for work already in progress.

With no indication that the aid freeze will be lifted soon, contractors are furloughing and/or terminating employees en masse.

An aid worker with contracts around the world told CBS that organizations are expecting to face lawsuits in foreign countries from governments who consider them in breach.

## USAID viewed by some Trump officials as too influenced by "woke" politics

Some top officials in the Trump administration view USAID, created by President John F. Kennedy to counter Cold War geopolitics, as an agency that has become overly influenced by left-wing and "woke" politics. They had privately voiced concerns that

000179

Two top security officials at USAID placed on leave, sources say - CBS News
Case 8:25-cv-00462-TDC   Document 25-1   Filed 02/20/25   Page 185 of 959
2/17/25, 5:01 PM

it hasn't had enough oversight, including from Congress.

Some in the administration, including Musk, have argued that Trump should shut USAID down altogether. On Sunday, Musk posted on his social media platform X: "USAID is a criminal organization. Time for it to die."

But not all of Trump's top advisors agree with Musk, multiple sources said.

## USAID website goes dark, multiple aid agencies say they are hobbled by funding freeze

The USAID website went offline on Saturday, and remained inaccessible on Sunday. Dozens of employees in the legislative and public affairs offices at the agency suddenly lost system and email access on Saturday night, three sources told CBS News.

Trump officials want to look into ways to streamline programs with a footprint in more than one government agency. USAID also contracts with multiple non-profits to implement programs.

As the Trump administration weighs restructuring USAID, the humanitarian aid program that does everything from funding polio and malaria eradication efforts overseas to emergency response to natural disasters, and removing old U.S. bombs from battlefields, aid organizations told CBS News that they are already preparing to lay off thousands of U.S. based aid workers this week.

Multiple aid organizations told CBS News that they are hobbled by Trump's funding freeze as contractors front money for projects and then apply for reimbursement from the U.S. government. As a result, the stop work order issued by Secretary of State Marco Rubio triggered financial crises at these international organizations who are also unable to receive backpay for work already performed, multiple aid organizations told CBS news.

Tom Hart, President and CEO of InterAction told CBS News that even after Rubio issued waivers to some organizations, the changes

000180

have not resulted in a flow of funds.

 "The current reality is life-saving medications expiring on shelves while children fall ill. Food aid rotting in warehouses while families go hungry. This isn't just a humanitarian catastrophe–it's an unconscionable waste of taxpayer resources that undermines America's investments in global stability and human dignity."

"This disruption is upending relationships built with communities over the last 60 years–relationships the Administration may find hard to restore after its review," Hart said.

The Trump administration has disrupted operations at organizations that also seem to be consistent with the America First agenda and efforts to stem illegal migration to the U.S. CBS News obtained a list of 13 organizations in El Salvador, Honduras, Mexico, Colombia and Guatemala whose efforts are aimed at countering factors that drive migration. In El Salvador, the Skills for Employment project helps some 12,000 Salvadorans get jobs so they don't migrate to the U.S. In Honduras, Effective Justice combats organizedf crime networks. In Colombia, the Venezuelan response ensures migrants do not migrate illegally to the U.S.

## Concerns over PEPFAR

Another program, PEPFAR, the President's Emergency Plan for AIDS Relief, received a waiver to resume specific types of operations within their broad portfolio of AIDS relief and HIV services, three sources confirmed this weekend to CBS News. Health officials indicated  that they are still waiting to see how narrowly the services will be defined including the question of whether it will include preventative treatments. Former aid officials shared concerns that global health programs are not yet turned back on, including those aimed at preventing malaria and tuberculosis.

"This is not a pause, it is a demolition," Atul Gawande, former USAID Global Health Director, told CBS News. "You cannot pause a flight in midair, that's what they're trying to do."

000181

The Trump administration has stipulated the review is to last 90 days but the stop work order from Rubio immediately ceased operations for many organizations. Since the freeze is taking place while the review is being conducted, it has caused an immediate disruption with real world impact such as disruption of anti-viral medication to HIV positive individuals, including children.

"There was a release of that hold that was put, that was authorized, but it shouldn't be the case that the American people fund HIV and AIDS drugs for 20 million people across Africa, where many of these countries are working very directly with our adversaries, like China," Mast told "Face the Nation," confirming portions of PEPFAR had resumed. But he referred to it as a "grift" and raised questions about its fate.

"That is an example of them taking us for granted," Mast said. "We need to be asking the question, should they be weaning off of this, should we be paying for these very expensive HIV and AIDS drugs?"

But these efforts have been deemed in U.S. national security interests by multiple presidents, and a type of "soft power" that wins goodwill for the U.S. in the competition for influence against adversaries. It is now China, but during the Cold War when the established the prime competition was the Soviet Union, USAID efforts were effective in Eastern Europe and elsewhere.

CBS News reported last week that roughly 450 contractors were terminated from the Bureau for Global Health, which is responsible for overseeing the implementation of PEPFAR. More federal employees in the Global Health bureau have since been placed on administrative leave, raising concerns about how these programs will be implemented, despite the foreign assistance waiver for HIV/AIDS programs.

## More from CBS News

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/25/25   Page 188 of 959

**Support the Guardian**
Fund independent journalism with $5 per month

Support us →

Print subscriptions | Newsletters | Sign in

**USAid**

# Doge v USAid: how Elon Musk helped his acolytes infiltrate world's biggest aid agency

**Exclusive: Takeover of USAid agency by Doge operatives seen as pilot for large-scale overhaul of federal government**



 People protest outside USAid's headquarters in Washington DC on 3 February 2025. Photograph: Mandel Ngan/AFP/Getty Images

 **Andrew Roth** *in Washington*
Wed 5 Feb 2025 12.26 EST

USAid security personnel were defending a secure room holding sensitive and classified data in a standoff with "department of government efficiency"

**Most viewed**

The new world order is exactly what it looks like. Are we too frozen with fear to name it?
Zoe Williams

Doge v USAid: how Elon Musk helped his acolytes infiltrate world's biggest aid agency | USAid | The Guardian
2/17/25, 5:00 PM

Case 8:25-cv-00446-TDC   Document 23-1   Filed 02/25/25   Page 189 of 959

employees when a message came directly from Elon Musk: give the Doge kids whatever they want.

Since Donald Trump's inauguration last month, a posse of cocksure young engineers answering to Musk have stormed through Washington DC, gaining access to government computer systems as part of what Senator Chuck Schumer has called "an unelected shadow government … conducting a hostile takeover of the federal government".

The young men, who are all under the age of 26 and have almost no government experience, have tapped into the treasury department's federal payment system and vacuumed up employment histories at the office of personnel management (OPM). Roughly 20 Doge employees are now working out of the Department of Education, the Washington Post has reported, and have gained access to sensitive internal systems there too. On Wednesday, the Wall Street Journal reported they had infiltrated the Centers for Medicare and Medicaid Services and accessed key systems as well.

The young engineers, whose identities have been confirmed to the Guardian, wanted the same at USAid. One of them, Gavin Kliger, was a 25-year-old techie who has defended the failed attorney general nominee Matt Gaetz as a victim of the "deep state" and claimed he had left behind a seven-figure salary to join Doge and "save America". Another, Luke Farritor, 23, was a former SpaceX intern who had been given top-level clearances to USAid systems and had requested similar to Medicare and Medicaid. A third, Jeremy Lewin, was reportedly assigned to the General Services Administration. A superior planned to lobby the CIA for a clearance for him after he failed to gain access to a secure area.

Some US officials had begun calling the young engineers the "Muskovites" for their aggressive loyalty to the SpaceX owner. But some USAid staff used another word: the "incels".

The Guardian has identified three calls by Musk to USAid's political leadership and security officers in which he demanded the suspensions of dozens of the agency's leading officials, and cajoled and threatened senior USAid officials to give his acolytes private data and access to restricted areas. At one point, he threatened to call in the US Marshals Service.

One USAid employee said that the calls by Musk, two of which have not been previously reported, showed he had effectively usurped power at the agency even from the Trump administration's political leadership. "Who is in control of our government?" the person said. "[Doge] basically showed up and took over."

In the Heritage Foundation's Project 2025, USAid had been presented as a pilot test for a large-scale overhaul of the federal government that would downsize agencies and arbitrarily move federal employees to looser contracts that made them easier to fire.

"If the Trump administration is successful here, they're going to try this everywhere else," said Senator Andy Kim of New Jersey, a former USAid employee who came to protest alongside fired and furloughed workers outside the agency's headquarters on Monday. "This is just the beginning."


A 'great shock': Julianne Moore's children's book under review by Trump administration


Jewish man mistakes two Israeli tourists for Palestinians and opens fire on them in Miami


'This is a coup': Trump and Musk's purge is cutting more than costs, say experts


Trump administration files first supreme court appeal over firing of government watchdog

000184

A building security officer stands at a checkpoint in the lobby of the USAid office in Washington. Staffers have been instructed via an email to stay out of the agency's headquarters. Photograph: Shawn Thew/EPA

But it has also been a primer on how Doge operatives have inserted themselves into federal agencies and cajoled and bullied their way to access their most sensitive systems. This account of Doge's infiltration of USAid is based on interviews with more than a dozen current and former USAid, state department and other officials briefed on the events of the last week.

Security staff initially rebuffed the engineers' efforts to talk their way into the secure rooms, called sensitive compartmented information facilities (Scifs), because they didn't have the necessary security clearances. But that evening, Musk phoned a senior official at USAid to demand access for his subordinates, the first of numerous calls to officials and employees of Doge at USAid that have continued into this week.

Inside the building, chaos reigned. Areas that were once declared restricted, with limitations on electronics such as phones and watches, suddenly loosened their security protocols to allow in uncredentialed outsiders. Doge employees were said to obscure their identities to prevent online harassment, a tactic that was repeated at other agencies. And Peter Marocco, the controversial new director of foreign assistance at the state department, was stalking the halls and meeting in private with the Doge employees.

By Friday, things had gone further downhill. After a tense all-hands meeting with senior staff, and outsiders in the sixth-floor conference room, the young engineers rushed around the offices with their laptops, plugging cords into computers and other electronics as they gathered data from the agency.

After the meeting, Matt Hopson, a Trump appointee for USAid chief of staff, abruptly resigned. Jason Gray, the acting administrator, was removed from his position. The secretary of state, Marco Rubio, was soon to announce that he was the new administrator of USAid and appoint Marocco as his deputy. Musk was closing in on his goal.

000185

Doge v USAid: how Elon Musk helped his acolytes infiltrate world's biggest aid agency | USAid | The Guardian    2/17/25, 5:00 PM

Case 8:25-cv-00442-1 LLC    Document 23-1    Filed 02/25/25    Page 191 of 597

The Doge employees had open access to rooms throughout the sixth floor, including the offices of the administrator's suite. But the Scifs were still off limits.

At USAid, a newly installed leadership was formally in charge. But the real power lay with Marocco and Doge, which was plotting how to wind down the agency, a plan that Trump endorsed on Tuesday afternoon as he confirmed that teams were backed by the White House. That evening, USAid announced it would put all its direct-hire personnel around the world on administrative leave, a decision that would affect thousands of employees and their families.

Inside of USAid, the operation to shut down the decades-old operation was being run by Marocco, four engineers in their early 20s and the Doge leadership that contacted them by phone.

"It's all being driven through Doge right now," said a current USAid official, adding that Doge engineers in USAid headquarters continued to field calls from Musk and Marocco on Monday. "The folks in the building are turning the system off for [USAid employees], they've kept a small number of people from the different bureaus to help understand what programs will be kept and not kept, what the footprint will look like."

📷 Signage for USAid is seen on a cargo container behind people sorting through salvageable items to be sold to junk shops in Manila, Philippines, on Monday. Photograph: Jam Sta Rosa/AFP/Getty Images

The tension at USAid headquarters came to a head on Saturday evening, when Doge employees demanded access to the Scif on the agency's sixth floor. They were stopped by the agency's top security officer, John Voorhees.

Among those present was Steve Davis, according to one current and one former USAid official. Davis, a Musk deputy, has worked with the billionaire for more than 20 years at SpaceX and the Boring Company. He reportedly sometimes slept in the Twitter offices to help Musk slash costs there after he acquired it in 2022.

000186

**Sign up to This Week in Trumpland**    ✉ Free newsletter

A deep dive into the policies, controversies and oddities surrounding the
Trump administration

**Enter your email address**

Sign up

**Privacy Notice:** Newsletters may contain info about charities, online ads, and content funded by outside
parties. For more information see our Privacy Policy. We use Google reCaptcha to protect our website and the
Google Privacy Policy and Terms of Service apply.

The argument over access to the Scif had grown verbally heated and senior
Doge staff threatened to call in US marshals to gain access to it. During that
standoff, according to one account made to the Guardian, a call was again
made to Musk, who, as Bloomberg first reported, repeated the threat to
involve the US Marshals Service.

Shortly after, Voorhees was placed on administrative leave and the Doge
staffers entered the Scif. They took over the access control system and
employee records. Within hours, the USAid website went down. Hundreds of
employees were locked out of the system that weekend, and many still don't
know their status. (The Guardian has seen emails in which USAid
administrators admit they do not know the employment states of current
USAid officials.)

"I've been furloughed, I guess?" said one contractor with 15 years of
experience for the bureau for humanitarian assistance, where she had helped
coordinate urgent responses in Ukraine, Gaza, Somalia and Latin America. "I
don't know what my status is but I don't think I work here right now."

By Monday, Kliger wrote an email to all staff at 12.42am to tell them not to
bother coming into the building that day.

The incident has illustrated how Doge employees with Musk's backing were
able to override USAid leadership and bypass government procedures for
accessing restricted areas with classified materials, fueling criticism that his
agency is a national security risk.

"Did Secretary Rubio allow this kind of access by Musk's employees?" asked
Kim. "It worries me about USAid but if it's happening here, I'm guessing it's
probably happening at all these other national security agencies."

Formally, Rubio has delegated responsibility to Marocco, who has been
pressed by congressional staffers to give details of the changes affecting
USAid and the $40bn in foreign aid it manages each year.

"The question at hand is: who's in charge of the state
department?" Senator Brian Schatz told the Guardian. "So far the answer has
been Pete Marocco."

Doge did not respond to questions about what security clearances, if any, the
engineers held. "No classified material was accessed without proper security
clearances," wrote Katie Miller, a Doge spokesperson, on social media.

But Scifs are regulated by a strict protocol and it is unclear who could have
verified the Doge employees' credentials and filed the necessary paperwork

to allow them to enter.

Inside the building, staffers said that Doge cultivated a culture of fear.

"It's an extreme version of 'who do you trust, when and how?'" said Kristina Drye, a speechwriter at the agency, who watched dozens of senior colleagues escorted out of the building by security. "It felt like the Soviet stories that one day someone is beside you and the next day they're not."

People started meeting for coffee blocks away because "they didn't feel safe in the coffee shops here to even talk about what's going on", she added.

"I was in the elevator one morning and there was an older lady standing beside me and she had glasses on and I could see tears coming down under her glasses and before she got off her elevator she took her glasses off, wiped her eyes, and walked out," she said. "Because if they see you crying, they know where you stand."

000188

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/25/25   Page 194 of 959

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/25/25   Page 194 of 959



FEDSCOOP

FEDERAL

# USAID website goes dark, staff emails deactivated amid DOGE takeover, source says

DOGE workers' access to USAID systems signals an uncertain fate for the development agency.

BY REBECCA HEILWEIL • FEBRUARY 2, 2025

▶ Listen to this article    1:20    Learn more.

A view of the USAID sign above the entrance of the Ronald Reagan Building and International Trade Center in Washington, D.C. (Getty Images)

## More Like This

Treasury watchdog will aud
to payment systems

BY MATT BRACKEN

AFGE says it will fight mass
refuting 'performance' claim

BY MADISON ALDER

000189

T he main website for USAID went offline this weekend and thousands of staffers may have lost access to their email accounts amid rumors that the Trump administration intends to eliminate the agency.

The website went dark after staffers associated with the Elon Musk-led Department of Government Efficiency gained access to the domain and then blocked USAID employees, a person familiar with the matter told FedScoop. The source said around 2,000 email accounts associated with USAID workers have since been deactivated.

USAID did not respond to a request for comment by the time of publication.

The news follows a massive and sudden pause on American international aid that's shaken global development groups charged with disbursing critical and life-saving resources.

DOGE staffers have reportedly taken over other computer systems in the government, including in the Office of Personnel Management and the Treasury Department. The Trump administration has pulled down other government websites in recent days, including a Centers for Disease Control and Prevention data page and Census.gov, though both were later restored.

---



### Written by Rebecca Heilweil

Rebecca Heilweil is an investigative reporter for FedScoop. She writes about the intersection of government, tech policy, and emerging technologies. Previously she was a reporter at Vox's tech site, Recode. She's also written for Slate, Wired, the Wall Street Journal, and other publications. You can reach her at rebecca.heilweil@fedscoop.com. Message her if you'd like to chat on Signal.

## In This Story

UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT (USAID)

DEPARTMENT OF GOVERNMENT EFFICIENCY (DOGE)

# More Scoops

SHARE

DOGE 'touch-base' sessions preceded probationary term says

BY CAROLINE NIHILL



## Student group asks federal court to halt DOGE access to Education Department data

The complaint from the University of California Student Association asks the court to stop the agency from providing DOGE with unauthorized access to personal and financial information.

BY **CAROLINE NIHILL**



**Across the world, USAID workers' government phones are being disconnected**

BY **REBECCA HEILWEIL**    **CAROLINE NIHILL**



**CIOs of USDA, USAID named agency leaders until Trump picks enter office**

BY **BILLY MITCHELL**

Software license purchases need better agency tracking, GAO says

BY **MATT BRACKEN**

000191

**Trump administration**

# USAid website offline as Trump moves to put agency under state department

**Move would threaten life-saving global humanitarian aid programs, from HIV/Aids treatments to clean water access**



📷 The USAid flag outside the USAid building in Washington DC on 1 February 2025. Photograph: Annabelle Gordon/Reuters

**Edward Helmore**

Sat 1 Feb 2025 17.09 EST

The website for the US Agency for International Development, or USAid, appeared to be offline on Saturday, as the Trump administration moves to put the free-standing agency, and its current $42.8bn budget for global humanitarian operations, under state department control.

A message stating that the "server IP address could not be found" appeared when attempts were made to access the website on Saturday.

Two sources familiar with the discussions told Reuters on Friday that the Trump administration was moving to strip USAid of its independence as a government agency and put it under state department control.

The apparent failure of the website comes after plaques embossed with the agency's official seal were removed on Friday, according to Reuters, a sign that the merger into the state department was in the works.

The move comes as the Trump administration has vowed to overhaul the distribution of foreign aid, saying last week it was freezing foreign aid while conducting a review to ensure that assistance worldwide is aligned with Trump's "America First" foreign policies.

Current and former USAid officials said this week that a purge of senior staff

---

**Most viewed**



The new world order is exactly what it looks like. Are we too frozen with fear to name it?

Zoe Williams

appeared designed to silence any dissent and that bringing the agency under the state department would be a "seismic shift".

"This moves the United States government to a place where the humanitarian voice will not be in high-level policy discussions," the official said.

In an opinion column in the Wall Street Journal, the US secretary of state, Marco Rubio – who would assume oversight over USAid if it were or had been placed under the state department – outlined a new US diplomatic focus on the western hemisphere.

Rubio said he would make his first trip as the nation's most senior diplomat to El Salvador, Guatemala, Costa Rica, Panama and the Dominican Republic.

"These nations were neglected by past administrations that prioritized the global over the local and pursued policies that accelerated China's economic development, often at our neighbors' expense," Rubio wrote.

Reuters reported that the White House was exploring legal authority that Trump could use to issue an executive order to end USAid's independence and that he could sign such a directive as soon as Friday night or Saturday.

"Watch USAID tonight," Chris Murphy, a Democratic senator and member of the Senate foreign relations committee, said in a post on X on Friday evening.

Chuck Schumer, the Senate minority leader, citing a "rumor" that Trump planned to dissolve USAid as an independent agency, said in an X post that such a move would be "illegal and against our national interests".

But it is unclear whether the president has the legal authority to bypass Congress and order USAid's merger into the state department.

**Sign up to Headlines US**                    ✉ **Free newsletter**

Get the most important US headlines and highlights emailed direct to you every morning

**Enter your email address**

[                                        ]    Sign up

**Privacy Notice:** Newsletters may contain info about charities, online ads, and content funded by outside parties. For more information see our Privacy Policy. We use Google reCaptcha to protect our website and the Google Privacy Policy and Terms of Service apply.

If placed under the state department, USAid could become a more explicit armature of foreign policy goals than it has been as the world's largest single donor of life-saving humanitarian operations.

USAid has in the past been able to assist countries with whom the United States has no diplomatic relations, including Iran. A source at the agency told Reuters that the non-alignment with the US diplomatic mission had helped build bridges that might not have come to be under purely political objectives.

Perhaps signaling the new administration's plan to fold the agency under the



**A 'great shock': Julianne Moore's children's book under review by Trump administration**



**Jewish man mistakes two Israeli tourists for Palestinians and opens fire on them in Miami**



**'This is a coup': Trump and Musk's purge is cutting more than costs, say experts**



**Trump administration files first supreme court appeal over firing of government watchdog**

000193

state department, Trump has not nominated a person to run USAid.

The costs of a freeze on US foreign aid grants is already being felt. Field hospitals in Thai refugee camps, landmine clearance in war zones, and drugs to treat millions suffering from diseases such as HIV are among the programs facing defunding.

In fiscal year 2023, the United States disbursed $72bn of assistance worldwide on everything from women's health in conflict zones to access to clean water, HIV/Aids treatments, energy security and anti-corruption work. It provided 42% of all humanitarian aid tracked by the United Nations in 2024.

Following Trump's executive order last week, the state department issued worldwide stop-work directives, effectively freezing all foreign aid with the exception of emergency food assistance in a move that experts warned risked killing people.

Rubio earlier this week issued an additional waiver for "life-saving humanitarian assistance" while Washington undertakes the 90-day review.

000194









# WATCH: Trump makes appearance with Musk, signs executive order downsizing federal workforce

**Politics**   Feb 11, 2025 6:08 PM EST

WASHINGTON (AP) — President Donald Trump made a rare appearance with Elon Musk, his most powerful adviser, in the Oval Office on Tuesday before signing an executive order to continue downsizing the federal workforce.

**Watch Trump and Musk speak to the media in the player above.**

The Associated Press reviewed a White House fact sheet on the order, which is intended to advance Musk's work slashing spending with his Department of Government Efficiency.

Musk said there are some good people in the federal bureaucracy but they need to be accountable and called it an "unelected" fourth branch.

"The people voted for major government reform and that's what the people are going to get," he said. "That's what democracy is all about."

It was Musk's first time taking questions from reporters since he joined the Trump administration as a special government employee with sprawling influence over federal agencies. He's also the world's richest person and the owner of X, the social media platform formerly known as Twitter.

Despite concerns that he's amassing unaccountable power with little transparency, Musk described himself as an open book. He joked that the scrutiny was like a "daily proctology exam."

The White House fact sheet said that "agencies will undertake plans for large-scale reductions in force and determine which agency components (or agencies themselves) may be eliminated or combined because their functions aren't required by law."

It also said that agencies should "hire no more than one employee for every four employees that depart from federal service." There are plans for exceptions when it comes to immigration, law enforcement and public safety.

Trump and Musk are pushing federal workers to resign in return for financial incentives, although their plan is currently on hold while a judge reviews its legality. The deferred resignation program, commonly described as a buyout, would allow employees to quit and still get paid until Sept. 30. Administration officials said more than 65,000 workers have taken the offer.

000198

Case 8:25-cv-00648-TDC    Document 25-1    Filed 02/28/25    Page 204 of 959

Hundreds of people gathered for a rally Tuesday across the street from the U.S. Capitol in support of federal workers.

Janet Connelly, a graphic designer with the Department of Energy, said she's fed up with emails from the Office of Personnel Management encouraging people to take the deferred resignation program.

She tried to use her spam settings to filter out the emails but to no avail. Connelly said she has no plans to take the offer.

"From the get-go, I didn't trust it," she said.

Connelly said she thinks of her work as trying to do an important service for the American public.

"It's too easy to vilify us," she said.

Others have said fear and uncertainty have swept through the federal workforce.

"They're worried about their jobs. They're worried about their families. They're also worried about their work and the communities they serve," said Helen Bottcher, a former Environmental Protection Agency employee and current union leader in Seattle.

Bottcher participated in a press conference hosted by Sen. Patty Murray, a Democrat from Washington.
Murray said workers "deserve better than to be threatened, intimidated and pushed out the door by Elon Musk and Donald Trump." She also said that "we actually need these people to stay in their jobs or things are going to start breaking."

A government lawyer, who spoke to the Associated Press on the condition of anonymity because of fears of retaliation, said it was a terrifying time to be a federal worker.

She said people are worried that their phones and computers are being monitored. She's a single mother with a young daughter, and her father is urging her to take a safer job in the private sector.

But she's skeptical of the deferred resignation program, emphasizing that accepting the offer means workers can't sue if they're not paid what they're promised.

The idea, she said, was insane.

*AP writers Martha Bellisle in Seattle, Rebecca Santana, Michelle L. Price and Brian Witte in Annapolis, Maryland contributed to this report.*

*By —* **Chris Megerian, Associated Press**

000199



The lobby of the US Consumer Financial Protection Bureau headquarters as a worker removes belongings from the building in Washington on Feb. 9. *Photographer: Stefani Reynolds/Bloomberg*

Politics + Technology

# DOGE-Backed Halt at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet

Government-efficiency team's initial 'read-only' access expanded quickly to encompass closely guarded data, internal emails say.

By <u>Jason Leopold</u> and <u>Evan Weinberger</u>
February 10, 2025 at 5:00 AM EST

In another weekend takeover of a federal agency's operations, staffers from a efficiency initiative led by billionaire Elon Musk helped to effectively shut down the Consumer Financial Protection Bureau – as they gained access to a array of the bureau's protected information.

The actions began last Thursday, when four young staffers working under Musk for the Department of Government Efficiency, or DOGE, showed up at CFPB's Washington headquarters. At first, they had what was described as read-only access to a limited array of documents, including the agency's

Save now with a special offer.

## Subscribe now for

Case 8:25-cv-00462-TDC Document 23-1 Filed 02/20/25 Page 206 of 959
uninterrupted access.

Get the context behind every story for $1.99/month. Cancel anytime.

Or pay with credit card

Save now with a special offer.

Subscribe now for



2/17/25, 9:40 PM
Dozens of CFPB Workers Fired in After-Hours Blitz | WIRED
Case 8:25-cv-00462-TDC Document 23-1 Filed 02/20/25 Page 207 of 959

MAKENA KELLY    DHRUV MEHROTRA    **POLITICS**    FEB 11, 2025 10:41 PM

# Dozens of CFPB Workers Fired in After-Hours Blitz

**Some affected employees of the Consumer Financial Protection Bureau were notified with an email that addressed them as [EmployeeFirstName] [EmployeeLastName], [Job Title], [Division].**



The US Consumer Financial Protection Bureau headquarters in Washington, DC. PHOTOGRAPH: GETTY IMAGES

**SAVE**

Dozens of <u>Consumer Finance Protection Bureau employees</u> were terminated on Tuesday evening, sources tell WIRED.

The cuts largely targeted contractors and so-called probationary employees, workers who have served less than two years at the agency. Sources tell WIRED that the CFPB's enforcement division was hit hard, but it's unclear how many employees were let go.

---

## Politics Lab Newsletter by Makena Kelly

Not your average politics newsletter. Makena Kelly and the WIRED Politics team help you make sense of how the internet is shaping our political reality.

```
┌──────────────────────────────────────────────────────┐
│                                                      │
└──────────────────────────────────────────────────────┘
```

SIGN UP

By signing up, you agree to our <u>user agreement</u> (including <u>class action waiver and arbitration provisions</u>), and acknowledge our <u>privacy policy</u>.

Workers were informed that they had been fired with a frenetic email delivered around 9 pm ET on Tuesday. An evidently failed mail merge meant that some affected employees were addressed as [EmployeeFirstName][EmployeeLastName], [Job Title], [Division].

"This is to provide notification that I am removing you from your position of [Job Title] and federal service consistent with the above references," the email from acting chief human capital officer Adam Martinez says. "Unfortunately, the Agency finds that that [sic] you are not fit for continued employment because your ability, knowledge and skills do not fit the Agency's current needs."

000203

The firings follow a tumultuous few days at the CFPB. On Friday, staff for Elon Musk's Department of Government Efficiency shut down a portion of the agency's homepage after a day of struggling to obtain access to the CMS and other systems. WIRED reported last week that three DOGE staffers, including Gavin Kliger and Nikhil Rajpal, were given access to the CFPB's HR, procurement, and financial infrastructure. The DOGE workers were later granted access to all of the agency's systems on Friday, Bloomberg reported this week, including bank examination and enforcement records.

Later on Friday evening, Russell Vought—President Trump's newly confirmed director of the Office of Management and Budget—took over as the acting administrator for the CFPB late Friday evening, as first reported by The Wall Street Journal. Soon after, DOGE staff began sending out email requests asking CFPB managers to give Kliger additional access to agency systems, including physical access control system, payroll processing systems, and the ability to edit the CFPB's website, sources tell WIRED.

Just before 10:30 pm ET on Friday, sources say, someone who appeared to have administrative privileges accessed the agency server using Secure Shell, a protocol that allows remote control of a computer over a network. Bypassing the content management system, they unpublished the homepage file, causing a portion of the CFPB homepage to display a "404: Page not found" notice typical of a website that has been deleted or is otherwise missing. The remainder of the site was functional, including submission forms for industry whistleblowers and consumer complaints.

Around 11 pm on Friday, the CFPB's X account disappeared, and shortly after, according to a CFPB staffer, DOGE left the building.

CFPB sources who spoke to WIRED described being blindsided by the DOGE staffers. "They said they would follow protocol but repeatedly did not," one says, noting that the level of access these staffers have could allow them to lock others out of the building, take down the website, and "obstruct the bureau's ability to carry out its mandate."

**Got a Tip?**

Are you a current or former government worker with insight into what's going on? We'd like to hear from you. Using a nonwork phone or computer, contact the reporters securely using a personal device on Signal at makenakelly.32 and dmehro.89.

One source at CFPB on Friday says they saw two young DOGE staffers wandering through the halls of the building trying to open doors.

"DOGE pulled a Darth Vader in cloud city where they came in promising to respect our rules and ask for read access and then tonight [Friday] at 6 they took a heel turn and demanded website access," another CFPB source told WIRED at the time.

In a pair of emails sent Saturday and Monday, Vought effectively ordered all work at the agency to stop, freezing various enforcement efforts and work on regulations that would affect payment programs run by Big Tech companies.

The CFPB has long been a target of both Elon Musk and conservatives more broadly; the Project 2025 chapter on financial regulatory agencies describes it as "a highly politicized, damaging, and utterly unaccountable federal agency" and calls to have it abolished. Musk wrote "RIP CFPB" with a gravestone emoji in an X post Friday afternoon. In November, he posted "Delete CFPB." There are around 1,700 employees in total at the agency.

The CFPB was established by the 2010 Dodd-Frank Act, a sweeping piece of legislation that imposed significant regulatory reform in the wake of the 2008 financial crisis. Its remit is to protect consumers from unfair or deceptive financial practices, and the agency claims to be responsible for $19.7 billion in consumer relief since its inception, as well as $5 billion in civil penalties.

Some of those wins have come against payment processors including Block, which last month was ordered to pay $175 million in penalties for allegedly failing to sufficiently protect users of its Cash App from fraud. The CFPB also has an active lawsuit against JPMorgan Chase, Bank of America, and Wells Fargo for similar alleged failures on their shared payment app Zelle. Elon Musk will soon be in the peer-to-peer payments business as well, after X entered a partnership with Visa in late January.



ak performance.
Adobe increased click-throughs
% with the power of AI.
the report
obe

# *RollingStone*

# *RollingStone*

'CONFLICT OF INTEREST'

# INSIDE TRUMP AND MUSK'S WAR ON THE CONSUMER FINANCIAL PROTECTION BUREAU

Taking cops off the beat could be America's loss, and Trump and Musk's personal gain

By TIM DICKINSON, ANDREW PEREZ

FEBRUARY 10, 2025

RollingStone



**President Donald Trump and Elon Musk on November 19, 2024 in Brownsville, Texas.**

BRANDON BELL/GETTY IMAGES

The new boss at the Consumer Financial Protection Bureau had a jarring message for staffers Monday morning, in an internal memo leaked to *Rolling Stone*: "Stand down from performing any work task."

The message came from **Russell Vought** — a Project 2025 architect who was confirmed by the Senate last week to lead the Office of Management and Budget in the Trump White House. One of Vought's first official acts was to seize the reins as acting director at CFPB, the agency designed by Congress to safeguard Americans from the predatory practices of **Wall Street** and other financial malefactors.

The brainchild of now-Sen. Elizabeth Warren, the CFPB is one of the few agencies in Washington whose mission is to protect individual Americans against corporate power. It routinely orders large corporations to refund money to duped and abused consumers — more than $20 billion over the lifetime of the agency. It also wards against the kinds of systemic risks that led to the financial crisis of 2008.

000207

Case 8:25-cv-00462-TDC    Document 57-1    Filed 02/20/25    Page 213 of 597

*RollingStone*

To insulate CFPB from partisan reprisal, it is funded by the Federal Reserve, meaning that a hostile congressional majority can't zero out its budget. That CFPB's funding mechanism was declared constitutional by the conservative-dominated Supreme Court just last year.

Nuking the CFPB has long been a Republican priority. Project 2025, the conservative policy playbook Vouht played "**an indispensable part**" in developing, recommends abolishing the bureau, calling it "utterly unaccountable." The Trump administration — marching to the tune of the de-facto head of government **Elon Musk** — is naturally seeking to hogtie the bureau and cut off its funding, moves that experts insist pose a major conflict of interest.

Musk, the world's richest man, wants to transform X (formerly **Twitter**) into a **peer-to-peer payments platform**, which would likely subject the company to CFPB **regulation** — so it's no surprise he sees the bureau as a bugbear. He sicced his so-called Department of Government Efficiency (DOGE) minions on the agency last week, before tweeting out "**CFPB RIP**" adding a headstone emoji.

## EDITOR'S PICKS



**The 100 Best TV Episodes of All Time**

000208

*RollingStone*





**The 500 Greatest Albums of All Time**



**The 200 Greatest Singers of All Time**

"It's the USAID playbook," a CFPB lawyer tells *Rolling Stone,* referring to the foreign aid agency Musk helped send through the "**wood chipper**" last week, shutting down **life-saving relief operations** across the globe.

——————————— ADVERTISEMENT ———————————

2/17/25, 10:02 PM
Trump and Musk Go to War on the Consumer Financial Protection Bureau
Case 8:25-cv-00462-TDC   Document 71   Filed 02/28/25   Page 215 of 597

# *RollingStone*

substantive regulatory and legal work until permanent leaders can be put in charge.
"Withdrawing rules that haven't gotten into effect yet is not surprising or shocking to anyone," says the lawyer, who spoke on condition of anonymity to avoid reprisal.

But Vought has also taken CFPB examiners out of the field, a move the lawyer likens to taking cops off the beat. "It means that the CFPB is not going to uncover consumers being harmed," he says. That includes people having their cars wrongly repossessed, debtors being charged abusive fees that keep them paying down their loans, and people with disabilities wrongly being denied student loan forgiveness.

The CFPB is a unique agency, but the bureau lawyer draws a parallel to food safety: "The USDA secretary doesn't need to pause meat inspections when they take office," he says. "It suggests to me that they intend to fully cease operations."

Monday's order for employees to "stand down" adds to a sense of dread around the bureau's future. "There was still work to do," the attorney says, ranging from resolving "legal questions around how to comply with executive orders" to managing vendors or responding to public record requests under the Freedom of Information Act (FOIA).

---

### RELATED CONTENT

- **Baltimore Is Fighting the Right-Wing Takeover of Its Iconic Newspaper**

- **Elon Musk, Like So Many Parents, Is Leveraging His Child for Clicks**

- **Trump Publicly Admits He Thinks He Can Break Any Law He Wants**

- **'Acting Like a King': Michigan's Attorney General on the Lawsuit to Undo Musk's Damage**

---

Vought **tweeted** Sunday that CFPB has become "a woke & weaponized agency" adding: "this must end." He also announced that he is turning off the "spigot" to the CFPB — by refusing to draw new funding from the Federal Reserve, on the logic that the CFPB current cash-on-hand is "**excessive**." (The bureau's roughly $700 million reserve represents less than a year of funding; Musk has called on that money to be "**returned.**")

With Vought sending CFPB staffers home and barring them from conducting work, the acting director has also cleared the field for Musk's **controversial band of DOGE bros** to

000210

Case 2:25-cv-00461-LLC   Document 371   Filed 02/20/25   Page 216 of 959

*RollingStone*

security risk for companies regulated by CFPB as well as potential conflict of interests for Musk, according to the bureau lawyer.

"If I were a potential competitor of Elon Musk's planned payment app, I would be concerned about DOGE having access to my confidential supervisory information," the lawyer says, using agency jargon for proprietary business information. This can include balance sheets, risk-management practices, and other "extremely private" information that is not releasable under FOIA. "Now Elon Musk gets to look at all of that," the lawyer asserts.

With communications staff idled, *Rolling Stone* reached out to Mark Paoletta, whom Vought identified in Monday's memo as CFPB's chief legal officer. Paoletta was **reportedly** responsible for issuing the controversial, now court-enjoined, Trump administration memo implementing a sweeping federal spending freeze. (He is also a close friend and vigorous defender of Supreme Court Justice Clarence Thomas.) Paoletta did not immediately respond to *Rolling Stone* questions.

---

ADVERTISEMENT



---

A recent-former CFPB staffer echoes the concerns of the bureau lawyer that DOGE could misuse records that are intended to be confidential. Julie Margetta Morgan was an associate director of research, monitoring, and regulations with the bureau. She warns that Musk may now have "access to data about his competitors in a way that gives him a massive advantage."

Morgan adds that CFPB shutdown is rife with "conflict of interest" that runs all the way to the top. "You have multiple players in the Trump administration — including the president

she says. "The steps they've taken over the last few days have a major downside for consumers, and a major upside for key players in the Trump administration."

Notably, the Trump family has made recent moves into the financial sector, infamously **issuing crypto meme coins** and launching **World Liberty Financial**, a firm that describes its mission as "dismantling the stranglehold of traditional financial institutions."

Speaking about Musk's platform X and other Big Tech firms, Morgan says: "They want to play in the financial services space, but they don't want to play by the same set of rules. They simply do not think that ought to be regulated by the same institutions that regulate big **banks**."

The assault on CFPB is just an opening salvo in a broader battle against financial regulation, Morgan warns. "It's about opening the floodgates for big banks to have their way on financial services. It's incredibly dangerous, both for individuals and for the economy as a whole," she says, noting that CFPB is intended to help prevent another financial crisis.

Vought's shutdown orders and the intrusion of DOGE into the bureau have already provoked a legal reaction. CFPB union members have filed a pair of federal lawsuits against Vought. **One** seeks to have a judge enjoin his stop-work order unlawful as a violation of "separation of powers," because Congress sets CFPB's mission. The **second** seeks to block DOGE from accessing bureau records, including sensitive employee data.

The CFPB lawyer is confident the essential work of consumer protection will be harder to kill than Vought & Co. believe, because the Consumer Financial Protection Act includes a little-known safeguard: "They will regret nuking the CFPB, especially once they realize that states can enforce the [law]."

If the CFPB is hobbled expect states to "pick up the slack," he says. "They won't be as expert or have as many resources, but they would probably hire a bunch of us."

In the meantime there's a personal cost for public employees caught in the crossfire of an ideological war. "It sucks," says the lawyer. "I have kids. These people are trying to make us miserable for no reason."

IN THIS ARTICLE:  **BANKS,  DONALD TRUMP,  ELON MUSK,  RUSSELL VOUGHT,  TWITTER,  WALL STREET**



The lobby of the US Consumer Financial Protection Bureau headquarters as a worker removes belongings from the building in Washington on Feb. 9.  *Photographer: Stefani Reynolds/Bloomberg*

Politics + Technology

# DOGE-Backed Halt at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet

Government-efficiency team's initial 'read-only' access expanded quickly to encompass closely guarded data, internal emails say.

By <u>Jason Leopold</u> and <u>Evan Weinberger</u>
February 10, 2025 at 5:00 AM EST

In another weekend takeover of a federal agency's operations, staffers from a efficiency initiative led by billionaire Elon Musk helped to effectively shut down the Consumer Financial Protection Bureau – as they gained access to a array of the bureau's protected information.

The actions began last Thursday, when four young staffers working under Musk for the Department of Government Efficiency, or DOGE, showed up at CFPB's Washington headquarters. At first, they had what was described as read-only access to a limited array of documents, including the agency's

Save now with a special offer.

## Subscribe now for

000213

uninterrupted access.

Get the context behind every story for $1.99/month. Cancel anytime.

**Or pay with credit card**

enter the online payments industry, had already predicted the demise of the consumer-watchdog agency. He didn't respond to a request for comment.

The weekend's events came after Russell Vought, who heads the White House Office of Management and Budget, ordered wider access for DOGE, according to an email to CFPB officials that was seen by Bloomberg. Vought sent the email Friday evening, about 90 minutes before news broke that he'd also been named acting director of the financial-enforcement agency.

Vought is an architect of the Heritage Foundation's influential and controversial government-overhaul plan called Project 2025, which appears to have guided DOGE's attempts to dismantle portions of the federal bureaucracy. Earlier this month, the team played a key role in the administration's effort to shut down the US Agency for International Development, another longstanding conservative bête noire.

Bloomberg News sought comment from Musk, Vought, the DOGE team members and the White House. None responded.

*Bloomberg's FOIA expert uncovers interesting documents never seen before. Subscribe to Jason Leopold's FOIA Files newsletter.*

Save now with a special offer.

## Subscribe now for


000214

uninterrupted access.

Get the context behind every story for $1.99/month. Cancel anytime.

Or pay with credit card



A screenshot of the CFPB website's home page taken on Feb. 9. *Source: CFPB*

### 'CFPB RIP'

Project 2025 calls for abolishing the CFPB, which Congress created as a consumer watchdog in the wake of the financial crisis that precipitated the Great Recession. On Saturday night, Vought sent an email instructing its employees to stop "all supervision and examination activity" and "all stakeholder engagement," and he announced that he would decline additional funding for the bureau, saying its current account balance of $711.6 million is "excessive." Those steps came one day after Musk posted the message "CFPB RIP" next to a tombstone emoji on his personal X account.

The CFPB is mandated to perform direct supervision on large banks and other companies it oversees. Supervision in the financial regulatory world means that examiners look under the hood at a company's operations.

Save now with a special offer.

Subscribe now for

**uninterrupted access.**

Get the context behind every story for $1.99/month. Cancel anytime.

Or pay with credit card



Elon Musk *Photographer: Al Drago/Bloomberg*

CFPB examiners have access to banks with $10 billion or more in assets, but they also oversee debt collectors, payday and other online lenders, consumer credit reporting companies, some fintechs and payments processors, and a host of other companies that banking regulators don't monitor. The agency's former director told a congressional panel last year that it had returned $20.7 billion to consumers since its inception.

The confidential supervisory information CFPB examiners collect is stored on agency laptops and in its internal Supervision Examination System, a Salesforce platform. That data – including customer information and complaints; new products under development but not yet released to the public; and financial information – is valuable and closely guarded, the five people said.

While there's no evidence that DOGE staffers have begun studying any of the examination and enforcement records, employees of the financial-oversight agency questioned the appropriateness of giving the government-efficiency

Save now with a special offer.

**Subscribe now for**



**uninterrupted access.**

Get the context behind every story for $1.99/month. Cancel anytime.

Or pay with credit card

**DOGE staffers**

DOGE's engagement with the consumer-protection agency unfolded over several days and its scope gradually expanded.

On Friday, four DOGE staffers–Gavin Kliger, Luke Farritor, Nikhil Rajpal and Jordan Wick – were described as needing to be onboarded and provided with complete building access in an email sent to a half-dozen CFPB officials by Chris Chilbert, the agency's chief information officer. Two additional DOGE team members, Christopher Young and Jeremy Lewin, who were provided with CFPB email addresses, were copied on the correspondence.

In the email, which was seen by Bloomberg, Chilbert asked employees to give the DOGE team the benefit of the doubt.

"I know there's a lot going on in the press and on social right now," Chilbert wrote. "It's hard to separate fact from fiction. Please reach out to me anytime you have questions or concerns. I'm very proud of the work we've done to build a strong technology foundation and I think we have a lot of good things we can show" DOGE.

The team's initial entry to CFPB Thursday had been accompanied by an "Assignment Agreement," or a memorandum of understanding between the efficiency initiative and the consumer agency, a copy of which was seen by Bloomberg News. It explained that authority for the CFPB operation emanated from a Jan. 20 executive order. It also said that the scope of the DOGE team's efforts would include, "work on software modernization initiatives," the promotion of "inter-operability between agency networks and systems" and

Save now with a special offer.

Subscribe now for



000217

uninterrupted access.

Get the context behind every story for $1.99/month. Cancel anytime.

Or pay with credit card

interest or confidentiality protocols."

Initially, CFPB officials were told that a DOGE team needed just "read only" access to their human resources, procurement and finance systems. By Frida evening, according to an email sent by Chilbert that was seen by Bloomberg News, Vought had instructed CFPB to give DOGE administrative access – a much broader form of permissioning.

The employees were forwarded an email sent to the agency by Vought. Attached to it was the signed memorandum of understanding.

"I'm sending this e-mail in my capacity as acting director of the Bureau of Consumer Financial Protection," Vought wrote in the email, which was seen I Bloomberg. "See attached letter which has been signed by me. This e-mail als constitutes my authorization to begin work under the agreement."

A few hours later, CFPB's X account was deleted, and the home page of the agency's website was partially dismantled. Visitors to the website now see a "404 page not found" message when visiting the home page, although links to most pages are still accessible.

CFPB employees who read the memorandum of understanding started backchannel discussions about it and raised red flags, according to the five people familiar with the matter. They asked why DOGE would need to access the human resources, finance and procurement data if its goal was to modernize the agency's software, the people said.

Save now with a special offer.

Subscribe now for



**uninterrupted access.**

Get the context behind every story for $1.99/month. Cancel anytime.

Or pay with credit card



The CFPB headquarters on Feb. 2. *Photographer: Al Drago/Bloomberg*

## Chipotle Order

The DOGE team were given "senior advisor" titles at the agency and worked from a conference room in the basement of CFPB's headquarters. The CFPB's union attempted to greet them at the door, but the DOGE teams were standoffish and didn't talk to anyone, according to multiple people familiar with the matter. The DOGE employees largely stayed in the basement; one was spotted emerging to pick up a Chipotle order for lunch in the CFPB lobby.

By Saturday afternoon, according to five people familiar with the matter, the DOGE team's administrative access had expanded, giving users the ability to choose which of the agency's internal systems they can explore.

Save now with a special offer.

**Subscribe now for**





# EXHIBIT 2

000221

Docusign Envelope ID: 91A6B1FE-FA91-45B9-B880-DFBF4E 07F9A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 1-26,

*Plaintiffs*

v.

ELON MUSK, in his official capacity,
UNITED STATES DOGE SERVICE, *and*
the DEPARTMENT OF GOVERNMENT
EFFICIENCY,

*Defendants*

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF J. DOE 1

I, J. Doe 1, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.       I am a plaintiff in this litigation, identified as "J. Doe 1" in the complaint.[1]

2.       I am a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and have been with the agency since 2017.

3.       My role is to coordinate humanitarian assistance. My main duties include managing a portfolio of partners and providing guidance to junior staff. Through work with USAID, I have deployed into dangerous areas around the world, including Pakistan.

4.       Under the terms of my contract, the government cannot terminate the contract in the middle of the contractual period unless it provides at least 15 days advance notice. I was cut off from access to my work email without any advanced notice.

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

5.      As of February 17, I have been given access to my USAID email, and my devices and internal systems have been largely restored. However, I do not have access to the USAID financial system, which I previously used as part of my regular duties.

6.      I  have a voucher for reimbursement pending payment. I submitted this voucher for reimbursement to my Contracting Officer on February 7, during the week I was locked out of USAID systems. I was unable to get the approval because my team lead, who needed to sign off on it, was also locked out.The voucher process is separate from our regular payroll. I understand people are not being reimbursed for costs they incurred. If I had been able to send the request that day, it should have been paid by now. Instead, I re-submitted the request during the week of February 10, when my team was back online and my request is still pending.

7.      I am not currently able to work under my normal conditions.

    a.  I do not have any emails from the week that I was locked out, which hindered my ability to respond to information requests from my team for the latest status of our partners and programs.

    b.  I have not been permitted to access my office building since January. I have cherished personal items including personal photos, mementos from my time and work abroad, which represent memories of major life experiences,  as well as award and training certificates at the office that document professional skills and accomplishments. I am unable to retrieve these items and my understanding is that USAID offices are being physically torn apart and relinquished to other agencies. I have no idea if I will ever see these deeply personal belongings again. This adds insult to the injury that we, as USAID personnel, have already experienced.

    c.  I am no longer able to approve reimbursement for our partner organizations, accept

reports, or provide process guidance, which were part of my regular duties. Many of these partners have emailed with great distress to indicate that though they have waivers or exemptions, they will have to cease programming in the coming weeks due to lack of funds and non-payment from USAID.

d.  There have also been several directives regarding permitted and non-permitted external communications that have impeded my normal duties, including direction not to email or respond to the USAID Office of Inspector General (OIG) office, and only to provide notifications through the online portal.

e.  A small but telling point is that I have also been instructed to enter my hours into my timesheet daily. While this may be normal in many offices, in mine most staff would fill it out at the end of the pay period before the approval deadline. I believe that the direction for daily time accounting is to ensure accuracy of the time records in the case of my sudden placement on administrative leave or termination.

8.  Many partners have said they will cease programming due to lack of funds and non-payment from USAID.

9.  As a result of the dangerous nature of my job, specifically my deployment into conflict zones, my personnel and security clearance files contains highly sensitive personal information—social security number, passport information, personal references, foreign contacts, previous addresses, financial records, tattoo descriptions, a safety pass phrase, and my family members' information. I am aware that government workers have, for some illogical reason, become public targets in a fraught environment and have been subject to doxxing, threats, and other harms. I fear that Defendants do not have the security clearance or training needed to

handle this type of  extremely confidential information, and will use it to my and/or my family's

detriment.

10.    I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 17th day of February, 2025.**

                                                                **J. Doe 1**

                                                                Signed by:
                                                                J. Doe 1
                                                                CBE633781E974AD...
                                                                **Signature**

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1-26,

 *Plaintiffs*

 v.

ELON MUSK, in his official capacity,
UNITED STATES DOGE SERVICE, *and*
the DEPARTMENT OF GOVERNMENT
EFFICIENCY,

 *Defendants*

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF J. DOE 2

I, J. Doe 2, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 2" in the complaint.[1]

2.      I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for over 10 years.

3.      My main duties include technological responsibilities related to cybersecurity and privacy. My position involves extensive interaction with USAID's information technology ("IT") infrastructure, including its data security systems.

4.      On January 30, 2025, I  was working from the USAID office when I was told to provide systems access to individuals from DOGE.

5.      I conducted research and determined that the individuals from DOGE who were trying to get access to these crucial systems have a  history of issues with data misuse. I was alarmed and

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

raised this issue with my supervisors, indicating that the DOGE personnel should not obtain access.

6.      However, I thereafter discovered that the DOGE personnel had already been given access. Furthermore, the DOGE personnel were given *root access* to USAID systems, the highest level of access one can obtain and which allows a person to take over a system. This includes the ability to modify, add, delete data, and create user accounts.

7.      On Feb 1, 2025, DOGE personnel who did not have a security clearance, used their administrative rights to grant themselves access to restricted areas requiring security clearance. It is unclear what the DOGE personnel did with that access.

8.      DOGE personnel have also taken over delegate rights to every USAID mailbox. With this they have the ability to see every email, delete, and send email on behalf of every user within USAID.  I am also aware that there is rapid preparation to tear down the USAID network to create a condition where USAID employees will not have access to any facilities nor computing environment.

9.      All of the classified systems in multiple USAID buildings have been dismantled and are not available to use.  If there is information that is being shared with USAID on critical issues occurring around the world of a classified nature, which may only be accessed by USAID staff through the classified systems inside of the USAID systems, that access no longer exists because the IT infrastructure and access no longer exists.

10.     On February 4, 2025, I was put on administrative leave and lost all access to USAID systems.

11.     On February 10, 2025, I was allowed back into the USAID system, apparently pursuant to a temporary restraining order in a separate lawsuit between different parties. I currently have access to my USAID email, but other USAID systems have been taken offline.

12.     I understand that the DOGE personnel have administrative privileges into all the USAID systems and tools and that DOGE personnel took information out of the agency and sent it elsewhere.

13.     DOGE's actions have caused me emotional injury, as I am aware of the extent of confidential information that has been breached by DOGE, including confidential information of USAID personnel, and the privacy laws broken.

14.     Since Defendants began dismantling USAID, there has been a more than two-fold increase in the total number of security incidents flagged by our IT tools. This includes both incidents related to outside attacks and incidents related to internal use of sensitive data (e.g. individuals within USAID downloading materials that contain sensitive information, like social security numbers, which is flagged even when an individual is downloading their own information). This has overwhelmed the IT team responsible for responding to these incidents. Previously, the IT team could keep up with the incident response on essentially a daily basis but can no longer do so. This is a security issue in and of itself as the IT team is stretched thin and therefore cannot focus as much attention as needed on actually threatening incidents.

15.     I understand that the USAID buildings/floors within buildings have been given to other agencies for other purposes, including allowing the breaking down of offices and cubicles. USAID staff and contractors who worked in the USAID buildings are not allowed inside, even to obtain personal belongings. Before I was no longer allowed in the USAID building I worked in, I

kept in my office photographs, awards, coins collected over the years, and other keepsakes. I no longer have access to these items.

16.     My fellow USAID staff and I are locked out of our offices, and we were told to stay away from all USAID locations.  While we have been away, the leases were allowed to expire as they sought other Agencies to occupy the buildings. I am aware that the headquarters location at the Ronald Reagan Building. 1300 Pennsylvania Ave. has been turned over to the Department of Homeland Security/ Customs and Border Protection. The building that I worked from, 500 D Street SW, is actively being shopped out to other Agencies. This is happening with no communications to employees other than that the buildings are closed until further notice.

17.     Our regular activities are not being performed as the usual processes are not being followed and there is complete uncertainty about the path forward.  No one knows who holds certain roles and how to advance through most processes as many of the leaders are not in their formal roles and most people are fearful of making any decisions.  It is clear that the focus is on the total dismantling of the Agency and not its core functions, not the support functions that are codified by statute.  This includes FITARA, FISMA, the Privacy Act, Section 508 of the Americans with Disabilities Act, E-Government Act of 2002, Government Performance and Results Act, the Paperwork Reduction Act and many more. The best description of the current environment is very tense and paralyzing.

Docusign Envelope ID: DE763BA3-4DE9-4B05-8FCF-379EB8EA8F92

18.     I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 18th day of February, 2025.**

                                               **J. Doe 2**

                                        Signed by:

                                        J. Doe 2

                                        ─────────────────────
                                        BADF4EA99F0F449

                                        **Signature**

# EXHIBIT 4

000232

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1-26, | |
| *Plaintiffs* | **Case No. 25 8:25-cv-00462-TDC** |
| v. | |
| ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY, | |
| *Defendants* | |

<u>**DECLARATION OF J. DOE 6**</u>

I, J. Doe 6, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 6" in the complaint.[1]

2.      I am a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and have worked in this field for over 25 years.

3.      I am a subject matter expert whose main duties include working on countering authoritarianism and foreign malign influence which undermines U.S. national security.

4.      Under the terms of my contract, the government cannot terminate the contract in the middle of the contractual period unless it provides at least 15 days advance notice.

5.      I was in Africa for work with USAID when the stop work order came out. I traveled back home to the United States and have thousands of dollars of travel costs reimbursement that is supposed to be covered by USAID.

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

6.      I lost access to my work email and USAID systems on February 2 and as of February 17, I still have no access.  I have received no formal communication from anyone within the agency about my situation.  I am in touch with my supervisor and Office Director daily and am in regular contact with my Contracting Officer.  So far none of them has provided any notification of my status or other guidance to me.

7.      I have requested support from the Helpdesk and received a response letting me know that I am not on the list for access and that any changes will need to be approved by political leadership.

8.      I am not able to perform my duties and scope of work optimally or engage equally as a teammate as I do not have access.

9.      Moreover, there is extreme confusion as to whether PSCs have been placed on administrative leave or not. Like many PSCs, I have received zero information regarding my employment status despite losing access to my account.  While some PSCs have had their accounts restored, many have not. This is extremely frustrating and confusing.

10.     My health insurance is primarily covered by USAID, and I do not know if I continue to have health insurance coverage or how long that coverage will last.

11.     My livelihood is severely jeopardized by Defendants' illegal activity.

12.     I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 17th day of February, 2025.**

**J. Doe 6**

Signed by:

J. Doe 6

F0F1S4EACE0742B...

**Signature**

# EXHIBIT 5

Docusign Envelope ID: 8435F213-9616-4441-82BD-4405219FE123

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1-26, <br><br> *Plaintiffs* <br><br> v. <br><br> ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY, <br><br> *Defendants* | **Case No. 25 8:25-cv-00462-TDC** |

<u>**DECLARATION OF J. DOE 7**</u>

I, J. Doe 7, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.  I am a plaintiff in this litigation, identified as "J. Doe 7" in the complaint.[1]

2.  I am a Civil Service Excepted ("CSE") employee at the United States Agency for International Development ("USAID") and have been with the agency for over 10 years.

3.  I work in a bureau focused on disaster response.

4.  On Sunday, February 2, USAID personnel were cut off from accessing USAID systems in droves.

5.  On Monday, February 3, more USAID personnel were cut off from accessing systems. That morning, I spoke with the information technology ("IT") personnel in my building. The IT team shared that representatives from DOGE had access to all systems. The IT personnel knew this because they were required to help the DOGE representatives obtain access. Two separate IT

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

personnel told me that the representatives from DOGE "have everything" and that they now have "the keys to the kingdom."

6.      On the morning of February 3, I was contacted by USAID personnel overseas who were stranded without access to government phone, laptop, and systems, including AtHoc and Scry, the apps used to disseminate emergency safety and security information/direction to colleagues. The systems to help the USAID people stranded overseas were shut down, and so I could not assist them.

7.      On Tuesday, February 4, I went into the office and was eventually informed by colleagues that I and other personnel had to leave the building. I then went home to keep working. That evening, I was told I was put on administrative leave via an email from the USAID press email address, sent from one of DOGE's representatives. Shortly after receiving this notice, I lost access to USAID systems.

8.      On Sunday, February 9, apparently in response to a temporary restraining order issued in another lawsuit, I was given access to USAID systems.

9.      I did not have access to the Abacus system until February 13. Our Bureau uses Abacus for award management, running reports on awards, partners, and tracking our available budget and funds. As of February 17, the Automated Directive System (ADS), which covers all internal USAID policy and guidance from everything to HR and timekeeping issues to acquisitions and assistance to non-governmental organizations, UN agencies and other Public International Organization (PIOs), and for-profit organizations, was still offline.

10.     Many PSCs were not paid for 2025 Pay Period 1 and did not receive their cost of living

adjustment, and they were not paid for outstanding vouchers for travel, health insurance, and

other reimbursable expenses.

11.     The freeze on payment systems has also resulted in implementing partners being unable

to get paid out for vouchers submitted for work already completed. World Food Program alone is

owed over $819M for work already completed. Several non-governmental organizations have

already had to close up shop.

12.     Not all of my team members and colleagues have had their access to email and systems

restored, and that has placed an extra burden on those of us who are able to continue working.

Those without access are unable to use email, any of the databases including documents on the

shared drives, and are unable to work on anything SBU (sensitive but unclassified), as SBU

materials can only be completed on government systems.

13.     As part of my job, I am expected to serve on Response Management Teams (RMT) in a

classified Ops Center in DC and/or Disaster Assistance Response Teams (DART) overseas at any

given moment. At this time, USAID no longer has the lease to our headquarters space in the

Ronald Reagan Building, which therefore means that we don't have access to any classified Ops

Centers. Customs and Border Patrol has taken over our space. We have been told that no one

from USAID will be allowed access to retrieve their personal items.

14.     As a result of not having access to a classified Ops Center, we can not conduct regular

operations for disaster response. This means that if an earthquake similar to the February 6, 2023

earthquake in Turkey and Syria were to occur tomorrow, we would be unable to operate as

normal. At this time, we have active RMTs for the Afghanistan, Ukraine, Sudan, Gaza, and

Yemen regions, however they do not have access to the classified Operations Center in the

Ronald Reagan Building. Staff who had been delegated to short-term Tour of Duty (TDY)

assignments on the respective DARTs have been called home, and the disaster responses are not

able to function as normal.

15.     I understand that the DOGE representatives have access to my personnel, medical, and

security clearance files. These files have extremely sensitive information about me and my

family members, including information that could subject me to harassment by DOGE members

and/or by third parties. I am extremely worried about this prospect. Some of my colleagues have

been doxxed, and so this concern is especially heightened.


16.     I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 17th day of February, 2025.**


                                                  **J. Doe 7**


                                                  _____
                                                  **Signature**

# EXHIBIT 6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 1-26,<br><br>*Plaintiffs*<br><br>v.<br><br>ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY,<br><br>*Defendants* | Case No. 25 8:25-cv-00462-TDC |

### DECLARATION OF J. DOE 9

I, J. Doe 9, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 9" in the complaint.[1]

2.      I am a personal services contractor ("PSC") offshore at the United States Agency for International Development ("USAID").

3.      I am in a high-risk area in the Middle East.

4.      On Monday, February 3, 2025, I tried to login to my USAID email account but was locked out. I received no warning or notification in advance of being shut out of USAID's systems. My supervisor and Head of Mission were not informed in advance of the cutoff.

5.      All of the contacts and the safety and security applications, including the SCRY application used to monitor and account for overseas personnel, were removed remotely from my USAID work phone. The SCRY application is the safety and security mechanism by which federal government staff overseas in dangerous areas indicate that they are in a dangerous situation and access help.

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

6.      I live with my family in the foreign country in which I am stationed and I am concerned for mine and my family's safety. If there is an emergency, I hope we will be able to get out and be taken care of by USAID, but there is no guarantee as over the last few weeks, nothing done within USAID by Defendants has been according to protocol or implemented in a methodical, safe manner.

7.      I have no idea what my status is each day. I continue to go into the office in order to execute my duties to the best of my ability despite not having access to any of the tools and resources required to do so.

8.      As of February 17, 2025,  I am still locked out of all USAID systems, including email, safety and security applications (including SCRY application), my calendar, Drive, and desktop. I have tried numerous times to reach out to different helpdesk lines in Washington, DC. The only response I have received is a message that the helpdesk confirms my account is disabled but that they can only tell me to contact political leadership in order to try to obtain my access to USAID systems.

9.      Our Mission leadership and human resources held a meeting at the end of last week. They indicated that PSCs should prepare for when, not if, our contracts will be terminated. It is unclear whether the 30-day period to depart will apply to us as soon as the Temporary Restraining Orders in other cases lapse. It appears that even if we get approval to stay (*e.g.* to allow my child(ren) to finish the school year), we would no longer receive important provisions, like government-provided housing. I am scheduled to go on medical leave soon. If my contract is terminated before that time, I will lose the paid medical leave I have relied on.

10.     I am under an incredible amount of emotional and psychological distress. My safety and my family's safety weighs on my mind. I am worried and anxious about whether my family will

be uprooted in the next thirty days, including taking my child(ren) out of their school in the middle of the school year. I am distressed that I may lose my job without access to my salary, healthcare, and housing. And I am in emotional turmoil over the prospect of having a major medical event (I am already feeling the effects of this medical situation) without knowing that I will have access to my healthcare nor my paid medical leave. Additionally, the emotional and psychological distress from the situation within USAID exacerbates the effects of my medical situation.

11.     I hereby declare under penalty of perjury that the foregoing is true and correct.


**Executed on the 18th day of February, 2025.**


**J. Doe 9**

Signé par :

*J. Doe 9*

E9C00053D73D43D...

**Signature**

# EXHIBIT 7

000244

Docusign Envelope ID: 6C245FA0-85B8-4C48-BFA4-9F1D9687F322

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| J. DOE 1-26,<br><br>*Plaintiffs*<br><br>v.<br><br>ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY,<br><br>*Defendants* | Case No. 25 8:25-cv-00462-TDC |

<u>**DECLARATION OF J. DOE 12**</u>

I, J. Doe 12, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and

correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 12" in the complaint.

2.      I am a personal services contractor ("PSC")  at the United States Agency for International

Development ("USAID").

3.      My main duties include advocating for humanitarian assistance within the U.S.

Government (USG) interagency, including training and preparing USG employees on supporting

a USAID-led humanitarian response. I deploy to disasters around the world, often with 24 hours

notice, and support steady-state capacity building and assessments to improve the execution of

USAID-led humanitarian response.

4.      On February 3, I lost access to USAID email and other systems. I have reported the lack

of access to numerous entities within USAID and for several days received circular information

Docusign Envelope ID: 6C245FA0-85B8-4C48-BFA4-9F1D9687F322

about how to resume access. I was originally told to contact HR, which I did via email and phone, and then was referred to USAID's Chief Information Office ("CIO"), only to be re-referred to the original office.

5.      On February 11, someone working in CIO responded to one of my requests to restore system connectivity with the following, "Hello, Thank you for contacting the Service Desk. Your account is disabled. Please contact your Bureau/political leadership for guidance on disabled accounts, not CIO. As this is a referral, this ticket will be resolved." I continue to include human resources and CIO in my daily emails to the Contracting Officers, indicating that I do not have systems access.

6.      The Agency is sending out important notices about the ongoing evolution of USAID to USAID email accounts only. Despite still being a PSC with USAID, I am unable to receive these notices.

7.      I believe that I still have access to the emergency notification systems ("ENS"), because I had previously approved ENS alerts to be sent to my personal account. However, many of my colleagues had not previously chosen to opt into receiving ENS on their personal accounts and would not have access to ENS absent their USAID account. ENS provides updates on public safety and building safety. Relatedly, we continue to be barred from the USAID buildings and

Docusign Envelope ID: 6C245FA0-85B8-4C48-BFA4-9F1D9687F322

have not received a formal notice of closure through ENS since February 6. Typically building

closures are announced through ENS.

8.    The leadership of my office have held important meetings related to the status of USAID

and potential closure, however only staff with current access are permitted to attend. As a result,

I have to rely on second hand information about the status of my future employment and other

related topics.

9.    My main concern is that the lifesaving work that USAID facilitated has stopped

overnight. The recipients of USAID programming are some of the most vulnerable people in the

world, and the cruel overnight closure of many USAID programs has increased human suffering

around the world. I have spent the last few weeks weeping, nearly daily, as I think about the risk

to people on the brink of death and utter devastation. For the last decade, I have worked in DC

and almost 20 countries, supporting populations in crisis. I see the faces and stories that I've been

privileged to serve and am heartbroken to think that in the course of one day many life saving

programs and humanitarian activities---even those that were already funded---were halted. The

international humanitarian system, which was formalized following the Second World War, has

been shattered by Defendant Musk's actions against USAID. Within a matter of days, Defendant

Musk and DOGE dismantled a global system under the guise of a "90 Day Review." I have

experienced harm and moral injury as an anticipated good faith effort to honor the American

Docusign Envelope ID: 6C245FA0-85B8-4C48-BFA4-9F1D9687F322

taxpayer was weaponized and used as a tool by Defendant Musk to dismantle an entire

government agency and cancel life saving humanitarian assistance in the process.

10.     I am very worried that I will not be reimbursed for expenses that are part of my

compensation package. As a PSC, I pay upfront for entitlements such as health and life insurance

and then submit vouchers for reimbursement. The USG is required to reimburse for allowable

costs within 30 days of receipt, but PSCs have been informed that the systems that disburse the

reimbursements are down per the interpretation of Executive Order 14169.

11.     I am deeply concerned about my cybersafety and identity. Based on DOGE's access to

information, I believe that there is a credible threat to the security of individuals that speak out

against the actions of Defendants Musk and/or DOGE. Moreover, I am concerned that action

could be taken against me, through the use of facial recognition software, particularly as it relates

to my participation in first amendment activity in my personal capacity and outside of work

hours. I perceive a credible threat of being doxxed by Defendants Musk and DOGE, and fear that

my family would also be implicated in a doxx.

12.     I fear that Defendant Musk's statements about USAID and federal workers have caused

irreparable harm on the international stage. Due to the actions of Musk and DOGE, the

humanitarian industry/professional community are severely damaged. Nearly all American aid

workers are now at risk of unemployment or underemployment, should they decide to stay in this

line of work. Defendant Musk and his team have disparaged USAID workers and stained our

reputation internationally. Additionally, I have personally heard remarks that explicitly and

implicitly accused USAID workers of being "corrupt" and "stealing from the American people."

Docusign Envelope ID: 6C245FA0-85B8-4C48-BFA4-9F1D9687F322

My family has reported to me that they have received questions from community members inquiring about the "lack of accountability and liberal corruption" within USAID, based on the comments that Defendant Musk has made about the Agency and its staff. I am afraid that nearly a decade of service to my country is being devalued and smeared in civil discourse.

13. I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 17th day of February, 2025.**

**J. Doe 12**

Signed by:

*J. Doe 12*

22C81920EFC74E0...

**Signature**

000249

# EXHIBIT 8

000250

Docusign Envelope ID: 335DE95D-6271-46A4-A479-47B32AF5A4C7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1-26,

*Plaintiffs*

v.

ELON MUSK, in his official capacity,
UNITED STATES DOGE SERVICE, *and*
the DEPARTMENT OF GOVERNMENT
EFFICIENCY,

*Defendants*

**Case No. 25 8:25-cv-00462-TDC**

<u>**DECLARATION OF J. DOE 19**</u>

I, J. Doe 19, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and

correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 19" in the complaint.

2.      I am a personal services contractor ("PSC")  at the United States Agency for

International Development ("USAID") and have been with the agency for over 7 years.

3.      I was previously on assignment in Africa for 6 years with USAID, working on health

programing.

4.      I am in Asia on assignment with USAID and have been since 2023. My family and I

moved to Asia for this position. I am a senior advisor responsible for supporting multiple

countries in the region.

5. On the morning of February 3, I was messaged by one of my direct reports who let me know that she was locked out of her account. I was locked out of my USAID email and systems a few hours later. I received no communication from the agency before being locked out.

6. I sent a message to the Information Technology ("IT") Helpdesk who informed me that my account had been disabled but that they were not authorized to reinstate my account. I was also told to "have your career leadership reach out to political leadership." I later reached out to the HR Helpdesk and was told "You are likely still on administrative leave, but HCTM [the HR department] is unable to confirm this for USPSC staff. Please consult with your cognizant contracting officer if you need assistance regarding your personal contract." I have not been put on administrative leave and my contracting officer confirmed that I should continue reporting for duty as I have done each workday since February 3.

7. As of February 18, I am still locked out of all of my devices, including my work computer and G-Suite.

8. My contracting officer has also not been told what is going on or what I should expect regarding my employment.

9. I am emotionally and psychologically harmed by the actions taken by Defendants, including locking me out of all USAID systems. I have received no concrete information about my employment situation. I am the sole breadwinner for my family and the uncertainty

surrounding my access to USAID systems and my employment weighs on me heavily. I am

worried that I may lose my job, my home, and my salary. I have already lost healthcare coverage

as my insurance premium was up for annual renewal at the end of January and I have not been

able to purchase a new policy with the uncertainty around where I will live and will therefore

need coverage for the next year and whether or not I will be reimbursed for the premium as per

the terms of my contract.

10.     I have anxiety about whether my family will be uprooted out of Asia in the next thirty

days as it is unclear how the 30-day order applies to me.

11.     I hereby declare under penalty of perjury that the foregoing is true and correct.


**Executed on the 18th day of February, 2025.**


                                                        **J. Doe 19**

                                                        Signed by:

                                                        J. Doe 19

                                                        3F90110D104F49F...

                                                        **Signature**

# EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 1-26,

*Plaintiffs*

v.

ELON MUSK, in his official capacity,
UNITED STATES DOGE SERVICE, *and*
the DEPARTMENT OF GOVERNMENT
EFFICIENCY,

*Defendants*

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF J. DOE 26

I, J. Doe 26, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 26" in the complaint.[1]

2.      I am a Civil Service Excepted (CSE) employee at the United States Agency for International Development ("USAID") and have been with the agency for over 13 years. I am a senior manager at USAID.

3.      On February 3, I lost access to my USAID email and systems. I received no explanation for this but rather was just cut off from the systems. I could not email my supervisor and could not receive any message explaining admin leave. I emailed HR Helpdesk to request leave or access restored. HR Helpdesk responded letting me know that they could not confirm my status but the fact that I did not have systems access likely meant I was on admin leave status.

4.      My email access was restored on Sunday, February 9, after a TRO in another lawsuit. I have systems access and have been teleworking but have no access to my work station in the Ronald Reagan Building.

---

[1] A Motion to Proceed Under Pseudonyms is pending with the Court.

5.     There is a substantial negative impact on my work and some limitations due to the
current situation of uncertainty, no access to the building, and lack of fully functioning systems
within the Agency. Examples include (1) some staff still don't have access to systems, (2) some
staff who need to access classified email cannot do so, (3) staff members who onboarded
recently still have not been issued their onboarding materials, (4) the lack of access to the Ronald
Reagan Building hinders our ability to properly manage government records and hinders our
office from the close collaboration that is integral to our functioning, (5) many key members of
our workforce were institutional contractors whose contract was terminated with no warning
mid-week, (6) the Agency financial system (Phoenix) has not been accessible or functional all
week, preventing us from processing payments for staff and partners.

6.     I understand that DOGE "broke" or "damaged" the system. The inability to use Phoenix
has caused incredible hardship to the Agency worldwide.

7.     Despite being initially told to report to work on Monday, February 10, I was subsequently
told that my access to the Ronald Reagan Building was not allowed, due to the building lease
having been signed over to Customs and Border Protection. At least one other colleague
attempted to gain access to the building and was denied. This colleague (and some others) have
their government-furnished equipment (laptop, phone) still in the building and have not been
able to retrieve it all week.

8.     The lack of access to the building is problematic because staff and leaders are not able to
access resources they need in the building or any classified materials. The lack of access to this
classified material and communications methods prevents us from participating in interagency
discussions on national security issues.

9.      My job duties require access to physical records (files) in our office, the lack of which is problematic for the closeout of contracts that were terminated this week. The orderly and lawful closeout of these awards, including prompt payment, requires proper record keeping.

10.     Many of the programs that our office implements were on a list of contracts to be terminated - an action that, once taken, cannot be reversed (and requires thousands of hours of effort and months of time to recompete).

11.     As a result of the public smear campaign by Defendant Elon Musk against USAID and our staff, I feel unsafe.

12.     I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 17th day of February, 2025.**

                                                                **J. Doe 26**

                                                                Signed by:

                                                                *J. Doe 26*

                                                                A03A327FCC81439...

                                                                **Signature**

# EXHIBIT 10



# EXHIBIT 11



The New York Times

https://www.nytimes.com/2025/02/15/opinion/trump-musk-america.html

MAUREEN DOWD

# Who Will Stand Up to Trump at High Noon?

Feb. 15, 2025

▶ Listen to this article · 7:24 min   Learn more



**By Maureen Dowd**
Opinion Columnist, reporting from Washington

When I was a teenager, my older brother took me to see "Shane."

I wasn't that into westerns, and the movie just seemed to be about a little boy running after Alan Ladd in the wilderness of the Tetons, screaming "Sha-a-a-a-ne, come back!"

I came across the movie on Turner Classic Movies the other night, and this time I understood why the George Stevens film is considered one of the best of all time. (The A.F.I. ranks "Shane, come back!" as one of the 50 top movie lines of all time.)

000261

Case 3:25-cv-00446-TLM   Document 37-1   Filed 02/20/25   Page 267 of 959

The parable on good and bad involves a fight between cattle ranchers and homesteaders. Ladd's Shane is on the side of the honest homesteaders — including an alluring married woman, played by Jean Arthur. Arriving in creamy fringed buckskin, he is an enigmatic golden gunslinger who goes to work as a farmhand. Jack Palance plays the malevolent hired gun imported by the brutal cattle ranchers to drive out the homesteaders. Palance is dressed in a black hat and black vest. In case you don't get the idea, a dog skulks away as Palance gets up in a saloon.

It's so easy to tell the good guys from the bad guys, the right thing to do versus the wrong. Law and order wasn't a cliché or a passé principle that could be kicked aside if it interfered with baser ambitions.

The 1953 film is also a meditation on American masculinity in the wake of World War II. A real man doesn't babble or whine or brag or take advantage. He stands up for the right thing and protects those who can't protect themselves from bullies.

I loved seeing all those sentimental, corny ideals that America was built on, even if those ideals have often been betrayed.

So it's disorienting to have the men running America, Donald Trump and Elon Musk, relish bullying people who can't fight back and blurring lines between good and bad.

> **Sign up for the Opinion Today newsletter** Get expert analysis of the news and a guide to the big ideas shaping the world every weekday morning. Get it sent to your inbox.

They should be working for us, but we suspect they're working for themselves.

000262

2/18/25, 8:25 AM

After Elon met with Prime Minister Narendra Modi of India on Thursday, Trump admitted that he wasn't sure if Musk was there as a representative of the U.S. government or as an American C.E.O. "I don't know," he said. "They met, and I assume he wants to do business in India."

Trump and Musk see government workers as losers for devoting themselves to public service rather than chasing dollars.

Axios called their aggressive approach "masculine maximalism."

"Trump and Musk view masculinity quite similarly: tough-guy language, macho actions, irreverent, crude — and often unmoved by emotionalism, empathy or restraint."

The two are freezing programs, firing federal workers en masse, ripping apart the government and decimating agencies with no precision, transparency or decency.

Republicans are cowering, and Democrats are frozen like the townsfolk in westerns when the bad guys take over.

Trump's glowering mug shot even hangs outside the Oval, like an Old West "Wanted: dead or alive" poster. And Musk, giving a news conference with his son X Æ A-Xii on his shoulders, mirrored Palance with his black outfit, including a Dark MAGA hat.

It's bizarre to have the White House accusing judges who pause Trump's depredations for a constitutional review of provoking a constitutional crisis.

Trump and Elon are turning our values upside down. The president demands fealty, even if he is asking his followers and pawns to do something illicit or transgressive. Loyalty outweighs legality.

000263

He immediately purged federal prosecutors who worked on Jan. 6-related cases. He ordered a McCarthyesque probe of thousands of F.B.I. agents who investigated a bloody sack of the U.S. Capitol that endangered police officers and lawmakers. So now the agents are the scofflaws, and the scofflaw is the dispenser of "justice"?

Trump is even making it easier for American companies to bribe foreign governments — something that's not exactly an American ideal.

Danielle Sassoon, the acting U.S. attorney for the Southern District of New York, whose office was prosecuting the corruption case against Mayor Eric Adams of New York, resigned on Thursday before she could be fired, after Trump's Justice Department ordered her to drop the case against the mayor. Trump seemed willing to let Adams, his latest sycophant, off the hook if he cooperated with the administration's deportation efforts. On Thursday, Adams granted immigration officers access to the city's jail.

On "Fox & Friends" on Friday, Adams sat with Tom Homan, Trump's monomaniacal border czar, who didn't mince words.

"If he doesn't come through, I'll be back in New York City," Homan said. "And we won't be sitting on the couch. I'll be in his office, up his butt, saying, 'Where the hell is the agreement we came to?'"

Sassoon is a conservative legal star with Harvard and Yale degrees who clerked for Antonin Scalia and is a contributor to the Federalist Society — and is, by the way, going through all this mishegoss with a baby due in mid-March.

She is the heroine of the story, and Adams is the miscreant. But Trump and his former lawyer, now the acting No. 2 at Justice, Emil Bove III, are trying to brand her as incompetent and insubordinate and Adams as politically persecuted (like

000264

Case 3:25-cv-00446-TLTC   Document 37-1   Filed 02/22/025   Page 270 of 597

2/18/25, 8:25 AM

Trump).

Six more Justice Department officials quit after Sassoon, including the lead prosecutor on the Adams case, a former Brett Kavanaugh clerk named Hagan Scotten. Scotten wrote to Bove: "If no lawyer within earshot of the president is willing to give him that advice, then I expect you will eventually find someone who is enough of a fool, or enough of a coward, to file your motion. But it was never going to be me."

R.F.K. Jr., our new secretary of health and human services — as hard as that is to believe — is hailed by Trump as a health savior, when he's a dire threat to America's children with his dismissal of vaccines.

Most of the world sees Volodymyr Zelensky as a hero and Vladimir Putin as a villain. I feel queasy when I hear President Trump talking dotingly about Putin, a K.G.B.-trained thug. I'm sure that dogs skulk away from Putin as he walks by.

But Putin has made it his business to seduce the president, so the easily flattered Trump sees Zelensky as the inevitable loser in his bid to keep Ukraine intact. As the Pentagon chief, Pete Hegseth, put it, Zelensky needs to get with it and understand "hard power realities," like the reality that he's not getting all of his territory back.

On Ukraine joining NATO, Trump sounds like a Putin spokesman, asserting that "Russia would never accept" that.

In a speech in Brussels on Thursday, Hegseth said, "We can talk all we want about values. Values are important. But you can't shoot values. You can't shoot flags. And you can't shoot strong speeches. There is no replacement for hard power."

000265

2/18/25, 8:25 AM

But if we lose our values and abandon what those before us have fought for, are we the same America? Our heroes preserved the Union and liberated Europe from the Nazis. We're supposed to be the shining city on the hill. It feels as if we're turning our country into a crass, commercial product, making it cruel, as we maximize profits.

I hope, as President Trump and Elon Musk exercise their "masculine maximalism," they remember the words of John Wayne in the 1972 western "The Cowboys": "A big mouth don't make a big man."

*The Times is committed to publishing a diversity of letters to the editor. We'd like to hear what you think about this or any of our articles. Here are some tips. And here's our email: letters@nytimes.com.*

*Follow the New York Times Opinion section on Facebook, Instagram, TikTok, Bluesky, WhatsApp and Threads.*

Maureen Dowd is an Opinion columnist for The Times. She won the 1999 Pulitzer Prize for distinguished commentary. @MaureenDowd · Facebook

---

A version of this article appears in print on , Section SR, Page 3 of the New York edition with the headline: Shane, Come Back! Hurry!!

000266

# EXHIBIT 12



# EXHIBIT 13

POLITICS · TRUMP ADMINISTRATION

# Trump Administration Fires, Then Rescinds Firing of Nuclear Weapons Workers

**4 MINUTE READ**



Elon Musk walks to the Eisenhower Executive Office Building near the White House in Washington, D.C., on Feb. 13, 2025. *Stefan Reynolds—Bloomberg/Getty Images*

BY **TARA COPP AND ANTHONY IZAGUIRRE / AP**   FEBRUARY 16, 2025 9:00 PM EST

WASHINGTON — The Trump Administration has halted the firings of hundreds of federal employees who were tasked with working on the nation's nuclear weapons programs, in an about-face that has left workers confused and experts cautioning that DOGE's blind cost cutting will put communities at risk.

Three U.S. officials who spoke to The Associated Press said up to 350 employees at the National Nuclear Security Administration were abruptly laid off late Thursday, with some losing access to email before they'd learned they were fired, only to try to enter their offices on Friday morning to find they were locked out. The officials spoke on the condition of anonymity for fear of retaliation.

One of the hardest hit offices was the Pantex Plant near Amarillo, Texas, which saw about 30% of the cuts. Those employees work on reassembling warheads, one of the most sensitive jobs across the nuclear weapons enterprise, with the highest levels of clearance.

The hundreds let go at NNSA were part of a DOGE purge across the Department of Energy that targeted about 2,000 employees.

BRANDED CONTENT

## Woman of Impact: Championing Women's Heart Health ↗

BY AMERICAN HEART ASSOCIATION

"The DOGE people are coming in with absolutely no knowledge of what these departments are responsible for," said Daryl Kimball, executive director of the

000271

Arms Control Association, referencing Elon Musk's Department of Government Efficiency team. "They don't seem to realize that it's actually the department of nuclear weapons more than it is the Department of Energy."

**Read More:** *Inside Elon Musk's War on Washington*

By late Friday night, the agency's acting director, Teresa Robbins, issued a



TIME    ● SIGN UP FOR OUR IDEAS NEWSLETTER POV    SUBSCRIBE    🔍

**YOU MAY ALSO LIKE**

POLITICS

Tesla Removed



POLITICS

White House, Trump



POLITICS

Who is Nancy Mace?



POLITICS

Trump's Kennedy Center



"This letter serves as formal notification that the termination decision issued to you on Feb. 13, 2025 has been rescinded, effective immediately," said the memo, which was obtained by the AP.

The accounts from the three officials contradict an official statement from the Department of Energy, which said fewer than 50 National Nuclear Security Administration staffers were let go, calling them "probationary employees" who "held primarily administrative and clerical roles."

But that wasn't the case. The firings prompted one NNSA senior staffer to post a warning and call to action.

"This is a pivotal moment. We must decide whether we are truly committed to leading on the world stage or if we are content with undermining the very systems that secure our nation's future," deputy division director Rob Plonski posted to LinkedIn. "Cutting the federal workforce responsible for these functions may be seen as reckless at best and adversarily opportunistic at worst."

**Read More:** *'The Worst I've Ever Seen': Trump's Mass Layoffs Leave Federal Workers Baffled and Angry*

While some of the Energy Department employees who were fired dealt with energy efficiency and the effects of climate change, issues not seen as priorities by the Trump Administration, many others dealt with nuclear issues, even if they didn't directly work on weapons programs. This included managing massive radioactive waste sites and ensuring the material there doesn't further contaminate nearby communities.

That incudes the Savannah River National Laboratory in Jackson, South Carolina; the Hanford Nuclear Site in Washington state, where workers secure 177 high-level waste tanks from the site's previous work producing plutonium for the atomic bomb; and the Oak Ridge Reservation in Tennessee, a Superfund contamination site where much of the early work on the Manhattan Project was

done, among others.

U.S. Rep. Marcy Kaptur of Ohio and U.S. Sen. Patty Murray of Washington, both Democrats, called the firings last week "utterly callous and dangerous."

The NNSA staff who had been reinstated could not all be reached after they were fired, and some were reconsidering whether to return to work, given the uncertainty created by DOGE.

Many federal employees who had worked on the nation's nuclear programs had spent their entire careers there, and there was a wave of retirements in recent years that cost the agency years of institutional knowledge.

But it's now in the midst of a major $750 billion nuclear weapons modernization effort—including new land-based intercontinental ballistic missiles, new stealth bombers and new submarine-launched warheads. In response, the labs have aggressively hired over the past few years: In 2023, 60% of the workforce had been there five years or less.

Edwin Lyman, director of nuclear power safety at the Union of Concerned Scientists, said the firings could disrupt the day-to-day workings of the agency and create a sense of instability over the nuclear program both at home and abroad.

"I think the signal to U.S. adversaries is pretty clear: throw a monkey wrench in the whole national security apparatus and cause disarray," he said. "That can only benefit the adversaries of this country."

## MORE MUST-READS FROM TIME

- Inside **Elon Musk's War** on Washington
- Why Do More **Young Adults Have Cancer?**
- **Colman Domingo** Leads With Radical Love
- **11 New Books** to Read in February
- How to Get Better at **Doing Things Alone**
- **Cecily Strong** on Goober the Clown
- Column: The Rise of **America's Broligarchy**
- Introducing the **2025 Closers**

**CONTACT US AT** LETTERS@TIME.COM

Neurologists Amazed: Barefoot Shoes are The Best Thing You Can Do in 2025 - NOW 70% OFF!

Barefoot Vitality | Sponsored

# EXHIBIT 14

POLITICS

## Trump begins firings of FAA air traffic control staff just weeks after fatal DC plane crash





**BY** [TARA COPP](#)

Updated 2:03 PM EST, February 17, 2025

WASHINGTON (AP) — The Trump administration has begun firing several hundred Federal Aviation Administration employees, upending staff on a busy air travel weekend and just weeks after a January fatal mid-air collision at Ronald Reagan Washington National Airport.

000275

Probationary workers were targeted in late night emails Friday notifying them they had been fired, David Spero, president of the Professional Aviation Safety Specialists union, said in a statement.

The impacted workers include personnel hired for FAA radar, landing and navigational aid maintenance, one air traffic controller told the Associated Press. The air traffic controller was not authorized to talk to the media and spoke on condition of anonymity.

The National Air Traffic Controllers Association said in a brief statement Monday it was "analyzing the effect of the reported federal employee terminations on aviation safety, the national airspace system and our members."

ADVERTISEMENT



sifma

How will 2025 impact the Capital Markets?

READ O
OUTLO

Other FAA employees who were fired were working on an urgent and classified early warning radar system the Air Force had announced in 2023 for Hawaii to detect incoming cruise missiles, through a program that was in part funded by the Department of Defense. It's one of several programs that the FAA's National Defense Program manages that involve radars providing longer-range detection around the country's borders.

## RELATED STORIES



000276

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE



**Air traffic controllers were initially offered buyouts**



000277

**American Airlines jet collides with Army helicopter at Reagan Airport**

Due to the nature of their work, staff in that office typically provide an extensive knowledge transfer before retiring to make sure no institutional knowledge is lost, said Charles Spitzer-Stadlander, one of the employees in that branch who was terminated.

The Hawaii radar and the FAA National Defense Program office working on it "is about protecting national security," Spitzer-Stadlander said. "I don't think they even knew what NDP does, they just thought, oh no big deal, he just works for the FAA."

ADVERTISEMENT

"This is about protecting national security, and I'm scared to death," Spitzer-Stadlander said. "And the American public should be scared too."

Spero said messages began arriving after 7 p.m. on Friday and continued late into the night. More might be notified over the long weekend or barred from entering FAA buildings on Tuesday, he said.

000278



President Donald Trump speaks to reporters after landing at Palm Beach International Airport in West Palm Beach, Fla ., Sunday, Feb. 16, 2025, after attending the NASCAR Daytona 500 auto race. (Pool via AP)



Tesla CEO Elon Musk speaks before unveiling the Model Y at Tesla's design studio, March 14, 2019, in Hawthorne, Calif. (AP Photo/Jae C. Hong, File)

The employees were fired "without cause nor based on performance or conduct," Spero said, and the emails were "from an 'exec order' Microsoft email address" — not a government email address. A copy of the

000279

termination email that was provided to the AP shows the sending address from the address "ASK_AHR_EXEC_Orders@usfaa.mail.outlook.com."

The firings hit the FAA when it faces a shortfall in controllers. Federal officials have been raising concerns about an overtaxed and understaffed air traffic control system for years, especially after a series of close calls between planes at U.S. airports. Among the reasons they have cited for staffing shortages are uncompetitive pay, long shifts, intensive training and mandatory retirements.

In the Jan. 29 fatal crash between a U.S. Army Black Hawk helicopter and American Airlines passenger jet, which is still under investigation, one controller was handing both commercial airline and helicopter traffic at the busy airport.

Just days before the collision, President Donald Trump had already fired all the members of the Aviation Security Advisory Committee, a panel mandated by Congress after the 1988 PanAm 103 bombing over Lockerbie, Scotland. The committee is charged with examining safety issues at airlines and airports.

Spitzer-Stadtlander suggested he was targeted for firing for his views on Tesla and X, formerly Twitter, not as part of a general probationary-level sweep. Both companies are owned by Elon Musk, who is leading Trump's effort to cut the federal government.

Spitzer-Stadtlander is Jewish and was angered by Elon Musk's straight arm saluting at Trump's inauguration. On his personal Facebook account he urged friends to get rid of their Teslas and "X," or Twitter, accounts in response.

That post drew the attention of a DOGE Facebook account, which reacted with a laughing emoji. Soon after, he saw the same account reacting to much older posts through his personal Facebook feed.

"The official DOGE Facebook page started harassing me on my personal Facebook account after I criticized

000280

Tesla and Twitter," Spitzer-Stadlander wrote in a post over the weekend on Linked In. "Less than a week later, I was fired, despite my position allegedly being exempted due to national security."

He added: "When DOGE fired me, they turned off my computer and wiped all of my files without warning."

Spitzer-Stadlander said he was supposed to be exempted from the probationary firings because the FAA office he worked in focused on national security threats such as attacks on the national airspace by drones.

The Musk-led Department of Government Efficiency did not immediately respond to a request for comment. The firings were first reported by CNN.

—-

Associated Press writer Ellen Knickmeyer contributed from Washington.

**TARA COPP**
Copp covers the Pentagon and national security for the Associated Press. She has reported from Afghanistan, Iraq, throughout the Middle East, Europe and Asia.





000281

# EXHIBIT 15

# Musk's DOGE team to visit US FAA command center on Monday

By **David Shepardson**

February 16, 2025 11:44 PM EST · Updated a day ago

  



000283

Exclusive news, data and analytics for financial market professionals   LSEG

 Reuters   World ⌄   Business ⌄   Markets ⌄   My News   🔍   JC   Subscribe

Visit comes days after effort to fire hundreds of probationary FAA employees

White House said air traffic controllers not eligible for incentive to quit

Sustainability ⌄   Legal ⌄

Breakingviews ⌄   More ⌄



WASHINGTON, Feb 16 (Reuters) - Personnel from Elon Musk's government downsizing team DOGE will visit the Federal Aviation Administration's Air Traffic Control command center in Warrenton, Virginia, on Monday, as the Trump administration says it wants to reform the system.

Transportation Secretary Sean Duffy disclosed the plan in a social media post on Sunday.

DOGE personnel will "get a firsthand look at the current system, learn what air traffic controllers like and dislike about their current tools, and envision how we can make a new, better, modern and safer system," he added.

Report this ad

Advertisement · Scroll to continue

Report this ad

The Trump administration this month reversed course and denied participation to air traffic controllers or security officers of the Transportation Security Administration in a government incentive program to quit.

On Saturday, the Professional Aviation Safety Specialists union said several hundred FAA probationary employees were among thousands fired as part of a campaign by President Donald Trump and Musk to slash the U.S. bureaucracy.

The union said the "draconian action will increase the workload and place new responsibilities on a workforce that is already stretched thin."

000285

Musk's DOGE team to visit US FAA command center on Monday | Reuters
Case 3:25-cv-00461-TLC Document 25-1 Filed 02/27/25 Page 291 of 597
2/18/25, 8:28 AM

Advertisement · Scroll to continue

The FAA did not immediately comment on Sunday.

Musk, the chief executive of Tesla (TSLA.O) ⧉ and SpaceX, said on X in response late on Sunday to the planned DOGE visit that the "safety of air travel is a non-partisan matter. SpaceX engineers will help make air travel safer."

Musk previously cited concerns about the recent temporary failure of the FAA's NOTAM pilot alerting system, housed at the Virginia command center.

This month Senator Maria Cantwell called on Duffy to bar Musk from involvement in FAA air space reform, citing conflicts of interest and saying SpaceX was fined by the agency. SpaceX

000286

did not comment late on Sunday.



**AD**  00:28  **Coming up:** US, Russian offic

DSW.

The FAA handles an average of 45,000 daily
flights and says more than a quarter of the world's
scheduled flights arrive at or depart from U.S.
airports.

Last week, two U.S. senators called for increased
funding and staffing for FAA air traffic after a fatal
midair collision highlighted the persistent lack of
aviation safety personnel.

Senators Jeanne Shaheen and John Hoeven said
the FAA is more than 3,500 air traffic controllers
short of targeted staffing levels. FAA controller
staffing has been flat in recent years and is down
10% from 2012.

A January 29 collision between an American
Airlines (AAL.O) ⤢ regional jet and an Army
helicopter killed 67 people near Washington
Reagan National Airport in the deadliest U.S. air
disaster in more than 20 years.

Duffy says the administration plans to "make sure
that America has the most innovative,
technologically advanced air traffic control
system."

000287

## Sponsored Content





**3 Clean Energy and Vehicle Tax Credits**

Sponsored by Charles

**Use Tech Industry Learnings To Develop a Liquidity Strategy**

Sponsored by Bank of America

**Today's Markets: What Investors Should Know Now**

Sponsored by Charles Schwab

He is reconsidering rules that let air traffic control supervisors cut staffing before the fatal collision.

Duffy plans to soon announce steps to surge more air traffic control training and applicants and will visit the FAA Academy in Oklahoma this week to meet air traffic controller instructors and students.

> Get weekly news and analysis on U.S. politics and how it matters to the world with the Reuters Politics U.S. newsletter. Sign up here.

Reporting by David Shepardson; Editing by Gerry Doyle and Clarence Fernandez

Our Standards: **The Thomson Reuters Trust**

000288

# EXHIBIT 16

# Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS

The unusual request could put sensitive data about millions of American taxpayers in the hands of Trump political appointees.

Updated February 16, 2025

🎧 5 min    ↱    🔖    💬 8615

By [Jacob Bogage](#) and [Jeff Stein](#)

Elon Musk's U.S. DOGE Service is seeking access to a heavily guarded Internal Revenue Service system that includes detailed financial information about every taxpayer, business and nonprofit in the country, according to three people familiar with the activities, sparking alarm within the tax agency.

Under pressure from the White House, the IRS is considering a memorandum of understanding that would give officials from DOGE — which stands for Department of Government Efficiency — broad access to tax-agency systems, property and datasets. Among them is the Integrated Data Retrieval System, or IDRS, which enables tax agency employees to access IRS accounts — including personal identification numbers — and bank information. It also lets them enter and adjust transaction data and automatically generate notices, collection documents and other records.

000290

Musk's DOGE seeks access to personal taxpayer data at IRS - The Washington Post
Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/18/25   Page 296 of 959
2/18/25, 8:28 AM

According to a draft of the memorandum obtained by The Washington Post, DOGE software engineer Gavin Kliger is set to work at the IRS for 120 days, though the tax agency and the White House can renew his deployment for the same duration. His primary goal at the IRS is to provide engineering assistance and IT modernization consulting.

The agreement requires that Kliger maintain confidentiality of tax return information, shield it from unauthorized access and destroy any such information shared with him upon the completion of his IRS deployment.

IDRS access is extremely limited — taxpayers who have had their information wrongfully disclosed or even inspected are entitled by law to monetary damages — and the request for DOGE access has raised deep concern within the IRS, according to three people familiar with internal agency deliberations who, like others in this report, spoke on the condition of anonymity to discuss private conversations.

Kliger had not been granted IDRS access as of Sunday evening, according to a person with firsthand knowledge of his movement and access at the tax agency, as acting IRS commissioner Doug O'Donnell had yet to finalize the memorandum that would permit him to do more detailed work.

O'Donnell's predecessor, Danny Werfel, resigned on Jan. 20, after Trump announced plans to replace him with former congressman Billy Long (R-Missouri). Long has not yet been confirmed by the Senate.

The news comes as roughly 150 million taxpayers prepare to file returns by the April 15 deadline. In his first term, Trump openly mused about sending IRS agents after political opponents, leaving agency officials on edge about the IRS's independence.

The tax agency's systems are widely considered antiquated — many were built using computer coding language from the 1960s — and overhauling the agency's IT is in line with DOGE's mandate to modernize government technology. IRS contractors are generally provided system access to repair or maintain IDRS and similar data systems.

But it's highly unusual to grant political appointees access to personal taxpayer data, or even programs adjacent to that data, experts say. IRS commissioners traditionally do not have IDRS access. The same goes for the national taxpayer advocate, the agency's internal consumer watchdog, according to Nina Olson, who served in the role from 2001 to 2019.

"The information that the IRS has is incredibly personal. Someone with access to it could use it and make it public in a way, or do something with it, or share it with someone else who shares it with someone else, and your rights get violated," Olson said.

000291

A Trump administration official said DOGE personnel needed IDRS access because DOGE staff are working to "eliminate waste, fraud, and abuse, and improve government performance to better serve the people."

The official said the "DOGE mission … to bring much-needed efficiency to our bureaucracy" is being carried out "legally and with the appropriate security clearances."

A security clearance is not a sufficient credential for access to taxpayer systems, according to IRS procedures. IDRS access is governed by compelling needs for tax administration, not national security.

"IDRS users are authorized to access only those accounts required to accomplish their official duties," according to IRS policy.

In a statement, White House spokesman Harrison Fields told The Post: "Waste, fraud and abuse have been deeply entrenched in our broken system for far too long. It takes direct access to the system to identify and fix it. DOGE will continue to shine a light on the fraud they uncover as the American people deserve to know what their government has been spending their hard earned tax dollars on."

Representatives from the Treasury Department and IRS did not immediately respond to requests for comment.

Kliger arrived unannounced at IRS headquarters on Thursday and was named senior adviser to the acting commissioner. IRS officials were told to treat Kliger and other DOGE officials as contractors, two people familiar said.

A White House official said Sunday, however, that DOGE personnel at the IRS were full agency employees and not contractors.

Kliger met with Ken Corbin, the IRS's chief of taxpayer services, and Heather Maloy, the agency's top enforcement official, during his first day at the agency's headquarters, according to several of the people familiar with the meetings. The agency is preparing for Trump-ordered layoffs, as soon as this week, that could hit roughly 10,000 probationary employees. Kliger has not returned to IRS headquarters since those initial meetings.

000292

# EXHIBIT 17

Exclusive news, data and analytics for financial market professionals   

 **World** ⌄   **Business** ⌄   **Markets** ⌄   **Sustainability** ⌄       My News   🔍   

**Legal** ⌄   **Breakingviews** ⌄   **More** ⌄

# Exclusive: Musk aides lock workers out of OPM computer systems

By **Tim Reid**

February 2, 2025 5:32 PM
EST · Updated 16 days ago

    



000294





**[1/4]** Protest outside the Office of Personnel Management headquarters, Washington, D.C., February 2, 2025. REUTERS/Kent Nishimura <u>Purchase Licensing Rights</u> ⬀

Report this ad

## Summary    Companies

Musk aides restrict access to federal employee data systems

Musk's team works around the clock, installs sofa beds at OPM

Concerns include cybersecurity and lack of oversight

WASHINGTON, Jan 31 (Reuters) - Aides to Elon Musk charged with running the U.S. government human resources agency have locked career civil servants out of computer systems that contain the personal data of millions of federal employees, according to two agency officials.

Since taking office 11 days ago, President <u>Donald Trump</u> has embarked on a massive government makeover, <u>firing and sidelining hundreds of civil servants</u> in his first steps toward <u>downsizing the bureaucracy and installing more loyalists</u>.

000295

Advertisement · Scroll to continue

Musk, the billionaire Tesla (TSLA.O) ↗ CEO and X owner tasked by Trump to slash the size of the 2.2 million-strong civilian government workforce, has moved swiftly to install allies at the agency known as the Office of Personnel Management.

The two officials, who spoke to Reuters on condition of anonymity for fear of retaliation, said some senior career employees at OPM have had their access revoked to some of the department's data systems.

The systems include a vast database called Enterprise Human Resources Integration, which contains dates of birth, Social Security numbers, appraisals, home addresses, pay grades and length of service of government workers, the officials said.

000296

Advertisement · Scroll to continue

"We have no visibility into what they are doing with the computer and data systems," one of the officials said. "That is creating great concern. There is no oversight. It creates real cybersecurity and hacking implications."

Officials affected by the move can still log on and access functions such as email but can no longer see the massive datasets that cover every facet of the federal workforce.

Musk, OPM, representatives of the new team, and the White House did not immediately respond to requests for comment.

OPM has sent out memos that eschew the normal dry wording of government missives as it encourages civil servants to consider buyout

000297

offers to quit and take a vacation to a "dream destination."



cc

Don Moynihan, a professor at the Ford School of Public Policy at the University of Michigan, said the actions inside OPM raised concerns about congressional oversight at the agency and how Trump and Musk view the federal bureaucracy.

"This makes it much harder for anyone outside Musk's inner circle at OPM to know what's going on," Moynihan said.

## MUSK INFLUENCE

A team including current and former employees of Musk assumed command of OPM on Jan. 20, the day Trump took office. They have moved sofa beds onto the fifth floor of the agency's headquarters, which contains the director's office and can only be accessed with a security badge or a security escort, one of the OPM employees said.

The sofa beds have been installed so the team can work around the clock, the employee said.

Musk, a major donor to a famously demanding boss, installed beds at X for employees to enable

000298

them to work longer when in 2022 he took over the social media platform, formerly known as Twitter.

## Sponsored Content 



**Tax Deduction Basics and Tips**

Sponsored by Charles Schwab

**We called AI and Nvidia— this is our next big tech pick**

Sponsored by The Motley

**Know the Cyber Risks of AI for Your Business**

Sponsored by Bank of America

Report this ad

"It feels like a hostile takeover," the employee said.

The new appointees in charge of OPM have moved the agency's chief management officer, Katie Malague, out of her office and to a new office on a different floor, the officials said.

Malague did not respond to a request for comment.

The moves by Musk's aides at OPM, and upheaval

inside the Treasury building caused <u>by other Musk aides</u> that was reported on Friday, underscore the sweeping influence Musk is having across government.

David Lebryk, the top-ranking career U.S. Treasury Department official, is set to leave his post following a clash with allies of Musk after they asked for access to payment systems, the Washington Post reported on Friday.

The new team at OPM includes software engineers and Brian Bjelde, who joined Musk's SpaceX venture in 2003 as an avionics engineer before rising to become the company's vice president of human resources. Bjelde's role at OPM is that of a senior adviser.

The acting head of OPM, Charles Ezell, has been sending memos to the entire government workforce since Trump took office, including Tuesday's offering federal employees the chance to quit with eight months pay.

"No-one here knew that the memos were coming out. We are finding out about these memos the same time as the rest of the world," one of the officials said.

Among the group that now runs OPM is Amanda Scales, a former Musk employee, who is now OPM's chief of staff. In some memos sent out on Jan. 20 and Jan. 21 by Ezell, including one directing agencies to identify federal workers on probationary periods, agency heads were asked to email Scales at her OPM email address.

Another senior adviser is Riccardo Biasini, a

000300

former engineer at Tesla and most recently a director at The Boring Company, Musk's tunnel-building operation in Las Vegas.

> Get weekly news and analysis on U.S. politics and how it matters to the world with the Reuters Politics U.S. newsletter. Sign up here.

Reporting by Tim Reid; Editing by Ross Colvin and Howard Goller

Our Standards: **The Thomson Reuters Trust Principles.** ⬈

Suggested Topics:  United States

ADAS, AV & Safety

Sustainable & EV Supply Chain    Workforce

Donald Trump

      **Purchase Licensing Rights**

## Read Next

 

000301

# EXHIBIT 18

Exhibit 18:

**List of officers in Executive Office of the President who are appointed by Senate consent**

| Statute | Position(s) |
|---|---|
| 15 U.S.C. § 1023(a)(2) | Executive Office of the President a Council of Economic Advisers |
| 42 U.S.C. § 6612 | Director of the Office of Science and Technology, Director, Associate Director, of the National Science Foundation |
| 42 U.S.C. § 4342 | Chair Council on Environmental Quality, |
| 19 U.S.C. § 2171(b) | Office of the Trade Rep., US Trade Rep., Deputy Trade Rep., Chief Intellectual Property Negotiator, and Chief Agricultural Negotiator |
| 6 U.S.C. § 1500(b) | National Cyber Director |
| 31 U.S.C. § 502 | Deputy Director of the Office of Management and Budget |
| 44 U.S.C. § 3503(b) | Office of Information and Regulatory Affairs |
| 41 U.S.C. § 1102(b | Office of Federal Procurement Policy |
| 31 U.S.C.A. § 504(b) | Office of Federal Financial Management a Controller, |
| 21 U.S.C. § 1703(a)(1)(A) | Office of National Drug Control Policy: Director |

# EXHIBIT 19

Other State Department Archive Sites

The State Department web site below is a permanent electronic archive of information released online from January 1, 1997 to January 20, 2001. Please see www.state.gov for current material from the Department of State. Or visit http://2001-2009.state.gov for information from that period. Archive sites are not updated, so external links may no longer function. Contact us with any questions about finding information. NOTE: External links to other Internet sites should not be construed as an endorsement of the views contained therein.



**Reorganization Plan and Report (revised March 1999)**
*Submitted Pursuant to Section 1601 of the Foreign Affairs Reform and Restructuring Act of 1998, as Contained in Public Law 105-277*
Re-posted from the USIA web site April 14, 1999

# Foreword

The *Foreign Affairs Reform and Restructuring Act of 1998* provides the authority to implement the Administration's plan to reorganize and strengthen the foreign affairs agencies. This initiative, which the President announced on April 18, 1997, emerged from productive consultations with the Congress and enjoys bipartisan support. Under the leadership of Vice President Gore, the Reorganization Plan and Report being submitted today were designed with careful attention to preserve the unparalleled capabilities and skills of the foreign affairs agencies and their personnel. Reorganization enhances the ability of the United States to meet the international challenges of the next century by placing arms control and nonproliferation, public diplomacy, and sustainable development at the heart of our foreign policy. The Administration will work closely and cooperatively with the Congress to implement this integration.

This Reorganization Plan and Report, developed through the cooperative efforts of the Department of State, the Arms Control and Disarmament Agency, the United States Information Agency, and the United States Agency for International Development, describe how reorganization will be implemented. As a result, U.S. foreign policy will benefit in a number of important ways:

· Integrating ACDA into State will better combine its unique negotiating, verification, and technical expertise with State's broad diplomatic expertise and regional experience so as to strengthen policies on arms control, nonproliferation, and other political-military affairs. Integration will also establish a structure within State that will preserve unique arms control and nonproliferation perspectives.

· Integrating USIA and bringing public diplomacy insights into play sooner will result in more effective policies that are persuasive to foreign audiences. The infusion of USIA's strategic approach to public diplomacy, open style, close ties with non-governmental organizations (NGOs), technology

000305

for open communications, and skillful Internet use will make U.S. foreign policy more agile.

· The strengthened State-USAID tie will enhance the cohesiveness of our foreign policy and sustainable development and humanitarian programs, which promote reform and conflict resolution and help vulnerable people in many areas of the world.

· The integration of policy support and management functions will create possible streamlining opportunities.

The human dimension of reorganization is vital. Specific positions are being identified for every employee who will be transferred. There are no plans for a reduction-in-force, although over time integration will yield efficiencies as well as improve effectiveness. The *Act* gives the Secretary of State the flexibility needed to align people and positions most effectively.

As integration advances, State will continue intensive efforts to reinvent itself. Integration offers more scope for this and widens the circle of opportunity to restructure and adopt best practices. State has already taken some important steps. The Under Secretaries have assumed responsibility as State's Corporate Board, chaired by the Deputy Secretary. Performance Planning has been redesigned greatly to enhance the alignment of strategy and resources.

Finally, increased efficiency is very important, but is not, by itself, enough to assure U.S. leadership in the world. For this, the foreign affairs agencies must have the wherewithal to meet growing responsibilities and take full advantage of new opportunities. American strength today results from our predecessors' bold decisions and timely investments, beginning with Lend Lease and the Marshall Plan. The Administration's plan does not propose anything this expensive, but we have to do better in order to seize the initiative. Embassy bombings in East Africa, the international financial crisis, instability in the Middle East, Kosovo, and Russia, and risks that nuclear, biological, and chemical weapons will proliferate show how the world remains dangerous and uncertain. Therefore, it is vital that our country has the resources it needs for a strong foreign policy that serves America's interests.

# Reorganization Plan

## Section 1. Status of Agencies.

**(a) Arms Control and Disarmament Agency**. Effective April 1, 1999, the Arms Control and Disarmament Agency shall be abolished in accordance with the Foreign Affairs Agencies Consolidation Act of 1998 (the "Act"), Subdivision A, Foreign Affairs Reform and Restructuring Act of 1998, as contained in Division G of Pub. Law 105-277.

**(b) International Development and Cooperation Agency**. Effective April 1, 1999, the International Development and Cooperation Agency shall be abolished in accordance with the Act.

000306

**(c) United States Information Agency**. Effective October 1, 1999, the United States Information Agency shall be abolished in accordance with the Act.

**(d) United States Agency for International Development**. Effective April 1, 1999, the United States Agency for International Development shall continue as an independent establishment in the Executive Branch.

# Section 2. Transfer of Functions.

**(a) Arms Control and Disarmament Agency**. Effective April 1, 1999, all functions and authorities of the Arms Control and Disarmament Agency shall be transferred to the Secretary of State in accordance with title XII of the Act.

**(b) International Development and Cooperation Agency.** Effective April 1, 1999, functions and authorities of the International Development and Cooperation Agency shall be transferred to the Secretary of State in accordance with title XIV of the Act.

**(c) United States Agency for International Development**. Effective no later than April 1, 1999, the following functions of the United States Agency for International Development shall be transferred to the Secretary of State in accordance with title XV of the Act:

(1) functions related to the Press Office; and

(2) functions related to retirement counseling and processing, location of headquarters mainframe computer operations, storage of employees' household goods and other transportation and storage services, and such other functions as the United States Agency for International Development and the Department of State may agree.

The transfer of functions provided for in paragraph (2) shall be through memoranda of understanding between the United States Agency for International Development and the Department of State.

**(d) United States Information Agency**. Effective October 1, 1999, all functions of the United States Information Agency, except those transferred to the Broadcasting Board of Governors under subsection (e) of this section, shall be transferred to the Secretary of State in accordance with title XIII of the Act, including functions associated with the Bureau of Information, the Bureau of Educational and Cultural Affairs, the Office of Research and Media Reaction, and Worldnet interactive dialogues and other similar overseas public diplomacy programs.

**(e) Broadcasting Board of Governors**. Effective October 1, 1999, functions of the United States Information Agency related to international broadcasting shall be transferred to the Broadcasting Board of Governors in accordance with title XIII of the Act, including functions associated with the International Broadcasting Bureau, the Voice of America, Radio and TV Marti, Radio Free Europe/Radio Liberty, and Radio Free Asia, but excluding Worldnet interactive dialogues and similar overseas public diplomacy programs.

# Section 3. Transfer of Personnel.

000307

Personnel of the Arms Control and Disarmament Agency, the United States Agency for International Development, and the United States Information Agency shall be transferred to the Department of State and the Broadcasting Board of Governors in accordance with the Act and this Plan.

# Section 4. Transfer and Allocation of Funds.

**(a) Arms Control and Disarmament Agency**. Effective April 1, 1999, the current and expired accounts of the Arms Control and Disarmament Agency shall become separate accounts of the Department of State. Funds currently available in the current year account shall be available for obligation and expenditure for purposes authorized by law. Funds in expired accounts shall continue to be available for adjustment and liquidation of obligations until such accounts are closed as required by law, at which time any remaining funds shall be returned to the General Fund of the U.S. Treasury.

**(b) United States Agency for International Development**. Effective no later than April 1, 1999, unobligated current year funds associated with the functions described in section 2(c)(1) of this Plan shall be transferred to the Secretary of State for appropriate allocation. Unliquidated obligations and related budget authority associated with such functions shall not be transferred. Funds associated with the functions described in section 2(c)(2) shall be transferred to the Department of State in accordance with memoranda of understanding between the United States Agency for International Development and the Department of State.

**(c) United States Information Agency**. Effective October 1, 1999, funds appropriated to the United States Information Agency shall be transferred and allocated as follows:

(1) <u>International Information Programs Accounts</u>. Expired International Information Program Accounts shall become separate accounts of the Department of State. Funds in expired accounts shall continue to be available for adjustment and liquidation of obligations until such accounts are closed as required by law, at which time any remaining funds shall be returned to the General Fund of the U.S. Treasury. Funds that remain available for obligation and expenditure in an International Information Programs account shall be transferred to the Secretary of State for appropriate allocation, except that such amounts as are associated with international broadcasting functions described in section 2(e) of this Plan shall be transferred to the Broadcasting Board of Governors for appropriate allocation. Funds that are deobligated and remain available for obligation and expenditure shall likewise be transferred to the Secretary of State and the Broadcasting Board of Governors for appropriate allocation.

(2) <u>Technology Fund</u>. Funds that remain available for obligation and expenditure in the Technology Fund shall be transferred to the Secretary of State as a separate account for appropriate allocation, except that such funds associated with international broadcasting functions described in section 2(e) of this Plan shall be transferred to the Broadcasting Board of Governors for appropriate allocation. Unliquidated obligations and related budget authority shall be transferred to the same account and shall continue to be available for adjustment and liquidation. Funds that are deobligated and remain available for obligation and expenditure shall be transferred to the Secretary of State and the Broadcasting Board of Governors for appropriate allocation.

000308

(3) <u>Foreign Service National Separation Liability Trust Fund</u>. Funds that remain available for obligation and expenditure in the United States Information Agency Foreign Service National Separation Liability Trust Fund shall be transferred to the Department of State's Foreign Service National Separation Liability Trust Fund, except that such funds associated with international broadcasting functions described in section 2(e) of this Plan shall be transferred to the Broadcasting Board of Governors Foreign Service National Separation Liability Trust Fund. Unliquidated obligations and related budget authority shall continue to be available for adjustment and liquidation in a separate account of the Department of State, except that unliquidated obligations and related budget authority associated with international broadcasting functions described in section 2(e) of this Plan shall be transferred to the Broadcasting Board of Governors Foreign Service National Separation Liability Trust Fund.

(4) <u>Buying Power Maintenance Account</u>. All amounts in the United States Information Agency Buying Power Maintenance Account shall be transferred to the Department of State's Buying Power Maintenance Account, except for amounts associated with international broadcasting functions described in section 2(e) of this Plan, which shall be transferred to the Broadcasting Board of Governors Buying Power Maintenance Account.

(5) <u>Suspense Deposits Abroad</u>. The United States Information Agency Suspense Deposits Abroad account shall become a separate account of the Department of State. All amounts identified and validated shall be transferred to the Department of State's Suspense Deposit Abroad account, except for amounts associated with international broadcasting functions described in section 2(e) of this Plan, which shall be transferred to the Broadcasting Board of Governors Suspense Deposit Abroad Account.

(6) <u>United States Information Agency Trust Funds Account</u>. The United States Information Agency Trust Funds Account shall become a separate account of the Department of State. Funds currently available in this account shall be available for obligation and expenditure for purposes authorized by law, except that funds associated with international broadcasting functions described in section 2(e) of this Plan shall be transferred to the Broadcasting Board of Governors Trust Funds Account. Unliquidated obligations and related budget authority shall continue to be available for adjustment and liquidation, except that unliquidated obligations and related budget authority associated with international broadcasting functions described in section 2(e) of this Plan shall be transferred to the Broadcasting Board of Governors Trust Funds Account.

(7) <u>Other Active Accounts</u>. The following accounts shall become separate accounts of the Department of State: East-West Center, North/South Center, Educational and Cultural Exchange, National Endowment for Democracy, American Studies Endowment Fund, Israeli Arab Scholarship Fund, Eastern Europe Student Exchange, Russian Far East Technical Assistance, and United States Information Agency Office of the Inspector General. Funds currently available in these accounts shall be available for obligation and expenditure for purposes authorized by law. Funds in expired accounts shall continue to be available for adjustment and liquidation of obligations until such accounts are closed as required by law, at which time any remaining funds shall be returned to the General Fund of the U.S. Treasury.

(8) <u>Transfer to the Broadcasting Board of Governors</u>. In addition to the accounts otherwise referred to in this subsection, the following accounts shall be transferred to the Broadcasting Board of Governors: Radio Construction, International Broadcasting Operation, Broadcasting to Cuba, Radio Free Asia, Israel Radio Relay Station, and certain Grants and Expenses accounts. Funds currently available in these accounts shall be available for obligation and expenditure for purposes authorized by law. Funds in expired accounts shall continue to be available for adjustment and liquidation of obligations until such accounts are closed as required by law, at which time any remaining funds shall returned to the General Fund of the U.S. Treasury.

(9) <u>Inactive Accounts</u>. Upon the request of the United States Information Agency, the Department of Treasury shall close all inactive accounts associated with the United States Information Agency. Such closure shall occur on or before September 30, 1999.

**(d) Authority to Reallocate**. Nothing in this section shall be construed as prohibiting the Secretary of State or the Broadcasting Board of Governors from reallocating funds allocated under this section, as appropriate, in accordance with law.

# Section 5. Disposition of Property, Facilities, Contracts, Records, and Other Assets and Liabilities

**(a) Arms Control and Disarmament Agency**. All property, facilities, contracts, records and other assets and liabilities of the Arms Control and Disarmament Agency shall be transferred to the Secretary of State for appropriate allocation.

**(b) Certain Functions of the United States Agency for International Development**. All property, facilities, contracts and other assets and liabilities related to the functions transferred pursuant to section 2(c) of this Plan shall be transferred to the Secretary of State for appropriate allocation.

**(c) United States Information Agency**. All property, facilities, contracts and other assets and liabilities related to the functions transferred pursuant to section (2)(d) of this Plan shall be transferred to the Secretary of State for appropriate allocation.

**(d) Broadcasting Board of Governors**. All property, facilities, contracts and other assets and liabilities related to the functions transferred pursuant to section (2)(e) of this Plan shall be transferred to the Broadcasting Board of Governors for appropriate allocation.

# Section 6. Reorganization of the Department of State.

**(a) Under Secretaries of State.** There shall be within the Department of State an Under Secretary of State for Arms Control and International Security and an Under Secretary of State for Public Diplomacy and Public Affairs.

**(b) Senior Adviser for Arms Control, Nonproliferation, and Disarmament**. Effective April 1, 1999, the Under Secretary for Arms Control and International Security shall also serve as the Senior Adviser to the President and the Secretary of State on Arms Control, Nonproliferation and Disarmament. Subject to the direction of the President, the Under Secretary may attend and

000310

participate in meetings of the National Security Council in his role as Senior Adviser.

**(c) Arms Control, Nonproliferation and Verification**. Effective April 1, 1999, there shall be within the Department of State a Bureau of Arms Control and a Bureau of Nonproliferation, each of which shall be headed by an Assistant Secretary of State. The position of a Special Adviser for Verification and Compliance shall also be established, who shall report directly to the Under Secretary of State for Arms Control and International Security. Presidential Special Representatives shall report to the Secretary through the appropriate Assistant Secretary, who will provide support for such Special Representatives, and the Under Secretary of State for Arms Control and International Security. A scientific and policy Advisory Board on arms control, nonproliferation and disarmament shall report to the Secretary through the Under Secretary of State for Arms Control and International Security. The Bureau of Political-Military Affairs shall continue as a bureau within the Department of State. The Secretary of State shall allocate personnel and currently available funds allotted to the Department of State's Bureau of Political-Military Affairs to the Bureau of Arms Control and the Bureau of Nonproliferation in an amount appropriate to the transfer of activities to such bureaus.

**(d) Public Diplomacy**. Effective October 1, 1999, there shall be within the Department of State a Bureau of Educational and Cultural Affairs, which shall be headed by an Assistant Secretary of State. In addition, there shall be an Office of International Information Programs, which shall be headed by a Coordinator for International Information Programs, who shall report directly to the Under Secretary of State for Public Diplomacy and Public Affairs.

**(e) Support functions**. Budget, administrative, personnel, information technology, security, legislative, legal and other support activities of the Arms Control and Disarmament Agency and the United States Information Agency transferred to the Department of State by the Act shall be consolidated, as appropriate, with the Department of State's Bureau of Financial Management and Policy, Bureau of Administration, Bureau of Personnel, Bureau of Information Resource Management, Bureau of Diplomatic Security, Bureau of Legislative Affairs, Office of the Legal Adviser and other Department offices.

# Section 7. Additional Transitional Matters.

**(a) To the Secretary of State**. Any functions, assets, liabilities, contracts, property, records, facilities and unexpended balances of appropriations, authorizations, allocations or other funds, transferred under the Act to the Secretary of State or the Department of State but not otherwise provided for in this Plan shall be transferred to the Secretary of State for appropriate allocation.

**(b) To the Broadcasting Board of Governors**. Any functions, assets, liabilities, contracts, property, records, facilities and unexpended balances of appropriations, authorizations, allocations or other funds, transferred under the Act to the Broadcasting Board of Governors or its Chairman but not otherwise provided for in this Plan shall be transferred to the Broadcasting Board of Governors for appropriate allocation.

# Section 8. Construction and Relationship with Other Laws.

**(a) Construction**. Nothing in this Plan or its accompanying Report shall be construed as derogating

000311

from or limiting any authority conferred by the Act on any Department or agency or on the President, the Secretary of State, the Administrator of the United States Agency for International Development, the Broadcasting Board of Governors or its Chairman, the Director of the Office of Management and Budget or any other official, including the authority to request and make incidental dispositions of personnel, assets, liabilities, grants, contracts, property, records, and unexpended balances of appropriations, authorizations, allocations and other funds held, used, arising from, available to, or to be made available in connection with functions transferred by the Act.

**(b) Relationship with Other Laws**. Nothing in this Plan or its accompanying Report shall be construed as derogating from or limiting any authority conferred by any other law on any Department or agency or on the President, the Secretary of State, the Administrator of the United States Agency for International Development, the Broadcasting Board of Governors or its Chairman, the Director of the Office of Management and Budget or any other official, to take appropriate measures, including the authority further to reorganize or to reallocate positions or funds, consistent with any applicable provision of law, including those governing reprogramming and transfer of funds.

# Table of Contents

**Executive Summary**...............................................................1

**I. The Department of State**.......................................................6

**II. The Arms Control, Nonproliferation,**
**and International Security Mission**........................12
**III. The Public Diplomacy and Public Affairs Missions**.......19

**IV. Broadcasting**.....................................................25

**V. The Development Assistance Mission**...............................29

**VI. Policy Support Functions**

**A. Under Secretarial Staffs**.............................................35

**B. Executive Secretariat**.................................................39

**C. Congressional Relations**.............................................44

**D. Legal Affairs**.............................................................47

**E. Press and Constituent Relations**.............................51

**VII. Management Functions**

**Overview**..........................................................................55

000312

A. Budget and Finance.................................................57

B. Domestic Facilities................................................60

C. EEO..................................................................62

D. Grants..............................................................64

E. Human Resources..................................................66

F. Information Technology..........................................69

G. Logistics...........................................................72

H. Overseas Facilities...............................................74

I. Overseas Operations..............................................76

J. Records and Publishing Services..............................79

K. Security............................................................82

L. Statutory Procurement Functions.............................84

M. Training............................................................86

VIII. Reinvention....................................................88

IX. Implementation..................................................95

X. Other Reporting Requirements ...............................98

# EXECUTIVE SUMMARY

The reorganization of the foreign affairs agencies will preserve and improve U.S. leadership for a new century that will pose new threats and opportunities. The risks posed by chemical, biological, and nuclear weapons may grow as numerous new state and non-state actors, some with interests inimical to our own, try to obtain those weapons. Democracies, citizen organizations, and market structures will become more prominent around the world, and Americans will feel the effects of decisions they make, outside traditional government-to-government channels. As developing countries add to the international economy, environmental and demographic pressures can challenge American prosperity and security, as well as our humanitarian instincts. By integrating our national arms control, nonproliferation, public diplomacy, and sustainable development efforts into a single foreign affairs structure, we will be better able to prepare, prevent, and when necessary respond.

The Administration will work closely and cooperatively with the Congress to implement this historic reorganization. The plan is designed around our greatest strengths -- the abilities and expertise of our dedicated public servants in the foreign affairs agencies and the message America brings to the

world. Reorganization will make clear that we are creating an international affairs structure that serves the times by functioning better, faster, more flexibly, and efficiently.

The United States Information Agency (USIA) and the Arms Control and Disarmament Agency (ACDA) will be abolished and integrated into State, the Broadcasting Board of Governors (BBG) will become an independent executive branch entity, and the International Development Cooperation Agency will be eliminated. The Administrator of the United States Agency for International Development (USAID) will be under the direct authority and foreign policy guidance of the Secretary of State, and USAID's press office and certain administrative functions will move to State. About seven thousand USIA personnel -- Foreign Service, Civil Service, and Foreign Service Nationals -- are involved. Nearly three thousand will go to the BBG and the remainder will join State, as will about 250 ACDA and a few USAID employees. Under the provisions of the *Foreign Affairs Reform and Restructuring Act of 1998*, all personnel and positions shall be transferred to State at the same grade or class, with the same rate of basic pay or basic salary, and with the same tenure held immediately preceding transfer.

# Arms Control, Nonproliferation, and International Security

ACDA will be abolished on April 1, 1999. The integrated foreign policy missions of ACDA and State's Political-Military Affairs Bureau (PM) will be under the policy oversight of the Under Secretary for Arms Control and International Security. The Under Secretary will also be Senior Adviser to the President and the Secretary of State on Arms Control, Nonproliferation, and Disarmament. Five current bureaus (four in ACDA and PM) will be reduced to three in State, all under the policy oversight of the Under Secretary. An office reporting directly to the Under Secretary will advise on verification and compliance issues. During the transition period, the Director of ACDA has been "double-hatted" as Acting Under Secretary. Under the *Act*, a scientific and policy Advisory Board will be established to advise and make recommendations to the Secretary of State on U.S. arms control, nonproliferation, and disarmament policy and activities.

# Public Diplomacy and Public Affairs

USIA will be abolished on October 1, 1999. Public diplomacy programs -- designed to understand, inform, and influence foreign audiences -- will be under the direction of a new Under Secretary for Public Diplomacy and Public Affairs who will provide policy oversight over two bureaus and one office.

The Bureau of Educational and Cultural Affairs will be responsible for educational and cultural programs. The current commitment to academic and professional exchange programs will continue unabated. A separate Office of International Information Programs will produce information programs and products tailored for foreign opinion-makers. Its information efforts will focus on foreign audiences in recognition of the intent of Congress to separate overseas public diplomacy efforts from information efforts which inform the press and the American public about foreign policy. The Bureau of Public Affairs will be expanded by incorporating press relations offices of all four foreign affairs agencies and the Foreign Press Centers now operated by USIA. Public diplomacy staffs will be added to State's regional and functional staffs and bureaus.

000314

Consistent with the *Act*, international broadcasting will remain an essential instrument of U.S. foreign policy. The BBG will be under the foreign policy guidance of the Secretary of State, who will have a seat on the BBG replacing the USIA Director. The Secretary and the Board will, however, respect the professional independence and integrity of the BBG's International Broadcasting Bureau (IBB) and its Voice of America, surrogate broadcasting services, and grantees. In cooperation with USIA and the BBG and IBB, State is developing mechanisms to transfer to the BBG and IBB those funds, resources, and personnel commensurate with administrative and other support they now receive from USIA.

## International Development

IDCA will be abolished on April 1, 1999. USAID will be a separate agency, and its Administrator will be under the direct authority and foreign policy guidance of the Secretary of State. To maximize consistency with overall U.S. international affairs priorities, the Secretary will ensure coordination among agencies of the United States Government in carrying out the policies contained in relevant foreign assistance legislation. The Secretary will coordinate development and other economic assistance, and review USAID's strategic plan and annual performance plan, annual budget submission and appeals, and allocations and significant (in terms of policy or money) reprogrammings of development and other economic assistance. In this context, the Secretary will delegate or re-delegate to USAID the functions and authorities that USAID needs to carry out its mission. Under the direct authority and foreign policy guidance of the Secretary, the Administrator will create development policy, implement development and other economic assistance programs, and manage and administer assistance programs. State and USAID will establish more mechanisms for consultation and coordination. The International Cooperative Administrative Support Services (ICASS) system will be the basis for shared administrative services for USAID missions overseas.

## Policy Support and Management Functions

· **Legal Affairs** -- ACDA's and much of USIA's legal staffs will join State's Legal Adviser's Office. The Legal Adviser will be assisted by a new Associate Legal Adviser, whose portfolio will be devoted primarily to arms control and nonproliferation issues, and an Assistant Legal Adviser for Public Diplomacy.
· **Congressional Liaison** -- Units of ACDA and USIA will join State's Bureau of Legislative Affairs, providing new senior policy advisers.
· **Press and Public Affairs** -- Press relations staffs from all four agencies will be drawn together under the Bureau of Public Affairs, which will be responsible for issuing all press statements and press releases for State and USAID.
· **Management** -ACDA's and USIA's central management functions will be integrated in units under the oversight of the Under Secretary of State for Management. These functions include information resource management, overseas facilities and operations, domestic facilities, logistics, diplomatic security, financial management, grants, human resources, and training.
· **Executive Offices** -- At the bureau level the new administrative units will be similar to current State models.

000315

# State Reinvention

Reinvention of State will be accelerated and bolstered by new talents, strengths, and assets acquired through enhanced integration of foreign affairs agencies. State has already taken significant reinvention steps:

· The Under Secretaries have assumed responsibility as the Corporate Board, meeting weekly under the chair of the Deputy Secretary to address major cross-cutting issues and conduct strategic planning.
· Performance Planning has been redesigned to align strategy and resources better under the International Affairs and State Strategic Plans.
· State's Overseas Staffing Model is helping prioritize and define staffing levels for the next century at our missions in the field.
· State has revitalized capital planning for facilities and investment in information systems, two critical but high-cost areas.
· State has consolidated its information technology (IT) professionals into a new Bureau of Information Resource Management under the leadership of the Chief Information Officer, creating a strong focus on IT issues and modernization.
· State has developed and implemented the International Cooperative Administrative Support Service (ICASS), a transparent system which maximizes shared administrative services for agencies abroad. ICASS uses the concept of best practices and considers the cost and quality of services.
· State has reengineered its logistics system and built a nimble structure which delivers improved responsiveness and customer service, incorporates electronic commerce and features an Internet acquisition website, with information on procurement opportunities at State's installations worldwide.
· State has created a new Bureau of Western Hemispheric Affairs, by moving Canada into the former Bureau of Inter-American Affairs. This change emphasizes the importance of NAFTA and is an example of our strengthened policy focus on economics and global issues.

But this is only the beginning. Bringing together the talented professionals of State, USIA, and ACDA in a single organization will afford opportunities for further reinvention. The Administration will be examining steps to better integrate related activities now conducted in several places in State and USAID, and to otherwise improve our ability to deal with both traditional and new problems.

# I. The Department of State

The plan to reorganize the foreign affairs agencies called for a foreign policy apparatus to meet the demands of a new era in international relations. The structure proposed for State reflects this mandate. It was designed with careful attention to the Vice President's anticipation that reorganization preserve the unique skills and capabilities of all foreign affairs agencies and their personnel. The design strengthens the arms control, nonproliferation, and political-military missions, and more closely integrates public diplomacy and assistance activities into overall U.S. foreign

policy and the conduct of diplomatic relations. It puts missions and resources into a more unified structure.

## How Reorganization Makes U.S. Foreign Policy Stronger

Reorganization of the foreign affairs agencies will strengthen our ability to achieve U.S. international affairs goals. Integrating the mission, programs, and personnel of USIA will bring public diplomacy to the core of foreign policy, yielding a stronger capability to understand, inform, and influence foreign publics and policy-makers. USIA's public diplomacy and communications professionals will infuse State with their own sophisticated information management skills and media tools. When public diplomacy perspectives come into play from the outset as policy is formulated, U.S. policy articulation will be clearer and more persuasive to foreign publics and governments.

Integration of arms control, nonproliferation, and disarmament functions with international security assistance activities will complement the activities of each and strengthen the effectiveness of the whole. Consistent with our objective to ensure a strengthened role for arms control and nonproliferation at State, the lead for all new negotiations on these issues and related policy development and backstopping will reside in the functional bureaus. The Secretary of State will be better able to assess treaty verification and compliance, lead the interagency nonproliferation process, and play an enhanced role in the arms control interagency process. State will also be better able to contribute to the coordination of foreign and defense policy and deploy more effectively the broad tools of diplomacy to promote arms control and nonproliferation. The new structure will bring greater focus to priority defense policy issues -- preventing the proliferation of weapons of mass destruction and overseeing the transfer and control of conventional arms and technologies.

## What State Will Look Like

The movement of boxes on organization charts is less important than the impact on mission, but State will look different. The incorporation of USIA and ACDA functions will add one new Under Secretary and greatly expand the portfolio and reporting structure of another. It will consolidate six bureaus from two agencies into three State bureaus and one major office. Integration will join more than 4,000 skilled American and Foreign Service National personnel, including public diplomacy experts, communications and media specialists, treaty negotiators, nonproliferation experts, and verification analysts, with colleagues at State. All full-time permanent positions from ACDA and USIA (except for those associated with the Broadcasting Board of Governors) and eight USAID positions will be transferred to State. Also to be transferred are all part-time, intermittent, and temporary positions and the full range of program and support funding.

A new Under Secretary of State for Public Diplomacy and Public Affairs will exercise policy oversight for the Bureau of Educational and Cultural Affairs, the Office of International Information Programs, and the Bureau of Public Affairs.

The Bureau of Educational and Cultural Affairs will be responsible for exchange and academic programs. The Office of International Information Programs will produce information programs and products tailored to influence foreign opinion makers. This Office will focus on programs and

000317

products for foreign audiences in recognition of the intent of Congress to separate overseas public diplomacy efforts from information efforts which inform the press and the American public about foreign policy. State's Bureau of Public Affairs will be expanded by incorporating the press relations offices of all four foreign affairs agencies and the Foreign Press Centers now operated by USIA. USAID will retain its non-press public affairs functions. The Bureau will continue to inform domestic audiences and the press about U.S. foreign affairs activities. It will also continue to sponsor outreach and domestic speakers programs to engage the American public on foreign policy issues. State's regional and functional staffs and bureaus will acquire public diplomacy staffs. Regional bureaus will assume oversight responsibility for field public diplomacy operations.

The addition of ACDA's arms control, nonproliferation, disarmament, and verification functions will strengthen the role of the transformed Under Secretary for Arms Control and International Security, enhancing State's capabilities in international security matters. The Under Secretary will also serve as Senior Adviser to the President and the Secretary of State on Arms Control, Nonproliferation, and Disarmament. State will integrate the operations of the Bureau of Political-Military Affairs (PM) with those of ACDA. The Under Secretary will provide policy oversight for three bureaus.

· The Bureau of Arms Control will be responsible for international agreements on conventional, chemical/biological, and strategic forces, treaty verification and compliance, and supporting ongoing negotiations, policy-making, and interagency implementation efforts. The Bureau will have an enhanced role in the NSC-chaired arms control interagency policy process.

· The Bureau of Nonproliferation will lead efforts to halt the spread of nuclear, chemical, biological, and conventional weapons and missiles capable of delivering weapons of mass destruction, secure nuclear materials in the New Independent States of the former Soviet Union, and promote protection of nuclear materials worldwide. The Bureau will have primary responsibility for leadership in the interagency policy process for nonproliferation issues.

· The Bureau of Political-Military Affairs will retain most of its current international security policy and operational functions. It will be responsible for issues relating to security assistance, arms transfers, defense trade controls, and political-military and defense cooperation in critical infrastructure protection, contingency planning, crisis management, and peacekeeping. The Assistant Secretary for Political-Military Affairs will contribute significantly to stronger State efforts on regional security issues and better articulation of State's views on defense policies with foreign policy implications.

· A Special Adviser reporting directly to the Under Secretary will advise on verification and compliance issues and prepare compliance reports to Congress.
After two years, all regional and functional staff and bureau configurations will be reviewed to determine whether the present structure remains the best one.

What will not change in State as it incorporates elements of USIA and ACDA into Congressional, legal, press, and management operations is the quality of these critical functions. The Secretary of State will continue to receive top-notch legal advice, but this advice will support a broader programmatic mandate. She will still be supported on Capitol Hill by legislative experts, but they

000318

will represent an expanded portfolio of policy interests. The spectrum of management support operations will continue, but with newly integrated resources, facilities, and efficiencies.

State will have a closer relationship to USAID. The International Development Cooperation Agency will be abolished, and the USAID Administrator will be under the direct authority and foreign policy guidance of the Secretary of State. In this context, the Secretary will review USAID's strategic plan and annual performance plan, annual budget submission and appeals, and allocations and significant reprogrammings of development and other economic assistance. The two agencies will expand shared administrative functions.

Our posts and missions abroad will be even more integrated than now. Public Affairs Officers will become embassy and mission section heads. ACDA overseas administrative units will be integrated with embassy and mission administrative sections. USAID budgeting and planning at overseas missions will be consistent with overall Mission Performance Plans, and the Chief of Mission will approve the USAID mission's country assistance strategy and assessment of program performance and request for resources. State and USAID will utilize the International Cooperative Administrative Support Service (ICASS) system to maximize shared administrative services consistent with its goals of quality and cost-effectiveness.

## People - Our Greatest Asset

State will offer more career opportunities to both the Civil Service and the Foreign Service. Civil Service employees will be able to compete for positions among a wider field of career possibilities, the breadth of which will particularly benefit former ACDA and USIA employees. In keeping with the changing requirements of international affairs in the 21st century, State will offer more opportunities for retraining and upgrading skills.

USIA brings to State an innovative system for career development and training for Civil Service employees. For State to reach its potential, greater personnel flexibility and opportunities for overseas tours for Civil Service employees will be essential. State Foreign Service personnel will benefit from the opportunity to bid on and serve in new positions in arms control, nonproliferation, and public diplomacy -- acquiring needed skills in these fields, which are so essential to modern diplomacy. The merger of USIA into State will bring about a fifth Foreign Service career cone - public diplomacy. Public diplomacy officers will be able to bid on Washington assignments which include public diplomacy and public affairs positions in the regional and functional bureaus, as well as assignments in other cones. USIA executive officers will become administrative officers in State and be able to bid on all administrative assignments as well as on assignments in other cones. New access to multi-functional assignments will give these officers opportunities for advancement to a wider range of senior positions, and give officers in other cones more exposure to public diplomacy and communications skills needed in the age of information.

Collectively, all State elements must focus more on training our foreign national colleagues, who make such important contributions to our overall efforts abroad.

## Reorganization and Reinvention

000319

Reorganization will streamline administrative and management operations and lead to greater efficiencies while building on the diverse strengths of the merging organizations and their employees. Prior to ICASS, independent agencies operating at the same posts overseas inevitably brought a degree of redundancy to their administrative functions. Important operating efficiencies have been achieved through ICASS. At home, State will achieve efficiencies by merging State and USIA administrative systems in such areas as payroll and accounting. Over time, other systems and especially communications technology will be merged. For example, USIA will bring to State a strong technical capacity for open communications, greater Internet access, and other communications tools that will complement State's extensive secure communications network.

Reinvention at State will be accelerated and bolstered by integration as new talents, strengths and assets are brought in, affording more opportunities for reinvention. State will also initiate new reinvention efforts building on the strengths which come from integration. State has already taken a number of steps which reflect its strong emphasis on improving effectiveness and building a firmer foundation for effective integration; these are detailed in Chapter VIII.

# II. The Arms Control, Nonproliferation, and International Security Mission

# What Will Happen to the U.S. Arms Control and Disarmament Agency (ACDA)

## Current Responsibilities

ACDA's mission is to strengthen national security by formulating, advocating, negotiating, implementing, and verifying effective arms control, nonproliferation, and disarmament policies, strategies, and agreements. ACDA also ensures that arms control concerns are fully integrated into the development and conduct of U.S. national security policy. In addition, ACDA's Director functions as the principal adviser to the President, the National Security Adviser, and the Secretary of State on arms control, nonproliferation and disarmament matters.

ACDA's four bureaus have specialized expertise and responsibility in the following areas:

· **Intelligence, Verification, and Information Management** -- Covers the full panoply of arms control intelligence, verification, compliance, and technology issues.

· **Multilateral Affairs** -- Develops U.S. policy, strategy, and tactics for multilateral negotiations and implementation, including the Chemical and Biological Weapons Conventions, the Comprehensive Nuclear Test Ban Treaty, and the Fissile Material Cutoff Treaty; staffs and backstops these efforts, and leads ACDA efforts on conventional arms control in Europe.

000320

· **Nonproliferation and Regional Arms Control** -- Develops and implements policies for nonproliferation of nuclear, chemical, biological, and conventional weapons and missile delivery systems, export controls for related U.S. products, and regional arms control measures.

· **Strategic and Eurasian Affairs** -- Leads U.S. efforts in nuclear arms control with the New Independent States (NIS) of the former Soviet Union and China, including the Strategic Arms Reduction (START) I and II, and negotiations on future reductions, Intermediate-Range Nuclear Forces (INF), and Anti-Ballistic Missile (ABM) treaties.

The Under Secretary for Arms Control and International Security Affairs (T) provides policy oversight of and coordinates arms control, nonproliferation, and security assistance policy for State. The Bureau of Political-Military Affairs (PM) is responsible for formulating and implementing policies on such national security issues as nonproliferation of weapons of mass destruction and missile technology, nuclear and conventional arms control, arms export controls, and regional security assistance programs and initiatives. PM also acts as State's primary liaison with the Department of Defense on security assistance issues and on the implications of U.S. foreign policy.

## Personnel

ACDA currently has 245 full-time permanent positions, 48 reimbursable positions, and three non-reimbursable ones.

Within State, PM has 262 full-time permanent positions and 29 non-reimbursable ones. The Under Secretary's office has a staff of nine full-time permanent positions.

## Key Issues Considered

The security issues facing America today are quite different from those of 10 years ago. The macro issues include:

· **Nonproliferation** -- Nonproliferation of dangerous weapons and technologies, encompassing weapons of mass destruction and advanced conventional weapons and delivery systems, has high priority. Decades of work have put norms and regimes in place, but much work with problem states lies ahead. Integrating the assets of ACDA and State will help implement international structures already in place and address current proliferation challenges.

· **Critical Infrastructure Protection** -- Safeguarding the nation's critical infrastructure from a new category of threats to national security posed by and to interconnected information systems is emerging as a key issue. Along with countering the smuggling of nuclear materials, critical infrastructure protection (CIP) involves coordination with domestic as well as defense agencies and other countries. Under the new structure, we will be equipped to address this growing security problem by increasing and consolidating our resources devoted to it.

· **Force Reduction** -- Reducing forces is also a priority. Major negotiations are anticipated on START III and are underway on the adaptation of the Conventional Armed Forces in Europe (CFE) treaty. A

000321

large number of existing agreements need to be implemented.

· **Defense Policy** -- When military force is used in support of diplomacy, State plays a major role in shaping defense policies that have major foreign policy implications. The new structure reallocates resources for this function and makes it a primary role of PM.

· **Monetary Incentives** -- These have become increasingly important in today's diplomacy. Nunn-Lugar assistance, which helps the NIS countries decommission weapons and convert from military to peacetime industries, is a creative way to advance foreign policy goals, in this case with Department of Defense funds. State should have the capability to participate actively in long-term planning and current programming to support optimum use of funds to promote arms control objectives.

## Proposed Integration into State

Under the guidelines set out in the Vice President's plan, integrating ACDA into State will preserve and strengthen the effectiveness of the arms control, nonproliferation, disarmament, and security assistance functions. After considering a wide range of possible groupings, a streamlined structure was chosen that will reduce the number of bureaus in the two agencies from five to three and cut the number of executive-level Presidential appointees from eight to four. To increase efficiency and facilitate allocation of resources, a single administrative office will be established to support the three bureaus. The role of each new unit will be as follows.

## Under Secretary

On April 18, 1997, the President announced that the ACDA Director would be double-hatted as the Under Secretary for Arms Control and International Security and then the two positions will be merged as Under Secretary/Senior Adviser to the President and Secretary of State, who will be able to communicate with the President through the Secretary of State. In the capacity of Senior Adviser, the Under Secretary will attend and participate, at the direction of the President, in NSC and its subordinate meetings (Presidential Decision Directive 65). The office will have 13 full-time permanent positions (four from ACDA and nine from State). The Under Secretary will exercise policy oversight for three bureaus: Arms Control, Nonproliferation, and Political-Military Affairs.

Special representatives and envoys now reporting to the ACDA Director will be supported by the relevant Assistant Secretary and report to this Assistant Secretary and the Under Secretary.

A new scientific and policy Advisory Board on arms control, nonproliferation and disarmament, authorized by the *Foreign Affairs Reform and Restructuring Act of 1998*, will report to the Secretary through the Under Secretary, who will maintain operational authority over the Board, including designation of members and staff (two full-time permanent positions from ACDA).

The verification and compliance function will be managed through both an oversight unit and a staff support unit. A Special Adviser for Verification and Compliance, with a staff of six full-time permanent positions and one reimbursable position, all from ACDA, will report directly to the Under Secretary on critical verification and compliance issues and prepare compliance reports to Congress. Thus the Under Secretary will receive verification and compliance assessments independent of the

000322

bureaus responsible for negotiating and implementing agreements. In addition, a larger group of verification and compliance specialists in the Bureau of Arms Control will provide policy, technical, and analytical support.

Additionally, four positions (two full-time permanent, one reimbursable, and one non-reimbursable - all from ACDA) will move to the Bureau of Intelligence and Research to provide direct intelligence support as well as a robust interface with the Intelligence Community.

## Political-Military Affairs Bureau

The Political-Military Affairs Bureau will support the Secretary and the Under Secretary in playing a larger role in security and defense policy. It will provide analytical support for the Secretary and the Under Secretary on defense-related foreign policy issues, contribute to the coordination of peacekeeping and other military operations, and assume greater responsibilities with regard to crisis management. The Bureau will be responsible for a cluster of issues involving arms transfers and defense trade controls, and political-military and defense cooperation in critical infrastructure protection, and will support the Under Secretary in coordinating security assistance. The Assistant Secretary for Political-Military Affairs will contribute to a stronger State effort on regional security issues and give State a more informed voice on defense policies with major foreign policy implications.

The Bureau will have 142 full-time permanent positions (nine from ACDA and 133 from PM), one reimbursable position (from ACDA), and 23 non-reimbursable ones (all from PM).

## Arms Control Bureau

The Arms Control Bureau will support the Secretary and the Under Secretary in leading efforts to negotiate new agreements, primarily START III and other future strategic arms control agreements, and negotiating efforts in the Conference on Disarmament (CD), e.g., fissile material cutoff treaty, ban on the transfer of antipersonnel landmines. It will have the equally important task of implementing a large number of existing agreements, including ABM, INF, START I, START II, CWC, and BWC, and of preparing to implement CTBT. The Bureau will assume the U.S. lead for negotiations and policy development related to Confidence and Security-Building Measures (CSBMs), Open Skies, Dayton Article V negotiations, verification and information for European arms control, have responsibilities with respect to CFE Treaty issues, and participate fully in the Task Force on CFE under the Under Secretary.

The Verification and Compliance staff will contribute primarily to ongoing negotiations, technology policy coordination, policy analysis, information management, arms control efforts relative to critical infrastructure protection, and interagency implementation efforts.

Consistent with our objective to ensure a strengthened role for arms control and nonproliferation in State, the lead for all negotiations on these issues and related policy development and backstopping will reside in the new functional bureaus. But, because of the sensitive stage of current negotiations on CFE and directly related CSBMs, these negotiations will temporarily continue to be handled

000323

under existing arrangements with the regional bureaus, under the direction of the Under Secretary, along with a Special Representative and Task Force under the Under Secretary's leadership, established for policy direction and coordination with all relevant bureaus and offices. This arrangement will be reviewed in 1999 with a view to consolidating the lead in the Arms Control Bureau at the earliest practicable date.

The Bureau will have 144 full-time permanent positions (109 from ACDA and 35 from PM), 37 reimbursable positions (all from ACDA), and four non-reimbursable ones (two from PM and two from ACDA).

# Nonproliferation Bureau

One goal of integrating ACDA and State is to give new emphasis to a broad range of efforts to curb proliferation of dangerous weapons and delivery systems. The Nonproliferation Bureau's role is to do this, including by supporting the Secretary and the Under Secretary in leading the nonproliferation interagency policy process.

The Bureau will be responsible for nuclear nonproliferation, e.g., supporting the International Atomic Energy Agency (IAEA), implementing the Nuclear Non-Proliferation Treaty (NPT), securing nuclear materials in the NIS, disposing of stockpiles of fissile materials, advancing civil nuclear cooperation under safe and sound conditions, and promoting effective protection, control, and accounting of nuclear material worldwide. It will press for nonproliferation of chemical and biological weapons and missiles, and promote restraint in transfers of conventional arms. The Bureau will also pursue regional and bilateral initiatives designed to reduce proliferation pressures and destabilizing arms acquisitions.

As part of the consolidation of activities in ACDA and State, some staff will be shifted in order to expand critical nonproliferation efforts and enhance State's security assistance capabilities.

The Bureau will have 130 full-time permanent positions (48 from ACDA and 82 from PM), six reimbursable positions (all from ACDA), and four non-reimbursable ones (all from PM).

# Executive Office

A single Executive Office, reporting to the Assistant Secretary for Nonproliferation, will provide the full range of administrative support services to all three bureaus. It will have 38 full-time permanent positions (26 from ACDA and 12 from PM).

# Positive Outcomes

The three-bureau structure will put the Secretary and State in a strong position to:

· Bring foreign policy considerations to bear on defense issues;

000324

· Negotiate, implement, and verify arms control agreements; and
· Pursue effective policies for nonproliferation of dangerous weapons.

This structure will also provide the Under Secretary with effective tools to carry out other elements of the President's decision, including advising the Secretary and the President on arms control, nonproliferation, and disarmament, assessing verification and compliance, leading the nonproliferation interagency process, and playing a stronger role in the interagency arms control process.

The integrated structure is designed to focus more effort on the priority issues of defense-related foreign policy, security assistance, and the transfer and control of conventional arms and technologies.

# III. The Public Diplomacy and Public Affairs Missions

We place very high priority on public diplomacy with foreign audiences, and are firmly committed to integrating public diplomacy more fully into foreign policy. Our goal is to strengthen public diplomacy through its integration into the policy process. Negotiations on such issues as NATO enlargement, Iraqi sanctions, and global climate change show the value of being proactive in informing and influencing foreign publics, NGOs, and others. These audiences are playing greater roles on international issues as communications improve and pluralism expands. When public diplomacy strategies are applied from the outset as policy is formulated, policy and its articulation will improve and be more persuasive to foreign publics and policy-makers.

# What Will Happen to the U.S. Information Agency (USIA)

## Current Responsibilities

Public diplomacy promotes U.S. national security and other interests by seeking to understand, inform, and influence foreign publics and policy-makers, and by broadening the dialogue between American citizens and institutions and their counterparts abroad. In comparison, public affairs is the provision of information to the press, the American people, and others about the policies and activities of the U.S. government.

Different aspects of the public diplomacy mission roughly correspond to the role of each of the Agency's current major programmatic elements (current USIA broadcasting functions are enumerated in Chapter IV on International Broadcasting):

· **Bureau of Information (I), Area Offices, and USIS Posts Abroad** -- Inform and seek to influence foreign opinion-makers by presenting U.S. positions on policy issues through a variety of products,

000325

including the daily Washington File, expert speakers (in person and in digital video or telepress conferences), Information Resource Centers overseas, electronic journals and Web sites, and print publications.

· **Bureau of Educational and Cultural Affairs (E), Area Offices, and USIS Posts Abroad** -- Broaden long-term dialogue with foreign publics through a variety of person-to-person exchanges, including the Fulbright Program for scholars, teachers, and students; the International Visitors program to bring foreign leaders to the U.S.; Citizen Exchanges efforts to develop international exchange programs through nonprofit American institutions; and programs to affiliate U.S. and foreign academic institutions, advise foreign students about American colleges and universities, foster the teaching abroad of U.S. studies and the English language, and strengthen educational institutions abroad.

· **Office of Research and Media Reaction (R)** -- Seeks to understand foreign publics through opinion polling abroad and, utilizing reporting from USIS posts abroad and other media, to analyze attitudes toward U.S. policies and activities in the foreign media.

# Personnel

USIA currently has 6,715 full-time permanent positions, of which 2,689 are engaged in broadcasting activities. The remaining 4,026 consist of 652 Americans and 2,080 Foreign Service Nationals (FSN) overseas, and 1,294 positions in the U.S.

# Key Issues Considered

**Budget Structure** -- Funding for public diplomacy (excluding exchange and academic programs, which have and will continue to have their own appropriations) will be incorporated through increases to existing Congressional appropriations to State for Diplomatic and Consular Programs Abroad, the Security and Maintenance of Buildings Abroad, Representation Allowances, Emergencies in the Diplomatic and Consular Service, and the Capital Investment Fund. In the appropriation for Diplomatic and Consular Programs Abroad, State will separately plan for, identify, and account for public diplomacy resources for programs and products aimed at foreign audiences, and foreign national personnel and other programmatic expenses of public diplomacy sections of embassies and missions abroad and in appropriate offices in State.

**Organizational Structures** -- We examined ways to promote maximum appropriate synergy of public diplomacy and public affairs activities under the oversight of the new Under Secretary for Public Diplomacy and Public Affairs.

**Smith-Mundt and Zorinsky Amendments** -- In legislation over the years, Congress has restricted USIA's public diplomacy apparatus from being used to influence U.S. public opinion. The Foreign Relations Authorization Act of 1972 amended the Smith-Mundt Act of 1948 to include a ban on disseminating within the United States any "information about the United States, its people, and its policies" prepared for dissemination abroad. The Zorinsky Amendment added a new prohibition: "no funds authorized to be appropriated to the United States Information Agency shall be used to influence public opinion in the United States, and no program material prepared by the United States Information Agency shall be distributed within the United States." The *Foreign Affairs Reform and*

000326

*Restructuring Act of 1998* (the *Act*) addresses the application of these restrictions to State, giving it the flexibility to allocate personnel and other resources effectively and efficiently. In integrating USIA, State will observe all applicable legal restrictions.

Consistent with Congressional intent, public diplomacy information efforts will focus on programs and products for foreign audiences. Exchange programs will continue to engage American and foreign participants and organizations under the Mutual Educational and Cultural Exchange Act of 1961 (Fulbright-Hays).

Public diplomacy has diplomatic aspects. As an example public diplomacy officers engage foreign audiences with techniques, language skills, and area knowledge not duplicated in domestic public affairs activities. At the same time, much policy content in public diplomacy and public affairs is the same for foreign and domestic audiences, e.g., State's daily press briefings and fact sheets on policy issues. These messages are delivered both to domestic and foreign audiences by many of the same media, e.g., CNN, the World Wide Web, and international wire services. More than half of the journalists whom State serves on a daily basis work for foreign media, and State and USIA web pages can be accessed from anywhere.

# Proposed Integration into State

## <u>Under Secretary</u>

The Under Secretary for Public Diplomacy and Public Affairs will advise the Secretary on public diplomacy and public affairs and provide policy oversight for the Bureau of Public Affairs; the Bureau of Educational and Cultural Affairs, which will be responsible for exchange and academic programs; and the Office of International Information Programs, which will produce public diplomacy programs and products tailored to influence foreign opinion-makers. The Under Secretary or his or her designee will also chair the interagency Core Group on international public information (IPI), which will develop and coordinate U.S. public information strategies and activities to address regional and transnational threats and crises. The office will have nine full-time permanent positions, all from USIA.

## <u>Bureau of Educational and Cultural Affairs</u>

The bureau will be formed from the staff of USIA's current Bureau of Educational and Cultural Affairs. Additionally, a
staff of twelve full-time permanent positions, formerly in the USIA General Counsel's office, will report to the Assistant Secretary and be responsible for exchange visitor program designations; one additional full-time permanent position, responsible for film attestations under the Beirut Convention, will also transfer to the Assistant Secretary's office; as will nine positions involved in grants management that were originally in the USIA central contracts office.

The Assistant Secretary will also be supported by the continuing efforts of the Cultural Property Advisory Committee and the Fulbright Scholarship Board (three full-time permanent positions).

It will have 286 full-time permanent American positions domestically, plus 11 overseas.

# Office of International Information Programs

International information activities will continue to emphasize rapid response, cross-functional teamwork, and field orientation. Thus, the achievements of USIA's innovative Bureau of Information, launched four years ago as a Reinvention Laboratory based on Vice President Gore's National Performance Review and the best practices of private industry, will be maintained and strengthened under the leadership of the Coordinator for International Information Programs.

These public diplomacy products will be available to all bureaus and overseas posts, to provide them with the assistance they need to advance U.S. interests abroad. Public diplomacy programs will be prepared in response both to Washington initiatives and to post needs. Guided by country information, including polling data, and other available information, the assistance provided in these programmatic packages, will enable the field to aggressively promote our foreign policy goals through world-class information services.

There will be a total of 219 full-time permanent American domestic positions plus 16 overseas American and one FSN, including the former Office of Strategic Communications (six full-time permanent positions and one non-reimbursable position).

# Bureau of Public Affairs

The three USIA foreign press center operations and its offices in Washington, New York, and Los Angeles (24 full-time permanent positions) will be transferred to the Bureau of Public Affairs. One position from ACDA's Bureau of Public Affairs will transfer to State's Office of the Historian, located in PA.

BBG personnel who carry out Worldnet TV interactives (12 full-time permanent positions) will be transferred to State's Bureau of Public Affairs, as will the BBG's Foreign Broadcast Support Unit (eight full-time permanent positions). Worldnet TV interactives will continue to promote dialogues with foreign audiences via international satellite programs.

# Public Diplomacy in Regional and Functional Staffs and Bureaus

USIA's area offices will integrate where practical and efficient into State's regional bureaus (123 full-time permanent positions), building on the successful European Bureau/Office of West European Affairs model. These will coordinate public diplomacy activities of their respective embassies and missions abroad. Overseas 445 full-time permanent American positions and 1,720 FSN positions will engage in public diplomacy work.

Public diplomacy personnel (initially 25 full-time permanent positions, drawn from USIA's staff, area, and support offices) will be added to State's functional staffs and bureaus. These units will advise on policies from a public diplomacy perspective, and help develop public diplomacy strategies on regional and thematic basis to promote such U.S. national goals in areas such as counter terrorism, narcotics, arms control, and nonproliferation.

# Other Public Diplomacy Integration

State's International Affairs Strategic Plan will encompass public diplomacy goals, and respective

000328

Bureau and Mission Performance Plans will reflect targets and projects for each region, country, and functional area.

USIA's Office of Research and Media Reaction will be merged with into the Bureau of Intelligence and Research. We will look to even more sophisticated ways to understand and evaluate trends in foreign opinion. The Office has a public opinion research function (35 full-time permanent positions) and a media reaction division (six full-time permanent positions).

The Bureau of Educational and Cultural Affairs and the Office of International Information Programs will be supported by a single administrative office drawn from existing support positions, plus the transfer of 32 full-time permanent positions from USIA's current Management Bureau, which has been providing support services.

Similar State and USIA information-related support functions will be combined into existing State structures. USIA's print operations and associated support (22 American and 91 foreign national full-time permanent positions) will join State's. Domestic library activities will be combined (two full-time permanent positions.) Efforts to promote U.S. foreign policy on the Internet will be combined and coordinated.

## Positive Outcomes

This structure will bring together all elements charged with presenting and interpreting U.S. foreign policy to public audiences. It will give public diplomacy practitioners greater access to the foreign policy formulation process. The new structure will ensure that the policy content of State's domestic and international outreach programs is consistent and coordinated, yet tailored for specific target audiences. It will ensure that all applicable legal requirements are adhered to. And it will strengthen State's Bureau of Public Affairs by increasing its press expertise.

By placing public diplomacy staffs in State's regional and functional staffs and bureaus, the new structure will offer a better integrated mechanism for identifying and acting on priority public diplomacy issues, and coordinating Washington resources with the needs of the field. International broadcasting will preserve its editorial integrity while adding new services and maintaining close ties with State, complementing other U.S. public diplomacy efforts in support of U.S. foreign policy interests.

# IV. INTERNATIONAL BROADCASTING

Open communication of ideas and information to the people of the world is a critical element of U.S. foreign policy. The mission of conveying news and information is carried out, in substantial part, by the Voice of America and other U.S. Government-funded international broadcasters.

# What Will Happen to the Broadcasting Board of

000329

# Governors (BBG)

## Current Responsibilities

All nonmilitary U.S. Government-funded international broadcasting, including the Voice of America and surrogate broadcasting, is administered through the BBG. It has nine presidentially appointed, Senate-confirmed members, including the USIA Director. The BBG is a self-governing element within USIA, and receives administrative, technical, and management support from other elements of USIA.

Broadcasting seeks to inform and influence foreign publics. The key elements are:

· **International Broadcasting Bureau (IBB)** -- The Voice of America, the Worldnet Television and Film Service, and Radio and TV Marti broadcast international news, commentaries, editorials, roundtable discussions, features and programming about the United States, its people, and its foreign policies. VOA broadcasts more than 900 hours of programming per week in 53 languages, and reaches an estimated 86 million people each week from IBB transmitter stations worldwide and through leased satellite links.

· **BBG Grantees** -- The BBG grantees, including Radio Free Europe/Radio Liberty (which incorporates Radio Free Iraq and the Farsi language service) and Radio Free Asia, broadcast local, regional, and international news and seek to inform and influence foreign publics. The grantees are private, non-profit organizations which receive all of their funding from the BBG.

## Personnel

At present, 2,689 full-time permanent employees of USIA are employed directly in broadcasting activities. Additional USIA employees, both domestically and internationally, provide support services to the BBG and its elements. The BBG grantees separately employ broadcast staffs that are not employees of USIA.

## Future International Broadcasting

Under the *Foreign Affairs Reform and Restructuring Act of 1998*, the BBG will become an independent federal entity by October 1, 1999. Consistent with the *Act*, international broadcasting will remain an essential instrument of U.S. foreign policy. The Board (including the Secretary of State, who will be a statutory member of the Board) and State will respect the professional independence and integrity of U.S. international broadcasting.

The Director of the IBB, as mandated by the *Act*, will organize a coordinating committee to examine and make recommendations to the Board on long-term broadcasting strategies.

## Key Issues Considered

The principal issue considered in connection with the pending independence of the BBG was the

identification of the support resources of USIA currently used by the BBG and its elements. Under the *Act*, those activities now in USIA which are dedicated to carrying out the broadcasting function will be located in the BBG when it becomes a separate entity. In addition, the Secretary of State, with the concurrence of the BBG, will transfer to the BBG funds, resources and personnel commensurate with the administrative, management and other support they currently receive from USIA.

Personnel, salaries, operating funds, and equipment commensurate with the support currently provided by USIA to the BBG and the IBB will be transferred in support areas such as administration, technology, legal, marketing, EEO, management, personnel, payroll, accounting, security, and contracting. The transfer will be made on a pro-rata basis using current (FY-99) assets as the baseline. In some cases, the services necessary to support a new, stand-alone agency (including start-up costs) are higher than the services currently provided to the BBG. In these cases, the additional resource requirements will be filled by State's adjusting the transfer or a reallocation of resources within the BBG. Sixty-six USIA full-time permanent positions, including three from USIA's special complements, will be transferred to the BBG to provide administrative support (48), legal support (seven), program direction (three), FOIA (two), and equal opportunity activities (six). The 48 administrative support positions consist of: four management positions, four budget positions, three personnel positions, two training positions, seven contracting positions, two contracting policy positions, 13 security positions, six information technology positions, 1 general administrative position, two travel and transportation positions, three mail and messenger positions, and one printing position. Twenty-three additional full time permanent positions will shift to State to provide reimbursable support in financial services (20) and declassification (three).

Additionally, five full-time permanent American positions and 30 foreign national ones will be transferred to the BBG to direct and provide placement services for radio and TV material to foreign broadcasters. These American positions will be drawn from USIA's special complements. The foreign national positions will be derived from overseas support positions as they become vacant during integration, and not later than the end of FY-00 (nine have already been identified). Additional placement support will continue to be available for a transition period on a non-reimbursable basis for at least two years.

With respect to transfers from the BBG to State, the BBG will transfer twelve full-time permanent positions directly responsible for producing interactives and providing technical support and the funds associated with the function. The BBG will also transfer the eight full-time permanent positions of the Foreign Broadcast Support Unit (FBSU) to the Foreign Press Centers. The FBSU facilitates the visits of foreign broadcasters to the United States, and this mission is more consistent with State's public affairs mission than with the journalistic mission of the BBG and the IBB.

The Secretary of State will have access to the facilities and services of the BBG television studios and the BBG worldwide satellite capabilities for interactive dialogues as has been past practice. State will be able to use the technical facilities of the BBG on a non-reimbursable basis to broadcast interactive dialogues worldwide. Policy interactive dialogues will become the responsibility of State and continue to be produced from the BBG studios. Some of these interactive dialogues will allow for the appearance of individuals located at Main State and the Foreign Press Center. The cooperative professionalism that has marked past working relationships will continue in the future.

000331

## Positive Outcomes

Pursuant to the *Act*, the BBG will become an independent federal entity. This provides a "firewall" between State and the broadcasters to ensure the integrity of journalism.

The *Act* thus ensures that the credibility and journalistic integrity of broadcasting will be preserved and enhanced. International broadcasting is, and should remain, an essential important instrument of U.S. foreign policy, by telling America's story and otherwise serving broad American foreign policy objectives. The Secretary of State will provide foreign policy guidance to the BBG.

# V. The Development Assistance Mission

# What Will Happen to the U.S. Agency for International Development (USAID)

Consistent with the President's decision in April 1997 and the *Foreign Affairs Reform and Restructuring Act of 1998* (the *Act*), USAID will remain a distinct agency with a separate appropriation. The USAID Administrator will be under the direct authority and foreign policy guidance of the Secretary of State. Under the direction of the President, the Secretary will coordinate all U.S. development and other economic assistance except activities related to export promotion and to international financial institutions and certain other financial assistance. The *Act* abolishes the International Development Cooperation Agency (IDCA). It requires that USAID integrate its press office and certain administrative functions with State.

## Abolition of IDCA and Delegation of Authorities

Several steps will be taken to implement the *Act* and the President's decision so as to provide for the "direct authority" relationship. In essence, the "dotted" organizational line between USAID and State will be filled in, with the Administrator having most authorities derived by redelegation from the Secretary of State. Under the direct authority and foreign policy guidance of the Secretary, the Administrator will carry out the approved overall assistance and economic cooperation strategy.

In accordance with the *Act*, Reorganization Plan No. 2 of 1979 -- which established IDCA, with USAID as a component, and granted it primary responsibility for establishing overall development assistance policy and coordinating international development activities supported by the United States -- will cease to be effective as of April 1, 1999. The effective repeal of this Plan and the enactment of conforming amendments contained in the *Act* returns those functions now vested in IDCA or its director back to USAID or the Secretary of State, as was the case by statute prior to 1979 Plan.

Executive Order 12163, which delegated most Foreign Assistance Act development and other

economic assistance-related authorities to IDCA, will be amended to delegate assistance functions vested by law in the President to the Secretary of State, except for those reserved to the President or specifically delegated to another agency. This will be the same framework that existed prior to the establishment of IDCA. The *Act* also establishes USAID as a U.S. government agency.

To maximize consistency with overall U.S. international affairs priorities, the Secretary of State will coordinate development and other economic assistance. The Secretary will ensure coordination among agencies of the United States Government in carrying out the policies contained in relevant foreign assistance legislation. In keeping with USAID's status as a distinct agency and recognizing that the USAID Administrator is under the Secretary's direct authority and foreign policy guidance, the Secretary will review USAID's strategic plan and annual performance plan, annual budget submission and appeals, and allocations and significant (in terms of policy or money) reprogrammings of development and other economic assistance.

In this context, the Secretary of State will delegate or redelegate to USAID the functions and authorities needed to carry out its mission. These include authorities to:

· Receive apportionments for development and other economic assistance appropriations;

· Create policies for development and other economic assistance programs;

· Implement development and other economic assistance programs; and

· Manage and administer assistance programs, including the requisite personnel authorities.

In carrying out its functions and authorities under the direct authority and foreign policy guidance of the Secretary, USAID will consult as appropriate with State.

## State-USAID Policy and Resource Coordination

The leadership of both State and USAID recognize the need for effective coordination consistent with strong accountability and a clear division of responsibility. The promotion of the sustainable development mission will remain a priority objective of the closer State-USAID relationship at all levels. Broad foreign policy coherence is best assured through strategic planning and resource allocation processes as described in this chapter, which align USAID resources in support of foreign policy priorities and allow the sustainable development mission to be carried out effectively. Under the direct authority and foreign policy guidance of the Secretary, the Administrator will create development policy, implement development and other economic assistance programs, and manage and administer these programs. State and USAID will establish a number of regular mechanisms to enhance consultation and coordination, including in the field, in Washington at the bureau level, and in the relationship of USAID and State activities on global issues. These mechanisms will include:

· **Coordination in Strategic Planning** -- Both State and USAID develop strategic plans in the context of the Government Performance and Results Act (GPRA). State coordinates with USAID in developing the "International Affairs Strategic Plan," and USAID's "Strategic Framework" is coordinated with this Plan.

000333

· **Coordination in Washington --** Preparation of Bureau Performance Plans at State will involve full consultation with USAID, which will participate in the Secretary's reviews of such Plans and in reviews of Mission Performance Plans (MPPs). Under the direction of the Secretary, other specific coordination mechanisms will be established, including a more structured system for coordination among State and USAID bureaus.

· **Coordination in the Field** -- Close coordination in the field is at the heart of an effective State-USAID relationship. USAID overseas missions will participate actively in the MPP process, and their budgeting and planning will be consistent with MPPs. Chiefs of Mission will approve USAID missions' multi-year country assistance strategies and annual assessments of program performance and requests for resources (R-4), both of which will be consistent with USAID's GPRA-mandated Strategic Plan. The principal USAID official at post is a member of the country team. Unless otherwise provided, the Chief of Mission will have primary responsibility for the annual performance rating of this official, and Chief of Missions and appropriate USAID Assistant Administrators will agree on a specific work plan for the official.

· **Informal and Other Coordination** -- Both agencies' officials will participate in a range of staff meetings, interagency groups, task forces, bi-national commissions, and other international meetings where they will coordinate their activities. Day-to-day exchanges of information and clearance of messages will constitute an important form of coordination. Informal coordination, including frequent telephone calls and "dropping by," will be valuable. These relationships are less visible than formal arrangements, but they play an essential role in identifying early on issues of importance to both institutions.

# Coordination of U.S. Assistance

Consistent with the *Act*, the Secretary of State will exercise new authorities in the coordination of U.S. development and other economic assistance. Coordination activities of the Secretary, under the direction of the President, will include: (1) approving an overall assistance and economic cooperation strategy; (2) ensuring program and policy coordination among USG agencies in carrying out the policies set forth in the Foreign Assistance Act of 1961, the Arms Export Control Act, and other relevant assistance acts; (3) pursuing coordination with other countries and international organizations; and (4) resolving policy, program, and funding disputes among U.S. government agencies. Coordination of activities relating to promotion of exports of U.S. goods and services, however, will continue to be primarily the responsibility of the Secretary of Commerce, and coordination of activities relating to U.S. participation in international financial institutions and organization of multilateral efforts aimed at currency stabilization, currency convertibility, debt reduction, and comprehensive economic reform programs will continue to be primarily the responsibility of the Secretary of the Treasury.

The Secretary of State will establish effective mechanisms to seek to resolve disputes among U.S. government agencies whose activities are covered by the *Act*. These mechanisms will build on field coordination, including cooperative efforts of all agencies at post to prepare MPPs and align plans of

000334

agencies in the field to MPP goals and strategies. In Washington, the Secretary will oversee the coordination of assistance, supported by State-chaired mechanisms at various levels which will involve U.S. government agencies that fund and deliver U.S. assistance.

Due to the need for high-profile interagency coordination at the startup of assistance to Central and Eastern Europe and the New Independent States of the former Soviet Union, the Congress mandated establishment of special Coordinators at State to oversee all development and other economic assistance to these areas. There are close professional relationships and interactions between USAID offices and the offices of the Coordinators. This process has contributed to achieving our objectives in these regions, where U.S. assistance is a critical part of U.S. foreign policy.

USAID already carries out highly effective donor coordination in the field, through international organizations and in contacts with donor governments and NGOs. State, in consultation with USAID, will continue to represent the United States in treaty negotiations on development-related issues. The Administrator, in appropriate coordination with the relevant State bureaus, will continue to be the principal U.S. government contact with development ministers from other donor nations and represent the United States at OECD Development Assistance Committee meetings, development activities of international financial institutions (e.g., World Bank Consultative Group meetings), and United Nations development agencies. State will use its diplomatic mandate in support of development policy to advance U.S. foreign policy interests.

## Integration of Press Office and Certain Administrative Functions

On April 1, 1999, USAID's press office will be merged with State's Bureau of Public Affairs, which will be responsible for issuing all USAID press statements and press releases. The eight USAID full-time permanent press relations officers will become State public affairs officers. They will provide full, coordinated media support services to USAID's Administrator, Deputy Administrator, Assistant Administrators, and regional and functional bureaus.

Reorganization will include the consolidation of certain USAID administrative functions with those of State. Three years ago, State and USAID began to consolidate overlapping administrative support functions. A memorandum of understanding between the two agencies specifies four areas for shared services that provide logical, efficient, and effective operations. These services are:

· **Support** -- State will process the retirement of USAID Foreign Service Officers and provide retirement counseling. USAID now uses the same travel contract as State and has co-located its headquarters mainframe computer operations with State's. The two agencies will implement a number of other small agreements for joint headquarters services.

· **ICASS** -- State and USAID have implemented International Cooperative Administrative Support Service (ICASS) to maximize shared administrative services, using the concept of best practices and considering the cost and quality of services. Requests for exceptions to the use of ICASS as the service provider will be referred to Washington.

· **Training** -- USAID will expand its use of State training services, e.g., foreign language training.

State and USAID will also develop professional and technical training programs together to the maximum extent possible.

· **Storage --** State will accommodate USAID's needs for storage of employees' household goods. The two agencies already share other transportation and storage services.

Additionally:

· **Housing** -- At all overseas locations the two agencies will operate under a unified Housing Board and joint State/USAID regulations will be issued on utilizing a single housing pool for short-term leased units.

· **Security** -- State and USAID will review their security services to determine what further coordination can be achieved.

· **Other Functions** -- State and USAID will continue to explore other efficient ways to coordinate or consolidate as many administrative functions as possible.


# VI. Policy Support Functions

# A. Under Secretarial Staffs

## Current Responsibilities

State's five Under Secretaries (for Political Affairs, Economic, Business, and Agricultural Affairs, Arms Control and International Security Affairs, Management, and Global Affairs) and its Counselor are both advisers to the Secretary and policy makers in their own right on selected issues. They do not have "action" responsibility for policy and program implementation -- this belongs to the Assistant Secretaries who report to them. The Under Secretaries have personal staffs of about a dozen.

ACDA's Office of the Director consists of a Director and Deputy Director; a military liaison officer; a Special Representative who performs Ambassador-at-Large like responsibilities; a Special Representative who serves as the Chief Science Adviser; a Counselor; an advance planning director who also serves as the Executive Director of the Director's Advisory Committee; the agency's EEO supervisory official; and staff support.

USIA's Office of the Director consists of the Offices of the Director, Deputy Director, Counselor, Strategic Communications, and Research and Media Reaction.

## Personnel

For the purpose of comparison, the office of State's Under Secretary for Political Affairs consists of 12 full-time permanent positions.

ACDA's Office of the Director has 12 full-time permanent positions and a reimbursable one, not including positions in its Executive Secretariat.

USIA's Office of the Director has 14 full-time permanent positions, not including positions in its Executive Secretariat.

## Key Issues Considered

The new Under Secretary for Arms Control and International Security and the new Under Secretary for Public Diplomacy and Public Affairs will advise the Secretary on policy issues that are similar to those they managed as agency heads. However, a number of structural issues require changes in transforming both current Directors' offices into Under Secretarial offices:

· **Size/Structure of Staffs:** ACDA and USIA agency chiefs have larger and more functionally diversified staffs than State's Under Secretaries.
· **Deputies:** ACDA's and USIA's Deputy Directors have no counterparts in an Under Secretary's office.
· **Adjunct Offices:** ACDA's and USIA's adjunct offices were functionally analyzed to determine if they should be located in the new Under Secretaries' offices, established elsewhere in State, or abolished and their functions transferred to other offices in the newly consolidated State.
· **Special Representatives:** A number of arms control special representatives report to the ACDA Director; while in State, special envoys typically report to either the Secretary or an Assistant Secretary.

## Proposed Integration into State

## ACDA

The office of the new Under Secretary for Arms Control and International Security/Senior Adviser to the President and the Secretary of State for Arms Control, Nonproliferation and Disarmament will be structured along the lines of the current Under Secretary for Arms Control and International Security Affairs with thirteen full-time permanent positions, drawn from the ACDA Director's office (two) and ACDA's Executive Secretariat (two) and the former State Under Secretary's office (nine). Other positions in the Director's office will move elsewhere in the new structure.

The office will take on the new functions of advising the Under Secretary in the role of Senior Adviser to the President and the Secretary of State. The staff will assist the Under Secretary in communicating with the President through the Secretary of State, developing and maintaining senior-level contacts and procedures for rapid interface with other U.S. government agencies, and coordinating the Under Secretary's participation in senior-level interagency meetings, including NSC and its subordinate meetings (Presidential Decision Directive 65). Because of the unique defense liaison role that the Under Secretary plays, the State senior military advisor will also report to the Under Secretary. Positions from the ACDA Director's immediate office will transfer to the

000337

Nonproliferation Bureau (two), the Arms Control Bureau (two), the Political-Military Affairs Bureau (one), the Congressionally authorized Advisory Board (one), the Office of Equal Employment Opportunity and Civil Rights (one), and the Legal Advisor's Office (one).

The Special Adviser for Verification and Compliance will report directly to the Under Secretary on critical verification and compliance issues. Special representatives and envoys reporting to the ACDA Director will report to the appropriate Assistant Secretary and the Under Secretary. The scientific and policy Advisory Board on arms control, nonproliferation and disarmament will report to the Secretary through the Under Secretary, who will maintain operational authority over the Board, including designating its members and staff.

## USIA

The office of the new Under Secretary for Public Diplomacy and Public Affairs will be structured similarly to the other Under Secretaries. The Under Secretary will have a staff of nine. Four other positions in the Director's office will move to public diplomacy support units in the functional bureaus, and one position will move to the Office of the Under Secretary for Management. Six of the Office of Strategic Communications full-time permanent positions plus a reimbursable one will move to the Office of International Information Programs to provide analysis and program support; the seventh will transfer to State's Policy Planning Staff. The positions in the Office of Research and Media Reaction will be shifted to the Bureau of Intelligence and Research (41 full-time permanent positions).

## Positive Outcomes

· Establishment of new Under Secretaries in State with unique roles reflecting authorities transferred from the ACDA and USIA Directors, thereby strengthening State's policy and programmatic capabilities and their coherence.
· Establishment of a structure within State to ensure that unique arms control and nonproliferation perspectives will continue to be available at the highest levels of the U.S. government, including the President.
· Establishment of an entity which provides independent arms control and nonproliferation verification and compliance assessments.
· Provide oversight for State's new interagency leadership role on nonproliferation.
· Ensure better integration of public diplomacy in international affairs strategic planning, including through the presence of the Under Secretary for Public Diplomacy and Public Affairs on the Corporate Board.

# VI. Policy Support Functions

# B. Executive Secretariat

## Current Responsibilities

State's Executive Secretariat is a distinct organizational entity. The Executive Secretariat equivalents at USIA and ACDA are both situated within their Directors' offices.

State's Executive Secretariat (S/S) manages, coordinates, tracks and records the information and work flows among the Secretary of State, other State principals, and bureaus within State; and between State and the interagency community. It is State's principal tasking organization, particularly in overseeing the preparation of briefing materials for State principals and assigning actions. It takes the lead in coordinating crisis management. It also provides administrative support for the Offices of the Secretary, other State principals, and special envoys. Its subordinate components include the:

· **Executive Office (S/S-EX)**, which provides centralized administrative support and information management functions for State principals, offices reporting directly to the Secretary, and the Bureaus of Public Affairs and Legislative Affairs.
· **Operations Center (S/S-O)**, which handles crisis management, briefs/alerts State officials, distribution of sensitive information, and supports principals' communications needs around-the-clock.
· **Secretariat Staff (S/S-S),** which oversees the preparation and clearance of briefing material for the Secretary and other principals, coordinates the Secretary's travel, and manages interagency communications.
· **Record Management (S/S-RMD),** which indexes, records, distributes, and archives the Secretary's and other principals' decisions, and documents and tracks Presidential and State principals' correspondence.


ACDA's Office of the Executive Secretary (ACDA/D/EX) manages, coordinates, tracks, and records the information and work flows among the Director, Deputy Director, other ACDA principals and the Agency's bureaus and offices; and between the ACDA and the interagency community. It is ACDA's principal tasking organization for overseeing the preparation of briefing and action materials for ACDA principals. It communicates formally ACDA's views and is the formal recipient of other Executive branch views. It monitors ACDA's representation in interagency meetings and represents the Director and the Deputy Director in planning for diplomatic events. It has the lead responsibility for assigning and maintaining records and for assigning access to limited distribution, highly sensitive documents. It maintains ACDA's deadlines, both internal and external. It has no round-the-clock facility.

USIA's Secretariat tasks, tracks, reviews and records the flow of information, briefing materials and correspondence to and from USIA's Director and Deputy Director, both within the agency and between it and the interagency community. Its Operations Center, distinct from the Secretariat, provides round-the-clock digests of print and electronic media (domestic and foreign), transcripts of public events, other public documents, briefing material and the latest press guidance for Washington agencies and overseas posts. It also monitors key media round-the-clock, and provides emergency support to official international exchange visitors. It takes the lead in coordinating the clearance process for VOA editorials.

# Personnel

000339

There are 142 full-time permanent positions in State's Executive Secretariat.

ACDA's Executive Secretariat consists of seven full-time permanent positions.

USIA's Secretariat and Operations Center consist of 23 full-time permanent positions.

# Key Issues Considered

The Executive Secretariats of all three agencies perform essentially the same functions for their principals. Their consolidation raises a number of issues:

· **Functions:** While functions are largely the same for all three secretariats, they are distributed differently among each secretariat's component parts.
· **Systems:** Document archiving, tracking and retrieval systems must be consolidated and harmonized.
· **Operations Centers:** The functions of the USIA Operations Center, which were different, were analyzed and allocated.

# Proposed Integration into State

## State

State's Executive Secretariat will be reorganized to prepare for the influx of new functions. A Correspondence and Records division (S/S-CR) will be established on the foundation of the existing Record Management division (S/S-RMD). It will have units responsible for records management and research, tracking and tasking correspondence for the Secretary and other principals, and managing the interagency calendar and associated functions. The Secretariat Staff division (S/S-S) will have oversight of the tasking and tracking of memoranda for the Secretary and other State principals and for coordinating the Secretary's overseas travel. The Operations Center (S/S-O) will integrate additional personnel from the USIA Operations Center to expand core responsibilities, including enhanced press/public affairs activities and expanded crisis management support operations. The Executive Office (S/S-EX) will continue to provide centralized administrative and information management support.

## ACDA

The functions of ACDA's Executive Secretariat will be reallocated to:

· **Under Secretary's Staff:** To provide programmatic support for the Under Secretary, who also serves as Senior Adviser to the President and the Secretary of State for Arms Control, Nonproliferation, and Disarmament.
· **S/S-CR and the Bureau of Legislative Affairs:** Task and track general and Congressional correspondence addressed to the Under Secretary.
· **S/S and S/S-CR:** Serve as the Under Secretary's coordinator of interagency communications.
· **S/S-CR and S/S-O:** Distribute and store classified and highly sensitive material.
· **S/E-EX:** Provide administrative and information management support for the Under Secretary's office.

· **Under Secretary's Staff and S/S-CR:** Maintain a formal record of the Under Secretary's decisions and actions.
· **The Bureau of Administration:** Process Congressional, FOIA, Privacy Act, and document subpoena requests.
· **S/S-O:** Provide 24-hour alert, briefing, crisis coordination, and principal locator services.

ACDA's Executive Secretariat's seven full-time permanent positions will move to the staff of the Under Secretary for Arms Control and International Security (two), to the Under Secretary's subordinate bureaus (two to PM and two to AC), and to State's Executive Secretariat systems staff (one).

# USIA

The functions of USIA's Executive Secretariat will be reallocated to:

· **Under Secretary's Staff:** Provide programmatic support for the Under Secretary to carry out his duties.
· **S/S-CR and the Bureau of Legislative Affairs:** Task and track general and Congressional correspondence addressed to the Under Secretary.
· **S/S and S/S-CR:** Serve as the Under Secretary's coordinator of interagency communications.
· **S/S-CR and S/S-O:** Distribute and store classified and highly sensitive material.
· **S/S-EX:** Provide administrative and information management support for the Under Secretary's office.
· **Under Secretary's staff and S/S-CR:** Maintain formal record of the Under Secretary's decisions and actions.
· **The Bureau of Administration:** Process Congressional, FOIA, Privacy Act, and document subpoena requests.
· **S/S-O:** Provide 24 hour alert, briefing, crisis coordination and principal locator services, and rapid response to urgent public affairs needs for overseas posts, including transcripts, press guidance and media summaries.
· **S/S-O and the Office of International Information Programs:** Conduct 24-hour global media monitoring and provide information and summaries of foreign affairs coverage - on general and specific issues -- to senior officials in Washington and overseas.
· **The Bureau of Public Affairs and the Office of International Information Programs:** Manage the repository of transcripts of public statements and appearances by U.S. government officials, and of press guidance and releases of U.S. Government agencies, and serve as principal point of contact for non-urgent information for press officers in the field.
· **S/S-S:** Coordinate clearance process for Voice of America editorials.
· **The Bureau of Educational and Cultural Affairs:** Provide duty officer for after-hour contact by exchange visitor program participants.

USIA's Executive Secretariat's 10 full-time permanent positions will move to State's Executive Secretariat (seven) and to Legislative Affairs (three). Of the USIA Operations Center's 13 full-time permanent positions, four will move to the functional staffs and bureaus for public diplomacy work, seven will join the State Operations Center, and two will transfer to State's Executive Secretariat administrative office. One additional full-time permanent position, from USIA's Management

Bureau, will shift to State's Executive Secretariat systems office to support the Bureau of Legislative Affairs and a second one from USIA's special complements will move to the staff of the Foreign Service Grievance Board.

## Positive Outcomes

· Increased responsiveness to overseas crisis management and information requirements.
· Centralized correspondence processing.
· Centralized interagency communications and scheduling.
· Improved document tasking, tracking and retrieval.

# VI. Policy Support Functions

# C. Congressional Relations

## Current Responsibilities

State, ACDA, and USIA have units devoted to Congressional relations, charged with roughly the same responsibilities for their subject areas. State's Bureau of Legislative Affairs (H) coordinates legislative activity for State and advises the Secretary of State and other State officials on legislative matters concerning all international affairs policy and funding issues. The Bureau's primary mission is to ensure that the Secretary's policies are reflected throughout the legislative process. H serves as the primary liaison between the Congress and the Executive Branch (including OMB and other governmental agencies) on foreign policy legislative matters as well as State's authorization legislation and two appropriations bills, the Commerce, Justice, State and Foreign Operations appropriations.

ACDA's Office of Congressional Affairs (CA) is responsible for the legislative implications of arms control, nonproliferation, and disarmament proposals, policies, and activities, including treaty ratifications. It advises the Director on legislation and Congressional views; arranges briefings for legislators/staffs; arranges Congressional appearances; coordinates Agency responses to the Congress; and obtains Congressional approval of the budget. The office provides routine status reports on arms control and nonproliferation diplomatic efforts to the Senate Arms Control Observer Group and the House Arms Control Observer Group. It also serves as the Agency's liaison with OMB.

USIA's Office of Congressional and Intergovernmental Affairs (CL) is the principal point of contact on public diplomacy issues and programs with the Congress, Executive Branch legislative offices, and state and local officials. The office is responsible for all aspects of the Agency's authorization legislation and, in conjunction with the Agency comptroller, appropriations legislation as well. CL advises the Director and other top Agency officials on Congressional views and develops and implements legislative strategy for USIA. CL coordinates Agency legislative activity, prepares Agency officials for Congressional appearances, keeps interested Members and staff informed of

Agency activities which affect them or their constituents. CL also conducts outreach with state and local government officials.

## Personnel

State's Bureau of Legislative Affairs has 48 full-time permanent positions.

ACDA's Office of Congressional Affairs has four full-time permanent positions.

USIA's Office of Congressional and Intergovernmental Affairs has eight full-time permanent positions.

## Proposed Integration into State

The new structure will have four deputy assistant secretaries (DASs) and four senior policy advisers (SPAs), a plan that will maintain the H Bureau's current DAS structure and create two new SPA positions. These new SPA positions will act as direct liaisons to the proposed new Under Secretaries and provide leadership and expertise within H on arms control and nonproliferation and public diplomacy.

State's Bureau of Legislative Affairs will absorb most of the staff positions of the USIA legislative affairs operation, as well as some from their Secretariat operations and several administrative support positions.

Of USIA's eight positions, six will transfer to H, one to the Bureau of Democracy, Human Rights and Labor (along with the international labor portfolio), and one to the Bureau of Public Affairs (along with the state and local government relations portfolio). Additionally, the three positions from USIA's Secretariat staff which support Congressional correspondence will be transferred to H, along with one position from USIA's Management Bureau.

All four positions from ACDA will go to H.

Each State Under Secretary will have a senior individual within Legislative Affairs, a Deputy Assistant Secretary (DAS) or Senior Policy Advisor (SPA), who will oversee issues under the Under Secretary's purview.

Each Under Secretary will designate a point of contact in his/her office for the DAS or SPA and the relevant Legislative Management Officer (LMO). This is a collateral duty which will not require a full-time position.

The Bureau of Legislative Affairs will continue to shepherd the authorization and appropriations bills through the Congress, working closely with those offices, particularly the Chief Financial Officer, which have responsibility for preparation of the budget.

## Positive Outcomes

These proposals will provide for the unified representation to the Congress of State's views on the

000343

widest range of foreign policy issues. State principals can be sure that their Congressional priorities will be brought to the attention of the Secretary and addressed through her frequent testimony and meetings on the Hill.

# VI. Policy Support Functions

# D. Legal Affairs

## Current Responsibilities

State's Legal Adviser (L) provides legal advice and services to the Secretary -- and through her to the National Security Council (NSC) and the President -- as well as to other State offices. These activities include:

· Bringing legal considerations to bear in formulating and carrying out U.S. foreign policy and in administering the Department, including the Foreign Service;
· Participating in international negotiations and representing the U.S. in international conferences having legal content;
· Representing the U.S. in international litigation and assisting the Department of Justice in domestic litigation involving State;
· Serving as State's point of contact with Justice, Treasury, and other law enforcement agencies on sensitive operations and prosecutions that may affect the conduct of U.S. foreign policy;
· Chairing the Department's advisory committees on public and private international law.

ACDA's Office of the General Counsel, responsible for legal matters arising from arms control, nonproliferation, and disarmament activities of the U.S. government, provides legal advice and assistance to the Director -- and through him to the NSC and the President -- as well as to other ACDA offices. These activities include:

· Participating throughout the negotiation, conclusion, ratification, and implementation of arms control treaties and agreements;
· Interpreting legislation affecting the field of arms control, nonproliferation, and disarmament, including representing ACDA with respect to proposed and pending legislation;
· Providing legal support in ratification and interpretation of arms control treaties, including drafting implementing legislation and the article-by-article analysis for transmittal by the President to the Congress;
· Providing legal support for arms control initiatives by the President, the Director, and the different bureaus of ACDA; and
· Addressing arms control legal issues at courses, seminars, and conferences.

USIA's General Counsel's Office (GC) provides legal services to all Agency elements (with the exception of the immediate legal needs of the Broadcasting Board of Governors) in support of USIA's domestic and international activities. These activities include:

000344

· Drafting and interpreting statutes and regulations;
· Preparing for and negotiating site agreements, educational and cultural exchange agreements, and other international agreements;
· Addressing requests for immunity from judicial seizure;
· Representing the Agency in administrative litigation;
· Assisting the Department of Justice in judicial litigation; and
· Providing advice on matters as diverse as telecommunications issues, cultural property, labor relations, and ethical constraints on the activities of Agency officials.

## Personnel

The Office of the Legal Advisor (L) within State has 165 full-time permanent positions.

ACDA's Office of the General Counsel (GC) has 14 full-time permanent positions and a reimbursable one.

USIA's Office of the General Counsel (GC) has 62 full-time permanent positions.

## Key Issues Considered

The task force considered a range of issues, including: the number and level of officials in the Legal Adviser's Office charged with providing legal support for transferred functions; the placement of functions currently residing in General Counsels' offices which might be placed elsewhere in the new structure; the necessity for any internal management changes; and the April 1997 White House statement which indicated that ACDA's legal functions will be preserved.

## Proposed Integration into State

## General

USIA legal staff will be transferred to the BBG in proportion to the amount of work currently performed by USIA's General Counsel's office for broadcasting components (seven full-time permanent positions). All other full-time permanent USIA legal staff (13 full-time permanent positions) and all ACDA legal staff positions will transfer to the Office of the Legal Adviser. One computer support position from USIA's Management Bureau will transfer to the Office of the Legal Adviser.

All but one SES position currently assigned for legal functions in each of the three agencies will be transferred to the newly integrated Legal Adviser's Office and assigned SES responsibilities.

Certain ACDA and USIA attorneys and support staff will be transferred to the appropriate management offices in the Legal Adviser's Office.

The newly integrated Legal Adviser's Office will perform only legal functions. Non-legal functions will be transferred to other bureaus where these functions either are more compatible with the mission of that bureau or can be more effectively managed.

FOIA, privacy, and declassification functions of ACDA and USIA will be transferred to State's Bureau of Administration and to the BBG. ACDA's efforts are currently conducted entirely by rehired annuitants. Ten full-time permanent positions (two on FOIA and eight on declassification) will move from USIA, including three to provide declassification support to the BBG on a reimbursable basis. Five additional positions from declassification will move to public diplomacy efforts in the functional staffs and bureaus. Two full-time permanent positions working on FOIA will be transferred to the BBG.

## USIA Specific

The USIA General Counsel will become the General Counsel to the BBG.

A new Assistant Legal Adviser for Public Diplomacy and associated staff will be established in the Office of the Legal Adviser.

USIA's attestation function -- reviewing films to determine whether they are of "international educational value" and thus warrant favorable export treatment under the Beirut Agreement -- will be transferred to the Bureau of Educational and Cultural Affairs (one full-time permanent position).

The USIA Exchange Visitors visa waiver review procedure will be transferred to the Bureau of Consular Affairs (12 full-time permanent positions).

The Exchange visa program designation function will become a staff element in the office of the Assistant Secretary for Educational and Cultural Affairs (12 full-time permanent positions).

Seven full-time permanent positions will transfer to the BBG.

## ACDA Specific

The ACDA General Counsel will become the Associate Legal Adviser for Arms Control and Nonproliferation and will report to the Legal Adviser.

A new Assistant Legal Adviser for Arms Control and Nonproliferation and associated staff will be established and will report to the Associate Legal Adviser.

All 14 full-time permanent positions and a reimbursable one will transfer to State plus two additional full-time permanent positions from elsewhere in the agency.

## Positive Outcomes

The Secretary and other State principals will receive top-quality legal services from an integrated office under the direction of the Legal Adviser. Full integration of the arms control specialty into the Legal Adviser's Office will best preserve ACDA's unique legal functions. This arrangement will allow the Legal Adviser and client bureaus to draw upon the broad-ranging expertise of the Legal Adviser's Office. The Legal Adviser's Office will maintain its active recruitment program, which attracts some of the best lawyers in the country, as well as procedures for hiring experts in particular fields where appropriate. Client bureaus will provide travel funds adequate to preserve the legal functions of the lawyers participating in delegations, commissions and discussions.

000346

# VI. Policy Support Functions

# E. Press and Constituent Relations

## Current Responsibilities

Public affairs is the provision of information to the press, the American public, and others concerning the goals, policies, and activities of the U.S. government. Public diplomacy seeks to promote the national interest of the U.S. through understanding, informing, and influencing foreign publics.

· **State's Bureau of Public Affairs (PA)** provides information to various publics concerning the goals and development of U.S. foreign policy. Through dialogue with the media, individual citizens, and groups, it attempts to foster understanding of the importance of American leadership and engagement in the world. PA directs public affairs strategies, coordinates interagency public affairs activities, and serves as a principal adviser to the Secretary, senior State officials, and others in the U.S. government**.**

· **USIA's Office of Public Liaison (PL)** is responsible for planning, directing, coordinating, implementing, and evaluating USIA's domestic public affairs program and for developing its communication strategy. PL provides information about the Agency's policies, mission, and programs to the general public, the communications media, academic and educational institutions, and government and non-governmental organizations.

· **ACDA's Office of Public Affairs (PA)** disseminates and coordinates public information concerning arms control, nonproliferation, and disarmament. The office handles media outreach, coordinates press guidance on Agency issues, plans and coordinates press conferences and interviews with ACDA officials, and is responsible for a comprehensive Speaker's Program.

· **USAID's Press Relations Division (AID/LPA/PR)** manages the communication of the Agency's mission, goals, and activities to the American public, primarily through the media. It is part of USAID's Bureau for Legislative and Public Affairs.

· **USIA's Foreign Press Centers** in Washington, New York and Los Angeles deal with visiting and U.S.-based foreign media.

## Personnel

State's PA bureau is staffed by 117 full-time permanent positions.

USIA's Office of Public Liaison has 12 full-time permanent positions.

ACDA's Office of Public Affairs has eight full-time permanent positions.

USAID's Press Relations Division has eight full-time permanent positions.

USIA's Foreign Press Centers have 24 full-time permanent positions.

USIA's Broadcasting Bureau has eight full-time permanent positions in its Foreign Broadcast Support Unit and 12 who carry out Worldnet television policy interactives.

# Key Issues Considered

The major issues of integrating press relations functions into State are part of the larger issue of integrating USIA's public diplomacy mission into State.

# Proposed Integration into State

The domestic press functions of USIA, ACDA, and USAID will be integrated into PA's Office of Press and Media Relations. USAID's press officers will become State Public Affairs Officers. USIA's Office of Public Liaison will integrate with PA.

Existing press relations resources will be restructured into four inter-related offices in PA. The Assistant Secretary for Public Affairs will have overall managerial responsibility and the Principal Deputy Assistant Secretary will have day-to-day responsibility for the activities of these offices. They, in turn, will be responsible to the Under Secretary for Public Diplomacy and Public Affairs and the Secretary of State.

The **Domestic Press Office** (a.k.a. "*the Press Office*") will be responsible for day-to-day relations with domestic and
foreign media on major foreign policy matters, and for supporting media and public affairs events involving the Secretary or her deputies in the U.S. and overseas. This office will be staffed with positions presently in the Press Office and two transferred from USIA's Office of Public Liaison.

The **Foreign Press Centers Office** will be responsible for day-to-day relations with U.S.-based and visiting foreign-based media whose areas of inquiry fall outside those already described above. The Centers' efforts will continue to focus on briefings, programs, and direct contact by press officers and other specialists with foreign journalists.

The Centers in Washington, New York, and Los Angeles will remain where they are to serve their clientele, but will coordinate and integrate their daily operations with other offices of PA, under the daily direction of the Principal Deputy Assistant Secretary/Deputy Spokesman. Foreign Press Center operations will remain nearly identical to their current set-up (24 full-time permanent positions). Expertise from USAID's press relations office will also be available to address assistance issues.

The **Media Outreach Office** will continue to be responsible for providing policy information to national and major regional media in a proactive fashion, and for reaching out to specialty, local, ethnic and other niche media organizations, all with the objective of better fulfilling our obligation to explain U.S. foreign policy and the U.S. role in world affairs to the broadest possible audiences, including those that have not traditionally been engaged by State and other foreign affairs agencies.

000348

The office will also be responsible, in concert with other bureaus as appropriate, for handling of media interviews of State principals other than the Secretary. Staff will consist of the present positions, augmented by two full-time permanent positions from USIA's Office of Public Liaison and expertise from USAID's Office of Press Relations.

A **Multimedia Office** will be responsible for television and certain other multimedia functions. Eight full-time permanent positions in the BBG's Foreign Broadcast Support Unit will shift to this office, as will BBG personnel who carry out Worldnet television policy interactives (12 full-time permanent positions.)

## Press Functions at USIA, USAID and ACDA

**USIA's Office of Public Liaison** will have its positions transferred to corresponding parts of State's Bureau of Public Affairs. Those presently supporting "speaker programs" (four full-time permanent positions) will be transferred to PA's Office of Public and Intergovernmental Liaison to continue similar functions and activities there. Those working on "press relations" (four full-time permanent positions) will be transferred (two positions each) to the Press Office and to Media Outreach. One position working with LAN computer and related matters will be transferred to the Public Communications office, where such activities are concentrated within the Bureau of Public Affairs. One position will be transferred to the Public Affairs front office. And, two positions will become part of public diplomacy units in the functional bureaus.

**USAID's Office of Press Relations** (eight full-time permanent positions) will be integrated into the Bureau of Public Affairs.

The public affairs positions of the **Arms Control and Disarmament Agency** (eight full-time permanent positions) will be transferred: two to the Assistant Secretary for NP, two to the Assistant Secretary for AC, two to PM, one to the Office of the Historian in PA, and one to the Bureau of Administration.

The Bureau of Public Affairs will be supported by an administrative office drawn from existing staff, plus 15 positions from USIA's former Management Bureau, which has been providing central support.

## Positive Outcomes

The Under Secretary for Public Diplomacy and Public Affairs, having responsibility for both foreign and domestic audiences, will help ensure a consistent, coordinated, and timely message, as well as appropriate priorities for projects. With the merging of USIA's Foreign Press Centers into the Bureau for Public Affairs, the media will benefit from a coherent message emanating from a single source.

# VII. Management Functions

000349

# Overview

Integrating management support functions into a single organization is in most cases a straightforward exercise. The State organizational structures reflect the needs of larger and, consequently, more complex and specialized units. Thus, in general, the current State organizational structures are more appropriate for the consolidated State organization. Furthermore, aside from the relative sizes of the agencies, there are more similarities in management operations than there are differences. Conforming changes in some management policies and procedures will need to be made to become one smoothly functioning organization. The most important task is to bring the people in the organizations together with the leadership, structures, and tools appropriate for a high-performance organization.

One major challenge is the technological difficulty of uniting the three agencies. Separate electronic mail systems and computer databases that often cannot talk to each other will be expensive to standardize.

Another challenge is to achieve the proper balance of responsibilities between central management functions and bureau-level management. There is no one "right" answer, since the most cost-efficient and program-effective solution in one case may not apply to others.

A final requirement is to appropriately apportion support resources to the Broadcasting Board of Governors from USIA's central management and policy support structure.

Coordinating implementation of the reorganization among the various management functions must also be done in such a way that essential operations are not disrupted despite the additional workload.

Though there will be some downstream savings from consolidated management functions, there will be no short-term ones. In fact, costs are likely to rise over the next several fiscal years as relocation costs are borne and incompatible information technologies are conformed. Additionally, there will be some incremental costs in establishing the Broadcasting Board of Governors as an independent entity, absorbing potential immediate savings.

In addition to the position transfers outlined in the sections that follow, full-time permanent positions will transfer from USIA's central management staff to: the Office of Resource, Plans and Policy (one), the Office of Management, Policy and Planning (one), and the executive office of the Bureau of Administration (five).

# VII. Management Functions

# A. Budget and Finance

## Current Responsibilities

000350

Each of the three affected agencies has units with similar responsibilities for budgeting, accounting, financial management operations, budget presentation to OMB and Congress, execution of financial plans, and liaison on financial matters with Treasury, GAO, and other U.S. government agencies. The respective units are:

· **State** -- **Chief Financial Officer**, heading the Bureau of Financial Management and Policy (FMP) and reporting to the Under Secretary for Management.
· **ACDA** -- **Financial Manager,** who reports to the Director of Administration.
· **USIA** -- **Director of the Office of the Comptroller,** who reports to the Agency Associate Director heading the Bureau of Management.

## Personnel

State's Bureau of Financial Management and Policy has 559 permanent full-time positions; 357 American and the remainder, foreign nationals.

ACDA's Financial Management Division has seven full-time permanent positions. Its payroll and accounting services are executed by the General Services Administration.

USIA's Office of the Comptroller has 86 full-time permanent positions.

## Key Issues Considered

**Appropriation Structure --** USIA and ACDA operating accounts will be merged into State's D&CP and S&E accounts. Funding for USIA overseas public diplomacy programs and products, including foreign national program salaries, will be allotted separately to respect all applicable legal restrictions. The appropriations for exchanges and the specialized activities such as the East West Center and the North South Center will be retained.

**Single Payroll System** -- Payroll system transfers are recognized as having a tremendous impact on employees in a reorganization because of the devastating impact on morale should pay not be received on time. The transition to a single payroll system is a critical priority for implementing the integration and system improvements are already underway.

**Integrating Budget Submissions** -- USIA's and ACDA's FY-00 budget requirements are being incorporated into the President's budget request for the Department of State. BBG will develop its first independent budget for FY-00.

**Integrating Financial Accounting** -- ACDA's FY-99 appropriation, and its prior year balances will be shifted to State as of April 1, 1999. USIA's prior year balances will be shifted to State as of October 1, 1999.

**Structure and Autonomy** -- As members of State's Corporate Board, the Under Secretaries will play a vital role in resource management decisions, particularly those involving bureaus within their areas of responsibility.

000351

## Proposed Integration into State

ACDA's and USIA's central financial management functions will be integrated into State's, with conversion to common financial management systems, including single budget, accounting, and payroll systems.

The FMP Office of Budget and Planning (FMP/BP) will handle budget formulation, presentation, and financial planning for all State appropriations. USIA and ACDA operating accounts will be merged into parallel State appropriations, with a separate allotment process established for overseas public diplomacy programs and products. Separate appropriations will be retained for the exchange program and for the current specialized activities like the East West Center and the North South Center.

Sixty-eight permanent full-time positions will transfer from USIA to the Chief Financial Officer, 66 from the Office of the Comptroller, one from the Executive Office, and one from the Office of Technology. The remaining positions from the Office of the Comptroller will be transferred to other offices within State (one to Legislative Affairs, 10 to regional bureaus, one to the Bureau of Administration, three to the administrative office supporting the Bureau of Educational and Cultural Affairs and the Office of International Information Programs, two to the administrative office supporting the Assistant Secretary for Public Affairs, and one to the Bureau of Administration. Four positions will transfer to the BBG. Also, since BBG plans to obtain financial services from State, twenty of the positions transferred to State will provide those services to the BBG on a reimbursable basis.

Six of the ACDA positions will provide financial management services to the executive office for the bureaus under the Under Secretary for Arms Control and International Security, with the seventh position moving to the Bureau of Administration. State's Financial Services Centers (FSCs) currently provide disbursing, accounting, and payroll services for State, as well as USIA and ACDA at overseas posts. With integration, the services to the former USIA and ACDA overseas operations will continue. The BBG will reimburse for these services under ICASS.

## Positive Outcomes

Key programs will be put under the direct leadership of the Secretary. Integration will facilitate stronger links between resource allocations and our international affairs strategic goals, giving the Secretary greater resource flexibility to set priorities.

Consolidation of three currently separate sets of financial management systems will bring about future cost savings, streamlining, and process improvements through applying best practices. At the same time, it will create a wider field for career development and growth in the financial management field.

# VII. Management Functions

# B. Domestic Facilities

000352

## Current Responsibilities

State's Deputy Assistant Secretary for Operations (A/OPR) supervises four offices which exercise oversight for federally owned and leased domestic properties and provide support services for State's operations. They are responsible for domestic operations at 85 locations.

· **The Office of Facilities Management Services (FMS)** conducts all buildings maintenance operations.
· **The Office of General Services Management (GSM)** coordinates and provides support services for conference planning and diplomatic events, and manages the State's technical services unit, employee services center, diplomatic conference and reception rooms, authentications staff, and motor pool.
· **The Office of Real Property Management (RPM)** manages the Master Real Estate Plan for domestic real property including acquisition, and manages the assignment, design and fit-out of internal space.
· **The Office of Projects Management (PM)** oversees long-range planning and the implementation of major construction projects.

USIA has two units within its Bureau of Management's Office of Administration that provide similar services at 18 locations.

ACDA has a small General Services staff that provides administrative support and oversees facilities management at four locations.

## Personnel

Currently State has a total of 132 full-time permanent positions that support domestic facilities and services.

USIA has 17 full-time permanent positions providing domestic facilities support.

ACDA' General Services staff has seven full-time permanent positions.

## Key Issues Considered

A/OPR will assume, under the terms and conditions of existing leases, the management and operation of USIA real estate and building facilities, except those units being transferred to the BBG.

To the extent possible, USIA headquarters staff members being incorporated into State will be moved to existing State facilities, with the eventual goal of integrating most staff members in the Foggy Bottom area. Duplicate support facilities in other areas will also be consolidated as soon as possible. This consolidation will permit the cancellation of some leases.

## Proposed Integration into State

000353

USIA's domestic facilities and support staffs (17 full-time permanent positions) will transfer to A/OPR and consolidate with parallel offices in Facilities Management (A/OPR/FMS), General Services (A/OPR/GSM), Real Estate Management (A/OPR/RPM), or Projects Management (A/OPR/SP/P). Aditionally, two full time permanent positions will also shift, one each from USIA's human resources and technology units. ACDA's General Services staff (seven full-time permanent positions) will transfer to the Executive Office of the bureaus under the oversight of the Under Secretary for Arms Control and International Security Affairs (five) and the Bureau of Administration (two).

The number of facilities to be managed and the workload will remain the same for the time being, though facilities are already being reviewed to determine if and when they can be consolidated.

## Positive Outcomes

A centralized domestic facilities program will realize efficiencies over time. Capable professional staffs will be combined and permit a greater depth of expertise. When the headquarters elements of three Foreign Service agencies are combined within the Foggy Bottom area and support elements are combined at appropriate locations, economies of scale will permit identification of facilities and support services that could be eliminated. The General Services Administration and vendors will also benefit by having a single point of contact within State.

# VII. Management Functions

# C. EEO

## Current Responsibilities

Government-wide Equal Employment Opportunity Commission regulations (29 C.F.R. 1614.102) govern EEO programs at State, ACDA, and USIA. The Deputy Assistant Secretary of State, and the Directors of EEO at ACDA and USIA, serve as principal advisers to their respective agency heads. Each recommends changes in policies and procedures to insure nondiscrimination in all programs or activities conducted and/or funded by their respective agencies.

## Personnel

State's Office of Equal Opportunity and Civil Rights (S/EEOCR) has a total of 17 full-time permanent positions.

At USIA 12 full-time permanent positions are assigned to the Office of Civil Rights.

ACDA has one full-time permanent position located in the Director's Office.

## Key Issues Considered

**High-Level Attention** -- Reporting relationships differ among the organizations. At USIA, the

Director of Civil Rights for EEO reports directly to the head of the Agency. At ACDA, the EEO manager reports directly to the ACDA Deputy Director. At State, the Deputy Assistant Secretary of S/EEOCR reports to the Deputy Secretary on questions of policy, but as a practical matter works closely with the Under Secretary for Management on day-to-day operations.

## Proposed Integration into State

EEO programs will remain a vital element of State's management priorities and the new structure will consolidate existing USIA, ACDA, and State program personnel. The Director of the office, who will operate at the level of Assistant Secretary, will continue to receive routine guidance and support from the Under Secretary for Management, but will also continue to report to the Secretary and have access on any EEO concerns. Six of USIA's positions and the ACDA position will transfer to State. The other six USIA positions will transfer to the BBG.

## Positive Outcomes

As a result of a consolidated, experienced staff, several underdeveloped programs like EEO Counseling, Alternative Dispute Resolution, Disability, and Civil Rights Compliance programs will be enhanced. The integration of new staff from USIA and ACDA, which include three Foreign Service positions, will also increase S/EEOCR's ability to address the needs of State's employees at posts abroad.

# VII. Management Functions

# D. Grants

## Current Responsibilities

USIA and, in select circumstances, State make grants (transfers of money to non-governmental entities) to accomplish public purposes. Grant authorities, procedures, and limitations are determined by statute, and differ from program to program. USIA grants functions are focused on Fulbright, Expert Speakers, and International Visitor programs.

## Personnel

In State, the Bureau of Administration's Office of the Procurement Executive establishes and oversees grants policy and the respective operating or program office handles grants execution. State does not identify personnel resources separately for grants because of the small volume involved.

In USIA, the Grants Division in the Office of the Agency Procurement Executive has ten full-time permanent positions. There is also a grants management division of three full-time permanent positions in the Office of the Executive Director of the Bureau of Educational and Cultural Affairs.

ACDA has no full-time personnel associated with this function.

## Key Issues Considered

**Authority** -- The appropriate focus of grants authority, with respect to centralization or decentralization, is to balance the need to place grant office authority close to the program office familiar with the program requirements and limits, while providing central expertise, policy, and oversight.

**Overseas** -- Recognizing that the effectiveness of the public diplomacy mission depends on the flexibility of Public Affairs Officers overseas to issue grants, the consolidated State structure will retain the current practice.

## Proposed Integration into State

The establishment of State-wide policy will remain in the Office of the Procurement Executive. Grants execution domestically and overseas will continue to operate in the appropriate operating or program office. A unit of nine, specializing in public diplomacy exchanges, will be located in the Bureau of Educational and Cultural Affairs. One position will transfer to the BBG.

## Positive Outcomes

There will be compliance with good management practices and grants law and regulation, and maintenance of current program flexibility essential to accomplish the mission.

# VII. Management Functions

# E. Human Resources

## Current Responsibilities

At State, the formulation and implementation of personnel policies and programs for Civil Service, Foreign Service, and foreign national personnel are vested in the Bureau of Personnel (PER), under the leadership of the Director General of the Foreign Service and Director of Personnel (DG), and the Under Secretary for Management.

ACDA's Office of Personnel General Services (A/PGS), reporting to the Director of Administration, provides the full range of personnel functions for ACDA's civil service personnel.

USIA's Office of Human Resources (M/HR), reporting to the Associate Director for Management, provides personnel services similar to those provided by the Bureau of Personnel at State, for Civil Service, Foreign Service and foreign national personnel.

## Personnel

State's PER has 312 full-time permanent positions.

000356

ACDA's Personnel Office has eight full-time permanent positions.

USIA's Office of Human Resources has 53 full-time permanent positions devoted to personnel activities.

# Key Issues Considered

**Employees** -- *The Foreign Affairs Reform and Restructuring Act* states that all personnel and positions of USIA and ACDA shall be transferred to State at the same grade or class, with the same rate of basic pay or basic salary rate, and with the same tenure held immediately preceding transfer. This includes foreign national personnel overseas. Consideration of the impact of reorganization on employees has also been a central concern of the collective planning effort.

While the intent of the reorganization is not downsizing per se, there may be streamlining and position savings in some areas down the road after implementation is complete. Policies are being designed to review all Civil Service vacancies and hold those which could be needed for "at-grade" assignments upon integration. This includes an OPM- approved policy to advertise vacancies to ACDA, USIA and State before going to outside sources. All overseas posts have been instructed to develop plans to maximize the utilization of USIA and State foreign national personnel. While no agency can guarantee future actions, the intent is that any downsizing will occur gradually through normal attrition and sound work force management and planning. All the tools available will be utilized to minimize adverse impact on the workforce.

**Communication** -- Uncertainty concerning potential RIFs, downsizing, assignment changes, and inequities is normal in any large-scale reorganization, and employee morale and productivity might fall if these concerns are not adequately addressed. Timely and open communications are essential. Prompt decisions on organizational structure, followed by individual assignments, will help to alleviate uncertainty. Discussions will also continue with the employee organizations, AFGE and AFSA. Other strategies to help employees cope with these changes will include training for supervisors and managers, as well as staff, and provision of counseling services.

**Integration of Foreign Service Systems** -- With integration, a fifth generalist cone, called Public Diplomacy, will be created. USIA's administrative generalists will become State administrative officers. New specialist skill codes will be developed in State for USIA printing specialists, information resource officers, and English language officers. Policy differences such as time in class, tenuring, threshold window, assignments and promotion precepts will be addressed and resolved, with best practices considered.

**Decentralization** -- There is general support for continuing State's current move toward decentralized authority by allowing bureaus to classify and staff positions at the GS-13 level and below, and provide performance management and employee relations services. State may engage in pilot programs for extended delegations to bureaus based on the skills and experience of the executive director's staff.

# Proposed Integration into State

Seven ACDA positions will move to the executive office of the bureaus under the Under Secretary for Arms Control and International Security, with the remaining position moving to the Bureau of Personnel.

USIA human resources positions will move to the administrative office supporting the Bureau of Educational and Cultural Affairs and the Office of International Information Programs (six), the Bureau of Public Affairs (three), the Bureau of Administration (one), and the Bureau of Personnel (41), plus two additional positions from USIA's detail complement that had been detailed to the Board of Examiners. Three positions will transfer to the BBG.

USIA's detail (22), pipeline (57), and training (45) complements encompass 124 full-time permanent positions after reductions from the FY-99 number for: budgetary adjustments (seven) and transfers to the BBG (eight), plus permanent shifts of personnel currently detailed to the Board of Examiners (two) and the staff of the Foreign Service Grievance Board (one).

## Positive Outcomes

Integrating similar functional responsibilities and eliminating redundancies could over time increase efficiency in personnel operations by allowing currently underserved issues to receive more time and attention. Moving away from separate agency regulations and procedures to a common system based on best practices will lead to better personnel policies and processes.

Steps will also be investigated to encourage all personnel to consider opportunities in the new areas of arms control, nonproliferation and public diplomacy. The integration has the potential to provide opportunities for work in a wider range of organizational units within State. Furthermore, because of the shifts being made, many employees will have the opportunity to obtain new skills.

# VII. Management Functions

# F. Information Technology

## Current Responsibilities

Information technology (IT) organizations are responsible for acquiring, maintaining, and standardizing information equipment and operating systems which help accomplish the agency's mission and manage its resources. Information resources include computers, networks, other office automation equipment, and telephone and communications equipment. A critical component of IT management is planning and policy formulation for information resource strategies.

State's Bureau of Information Resource Management (IRM), under the direction of the Chief Information Officer (CIO), manages all these activities for State. The geographic and functional bureaus have responsibility for their particular IT systems related programs.

Information technology resources are generally dispersed throughout a large organization, in addition to centralized IT management units. These dispersed IT resources generally provide for operations of

specific programs (e.g., export controls, consular systems) or give immediate support for administration of office automation and networks. This section focuses primarily on the structure of centralized IT functions.

# Personnel

State's IRM has a domestic staff of 470 full-time permanent positions.

USIA's Office of Technology within its Management Bureau has 125 permanent full-time positions.

ACDA has 15 full-time permanent positions working on information management and computer operations.

# Key Issues Considered

· **Open Communication** -- The three agencies' current IT systems do not offer common e-mail connections. USIA operates in an open, unclassified IT environment with internet connections. For national security reasons, ACDA operates almost exclusively in a classified environment. State operates open systems, unclassified but controlled systems, and classified systems. Complicating any solution is the absence of U.S. Government approved technology to establish safe "firewalls," which will allow multiple classification levels on one set of equipment.

· **Standardized Systems and Software --** Development of a common architecture for equipment and software is critical for effective information management operations. Establishing these standards will permit maximum effective use of available capital funds.

# Proposed Integration into State

Centralized IT functions will be provided by State IRM, strengthened with positions from USIA. Positions supporting particular programmatic functions will remain located in that program unit.

Several operations of the merged entities will be combined quickly because they are essentially alike: communications centers, telephone services, mainframe operations, Strategic IRM Planning, and CIO support.

Steps to strengthen information technology operations will include:

· Identify redundant or "stovepipe" operating systems for elimination, with the goal of standardizing on as few systems as possible;
· Consolidate existing database management systems;
· Determine new hardware requirements for desktop systems, file servers, minicomputers, mainframes, and related peripherals.

An expanded network management center in IRM will provide critical enterprise-wide 24-hour service to support network operations.

An expanded Information Help Desk will provide one-stop shopping for customers seeking information on resolution of problems having to do with IRM-supported products and services.

Of USIA's 125 positions, 96 will transfer to the IRM Bureau, one to the Chief Financial Officer, one to the Bureau of Administration, one to the Legal Adviser's Office, 20 to the administrative office supporting the Bureau of Educational and Cultural Affairs and the Coordinator for International Information Programs. Six will go to the BBG.

ACDA's decentralized IT operation will move to the bureaus under the policy oversight of the Under Secretary for Arms Control and International Security. Thirteen full-time permanent positions will be located in the Arms control Bureau, one positions will transfer to the Bureau of Administration, and one position will transfer to the Bureau of International Organization Affairs to support IT operations in Geneva.

## Positive Outcomes

Combined central IT management and policy will allow more effective use of scarce resources and more rational planning and acquisition programs.

The Bureau of Administration's Diplomatic Telecommunications Service Program Office (DTS-PO) will continue to provide long-haul telecommunications support to both the integrated State operations and to all the other agencies located at diplomatic and consular posts.

# VII. Management Functions

# G. Logistics

## Current Responsibilities

The Office of Logistics Management at State is responsible for a variety of functions, including supply, transportation, and procurement.

ACDA's logistics operations are split among three divisions in its Office of Administration: Financial Management (travel), Contracting, and Personnel and General Services (transportation, mail, property management, and printing).

USIA has logistics operations in the Bureau of Management's Offices of Administration (M/A) and Contracts (M/K). A small staff provides logistics support for Printing Services of the Information Bureau.

## Personnel

State has 214 full-time permanent positions engaged in logistics functions.

USIA has 75 full-time permanent positions engaged in logistics management.

000360

ACDA has six full-time permanent positions engaged in logistics operations.

## Key Issues Considered

**Separate Authorities** -- Arms control, nonproliferation and public diplomacy will not retain agency-type authority, such as procurement. Customer service teams will provide high-quality service to these functions.

**Logistics Information Systems** -- Few systems are shared between agencies. Integration will require a mixture of using best practices systems and creation of new systems.

## Proposed Integration into State

The structure designed to implement State's reengineered logistics processes will serve as the basis for the consolidated logistics operation. Expanded logistics operations for the consolidated agencies will be organized, under the direction of a Deputy Assistant Secretary, around work processes in three offices:

· Operations Management,
· Acquisitions Management, and
· Program Management.

Of USIA's 76 full-time permanent positions (including one in their Comptroller's office), 65 will transfer to the Bureau of Administration, and 11 to the BBG. Three additional full-time permanent positions, providing passport and visa support, will transfer to the administrative office supporting the Bureau of Educational and Cultural Affairs and the Office of International Information Programs (two) and the administrative office supporting the Bureau of Public Affairs (one).

Four ACDA full-time permanent positions will transfer to the Bureau of Administration and two to the Nonproliferation Bureau. One additional full-time permanent position will also move to logistics from elsewhere in the agency.

## Positive Outcomes

Integration will permit State to expand its reengineering design to serve arms control, nonproliferation, and public diplomacy activities. The timing of the reorganization will permit the incorporation of USIA and ACDA business requirements and practices into new logistics process implementation.

Redundant operations (e.g., warehousing, diplomatic pouch and mail) will be merged or phased out to permit further streamlining. Additional economies of scale will over time result from including USIA and ACDA requirements in contract and vendor management initiatives and from consolidating distribution channels and logistics systems.

# VII. Management Functions

# H. Overseas Facilities

## Current Responsibilities

State's Foreign Buildings Office (FBO), located in the Bureau of Administration, acts as the single real property manager for U.S. government diplomatic and consular property abroad. FBO activities include: determining building funding priorities; design, construction, acquisition, sale, maintenance, and utilization of real properties; use of sales proceeds; and providing direction on foreign buildings matters to regional bureaus and other agencies. FBO already provides a broad array of these services to ACDA and USIA.

## Personnel

FBO has 382 full-time permanent positions domestically and 174 Foreign Service full-time permanent positions (primarily facilities managers) overseas.

The overseas property management responsibilities of ACDA's Executive Director in Geneva are limited to serving as the administrative liaison with the U.S. Mission there and the U.S. Embassy The Hague. ACDA has no full-time positions with overseas property management responsibilities.

USIA has 10 full-time permanent positions in the Bureau of Management responsible for design, technical assistance, overseas procurement, safety, and facilities security.

## Key Issues Considered

### · Consolidation

Consideration was given to physical consolidation of all USIA overseas activities into current State facilities, but it was determined that such a collocation would be prohibitively expensive.

### · Representational Considerations

Representational housing, china, glassware, and silverware are not provided for any heads of section at State. This will be a change for the USIS Public Affairs Officers (PAOs), who currently, as head of an agency at post, automatically receive such items. Post Housing Boards will give appropriate consideration to functional needs when making assignments for PAOs arriving from the summer of 1999 onward.

## Proposed Integration

ACDA's and USIA's existing functions will be incorporated into FBO, building on FBO's broad mission, experience, and scope of operations, and the extensive property management services FBO already provides to both ACDA and USIA. Support activities will continue without interruption.

USIA staff, including designers, architects, physical security personnel, safety officer, and facilities security personnel will join FBO. Personnel transferred from USIA to FBO are expected to assume duties closely related to their current activities. Because ACDA does not dedicate full-time resources to property management, no personnel will be transferred.

At overseas locations all agencies will operate under a unified Housing Board. Joint State/USAID regulations will be issued on utilizing a single housing pool for short-term leased units.

## Positive Outcomes

More comprehensive services and programs will be available for all personnel in the areas of safety, security, and in-house construction and design expertise.

Longer-term implementation of integrated facilities management overseas will result in more efficient utilization of space, reduced service costs, and fewer personnel necessary for space management.

# VII. Management Functions

# I. Overseas Operations

## Current Responsibilities

State has an overseas presence at some 260 locations worldwide. Most of these include not only State personnel but personnel from many other agencies as well.

USIS (the United States Information Service, as USIA is known overseas) currently has a separate agency identity within the embassy. A Public Affairs Officer (PAO) heads the USIS unit with its own resource allocations. In practice, however, public diplomacy functions are already partially integrated at post. PAOs consult regularly with the Ambassador and country team colleagues, and USIS country program plans track closely with overall mission goals and objectives. USIA already receives many administrative services from State, although USIS operations provide varying degrees of their own administrative and program support.

ACDA's most significant overseas presence is in Geneva, where it is engaged in several critical roles, including supporting ongoing arms control negotiations in the Conference on Disarmament. In The Hague, ACDA leads the U.S. Delegation to the international organization implementing the Chemical Weapons Convention; and, in Vienna, it has staffs addressing implementation and adaptation of the European conventional arms control agreements and the Comprehensive Test Ban Treaty. Currently, ACDA receives most of its overseas administrative services from State.

## Personnel

State's overseas presence includes 4,100 American and 7,600 full-time permanent Foreign Service National (FSN) positions.

000363

USIA's area offices overseas would encompass 191 locations with 478 full-time permanent American positions and 1,958 full-time permanent FSNs (not including the 30 which are shifting to the BBG), plus an additional seven Americans who are carried on USIA Washington's rolls.

ACDA's three overseas locations are staffed by fourteen full-time permanent positions.

# Key Issues Considered

**Consolidation at Small Posts --** Personnel at smaller posts often perform both program and administrative functions; thus it is more difficult to realign duties to consolidate program and administrative support functions into separate positions.

**Consolidation of USIS and State Information Systems -** Information technology support activities are an integral component of USIS and State operations at overseas posts. In some instances, USIS computer support personnel may have program responsibilities involving contact with foreign publics and development of program products, as well as specialized technical responsibilities. State information systems personnel at posts have responsibility for communications and office support networks, as well as for systems that support program activities, such as consular work. The goals for consolidating USIS and State information systems overseas are to:

· Maintain the level and quality of all computer systems and applications;
· Use skilled computer personnel (likely to be in short supply) to the maximum benefit of all operations at post;
· Develop and implement a post plan to fully integrate all computer system operations.

This is a case where additional changes in position allocation may occur over the near term as experience dictates.

# Proposed Integration into State

USIS overseas positions will be transferred to the respective regional bureaus, with appropriate field budget transfers as well. The PAO will head the embassy public diplomacy section and report to the Deputy Chief of Mission. The public diplomacy section will be on a par with the consular, economic, administrative, and political sections in an embassy. Current USIS Branch Public Affairs offices, located where there are no State offices, will be re-titled in line with State nomenclature.

In keeping with the principle that the core functions of USIS will be preserved, the composition of the public diplomacy section and its resources will not drastically

change (445 full-time permanent American positions). Several functions closely tied to public diplomacy such as program planning and budgeting, program logistics, and grant administration will remain in the public diplomacy section. FSNs with these functions will remain in the public diplomacy section (1,720 full-time permanent positions).

General administrative functions (e.g., personnel, financial management, transportation, and information technology) will be integrated with the administrative section. USIS executive officer positions (26) will become State administrative positions, as will seven USIS regional management

000364

officer positions. FSN positions with purely administrative duties will be assigned to mission administrative sections (238 full-time permanent positions). Further adjustments may also be made as circumstances warrant. Additionally, 30 full time permanent foreign national positions are being transferred to the BBG.

Six full-time permanent foreign national positions, currently providing printing services in Vienna, will shift to the Bureau of Administration.

In Geneva, interagency arms control delegations will be supported administratively by the U.S. Mission. Support functions currently performed by ACDA will transfer to the mission's administrative section, with provision for a conference services officer to coordinate arms control delegation requirements.

## Positive Outcomes

The Country Team approach will continue, with preservation of the strong role of public diplomacy.

Public diplomacy and arms control and nonproliferation functions will be supported effectively at overseas posts.

Integration of administrative support will provide a more streamlined structure with potential for future savings.

# VII. Management Functions

# J. Records and Publishing Services

## Current Responsibilities

Within State's Bureau of Administration, the Deputy Assistant Secretary for Records and Publishing Services (A/RPS) is responsible for a variety of information-related programs and functions. A/RPS' activities include all information programs covering access, privacy, and national security classification and declassification management (mandated by the Freedom of Information Act, Privacy Act, and Executive Order 12958, among others); traditional records management; congressional and judicial document production; central archives; research; and State's Library. Also under the A/RPS umbrella are the Multi-Media Publishing Services operation (i.e., Printing) and Directives Management (including regulations and Paperwork Reduction Act).

ACDA's and USIA's related information programs are located in a number of different organizations including the USIA's General Counsel's Office (GC), Bureau of Management (Office of Administration, M/A) and Bureau of Information (I), and ACDA's Bureau of Intelligence, Verification, and Information Management, and its Office of Public Affairs.

## Personnel

000365

State's A/RPS has a staff of 237 full-time permanent positions.

Parallel programs in USIA involve full-time permanent positions in: printing operations both at headquarters and overseas, 19 American and 91 foreign national positions (I, M/A and EEN); directives staff, two positions (M/A); library and records management, four positions (I); FOIA operations, four positions (GC); and declassification operations, 13 positions (GC).

The records management and declassification programs are the only related programs in ACDA, involving one full-time permanent employee in the Office of Public Affairs and one in the Intelligence, Technology, and Analysis Division of the Bureau of Intelligence, Verification, and Information Management.

# Key Issues Considered

### · Statutory Compliance
Since many of the program activities are driven by legal mandates (e.g. FOIA, Privacy Act, E.O. 12958, Federal Records Act) or traditional organizational activities (such as libraries and printing plants), there is considerable commonality in function and programmatic requirements.

### · Corporate Archives
Throughout its history, State has maintained a central record collection documenting the conduct of foreign policy and its other business requirements. Neither ACDA nor USIA has such a resource, and thus there is a need to integrate records life-cycle requirements as an ongoing part of program responsibilities, as well as a corporate record resource.

# Proposed Integration into State

The reorganization of State, ACDA, and USIA entities will be relatively easy to accomplish because they are essentially alike. For example, there are already joint State/ACDA/USIA regulations; USIA's historical declassification review activity required by E.O. 12958 is already collocated with State's facility; and the ACDA Library has already been merged with State's. Because separate facilities will continue for some time, a Library annex will temporarily remain at the former USIA headquarters.

From USIA, eight full-time permanent declassification positions will transfer to the Bureau of Administration, including three that will provide this service to the BBG on a reimbursable basis; the remaining five positions will provide public diplomacy support in the functional bureaus and staffs. Two full time permanent FOIA positions each will transfer to the Bureau of Administration and to the BBG.

Two ACDA positions will transfer to the Bureau of Administration.

Two USIA full-time permanent positions for domestic library support, two for records management, and two for directives will transfer to the Bureau of Administration.

Nineteen full-time American positions (14 domestic and five overseas), and 91 full-time permanent

000366

FSN positions (85 in Manila and six in Vienna) will transfer to the Bureau of Administration to provide printing services. One full time permanent American position will transfer to the BBG.

## Positive Outcomes

Integrated programs will enable the new organization to implement best business practices -- especially through leveraging technologies -- and thereby increase the potential of achieving increased economies and efficiencies.

# VII. Management Functions

# K. Security

## Current Responsibilities

State, ACDA, USAID, and USIA all have similar responsibilities for ensuring the protection of personnel, facilities, and national security information. However, State is responsible for managing and providing security at overseas posts.

At State, the Bureau of Diplomatic Security (DS) manages the security programs, including formulating security policy and implementing programs to provide a secure environment for the conduct of U.S. diplomacy.

ACDA's Security Division is in its Office of Administration.

USIA's Security Office is part of the Management Bureau.

USAID's Security Office reports to the Administrator.

## Personnel

DS has 800 full-time permanent positions. An additional 371 American positions and 317 foreign national positions perform security-related functions overseas under the regional bureaus.

ACDA has six full-time permanent positions, plus one reimbursable position, in its Security Division.

USIA has 48 full-time permanent positions in its Office of Security.

USAID has 35 full-time permanent positions in its Office of Security.

## Key Issues Considered

### · ACDA Investigations
ACDA by law has been required to contract for personnel investigations with the successor privatized entity formerly in the Office of Personnel Management. DS will take on this responsibility

000367

with no increase in investigations staff.

**· Integrating Systems**
Because of cost, there will not be an immediate standardization of common domestic security systems. Separate systems will continue for at least 12-18 months beyond the effective date of integration. Systems in the former USIA building will gradually be converted to the State system.

**· USAID Security Office**
Because of recent Congressionally mandated changes to the structure of USAID's security function, State and AID will review their operations to determine what further coordination can be achieved.

## Proposed Integration into State

There will be complete integration of the personnel and material resources of the ACDA and USIA security units into DS. All currently conduct operations in accord with the same or similar executive orders, statutes, and regulations. Individual customer demands and requirements are also similar in each agency. Personnel from each agency possess the same qualifications, experience, and security clearances.

From ACDA, four full-time permanent positions and one reimbursable one will transfer to DS, one full-time permanent position will transfer to the Bureau of Intelligence and Research, and one full-time permanent position will transfer to the Executive Office supporting the bureaus under the direction of the Under Secretary.

From USIA, 32 full-time permanent positions will transfer to DS, two to the Bureau of Administration, one to the Bureau of Information Resource Management, and 13 to the BBG.

## Positive Outcomes

Reorganization will integrate the security responsibilities of two agencies into DS, making it better able to promote efficiency, ensure uniformity of standards, and provide better service. After integration is complete, DS will be able to further streamline its operations and eliminate overlapping overseas coverage.

# VII. Management Functions

# L. Statutory Procurement Functions

## Office of the Procurement Executive (A/OPE)
## and
## Office of Small and Disadvantage Business Utilization (A/SDBU)

000368

# Current Responsibilities

**A/OPE** is responsible for establishing overall State guidance and regulations regarding acquisition and grants policies and procedures for both domestic and overseas contracting activities in accordance with statutory and regulatory requirements.

**A/SDBU** is responsible for the implementation and supervision of State's procurement activities related to small and disadvantaged business and women-owned business in accordance with statutory and regulatory requirements.

**USIA's Procurement Executive** has similar policy responsibilities. This office also performs the SDBU function, which at State is performed by a separate office, A/SDBU. USIA's unit also has two operational functions which award and administer grants and contracts.

**ACDA** has an operational office and no formal policy function.

# Personnel

A/OPE consists of 15 full-time permanent positions. A/SDBU consists of five full-time permanent positions.

In USIA, the Policy and Procedures Staff of their Office of Contracts has four full-time permanent positions, which perform both the acquisition and grant policy function and the SDBU function.

ACDA has no formal policy program.

# Key Issues Considered

· **Authority**
The best approach is to maintain the current centralized policy oversight system, which operates well at both agencies. The operational work of awarding and administering contracts and grants will continue to be handled within the various contracting activities.

· **Overseas**

State will continue to provide centralized acquisitions and grants expertise and training to overseas contracting and grant officers.

# Proposed Integration into State

USIA's Policy and Procedure Staff will be transferred as follows: two full-time permanent positions to the Bureau of Administration (one to A/OPE and one to A/SDBU), and two full-time permanent positions to the BBG.

No staff from ACDA will be transferred.

## Positive Outcomes

Enhancing efficiency, there will be one acquisition and grant policy system, and one small and disadvantaged business unit. This constitutes "one-stop shopping" for customers of these services.

# VII. Management Functions

# M. Training

## Current Responsibilities

At State, implementation of training policies and programs is vested in the Director of the Foreign Service Institute (FSI). FSI provides language, area studies, career development and functional training to employees of State and other agencies.

USIA has a training division within its Office of Human Resources.

ACDA's Office of Personnel and General Services (A/PGS), reporting to the Director of Administration, deals with training matters. ACDA contracts with government and non-government vendors to provide training.

## Personnel

State's FSI has 394 full-time permanent positions and 178 in its training complement.

USIA's Office of Human Resources devotes 16 full-time permanent positions to its training activities and has a training complement of 45.

ACDA's Personnel Office devotes less than one full person year to the training oversight function.

## Key Issues Considered

Training will be a key component in the successful integration of USIA and ACDA into State. The new Division of Public Diplomacy in FSI's School of Professional and Area Studies will be charged not only with tradecraft training for public diplomacy professionals, but with assuring that an understanding of public diplomacy as a critical tool of foreign policy is reflected throughout the FSI curriculum.

Training will also be critical to addressing employees' concerns and needs for information throughout the transition process and to ensure that employees of State, USIA and ACDA have the training required to make integration succeed.

## Proposed Integration into State

000370

Thirteen USIA full time permanent positions from its Human Resources training division will transfer to FSI and one will transfer to the Bureau of Personnel. Two positions will transfer to the BBG. ACDA has no full-time trainers and no positions will be transferred. Also, one full-time permanent position will transfer to FSI from USIA's Office of Administration in its Management Bureau.

USIA training complement, equivalent to 45 full-time permanent positions, will shift to FSI.

FSI's School of Professional and Area Studies will be restructured to include a new Division of Public Diplomacy. USIA's emphasis on technology training and foreign national personnel training will continue.

## Positive Outcomes

Integration of USIA and ACDA training programs into the Foreign Service Institute will ensure that foreign affairs professionals from a wide array of disciplines have increased opportunities to understand the central role of arms control, nonproliferation and public diplomacy in American foreign policy. ACDA and USIA employees joining State will have access to FSI's broad range of course offerings, including language and area studies, professional development, and management and leadership training.

Bringing former ACDA and USIA employees together in the classroom with their new State colleagues will also build a common sense of mission, professionalism, and esprit for all involved.

# VIII. Reinvention

Reinvention is a fact of life at State, and a dynamic process. The Secretary has called for continual reinvention of State's operations in the face of declining budgets, increasing demands, novel challenges, and new technologies. Her confidence in the creativity of State's people - its main resource - and insistence that they be allowed to make important decisions are a firm foundation for the integration of foreign affairs agencies. With the introduction of new expertise and backgrounds, integration will be a very significant step forward in making our foreign policy more agile, coherent, and relevant for the new challenges of the 21st century.

It is commonplace to note changes in the world. But it is worth highlighting those that directly affect the context in which State operates. In the past decade, many new international actors - countries, corporations, and non-governmental organizations - have joined the international community. Subjects often hidden from international view - internal rivalries and hatred, especially - have become regular subjects of international action. Information moves faster and with fewer restrictions than ever before. Thankfully, citizens around the world have become more important than ever in the formulation, execution, and evaluation of the way governments operate.

In the last six years, State's operating budgets have declined by 17% in real terms, forcing us into a substantial and ongoing reorientation of our priorities. Our discretionary Economic Support Fund

000371

budget has been cut by two-thirds, leaving us with minimal funds to respond to unanticipated emergencies. During this time, the number of U.S. embassies has increased by 16, and State's consular workload -- which is required to protect America's borders and Americans overseas -- has increased by 22%. Meanwhile, turbulence around the world from the Balkans to the Persian Gulf to Central Africa and East Asia has generated new threats to American interests and new demands on America's international affairs resources.

The current reorganization builds on efforts undertaken throughout the 1990's to improve the efficiency and effectiveness of State operations.

These efforts include the State 2000 exercise, undertaken in 1992-93; the National Performance Review in 1993; the Strategic Management Initiative of 1995 and the creation of the Strategic Plan for International Affairs in 1997.

These initiatives reflect an ongoing, continuous effort within the Department to eliminate duplication, ensure accountability, set clear strategic goals and achieve results. They reflect, as well, the increased importance of economic and global issues, and the need to obtain and install improved information technology.

A vital lesson of the past decade is that management is a dynamic process. Plans developed one year may need to be changed as early as the next, in response to changing events.

For example, no planner a decade ago would have envisioned the need for the U.S. to open 14 new embassies within the territory of the then-still existing Soviet Union. But we have done this, in order to protect our vital security interest in preventing the spread of nuclear arms and expertise, to ensure the flow of petroleum to world markets, and to promote democratic practices, including economic reform.

In coping with change, State has not sought not so much to reinvent the wheel, but rather to find new uses for the wheels we have. In Bosnia and Herzegovina, we have developed a range of partnerships, with institutions that include NATO, the OSCE and the Office of the High Representative, to carry out the military and civilian components of the Dayton accords. In Kosovo, the OSCE is organizing a ground verification force, backed by a NATO-led extraction force, both of which complement diplomatic efforts sponsored by the Contact Group and humanitarian relief efforts provided by the UN and others.

The purpose of such arrangements is to ensure that the United States does not bear an unfair share of the costs and risks of such operations, and to take advantage of the specific capabilities different institutions are able to contribute to such missions.

We have also been retooling our normal operations. The Secretary forged a strong basis for policy reinvention by forming the Under Secretaries into a Corporate Board chaired by the Deputy Secretary, and strengthening the authority of the Assistant Secretaries to emphasize their primary policy and resource allocation role. These innovations have fostered increased strategic vision and operational effectiveness. The introduction of strategic planning has given the Secretary a powerful

000372

new tool for aligning resources with policy and for managing government-wide efforts to achieve U.S. international affairs goals. The International Affairs Strategic Plan provides a conceptual framework of national interest and strategic goals. The new Mission Performance Plans for overseas missions and the Bureau Performance Plans for headquarters offices link resources and programs, providing better integration of U.S. activities, and building a structure for measuring performance. This new orientation to showing results is entirely consistent with the Government Performance and Results Act (GPRA).

We are also working to ensure that we have the right people and expertise in the right places overseas. The Overseas Staffing Model has helped to set priorities and define staffing levels for our posts abroad. We have expanded significantly the place of other agencies in our embassies. This expertise, whether in development, international crime, environmental matters, arms control, nonproliferation, public diplomacy, or other specialties, gives our ambassadors the tools they need to represent America adequately. The heads of these posts now are required to prepare annual mission plans that integrate all these multi-dimensional activities into a coherent strategy tied to resources. This provides for accountability.

We are changing the location and size of our missions as necessary. In several countries we have established one- or two-person posts so that American interests are represented on the ground where important decisions are made. Our presence in Banja Luka and Mostar in Bosnia has been integral to implementation of the Dayton Agreement. The Secretary has just announced the opening of a small American Presence Post in Lyon, France, to reflect U.S. interests in that important commercial center. When appropriate, we have established regional centers so that transnational issues can be handled consistently throughout affected areas rather than by officers separated by boundaries.

State has made several organizational changes which have enhanced effectiveness. The newly-created Bureau of Western Hemispheric Affairs, which now includes Canada, emphasizes the importance of NAFTA and is an example of our strengthened policy focus on global issues and economics. State has created a Chief Information Officer position and consolidated all domestic information technology (IT) personnel into the new Bureau of Information Resource Management (IRM) under the CIO's leadership, focused on IT issues and modernization. State has improved its crisis management capabilities by combining its three separate 24-hour emergency operations centers into one, merging its security and intelligence staffs with its Operations Center to provide one central monitoring, alerting, and crisis management organization. The unified State Operations Center has strengthened links with sister centers at other government agencies to coordinate their activities and eliminate redundancies. State has worked closely with other agencies to carry out a review of the interagency crisis management process, which clarified agency roles and responsibilities for handling crises abroad.

The 1990s have also seen a steady stream of innovative management initiatives at State. The development and implementation of the ICASS system is an impressive example of State's creativity and leadership. Melding best practices and incorporating a wide range of ideas, State has built a fair, transparent system that benefits all agencies with personnel overseas. ICASS has generated much new thinking on other ways to provide improved administrative support to the overseas workforce. State has reached out and joined forces with other foreign affairs agencies, offering to share its

000373

contracts and support structures, in order to consolidate overlapping administrative support functions. These efforts have succeeded, achieving significant efficiencies. State, ACDA, USIA and USAID now share a common travel management contract, while State, USIA and USAID use the same contracts for packing, storing and shipping household effects for employees transferring abroad. State's transportation division provides cost effective services to 30 other government agencies, using the Working Capital Fund as an effective partnering medium.

State undertook a major overhaul of its logistics system, conducting a classic reengineering effort to build a nimble structure featuring improved responsiveness and customer service. The logistics acquisition system now incorporates electronic commerce, eliminating paper transactions and reducing processing time for some procurement actions from two weeks to one day. State has established an Internet acquisition website, which offers the vendor community information on worldwide procurement opportunities at State and provides procurement guidance to vendors and contracting officers alike.

State has revitalized its capital planning process for facilities, a critical high-cost support area. Its asset management program identifies surplus overseas properties for sale, generating capital to construct new facilities.
To keep those facilities in order, State has established a professional facilities maintenance program to meet the challenge of providing safe, operational facilities in difficult security environments. Emphasis on energy efficiency has translated into significant cost avoidance at our high energy-consumption posts.

Domestically, State has pursued a facilities plan to consolidate its operations in the Foggy Bottom area. By acquiring less expensive office space adjacent to Main State, it has closed distant annexes in more expensive leased space, saving money and increasing efficiency by bringing more employees onto the Foggy Bottom campus.

Computer modernization has been a difficult issue. State began the decade with an enormous installed base of outmoded legacy systems and few resources available for modernization. IRM is aggressively pursing capital investment, desktop productivity systems and the expansion of e-mail and shared information systems. To target scarce funds most efficiently, State has introduced an IRM Program Board to screen proposed projects and has adopted an agency-wide strategy for information technology modernization called "ALMA" -- A Logical Modernization Approach. Under ALMA, State has focused on best practices and commercial off-the-shelf systems in order to achieve efficiencies at the lowest cost.

State's emphasis on innovation has realized additional benefits through new programs such as the Diplomatic Telecommunications Service Program Office's International Voice Gateway, which makes better use of State's worldwide telecommunications network to extend and improve voice capabilities at overseas posts, saving millions of dollars annually for all agencies. Another example is the Domestic Enterprise Backbone Network (E-Net), which provides voice, video and high-speed data to users at a lower cost, with improved performance, flexibility and security. E-Net is centrally managed by the IRM bureau and paid for by its customers on a fee-for-service basis.

The Consular Affairs Bureau has been highly successful in applying technology to meet the growing demand for visa and passport services. The use of visa fees, as noted above, has reduced pressure to obtain additional funding for these enhancements. Increasing the number of visa waiver countries has helped significantly in managing the workload, and State is pursuing additional prospects for the visa waiver program consonant with border security.

Just as ICASS revolutionized the service relationship between State and other agencies overseas, increased reliance on the Working Capital Fund has brought similar dramatic change in State's domestic support structure. To improve accountability and ensure that support services were being used efficiently, State expanded the use of the Working Capital Fund (WCF) to provide a variety of services, such as motor pool, telecommunications, and publishing and graphics services. Under the WCF system, customers pay for services they actually use, instead of drawing free services from a centrally-funded provider. Introducing a supply and demand dimension has brought more efficient operations by helping service providers tailor services to areas of highest demand and making customers aware of, and responsible for, the costs of services they consume.

State has undertaken a number of personnel initiatives to improve the effectiveness and productivity of the workforce. The American Family Member Associates program, which makes greater use of the skills of Foreign Service family members at overseas posts, and increased use of local hiring programs are providing much needed support staffing at overseas missions at lower costs. The Consular Associates program is providing us with rapid reserves at our busiest consular sections. State strengthened its Foreign Service promotion precepts and renewed its emphasis on creating truly multifunctional officers to assure our Foreign Service cadre will have the depth of experience and expertise in regional, multinational and global issues as well as the resource management skills required to guide our nation's foreign policy in the 21st century. State has reinvented career development programs for its Civil Service workforce to increase training and mobility, including expanded opportunities for service at overseas posts. Chaired by the Under Secretary for Management, State's Council on Equality reflects Secretary Albright's commitment to increasing State's diversity and ensuring a fair and supportive workplace for all of State's Civil and Foreign Service employees.

The most important, and difficult, form of reinvention is cultural - a challenge to the way we operate. The Secretary has made clear that diplomacy requires outreach - far beyond the ministry buildings too often thought of as the home of diplomats. This outreach starts with the American people, who must understand the value of our foreign policy, for without their support our foreign policy cannot succeed. Our Bureau of Public Affairs has redesigned its outreach efforts to contact opinion leaders, involved public groups, and other affected by our foreign policy.

We are also reaching for new ways to conduct policy. Around the world citizen groups and the private sector have emerged as powerful voices in diplomacy. The Secretary has insisted on finding ways to identify the concerns of those groups, work with them when consistent with U.S. interests, and communicate closely when our interests diverge so that U.S. concerns will be understood. This will require a continual commitment by State to openness, outreach, and public diplomacy. Our advances in information technology are intended to facilitate such communication; our reinvention of public affairs is meant to build on the efforts we have made; and the integration of public diplomacy

000375

will make us even more effective in achieving these goals.

# IX. Implementation

Following the submission of this Report, a process and structure will be established to implement the integration of USIA, ACDA, and parts of USAID into State. The structure will include implementation teams for specific areas, a supporting infrastructure to manage the process, and a leadership group to provide strategic direction, make decisions, and set priorities. It will also provide an avenue for consultations with the Congress,

## Implementation Teams

Implementation teams will be established to execute specific tasks in the integration plan. Leadership for the teams will be drawn from the responsible functional areas in the current organizations to assure that those who implement the plans will be responsible and accountable for the results. (For example, a senior member of the Director General's staff will chair the human resources team; a senior member of the Bureau of Administration's staff will head the facilities team.) The first task for each team will be to develop a detailed action plan and timeline for implementation.

## Special Coordinator for Reorganization

An Office of the Special Coordinator for Reorganization will be established to provide the infrastructure for the implementation process. The Coordinator will have overall responsibility and will chair the Reorganization Coordinating Committee (see below). Day to day operations will be under the direction of a Deputy Coordinator assisted by a small staff which will facilitate the work of the implementation teams and identify issues that require resolution. The Special Coordinator's staff will also include a communications unit which will serve as the focal point for outreach to headquarters and field personnel to ensure that implementation of the reorganization plan is conducted in a transparent, open environment. The unit will regularly seek feedback from employees about issues of particular concern. The Coordinator and Deputy Coordinator will work closely with the respective legislative affairs, public affairs, personnel, legal offices, and others, will respond to Congressional interests, as well as those of other agencies and the public, as implementation moves forward.

The Special Coordinator's Office will coordinate all implementation tasks, direct production of a master action plan, and maintain master and project timelines. This office will coordinate among functional area responsibilities (e.g., space or payroll) to ensure orderly integration action among the different implementation tasks, track progress toward milestones, ensure best practices are considered, and identify any roadblocks to implementation.

## Coordinating Committee

A Coordinating Committee, chaired by the Special Coordinator, and composed of Assistant Secretary-level officials from each of the agencies, will provide strategic direction. The Committee will provide appropriate senior level support in resolving issues and keeping the integration effort on

schedule. The Chair will report regularly on the integration effort to the Corporate Board.

# Timeline

**ACDA:** All personnel (American and foreign national; full-time, part time, intermittent, temporary, when actually employed; and detailees) and funding related to ACDA integration will be transferred on April 1, 1999. Given the relatively small size of ACDA, and the fact that its personnel operate under Civil Service regulations, we expect that we will need to make only minor readjustments after that date. Implementation of office space changes will take longer but will be resolved before December 31, 1999, when the General Services Administration is scheduled to begin renovation of the space that ACDA currently occupies in the old wing of the State complex.

Overseas, on April 1, 1999, ACDA negotiating personnel will become State employees and will continue to operate as delegations to their respective entities, with administrative support assumed, to the extent that it is not already, by State administrative sections in the embassies or missions in the host cities.

**USIA**: All personnel (American and foreign national; full-time, part time, intermittent, temporary, when actually employed; and detailees) and funding related to USIA integration will be transferred by October 1, 1999. Differing Foreign Service regulations and policies will be conformed. Payroll, accounting and personnel systems will be coordinated. All personnel will be reassigned to positions in the new State organizational structure or the Broadcasting Board of Governors. During the six months that follow (October 1, 1999 to March 30, 2000), some personnel adjustments may be needed to provide for a more efficient and effective operation.

Given the overall shortage of office space in Foggy Bottom, and the upcoming renovation of the Main State complex, it will be some time before all current USIA program personnel can be relocated to Main State. Implementation will concentrate on establishing the office of the Under Secretary, combining Executive Secretariat functions, and relocating USIA area office personnel and other public diplomacy personnel who will be attached to State's functional bureaus to Main State. Efforts will also commence to relocate USIA management personnel to Main State and the various State annexes and support facilities where parallel functions are currently carried out, both in the Washington area and elsewhere in the United States and overseas.

Overseas, on October 1, l999, USIS personnel will become part of the responsible State bureau for their respective operation, and will become part of the State contingent of the embassy, mission, or consulate where they are located, or continue to operate Branch Public Affairs offices where there is no State entity present. Those engaged in programmatic activities will become members of public diplomacy sections. Those engaged in basic administrative operations will be assigned to State administrative sections. Given the relatively large number of foreign national employees involved, and the fact that many now perform multiple duties on behalf of USIS, or operate and maintain equipment that is not common with State, minor additional staffing adjustments for foreign national employees can be anticipated over the next several years as restructuring and retirements occur, and equipment changes.

Also, on October 1, 1999, USIS regional and support operations will transfer to State. Such

000377

operations will remain intact or become part of one of State's regional support operations. Though no major changes are anticipated, minor adjustments in regional responsibilities and locations may occur as part of integration during the next two or three fiscal years.

Conforming changes will be made as appropriate to any orders or directives, including regulations, that may be required to carry out the integration.

# X. Other Reporting Requirements

# Recommendations for Legislation Necessary to Carry Out Changes Relating to Personnel and Incidental Transfers

The Act provides broad authorities to State for transfers of personnel and incidental transfers in connection with reorganization. To date, State has not identified any need for additional legislation necessary to carry out the changes set forth in the Act with respect to personnel and incidental transfers.

# Additional Reporting Requirement On Funding For Public Affairs And Public Diplomacy Programs

Pursuant to Sec. 1333 (d) of *The Act*, the following additional information is provided:

(1) $9,860,000 was obligated by the Department of State for public affairs programs during fiscal year 1998, and on the personnel and support costs for such programs. As of September 30, 1998, $9,058,000 was expended.

(2) $1,129,067,000 was appropriated to USIA for its public diplomacy programs during fiscal year 1998, and on the personnel and support costs for such programs. As of September 30, 1998, $1,095,127,000 was obligated and $851,859,000 was expended.

(3) In FY 2000, USIA public diplomacy programs and related program support functions will be merged with the Department of State. The President's budget for FY 2000 requests $696,320,000 for former USIA public diplomacy activities. Of this amount, $233,320,000 is requested for bureaus and offices directly conducting former USIA public diplomacy activities, and $257,700,000 is requested for educational and cultural exchange and information activities. Other supporting resources will be aligned to functions directly related to regional, functional, and management staffs and bureaus of the Department. For former USIA public affairs activities that will be merged with the Department's Bureau of Public Affairs, the FY 2000 request seeks $6,545,000. Funds to be transferred from USIA for public diplomacy programs will be transferred effective October 1, 1999 and will consist of unliquidated balances and unobligated balances for no-year and multi-year appropriations.

000378

The BBG will submit its own fiscal year 2000 budget.

[end of document]

Plans, Resources, and Reorganization Home Page
U.S. Department of State Home Page

000379

# EXHIBIT 20



# EXHIBIT 21



**Elon Musk** ✓ 🅧
@elonmusk

Subscribe

 

This building is now occupied by @CBP



> 💲 **Department of Government Efficiency** ✓ @DOGE · Feb 7
> Unburdened by what has been.

3:10 PM · Feb 7, 2025 · **31.9M** Views

💬 5.6K    🔁 28K    ❤️ 215K    🔖 4.6K    ⬆️

J   Post your reply     Reply

**Kreately.in** ✓ @KreatelyMedia · Feb 7   🅧 ···
It's over for Democrats

💬 1    🔁 6    ❤️ 38    📊 1.7K    🔖 ⬆️

🏛 🌹 **PeriklestheGREAT** 🌹 🏛 **"Vox P...** ✓ 👤 @Perikles... · Feb 7 🅧 ···
🔥US AID became a PIGGY Bank used by the LEFT to FUND UNPOPULAR
& often ILLEGAL policies both domestically & internationally ! Good
Riddance ! 🔥

DDAVCO *ComicallyIncorrect.com*

000383

# EXHIBIT 22





# EXHIBIT 23

000387



ABOUT    DOSSIERS ⌄    AGENCIES ⌄    TIPLINE

SEARCH



# DEI Watchlist: America's Bureaucrats Most Abusing Diversity, Equity and Inclusion

The DEI  Watchlist is focused on exposing the unelected career staff driving radical Diversity, Equity, and Inclusion (DEI) initiatives within the federal government.

The real power often lies with behind-the-scenes bureaucrats who push divisive DEI agendas that undermine merit, fairness, and accountability. By uncovering these hidden influencers and their failures, we aim to restore integrity and common sense to our government. Join us in rejecting the politicization of federal agencies and standing up for policies that reflect real American values.



000388

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/26/25   Page 394 of 959



ABOUT    DOSSIERS ⌄    AGENCIES ⌄    TIPLINE

# Top Dossiers



**EUNA M. AUGUST**

Deputy Associate Director for
Science, Office of Health Equity



**CHASTITY WALKER**

Deputy Country Director



**JOHN BALBUS**

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/26/25   Page 395 of 959

ABOUT      DOSSIERS ⌄      AGENCIES ⌄      TIPLINE

Secretary for Health



## SHUNTRICE HOLLOMAN

Diversity and Inclusion
Strategist at Office of Equity,
Diversity, and Inclusion (EDI)



## BRIAN KING

Director, Center for Tobacco
Products



## CAROLINA LUNA-PINTO

Acting Director, Office of
Minority Health

000390

Case 8:25-cv-00462-TDC   Document 23-1   Filed 02/20/25   Page 396 of 959



ABOUT       DOSSIERS ⌄       AGENCIES ⌄       TIPLINE



## DR. CHARLES LU

Branch Chief - The National
Institutes of Health



## BENITA HARRIS

Senior Public Health Analyst



## DR. SHAKIRA NELSON

Program Officer, Division of
Training, Workforce
Development, and Diversity -
National Institute of General
Medical Sciences (NIGMS)



ABOUT       DOSSIERS ⌄       AGENCIES ⌄       TIPLINE



## ANGELA HOLMES

Program Officer - National
Institute on Drug Abuse

# Sign Up to Get More Information

*Get the latest news and information about the fight to protect and defend America's values.*

**Name**

**Email Address**

**SUBMIT**

☐ I'm not a robot

reCAPTCHA
Privacy - Terms

000392



ABOUT    DOSSIERS ⌄    AGENCIES ⌄    TIPLINE



 

*A Project of the American Accountability Foundation*



 

*A Project of the American Accountability Foundation*

# EXHIBIT 24

000394



 News Room

# BIDEN'S BASEMENT

# LOCK THEM OUT!

## Employers Beware!

As a public service, we at Biden's Basement have spent the last four years identifying the people running our government, oftentimes creating or stoking one crisis after another. Our research has filled in the details about the Biden administration's non-governmental affiliations, special interest influences, activist contacts, and other pertinent information. It's been fun getting to know them.

Now, as a new administration takes the wheel, it's hard to bid farewell to the team that brought us extended pandemic lockdowns, immigration pandemonium, and $5 per gallon gas. So, Biden's Basement has retooled and repurposed to keep in touch with the policy ninjas that engineered the Afghanistan disaster, crippled American energy production, drove up inflation, and gave billions in taxpayer dollars to their extremist cronies. We want to know where the public servants land who rammed divisive woke politics into every corner of our government and who maintained the fiction that President Biden was "sharp as a tack."

000395

Case 8:25-cv-00462-TDC   Document 57-1   Filed 02/26/25   Page 401 of 959

So welcome to the new Biden's Basement. We're keeping track of Biden administration alumni and where they land. We know they're not going far – the siren song of The Swamp will persist. Folks who spent months "Trump-proofing" the Biden administration's "legacy" will want to stick around and admire their handiwork and chuck a wrench or two in from the outside if they can. Many appointees will use the revolving door to return to the special interests who financially benefited from this administration's policies – and not just the Chinese, Ukrainian, and Iranian ones. Others will seek to cash out while making grand promises to their new employers about their continued access with resistant career officials and knowledge of how their former agencies will operate.

They're hoping to get big jobs with large trade associations, lobbying shops, law firms, and corporate America as a reward for driving America into a ditch. The Basement will seek to Lock Them Out! Through tracking of where appointees land and which employers hire them with an expectation of benefiting their clients and corporate bottom lines, we will seek to ensure the new administration's agenda – and the agencies that implement it – are aware of those Biden-connected special interests trying to get in the building.

Beware future employers – this will not be a winning strategy for your shareholders or your clients!

**Search for a former Appointee or Employer**                                                    🔍

# UPDATES FROM BIDEN'S BASEMENT

First Name                    Last Name                    Email Address                    Subscribe

We want your help. If you have any additional information about an appointee that is or isn't in our database, or any corrections, let us know via email at info@insidebidensbasement.org .

© 2025 Biden's Basement. All rights reserved

000397

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

J. DOE 1, et al.,

                *Plaintiffs*,

      v.

ELON MUSK, *et al.*,

                *Defendants*.

Case No. 8:25-cv-00462-TDC

## Exhibit Index

**Exhibit 25:** OPM Memorandum, Guidance on Probationary Periods, Administrative Leave & Details (Jan. 20, 2025), https://perma.cc/4QGN-XZLP.................................................................398–401

**Exhibit 26:** Declaration of Peter Marocco with Exhibits.........................................402–422

**Exhibit 27:** Declaration of Joshua Fisher..................................................................423–425

# EXHIBIT 25



**UNITED STATES OFFICE OF PERSONNEL MANAGEMENT**

Washington, DC 20415

The Director

# MEMORANDUM

**TO:**        Heads and Acting Heads of Departments and Agencies

**FROM:**    Charles Ezell, Acting Director, U.S. Office of Personnel Management

**DATE**:      January 20, 2025

**RE**:          Guidance on Probationary Periods, Administrative Leave and Details

---

The U.S. Office of Personnel Management (OPM) is providing the following guidance to agencies regarding critical potential personnel actions.  Specifically, this memorandum deals with 1) probationary periods, and 2) administrative leave and details.

## I.        Probationary Periods

Probationary periods are an essential tool for agencies to assess employee performance and manage staffing levels.[1] Employees on probationary periods can be terminated during that period without triggering appeal rights to the Merit Systems Protection Board (MSPB).[2]

Generally, employees in the competitive service with less than one year of service, and in the excepted service with less than two years of service, can be terminated without triggering MSPB appeal rights.[3]  This applies to temporary employees on appointments "not to exceed" a date certain.[4]

No later than January 24, 2025, agencies should identify all employees on probationary periods, who have served less than a year in a competitive service appointment, or who have served less than two years in an excepted service appointment, and send a report to OPM listing all such employees to employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.  In addition, agencies should promptly determine whether those employees should be retained at the agency.

## II.        Administrative Leave and Details

---

[1] *See* U.S. Merit Systems Protection Board Report to the President and Congress, *The Probationary Period: A Critical Assessment Opportunity* (August 2005), https://www.mspb.gov/studies/studies/The_Probationary_Period_A_Critical_Assessment_Opportunity_224555.pdf.

[2] *Starkey v. Dep't of Hous. and Urban Dev.*, 2024 MSPB 6, ¶ 16; *Marynowski v. Dep't of the Navy*, 2012 MSPB 82, ¶ 4 (2012).

[3] *Forest v. Merit Sys. Prot. Bd,* 47 F.3d 409, 412 (Fed. Cir. 1995); *Holmes v. Merit Sys. Prot. Bd.*, 655 F. App'x 816, 818 (Fed. Cir. 2016); see also 5 U.S.C. §§ 7511(a)(1)(A), (C).

[4] *See Forest,* 47 F.3d at 410*; Holmes,* 655 F. App'x at 816.

    "Federal agencies have the discretion to grant paid administrative leave to employees to help manage their workforces when it is in their best interest to do so."[5] The flexibility given to agencies in using paid administrative leave reflects the fact that "heads of Executive agencies have broad authority to manage their organizations, including the authority to grant administrative leave, unless prohibited by law."[6]

    OPM regulations note four pertinent areas where paid administrative leave is appropriate: (1) "the absence is directly related to the agency's mission," (2) "the absence is officially sponsored or sanctioned by the agency," or (3) "the absence will clearly enhance the professional development or skills of the employee in the employee's current position," or (4) "the absence is in the interest of the agency or of the Government as a whole."[7] "An agency must retain the discretion to grant or not grant administrative leave in any circumstance based on agency judgments regarding mission needs."[8]

    Placing an employee on paid administrative leave may be an appropriate action where the agency component in which the employee works is being eliminated or restructured, or where the agency weighs changes to the individual's role at the agency as part of a workforce realignment. It also may be appropriate when a new agency manager determines that the absence of the employee from the office "is in the interest of the agency or of the Government as a whole."[9] Agencies are encouraged to use flexibilities associated with paid administrative leave as they implement agency restructuring initiatives or determine the best ways to manage agency components going forward.

    In addition, agency heads have broad discretion to detail employees "among the bureaus and offices of [their] department[s]" for up to 120 days by written order.[10] An agency may temporarily detail an employee to "unclassified duties."[11] Such details may provide additional

---

[5] *Administrative Leave, Investigative Leave, and Notice Leave*, 89 Fed. Reg. 10,2256-01 (Dec. 17, 2024).

[6] U.S. Office of Personnel Management, *Fact Sheet: Administrative Leave*, https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/administrative-leave/.

[7] 5 C.F.R. § 630.1403(a)(1).

[8] 5 C.F.R. § 630.1403(a)(4). OPM reiterates that while "[t]he effective date for these regulations addressing administrative leave (subpart N) and investigative and notice leave (subpart O) is 30 days after the date of publication," nonetheless "the compliance date is set as 270 days after the date of publication." 89 Fed. Reg. at 10,2257. That is, agencies must "revise and implement their internal policies consistent with the Act within 270 calendar days from the date OPM prescribes the regulations," and "[a]gencies are responsible for compliance with time limits provided for in the Act, these OPM regulations, and any related guidance." *Id.* OPM thus believes that agencies are not required to comply with the administrative leave rule and new regulations until September 13, 2025, the deadline for agencies to issue their own implementing regulations. **OPM requests that agencies not issue any agency-specific rules until such rules have been reviewed and approved by OPM.**

[9] 5 C.F.R. § 630.1403(a)(1).

[10] 5 U.S.C. § 3341.

[11] *Frankel v. Dep't of Educ.*, 17 M.S.P.R. 453, 455–56 (1983).

flexibilities to agencies during the transition period and as agencies undertake reorganization efforts and close offices.

Please do not hesitate to contact OPM if you have any questions regarding these matters at employeeaccountability@opm.gov, with a copy to Amanda Scales at amanda.scales@opm.gov.

cc: Chief Human Capital Officers (CHCOs), Deputy CHCOs, and Human Resources Directors

# EXHIBIT 26

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 1, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>ELON MUSK, *et al.*,<br><br>*Defendants*. | Case No. 8:25-cv-00462-TDC |

## DECLARATION OF PETER MAROCCO

I, Peter Marocco, pursuant to 28 U.S.C. 1746, hereby declare as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

2.  Since Thursday, January 30, 2025, I have performed the duties and functions of Deputy Administrator of the United States Agency for International Development (USAID). Since January 20, 2025, I have also served as the Director of Foreign Assistance at the Department of State (State). Previously, I served as a U.S. Marine and a Deputy Assistant Secretary at both the Department of State and the Department of Defense. Additionally, I served on a special assignment as the Senior Advisor for Intelligence and Security to the Secretary of Commerce and served as the Assistant to the Administrator at USAID, overseeing the Bureau for Conflict Prevention and Stabilization.

3.  On January 20, 2025, President Trump issued an Executive Order—"Reevaluating

1

and Realigning United States Foreign Aid"—directing a 90-day pause in foreign development assistance, to allow for an "assessment of programmatic efficiencies and consistency with United States foreign policy." *See* Executive Order, *Reevaluating and Realigning United States Foreign Aid* (Jan. 20, 2025), attached as Exhibit A. Further, on January 24, 2025, Secretary of State Rubio, consistent with that Executive Order, directed a "pause[]" on "all new obligations of funding, pending a review, for foreign assistance programs funded by or through the [State] Department and USAID." *See Secretary of State* ALDAC *re Executive Order on Review of Foreign Assistance Programs*, 25 STATE 6528 (Jan. 24, 2025), attached as Exhibit B.

4. In both my role as the Director of Foreign Assistance, which oversees USAID's delivery of foreign aid, and now in my role managing USAID's operations, my primary focus has been to develop a tracking system to achieve greater accountability of USAID's human resources and capital outlays across its global footprint. Accountability and effective controls are essential to ensuring that USAID's programs further, rather than undermine, the foreign policy and national interests of the United States.

5. To that end, beginning shortly after the President's Executive Order directed the 90-day foreign assistance pause on January 20, 2025, I made numerous requests for information about USAID's operations, programs, and compliance with the President's directives. In both of my roles, I have consistently found USAID's senior staff were unwilling or unable to provide basic compliance and oversight information. For example, senior professionals in USAID's Bureaus and finance, legal, and human capital groups were not able to identify who, when, and why dozens of specific, multi-

2

million-dollar payments were approved or disbursed in the days following the President's and Secretary's directives to pause most USAID disbursements and programs. USAID senior staff were not able to explain whether USAID's payments system contained any controls to ensure compliance with those directives and, if so, how those processes worked. After the Secretary approved waivers to permit specific programs or activities to continue, USAID staff have been consistently unable to identify which specific payments were affected by the waivers and should be released for disbursement. It took more than two days for USAID senior staff to produce a list of overseas personnel and their physical location despite repeated and direct requests.

6. This lack of clear or timely information sharing caused grave concern about whether USAID was faithfully following the President's and Secretary's directives. Those concerns were amplified when, in the days just before and following Secretary Rubio's directive, USAID leadership became aware that a group of USAID employees were not complying with the President's Executive Order and the Secretary's order and continued to permit new funding obligations paused by those directives. In the days following the Secretary's order, USAID leadership conducted a review of USAID operations and identified certain employees who were responsible, directly or indirectly, for permitting the unauthorized flow of funds in violation of these Presidential and Secretarial directives.

7. Moreover, the noncompliance identified by USAID leadership raised serious, systemic concerns about the management and processes governing USAID. As articulated by Secretary Rubio, and consistent with the views of the President, USAID's foreign assistance processes reflected signs of severe inefficiency, and a substantial number of

the programs funded by USAID neither substantially benefited the American people, nor reflected the priorities of the President and Secretary. Many of USAID's programs substantially overlap, conflict, or duplicate functions at the Department of State, which often leads to discord in the President's ability to carry out foreign relations with one voice. Furthermore, many of USAID's pre-existing programs were in conflict with the directives and priorities of the President and Secretary, and therefore were inconsistent with the public interest and foreign policy judgments of the Executive Branch. Given the scale of these programs, an *ad hoc* review of these conflicting programs would unduly burden the execution of the President's other foreign policy priorities. A blanket pause with a waive-in process was the more efficient and effective path.

8. In light of these problems, on January 30, President Trump directed Secretary of State Rubio to perform the functions and duties of the Administrator of USAID in an acting capacity; the prior Acting Administrator returned to his prior position as Chief Information Officer. Several days later, Secretary Rubio sent a letter to Congress, formally notifying them, consistent with applicable law, including sections 7063 and 7015 of the Department of State, Foreign Operations, and Relation Programs Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), of "our intent to initiate consultations with you regarding the manner in which foreign aid is distributed around the world through [USAID]," including the review and potential reorganization of USAID and the potential absorption by the Department of State of certain bureau, offices, and mission of USAID. *See* February 3, 2025 Letter to the Chairs and Ranking Members of the House Committee on Foreign Affairs, the Senate Committee on Foreign

4

Relations, and the House and Senate Committees on Appropriations, attached as Exhibit C. The letter further stated that Secretary Rubio had delegated to me the duties of Deputy Administrator of USAID, "to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest." *Id.*

9. The first step of this review, in essence, involved the majority of USAID pausing a substantial portion of its ongoing work—going "pencils down"—so that the Secretary and USAID leadership could gain control of an organization that included some employees who had refused to comply with lawful directives by the President and the Secretary, directives designed to identify wasteful or fraudulent programs or those contrary to the foreign policy interests of the United States. The pause of ongoing work and use of paid administrative leave enabled USAID leadership to begin a thorough review of USAID's operations and align its functions to the President's and Secretary's priorities, without continued noncompliance by former USAID leadership and management undermining those priorities. Pausing a majority of USAID's work was, and remains, necessary to continue this thorough review into the noncompliance issues first identified, as well as to continue to examine USAID's processes and the manner by which USAID funds its programs. Only by engaging in this audit and review, can USAID leadership and the Secretary ensure that USAID's funding decisions aligned with the foreign policy priorities of the United States. This audit and review would have been ineffective and would have been inconsistent with the public interest if USAID's then extant operations remained unchecked. Indeed, our experience with widespread noncompliance with initial stop-work directives raised serious doubt about

whether USAID leadership would have received necessary information in a timely manner and also whether directives of USAID leadership would be promptly and faithfully complied with. Instead, the best course was an across-the-board pause, where USAID leadership could then determine on a more targeted basis which programs continued to make sense for the American people, and which did not.

10. At the time the general pause on foreign aid was issued, Secretary Rubio issued four waivers for: foreign military financing for Israel and Egypt, emergency food assistance, related administrative expenses, and legitimate expenses incurred before the pause went into effect. In the days following the general pause on foreign aid, Secretary Rubio adopted a waiver process to ensure that important aid programs within the national interest would be able to continue during the period of review. For instance, on January 28, Secretary Rubio issued an emergency humanitarian waiver for life-saving humanitarian assistance programs. Along with this general waiver, the State Department issued case-by-case waivers, based on specific programs. Consistent with this approach to foreign assistance administered by the State Department, a similar pause and waiver process applied to USAID's operations to ensure they too are aligned with the President's and Secretary's priorities. And the humanitarian waiver just noted (among others) applied in full measure to USAID programs.

11. There are 4,765 direct hire full-time equivalent employees at USAID. USAID identified an initial set of 58 employees who were placed on paid administrative leave on Monday, January 27, 2025. This group included senior staff who engaged in non-compliance vis-à-vis the funding pause and stop-work orders or other acts of insubordination or questionable contracting practices or who were charged with

6

managing and administering initiatives no longer deemed to be in the national interest (*e.g.,* DEI programs). On Saturday, February 1, 2024, an additional 57 employes were placed on administrative leave, many of whom engaged in similar acts of insubordination, deceit, or non-compliance with Executive Orders or USAID leadership directives.

12. USAID leadership ultimately determined that the placement of a substantial number of USAID personnel on paid administrative leave was the only effective way to pause operations, faithfully implement the pause, and conduct a full and unimpeded audit of USAID's operations and programs, consistent with the President's and Secretary's directives. Accordingly, on Monday, February 3, 2025, USAID placed an additional 606 employees on paid administrative leave; on Tuesday, February 4, 2025, another 1,416 employees were placed on paid administrative leave. On February 7, 2025, before the court in *American Foreign Service Assoc., et al. v. President Donald Trump, et al.*, No. 1:25-cv-00352-CJN (D.D.C.), issued a temporary restraining order, approximately 2,140 total USAID U.S. direct hires were on paid administrative leave. To the best of my knowledge, none of these employees were located in high-risk countries, such as Syria.

13. Approximately 98% of the 2,140 employees on paid administrative leave as of February 7, 2025, were physically located within the Continental United States, with the remaining located in developed counties like the United Kingdom or Hungary where employees face little risk of physical danger and where USAID has little to no mandate. USAID did not intentionally place any employee in a high-risk location on paid administrative leave. Upon being informed that several employees might have

temporarily been in high-risk locations, USAID immediately removed those employees from administrative leave and fully restored their preexisting access to all USAID and other government systems.

14. As is customary, each of the employees placed on administrative leave had their access restricted to USAID digital systems, including their USAID-sponsored email accounts. Given the sensitivity of government information systems, the need to protect sensitive government information, to avoid the risk of data breach, and to maintain the integrity of the ongoing pencils down review, USAID leadership thought it prudent to restrict access for those employees temporarily removed from their regular duties by being placed on paid administrative leave. As noted, these were employees physically located in the United States or other safe, developed nations where restricting their access to USAID systems posed minimal risk of danger. I am unaware of any employee in a dangerous location such as Syria whose access was impacted.

15. During this same period, and following the same principles, USAID leadership approved the termination of nearly 800 personal service contractors (PSCs), who performed work in the United States or high- or upper-middle-income countries, as defined by the World Bank. USAID has either preserved or restored access to the overwhelming majority of overseas PSCs—and to the best of my knowledge, all PSCs who may be in dangerous locations or frontline aid delivery countries. USAID will diligently work to restore access to any employee or PSC whose access was terminated in error.

16. As part of this effort to pause work at USAID, USAID leadership also conducted a review of its employees to identify which employees were essential—*i.e.*, those who

8

are responsible for mission-critical functions, core leadership, and those who work on specially designated programs—and who should not be placed on administrative leave.

17. Over the course of the first week in February, USAID leadership initially determined that approximately 611 employees qualified as essential to perform USAID's required duties and to facilitate orderly contingency and audit operations.  For example, many employees in the travel office were deemed essential because they would be responsible for helping USAID employees abroad come home to the United States, if they wished to do so.  Essential personnel also included subject matter experts from most parts of USAID such as the regional bureaus; a large contingent of personnel administering and overseeing emergency humanitarian, food, and medical assistance; information systems managers; security officers; legal counsel; the Chief Human Capital Officer and other human resources employees, contracting officers and others. The process of selection included senior political and career leaders who carefully contemplated an essential staff level.

18. As part of its efforts to pause work and facilitate an audit of USAID's operations, USAID had planned to place another approximately 2,104 employees on paid administrative leave beginning on 11:59 p.m. on Friday, February 7, 2025.

19. Following the D.C. District Court's February 7, 2025 Order, however, USAID did not place any additional employees on administrative leave, and reinstated all employees previously placed on any form of administrative leave.  Moreover, USAID restored access to email, payment, and security notification systems to those employees whose access was previously limited or shut off.

20. Before the D.C. District Court's February 7, 2025 Order, USAID's website indicated that all non-essential employees would be placed on administrative leave that evening. After this Court's Order, however, USAID removed that message from its website. Moreover, USAID sent an email notice of the Order to all USAID employees.

21. On Thursday, February 13, a different judge on the District of Columbia District Court issued a temporary restraining order blocking certain foreign aid determinations.

22. On Friday, February 21, the District Court in *American Foreign Service Assoc., et al.*, denied a motion for further injunctive relief, and let its prior temporary restraining order expire.

23. All of the actions described above at USAID were taken by Secretary Rubio or myself, or USAID employees at one of our directions.

24. Neither Elon Musk nor USDS has any formal authority over me. Neither has the independent legal authority to direct me or anyone at USAID regarding access to USAID data or systems; to alter or restore email communications; to manage personnel or take personnel actions; to take any action with respect to grants, contracts, and other agreements; or to take any other similar governmental action.

25. Consistent with the President's Executive Order, E.O. 14158, Sec. 3(c), 90 Fed. Reg. 8441 (Jan. 20, 2025), I sometimes consult or coordinate with policymakers and others at USDS. But I am entitled to disregard their suggestions. I report to Secretary Rubio and President Trump, not Elon Musk or USDS.

26. Following the President's Executive Order, but before Secretary Rubio was designated as Acting Administrator and delegated to me the duties of Deputy Administrator, the Agency established a "DOGE Team" at USAID. E.O. 14158, Sec. 3(c). All Team

10

members have been detailed to USAID from other federal agencies, not USDS. They are treated as employees of USAID, and report to USAID leadership including Secretary Rubio and me, with supervisory duties assigned to the White House Liaison, when performing USAID duties.

27. Following the President's Executive Order, I consult with the DOGE Team on certain matters, including personnel. E.O. 14210, Sec. 3(b)(ii), 90 Fed. Reg. 9669 (Feb. 14, 2025). But Secretary Rubio and I have ultimate authority over those decisions; the DOGE Team cannot legally direct me to do anything regarding personnel, funding, or the like.

Executed this 22nd day of February, 2025

/s/ Peter Marocco

_____

PETER MAROCCO

11

# EXHIBIT A


## Presidential Documents

Executive Order 14169 of January 20, 2025

### Reevaluating and Realigning United States Foreign Aid

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* The United States foreign aid industry and bureaucracy are not aligned with American interests and in many cases antithetical to American values. They serve to destabilize world peace by promoting ideas in foreign countries that are directly inverse to harmonious and stable relations internal to and among countries.

**Sec. 2**. *Policy.* It is the policy of United States that no further United States foreign assistance shall be disbursed in a manner that is not fully aligned with the foreign policy of the President of the United States.

**Sec. 3**. (a) *90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy.* All department and agency heads with responsibility for United States foreign development assistance programs shall immediately pause new obligations and disbursements of development assistance funds to foreign countries and implementing non-governmental organizations, international organizations, and contractors pending reviews of such programs for programmatic efficiency and consistency with United States foreign policy, to be conducted within 90 days of this order. The Office of Management and Budget (OMB) shall enforce this pause through its apportionment authority.

(b) *Reviews of United States foreign assistance programs.* Reviews of each foreign assistance program shall be ordered by the responsible department and agency heads under guidelines provided by the Secretary of State, in consultation with the Director of OMB.

(c) *Determinations.* The responsible department and agency heads, in consultation with the Director of OMB, will make determinations within 90 days of this order on whether to continue, modify, or cease each foreign assistance program based upon the review recommendations, with the concurrence of the Secretary of State.

(d) *Resumption of paused development assistance funding.* New obligations and disbursements of foreign development assistance funds may resume for a program prior to the end of the 90-day period if a review is conducted, and the Secretary of State or his designee, in consultation with the Director of OMB, decide to continue the program in the same or modified form. Additionally, any other new foreign assistance programs and obligations must be approved by the Secretary of State or his designee, in consultation with the Director of OMB.

(e) *Waiver.* The Secretary of State may waive the pause in Section 3(a) for specific programs.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02091
Filed 1–29–25; 11:15 am]
Billing code 3395–F4–P

# EXHIBIT B

| | |
|---|---|
| State Seal | |
| Action Office: | ALDACS, ECON, OECD |
| Info Office: | |

| | |
|---|---|
| MRN: | 25 STATE 6828    Reply |
| Date/DTG: | Jan 24, 2025 / 241600Z JAN 25 |
| From: | SECSTATE WASHDC |
| Action: | ALL DIPLOMATIC AND CONSULAR POSTS COLLECTIVE *Immediate* |
| E.O.: | 13526 |
| TAGS: | PREL, AID, EAID |
| Subject: | Executive Order on Review of Foreign Assistance Programs |

1. (U) Consistent with the President's Executive Order on Reevaluating and Realigning United States Foreign Aid, this ALDAC pauses all new obligations of funding, pending a review, for foreign assistance programs funded by or through the Department and USAID.

2. (U) Across the United States government, it is currently impossible to access sufficient information in one place to determine whether the foreign assistance policies and interests supported by appropriations are not duplicated, are effective, and are consistent with President Trump's foreign policy. The Department needs a centralized repository from which senior Department, USAID officials, Ambassadors, missions and others can draw sufficiently detailed information from which the Secretary can make judgments. Further guidance regarding a new or updated repository and mandatory bureau submissions to it will be forthcoming.

**ACTIONS TO BE TAKEN**

3. (U) Within thirty (30) days, the Director of the Policy Planning Staff (S/P) or its designate shall develop appropriate review standards and collaborate with the Director of the Office of Foreign Assistance (F), the Office of Budget and Planning (BP), the Office of Management and Budget (OMB), and/or other departments and agencies as appropriate to ensure that all foreign assistance is aligned with President Trump's foreign policy agenda and that data regarding all foreign assistance spending in the future is aggregated and inputted into a comprehensive internal Department repository.

4. (U) Within eighty-five (85) days of this ALDAC, the government-wide comprehensive review of all foreign assistance shall be completed, and a report shall be produced to the Secretary of State for his consideration and recommendation to the President.

5. (U) In keeping with one voice of American foreign policy, the United States government, through any department, agency or entity, shall not provide foreign assistance funded by or through the Department and USAID without the Secretary of State's authorization or the authorization of his designee.

6. (U) All U.S. foreign assistance shall be aligned under the Secretary of State's coordination, direction, and supervision, as appropriate, consistent with section 622(c) of the Foreign Assistance Act of 1961 and section 1523 of the Foreign Affairs Reform and Restructuring Act of 1998 (FARRA) within 180 days.

7. (U) Effective immediately, Assistant Secretaries and Senior Bureau Officials shall ensure that, to the maximum extent permitted by law, no new obligations shall be made for foreign assistance until such time as the Secretary shall determine, following a review. For existing foreign assistance awards, contracting officers and grant officers shall immediately issue stop-work orders, consistent with the terms of the relevant award, until such time as the Secretary shall determine, following a review. Decisions whether to continue, modify, or terminate programs will be made following this review.

8. (U) Effective immediately, pending a review of foreign assistance programs: no new requests for proposals (RFPs), requests for application (RFAs), notices of funding opportunities (NOFOs), or any other kind of solicitation or request for foreign assistance funding shall be published or processed by the Department, USAID, or other agencies implementing programs funded by the Department or USAID until each has been reviewed and approved by F as consistent with the President's policy; no further technical evaluation committees shall be convened; and there shall be no further funding obligated to awards and contracts or indefinite delivery /indefinite quantity (IDIQ) contracts.

9. (U) Effective immediately, I am suspending the review process for proposals for new foreign assistance grants, subgrants, contracts, or subcontracts. No new funds shall be obligated for new awards or extensions of existing awards until each proposed new award or extension has been reviewed and approved by F as consistent with President Trump's agenda.

10. (U) Within thirty (30) days of the issuance of the review standards in paragraph 4, every Bureau, agency office and entity providing any type of foreign assistance shall produce to F for review a list of all active, pending, or proposed grants, subcontracts, contracts, or subcontracts, and provide a clear and concise statement explaining if and how the current or proposed use of obligated funds advances President Trump's policy.

11. (U) The spokesperson will also release a public statement to this effect.

12. (U) The Secretary of State has approved waivers of the pause under the Executive Order and this ALDAC, subject to further review, with respect to:

(a) foreign military financing for Israel and Egypt and administrative expenses, including salaries, necessary to administer foreign military financing;

(b) emergency food assistance and administrative expenses, including salaries, necessary to administer such assistance;

(c) on a temporary basis, salaries and related administrative expenses, including travel, for U.S. direct hire employees, personal services contractors, and locally employed staff;

(d) legitimate expenses incurred prior to the date of this ALDAC under existing awards or legitimate expenses associated with stop-work orders; and

(e) exceptions to the pause approved by the Director of Foreign Assistance.

DEFINITIONS

13. (U) Only for purposes of this ALDAC, foreign assistance means assistance funded from accounts in titles III and IV and from International Organizations and Programs in the Department of State, Foreign Operations, and Related Programs Appropriations Acts.

| | |
|---|---|
| Signature: | RUBIO |
| Drafted By: | S/TT:Marocco, Peter |
| Cleared By: | S/TT:Holler, Daniel |
| | L:Vsek, Richard |
| | L:Dorosin, Joshua |
| | S/TT:Anton, Michael |
| | C:Needham, Michael |
| Approved By: | S: Rubio, Marco |
| Released By: | POEMS_P:Acker, Vanessa G |
| Info: | IO COLLECTIVE *Immediate* |
| XMT: | BASRAH, AMCONSUL; CARACAS, AMEMBASSY; CHENGDU, AMCONSUL; KABUL, AMEMBASSY; MINSK, AMEMBASSY; SANAA, AMEMBASSY; ST PETERSBURG, AMCONSUL; VLADIVOSTOK, AMCONSUL; YEKATERINBURG, AMCONSUL |

# EXHIBIT C



**THE SECRETARY OF STATE**

WASHINGTON

February 3, 2025

The Honorable James Risch, Chairman
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Jeanne Shaheen, Ranking Member
Committee on Foreign Relations
United States Senate
Washington, DC 20510

The Honorable Brian Mast, Chairman
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Gregory Meeks, Ranking Member
Committee on Foreign Affairs
House of Representatives
Washington, DC 20515

The Honorable Tom Cole, Chairman
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Rosa DeLauro, Ranking Member
Committee on Appropriations
House of Representatives
Washington, DC 20515

The Honorable Susan Collins, Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

The Honorable Patty Murray, Vice Chairwoman
Committee on Appropriations
United States Senate
Washington, DC 20510

Dear Chairman Risch, Mast, Cole, Collins, Ranking Members
Shaheen, Meeks, DeLauro, and Vice Chairwoman Murray:

Consistent with applicable law, including sections 7063 and 7015 of the
Department of State, Foreign Operations, and Related Programs
Appropriations Act, 2024 (Div. K, P.L. 118-47), as carried forward by the
Continuing Appropriations Act, 2025 (Div. A, P.L. 118-83), this letter provides
notice and advises you of our intent to initiate consultations with you
regarding the manner in which foreign aid is distributed around the world
through the United States Agency for International Development ("USAID").
Current foreign assistance processes are severely inefficient and do not
substantially benefit the American people.  USAID has numerous conflicting,
overlapping, and duplicative functions that it shares with the Department of
State.  Additionally, USAID's systems and processes are not well synthesized,
integrated, or coordinated, and often result in discord in the foreign policy
and foreign relations of the United States.  This undermines the President's
ability to carry out foreign relations.

I have authorized Peter W. Marocco, the Director of Foreign Assistance, and the individual to whom I have delegated authority to perform the duties of the Deputy Administrator of USAID, to begin the process of engaging in a review and potential reorganization of USAID's activities to maximize efficiency and align operations with the national interest.  This review and potential reorganization will substantially further the foreign relations of the United States, and may include, among other things, the suspension or elimination of programs, projects, or activities; closing or suspending missions or posts; closing, reorganizing, downsizing, or renaming establishments, organizations, bureaus, centers, or offices; reducing the size of the workforce at such entities; and contracting out or privatizing functions or activities performed by Federal employees.

The Department of State and other pertinent entities will be consulting with Congress and the appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID.  Such consultation shall occur on behalf of the heads of such entities, as directed by the President.
In consultation with Congress, USAID may move, reorganize, and integrate certain missions, bureaus, and offices into the Department of State, and the remainder of the Agency may be abolished consistent with applicable law.

Sincerely,

Marco Rubio
Secretary of State

# EXHIBIT 27

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW MEXICO, et al.

     *Plaintiffs,*

   v.                             Case No. 1:25-cv-00429

ELON MUSK, in his official capacity, et al.,

     *Defendants.*

### DECLARATION OF JOSHUA FISHER

    I, Joshua Fisher, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of

perjury, as follows:

    1.     I make these statements based on personal knowledge and knowledge obtained in the

course of my official duties.

    2.     I am the Director of the Office of Administration. I have held that position since

January 20, 2025. In that capacity, I am personally involved in the appointment of special

government employees. I have personal knowledge of Mr. Elon Musk's employment status with the

federal government.

    3.     Mr. Musk is an employee of the White House Office. He holds that position as a non-

career Special Government Employee ("SGE").

    4.     In that job, Mr. Musk is a Senior Advisor to the President. It is not uncommon for

the President to have Senior Advisors who are SGEs. For instance, Anita Dunn was an influential

Senior Advisor to President Biden, while serving as an SGE.

    5.     In his role as a Senior Advisor to the President, Mr. Musk has no greater authority

than other senior White House advisors. Like other senior White House advisors, Mr. Musk has no

actual or formal authority to make government decisions himself. Mr. Musk can only advise the President and communicate the President's directives.

6.     The U.S. DOGE Service is a component of the Executive Office of the President. The U.S. DOGE Service Temporary Organization is within the U.S. DOGE Service. Both are separate from the White House Office. Mr. Musk is an employee in the White House Office. He is not an employee of the U.S. DOGE Service or U.S. DOGE Service Temporary Organization. Mr. Musk is not the U.S. DOGE Service Administrator.

Dated: Washington, D.C.
     February 17, 2025

                                        Joshua Fisher
                                        Director
                                        Office of Administration

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**J. DOE 1,** *et al.,*

        *Plaintiffs*

        **v.**

**ELON MUSK,** *et al.,*

        *Defendants*

**Case No. 8:25-cv-00462-TDC**

## <u>COVER SHEET FOR EXHIBITS</u>

Exhibits cited in Plaintiffs' Reply to Defendants' Response to Plaintiffs' Motion for Preliminary Injunction are numbered as follows:

    28. Second Declaration of J. Doe 1, J.R. 426-428

    29. Second Declaration of J. Doe 2, J.R. 429-431

    30. Second Declaration of J. Doe 9, J.R. 432-434

    31. Declaration of J. Doe 8, J.R. 435-436

    32. Declaration of J. Doe 20, J.R. 437-438

    33. Declaration of J. Doe 21, J.R. 439-455

    34. Declaration of J. Doe 22, J.R. 456-457

    35. Declaration of Ann Lewis, J.R. 458-461

    36. Declaration of Mary Comans, J.R. 462-465

    37. Declaration of John Cheston, J.R. 466-468

    38. The White House, *Interview of President Trump and Elon Musk by Sean Hannity, "the Sean Hannity Show"* (Feb. 18, 2025), J.R. 469-535

39. Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House, Feb 19, 2025, J.R. 536-542

40. DOGE Website Redacted, J.R. 543-547

41. Zoë Schiffer, *DOGE Puts $1 Spending Limit on Government Employee Credit Cards*, Wired (Feb. 20, 2025),  J.R. 548-558

42. Meredith Lee Hill, *The private GOP panic over the slash-and-burn DOGE firings*, Politico (Feb. 20, 2025), J.R. 559-566

43. Andrea Shalal & Nandita Bose, *Trump appears to contradict White House, says Elon Musk in charge of DOGE*, Reuters (Feb. 20, 2025), J.R. 567-570

44. Matt Bai, *The Blinding Contempt of the DOGE Bros*, Wash. Post (Feb. 24, 2025), J.R. 571-576

45. Jeff Stein et al, *Musk's blitzkrieg is unnerving many of Trump's senior advisers,* Wash. Post (Feb. 21, 2025)*,* J.R. 577-583

46. Rachel Treisman, *The USDA fired staffers working on bird flu. Now it's trying to reverse course*, NPR (Feb. 19, 2025), J.R. 584-599

47. Elon Musk (@elonmusk) X, (Feb 21, 2025, 2:43 AM), J.R. 600

48. Eli Stokkols & Daniel Lippman, *Musk's 'What Did You Do Last Week?' Email Hits a Million Replies*, Politico (Feb. 25, 2025), J.R. 601-606

49. Lindsay Whitehurst & Chris Megerian, *Trump backs Musk as he roils the federal workforce with demands and threats*, A.P. (Feb. 24, 2025), J.R. 607-613

50. Kaitlan Collins & Tierney Sneed, *White House reveals who DOGE acting administrator is*, CNN (Feb. 25, 2025), J.R. 614-622

51. Alexandra Alper and Raphael Satter, *Staffer with Elon Musk's DOGE amplified white supremacists online*, Reuters, (Feb. 7, 2025), J.R. 623-634

52. Marcia Brown, *DOGE staffer Gavin Kliger arrives at USDA*, Politico, (Feb. 19, 2025), J.R. 635-636

53. Shannon Bond, *et al*, *Who is part of Elon Musk's DOGE, and what are they doing?*, NPR, (Feb. 7, 2025),J.R. 637-659

54. Jacob Bogage & Jeff Stein, *Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS*, Washington Post, (Updated Feb. 16, 2025),  J.R. 660-662

55. Declaration of J. Roe 1 (filed under seal; motion forthcoming)

56. Declaration of J. Roe 3 (filed under seal; motion forthcoming)

57. Declaration of J. Roe 4 (filed under seal; motion forthcoming)

58. Selected Elon Musk X Posts, J.R. 663-701

59. Elon Musk (@elonmusk) X (Feb. 22, 2025, 2:46 PM), J.R. 702

60. *Alliance for Retired Americans v. Bessent*, Transcript of Preliminary Injunction Hearing (Feb. 23, 2025), J.R. 703-843

61. *AIDS Vaccine Advocacy Coalition v. United States Dep't of Def.*, Transcript of Motion Hearing (Feb. 25, 2025), J.R. 844-903

62. Donald Trump (@Realdonaldtrump), Truth Social (Feb. 22, 2025, 8:04 AM), J.R. 904

63. Faiz Siddiqui, Joseph Menn and Jacob Bogage, *DOGE's grab of personal data stokes privacy and security fears,* Washington Post, (Feb. 25, 2025, Updated 6:02 PM EST), J.R. 905-910

64. Declaration of J. Doe 11, J.R. 911-913

# EXHIBIT 28

Docusign Envelope ID: 236EF7CA-FDD9-4388-814D-FC8F05262DD0

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

J. DOE 1, *et al.*,

          ***Plaintiffs***

          **v.**

ELON MUSK, *et al.*,

          ***Defendants***

**Case No. 25 8:25-cv-00462-TDC**

## SECOND DECLARATION OF J. DOE 1

I, J. Doe 1, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 1" in the complaint.

2. This is my second declaration.

3. I am a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and have been with the agency since 2017.

4. My contract was terminated on February 19, 2025, with my last day of employment listed as March 6, 2025. I received a generic letter of termination that I was blind carbon copied on. It does not contain my name or contract number. I believe that the generic nature of this letter, if intended for me, will prevent my ability to apply for unemployment benefits, as they will be unable to confirm that this letter was intended for me personally. I also believe that the generic nature of the letter indicates that my contract was not fully reviewed and selected for termination, but was batch terminated, which goes against the provisions of my contract.

5. I know that DOGE has administrative access to our email system, which means that they can send emails under our email addresses. As a result, I do not know if the termination notice sent to me, but signed by a CO that did not send it, was truly sent by the person shown on the email, or if the CO who signed the generic letter even knew who it was being sent to.

6. I have continued to receive emails that come from outside my office that are unsigned and do not follow our communications guidelines. This is not typical procedure as, to the best of my recollection, all other communications with agency supervisors that I have received were signed or, at minimum, indicated from whom the email/communication was sent.

7. In addition, the agency website is being edited to give directives to staff, which are also unattributed and not in line with our expectations of official communications to staff.

8. Valid payments have continued to be held up by persons unknown, which is preventing our partners with exemptions or waivers from carrying out their work, due to lack of funds. Payments to myself for valid work expenses also continue to go unpaid due to lack of access to systems by trained and proven USAID staff.

9. The terminated contracts of my colleagues have been posted to the DOGE website. As we are PSC contractors without a contracting company to work under, our contracts include personally identifying information, such as our home address and phone number. These were not redacted for my colleagues. I have a genuine fear that in time, my own terminated contract will be posted on the DOGE website and since the president and Elon Musk have worked to demonize USAID and our work among the American public

2

through their lies and insinuations, that someone will use this information to physically

harm me or my family. I have already planned to stop inviting others to my home after

the information is posted due to this fear, which will likely isolate me further from my

support systems.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

                                      **J. Doe 1**

Signed by:

J. Doe 1

CBE033701EB74AB...

                                      **Signature**

# EXHIBIT 29

Docusign Envelope ID: 5B68CC3F-1E22-470D-9F2C-A19B6A8110F8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 1, *et al.*,

            ***Plaintiffs***

                    **v.**

ELON MUSK, *et al.*,

            ***Defendants***

**Case No. 25 8:25-cv-00462-TDC**

## SECOND DECLARATION OF J. DOE 2

I, J. Doe 2, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.  I am a plaintiff in this litigation, identified as "J. Doe 2" in the complaint.

2.  This is my second declaration.

3.  I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for over 10 years.

4.  My main duties include technological responsibilities related to cybersecurity and privacy. My position involves extensive interaction with USAID's information technology ("IT") infrastructure, including its data security systems.

5.  On February 23, 2025, Gavin Kliger, a DOGE member, created the user account hr_announcements@usaid.gov. A screenshot of the ticket that was generated as a result of a new user being added to the system is attached to this declaration.

6.  As referenced in my first declaration, DOGE's continued access to USAID systems makes those systems vulnerable because the DOGE personnel with complete control of

the systems do not have the full knowledge of the systems nor have they received the

proper training for such access.  This amounts to a massive breach since USAID has lost

all control of its systems and data to DOGE, including removing the ability for cyber and

other security professionals to monitor the actions DOGE has performed within the

systems. This brings me great distress on an emotional and professional level as I have a

total inability to protect USAID's data, including that of mine and my colleagues'

extremely sensitive data. I have not had any rest since DOGE came into USAID  and I

have a sense of helplessness.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 2**

Signed by:

*J. Doe 2*

DA0F4EA99F6F449...

**Signature**



# EXHIBIT 30

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1, *et al.*,

**Plaintiffs**

v.

ELON MUSK, *et al.*,

**Defendants**

**Case No. 25 8:25-cv-00462-TDC**

---

**SECOND DECLARATION OF J. DOE 9**

I, J. Doe 9, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 9" in the complaint.

2. This is my second declaration.

3. I am a personal services contractor ("PSC") offshore at the United States Agency for International Development ("USAID").

4. I am in a high-risk area in the Middle East.

5. On Monday, February 3, 2025, I tried to login to my USAID email account but was locked out. I received no warning or notification in advance of being shut out of USAID's systems. My supervisor and Head of Mission were not informed in advance of the cutoff.

    a. All of the contacts and the safety and security applications, including the SCRY application used to monitor and account for overseas personnel, were removed remotely from my USAID work phone. The SCRY application is the safety and security mechanism by which federal government staff overseas in dangerous areas indicate that they are in a dangerous situation and access help.

Docusign Envelope ID: A4658E27-A1B5-4EEC-8B66-00138CE37F82

6. On the afternoon of February 19, 2025, 16 days after being cut off from all USAID systems, I obtained access to *some* of my USAID systems. The renewed access included email and USAID applications but not the Scry application.

7. On February 24, 2025, 21 days after being cut off from all USAID systems, I was able to get the Scry application and my work contacts back on my phone.

8. As of February 25, 2025, I am still employed with USAID and have not received an email informing me that I have been put on administrative leave or terminated. However, since the situation is changing so quickly each day, I wake up each day expecting the worst, including once again suddenly losing my access to critical safety tools without warning. As I explained more fully in my first declaration, I am extremely worried about (1) my and my family's safety, (2) my child(ren)'s ability to continue in the school they are enrolled in, and (3) my ability to go on necessary medical leave soon.

9. I am distraught over how things are unfolding with respect to USAID and the treatment we continue to endure. In addition to what I noted in my prior declaration (and summarized in paragraph 8 of this declaration), I have psychological distress over the false accusations about USAID's work, which were started by Defendants and others in Washington DC, and have since been picked up by local media outlets. These claims have a direct negative impact on the perception of USAID where I work and I am concerned about the safety and security of myself, my family, and colleagues in a context where misinformation and disinformation about our work is spreading rapidly. We have no ability to counter these claims, since the statements are made by high ranking US officials, including Defendant Musk.

10. Based on what has happened within the agency as well as my understanding of what is happening at other agencies, I believe my personally identifiable information is being misused, activity on my government-furnished devices is being tracked by unauthorized, unvetted individuals, including noting down passwords and other sensitive information. In the high-risk country where I am stationed, our team deals with information and topics that are highly sensitive in nature.

11. I have a deep concern because I know that DOGE's team has full access to USAID systems and the work performed, for life-saving missions, can and has been taken out of context by DOGE and used against the USAID staff members performing the work.

12. Additionally, I am concerned that information related to these sensitive topics is in danger of being leaked, along with personal information connecting certain individuals to certain work products. This is causing me deep anxiety.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 26th day of February, 2025.**

**J. Doe 9**

**Signature**

# EXHIBIT 31

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 1, *et al.*,

**Plaintiffs**

v.

ELON MUSK, *et al.*,

**Defendants**

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF J. DOE 8

I, J. Doe 8, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 8" in the complaint.

2. I am a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and have been with the agency for over 7 years.

3. My first top secret security clearance took over 9 months to process and colleagues have informed me that theirs took even longer. Considering this administration has only been on the job for about one month and DOGE personnel were not prior federal workers, I do not believe they have any level of clearance or a "need to know" such information.

4. I received a termination email on Friday evening, Feb 21, 2025. The letter was not addressed to me and did not contain my contract number or any additional personally identifiable information. The letter indicated my last day of employment to be March 10, 2025.

Docusign Envelope ID: 562B9D8E-87BA-4BA1-8C0A-B812759831C4

5. As a recently-terminated PSC, I am concerned about the misuse of my own personally identifiable information, including misuse by DOGE personnel since they have posted personally identifiable information of other PSCs whose contracts have been terminated on the DOGE website.

6. I am also concerned about not being paid for the remainder of my unused annual leave balance as there is hardly anyone left in the agency to process these payments.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 8**

Signed by:

J Doe 8

87A6912045F04EA...

**Signature**

# EXHIBIT 32

Docusign Envelope ID: 4594D980-CB00-4089-8429-54DB8667FC55

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1, *et al.*, | |
| **Plaintiffs** | Case No. 25 8:25-cv-00462-TDC |
| **v.** | |
| ELON MUSK, *et al.*, | |
| **Defendants** | |

### DECLARATION OF J. DOE 20

I, J. Doe 20, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.      I am a plaintiff in this litigation, identified as "J. Doe 20" in the complaint.

2.      I was a personal services contractor ("PSC")  at the United States Agency for International Development ("USAID") and was with the agency for almost 3 years.

3.      My contract with USAID was recently terminated.

4.      My PSC contract is one of the ones featured on the DOGE website with some of my personal information included.

5.      Additionally, all of the Contracting Offices and Contracting Officer Representatives that I and my PSC colleagues have been communicating with regarding our termination and offboarding processes have been placed on administrative leave. This means there is currently no way for terminated PSCs like myself to proceed with offboarding, finalizing contract modifications, or receiving payment for our accrued annual leave.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Docusign Envelope ID: 4594D980-CB00-4089-8429-54DB8667FC55

Executed on the 25th day of February, 2025.

**J. Doe 20**

Signed by:

*J. Doe 20*

F3A439601063437...

**Signature**

# EXHIBIT 33

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 1, *et al.*, | |
| **Plaintiffs** | **Case No. 25 8:25-cv-00462-TDC** |
| **v.** | |
| ELON MUSK, *et al.*, | |
| **Defendants** | |

## DECLARATION OF J. DOE 21

I, J. Doe 21, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 21" in the complaint.

2. I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for 16 years.

3. I was initially locked out of my access to USAID systems on February 3, 2025, along with many of my colleagues. There was no advance notice given before I lost system access. HCTM-ELR (USAID's human resources team) replied to my outreach on February 4, letting me know that they thought I was on administrative leave, but could not confirm at that time.

4. On February 10, 2025, apparently in response to a former TRO issued in a different case, I regained access to USAID systems.

5. On February 18, I and other staff noticed that all outgoing emails are now labeled SBU (sensitive but unclassified), without regard to the actual sensitivity of the contents.

6.  On Saturday, February 22, I received from hr@opm.gov an email titled "What did you do last week?" The body of the email, in its entirety, said: "Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager. Please do not send any classified information, links, or attachments. Deadline is this Monday at 11:59pmEST." That email is attached to this declaration as Appendix A.

7.  On Sunday, February 23, I received a broad notice advising that virtually all staff would be placed on administrative leave effective 11:59 pm the same day. That notice is attached to this declaration as Appendix B.

8.  A few hours later on February 23, I received a Reduction in Force ("RIF") notice from hr_announcements@usaid.gov.

9.  The RIF document was an unsigned form letter from "Acting Deputy Administrator" Peter Marocco with my information filled into the blanks attached to a brief, generic email. The RIF document is attached to this declaration as Appendix C.

10. Also on February 23, I contacted HCTM-ELR via email to HCTM-ELR@usaid.gov, as the RIF letter suggested.

    a.  In the email, I asked whether the RIF notices were sent by HCTM.

    b.  At first, I received an auto-reply to my email. A screenshot of that reply is attached to this declaration as Appendix D.

    c.  I then received a reply from HCTM-ELR confirming that they did not send the RIF notices and they lacked any additional information on next steps.

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

11. As of the evening of February 24, 2025, despite the seemingly contrary indication within the notice in Attachment 2 that "most personnel will continue to have access to USAID systems," I have been locked out of USAID systems.

12. On February 24, upon losing system access, I wrote to the CIO Helpdesk to ask if this was a change of policy from the previously provided notice, and received a form reply. The form reply is attached at Appendix E.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 21**

Signed by:

*J. Doe 21*

B17735A5CB6694CD...

**Signature**

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

# Appendix A

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC
2/24/25, 8:00 AM
USAID Mail - What did you do last week?
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 458 of 959



---

## What did you do last week?

---

**HR** <hr@opm.gov>                                          Sat, Feb 22, 2025 at 5:36 PM
Reply-To: "HR@opm.gov" <hr0@opm.gov>

Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager.

Please **do not send** any classified information, links, or attachments.

Deadline is this Monday at 11:59pmEST.

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

# Appendix B

                                            

## SBU: Notification of Administrative Leave

**USAID Office of the Administrator** <usaid_fo@subscribe.usaid.gov>          Sun, Feb 23, 2025 at 3:42 PM
To:

# SENSITIVE BUT UNCLASSIFIED



Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC
2/24/25, 8:02 AM
USAID Mail – SBU: Notification of Administrative Leave

Case 8:25-cv-00462-TDC   Document 36   Filed 02/26/25   Page 461 of 959

As of 11:59 p.m. EST on Sunday, February 23, 2025, all USAID direct hire personnel, with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally.

Most personnel will continue to have access to USAID systems and should continue to monitor email for further guidance. Employees on administrative leave, however, are not authorized to conduct Agency business or to download or access official USAID files without the express permission of Agency leadership.

Concurrently, USAID is beginning to implement a Reduction-in-Force that will affect approximately 2,000 USAID personnel with duty stations in the United States.

Individuals that are impacted will receive specific notifications on February 23, 2025, with further instructions and information about their benefits and rights.

Designated essential personnel who are expected to continue working will be informed by Agency leadership February 23, 2025, by 5 p.m. EST.

For overseas personnel, USAID intends a voluntary Agency-funded return travel program and other benefits. USAID is committed to keeping its overseas personnel safe. Until they return home, personnel will retain access to Agency systems and to diplomatic and other resources.

In the coming week, we will provide details on how to retrieve personal items from the former USAID workspaces at the Ronald Reagan Building for current and former USAID staff who previously had a workspace at RRB.

Additional guidance is forthcoming, and all future updates/notices will continue to be communicated through official USAID channels and posted on USAID.gov for those without access to USAID systems.

---

Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.

---

This email was sent to tthwing@usaid.gov using govDelivery Communications Cloud on behalf of: United States Agency for International Development · 1300 Pennsylvania Avenue NW · Washington, DC · 20004



Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

# Appendix C

MEMORANDUM FOR: ███████ ███████

FROM:              Peter Marocco
                   Acting Deputy Administrator, USAID

DATE:              February 23, 2025

SUBJECT:           Specific Notice of Reduction in Force

I regret to inform you that you are affected by a Reduction in Force (RIF) action. This RIF is necessary to restructure USAID's operations to better reflect Agency priorities and the foreign policy priorities of the United States.

This is your specific notice of RIF. In accordance with RIF procedures specified in Title 5, Code of Federal Regulations, Part 351, you are being released from your competitive level because your competitive area is being eliminated. Consequently, you will be separated from the Federal service effective April 24, 2025. In the event you are qualified and have assignment rights to a position that becomes available during the notice period, you will be informed via a specific, subsequent RIF notice. Should the circumstances of the RIF otherwise change, this notice may be withdrawn.

**RIF Package**

Each employee impacted by RIF has access to documents that outline applicable benefits for which you may be eligible or entitled as appropriate. These documents will be provided to you by Human Capital and Talent Management (HCTM) within fourteen (14) days of this communication. To obtain paper copies of the documents or ask for additional information, you may make an appointment by contacting HCTM at HCTM-ELR@usaid.gov or 202-712-1234. In addition, the websites to certain relevant external benefits provided by other entities are found immediately below.

For training benefits under the Workforce Improvement Act of 1998, please see www.careeronestop.org.

For unemployment compensation benefits, please refer to the Department of Labor website at www.dol.gov.

For general information on transition assistance, please refer to the Office of Personnel Management website at www.opm.gov.

**Appeal and Grievance Rights**

U.S. Merit Systems Protection Board (MSPB)
If you believe your rights have been violated, you may appeal this action to the MSPB. You may file your appeal with the MSPB's Washington Office, 1615 M Street, NW, Washington, DC

20419. Your appeal must be in writing and may be filed any time after the effective date of the action being appealed until <u>no later than 30 calendar days</u> after the effective date. Failure to file an appeal within the time limit may result in dismissal of the appeal as untimely filed. More information on filing appeals is included in your RIF package. You may also access the MSPB website at [www.mspb.gov](http://www.mspb.gov) for additional and further detailed information on the appeal process.

<u>Equal Employment Opportunity (EEO)</u>
If you believe this personnel action is based in whole or in part on discrimination based on your race, color, religion, sex, national origin, age or handicap, you may file a complaint with the Agency's Office of Civil Rights (OCR) at 202-712-1110 or [OCRDlist@usaid.gov](mailto:OCRDlist@usaid.gov). You must contact OCR no <u>later than 45 calendar days</u> of the effective date of the action, specifically, your separation from Federal service. You may also file with MSPB as noted above and raise discrimination as an affirmative defense. However, you may not proceed through both forums; you must elect one or the other. You may also access the U.S. Equal Employment Opportunity Commission (EEOC) website at [www.eeoc.gov](http://www.eeoc.gov) for additional and further detailed information on the Federal sector EEO process.

<u>Office of Special Counsel</u>
You may also seek corrective action before the U.S. Office of Special Counsel (OSC). Visit the OSC e-filing system web site at [www.osc.gov](http://www.osc.gov), to access the online application. However, if you do so, you will be limited to whether the agency took one or more covered personnel actions against you in retaliation for making protected whistleblowing disclosures. If you choose to file an action with OSC, you will be foregoing your right to otherwise challenge the basis for this personnel action.

**Employee Information**

The following information was collected regarding your employment with USAID in connection with this RIF action:



Competitive Area:
Type of Service:
Work
Title:
Grade and Level:
Tenure Group:
Service Date:
Veterans' Preference:
Last Three Performance Ratings:

The above information did not affect your standing or treatment in this RIF action, which eliminated your entire competitive area. Nonetheless, please contact HCTM if you believe any of

the above information is incorrect and would like to request an update to your profile in USAID's HR systems.

**Conclusion**

This action is being taken in accordance with the applicable civil service RIF regulations. Included in your RIF package is a copy of the Office of Personnel Management (OPM) retention regulations, 5 C.F.R. Part 351. Further and detailed information about the RIF regulations may also be accessed on OPM website, Reductions in Force. You may make an appointment to review and obtain a copy of the RIF regulations and/or records pertaining to you by contacting HCTM.

In addition, our USAID StaffCare team is available to provide support to you and your families. The USAID Staff Care Center resources are available for virtual consultations and referrals. The entire USAID workforce, regardless of staffing mechanism, and their family members can access the Staff CareCenter services 24 hours a day, 7 days a week, 365 days a year. Services are free and confidential.

Contact Staff Care:

- Free phone: +1 (877) 988-7243
- Direct dial: +1 (919) 645-4960
- Global direct dial: +44 (208) 987-6200
- Email: staffcarecenter@usaid.gov
- Website: Staff Care Center (Registration code: USAID)

Because you are being separated through a RIF action, you are eligible for career transition and placement assistance. Your RIF package includes further information on these programs.

Please be advised that an early resignation may affect your eligibility for placement assistance and your appeal rights. It may also impact your ability to qualify for unemployment compensation and training benefits provided under WIA. You are encouraged to contact your State's Department of Labor and Employment for any questions regarding unemployment compensation. You are also encouraged to contact HCTM at HCTM-ELR@usaid.gov or 202-712-1234 to determine how an early resignation may affect your benefits.

This RIF action does not reflect directly on your service, performance, or conduct. It is being taken solely for the reasons stated above. Leadership at USAID thank you for your service to our Agency and the nation.

**Attachments (6)**
1. Acknowledgement of Receipt
2. MSPB Appeal Information
3. OPM Retention Regulations
4. Unemployment Insurance and State Workforce Programs

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

5. Authorization for Release of Employment Information
6. CTAP, ICTAP and Reemployment Priority List (RPL) Program Information

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

# Appendix D

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC



Thank you for contacting Employee and Labor Relations. In light of the most recent actions (2/23/25), please note that ELR only has a skeleton staff at this point and may not be able to respond to everyone individually. Please see the responses below for answers to our most common questions and thank you for your patience as we are currently dealing with a heavy load of emails.

We cannot currently provide information about your individual status. Per the notices that went out last night, If you are a direct hire and received an email stating that you are "essential" you should be working. Otherwise, if you are direct hire, per the notice posted on the usaid.gov website, you have been placed on administrative leave. Contractors should contact their COs for further guidance.

We do not have any additional information to provide at this point regarding those who elected DRP and also received the RIF notice. If you have questions or need corrections or documentation, please submit them to hr-helpdesk@usaid.gov as we are tracking them there and are working on putting together a FAQ.

If you need IT assistance, please contact the IT helpdesk at cio-helpdesk@usaid.gov or at 202-712-1234, Press 1.

For HR related questions, including retirement, VERA, and deferred resignation, please email hr-helpdesk@usaid.gov. For payroll questions, please reach out to payroll@usaid.gov.

I am sorry we are not able to provide you with more guidance at this time. Thank you for your patience as we all try to work through this situation.

Docusign Envelope ID: 99A96A68-3662-4A92-A3E5-0100AFCF66FC

# Appendix E

 Gmail

## Service Request INC[REDACTED] has been resolved
1 message

**USAID Service Central Ticketing System** <usaidsnts@usaid.gov>   Mon, Feb 24, 2025 at [REDACTED]
Reply-To: USAID Service Central Ticketing System <usaidsnts@usaid.gov>
To: [REDACTED]

Service Request ticket INC[REDACTED] has been resolved and will be closed in 5 business days.

Short description: Lost systems access

Resolution notes: Hello,

Thank you for contacting the USAID IT Service Desk.

At this time, both the CIO Service Desk and HCTM are not able to validate the disablement of USAID accounts or restore them without authorization from political leadership.
In the event that a user is no longer able to access their USAID account, please have the user's mission/bureau career leadership work with their political leadership to request confirmation of the action.

Any questions regarding Administrative Leave Status should be directed to hctm.elr@usaid.gov.

As we have referred you on who to contact, we will now be resolving this ticket.

Regards,

[REDACTED]
USAID Service Desk Analyst
U.S. Agency for International Development (USAID)

Ref:[REDACTED]

# EXHIBIT 34

Docusign Envelope ID: 30742D02-232B-49F6-B2C2-672A   CBD2A25

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| J. DOE 1, *et al.*, | |
| **Plaintiffs** | |
| **v.** | **Case No. 25 8:25-cv-00462-TDC** |
| ELON MUSK, *et al.*, | |
| **Defendants** | |

## DECLARATION OF J. DOE 22

I, J. Doe 22, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 22" in the complaint.

2. I am an employee at the United States Agency for International Development ("USAID") and have been with the agency since 2020.

3. I am in a high-risk area in Central America.

4. On February 23rd, 2025, I was placed on administrative leave. Aside from a public announcement on the USAID website, the only indication I have that I have been placed on leave is an informal email from my Mission director. I did not receive a formal notice of being placed on leave.

5. The people that appear to be tasked with getting us home seem very unaware as to how to access normal information about personnel such as staffing patterns and family composition. My colleagues and I have received strange google forms asking for our family information when all of that information is in our OF-126 (a form/file within USAID systems).

Docusign Envelope ID: 30742D02-232B-49F6-B2C2-672ABCBD2A25

6. Because DOGE has shut down USAID's payment system (Phoenix), our housing electricity and the electricity in our USAID building have not been paid for. Mission leadership has informed us that the only reason our electricity is on is because we've asked for an extension from the electric company. The Mission asked for a waiver but because our payment system is down, the Treasury has no way to issue money to USAID and State Department representatives here are hesitant to make payments on our behalf for fear of not being reimbursed.

7. Once the electricity goes out in our homes, we lose access to our security cameras and radios. Again, I live in a high-risk post, so access to security systems is very important to me.

8. I have been told by Mission leadership that the cell phone and internet bills are due this week with no way to pay them. This is despite the so-called "waiver" process that has been allegedly implemented to preserve such access.

9. Our cell phones and radios are also the only way to communicate with the Regional Security Office about security threats. We have access to no other USAID security systems.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**J. Doe 22**

Signed by:

*J. Doe 22*

470070FBBA2146F...

**Signature**

# EXHIBIT 35

Docusign Envelope ID: 9636C979-D932-4908-83DD-56785282B9C8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1, *et al.*,

　　　　　*Plaintiffs*

　　　　　**v.**

ELON MUSK, *et al.*,

　　　　　*Defendants*

Case No. 25 8:25-cv-00462-TDC

**DECLARATION OF ANN LEWIS**

I, Ann Lewis,  pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am the former Director of the Technology Transformation Services ("TTS") within the U.S. General Services Administration.

2. I have a degree in computer science from Carnegie Mellon University. I have worked in tech for over 20 years, and as a technology leader for over 12 years, including roles as Chief Technology Officer at a national nonprofit organization, and as a software engineer for a multi-billion dollar company.

3. I have read public reporting as well as declarations in this lawsuit which discuss the level of access that members of DOGE have within the USAID systems.

4. I understand that DOGE has "root access" (sometimes called "administrator access" or more colloquially "God Mode") to all USAID technology systems.

Docusign Envelope ID: 9636C979-D932-4908-83DD-56785282B9C8

5.  Administrator access is defined by CISA (Cybersecurity and Infrastructure Security
    Agency) as "elevated system privileges that allow a user to install software, change
    security settings, manage accounts, and configure system settings." Administrator access
    is generally understood by the tech industry and by IT professionals as the highest and
    most powerful level of access to any system. Administrator access to a system gives the
    user the ability to create, read, update, and delete/destroy any and all data and code within
    the system. This can include modifying or deleting website content, reading another
    user's emails, sending email on behalf of every user, adding or removing code to change
    the behavior of the system, granting other users any level of access (including additional
    administrator access), revoking access from any user, updating data, deleting data, and
    extracting all data including sensitive data and the Personal Identifying Information of
    users.  Administrator access not only allows the user to delete critical data owned by and
    affecting other users, but it also allows the user to disable, modify, or destroy data
    backups and audit trails used to conduct forensic analysis, and it allows the user to take
    system components fully offline.

6.  Through my work leading TTS, I became aware of the Federal Information Security
    Management Act (FISMA)
    https://www.congress.gov/bill/113th-congress/senate-bill/2521/text , and NIST's SP
    800-53 Security and Privacy Controls for Information Systems and Organizations
    https://csrc.nist.gov/pubs/sp/800/53/r5/upd1/final.

7. FISMA is a US law that protects government information and operations, and NIST 800-53 is a cybersecurity framework that provides a comprehensive set of security and privacy controls for federal information systems and organizations.

8. The Principle of Least Privilege is a fundamental cybersecurity concept and best practice that states that users should have only the minimum rights, roles and permissions required to perform their roles and responsibilities. This protects access to high-value data and critical assets, and helps prevent unauthorized access, accidental damage from user errors, and malicious actions. The Principle of Least Privilege applies to all aspects of system and software management, including access control, user roles in systems, software, databases, applications, service accounts, APIs, and automated processes.

9. FISMA Section 3544 (Management of Information Security Risk) states that the head of each agency shall be responsible for complying with the requirements of this subchapter and related policies, procedures, standards, and guidelines, including information security standards promulgated under section 11331 of title 40. And section 11331 of title 40 states that the National Institute of Standards and Technology (NIST) prescribes standards and guidelines pertaining to Federal information systems.

10. NIST 800-53 AC-6 lists The Principle of Least Privilege as a key security control:

https://csrc.nist.gov/CSRC/media/Projects/risk-management/800-53%20Downloads/800-53r5/SP_800-53_v5_1-derived-OSCAL.pdf

11. NIST 800-53 defines "administrator access" as a privileged role that allows users to perform security-relevant functions that are not typically available to ordinary users

12. Granting DOGE engineers administrator access to all USAID systems is a clear violation of the Principle of Least Privilege, and at odds with cyber security best practices federal agencies are required to follow, as specified by NIST SP 800-53.

13. Granting administrator access to any system opens up new fraud vectors and new cyber security risks. As a technology professional and former government employee, I believe that **every cyber security risk is also a national security risk**. At present, every hacker in the world knows there are a small number of people new to federal service who hold the keys to access all US government payments, contracts, civil servant personal info, and more. When sensitive data exists within government security boundaries, we can audit and track it, but after it leaves, we can't know where it goes or what it's being used for. Anyone with administrator access to a system can not only export all data, but can also disable tracking and audit logging critical to forensic analysis.

14. The costs of cyber security incidents are high, not just to the agency or breached system, but especially to the users whose Personal Identifying Information was leaked, shared without their permission, or stolen. Stolen PII can't be easily changed or drawn back, and the damage to the individual can last a lifetime. A user's stolen PII can be sold, used to commit fraud, used for scams, harassment, and identity theft.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**Ann Lewis**

DocuSigned by:

Ann Lewis

FDF73ECA11BC46E...

**Signature**

EXHIBIT 36

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 1, *et al.*,

**Plaintiffs**

**v.**

ELON MUSK, *et al.*,

**Defendants**

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF MARY COMANS

I, Mary Comans, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1.    From March 2017 until February 2025, I served as the Chief Financial Officer for the Federal Emergency Management Agency ("FEMA"). I have been a member of the Senior Executive Service for nearly one decade. From January 20 – 26, 2025, I served as the Senior Official Performing the Duties of FEMA Deputy Administrator. I previously served in numerous positions across the Department of Homeland Security ("DHS").

2.    On or around February 5, 2025, I participated in an in-person meeting with leadership of FEMA and DHS, to include Acting DHS General Counsel Joseph Mazzara, and two DOGE team members: Brad Smith and John Burham. Another DOGE team member, Kyle Schutt, participated by phone.

3.    The DOGE team members said they were embedded at U.S. Department of Health and Human Services but were there to help as the DHS DOGE members onboarded. Specifically, they wanted to ensure that FEMA was not sending money to non-

governmental organizations ("NGOs") that aided undocumented immigrants through the "Shelter and Services Program" grant that FEMA administers for U.S. Custom and Border Protection.

4. Mr. Smith, one of the DOGE members, asked FEMA's leadership team whether they had stopped all payments to NGOs. A FEMA representative who oversees grants confirmed that they had. Mr. Smith then asked about payments to state and local governments. The FEMA representative said those payments were being continued. Wagging his finger for emphasis, Mr. Smith affirmed, "that's the right answer."

5. The next day, on Thursday, February 6, 2025, FEMA, DHS leadership and DOGE had a follow up meeting, which I attended, to ensure FEMA was providing the system access needed.  Initially, DOGE asked for elevated system administrator privileges to FEMA's Grant Management system, which manages the life-cycle of all FEMA grant programs, to include grant awards. This request was granted by the executive officer that oversees the Grant Directorate.  At this time, DOGE's also asked for read-only access to the FEMA financial system, and I granted that request.

6. Recognizing the potential audit and internal control risk, I asked my supervisor, the Acting FEMA Administrator, to obtain a written directive from DHS leadership directing expanded access to FEMA's grant management system. I asked for the written directive in order to protect FEMA from liability. Additionally, I knew, for instance, that the code in our financial system is proprietary and therefore access is supposed to be strictly limited. DHS never issued this written directive; instead, on February 10, 2025, the

Acting FEMA Administrator signed a memo that I executed to grant DOGE full system administrative right to FEMA's financial system.

7. As I understand it, on Sunday, February 9, 2025, around 5:00 PM, a DOGE team member embedded at the Treasury Department flagged that FEMA had recently paid New York City tens of millions of dollars. This payment was under the Shelter and Service Program to reimburse New York City for eligible expenses incurred for the care and sheltering services the City had provided to migrants following their release from DHS custody. I spent the entire evening analyzing the amount of funds paid and in what manner. I was also directed by DHS Deputy Chief of Staff Troup Hemenway to grant Mr. Schutt, a DOGE representative, full system access to FEMA's financial system, and I did so.

8. I became aware that Elon Musk posted on X (formerly Twitter) at 4:03AM on February 10, 2025, that "The @DOGE team just discovered that FEMA sent $59M LAST WEEK to luxury hotels in New York City to house illegal migrants. Sending this money violated the law and is in gross insubordination to the President's executive order. That money is meant for American disaster relief and instead is being spent on high end hotels for illegals! A clawback demand will be made today to recoup those funds."[1]

9. I spent all day on Monday, February 10, 2025, recouping the funds from New York City, which ultimately totaled $80 million dollars. On Monday, February 10, 2025, at 3:45PM, FEMA's Acting Administrator sent an email to DHS confirming that the process to claw

---

[1] Elon Musk (@elonmusk), X (Feb. 10, 2025, 4:03 AM), https://x.com/elonmusk/status/1888891512303263815.

back funding was occurring. At 5:29PM, I reported to my leadership that I had

successfully coordinated with Treasury and the funds were being returned.

10.     Based on my experience and the interactions I witnessed, there was a sudden policy

change concerning whether FEMA could send resources to state and local governments. I

know the changed policy was not a decision made by FEMA leadership. Upon

information and belief, I believe that this decision was made by Mr. Musk and/or DOGE.

11.     On Tuesday, February 11, 2025, I was terminated from federal employment.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th day of February 2025.


_____
Mary Comans

# EXHIBIT 37

Docusign Envelope ID: B3B243E9-F335-469F-91B -1C606AAE4735

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1, *et al.*,

**Plaintiffs**

**v.**

ELON MUSK, *et al.*,

**Defendants**

**Case No. 25 8:25-cv-00462-TDC**

## <u>DECLARATION OF JOHN B. CHESTON</u>

I, John B. Cheston, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a research assistant for Marziani, Stevens & Gonzalez PLLC, counsel for Plaintiffs in this case.

2. I combined the video attached to this Declaration as Appendix A.

3. I created this video from the publicly available sources listed below, all of which I understand are being separately entered into the record in this case. Those sources are:

   a. The White House, *President Trump Participates in the FII PRIORITY Summit,* YouTube 16:00 (Feb. 19, 2025) https://www.youtube.com/watch?v=11CnoIJidr8

   b. ALX (@alx), *ELON MUSK: "We need to delete entire agencies…"* (Feb. 13, 2025), X, https://x.com/alx/status/1889912783627825445

   c. Sean Hannity, *Interview with President Donald Trump and Elon Musk*, Fox News (Feb. 19, 2025)

   https://nation.foxnews.com/watch/1ebe75d66f1b33d8943a0be8a14222b8/

    d.  CSPAN (@cspan), *"President Trump on DOGE emails…"* (Feb. 24 2025), X,

https://x.com/cspan/status/1894095758686634306/video/1

4.      I used iMovie to create the video.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 25th day of February, 2025.**

**John B. Cheston**

**Signature**

# Appendix A

https://drive.google.com/file/d/1v7KT8SzA_HsuJNrrXaa7VLL38m7rDflg/view

# EXHIBIT 38

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 489 of 959

Menu    Search



REMARKS

# INTERVIEW OF PRESIDENT TRUMP AND ELON MUSK BY SEAN HANNITY, "THE SEAN HANNITY SHOW"

February 18, 2025

Roosevelt Room

11:48 A.M. EST

000469

Q   Mr. President, great to see you again.

THE PRESIDENT:  Thank you very much.  Thank you.

Q   How are you?

THE PRESIDENT:  Thank you.

Q   Elon Musk.

MR. MUSK:  Hi.

Q   Great to see you.

MR. MUSK:  Thanks.  Thanks for having me.

Q   I've been reading a lot about you.  I've got to start with this.  So, he's working for free with DOGE.  He's — he's kind of put a lot of his life on hold, and you sued Twitter a number of years ago.  You just made him pay you $10 million?

THE PRESIDENT:  That's right.  That's right.

Q   That's — that's right.  (Laughs.)

THE PRESIDENT:  Well, I sued — I sued from long before he had it.

MR. MUSK:  Yeah.  Yeah.  (Inaudible.)

THE PRESIDENT:  And, I mean, they really did a number on me, you know.  And I sued, and they had to pay.  You know, they paid $10 million settlement.

000470

Q   You're okay with that?

MR. MUSK:  I mean, I left it up to the lawyers and, you know, the team running Twitter.  So, I said, "You guys do what you think is the right — makes sense."

Q   I think it's funny.

THE PRESIDENT:  I think —

Q   Because —

THE PRESIDENT:  — it's a very low — I was looking to get much more money than that.

Q   So, you gave him a discount w- — in the lawsuit?

THE PRESIDENT:  He got — oh, he got a big discount.  I don't think he even knows about it.

Q   He's become one of your — if you read and believe the media — he's become one of your best friends.  He's working for free for you.  He's —

MR. MUSK:  Well, I love the president.  I just want to be clear about that.

Q   You don't care about that?

MR. MUSK:  I — no, I love the pr- — I —

Q   You love the president?

MR. MUSK:  I think — I think President Trump is a good man, and — and he's, you know — I — I —

THE PRESIDENT:  That's the way he said that.  You know, there's something nice about.  (Laughter.)

MR. MUSK:  No, it is.  I, you know —

THE PRESIDENT:  It is.

MR. MUSK:  Because, I mean, the president has been so — so unfairly attacked in the media.  It's truly outrageous.  And I've sp- — at this point, spent a lot of time with the president, and not once have I seen him do something that was mean or cruel or — or wrong.  Not once.

Q    You know, I've known him for 30 years.

MR. MUSK:  Yeah.

Q    And I've never seen anybody take as much as he's taken.

MR. MUSK:  Yeah.

Q    And we've discussed this.  And I'm like, "How do you deal with it?"

THE PRESIDENT:  Did have a choice?  (Laughs.)  I didn't have a choice.

Q    Well, you would say that to me.  I'm like, "What — what am I going to do?  Worry about it?"

THE PRESIDENT:  That's the only thing I can say.

Q    And, you know — and then culminating in two assassination attempts, which resulted in your endorsement.

MR. MUSK:  Well, I was going to do it anyway, but that was —

Q    That was it?

MR. MUSK:  — a precipitating event, yeah.

THE PRESIDENT:  That speeded it up a little bit?

MR. MUSK:  Yeah.  Yeah.

Q    The day of the assassination?

THE PRESIDENT:  Nice.  I didn't know that.

MR. MUSK:  Yeah, it just — it sped it up, but I was going to do it anyway.

Q    Mr. President, with your indulgence, I'm convinced that people only know a little bit about Elon.  I don't think they know everything about Elon, because as I studied for and prepared for this interview, I learned a lot about you that I didn't know.  I think people will think about Tesla.  Democrats are demonizing you and — and trying to make the country hate you.

I just want people to understand you a little bit better, and the person that you've gotten to know and have now put a lot of trust in.

000473

THE PRESIDENT:  Sure.

Q   And, you know, just — let's go over a little bit of your bio, starting —

MR. MUSK:  Ah, okay.

Q   — with PayPal and how you became involved in Tesla and SpaceX and Neuralink —

MR. MUSK:  This — this could take a while.

Q   — and all these —

MR. MUSK:  I mean, you know, I — I think the way you think of me is, like, I'm a technologist and I try to make technologies that improve the world and make life better.

Q   You can show them your shirt.

MR. MUSK:  Yeah, and that's why, like, my t-shirt says "tech support" — (laughter) — because I'm here to provide the president with — with technology support.

And now, that — that may seem, like, well, is that a silly thing?  But actually, it's a very important thing, because the president will make these executive orders, which are very sensible and good for the country, but then they don't get implemented, you know?

So, if you take the — for example, all the funding for the migrant hotels, the

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 495 of 959

president issued an executive order: Hey, we need to stop taking taxpayer money and — and paying for luxury hotels for illegal immigrants —

Q   It's crazy.

MR. MUSK:  — which makes no sense.  Like, obviously, people do not want their tax dollars going to — to fund high-end hotels for — for illegals.  And yet, they were still doing that, even as late as last week.

And so, you know, we went in there, and we were like, "This is in violation of the presidential executive order.  It needs to stop."

So — so, what we're — what we're doing here is — is — one of the biggest functions of the DOGE team is just making sure that the presidential executive orders are actually carried out.  And this is — I just want to point out, this is a very important thing, because the president is the elected representative of the people, so he's representing the will of the people.  And if the bureaucracy is fighting the will of the people and preventing the pres- — the president from implementing what the people want, then what we live in is a bureaucracy and not a democracy.

Q   Yeah.  You — you're both aware — you have to be keenly aware that the media and — and the punditry class — not that — you know, I think you've proven they have no power anymore, because they threw everything they had at you, and they didn't win.  And that was, you know, the New York Times, Washington Post, three networks, every late-night comedy show, two cable channels — they — they just threw — they threw everything — lawfare, weaponization.

THE PRESIDENT:  It's true.

Q    And now I see they want you two to start — they want a divorce.  They want you two to start hating each other.  And they try — "Oh, President Elon Musk," for example.  You do know that they're doing that to you?

THE PRESIDENT:  Oh, I see it all the time.  They tried it, then they stopped.  That wasn't — they have many different things of hatred.

Actually, Elon called me.  He said, "You know they're trying to drive us apart."  I said, "Absolutely."

You know, they said, "We have breaking news: Donald Trump has ceded control of the presidency to Elon Musk.  President Musk will be attending a Cabinet meeting tonight at 8 o'clock."  (Laughter.)  And I say — it's just so obvious.  They're so bad at it.

I used to think they were good at it.  They're actually bad at it, because if they were good at it, I'd never be president because I — I think nobody in history has ever gotten more bad publicity than me.

I could do the greatest things; I get 98 percent bad publicity.  I could do — outside of you and a few of your very good friends.  It's, like, the craziest thing.

But you know what I have learned, Elon?  The people are smart.  They get it.

MR. MUSK.  Yeah.  They do, actually.  Yeah.

THE PRESIDENT:  They get it.  They really see what's happening.

MR. MUSK:  Yes.

Q   And at the end of this interview, I — what I would like is, I — I want people to know the relationship and know more about you.

What is the relationship, Mr. President?

THE PRESIDENT:  Well, I respect him.  I've always respected him.  I never knew that he was right on certain things, and I'm usually pretty good at this stuff.  He did Starlink.  He did things that were so advanced and nobody knew what the hell they were.

I can tell you, in North Carolina, they had no communication.  They were wiped out.  Those people were — you know, they had rivers in between — land that never saw water, all of a sudden, there was a river and a vicious — like, rapids.  People were dying all over.  They had no communication.

They said, "Do you know Elon Musk?"   And they didn't really know I knew him.  I said, "Yeah."  They said, "Could you get Starlink?"  It's, like, the first time I ever heard of it.  I said, "What's Starlink?"  "A communication system that's unbelievable."

Q   I have it.

THE PRESIDENT:  And he — yeah.  And he said — I called him, and I said, "Listen, they really need it."  And he got, like, thousands of units of this communication, and it saved a lot of lives.  He got it immediately.  And you can't get it.  I mean, you have to wait a long time to get it.  But he got it to him immediately.

And I said, "That's pretty amazing."  And I didn't even know he had it.

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 336    Filed 02/26/25    Page 498 of 959

We watch the rocket ships, and we watch Tesla.

I think, you know, something that had an effect on me was when I saw the rocket ship come back and get grabbed like you grab a beautiful little baby.  You grab your baby.  It just —

MR. MUSK:  Just hug the rocket.

THE PRESIDENT:  I'd never seen —

MR. MUSK:  Everyone — right.  Everyone needs (inaudible) —

Q    You hug the rocket.  You hug the rocket.

MR. MUSK:  — (inaudible) rockets.

THE PRESIDENT:  Yeah.  No, but — and he said, "You know, you can't really have a rocket program if you're going to dump a billion dollars into the ocean every time you fly.  You have to save it."  And he saved it.  First time —

Q    That's ever been done.

THE PRESIDENT:  — I've ever seen that done.  Now nobody else can do it.

If you look at the U.S., Russia, or China, they can't do it, and they won't be able to do it for a long time.  He has the technology.  So, you learn — I wanted somebody really smart to work with me, in terms of the country — a very important aspect.  Because, I mean, he doesn't talk about it.  He's actually a very good businessman.  And when he talks about the executive orders — and this is

Case 8:25-cv-01042-TDC     Document 36     Filed 02/26/25     Page 499 of 959

probably true for all presidents: You write an executive order and you think it's done, you send it out; it doesn't get done.  It doesn't get implemented.  They don't implement it.

They — maybe they're from the last administration — and they are, in some cases.  You try and get them out as fast as you can.  But I could — as soon as he said that, I said, "You know, that's interesting."  You write a beautiful executive — and you sign it and you assume it's going to be done, but it's not.  What he does is he takes it, and with his hundred geniuses — he's got some very brilliant young people working for him that dress much worse than him, actually —

MR. MUSK:  Yeah, they do.

THE PRESIDENT:  — they dress in just t-shirts.  (Laughter.)  You wouldn't know they have 180 IQ.

Q   Wait.  Wait.  So, what — he's — he's your tech support?

MR. MUSK:  I —

THE PRESIDENT:  No, no.  He is —

MR. MUSK:  I actually virtually am tech support.

THE PRESIDENT:  He's much more than that.

MR. MUSK:  I actually am tech support, though.  But that's —

THE PRESIDENT:  But he gets it done.  He's a leader.  He really is a — he gets it done.  You get a lot of tech people, and you have people, they're good with tech,

000479

but they — he gets it done.

You know, I said, in real estate, you had guys that would draw beautiful renderings of a building, and they'd draw the rendering, it would be great, and you'd say, "Great. When are you starting?" But they were never able to get it built. They couldn't get the finances. They couldn't get the approvals. It would never get done. And then you have other guys that are able to get it done. You know, they could just get it done.

I was in real estate. Same thing in this. He gets it done.

So, when he said that — he said, "You know, when you sign these executive orders, a lot of them don't get done, and maybe the most important ones," and he would take that executive order that I'd signed, and he would have those people go to whatever agency it was — "When are you doing it? Get it done. Get it done." And some guy that maybe didn't want to do it, all of a sudden, he's signing — he just doesn't want to bothered.

Q   Does — do a lot of those executive orders have to be codified into law to — do you need the Republican Congress to follow up?

THE PRESIDENT: Yeah, and they will. A lot of them will be. Yeah.

Q   They will?

THE PRESIDENT: Look, in the meantime, we have four years. The beauty is, we have four years. That's why I like doing it right at the beginning. Because an executive order is great. I mean, the one problem — it's both good and bad, because when they did all these executive orders, I've canceled most of them. They were terrible. I mean, we were going to go radical left, communist, okay?

It was crazy.  Their —

MR. MUSK:  Really crazy.

THE PRESIDENT:  — executive orders were so bad, if they ever got them codified, you'd never be able to break them.  So, the damage that Biden has done to this country — and it's not even Biden; it's the people that circled him in the Oval Office, okay? — but the damage they did to this country, in terms of, let's say, open borders — you know, there's so many things, but open borders, where millions of people poured into our country, and hundreds of thousands of those people are criminals.  They're murderers.  They're drug dealers.  They're gang members.  They're people from prisons from all over the world.

And we have a great guy, Tom Homan, and he is doing so incredibly.  You saw the numbers.  They're down like 96 percent.

Q   Ninety-five percent.

THE PRESIDENT:  He is a phenomenal guy.  And Kristi Noem is doing an unbelievable job.  And he wanted her.  He said, "She's so tough."  And I said, "I don't think of her as that way.  You know, she's very nice."  He said, "No, she's so tough."  And she is.  I see her with the horses.  She's riding the horse.  Let's — (laughter) — she's great.

But the team we have is — is really unbelievable.

But those executive orders, I sign them, and now they get passed on to him and his group and other people, and they're all getting done.  We're getting them done.

Q   Let me go back a little bit to your background, because —

MR. MUSK:  Sure.

Q   — it's beyond impressive.  You were the chief engineer, for example — you were an early believer in Tesla.  You became the CEO and — and then the chief engineer, which was phenomenal.  SpaceX, same thing, which is unbelievable.

I mean, you were the first company — private company to send astronauts successfully into — into space, first private company to send astronauts into orbit.

MR. MUSK:  Yeah.

Q   That's — that's pretty deep.

THE PRESIDENT:  He's going to go into orbit soon.

Q   Okay.

MR. MUSK:  (Laughs.)  Yeah.

THE PRESIDENT:  No, he's going to go to Mars.  He's going to fly on his —

Q   Starlink.

MR. MUSK:  At some point, yeah.

Q   As in (inaudible) —

MR. MUSK: But they say — they always ask me, like, "Do you want to die on Mars?" And I say, "Well, yes, but not on impact." (Laughter.)

Q    Star- — Starlink is in 100 countries.

This is going to be hard. I feel like I'm interviewing two brothers here.

MR. MUSK: You go ahead.

Q    Starshield, which could be used for national defense.

MR. MUSK: Yeah, it is already being used for national defense.

Q    Then you have a — what is it called? Optimus, a part of Tesla.

MR. MUSK: They're a robot, yeah.

Q    A robotic arm. Then you have an AI arm. And then you have something that really fascinated me, and it's called Neuralink.

MR. MUSK: Yes.

Q    You might help the blind to see and people with spinal cord injuries that they — that they can recover, where in the past — how close is that to becoming a success?

MR. MUSK: At Neuralink we're — we've ha- — we've implanted Neuralink in three patients so far, who are quadriplegics, and it allows them to directly control their phone and computer just using their mind, just by thinking. It's like

000483

— so, we call this product Telepathy, so you control your computer and phone just by thinking, and it's possible to actually control the computer and phone faster than someone who has working hands.

Then the next step would be to add a second Neuralink implant past the point where these — the neurons are damaged, so that somebody can walk again and so the pe- — they can have full-body functionality restored. And —

THE PRESIDENT: And you like Bobby, right?

MR. MUSK: I like Bobby, actually. Yeah. I — I supported Bobby Kennedy. I think he — you know, he's unfairly maligned as someone who is anti-science. But I think he — he isn't. He just wants to question the science, which is the essence of the science — the scientific method, fundamentally, is about always questioning the science.

Q   Well, they didn't tell us the truth about COVID.

MR. MUSK: Correct.

Q   That's for sure.

MR. MUSK: Yes.

Q   And we learned a lot with the Twitter files. And that just, then, raises a question. You're the richest man in the world. You may not like that part.

THE PRESIDENT: Yeah.

Q   You're pretty competitive.

MR. MUSK:  I mean, it's neither here nor there.

Q   I've known you a long time.

MR. MUSK:  I don't think it matters.

Q   But —

THE PRESIDENT:  That's why I became president.

Q   — he's on your team.

THE PRESIDENT:  (Inaudible) —

Q   Well, that's true.  He can't top that.

THE PRESIDENT:  He's good.  You know, I wanted to find somebody smarter than him.  I searched all over.  I just couldn't do it.  I couldn't.  I couldn't.

Q   You really tried hard.

THE PRESIDENT:  I couldn't find anyone smarter, right?  So, we had to — we had to, for the country.

Q   But this is the thing —

THE PRESIDENT:  So, we settled on — we settled on this guy.

MR. MUSK:  Well, thanks for having me.

THE PRESIDENT:  (Laughs.)  Yeah.

Q   So —

MR. MUSK:  I'm just trying to be useful here.

Q   But this is the interesting — but this is where we are as a so- — a society.  And I — I hate to do this to you, but I'm going to do it anyway.  You're doing all of these things.  At DOGE, nobody at DOGE gets paid a penny, correct?

MR. MUSK:  Well, actually, some people are federal employees, so they do.

Q   Oh, okay.

MR. MUSK:  Yeah.  They're (inaudible).  But it's fair to say that the software engineers at DOGE could be earning millions of dollars a year and instead of earning a small fraction of that as federal employees.

Q   Okay.  So, just —

THE PRESIDENT:  And they're very committed people.

MR. MUSK:  Yes.

Q   So — you're — you're committed to helping the blind see, people with spinal cord injuries recover.

MR. MUSK:  Yes.

Case 8:25-cv-00462-TDC	Document 36	Filed 02/26/25	Page 507 of 959

Q    You're committed to getting to Mars.  You're committed to rescue — you're going to help rescue, next month, two astronauts that I think were abandoned.  They — they dispute that in an interview.

THE PRESIDENT:  When are you — when are you getting them?

MR. MUSK:  At the — at the president's request, we — or instruction, we are accelerating the return of the astronauts, which was postponed, kind of, to a ridiculous degree.

THE PRESIDENT:  They got left in space.

Q    They've been there.  They were supposed to be there eight days.  They're there almost 300.

THE PRESIDENT:  Biden.

MR. MUSK:  They were put —

Q    Yeah.

MR. MUSK:  Yes, they were left up there for political reasons, which is not good.

Q    Okay, it's not good.  Now, if I had the weight and pressure of doing that successfully on my shoulders, I think I'd be, you know — but you — when we spoke before we did this interview, you were very confident.  You think this will be a successful mission.

MR. MUSK:  Well, we don't want to be complacent, but we have brought

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 508 of 959

astronauts back from the space station many times before, and always with success.  So, as long as we're not complacent —

THE PRESIDENT:  When are they — when are you going to launch?

MR. MUSK:  I think it's about — about four weeks to bring them back.

Q   About four weeks?

MR. MUSK:  Yeah.

THE PRESIDENT:  And you have the go-ahead.

MR. MUSK:  We're being extremely cautious.

Q   Yeah.

THE PRESIDENT:  You now have the go-ahead.

MR. MUSK:  Yes.  Well, thanks to you —

THE PRESIDENT:  They didn't have the go-ahead with Biden.

Q   What's that?

THE PRESIDENT:  He was going to leave him in space.  I think he was going to leave them in space.

Q   Well, it's like the (inaudible) —

THE PRESIDENT:  He considered it a —

Q   — growing up, lost in space.

THE PRESIDENT:  Yeah, he didn't want the publicity.  Can you believe it?

Q   Unbelievable.  And so —

MR. MUSK:  Yeah.

Q   — I want to echo something that the president said and then ask an overarching question.  So, people in — get hit with Hurricane Helene, they have no communication with the outside world.  You come to the rescue.  You donated that, I believe?

MR. MUSK:  Yes.  Yes.

Q   You donated to the people of —

THE PRESIDENT:  He saved a lot of lives.  In North Carolina, he saved a lot of lives.

Q   And California, after the wildfires?

THE PRESIDENT:  California.  But, I mean, in North Carolina, where they were really in trouble, they had no communication, people were dying.

Q   Nothing.

Case 8:25-cv-01462-TDC    Document 36    Filed 02/26/25    Page 510 of 959

THE PRESIDENT:  They were dying of starvation.  He saved a lot of lives in North Carolina.

Q   Okay.  Now you're going to rescue astronauts.  And now — again, you do — you do all of this — I would think liberals would love the fact that you have the biggest electric vehicle company in the world.

MR. MUSK:  Yeah.  I mean, I used to be adored by the left, you know.

Q   Not anymore.

MR. MUSK:  Le- — less so these days.

Q   He killed that, huh?

MR. MUSK:  I mean, less —

THE PRESIDENT:  I really (inaudible) —

MR. MUSK:  Well, I mean, this — this whole sort of, like, you know — it was — they call it, like, "Trump derangement syndrome."  And I didn't — you know, you don't realize how real this is until, like, it's — you can't reason with people.

So, like, I was at a friend's birthday party in L.A., just a birthday dinner, and it was, like, a nice, quiet dinner, and everything was — everyone was behaving normally.  And then I happened to mention — this was before the election, like a month or two before — I happened to mention the president's name, and it was like they got shot with a dart in the jugular that contained, like, the methamphetamine and rabies.  Okay?  (Laughter.)

And they're like, "Whyy?"  And I'm, like, "What is wrong — like, guys, like" — you just can't have, like, a normal conversation.  And it's like — it's like they become completely irrational.

Q   He — he has no idea, if you're friends with him —

MR. MUSK:  Yeah.

Q   — you pay a price.  You know, it's like, I walk into a restaurant in New York, and it's like half the room gets daggers and they want to —

MR. MUSK:  The eye-daggers — eye-daggers level is insane.  (Laughter.)

I mean, there was, like — I had, like, some — some invitation because — so, I got invited to, like, so- — basically, a big, sort of, damn — damn event like that was — but I'd received the invitation, like, the beginning of last year and then — and I still attended, even after I'd endorsed President Trump, and I didn't realize how profoundly that would affect, you know, how I was received.  (Laughter.)

I mean, I walk into the room and I'm getting just the dirty looks from — from everyone.  Like, if looks could kill, I would have been dead several times over.

Q   But that was not — (laughter) — before Trump

MR. MUSK:  (Inaudible) —

Q   Before Trump: "BC" —

MR. MUSK:  — ashes on the floor.  (Laughs.)

Q    — or "BT." Before Trump, that never happened. Right?

MR. MUSK: No.

Q    No. So —

MR. MUSK: I — I just — doesn't seem strange? Like, what — what is up with this total, like, madness?

Q    You're smarter than me. Can you — I actually think that there's a level of irrationality. It's almost like a trigger and —

MR. MUSK: It totally triggers.

Q    And it's like — look, I — I've been on TV — this is my 29th year. I've been on radio 35 years. I will — I've gone hard in the paint to — for candidates that lost.

MR. MUSK: Yeah.

Q    And guess what? I get over it.

MR. MUSK. Sure. Yeah, yeah.

Q    And I just keep doing my show, and I just — you know, I come back to fight another day.

So, here's the big — then this is the million dollar or billion dollar — I'm among billionaires — question. So, you have all this going on and you stop, in a way — you're still doing it — and you partner with him. And this is what you get for it from the Democrats. You get "nobody voted for Elon." Well, nobody voted for

any of your Cabinet nominees. Okay? "People are dying because of DOGE cuts." I'll give you a chance to respond to all that. "What DOGE is doing is illegal." "Elon Musk is" — more street vernacular for a male body part. "It's a constitutional crisis."

MR. MUSK: How c- — why — why are they reacting like this?

Q   Well, first of all, do you give a flying rip? Number one. And —

MR. MUSK: Well, I guess we must be — if we're the target, we're doing something right. You know, if — like, they wouldn't be complaining so much if they — we weren't doing something useful, I think.

What — all we're really trying to do here is restore the will of the people through the president. And — and what we're finding is there's an unelected bureaucracy. Speaking of unelected, there's a — there's a vast federal bureaucracy that is implacably opposed to the — the president and the Cabinet.

And you look at, say, D.C. voting. It's 92 percent Kamala. Okay, so we're in 92 percent Kamala. That's a lot.

Q   Yeah. They don't like me here either.

MR. MUSK: I think about that number a lot. I'm like, 92 percent. That's, basically, almost everyone. And so — but if — but how can you — if — if the will of the president is not implemented, and the president is representative of the people, that means the will of the people is not being implemented, and that means we don't live in a democracy, we live in a bureaucracy.

And so, I think what we're seeing here is the — sort of, the thrashing of the bureaucracy as we try to restore democracy and the will of the people.

Q   You —

MR. MUSK:  Is this making sense?  I mean — sorry.

Q   Y- — no, of course it does.  I mean, to me, if you look at our framers and our founders — and you've really become a student of history, Mr. President, and we've ta- — we've had conversations both on air and off air — and if we talk about constitutional order or transformational change, nobody can argue that what's happening here is going at the speed of light.

But however, what were the principles of our framers and our founders?  They wanted limited government, greater freedom for the people — and we'll get to the specific cutting of waste, fraud, and abuse.  That — that is your goal, is it not?

THE PRESIDENT:  Yeah.  And my goal was to get great people.  And when you look at what this man has done, I mean, it was something — I knew him a little bit through the White House. Originally, I'd see him around a little bit.  I didn't know him before that, and I respected what he did.  And he fought hard.  You know, he was a — he was maybe questioned for a while.  He was having some difficulties.  It was not easy doing what he did.

I mean, how many people have started a car company and made it really successful and made a better car where it's, you know, beating these big companies that that's all they do is cars?  I mean, it's really amazing the things that he's done.

But I didn't know it as much then as now.  I mean, the fruits have sort of taken hold.

But I wanted great people, and he's a great person. He's an amazing person. He's also a caring person. You know, he uses the word "care."

So, they sign a contract in a government agency, and it has three months. And the guy leaves that signed the contract, and nobody else is there, and they pay the contract for 10 years.

So, the guy is getting checks for years and years and years, and he's telling his family, obviously — maybe it was crooked, maybe he paid to get the contract, or maybe he paid that they didn't terminate him. But, you know, we have contracts that go forever, and they've been going for years, and they're supposed to end in three months or five months or two years or something, and they go forever. So, the guy is either crooked — you know, where he knew this was going to happen — or he's crooked because he's getting payments that he knows he shouldn't be getting.

MR. MUSK: Yeah.

THE PRESIDENT: But they're finding things like that. They're finding things far worse than that. And they're finding billions — and it will be hundreds of billions of dollars' worth of fraud. I say waste and abuse, but fraud, waste, and abuse. And he's doing an amazing job.

And he attracts a young, very smart type of person. I call them high-IQ individuals, and they are. They're very high Q and — high IQ. And when they go in to see the people and talk to these people — you know, the people think they're going to pull it over. They don't. These guys are smart, and they love the country. You know, there's a certain something.

But he uses the word "care." So, people have to care. Like, when I bought Air Force One —

MR. MUSK: Exactly.

THE PRESIDENT: — I negotiated the price. It was $5.7 billion, and I got it — I got them down $1.7 billion. Now they're not building the plane fast enough. I mean, they're actually in default — Boeing. They're supposed to —

Q    When is it —

THE PRESIDENT:  They've been building this thing forever.  I don't know —

Q    This is the new Air Force One?

THE PRESIDENT:  — what's going on.

MR. MUSK:  Yeah.

THE PRESIDENT:  We don't build the way we used to build.  You know, we used to build like a ship a day, and now to build a ship is, like, a big deal, and we're going to get this country back on track.  We could do it, but so many things — it takes so long to get things built and get things done.

And a lot of it could be something we've been discussing.  The regulators go in and they make it impossible to build.  They make it very difficult to build anything, whether it's a ship, a plane, or a building or anything.  And some of them do it because they want to show how important they are.  Some of them do it maybe because they think they're right.  They use the environment to stop progress and to stop things.  It's always the environment.  "It's an environmental problem."  It's not an environmental problem at all.  But they do a lot of things.

And, by the way, speaking of that, Lee Zeldin is going to be fantastic in the position.  So important.  He could take 10 years to approve or disapprove something, or he could do it in a month.  You know, just as good.

Q    Sure.

THE PRESIDENT:  And I think you're going to see some fantastic — a fantastic job done by him.  He's a tremendous guy.

Q    Newt — you echoed something when I had just met you, and it was very similar to what Newt has been saying, that we're — he brought this country to the dance.  This is the opportunity to be transformational, and to have, I would argue, a — the most consequential presidency if we — if we'd really dig down and do something that had never been done before, and that is get rid of this bureaucracy.  And I'm going —

MR. MUSK:  Yes.

Q    — to get to specifics.  You say the same thing.  It's not done yet.

000496

Case 8:25-cv-01462-TDC     Document 336     Filed 02/26/25     Page 517 of 959

MR. MUSK:  Absolutely.

Q    And what did you mean by that?

MR. MUSK:  Well, I mean the — w- — winning the election is really the opportunity to fix the system.  It is not fixing the system itself.  So, it's an opportunity to fix the system and to restore the power of democracy.

And, you know, people — like, it's funny how — how often it — you — when these attacks occur, the thing that they're accusing the administration of is what they are guilty of.  They're saying that things are — are being done are unconstitutional, but what they are doing is unconstitutional.  They are guilty of the crime of which they accuse us.

THE PRESIDENT:  That's always the first thing they do.

MR. MUSK:  Yeah.

THE PRESIDENT:  "He's in violation of the Constitution."  They don't even know what they're talking — well, they know.

MR. MUSK:  It's absurd.

THE PRESIDENT:  It's just a con job.  It's a big con job.  And they're so bad for the country, so dangerous and so bad.

And the media is so bad.  When I watch MSNBC, which I don't watch much, but you have to watch the enemy on occasion, the level of arrogance and — and cheating and — they're just horrible people.  These are horrible people.

Q    They lie.

THE PRESIDENT:  These are horrible people.

Q    They tell conspiracy theories.

THE PRESIDENT:  They lie, and they start up with the Constitution.  They couldn't care less about the Constitution.

CNN, likewise.  I mean, I watched them asking questions with, you know, the hatred with the — why — I said, "What are you asking the question with such anger?  You're asking me a normal question."  But you see the bias.  The bias is so incredible.  Those two are bad.

PBS is bad.  AP is bad.  CBS is terrible.

000497

I mean, CBS now — they changed an answer in Kamala.  They asked her some questions.  She answered them like, you know, a low-IQ person.  The opposite of him — the absolute opposite.  But she gave a horrible answer.  They took the entire answer out, and they put another answer that she gave 20 minutes later into the — in- — as the answer.

Q    It was part of her word salad.

THE PRESIDENT:  I've never even heard of that be- — I thought I heard of it all.

MR. MUSK:  Right.


Q    That wh- — "60 Minutes" once — one — wanted to do an interview with me, and I said, "Live to tape."

MR. MUSK:  Yeah, exactly.

Q    They said, "No."  And I said, "No" —

MR. MUSK:  Right.

Q    — "No deal."

MR. MUSK:  Exactly.  They can- —

Q    Like, this interview will —

THE PRESIDENT:  I've never even heard — you know, I've seen where they take a sentence off or something and they'll do — but they —

Q    Sometimes you cut for time o- —

THE PRESIDENT:  No, no.  They took the entire — this long, terrible statement that she made and put another.

Nobody's ever seen what's happening.  And, you know, the people that do all this complaining, they're very dishonest people.

MR. MUSK:  Yeah.


Q    Yeah.  I — I'm going to, just for the sake of saving time —

THE PRESIDENT:  Yeah.

Q    — because I could spend — and I've done this on radio and TV, I — I can spend an hour finding the outrageous amounts of money being spent abroad,

like USAID.

MR. MUSK:  Sure.

Q    And I do want to mention a couple, but I'm going to —

MR. MUSK:  Yeah.

Q    — scroll it and —

MR. MUSK:  Well — well, I guess, at a high level, I think it's what the president mentioned earlier, which is that in order to save taxpayer money, it comes down to two things: competence and caring.  And —

THE PRESIDENT:  That's right.

MR. MUSK:  — and when — when president was shown the outrageous bill for the new Air Force One and — and then negotiated it down, if he had — if the president had not applied competence and caring, the price would have been 50 percent higher — literally, 50 percent higher.  The president cared.  The president was competent.  The price was not 50 percent higher as the result.

And so, when you add more competence and caring, you get a better deal for the American people.

THE PRESIDENT:  But we could take — we were talking about this yesterday.  I could take — give me thousands of bills — any — I could pick any one of them, and I could —

MR. MUSK:  Yes, exactly.

THE PRESIDENT:  — take all thousand.  And let's say it's a bill for $5,000 — just $5,000, and it's done by some bureaucrat.  And if he would say, "I'll give you three.  I don't want to pay you five.  It's too high.  I'll give you three."  But they don't do that.  If a guy sends in a bill for $5,000, they pay $5,000.  They expect to be cut.  Everybody expects to be cut.  When you send in a bill, you expect to be cut.  They send in the bill higher, for the most part.  This is true with lawyers, legal fees.  When they send in legal fees, you — I can cut — I wish I had the time, I would save so — but I could cut these bills in half — much better than half.

But you offer people a much lower number because you know they — they actually put fat — I'm not even saying it's — it's like a way of business.  They put

Case 8:25-cv-01062-TDC     Document 36     Filed 02/26/25     Page 520 of 959

more on because they expect to be negotiated.  When you send in a bill to the government, there's nobody to negotiate.

MR. MUSK:  Yes.

THE PRESIDENT:  You send it a bill for $10,000, and they send you a check back for $10,000.  If you would call them and said, "We'll give you five."  "No, no, no.  I need more than five."  "We'll give you a five."  "I'm not going to pay any more than five."  "Make it six."  "No, I'm not going to make it six."  And you'll settle for $5,500.  You've just cut the bill almost in half, and it took, like, two minutes.  When did that stop?  But —

Q   (Inaudible) the art of the deal?

THE PRESIDENT:  — that's caring.  No, it's not even the art of the deal.  It's caring.  He uses the word —

MR. MUSK:  It's — it's competence and caring.

THE PRESIDENT:  — it's caring.

Q   Yeah.

THE PRESIDENT:  It's — it's a certain competence, but I think it's more caring.

MR. MUSK:  I — if you —

THE PRESIDENT:  (Inaudible.)

MR. MUSK:  Actually, if you add either ingredient — either competence or caring — you'll — you'll get a better outcome.  But it stands to reason —

Q   Right.  People don't want to do this (inaudible.)

MR. MUSK:  — that's the reason that if you don't have competency and you don't have caring, you're going to get a terrible deal.  And the problem is that the American taxpayer has been — been getting a terrible deal, because — look at the last administration.  Can you — can anyone — can any reasonable person say that last administration was either competent or caring?

Q   But they lied to us and said that Joe didn't have a cognitive decline.

MR. MUSK:  They fully lied.

Q   They said the borders were closed.  They said that the borders were secure.  They said that —

000500

Case 8:25-cv-01462-TDC    Document 336    Filed 02/26/25    Page 521 of 959

MR. MUSK:  Right.

Q   You know, they said Obamacare would save —

MR. MUSK:  They flat out lied.

Q   They flat out lied —

MR. MUSK:  It was insane.

Q   — on many occasions.

MR. MUSK:  Yes.

Q   I tell my audience all the time: Don't trust government.

MR. MUSK:  Yes.

Q   So, the — I want — as I scroll this information, and it's — it's — I'll scroll a lot more than I'll mention to both of you, and this is the cost savings.  I want you — I want people at home to understand this part: The average American makes $66,000 a year.

MR. MUSK:  Yeah.

Q   Okay?  We have $37 trillion in national debt.

MR. MUSK:  Yes.

Q   Now, all the money I'm about to mention and what we're going to scroll on our screen — and all of this is going to foreign countries.  It is not being spent here in America —

MR. MUSK:  Yes.

Q   — for better schools, law and order.

MR. MUSK:  I — I think the average taxpaying American should be mad as hell because their tax money is being poorly spent.

Q   I'm mad.  It's stealing from —

MR. MUSK:  It's a — it's an outrage —

Q   — our kids and grandkids.

MR. MUSK:  Yes, and the — and people —

THE PRESIDENT:  And a lot of fraud, Sean.  A lot of fraud.

Q   Yes.

THE PRESIDENT:  And a lot of kickbacks.

000501

They're sending money out. They're not that stupid. These people aren't that stupid. They're sending for transgender — something having to do with the opera, and they're sending out $7 million —

MR. MUSK: (Laughs.) Literally.

THE PRESIDENT: — $7 million. (Inaudible) —

Q   You just stole my next line. I can't believe that.

THE PRESIDENT: No, it's incredible.

Q   I was going to mention that.

THE PRESIDENT: No, but it's incredible: $7 million.

Now, you know they — they're not so stupid. They're sending all this money. They expect to get a lot of it back. And that's what happens.

Q   Okay. So, let's go through it.

MR. MUSK: Yes, they're — a bunch of —

Q   So, for the average person at home —

MR. MUSK: — this stuff is round-tripping. To the president's point, they'll — they'll make it sound like it's going to help some people in a foreign country, but then they — then they get kickbacks.

Q   All right. Let me go to the ne- — to the fir- —

MR. MUSK: Yeah.

Q   — to the second question first. I want to know, because people like Joni Ernst, and — and House —

MR. MUSK: Yeah, Joni — Joni Ernst has been —

Q   They tried to get —

MR. MUSK: — has tried for a long time, and she's actually got a lot of good data. Senator Ernst has been really helpful, actually.

Q   Okay, but they — they actually hide what the real purpose of the spending is.

MR. MUSK: That's true.

Q   In other words, they — and — and h- — this is a question: How did you decipher? It will say, "Humanitarian blah, blah, blah in Serbia or Afghanistan."

000502

We've been giving money to China for crying out loud, which I think is nuts.

MR. MUSK:  Well, we're giving money to the Taliban.

Q   Money to the Taliban?

MR. MUSK:  Like a lot.

Q   All right.  So —

MR. MUSK:  (Laughs.)  I'm like, for what?

Q   But they —

MR. MUSK:  I — I want to see pictures of what they did.

Q   But they try to obscure it, and — and — but then you got to the bottom line, which is what I'm now scrolling on the screen —

MR. MUSK:  Yes.

Q   — and that is: $20 million on a Sesame Street show in Iraq; $56 million to boost tourism in Tunisia and Egypt; $40 million to build schools in Jordan; $11 million to tell the Vietnamese to stop burning trash; $45 million for DEI scholarships in Burma; $520 million for consultant-driven ESG investments in Africa; DEI programs in Serbia; the president's favorite — I'm sure you — you love that taxpayer money was spent on a DEI musical in Ireland or a chan- — transgender opera in Colombia or a —

MR. MUSK:  If I could, like, it sounds like —

Q   — transgender comic book in Peru.

MR. MUSK:  It sounds like — it sounds like how can these things be real?  But this is actually what was done.

Q   Okay.  The — I —

MR. MUSK:  It — it sounds like a comedy sketch or something.  It's like —

Q   I have 20 pages of this.

MR. MUSK:  Right.  It's not — the list is a mile long.

THE PRESIDENT:  The one thing you didn't mention, the media.  The media is getting millions of dollars.

MR. MUSK:  Yes.

THE PRESIDENT:  Now, they say Politico, which is a radical left —

000503

Case 8:25-cv-01462-TDC    Document 336    Filed 02/26/25    Page 524 of 959

Q   Subscriptions.

THE PRESIDENT:  — you know, garbage magazine or — or program.  I guess they have magazine and they have some — some media of all types.  $8 million.

I hear the New York Times got a lot.  I hear they get subscriptions — where they have subscriptions but maybe the paper is not sent.  I have no idea if that's true or not, but it's — they call it subscriptions.  Lots of subscri- — to different media, not just the Times — maybe the Times, and maybe not the Times.

Q   A million dollars in subscriptions is a lot.

THE PRESIDENT:  Well — but — but millions of dollars going to media that's radical-left, crooked, dishonest media.

MR. MUSK:  Well — well, Reuters — this is actually really wild: Reuters got like — something like $10 million for something that was literally titled "mass disinformation campaign."

Q   Well —

MR. MUSK:  That was on the purchase order.  Well, I — I thought that was a little bold.  (Laughs.)

Q   I will tell you what was bold is when you released —

MR. MUSK:  I'm like —

Q   — the Twitter files.

MR. MUSK:  — shouldn't you at least try to call it something else?  (Laughs.)

Q   The Twitter files — how they targeted him; how Twitter, at the time, worked closely with the FBI, the CIA; and, even before the release of Hunter's very real laptop, they were feeding them disinformation.  That —

MR. MUSK:  Absolutely.

Q   — you found all that out.

MR. MUSK:  Well, I think —

Q   That's called transparency, right?

THE PRESIDENT:  The FBI has to be rehabbed.  The FBI —

MR. MUSK:  Yeah.

THE PRESIDENT:  What's happened with the FBI and the DOJ is just — their — their stock has gone way down.  I mean, their reputation is shot.

Q   And intelligence.

THE PRESIDENT:  And I think Pam is going to do great.  I think Kash is going to do great.  I think they have to do great or we have a problem.

But when you look at what they did, the raid of Mar-a-Lago — the raid of Mar-a-Lago — you look at what they did, their reputation is shot.

Q   It is.

What — you were going to say, Elon?

MR. MUSK:  Well, no, I was going to say that I think probably a — like, a lot of people still —

Q   How — how did you find (inaudible)?

MR. MUSK:  — still believe, like, the Russia hoax, even though you've done a lot to combat that.  The — you know, the — the Steele dossier was an incre- — a massive scam that was concocted by Hillary Clinton and her — her campaign.

Q   She bought and paid it — for it —

MR. MUSK:  Right.

Q   — Russian disinformation.

MR. MUSK:  There was — it was — the — people still think the — the Russia hoax is real.  Like a lot of people s- — because they never — they never heard the counterpoint.  I mean — I mean, a bunch of people should be in prison for that.  That was a — that was outrageous election interference, creating a fake Russia hoax.

Q   How much — if you had to put a number on it, how much do you think you've identified waste, fraud, abuse, corruption at this point?  And again, we've been — we're going to be scrolling this throughout the program.

MR. MUSK:  Well, the — the overall goal is to try to get a trillion dollars out of the deficit.  And if we — if we — if the deficit is not brought under control, America will go bankrupt.  This is a very important thing for people to

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 526 of 959

understand.  A country is no different from an individual, in that if an individual overspends, an individual can go bankrupt, and so can a country.

And — and the out- — the massive waste, fraud, and abuse that has been going on, which is leading to a $2-trillion-a-year deficit, that — that's what the president was handed on Jan. 20th, a $2 trillion deficit.  It's insane.

Q   For this fiscal year?

THE PRESIDENT:  Two trill- — yeah.  We inherited it.

MR. MUSK:  Two —

THE PRESIDENT:  Yeah.  And inflation is back.  I'm only here for two and a half weeks.

Q   That was January —

THE PRESIDENT:  Inflating is back —

Q   — you were there for a week.

THE PRESIDENT:  No, think of it, inflation is back.  And they said, "Oh, Trump infla-" — I had nothing to do with it.  These people have — have run the country.  They spent money like nobody has ever spent.  They were — they were given $9 trillion to throw out the window — $9 trillion, and they spent it on the Green New Scam, I call it.  It's the greatest scam in the history of the country.  One of them.  We have a lot of them, I guess.  But one of them.

Q   Well —

THE PRESIDENT:  Dollar-wise, probably —

Q   — and DEI —

THE PRESIDENT:  — it is.

Q   — and wokeism —

THE PRESIDENT:  Yeah, yeah.

Q   — and transgenderism —

THE PRESIDENT:  Well, that's all part of it.  Yeah.

Q   — and LGBTQ+.

MR. MUSK:  Yes.

Q   And, by the way, not in America — other countries, not here.

000506

THE PRESIDENT: You know, the amazing thing is when you see, like, the teaching of DEI: $9 million. How do you spend $9 million to teach no matter what it is?

MR. MUSK: Right.

THE PRESIDENT: You could teach physics.

MR. MUSK: Exactly. Totally.

THE PRESIDENT: You could go to MIT for a lot less.

MR. MUSK: It's (inaudible) expensive. (Laughs.) Expensive.

THE PRESIDENT: Yeah, the teaching —

MR. MUSK: Expensive BS.

THE PRESIDENT: — of DEI.

Q   Well, I think it would be better spent on —

THE PRESIDENT: No, it's a kickback. It's got to be a kickback. Nobody is that — nobody could do that. Nobody is —

Q   Well, it —

THE PRESIDENT: Nobody is giving — to assess the dialog of an audience coming out of a theater: $4 million.

Q   How much do you believe, Elon, you've identified in — in waste, fraud, abuse, corruption now? And how much —

MR. MUSK: Well —

Q   — do you anticipate you will?

MR. MUSK: Sure. Well, the — I — I think —

THE PRESIDENT: One percent.

MR. MUSK: (Laughs.)

THE PRESIDENT: No, because it's so massive. It's — this is —

MR. MUSK: Yeah, exactly.

THE PRESIDENT: — huge money. Huge money. Look —

Q   So, what we've found now is one percent?

MR. MUSK: Well, we've j- — we've just gotten started here.

THE PRESIDENT: As good as they are, they're not going to find some contract that was crooked — you know, crooked as hell. And, I mean, there's going to be so much that isn't found. But what is found — I think he's going to find a trillion dollars.

MR. MUSK: Yeah, I think so.

THE PRESIDENT: But I think it's a very small percentage compared to what it is. I mean, he could tell you about treasuries; he could tell you about a woman that worked for Biden that became a very wealthy woman while she was working for him. Right?

MR. MUSK: Yeah.

Q   Yeah, I know who you're talking about.

MR. MUSK: I mean, there are some strange situations where people — where, you know, someone's working for the government earning $200,000 a year, and then, suddenly, they're worth tens of millions of dollars within a few years. Where'd the money come?

Q   How'd they earn it?

MR. MUSK: Yeah.

Q   They have a private company on the side?

MR. MUSK: We're just curious. Like, can you —

THE PRESIDENT: While they were working.

MR. MUSK: Can you show us — because, like, in order to be worth tens of millions of dollars, you'd have to start a company, or you've got to get some kind — the compensation has got to come from somewhere. So, how does a civil servant with — earning $200,000 a year suddenly, within a span of a few years, be worth tens of millions dollars?

Q   W- —

MR. MUSK: So, I just want to connect the dots here.

Q   All right, s- —

MR. MUSK: Maybe there's a legitimate explanation, but I don't think so. (Laughter.)

000508

Q    So, you know, and this gets to kind of the heart of where I am.  I — I looked at your work, and I look at this amount of money, and I get angry.  And I don't get v- — I'm not an angry person.

MR. MUSK:  Sure.

Q    I don't get angry.  I get a- — I get annoyed sometimes, but I don't get angry.  And I did live paycheck to bay- — paycheck a part of my life.  And I think of, you know, the working men and women in this country that the — 56 percent of which cannot afford a $1,000 emergency after four years of Harris and Biden.

MR. MUSK:  Sure.

Q    Okay?  That is serious, you know, financial trouble.  Or they're putting bare necessities on credit cards.

And I'm looking at this and I'm thinking, well, how much — when we — when all is said and done, we could have written a check or cut the taxes or fixed our schools —

MR. MUSK:  Yes.  Yes.

Q    — or deported these illegals that we keep finding, known terrorists, cartel members, gang members.

MR. MUSK:  Yeah.

Q    And — and we're not doing it.

THE PRESIDENT:  Sean, the saddest thing is they don't talk about the individual lines.  I could go on your show right now,  I could get a list that I have on the beautiful Resolute Desk in the Oval Office, and it's got 40 points, and all they are is the heading of what this money is.

You don't have to go deep into it, and you see it's, you know, all different things and it's so ridiculous.

I mean, normally, when you look for fraud, you're looking for one thing out of a hundred.  Here, out of a hundred, 95 are going to be bad.  I mean, they're — and they're so obvious just by the heading.

But they never mention that.  They only mention, "This is a violation of our Constitution.  This is a" — the word they give, you know, it's like a sound bite —

Case 8:25-cv-01462-HDC    Document 36    Filed 02/26/25    Page 530 of 959

"constitutional crisis." It's a new thing, "constitution-" — But they never mention about where the money is going.

MR. MUSK: Yes. Exactly.

THE PRESIDENT: And when people hear that — I had a very smart man, John Kennedy — he's actually a very smart man. He said, "Sir, you should just go on television and just read the name of the topic that you're giving all the money — just the topic that you're giving this money to, and don't say anything more," and he's right.

MR. MUSK: Yeah.

THE PRESIDENT: And I'll do it at some point, you know, when —

But they never talk about where the money is going. They just talk about, "It's a constitutional crisis."

It's so sad. And honestly, I think they're bad people. I used to give them the benefit of the doubt, but you almost think they hate the country. I think they hate the country. They're sick people.

Q   Remember, what they can't — what they couldn't accomplish at the ballot box, what they can't accomplish legislatively, now they're using the courts.

MR. MUSK: Yes.

Q   And they c- — they're trying to bury you in lawsuits.

THE PRESIDENT: That's right. You know the good news, though? They've lost their confidence. They're not the same people.

Q   I think you're right.

THE PRESIDENT: They're — they're not the same people.

This election was brutal for them. We won every swing state. We won by millions and millions of votes. We won everything. We — all 50 states went up — all 50. It's never happened.

Q   Popular vote.

THE PRESIDENT: Every one. All 50 states went up.

They've lost their confidence. I see it. And they're — they're just swirling and twirling. They don't know what the hell is happening. They're much different.

They're just as mean, but they're not getting to the point.

Q    Why do you invite them into the Oval Office nearly every day?

MR. MUSK:  (Laughs.)

THE PRESIDENT:  Well, the media — you're talking about the media.

Q    Yeah, your friends in the media.

THE PRESIDENT:  The media — no, they're — you know, the anger that — they ask questions so angry — a question — a normal question.  I give them an answer.  They — but they — I say, "Why are you so angry when you ask a question?"  Just a standard question.  And, I don't know, there's something —

Q    They haven't had a- — they haven't been allowed in that office for the last four years, and here you're giving them access.

Let me go to an area that I think is key, and — and you talked about this in recent interviews, and that is: We don't need a Department of Education.  Okay.  And what some people are trying to do is stoke fears that, "Oh, my gosh, my kid is not going to get the money for education."

THE PRESIDENT:  (Laughs.)  Yeah.

Q    Or "grandma's Social Security and Medicare."  This was a big promise of yours on the campaign trail.

THE PRESIDENT:  Yeah.  Yeah.

Q    So, I really want to give you both an opportunity to assure the American people you will keep — that money will be allocated for students, but with higher standards.  For example, I would assume associated with monies given or vouchers.

THE PRESIDENT:  (Inaudible) so much and — and then Elon goes.  But, look, Social Security won't be touched —

Q    Won't be touched.

THE PRESIDENT:  — other than if there's fraud or something — we're going to find it; it's going to be strengthened — but won't be touched.  Medicare, Medicaid, none of that stuff is going to be touched.  It's just —

Q    Nothing.  I want you to —

THE PRESIDENT: (Inaudible) don't have to.

Now, if there are illegal migrants in the system, we're going to get them out of the system, and all of that fraud. But it's not going to be touched.

School — I want to bring school back to the states, so that Iowa, Indiana — all these places — Idaho, New Hampshire — there's so many places, the states. I figure 35 really run well.

And right now, it's Norway, Sweden, Denmark, Finland, China — China, can you imagine? — has top — top schools. We're last.

So, they have a list of 40 countries. We're number 40. Usually we're 38, 39, but last time, we were number 40. And what I say is you've got to give it back.

So, it doesn't work.

I'll tell you what we're number one in: cost per pupil. We spend more money than any other country by far — it's not even close — per pupil. Okay? So, we know it doesn't work.

So, we spend the most and we have the worst — right? — the worst result.

When we give that — when we give that back to Indiana, when we give that b- — back to Iowa and back to a lot of the states that run well — they run well, a lot of them — 35, 37, 38 — now, you're going to have 10 laggards, but you're going to have 5 real laggards, but that's going to be okay.

Take New York — you give it to Westchester County, you give it to Suffolk County, you give it to Upstate New York, and you give it to Manhattan — but you give it to four or five subsections. Same thing in California. Los Angeles is going to be a problem, but you're going to give it to places that run well. We can change education

Now, school choice is important, but that will get care — taken care of automatically.

We want to bring education back to the states. You will spend half the number. And I'm not even doing this —

Q   So, you're leaning more towards grants not vouchers, like to parents?

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 533 of 959

THE PRESIDENT:  I'm not even — I'm not even doing this to save, but you will save.  It will cost you much less money.  You get a much better education.  If you go to some of these states, you'll be the equivalent of Norway, Sweden, Denmark — places that really have a good school system.  You'll have — those places will be the equivalent, and your overall numbers will get so much better.

Q   Do you want standards associated with the money?

THE PRESIDENT:  The only thing I want to do from — from Washington, D.C., is make sure they're teaching English, reading, writing —

Q   Math and science.

THE PRESIDENT:  — and arithmetic.  Okay?

Q   Science?  Science might help.

THE PRESIDENT:  Okay.  A little science.  You know —

Q   Computers.

THE PRESIDENT:  — you're not going to have much of a problem with that, but that's it.

Do you know, we have half the buildings — I mean, you look at Department of Education —

MR. MUSK:  It's empty.

THE PRESIDENT:  Look at the real estate and the —

MR. MUSK:  Yeah.

THE PRESIDENT:  — the level.  For what?  To — to — I mean, for — what do they do?

We have really bad educa- — the teachers — I love teachers.  I respect teachers.  And, by the way, there's no reason why teachers can't form a union.  They can do whatever they want to do, if it's back in the states.  So, we're not looking to hurt the teacher — I'm — I'm going to help the teachers.  I think the teachers should be incentivized, because a good teacher is like a good scientist, is like a great doctor.

MR. MUSK:  Sure.

THE PRESIDENT:  It's a valuable commodity.

000513

MR. MUSK:  Yeah.

THE PRESIDENT:  I think they should be incentivized.

MR. MUSK:  Yes.

THE PRESIDENT:  So, I'm totally for the teachers.

MR. MUSK:  Absolutely.

Q   I interview a guy a lot on radio.  He's from Wichita, Kansas.  And he started —

THE PRESIDENT:  Right.

Q   — as a medical doctor.  Started Atlas.MD, and he's now — he's rolled it out nationwide.  Concierge care, $50 a month, 24-hour access to a doctor.

THE PRESIDENT:  Right.

Q   You know, they use a lot of telemedicine now as part of it — very innovative.  He negotiates directly with pharmaceutical companies.  People — if they have high blood pressure, they walk out with their medicine.  They have high cholesterol, they walk out with their medicine.  And they pay pennies on the dollar.

You mentioned —

THE PRESIDENT:  By the way, forms of that could be done.

Q   Forms of that?

THE PRESIDENT:  Forms of that could be done.

Q   Innovation.

THE PRESIDENT:  We got hurt when we didn't get the vote on Obamacare.  I made Obamacare — I had a choice: I could let it rot and win a point, or I could do the best you could do with it.  And that's what I did.  We did a great job with it, and we made it sort of work, but it's lousy.  We could do so much better.  And when you say — you go to certain areas, they — they have doctors round the clock.  They have great medical care for a fraction of what we're paying right now.

There are things we could do.

But, look, just overall, this man has been so valuable.  I hate to see the way they go after him.  They go after him.  It's so unfair.  He doesn't need this.  He wants to

000514

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 535 of 959

do this.

First of all, this is bigger than anything he's ever done. He's done great companies and all, but this is much — you know, this is trillion — everything's trillions, right?

MR. MUSK: Yeah. The numbers are crazy.

Q   To go back to my original point —

THE PRESIDENT: He can save —

MR. MUSK: Yeah.

Q   But let me — give him his $10 million back.

MR. MUSK: Well — well — I — no. So, people ask me, like, "What's — what's the — what's the — what's, like, the — what's your biggest surprise in — in D.C.?" And I'm like, "The sheer scale."

Q   It's massive. So, you love the challenge?

MR. MUSK: Well, I mean, to —

THE PRESIDENT: He'll never do anything bigger.

MR. MUSK: To the president's point —

THE PRESIDENT: That's the only thing you can say, "He'll never do anything" —

MR. MUSK: But, I mean, you do something slightly better, and you save billions of dollars for the American taxpayer — just slightly better. Slightly. (Laughs.)

Q   When you say "tech support" —

MR. MUSK: You go one percent better, and it's, like, you know, tens of billions of dollars saved to the American taxpayer.

Now, if I may address the point that you — the question you asked earlier, which is, you know, how do we assure people that —

Q   They want to know.

MR. MUSK: Yeah, how do we assure people that we're going to do the right thing, that their — that their Social Security benefits will be there, that their — the medical care will be good and s- — and — in fact, how do we make it —

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 536 of 959

ensure that there's better medical care in the future? How do we improve their benefits? How do we make sure that their Social Security check goes further than it did in the past and not — it doesn't get weakened by inflation?

So, the — if we — if we address the — the massive deficit spending, the sort of — the — the waste in the government, then — then we can actually address inflation.

So, provided the economy grows faster than the money supply, which means you stop the government overspending and the waste, and the output of real useful goods and services exceeds the increase in the money supply, you have no inflation.

Q Yeah.

MR. MUSK: And — and you also drop the — the interest payments that people pay, because if the government keeps —

Q Way too high.

MR. MUSK: Yes. The — the reason the interest payments are so high is because the — the national debt keeps increasing. So, the — the government is competing for — to sell debt with — for — with — with the private citizens. This drives up the interest rate.

So, if you have a — if you have a — if you cut back on the deficit, you actually have an amazing situation for people, because you get r- — you get rid of inflation and you drop the interest rates. And that means people's mortgage payments go down, their credit card payments go down, their car payments go down, their student loans go down. Everything — their — their life becomes more affordable and they're standard of living improves.

Q How quickly? Because I think people are suffering now. We're still living under the Biden-Harris economy.

THE PRESIDENT: But, Sean, you have states right now —

Q Yeah.

THE PRESIDENT: You have some states that operate that way. They operate as well as any corporation. They really operate well.

MR. MUSK:  Yeah.

Q   Florida.

THE PRESIDENT:  They have surpluses.  They ha- — they don't —

MR. MUSK:  Texas is — has a surplus, for example.

Q   Yeah.

THE PRESIDENT:  When they — when they look at New York and — and California and some of these places that should have an advantage — I mean, there's a big advantage — or Pritzker does such a bad job in Illinois; it's horrible how bad he is — and they don't have that advantage.

You know, New York has stock exchange and a lot of things.  And California has the weather and the beautiful water and all the thing- —

MR. MUSK:  California has — has great weather.  The most expensive weather on Earth.

THE PRESIDENT:  Yeah.  (Laughter.)  But — but —

Q   I like Florida.

MR. MUSK:  Yeah.

THE PRESIDENT:  But some states operate the way he's talking about.

Q   Efficiently.

THE PRESIDENT:  When you go into some of these states, you're going to find very little.  You're going to find almost nothing.  They really operate well — big surpluses, low taxes.  And —

Q   You know, my taxes went up the first time you were president, because you took away the SALT deduction —

THE PRESIDENT:  I — well, I did.

Q   — which, by the way, I thought was the right decision.

THE PRESIDENT:  It was the right decision — in fact, Reagan tried to do it — because it rewards badly run states.

But at the same time, it's a tough — it was — it's tough for the states.  I mean, it really is tough for the states.

The sad part is it rewards really badly run states.

000517

Q   Yeah.

THE PRESIDENT:  And Reagan tried to do it.  He was unable to do it.  I got it done.

Q   You got it done, and —

THE PRESIDENT:  And now we're going to give some back.

Q   A little bit.

THE PRESIDENT:  Because you know what?  We've got to help them.

Q   It's only a little.

THE PRESIDENT:  We've got to help.

Q   Because otherwi- — we're encouraging people to elect high taxes, spen- —

THE PRESIDENT:  Nobody had any idea it would be that devastating.  I did the right thing.  I got something that Reagan couldn't do.  I got it done, where everybody is — are the same.  But you know what?  We've got to help them out.

Q   Reagan had the Grace Commission, some of the best business minds in the country.

THE PRESIDENT:  Right.

Q   And they came up with recommendations.  Congress adopted none of them, and none of them were implemented.

I've got to ask this question, because the media is obsessed about it: What — what if there is a conflict?  In other words, because you do business — it was funny, when it came out the other day, that there was going to be, I think, $400 million — billio- — I don't know if it was millions or billions — a lot of money on Teslas that Joe Biden's administration w- — did with Tesla, and —

MR. MUSK:  I'm not familiar with that.

Q   You're not even familiar with it?  But —

MR. MUSK:  I — I don't think — are you talking about, like, the Inflation Reduction Act stuff or —

Q   It was some — it was a purchase order of Tesla vehicles.

MR. MUSK:  Oh.  Oh, that was — that was incorrect.  There was s- — like, there's some sort of — the media claim that there was, like, $400 million worth of

Cybertrucks —

Q   That was it.

MR. MUSK:  — being bought by the DOD.

Q   And that he gave it to you.

MR. MUSK:  No — well, first of all, that was —

THE PRESIDENT:  No, actually, it was —

MR. MUSK:  Th- — it was fa- —

THE PRESIDENT:  It was Biden.

Q   It was Biden.

THE PRESIDENT:  And you know Biden wouldn't give him much.

MR. MUSK:  But — but it wasn't even — it was fake news, six weeks to Sunday. Tesla is not getting $400 million for Cybertrucks.  And the — and the — and this alleged —

Q   That's what it was, Cybertrucks.

MR. MUSK:  This — yeah.  This alleged award occurred in December, before the president took office.  So, it's — it's fake on multiple levels.  There i- — Tesla isn't getting $400 million.  And even if it — even if it was, which it isn't, it was awarded during the Biden administration.

Q   Okay, but you're — you — you —

MR. MUSK:  It's total fake news.

Q   There — there is —

MR. MUSK:  It's fake on, like — it's like multiple leverals —

Q   There is some integration —

MR. MUSK:  — multiple layers of fake.

Q   So, you're — you're tasked now — and I pray to God this is successful.  I really do.  I wish you Godspeed.

MR. MUSK:  Yeah.

Q   You know, "Godspeed, John Glenn."

THE PRESIDENT:  It's — it's going to be, by the way.  I really believe it's going to be.

Q   But — but there —

MR. MUSK:  Oh, yeah.

Q   But there are legitimate areas —

THE PRESIDENT:  Because the country is going to do well beside this. This is cutting.  We're only talking about cutting. We're also going to make a lot of money.  We're g- — we're taking in so much money.

Q   But what about his business?  What if — if there is —

THE PRESIDENT:  Then we won't let him do it.

Q   — a contract he would otherwise get?

THE PRESIDENT:  We're not going to let him do it.  He — if —

Q   You're not going to let him do it?

THE PRESIDENT:  If he's got a conflict — I mean, look — he —

Q   Y- — now y- —

THE PRESIDENT:  He's in certain areas — I mean, I see this morning — I didn't — I didn't know, but I said, "Do the right thing" — where they're cutting way back on the electric vehicle subsidies.

MR. MUSK:  Yes.

THE PRESIDENT:  They're cutting back.

Q   You're losing —

THE PRESIDENT:  Not only cutting back —

Q   It hurts you.

MR. MUSK:  Correct.

THE PRESIDENT:  Yeah.

Now, I will tell you —

Q   You don't care?

MR. MUSK:  Well —

THE PRESIDENT:  He's probably not that happy with it, but that would have been one thing he would have come to me and said, "Listen, you got to do me a favor.

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 541 of 959

This is crazy." (Laughter.) But this was in the tax bill. They're cutting back on the subsidies.

I didn't — I wasn't involved in it. I said, "Do what's right, and you get" — and they're coming up with the tax, but it's just preliminary.

But I mean, if he were involved, wouldn't you think he'd probably do that? Now, maybe he does better if you cut back on the subsidies. Who knows. Because he figures — he does think differently. He thinks he has a better product, and as long as he has a level playing field, he doesn't care what you do —

MR. MUSK: Exactly.

THE PRESIDENT: — which he's very — he's told me that.

MR. MUSK: Yeah. I mean, I haven't asked the president for anything ever.

THE PRESIDENT: It's true.

Q   And if it comes up, how — how will you handle it? (Inaudible.)

THE PRESIDENT: He won't be involved.

MR. MUSK: Yeah, I'll — I'll re- — I'll recuse myself if it is a conflict.

THE PRESIDENT: If there's a conflict, he won't be involved.

MR. MUSK: Yeah.

THE PRESIDENT: I mean, I wouldn't want that, and he won't want it.

MR. MUSK: Right. And — and also, I'm getting a — sort of a daily proctology exam here. You know, it's not like I'll be getting away from something in the dead of night.

Q   Welcome to D.C. If you want a friend, get a dog.

MR. MUSK: Well, I do have a dog, but I also have friends. (Laughter.) My dog loves me, poor little creature.

THE PRESIDENT: You know the truth was —

MR. MUSK: I need to bring him to D.C.

THE PRESIDENT: He's — I know every businessman. I know the — the good ones, the bad ones, the smart ones, the lucky ones. I know them all. This guy is a ver- — he's a brilliant guy. He's a great guy. He's got tremendous imagination and scientific imagin- — far beyond — you know, you keep talking about a technologist and all, but you're much more than a technologist. You are that. But he's also a good person. He's a very good person, and he wants to see the country do well.

And I know a lot of great businesspeople, really great business people, but, you know, they're not really, in some cases, very good people. And I know people that would try and take advantage of the situation.

This guy is somebody that really cares for the country, and I saw that very early on. I saw it, really, a long time ago when I got to know him. He's a very different kind of a character.

That's why — you know who loves him: young people that are very smart and that love the country. He's got, like, a tremendous following, because that's what he's — he's a good person.

And he doesn't need this. He didn't need this, and he's doing this to help the country. If I didn't win this election, this country was — I don't think it could have made it. I don't — I mean, we're allowing criminals — millions of criminals into our country, where everything is transgender, it's men playing in women's sports.

I mean, none of this stuff — you could go — I could give you a hundred things. It's almost like they're trying to destroy the fabric of — of the country, of the world, because the world was following us. Now the world is following us out of this pit.

We've done a lot. I'll tell you what, in three weeks, we've done more — I think we've done more — in — in terms of meaningful, not just dollars — than maybe any president ever. And a lot of people are saying that.

Q    Shock — it's been shock and awe.

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 543 of 959

THE PRESIDENT:  I mean, if we can keep it going at this level, this country is going to be at a level that it's never seen before.

Q   You know one of the things you did that I really thought was pretty clever and smart and fair, and that was reciprocal tariffs.

THE PRESIDENT:  Yeah, reciprocal.

Q   Ta- — I didn't know India charged so much.  I didn't know the European Union to charge them.

MR. MUSK:  Yeah, totally.

Q   I didn't know Canada was charging us.

THE PRESIDENT:  Everybody.  Everybody.  Everybody but us.

Q   Brazil, why?

THE PRESIDENT:  And I was doing it — you know, I charged China tariffs.  I took in hundreds of billions of dollars, and I was doing that.  But when we got — we had the greatest economy in history.  But then we got hit with COVID, and we had to solve that problem, because I was doing it — and now I said, I want to come back and do the recipri- — because every country in the world almost — we have a deficit with almost every country — not every one, but just about, pretty close.

And — but every country in the world takes advantage of us, and they do it with tariffs.  They makes — make it — it's impossible for him to sell a car, practically, in, as an example, India.  I don't know if that's true or not, but I think —

MR. MUSK:  The tariffs are like 100 percent import duty.

THE PRESIDENT:  The tariffs are so high —

MR. MUSK:  Yeah.

THE PRESIDENT:  — they don't want to — now, if he built the factory in India, that's okay, but that's unfair to us.  It's very unfair.

And I said, "You know what we do?"  I told Prime Minister Modi yesterday — he was here.  I said, "Here's what you do.  We're going to do — be very fair with you."  They charge the highest tariffs in the world, just about.

Q   36 percent?

THE PRESIDENT:  Oh, much — much higher.

MR. MUSK:  It's 100 percent on — auto imports are 100 percent.

THE PRESIDENT:  Yeah, that's peanuts.  So, much higher.  And — and others too.  I said, "Here's what we're going to do: reciprocal.  Whatever you charge, I'm charging."  He goes, "No, no, I don't like that."  "No, no, whatever you charge, I'm going to charge."  I'm doing that with every country.

MR. MUSK:  It seems fair.

Q  Don't you —

THE PRESIDENT:  (Laughs.) It does.

MR. MUSK:  It's — it's like fair is fair.

THE PRESIDENT:  Nobody can argue with me.  You know, the media can't argue — I said — they said, "Tariffs — you're going to charge tariffs?"  You know, if I said, like, 25 percent they'd say, "Oh, that's terrible."  I don't say that anymore —

Q  Can I — (inaudible) —

THE PRESIDENT:  — because I say, "Whatever they charge, we'll charge."  And you know what?

Q  They stop.

THE PRESIDENT:  They — then they say, "Oh, that sounds fair."

MR. MUSK:  All the president is saying is that —

Q  (Inaudible.)

MR. MUSK:  — it needs to be at a level playing field and — and fair and square.

Q  Yeah.  And how does — how —

THE PRESIDENT:  And we're going to make a lot of money and a lot of businesses are going to come pouring in.

MR. MUSK:  How can you argue with a fair and square situation?

Case 8:25-cv-00462-TDC Document 36 Filed 02/26/25 Page 545 of 959

Q   Don't — don't you think most of them will look at the — the — for example, without America, China's economy will tank.  They need our business.

THE PRESIDENT:  They do.  Everybody needs us.

Q   Everybody needs it.

THE PRESIDENT:  And you know what?

Q   Do- — don't you think they'll stop?

THE PRESIDENT:  We only have so long left where we're in this position.  We're the bank, and the bank is getting smaller and smaller and smaller.  We — we're the bank.  We got to do this now.  We can't wait another 10 years and have a shell of a country left, because that's what was going to happen.

Q   Mr. President —

THE PRESIDENT:  This country — if I didn't win this election and have people like this man right here that really do care, because that's the other word — if you don't care, you could be the smartest guy in the world, it's not going to matter.  But if we didn't win this election, I'm telling you, we would not have had a country for very long.

Q   How quickly —

MR. MUSK:  May I say —

Q   — do you balance the budget and — and when do we start paying down that debt?

THE PRESIDENT:  Well, potentially, very quickly, between what he's doing and with income coming in from tariffs and other things.  I mean, I hope we can — I don't want to give a date, because then these people are going to say, "Oh, well, he didn't make the date."  But I think we can do it very quickly.

We would have never done it if this didn't happen.  Never.  It would have never been — it would only get worse and worse, and ultimately, it would have exploded.

This country was headed down a very bad track.  And the whole DEI thing, that was — that was a trap.  That was a sick trap.

2/25/25, 8:13 PM — Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 546 of 959

Q   (Inaudible.)

MR. MUSK:  (Inaudible.)

THE PRESIDENT:  And, you know, we've destroyed that.  That's gone.  That's pretty much gone.

Q   I agree.

MR. MUSK:  (Inaudible) —

Q   We're not — we're not funding it.

MR. MUSK:  If — I really want to — I really want to emphasize to people that — this is a very important point — if we don't solve the deficit, there won't be money for medical care.  There won't be money —

THE PRESIDENT:  Right.

MR. MUSK:  — for Social Security.  We either solve the deficit or all we'll be doing is paying debt.

Q   Nobody —

MR. MUSK:  It's — it's got to be solved, or there's no medical care, there's no Social Security, there's no nothing.  That's got to be solved.  It's not optional.  America will go bankrupt if this is not done.  That's why I'm here.

Q   The president's —

THE PRESIDENT:  Europe takes advantage of us.

MR. MUSK:  And — and I'd like to also just send a message — like, because, as the president said, like, this — there's a lot of rich people out there.  They should be caring more about the country because — the reason they should be caring about — more about country is: America falls, what do you think is going to happen to your business?  What do — what do you think — do you think you're be going to be okay if — if the ship of America sinks?  Of course not.  Like, what — what I'm doing here, what the president is doing is it's just long-term thinking.  The ship of America must be strong.  The ship of America

cannot sink.  If it sinks, we all sink with it.

   THE PRESIDENT:  Sean, you're a —

Q   This is what — this is what drives you?

MR. MUSK:  Yes.

Q   This is important.  It says "tech support."  So, you're not trying to be president, as the media suggests.  You are really here because your heart and your passion is this.  And the president described you as being — this is the biggest thing you ever done.  Now you trying to bring sight to —

THE PRESIDENT:  There could be nothing bigger.  There's nothing —

Q   You're sending ships up to Mars — you know, spaceships up in the sky all the time —

THE PRESIDENT:  That's peanuts.

Q   — and saving astronauts.  That's pretty big.

THE PRESIDENT:  That's peanuts compared to what we're talking about.

Q   It's peanuts?

THE PRESIDENT:  Yeah.

Q   Do you agree with that?

MR. MUSK:  Well, it's esse- — it's essential that America be healthy, that America's economy be strong.  And — and if that — if — basically, like, my concern is like, if — if — America is the central pillar holding up Western civilization.  That pillar must be strong.  If that pillar falls, the whole roof comes crashing down.

THE PRESIDENT:  Including his ships.

MR. MUSK:  There's no place to hide.

THE PRESIDENT:  Including his ships going up.

MR. MUSK:  There's no place to run.

THE PRESIDENT:  Nothing.  There's nothing left.

Q   Why — why, if this is your goal, your motivation, you're losing money in the process, you're offeri- — you do all these nice things for people for free; you're trying to solve, you know, blindness; you're going to rescue astronauts; you help

000527

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 548 of 959

the people in North Carolina, California; you're cutting money that was sent abroad that's not helping the American people, then why the rage —

MR. MUSK:  Actually, I think it was like —

Q   But why this rage?

MR. MUSK:  — it was not helping the American people and hurting people overseas, to be clear.

Q   Why this rage against you now?  First, they hated him.  Now they hate both of you.

MR. MUSK:  Well, I think we're seeing an antibody reaction from — from those who are receiving the — the wasteful and fraudulent money.

Q   They're being exposed.

MR. MUSK:  Yes.

Q   Nobody wants to be exposed when you're corrupt.

MR. MUSK:  I'll — I'll tell you a lesson I learned at PayPal.  You know who complained the loudest — the quickest and the loudest and with the most amount of righteous indignation?  The fraudsters.  That's who complained first, loudest, and — and they would generally have this immense overreaction.  That's how we knew there were the fraudsters.  That's how we knew.  There's a tell.

Q   What di- — I've never — I've never met you before today.

MR. MUSK:  Yeah.

Q   And it's nice to meet you, by the way.  Thank — thank you for doing this.  You guys are really friends.  I could s- — you guys — I could see you kicking up your shoes.

THE PRESIDENT:  Well, he doesn't do this kind of thing.  And the way I figured that you'd get to know him is if I did it with him.  I said, "Come on, let's do it together."  He doesn't do this.

I think he's smarter not doing it, overall. Because, you know, I mean, he's done very well without doing it. But he doesn't feel it's really worthwhile. He wants the product to speak for itself, or whatever he does speak for itself. But he views it as — you know, does it matter?

And I'm doing this with you today because I wanted to have people understand him. And I think it's very important — I disagree with him. I think it's very important that they do understand him.

He doesn't need this. He doesn't need it. Now, I happen to think it's made him very popular. I think it — he's more popular now because there are so many people — you know, you're talking about the radical left — they have the lowest ratings. MSNBC is dying. CNN is dying. They're all dying. The New York Times is doing lousy. The Washington Post is doing horribly. They're all doing badly because people don't buy it anymore.

But I think it was important that he do this one interview. You've been a very fair guy. I think you were the right guy to do it. If we could get some radical left guy — and he'd do just as well, frankly, because it's all about common sense.

Q   They would attack him —

THE PRESIDENT:  But this — Sean —

Q   — as being unconstitutional, not — a fascist.

THE PRESIDENT:  — to me this was a — it was important for people to understand, he's doing a big job. He's doing a very thankless job. He's doing a thankless job, but he's helping us to save our country.

Our country was in serious trouble, and I had to get the best guy, somebody with credibility, because if he were just a regular, good — very good, solid businessman, he wouldn't have the credibility. He's got the best credibility for this.

And people also know he's an honest guy. He's an honest guy. He's just a very, very smart guy who's done amazing things. And this will be the biggest thing he's ever done, because, you know, his companies are all great. But if this country goes bad — I guess where he is a little selfish is this. He knows one

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 550 of 959

thing and probably doesn't think — but if his — if this country goes bad, his stuff is not going to be worth very much, I can tell you.

MR. MUSK:  Well, I'd say, if the — if the ship of America sinks, we're all go- — going down with it.  You know, this idea that people can escape to New Zealand or some other place is false.  If the central pillar of Western civilization that is America falls, the whole roof comes crashing down and there is no escape.

Q   It's amazing, since you've been elected, to watch Canada, Mexico, Venezuela, Colombia — I — I was shocked at the statements that Vladimir Putin made about you.  I — I was shocked at the hostage release.  I was shocked that Venezuela had done it — had done it.  Zelenskyy wants a deal.  Putin wants a deal.

THE PRESIDENT:  All good statements.

Q   King Abdullah was interested.

THE PRESIDENT:  You mean by that all good statements.  Look, they respect the president of this country.  They respect — they did not respect the last president.  They laughed at him, and they laughed at our country, and he's done great damage to our country.

Q   Have foreign leaders told you what they thought of Biden?

THE PRESIDENT:  Yeah, they have, but I'd rather not say.  They — they have.  It's not — it — look —

Q   It's the obvious.

THE PRESIDENT:  He was not George Washington, let's put it that way.

MR. MUSK:  (Inaudible.)

THE PRESIDENT:  Not the greatest.

Q   Sorry, if that's (inaudible).

THE PRESIDENT:  He's done a tremendous disservice.

Q   Will you be here —

THE PRESIDENT:  And, by the way, the Democrats have done a great disservice, and they ought to get their act together and use a little judgment, and they ought to work with us on straightening out this mess that —

Q   Who?  John Fetterman?

THE PRESIDENT: — a lot of people have —

Q   Maybe?  Who — what Democrat is not radicalized?

THE PRESIDENT:  Actually, you mention John.

Q   John Fetterman.

THE PRESIDENT:  He's become the best voice in the Democrat party.  You know, I had lunch with him, and I thought he was terrific, but he's a much different man than he was before he had this difficulty.  He used to be radical left, and I think he became much smarter, actually.  He's really — he's really a voice of reason.  But the Democrats have to get together.  They have to get their act together, because the stuff they — they talk about makes no sense.  It makes — none whatsoever.  And they must know it.  They must know.

MR. MUSK:  Yeah.  I mean, like, the country has spoken very clearly and rejected the core tenets of the Demo- — Democratic Party.  The country voted t- — fo- — I mean, the country made the — America has made its vote clear.  The president won the popular vote decisively.  The Republicans won the House.  Repub- — Republicans won the Senate.  What more do you need?  The Democratic Party needs to take a hard look in the mirror and — and change their ways.

Q   I think they went from shock, denial, into the depression stage of grief, and now they're in the rage stage, where I anticipate they'll stay for four years, and if they get the chance, they'll want to impeach him 10 times.  Do you anticipate you'll be here in four years?  My last question.

MR. MUSK:  I'll — I'll be as helpful as long as I can be helpful.

THE PRESIDENT:  That's a good question.  I mean, I was thinking about that just now.  I said, "I wonder how long he's going to be doing it."  You can't get somebody like this.  He cares, and he's brilliant, and he's got energy.  You need energy, also, in addition to those other things.

You know, I have a lot of guys that are very smart, but they have no energy.  They want to sleep all day long.  You need a lot of energy.  He's got a lot of energy.  He's doing a great job.

2/25/25, 8:13 PM
Interview of President Trump and Elon Musk by Sean Hannity, "The Sean Hannity Show" – The White House
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 552 of 959

If there's any conflict, he — he will stop it. But if he didn't, I'd stop it. I'd see if there's a conflict. I mean, we're talking about big stuff.

But he's under a pretty big microscope.

MR. MUSK: Yeah, seriously.

THE PRESIDENT: I mean, everybody is watching him. If there's a conflict, you're going to be reading about it within about two minutes after the conflict.

MR. MUSK: Exactly. There — there's — the possibility of me getting away with something is 0 percent — 0.0. I — I'm scrutinized to a ridiculous degree.

And — and the other thing is that we — you know, what — what's — you know what's better than saying "trust — trust me" is just full transparency. So, what we're doing with — with the DOGE — DOGE dot — just go to DOGE.gov. You can see every single action that's being taken.

And now –and I want to be clear, we are going to make some mistakes. We're not going to be perfect. Nobody bats a thousand. But we're going to fix the mistakes very quickly. That's what matters: not that you don't make mistakes, but that you fix the mistakes very fast.

THE PRESIDENT: And you're going to ask the other side, when they talk about, "This is a constitutional crisis," you got to a- — what are they paying for? Where are those tax — because when you read off the list of things, it's a big con job. See, when they talk Constitution —

MR. MUSK: Totally.

THE PRESIDENT: — it's a total con job.

MR. MUSK: Yes.

THE PRESIDENT: They never talk — and I watch some of the shows —

MR. MUSK: It's specifics — they avoid specifics.

THE PRESIDENT: Yeah, when you start talking about how did — how come they spent money on transgender here and transgender there —

MR. MUSK: Yeah, totally.

THE PRESIDENT: — and all the stuff in some country that nobody ever heard of, they don't want to talk about it. They just talk about, "This is a

constitutional crisis."

Q    It shocks the conscious.

THE PRESIDENT:  The money is being squandered purposely — tremendous theft, tremendous kickbacks, everything — and we're straightening it out.  And thank goodness.  I look up, and I say, "Thank you," because I think if it went on for four more years, it would not be salvageable.  You wouldn't be able —

MR. MUSK:  Absolutely.

THE PRESIDENT:  You wouldn't be able to save it.

Q    You believe, too, that when you were in Butler, came within a millimeter being assassinated —

THE PRESIDENT:  Yeah.

Q    The day you endorsed him, that was that day.

MR. MUSK:  Yes.

Q    But you had been planning on it?

MR. MUSK:  Yeah.

Q    Pretty — I think everybody will never forget that iconic blood on your face.  "Fight, fight, fight."  I actually was afra- — watching it and thought you might drop again.  You know, I didn't know if it had hit you.  You can sometimes get up and then the blood starts to accumulate.  It was scary — pretty scary.

MR. MUSK:  Well, I mean, th- — this is how you know someone's true character, because everyone can say they're brave, but the president was actually shot.  Okay?  Courage under fire.  "Fight, fight, fight," blood streaming down the face.  That's true courage.  You can't fake that.

Q    Yeah.  Thank you both.


    Mr. President, thank you, sir.

THE PRESIDENT:  Thank you very much.

Q    Appreciate it.  Elon, thank you for your time.  Really nice to meet you.

                    END            1:01 P.M. EST

000533

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 554 of 959

News

Administration

Issues

Contact

Visit

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

000534

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 535 of 959

Copyright

Privacy

# EXHIBIT 39

2/24/25, 1:16 PM     Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 556 of 959



Menu            Search

PRESIDENTIAL ACTIONS

# ENSURING LAWFUL GOVERNANCE AND IMPLEMENTING THE PRESIDENT'S "DEPARTMENT OF GOVERNMENT EFFICIENCY"

2/24/25, 1:16 PM    Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 558 of 959

# DEREGULATORY INITIATIVE

EXECUTIVE ORDER

February 19, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose. It is the policy of my Administration to focus the executive branch's limited enforcement resources on regulations squarely authorized by constitutional Federal statutes, and to commence the deconstruction of the overbearing and burdensome administrative state. Ending Federal overreach and restoring the constitutional separation of powers is a priority of my Administration.

Sec. 2. Rescinding Unlawful Regulations and Regulations That Undermine the National Interest. (a) Agency heads shall, in coordination with their DOGE Team Leads and the Director of the Office of Management and Budget, initiate a process to review all regulations subject to their sole or joint jurisdiction for consistency with law and Administration policy. Within 60 days of the date of this order, agency heads shall, in consultation with the Attorney General as appropriate, identify the following classes of regulations:

(i)  unconstitutional regulations and regulations that raise serious

2/24/25, 1:16 PM    Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 559 of 959

constitutional difficulties, such as exceeding the scope of the power vested in the Federal Government by the Constitution;

(ii)   regulations that are based on unlawful delegations of legislative power;

(iii)   regulations that are based on anything other than the best reading of the underlying statutory authority or prohibition;

(iv)   regulations that implicate matters of social, political, or economic significance that are not authorized by clear statutory authority;

(v)   regulations that impose significant costs upon private parties that are not outweighed by public benefits;

(vi)   regulations that harm the national interest by significantly and unjustifiably impeding technological innovation, infrastructure development, disaster response, inflation reduction, research and development, economic development, energy production, land use, and foreign policy objectives; and

(vii)   regulations that impose undue burdens on small business and impede private enterprise and entrepreneurship.

(b)   In conducting the review required by subsection (a) of this section, agencies shall prioritize review of those rules that satisfy the definition of "significant regulatory action" in Executive Order 12866 of September 30, 1993 (Regulatory Planning and Review), as amended.

(c)   Within 60 days of the date of this order, agency heads shall provide to the Administrator of the Office of Information and Regulatory Affairs (OIRA) within the Office of Management and Budget a list of all regulations identified by class as listed in subsection (a) of this section.

(d)   The Administrator of OIRA shall consult with agency heads to develop a Unified Regulatory Agenda that seeks to rescind or modify these regulations, as appropriate.

Sec. 3.  Enforcement Discretion to Ensure Lawful Governance.  (a)  Subject to their paramount obligation to discharge their legal obligations, protect public safety, and advance the national interest, agencies shall preserve their limited

000538

2/24/25, 1:16 PM          Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC     Document 36     Filed 02/26/25     Page 560 of 959

enforcement resources by generally de-prioritizing actions to enforce regulations that are based on anything other than the best reading of a statute and de-prioritizing actions to enforce regulations that go beyond the powers vested in the Federal Government by the Constitution.

(b)  Agency heads shall determine whether ongoing enforcement of any regulations identified in their regulatory review is compliant with law and Administration policy.  To preserve resources and ensure lawful enforcement, agency heads, in consultation with the Director of the Office of Management and Budget, shall, on a case-by-case basis and as appropriate and consistent with applicable law, then direct the termination of all such enforcement proceedings that do not comply with the Constitution, laws, or Administration policy.

Sec. 4.  Promulgation of New Regulations.  Agencies shall continue to follow the processes set out in Executive Order 12866 for submitting regulations for review by OIRA.  Additionally, agency heads shall consult with their DOGE Team Leads and the Administrator of OIRA on potential new regulations as soon as practicable.  In evaluating potential new regulations, agency heads, DOGE Team Leads, and the Administrator of OIRA shall consider, in addition to the factors set out in Executive Order 12866, the factors set out in section 2(a) of this order.

Sec. 5.  Implementation.  The Director of the Office of Management and Budget shall issue implementation guidance, as appropriate.

Sec. 6.  Definitions.  (a)  "Agency" has the meaning given to it in 44 U.S.C. 3502, except it does not include the Executive Office of the President or its components.

(b)  "Agency head" shall mean the highest-ranking official of an agency, such as the Secretary, Administrator, Chairman, or Director.

(c)  "DOGE Team Lead" shall mean the leader of the DOGE Team at each agency as described in Executive Order 14158 of January 20, 2025 (Establishing and Implementing the President's "Department of Government Efficiency").

(d)  "Enforcement action" means all attempts, civil or criminal, by any agency to deprive a private party of life, liberty, or property, or in any way affect a private party's rights or obligations, regardless of the label the agency has historically placed on the action.

(e)  "Regulation" shall have the meaning given to "regulatory action" in section 3(e) of Executive Order 12866, and also includes any "guidance document" as defined in Executive Order 13422 of January 18, 2007 (Further Amendment to Executive Order 12866 on Regulatory Planning and Review).

(f)  "Senior appointee" means an individual appointed by the President, or performing the functions and duties of an office that requires appointment by the President, or a non-career member of the Senior Executive Service (or equivalent agency system).


Sec. 7.  Exemptions.  Notwithstanding any other provision in this order, nothing in this order shall apply to:

(a)  any action related to a military, national security, homeland security, foreign affairs, or immigration-related function of the United States;

(b)  any matter pertaining to the executive branch's management of its employees; or

(c)  anything else exempted by the Director of the Office of Management and Budget.


Sec. 8.  Severability.  If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 9.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department, agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

  February 19, 2025.

News

Administration

Issues

Contact

Visit

2/24/25, 1:16 PM    Ensuring Lawful Governance and Implementing the President's "Department of Government Efficiency" Regulatory Initiative – The White House

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 563 of 959

THE WHITE HOUSE

1600 Pennsylvania Ave NW

Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

# EXHIBIT 40



2/25/25, 6:17 AM                                                FPDS-NG : ICDUSER [ Award ]



000544



2/25/25, 6:17 AM                                         FPDS-NG : ICDUSER [ Award ]

| Product/Service Code: | R497 [...] | Description: | SUPPORT- PROFESSIONAL: PERSONAL SERVICES C |
| Principal NAICS Code: | 541611 [...] | Description: | ADMINISTRATIVE MANAGEMENT AND GENERAL MAN |
| Bundled Contract: | Not Bundled | | |
| DOD Acquisition Program: | [...] | Description: | |
| Country of Product or Service Origin: | USA [...] UNITED STATES | | |
| Place of Manufacture: | Not a manufactured end product | | |
| Domestic or Foreign Entity: | U.S. Owned Business | | |
| Recovered Materials/Sustainability: | No Clauses Included and No Sustainability Included | | OMB Policy on Sustainable Acquisition |
| Information Technology Commercial Category: | Select One | | |
| Claimant Program Code: | [...] | Description: | |
| Sea Transportation: | Select One | | |
| GFP Provided Under This Action: | Transaction does not use GFP | | |
| Use Of EPA Designated Products: | Not Required | | |
| Description Of Requirement: (Limit 250 characters) Current: 119 | The purpose of this modification is to terminate the PSC pursuant to FAR 52.249-12 with an end date of 10 January 2025. | | |

### Competition Information

| Extent Competed For Referenced IDV: | |
| Extent Competed: | Full and Open Competition |
| Source Selection Process: | Trade-off |
| Solicitation Procedures: | Negotiated Proposal/Quote |
| IDV Type Of Set Aside: | |
| Type Of Set Aside: | No set aside used |
| Type Of Set Aside Source: | This Action |
| Evaluated Preference: | No Preference used |
| SBIR/STTR: | Select One |
| Fair Opportunity/Limited Sources: | Select One |
| Other Than Full And Open Competition: | Select One |
| Local Area Set Aside: | No |
| Contract Opportunities Notice: | No |
| A76 Action: | Select One |
| Commercial Products and Services Acquisition Procedures: | Commercial Products/Services |
| IDV Number Of Offers: | |
| Number Of Offers Received: | 3    Number of Offers Source: This Action |
| Small Business Competitiveness Demonstration Program: | |

https://www.fpds.gov/common/jsp/LaunchWebPage.jsp?command=execute&requestid=240651167&version=1.5                    3/4



000547

# EXHIBIT 41

ZOË SCHIFFER    **BUSINESS**    FEB 20, 2025 11:57 AM

# DOGE Puts $1 Spending Limit on Government Employee Credit Cards

**The restrictions are already in place at the General Services Administration along with several other agencies. Soon they'll roll out to most of the federal government, sources say.**



PHOTOGRAPH: GETTY IMAGES

000548



Elon Musk's so-called Department of Government Efficiency put a $1 spending limit on most credit cards belonging to employees and contractors of the General Services Administration—a critical agency that manages IT and office buildings for the US government—along with at least three other federal agencies. Similar restrictions are expected to roll out to the entire government workforce soon, according to several sources familiar with the matter.

"Effective immediately, all GSA SmartPay Travel and Purchase Cards issued to GSA employees and contractors are being paused and will not be available for use except in very limited circumstances," GSA wrote in a memo to staff Thursday morning viewed by WIRED. The memo later stated that for "up to 0.1% of the GSA workforce, requests may be made for certain individual purchase charge card spend thresholds be set above $1. Please provide the rationale for all such deviations on an employee-by-employee basis along with the proposed increased threshold."

## AI Lab Newsletter by Will Knight

WIRED's resident AI expert Will Knight takes you to the cutting edge of this fast-changing field and beyond—keeping you informed about where AI and technology are headed. Delivered on Wednesdays.

SIGN UP

By signing up, you agree to our user agreement (including class action waiver and arbitration provisions), and acknowledge our privacy policy.

The GSA, one of the first agencies that Musk allies infiltrated after DOGE was established, manages the SmartPay program for more than 250 federal agencies and organizations. The SmartPay website claims it is "the world's largest government charge card and commercial payment solutions program."

000549

The spending freeze comes after DOGE posted on X earlier this week that it was working to "simplify" the government credit card program and "reduce costs."

The restrictions immediately apply to GSA, the Office of Personnel Management, the Consumer Finance Protection Bureau, and the United States Agency for International Development, according to a source with direct knowledge of the project. All four of the agencies have been prominent targets of DOGE in recent weeks. Employees who spoke with WIRED say the changes will result in enormous complications to their existing workflows and that excessive or fraudulent spending is rare. Those who've already received approval for travel expenses (and may currently be traveling) have to request a temporary spending limit increase, the sources say.

One important reason that federal employees typically put expenses on special government-issued credit cards is to ensure they avoid paying state sales tax on things like hotels and rental cars, which federal agencies are supposed to be exempt from. The GSA's website states that the state sales tax exemption is "determined by method of payment," not by the employee's ability to prove they work for the federal government.

---

**Got a Tip?**

Are you a current or former government employee who wants to talk about what's happening? We'd like to hear from you. Using a nonwork phone or computer, contact the reporter securely on Signal at zoeschiffer.87.

---

As DOGE attempts to cut billions of dollars from the federal budget, Elon Musk has been posting examples of alleged "fraud" his team has uncovered to his over 218 million followers on X. In some cases, reporting from WIRED and other outlets suggests DOGE may be misinterpreting or misrepresenting what they've found.

For example, Musk has falsely claimed that 150-year-olds were receiving Social Security benefits. Experts told WIRED that DOGE likely overlooked a quirk in the payments system that doles out these benefits, which automatically sets a person's birthday to May 20, 1875 if the real date is unknown, making these individuals appear to be 150 in the system.

000550

The new spending restrictions apply to both SmartPay travel and purchase cards. Travel cards are widely used across the government (for example, most army reservists have these cards). The government tracks travel expenses, like hotel and airline fees, through software tools like Concur. The GSA already requires receipts for any purchase that its employees make over $75. "The system is a pain in the ass and requires authorization from a supervisor before any money can be spent," says a current GSA employee.

Once a trip is done, employees have to submit a voucher that matches the approved expenses. Expenses are scrupulously tracked—employees are told to minimize ATM withdrawals to avoid unnecessary fees, according to a current GSA employee, who like the others in this story, spoke to WIRED on the condition of anonymity because they were not authorized to speak publicly. They say misusing a card is already grounds for disciplinary action, including termination.

Purchase cards are more rare and are used for work expenses under $10,000; anything above this amount requires a formal government contract. They're used for office supplies, IT equipment, and trainings, among other things. If employees want to spend money on a purchase card, they have to submit a form, which then needs to be approved and signed by a supervisor. When that's done, the form is submitted for approval to the approving office, with the name of the person who wants to make the purchase, a description of the item, the estimated price, an accounting code, and the date when the goods or services are needed.

Once the payment is approved, it's assigned a purchase request number. Only then can the employee actually spend money. If they spend 10 percent more than the approved amount, they need written approval again. At the GSA, each purchase is tracked through a program called Pegasys, which requires a separate form to access. Pegasys has two sides: The purchase side, which shows the money that was spent, and the reconciliation side. The card holder has to match these two sides, cent for cent, using the request number.

"To commit fraud, you'd have to have the employee, supervisor, and likely someone in finance in on it," says another current GSA employee. "It's not as easy as [DOGE is] claiming."

# You Might Also Like ...

- **In your inbox:** Upgrade your life with WIRED-tested gear
- Musk takeover: DOGE's race to the bottom
- **Big Story:** The bust that took down Durov and upended Telegram
- WIRED's favorite 'buy it for life' gear
- **Event:** Join us for WIRED Health on March 18 in London

---

Zoë Schiffer oversees coverage of business and Silicon Valley at WIRED. She was previously managing editor of Platformer and a senior reporter at The Verge. ... Read more

DIRECTOR, BUSINESS AND INDUSTRY

TOPICS    DOGE     GOVERNMENT     ELON MUSK     FINANCE     CREDIT CARDS

---

# AI Lab Newsletter by Will Knight

WIRED's resident AI expert Will Knight takes you to the cutting edge of this fast-changing field and beyond—keeping you informed about where AI and technology are headed. Delivered on Wednesdays.

SIGN UP

---

READ MORE

---

## Early Investors in Donald Trump's Memecoin May Have Been Tipped Off, Experts Claim

Within moments of Donald Trump announcing his new coin, traders made high-value bets that quickly paid off. Did they have an edge?

JOEL KHALILI

## DOGE Put Him in the Treasury Department. His Company Has Federal Contracts Worth Millions

Experts say the conflicts posed by Tom Krause's dual roles are unprecedented in the modern era.

PARESH DAVE

## A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System

The Bureau of the Fiscal Service is a sleepy part of the Treasury Department. It's also where, sources say, a 25-year-old engineer tied to Elon Musk has admin privileges over the code that controls Social Security payments, tax returns, and more.

VITTORIA ELLIOTT

000554

# Government Tech Workers Forced to Defend Projects to Random Elon Musk Bros

A recent high school graduate and former Neuralink intern has joined meetings to review lines of code and other work history of career public servants, sparking chaos at a major government agency.

MAKENA KELLY

## The GSA Plans to Sell Hundreds of Its Federal Government Buildings

The General Services Administration, staffed at its upper levels by Elon Musk associates, plans to sell 500-plus buildings—some of which house government agencies and the offices of US senators.

LEAH FEIGER

## Chokepoint 2.0: An Investigation Promises the Truth About Crypto's Biggest Conspiracy

Did bureaucrats in the US plot to cut the crypto industry out of the banking system? An investigation begins.

JOEL KHALILI

## The Collapse of USAID Is Already Fueling Human Trafficking and Slavery at Scammer Compounds

The dismantling of USAID by Elon Musk's DOGE and a State Department funding freeze have severely disrupted efforts to help people escape forced labor camps run by criminal scammers.

MATT BURGESS

## No, 150-Year-Olds Aren't Collecting Social Security Benefits

Elon Musk claims to have found rampant fraud in the Social Security Administration. There's a much simpler explanation.

DAVID GILBERT

**WIRED**

**Gift WIRED for**
~~$30~~ **$12**

GIVE A GIFT

PRIVACY CONFIGURATIONS

000558

# EXHIBIT 42

2/25/25, 9:42 PM
The private GOP panic over the slash-and-burn DOGE firings - POLITICO
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 583 of 959





**AGRICULTURE**

# The private GOP panic over the slash-and-burn DOGE firings

White House aides are inundated with congressional calls as Republicans fret.



Kansas Sen. Jerry Moran is among the Republicans concerned about Trump administration cuts affecting

✕

## Thanks for signing in

Enjoy unlimited access to POLITICO.com

000559

2/25/25, 9:42 PM
The private GOP panic over the slash-and-burn DOGE firings - POLITICO
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 584 of 959

A growing number of congressional Republicans are desperately trying to back-channel with White House officials as President Donald Trump's Department of Government Efficiency ramps up its slash-and-burn firings of federal workers.

GOP lawmakers unleashed a frantic flurry of calls and texts after federal agencies undertook the latest firings this past weekend, with Republicans particularly worried about cuts affecting public safety and health roles. Trump's legislative affairs team, headed by former JD Vance aide James Braid, took the brunt of the frenetic fallout, according to four Republicans granted anonymity to discuss the conversations.

Advertisement

For the most part, Republican members are publicly cheering the administration's push to slash the federal government, which is being led by billionaire tech mogul Elon Musk with Trump's blessing. But privately, many are feeling helpless to counter the meat-ax approach that has been embraced so far, with lawmakers especially concerned about the dismissal of military veterans working in federal agencies as well as USDA employees handling the growing bird flu outbreak affecting poultry and dairy farms.

✕

## Thanks for signing in

Enjoy unlimited access to POLITICO.com

⌄

000560

White House spokesperson Anna Kelly said the administration's efforts are "already uncovering waste, fraud, and abuse across federal agencies and ensuring better stewardship of taxpayer dollars, including for American farmers and families." The president, she said, will eventually "cut programs that do not serve the interests of the American people and keep programs that put America First."

Republican lawmakers are growing particularly uneasy with cuts impacting veterans, who are given preference in the federal hiring process and have been disproportionately affected by the dismissals. GOP members are also concerned that federal services for veterans could be affected.

Republicans have quietly warned the White House to reinstate many of the 1,000 employees at the Department of Veterans Affairs who have been dismissed in recent days.

Senate Veterans Affairs Chair Jerry Moran (R-Kan.) said in an interview that he and his staff have been communicating their concerns with the White House legislative affairs team, along with Veterans Affairs Secretary Doug Collins.

"Certainly on the veterans side, we're asking for information from the administration," Moran said. "We are being reassured that no one at the VA who has any direct care responsibilities are being terminated or laid off, and we're just looking for the positions and circumstances in which it's occurring."

Other Republicans consider federal agency officials powerless to call off DOGE. They're instead focusing their efforts on the White House as their offices are inundated with calls from frantic constituents.

Advertisement

×

**Thanks for signing in**

Enjoy unlimited access to POLITICO.com

⌄

AD

Their strategy to back-channel with any White House official who will pick up the phone has yielded some small, scattered successes. The Agriculture Department said Monday it would reverse some of the firings impacting the bird flu response after GOP lawmakers complained to the White House legislative affairs team and other Trump officials.

📣 Want more POLITICO? Download our mobile app to save stories, get notifications and more. In iOS or Android.

The fears of Republican lawmakers in rural districts go deeper, though. They're also worried about the long-term fallout of Trump's moves as the federal government struggles to hire the next generation of federal employees who will keep farm and public health programs running across rural America.

✕

**Thanks for signing in**

Enjoy unlimited access to POLITICO.com

∨

"I worry what his plans are," said one Republican lawmaker who questioned whether cuts would be limited to waste, fraud and abuse or would curtail benefits for legitimate program participants. House GOP leaders are separately pushing for major Medicaid cuts to help pay for Trump's legislative agenda.

While the DOGE buzz saw continues to spin, many GOP lawmakers from leadership to the rank and file have settled on a strategy of keeping a careful eye on Musk's team while refraining from public criticism.

Senate Majority Leader John Thune told reporters Wednesday that GOP lawmakers will intervene with the Trump administration "if there are things that we think that need to be addressed" or if there are issues "perhaps they're not considering when they make these decisions."

Thune added he thought it was key "that we don't undermine important services," including health and safety. But he put his support behind the administration's efforts to give the federal government a careful "scrub" with the goal of a more limited presence.

Many other Republicans are praising efforts to slash federal funding. Sen. Rand Paul of Kentucky said he suggested to Vance during Senate Republicans' private lunch this week that Congress should codify the DOGE cuts, so that they "become real."

Speaking to the Conservative Political Action Conference on Thursday, Speaker Mike Johnson praised DOGE: "What Elon and the team are doing is what Congress has not had the ability to do. ... They are exposing this massive fraud, waste and abuse that we have not been unable to uncover because the deep state has hidden it from us."

✕

**Thanks for signing in**

Enjoy unlimited access to POLITICO.com

⌄

"Happy to do that once we balance the budget," Sen. Ron Johnson (R-Wis.) posted on X.

**FILED UNDER:** REPUBLICANS, RAND PAUL, DONALD TRUMP, JERRY MORAN, ELON MUSK, 



# West Wing Playbook: Remaking Government

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

**SIGN UP**

Advertisement

AD

Advertisement

✕

# Thanks for signing in

Enjoy unlimited access to POLITICO.com

⌄

**SPONSORED CONTENT**





### Look like a legit logo designer.

Create a professional logo as unique as your business with…

Godaddy

### Why Canada should join the EU

The Economist

### Elon Musk vows to cancel grants after gaining…

Financial Times







### New York Will Cover the Cost to Install Solar if Y…

Find out if you qualify. Get your free quote today!

EasySolar

### Special prices from NYC to Italy!

Discover all the special offers, fly non-stop to Rome with ITA…

ITA Airways

### Should Married Couples File Jointly or…

TurboTax

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition



Headlines

Photos

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

_____

© 2025 POLITICO LLC

**Thanks for signing in**

Enjoy unlimited access to POLITICO.com

✕

⌄

000566

https://www.politico.com/news/2025/02/20/gop-lawmaker-doge-cut-panic-00205282?template_id=OTJIR2CRKUD6&variant_id=OTV1GDUJ5B1ZS&is_login_link…    8/8

# EXHIBIT 43

Learn more about LSEG

## Trump appears to contradict White House, says Elon Musk in charge of DOGE

By **Andrea Shalal** and **Nandita Bose**

February 20, 2025 12:27 PM EST · Updated 5 days ago

 



While Elon Musk is playing a central role in the U.S. government as head of President Donald Trump's task force to slash government spending, the world's richest person has also weighed in prominently on politics in Germany.

Companies

 **Tesla Inc**

Follow

MIAMI/WASHINGTON Feb 19 (Reuters) - U.S. President Donald Trump on Wednesday said he has put billionaire Elon Musk in charge of the Department of Government Efficiency, appearing to contradict the White House over who runs the cost-cutting program.

The White House said in a court filing on Monday that Musk's role in the Trump administration was that of a White House employee and senior adviser to the president, and that he had no authority over DOGE and was not an employee of the program.

Advertisement · Scroll to continue



Report this ad

The White House declared this to a judge in a case filed by Democratic attorneys general against Musk and DOGE.

Trump appeared to contradict at least part of the White House assertion on Wednesday.



Elon Musk listens to U.S. President Donald Trump speak in the Oval Office of the White House in Washington, D.C., U.S., February 11, 2025. REUTERS/Kevin Lamarque/File Photo Purchase Licensing Rights ↗

"I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge," Trump told an audience of investors and company executives in Miami.

The President has repeatedly talked about Musk as the functional leader of DOGE, which is not a cabinet-level department, featuring him in a news conference at the White House this month to answer questions about the program.

Advertisement · Scroll to continue

Trump on his first day in office set up the cost-cutting body in an executive order that did not say who its "administrator" would be. White House officials this week have not answered repeated requests to identify the administrator.

DOGE has swept through federal agencies since Trump began his second term as president last month. Musk, chief executive of carmaker Tesla (TSLA.O) ⎘ , was put in charge of rooting out what the White House calls wasteful spending as part of a dramatic overhaul of government that has included thousands of job cuts.

Advertisement · Scroll to continue

Musk has been accused of a host of conflicts of interest between his business interests and his efforts to cut costs for the federal government. The White House has said the billionaire will recuse himself if any conflicts of interest arise.

## Sponsored Content

Dianomi ▷



**Leverage a powerful platform designed for self-directed traders.**

Sponsored by
TradeStation



**Caregivers need care too. Read our self-care tips. Learn more**

Sponsored by
Guardian Life



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**

Sponsored by
WalletJump

Feedback

Get weekly news and analysis on U.S. politics and how it matters to the world with the Reuters Politics U.S. newsletter. Sign up here.

Reporting by Andrea Shalal in Miami and Nandita Bose in Washington; Editing by Tom Hogue

Our Standards: **The Thomson Reuters Trust Principles.** ⎘

Suggested Topics:

United States    Donald Trump

Purchase Licensing Rights

## Read Next

United States
**US House Republicans advance Trump's tax cut plan**
2:24 AM UTC

---

United States
**Trump blocked from imposing sweeping federal funding freeze**
1:01 AM UTC

---

United States
**Musk's new ultimatum spurs fresh confusion among US government workers**
12:59 AM UTC

---

United States
**White House takes control of the press pool covering Trump**
ago

---

 REUTERS PLUS™

**AI Frontiers**
Sponsored by KPMG

LSEG Workspace    The next-generation human interface for financial professionals.

Feedback

# EXHIBIT 44

**Opinion**

Matt Bai

# The blinding contempt of the DOGE bros

Terrorizing USAID isn't reform. Here's an inside story of Elon Musk's takeover.

Today at 6:15 a.m. EST

🎧 14 min    ↗    🔖    💬 1339

(Illustration by David Plunkert/For The Washington Post)

More often than not, when conquering armies storm across borders or into rebel strongholds, they set about finding ways to humiliate the people they find there. They are capricious and cruel. They want their enemies to understand their own insignificance.

In Elon Musk's siege on Washington, the first village taken was the U.S. Agency for International Development, which dispensed roughly $32 billion in foreign aid last year (or less than half a percent of the federal budget). And for four weeks now, his U.S DOGE Service has made a chilling example of the people who served there.

I recently had a series of conversations with a senior USAID staff member who witnessed the agency's takeover from the inside. (I'd love to have asked DOGE, which stands for Department of Government Efficiency, about these events, but despite Musk's grand claim of historic transparency, his department has no contact with the media beyond self-serving social media posts.)

A DOGE official first arrived at USAID's offices on Jan. 27, a week after Donald Trump's inauguration. Late that night, a group of senior employees was hastily summoned to a teleconference with the two men who were to become their DOGE-era overlords: Luke Farritor and Gavin Kliger.

Farritor, 23, is a former SpaceX intern and University of Nebraska dropout who became famous in the tech world for having been part of a team that decoded an ancient Roman scroll. Kliger, 25, is a deep-state conspiracist on social media who, according to Wired, attended Berkeley and worked for an AI start-up. (He's also the guy Musk has now installed at the Treasury Department.)

Farritor and Kliger appeared to USAID staff as remote figures on a computer screen, bringing to mind the "Wizard of Oz." They wore T-shirts and polos and seemed to be Zooming from their offices in the Eisenhower Executive Office Building, next to the White House. They were unfailingly civil but not much for listening.

000571

The first thing the two bros — Farritor and Kliger — wanted to know was about how often these bills were paid and where the data was stored. They demanded and were given access to the payment system, but only on what you might think of as a "read only" basis; according to the official I talked to, who spoke on condition of anonymity to avoid retribution, they could not, initially, alter any transactions. Trump had decreed a freeze on all USAID spending five days earlier, and the two DOGE bros, as the staff would come to call them, wanted to make sure that order was being followed.

The cordial atmosphere darkened three days later, on Jan. 30, when White House officials learned that some USAID grantees overseas had somehow gotten paid through the Health and Human Services Department *after* Trump issued his order. The White House team believed USAID had been secretly funneling money through fellow bureaucrats in the labyrinth of deep-state agencies. This is what Marco Rubio, the secretary of state and nominal head of USAID, was talking about when he told reporters traveling with him in Panama that the agency's staff had been "insubordinate" and needed to be brought to heel.

In fact, the explanation here, like the explanations for most things in government, was pretty mundane. It turns out that most of the government's humanitarian *grants* — as opposed to contractor *payments* — are administered through HHS. (Ironically, this is an efficiency measure, because it creates a central storehouse for multiple agencies' grants.) USAID staff wasn't going behind anyone's back to disburse the grant money; it's just that no one had told HHS to shut off the spigot.

You can imagine, though, that DOGE didn't have much use for the boring government realities here. Musk's team needed a pretext for gutting the agency, and they decided they had one.

The White House immediately decapitated the agency, putting 65 senior staff members on administrative leave. In internal conversations with senior staff, Farritor and Kliger demanded that all senior managers be stripped of their power to authorize payments — and that they alone become the authorizers.

The most public clash at USAID revolved around DOGE officials who showed up at USAID headquarters at the Ronald Reagan Building and demanded access to its sensitive compartmented information facility, or SCIF, where confidential records are stored; three officials who refused to let them in were either fired or resigned. Out of view, though, the agency's most essential humanitarian programs overseas became the object of a weeks-long standoff between the State Department and DOGE.

Rubio had decreed that certain critical programs — such as aid to Ukraine and Syria and costs related to the PEPFAR program to combat HIV in Africa — would continue to be funded. Several times, USAID managers prepared packages of these payments and got the agency's interim leaders to sign off on them with support from the White House.

But each time one of Elon Musk's lieutenants, Farritor and Kliger would veto the payments — a process that required them to manually check boxes in the payment system one at a time, the same tedious way you probably pay your bills online. Meanwhile, AIDS clinics shuttered and staff found themselves stranded in unstable countries like Congo. A pregnant woman in an undisclosed country has sued the Trump administration because she was denied a Medevac helicopter. In another case, I was told, an employee in southern Africa who needed chemotherapy was also denied a chopper because no one would authorize the money.

One night, as staff tried yet again to assemble a list of necessary payments, the agency's computer network went down for two hours. When it came back on, members of the IT team whispered to colleagues to be wary; during the outage, they believed, spyware had been installed on the network to monitor communication among employees.

Finally, on the second Saturday in February, the two IT guys from DOGE shut everyone else out of the payment system entirely. They were now the only people who could even see the payments waiting to be approved. Hardly any of the essential funding promised by Rubio had been processed as of last week.

All this rigmarole over paying bills probably seems arcane compared with, say, mass firings or forced resignations at the Justice Department. But if you step back for a moment, what's happened at USAID over the past couple of weeks is unfathomable. A $50 billion agency — funded by taxpayers, empowered by Congress and employing something like 11,000 people around the world — is now tightly controlled by a handful of 20-something software engineers who have never worked a day in government. They disregard promises from the American secretary of state while agonized policy experts stand by helplessly.

In the coming weeks, courts will have to decide if those engineers and their billionaire boss had the right to fire pretty much everybody who worked at USAID. If I were betting (admittedly, this would have to be one very un-fun gambling site), I would wager that a year from now the agency itself will have disappeared, with much of its programs and staff continuing on at State. All of which probably could have been achieved in a more orderly and humane way had the agency been allowed to wind down more gradually under Rubio's supervision.

Maybe this unsettles Farritor and Kliger on some level — maybe they toss and turn on leather couches in the Eisenhower Building, troubled by a suspicion that Musk has them doing things they will one day regret. But I doubt it. Like young revolutionaries everywhere, Musk's former interns are probably swept up in the cause, reveling in the power to torture a bureaucracy they've been taught to loathe. Humiliating career public servants isn't some accidental by-product of the quest for efficiency. It seems to be the point of the exercise.

The swift sacking of USAID shook official Washington and set the tone for how DOGE would attack the rest of the government, starting with the Education Department and the Consumer Financial Protection Bureau. For me, it raises a fundamental question about Musk's work, and I don't think I'm alone in asking it. Is it what Musk is trying to do that makes me recoil — or is it the way in which he's doing it? Is it even possible to separate the substance here from the style?

After all, in the abstract — removed from the ever-present federal worker telling me no about a lot of them — would be open to bold moves like folding USAID into the State Department or padlocking the Education Department. If anything, as I've written, I'd like to see Musk take on even more controversial fights, like modernizing the entitlement programs that are the drivers of unsustainable debt or overhauling the corrupt and outdated system by which the Pentagon gets its weapons. You don't have to work hard to convince me that we have too many agencies and too many low-impact programs.

But does this really need to be done — can it be done effectively at *all* — by branding lifelong public servants as "criminals" and making them suffer for sport? What's the perverse joy to be had in making some of the foremost experts in their fields prostrate themselves before a couple of grad-school-level coders who probably couldn't find Congo on a map?

Here's a thought exercise: Let's imagine for the moment that Kamala Harris had won the presidency, and she had immediately gone out and recruited, say, Mark Cuban to reprise Al Gore's old mission of "reinventing government." Let's imagine that Cuban brought with him to Washington a cadre of young, idealistic MBAs, and in the first week they held meetings at some small agency and very respectfully asked for their personnel and payment records, so they could suggest some meaningful reforms. And let's say the agency told them to go to hell.

Would all of us who believe in the value of government service be jumping up and down and screaming about breaches of protocol and congressional prerogative? Or would we be saying: Who are these bureaucrats to think they can deny the president access to *anything*?

The problem isn't that Musk has been given a brief to reassess program and budgets; it's that he evinces no real intellectual interest in any of these things. Musk — who, according to biographer Walter Isaacson, calls other people "stupid" the way most of us say "please" or "thank you" — seems to have chosen his hires not for any remotely relevant experience but rather to send a message about how little respect he has for public service generally. *A couple of my interns can do this better than all of you*. Posting on X, Musk said it was time for USAID to die and crowed about feeding it to a wood chipper. It's impossible to overstate the level of his contempt.

You can ascribe that contempt to right-wing or libertarian political ideology, but I'm guessing it has at least as much to do with the tech industry generally. From the moment Silicon Valley exploded in the 1990s, and probably before that, its leading denizens have subscribed to a kind of techno-chauvinism — a belief that only engineers know how to solve the problems of humankind, and if you work for the government, then you can't be very smart, so you must be doing everything wrong.

Rep. Ro Khanna (D-California), whose district includes legendary tech meccas like Cupertino and Sunnyvale, expressed it to me this way: "They have this view that they have more knowledge, more *chutzpah*, that they are the ones who are moving civilization forward and building new things, that they're entitled to rule or govern, and that they do a better job of it than democracy."

No one embodies this secret vanity like Musk. You can't escape the feeling that to him, the federal government is just some legacy company they acquired for not very much (with Trump as their front man), and now they're going to shutter it. They marched into USAID as you would march into any newly owned subsidiary on the verge of bankruptcy. They see themselves, I'm sure, as selfless; they could be back west plotting new start-ups and reaping untold billions, but they've decided to save their country from mentally challenged bureaucrats instead.

You have to wonder, though, if all that contempt is blinding Musk to the obvious ways in which government agencies aren't — and shouldn't be — analogous to bloated companies at all. For one thing, the goal of any company, when you get past all the Messianic blather about changing the world, is to make money for its investors — period. The more efficient you are, the more money everybody makes.

The central goal of government, on the other hand, is to protect its citizens and enforce its laws — and to address the imbalances that a free market can't. Efficiency is desirable and often lacking for no good reason — but it is not an end in itself.

Why does it take multiple people and several days just to authorize a batch of payments at USAID? Because every agency has a system of checks and balances to make sure the taxpayers aren't being cheated. Government always trades off some efficiency to safeguard the integrity of the system.

And when you buy a failing company, you own it outright, whereas, in government, Congress is a permanent and coequal board of directors that can't just be ignored. This is why DOGE's ransacking of departments has already drawn a raft of legal challenges, some of which will probably be sustained, though that could take months if not longer. Musk's unelected engineers are unilaterally unmaking decisions that only Congress has the constitutional power to undo.

It would have been easy enough for Trump's White House to go to its sheep-like caucuses in Congress and ask them to eliminate a bunch of agencies in the next budget. But Trump and Musk wanted the immediate gratification of a blitzkrieg instead, which means they may well end up having to give back some of the territory they so triumphantly seized.

You could argue, and I'm sure Musk would, that such a view is hopelessly naive — that a government that's been spreading its tentacles slowly for 100-plus years can only be hacked back viciously and all at once, without all the legal niceties that entrenched bureaucracies are adept at exploiting. But my instinct, having been around Washington a lot longer than anyone at DOGE, is that most of what's done here thoughtlessly and by fiat is generally undone by someone at some point.

Terrorizing an agency really isn't the same thing as permanently reforming it. Although to Musk and his band of engineers, it might be a lot more fun.

---

**What readers are saying**

The comments overwhelmingly criticize Elon Musk's approach to restructuring government agencies like USAID, describing it as cruel, chaotic, and driven by personal vendettas rather than genuine

efficiency ... across ... over the last ... and ... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 45

*Democracy Dies in Darkness*

**National**

# Musk's blitzkrieg is unnerving many of Trump's senior advisers

Officials have been blindsided by DOGE's actions. But the president's strong support of the group means other advisers have limited options.

February 21, 2025

🎧 15 min    ✦    ↪    🔖    💬 2414

By Jeff Stein, Jacqueline Alemany, John Hudson, Laura Meckler and Dan Diamond

Top treasury officials have complained about disruption. The secretary of state has pushed back on staff cuts. Inside the Education and Health and Human Services departments, political appointees have been informed — not consulted — about canceled grants and contracts, sometimes learning about decisions from the media.

Elon Musk's aggressive tactics to reshape the federal government have irritated and blindsided many senior officials in the Trump administration, including those tasked with running Cabinet departments being squeezed by his U.S. DOGE Service, according to interviews with more than 30 current and former officials and their advisers, many of whom spoke on the condition of anonymity to discuss internal matters. Amid these bubbling tensions, White House Chief of Staff Susie Wiles personally asked Musk last week to better coordinate on DOGE's sweeping actions.

The broad goals of Musk's team at DOGE, which stands for the Department of Government Efficiency, are shared not just by President Donald Trump but also by most of his senior advisers, who also want to shrink the government through unilateral cuts. And yet agency heads whom Trump chose are finding themselves caught off guard by DOGE's actions and forced to reverse, mitigate or answer for some of its most disruptive moves. While working to win Senate confirmation to be health and human services secretary, for instance, Robert F. Kennedy Jr. had to reassure GOP senators he would reexamine DOGE-driven cuts to the National Institutes of Health. Linda McMahon, Trump's nominee for education secretary, told senators that she, too, would investigate cuts at her department.

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises, his picks for key roles and legal challenges to his executive orders and actions.

DOGE's blitzkrieg across the federal government has sparked deep concern among civil servants, who have been targeted for layoffs and required to implement policies they see as unwise, if not illegal. But Trump's political appointees are quietly expressing unease with Musk as well.

"Basically every Cabinet member is sick of him, but nobody feels like they're in a position to do anything about it," said one person who spoke on the condition of anonymity to describe private conversations with several incoming secretaries or their staffs. "People are afraid to cross him even as he's wreaking havoc on their agencies."

Trump, though, has made clear that he supports Musk. And none of the tensions with other appointees seem significant enough to block DOGE's work.

In a joint interview aired on Fox News on Tuesday, Trump lavished praise on the billionaire and said Musk was ensuring his orders were not watered down by federal workers.

One of Trump's few known complaints about Musk came after an Oval Office session last week to which Musk brought his toddler, who interrupted and gestured playfully while the men spoke with reporters, two people familiar with the matter said.

"When you sign these executive orders, a lot of them don't get done," Trump said on Fox. He said Musk would make sure they are implemented as intended: "Some guy that maybe didn't want to do it, all of a sudden, he's signing."

The 78-year-old president and 53-year-old magnate have been seen together constantly since Trump's victory in November. Musk has interviewed Cabinet picks, taken questions from reporters alongside the president and even joined Trump's calls with world leaders. And he has made powerful allies in Stephen Miller, Trump's deputy chief of staff, and his wife, Katie Miller, who has worked on behalf of DOGE.

In court filings, the White House has stated that Musk has no "actual or formal" authority to make decisions and is not a DOGE employee. In practice, however, DOGE's ability to act even without prior approval from Cabinet secretaries illustrates how much power Musk has accrued.

"If you're a good Cabinet secretary, you might be annoyed that DOGE is undermining your agency, or feel you'll look like a fool if you say X and DOGE does Y. You might find that annoying, and that's understandable," said Avik Roy, president of the Foundation for Research on Equal Opportunity, a think tank that promotes free markets. "But Trump likes the fact that these Cabinet heads don't have carte blanche to do whatever they want and that Musk gives them another set of eyes at the agencies. That's what the president wants, and he's entitled to run the executive branch that way."

But the extent of Musk's ability to execute sweeping changes without approval or input from department heads appears to be unprecedented — and unsettling for the Cabinet.

"Why do you want to be a Cabinet secretary if you can't run your own agency and the president and Elon Musk run your agency for you? That doesn't seem like a great job to me. It's very unusual. We've never seen anything like this," said Doug Holtz-Eakin, president of the American Action Forum, a right-leaning think tank. "These uncoordinated efforts have downsides — you have the secretaries and DOGE at cross-purposes, and that doesn't serve anyone well."

A White House spokesman said there's no tension between Musk and other officials, and other Trump officials downplayed any disagreement.

"The entire Trump administration is aligned on delivering on President Trump's agenda to streamline our bloated government and make it more efficiently serve the American people," spokesman Kush Desai said in a statement. "DOGE is working hand in hand with the White House and federal agencies to identify and slash waste, fraud, and abuse at lightning speed. Any unfounded rumors peddled by anonymous sources simply do not have any clue what's happening or are actively working against the President's agenda and the will of the American people."

# DOGE clashes with agencies

Almost as soon as Treasury Secretary Scott Bessent took office, the DOGE team thrust his department into the spotlight.

David A. Lebryk, the most senior career official at Treasury, had clashed with DOGE allies who demanded access to sensitive payment systems that disburse more than $5 trillion annually so they could unilaterally terminate foreign aid payments. Lebryk thought that was illegal and resigned.

Just a few days after being sworn in, Bessent began to hear from peers about how valuable Lebryk was. In a call, Federal Reserve Board Chair Jerome H. Powell, a former treasury official himself, extolled Lebryk as a valuable public servant, two people said, although that was not the primary purpose of the conversation. Several other former senior treasury officials made similar points in separate calls with Bessent's deputies around the same time, two other people said. The incident touched off broad alarm among the Treasury civil staff whom secretaries depend on to manage their agencies, and even among Republicans who had served in the department.

The controversy spread to the New York bureaucracy and raised doubts about the secretary's credibility as well. Bessent later told congressional Republicans that Musk's team did not control the payment systems, and department officials said in a public statement that DOGE staffers had "read-only" access. An affidavit filed in federal court from a senior career treasury staffer said 25-year-old Marko Elez had, in fact, been granted editing permissions that were later revoked. Top treasury officials later expressed frustration to confidants that the matter weakened their standing with the department, two people familiar with those comments said.

"It undermined him with the treasury staff and made him look like he was not in control," one former Trump administration official said.

On Bloomberg News on Thursday, Bessent compared Musk to star athletes Michael Jordan and Lionel Messi and praised DOGE's work, which Treasury has said publicly it is supporting.

"He is focused, and his energy level is unbelievable," Bessent said of Musk. "He has gotten to where he has because everything is on the table."

Bessent is not the only Trump Cabinet secretary to have to manage fallout from Musk's aggressive approach. Other political appointees have been left in the dark about key initiatives in their own departments — or forced to try to reverse Musk's maneuvers.

During Secretary of State Marco Rubio's first official foreign trip, DOGE representatives in Washington presented a plan to eliminate almost all of USAID, which Rubio was nominally running as acting administrator. The plan proposed cutting the 10,000-person agency to roughly 290, a staffing level so low that experts said it would be impossible to administer the tens of billions of dollars in foreign aid approved by Congress every year.

Rubio and his aides, who during his trip to Central America vowed that foreign aid would continue, advocated for more USAID officials to keep their jobs, resulting in 600 workers being deemed essential — roughly double what the DOGE team originally proposed.

But the Trump administration's aid freeze still left chaos across the agency, the world's largest provider of food assistance. In public, Rubio forcefully defended Musk and blamed USAID officials for "insubordination" in DOGE's effort to audit the agency. But in more private settings with U.S. officials, Rubio has acknowledged that it's much easier to smash things than put them back together, a point underscored by nonprofit groups that have struggled through the freeze to protect programs the Trump administration says it still supports, said current and former U.S. officials.

A spokeswoman for the State Department did not respond to requests for comment.

"The secretary is trying to make foreign aid work better, but much of the current DOGE actions inside and outside of Foggy Bottom are focused on ending it," said Matthew Bartlett, a political appointee at the State Department during Trump's first term.

# A seized office and a white noise machine

In the first days after Trump's inauguration, the offices on the seventh floor of the Education Department were mostly empty, waiting for senior political officials who require Senate confirmation to arrive. But at least one political appointee had found an office and started to settle in, said one person with knowledge of the situation.

Then, the DOGE team that arrived at the agency Jan. 31 abruptly commandeered that office. DOGE staffers refused to interact with others — declining even to return pleasantries or acknowledge greetings — and got into at least one altercation with a political appointee, this person said. The DOGE team also took possession of the large, windowed corner office meant for the agency's undersecretary, dragging extra desks and chairs in to set up a war room. Also set up: white noise machines, to prevent others from hearing their conversations.

The DOGE team has made almost all of the decisions about what grants and contracts to cancel and which employees to put on leave, without seeking or considering input from political appointees on-site, people familiar with the situation said.

In many cases, political appointees are hearing about cuts at the same time as the public is — via DOGE or Musk posts on X, the social media network the billionaire owns.

The political appointees "had a plan in place for how they wanted the first couple of weeks or months to go, and this is just derailing it," one person said. The team's members, this person said, did not realize that they would have to "fight this battle."

DOGE's decisions included putting employees on leave because of alleged ties to diversity, equity and inclusion initiatives — even if all they did was participate in a DEI program that had been endorsed by the first Trump administration. DOGE also canceled contracts for functions mandated by law and killed others in which the agency had already paid out most of the money. Many contracts will need to be rebid — a time-consuming and avoidable process, people familiar with the situation said.

McMahon, who is still awaiting Senate confirmation, has heard these complaints from political staff and has been frustrated by the situation, according to someone close to her.

"She's frustrated because she's going to have to come in and clean up a big mess," this person said. He expects McMahon will tell DOGE to operate differently, saying she would probably explain: "Make recommendations, and then I will decide. You can no longer come in and cut and strike and delete."

Asked for comment, an Education Department spokeswoman provided a statement from the agency's chief of staff, Rachel Oglesby, who said DOGE team members were a valuable part of the department's work. "We all serve at the pleasure of President Trump and are working to implement his agenda together," she said. "Any reports to the contrary are inaccurate, unnecessary and unhelpful to accomplishing our shared goals."

DOGE also descended on the Department of Health and Human Services, embedding employees in what it says is an effort to root out waste and fraud in the agency's nearly $2 trillion budget. Musk's team has repeatedly surprised political officials who weren't aware of DOGE's plans or the extent of the group's planned cuts, and they have sometimes learned of actions only from news reports.

Some Trump appointees were caught off guard by a Friday night announcement on Feb. 7, driven by DOGE, that the National Institutes of Health would cut billions of dollars in payments to universities and research organizations, said two people familiar with the matter. That move also prompted complaints from GOP leaders worried about the impact on higher education and jobs in their states — leading Kennedy, who had not yet been confirmed as HHS secretary, to assure GOP senators he would review the policy.

The White House declined to comment on whether officials were briefed on DOGE's specific actions such as NIH funding cuts.

# 'DOGE is by definition disruptive'

Many of these complaints have found their way to the White House. But Trump has made clear his support for DOGE, limiting the options for constraining Musk's power.

Last week, Wiles, the chief of staff, spoke privately with Musk near the East Room of the White House, two people familiar with the exchange said. But Wiles did not reprimand Musk or give him a list of demands — she just asked for improved coordination between DOGE and White House staff, people familiar with the conversation said. Some details of that talk were previously reported by Reuters.

A White House official said that lines of communication between the two have already improved. Musk traveled with Trump during a leg of his trip to Florida last weekend, and on the plane, Musk ran things by Wiles and didn't go into Trump's office without letting her know.

"To be crystal clear, DOGE is by definition disruptive, so it's normal and expected for Wiles to have some back and forth with Musk as he goes along," said a senior administration official.

Democrats have long predicted a split between Musk and Trump, arguing that a falling-out between such large personalities is inevitable. Even many of Trump's aides have wondered when or if the president will tire of sharing the spotlight with Musk, the richest person in the world.

"The conversation at Mar-a-Lago in late December was already, 'Why is DOGE getting all this attention and credit?'" one person familiar with the dynamic said.

But others emphasize the men's shared personal and ideological affinity. On Fox News, Trump referred to Musk as "brilliant" and marveled at his "tremendous imagination." Musk was similarly complimentary of Trump: "Not once have I seen him do something that was mean or cruel or — or wrong. Not once."

Nonpublic polling has shown DOGE and Musk's popularity ratings trending toward negative numbers, according to a White House official. A Washington Post-Ipsos poll found that 43 percent of Americans support what Trump has done in his first month, while 48 percent oppose it. But Musk's polling is worse: Only 34 percent approve of how he's handling his job, while 49 percent disapprove.

Allies say Trump believes Musk played a crucial role in the 2024 presidential election, especially turning out voters in key states, and is doing necessary work to weaken the federal civil service that has resisted Trump's agenda. While DOGE has irritated Trump aides by generating nearly daily chaos in the capital, the president sees that disruption as a strength, not a weakness. Musk, meanwhile, has said Trump offers a generational opportunity to save the American government — and pave the way for his goal of getting to Mars.

"Trump understands that you can't take on the establishment with a scalpel. If you take on the system with a scalpel, the system will break you," said Newt Gingrich, who served as speaker of the House in the 1990s and is a Trump ally. "Trump understands he needs a sledgehammer. Elon is that sledgehammer."

**What readers are saying**

The comments express strong disapproval of Elon Musk's aggressive tactics in reshaping the federal government, with many seeing it as a power grab that undermines democracy. Commenters criticize Musk's influence over Trump, suggesting that Musk is effectively running the... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 46

2/26/25, 9:45 AM
USDA seeks to undo firings of bird flu officials : NPR
Case 8:25-cv-00462-TDC    Document 36    Filed 02/26/25    Page 612 of 959




DONATE

POLITICS

# The USDA fired staffers working on bird flu. Now it's trying to reverse course

FEBRUARY 19, 2025 · 1:02 PM ET

By Rachel Treisman



The U.S. Department of Agriculture says it is taking steps to optimize its workforce and reduce its spending — but is now trying to rescind the firing of some employees.

*J. David Ake/Getty Images*

The U.S. Department of Agriculture says it is trying to reverse the firing of staffers who worked on the government's response to bird flu, amidst growing concerns about its spread.

Tens of thousands of workers across the federal government have been told they are losing their jobs, and more layoffs and firings are in the works. The USDA is among multiple health agencies that have faced mass firings.

On Friday, the USDA publicly touted what it called "the first tranche in a series of bold reforms," including "an aggressive plan to optimize its workforce by eliminating positions that are no longer necessary," in line with the efforts of the Department of Government Efficiency (DOGE).

**Sponsor Message**



**PUBLIC HEALTH**

**After delay, CDC releases data signaling bird flu spread undetected in cows and people**

Within days, however, the agency sought to reverse some of those firings — particularly those related to its handling of the highly pathogenic avian influenza (HPAI).

"Although several positions supporting HPAI were notified of their terminations over the weekend, we are working to swiftly rectify the situation and rescind those letters," a spokesperson wrote in a statement shared with NPR. It was first reported by NBC News on Tuesday.

The agency continues to prioritize its response to bird flu, the spokesperson added.

000585

Several job categories — including veterinarians and animal health technicians — have been "exempted from the recent personnel actions" to support those efforts. The USDA also says it is "continuing to hire the workforce necessary to ensure the safety and adequate supply of food to fulfill our statutory mission."



**PUBLIC HEALTH**

**FDA staff handling drug safety for pets and livestock lost jobs in Trump firings**

The H5 bird flu is widespread in wild birds globally, causing outbreaks in poultry and U.S. dairy cows. Many Americans are now feeling the impact, with egg prices high and supply low. The outbreak has also gotten some people sick.

There have been 68 confirmed U.S. cases of bird flu since 2024, according to the Centers for Disease Control and Prevention (CDC). There has been one confirmed death, of a person in Louisiana, in January. The CDC says the "current public health risk is low."



**PUBLIC HEALTH**

**On the frontline against bird flu, egg farmers fear they're losing the battle**

However, the Trump administration's efforts to slash the federal workforce — including at numerous health agencies — and restrict public health communications have been cause for concern to many in those fields, as NPR has reported.

The first bird flu study from the CDC published under the Trump administration — released after a delay last week — suggested that some spillovers from dairy cattle into veterinarians who worked with them have gone undetected.

## This isn't the only department trying to reverse firings

Several Democratic lawmakers were quick to lay the blame for the bird flu firings on DOGE and Elon Musk, who effectively runs it.

"This is what happens when you let a bunch of inexperienced hacks tear down vital government agencies and services," tweeted Sen. Chris Van Hollen of Maryland. "Elon Musk and the DOGE boys are playing with people's lives and our national security, and we need to shut them down."

Sen. Amy Klobuchar of Minnesota also amplified reports of USDA's efforts to rehire staffers working on bird flu, writing, "They were 'accidentally' fired by the administration."



**PUBLIC HEALTH**

**Health agencies lose staff members in key areas as Trump firings set in**

Amidst mass layoffs across the entire federal government, the USDA isn't the first federal agency that has reversed course on certain terminations.

Last week, chaos unfolded at the National Nuclear Security Administration (NNSA) — the civilian agency that oversees the U.S. nuclear weapons stockpile — where officials were given hours to fire hundreds of employees as part of broader Department of Energy layoffs on Thursday.

The process sparked confusion among employees and concern from lawmakers, given the national security implications. Some critics suggested the Trump administration had carried out the layoffs without understanding the scope of the NNSA's work.

**POLITICS**

000587

**Trump firings cause chaos at agency responsible for America's nuclear weapons**

"The DOGE people are coming in with absolutely no knowledge of what these departments are responsible for," Daryl Kimball, executive director of the Arms Control Association, told the Associated Press. "They don't seem to realize that it's actually the department of nuclear weapons more than it is the Department of Energy."

On Friday, the NNSA director issued a memo rescinding the firings of all but some two dozen employees, according to the AP.

The story didn't end there, however. Citing an internal NNSA email, NBC News reported that agency officials struggled over the weekend to contact some of those employees to inform them about their reinstatement, since they had lost access to their government email accounts after being fired.



**POLITICS**

**A federal judge has denied states' bid to halt DOGE and Musk's work**

When asked on Tuesday if he had any concerns about how the NNSA firings had been handled, President Trump told reporters, "No, not at all, I think we have to just do what we have to do."

"It's amazing what's being found right now — it's amazing," Trump added. "Some, if we feel that, in some cases, they'll fire people and then they'll put some people back, not all of them, because a lot of people were let go."

bird flu     usda     doge     trump administration



# Can't keep up? We've got you.

Let the NPR Politics newsletter keep you up to speed and break it all down in one email.

| Email address | SUBSCRIBE |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy. NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR



POLITICS
**Federal agencies still can't agree on 'What did you do last week?' email**

000589



**POLITICS**

Reconciliation is the key to unlocking Trump's agenda. Here's how it works



**LAW**

Supreme Court orders new trial for death row inmate in Oklahoma



**POLICY-ISH**

## Some Trump voters want him to rein in health care costs. It's unclear if he will



**ANALYSIS**

## Trump White House seeks tighter grip on message with new limits on press



POLITICS

**Trump introduces a green card for the rich: the gold card**

## Popular on NPR.org



2/26/25, 9:45 AM
USDA seeks to undo firings of bird flu officials : NPR
Case 8:25-cv-00462-TDC     Document 30     Filed 02/26/25     Page 621 of 959

**POLITICS**

## House Republicans pass budget resolution, clearing a key early test for Trump agenda



**POLITICS**

## 21 DOGE staffers resign, saying they won't help 'dismantle' public services



**POLITICS**

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 622 of 959

**6 federal workers get their jobs back in 1st successful challenge to Trump's firings**



GOATS AND SODA

**Judge tells Trump administration it has less than 2 days to resume USAID funding**



LIVING BETTER

**A break from your smartphone can reboot your mood. Here's how long you need**

2/26/25, 9:45 AM
USDA seeks to undo firings of bird flu officials : NPR
Case 8:25-cv-00462-TDC     Document 30     Filed 02/26/25     Page 623 of 959



**UKRAINE INVASION — EXPLAINED**

**Top Ukrainian official says Kyiv will refuse any 'bad' peace deal**

## NPR Editors' Picks

Case 8:25-cv-00462-TDC          Document 36          Filed 02/26/25          Page 624 of 959



**RELIGION**

## Christianity declines among U.S. adults while "religiously unaffiliated" grows, study says



**ENVIRONMENT**

## Meet the 'wooly devil,' a new plant species discovered in Big Bend National Park



MIDDLE EAST CRISIS — EXPLAINED

**Israelis hold a mass funeral for Shiri Bibas and her two sons killed in Gaza**



UP FIRST NEWSLETTER

**For Women's History Month, NPR wants to know who has made an impact in your life**



SHOTS - HEALTH NEWS

**Tablets for tots? Survey says kids watch videos on their own devices by age 2**



SCIENCE

**Lunar Trailblazer sets out to find water on the moon**

**READ & LISTEN**

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

**CONNECT**

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

**Accessibility**

**Ethics**

**Finances**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2025 npr

# EXHIBIT 47



# EXHIBIT 48





**WHITE HOUSE**

# Musk's 'what did you do last week?' email hits a million replies

About one-third of the federal workforce replied to the demand.



Elon Musk's ongoing purge of the federal workforce has drawn legal challenges and, in multiple instances, unthinkingly fired employees critical to national security and public safety that agencies then sought to quickly rehire. | Francis Chung/POLITICO



By **ELI STOKOLS** and **DANIEL LIPPMAN**

02/25/2025 01:44 PM EST

controversial email — amplified by Elon Musk in a threatening post on X — demanding a list of five things they did on the job last week.

The White House, eager to present the email demand as part of its coordinated attempt to dramatically scale down the size of the federal government, made that announcement at Tuesday's press briefing.

Advertisement

"All federal workers should be working at the same pace as President Trump is working and moving," Leavitt said. "This is to ensure that federal workers are not ripping off American taxpayers, that they are showing up to the office and that they are doing their jobs. And it's a very simple task to complete."

That amounts to roughly a third of the federal workforce, which numbers about 3 million.

Leavitt's announcement was, to a large degree, a response to several days of confusion following the Saturday evening email, which Musk said required a response from all federal workers and that failing to reply would be viewed as a resignation.

Many federal agencies, especially those in the national security space, quickly

in their termination.

---

📣  Want more POLITICO? Download our mobile app to save stories, get notifications and more. In iOS or Android.

---

But the relatively high response rate suggests many workers, amid the conflicting guidance, decided to err on the side of compliance to avoid the chance they might lose their jobs.

The news from the White House also came just hours after 21 people working for Musk's Department of Government Efficiency resigned, reportedly no longer willing to use their technical expertise to "dismantle critical public services." The Associated Press was first to report on the resignations.

Although Musk's ongoing purge of the federal workforce has drawn legal challenges and, in multiple instances, unthinkingly fired employees critical to national security and public safety that agencies then sought to quickly rehire, Trump and allies remain committed to the efforts broadly and believe that there is strong public support for shrinking government.

Presidential counselor Alina Habba, speaking to reporters Tuesday morning outside the West Wing, suggested that the outcry over DOGE's efforts, specifically the email asking employees to demonstrate productivity to their superiors, was "ridiculous."

"Look at all of you standing here asking me why people are upset to answer to their boss, the American people and the president of the United States, what you've done at work," Habba said. "What a ridiculous thing."

**FILED UNDER:** WHITE HOUSE, FEDERAL EMPLOYEES, DONALD TRUMP, DOGE



---

Your guide to Donald Trump's unprecedented overhaul of the federal government.

**EMAIL**

Your Email

**EMPLOYER**

Employer

**JOB TITLE**

Job Title

By signing up, you acknowledge and agree to our Privacy Policy and Terms of Service. You may unsubscribe at any time by following the directions at the bottom of the email or by contacting us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

Advertisement

AD

Advertisement

AD

**SPONSORED CONTENT**





## Look like a social media savant.

Spin up slick social posts, plus monthly calendars and full...

Godaddy

## Kathleen Kennedy to Step Down at Lucasfilm

Puck

## Wall St. Legend Reveals:"Strange Days...

Hedge funds and billionaires are already moving their money. Bi...

Vision







## New York Will Cover the Cost to Install Solar if Y...

Find out if you qualify. Get your free quote today!

EasySolar

## This Spring Break leave New York behind

This Spring Break, leave New York behind and book your hot...

Barceló Hotel Group

## Small Prefab Houses For Seniors At Lowest Price...

PopularSearchNow | Search Ads

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos



000605

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

_____

© 2025 POLITICO LLC



000606

# EXHIBIT 49

ADVERTISEMENT

AP SETS THE STANDARD FOR POLITICAL REPORTING.
SUPPORT INDEPENDENT, FACT-BASED JOURNALISM.

DONATE



Live: Budget plan    Stock market today    Pope Francis    Congo mystery illness    Diana Taurasi

POLITICS

# Trump backs Musk as he roils the federal workforce with demands and threats

BY **LINDSAY WHITEHURST** AND **CHRIS MEGERIAN**
Updated 9:06 PM EST, February 24, 2025

WASHINGTON (AP) — President Donald Trump backed Elon Musk's demand that federal employees explain their recent accomplishments by the end of Monday or risk getting fired, even as government agency officials were told that compliance with Musk's edict was voluntary.

Confusion and anger over the situation spawned new litigation and added to turmoil within the federal workforce.

"What he's doing is saying, 'Are you actually working?'" Trump said in the Oval Office during a meeting with French President Emmanuel Macron. "And then, if you don't answer, like, you're sort of semi-fired or you're fired, because a lot of people aren't answering because they don't even exist."

The Republican president said Musk's Department of Government Efficiency has found "hundreds of billions of dollars in fraud" as he suggested that federal paychecks are going to nonexistent employees. He did not present evidence for his claims.



AP AUDIO: Trump backs Musk as he roils the federal workforce with demands and threats

AP Washington correspondent Sagar Meghani reports on a lawsuit over Elon Musk's demand that federal workers detail what they did last week.

Even as Trump and Musk pressed their case, the Office of Personnel Management informed agency leaders that their workers were not required to respond by the deadline of 11:59 p.m. EST Monday, according to a person with knowledge of the conversation who requested anonymity to discuss internal matters.

**RELATED STORIES**



**DOGE notches courtroom wins as Elon Musk crusades to slash federal government**



2/25/25, 9:44 PM
Trump backs Musk as he roils the federal workforce with demands and threats | AP News
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 640 of 959



**Musk gives federal workers 48 hours to say what they did last week**



**White House says Elon Musk is not in charge at DOGE, but is advising the president**

The conflicting directives led to varying advice for federal employees, depending on where they work. Some were told to answer the request for a list of five things that they did last week, others were informed it was optional, and others were directed not to answer at all.

Musk bristled at resistance, saying federal workers "hate even the tiniest amount of accountability." He continued to threaten firings hours after employees were told that they didn't need to comply with his demands.

"Subject to the discretion of the President, they will be given another chance," he posted on X, his social media platform. "Failure to respond a second time will result in termination."

Attorneys representing unions, businesses, veterans and conservation organizations filed an updated lawsuit in federal court in California on Monday, arguing Musk had violated the law by threatening mass firings.

The lawsuit, spearheaded by the State Democracy Defenders Fund, called it "one of the most massive employment frauds in the history of this country."

Anna Kelly, a White House deputy press secretary, criticized the litigation by saying "in the time it took these employees on taxpayer-funded salaries to file a frivolous lawsuit, they could have briefly recapped their accomplishments to their managers, as is common in the private sector, 100 times over."

Musk is leading Trump's efforts to overhaul and downsize the federal government. They've urged employees to resign, directed agencies to lay off probationary workers and halted work at some agencies altogether.

There has been pushback in protests around Washington and from within the government. The Office of Special Counsel, a watchdog for the federal workforce, said Monday that the firing of several probationary workers may be illegal. Trump is trying to fire the office's leader, Hampton Dellinger, in a case that has reached the U.S. Supreme Court.

Dellinger asked the U.S. Merit Systems Protection Board to stop layoffs of six employees, but suggested that many more workers should also be protected from losing their jobs.

There are also signs Musk is testing the limits of his influence. Some administration officials — including some of Trump's most strident allies, such as FBI Director Kash Patel — have told employees not to respond to the email requesting five things they did, citing privacy or security concerns and noting that agencies have their own processes for evaluating employees.

"When and if further information is required, we will coordinate the responses. For now, please pause any responses," Patel wrote in an email.

It has been the most significant public divergence between the billionaire entrepreneur and Senate-approved Cabinet leaders who have otherwise been enthusiastic about fulfilling Musk's objectives.

Trump dismissed the idea there was any kind of split involving his most powerful adviser.

"They don't mean that in any way combatively with Elon," he said, adding that "everyone thought it was a pretty ingenious idea."

The latest turbulence began over the weekend, when Trump posted on his social media website, "ELON IS DOING A GREAT JOB, BUT I WOULD LIKE TO SEE HIM GET MORE AGGRESSIVE."

Musk followed by saying "all federal employees will shortly receive an email requesting to understand what they got done last week," and he claimed "failure to respond will be taken as a resignation." The directive echoed how he has managed his own companies.

The Office of Personnel Management, or OPM, sent out its own request afterward.

"Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager," the message said. However, it said nothing about the potential for employees being fired

There was [swift resistance from several key U.S. agencies](#) led by the president's loyalists — including the State Department, Homeland Security and the Pentagon — which instructed their employees over the weekend not to respond. Lawmakers in both major political parties said Musk's mandate may be illegal.

Justice Department employees were told in an email Monday morning that they don't need to respond to the request "due to the confidential and sensitive nature of the Department's work."

But employees in the U.S. attorney's office in Washington were instructed to respond "in general terms," leaving out case-specific or otherwise sensitive information. In an email viewed by The Associated Press, attorneys were provided with guidance about how to respond about the number of court hearings they attended, defendants they charged, cases they resolved or other tasks.

The Department of Health and Human Services told staff that "there is no HHS expectation that HHS employees respond." If anyone wanted to write back, they were directed to be vague.

"Assume that what you write will be read by malign foreign actors and tailor your response accordingly," said an email to employees.

Education Department workers were directed to comply on Monday morning. "The email is legitimate and employees should respond," wrote Rachel Oglesby, chief of staff at the department. She added that "frontline supervisors will evaluate responses and non-responses."

Charles Ezell, the acting director of OPM, suggested that Musk's request may lead to new expectations for employees. Officials "may consider incorporating an expectation that employees submit weekly accomplishments bullets," he wrote in an email to staff.

Thousands of government employees have already been forced out of the federal workforce — either by being fired or through a "deferred resignation" offer — during the first month of [Trump's second term](#). There's no official figure available for the total firings or layoffs, but [the AP has tallied](#) hundreds of thousands of workers who are being affected. Many work outside Washington.

——

Associated Press writers Steve Peoples in New York, Eric Tucker, Amanda Seitz, Byron Tau, Ellen Knickmeyer, Matthew Perrone, Alanna Durkin Richer and Tara Copp in Washington and Valerie Gonzalez in McAllen, Texas, contributed to this report.



**LINDSAY WHITEHURST**
Whitehurst covers the Supreme Court, legal affairs and criminal justice for The Associated Press in Washington, D.C. Past stops include Salt Lake City, New Mexico and Indiana.
𝕏  ✉



**CHRIS MEGERIAN**
Megerian covers the White House for The Associated Press. He previously wrote about the Russia investigation, climate change, law enforcement and politics in California and New Jersey.
𝕏  ✉



**MOST READ**



| 1 | Pennsylvania's governor says the Trump administration has unfrozen billions in grants and loans |
| 2 | Joy Reid is leaving MSNBC as the network cancels her evening show |
| 3 | US refuses to blame Russia for Ukraine war, splitting with European allies in UN votes |
| 4 | Trump backs Musk as he roils the federal workforce with demands and threats |
| 5 | Idaho town hall meeting turns chaotic after woman is forcibly removed for shouting at speakers |



000613

# EXHIBIT 50

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 646 of 959

 Politics

Subscribe    **Sign in**

000614

# administrator is

By Kaitlan Collins and Tierney Sneed, CNN

🕐 2 minute read · Updated 8:15 PM EST, Tue February 25, 2025



This undated photo from LinkedIn shows Amy Gleason. From Amy Gleason/LinkedIn

**(CNN)** — Amy Gleason is the acting administrator of the US DOGE Service, the agency that houses the temporary Department of Government Efficiency, a White House official told CNN on Tuesday.

The announcement, after weeks of questions about Elon Musk's official role and authority over DOGE, reveals the technical leader of the Musk-driven initiative tasked with reconfiguring the federal government.

000615

Advertisement

Gleason has a background in health care and previously worked at the US Digital Service, an office created by President Barack Obama and most recently named after DOGE. Her position with DOGE was first reported by the Washington Examiner.



**RELATED ARTICLE**
How DOGE cracked Washington: A focus on arcane agencies gave Musk and his allies swift control of government nerve centers

She also worked in President Donald Trump's first term, including being placed on the White House Coronavirus Task Force's data team because of her technology background. That team was led by Dr. Deborah Birx.

Despite pledging full transparency, the White House has refused or been unable to identify the administrator of DOGE, including during Tuesday's press briefing. While Musk has served as the initiative's public face and continues to issue social-media directives to government workers, the White House has maintained that his status is one of a special government employee, and not a full-time worker.

"So, the president tasked Elon Musk to oversee the DOGE effort," press secretary Karoline Leavitt said earlier Tuesday when asked directly who was administering the initiative. "There are career officials and there are political appointees who are helping run DOGE on a day-to-day basis."

Advertisement

Justice Department attorneys were grilled in a court appearance Monday about who the administrator was, but none were able to say then, either.

"Who's involved? Who's in charge? Who's giving them direction?" Judge Colleen Kollar-Kotelly asked government attorneys at the hearing, which examined DOGE's access to sensitive data systems at the Treasury Department.

Judges, including Kollar-Kotelly, have raised the lack of clarity around DOGE's structure as impeding their ability to decide the emergency disputes before them.

She and others have raised possible constitutional issues, depending on the chain of command at DOGE and who is behind the sweeping decisions that have the upended federal government's operations in recent weeks.

The White House official did not say how long Gleason has been the acting adminstrator.

*CNN's Michael Williams contributed to this report.*

## ▌ MORE FROM CNN

 How DOGE cracked Washington: A focus on arcane agencies gave Musk and his allies swift control of government nerve centers

 'No legitimate rationale': Lawmakers raise concerns over what NASA won't say about DOGE

 Republicans press House leadership for help as they face pressure over

000617

DOGE cuts at home

## ▎NEWS & BUZZ



### Johnson and Trump pull off surprising win to advance GOP agenda after vote whiplash in the House



### Trump says US will sell $5 million 'gold card' to wealthy foreigners



### A nascent backlash against Musk sharpens risk for Trump and GOP

---

Search CNN...                                                                🔍

**Subscribe**

**Sign in**

Live TV

Listen

Watch

US

World

Politics

Business

Markets

Health

Entertainment

Tech

Style

Travel

Sports

Science

Climate

Weather

Ukraine-Russia War

Israel-Hamas War

Watch

Listen

CNN Underscored

Games

About CNN

## Politics

### FOLLOW CNN POLITICS

   

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Subscribe    Newsletters

Transcripts    Help Center

000619

© 2025 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.

CNN Sans ™ & © 2016 Cable News Network.

000620

000622

# EXHIBIT 51

2/26/25, 9:48 AM
Staffer with Elon Musk's DOGE amplified white supremacists online | Reuters
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 656 of 959

Learn more about 



My News  

# Staffer with Elon Musk's DOGE amplified white supremacists online

By **Alexandra Alper** and **Raphael Satter**

February 7, 2025 7:07 PM EST · Updated 19 days ago

  



Elon Musk walks on Capitol Hill on the day of a meeting with Senate Republican Leader-elect John Thune (R-SD), in Washington, U.S. December 5, 2024. REUTERS/Benoit Tessier/File Photo Purchase Licensing Rights ↗

WASHINGTON, Feb 7 (Reuters) - One of the people working with billionaire Elon Musk in his efforts to overhaul the U.S. government is a Berkeley-educated computer scientist who has boosted white supremacists and misogynists online.

Gavin Kliger lists his job on LinkedIn as "Special Advisor to the Director" at the Office of Personnel Management, which has been spearheading Musk's efforts to shrink the federal workforce. His USAID email address was copied on a message reviewed by Reuters that was sent to staffers at the international aid agency on Monday. It urged them to stay home while the agency was being shut down.

He graduated in 2020 from the University of California, Berkeley with a 3.95 grade point average and degrees in Electrical Engineering and Computer Science, according to his LinkedIn profile. Reuters confirmed his attendance at Berkeley, but was unable to verify other details in his profile.

Kliger is one of about a dozen men identified by Reuters and other news outlets who have been recruited by Musk and his DOGE office to reshape the federal government. Reuters could not determine the importance of Kliger's role at OPM.

2/26/25, 9:48 AM
Staffer with Elon Musk's DOGE amplified white supremacists online | Reuters
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 020 of 920

In social media posts between October 2024 and January, Kliger has voiced controversial views and reposted content from white supremacist Nick Fuentes and self-described misogynist Andrew Tate.

An OPM spokeswoman declined to comment on Kliger's posts. Kliger did not respond to multiple requests for comment via email and text. Following Reuters' request for comment on Thursday evening, public access to Kliger's X account was blocked.

In response to a post about New York Mayor Eric Adams possibly shutting down a migrant shelter in November, Kliger wrote: "Just leave them be for a few more months. Will be much more convenient to deport them all if they are in one spot."

Kliger has reposted comments from white supremacist Fuentes, who has at times been banned from social media platforms including Facebook, YouTube and Twitter for hate speech.

Kliger shared a December 4 post from Fuentes' X account. Kliger has since unshared the post, but Reuters examined a copy of the original repost via the Internet Archive.

In the post on X, Fuentes mocks a post praising a photo of an apparently white couple pictured with two light-skinned children and a dark-skinned baby. In his post Fuentes referred to "adopted Black kids", denigrating the apparent interracial adoption. He also used the word "huzz", a pejorative term for women. Reuters could not immediately establish the identity or ethnicity of the people depicted. Fuentes did not respond to a request for comment on the post by email.

Kliger has also reposted social media influencer and self-described misogynist Andrew Tate.

The British-American former kickboxer is being investigated by Romanian prosecutors for human trafficking, trafficking of minors, sexual intercourse with a minor and money laundering and has since founded a nativist British political party. Tate has denied wrongdoing.

The post, shared by Kliger, exhorts foreigners to "respect British culture, standards of hygiene and social norms. You operate within our parameters ... Problem? leave ... Multiple complaints of the contrary? Visa revoked."

Another Department of Government Efficiency staffer, Marko Elez, quit on Thursday amid questions from the Wall Street Journal about links to a deleted social-media account that advocated for racism and eugenics, according to the Journal's subsequently published story. Reuters could not determine how Elez, Kliger, or any of the individuals working with Musk to slash government and staffing, were selected for their jobs.

Trump and Vice President JD Vance on Friday said Elez should get his job back.

Also on Friday, the ex-employer of Edward Coristine, another member of the DOGE team, disclosed that Coristine had been fired from a previous job amid a leak investigation.

In a statement in a response to a query from Reuters on Coristine's employment, Arizona-based network monitoring company Path Network said it could confirm that Coristine's "brief contract" had been "terminated after the conclusion of an internal investigation into the leaking of proprietary company information that coincided with his tenure."

Coristine didn't immediately respond to a request seeking comment. His dismissal from Path was first reported by Bloomberg.

A White House official told Reuters on Wednesday that Musk and his engineers have appropriate security clearances and are operating in "full compliance with federal law, appropriate security clearances, and as employees of the relevant agencies, not as outside advisors or entities."

Get weekly news and analysis on U.S. politics and how it matters to the world with the Reuters Politics U.S. newsletter. Sign up here.

Reporting by Alexandra Alper and Raphael Satter; Additional reporting by Tim Reid in Washington and Julia Harte in New York; Editing by Chris Sanders, Daniel Wallis and Rosalba O'Brien

Our Standards: **The Thomson Reuters Trust Principles.** 🔗

Suggested Topics:

United States    Donald Trump    Human Rights

Purchase Licensing Rights


**Raphael Satter**
Thomson Reuters

Reporter covering cybersecurity, surveillance, and disinformation for Reuters. Work has included investigations into state-sponsored espionage, deepfake-driven propaganda, and mercenary hacking.

   

---

## Read Next

United States

**Musk to attend Trump cabinet meeting as workers brace for more uncertainty**

ago

---

Legal

**'Where is Mr. Musk in all of this?' Judges question secrecy of DOGE's activities**

11:11 AM UTC

---

Legal

**Straight woman's claim of discrimination heads to US Supreme Court**

11:09 AM UTC

---

**Trump administration loophole snags US research grants from Lyme to lung disease**

11:15 AM UTC

---

## Sponsored Content

Dianomi



**Solidify Your Liquidity Strategy With Lessons From the Tech Industry**

Sponsored by
Bank of America



**Schwab's Weekly Market Outlook**

Sponsored by
Charles Schwab



**What Declining Interest Rates Could Mean for You**

Sponsored by
Charles Schwab

Feedback

Sponsored Content

Dianomi



**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**

Sponsored by WalletJump



**3 Clean Energy and Vehicle Tax Credits**

Sponsored by Charles Schwab



**Weekly Trader's Stock Market Outlook**

Sponsored by Charles Schwab



**'DOGE' to unleash America's biggest financial transformation?**

Sponsored by Altimetry



**Today's Markets: What Investors Should Know Now**

Sponsored by Charles Schwab



**Know the Cyber Risks of AI for Your Business**

Sponsored by Bank of America

World ›

Feedback

# Ukraine says it has agreed minerals deal with US

World · February 26, 2025 · 9:40 AM EST · 7 min ago

Ukraine said it had reached a preliminary" deal to hand revenue from some of its mineral resources to the United States, before an expected trip to Washington by President Volodymyr Zelenskiy on Friday.

World

**Putin hosts Guinea-Bissau leader as Russia builds Africa ties**

12 min ago

---

**Read the full deal document**

17 min ago

---

Cybersecurity

**Belgian prosecutor probes alleged Chinese hacking of intelligence service**

18 min ago

---

**Ukraine outlines US minerals deal, document has no concrete security guarantees**

19 min ago

## Sponsored Content

Dianomi ▷

**Know the Cyber Risks of AI for Your Business**
Sponsored by Bank of America


**Seniors Born 1941-1979 Receive 55 Benefits This Month if They Ask**
Sponsored by WalletJump


**A Look at What's Impacting Futures Markets**
Sponsored by Charles Schwab


**8 Ways to Prepare for Tax Filing Season**
Sponsored by Charles Schwab


**'DOGE' to unleash America's biggest financial transformation?**
Sponsored by Altimetry


**7 Wealth Tips Once Your Portfolio Reaches $1 Million**
Sponsored by Fisher Investments


## Sponsored Content

Dianomi ▷

**Leverage a powerful platform designed for self-directed traders.**
Sponsored by TradeStation

**8 Dumbest Things Smart People Waste Money On**
Sponsored by FinanceBuzz

**Don't Borrow From The Bank If You Own A Home, Borrow From Yourself**
Sponsored by Lendgo

**Start a Schwab financial plan today and help get more from your money.**
Sponsored by Charles Schwab

**Schwab's Take on Market Volatility**
Sponsored by Charles Schwab

**Learn how to think differently, innovate, and be a game-changer. Go.**
Sponsored by HBS Executive Education

Feedback

---

Latest

Home

Authors

Topic Sitemap

Browse

World

Business

Markets

Archive

Article Sitemap

Sustainability

Legal

Breakingviews

Media

Technology

Videos

Investigations

Pictures

Sports

Graphics

Science

Podcasts

Lifestyle

About Reuters

About Reuters ⎋

Advertise with Us ⎋

Careers ⎋

Reuters News Agency ⎋

Brand Attribution Guidelines ⎋

Reuters and AI ⎋

Reuters Leadership ⎋

Reuters Fact Check

Reuters Diversity Report ⎋

Stay Informed

Download the App (iOS) ⎋

Download the App (Android) ⎋

Newsletters

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

Thomson Reuters Products

**Westlaw** ⎋

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**ONESOURCE** ⎋

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⎋

The industry leader for online information for tax, accounting and finance professionals.

LSEG Products

**Workspace** ⎋

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**DataCatalogue** ⧉

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**World-Check** ⧉

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

---

**Advertise With Us** ⧉    **Advertising Guidelines**    **Purchase Licensing Rights** ⧉

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ⧉    **Terms of Use**    **Privacy** ⧉    **Digital Accessibility** ⧉    **Corrections**    **Site Feedback** ⧉

© 2025 Reuters. All rights reserved

Feedback

000629

2/26/25, 9:48 AM
Staffer with Elon Musk's DOGE amplified white supremacists online | Reuters
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 665 of 959

000634

# EXHIBIT 52

archive.today
webpage capture

Saved from | https://subscriber.politicopro.com/article/2025/02/doge-staffer-gavin-kliger-ar | search

All snapshots from host subscriber.politicopro.com
no other snapshots from this url

24 Feb 2025 21:55:38 UTC

Webpage | Screenshot

share   download .zip   report bug or abuse

PRO    Search all of POLITICO Pro...    ⟵    ⓘ    Need Help?    🔔  🌐  ✉  ⦿

**POLITICO** PRO

# DOGE staffer Gavin Kliger arrives at USDA

He was also part of the team that overhauled USAID and is trying to access data at the IRS.

BY: **MARCIA BROWN** | 02/19/2025 11:26 AM EST



The U.S. Department of Agriculture building is shown in Washington, D.C., on July 21, 2007.| Saul Loeb/AFP via Getty Images

Gavin Kliger, a software engineer turned staffer for Elon Musk's so-called Department of Government Efficiency, is working to slash contracts and staffing at the Agriculture Department, three people familiar with the matter told POLITICO.

Kliger was also part of the DOGE team that worked to overhaul the U.S. Agency for International Development, and he's currently trying to gain access to sensitive taxpayer data at the Internal Revenue Service.

A DOGE USDA account on X is asking public input on which programs, services and contracts it should cancel first.

Kliger has also reportedly shared white supremacist content on social media, such as posts from Nick Fuentes, according to Reuters.

Spokespeople for USDA and the White House did not immediately respond to requests for comment.

In her first speech to staff last Friday, USDA Secretary Brooke Rollins welcomed DOGE into the department, saying that it will make USDA "stronger" and "more efficient." She said that DOGE had already been at USDA for some time, but did not share who was leading its work within the department.

TOPICS IN THIS ARTICLE

Follow topics to receive email news alerts and see updates on the homepage. Manage topics

**Agriculture**

Follow +

# EXHIBIT 53

2/26/25, 9:49 AM
Who is part of Elon Musk's DOGE, and what are they doing? : NPR
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 672 of 959






WAMU 88.5
BBC Newshour

PLAYLIST

NPR    WAMU 88.5                                      DONATE

POLITICS

# Who is part of Elon Musk's DOGE, and what are they doing?

FEBRUARY 7, 2025 · 4:23 PM ET

HEARD ON ALL THINGS CONSIDERED

By Shannon Bond, Stephen Fowler, Bobby Allyn

**4-Minute Listen**                    PLAYLIST    TRANSCRIPT



Elon Musk at the inauguration of President Trump on Jan. 20 in Washington, D.C. Trump tasked Musk with dramatically slashing government via the Department of Government Efficiency team. Its work has been secretive and controversial and has created chaos throughout the federal workforce.

*Pool/Getty Images*

000637

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 673 of 959

The DOGE effort helmed by Elon Musk appears to be focusing on technology and personnel in its stated goal to cut government spending. Staffers connected to DOGE and often to Musk's companies, including SpaceX and Tesla, are fanning out across federal agencies, where they are gaining access to sensitive systems and information on government payments and employees.

The scope of DOGE's work and the identities of the people carrying it out isn't fully clear — leaving agencies in chaos and government workers alarmed.

"One of the reasons we can't tell what's going on and what power they have is because they haven't really made what they're doing public at all," said Deborah Pearlstein, a constitutional scholar who directs the program in law and public policy at Princeton University.



**POLITICS**

**Elon Musk is barreling into government with DOGE, raising unusual legal questions**

Musk is using his platform X to claim DOGE victories, including feeding the U.S. Agency for International Development (USAID) "into the wood chipper" and "shutting down" what he described as "illegal payments" from the Department of Health and Human Services to nonprofit groups.

000638

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 674 of 959

# Who is part of DOGE and what are they doing?

One set of Musk-connected figures have been named to senior roles at agencies. That includes Tom Krause, CEO of the Cloud Software Group, who on Friday was put in charge of the Treasury Department's system that processes trillions of dollars in payments every year. Musk has posted on X about shutting off foreign aid payments as part of his DOGE cost-cutting.



**GOATS AND SODA**

**Why is the Trump administration targeting USAID?**

Amanda Scales, who worked for Musk at xAI, has been named chief of staff at the Office of Personnel Management (OPM), essentially the government's HR department.

Riccardo Biasini, who worked at Musk's Tesla and the Boring Company, is senior adviser to the director at OPM, and was listed as the point of contact for a new government-wide email system the Trump administration is using.

Former Tesla software engineer Thomas Shedd is now running the General Services Administration's Technology Transformation Services unit, which develops tech for the government.



A file photo of the Treasury Department headquarters in Washington, D.C., where billionaire Elon Musk has installed an ally to oversee a key payment system as part of his cost-cutting efforts.
*Chip Somodevilla/Getty Images*

Many DOGE-affiliated staffers are young male software engineers from the tech world. That includes Marko Elez, a 25-year-old Rutgers University graduate who worked at Musk's SpaceX and X. Elez was a temporary appointee at Treasury who was granted access to the Treasury payment system, alongside Krause. Elez resigned from the Treasury Department on Thursday after the Wall Street Journal identified now-deleted racist social media posts.

Vice President Vance on Friday said he disagrees with Elez's posts but that "stupid social media activity" should not "ruin a kid's life," he wrote on X. "So I say bring him back," which President Trump said he would support. Musk replied with: "He will be brought back. To err is human, to forgive divine."

---



**POLITICS**

**Member of Elon Musk's DOGE team resigns after racist posts resurface**

Other Silicon Valley engineers have popped up across agencies, including Gavin Kliger, who worked at Twitter in 2019 and, most recently, as a senior software engineer at the data analytics company Databricks. Kliger's LinkedIn page describes him as "special advisor to the director" at OPM. He also has an email address at USAID, which appeared on a message sent to staff this week about the agency's headquarters closing.

On Thursday evening, Kliger's name appeared in the Consumer Financial Protection Bureau's internal staff directory along with two other DOGE-connected staffers, according to the union representing CFPB workers.

At the General Services Administration (GSA), which manages federal real estate and technology, DOGE-connected individuals have interviewed software engineers about their work. In some cases, they have only provided their first names to the federal employees they spoke to, according to GSA staffers who spoke to NPR on condition of anonymity because they aren't authorized to speak publicly and fear retaliation in their jobs.

It's not consistently clear what the employment status of DOGE-connected staff is. Musk, Krause and Elez were made "special government employees," federal officials have said. That's a temporary role that limits them to working no more than 130 days in a year.

As an unpaid special government employee who is not a commissioned officer, Musk will file a confidential financial disclosure report, a White House official said on Friday, speaking on condition of anonymity because they were not

Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 677 of 959

authorized to talk about personnel matters publicly. Musk also received an ethics briefing, and other DOGE staff will be treated the same, the official said.

Historically, SGEs have been outside experts who serve on federal advisory boards, though recent administrations have used the designation for senior advisors within the executive branch.

Speaking Friday at the White House, Trump said he is not concerned about the security of personal information and other data accessed by DOGE, adding he was "very proud of the job that this group of young people" are doing. Trump added that his administration's cost-cutting focus would also soon turn to the Education Department and Pentagon, where he suggested without evidence there could be "trillions" of dollars in wasted spending within the $6.75 trillion the federal government spent in fiscal year 2024.

"We're going to be looking at tremendous amounts of money, Peter, being spent on things that bear no relationship to anything and have no value," Trump said in response to a reporter's question.

## What is DOGE supposed to be doing?

While DOGE has aggressively sought to retool the federal government to the liking of Musk and Trump, the executive order creating the entity spells out a much more limited role than how it has been deployed in some agencies so far. A

000642

preexisting office called the United States Digital Service was renamed the "United States DOGE Service," moving from the Office of Management and Budget to report to the White House chief of staff.

---



**POLITICS**

**With a new home for DOGE in the White House, here's what you need to know**

The earlier incarnation of the USDS acted as a sort of digital strike team to partner with federal agencies on targeted projects to improve software, websites and technology infrastructure. Within the new USDS, there is also now a "U.S. DOGE Service Temporary Organization" that has a mandate to advance Trump's "18-month DOGE agenda" of cutting costs and streamlining the government's operations.



People protest against President Trump and Elon Musk's Department of Government Efficiency (DOGE) near the U.S. Capitol in Washington, D.C., on Feb. 5, 2025.

*Drew Angerer/AFP*

Trump's order also directs the USDS to "improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." To do so, each federal agency head is supposed to establish a DOGE team of at least four employees — which may include special government employees — to coordinate with the DOGE entity on cutting back spending.

DOGE employees have also reportedly taken wide latitude with the type of information and systems they have sought access to, as the order also says the USDS "has full and prompt access to all unclassified agency records, software systems, and IT systems." DOGE representatives gained access to classified material at USAID over the objections of the agency's security officials, the Associated Press reported.

The deployment of DOGE staffers and reported actions they have taken within several federal agencies paint a different picture than the expectations of the executive order.

Much of the early work, especially with DOGE-affiliated employees in the Office of Personnel Management, has focused on efforts to reduce the headcount of federal workers, whose salaries typically comprise about 5% of the overall budget, and on cutting programs and priorities that Trump and Musk disagree with, like USAID.

Mimicking a similar offer Musk made to Twitter employees when he took over the social media company, OPM sent a mass email to more than two million federal

000644

employees Jan. 28 titled "Fork in the Road," which offered a "deferred resignation" to employees with a promise of pay and benefits through the end of September. On Thursday, a federal judge paused the offer's deadline until Monday in response to a lawsuit from labor unions arguing the proposal was unlawful and unenforceable.

---



**POLITICS**

**Federal judge pauses deadline for Trump administration's 'Fork' resignation offer until Monday**

Meanwhile, there are lingering issues with the government's software and IT infrastructure that need addressing. A new Government Accountability Office report says the federal government spends more than $100 billion on IT, but agencies have failed to implement what the report describes as critical changes to how technology is acquired, managed and implemented.

## Is there oversight of DOGE?

DOGE is operating under the direction of President Trump, who has committed to policing any conflicts encountered by Musk, who operates six companies, including SpaceX and Tesla.

2/26/25, 9:49 AM
Who is part of Elon Musk's DOGE, and what are they doing? : NPR
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 681 of 959

"When we think there's a conflict or a problem, we won't let him go near it," Trump said on Monday.

When pressed on this at the White House recently, Press Secretary Karoline Leavitt said she is confident Musk would "excuse himself" if any of DOGE's work intersected with his companies.

Former White House ethics lawyers have told NPR even special government employees must comply with conflict of interest laws that prohibit working on any U.S. government matters that could have an effect on financial holdings.

That should, experts told NPR, force Musk to either divest in any financial interests that create a conflict, or recuse himself from government work that could involve something like a federal contract, or investigation, tied to one of his companies.

"That's exactly the kind of law that was passed to make sure that what you're doing is not treating the government as your own personal piggy bank, but treating it as a tool to be used in the interest of achieving what the American people elected you to go do," Pearlstein said.

Congress has so far not challenged any of DOGE's work. Republicans control both chambers in Washington, and they have already blocked an attempt by Democrats to subpoena Musk for questioning about possible conflicts.



**POLITICS**

**Republicans in Congress mostly shrug as Musk and DOGE set sights on spending**

Some members of Congress have written letters to Musk companies demanding answers about whether the tech billionaire is engaging in self-dealing, though, again, without support from Republicans, the letter-writing is not likely to lead to public hearings.

## How might lawsuits affect their work?

The lawsuits aimed at DOGE came fast.

Within minutes of Trump being sworn in, the first lawsuit against DOGE was filed alleging that the team is illegal, since it gave private individuals roles in government decision-making, though this was before the White House clarified that some DOGE workers are special government employees.

Since then, DOGE's work has prompted numerous suits, including one on Thursday from unions representing employees at USAID. Musk has railed against the humanitarian assistance agency as a "criminal organization. The Trump administration plans to reduce its staff to fewer than 300 from more than 13,000.



**POLITICS**

**USAID unions sue Trump administration to halt 'unconstitutional and illegal' cuts**

Another legal battle launched by unions representing Treasury workers led to a federal judge issuing an order on Wednesday limiting what kind of access DOGE employees can have to highly sensitive systems that process trillions of dollars in government payments every year.

And on Friday, the University of California student government sued to stop DOGE from gaining access to data on the millions of student borrowers who have federal government loans.

Legal experts say the scope of DOGE's work is likely to hinge on the outcome of
what could become dozens of lawsuits challenging the unit's power. Some of those
cases could end up being decided by the Supreme Court.

*NPR's Chris Arnold contributed reporting.*

doge     elon musk     treasury department     donald trump

---



# Can't keep up? We've got you.

Let the NPR Politics newsletter keep you up to speed and break it
all down in one email.

| Email address | SUBSCRIBE |
|---|---|

[See more subscription options](#)

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy.
NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR

000648



POLITICS

**Federal agencies still can't agree on 'What did you do last week?' email**



POLITICS

**Reconciliation is the key to unlocking Trump's agenda. Here's how it works**



**LAW**

## Supreme Court orders new trial for death row inmate in Oklahoma



**POLICY-ISH**

## Some Trump voters want him to rein in health care costs. It's unclear if he will

2/26/25, 9:49 AM
Who is part of Elon Musk's DOGE, and what are they doing? : NPR
Case 8:25-cv-00462-TDC    Document 30    Filed 02/26/25    Page 686 of 959



ANALYSIS

## Trump White House seeks tighter grip on message with new limits on press



POLITICS

## Trump introduces a green card for the rich: the gold card

## Popular on NPR.org



POLITICS

**House Republicans pass budget resolution, clearing a key early test for Trump agenda**



**21 DOGE staffers resign, saying they won't help 'dismantle' public services**



GOATS AND SODA

**Judge tells Trump administration it has less than 2 days to resume USAID funding**



POLITICS

**6 federal workers get their jobs back in 1st successful challenge to Trump's firings**



LIVING BETTER

**A break from your smartphone can reboot your mood. Here's how long you need**



UKRAINE INVASION — EXPLAINED

**Top Ukrainian official says Kyiv will refuse any 'bad' peace deal**

**NPR Editors' Picks**



RELIGION

**Christianity declines among U.S. adults while "religiously unaffiliated" grows, study says**

Case 8:25-cv-00462-TDC   Document 30   Filed 02/26/25   Page 691 of 959



**ENVIRONMENT**
## Meet the 'wooly devil,' a new plant species discovered in Big Bend National Park



**MIDDLE EAST CRISIS — EXPLAINED**
## Israelis hold a mass funeral for Shiri Bibas and her two sons killed in Gaza



**UP FIRST NEWSLETTER**

## For Women's History Month, NPR wants to know who has made an impact in your life



**SHOTS - HEALTH NEWS**

## Tablets for tots? Survey says kids watch videos on their own devices by age 2



SCIENCE

**Lunar Trailblazer sets out to find water on the moon**

**READ & LISTEN**

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

**CONNECT**

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

**ABOUT NPR**

**Overview**

**Diversity**

**NPR Network**

**GET INVOLVED**

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

000658

**Accessibility**

**Ethics**

**Finances**

**NPR Shop**

**NPR Events**

**NPR Extra**

---

terms of use

privacy

your privacy choices

text only

© 2025 npr

# EXHIBIT 54

*Democracy Dies in Darkness*

# Musk's DOGE seeks access to personal taxpayer data, raising alarm at IRS

The unusual request could put sensitive data about millions of American taxpayers in the hands of Trump political appointees.

Updated February 16, 2025

🎧 5 min    ↱    🔖    💬 8712

By Jacob Bogage and Jeff Stein

Elon Musk's U.S. DOGE Service is seeking access to a heavily guarded Internal Revenue Service system that includes detailed financial information about every taxpayer, business and nonprofit in the country, according to three people familiar with the activities, sparking alarm within the tax agency.

Under pressure from the White House, the IRS is considering a memorandum of understanding that would give officials from DOGE — which stands for Department of Government Efficiency — broad access to tax-agency systems, property and datasets. Among them is the Integrated Data Retrieval System, or IDRS, which enables tax agency employees to access IRS accounts — including personal identification numbers — and bank information. It also lets them enter and adjust transaction data and automatically generate notices, collection documents and other records.

## Trump presidency

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises, his picks for key roles and legal challenges to his executive orders and actions.

According to a draft of the memorandum obtained by The Washington Post, DOGE software engineer Gavin Kliger is set to work at the IRS for 120 days, though the tax agency and the White House can renew his deployment for the same duration. His primary goal at the IRS is to provide engineering assistance and IT modernization consulting.

The agency also required Kliger to maintain confidentiality of the information and protect it from unauthorized access and destroy any such information shared with him upon the completion of his IRS deployment.

IDRS access is extremely limited — taxpayers who have had their information wrongfully disclosed or even inspected are entitled by law to monetary damages — and the request for DOGE access has raised deep concern within the IRS, according to three people familiar with internal agency deliberations who, like others in this report, spoke on the condition of anonymity to discuss private conversations.

Kliger had not been granted IDRS access as of Sunday evening, according to a person with firsthand knowledge of his movement and access at the tax agency, as acting IRS commissioner Doug O'Donnell had yet to finalize the memorandum that would permit him to do more detailed work.

O'Donnell's predecessor, Danny Werfel, resigned on Jan. 20, after Trump announced plans to replace him with former congressman Billy Long (R-Missouri). Long has not yet been confirmed by the Senate.

The news comes as roughly 150 million taxpayers prepare to file returns by the April 15 deadline. In his first term, Trump openly mused about sending IRS agents after political opponents, leaving agency officials on edge about the IRS's independence.

The tax agency's systems are widely considered antiquated — many were built using computer coding language from the 1960s — and overhauling the agency's IT is in line with DOGE's mandate to modernize government technology. IRS contractors are generally provided system access to repair or maintain IDRS and similar data systems.

But it's highly unusual to grant political appointees access to personal taxpayer data, or even programs adjacent to that data, experts say. IRS commissioners traditionally do not have IDRS access. The same goes for the national taxpayer advocate, the agency's internal consumer watchdog, according to Nina Olson, who served in the role from 2001 to 2019.

"The information that the IRS has is incredibly personal. Someone with access to it could use it and make it public in a way, or do something with it, or share it with someone else who shares it with someone else, and your rights get violated," Olson said.

A Trump administration official said DOGE personnel needed IDRS access because DOGE staff are working to "eliminate waste, fraud, and abuse, and improve government performance to better serve the people."

The official said the "DOGE mission … to bring much-needed efficiency to our bureaucracy" is being carried out "legally and with the appropriate security clearances."

A security clearance is not a sufficient credential for access to taxpayer systems, according to IRS procedures. IDRS access is governed by compelling needs for tax administration, not national security.

"IDRS are subject to logs on documents reject noncompliance with rules," [according to IRS policy]().

In a statement, White House spokesman Harrison Fields told The Post: "Waste, fraud and abuse have been deeply entrenched in our broken system for far too long. It takes direct access to the system to identify and fix it. DOGE will continue to shine a light on the fraud they uncover as the American people deserve to know what their government has been spending their hard earned tax dollars on."

Representatives from the Treasury Department and IRS did not immediately respond to requests for comment.

Kliger arrived unannounced at IRS headquarters on Thursday and was named senior adviser to the acting commissioner. IRS officials were told to treat Kliger and other DOGE officials as contractors, two people familiar said.

A White House official said Sunday, however, that DOGE personnel at the IRS were full agency employees and not contractors.

Kliger met with Ken Corbin, the IRS's chief of taxpayer services, and Heather Maloy, the agency's top enforcement official, during his first day at the agency's headquarters, according to several of the people familiar with the meetings. The agency is preparing for Trump-ordered layoffs, as soon as this week, that could hit roughly 10,000 probationary employees. Kliger has not returned to IRS headquarters since those initial meetings.

---

**What readers are saying**

The comments express strong opposition to DOGE gaining access to the IRS's Integrated Data Retrieval System, highlighting concerns about privacy invasion, misuse of data, and potential authoritarian control. Many commenters fear that this access could lead to political... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 55

(filed under seal)

# EXHIBIT 56

(filed under seal)

# EXHIBIT 57

(filed under seal)

# EXHIBIT 58



← Post                                    Reply  ⇄

Elon Musk ✓ 𝕏                        Subscribe  𝕏  ···
@elonmusk

According to the Social Security database, these are the numbers of
people in each age bucket with the death field set to FALSE!

Maybe Twilight is real and there are a lot of vampires collecting Social
Security 🤣🤣

| Age Range | Count |
|-----------|-------|
| 0-9 | 38,825,456 |
| 10-19 | 44,326,480 |
| 20-29 | 47,995,478 |
| 30-39 | 52,106,915 |
| 40-49 | 47,626,581 |
| 50-59 | 45,740,805 |
| 60-69 | 46,381,281 |
| 70-79 | 33,404,412 |
| 80-89 | 15,165,127 |
| 90-99 | 6,054,154 |
| 100-109 | 4,734,407 |
| 110-119 | 3,627,007 |
| 120-129 | 3,472,849 |
| 130-139 | 3,936,311 |
| 140-149 | 3,542,044 |
| 150-159 | 1,345,083 |
| 160-169 | 121,807 |
| 170-179 | 6,087 |
| 180-189 | 695 |
| 190-199 | 448 |
| 200-209 | 879 |
| 210-219 | 866 |
| 220-229 | 1,039 |
| 240-249 | 1 |
| 360-369 | 1 |

11:55 PM · Feb 16, 2025 · **93.7M** Views

000663



← **Post**



**James Fishback** ✓ @j_fishback · Feb 18

President Trump and @ElonMusk should announce a 'DOGE Dividend'—a tax refund check sent to every taxpayer, funded exclusively with a portion of the total savings delivered by DOGE. 🧾

𝕏 Has Musk supported DOGE Dividend?    Eligibility for DOGE Dividend

💬 1.7K          ↻ 2.1K          ♡ 9.7K          📊 1.2M          🔖    ⬆

**Elon Musk** ✓ 𝕏                                    Subscribe    𝕏  ···
@elonmusk

Will check with the President

4:46 PM · Feb 18, 2025 · **379K** Views







000668



**Post**

**Elon Musk** ✓ 𝕏
@elonmusk

Subscribe

Legacy media are mostly just puppets, with massive influence by the state.

The amount of money that @DOGE is discovering going from government to fake "independent" media is shocking.

**Glenn Greenwald** ✓ ▶ @ggreenwald · Feb 20

People in corporate media have zero -- I mean, zero -- knowledge of pre-2017 US history.

Do they not know the US has long allied with, funded and installed many of the planet's most repressive tyrants: Saudi, Egypt, Indonesia, etc?...
Show more

⇄ Lessig 🇺🇦 reposted

**Julia Ioffe** ✓ @juliaioffe · 17h

The fact of the matter is that America, as embodied by this administration, is no longer allies with our traditional allies. That is over. America's allies are now Putin, the AfD, Viktor Orban, and other far-right, fascist regimes.

○ 140          ⇄ 770          ♡ 2.6K          �features 86K

9:20 AM · Feb 20, 2025 · **7.8M** Views



← **Post**

 **ELON CLIPS** ✓
@ElonClipsX

Subscribe   ···

**Elon Musk: I wasn't really interested in politics, but at a certain point I had no choice.**

"I would say I was politically neutral for quite a while, leaning a little Democrat. But then, there was this whole cancel culture, trying to stop freedom of speech and infringe upon people's personal freedoms.

They want state control of what you say. They want to take away your guns, so there's nothing you can do to oppose them.

We just need to restore the fundamental elements of what made America great, which is freedom and opportunity.

I really just wanted to do useful things, provide products and services that are good. I wasn't really that interested in being political. It's just that, at a certain point, there was no choice."

CPAC, February 20, 2025



for quite a while,

1:03

2:19 PM · Feb 21, 2025 · **1.2M** Views

 519    2K    42K    598   

000671























000682



← **Post**

**Elon Musk** ✔ X
@elonmusk

Subscribe

The executive branch must necessarily be subject to the will of the President, given that he is the elected representative of the people.

Otherwise, we do not live in a DEMOcracy, but rather a BUREAUcracy.

**Shylock Holmes** ✔ @shylockh · Feb 21

Every day for the past month, I've been reminded that for my entire life up to 2024, I was assured that it was impossible to fire civil servants in any meaningful quantity, that government departments couldn't ever be closed down.

...
Show more

4:12 AM · Feb 22, 2025 · **11.6M** Views

4.7K        9.2K        52K        1K



000684













← **Post**

**Elon Musk** ✓ X
@elonmusk

Subscribe  ✕|  ⋯

The reason this matters is that a significant number of people who are supposed to be working for the government are doing so little work that they are not checking their email at all!

In some cases, we believe non-existent people or the identities of dead people are being used to collect paychecks. In other words, there is outright fraud.

😈 **Libs of TikTok** ✓ @libsoftiktok · Feb 23
Literally takes 2 minutes to respond.

Reporting to your boss about what you accomplished at work is very standard.

Why is this so controversial?

What did you do last week?  ❗

🟢 H   **HR**                    ·        4:46 PM
                                          ❗  ⋯

                                              ☺

Please reply to this email with approx. 5 bullets of what you accomplished last week and cc your manager.

Please **do not send** any classified information, links, or attachments.

Deadline is <u>this Monday at 11:59pmEST</u>.

8:43 AM · Feb 23, 2025 · **36.2M** Views

💬 30K    ↻ 53K    ♡ 250K<span style="color:red">000690</span>    🔖 10K    ↥











000695









 **Aaron Rupar**
@atrupar.com



Johnson: "Elon's cracked the code. He's now inside these agencies. He's created these algorithms that are constantly crawling through the data & as he told me in his office, data doesn't lie. We're gonna be able to get the information. We're gonna be able to transform the way federal govt works."



February 24, 2025 at 12:35 PM 🧑‍🤝‍🧑 Everybody can reply

**472** reposts   **1.2K** quotes   **1.8K** likes



# EXHIBIT 59



# EXHIBIT 60

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2                               ---

 3
      ALLIANCE FOR RETIRED          )
 4    AMERICANS, et al.,            )
                                    )
 5                                  )  CIVIL NO. 25-313
                  Plaintiffs,       )
 6                                  )
      v.                            )  February 24, 2025
 7                                  )
      SCOTT BESSENT, et al.,        )  2:03 p.m. - 5:01 p.m.
 8                                  )
                                    )
 9                Defendants.       )
      _____)
10

11             TRANSCRIPT OF PRELIMINARY INJUNCTION

12         BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                   UNITED STATES DISTRICT JUDGE
13
                               ---
14
      APPEARANCES:       PUBLIC CITIZEN LITIGATION GROUP
15                       BY:  Nandan M. Joshi
                              Allison Marcy Zieve
16                            Norman Eisen
                         1600 20th Street, NW
17                       Washington, DC 20009
                         (202) 588-1000
18                       Email: njoshi@citizen.org
                                azieve@citizen.org
19
                         For the Plaintiffs
20

21                             ---

22

23


24    COURT REPORTER:    CHANDRA R. KEAN, RMR
                         Official Court Reporter
25                       333 Constitution Avenue, NW
                         Washington, DC 20001
```

```
 1     APPEARANCES CONT'D:

 2
                               U.S. DEPARTMENT OF JUSTICE
 3                             BY:  Bradley Humphreys
                                    Elizabeth Shapiro
 4                                  Christopher Healy, Treasury
                               1100 L Street, NW
 5                             Washington, DC 20005
                               (202) 305-0878
 6                             Email: Bradley.humphreys@usdoj.gov

 7
                               For the Defendants
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

14:04:31

1                     **PROCEEDINGS**

13:23:01   2          (Court called to order at 2:03 p.m.)

14:03:21   3              DEPUTY COURTROOM CLERK:  Civil case 25-313,

14:03:25   4     Alliance for Retired Americans et al., versus Scott

14:03:29   5     Bessent.

14:03:29   6          Counsel, would you please identify yourself for the

14:03:31   7     record, starting with the plaintiff.

14:03:34   8              THE COURT:  When you speak, you can take the

14:03:35   9     masks off, because otherwise we really can't get a

14:03:41   10    record, so that's not a problem.  And I would ask that

14:03:43   11    you come to the podium.  It just makes it easier.

14:03:46   12         We do have a public access line so those others can

14:03:52   13    hear what's going on.  So it's important that you speak

14:03:56   14    clearly into the microphone, not only for me to hear it

14:04:01   15    but for others as well.

14:04:03   16         All right.

14:04:03   17             MR. JOSHI:  Thank you, Your Honor.  Nandan

14:04:05   18    Joshi with Public Citizens Litigation Group for

14:04:07   19    plaintiffs.

14:04:07   20         With me at counsel table is Allison Zieve with

14:04:11   21    Public Citizens Litigation Group and Norm Eisen with

14:04:16   22    State Democracy Defender's Fund.

14:04:16   23             THE COURT:  All right.  Good afternoon.

14:04:19   24             MR. HUMPHREYS:  Good afternoon, Your Honor.

14:04:20   25    Bradley Humphreys for the Department of Justice on

14:04:23   1    behalf of the defendants.  I also have with me Elizabeth

14:04:27   2    Shapiro of the Department of Justice and Christopher

14:04:33   3    Healy of the Treasury Department.

14:04:35   4          Thank you, Your Honor.

14:04:43   5          THE COURT:  All right.  So we're here on a

14:04:46   6    hearing on the preliminary injunction.  You should make

14:04:49   7    an assumption that I've read the briefs, the affidavit,

14:04:52   8    and the other materials that have been provided, as well

14:04:54   9    as the opinions that have been coming down.  Although

14:04:58   10   not all of the opinions I've -- some of them, if they've

14:05:01   11   been out of our circuit, I had less of a chance to

14:05:06   12   really study them carefully but -- other than the New

14:05:09   13   York one.

14:05:10   14         Obviously, the issues are complex and some may

14:05:14   15   even -- can be considered novel.

14:05:15   16         So I have a series of questions.  So I'm going to

14:05:19   17   have the plaintiffs get up, and you're going to be

14:05:20   18   answering questions.

14:05:22   19         If my question goes to something that somebody else

14:05:25   20   that's standing here -- one of your other attorneys is

14:05:28   21   better suited to answer, that's fine.  Just let them

14:05:31   22   come up.  Whoever it is that's versed in whatever I'm

14:05:34   23   asking you, I don't have any problem with your switching

14:05:37   24   around and having different people make arguments.  And

14:05:40   25   same thing, of course, for the defendants.

14:05:43  1       So I have questions both -- for the plaintiffs,

14:05:44  2  then I'll have questions for the defendants.

14:05:47  3       I'll let the plaintiffs come back, and if you want

14:05:50  4  to respond to something the defendants have raised, you

14:05:52  5  can do so since it is your burden.

14:05:57  6       I will let you make -- once we've gone through that

14:06:00  7  process, make any additional arguments that do not

14:06:05  8  correspond with what we've already talked about through

14:06:07  9  my questions.  But if there's something additional you

14:06:10  10  want to bring to my attention, I don't have any problem

14:06:13  11  with that.

14:06:14  12       And then at the end, we'll discuss sort of moving

14:06:16  13  forward and next steps in terms of what we should do.

14:06:26  14       So I'm sure everybody is aware that Judge Vargas in

14:06:32  15  New York granted a preliminary injunction for the

14:06:34  16  Treasury Department, although the issues were slightly

14:06:37  17  different and some arguments were different, but

14:06:40  18  basically it's the same preliminary injunction that was

14:06:45  19  filed in this particular case.  Although I think the

14:06:48  20  relief is probably perhaps a little broader than

14:06:51  21  requested.

14:06:51  22       So let me just ask at the outset before we go

14:06:55  23  through all of this:  Given Judge Vargas's ruling in the

14:06:58  24  Southern District of New York, why is an injunction from

14:07:02  25  this Court necessary to prevent irreparable harm?

| | | |
|---|---|---|
| 14:07:10 | 1 | So, Plaintiff, you're up. |
| 14:07:11 | 2 | MR. JOSHI:  Thank you, Your Honor. |
| 14:07:12 | 3 | Yes, the injunction in New York is -- would protect |
| 14:07:18 | 4 | us, but the -- I think the -- this case, as you note, is |
| 14:07:25 | 5 | on -- has some slightly different claims to it, |
| 14:07:28 | 6 | especially under the Privacy Act, that the action at |
| 14:07:32 | 7 | issue is in violation of the requirements of the Privacy |
| 14:07:36 | 8 | Act and the Internal Revenue Code.  The Court in New |
| 14:07:39 | 9 | York did not reach those because the state's interests |
| 14:07:43 | 10 | were different. |
| 14:07:44 | 11 | The -- I think that just simply as a matter of |
| 14:07:47 | 12 | course, the injunction may or may not last in New York. |
| 14:07:51 | 13 | I don't know yet if the government will appeal that |
| 14:07:53 | 14 | injunction.  In addition, the Court there provided an |
| 14:07:56 | 15 | opportunity for the government to come back with some |
| 14:07:59 | 16 | more information which may modify the injunction. |
| 14:08:03 | 17 | And rather than having us come back if something |
| 14:08:07 | 18 | changes in New York, I think -- or have a triggering |
| 14:08:12 | 19 | preliminary injunction here, it makes more sense for the |
| 14:08:15 | 20 | Court to address the issues presented in the motions. |
| 14:08:20 | 21 | THE COURT:  All right.  I expected that answer, |
| 14:08:21 | 22 | which is why I prepared my questions, but I thought you |
| 14:08:24 | 23 | should be asked at least at the outset. |
| 14:08:26 | 24 | So let me start with standing.  And let me just put |
| 14:08:31 | 25 | a little bit of background to it. |

14:08:34  1          To secure a preliminary injunction, plaintiffs must

14:08:37  2     show a substantial likelihood of standing under the

14:08:40  3     heightened standard for evaluating a motion for summary

14:08:43  4     judgment, and you have to rely on affidavits or other

14:08:46  5     credible evidence to do so.

14:08:47  6          So there's three elements of what I assume you're

14:08:50  7     raising, which is association with standing.

14:08:54  8          Plaintiffs' members could use on their own -- could

14:08:58  9     sue -- I'm sorry -- on their own.  The interests

14:09:01  10    plaintiffs seek to protect are germane to the

14:09:03  11    organizational purposes.  Neither the claim asserted or

14:09:06  12    relief requested requires participation of individual

14:09:11  13    members.

14:09:12  14         And then there's three elements of regular

14:09:15  15    standing, which is concrete injury-in-fact, causation,

14:09:18  16    and redressability.

14:09:19  17         So am I correct that you're only advancing a theory

14:09:23  18    of associational standing, and you're bringing these

14:09:26  19    claims on behalf of your members, not under a theory of

14:09:30  20    organizational standing that the plaintiffs organization

14:09:33  21    are injured as well?

14:09:34  22         Is that correct?

14:09:36  23         MR. JOSHI:  That's correct, Your Honor.

14:09:37  24         THE COURT:  Okay.  So your briefing on standing

14:09:40  25    focuses exclusively on the first requirement of

14:09:44  1    associational standing that plaintiffs' members could

14:09:46  2    sue on their own.  But I obviously have to make findings

14:09:50  3    on all three elements.

14:09:52  4         The second one:  Why are the interests that

14:09:56  5    plaintiffs are seeking to protect germane to the

14:09:58  6    organizations' purposes?

14:10:00  7         Where in the record can I see that?

14:10:02  8         And the third:  Do individual members need to

14:10:05  9    participate in this lawsuit?  And if not, why not?

14:10:08  10        So if you can answer those two, you know, whatever

14:10:10  11   arguments you have.  And you can do these in summary

14:10:12  12   form.  You obviously have written --

14:10:14  13        MR. JOSHI:  Sure.  We have declarations from

14:10:16  14   the organizational leaders attached to our motion.  I

14:10:21  15   think that's the best place to find the discussion of

14:10:24  16   germaneness.

14:10:25  17        As to the need for individual plaintiffs to

14:10:29  18   participate -- individual members to participate, since

14:10:32  19   this is an APA case, this is not the typical type of

14:10:35  20   case where the members themselves have information that

14:10:41  21   would -- that require their presence in a court.

14:10:44  22        THE COURT:  Okay.  So in terms of the

14:10:46  23   injury-in-fact requirement as to -- relates to the

14:10:50  24   individual members and the first prong of associational

14:10:54  25   standing, can you succinctly state the injury-in-fact

14:10:58  1    here?

14:10:59  2          MR. JOSHI:  The injury-in-fact is the removal

14:11:01  3    of protections that are guaranteed by law to the

14:11:08  4    security of information -- personal, sensitive

14:11:11  5    information stored in the Bureau's systems.

14:11:14  6          We do not have the -- there's been no

14:11:17  7    administrative record filed in this case, and we do not

14:11:20  8    have the contours of the Secretary's changes to the

14:11:23  9    access procedures at the Bureau.  But we -- based on the

14:11:30  10   information we have been provided, in -- throngh the

14:11:34  11   declarations of the Bureau, it does appear that

14:11:37  12   significant changes have been made to the level of

14:11:41  13   access given to personal information in those systems.

14:11:48  14         And this is a -- this is a request for injunctive

14:11:54  15   relief, and so the harm here is, under TransUnion,

14:11:59  16   different than -- it's a different analysis than you

14:12:04  17   might have in a particular data breach case where a

14:12:07  18   plaintiff is seeking damages.

14:12:08  19         And I think Judge Vargas in New York explained that

14:12:11  20   pretty well in her decision, citing various courts that

14:12:16  21   have recognized that injunctive relief can prevent harm

14:12:22  22   caused by the loss of security is sufficient to show

14:12:28  23   harm for -- injury for purposes of injunctive relief.

14:12:33  24         THE COURT:  Okay.  So the defendants argue that

14:12:34  25   there's no standing under TransUnion, a case we all

14:12:39  1    know, without a public disclosure.  And your response

14:12:41  2    was that disclosure is not required by analogy to the

14:12:44  3    tort of intrusive -- intrusion upon seclusion.

14:12:49  4        Now, why isn't public disclosure of private facts a

14:12:53  5    better analog?  TransUnion mentions that tort as well.

14:12:57  6        And let me just run through the questions and then

14:12:59  7    you can decide how you want to formulate it.

14:13:02  8        Does TransUnion give me guidance about how I'm

14:13:05  9    supposed to decide which tort -- "intrusion upon

14:13:08  10   seclusion" or "public disclosure of private facts" --

14:13:11  11   provides the best or maybe the most relevant analog?

14:13:14  12       And intrusion on seclusion imposes liability on the

14:13:18  13   person who does the intruding not the steward of the

14:13:22  14   private information who allows the intrusion to happen?

14:13:26  15       Is that a problem in this case?

14:13:28  16       So if you could address them, and you can do them

14:13:30  17   in whatever order you want.

14:13:32  18           MR. JOSHI:  Sure.  The lack of standing in

14:13:39  19   TransUnion, that case focused on a damages claim.  And

14:13:43  20   the Court was very clear there that when you're seeking

14:13:47  21   damages based on an action that poses a risk of harm,

14:13:52  22   you have to show a little bit more to get -- bring --

14:13:56  23   get some type of monetary relief.

14:13:59  24       And they distinguish that from the injunctive

14:14:03  25   situation involving an injunction where the whole

14:14:05  1     purpose is to prevent a harm.

14:14:07  2         So, for example, if the government issued a

14:14:11  3     regulation saying no one could use passwords on their

14:14:14  4     system, that doesn't produce an immediate harm until

14:14:17  5     someone's information is stolen.  But I think under

14:14:21  6     TransUnion, and under other cases involving injunctive

14:14:25  7     relief, someone who wanted to use a password to protect

14:14:30  8     their privacy would be able to bring an APA claim.  And

14:14:33  9     we've suffered immediate injury from the loss of that

14:14:35  10    protection.

14:14:36  11        And it really doesn't matter whether that

14:14:37  12    information is on their personal laptop, in the cloud,

14:14:40  13    or on the government systems.  Their interest in

14:14:44  14    protecting personal, private information from being

14:14:52  15    unprotected is one -- I think as you alluded to, akin to

14:14:57  16    the interest in a protection -- intrusion on seclusion,

14:15:04  17    which is that there are certain pieces of information

14:15:06  18    that the law protects against being intruded upon by

14:15:14  19    third parties against the plaintiff's consent.

14:15:16  20        And here you have two statutes, the Privacy Act and

14:15:19  21    the Internal Revenue Code, that specifically provide

14:15:23  22    plaintiff -- individuals the right to consent before

14:15:28  23    their information is disclosed, absent falling into one

14:15:32  24    of the expressed statutory exclusions.

14:15:34  25        And so that's the situation we have here.

14:15:38    1          And I -- you know, the actual decision in

14:15:43    2    TransUnion, because that involved a damages claim, I

14:15:45    3    don't think is directly applicable.  But I think the

14:15:49    4    distinction the Court drew there between injunctive

14:15:52    5    relief and damages action in analyzing standing is

14:15:54    6    relevant.

14:15:55    7          THE COURT:  So your view is the intrusion on

14:15:57    8    seclusion as the better -- is the better argument from

14:16:00    9    your perspective?

14:16:02    10          MR. JOSHI:  It's the most analogous to the

14:16:04    11    common law -- traditional common law torts.

14:16:07    12          Now, I will say here, even if you have a

14:16:10    13    publication -- if you look to the other courts that

14:16:15    14    require publication, here you do have the threat of

14:16:17    15    publication outside the Treasury Department.  And

14:16:21    16    Congress, in both of the statutes that are at issue

14:16:26    17    here, did seek to protect information from being

14:16:28    18    shuttled throughout the Federal Government and is

14:16:31    19    meant -- the protections are meant to confine personal

14:16:38    20    information to the agency that holds the data for the

14:16:41    21    agency purposes.

14:16:42    22          And so here you have a risk -- you have a directive

14:16:44    23    from the President that says agencies should give the

14:16:50    24    U.S. DOGE Service prompt -- full and prompt access to

14:16:54    25    all unclassified information on their systems.  That's

14:16:57   1    in the DOGE Executive Order.  And that would -- if that

14:17:04   2    were implemented, if the courts were to lift their

14:17:08   3    order -- if this Court were to lift its order and the

14:17:11   4    New York Court were to lift its order and the Executive

14:17:14   5    Order were implemented, that would entail sharing of

14:17:17   6    personal information outside the Bureau to the Executive

14:17:19   7    Office of the President.

14:17:27   8         THE COURT:  Okay.  Do you want to add any

14:17:30   9    additional arguments to my third sort of question, which

14:17:33  10    was the intrusion on seclusion liability on the person

14:17:36  11    who does the intruding not the steward of the

14:17:38  12    information, as to whether there's, you know, a problem

14:17:41  13    in this particular case?

14:17:43  14         MR. JOSHI:  Well, here if you take the

14:17:45  15    government's theory, the steward and the person doing

14:17:47  16    the intruding are the Federal Government, right?

14:17:48  17         It's one part of the Federal Government holds the

14:17:51  18    information and another part of the Federal Government,

14:17:53  19    the Executive Office of the President, the U.S. DOGE

14:17:58  20    Service, wants access to it.

14:18:01  21         So it's -- beyond that, I think the -- I mean, the

14:18:06  22    common law analogs to Article III injury don't have to

14:18:10  23    be perfect.  They don't have to line up element by

14:18:15  24    element.  They simply -- you look to the common law to

14:18:18  25    determine whether the type of injury that the plaintiff

14:18:21  1    would suffer is the type that was protected at common

14:18:25  2    law.  And here, we are talking about a massive loss of

14:18:28  3    privacy just like in any -- any type of situation where

14:18:33  4    personal information is held in the trust of someone

14:18:36  5    else, whether it's your bank or your creditor company or

14:18:41  6    here, your government.

14:18:42  7        And so it's -- or if it's -- even if it's just held

14:18:46  8    in, you know, in your own home, if there's an invasion

14:18:50  9    of that privacy by itself is -- the type of injury that

14:18:54  10    was reflected in common law and that's protected by

14:18:58  11    federal law and gives rise to an Article III injury.

14:19:02  12            THE COURT:  Well, if we look at the other

14:19:04  13    elements in terms of -- you're looking at the

14:19:07  14    injury-in-fact, what's the fairly traceable connection

14:19:09  15    between the members' injuries and the defendants'

14:19:12  16    conduct, as you see it.

14:19:17  17        You've gone to some of it, but if there's anything

14:19:19  18    else you want to add.

14:19:21  19            MR. JOSHI:  Right.  The traceability is if -- I

14:19:23  20    mean, it's the change in policy that is effectuated at

14:19:27  21    Treasury to implement the President's DOGE Executive

14:19:33  22    Order that changed the security that was -- that

14:19:38  23    protected plaintiffs' members' information.  And we

14:19:42  24    already have, even in one week since the -- that change

14:19:47  25    was implemented, we have a potential data breach that

14:19:51  1    still hasn't been fully resolved with Mr. Elez's perhaps

14:19:55  2    sending emails out of the Treasury into presumably

14:20:00  3    somewhere else in the Federal Government.

14:20:02  4         And I don't think they have provided information

14:20:03  5    about where --

14:20:05  6              THE COURT:  I'm going to be asking -- that's in

14:20:07  7    Judge Vargas's opinion, and hopefully --

14:20:10  8              MR. JOSHI:  That's something that could not --

14:20:12  9    would not have happened before -- before this change

14:20:17  10   that took place at Treasury to accommodate the Executive

14:20:21  11   Order.

14:20:21  12             THE COURT:  So you view it as a new policy or

14:20:22  13   as a change in the policy?

14:20:24  14             MR. JOSHI:  Yes.  Certainly, the information we

14:20:27  15   have was that up until Secretary Bessent took office,

14:20:32  16   career staff did not adhere to their old security

14:20:37  17   policy, and that there was a change when he took office

14:20:40  18   on January -- I think 28th was the exact date; that he

14:20:47  19   removed the career head of the Bureau and allowed the

14:20:54  20   DOGE team at the Treasury to access what Mr. Gioeli

14:21:03  21   called "broader access than has ever been granted

14:21:06  22   before."

14:21:07  23        And so that is -- I think that is a change in

14:21:09  24   policy just as if they had, you know, changed their

14:21:13  25   regulation to change their -- a regulation to change the

14:21:17  1    security that they use to protect their systems.

14:21:19  2              THE COURT:  All right.  And why is it likely

14:21:21  3    that your requested relief will redress members'

14:21:24  4    injuries, which is the last one.

14:21:25  5       You've discussed it to some degree.  Anything you

14:21:28  6    want to add to that?

14:21:29  7              MR. JOSHI:  No, Your Honor.  We're looking to

14:21:31  8    maintain the status quo to the extent possible with

14:21:35  9    respect to the old policy until this Court can issue a

14:21:41  10   final judgment.  And so that's -- our plaintiffs'

14:21:45  11   members' information would be protected from DOGE under

14:21:47  12   the old policy that was in place.

14:21:50  13             THE COURT:  All right.  Let me move to some

14:21:52  14   questions about subject matter jurisdiction under APA

14:21:59  15   702.

14:21:59  16      So APA Section 702 waives sovereign immunity for

14:22:04  17   suit seeking relief other than money damages against an

14:22:07  18   agency or officer.  But it conditions that waiver,

14:22:10  19   quote, "Nothing herein confers authority to grant relief

14:22:14  20   if any other statute that grants consent to suit

14:22:17  21   expressly or impliedly forbids the relief which is

14:22:22  22   sought."

14:22:23  23      "Impliedly forbids" is part of the issue.

14:22:25  24      The Court lacks subject matter jurisdiction if

14:22:27  25   another statute forbids the injunctive relief plaintiffs

14:22:31  1    seek here.

14:22:32  2        So both the Privacy Act and Internal Revenue Code,

14:22:36  3    which are the ones you're relying on, provide damage

14:22:39  4    remedies for unlawful disclosures.  Neither provides

14:22:42  5    injunctive relief against improper disclosure.

14:22:47  6        Why shouldn't I read that as impliedly by

14:22:49  7    implication forbidding injunctive relief for unlawful

14:22:52  8    disclosures?

14:22:54  9        MR. JOSHI:  I think you need something more

14:22:55  10   than a damages remedy.  Congress can always supplement

14:22:58  11   the APA with additional remedies, but if you don't have

14:23:01  12   anything more than -- even for an implied restriction,

14:23:09  13   if you don't have anything more than the existence of a

14:23:11  14   damages remedy, then you're simply saying that

14:23:14  15   supplementing the APA's remedies with something else

14:23:18  16   automatically forecloses the APA remedy.

14:23:22  17       And I don't think that's -- the courts have applied

14:23:25  18   702 that strictly.  I'm pretty sure they haven't.  The

14:23:29  19   Supreme Court in *Doe v. Chao* seem to recognize that the

14:23:32  20   Privacy Act and the APA can exist side by side.  The

14:23:37  21   Privacy Act for damages remedies, but the APA for

14:23:40  22   injunctive relief for policymaking decisions that affect

14:23:45  23   individual privacy.

14:23:48  24       The Court's decision last year in *USDA v. Kirts*

14:23:53  25   also recognized that the Privacy Act was not an

14:23:55  1      exclusive remedy that forecloses other statutes that

14:23:59  2      might provide a remedy against the Federal Government

14:24:03  3      for violations.

14:24:05  4          That case involved two statutes involving damages

14:24:08  5      remedy.  But I think the situation is even starker here

14:24:13  6      where you have two statutes citing the APA and the

14:24:16  7      Privacy Act.  They really go after two different

14:24:20  8      things.

14:24:20  9          I think the -- if the Privacy Act and the Internal

14:24:24  10     Revenue Code had specific methods for injunctive relief,

14:24:29  11     its own separate track for seeking review of

14:24:32  12     policymaking decisions, then you'd have a stronger

14:24:35  13     argument that Congress meant individuals to go through

14:24:37  14     that route rather than the APA.  But as it stands, you

14:24:41  15     don't have that sort of disconnect between the remedies

14:24:49  16     under the Privacy Act and the IRC versus the APA type of

14:24:54  17     remedy for unreasonable or unlawful policymaking

14:24:59  18     decisions.

14:25:03  19          THE COURT:  But doesn't *Match-E-Be-Nash* say

14:25:05  20     that when Congress intends a remedy to be exclusive the

14:25:08  21     APA can't undo that judgment?

14:25:09  22          Isn't that what you're asking for here?

14:25:11  23          MR. JOSHI:  No, I think once again, there's no

14:25:15  24     exclusivity indicated in either of the other statutes.

14:25:17  25     They are simply remedial statutes for certain types of

14:25:21   1   economic harm.

14:25:22   2        The Privacy Act involves economic harm, I should

14:25:25   3   say, but the -- for certain types of violations, but

14:25:28   4   they are supplementary and really go after damages

14:25:33   5   caused by violation as opposed to -- what the APA is

14:25:38   6   about was to ensure that aggrieved persons can seek

14:25:42   7   redress for violations of agency actions that are

14:25:47   8   contrary to law or arbitrary.

14:25:50   9        THE COURT:  So does it matter that the Privacy

14:25:52  10   Act does provide for injunctive relief for other things,

14:25:55  11   like correcting records, forcing an agency to provide

14:25:58  12   access to records about the individual person but not

14:26:03  13   for the remedy that you're requesting?

14:26:08  14        MR. JOSHI:  No.  In fact, I think it would go

14:26:10  15   the other way.  If an individual tried to get APA relief

14:26:14  16   for things that the Privacy Act -- injunctive relief

14:26:20  17   that the Privacy Act called for, that might be a better

14:26:23  18   argument for preclusion, but not a damages remedy.

14:26:26  19        And the courts have done the same thing in the FOIA

14:26:29  20   context, where the courts have said the fact that

14:26:34  21   individuals seeking records should proceed under FOIA

14:26:36  22   rather than the APA because they provide the same type

14:26:39  23   of relief: access to records.

14:26:41  24        But that doesn't preclude someone from using the

14:26:44  25   APA to file a reverse FOIA action.  The fact that FOIA

14:26:49  1    exists doesn't mean a reverse FOIA action is somehow

14:26:52  2    precluded under the APA.  Courts hear those all the time

14:26:58  3    because those involve a different type of remedy and

14:27:04  4    action than the FOIA itself -- than is implicated by

14:27:11  5    FOIA itself.

14:27:12  6          THE COURT:  So what's your best precedent

14:27:15  7    supporting your argument that APA relief, the injunctive

14:27:18  8    relief which we're talking about, is available here and

14:27:21  9    not under APA Section 702, "impliedly" forbidden by the

14:27:26  10   Privacy Act or the Internal Revenue Code?

14:27:29  11         MR. JOSHI:  We cited *Bowen v. Massachusetts*.  I

14:27:32  12   think that's more of a 704 case, but it seems like that

14:27:35  13   would also apply to 702.

14:27:39  14      It seems odd that if you can sue in the Court of

14:27:41  15   Claims for damages, that precludes -- that somehow

14:27:43  16   doesn't waive the government's sovereign immunity for

14:27:46  17   the -- under the APA.

14:27:55  18         THE COURT:  All right.  Let me move to -- and

14:27:56  19   I'll get back to that particular case, but I'll take it

14:27:59  20   at a later point.

14:28:01  21      Adequate Alternative Remedies Under APA 704.

14:28:05  22      So the D.C. Circuit said in Garcia that an

14:28:10  23   alternative remedy can be, quote, "adequate" and bar an

14:28:14  24   APA suit even if it's not identical to the injunctive

14:28:17  25   relief that would be available under the APA.

```
14:28:19   1              And what's your response to that in terms of
14:28:23   2     Garcia?
14:28:23   3              MR. JOSHI:  Well, I agree it doesn't have to be
14:28:25   4     identical, but it does have to be adequate.  So if
14:28:30   5     there's a -- once again, I go back to the FOIA example.
14:28:34   6     A FOIA suit for records might not be exactly the same as
14:28:38   7     an APA suit, but they involve the same type of remedy,
14:28:43   8     which is getting access to records.
14:28:46   9              You don't have that situation here.  The Privacy
14:28:51  10     Act and the Internal Revenue Code do not care about
14:28:54  11     agency policymaking.  They don't care if the agency's
14:28:57  12     decisions are arbitrary and capricious.  They are simply
14:29:00  13     not grounded in those types of harms.
14:29:03  14              The APA is the only remedy that's available for
14:29:07  15     this sort of policymaking decision that was made here,
14:29:10  16     which was to change the security that applies to
14:29:18  17     information held in the Bureau's systems.
14:29:21  18              And so it's -- there's no, I think, sense that
14:29:30  19     the -- that somehow a private suit under -- for damages
14:29:34  20     under either of the statutes can address the situation
14:29:39  21     we have here where we're trying to restore the
14:29:45  22     protections that were previously afforded to this
14:29:48  23     information.
14:29:50  24              THE COURT:  Both sides cite to *Cell Associates*.
14:29:55  25     Why does that decision help you more than the
```

```
14:30:00   1    defendants?
14:30:01   2           MR. JOSHI:  I know we addressed it in our
14:30:07   3    brief, Your Honor.  I'm sorry, I'm blanking on *Cell*
14:30:10   4    *Associates*.
14:30:10   5           THE COURT:  From *Cell Associates:*  Congress,
14:30:12   6    quote, "linked particular violations of the Act to
14:30:15   7    particular remedies in a specific and detailed manner,"
14:30:18   8    which "points to a conclusion that Congress did not
14:30:21   9    intend to authorize the issuance of other injunctions."
14:30:27  10           MR. JOSHI:  I believe that was -- yes, I
14:30:29  11    believe that case involved a claim under the Privacy
14:30:32  12    Act.  And so this -- if this were a claim under the
14:30:35  13    Privacy Act, we would be limited to Privacy Act remedies
14:30:37  14    and not other remedies the Court could fashion.
14:30:40  15        That has nothing to do with the question of whether
14:30:41  16    the -- a suit under the APA allows for APA remedies --
14:30:47  17    the Court to award APA remedies.
14:30:53  18           THE COURT:  Okay.  Can you point me to some of
14:30:55  19    the best cases supporting the proposition that damages
14:30:59  20    under the Privacy Act are an inadequate remedy for the
14:31:03  21    injury that you're asserting and also in the Internal
14:31:07  22    Revenue Code?
14:31:07  23           MR. JOSHI:  I don't have any -- haven't seen
14:31:09  24    any cases under the Internal Revenue Code.  Once I
14:31:13  25    mentioned *Doe v. Chao*, albeit that's dicta, but that's
```

14:31:17   1    at 540 --

14:31:18   2            THE COURT:  That's in your brief, right?

14:31:20   3            MR. JOSHI:  That's in our brief, yes.

           4            THE COURT:  Right.

14:31:23   5            MR. JOSHI:  Note 1 talks about the coexistence

14:31:25   6    of the Privacy Act with the APA.  And of course, we do

14:31:29   7    have -- I'll mention again, those are -- the D.C.

14:31:33   8    Circuit's case, *Doe v. Stephens*, also cited our brief,

14:31:39   9    does engage in APA review of a Privacy Act-related

14:31:45   10   action.

14:31:45   11       It's a -- it was a combination of the Privacy Act

14:31:48   12   of, I believe, a veteran statute.  And once again, *Bowen*

14:31:53   13   *v. Massachusetts* is -- squarely addresses the issue of

14:31:57   14   damages versus APA relief.

14:31:59   15           THE COURT:  You raised *Bowen* so let me get to

14:32:03   16   that one.

14:32:04   17       Isn't that more about the inadequacy of review in

14:32:07   18   the Federal Court of Claims -- which isn't obviously an

14:32:10   19   Article III court and might not have subject matter

14:32:12   20   jurisdiction over the relevant claims in the first

14:32:15   21   place.

14:32:15   22       So how does that case extend here?  Where can you

14:32:20   23   bring a damages suit in District Court?

14:32:22   24           MR. JOSHI:  It does -- it does talk about that,

14:32:25   25   but it also talks about the fact that the damages are

14:32:30  1    simply not the type -- a damages remedy is simply not

14:32:35  2    the type of remedy that is sufficient by itself to

14:32:40  3    displace injunctive relief under the APA.

14:32:43  4        So I don't think it's solely about the venue at

14:32:47  5    issue with respect to the ability to sue.  It's -- it

14:32:56  6    does have a discussion about the remedies -- the

14:33:00  7    distinction between the remedies.

14:33:01  8            THE COURT:  So that's where you would have me

14:33:03  9    focus in terms of looking at the case?

14:33:05  10           MR. JOSHI:  Yes.

14:33:07  11           THE COURT:  All right.  Let me move to final

14:33:10  12   agency action.

14:33:12  13       APA Section 704 limits judicial review to, quote,

14:33:18  14   "final agency action" only.  And the action is final

14:33:24  15   when it marks the consummation of an agency

14:33:27  16   decision-making process.  It's one by which rights or

14:33:30  17   obligations have been determined or from which legal

14:33:32  18   consequences will flow.

14:33:35  19       So to show final agency action you seem to focus on

14:33:38  20   the implementation of a, quote, "new policy," end

14:33:43  21   quote -- which is what you mentioned earlier -- about

14:33:45  22   who can access the BFS systems.  But as you discuss in

14:33:50  23   your brief, this access was part of a, quote, "payment

14:33:53  24   process engagement plan" that was approved by the

14:33:58  25   Treasury Secretary.

14:33:59   1          Isn't the better argument that the approval of the

14:34:02   2    engagement plan was a final agency action?

14:34:06   3          I'm trying to get at what your -- what the new

14:34:11   4    policy is.  I mean, isn't it basically putting in place

14:34:14   5    the engagement plan?

14:34:17   6          MR. JOSHI:  Well, once again, we don't have a

14:34:19   7    record, but based on what we've seen so far --

14:34:20   8          THE COURT:  Well, we don't know what it is.

14:34:22   9    I'll agree with you on that.

14:34:25  10          MR. JOSHI:  Yes.  There were what seems to be a

14:34:29  11    series of steps that were taken shortly after Secretary

14:34:32  12    Bessent was sworn in.  The first was changing the

14:34:35  13    policies that had prevented the DOGE team from accessing

14:34:39  14    the data.  It appears then -- or around the same time

14:34:44  15    there was some negotiation that occurred between the

14:34:47  16    DOGE team and agency staff about this engagement plan,

14:34:52  17    as well as so-called mitigation measures to protect

14:34:58  18    information that was at risk because of this new access

14:35:01  19    policy.

14:35:02  20          And my understanding is Secretary Bessent either

14:35:06  21    directly or through his Chief of Staff approved all of

14:35:10  22    these changes.  So I can't segregate out the first

14:35:15  23    change from the subsequent implementation of the new

14:35:21  24    policy that occurred within a matter of a few days.  But

14:35:25  25    I think all together they add up to final agency action

14:35:31  1    that's at issue -- the final agency action that's at

14:35:34  2    issue in this case.

14:35:35  3        It has been consummated, and I don't think -- as I

14:35:39  4    read the defendants' brief, they don't challenge the

14:35:41  5    fact that there was agency action.  They simply say it's

14:35:44  6    not final.

14:35:44  7        But it's been done.  It's been implemented.  And it

14:35:48  8    changes the legal protections that plaintiffs' members

14:35:56  9    have with respect to the -- their personal data that's

14:35:59  10   in the Bureau systems.

14:36:01  11       So I'm not sure what else would be needed to make

14:36:04  12   the action final at this point.

14:36:08  13           THE COURT:  Okay.  Well, the engagement plan,

14:36:10  14   as I understood it, seems to have provided for a new

14:36:13  15   protocol for tagging BFS payment systems with symbols

14:36:21  16   and codes to categorize particular payments, which it

14:36:24  17   would appear had not been done before.

14:36:27  18           MR. JOSHI:  No, I -- my understanding --

14:36:30  19           THE COURT:  Unprecedented access by one person

14:36:31  20   to multiple sensitive databases.

14:36:36  21           MR. JOSHI:  Yeah, my understanding is there

14:36:38  22   were two different things that were going on.

14:36:40  23       The first was the attempt early on by the DOGE team

14:36:44  24   to implement the President's freeze on foreign aid

14:36:48  25   assistance.  And they went in and either attempt --

14:36:51  1    started to make some changes or made some changes to the

14:36:57  2    way the Bureau processes those payments in order to

14:37:02  3    implement the foreign aid Executive Order -- the foreign

14:37:05  4    aid freeze in the Executive Order.

14:37:09  5        Separate from that, there's this engagement plan

14:37:13  6    which is supposedly -- is supposed to last between four

14:37:15  7    to six weeks, by which the DOGE team will learn how the

14:37:19  8    Bureau's systems operate for some -- various purposes.

14:37:33  9        It's not clear -- we know from the President's

14:37:34  10   Executive Order that DOGE -- the USDS DOGE framework

14:37:45  11   lasts until July 2026.  What we don't know for Treasury

14:37:50  12   is after this engagement plan is completed in four to

14:37:53  13   six weeks what's next on the horizon for them.

14:37:56  14       But I think the engagement plan is different from

14:37:59  15   the procedures they implemented -- to implement the

14:38:03  16   Executive Order -- the foreign aid freeze Executive

14:38:08  17   Order.

14:38:08  18           THE COURT:  So would you rely on both of them

14:38:09  19   in your argument about a final agency action?

14:38:12  20           MR. JOSHI:  We're focused more on just the

14:38:14  21   access, which I think is represented more by the

14:38:17  22   engagement plan than the freeze order.  At least as I

14:38:22  23   understand it, that involved payments to grantees,

14:38:30  24   perhaps abroad, and if that's the case, that would

14:38:35  25   implicate the privacy interest of plaintiffs' members.

14:38:40  1          THE COURT:  Okay.  So what in terms of -- I'm

14:38:42  2     looking for precedent for some of these.

14:38:44  3     What's your best precedent for the proposition that

14:38:47  4     an agency's decision about how to manage and share

14:38:50  5     information within the Federal Government is a final

14:38:54  6     agency action, something that's more specific than what

14:38:58  7     I have at this point?

14:38:59  8          MR. JOSHI:  I do have the D.C. Circuit's

14:39:02  9     decision, *Doe v. Stephens*, that involved the routine use

14:39:06  10    exception.  But it did involve submitting information to

14:39:10  11    a grand jury.

14:39:10  12    To be honest, Your Honor, I think this type of --

14:39:14  13    what's going on now is pretty unprecedented, so I don't

14:39:17  14    know if I have anything that's squarely on point --

14:39:21  15          THE COURT:  Okay.

14:39:24  16          MR. JOSHI:  -- for this type of radical change

14:39:26  17    in how agencies manage their computer systems.

14:39:31  18          THE COURT:  Okay.  As I said, some of these

14:39:33  19    things are novel, so part of it is to find out whether

14:39:37  20    you have -- what you would focus on as precedent or if

14:39:40  21    there is actually any.

14:39:43  22    So let me move in terms of the merits, the

14:39:45  23    violation of the Privacy Act.

14:39:49  24    Obviously, the Privacy Act broadly prohibits

14:39:52  25    agencies from disclosing records to any person or any

14:39:54  1      other agency, but the Act also provides exceptions that

14:39:59  2      allow disclosure.  And there are two exceptions that are

14:40:02  3      relevant.

14:40:05  4           First, the Act allows disclosures to, quote, "those

14:40:08  5      officers and employees of the agency which maintains the

14:40:12  6      record who have a need for the record in the performance

14:40:15  7      of their duties."

14:40:16  8           And the second one is the Act allows disclosures,

14:40:19  9      quote, "for a routine use" that's identified in a

14:40:23 10      Systems of Record, without citing to the statute.

14:40:26 11           So the disclosure to employees exception, reading

14:40:32 12      their papers, you appear to -- I won't use speculate --

14:40:37 13      but to propose that Mr. Krause might be an employee of

14:40:40 14      USDS, which is not part of Treasury -- although we have

14:40:45 15      some issues with the organizations -- in addition to his

14:40:48 16      role as a Treasury employee and leader of the Treasury

14:40:52 17      DOGE team.

14:40:53 18           So can you point to anything in the record that

14:40:56 19      substantiates that, if I've read it correctly?

14:41:00 20           MR. JOSHI:  Well, we have Mr. Krause's

14:41:03 21      declaration, which says he does meet with USDS and gets

14:41:08 22      direction from them.  We accept that the declaration

14:41:12 23      says that Mr. Krause and formerly Mr. Elez, and I

14:41:15 24      believe they have a new person now, have job titles with

14:41:22 25      -- from the Treasury Department.

14:41:25  1            But I think there's still some ambiguity as to

14:41:29  2     whether they operate with two masters.  They are part of

14:41:32  3     the DOGE team.  The DOGE team was a creation of the

14:41:35  4     President's Executive Order.  There is some relationship

14:41:38  5     between the DOGE team at the agencies and USDS and the

14:41:44  6     Executive Office of the President that is not exactly

14:41:46  7     clear.

14:41:50  8            So if there were a chance for discovery on an

14:41:54  9     administrative record, it would be useful to have that

14:41:55  10    information, but at this -- based on what we have --

14:42:01  11    based on what we have now, I think there's at least some

14:42:04  12    ambiguity as to whether the DOGE team wears two hats.

14:42:08  13           And if they are doing that, then even when they're

14:42:12  14    getting information as employees -- officers or

14:42:17  15    employees of the Treasury, they are also getting

14:42:19  16    information -- the same information wearing that other

14:42:22  17    hat at the same time.

14:42:24  18           So that's our concern there.  It could be a back

14:42:26  19    door around the -- there's supposed to be a limited

14:42:32  20    exception to the nonconsensual nondisclosure requirement

14:42:37  21    if they're in fact sort of wearing two hats.

14:42:41  22           I think it would be the same thing of giving an

14:42:44  23    employee the job title of sharing information with

14:42:48  24    DOGE -- with USDS.  I don't think an agency would just

14:42:52  25    give a job title to their employees and say, well,

14:42:55  1    therefore, we can get around the Privacy Act limitations

14:42:57  2    that way.

14:42:58  3        So that's -- that's our concern with Mr. Krause, as

14:43:03  4    well as the other members of the DOGE team.

14:43:05  5        THE COURT:  I'm going to be asking the

14:43:07  6    defendant some questions relating to that.

14:43:09  7        So let's assume Mr. Krause is an employee of USDS.

14:43:15  8    Would that be a problem if he's only an employee of USDS

14:43:19  9    in the Executive Office of the President?  Because as I

14:43:21  10   understand it, USDS is an Executive Office of the

14:43:24  11   President.  Or do you think that Mr. Krause holding a

14:43:28  12   role in USDS is problematic even if he's both an

14:43:33  13   employee of Treasury and of USDS?

14:43:37  14       I'm giving different possibilities here.  We'll

14:43:40  15   hear from defendant hopefully a little more

14:43:43  16   specifically, but to ask you.

14:43:44  17       MR. JOSHI:  I think it's problematic if, once

14:43:48  18   again, he has two masters, in which case you're not

14:43:52  19   sealing off the information in the Bureau's records from

14:43:58  20   being disclosed outside the Bureau without the consent

14:44:00  21   of the individual involved.

14:44:03  22       It would be the same situation on the technical

14:44:08  23   side if you somehow connected the Bureau's computers

14:44:11  24   with the White House's computers and said that's all one

14:44:16  25   computer system.  I don't think you can do that to get

14:44:19  1    around the Privacy Act.  The same way I don't think you

14:44:21  2    can have an employee that has two masters, if you will,

14:44:25  3    and say that we're only disclosing information --

14:44:31  4    private information to the employee wearing hat A and

14:44:36  5    not hat B, especially in a situation where we know

14:44:40  6    they're working together for a common objective of some

14:44:44  7    sort.

14:44:44  8         THE COURT:  Who is the "they"?

14:44:46  9         MR. JOSHI:  USDS and the Treasury DOGE team.

14:44:50  10         THE COURT:  So is this "two hat" problem really

14:44:55  11    in terms of the Treasury USDS or -- I mean, the one --

14:44:57  12    you know, the two hats he clearly is is he's a Treasury

14:45:00  13    employee, at least at this point, but he's also the CEO

14:45:04  14    of Cloud Software Group.  That's the "two hat" question.

14:45:08  15         MR. JOSHI:  We have concerns about that.  We

14:45:09  16    don't have information at this point about what he's

14:45:13  17    doing with respect to his private CEO work as it relates

14:45:18  18    to what he's doing at the Treasury.

14:45:20  19       We don't have enough of a basis to make an

14:45:22  20    allegation with respect to those two roles he has.  I

14:45:26  21    think it's a concern.  I just don't know yet if it's a

14:45:32  22    legal claim.

14:45:33  23         THE COURT:  You don't -- I agree, at least I

14:45:35  24    don't see any information that was provided that tells

14:45:38  25    us exactly what he is or is not doing as the CEO.  But

14:45:42  1    my understanding is he at the same time as -- his

14:45:49  2    employment at this point is the government employment --

14:45:52  3    well, you have to be careful about how you term these.

14:45:55  4         Anyway, that he is the CEO of Cloud Software Group

14:46:01  5    at the present time.

14:46:02  6         Now, whether he's doing anything, I'm not -- I'm

14:46:05  7    not positive about it, but that seems to be a two hat --

14:46:09  8    more of a "two hat" issue than the other one.

14:46:12  9         MR. JOSHI:  No, I agree, Your Honor.  And to my

14:46:14  10   knowledge, the government has not taken the position

14:46:16  11   that Mr. Krause or anyone else can transfer the

14:46:20  12   Treasury's data to cloud computing legally.

14:46:24  13        I think they are taking the position that it is

14:46:29  14   okay and lawful for Treasury to --

14:46:33  15        THE COURT:  To have him have both positions.

14:46:36  16   But I agree, I don't think they're saying he can

14:46:39  17   transfer it but --

14:46:39  18        MR. JOSHI:  Well, I think they are taking the

14:46:41  19   position they can transfer it within the Federal

14:46:43  20   Government freely.

14:46:43  21        THE COURT:  Right.

14:46:44  22        MR. JOSHI:  But I don't think they're taking

14:46:45  23   the position they can transfer to a private --

14:46:48  24        THE COURT:  Right.  And that, I understand.  I

14:46:49  25   wasn't suggesting that they were doing that.  I think

14:46:51  1    they're aware that he has the two positions.

14:46:54  2            MR. JOSHI:  Yeah.

14:46:54  3            THE COURT:  Not that the information

14:46:56  4    necessarily gets -- the information gets transferred but

14:47:01  5    it does provide him, at this point at least, with access

14:47:05  6    to the information.

14:47:08  7        Does the timeline of Mr. Krause's employment status

14:47:12  8    matter for purposes of the preliminary injunction?

14:47:16  9        There have been obviously some irregularities which

14:47:20  10   have now been corrected about his onboarding process --

14:47:23  11   without getting into all the dates, which I will at one

14:47:26  12   point -- and some confusion by the government about what

14:47:29  13   role he had at various times.

14:47:32  14       I ask that because at least at one point in

14:47:35  15   their -- in the time frame, the engagement plan was

14:47:39  16   produced before he actually, I think, became a Treasury

14:47:44  17   employee.

14:47:45  18       So I'm curious as to whether you think the

14:47:50  19   employment, you know -- the changes in his employment

14:47:54  20   status have created any issues as far as you're

14:48:01  21   concerned.

14:48:02  22           MR. JOSHI:  There's some murkiness in the sense

14:48:07  23   that he -- according to the declarations, he became an

14:48:13  24   employee on January 23rd.  I believe his paperwork

14:48:17  25   initially said February 9th.  And then there was a

14:48:20  1  declaration that says that was in error and was

14:48:22  2  corrected.

14:48:23  3      So he -- if true, if that's true, then he became --

14:48:27  4  he started working at the Treasury Department on

14:48:30  5  January 23rd, which was before Secretary Bessent

14:48:34  6  actually was sworn in.

14:48:38  7      It's not clear from the record who he was reporting

14:48:42  8  to during that period since there was no -- I don't

14:48:45  9  believe there was a Treasury Secretary or even an acting

14:48:50  10  named during that time, so I think there was some

14:48:52  11  confusion there.

14:48:57  12      We have taken it that -- based on the reporting and

14:49:00  13  based on the information in the record, that when

14:49:02  14  Secretary Bessent came in, that's when Mr. Krause and

14:49:07  15  the DOGE team were granted full access to the Bureau's

14:49:11  16  systems.  I don't think they had that before, based on

14:49:15  17  the policy that was in place and being enforced by the

14:49:19  18  prior career staff.

14:49:22  19      THE COURT:  I'm going to ask the defendants in

14:49:24  20  terms -- there's a whole bunch of different dates, which

14:49:26  21  I won't go through now, but the engagement plan was

14:49:30  22  agreed to on January 26th, so part of it is to figure

14:49:35  23  out what position he actually was in at the point that

14:49:39  24  they came to that specific agreement, which I don't know

14:49:43  25  the answer to, but I assume you don't either.  And I

14:49:49  1        need to ask the defendants.

14:49:50  2              MR. JOSHI:  Yeah, I think that's right.  I

14:49:53  3        guess, as I understand it, they -- Mr. Krause came in.

14:49:57  4        Mr. Elez was already there on January 21st.  They had

14:50:04  5        this plan in place that they want to implement.  They

14:50:06  6        were not able to, by the way, because of the policy

14:50:10  7        enforced by the career staff.

14:50:11  8            Then Secretary Bessent was sworn in, and then the

14:50:14  9        policy changed.  And they were able to start

14:50:17  10       implementing the plan until the -- this Court's order,

14:50:21  11       and the court order in New York, at least, limited their

14:50:25  12       ability to access the systems directly.

14:50:30  13             THE COURT:  Okay.  The defendants seem to say

14:50:38  14       that Mr. Krause has a "need to know" information in BFS

14:50:44  15       systems because of his role in the payment processing

14:50:47  16       and the engagement plan.

14:50:49  17           Do you dispute that?

14:50:50  18             MR. JOSHI:  We have job descriptions for

14:50:55  19       Mr. Krause that are provided in the declarations.

14:51:01  20       They -- our concern with them is that they seem very

14:51:04  21       capacious, which is -- the "need to know" provision of

14:51:17  22       the Privacy Act is supposed to be about actual need to

14:51:22  23       know.  And it seems to me they draw this line between a

14:51:26  24       very broad description over IT improvements, basically,

14:51:30  25       to say he needs access to everything at all times upon

14:51:34  1      request, as far as I can -- as far as I see.

14:51:37  2          I think that could -- it could be a circumvention

14:51:41  3      around the Privacy Act limitations if, once again, they

14:51:45  4      had said his job description was to sell private data --

14:51:49  5      sell data in the private market.

14:51:51  6          That's not a reason to get around the Privacy Act.

14:51:55  7      You can't use the job description to do whatever you

14:51:57  8      want.

14:51:58  9          And so -- and that's our concern with what's been

14:52:04  10     put into the record so far, is that there's no apparent

14:52:09  11     cabining of his ability to access private data with

14:52:14  12     respect to how broadly they have defined his role.

14:52:20  13             THE COURT:  Okay.  Because their argument is

14:52:21  14     that the need to know -- they tie it together with his

14:52:23  15     role in the -- which we've talked about, which obviously

14:52:27  16     needs some more elucidation -- but the payment process,

14:52:30  17     the engagement plan, basically.

14:52:32  18         So it's not clear to me whether your -- you

14:52:35  19     obviously have concern broader than that in terms of

14:52:38  20     whether he's -- what his role is in the engagement plan

14:52:42  21     and some other aspects to it.  But do you see some

14:52:46  22     connection between "need to know" and this agreement

14:52:49  23     that they have, the engagement plan?

14:52:51  24             MR. JOSHI:  We don't have the contents of the

14:52:53  25     engagement plan.

14:52:54    1          As far as I understand it, the engagement plan says

14:52:57    2    they want to make improvements to the systems to spot

14:53:02    3    waste and abuse.  And they are going to look at

14:53:07    4    everything and, therefore, they need access to

14:53:09    5    everything without any sort of -- at least not that's in

14:53:13    6    the record -- any sort of detail as to how that will be

14:53:16    7    structured.

14:53:20    8          It's basically a roving charge to find fraud and

14:53:25    9    therefore they have access to whatever they want.

14:53:27    10          Mr. Gioeli called it broader than access -- you

14:53:30    11    know, "a broader level of access than has ever been

14:53:35    12    given before," I believe.  And I don't think the record

14:53:39    13    that they've put in place -- first of all, the record

14:53:42    14    they put in has nothing by the official decision-makers,

14:53:47    15    like Secretary Bessent, in terms of what he was

14:53:50    16    considering when he was structuring this plan.  So I

14:53:57    17    think it's deficient in that regard.

14:54:00    18          But if we had a statement, if we had some sort of

14:54:03    19    reasoned decision-making, we would have perhaps an

14:54:04    20    analysis of why everything -- all the data in the Bureau

14:54:08    21    systems would be open to the DOGE team seemingly upon

14:54:13    22    request.

14:54:14    23          THE COURT:  Okay.  Let me move to the routine

14:54:18    24    use in Paragraph 17 of the payment record, the SORN, in

14:54:25    25    terms of why it wouldn't apply here.

14:54:27  1          And as I understand it, Paragraph 17 allows

14:54:30  2     disclosures to a, quote, "federal or state agency, its

14:54:34  3     employees, agents, or contractors for the purpose of

14:54:37  4     identifying, preventing, or recouping improper payments

14:54:41  5     to an applicant for, or recipient of, federal funds."

14:54:49  6          So why doesn't that apply?  Why wouldn't you think

14:54:52  7     of it applying?

14:54:53  8          And let me add the next question, which is -- you

14:54:56  9     don't address this, I believe, because the defendants

14:55:00  10    only invoked the routine use exception as disclosures

14:55:04  11    made to State and Interior at the point that they did

14:55:08  12    that, not disclosures to USDS or Treasury DOGE team

14:55:13  13    personnel, or other reasons.

14:55:19  14         So is there a reason for not discussing this?  Is

14:55:22  15    it because they haven't brought it up as --

14:55:25  16         MR. JOSHI:  They didn't defend on that basis.

14:55:28  17    And I think -- the way I read that exception, it's for

14:55:31  18    actual fraud investigations.  For example, it includes

14:55:34  19    state agencies.

14:55:34  20         I don't think the Bureau would say, We can open up

14:55:37  21    our systems to states wholesale because there might be

14:55:40  22    fraud in our systems and therefore the states might be

14:55:43  23    able to help find that.

14:55:45  24         I read that exception for -- to allow for sort of

14:55:48  25    bona fide individualized fraud investigations, not to --

14:55:52   1    not for systematic technical changes to the system to

14:55:59   2    detect fraud.

14:56:00   3          THE COURT:  But you didn't really address it,

14:56:03   4    unless I missed it somehow.

14:56:04   5          MR. JOSHI:  No, we did not address it in our

14:56:07   6    reply brief because --

14:56:08   7          THE COURT:  Do you want to address it now?

14:56:09   8          MR. JOSHI:  I think that exception doesn't

14:56:11   9    apply --

14:56:11  10          THE COURT:  Is it what you just said?

14:56:12  11          MR. JOSHI:  Yeah.

14:56:13  12          THE COURT:  Okay.

14:56:14  13          MR. JOSHI:  It's -- I read that exception to

14:56:16  14    apply for particularized investigations.

14:56:22  15      So for example, they had an instance where an

14:56:24  16    account -- let's say the DOJ was conducting a fraud

14:56:28  17    investigation for illegal payments.  They might use the

14:56:30  18    Bureau.  They might coordinate with state agencies

14:56:35  19    about, you know, looking at payment transfers to

14:56:38  20    bringing a criminal action against a particular group of

14:56:42  21    entities.

14:56:43  22      I think that's what that exception is.  That's how

14:56:45  23    I read that exception to apply.

14:56:46  24          THE COURT:  Okay.

14:56:47  25          MR. JOSHI:  Which is why it has such a broad

14:56:52   1     category of recipients of information, not -- it's not

14:56:58   2     the type of thing where -- I think Mr. Krause is focused

14:57:02   3     on, according to his declaration, in improving the fraud

14:57:08   4     detection capabilities of the Bureau's payment systems.

14:57:13   5           THE COURT:  Okay.  So let me move just to the

14:57:17   6     Internal Revenue Code in terms of violation of that.

14:57:20   7       The Internal Revenue Code requires that, quote,

14:57:23   8     "returns and return information shall be confidential.

14:57:26   9     No one shall disclose any return or return information."

14:57:31  10     It does provide a whole bunch of exceptions to that

14:57:35  11     general rule.  They focus on -- defendants focus on one

14:57:39  12     exception which, quote, "allows disclosure to certain

14:57:43  13     federal officers and employees for purposes of tax

14:57:45  14     administration."

14:57:46  15       So why doesn't the tax administration exception

14:57:48  16     apply to any disclosures to the Treasury DOGE team?

14:57:54  17          MR. JOSHI:  I don't think there's enough

14:57:57  18     information that they put in that they're engaged in tax

14:58:00  19     administration.  They're looking -- if you take them at

14:58:05  20     their word, they're looking for making -- looking to

14:58:08  21     make systemic changes to the computer systems at the

14:58:13  22     Bureau, to perhaps detect tax information.

14:58:19  23       There's no sense of why they would need to look at

14:58:26  24     specific individualized tax return information of

14:58:29  25     individuals to engage in that activity.

14:58:32  1          I would note, I think there was recent reporting

14:58:35  2     that with respect to the DOGE team at the IRS, they're

14:58:38  3     not going to look at individualized tax information.

14:58:41  4     That was the representation made recently that was

14:58:42  5     reported in the media.

14:58:44  6          So I think there's a disconnect between sort of the

14:58:46  7     broad charge that the DOGE team has and the specific

14:58:53  8     exception for tax administration purposes that the

14:58:57  9     Internal Revenue Code provides for.

14:59:00  10          THE COURT:  All right.  Let me get into -- I

14:59:02  11     just have one question about the -- in terms of, again,

14:59:08  12     the merits, the arbitrary and capricious.

14:59:12  13          APA requires agencies engaged in reasoned

14:59:16  14     decision-making.  And the Court could set aside agency

14:59:20  15     action if it was arbitrary and capricious.

14:59:24  16          So the defendant's declaration suggests that

14:59:26  17     they're aware of the security, the operational risks

14:59:29  18     associated with the access they've provided to the

14:59:32  19     Treasury DOGE team.  They appear to have taken several

14:59:36  20     measures in response to those risks, which was in the

14:59:39  21     materials.

14:59:40  22          In your view, what factors or alternatives did they

14:59:43  23     fail to consider?

14:59:45  24          What should they have done differently, if you want

14:59:48  25     to address that.

14:59:48  1          MR. JOSHI:  Well, the first thing they could

14:59:50  2     have done, which is not in the record, is make

14:59:52  3     absolutely crystal clear that they cannot share any

14:59:56  4     personal data that's stored in the Bureau systems

14:59:58  5     outside the Bureau, especially to the Executive Office

15:00:01  6     of the President, because that's what's required under

15:00:03  7     the Executive Order, the DOGE Executive Order.  They

15:00:07  8     could have said, you know what, the DOGE Executive Order

15:00:10  9     says we have to follow all laws.  We need to make

15:00:13  10    crystal clear all of the data in our systems remain in

15:00:16  11    our systems.

15:00:17  12         Mr. Krause, the other members of the DOGE team, can

15:00:19  13    do their analysis, assuming everything else is lawful,

15:00:23  14    but they have to do it in-house.  They can't be sharing

15:00:27  15    that information outside of the agency.

15:00:30  16         So that's not in the record right now.

15:00:35  17         Beyond that, there's no real explanation of -- by a

15:00:40  18    decision-maker, especially Mr. Bessent, about what he

15:00:44  19    considered in implementing this particular system.  We

15:00:48  20    know it's failed already in the one week it was --

15:00:54  21    Mr. Elez was working under it.  And we don't have -- we

15:01:00  22    don't have a consideration of alternatives.  We don't

15:01:01  23    have any discussion of how they view the Privacy Act and

15:01:05  24    the Internal Revenue Code as limiting their discretion.

15:01:10  25         The Treasury has a privacy policy in place that is

15:01:16  1    supposed to implement the Privacy Act, and I don't think

15:01:18  2    there's any discussion about how their new system

15:01:23  3    comports with what they have articulated in that privacy

15:01:27  4    policy.

15:01:27  5        And so it's -- all that's missing.  For such a

15:01:31  6    pretty significant and unprecedented change in how the

15:01:35  7    Bureau has done -- has operated throughout its history.

15:01:40  8    I -- what we have is some contours of the end result of

15:01:44  9    the decision but not really an explanation and a

15:01:47  10   reasoned analysis for the decision.

15:01:49  11       THE COURT:  Okay.  So irreparable harm, which

15:01:54  12   I'll be frank, I think is your weakest link in terms of

15:01:59  13   discussing it.

15:02:00  14       Do you see precedent, which I would say is stricter

15:02:03  15   in a higher standard than New York, reading the cases

15:02:08  16   from Judge Vargas about --

15:02:10  17       Anyway, the D.C. Circuit precedent sets a very

15:02:13  18   "high standard" for the showing of "irreparable harm"

15:02:17  19   that is necessary to support the preliminary

15:02:20  20   injunction.

15:02:20  21       The threatened injury must be, quote, "beyond

15:02:24  22   remediation" and "injunctive relief" -- this is again a

15:02:27  23   quote -- "will not be granted against something merely

15:02:31  24   feared is liable to occur at some indefinite time," nor

15:02:35  25   will such relief be granted against an injury that's

15:02:38  1    merely theoretical, which is not simple.

15:02:43  2        Applying the standards, certainly a number of the

15:02:48  3    judges in this district have declined to issue TROs and

15:02:53  4    preliminary injunctions against, for instance, the high

15:02:57  5    stakes project like the oil pipeline when plaintiffs

15:03:01  6    have been unable to show that they've threatened harm,

15:03:05  7    oil spills is likely.

15:03:06  8        So what's your best precedent from this circuit for

15:03:10  9    the proposition that an uncertain or unmeasurable risk

15:03:16  10   of future harm satisfied, quote, "the likelihood of

15:03:20  11   irreparable harm" requirement for a preliminary

15:03:23  12   injunction?

15:03:24  13       And let me go to the second part, and you can

15:03:26  14   answer both together.

15:03:27  15       How do you distinguish cases in which judges in

15:03:29  16   this district have declined to find a likelihood of

15:03:32  17   irreparable harm, say, for example, from the permitting

15:03:36  18   of major oil pipeline projects based on a risk of future

15:03:42  19   harm, despite the opinions recognized that an oil spill

15:03:45  20   would be an enormous harm if it occurred?

15:03:49  21       Anything you can say on this point would be most

15:03:52  22   helpful.

15:03:53  23       MR. JOSHI:  Well, I agree the precedents are

15:03:55  24   mostly pretty recent because I don't think agencies have

15:03:58  25   been in the habit on a policy-making level of not

15:04:02  1    guarding their data pretty vigilantly.

15:04:04  2        I will say in terms of imminence, I would once

15:04:09  3    again go back to the Executive Order which says -- I'll

15:04:11  4    just read it.  This is what it requires:

15:04:14  5        "Agency heads shall ensure that USDS -- and that's

15:04:21  6    in the Executive Office of the President" --

15:04:23  7            THE COURT:  Right.

15:04:23  8            MR. JOSHI:  -- "has full and prompt access to

15:04:25  9    unclassified agency records."

15:04:28  10        And so in terms of imminence, but for this Court's

15:04:32  11   order and the Court order in New York, if Treasury is

15:04:35  12   going to comply with this Executive Order, and we have

15:04:39  13   no indication that they're not, they're going to share

15:04:43  14   data as soon as the courts allow them to.

15:04:46  15        And I don't think there's any --

15:04:48  16            THE COURT:  Share data with whom in terms of --

15:04:51  17            MR. JOSHI:  USDS.

15:04:52  18            THE COURT:  Okay.

15:04:53  19            MR. JOSHI:  USDS.  Share it outside of the

15:04:56  20   four -- the walls of the Bureau -- or the Treasury

15:04:58  21   Department.

15:04:58  22        And if -- if this were a situation where it was

15:05:02  23   just a piece of paper going from one agency into

15:05:06  24   another, that's something that can be clawed back.  I

15:05:09  25   think that -- in situations like that, you might find no

15:05:13  1    irreparable harm because you can sort of fix the problem

15:05:15  2    if the Court later determines that the plaintiff should

15:05:18  3    prevail.

15:05:20  4        But here, we're talking about a trove of

15:05:26  5    information in a database that will be transferred

15:05:30  6    wholesale if the Executive Order is to be taken on its

15:05:33  7    word, which talks about interoperability of systems and

15:05:37  8    data synchronization.

15:05:39  9        So once you transfer that database, and I don't

15:05:43  10   think there's any dispute of this either in this case or

15:05:47  11   any other cases, that can't be fixed.  You can't go back

15:05:51  12   to the status quo ante if you allow any kind of

15:05:55  13   wholesale database transfer of millions of records

15:05:58  14   containing personal information.  It's going to be mixed

15:06:01  15   up with other records, presumably from other agencies,

15:06:04  16   if this order is carried out.  And I think it's

15:06:07  17   impossible to disaggregate that.

15:06:14  18        That's why the preliminary injunction is so

15:06:16  19   important in this case, is to make sure that the

15:06:20  20   integrity of the data stays in place until this Court

15:06:23  21   can determine in a final decision whether in fact what

15:06:27  22   they're doing is lawful and permissible.  And -- because

15:06:34  23   once it's gone, it's a fait accompli.

15:06:38  24        And I think one of the things that perhaps I

15:06:42  25   disagree with some of the other decisions that have come

15:06:45  1    down --

15:06:46  2              THE COURT:  Please.

15:06:47  3              MR. JOSHI:  -- is they accept -- well, there's

15:06:48  4    a factual distinction and a legal error, in my view.

15:06:51  5        The factual distinction is in some of the other

15:06:53  6    cases, I believe there are actual declarations providing

15:06:58  7    the Court some assurance that no data would be shared if

15:07:02  8    it weren't for the Court's order.

15:07:03  9        You don't have that here.  There was no -- there's

15:07:06  10   no promise of not sharing data.

15:07:09  11             THE COURT:  In terms of -- if you can be more

15:07:11  12   specific about your concern of what -- sharing it with

15:07:14  13   whom?  Because I mean, you can do it within Treasury or

15:07:17  14   others.

15:07:17  15       So you're talking about USDS presumably or

15:07:20  16   something else?

15:07:21  17             MR. JOSHI:  Well, the Executive Order mentions

15:07:25  18   USDS, but to be honest, the whole DOGE thing is sort of

15:07:27  19   squirrely, because there's this USDS and there's this

15:07:31  20   USDS Temporary Organization that sits under it.  Then

15:07:35  21   there's the DOGE teams at each agency.  And then we

15:07:39  22   don't know Elon Musk's status.

15:07:42  23       The President said he was running DOGE, but there

15:07:44  24   was a filing in another case that said he was not the

15:07:47  25   USDS administrator.

15:07:50    1          So even though the Executive Order talks about

15:07:53    2    USDS, I think if it leaves the Treasury, if the

15:07:59    3    information we're worried about --

15:07:59    4          THE COURT:  So as long as it -- once it leaves

15:08:01    5    Treasury to --

15:08:02    6          MR. JOSHI:  Yeah.

15:08:03    7          THE COURT:  Okay.

15:08:03    8          MR. JOSHI:  And obviously, the DOGE network is

15:08:06    9    throughout the Federal Government at this point.  So

15:08:08   10    it's unclear what's happening behind their scenes with

15:08:10   11    respect to the computer networks.  But, right, Your

15:08:14   12    Honor, once the information leaves, it's not coming

15:08:17   13    back.  And that's gone forever.

15:08:20   14          And so that -- I think -- the legal error I think

15:08:26   15    from some of the other decisions is they seem to treat

15:08:34   16    intra-agency transfers as not public transfers.

15:08:37   17          And the Privacy Act says something different.  The

15:08:39   18    Internal Revenue Code says something different.

15:08:42   19          When you transfer information from one agency to

15:08:44   20    another, that's the equivalent, legally, of transferring

15:08:48   21    information from the agency to a private party.  They

15:08:53   22    are both, you know, unlawful unless they fall into an

15:08:58   23    exception that's specified in the statute.

15:09:00   24          THE COURT:  But this -- it does say -- in terms

15:09:05   25    of -- the other opinions sort of view it as it's not a

15:09:09  1    problem because it's an intra-agency sort of -- is that

15:09:11  2    your argument?  That an intra-agency transfer -- or

15:09:17  3    you're viewing it as not falling into that bucket, that

15:09:20  4    it's -- because it's a USDS and it's an entity that

15:09:22  5    is -- well, one we don't know totally how it's

15:09:25  6    formulated.  But that that's really the problem?

15:09:28  7         Do I understand your argument or not?

15:09:30  8         MR. JOSHI:  Maybe that's a distinction.  I

15:09:33  9    don't think -- going back to the standing argument, I

15:09:36  10   don't think publication is necessarily required, but to

15:09:41  11   the extent there is publication in violation of the

15:09:43  12   statute, the Court should treat -- respect Congress's

15:09:48  13   judgment that intra-agency transfers are the equivalent

15:09:53  14   of transfers to any other third party.

15:09:56  15        THE COURT:  Okay.  All right.

15:09:57  16        I missed your argument there.  Okay.

15:10:00  17        All right.  Anything else?  Because I think of the

15:10:03  18   arguments that I've gone through, and I haven't made a

15:10:05  19   final decision -- I wanted to hear from all of you -- I

15:10:11  20   think is the weakest link, to be frank with you.

15:10:14  21        So if there's any other argument that you want to

15:10:15  22   make on this, please go ahead.  I mean, I've focused on

15:10:19  23   certain things, but anything else you want to add at

15:10:21  24   this point would be welcome.

15:10:23  25        MR. JOSHI:  I think I'm good right now.  I

| 15:10:26 | 1 | might add some more on rebuttal. |
| 15:10:28 | 2 | THE COURT:  Okay. |
| 15:10:28 | 3 | MR. JOSHI:  Thank you. |
| 15:10:29 | 4 | THE COURT:  The other thing is the balance of |
| 15:10:31 | 5 | equities in public interest. |
| 15:10:33 | 6 | Can you just give a short summary what you view |
| 15:10:37 | 7 | that as? |
| 15:10:38 | 8 | MR. JOSHI:  Oh, sure.  Once again, I think it |
| 15:10:39 | 9 | goes back to the immense harm that would happen if this |
| 15:10:43 | 10 | data was compromised versus I think very little effect |
| 15:10:48 | 11 | on the government's ability to do what it wants to do. |
| 15:10:52 | 12 | For example, if the DOGE team at Treasury can |
| 15:10:56 | 13 | undertake the reforms using Treasury career staff, I |
| 15:11:03 | 14 | don't -- I don't think the showing has been made that |
| 15:11:06 | 15 | the individual -- the two or three individuals who end |
| 15:11:10 | 16 | up being on the DOGE team need to look through and |
| 15:11:14 | 17 | process individualized personal information in order to |
| 15:11:19 | 18 | see the structure of the Treasury systems -- if that's |
| 15:11:23 | 19 | what they're interested in -- and how they work, and be |
| 15:11:31 | 20 | able to propose reforms to the way Treasury processes |
| 15:11:35 | 21 | data. |
| 15:11:39 | 22 | There's -- they say they need access to the |
| 15:11:41 | 23 | individual information.  It's not clear why -- there's |
| 15:11:45 | 24 | been no showing as to why that is the case, and what |
| 15:11:49 | 25 | harm would happen if they walled off from the personal |

15:11:59    1    information while this case is pending -- what harm

15:12:07    2    would happen.

15:12:07    3        So I think the -- if you get to the balance of the

15:12:09    4    equities, it's pretty lopsided in favor of protecting

15:12:13    5    the individual privacy interests.

15:12:17    6        THE COURT:  All right.  Anything else you want

15:12:18    7    to make a particular point of?  Or anything that's new?

15:12:22    8    This is sort of an evolving case in terms of different

15:12:25    9    affidavits and material coming out.

15:12:27    10       And I was unable to get a copy of a transcript from

15:12:35    11   the New York case so I don't know whether something came

15:12:37    12   out of -- anything else other than what Judge Vargas put

15:12:41    13   in her opinion that came out in the, you know, in the

15:12:44    14   hearing.  But if you know of anything else that I should

15:12:49    15   know, please bring it to my attention.

15:12:50    16       MR. JOSHI:  I don't know of anything new.  I do

15:12:52    17   want to emphasize one thing about data security and

15:12:59    18   irreparable harm, which is we know about the breach with

15:13:01    19   respect to Mr. Elez's access.  We know he had wide

15:13:07    20   access, and we also know he sent emails out that they

15:13:12    21   still haven't tracked down.

15:13:14    22       And I would just point out that this was a very

15:13:18    23   minor breach, if the declarations are accurate.  And

15:13:24    24   yet, a week later, ten days later, we still don't know

15:13:26    25   the full scope of, you know, the harm or the level of

15:13:30  1    breach.  And once again --

15:13:33  2             THE COURT:  Excuse me.  When you say the --

15:13:36  3    this is what came out of the preliminary injunction

15:13:38  4    hearing, is that correct?

15:13:39  5             MR. JOSHI:  Yes.

15:13:40  6             THE COURT:  In New York.  I just want to make

15:13:41  7    sure.

15:13:41  8             MR. JOSHI:  Well, they put the information --

15:13:43  9    they have some declarations in here as well --

15:13:44  10            THE COURT:  Right.  Okay.

15:13:45  11            MR. JOSHI:  -- about the breach, but the

15:13:47  12   forensic analysis that they're going -- they're

15:13:50  13   undertaking for that minor breach is still not

15:13:53  14   completed.

15:13:53  15       And so I just think it -- it emphasizes that if

15:13:57  16   there's a wholesale compromise of the information issue,

15:14:04  17   if it gets transferred out, it's not going to be

15:14:06  18   repaired.

15:14:10  19            THE COURT:  Okay.  All right.

15:14:11  20       I don't have anything else.  So let me hear from

15:14:16  21   the defendants.  If they can wait one second and let me

15:14:19  22   get my papers together here.

15:15:39  23            MR. HUMPHREYS:  Thank you, Your Honor.

15:15:40  24            THE COURT:  So I have some questions, and most

15:15:43  25   of them are focused to bring some clarity -- my initial

| | | |
|---|---|---|
| 15:15:48 | 1 | ones at least -- on the organizational structure of DOGE |
| 15:15:51 | 2 | and USDS, et cetera, since there's some -- it's rather |
| 15:15:57 | 3 | opaque, at least from taking a look at it. |
| 15:16:01 | 4 | So let me start with the Executive Trump's -- |
| 15:16:06 | 5 | President Trump's Executive Order and go through it. |
| 15:16:08 | 6 | So President Trump's Executive Order regarding the |
| 15:16:12 | 7 | U.S. DOGE Service -- which I'm going to call USDS, it's |
| 15:16:16 | 8 | just easier -- did three things, as I understand it. |
| 15:16:18 | 9 | It renamed the U.S. Digital Service.  It required |
| 15:16:23 | 10 | that the administrator of the U.S. DOGE Service report |
| 15:16:26 | 11 | to the White House Chief of Staff, so it moved it into |
| 15:16:28 | 12 | the Chief Executive Office.  And it created the U.S. |
| 15:16:35 | 13 | DOGE Service Temporary Organization. |
| 15:16:37 | 14 | So let me ask you some questions about those |
| 15:16:39 | 15 | actions. |
| 15:16:40 | 16 | So on January 19th of this year, where was USDS |
| 15:16:46 | 17 | located within the federal bureaucracy?  Was it a |
| 15:16:50 | 18 | component -- and I'll go through my questions, then you |
| 15:16:52 | 19 | can answer. |
| 15:16:53 | 20 | Was it a component of OMB? |
| 15:16:55 | 21 | And at that time the administrator of the USDS was |
| 15:16:59 | 22 | a Schedule C government employee; is that correct? |
| 15:17:02 | 23 | And that administrator reported to or was |
| 15:17:06 | 24 | supervised by the deputy director of management at OMB, |
| 15:17:10 | 25 | if that's correct. |

```
15:17:11   1           And then the deputy Director of OMB is an officer

15:17:15   2    nominated by the President and confirmed by the Senate,

15:17:18   3    if that's correct.

15:17:18   4           And then the deputy director is supervised by the

15:17:21   5    Director of OMB, if that's correct.  And the director is

15:17:24   6    a principal officer nominated by the President and

15:17:28   7    confirmed by the Senate, if that's correct.

15:17:30   8           So let me go through each one of these.

15:17:33   9           This is January 19th of this year.  Where was USDS

15:17:39  10    located within the federal bureaucracy?

15:17:41  11           Was it a component of OMB, as I understand it?

15:17:45  12               MR. HUMPHREYS:  Your Honor --

15:17:46  13               THE COURT:  In its early stages.

15:17:47  14               MR. HUMPHREYS:  I apologize.  I may have to

15:17:49  15    confer with my colleagues.  I don't think that these

15:17:52  16    issues are directly presented in the plaintiffs' motion

15:17:54  17    or, you know, the structure before the Executive Order.

15:17:56  18           So on these specific questions about sort of the

15:17:59  19    USDS --

15:18:00  20               THE COURT:  Well, they do make a difference

15:18:02  21    ultimately, and I can get to that, but it does make a

15:18:06  22    difference in terms of where they are organizationally

15:18:08  23    and who the individuals are involved with as to whether

15:18:12  24    or not they have -- should have access to some of this

15:18:15  25    material, which is certainly at issue here.
```

15:18:17  1          So I mean, it's a road to get there, and some of

15:18:21  2    this is obviously factual information that I would hope

15:18:26  3    the government would know.  If there's somebody else who

15:18:29  4    has more knowledge about this, I'd appreciate it.

15:18:32  5          MR. HUMPHREYS:  I can check on that, Your

15:18:33  6    Honor.  I will say, I think this case, as plaintiffs

15:18:36  7    have pleaded it, is very simple in that the individuals

15:18:40  8    who have ever had access before this Court's

15:18:44  9    injunction --

15:18:44 10          THE COURT:  You need to move the microphone

15:18:46 11    over a little.

15:18:46 12          MR. HUMPHREYS:  Yes, Your Honor.

15:18:48 13      And that the specific individuals who had access

15:18:49 14    before this Court's injunction have and are and always

15:18:53 15    have been -- except that Mr. Wunderly has replaced

15:18:58 16    Mr. Elez -- but Treasury Department employees.

15:19:00 17          THE COURT:  Okay.  Let me go through this --

15:19:03 18    let me go through it in my way, if you don't mind.

15:19:06 19          MR. HUMPHREYS:  Yes, of course, Your Honor.

15:19:07 20          THE COURT:  Because it's particular time

15:19:09 21    periods and different decisions that were made along the

15:19:12 22    way.  And it does make a difference in terms of the

15:19:14 23    Privacy Act and various other things as to what category

15:19:17 24    they were in and where the organizations were, which is

15:19:21 25    why I'm starting with some sort of basic information

15:19:25  1    that cumulatively will answer some questions that I

15:19:31  2    have.  Okay?

15:19:32  3                MR. HUMPHREYS:  Of course, Your Honor.

15:19:32  4                THE COURT:  So let me get back to, do you know

15:19:35  5    where it was located on January 19th?

15:19:38  6        Was it a component of OMB, which I believe it was,

15:19:41  7    but I want to make sure that I'm correct.

15:19:44  8                MR. HUMPHREYS:  I also believe that's correct,

15:19:46  9    Your Honor.

15:19:46  10               THE COURT:  You do not?

15:19:47  11               MR. HUMPHREYS:  I do believe that's correct.

15:19:49  12               THE COURT:  You do.  Okay.

15:19:50  13       So it was a component of OMB.  And the

15:19:53  14   administrator of USDS at that point was a Schedule C

15:19:58  15   government employee, is that correct, based on the fact

15:20:00  16   that it's in OMB?

15:20:03  17               MR. HUMPHREYS:  I don't know the answer to

15:20:04  18   that, Your Honor.

15:20:05  19               THE COURT:  Okay.  USDS.

15:20:09  20       So do you know any -- in terms of who it is that

15:20:13  21   was in charge of the -- while it was sitting in OMB?

15:20:18  22               MR. HUMPHREYS:  No, Your Honor.

15:20:19  23               THE COURT:  For instance, administrator

15:20:22  24   reported to, supervised by the deputy director, which

15:20:25  25   are -- and some of these people are nominated by the

15:20:27  1    President, confirmed by them.  So the deputy director is

15:20:33  2    supervised by the Director of OMB, and some of these

15:20:37  3    people are -- as I said, are nominated by the President,

15:20:41  4    confirmed by the Senate, which puts them in different

15:20:45  5    categories.

15:20:45  6         So do you know any of that information?

15:20:47  7         MR. HUMPHREYS:  That information is knowable.

15:20:49  8    I'm sure the government does know it.  I just don't have

15:20:52  9    it at my fingertips.

15:20:54  10         THE COURT:  Okay.  Anybody at the table know?

15:20:57  11         Really, what I'm getting at is I understand it was

15:21:00  12    a component of OMB at that point.  And then I take it

15:21:02  13    nobody knows what the structure was as to who -- since

15:21:05  14    at this point there doesn't appear to be an

15:21:09  15    administrator, but I'll get to that.

15:21:11  16         So when it was with OMB, I take it it did have an

15:21:14  17    administrator who was a Schedule C government employee,

15:21:18  18    so you would be a government employee at that -- you

15:21:20  19    don't know that?

15:21:22  20         MR. HUMPHREYS:  I don't have that information.

15:21:23  21    I don't know at this time, you know, just here at the

15:21:26  22    lectern, Your Honor, about the structure before the

15:21:28  23    President's EO, but certainly we can get you that

15:21:35  24    information to confirm.

15:21:36  25         THE COURT:  Okay.  Anybody else know at the

```
15:21:38   1    table?

15:21:44   2         And this would have been before it was relocated to

15:21:46   3    the Executive Office of the President.

15:21:49   4              MR. HUMPHREYS:  We do not have that

15:21:52   5    information, Your Honor.  It did have --

15:21:52   6              THE COURT:  Okay.  Let me move on, then.

15:21:55   7              MR. HUMPHREYS:  Sorry.

15:21:56   8              THE COURT:  That's okay.  I realize that you

15:21:58   9    may not have come prepared for this, but I hoped you'd

15:22:02  10    know.

15:22:02  11         So now USDS has been renamed and it has been

15:22:06  12    relocated out of OMB to the Executive Office of the

15:22:09  13    President.  And an administrator of USDS reports to the

15:22:14  14    White House Chief of Staff.

15:22:14  15         Is that correct, at this point?

15:22:19  16              MR. HUMPHREYS:  That is the terms of the

15:22:21  17    Executive Order, that the administrator will report to

15:22:23  18    the Chief of Staff.

15:22:23  19              THE COURT:  Okay.  Is the position of

15:22:25  20    administrator of USDS still a Schedule C employee

15:22:29  21    position?

15:22:29  22              MR. HUMPHREYS:  I don't know.  If it's --

15:22:31  23    technically goes within Schedule C, Your Honor.

15:22:34  24              THE COURT:  Okay.  So what is the U.S. DOGE

15:22:37  25    Service Temporary Organization?
```

15:22:39  1          How is it different from USDS, and why are there

15:22:42  2     two versions of it?

15:22:46  3          Does that still exist or was that simply stored?

15:22:49  4          What's the --

15:22:50  5          MR. HUMPHREYS:  As the Executive Order

15:22:51  6     explains, it was renamed from U.S. Digital Service to

15:22:54  7     U.S. DOGE Service.

15:22:57  8          The second part of the question --

15:22:58  9          THE COURT:  What happened with the DOGE Service

15:23:00  10    Temporary Organization?

15:23:03  11          MR. HUMPHREYS:  I think for our purposes and

15:23:06  12    effectively the relationship between USDS and agencies,

15:23:08  13    that USDS and the USDS Temporary Organization are one in

15:23:14  14    the same.

15:23:15  15          THE COURT:  Okay.  So it's just two different

15:23:17  16    names for the same organization?  Or is one under the

15:23:20  17    other or what?

15:23:22  18          MR. HUMPHREYS:  One within the other.  I

15:23:24  19    believe there may be some internal reasons why there's a

15:23:28  20    separate organization.  But as for the interface with

15:23:30  21    Treasury, for example, as relevant here, there's not a

15:23:32  22    distinction.

15:23:34  23          THE COURT:  Okay.  Well, we move on, then.

15:23:42  24          Now, in the complaint, in the motion and

15:23:45  25    affidavits, it's obvious that the plaintiffs and their

15:23:49    1    members seem particularly concerned with the disclosures

15:23:52    2    that have been made to Elon Musk.

15:23:55    3        So on February 17th, the Department of Justice

15:23:58    4    represented to Judge Chutkan in 25-CV-429 that Mr. Musk,

15:24:05    5    quote, "is not an employee of USDS or the USDS Temporary

15:24:10    6    Organization," unquote.  And that Mr. Musk is not the

15:24:14    7    USDS administrator.

15:24:15    8        Is that all correct?

15:24:17    9            MR. HUMPHREYS:  That is correct, Your Honor.

15:24:18   10            THE COURT:   Okay.  Let me go through -- cite to

15:24:27   11    some other representations that had been made in terms

15:24:29   12    of balancing this out and considering what was said to

15:24:33   13    Judge Chutkan and what else has come out.

15:24:35   14        So this was -- she made those statements on

15:24:39   15    February -- the Department of Justice made those

15:24:41   16    statements on February 17th.

15:24:42   17        So the White House Press Secretary at -- on

15:24:47   18    February 3rd, said, quote, "President Trump tasked

15:24:50   19    Mr. Musk with starting up DOGE, and he has already done

15:24:54   20    that," unquote.

15:24:55   21        Mr. Musk issued a statement on February 8th:

15:25:00   22    Quote, "To be clear, what the DOGE team and Treasury

15:25:03   23    have jointly agreed makes sense is the following."

15:25:07   24        And then he lists a series of policy changes the

15:25:11   25    Treasury DOGE team is purportedly implementing.

15:25:14  1    Now, in his February 12th declaration, Mr. Krause

15:25:18  2  said that, quote, "In January, USDS recommended to me

15:25:22  3  that Mr. -- is it Elez?

15:25:28  4    MR. HUMPHREYS:  Elez, I believe, Your Honor.

15:25:29  5    THE COURT:  Elez be selected for a role at

15:25:32  6  Treasury because of experience as, quote, "a highly

15:25:36  7  qualified software engineer who previously worked at

15:25:40  8  several of Elon Musk' companies, including SpaceX and

15:25:44  9  X."

15:25:44  10    The President in a February 19th speech -- so this

15:25:48  11  is two days after Judge Chutkan -- at the Future

15:25:52  12  Investment Initiative Forum said, quote, "I signed an

15:25:55  13  order creating the Department of Government Efficiency

15:25:58  14  and put a man named Elon Musk in charge," unquote.

15:26:03  15    Two days ago, the acting U.S. Attorney for the

15:26:06  16  District of Columbia issued a statement about -- that's

15:26:10  17  about that OPM email -- to federal employees that they

15:26:14  18  received, and it says, "DOGE and Elon are doing great

15:26:19  19  work," unquote.

15:26:20  20    So if I have to decide at some point whether

15:26:23  21  Mr. Musk has a role at USDS, what representation do I

15:26:30  22  rely on?  He's not the administrator.  He obviously has

15:26:36  23  a role in all of this in terms of it, so what is his

15:26:41  24  position?  I mean, the different positions would suggest

15:26:43  25  that he has a greater role, although none of them --

15:26:46  1    some of them are not exact, but certainly they associate

15:26:49  2    USDS with Mr. Musk, but he's not the administrator.  And

15:26:56  3    he's not, as I understand it, an employee of USDS, but

15:27:01  4    he does seem to be speaking on behalf of USDS -- or

15:27:04  5    everybody seems to say so.

15:27:05  6         So my point is, if I have to decide -- if it's

15:27:10  7    important to decide what his role is, what

15:27:14  8    representation do I rely on?  These are all different.

15:27:19  9    Some before what was said to Judge Chutkan, and some

15:27:23 10    afterwards.  But they all seem to indicate a greater

15:27:26 11    role than not being the administrator of USDS or an

15:27:34 12    employee of USDS.

15:27:35 13         So can you tell me what his role is, and what I can

15:27:39 14    rely on?

15:27:40 15              MR. HUMPHREYS:  And Your Honor, with just a

15:27:42 16    caveat --

15:27:43 17              THE COURT:  I don't mean to put you -- you

15:27:44 18    know, pin you to the wall.  And I realize that you can

15:27:47 19    only say what you've been told.  So understanding that,

15:27:50 20    you're the messenger.

15:27:51 21              MR. HUMPHREYS:  And with the caveat, Your

15:27:53 22    Honor, that I don't believe that issue is presently

15:27:56 23    presented in plaintiffs' briefs or pleadings.  But with

15:27:59 24    that caveat, I mean, my understanding is Mr. Musk is a

15:28:03 25    close adviser to the President.

15:28:05  1        However, for our purposes, the authority flows from

15:28:08  2   the President to USDS and then -- or excuse me -- well,

15:28:13  3   for our purposes the authority flows from the President

15:28:16  4   to the Secretary of the Treasury, who then oversees

15:28:19  5   through the Chief of Staff, Mr. Krause, who then would

15:28:24  6   manage --

15:28:24  7        THE COURT:  Right.  Okay.  But where is

15:28:26  8   Mr. Musk in all of this?  Since he seems to be giving,

15:28:30  9   you know -- being involved in the operation of USDS or

15:28:34  10  the ideas or what they're implementing.  So what is his

15:28:39  11  role?

15:28:39  12       Is he in the -- is he sort of a separate adviser?

15:28:42  13       Is he in the Chief Executive Office of the

15:28:45  14  President?  I mean, what is he?

15:28:48  15       MR. HUMPHREYS:  I don't have any further

15:28:49  16  information beyond a close adviser to the President,

15:28:51  17  which then, under the President's authority, goes to the

15:28:53  18  Secretary of Treasury and then down to the Treasury, the

15:28:58  19  DOGE team.

15:28:59  20       THE COURT:  But that -- I understand that.

15:28:59  21  That goes from the President to the Secretary of the

15:29:04  22  Treasury.  And then we can get into what else is doing

15:29:08  23  there.

15:29:08  24       But Mr. Musk at this point, you don't know what

15:29:11  25  role -- you can't tell me what role he has.

| 15:29:15 | 1 | MR. HUMPHREYS: My understanding is what I just |
| 15:29:17 | 2 | said. As an adviser to the President, Your Honor. |
| 15:29:18 | 3 | THE COURT: Okay. And so as an adviser would |
| 15:29:21 | 4 | he be in some category that -- in terms of some, you |
| 15:29:30 | 5 | know, employment category as an adviser? |
| 15:29:32 | 6 | MR. HUMPHREYS: I -- I'm not aware, Your Honor. |
| 15:29:34 | 7 | THE COURT: Okay. |
| 15:29:38 | 8 | All right. So is there an administrator of USDS at |
| 15:29:44 | 9 | the present time? |
| 15:29:44 | 10 | MR. HUMPHREYS: I don't know the answer to that |
| 15:29:46 | 11 | either, Your Honor. |
| 15:29:56 | 12 | THE COURT: So let me -- we're at a point where |
| 15:29:58 | 13 | we don't know whether there is an administrator. |
| 15:30:01 | 14 | Is that what you're saying to me? |
| 15:30:03 | 15 | MR. HUMPHREYS: I'm saying I don't know, Your |
| 15:30:05 | 16 | Honor. |
| 15:30:05 | 17 | THE COURT: Okay. Everybody speak up over |
| 15:30:07 | 18 | there, if you know anything else at the table. |
| 15:30:15 | 19 | So if you don't know -- I mean, I have to say the |
| 15:30:18 | 20 | government represented to Judge Alston in the Eastern |
| 15:30:21 | 21 | District of Virginia that there is, quote, "Acting USDS |
| 15:30:25 | 22 | administrator" -- and this was at Page 2 of his |
| 15:30:27 | 23 | opposition to the motion for TRO. And obviously the |
| 15:30:32 | 24 | Executive Order creating USDS says, "There shall be a |
| 15:30:36 | 25 | USDS administrator, and that the USDS Temporary |

15:30:39  1    Organization shall be headed by the USDS

15:30:44  2    administrator."

15:30:44  3        So isn't there some problem if there's no

15:30:50  4    administrator as to how USDS functions, who supervises

15:30:55  5    them, how they come up with ideas?  I mean, if you've

15:30:58  6    got employees working with USDS that are working with

15:31:00  7    Treasury, who's telling them what to do if there's no

15:31:03  8    administrator?

15:31:05  9            MR. HUMPHREYS:  I can't opine on that.  I would

15:31:06  10   have to evaluate it in terms of the specific legal

15:31:10  11   claim.  I don't think plaintiffs have challenged --

15:31:12  12           THE COURT:  Well, it does make a difference

15:31:14  13   ultimately.  I'm getting there, but I need to know some

15:31:17  14   facts before I get there in terms of -- but, you know,

15:31:20  15   obviously, if USDS employees are involved in this

15:31:25  16   engagement plan or whatever, I would think that somebody

15:31:30  17   would be telling them what to do, supervising their work

15:31:32  18   or doing something.

15:31:34  19       And as I understand it, you don't know how that's

15:31:36  20   operating?

15:31:38  21           MR. HUMPHREYS:  Again, as I mentioned, Your

15:31:39  22   Honor, Mr. Krause reports to the Treasury -- reports to

15:31:44  23   the Treasury Chief of Staff, who reports to the Treasury

15:31:46  24   Secretary.  And USDS is not part of that chain of

15:31:49  25   command.

15:31:49  1                    THE COURT:  Okay.  So it's not -- but that's

15:32:01  2      the whole point.  Mr. Krause doesn't seem to me -- he's

15:32:04  3      part of the USDS team or the DOGE team, but is he -- who

15:32:08  4      is telling him what the priorities or anything else is?

15:32:13  5                    MR. HUMPHREYS:  Well, the Executive Order sets

15:32:14  6      out, you know, high-level priority for modernization.

15:32:20  7                    THE COURT:  So he -- whatever the Executive

15:32:21  8      Order is, which is fairly broad, that -- he's to decide

15:32:24  9      how that is to be implemented?

15:32:26  10          I mean, is that the answer?

15:32:28  11                    MR. HUMPHREYS:  I --

15:32:29  12                    THE COURT:  As you know?

15:32:30  13                    MR. HUMPHREYS:  As otherwise directed by the

15:32:32  14      Chief of Staff of Treasury and the Treasury

15:32:34  15      Department -- Treasury Secretary.

15:32:37  16                    THE COURT:  But they're not -- they're not part

15:32:40  17      of USDS or the DOGE team, so are they -- what's the

15:32:45  18      relationship, then, between the Secretary and Mr. Krause

15:32:49  19      in terms of their relationship on this issue of, you

15:32:54  20      know, the implementation of the DOGE priorities?

15:32:58  21                    MR. HUMPHREYS:  Again, as a formal matter, I

15:32:59  22      don't think there is a relationship, Your Honor.  The

15:33:02  23      relationship is through the Executive Order, and I can't

15:33:05  24      say that discussions, you know, don't happen between

15:33:09  25      USDS and Mr. Krause.  I believe they do.  But in terms

15:33:11  1    of authority and who has the decision-making -- again,

15:33:14  2    it's the chain of command that I discussed.

15:33:16  3         THE COURT:  Well, the Executive Order states

15:33:20  4    that agency heads, and that would be Secretary

15:33:22  5    Bessent -- I'm not sure I'm pronouncing that

15:33:24  6    correctly -- shall select the DOGE team members in

15:33:27  7    consultation with the USDS administrator.

15:33:30  8         So there's no administrator to consult with.  Who

15:33:37  9    did he consult with when he hired Mr. Krause?  This is

15:33:40  10   the Executive Order that says this.

15:33:44  11        And the Executive Order states, "the USDS

15:33:47  12   administrator shall commence a software modernization

15:33:51  13   initiative."

15:33:54  14        Has the initiative been commenced?  By whom?

15:33:58  15        If there's no administrator, who did it?

15:34:00  16        MR. HUMPHREYS:  Well, yes, Your Honor.  I mean,

15:34:01  17   as we described, the team is going about modernizing and

15:34:04  18   improving the legacy systems at BFS consistent with the

15:34:09  19   direction --

15:34:09  20        THE COURT:  Okay.  What team?

15:34:12  21        MR. HUMPHREYS:  When I say the Treasury DOGE

15:34:14  22   team, I'm referring to Mr. Krause, previously Mr. Elez,

15:34:18  23   but now Mr. Wunderly.  But of course, they have not been

15:34:21  24   conducting work beyond --

15:34:22  25        THE COURT:  Okay.  And who is, who is -- I

15:34:24   1    mean, Mr. Krause, it looks like, hasn't been -- there's

15:34:27   2    no administrator telling him anything.  So it's -- I'm

15:34:35   3    still having trouble grasping how they're going out as

15:34:38   4    the team if nobody is telling them what to do, other

15:34:41   5    than the Executive Order, if that's -- as you

15:34:44   6    understand, and I realize that you -- it doesn't sound

15:34:47   7    like you were prepared for these questions, which is

15:34:52   8    unfortunate, but I will get to the point in a moment is

15:34:55   9    why I'm asking these.  But as I understand it, there's

15:35:00  10    no administrator.

15:35:02  11         So what the Executive Order says the administrator

15:35:05  12    is suppose to be doing at USDS is not happening.  And at

15:35:08  13    this point, we don't know who is actually doing these

15:35:10  14    things that the administrator was supposed to do.

15:35:14  15         Would that be fair?

15:35:15  16              MR. HUMPHREYS:  I don't think that's fair, Your

15:35:17  17    Honor.

15:35:17  18         Again, the mission of the Executive Order was to

15:35:19  19    modernize the technology --

15:35:21  20              THE COURT:  Right.

15:35:21  21              MR. HUMPHREYS:  -- of the agency.

15:35:22  22              THE COURT:  But who decides what's

15:35:24  23    modernization or what to do with the modernization?

15:35:26  24              MR. HUMPHREYS:  Well, as we described in the

15:35:27  25    declaration, Mr. Krause was selected because he has a

15:35:31  1    wealth of experience --

15:35:33  2              THE COURT:  Selected by whom?

15:35:34  3              MR. HUMPHREYS:  Well, was appointed by the

15:35:36  4    Treasury Department in conjunction with USDS officials

15:35:38  5    there.

15:35:39  6              THE COURT:  Right.  And who at USDS, since

15:35:41  7    there's no administrator?

15:35:43  8              MR. HUMPHREYS:  I -- I don't know specifically

15:35:45  9    the person who consulted with Mr. -- with the Secretary

15:35:51  10   to appoint him.

15:35:52  11             THE COURT:  Let me get to my reason for asking

15:35:55  12   these, which I think you indicated you thought they were

15:35:59  13   sort of outside of what -- the complaint.  But I'll tell

15:36:01  14   you why I think it's important.

15:36:04  15       Based on the limited record I have before me, I

15:36:06  16   have some concerns about the constitutionality, frankly,

15:36:09  17   of USDS's structure and operations.

15:36:14  18       USDS seems to be taking actions, like entering into

15:36:16  19   the payment process engagement plan.  That plan appears

15:36:20  20   to bind a federal agency, the Treasury Department.

15:36:23  21       The Appointments Clause of the Constitution

15:36:26  22   requires that principal officers be nominated by the

15:36:30  23   President and confirmed by the Senate.  Employees and

15:36:33  24   inferior officers need to be supervised by principal

15:36:37  25   officers to comply with the Appointments Clause.

15:36:39  1          So I want to ask a few questions -- and I have

15:36:42  2    been -- about the status of the people acting in

15:36:46  3    official capacities at USDS.  It appears to me that the

15:36:50  4    people within USDS could be exercising authority as

15:36:54  5    officers of the United States, including by supervising

15:36:57  6    and directing Treasury employees, like Mr. Krause,

15:37:01  7    without complying with the Appointments Clause, so --

15:37:07  8    which I think is something that the Court can certainly

15:37:09  9    note may be a problem.  It may not.  But at least on

15:37:14  10   this record, we certainly don't have enough information

15:37:16  11   in terms of who is supervising and whether they're in a

15:37:19  12   position to make the --you know, make these

15:37:22  13   arrangements, et cetera.

15:37:25  14          At Paragraph 4 of the February 12th declaration,

15:37:29  15   Mr. Krause said that, quote, "He coordinates with

15:37:32  16   officials at USDS DOGE, provides them with regular

15:37:40  17   updates about the team's progress, and receives

15:37:44  18   high-level policy direction from those officials."

15:37:45  19          Now, officials are not just employees.  So

15:37:49  20   officials are people that -- principal officers,

15:37:57  21   officials.  They're in a different category than regular

15:38:00  22   employees.

15:38:01  23          So my question is:  Who are the officials who give

15:38:04  24   Mr. Krause direction?  Are any of them -- well, they're

15:38:09  25   not going to be the USDS administrator.

15:38:14  1          What are their titles?  Do they work only for USDS?

15:38:17  2          In *Lucia*, the Supreme Court held that "government

15:38:21  3    officials," which we're talking about, are officers,

15:38:23  4    rather than employees, subject to the Appointments

15:38:27  5    Clause when they exercise "significant authority" and

15:38:30  6    "significant discretion."  When USDS officials provide

15:38:34  7    "high-level policy direction" to a high-ranking employee

15:38:38  8    at Treasury, are they exercising significant authority

15:38:42  9    and discretion?

15:38:45  10         If yes, does that make them officers under the

15:38:51  11   Appointments Clause as interpreted by the Supreme Court?

15:38:52  12         Were they nominated by the President and confirmed

15:38:55  13   by the Senate?

15:38:56  14         Does the statute provide for their appointment by

15:38:58  15   some other means?

15:38:59  16         So that's why I'm asking these questions.  And

15:39:02  17   based on the fact that there's a lack of information

15:39:04  18   about all this, how this is all connected and

15:39:10  19   structured.

15:39:10  20         Do you understand my concern?

15:39:13  21             MR. HUMPHREYS:  I believe I understand your

15:39:14  22   concern, Your Honor, although not how it relates to the

15:39:17  23   Appointments Clause.

15:39:17  24             THE COURT:  Well, it does if USDS is not acting

15:39:19  25   constitutionally.

15:39:20  1          Wouldn't that be irreparable harm?

15:39:23  2          MR. HUMPHREYS:  No, Your Honor, for many

15:39:24  3    reasons we can discuss.  These particular plaintiffs

15:39:27  4    don't have standing.

15:39:28  5          THE COURT:  Well, if you are asking, wouldn't

15:39:30  6    it be ultra vires -- potentially ultra vires in terms of

15:39:37  7    the -- if they're taking direction or doing things where

15:39:40  8    they do not have this authority under the Appointments

15:39:43  9    Clause or something else?

15:39:46  10         MR. HUMPHREYS:  I'm just not prepared to opine

15:39:49  11   on issues the plaintiffs have not briefed and are not in

15:39:52  12   their complaint, Your Honor.  I mean, there is --

15:39:53  13         THE COURT:  Okay.  But I'm raising an issue for

15:39:55  14   you, and part of it is some knowledge, hopefully, that

15:39:58  15   you all will learn as to how these -- who's involved,

15:40:02  16   who's in charge, who's giving them direction, which I

15:40:09  17   think is key to making some decisions here about what

15:40:15  18   exactly their authority is to make these decisions,

15:40:18  19   engage in the plan, and do other things.

15:40:20  20       So at this point it would appear that you're not in

15:40:22  21   a position to answer them.

15:40:23  22         Would that be accurate?

15:40:24  23         MR. HUMPHREYS:  I'm not, Your Honor.  I know we

15:40:26  24   do have Appointments Clause litigation.  I'm happy to

15:40:29  25   consult, and we can update the Court.

15:40:36  1              THE COURT:  Okay.  So let me move on to some

15:40:39  2      other areas.

15:40:40  3          But I'll finish this whole thing so that you have

15:40:42  4      some idea of what I'm getting that.  I may need to have

15:40:48  5      additional information provided.

15:40:49  6          For instance, in *Free Enterprise Fund*, a Supreme

15:40:53  7      Court case in *Edmond* -- they're back -- one is 2010.

15:40:56  8      The other is 1997 -- the Supreme Court held that

15:40:59  9      inferior officers are officers whose work is supervised

15:41:03  10     by other officers nominated by the President, confirmed

15:41:06  11     by the Senate.

15:41:07  12         So, again, are the USDS officials, which have not

15:41:12  13     been identified, the ones who give direction to

15:41:16  14     Mr. Krause, supervised by an officer nominated by the

15:41:19  15     President and confirmed by the Senate?

15:41:22  16         I would point out that the White House Chief of

15:41:23  17     Staff is not such an officer.

15:41:30  18         So what I'm getting at, does it mean that USDS

15:41:32  19     officials that Mr. Krause identified -- well, he didn't

15:41:35  20     identify principal officers within the meaning of the

15:41:40  21     Appointments Clause interpreted by the Supreme Court --

15:41:43  22     who are they?  Do they give direction to Mr. Krause?

15:41:46  23     Were they nominated by the President and confirmed by

15:41:49  24     the Senate?

15:41:51  25         It does seem to me that if you have people that are

15:41:58  1    not authorized to carry out some of these functions that

15:42:00  2    they're carrying out, that that does raise an issue.

15:42:06  3        I would hope that by now we would know the

15:42:10  4    structure.  Who's the administrator?  Who's acting as

15:42:15  5    the administrator?  Who is providing some of this

15:42:17  6    information?  What authority do they have within

15:42:19  7    Treasury or within, frankly, USDS?

15:42:27  8        MR. HUMPHREYS:  Yes, Your Honor, we can report

15:42:28  9    back on that, except just to point out one more time,

15:42:32  10   that Mr. Krause is overseen by a Senate-confirmed

15:42:38  11   official, who is Secretary Bessent.  But we understand

15:42:39  12   the Court has additional questions, and we can report

15:42:43  13   back.

15:42:43  14       THE COURT:  Okay.  Let me move on to some other

15:42:45  15   issues.

15:42:46  16       In terms of standing, as to associational standing,

15:42:51  17   which is what they have focused on, your briefing

15:42:55  18   focuses exclusively on their point that plaintiffs'

15:43:02  19   members would have standing to sue on their own.

15:43:03  20       Are you disputing whether the interests plaintiffs

15:43:06  21   seek to protect are germane to their organizational

15:43:09  22   interest or are you disputing whether the individual

15:43:11  23   members have to participate in this suit?

15:43:14  24       It wasn't clear to me.

15:43:15  25       MR. HUMPHREYS:  On the second point, we would

15:43:16   1   not dispute that the interests are germane to the

15:43:20   2   organization.

15:43:21   3           THE COURT:  Okay.

15:43:21   4           MR. HUMPHREYS:  However, we do think, for

15:43:23   5   reasons that are also tied up with adequate alternative

15:43:26   6   remedies, the 702 issue, that this case really should be

15:43:29   7   brought as either an individual Privacy Act claim or

15:43:34   8   individual Internal Revenue Code claim if it ever came

15:43:37   9   to pass that there was actual harm for the purposes of

15:43:41   10  standing to bring this claim in the first place.  But we

15:43:45   11  don't think that that has occurred.

15:43:47   12       Certainly, plaintiffs have not provided any reason

15:43:50   13  whatsoever that -- to think that there -- specific

15:43:55   14  members' data has ever been viewed much less disclosed

15:43:58   15  to a third party.

15:43:59   16          THE COURT:  So you're disputing whether the

15:44:01   17  individual members have to participate in this suit, as

15:44:03   18  opposed to the association.

15:44:05   19          MR. HUMPHREYS:  Well, I do think -- so, Your

15:44:09   20  Honor, because in order -- you know, it goes sort of to

15:44:12   21  the -- whether there's a final agency action.

15:44:15   22       Plaintiffs contend -- although we would dispute --

15:44:20   23  that there was a change in policy that allowed access

15:44:26   24  for these individuals to occur.

15:44:27   25       As Mr. Gioeli explains in his declaration, there is

15:44:30  1    no such change in policy.  These are Treasury employees

15:44:32  2    and properly have authorized access.

15:44:34  3        So if there's any actual claim --

15:44:36  4            THE COURT:  Who are the Treasury employees that

15:44:39  5    you're talking about?

15:44:41  6            MR. HUMPHREYS:  Mr. Krause and now

15:44:44  7    Mr. Wunderly, Your Honor.

15:44:45  8            THE COURT:  Okay.

15:44:46  9            MR. HUMPHREYS:  And so if that is the change in

15:44:47  10   policy that they're challenging, that does not go to

15:44:50  11   show, nor would a record reveal, whether or not

15:44:53  12   individuals in any specific instance were harmed such

15:44:57  13   that they could maintain suit.  And I think that goes to

15:45:00  14   show, Your Honor, why this case is not an appropriate

15:45:02  15   vehicle for the Administrative Procedure Act.

15:45:05  16       If and when plaintiffs' members' actual data is

15:45:08  17   ever released and they suffer, you know, actual harm --

15:45:12  18   injury-in-fact for the purposes of Article III, there's

15:45:15  19   a remedy under the Privacy Act or under the Internal

15:45:18  20   Revenue Code for damages.

15:45:21  21           THE COURT:  So is that sort of your argument as

15:45:23  22   well about the injury-in-fact requirement?

15:45:29  23       Is that what you're getting at?

15:45:31  24           MR. HUMPHREYS:  Yeah, I think that they're

15:45:32  25   similar, but it goes to show why, again, this is not a

15:45:36   1    proper vehicle for an Administrative Procedure Act.

15:45:38   2         But I do think you're right, Your Honor.  The focus

15:45:39   3    of our briefing was on injury-in-fact, and that is a

15:45:42   4    very clear reason why plaintiffs don't have standing

15:45:45   5    here.

15:45:45   6         THE COURT:  So let me just clarify a couple of

15:45:46   7    other -- in terms of the elements, do you dispute that

15:45:47   8    the members' injury is fairly traceable to defendants'

15:45:50   9    alleged conduct?

15:45:54  10         MR. HUMPHREYS:  Well, given that there's no

15:45:55  11    injury, yes, absolutely, Your Honor.

15:45:57  12         THE COURT:  Okay.  And do you dispute that

15:46:00  13    their injury would be redressed by the requested

15:46:04  14    injunctive relief?

15:46:05  15         MR. HUMPHREYS:  Yes, Your Honor, given that

15:46:06  16    there's no injury.

15:46:10  17         THE COURT:  Okay.  In your opposition you argue

15:46:12  18    that, quote, "an exchange of protected records internal

15:46:14  19    to the federal government is insufficient to establish

15:46:18  20    standing and the plaintiffs' need to show a public

15:46:20  21    disclosure."  So let me just ask a couple questions.  I

15:46:24  22    know that that's your position.

15:46:27  23         So just as an example, Congress is part of the

15:46:31  24    federal government.  Would disclosing an individual's

15:46:35  25    tax returns to a Congressional committee cause an injury

15:46:38 1     sufficient to create standing, as an example?

15:46:44 2          MR. HUMPHREYS:  In the hypothetical, Your

15:46:45 3     Honor, it may be that there's a routine use that permits

15:46:48 4     the disclosure under the relevant SORN, and so there may

15:46:54 5     not even be a bare statutory violation in that instance.

15:46:58 6          So therefore not --

15:46:58 7          THE COURT:  So if there was a routine use that

15:47:03 8     could be given, so -- a record could be given to

15:47:06 9     Congress, a congressional committee?

15:47:09 10         Is that what you're saying?

15:47:10 11         MR. HUMPHREYS:  My understanding, Your Honor,

15:47:11 12    is, yes, that there are routine uses that allow for the

15:47:15 13    disclosure of information to Congress.

15:47:17 14         THE COURT:  That allow disclosures to Congress?

         15         MR. HUMPHREYS:  Or in some instances.

15:47:19 16         THE COURT:  Or just in general allow

15:47:21 17    disclosures in certain circumstances?

15:47:23 18         MR. HUMPHREYS:  Well, one would have to look at

15:47:24 19    the specifics of the Systems of Record Notice, but many

15:47:26 20    of them do, based on my understanding, allow disclosures

15:47:30 21    to Congress by agencies in certain circumstances.

15:47:34 22         So that may not violate the Privacy Act at all,

15:47:38 23    much less -- there are two separate issues, but there

15:47:42 24    may also be no -- probably likely -- well, it would

15:47:45 25    depend, but there wouldn't -- may not be injury-in-fact.

15:47:47 1          THE COURT:  Okay.  Let me try a different

15:47:49 2  hypothetical.

15:47:52 3      The White House political director is a member, of

15:47:54 4  course, of the Executive Office of the President in the

15:47:58 5  executive branch.  If the Secretary of the Treasury sent

15:48:03 6  that person the tax returns of a first term President's

15:48:06 7  opponent in a primary, would that cause an injury

15:48:09 8  sufficient to create standing?  Just as a hypothetical.

15:48:13 9          MR. HUMPHREYS:  Yes, Your Honor.  Assuming

15:48:14 10  there were no routine use that allowed for such, I think

15:48:19 11  that is probable, although I don't know if a routine use

15:48:22 12  would apply but, again, one would have to look at the

15:48:29 13  SORN, the Systems of Record Notice.

15:48:32 14          THE COURT:  All right.  Mr. Krause is the CEO

15:48:34 15  of a software company as well as the employee of the

15:48:38 16  executive branch.  If he accessed the sensitive

15:48:42 17  financial disclosures of a competing firm, would that

15:48:45 18  firm have standing?

15:48:47 19      These are all standing questions.

15:48:50 20          MR. HUMPHREYS:  In his role as a Treasury

15:48:54 21  Department employee --

15:48:54 22          THE COURT:  Yeah, he's an employee of Treasury.

15:48:56 23  He's also the CEO of this company, software company.

15:49:01 24      So if he accessed the sensitive financial

15:49:04 25  disclosure information -- he's a competing firm, okay,

15:49:08  1    so we're talking about access -- would that -- would the

15:49:11  2    firm have standing?

15:49:13  3            MR. HUMPHREYS:  I think that --

15:49:15  4            THE COURT:  The competing firm.

15:49:16  5            MR. HUMPHREYS:  That would be up to the "need

15:49:18  6    to know" issue, I believe, Your Honor.  I mean, if he

15:49:20  7    accessed that information properly as part of his

15:49:25  8    duties, no, I don't think there would even be a bare

15:49:28  9    statutory violation.  And of course, in TransUnion, the

15:49:31  10   Court says that for standing there has to be something

15:49:33  11   even more than a bare statutory violation, some concrete

15:49:37  12   harm.

15:49:38  13       So if he exercised, you know -- if he were to view

15:49:42  14   information on a competitor, it would depend for what

15:49:46  15   purpose I think he accessed it.  But it may qualify into

15:49:50  16   the intra-agency exception within the Privacy Act but,

15:49:57  17   again, the plaintiff in that case, the litigant, would

15:49:59  18   have to show some concrete injury in order to have a

15:50:04  19   viable claim.

15:50:05  20       As they said in TransUnion:  No concrete injury, no

15:50:09  21   standing.  So --

15:50:17  22            THE COURT:  So if -- would you agree that there

15:50:18  23   can be a case where there's an injury sufficient to

15:50:22  24   create standing in an information access case, like the

15:50:27  25   one -- the examples that I've been giving you, without a

15:50:31  1    public disclosure?

15:50:32  2         MR. HUMPHREYS:  No, Your Honor, I wouldn't

15:50:33  3    agree with that.  I think under that hypothetical, you

15:50:35  4    know, the information --

15:50:36  5         THE COURT:  Under a couple of hypotheticals

15:50:40  6    I've given you.

15:50:41  7         MR. HUMPHREYS:  Yes, Your Honor.  The one I'm

15:50:42  8    speaking of --

15:50:42  9         THE COURT:  I would point out that I think, you

15:50:43 10    know, at least one hypothetical, although it's not

15:50:46 11    perfect, would certainly be the *Mazars,* M-A-Z-A-R-S,

15:50:56 12    President Trump case relating to the committee.  But at

15:50:58 13    any rate, it's your view -- well, let me not say what

15:51:03 14    your view is.  You tell me as to whether there would be

15:51:05 15    an issue in terms of whether you could in a particular

15:51:08 16    case have standing, where it's an information access

15:51:14 17    case such as the one I just gave you, without public

15:51:18 18    disclosure.

15:51:19 19         MR. HUMPHREYS:  No, Your Honor.  I think public

15:51:20 20    disclosure is required for standing.  And I think in

15:51:22 21    that instance, the hypothetical where Mr. Krause saw the

15:51:26 22    information, I think the outside disclosure there would

15:51:28 23    be to, you know, his company --

15:51:31 24         THE COURT:  But isn't the disclosure -- you're

15:51:34 25    basically having, you know, somebody who is competing

15:51:36  1    with the information that he has.  Wouldn't the fact

15:51:41  2    that he just got the information give him an advantage?

15:51:45  3    He wouldn't have a -- you know, he would not be privy to

15:51:48  4    this information under other circumstances.

15:51:51  5        This is in my hypothetical.  I'm not saying

15:51:53  6    Mr. Krause would do this.  But in my hypothetical, in

15:51:56  7    terms of just the fact that he would have access to the

15:51:59  8    information that is a competing -- you know, competing

15:52:02  9    firm in terms of, you know, just getting the

15:52:09  10   information.

15:52:09  11       MR. HUMPHREYS:  No, Your Honor.  I think that

15:52:10  12   is still a public disclosure with respect to

15:52:13  13   Mr. Krause's company.  I mean, I think there has to be

15:52:17  14   something more than Mr. Krause knowing it in his mind.

15:52:19  15   He has to use it for some other reason to create, again,

15:52:23  16   hypothetically, a competitive advantage.

15:52:28  17       In all the cases plaintiffs cite, I believe, there

15:52:32  18   is some publication that requires -- in the data access

15:52:37  19   case that was essentially -- in TransUnion, in order for

15:52:43  20   there to be standing, there had to be disclosure of the

15:52:45  21   information to another party, which was through the

15:52:48  22   credit reporting.

15:52:49  23       I mean, in that case, the plaintiffs there had

15:52:51  24   actually been designated in the defendant's system as

15:52:55  25   either potentially a terrorist or a drug trafficker.

15:52:58  1    But the Court still said where the information hadn't

15:53:01  2    left the agency that there's no standing and therefore

15:53:05  3    dismissed the claim as to the people -- where there had

15:53:09  4    been no publication.

15:53:10  5         THE COURT:  TransUnion talks about, you know,

15:53:13  6    different competing common law harms.  And you had

15:53:21  7    focused on the public disclosure of private facts rather

15:53:26  8    than intrusion upon seclusion, which is what the

15:53:35  9    plaintiffs have focused on.  So tell me why that doesn't

15:53:37  10   work in terms of their theory, not the one you brought

15:53:39  11   up.

15:53:40  12        MR. HUMPHREYS:  Yes, Your Honor.  Plaintiffs do

15:53:42  13   point to intrusion upon seclusion.

15:53:45  14     TransUnion didn't mention that as a potential

15:53:47  15   analog that could create standing; however, I think if

15:53:49  16   you look at the cited case in that case --

15:53:52  17        THE COURT:  I'm sorry, what didn't they -- I

15:53:53  18   missed what they didn't specifically bring up.

15:53:55  19        MR. HUMPHREYS:  They did list intrusion upon

15:53:58  20   seclusion among the list of historic analogs that may

15:54:03  21   give rise to standing.

          22        THE COURT:  Okay.  I see.

15:54:04  23        MR. HUMPHREYS:  However, the case cited, the

15:54:07  24   Seventh Circuit case the Supreme Court cited in

15:54:10  25   TransUnion, shows that the facts are very different from

15:54:14  1      the circumstance here.

15:54:16  2          There, the Court addressed text messages that were

15:54:18  3      being received on the plaintiff's phone, and the Court

15:54:22  4      compared that to receiving unwanted phone calls at your

15:54:27  5      house.  And there, I think the comparison -- or the

15:54:32  6      analogy to an intrusion upon the home is much clearer

15:54:37  7      here, where the information before the Court is that

15:54:40  8      these are Treasury systems that have data and the

15:54:45  9      Treasury Department is giving access to its own

15:54:49  10     employees, access to that data.

15:54:51  11         And we just don't think that the analogy to

15:54:53  12     intrusion upon seclusion at all works, unlike a case

15:54:57  13     like Gadelhak that the Supreme Court cited in the

15:55:01  14     TransUnion situation.

15:55:03  15             THE COURT:  Okay.  So let me move to APA 702,

15:55:09  16     which as I indicated when I was talking to the

15:55:12  17     plaintiffs, that waives sovereign immunity for suits

15:55:15  18     seeking relief other than money damages against an

15:55:17  19     agency or officer.  But it conditions that waiver,

15:55:21  20     quote, "Nothing herein confers authority to grant relief

15:55:25  21     if any other statute that grants consent to suit

15:55:28  22     expressly or impliedly forbids the relief which is

15:55:33  23     sought."

15:55:33  24         And the Court lacks subject matter jurisdiction if

15:55:36  25     another statute forbids the injunctive relief plaintiffs

15:55:41  1    seek here.

15:55:41  2         You rely on *Match-E-Be-Nash*.

15:55:47  3         I'll give the court reporter what that cite is.

15:55:52  4         And there, the Supreme Court held that the Quiet

15:55:55  5    Title Act forbids the relief the plaintiffs sought under

15:55:58  6    the APA.  But the Quiet Title Act had an explicit

15:56:03  7    exception to its waiver of sovereign immunity.  Anything

15:56:07  8    similar to that in the Privacy Act or Internal Revenue

15:56:13  9    Code?

15:56:13  10         MR. HUMPHREYS:  No, Your Honor, not explicitly.

15:56:15  11    I think our point is that Congress has devised a very

15:56:18  12    specific scheme both with respect to the Privacy Act and

15:56:21  13    the Internal Revenue Code.  And as Your Honor pointed

15:56:23  14    out, has in the Privacy Act injunctive relief for

15:56:26  15    certain types of claims and monetary relief for others.

15:56:30  16    And we think that the, you know, the upshot of that

15:56:34  17    carefully crafted scheme with respect to both the

15:56:36  18    Privacy Act and the Internal Revenue Code, is that

15:56:40  19    prospective relief through the Administrative Procedure

15:56:42  20    Act should not be -- should not be permitted.

15:56:45  21         And, again, I think it helps to focus on what a

15:56:51  22    plaintiff might need to show in order to make out a

15:56:54  23    Privacy Act or Internal Revenue claim, which is that

15:56:58  24    their particular information was disclosed, not that

15:57:00  25    employees of the Treasury Department were given access

15:57:03  1    to a Treasury Department system.

15:57:08  2              THE COURT:  Okay.  Any other precedents holding

15:57:12  3    that the Privacy Act or Internal Revenue Code forbid

15:57:17  4    relief such that Section 702 doesn't waive sovereign

15:57:22  5    immunity?  Anything else?

15:57:23  6              MR. HUMPHREYS:  No, Your Honor.  Although I

15:57:24  7    think the 702 claim is what -- part and parcel to the

15:57:27  8    704 claim.

15:57:28  9              THE COURT:  Okay.

15:57:29  10             MR. HUMPHREYS:  If the Court created a

15:57:30  11   statutory scheme and impliedly meant to preclude review

15:57:33  12   for the APA, there's another alternative remedy.

15:57:37  13             THE COURT:  All right.

       14             MR. HUMPHREYS:  So we would also rely on the

       15   cases in that --

15:57:41  16             THE COURT:  Yeah.  The plaintiffs also bring up

15:57:43  17   *Agriculture v. Kirtz*.  So didn't the Supreme Court

15:57:47  18   indicate in that particular case that the Privacy Act is

15:57:50  19   not the kind of legislation that occupies the field of

15:57:54  20   privacy remedies and forbids relief under other

15:57:59  21   statutes, if you're familiar with the case?

15:58:03  22        It's K-I-R-T-Z, *Agriculture v. Kirtz*.  I'm sorry, I

15:58:11  23   didn't write down the page number.

15:58:20  24             MR. HUMPHREYS:  Yes, Your Honor, but I don't --

15:58:23  25   I don't have -- I acknowledge the Court said that.

15:58:26  1          Yeah, I don't have nothing else to add.

15:58:28  2          THE COURT:  Okay.  Let me move to final agency

15:58:30  3     action.  This is obviously 704, and -- judicial review

15:58:38  4     is limited to final agency action.  And that "agency

15:58:43  5     action is final when it marks the consummation of an

15:58:45  6     agency's decision-making process.  It's one by which

15:58:49  7     rights or obligations have been determined or for which

15:58:53  8     legal consequences flow."

15:58:54  9          Your supplemental memoranda stated that, quote,

15:58:58  10    "there's no waiver of sovereign immunity under the APA

15:59:01  11    because plaintiffs have not identified a final agency

15:59:03  12    action."  But the D.C. Circuit in *Trudeau* stated that

15:59:13  13    the APA's final agency action requirement is not

15:59:17  14    jurisdictional.

15:59:19  15         Should I interpret your argument as really going to

15:59:22  16    the merits and not jurisdiction?

15:59:24  17         MR. HUMPHREYS:  Yes, that's fair, Your Honor.

15:59:26  18         THE COURT:  Okay.  Just to make sure.

15:59:27  19         But you argue that there's no final agency action

15:59:30  20    because decisions about access to records are a routine

15:59:33  21    matter; part of Treasury's day-to day operations.

15:59:38  22         That's your argument, principal one; correct?

15:59:44  23         MR. HUMPHREYS:  Yes, Your Honor.

15:59:45  24         THE COURT:  Okay.  Well, the USDA issues

15:59:47  25    thousands of licenses per year.  Is the issuance of a

15:59:50  1    license by, say, USDA a final agency action even though

15:59:56  2    they do it every day?

15:59:57  3        So does the APA define final agency action by

16:00:02  4    reference to how routine or important the agency action

16:00:04  5    is?

16:00:06  6            MR. HUMPHREYS:  Yes, Your Honor.  There can be

16:00:07  7    actions that happen frequently that are also final

16:00:11  8    agency actions.  We don't believe that's the case here.

16:00:14  9            THE COURT:  Why not?

16:00:17  10           MR. HUMPHREYS:  Well, because, again, the

16:00:17  11   decision of whether or not to give a particular employee

16:00:20  12   within the Treasury Department access to some of -- data

16:00:26  13   which is housed within the agency is the sort of routine

16:00:30  14   or ministerial agency decision that should not be

16:00:34  15   subject to APA review.

16:00:36  16       And I would point the Court to the Supreme Court's

16:00:38  17   decision in *Norton v. Southern Utah Wilderness*

16:00:48  18   *Association* for the point that such ministerial actions

16:00:51  19   aren't subject to APA review.

16:00:55  20       In other words, because there is no policy that

16:00:56  21   requires the denial of access as to the Treasury DOGE

16:01:02  22   team, it's not reviewable under the APA.

16:01:05  23           THE COURT:  Wouldn't the, you know, payment

16:01:07  24   process engagement plan, the engagement plan, be a final

16:01:11  25   agency action?  It's an agreement that they reached in

16:01:13  1      terms of how things were to be done?

16:01:15  2           MR. HUMPHREYS:  I mean, there is a decision

16:01:16  3      there, Your Honor, to give employees access to BFS

16:01:20  4      systems, but I don't think that any legal consequences

16:01:24  5      flow from that decision with respect --

16:01:26  6           THE COURT:  Well, isn't it a different decision

16:01:28  7      from what -- it changes what has been the policy in the

16:01:31  8      past in terms of -- I mean, we don't have the engagement

16:01:35  9      plan so it's a little difficult to do it, but my

16:01:37  10     understanding is that there was a change in terms of

16:01:41  11     access that had not been provided in the past.  And that

16:01:44  12     was the purpose of part of the plan, if I understood

16:01:48  13     the -- as I understood it correctly.

16:01:51  14          MR. HUMPHREYS:  Well, the purpose of the plan

16:01:53  15     is to give the Treasury DOGE team access, but we dispute

16:01:55  16     that there's any change in policy.  And that's actually

16:01:58  17     in our declaration.

16:01:59  18          THE COURT:  Well, ordinarily somebody in that

16:02:02  19     position would not have -- as I understand it, would not

16:02:05  20     have had access to it.  So wouldn't that make it a

16:02:09  21     change?

16:02:10  22          MR. HUMPHREYS:  Again, I don't think that's the

16:02:12  23     sort of -- there's no legal consequences, which is the

16:02:15  24     analysis of what the final agency action that flow from

16:02:18  25     the decision to allow a particular employee access to

16:02:22  1    one system or two or three.  And I don't think that

16:02:26  2    changes the analysis just because a prior employee may

16:02:31  3    never have had the same access.

16:02:33  4        There are no legal consequences that flow.  The

16:02:36  5    Privacy Act and the Internal Revenue Code still apply.

16:02:40  6    And to the extent there is ever hypothetically a

16:02:43  7    violation of one of those statutes, that can be brought

16:02:45  8    through a separate claim individually as opposed to

16:02:50  9    through broad APA review.

16:02:53  10        THE COURT:  I'll leave that one alone.  If the

16:02:57  11   plaintiffs want to respond, I'll let them do that.

16:02:59  12        You also argue that the Treasury decisions here,

16:03:02  13   particular ones in, say, the engagement plan among other

16:03:06  14   things, have no effect on rights or obligations.  But

16:03:10  15   isn't this -- you know, if you look under the Privacy

16:03:15  16   Act of right against disclosure without consent, if

16:03:17  17   you're disclosing protected records to persons who might

16:03:20  18   not have lawful access, wouldn't that affect that right?

16:03:24  19        MR. HUMPHREYS:  No, Your Honor.  Because they

16:03:25  20   do have lawful access.  They are employees with a need

16:03:28  21   to know.  So therefore fall within, for the Privacy Act,

16:03:32  22   552(a)(B) --

16:03:34  23        THE COURT:  Well, we don't know that they're

16:03:36  24   all employees.  Part of the problem I think is in terms

16:03:38  25   of precisely what categories they are in.

16:03:40  1          MR. HUMPHREYS:  Well, I think we do, Your

16:03:42  2    Honor.  Mr. Krause and Mr. Wunderly are both employees,

16:03:45  3    so therefore they're covered by 552(a)(B)(1).

16:03:51  4        To the extent that information were to go outside

16:03:54  5    of the Treasury Department, it would only be able to do

16:03:56  6    so subject to a routine use, and therefore, one would

16:03:59  7    look at the relevant SORN.

16:04:05  8        There's no broad policy here of allowing sharing

16:04:08  9    outside of the department just to employees within the

16:04:11  10   Treasury DOGE team who have access, who have authorized

16:04:14  11   access, and therefore fall within the Privacy Act's

16:04:17  12   parameters.

16:04:25  13       So no, Your Honor, we would not say -- we would

16:04:26  14   strongly disagree that there's any unlawful access

16:04:30  15   because the employees themselves have a need to know and

16:04:33  16   fall within a 552(a)(B)(1).  And if information is going

16:04:39  17   outside of the Treasury Department, it would only do so

16:04:42  18   pursuant to a routine use, as in the case with the State

16:04:45  19   Department with Routine Use 17 of the SORN at issue for

16:04:49  20   that systems --

16:04:58  21          THE COURT:  Okay.  You also argued in the

16:04:59  22   supplemental memorandum, "there's no waiver of sovereign

16:05:01  23   immunity because adequate alternate remedies preclude

16:05:05  24   APA review."  And then you -- the D.C. Circuit held in

16:05:08  25   *Perry Capital,* "there is no textual or logical basis for

16:05:12  1      construing 704 to condition of waiver sovereign immunity

16:05:16  2      on the absence of an adequate remedy."

16:05:21  3          So wouldn't, again, this go to merits rather than

16:05:25  4      jurisdiction?

16:05:27  5              MR. HUMPHREYS:  I do think it goes to the

16:05:28  6      merits, Your Honor, but the merits question is -- there

16:05:30  7      must be a final agency action for plaintiffs to be able

16:05:33  8      to prevail on the merits of an APA claim.

16:05:35  9          Again, they could bring -- their members could

16:05:39  10     bring a Privacy Act claim or an Internal Revenue Act

16:05:42  11     claim if there is ever a disclosure of their information

16:05:46  12     that harms them.

16:05:47  13         But in order to give the sort of broad programmatic

16:05:51  14     review of the APA, they must show final agency action.

16:05:55  15     And given the Congressional remedies that have been

16:05:58  16     carefully created, we don't think that final -- excuse

16:06:00  17     me, that -- excuse me -- we do think that there is other

16:06:03  18     alternate remedies available here.

16:06:06  19             THE COURT:  Okay.  You argue that the Privacy

16:06:10  20     Act creates a "detailed remedial scheme," a specific one

16:06:13  21     regarding violations of its prohibitions against

16:06:16  22     disclosures.  But the damages remedy for disclosure is

16:06:20  23     in a catch-all provision for failure to, quote, "comply

16:06:23  24     with any other provision of this section."

16:06:26  25         So should that affect my thinking about how

16:06:29  1    detailed and comprehensive the remedial scheme is?  Why

16:06:34  2    shouldn't I be able to conclude that the scheme is

16:06:36  3    detailed as to actions for correction of records as

16:06:39  4    opposed to actions regarding disclosure?

16:06:43  5        Isn't most of the statute about that rather than

16:06:46  6    disclosure?

16:06:48  7            MR. HUMPHREYS:  I don't think how Congress --

16:06:51  8    where within the statute it organized remedies makes a

16:06:55  9    difference.  I mean, the reality is that plaintiffs may

16:06:59  10   bring a claim for monetary damages through the Privacy

16:07:02  11   Act, and plaintiffs often do.  Congress provided that

16:07:06  12   avenue for them.  I don't think the organizational

16:07:08  13   structure there matters, Your Honor.

16:07:12  14           THE COURT:  Okay.  Now, you cite a number of

16:07:14  15   cases from this district where courts held that a

16:07:18  16   plaintiff cannot use the APA to duplicate the injunctive

16:07:22  17   relief provided by the Privacy Act.

16:07:24  18       Can you point me to any precedent from the circuit

16:07:28  19   where a court has concluded that the damages remedy is

16:07:31  20   an adequate alternative for an APA injunction?

16:07:36  21           MR. HUMPHREYS:  Not specifically, Your Honor,

16:07:38  22   beyond the cases we cited.  I think the *Cell Associates*

16:07:41  23   case about the availability of injunctive remedy is

16:07:45  24   probably our best case.

16:07:47  25           THE COURT:  So do you think that when Congress

16:07:49  1    created the damages remedy in the Privacy Act it had in

16:07:52  2    mind a challenge to a policy of allegedly unlawful

16:07:57  3    disclosures?  As opposed to sort of one-off

16:08:00  4    retrospective challenges to unlawful disclosures of an

16:08:04  5    individual plaintiff's records?

16:08:06  6         So one is really more in the context of a policy as

16:08:09  7    opposed to individuals.

16:08:13  8             MR. HUMPHREYS:  I think that the same analysis

16:08:15  9    applies, Your Honor, and it kind of goes back to the

16:08:18  10   standing requirement, which is incorporated within the

16:08:21  11   Privacy Act as an adverse consequence.

16:08:23  12        I mean, I don't -- Congress required an adverse

16:08:26  13   consequence before one can bring a Privacy Act claim.

16:08:32  14   And that means that they thought there should be an

16:08:36  15   individualized showing of harm before money damages can

16:08:41  16   attach.  And I think in order to allow sort of

16:08:45  17   programmatic review through the APA would upend that

16:08:49  18   system and root out the adverse consequences portion of

16:08:57  19   the statute.

16:09:00  20            THE COURT:  Okay.  So in terms of the arbitrary

16:09:03  21   and capricious, if I disagree with your threshold

16:09:07  22   arguments and reach the merits, how should I assess

16:09:11  23   whether Secretary Bessent considered the relevant

16:09:13  24   factors and alternatives when deciding to give the

16:09:17  25   Treasury DOGE team access to the BFS records?

16:09:20  1          Should I order you to produce a complete

16:09:23  2   administrative record?

16:09:24  3          Should I allow plaintiffs to obtain limited

16:09:26  4   discovery from the Secretary?

16:09:30  5          I mean, how would I know whether -- you know, what

16:09:35  6   the Secretary considered in doing -- in making this

16:09:40  7   decision so -- to determine whether the decision was --

16:09:44  8   the reasonable decision-making was arbitrary and

16:09:46  9   capricious?

16:09:46  10         Where would it fit with the administrative record

16:09:49  11   and potential discovery which plaintiffs have asked for?

16:09:53  12          MR. HUMPHREYS:  Well, for the reasons stated in

16:09:54  13   our supplemental memorandum, Your Honor, we think the

16:09:56  14   Court can and should decide this motion on the

16:10:00  15   information already before the case -- excuse me, before

16:10:03  16   the Court.

16:10:04  17         And that is because, as the D.C. Circuit has

16:10:07  18   explained, the Court can evaluate jurisdictional

16:10:10  19   questions, like whether plaintiffs have suffered any

16:10:12  20   injury-in-fact without resorting to the administrative

16:10:17  21   record.

16:10:17  22         If the Court believes at this juncture that more

16:10:20  23   information is required, we do believe that an

16:10:22  24   administrative record is the appropriate way for the

16:10:26  25   Court to proceed.

16:10:27  1        Plaintiffs have opted to bring this claim as in --

16:10:31  2   their claims under the APA.  And as your Court

16:10:35  3   indicated, the general rule for APA review is the

16:10:38  4   administrative record.

16:10:39  5        We don't think that discovery would be appropriate.

16:10:42  6   Again, had plaintiffs chosen to plead this case through

16:10:45  7   the Privacy Act showing harm based on an individualized

16:10:50  8   disclosure, there may be discovery there.  But

16:10:53  9   plaintiffs have chosen the APA, and we think they should

16:10:57  10  be held to their choice.

16:10:58  11       THE COURT:  Okay.  Let me move to what Judge

16:11:01  12  Vargas did.  She concluded the plaintiffs in the case

16:11:04  13  before her were likely to succeed in showing that

16:11:07  14  Treasury's decision to give, quote, "the Treasury DOGE

16:11:10  15  team access to critical BFS payment systems with full

16:11:15  16  knowledge of the serious risks that access entailed was

16:11:19  17  arbitrary and capricious."

16:11:20  18       And she cited the inexplicable urgency and time

16:11:25  19  constraints under which this access was granted, which

16:11:28  20  she concluded, quote, "all but ensured that the launch

16:11:32  21  of the Treasury DOGE team was chaotic and haphazard,"

16:11:36  22  unquote.

16:11:37  23       Give me a reason why I should think differently.

16:11:41  24       MR. HUMPHREYS:  Well, we disagree, Your Honor.

16:11:44  25  As set forth in the EO, it is a priority of the

16:11:47  1    President to modernize agency systems, certainly

16:11:50  2    reasonable for the agency to act swiftly to implement

16:11:53  3    the President's priorities to combat waste, fraud, and

16:11:57  4    abuse and to modernize government systems.

16:12:00  5        Also I think the declaration, particularly the

16:12:04  6    Gioeli declaration, makes clear that the agency thought

16:12:06  7    this through.  There were risks identified and measures

16:12:08  8    put in place to combat that risk.

16:12:10  9        The fact that things moved quickly does not suggest

16:12:14  10   arbitrary and capriciousness, and we would disagree with

16:12:17  11   the characterization, Your Honor, that the rollout was

16:12:22  12   haphazard.

16:12:29  13            THE COURT:  Okay.  Let me -- and hopefully we

16:12:32  14   can move through this a little more -- I'm getting to

16:12:35  15   the end -- but a little more quickly.

16:12:38  16       In terms of Mr. Krause's employment status, he

16:12:42  17   started working -- he, Mr. Krause, started working at

16:12:45  18   Treasury on January 23rd.  He took the oath, was

16:12:50  19   onboarded, but his actual employment paperwork was not

16:12:54  20   processed until February 3rd.  And the paperwork

16:12:57  21   originally identified Mr. Krause's start date as

16:13:00  22   February 9th, which is more than two weeks after he

16:13:03  23   began working at the Treasury Department.

16:13:04  24       So on February 10th, the appointing official

16:13:08  25   executed a revised appointment documentation for

16:13:11  1    Mr. Krause, retroactively stating that his appointment

16:13:14  2    began on January 23rd.

16:13:17  3        On February 5th, the Secretary delegated to

16:13:20  4    Mr. Krause the duties of the Fiscal Assistant Secretary,

16:13:24  5    which is a leadership role with the responsibility for

16:13:26  6    BFS.  But between January 23rd and February 13th,

16:13:32  7    Mr. Krause was nominally a, quote, "consultant" for

16:13:37  8    Treasury.

16:13:38  9        A consultant cannot perform managerial or

16:13:42  10   supervisory work except as team leader or director of

16:13:45  11   the specific project for which he's been hired.  And a

16:13:48  12   consultant also cannot make final decisions on

16:13:52  13   substantive policies or otherwise function in the agency

16:13:55  14   chain of command.

16:13:58  15       Because of these restrictions, as I understand it,

16:14:01  16   the defendants represent that Mr. Krause did not, quote,

16:14:04  17   "assume the duties of the Fiscal Assistant Secretary

16:14:07  18   until he was appointed as a temporary transitional

16:14:11  19   Schedule C on February 13th."

16:14:14  20       Now, there are a couple other questions about, you

16:14:16  21   know, what his status was in the meantime.

16:14:19  22       The Payment Process Engagement Plan was entered

16:14:24  23   into in terms of the agreement on January 26th.  So did

16:14:29  24   he have the authority at that point to do so?  And if

16:14:36  25   not, who did?  Because in terms of February 26, which

16:14:42  1    would be between January 23rd and February 3rd, the date

16:14:51  2    they processed his appointment paperwork, so he seems to

16:14:56  3    have been a consultant from January 23rd to

16:15:00  4    February 13th, which would cover the period of the

16:15:03  5    January 26th.

16:15:04  6        So if he was a consultant, what was his authority?

16:15:08  7        Consultants don't have the authority to do

16:15:10  8    policymaking and a bunch of other things to have done

16:15:12  9    the engagement plan?  Or did somebody else have the

16:15:15  10   authority?

16:15:16  11       MR. HUMPHREYS:  No, correct, Your Honor.  He

16:15:17  12   was a consultant and working under the Secretary's Chief

16:15:24  13   of Staff, and therefore he exercised that authority, not

16:15:27  14   independent policymaking authority.

16:15:28  15       THE COURT:  So who -- but as I understand it,

16:15:32  16   he was involved in the -- unless I'm wrong, and correct

16:15:36  17   me -- I'll call it, for shorthand, the "engagement

16:15:40  18   plan," in terms of it being established and agreed to at

16:15:42  19   that point, he wouldn't have had authority as a

16:15:45  20   consultant.  So who basically did the agreement from the

16:15:50  21   perspective of presumably the DOGE team or whatever?

16:15:57  22       MR. HUMPHREYS:  I think the engagement plan

16:16:01  23   sets out the terms that Mr. Krause was going to be

16:16:05  24   performing.  It doesn't suggest that there's any

16:16:08  25   policymaking authority on his part, Your Honor.

16:16:10  1          THE COURT:  I thought that the engagement plan

16:16:12  2    had not only discussions of Mr. Krause but had

16:16:20  3    basically, you know -- you don't view them as the

16:16:22  4    changes, but the plaintiff does -- affecting access,

16:16:26  5    I'll put it that way -- in terms of who would be getting

16:16:29  6    access to the system.  I don't think it was the BFS

16:16:33  7    system.  It was another system.

16:16:35  8      But it went beyond just talking about Mr. Krause,

16:16:38  9    right?

16:16:39  10         MR. HUMPHREYS:  Well, yes, Your Honor.  And I

16:16:40  11   meant by "Mr. Krause," him and the Treasury DOGE team.

16:16:44  12   And, yes, it sets out the -- essentially the scope of

16:16:49  13   work that they will be performing, but, again, I don't

16:16:51  14   think that suggests that Mr. Krause had any policymaking

16:16:55  15   role at that time.

16:16:57  16     And the -- sorry.

16:16:59  17         THE COURT:  Go ahead.

16:17:01  18         MR. HUMPHREYS:  And of course, Your Honor, we

16:17:02  19   do disagree that there's any change in policy.  And

16:17:05  20   there's nothing -- plaintiffs had mentioned several

16:17:06  21   times about --

16:17:07  22         THE COURT:  Okay.

16:17:08  23         MR. HUMPHREYS:  Sure.

16:17:09  24         THE COURT:  So let's -- looking at the time

16:17:10  25   between January 23rd and February 9th, for Privacy Act

16:17:16  1    purposes, was he an officer, employee, or federal agency

16:17:19  2    during that time?

16:17:21  3              MR. HUMPHREYS:  Yes, Your Honor.  A consultant

16:17:22  4    is an employee for --

16:17:23  5              THE COURT:  As a consultant?

16:17:25  6              MR. HUMPHREYS:  Yes, Your Honor.

16:17:26  7              THE COURT:  And what confidentiality

16:17:28  8    obligations did Mr. Krause owe to the federal government

16:17:30  9    during those particular times?

16:17:34  10             MR. HUMPHREYS:  Those of any other employee, is

16:17:36  11   my understanding, Your Honor.  He was advised of his

16:17:39  12   need to keep information confidential.

16:17:41  13             THE COURT:  And what remedies would have been

16:17:43  14   available to enforce those obligations as a consultant?

16:17:51  15             MR. HUMPHREYS:  Well, he's a consultant on

16:17:53  16   behalf of the agency, Your Honor, so if he had --

16:17:55  17             THE COURT:  In terms of Treasury?

16:17:58  18             MR. HUMPHREYS:  What remedies --

16:18:00  19             THE COURT:  He was a consultant on "the

16:18:04  20   agency."

16:18:04  21        What did you mean by that?

16:18:05  22             MR. HUMPHREYS:  He's a consultant of the agency

16:18:07  23   and an employee --

16:18:09  24             THE COURT:  The agency being --

16:18:11  25             MR. HUMPHREYS:  The Treasury Department, Your

16:18:14   1   Honor.

16:18:14   2         THE COURT:  Okay.  That's what I'm trying to

16:18:15   3   get at.  Okay.

16:18:18   4      So he didn't assume the duties of Fiscal Assistant

16:18:24   5   Secretary until February 13th when he was appointed as a

16:18:27   6   temporary Schedule C employee rather than a consultant.

16:18:31   7      So how would you describe his duties before

16:18:34   8   February 13th?

16:18:34   9         MR. HUMPHREYS:  As a consultant providing

16:18:36   10   expertise on modernization and integration of systems,

16:18:43   11   which is the work that the Treasury DOGE did.

16:18:44   12         THE COURT:  Was he supervising or managing

16:18:48   13   anybody before February 13th that we know?

16:18:51   14         MR. HUMPHREYS:  He is the -- was the team

16:18:54   15   leader of the Treasury DOGE team, and so to some degree

16:18:57   16   at least, Mr. Elez, when he was at the Treasury

16:19:01   17   Department, worked under him.  But I don't -- in terms

16:19:08   18   of his direct supervisor, I don't believe so.

16:19:10   19         THE COURT:  Well, wouldn't he have been

16:19:12   20   supervising Mr. Elez?

16:19:15   21      I'm mispronouncing it, I'm sorry.

16:19:18   22         MR. HUMPHREYS:  No, Your Honor, I think you're

16:19:19   23   doing well.

16:19:22   24      In the sense that he is the team leader of the

16:19:25   25   Treasury Department -- excuse me, of the Treasury DOGE

16:19:26  1    team, I think he's providing direction to the team,

16:19:28  2    although I don't -- I don't know if he was his direct

16:19:32  3    supervisor.  I think the fact that he was a consultant

16:19:34  4    suggests not.  He was certainly the team leader

16:19:39  5    directing the team's work within the agency.  The agency

16:19:42  6    being Treasury.

16:19:46  7          THE COURT:  Okay.  Let me move back to

16:19:47  8    something I had talked to you earlier.

16:19:49  9       Let's assume hypothetically that the Treasury

16:19:53  10   Department disclosed records to Mr. Krause, and he was

16:19:54  11   acting in his capacity as the CEO of the software

16:20:01  12   company.  I take it you would agree that that would

16:20:04  13   violate the Privacy Act?  I mean, he has two hats.

16:20:08  14          MR. HUMPHREYS:  Yeah, if -- if the purpose of

16:20:10  15   providing him with the records was for his work in

16:20:14  16   his --

16:20:15  17          THE COURT:  Well, he's acting -- Mr. Krause

16:20:18  18   is -- my hypothetical has him acting in his capacity as

16:20:21  19   the CEO of a software company, and he is provided these

16:20:27  20   records not as for USDS.

16:20:32  21          MR. HUMPHREYS:  I think the Court should look

16:20:33  22   to the Privacy Act in 552(a)(B)(1), which talks about

16:20:38  23   whether or not there's a need for the record in the

16:20:41  24   performance of the duties.

16:20:43  25       So if there was no need for the records in the

16:20:46  1    performance of the duties, it would fall outside the

16:20:49  2    scope of that exception.

16:20:52  3              THE COURT:  But that doesn't fit my

16:20:54  4    hypothetical, does it?

16:20:59  5        I mean, I'm talking about him being the CEO of the

16:21:02  6    company, and he's in that capacity and he gets records.

16:21:05  7              MR. HUMPHREYS:  Right.  So in that -- I believe

16:21:07  8    in your hypothetical, Mr. Krause would be wearing his

16:21:09  9    hat as the --

16:21:10  10             THE COURT:  The CEO.

16:21:12  11             MR. HUMPHREYS:  The CEO.

16:21:13  12             THE COURT:  So would --

16:21:13  13             MR. HUMPHREYS:  And therefore --

16:21:14  14             THE COURT:  -- you would agree that it would

16:21:15  15    violate the Privacy Act?

16:21:17  16             MR. HUMPHREYS:  If he is not wearing his

16:21:18  17    Treasury Department hat?

16:21:19  18             THE COURT:  Right, right.

16:21:20  19             MR. HUMPHREYS:  Then, yes, I would agree with

16:21:22  20    that.

16:21:22  21             THE COURT:  Okay.  Because he's got two hats.

16:21:24  22    He's Treasury and then he's also the CEO of this other

16:21:30  23    company.

16:21:35  24        All right.  One last area.  Mr. Elez's

16:21:46  25    communications potentially outside the Treasury

1    Department.

16:21:50  2      Judge Vargas of the Southern District of New York

16:21:54  3    found based on representations during a PI hearing --

16:21:57  4    and of course I don't have the transcript, but she put

16:21:59  5    it in her opinion -- that was on February 14th -- that

16:22:03  6    Mr. Elez sent emails to USDS personnel outside the

16:22:07  7    Treasury Department.

16:22:10  8      That information is not in the record in this case;

16:22:13  9    however, it is consistent with the declaration of Joseph

16:22:17  10    Gioeli, which states that BFS officials, quote, "have

16:22:24  11    found no indication that Mr. Elez used his BFS's laptop

16:22:30  12    to share any BFS payment systems data outside the U.S.

16:22:38  13    Government."

16:22:38  14    "Mr. Elez had the ability to copy sensitive payment

16:22:41  15    data from BFS databases onto his BFS laptop."

16:22:48  16    Now, outside the U.S. Government, but would

16:22:53  17    there -- he didn't share it, but -- outside of the

16:22:57  18    Treasury Department, so who did he share it --

16:23:01  19    presumably, at some other government agency, but is

16:23:04  20    it --

16:23:05  21    MR. HUMPHREYS:  Well, we know, Your Honor, that

16:23:07  22    Mr. Elez shared information with the State Department as

16:23:10  23    part of the process to review payments in conjunction

16:23:15  24    with the President's Executive Order on foreign

16:23:19  25    assistance.  And there is a specific routine use for

16:23:21  1     that, number 17 of the applicable SORN.

16:23:25  2         THE COURT:  So that's the forensic analysis

16:23:27  3     that's been shown that it's the material from the State

16:23:31  4     Department?  That's not -- I wasn't at the hearing so

16:23:32  5     obviously I can't say, but that's not the impression

16:23:34  6     that I had that they were referring to that.

16:23:37  7         MR. HUMPHREYS:  I wasn't finished, Your Honor.

16:23:39  8     I wasn't at the hearing either and have been unable to

16:23:41  9     get a transcript, but I am aware of the quote that Judge

16:23:45  10    Vargas has in her opinion.

16:23:47  11        There is, for one, the State Department sharing of

16:23:51  12    information that we described in our declarations.  So

16:23:55  13    that would be one instance of --

16:23:56  14        THE COURT:  Is there anything else, though?  I

16:23:58  15    mean, the State Department we already know in terms of

16:24:00  16    their, you know, having looked at particular payments

16:24:03  17    that were being made, et cetera.  And then they may have

16:24:07  18    set up a different system where the State Department

16:24:09  19    looked at it before it got, you know, it got -- the

16:24:13  20    Treasury got involved and changed their procedures.  But

16:24:17  21    was there any other contact outside of the Treasury

16:24:27  22    Department other than the State Department, or do --

16:24:28  23        In other words, has the forensic analysis actually

16:24:30  24    been completed about all of it or not?

16:24:32  25        MR. HUMPHREYS:  The forensic analysis has not

16:24:34    1    been complete.  We are not aware of another sharing

16:24:39    2    currently.

16:24:40    3        I will note that -- I think it's important, Your

16:24:41    4    Honor, that the mere fact that information -- if we

16:24:44    5    later learn that information went to another federal

16:24:48    6    government agency, that does not necessarily mean that

16:24:50    7    anything improper happened.  Because just as with the

16:24:53    8    State Department sharing information, there may be a

16:24:56    9    routine use that would cover it, therefore, making it

16:25:02   10    completely lawful under the Privacy Act.

16:25:04   11        THE COURT:  But it does make a difference in

16:25:06   12    terms of who outside of the -- even if it's within the

16:25:08   13    government, who outside of the Treasury Department he

16:25:11   14    communicated with, you know, in terms of any

16:25:14   15    confidentiality requirements that bind the recipients of

16:25:17   16    them, in terms of, you know, any of the recipients, were

16:25:22   17    they employed by the Executive Office of the President.

16:25:25   18        Does the Privacy Act actually apply to them?  And

16:25:30   19    more pointedly, is the USDS an agency for purposes of

16:25:33   20    the Privacy Act?

16:25:34   21        So it does make a difference in terms of how the

16:25:44   22    information is shared with others outside of Treasury

16:25:51   23    but still within the government.

16:25:52   24        MR. HUMPHREYS:  Well, yes, Your Honor.  And if

16:25:54   25    it were discovered that there was a disclosure outside

16:25:58   1      of the Treasury Department and --

16:26:00   2                THE COURT:  Just with State, as far as you

16:26:02   3      know.

16:26:02   4                MR. HUMPHREYS:  No, the only one that I'm aware

16:26:04   5      of is the State Department, Your Honor.

16:26:05   6                THE COURT:  I'm sorry?

16:26:06   7                MR. HUMPHREYS:  The only one that I'm aware of,

16:26:08   8      information-sharing, is with the State Department.  But

16:26:11   9      I mean, my point is if there is -- if there were such a

16:26:13  10      disclosure, plaintiffs, if harmed, could bring a

16:26:17  11      challenge regarding that disclosure and seek monetary

16:26:22  12      damages.

16:26:22  13                THE COURT:  Okay.  So let me just ask.  You're

16:26:26  14      arguing that -- let's assume that they disclosed the

16:26:29  15      payment records to the State Department.  And they

16:26:32  16      didn't violate the Privacy Act because they were

16:26:36  17      complying with the routine use exception.  And you

16:26:39  18      invoke Routine Use 17 which allows disclosures for

16:26:42  19      purposes of identifying, preventing, and recouping, say,

16:26:46  20      improper payments.

16:26:47  21           I believe that's what you argued, am I correct?

16:26:49  22                MR. HUMPHREYS:  That's correct, Your Honor.

16:26:51  23                THE COURT:  Okay.  Why were those payments

16:26:52  24      improper within the meaning of the Routine Use 17?

16:26:57  25           Is it because they were improper because they were

16:27:00  1  inconsistent with the President's Executive Order

16:27:03  2  purporting to pause foreign aid payments that are not

16:27:07  3  aligned with the foreign policy?

16:27:09  4      Is there any other reason they were improper?

16:27:11  5      I mean, there's no allegation that they were

16:27:14  6  fraudulent or not duly authorized by Congress, correct?

16:27:19  7          MR. HUMPHREYS:  Well, I'm not saying they were

16:27:20  8  or weren't improper, Your Honor.  My understanding is

16:27:22  9  that all those payments were ultimately approved, only

16:27:25  10  that the sharing of information in order to determine,

16:27:26  11  in conjunction with the State Department, whether or not

16:27:29  12  they are proper is a permitted routine use in the

16:27:33  13  published SORN.

16:27:36  14          THE COURT:  But it's all based on it being

16:27:39  15  improper, right, in terms of not some other

16:27:43  16  fraudulent --  or whatever.  So let me test this with

16:27:51  17  another one of these hypotheticals.

16:27:54  18      The President can't just decide that something is

16:27:57  19  improper through an Executive Order and then remove the

16:28:00  20  Privacy Act protections.  Let's assume that the

16:28:04  21  President decides there's a policy that elected

16:28:07  22  officials shouldn't voluntarily take itemized tax

16:28:11  23  deductions and should take the standard deductions.

16:28:16  24      Would a tax refund to a politician's itemized

16:28:20  25  deductions be improper within the routine use?  And

16:28:24  1    would Mr. Krause be complying with Routine Use 17 if he

16:28:27  2    went through the Treasury database, identified tax

16:28:32  3    returns for members of Congress who took itemized

16:28:35  4    deductions and then reported them as improper payments,

16:28:40  5    using my hypothetical?

16:28:41  6        MR. HUMPHREYS:  If I understand it correctly,

16:28:43  7    Your Honor, for the purposes of the Privacy Act alone,

16:28:46  8    if there were a question about whether or not any

16:28:51  9    particular payment were proper, it would be permissible

16:28:57  10   to share the information from the Treasury Department

16:29:00  11   to, in this instance, the consulting agency to determine

16:29:05  12   whether or not those payments are proper or not.

16:29:08  13       And so I --

16:29:12  14       THE COURT:  But they would be improper based on

16:29:15  15   the Executive Order, as I understand it, not on

16:29:18  16   something else -- at least as I understood it from the

16:29:21  17   State Department.

16:29:23  18       So I gave you a -- you know, another hypothetical

16:29:27  19   why it's -- you know, in terms of its -- there's nothing

16:29:31  20   fraudulent or anything about these, particularly in

16:29:34  21   terms of -- but it's strictly that it's based on an

16:29:40  22   Executive Order that came down that's made it improper.

16:29:44  23       MR. HUMPHREYS:  I think it would depend, Your

16:29:46  24   Honor, on -- in the context of that hypothetical what

16:29:48  25   else Congress restrictions had established and whether

16:29:51  1    or not the Executive Order conflicted with them.  And I

16:29:55  2    don't think we have anything present as to the State

16:29:59  3    Department that would impose those same sort of

16:30:02  4    restrictions.  But, again, I think sharing information,

16:30:06  5    just to determine whether or not something is improper

16:30:09  6    or to ask the opinion of another agency, as permitted

16:30:14  7    explicitly by the SORN, falls within the scope of Number

16:30:23  8    17.

16:30:23  9         THE COURT:  Okay.  So my last question really

16:30:26  10   gets to the irreparable harm in terms of the sharing

16:30:43  11   outside of the federal government.  Obviously, we'd

16:30:47  12   agree with that, that that's irreparable harm.  The

16:30:51  13   question is whether outside of the Treasury Department

16:30:52  14   whether that's an issue.

16:30:54  15       Have there been steps taken to mitigate risks of

16:30:58  16   harm at this point or in the future in terms of making

16:31:02  17   sure that the mistakes that were made with Mr. Elez

16:31:05  18   have -- don't get repeated?

16:31:08  19         MR. HUMPHREYS:  I'm not sure I agree with the

16:31:09  20   premise to start, Your Honor.

16:31:10  21       I mean, the only mistake that I'm aware of, and I

16:31:14  22   believe our Treasury is aware of, with respect to

16:31:17  23   Mr. Elez is the short period of time in which he was

16:31:20  24   given write access in addition to read access.

16:31:29  25       Write, W-R-I-T-E.

16:31:29  1          THE COURT:  Well, I'm just saying though, a

16:31:30  2  mistake is a mistake.  And the point I'm getting at is:

16:31:33  3  Has that made it clear to Treasury that maybe they need

16:31:36  4  better procedures or training or whatever, as Judge

16:31:39  5  Vargas had indicated?

16:31:40  6          MR. HUMPHREYS:  Your Honor, well -- the agency

16:31:42  7  has --

16:31:43  8          THE COURT:  That -- she's going to require it.

16:31:45  9  She made some findings.  I take it you disagree with

16:31:47  10  them, but has the Treasury done anything to implement

16:31:51  11  it, even before she did her order?

16:31:54  12          MR. HUMPHREYS:  Well, with the read/write

16:31:59  13  error, the access that Mr. Elez very briefly had, the

16:32:03  14  agency became aware of it and corrected it before

16:32:06  15  Mr. Elez, we believe, ever knew about his write access

16:32:09  16  in order -- or ever logged into the system.

16:32:11  17      So, yes, that was a mistake, but the agency found

16:32:14  18  it out on its own accord and, yes, has corrected that,

16:32:17  19  and I'm sure will be very aware to make sure that, you

16:32:20  20  know, the proper access is granted going forward.

16:32:23  21          THE COURT:  So will there be any kind of

16:32:25  22  procedures, if you know, by the defendants who are

16:32:30  23  logging or monitoring the activities of the Treasury

16:32:34  24  DOGE team members when they interact with the BFS

16:32:37  25  systems?

16:32:38    1            MR. HUMPHREYS:  Yes, Your Honor, as

16:32:39    2    described --

16:32:39    3            THE COURT:  In terms of doing some -- to make

16:32:41    4    sure -- especially if it goes outside of the Treasury

16:32:46    5    Department?

16:32:48    6            MR. HUMPHREYS:  Excuse me, Your Honor.

16:32:48    7        Yes, Your Honor.  The Gioeli declaration explains

16:32:53    8    many steps that were taken to mitigate risks with

16:32:55    9    respect to members of the Treasury --

16:32:57   10            THE COURT:  So there will be -- what I'm asking

16:33:01   11    is, is there a system of monitoring and logging in so

16:33:03   12    that you can keep track of where information goes, if it

16:33:06   13    goes outside of Treasury?

16:33:07   14            MR. HUMPHREYS:  Yes, Your Honor.

16:33:08   15            THE COURT:  Okay.  All right.  It's gotten

16:33:11   16    late.  My questions took longer, but let me take -- I

16:33:16   17    take it back.  I have one last question, which I forgot,

16:33:21   18    and then we'll take a break.

16:33:23   19        And at this point if there's something additional

16:33:25   20    you want to raise for me, that's fine, you know, that I

16:33:28   21    should be focused on.  If not, we'll move to next

16:33:33   22    steps.

16:33:34   23        So let me -- let's make an assumption here that

16:33:36   24    there was a disclosure from Treasury to USDS.

16:33:43   25        Now, any harm from that disclosure might be mooted

16:33:47  1    if the Privacy Act prohibits further disclosures by USDS

16:33:51  2    employees.  But the Privacy Act applies only to

16:33:54  3    government agencies, and the agencies adopt the FOIA's

16:33:59  4    definition of what it means to be a government agency.

16:34:03  5        And is USDS an agency within the meaning of FOIA,

16:34:08  6    which means the Privacy Act applies?

16:34:13  7        MR. HUMPHREYS:  We've not briefed that issue in

16:34:14  8    this case.  I know some of my colleagues have and have

16:34:17  9    taken a position that it is not.

16:34:20  10        THE COURT:  So it's -- well, they've indicated

16:34:25  11    that it's a government agency, correct, USDS?  Or not?

16:34:31  12        MR. HUMPHREYS:  I don't know the answer to

16:34:33  13    that, Your Honor.

16:34:33  14        THE COURT:  I'm sorry?

16:34:34  15        MR. HUMPHREYS:  I don't know the answer to

16:34:35  16    that.  It's not been presented.

16:34:38  17        THE COURT:  Would you agree that if it was -- I

16:34:40  18    mean, if it was an agency, it has to follow the

16:34:42  19    definition of FOIA, which means you would be subject to

16:34:44  20    FOIA as well?

16:34:47  21        You don't know one way or the other?

16:34:51  22        MR. HUMPHREYS:  No, my understanding is it's a

16:34:52  23    complicated body of law out there.

16:34:53  24        THE COURT:  No, no, no, I'm just asking you

16:34:55  25    whether -- if USDS is an agency, using the FOIA

16:35:01  1    definition, then that's what I'm asking you:  Is USDS

16:35:05  2    a -- an agency, and what's required is that you use the

16:35:09  3    definition that happens to be in the FOIA statute, which

16:35:12  4    would seem to assume that you would then be subject to

16:35:15  5    FOIA.  But that's not -- I'm not getting into FOIA.  I'm

16:35:19  6    just asking you whether USDS is an agency.

16:35:20  7            MR. HUMPHREYS:  I don't -- that hasn't been

16:35:22  8    presented in this case, Your Honor.

16:35:24  9            THE COURT:  Okay.  Let me take a break at this

16:35:26  10   point and -- I'm assuming we've covered everything, but

16:35:31  11   if there's something you want to bring up, plaintiff,

16:35:33  12   I'll let you -- get me to focus on something that you

16:35:36  13   think based on the answers that would be -- you want to

16:35:41  14   bring up, and then we'll move forward to what we need to

16:35:44  15   do next steps, no matter what I do with the PI.

16:35:49  16       So let me -- so it should be a short conversation.

17   (Pause)

16:36:18  18           THE COURT:  The court reporter has kindly said

16:36:20  19   ten minutes, so about a quarter to 5:00, and we should

16:36:24  20   be done by 5:00.  So let's take a quick break.

16:51:45  21       (Court in recess at 4:36 p.m.)

16:51:45  22       (After recess, 4:51 p.m.)

16:51:52  23           THE COURT:  Okay.  I do have one additional

16:51:54  24   question, defense counsel.

16:52:03  25       So the President's Executive Order establishing the

16:52:06  1    U.S. DOGE Service provides in Section 4(b), and I'm

16:52:12  2    going to read exactly what it says:

16:52:13  3        "Agency heads shall take all necessary steps in

16:52:19  4    coordination with the USDS administrator and to the

16:52:25  5    maximum extent consistent with law to ensure that USDS

16:52:29  6    has full and prompt access to all unclassified agency

16:52:33  7    records, software systems, and IT systems.  USDS shall

16:52:43  8    adhere to rigorous data protection standards."

16:52:43  9        Based on the Executive Order, which I've just read,

16:52:46  10    what is the defendant's position on the extent to which

16:52:49  11    it would be quote, "consistent with law," unquote, to

16:52:52  12    provide USDS with full and prompt access to BFS payment

16:52:58  13    systems as directed by the Executive Order?

16:53:01  14            MR. HUMPHREYS:  Our position, Your Honor, is

16:53:03  15    that the "consistent with law" phrase there incorporates

16:53:06  16    or refers to also the Privacy Act and the Internal

16:53:10  17    Revenue Code.

16:53:11  18        So sharing information from Treasury to USDS would

16:53:15  19    only be permissible as authorized by those specific

16:53:20  20    statutes, including whatever restrictions --

16:53:23  21            THE COURT:  So in the absence of an injunction

16:53:25  22    from this Court or the Southern District of New York,

16:53:31  23    you would give access to USDS officials based on the

16:53:37  24    Executive Order.

16:53:37  25        Do I understand that correctly?

16:53:40  1           MR. HUMPHREYS:  No, Your Honor.  I did not mean

16:53:41  2    to say that at all.  Only to the extent that the Privacy

16:53:44  3    Act or the Internal Revenue Code allowed so -- because

16:53:50  4    plaintiffs are claiming here an APA violation based on a

16:53:52  5    violation of the Privacy Act or the Internal Revenue

          6    Code.

16:53:55  7           What I'm saying is that the defendants, the

16:53:57  8    Treasury Department, would not share information with

16:54:00  9    USDS unless it were authorized by the Privacy Act or the

16:54:05  10   Internal Revenue Code.

16:54:06  11          So, for example, with the Privacy Act, there would

16:54:10  12   need to be a routine use published in the Systems of

16:54:13  13   Record Notice and applied and allowed for under the

16:54:18  14   Privacy Act the sharing of that information.

16:54:19  15          THE COURT:  So from your perspective, the

16:54:22  16   Executive Order would not authorize them to go forward

16:54:29  17   and provide USDS with access; is that what you're

16:54:34  18   saying?

16:54:34  19          MR. HUMPHREYS:  Not in all circumstances.

16:54:35  20   There would have to be a reason consistent with the

16:54:37  21   Privacy Act that allowed for the sharing of that

16:54:39  22   information, which is what the "consistent with law"

16:54:42  23   means there.

16:54:43  24          If it would violate the Privacy Act, then the

16:54:45  25   defendants would not share that information, or the

000820

16:54:47  1    Internal Revenue Code --

16:54:59  2              THE COURT:  Okay.  I'm obviously going to take

16:55:01  3    this under advisement.  At this point I'm inclined to

16:55:03  4    conclude that plaintiffs do have standing.  So we'll be

16:55:07  5    moving forward and the Court will be taking it under

16:55:09  6    advisement.

16:55:11  7         D.C. Circuit case law requires that I have the

16:55:14  8    administrative record to rule on the merits, and many of

16:55:18  9    the arguments from the defendants today appear to boil

16:55:22  10   down to an argument on the merits.  So I'm inclined at

16:55:25  11   this point to conclude that the plaintiffs do have

16:55:29  12   standing and that I do need the administrative record.

16:55:32  13        So when can you produce it?  What kind of a

16:55:37  14   timeline do you have?

16:55:40  15        Hopefully somebody has thought about it?

16:55:47  16             MR. HUMPHREYS:  May I confer for just a moment

16:56:07  17   with my colleagues?

16:56:08  18             THE COURT:  Sure.

16:56:09  19        (Counsel conferring)

16:56:14  20             MR. HUMPHREYS:  Thank you, Your Honor.

16:56:16  21        We'd ask for two weeks.  If there's any way we can

16:56:20  22   file it sooner than that, we certainly will.

16:56:23  23             THE COURT:  Sure.  Can you give me a date?

16:56:25  24        Let me just look.

16:56:30  25        So March 10th?  That's two weeks.

16:56:32  1           MR. HUMPHREYS:  Yes, Your Honor.

16:56:34  2           THE COURT:  Okay.  Has anybody thought about

16:56:36  3    what's going to happen next or what you're proposing

16:56:39  4    next?  Motions or whatever else, if anybody's got ideas?

16:56:46  5       I mean, this is the time to say something.

16:56:49  6           MR. HUMPHREYS:  Since I'm here --

        7           THE COURT:  Plaintiffs or defendants?

16:56:49  8           MR. HUMPHREYS:  -- we would propose a motion to

16:56:52  9    dismiss, Your Honor.

16:56:56  10          THE COURT:  Okay.  Anything from the plaintiff?

16:56:58  11   I'm trying to set a schedule while everybody is here

16:57:01  12   instead of trying to do it at a later point.

16:57:03  13          MR. JOSHI:  Yes.  If they are proceeding with a

16:57:05  14   motion to dismiss, we would proceed with a cross-motion

16:57:07  15   for summary judgment, but the record would be helpful in

16:57:12  16   that process.

16:57:13  17          THE COURT:  I'm sorry, I missed the last part.

16:57:16  18          MR. JOSHI:  The record, having the

16:57:18  19   administrative record --

16:57:21  20          THE COURT:  The administrative record, okay.

        21          MR. JOSHI:  -- and seeing what that consists --

16:57:22  22          THE COURT:  I don't know whether today you're

16:57:24  23   in a position to give me a schedule or you need to

16:57:26  24   confer among yourselves and with opposing counsel and

16:57:30  25   propose one for the motion to dismiss or the

16:57:32  1    cross-motion.

16:57:36  2        I'm sorry, I was talking while you all were

16:57:39  3    conferring.  Let me let you confer.

          4        (Counsel conferring)

16:57:42  5        THE COURT:  Okay.  So what I was going to do is

16:57:45  6    suggest a schedule for the motion to dismiss, and if

16:57:47  7    they file them, cross-motion.

16:57:49  8        In terms of a schedule, we can either set it now or

16:57:53  9    if you need to confer and talk to each other and propose

16:57:57  10   a schedule, I can, you know, wait, and you can give it

16:58:02  11   to me tomorrow.

16:58:02  12       I don't know whether you all have thought about it

16:58:04  13   already and -- or you can have a quick discussion or --

16:58:09  14       I'll give you a few minutes to talk, if you want.

16:58:19  15       (Counsel conferring)

16:58:48  16       THE COURT:  One question, obviously, is whether

16:58:52  17   I should resolve the PI before briefing on the motion to

16:58:55  18   dismiss or -- resolve it or hold it in abeyance.

16:59:01  19       I don't know what people's positions are.

16:59:05  20       MR. HUMPHREYS:  May I make a point on that,

16:59:07  21   Your Honor?

16:59:07  22       THE COURT:  Sure.

16:59:07  23       MR. HUMPHREYS:  So the government respectfully

16:59:11  24   asks that the Court would decide the PI motion before

16:59:12  25   briefing on the motion to dismiss.

16:59:13  1          Our agreement to an order in this case to maintain

16:59:16  2     the status quo is premised on an understanding that that

16:59:19  3     agreed-upon order would last for only a very short

16:59:22  4     period of time.  And defendants believe --

16:59:26  5          THE COURT:  Well, I understand that the PI

16:59:31  6     would end when the -- I mean, the agreement would end

16:59:36  7     once the Court issued whatever I did on the PI,

16:59:41  8     depending on what you're doing with the motion to

16:59:43  9     dismiss.

16:59:44  10         What's your schedule for that?

16:59:47  11         MR. HUMPHREYS:  We are going to confer on that,

16:59:49  12    Your Honor.

16:59:49  13         MR. JOSHI:  Yes.

16:59:50  14         THE COURT:  Do you have a date?

16:59:51  15         Tell me what the dates are.

16:59:53  16         MR. HUMPHREYS:  We were hoping to confer off

16:59:57  17    line and touch base with our clients --

17:00:01  18         THE COURT:  I'm sorry?

          19         MR. HUMPHREYS:  We were hoping to confer also

17:00:00  20    with our clients and then file something.

17:00:01  21         THE COURT:  And then come back?  Okay.

17:00:03  22         Plaintiffs, in terms of holding off or not holding

17:00:05  23    off?

17:00:06  24         MR. JOSHI:  We would just -- we would ask the

17:00:11  25    Court to determine the PI.  We have this consent order

| 17:00:15 | 1 | in place but it's reached by agreement. |

```
17:00:15   1    in place but it's reached by agreement.

17:00:18   2        We would point out on the irreparable harm the

17:00:21   3    Treasury officials' brief that talks about how things --

17:00:29   4    how it worked at the Treasury and the harms that would

17:00:31   5    result in changes, but we would -- I think the decision

17:00:34   6    on the PI would help --

17:00:38   7        THE COURT:  So at this point I should go ahead

17:00:39   8    and make the decision on the PI separate from whatever

17:00:42   9    you come up with for the motion to dismiss, if I

17:00:45  10    understand you correctly?

17:00:46  11        MR. JOSHI:  That's our preference.

17:00:48  12        THE COURT:  Okay.  So you both have the same

17:00:50  13    view, it sounds like?

17:00:53  14        MR. HUMPHREYS:  Yes, Your Honor.  We agree.

17:00:54  15        THE COURT:  Okay.  All right.

17:01:00  16        Then obviously, confer with your clients.  If you

17:01:01  17    can get back -- why don't you file a proposed schedule?

17:01:06  18    We don't need to discuss it again.  And I'll issue an

17:01:09  19    order in terms of, you know, how the motions are to be

17:01:14  20    filed and whatever, you know, conditions, et cetera, are

17:01:18  21    done.

17:01:19  22        Okay.  So March 10th is the administrative record,

17:01:24  23    and then the Court will go forward with making a

17:01:27  24    decision on the PI and the motion to dismiss, you know,

17:01:31  25    you'll give me a briefing.  Motion to dismiss and
```

17:01:35    1    cross-motion for summary judgment.

17:01:38    2         Okay.  Anything else at this point?

17:01:40    3         Plaintiffs?

17:01:40    4              MR. JOSHI:  No, Your Honor.

17:01:41    5              THE COURT:  Defendants?

17:01:43    6              MR. HUMPHREYS:  No, Your Honor.

17:01:46    7              THE COURT:  All right.  The parties are

17:01:47    8    excused.  Take care.

17:01:48    9         (Court adjourned 5:01 p.m.)

17:01:54    10

            11                        - - - - -

            12

            13

            14

            15                      CERTIFICATE

            16

            17         I, Chandra Kean, RMR, certify that the foregoing is

            18    a correct transcription from the record of proceedings

            19    in the above-titled matter.

            20

            21    _____        February 25, 2025

            22         Chandra Kean, RMR                    DATE

            23

            24

            25

## 1

**1** [1] - 23:5
**10th** [3] - 98:24, 119:25, 123:22
**12th** [2] - 62:1, 71:14
**13th** [6] - 99:6, 99:19, 100:4, 103:5, 103:8, 103:13
**14th** [1] - 106:5
**17** [8] - 38:24, 39:1, 92:19, 107:1, 109:18, 109:24, 111:1, 112:8
**17th** [2] - 61:3, 61:16
**1997** [1] - 74:8
**19th** [4] - 54:16, 55:9, 57:5, 62:10

## 2

**2** [1] - 65:22
**2010** [1] - 74:7
**2025** [1] - 124:21
**2026** [1] - 27:11
**21st** [1] - 36:4
**23rd** [8] - 34:24, 35:5, 98:18, 99:2, 99:6, 100:1, 100:3, 101:25
**25** [1] - 124:21
**25-313** [1] - 3:3
**25-CV-429** [1] - 61:4
**26** [1] - 99:25
**26th** [3] - 35:22, 99:23, 100:5
**28th** [1] - 15:18
**2:03** [1] - 3:2

## 3

**3rd** [3] - 61:18, 98:20, 100:1

## 4

**4** [1] - 71:14
**4(b** [1] - 117:1
**4:36** [1] - 116:21
**4:51** [1] - 116:22

## 5

**540** [1] - 23:1
**552(a)(B** [1] - 91:22
**552(a)(B)(1** [1] - 104:22
**552(a)(B)(1)** [1] - 92:3, 92:16
**5:00** [2] - 116:19, 116:20
**5:01** [1] - 124:9
**5th** [1] - 99:3

## 7

**702** [9] - 16:15, 16:16, 17:18, 20:9, 20:13, 76:6, 85:15, 87:4, 87:7
**704** [6] - 20:12, 20:21, 24:13, 87:8, 88:3, 93:1

## 8

**8th** [1] - 61:21

## 9

**9th** [3] - 34:25, 98:22, 101:25

## A

**abeyance** [1] - 121:18
**ability** [5] - 24:5, 36:12, 37:11, 51:11, 106:14
**able** [8] - 11:8, 36:6, 36:9, 39:23, 51:20, 92:5, 93:7, 94:2
**above-titled** [1] - 124:19
**abroad** [1] - 27:24
**absence** [2] - 93:2, 117:21
**absent** [1] - 11:23
**absolutely** [2] - 43:3, 78:11
**abuse** [2] - 38:3, 98:4
**accept** [2] - 29:22, 48:3
**access** [71] - 3:12, 9:9, 9:13, 12:24, 13:20, 15:20, 15:21, 19:12, 19:23, 21:8, 24:22, 24:23, 25:18, 26:19, 27:21, 34:5, 35:15, 36:12, 36:25, 37:11, 38:4, 38:9, 38:10, 38:11, 42:18, 46:8, 51:22, 52:19, 52:20, 55:24, 56:8, 56:13, 76:23, 77:2, 81:1, 81:24, 82:16, 83:7, 83:18, 85:9, 85:10, 86:25, 88:20, 89:12, 89:21, 90:3, 90:11, 90:15, 90:20, 90:25, 92:10, 92:11, 92:14, 95:25, 97:15, 97:16, 97:19, 101:4, 101:6, 112:24, 113:13, 113:15, 113:20,

117:6, 117:12, 117:23, 118:17
**accessed** [4] - 80:16, 80:24, 81:7, 81:15
**accessing** [1] - 25:13
**accommodate** [1] - 15:10
**accompli** [1] - 47:23
**accord** [1] - 113:18
**according** [2] - 34:23, 41:3
**account** [1] - 40:16
**accurate** [2] - 52:23, 73:22
**acknowledge** [1] - 87:25
**act** [1] - 98:2
**Act** [87] - 6:6, 6:8, 11:20, 17:2, 17:20, 17:21, 17:25, 18:7, 18:9, 18:16, 19:2, 19:10, 19:16, 19:17, 20:10, 21:10, 22:6, 22:12, 22:13, 22:20, 23:6, 23:9, 23:11, 28:23, 28:24, 29:1, 29:4, 29:8, 31:1, 32:1, 36:22, 37:3, 37:6, 43:23, 44:1, 49:17, 56:23, 76:7, 77:15, 77:19, 78:1, 79:22, 81:16, 86:5, 86:6, 86:8, 86:12, 86:14, 86:18, 86:20, 86:23, 87:3, 87:18, 91:5, 91:16, 91:21, 93:10, 93:20, 94:11, 94:17, 95:1, 95:13, 95:15, 97:7, 101:25, 104:13, 104:22, 105:15, 108:10, 108:18, 108:20, 109:16, 110:20, 111:7, 115:1, 115:2, 115:6, 117:16, 118:3, 118:5, 118:9, 118:11, 118:14, 118:21, 118:24
**Act's** [1] - 92:11
**Act-related** [1] - 23:9
**acting** [8] - 35:9, 62:15, 71:2, 72:24, 75:4, 104:11, 104:17, 104:18
**Acting** [1] - 65:21
**action** [34] - 6:6, 10:21, 12:5, 19:25, 20:1, 20:4, 23:10, 24:12, 24:14, 24:19, 25:2, 25:25, 26:1,

26:5, 26:12, 27:19, 28:6, 40:20, 42:15, 76:21, 88:3, 88:4, 88:5, 88:12, 88:13, 88:19, 89:1, 89:3, 89:4, 89:25, 90:24, 93:7, 93:14
**actions** [8] - 19:7, 54:15, 70:18, 89:7, 89:8, 89:18, 94:3, 94:4
**activities** [1] - 113:23
**activity** [1] - 41:25
**actual** [9] - 12:1, 36:22, 39:18, 48:6, 76:9, 77:3, 77:16, 77:17, 98:19
**add** [8] - 13:8, 14:18, 16:6, 25:25, 39:8, 50:23, 51:1, 88:1
**addition** [3] - 6:14, 29:15, 112:24
**additional** [8] - 5:7, 5:9, 13:9, 17:11, 74:5, 75:12, 114:19, 116:23
**address** [8] - 6:20, 10:16, 21:20, 39:9, 40:3, 40:5, 40:7, 42:25
**addressed** [2] - 22:2, 85:2
**addresses** [1] - 23:13
**adequate** [7] - 20:21, 20:23, 21:4, 76:5, 92:23, 93:2, 94:20
**adhere** [2] - 15:16, 117:8
**adjourned** [1] - 124:9
**administration** [4] - 41:14, 41:15, 41:19, 42:8
**administrative** [12] - 9:7, 30:9, 96:2, 96:10, 96:20, 96:24, 97:4, 119:8, 119:12, 120:19, 120:20, 123:22
**Administrative** [3] - 77:15, 78:1, 86:19
**administrator** [35] - 48:25, 54:10, 54:21, 54:23, 57:14, 57:23, 58:15, 58:17, 59:13, 59:17, 59:20, 61:7, 62:22, 63:2, 63:11, 65:8, 65:13, 65:22, 65:25, 66:2, 66:4, 66:8, 68:7, 68:8, 68:12, 68:15, 69:2,

69:10, 69:11, 69:14, 70:7, 71:25, 75:4, 75:5, 117:4
**adopt** [1] - 115:3
**advancing** [1] - 7:17
**advantage** [2] - 83:2, 83:16
**adverse** [2] - 95:11, 95:12, 95:18
**advised** [1] - 102:11
**advisement** [2] - 119:3, 119:6
**adviser** [6] - 63:25, 64:12, 64:16, 65:2, 65:3, 65:5
**affect** [3] - 17:22, 91:18, 93:25
**affecting** [1] - 101:4
**affidavit** [1] - 4:7
**affidavits** [3] - 7:4, 52:9, 60:25
**afforded** [1] - 21:22
**afternoon** [2] - 3:23, 3:24
**afterwards** [1] - 63:10
**agencies** [13] - 12:23, 28:17, 28:25, 30:5, 39:19, 40:18, 42:13, 45:24, 47:15, 60:12, 79:21, 115:3
**agency** [84] - 12:20, 12:21, 16:18, 19:7, 19:11, 21:11, 24:12, 24:14, 24:15, 24:19, 25:2, 25:16, 25:25, 26:1, 26:5, 27:19, 28:6, 29:1, 29:5, 30:24, 39:2, 42:14, 43:15, 46:5, 46:9, 46:23, 48:21, 49:16, 49:19, 49:21, 50:1, 50:2, 50:13, 68:4, 69:21, 70:20, 76:21, 81:16, 84:2, 85:19, 88:2, 88:4, 88:11, 88:13, 88:19, 89:1, 89:3, 89:4, 89:8, 89:13, 89:14, 89:25, 90:24, 93:7, 93:14, 98:1, 98:2, 98:6, 99:13, 102:1, 102:16, 102:20, 102:22, 102:24, 104:5, 106:19, 108:6, 108:19, 111:11, 112:6, 113:6, 113:14, 113:17, 115:4, 115:5, 115:11, 115:18, 115:25,

116:2, 116:6, 117:3,
117:6
**agency's** [3] - 21:11,
28:4, 88:6
**agents** [1] - 39:3
**aggrieved** [1] - 19:6
**ago** [1] - 62:15
**agree** [15] - 21:3, 25:9,
32:23, 33:9, 33:16,
45:23, 81:22, 82:3,
104:12, 105:14,
105:19, 112:12,
112:19, 115:17,
123:14
**agreed** [4] - 35:22,
61:23, 100:18, 122:3
**agreed-upon** [1] -
122:3
**agreement** [8] - 35:24,
37:22, 89:25, 99:23,
100:20, 122:1,
122:6, 123:1
**Agriculture** [2] -
87:17, 87:22
**ahead** [3] - 50:22,
101:17, 123:7
**aid** [5] - 26:24, 27:3,
27:4, 27:16, 110:2
**akin** [1] - 11:15
**al** [1] - 3:4
**albeit** [1] - 22:25
**aligned** [1] - 110:3
**allegation** [2] - 32:20,
110:5
**alleged** [1] - 78:9
**allegedly** [1] - 95:2
**Alliance** [1] - 3:4
**Allison** [1] - 3:3
**allow** [11] - 29:2,
39:24, 46:14, 47:12,
79:12, 79:14, 79:16,
79:20, 90:25, 95:16,
96:3
**allowed** [6] - 15:19,
76:23, 80:10, 118:3,
118:13, 118:21
**allowing** [1] - 92:8
**allows** [7] - 10:14,
22:16, 29:4, 29:8,
39:1, 41:12, 109:18
**alluded** [1] - 11:15
**alone** [2] - 91:10,
111:7
**Alston** [1] - 65:20
**alternate** [2] - 92:23,
93:18
**Alternative** [1] - 20:21
**alternative** [4] - 20:23,
76:5, 87:12, 94:20
**alternatives** [3] -

42:22, 43:22, 95:24
**ambiguity** [2] - 30:1,
30:12
**Americans** [1] - 3:4
**analog** [3] - 10:5,
10:11, 84:15
**analogous** [1] - 12:10
**analogs** [2] - 13:22,
84:20
**analogy** [3] - 10:2,
85:6, 85:11
**analysis** [11] - 9:16,
38:20, 43:13, 44:10,
53:12, 90:24, 91:2,
95:8, 107:2, 107:23,
107:25
**analyzing** [1] - 12:5
**answer** [13] - 4:21,
6:21, 8:10, 35:25,
45:14, 54:19, 57:1,
57:17, 65:10, 67:10,
73:21, 115:12,
115:15
**answering** [1] - 4:18
**answers** [1] - 116:13
**ante** [1] - 47:12
**anyway** [2] - 33:4,
44:17
**APA** [53] - 8:19, 11:8,
16:14, 16:16, 17:11,
17:16, 17:20, 17:21,
18:6, 18:14, 18:16,
18:21, 19:5, 19:15,
19:22, 19:25, 20:2,
20:7, 20:9, 20:17,
20:21, 20:24, 20:25,
21:7, 21:14, 22:16,
22:17, 23:6, 23:9,
23:14, 24:3, 24:13,
42:13, 85:15, 86:6,
87:12, 88:10, 89:3,
89:15, 89:19, 89:22,
91:9, 92:24, 93:8,
93:14, 94:16, 94:20,
95:17, 97:2, 97:3,
97:9, 118:4
**APA's** [2] - 17:15,
88:13
**apologize** [1] - 55:14
**apparent** [1] - 37:10
**appeal** [1] - 6:13
**appear** [7] - 9:11,
26:17, 29:12, 42:19,
58:14, 73:20, 119:9
**applicable** [2] - 12:3,
107:1
**applicant** [1] - 39:5
**applied** [2] - 17:17,
118:13
**applies** [4] - 21:16,

95:9, 115:2, 115:6
**apply** [10] - 20:13,
38:25, 39:6, 40:9,
40:14, 40:23, 41:16,
80:12, 91:5, 108:18
**applying** [2] - 39:7,
45:2
**appoint** [1] - 70:10
**appointed** [3] - 70:3,
99:18, 103:5
**appointing** [1] - 98:24
**appointment** [4] -
72:14, 98:25, 99:1,
100:2
**Appointments** [9] -
70:21, 70:25, 71:7,
72:4, 72:11, 72:23,
73:8, 73:24, 74:21
**appreciate** [1] - 56:4
**appropriate** [3] -
77:14, 96:24, 97:5
**approval** [1] - 25:1
**approved** [3] - 24:24,
25:21, 110:9
**arbitrary** [8] - 19:8,
21:12, 42:12, 42:15,
95:20, 96:8, 97:17,
98:10
**area** [1] - 105:24
**areas** [1] - 74:2
**argue** [5] - 9:24,
78:17, 88:19, 91:12,
93:19
**argued** [2] - 92:21,
109:21
**arguing** [1] - 109:14
**argument** [16] - 12:8,
18:13, 19:18, 20:7,
25:1, 27:19, 37:13,
50:2, 50:7, 50:9,
50:16, 50:21, 77:21,
88:15, 88:22, 119:10
**arguments** [8] - 4:24,
5:7, 5:17, 8:11, 13:9,
50:18, 95:22, 119:9
**arrangements** [1] -
71:13
**Article** [4] - 13:22,
14:11, 23:19, 77:18
**articulated** [1] - 44:3
**aside** [1] - 42:14
**aspects** [1] - 37:21
**asserted** [1] - 7:11
**asserting** [1] - 22:21
**assess** [1] - 95:22
**assistance** [2] - 26:25,
106:25
**Assistant** [3] - 99:4,
99:17, 103:4
**associate** [1] - 63:1

**associated** [1] - 42:18
**Associates** [4] -
21:24, 22:4, 22:5,
94:22
**Association** [1] -
89:18
**association** [2] - 7:7,
76:18
**associational** [4] -
7:18, 8:1, 8:24,
75:16
**assume** [9] - 7:6, 31:7,
35:25, 99:17, 103:4,
104:9, 109:14,
110:20, 116:4
**assuming** [3] - 43:13,
80:9, 116:10
**assumption** [2] - 4:7,
114:23
**assurance** [1] - 48:7
**attach** [1] - 95:16
**attached** [1] - 8:14
**attempt** [2] - 26:23,
26:25
**attention** [2] - 5:10,
52:15
**Attorney** [1] - 62:15
**attorneys** [1] - 4:20
**authority** [20] - 16:19,
64:1, 64:3, 64:17,
68:1, 71:4, 72:5,
72:8, 73:8, 73:18,
75:6, 85:20, 99:24,
100:6, 100:7,
100:10, 100:13,
100:14, 100:19,
100:25
**authorize** [2] - 22:9,
118:16
**authorized** [6] - 75:1,
77:2, 92:10, 110:6,
117:19, 118:9
**automatically** [1] -
17:16
**availability** [1] - 94:23
**available** [5] - 20:8,
20:25, 21:14, 93:18,
102:14
**avenue** [1] - 94:12
**award** [1] - 22:17
**aware** [12] - 5:14,
34:1, 42:17, 65:6,
107:9, 108:1, 109:4,
109:7, 112:21,
112:22, 113:14,
113:19

**B**

**background** [1] - 6:25

**balance** [2] - 51:4,
52:3
**balancing** [1] - 61:12
**bank** [1] - 14:5
**bar** [1] - 20:23
**bare** [3] - 79:5, 81:8,
81:11
**base** [1] - 122:17
**based** [22] - 9:9,
10:21, 25:7, 30:10,
30:11, 35:12, 35:13,
35:16, 45:18, 57:15,
70:15, 72:17, 79:20,
97:7, 106:3, 110:14,
111:14, 111:21,
116:13, 117:9,
117:23, 118:4
**basic** [1] - 56:25
**basis** [3] - 32:19,
39:16, 92:25
**became** [4] - 34:16,
34:23, 35:3, 113:14
**began** [2] - 98:23,
99:2
**behalf** [4] - 4:1, 7:19,
63:4, 102:16
**behind** [1] - 49:10
**believes** [1] - 96:22
**Bessent** [12] - 3:5,
15:15, 25:12, 25:20,
35:5, 35:14, 36:8,
38:15, 43:18, 68:5,
75:11, 95:23
**best** [7] - 8:15, 10:11,
20:6, 62:19, 28:3,
45:8, 94:24
**better** [7] - 4:21, 10:5,
12:8, 19:17, 25:1,
113:4
**between** [16] - 12:4,
14:15, 18:15, 24:7,
25:15, 27:6, 30:5,
36:23, 37:22, 42:6,
60:12, 67:18, 67:24,
99:6, 100:1, 101:25
**beyond** [7] - 13:21,
43:17, 44:21, 64:16,
68:24, 94:22, 101:8
**BFS** [15] - 24:22,
26:15, 36:14, 68:18,
90:3, 95:25, 97:15,
99:6, 101:6, 106:10,
106:12, 106:15,
113:24, 117:12
**BFS'** [1] - 106:11
**bind** [2] - 70:20,
108:15
**bit** [2] - 6:25, 10:22
**blanking** [1] - 22:3
**body** [1] - 115:23

**boil** [1] - 119:9
**bona** [1] - 39:25
**Bowen** [3] - 20:11, 23:12, 23:15
**Bradley** [1] - 3:25
**branch** [2] - 80:5, 80:16
**breach** [7] - 9:17, 14:25, 52:18, 52:23, 53:1, 53:11, 53:13
**break** [3] - 114:18, 116:9, 116:20
**brief** [8] - 22:3, 23:2, 23:3, 23:8, 24:23, 26:4, 40:6, 123:3
**briefed** [2] - 73:11, 115:7
**briefing** [6] - 7:24, 75:17, 78:3, 121:17, 121:25, 123:25
**briefly** [1] - 113:13
**briefs** [2] - 4:7, 63:23
**bring** [17] - 5:10, 10:22, 11:8, 23:23, 52:15, 53:25, 76:10, 84:18, 87:16, 93:9, 93:10, 94:10, 95:13, 97:1, 109:10, 116:11, 116:14
**bringing** [2] - 7:18, 40:20
**broad** [7] - 36:24, 40:25, 42:7, 67:8, 91:9, 92:8, 93:13
**broader** [5] - 5:20, 15:21, 37:19, 38:10, 38:11
**broadly** [2] - 28:24, 37:12
**brought** [4] - 39:15, 76:7, 84:10, 91:7
**bucket** [1] - 50:3
**bunch** [3] - 35:20, 41:10, 100:8
**burden** [1] - 5:5
**Bureau** [15] - 9:9, 9:11, 13:6, 15:19, 26:10, 27:2, 31:20, 38:20, 39:20, 40:18, 41:22, 43:4, 43:5, 44:7, 46:20
**Bureau's** [7] - 9:5, 21:17, 27:8, 31:19, 31:23, 35:15, 41:4
**bureaucracy** [2] - 54:17, 55:10

**C**

**cabining** [1] - 37:11

63:21, 63:24
**Cell** [4] - 21:24, 22:3, 22:5, 94:22
**CEO** [12] - 32:13, 32:17, 32:25, 33:4, 80:14, 80:23, 104:11, 104:19, 105:5, 105:10, 105:11, 105:22
**certain** [8] - 11:17, 18:25, 19:3, 41:12, 50:23, 79:17, 79:21, 86:15
**certainly** [12] - 15:14, 45:2, 55:25, 58:23, 63:1, 71:8, 71:10, 76:12, 82:11, 98:1, 104:4, 119:22
**CERTIFICATE** [1] - 124:15
**certify** [1] - 124:17
**cetera** [4] - 54:2, 71:13, 107:17, 123:20
**chain** [3] - 66:24, 68:2, 99:14
**challenge** [3] - 26:4, 95:2, 109:11
**challenged** [1] - 66:11
**challenges** [1] - 95:4
**challenging** [1] - 77:10
**chance** [2] - 4:11, 30:8
**Chandra** [2] - 124:17, 124:21
**change** [19] - 14:20, 14:24, 15:9, 15:13, 15:17, 15:23, 15:25, 21:16, 25:23, 28:16, 44:6, 76:23, 77:1, 77:9, 90:10, 90:16, 90:21, 101:19
**changed** [4] - 14:22, 15:24, 36:9, 107:20
**changes** [6] - 6:18, 9:8, 9:12, 25:22, 26:8, 27:1, 34:19, 40:1, 41:21, 61:24, 90:7, 91:2, 101:4, 123:5
**changing** [1] - 25:12
**Chao** [2] - 17:19, 22:25
**chaotic** [1] - 97:21
**characterization** [1] - 98:11
**charge** [5] - 38:8, 42:7, 57:21, 62:14, 73:16
**check** [1] - 56:5

**Chief** [11] - 25:21, 54:11, 54:12, 59:14, 59:18, 64:5, 64:13, 66:23, 67:14, 74:16, 100:12
**choice** [1] - 97:10
**chosen** [2] - 97:6, 97:9
**Christopher** [1] - 4:2
**Chutkan** [4] - 61:4, 61:13, 62:11, 63:9
**Circuit** [7] - 20:22, 44:17, 84:24, 88:12, 92:24, 96:17, 119:7
**circuit** [3] - 4:11, 45:8, 94:18
**Circuit's** [2] - 23:8, 28:8
**circumstance** [1] - 85:1
**circumstances** [4] - 79:17, 79:21, 83:4, 118:19
**circumvention** [1] - 37:2
**cite** [5] - 21:24, 61:10, 83:17, 86:3, 94:14
**cited** [8] - 20:11, 23:8, 84:16, 84:23, 84:24, 85:13, 94:22, 97:18
**citing** [3] - 9:20, 18:6, 29:10
**Citizens** [2] - 3:18, 3:21
**civil** [1] - 3:3
**claim** [24] - 7:11, 10:19, 11:8, 12:2, 22:11, 22:12, 32:22, 66:11, 76:7, 76:8, 76:10, 77:3, 81:19, 84:3, 86:23, 87:7, 87:8, 91:8, 93:8, 93:10, 93:11, 94:10, 95:13, 97:1
**claiming** [1] - 118:4
**Claims** [2] - 20:15, 23:18
**claims** [5] - 6:5, 7:19, 23:20, 86:15, 97:2
**clarify** [1] - 78:6
**clarity** [1] - 53:25
**Clause** [9] - 70:21, 70:25, 71:7, 72:5, 72:11, 72:23, 73:9, 73:24, 74:21
**clawed** [1] - 46:24
**clear** [13] - 10:20, 27:9, 30:7, 35:7, 37:18, 43:3, 43:10, 51:23, 61:22, 75:24,

78:4, 98:6, 113:3
**clearer** [1] - 85:6
**clearly** [2] - 3:14, 32:12
**CLERK** [1] - 3:3
**clients** [3] - 122:17, 122:20, 123:16
**close** [2] - 63:25, 64:16
**Cloud** [2] - 32:14, 33:4
**cloud** [2] - 11:12, 33:12
**Code** [25] - 6:8, 11:21, 17:2, 18:10, 20:10, 21:10, 22:22, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:20, 86:9, 86:13, 86:18, 87:3, 91:5, 117:17, 118:3, 118:6, 118:10, 119:1
**codes** [1] - 26:16
**coexistence** [1] - 23:5
**colleagues** [3] - 55:15, 115:8, 119:17
**Columbia** [1] - 62:16
**combat** [2] - 98:3, 98:8
**combination** [1] - 23:11
**coming** [3] - 4:9, 49:12, 52:9
**command** [2] - 66:25, 68:2, 99:14
**commence** [1] - 68:12
**commenced** [1] - 68:14
**committee** [3] - 78:25, 79:9, 82:12
**common** [8] - 12:11, 13:22, 13:24, 14:11, 14:10, 32:6, 84:6
**communicated** [1] - 108:14
**communications** [1] - 105:25
**companies** [1] - 62:8
**company** [10] - 14:5, 80:15, 80:23, 82:23, 83:13, 104:12, 104:19, 105:6, 105:23
**compared** [1] - 85:4
**comparison** [1] - 85:5
**competing** [7] - 80:17, 80:25, 81:4, 82:25, 83:8, 84:6
**competitive** [1] - 83:16
**competitor** [1] - 81:14

**complaint** [3] - 60:24, 70:13, 73:12

**complete** [2] - 96:1, 108:1

**completed** [3] - 27:12, 53:14, 107:24

**completely** [1] - 108:10

**complex** [1] - 4:14

**complicated** [1] - 115:23

**comply** [3] - 46:12, 70:25, 93:23

**complying** [3] - 71:7, 109:17, 111:1

**component** [6] - 54:18, 54:20, 55:11, 57:6, 57:13, 58:12

**comports** [1] - 44:3

**comprehensive** [1] - 94:1

**compromise** [1] - 53:16

**compromised** [1] - 51:10

**computer** [4] - 28:17, 31:25, 41:21, 49:11

**computers** [2] - 31:23, 31:24

**computing** [1] - 33:12

**concern** [9] - 30:18, 31:3, 32:21, 36:20, 37:9, 37:19, 48:12, 72:20, 72:22

**concerned** [2] - 34:21, 61:1

**concerns** [2] - 32:15, 70:16

**conclude** [3] - 94:2, 119:4, 119:11

**concluded** [3] - 94:19, 97:12, 97:20

**conclusion** [1] - 22:8

**concrete** [4] - 7:15, 81:11, 81:18, 81:20

**condition** [1] - 93:1

**conditions** [3] - 16:18, 85:19, 123:20

**conduct** [2] - 14:16, 78:9

**conducting** [2] - 40:16, 68:24

**confer** [9] - 55:15, 119:16, 120:24, 121:3, 121:9, 122:11, 122:16, 122:19, 123:16

**conferring** [4] - 119:19, 121:3, 121:4, 121:15

**confers** [2] - 16:19, 85:20

**confidential** [2] - 41:8, 102:12

**confidentiality** [2] - 102:7, 108:15

**confine** [1] - 12:19

**confirm** [1] - 58:24

**confirmed** [10] - 55:2, 55:7, 58:1, 58:4, 70:23, 72:12, 74:10, 74:15, 74:23, 75:10

**conflicted** [1] - 112:1

**confusion** [2] - 34:12, 35:11

**Congress** [19] - 12:16, 17:10, 18:13, 18:20, 22:5, 22:8, 78:23, 79:9, 79:13, 79:14, 79:21, 86:11, 94:7, 94:11, 94:25, 95:12, 110:6, 111:3, 111:25

**Congress's** [1] - 50:12

**Congressional** [2] - 78:25, 93:15

**congressional** [1] - 79:9

**conjunction** [3] - 70:4, 106:23, 110:11

**connected** [2] - 31:23, 72:18

**connection** [2] - 14:14, 37:22

**consent** [7] - 11:19, 11:22, 16:20, 31:20, 85:21, 91:16, 122:25

**consequence** [2] - 95:11, 95:13

**consequences** [6] - 24:18, 88:8, 90:4, 90:23, 91:4, 95:18

**consider** [1] - 42:23

**consideration** [1] - 43:22

**considered** [4] - 4:15, 43:19, 95:23, 96:6

**considering** [2] - 38:16, 61:12

**consistent** [7] - 68:18, 106:9, 117:5, 117:11, 117:15, 118:20, 118:22

**consists** [1] - 120:21

**Constitution** [1] - 70:21

**constitutionality** [1] - 70:16

**constitutionally** [1] - 72:25

**constraints** [1] - 97:19

**construing** [1] - 93:1

**consult** [3] - 68:8, 68:9, 73:25

**consultant** [16] - 99:7, 99:9, 99:12, 100:3, 100:6, 100:12, 100:20, 102:3, 102:5, 102:14, 102:15, 102:19, 102:22, 103:6, 103:9, 104:3

**consultants** [1] - 100:7

**consultation** [1] - 68:7

**consulted** [1] - 70:9

**consulting** [1] - 111:11

**consummated** [1] - 26:3

**consummation** [2] - 24:15, 88:5

**contact** [1] - 107:21

**containing** [1] - 47:14

**contend** [1] - 76:22

**contents** [1] - 37:24

**context** [3] - 19:20, 95:6, 111:24

**contours** [2] - 9:8, 44:8

**contractors** [1] - 39:3

**contrary** [1] - 19:8

**conversation** [1] - 116:16

**coordinate** [1] - 40:18

**coordinates** [1] - 71:15

**coordination** [1] - 117:4

**copy** [2] - 52:10, 106:14

**correct** [24] - 7:17, 7:22, 7:23, 53:4, 54:22, 54:25, 55:3, 55:5, 55:7, 57:7, 57:8, 57:11, 57:15, 59:15, 61:8, 61:9, 88:22, 100:11, 100:16, 109:21, 109:22, 110:6, 115:11, 124:18

**corrected** [4] - 34:10, 35:2, 113:14, 113:18

**correcting** [1] - 19:11

**correction** [1] - 94:3

**correctly** [6] - 29:19, 68:6, 90:13, 111:6, 117:25, 123:10

**correspond** [1] - 5:8

**counsel** [6] - 3:6, 3:20, 116:24,

119:19, 120:24, 121:15

**Counsel** [1] - 121:4

**couple** [4] - 78:6, 78:21, 82:5, 99:20

**course** [4] - 4:25, 6:12, 23:6, 56:19, 57:3, 68:23, 80:4, 81:9, 101:18, 106:4

**court** [7] - 8:21, 23:19, 36:11, 86:3, 94:19, 116:18, 116:21

**Court** [58] - 3:2, 5:25, 6:8, 6:14, 6:20, 10:20, 12:4, 13:3, 13:4, 16:9, 16:24, 17:19, 20:14, 22:14, 22:17, 23:18, 23:23, 42:14, 46:11, 47:2, 47:20, 48:7, 50:12, 71:8, 72:2, 72:11, 73:25, 74:7, 74:8, 74:21, 75:12, 81:10, 84:1, 84:24, 85:2, 85:3, 85:7, 85:13, 85:24, 86:4, 87:10, 87:17, 87:25, 89:16, 96:14, 96:16, 96:18, 96:22, 96:25, 97:2, 104:21, 117:22, 119:5, 121:24, 122:7, 122:25, 123:23, 124:9

**COURT** [227] - 3:8, 3:23, 4:5, 6:21, 7:24, 8:22, 9:24, 12:7, 13:8, 14:12, 15:6, 15:12, 16:2, 16:13, 18:19, 19:9, 20:6, 20:18, 21:24, 22:5, 22:18, 23:2, 23:4, 23:15, 24:8, 24:11, 25:8, 26:13, 26:19, 27:18, 28:1, 28:15, 28:18, 31:5, 32:8, 32:10, 32:23, 33:15, 33:21, 33:24, 34:3, 35:19, 36:13, 37:13, 38:23, 40:3, 40:7, 40:10, 40:12, 40:24, 41:5, 42:10, 44:11, 46:7, 46:16, 46:18, 48:2, 48:11, 49:4, 49:7, 49:24, 50:15, 51:2, 51:4, 52:6, 53:2, 53:6, 53:10, 53:19, 53:24, 54:13, 55:20, 56:10, 56:17, 56:20, 57:4, 57:10, 57:12, 57:19, 57:23,

58:10, 58:25, 59:6, 59:8, 59:19, 59:24, 60:9, 60:15, 60:23, 61:10, 62:5, 63:17, 64:7, 64:20, 65:3, 65:7, 65:12, 65:17, 66:12, 67:1, 67:7, 67:12, 67:16, 68:3, 68:20, 68:25, 69:20, 69:22, 70:2, 70:6, 70:11, 72:24, 73:5, 73:13, 74:1, 75:14, 76:3, 76:16, 77:4, 77:8, 77:21, 78:6, 78:12, 78:17, 79:7, 79:14, 79:16, 80:1, 80:14, 80:22, 81:4, 81:22, 82:5, 82:9, 82:24, 84:5, 84:17, 84:22, 85:15, 87:2, 87:9, 87:13, 87:16, 88:2, 88:18, 88:24, 89:9, 89:23, 90:6, 90:18, 91:10, 91:23, 92:21, 93:19, 94:14, 94:25, 95:20, 97:11, 98:13, 100:15, 101:1, 101:17, 101:22, 101:24, 102:5, 102:7, 102:13, 102:17, 102:19, 102:24, 103:2, 103:12, 103:19, 104:7, 104:17, 105:3, 105:10, 105:12, 105:14, 105:18, 105:21, 107:2, 107:14, 108:11, 109:2, 109:6, 109:13, 109:23, 110:14, 111:14, 112:9, 113:1, 113:8, 113:21, 114:3, 114:10, 114:15, 115:10, 115:14, 115:17, 115:24, 116:9, 116:18, 116:23, 117:21, 118:15, 119:2, 119:18, 119:23, 120:2, 120:7, 120:10, 120:17, 120:20, 120:22, 121:5, 121:16, 121:22, 122:5, 122:14, 122:18, 122:21, 123:7, 123:12, 123:15, 124:5, 124:7

**Court's** [7] - 17:24,

36:10, 46:10, 48:8,
56:8, 56:14, 89:16
**COURTROOM** [1] -
3:3
**courts** [9] - 9:20,
12:13, 13:2, 17:17,
19:19, 19:20, 20:2,
46:14, 94:15
**cover** [2] - 100:4,
108:9
**covered** [2] - 92:3,
116:10
**crafted** [1] - 86:17
**create** [5] - 79:1, 80:8,
81:24, 83:15, 84:15
**created** [5] - 34:20,
54:12, 87:10, 93:16,
95:1
**creates** [1] - 93:20
**creating** [2] - 62:13,
65:24
**creation** [1] - 30:3
**credible** [1] - 7:5
**credit** [1] - 83:22
**creditor** [1] - 14:5
**criminal** [1] - 40:20
**critical** [1] - 97:15
**cross** [4] - 120:14,
121:1, 121:7, 124:1
**cross-motion** [4] -
120:14, 121:1,
121:7, 124:1
**crystal** [2] - 43:3,
43:10
**cumulatively** [1] -
57:1
**curious** [1] - 34:18

---

**D**

**D.C** [8] - 20:22, 23:7,
28:8, 44:17, 88:12,
92:24, 96:17, 119:7
**damage** [1] - 17:3
**damages** [27] - 9:18,
10:19, 10:21, 12:2,
12:5, 16:17, 17:10,
17:14, 17:21, 18:4,
19:4, 19:18, 20:15,
21:19, 22:19, 23:14,
23:23, 23:25, 24:1,
77:20, 85:18, 93:22,
94:10, 94:19, 95:1,
95:15, 109:12
**data** [31] - 9:17, 12:20,
14:25, 25:14, 26:9,
33:12, 37:4, 37:5,
37:11, 38:20, 43:4,
43:10, 46:1, 46:14,
46:16, 47:8, 47:20,

48:7, 48:10, 51:10,
51:21, 52:17, 76:14,
77:16, 83:18, 85:8,
85:10, 89:12,
106:12, 106:15,
117:8
**database** [4] - 47:5,
47:9, 47:13, 111:2
**databases** [2] - 26:20,
106:15
**DATE** [1] - 124:21
**date** [5] - 15:18, 98:21,
100:1, 119:23,
122:14
**dates** [3] - 34:11,
35:20, 122:15
**day-to** [1] - 88:21
**days** [4] - 25:24,
52:24, 62:11, 62:15
**decide** [9] - 10:7, 10:9,
62:20, 63:6, 63:7,
67:8, 96:14, 110:18,
121:24
**decides** [2] - 69:22,
110:21
**deciding** [1] - 95:24
**decision** [32] - 9:20,
12:1, 17:24, 21:15,
21:25, 24:16, 28:4,
28:9, 38:14, 38:19,
42:14, 43:18, 44:9,
44:10, 47:21, 50:19,
68:1, 88:6, 89:11,
89:14, 89:17, 90:2,
90:5, 90:6, 90:25,
96:7, 96:8, 97:14,
123:5, 123:8, 123:24
**decision-maker** [1] -
43:18
**decision-makers** [1] -
38:14
**decision-making** [6] -
24:16, 38:19, 42:14,
68:1, 88:6, 96:8
**decisions** [12] - 17:22,
18:12, 18:18, 21:12,
47:25, 49:15, 56:21,
73:17, 73:18, 88:20,
91:12, 99:12
**declaration** [14] -
29:21, 29:22, 35:1,
41:3, 42:16, 62:1,
69:25, 71:14, 76:25,
90:17, 98:5, 98:6,
106:9, 114:7
**declarations** [8] -
8:13, 9:11, 34:23,
36:19, 48:6, 52:23,
53:9, 107:12
**declined** [2] - 45:3,

45:16
**deductions** [4] -
110:23, 110:25,
111:4
**defend** [1] - 39:16
**defendant** [2] - 31:6,
31:15
**defendant's** [3] -
42:16, 83:24, 117:10
**defendants** [20] - 4:1,
4:25, 5:2, 5:4, 9:24,
22:1, 35:19, 36:1,
36:13, 39:9, 41:11,
53:21, 99:16,
113:22, 118:7,
118:25, 119:9,
120:7, 122:4, 124:5
**defendants'** [3] -
14:15, 26:4, 78:8
**Defender's** [1] - 3:22
**defense** [1] - 116:24
**deficient** [1] - 38:17
**define** [1] - 89:3
**defined** [1] - 37:12
**definition** [4] - 115:4,
115:19, 116:1, 116:3
**degree** [2] - 16:5,
103:15
**delegated** [1] - 99:3
**Democracy** [1] - 3:22
**denial** [1] - 89:21
**Department** [52] -
3:25, 4:2, 4:3, 5:16,
12:15, 29:25, 35:4,
46:21, 56:16, 61:3,
61:15, 62:13, 67:15,
70:4, 70:20, 80:21,
85:9, 86:25, 87:1,
89:12, 92:5, 92:17,
92:19, 98:23,
102:25, 103:17,
103:25, 104:10,
105:17, 106:1,
106:7, 106:18,
106:22, 107:4,
107:11, 107:15,
107:18, 107:22,
108:8, 108:13,
109:1, 109:5, 109:8,
109:15, 110:11,
111:10, 111:17,
112:3, 112:13,
114:5, 118:8
**department** [1] - 92:9
**deputy** [5] - 54:24,
55:1, 55:4, 57:24,
58:1
**DEPUTY** [1] - 3:3
**describe** [1] - 103:7
**described** [4] - 68:17,

69:24, 107:12, 114:2
**description** [3] -
36:24, 37:4, 37:7
**descriptions** [1] -
36:18
**designated** [1] - 83:24
**despite** [1] - 45:19
**detail** [1] - 38:6
**detailed** [4] - 22:7,
93:20, 94:1, 94:3
**detect** [2] - 40:2,
41:22
**detection** [1] - 41:4
**determine** [7] - 13:25,
47:21, 96:7, 110:10,
111:11, 112:5,
122:25
**determined** [2] -
24:17, 88:7
**determines** [1] - 47:2
**devised** [1] - 86:11
**dicta** [1] - 22:25
**difference** [7] - 55:20,
55:22, 56:22, 66:12,
94:9, 108:11, 108:21
**different** [28] - 4:24,
5:17, 6:5, 6:10, 9:16,
18:7, 20:3, 26:22,
27:14, 31:14, 35:20,
49:17, 49:18, 52:8,
56:21, 58:4, 60:1,
60:15, 62:24, 63:8,
71:21, 80:1, 84:6,
84:25, 90:6, 107:18
**differently** [2] - 42:24,
97:23
**difficult** [1] - 90:9
**Digital** [2] - 54:9, 60:6
**direct** [2] - 103:18,
104:2
**directed** [2] - 67:13,
117:13
**directing** [2] - 71:6,
104:5
**direction** [10] - 29:22,
68:19, 71:18, 71:24,
72:7, 73:7, 73:16,
74:13, 74:22, 104:1
**directive** [1] - 12:22
**directly** [4] - 12:3,
25:21, 36:12, 55:16
**director** [7] - 54:24,
55:4, 55:5, 57:24,
58:1, 80:3, 99:10
**Director** [3] - 55:1,
55:5, 58:2
**disaggregate** [1] -
47:17
**disagree** [7] - 47:25,
92:14, 95:21, 97:24,

98:10, 101:19, 113:9
**disclose** [1] - 41:9
**disclosed** [6] - 11:23,
31:20, 76:14, 86:24,
104:10, 109:14
**disclosing** [4] - 28:25,
32:3, 78:24, 91:17
**disclosure** [31] - 10:1,
10:2, 10:4, 10:10,
17:5, 29:2, 29:11,
41:12, 78:21, 79:4,
79:13, 80:25, 82:1,
82:18, 82:20, 82:22,
82:24, 83:12, 83:20,
84:7, 91:16, 93:11,
93:22, 94:4, 94:6,
97:8, 108:25,
109:10, 109:11,
114:24, 114:25
**disclosures** [18] -
17:4, 17:8, 29:4,
29:8, 39:2, 39:10,
39:12, 41:16, 61:1,
79:14, 79:17, 79:20,
80:17, 93:22, 95:3,
95:4, 109:18, 115:1
**disconnect** [2] -
18:15, 42:6
**discovered** [1] -
108:25
**discovery** [5] - 30:8,
96:4, 96:11, 97:5,
97:8
**discretion** [3] - 43:24,
72:6, 72:9
**discuss** [4] - 5:12,
24:22, 73:3, 123:18
**discussed** [2] - 16:5,
68:2
**discussing** [2] -
39:14, 44:13
**discussion** [5] - 8:15,
24:6, 43:23, 44:2,
121:13
**discussions** [2] -
67:24, 101:2
**dismiss** [10] - 120:9,
120:14, 120:25,
121:6, 121:18,
121:25, 122:9,
123:9, 123:24,
123:25
**dismissed** [1] - 84:3
**displace** [1] - 24:3
**dispute** [7] - 36:17,
47:10, 76:1, 76:22,
78:7, 78:12, 90:15
**disputing** [3] - 75:20,
75:22, 76:16
**distinction** [6] - 12:4,

24:7, 48:4, 48:5, 50:8, 60:22
**distinguish** [2] - 10:24, 45:15
**District** [6] - 5:24, 23:23, 62:16, 65:21, 106:2, 117:22
**district** [3] - 45:3, 45:16, 94:15
**documentation** [1] - 98:25
**Doe** [4] - 17:19, 22:25, 23:8, 28:9
**DOGE** [67] - 12:24, 13:1, 13:19, 14:21, 15:20, 16:11, 25:13, 25:16, 26:23, 27:7, 27:10, 29:17, 30:3, 30:5, 30:12, 30:24, 31:4, 32:9, 35:15, 38:21, 39:12, 41:16, 42:2, 42:7, 42:19, 43:7, 43:8, 43:12, 48:18, 48:21, 48:23, 49:8, 51:12, 51:16, 54:1, 54:7, 54:10, 54:13, 59:24, 60:7, 60:9, 61:19, 61:22, 61:25, 62:18, 64:19, 67:3, 67:17, 67:20, 68:6, 68:21, 71:16, 89:21, 90:15, 92:10, 95:25, 97:14, 97:21, 100:21, 101:11, 103:11, 103:15, 103:25, 113:24, 117:1
**DOJ** [1] - 40:16
**done** [12] - 19:19, 26:7, 26:17, 42:24, 43:2, 44:7, 61:19, 90:1, 100:8, 113:10, 116:20, 123:21
**door** [1] - 30:19
**down** [7] - 4:9, 48:1, 52:21, 64:18, 87:23, 111:22, 119:10
**draw** [1] - 36:23
**drew** [1] - 12:4
**drug** [1] - 83:25
**duly** [1] - 110:6
**duplicate** [1] - 94:16
**during** [5] - 35:8, 35:10, 102:2, 102:9, 106:3
**duties** [8] - 29:7, 81:8, 99:4, 99:17, 103:4, 103:7, 104:24, 105:1

## E

**early** [2] - 26:23, 55:13
**easier** [2] - 3:11, 54:8
**Eastern** [1] - 65:20
**economic** [2] - 19:1, 19:2
**Edmond** [1] - 74:7
**effect** [2] - 51:10, 91:14
**effectively** [1] - 60:12
**effectuated** [1] - 14:20
**Efficiency** [1] - 62:13
**Eisen** [1] - 3:21
**either** [11] - 18:24, 21:20, 25:20, 26:25, 35:25, 47:10, 65:11, 76:7, 83:25, 107:8, 121:8
**elected** [1] - 110:21
**element** [2] - 13:23, 13:24
**elements** [5] - 7:6, 7:14, 8:3, 14:13, 78:7
**Elez** [18] - 29:23, 36:4, 43:21, 56:16, 62:3, 62:4, 62:5, 68:22, 103:16, 103:20, 106:6, 106:11, 106:14, 106:22, 112:17, 112:23, 113:13, 113:15
**Elez's** [3] - 15:1, 52:19, 105:24
**Elizabeth** [1] - 4:1
**Elon** [5] - 48:22, 61:2, 62:8, 62:14, 62:18
**elucidation** [1] - 37:16
**email** [1] - 62:17
**emails** [3] - 15:2, 52:20, 106:6
**emphasize** [1] - 52:17
**emphasizes** [1] - 53:15
**employed** [1] - 108:17
**employee** [31] - 29:13, 29:16, 30:23, 31:7, 31:8, 31:13, 32:2, 32:4, 32:13, 34:17, 34:24, 54:22, 57:15, 58:17, 58:18, 59:20, 61:5, 63:3, 63:12, 72:7, 80:15, 80:21, 80:22, 89:11, 90:25, 91:2, 102:1, 102:4, 102:10, 102:23, 103:6
**employees** [27] - 29:5, 29:11, 30:14, 30:15,

30:25, 39:3, 41:13, 56:16, 62:17, 66:6, 66:15, 70:23, 71:6, 71:19, 71:22, 72:4, 77:1, 77:4, 85:10, 86:25, 90:3, 91:20, 91:24, 92:2, 92:9, 92:15, 115:2
**employment** [8] - 33:2, 34:7, 34:19, 65:5, 98:16, 98:19
**end** [7] - 5:12, 44:20, 44:8, 51:15, 98:15, 122:6
**enforce** [1] - 102:14
**enforced** [2] - 35:17, 36:7
**engage** [2] - 23:9, 41:25, 73:19
**engaged** [2] - 41:18, 42:13
**engagement** [27] - 24:24, 25:2, 25:5, 25:16, 26:13, 27:5, 27:12, 27:14, 27:22, 34:15, 35:21, 36:16, 37:17, 37:20, 37:23, 37:25, 38:1, 66:16, 70:19, 89:24, 90:8, 91:13, 100:9, 100:17, 100:22, 101:1
**Engagement** [1] - 99:22
**engineer** [1] - 62:7
**enormous** [1] - 45:20
**ensure** [3] - 19:6, 46:5, 117:5
**ensured** [1] - 97:20
**entail** [1] - 13:5
**entailed** [1] - 97:16
**entered** [1] - 99:22
**entering** [1] - 70:18
**Enterprise** [1] - 74:6
**entities** [1] - 40:21
**entity** [1] - 50:4
**EO** [2] - 58:23, 97:25
**equities** [2] - 51:5, 52:4
**equivalent** [2] - 49:20, 50:13
**error** [4] - 35:1, 48:4, 49:14, 113:13
**especially** [5] - 6:6, 32:5, 43:5, 43:18, 114:4
**essentially** [2] - 83:19, 101:12
**establish** [1] - 78:19
**established** [2] -

100:18, 111:25
**establishing** [1] - 116:25
**et** [5] - 3:4, 54:2, 71:13, 107:17, 123:20
**evaluate** [2] - 66:10, 96:18
**evaluating** [1] - 7:3
**evidence** [1] - 7:5
**evolving** [1] - 52:8
**exact** [2] - 15:18, 63:1
**exactly** [5] - 21:6, 30:6, 32:25, 73:18, 117:2
**example** [10] - 11:2, 21:5, 39:18, 40:15, 45:17, 51:12, 60:21, 78:23, 79:1, 118:11
**examples** [1] - 81:25
**except** [2] - 56:15, 75:9, 99:10
**exception** [18] - 28:10, 29:11, 30:20, 39:10, 39:17, 39:24, 40:8, 40:13, 40:22, 40:23, 41:12, 41:15, 42:8, 49:23, 81:16, 86:7, 105:2, 109:17
**exceptions** [3] - 29:1, 29:2, 41:10
**exchange** [1] - 78:18
**exclusions** [1] - 11:24
**exclusive** [2] - 18:1, 18:20
**exclusively** [2] - 7:25, 75:18
**exclusivity** [1] - 18:24
**Excuse** [1] - 114:6
**excuse** [6] - 53:2, 64:2, 93:16, 93:17, 96:15, 103:25
**excused** [1] - 124:8
**executed** [1] - 98:25
**executive** [2] - 80:5, 80:16
**Executive** [58] - 13:1, 13:4, 13:6, 13:19, 14:21, 15:10, 27:3, 27:4, 27:10, 27:16, 30:4, 30:6, 31:9, 31:10, 43:5, 43:7, 43:8, 46:3, 46:6, 46:12, 47:6, 48:17, 49:1, 54:4, 54:5, 54:6, 54:12, 55:17, 59:3, 59:12, 59:17, 60:5, 64:13, 65:24, 67:5, 67:7, 67:23, 68:3, 68:10, 68:11,

69:5, 69:11, 69:18, 80:4, 106:24, 108:17, 110:1, 110:19, 111:15, 111:22, 112:1, 116:25, 117:9, 117:13, 117:24, 118:16
**exercise** [1] - 72:5
**exercised** [2] - 81:13, 100:13
**exercising** [2] - 71:4, 72:8
**exist** [2] - 17:20, 60:3
**existence** [1] - 17:13
**exists** [1] - 20:1
**expected** [1] - 6:21
**experience** [2] - 62:6, 70:1
**expertise** [1] - 103:10
**explained** [2] - 9:19, 96:18
**explains** [3] - 60:6, 76:25, 114:7
**explanation** [2] - 43:17, 44:9
**explicit** [1] - 86:6
**explicitly** [2] - 86:10, 112:7
**expressed** [1] - 11:24
**expressly** [2] - 16:21, 85:22
**extend** [1] - 23:22
**extent** [7] - 16:8, 50:11, 91:6, 92:4, 117:5, 117:10, 118:2

## F

**fact** [24] - 7:15, 8:23, 8:25, 9:2, 14:14, 19:14, 19:20, 19:25, 23:25, 26:5, 30:21, 47:21, 57:15, 72:17, 77:18, 77:22, 78:3, 79:25, 83:1, 83:7, 96:20, 98:9, 104:3, 108:4
**factors** [2] - 42:22, 95:24
**facts** [5] - 10:4, 10:10, 66:14, 84:7, 84:25
**factual** [3] - 48:4, 48:5, 56:2
**fail** [1] - 42:23
**failed** [1] - 43:20
**failure** [1] - 93:23
**fair** [3] - 69:15, 69:16, 88:17
**fairly** [3] - 14:14, 67:8,

78:8
**fait** [1] - 47:23
**fall** [5] - 49:22, 91:21, 92:11, 92:16, 105:1
**falling** [2] - 11:23, 50:3
**falls** [1] - 112:7
**familiar** [1] - 87:21
**far** [7] - 25:7, 34:20, 37:1, 37:10, 38:1, 109:2
**fashion** [1] - 22:14
**favor** [1] - 52:4
**feared** [1] - 44:24
**February** [24] - 34:25, 61:3, 61:15, 61:16, 61:18, 61:21, 62:1, 62:10, 71:14, 98:20, 98:22, 98:24, 99:3, 99:6, 99:19, 99:25, 100:1, 100:4, 101:25, 103:5, 103:8, 103:13, 106:5, 124:21
**Federal** [10] - 12:18, 13:16, 13:17, 13:18, 15:3, 18:2, 23:18, 28:5, 33:19, 49:9
**federal** [14] - 14:11, 39:2, 39:5, 41:13, 54:17, 55:10, 62:17, 70:20, 78:19, 78:24, 102:1, 102:8, 108:5, 112:11
**few** [3] - 25:24, 71:1, 121:14
**fide** [1] - 39:25
**field** [1] - 87:19
**figure** [1] - 35:22
**file** [5] - 19:25, 119:22, 121:7, 122:20, 123:17
**filed** [3] - 5:19, 9:7, 123:20
**filing** [1] - 48:24
**final** [30] - 16:10, 24:11, 24:14, 24:19, 25:2, 25:25, 26:1, 26:6, 26:12, 27:19, 28:5, 47:21, 50:19, 76:21, 88:2, 88:4, 88:5, 88:11, 88:13, 88:19, 89:1, 89:3, 89:7, 89:24, 90:24, 93:7, 93:14, 93:16, 99:12
**financial** [2] - 80:17, 80:24
**findings** [2] - 8:2, 113:9

**fine** [2] - 4:21, 114:20
**fingertips** [1] - 58:9
**finish** [1] - 74:3
**finished** [1] - 107:7
**firm** [6] - 80:17, 80:18, 80:25, 81:2, 81:4, 83:9
**first** [11] - 7:25, 8:24, 23:20, 25:12, 25:22, 26:23, 29:4, 38:13, 43:1, 76:10, 80:6
**Fiscal** [3] - 99:4, 99:17, 103:4
**fit** [2] - 96:10, 105:3
**fix** [1] - 47:1
**fixed** [1] - 47:11
**flow** [5] - 24:18, 88:8, 90:5, 90:24, 91:4
**flows** [2] - 64:1, 64:3
**focus** [8] - 24:9, 24:19, 28:20, 41:11, 78:2, 86:21, 116:12
**focused** [10] - 17:20, 41:2, 50:22, 53:25, 75:17, 84:7, 84:9, 114:21
**focuses** [2] - 7:25, 75:18
**FOIA** [16] - 19:19, 19:21, 19:25, 20:1, 20:4, 20:5, 21:5, 21:6, 115:5, 115:19, 115:20, 115:25, 116:3, 116:5
**FOIA's** [1] - 115:3
**follow** [2] - 43:9, 115:18
**following** [1] - 61:23
**forbid** [1] - 87:3
**forbidden** [1] - 20:9
**forbidding** [1] - 17:7
**forbids** [7] - 16:21, 16:23, 16:25, 85:22, 85:25, 86:5, 87:20
**forcing** [1] - 19:11
**forecloses** [2] - 17:16, 18:1
**foregoing** [1] - 124:17
**foreign** [7] - 26:24, 27:3, 27:16, 106:24, 110:2, 110:3
**forensic** [4] - 53:12, 107:2, 107:23, 107:25
**forever** [1] - 49:13
**forgot** [1] - 114:17
**form** [1] - 8:12
**formal** [1] - 67:21
**formerly** [1] - 29:23
**formulate** [1] - 10:7

**formulated** [1] - 50:6
**forth** [1] - 97:25
**Forum** [1] - 62:12
**forward** [5] - 5:13, 113:20, 116:14, 118:16, 119:5, 123:23
**four** [3] - 27:6, 27:12, 46:20
**frame** [1] - 34:15
**framework** [1] - 27:10
**frank** [2] - 44:12, 50:20
**frankly** [2] - 70:16, 75:7
**fraud** [8] - 38:8, 39:18, 39:22, 39:25, 40:2, 40:16, 41:3, 98:3
**fraudulent** [3] - 110:6, 110:16, 111:20
**Free** [1] - 74:6
**freely** [1] - 33:20
**freeze** [4] - 26:24, 27:4, 27:16, 27:22
**frequently** [1] - 89:7
**full** [7] - 12:24, 35:15, 46:8, 52:25, 97:15, 117:6, 117:12
**fully** [1] - 15:1
**function** [1] - 99:13
**functions** [2] - 66:4, 75:1
**Fund** [2] - 3:22, 74:6
**funds** [1] - 39:5
**Future** [1] - 62:11
**future** [3] - 45:10, 45:18, 112:16

**G**

**Gadelhak** [1] - 85:13
**Garcia** [2] - 20:22, 21:2
**general** [3] - 41:11, 79:16, 97:3
**germane** [4] - 7:10, 8:5, 75:21, 76:1
**germaneness** [1] - 8:16
**Gioeli** [6] - 15:20, 38:10, 76:25, 98:6, 106:10, 114:7
**given** [11] - 5:23, 9:13, 38:12, 78:10, 78:15, 79:8, 82:6, 86:25, 93:15, 112:24
**Government** [12] - 12:18, 13:16, 13:17, 13:18, 15:3, 18:2, 28:5, 33:20, 49:9,

62:13, 106:13, 106:16
**government** [29] - 6:13, 6:15, 11:2, 11:13, 14:6, 33:2, 33:10, 34:12, 54:22, 56:3, 57:15, 58:8, 58:17, 58:18, 65:20, 72:2, 78:19, 78:24, 98:4, 102:8, 106:19, 108:6, 108:13, 108:23, 112:11, 115:3, 115:4, 115:11, 121:23
**government's** [3] - 13:15, 20:16, 51:11
**grand** [1] - 28:11
**grant** [2] - 16:19, 85:20
**granted** [7] - 5:15, 15:21, 35:15, 44:23, 44:25, 97:19, 113:20
**grantees** [1] - 27:23
**grants** [2] - 16:20, 85:21
**grasping** [1] - 69:3
**great** [1] - 62:18
**greater** [2] - 62:25, 63:10
**grounded** [1] - 21:13
**group** [1] - 40:20
**Group** [4] - 3:18, 3:21, 32:14, 33:4
**guaranteed** [1] - 9:3
**guarding** [1] - 46:1
**guess** [1] - 36:3
**guidance** [1] - 10:8

**H**

**habit** [1] - 45:25
**haphazard** [2] - 97:21, 98:12
**happy** [1] - 73:24
**harm** [34] - 5:25, 9:15, 9:21, 9:23, 10:21, 11:1, 11:4, 19:1, 19:2, 44:11, 44:18, 45:6, 45:10, 45:11, 45:17, 45:19, 45:20, 47:1, 51:9, 51:25, 52:1, 52:18, 52:25, 73:1, 76:9, 77:17, 81:12, 95:15, 97:7, 112:10, 112:12, 112:16, 114:25, 123:2
**harmed** [1] - 77:12, 109:10
**harms** [4] - 21:13,

84:6, 93:12, 123:4
**hat** [9] - 30:17, 32:4, 32:5, 32:10, 32:14, 33:7, 33:8, 105:9, 105:17
**hats** [5] - 30:12, 30:21, 32:12, 104:13, 105:21
**head** [1] - 15:19
**headed** [1] - 66:1
**heads** [3] - 46:5, 68:4, 117:3
**Healy** [1] - 4:3
**hear** [6] - 3:13, 3:14, 20:2, 31:15, 50:19, 53:20
**hearing** [6] - 4:6, 52:14, 53:4, 106:3, 107:4, 107:8
**heightened** [1] - 7:3
**held** [9] - 14:4, 14:7, 21:17, 72:2, 74:8, 86:4, 92:24, 94:15, 97:10
**help** [3] - 21:25, 39:23, 123:6
**helpful** [2] - 45:22, 120:15
**helps** [1] - 86:21
**herein** [2] - 16:19, 85:20
**high** [6] - 44:18, 45:4, 67:6, 71:18, 72:7
**high-level** [3] - 67:6, 71:18, 72:7
**high-ranking** [1] - 72:7
**higher** [1] - 44:15
**highly** [1] - 62:6
**hired** [2] - 68:9, 99:11
**historic** [1] - 84:20
**history** [1] - 44:7
**hold** [1] - 121:18
**holding** [4] - 31:11, 87:2, 122:22
**holds** [2] - 12:20, 13:17
**home** [2] - 14:8, 85:6
**honest** [2] - 28:12, 48:18
**Honor** [109] - 3:17, 3:24, 4:4, 6:2, 7:23, 16:7, 22:3, 28:12, 33:9, 49:12, 53:23, 55:12, 56:6, 56:12, 56:19, 57:3, 57:9, 57:18, 57:22, 58:22, 59:5, 59:23, 61:9, 62:4, 63:15, 63:22, 65:2, 65:6, 65:11,

65:16, 66:22, 67:22, 68:16, 69:17, 72:22, 73:2, 73:12, 73:23, 75:8, 76:20, 77:7, 77:14, 78:2, 78:11, 78:15, 79:3, 79:11, 80:9, 81:6, 82:2, 82:7, 82:19, 83:11, 84:12, 86:10, 86:13, 87:6, 87:24, 88:17, 88:23, 89:6, 90:3, 91:19, 92:2, 92:13, 93:6, 94:13, 94:21, 95:9, 96:13, 97:24, 98:11, 100:11, 100:25, 101:10, 101:18, 102:3, 102:6, 102:11, 102:16, 103:1, 103:22, 106:21, 107:7, 108:4, 108:24, 109:5, 109:22, 110:8, 111:7, 111:24, 112:20, 113:6, 114:1, 114:6, 114:7, 114:14, 115:13, 116:8, 117:14, 118:1, 119:20, 120:1, 120:9, 121:21, 122:12, 123:14, 124:4, 124:6
**hope** [2] - 56:2, 75:3
**hoped** [1] - 59:9
**hopefully** [5] - 15:7, 31:15, 73:14, 98:13, 119:15
**hoping** [2] - 122:16, 122:19
**horizon** [1] - 27:13
**house** [2] - 43:14, 85:5
**House** [5] - 54:11, 59:14, 61:17, 74:16, 80:3
**House's** [1] - 31:24
**housed** [1] - 89:13
**HUMPHREYS** [149] - 3:24, 53:23, 55:12, 55:14, 56:5, 56:12, 56:19, 57:3, 57:8, 57:11, 57:17, 57:22, 58:7, 58:20, 59:4, 59:7, 59:16, 59:22, 60:5, 60:11, 60:18, 61:9, 62:4, 63:15, 63:21, 64:15, 65:1, 65:6, 65:10, 65:15, 66:9, 66:21, 67:5, 67:11, 67:13, 67:21,

68:16, 68:21, 69:16, 69:21, 69:24, 70:3, 70:8, 72:21, 73:2, 73:10, 73:23, 75:8, 75:25, 76:4, 76:19, 77:6, 77:9, 77:24, 78:10, 78:15, 79:2, 79:11, 79:15, 79:18, 80:9, 80:20, 81:3, 81:5, 82:2, 82:7, 82:19, 83:11, 84:12, 84:19, 84:23, 86:10, 87:6, 87:10, 87:14, 87:24, 88:17, 88:23, 89:6, 89:10, 90:2, 90:14, 90:22, 91:19, 92:1, 93:5, 94:7, 94:21, 95:8, 96:12, 97:24, 100:11, 100:22, 101:10, 101:18, 101:23, 102:3, 102:6, 102:10, 102:15, 102:18, 102:22, 102:25, 103:9, 103:14, 103:22, 104:14, 104:21, 105:7, 105:11, 105:13, 105:16, 105:19, 106:21, 107:7, 107:25, 108:24, 109:4, 109:7, 109:22, 110:7, 111:6, 111:23, 112:19, 113:6, 113:12, 114:1, 114:6, 114:14, 115:7, 115:12, 115:15, 115:22, 116:7, 117:14, 118:1, 118:19, 119:16, 119:20, 120:1, 120:6, 120:8, 121:20, 121:23, 122:11, 122:16, 122:19, 123:14, 124:6
**Humphreys** [1] - 3:25
**hypothetical** [14] - 79:2, 80:2, 80:8, 82:3, 82:10, 82:21, 83:5, 83:6, 104:18, 105:4, 105:8, 111:5, 111:18, 111:24
**hypothetically** [3] - 83:16, 91:6, 104:9
**hypotheticals** [2] - 82:5, 110:17

**I**
**idea** [1] - 74:4
**ideas** [3] - 64:10, 66:5, 120:4
**identical** [2] - 20:24, 21:4
**identified** [7] - 29:9, 74:13, 74:19, 88:11, 98:7, 98:21, 111:2
**identify** [2] - 3:6, 74:20
**identifying** [2] - 39:4, 109:19
**Ill** [4] - 13:22, 14:11, 23:19, 77:18
**illegal** [1] - 40:17
**immediate** [2] - 11:4, 11:9
**immense** [1] - 51:9
**imminence** [1] - 46:2, 46:10
**immunity** [8] - 16:16, 20:16, 85:17, 86:7, 87:5, 88:10, 92:23, 93:1
**implement** [8] - 14:21, 26:24, 27:3, 27:15, 36:5, 44:1, 98:2, 113:10
**implementation** [3] - 24:20, 25:23, 67:20
**implemented** [6] - 13:2, 13:5, 14:25, 26:7, 27:15, 67:9
**implementing** [4] - 36:10, 43:19, 61:25, 64:10
**implicate** [1] - 27:25
**implicated** [1] - 20:4
**implication** [1] - 17:7
**implied** [1] - 17:12
**impliedly** [5] - 16:21, 17:6, 20:9, 85:22, 87:11
**Impliedly** [1] - 16:23
**important** [6] - 3:13, 47:19, 63:7, 70:14, 89:4, 108:3
**impose** [1] - 112:3
**imposes** [1] - 10:12
**impossible** [1] - 47:17
**impression** [1] - 107:5
**improper** [15] - 17:5, 39:4, 108:7, 109:20, 109:24, 109:25, 110:4, 110:8, 110:15, 110:19, 110:25, 111:4, 111:14, 111:22,

112:5
**improvements** [2] - 36:24, 38:2
**improving** [2] - 41:3, 68:18
**in-house** [1] - 43:14
**inadequacy** [1] - 23:17
**inadequate** [1] - 22:20
**inclined** [2] - 119:3, 119:10
**includes** [1] - 39:18
**including** [2] - 62:8, 71:5, 117:20
**inconsistent** [1] - 110:1
**incorporated** [1] - 95:10
**incorporates** [1] - 117:15
**indefinite** [1] - 44:24
**independent** [1] - 100:14
**indicate** [2] - 63:10, 87:18
**indicated** [6] - 18:24, 70:12, 85:16, 97:3, 113:5, 115:10
**indication** [2] - 46:13, 106:11
**individual** [17] - 7:12, 8:8, 8:17, 8:18, 8:24, 17:23, 19:12, 19:15, 31:21, 51:15, 51:23, 52:5, 75:22, 76:7, 76:8, 76:17, 95:5
**individual's** [1] - 78:24
**individualized** [6] - 39:25, 41:24, 42:3, 51:17, 95:15, 97:7
**individually** [1] - 91:8
**individuals** [11] - 11:22, 18:13, 19:21, 41:25, 51:15, 55:23, 56:7, 56:13, 76:24, 77:12, 95:7
**inexplicable** [1] - 97:18
**inferior** [2] - 70:24, 74:9
**information** [114] - 6:16, 8:20, 9:4, 9:5, 9:10, 9:13, 10:14, 11:5, 11:12, 11:14, 11:17, 11:23, 12:17, 12:20, 12:25, 13:6, 13:12, 13:18, 14:4, 14:23, 15:4, 15:14, 16:11, 21:17, 21:23,

25:18, 28:5, 28:10, 30:10, 30:14, 30:16, 30:23, 31:19, 32:3, 32:4, 32:16, 32:24, 34:3, 34:4, 34:6, 35:13, 36:14, 41:1, 41:8, 41:9, 41:18, 41:22, 41:24, 42:3, 43:15, 47:5, 47:14, 49:3, 49:12, 49:19, 49:21, 51:17, 51:23, 52:1, 53:8, 53:16, 56:2, 56:25, 58:6, 58:7, 58:20, 58:24, 59:5, 64:16, 71:10, 72:17, 74:5, 75:6, 79:13, 80:25, 81:7, 81:14, 81:24, 82:4, 82:16, 82:22, 83:1, 83:2, 83:4, 83:8, 83:10, 83:21, 84:1, 85:7, 86:24, 92:4, 92:16, 93:11, 96:15, 96:23, 102:12, 106:8, 106:22, 107:12, 108:4, 108:5, 108:8, 108:22, 109:8, 110:10, 111:10, 112:4, 114:12, 117:18, 118:8, 118:14, 118:22, 118:25
**information-sharing** [1] - 109:8
**initial** [1] - 53:25
**initiative** [2] - 68:13, 68:14
**Initiative** [1] - 62:12
**injunction** [20] - 4:6, 5:15, 5:18, 5:24, 6:3, 6:12, 6:14, 6:16, 6:19, 7:1, 10:25, 34:8, 44:20, 45:12, 47:18, 53:3, 56:9, 56:14, 94:20, 117:21
**injunctions** [2] - 22:9, 45:4
**injunctive** [22] - 9:14, 9:21, 9:23, 10:24, 11:6, 12:4, 16:25, 17:5, 17:7, 17:22, 18:10, 19:10, 19:16, 20:7, 20:24, 24:3, 44:22, 78:14, 85:25, 86:14, 94:16, 94:23
**injured** [1] - 7:21
**injuries** [2] - 14:15, 16:4
**injury** [28] - 7:15, 8:23,

8:25, 9:2, 9:23, 11:9, 13:22, 13:25, 14:9, 14:11, 14:14, 22:21, 44:21, 44:25, 77:18, 77:22, 78:3, 78:8, 78:11, 78:13, 78:16, 78:25, 79:25, 80:7, 81:18, 81:20, 81:23, 96:20
**injury-in-fact** [10] - 7:15, 8:23, 8:25, 9:2, 14:14, 77:18, 77:22, 78:3, 79:25, 96:20
**instance** [9] - 40:15, 45:4, 57:23, 74:6, 77:12, 79:5, 82:21, 107:13, 111:11
**instances** [1] - 79:15
**instead** [1] - 120:12
**insufficient** [1] - 78:19
**integration** [1] - 103:10
**integrity** [1] - 47:20
**intend** [1] - 22:9
**intends** [1] - 18:20
**interact** [1] - 113:24
**interest** [5] - 11:13, 11:16, 27:25, 51:5, 75:22
**interested** [1] - 51:19
**interests** [6] - 6:9, 7:9, 8:4, 52:5, 75:20, 76:1
**interface** [1] - 60:20
**Interior** [1] - 39:11
**Internal** [27] - 6:8, 11:21, 17:2, 18:9, 20:10, 21:10, 22:21, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:19, 86:8, 86:13, 86:18, 86:23, 87:3, 91:5, 93:10, 117:16, 118:3, 118:5, 118:10, 119:1
**internal** [2] - 60:19, 78:18
**interoperability** [1] - 47:7
**interpret** [1] - 88:15
**interpreted** [2] - 72:11, 74:21
**intra** [5] - 49:16, 50:1, 50:2, 50:13, 81:16
**intra-agency** [5] - 49:16, 50:1, 50:2, 50:13, 81:16
**intruded** [1] - 11:18
**intruding** [3] - 10:13, 13:11, 13:16

**intrusion** [12] - 10:3, 10:9, 10:12, 10:14, 11:16, 12:7, 13:10, 84:8, 84:13, 84:19, 85:6, 85:12
**intrusive** [1] - 10:3
**invasion** [1] - 14:8
**investigation** [1] - 40:17
**investigations** [3] - 39:18, 39:25, 40:14
**Investment** [1] - 62:12
**invoke** [1] - 109:18
**invoked** [1] - 39:10
**involve** [3] - 20:3, 21:7, 28:10
**involved** [12] - 12:2, 18:4, 22:11, 27:23, 28:9, 31:21, 55:23, 64:9, 66:15, 73:15, 100:16, 107:20
**involves** [1] - 19:2
**involving** [3] - 10:25, 11:6, 18:4
**IRC** [1] - 18:16
**irregularities** [1] - 34:9
**irreparable** [11] - 5:25, 44:11, 44:18, 45:11, 45:17, 47:1, 52:18, 73:1, 112:10, 112:12, 123:2
**IRS** [1] - 42:2
**issuance** [2] - 22:9, 88:25
**issue** [23] - 6:7, 12:16, 16:9, 16:23, 23:13, 24:5, 26:1, 26:2, 33:8, 45:3, 53:16, 55:25, 63:22, 67:19, 73:13, 75:2, 76:6, 81:6, 82:15, 92:19, 112:14, 115:7, 123:18
**issued** [4] - 11:2, 61:21, 62:16, 122:7
**issues** [10] - 4:14, 5:16, 6:20, 29:15, 34:20, 55:16, 73:11, 75:15, 79:23, 88:24
**IT** [2] - 36:24, 117:7
**itemized** [3] - 110:22, 110:24, 111:3
**itself** [4] - 14:9, 20:4, 20:5, 24:2

## J

**January** [17] - 15:18, 34:24, 35:5, 35:22,

36:4, 54:16, 55:9, 57:5, 62:2, 98:18, 99:2, 99:6, 99:23, 100:1, 100:3, 100:5, 101:25
**job** [6] - 29:24, 30:23, 30:25, 36:18, 37:4, 37:7
**jointly** [1] - 61:23
**Joseph** [1] - 106:9
**JOSHI** [74] - 3:17, 6:2, 7:23, 8:13, 9:2, 10:18, 12:10, 13:14, 14:19, 15:8, 15:14, 16:7, 17:9, 18:23, 19:14, 20:11, 21:3, 22:2, 22:10, 22:23, 23:3, 23:5, 23:24, 24:10, 25:6, 25:10, 26:18, 26:21, 27:20, 28:8, 28:16, 29:20, 31:17, 32:9, 32:15, 33:9, 33:18, 33:22, 34:2, 34:22, 36:2, 36:18, 37:24, 39:16, 40:5, 40:8, 40:11, 40:13, 40:25, 41:17, 43:1, 45:23, 46:8, 46:17, 46:19, 48:3, 48:17, 49:6, 49:8, 50:8, 50:25, 51:3, 51:8, 52:16, 53:5, 53:8, 53:11, 120:13, 120:18, 120:21, 122:13, 122:24, 123:11, 124:4
**Joshi** [1] - 3:18
**Judge** [15] - 5:14, 5:23, 9:19, 15:7, 44:16, 52:12, 61:4, 61:13, 62:11, 63:9, 65:20, 97:11, 106:2, 107:9, 113:4
**judges** [2] - 45:3, 45:15
**judgment** [6] - 7:4, 16:10, 18:21, 50:13, 120:15, 124:1
**judicial** [2] - 24:13, 88:3
**July** [1] - 27:11
**juncture** [1] - 96:2
**jurisdiction** [6] - 16:14, 16:24, 23:20, 85:24, 88:16, 93:4
**jurisdictional** [2] - 88:14, 96:18
**jury** [1] - 28:11
**Justice** [4] - 3:25, 4:2, 61:3, 61:15

## K

**Kean** [2] - 124:17, 124:21
**keep** [2] - 102:12, 114:12
**key** [1] - 73:17
**kind** [5] - 47:12, 87:19, 95:9, 113:21, 119:13
**kindly** [1] - 116:18
**Kirts** [1] - 17:24
**Kirtz** [2] - 87:17, 87:22
**KIRTZ** [1] - 87:22
**knowable** [1] - 58:7
**knowing** [1] - 83:14
**knowledge** [4] - 33:10, 56:4, 73:14, 97:16
**knows** [1] - 58:13
**Krause** [50] - 29:13, 29:23, 31:3, 31:7, 31:11, 33:11, 35:14, 36:3, 36:14, 36:19, 41:2, 43:12, 62:1, 64:5, 66:22, 67:2, 67:18, 67:25, 68:9, 68:22, 69:1, 69:25, 71:6, 71:15, 71:24, 74:14, 74:19, 74:22, 75:10, 77:6, 80:14, 82:21, 83:6, 83:14, 92:2, 98:17, 99:1, 99:4, 99:7, 99:16, 100:23, 101:2, 101:8, 101:11, 101:14, 102:8, 104:10, 104:17, 105:8, 111:1
**Krause's** [5] - 29:20, 34:7, 83:13, 98:16, 98:21

## L

**lack** [2] - 10:18, 72:17
**lacks** [2] - 16:24, 85:24
**laptop** [3] - 11:12, 106:11, 106:15
**last** [9] - 6:12, 16:4, 17:24, 27:6, 105:24, 112:9, 114:17, 120:17, 122:3
**lasts** [1] - 27:11
**late** [1] - 114:16
**launch** [1] - 97:20
**law** [12] - 9:3, 11:18, 12:11, 13:22, 13:24, 14:2, 14:10, 14:11, 19:8, 84:6, 115:23, 117:5, 117:11,

117:15, 118:22, 119:7
**lawful** [6] - 33:14, 43:13, 47:22, 91:18, 91:20, 108:10
**laws** [1] - 43:9
**lawsuit** [1] - 8:9
**leader** [5] - 29:16, 99:10, 103:15, 103:24, 104:4
**leaders** [1] - 8:14
**leadership** [1] - 99:5
**learn** [3] - 27:7, 73:15, 108:5
**least** [15] - 6:23, 27:22, 30:11, 32:13, 32:23, 34:5, 34:14, 36:11, 38:5, 54:1, 54:3, 71:9, 82:10, 103:16, 111:16
**leave** [1] - 91:10
**leaves** [3] - 49:2, 49:4, 49:12
**lectern** [1] - 58:22
**left** [1] - 84:2
**legacy** [1] - 68:18
**legal** [10] - 24:17, 26:8, 32:22, 48:4, 49:14, 66:10, 88:8, 90:4, 90:23, 91:4
**legally** [2] - 33:12, 49:20
**legislation** [1] - 87:19
**less** [3] - 4:11, 76:14, 79:23
**level** [7] - 9:12, 38:11, 45:25, 52:25, 67:6, 71:18, 72:7
**liability** [2] - 10:12, 13:10
**liable** [1] - 44:24
**license** [1] - 89:1
**licenses** [1] - 88:25
**lift** [3] - 13:2, 13:3, 13:4
**likelihood** [3] - 7:2, 45:10, 45:16
**likely** [4] - 16:2, 45:7, 79:24, 97:13
**limitations** [2] - 31:1, 37:3
**limited** [6] - 22:13, 30:19, 36:11, 70:15, 88:4, 96:3
**limiting** [1] - 43:24
**limits** [1] - 24:13
**line** [4] - 3:12, 13:23, 36:23, 122:17
**link** [2] - 44:12, 50:20
**linked** [1] - 22:6

**list** [2] - 84:19, 84:20
**lists** [1] - 61:24
**litigant** [1] - 81:17
**Litigation** [2] - 3:18, 3:21
**litigation** [1] - 73:24
**located** [3] - 54:17, 55:10, 57:5
**logged** [1] - 113:16
**logging** [2] - 113:23, 114:11
**logical** [1] - 92:25
**look** [15] - 12:13, 13:24, 14:12, 38:3, 41:23, 42:3, 51:16, 54:3, 79:18, 80:12, 84:16, 91:15, 92:7, 104:21, 119:24
**looked** [2] - 107:16, 107:19
**looking** [9] - 14:13, 16:7, 24:9, 28:2, 40:19, 41:19, 41:20, 101:24
**looks** [1] - 69:1
**lopsided** [1] - 52:4
**loss** [3] - 9:22, 11:9, 14:2
**Lucia** [1] - 72:2

## M

**maintain** [3] - 16:8, 77:13, 122:1
**maintains** [1] - 29:5
**major** [1] - 45:18
**maker** [1] - 43:18
**makers** [1] - 58:4
**man** [1] - 62:14
**manage** [3] - 28:4, 28:17, 64:6
**management** [1] - 54:24
**managerial** [1] - 99:9
**managing** [1] - 103:12
**manner** [1] - 22:7
**March** [2] - 119:25, 123:22
**market** [1] - 37:5
**marks** [2] - 24:15, 88:5
**masks** [1] - 3:9
**Massachusetts** [2] - 20:11, 23:13
**massive** [1] - 14:2
**masters** [3] - 30:2, 31:18, 32:2
**Match** [2] - 18:19, 86:2
**Match-E-Be-Nash** [2] - 18:19, 86:2
**material** [3] - 52:9,

55:25, 107:3
**materials** [2] - 4:8, 42:21
**matter** [13] - 6:11, 11:11, 16:14, 16:24, 19:9, 23:19, 25:24, 34:8, 67:21, 85:24, 88:21, 116:15, 124:19
**matters** [1] - 94:13
**maximum** [1] - 117:5
**Mazars** [1] - 82:11
**MAZARS** [1] - 82:11
**mean** [39] - 13:21, 14:20, 20:1, 25:4, 32:11, 48:13, 50:22, 56:1, 62:24, 63:17, 63:24, 64:14, 65:19, 66:5, 67:10, 68:16, 69:1, 73:12, 74:18, 81:6, 83:13, 83:23, 90:2, 90:8, 94:9, 95:12, 96:5, 102:21, 104:13, 105:5, 107:15, 108:6, 109:9, 110:5, 112:21, 115:18, 118:1, 120:5, 122:6
**meaning** [3] - 74:20, 109:24, 115:5
**means** [6] - 72:15, 95:14, 115:4, 115:6, 115:19, 118:23
**meant** [5] - 12:19, 18:13, 87:11, 101:11
**meantime** [1] - 99:21
**measures** [3] - 25:17, 42:20, 98:7
**media** [1] - 42:5
**meet** [1] - 29:21
**member** [1] - 80:3
**members** [21] - 7:8, 7:13, 7:19, 8:1, 8:8, 8:18, 8:20, 8:24, 26:8, 27:25, 31:4, 43:12, 61:1, 68:6, 75:19, 75:23, 76:17, 93:9, 111:3, 113:24, 114:9
**members'** [7] - 14:15, 14:23, 16:3, 16:11, 76:14, 77:16, 78:8
**memoranda** [1] - 88:9
**memorandum** [2] - 92:22, 96:13
**mention** [2] - 23:7, 84:14
**mentioned** [4] - 22:25, 24:21, 66:21, 101:20
**mentions** [2] - 10:5,

48:17
**mere** [1] - 108:4
**merely** [2] - 44:23, 45:1
**merits** [10] - 28:22, 42:12, 88:16, 93:3, 93:6, 93:8, 95:22, 119:8, 119:10
**messages** [1] - 85:2
**messenger** [1] - 63:20
**methods** [1] - 18:10
**microphone** [2] - 3:14, 56:10
**might** [15] - 9:17, 18:2, 19:17, 21:6, 23:19, 29:13, 39:21, 39:22, 40:17, 40:18, 46:25, 51:1, 86:22, 91:17, 114:25
**millions** [1] - 47:13
**mind** [3] - 56:18, 83:14, 95:2
**ministerial** [2] - 89:14, 89:18
**minor** [2] - 52:23, 53:13
**minutes** [2] - 116:19, 121:14
**mispronouncing** [1] - 103:21
**missed** [4] - 40:4, 50:16, 84:18, 120:17
**missing** [1] - 44:5
**mission** [1] - 69:18
**mistake** [4] - 112:21, 113:2, 113:17
**mistakes** [1] - 112:17
**mitigate** [2] - 112:15, 114:8
**mitigation** [1] - 25:17
**mixed** [1] - 47:14
**modernization** [5] - 67:6, 68:12, 69:23, 103:10
**modernize** [2] - 69:19, 98:1, 98:4
**modernizing** [1] - 68:17
**modify** [1] - 6:16
**moment** [2] - 69:8, 119:16
**monetary** [4] - 10:23, 86:15, 94:10, 109:11
**money** [2] - 16:17, 85:18, 95:15
**monitoring** [2] - 113:23, 114:11
**mooted** [1] - 114:25
**most** [5] - 10:11, 12:10, 45:21, 53:24,

94:5
**mostly** [1] - 45:24
**motion** [21] - 7:3, 8:14, 55:16, 60:24, 65:23, 96:14, 120:8, 120:14, 120:25, 121:1, 121:6, 121:7, 121:17, 121:24, 121:25, 122:8, 123:9, 123:24, 123:25, 124:1
**motions** [3] - 6:20, 120:4, 123:19
**move** [18] - 16:13, 20:18, 24:11, 28:22, 38:23, 41:5, 56:10, 59:6, 60:23, 74:1, 75:14, 85:15, 88:2, 97:11, 98:14, 104:7, 114:21, 116:14
**moved** [2] - 54:11, 98:9
**moving** [2] - 5:12, 119:5
**MR** [223] - 3:17, 3:24, 6:2, 7:23, 8:13, 9:2, 10:18, 12:10, 13:14, 14:19, 15:8, 15:14, 16:7, 17:9, 18:23, 19:14, 20:11, 21:3, 22:2, 22:10, 22:23, 23:3, 23:5, 23:24, 24:10, 25:6, 25:10, 26:18, 26:21, 27:20, 28:8, 28:16, 29:20, 31:17, 32:9, 32:15, 33:9, 33:18, 33:22, 34:2, 34:22, 36:2, 36:18, 37:24, 39:16, 40:5, 40:8, 40:11, 40:13, 40:25, 41:17, 43:1, 45:23, 46:8, 46:17, 46:19, 48:3, 48:17, 49:6, 49:8, 50:8, 50:25, 51:3, 51:8, 52:16, 53:5, 53:8, 53:11, 53:23, 55:12, 55:14, 56:5, 56:12, 56:19, 57:3, 57:8, 57:11, 57:17, 57:22, 58:7, 58:20, 59:4, 59:7, 59:16, 59:22, 60:5, 60:11, 60:18, 61:9, 62:4, 63:15, 63:21, 64:15, 65:1, 65:6, 65:10, 65:15, 66:9, 66:21, 67:5, 67:11, 67:13, 67:21, 68:16, 68:21, 69:16, 69:21, 69:24,

70:3, 70:8, 72:21, 73:2, 73:10, 73:23, 75:8, 75:25, 76:4, 76:19, 77:6, 77:9, 77:24, 78:10, 78:15, 79:2, 79:11, 79:15, 79:18, 80:9, 80:20, 81:3, 81:5, 82:2, 82:7, 82:19, 83:11, 84:12, 84:19, 84:23, 86:10, 87:6, 87:10, 87:14, 87:24, 88:17, 88:23, 89:6, 89:10, 90:2, 90:14, 90:22, 91:19, 92:1, 93:5, 94:7, 94:21, 95:8, 96:12, 97:24, 100:11, 100:22, 101:10, 101:18, 101:23, 102:3, 102:6, 102:10, 102:15, 102:18, 102:22, 102:25, 103:9, 103:14, 103:22, 104:14, 104:21, 105:7, 105:11, 105:13, 105:16, 105:19, 106:21, 107:7, 107:25, 108:24, 109:4, 109:7, 109:22, 110:7, 111:6, 111:23, 112:19, 113:6, 113:12, 114:1, 114:6, 114:14, 115:7, 115:12, 115:15, 115:22, 116:7, 117:14, 118:1, 118:19, 119:16, 119:20, 120:1, 120:6, 120:8, 120:13, 120:18, 120:21, 121:20, 121:23, 122:11, 122:13, 122:16, 122:19, 122:24, 123:11, 123:14, 124:4, 124:6
**multiple** [1] - 26:20
**murkiness** [1] - 34:22
**Musk** [2] - 61:2, 62:14
**musk** [9] - 61:4, 61:6, 61:19, 61:21, 62:21, 63:2, 63:24, 64:8, 64:24
**Musk'** [1] - 62:8
**Musk's** [1] - 48:22
**must** [4] - 7:1, 44:21, 93:7, 93:14

**N**

**named** [2] - 35:10, 62:14
**names** [1] - 60:16
**Nandan** [1] - 3:17
**Nash** [2] - 18:19, 86:2
**necessarily** [3] - 34:4, 50:10, 108:6
**necessary** [3] - 5:25, 44:19, 117:3
**need** [34] - 8:8, 8:17, 17:9, 29:6, 36:1, 36:14, 36:21, 36:22, 37:14, 37:22, 38:4, 41:23, 43:9, 51:16, 51:22, 56:10, 66:13, 70:24, 74:4, 78:20, 81:5, 86:22, 91:20, 92:15, 102:12, 104:23, 104:25, 113:3, 116:14, 118:12, 119:12, 120:23, 121:9, 123:18
**needed** [1] - 26:11
**needs** [2] - 36:25, 37:16
**negotiation** [1] - 25:15
**network** [1] - 49:8
**networks** [1] - 49:11
**never** [1] - 91:3
**new** [10] - 15:12, 24:20, 25:3, 25:18, 25:23, 26:14, 29:24, 44:2, 52:7, 52:16
**New** [16] - 4:12, 5:15, 5:24, 6:3, 6:8, 6:12, 6:18, 9:19, 13:4, 36:11, 44:15, 46:11, 52:11, 53:6, 106:2, 117:22
**next** [7] - 5:13, 27:13, 39:8, 114:21, 116:15, 120:3, 120:4
**nobody** [2] - 58:13, 69:4
**nominally** [1] - 99:7
**nominated** [9] - 55:2, 55:6, 57:25, 58:3, 70:22, 72:12, 74:10, 74:14, 74:23
**nonconsensual** [1] - 30:20
**nondisclosure** [1] - 30:20
**none** [1] - 62:25
**Norm** [1] - 3:21
**Norton** [1] - 89:17
**note** [5] - 6:4, 23:5,

42:1, 71:9, 108:3
**Nothing** [2] - 16:19, 85:20
**nothing** [5] - 22:15, 38:14, 88:1, 101:20, 111:19
**Notice** [3] - 79:19, 80:13, 118:13
**novel** [2] - 4:15, 28:19
**number** [4] - 45:2, 87:23, 94:14, 107:1
**Number** [1] - 112:7

**O**

**oath** [1] - 98:18
**objective** [1] - 32:6
**obligations** [5] - 24:17, 88:7, 91:14, 102:8, 102:14
**obtain** [1] - 96:3
**obvious** [1] - 60:25
**obviously** [19] - 4:14, 8:2, 8:12, 23:18, 28:24, 34:9, 37:15, 37:19, 49:8, 56:2, 62:22, 65:23, 66:15, 88:3, 107:5, 112:11, 119:2, 121:16, 123:16
**occupies** [1] - 87:19
**occur** [2] - 44:24, 76:24
**occurred** [4] - 25:15, 25:24, 45:20, 76:11
**odd** [1] - 20:14
**Office** [13] - 13:7, 13:19, 30:6, 31:9, 31:10, 43:5, 46:6, 54:12, 59:3, 59:12, 64:13, 80:4, 108:17
**office** [1] - 15:15, 15:17
**officer** [7] - 16:18, 55:1, 55:6, 74:14, 74:17, 85:19, 102:1
**officers** [14] - 29:5, 30:14, 41:13, 70:22, 70:24, 70:25, 71:5, 71:20, 72:3, 72:10, 74:9, 74:10, 74:20
**official** [4] - 38:14, 71:3, 75:11, 98:24
**officials** [14] - 70:4, 71:16, 71:18, 71:19, 71:20, 71:21, 71:23, 72:3, 72:6, 74:12, 74:19, 106:10, 110:22, 117:23
**officials'** [1] - 123:3

**often** [1] - 94:11
**oil** [4] - 45:5, 45:7, 45:18, 45:19
**old** [3] - 15:16, 16:9, 16:12
**OMB** [13] - 54:20, 54:24, 55:1, 55:5, 55:11, 57:6, 57:13, 57:16, 57:21, 58:2, 58:12, 58:16, 59:12
**onboarded** [1] - 98:19
**onboarding** [1] - 34:10
**once** [16] - 5:6, 18:23, 21:5, 22:24, 23:12, 25:6, 31:17, 37:3, 46:2, 47:9, 47:23, 49:4, 49:12, 51:8, 53:1, 122:7
**one** [62] - 4:13, 4:20, 8:4, 11:3, 11:15, 11:23, 13:17, 14:24, 16:4, 23:16, 24:16, 26:19, 29:8, 31:24, 32:11, 33:8, 34:11, 34:14, 41:9, 41:11, 42:11, 43:20, 46:23, 47:24, 49:19, 50:5, 52:17, 53:21, 55:8, 60:13, 60:16, 60:18, 74:7, 75:9, 79:18, 80:12, 81:25, 82:7, 82:10, 82:17, 84:10, 88:6, 88:22, 91:1, 91:7, 91:10, 92:6, 93:20, 95:3, 95:6, 95:13, 105:24, 107:11, 107:13, 109:4, 109:7, 110:17, 114:17, 115:21, 116:23, 120:25, 121:16
**one-off** [1] - 95:3
**ones** [4] - 17:3, 54:1, 74:13, 91:13
**opaque** [1] - 54:3
**open** [2] - 38:21, 39:20
**operate** [2] - 27:8, 30:2
**operated** [1] - 44:7
**operating** [1] - 66:20
**operation** [1] - 64:9
**operational** [1] - 42:17
**operations** [2] - 70:17, 88:21
**opine** [2] - 66:9, 73:10
**opinion** [5] - 15:7, 52:13, 106:5, 107:10, 112:6

**opinions** [4] - 4:9, 4:10, 45:19, 49:25
**OPM** [1] - 62:17
**opponent** [1] - 80:7
**opportunity** [1] - 6:15
**opposed** [6] - 19:5, 76:18, 91:8, 94:4, 95:3, 95:7
**opposing** [1] - 120:24
**opposition** [2] - 65:23, 78:17
**opted** [1] - 97:1
**order** [29] - 3:2, 10:17, 13:3, 13:4, 27:2, 27:22, 36:10, 36:11, 46:11, 47:16, 48:8, 51:17, 62:13, 76:20, 81:18, 83:19, 86:22, 93:13, 95:16, 96:1, 110:10, 113:11, 113:16, 122:1, 122:3, 122:25, 123:19
**Order** [44] - 13:1, 13:5, 14:22, 15:11, 27:3, 27:4, 27:10, 27:16, 27:17, 30:4, 43:7, 43:8, 46:3, 46:12, 47:6, 48:17, 49:1, 54:5, 54:6, 55:17, 59:17, 60:5, 65:24, 67:5, 67:8, 67:23, 68:3, 68:10, 68:11, 69:5, 69:11, 69:18, 106:24, 110:1, 110:19, 111:15, 111:22, 112:1, 116:25, 117:9, 117:13, 117:24, 118:16
**ordinarily** [1] - 90:18
**organization** [4] - 7:20, 60:16, 60:20, 76:2
**Organization** [7] - 48:20, 54:13, 59:25, 60:10, 60:13, 61:6, 66:1
**organizational** [6] - 7:11, 7:20, 8:14, 54:1, 75:21, 94:12
**organizationally** [1] - 55:22
**organizations** [2] - 29:15, 56:24
**organizations'** [1] - 8:6
**organized** [1] - 94:8
**originally** [1] - 98:21
**otherwise** [3] - 3:9,

67:13, 99:13
**outset** [2] - 5:22, 6:23
**outside** [26] - 12:15, 13:6, 31:20, 43:5, 43:15, 46:19, 70:13, 82:22, 92:4, 92:9, 92:17, 105:1, 105:25, 106:6, 106:12, 106:16, 106:17, 107:21, 108:12, 108:13, 108:22, 108:25, 112:11, 112:13, 114:4, 114:13
**overseen** [1] - 75:10
**oversees** [1] - 64:4
**owe** [1] - 102:8
**own** [8] - 7:8, 7:9, 8:2, 14:8, 18:11, 75:19, 85:9, 113:18

**P**

**p.m** [4] - 3:2, 116:21, 116:22, 124:9
**page** [1] - 87:23
**Page** [1] - 65:22
**paper** [1] - 46:23
**papers** [2] - 29:12, 53:22
**paperwork** [4] - 34:24, 98:19, 98:20, 100:2
**Paragraph** [3] - 38:24, 39:1, 71:14
**parameters** [1] - 92:12
**parcel** [1] - 87:7
**part** [23] - 13:17, 13:18, 16:23, 24:23, 28:19, 29:14, 30:2, 35:22, 45:13, 60:8, 66:24, 67:3, 67:16, 73:14, 78:23, 81:7, 87:7, 88:21, 90:12, 91:24, 100:25, 106:23, 120:17
**participate** [5] - 8:9, 8:18, 75:23, 76:17
**participation** [1] - 7:12
**particular** [21] - 5:19, 9:17, 13:13, 20:19, 22:6, 22:7, 26:16, 40:20, 43:19, 52:7, 56:20, 73:3, 82:15, 86:24, 87:18, 89:11, 90:25, 91:13, 102:9, 107:16, 111:9
**particularized** [1] - 40:14
**particularly** [3] - 61:1,

98:5, 111:20
**parties** [2] - 11:19, 124:7
**party** [4] - 49:21, 50:14, 76:15, 83:21
**pass** [1] - 76:9
**password** [1] - 11:7
**passwords** [1] - 11:3
**past** [2] - 90:8, 90:11
**pause** [1] - 110:2
**Pause** [1] - 116:17
**payment** [15] - 24:23, 26:15, 36:15, 37:16, 38:24, 40:19, 41:4, 70:19, 89:23, 97:15, 106:12, 106:14, 109:15, 111:9, 117:12
**Payment** [1] - 99:22
**payments** [13] - 26:16, 27:2, 27:23, 39:4, 40:17, 106:23, 107:16, 109:20, 109:23, 110:2, 110:9, 111:4, 111:12
**pending** [1] - 52:1
**people** [8] - 4:24, 57:25, 58:3, 71:2, 71:4, 71:20, 74:25, 84:3
**people's** [1] - 121:19
**per** [1] - 88:25
**perfect** [2] - 13:23, 82:11
**perform** [1] - 99:9
**performance** [3] - 29:6, 104:24, 105:1
**performing** [2] - 100:24, 101:13
**perhaps** [6] - 5:20, 15:1, 27:24, 38:19, 41:22, 47:24
**period** [4] - 35:8, 100:4, 112:23, 122:4
**periods** [1] - 56:21
**permissible** [3] - 47:22, 111:9, 117:19
**permits** [1] - 79:3
**permitted** [3] - 86:20, 110:12, 112:6
**permitting** [1] - 45:17
**Perry** [1] - 92:25
**person** [9] - 10:13, 13:10, 13:15, 19:12, 26:19, 28:25, 29:24, 70:9, 80:6
**personal** [12] - 9:4, 9:13, 11:12, 11:14, 12:19, 13:6, 14:4, 26:9, 43:4, 47:14,

51:17, 51:25
**personnel** [2] - 39:13, 106:6
**persons** [2] - 19:6, 91:17
**perspective** [3] - 12:9, 100:21, 118:15
**phone** [2] - 85:3, 85:4
**phrase** [1] - 117:15
**PI** [10] - 106:3, 116:15, 121:17, 121:24, 122:5, 122:7, 122:25, 123:6, 123:8, 123:24
**piece** [1] - 46:23
**pieces** [1] - 11:17
**pin** [1] - 63:18
**pipeline** [2] - 45:5, 45:18
**place** [13] - 8:15, 15:10, 16:12, 23:21, 25:4, 35:17, 36:5, 38:13, 43:25, 47:20, 76:10, 98:8, 123:1
**Plaintiff** [1] - 6:1
**plaintiff** [11] - 3:7, 9:18, 11:22, 13:25, 47:2, 81:17, 86:22, 94:16, 101:4, 116:11, 120:10
**plaintiff's** [3] - 11:19, 85:3, 95:5
**plaintiffs** [47] - 3:19, 4:17, 5:1, 5:3, 7:1, 7:10, 7:20, 8:5, 8:17, 16:25, 45:5, 56:6, 60:25, 66:11, 73:3, 73:11, 75:20, 76:12, 76:22, 78:4, 83:17, 83:23, 84:9, 84:12, 85:17, 85:25, 86:5, 87:16, 88:11, 91:11, 93:7, 94:9, 94:11, 96:3, 96:11, 96:19, 97:1, 97:6, 97:9, 97:12, 101:20, 109:10, 118:4, 119:4, 119:11, 122:22, 124:3
**Plaintiffs** [1] - 120:7
**plaintiffs'** [11] - 7:8, 8:1, 14:23, 16:10, 26:8, 27:25, 55:16, 63:23, 75:18, 77:16, 78:20
**plan** [34] - 24:24, 25:2, 25:5, 25:16, 26:13, 27:5, 27:12, 27:14, 27:22, 34:15, 35:21, 36:5, 36:10, 36:16,

37:17, 37:20, 37:23, 37:25, 38:1, 38:16, 66:16, 70:19, 73:19, 89:24, 90:9, 90:12, 90:14, 91:13, 100:9, 100:18, 100:22, 101:1
**Plan** [1] - 99:22
**plead** [1] - 97:6
**pleaded** [1] - 56:7
**pleadings** [1] - 63:23
**podium** [1] - 3:11
**point** [55] - 20:20, 22:18, 26:12, 28:7, 28:14, 29:18, 32:13, 32:16, 33:2, 34:5, 34:12, 34:14, 35:23, 39:11, 45:21, 49:9, 50:24, 52:7, 52:22, 57:14, 58:12, 58:14, 59:15, 62:20, 63:6, 64:24, 65:12, 67:2, 69:8, 69:13, 73:20, 74:16, 75:9, 75:18, 75:25, 82:9, 84:13, 86:11, 89:16, 89:18, 94:18, 99:24, 100:19, 109:9, 112:16, 113:2, 114:19, 116:10, 119:3, 119:11, 120:12, 121:20, 123:2, 123:7, 124:2
**pointed** [1] - 86:13
**pointedly** [1] - 108:19
**points** [1] - 22:8
**policies** [2] - 25:13, 99:13
**policy** [32] - 14:20, 15:12, 15:13, 15:17, 15:24, 16:9, 16:12, 24:20, 25:4, 25:19, 25:24, 35:17, 36:6, 36:9, 43:25, 44:4, 45:25, 61:24, 71:18, 72:7, 76:23, 77:1, 77:10, 89:20, 90:7, 90:16, 92:8, 95:2, 95:6, 101:19, 110:3, 110:21
**policy-making** [1] - 45:25
**policymaking** [9] - 17:22, 18:12, 18:17, 21:11, 21:15, 100:8, 100:14, 100:25, 101:14
**political** [1] - 80:3
**politician's** [1] - 110:24

portion [1] - 95:18
**poses** [1] - 10:21
**position** [16] - 33:10, 33:13, 33:19, 33:23, 35:23, 59:19, 59:21, 62:24, 71:12, 73:21, 78:22, 90:19, 115:9, 117:10, 117:14, 120:23
**positions** [4] - 33:15, 34:1, 62:24, 121:19
**positive** [1] - 33:7
**possibilities** [1] - 31:14
**possible** [1] - 16:8
**potential** [4] - 14:25, 84:14, 96:11
**potentially** [4] - 73:6, 83:25, 105:25
**precedent** [8] - 20:6, 28:2, 28:3, 28:20, 44:14, 44:17, 45:8, 94:18
**precedents** [2] - 45:23, 87:2
**precisely** [1] - 91:25
**preclude** [3] - 19:24, 87:11, 92:23
**precluded** [1] - 20:2
**precludes** [1] - 20:15
**preclusion** [1] - 19:18
**preference** [1] - 123:11
**preliminary** [11] - 4:6, 5:15, 5:18, 6:19, 7:1, 34:8, 44:19, 45:4, 45:11, 47:18, 53:3
**premise** [1] - 112:20
**premised** [1] - 122:2
**prepared** [4] - 6:22, 59:9, 69:7, 73:10
**presence** [1] - 8:21
**present** [3] - 33:5, 65:9, 112:2
**presented** [5] - 6:20, 55:16, 63:23, 115:16, 116:8
**presently** [1] - 63:22
**President** [37] - 12:23, 13:7, 13:19, 30:6, 31:9, 31:11, 43:6, 46:6, 48:23, 54:5, 54:6, 55:2, 55:6, 58:1, 58:3, 59:3, 59:13, 61:18, 62:10, 63:25, 64:2, 64:3, 64:14, 64:16, 64:21, 65:2, 70:23, 72:12, 74:10, 74:15, 74:23, 80:4, 82:12, 98:1,

108:17, 110:18, 110:21
**President's** [11] - 14:21, 26:24, 27:9, 30:4, 58:23, 64:17, 80:6, 98:3, 106:24, 110:1, 116:25
**Press** [1] - 61:17
**presumably** [5] - 15:2, 47:15, 48:15, 100:21, 106:19
**pretty** [7] - 9:20, 17:18, 28:13, 44:6, 45:24, 46:1, 52:4
**prevail** [2] - 47:3, 93:8
**prevent** [3] - 5:25, 9:21, 11:1
**prevented** [1] - 25:13
**preventing** [2] - 39:4, 109:19
**previously** [3] - 21:22, 62:7, 68:22
**primary** [1] - 80:7
**principal** [6] - 55:6, 70:22, 70:24, 71:20, 74:20, 88:22
**priorities** [3] - 67:4, 67:20, 98:3
**priority** [2] - 67:6, 97:25
**privacy** [9] - 11:8, 14:3, 14:9, 17:23, 27:25, 43:25, 44:3, 52:5, 87:20
**Privacy** [78] - 6:6, 6:7, 11:20, 17:2, 17:20, 17:21, 17:25, 18:7, 18:9, 18:16, 19:2, 19:9, 19:16, 19:17, 20:10, 21:9, 22:11, 22:13, 22:20, 23:6, 23:9, 23:11, 28:23, 28:24, 31:1, 32:1, 36:22, 37:3, 37:6, 43:23, 44:1, 49:17, 56:23, 76:7, 77:19, 79:22, 81:16, 86:8, 86:12, 86:14, 86:18, 86:23, 87:3, 87:18, 91:5, 91:15, 91:21, 92:11, 93:10, 93:19, 94:10, 94:17, 95:1, 95:11, 95:13, 97:7, 101:25, 104:13, 104:22, 105:15, 108:10, 108:18, 108:20, 109:16, 110:20, 111:7, 115:1, 115:2, 115:6, 117:16, 118:2,

**118**:5, 118:9, 118:11, 118:14, 118:21, 118:24
**private** [13] - 10:4, 10:10, 10:14, 11:14, 21:19, 32:4, 32:17, 33:23, 37:4, 37:5, 37:11, 49:21, 84:7
**privy** [1] - 83:3
**probable** [1] - 80:11
**problem** [13] - 3:10, 4:23, 5:10, 10:15, 13:12, 31:8, 32:10, 47:1, 50:1, 50:6, 66:3, 71:9, 91:24
**problematic** [2] - 31:12, 31:17
**Procedure** [3] - 77:15, 78:1, 86:19
**procedures** [5] - 9:9, 27:15, 107:20, 113:4, 113:22
**proceed** [3] - 19:21, 96:25, 120:14
**proceeding** [1] - 120:13
**PROCEEDINGS** [1] - 3:1
**proceedings** [1] - 124:18
**process** [11] - 5:7, 24:16, 24:24, 34:10, 37:16, 51:17, 70:19, 88:6, 89:24, 106:23, 120:16
**Process** [1] - 99:22
**processed** [2] - 98:20, 100:2
**processes** [2] - 27:2, 51:20
**processing** [1] - 36:15
**produce** [3] - 11:4, 96:1, 119:13
**produced** [1] - 34:16
**programmatic** [2] - 93:13, 95:17
**progress** [1] - 71:17
**prohibitions** [1] - 93:21
**prohibits** [2] - 28:24, 115:1
**project** [2] - 45:5, 99:11
**projects** [1] - 45:18
**promise** [1] - 48:10
**prompt** [5] - 12:24, 46:8, 117:6, 117:12
**prong** [1] - 8:24
**pronouncing** [1] - 68:5

**proper** [5] - 78:1, 110:12, 111:9, 111:12, 113:20
**properly** [2] - 77:2, 81:7
**propose** [5] - 29:13, 51:20, 120:8, 120:25, 121:9
**proposed** [1] - 123:17
**proposing** [1] - 120:3
**proposition** [1] - 22:19, 28:3, 45:9
**prospective** [1] - 86:19
**protect** [8] - 6:3, 7:10, 8:5, 11:7, 12:17, 16:1, 25:17, 75:21
**protected** [6] - 14:1, 14:10, 14:23, 16:11, 78:18, 91:17
**protecting** [2] - 11:14, 52:4
**protection** [3] - 11:10, 11:16, 117:8
**protections** [5] - 9:3, 12:19, 21:22, 26:8, 110:20
**protects** [1] - 11:18
**protocol** [1] - 26:15
**provide** [12] - 11:21, 17:3, 18:2, 19:10, 19:11, 19:22, 34:5, 41:10, 72:6, 72:14, 117:12, 118:17
**provided** [14] - 4:8, 6:14, 9:10, 15:4, 26:14, 32:24, 36:19, 42:18, 74:5, 76:12, 90:11, 94:11, 94:17, 104:19
**provides** [6] - 10:11, 17:4, 29:1, 42:9, 71:16, 117:1
**providing** [5] - 48:6, 75:5, 103:9, 104:1, 104:15
**provision** [3] - 36:21, 93:23, 93:24
**public** [12] - 3:12, 10:1, 10:4, 10:10, 49:16, 51:5, 78:20, 82:1, 82:17, 82:19, 83:12, 84:7
**Public** [2] - 3:18, 3:21
**publication** [7] - 12:13, 12:14, 12:15, 50:10, 50:11, 83:18, 84:4
**published** [2] - 110:13, 118:12

**purportedly** [1] - 61:25
**purporting** [1] - 110:2
**purpose** [6] - 11:1, 39:3, 81:15, 90:12, 90:14, 104:14
**purposes** [17] - 7:11, 8:6, 9:23, 12:21, 27:8, 34:8, 41:13, 42:8, 60:11, 64:1, 64:3, 76:9, 77:18, 102:1, 108:19, 109:19, 111:7
**pursuant** [1] - 92:18
**put** [12] - 6:24, 37:10, 38:13, 38:14, 41:18, 52:12, 53:8, 62:14, 63:17, 98:8, 101:5, 106:4
**puts** [1] - 58:4
**putting** [1] - 25:4

**Q**

**qualified** [1] - 62:7
**qualify** [1] - 81:15
**quarter** [1] - 116:19
**questions** [24] - 4:16, 4:18, 5:1, 5:2, 5:9, 6:22, 10:6, 16:14, 31:6, 53:24, 54:14, 54:18, 55:18, 57:1, 69:7, 71:1, 72:16, 75:12, 78:21, 80:19, 96:19, 99:20, 114:16
**quick** [2] - 116:20, 121:13
**quickly** [2] - 98:9, 98:15
**Quiet** [2] - 86:4, 86:6
**quo** [2] - 16:8, 47:12, 122:2
**quote** [34] - 16:19, 20:23, 22:6, 24:13, 24:20, 24:21, 24:23, 29:4, 29:9, 39:2, 41:7, 41:12, 44:21, 44:23, 45:10, 61:5, 61:18, 61:22, 62:2, 62:6, 62:12, 65:21, 71:15, 78:18, 85:20, 88:9, 93:23, 97:14, 97:20, 99:7, 99:16, 106:10, 107:9, 117:11

**R**

**radical** [1] - 28:16
**raise** [1] - 75:2, 114:20
**raised** [1] - 5:4, 23:15

**raising** [2] - 7:7, 73:13
**ranking** [1] - 72:7
**rate** [1] - 82:13
**rather** [6] - 6:17, 18:14, 19:22, 54:2, 72:4, 84:7, 93:3, 94:5, 103:6
**reach** [2] - 6:9, 95:22
**reached** [2] - 89:25, 123:1
**read** [12] - 4:7, 17:6, 26:4, 29:19, 39:17, 39:24, 40:13, 40:23, 46:4, 112:24, 117:2, 117:9
**read/write** [1] - 113:12
**reading** [2] - 29:11, 44:15
**real** [1] - 43:17
**reality** [1] - 94:9
**realize** [3] - 59:8, 63:18, 69:6
**really** [14] - 3:9, 4:12, 11:11, 18:7, 19:4, 32:10, 40:3, 44:9, 50:6, 58:11, 76:6, 88:15, 95:6, 112:9
**reason** [9] - 37:6, 39:14, 70:11, 76:12, 78:4, 83:15, 97:23, 110:4, 118:20
**reasonable** [2] - 96:8, 98:2
**reasoned** [3] - 38:19, 42:13, 44:10
**reasons** [5] - 39:13, 60:19, 73:3, 76:5, 96:12
**rebuttal** [1] - 51:1
**received** [2] - 62:18, 85:3
**receives** [1] - 71:17
**receiving** [1] - 85:4
**recent** [2] - 42:1, 45:24
**recently** [1] - 42:4
**recess** [2] - 116:21, 116:22
**recipient** [1] - 39:5
**recipients** [3] - 41:1, 108:15, 108:16
**recognize** [1] - 17:19
**recognized** [3] - 9:21, 17:25, 45:19
**recommended** [1] - 62:2

**Record** [4] - 29:10, 79:19, 80:13, 118:13
**record** [37] - 3:7, 3:10, 8:7, 9:7, 25:7, 29:6,

**29**:18, 30:9, 35:7, 35:13, 37:10, 38:6, 38:12, 38:13, 38:24, 43:2, 43:16, 70:15, 71:10, 77:11, 79:8, 96:2, 96:10, 96:21, 96:24, 97:4, 104:23, 106:8, 119:8, 119:12, 120:15, 120:18, 120:19, 120:20, 123:22, 124:18
**records** [24] - 19:11, 19:12, 19:21, 19:23, 21:6, 21:8, 28:25, 31:19, 46:9, 47:13, 47:15, 78:18, 88:20, 91:17, 94:3, 95:5, 95:25, 104:10, 104:15, 104:20, 104:25, 105:6, 109:15, 117:7
**recouping** [2] - 39:4, 109:19
**redress** [2] - 16:3, 19:7
**redressability** [1] - 7:16
**redressed** [1] - 78:13
**reference** [1] - 89:4
**referring** [2] - 68:22, 107:6
**refers** [1] - 117:16
**reflected** [1] - 14:10
**reforms** [2] - 51:13, 51:20
**refund** [1] - 110:24
**regard** [1] - 38:17
**regarding** [4] - 54:6, 93:21, 94:4, 109:11
**regular** [2] - 7:14, 71:16, 71:21
**regulation** [3] - 11:3, 15:25
**related** [1] - 23:9
**relates** [3] - 8:23, 32:17, 72:22
**relating** [2] - 31:6, 82:12
**relationship** [6] - 30:4, 60:12, 67:18, 67:19, 67:22, 67:23
**released** [1] - 77:17
**relevant** [8] - 10:11, 12:6, 23:20, 29:3, 60:21, 79:4, 92:7, 95:23
**relief** [40] - 5:20, 7:12, 9:15, 9:21, 9:23, 10:23, 11:7, 12:5,

16:3, 16:17, 16:19, 16:21, 16:25, 17:5, 17:7, 17:22, 18:10, 19:10, 19:15, 19:16, 19:23, 20:7, 20:8, 20:25, 23:14, 24:3, 44:22, 44:25, 78:14, 85:18, 85:20, 85:22, 85:25, 86:5, 86:14, 86:15, 86:19, 87:4, 87:20, 94:17
**relocated** [2] - 59:2, 59:12
**rely** [7] - 7:4, 27:18, 62:22, 63:8, 63:14, 86:2, 87:14
**relying** [1] - 17:3
**remain** [1] - 43:10
**remedial** [3] - 18:25, 93:20, 94:1
**remediation** [1] - 44:22
**Remedies** [1] - 20:21
**remedies** [20] - 17:4, 17:11, 17:15, 17:21, 18:15, 22:7, 22:13, 22:14, 22:16, 22:17, 24:6, 24:7, 76:6, 87:20, 92:23, 93:15, 93:18, 94:8, 102:13, 102:18
**remedy** [24] - 17:10, 17:14, 17:16, 18:1, 18:2, 18:5, 18:17, 18:20, 19:13, 19:18, 20:3, 20:23, 21:7, 21:14, 22:20, 24:1, 24:2, 77:19, 87:12, 93:2, 93:22, 94:19, 94:23, 95:1
**removal** [1] - 9:2
**remove** [1] - 110:19
**removed** [1] - 15:19
**renamed** [3] - 54:9, 59:11, 60:6
**repaired** [1] - 53:18
**repeated** [1] - 112:18
**replaced** [1] - 56:15
**reply** [1] - 40:6
**report** [4] - 54:10, 59:17, 75:8, 75:12
**reported** [4] - 42:5, 54:23, 57:24, 111:4
**reporter** [2] - 86:3, 116:18
**reporting** [4] - 35:7, 35:12, 42:1, 83:22
**reports** [3] - 59:13, 66:22, 66:23
**represent** [1] - 99:16

**representation** [3] - 42:4, 62:21, 63:8
**representations** [2] - 61:11, 106:3
**represented** [3] - 27:21, 61:4, 65:20
**request** [3] - 9:14, 37:1, 38:22
**requested** [4] - 5:21, 7:12, 16:3, 78:13
**requesting** [1] - 19:13
**require** [3] - 8:21, 12:14, 113:8
**required** [8] - 10:2, 43:6, 50:10, 54:9, 82:20, 95:12, 96:23, 116:2
**requirement** [7] - 7:25, 8:23, 30:20, 45:11, 77:22, 88:13, 95:10
**requirements** [2] - 6:7, 108:15
**requires** [8] - 7:12, 41:7, 42:13, 46:4, 70:22, 83:18, 89:21, 119:7
**resolve** [2] - 121:17, 121:18
**resolved** [1] - 15:1
**resorting** [1] - 96:20
**respect** [16] - 16:9, 24:5, 26:9, 32:17, 32:20, 37:12, 42:2, 49:11, 50:12, 52:19, 83:12, 86:12, 86:17, 90:5, 112:22, 114:9
**respectfully** [1] - 121:23
**respond** [2] - 5:4, 91:11
**response** [3] - 10:1, 21:1, 42:20
**responsibility** [1] - 99:5
**restore** [1] - 21:21
**restriction** [1] - 17:12
**restrictions** [4] - 99:15, 111:25, 112:4, 117:20
**result** [2] - 44:8, 123:5
**Retired** [1] - 3:4
**retroactively** [1] - 99:1
**retrospective** [1] - 95:4
**return** [4] - 41:8, 41:9, 41:24
**returns** [4] - 41:8, 78:25, 80:6, 111:3
**reveal** [1] - 77:11

**Revenue** [27] - 6:8, 11:21, 17:2, 18:10, 20:10, 21:10, 22:22, 22:24, 41:6, 41:7, 42:9, 43:24, 49:18, 76:8, 77:20, 86:8, 86:13, 86:18, 86:23, 87:3, 91:5, 93:10, 117:17, 118:3, 118:5, 118:10, 119:1
**reverse** [1] - 19:25, 20:1
**review** [14] - 18:11, 23:9, 23:17, 24:13, 87:11, 88:3, 89:15, 89:19, 91:9, 92:24, 93:14, 95:17, 97:3, 106:23
**reviewable** [1] - 89:22
**revised** [1] - 98:25
**rights** [3] - 24:16, 88:7, 91:14
**rigorous** [1] - 117:8
**rise** [2] - 14:11, 84:21
**risk** [6] - 10:21, 12:22, 25:18, 45:9, 45:18, 98:8
**risks** [6] - 42:17, 42:20, 97:16, 98:7, 112:15, 114:8
**RMR** [1] - 124:17, 124:21
**road** [1] - 56:1
**role** [20] - 29:16, 31:12, 34:13, 36:15, 37:12, 37:15, 37:20, 62:5, 62:21, 62:23, 62:25, 63:7, 63:11, 63:13, 64:11, 64:25, 80:20, 99:5, 101:15
**roles** [1] - 32:20
**rollout** [1] - 98:11
**root** [1] - 10:9
**route** [1] - 18:14
**routing** [20] - 28:9, 29:9, 38:23, 39:10, 79:3, 79:7, 79:12, 80:10, 80:11, 88:20, 89:4, 89:13, 92:6, 92:18, 106:25, 108:9, 109:17, 110:12, 110:25, 118:12
**Routine** [4] - 92:19, 109:18, 109:24, 111:1
**roving** [1] - 38:8
**rule** [3] - 41:11, 97:3, 119:8
**ruling** [1] - 5:23

**run** [1] - 10:6
**running** [1] - 48:23

## S

**satisfied** [1] - 45:10
**saw** [1] - 82:21
**scenes** [1] - 49:10
**schedule** [7] - 120:11, 120:23, 121:6, 121:8, 121:10, 122:10, 123:17
**Schedule** [7] - 54:22, 57:14, 58:17, 59:20, 59:23, 99:19, 103:6
**scheme** [6] - 86:12, 86:17, 87:11, 93:20, 94:1, 94:2
**scope** [4] - 52:25, 101:12, 105:2, 112:7
**Scott** [1] - 3:4
**sealing** [1] - 31:19
**seclusion** [10] - 10:3, 10:10, 10:12, 11:16, 12:8, 13:10, 84:8, 84:13, 84:20, 85:12
**second** [6] - 8:4, 29:8, 45:13, 53:21, 60:8, 75:25
**Secretary** [27] - 15:15, 24:25, 25:11, 25:20, 35:5, 35:9, 35:14, 36:8, 38:15, 61:17, 64:4, 64:18, 64:21, 66:24, 67:15, 67:18, 68:4, 70:9, 75:11, 80:5, 95:23, 96:4, 96:6, 99:3, 99:4, 99:17, 103:5
**Secretary's** [2] - 9:8, 100:12
**section** [1] - 93:24
**Section** [5] - 16:16, 20:9, 24:13, 87:4, 117:1
**secure** [1] - 7:1
**security** [8] - 9:4, 9:22, 14:22, 15:16, 16:1, 21:16, 42:17, 52:17
**see** [8] - 8:7, 14:16, 32:24, 37:1, 37:21, 44:14, 51:18, 84:22
**seeing** [1] - 120:21
**seek** [7] - 7:10, 12:17, 17:1, 19:6, 75:21, 86:1, 109:11
**seeking** [7] - 8:5, 9:18, 10:20, 16:17, 18:11, 19:21, 85:18

**seem** [11] - 17:19, 24:19, 36:13, 36:20, 49:15, 61:1, 63:4, 63:10, 67:2, 74:25, 116:4
**seemingly** [1] - 38:21
**segregate** [1] - 25:22
**select** [1] - 68:6
**selected** [3] - 62:5, 69:25, 70:2
**sell** [2] - 37:4, 37:5
**Senate** [9] - 55:2, 55:7, 58:4, 70:23, 72:13, 74:11, 74:15, 74:24, 75:10
**Senate-confirmed** [1] - 75:10
**sending** [1] - 15:2
**sense** [6] - 6:19, 21:18, 34:22, 41:23, 61:23, 103:24
**sensitive** [5] - 9:4, 26:20, 80:16, 80:24, 106:14
**sent** [3] - 52:20, 80:5, 106:6
**separate** [6] - 18:11, 60:20, 64:12, 79:23, 91:8, 123:8
**Separate** [1] - 27:5
**series** [3] - 4:16, 25:11, 61:24
**serious** [1] - 97:16
**Service** [11] - 12:24, 13:20, 54:7, 54:9, 54:10, 54:13, 59:25, 60:6, 60:7, 60:9, 117:1
**set** [5] - 42:14, 97:25, 107:18, 120:11, 121:8
**sets** [4] - 44:17, 67:5, 100:23, 101:12
**Seventh** [1] - 84:24
**several** [3] - 42:19, 62:8, 101:20
**shall** [9] - 41:8, 41:9, 46:5, 65:24, 66:1, 68:6, 68:12, 117:3, 117:7
**Shapiro** [1] - 4:2
**share** [11] - 28:4, 43:3, 46:13, 46:16, 46:19, 106:12, 106:17, 106:18, 111:10, 118:8, 118:25
**shared** [3] - 48:7, 106:22, 108:22
**sharing** [16] - 13:5, 30:23, 43:14, 48:10,

48:12, 92:8, 107:11, 108:1, 108:8, 109:8, 110:10, 112:4, 112:10, 117:18, 118:14, 118:21
**short** [4] - 51:6, 112:23, 116:16, 122:3
**shorthand** [1] - 100:17
**shortly** [1] - 25:11
**show** [12] - 7:2, 9:22, 10:22, 24:19, 45:6, 77:11, 77:14, 77:25, 78:20, 81:18, 86:22, 93:14
**showing** [6] - 44:18, 51:14, 51:24, 95:15, 97:7, 97:13
**shown** [1] - 107:3
**shows** [1] - 84:25
**shuttled** [1] - 12:18
**side** [3] - 17:20, 31:23
**sides** [1] - 21:24
**signed** [1] - 62:12
**significant** [5] - 9:12, 44:6, 72:5, 72:6, 72:8
**similar** [2] - 77:25, 86:8
**simple** [2] - 45:1, 56:7
**simply** [9] - 6:11, 13:24, 17:14, 18:25, 21:12, 24:1, 26:5, 60:3
**sits** [1] - 48:20
**sitting** [1] - 57:21
**situation** [10] - 10:25, 11:25, 14:3, 18:5, 21:9, 21:20, 31:22, 32:5, 46:22, 85:14
**situations** [1] - 46:25
**six** [2] - 27:7, 27:13
**slightly** [2] - 5:16, 6:5
**so-called** [1] - 25:17
**Software** [2] - 32:14, 33:4
**software** [7] - 62:7, 68:12, 80:15, 80:23, 104:11, 104:19, 117:7
**solely** [1] - 24:4
**someone** [3] - 11:7, 14:4, 19:24
**somewhere** [1] - 15:3
**soon** [1] - 46:14
**sooner** [1] - 119:22
**SORN** [8] - 38:24, 79:4, 80:13, 92:7, 92:19, 107:1,

110:13, 112:7
**sorry** [12] - 7:9, 22:3, 59:7, 84:17, 87:22, 101:16, 103:21, 109:6, 115:14, 120:17, 121:2, 122:18
**sort** [28] - 5:12, 13:9, 18:15, 21:15, 30:21, 32:7, 38:5, 38:6, 38:18, 39:24, 42:6, 47:1, 48:18, 49:25, 50:1, 52:8, 55:18, 56:25, 64:12, 70:13, 76:20, 77:21, 89:13, 90:23, 93:13, 95:3, 95:16, 112:3
**sought** [3] - 16:22, 85:23, 86:5
**sound** [1] - 69:6
**sounds** [1] - 123:13
**Southern** [4] - 5:24, 89:17, 106:2, 117:22
**sovereign** [8] - 16:16, 20:16, 85:17, 86:7, 87:4, 88:10, 92:22, 93:1
**SpaceX** [1] - 62:8
**speaking** [2] - 63:4, 82:8
**specific** [17] - 18:10, 22:7, 28:6, 35:24, 41:24, 42:7, 48:12, 55:18, 56:13, 66:10, 76:13, 77:12, 86:12, 93:20, 99:11, 106:25, 117:19
**specifically** [5] - 11:21, 31:16, 70:8, 84:18, 94:21
**specifics** [1] - 79:19
**specified** [1] - 49:23
**speculate** [1] - 29:12
**speech** [1] - 62:10
**spill** [1] - 45:19
**spills** [1] - 45:7
**spot** [1] - 38:2
**squarely** [2] - 23:13, 28:14
**squirrely** [1] - 48:19
**staff** [5] - 15:16, 25:16, 35:18, 36:7, 51:13
**Staff** [9] - 25:21, 54:11, 59:14, 59:18, 64:5, 66:23, 67:14, 74:17, 100:13
**stages** [1] - 55:13
**stakes** [1] - 45:5
**standard** [4] - 7:3,

44:15, 44:18, 110:23
**standards** [2] - 45:2, 117:8
**standing** [38] - 4:20, 6:24, 7:2, 7:7, 7:15, 7:18, 7:20, 7:24, 8:1, 8:25, 9:25, 10:18, 12:5, 50:9, 73:4, 75:16, 75:19, 76:10, 78:4, 78:20, 79:1, 80:8, 80:18, 80:19, 81:2, 81:10, 81:21, 81:24, 82:16, 82:20, 83:20, 84:2, 84:15, 84:21, 95:10, 119:4, 119:12
**stands** [1] - 18:14
**starker** [1] - 18:5
**start** [5] - 6:24, 36:9, 54:4, 98:21, 112:20
**started** [4] - 27:1, 35:4, 98:17
**starting** [3] - 3:7, 56:25, 61:19
**state** [4] - 8:25, 39:2, 39:19, 40:18
**State** [17] - 3:22, 39:11, 92:18, 106:22, 107:3, 107:11, 107:15, 107:18, 107:22, 108:8, 109:2, 109:5, 109:8, 109:15, 110:11, 111:17, 112:2
**state's** [1] - 6:9
**statement** [3] - 38:18, 61:21, 62:16
**statements** [2] - 61:14, 61:16
**States** [1] - 71:5
**states** [5] - 39:21, 39:22, 68:3, 68:11, 106:10
**stating** [1] - 99:1
**status** [9] - 16:8, 34:7, 34:20, 47:12, 48:22, 71:2, 98:16, 99:21, 122:2
**statute** [13] - 16:20, 16:25, 23:12, 29:10, 49:23, 50:12, 72:14, 85:21, 85:25, 94:5, 94:8, 95:19, 116:3
**statutes** [11] - 11:20, 12:16, 18:1, 18:4, 18:6, 18:24, 18:25, 21:20, 87:21, 91:7, 117:20
**statutory** [5] - 11:24,

79:5, 81:9, 81:11, 87:11
**stays** [1] - 47:20
**Stephens** [2] - 23:8, 28:9
**steps** [7] - 5:13, 25:11, 112:15, 114:8, 114:22, 116:15, 117:3
**steward** [3] - 10:13, 13:11, 13:15
**still** [12] - 15:1, 30:1, 52:21, 52:24, 53:13, 59:20, 60:3, 69:3, 83:12, 84:1, 91:5, 108:23
**stolen** [1] - 11:5
**stored** [3] - 9:5, 43:4, 60:3
**stricter** [1] - 44:14
**strictly** [2] - 17:18, 111:21
**stronger** [1] - 18:12
**strongly** [1] - 92:14
**structure** [8] - 51:18, 54:1, 55:17, 58:13, 58:22, 70:17, 75:4, 94:13
**structured** [2] - 38:7, 72:19
**structuring** [1] - 38:16
**study** [1] - 4:12
**subject** [10] - 16:14, 16:24, 23:19, 72:4, 85:24, 89:15, 89:19, 92:6, 115:19, 116:4
**submitting** [1] - 28:10
**subsequent** [1] - 25:23
**substantial** [1] - 7:2
**substantiates** [1] - 29:19
**substantive** [1] - 99:13
**succeed** [1] - 97:13
**succinctly** [1] - 8:25
**sue** [5] - 7:9, 8:2, 20:14, 24:5, 75:19
**suffer** [2] - 14:1, 77:17
**suffered** [2] - 11:9, 96:19
**sufficient** [5] - 9:22, 24:2, 79:1, 80:8, 81:23
**suggest** [4] - 62:24, 98:9, 100:24, 121:6
**suggesting** [1] - 33:25
**suggests** [3] - 42:16, 101:14, 104:4
**suit** [12] - 16:17,

16:20, 20:24, 21:6, 21:7, 21:19, 22:16, 23:23, 75:23, 76:17, 77:13, 85:21
**suited** [1] - 4:21
**suits** [1] - 85:17
**summary** [5] - 7:3, 8:11, 51:6, 120:15, 124:1
**supervised** [7] - 54:24, 55:4, 57:24, 58:2, 70:24, 74:9, 74:14
**supervises** [1] - 66:4
**supervising** [5] - 66:17, 71:5, 71:11, 103:12, 103:20
**supervisor** [2] - 103:18, 104:3
**supervisory** [1] - 99:10
**supplement** [1] - 17:10
**supplemental** [3] - 88:9, 92:22, 96:13
**supplementary** [1] - 19:4
**supplementing** [1] - 17:15
**support** [1] - 44:19
**supporting** [2] - 20:7, 22:19
**suppose** [1] - 69:12
**supposed** [6] - 10:9, 27:6, 30:19, 36:22, 44:1, 69:14
**supposedly** [1] - 27:6
**Supreme** [11] - 17:19, 72:2, 72:11, 74:6, 74:8, 74:21, 84:24, 85:13, 86:4, 87:17, 89:16
**swiftly** [1] - 98:2
**switching** [1] - 4:23
**sworn** [3] - 25:12, 35:6, 36:8
**symbols** [1] - 26:15
**synchronization** [1] - 47:8
**system** [15] - 11:4, 31:25, 40:1, 43:19, 44:2, 83:24, 87:1, 91:1, 95:18, 101:6, 101:7, 107:18, 113:16, 114:11
**systematic** [1] - 40:1
**systemic** [1] - 41:21
**systems** [38] - 9:5, 9:13, 11:13, 12:25, 16:1, 21:17, 24:22,

26:10, 26:15, 27:8, 28:17, 35:16, 36:12, 36:15, 38:2, 38:21, 39:21, 39:22, 41:4, 41:21, 43:4, 43:10, 43:11, 47:7, 51:18, 68:18, 85:8, 90:4, 92:20, 97:15, 98:1, 98:4, 103:10, 106:12, 113:25, 117:7, 117:13
**Systems** [4] - 29:10, 79:19, 80:13, 118:12

## T

**table** [4] - 3:20, 58:10, 59:1, 65:18
**tagging** [1] - 26:15
**talks** [7] - 23:5, 23:25, 47:7, 49:1, 84:5, 104:22, 123:3
**tasked** [1] - 61:18
**tax** [12] - 41:13, 41:15, 41:18, 41:22, 41:24, 42:3, 42:8, 78:25, 80:6, 110:22, 110:24, 111:2
**team** [49] - 15:20, 25:13, 25:16, 26:23, 27:7, 29:17, 30:3, 30:5, 30:12, 31:4, 32:9, 35:15, 38:21, 39:12, 41:16, 42:2, 42:7, 42:19, 43:12, 51:12, 51:16, 61:22, 61:25, 64:19, 67:3, 67:17, 68:6, 68:17, 68:20, 68:22, 69:4, 89:22, 90:15, 92:10, 95:25, 97:15, 97:21, 99:10, 100:21, 101:11, 103:14, 103:15, 103:24, 104:1, 104:4, 113:24
**team's** [2] - 71:17, 104:5
**teams** [1] - 48:21
**technical** [2] - 31:22, 40:1
**technically** [1] - 59:23
**technology** [1] - 69:19
**temporary** [2] - 99:18, 103:6
**Temporary** [7] - 48:20, 54:13, 59:25, 60:10, 60:13, 61:5, 65:25
**ten** [2] - 52:24, 116:19
**term** [2] - 33:3, 80:6
**terms** [67] - 5:13, 8:22, 14:13, 21:1, 24:9,

28:1, 28:22, 32:11, 35:20, 37:19, 38:15, 38:25, 41:6, 42:11, 44:12, 46:2, 46:10, 46:16, 48:11, 49:24, 52:8, 55:22, 56:22, 57:20, 59:16, 61:11, 62:23, 65:4, 66:10, 66:14, 67:19, 67:25, 71:11, 73:6, 75:16, 78:7, 82:15, 83:7, 83:9, 84:10, 90:1, 90:8, 90:10, 91:24, 95:20, 98:16, 99:23, 99:25, 100:18, 100:23, 101:5, 102:17, 103:17, 107:15, 108:12, 108:14, 108:16, 108:21, 110:15, 111:19, 111:21, 112:10, 112:16, 114:3, 121:8, 122:22, 123:19
**terrorist** [1] - 83:25
**test** [1] - 110:16
**text** [1] - 85:2
**textual** [1] - 92:25
**THE** [227] - 3:8, 3:23, 4:5, 6:21, 7:24, 8:22, 9:24, 12:7, 13:8, 14:12, 15:6, 15:12, 16:2, 16:13, 18:19, 19:9, 20:6, 20:18, 21:24, 22:5, 22:18, 23:2, 23:4, 23:15, 24:8, 24:11, 25:8, 26:13, 26:19, 27:18, 28:1, 28:15, 28:18, 31:5, 32:8, 32:10, 32:23, 33:15, 33:21, 33:24, 34:3, 35:19, 36:3, 37:13, 38:23, 40:3, 40:7, 40:10, 40:12, 40:24, 41:5, 42:10, 44:11, 46:7, 46:16, 46:18, 48:2, 48:11, 49:4, 49:7, 49:24, 50:15, 51:2, 51:4, 52:6, 53:2, 53:6, 53:10, 53:19, 53:24, 55:13, 55:20, 56:10, 56:17, 56:20, 57:4, 57:10, 57:12, 57:19, 57:23, 58:10, 58:25, 59:6, 59:8, 59:19, 59:24, 60:9, 60:15, 60:23, 61:10, 62:5, 63:17, 64:7, 64:20, 65:3, 65:7,

65:12, 65:17, 66:12, 67:1, 67:7, 67:12, 67:16, 68:3, 68:20, 68:25, 69:20, 69:22, 70:2, 70:6, 70:11, 72:24, 73:5, 73:13, 74:1, 75:14, 76:3, 76:16, 77:4, 77:8, 77:21, 78:6, 78:12, 78:17, 79:7, 79:14, 79:16, 80:1, 80:14, 80:22, 81:4, 81:22, 82:5, 82:9, 82:24, 84:5, 84:17, 84:22, 85:15, 87:2, 87:9, 87:13, 87:16, 88:2, 88:18, 88:24, 89:9, 89:23, 90:6, 90:18, 91:10, 91:23, 92:21, 93:19, 94:14, 94:25, 95:20, 97:11, 98:13, 100:15, 101:1, 101:17, 101:22, 101:24, 102:5, 102:7, 102:13, 102:17, 102:19, 102:24, 103:2, 103:12, 103:19, 104:7, 104:17, 105:3, 105:10, 105:12, 105:14, 105:18, 105:21, 107:2, 107:14, 108:11, 109:2, 109:6, 109:13, 109:23, 110:14, 111:14, 112:9, 113:1, 113:8, 113:21, 114:3, 114:10, 114:15, 115:10, 115:14, 115:17, 115:24, 116:9, 116:18, 116:23, 117:21, 118:15, 119:2, 119:18, 119:23, 120:2, 120:7, 120:10, 120:17, 120:20, 120:22, 121:5, 121:16, 121:22, 122:5, 122:14, 122:18, 122:21, 123:7, 123:12, 123:15, 124:5, 124:7
**themselves** [2] - 8:20, 92:15
**theoretical** [1] - 45:1
**theory** [4] - 7:17, 7:19, 13:15, 84:10
**therefore** [13] - 31:1,

38:4, 38:9, 39:22, 79:6, 84:2, 91:21, 92:3, 92:6, 92:11, 100:13, 105:13, 108:9
**they've** [5] - 4:10, 38:13, 42:18, 45:6, 115:10
**thinking** [1] - 93:25
**third** [5] - 8:8, 11:19, 13:9, 50:14, 76:15
**thousands** [1] - 88:25
**threat** [1] - 12:14
**threatened** [2] - 44:21, 45:6
**three** [6] - 7:6, 7:14, 8:3, 51:15, 54:8, 91:1
**threshold** [1] - 95:21
**throughout** [3] - 12:18, 44:7, 49:9
**tie** [1] - 37:14
**tied** [1] - 76:5
**timeline** [2] - 34:7, 119:14
**Title** [2] - 86:5, 86:6
**title** [2] - 30:23, 30:25
**titled** [1] - 124:19
**titles** [2] - 29:24, 72:1
**today** [2] - 119:9, 120:22
**together** [5] - 25:25, 32:6, 37:14, 45:14, 53:22
**tomorrow** [1] - 121:11
**took** [6] - 15:10, 15:15, 15:17, 98:18, 111:3, 114:16
**tort** [3] - 10:3, 10:5, 10:9
**torts** [1] - 12:11
**totally** [1] - 50:5
**touch** [1] - 122:17
**traceability** [1] - 14:19
**traceable** [2] - 14:14, 78:8
**track** [2] - 18:11, 114:12
**tracked** [1] - 52:21
**traditional** [1] - 12:11
**trafficker** [1] - 83:25
**training** [1] - 113:4
**transcript** [3] - 52:10, 106:4, 107:9
**transcription** [1] - 124:18
**transfer** [8] - 33:11, 33:17, 33:19, 33:23, 47:9, 47:13, 49:19, 50:2

**transferred** [3] - 34:4, 47:5, 53:17
**transferring** [1] - 49:20
**transfers** [5] - 40:19, 49:16, 50:13, 50:14
**transitional** [1] - 99:18
**TransUnion** [14] - 9:15, 9:25, 10:5, 10:8, 10:19, 11:6, 12:2, 81:9, 81:20, 83:19, 84:5, 84:14, 84:25, 85:14
**Treasury** [115] - 4:3, 5:16, 12:15, 14:21, 15:2, 15:10, 15:20, 24:25, 27:11, 29:14, 29:16, 29:25, 30:15, 31:13, 32:9, 32:11, 32:12, 32:18, 33:14, 34:16, 35:4, 35:9, 39:12, 41:16, 42:19, 43:25, 46:11, 46:20, 48:13, 49:2, 49:5, 51:12, 51:13, 51:18, 51:20, 56:16, 60:21, 61:22, 61:25, 62:6, 64:4, 64:18, 64:22, 66:7, 66:22, 66:23, 67:14, 67:15, 68:21, 70:4, 70:20, 71:6, 72:8, 75:7, 77:1, 77:4, 80:5, 80:20, 80:22, 85:8, 85:9, 86:25, 87:1, 89:12, 89:21, 90:15, 91:12, 92:5, 92:10, 92:17, 95:25, 97:14, 97:21, 98:18, 98:23, 99:8, 101:11, 102:17, 102:25, 103:11, 103:15, 103:16, 103:25, 104:6, 104:9, 105:17, 105:22, 105:25, 106:7, 106:18, 107:20, 107:21, 108:13, 108:22, 109:1, 111:2, 111:10, 112:13, 112:22, 113:3, 113:10, 113:23, 114:4, 114:9, 114:13, 114:24, 117:18, 118:8, 123:3, 123:4
**Treasury's** [3] - 33:12, 88:21, 97:14
**treat** [2] - 49:15, 50:12
**tried** [1] - 19:15

**triggering** [1] - 6:18
**TRO** [1] - 65:23
**TROs** [1] - 45:3
**trouble** [1] - 69:3
**trove** [1] - 47:4
**Trudeau** [1] - 88:12
**true** [2] - 35:3
**Trump** [2] - 61:18, 82:12
**Trump's** [3] - 54:4, 54:5, 54:6
**trust** [1] - 14:4
**try** [1] - 80:1
**trying** [5] - 21:21, 25:3, 103:2, 120:11, 120:12
**two** [31] - 8:10, 11:20, 18:4, 18:6, 18:7, 26:22, 29:2, 30:2, 30:12, 30:21, 31:18, 32:2, 32:10, 32:12, 32:14, 32:20, 33:7, 33:8, 34:1, 51:15, 60:2, 60:15, 62:11, 62:15, 79:23, 91:1, 98:22, 104:13, 105:21, 119:21, 119:25
**type** [15] - 8:19, 10:23, 13:25, 14:1, 14:3, 14:9, 18:16, 19:22, 20:3, 21:7, 24:1, 24:2, 28:12, 28:16, 41:2
**types** [4] - 18:25, 19:3, 21:13, 86:15
**typical** [1] - 8:19

**U**

**U.S** [13] - 12:24, 13:19, 54:7, 54:9, 54:10, 54:12, 59:24, 60:6, 60:7, 62:15, 106:12, 106:16, 117:1
**ultimately** [3] - 55:21, 66:13, 110:9
**ultra** [2] - 73:6
**unable** [3] - 45:6, 52:10, 107:8
**uncertain** [1] - 45:9
**unclassified** [3] - 12:25, 46:9, 117:6
**unclear** [1] - 49:10
**under** [49] - 6:6, 7:2, 7:19, 9:15, 9:25, 11:5, 11:6, 16:11, 16:14, 18:16, 19:21, 20:2, 20:9, 20:17, 20:25, 21:19, 21:20,

22:11, 22:12, 22:16, 22:20, 22:24, 24:3, 43:6, 43:21, 48:20, 60:16, 64:17, 72:10, 73:8, 77:19, 79:4, 82:3, 82:5, 83:4, 86:5, 87:20, 88:10, 89:22, 91:15, 97:2, 97:19, 100:12, 103:17, 108:10, 118:13, 119:3, 119:5
**Under** [1] - 20:21
**understood** [4] - 26:14, 90:12, 90:13, 111:16
**undertake** [1] - 51:13
**undertaking** [1] - 53:13
**undo** [1] - 18:21
**unfortunate** [1] - 69:8
**United** [1] - 71:5
**unlawful** [7] - 17:4, 17:7, 18:17, 49:22, 92:14, 95:2, 95:4
**unless** [4] - 40:4, 49:22, 100:16, 118:9
**unlike** [1] - 85:12
**unmeasurable** [1] - 45:9
**unprecedented** [2] - 26:19, 28:13, 44:6
**unprotected** [1] - 11:15
**unquote** [6] - 61:6, 61:20, 62:14, 62:19, 97:22, 117:11
**unreasonable** [1] - 18:17
**unwanted** [1] - 85:4
**up** [22] - 4:17, 4:22, 6:1, 13:23, 15:15, 25:25, 39:15, 39:20, 47:15, 51:16, 61:19, 65:17, 66:5, 76:5, 81:5, 84:11, 84:18, 87:16, 107:18, 116:11, 116:14, 123:9
**update** [1] - 73:25
**updates** [1] - 71:17
**upend** [1] - 95:17
**upshot** [1] - 86:16
**urgency** [1] - 97:18
**USDA** [3] - 17:24, 88:24, 89:1
**USDS** [97] - 27:10, 29:14, 29:21, 30:5, 30:24, 31:7, 31:8, 31:10, 31:12, 31:13, 32:9, 32:11, 39:12,

46:5, 46:17, 46:19, 48:15, 48:18, 48:19, 48:20, 48:25, 49:2, 50:4, 54:2, 54:7, 54:16, 54:21, 55:9, 55:19, 57:14, 57:19, 59:11, 59:13, 59:20, 60:1, 60:12, 60:13, 61:5, 61:7, 62:2, 62:21, 63:2, 63:3, 63:4, 63:11, 63:12, 64:2, 64:9, 65:8, 65:21, 65:24, 65:25, 66:1, 66:4, 66:6, 66:15, 66:24, 67:3, 67:17, 67:25, 68:7, 68:11, 69:12, 70:4, 70:6, 70:18, 71:3, 71:4, 71:16, 71:25, 72:1, 72:6, 72:24, 74:12, 74:18, 75:7, 104:20, 106:6, 108:19, 114:24, 115:1, 115:5, 115:11, 115:25, 116:1, 116:6, 117:4, 117:5, 117:7, 117:12, 117:18, 117:23, 118:9, 118:17
**USDS's** [1] - 70:17
**useful** [1] - 30:9
**uses** [1] - 79:12
**Utah** [1] - 89:17

**V**

**Vargas** [8] - 5:14, 9:19, 44:16, 52:12, 97:12, 106:2, 107:10, 113:5
**Vargas's** [2] - 5:23, 15:7
**various** [4] - 9:20, 27:8, 34:13, 56:23
**vehicle** [2] - 77:15, 78:1
**venue** [1] - 24:4
**versed** [1] - 4:22
**versions** [1] - 60:2
**versus** [4] - 3:4, 18:16, 23:14, 51:10
**veteran** [1] - 23:12
**viable** [1] - 81:19
**view** [12] - 12:7, 15:12, 42:22, 43:23, 48:4, 49:25, 51:6, 81:13, 82:13, 82:14, 101:3, 123:13
**viewed** [1] - 76:14
**viewing** [1] - 50:3

**vigilantly** [1] - 46:1
**violate** [5] - 79:22, 104:13, 105:15, 109:16, 118:24
**violation** [11] - 6:7, 19:5, 28:23, 41:6, 50:11, 79:5, 81:9, 81:11, 91:7, 118:4, 118:5
**violations** [5] - 18:3, 19:3, 19:7, 22:6, 93:21
**vires** [1] - 73:6
**Virginia** [1] - 65:21
**voluntarily** [1] - 110:22

**W**

**W-R-I-T-E** [1] - 112:25
**wait** [2] - 53:21, 121:10
**waive** [2] - 20:16, 87:4
**waiver** [6] - 16:18, 85:19, 86:7, 88:10, 92:22, 93:1
**waives** [2] - 16:16, 85:17
**wall** [1] - 63:18
**walled** [1] - 51:25
**walls** [1] - 46:20
**wants** [2] - 13:20, 51:11
**waste** [2] - 38:3, 98:3
**weakest** [2] - 44:12, 50:20
**wealth** [1] - 70:1
**wearing** [5] - 16:16, 30:21, 32:4, 105:8, 105:16
**wears** [1] - 30:12
**week** [3] - 14:24, 43:20, 52:24
**weeks** [5] - 27:7, 27:13, 98:22, 119:21, 119:25
**welcome** [1] - 50:24
**whatsoever** [1] - 76:13
**White** [6] - 31:24, 54:11, 59:14, 61:17, 74:16, 80:3
**whole** [6] - 10:25, 35:20, 41:10, 48:18, 67:2, 74:3
**wholesale** [4] - 39:21, 47:6, 47:13, 53:16
**wide** [1] - 52:19
**Wilderness** [1] - 89:17
**word** [2] - 41:20, 47:7

**words** [2] - 89:20, 107:23
**works** [1] - 85:12
**worried** [1] - 49:3
**write** [4] - 87:23, 112:24, 112:25, 113:15
**written** [1] - 8:12
**Wunderly** [4] - 56:15, 68:23, 77:7, 92:2

**Y**

**year** [4] - 17:24, 54:16, 55:9, 88:25
**York** [16] - 4:13, 5:15, 5:24, 6:3, 6:9, 6:12, 6:18, 9:19, 13:4, 36:11, 44:15, 46:11, 52:11, 53:6, 106:2, 117:22
**yourself** [1] - 3:6
**yourselves** [1] - 120:24

**Z**

**Zieve** [1] - 3:20

# EXHIBIT 61

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AIDS VACCINE ADVOCACY          .
COALTION, et al.,              .
                              .
         Plaintiffs,           .
                              .  CA No. 25-0400 (AHA)
    v.                         .
                              .
UNITED STATES DEPARTMENT OF    .
STATE, et al.,                 .
                              .
         Defendants.           .
. . . . . . . . . . . . . . . .
                              .
GLOBAL HEALTH COUNCIL,         .
et al.,                        .
                              .
         Plaintiffs,           .  CA No. 25-0406 (AHA)
                              .
    v.                         .
                              .
DONALD J. TRUMP, et al.,       .  Washington, D.C.
                              .  Tuesday, February 25, 2025
         Defendants.           .  11:00 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE AMIR H. ALI
UNITED STATES DISTRICT JUDGE

 APPEARANCES:

For Plaintiffs                 LAUREN BATEMAN, ESQ.
Case No. 25-0400:              Public Citizen Litigation Group
                              1600 20th Street NW
                              Washington, DC 20009


For Plaintiffs                 STEPHEN K. WIRTH, ESQ.
Case No. 25-0406:              Arnold & Porter Kaye Scholer LLP
                              601 Massachusetts Ave. NW
                              Washington, DC 20001


For Defendants:                INDRANEEL SUR, ESQ.
                              U.S. Department of Justice
                              1100 L St. NW
                              Washington, DC 20530

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   U.S. Courthouse, Room 4704-A
                                   333 Constitution Avenue NW
                                   Washington, DC 20001

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S

 2                  (Via Telephone Conference)

 3          THE DEPUTY CLERK:  We're here today for a motion

 4    hearing in civil action 25-400, Aids Vaccine Advocacy

 5    Coalition, et al., versus the United States Department of

 6    State, et al., as well as civil action 25-402, Global Health

 7    Council, et al., versus Donald Trump, et al.

 8      Beginning with counsel for the plaintiff in case 25-400,

 9    please state your name for the record.

10          MS. BATEMAN:  Hi.  My name is Lauren Bateman with

11    Public Citizen Litigation Group.  I represent plaintiffs in

12    case 400.

13          THE DEPUTY CLERK:  And defense?

14          MR. SUR:  Good morning.  This is Indraneel Sur at

15    the United States Department of Justice for the defendants.

16          THE DEPUTY CLERK:  Thank you.  And counsel for

17    plaintiffs in case 402?

18          MR. WIRTH:  Good morning.  This is Stephen Wirth

19    from Arnold & Porter on behalf of all plaintiffs in case 402.

20          THE DEPUTY CLERK:  And counsel for defense.

21          MR. SUR:  In case 402, this is Indraneel Sur for the

22    United States Department of Justice for the defendant.

23          THE DEPUTY CLERK:  Thank you all.

24          THE COURT:  All right.  Thanks, everyone.  Good

25    morning.  We've got two cases here called.  The Court has
```

1    received the new emergency motion to enforce in the Global

2    Health Council case, No. 402.  Called this hearing quickly

3    in the interest of hearing from the parties on it.  And given

4    the overlap in the AIDS vaccine case, which is the 400 case,

5    I'll hear from plaintiffs in that case too.

6        I understand, Mr. Sur, you'll be representing the

7    defendants in both of those cases.

8        Couple of things at the outset.  In terms of protocol

9    today, I'm going to start by hearing from plaintiffs in the

10   Global Health 402 case, given they have the pending motion.

11       Counsel for plaintiffs in 400, the AIDS vaccine case, I do

12   anticipate hearing from you briefly only to the extent that

13   you have a difference with or something to supplement what

14   you've heard from counsel in 402 in the interest of not just

15   having repetitive argument.

16       I'll then hear from counsel for the defendant, Mr. Sur,

17   and if I have questions after that, I'll let you all know.

18       You know, probably clear, but my main interest here is

19   what's happening on the ground as it relates to the pending

20   motion to enforce my temporary restraining order.  This is not

21   an opportunity to relitigate the TRO itself, which remains in

22   effect, has not been stayed, and must be followed by the

23   parties.

24       If I can, I'll resolve the pending motion orally today

25   so that the parties in the case can move forward.  But the

1    parties do remain under the obligation to file the joint

2    status report I've asked for tomorrow.  And if there's more I

3    want included in that, at the end of this hearing I'll let you

4    know that too.

5         All right.  With that, counsel for plaintiffs in the Global

6    Health Council case, 402, you've got the floor.

7         MR. WIRTH:  Good morning, Your Honor.  Stephen Wirth

8    from Arnold & Porter.  To begin, I just want to thank the

9    Court for promptly convening this hearing.  As we said in our

10   motion, we don't make this request lightly, and we deeply

11   appreciate the Court's continued attention to this case.

12        I'd like to start briefly by addressing the harms at

13   issue here.  You have our briefing and the declarations that

14   we filed yesterday.  I think you can tell from those that the

15   harms here are extremely immediate and need to be remedied

16   within hours, days at the most, or else my clients will face

17   truly irreparable harms to their businesses.  They're in the

18   midst of shuttering -- they're about to sign usurious loan

19   documents.  This is truly an emergency, and that is why we

20   filed this motion.

21        But I also wanted to raise to the Court's attention the

22   fact that our named plaintiffs are not the only plaintiffs

23   here who are suffering.  We represent two associations and the

24   members of those associations are suffering very similar harms

25   as our named individual organizational plaintiffs.  I'll just

1    give one example for the Court's attention.

2        I was recently given a message from one of the

3    organizations who's a member of SBAIC, and this woman owns a

4    small business.  She's owed almost a million dollars from the

5    government.  And she wrote to me:  "The impact on me is that

6    my business will not only close, but at 60 years old I will

7    have to go and keep working into old age to make up for that

8    $1 million loss which is backed by my personal wealth.  And I

9    will have almost no assets on which to live."

10        These are real harms to real people, and they go very deep.

11    And so I want to make sure that the Court is aware of them.

12    Not to mention, though, the truly disastrous humanitarian

13    effects that are happening right now all around the world.

14    So unless the Court has specific questions about the harms,

15    I would like to turn to what we understand is happening on

16    the ground with respect to payments.

17        THE COURT:  This may connect, and you can feel free

18    to tell me you're going to explain it in the context of

19    discussing what's going on on the ground, that's fine, but I

20    do have a question.  Obviously, it does seem like these harms

21    are very much the same type of harms that were briefed and

22    evidence was provided at the TRO consideration phase.  So

23    it's concerning that they've continued.

24        I just want to clarify, the harms you referred to, whether

25    it be the example you just gave or really hopefully all of

1    them, are you speaking specifically and exclusively as to

2    nonpayment for work that has already been completed or that

3    had already been completed before the TRO, for instance, or

4    are you speaking of money owed under, you know, agreements

5    projecting them into the future?

6         MR. WIRTH:  Yes, Your Honor.  Again, Stephen Wirth.

7    We are speaking about money owed for work that was completed

8    prior to the TRO.  There are also harms related to failure to

9    release money that is obligated going forward, and some of my

10   clients were unable to draw down money from funds that have

11   already been obligated.

12        But we're primarily talking today, the examples that we

13   gave in our declarations, for example, this is all for money

14   that is presently owed for past work and that our clients need

15   access to immediately in order to continue surviving as

16   ongoing concerns.  So we are talking about primarily past

17   work.

18        THE COURT:  Got it.  All right.  Why don't you go ahead

19   and continue where you were headed, and I'm sure I'll have

20   some clarification questions.

21        MR. WIRTH:  Absolutely.  So what we understand, and

22   what I know from my clients, is that they are not being paid

23   for all of this work that's already been done.  Since the

24   government has -- since the Court entered the TRO and

25   repeatedly reaffirmed it over the last few days, there have

1    been -- payments have essentially slowed to, from our

2    understanding, complete standstill.  The government said last

3    week in the -- in its status report that some $250 million had

4    been slated to be disbursed last week.  We've seen no evidence

5    of that.  Certainly, to the extent there have been any

6    payments at all, they've been a very, very, very small

7    fraction of that.

8        And it's our understanding that those payments are being

9    stopped by new procedures that these defendants have begun

10   imposing on the approval process at these agencies, at USAID

11   and at the State Department.

12       And our understanding is they're requiring new

13   justifications for invoices that have already been approved,

14   that have already gone through the entire approval process,

15   and that they have added a new level of approval at the very

16   top that requires the sign-off of a single person; and they're

17   at the point now where that person needs to individually approve

18   every single line item, and there are so many line items that

19   it's simply impossible.

20       I'll be very interested to hear what the government

21   represents as to what's happening on the ground, but these

22   representations that I'm making today are based on

23   conversations that I've had with numerous people at all levels

24   within both agencies, and my understanding is that this is a

25   policy choice that has been made at the highest levels, that

1    it is in furtherance of the same policy choices that were made

2    pursuant to the executive order that this Court has already

3    temporarily restrained.  And we believe that the government

4    has taken essentially no action to make prompt payments under

5    the TRO.

6         THE COURT:  Mr. Wirth, can I ask you, you referred to a

7    new level of approval at the top requiring the sign-off of a

8    single person.  Is that at one of the agencies in particular

9    that you're speaking or is that at both?

10         MR. WIRTH:  So my understanding, Your Honor, is that

11    the State Department has essentially subsumed many of the

12    functions of USAID, and several people are functioning in

13    roles at both agencies.

14      I'm sorry to sort of interrupt this colloquy, but I'm

15    getting word from my client that the public line is not --

16         THE DEPUTY CLERK:  Your Honor, this is the courtroom

17    deputy.

18      (Simultaneous speaking.)

19         THE DEPUTY CLERK:  Good morning.  This is the courtroom

20    deputy.  We are aware of the issues with the public line.

21    There is nothing that I can do about it at this moment, but

22    the IT staff is aware and they're about to come up here and

23    try to work on it.  But there is nothing that the Court can do

24    at this moment.  It's up to His Honor if he wants to continue

25    or wait until they can try to fix it.  Thank you.

1          THE COURT:  Okay.  Do you have an ETA on what the

2     timeline would be to fix it?

3          THE DEPUTY CLERK:  Your Honor, I do not.  I'm sorry.

4     I just called them about two minutes ago.

5          THE COURT:  Okay.  Do the parties have a position on

6     whether they'd like to pause for a moment?

7          MR. WIRTH:  Your Honor, we're happy to proceed if the

8     Court is comfortable proceeding, but we're also happy to take

9     a brief recess if you would like.

10          THE COURT:  Mr. Sur?

11          MR. SUR:  Same for us, Your Honor.  At your discretion.

12     Thank you.

13          THE COURT:  Yeah.  Why don't we go ahead, then, if

14     both parties, at least on the instant motion, are comfortable

15     proceeding.  I appreciate you letting me know about the issue,

16     and I appreciate the work the courtroom deputy and the IT

17     staff are doing to get the public line up.

18        So can you continue your answer to my question.  You were

19     saying that the State Department under your understanding has

20     subsumed, but I guess I'm wondering -- it sounds like the

21     answer to my question is yes, that there is a single person as

22     to both the State Department and as to USAID?

23          MR. WIRTH:  I believe that's true.  I'm not a hundred

24     percent certain who that person is or whether it's the same

25     person.  But my understanding is -- and the government

1    obviously has far more visibility into the agency than I do.

2    But my understanding is that Ken Jackson at USAID is in charge

3    of all approvals coming up through the agency.  And I'm not

4    sure if he's also in charge of the approvals out of the State

5    Department, but that would potentially also be Pete Marocco,

6    who submitted the declaration in support of the government's

7    status report last week.

8         THE COURT:  All right.  Mr. Sur, I'll expect you to

9    clarify that, but for the moment, that's helpful.

10        Did you have more you wanted to offer before I get to my

11   questions, Mr. Wirth?

12        MR. WIRTH:  No, Your Honor.  Happy to answer any

13   questions that you have.

14        THE COURT:  Okay.  So I know at the past hearing

15   which took place just a day after the TRO motion itself, you,

16   and I think the government also, wasn't able to provide much

17   specificity on the details of how these payments actually

18   work.  I take it some time has passed, and based on the

19   motions, that you all maybe know a lot more about that.

20        So could you walk me through that?  I mean, your motion

21   refers to invoices, reimbursement requests, access to letter

22   of credit facilities and I think drawdowns of those, and then

23   other payment management systems for grants.  It would just be

24   helpful to hear your understanding of the differences between

25   these things and how they all apply to the pending motion you

1        filed and to the TRO.

2            MR. WIRTH:  Yes, Your Honor.  So the way that these

3        agencies operate is largely through two different -- two

4        different large sort of categories:  Their acquisition funds,

5        their acquisition contracts, which operate sort of like a

6        normal government contract.  These are essentially, you know,

7        payments for specific services.  That is generally done

8        through a contract and then the contractors submit vouchers

9        for payment for services rendered.

10           And that is submitted to lower-level agency staff who are

11       responsible for processing the vouchers, ensuring that the

12       work was in fact completed, that all other, you know, aspects

13       of the contract have been honored.  And then the -- that goes

14       into a payment management system at USAID, it's called

15       Phoenix.

16           Once all the approvals are taken care of and the agency

17       has assured itself that the payment is proper, then it is

18       processed and funds are disbursed from the Treasury.  That's

19       sort of the typical process.

20           The other type of general category is assistance

21       agreements.  And these are in the form of grants or

22       cooperative agreements.  And oftentimes these sorts of awards

23       are managed through a letter of credit facility.  And so the

24       funds are made available, and then the awardee can draw down

25       funds from the award to pay for expenses on an ongoing basis.

 1     And it's generally important in a variety of circumstances,

 2     but oftentimes these implementing partners need to have

 3     immediate access to funds, so within certain parameters

 4     they're able to access funds immediately.  And then those

 5     drawdowns are subject to a variety of audits.

 6        And so my understanding is that on sort of both sides of

 7     the equation, things have been broken.  The Phoenix payment

 8     system for vouchers, generally for past work, has been --

 9     access to that by staff, by agency personnel, has been

10     severely limited, and so -- I'm sorry.  Am I still on the

11     line?

12              THE COURT:  I can still hear you.

13              MR. WIRTH:  Okay.  Good.  I'm sorry.  I heard a noise,

14     and I thought I might have been disconnected.

15        All right.  So as I was saying, my understanding is that

16     agency staff no longer have the access that they used to to

17     the system, which means that approvals are being done by only

18     a very small group of people, at sort of the lower and mid

19     levels, and then everything is being funneled up to a single

20     approver, and this has created a huge backlog for past

21     vouchers and the like.

22        On the other side of the equation, so letter of credit and

23     other payment management systems --

24              THE COURT:  I think we're getting the public line

25     connected, so let's pause and I'll ask the deputy to let us

1    know when we should restart.

2         THE DEPUTY CLERK:  Apologies, Your Honor.  We're trying

3    to get it connected again now.

4       (Pause.)

5         THE DEPUTY CLERK:  Okay.  Your Honor, we're reconnected

6    again.  I'm going to have to test it out on my cell phone.  If

7    you guys can continue speaking.  You can hear me?  OIT says

8    they can hear me.  They're testing it out.  So hopefully now

9    it'll work.

10         THE COURT:  Okay, great.  Mr. Wirth, you were just in

11    the middle of discussing how in practice things have, on your

12    understanding, have been frozen in the context of both the

13    acquisition contracts and the assistance agreements.  So

14    please continue.

15         MR. WIRTH:  Absolutely, Your Honor.  So with respect to

16    the assistance agreements, my understanding is that access to

17    the payment management systems and letter of credit facilities

18    was shut off sometime the week of January 20, and it has not

19    been -- access has not been resumed since then.

20       Just a few days ago -- and this is in an attachment to the

21    Northrip declaration that we filed on Monday -- we had a email

22    from a government official that said USAID facilities -- or

23    payments are not going out from the agency.  And that's

24    consistent with our experience.  From what we can tell --

25         THE COURT:  Let me clarify that.  Mr. Wirth, when you

1   say that access was shut off and has not been restored, is

2   that on the agency's side, meaning it's not been restored

3   to the people on the agency who would ordinarily access the

4   system?  Or is it in some way shut down on the receiver's

5   side?  Or tell me if that question doesn't make sense.

6        MR. WIRTH:  I think that question makes sense.

7   My understanding is that on the receiver side, everything has

8   been shut down and they're not able to access funds.  Normally

9   what happens is when a person wants to draw on one of these

10  letter of credit facilities, they go into the payment management

11  system or the facility that they use to make these types of

12  draws, they put in a request for a specific amount.  So long as

13  it meets parameters, it is disbursed generally within 24 hours.

14     And what my clients have been seeing on the ground is that

15  when they make these requests, the disbursement date -- it says

16  that the request has been processed but then the disbursement

17  date is set for almost a year from now, which makes no sense.

18     And so when they have inquired with agency personnel as to

19  what's happening, the answer is that no payments are going out

20  from the agency right now.

21     I'm not sure to what extent the agency personnel themselves

22  have lost access to these systems.  My understanding is that for

23  some time period potentially there was access to Phoenix that

24  was shut off.  I think that some personnel currently have access

25  to Phoenix, and in fact, have made all of the normal approvals

1    through the system that is -- that they normally do, and that

2    right now the thing that is stopping the payments from going out

3    is this final level of approval.

4        THE COURT:  Okay.  Understood.  And just to make sure

5    I'm still clear on this, obviously the invoices that are being

6    submitted on the side of the acquisition contracts is for work

7    that has already been completed, and the focus right now is on

8    work that was completed prior to February 13, the date of the

9    Court's TRO.  And the same in the context of the assistance

10   agreements and the letter of credit facilities as you

11   described them.

12       In other words, the drawdown, when it comes to the letter

13   of credit, is not a drawdown for something that happened

14   yesterday or today, but at least the focus right now is a

15   drawdown for something that happened prior to February 13.

16   Is that right?

17       MR. WIRTH:  Yes.  That's the focus right now.

18       THE COURT:  Okay.  So I'm looking at your proposed

19   order.  Do you have that in front of you, counsel?

20       MR. WIRTH:  I do, Your Honor.

21       THE COURT:  Can you walk me through the first two

22   components of that and just connect it to what you were

23   saying?  It may be obvious, but I want to make sure I fully

24   understand --

25       (Simultaneous speaking.)

1          THE COURT:  -- pay all invoices, and then permit and

2     promptly pay.  I just want to understand exactly what those

3     two are getting at.

4          MR. WIRTH:  Absolutely, Your Honor.  I don't think

5     these are obvious.  These are complicated, and I will admit

6     I'm not a government contracts expert, so I've been learning

7     this very quickly over the last couple of weeks as well.

8          So my understanding is that currently my clients have

9     numerous invoices that they've already submitted and that

10    they believe have already been approved through the normal

11    processes at USAID and potentially also at the State

12    Department, though I think State Department normally operates

13    on grants, not on contracts, but I can't make any specific

14    representations as to that.

15         So take the first of these instances, the pay all invoices

16    and letter of credit drawdown request, this would be for

17    acquisition contracts and specifically mentions work completed

18    prior to the entry of the Court's TRO.  So this would be sort

19    of typical government contracts type payments.

20         I understand that in like a small number of cases these are

21    not done through invoices but they're done through letter of

22    credit drawdown requests, which I think is unusual, but my

23    clients say that both of them need to be represented.

24         With respect to the second prong, so this is for grants and

25    assistance agreements, and these agreements permit drawdowns

1    on an ongoing basis and also, you know, for both past work and

2    for future work.  And in order to continue to do work under

3    the contracts that are currently in operation, the grants and

4    agreements that are currently in operation, they need to make

5    drawdowns on an ongoing and regular basis.  And so this is to

6    ensure that they are permitted to access those letter of

7    credit facilities and other payment management systems.

8         THE DEPUTY CLERK:  Are the parties still here?

9    Testing one, two, three.  Can you hear us?

10        MR. WIRTH:  I'm here.

11        THE DEPUTY CLERK:  Okay.

12        MR. SUR:  This is counsel for the government.

13        THE DEPUTY CLERK:  I think we lost --

14        THE COURT:  My apologies.  Judge Ali is here, and I

15   was asking a question but I was on mute.

16        THE DEPUTY CLERK:  Oh, okay.  My apologies, Your Honor.

17   Thank you.

18        THE COURT:  Thank you.  Mr. Wirth, because we're here

19   on a motion to enforce the TRO, can you make the connection,

20   then -- connect the dots as you see it between the relief

21   you're asking for -- and I'm really focused on the first two

22   points for now because I think the other ones are self-

23   explanatory about just following the order -- connect those

24   first two to the TRO itself for me.

25        MR. WIRTH:  So the TRO specifically ordered the

1    government to not take any actions to pause the disbursement
2    of foreign assistance funds, and these two components of
3    the proposed order go directly to the government's -- to
4    the temporary restraining order insofar as it orders the
5    government to stop any pause of disbursement of foreign
6    assistance funds.
7         THE COURT:  Right.  And is one way to look at how you
8    drafted here the first point we were talking about that begins
9    "Pay out all invoices and letter of credit," that's looking at
10   funds from before February 13, before the date of the TRO, and
11   the second one is looking at drawdowns in the future?  Tell me
12   if I'm --
13        MR. WIRTH:  No, not necessarily --
14        THE COURT:  -- oversimplifying.
15        MR. WIRTH:  I'm sorry.  No, Your Honor, it's not that
16   simple.  So my understanding is that these drawdown requests
17   can also be for past work.  So it's not as simple as saying
18   that it's only for past or only for future.  It depends on the
19   specific language of the grants and the assistance agreements
20   and what those funds are going to be used for.
21        THE COURT:  Okay.  So try again.  Tell me again what
22   that second point adds that's not already in the first point.
23        MR. WIRTH:  Well, the first point is specific to
24   acquisition contracts, and the second point is with respect to
25   grants and assistance agreements.  These are all the -- these

1    are all the --

2         THE COURT:  I see.  I see.  Okay.  Thank you.  That's

3    helpful.  I'm sorry to interrupt you.  So the key difference

4    is later in the sentence where it says "on contracts for work"

5    in the first one, and in the second one it says "for

6    reimbursement on grants and assistance agreements."  That's

7    the focus?

8         MR. WIRTH:  Yes.  Exactly, Your Honor.  And I think the

9    distinction is important because, with respect to sort of

10   vouchers that are submitted for work on contracts, I think my

11   understanding is those are all sort of retrospective for past

12   work, but that on grants and assistance agreements, draw-down

13   requests can be both retrospective and prospective, and so

14   this covers the waterfront, so to speak.

15        THE COURT:  Understood.  When it came to the meaning of

16   the second one, at least again as to the focus of your motion

17   which is for, you know, I don't think a significant amount but

18   it's for work completed prior to the entry of the TRO, if the

19   second paragraph included that qualification at the end, in

20   other words that the focus is for work completed prior to the

21   entry of the Court's TRO?

22        MR. WIRTH:  I -- I do worry that that would

23   unnecessarily limit the scope of the Court's TRO which

24   specifically refers to all disbursements of foreign assistance

25   funds.  Some of my clients receive drawdowns on an ongoing

1      basis, and I do worry that this would cut them off from credit

2      in a way that would perpetuate the irreparable harms they are

3      currently facing.

4           THE COURT:  Understood.  Fair point.  I think that

5      would be narrower than the TRO itself.  I'm just trying to

6      understand exactly the narrow focus -- or at least the highest

7      priority if that makes sense, of what's been enjoined.

8         Let me ask you a different question:  Can you give me

9      plaintiffs' position on the main regulation that defendants

10     have cited as authorizing suspension and termination?  And I'm

11     not trying to get ahead and hear your argument on the PI

12     necessarily.  I know you all still have time to get your brief

13     on file under the briefing schedule that's been entered, but

14     specifically as it relates to the present motion to enforce

15     the TRO, what is the place that the regulation that -- I think

16     it's 2 C.F.R. § 700.14 -- how does that relate to the present

17     TRO and your motion to enforce?

18          MR. WIRTH:  So my answer to that is that the Court has

19     already ordered the government to make payments and to stop

20     pausing the disbursement of foreign assistance funds.  Whether

21     the government can terminate contracts really is not relevant

22     to that specific question that we are seeking the Court --

23     seeking to enforce right now.

24        As the Court is aware, we are preparing our reply brief

25     which directly deals with the sort of subject matter question,

1    subject matter jurisdiction question the government has

2    raised.  We believe that we have strong arguments that there

3    is jurisdiction under the APA and that we absolutely can bring

4    exactly these types of claims because they are based on --

5           THE COURT:  Understood.  I'm sorry, counsel, this is

6    probably my fault.  I don't want to push you ahead to your PI

7    arguments.  I think the first part of your answer does the

8    trick for me.

9       And then I guess -- again, jumping ahead a little bit, and

10   this may be jumping into the PI, might be jumping ahead to

11   beyond the PI, but not in terms of merits argument.  I guess

12   I'm just interested, Counsel, in, for lack of a better way to

13   put it, what do you see as the ultimate end game here

14   realistically?

15      And let's just posit that it seems like -- and this does

16   not go to necessarily the compliance with the TRO, which is

17   the question before the Court right now, but clearly the

18   administration is signalling that it does not want to contract

19   with your clients, and you all satisfied your burden to show

20   irreparable harm and a likelihood of success on the merits was

21   done, and the government needs to comply with the Court's

22   order -- and I'm going to talk to the government soon -- and

23   that includes unfreezing payments, as I've said and

24   reiterated, and I'll come to that, but I guess I'm just -- do

25   you see a path to this actually leading to the reinstatement

1      of long-term contracts with your clients?

2           MR. WIRTH:  Yes, Your Honor.  So first of all, just to

3      be very clear, what we're here today for is so that we can

4      even get to the PI hearing.  The clients need to get to the PI

5      hearing in order to then be able to craft an order that will

6      be able to protect them going forward, a preliminary

7      injunction that protects their rights.

8        But we do see a path forward here.  The government has said

9      that they have the authority to cancel all these contracts.

10      If that's in fact true, then they will have to go through the

11      proper processes to cancel contracts.  What they can't do is

12      do what they've done here.  So, you know, our understanding is

13      that many of these contracts do serve the national interest,

14      and if they were actually going through these contracts and

15      evaluating them, that they would not cancel these contracts,

16      even if they had the ultimate authority to do so.

17        And beyond that, I think there's a couple of other issues

18      at issue here.  We're not saying the government has to spend

19      these foreign assistance funds to operate specific contracts.

20      But we are saying that the government can't unlawfully impound

21      all of these funds and make no foreign assistance obligations

22      going forward.

23        So what we would want going forward is not necessarily that

24      our clients' specific contracts will be kept in perpetuity.

25      That may not be possible.  And in fact, the government may

1     have the ability to cancel some of them.  But they can't do

2     this wholesale cancelation of all of their contracts all at

3     once.  They have to actually follow the law when canceling or

4     terminating agreements or grants.  And they actually have to

5     spend these foreign assistance funds that have been

6     appropriated by Congress, that have specific statements as to

7     how they are to be spent.  And the Executive Branch --

8          THE COURT:  Thank you.  I think that answers my

9     question.  I promised I wouldn't force you to argue the PI on

10    the spot.  That's helpful enough as you've answered it.  I

11    appreciate that.

12     So why don't I hear from counsel for the plaintiffs in the

13    AIDS vaccine case, 400.  Again, my interest would be anything

14    in your position based on your clients that differs from what

15    I've just heard from Mr. Wirth, or anything you can offer that

16    would supplement that, what I've just heard.

17          MS. BATEMAN:  Thank you so much, Your Honor.  This is

18    Lauren Bateman for plaintiffs in 25-cv-400.  I'm grateful for

19    the opportunity to speak and will remain mindful of this

20    Court's direction to only note areas where plaintiffs'

21    positions are different and to provide only additive

22    information.

23     We agree entirely with plaintiffs in 25-cv-402 about the

24    extent of noncompliance, but as we see it, the question before

25    the Court is not whether to enforce one part of the TRO; the

1    question is whether defendants are complying or violating the

2    TRO.  And they appear to be violating it in all respects.

3         So plaintiffs in 25-cv-400 would renew their motion to

4    enforce and motion for civil contempt, seeking enforcement of

5    the entire TRO, and we urge the Court not to enter relief that

6    would narrow the relief that the Court has already now thrice

7    granted.

8         I have a couple of factual additions that I'd like to add

9    to supplement Mr. Wirth's portrayal of the situation:  First,

10   we know that defendants have initiated new terminations in the

11   last couple of days explicitly on the bases forbidden by the

12   TRO.  On February 23 --

13        THE DEPUTY CLERK:  Counsel, the court reporter needs

14   you to slow down a moment.  And also, Your Honor, we're going

15   to attempt to reconnect the system one more time.

16        THE COURT:  Okay.  Apologies, Ms. Bateman.  We'll go

17   ahead and pause until the deputy confirms that we're

18   reconnected.

19        MS. BATEMAN:  Thank you, Your Honor.  My apologies.

20        THE DEPUTY CLERK:  Okay.  Pause for one moment.  We're

21   going to try this again.

22        Okay, Your Honor.  Back on the record.

23        THE COURT:  Okay.  Go ahead, Ms. Bateman.

24        MS. BATEMAN:  Thank you.  I was just indicating that

25   our understanding is that defendants have initiated new

1    terminations explicitly on the bases forbidden by the TRO in
2    the last couple of days.  On February 23 a notice was issued
3    to contracting officers to terminate a new tranche of awards.
4    And that notice made clear that the authority to do so came
5    from Secretary Rubio with the explicit instruction that those
6    terminations were implementing the executive order.
7        And then subsequently, at approximately 4:30 p.m.
8    yesterday, contracting officers received an email from Adam
9    Cox, whose title is acting deputy director of foreign
10   operations.  That email indicated that they were instructed by
11   DOGE to terminate several awards that same night, and also
12   indicated that many -- and "many" is capitalized in that
13   email -- more terminations are coming and that Foreign Service
14   officers were authorized for overtime to effectuate those
15   terminations.
16       We understand that the government now says oh, it was a
17   mistake for us to say that the executive order was the basis
18   for those terminations, but -- and that emails with the agency
19   claim that Secretary Rubio individually reviewed all of the
20   terminations and decided on his own to terminate those awards,
21   but that's frankly a fantastical claim.  Given the number and
22   complexity of the awards at issue, it's implausible on its
23   face, and it's also worth considering the implausibility of
24   that claim given Secretary Rubio's travel schedule from
25   February 13 to 19.  He was in Germany, then Israel, and then

 1    Saudi Arabia and the United Arab Emirates.

 2        So the key in plaintiffs' view is not whether defendants

 3    can conjure some alternative pretextual basis for their

 4    actions.  And the Supreme Court has been very clear about

 5    this.  In *Department of Commerce v. New York*, that's the

 6    census case before the Supreme Court, Chief Justice Roberts

 7    wrote for the Court and said that when a court receives an

 8    explanation for agency action that is incongruent with what

 9    the record reveals about the agency's priorities and

10    decisionmaking process --

11        (Simultaneous speaking.)

12        THE DEPUTY CLERK:  Counsel, please watch your speed.

13    Counsel, please watch your speed for the benefit of the court

14    reporter.  Thank you.

15        MS. BATEMAN:  My apologies.  Thank you.

16        In closing on that point, courts are not required to

17    exhibit a naïveté from which ordinary --

18        THE COURT:  Understood.  Yeah, I certainly have that

19    point, and it's been something I've reiterated each time any

20    sort of clarification has been sought.  That this is not

21    about, you know, continuing to suspend funds while the

22    government can come up with post hoc rationalization or a

23    pretextual basis for the action that I think I deemed likely

24    to be arbitrary and capricious in the first place.

25        And I'm familiar with the *Department of Commerce* case,

1    which I think was cited in the Court's last order.

2        Tell me anything else that you would supplement the prior

3    argument on or differ from.

4        MS. BATEMAN:  Thank you, Your Honor.  Two other points,

5    and I'll make them briefly.  On the subject of personnel

6    access to payment processing systems, on February 23, USAID

7    began to implement reductions of force that likewise appeared

8    tailored to circumvent the Court's orders.  Our understanding

9    is that those RIFs include financial management staffers, so

10   those are the people who would actually do the disbursement of

11   awards to implementing partners.

12       Our understanding is that before February 23 defendants

13   blocked those staffers from access to payment systems, but

14   after February 23, there's hardly anyone at the agency who has

15   those jobs.  And without those people, the funds can't move,

16   so there can't be compliance with the Court's order.

17       Defendants either know that or they're acting with such

18   ignorance and haste that they don't know what they're breaking

19   as they're breaking it.

20       Also included in that RIF were employees who interact on a

21   day-to-day basis with recipients of foreign aid assistance.

22   Those are the people who would theoretically get these

23   programs back up and running after a suspension is lifted.

24   And those people likewise have largely been terminated or

25   placed on administrative leave.

1    One other point for Your Honor's consideration.  To add

2    supplemental information to Mr. Wirth's discussion of the

3    problem of bottleneck at individual approval -- for individual

4    approval of line items, I wanted to call this court's

5    attention to reporting in *The Washington Post* in the last

6    couple of days.  That reporting details how Elon Musk and two

7    DOGE employees took over the USAID payment processing system,

8    stopping payments entirely and making the supposed waivers

9    issued by Secretary Rubio completely ineffectual.

10    That reporting indicates that USAID managers prepared

11    packages of payments that should have ostensibly been covered

12    by waivers and got the agency's interim leaders to sign off on

13    those packages, but each time Musk and one or two other

14    employees of DOGE would veto the payments.

15    That reporting is consistent with what I've gleaned in

16    speaking to people from within the agency.  My understanding

17    is that bureaus have flagged that they don't have access to

18    payment systems to effectuate the TRO, but the agency just has

19    not responded to those requests.

20    Just to take one example, nobody in the entire Global

21    Health Bureau, which among other things drives PEFPAR

22    programs, has access to the payment systems at all.  It's just

23    two 20-somethings and Elon Musk.  So essentially no funds are

24    being distributed.

25    THE COURT:  Can you clarify that statement?  The

1    systems you're referring to, are those USAID systems to

2    approve and put the payments forward, or are they

3    Treasury-side systems?

4        MS. BATEMAN:  Our understanding is that Phoenix is a

5    USAID-side system through which USAID employees can actually

6    approve disbursement of payments.

7        THE COURT:  And that's the system you're saying DOGE is

8    now controlling?

9        MS. BATEMAN:  That's right.

10        THE COURT:  Okay.  Understood.

11        MS. BATEMAN:  Thank you, Your Honor.

12        THE COURT:  Anything else?

13        MS. BATEMAN:  Nothing else.  We'd just conclude by

14    reiterating that we seek enforcement of the TRO in its

15    entirety.  Thank you.

16        THE COURT:  Okay.  Mr. Sur, I'll hear from you on

17    behalf of the defendants in both cases now.

18        MR. SUR:  Good morning, Your Honor.  Indraneel Sur from

19    the Department of Justice for the defendants.

20      I guess I will begin by noting that the defendants have

21    been focusing their efforts on preparation of the submissions

22    for the compliance and joint status report, working under the

23    Court's order with the due date for tomorrow, and that has

24    been the focus of the significant energy.

25      So when the plaintiffs in No. 402 early yesterday morning

1    raised this prospect of a renewed motion, there was failure of

2    time essentially for me to find anything.  I did -- and the

3    defendants do now have -- received plaintiffs' invoices and

4    are analyzing them.  But as for much of the assertions about

5    the facts, insofar as any of them are in the record at all,

6    we've not had the opportunity to respond to that.

7        And so at the outset, the Court noted the submissions for

8    tomorrow, and I think the Court also suggested that it might

9    provide guidance on what might be the appropriate content of

10   that submission.  So in that respect I might respectfully

11   submit that it would be appropriate to give the defendants an

12   opportunity to address some of what's been asserted here about

13   the facts.

14       But -- Mr. Wirth made certain assertions.  He did have the

15   benefit of pointing to the record on the previous motion, but

16   the dilemma is that the previous motion was denied, right,

17   albeit without prejudice for its renewal, but the renewal

18   papers didn't --

19           THE COURT:  Mr. Sur, let me maybe direct you to

20   something --

21           MR. SUR:  Sure.

22           THE COURT:  -- that would be helpful at this point.

23   I take your point that a motion was filed while the joint

24   status report was pending, but I'll remind you the government

25   also filed Friday, around midnight if I recall, its own

1      version of that after the joint status report was ordered as

2      well.

3          And so, you know, right now the Court has before it a

4      motion to enforce.  I've been clear that this is not going to

5      become -- well, certainly not intended to ever become a review

6      of individual contract determinations.  You're bringing it

7      down to that level right now, and I don't want to as the

8      court.

9          I think there are some basic questions that have been

10     posed here, and while you may not have reviewed those specific

11     invoices, the TRO has been in effect for now 12 days, since

12     February 13, and there are some just basic questions.

13         So let me just ask you, you know, the TRO was clear and the

14     Court has said it was clear that defendants could not continue

15     the blanket suspension of foreign aid funds pending a review.

16     And that was based on a finding that the plaintiffs had shown

17     irreparable harm.  It sounds like there's evidence right now

18     that it's deepened.

19         And to be honest -- obviously there's the PI motion pending

20     and briefing which the Court will consider, but at the TRO

21     phase I don't take the government really to have ever rebutted

22     that irreparable harm.  And there was a likelihood of success

23     that at least under the APA, for failing to consider that

24     irreparable harm, that the plaintiffs were likely to prevail.

25         And so the plaintiffs seem to be saying that the blanket

1       pause was not lifted in any meaningful sense.  I'd like you

2       to tell me in simple terms what action you are aware of that

3       the agency has lifted the blanket pause.

4               MR. SUR:  So to begin with, I think that after the

5       TRO -- and this was provided in the February 18 status report,

6       that after the TRO, the agencies gave instructions about the

7       TRO and notice to the funding recipients and to the officers

8       who managed the grants.  And the Court heard this morning

9       assertions about subsequent terminations, but -- and actually,

10      we had an exchange with plaintiffs Sunday night about that.

11          But the subsequent terminations have been, as I understand

12      it, grounded in individualized review which was consistent

13      with clauses in the Court's TRO distinguishing the blanket

14      from the individualized review.

15              THE COURT:  Let's just break this down a little bit.

16      So why don't we focus on two different periods.  Let's focus

17      on before February 13, the date of my TRO, and after February

18      13 separately.  So let's just focus on the period before

19      February 13.

20          There were suspensions pursuant to the EO in the

21      implementing orders that were enjoined by my TRO, and there

22      may have even been a series of suspensions and terminations

23      communicated during that window between January 19 and

24      February 13.

25          Are you contending that those suspensions and terminations

1      that would have occurred during that period remain valid and

2      should be given effect?

3          MR. SUR:  No, we understand the TRO to foreclose those.

4      I think that's clear.

5          THE COURT:  So that's helpful.  I appreciate that.  And

6      I appreciate you being candid about that.

7        So then, are you aware of steps that the agencies here have

8      taken to actually unpause the disbursement of funds as to

9      agreements that fall within that category or work done before

10     February 13?

11         MR. SUR:  So let me focus on that last point, if I

12     might, about the work done before February 13.

13         THE COURT:  Well, I actually want to focus on my

14     question, which is -- you just said to me that you understand

15     that any of the suspensions and terminations that took place

16     before February 13 are invalid and can't be given effect under

17     the TRO.  I do want to hear your full answer, but has the

18     government began -- has the government unfrozen disbursements

19     as to those contracts or assistance agreements for those --

20     for at least that period?

21         MR. SUR:  So for the -- the period before the TRO --

22     this is going back to February 18 joint status report, the

23     plaintiffs' characterization of some of those decisions --

24     and there's a wide variety, right, of grants and foreign

25     assistance arrangements, contracts -- was that all of them

1    were under the same challenged authority, and the government

2    explained in the status report that there were

3    contract-specific categories.

4        So where there were contracts that resumed and they had

5    claims for work done, there actually was a process for that.

6    The Secretary of State's memorandum, which was published at

7    page 2586828 [sic] of paragraph 12(d) provided for legitimate

8    expenses incurred prior to the date of that -- it's called an

9    ALDAC -- under existing awards or legitimate expenses

10   associated with stop-work orders.

11       So there was a process -- the legitimate expense waivers.

12   And that hasn't been disputed in the complaint, that that is

13   there for the work that has been done.

14       THE COURT:  Hey.  I guess I'm not sure why I can't

15   get a straight answer from you on this.  Are you aware of an

16   unfreezing of the disbursement of funds for those contracts

17   and agreements that were frozen before February 13?  And

18   you've acknowledged that under the TRO any of the terminations

19   or suspensions that took place before February 13 are

20   foreclosed, they're invalid and shouldn't be given effect.

21   Are you aware of steps taken to actually release those funds?

22       MR. SUR:  I'm not in a position to answer that.  I

23   think we will be in a position to answer that in the joint

24   status report.

25       THE COURT:  Well, we're 12 days into the TRO, and

1    you're here representing the government.  You had represented

2    in the initial February -- it wasn't a joint status report,

3    to be clear, to correct you, it was a status report from the

4    government, from the defendant, and, you know, made issue of

5    that it had been five days and there had been a holiday

6    weekend, but we're now 12 days in and you can't answer me

7    whether any funds that you've kind of acknowledged are covered

8    by the Court's order have been unfrozen?

9         MR. SUR:  All I can do really is say that the

10   preparations are underway for the joint status report on

11   compliance due tomorrow, and --

12        THE COURT:  It's not really [indiscernible] to a joint

13   status report, right?  The joint status report was something

14   I asked for.  And I'm asking you right now what you are aware

15   of.  Sounds like the answer is no.  If the answer's no, you

16   can say no, that you're not aware of any actions to unfreeze.

17        MR. SUR:  As I said, there was a legitimate expense

18   waiver process that is in place.  Beyond its presence, I can't

19   really go beyond that.

20        THE COURT:  But that's not referred to the TRO.  You're

21   citing back to the implementing regulation that's a part of

22   it, of the same implementing regulation that the TRO enjoins.

23   But I'm asking you -- this hearing is about enforcing the TRO

24   and compliance with the TRO.

25        MR. SUR:  So I do understand that.  I do also

1   understand the motion before the Court, the motion to enforce

2   to actually seek relief that is somewhat different in

3   character and is explicitly monetary.  And if the Court would

4   allow, I would appreciate the chance to elaborate a little bit

5   on that part of it.

6           THE COURT:  On which part of it?

7           MR. SUR:  That the relief before the Court as requested

8   in the present motion to enforce actually goes beyond the TRO

9   in that it is even more expressly of a monetary character and

10  therefore raises a serious problem of sovereign immunity.

11          THE COURT:  Well, yeah.  We can come to that.  I mean,

12  I don't understand the argument.  It seems like what you're

13  saying is instead of unfreezing or unpausing the funds, as the

14  TRO required, you just won't because of immunity.  If you want

15  to brief that at the PI stage, I suppose you can.  It's not an

16  argument that you all raised at the TRO phase.

17       Let me just ask you, though, here, because I think this is

18  important:  I have from you an acknowledgement that

19  suspensions or terminations from before February 13 are

20  invalid under the TRO.  And I appreciate that.  I just want to

21  be clear here --

22          MR. SUR:  I'm sorry --

23          THE COURT:  Let me just finish my question.  I just

24  want to be clear here.  So I understand that there is a review

25  of the agency's legal authorities and contractual terms, but I

1    assume then that you understand that it's not enough to just

2    go ahead and come up with a legal authority or contractual

3    term that would have justified a termination before February

4    13.  So an agency could be free to do that with independent

5    justification and legal authority in the future, but that

6    wouldn't justify or give effect to the terminations that

7    actually were communicated before February 13.

8        I assume you would agree with that given that you agreed

9    that it would violate the TRO to give those effect.

10        MR. SUR:  Where I'm having difficulty is that I think

11    as the February 18 report explained, the authorities for the

12    terminations and suspensions were up -- as best as we know,

13    part of these various contracts, grants and cooperative

14    agreements all along.

15        THE COURT:  Yeah.  I mean, I think that's kind of the

16    point, Counsel, right?  The TRO didn't say that there's no

17    underlying authority; that the agency is, you know, not acting

18    pursuant to the scope of its typical authority.  The TRO very

19    clearly, and it now has been reiterated, that the plaintiffs

20    were likely to succeed, at least for now, under the APA.

21        And so it wasn't about whether there was an underlying

22    authority.  For example, the Court didn't get to the

23    separation of powers problem.  The question was about the

24    failure to consider the irreparable harm here and the massive

25    reliance interest.  And finding new authorities does nothing

1    to do that, to address that.

2        So, you know, I think that it's explicit in the TRO but

3    it's also just illogical to say, well, we found some

4    authorities.  Again, the government has its authorities going

5    forward, but I think the point I'm trying to make, and this is

6    the point about not just coming up with a pretextual basis for

7    what has been held to likely be arbitrary and capricious and

8    enjoined -- I guess I'm not understanding where there is any

9    confusion here.  It seems kind of clear as day to me.

10        MR. SUR:  So, Your Honor, I think I would only be

11    reiterating what we've said in our previous filings, which is

12    that the Court's TRO we think appropriately recognized that

13    there were authorities that were located in contracts and

14    grants, and that the enforcement of those agreements at the

15    agreement-specific level was appropriate.  So -- and that I --

16        (Simultaneous speaking.)

17        THE COURT:  I take your point -- I understand the

18    government's position that it was appropriate.  I'm sorry,

19    counsel.  You're saying that -- I guess I'm hearing you say

20    two things.  One, it sounds like you're saying that the

21    termination of grants was appropriate.  Clearly, you prefer

22    not to have been enjoined.  But I also heard you say that you

23    understand that terminations and suspensions prior to February

24    13 were in fact enjoined.  I think the language you used was

25    foreclosed by the Court's TRO.

1          MR. SUR:  I think to that point insofar as -- I'm sorry

2     to interrupt.  But as I understood it to be insofar as it was

3     a blanket, I thought I was responding -- I'm sorry if I wasn't

4     clear.  I thought I was responding to the Court's question

5     about the concept of a blanket.

6          THE COURT:  Well, before February 13, everything was

7     proceeding pursuant to the blanket directive to terminate and

8     suspend.  That's what the directive was, implementing the

9     executive order.

10         MR. SUR:  So this is in the February 18 status report

11    as well, that following the TRO the agencies reviewed and

12    concluded that those suspensions and terminations were

13    consistent with terms of the contracts or grants or

14    cooperative agreements.  So maybe that's where I'm having

15    the -- in that --

16         THE COURT:  How is that different from just being a

17    post hoc rationalization kind of piece by piece of the kind of

18    en masse suspension that was deemed arbitrary and capricious?

19    I guess I can't tell whether you're just restating a position

20    that you want to preserve because you disagree with the TRO,

21    or there's actually some degree of confusion to begin with.

22    It seems clear to me, plaintiffs have articulated here in a

23    clear way as well.

24         So to the extent it's just a policy disagreement in terms

25    of the outcome of the TRO, that's fine, but I'd appreciate you

1    just being candid about that.

2        MR. SUR:  Um, well, I'm not certain if I would use the

3    term "confusion" so much as that the Court we think in the

4    original TRO in some sense recognized that there are

5    contract-level authorities and didn't foreclose that.  So --

6    you know, the government's subsequent filings I think have

7    sought to explain how those contract-level authorities have

8    been working.

9        THE COURT:  Okay.  All right.  We're going to move on

10    from that.  Why don't we focus on -- I'm not sure I understand

11    that point insofar as it deals with anything before February

12    13, because at that time, and I made clear that it's not just

13    about finding a contract term or a legal authority that

14    applies, but it cannot be taking place pursuant to the same

15    action here, which was a general directive to pause.  And so

16    everything before February 13 clearly was under that general

17    directive.

18      Let me turn you to the other period I mentioned, post

19    February 13, so after the TRO.  I want you to tell me again

20    what actions you understand have been taken -- aside from

21    mailing the notice, mailing a copy of the TRO and saying

22    further guidance would be provided, I want to know what

23    actions have been taken, including whether funds have been

24    unfrozen based on the TRO, and if so, what funds have and what

25    funds have not.

1          MR. SUR:  These would be I think the logical subjects

2     of the joint status report that is underway.  I don't have the

3     ability to recite those particular facts at this hearing.

4          THE COURT:  Twelve days into the TRO, you can't give me

5     any facts about funds being unfrozen based on the TRO?

6          MR. SUR:  I can -- I mean, there is this waiver

7     process.  And --

8          THE COURT:  Which was part of -- my TRO didn't have a

9     waiver process in it.  I'm asking about in response to my TRO.

10         MR. SUR:  Right.  So the TRO didn't enjoin paragraph

11    12(d) of the memorandum we were talking about, so that process

12    for approval of waivers of the pause --

13         THE COURT:  Counsel, is your answer then that the only

14    funds that have been reinstated are the ones that could have

15    been reinstated under the initial implementation of the TRO,

16    meaning only if they went through the waiver process?  That

17    sounds to me like you're just operating under the procedures

18    of the implementation.

19         MR. SUR:  So I'm offering that as one example.

20         THE COURT:  Can you give me other examples?

21         MR. SUR:  So in the joint status report -- I'm sorry.

22    I have incorrectly referred to it as the joint status report.

23    This is actually the February 18th status report -- there are

24    additional examples in that report and the supporting

25    declaration.

1          THE COURT:  Of funds being unfrozen in response to the

2     TRO?

3          MR. SUR:  I can only give you what the description here

4     is, authorization and requested disbursement of foreign

5     assistance funding.

6          THE COURT:  Okay.  All right.  Can you tell me -- look,

7     I'm interested in what the general directives have been since

8     the TRO.  So your clients, the heads of these agencies, issued

9     directives before the TRO.  These are the ones that were

10    restrained by the TRO that implemented the blanket suspension

11    of funds pending their review.  So that was enjoined.  After

12    the TRO, did they issue new directives walking that back?

13         MR. SUR:  Some of -- my understanding is we described

14    that in the February 18th status report.

15         THE COURT:  Can you describe it for me now, because I

16    didn't see that.

17        (Pause.)

18      Are you aware of directives from your clients or other

19    senior officials at the agencies that walked back the initial

20    general directive to suspend and terminate funds?

21         MR. SUR:  When you say "walked back," I think there

22    were notices of the TRO.  This is -- they stated -- if I

23    may --

24         THE COURT:  Go ahead.

25         MR. SUR:  -- for example, in the declaration that

 1    supported the February 18th status report, paragraph 5, the

 2    notice to the acquisition and assistance staff at USAID stated

 3    that until further notice the contracting and agreement

 4    officers should not enforce any agency directive issued under

 5    Executive Order 14169 and the Secretary's implementing

 6    memorandum that requires the generalized stop-work, suspension

 7    or pause of agency contracts, grants or other federal

 8    assistance awards.

 9        That was exhibit -- sorry, this was paragraph 5 of the

10    declaration, and then it pointed to Exhibit C.

11        THE COURT:  Counsel, I hope you understand why this

12    is important as the attorney who's presumably advising your

13    clients and you're here representing them.  The Court's been

14    clear and, you know, as recent as when the government came on

15    Friday night and asked for further clarification, the Court

16    said that the qualification about when there are terms in the

17    contract or other legal authorities which allow termination

18    applies, but not when the terminations are still deriving from

19    a general directive to suspend aid.  That's repeated

20    throughout the document we filed.  I haven't seen the

21    emergency appeal you had referred to in that document be

22    filed, and the TRO is still in effect.

23        So if I were you, you know, I would think it would be

24    very important to point to some sort of directive that --

25    or something that indicates that the suspensions that are

1    happening under lawful authority, whether it be a regulation

2    or the terms of the contract or otherwise, is not still just

3    deriving from a general direction to suspend aid from the

4    agency, because that, again, is the very action that was held

5    to be likely arbitrary and capricious, that general directive.

6    And I don't even take the defendants to have ever disputed

7    that at the TRO stage.  Maybe I'll -- you know, I'll look

8    closely at your PI briefing.

9        So I'll leave it at that, but I would think it would be

10    important for you to be able to explain that to your clients

11    and to point to that.

12        MR. SUR:  I realize I've said this before, but if I may

13    say it one more time, I do think that the submissions that are

14    underway now offered for tomorrow will help.

15        THE COURT:  Okay.  I appreciate that.  I'm going to

16    take that to mean that you're still in conversations with your

17    clients, and that's what your inability to give a clear answer

18    to the Court is today.  You can correct me if I'm wrong on

19    that.

20        MR. SUR:  Yeah, I would have to go back to the clients.

21        THE COURT:  Yeah.  Understood.  Okay.

22        So let me just see if I have any other questions for you,

23    Mr. Sur.

24        MR. SUR:  May I ask, would the Court permit me to

25    briefly address some of the points that are specific to the

1      monetary character of the relief sought on this particular

2      motion?

3             THE COURT:  Well, maybe.  Yes, but to this extent:

4      I said at the outset that the purpose of this hearing is to

5      understand and to hear arguments on the motion to enforce the

6      TRO.  It is not an opportunity to relitigate the TRO.  So if

7      there are arguments that you want to make that limit the scope

8      of injunctive relief, the place for that would have been in

9      your PI briefing.

10         So I hope any argument you're going to make about that is

11     in your PI briefing.  But if you want to make arguments about

12     what the scope of the TRO actually was, then those arguments

13     are welcome.

14            MR. SUR:  Right.  So I mean, again, I'll try to be very

15     brief.  But the sovereign immunity question is brought into

16     particular focus by the proposed order, including the clauses

17     that the Court discussed with counsel for plaintiffs in

18     No. 402 earlier this morning, because they have an explicitly

19     monetary character, demanding compensation for past work and

20     including relief that addresses the letters of credit.

21         As the Court notes, in the PI briefing we did address this

22     question of sovereign immunity, and the APA sovereign immunity

23     waiver not covering monetary claims premised on contracts.

24     But I do think it's helpful to understand in the particular

25     context of this morning's discussion that the particular

1    motion by the GHC plaintiffs is again framed in terms of

2    compensation for past work under contract and letters of

3    credit, very explicitly of a monetary character, the nature of

4    that relief.  And sort of an even sharper focus than some of

5    the other elements of the preliminary injunction bringing this

6    question.

7        So here again, there would be, for contract by the

8    government, remedies that are described in our PI motion under

9    the Contract Dispute Act that would proceed maybe in the Court

10   of Federal Claims but not as part of the APA's waiver of

11   sovereign immunity which is for nonmonetary relief.

12       THE COURT:  Understood.  I appreciate that.  I do have

13   that argument.  I have it in your preliminary injunction

14   briefing.  It's not something that's come up in your TRO

15   briefing until today, or TRO arguments or submissions until

16   today.  And as I said, this is not an opportunity to

17   relitigate the TRO.  The TRO is in effect, it hasn't been

18   stayed or overturned in any sort of way.  I do want to make

19   that clear.

20       So let me ask you about some particular things in the

21   record following the TRO that stood out to me.  I'm going to

22   give you one example.  I'm looking at ECF 29-1.  This is an

23   attachment to -- I'm sorry.  I should clarify.  This is in the

24   Global Health Council case, No. 402, the same case that has

25   the pending motion to enforce.

1    And as I understand it, ECF 29-1 is a declaration from

2    someone who describes an email from a State Department

3    official on February 18.  So this is five days after the

4    Court's TRO.  And the email apparently said, "Secretary Rubio

5    has implemented a 15-day disbursement pause on all 15.9

6    billion worth of grants at the State Department."

7    And apparently the same email directed personnel in a

8    particular bureau to undertake an assessment of all grants at

9    the post and then still said, "Review the President's

10    executive orders and recommend termination of grants that do

11    not comply with those orders."

12    So this is five days after the TRO.  I understand that

13    Ms. Bateman, counsel in the 400 case, AIDS vaccine, referred

14    to other instances in which guidance sent after February 13,

15    after the emergency relief, also are referring to review

16    pauses of disbursements and reviews pursuant to the

17    implementation that's been enjoined by the Court.

18    Can you provide any context for me on that that might be

19    helpful?

20    MR. SUR:  If I may just go back one step.  So this is

21    in case No. 402, this is document 29-1, just to catch up to

22    where you were.

23    THE COURT:  Yes.

24    MR. SUR:  And was it a particular exhibit, or was it a

25    declaration matter?

1          THE COURT:  Dunn-Georgiou declaration.  It is paragraph

2     3 where it starts to --

3          MR. SUR:  Okay.  I might briefly be able to address

4     this point about the executive orders.  And if I understand

5     that correctly -- I apologize for not seeing the quote here as

6     I'm scrolling through the PDF.  But the reference to executive

7     orders I think does not encompass the order that is challenged

8     in this action.  If there were a number of other executive

9     orders that announced various policies of the administration

10    including as to foreign assistance -- so I take the reference

11    to executive orders to be -- to those other, unchallenged for

12    purposes of this case, policies.  But again, because I'm not

13    seeing the quote, I'm not able to put that in the proper

14    context.

15         THE COURT:  Okay.  I can tell you exactly where it is.

16    It's document 29-1.  It's the first page.

17         MR. SUR:  Uh-huh.

18         THE COURT:  And you can see in paragraph 3 it quotes

19    the email from the State Department official that says

20    "Colleagues, Secretary Rubio has implemented" -- I won't read

21    it all again, but it should be right there in front of you.

22         MR. SUR:  I'm sorry, yes.  So I take the discussion to

23    be about the executive orders that I was talking about earlier

24    that are not the executive order that's challenged here.  But

25    that is pointing out that some grants are not, you know,

1      consistent with some of the other executive orders.

2            THE COURT:  Well, can you clarify the color on that

3      first sentence, that's again five days after the TRO, says

4      there's the implementation of a 15-day disbursement pause on

5      all 15 billion worth of grants at the State Department?

6            MR. SUR:  I don't actually have anything further beyond

7      what's on the text here.  I don't know the underlying --

8            THE COURT:  Okay.  Mr. Sur, I appreciate it.  Is there

9      any other thing you'd like to clarify, particularly if you

10     have any information about the kind of on-the-ground how these

11     grants work?  Mr. Wirth provided I think a helpful explanation

12     of the two categories, the contracts versus the assistance

13     agreements and the differences between invoices and lines of

14     credit.

15        No worries if that's clear, but I wanted to give you the

16     opportunity to clarify anything that he might have gotten

17     wrong about how that works.

18            MR. SUR:  Beyond understanding the lines of credit to

19     be a particularly sharp instance of the monetary character of

20     the relief sought, I don't actually have a further

21     understanding of those.  So I wouldn't be able to comment on

22     that.

23        I do in that respect just want to go back to another point,

24     which was that the legitimate expense provisions that we were

25     talking about earlier, they remain open, including to the

1    plaintiffs who are before the Court today.  So there has been

2    no, you know, final decision on these particular plaintiffs'

3    claims as to those, you know, expenses.  And I don't think it

4    would be arbitrary to make a determination on legitimate

5    expenses.

6        So again, just focusing on the particular motion that's

7    before the Court with that proposed order, the availability

8    of the legitimate expense provision, where it has not yet been

9    determined to be applied, I don't think would be --

10           THE COURT:  Can you clarify what you mean by

11    "legitimate expense"?  Is it kind of a repackaging of the

12    fraud argument that was raised in the Friday filing?

13           MR. SUR:  I don't think so.  I think it's a distinct

14    process that was built into the Secretary of State's

15    memorandum.

16           THE COURT:  Okay.  And is -- just a moment.

17        Okay.  Actually, I don't have any more questions for you,

18    Mr. Sur.

19        Mr. Wirth, I'll give you the chance to respond briefly to

20    anything critical here.

21           MR. WIRTH:  Yes, Your Honor.  I'll be brief.  I think

22    what the Court's colloquy with the government has revealed is

23    that the government has done nothing to make the flow of

24    payments happen, or at least that government counsel's is

25    aware of nothing the government has done, and certainly can't

1    contradict my clients' experiences that they've received no

2    payments that they are owed.

3        As far as we're aware, there's been zero directives from

4    the agency with respect to the unfreezing of funds.  There

5    have been, you know, some statements with respect to

6    suspensions and terminations, which is a separate question

7    entirely.  With respect to the unfreezing of funds, we're

8    aware of no directives from leadership whatsoever since the

9    Court's TRO over -- almost two weeks ago.

10       The government refers to the legitimate expense waiver, but

11   that was a waiver that was included in the -- a waiver to the

12   provisions that this court has already enjoined.  And even if

13   the invoices at issue here were subject to that waiver, no

14   payments have been made.  So the waiver is illusory.  So the

15   government's invocation of the waiver makes no sense two times

16   over.

17       And I just want to be very clear, there was some discussion

18   of terminations.  Terminations are a separate question.  But

19   the key point here is that even on contracts that have been

20   terminated, whether or not those terminations remain in effect

21   or not or have been re-upped or not, the government still has

22   to make payments that are owed regardless of whether the

23   government decides to terminate contracts.

24       The government referred to contract-level authorities.

25   They've cited no contract-level authorities for the

1    proposition that the government can refuse to pay its debts,

2    much less refuse to give meaning to the Court's TRO.  I do

3    want to focus very carefully on the language of the TRO here,

4    which specifically directed the government to stop suspending,

5    pausing or otherwise preventing the obligation or disbursement

6    of appropriated foreign assistance funds.

7        And I think what's crucial here and what's been

8    demonstrated by the government in this colloquy is that

9    they've done absolutely nothing to give meaning to that

10    provision of the TRO.

11        The government briefly mentioned the monetary nature of the

12    relief here.  I want to be very clear, the order that we put

13    forward sets out relief that is necessary to give effect to

14    the TRO.  We are going to fully brief the APA issues in our

15    reply brief.  But to be clear, the APA permits injunctive

16    relief that has the effect of causing the government to make

17    out payments.  There's case after case after case for that

18    proposition.  There's nothing stopping the Court from ordering

19    the relief that we've requested.  And to be clear, this is

20    relief that is necessary to give meaning to the TRO.  This is

21    not separate relief.

22        Finally, I do want to correct some either misunderstandings

23    or misstatements from the government with respect to the

24    terminations here.  The government has said that the

25    terminations prior to February 13 are currently invalid.  Our

1    understanding is that the government has decided that every

2    single termination that it effected prior to the Court's TRO

3    remains in effect.  They were never rescinded, they were never

4    taken off the books, they simply added a post hoc

5    rationalization for every single one of those.  That includes

6    all four tranches of the terminations that occurred in the

7    days around when we filed our complaint.

8        But we're here right now primarily discussing the failure

9    of the government to do anything whatsoever with respect to

10   the freeze of foreign assistance funds.  They still have done

11   nothing to stop the pause.  And to be clear, they still owe

12   that money even on terminated contracts, even if those

13   terminations are ultimately deemed to be valid, which we do

14   not believe they are.

15       So that's all I have to say.  Thank you.

16           THE COURT:  Thanks, Mr. Wirth.

17       Okay.  So the Court's going to take about a 15-minute

18   recess.  And I'll honor that.  If folks need to get up for 15

19   minutes and return to the phone in about 15 minutes, you have

20   my word I won't come back before that.  I also don't

21   anticipate coming back much after that.  But I do want to take

22   some time to consider the arguments and see what clarity I can

23   offer here orally.

24       So I will be back.  Appreciate it.

25           THE DEPUTY CLERK:  This honorable court is in a brief

1    recess.

2        (Recess from 12:31 p.m. to 1:01 p.m.)

3        THE DEPUTY CLERK:  Good afternoon.  Counsel for

4    plaintiffs in the 400 case, are you present?

5        MS. BATEMAN:  Yes.  Lauren Bateman for the plaintiffs

6    is present.

7        THE DEPUTY CLERK:  Thank you.  And defense?

8        MR. SUR:  Yes, I am.  This is Indraneel Sur for the

9    Department of Justice for the defendants.

10       THE DEPUTY CLERK.  Thank you.  And plaintiffs in the

11   402 case, are you present?

12       MR. WIRTH:  Yes.  This is Stephen Wirth on behalf of

13   plaintiffs.

14       THE DEPUTY CLERK:  All right.  Your Honor, we're ready.

15       THE COURT:  All right.  Thanks, everyone.  I appreciate

16   your patience.  And I wish I could say I'll give you that 15

17   minutes back, but I don't have a way of doing that.

18     The Court is prepared to rule on plaintiffs' written motion

19   to enforce in 402 and plaintiffs' oral motion to enforce in

20   400.

21     The Court makes clear at the outset that this ruling is

22   taking place in the context of enforcing specific aspects of

23   the Court's TRO, those that have been the focus of today's

24   hearing.  And accordingly, I'm making clear that in enforcing

25   specific components of the TRO, the Court is in no way

 1    limiting the scope of the TRO or modifying its terms.

 2        In granting the temporary restraining order, the Court

 3    made clear that the restrained defendants were enjoined from

 4    "suspending, pausing, or otherwise preventing the obligation

 5    or disbursement of appropriated foreign assistance funds in

 6    connection with any contracts, grants, cooperative agreements,

 7    loans, or other federal foreign assistance award that was in

 8    existence as of January 19, 2025."

 9        And in granting the subsequent motion to enforce, the Court

10    made clear that, "To the extent defendants have continued the

11    blanket suspension, they are ordered to immediately cease it

12    and to take all necessary steps to honor the terms of

13    contracts, grants, cooperative agreements, loans, and other

14    federal foreign assistance awards that were in existence as of

15    January 19, 2025, including but not limited to disbursing all

16    funds payable under those terms."  That's the Court's February

17    20th order.

18        Counsel for defendants today have acknowledged that the

19    Court's TRO forecloses giving effect at least to any

20    suspension or termination which took place before the Court's

21    temporary restraining order on February 13, 2025.

22        Plaintiffs have submitted evidence that defendants have not

23    lifted the suspension or freeze of funds as the TRO required.

24    Defendants have not rebutted that evidence, and when asked

25    today, defendants were not able to provide any specific

1    examples of unfreezing funds pursuant to the Court's TRO.

2        At the hearing today, defendants did for the first time, at

3    least as it relates to the TRO, argue that monetary relief

4    cannot be a consequence of the TRO under the APA due to

5    sovereign immunity.  The Court notes this is a further example

6    of the shifting ground that's taken place at the TRO phase and

7    that the argument's not sufficiently developed to be

8    considered today.

9        I do understand that defendants have included this argument

10   in their briefing at the preliminary injunction stage, and the

11   Court will of course give it due consideration at that stage.

12   And as the Court has noted several times, once the parties

13   complete their briefing schedule at the preliminary injunction

14   phase, the Court stands prepared to hold a hearing and resolve

15   the preliminary injunction as expeditiously as possible.

16       In the meantime, the motion to enforce the TRO is the issue

17   before the Court.  And the very point of a TRO is to prevent

18   irreparable harms in the course of considering a preliminary

19   injunction.

20       So, for these reasons, the Court is going to grant

21   plaintiffs' motion to enforce and finds that the relief

22   requested by plaintiffs in their proposed order is

23   appropriate.  So to be clear and to give effect to the Court's

24   TRO, the Court orders as follows:

25       By 11:59 p.m. on February 26, 2025, the restrained

1    defendants shall pay all invoices and letter of credit

2    drawdown requests on all contracts for work completed prior to

3    the entry of the Court's TRO on February 13.

4        They shall permit and promptly pay letter of credit

5    drawdown requests and requests for reimbursements on grants

6    and assistance agreements -- this is also for the purpose of

7    this motion to enforce, for work completed prior to the entry

8    of the Court's TRO on February 13.

9        And defendants shall take no actions to impede the prompt

10    payment of appropriated foreign assistance funds and shall

11    take all necessary action to ensure the prompt payment of

12    appropriated foreign assistance funds.

13        I'm reiterating that this relief takes place in the context

14    of a specific request to enforce the TRO.  This in no way

15    narrows the scope of the TRO itself.

16        That's the Court's ruling.

17        I do want to turn to the joint status report on compliance

18    that -- I'll be clear that the parties remain under an order

19    to file that joint status report by noon tomorrow.

20        Obviously, the required disbursements pursuant to this

21    motion to enforce that the Court has granted may still be

22    underway when the status report is filed; however, the report

23    shall confirm what steps have been taken by that time and that

24    such disbursements will be made by 11:59 p.m. tomorrow.

25        And in the interest of ensuring compliance with the Court's

order, as I previously ordered, to the extent there remain any

disputes as to compliance -- and here I'm speaking of the

whole TRO, not just the present motion to enforce.  To the

extent there remain disputes as to compliance, the parties

shall identify agency officials, employees, or other witnesses

who can testify under oath as to those disputes.

Finally, based on the discussion at today's hearing, I'm

also ordering defendants to provide the Court and plaintiffs

any directives or guidance that defendants or their agents

have sent since the Court's TRO on February 13 which pertain

to the implementation of the TRO or the suspension or

termination of agreement, and any directive or guidance after

the Court's TRO on February 13 which pertain to the

implementation of the TRO or the suspension or termination

of agreement.  And I want those by noon tomorrow as well.

And just in the interest of being clear, that would include

any directives or guidance that defendants or their agents

send through tomorrow, up until -- so even if it follows the

discussions we've had at the hearing today.  And I want those

documents by noon tomorrow.

With that, we can adjourn for the day.  I appreciate

everyone's time.

THE DEPUTY CLERK:  All right.  Thank you all.  This

honorable court is adjourned.

(Proceedings adjourned at 1:09 p.m.)

*   *   *   *   *   *

CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify
that the foregoing pages are a correct transcript from the
record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

# EXHIBIT 62



← **Truth Details**
4585 replies

**Donald J. Trump** ✅
@realDonaldTrump

ELON IS DOING A GREAT JOB, BUT I WOULD LIKE TO SEE HIM GET MORE
AGGRESSIVE. REMEMBER, WE HAVE A COUNTRY TO SAVE, BUT ULTIMATELY, TO
MAKE GREATER THAN EVER BEFORE. MAGA!

**12.3k** ReTruths  **66k** Likes                          Feb 22, 2025, 8:04 AM

🔍 Reply            🔁 ReTruth            ♡ Like            🔖            ⬆️            •••

### Continue the conversation
Join Truth Social to get the full story and details.

Log in

**Sign up**

# EXHIBIT 63

*Democracy Dies in Darkness*

# DOGE's grab of personal data stokes privacy and security fears

Twenty-one staffers of the U.S. DOGE Service announced their resignations Tuesday citing, among other worries, "mishandling sensitive data."

Updated yesterday at 6:02 p.m. EST

🎧 10 min    ↗    🔖    💬 1811

By Faiz Siddiqui, Joseph Menn and Jacob Bogage

Deputies of Elon Musk have sought access to massive amounts of information across the federal government, much of it personal and highly revelatory in its insights into the lives of everyday Americans.

They justify their work for the U.S. DOGE Service as a dogged quest for government efficiency. But people with deep knowledge of federal data systems and cybersecurity say they're skirting guardrails meant to protect sensitive data from misuse.

Before DOGE launched, most of the records at issue were kept in the hands of a select few officials to preserve privacy and avoid crossing legal red lines. Now Musk's group is seeking often-unfettered access, citing suspicion of fraud and waste. In addition to concerns about exposing private information, some critics fear that handing all the data to DOGE could enable bad actors to leak sensitive information to compromise political adversaries, act on personal vendettas or stir up online mobs against opponents.

This article is based on interviews with more than a dozen current or former government employees and officials with knowledge of government databases and systems, many of whom spoke on the condition of anonymity for fear of retribution.

A senior White House official said those working with Musk are following federal law and have appropriate security clearances as employees of relevant agencies. "The ongoing operations of DOGE may be seen as disruptive by those entrenched in the federal bureaucracy, who resist change," the official said. "While change can be uncomfortable, it is necessary and aligns with the mandate supported by more than 77 million American voters."

**Trump presidency**

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises, his picks for key roles and legal challenges to his executive orders and actions.



Musk presides over DOGE from a command center in a room of the old secretary of war's suite in the Eisenhower Executive Office Building, where rainbow-colored lights emanate from the tower and keyboard of the powerful gaming computer he uses to conduct government business. A "Make America Great Again" hat and a placard reading "D.O.G.E." sit on a large wooden desk, and cords snake across the carpet into a surge protector.

Within the White House complex, the WiFi permissions — meant to bolster security by prompting users to log in frequently — were recently changed to allow guests to remain logged in for a year, up from seven days, because so many personal devices are newly in use.

Already, DOGE associates have been granted access to sensitive material, having targeted federal payment portals and other huge datasets on government expenditures. Those included Treasury Department payment systems, which green-light federal dollars headed out of government accounts, and highly guarded systems at the IRS and the Social Security Administration that include detailed financial and medical information.

Last week, the lead engineer for a government text-messaging service resigned over a DOGE ally's request for access to data including personal identifying information about many Americans. On Tuesday, 21 staffers of the U.S. DOGE Service, the entity formed as the U.S. Digital Service under President Barack Obama and renamed in Trump's Day 1 executive order establishing DOGE, or the Department of Government Efficiency, announced their resignations in protest. The group — consisting of engineers, designers, product managers, and IT and operations staff — said they had been subjected to questions about "political loyalty" as part of a DOGE interview process that introduced "significant security risks." DOGE's actions, they wrote, have included "mishandling sensitive data" and "breaking critical systems" in ways that are incompatible with the original USDS mission.

"We will not use our skills as technologists to compromise core government systems, jeopardize Americans' sensitive data, or dismantle critical public services," the departing staffers said in the letter, written on official letterhead and addressed to White House Chief of Staff Susie Wiles. "We will not lend our expertise to carry out or legitimize DOGE's actions."

Among its initial actions, DOGE has posted classified information on its website, sharing the budget and staffing level of the National Reconnaissance Office, a spy agency.

Allowing Musk and his team to see some records isn't illegal. Because they're designated as "special government employees" and many are senior advisers at Cabinet agencies, they are entitled to much of the access they have sought, and some judges have declined to kick them out while hearing more evidence.

**Help us report on the U.S. DOGE Service**

The Washington Post covers HBO from people affected by the activities of federal agencies. You can contact our reporters by email or Signal encrypted message.

Faiz Siddiqui: faiz.siddiqui@washpost.com or 513-659-9944 on Signal.

Joseph Menn: joseph.menn@washpost.com or joemenn.01 on Signal.

Jacob Bogage: jacob.bogage@washpost.com or jacobbogage.87 on Signal.

Read more about how to use Signal and other ways to securely contact The Post.

But they need a reasonable basis to peruse files and databases, experts said, and a procedure for ensuring precautions are followed. And the people with access must be vetted and trained, said Brad Moss, an attorney representing plaintiffs in one of more than a dozen lawsuits contesting DOGE's handling of data.

Limiting entry to sensitive systems guards against any one federal worker gaining too much access, protecting both the data and the overall system, said Terry Lutes, who served as IRS associate chief information officer from 2003 to 2006. Lutes said even the most experienced employees are given only partial access to the IRS's Integrated Data Retrieval System, or IDRS.

DOGE last week sought access to that system, which would have provided the ability to see, and in some cases edit, detailed records — including bank accounts, payment balances, Social Security and other personal identification numbers, and, in some instances, medical information — for virtually every individual, business and nonprofit in the country.

"If anybody actually understood how all these pieces work together, we'd have to shoot them. They'd be too dangerous," Lutes said. "And I'm only halfway joking."

Access to the IDRS, in particular, would pose an enormous risk, he said. Entry to the system is so protected, "I would have fired anyone who tried to give me access."

An agreement between the White House and the Treasury Department limited DOGE to anonymized data, the same visibility that some academic researchers get.

Concerns about how Musk's team could use data stretch beyond the IRS and into other agencies that collect information that workers fear could be exploited.

One employee of the U.S. Digital Service started seeing his work differently once Musk took the reins of the renamed agency.

The person, who was involved in a government program that includes a database of addresses, has been grappling with the implications of work he had felt proud of — but which he suddenly fears could be used to go after people for purposes such as immigration enforcement.

"Now I feel like a little bit of an enabler," said the person, speaking on the condition of anonymity to discuss sensitive information. "I feel like I've been a part of creating a trap for people."

Clashes over DOGE's request have already come to a head. A Treasury department's the highest-ranking career official left in late January after a dispute over access to payment systems. Earlier this month, the Social Security Administration's acting commissioner departed after a disagreement over DOGE's attempts to access sensitive data.

At the IRS, taxpayers whose information is wrongfully disclosed or even inspected are entitled by law to monetary damages. Social Security employees who violate privacy laws could face stiff fines and jail time.

DOGE could use protected personal information at the Social Security Administration — including the world's largest repository of medical information — to search for improper payments, but it wouldn't amount to much return on investment, according to former senior agency officials, who spoke on the condition of anonymity to discuss internal conversations.

For years, officials there have studied the threshold at which detecting improper payments becomes unprofitable. The agency has repeatedly explored building more robust systems to ferret out over- and underpayments, which accounted for 0.3 percent of the more than $1.3 trillion in payments in fiscal 2024, adding up to roughly $4 billion, according to federal data. But it could cost more than that to track all the money down, the former officials said.

The prospect of highly protected information being misused is alarming some people outside government.

Kristofer Goldsmith, an Iraq War veteran who tracks and reports violent right-wing extremists, said he has grown worried for his safety since learning that some of the DOGE members had frequented internet groups popular with criminal hackers or espoused extremist views.

After letting his guard down, he said, he has gone back to wearing a gun in his home.

"I'm very concerned that the entire federal government is being compromised by people who want to target, harass and maybe even kill me," Goldsmith said. He is a plaintiff in a lawsuit over DOGE's access to personal records that led to a temporary restraining order Monday against the government.

Researchers have raised red flags about some of DOGE's team. They include Edward Coristine, a 19-year-old former Musk company intern who posted in channels associated with the Com, a loose network including many young criminals. An online handle he used once solicited an illegal denial-of-service attack. Coristine now has an email address at the Cybersecurity and Infrastructure Security Agency, which is in charge of defending federal agencies and essential private industries from cyberattacks. Coristine didn't respond to emailed requests for comment.

Another DOGE worker, Gavin Kliger, who sought access to records at the IRS, has retweeted white nationalist Nick Fuentes and written of being inspired by media criticism from a Holocaust denier. "I am Jewish and any insinuation of support for 'white nationalism' or 'anti-semitism' is false and defamatory," Kliger told The Washington Post.

Musk has a track record of violating privacy norms. When he took over X, then known as Twitter, his deputies publicly posted some private communications of former employees, alleging that they were proof of a liberal censorship conspiracy inside Twitter.

A group of FEMA workers in December, for example, also raised concerns that government records showing what they did in those cases could be used for harassment.

Moss, their attorney, is trying to stop further dissemination of their names, arguing that any list being compiled would be used not to probe wrongdoing but "to dox and expose the identities of federal officials, which would ordinarily be respected."

Moss and others say sweeping Washington agencies for data runs afoul of the Privacy Act, the Watergate-era reform law that limits what officials can do with information on Americans, not just federal workers.

Searching for fraud, waste and abuse, as well as trying to develop more efficient government systems, could be valid reasons for DOGE to access the data, several lawyers opposing DOGE say. Feeding data into artificial-intelligence programs, which The Post and others have reported the Education Department is doing, and is suspected by employees elsewhere, may also be legal if the move involves closely guarded, in-house programs.

But such actions increase the chances of inappropriate access, intentional or not, said Alan Butler, executive director of the Electronic Privacy Information Center, a nonprofit based in D.C. that advocates for privacy protections.

"It's pretty clear they want to use matching type systems to find payments they claim are fraudulent, and matching against datasets or key terms would be anathema to the Privacy Act if done on a whim or without limits," said Butler, whose group is suing DOGE and the Office of Personnel Management claiming privacy and data security violations on behalf of itself and an unnamed federal employee.

---

**What readers are saying**

The comments express significant concern over the potential privacy risks associated with DOGE's access to sensitive government data. Many commenters fear that this access could lead to data breaches, misuse of personal information, and even national security threats. There is a... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 64

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

J. DOE 1, *et al.*,

                *Plaintiffs*

                 **v.**

ELON MUSK, *et al.*,

              *Defendants*

**Case No. 25 8:25-cv-00462-TDC**

## DECLARATION OF J. DOE 11

I, J. Doe 11, pursuant to 28 U.S.C. § 1746, declare that the following statements are true and correct to the best of my knowledge and belief:

1. I am a plaintiff in this litigation, identified as "J. Doe 11" in the complaint.

2. I am an employee at the United States Agency for International Development ("USAID") and have been with the agency for over 14 years. I am a GS 15 supervisor.

3. On February 3, 2025, one of the DOGE personnel (Gavin Kliger), apparently accidentally, left his name on the bottom of an email sent out to USAID staff telling us to stay away from the Ronald Reagan Building.

4. At or around this same time, there were reports that DOGE personnel tried to get into a Sensitive Compartmented Information Facility ("SCIF") where classified material can be accessed by those with a security clearance and approval to enter. These DOGE personnel did not have such clearance or approval.

5. On Sunday, February 23, 2025, I received an administrative leave notice.

6. At 10:35 pm, also on Sunday, February 23, I received a Reduction in Force ("RIF")
notice from hr_announcements@usaid.gov.

7. The "specific notice of RIF" I received has an error in my type of service, listing me as
Senior Executive Service (SES), which I am not.

8. I understand that RIF notices have been riddled with errors for others, have gone out to
those who accepted the "fork" offer and to those who began the process for voluntary
early retirement.

9. I understand that HCTM (our human resources office) was not aware of these notices
before they were sent out and received notices themselves.

10. The RIF notices seem to have been sent in batches, starting with the hiring mechanism
(Foreign service in DC was first and civil service was next) and then by "competitive
area" (bureau/office). Foreign service officers who are overseas have begun to receive the
notices too, with a termination date of May 24.  Communications about the RIF have not
come from HCTM. The process overall seems to have little, if any, human review, which
is inconsistent with HCTM's past practices. The RIF notices were sent in a large batch
and included errors because of the wide coverage. Now it appears they are going through
with more targeted scripts to terminate more specific classes of employees or to correct
errors, like for people who took the "fork."

11. On February 24, 2025, termination letters were sent to "probationary" employees who
had received the RIF notice on February 23.

12. The specific RIF notices contain information that indicates the senders have significant access to our human resources files (via our Launchpad system), which contains sensitive personal information.

13. Two weeks ago, I froze my credit with the three credit agencies over concerns that DOGE has access to my personal information through accessing USAID systems.

14. However, now I can see that DOGE has my personal information. They are clearly running programs to extract my data to fill out standard RIF forms.

15. I do not know the security of the systems they are using and therefore the security of my information. They do not have security clearance or training in protecting PII (personal identifying information), for which we all receive annual training. As such, I do not know if they are using secure hardware and software according to USG standards.

16. I have served in dangerous conditions in foreign countries. I have been prepared to serve through hurricanes, riots, and rockets, but I remain unprepared for the fear and chaos of DOGE's takeover of USAID.

I hereby declare under penalty of perjury that the foregoing is true and correct.

**Executed on the 26th day of February, 2025.**


**J. Doe 11**

Signed by:

*J. Doe 11*

B20456BDCBF5423...

**Signature**