```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MARYLAND
2                      GREENBELT DIVISION
   _____
3                                      )
   J. DOES 1-26,                       )
4                                      )
        Plaintiffs,                    )
5                                      )Docket Number
                    vs.                )8:25-cv-00462
6                                      )
   ELON MUSK, et al.,                  )
7                                      )
        Defendants.                    )
8  _____)
          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
9         BEFORE THE HONORABLE THEODORE D. CHUANG
              UNITED STATES DISTRICT COURT JUDGE
10        FRIDAY, FEBRUARY 28, 2025, AT 2:00 P.M.

11

12 APPEARANCES:

13 On Behalf of the Plaintiff:

14      BY:  NORMAN EISEN, ESQUIRE
             TIANNA MAYS, ESQUIRE
15      State Democracy Defenders Fund
        Washington, DC  20003
16      (202)753-9667

17

        BY:  MIMI MARZIANI, ESQUIRE
18           REBECCA STEVENS, ESQUIRE
             JOAQUIN GONZALEZ, ESQUIRE
19      Marziani, Stevens & Gonzalez, PLLC
        1533 Austin Highway, Suite 102-40
20      San Antonio, TX  78218
        (210)343-5604

21

22 (Appearances continued)

23      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

24

25
```

```
1    On Behalf of the Defendant:

2         BY:   JOSHUA GARDNER, ESQUIRE
                JACOB SILER, ESQUIRE
3               CHRISTOPHER HALL, ESQUIRE
           Department of Justice
4          1100 L Street N.W., Suite 12200
           Washington, DC  20530
5          (202)305-7583

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2         (Court called to order.)
3             DEPUTY CLERK:  All rise.  The United States District
4    Court for the District of Maryland is now in session.  The
5    Honorable Theodore D. Chuang presiding.
6             THE COURT:  Thank you, everyone.  Please be seated.
7             DEPUTY CLERK:  The matter now pending before this
8    court is Civil Action Number TDC-25-0462, J. Does 1
9    through 26 v. Elon Musk, et al.  We are here today for the
10   purpose of a hearing on a motion for preliminary injunction.
11        Counsel, please identify yourselves for the record.
12            MR. EISEN:  Your Honor, Norman Eisen for the
13   plaintiffs, and with me --
14            MS. MARZIANI:  Mimi Marziani, also for the
15   plaintiffs.
16            MS. STEVENS:  Beth Stevens for the plaintiffs.
17            MR. GONZALEZ:  Joaquin Gonzalez for the plaintiffs.
18            MS. MAYS:  Tianna Mays for the plaintiffs.
19            THE COURT:  Good afternoon.
20            MR. EISEN:  Good afternoon, Your Honor.
21            MR. GARDNER:  Good afternoon, Your Honor.  Josh
22   Gardner with the United States Department of Justice on behalf
23   of the defendants.  And with me are my colleagues Jacob Siler
24   and Christopher Hall.
25            THE COURT:  Good afternoon.
```

```
 1        So we're here for a hearing on the motion for preliminary

 2   injunction.  The parties have filed their briefs with exhibits.

 3   I've reviewed those.

 4        I do have a number of questions, but I also want to give

 5   you an opportunity, if there's anything you want to amplify on.

 6        It's the plaintiffs' motion, so we'll start with them, and

 7   then we'll hear from the defense.  And then since it's their

 8   motion, I've give the plaintiff a very brief opportunity for

 9   rebuttal.

10        In light of the fact that I have questions, I don't know

11   how long it will take to get through some of them -- I'm not

12   going to put a firm clock on each side, but I would say we'll

13   give at least 20 minutes to each side and we'll see if I need

14   more time with you.  And then we'll do our best to give the

15   other side equal time, if they want it.  So we'll just start

16   with that.

17        Mr. Eisen?

18        MR. EISEN:  Thank you, Your Honor.  Just a couple of

19   housekeeping matters, if I may.

20        By agreement with the government, we would like to submit

21   additional Exhibits Number 65 to 69.  We would like to move

22   their admission.  This -- these are Twitter posts and other

23   materials -- pardon me, to 70.  Twitter posts and other

24   materials that have come into the record since we completed our

25   briefing; as Your Honor knows, fast breaking, and very lively
```

1    fact pattern here.

2        May I approach?

3        **THE COURT:**  Yes, you can hand them to the clerk.  And

4    just for the record, since it sounds like neither side is

5    objecting, all the exhibits that were submitted as part of the

6    joint record are subject to consideration on this motion.

7        Okay.  Go ahead, then.

8        **MR. EISEN:**  Thank you, Your Honor.

9        And then the next issue is the four sealed -- sought

10   sealing of four of our declarations where the contents of these

11   four items would reveal the identity of the declarants, and in

12   our view, expose them to danger.

13       We have provided those materials to the government.  We

14   request that the Court admit them subject to the agreed

15   protective order.  The protective order has been agreed, but I

16   do not believe, as of last consultation, we had agreement on --

17   on the treatment of these four declarations.

18       I do have those sealed declarations to hand up, proposed

19   sealed declarations.

20       **THE COURT:**  Well, are they the same ones I already

21   have?  It's Document Number 40 is the motion, and then I think

22   the declarations were previously submitted as 38-1 through

23   something?

24       **MR. EISEN:**  I have them marked as -- Your Honor, if I

25   may consult.

```
1        Your Honor, Ms. Marziani has negotiated these with the

2   government, and she's going to explain the state of play in

3   which ones are and are not in the record.

4           THE COURT:  Look, I just want to hear argument.  I

5   think we can handle these things outside of this process.

6        I thought I signed a protective order that both sides had

7   agreed to, correct?

8           MR. EISEN:  You did, Your Honor.

9           THE COURT:  Okay.  So there was a motion to seal,

10  which I don't believe was opposed; is that correct?

11          MR. GARDNER:  That is correct, Your Honor.

12          THE COURT:  Okay.  So I don't know if I issued that,

13  but I don't think we need further argument on that.  I think I

14  understand the reasons for that.

15       Other than the general standard question of -- again, as I

16  mentioned earlier, motions to seal are not necessarily purely

17  among the parties, I would be inclined to grant the motion.

18          MR. EISEN:  Thank you, Your Honor.

19          THE COURT:  But -- so I don't think we need to argue

20  it any further at this point.

21          MR. EISEN:  Thank you, Your Honor.

22       We're here today to seek a preliminary injunction on

23  behalf of 26 plaintiffs who have been exposed to what is, in

24  our view, unconstitutional conduct by the defendants, Mr. Musk

25  and DOGE.
```

1        I will begin by addressing the factual predicate

2   principally in the form of the defendants' own admissions, and

3   those of President Trump.

4        That -- those admissions and the actions that have been

5   taken, in our view, demonstrate again and again that Mr. Musk

6   enjoys a role as a super -- super cabinet member who is a

7   principal officer exercising significant authority in his own

8   right and also through DOGE, Your Honor.  And, indeed, Mr. Musk

9   is the most powerful principal officer currently in the

10  government alongside the President of the United States, and

11  one of the most powerful in our nation's history.

12       Ms. Marziani will explain, under the Constitution, why

13  we're likely to succeed on the merits, both in terms of our

14  appointments clause claim, and she will argue also the

15  separation of powers issue that the Court expressed interest

16  in.

17       She will submit that from the time of the founders, Your

18  Honor, to current Supreme Court precedent, the evidence

19  establishes we will likely succeed on the merits that Mr. Musk

20  is a principal officer and that his acts and those of the DOGE

21  are unconstitutional.

22       Finally, my co-counsel, Ms. Stevens, who has spent her

23  past weeks with our 26 plaintiffs and is most familiar with

24  their situation, will submit to the Court the detail.  We've

25  provided a mountain of evidence, the vast irreparable harm that

1   these individuals associated with USAID are suffering.

2        She will argue to the Court that the constitutional

3   violations we allege, if you will, the chainsaw that Mr. Musk

4   and his DOGE are applying to the Constitution has torn up these

5   plaintiffs' lives, including cutting some of them off from

6   life, potentially lifesaving services in dangerous places

7   around the world where the United States sent them.

8        Let me start with those party admissions and the other

9   evidence.  We've submitted a mountain of it to the Court.  I'm

10  just going to pick some of the most important ones.

11       On February 19th, in Florida, President Trump stated --

12  you can find this at Joint Record 568, and the video is at

13  Joint Record 466 -- "I signed an order creating the Department

14  of Government Efficiency, and I put a man named Elon Musk in

15  charge."

16       There, in itself, principal officer.  You would not know

17  it to read the declaration of Joshua A. Fisher, which says,

18  Mr. Musk has no actual or formal authority to make government

19  decisions himself.

20            **THE COURT:**  So let me ask you this.  I know you may

21  have some familiarity with the Executive Branch, with the White

22  House, Executive Office of the President.  I mean, there are

23  individuals in the White House, the Chief of Staff, the White

24  House Counsel, others who have very significant roles, and

25  within the Executive Branch, if they were to call over to a

1  cabinet agency, their word would probably be taken as something

2  that needs to be done because it's implicitly viewed as the

3  word of the President.

4      Why is this different from that?  And under your theory,

5  are all of those individuals also principal officers?

6          MR. EISEN:  They are not principal officers, Your

7  Honor.  I've had -- I've had the privilege of serving in

8  government in the White House, working closely with the

9  individuals that the government analogizes to.

10     Let's start with the White House Chief of Staff, by

11 agreement, the most powerful individual on the White House

12 staff.  He acts as a gatekeeper.  He --

13         THE COURT:  Are you saying Mr. Musk or the Chief of

14 Staff?

15         MR. EISEN:  No, the White House Chief of Staff acts

16 as a gatekeeper.

17     In my experience, Mr. Musk -- and we're prepared to you

18 introduce substantial additional evidence on this point, if

19 Your Honor wants it.

20     But since you asked, I will tell you, I have never heard

21 of even the most activist Chief of Staffs interfering, as we

22 allege, with congressionally authorized funding of federal

23 agencies, or accessing confidential data siloed across the

24 government, or installing their own people in federal agencies

25 to take control of agency operations where they hire and fire.

1    No White House Chief of Staff has threatened, either on his own

2    or through subordinates, to direct U.S. Marshals to remove

3    government workers from their place of employment.  No White

4    House Chief of Staff has canceled congressionally authorized

5    contracts.

6         Richard Nixon's White House Chief of Staff H.R. Haldeman,

7    describe the Chief's job -- and this is the most powerful

8    person.  Mr. Musk far outstrips him.  Your Honor, he described

9    the Chief's job as not -- quote, not to do the work of

10   government, but to get the work out to where it belongs, out to

11   the departments.

12        Mr. Musk -- we've produced a mountain of evidence.  The

13   Court has been very indulgent of the massive piles of

14   declarations and other evidence.  Mr. Musk is out there in the

15   departments.  It's the opposite of what a White House Chief of

16   Staff does.

17        It's an area of interest of mine.

18        So if the Court will indulge me one more point on this,

19   and I mustn't monopolize all the time, I'll tick through the

20   rest of the evidence, Your Honor, but it was so offensive to me

21   to analogize Mr. Musk's role to what I saw with my own eyes.

22   It bears no resemblance whatsoever.

23        The Brownlow Committee report --

24            **THE COURT:**  I'm sorry to offend you with my analogy,

25   Mr. Eisen.

1          **MR. EISEN:**  No, you -- quite the opposite, Your

2    Honor, as you can see, I was looking forward to the opportunity

3    to declaim.

4       The Brownlow Committee report to FDR on the ideal White

5    House aide, the shaping of the modern White House Chief of

6    Staff, again, far less powerful, held he or she should remain

7    in the background, issue no orders, make no decisions.

8       So I do not think we have seen, in modern times, anyone as

9    powerful -- other than a president, anyone as powerful as

10   Mr. Musk.  He's kind of a supercabinet officer.

11      Having occupied a fair share of my time on the White House

12   comparison, I'm going to quickly tick through some of the main

13   evidence in the voluminous record, if I may, Your Honor.

14          **THE COURT:**  Okay.  I am interested in, frankly, since

15   you provided a lot of information, what do you consider to be

16   the most -- most significant evidence, but also the most

17   significant specific actions that you're saying is an exercise

18   of significant authority?

19      Because, I mean, it's hard -- it's hard to sort of say,

20   well, it's everywhere, but give me the very best pieces that

21   you can identify.

22          **MR. EISEN:**  Yes, there are -- there -- in addition to

23   the admissions, outright admissions that Mr. Musk is acting as

24   a principal officer from Mr. Musk and from the President and

25   many others, you see the impact of Mr. Musk's action through

the DOGE at the USAID directly causing the irreparable harm
that Ms. Stevens is going to talk about.

So, for example, President Trump, on February 22nd tweets,
"Elon is doing a great job, but I would like to see him get
more aggressive."

Then utilizing that discretion as a general request, as a
principal officer, Mr. Musk is acting on it.

The same day, just a few hours later, Musk tweets,
"Consistent with the president's instructions, all federal
employees" -- I never heard of anybody having this power.  Even
the President doesn't e-mail all federal employees -- "all
federal employees will shortly receive an e-mail requesting to
understand what they get done last week.  Failure to respond
will be taken as a resignation."

He's asserting power endorsed by the President, asserting
power career life or death over the entire federal government,
Your Honor.  And it happens --

**THE COURT:**  How is that -- how is that different from
someone relaying a message from the President?  He actually
references the President, so is someone who relays a message
exercising significant authority, or are they just the
messenger?

**MR. EISEN:**  It -- Your Honor, it's different in the
following respects.

The President said get aggressive.  It's Mr. Musk who

1   formulated the policy, communicated the policy, and as I will

2   explain, executed the policy.  That's not relaying a message.

3        When I was working in the White House, I didn't even dare

4   to express what the President thought much less formulate

5   policy for the entire federal government.  My title was Special

6   Counsel to the President.

7        And then, of course, as the Court well knows, immediately

8   thereafter, OPM acts on this supercabinet member instruction

9   that delegated authority of the policy he forms.  And OPM

10  e-mails everyone in government, "Please reply to this e-mail

11  with approximately five bullets of what you accomplished."

12       The Court knows the rest of the drama.  It's in the

13  record.

14       But there's more, Your Honor; it's not just that.

15       Mr. Musk also acts through his DOGE subordinates.  And I'm

16  going to finish here subject to any questions the Court may

17  have for me.

18       And DOGE took over OPM systems on January 20th with full

19  systems access.  We have a sealed exhibit, 55, John Roe 1,

20  explaining exactly how that happened.  We sealed it because

21  revelation of the exhibit will identify the witness.

22       Then you have a DOGE operative, Mr. Gavin Kliger, who

23  obtained systems access to USAID February 1st.  That's Exhibit

24  56, John Roe 3 declaration, also under seal.

25       It's called God-level access, Your Honor.  And I think we

1    can agree if there's any principal officer, it's God.

2        Mr. Kliger --

3            **THE COURT:**  I'm not going to disagree with that.

4        But if -- am I right, though, that historically, the

5    people who have this kind of access are not necessarily cabinet

6    secretaries?  I would be surprised if, you know, a cabinet

7    secretary would even know what to do with that level of access.

8    And so isn't it usually some sort of federal government

9    employee who is charged with having that kind of access?

10           **MR. EISEN:**  But here's what's different about it,

11   Your Honor.  There's usually a normal chain of command with a

12   senate confirmed official, a cabinet official, not as President

13   Trump said, putting -- creating the Department of Government

14   Efficiency and putting a man named Elon Musk in charge.

15       Ms. Marziani will explain why from the founding of the

16   republic, the lack of accountability that that represents.

17       And then you have the DOGE workers who are infiltrating

18   the agency.  Mr. Kliger has popped up in agency after agency.

19   He creates a user account, HRannouncements@USAID.  This brings

20   it to our plaintiffs, that's the Exhibit 29, the second

21   declaration of John Doe 2, Joint Record 431.

22       And then there's an e-mail, HRannouncements@USAID.gov,

23   that's Exhibit 54, Joint Record 912, from Mr.-- as a result of

24   Mr. Kliger's command of this, as part of Mr. Musk's DOGE

25   operation, ordering a reduction in force.

1    Then Mr. Kliger tells IT staff to delete and recreate

2 HRannouncements@USAID.

3    We have Exhibit 56, sealed, at Paragraph 8, explaining the

4 affect is to prevent others from being able to see the e-mail

5 recipients and administrators.

6    And then finally, just to close the loop, Your Honor, we

7 explain that Mr. Musk called USAID officials to demand DOGE

8 access.  And that's Page 26, Paragraph 49 of the complaint,

9 Footnote 38, and it's in the joint record at 183, 184.

10    So this is a level of control that we have never seen in

11 our time, from a White House official, from someone who is not

12 confirmed.  He's a beyond-the-power-of-a-cabinet member.  He's

13 ranging across the government taking a wrecking ball to our

14 systems.  It's clearly an instance of a principal officer.

15    Now, the likelihood of success on the merits is also a

16 matter of filtering this through American law from the time of

17 our founding.

18    But briskly and expeditiously, Your Honor, to present-day

19 Supreme Court opinions both with respect to the appointments

20 clause and separation of powers, no nobody authorized Mr. Musk

21 to tear into Article I and contraindicate that he will use the

22 expression -- it's the last tweet I'm going to leave you

23 with -- "I spent the" -- "We spent the weekend putting USAID

24 into the wood chipper.  Could have gone to great parties

25 instead."

1    That's unheard of in our history.  It has -- it's against

2  the Constitution.

3    Mr. Musk has no right to destroy agencies that have been

4  congressionally authorized by statutes validly passed pursuant

5  to Article I.  So it poses profound appointments clause and

6  separation of powers issues -- issues, Ms. Marziani will speak

7  about those.  And then Ms. Stevens about the tremendous harm

8  this wrecking ball has wrought on our 26 actual individual

9  humans.

10    **THE COURT:**  Okay.  Thank you.

11    Ms. Marziani?

12    **MS. MARZIANI:**  Thank you, Your Honor.  Mimi Marziani

13  on behalf of the plaintiffs.

14    So at bottom, our appointments clause argument is actually

15  quite simple.  And there's very little the parties disagree

16  about as a matter of law, at least as far as I can tell.

17    To be sure, no appointments clause case has ever

18  confronted the unprecedented situation before us today.  We

19  just heard quite a bit about that.

20    But I do want to emphasize that the values underlying the

21  case law point us to where this case should be resolved.  I'll

22  just name a couple for the Court.

23    In the *Arthrex* case, for instance, Justice Roberts

24  explained that assigning the nomination power to the President

25  guarantees accountability through a quote, unquote, chain of

1    command with the senate sharing accountability for accepting a

2    bad appointment or rejecting a good one.

3         Concurring in *Lucia,* Justice Thomas tells us the exact

4    same thing, the appointment clause maintains, quote, unquote,

5    clear lines of accountability.

6         And you see this in the case law coming up over and over.

7         And it is in this manner that the appointments clause

8    forces what Justice Roberts has called constitutional

9    accountability.

10        So you've heard from my colleague about the extraordinary

11   amount of executive authority Mr. Musk is wielding on behalf of

12   President Trump, again, in his own admission.

13        **THE COURT:**  Well, I'm trying to understand what are

14   the two or three specific actions that Mr. Musk took that you

15   say are your best examples of exercise of significant

16   authority?

17        **MS. MARZIANI:**  Yep.  Absolutely.

18        A couple of responses.

19        First, we have done our absolute best to gather as much

20   evidence as possible outside of discovery, and so we believe,

21   and we have alleged, that Mr. Musk as the de facto DOGE

22   administrator is, in fact, behind significant decisions like

23   canceling contracts, terminating personnel, shutting down

24   offices, and controlling agency data systems.

25        To point to the record, let's take that last piece, for

1    instance, if you -- we have evidence in the record that DOGE
2    is, in fact, still in unilateral control of the back end
3    infrastructure of USAID.  So if you'll indulge me, I'm going to
4    connect the dots on a couple pieces of evidence.

5        Joint Record 429 is the exhibit to the second declaration
6    of J. Doe 2.  This shows Gavin Kliger, who has been identified
7    in other cases as a DOGE affiliate, and as my colleague
8    mentioned, has been installed across the federal government in
9    a variety of posts bullying the notion that he is just another
10   USAID employee.

11        **THE COURT:**  I guess what I'm trying to understand is,
12   why does having technical control over the systems mean that
13   you're exercising significant authority?  It's got to be what
14   you do with it, not just that you have control.

15       Because as I said to Mr. Eisen, my assumption, based on
16   the people who said they had it and were kicked out of the
17   room, that those folks weren't principal officers, they were
18   federal employees who had technical expertise who knew how to
19   run the system.  So the fact that someone else is coming in and
20   running the system just tells me they are doing what used to be
21   done by a federal employee.

22       So what is it about that aspect or some other action that
23   was taken that is the equivalent of deciding to prosecute
24   somebody or making a decision by an AALJ that has deemed to be
25   significant authority?  How is it equivalent?

1          To me, being a systems administrator, which, again, no

2    cabinet member has ever had that role or even known how to do

3    it.  I'm not sure -- that's the process, but what's the

4    decision that's being made or the action that's being taken?

5               **MS. MARZIANI:**  Absolutely.  Absolutely, Your Honor.

6          So we have evidence in the record, again, that DOGE

7    affiliates control the back-end infrastructure.  Then you

8    compare to the declaration that the defendants put into the

9    record.

10         Mr. Rubio's letter, Joint Record 422, he says that

11   Mr. Marocco has been undertaking the duties of the Acting

12   Deputy Secretary -- Acting Deputy Administrator of USAID.

13   You'll note that the defendants are very careful to say that

14   Mr. Marocco is not, in fact, the Deputy Administrator of the

15   USAID because he has not been properly appointed.

16         Then contrast that to a recent e-mail that just went out

17   yet again from USAID, Joint Record 440, this is also

18   Paragraph 8 of J. Doe 21's declaration, and Your Honor will see

19   that our plaintiffs received a reduction-in-force e-mail from

20   the phony e-mail address we talked about before, and it

21   purports to come from, quote, unquote, the Acting Deputy

22   Administrator, Pete Marocco.

23         That is something he's never called himself, Your Honor.

24   If you look at his declaration, he's very careful not to

25   identify himself as the actual Acting -- Acting Deputy

1  Administrator.

2      This shows -- this is strong circumstantial evidence that

3  whoever is sending out these e-mails -- and, again, we believe,

4  based on the record evidence, to be Gavin Kliger, is not

5  someone who has been, you know, informed in the nuances of how

6  you appoint people to agencies and instead is just making these

7  reduction-in-force important personnel decisions unilaterally.

8          THE COURT:  So I think I understand your theory.

9      It does seem circumstantial, though, in terms of the

10  evidence that because it appears as if Mr. Marocco may not have

11  cleared that language, because he would have known better, that

12  he wasn't actually the deputy that -- or acting deputy, that it

13  might have been someone else.  Now, whether it was that person

14  individually, Mr. Musk, or some USAID junior person who is not

15  an attorney, I mean, it's not totally clear at this point.

16      So you're saying it's an inference that you want me to

17  draw?

18          MS. MARZIANI:  Correct, Your Honor, although I would

19  submit that at this point, our burden is to show a likelihood

20  of success on the merits.  And we have -- we do not have access

21  to the information in the government's possession.  We have

22  produced defendant admissions, firsthand witness declarations,

23  and plaintiff declarations, all of it is supported by

24  investigative reporting.  And it all, quite frankly, points in

25  one direction, which is that Mr. Musk has extraordinary

1    authority and that he is directing these DOGE affiliates as

2    they are embedded throughout federal government agencies.

3            **THE COURT:**  I thought you said when we were -- I

4    think we had a conference to discuss this hearing, there had

5    been some discussions about discovery.  It feels as if these

6    issues, and I think there's a couple of other episodes I think

7    we can probably talk about, where there's really a factual

8    dispute about what happened and who made decisions.  And I

9    understand your theory about how I could perhaps infer it with

10   one person.

11       The government has offered, I guess, some more direct

12   evidence, but still not corroborated, not documented evidence

13   to the contrary.

14       So where did those discussions about discovery go?  Was --

15   did you ask for certain things?  Were they provided?  Were they

16   not provided?

17           **MS. MARZIANI:**  I will let the Department of Justice

18   speak for itself.  But I will share with Your Honor that we

19   inquired about discovery, and it was -- it was, my

20   understanding, not plausible in the short time period.

21           **THE COURT:**  Well, isn't it the kind of thing that at

22   some point we need to have to resolve these issues?

23           **MS. MARZIANI:**  Absolutely.

24       I mean, look, Your Honor, we are here today because, and

25   as my colleague will explain, we have plaintiffs who are

1  suffering urgent irreparable harm.  So we do believe there is

2  relief that should be granted and that we would ask you to

3  grant right now.

4       We also agree that, as I started my presentation -- at the

5  end of the day, I don't think that there is much of a

6  disagreement.  You guys might say otherwise, but I don't think

7  there's much of a disagreement on the appointments clause and

8  the separation of power principles and case law.  That central

9  disagreement is an issue of fact that would benefit from

10 discovery.

11          **THE COURT:**  Right.

12      So in this instance, just going back to the point you

13 raised about whether or not Mr. Marocco actually approved and

14 authorized this e-mail about a reduction in force, and you may

15 want to remind me which reduction in force that was, was

16 that -- you know, how many people, what percentage of the

17 agency.

18      But even assuming that was a decision made by Mr. Musk or

19 someone else under his direction, where is the line on that in

20 the sense that I -- my general assumption is that within the

21 government, certainly if a supervisor wants to arrange for the

22 termination of someone, they don't need the Secretary to sign

23 off on it.  I could be wrong.  Maybe it's through a delegation.

24 But either way, it's not something the Secretary gets involved

25 in.

1      Obviously, there's civil service rules which typically are

2   applied, so it's not an easy process, but it doesn't

3   necessarily involve a principal officer.

4      So where is the line where you're saying that action was

5   significant authority as opposed to how we generally look at

6   terminations?

7           **MS. MARZIANI:**  Absolutely, Your Honor.

8      And I want to note that the case law has not been precise

9   in what constitutes significant authority for officer status

10  under the appointments clause.  However, the Court has told us

11  over and over that it has to do with final executive

12  decision-making and things that are -- that are meaningful and

13  that bind the government.

14     We, again, believe that the record evidence -- you know,

15  going back to that weekend of February 1st, which was -- it

16  is -- taking their evidence at best, it's extraordinarily

17  unclear what Mr. Rubio was doing at that point, even if he had,

18  in fact, been designated as the Acting Secretary at USAID.  But

19  that was the weekend when, by all the accounts we have

20  gathered, DOGE unilaterally goes into USAID, they take systems

21  access, they send out an e-mail saying that the office is going

22  to be shut down.

23     And if you look at what defendants provided us, it wasn't

24  until after that weekend, February 3rd, when Mr. Rubio sends a

25  letter to Congress informing them of the possibility of a

1  reorganization.

2      So that is a critical time period, and we have alleged all

3  the facts that we can gather at this point, without discovery,

4  in the complaint.  And then as we noted, there's this more

5  recent evidence that we have brought to light showing that DOGE

6  is still, as we believe, in control of the back-end operations.

7      **THE COURT:**  So -- okay.  I agree with you.  That

8  period, perhaps, before February 3rd is important.

9      But, again, what are the specific actions?  You said final

10 executive action binding the government.  What are those

11 specific things that happened that you say were the

12 responsibility of Mr. Musk?  Regardless of -- starting with

13 what the actions are, then you can tell me how it connects

14 back.

15     **MS. MARZIANI:**  Yes, yes.

16     So in the context of USAID, it is our understanding, and

17 this is also corroborated by the AIDS vaccine case that, of

18 course, is ongoing, that the DOGE affiliates control the

19 contracting system.  So they are actually the ones making the

20 decisions about whether or not to release appropriated monies.

21     And that is, in fact -- this is our belief, based on what

22 the evidence we have gathered, that is, in fact, why the

23 government has not been able to comply with the TRO in that

24 other case.

25     In addition, as I mentioned, we have evidence, including,

1  actually most recently, Exhibit 70, which is the new under-seal

2  declaration, which is someone who is terminated -- got a

3  termination letter just on Monday, but she was able to look at

4  the metadata, and the metadata traces back to a gentleman named

5  Luke Farritor, who has -- is a well-known DOGE affiliate.  He

6  has been embedded in at least five agencies.  And he was the

7  one who actually sent that termination letter.

8      And I understand that defendants might say, well, you

9  know, it's not unusual -- obviously you need subordinates to be

10  sending out the actual termination letter, that's what you have

11  HR for.

12      But what is distinct here, is this gentleman,

13  Mr. Farritor, he is -- it's implausible to think that he could

14  be a legitimate employee across a number of agencies.

15      And so instead, it is our theory here, that the DOGE

16  people are maintaining this back-end control, and then they are

17  using it to exercise the decisions that Mr. Musk makes.

18          **THE COURT:**  Let me ask you this.  So that was just --

19  was that an individual termination or was it a letter that went

20  to many people, or an e-mail that went to many people, Exhibit

21  70?

22          **MS. MARZIANI:**  Well, we first -- Exhibit 70 needs to

23  be admitted.  And we will --

24          **THE COURT:**  I think we accepted the exhibit.

25          **MS. MARZIANI:**  Yeah, you've accepted it.  They have

1  agreed.  Thank you.

2      So what we have in the record is the metadata on an

3  individual termination letter that this individual received.

4  However --

5          **THE COURT:**  Well, who -- I mean, again, I'm trying to

6  find it right now, and I'm not -- who actually signed this

7  letter or listed their name at the bottom?  Because I

8  understand your point about the metadata, but usually there's

9  someone taking responsibility for the decision.  And I am

10  interested to know, so first of all, was it the Secretary, the

11  Administrator, somebody else?  An HR person?  And how did that

12  person compare to the person who usually would send such a

13  letter out, you know, before all this started happening?

14          **MS. MARZIANI:**  Would Your Honor like me to bring you

15  Exhibit 70?

16          **THE COURT:**  Well, I was just -- I was given a packet

17  of exhibits.

18          **MS. MARZIANI:**  Yeah, I'm sorry, this one was omitted

19  because it is under seal.

20          **THE COURT:**  It only goes up to 69.  Yeah.  Okay.

21          **MS. MARZIANI:**  That's correct.

22          **THE COURT:**  You can hand one to the clerk.

23          **MR. GARDNER:**  And, counsel, I'm a little confused.

24  My Exhibit 70 was the one you withdrew.

25          **MS. MARZIANI:**  That's because we did not update the

1  exhibit list after we sent that to you last night, so we

2  withdrew the Whipple declaration, and this is the new one that

3  we e-mailed you about this morning.

4         **MR. GARDNER:**  Got it.

5         **MS. MARZIANI:**  Would you like another copy?

6         **MR. GARDNER:**  I do need another copy.  Thank you.

7         **THE COURT:**  So this letter, and I think I can read

8  this portion, is -- it's a memorandum from Kenneth Jackson,

9  Assistant to the Administrator for Management and Resources at

10 USAID.  So just starting with that point, and it appears to

11 have kind of a signature for that person, are you saying

12 there's something irregular about the Assistant to the

13 Administrator for Management sending this type of

14 communication?  Is that the normal person, and you're just

15 saying it wasn't really that person?  Or you're saying that

16 that role is not the right role for this anyways?

17        **MS. MARZIANI:**  So through the conversations we've had

18 with witnesses and plaintiffs, it's our understanding that this

19 came from the -- the HR e-mail address that we believe to be

20 illegitimate, that we believe to have been created by DOGE

21 outside of the normal HR channels.

22        **THE COURT:**  So different from the one that you would

23 normally hear from HR on?

24        **MS. MARZIANI:**  Correct.

25        **THE COURT:**  Okay.

1          **MS. MARZIANI:**  It's an actual different e-mail

2     address that has been created and is being used.

3          And by the way, I would note that if you look at J. Roe 1,

4     so this is our first sealed witness declaration, I believe my

5     colleagues will get the exhibit number, but this is from the

6     witness who was a high-ranking official at -- or who is a

7     high-ranking official at OPM.

8          And that witness testifies -- thank you.  Oh, 55, is the

9     exhibit; 55.

10         And J. Roe 1 testifies to a very similar phenomenon at

11    OPM, that there have been new e-mail addresses created at OPM

12    by DOGE affiliates that purport to come from HR but are, in

13    fact, outside of the normal processes.

14         And, look, Your Honor, I will submit, this is

15    circumstantial evidence what I'm describing.  And it is

16    circumstantial evidence that is connected and directly

17    supported by the defendants' own admissions.  I mean, the

18    defendants are telling us they are doing this.

19         To go back to the example that my colleague raised, and if

20    you look at the new exhibit in the record, 67, we actually

21    provide a video from the cabinet meeting that happened just a

22    couple of days ago, and Mr. Musk describes the

23    five-things-you-did-this-week e-mail by saying that Mr. -- that

24    President Trump tweeted that he wanted Mr. Musk to get more

25    aggressive.

1    According to Defendant Musk, he then received a call from

2   the President seemingly telling him the same thing.

3    And then Mr. Musk went -- went forth based on, as far as

4   we know, instructions simply to be more aggressive, that he

5   then came up with this idea to send out a

6   five-things-you-did-this-week e-mail to every person in the

7   federal government.  And he did it from that OPM e-mail where

8   we have witness testimony to support that it is, in fact,

9   created and controlled by DOGE.

10    **THE COURT:**  So I understand the argument, you

11   mentioned there are cases on appointments clause issues.

12    **MS. MARZIANI:**  Correct.

13    **THE COURT:**  Are there any that involve what is

14   considered significant authority that is internal to the

15   government in terms of telling people within agencies what to

16   do or not to do, as opposed to -- I think the classic examples

17   are special counsel-type people, independent counsels, where

18   they basically have prosecutorial authority or administrative

19   law judges, or the equivalent, where they are basically making

20   judicial decisions in cases.

21    Can you give me an example of something that's closer to

22   this factually, particularly in the sense it's not making

23   decisions on behalf of the government directed at outside

24   parties but that's sort of the internal federal government

25   staff?

1    **MS. MARZIANI:**  Your Honor, I would want to go back to

2    see if I could find one.

3    I will say, as you note, the appointments clause case law

4    by and large has a different factual predicate.

5    I would also note, however, that we bring a separations of

6    powers claim, too.  And the separation of powers claim is

7    twofold.

8    On the one hand, an appointments clause violation is a

9    separation of powers violation as well.

10    **THE COURT:**  Sure.

11    **MS. MARZIANI:**  Yes.

12    **THE COURT:**  But those probably rise and fall largely

13    together.

14    **MS. MARZIANI:**  Of course.  Agreed.

15    **THE COURT:**  That aspect of it.

16    **MS. MARZIANI:**  In addition, the -- we all know from

17    *Youngstown*, and many other Supreme Court cases, that the

18    executive branch cannot execute legislative power that only

19    belongs only to Congress.

20    And here, based on the evidence that we have collected, we

21    think this is happening in three different ways that go to your

22    question.

23    One is, even a properly appointed agency head cannot take

24    actions within their agency that are contrary to law.  So, for

25    example, even a properly appointed USAID administrator cannot

1  blanket freeze dedicated appropriations or dismantle their own

2  agency.  That would be unlawful and that would be a separation

3  of powers problem.

4      Second, even if a properly appointed agency head could

5  lawfully dismantle their own agency, let's say they had

6  congressional authorization to do so, it's not the case that a

7  different agency head could do that.  So just -- for example,

8  the Secretary of Transportation can't use DOT staff to

9  dismantle USAID.

10     And then you get to the scenario that we are confronting

11 here, which is actually a third type of scenario, which is that

12 even if it were the case, that a properly appointed Secretary

13 of Transportation with properly delegated Congressional power

14 could shutter USAID, and we don't think that's the case, but

15 let's assume that's the case.  That's not actually what we're

16 looking at here.

17     Here, this is a made-up super agency being run by somebody

18 occupying a made-up position, or perhaps none at all, who is

19 giving the orders to dismantle it.

20     And so I do think that from that frame, this is a

21 significant separation of powers case in addition to

22 appointments clause case.

23         **THE COURT:**  So on that point, it sounds like you

24 might be talking about dismantling USAID as one form of the

25 extra constitutional actions.  Is that the most specific

1  example you -- or best example you have, or is there one that's

2  better than that from your perspective?

3          **MS. MARZIANI:**  I think that is the example that we

4  have the most firsthand evidence to support.  And I guess the

5  way I've been thinking about it, is that defendants have been

6  effectively dismantling USAID.  Obviously they are bragging

7  about it, as my colleague pointed out.

8      But the way that they're doing it is through the means

9  that we just discussed, they're doing it through controlling

10 back-end infrastructure; they're doing it by making decisions

11 about terminations; they're doing it by making decisions about

12 freezing contracts.  But all of that bundles up to effectively

13 paralyzing this independent agency.

14         **THE COURT:**  So if -- if I were to agree with you

15 that -- that terminating an agency outside of Congress is --

16 well, actually, on this one, you've given us some sources about

17 the statutory -- the statutes that relate to USAID.

18     As I look at it, it appears as if Congress created -- or

19 there's statutory authority for establishing the agency.  You

20 gave us some information from the appropriate -- or a statute

21 in which the Appropriations Committee basically said you need

22 to consult with us if you are going to do certain things,

23 reorganizing, closing certain offices, things that seem to be

24 short of dismantling the entire agency.

25     I didn't see in there any language about abolishing the

33

1   agency as one of the things that this consultation back and

2   forth goes.

3       So how do you read the significance of the appropriations

4   statute?  It seems to me on the one hand, it may support the

5   view that they can't abolish the agency because it's not even

6   listed there, but it may also support the view that they could

7   do some of these steps short of it, with appropriate

8   consultation, and that implies, at least, that the President

9   has some authority to reorganize, to move offices around, thing

10  likes that.  They may need to consult with Congress, but it

11  doesn't say they can't eventually do those things.  Or do you

12  read it differently?

13      **MS. MARZIANI:**  So I do want to be clear, I mean, our

14  case is alleging that there is nobody who has been properly

15  authorized who is making these decisions.  And so I agree -- I

16  mean, you know, I -- you could go through some of the decisions

17  that we are pointing to that we allege defendants haven't

18  properly made.  Some of those could be made by a properly

19  appointed agency head.

20      But importantly, that evidence is not in front of this

21  Court.  I mean, we have very little information from the

22  Department of Justice in their response brief as to, you know,

23  what, if anything, Mr. Rubio has known about, what he directly

24  authorizes.

25      I noted before, the declaration from Mr. Marocco is very,

1  very careful to actually say that he is exercising duties of

2  the Acting Deputy Secretary, but we believe he's not, in fact,

3  the Acting Deputy Secretary.

4      So I would submit that we need to have a lot more

5  information about the internal decision-making at USAID before

6  we could properly answer the Court's question.

7          **THE COURT:**  Well, okay.  I mean, I think there's some

8  things where, as you said, there's a factual dispute about who

9  decided to do certain things.  I think part of your argument

10  seemed to be that -- I think it's in the brief, that even if

11  the President or someone wanted to do these things, they

12  couldn't do it under the Constitution.  And so for those types

13  of actions, it doesn't appear as if you really need to know

14  exactly who did it, only whether it was done or not.

15      And so are there things in that category?  I mean, are you

16  saying that closing down USAID would be in that category?

17          **MS. MARZIANI:**  Yes.

