# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PERSONAL SERVICES CONTRACTOR
ASSOCIATION,

        Plaintiff,

     vs.

DONALD J. TRUMP, et al.,

        Defendants.
_____ /

Civil Action
No. 1:25-469

Washington, D.C.
March 6, 2025

10:06 a.m.

TRANSCRIPT OF CONTINUED TELEPHONIC MOTION HEARING
ON TEMPORARY RESTRAINING ORDER
**BEFORE THE HONORABLE CARL J. NICHOLS**
UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For the Plaintiff:**        **Carolyn E. Shapiro**
                                  **Rachael Yocum**
                                  SCNAPPER-CASTERAS, PLLC
                                  200 East Randolph Street, Ste 5100
                                  Chicago, Illinois 60601

                                **Joshua Karsh**
                                  MEHRI & SKALET, PLLC
                                  2000 K Street, NW, Suite 325
                                  Washington, D.C. 20006

                                **Marni Joy Willenson**
                                  WILLENSON LAW, LLC
                                  3420 Armitage Avenue, Suite 200
                                  Chicago, Illinois 60647

APPEARANCES, CONT'D:


**For the Defendants:**      **Michael P. Clendenen**
                             **Lauren Wetzler**
                               1100 L Street, NW
                               Washington, D.C. 20005



**Reported By:**             **LORRAINE T. HERMAN, RPR, CRC**
                               Official Court Reporter
                               U.S. District & Bankruptcy Cts.
                               333 Constitution Avenue NW
                               Washington, D.C. 20001
                               lorraine_herman@dcd.uscourts.gov



**\*\*\*** Proceedings recorded by stenotype shorthand.
**\*\*\*** Transcript produced by computer-aided transcription.

1      # P R O C E E D I N G S

2              **DEPUTY CLERK:** This is civil matter 25-0469,

3      *Personal Services Contractor Associates versus Donald J.*

4      *Trump, et al.*

5              Counsel, please state your appearance for the

6      record, beginning with the plaintiff.

7              **MS. SHAPIRO:** Good morning, Your Honor. This is

8      Carolyn Shapiro for the plaintiff.

9              **MR. KARSH:** Good morning, Your Honor. Also Joshua

10     Karsh for the plaintiff.

11             **THE COURT:** Good morning.

12             **MS. YOCUM:** Good morning, Your Honor. Rachael

13     Yocum for the plaintiff.

14             **THE COURT:** Also good morning.

15             **MR. CLENDENEN:** Good morning, Your Honor. Michael

16     Clendenen for the defendants. Also on the line is

17     [indiscernible] --

18             **THE COURT:** Good morning, Counsel. We are here on

19     the continued TRO hearing from yesterday. As I said, I

20     wanted to reflect on a few things, which I've done and I am

21     prepared to decide the TRO motion orally today. So I'm

22     going to just jump right into it.

23             Plaintiff Personal Services Contractor

24     Association, PSCA, seeks a TRO that would, in short, keep or

25     return USAID workers who are employed as personal service

1  contractors, or PSCs, to the terms and conditions of hire

2  that they enjoyed on January 19, 2025.

3  Because I summarized many of the facts underlying

4  this case in the Opinion I issued in the related case *AFSA*

5  *v. Trump*, No. 25-cv-352, which sought essentially the same

6  relief but as to USAID direct hires rather than PSCs, which

7  I will not recite those facts here in great detail.  Still,

8  I think it is helpful to lay out some of the relevant events

9  at least briefly.

10  Upon taking office on January 20, 2025, President

11  Trump issued an Executive Order that mandated a 90-day pause

12  in United States foreign development assistance pending

13  reviews for, quote, programmatic efficiency and consistency

14  with United States foreign policy, end quote.

15  The Order also directed that, at the end of the

16  90-day period, quote, responsible department and agency

17  heads, end quote, should, quote, make determinations  ... on

18  whether to continue, modify, or cease each foreign

19  assistance program based upon the review recommendations,

20  end quote.

