**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

~~J. DOE 1-26,~~

~~*Plaintiffs*~~

~~v.~~

~~ELON MUSK, in his official capacity, UNITED STATES DOGE SERVICE, *and* the DEPARTMENT OF GOVERNMENT EFFICIENCY,~~

~~Case No. 25 8:25-cv-00462-TDC~~

**J. DOE 4,**

**J. DOE 7,**

**J. DOE 22**

**J. DOE 27,**

**J. DOE 28,**

**J. DOE 29, on behalf of themselves and all others similarly situated,**

**_Plaintiffs_**

**v.**

**ELON MUSK, in his official capacity,**

**UNITED STATES DOGE SERVICE,**

**DEPARTMENT OF GOVERNMENT EFFICIENCY,**

**UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT,**

**UNITED STATES DEPARTMENT OF STATE,**

**Case No. 8:25-cv-00462-TDC**

**DONALD J. TRUMP, in his official capacity,**

**MARCO RUBIO, in his official capacity,**

**PETER MAROCCO, in his official capacity,**

**JEREMEY LEWIN, in his official capacity,**

**KENNETH JACKSON, in his official capacity,**

**AMY GLEASON, in her official capacity,**

*Defendants.*

## AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, J. Doe ~~1–26,†–by~~4, J. Doe 7, J. Doe 22, J. Doe 27, J. Doe 28 and ~~through their attorneys~~J. Doe 29,[1] on behalf of themselves and all others similarly situated, hereby bring this Amended Class Action Complaint

against Elon Musk, in his official capacity, ~~as well~~ as the *de facto* leader of DOGE; United States

DOGE Service and the Department of Government Efficiency (collectively "DOGE~~"). In support~~

~~thereof, upon personal knowledge as well as information and belief, Plaintiffs allege the following:~~

~~"); the~~ ~~NATURE OF THE ACTION~~

~~Defendant Elon Musk has an office in the White House, no supervising official, and a team~~

~~of individuals with wide-ranging government access whom he directs. Defendant Musk was the~~

~~driving force behind the creation of DOGE and acts as the *de facto* DOGE Administrator, despite~~

~~the lack of any formal announcement by President Donald J. Trump or any public process affiliated~~

~~with the selection of that position.~~

---

~~† Plaintiffs are filing a motion to waive the requirement under Local Rule 102.2(a) to provide their addresses~~ ~~and to~~
~~permit Plaintiffs to proceed under pseudonyms.~~

---

[1] The Court previously granted a motion waiving the requirements of Local Rule 102.2(a) and
permitting Plaintiffs to proceed under pseudonyms. ECF No. 81.

In his government role, Defendant Musk exercises an extraordinary amount of power. Indeed, the scope and reach of his executive authority appears unprecedented in U.S. history. His power includes, at least, the authority to cease the payment of congressionally approved funds, access sensitive and confidential data across government agencies, cut off systems access to federal employees and contractors at will, and take over and dismantle entire independent federal agencies.

Recent weeks demonstrate that Defendant Musk follows a predictable and reckless slash-and-burn pattern:

1. Identify a federal program target, often relying on information posted on his privately owned social media platform, X, to pick them.

2. Attempt to install his DOGE team—which largely consists of former employees from across a variety of Defendant Musk's businesses—within the agency or agencies that administer those programs.

3. Attempt to gain access to the agency's core operating systems—often demanding access that is forbidden by privacy and security laws for individuals who have no clearance to access that information.

4. If resistance is met by the duly appointed officers or regular staff, threaten and/or ensure that any personnel roadblocks are placed on leave or otherwise removed. Perhaps amplify threats against staff on X, heightening the risk of third-party harassment.

5. Install DOGE members within the target agency and gain access to the agency's internal systems.

6. Use the agency's internal technology and information systems—again, without proper legal authorization—to identify personnel for termination and contracts for freezing.

7. Begin dismantling the agency from within by severely disrupting or crippling

~~operations.~~

~~8. Post about his actions either on his personal X account or the official DOGE X account, or both.~~

~~In the case of USAID in particular, Defendant Musk's actions were far ahead of other members of the Trump Administration including (in that case) duly confirmed cabinet members like Secretary of State Marco Rubio.~~

~~It is clear, however, that the duties Defendant Musk and the DOGE team he directs have performed thus far—and the new duties he is now undertaking, such as starting to dismantle the Department of Education—represent "the performance of [] significant governmental dut[ies]" that may be "exercised only by persons who are 'Officers of the~~ United States~~,'" and duly appointed pursuant to the U.S. Constitution's Appointments Clause. *Buckley v. Valeo*, 424 U.S. 1, 141 (1976).~~

~~But Defendant Musk has not been nominated by President Trump and confirmed by the U.S. Senate, as Article II of~~ <u>Agency for International Development ("USAID");</u> the United States <u>Department of State ("State Department"); President Donald J. Trump; four key decision-makers at USAID—Secretary of State Marco Rubio, who also serves as the Acting Administrator of USAID; Peter Marocco, who performed the duties of Deputy Administrator of USAID; Jeremy Lewin, the Deputy Administrator for Policy and Programming and the Chief Operating Officer for USAID;[2] Kenneth Jackson, the Deputy Administrator for Management and Resources at USAID;[3] and Amy Gleason, the Acting Administrator of Defendant US DOGE Service.</u>

---

<u>[2] Or has been delegated and is performing the duties and functions of Deputy Administrator for Policy and Programming and Chief Operating Officer.</u>
<u>[3] Or has been delegated and is performing the duties and functions of Deputy Administrator for Management and Resources.</u>

## NATURE OF THE ACTION

"Since it was established by Executive Order on January 20, 2025, the 'Department of Government Efficiency,' or 'DOGE,' has sent teams of personnel to numerous federal departments and agencies, taken control of their computer systems, and in many instances, taken the lead in terminating numerous contracts and employees. In the case of [USAID], DOGE and its leader, Elon Musk, have also played a leading role in actions taken to shut down and dismantle the agency, which have included permanently closing its headquarters, taking down its website, and engaging in mass terminations of contracts, grants, and personnel." Mem. Op. at 1, ECF No. 73. Defendant Musk's exercise of extraordinary—and seemingly unprecedented—authority has included USAID decisions on "matter[s] of great significance" that required "substantial discretion," of the type that must be performed by a duly appointed officer. *Id*. at 29-30. Moreover, as the *de facto* head of DOGE, Defendant Musk's position has required ongoing, "around-the-clock" work that constitutes a "continuing position" under Appointments Clause jurisprudence. *Id*. at 34-36. Accordingly, this Court previously ruled that Plaintiffs have "demonstrated a likelihood of success on the merits of the Appointments Clause claim as to the decision to permanently close USAID headquarters." *Id*. at 36.

Additionally, the record compiled on the preliminary injunction motion demonstrates that "Defendants, as well as other government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency." *Id*. at 37. In February alone, this included "physically clos[ing] USAID headquarters and shut[ting] down key functionalities of the agency," taking the website offline, "eliminat[ing] or sidelining [] almost its entire workforce," terminating substantially all USAID grants and contracts, and preventing USAID from fulfilling even its statutorily required activities. *Id*. at 37-40. Indeed, by February 19, 2025, President Trump claimed,

"we have effectively eliminated" the agency. *Id*. at 40. Days later, Defendant Musk added, "the world will be better for this," referring to DOGE's dismantling of USAID. *Id*.

But,

Where Congress has consistently reserved for itself the power to create and abolish federal agencies, specifically established USAID as an agency by statute, and has not previously permitted actions taken toward a reorganization or elimination of the agency without first providing a detailed justification to Congress, Defendants' actions taken to abolish or dismantle USAID are "incompatible with the express or implied will of Congress."

*Id*. at 46-47 (quoting *Youngstown Sheet & Tube Co. v.* ~~Constitution requires. Moreover, even if Defendant Musk qualified only as an inferior officer (a dubious proposition, given his sweeping powers), Congress has not vested "by Law" the authority to appoint him in the President alone, without the advice and consent of the Senate. Finally, even if Defendant Musk could somehow be considered a mere "employee" rather than an "officer" of the United States, his exercise of "significant," seemingly unfettered authority constitutes a grave violation of the separation of powers.~~

~~Questions regarding Defendants Musk's and DOGE's roles, scope of authority, and~~

proper appointment processes are not merely academic. Plaintiffs among countless other American individuals and entities have ~~_Sawyer_, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Thus, this Court also previously found a likelihood of success on the merits of the Separation of Powers claim.~~

Plaintiffs and those similarly situated to them have had their lives upended as a result of ~~the actions undertaken by Defendants Musk and DOGE. Not only have Defendants pulled the rug out from under Plaintiffs professionally and financially, but they have~~Defendants' actions, which were made wholly outside the bounds of the Constitution. Defendant Musk in particular has repeatedly publicly besmirched the good names of these dedicated, ~~and~~ loyal civil servants to justify ~~their unconstitutional~~Defendants' power grab~~—~~. causing reputational injury to Plaintiffs that will threaten their ability to obtain future employment. ~~Upon information and belief, Defendants still have full access to the digital infrastructure of Plaintiffs' agency, causing continued disruptions and maintaining access to Plaintiffs' (sometimes highly sensitive) personnel files. More broadly, the reckless disregard with which~~ Defendants have ~~exercised their unconstitutional authority has~~also unlawfully ~~disrupted contracts of the United States—some of which are signed by individual Plaintiffs—undermined national security, and put American lives at risk~~accessed and disclosed Plaintiffs' personal data. In an affront to their dignity, Defendants have pulled the rug out from under Plaintiffs professionally and financially, without explanation or warning.

Moreover, the impact of this unauthorized dismantling of USAID has had disastrous consequences for the American and global public, effectively paralyzing operations that delivered life-saving aid across more than 100 countries. Critical humanitarian programs—such as HIV treatment initiatives, malaria prevention efforts, infectious disease strategies that prevent the

transnational spread of disease, and efforts supporting the Gaza-Israeli ceasefire—were simply shut off, as Plaintiffs and those similarly situated to them abruptly lost access to their USAID systems. Defendants left vulnerable communities in the lurch. Without essential medical care or other necessities USAID previously provided, Defendants exposed these populations to easily preventable harm, including death. Moreover, billions of dollars in development projects—ranging from significant support for Ukrainian security infrastructure to programs aimed at supporting education for girls in repressive regimes—are at risk of collapse. Defendants' actions not only undermine decades of progress in global health and economic stability but also diminish U.S. power and strategic influence abroad.

For all ~~of~~ these reasons, Plaintiffs ~~respectfully request permanent and preliminary~~ seek declaratory and injunctive relief ~~from this Court, enjoining Defendant Musk and his DOGE subordinates from performing their~~ to set aside the unlawful dismantling of USAID, and to declare that Defendant Musk's significant and wide-ranging ~~duties unless~~ activities at USAID violate the Appointments Clause and Separation of Powers principles of the U.S. Constitution.

## JURISDICTION AND VENUE

~~2.~~1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201.

~~4.~~2.  Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e) because at least one of the Plaintiffs resides in this district.

**PARTIES**

## INDIVIDUAL PARTY ALLEGATIONS

5.  Plaintiffs J. Does 1-26 are current and former employees or contractors of the U.S.

3.  ~~Agency for International Development ("~~were all duly employed by USAID"~~). ~~ as of January 20, 2025.[4]

2.  ~~J. Doe 1 is a personal services contractor ("PSC") who has been with USAID since 2017. Their role is to coordinate humanitarian assistance. Their main duties include managing a portfolio of partners and providing guidance to junior staff. Through work with USAID, they have deployed into dangerous areas around the world, including Pakistan. Under their contract, to end the contract in the middle of the contractual period, the government is required to provide a 15 day notice. As a result of Defendants' unlawful actions, J. Doe 1 was cut off from access to their work email without any advanced notice. As of February 12, 2025, J. Doe 1 has been given access to their USAID email but not to other critical USAID systems. Upon information and belief, DOGE staff have been given full access to USAID systems, which includes personnel information. As a result of the dangerous nature of J. Doe 1's job, specifically their deployment into conflict zones, their personnel and security clearance files contains highly sensitive personal information—social security number, passport information, personal references, foreign contacts, previous addresses, financial records, tattoo descriptions, a safety pass phrase, and their family members' information. J. Doe 1 is worried that Defendants do not have the security clearance or training needed to handle this type of extremely confidential information, and will use it to J. Doe 1's detriment.~~

---

[4] For the purposes of this Amended Complaint and the Class allegations, Plaintiffs use "employee" and "employed" to cover all USAID employees, including personal services contractors ("PSCs").

