**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 4 *et al.*, *individually and on behalf of all others similarly situated,* | |
| **Plaintiffs,** | Case No.  8:25-cv-00462-TDC |
| **v.** | |
| ELON MUSK *et al.*, | |
| **Defendants**. | |

**MOTION FOR EXPEDITED DISCOVERY &
MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

PROCEDURAL BACKGROUND............................................................................. 1

ARGUMENT ............................................................................................................ 5

    A. The Court Enjoys Broad Discretion to Grant Expedited Discovery..................... 5

    B. Plaintiffs Show Good Cause for Narrow, Closely Tailored Discovery. ............... 6

        i. Compelling reasons support Plaintiffs' motion, and the information sought cannot be obtained more efficiently from any other source.................................................... 7

        ii. Plaintiffs request only narrow, tailored discovery that imposes a minimal burden on Defendants. ...................................................................................................... 10

        iii. Defendants' anticipated motion to dismiss is of little consequence as this Court has already considered the underlying merits, and a divided Fourth Circuit panel opined that either (1) Plaintiffs were likely to succeed on the merits, or (2) Plaintiffs might succeed on the merits if allowed discovery. ...................................................................................... 15

    C. Defendant Lewin's and Defendant Marocco's Personal Involvement in the Events at Issue Overcomes Any Apex Doctrine Considerations. ................................................. 16

REQUESTED RELIEF............................................................................................. 20

Plaintiffs respectfully move this Court for leave to conduct expedited discovery, and in support show the following:

## INTRODUCTION

Plaintiffs[1] seek narrowly tailored, expedited discovery tied directly to the substance of their constitutional claims—namely, that Defendant Elon Musk's exercise of unprecedented executive authority without Senate confirmation violates the Appointments Clause and that Defendants' collective attempt to dismantle the United States Agency for International Development ("USAID") violates Separations of Powers principles core to the constitutional order. Limited discovery is necessary for Plaintiffs to supplement the record that they have already assembled in support of their case, which has largely relied on public information.

Plaintiffs do not bring this request to the Court lightly. Good cause supports granting limited, expedited discovery given Defendants' rapid dismantling of USAID. Indeed, pursuant to Defendant Jeremy Lewin's own words, USAID's "final mission" will be executed between July 1 and September 1 of this year, during which time the agency will be wound-down beyond repair. Thus, as a practical matter, at some point this summer, Plaintiffs will lose the ability to meaningfully achieve the injunctive relief they seek and thus will no longer be able to vindicate their constitutional rights. Upon conclusion of the proposed twenty-eight day discovery period, Plaintiffs can promptly move for summary judgment.

## PROCEDURAL BACKGROUND

Plaintiffs originally filed this case on February 13, 2025 against Defendant Elon Musk

---

[1] Plaintiffs, J. Doe 4, J. Doe 7, J. Doe 22, J. Doe 27, J. Doe 28, and J. Doe 29, bring this putative class action on behalf of themselves and others similarly situated. *See generally* ECF No. 93 ("Amend. Compl.").

and Defendant DOGE[2] on behalf of twenty-six current and recently-made former USAID personnel. Plaintiffs sought a preliminary injunction (the "PI") promptly thereafter. *See* ECF No. 15 (setting case management conference); ECF No. 18 (granting leave to file PI); ECF No. 17 (Plaintiffs' PI motion). Following a hearing on February 28, 2025, and multiple rounds of post-hearing supplemental factual submissions by the Parties, this Court substantially granted Plaintiffs' motion on March 18, 2025 (the "PI Order"). *See* ECF Nos. 74, 75. The PI Order directed Defendants Musk and DOGE to reinstate email and systems access to Plaintiffs and similarly situated USAID personnel and to take steps to secure the future availability of USAID's former headquarters if Plaintiffs ultimately prevailed. ECF No. 75. It further enjoined Defendants from taking "any action" or engaging in "any work [] relating to the shutdown of USAID," including any workforce reductions, contract terminations, grant recissions, and building closures, and enjoined any disclosure of personal or employment information outside of USAID. ECF No. 75.