18          **THE COURT:**  Are you saying something less than that,

19  like terminating X percentage of the force, workforce, and I

20  don't know what the right percentage is, or terminating X

21  percentage of the contracts would count as something that he

22  can't do?  Or are you -- where is the line there between

23  running the agency and doing some reorganization that might be

24  permitted --

25          **MS. MARZIANI:**  Absolutely.

1        **THE COURT:**  -- versus something that's outside the

2   constitutional power of the President?

3        **MS. MARZIANI:**  I think I would ask for discovery and

4   more briefing to get to kind of an exact percentage of where

5   the line is between effectively dismantling and neutralizing an

6   agency, which we think would fall outside the bounds of power,

7   and something that could be the -- the actions that could be

8   taken by a properly appointed agency head.

9        I will also note, though, and, of course, this is being

10  litigated in other forums, that there is a constitutional

11  problem with the executive branch unilaterally freezing funds

12  that have already been appropriated by Congress.  So that's

13  kind of a separate category of problematic behavior from a

14  separation of powers point of view.

15       **THE COURT:**  Well, you vaguely reference that -- or

16  you briefly reference that in your brief, but I didn't -- are

17  you relying on any particular statutes?  I know the

18  constitutional argument isn't -- doesn't overlay exactly on

19  statutory compliance or violations, but it's obviously a factor

20  to consider under *Youngstown*.  So are there statutes that get

21  into this question of you can't freeze everything?  You're

22  saying that that's your position, but is there anything that

23  shows that, at least from a statutory standpoint?

24       **MS. MARZIANI:**  So if Your Honor is very interested in

25  this point, I would ask for permission to brief it further.

1       But I would say that, in general, it's my understanding

2   that the empowerment act has limits on the ability of the

3   executive branch to, you know, unilaterally make decisions

4   about properly appropriated funds.

5           **THE COURT:**  I mean, would you agree that at least

6   some termination of contracts or some termination of employees

7   would not be a constitutional violation?  It's just some -- you

8   know, it's the magnitude -- I mean, is it -- is it roughly the

9   same as saying whatever you're doing is effectively terminating

10  the agency?

11          **MS. MARZIANI:**  So I --

12          **THE COURT:**  Whatever amount of contract or employee

13  termination gets you to that practical result?  Or is there

14  some other result, short of termination of the agency, that

15  you're saying is still a constitutional violation in terms of

16  just the volume of contract grant or employee terminations?

17          **MS. MARZIANI:**  So I think broadly speaking, there

18  are -- this goes to the two different claims.

19      So on the one hand, cases like *Lucia*, the appointments

20  clause cases tell us that if a person is improperly exercising

21  executive authority, that the remedy is to undo those tainted

22  decisions.

23      And so there, if we are able to, you know -- if, like, as

24  we allege, that Mr. Musk is, in fact, the decision-maker and

25  directing DOGE to do this, if we are correct on that, then the

1  proper remedy would be to undo the tainted decision-making.

2        **THE COURT:**  It doesn't have to be an extra

3  constitutional one in the sense of what Congress is authorized

4  to do, just that he was the wrong person to do that.

5        **MS. MARZIANI:**  Correct, correct.

6        **THE COURT:**  So in theory, if you could show that a

7  single termination of one person was a significant act of a

8  significant authority, then that could be undone.

9        **MS. MARZIANI:**  Correct.

10        **THE COURT:**  So I understand that's different than the

11  other theory, which requires more of a broader impact, I would

12  imagine, to violate the Constitution.

13        **MS. MARZIANI:**  That is -- I mean, I think when you

14  get into the second prong, the separation of powers prong, what

15  you are, as Your Honor was very wisely asking about, what

16  you're really talking about is, you know, what Congress has

17  specifically authorized, what Congress has specifically

18  delegated versus powers that the executive is taking that is

19  outside of congressional authorization.

20        **THE COURT:**  Okay.  So -- but it is correct that part

21  of your argument on the separation of powers is separate from

22  the appointments clause issue in terms of whether it's

23  dismantling the agency or otherwise, that that goes beyond what

24  the President or the executive branch can do?

25        **MS. MARZIANI:**  Yes; yes, Your Honor.

 1              **THE COURT:**  And the one that you seem to have latched

 2    onto is dismantling the agency.  Again, how that's defined is

 3    perhaps the tricky part.

 4              **MS. MARZIANI:**  Yes.

 5              **THE COURT:**  Is there any other action you would say

 6    that would violate the separation of powers, just separate and

 7    apart from who took the action?

 8              **MS. MARZIANI:**  Yes, I think the other one is the

 9    issue that, again, is front and center in the AIDS vaccine

10    case, but is this question of freezing appropriated funds, yes,

11    Your Honor.

12              **THE COURT:**  Freezing.

13         And is it your view, as I said with employees or

14    contracts, it's not just freezing one particular payment, but

15    it's the way it was done here in terms of how broad based it

16    was?  Or are you saying it's not even necessarily that?

17              **MS. MARZIANI:**  You're correct, Your Honor.

18         I mean, look, we, of course, would take the position that

19    a properly appointed agency head can, you know, authorize a

20    reduction in force, right?  Those processes exist.

21         So, yes, there's no separation of powers concern there if

22    somebody is properly authorized to do so.  And you're correct,

23    that the separation of powers problem starts to creep in where

24    the magnitude of those decisions is effectively dismantling an

25    agency that's been created by Congress.

1          **THE COURT:**  Okay.  In terms of any guidance that you

2    would ask me to rely upon on the separation of powers issue,

3    seems as if what you've given me are the appropriation statute,

4    the foreign affairs statute, *Youngstown*.  Is there anything

5    else that you would suggest I focus on in trying to determine

6    whether there's a likelihood of success on that claim?

7          **MS. MARZIANI:**  We did our best -- given your interest

8    at the status conference, we did our best to put that

9    information in the reply brief.

10         **THE COURT:**  Okay.  Okay.

11         **MS. MARZIANI:**  Your Honor, would you like to hear

12   from my colleague on the issue of irreparable --

13         **THE COURT:**  Yes, is there anything else you want to

14   raise on the merits before we go to that?

15         **MS. MARZIANI:**  Nothing else, Your Honor.

16         **THE COURT:**  Okay.  Thank you.

17         **MS. MARZIANI:**  Thank you very much.

18         **THE COURT:**  So, Ms. Stevens, perhaps you could start

19   by updating, if there is anything to update on, in terms of the

20   status of the plaintiffs relative to, you know, whatever was

21   submitted previously by them in terms of their individual

22   status.

23      I recall there was at least some discussion at the

24   conference about how the Justice Department was going to work

25   within the government to try to see if some of the problems

1  that you had identified that were causing injury could be

2  addressed in the short term?  And I don't know if any of that

3  has happened or not, so maybe you can start with that.

4          **MS. STEVENS:**  Absolutely, Your Honor.

5      We did engage in that conversation with the Department of

6  Justice in an effort to negotiate a good-faith interim order.

7  We were unable to come to an agreement.

8      Where we left it is -- well, there are a couple of parts

9  of the relief that we would need the Department of Justice to

10  consider including providing access back to our clients.  And

11  unfortunately, we were not --

12          **THE COURT:**  Access to the computer systems?

13          **MS. STEVENS:**  To USAID systems generally including

14  the safety and security systems.

15      And so where we left it is, we, and our clients, are

16  deeply uncomfortable with the notion that a DOGE person would

17  be responsible for providing that access back.  And so we

18  needed guarantee that they would not be the ones to see our

19  clients' information.

20      We couldn't -- we were not provided with that assurance by

21  the Department of Justice, and so it sort of stalled there.

22          **THE COURT:**  So the current status, then, is -- and

23  remind me if there's more than one category in terms of -- I

24  believe, you know, you have employees and contractors, you have

25  people who are on administrative leave, I think some who may

1  have been officially terminated, just so -- there may be

2  different answers for different people.

3      But in terms of the most significant issue now in terms of

4  irreparable harm, and maybe also on the issue of standing, what

5  is the most compelling example of someone who is facing

6  irreparable harm and what are their current circumstances?

7          **MS. STEVENS:**  So the first sort of category of

8  irreparable harm is the -- well, first of all, Your Honor, I'm

9  going to try to refer to plaintiffs as "he" or "they" to try to

10  keep the anonymity.

11          **THE COURT:**  Okay.

12          **MS. STEVENS:**  But the first category of irreparable

13  harm is their physical peril and their psychological harm.  And

14  this is very tied to our three plaintiffs who are overseas,

15  again, at the direction of the United States government.

16      And to update Your Honor, J. Doe 9 has two declarations

17  before the Court.  They, for over two weeks, had no access to

18  USAID systems, including the safety and security apparatus.

19  They have been given, in the last three or four days, access

20  back to those systems.

21      They are still quite worried because of the chaotic and,

22  you know, unclear nature of toggling on and off access to these

23  systems done by defendants DOGE, at the direction of Mr. Musk.

24  But they have the psychological harm that goes along with

25  having lost the access for over two weeks and not knowing if

1    that will happen again.  And they are in a high-risk area of

2    the world.

3        And then we have a new --

4            **THE COURT:**  Is that high-risk issue something that --

5    I know you're trying to preserve anonymity.  Is that -- I mean

6    I guess, first of all, is there a way for me to know where that

7    is?  And, also, does the government know, at least the

8    attorneys, so -- to understand so they can fairly argue how --

9    how great a harm this is at this point?

10           **MS. STEVENS:**  We have identified the area of the

11   world as the Middle East.  We have not pinpointed further than

12   that.

13           **THE COURT:**  Okay.

14           **MS. STEVENS:**  For anonymity reasons.

15           **THE COURT:**  Sure.

16       So -- but you're saying they now have access to the

17   systems, they are concerned it might not stick.  Do you know

18   whether that was provided because as an accommodation in this

19   case?  Or was it something else?

20       I think that there were -- at least according to the

21   Marocco declaration, they weren't trying to cut people off.

22   Whether you agree with that or not, they seemed to imply that

23   they would put people back on if it was appropriate.  Or is

24   it -- I know there was some rulings in other cases in which

25   some of these things, at least arguably, might happen.

1        So do you know what caused that to happen?

2            **MS. STEVENS:**  We don't know what caused it to happen,

3   Your Honor.  It was very -- it was within a week of filing the

4   motion in this case.  It was also, as you note, on the heels of

5   the temporary restraining order by Judge Nichols, and the

6   temporary retraining order in the AIDS vaccine case, both of

7   which arguably reached to personal services contractors, which

8   J. Doe 9 is.

9        But there's not been any shedding of light on the reasons

10  by the DOJ on that.

11       Our other client -- may I move on to the other client,

12  Your Honor?

13           **THE COURT:**  Beside -- so let me just understand the

14  J. Doe 9 issue here.

15       So part of the issue is not having access to the systems,

16  in particular, to contact security personnel if there was a

17  need to, you're saying that may now be available.

18       What is the -- I mean, remind me again, is this individual

19  on leave?  Is there -- is the person either required to come

20  back to the United States, wants to, doesn't want to, is

21  waiting to see because there might be restatement?  What is

22  sort of the apparent future here?

23           **MS. STEVENS:**  I'll be careful with my phrasing here,

24  Your Honor, to maintain anonymity.

25           **THE COURT:**  Sure.

1          **MS. STEVENS:**  They are a personal services contractor

2    overseas not on administrative leave or otherwise locked out of

3    their systems currently.  They are --

4          **THE COURT:**  But the lockout before was because they

5    were in one of those statuses or because just everyone lost it

6    for some reason?

7          **MS. STEVENS:**  Well, I mean that is part of the chaos

8    of the defendants' implementation here.

9          **THE COURT:**  I see, okay.

10         **MS. STEVENS:**  Is they lost systems access on

11   February 3rd, along with a whole host of other USAID employees

12   and personal services contractors.  And, again, were without

13   that for over two weeks.

14         **THE COURT:**  I understand.  Okay.

15         **MS. STEVENS:**  I think you had a question about --

16         **THE COURT:**  Okay.  Well, just -- okay.  So other than

17   the systems access, is there another aspect to the harm to that

18   individual?

19         **MS. STEVENS:**  The psychological harm of this access

20   may be lost at any moment, based on defendants' past conduct.

21         **THE COURT:**  Okay.  You were going to give another

22   example.

23         **MS. STEVENS:**  Yes, Your Honor.  J. Doe 22, this is a

24   new declaration that we attached to the reply, they are in

25   Central America in a high-risk area.  They have identified

1  that --

2          **THE COURT:**  Do you have an exhibit number for this

3  one?

4          **MS. STEVENS:**  Yes, Your Honor.  One moment.  It is

5  Exhibit 34.

6          **THE COURT:**  Okay.

7          **MS. STEVENS:**  They have identified that the

8  defendants -- let me back up a little bit.

9      My colleagues went through the access that defendants from

10 DOGE have and USAID systems.  You have in front of you several

11 declarations that are -- pinpoint what that access is a little

12 more specifically than God mode or system levels access.  It

13 really details in J. Roe 3, which is under seal -- J. Roe 3's

14 declaration details exactly which systems DOGE has access to

15 within USAID, and it includes the Phoenix application or the

16 Phoenix system, which is how USAID pays its bills.  And that is

17 across the paying-bills spectrum.  So it includes paying

18 partners and paying -- like downstream folks.  But it also

19 includes paying for electricity and other services for United

20 States workers who are overseas.

21     So it includes J. Doe 22's access to electricity and

22 access to their phone -- cell phone.  And they testify in their

23 declaration that that system has been cut off by defendants and

24 remains off.

25     And what that means, how you tie that to the irreparable

1    harm is that, again, they are in a high-risk area, and if they

2    lose access to their electricity, they lose access to the radio

3    function and the -- the security cameras that they have at

4    their home.

5        And then, if they lose access to their cell phones, they

6    lose access to the ability to contact security personnel.

7        And so this is a real substantive danger.

8        **THE COURT:**  Okay.  So I understand that.  You're

9    saying that those bills are not getting paid right now.

10       Do you know -- just in looking at the declaration, it's

11   not clear from this, and maybe they don't know specifically,

12   but, like, I mean, we all know if you don't pay, it gets cut

13   off at some point.

14       But is there a schedule for that?  Do we have any idea how

15   much time there is before that happens?

16       **MR. EISEN:**  They expected it to be soon based on

17   conversations with their mission head.

18       And I think they note in their declaration that there's

19   been some leeway given by the electricity company and the cell

20   phone company, because they asked for an extension, because the

21   systems are literally cut off, and they have gotten a short

22   extension.

23       **THE COURT:**  Meaning the declarant asked for it or the

24   State Department personnel at the mission or some --

25       **MS. STEVENS:**  The mission.  The mission, is our

1    understanding.

2              **THE COURT:**  Okay.

3              **MS. STEVENS:**  But you will note, Your Honor, at the

4    end of that declaration, that the State Department personnel on

5    location, or in country, are hesitant to pay those invoices on

6    behalf of USAID because they fear not being able to get

7    reimbursed.

8         So this is not a situation that is tenable for long.

9              **THE COURT:**  You're saying that the State Department

10   personnel are concerned that State Department won't get

11   reimbursed because there may be something improper about making

12   these payments, or at least they don't know?

13             **MS. STEVENS:**  Well, I don't think we've speculated

14   that far, but the Phoenix system is not on to do the

15   reimbursement.  So it's just -- the point is, the mission is

16   seeking access to money to be able to pay for these very

17   important systems.

18             **THE COURT:**  I understand.

19             **MS. STEVENS:**  And is not able to get it.

20             **THE COURT:**  And this person is on leave, right?

21   Administrative leave involuntarily; is that correct?

22             **MS. STEVENS:**  They have been put on administrative

23   leave, yes, sir.

24             **THE COURT:**  So they are not necessarily supposed to

25   come back to the United States yet?  They are supposed to wait

1  and see what happens?

2            **MS. STEVENS:**  That's my understanding, Your Honor.

3            **THE COURT:**  Okay.  Okay.  Understood.

4       So besides those two examples, are there any others that

5  are either -- I mean, again, in your view compelling examples

6  of irreparable harm that's ongoing at this point?

7            **MS. STEVENS:**  Your Honor, I just want to note that

8  J. Doe 19 did provide a declaration in this.  They are also

9  overseas.  As of the last time we spoke with them, they still

10  were without access to USAID systems generally.

11       They -- they, because of where they are located, don't

12  rely on the Scry app, which J. Doe 9 does rely on.  And so

13  while it is not quite the same step as J. Doe 9 and J. Doe 22,

14  J. Doe 19 is still fully without access to USAID systems, and

15  they are overseas.

16            **THE COURT:**  What exhibit number is that?

17            **MS. STEVENS:**  8, Your Honor.

18            **THE COURT:**  Okay.  Okay.

19       I mean, are you -- which of these prongs of harm do you

20  think is the most significant, from your perspective, that

21  you've identified three or four, at least, theories under which

22  there's irreparable harm?

23            **MS. STEVENS:**  Well, Your Honor, certainly the

24  physical and psychological harms that we just went through with

25  respect to the folks that are overseas.

1      But then turning right next to the access by defendants,

2  access and control of all of our plaintiffs' sensitive data

3  that is housed in the USAID systems.

4      And Ms. Marziani and Mr. Eisen went over a little bit what

5  that access and control looks like with respect to -- like,

6  currently, Mr. Kliger and Mr. Farritor's full access to these

7  systems, and the manipulation of those systems in the last five

8  days.

9      And so I would point to, Your Honor, there are three sort

10 of subparts under the access and control that are important to

11 point out to the Court.

12     One is the continued unauthorized control of the systems

13 by itself we think is sufficient to demonstrate irreparable

14 harm.  We have a very recent case out of this district granting

15 a temporary retraining order in the AFT matter that where

16 that -- the Court went through and highlighted the nature of

17 the information in that situation DOGE would have access to,

18 including plaintiffs' full name, plaintiffs' address, Social

19 Security numbers, other private information and personally

20 identifiable information.  And the Court really analyzed all

21 that can be found out about a person when you have that type of

22 access.

23     And here, it is even broader than that, or more intense

24 than that, because many of our plaintiffs have security

25 clearances where you essentially lay bare your entire life in

1    order to get a security clearance.  Those files are in these

2    systems that defendants have access to.

3        And we know this is another -- the next part -- so the

4    access itself is sufficient, and then the defendants have

5    demonstrated their willingness to misuse this access.  And

6    that's in two parts.

7        One is that we know that DOGE members have obtained

8    systems level access and then given themselves the ability to

9    go into secure areas within USAID buildings.  They did this

10   that first weekend when they took control of USAID systems.  So

11   that's one.

12       And then the other is highlighting on DOGE's website,

13   under their savings page, personal information of fired

14   personal services contractors.

15       And there's two key pieces of evidence to point Your Honor

16   to.  One is J. Doe 20, who you have a declaration from, Your

17   Honor, which is at Exhibit 32, J. Doe 20 is featured -- is

18   included on the savings page of the DOGE website.  Some of

19   their personal information is included.

20            THE COURT:  Can I -- I actually had this question.  I

21   mean, when I look at Exhibit 20, I can't really tell what it

22   is.  So what is it about this screenshot that establishes that

23   the personal information of J. Doe 20 is now publicly

24   available?

25            MS. STEVENS:  Your Honor, I'm going to step to the

1    back and grab Number 20.

2         **THE COURT:**  Okay.

3         **MS. STEVENS:**  Okay.  Apologies, Your Honor.  I

4    thought I knew the exhibit you were talking about, but I wanted

5    to verify.

6         So Exhibit 20 is the main page, is a screenshot of the

7    main page that individuals see when they access the DOGE

8    website and go to the savings page.

9         Embedded sort of down the page is a running list of

10   contracts canceled by DOGE.  It's not just USAID systems, it's

11   sort of all of the agencies that they've gone into and been

12   canceling.

13        But, of course, the USAID-canceled contracts were first,

14   or part of the first tranche uploaded onto this site, and they

15   include some personal services contractors' cancellation, and

16   if you --

17        **THE COURT:**  I'm just looking at the document.  I'm

18   not seeing that here.

19        So are you just telling me that -- you just wanted to give

20   me, like, a higher-level page, but I actually can't see the

21   part about the personal services contractor, or --

22        **MS. STEVENS:**  We have an additional exhibit, Your

23   Honor, which is -- this was attached to our reply brief, Your

24   Honor.  Exhibit 40.

25        **THE COURT:**  Okay.  And I did see this, but is this

1    the same system but a more granular file?  Or is it a different

2    system than Exhibit 20?

3              MS. STEVENS:  It's the same system, a more granular

4    file.  You -- a user is interacting with the website, you click

5    on one of the listed contracts, and what is opened is the -- is

6    what you see in Exhibit 40.

7              THE COURT:  So this is information about a particular

8    contract that was terminated for convenience, and you're saying

9    it's basically a personal services contract for an individual

10   person, therefore, their name is in this redacted portion?  And

11   their address?

12             MS. STEVENS:  That's correct, Your Honor.

13        And if Your Honor looks at the second page of the exhibit,

14   at the bottom right, it has the street address, city, state,

15   ZIP.

16        And then on the next page, it has the phone number.

17             THE COURT:  I'm sorry, is it redacted, or it's

18   just --

19             MS. STEVENS:  It is redacted, Your Honor.

20        But it says "phone" off to the left.  This is at JR545.

21             THE COURT:  545, huh?  Oh, at the top.  Okay.

22        Okay.  I understand.

23        But this is not one of your plaintiffs, right?  This was

24   the one that is an example of something that they are in that

25   system?

1          **MS. STEVENS:**  That's correct, Your Honor.

2          **THE COURT:**  And is there a contract in the same

3    category in the sense of -- is J. -- J. Doe 20's contract

4    comparable to this one in terms of what type of contract it is?

5          **MS. STEVENS:**  It is, Your Honor.  They had previously

6    interacted with their contracting personnel before DOGE and

7    Defendant Musk came into the picture.

8          **THE COURT:**  Uh-huh.

9          **MS. STEVENS:**  And had their information suppressed

10   from what DOGE is pulling from now.

11         **THE COURT:**  Okay.

12         **MS. STEVENS:**  And -- sorry.

13         **THE COURT:**  No, go ahead.

14         **MS. STEVENS:**  Our understanding, with respect to our

15   other personal service contractors clients, is most of them

16   have not been able to negotiate a similar suppression of their

17   information in part because this whole thing has been so

18   chaotic and there's not been the ability to talk to anyone

19   about this.

20         **THE COURT:**  Wait.  So J. Doe 20 has been able to, at

21   least for now, not have their personal information on that

22   page?

23         **MS. STEVENS:**  There's some of their personal

24   information, not to the level of detail as Exhibit 40.  But

25   that -- they negotiated that situation prior to the defendants

1  coming into the picture.

2          **THE COURT:**  I see.  I see.

3      Let me ask you this.  Let's assume that you've established

4  that there is at least some imminent harm that would be very

5  problematic, possibly irreparable, to your clients.  If -- one

6  remedy would be, look, don't put stuff on the website, don't --

7  you know give them access to -- you know, pay their bills, all

8  of those these things that immediately address the issue that

9  you've just identified, obviously you want that relief.  But

10 you seem to want more than that.

11     And so how does one justify any additional broader scope

12 relief when the harm arguably couldn't be addressed to those

13 individuals by doing those things?

14         **MS. STEVENS:**  Well, Your Honor, we don't think that

15 you can -- that the defendants could un- -- untie the access to

16 our clients' data from the access, period.  The most

17 appropriate thing to do is have them put, in their words,

18 pencils down, get out of these systems, do not have access to

19 our clients' data or any USAID data; do not have access such

20 that they can abuse that access, like the example of going into

21 secured systems; and the inability to post our clients'

22 information on this DOGE website.

23         **THE COURT:**  Okay.  I guess what I'm saying is, how do

24 you get from being concerned about these individual issues and

25 perhaps addressing those issues to basically undoing all the

1  terminations, all the contract terminations, employee

2  terminations, reversing the removal of the USAID sign outside

3  their office?

4       I mean, I don't know if you're asking for all of those

5  individual things, but it does seem like you're asking for

6  something more broad than just putting these plaintiffs back to

7  a stable status quo.  And if so, how do you legally get the,

8  you know, leap from one to the other?

9       **MS. STEVENS:**  Your Honor, at least with respect to

10  the data access itself, there -- we know of no way that Your

11  Honor could direct DOGE to not have access to our plaintiffs'

12  data within these -- across these USAID systems and still allow

13  the access to other peoples'.  So that's -- data access is

14  certainly intertwined.

15       With respect to the contracts that DOGE has been canceling

16  or not paying the -- not allowing payment of the invoices for,

17  it is our position that DOGE's unilateral decision-making is

18  ongoing.  We have the evidence of Mr. Kliger creating his own

19  user name.

20       This is really highlighted in our J. Doe 2 second

21  declaration.  That person explains and actually has a

22  screenshot of Mr. Kliger using his systems access to make a

23  user account that then shortly, I think, 24 to 48 hours later,

24  is used to send out the RIFs that Ms. Marziani talked about.

25       It was also used to send out the e-mail firing the

1  probationary employee which is highlighted in the J. Roe 5

2  declaration.  This is also under seal.

3          **THE COURT:**  Yeah.  I'm just trying to understand what

4  are you asking for as your relief?  Because, again, it seems to

5  make sense you want to address these individual issues from the

6  plaintiffs, but for something like that, are you saying, well,

7  don't let the DOGE people access the computers even though

8  someone from USAID, in theory, could just do exact the same

9  action?

10      Or are you trying to say they can't fire people, they

11  can't RIF people, they can't terminate contracts?  What are you

12  asking for, and then how do you justify it under the -- at

13  least in terms of the connection to any potential irreparable

14  harm here.

15          **MS. STEVENS:**  Your Honor, at minimum, and I'm looking

16  at our prayer for relief in the motion -- excuse me, in the

17  memorandum, at minimum, we're asking for them to stop accessing

18  the data, stop distributing it, stop sharing it or otherwise

19  disclosing the data.  We think that necessarily means they need

20  to be out of the data, period.

21          **THE COURT:**  Uh-huh.

22          **MS. STEVENS:**  And to address Your Honor's question of

23  how -- where does this go, what layers, that's the minimum --

24          **THE COURT:**  Okay.

25          **MS. STEVENS:**  -- that we think is required.

 1          With respect to the reinstatement of e-mail, payments,

 2     security notification, and other systems, at minimum, our

 3     clients need access to the systems to which they are currently

 4     entitled.

 5                    THE COURT:  And that's --

 6                    MS. STEVENS:  And then we -- sorry.

 7                    THE COURT:  That's assuming -- are you talking

 8     about -- I think you have some plaintiffs here who have already

 9     been terminated, correct?

10                    MS. STEVENS:  We do have some that have already

11     been -- well --

12                    THE COURT:  What would it mean for them to have

13     access to things they are entitled to, things that they would

14     have been if they hadn't been terminated, or things that they

15     presently should be getting to but they can't?

16                    MS. STEVENS:  For the -- I want to distinguish

17     between personal services contractors who have gotten the

18     letter letting them know that they have a two-week notice, and

19     then we have other clients who are direct-hire employees who

20     have gotten notification that they are on administrative leave.

21                    THE COURT:  Uh-huh.

22                    MS. STEVENS:  And so -- but those folks that are on

23     administrative leave have been -- shortly after they were put

24     on administrative leave and told that they would still have

25     systems access by that e-mail --

1          **THE COURT:**  They have been cut off.

2          **MS. STEVENS:**  Correct.

3      And then for the personal services contractors, until that

4  two weeks is up, they should have also have access but they

5  don't.  They got a letter saying they are getting cut off -- or

6  excuse me, they got a letter saying they were getting

7  terminated, and then they got cut off.

8      There's a pattern here of cutting everyone, but including

9  our plaintiffs, out of these systems that they are otherwise

10  should be allowed to be in.

11          **THE COURT:**  Okay.  And then is there any other,

12  again, broader relief than dealing with the individual

13  situations, and if so, is there justification for that?  Or are

14  you just -- that's all you're asking for?

15          **MS. STEVENS:**  No, Your Honor, the broader relief we

16  think, at a minimum, is DOGE out of these USAID systems.

17          **THE COURT:**  Okay.  So in terms of -- you're not

18  asking for anything to be done, at least at the preliminary

19  stage, on terminations of people, contract terminations, other

20  aspects of terminating the agency, you're not asking for

21  anything right now on those things?

22          **MS. STEVENS:**  Your Honor, we think the -- we think

23  the appropriate thing to do would be to get the at-minimum

24  relief that I just articulated, and then engage in expedited

25  discovery to bring back to the Court the next -- to the extent

1   that it is appropriate, the next set of relief that would be

2   required by that discovery process.

3          **THE COURT:**  But -- so let me ask you that.  I

4   mentioned to your colleague, Ms. Marziani, this issue of

5   discovery, and she says you need some.  I -- I agree that

6   there's an incomplete record, so more information would help on

7   the facts.

8      Are you suggesting that if you could get -- with or

9   without an injunction here, if you get an injunction, and it

10  puts your -- the plaintiffs back to a reasonable position, you

11  would be comfortable with that.

12     And then are you saying that you would want to have yet

13  another motion, or you want to have part of the motion held in

14  abeyance while you do discovery?  Or are you saying, well, at

15  that point we would be sort of in the regular case with

16  discovery -- perhaps moving faster than typical, but we would

17  be in a regular mode at that point?

18         **MS. STEVENS:**  I think, Your Honor -- I think, Your

19  Honor, it depends on the relief fashioned by the Court and the

20  discovery allowed.

21     So to Your Honor's point about contracts and PSC

22  terminations, we think the evidence is strong, stronger than

23  just merely circumstantial, that DOGE is taking unilateral

24  action to cancel contracts including our personal services

25  contractors, taking unilateral action to put our employee

1    clients on RIFs, on terminating outright.

2        And so if we're allowed to engage in limited expedited

3    discovery on that, we think that might be pertinent to bring

4    back to the Court and ask, but it is hard to say at this point

5    for sure what that might look like.

6        **THE COURT:**  Well, it just seems as if it's hard to

7    have multiple rounds of preliminary injunctions.  It seems

8    like -- I know there's no formal rule on it, but in an ideal

9    world, you would get one crack at that, and then we would be in

10   the regular case.  And, again, I could see a scenario where

11   this case maybe should move faster than some others.

12       But -- so that's why I was asking whether -- it seems to

13   me if you want some kind of preliminary relief that requires

14   discovery, then perhaps the answer is to delay a ruling on that

15   until after there is some expedited discovery, or we could just

16   see where we are now based on the current record.

17       And, then, again if there's -- if it's really a factual

18   distinction -- a factual dispute that requires the discovery,

19   we could do that on the regular process.

20       But it seems strange, at least to me, to say, well, we'll

21   do preliminary relief in part, and then we'll do another motion

22   on this later.  And we probably will never get out of the loop

23   of motions for preliminary injunctions.

24       **MS. STEVENS:**  That's reasonable, Your Honor.  I -- we

25   agree with you.  We think there is absolutely sufficient record

1  before the Court right now to award the relief that I've

2  highlighted a few times, number one, in our -- in our prayer.

3      And if the Court will allow an expedited discovery process

4  and maybe move the case faster, I think we agree that that

5  would be the appropriate thing to do next.

6          **THE COURT:**  Okay.  I think I understand.

7      Anything else that you wanted to offer?

8          **MS. STEVENS:**  Your Honor, I would just point the

9  Court to our -- to our -- both the memorandum and the reply

10  with respect to some of the other harms included in the

11  constitutional harms at issue.

12          **THE COURT:**  Okay.  Thank you.

13          **MS. STEVENS:**  Thank you.

14          **THE COURT:**  Mr. Gardner, I know you've been waiting

15  patiently.

16          **MR. GARDNER:**  Whenever you're ready, Your Honor.

17          **THE COURT:**  Yes, go ahead.

18          **MR. GARDNER:**  May it please the Court.

19      Plaintiffs seek the extraordinary remedy of a preliminary

20  injunction and claim that Elon Musk and the Department of

21  Government Efficiency's role in the administration has

22  irreparably harmed them based, as they admitted, largely on

23  circumstantial evidence.

24      But as we explained in our filings and supporting

25  declarations, plaintiffs cannot meet any of the four factors

1   necessary to show entitlement to preliminary relief.

2       I would like to start, Your Honor, with something that I

3   did not hear my counsels address either in their briefing or

4   today at the lectern, and that is standing, which is something

5   we squarely addressed in our opposition.

6       **THE COURT:**  I think you always do in these cases, so

7   I -- I read that with interest.

8       Well, let me ask you on standing, I mean, is there -- it

9   seemed to me that -- I mean, you made an argument that some of

10  this intrusion into personal data might not be an injury, but I

11  didn't see anything in your brief saying that some of these

12  issues specific to the plaintiffs, whether it's -- I mean, they

13  had someone who hadn't gotten their travel reimbursements back

14  yet.  They had someone, as we heard now, who aren't getting

15  payments for certain things that otherwise would get paid for

16  at their foreign residences and things likes that.  I haven't

17  heard you say those are not injuries.  It seems like your

18  argument was more on redressability or something like that.

19  But you weren't saying those were not injuries; is that

20  accurate?

21      **MR. GARDNER:**  That is correct, Your Honor.  Some

22  things we contend are not injuries, so the access issues.

23      The other aspects of the claims we contend are either are

24  not caused or traceable to the defendants and/or are not

25  redressable by a court order.

1        So maybe I can start with the access issues.  And let me

2   see if I can clear something up right now.  And I want to put

3   on the ELMO -- here we go.

4        This is what plaintiffs have represented is Exhibit 40.

5   And this is the DOGE website.

6        And I want to draw the Court's attention to what I've

7   highlighted here on the top, which is FPDSNG.

8        As we note in our brief, and I not hear plaintiffs refute

9   this, this is referencing the publically available Federal

10  Procurement Data System website.

11       All the DOGE website does is link to this publicly

12  available website, and this contract information, including the

13  details, are on that publicly available website.

14       It is not clear to the government how plaintiffs are

15  injured --

16            **THE COURT:**  Do you know whether all the PII is

17  unredacted on the public website that predated this DOGE link?

18            **MR. GARDNER:**  I did not go through every single

19  contract, Your Honor, so I would never represent that.

20       But I will represent to you, as an officer of the court, I

21  did some spot checking on random USAID contracts, and the

22  contracts that I saw in the FPDS did not contain redactions for

23  things like addresses and the like.

24            **THE COURT:**  So including, for example, Exhibit 40?

25            **MR. GARDNER:**  That's right.  So I did not look at

1   Exhibit 40, in particular, that contract.  But if you go onto

2   the --

3          **THE COURT:**  Well, it seemed to me that's where I

4   would have gone first.  So is there a reason why you didn't

5   look at that one?

6          **MR. GARDNER:**  Yeah, because I just went onto the

7   website and chose, I think, five USAID contracts that were on

8   there and spot checked them to see if they contained

9   redactions, and I not see redactions on those.

10     But I am happy, Your Honor, as an officer of the court, to

11  go back and look at this particular one to see if it's

12  identical to both.  I just --

13         **THE COURT:**  Okay.  I understand the point.

14     Nevertheless, I mean, you don't think it's a reasonable

15  concern, given all the social media discussions regarding even

16  just this case and things regarding this case, that there's no

17  potential risk of harm to someone whose information is out

18  there not just as a contractor, but as someone who, you know,

19  is currently in this situation, either not -- whether they are

20  in this case or even just not being in this case, but in this

21  category of someone who is either terminated, on leave, what

22  have you, isn't this a different place than we were two years

23  ago when this website might have been unknown to anybody, or of

24  no interest to anybody?

25         **MR. GARDNER:**  Your Honor -- I did not mean to

1    interrupt you.

2        What I was going to say is, look, under *Clapper,* any risk

3    of harm based upon the republication of publicly available

4    information is inherently speculative.  Plaintiffs have, I

5    think, more than a dozen declarations.  None of those

6    declarations indicate that they are actually being harmed by

7    this publicly available information being on another website.

8    And I think that's telling, because they are not being

9    currently harmed and they have not identified any imminent harm

10   or future harm that's imminent.

11        **THE COURT:**  So do the DOGE individuals have access to

12   security clearance, you know, SF86 background information?  I

13   mean, again, whether they have accessed it or not, I don't

14   know, but do they have access if they want to get to it?

15        **MR. GARDNER:**  I have seen news reportings suggesting

16   that, Your Honor, but I don't have any personal knowledge.

17        **THE COURT:**  And why is it necessary?

18        **MR. GARDNER:**  I don't have any personal knowledge.

19        **THE COURT:**  Why is it even legal?  Do they have their

20   security clearances?  Do they have their own SF86s?

21        **MR. GARDNER:**  Here's what I do know.  Here's what I

22   can tell you, Your Honor, that I do know.  The two people they

23   have identified as being affiliated with the DOGE, that's

24   Luke -- I believe the last name is pronounced Farritor,

25   Farritor, as well as Gavin Kliger, are detailed employees to

1   the USAID.  So they --

2             **THE COURT:**  From where?

3             **MR. GARDNER:**  From other government agencies.

4             **THE COURT:**  Which agencies?

5             **MR. GARDNER:**  I don't know off the top of my head,

6   Your Honor.  I can get you that information.

7             **THE COURT:**  Well, that is kind of important.  I mean,

8   are you saying that they are from a certain agency where

9   everyone has a clearance, or are they from somewhere else?

10     I mean, my impression was -- are you saying that they

11  worked for the government before January 20th, 2025?

12            **MR. GARDNER:**  I can't say they worked for the

13  government before January 20th, 2025, but I do know that they

14  were specifically detailed from other agencies --

15            **THE COURT:**  Why is that helpful, then, as a fact?

16  Because, I mean, first of all, my understanding is they could

17  be a staff of DOGE, but a lot of times with these White House

18  offices, they -- for HR purposes, they have an agency.  But

19  when you're detailed, you are still taking orders from whoever

20  you are taking orders from.  So why is that relevant?

21            **MR. GARDNER:**  Well, it's relevant for the exact

22  reason you said, that when those people on the DOGE team are

23  detailed over to USAID, they are taking orders from USAID

24  employees.  And I think that's exactly what the declaration we

25  provided from the person performing the responsibilities of the

1  acting deputy director shows.

2       **THE COURT:**  So why is it that we get a declaration

3  and there's really no documentation of anything in there?

4       I mean, again, it would be very easy to provide even just

5  the name of the agency where these individual work --

6  individuals work.  But you're saying, you know, you don't know.

7  So somehow no one knows where they are from, but you know they

8  are from another agency.

9       And then, you know, Mr. Marocco says every decision was

10  approved by the Secretary.

11       I've got no documentation, either a letter, an e-mail or

12  anything showing that the Secretary approved anything.

13       **MR. GARDNER:**  Right.  So a few points, Your Honor.

14       One, and this is not to garner sympathy, but I think this

15  is important just that everyone understands the context here,

16  since January 20th, we have received, I think, approximately 80

17  lawsuits.  And our staff at the federal programs branch has

18  been cut in half.  We have about half the number of staff that

19  we had in the beginning of November.

20       And we are working on very expedited schedules on all of

21  these cases, including yours.  And I just say that to you --

22       **THE COURT:**  Well, Mr. Marocco could have provided you

23  more.  It wouldn't have taken any extra work on your part to

24  say give me the documentation.  I mean, when -- you know, let

25  me ask you this question:

1    There was a RIF -- I mean, these termination -- the freeze

2    orders on contracts, the terminations of employees, placing

3    them on administrative leave, if it really was a decision by

4    USAID, there should be either a piece of paper or at least an

5    electronic message from the Secretary, from Secretary Rubio

6    himself, saying "I'm approving this," or Mr. Marocco to the

7    extent that he had the authority.