21  Secretary of State Marco Rubio then issued a

22  memorandum that paused all foreign assistance programs

23  funded by the Department of State and USAID, with exceptions

24  for foreign financing for Israel and Egypt, emergency food

25  assistance, legitimate expenses incurred prior to the date

of the memorandum and, quote, salaries and related

administrative expenses, including travel, for U.S. direct

hire employees, personal services contractors and locally

employed staff, end quote.  Secretary Rubio later also

waived the pause as to, quote, life-saving humanitarian

assistance during the period of review, end quote.

On January 30th, 2025, President Trump appointed

Secretary Rubio as the Acting Administrator of USAID.  Four

days later, the Secretary sent a letter to members of the

Congressional Committees on Foreign Relations, Foreign

Affairs, and Appropriations informing them that Peter

Marocco had been delegated the duties of Deputy

Administrator of USAID and would, quote, begin the process

of engaging in a review and potential reorganization of

USAID's activities to maximize efficiency and align

operations with the national interest, end quote.

USAID has approximately 1,230 personal services

contractors, or PSCs, stationed in both the U.S. and

overseas.  PSCs serve as technical advisors across USAID and

provide flexibility to rapidly respond to developmental

needs and critical staffing gaps.

On February 2, 2025, USAID approved the

termination of 791 PSCs stationed in high- and middle-income

countries like the U.S., Moldova and Thailand.  According to

Deputy Administrator Marocco, those contracts, quote, appear

to be inconsistent with the mission of USAID, end quote, which is to, quote, assist primarily in low-income countries, end quote. Those are quotes from the Second Marocco Declaration, Paragraph 4, ECF No. 13-2.

As of February 23rd 2025, 493 termination notices had been issued, 35 contracts were determined to be no longer active, for example, because the PSC resigned or moved positions, and 286 are under review. As required by their contracts, PSCs who are terminated are being given 15 days' advance notice.

Again, the PSCA seeks a TRO that would "protect" its PSC members from these changes at USAID.

To obtain a TRO -- and this is a quote from *Chaplaincy of Full Gospel Churches vs. England*, 454 F.3d 290, 297; that's the D.C. Circuit 2006 -- quote, the moving party must show, one, a substantial likelihood of success on the merits; two, that it would suffer irreparable injury if an injunction were not granted; three, that an injunction would not substantially injure other interested parties; and four, that the public interest would be furthered by the injunction, end quote.

Where, as here, the requested temporary relief would run against the government, "the final two factors -- balancing the equities and public interest merge, end quote.

I will now discuss how each of the TRO factors

1    applies here.  I will start with irreparable harm.

2         As in *AFSA,* because irreparable harm is the

3    touchstone of preliminary injunctive relief and the PSCA's

4    allegations of irreparable harm necessarily inform the

5    relief that I could conceivably order at this time, it is

6    helpful to begin the analysis with this factor.

7         The standard for irreparable harm is high.  That

8    is recognized by many courts, to include *Hi-Tech Pharmacal*

9    *Company vs. FDA*, 587 F.Supp. 2d 1, 11, which is a D.D.C.

10   case 2008.  To meet it, a plaintiff must demonstrate that it

11   faces injuries that are, quote, certain, great, actual and

12   imminent, end quote, that same case, as well as, quote,

13   beyond remediation, end quote.  And that is from *Chaplaincy*

14   *of Full Gospel Churches vs.  England,* 454 F.3d 290, 297;

15   that's a D.C. Circuit case from 2006.

16        The PSCA argued in its reply brief that the

17   gravest imminent irreparable harm in this case flows not

18   from changed employment conditions and their follow-on

19   effects, but from the harm to our constitutional democracy,

20   end quote, if USAID eventually ceases to exist.

21        But it is not clear how alleged harms to our

22   constitutional democracy affect plaintiff's members in

23   particular, as needed to surmount the ban on generalized

24   litigating grievances.  And it remains the case that the

25   President and Secretary of State have not placed a blanket

pause on USAID's spending.  Instead, the government has
reiterated   that its current actions *vis à vis* USAID are
taken with an eye toward reviewing the agency's operations.