5. ~~J. Doe 2 is a USAID employee and has been with the agency for over 10 years. Their main duties include technological responsibilities related to cybersecurity and privacy. On January 30, 2025, J. Doe 2 was working from the USAID office when they were told to provide access to individuals from DOGE. J. Doe 2 conducted research and~~

determined that the people who were trying to get access to these crucial systems were "hackers." J. Doe 2 was alarmed and raised this issue with their supervisors, indicating that the DOGE personnel should not obtain access. However, J. Doe 2 thereafter discovered that the DOGE personnel had already been given access. Furthermore, they were given *root access* to these systems, the highest level of access one can obtain and which allows a person to take over a system. This includes the ability to modify, add, delete data, and create user accounts. On Feb 1, 2025, DOGE personnel who did not have a security clearance, used their administrative rights to grant themselves access to restricted areas requiring security clearance. It is unclear what the DOGE personnel did with that access. DOGE personnel have also taken over delegate rights to every USAID mailbox. With this they have the ability to see every email, delete, and send email on behalf of every user within USAID. J. Doe 2 is also aware that there is rapid preparation to tear down the USAID network to create a condition where USAID employees will not have access to any facilities nor computing environment.

On February 4, 2025, J. Doe 2 was put on administrative leave and lost all access to USAID systems. On February 10, 2025, J. Doe 2 was allowed back into the USAID system, apparently pursuant to a temporary restraining order in a separate lawsuit between different parties.

J. Doe 2 understands that the DOGE personnel had administrative privileges into all the USAID systems and tools and that DOGE personnel took information out of the agency and sent it elsewhere. DOGE's actions have caused J. Doe 2 emotional injury, as J. Doe 2 is aware of the extent of confidential information that has been breached and the privacy

_____

J. Doe 2 also understands the USAID buildings have been given to other agencies for other purposes, including allowing the breaking down of offices and cubicles. USAID staff and contractors who worked in the USAID buildings are not allowed inside, even to obtain personal belongings.

14. J. Doe 3 is a PSC who has been with USAID, in the Bureau of Humanitarian Assistance (BHA), since 2017. They are a part of the Support Relief Group (SRG), a group of staff who fill regular staffing shortages in DC and the field, as well as surge to support BHA disaster responses worldwide. They are a former Army officer and an engineer with a high level security clearance. They have filled roles in grant programming and operations, both in DC and in the field. They have also worked on more than a dozen response teams.

As a result of Defendants' unlawful actions, J. Doe 3 has been locked out of their email account and other systems (including time cards, vouchers, etc.) since February 2, 2025. J. Doe 3 has received no communication about the status of their contract or employment. J. Doe 3 has over $15,000 worth of travel vouchers that should be paid by the agency but have not been paid thus far.

J. Doe 3 has spent 20 years working in the humanitarian field. J. Doe 3 does not know what they will do if they lose this job and there is no prospect of getting comparable employment, especially if the entire humanitarian aid sector collapses due to the huge cuts in U.S. funding. Further, J. Doe 3 is worried about what will happen if there is a

humanitarian emergency that J. Doe 3's bureau (and USAID more broadly) would typically respond to and they will not be there to provide support; this concern is shared by other USG agencies that support USAID personnel during responses.

22. J. Doe 4 has dedicated over 10 years of their life in service at USAID. On February 4, 2025, as a result of Defendant's illegal conduct, J. Doe 4 was cut off from accessing USAID email and other systems. J. Doe 4 has witnessed the negative impacts of USAID's stop-work order on the partners and beneficiaries of USAID, some of the most vulnerable people on the planet, whom they have worked with directly in implementing USAID programs. Additionally, J. Doe 4 experienced the harm of seeing years of their efforts and U.S. taxpayer dollars wasted, as current USAID leadership unlawfully discards investments to design and implement effective USAID programs without a fair assessment of their merit or impact. J. Doe 4 has also witnessed the harm of colleagues around them, including a fellow whom J. Doe 4 had arranged to join the agency; the fellow was *en route* to their first day when notified the position was eliminated. Finally, J. Doe 4 experienced direct personal harm, as the President of the United States and Defendant Musk label civil servants "lunatics" and threaten to end their employment at a whim, even though J. Doe 4's work has been supported by bipartisan appropriations bills and is based on systematic analysis.

23. J. Doe 5 is a PSC who has been with USAID for almost 3 years. They support the agency's efforts to combat human trafficking. For instance, at the end of February, they were scheduled to travel to Southeast Asia to help design new activities that would have worked to strengthen the U.S. government's ability to respond to trafficking rings in Asia

that impact U.S. security interests. They lost access to their email Sunday, February 2, without explanation. When that shut down, they also lost the ability to finalize a report on USAID's counter-trafficking efforts, as required by 22 U.S.C. § 7103(d)(7). The loss of email access also prohibited them from being able to respond to an active GAO audit, titled "Combating Human Trafficking During Armed Conflicts." When they regained email access on February 9, there were no emails in their inbox from the previous week, even though they had repeatedly copied their work email address when trying to communicate with their contracting officer about their employment status between February 2 and February 9. They remain confused and anxious about the status of their employment—to date no one at the agency has provided guidance on whether or not they were on administrative leave—but, pursuant to their employment contract, only their contracting officer has authority to end the contract. There has also been no guidance on if or how they should finalize the report, audit and other activities they were working on for the agency.

26. J. Doe 6 is a PSC who has been with USAID for several years and has worked for over 25 years in this field. They are a subject matter expert whose main duties include working on supporting independent media, advocating for digital rights, and promoting information integrity, including working on countering authoritarianism and foreign malign influence which undermines U.S. national security. Under their contract, in order to end the contract in the middle of the contractual period, the government is required to provide a 15 day notice. J. Doe 6 was in Africa for work with USAID when the stop work order came out. They traveled back home to the United States and have thousands of

dollars of travel costs reimbursement that is supposed to be covered by USAID. As a result of Defendants' unlawful actions, J. Doe 6 lost access to their work email and USAID systems on February 2. J. Doe 6 has received no formal communication about their situation. J. Doe 6's insurance is covered to a large degree by USAID and they do not know if the insurance will be covered. As of February 12, 2025, J. Doe 6's access has not been restored. J. Doe 6's livelihood is severely jeopardized by Defendants' illegal activity.

29. J. Doe 7 is a Civil Service Excepted ("CSE") employee who has been with USAID for over 10 years. They work in a department focused on disaster response. On Sunday, February 2, 2025, USAID personnel were cut off from accessing USAID systems in droves. On Monday, February 3, 2025, more USAID personnel were cut off from accessing systems. That morning, J. Doe 7 spoke with the information technology ("IT") personnel in their building. The IT person shared that representatives from DOGE had access to all systems. The IT personnel knew this because they were required to help the DOGE representatives obtain access. On the morning of February 3, 2025, J. Doe 7 was contacted by USAID personnel overseas who were stranded without access to government phone, laptop, and systems, including AtHoc and Scry, the apps used to disseminate emergency safety and security information/direction to colleagues. The systems to help the USAID people overseas were shut down and so J. Doe 7 could not assist them.

On Tuesday, February 4, 2025, J. Doe 7 went into the office and was eventually informed by colleagues that they and other personnel had to leave the building. J. Doe 7 then went

home to keep working. That evening, as a result of Defendants' unlawful actions, J. Doe 7 was told they were put on administrative leave via an email from the USAID press email address, sent from one of DOGE's representatives. Shortly after receiving this notice, J. Doe 7 lost access to USAID systems. On Sunday, February 9, 2025, apparently in response to a temporary restraining order issued in another lawsuit, J. Doe 7 was given access to USAID systems.

J. Doe 7 understands that the DOGE representatives have access to their personnel, medical, and security clearance files. These files have extremely sensitive information about J. Doe 7 and their family members, including information that could subject them to harassment by DOGE members and/or by third parties. J. Doe 7 is extremely worried about this prospect. Some of J. Doe 7's colleagues have been doxxed and so this concern is especially heightened.

4.   ~~J. Doe 8 is a PSC who has worked for the federal government for almost 16 years. They are part of a team that provides emergency aid during humanitarian disasters and crises. They have worked as an emergency responder across the globe, including back-to-back deployments in Armenia, Gaza, and Ukraine, as well as other crisis areas as a part of their work for USAID.  As a result of Defendants' unlawful actions, on February 3, 2025, J. Doe 8 was locked out of~~ J. Doe 4 is an employee of USAID and has been an employee for 10 years. As a result of Defendants' unconstitutional actions, J. Doe 4 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe

4 represents.

5.    J. Doe 7 is an employee of USAID and has been an employee for over 10 years. As a result of Defendants' unconstitutional actions, J. Doe 7 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 7 represents.

6.    J. Doe 22 is an employee of USAID and has been an employee for 5 years. As a result of Defendants' unconstitutional actions, J. Doe 22 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 22 represents.

7.    J. Doe 27 is an employee of USAID and has been an employee for over 2 years. As a result of Defendants' unconstitutional actions, J. Doe 27 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 27 represents.

8.    J. Doe 28 is an employee of USAID and has been an employee for over 1.5 years. As a result of Defendants' unconstitutional actions, J. Doe 28 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 28 represents.

9.    J. Doe 29 is or was an employee of USAID and has been an employee for 2 years.[5] As a result

---

[5] As of the date of filing, J. Doe 29's precise employment status is unclear.

of Defendants' unconstitutional actions, J. Doe 29 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 29 represents.

6. ~~*USAID* systems, including their email access. They received no communication about why access was stopped. On Monday, February 10, 2025, J. Doe 8 was able to access their USAID email. There has still been no communication from USAID about why access was cut off in the first place. About half of J. Doe 8's~~

immediate team colleagues still do not have access.

10. J. Doe 9 is a PSC offshore, in a high-risk area in the Middle East. On Monday, February 3, 2025, J. Doe 9 tried to login to their USAID email account but was locked out. J. Doe 9 received no warning or notification in advance from being shut out of USAID's systems. Their supervisor and head of mission were not informed in advance of the cutoff. All of the contacts and the safety and security applications from J. Doe 9's USAID work phone were removed remotely. The safety and security application is the mechanism by which federal government staff overseas in dangerous areas indicate that they are in a dangerous situation and access help. J. Doe 9 lives with their family in the foreign country in which they are stationed and is concerned for their safety. If there is an emergency, J. Doe 9 hopes they will be able to get out and be taken care of by USAID, but there is no guarantee as over the last few weeks, nothing done within USAID by Defendants has been according to protocol or implemented in a methodical, safe manner.

J. Doe 9 has no idea what their status is each day. They continue to come into the office in order to execute their duties to the best of their ability despite not having access to any of the tools and resources required to do so. As of February 12, 2025, they are still locked out of all USAID systems, including email. They have tried numerous times to reach out to different helpdesk lines in Washington, DC. The only response J. Doe 9 has received is a message that the helpdesk confirms J. Doe 9's account is disabled but that they cannot provide further information.

13. J. Does 10, 12, 14, 16, 17, 19, 20, 23, and 25 are PSCs or other contractors who, as a

~~result of Defendant's unlawful actions, have all lost access to USAID systems with only some of them obtaining access on or about February 10, 2025, and remain in limbo as to whether the terms of their employment contracts will be honored. J. Does 11, 13, 15, 18, 21, 22, 24, and 26 are employees who, as a result of Defendant's unlawful actions, have all lost access to USAID systems; some of the employees have regained access to USAID systems apparently in response to a temporary restraining order granted in another case.~~

~~16.~~10.  Defendant Musk is, according to White House spokespeople, an unpaid "special government employee" pursuant to 18 U.S.C. § 202. Upon information and belief, Defendant Musk acts as the *de facto* DOGE Administrator. *See* Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" 90 ~~FR 8441 (2025) ("There shall be a USDS Administrator established in the Executive Office of the President who shall report to the White House Chief of Staff."). In his~~Fed. Reg. 8,441 (2025). In this role, Defendant Musk oversees a DOGE team, including a "DOGE Team Lead" embedded within each federal agency. *See id*. at Sec. 3(c).

~~17.~~11.  Defendant United States DOGE Service ("USDS") was established on January 20, 2025 by Executive Order 14158. DOGE's stated purpose is to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id*. at Sec. 1. "DOGE ~~. . .~~ shall terminate on July 4, 2026" but that termination "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id*. at Sec. 3(b).

~~18.~~ On information and belief, Defendant ~~United States DOGE Service is in a transitional state and not fully formed, but there is~~Musk directs a web of employees working ~~at the~~

direction of



12.  ~~Defendant Musk which is referred to as~~ for "the Department of Government Efficiency~~,~~" or DOGE. Not all members of DOGE are necessarily employees of USDS. For purposes of this Complaint, both Defendant United States DOGE Service, as well as the network of personnel working at the direction of Defendant Musk, are referred to collectively herein as "DOGE."

13.  Defendant United States Agency for International Development was created by Congress in 1961. It is an independent executive agency that is primarily responsible for administering civilian foreign aid and development assistance.

14.  Defendant United States Department of State is an executive department that is responsible for the country's foreign affairs policy and relations.

15.  Defendant Donald J. Trump is the 47th President of the United States of America.

16.  Defendant Marco Rubio is the United States Secretary of State. On February 3, 2025, it was publicly reported that President Trump appointed Secretary Rubio to serve as Acting Administrator of USAID.

17.  Defendant Peter Marocco either served as or performed the duties and functions of the Acting USAID Deputy Administrator from at least February 2, 2025, to March 18, 2025. In sworn testimony, Defendant Marocco indicated that he assumed those duties on January 30, 2025, but delegation of authority documents signed by Secretary Rubio indicate that Defendant Marocco's delegation occurred no earlier than February 2, 2025.