On March 20, 2025, the Court declined to modify the scope of the PI, denying Defendants' request to exempt Defendant Jeremy Lewin from the PI Order. The Court reasoned that Defendant Lewin was a DOGE affiliate explicitly subject to the PI; indeed, Defendant Lewin submitted a declaration in which he self-identified as the "DOGE Team Lead at USAID for a period of time." ECF No. 77-2 ¶ 9. Defendants appealed and sought a stay of the PI. On March 28, 2025, a three-judge panel of the Fourth Circuit Court of Appeals stayed the PI. ECF No. 88 ("Stay Order"). The majority decision opined there were likely two deficiencies in Plaintiffs'

---

[2] "DOGE" includes the United States DOGE Service; the Department of Government Efficiency; and their officers, agents, servants and employees. The term also includes all individuals who at any time from January 20, 2025 through the present have been designated as, or have served in the role as, a DOGE Team Lead or DOGE Team Member, regardless of the formal personnel status of that individual.

case on the merits. *First*, it considered the evidentiary record lacking as to the Appointments Clause claim. Specifically, according to the panel, the record contained only "social media posts and news reports" that, alone, were insufficient to establish that Defendant Musk directed the allegedly unlawful acts and that he did so without the approval or ratification of properly appointed USAID officials. *Id*. at 7. *Second*, the majority said Plaintiffs "failed, in part, to name the unconstitutional actors as defendants," given that neither "the Executive nor USAID" were sued, and that this omission undermined Plaintiffs' ability to seek relief for Separation of Powers violations. *Id*. at 9; *see also id*. at 13-14.

Judge Roger Gregory concurred only in the result, based solely on his conclusion that "Plaintiffs failed to include the proper Defendants." *Id*. at 16. He explained, however, that "the merits of Plaintiffs' separation of power claim are clear," given the uncontroverted evidence that persons within the Executive Branch are dismantling USAID without any consultation with or involvement by Congress. *Id*. at 17, *see also id*. at 25-26 (noting Secretary Rubio sent a letter to Congress announcing the start of a reorganization process on February 3, 2025, *after* Defendants had already announced USAID's closure), *id*. at 28 ("Defendants have *de facto* shut down USAID such that it cannot carry out its congressionally delegated functions."), *id*. at 29 ("Musk's actions initiated the end of USAID, leading to what will be the end of the United States' humanitarian aid to foreign countries."). Judge Gregory went on to explain that, from his view, the record makes plain that Defendant Musk has been unconstitutionally acting as an officer of the United States, including in light of "the district court's factual finding that Musk and DOGE directed the effective closure of USAID, impacting the lives of thousands of employees and their families," *id*. at 32, and that Defendant Musk exercised his authority with "considerable discretion" and final decision-making power. *Id*. at 33.

Since the stay was issued, Defendants and senior USAID leadership have taken swift and dramatic steps to actualize the agency's dismantling, despite the constitutional concerns this Court recognized. Most notably, the same day the Stay Order was released, on March 28, 2025, Defendant Lewin sent an email to USAID personnel entitled "Final Mission." Ex. 1, J.R. 1. The email stated: "[s]ubstantially all non-statutory positions at USAID will be eliminated. As a result, USAID personnel globally will be subject to a consolidated Reduction-in-Force ("RIF") action. Within the next few minutes, USAID personnel will begin receiving RIF notices via email. These notices will specify one of two separation dates: July 1, 2025 or September 2, 2025." *Id*. at J.R. 2. It went on to say that,

> [b]y July 1, 2025, the State Department will have assumed responsibility for USAID's remaining programming, and many of our colleagues will depart for State or other opportunities. The remaining USAID personnel will then supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations. By September 2, 2025, the Agency's operations will have been substantially transferred to State or otherwise wound down.

*Id*. In other words, Defendants plan to eliminate USAID as an independent agency by September 2, 2025, at the latest.

Plaintiffs filed the Amended Class Action Complaint on April 17, 2025. ECF No. 93 (the "Amended Complaint"). The Amended Complaint:

- Names additional Executive Branch defendants, including the key decision-makers at the agency: USAID; the United States Department of State ("State Department"); President Donald J. Trump; Secretary of State Marco Rubio, who also serves as the Acting Administrator of USAID; Peter Marocco, who performed the duties of Deputy Administrator of USAID; Jeremy Lewin, the Deputy Administrator for Policy and Programming and the Chief Operating Officer for USAID; Kenneth Jackson, the Deputy Administrator for Management and Resources at USAID; and

Amy Gleason, the Acting Administrator of Defendant US DOGE Service.

- Asserts constitutional claims on behalf of a putative class, making broad injunctive relief appropriate; and

- Provides supplemental allegations regarding factual developments since the initial filing, marshalling information from the public record in support of Plaintiffs' claims.

This Court held a case management conference on April 22, 2025. ECF No. 100. In addition to setting briefing schedules for Defendants' motion to dismiss and Plaintiffs' motion for class certification, the Court granted leave for the Plaintiffs to seek expedited discovery. ECF No. 105. Plaintiffs now move the Court for narrowly tailored discovery to develop a record to support final judgment before Defendants consummate their unconstitutional deletion of a congressionally created and appointed-for independent agency.