8        Mr. Marocco would have had access to anything he signed.

9        So why do we not have any of that?

10       **MR. GARDNER:**  Well, again, I was trying to get to

11   that, Your Honor, and I'm trying to be obsequious.  We are

12   doing the best we can to get as much information as short a

13   period of time as possible.  And honestly, Your Honor --

14       **THE COURT:**  So you're saying the Justice Department

15   isn't taking this case seriously, they are not staffing it

16   sufficiently?

17       **MR. GARDNER:**  Quite the opposite.  We -- Your Honor,

18   I've not had a day off work since January 20th, and none of my

19   colleagues have either.  We are working day and night to

20   support -- so we're taking this seriously.

21       **THE COURT:**  I understand.  I understand.  I mean,

22   again, you know, you're cutting people all across the

23   government.  So if you're saying you don't have enough people,

24   maybe that's part of the problem.

25       **MR. GARDNER:**  I'm not trying to disagree with that,

1    Your Honor.

2         **THE COURT:**  I mean, and if USAID can't respond to

3    lawsuits, then maybe they need more people.

4         **MR. GARDNER:**  All I can tell you, Your Honor, is I'm

5    trying to be as transparent and forthcoming as possible, giving

6    you as much information as I can under, you know, a very

7    truncated schedule.  And, look, if there's more --

8         **THE COURT:**  Could you provide any of these things on

9    a truncated schedule now that you know they might be relevant?

10        **MR. GARDNER:**  I can certainly go back.

11       But I will say this, Your Honor.  Even if there's

12   additional information out there, I do think the record, as it

13   currently exists, is certainly clear enough to resolve the

14   legal question.

15        **THE COURT:**  It could be.  But, I mean, in the

16   conference you gave the very strong impression that the United

17   States government would provide some additional information in

18   the way of informal discovery to help get everyone on the same

19   page on these issues.  And it sounds like the government didn't

20   provide anything.

21       And so, yes, at this point, you have a declaration, and

22   they have circumstantial evidence, but they did ask for more

23   and there was time to get more.

24       Again, it wouldn't be that hard for Mr. Marocco to have

25   given the backup for all the decisions he approved, if he

1    approved any of them.  And the fact that we don't have that is

2    questioning -- I mean, it creates question.

3        So, you know, why couldn't that be obtained or why

4    couldn't that be obtained in the next few days?  I mean, it

5    seems as if, you know, your side has set the playing field in a

6    way that it's tilted, and it can't be undone -- or it could be

7    undone, if you are willing to allow it to be.

8        **MR. GARDNER:**  Well, I mean, look, I guess what I

9    would say to that, Your Honor, is plaintiffs have a burden of

10   proof to show that they need a preliminary injunction now.  We

11   do not think they've met that burden.

12       The next step would seem to us to be to deny the motion

13   for preliminary injunction, engage in motions practice, and

14   then ultimately, if the Court concludes the case should go

15   forward, to --

16       **THE COURT:**  It seems to me on this case, I mean, the

17   way I look at it, if we do -- and I'm not saying I will, but if

18   I end up addressing the merits on this motion, that's basically

19   the motion to dismiss.  We're not going to do this twice.

20       You know, if I find a likelihood of success, implicitly

21   I've found that there's no basis to dismiss.  And if I don't, I

22   think I can make it clear whether I think it meets the -- that

23   standard.

24       So we're not going to drag this out for years through

25   motions to dismiss and things like that.  We would probably

1  start discovery in parallel even if there were motions to

2  dismiss.

3      I know there's another case in another district in

4  which -- and, again, I asked the plaintiffs if they wanted

5  this, and it wasn't clear they did, but they were doing

6  discovery before the ruling on the motion.  And that happens in

7  certain cases, expedited discovery before a preliminary

8  injunction motion is ruled upon.  And so do you have any

9  objection to that?

10         **MR. GARDNER:**  Well, so I think you're referring to

11  the New Mexico case before Judge Chutkan?

12         **THE COURT:**  I think that's one of them, yes.

13         **MR. GARDNER:**  That's my case, one of many.

14         **THE COURT:**  So how hard would it be, then, since

15  you're getting discovery in that case?

16         **MR. GARDNER:**  Well, that's not necessarily the case,

17  Your Honor.  The way Judge Chutkan structured it is plaintiffs

18  could file a motion to seek discovery.  We would then respond,

19  and then the Court would take up whether or not discovery is

20  appropriate.

21      So I don't want to suggest that Judge Chutkan has already

22  allowed discovery to go forward because that's -- that's not

23  correct.  She has allowed plaintiffs the opportunity to make

24  the case why they need discovery.

25      Our response to that is due today, actually, and then our

1  motion to dismiss is due next week.

2  **THE COURT:**  Well, I mean, it seems to me there's

3  clearly a need for discovery, it's just a question of when,

4  right?  I mean, I saw you nodding when I was talking to the

5  plaintiffs about, you know, isn't this a factual dispute about

6  what happened.  And that usually means we need discovery.

7  So -- so, I mean, I guess your position, obviously, is

8  that you're not willing to provide anything now, is that what

9  it is?

10  **MR. GARDNER:**  Well, I would certainly have to go

11  back, Your Honor, and consult with my client.  I don't have the

12  authority to tell you that, yes, USAID is going to produce X,

13  Y, and Z.

14  But, again, I would emphasize that I do think on the

15  current record, the declarations are sufficient to allow you to

16  resolve the issues in the preliminary injunction.

17  **THE COURT:**  They might be sufficient, but if I said I

18  needed -- I'm not saying full-blown discovery, I needed a

19  certain number of documents that either have been referenced or

20  must exist based on what we have, would the government be able

21  to provide those?

22  **MR. GARDNER:**  Again, I have to go back.  I'm not

23  trying to be difficult with you, Your Honor, I just --

24  **THE COURT:**  What if it was an order from the Court?

25  **MR. GARDNER:**  Well, obviously we would follow all

1    lawful orders.  I would hope so at least, Your Honor.  That's

2    been my experience in the department.

3              **THE COURT:**  Okay.  So anyways, standing, you were

4    raising this issue of whether things can be traced back.  And,

5    I mean, there's a line of cases, I think you even cited one of

6    them, in which certainly the -- even if we accept the view that

7    there are folks at USAID who would have to -- well, maybe.  I

8    don't think the plaintiffs accept this, but if I were to take

9    the position that there were folks at USAID who could do the

10   things necessary to address some of the harms with some the

11   injuries, that if there is -- you could still have a scenario

12   where someone is able to, you know, be subject to suit because

13   they actually are in a position where whatever -- if they are

14   ordered to do something, it actually could impact the end

15   result.

16        And so, it seems to me, their theory is that Mr. Musk and

17   DOGE have such a -- have such great influence over what's

18   happening at USAID, particularly on these kinds of issues, that

19   if they were ordered to do something, that it would happen,

20   because everything else that they have asked to have happen has

21   happened, what's wrong with that reasoning?

22             **MR. GARDNER:**  It runs directly in contravention of

23   what Pete Marocco testified to in his declaration, that all the

24   actions challenged by the plaintiffs were taken by Secretary

25   Rubio or Mr. Marocco or USAID employees at their direction.

1  That's declaration, Paragraph 23.

2       And so --

3            THE COURT:  Isn't the point, though, that even if

4  they agree to do these things, if the whole way it happened

5  factually was that DOGE and Mr. Musk said we want these things

6  to happen, maybe even that the President wants these things to

7  happen, and so they complied, so they have a level of just

8  causative impact on what happens at this department, that yes,

9  I suppose if they had sued USAID, then USAID could be -- you

10 probably wouldn't have a good argument on standing as to them.

11 But even one level up the chain, again, under their theory,

12 that Mr. Musk has so much control over these issues, where

13 there's certainly evidence that they have -- had great

14 influence over the situation -- again, we're not talking about

15 even proximate causation, but the traceability standard is just

16 that there is some -- it was caused in part or the conduct is

17 caused in part by the defendant, I mean, that seems pretty

18 easily satisfied here.

19     And are you saying that you disagree with the idea that it

20 could be this intermediate party who has such influence, and

21 whatever they do has such influence over the final actor that

22 standing can exist under those circumstances?  That seems to be

23 their theory on these types of injuries.

24            MR. GARDNER:  Well, and I will say, that theory is

25 based wholly on circumstantial evidence, which, again, if they

1  have got the burden to establish standing, it seems to me that

2  they cannot establish standing based on a circumstantial theory

3  that Elon Musk wielded and influenced in a very particular way

4  that's in contravention to what Mr. Marocco testified to.

5        THE COURT:  But aren't you asking us to -- again, I

6  mean, look, sorry to cut you off.  But *Equity Athletic*

7  *Incorporated* from the Fourth Circuit, 639 F.3rd 91, I mean, as

8  I understand it, I'm supposed to assume that the merits will be

9  resolved in favor of the party invoking it -- invoking or

10  bringing this case.  And then I have to look at that situation

11  and say could be this redressed.

12       And if I assume, as they have alleged, that Mr. Musk has

13  this kind of influence, then I'm not sure why the harm couldn't

14  be addressed.

15       MR. GARDNER:  I view the Fourth Circuit's decision in

16  *Equity* as addressing the question on a motion to dismiss

17  accepting as true the factual allegations, and that is

18  certainly the case.

19       But on a motion for preliminary injunction, where

20  plaintiffs have the burden, both, of showing all four factors,

21  including likelihood of success on the merits, and the burden

22  to show standing, we do believe that plaintiffs need to show

23  that, in fact, there is something that was caused by the

24  defendants that can be redressable by the courts.

25       And even if you took away the burden, the fact that we

1  have put on affirmative evidence, that they have not been able

2  to refute with any actual evidence of their own, supports the

3  conclusion that they cannot show causation of redressability.

4       **THE COURT:**  What about the President's statement that

5  he put Mr. Musk in charge, and that they are shutting down

6  USAID, and that Mr. Musk had that discussion with him?

7       And there was nobody from USAID in any of those

8  discussions.  I mean, that seems to counter what Mr. Marocco

9  says.

10      **MR. GARDNER:**  Right.

11      **THE COURT:**  Should I believe the President or should

12  I believe Mr. Marocco?

13      **MR. GARDNER:**  So I would never stand before this

14  Court and tell you what I understand the President or any other

15  public official to mean when they say what they say.  That is

16  not what I'm here to do.

17      **THE COURT:**  But, again, it's evidence.

18      **MR. GARDNER:**  Yes.

19      **THE COURT:**  I mean, these are facts.

20      **MR. GARDNER:**  Yes.

21      **THE COURT:**  So it could be viewed different ways.

22      And why isn't that a fair inference, that Mr. Marocco may

23  say that he signed on the dotted line, but these other actors

24  are the ones making these decisions, or at least that's what

25  they are saying themselves?

1          **MR. GARDNER:**  Right.  And so I think for that, Your

2   Honor, I would take you back to the letter to senate

3   appropriations that Secretary Rubio submitted, that is, I

4   believe, Exhibit C to the Marocco declaration, and that shows

5   that what USAID is intending to do, or the State Department is

6   intending to do, is a reorganization in consultation with

7   Congress.

8      So I know there are news clippings saying that USAID is

9   going to be decimated or whatever --

10          **THE COURT:**  Well, Mr. Rubio's letter -- or Secretary

11   Rubio's letter specifically references abolishing the

12   department or the agency, which frankly is not -- again, as I

13   mentioned, is not in the appropriations statute as anything

14   that is even contemplated.

15      But he went beyond what's in the statute.  He referenced

16   abolishing the agency, as has Mr. Musk, as has the President.

17   They have all talked about shuting it down, either that it has

18   been shut down or it will be.

19          **MR. GARDNER:**  Right.

20          **THE COURT:**  So how am I supposed to read that as a

21   reorganization?

22          **MR. GARDNER:**  Well, I don't read his letter, unless I

23   am misremembering it, as saying that the Secretary of State

24   intends to shut down USAID.  I understood him to say we need to

25   consult with you for a reorganization.  And I could be

1  misremembering --

2          **THE COURT:**  The very last line, "The remainder of the

3  agency may be abolished consistent with applicable law."

4          **MR. GARDNER:**  It doesn't say, though, that it will,

5  right?  I mean, that's -- I think it's saying it may be.

6  That's a possibility.  But I don't think that is a conclusion.

7          **THE COURT:**  Well, it also says it may move and

8  reorganize and so forth.

9      And, again, you take his statement of at least conditional

10 intent along with everything the President, Mr. Musk has

11 said --

12         **MR. GARDNER:**  Right, right.

13         **THE COURT:**  A wood chipper usually isn't a

14 reorganization, as far as I recall.

15         **MR. GARDNER:**  I don't even know what that means, Your

16 Honor.  I saw the same thing that plaintiffs saw.  I read the

17 news.  But I --

18         **THE COURT:**  I mean, to me, it says that they are

19 shutting the agency down.  What other -- what other

20 interpretation would you give me?

21         **MR. GARDNER:**  I'm not going to interpret what public

22 officials say outside of litigation.  I can't do that.

23         **THE COURT:**  Well, that's part of the litigation.

24 These are statements by a party opponent.

25         **MR. GARDNER:**  They are, but they are public

1  statements, they are subject to cross-examination or

2  deposition.  So again, I --

3          THE COURT:  They may be later in the case.

4          MR. GARDNER:  Perhaps.  And when we get to that later

5  it the case, and it's the kind of evidence that is, you know, I

6  think credible --

7          THE COURT:  My point is this, is again, I mean, if

8  you're acknowledging that we have -- we don't have those

9  opportunities, why aren't those statements relevant for

10 analyzing whether it's redressability or the merits, or

11 anything else, you're saying I can't consider those?

12         MR. GARDNER:  I didn't say you can't consider them.

13 I just think that in terms of circumstantial evidence, it's not

14 particularly powerful when you line it up with the actual sworn

15 declarations that we provided in this case.  So I think, you

16 know --

17         THE COURT:  So you're saying that Mr. Marocco, to the

18 extent I think it's inconsistent, he's contradicting the

19 President and Mr. Musk.

20         MR. GARDNER:  I'm not sure there's a conflict.

21         THE COURT:  I mean, I think there is.  You're telling

22 me to believe Mr. Marocco and not the President?

23         MR. GARDNER:  I'm telling you that Mr. Marocco has

24 provided a statement under oath to this Court, and there's no

25 reason to think that that's not correct.

 1          **THE COURT:**  Okay.  Let's move past standing.  I'm not

 2   really that concerned about standing.

 3          **MR. GARDNER:**  Yes.  Understood.

 4          **THE COURT:**  Appointments clause.

 5          **MR. GARDNER:**  Yep.

 6          **THE COURT:**  So as we said, there's some factual

 7   issues here that obviously can't be completely sorted out.

 8      But let me ask you, your theory on -- I understand the

 9   concept that you're saying, well, so long as Mr. Marocco or

10   someone else from the agency signs off on it, rubber stamps it,

11   whatever you want to call it, that there's no violation, and I

12   understand the concept there, but is there any authority or

13   case law or anything else that bolsters that theory?

14      I know there's -- it's a relatively thin body of law on

15   this issue.

16          **MR. GARDNER:**  Right.

17      And I want to answer your question directly.  So the

18   answer is, I'm not aware off the top of my head, but I think

19   the reason is that these issues often show up, and I think you

20   alluded to this, typically in the context of things like ALJ

21   and quasi-judicial bodies.  And I think the key here, and the

22   D.C. Circuit's decision in *Landry* really drives this point

23   home, that in order to have an appointments clause issue, there

24   has to actually be an office established by law, i.e., by

25   Congress.

1        And I think that's what makes this case so different than

2   the cases my colleagues on the other side were talking about,

3   right?  Because the reason why you don't conclude that senior

4   advisors to the White House, White House counsel, and those

5   kinds of positions are subject to the appointments clause is

6   because those are not positions that Congress has established.

7   Those are positions that are internal to the White House.

8        And I think the *Landry* case in the D.C. Circuit really

9   drives that point home.  And plaintiffs have not cited to a

10  single appointments clause case that concluded that someone

11  that was not the subject of a congressionally created position

12  has somehow violated the appointments clause.

13           **THE COURT:**  But no one has rejected that theory

14  either.  I mean, frankly, I'm not sure this has ever happened

15  before.

16       So -- but you're saying it's kind of an open field, or are

17  you saying there's something that forecloses that argument that

18  you can identify?

19           **MR. GARDNER:**  Well, I think the *Landry* decision from

20  the D.C. Circuit -- and Court's indulgence.  The D.C. Circuit

21  decision is 204 F.3d 1125, the D.C. Circuit in 2000.  And what

22  that decision says, as I read it, is that one of the

23  preconditions to triggering the appointments clause is to have

24  a position that is established by law, i.e., by Congress.

25       And here, I don't think there's any dispute between the

parties that a senior advisor to the White House is not a
congressionally created position.

So am I telling you that *Landry* completely forecloses this
argument?  I am not sure I would go that far.  But I think it
is a precondition to the appointments clause, and that
precondition is clearly not satisfied here.

**THE COURT:**  Okay.  So would you agree -- and, again,
I know you're not going to agree with this factually, but if --
assuming for the sake of argument that Mr. Musk was -- caused
the shutdown of USAID, or someone, even if you just make it a
hypothetical person, would that person be exercising
significant authority?

**MR. GARDNER:**  If they -- if they were personally
responsible for shutting down a complete agency --

**THE COURT:**  Yes.

**MR. GARDNER:**  -- is that the --

**THE COURT:**  Yes.

**MR. GARDNER:**  I think I would --

**THE COURT:**  I mean, ordering it or something, or
causing it to happen by their own direction.

**MR. GARDNER:**  Right, right.  Right.

I think the problem there with the hypothetical is it's
slightly incomplete because that person who would be doing the
ordering would also need to hold a continuing position.  And I
think that's --

1          **THE COURT:**  Well, no, but I said significant

2    authority.  I didn't say it was an appointments clause.  That's

3    the first problem.

4          **MR. GARDNER:**  No, no.  I understand.  Just to

5    complete the hypothetical.  While it may satisfy one of the

6    preconditions to the appointments clause, without more

7    information, it wouldn't satisfy the second.

8          **THE COURT:**  I mean, do you agree that the continuing

9    office issue doesn't necessarily mean it's a 200-year-old

10   office, like Secretary of State?

11         **MR. GARDNER:**  Of course.

12         **THE COURT:**  I mean, these independent counsel are --

13   don't seem particularly continuing, but the courts have found

14   that they were continuing.

15         **MR. GARDNER:**  Right.

16      And I think the big difference between -- I think you're

17   talking about *Morrison v. Olson*.  And this case -- remember, in

18   *Morrison v. Olson*, one, the special -- the independent counsel

19   was a position created by Congress; and two, it wasn't personal

20   to Mr. Morrison.

21      Remember what happened in *Morrison v. Olson* was there was

22   an independent counsel before Mr. Olson, I believe his name was

23   Mr. McKay.  And that's one of the big defining differences

24   between what's going on here and what happened in *Morrison*.

25      I don't think there's any dispute that the reason why

1    Mr. Musk is a senior advisor of the President is because he's

2    Mr. Musk.  And I don't think there's any --

3              **THE COURT:**  Well, isn't that a factual issue?

4       So, going back to the other one, I mean, I agree with you,

5    there's a distinction there, but wouldn't the very first

6    independent counsel, if one really analyzed it correctly, still

7    be deemed to be in a continuing office even though they weren't

8    the second, they were the first?  So --

9              **MR. GARDNER:**  Yes.  But the point of that position,

10   Your Honor, is that when you have additional people filling the

11   role, it's not personal to the person, and that's the defining

12   difference with a continuing position.

13             **THE COURT:**  But the executive order about DOGE

14   doesn't say this is about Mr. Musk.  It creates an entity, and

15   I guess we've been now told there's an acting administrator who

16   is not even Mr. Musk.

17      So it seems like the entity is not -- I mean, I know you

18   have a dispute over whether he's actually part of DOGE, that

19   he's off to the side as a senior advisor having nothing to do

20   with DOGE, which seems factually inaccurate when you look at

21   everything they have been saying publicly.

22      But if -- the point is, the DOGE operation seems to be an

23   entity not just a personality, because there's another person

24   in a role there, the executive order doesn't define it by

25   person, it defines it as a concept with a function.

1              **MR. GARDNER:**  Right.  So I think maybe we need to

2     take this one step at a time.

3          We've got Mr. Musk and whether he's an officer under the

4     appointments clause, and then we have whether the DOGE itself

5     somehow is violative of the appointments clause.  And so I can

6     address each of those in turn.

7              **THE COURT:**  Either way.  I mean, again, you create an

8     office of an independent counsel -- I haven't looked at the

9     documents that establish those things and examples from the

10    cases, but I would imagine they didn't name a person.  They

11    said we need somebody to do this independent counsel function.

12             **MR. GARDNER:**  Right.

13             **THE COURT:**  And that's part of the argument why it's

14    a continuing office even though somebody might have -- it's not

15    an office in perpetuity.

16         But, again, the document that created the DOGE

17    organization doesn't seem similar, it describes a function that

18    needs to be done even on a temporary basis.  And so there's

19    that.

20         And then, again, it seems as if the way it's operating,

21    the person running that is at least doing some pretty

22    significant things.  I'm not going to say significant

23    authority, but doing some significant things.

24             **MR. GARDNER:**  So, again, I just want to make sure

25    we're not conflating things.

1          There's nothing in the executive order that names Mr. Musk

2   as a senior advisor to the White House.  Right?

3               THE COURT:  Or -- or the head of DOGE or anything

4   else.

5               MR. GARDNER:  Because he's not the head of DOGE, Your

6   Honor.

7               THE COURT:  Who was the head of DOGE before

8   Ms. Gleason?

9               MR. GARDNER:  I can't answer that.  I don't know.

10              THE COURT:  I mean, that seems like such a knowable

11  fact, though, doesn't it?

12              MR. GARDNER:  I am sure it is knowable, I just don't

13  know it.

14          And, again, I'm very conscious about being very accurate

15  with all courts, and I just can't make a representation to

16  you --

17              THE COURT:  Have you asked anybody?

18              MR. GARDNER:  I have not asked.

19              THE COURT:  So, again --

20              MR. GARDNER:  Actually -- strike that.  Strike that.

21  That is untrue.

22          I have asked previously and I was not able to get an

23  answer when I previously asked.

24              THE COURT:  Okay.  I mean, are you saying there was

25  somebody or that there was nobody until this new person was put

1  in?

2         MR. GARDNER:  I'm not saying either way, because I

3  don't know.  And I'm not trying to be difficult with you, and

4  I'm not trying to frustrate you, I just want to be precise and

5  accurate with you about what I know and what I don't know.

6         THE COURT:  So is there a piece of paper that -- you

7  know, an appointment paper, one of those -- I mean, I think you

8  work in the federal government, you've seen these before, where

9  maybe it's SF-50, I'm not sure, that says you've got this job

10  now.

11     Is there one that says Elon Musk, Senior Advisor to the

12  President?

13         MR. GARDNER:  Sorry, let's just back up a step.

14     So now you're not talking about the DOGE administrator,

15  but you're now talking about Elon Musk?

16         THE COURT:  Well, I mean, they are disputing -- they

17  are saying he was the head of DOGE.  You're saying he wasn't

18  but we can't tell you who was.

19         MR. GARDNER:  Right.

20         THE COURT:  Which, admittedly, is highly suspicious.

21  I'm not saying that you're not being candid, but just the whole

22  operation, it raises questions.

23     And so given that, again, there's an affidavit saying he's

24  the Senior Advisor to the President, but given that strange

25  disconnect, where he has always referred to himself in public

1  as affiliated with DOGE, and not as a Senior Advisor to the

2  President, until recently, after these lawsuits were filed,

3  having some backup documentation for that would seem to be a

4  useful thing.

5         **MR. GARDNER:**  I understand, Your Honor.

6      I will say the Fisher declaration goes further.

7         **THE COURT:**  I was asking, does that document exist?

8         **MR. GARDNER:**  And, again, I'm not trying to frustrate

9  you, I don't know the answer to that.

10     But I will just very quickly tell you that the Fisher

11 declaration goes further than that, right?

12        **THE COURT:**  Okay.

13        **MR. GARDNER:**  The Fisher declaration says, if I

14 recall correctly, that Mr. Musk, not only is he a senior

15 advisor employed by the White House, but he is not employed by

16 the DOGE and he's not the DOGE administrator.

17     So I think it does more than just simply say where he

18 works, it also says where he does not work.

19        **THE COURT:**  Okay.  I think that's a fair point.

20     So I asked if you could provide any records showing who

21 actually ordered the shutdown of the USAID -- maybe not these

22 specific things, but key facts, you know, who ordered the

23 shutdown of the USAID office, the removal of the sign, taking

24 down the website.  Is there anything that shows on paper or

25 electronically who actually made that decision?

1          **MR. GARDNER:**  Yeah, I -- I can certainly take that

2    back, Your Honor.  I just don't know the answer.

3          **THE COURT:**  Or placing everyone -- placing on leave

4    or terminating USAID employees or terminating contracts and

5    grants.  I mean, is there someone -- is there something that

6    shows who made those decisions?

7          **MR. GARDNER:**  Well, certainly -- and I don't just

8    want to repeat myself, but certainly the Marocco declaration

9    expressly says that all the decisions challenged in this case

10   were done either by Secretary Rubio, Mr. Marocco, or those

11   acting under their authority.

12         **THE COURT:**  There would be nothing wrong with getting

13   those documents, right?  They are final decisions, they are not

14   deliberative.  You just have a final thing saying, yes, go

15   ahead and terminate these people.

16         **MR. GARDNER:**  Again, I am not trying to be difficult,

17   Your Honor.  I certainly would have to take that back to my

18   clients to see where those documents are and what we can do

19   about that.  I can't make a representation here without talking

20   to my clients.

21         **THE COURT:**  Okay.  But going back to my earlier

22   question, though, leaving aside the continuing office issue,

23   would you agree that if someone in the executive branch shut

24   down USAID, or some other federal agency, that would be a

25   significant -- an act of significant authority, would you agree

1    with that?

2         **MR. GARDNER:**  I would concede that that action would

3    be significant.

4         **THE COURT:**  Okay.  So it really does come down to

5    some factual questions about who actually did that, things like

6    that?

7         **MR. GARDNER:**  I mean, again, Your Honor, I do think

8    the declarations answer those factual questions.  I understand

9    that you want the receipts.  I understand that.

10        I do think, though, that the evidence under oath does

11   answer those questions.  And if you think that there are

12   fact --

13        **THE COURT:**  And I wouldn't -- in an ordinary case,

14   I'm not -- I wouldn't disagree with you necessarily, but,

15   again, we have these public statements by the people involved

16   that seem to contradict his statement.  And so it creates, at a

17   minimum, some confusion over here, so --

18        **MR. GARDNER:**  I understand your point, Your Honor.

19        I think the answer, then, if that is the case, is to deny

20   the motion for preliminary injunction and then we proceed on --

21   you know, as the Court thinks is appropriate.

22        But it strikes me that if there is this real confusion,

23   based particularly on circumstantial evidence, the answer is

24   not to grant the preliminary injunction.

25        **THE COURT:**  I mean, I thought one option was to get

1  the records, but it sounds like you're not willing to commit to

2  that.  So that is unfortunate, but --

3          **MR. GARDNER:**  Your Honor -- I'm sorry, I didn't mean

4  to interrupt you.

5      You have to understand my position, I have to talk to my

6  clients.

7          **THE COURT:**  I do understand your position.  I don't

8  mean to be difficult.

9      So -- okay.  So then would you agree that terminating -- I

10  don't actually know the exact number, but it's a pretty big

11  number, terminating or placing on leave the personnel that have

12  to date -- again, if one person made all those decisions, would

13  that be significant authority?  Again, assuming.  I'm not

14  saying that you have to concede that point at all.

15          **MR. GARDNER:**  You know, and I'm not trying to be

16  difficult with you, Your Honor.  I think it would depend on the

17  magnitude.  I think if we're talking one or two people, it's

18  not clear to me that that is significant authority.

19          **THE COURT:**  Sure.  I don't -- I agree with you on

20  that, but --

21          **MR. GARDNER:**  I think 90 percent of an agency, I

22  think that might be possible.  I am not sure we have ever seen

23  any cases that try to qualify --

24          **THE COURT:**  Sure.

25          **MR. GARDNER:**  -- or quantify, I should say, what

1  level of employment actions would be necessary to create

2  significant action under the appointments clause.  So I think

3  we're all sort of flying blind here.

4       But --

5            **THE COURT:**  Sure.

6            **MR. GARDNER:**  -- I would think it stands to reason

7  that the larger the numbers, the more likely it could be deemed

8  significant.

9            **THE COURT:**  So 50 percent?

10            **MR. GARDNER:**  I couldn't stand here and give you a

11  number, and I don't think there's any case that would give you

12  guidance on that.

13            **THE COURT:**  What about contracts, same thing,

14  different analysis?

15            **MR. GARDNER:**  I mean, the government --

16            **THE COURT:**  Terminating all the contracts versus

17  some, versus one or two?

18            **MR. GARDNER:**  I think, again, there's no case that

19  I'm aware of that would indicate what magnitude of contract

20  cancellation would constitute significant power.  But I do,

21  again, as a reasonable person, think that there comes a point

22  in time where that magnitude gets so great that it could

23  reasonably be concluded that --

24            **THE COURT:**  Okay.  So there could be a number, you're

25  not sure what it is, and I understand nobody really does.

1          **MR. GARDNER:**  I don't think anybody knows what it is.

2          **THE COURT:**  So far.  Okay.  Yes, I understand.

3      And then what about freezing all contract grant payments

4  either basically a hundred percent, but maybe not exactly, a

5  few exceptions, but pretty close to all?

6          **MR. GARDNER:**  Again, same --

7          **THE COURT:**  Significant authority?

8          **MR. GARDNER:**  Same answer, Your Honor.  I think it

9  depends on the magnitude.  We have no case law to support, you

10  know, what threshold that would be.  But at some point, it

11  stands to reason that if you freeze all contracts within an

12  agency, that would be an exercise of significant authority.

13          **THE COURT:**  And in this case, that's actually

14  happened, right?  Or at least --

15          **MR. GARDNER:**  Well, I'm not sure --

16          **THE COURT:**  Again, I'm not saying I know who did it,

17  but that freeze did happen?

18          **MR. GARDNER:**  My recollection -- and, again, I want

19  to make sure I'm being very accurate here, is I believe that

20  some of those contracts have been unfrozen and are now back in

21  place.  That's my recollection.

22          **THE COURT:**  Right.  I mean, I think it was either a

23  hundred percent, and then a few were taken away, or is

24  90-something percent with a few exceptions to avoid

25  100 percent.  But it was pretty darn close, wasn't it?

1          **MR. GARDNER:**  So I don't recall, and I don't want to
2     speculate.

3          But what I will say, though, again, is -- and you may not
4     give him credit, but Mr. Marocco says those decisions were made
5     by him.

6          **THE COURT:**  No, I understand.

7          But I'm just trying to see where -- where there's a
8     dispute among the parties and where there isn't.  It sounds
9     like there's not really a dispute that, you know, the freeze
10    order would be significant authority, but there's obviously a
11    big dispute about who made that decision.

12         Is that fair?

13         **MR. GARDNER:**  I think that is fair, Your Honor.

14         **THE COURT:**  Okay.

15         **MR. GARDNER:**  I do.

16         **THE COURT:**  Okay.  Do you have a reaction to the
17    Federal Vacancies Reform Act discussion in the reply brief?

18         **MR. GARDNER:**  I do.

19         **THE COURT:**  I know that was in the reply brief, so
20    you didn't not write anything on it.

21         **MR. GARDNER:**  I do.  And as Your Honor noted, the
22    first time this issue is raised, in the reply brief.  And I
23    would also note that USAID is not a defendant to this case.

24         But putting those two sort of threshold issues aside, this
25    argument fails on the merits.

1      The Federal Vacancy Reform Act is concerned with those

2  holding certain titles.  And plaintiffs mistakenly claim that

3  Mr. Marocco was the Acting Deputy Director of USAID.  But

4  that's not factually correct, as reflected in that February 3rd

5  letter that Secretary Rubio sent to the Senate Appropriations

6  Committee delegating Mr. Marocco the authority to perform the

7  duties of the Deputy Administrator of USAID.

8      In other words, just to be clear about this, Mr. Marocco

9  does not hold the title of Acting Deputy Administrator, rather

10  he is performing the duties.

11          **THE COURT:**  No, I understand the distinction.

12          **MR. GARDNER:**  And that's a distinction that --

13          **THE COURT:**  Sadly, we have cases where this sort of

14  thing has come up, so I understand the distinction.

15          **MR. GARDNER:**  Yes.  And that distinction has massive

16  legal significance, because plaintiffs cite to no authority

17  that appointing someone to serve the duties of a position that

18  is subject to the Federal Vacancy Reform Act must itself

19  satisfy the Federal Vacancy Reform Act.  And case law seems to

20  be to the contrary.

21      So one case I can give you, Your Honor, is a case called

22  *Arthrex v. Smith & Nephews, Inc.,* a case from the Federal

23  Circuit, 35 F.4th 1328 from 2022.

24          **THE COURT:**  Okay.  Well, I think their point, if I'm

25  not mistaken, was perhaps it was to refute his assertion that

1    he approved all of these things, and saying that if he did, it

2    wasn't legitimate.

3        But we're still back to our original dispute of whether it

4    was Mr. Musk or his people, or whether it was Mr. Marocco and

5    his USAID people who are actually making these decisions as a

6    factual matter.

7        You're just saying that the claim that if I conclude that

8    he did make those decisions, but somehow we can't consider

9    those because of the FVRA, that that would be not legally

10   correct?

11            **MR. GARDNER:**  That is correct, Your Honor.

12       I understand -- and plaintiffs can obviously speak for

13   themselves better than I can speak for them, but my

14   understanding is their argument is that even if Mr. Marocco had

15   made these decisions, he did so unlawfully because he's

16   violating the Federal Vacancy Reform Act.  And our point is, he

17   has not violated it because he's performing the duties of

18   rather than actually being the acting deputy.

19            **THE COURT:**  So there is no deputy or acting deputy

20   right now, correct?  Just the way --

21            **MR. GARDNER:**  I believe that's correct.  I believe

22   it's just Mr. Marocco serving the duties of the acting deputy.

23            **THE COURT:**  Okay.  So on the separation of powers

24   issue, I asked some of these questions of your counterpart, and

25   while you take different -- you're in different places in this

1  case, some of these I'm thinking there may be some agreement

2  on.

3      Do you agree that shutting down and terminating an agency

4  is congressional, that that's congressional authority and not

5  executive authority?  I mean, again, I'm not -- you may

6  disagree on whether that's happened yet, but do you agree that

7  that would be something that the President can't do

8  unilaterally?  Or the executive branch?

9          MR. GARDNER:  I think I would say it this way, Your

10  Honor, just to be careful, I want to be thoughtful about this,

11  I think in a circumstance where Congress has created an agency

12  by statute, I don't think the President could unilaterally

13  completely eliminate that agency.

14          THE COURT:  And is that -- isn't that where we are

15  here?  I mean, there is a statute that established USAID.

16          MR. GARDNER:  Well, again, I think I fight the

17  premise that USAID has been completely dismantled.

18          THE COURT:  I agree.  I think that's a factual

19  question.

20          MR. GARDNER:  Yeah.

21          THE COURT:  But, again, just as a legal question,

22  if -- I mean, I'm just trying to understand sort of where the

23  disputes on the spectrum of, you know, what actions might be a

24  separations of power violations and what might not be.  And

25  that one seemed to be furthest over to the side of this really

1    is something only Congress can do.

2         **MR. GARDNER:**  Right.  I mean, I think the problem,

3    Your Honor, is, one, as my colleague on the other side

4    acknowledged, part of their separation of powers argument

5    simply collapses in the appointments clause argument.  So I'm

6    not going to rehash any of that stuff.

7         **THE COURT:**  Right.  And I don't think -- I don't

8    think there's anything wrong with that argument, but I think

9    the ground that we covered relates to that.

10        **MR. GARDNER:**  Agreed.  I didn't mean to interrupt

11   you.

12        **THE COURT:**  Sure.

13        **MR. GARDNER:**  But then the second piece of it, it

14   seems like a large piece of their separation of powers argument

15   is that the executive branch is violating congressionally

16   enacted statutes.  And that really is just an ultra vires claim

17   more than anything, rather than a true separation of powers

18   claim.

19        And so to the extent they are saying that, you know, USAID

20   or the defendants did something that's in violation of an

21   operative statute, that's not really a separation of powers

22   claim as it's traditionally conceived, that's just the

23   executive branch violating a federal statute.  That's ultra

24   vires.

25        **THE COURT:**  Well, no, I mean, they reference the

99

1   statutes.  I mean, I understand -- I mean, they reference

2   *Youngstown* as well.

3       As I understand the argument, and I think you would

4   probably agree with this, is that whether it's violating a

5   statute or not is at least relevant evidence on the question of

6   whether there's a violation of the separation of powers.  It

7   puts you into, arguably, one of these various categories under

8   *Youngstown.*  But it's not -- I mean, it's not dispositive one

9   way or the other, but it's something that we should be thinking

10  about.

11      But ultimately, the question is, whether the President can

12  do this.  And whether he's -- Congress has told him not to do

13  it in a statute or has told him he could do it, or somewhere in

14  between, is relevant, so we should talk about it.

15      But I'm not taking the view, and I'm not sure they are

16  either, that that's the be-all, end-all of their argument.

17          **MR. GARDNER:**  Right.  I mean, and look, we can

18  definitely talk about *Youngstown* and the fact that foreign

19  affairs authority is a shared authority between the executive

20  branch and Congress, and how that is, I think, negotiated or

21  shared.

22      But we are in that *Youngstown* -- sort of *Youngstown* 2

23  territory where there is shared responsibility and authority

24  under the constitution for foreign affairs powers, which

25  clearly the USAID falls into that category.

1        Now, what the metes and bounds are with that, we can

2    certainly have that discussion.

3        I think we already talked about completely shutting down

4    the agency, but I'm happy to answer any additional questions

5    you have about that.

6        **THE COURT:**  Sure.  On that front, there's a couple of

7    different ways to look at this.  It seems to me, along the

8    lines of my discussion with your -- with the plaintiffs, is

9    that, would you agree, and maybe this is similar to our other

10   colloquy, but certainly terminating an employee here or there,

11   or even a small percentage, or shutting -- terminating some

12   contracts, I'm not sure what statutes those violate.  They

13   might violate various personnel or contracting laws, but, you

14   know, again, that's not sufficient.  And I don't think they're

15   arguing, and I probably would not agree, that that is a

16   separations of powers violation.

17       But I think part of the argument here that they are

18   offering is that there's some point at which by terminating

19   enough people or terminating enough contracts, that one of two

20   things could happen.  One, is that it could effectively be

21   shutting down the agency overall, and again I'm not sure what

22   percentage or whatever gets you there, it's probably a

23   fact-based question.  But would you agree that stopping

24   contracts, grants, employees to the point that it effectively

25   shuts down the agency would be the same thing?  Or there's at

1    least a scenario you can see where that would be the same thing

2    as shutting down the agency.

3    **MR. GARDNER:**  I think this gets to a very difficult

4    question, Your Honor, and that is sort of on the one side,

5    thinking about the unitary executive and Article II authority

6    to control the workforce on the one hand, and then on the other

7    hand a federal statute which creates a federal agency.  And I

8    think this, you know, if we could spin out some hypotheticals,

9    we could probably get to a place where those two constitutional

10   prerogatives are in direct conflict.  How that conflict gets

11   resolved, we would be breaking some new ground, I think.