Even though the PSCA's reply brief focuses on that
claimed irreparable harm, its opening brief and declarations
identify other potential "harms and threats of harm" that
PSCs face from the government's actions with respect to
USAID.  The PSCA says that those harms are "identical to
those impacting direct hires," which were at issue in the
*AFSA* case.

Specifically, the PSCA points to:  The possibility
that its members will face safety risks due to losing access
to USAID communication and security tools while overseas;

The possibility that the funding pause will delay
payment of overseas PSCs' authorized living expenses,
including causing them to lose critical utilities like water
and electricity;

The risk of familial and medical disruptions due
to expedited evacuations of PSCs stationed abroad; PSCs'
loss of goodwill with USAID implementing partners who are no
longer receiving agency funds;

And general reputation damage to PSCs, both
because of President Trump's negative statements about USAID
and because DOGE, D-O-G-E, allegedly has published personal
identifying information about PSCs on its website.

1    Because of the same reasons I explained in my

2  *AFSA* Opinion, none of these alleged harms meet the high

3  standard needed to warrant preliminary relief.  *Hi-Tech*, 587

4  F.Supp. 2d at 11.

5    Beginning with PSCs' loss of communication tools

6  and utilities while overseas, the PSCA has not demonstrated

7  any such harm is "certain" or "imminent."  The PSCs whose

8  contracts have been or are being terminated, are in

9  high-income and middle-income countries, it appears unlikely

10  physical harm would result were those PSCs cut off from

11  government communication or security systems as a result of

12  their terminations.  To the extent that PSCs are also

13  concerned about pre-termination lapses in access, the

14  government has credibly attested that that will not occur.

15    And as the PSCA's affiant acknowledges in a

16  declaration, the non-payment of allowable living expenses is

17  merely an unintended consequence, quote/unquote, of the

18  funding freeze, because Secretary Rubio specifically

19  exempted the administrative expenses of PSCs from the 90-day

20  pause.  The PSCA has not pointed to any member who faces

21  personal present, personal danger of unintended consequence,

22  which appears to be resolved soon.  For that last point, I

23  am citing both Exhibit J, Paragraph 7 and Exhibit D,

24  Paragraphs 3 through 5 of the declarations there.

25    As for disruptions that the PSCA's members might

face as a result of departing their posts earlier than anticipated, that is within the 15-day pretermination windows afforded them, the PSCA has not demonstrated an imminent risk of irremediable harm from any expedited departures.

Any economic harm from early departure from post, such as breaking a lease or being unable to sell a car, is not irreparable because affected PSCs could seek "adequate compensatory relief at a later date."  Citing there *Full Gospel Churches* 454 F.3d at 297.

And although the PSCA flags the possibility that pregnant members or members with upcoming in-country medical procedures could be forced to evacuate on timelines that could disrupt their care, the PSCA has not identified anyone who is indeed in that situation and being forced to depart post.  Moreover, the government attested at yesterday's hearing that it would work to resolve any such situation in individual circumstances should it arise.

Finally, the PSCA's various allegations regarding loss of goodwill and reputational damage do not amount to a "great" harm of the kind warranting injunctive relief.  Here I am relying on *Sampson v. Murray*, 415 U.S. 61, at 91-92. And while the PSCA alleges that its members face a risk of doxxing, that danger is too hypothetical to support a TRO, especially where PSCA affiants acknowledge that the personal

1    data of USAID PSCs has been available on certain government

2    databases for some time.

3            For all these reasons, I conclude that the PSCA

4    has not established that its members would suffer imminent

5    irreparable harm as a result of the government's challenged

6    actions absent a TRO.

7            Turning now to likelihood of success on the

8    merits.  As in *AFSA*, the PSCA asserts that its members

9    challenge the wholesale dissolution of USAID, as opposed to

10   the dissolution of their contracts, in particular, or the

11   changes to the terms of the contracts.