18.  Defendant Jeremy Lewin was the DOGE team lead at USAID prior to being delegated the roles of USAID Deputy Administrator for Policy and Programming and of Chief Operating Officer on March 18, 2025.

19.  Defendant Kenneth Jackson was delegated the role of USAID Deputy Administrator for Management and Resources on March 18, 2025.

20. Defendant Amy Gleason is the Acting Administrator of Defendant US DOGE Service. She was appointed the acting administrator in February of 2025.

**CLASS ALLEGATIONS**

21. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), seeking solely final injunctive relief and/or corresponding declaratory relief.

22. The Class is defined as follows:

   a. All persons who, between January 20, 2025 through the present (the "Class Period"), worked at any time as employees of USAID, including as personal services contractors; specifically excluded from this class are Defendants or any other person who, during the Class Period, acted as Administrator or Deputy Administrator of USAID.

23. Plaintiffs reserve the right to seek to amend or modify the class definition, including by proposing subclasses, as the litigation progresses.

24. This action seeks only declaratory and injunctive relief. Any and all claims for monetary damages are not within the purview of this litigation, including any individual employment claims and/or any claims arising under any individual contract with USAID.

25. ***Fed.R.Civ.P. 23(a)(1) Numerosity*****:** As of January 20, 2025, USAID employed between 5,500 and 10,000 people throughout the United States and internationally, rendering joinder of all Class members impractical. The Class is ascertainable and identifiable from USAID employment records and documents.

26. ***Fed.R.Civ.P. 23(a)(2) Commonality*****:** There are core questions of law and fact common to the

Class, resolution of which will generate common answers apt to drive the resolution of the litigation. Those include:

    a.  Whether Defendants' exercise of executive power beyond the scope of any legally authorized appointment, specifically decisions made by Defendant Musk and other DOGE members between January 20 and February 3, 2025 pertaining to USAID, violates the Appointments Clause of the U.S. Constitution;

    b.  Whether Defendants' exercise of executive power beyond the scope of any constitutional or legislative grant of authority, specifically the ongoing dismantling of USAID, violates fundamental Separation of Powers principles; and

    c.  The nature and scope of injunctive and/or declaratory relief appropriate in light of these constitutional violations.

27. ***Fed.R.Civ.P. 23(a)(3) Typicality***:  Plaintiffs' claims are typical of the claims of the Class they seek to represent. Plaintiffs J. Doe 4, J. Doe 7, J. Doe 22, J. Doe 27, J. Doe 28, J. Doe 29, like all members of the Class, were employed by USAID between January 20, 2025 and the present (the "Class Period") and suffered unauthorized access to or disclosure of their private data, interruptions to the ordinary course of their employment (including, but not limited to, lost access to critical security systems and basic utilities), reputational harm and/or dignitary harm as a result of Defendants' Appointments Clause and Separation of Powers violations. Plaintiffs and all members of the Class were thus all directly and similarly injured as a result of Defendants' common course of conduct. Plaintiffs' claims all arise from the same conduct and actions as the claims of all Class members, they have and assert the same legal claims arising therefrom, and they are not subject to any unique defenses.

28. ***Fed.R.Civ.P. 23(a)(4) Adequacy***: Plaintiffs are committed to the vigorous prosecution of this

action. Plaintiffs understand the nature of class action proceedings and this action specifically, and they are willing and able to fulfill their duties of class representatives. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class, and Plaintiffs have retained counsel competent and experienced in the prosecution of constitutional class action litigation to represent themselves and the Class. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

29.  ***Fed.R.Civ.P. 23(b)(2)***: Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole.

## FACTS

### *Before January 20, 2025: DOGE's Origin and Defendant Musk's Role*

~~19.~~ In addition to his government role, Defendant Musk serves as the Chief Executive Officer of automaker Tesla and of rocket manufacturer ~~Space X~~SpaceX. He also owns the social media company X, formerly known as Twitter. Additionally, he co-founded Neurolink, a neurotechnology startup, and founded xAI, an artificial intelligence company. Defendant Musk's estimated wealth is ~~$379~~approximately $370 billion dollars,[2] and he was the largest contributor of the

30.  2024 election cycle, contributing $288 million to support President Trump and other Republican candidates.[3]

~~20.~~31. In August 2024, Defendant Musk proposed the idea of a "government efficiency commission" in a podcast interview with Lex Fridman. As recounted by *Forbes Magazine*,

"When Fridman said he wished Musk 'could go into Washington for a week and be the head of the committee for making government smaller,' the billionaire said he has 'discussed with Trump the idea of a government efficiency commission, and I would be willing to be part of that commission.'"

---

[2] *Bloomberg Billionaires Index*, BLOOMBERG (Feb. 11, 2025), https://www.bloomberg.com/billionaires/profiles/elon-r-musk.

[3] Trisha Thanadi et al., *Elon Musk Donated $288 Million in 2024 Election, Final Tally Shows*, WASH. POST (Jan. 31, 2025), https://www.washingtonpost.com/politics/2025/01/31/elon-musk-trump-donor-2024-election.

be willing to be part of that commission.'"[4]

29.32.  After that, on August 12, 2024, Defendant Musk interviewed then former President Trump on X. Defendant Musk proposed the creation of a "government efficiency commission" that would ensure "~~taxpayers~~taxpayers' money . . . is spent in a good way." Former President Trump expressed support for the idea and indicated that he would consider appointing Defendant Musk to lead such a commission if re-elected.[5]

30.33.  On September 5, 2024, in a speech to the Economic Club of New York, then former President Trump announced his plans to establish a "government efficiency commission" that would be "tasked with conducting a complete financial and performance audit of the entire federal government, and making recommendations for drastic reforms." Former President Trump also stated that Defendant Musk had agreed to lead this commission.[6]

31.34.   At the time of the 2024 election, Defendant Musk's companies had more than $15 billion in contracts with the United States government, including contracts with nine cabinet departments and three federal agencies. His companies were the subject of at least 20 recent investigations or reviews by five cabinet departments and six independent agencies.[7]

[4] Siladitya Ray, *Trump Backs Idea Of Musk Joining 'Government Efficiency Commission' If He Wins Second Term*, FORBES (Aug. 13, 2024), https://www.forbes.com/sites/siladityaray/2024/08/13/trump-backs-idea-of-musk-joining-government-efficiency-commission-if-he-wins-second-term.

[5] Siladitya Ray, *Trump Backs Idea Of Musk Joining 'Government Efficiency Commission' If He Wins Second Term*, FORBES (Aug. 13, 2024), https://www.forbes.com/sites/siladityaray/2024/08/13/trump-backs-idea-of-musk-joining-government-efficiency-commission-if-he-wins-second-term

[6] Nick Robins-Early, *Trump Announces Plan for Elon Musk-Led "Government Efficiency Commission,"* THE GUARDIAN (Sep. 5, 2024), https://www.theguardian.com/us-news/article/2024/sep/05/trump-musk-efficiency-commission.

[7] Eric Lipton et al., *U.S. Agencies Fund, and Fight With, Elon Musk. A Trump Presidency Could Give Him Power Over Them*, N.Y. TIMES (Oct. 21, 2024), https://www.nytimes.com/2024/10/20/us/politics/elon-musk-federal-agencies-contracts.html.

32. On November 12, 2024, President-elect Trump announced that "the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy will lead the Department of Government Efficiency ('DOGE')." The announcement further stated that: "Together, these two wonderful Americans will pave the way for my Administration to dismantle Governmental Bureaucracy, slash excess regulations, cut waste expenditures, and restructure Federal Agencies—Essential to the 'Save America' Movement." "This will send shockwaves through the system, and anyone involved with Government waste, which is a lot of people!" stated Defendant Musk.[8] Defendant Musk

35.   posted this same statement to X and then reposted it as the first X post from the Department of Government Efficiency.[9]

33.36.  Defendant Musk and Mr. Ramaswamy made similar points on November 20, 2024 in a *Wall Street Journal* opinion editorial, emphasizing that DOGE would "cut the federal government down to size," through three types of reform: "regulatory rescissions, administrative reductions and cost savings." ~~They~~The editorial criticized "rules and regulations" issued by "millions of unelected, unappointed civil servants (from) within government agencies who view themselves as immune from firing thanks to civil service protections." ~~They~~It said that DOGE will identify the minimum number of employees required at agencies to perform their "constitutionally permissible and statutorily mandated functions" and then reduce agency staff in proportion to the number of regulations that are cut. Defendant Musk and Mr. Ramaswamy claimed that they would co-lead DOGE as "outside volunteers" and stressed the importance of public support and transparency.

---

[8] ~~Donald J. Trump (@realDonaldTrump), Truth Social (Nov 12, 2024, 7:46 PM), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.~~

[9] Department of Government Efficiency (@DOGE), X, https://web.archive.org/web/20241115012406/https://x.com/doge (last accessed Feb. 12, 2025).

co-lead DOGE as "outside volunteers" and stressed the importance of public support and transparency.[10]

34.37. On December 4, 2024, President-elect Trump announced that the "team of incredible pioneers at DOGE" would "rebuild a U.S. Government that truly serves the People."[11]

35.38. On January 8, 2024, Defendant Musk stated that DOGE would seek to cut $2 trillion in government spending with $1 trillion as a realistic goal, and that reducing spending within the federal government would provide a "target rich environment."[12]

***After January 20, 2025: The Creation, Mission, Structure and Staffing of DOGE***

36.39. President Trump created the United States DOGE Service in the Executive Office of the President on January 20, 2025, in one of his first acts as President. Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency'" 90 FR 8441Fed. Reg. 8,441 (2025). In pursuit of the stated mission "to implement the President's DOGE Agenda," the order:

> a. Creates DOGE teams within each federal agency, including an embedded "DOGE Team memberLead" who can only be hired by the agency "in consultation with" the DOGE Administrator, *id*. at Sec. 3(c);

---

[10] Elon Musk & Vivek Ramaswamy, *Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government*, WALL ST. J. (Nov. 20, 2024), https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance- end-executive-power-grab-fa51c020.

[11] Statement by President-elect Donald J. Trump Announcing the Appointment of David A. Warrington as Assistant to the President and Counsel to the President (Dec. 04, 2024), https://www.presidency.ucsb.edu/documents/statement-president-elect-donald-j-trump-announcing-the-appointment- david-warrington.

[12] Live (@Live), Interview by Mark Penn with Elon Musk, X (Jan 8, 2025, 10:46 PM), https://x.com/Live/status/1877200335443304685.

b.  Orders the DOGE Administrator to commence "a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote ~~interoperability~~inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization," *id*. at Sec. 4(a~~).;~~); and

c.  Directs agency leaders to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems," *id*. at Sec. 4(b).

~~37. According to the *New York Times*, "In November, Mr. Trump initially said the group would provide outside advice as it worked closely with White House budget officials. The president's order, however, brings the group inside the federal government. The order also follows a major shake-up in leadership. Elon Musk will be its sole leader after Vivek Ramaswamy bowed out of the project."[13]~~

~~38. The details of Defendant Musk's employment, including whether he has been formally named as the DOGE administrator, have not been shared with the public. However, a White House official has stated that Defendant Musk was classified as a "special~~

---

~~[13] Madeleine Ngo & Theodore Schleifer, *How Trump's Department of Government Efficiency Will Work*, N.Y. TIMES (Jan. 21, 2025), https://www.nytimes.com/2025/01/21/us/politics/doge-government-efficiency-trump-musk.html.~~

~~governmental employee," has a governmental email, and an office at the White House.[14]~~

~~39. Upon information and belief, Defendant Musk reports directly to President Trump, and often acts unilaterally in directing DOGE operations. The *New York Times* has stated that "Senior White House staff members have at times also found themselves in the dark, according to two officials, who spoke on the condition of anonymity to describe sensitive discussions. One Trump official, who was not authorized to speak publicly, said (Defendant) Musk was widely seen as operating with a level of autonomy that almost no~~

40. ~~one can control."[15]~~ Since issuing Executive Order 14158, President Trump has issued additional executive orders that expand DOGE's role. For instance:

   a.   On February 11, he signed Executive Order 14,210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," which directs agencies to develop data-driven hiring plans and mandates that they shall not fill vacancies that "the DOGE Team Lead assesses should not be filled," unless the agency head determines otherwise. Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025).

   b.   On February 26, he signed another executive order directing agencies to consult with DOGE Team Leads on contract and grant reviews, approvals, and terminations. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025).

41. Since January 20, President Trump has regularly and repeatedly ~~praised~~identified Defendant Musk ~~and~~as the leader of DOGE, including but not limited to:

   a.   ~~indicated that~~ On February 11, during a press conference held jointly by President Trump and Defendant Musk in the Oval Office;

b. On February 18, during an interview with the Sean Hannity Show, where President Trump was joined by Defendant Musk;

c. On February 19, before an audience of investors and company executives at the Future Investment Initiative Priority Summit;

d. On February 26, when President Trump ~~supervises~~had Defendant Musk present on DOGE activities at length during the first meeting of the President's Cabinet; and

e. On March 4, during his Presidential Address to Congress.