## ARGUMENT

### A.    The Court Enjoys Broad Discretion to Grant Expedited Discovery.

The Court has "wide latitude in controlling discovery," and rulings on the course and scope of discovery "will not be overturned absent a showing of clear abuse of discretion." *Ardrey v. United Parcel Serv.*, 798 F.2d 679, 682 (4th Cir. 1986); *accord Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 195 (4th Cir. 2003). Indeed, in the Fourth Circuit, "[d]istrict courts enjoy nearly unfettered discretion to control the timing and scope of discovery." *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 426 (4th Cir. 1996). Accordingly, the Federal Rules of Civil Procedure and the Local Rules authorize courts to enter scheduling orders expediting discovery. *See* Fed. R. Civ. P. 26(f)(4); Local Rule 104.4; *see also* Fed. R. Civ. P. 30(a)(2), 33(a), 33(b)(2) & 34(b) (giving courts the power to adjust the discovery timing requirements imposed under

Rule 26(d) and, if warranted, to expedite).

In reviewing expedited discovery requests, courts in the District of Maryland apply "a standard based upon reasonableness or good cause, taking into account the totality of the circumstances." *Courthouse News Serv. v. Harris*, No. CV ELH-22-548, 2022 WL 3577255, at *4 (D. Md. Aug. 18, 2022) (quoting in part *L'Occitane, Inc. v. Trans Source Logistics, Inc.*, No. CIVA WMN-09-CV-2499, 2009 WL 3746690, at *2 (D. Md. Nov. 2, 2009)); *accord ClearOne Advantage, LLC v. Kersen*, No. CV JKB-23-03446, 2024 WL 278917, at *1 (D. Md. Jan. 25, 2024). In making this determination, courts in this district have considered some or all of the following "non-exhaustive" factors:

> (1) whether a preliminary injunction motion is pending; (2) the breadth of the requested expedited discovery; (3) the proffered reasons for the expedited discovery; (4) the burden on the opponent to comply with the request for expedited discovery; (5) whether the evidence sought could be obtained more efficiently from some other source; (6) the extent to which the discovery process would be expedited; and (7) whether a motion to dismiss for failure to state a claim is pending.

*Abrego Garcia v. Noem*, No. 8:25-CV-00951-PX, 2025 WL 1113440, at *1 (D. Md. Apr. 15, 2025) (citing *Courthouse News Serv.*, 2022 WL 3577255, at *4).

### B.    Plaintiffs Show Good Cause for Narrow, Closely Tailored Discovery.

Here, the above-listed factors and the totality of the circumstances favor finding good cause for the proposed discovery and granting Plaintiffs' Motion. *First*, Defendants have manufactured the urgent timeline driving this Motion by seeking to wholly dismantle USAID on a timeline that is faster than the normal pace of federal civil litigation—despite this Court's previous finding that Defendants' actions are likely unconstitutional. *See* ECF No. 73. It is hardly fair for Defendants to now object to Plaintiffs seeking to develop the factual record on the only timeline that keeps pace with their unconstitutional actions. *Second*, Plaintiffs cabin the request

to narrowly-tailored discovery that minimally burdens Defendants and is largely focused on authenticating the core events giving rise to the claim. *Third*, the course of litigation to date gives little reason to believe that Defendants can defeat Plaintiffs' claims solely on the pleadings.

### i. Compelling reasons support Plaintiffs' motion, and the information sought cannot be obtained more efficiently from any other source.

*a. Plaintiffs have consistently pursued urgent, injunctive relief in this case, and intend to use discovery to address time-sensitive claims of harm.*

Plaintiffs have sought expedited injunctive relief in this lawsuit since its inception, and have repeatedly emphasized the urgency of the matter at hand, including by previously moving for their PI. "[E]xpedited discovery in the instant case accords with that preliminary relief," which—while currently not enforceable—has also not been reversed, but is still pending on appeal. *See Abrego Garcia*, 2025 WL 1113440, at *3. Here, even though the proposed discovery is not intended to be used to prepare for a preliminary injunction motion, the combined factors of (a) Plaintiffs' pending PI motion on appeal, and (b) Plaintiffs' intent to use this discovery to seek urgent injunctive relief, weigh in favor of granting this Motion. *See, e.g.*, *Does 1-9 v. Dep't of Just.*, No. 25-CV-325 (JMC), 2025 WL 894120, at *8 (D.D.C. Mar. 22, 2025) (noting that "Plaintiffs' motion for a preliminary injunction is pending before the court, which weighs in Plaintiffs' favor" (internal citation omitted)); *Evapco, Inc. v. Mech. Prods. Sw.*, LLC, No. CV SAG-22-3375, 2023 WL 361131, at *1 (D. Md. Jan. 23, 2023) (directing the parties to "conduct expedited discovery in the interim" after denying a TRO and staying consideration of "whether to grant a preliminary injunction" until a later hearing date).