12   But I do think that is a very significant question that

13   this Court would have to resolve before concluding there's a

14   separation of powers violation.

15   **THE COURT:**  But then on -- I think they identify one

16   issue, which is maybe it's in the realm of a de facto shutdown

17   of the organization, and maybe there's some point at which you

18   get there.  Unclear what that point is.

19   The other argument they seem to offer in this regard is

20   that the -- by terminating all of these employees or these

21   contracts, they are basically impacting -- I mean, they are

22   going against Congress' authority with respect to, you know,

23   the power the person who has spending authority because they

24   are saying that Congress has appropriated this money.

25   And yeah, sure, maybe you terminated one person, and you

1    don't pay for that slot for a year, that happens.  But when

2    you're doing it on that scale, you're now going beyond what the

3    President can do.

4            **MR. GARDNER:**  Right.  And, again, I'm not trying to

5    repeat myself, I think that's what gets into the very authority

6    issue about Article II authority over the, you know, the

7    federal workforce plus the shared power over foreign affairs.

8    And I think you would have to balance both of those things

9    against, you know, the prerogatives of Congress in that shared

10   space.

11           **THE COURT:**  So -- okay.  So you agree, though, that

12   people can look at this differently and that there's at least a

13   legitimate argument to be made that at some point, you have so

14   reduced or stopped the spending that you are now potentially

15   violating Congress' authority as a matter of separation of

16   powers?

17           **MR. GARDNER:**  Again --

18           **THE COURT:**  Whether we agree on whether that happened

19   here yet --

20           **MR. GARDNER:**  Right.

21           **THE COURT:**  -- or not is a different question.  But

22   just legally --

23           **MR. GARDNER:**  Putting aside -- putting aside the

24   factual predicate of whether it happened or not, I think

25   academically, there could come a point in time where Congress'

1    prerogatives could trump the executive's prerogatives.  Now,

2    where that line is, no one knows.  I don't think there's a case

3    that's going to tell us that issue.

4         **THE COURT:**  Okay.

5         **MR. GARDNER:**  But I do think, though, that it goes

6    back to sort of the reason we're here today, is I'm not sure

7    that on a preliminary injunction motion based largely on

8    circumstantial evidence, this would be the perfect vehicle to

9    try to address that issue.

10         **THE COURT:**  Sure.

11         Now, you also mentioned the foreign policy power.  It

12    seems like a better use of that -- or that seems to come up

13    would be a better -- a better place for that to have a

14    significant role would be a question of whether the President

15    could or should send a certain amount of money for foreign aid

16    to a certain country or pull it back, under certain

17    circumstances, but here we're not necessarily talking about

18    that.  We're talking about, again, physically shutting down the

19    agency, terminating, you know, large swaths of the civilian

20    workforce, most of whom are not, you know, foreign service

21    officers doing anything foreign policy related.  I mean, can

22    you give an example of where the foreign policy power has held

23    sway in case law or otherwise where it wasn't about

24    interactions with foreign countries but just the operations of

25    an agency that happens to deal with foreign policy?  Because,

frankly, this is happening in most of the agencies around the government, many of the agencies around the government. It's not a very different playbook, so it sure looks as if this isn't about foreign policy, even though you can perhaps bring that into it.

But are there examples where you're just talking about civilian workforce or payments and you're not dealing with interactions with foreign governments, and yet that power is a significant factor?

**MR. GARDNER:** Right. So I think now that's not really talking about the foreign affairs power but the overall Article II powers to avoid waste, fraud, and abuse.

And the President has made a finding, as reflected in the EO, that he believes there is substantial waste, fraud and abuse within USAID. And that is based, again, on his, you know, Article II prerogatives to ensure, you know, that the workforce and federal government's money is being properly spent.

So it comes up in USAID both in terms of that structural Article II issue plus foreign affairs authority. But to your point about other agencies, I think there's that more general authority about ensuring that there is no waste, fraud, and abuse in various federal agencies.

**THE COURT:** Is there a case that identifies that as an Article II -- you know, a -- an iteration of Article II

1  power where they specifically say, well, that's sort of a

2  significant presidential authority?

3          **MR. GARDNER:**  Well, I think it's --

4          **THE COURT:**  Are you just taking about like, take-care

5  clause and things like that?

6          **MR. GARDNER:**  Right.

7          **THE COURT:**  Or do you have anything more specific

8  than that?

9          **MR. GARDNER:**  No, I think it's inherent in the

10  structure of Article II itself is that the President is

11  ultimately responsible for the operations, the efficient

12  operations of the executive branch.  And I don't think that's a

13  particularly controversial statement.

14      And so if we accept that proposition that it seems to

15  necessarily follow that if the President concludes that there

16  is waste, fraud, and abuse within an agency, he can take

17  actions under his Article II authority to remedy that concern.

18          **THE COURT:**  Okay.  And maybe -- my last question in

19  this area is sort of where we started, about -- you know, the

20  Secretary of State in the letter to Congress states that the

21  remainder of the agency after reorganization may be abolished.

22      Is that something -- do you agree that that's not

23  something that the Consolidated Appropriations Act, Further

24  Consolidations Appropriations Act contemplates as something

25  that the agency can do on its own, or that is even part of that

1  colloquy back and forth where, you know, everything else they

2  identify is what we're going to have discussions about is not

3  abolition, you agree with that?

4       **MR. GARDNER:**  So -- I'm not trying to not the answer

5  the question, but here is my understanding of things.

6       The reason to have this consultation process is to give

7  Congress, the appropriators, a seat at the table and to let

8  them respond to the plans of the executive branch.

9       And so if the appropriators reach a conclusion that they

10  disagree with the reorganization plans, then certainly, my

11  understanding is, they can express those to the executive, and

12  then they work that out through negotiations.

13       **THE COURT:**  But, again, the universe of things to

14  discuss seems to be in the statute, and abolishing the agency

15  is not one of them.

16       Do you agree with that?

17       **MR. GARDNER:**  Well -- well, I mean, I would say it

18  this way, I think that Secretary Rubio's letter invites

19  Congress to weigh in on the plan.  And if Congress thinks that

20  plan is inappropriate or invalid, the executive branch can, you

21  know, obviously start to have those conversations and take that

22  into account.

23       **THE COURT:**  Okay.  I know we had a significant

24  discussion with the plaintiffs about whether there's any

25  irreparable harm.

1      Is there anything that you heard from plaintiffs' counsel
2  that you disagree with factually about the state of play now?
3  Again, I thought there was going to be some effort to try to
4  address some of the needs of the particular plaintiffs.  I
5  don't know if there was anything beyond what the plaintiffs
6  said.  But --
7          MR. GARDNER:  Yeah.
8          THE COURT:  It didn't look like that much progress
9  had been made.
10          MR. GARDNER:  So here's what I did, Your Honor.
11  We've had a similar issue in -- before Judge Bennett in
12  Baltimore in the *Students for Fair Admission v. United States*
13  *Naval Academy* case, where the plaintiffs proceeded
14  pseudonymously.
15      And in that case, we entered into a protective order that
16  Judge Bennett approved to give us access to the plaintiffs'
17  names so that we could facilitate discovery.
18      I shared that protective order with counsel for the
19  plaintiff saying this was an approach that worked, and I would
20  suggest we do that.
21      Plaintiffs' counsel is concerned that anyone who is
22  related to the DOGE has access to this information.
23      And so I have been trying to work with USAID to try to
24  identify an individual who is not related to the DOGE that I
25  could assuage them would not jeopardize their information, and

1  that process is ongoing.

2         **THE COURT:**  But who would still be able to act on the

3  information in a favorable way?

4       **MR. GARDNER:**  Correct.  Exactly.  And that's been

5  sort of the sticking point now is, you know, obviously the

6  agency, as I think we've discussed a lot today, is undergoing

7  transition.  So trying to find a person who can facilitate that

8  that meets plaintiff --

9         **THE COURT:**  Why is that so hard if it's really -- if

10 USAID is doing everything, and DOGE is just advisory, why is

11 that hard?

12        **MR. GARDNER:**  Well, no, it's not hard, it's just

13 trying to find the correct person who has the technical ability

14 to do what it is that --

15        **THE COURT:**  But you could find a DOGE person without

16 any trouble, is that what you're saying?

17        **MR. GARDNER:**  No, I'm not saying that either.  I'm

18 trying to find a person first and foremost, and then once I

19 find that person, make sure that it's someone who is -- that

20 plaintiffs believe is appropriate.

21     So, look, I think we're going to get there, Your Honor.

22 I -- we've sort of been doing a lot of briefing in the past few

23 days, so it is a priority, it's just being overcome by a lot of

24 other priorities.

25        **THE COURT:**  So you don't -- so you don't disagree --

1  and I'm not saying there's any lack of good faith in trying to

2  do this, but practically speaking, you don't disagree with the

3  plaintiffs' position of where we are factually with these Jane

4  Does, John Does?

5          MR. GARDNER:  Well, I mean, I think I would emphasize

6  a few things.  And one, is I would draw the Court's attention

7  to Paragraph 15 of the Marocco declaration, whereas he

8  explained USAID is working diligently to restore access to any

9  employee or personal service contractor whose access was

10  terminated in error.

11     And we see through plaintiffs' only declarations that that

12  appears to be working.  Because if you look at the second

13  declaration of J. Doe 9, that's at 432 of the joint exhibits,

14  Jane Doe 9 states in Paragraph 6 of her -- or of their

15  declaration that on February 19th, they obtained access to some

16  of their USAID applications.  And on February 24th, they were

17  able to get the -- I believe it's pronounced Scry application

18  and work contacts back on their phone.

19          THE COURT:  Okay.  But leaving aside what people are

20  trying to do, to the extent that they are saying some things

21  haven't happened yet, you don't have any reason to doubt those

22  things at this stage?

23          MR. GARDNER:  Without having access to the named

24  plaintiffs, it is impossible for me to verify or to dispute.

25          THE COURT:  Okay.  No, I understand that.

1          **MR. GARDNER:**  And I would, I guess, just make a few

2    additional points, briefly, Your Honor.  I know I took up a lot

3    of time.  I want to respect your time.

4          **THE COURT:**  Well, for better or for worse, you've had

5    less than the other side, so you're free to it.

6          **MR. GARDNER:**  I will still try to be as brief as I

7    can.

8         I want to talk about their claim about the harm related to

9    the DOGE access of the databases.  I know the plaintiffs cited

10   to a recent decision from, I believe it's Judge Boardman on

11   this court, I'd refer this Court to another decision in the

12   D.C. District Court by Judge Moss.  That's the *University of*

13   *California Student Association v. Carter* case.  That's Docket

14   Number 25354, and the West Law citation is 2025 West Law

15   542586.

16        Like I said, it's the D.C. District Court from

17   February 17th of this year.

18        And as Judge Moss held in that case, to establish

19   irreparable injury due to an allegation of unlawful access, a

20   plaintiff must show that information will be made public or end

21   up in the hands of someone with no obligation to keep it

22   confidential.

23        And Judge Moss in that case rejected the argument made by

24   plaintiffs, which is similar to the argument made here, that

25   mere access to personal data by government employees who are

1  not formally authorized to view it without more creates an

2  irreparable injury.  He further stated that the concerns of the

3  risk of identity theft and further dissemination, pardon me,

4  was, quote, entirely conjectural.

5       **THE COURT:**  Let me ask you this, though, and again,

6  maybe it's different by agency, which agency was involved in

7  that case, do you know?

8       **MR. GARDNER:**  I do know.  That was -- Court's

9  indulgence, Your Honor.

10      It is the Department of Education.

11      **THE COURT:**  Okay.  So they are all a little bit

12  different.

13      But, I mean, we started by -- I asked you, you know, where

14  did these DOGE individuals who have the technical access, where

15  do they actually work officially, and you didn't know the

16  answer to that, despite trying.  I mean, have they signed

17  anything, or is there anything that shows that they --

18      **MR. GARDNER:**  Are detailed?

19      **THE COURT:**  Well, just --

20      **MR. GARDNER:**  Yes.

21      **THE COURT:**  That they have -- they have agreed not to

22  disseminate this any further, that they agree that they are

23  subject to whatever regulations may exist that prevent

24  government employees from disseminating any information?

25      I mean, there's really nothing -- we have nothing on these

1    individuals.  So, I mean, if you had told me, look, they have a

2    security clearance, showed me that document, or they have some

3    other access where they've, you know, agreed, committed to

4    certain guidelines or rules, but we don't really have anything

5    like that.  So that's why I was asking maybe we do.

6          MR. GARDNER:  Well, so I will say that the executive

7    order itself from January 20th, 2025, that's Executive Order

8    14158, expressly says that the USDS shall adhere to rigorous

9    data protection standards.  And that's in the executive order

10   itself.

11        I will also say --

12          THE COURT:  But what are those?

13          MR. GARDNER:  What are the data protection standards?

14          THE COURT:  Right.  And is there any evidence that

15   they are applying those at USAID?

16          MR. GARDNER:  So I can't answer that question.

17   That's not in the record.

18        But I do want to mention one point that I don't think I

19   did mention earlier, and that is the notion that it is somehow

20   unusual that certain DOGE team members who are detailed to

21   USAID are also detailed to other places.

22        I am loathed to testify, Your Honor, but last year I was

23   detailed to two separate organizations while still working at

24   federal programs.  It's not that unusual.  I worked for both,

25   you know, Special Counsel Jack Smith and Special Counsel Rob

1    Hur at the same time.  So the notion of doing multiple details

2    within the federal government, it's not unusual, in my

3    experience.

4         **THE COURT:**  Okay.

5         **MR. GARDNER:**  Or maybe I should say -- I should maybe

6    say it differently.  It's certainly not unheard of.  And I'm an

7    example of that.

8         **THE COURT:**  Okay.  No, I don't disagree with that.

9         But, again, I mean, is there any paperwork on, again --

10   normally, when you -- again, when you -- not everything is

11   classified.  In fact, my guess is most of this isn't.  But to

12   the extent that we've been told they are all these, you know,

13   concerns in general, even before this case, or this

14   administration, about information -- you know, personal

15   information that I have to assume that there is some process by

16   which people have this access are, you know, required to

17   acknowledge that they are going to follow certain rules, and,

18   again, we don't have any evidence of that.  In fact, it seems

19   as if the evidence seems to be this was an abrupt transition

20   where, you know, we have evidence that Mr. Musk, you know,

21   ordered people placed on administrative leave who refused to

22   give his people access, implying that they just took the access

23   against peoples' will, and therefore, they may not have gone

24   through the same training or commitment to follow certain rules

25   or anything like that.

1    So you don't have anything, I take it, that establishes

2    that they did commit to follow certain safeguards?

3    **MR. GARDNER:**  I would say it this way:  There's

4    nothing in the evidentiary record before this Court now that

5    speaks to that issue.

6    **THE COURT:**  Okay.  Okay.  Anything else you want to

7    offer on whether it's harm, or if you want to go back to

8    anything we didn't cover?

9    **MR. GARDNER:**  Very briefly, Your Honor.

10    I just wanted to respond to one of my colleagues',

11    Mr. Eisen's, comments earlier today where he talked about the

12    five-question e-mail.  I don't know if you recall that.  It

13    feels like it was years ago now.  But this was the notion that

14    Elon Musk had ordered every agency to have every employee

15    identify five things they did last week.

16    And Mr. Eisen, as I understood it, suggested that is

17    evidence of the significant authority that Mr. Musk wields in

18    the government.

19    I actually think that example is completely contrary to

20    their theory of the case, because as I know the Court knows,

21    many federal agencies said we are not going to do this.  And if

22    it's the case that Mr. Musk has all this authority, then it

23    seems inconsistent with that authority for these agency heads

24    to say we are not going to do this.

25    So I think one of Mr. Eisen's, you know, primary examples

1   of this extravagant authority actually works against him.

2           **THE COURT:**  I understand the point.  But one thing

3   which we didn't cover, and I'm not sure we need to any further,

4   but just one of the reasons why I asked who was the DOGE

5   administrator before the current acting one, was that in cases

6   like this, it's not unusual to have a situation where things

7   are done a certain way, perhaps not within the rules or the

8   law.  And then whether it's lawsuits or other things happen,

9   that all of a sudden, everyone starts trying to get into

10  compliance, which is always a good thing.  No one is opposed to

11  that.

12          **MR. GARDNER:**  Right.

13          **THE COURT:**  But the timing may differ.

14       Now, it may affect what is the prospect -- what is the --

15  you know, the prognosis for the future in terms of what needs

16  to be done, but whether there was some sort of violation or

17  something, sometimes those violations happen early in the case,

18  and then people realize they have a problem, and so then

19  they -- instead of saying -- or shutting it down, they start

20  saying other things.  Or instead of saying we -- Mr. Musk is in

21  charge of DOGE, they suddenly say, well, now he's a senior

22  advisor.

23       And I don't have a date on when that happened or anything

24  like that.

25       And again, I don't know who the acting administrator was,

1    or the administrator, but there was a period of time, which is

2    a black hole right now.

3        And so I understand your point.  I think the media

4    reported that, as well now the agencies are starting to push

5    back, but that doesn't mean that there wasn't an earlier period

6    where someone did have total control.  So that's what I'm

7    trying to understand.

8        But I get your point that it seems as if that can be read

9    different ways.

10        **MR. GARDNER:**  Right.

11        And, again, I don't want to repeat myself, I do want to be

12    clear, that we do know definitively from Josh Fisher's

13    declaration that whomever may or may not have been the acting

14    DOGE administrator, it was not Mr. Musk.  And Mr. Fisher's

15    declaration expressly says that.

16        And then I guess just the last point I would make, Your

17    Honor, is we've talked a lot today, and I think you talked with

18    my colleagues on the other side about these open factual

19    questions.

20        Again, I just want to reiterate, because the plaintiffs

21    have the burden of proof to establish these four requirements.

22    And because they essentially acknowledged they don't have the

23    evidence to establish this, we respectfully request that

24    plaintiffs' motion for preliminary injunction be denied.

25        **THE COURT:**  Okay.  Thank you.

1        I did say, even though I think overall the government

2    still had less time, but again, that's not -- some of the time

3    taken was because I asked questions, so I'll -- some brief

4    rebuttal, if you would like, from the plaintiffs.

5        Really just on very specific things that you want to

6    respond to from Mr. Gardner, not really new information that

7    wasn't part of that colloquy.

8        So, Mr. Eisen?

9        **MR. EISEN:**  Yes, Your Honor.  Thank you.

10       I'll start on Mr. Gardner's point.  I wrote it down in

11   quotation marks, "largely on circumstantial."  And I think that

12   the government misunderstands the nature of the evidence.

13       I would direct the Court to our complaint, starting

14   Paragraph 47, Page 25, which has the bookends of Mr. Musk

15   saying he's going to take control, and, quote, we're in the

16   process of shutting down, and that after it's done, this is

17   January -- this is the end of January, January 30th, and then

18   this runs on Page 26, 27, and onto 28, ending with Mr. Musk

19   saying, "We spent the weekend feeding USAID into the wood

20   chipper."

21       He's admitting it, Your Honor.  He's admitting he's acting

22   as a principal officer.

23       And then in our reply brief, I would direct the Court to

24   the plethora of evidence on how he did it.

25       Mr. Kliger, acting -- I never heard of a -- Mr. Kliger is

1  detailed to five agencies.  I never heard of that in all my

2  time in government, Your Honor.

3        Be that as it may, Mr. Kliger acting at Mr. Musk's behest

4  with DOGE affiliate Luke Farritor, that's -- we break down

5  exactly how they did it, and we explain that they were able to

6  render USAID inoperable.  They are setting up that abolition

7  which, of course -- the Court noted, the last line of

8  Mr. Rubio's letter, of course that would be illegal, contrary

9  to the existing statutory scheme.

10       On the point of Mr. Rubio's letter and Mr. Marocco's

11  declaration, the letter in the Marocco declaration comes on

12  February 3rd, after all of this has happened.

13       So if the Court takes those portions of the complaint,

14  plus without -- we've begged the government for preliminary

15  discovery.  None of the things Your Honor asked for -- I have

16  the transcript -- have been provided to us.  Despite that, we

17  have put dozens of affidavits in the record.

18       The only thing circumstantial about it is that we weren't

19  there to videotape it.

20       If the smoke is pouring out of the walls and the flames

21  are shooting out of them, you can conclude that there's a fire,

22  particularly if the arsonist says, "I'm going to burn down the

23  house," and then finishes by saying, "I did it."  That's

24  circumstantial in a sense.

25            **THE COURT:**  Let me ask this, I understand your point,

1  on this shut down concept.

2      So we know that the headquarters building is closed, has

3  been turned over to CBP, or at least that portion of the Reagan

4  building, I believe it is.  We know the website has been shut

5  down.  You can't even access anything there.  We know that a

6  certain number of employees have been terminated and some have

7  been placed on administrative leave.

8      Do you happen to have, you know, numbers, percentages -- I

9  talked with both sides about, well, five or six people, not

10  really an issue; 95 percent, probably a big problem.  But I

11  don't actually know where we are right now, do you?

12          **MR. EISEN:**  Your Honor, I would love to know that

13  basic information.

14      My understanding, from talking to our 26 clients, from the

15  mountain of evidence we've provided, from the functional --

16  from the mountain of evidence we've provided, from the public

17  record, and these affidavits from the lives of these 26 people,

18  is USAID has been functionally abolished.  That is the point of

19  our separation of powers argument.  I won't belabor it,

20  because --

21          **THE COURT:**  Well, again, people can disagree on what

22  that means.  But I'm just trying to get, you know, statistics,

23  so to speak.

24      I mean, how many contracts -- I mean, there was this

25  blanket freeze, but, like, in terms of contracts that have now

1  been formally terminated, what percentage, how many employees

2  have been terminated or in this leave category, or are still

3  working?  I know there are some that are still working.  Do we

4  know that?

5      And again, me being here that if one added it all up, I

6  would have that information, I just don't --

7          **MR. EISEN:**  Your Honor, we have some information

8  about it, not complete information, in the Marocco affidavit, I

9  believe.  And it tells us in Paragraph 11 that there are 4,765,

10 and approximately -- it tells us in 13, approximately

11 98 percent of the 2,140 employees on paid administrative leave.

12 So there's some details.

13     It goes to -- and then there's more in Paragraph 18.

14     Your Honor, it goes to 611, is another statistic in here

15 who -- that remain.  It goes to -- I'm going to come to this at

16 the end of my very brief rebuttal.  The Court has been so

17 patient with us.

18     It goes to -- the solution to the dilemma before us, that

19 the Court has identified from the bench, which is some very

20 expedited -- to continue the meet and confer, to get some very

21 expedited discovery, to get some answers and some

22 documentation.  We've been begging, Your Honor, on this point.

23     My colleagues from DOJ, I sympathize with them.  Every

24 time I see my friend Chris, if I may, he looks sleepier.  And

25 so am I, Your Honor, and I'm older than he is.  I can less well

1   sustain the all-nighters than he can.

2       Nevertheless, we have been asking since we filed this

3   case, and -- since we filed this case, we have been asking for

4   a person who is not a DOGE person.  There's been about two

5   weeks now, Your Honor.  That should not be that hard to find.

6   That allows us to do the expedited discovery that will, in a

7   matter of days, resolve this case.

8       We need that -- think of the torment for our 26 clients

9   who day after day say, have you found the person yet?  Is there

10  somebody there?  You can't tell Elon Musk my name.  You can't

11  tell -- you can't put it in the information for these people

12  who are running the agency.  Is that, if I may ask for the

13  Court, is that person so hard to find?  26 people in torment.

14  Could we turn USAID sideways and shake it a little bit to get a

15  human who is not affiliated with DOGE?

16      I'm going to quickly tick through the rest of my -- tick

17  through the rest of my list.

18      So it's not circumstantial.

19      They concede that shutting down an agency would be --

20  there are a series of concessions, what would be significant

21  authority, what would make somebody a principal officer.  We

22  think we've established non-circumstantial evidence.  Public

23  record, a mountain of affidavits that is, in effect, happening

24  here.

25      On the question, the factual question, does DOGE have

```
 1   access to these sensitive records.  I want to point the Court
 2   to two -- to two of our declarations, if the Court will bear
 3   with me.
 4        The declaration, the public declaration, Exhibit 3, of
 5   John Doe 2, which says DOGE personnel who did not have a
 6   security clearance used their administrative rights to grant
 7   themselves access to restricted areas requiring security
 8   clearance.  It is unclear what DOGE did with that information
 9   at USAID.
10        And then if I may point the Court to Exhibit 56, it is a
11   sealed exhibit, it has -- I think I'm not giving away the
12   identifying information of the person, that sensitive access
13   includes -- the access they have includes sensitive personnel
14   data of all employees of USAID, clearance information,
15   disciplinary actions, and on and on.
16        So I would point the Court to those two items there.
17        And forgive me, I'm just going to turn my papers on the
18   documentation -- on the documentation point, I've made my point
19   that we've asked and asked and asked the things that the Court
20   wants the most basic evidence, the facts the Court said are
21   very important, I would like to know what is the actual legal
22   status of Mr. Musk within the administration and his staff?
23   How is that documented?  Who are the people who have actually
24   been formally making decisions on paper?  And on and on, the
25   other questions that the Court asked us.
```

1    If we can't resolve that promptly together with this

2  person that we need, the Court can order it.  The Court can

3  order, find a non-DOGE person or put a non-DOGE person in there

4  to protect our plaintiffs while we do extremely expedited

5  discovery into these very fundamental questions.

6         **THE COURT:**  Can I just get clarification on that?

7  This non-DOGE person you want, I thought what that person was

8  supposed to be for would be -- they would be -- within a

9  protective order, they would have the names of the plaintiffs.

10  They would then presumably be in a position to address some of

11  the issues that were identified by Ms. Stevens, whether it's

12  things not getting paid, bills not getting paid, people not --

13  at times not having access to the systems, things like that.

14    So that would be less discovery and more of just

15  addressing the current harm.

16    Is there a discovery aspect for which this non-DOGE person

17  is important?  I mean, is there any reason why at some point,

18  when discovery starts, we don't just -- I mean, why do we need

19  somebody like that for that?  We just tell them -- you know, or

20  someone issues discovery requests for documents and depositions

21  and -- so is that non-DOGE person just for this issue of trying

22  to address --

23         **MR. EISEN:**  Yes, Your Honor.

24         **THE COURT:**  -- just bridge the gap with the

25  plaintiffs' issues?

1          **MR. GARDNER:**  We have 26 people.  We've been before

2    the Court now almost two weeks.  I know it's not the Court's

3    preference, but a way -- to your point about two PIs and a

4    motion to dismiss, the way courts have dealt with this in other

5    context is to do a limited TRO, and -- and in order to stanch

6    that urgent irreparable harm, and then to allow some expedited

7    discovery, and a week or two later to have a PI briefing.  That

8    was where we started here.

9        I know the Court didn't want to go there.  I want to keep

10   working with the government.  But we may be forced into that

11   posture.  That is -- it's not the Court's preference.  That is

12   not an unusual situation.

13         **THE COURT:**  I think I asked -- I think I asked one of

14   your colleagues whether you wanted any discovery before the

15   motion was resolved, and at least the broad answer I seem to

16   get was no, you just want the motion resolved and then you'll

17   move on to that.  But maybe I misunderstood that.

18         **MR. EISEN:**  Only -- I'm just putting a finer point on

19   it, Your Honor.  Only because these 26 people, Ms. Stevens

20   talks to them every day, are in such urgent and dire

21   circumstances.  We need a short-term fix for them --

22         **THE COURT:**  I understand.

23         **MR. EISEN:**  -- whether by agreement or otherwise.

24       We need this -- I believe -- I want to say, the

25   combination of circumstantial and non-circumstantial evidence,

1  Mr. Musk saying he was going to do it, saying -- DOGE saying

2  USAID has to die, and then saying he was in the wood chipper,

3  together with that very elaborate trail of crumbs we've laid

4  out for the Court, I gave you the pages, that is sufficient

5  evidence to be a predicate for success on the merits here to

6  provide this relief that we need.

7       But it would be better if we could solve the emergency.

8  That would be best of all.  Take a week to get that discovery,

9  and then move to the PI stage.

10      We believe the conclusion, then, will be done.  We will --

11  of course, we stand by the PI, we believe in the PI, we believe

12  we've met the records.  Isn't there some more humane short-

13  solution for these 26 individuals who are suffering irreparable

14  harm, Your Honor?

15          **THE COURT:**  I guess, I'm missing this point about

16  even if there were some interim ruling for the plaintiffs on

17  their harm, you're saying then we would have a week of

18  discovery, and then we do the rest of the motion?  I guess, I'm

19  misunderstanding or not understanding what you're suggesting

20  there.

21          **MR. EISEN:**  We're prepared -- we're prepared to

22  submit today, and we believe we've met the four requirements,

23  particularly in light of the government's utter failure to make

24  transparent the documentary trail here.

25      That being said, some other courts, I have argued there,

1  they will provide a TRO, freeze the harm if the government

2  cannot solve the problem for us, and then move from there, a

3  few days of rapid discovery narrowly crafted.

4         **THE COURT:**  On what?  Again, I mean, I just -- you

5  could have asked for that, like, when we started with the

6  briefing.  You didn't do that.  Now you're asking for it now?

7         **MR. EISEN:**  Your Honor -- the Court raised it.  We

8  endeavor -- the Court encouraged the parties to try to do it.

9  We diligently worked through that.  We have been unable to get

10 that information.

11       At any rate, we believe we've established a sufficient --

12 a sufficient predicate.  But we also think that the Court's

13 very logical request to have more information from the

14 government, it -- it's -- it's a reasonable request.

15       There is a way that some courts do it.  I would not

16 presume to tell this Court how, but TRO frees the status quo

17 address.  We've given you a set of very specific --

18        **THE COURT:**  I understand.  And, again, as you said,

19 judges do these things differently.  Some of those requests for

20 TROs were denied anyways, including in similar cases.  Other

21 TROs have been modified or reversed when people move too

22 quickly.  So I understand the request, though.

23       Okay.  Anything else?

24        **MR. EISEN:**  Your Honor, may I just quickly flip

25 through my notes?  I'm about done.

1        Your Honor, there were a couple of points that came up for

2   the first time on -- on the government's presentation, and I

3   would just -- I would just point the Court to the briefs on

4   this question of the -- the continuing office.

5        We've explained that regardless of title, there's clearly

6   a continuing office here.

7        This is a far cry from the continuing offices cases, like

8   the merchant appraiser in the *Auffmordt* case, or the civil

9   surgeon in *United States v. Germaine,* including giving -- given

10  the executive order establishing DOGE, which I think is

11  unquestionably, on the evidence in the record, inside USAID

12  operating at the direction of Mr. Musk.

13       Remember, we've presented evidence that in addition to

14  what Mr. Musk said before and after that fateful January 30 to

15  February 3rd period, he called USAID in the middle of it to

16  demand access for his people.  So that is -- so that is that.

17       So, Your Honor, we will submit -- we will -- oh, I wanted

18  to make one point on separation of powers, since we've been so

19  focused on the appointments clause.

20       I just would point the Court to *NLRB v. Canning,*

21  collecting the cases and highlighting the individual injuries

22  from these type of structural constitutional issues.  *City of*

23  *Philadelphia v. Attorney General,* 916 F.3d, where the Third

24  Circuit makes clear what is the point of *Youngstown*, which is

25  that when the executive is acting with no Congressional

1  delegation, he is, in the words of the Court, literally -- he,

2  in the words of the Court, literally has no power to act.

3      And that's a constitutional violation, not a mere backdoor

4  to the APA.

5      So we thank the Court for its indulgence.  We will

6  continue to meet and confer, as we have done incessantly, to

7  try to find solutions.

8      To the extent the Court has any question, we think that

9  expeditious discovery -- based on the mountain of evidence

10  we've presented, that expeditious discovery will show that no,

11  there is no paper trail, there is no authorization.

12      But the Court can find that based on that portion of the

13  complaint, the reply brief, and those dozens of affidavits we

14  submitted describing exactly what went on during that period of

15  time when Mr. Musk said he was going to kill USAID, and then at

16  the end of it, said we fed it into the wood chipper.

17      Thank you, Your Honor.

18          **THE COURT:**  Thank you.

19      Okay.  Thank you for a spirited argument.  I appreciate

20  all the information.  I have the joint record plus the new

21  exhibits that came in today.

22      I appreciate everyone's patience.  These are important

23  issues.  I think everyone seems to agree they are not ones that

24  are -- I don't know if I call them issues of first impression,

25  or just ones for which there's no clear legal roadmap that can

1   be easily overlaid to this situation.  So I will do my best to

2   get you an answer as soon as possible.  But I'll take it under

3   advisement for now.

4       I think, as you said, further discussions among the

5   parties on some of the issues that have been under discussion I

6   think is always a fruitful thing, because I think it -- some

7   sort of voluntary agreement on various things could be helpful

8   for everyone involved.

9       Is there anything else, while we're here, that needs to be

10  discussed or put on the record regarding this case?

11           **MR. GARDNER:**  Nothing from the government, Your

12  Honor.

13           **MR. EISEN:**  Nothing from plaintiffs, Your Honor.

14           **THE COURT:**  Okay.  Thank you.

15           **DEPUTY CLERK:**  All rise.  This Honorable Court now

16  stands adjourned.

17       (Proceedings were concluded at 5:01 p..m.)

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, Paula J. Leeper, Federal Official Court Reporter, in

5   and for the United States District Court for the District of

6   Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

7   the foregoing is a true and correct transcript of the

8   stenographically-reported proceedings held in the

9   above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                          Dated this 3rd day of March 2025.