12           The reason that the PSCs are suffering or will

13   suffer Article III injury in fact, and the only reason that

14   they have identified potential imminent harm or possible

15   irreparable harm, is that they do have contractual

16   relationships with USAID that USAID is attempting to alter.

17           In short, the only reason plaintiff's members have

18   standing to bring their statutory and constitutional claims,

19   setting aside the narrower question of whether they have

20   demonstrated irreparable harm warranting a TRO on those

21   claims, is because of the injuries they will suffer as the

22   result of the government changing those contractual

23   relationships.

24           Thus, at least for TRO and preliminary relief

25   purposes, this case presents as essentially a federal

contract dispute, that is, a dispute about the government's efforts to change the nature of its contractual relationships with PSCs.  Plaintiff's efforts to broaden the case into one about structural constitutional powers and claimed harm of being subjected to unconstitutional decisions doesn't work here because, at this juncture, its members' Article III injuries, including, again, any alleged irreparable injuries, are all directly traceable to their contracts with USAID and wholly redressed by a decision reinstating them.

This is critical because, under the Contract Disputes Act, federal courts lack jurisdiction to adjudicate certain types of federal contracts.  This particular federal court lacks jurisdiction to adjudicate certain types of cases involving federal contracts, including federal contracts for the procurement of services.

As relevant here, that Act, quote, establishes an administrative system for disputes relating to federal procurement contracts, end quote.  And then, quote, vests exclusive jurisdiction over claims in only two venues:  One, at the Court of Federal Claims and, two, agency board of contract appeals.  Before filing suit in either venue, contractors must administratively exhaust by submitting a written claim to the contracting officer for a final decision.

1        Here, whether the claims of plaintiff's members

2   are, in fact, subject to the CDA's exclusive review scheme

3   depends on the precise terms of their contracts, which

4   plaintiff has not produced in this litigation.

5        The government argues, and PSCA has not really

6   rebutted the notion, that there are contracts here that are

7   subject to the CDA.  And, in any event, the PSCA cannot

8   avoid the jurisdictional bar of the CDA by cloaking its

9   claim in non-contractual language such as the Constitution

10  statutes or the APA.

11       Instead, determination of whether an action is at

12  its essence a contract action, subject to the CDA, depends

13  both on the source of the rights upon which the plaintiff

14  bases its claim and upon the relief sought (or appropriate).

15  Where plaintiff's members have Article III standing to sue

16  only because of their contractual relationships with USAID,

17  and expressly seek reinstatement of their contracts and/or

18  damages for unpaid contractual obligations, it appears

19  likely that their claims are at bottom contractual ones to

20  which the CDA will apply.

21       Indeed, the PSCA offered in its reply brief no

22  substantive argument in response to the government's

23  discussion of these points beyond simply asserting in that

24  reply that its constitutional claims are collateral to any

25  contract claims that could be brought under the CDA.  But

the PSCA, in its brief, made no effort to explain how that
is so, when its only theories of particularized irreparable
harm relate exclusively to contractual relationships between
its members and USAID.

To be sure, at yesterday's hearing, the PSCA
pointed me to *Crowley Government Services, Inc. versus GSA*
38 F.4th 1099, 1102, D.C. Circuit 2022, which held that a
plaintiff's claim against GSA for essentially tortiously
interfering with the plaintiff's DOD contract was not, at
its essence, a contractual claim over which the district
court lacked jurisdiction.

I am not persuaded that the logic of *Crowley*
applies here, where the PSCA has sued the contracting entity
itself, USAID, and it cannot be said that its asserted right
exists independently of the contract with USAID.

To be sure, I realize, as I noted before, that
plaintiff has disavowed making any direct contract claim but
to think about the remedy here, the remedy that would
redress their Article III injuries; that is to say, those
injuries that give me jurisdiction in the first place, would
be the restoration of their contracts and contractual rights
as they existed on January 19th, 2025; that is the remedy
that would redress the injury that creates Article III
standing here. And, in my view, that means that the CDA
likely applies and, at a minimum, that the logic of *Crowley*

1    and its holding that the CDA did not apply to that dispute,

2    is not binding on me here.