42. Similarly, Defendant Musk has regularly and repeatedly identified himself as the leader of DOGE. Defendant Musk ~~himself. For instance, President Trump recently stated, referring to Defendant Musk, "He's a very talented guy from the standpoint~~has consistently posted statements on X claiming to be directing DOGE's work and presented himself as the leader of ~~management and costs, and we put~~DOGE during numerous press interviews. Indeed, in filings in a Delaware court on March 23, Defendant Musk's personal lawyers identified him as a "high-ranking government official" who is "in charge of ~~seeing what he can do with certain groups and certain numbers."¹⁶ And also that, "I told him, do that~~" DOGE.

43. ~~and then I'm going~~As the leader of DOGE, Defendant Musk reports directly to ~~tell him very soon—like, maybe~~President Trump and often acts unilaterally in ~~24 hours—~~directing DOGE operations.

44. On February 25, 2025, the White House named Amy Gleason as the Acting USDS Administrator. That same day, however, White House Press Secretary Karoline Leavitt confirmed that "the President tasked Elon Musk to ~~go check the~~oversee the DOGE effort" while others, including presumably Ms. Gleason, "are helping run DOGE on a day-to-day basis."

45. The Department of ~~Education."⁴⁷~~Justice and other administrative officials have, at various times, disputed that Defendant Musk leads DOGE and exercises significant authority. But numerous courts, including this Court, have concluded that the weight of the factual evidence demonstrates that, in fact, Defendant Musk has and still does lead DOGE.

46. ~~Public~~The structure of DOGE, including specifically creating and embedding DOGE teams within each administrative agency, has allowed Defendant Musk to amass an unprecedented amount of power. He has access to sensitive information across agencies, despite purportedly lacking security clearances, and control over the computer systems and digital data of numerous agencies. He authorizes and oversees terminating employees and contractors, canceling government grants and contracts, terminating leases, and (as discussed more below) removing the name from the front of USAID's building.

47. Since January 20, DOGE has taken numerous actions without any apparent advanced approval by agency leadership across nearly every executive department and agency. For example, on February 22, 2025, at 2:46 p.m., Musk posted on X that, in line with President Trump's directive to "GET MORE AGGRESSIVE," all federal employees would soon receive an email asking them to report what they had accomplished during the prior week, and warned that "[f]ailure to respond will be taken as resignation." The email was sent less than three hours later.

~~40.~~ While the members of DOGE have not been consistently identified by the White House or other members of the administration, public reporting has filled in some of the gaps ~~in official announcements from the White House.~~. For instance, the *New York Times* and *Pro Publica* ~~tracked~~track DOGE-affiliated individuals working within DOGE as well

[14] Ty Roush, *White House Says Elon Musk Trusted To Claim His Own Conflicts Of Interest As 'Special Government Employee'—Here's What That Means*, FORBES (Feb. 5, 2025), https://www.forbes.com/sites/tylerroush/2025/02/05/white-house-says-elon-musk-trusted-to-claim-his-own-conflicts-of-interest-as-special-government-employee-heres-what-that-means/; Kaitlan Collins & Tierney Sneed, *Elon Musk Is Serving As A 'Special Government Employee,' White House Says,* CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/03/politics/musk-government-employee/index.html.

[15] Jonathan Swan et al., *Inside Musk's Aggressive Incursion Into the Federal Government*, N.Y. TIMES (Feb. 4, 2025), https://www.nytimes.com/2025/02/03/us/politics/musk-federal-government.html.

[16] Justin Elliott et al., *The Elite Lawyers Working for Elon Musk's DOGE Include Former Supreme Court Clerks*, PROPUBLICA (Feb. 7, 2025), https://www.propublica.org/article/elon-musk-doge-lawyers-supreme-court.

[17] Bret Baier (@BretBaier), Interview with Donald Trump, X (Feb. 9, 2025, 9:16 AM), https://x.com/BretBaier/status/1888592903666029042.

48. as within other agencies. ItReporting shows some DOGE members within DOGEUSDS itself (seemingly as employees of the Executive Office of the President), as well as embedded within numerous agencies, including the Office of Personnel Management ("OPM"), General Services Administration, Treasury Department, Department of Health and Human Services, Environmental Protection Agency, FBI, Social Security Administration, and USAID. MostMany of the individuals affiliated with DOGE have had prior professional relationships with Defendant Musk, including previously working at one or more of his companies.[18]

41.49. For instance, on January 23, 2025, OPM announced it was testing a new capability to communicate with all civilian federal employees. From on or about January 23, 2025 through January 26, 2025, OPM sent numerous requests to various federal agencies to collect information on government employees and about diversity, equity, and inclusion initiatives that are now barred. OPM listed an individual named Amanda Scales was listed as the contact for questions about these requests. Until recently, Ms. Scales worked in human resources at xAI, the private artificial intelligence corporation of which Defendant Musk is the founder. *Pro Publica* reports that she is now Chief of Staff at OPM, although it is unclear whether she held that role at the time she was collecting such sensitive information, or whether she was still at xAI.[19]

50. Similarly, DOGE member Gavin Kliger has appeared in roles at least at the following agencies: OPM, Treasury Department, Commerce Department, Consumer Financial Protection Bureau, Internal Revenue Service, Department of Agriculture and USAID. *Forbes* reports that, at least as of March 31, 2025, Mr. Kliger was still employed as a senior software engineer at Databricks, a cloud-based AI company, but on a leave of absence.

51. DOGE member Luke Farritor has appeared in roles at least at the following agencies: General Services Administration, Centers for Disease Control, Centers for Medicare and Medicaid Services, Social Security Administration, Department of Energy, Department of Education, Department of Health and Human Services, United States Digital Service, Consumer Financial Protection Bureau and USAID. *Pro Publica* reports that Mr. Farritor interned at SpaceX.

52. Defendant Jeremy Lewin, who is also a member of DOGE, has appeared in roles at least at the following agencies: General Services Administration, State Department, Consumer Financial Protection Bureau and USAID.

42. ***USAID***~~The *Washington Post* reports that "[i]n federal directories, DOGE staffers are sometimes listed at multiple different agencies, making the full nature of their roles within the government unclear." One young team member—Edward Coristine, a 19-year-old recent~~

___

~~[18] Avi Asher-Schapiro et al., *Elon Musk's Demolition Crew*, PRO PUBLICA (Feb. 11, 2025), https://projects.propublica.org/elon-musk-doge-tracker.~~

~~[19] *Id.*; Complaint–Class Action at 15-23, Jane Does 1-2~~

53. Prior to Defendants' actions described below, USAID employed up to 10,000 staff, with approximately two-thirds posted at the Agency's more than 60 overseas missions.

54. USAID was first created by an Executive Order in 1961. Exec. Order No. 10,973, 26 Fed Reg. 10,469, § 102 (Nov. 3, 1961).

55. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") set the framework for USAID's operation as an independent agency, distinct from the Department of State. *See* 22 U.S.C. § 6563(a) ("[T]here is within the Executive branch of Government the United

States Agency for International Development"). FARRA granted the President a limited 60-day period to submit a written "reorganization plan and report" for USAID to Congress, a process that allowed for options to "provide for the abolition of [USAID] and the transfer of all its functions to the Department of State" or to propose a plan for the "transfer to and consolidation" of certain functions along with "additional consolidation, reorganization, and streamlining" of the agency. 22 U.S.C. § 6601(a)-(d). President Clinton's report, submitted on December 30, 1998, clearly confirmed that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the FARRA, *as contained in* Public Law 105-277, 112 Stat. 2681 (1998), Ex. 19 at J.R. at 000332.

56. Since the enactment of FARRA, Congress has not provided the President with statutory authority to reorganize, reconstitute, consolidate, or abolish USAID; rather, it has expressly rejected attempts to eliminate the agency and continuously reinforced USAID's independent status through repeated direct appropriations.

57. The Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, prohibits the use of appropriated funds for any reorganization, redesign, or similar plan affecting the State Department, USAID, or related entities without prior consultation with the appropriate congressional committees. This includes plans to restructure agencies, alter overseas presence, or change staffing levels from those previously justified to Congress. It also bars financial commitments to eliminate or modify programs, offices, or activities without prior justification or advance notice to appropriators.

58. On March 15, 2025, President Trump signed Pub. L. 119-4, 139 Stat. 9, the Full-Year Continuing Appropriations and Extensions Act of 2025, which continues funding "at the

level specified . . . and under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024," including USAID. *Id.* at § 1101.

v. Off. Personnel Mgmt., No. 1:25-cv-00234 (D.D.C. Jan 27, 2025).

college graduate and former Neuralink intern — is reported to have positions at DOGE, OPM, USAID and at the State Department. "The unusual appointment reflects how Musk's DOGE has deployed some of its personnel to multiple agencies at once, giving young and relatively inexperienced — and largely unvetted — individuals unprecedented visibility into the workings of government."[20]

After *January 20, 2025*: Defendant Musk's and DOGE's Unlawful Actions across Agencies *- February 3, 2025: Initial Dismantling of USAID*

59. Upon On January 20, 2025, in addition to establishing DOGE, President Trump signed Executive Order 14,169, "Reevaluating and Realigning United States Foreign Aid" (the "Foreign Aid Executive Order"). This order directs a "90-day pause" of "new obligations and disbursements" of "foreign development assistance" funds in order to assess "programmatic efficiencies and consistency with United States foreign policy," subject to waivers by the Secretary of State for specific programs. Exec. Order No. 14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025). Thereafter, Secretary Rubio issued a directive (the "Rubio Order") similarly halting "all new obligations of funding . . . for foreign assistance programs" at the State Department and USAID. In Defendant Marocco's words, this involved USAID "going 'pencils down'" on most of its ongoing work.

43. On information and belief, the structure of DOGE, including specifically creating and embedding during this same early period, DOGE teams within each administrative agency, has allowed Defendant Musk to amass an unprecedented amount of power. He has access to sensitive information across agencies, and control over the computer systems and digital

41

data of numerous agencies. He authorizes and oversees terminating employees and contractors, canceling government grants and contracts, terminating leases, and removing the name from the front of USAID's building.[21]

44. DOGE routinely posts on its X account about the trans-agency activities it undertakes. For example, on February 3 and 4, DOGE posted that it had terminated "36 contracts . . . for a total savings of ~$165mm across 6 agencies," and canceled 12 leases.[22]

45. Defendant Musk often uses his personal X account to identify changes that he wishes to implement across various agencies, and then promptly executes those changes through his role leading DOGE. For example, on February 2, 2025—the day he and his DOGE

[20] Faiz Siddiqui et al., *19-Year-Old Musk Surrogate Takes On Roles at State Department and DHS*, WASH. POST (Feb 10, 2025), https://www.washingtonpost.com/business/2025/02/10/musk-doge-state-department-surrogate.

[21] *See, e.g.*, Department of Governmental Efficiency (@DOGE), X, https://x.com/DOGE/.

[22] *Id.* at https://x.com/DOGE/status/1886982858369020330.

team gained access to the Bureau of Fiscal Service's payment systems—Defendant Musk responded to an X post about certain federal program grants awarded by the Department of Health and Human Services by stating: "The @DOGE team is rapidly shutting down these illegal payments."[23]

46. Similarly, on February 5, 2025, Defendant Musk responded to a post from X user @libsoftiktok that identified a government website containing diversity, equity, inclusion, and accessibility ("DEIA") language, to which Defendant Musk responded that "Doge will fix it."[24] Shortly after Defendant Musk's promise that "Doge will fix it," the "DOGE Commerce team" searched the agency website and executed changes to it.[25]

47. On February 3, Defendant Musk posted on X that President Trump would succeed in dismantling the Education Department.

48. Since then, numerous DOGE staffers have been installed at the Department of Education. According to *NBC News*, by February 7, DOGE members Akash Bobba and Ethan Shaotran had obtained administrator-level status in the Department of Education's computer systems with potential access to sensitive information. Shaotran had accessed the back end of the ed.gov website that day. DOGE staff sent a directive to Department staff instructing them to not include "extraneous information, including gender identifying pronouns, motivational quotes, and GIFs" in their email signature blocks.[26]

49. On February 10, 2025, DOGE announced that it had cut $881 million in Department of

---

[23] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:14 AM), https://x.com/elonmusk/status/1885964969335808217.
[24] Elon Musk (@elonmusk), X (Feb. 2, 2025, 3:47 AM), https://x.com/elonmusk/status/1885973321595928862.

[25] Department of Governmental Efficiency (@DOGE), X (Feb 5, 2025, 11:12 PM), https://x.com/DOGE/status/1887353683970535877.

[26] Tyler Kingkade & Natasha Korecki, *Inside DOGE's Takeover of the Education Department*, NBC News (Feb 8, 2025), https://www.nbcnews.com/news/us-news/elon-musk-doge-team-education-department-rcna191244.