Moreover, "courts have routinely granted expedited discovery in cases involving challenges to constitutionality of government action." *Ellsworth Assocs., Inc. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996) ("Expedited discovery is particularly appropriate when a

plaintiff seeks injunctive relief because of the expedited nature of injunctive proceeding.")
(citing *Optic–Electronic Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987); *Saco Defense Sys. Div. Maremont Corp. v. Weinberger*, 606 F.Supp. 446, 449 (D. Me. 1985)). Again, here, Defendants *created* the exigent circumstances by seeking to effectuate their unconstitutional dismantling of USAID swiftly, including on a timeline that is faster than the schedule on which the Fourth Circuit normally hears an appeal. "Courts have found that immediate discovery 'should be granted when some unusual circumstances or conditions exist that would likely prejudice the party if he were required to wait the normal time,'" as is the situation here. *ForceX, Inc. v. Tech. Fusion, LLC*, No. 4:11CV88, 2011 WL 2560110, at *3 (E.D. Va. June 27, 2011) (cleaned up); *NAPCO, Inc. v. Landmark Tech. A, LLC*, 555 F. Supp. 3d 189, 225 (M.D.N.C. 2021) (quoting *ForceX*); *Williams v. Ests., LLC*, No. 1:19CV1076, 2019 WL 13148707, at *1 (M.D.N.C. Nov. 5, 2019) (same).

   *b. Plaintiffs' discovery requests are necessary to support the merit of their claim while there is still an agency left to salvage.*

In issuing its PI Order, this Court recognized that the undisputed central facts supporting this lawsuit's constitutional claims are established by the public record. *See, e.g.,* ECF No. 73 ("Mem. Op.") at 3 (finding that "President Trump has identified Musk as the leader of DOGE" based on the President's numerous public statements), 4 ("Musk's public statements and posts on the social media platform X . . . suggest that he has the ability to cause DOGE to act."), 6 ("DOGE has taken numerous actions without any apparent advanced approval by agency leadership," based largely on press reporting), 37 ("The record demonstrates that Defendants, as well as other government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency."). While the established facts supporting the underlying record for this Court's order remain, Plaintiffs also recognize the need for limited discovery prior to

moving for summary judgement, for the reasons set forth below.

*First*, as the Fourth Circuit's Stay Order recognized, there are factual disputes between the Parties as to the Appointments Clause claim. Contrary to Defendants' arguments that the Appointments Clause hinges entirely on whether Defendant Musk has been given a formal title, courts uniformly agree that an Appointments Clause violation instead turns on the actual exercise of significant authority, *see* Mem. Op. at 30-31 (collecting authorities), and the stay-panel majority did not suggest that Plaintiffs' Appointments Clause claim failed as a matter of law due to Musk's particular title or lack thereof.

Defendants have repeatedly claimed that Defendant Musk does not, in fact, lead DOGE or exercise significant decision-making authority, despite repeated assertions by both President Trump and by Defendant Musk to the contrary. *See* Stay Order at 3, 7-8; *see also* Mem. Op. at 5. While Plaintiffs have these facts from Defendants' public admissions and from press accounts, the additional, admissible information sought in discovery will likely further prove the claim and—upon information and belief—this new information is exclusively known to Defendants.

*Second*, the record regarding official decision makers and the specific course of events taken to dismantle USAID between January 20, 2025 and February 3, 2025, including, in particular, the critical time period between January 30 and February 2, 2025, needs further factual development. Notably, according to multiple statements by Defendant Marocco and Secretary Rubio, on January 30, 2025, Jason Gray was removed from his position as USAID Acting Administrator. That same day, President Trump purportedly directed Secretary Rubio to perform the duties of USAID Administrator. However, on information and belief, Defendants have never publicly produced an official instrument documenting the date of this transition, and there was no public reporting of Secretary Rubio's new role until February 3, 2025. Moreover, despite

Defendant Marocco's previous sworn statement to the contrary, a subsequent official delegation of duties document indicates that Defendant Marocco was not delegated the Deputy Administrator authority until February 2, 2025 at the earliest. Amend. Compl. ¶¶ 72-73. Plaintiffs thus believe that there was no person acting with the authority of USAID Deputy Administrator during that weekend when Defendant Musk has claimed he and DOGE were "feeding USAID into the wood chipper." *Id*. ¶ 87; *see generally id*. ¶¶ 59-90. Plaintiffs further believe that the remaining information on these matters is only known to Defendants themselves.