13

14

15                          /S/ Paula J. Leeper
                            _____
16
                            Paula J. Leeper, RPR, CRR
17                          Federal Official Reporter

18

19

20

21

22

23

24

25

DEPUTY CLERK: [3] 3/3 3/7 129/15
MR. EISEN: [24] 5/18 6/3 6/9 6/13 6/17
 6/21 9/6 9/15 11/22 12/23 14/10 46/16 117/9
 119/12 120/7 123/23 124/18 124/23 125/21 126/7
 126/24 129/13
MR. GARDNER: [146]
MR. GONZALEZ: [5] 3/17
MS. MARZIANI: [43] 3/14 16/12 17/17 19/5 20/18
 21/17 21/23 23/7 24/15 25/22 25/25 26/14 26/18
 26/21 26/25 27/5 27/17 27/24 28/1 29/12 30/1 30/11
 30/14 30/16 32/3 33/13 34/17 34/25 35/3 35/24
 36/11 36/17 37/5 37/9 37/13 37/25 38/4 38/8 38/17
 39/7 39/11 39/15 39/17
MS. MAYS: [1] 3/18
MS. STEVENS: [54] 3/16 40/4 40/13 41/7 41/12 42/10
 42/14 43/2 43/23 44/1 44/7 44/10 44/15 44/19 44/23
 45/4 45/7 46/25 47/3 47/13 47/19 47/22 48/2 48/7
 48/17 48/23 50/25 51/3 51/22 52/3 52/12 52/19 53/1
 53/5 53/9 53/12 53/14 53/23 54/14 55/9 56/15 56/22
 56/25 57/6 57/10 57/16 57/22 58/2 58/15 58/22
 59/18 60/24 61/8 61/13
THE COURT: [261]

/

/S [1] 130/15

0

00462 [1] 1/5
0462 [1] 3/8

1

1-26 [1] 1/3
100 percent [1] 93/25
102-40 [1] 1/19
11 [1] 120/9
1100 [1] 2/4
1125 [1] 61/21
12200 [1] 2/4
13 [1] 120/10
1328 [1] 95/23
14158 [1] 112/8
15 [1] 109/7
1533 [1] 1/19
17th [1] 110/17
18 [1] 120/13
183 [1] 15/9
184 [1] 15/9
19 [2] 48/4 48/14
19th [2] 8/11 109/15
1st [2] 13/23 23/15

2

2,140 [1] 120/11
20 [9] 4/13 50/16 50/17 50/21 50/23 51/1 51/6 52/2
 53/20
20's [1] 53/3
200-year-old [1] 83/9
2000 [1] 81/21
20003 [1] 1/15
202 [2] 1/16 2/5
2022 [1] 95/23
2025 [6] 1/10 66/11 66/13 110/14 112/7 130/12
204 [1] 81/21
20530 [1] 2/4
20th [6] 13/18 66/11 66/13 67/16 68/18 112/7
21's [1] 19/18
210 [1] 1/20
22 [2] 44/23 48/13
22's [1] 45/21
22nd [1] 12/3
23 [1] 74/1
24 [1] 55/23
24th [1] 109/16
25 [1] 117/14
25354 [1] 110/14
26 [13] 1/3 6/23 7/23 15/8 16/8 117/18 119/14
 119/17 121/8 121/13 124/1 124/19 125/13
27 [1] 117/18
28 [3] 1/10 117/18 130/6
29 [1] 14/20
2:00 [1] 1/10

3

3's [1] 45/13
30 [1] 127/14
305-7583 [1] 2/5
30th [1] 117/17
32 [1] 50/17
34 [1] 45/5
343-5604 [1] 1/20
35 [1] 95/23
38 [1] 15/9
38-1 [1] 5/22
3rd [7] 23/24 24/8 44/11 95/4 118/12 127/15 130/12

4

4,765 [1] 120/9
40 [8] 1/19 5/21 51/24 52/6 53/24 63/4 63/24 64/1
422 [1] 19/10
429 [1] 18/5
431 [1] 14/21
432 [1] 109/13
440 [1] 19/17
466 [1] 8/13
47 [1] 117/14
48 [1] 55/23
49 [1] 15/8

5

50 [1] 87/9

50 percent [1] 92/9
54 [1] 14/23
54258 [1] 1/24
545 [1] 2/4
55 [3] 13/19 28/8 28/9
56 [3] 13/24 15/3 122/10
5604 [1] 1/20
568 [1] 8/12
5:01 [1] 129/17

6

611 [1] 120/14
639 [1] 75/7
65 [1] 4/21
67 [1] 28/20
69 [2] 4/21 26/20

7

70 [6] 4/23 25/1 25/21 25/22 26/15 26/24
753 [1] 130/6
753-9667 [1] 1/16
7583 [1] 2/5
78218 [1] 1/20

8

80 [1] 67/16
8:25-cv-00462 [1] 1/5

9

90 percent [1] 91/21
90-something [1] 93/24
91 [1] 75/7
912 [1] 14/23
916 [1] 127/23
95 percent [1] 119/10
9667 [1] 1/16
98 percent [1] 120/11

A

AALJ [1] 18/24
abeyance [1] 59/14
ability [5] 36/2 46/6 50/8 53/18 108/13
able [16] 15/4 24/23 25/3 36/23 47/6 47/16 47/19
 53/16 53/20 72/20 73/12 76/1 86/22 108/2 109/17
 118/5
abolish [1] 33/5
abolished [5] 78/3 105/21 119/18
abolishing [4] 32/25 77/11 77/16 106/14
abolition [2] 106/3 118/6
above [1] 130/9
above-entitled [1] 130/9
abrupt [1] 113/19
absolute [1] 17/19
absolutely [8] 17/17 19/5 19/5 21/23 23/7 34/25
 40/4 60/25
abuse [5] 54/20 104/12 104/15 104/23 105/16
academically [1] 102/25
Academy [1] 107/13
accept [3] 73/6 73/8 105/14
accepted [2] 25/24 25/25
accepting [2] 17/1 75/17
access [88] 13/19 13/23 13/25 14/5 14/7 14/9 15/8
 20/20 23/21 40/10 40/12 40/17 41/17 41/19 41/22
 41/25 42/16 43/15 44/10 44/17 44/19 45/9 45/11
 45/12 45/14 45/21 45/22 46/2 46/5 46/6 47/16
 48/10 48/14 49/1 49/2 49/5 49/6 49/10 49/17 49/22
 50/2 50/4 50/5 50/8 51/7 54/7 54/15 54/16 54/18
 54/19 54/20 55/10 55/11 55/13 55/13 55/22 56/7
 57/3 57/13 57/25 58/4 62/22 63/1 65/11 65/14 68/8
 107/16 107/22 109/8 109/9 109/15 109/23 110/9
 110/19 110/25 111/14 112/3 113/16 113/22 113/22
 119/5 122/1 122/7 122/12 122/13 123/13 127/16
accessed [1] 65/13
accessing [2] 9/23 56/17
accommodation [1] 42/18
accomplished [1] 13/11
according [2] 29/1 42/20
account [3] 14/9 55/23 106/22
accountability [5] 14/16 16/25 17/1 17/5 17/9
accounts [2] 23/19
accurate [4] 62/20 86/14 87/5 93/19
acknowledge [1] 113/17
acknowledged [2] 98/4 116/22
acknowledging [1] 79/8
across [7] 9/23 15/13 18/8 25/14 45/17 55/12 68/22
act [12] 36/2 37/7 89/25 94/17 95/1 95/18 95/19
 96/16 105/23 105/24 108/2 128/2
acting [26] 11/23 12/7 19/11 19/12 19/21 19/25
 19/25 20/12 23/18 34/2 34/3 67/1 84/15 89/11 95/3
 95/9 96/18 96/19 96/22 115/5 115/25 116/13 117/21
 117/25 118/3 127/25
action [13] 3/8 11/25 18/22 19/4 23/4 24/10 38/5
 38/7 56/9 59/24 59/25 90/2 92/2
actions [14] 7/4 11/17 17/14 24/9 24/13 30/24
 31/25 34/13 35/7 73/24 92/1 97/23 105/17 122/15
activist [1] 9/21
actor [1] 74/21
actors [1] 76/23
acts [5] 7/20 9/12 9/15 13/8 13/15
actual [8] 8/18 16/8 19/25 25/10 28/1 76/2 79/14
 122/21
actually [35] 12/19 16/14 20/12 22/13 24/19 25/1
 25/7 26/6 28/20 31/11 31/15 32/16 34/1 50/20 51/20
 55/21 65/6 71/25 73/13 73/14 80/24 84/18 86/20
 88/21 88/25 90/5 91/10 93/13 96/5 96/8 96/11 115/11
 114/19 115/1 119/11 122/23
added [1] 120/5
addition [5] 11/22 24/25 30/16 31/21 127/13
additional [4] 4/21 9/18 51/22 54/11 69/12 69/17
 84/10 100/4 110/2
address [17] 19/20 27/19 28/2 49/18 52/11 52/14

54/8 56/5 56/22 62/3 73/10 85/6 103/9 107/4 123/10
 123/22 126/17
addressed [1] 75/14
addressing [5] 7/1 54/25 70/18 75/16 123/15
adhere [1] 112/8
adjourned [1] 129/16
administration [3] 61/21 113/14 122/22
administrative [13] 29/18 40/25 44/2 47/21 47/22
 57/20 57/23 57/24 88/2 113/21 119/7 120/11 122/6
administrator [19] 17/22 19/1 19/12 19/14 19/22
 20/1 26/11 27/9 27/13 30/25 84/15 87/14 88/16 95/7
 95/9 115/5 115/25 116/1 116/14
administrators [1] 15/5
admission [3] 4/22 17/12 107/12
admissions [7] 7/4 7/4 8/8 11/23 11/23 20/22 28/17
admit [1] 5/14
admitted [2] 25/23 61/22
admittedly [1] 87/20
admitting [2] 117/21 117/21
advisement [1] 129/3
advisor [9] 82/1 84/1 84/19 86/2 87/11 87/24 88/1
 88/15 115/22
advisors [1] 81/4
advisory [1] 108/10
affairs [6] 39/4 99/19 99/24 102/7 104/11 104/20
affect [2] 15/4 115/14
affidavit [2] 87/23 120/8
affidavits [4] 118/17 119/17 121/23 128/13
affiliate [3] 18/7 25/5 118/4
affiliated [3] 65/23 88/1 121/15
affiliates [4] 19/7 21/1 24/18 28/12
affirmative [1] 76/1
AFT [1] 49/15
after [11] 14/18 23/24 27/1 57/23 60/15 88/2
 105/21 117/16 118/12 121/9 127/14
afternoon [4] 3/19 3/20 3/21 3/25
again [85] 6/15 7/5 7/5 11/6 17/12 19/1 19/6 19/17
 20/3 23/14 24/9 26/5 38/2 38/9 41/15 42/1 43/18
 44/12 46/1 48/5 56/4 58/12 60/10 60/17 65/13 67/4
 68/10 68/22 69/24 71/4 72/14 72/24 72/22 74/11 74/14
 74/25 75/5 76/17 77/12 78/9 79/2 79/7 82/7 85/7
 85/16 85/20 85/24 86/14 86/19 87/23 88/8 89/16
 90/7 90/15 91/12 91/13 92/8 92/21 93/5 93/14 93/15
 93/18 94/3 97/5 97/16 97/21 100/14 100/21 102/4
 102/17 103/18 104/15 106/13 107/3 111/5 113/9
 113/9 113/10 113/18 115/25 116/11 116/20 117/2
 122/5 123/25 126/4 126/18
against [5] 16/1 101/22 102/9 113/23 115/1
agencies [19] 9/23 9/24 16/3 20/6 21/2 25/6 25/14
 29/15 51/11 66/3 66/4 66/14 100/4 100/4 104/2 104/21
 104/23 114/21 116/4 118/1
agency [65] 9/1 9/25 14/18 14/18 14/18 17/24 22/17
 30/23 30/24 31/2 31/4 31/5 31/7 31/17 32/13 32/15
 32/19 32/24 33/1 33/5 33/19 34/23 35/6 35/6 36/10
 36/14 37/23 38/2 38/19 38/25 58/20 66/8 66/18 67/5
 67/8 77/12 77/16 78/3 78/19 80/10 82/14 89/24
 91/21 93/12 97/3 97/11 97/13 100/4 100/21 100/25
 101/2 101/7 103/9 105/18 105/16 105/21 105/25
 106/14 108/6 111/6 111/6 114/14 114/23 121/12
 121/19
aggressive [4] 12/5 12/25 28/25 29/4
ago [3] 28/22 64/23 114/13
agree [33] 14/1 22/4 24/7 32/14 33/15 36/5 42/22
 59/5 60/25 61/4 74/4 82/7 82/8 83/8 84/4 89/23
 89/25 91/9 91/19 97/3 97/6 97/18 99/4 100/9 100/15
 100/23 102/11 102/18 105/22 106/3 106/16 111/22
 128/23
agreed [8] 5/14 5/15 6/7 26/1 30/14 98/10 111/21
 112/3
agreement [4] 4/20 5/16 9/11 40/7 97/1 124/23
 129/7
ahead [4] 5/7 53/13 61/17 89/15
aid [1] 103/15
aide [1] 11/5
AIDED [1] 1/23
AIDS [3] 24/17 38/9 43/6
al [2] 1/6 3/9
ALJ [1] 80/20
all [64] 3/3 5/5 9/5 10/19 12/9 12/11 12/11 20/23
 20/24 23/19 24/2 26/10 26/13 30/16 31/18 32/12
 41/8 42/6 46/12 49/2 49/20 51/11 54/7 54/25 55/1
 55/4 58/14 63/11 63/16 64/15 66/16 67/20 68/22
 69/4 69/25 72/25 73/23 75/20 77/17 86/15 89/9
 91/12 91/14 92/3 92/16 93/3 93/5 93/11 94/7 94/16
 99/16 101/20 111/11 113/12 114/22 115/9 118/1
 118/12 120/5 121/1 122/14 125/8 128/20 129/15
all-nighters [1] 121/1
allegation [1] 110/19
allegations [1] 75/17
allege [4] 8/3 9/22 33/1 36/24
alleged [3] 17/21 24/2 75/12
alleging [1] 33/14
allow [5] 55/12 61/3 70/7 72/15 124/6
allowed [5] 58/10 59/20 60/2 71/22 71/23
allowing [1] 55/16
allows [1] 121/6
alluded [1] 80/20
almost [1] 124/2
along [4] 41/24 44/11 78/10 100/7
alongside [1] 7/10
already [6] 5/20 35/12 57/8 57/10 71/21 100/3
also [31] 3/14 4/4 7/8 7/14 9/5 11/16 13/15 13/24
 15/15 19/17 22/4 24/17 30/5 33/6 35/9 41/4 42/7
 43/4 45/18 48/8 55/25 56/2 58/4 78/7 82/24 88/18
 94/23 103/11 112/11 112/21 126/12
although [1] 20/18
always [4] 62/6 87/25 115/10 129/6
am [13] 11/14 14/4 26/9 64/10 77/20 77/23 82/3
 82/4 86/12 89/16 91/22 112/22 120/25
America [1] 44/25
American [1] 15/16
among [3] 6/17 94/8 129/4

## A

```
amount [3]    17/21 36/12 109/15
amplify [1]   10/21
analogize [1] 10/21
analogizes [1] 9/9
analogy [1]   10/24
analysis [2]  92/14
analyzed [2]  49/20 84/6
analyzing [1] 79/10
anonymity [4] 41/10 42/5 42/14 43/24
another [19]  18/9 27/5 27/6 44/17 44/21 50/3 59/13
 60/21 65/7 67/8 71/3 71/3 84/23 110/11 120/14
answer [19]   34/6 60/14 80/17 80/18 86/9 86/23 88/9
 89/2 90/8 90/11 90/19 90/23 93/8 100/4 106/4
 111/16 112/16 124/15 129/2
answers [2]   41/2 120/21
Antonio [1]   1/20
anybody [5]   12/10 64/23 64/24 86/17 93/1
anyone [4]    11/8 11/9 53/18 107/21
anything [39] 4/5 33/23 35/22 39/4 39/13 39/19
 58/18 58/21 61/7 62/11 67/13 67/12 68/8 69/20
 72/8 77/13 79/11 80/13 86/3 88/24 94/20 98/8 98/17
 103/21 105/7 107/1 107/5 111/7 111/17 112/4
 113/25 114/1 114/6 114/8 115/23 119/5 126/23 129/9
anyways [3]   27/16 73/3 126/20
APA [1]       128/4
apart [1]     38/7
Apologies [1] 51/3
app [1]       48/12
apparatus [1] 41/18
apparent [1]  43/22
appear [1]    34/13
APPEARANCES [2] 1/12 1/22
appears [4]   20/10 27/10 32/18 109/12
applicable [1] 78/3
application [2] 45/15 109/17
applications [1] 109/16
applied [1]   23/2
applying [2]  8/14 11/15
appoint [1]   20/6
appointed [8] 19/15 30/23 30/25 31/4 31/12 33/19
 35/8 38/19
appointing [1] 95/17
appointment [3] 17/2 17/4 87/7
appointments [28] 7/14 15/19 16/5 16/14 16/17 17/7
 22/7 23/10 29/11 30/3 30/8 31/22 36/19 77/22 80/4
 80/23 81/5 81/10 81/12 81/23 82/5 83/2 83/6 85/4
 85/5 92/2 98/5 127/19
appraiser [1] 127/8
appreciate [2] 128/19 128/22
approach [2]  5/2 107/19
appropriate [10] 32/20 33/7 42/23 54/17 58/23 59/1
 61/5 71/20 90/21 108/20
appropriated [5] 24/20 35/12 36/4 38/10 101/24
appropriation [1] 39/3
appropriations [8] 31/1 32/21 33/3 77/3 77/13 95/5
 105/23 105/24
appropriators [2] 106/7 106/9
approved [7]  22/13 67/10 67/12 69/25 70/1 96/1
 107/16
approving [1] 68/6
approximately [4] 13/11 67/16 120/10 120/10
area [6]      10/17 42/1 42/10 44/25 46/1 105/19
areas [2]     50/9 122/7
aren't [3]    62/14 75/5 79/9
arguably [4]  42/23 43/7 54/12 99/7
argue [4]     6/19 7/14 8/2 42/8
argued [1]    125/25
arguing [1]   100/15
argument [29] 6/4 6/13 16/14 29/10 34/9 35/18
 37/21 62/9 62/18 74/10 81/17 82/4 82/9 85/13 94/25
 96/14 98/4 98/5 98/8 98/14 99/3 99/16 100/17
 101/19 102/13 110/23 110/24 119/19 128/19
around [4]    8/7 33/9 104/1 104/2
arrange [1]   22/22
arsonist [1]  118/22
Arthrex [2]   16/23 95/22
Article [11]  15/21 16/5 101/5 102/6 104/12 104/16
 104/20 104/25 104/25 105/10 105/17
Article II [7] 102/6 104/12 104/16 104/20 104/25
 105/10 105/17
articulated [1] 58/24
aside [5]     89/22 94/24 102/23 102/23 119/14
ask [17]      8/20 21/15 22/25 25/18 35/3 35/25 39/2
 59/6 69/12 69/17 69/25 69/22 80/8 111/5 118/25
 121/12
asked [22]    9/20 46/20 46/23 71/4 73/20 86/17 86/18
 86/22 86/23 88/20 96/24 111/13 115/4 117/3 118/15
 122/19 122/19 122/19 122/25 124/13 124/13 126/5
asking [16]   37/15 55/4 55/5 56/4 56/12 56/17 58/14
 58/18 58/20 60/12 75/5 88/7 112/5 121/2 121/3
 126/6
aspect [4]    18/22 30/15 44/17 123/16
aspects [2]   58/20 62/23
asserting [2] 12/15 12/15
assertion [1] 95/25
assigning [1] 16/24
Assistant [2] 27/9 27/12
associated [1] 8/1
Association [1] 110/13
assuage [1]   107/25
assume [3]    31/15 54/3 75/8 75/12 113/15
assuming [4]  25/17 57/7 82/9 91/13
assumption [2] 18/15 22/20
assurance [1] 40/20
Athletic [1]  75/6
attached [2]  44/24 51/23
attention [2] 63/6 109/6
attorney [2]  20/15 127/23
attorneys [1] 1/4
Auffmordt [1] 127/8
Austin [1]    1/19
authority [53]  7/7 8/18 11/18 12/21 13/9 17/11
```

## B

```
back [44]     18/2 19/7 22/12 23/15 24/6 24/14 25/4
 25/16 28/19 30/1 32/10 33/13 40/10 40/17 41/20
 42/23 43/20 45/8 47/25 51/1 55/6 58/25 59/10 60/4
 62/13 64/11 69/10 72/11 72/22 73/4 77/2 84/4 87/13
 89/2 89/17 89/21 93/20 96/3 103/6 103/16 106/1
 109/18 114/7 116/5
back-end [4]  19/7 24/6 25/16 32/10
backdoor [1]  128/3
background [2] 11/7 65/12
backup [2]    69/25 88/3
bad [1]       17/7
balance [1]   102/8
ball [2]      15/13 16/8
Baltimore [1] 107/12
bare [1]      49/25
based [20]    18/15 20/4 24/21 29/3 30/20 38/15 44/20
 46/16 60/16 61/22 65/3 72/20 74/25 75/2 90/23
 100/23 103/7 104/15 128/9 128/12
basic [2]     119/13 122/20
basically [8] 29/18 29/19 32/21 52/9 54/25 70/18
 93/4 101/21
basis [2]     70/21 85/18
be-all [1]    99/16
bear [1]      122/2
bears [1]     10/22
because [52]  9/2 11/19 13/20 18/15 19/15 20/10
 20/11 21/24 26/19 26/25 33/5 41/21 42/18
 43/21 44/4 44/5 46/20 46/20 47/6 47/11 48/11 49/24
 53/17 56/4 64/6 65/8 66/16 71/22 73/12 73/20 81/3
 81/6 82/23 84/1 84/22 86/5 87/2 95/6 96/10 110/11
 111/8 115/22 117/10 121/10 124/19 129/6
before [33]   1/9 3/7 16/18 19/20 24/8 26/13 33/25
 34/5 39/14 41/17 44/4 46/15 53/6 61/1 66/11 66/13
 71/6 71/7 71/11 74/8 81/15 83/22 86/7 87/8 101/13
 107/11 113/13 114/4 115/5 120/18 124/1 124/14
 127/14
begged [1]    118/14
begging [1]   120/22
begin [1]     7/1
beginning [1] 67/19
behalf [8]    1/13 2/1 3/22 6/23 16/13 17/11 29/23
 47/6
behavior [1]  35/13
behest [1]    118/3
behind [1]    17/22
being [22]    15/4 19/1 19/4 19/4 28/2 31/17 35/9
 47/6 54/24 64/20 65/6 65/7 65/8 65/23 86/14 87/21
 93/19 96/18 104/17 108/23 120/5 125/25
belabor [1]   119/19
belief [1]    24/21
believe [33]  5/16 6/10 17/20 20/3 22/1 23/14 24/6
 27/19 27/20 28/4 34/2 40/24 65/24 75/22 76/11
 76/12 77/4 79/22 83/22 93/19 96/21 96/21 108/20
 109/17 110/10 119/4 120/9 124/24 125/10 125/11
 125/11 125/22 126/4
believes [1]  104/14
belongs [2]   10/10 30/19
bench [1]     120/19
benefit [1]   22/9
Bennett [2]   107/11 107/16
Beside [1]    43/13
besides [1]   48/4
best [11]     4/14 11/20 17/15 17/19 23/16 32/1 39/7
 39/8 68/12 125/8 129/1
Beth [1]      3/16
better [8]    20/11 32/2 96/13 103/12 103/13 103/13
 110/4 125/7
between [8]   34/22 35/5 57/17 81/25 83/16 83/24
 99/14 99/19
beyond [5]    15/12 37/23 77/15 102/2 107/5
big [5]       83/16 83/23 91/10 94/11 94/7 123/12
bills [5]     45/16 45/17 46/9 54/7 123/12
bind [1]      23/13
binding [1]   24/10
bit [5]       16/19 45/8 49/4 111/11 121/14
black [1]     116/2
blanket [2]   31/1 119/25
blind [1]     92/3
blown [1]     72/18
Boardman [1]  110/10
bodies [1]    80/21
body [1]      80/14
bolsters [1]  80/13
bookends [1]  117/14
both [11]     6/6 7/13 13/19 43/6 61/9 64/12 75/20
 102/8 104/19 112/24 119/9
bottom [3]    10/12 64/24 119/9
bounds [2]    35/6 100/11
bragging [1]  32/6
branch [15]   8/21 8/25 30/18 35/11 36/3 37/24 67/17
 89/23 97/8 98/15 98/23 99/20 105/12 106/8 106/20
break [1]     118/4
breaking [2]  4/25 101/11
```

## C

```
cabinet [8]   7/6 9/1 14/5 14/6 14/12 15/12 19/2
 28/21
California [1] 110/13
call [4]      8/25 29/1 80/11 128/24
called [7]    3/2 13/25 15/7 17/8 19/23 95/21 127/15
came [5]      27/19 29/5 53/7 127/1 128/21
cameras [1]   46/3
can't [30]    31/8 33/5 33/11 34/22 35/21 50/1 51/20
 56/10 56/11 56/15 57/15 66/12 69/2 70/6 78/22
 79/11 79/12 80/7 86/9 86/15 87/18 89/19 96/8 97/7
 112/16 119/5 121/10 121/10 121/11 121/23
cancel [1]    59/24
canceled [3]  10/4 51/10 51/13
canceling [1] 17/23 51/12 55/15
cancellation [2] 51/15 92/20
candid [1]    87/21
Canning [1]   127/20
cannot [7]    30/18 30/23 30/25 61/25 75/2 76/3 126/2
care [1]      105/4
career [1]    12/16
careful [5]   19/13 19/24 34/1 43/23 97/10
Carter [1]    110/13
case [80]     16/17 16/21 16/21 16/23 17/6 22/8 23/8
 24/17 24/24 30/3 31/6 31/12 31/14 31/15 31/21
 31/22 33/14 38/10 42/19 43/4 43/6 49/14 59/15
 60/10 60/11 61/4 64/16 64/16 64/20 64/20 68/15
 70/14 70/16 71/3 71/12 71/13 71/15 71/16 71/24
 75/10 75/18 79/3 79/5 79/15 80/13 81/1 81/8 81/10
 83/17 89/9 90/13 90/19 92/11 92/18 93/9 93/13
 94/23 95/19 95/21 95/22 97/11 103/22 103/22 103/23
 104/24 107/13 107/15 110/13 110/18 112/23 117/7
 113/13 114/20 114/22 115/17 121/3 121/3 121/7
 127/8 129/10
cases [19]    18/7 29/11 29/20 30/17 36/19 36/20
 42/24 62/6 67/21 71/7 73/5 81/2 85/10 91/23 95/13
 115/5 126/20 127/7 127/21
categorizes [1] 99/7
category [10] 34/15 34/16 35/13 40/23 41/7 41/12
 53/3 64/21 99/25 120/2
causation [2] 74/15 76/3
causative [1] 74/8
caused [7]    43/1 43/2 62/24 74/16 74/17 75/23 82/9
causing [3]   121/2 40/1 82/20
CBP [1]       119/3
cell [3]      45/22 46/5 46/19
center [1]    38/9
central [2]   22/8 44/25
certain [19]  21/15 32/22 32/23 34/9 62/15 66/8
 71/7 72/19 95/2 103/15 103/16 103/16 112/4 112/20
 113/17 113/24 114/2 115/7 119/6
certainly [7] 22/21 48/23 55/14 69/10 69/12 72/10
 73/6 74/13 75/18 89/1 89/7 89/8 89/17 102/4 110/10
 106/10 113/6
CERTIFICATE [1] 129/18
certify [1]   130/6
chain [3]     14/11 16/25 74/11
chainsaw [1]  8/3
challenged [2] 73/24 89/9
channels [1]  27/21
chaos [1]     44/7
chaotic [2]   41/21 53/18
charge [4]    8/15 14/14 76/5 115/21
charged [1]   14/9
checked [1]   64/8
checking [1]  63/1
Chief [10]    8/23 9/10 9/13 9/15 9/21 10/1 10/4 10/6
 10/15 11/5
Chief's [2]   10/7 10/9
chipper [5]   15/24 78/13 117/20 125/2 128/16
chose [1]     64/7
Chris [1]     122/23
CHRISTOPHER [2] 2/3 3/24
CHUANG [2]    1/9 3/5
Chutkan [3]   71/11 71/17 71/21
Circuit [7]   75/7 81/8 81/20 81/20 81/21 95/23
 127/24
Circuit's [2] 75/15 80/22
circumstance [1] 97/11
circumstances [4] 41/6 74/22 103/17 124/21
circumstantial [19] 20/22 20/9 28/15 28/16 59/23
 61/23 69/22 74/25 75/2 79/13 90/23 103/8 117/11
 118/18 118/24 121/18 121/22 124/25 124/25
citation [1]  110/14
cite [1]      95/16
cited [3]     73/5 81/9 110/9
city [2]      52/14 127/12
civil [3]     3/8 23/1 127/8
```

**C**

civilian [2]  103/19 104/7
claim [11]  17/24 65/9 74/14 95/18
 98/16 98/18 98/22 110/8
claims [2]  36/18 62/23
clapper [1]  65/2
clarification [1]  123/6
classic [1]  29/16
classified [1]  113/11
clause [30]  7/14 15/20 16/5 16/14 16/17 17/4 17/7
 22/7 23/10 29/11 30/3 30/8 31/22 36/20 37/22 80/4
 80/23 81/5 81/10 81/12 81/23 82/5 83/2 83/6 85/4
 85/5 92/2 98/5 105/5 127/19
clear [14]  17/5 20/15 33/13 46/11 63/2 63/14 69/13
 70/22 71/5 91/18 95/8 116/12 127/24 128/25
clearance [7]  50/1 65/12 66/9 112/2 122/6 122/8
 122/14
clearances [2]  49/25 65/20
cleared [1]  21/14
clearly [5]  15/14 72/2 82/6 99/25 127/5
clerk [2]  5/3 26/22
click [1]  52/4
client [3]  43/11 43/11 72/11
clients [12]  40/10 40/15 53/5 53/15 54/5 57/3 57/19
 60/1 85/18 89/20 91/6 119/14 121/8
clients' [4]  40/19 54/16 54/19 54/21
clippings [1]  77/8
clock [1]  4/12
close [3]  15/6 93/5 93/25
closed [1]  119/2
closely [1]  9/8
closer [1]  29/21
closing [2]  32/23 34/16
co [1]  7/22
co-counsel [1]  7/22
collapses [1]  98/5
colleague [8]  17/10 18/7 21/25 28/19 32/7 39/12
 59/4 98/3
colleagues [8]  3/23 28/5 45/9 68/19 81/2 116/18
 120/23 124/14
colleagues' [1]  114/10
collected [1]  30/20
collecting [1]  127/21
colloquy [3]  100/10 106/1 117/7
combination [1]  124/25
come [11]  4/24 19/21 28/12 40/7 43/19 47/25 90/4
 95/14 102/25 103/12 120/15
comes [1]  92/21 104/19 118/11
comfortable [1]  59/11
coming [3]  17/6 18/19 54/1
command [3]  14/11 14/24 17/1
comments [1]  114/11
commit [2]  91/1 114/2
commitment [1]  113/24
committed [1]  112/3
Committee [4]  10/23 11/4 32/21 95/6
communicated [1]  13/1
communication [1]  27/14
company [2]  46/19 46/20
comparable [1]  53/4
compare [2]  19/8 26/12
comparison [1]  11/12
compelling [2]  41/5 48/5
complaint [5]  15/8 24/4 117/13 118/13 128/13
complete [3]  82/14 83/5 120/8
completed [1]  4/24
completely [6]  80/7 82/3 97/13 97/17 100/3 114/19
compliance [2]  35/19 115/10
complied [1]  74/7
comply [1]  24/23
computer [2]  91/14 121/19
COMPUTER-AIDED [1]  1/23
computers [1]  56/7
concede [5]  90/2 91/14 121/19
conceived [1]  98/22
concept [4]  80/9 80/12 84/25 119/1
concern [3]  38/21 64/15 105/17
concerned [6]  42/17 47/10 54/24 80/2 95/1 107/21
concerns [2]  111/2 113/13
concessions [1]  121/20
conclude [3]  81/3 96/7 118/21
concluded [1]  81/10 92/23 129/17
concludes [2]  70/14 105/15
concluding [1]  101/13
conclusion [4]  76/3 78/6 106/9 125/10
Concurring [1]  17/3
conditional [2]  78/9
conduct [3]  6/24 44/20 74/16
confer [2]  120/20 128/6
conference [5]  21/4 39/8 39/24 69/16 130/10
confidential [2]  9/23 110/22
confirmed [2]  14/12 15/12
conflicting [1]  85/25
conflict [3]  79/20 101/10 101/10
conformance [1]  130/10
confronted [1]  16/18
confronting [1]  31/10
confused [1]  26/23
confusion [2]  90/17 90/22
Congress [25]  23/25 30/19 32/15 32/18 33/10 35/12
 37/3 37/16 37/17 38/25 77/7 80/25 81/6 81/24 83/19
 97/11 98/1 99/12 99/20 101/24 102/9 105/20 106/7
 106/19 106/19
Congress' [1]  101/22 102/15 102/25
congressional [6]  31/6 31/13 37/19 97/4 97/4
 127/25
congressionally [6]  92/10 104/6 81/11 82/2
 98/15
conjectural [1]  111/4
connect [1]  18/4
connected [1]  28/16
connection [1]  56/13
connects [1]  24/13

**Consc** (second column)

conscious [1]  86/14
consider [6]  11/15 35/20 40/10 79/11 79/12 96/8
consideration [1]  96/1
considered [2]  12/9 78/3
consistent [2]  12/9 78/3
Consolidated [1]  105/23
Consolidations [1]  105/24
constitute [1]  29/9
constitutes [1]  23/9
constitution [6]  7/12 8/4 16/2 34/12 37/12 99/24
constitutional [13]  8/2 17/8 31/25 35/2 35/10
 35/18 36/7 36/15 37/3 61/11 101/9 127/22 128/3
consult [5]  5/25 32/22 33/10 72/11 77/25
consultation [5]  5/16 33/1 33/8 77/6 106/6
contact [2]  43/16 46/6
contacts [1]  119/18
contain [1]  63/22
contained [1]  64/8
contemplated [1]  77/14
contemplates [1]  105/24
contend [2]  62/22 62/23
contents [1]  5/10
contest [6]  12/6 67/15 80/20 124/5
continue [2]  120/20 128/6
continued [2]  1/22 49/12
continuing [11]  82/24 83/8 83/13 83/14 84/7 84/12
 85/14 89/22 127/4 127/6 127/7
contract [14]  36/12 36/16 52/8 52/9 53/2 53/3 53/4
 55/1 58/19 63/12 63/19 64/1 92/19 93/3
contractor [4]  44/1 51/21 64/18 109/9
contractors [8]  40/24 43/7 44/12 50/14 53/15 57/17
 58/3 59/25
contractors' [1]  51/15
contracts [20]  10/5 17/23 32/12 34/21 36/6 38/14
 51/10 51/13 52/5 55/15 56/11 59/21 59/24 63/21
 63/22 64/7 68/2 89/4 92/13 92/16 93/11 93/20
 100/12 100/19 100/24 101/21 119/24 119/25
contradict [1]  90/16
contradicting [1]  79/18
contraindicate [1]  115/21
contrary [5]  21/13 30/24 95/20 114/19 118/8
contrast [1]  19/16
contravention [2]  73/22 75/4
control [18]  9/25 15/10 18/2 18/12 18/14 19/7 24/6
 24/18 25/16 49/2 49/5 49/10 49/12 50/10 74/12
 101/6 116/6 117/15
controlled [1]  29/9
controlling [2]  17/24 32/9
controversial [1]  105/13
convenience [1]  52/8
conversation [1]  40/5
conversations [3]  27/17 46/17 106/21
copy [2]  27/5 27/6
correct [30]  6/7 6/10 6/11 20/18 26/21 27/24 29/12
 36/25 37/5 37/5 37/9 37/20 38/17 38/22 47/21 52/12
 53/1 57/9 58/2 62/21 71/23 79/25 95/4 96/10 96/11
 96/20 96/21 108/4 108/13 130/7
correctly [2]  84/6 88/14
corroborated [2]  21/12 24/17
couldn't [7]  34/12 40/20 54/12 70/3 70/4 75/13
 92/11
counsel [18]  3/11 7/22 8/24 13/6 26/23 29/17 81/4
 83/12 83/18 83/22 84/6 85/8 85/11 107/1 107/18
 107/21 112/25 112/25
counsel-type [1]  29/17
counsels [2]  29/17 62/3
count [1]  34/21
counter [1]  76/8
counterpart [1]  96/24
countries [1]  103/24
country [2]  47/5 103/16
couple [9]  4/18 16/22 17/18 18/4 21/6 28/22 40/8
 100/6 127/1
course [10]  13/7 24/18 30/14 35/9 38/18 51/13
 83/11 118/7 118/18 125/11
court [80]  1/1 1/9 3/2 3/4 3/8 5/14 7/15 7/18 7/24
 8/2 8/9 10/13 10/18 13/7 13/12 13/16 15/19 16/22
 23/10 30/17 33/21 41/17 49/11 49/16 49/20 58/25
 59/19 60/4 61/1 61/3 61/9 61/18 62/4 63/20 64/10
 70/14 71/10 72/24 76/14 79/14 90/21 101/13 110/11
 110/11 110/12 110/16 114/4 114/20 117/13 117/23
 118/7 118/13 120/16 120/19 121/13 122/1 122/2
 122/10 122/16 122/19 122/24 124/9 125/23 125/25
 124/2 124/9 125/4 126/7 126/18 126/16 127/3 127/20
 128/1 128/2 128/5 128/8 128/12 129/15 130/4 130/4
Court's [28]  34/6 63/6 81/20 109/6 111/8 124/2
 124/11 126/12
courts [6]  75/24 83/13 86/15 124/4 125/25 126/15
cover [2]  114/8 115/3
covered [1]  98/9
crack [1]  104/9
crafted [1]  126/3
create [2]  85/7 92/1
created [11]  27/20 28/2 28/11 29/9 32/18 38/25
 81/11 82/2 83/19 85/16 97/11
creates [5]  14/19 70/2 84/14 90/16 101/7 111/1
creating [3]  8/13 14/13 55/18
credible [1]  79/6
credit [1]  94/4
creep [1]  38/23
critical [1]  24/2
cross [1]  79/1
cross-examination [1]  79/1
CRR [1]  130/16
crumbs [1]  125/3
cry [1]  127/7
current [7]  7/18 40/22 41/6 60/16 72/15 115/5
 123/15
currently [7]  7/9 44/3 49/6 57/3 64/19 65/9 69/13
cut [9]  42/21 45/23 46/12 46/21 58/1 58/5 58/7
 67/18 75/6
cutting [3]  8/5 58/8 68/22

**cv** (third column)

cv [1]  1/5

**D**

D.C [7]  10/22 81/8 81/20 81/20 81/21 110/12 110/16
danger [2]  5/12 46/7
dangerous [1]  8/6
dare [1]  13/3
darn [1]  93/25
data [18]  9/23 17/24 49/2 54/16 54/19 54/19 55/10
 55/12 55/13 56/18 56/19 56/20 62/10 63/10 110/25
 112/9 112/13 122/14
databases [1]  110/9
date [2]  91/12 115/23
Dated [1]  130/12
day [9]  12/8 15/18 22/5 68/18 68/19 121/9 121/9
 124/20 130/12
days [7]  28/22 41/19 49/8 70/4 108/23 121/7 126/3
DC [2]  1/15 2/4
de [2]  17/21 101/16
deal [1]  103/25
dealing [2]  58/12 104/7
dealt [1]  124/4
death [2]  12/16
decided [1]  34/9
deciding [2]  18/23
decimated [1]  77/9
decision [20]  18/24 19/4 22/18 23/12 26/9 34/5
 36/24 37/1 55/17 67/9 68/3 75/15 80/22 81/19 81/21
 81/22 88/25 94/11 110/10 110/11
decision-maker [1]  36/24
decision-making [4]  33/25 34/5 37/1 55/17
decisions [27]  8/19 11/7 17/22 20/7 21/8 24/20
 25/17 29/20 29/23 32/10 32/11 33/15 33/16 36/3
 36/22 38/24 69/25 76/24 89/6 89/13 91/12 94/4
 96/5 96/8 96/15 122/24
declaim [1]  11/3
declarant [1]  46/23
declarants [1]  5/11
declaration [41]  8/17 13/24 14/21 18/5 19/8 19/18
 19/24 25/2 27/23 38/20 42/21 44/24 45/14 45/23
 46/10 46/18 47/4 48/8 50/16 55/21 56/2 66/24 67/2
 69/21 73/23 74/1 77/4 88/6 88/11 88/13 89/8 109/7
 109/13 109/15 116/13 116/15 118/11 118/11 124/4
 122/4
declarations [18]  5/10 5/17 5/18 5/19 5/22 10/14
 20/22 20/23 41/6 45/1 61/20 65/5 65/6 65/7 72/15
 79/15 90/8 109/11 122/2
dedicated [1]  31/1
deemed [3]  18/24 84/7 92/7
deeply [1]  40/16
defendant [6]  2/1 20/22 29/1 53/7 74/17 94/23
defendants [22]  1/7 3/23 6/24 19/9 19/13 23/23
 25/8 28/18 32/5 33/17 41/23 45/8 45/9 45/23 49/1
 50/2 50/4 53/25 54/15 62/24 75/24 98/20
defendants' [4]  72/18 72/17 44/8 44/20
Defenders [1]  1/15
defense [1]  4/7
define [1]  84/24
defined [1]  38/2
defines [1]  84/25
defining [2]  83/23 84/11
definitely [1]  99/18
definitively [1]  116/12
delay [1]  60/14
delegated [3]  13/9 91/13 37/18
delegating [1]  95/6
delegation [2]  22/23 128/1
delete [1]  15/1
deliberative [1]  89/14
demand [2]  15/7 127/16
Democracy [1]  1/15
demonstrate [2]  7/5 49/13
demonstrated [1]  50/5
denied [21]  116/24 126/20
deny [2]  70/12 90/19
department [21]  2/3 3/22 8/13 14/13 21/17 33/22
 39/24 40/5 40/9 40/21 46/24 47/4 47/9 47/10 61/20
 68/14 73/2 74/2 77/5 77/12 111/10
departments [2]  10/11 10/15
depend [1]  91/16
deposition [1]  93/9
deposition [1]  79/2
depositions [1]  123/20
deputy [17]  19/12 19/12 19/14 19/21 19/25 20/12
 20/12 34/2 34/3 67/1 95/3 95/7 95/9 96/18 96/19
 96/19 96/22
describe [1]  10/7
described [1]  10/8
describes [2]  28/22 85/17
describing [2]  28/15 128/14
designated [1]  23/18
despite [2]  111/16 118/16
destroy [1]  16/3
detail [2]  7/24 53/24
detailed [9]  65/25 66/14 66/19 66/23 111/18 112/20
 112/21 112/23 118/1
details [5]  45/13 45/14 63/13 113/1 120/12
determine [1]  39/5
die [1]  125/2
differ [1]  115/13
difference [2]  83/16 84/12
differences [1]  83/23
different [26]  9/4 12/18 12/23 14/10 27/22 28/1
 30/4 30/21 31/7 36/18 37/10 41/2 41/2 52/1 64/22
 76/21 81/1 92/14 96/25 96/6 102/21 102/21 104/3
 111/6 111/12 116/9
differently [4]  33/12 102/12 113/6 126/19
difficult [6]  72/23 87/3 89/16 91/8 91/16 101/3
dilemma [1]  120/18
diligently [2]  109/8 126/9
dire [1]  124/20
direct [7]  10/2 21/11 55/11 57/19 101/10 117/13
 117/23