3             In sum, in my view, I conclude that the PSCA has

4    not carried its burden of establish establishing the Court's

5    subject matter jurisdiction over the claims here, which

6    appear likely to be stripped and must be adjudicated

7    elsewhere by the Contracts Dispute Act.  As a result, PSCA,

8    in my view, has not established a likelihood of success on

9    the merits.

10             Turning to the last two factors, which merge, as I

11   said earlier, into one, essentially, this final factor,

12   final two factors requires me to weigh the hardship to the

13   PSCA if the TRO is not granted against the harm to the

14   government if it is, and the public's interest relatedly.

15             Because the PSCA has not carried its burden on

16   irreparable harm and likelihood of success there is no need

17   to balance hardships in detail.  The D.C. Circuit held that

18   in and among other cases, *Davis*, 571 F.3d 1288.  Regardless,

19   at least as the parties have briefed this issue, this

20   factor, at a minimum is in equipoise and perhaps favors the

21   government as well.

22             As I explained in the *AFSA* Opinion, the government

23   has articulated plausible harms that would occur if its

24   efforts with respect to USAID are not allowed to continue;

25   namely, that it would not be able to audit USAID in the

1    manner needed to ensure the agency is acting in national and

2    global interest.  In the context of this case, the

3    government has claimed that maintaining PSCs in middle- and

4    high-end countries is antithetical to the mission of USAID

5    and wasteful of American tax dollars.

6              In response to these points, the PSCA asserts that

7    the equities and public interest favor a TRO because denying

8    preliminary injunctive relief would harm our constitutional

9    democracy by supposedly conferring on the executive vast and

10   generally unreviewable powers in the realm of foreign

11   affairs.

12             But the merits question of what powers the

13   executive branch holds with respect to USAID is not directly

14   before the Court today.  Instead, the inquiry on this final

15   TRO factor is whether the balance of the equities and the

16   public interest favor an injunction before that merits

17   question can be answered.

18             In my view, and for the very reasons I've

19   discussed in *AFSA*, it is impossible for me to conclude that

20   these final factors weigh heavily in favor of an injunction.

21   For all these reasons, I conclude that the PSCA has not

22   demonstrated its members will suffer irreparable injury

23   absent a TRO; that its claims are likely to succeed on the

24   merits; or that the balance of the hardships, or the public

25   interest, weigh heavily in favor of a TRO, I will deny the

1    PSCA's motion, which is ECF No. 6.

2            Ms. Shapiro, obviously I just announced the

3    decision.  Are there any topics I just announced that the

4    plaintiff would like to address today either by way of next

5    steps, the case more generally or any related issues?

6            **MS. SHAPIRO:**  Your Honor, I think we will want to

7    conference and absorb the opinion before we address those

8    issues.

9            **THE COURT:**  Okay.  Very well.

10           Does the government want to raise anything today

11   before we sign off and then wait for the parties to come

12   back for proposals of next steps?

13           **MR. CLENDENEN:**  No, Your Honor.

14           **THE COURT:**  Okay.  Thank you, all.

15           Ms. Shapiro, obviously in any event that the

16   plaintiff comes up with something it would like me to take

17   up either by way of scheduling, another motion and/or

18   anything like that, obviously I am here to accept any and

19   all filings.

20           I would generally though appreciate if you would

21   to the extent there is something that you would like to

22   propose that you meet and confer with the government and at

23   least get its views before I will wait to hear from the

24   parties thank you all.

25           **MS. SHAPIRO:**  Thank you, Your Honor.

1          (Proceedings concluded at 10:28 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T E**

      I, **Lorraine T. Herman, Official Court Reporter,**
certify that the foregoing is a true and correct transcript
of the record of proceedings in the above-entitled matter.

    March 6, 2025          /s/  Lorraine T. Herman
        **DATE**                     **Lorraine T. Herman**