Education contracts, including 170 contracts for the Department's Institute of Education Sciences.[27]

50. On or around February 5, 2025, members of DOGE were on site at Centers for Medicare and Medicaid Services ("CMS") and had gained access to key payment and contracting systems.[28] The representatives were looking at the systems' technology, spending, organizational design, and staffing. In response to reporting on DOGE's access to CMS, Defendant Musk posted on X, "Yeah, this is where the big money fraud is happening."[29]

51. As reported in the *New York Times*, "Mr. Musk's aides have been conducting 15-minute video interviews with federal workers. Some of their questions have been pointed, such as querying employees about whom they would choose to fire from their teams if they had to pick one person."[30]

**After January 20, 2025: United States Department of Treasury**

52. DOGE has trained a particular focus on the Treasury Department, apparently because federal payments are made through the Treasury Department's electronic system. David Lebryk, a decades-long non-political employee of the Department, was named Acting Secretary by President Trump and served in that role until Scott Bessent was confirmed

[27] Rebecca Carballo & Juan Perez Jr., *DOGE Announces $881 Million in Cuts for Education Department Contracts*, Politico (Feb. 10, 2025), https://www.politico.com/news/2025/02/10/education-department-pauses-research-contracts-00203494.
[28] Molly Bohannon & Derek Saul, *Trump Signs Executive Order Instructing Government To Work With Musk's DOGE—Here's What To Know*, Forbes (Feb. 11, 2025), https://www.forbes.com/sites/mollybohannon/2025/02/08/heres-what-to-know-about-elon-musks-doge-judge-blocks

-doges-treasury-access.

[29] Elon Musk (@elonmusk), X (Feb. 5, 2025, 12:01 PM), https://x.com/elonmusk/status/1887184902543577590.

[30] Theodore Schleifer et al., *Young Aides Emerge* as *Enforcers in Musk's Broadside Against Government*, N.Y. Times (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.

60. ~~as~~ Treasury Secretary on January 27, 2025. On or around January 25, 2025, Defendant Musk's allies began asking Mr. Lebryk about source code information related to the nation's payment system on behalf of DOGE. Mr. Lebryk denied those requests, and was put on administrative leave shortly thereafter.[31]

~~53.~~ 61.    In seeking access to Treasury systems, Defendants Musk and DOGE initially stated that their goal was merely to undertake a general review of the system and observe its operations without interfering with disbursements. However, a January 24, 2025 email exchange revealed that the DOGE push for access to the Treasury payment system was actually intended to "receive access to the closely held payment system so that the Treasury could freeze disbursements to [USAID]."[32]

~~54. On or around January 31, 2025, Treasury Secretary Scott Bessent gave DOGE members full access to the U.S. Treasury's federal payment system that manages the finances of the United States Government, which in fiscal year 2024 involved nearly $5 trillion in receipts and $6.7 trillion in outlays.[33]~~

~~55.~~ 62.    At least initially, DOGE members gained administrator-level privileges, including the ability to write code to the Treasury's secure payment system. On information and belief, a DOGE member named Marko Elez made changes to the code base for the payment systems related to blocking payments and making the blocked payments less visible. Per a January 26, 2025 communication between Treasury officials, the payment systems were set up to "intercept USAID payments files prior to ingestion into our PAM/SPS systems," so that they could be reviewed and blocked. On information and belief, Mr. Elez improperly exported data containing personally identifiable information, including information of Class members,

outside of the Treasury systems.

63. Around this time, White House officials became aware that certain overseas USAID grantees had received payments via the Department of Health and Human Services ("HHS") payment system. Although this was the standard method for processing such payments and these payments represented obligations for work already completed, DOGE team members insisted that USAID senior managers be stripped of their authority to approve payments and that only DOGE members be permitted to authorize them going forward.

64. On Monday, January 27, 2025, DOGE members arrived at USAID headquarters at the Ronald Reagan Building in Washington, D.C. and demanded unrestricted access to USAID's financial, personnel, and administrative data systems. Soon thereafter, DOGE members, including specifically Mr. Kliger and Mr. Farritor, were given the highest level of access to USAID digital systems and infrastructure, including the ability to view and alter emails on behalf of all USAID users and access to even the most sensitive personnel information. Other DOGE members physically present included Clayton Cromer and Noah Peters.

65. Also on Monday, January 27, 2025, Mr. Cromer presented to USAID Acting Administrator Jason Gray a list of 57 senior officials at USAID with instructions to place them on paid administrative leave. The stated reason was their involvement in violations of the funding freeze; however, many of the individuals did not have roles related to payments decisions or systems. Mr. Gray ultimately approved the demand and placed the 57 senior officials on administrative leave.

66. An agency-wide message was sent in the name of Mr. Gray stating that the individuals were placed on leave because they had been identified as taking actions within USAID that appeared to be "designed to circumvent the President's Executive Orders and the mandate

from the American people." On information and belief, the substance of this message was composed by DOGE members.

67. On January 30, 2025, Mr. Peters, a DOGE member embedded in the OPM (among other agency assignments), transmitted to Nicholas Gottlieb, USAID Director of Employee and Labor Relations, a list of 11 names. The email indicated that the individuals were users who had logged into HHS's payments systems since the new administration had taken office. These 11 names had been forwarded to Mr. Peters by another DOGE member, Mr. Farritor, operating, for these purposes, with an HHS email address.

68. Early on January 30, 2025, Chief Human Capital Officer Bill Malyszka summoned Mr. Gottlieb to his office. DOGE members Mr. Peters and Defendant Lewin were present. (At the time, they purported to be housed in OPM.) Mr. Peters informed Mr. Malyszka and Mr. Gottlieb of DOGE's intent to conduct a Reduction in Force ("RIF") within USAID.

69. Shortly after that initial meeting, Mr. Gottlieb was resummoned to Mr. Mlyszka's office. This time, Defendant Lewin demanded that five specific individuals be terminated. Defendant Lewin had a written memorandum identifying four of the individuals, and he verbally identified a fifth to Mr. Gottlieb. Defendant Lewin instructed Mr. Gottlieb to immediately prepare termination notices for these individuals. Mr. Malyszka and Mr. Gottlieb informed Defendant Lewin that it would be illegal to terminate those employees without affording them due process. Defendant Lewin indicated that he would speak with others and ordered that, while Defendant Lewin and DOGE members worked to gather sufficient information to warrant the termination of employees, USAID officials were to prioritize preparing and implementing RIF notices.

70. Mr. Gottlieb prepared a memorandum that same day detailing why there was no legal

justification for keeping the 57 senior officials individuals on administrative leave and his intention to reinstate those individuals that afternoon. At 4:19 p.m. that day, January 30, 2025, Mr. Gottlieb sent an email to his USAID colleagues stating: "Today, representatives of the Agency's front office and DOGE instructed me to violate the due process of our employees by issuing immediate termination notices to a group of employees without due process. I refused and have provided Acting Administrator Gray with written notification of my refusal. I have recommended in that written notification that his office cease and desist from further illegal activity. . . . I was notified moments ago that I will be placed on administrative leave, effective immediately."

71. Mr. Gottlieb's distribution of his memorandum, and refusal to follow DOGE member Defendant Lewin's orders, sparked the chain of events described below, including the unauthorized physical takeover of USAID headquarters by DOGE.

72. According to statements by Defendant Marocco and Secretary Rubio, including sworn statements by Defendant Marocco, on January 30, 2025, Mr. Gray was removed from his position as Acting Administrator and returned to his former position of Chief Information Officer of USAID. That same day, President Trump purportedly directed Secretary Rubio to perform the duties of USAID Administrator. However, on information and belief, Defendants have never publicly produced an official instrument documenting the date of this transition, and there was no public reporting of the transition, including Secretary Rubio's new role, until February 3, 2025.

73. In sworn declarations filed in multiple legal cases, Defendant Marocco has stated that Secretary Rubio delegated to him the duties and functions of the USAID Deputy

Administrators,[6] in his role as Acting Administrator on January 30, 2025. However, a subsequent official delegation of duties document signed by Secretary Rubio indicates that Defendant Marocco was not delegated this authority until February 2, 2025, which would mean that there was no person acting with the authority of Deputy Administrator during this critical time period (January 30-February 2, 2025).

74. On Friday, January 31, 2025, Defendants removed plaques with USAID's official seal from the agency's headquarters.

75. On Saturday, February 1, 2025, DOGE operatives shut down the USAID website. That same day, USAID placed an additional 57 employees on administrative leave.

76. Also on February 1, 2025, Steve Davis, a very high ranking member of the DOGE apparatus, and a team of other DOGE members (including Messrs. Kliger, Farriter, and Peters), arrived at the Ronald Reagan building demanding physical access to USAID offices. DOGE members Edward Corsitine and Defendant Lewin were also reportedly present. The DOGE team sought access to USAID's data security systems, physical access to highly restricted areas, including sensitive compartmented information facilities ("SCIFs"), despite lacking proper security clearances.

77. Security personnel, including at various points USAID Director of Security John Vorhees and Deputy Director Brian McGill, tried to prevent DOGE from accessing classified spaces. Initially, USAID personnel refused to give DOGE members access to any part of the building. Mr. Davis and other members of DOGE began yelling at the security personnel and threatened to call the U.S. Marshals Service to apprehend the USAID employees. Eventually,

---

[6] At various times in agency history, the role of Deputy Administrator has been split between a Deputy Administrator of Policy and Programming and a Deputy Administrator of Management and Resources.

the ranking USAID employee at the scene allowed the DOGE team into the main entrance area of the building but not into any restricted areas.

78. The DOGE team continued to yell at the security personnel, demanding greater access to the building. Mr. Davis called Defendant Musk on the phone, and the two made several direct calls to USAID senior leadership. During these calls they yelled at the officials, threatened them with the U.S. Marshals Service, and demanded that members of DOGE be granted immediate access to sensitive agency data systems and physically restricted areas within headquarters. They also insisted that dozens of USAID officials be suspended from duty. On information and belief, Defendant Marocco may also have been involved in these calls and may have been physically present. It is unclear why it was necessary to harass and intimidate Mr. Gray or other USAID leaders, if, as Defendants have claimed, Secretary Rubio was already performing the duties of Administrator and Defendant Marocco was already performing the duties of Deputy Administrator, in which case they would have had the authority to simply order access.

79. At the same time this altercation was occurring, DOGE members began trying to access the USAID building security systems on their computers.

80. At one point, while searching through USAID's computer systems, Messrs. Davis, Farritor, and Peters figured out that a particular security official had restricted their access to the building. Because certain DOGE members, including Mr. Farritor, already had complete administrative access to USAID systems, Mr. Farritor was able to manually remove the building restrictions for himself and other members of DOGE so that they could access the entire building, including restricted, confidential areas for which they had no clearance to access. The DOGE members took these actions unilaterally, on the spot, and in person.

81. Mr. Vorhees and Mr. McGill were both placed on administrative leave at this time.

82. During this time period, Matt Hopson, the Chief of Staff for USAID, resigned.

83. On Sunday, February 2, 2025, without prior notification, DOGE cut off access to email and other government computer systems for thousands of Class members.

84. Over the course of February 1 and 2, 2025, Defendants Musk and DOGE continued to dismantle both the agency's physical and technological infrastructure. This included searching through the work and personal belongings of USAID employees who worked at the Ronald Reagan building. Current and former copies of USAID's Automated Directive System, which contain the official internal USAID policies and guidance, were deleted from the internet, and the agency's classified computer systems were dismantled.

85. On February 2, 2025, it was communicated to staff that 791 individual PSCs would have their contracts terminated.

86. At 12:42 AM on Monday, February 3, 2025, Mr. Kliger sent an email to all USAID staff telling them to work remotely for the day, as USAID headquarters would be closed. The email purported to be from "USAID Press" and stated that the directive was "[a]t the direction of Agency leadership," but listed Mr. Kliger as the reply-to recipient. Mr. Kliger gained access to the USAID computer systems as part of the infiltration of digital assets described above and issued to himself an agency email address, gkliger@usaid.gov.

87. Minutes after Mr. Kliger sent that email, Defendant Musk posted on X (at 12:54 AM): "We spent the weekend feeding USAID into the wood chipper."

Indeed, Defendant Musk made numerous statements during this time period claiming responsibility for dismantling USAID and vilifying Class members. For instance,

---

31. Andrew Duehren et al., *Treasury Official Quits After Resisting Musk's Requests on Payments*, N.Y. TIMES (Jan. 31, 2025), https://www.nytimes.com/2025/01/31/us/politics/david-lebryk-treasury-resigns-musk.html.

[32] Andrew Duehren et al., *Treasury Sought to Freeze Foreign Aid Payments, Emails Show*, N.Y. TIMES (Feb. 6, 2025), https://www.nytimes.com/2025/02/06/us/politics/trump-musk-usaid.html; Fatima Hussein, *DOGE Was Tasked With Stopping Treasury Payments To USAID*, AP sources say, ASSOCIATED PRESS (Feb. 6, 2025), https://apnews.com/article/treasury-doge-musk-read-only-access-489231c6db1a9f07fc68f9f08803f815.