*Finally*, while the Defendants' unconstitutional acts to dismantle USAID are largely publicly known, and while Plaintiffs have been able to establish additional facts through documents provided from other witnesses, Plaintiffs plan to utilize requests for production to authenticate government documents obtained from other sources. Though there may be evidentiary exceptions that ultimately allow the Court to consider statements and documents from indirect sources, Plaintiffs and this Court would be best served by having fully authenticated versions of key documents that evidence the acts at the core of both the Appointments Clause and Separation of Powers claims. Indeed, the stakes at issue are great given that "the Constitution's core, government-structuring provisions are no less critical to preserving liberty than are the later adopted provisions of the Bill of Rights." *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 570 (2014) (Scalia, J., concurring).

### ii. Plaintiffs request only narrow, tailored discovery that imposes a minimal burden on Defendants.

Plaintiffs' discovery requests are relevant, minimally burdensome, and proportional to the needs of the case. "Discovery is relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *Dean v. Integrace, Inc.*, No. 1:23-CV-1221-GLR, 2025 WL 833922, at *2 (D. Md. Mar. 17, 2025) (internal citations and quotation

marks omitted). Relevancy in the discovery context "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." *Nat'l Credit Union Admin. v. First Union Cap. Mkts. Corp.*, 189 F.R.D. 158, 161 (D. Md. 1999) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)). Proportionality is determined by taking into account "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26.

Plaintiffs seek a limited number of discovery requests: ten interrogatories; six depositions; and fourteen requests for document production. This is fewer than envisioned by the Federal Rules of Civil Procedure or the District of Maryland Local Rules. *See* Fed. R. Civ. P. 30(a)(2)(A)(i) (allowing up to ten depositions without leave); Fed. R. Civ. P. 33(a)(1) (allowing up to twenty-five interrogatories without leave); L. Rule 104.1 (allowing up to thirty requests for production and up to thirty requests for admission). As described below, each request seeks legally relevant information not otherwise available to Plaintiffs and is crafted to minimize any burden on Defendants. Responding to the requests would impose *de minimis* costs, and the United States has sufficient resources to do so. *Cf.* ECF No. 66 (ordering government defendants to produce relevant documents similar to those requested below). Further, Plaintiffs will provide Defendants reciprocal discovery on the same timeline proposed herein.

1. <u>Proposed Interrogatories & Requests for Production</u> (attached as App. A)[3]

Plaintiffs' interrogatories are limited to: (1) identifying which individuals from Defendant

---

[3] Plaintiffs identify seven of ten proposed interrogatories and eleven of fourteen proposed requests for production. Plaintiffs wish to reserve up to three additional interrogatories and up to three

DOGE have gained what level of access to USAID operating systems; (2) identifying the formal instruments by which certain authorities were purportedly delegated to certain individuals, as alluded to in Defendants' previous submissions in this case; and (3) identifying discrete actual and anticipated personnel levels on particular key dates. These requests are minimally burdensome, asking only for information that is readily available to Defendants, but is also currently only possessed by Defendants.

Plaintiffs' requests for production are limited to requests for: (1) authenticated copies of known, non-privileged documents that are central to this case, most of which are publicly available in unauthenticated versions or have been described to Plaintiffs; and/or (2) metadata for and unredacted copies of documents that were previously produced in this case. The authenticated, readily admissible, and complete form of this evidence is available only to Defendants. These requests impose *de minimis*, if any, costs on Defendants. To the extent there is personally identifiable information in the previously produced redacted versions of the requested documents, Plaintiffs are willing to enter into a protective order with Defendants to keep such information confidential.

2.  <u>Proposed Depositions</u>[4]

**John Vorhees:** served as USAID Director of Security until being placed on administrative leave on or around February 1, 2025. Amend. Compl. ¶¶ 77, 81. Mr. Vorhees was present at and would have personal knowledge of the events taking place at the Ronald Reagan headquarters on

---

additional requests for production should discovery reveal the need for further discoverable information. Defendants would be able to raise any objections to those requests at the appropriate time should Plaintiffs issue them.

[4] Plaintiffs name five of the six proposed deponents here, reserving the sixth pending the information obtained in the first tranche of depositions. Plaintiffs wish to reserve the sixth deponent should discovery reveal the need for further discoverable information that can only be obtained from a particular source. Defendants would be able to raise any objections to those requests at the appropriate time should Plaintiffs issue them.

or around February 1, 2025, during which Plaintiffs have alleged that DOGE personnel coercively gained access to the headquarters and used their systems administrator level access to give themselves unauthorized physical access to secure locations within the headquarters. *Id.* ¶¶ 77-80. Mr. Vorhees has information likely to be relevant to Plaintiffs' claims, speaking, as an individual who resisted DOGE efforts, as to who took what actions and under what authority during this critical weekend in which large parts of the agency were effectively dismantled.