**D**

direct-hire [1] 57/19
directed [1] 114/5
directing [2] 21/1 36/25
direction [7] 20/25 22/19 41/15 41/23 73/25 82/20 127/12
directly [5] 12/1 28/16 33/23 73/22 80/17
director [2] 67/1 95/3
disagree [12] 14/3 16/15 68/25 74/19 90/14 97/6 106/10 107/2 108/25 109/3 118/2 119/21
disagreement [3] 22/6 22/7 22/9
disciplinary [1] 122/15
disclosing [1] 56/3
disconnect [1] 87/25
discovery [46] 17/20 21/5 21/14 21/19 22/10 24/3 35/3 58/25 59/2 59/5 59/14 59/16 59/20 60/3 60/14 60/15 60/18 61/3 69/18 71/1 71/6 71/7 71/15 71/18 71/19 71/22 71/24 72/3 72/6 72/18 107/17 118/15 120/21 121/6 123/5 123/14 123/16 123/18 123/20 124/7 124/14 125/8 125/18 126/3 128/9 128/10
discretion [1] 12/6
discuss [2] 21/4 106/14
discussed [3] 32/9 108/6 129/10
discussion [7] 39/23 76/6 94/17 100/2 100/8 106/24 129/5
discussions [6] 21/5 21/14 64/15 76/8 106/2 129/4
dismantle [4] 31/1 31/5 31/9 31/19
dismantled [1] 97/17
dismantling [7] 31/24 32/6 32/24 35/5 37/23 38/2 38/24
dismiss [7] 70/19 70/21 70/25 71/2 72/1 75/16 124/4
dispositive [1] 99/8
dispute [12] 21/8 34/8 60/18 72/5 81/25 83/25 84/18 94/8 94/9 94/11 96/3 109/24
disputes [1] 97/23
disputing [1] 87/16
disseminate [1] 111/22
disseminating [1] 111/24
dissemination [1] 111/3
distinct [1] 25/12
distinction [6] 60/18 84/5 95/11 95/12 95/14 95/15
distinguish [1] 57/16
distributing [1] 56/18
district [11] 1/1 1/1 1/9 3/3 3/4 49/14 71/3 110/12 110/16 130/5 130/5
DIVISION [1] 1/2
do [136]
do what [1] 108/14
Docket [2] 1/5 110/13
document [5] 5/21 51/17 85/16 88/7 112/2
documentary [1] 125/24
documentation [7] 67/3 67/11 67/24 88/3 120/22 122/18 122/18
documented [2] 21/12 122/23
documents [5] 72/19 85/9 89/13 89/18 123/20
Doe [22] 14/21 18/6 19/18 41/16 43/8 43/14 44/23 45/21 48/8 48/12 48/13 48/13 48/14 50/16 50/17 50/23 53/3 53/20 55/20 109/13 109/14 122/5
DOGE [88] 6/25 7/8 7/20 8/4 12/1 13/15 13/18 13/22 14/17 14/24 15/7 17/21 18/1 18/7 19/6 21/1 23/20 24/5 24/18 25/5 25/15 27/20 28/2 29/9 36/25 40/16 41/23 45/10 45/14 49/17 50/7 50/18 51/7 51/10 53/6 53/10 54/22 55/11 55/15 56/7 58/16 59/23 63/5 63/11 63/17 65/11 65/23 66/17 66/22 73/17 74/5 84/13 84/18 84/20 84/22 85/4 85/16 86/3 86/5 86/7 87/14 87/17 88/1 88/16 88/16 107/22 107/24 108/10 108/15 110/9 111/14 112/20 115/4 115/21 116/14 118/4 121/4 121/15 121/23 122/18 123/3 123/23 123/7 123/16 123/21 125/1 127/10
DOGE's [2] 50/12 55/17
doing [21] 12/4 18/20 23/17 28/18 32/8 32/9 32/10 32/11 34/23 36/9 54/13 68/12 71/5 82/23 85/21 85/23 102/2 103/21 108/10 108/22 113/1
DOJ [2] 103/10 120/23
DOT [1] 31/8
dots [1] 114/4
dotted [1] 76/23
doubt [1] 109/21
down [28] 17/23 23/22 34/16 51/9 54/18 76/5 77/17 77/18 77/24 79/18 82/14 86/24 89/24 90/4 97/3 100/3 100/21 100/25 101/2 103/18 115/19 117/10 117/16 118/4 118/22 119/1 119/5 121/19
downstream [1] 45/18
dozen [1] 65/5
dozens [2] 118/17 128/13
drag [1] 70/24
drama [1] 13/12
draw [3] 20/17 63/6 109/6
drives [2] 80/22 81/9
due [3] 71/25 72/1 110/19
during [1] 128/14
duties [9] 19/11 34/1 95/7 95/10 95/17 96/17 96/22

**E**

e-mail [22] 12/11 12/12 13/10 14/22 15/4 19/16 19/19 19/20 22/14 23/21 25/20 27/19 28/1 28/11 28/23 29/6 29/7 57/5 57/17 57/25 67/11 114/12
e-mailed [1] 27/3
e-mails [2] 13/10 20/3
each [3] 4/12 4/13 85/6
earlier [5] 6/16 89/21 112/19 114/11 116/5
early [1] 115/17
easily [2] 74/18 129/1
East [1] 42/11
easy [2] 23/2 67/4
Education [1] 111/10
effect [1] 121/23
effectively [7] 32/6 32/12 35/5 36/9 38/24 100/20 100/24
Efficiency [2] 8/14 14/14
Efficiency's [1] 61/21

**E**

efficient [1] 105/11
effort [2] 40/6 107/3
EISENBERG [77] 1/17 2/7 10/22 13/16 13/21 17/7 109/13 109/19 127/3 ... 111/23
Eisen's [2] 114/11 114/15
either [21] 10/1 22/24 43/19 48/5 62/3 62/23 64/9 64/21 67/11 68/4 68/19 72/19 77/17 81/14 85/7 87/2 89/10 93/4 93/22 99/18 108/17
elaborate [1] 125/3
electricity [4] 45/19 45/21 46/2 46/19
electronic [1] 68/5
electronically [1] 88/25
eliminate [1] 97/13
ELMO [1] 10/3
ELON [11] 1/6 3/9 8/14 12/4 14/14 61/20 75/3 87/11 87/15 114/14 121/10
else [19] 18/19 20/13 22/19 26/11 39/5 39/13 39/15 42/19 61/7 66/9 73/20 79/11 80/10 80/13 86/4 106/1 106/23 107/10
embedded [3] 21/2 25/6 51/9
emergency [1] 125/7
emphasize [3] 16/20 72/14 109/5
employed [2] 88/15 88/15
employee [12] 14/9 18/10 18/21 25/14 36/12 36/16 55/1 56/1 59/25 100/1 109/9 114/14
employees [22] 12/10 12/11 12/12 18/18 36/6 38/13 40/24 44/11 57/19 65/25 66/24 68/2 73/25 89/4 100/24 101/20 110/11 114/24 119/6 120/1 120/11 122/14
employment [2] 10/3 92/1
empowerment [1] 36/2
enacted [1] 98/16
encouraged [1] 126/8
end [14] 18/2 19/7 22/5 24/6 25/16 32/10 47/4 70/18 73/14 99/16 110/20 117/17 120/16 128/16
end-all [1] 99/16
endeavor [1] 116/8
ending [1] 117/18
endorsed [1] 12/15
engage [4] 40/5 58/24 60/2 70/13
enjoys [1] 7/6
enough [4] 68/23 69/13 100/19 100/19
ensure [1] 104/16
ensuring [1] 104/22
entered [1] 107/15
entire [4] 12/16 13/5 32/24 49/25
entirely [1] 111/4
entitled [3] 57/4 57/13 130/9
entitlement [1] 62/1
entity [1] 84/14 84/17 84/23
EO [1] 104/14
episodes [1] 21/6
equal [1] 45/15
Equity [2] 75/6 75/16
equivalent [3] 18/23 18/25 29/19
error [1] 109/10
ESQUIRE [8] 1/14 1/14 1/17 1/18 1/18 2/2 2/2 2/3
essentially [2] 49/25 116/22
establish [6] 75/1 75/2 85/9 110/18 116/21 116/23
established [7] 54/3 80/24 81/6 81/24 97/15 121/22 126/11
establishes [3] 7/19 50/22 114/1
establishing [2] 32/19 127/10
et [2] 1/6 3/9
even [44] 9/21 12/10 13/3 14/7 19/2 22/18 23/17 30/23 30/25 31/4 31/12 33/5 34/10 38/16 49/23 56/7 64/15 64/20 65/19 67/4 69/11 71/1 73/5 73/6 74/3 74/6 74/11 74/15 75/25 77/14 78/15 82/10 84/7 84/16 85/14 85/18 96/14 100/11 104/4 105/25 113/13 117/1 119/5 125/16
eventually [1] 33/11
ever [4] 16/17 19/2 81/14 91/22
every [7] 29/6 63/18 67/9 114/14 120/23 124/20
everyone [11] 3/6 13/10 44/5 58/8 66/9 67/15 69/15 89/3 115/9 128/23 129/8
everything [7] 35/21 73/20 78/10 84/21 106/1 108/10 113/10
everywhere [1] 11/20
evidence [61] 7/18 7/25 8/9 9/18 10/12 10/14 10/20 11/13 11/16 17/20 18/1 18/4 19/6 20/2 20/4 20/10 21/12 21/12 23/14 23/16 24/5 24/22 24/25 28/5 28/16 30/20 32/4 33/20 50/15 55/18 59/22 61/23 69/22 74/13 74/25 76/1 76/2 76/17 79/5 79/13 90/10 90/23 99/5 103/8 112/14 113/18 113/19 113/20 114/17 116/23 117/12 117/19 119/16 119/16 121/22 122/20 124/25 125/5 127/11 127/12 127/25
evidentiary [1] 114/4
exact [5] 17/3 35/4 56/8 66/21 91/10
exactly [9] 13/20 34/14 35/18 45/14 66/24 93/4 108/4 118/5 128/14
examination [1] 79/1
example [16] 12/3 28/19 29/21 30/25 31/7 32/1 32/1 32/3 45/19 44/22 52/24 54/20 63/24 103/22 113/7 114/19
examples [7] 17/15 29/16 48/4 48/5 85/9 104/6 114/25
exceptions [2] 93/5 93/24
excuse [2] 56/16 58/6
execute [1] 30/18
executed [1] 13/2
executive [31] 8/21 8/22 8/25 17/11 23/11 24/10 30/18 35/11 36/3 36/21 37/18 37/24 84/13 84/24 86/1 89/23 97/5 97/8 98/15 98/23 99/19 101/5 105/12 106/9 106/11 106/20 112/6 112/7 112/9 127/10 127/25
executive's [1] 103/1
exercise [4] 11/17 17/15 25/17 93/12
exercising [6] 7/7 12/21 18/13 34/1 36/20 82/11
exhibit [37] 13/19 13/21 13/23 14/20 14/23 15/3 18/5 25/1 25/20 25/22 25/24 26/15 26/24 27/1 28/5 28/9 28/20 45/5 45/18 50/17 50/21 51/4 51/6

51/22 51/24 52/2 52/6 52/13 53/24 63/4 63/24 64/1 77/4 122/4 122/10 122/11
exhibits [2] 50/21 51/1 109/13 128/21
exist ... 92/16 118/4 88/7 111/23
existing [1] 118/9
exists [1] 69/13
expected [1] 46/16
expedited [11] 58/24 60/2 60/15 61/3 67/20 71/7 120/22 120/21 121/6 123/4 124/6
expeditious [2] 128/9 128/10
expeditiously [1] 15/18
experience [3] 9/17 73/2 113/3
expertise [1] 18/18
explain [6] 6/2 7/12 12/2 14/15 15/7 21/25 118/5
explained [4] 16/24 61/24 109/8 127/5
explaining [2] 13/22 15/20
explains [1] 55/21
expose [1] 5/12
exposed [2] 6/23
express [2] 13/4 106/11
expressed [1] 7/15
expression [1] 15/22
expressly [3] 89/9 112/8 116/15
extension [2] 46/20 46/22
extent [7] 58/25 68/7 79/18 98/19 109/20 113/12 128/8
extra [3] 31/25 37/2 67/23
extraordinarily [1] 123/4
extraordinary [3] 17/10 20/25 61/19
extravagant [1] 115/1
extremely [1] 123/4
eyes [1] 10/21

**F**

F.3d [2] 81/21 127/23
F.3rd [1] 75/7
F.4th [1] 95/23
facilitate [2] 107/17 108/7
facing [1] 41/5
fact [24] 4/10 5/1 17/22 18/2 18/19 19/14 22/9 23/18 24/21 24/22 28/13 29/8 34/2 36/24 66/15 70/11 75/23 75/25 86/11 90/12 99/18 100/23 113/11 113/18
fact-based [1] 100/23
facto [2] 17/21 101/16
factor [2] 31/9 54/9
factors [2] 61/25 75/20
facts [5] 24/3 59/7 76/19 88/22 122/20
factual [17] 7/1 21/7 30/4 34/8 60/17 60/18 72/5 75/17 80/6 84/7 90/5 96/6 97/18 102/24 116/18 121/25
factually [7] 29/22 74/5 82/8 84/20 95/4 107/2 109/3
fails [1] 94/25
failure [2] 12/13 125/23
fair [6] 11/11 76/22 88/19 94/12 94/13 107/12
fairly [1] 42/8
faith [2] 40/6 109/17
fall [2] 30/12 113/6
falls [1] 99/25
familiar [1] 7/23
familiarity [1] 8/21
far [9] 10/8 11/6 16/16 29/3 47/14 78/14 82/4 93/2 127/7
Farritor [5] 25/5 25/13 65/24 65/25 118/4
Farritor's [1] 49/6
fashioned [1] 59/19
fast [1] 4/25
faster [3] 59/16 60/11 61/4
fateful [1] 127/14
favor [1] 75/9
favorable [1] 108/3
FDR [1] 11/4
fear [1] 47/6
featured [1] 50/17
FEBRUARY [14] 1/10 8/11 12/3 13/23 23/15 23/24 24/8 44/11 95/4 109/15 109/16 110/17 118/12 127/15
February 17th [1] 110/17
February 19th [1] 8/11 109/15
February 1st [2] 13/23 23/15
February 22nd [1] 12/3
February 24th [1] 109/16
February 3rd [6] 23/24 24/8 44/11 95/4 118/12 127/15
fed [1] 128/16
federal [35] 9/22 9/24 12/9 12/11 12/12 12/16 13/5 14/8 18/8 18/18 18/21 21/2 29/7 29/24 63/9 67/17 87/8 89/24 94/17 95/1 95/18 95/19 95/22 96/16 98/23 101/7 101/7 102/7 104/17 104/23 112/24 113/2 114/21 130/4 130/17
feeding [1] 117/19
feels [2] 21/5 114/13
few [11] 12/6 61/2 67/13 70/4 93/5 93/23 93/24 108/22 109/6 110/1 126/3
field [2] 70/5 81/16
fight [1] 97/16
file [3] 52/1 52/4 71/18
filed [4] 4/2 88/2 121/2 121/3
files [1] 50/1
filing [1] 43/3
filings [1] 61/24
filling [1] 84/10
filtering [1] 15/16
final [5] 23/11 24/7 74/21 89/13 89/14
finally [2] 7/22 15/6
find [24] 8/12 26/6 30/2 70/20 108/7 108/13 108/15 108/18 108/19 121/5 121/13 123/1 128/7 128/12
finding [1] 104/13
finer [1] 124/18
finish [1] 13/16
finishes [1] 113/23
fire [3] 9/25 56/10 118/21
fired [1] 95/17
firing [1] 55/25

## F

firm [1] 4/12
first [20] 11/17 18/22 19/18 29/7 39/24
42/6 50/10 51/13 51/14 64/4 66/16 83/3 84/5 84/8
94/22 108/18 127/2 128/24
firsthand [2] 20/22 32/4
Fisher [4] 8/17 88/6 88/10 88/13
Fisher's [2] 116/12 116/14
five [10] 13/11 25/6 28/23 29/6 49/7 64/7 114/12
114/15 118/1 119/9
five-question [1] 114/12
five-things-you-did-this-week [2] 28/23 29/6
fix [1] 124/21
flames [1] 118/20
flip [1] 126/24
Florida [1] 8/11
flying [1] 92/3
focus [1] 39/5
focused [1] 127/19
folks [6] 18/17 45/18 48/25 57/22 73/7 73/9
follow [5] 72/25 105/15 113/17 113/24 114/2
following [1] 12/24
Footnote [1] 15/9
force [7] 14/25 19/19 20/7 22/14 22/15 34/19 38/20
forced [1] 124/10
forces [1] 17/8
forecloses [2] 81/17 82/3
foregoing [1] 130/7
foreign [16] 39/4 62/16 99/18 99/24 102/7 103/11
103/15 103/20 103/21 103/22 103/24 103/25 104/4
104/8 104/11 104/20
foremost [1] 108/18
forgive [1] 122/17
form [2] 7/2 31/24
formal [2] 8/18 60/8
formally [3] 111/1 120/1 122/24
format [1] 130/9
forms [1] 13/9
formulate [1] 13/4
formulated [1] 13/1
forth [4] 29/3 33/2 78/8 106/1
forthcoming [1] 69/5
forums [1] 35/10
forward [3] 11/2 70/15 71/22
found [4] 49/21 70/21 83/13 121/9
founders [1] 7/17
founding [2] 14/15 15/17
four [10] 5/9 5/10 5/17 41/19 48/21 61/25
75/20 116/21 125/22
Fourth [2] 75/7 75/15
FFDS [1] 63/22
FFDSNG [1] 63/7
frame [1] 31/20
frankly [5] 11/14 20/24 77/12 81/14 104/1
fraud [4] 104/12 104/14 104/22 105/16
free [1] 110/5
frees [1] 126/16
freeze [8] 31/1 35/21 68/1 93/11 93/17 94/9 119/25
126/1
freezing [6] 32/12 35/11 38/10 38/12 38/14 93/3
FRIDAY [1] 1/10
friend [1] 120/24
front [4] 33/20 38/9 45/10 100/6
fruitful [1] 129/6
frustrate [2] 87/4 88/8
full [4] 13/18 49/6 49/18 72/18
full-blown [1] 72/18
fully [1] 48/14
function [4] 46/3 84/25 85/11 85/17
functional [1] 119/15
functionally [1] 119/18
Fund [1] 1/15
fundamental [2] 123/5
funding [1] 9/22
funds [3] 35/11 36/4 38/10
further [12] 6/13 6/20 35/25 42/11 88/6 88/11
105/23 111/2 111/3 111/22 115/3 129/4
furthest [1] 97/25
future [3] 43/22 65/10 115/15
FVRA [1] 96/9

## G

gap [1] 123/24
GARDNER [4] 2/2 3/22 61/14 117/6
Gardner's [1] 117/10
garner [1] 61/4
gatekeeper [2] 9/12 9/16
gather [2] 17/19 24/3
gathered [2] 23/20 24/22
gave [3] 32/20 69/16 125/4
Gavin [4] 13/22 18/6 20/4 65/25
general [7] 6/15 12/6 22/20 36/1 104/21 113/13
127/23
generally [3] 23/5 40/13 48/10
gentleman [2] 25/4 25/12
Germaine [1] 127/10
getting [9] 46/9 57/15 58/5 58/6 62/14 71/15 89/12
123/12 123/12
give [19] 4/4 4/8 4/13 4/14 11/20 29/21 44/21
51/19 54/7 67/4 74/24 78/20 92/10 92/11 94/4 95/21
103/22 106/6 107/16 113/22
given [13] 26/16 32/16 39/3 39/7 41/19 46/19 50/8
64/15 69/25 87/23 87/24 126/17 127/9
giving [4] 31/19 69/5 122/11 127/9
Gleason [1] 86/8
go [25] 5/7 21/14 28/19 30/1 30/21 33/16 39/14
50/9 51/8 53/13 56/23 61/17 63/3 63/18 64/1 64/11
69/10 70/14 71/22 72/10 72/22 82/4 89/14 114/7
124/9
God [3] 13/25 14/1 45/12
God-level [1] 13/25
goes [13] 23/20 26/20 33/2 36/18 37/23 41/24 88/6
88/11 103/5 120/13 120/14 120/15 120/18
going [46] 4/12 6/2 8/10 11/12 12/2 13/16 14/3
15/22 17/24 19/21 19/24 20/18 23/21 23/22 26/23
28/11 30/23 31/6 32/17 36/4 37/16 37/18 40/17
78/21 82/8 84/19 85/3 88/15 89/22 90/2 91/18 92/5
102/2 103/3 106/2 107/13 108/21 113/17 114/21
114/24 117/15 118/22 120/15 121/16 122/17 125/1
128/15
gone [4] 15/24 51/11 64/4 113/23
GONZALEZ [2] 1/18 1/19 3/17
good [9] 3/19 3/20 3/21 3/25 17/2 40/6 74/10 109/1
115/10
good-faith [1] 40/6
got [10] 18/13 25/2 27/4 58/5 58/6 58/7 67/11 75/1
85/3 87/9
gotten [4] 46/21 57/17 57/20 62/13
government [56] 4/20 5/13 6/2 7/10 8/14 8/18 9/8
9/9 9/24 10/3 10/10 12/16 13/5 13/10 14/8 14/13
15/13 18/8 21/7 22/8 25/23 27/15 42/7 61/21 63/14
66/3 66/11 66/13 68/23 69/17 69/19 72/20 87/4
92/15 104/2 104/2 110/25 114/24 114/13 114/17
117/12 118/2 118/14 124/10 126/1 126/14 129/11
government's [4] 20/21 104/17 125/23 127/2
governments [1] 104/8
grab [1] 51/1
grant [6] 6/17 22/3 36/16 90/24 93/3 122/6
granted [1] 22/2
granting [1] 49/14
grants [2] 89/5 100/24
granular [2] 52/1 52/3
great [6] 12/4 15/24 42/9 73/17 74/13 92/12
greet that [1] 92/22
GREENBELT [1] 1/2
ground [2] 98/9 101/11
guarantee [1] 40/18
guarantees [1] 16/25
guess [13] 18/11 21/11 32/4 42/6 54/23 70/8 72/7
84/15 110/1 113/11 116/16 125/15 125/18
guidance [1] 39/1 92/12
guidelines [1] 112/4
guys [1] 22/6

## H

H.R [1] 10/6
hadn't [2] 57/14 62/13
Haldeman [1] 10/6
half [2] 67/18 67/18
HALL [2] 2/3 3/24
hand [8] 5/3 5/18 26/22 30/8 33/4 36/19 101/6
101/7
handle [1] 6/5
hands [1] 110/21
happen [14] 42/1 42/25 43/1 43/2 73/19 73/20 74/6
74/7 82/20 93/17 100/20 115/8 115/17 119/8
happened [18] 13/20 21/8 24/1 28/21 40/3 72/6
73/21 74/4 81/14 83/21 83/24 93/14 97/6 102/18
102/24 109/21 115/23 118/12
happening [5] 26/13 30/21 73/18 104/1 121/23
happens [7] 12/17 46/15 48/1 71/6 74/8 102/1
103/25
happy [2] 64/10 100/4
hard [11] 11/9 11/19 60/4 60/6 69/24 71/14 108/9
108/11 108/12 121/5 121/13
harm [34] 7/25 12/1 16/7 22/1 41/4 41/6 41/8 41/13
41/13 41/24 42/9 44/17 44/19 46/1 48/6 48/19 48/22
49/14 54/4 54/12 56/14 64/17 65/3 65/9 65/10 75/13
106/25 110/8 114/7 123/15 124/6 125/14 125/17
126/1
harmed [1] 61/22 65/6 65/9
harms [4] 48/24 61/10 61/11 73/10
have already [1] 57/10
having [10] 11/11 12/10 14/9 18/12 41/25 43/15
84/19 88/3 109/23 123/13
head [13] 30/23 31/4 31/7 33/19 35/8 38/19 46/17
66/5 80/18 86/3 86/5 86/7 87/17
headquarters [1] 119/2
heads [1] 114/23
hear [6] 4/7 6/4 27/23 39/11 62/3 63/8
heard [9] 9/20 12/10 16/19 17/10 62/14 107/1 107/1
117/25 118/1
hearing [4] 1/8 3/10 4/1 21/4
heels [1] 33/4
held [5] 11/6 59/13 103/22 110/18 130/8
help [2] 59/6 69/18
helpful [2] 66/15 129/7
hereby [1] 130/6
hesitant [1] 47/5
high [6] 28/6 28/7 42/1 42/4 44/25 46/1
high-ranking [2] 28/6 28/7
high-risk [4] 42/1 42/4 44/25 46/1
higher [1] 51/20
higher-level [1] 51/20
highlighted [5] 49/16 55/20 56/1 61/2 63/7
highlighting [2] 50/12 127/21
highly [1] 87/20
Highway [1] 1/19
him [10] 10/8 12/4 29/2 76/6 77/24 94/4 94/5 99/12
99/13 115/1
himself [5] 8/19 19/23 19/25 68/6 87/25
hire [2] 9/25 57/19
his [23] 7/7 7/20 8/4 10/1 13/15 17/12 19/24 22/19
55/18 55/22 73/23 77/22 78/9 83/22 90/16 95/25
96/4 96/5 104/15 105/11 113/22 122/22 127/16
historically [1] 14/4
history [2] 7/11 16/1
hold [2] 82/24 95/9
holding [1] 95/2
hole [1] 116/2
home [3] 46/4 80/23 81/9
honestly [1] 68/13
Honor [147]
Honor's [2] 56/22 59/21

## 

HONORABLE [3] 1/9 3/5 129/15
hope [1] 73/1
host [1] 9/4
hours [1] ...
house [24] 8/22 8/23 8/24 9/8 9/10 9/11 9/15 10/1
10/4 10/6 10/15 11/5 11/5 11/11 13/3 15/11 66/17
81/4 81/4 81/7 82/1 86/2 88/15 118/23
housed [1] 49/3
housekeeping [1] 4/19
however [3] 23/10 26/4 30/5
HR [7] 25/11 26/11 27/1 27/21 27/23 28/12 66/18
HRannouncements [3] 14/19 14/22 15/2
huh [4] 52/21 53/8 56/21 57/21
human [1] 121/15
humane [1] 125/12
humans [1] 116/9
hundred [2] 93/4 93/23
Hur [1] 113/1
hypothetical [3] 82/11 82/22 83/5
hypotheticals [1] 101/8

## I

I'd [1] 110/11
I'll [6] 10/19 16/21 43/23 117/3 117/10 129/2
I'm [87] 4/11 8/9 10/24 11/12 13/15 14/3 15/22
17/13 18/3 18/11 19/3 26/5 26/6 26/18 26/23 28/15
41/8 50/25 51/17 51/17 52/17 54/23 54/5 55/6 68/6
68/11 68/25 69/4 70/17 72/18 72/22 75/8 75/13
76/16 78/21 79/20 79/23 80/1 80/18 81/14 85/22
86/14 87/2 87/3 87/4 87/9 87/21 88/8 90/14 91/3
91/13 91/15 92/19 93/15 93/16 93/19 94/7 95/24
97/1 97/5 97/22 98/5 99/15 99/15 100/4 100/12
100/21 102/4 103/6 106/4 108/17 108/17 109/1 113/6
115/3 116/6 118/24 120/2 120/15 120/25 121/20
122/17 122/17 124/18 125/15 125/18 126/25
I've [11] 4/3 4/8 9/7 9/7 32/5 61/1 63/6 67/11
68/18 70/21 122/18
i.e [2] 80/24 81/24
idea [3] 29/5 46/14 74/19
ideal [2] 11/4 60/8
identical [1] 64/12
identifiable [1] 49/20
identified [11] 18/6 40/1 42/10 44/25 45/7 48/21
54/9 65/9 65/23 120/19 123/11
identifies [1] 104/24
identify [9] 3/11 11/21 11/21 19/25 81/18 101/15
106/2 107/24 114/15
identifying [1] 122/12
identity [2] 5/11 111/3
II [9] 101/5 102/6 104/12 104/16 104/20 104/25
104/25 105/10 105/17
illegal [1] 118/8
illegitimate [1] 27/20
imagine [2] 37/12 85/10
immediately [2] 13/7 54/8
imminent [3] 54/4 65/9 65/10
impact [4] 11/25 37/11 73/14 74/8
impacting [1] 101/21
implausible [1] 25/13
implementation [1] 44/8
implicitly [2] 9/2 70/20
implies [1] 33/8
imply [1] 42/22
implying [1] 113/22
important [10] 8/10 20/7 24/8 47/17 49/10 66/7
67/15 122/21 123/17 128/22
importantly [1] 33/20
impossible [1] 129/24
impression [3] 66/10 69/16 128/24
improper [1] 47/11
improperly [1] 36/20
inability [1] 54/21
inaccurate [1] 84/20
inappropriate [1] 106/20
Inc [1] 95/22
incessantly [1] 128/6
inclined [1] 6/17
include [1] 51/15
included [3] 50/18 50/19 61/10
includes [6] 45/15 45/17 45/19 45/21 122/13 122/18
including [14] 8/5 24/25 40/10 40/13 41/18 49/18
58/8 59/24 63/12 63/24 67/21 75/21 126/20 127/9
incomplete [2] 59/6 82/23
inconsistent [2] 79/18 114/23
Incorporated [1] 75/7
indeed [1] 70/8
independent [8] 29/17 32/13 83/12 83/18 83/22 84/6
85/8 85/11
indicate [2] 65/6 92/19
individual [16] 9/11 16/8 25/19 26/3 26/3 39/21
43/18 44/18 52/9 54/24 55/5 56/5 58/12 67/5 107/24
127/21
individually [2] 20/14
individuals [11] 8/1 8/23 9/5 9/9 51/7 54/13 65/11
67/6 111/14 112/1 125/13
indulge [2] 10/18 18/3
indulgence [3] 81/20 111/9 128/5
indulgent [1] 10/13
infer [1] 21/9
inference [2] 20/16 76/22
infiltrating [1] 14/17
influence [5] 74/23 74/24 74/24 75/3
influenced [1] 75/3
informal [1] 69/18
information [50] 11/15 20/21 32/20 33/21 34/5 39/9
40/19 49/17 49/19 49/20 50/13 50/19 50/23 52/7
53/9 53/17 53/21 53/24 54/22 59/6 63/12 64/17 65/4
65/7 65/12 66/6 68/12 69/6 69/12 69/17 83/7 107/22
107/25 108/3 110/21 111/24 113/14 113/15 118/11
112/12 122/17 124/18 125/15 126/1 127/20 128/22
122/14 126/10 126/13 128/20
informed [1] 20/5
informing [1] 23/25

## I

infrastructure [3] 18/3 19/7 32/10
inherent [1] 115/19
inherently [1] 65/4
injunction [16] 1/8 3/10 4/2 6/22 59/9 59/9 61/20 70/10 70/13 71/8 72/16 75/19 90/20 90/24 103/7 116/24
injunctions [2] 60/7 60/23
injured [1] 63/15
injuries [6] 62/17 62/19 62/22 73/11 74/23 127/21
injury [4] 40/1 62/10 110/19 111/2
inoperable [1] 118/6
inquired [1] 21/19
inside [1] 127/11
installed [1] 18/8
installing [1] 9/24
instance [4] 15/14 16/23 18/1 22/12
instead [5] 15/25 20/6 25/15 115/19 115/20
instruction [1] 13/8
instructions [2] 12/9 29/4
intending [2] 77/5 77/6
intends [1] 77/24
intense [1] 49/23
intent [1] 78/10
interacted [1] 53/6
interacting [1] 52/4
interactions [2] 103/24 104/8
interest [5] 7/15 10/17 39/7 62/7 64/24
interested [3] 11/14 26/10 35/24
interfering [1] 9/21
interim [2] 40/6 125/16
intermediate [1] 74/20
internal [4] 29/14 29/24 34/5 81/7
interpret [1] 78/21
interpretation [1] 78/20
interrupt [3] 65/1 91/4 98/10
intertwined [1] 55/14
introduce [1] 9/18
intrusion [1] 62/10
invalid [1] 106/20
investigative [1] 20/24
invites [1] 106/18
invoices [2] 47/5 55/16
invoking [2] 75/9 75/9
involuntarily [1] 47/21
involve [2] 23/9 23/10
involved [4] 22/24 90/15 111/6 129/8
irregular [1] 27/12
irreparable [19] 7/25 12/1 22/1 39/12 41/4 41/6 41/8 41/12 45/25 48/6 48/22 49/13 54/5 56/13 106/25 110/19 111/2 124/6 125/13
irreparably [1] 61/12
is [513]
isn't [15] 14/8 21/21 35/18 64/22 68/15 72/5 74/3 76/22 78/13 84/3 94/8 97/14 104/4 113/11 125/12
issue [33] 5/9 7/15 11/7 22/9 37/22 38/9 39/2 39/12 41/3 41/4 42/4 43/14 43/15 54/8 59/4 61/11 73/4 80/15 80/23 83/9 84/3 89/22 94/22 96/24 101/16 102/6 103/3 103/9 104/20 107/11 114/5 119/10 123/21
issued [1] 6/12
issues [25] 16/6 16/6 21/6 21/22 29/11 54/24 54/25 56/5 62/12 62/22 63/1 69/19 72/16 73/18 74/12 80/7 80/19 94/24 123/11 123/20 123/25 127/22 128/23 128/24 129/5
items [2] 5/11 122/16
iteration [1] 104/25
itself [10] 8/16 21/18 49/13 50/4 55/10 85/4 95/18 105/10 112/7 112/10

## J

J. [1] 48/8
J. Doe [1] 48/8
Jack [1] 112/25
Jackson [1] 27/8
JACOB [2] 2/2 3/23
Jane [2] 109/3 109/14
January [10] 13/18 66/11 66/13 67/16 68/18 112/7 117/17 117/17 117/17 127/14
January 20th [6] 13/18 66/11 66/13 67/16 68/18 112/7
January 30 [1] 127/14
January 30th [1] 117/17
jeopardize [1] 107/25
JOAQUIN [2] 1/18 3/17
job [4] 10/7 12/9 12/4 87/9
John [8] 13/19 13/24 14/21 109/4 122/5
joint [11] 5/6 8/12 8/13 14/21 14/23 15/9 18/5 19/10 19/17 109/13 128/20
Josh [2] 3/21 116/12
JOSHUA [2] 2/2 8/17
JR545 [1] 52/20
JUDGE [11] 1/9 43/5 71/11 71/17 71/21 107/11 107/16 110/10 110/12 110/18 110/23
judges [2] 29/19 126/19
judicial [3] 29/20 80/21 130/10
junior [1] 20/14
Justice [12] 2/3 3/22 16/23 17/3 17/8 21/17 33/22 39/24 40/6 40/9 40/21 68/14
justification [1] 58/13
justify [2] 54/11 56/12

## K

keep [3] 41/10 110/21 124/9
Kenneth [1] 27/8
key [3] 50/15 80/21 88/22
kicked [1] 18/16
kill [1] 128/15
kind [12] 11/10 14/5 14/9 21/21 27/11 35/4 35/13 60/13 66/7 75/13 79/5 81/16
kinds [2] 73/18 81/5
Kliger [13] 13/22 14/2 14/18 15/1 18/6 20/4 49/6

55/18 55/22 65/25 117/25 117/25 118/3
Kliger's [1] 14/24
knew [2] 19/19 113/1
knowing [1] 41/25
knowledge [1] 96/15
knowing [1] 41/25
knowledge [2] 65/16 65/18
known [4] 19/2 20/11 25/5 33/23
knows [7] 4/25 13/7 13/12 67/7 93/1 103/2 114/20

## L

lack [2] 14/16 109/1
laid [1] 125/3
Landry [6] 80/22 81/8 81/19 82/3
language [2] 20/11 32/25
large [3] 30/4 98/14 103/19
largely [4] 30/12 61/22 103/7 117/11
larger [1] 92/7
last [15] 5/16 12/13 15/22 17/25 27/1 41/19 48/9 49/7 65/24 78/2 105/18 112/22 114/15 116/16 118/7
latched [1] 38/1
later [6] 12/8 55/23 60/22 79/3 79/4 124/7
law [20] 15/16 16/16 16/21 17/6 22/8 23/8 29/19 30/3 30/24 78/3 80/13 80/14 80/24 81/24 89/5 103/23 110/14 110/14 115/8
lawful [1] 73/1
lawfully [1] 31/5
laws [1] 100/13
lawsuits [4] 67/17 69/3 88/2 115/8
lay [1] 49/25
layers [1] 59/21
leap [1] 55/8
least [29] 4/13 16/16 25/6 33/8 35/23 36/5 39/23 42/7 42/20 42/25 47/12 48/21 53/21 54/4 55/9 56/13 58/18 60/20 68/4 73/1 76/24 78/9 85/21 93/14 99/5 101/1 102/12 119/3 124/15
leave [18] 15/22 40/25 43/19 44/2 47/20 47/21 47/23 57/20 57/23 57/24 64/21 68/3 89/3 91/11 113/21 119/7 120/2 120/11
leaving [2] 89/22 109/19
lectern [1] 62/4
Leeper [3] 130/4 130/15 130/16
leeway [1] 46/19
left [3] 40/8 40/15 52/20
legal [6] 65/19 69/14 95/16 97/21 122/21 128/25
legally [3] 55/7 96/9 102/22
legislative [1] 30/18
legitimate [3] 25/14 96/2 102/12
less [7] 11/6 13/4 34/18 110/5 117/2 120/25 123/14
letter [24] 19/10 23/25 25/3 25/7 25/9 120/25 26/3 26/7 26/13 27/7 57/18 58/5 58/6 67/11 77/2 77/10 77/11 77/22 95/5 105/20 106/18 118/8 118/10 118/11
letting [1] 57/18
level [9] 13/25 14/7 15/10 50/8 51/20 53/24 74/7 74/11 92/1
levels [1] 45/12
life [3] 8/6 12/16 49/25
lifesaving [1] 8/6
light [4] 4/10 24/5 43/9 125/23
likelihood [5] 15/15 20/19 39/6 70/20 75/21
likely [3] 7/13 7/19 92/7
likes [2] 33/10 62/16
limited [2] 60/2 124/5
limits [1] 36/2
line [10] 22/19 23/4 34/22 35/5 73/5 76/23 78/2 79/14 103/2 118/7
lines [2] 17/5 100/8
link [2] 63/11 63/17
list [3] 27/1 51/9 121/17
listed [3] 26/7 33/6 52/5
literally [3] 46/21 128/1 128/2
litigation [1] 35/10
litigation [2] 78/22 78/23
little [8] 16/15 26/23 33/21 45/8 45/11 49/4 112/14 121/16
lively [1] 4/25
lives [2] 8/5 119/17
loathed [1] 112/22
located [1] 48/11
location [1] 47/5
locked [1] 44/2
lockout [1] 44/4
logical [1] 126/13
long [3] 4/11 47/8 80/9
look [33] 6/4 19/24 21/24 23/5 23/23 25/3 28/3 28/14 28/20 32/18 38/18 50/21 54/6 60/5 63/25 64/5 64/11 65/2 69/7 70/8 70/17 75/6 75/10 84/20 99/17 100/7 102/12 107/8 108/21 109/12 112/1
looked [1] 85/8
looking [5] 11/2 31/16 46/10 51/17 56/15
looks [4] 49/5 52/13 104/3 120/24
loop [2] 15/6 62/20
lose [4] 46/2 46/2 46/5 46/6
lost [4] 41/25 44/5 44/10 44/20
lot [8] 11/15 34/4 66/17 108/6 108/22 108/23 110/2 116/17
love [1] 119/12
Lucia [2] 17/3 36/19
Luke [3] 25/5 65/24 118/4