[33] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payments System*, N.Y. TIMES (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

systems related to blocking payments and making the blocked payments less visible.[34] Mr. Elez's post-college work experience prior to DOGE was at two companies owned by Defendant Musk, SpaceX and X. Mr. Elez had been given administrator-level access to the Payment Automation Manager and Secure Payment System at the Treasury's Department's Bureau of the Fiscal Service. "Housed on a secure mainframe, these systems control, on a granular level, government payments that in their totality amount to more than a fifth of the US economy."[35]

88. On February 6, Mr. Elez resigned after the *Wall Street Journal* published a story about his racist and pro-eugenic posts on social media. On February 7, Defendant Musk initiated a poll on X asking users whether Mr. Elez should be reinstated. Later that day, Defendant Musk rehired

56. On February 2, 2025 Mr. Elez, illustrating that Defendant Musk holds and exercises control over the DOGE members embedded in agencies.[36]

**After January 20, 2025: USAID**

57. Upon information and belief, between roughly January 30 and February 3, Defendant Musk directed DOGE to take control of USAID employee email accounts and all digital infrastructure and to shut down the same; he also directed DOGE to shut down USAID's

[34] Matt Shuham, *DOGE Aide Has Full Access to The Top Government Payment System: Reports*, HUFFPOST (Feb. 4, 2025), https://www.huffpost.com/entry/elon-musk-doge-aide-treasury-payments-administrative-privileges_n_67a25541e4b 042f60737bd47.

[35] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, WIRED (Feb. 4, 2025), https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system.

[36] Jason Abbruzzese, *Elon Musk Says DOGE Staffer Who Resigned for Racist X Posts Will Be Brought Back*, NBC News (Feb. 7, 2025), https://www.nbcnews.com/politics/jd-vance/bring-back-vance-says-supports-rehiring-doge-staffer-resigned-racist-s- rcna191224.



offices and force employees to work remotely. Indeed, Defendant Musk recounted on the morning of February 3 that "With regards to the USAID stuff, I went over it with (the president) in detail and he agreed that we should shut it down."[37]

58. Upon information and belief, on or around January 30, Defendants began instructing USAID employees to give them access to USAID technology systems. Employees raised concerns with their supervisors because the DOGE staff was attempting to access critical systems that contained sensitive information which Defendants were not legally authorized to access.

59. Continuing into February 1, Defendants demanded access to classified USAID systems without the required security clearances. This included Defendant Musk making direct calls to USAID's leadership and security officials in which he demanded that DOGE team members receive access to private data and restricted areas. Defendant Musk threatened to call the U.S. Marshals service to gain access.[38] USAID Director for Security John Vorhees and Deputy Director for Security Brian McGill attempted to block the DOGE team's access and in turn were placed on administrative leave.

60. On or around February 1, DOGE personnel gained access to the USAID computer systems. They obtained root access to these systems, the highest level of access one can obtain, which allows complete control over a system. DOGE began blocking USAID employees from accessing their systems. Immediately thereafter, hundreds of USAID

---

[37] Jennifer Hansler et al., *Elon Musk Said Donald Trump Agreed USAID Needs to Be 'Shut Down'*, CNN (Feb. 3, 2025), https://www.cnn.com/2025/02/02/politics/usaid-officials-leave-musk-doge/index.html.
[38] Andrew Roth, *DOGE v USAID: How Elon Musk Helped His Acolytes Infiltrate World's Biggest Aid Agency*, THE GUARDIAN (Feb. 5, 2025), https://www.theguardian.com/us-news/2025/feb/05/musk-doge-takeover-usaid;

Margaret Brennan, *Two Top Security Officials at USAID Placed on Leave, Sources Say*, CBS News (Feb. 3, 2025), https://www.cbsnews.com/news/usaid-dramatic-changes-security-officials-on-leave.

~~civil servants lost access to their emails without prior notification.~~[39]

~~61. That same day, USAID.gov went offline, showing an error message that read "server IP address could not be found."~~[40]

~~62.~~a. ~~The next morning~~, in response to an X post describing Mr. Vorhees and Mr. McGill's placement on leave, Defendant Musk posted "USAID is a criminal organization. Time for it to die."[41]

~~63.~~ Later on February 2, 2025, in the "First DOGE ~~X~~X Spaces Conversation,"[7] Defendant Musk said,

b. "So to be clear, in shutting down, which we're in the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, maybe you can take the worm out, but if you've got actually just a ball of worms, it's hopeless. And USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically get rid of the whole thing . . . That is why it's got to go, it's beyond repair." [42]

~~64. At 12:42 AM on February 3, Gavin Kliger, a DOGE team member, sent an email to all USAID staff telling them to work remotely that Monday, as USAID headquarters would be closed. The email purported to be from "USAID Press" and stated that the directive~~

~~[39] Rebecca Heilweil, *USAID Website Goes Dark, Staff Emails Deactivated Amid DOGE Takeover, Source Says*, FEDSCOOP (Feb. 2, 2025), https://fedscoop.com/usaid-website-goes-dark-staff-emails-deactivated-amid-doge-takeover-source-says.~~
~~[40] Edward Helmore, *USAID Website Offline as Trump Moves to Put Agency under State Department*, THE GUARDIAN (Feb. 1, 2025), https://www.theguardian.com/us-news/2025/feb/01/usaid-website-offline-trump.~~

[7] This was a live audio discussion held on X, hosted by Defendant Musk and featuring different speakers.

[41] Elon Musk (@elonmusk), X (Feb 2, 2025, 12:20 PM), https://x.com/elonmusk/status/1886102414194835755.

[42] Department of Governmental Efficiency (@DOGE), X (Feb 2, 2025, 12:25 AM), https://x.com/DOGE/status/1886284966855647234.

was "At the direction of Agency leadership" but listed Mr. Kliger on reply. On information and belief, Mr. Kliger gained access to the USAID computer systems as part of the infiltration of digital assets described above and issued to himself an agency email address, gkilger@usaid.gov.[43]

65. Immediately after Mr. Kliger sent that email, Defendant Musk posted on X at 12:54AM that "We spent the weekend feeding USAID into the wood chipper."[44]

   c. On information and belief, On February 3, 2025, Defendant Musk stated that, "[w]ith regards to the USAID stuff, I went over it with (the President) in detail, and he agreed that we should shut it down."

89. On February 3, 2025, Edward Martin, then U.S. District Attorney for the District of Columbia, wrote a letter to Defendant Musk which opened with the line, "It was good to work with the DOGE team this weekend."

90. At or around this time, Defendant Jeremy Lewin began acting as the DOGE team lead for USAID.

***February 4, 2025 - March 18, 2025: Second Phase Dismantling of USAID***

66.91. Defendant Musk, assisted by his DOGE subordinates on DOGE staff, has exercised and continues, continued to exercise control over USAID systems—including restricted systems and locations that house sensitive data which the DOGE staff does not have clearance to legally access—and to systematically blockedblock access to all systems by USAID personnel.

67. The impact of this unauthorized dismantling of USAID has had disastrous consequences for the American and global public, effectively paralyzing operations that delivered life-

saving aid across more than 100 countries. Critical humanitarian programs—such as HIV treatment initiatives, malaria prevention efforts, clinical trials, and infectious disease strategies that prevent the transnational spread of disease—were shut off from the U.S. Government with no warning and no explanation, as Plaintiffs and other USAID staff suddenly lost access to their USAID systems. Vulnerable communities were left in the lurch, without essential medical care or other necessities, exposing them to preventable harm, including death. Moreover, billions of dollars in development projects—ranging

---

43 Sam Stein (@samstein), X (Feb 3, 2025, 7:37 AM), https://x.com/samstein/status/1886393465870676475.
44 Elon Musk (@elonmusk), X (Feb 3, 2025, 1:54 AM), https://x.com/elonmusk/status/1886307316804263979.

62

from significant support for Ukrainian security infrastructure to programs aimed at supporting education for girls in repressive regimes—are at risk of collapse, a disruption that not only undermines decades of progress in global health and economic stability but also diminishes U.S. power and strategic influence abroad.

68.92.     InFor instance, in a joint press conference with President Trump on February 11, 2025, Defendant Musk made clear that he and his DOGE team directly controlstill controlled the levers of funding at USAID. A journalist asked Defendant Musk: "USAID has been one of your main targets. Are you concerned at all that some of the cuts, or shutting an agency altogether, may lead to disease or other bigger problems starting in other countries that then come to the United States?" In his response, Defendant Musk, referring to DOGE, stated, "we have turned on funding for Ebola prevention and for HIV/PR prevention. And yes, we are moving fast. We will make mistakes, but we'llwe'll fix them very quickly."45

93. On Friday, February 7, 2025, Musk announced on X that United States Customs and Border Protection ("CBP") had taken over the USAID headquarters. He posted a photo of the building's main entrance with the words "U.S. Agency for International Development" removed from above the door, accompanied by the caption "Unburdened by what has been." USAID staff and contractors who worked in the building were not permitted to enter to collect their personal belongings.

94. Between February 3 and February 7, 2025, approximately 2,140 of the approximately 4,765 (44.9%) direct hire employees of USAID had been placed on administrative leave.

95. An internal communications notice was sent to USAID employees stating that, effective February 7, 2025 at 11:59 P.M., "all USAID direct hire personnel will be placed on

administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs." Defendants had identified an additional 2,104 USAID employees and scheduled them to be placed on administrative leave, which would have brought the total number of USAID direct hire employees on leave to 4,244 out of 4,765—nearly 90% of the agency's direct hire workforce.

96. On February 7, 2025, a D.C. District Court Judge issued a temporary restraining order ("TRO") blocking the administration's plan to put additional USAID employees on administrative leave. *See American Foreign Service Ass'n v. Trump*, — F. Supp. 3d —, No. 1:25-CV-352 (CJN), 2025 WL 435415 (D.D.C. Feb. 7, 2025). The district court dissolved this order on February 21, 2025. *See American Foreign Service Ass'n v. Trump*, — F. Supp. 3d —, No. 1:25-CV-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025).

97. On or around February 8, 2025, the USAID Office of Inspector General estimated that approximately 90% of USAID's Bureau for Humanitarian Assistance ("BHA") global staff—approximately 1,089 individuals, including direct hires, PSCs, and Institutional Support Contractors—had been or would soon be sidelined through the Trump Administration's actions.

98. Over 1,400 USAID Foreign Service Officers serving overseas were issued a Recall Notice requiring them to return to the United States within 30 days. Typically this would be a six to nine month process.

99. On or around February 8, 2925, DOGE lead for USAID, Defendant Lewin, drafted an "Action Memo for Secretary Rubio" directing USAID to terminate approximately 78 contracts totaling $1.02 billion and 68 grants totaling $660.7 million in aggregate value.

100. Some of these awards contained funding appropriated through the Reinforcing Education

Accountability in Development Act of 2017 (the "READ Act"), P.L. 115-56, 131 Stat. 1129, which was originally signed into law on September 8, 2017 by President Trump, and introduced in 2023 for reauthorization by then Senator Marco Rubio. When the USAID contracting officers asked the Agency Front Office about these awards, they were instructed to terminate them without notification to Congress that funds appropriated through a specific Act of Congress were being terminated. Further, after receiving an order to terminate contracts, at least one contracting officer asked the Senior Procurement Executive, Jami Rodgers, who had issued the orders and received a response back directly from DOGE member Defendant Lewin.

101. Defendant Lewin reprimanded at least one high ranking USAID employee for conducting reviews of the awards slated for termination, with Defendant Lewin writing, "bureaus should not be conducting their own policy and program reviews before acting on these termination instructions."

102. Public reports of the initial plans for USAID indicated that the Trump Administration intended to eventually take the agency from a staff of over 10,000 down to a staff of approximately 300. Defendant Marocco has separately stated that it was determined that, at that time, only 611 employees qualified as essential, some of whom were considered essential only in order to continue winding down operations.

103. On February 12, 2025, U.S. Representative Gregory W. Meeks, ranking member of the House Foreign Affairs Committee, sent a letter to Secretary Rubio complaining that the administration had started downsizing and reorganizing USAID without statutorily required consultation and stated, "To be clear: USAID cannot be abolished by the Secretary of State nor the President of the United States without an act of Congress." Upon information and

belief, Defendants did not publicly respond to this concern.

104. During a February 13, 2025 video appearance at the World Governments Summit, Defendant Musk stated, "I think we do need to delete entire agencies as opposed to leave [sic] a part of them behind . . . It's kind of like a weed, if we don't remove the roots of the weed, then it's easy for the weed to grow back."

105. On February 13, 2025, a D.C. district judge issued an order enjoining the Trump Administration from issuing stop-work orders or preventing the obligation of congressionally appropriated funds for any federal foreign assistance awards that were in existence as of January 19, 2025. *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, — F. Supp. 3d —, No. CV 25-00400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025), *enforced* 2025 WL 569381 (D.D.C. Feb. 20, 2025).

106. Because agency staffing had been gutted and operating systems, such as USAID's payment system Phoenix, were wholly or partially rendered inoperable by DOGE, compliance with court orders regarding restarting operations has been stymied and incomplete.