**Gavin Kliger:** is a DOGE team member who demanded and received unrestricted access to USAID's financial, personnel, and administrative data systems. Amend. Compl. ¶ 64. As part of the infiltration of digital assets, Mr. Kliger issued himself an agency email address and later created a USAID HR email account. *Id.* ¶¶ 86, 112. On information and belief, he used and continues to use his access to exert control over and directly execute agency personnel and contracting actions. Mr. Kliger was also present on February 1, 2025, and witnessed DOGE team members, including Steve Davis, a high ranking member of the DOGE apparatus, physically demand and gain access to USAID offices in the Ronald Reagan building. *Id.* ¶ 76. Mr. Kliger has information likely to be relevant to Plaintiffs' claims, speaking in unique ways about who has taken what actions and under what authority in dismantling USAID, and the continued access and control of agency systems by DOGE members.

**Luke Farritor:** is a DOGE member who has served in roles at several agencies, including USAID. Amend. Compl. ¶ 51. As a DOGE member serving at USAID, Defendant Farritor was provided the highest level of access to USAID systems on January 27, 2025. *Id.* ¶ 64. Using this access, Defendant Farritor identified individuals at USAID who he claimed had taken actions relating to releasing already obligated, congressionally appropriated funds. *Id.* ¶¶ 64, 67. These individuals were targeted for leave and/or termination based on claims that they violated the

13

agency's funding pause. *Id.* ¶¶ 67-69. On February 1, 2025, Mr. Farritor and other DOGE members arrived at the Ronald Reagan building and demanded physical access to USAID offices, including physical access to highly restricted areas despite lacking proper security clearances. *Id.* ¶ 76. Using the complete administrative access to USAID systems that had already been provided to him, Defendant Farritor manually removed building restrictions for himself and DOGE members. *Id.* ¶ 80. On information and belief, Mr. Farritor has continued to play a role dismantling USAID by restricting payment systems and helping prepare and disseminate termination and leave notices. Mr. Farritor has information likely to be relevant to Plaintiffs' claims, speaking as to who has directed DOGE members, under what authority, what actions those individuals were directed to take, and in providing information on the extent of the dismantling of the agency, including its payment and other operating systems.

**Defendant Peter Marocco:** either served as or performed the duties and functions of the Acting USAID Deputy Administrator from at least February 2, 2025, to March 18, 2025. Amend. Compl. ¶ 17. Defendant Marocco is likely to have unique relevant information about the process of removing the Acting Administrator, Jason Gray, including whether or not information documenting the date and timing of the transitions in leadership at USAID, prior to February 3, 2025, exists. *Id.* ¶ 72. There are apparent discrepancies between Defendant Marocco's declaration testimony and documentary evidence that requires further examination. *See id.* ¶ 73. As further described in subsection C below, Defendant Marocco was personally involved in key events in the dismantling of USAID, including determining the extent and timing of contract and personnel cuts. *See generally* ECF No. 28-2 (Peter Marocco declaration). Defendant Marocco has information only available to him, or perhaps Secretary Rubio, likely to be relevant to Plaintiffs' claims, speaking as to who had what authority at what time, who took which actions, and information

relevant to the effective scope of the dismantling of the agency.

**Defendant Jeremy Lewin:** was DOGE's team lead and, as of March 18 2025, has performed the roles of Deputy Administrator for Policy & Programming and Chief Operating Officer. Amend. Compl. ¶¶ 18, 118. He personally executed key steps in dismantling USAID. On January 30, 2025 he sat in Chief Human Capital Officer Bill Malyszka's office, demanded the immediate firing of five employees and ordered officials to prioritize a Reduction-in-Force plan. *Id.* ¶¶ 68–69. He was physically present during the February 1 takeover of headquarters. *Id.* ¶ 76. As DOGE lead, Defendant Lewin drafted the February 8 "Action Memo for Secretary Rubio" directing USAID to terminate 78 contracts ($1.02 billion) and 68 grants ($660.7 million), personally confirmed those orders to the Senior Procurement Executive, and reprimanded staff for even reviewing the cancellations. *Id.* ¶¶ 99–101. On March 28, 2025 he emailed USAID's "Final Mission," announcing that "substantially all" non-statutory positions would be eliminated via a global RIF with July 1 or September 2 separation dates and telling remaining personnel they would have to reapply for State Department roles. *Id.* ¶¶ 120–121. These hands-on actions, and particular position as both a DOGE member and agency official, give Defendant Lewin unique, first-hand knowledge central to claims challenging USAID's dismantling, plans for the agency's continued dismantling, and DOGE's role in such.

### iii. Defendants' anticipated motion to dismiss is of little consequence as this Court has already considered the underlying merits, and a divided Fourth Circuit panel opined that either (1) Plaintiffs were likely to succeed on the merits, or (2) Plaintiffs might succeed on the merits if allowed discovery.