## M

made [21] 19/4 21/8 22/18 31/17 31/18 33/18 33/18 62/9 88/25 89/6 91/12 94/4 94/11 96/15 102/13 104/13 107/9 110/20 110/23 110/24 122/18
made-up [2] 31/17 31/18
magnitude [6] 36/8 38/24 91/17 92/19 92/22 93/9
mail [22] 12/11 12/12 13/10 14/22 15/4 19/16 19/19 19/20 22/14 23/21 25/20 27/19 28/1 28/11 28/23 29/6 29/7 55/25 57/1 57/25 67/11 114/12
mailed [1] 27/3
mails [2] 13/10 20/3
main [3] 11/2 51/6 51/7
maintain [1] 43/24
maintaining [1] 25/16

maintains [1] 17/4
make [19] 8/18 11/7 36/3 55/22 56/5 70/22 71/23 116/9 117/9 117/9 117/9 117/12 119/9 96/8 108/19 110/1 116/22 117/1
maker [1] 36/24
makes [3] 25/17 81/1 127/24
making [16] 18/24 20/6 23/12 24/19 29/19 29/22 122/24 54/5 35/1 37/1 47/11 55/17 76/24 96/5 122/24
man [2] 8/14 14/14
Management [2] 27/9 27/13
manipulation [1] 49/7
manner [1] 17/7
many [11] 11/25 22/16 25/20 25/20 30/17 49/24 71/13 104/2 114/21 119/24 120/1
March [1] 130/12
marked [1] 5/24
marks [1] 117/11
Marocco [15] 19/11 19/14 19/22 20/10 22/13 33/25 42/21 67/9 67/22 68/6 68/8 69/24 73/23 73/25 75/4 76/8 76/12 76/22 77/4 79/17 79/22 79/23 80/9 89/8 89/10 94/4 95/3 95/6 95/8 96/4 96/14 96/22 109/7 113/12 120/8
Marocco's [1] 118/10
Marshals [1] 10/2
MARYLAND [3] 1/1 3/4 130/6
MARZIANI [12] 1/17 1/19 3/14 6/1 7/12 14/15 16/6 16/11 16/12 49/4 55/24 59/4
massive [2] 10/13 95/15
materials [3] 4/23 4/24 5/13
matter [8] 3/7 15/16 16/19 49/15 96/6 102/15 121/7 130/9
matters [1] 4/19
may [40] 4/19 5/2 5/25 8/20 11/13 13/16 20/10 22/14 33/4 33/6 33/10 40/25 41/1 43/11 43/17 44/20 47/11 61/18 76/22 78/3 78/5 78/7 79/3 83/5 94/3 97/1 97/5 105/21 111/23 113/3 115/13 115/14 116/13 116/13 118/3 120/14 122/10 124/10 124/19 126/24
maybe [25] 22/23 40/3 41/4 46/11 60/11 61/4 63/1 68/24 69/3 73/7 74/6 85/1 87/9 88/21 93/4 100/9 101/16 101/17 101/25 105/18 111/6 112/5 113/5 113/5 124/17
MAYS [2] 1/14 3/18
McKay [1] 83/23
mean [102] 8/22 11/19 18/12 20/15 21/24 26/5 28/17 33/13 33/16 33/24 41/7 44/14 45/7 35/16 36/8 37/13 38/18 42/5 43/18 44/7 46/12 48/5 48/19 50/21 55/4 57/12 62/8 62/9 62/12 64/14 64/15 65/13 66/7 66/10 66/16 67/4 67/24 68/1 68/21 69/2 69/15 70/2 70/4 70/8 70/16 72/2 72/4 72/7 73/5 74/17 75/6 75/7 76/8 76/15 76/19 78/5 78/18 79/7 79/21 81/4 82/19 83/8 83/9 83/12 84/4 84/17 85/7 86/10 86/24 87/7 87/16 89/5 90/7 90/25 91/3 91/8 92/15 97/5 97/15 97/22 98/2 98/10 98/25 99/1 99/1 99/8 99/17 101/21 103/21 106/17 109/5 111/13 111/16 111/25 112/2 113/9 116/5 119/24 119/24 123/17 123/18 124/4
Meaning [1] 46/23
meaningful [1] 23/12
means [6] 32/8 45/25 56/19 72/6 78/15 119/22
media [2] 64/15 116/3
meet [3] 61/25 120/20 128/6
meeting [1] 28/21
meets [2] 50/7 112/20
member [4] 7/6 13/8 15/12 19/2
members [2] 50/7 112/20
memorandum [3] 27/8 56/17 61/9
mention [2] 112/18 112/19
mentioned [7] 6/16 18/8 24/25 29/11 59/4 77/13 103/11
merchant [1] 127/8
mere [2] 110/25 128/3
merely [1] 59/23
merits [11] 7/13 7/19 15/15 20/20 39/14 70/18 75/8 75/21 79/10 94/25 125/5
message [4] 12/19 12/20 13/2 68/5
messenger [1] 12/22
met [3] 70/11 125/12 125/22
metadata [4] 25/4 25/4 26/2 26/8
metes [1] 100/1
Mexico [1] 71/11
middle [2] 42/11 127/15
might [19] 20/13 22/6 25/8 31/24 34/23 42/17 42/25 43/21 60/3 60/5 62/10 64/23 69/9 72/17 85/14 91/22 97/23 97/24 100/13
MIMI [3] 1/17 3/14 16/12
mine [1] 10/17
minimum [7] 56/15 56/17 56/23 57/2 58/16 58/23 90/17
minutes [4] 4/13
misremembering [2] 77/23 78/1
missing [1] 125/15
mission [5] 46/17 46/24 46/25 46/25 47/15
mistaken [1] 95/25
mistakenly [1] 95/2
misunderstanding [1] 125/19
misunderstands [1] 117/12
misunderstood [1] 124/17
misuse [1] 50/5
mode [2] 45/12 59/17
modern [2] 117/2
modified [1] 126/21
moment [2] 44/20 45/4
Monday [1] 25/3
money [4] 47/16 101/24 103/15 104/17
monies [1] 24/20
monopolize [1] 10/19
more [37] 4/14 10/18 12/5 13/14 21/11 24/4 28/24 29/4 34/4 35/4 37/11 40/23 45/12 49/23 52/1 52/3 54/10 55/6 59/6 62/18 65/5 67/23 69/3 69/7 69/22 69/23 83/6 88/17 92/7 98/17 104/21 105/7 111/1 120/13 123/14 125/12 126/13
morning [1] 27/3

**M**

Morrison [5] 83/17 83/18 84/20 83/21 83/24
Moss [3] 110/5 110/19 110/20
most [22] 7/9 7/11 7/25 8/18 9/23 10/7 11/16
11/16 11/16 25/1 31/25 32/4 41/3 41/5 48/20 53/5
54/16 103/20 104/1 113/11 122/20
motion [29] 3/10 4/1 4/6 4/8 5/6 5/21 6/9 6/17
43/4 56/16 59/13 59/13 60/21 70/12 70/18 70/19
71/6 71/8 71/18 72/1 75/16 75/19 90/20 103/7
116/24 124/4 124/15 124/16 125/18
motions [5] 6/16 60/23 70/13 70/25 71/1
mountain [7] 7/25 8/9 10/12 119/15 119/16 121/23
128/9
move [11] 4/21 33/9 43/11 60/11 61/4 78/7 80/1
124/17 125/9 126/2 126/21
moving [1] 59/16
Mr [7] 10/25 14/23 28/23 49/6 67/9 77/10 84/16
Mr. [125] 4/17 6/24 7/5 7/17 8/7 9/3 9/13 9/13
9/17 10/8 10/12 10/14 10/21 11/10 11/23 11/24
11/25 12/7 12/25 13/15 13/22 14/2 14/18 14/24
14/24 15/1 15/7 15/20 16/3 17/11 17/14 17/21 18/15
19/10 19/11 19/14 20/10 20/14 20/25 22/13 22/18
23/17 23/24 24/12 25/13 25/17 28/22 28/24 29/3
33/23 33/25 36/24 41/23 49/4 49/6 55/18 55/22
61/14 67/22 68/6 68/8 69/24 73/16 73/25 74/5 74/12
75/4 75/12 76/5 76/6 76/8 76/12 76/22 77/16 78/10
79/17 79/19 79/22 79/23 80/9 82/9 83/20 83/22
83/23 84/1 84/2 84/14 85/3 86/1 88/14 89/10 94/4
95/3 95/6 95/8 96/4 96/4 96/14 96/12 113/20 114/11
114/16 114/17 114/22 114/25 115/20 116/14 116/14
117/6 117/8 117/10 117/14 117/18 117/20 117/25
118/3 118/13 118/8 118/10 118/24 122/4 122/5
127/12 127/14 128/15
Mr. Eisen [5] 4/17 18/15 49/4 114/16 117/8
Mr. Eisen's [2] 114/11 114/25
Mr. Farritor [1] 25/13
Mr. Fisher's [1] 116/14
Mr. Gardner [2] 61/14 117/6
Mr. Gardner's [1] 117/10
Mr. Gavin [1] 13/22
Mr. Kliger [9] 14/2 14/18 15/1 49/6 55/18 55/22
117/25 117/25 118/3
Mr. Kliger's [1] 14/24
Mr. Marocco [26] 19/11 19/14 20/10 22/13 33/25
67/22 68/6 68/8 69/24 73/25 74/5 74/8 76/12 76/22
79/17 79/22 79/23 80/9 89/10 94/4 95/3 95/6 95/8
96/4 96/14 96/22
Mr. Marocco's [1] 118/10
Mr. McKay [1] 83/23
Mr. Morrison [1] 83/20
Mr. Musk [62] 6/24 7/5 7/8 7/19 8/3 8/18 9/13 9/17
10/8 10/12 10/14 11/10 11/23 11/24 12/7 12/25
13/15 15/7 15/20 16/3 17/11 17/14 17/21 22/18 24/12
20/25 22/18 24/12 25/17 28/22 28/24 29/3 36/24
41/23 73/16 74/5 74/12 75/12 76/5 76/6 77/16 78/10
79/19 82/9 84/1 84/2 84/14 85/3 86/1 88/14 96/4
113/20 114/17 114/22 115/20 116/14 117/14 117/18
122/22 125/11 127/12 127/14 128/15
Mr. Musk's [4] 10/21 11/25 14/24 118/3
Mr. Olson [1] 83/22
Mr. Rubio [3] 23/17 23/24 33/23
Mr. Rubio's [3] 19/10 118/8 118/10
Ms. [15] 6/1 7/12 7/22 12/2 14/15 16/6 16/7 16/11
39/18 49/4 55/24 59/4 86/8 123/1 124/19
Ms. Gleason [1] 86/8
Ms. Marziani [8] 6/1 7/12 14/15 16/6 16/11 49/4
55/24 59/4
Ms. Stevens [6] 7/22 12/2 16/7 39/18 123/1 124/19
much [10] 13/4 17/19 22/5 22/7 39/17 46/15 68/12
69/6 74/12 107/8
multiple [2] 60/7 113/1
MUSK [76] 1/6 3/9 6/24 7/5 7/8 7/19 8/3 8/14 8/18
9/13 9/17 10/8 10/12 10/14 11/10 11/23 11/24 12/7
12/8 12/25 13/15 14/14 15/7 15/20 16/3 17/11 17/14
17/21 20/14 20/25 22/18 24/12 25/17 28/22 28/24
29/1 29/3 36/24 41/23 53/7 61/20 75/16 74/5 74/12
75/3 75/12 76/5 76/6 77/16 78/10 79/19 82/9 84/1
84/2 84/14 84/16 85/3 86/1 87/11 87/15 88/14 96/4
113/20 114/14 114/17 114/22 115/20 116/14 117/14
117/18 121/10 122/22 125/1 127/12 127/14 128/15
Musk's [4] 10/21 11/25 14/24 118/3
must [3] 72/20 95/18 110/20
mustn't [1] 110/5
myself [3] 89/8 102/5 116/11

**N**

N.W [1] 2/4
name [10] 12/6 26/7 49/18 52/10 55/19 65/24 67/5
83/22 85/10 121/20
named [4] 8/14 14/14 25/4 109/23
names [3] 86/1 107/17 123/9
narrowly [1] 126/3
nation's [1] 71/1
nature [3] 41/22 49/16 117/12
Naval [1] 107/13
necessarily [1] 6/16 14/5 23/3 38/16 47/24 56/19
71/16 83/9 90/14 103/17 105/15
necessary [4] 62/1 65/17 73/10 92/1
need [33] 4/13 6/13 6/19 21/22 22/22 25/9 27/6
32/21 33/10 34/4 34/13 40/9 43/17 56/19 57/3 59/5
69/3 70/10 71/24 72/3 72/6 75/22 77/24 82/24 85/1
85/11 115/3 121/8 123/2 123/18 124/21 124/24 125/6
needed [3] 40/18 72/18 72/18
needs [6] 9/2 25/22 85/18 107/4 115/5 129/9
negotiate [2] 40/6 53/16
negotiated [3] 6/21 53/25 99/20
negotiations [1] 106/12
neither [1] 5/4
Nephews [1] 95/22
neutralizing [1] 35/5
never [9] 9/20 12/10 15/10 19/23 60/22 63/19 76/13
117/25 118/1

**Nevertheless [2]** 64/14 121/2
new [11] 25/1 27/2 28/11 28/20 42/3 44/24 71/11
86/22
news [4] 5/9 49/1 50/3 52/16 58/25 59/1 61/5 70/4
70/12 72/1
next [10] 5/9 49/1 50/3 52/16 58/25 59/1 61/5 70/4
70/12 72/1
Nichols [1] 43/5
night [2] 27/1 68/19
nighters [1] 121/1
Nixon's [1] 10/6
NLRB [1] 127/20
no [53] 8/18 9/15 10/1 10/3 10/22 11/1 11/7 11/7
15/20 16/3 16/17 19/1 38/21 41/17 53/13 55/10
58/15 60/8 64/16 64/24 67/3 67/7 67/11 70/21 79/24
80/11 81/13 83/1 83/4 83/4 92/18 93/9 94/6 95/11
95/16 96/19 98/25 103/2 104/22 105/19 108/12 108/17
109/25 110/21 113/8 115/10 124/16 127/25 128/2
128/10 128/11 128/11 128/25
nobody [5] 15/20 33/14 76/7 86/25 92/25
nodding [1] 72/4
nomination [1] 16/24
non [7] 121/22 123/3 123/3 123/7 123/16 123/21
86/22
non-circumstantial [2] 121/22 124/25
non-DOGE [5] 123/3 123/3 123/7 123/16 123/21
none [4] 31/18 65/5 68/18 118/15
normal [4] 14/11 27/14 27/21 28/13
normally [2] 27/23 113/10
NORMAN [2] 1/14 3/12
not [255]
note [12] 19/13 23/8 28/3 30/3 30/5 35/9 43/4
46/18 47/3 48/7 63/8 94/23
noted [4] 24/4 33/25 94/21 118/7
notes [2] 1/23 126/25
nothing [9] 39/15 84/19 86/1 89/12 111/25 111/25
114/4 129/11 129/13
notice [1] 57/18
notification [2] 57/2 57/20
notion [5] 18/9 40/16 112/19 113/1 114/13
November [1] 67/19
nuances [1] 20/5
number [20] 1/5 3/8 4/4 4/21 5/21 25/14 28/5 45/2
48/16 51/1 52/16 61/2 67/18 72/19 91/10 91/11
92/11 92/24 110/14 119/8
numbers [3] 49/19 92/7 119/8

**O**

oath [2] 79/24 90/10
objecting [1] 5/5
objection [1] 71/9
obligation [1] 110/21
obsequious [1] 68/11
obtained [5] 13/23 50/7 70/3 70/4 109/15
obviously [12] 23/1 25/9 32/6 35/9 54/9 72/7
72/25 80/7 94/10 96/12 106/21 108/5
occupied [1] 11/11
occupying [1] 31/18
off [18] 8/5 22/23 41/22 42/21 45/23 45/24 46/13
46/21 52/20 58/1 58/5 58/7 65/5 68/18 75/6 80/10
80/18 84/19
offend [1] 10/24
offensive [1] 10/20
offer [3] 61/7 101/19 114/7
offered [1] 21/11
offering [1] 100/18
office [14] 8/22 23/21 55/3 80/24 83/9 83/10 84/7
85/8 85/14 85/15 88/23 89/22 127/4 127/6
officer [16] 7/7 7/9 7/20 8/16 11/10 11/24 12/7
14/1 15/14 23/3 23/9 63/20 64/10 85/3 117/22
121/21
officers [4] 9/5 9/6 18/17 103/21
offices [5] 17/24 32/23 33/9 66/18 127/7
official [9] 14/12 14/12 15/11 28/6 28/7 76/15
113/2 113/6 113/10 113/17
officially [2] 41/1 111/15
officials [2] 15/7 78/22
often [1] 80/19
oh [3] 28/8 52/21 127/17
okay [71] 5/7 6/9 6/12 11/14 16/10 24/7 26/20
27/25 34/7 37/20 39/1 39/10 39/16 41/11
42/13 44/9 44/14 44/16 44/16 44/21 45/6 46/8 47/2
48/3 48/3 48/18 48/18 51/2 51/3 51/25 52/21 52/22
53/11 54/23 56/24 58/11 58/17 61/6 61/12 64/13
73/3 80/1 82/7 86/24 88/12 88/19 89/21 90/4 91/9
92/24 93/2 94/14 94/16 95/24 96/23 102/11 103/4
105/18 106/23 109/19 109/25 111/11 113/4 113/8
114/6 114/6 116/25 126/23 128/19 129/14
old [1] 80/19
older [1] 120/25
Olson [4] 83/17 83/18 83/21 83/22
omitted [1] 26/18
once [1] 108/18
one [88] 7/11 10/18 17/2 20/25 21/10 25/7 26/18
26/22 26/24 27/2 27/22 30/2 32/2 32/5 32/10
32/16 33/1 33/4 36/19 37/3 37/7 38/1 38/8 38/14
40/23 44/5 45/3 45/4 49/12 50/7 50/11 50/16 52/5
52/23 52/24 53/4 54/5 54/11 55/8 60/9 61/2 64/5
64/11 67/7 67/14 71/12 71/13 73/5 74/11 81/13
81/22 83/5 83/18 83/23 84/14 86/5 86/20 87/7 87/11
90/25 91/12 91/25 92/17 95/21 97/25 98/3 99/1 99/8
100/19 100/20 101/4 101/6 101/15 101/25 103/2
106/15 109/6 112/18 114/5 115/2 115/4 115/24
120/24 121/20 123/12 124/13 127/18
ones [8] 5/20 6/3 12/20 24/19 47/15 74/24 128/23
128/25
ongoing [2] 24/18 48/6 55/18 108/1
only [10] 26/20 30/18 30/19 34/14 48/14 98/1
109/11 118/18 124/18 124/19
open [2] 81/16 116/18
opened [1] 52/5
operating [2] 85/20 127/12
operation [3] 14/25 84/22 87/22
operations [5] 9/25 24/6 103/24 105/11 105/12

operative [2] 13/22 98/21
opinions [2] 15/19
opponents [1] 129/7
OPM Page [1] 28/11 28/11 29/7
opportunities [1] 79/9
opportunity [4] 4/5 4/8 11/2 72/2
opposed [6] 6/10 23/5 29/16 115/10
opposite [3] 10/15 11/1 68/17
opposition [2] 62/5
option [1] 90/25
order [27] 3/2 5/15 5/15 6/6 8/13 40/6 43/5 43/6
49/15 50/1 62/25 72/24 80/23 84/13 84/24 86/1
94/10 107/15 107/18 112/7 112/7 112/9 123/2 123/3
123/9 124/5 127/10
ordered [6] 73/14 73/19 88/21 88/22 113/21 114/14
ordering [3] 14/25 82/19 82/24
orders [7] 11/7 31/19 66/19 66/20 66/23 68/2 73/1
ordinary [1] 90/13
organization [2] 85/17 101/17
organizations [1] 112/23
original [1] 96/3
other [61] 4/15 4/22 4/23 6/5 8/18 10/14 11/9 18/7
18/22 21/6 24/24 30/17 35/10 36/14 37/11 38/5 38/8
42/24 43/13 44/14 45/19 46/10 47/6 59/19 50/22
53/15 55/8 55/13 57/2 57/19 58/11 58/12 60/6 61/10
62/23 66/3 66/14 76/14 76/23 78/19 78/19 81/2 84/4
89/24 93/8 98/23 100/9 101/6 103/4 105/11 106/18
108/24 110/5 112/3 112/21 115/8 115/20 116/18
122/24 124/4 125/25 126/20
others [5] 8/24 11/25 15/4 48/4 60/11
otherwise [8] 22/6 37/23 44/2 56/18 58/9 62/15
103/23 124/23
out [31] 10/10 10/14 18/16 19/16 20/3 23/21
25/10 26/13 29/5 32/7 44/2 46/24 46/24 49/21 54/18
55/24 55/25 56/20 58/9 58/16 60/22 64/17 69/12
70/24 80/7 101/8 106/12 118/20 118/21 125/4
outright [2] 11/23 63/11
outside [11] 6/5 17/20 27/21 28/13 29/23 32/15
35/1 35/6 37/19 55/22 78/22
outstrips [1] 10/8
over [23] 8/25 12/16 13/18 17/6 17/6 18/12 23/11
23/11 41/17 41/25 46/13 49/4 66/23 73/17 74/12
82/7 84/21 84/18 90/17 97/25 102/6 102/7 119/3
overall [3] 100/21 104/11 117/1
overcome [1] 108/23
overlaid [1] 129/1
overlay [1] 35/18
overseas [6] 41/14 44/2 45/20 48/9 48/15 48/25
own [14] 7/2 7/7 9/24 10/1 10/21 17/12 28/17 31/1
31/5 55/18 65/20 76/2 82/20 105/25

**P**

p..m [1] 129/17
P.M [1] 1/10
packet [1] 26/16
page [15] 51/8 50/13 50/18 51/6 51/7 51/8 51/9
51/20 52/13 52/16 53/22 69/19 117/14 117/18 130/9
pages [1] 125/4
paid [5] 46/9 62/15 120/11 123/12 123/12
paper [6] 68/4 87/6 87/7 88/24 122/24 128/11
papers [1] 122/17
paperwork [1] 113/9
Paragraph [9] 15/3 15/18 19/18 74/1 109/7 109/14
117/14 120/9 120/13
Paragraph 8 [1] 19/18
parallel [1] 71/1
paralyzing [1] 32/13
pardon [2] 4/23 111/3
part [24] 5/5 14/24 34/9 37/20 38/3 43/15 44/7
50/3 51/14 51/21 53/17 59/13 60/21 67/23 68/24
74/16 74/17 78/23 84/18 85/13 98/4 100/17 105/25
117/7
particular [8] 35/17 38/14 43/16 52/7 64/1 64/11
75/3 107/4
particularly [8] 29/22 73/18 79/14 83/13 90/23
105/13 118/22 125/23
parties [9] 4/2 6/17 15/24 16/15 29/24 82/1 94/8
126/8 129/5
partners [1] 45/18
parts [2] 40/8 50/6
party [4] 8/8 74/20 75/9 78/24
passed [1] 16/4
past [4] 7/23 44/20 80/1 108/22
patience [1] 128/22
patient [1] 120/17
patiently [1] 61/15
pattern [2] 5/1 58/8
Paula [3] 130/4 130/15 130/16
pay [5] 46/12 47/5 47/16 54/7 102/1
paying [5] 45/17 45/17 45/18 45/19 55/16
paying-bills [1] 45/17
payment [2] 38/14 55/16
payments [5] 47/12 57/1 62/15 93/3 104/7
pays [1] 45/16
pencils [1] 54/18
pending [1] 9/7
people [47] 9/24 14/5 18/16 20/6 22/16 25/20
25/20 29/15 29/17 40/25 41/22 42/21 42/23 56/7
56/10 56/11 58/19 65/2 66/4 68/9 75/4 100/18 102/12
102/19 113/16 113/21 113/22 115/18 119/9 119/17
119/21 121/11 121/13 123/2 123/12 124/1 124/19
126/21 127/16
peoples' [2] 55/13 113/23
percent [8] 91/21 92/9 93/4 93/23 93/24 93/25
119/10 120/11
percentage [8] 22/16 34/19 34/20 35/4 100/11
100/22 120/11
percentages [1] 119/8
perfect [1] 103/8
perform [1] 95/6
performing [3] 66/25 95/10 96/17
perhaps [12] 21/9 24/8 31/18 38/3 39/18 54/25

**P**

perhaps... [6] 56/5 59/16 60/14 73/4 95/23 104/4 110/21
peril [1] 41/21
period [10] 21/20 24/2 24/8 54/16 56/20 68/13 116/1 116/5 127/15 128/14
permission [1] 35/25
permitted [1] 34/24
perpetuity [1] 85/15
person [51] 10/8 20/13 20/14 21/10 26/11 26/12 26/12 27/11 27/14 27/15 29/6 36/20 37/4 37/7 40/16 43/19 47/20 49/21 52/10 55/21 66/25 82/11 82/11 82/23 84/11 84/23 84/25 85/10 85/21 86/25 91/12 92/21 101/23 101/25 108/7 108/13 108/15 108/18 108/19 121/4 121/4 121/9 121/13 122/12 123/2 123/3 123/3 123/7 123/7 123/16 123/21
personal [24] 43/7 44/1 44/12 50/13 50/14 50/19 50/23 51/15 51/21 52/9 53/5 53/21 53/23 57/17 58/3 59/24 62/10 65/16 65/18 83/19 84/11 109/9 110/25 113/14
personality [1] 84/23
personally [2] 49/19 82/13
personnel [12] 17/23 20/7 43/16 44/6 46/24 47/4 47/10 53/6 91/11 100/13 122/5 122/13
perspective [2] 32/2 48/20
pertinent [1] 60/3
Pete [2] 19/22 73/23
phenomenon [1] 127/20
Philadelphia [1] 127/23
Philadelphia v. Attorney [1] 127/23
Phoenix [3] 45/15 45/16 47/14
phone [6] 45/22 45/22 46/20 52/16 52/20 109/18
phones [1] 46/5
phony [1] 19/20
phrasing [1] 43/23
physical [2] 41/13 48/24
physically [1] 103/18
PI [4] 124/7 125/9 125/11 125/11
pick [1] 8/10
picture [2] 53/7 54/1
piece [5] 17/25 68/4 87/6 98/13 98/14
pieces [3] 11/20 18/4 50/15
PII [1] 63/16
piles [1] 10/13
pinpoint [1] 45/11
pinpointed [1] 42/11
PIs [1] 124/3
place [5] 10/3 64/22 93/21 101/9 103/13
placed [1] 113/21 119/7
places [3] 8/6 96/25 112/21
placing [4] 68/2 89/3 89/3 91/11
plaintiff [6] 1/13 4/8 20/23 107/19 108/8 110/20
plaintiffs [59] 1/4 3/13 3/15 3/16 5/4 6/3 6/23 7/23 14/20 16/13 19/19 21/25 27/18 39/20 41/9 41/14 49/24 52/23 55/6 56/6 57/8 58/9 59/10 61/19 61/25 62/12 63/4 63/8 63/14 65/4 70/9 71/4 71/17 71/23 72/5 73/8 73/24 75/20 75/22 78/16 81/9 95/2 95/16 96/12 100/8 100/24 107/4 107/5 107/13 108/20 109/24 110/9 110/24 116/20 117/14 123/4 123/25 125/16 129/13
plaintiffs' [13] 4/6 8/5 49/2 49/18 55/11 107/1 107/16 107/21 109/3 109/11 116/24 123/25
plan [2] 106/19 106/20
plans [2] 106/8 106/10
plausible [1] 21/20
play [2] 6/2 107/22
playbook [1] 104/3
playing [1] 70/5
please [4] 3/6 3/11 13/10 61/18
plethora [1] 117/24
PLLC [1] 1/19
plus [4] 102/7 104/20 118/14 128/20
point [74] 6/20 9/18 10/18 16/21 17/25 20/15 20/19 21/22 22/12 23/17 24/3 26/8 27/10 31/23 35/14 35/25 42/9 46/13 47/15 48/6 49/9 49/11 50/15 59/15 59/17 59/21 60/4 61/8 64/13 69/21 74/3 79/7 80/22 81/9 84/9 84/22 88/19 90/18 91/14 92/21 93/10 95/24 96/16 100/18 100/24 101/17 101/18 102/12 102/25 104/21 108/5 112/18 115/2 116/3 116/8 116/16 117/10 118/10 118/19 120/22 122/1 122/12 122/16 122/18 122/18 123/17 124/3 124/18 125/15 127/3 127/18 127/20 127/24
pointed [1] 32/7
pointing [1] 33/17
points [4] 20/24 67/13 110/2 127/1
policy [10] 13/1 13/1 13/2 13/5 13/9 103/11 103/21 103/22 103/25 104/4
popped [1] 14/18
portion [4] 27/8 52/10 119/3 128/12
portions [1] 118/13
poses [1] 16/5
position [20] 31/18 35/22 38/18 55/17 59/10 72/7 73/9 73/13 81/11 81/24 82/2 82/24 83/19 84/9 84/12 91/5 91/7 95/17 109/3 123/10
positions [3] 81/5 81/6 81/7
possession [1] 20/21
possibility [2] 23/25 78/6
possible [5] 17/20 68/13 69/5 91/22 129/2
possibly [1] 54/5
post [1] 54/21
posts [3] 4/22 4/23 18/9
posture [1] 124/11
potential [2] 56/13 64/17
potentially [2] 8/6 102/14
pouring [1] 118/20
power [20] 12/10 12/15 12/16 15/12 16/24 22/8 30/18 31/13 35/2 35/6 92/20 97/24 101/23 102/7 103/11 103/22 104/8 104/11 105/1 128/2
powerful [8] 7/9 7/11 9/11 10/7 11/6 11/9 11/9 79/14
powers [29] 7/15 15/20 16/6 30/6 30/9 30/9 31/3 31/21 35/14 37/14 37/18 37/21 38/6 38/21 38/23 39/2 96/23 98/4 98/14 98/17 98/21 99/6 99/24 100/16 101/14 102/16 104/12 119/19 127/18

**P** (continued)

practical [1] 36/13
practically [1] 109/2
practice [1] 43/8
prayer [1] 5/20
precedent [1] 7/18
precise [2] 23/8 87/4
precondition [2] 82/5 82/6
preconditions [2] 81/23 83/6
predated [1] 63/17
predicate [5] 7/1 30/4 102/24 125/5 126/12
preference [2] 124/3 124/11
preliminary [21] 1/8 3/10 4/1 6/22 58/18 60/7 60/13 60/21 60/23 61/19 62/1 70/10 70/13 71/7 72/16 75/19 90/20 90/24 103/7 116/24 118/14
premise [1] 97/17
prepared [3] 9/17 125/21 125/21
prerogatives [5] 101/10 102/9 103/1 103/1 104/16
present [1] 15/18
present-day [1] 15/18
presentation [2] 22/4 127/2
presented [2] 127/13 128/10
presently [1] 57/15
preserve [1] 62/5
president [43] 7/3 7/10 8/11 8/22 9/3 11/9 11/24 12/3 12/11 12/15 12/19 12/20 12/25 13/4 13/6 14/12 16/24 17/12 28/24 29/2 33/8 34/11 35/2 37/24 74/6 76/11 76/14 77/16 78/10 79/19 79/22 84/1 87/12 87/24 88/2 97/7 97/12 99/11 102/3 103/14 104/13 105/10 105/15
president's [2] 12/9 76/4
presidential [1] 105/2
presiding [1] 3/5
presumably [1] 123/10
presume [1] 126/16
pretty [5] 74/17 85/21 91/10 93/5 93/25
prevent [2] 15/4 111/23
previously [5] 5/22 39/21 53/5 86/22 86/23
primary [1] 114/25
principal [14] 7/7 7/9 7/20 8/16 9/5 9/6 11/24 12/7 14/1 15/14 18/17 23/3 117/22 121/21
principally [1] 7/2
principles [1] 22/8
prior [1] 53/25
prioritise [1] 108/24
priority [1] 108/23
private [1] 49/19
privilege [1] 9/7
probably [11] 9/1 21/7 30/12 60/22 70/25 74/10 99/4 100/15 100/22 101/9 119/10
probationary [1] 56/1
problem [10] 31/3 35/11 38/23 68/24 82/22 83/3 98/2 115/18 119/10 126/2
problematic [2] 35/13 54/5
problems [1] 39/25
proceed [1] 90/20
proceeded [1] 107/13
proceedings [2] 129/17 130/8
process [10] 6/5 19/3 23/2 59/2 60/19 61/3 106/6 108/1 132/15 117/16
processes [2] 28/13 38/20
Procurement [1] 63/10
produce [1] 72/12
produced [2] 10/12 20/22
profound [1] 16/5
prognosis [1] 115/15
programs [2] 67/17 112/24
progress [1] 107/8
promptly [1] 123/1
prong [2] 37/14 37/14
prongs [1] 48/19
pronounced [2] 65/24 109/17
proof [2] 70/10 116/21
proper [1] 37/1
properly [15] 19/15 30/23 30/25 31/4 31/12 31/13 32/18 33/18 34/6 35/8 36/4 38/19 38/22 104/17
proposed [1] 5/18
proposition [1] 105/14
prosecute [1] 18/23
prosecutorial [1] 29/18
prospect [1] 115/14
protect [1] 123/4
protection [2] 112/9 112/13
protective [6] 5/15 5/15 6/6 107/15 107/18 123/9
provide [11] 28/21 48/8 67/4 69/8 69/17 69/20 72/8 72/21 88/20 125/6 126/1
provided [15] 5/13 7/25 11/15 21/15 21/16 23/23 40/20 42/18 66/25 67/22 79/15 79/24 118/16 119/15 119/16
providing [2] 40/10 40/17
proximate [1] 74/15
PSC [1] 59/21
pseudonymously [1] 107/14
psychological [4] 41/13 41/24 44/19 48/24
public [10] 61/7 76/15 78/21 78/25 87/25 90/15 110/20 119/16 121/22 122/24
publically [1] 63/9
publicly [6] 50/23 63/11 63/13 65/3 65/7 84/21
pull [1] 103/16
pulling [1] 53/10
purely [1] 6/16
purport [1] 28/12
purports [1] 19/21
purpose [1] 3/10
purposes [1] 66/18
pursuant [2] 16/4 130/6
push [1] 116/4
put [38] 4/12 8/14 19/8 39/8 42/23 47/22 54/6 54/17 57/23 59/25 63/2 76/1 76/5 86/25 118/17 121/11 123/13 129/10
puts [2] 59/10 99/7
putting [8] 14/13 14/14 15/23 55/6 94/24 102/23 102/23 124/18

**Q**

qualify [1] 91/23
quarrel [1] 19/24
quasi [1] 80/21
quasi-judicial [1] 80/21
question [32] 6/15 30/22 34/6 35/21 38/10 44/15 50/20 56/22 67/25 69/14 70/2 72/3 75/16 80/17 89/22 97/19 97/21 99/5 99/11 100/23 101/4 101/12 102/21 103/14 105/18 106/5 112/16 114/12 121/25 121/25 127/4 128/8
questioning [1] 70/2
questions [13] 4/4 4/10 13/16 87/22 90/5 90/8 90/11 96/24 100/4 116/19 117/3 122/25 123/5
quickly [5] 11/12 88/10 121/16 126/22 126/24
quite [7] 11/1 16/15 16/19 20/24 41/21 48/13 68/17
quo [2] 55/7 126/16
quotation [1] 117/11
quote [6] 10/9 16/25 17/4 19/21 111/4 117/15

**R**

radio [1] 46/2
raise [1] 39/14
raised [4] 22/13 28/19 94/22 126/7
raises [1] 87/22
raising [1] 73/4
random [1] 63/21
ranging [1] 15/13
ranking [2] 28/6 28/7
rapid [1] 126/3
rate [1] 126/11
rather [3] 95/9 96/18 98/17
reach [1] 106/9
reached [1] 43/7
reaction [1] 94/16
read [10] 8/17 27/7 33/3 33/12 62/7 77/20 77/22 78/16 81/22 116/8
ready [1] 61/16
Reagan [1] 119/3
real [2] 46/7 90/22
realize [1] 115/18
really [28] 21/7 27/15 34/13 37/16 45/13 49/20 50/21 55/20 60/17 67/3 68/3 80/2 80/22 81/8 84/6 90/4 92/25 94/9 97/25 98/9 98/21 104/11 108/9 111/25 112/4 117/5 117/6 119/10
realm [1] 101/16
reason [33] 44/6 64/4 66/22 79/25 80/19 81/3 83/25 92/6 93/11 103/6 106/9 109/21 123/17
reasonable [5] 59/10 60/24 64/14 92/21 126/14
reasonably [1] 92/22
reasoning [1] 73/21
reasons [4] 6/14 42/14 43/9 115/4
REBECCA [1] 1/18
rebuttal [3] 4/9 117/4 120/16
recall [5] 39/23 78/14 88/14 94/1 114/12
receipts [1] 90/9
receive [1] 12/12
received [4] 19/19 26/3 29/1 67/16
recent [4] 19/16 24/5 49/14 110/10
recently [2] 25/1 88/2
recipients [1] 15/5
recollection [2] 93/18 93/21
record [36] 3/11 4/24 5/4 5/6 6/3 8/12 8/13 11/13 13/13 14/21 14/23 15/9 17/25 18/1 18/5 19/6 19/9 19/10 19/17 20/4 23/14 26/2 28/20 59/6 60/16 60/25 69/12 72/15 112/17 114/4 118/17 119/17 121/23 127/11 128/20 129/10
records [4] 88/20 91/1 122/1 125/12
recreate [1] 15/1
redacted [3] 52/10 52/17 52/19
redactions [3] 63/22 64/9 64/9
redressability [3] 62/18 76/3 79/10
redressable [2] 62/25 75/24
redressed [1] 75/11
reduced [1] 102/14
reduction [6] 14/25 19/19 20/7 22/14 22/15 38/20
refer [2] 41/9 110/11
reference [4] 35/15 35/16 98/25 99/1
referenced [2] 72/19 77/15
references [2] 12/20 77/11
referencing [1] 63/9
referred [1] 87/25
referring [1] 71/10
reflected [2] 95/4 104/13
Reform [5] 94/17 95/1 95/18 95/19 96/16
refused [1] 113/21
refute [3] 63/8 76/2 95/25
regard [1] 101/19
regarding [18] 64/15 64/16 129/10
regardless [2] 24/12 127/5
regular [4] 59/15 59/17 60/10 60/19
regulations [2] 111/23 130/10
rehash [1] 98/6
reimbursed [2] 47/7 47/11
reimbursement [1] 47/15
reimbursements [1] 62/13
reinstatement [1] 57/1
reiterate [1] 116/20
rejected [2] 81/13 110/23
rejecting [1] 17/2
relate [1] 32/17
related [4] 103/21 107/22 107/24 110/8
relates [1] 98/9
relative [1] 39/20
relatively [1] 80/14
relaying [2] 12/19 13/2
relays [1] 12/20
release [1] 24/20
relevant [6] 66/20 66/21 69/9 79/9 99/5 99/14
relief [16] 22/2 40/9 54/9 54/12 56/4 56/16 58/12 58/15 58/24 59/1 59/19 60/13 60/21 61/1 62/1 125/6
rely [3] 39/2 48/12 48/12
relying [1] 35/17