107. On February 19, 2025, during the Future Investment Initiative Institute Priority Summit, President Trump stated, "[o]ver the past month, we have effectively eliminated the U.S. Agency for International Development."

108. On February 21, 2025, Defendant Musk responded to a post, regarding the dissolution of the TRO enjoining placing certain USAID staff on leave, that read "President Trump and DOGE can now DISMANTLE USAID." Defendant Musk responded that "the world will be better for this."

109. By February 22, 2025, approximately 800 PSCs, or 75% of the entire PSC workforce, had received termination notices.

110. On February 23, 2025, Defendants posted a "Notification of Administrative Leave" to USAID.gov, stating that as of 11:59 PM, all USAID direct hire personnel, with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, would be placed on administrative leave globally. The notice also announced that, concurrently, USAID would begin implementing RIF actions.

111. At approximately 3:42 PM, USAID employees received a message from usaid_fo@subscribe.usaid.gov stating that, effective 11:59 PM that evening, "all USAID direct hire personnel with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally." The notice further advised: "Concurrently, USAID is beginning to implement a Reduction-in-Force that will affect approximately 2,000 USAID personnel with duty stations in the United States."

112. On Sunday, February 23, 2025, DOGE member Mr. Kliger created the email account hr_announcements@usaid.gov. That same day, employees began receiving RIF notices from hr_announcements@usaid.gov consisting of an unsigned memorandum identified as being from "Peter Marocco, Acting Deputy Administrator, USAID" (despite Defendant Marocco not occupying that position). Those notices stated that the employees would be "separated from the Federal service" effective April 24, 2025 for domestic employees and May 26, 2025 for overseas employees. All staff serving overseas were ordered to return to the United States. The RIF Notice instructed employees to contact USAID Employee and Labor Relations via email for any questions, but when they did, they received an automatic reply stating that the office "only has a skeleton staff at this point and may not be able to respond to everyone individually," and that it "cannot currently provide information on your individual status."

At least one employee later received a message stating that the Employee and Labor Relations office had not, in fact, sent these RIF notices.

113. On or about February 26, 2025, Defendants completed a review of USAID obligation awards and determined that USAID would terminate approximately 5,800 awards and retain only approximately 500 (less than 10%). That same day, approximately 5,700 award termination notices were sent out from a previously non-existent or unused SPE@usaid.gov email address. The notices were signed using a generic cursive font by contracting officers who were not responsible for the awards, rather than verified digital signatures by the appropriate contracting officers, as is typical. The correct USAID personnel responsible for managing the awards were not copied on the notices.

114. On February 27 and 28, 2025, after it was raised as an issue in litigation, Defendants directed USAID staff who had worked at the Ronald Reagan Building to collect their personal belongings in 15-minute intervals.

115. By March 2, 2025, the Bureau for Global Health—which has an annual appropriation of $10 billion from Congress that includes funding for HIV, tuberculosis, malaria, maternal and child health, infectious diseases, global health security, family planning and reproductive health, and nutrition—had been reduced from having an active workforce of 783 down to a workforce of 67 (a 91.4% reduction).

116. On March 10, 2025, Secretary Rubio announced that 5,200 contracts, representing roughly 83% of USAID programming, had been cancelled, and wrote, "[t]hank you to DOGE and our hardworking staff who worked very long hours to achieve this overdue and historic reform."

117. Based on its own accounting as of March 10, 2025, DOGE claimed direct credit for

terminating 2,191 contracts valued at $26.1 billion and 2,366 grants valued at $41.8 billion, totaling nearly $68 billion.

*March 18, 2025 - Present: Third Phase Dismantling of USAID*

118. On or around March 18, 2025, Defendant Lewin, who describes himself as the previous DOGE team lead at USAID, and Defendant Jackson were delegated the duties and functions of the USAID Deputy Administrator for Policy and Programming and Deputy Administrator for Management and Resources, respectively. Defendant Lewin was also assigned the duties and functions of USAID Chief Operating Officer.

119. On March 19, 2025, it was publicly reported that unnamed Trump Administration officials had crafted a document outlining their foreign aid policy plans. These plans included winding down USAID and then "[c]odifying the refocused USAID under a new name as a subsidiary of the State Department," and "abolishing its legal status as an 'independent establishment.'" In the "Structural Changes, Short Term" section of the Appendix "Roadmap to Implementation," the document recommended entirely eliminating 12 bureaus and 8 offices within USAID, as well as consolidating other bureaus within the Agency.

120. On March 28, 2025, Defendant Lewin sent an email to USAID personnel entitled "Final Mission." The email stated: "Substantially all non-statutory positions at USAID will be eliminated. As a result, USAID personnel globally will be subject to a consolidated Reduction-in-Force ("RIF") action. Within the next few minutes, USAID personnel will begin receiving RIF notices via email. These notices will specify one of two separation dates: July 1, 2025 or September 2, 2025." It went on to say that "[b]y July 1, 2025, the State Department will have assumed responsibility for USAID's remaining programming, and

many of our colleagues will depart for State or other opportunities. The remaining USAID personnel will then supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations."

121. If allowed to take effect, Defendants' current plans would take USAID down to a workforce of only approximately 15 positions. As Defendant Lewin's email specifies, any previous USAID employees would have to separately reapply for any "available roles" at the State Department.

122. Shortly after this email, USAID employees began receiving RIF notices via email. Many of these notices appeared to be the result of a sloppy mail merge, containing incorrect recipient information. The details of employment history for individuals were also highly inaccurate. In addition to being disrespected and humiliated, Class members have been left in a state of complete uncertainty as to their current status and are unable to properly plan for themselves and their families.

123. Also on March 28, 2025, a Congressional Notification Transmittal Letter and Congressional Notification was sent by Paul Guaglianone, Senior Bureau Official in the Bureau of Legislative Affairs to Congress. Among other things, the Notification stated that "[s]ubstantially all USAID personnel will be separated from federal service within the current fiscal year via Reduction-In-Force procedures," that "a separate and independent hiring process to build foreign assistance capacity" in the State Department would be initiated to replace USAID, and that existing USAID bureaus and offices would either be "abolished" or "realigned to the State Department." Additionally, congressionally appropriated funds would be "transfer[red]" from USAID to the State Department, which would manage the funds while operations at USAID are "closed out in a smooth and orderly transition." The

letter was framed as simply notifying Congress of Defendants' plans for the Agency and in no way indicated an opportunity for consultation between Congress or congressional committees and the Agency or its leaders.

124. Accompanying this development, Secretary Rubio issued a statement in which he claimed, "USAID strayed from its original mission long ago," and characterized its activities as "misguided and fiscally irresponsible." The statement further confirmed that the Department had "notified Congress on their intent to undertake a reorganization that would involve realigning certain USAID functions to the Department by July 1, 2025, and discontinuing the remaining USAID functions that do not align with Administration priorities."

~~69.~~ Due to its effective dismantling, USAID is "unable to perform its core functions and even certain basic functions of a governmental agency." Mem. Op. ~~Also at the February 11 joint press conference, Defendant Musk said, "there are quite a few people in bureaucracy who have ostensibly a salary of a few hundred thousand dollars but have somehow manage[d] to accrue tens of millions of dollars of net worth, uh, while in that position, which is what happened at USAID ..."[46] On information and belief, Defendants Musk and DOGE have unprecedented and illegal access to thousands of federal government employee records, including security clearance files *which contain the net worth of those employees*. On information and belief, Defendant Musk has used~~

~~[45] Chris Megerian, *WATCH: Trump Makes Appearance With Musk, Signs Executive Order Downsizing Federal Workforce*, PBS News (Feb. 11, 2025), https://www.pbs.org/newshour/politics/watch-trump-makes-appearance-with-musk-signs-executive-order-downsizin g-federal-workforce.~~
~~[46] Id.~~

his illegal access to personnel and security clearance files to the detriment of those individuals by disclosing the contents of those files.

**After January 20, 2025: Consumer Financial Protection Bureau**

70. Defendant Musk's and DOGE's latest target has been the Consumer Financial Protection Bureau ("CFPB"). Upon information and belief, Defendant Musk, as the *de facto* DOGE Administrator, is intimately and actively involved in the efforts targeting each agency, including CFPB. As a result of his involvement in CFPB, Defendant Musk will have easy access to non-public information to business competitors.

71. On or around Thursday, February 6, "four young staffers working under Musk" at DOGE—Gavin Kliger, Luke Farritor, Nikhil Rajpal and Jordan Wick—arrived at the CFPB's offices. As *Bloomberg News* reports, "the DOGE staffers were granted access to all of CFPB's data systems, including sensitive bank examination and enforcement records, according to five people familiar with the matter and emails seen by *Bloomberg News*. The people asked not to be identified, citing concerns over potential retribution. By Sunday, the agency was a skeleton, with its funding limited and activities suspended."

[47]Reporting by *Wired* confirms the same—"On Friday, [February 7], staff for Elon Musk's Department of Government Efficiency shut down a portion of the agency's homepage after a day of struggling to obtain access to the CMS and other systems. . . [T]hree DOGE staffers, including Gavin Kliger and Nikhil Rajpal were given access to

47 Jason Leopold, et al., *DOGE-BACKED HALT at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet*, Bloomberg (Feb. 10. 2025), https://www.bloomberg.com/news/features/2025-02-10/doge-backed-halt-at-cfpb-comes-amid-musk-s-plans-for-x-d igital-wallet?embedded-checkout=true

CFPB's HR, procurement, and financial infrastructure."[48]

72. On Monday, February 10, OMB issued a memo for all CFPB employees to "Stand down from performing any work task," while DOGE's investigation of internal agency records continued.[49]

73. On Tuesday, February 11, many workers at CFPB were "informed that they had been fired with a frenetic email" some of which were not addressed to the individual employee but rather were "addressed as [EmployeeFirstName][EmployeeLastName], [Job Title], [Division]."[50]

74. Defendant Musk has a direct business connection to CFPB. "Just nine days before his DOGE team visited CFPB, Musk's X—the former Twitter—announced that it had struck a deal with Visa to process peer-to-peer payments. Musk has publicly mused about expanding into payment services since he first took control of X in 2022. Entering that business could bring CFPB oversight under rules the agency finalized in November. The records DOGE can now access would include sensitive and potentially competitive information."[51]

[48] Makena Kelly et al., *Dozens of CFPB Workers Fired in After-Hours Blitz*, Wired (Feb 11. 2025),https://www.wired.com/story/dozens-of-cfpb-workers-terminated-in-after-hours-firing-blitz/.

[49] Tim Dickinson & Andrew Perez, *Inside Trump and Musk's War on the Consumer Financial Protection Bureau*, Rolling Stone (Feb. 10, 2025), https://www.rollingstone.com/politics/politics-features/trump-musk-cfpb-consumer-financial-protection-bureau-123 5262743/.

[50] Makena Kelly, Dhruv Mehrotra, *Dozens of CFPB Workers Fired in After-Hours Blitz*, Wired (Feb. 11, 2025), https://www.wired.com/story/dozens-of-cfpb-workers-terminated-in-after-hours-firing-blitz/.

[51] Jason Leopold & Evan Weinberger, *DOGE-Backed Halt at CFPB Comes Amid Musk's Plans for 'X' Digital Wallet*, Bloomberg (Feb. 10, 2025),

https://www.bloomberg.com/news/features/2025-02-10/doge-backed-halt-at-cfpb-comes-amid-musk-s-plans-for-x-d igital-wallet.

75. On February 5, 2025, in the wake of questions regarding Defendant Musk's possible conflicts of interest due to his extensive business interests, White House Press Secretary Katherine Leavitt stated that Defendant Musk will determine for himself whether he has any conflicts that would preclude him from engaging on any particular matter.

## Plaintiffs' injuries

76. Plaintiffs have suffered and continued to suffer myriad injuries as a result of Defendant Musk and DOGE's unconstitutional actions. These include but are not limited to:

   a. **Financial injuries as a direct result of losing access to their personal email accounts and other digital records.** Plaintiffs lost access to timesheets, reimbursement records, and health benefits, seriously threatening their ability to recoup those resources. J. Doe 3, for instance, unexpectedly and suddenly lost access to over $15,000 worth of travel vouchers. J. Doe 6 has hundreds of dollars in travel costs to be reimbursed and has still not been able to access the relevant system.

   b. Uncertain employment status as

   a direct result of losing access to their personal email accounts

   and other digital records and

**Defendants' other actions.**

    i.   Plaintiff PSCs, after suddenly losing access to email and other communication devices, have no way to confirm the status of their contracted employment with the agency. Many were prevented, as a practical matter, from discussing their status with their contracting officer

during the black-out period. If USAID provided them with the 15-day notice prior to termination during that time period—as required by every PSC contract—they have no way to know. J. Doe 5 noticed, upon regaining access to their email, a complete lack of emails in their inbox, even though they had copied their work email address while sending multiple emails to their contracting officer from their personal email address.

ii. Moreover, if the various legal actions pausing USAID's demise are not successful, and Plaintiffs are terminated, they face bleak employment prospects because the dismantling of USAID has had disastrous consequences for the humanitarian infrastructure around the world, leading to widespread layoffs and organizational closures.

c. **Potential legal liability as a direct result of losing access to their specific USAID email accounts, other digital records, and inability to comply with legally required reporting requirements.** Some Plaintiffs are authorized to sign grant awards and other contracts on behalf of USAID and, by signing their name, pledge to perform ongoing diligence and other acts. They have been prevented from performing their contractual obligations. A multi-day period where professional emails were blocked and seemingly wiped out, without any error message or other indication to the other party, raises serious questions about what lost work product, contacts, and other professionally critical assets Plaintiffs may have lost during that period. Additionally, because USAID is an organization

provided for by law, some USAID personnel, such as J. Doe 5, have various reporting responsibilities laid out in statute and are unable to comply with those requirements due to Defendants' actions.