Although Defendants object to discovery while their motion to dismiss is pending, the unique circumstances here weigh in favor of proceeding with discovery. Similar to the situation in *Ellsworth Assocs., Inc.*, 917 F. Supp. at 844, wherein the parties agreed to consolidate the preliminary injunction hearing and consideration of plaintiffs' claims on the merits, here

Defendants previously requested that the preliminary injunction Plaintiffs initially sought should have been merged with a final judgment, *see* ECF No. 28 at 30. This contradicts their position to now delay the Court's ability to reach a final judgment.

More fundamentally, "the 'mere possibility' that a 'defendant may defeat a complaint at a later stage is not a legitimate basis to deny a Rule 26(d)(1) expedited discovery motion that otherwise satisfies Rule 26's discovery standards.'" *New Mexico v. Musk*, No. 25-CV-429, 2025 WL 783192, at *6 (D.D.C. Mar. 12, 2025) (quoting *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1211 (D.C. Cir. 2020)) (cleaned up). That rule is particularly apt here, given the remoteness of possible dismissal in this case. This Court has already considered the merits of Plaintiffs' constitutional claims at length and determined that Plaintiffs are likely to succeed on both claims. *See generally* Mem. Op. at 24-53. Indeed, even though the Fourth Circuit panel stayed the PI Order pending appeal, the concurring opinion explicitly endorsed Plaintiffs' merits arguments and the majority stated that "none of this is to say that plaintiffs will not be able to develop evidence of unconstitutional conduct as the case progresses. . . . Our holding is merely that, at this time, the record does not support the district court's finding of a likelihood of constitutional violations." Stay Order at 9. Thus, no court has indicated that Plaintiffs' claims fail as a matter of law, and Defendants' anticipated motion to dismiss, in light of their insistence on rushing to destroy an agency in a way this Court deemed likely unconstitutional, should be given little, if any, weight.

### C.    Defendant Lewin's and Defendant Marocco's Personal Involvement in the Events at Issue Overcomes Any Apex Doctrine Considerations.

Defendants represented to Plaintiffs their intent to raise apex doctrine objections to deposing Defendants Lewin and Marocco due to their current and/or former senior officer positions. That doctrine, however, "is bottomed on the apex executive lacking any knowledge of

the relevant facts." *Paice, LLC v. Hyundai Motor Co.*, No. 12-CV-499, 2014 WL 3613394, at *1 (D. Md. June 27, 2014) (quoting *Minter v. Wells Fargo Bank, N.A.*, 258 F.R.D. 118, 125 (D. Md. 2009)). It does not shield an official from discovery when the individual in question was materially "personally involved" in the conduct at issue. *See United States v. Wal-Mart Stores, Inc.*, No. 01-1521, 2002 WL 562301, at *3 (D. Md. Mar. 29, 2002) ("[C]ourts will require the high-ranking official submit to deposition in litigation not specifically directed at his conduct if: 1) extraordinary circumstances are shown; or 2) the official is personally involved in a material way."); *see also Trs. of Purdue Univ. v. Wolfspeed, Inc.*, No. 1:21-CV-840, 2023 WL 4564558, at *4 (M.D.N.C. July 17, 2023) ("[T]he [A]pex [D]octrine, whatever its authority, does not prohibit the deposition of executives who have personal knowledge relevant to the parties' claims and defenses.") (internal citation and quotation marks omitted, alterations in original); *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) (holding that a high-ranking government official may be deposed if "the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means."). Here, Defendants Marocco and Lewin played distinctly personal roles in the events at issue. That these Defendants *already* submitted declaration testimony in this case of their own accord clearly demonstrates they each have unique and relevant knowledge of material information.

Each of their declarations includes several examples of their personal, direct, and, in many cases, primary roles in the activities at issue. In his February 22, 2025 declaration, Defendant Marocco takes credit for a number of decisions in early and mid-February that are central to Plaintiffs' claims. These decisions include:

- Pausing a substantial portion of USAID's ongoing work—"going 'pencils down'"—to

enable "USAID leadership" to review operations and priorities, ECF No. 28-2 at 11, ¶ 9;

- Determining, on February 3, 2025, that "the placement of a substantial number of USAID personnel on paid administrative leave was the only effective way to pause operations," and then further deciding to place 2,104 additional employees on administrative leave on February 7, 2025, *id*. ¶¶ 12, 18;

- Deciding it was "prudent to restrict access for those employees temporarily removed from their regular duties by being placed on paid administrative leave," *id*. ¶ 14; and

- Conducting a review during the first week in February of which employees were deemed essential, *id*. ¶¶ 16-17.

Indeed, during the time period that is critical to the Appointments Clause claims at issue, Defendant Marocco claims that "Secretary Rubio and I [had] ultimate authority over [] decisions . . . regarding personnel, funding, [and] the like," *id*. ¶ 27.