**R**

remain [2] 116/25 120/15
remainder [2] 116/2 117/12
remains [1] 45/24
remedy [5] 36/21 37/1 54/6 61/19 105/17
remember [2] 83/17 83/21 127/13
remind [3] 22/15 40/23 43/18
removal [2] 55/2 88/23
remove [1] 10/2
render [1] 118/6
reorganization [8] 24/1 34/23 77/6 77/21 77/25 78/14 105/21 106/10
reorganize [2] 33/9 78/8
reorganizing [1] 32/23
repeat [3] 89/8 102/5 116/11
reply [10] 13/10 39/9 44/24 51/23 61/9 94/17 94/19 94/22 117/23 128/13
report [2] 10/23 11/4
reported [2] 116/4 130/8
REPORTER [3] 130/1 130/4 130/17
reporting [1] 20/24
reportings [1] 65/15
represent [2] 63/19 63/20
representation [2] 86/15 89/19
represented [1] 63/4
represents [1] 14/16
republic [1] 14/16
republication [1] 65/3
request [6] 5/14 12/6 116/23 126/13 126/14 126/22
requesting [1] 12/12
requests [2] 123/20 126/19
required [4] 43/19 56/25 59/2 113/16
requirements [2] 116/21 125/22
requires [3] 37/11 60/13 60/18
requiring [1] 122/7
resemblance [1] 10/22
residences [2] 62/16
resignation [1] 12/14
resolve [6] 21/22 69/13 72/16 101/13 121/7 123/1
resolved [5] 16/21 75/9 101/11 124/15 124/16
Resources [1] 27/9
respect [10] 15/19 48/25 49/5 53/14 55/9 55/15 57/1 61/10 101/22 110/3
respectfully [1] 116/23
respects [1] 12/24
respond [6] 12/13 69/2 71/18 106/8 114/10 117/6
response [2] 33/22 71/25
responses [1] 17/18
responsibilities [1] 66/25
responsibility [3] 24/12 26/9 99/23
responsible [3] 40/17 82/14 105/11
rest [5] 10/20 13/12 121/16 121/17 125/18
restatement [1] 43/21
restore [1] 109/8
restraining [1] 43/5
restricted [1] 122/7
result [4] 14/23 36/13 36/14 73/15
retraining [2] 43/6 49/15
reveal [1] 5/11
revelation [1] 13/21
reversed [1] 126/21
reversing [1] 55/2
reviewed [1] 4/3
Richard [1] 10/6
RIF [2] 56/11 68/1
RIFs [2] 55/24 60/1
right [53] 7/8 14/4 16/3 22/3 22/11 26/6 27/16 34/20 38/20 46/9 47/20 49/1 52/14 52/23 58/21 61/1 63/2 63/25 67/13 72/4 76/10 77/1 77/19 78/5 78/12 78/12 80/16 81/3 82/21 82/21 82/21 83/15 85/1 85/12 86/2 87/19 88/11 89/13 93/14 93/22 96/20 98/2 98/7 99/17 102/4 102/20 104/10 105/6 112/14 115/12 116/2 116/10 119/11
rights [1] 122/6
rigorous [1] 112/8
rise [3] 3/3 30/12 129/15
risk [7] 42/1 42/4 44/25 46/1 64/17 65/2 111/3
roadmap [1] 128/25
Rob [1] 112/25
Roberts [2] 16/23 17/8
Roe [7] 13/19 13/24 28/3 28/10 45/13 45/13 56/1
role [19] 7/6 10/21 19/2 27/16 27/16 61/21 84/11 84/24 103/14
roles [1] 8/24
room [1] 18/17
roughly [1] 36/8
rounds [1] 60/7
RPR [1] 130/16
rubber [1] 80/10
Rubio [8] 23/17 23/24 33/23 68/5 73/25 77/3 89/10 95/5
Rubio's [6] 19/10 77/10 77/11 106/18 118/8 118/10
rule [1] 60/8
ruled [1] 71/8
rules [3] 23/1 112/4 113/17 113/24 115/7
ruling [3] 60/14 71/6 125/16
rulings [1] 42/24
run [2] 18/19 31/17
running [5] 18/20 34/23 51/9 85/21 121/12
runs [2] 73/22 117/18

**S**

Sadly [1] 95/13
safeguards [1] 114/2
safety [2] 40/14 41/18
sake [1] 82/9
same [19] 5/20 12/8 17/4 29/2 36/9 43/13 52/1 52/3 53/2 56/8 69/18 78/16 92/13 93/6 93/8 100/25 101/1 113/1 113/24
San [1] 1/20
satisfied [2] 74/18 82/6
satisfy [3] 83/5 83/7 95/19

savings [5] 50/13 50/18 51/15
saw [5] 10/21 63/22 72/4 78/16 78/16
saying [17] 8/1 24/11 38/10 41/24 42/24 42/25 38/16 42/16 43/17 46/9 47/9 52/8 54/23 56/6 58/5 58/6 59/12 59/14 62/11 62/19 66/8 69/10 69/10 68/14 68/23 70/17 72/18 74/19 76/25 77/8 77/23 78/11 79/11 79/17 80/9 81/16 81/17 84/21 86/24 87/2 87/17 87/17 87/21 87/23 89/14 91/14 93/16 96/1 96/7 98/19 101/24 107/19 108/16 108/17 109/1 109/20 115/19 115/20 115/20 117/19 118/23 125/1 125/1 125/1 125/2 125/17
scale [1] 102/2
scenario [5] 31/10 31/11 60/10 73/11 101/1
schedule [3] 46/14 69/7 60/9
schedules [1] 67/20
scheme [1] 118/9
scope [1] 54/11
screenshot [3] 50/22 51/6 55/22
Scry [2] 48/12 109/17
seal [7] 6/9 6/16 13/24 25/1 26/19 45/13 56/2
sealed [8] 5/9 5/18 5/19 13/19 13/20 15/3 28/4 122/11
sealing [1] 5/10
seat [1] 106/7
seated [1] 3/6
second [10] 14/20 18/5 31/4 37/14 52/13 55/20 83/7 84/8 98/13 109/12
secretaries [1] 14/6
secretary [23] 14/7 19/12 22/22 22/24 23/18 26/10 31/8 31/12 34/2 34/3 67/10 67/12 68/5 68/5 73/24 77/3 77/10 77/23 83/10 89/10 95/5 105/20 106/18
secure [1] 50/9
secured [1] 54/21
security [14] 40/14 41/18 43/16 46/3 46/6 49/19 49/24 50/1 57/2 65/12 65/20 112/2 122/6 122/7
see [32] 4/13 11/2 11/25 12/4 15/14 17/6 19/18 30/2 32/25 39/25 40/18 43/24 44/9 48/1 51/7 51/20 51/25 52/6 54/2 54/2 60/10 60/18 62/3 64/8 64/9 64/11 89/18 94/7 101/1 109/11 120/24
seeing [1] 51/18
seek [3] 62/2 61/19 71/18
seeking [1] 47/16
seem [12] 20/9 32/23 38/1 54/10 55/5 70/12 83/13 85/17 88/3 90/16 101/19 124/15
seemed [5] 34/10 42/22 62/9 64/3 97/25
seemingly [1] 29/2
seems [33] 33/4 39/3 56/4 60/6 60/7 60/12 60/20 62/17 70/5 70/16 72/2 73/16 74/17 74/22 75/1 76/8 84/17 84/20 84/22 85/20 86/10 95/19 98/14 100/7 103/12 103/12 105/14 106/14 113/18 113/19 114/23 116/8 128/23
seen [5] 11/8 15/10 65/15 87/8 91/22
senate [4] 14/12 17/1 77/2 95/5
send [6] 23/21 26/12 29/5 55/24 55/25 103/15
sending [3] 20/3 25/10 27/13
sends [1] 23/24
senior [10] 81/3 82/1 84/1 84/19 86/2 87/11 87/24 88/1 88/14 115/21
sense [6] 22/20 29/22 37/3 56/5 118/24
sensitive [4] 49/2 122/1 122/12 122/13
sent [4] 8/7 25/7 27/1 95/5
separate [4] 35/13 37/21 38/6 112/23
separation [25] 7/15 15/20 16/6 22/8 30/6 30/9 31/2 31/21 35/14 37/14 37/21 38/6 38/21 38/23 39/2 96/23 98/4 98/14 98/17 98/21 99/6 101/14 102/15 119/19 127/18
separations [3] 30/5 97/24 100/16
series [1] 121/20
seriously [2] 68/15 68/20
serve [1] 95/17
service [4] 23/1 53/15 103/20 109/9
services [12] 8/6 43/7 44/1 44/12 45/19 50/14 51/15 51/21 52/9 57/17 58/3 59/24
serving [2] 9/7 96/22
session [1] 3/4
set [3] 59/1 70/5 126/17
setting [1] 118/6
several [1] 45/10
SF [1] 87/9
SF-50 [1] 87/9
SF86 [1] 65/12
SF86s [1] 65/20
shake [1] 121/14
shall [1] 112/8
shaping [1] 11/5
share [2] 111/21 21/18
shared [6] 99/19 99/21 99/23 102/7 102/9 107/18
sharing [2] 17/1 56/18
shedding [1] 43/9
shooting [1] 118/21
short [9] 21/20 32/24 33/7 36/14 40/2 46/21 68/12 124/21 125/12
short-term [1] 124/21
shortly [3] 12/12 55/23 57/23
show [10] 20/19 37/6 62/21 70/10 75/22 75/22 76/3 80/19 110/20 128/10
showed [1] 112/2
showing [4] 24/5 67/12 75/20 88/20
shows [8] 18/6 20/2 35/23 67/1 77/4 88/24 89/6 111/17
shut [6] 23/22 77/18 77/24 89/23 119/1 119/4
shutdown [4] 82/10 88/21 88/23 101/16
shuting [1] 77/17
shuts [1] 100/25
shutter [1] 31/14
shutting [13] 17/23 76/5 78/19 82/14 97/3 100/3 100/11 100/21 101/12 118/18 115/19 117/16 121/19 98/3 101/4 110/5 116/18
side [12] 4/12 4/13 4/15 5/4 70/5 81/2 84/19 97/25
sides [1] 6/6 119/9
sideways [1] 121/14
sign [3] 22/22 55/2 88/23

signature [1] 27/11
signed [6] 6/6 8/13 26/6 68/8 76/23 111/16
signers [1] 111/7
significant [5] 61/8 74/6 74/15 84/12 85/20
similar [2] 11/16 11/17 11/18 12/21 17/15 17/22 18/13 18/25 23/5 23/9 29/14 31/21 37/7 37/8 41/3 48/20 82/12 83/1 85/22 85/22 85/23 89/25 89/25 90/3 91/13 91/18 92/2 92/8 92/20 93/7 93/12 94/10 101/12 103/14 104/9 105/2 106/23 114/17 121/20
signs [1] 80/10
SILER [2] 2/2 3/23
siloed [1] 9/23
similar [7] 28/10 53/16 85/17 100/9 107/11 110/24 126/20
simple [1] 16/15
simply [3] 29/4 88/17 98/5
since [11] 4/7 4/24 5/4 9/20 11/14 67/16 68/18 71/14 121/2 121/3 127/18
single [3] 37/7 63/18 81/10
site [1] 51/14
situation [11] 7/24 16/18 47/8 49/17 53/25 64/19 74/14 75/10 115/6 124/12 129/1
situations [1] 58/13
six [1] 119/9
sleepier [1] 120/24
slightly [1] 82/23
slot [1] 102/1
small [1] 100/11
Smith [2] 95/22 112/25
smoke [1] 118/20
so [245]
social [2] 49/18 64/15
solution [2] 120/18 125/13
solutions [1] 128/7
solve [2] 125/7 126/2
somebody [10] 18/24 26/11 31/17 38/22 85/11 85/15 86/25 121/10 121/21 123/19
somehow [5] 67/7 81/12 85/5 96/8 112/19
someone [29] 12/19 12/20 15/11 18/19 20/5 20/13 22/19 22/22 25/2 26/9 34/11 41/5 56/8 62/13 62/14 64/17 64/18 64/21 73/12 80/10 81/10 82/10 89/5 89/23 95/17 108/19 110/21 116/6 123/20
something [5] 5/23 9/1 19/23 22/24 27/12 29/21 34/18 34/21 35/1 35/7 50/24 54/9 57/1 62/24 66/6 56/6 62/2 62/4 62/18 63/2 73/14 73/19 73/23 81/17 82/19 89/5 93/24 97/7 98/1 98/20 99/9 105/22 105/23 105/24 115/17
sometimes [1] 115/7
somewhere [2] 66/9 99/13
soon [2] 46/16 129/2
sorry [8] 11/22 24/20 26/18 52/17 53/12 57/6 75/6 87/13 91/3
sort [23] 11/19 14/8 29/24 40/21 41/7 43/22 49/9 51/9 51/11 59/15 92/3 94/24 95/13 97/22 99/22 105/9 105/11 105/19 108/5 108/22 115/16 129/7
sorted [1] 80/7
sought [1] 5/9
sounds [5] 5/4 31/23 69/19 91/1 94/8
sources [1] 32/16
space [1] 102/10
speak [5] 16/6 21/18 96/12 96/13 119/23
speaking [2] 36/17 109/2
speaks [1] 114/5
special [5] 13/5 29/17 83/18 122/25 112/25
specific [10] 11/17 17/14 24/9 24/11 31/25 62/12 88/22 105/7 117/5 126/1
specifically [7] 37/17 37/17 45/12 46/11 66/14 77/11 105/1
spectrum [2] 45/17 97/23
speculate [1] 94/2
speculated [1] 47/13
speculative [1] 65/4
spending [2] 101/23 102/14
spent [5] 7/22 15/23 15/23 104/18 117/19
spin [1] 101/8
spirited [1] 128/19
spoke [1] 48/9
spot [2] 63/21 64/8
squarely [1] 62/5
stable [1] 55/7
staff [17] 8/23 9/10 9/12 9/14 9/15 10/11 10/4 10/6 10/16 11/6 15/1 29/25 31/8 66/17 67/17 67/18 122/22
staffing [1] 68/15
Staffs [1] 9/21
stage [3] 58/19 109/22 125/22
stalled [1] 40/21
stamps [1] 80/10
stanch [1] 124/5
stand [3] 76/13 92/10 125/11
standard [3] 6/15 70/23 74/15
standing [11] 41/4 62/4 62/8 73/3 74/10 74/22 75/1 75/2 75/22 80/1 80/2
standpoint [1] 35/23
stands [3] 92/6 93/11 129/16
start [12] 4/6 4/15 8/9 9/10 39/18 40/3 62/2 63/1 71/1 106/21 115/19 117/10
started [6] 12/23 105/19 111/13 124/8 126/5
starting [4] 24/12 27/10 116/4 117/13
starts [3] 38/23 115/9 123/18
state [12] 1/15 6/2 46/24 47/4 47/9 47/10 52/14 77/5 77/23 83/10 105/20 107/2
stated [2] 8/11 111/2
statement [5] 76/4 78/9 79/24 90/16 105/13
statements [4] 78/24 79/1 79/9 90/15
states [17] 1/1 1/9 3/3 3/22 7/10 8/7 41/15 43/20 45/20 47/25 90/14 107/12 109/14 127/9 130/5 130/11
States v. Germaine [1] 127/9
statistic [1] 120/14
statistics [1] 119/22
status [8] 23/9 39/8 39/20 39/22 40/22 55/7 122/22

## S

status... [1] 126/16
statuses [1] 72/22
statute [14] 32/20 33/4 39/3 39/4 77/13 77/15 97/12 97/15 98/21 98/23 99/5 99/13 101/7 106/14
statutes [7] 16/4 32/17 35/17 35/20 98/16 99/1 100/12
statutory [5] 32/17 32/19 35/19 35/23 118/9
stenographically [1] 130/8
stenographically-reported [1] 130/8
STENOTYPED [1] 1/23
step [5] 48/13 50/25 70/12 85/2 87/13
steps [1] 33/7
STEVENS [9] 1/18 1/19 3/16 7/22 12/2 16/7 39/18 123/11 124/19
stick [1] 42/17
sticking [1] 108/5
still [19] 18/2 21/12 24/6 36/15 41/21 48/9 48/14 55/12 57/24 66/19 73/11 84/6 96/3 108/2 110/6 112/23 117/2 120/2 120/3
stop [3] 56/17 56/18 56/18
stopped [1] 102/14
stopping [1] 100/23
strange [2] 60/20 87/24
street [2] 2/4 52/14
strike [2] 86/20 86/20
strikes [1] 90/22
strong [3] 20/2 59/22 69/16
stronger [1] 59/22
structural [2] 104/19 127/22
structure [1] 105/10
structured [1] 71/17
Student [1] 107/12
Students [1] 107/12
stuff [2] 54/6 98/6
subject [9] 5/6 5/11 13/16 73/12 79/1 81/5 81/11 95/18 111/23
submit [8] 4/20 7/17 7/24 20/19 28/14 34/4 125/22 127/17
submitted [6] 5/5 5/22 8/9 39/21 77/3 128/14
subordinates [3] 10/2 13/15 25/9
subparts [1] 49/10
substantial [2] 9/18 104/14
substantive [1] 46/7
succeed [2] 7/13 7/19
success [6] 15/15 20/20 39/6 70/20 75/21 125/5
such [8] 26/12 54/19 73/17 73/17 74/20 74/21 86/10 124/20
sudden [1] 115/9
suddenly [1] 115/21
sued [1] 74/9
suffering [3] 8/1 22/1 125/13
sufficient [9] 49/13 50/6 54/9 60/25 72/15 72/17 100/14 125/4 126/11 126/12
sufficiently [1] 68/16
suggest [3] 39/5 71/21 107/20
suggested [1] 114/16
suggesting [3] 59/8 65/15 125/19
suit [1] 73/12
Suite [2] 1/19 2/4
super [3] 7/6 7/6 31/17
supercabinet [1] 11/10 13/8
supervisor [1] 22/21
support [6] 29/8 32/4 33/4 33/6 68/20 93/9
supported [2] 20/23 28/17
supporting [1] 61/24
supports [1] 76/2
suppose [1] 74/9
supposed [5] 47/24 47/25 75/8 77/20 123/8
suppressed [1] 53/9
suppression [1] 53/16
Supreme [3] 7/18 15/19 30/17
surgeon [1] 127/9
surprised [1] 14/6
suspicious [1] 87/20
sustain [1] 121/1
swaths [1] 103/19
sway [1] 103/23
sworn [1] 79/14
sympathize [1] 120/23
sympathy [1] 67/14
system [12] 18/19 18/20 24/19 45/12 45/16 45/23 47/14 52/1 52/2 52/3 52/25 63/10
systems [43] 13/18 13/19 13/23 15/14 17/24 18/12 19/1 23/20 40/12 40/13 40/14 41/18 41/20 41/23 42/17 43/15 44/3 44/10 44/17 45/10 45/14 46/21 47/17 48/10 48/14 49/3 49/7 49/7 49/12 50/2 50/8 50/10 51/10 54/18 54/21 55/12 55/22 57/2 57/3 57/25 58/9 58/16 123/13

## T

table [1] 106/7
tainted [2] 36/21 37/1
take-care [1] 105/4
taken [10] 7/5 9/1 12/14 18/23 19/4 35/8 67/23 73/24 93/23 117/3
takes [1] 118/13
taking [14] 15/13 23/16 26/9 37/18 59/23 59/25 66/19 66/20 66/23 68/15 68/20 88/23 99/15 105/4
talk [7] 12/2 21/7 53/18 91/5 99/14 99/18 110/8
talked [8] 19/20 55/24 77/17 100/3 114/11 116/17 116/17 119/9
talking [17] 31/24 37/16 51/4 57/7 72/4 74/14 81/2 83/17 87/14 87/15 89/19 91/17 103/17 103/18 104/6 104/11 119/14
talks [1] 124/20
TDC [1] 3/8
TDC-25-0462 [1] 3/8
team [2] 66/22 112/20
tear [1] 15/21
technical [4] 18/12 18/18 108/13 111/14
tell [16] 9/20 16/16 24/13 36/20 50/21 65/22 69/4

72/12 76/14 87/18 88/10 103/7 121/10 121/11 123/19 126/16
telling [3] 79/15 121/11 121/12
tells [5] 11/1 17/3 18/20 120/9 120/10
temporary [4] 43/5 43/6 49/15 85/18
tenable [1] 47/8
term [2] 40/2 124/21
terminate [2] 56/11 89/15
terminated [12] 25/2 41/1 52/8 57/9 57/14 58/7 64/21 101/25 109/10 119/6 120/1 120/2
terminating [19] 17/23 32/15 34/19 34/20 36/9 58/20 60/1 89/4 89/4 91/9 91/11 92/16 97/3 100/10 100/11 100/18 100/19 101/20 103/19
termination [22] 22/22 23/3 25/7 25/10 25/19 36/6 36/6 36/13 36/14 37/7 68/1
terminations [10] 23/6 32/11 36/16 55/1 55/1 55/2 58/19 58/19 59/22 68/2
terms [19] 7/13 20/9 29/15 36/15 37/22 38/15 39/1 39/19 39/21 40/23 41/3 41/3 53/4 56/13 58/17 79/13 104/19 115/15 119/25
territory [1] 99/23
testified [2] 73/23 75/4
testifies [2] 28/8 28/10
testify [2] 45/22 112/22
testimony [1] 29/8
theft [1] 111/3
themselves [4] 50/8 76/25 96/13 122/7
then we [1] 57/6
THEODORE [2] 1/9 3/5
theories [1] 48/21
theory [16] 9/4 20/8 21/9 29/15 37/6 37/11 56/8 73/16 74/11 74/23 74/24 75/2 80/8 80/13 81/13 114/20
thereafter [1] 13/8
therefore [2] 52/10 113/23
they're [5] 32/8 32/9 32/10 32/11 100/14
they've [3] 51/11 70/11 112/3
thin [1] 80/14
thing [19] 17/4 21/21 29/2 33/9 53/17 54/17 58/23 61/5 78/16 88/4 89/14 92/13 95/14 100/25 101/1 115/2 115/10 118/18 129/6
things [61] 6/5 21/15 23/12 24/11 28/23 29/6 32/22 32/23 33/1 33/11 34/8 34/9 34/9 41/5 42/5 54/8 54/13 55/5 57/13 57/13 57/14 58/21 62/15 62/16 62/22 63/23 64/16 69/8 70/25 73/4 73/10 74/4 74/5 74/6 80/20 85/9 85/22 85/23 85/25 88/22 90/5 96/1 100/20 102/8 105/5 106/5 106/13 109/6 109/20 109/22 114/15 115/6 115/8 115/20 117/5 118/15 122/19 123/12 123/13 126/19 129/7
think [166]
thinking [4] 32/5 97/1 99/9 101/5
thinks [2] 90/21 106/19
third [2] 31/11 127/23
Thomas [1] 17/3
though [18] 14/4 20/9 35/9 56/7 74/3 78/4 84/7 85/14 86/11 89/22 90/10 94/3 102/11 103/5 104/4 111/5 117/1 126/22
thought [7] 6/4 13/4 21/3 51/4 90/25 107/3 123/7
thoughtful [1] 97/10
threatened [1] 10/1
three [6] 17/14 30/21 41/14 41/19 48/21 49/9
threshold [2] 93/10 94/24
through [28] 3/9 4/11 5/22 7/8 10/2 10/19 11/12 11/25 13/15 13/16 16/25 22/23 27/7 32/8 32/9 33/16 45/9 48/24 49/16 63/18 70/24 106/12 109/11 113/24 121/16 121/17 126/9 126/25
through 26 v. Elon [1] 3/9
throughout [1] 21/2
TIANNA [2] 1/14 3/18
tick [4] 10/19 11/12 121/16 121/16
tie [1] 45/25
tied [1] 41/14
tilted [1] 70/6
time [27] 4/14 4/15 7/17 10/19 11/11 15/11 15/16 21/20 24/2 46/15 48/9 68/13 69/23 85/2 92/22 94/22 102/25 110/3 110/3 113/1 116/1 117/2 117/2 118/2 120/24 127/12 128/15
times [4] 11/8 61/2 66/17 123/13
timing [1] 115/13
title [3] 13/5 95/9 127/5
titles [1] 95/2
today [22] 3/9 6/22 16/18 21/24 62/4 71/25 103/6 108/6 114/11 116/17 125/22 128/21
together [3] 30/13 123/21 125/3
toggling [1] 41/22
told [7] 23/10 57/24 84/15 99/12 99/13 112/1 113/12
took [19] 13/18 17/14 38/7 50/18 70/25 110/2 113/22
top [4] 52/21 63/7 66/5 80/18
torment [2] 121/8 121/13
torn [1] 81/4
total [1] 116/6
totally [1] 20/15
traceability [1] 74/15
traceable [1] 62/24
traced [1] 39/14
traces [1] 25/4
traditionally [1] 98/22
trail [3] 125/3 125/24 128/11
training [1] 113/24
tranche [1] 51/14
transcript [4] 1/8 118/16 130/7 130/9
TRANSCRIPTION [1] 1/23
transition [2] 108/7 113/19
transparent [2] 69/5 125/24
Transportation [2] 31/8 31/13
travel [1] 62/13
treatment [1] 5/17
tremendous [1] 16/7
tricky [1] 38/3
triggering [1] 81/23
TRO [4] 123/24 124/5 126/1 126/16

TROs [2] 126/20 126/21
trouble [1] 108/16
true [7] 47/9 75/3 79/15 121/11 121/12
trump [11] 3/6 3/8 4/21 7/9 11/8 17/12 28/24 103/1 103/1
truncated [2] 69/7 69/9
try [10] 39/25 41/9 41/9 91/23 103/3 107/3 107/23 110/6 126/8 128/7
trying [33] 17/13 18/11 26/5 39/5 42/5 42/21 56/3 56/10 68/10 68/11 68/25 69/5 72/23 87/3 87/4 88/8 89/16 91/15 94/7 97/22 102/4 106/4 107/23 108/7 108/13 108/18 109/1 109/20 111/16 115/9 116/7 119/22 123/21
turn [3] 85/6 121/14 122/17
turned [1] 119/3
turning [1] 49/1
tweet [1] 15/22
tweeted [2] 28/24
tweets [2] 12/3 12/8
twice [1] 70/19
Twitter [2] 4/22 4/23
two [27] 17/14 36/18 41/16 41/17 41/25 44/13 48/4 50/6 50/15 57/18 58/4 64/22 65/22 83/19 91/17 92/17 94/24 100/19 112/23 121/4 122/2 122/16 124/2 124/3 124/7
two-week [1] 57/18
twofold [1] 30/7
TX [1] 1/22
type [6] 27/13 29/17 31/11 49/21 53/4 127/22
types [2] 34/12 74/23
typical [1] 59/16
typically [2] 23/1 80/20

## U

U.S [1] 10/2
U.S.C [1] 130/6
Uh [3] 53/8 56/21 57/21
Uh-huh [3] 53/8 56/21 57/21
ultimately [3] 70/14 99/11 105/11
ultra [2] 98/16 98/23
un [1] 54/15
unable [2] 40/7 126/9
unauthorized [1] 49/4
unclear [4] 23/17 41/22 101/18 122/8
uncomfortable [1] 40/16
underground [1] 6/24 7/21
under [30] 7/12 9/4 13/24 22/19 23/10 25/1 26/19 34/12 35/20 45/13 48/21 49/10 50/13 56/2 56/12 65/2 69/6 74/11 74/22 79/24 85/3 89/11 90/10 92/2 99/7 99/24 103/16 105/1 105/24 106/4 129/2
under-seal [1] 25/1
undergoing [1] 108/6
underlying [1] 16/20
understand [49] 6/14 12/13 17/13 18/11 20/8 21/9 25/8 26/8 29/10 37/10 42/8 43/13 44/14 46/8 47/18 52/22 56/3 61/6 64/13 68/21 75/8 76/14 80/8 80/12 83/4 88/5 90/8 90/9 90/9 90/14 91/5 91/7 92/25 93/2 94/6 95/11 95/14 96/12 97/22 99/1 99/3 109/25 115/2 116/3 116/7 118/25 124/22 126/18 126/22
understands [1] 67/11
understood [4] 48/3 77/24 80/3 114/16
undertaking [1] 19/11
undo [2] 36/21 37/1
undoing [1] 54/25
undone [3] 37/8 70/6 70/7
unfortunate [1] 91/2
unfortunately [1] 40/11
unfrozen [1] 93/20
unheard [2] 16/1 113/6
unilateral [4] 18/2 55/17 59/23 59/25
unilaterally [6] 20/7 23/20 35/11 36/3 97/8 97/12
unitary [1] 101/5
UNITED [15] 1/1 1/9 3/3 3/22 7/10 8/7 41/15 43/20 45/19 47/25 69/16 107/12 127/9 130/5 130/11
universe [1] 106/13
University [1] 107/12
unknown [1] 64/23
unlawful [2] 31/2 110/19
unlawfully [1] 96/15
unless [1] 77/22
unprecedented [2] 16/18
unquestionably [1] 127/11
unquote [2] 16/25 17/4 19/21
unredacted [1] 63/17
untie [1] 54/15
until [5] 23/24 58/3 60/15 86/25 88/2
untrue [1] 86/21
unusual [6] 25/9 112/20 112/24 113/2 115/6 124/12
up [26] 5/18 8/4 14/18 17/6 26/20 29/5 31/17 31/18 32/12 45/8 58/4 63/2 70/18 71/19 74/11 79/14 80/19 87/13 95/14 103/12 104/19 110/2 110/16 118/6 120/5 127/1
update [3] 26/25 39/19 41/16
updating [1] 39/19
uploaded [1] 51/14
upon [3] 39/2 65/3 71/8
urgent [3] 22/1 124/6 124/20
USAID [94] 8/1 12/1 13/23 14/19 15/2 15/7 15/23 18/3 18/10 19/12 19/15 19/17 20/14 23/18 23/20 24/16 27/10 30/25 31/9 31/14 31/24 32/6 32/17 34/5 34/16 40/13 41/18 44/11 45/10 45/15 45/16 47/6 48/10 48/14 49/3 50/9 50/10 51/13 54/19 55/2 55/12 56/8 58/16 63/21 64/7 66/1 66/23 66/23 68/4 69/2 72/12 73/7 73/9 73/18 73/25 74/9 74/9 76/7 77/5 77/8 77/24 82/10 88/1 88/23 89/4 89/24 94/23 95/3 95/7 96/5 97/17 98/19 99/25 104/15 104/19 107/23 108/10 109/8 109/16 112/15 112/21 117/19 118/6 119/18 121/24 127/21 127/21 127/22 127/15 128/15
USAID-canceled [1] 51/13
USAID.gov [1] 14/22
USDS [1] 112/8

## U

**use [3]**   15/21 31/8 103/19
**used [5]**   18/22 50/23 56/5 67/24 103/11
**useful [1]**   88/4
**user [4]**   14/19 52/4 55/19 55/23
**using [2]**   25/17 55/22
**usually [6]**   14/8 14/11 26/8 26/12 72/6 78/13
**utilizing [1]**   12/6
**utter [1]**   125/23

## V

**v. [3]**   3/9 127/9 127/23
**Vacancies [1]**   94/17
**Vacancy [4]**   95/1 95/18 95/19 96/16
**vaccine [3]**   24/17 38/9 43/6
**vaguely [1]**   35/15
**validly [1]**   16/4
**values [1]**   16/20
**variety [1]**   18/9
**various [4]**   99/7 100/13 104/23 129/7
**vast [1]**   7/25
**vehicle [1]**   103/8
**verify [2]**   51/5 109/24
**versus [4]**   35/1 37/18 92/16 92/17
**very [45]**   4/8 4/25 8/24 10/13 11/20 16/15 19/13
19/24 28/10 33/21 33/25 34/1 35/24 37/15 39/17
41/14 43/3 47/16 49/14 54/6 67/4 67/20 69/6 69/16
75/3 78/2 84/5 86/14 86/14 88/10 93/19 101/3
101/12 102/5 104/3 114/9 117/5 120/16 120/19
120/20 122/21 123/5 125/3 126/13 126/17
**video [2]**   8/12 28/21
**videotape [1]**   118/19
**view [12]**   5/12 6/24 7/5 33/5 33/6 35/14 38/13 48/5
73/6 75/15 99/15 111/1
**viewed [2]**   9/2 76/21
**violate [4]**   37/12 38/6 100/12 100/13
**violated [2]**   81/12 96/17
**violating [5]**   96/16 98/15 98/23 99/4 102/15
**violation [11]**   30/8 30/9 36/7 36/15 80/11 98/20
99/6 100/16 101/14 115/16 128/3
**violations [4]**   8/3 35/19 97/24 115/17
**violative [1]**   85/5
**vires [2]**   98/16 98/24
**volume [1]**   36/16
**voluminous [1]**   11/13
**voluntary [1]**   129/7
**vs [1]**   1/5

## W

**wait [1]**   47/25 53/20
**waiting [2]**   43/21 61/14
**walls [1]**   118/20
**want [49]**   4/4 4/5 4/15 6/4 16/20 20/16 22/15 23/8
30/1 33/13 39/13 43/20 48/7 54/9 54/10 56/5 57/16
59/12 59/13 60/13 63/2 63/6 65/14 71/21 74/5 80/11
80/17 85/24 87/4 89/8 90/9 93/18 94/1 97/10 110/3
110/8 112/18 114/6 114/7 116/11 116/11 116/20
117/5 122/1 123/7 124/9 124/9 124/16 124/24
**wanted [9]**   28/24 34/11 51/4 51/19 61/7 71/4 114/10
124/14 127/17
**wants [5]**   9/19 22/21 43/20 74/6 122/20
**was [117]**   6/9 6/10 10/20 12/1 13/3 13/5 18/23
20/13 21/14 21/19 21/19 22/15 22/15 22/18 23/4
23/15 23/17 23/19 25/3 25/6 25/18 25/19 25/19
26/10 26/16 26/16 26/18 26/24 28/6 34/14 37/4 37/7
37/15 38/15 38/16 39/20 39/23 39/24 42/18 42/19
42/23 42/24 43/3 43/3 43/4 43/16 44/4 51/23 52/8
52/23 55/25 60/12 62/18 65/2 66/10 67/9 68/1 68/3
68/10 69/23 72/4 72/24 74/5 74/16 75/23 76/7 81/11
82/9 83/2 83/19 83/21 83/22 86/7 86/22 86/24
86/25 86/25 87/17 87/18 88/7 90/25 93/22 93/25
94/19 95/3 95/25 95/25 96/4 96/4 107/3 107/5
107/19 109/9 111/4 111/6 111/8 112/5 112/22 113/19
114/13 114/13 115/4 115/5 115/16 115/25 116/1
116/14 117/3 119/24 123/7 124/8 124/15 124/16
125/1 125/2 128/15
**Washington [2]**   1/15 2/4
**wasn't [11]**   20/12 23/23 27/15 71/5 83/19 87/17
93/25 96/2 103/23 116/5 117/7
**waste [4]**   104/12 104/14 104/22 105/16
**way [26]**   22/24 28/3 32/5 32/8 38/15 42/6 55/10
69/18 70/6 70/17 71/17 74/4 75/3 85/7 85/20 87/2
96/20 97/9 99/9 106/18 108/3 114/3 115/7 124/3
124/4 126/15
**ways [4]**   30/21 76/21 100/7 116/9
**we'll [8]**   4/6 4/7 4/12 4/13 4/14 4/15 60/20 60/21
**website [17]**   50/12 50/18 51/8 52/4 54/6 54/22 63/5
63/10 63/11 63/12 63/13 63/17 64/7 64/23 65/7
88/24 119/4
**week [10]**   12/13 28/23 29/6 43/3 57/18 72/1 114/15
124/7 125/8 125/17
**weekend [6]**   15/23 23/15 23/19 23/24 50/10 117/19
**weeks [7]**   7/23 41/17 41/25 44/13 58/4 121/5 124/2
**weigh [1]**   106/19
**well [70]**   5/20 11/20 13/7 17/13 21/21 25/5 25/8
25/22 26/5 26/16 30/9 32/16 34/7 35/15 40/8 41/8
44/7 44/16 47/13 48/23 54/14 56/6 57/11 59/14 60/6
60/20 62/8 64/3 65/25 66/7 66/21 67/22 68/10 70/8
71/10 71/16 72/2 72/10 72/25 73/7 74/24 77/10
77/22 78/7 78/23 80/9 81/19 83/1 84/3 87/16 89/7
93/15 95/24 97/16 98/25 99/2 105/1 105/3 106/17
106/17 108/12 109/5 110/4 111/19 112/6 115/21
116/4 119/9 119/21 120/25
**well-known [1]**   25/5
**went [12]**   19/16 25/19 25/20 29/3 29/3 45/9 48/24
49/4 49/16 64/6 77/15 128/14
**West [2]**   110/14 110/14
**whatever [9]**   36/9 36/12 39/20 73/13 74/21 77/9
80/11 100/22 111/23
**whatsoever [1]**   10/22
**Whenever [1]**   61/16
**whereas [1]**   109/7

**whether [38]**   20/13 22/13 24/20 34/14 37/22 39/6
42/18 42/22 60/12 62/12 63/16 64/19 65/13 70/22
71/1 71/25 72/18 72/20 72/22 76/5 80/1 93/15 95/20
99/21 100/21 101/21 102/18 103/11 104/23 105/5
106/24 114/7 115/8 115/16 123/11 124/14 124/25
**while [7]**   48/13 59/14 83/5 96/25 112/23 123/4
129/9
**Whipple [1]**   27/2
**White [23]**   8/21 8/23 8/23 9/8 9/10 9/11 9/15 10/1
10/3 10/6 10/15 11/4 11/5 11/11 13/3 15/11 66/17
81/4 81/4 81/7 82/1 86/2 88/15
**whoever [2]**   20/3 66/19
**whole [4]**   44/11 53/17 74/4 87/21
**wholly [1]**   74/25
**whom [1]**   103/20
**whomever [1]**   116/13
**whose [2]**   64/17 109/9
**wielded [1]**   75/3
**wielding [1]**   17/11
**wields [1]**   114/17
**willing [3]**   70/7 72/8 91/1
**willingness [1]**   50/5
**wisely [1]**   37/15
**withdrew [2]**   26/24 27/2
**within [16]**   8/25 22/20 29/15 30/24 39/25 43/3
45/15 50/9 55/12 93/11 104/15 105/16 113/2 115/7
122/22 123/8
**without [11]**   24/3 44/12 48/10 48/14 59/9 83/6
89/19 108/15 109/23 111/1 118/14
**witness [6]**   13/21 20/22 28/4 28/6 28/8 29/8
**witnesses [1]**   27/18
**won't [2]**   47/10 119/19
**wood [5]**   15/24 78/13 117/19 125/2 128/16
**word [2]**   9/1 9/3
**words [4]**   54/17 95/8 128/1 128/2
**work [13]**   10/9 10/10 39/24 67/5 67/6 67/23 68/18
87/8 88/18 106/12 107/23 109/18 111/15
**worked [5]**   66/11 66/12 107/19 122/24 126/9
**workers [3]**   10/3 14/17 45/20
**workforce [6]**   34/19 101/6 102/7 103/20 104/7
104/17
**working [10]**   9/8 13/3 67/20 68/19 109/8 109/12
112/23 120/3 120/3 124/10
**works [2]**   88/18 115/17
**world [4]**   8/7 42/2 42/11 60/9
**worried [1]**   41/21
**worse [1]**   110/4
**wouldn't [7]**   67/23 69/24 74/10 83/7 84/5 90/13
90/14
**wrecking [2]**   15/13 16/8
**write [1]**   94/20
**wrong [5]**   22/23 37/4 73/21 89/12 98/8
**wrote [1]**   117/10
**wrought [1]**   16/8

## Y

**yeah [9]**   25/25 26/18 26/20 56/3 64/6 89/1 97/20
101/25 107/7
**year [4]**   83/9 102/1 110/17 112/22
**years [3]**   64/22 70/24 114/13
**Yep [2]**   17/17 80/5
**yes [33]**   5/3 11/22 24/15 24/15 30/11 34/17 37/25
37/25 38/4 38/8 38/10 38/21 39/13 44/23 45/4 47/23
61/17 69/21 71/12 72/12 74/8 76/18 76/20 80/3
82/15 82/17 84/9 89/14 93/2 95/15 111/20 117/9
123/23
**yet [19]**   17/17 47/25 59/12 62/14 97/6 102/19 104/8
109/21 121/9
**you'll [3]**   18/3 19/13 124/16
**Youngstown [9]**   30/17 35/20 39/4 99/2 99/8 99/18
99/22 99/22 127/24
**yours [1]**   67/21
**yourselves [1]**   3/11

## Z

**ZIP [1]**   52/15