125. Reputational injuries resulting from Defendant Musk leveraging the vast power of his unconstitutional position to disparage USAID and Plaintiffs. at 39, ECF No. 73. For example, on April 4, 2025, in response to a question by a member of the press as to whether the dismantling of USAID had contributed to the lack of an on-the-ground response to the devastating Myanmar earthquake, Secretary Rubio acknowledged that it had. It was also publicly reported that the limited number of USAID workers who had been sent to Myanmar to deal with the humanitarian emergency were then terminated while on assignment.

126. Not only do Defendants' actions injure the Plaintiffs and Class members as described herein, but, according to the USAID Office of Inspector General, the "pause in funding and reductions in staff, including over 90 percent of [the Bureau for Humanitarian Assistance's] workforce furloughed or placed on administrative leave" has "curtailed USAID's ability to vet humanitarian assistance awards for potential terrorist ties and monitor aid deliveries in high-risk environments."

127. Further, because of Defendants' actions, Defendant USAID is failing to comply with statutory obligations, including those imposed by the Federal Information Technology Acquisition Reform Act, the Federal Information Security Management Act, the Privacy Act, the E-Government Act of 2002, and the Government Performance and Results Act, among others. In addition, the shutdown of the USAID website likely prevents the agency from

fulfilling its congressional reporting and transparency requirements, such as those contained in the Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 770, div. F, tit. VII, § 7016(b).

d. For instance, on February 2, 2025 Defendant Musk, through his social media platform, X, accused Plaintiffs of belonging to "a criminal organization" and described them as "a ball of worms." In response, his X followers responded with strings of vitriol aimed at USAID and its employees, including accusing USAID employees of "funneling money into the hands of Hamas terrorists."[52] In a February 11 press conference joint press conference by Defendant Musk and President Trump, Defendant Musk accused USAID employees of "getting wealthy at taxpayer expense." President Trump added "But USAID is really corrupt. I'll tell you, it's corrupt, it's incompetent." As a group, Plaintiffs are deeply concerned that their professional experience at USAID is forever publicly tarnished. Due to the resulting online threats and harassment following such heated language from Defendant Musk and President Trump, Plaintiffs also fear for their personal safety.

e. **Severe emotional distress due Defendant Musk and DOGE having access to extremely sensitive personal information.** For instance, as a result of the

---

[52] The Conservative Alternative (@OldeWorldOrder), X (Feb. 2, 2025, 12:23 PM), https://x.com/OldeWorldOrder/status/1886103036889559417.

dangerous nature of J. Doe 1's job, specifically their deployment into conflict zones, their personnel and security clearance files contain highly sensitive personal information — including, social security number, passport information, personal references, foreign contacts, previous addresses, financial records, descriptions of their tattoos, a safety pass phrase, and intimate information about their extended family members. J. Doe 1 is extremely concerned that Defendants do not have the security clearance or training needed to handle this type of extremely confidential, and will use it to the detriment of J. Doe 1 and/or their loved ones. Defendant Musk provided evidence of the abuse of his and DOGE's illegal access to personnel and security clearance files this week when he indicated Defendants are examining the net worth of federal employees, including those at USAID.

f.   **Severe emotional distress stemming from the first-hand knowledge of what the sudden disruption of grants and USAID services means for vulnerable populations globally.** After 10 years of USAID service, J. Doe 4 has been devastated to witness the negative impacts of USAID's stop-work order and sudden disengagement with partners and beneficiaries of USAID, some of the most vulnerable people on the planet, whom they have worked with directly in implementing USAID programs. J. Doe 10 is a nutrition advisor for clinics in Africa, including Somalia. When they suddenly lost the ability to contact these partners, they suffered extreme distress in being suddenly prevented from communicating with their overseas partners who depend on J. Doe 10 and USAID

~~to fund programs that keep children from starving. J. Doe 10 is a parent and knows clinics are in danger of shutting down, leaving malnourished children in grave danger.~~

## COUNT ONE:

## VIOLATION OF THE APPOINTMENTS CLAUSE OF THE UNITED STATES CONSTITUTION

~~77. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.~~ Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

128.

~~78.~~129.      The Appointments Clause of the U.S. Constitution states, in relevant part, that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The President cannot evade the requirements of the Constitution by purporting to vest the powers of a principal officer in a "mere employee."

~~79. There~~ Principal officers are ~~two important aspects of the Appointments Clause implicated by Defendants' attempted government takeover. *First,* it establishes that Congress is the sole body with constitutional~~ defined by possessing significant authority ~~to create Officers~~



of the United States. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J. concurring) ("Although the Constitution contemplates that there will be 'other Officers of the United States, whose Appointments are not herein otherwise provided for,' it clearly requires that those offices "shall be established by Law."); Office of Legal Counsel, *The Test for Determining "Officer"*

*Status Under the Appointments Clause*, 49 Op. ~~O.L.C.~~ (Jan. 16, 2025) ("The Appointments Clause [provides] that offices not recognized by the Constitution itself 'shall be established by Law,' thus lodging in Congress ultimate authority over the creation of most offices.") (citing U.S. Const. art. II, § 2, cl. 2; *United States v. Maurice*, 26 F. Cas. 1211, 1213-14 (C.C.D. Va. 1823); Office of Legal Counsel, *Limitations* on *Presidential Power to Create a New Executive Branch Entity to Receive and Administer Funds Under Foreign Aid Legislation*, 9~~a~~n ongoing basis, as judged by the importance of the matters implicated by their actions, the scope of their discretion and their ability to make final decisions on behalf of the executive branch. ~~Op. O.L.C. 76, 77–78 (1985)).~~

~~80. *Second*, it lays out the framework for how officers must be appointed to office. Based on the Appointments Clause, there is a tripartite classification of federal government workers. They are either (1) principal officers; (2) inferior officers; or (3) lesser functionaries ("mere employees"). *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241, 245, n.3 (2018).~~

~~81.~~ Principal officers must always be appointed "by and with the Advice and Consent of the Senate." ~~U.S. Const. art. II, § 2, cl. 2.~~

~~82. Inferior officers may be appointed directly by the President, but only when Congress has "by Law vest[ed] the Appointment of such inferior Officers" in the President. *Id.*~~

~~83~~ 130. ~~As the facts alleged above demonstrate,~~ Defendant Musk ~~and his DOGE team are exercising~~was never appointed in this manner, despite serving as the *de facto* DOGE administrator and continuing to exercise an unprecedented level of power and control over the federal government~~—one which spans agencies and seems to know no bounds~~

absent federal court orders restricting it. Moreover, upon information and belief, Defendant Musk reports directly to President Trump. Such authority can only be considered that of a principal officer..

84. Defendants have not been appointed with the advice and consent of the Senate. Even if

Defendants were to be considered inferior officers (which is highly doubtful given their unfettered control over multiple agencies), Congress has not "by Law" vested the authority to appoint these new-fangled inferior officers "in the President alone." Nor can the President evade the requirements of the Constitution by vesting the powers of an officer in a mere employee; this is all the more true when those powers are unbounded and include control over every possible aspect of every federal agency. *See Maurice*, 26 F. Cas. at 1214 (an office must be "established by law" and "exist with ascertained duties."). As detailed above, Defendants have exercised executive power far beyond the scope of any legally authorized appointment, engaging in personnel decisions, directing agency operations, and overriding executive branch officials.

131. Through his DOGE subordinates, Defendant Musk directed the closure of USAID headquarters and the effective dismantling of USAID. Especially prior to February 3, 2025, Defendant Musk exercised unbridled discretion in doing so, unilaterally acting far outside any lawfully recognized chain of command.

132. Defendant Musk's actions with regard to USAID have been mirrored throughout the executive branch; indeed, as President Trump has explained, Defendant Musk's responsibility is to ensure that the President's executive orders are immediately implemented, regardless of legal or administrative roadblocks. This arrangement eviscerates the protections that undergird our constitutional system and is not allowed by the Appointments Clause.

**COUNT TWO:**
**VIOLATION OF SEPARATION OF POWERS**

Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

133.

85. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

86.134. In addition to violating the Appointments Clause of the Constitution, Defendants have violated and stand to continue to violate fundamental Separation of Powers principles by repeatedly subverting the Congress and superseding powers reserved for the Legislative Branch.

87.135. The United States Constitution establishes a system of separated powers, ensuring that legislative power is vested in Congress (Article I), executive power is vested in the President (Article II), and judicial power is vested in the courts (Article III).

88. This constitutional structure is designed to prevent any single individual or entity from amassing unchecked governmental authority and to preserve the fundamental principle

136. that each branch of government operates within its designated sphere~~.~~, thereby preventing any single individual or entity from amassing the type of unchecked governmental authority that undermines democracy itself.

137. Defendants' collective actions to dismantle USAID, a congressionally created independent agency that is provided for with direct appropriations that have specific conditions, without congressional authorization far exceeds any previously known or acceptable exercise of executive power. In other words, President Trump cannot authorize any Defendant to "delete" USAID—that decision is for Congress alone to make.

138. Additionally, here, Defendants' Appointment Clause violations necessarily constitute a Separations of Powers offense.

~~89.~~139. Further, DOGE itself, as structured and implemented, operates beyond the bounds of any proper executive power. Despite purporting to be an information technology efficiency initiative, DOGE is embedded within USAID and other federal agencies and wields significant, coercive power ~~over federal agencies~~, including the ability to mandate staffing and key operational changes, ~~conduct unauthorized audits,~~ override proper channels of agency decision-making, implement new policies with regulatory effect, ~~and, importantly,~~ freeze congressionally appropriated funds~~.~~, and shut down agencies.

~~90. The creation of "DOGE teams" embedded within executive agencies, reporting not to agency heads but to an unappointed and unconfirmed individual—Defendant Musk—effectively creates a shadow chain of command that undermines statutory delegation, and allows for countless ethics, privacy, and other regulatory statutes to be wholesale ignored with absolutely no accountability. This far exceeds any previously known or acceptable~~

exercise of executive power.

91.140.    The lack of any formal appointment, congressional authorization, or duties that are clearly defined in law rendersIn sum, Defendants' government takeoveractions contravening the expressed will of Congress are a direct affront to the Constitution's structural safeguards against tyranny. and violate core Separation of Powers principles.

**PRAYER FOR RELIEF**

92.141.    WHEREFORE, Plaintiffs and Class members request that this Court:

a.    Declare unlawful and set aside any actions taken by Defendants Musk and DOGE, as currently operating, to be actingto unlawfully modify, reorganize, or eliminate USAID or its bureaus, departments, offices, or subdivisions in violation of Separation of Powers principles;

a.b.Declare that Defendant Musk's significant and wide-ranging activities at USAID violates the Appointments Clause of the United StatesU.S. Constitution;

b.    Declare unlawful and set aside any actions taken under the color of lawat USAID by

c.    Defendant Musk, his DOGE subordinates, ~~Defendants DOGE,~~ and any person working on behalf of or at the direction of Defendant Musk or DOGE ~~or its team or staff;~~;

d.    Enjoin Defendants from taking further actions to unlawfully modify, reorganize, or eliminate USAID or its bureaus, departments, offices, or subdivisions unless and until specifically authorized to do so by Congress;

~~e.~~e.Enjoin Defendant Musk and his DOGE subordinates from performing their significant and wide-ranging duties ~~unless and until Defendant Musk is properly appointed pursuant to the U.S. Constitution; *and*~~at USAID;

f.    Award the Plaintiffs and Class members reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

~~d.~~g.Award such other relief as the Court deems just.

~~Dated: February 15, 2025~~

Respectfully submitted,

 */s/ Norman L. Eisen*
Norman L. Eisen~~,~~ [9112170186]
Tianna J. Mays~~,~~ [1112140221]
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
~~Norman@statedemocracydefenders.org~~
~~Tianna@statedemocracydefenders.org~~

Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani** *
Rebecca (Beth) Stevens** *
Joaquin Gonzalez***
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway, Suite 102-402 San Antonio, TX 78218
Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com

*Attorneys for Plaintiffs*

**Application for admission or admission
Richard M. Heimann**
Nicole M. Rubin***
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

* *Admitted* pro hac vice pending.
** *Notice of appearance and pro hac vice forthcoming*
*** *Notice of appearance forthcoming*