Defendant Lewin reiterates this in his March 18, 2025 declaration, stating that "[s]ince February 3, 2025, Acting Administrator Rubio and PTDO Deputy Administrator Marocco have authorized numerous actions in connection with [USAID's] proposed restructuring, and to better align USAID's operations with its appropriate focus on life-saving and strategic aid delivery." ECF 77-2 ¶ 6. He then describes his own duties as including "overseeing the responsible administration of USAID's day to day activities" as Deputy Administrator for Policy and Programming. ECF 77-2 ¶ 3. According to his declaration, his role gives him "directive authority over and ultimate responsibility for USAID's regional and pillar bureaus and all of USAID's global programming," *id*. ¶ 12, and that he thus needs to take a variety of "steps and actions" regarding the "restructuring" of USAID, *id*. ¶ 11, including "certain personnel actions," *id*. ¶ 16. Indeed, just days after he executed this declaration, Defendant Lewin sent the "Final Mission"

email to USAID personnel described above, notifying thousands of personnel of their termination date and describing efforts to wind-down the agency.

Defendants Lewin and Marocco also were both physically present and played personal roles in key events at issue in the case. For example, in his capacity as a DOGE member, Defendant Lewin personally prepared a memorandum calling for staff terminations, and ordered reluctant agency officials to prepare their termination notices. Amend. Compl. ¶¶ 68-69. He further personally directed agency HR officials to begin preparing and implementing RIF notices, *id.*, and personally reprimanded a high-ranking USAID employee for conducting reviews of grant awards slated for termination. *Id.* ¶ 101. Both Defendants Lewin and Marocco have also been reported as present, either in person or on the phone, intimidating and coercing agency officials, including on phone calls believed to have involved Defendant Musk himself, during the events on January 30, 2025 through February 1, 2025 that included DOGE physically taking over and beginning to dismantle the agency. *See id.* ¶¶ 76-80.

Defendants cannot simultaneously rely on these individuals' declaration testimony as a defense but shield them from discovery. The apex doctrine is not a "tool for evading otherwise relevant and permissible discovery." *Cunagin as Next friend of J.C. v. Cabell Huntington, Hosp., Inc.*, No. 3:19-CV-00250, 2021 WL 1518877, at *4 (S.D.W. Va. Apr. 16, 2021) (quoting *Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012)). Additionally, it is dubious that either Defendant Marocco or Defendant Lewin are even apex officials, given "apex" deponents typically sit "at the highest level of a company or government[,] such as governors, cabinet members, [and] chief executive officers," who are "removed from the daily subjects of the litigation and have no unique personal knowledge of the facts at issue." *Id.* (internal citations and quotation marks omitted).

One final note: In their letter to this Court seeking leave to file a motion to dismiss, Defendants pointed to a recent ruling by the D.C. Circuit granting an emergency motion to stay discovery based on considerations raised in *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367 (2004). *See* ECF No. 95 at 3 (citing *In re: Musk*, No. 25-5072 (D.C. Cir. Mar. 26. 2025)). These considerations relate to seeking discovery that implicates the internal workings of the Office of the President. In a telephone conference between the parties, Defendants represented that these concerns were not applicable to Plaintiffs' proposed deponents in relation to their roles at USAID, and so did not intend to brief that issue. Plaintiffs accordingly are also not providing briefing on that issue, but, should Defendants raise the issue, Plaintiffs reserve the right and request the opportunity to reply to that argument.

## REQUESTED RELIEF

For the reasons provided herein, Plaintiffs have demonstrated good cause to grant their Motion. Plaintiffs plan to seek leave from this Court to move for summary judgment immediately upon completion of the discovery period and significant delay could render meaningful injunctive relief impossible. That is especially true given that Defendants seem determined to get ahead of any court decision that could slow or otherwise interfere with their unconstitutional acts. Thus, Plaintiffs respectfully request that this Court: (a) grant the instant Motion; (b) order a 28-day discovery period to begin immediately; and (c) order Defendants to promptly respond to Plaintiffs' discovery requests in general, and specifically to respond to Plaintiffs' Requests for Production and Interrogatories within seven days.

Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen [9112170186]
Tianna J. Mays [1112140221]
**STATE DEMOCRACY DEFENDERS FUND**

600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani*
Rebecca (Beth) Stevens*
Joaquin Gonzalez*
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway
Suite 102-402
San Antonio, TX 78218
Tel: (210) 343-5604

Richard M. Heimann*
Nicole M. Rubin
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

\* *Admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below, I electronically served Plaintiffs' Motion for Expedited Discovery on all counsel of record by using the CM/ECF system.

This 25th day of April, 2025.

/s/ Tianna J. Mays
Tianna J. Mays
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Tianna@statedemocracydefenders.org
