### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 4, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>ELON MUSK, *et al.*,<br><br>    *Defendants*. | Case No. 8:25-cv-00462-TDC |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

I.      Procedural History ................................................................................................. 2

II.     Factual Background ............................................................................................... 3

          A.      USDS ......................................................................................................... 3

          B.      Elon Musk ................................................................................................. 5

          C.      USAID ...................................................................................................... 5

LEGAL STANDARDS ..................................................................................................... 6

ARGUMENT .................................................................................................................... 6

I.      This Court Should Dismiss for Lack of Jurisdiction ............................................ 6

          A.      Employee Plaintiffs' Claims Are Precluded by the CSRA.................................... 7

                   1.      Congress Intended to Preclude District Court Jurisdiction........................ 8

                   2.      These Claims Are of the Type Congress Intended to be Reviewed Within the Scheme ...................................................................................... 9

          B.      PSC Plaintiffs Must Pursue the Contractual Claims Advanced Here Through Established Agreement-Specific Procedures ......................................... 13

          C.      Plaintiffs Have Failed to Plead Article III Standing. ............................................ 17

          D.      Plaintiffs' Claims Raise Claim-Splitting Concerns .............................................. 20

II.     Plaintiffs' Complaint Fails to State a Claim ....................................................... 21

          A.      Plaintiffs' Appointments Clause Claim Against Musk Fails to State a Claim....................................................................................................... 21

                   1.      Plaintiffs Concede Validly Serving Agency Officials Are Overseeing the Agency's Reorganization.................................................... 22

                   2.      Plaintiffs Fail to Allege Mr. Musk's Position Satisfies the Elements of an Appointments Clause Claim .......................................................... 25

                     3.      Mr. Musk Does Not Occupy a "Continuing" Office ................................ 30

i

B.      Plaintiffs Fail to State a Separation-of-Powers Claim ........................................... 31

C.      Plaintiffs' Claim Against the President Should Be Dismissed ............................ 34

CONCLUSION........................................................................................................................ 34

# TABLE OF AUTHORITIES

## CASES

*A & S Council Oil Co. v. Lader*,
    56 F.3d 234 (D.C. Cir. 1995) ........................................................................ 16

*Air Excursions LLC v. Yellen*,
    66 F.4th 272 (D.C. Cir. 2023) ........................................................ 17, 19, 20

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
    929 F.3d 748 (D.C. Cir. 2019) ........................................................... 7, 9, 11

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ..................................................................................... 32

*American Foreign Serv. Assoc. v. Trump*,
    No. 1:25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025) ............... 7, 10, 11

*Andrade v. Regnery*,
    824 F.2d 1253 (D.C. Cir. 1987) .................................................... 21, 22, 23, 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 6, 18, 24

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
    997 F.2d 898 (D.C. Cir. 1993) .................................................................... 29

*Axon Enter. v. FTC*,
    598 U.S. 175 (2023) ..................................................................... 8, 9, 10, 12

*Baker v. Carr*,
    369 U.S. 186 (1962) ..................................................................................... 33

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................... 6

*Burnap v. United States*,
    252 U.S. 512 (1920) ..................................................................................... 25

*Byrne v. Clinton*,
    410 F. Supp. 3d 109 (D.D.C. 2019) ............................................................ 19

*CFPB v. Gordon*,
    819 F.3d 1179 (9th Cir. 2016) ..................................................................... 22

*Cnty. of Santa Clara v. Trump*,
    250 F. Supp. 3d 497 (N.D. Cal. 2017) ........................................................ 34

iii

*Crowley Gov't Servs., Inc. v. GSA,*
    38 F.4th 1099 (D.C. Cir. 2022) ........................................................ 14

*Dai Glob. v. Adm'r of USAID,*
    945 F.3d 1196 (Fed. Cir. 2019) ........................................................ 15

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ........................................................ 20

*Dalton v. Spector,*
    511 U.S. 462 (1994) ........................................................ 2, 32

*Elgin v. Dep't of Treasury,*
    567 U.S. 1 (2012) ........................................................ 9, 12, 13

*Evans v. B.F. Perkins Co.,*
    166 F.3d 642 (4th Cir. 1999) ........................................................ 14

*Fed. Law Enforcement Officers Assoc. v. Ahuja,*
    62 F.4th 551 (D.C. Cir. 2023) ........................................................ 12

*Filebark v. DOT,*
    555 F.3d 1009 (D.C. Cir. 2009) ........................................................ 9

*Fleming v. Spencer,*
    718 F. App'x 185 (4th Cir. 2018) ........................................................ 8

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................ 34

*Free Enterprise Fund v. PCAOB,*
    561 U.S. 477 (2010) ........................................................ 12, 13, 22

*Freytag v. Comm'r,*
    501 U.S. 868 (1991) ........................................................ 22, 25, 26, 27

*Graham v. Ashcroft,*
    358 F.3d 931 (D.C. Cir. 2004) ........................................................ 9

*Hall v. Clinton,*
    235 F.3d 202 (4th Cir. 2000) ........................................................ *passim*

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir.), *vacated and remanded on other grounds*, 583 U.S. 941 (2017) ........ 34

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ........................................................ 32

*Heckler v. Ringer,*
   466 U.S. 602 (1984) ........................................................................................ 12

*Hernandez v. Noom, Inc.,*
   No. 1:23-cv-00641-JRR, 2023 WL 8934019 (D. Md. Dec. 27, 2023) ..................................... 19

*Int'l Refugee Assistance Project v. Trump,*
   857 F.3d 554 (4th Cir.), *vacated and remanded on other grounds sub. nom.,*
   *Trump v. Int'l Regugee Assistance,* 138 S. Ct. 353 (2017) ....................................... 34

*J. Does 1-26 v. Musk,*
   ---F. Supp. 3d---, 2025 WL 840574 (D. Md. Mar. 18, 2025) ....................................... 11

*J. Does 1-26 v. Musk,*
   No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025).......................................... 11

*Jarkesy v. SEC,*
   803 F.3d 9 (D.C. Cir. 2015) ........................................................................... 8

*Jooce v. FDA,*
   981 F.3d 26 (D.C. Cir. 2020) .................................................................... 22, 29

*Landry v. Fed. Deposit Ins. Corp.,*
   204 F.3d 1125 (D.C. Cir. 2000) ..................................................................... 25

*Lee v. United States,*
   127 Fed. Cl. 734 (2016) ............................................................................. 15

*Lucia v. SEC,*
   585 U.S. 237 (2018) ............................................................................ *passim*

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .............................................................................. 17, 18

*Mapes v. Reed,*
   487 F. Supp. 3d 20 (D.D.C. 2020) ..................................................................... 8

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .................................................................................. 32

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) ....................................................................... 14

*Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1866)......................................................................... 34

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ............................................................................... 17, 24

*N.Y. Republican State Comm. v. SEC,*
  799 F.3d 1126 (D.C. Cir. 2015) ........................................................................ 8

*Newdow v. Bush,*
  355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................ 34

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010) ...................................................................... 34

*Price v. City of Charlotte,*
  93 F.3d 1241 (4th Cir. 1996) .......................................................................... 19

*Richmond, Fredericksburg & Potomac R.R. v. United States,*
  945 F.2d 765 (4th Cir. 1991) .......................................................................... 14

*Rick's Mushroom Serv. v. United States,*
  521 F.3d 1338 (Fed. Cir. 2008) ...................................................................... 15

*Schlesinger v. Reservists Comm. to Stop the War,*
  418 U.S. 208 (1974) ........................................................................................ 20

*Schneider v. Kissinger,*
  412 F.3d 190 (D.C. Cir. 2005) ........................................................................ 33

*Schreiber v. Dunabin,*
  938 F. Supp. 2d 587 (E.D. Va. 2013) ............................................................. 33

*Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,*
  452 F. Supp. 2d 621 (D. Md. 2006), *aff'd,* 273 F. App'x 256 (4th Cir. 2008) ...................... 20

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) ........................................................................ 32

*Slattery v. United States,*
  635 F.3d 1298 (Fed. Cir. 2011) ...................................................................... 16

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ........................................................................................ 17

*Sunshine Anthracite Coal Co. v. Adkins,*
  310 U.S. 381 (1940) ........................................................................................ 26

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996) ........................................................................ 34

*Systems Application & Tech., Inc. v. United States,*
  26 F.4th 163 (4th Cir. 2022) ...................................................................... 15, 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ................................................................................... 5, 6

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ...................................................................................... 8

*Tolliver Grp., Inc. v. United States*,
   20 F.4th 771 (Fed. Cir. 2021) ..................................................................... 16

*Trauma Serv. Grp. v. United States*,
   104 F.3d 1321 (Fed. Cir. 1997) ................................................................... 15

*Tucker v. Comm'r*,
   676 F.3d 1129 (D.C. Cir. 2012) ............................................................ 26, 27

*U.S. ex rel. Vuyyuru v. Jadhav*,
   555 F.3d 337 (4th Cir. 2009) ........................................................................ 6

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ..................................................................... 15

*United States v. Donziger*,
   38 F.4th 290 (2d Cir. 2022) ............................................................ 22, 30, 31

*United States v. Fausto*,
   484 U.S. 439 (1988) ...................................................................................... 8

*United States v. Hartwell*,
   73 U.S. (6 Wall.) 385 (1867) ....................................................................... 30

*United States v. Maurice*,
   26 F. Cas. 1211 (C.C.D. Va. 1823) ............................................................. 30

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) .................................................................................... 20

*Wille v. Raimondo*,
   No. 22-cv-0689-BAH, 2024 WL 2832599 (D. Md. June 3, 2024) ............... 29

**STATUTES**

5 U.S.C. § 104 .................................................................................................. 5

5 U.S.C. § 7105 ................................................................................................ 9

5 U.S.C. § 7123 ................................................................................................ 9

5 U.S.C. § 7703 ........................................................................................... 9, 12

18 U.S.C. § 202 ................................................................................................ 5, 26, 30

22 U.S.C. § 6563 ..................................................................................................... 5

22 U.S.C. § 6592 ..................................................................................................... 5

28 U.S.C. § 1491 ................................................................................................... 15

41 U.S.C. §§ 7101–09 .......................................................................................... 14

41 U.S.C. § 7102 ................................................................................................... 15

41 U.S.C. § 7103 .............................................................................................. 15, 16

41 U.S.C. § 7104 .............................................................................................. 15, 16

41 U.S.C. § 7105 .............................................................................................. 15, 16

Foreign Affairs Reform and Restructuring Act of 1998,
 Pub. L. No. 105-277, 112 Stat. 2681 ............................................................... 5

Further Consolidated Appropriations Act of 2024
 Pub. L. No. 118-47, 138 Stat. 460 .............................................................. 31, 32

**RULES**

Fed. R. Civ. P. 12 ................................................................................................... 6

**REGULATIONS**

*Administration of Foreign Assistance & Related Functions*,
 Exec. Order No. 10,973 26 Fed. Reg. 10,469 (Nov. 3, 1961) ........................... 5

*Establishing & Implementing the President's "Department of Government Efficiency,"*
 Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) .................... 3, 4, 26

*Implementing the President's "Department of Government Efficiency" Workforce
 Optimization Initiative*,
 Exec. Order. No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ...................... 4, 26

*Implementing the President's "Department of Government Efficiency" Cost Efficiency
 Initiative*,
 Exec. Order. No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025) ........................ 4

**OTHER AUTHORITIES**

*Appointment to the Commission on the Bicentennial of the Constitution*,
 8 Op. O.L.C. 200 (1984) ..................................................................................... 28

Margaret MacMillan, *Paris 1919* (2001) ......................................................................... 29

*Special Government Employee Serving as Paid Consultant to Saudi Company*,
  40 Op. O.L.C. 1 (2016) ....................................................................................................... 3

## INTRODUCTION

By Plaintiffs' own account, USAID is presently being reorganized under the oversight and direction of duly appointed officers, including Secretary of State (and Acting USAID Administrator) Marco Rubio. That should be the end of this case. When governmental action is taken by the hand of a duly appointed officer, there is no Appointments Clause problem; it does not matter whether some presidential advisor without any legal authority helped forge the plan. And when those officers reform an agency using their statutory authority, there is no separation of powers problem; any alleged conflict with the organic statute is just that—an alleged statutory violation, not one with any constitutional dimension. In short, while Plaintiffs clearly object to what is going on at USAID, their effort to shoehorn those grievances into *constitutional* challenges is simply meritless.

Even before these obvious defects are considered, Plaintiffs' claims fail for lack of jurisdiction. Plaintiffs—who are current or former USAID employees and/or contractors—claim employment or contract-related harms. But Congress has established exclusive statutory review of such claims through the Civil Service Reform Act (for employees) and the Contract Disputes Act (for contractors) that preclude review in this Court. And Plaintiffs' generic and conclusory allegations of harm fail to meet the prerequisites for Article III standing.

Turning to the merits, beyond the concession that the complained-of reorganization is being overseen by an officer whose appointment is unchallenged, Plaintiffs' theory of the Appointments Clause is defective because that provision is concerned only with the authorization of formal power vested in an office "established by law" "pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citation omitted). Plaintiffs concede that Elon Musk holds no such office, and with that concession their claim fails. And Plaintiffs' "separation of powers" claim is little more than an improper attempt to dress up a claim that Defendants exceeded their statutory

authority in constitutional garb. *See Dalton v. Specter*, 511 U.S. 462, 473–74 (1992). Finally, Plaintiffs' claims for injunctive and declaratory relief against the President should be dismissed on separation of powers grounds.

This case should be dismissed.

## BACKGROUND

### I.    Procedural History

Plaintiffs filed this action on February 13, 2025, alleging violations of the Appointments Clause against Mr. Musk and the "separation of powers" against Mr. Musk, the United States DOGE Service ("USDS"), and "the Department of Government Efficiency." *See* Compl., ECF No. 1. Although this Court initially granted a preliminary injunction, Mem. Op., ECF No.73, the Fourth Circuit stayed that injunction pending appeal on March 28. The Fourth Circuit stay panel unanimously found that Plaintiffs had "failed . . . to name the [allegedly] unconstitutional actors as defendants" and two judges found that the record before the Court "does not support the . . . finding of a likelihood of constitutional violations." *See* Order at 9, ECF No. 88 ("Stay Order"); *see id.* at 17 (Gregory, J. concurring in result).

Plaintiffs amended their complaint on April 17, 2025, dropping 23 plaintiffs and adding three new plaintiffs, adding class action allegations, and adding eight additional Defendants, including the President. *See* Am. Compl., ECF No. 93. In the Amended Complaint, which asserts the same constitutional claims as the original Complaint, each Plaintiff alleges it has suffered the same four generic harms, "(1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm." *Id.* ¶¶ 4–9; *see id.* ¶¶ 128–40. The Amended Complaint does not specify whether any of the named Plaintiffs are employees or personal services contractors ("PSCs") at USAID. *See id.* ¶ 3 n.4.

The Amended Complaint also does not allege any action taken or statement made by Mr. Musk related to USAID after February 26, 2025, when briefing closed on Plaintiffs' preliminary injunction motion.[2] *See* ECF No. 35. As for the last two months and more, Plaintiffs' allegations instead focus on Secretary Rubio and others who Plaintiffs concede are validly serving (like Jeremy Lewin, who has been delegated the duties of Deputy Administrator for Policy and Programming). *See, e.g., id.* ¶¶ 72–73, 116, 118–24. Plaintiffs allege that these individuals are currently overseeing a plan "to undertake a reorganization that would involve realigning certain USAID functions to the [State] Department by July 1, 2025, and discontinuing the remaining USAID functions," pursuant to which "[s]ubstantially all USAID personnel will be separated from federal service." *Id.* ¶¶ 123, 124.

## II.    Factual Background

### A.    USDS

On January 20, 2025, the President issued Executive Order 14,158. *Establishing & Implementing the President's "Department of Government Efficiency,"* Exec. Order No. 14,158, § 4, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("USDS E.O."). The USDS E.O. redesignated the United States Digital Service as the United States DOGE Service ("USDS") and established that entity in the Executive Office of the President. *Id.* § 3(a). It also established a "U.S. DOGE Service Temporary Organization" within USDS, which is headed by the USDS Administrator, who reports to the White House Chief of Staff. *Id.* § 3(b). The USDS E.O. also requires agency heads to establish DOGE Teams within their agencies composed of agency employees. *Id.* § 3(c).

The USDS E.O. directed USDS to collaborate with Executive agencies to modernize the

---

[2] As the court previously recognized, documents Plaintiffs have incorporated by reference in the Amended Complaint (*see infra* note 3) detail much of the activity at USAID prior to February 26, 2025, and explain that every major action at the agency was done under the oversight or at the direction of a duly appointed officer. *See* Mem. Op. 26-27.  Plaintiffs don't even *allege* otherwise.

government's technology and software infrastructure to increase efficiency and productivity and ensure data integrity. *Id.* § 4. To do so, the USDS E.O. directed USDS to work with relevant agency heads, and vice versa, to ensure that USDS has access to "unclassified agency records, software systems, and IT systems" to the "extent consistent with law." *Id.* § 4(b). At all times, the USDS E.O. instructed, USDS must "adhere to rigorous data protection standards." *Id.*

The President subsequently signed two additional Executive Orders directing USDS to consult with the heads of federal agencies. On February 11, 2025, he signed Executive Order 14,210, directing agency heads to "promptly undertake preparations to initiate large-scale reductions in force (RIFs), consistent with applicable law, and to separate from Federal service temporary employees and reemployed annuitants working in areas that will likely be subject to the RIFs." *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order. No. 14,210, § 3(c), 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce E.O."). The Workforce E.O. further required that new career appointment hiring decisions shall be made "in consultation with the agency's DOGE Team Lead, consistent with applicable law." *Id.* § 3(b)(i)–(ii). And on February 26, 2025, the President signed Executive Order 14,222, requiring agency heads to "review all existing covered contracts and grants"; to, where "consistent with applicable law[,]" "reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies" of the Administration; and to "issue guidance on signing new contracts or modifying existing contracts to promote Government efficiency" and Administration policy. *Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative*, Exec. Order. No. 14,222, § 3(b)–(d)(i), 90 Fed. Reg. 11,095 (Feb. 26, 2025). The order directs agency heads to undertake the above activities "in consultation with the agency's DOGE Team Lead." *Id.* §§ 3(b)–(d).

4

### B.     Elon Musk

Elon Musk is a Special Government Employee ("SGE"). *See* Am. Compl. ¶ 10. An SGE is "an officer or employee of the executive or legislative branch of the United States Government" who "is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis." 18 U.S.C. § 202(a).

### C.     USAID

In 1961, President Kennedy issued Executive Order No. 10,973, directing the Secretary of State to "establish an agency in the Department of State to be known as the Agency for International Development." *Administration of Foreign Assistance & Related Functions*, Exec. Order No. 10,973 § 102, 26 Fed. Reg. 10,469 (Nov. 3, 1961). Section 1413 of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, Div. G, 112 Stat. 2681, recognized USAID as an "independent establishment" in the executive branch. *See* 22 U.S.C. § 6563; 5 U.S.C. § 104. Under FARRA, the USAID Administrator is "under the direct authority and foreign policy guidance of the Secretary of State." 22 U.S.C. § 6592.

Consistent with this authority, on January 30, 2025, President Trump appointed Secretary of State Marco Rubio to act as the Acting Administrator of USAID. Decl. of Peter Marocco[3] ¶ 8, ECF No. 28-2 ("Marocco Decl"); *see* Am. Compl. ¶ 72. The Secretary sent a letter to Congress on February 3, stating that Peter Marocco was delegated the duties of Deputy Administrator of USAID and would "begin the process of engaging in a review and potential reorganization of

---

[3] Plaintiffs incorporate numerous documents into the Amended Complaint by reference, including the Declaration of Peter Marocco & Jeremy Lewin's March 28, 2025 email. *See* Am. Compl. ¶¶ 73, 120, 123. The Court may consider these documents in the context of a motion to dismiss without conversion to a motion for summary judgment. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

USAID's activities[.]" Marocco Decl. ¶ 8; *see* Am. Compl. ¶ 73.

On March 18, 2025, Secretary Rubio delegated Jeremy Lewin the authorities of the Deputy Administrator for Policy and Programming and Chief Operating Officer of USAID. *Id.* ¶ 118. On March 28, 2025, USAID, under Secretary Rubio, notified Congress of the Department of State and USAID's intent to undertake a reorganization that would involve realigning certain USAID functions and discontinue other USAID functions that do not align with Administration priorities. Am Compl. ¶ 123; *see id.* ¶ 124. As part of the reorganization and transfer of functions process, substantially all non-statutory positions at USAID will be eliminated. *See id.* ¶ 120; Lewin Email, ECF No. 106-1.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established jurisdiction by a preponderance of the evidence. *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009).

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court considers "the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.

## ARGUMENT

## I.    This Court Should Dismiss for Lack of Jurisdiction

The Court lacks jurisdiction over this matter for at least two reasons. First, because Congress has channeled these personnel and contract claims into an administrative scheme with

specific review provisions—as another court has recently held in a similar case concerning USAID. *American Foreign Serv. Assoc. v. Trump*, No. 1:25-cv-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025). And second, because Plaintiffs lack standing to bring this suit.

### A.    Employee Plaintiffs' Claims Are Precluded by the CSRA

Plaintiffs allege that they are "employees" of USAID who suffered "interruptions to the ordinary course of their employment" and other harms arising from their employment status, and ask the Court to "set aside [various] actions taken at USAID" and "[e]njoin Defendants from taking further actions to . . . reorganize or eliminate USAID or its bureaus, departments, offices, or subdivisions . . . ." Am. Compl. ¶¶ 3-9; *id.* ¶ 141 c & d. These are employment claims, and they fall outside of district court jurisdiction.

As an initial matter, Plaintiffs' Amended Complaint fails to identify which named Plaintiffs are current or former employees of USAID and which are current or former personal services contractors ("PSCs"). *See* Am. Compl. ¶ 3 & n.4 ("[f]or the purposes of this Amended Complaint and the Class allegations, Plaintiffs use 'employee' and 'employed' to cover all USAID employees, including personal service contractors ('PSCs')"). Plaintiffs' failure to clearly identify which of them are USAID employees ("Employee Plaintiffs") and which are contractors ("PSC Plaintiffs") dooms their claims. Plaintiffs bear the burden of establishing subject-matter jurisdiction, and the failure to clearly identify the employment status of the named Plaintiffs means that this case should be dismissed.

Employee Plaintiffs cannot show subject-matter jurisdiction because Congress has divested the federal district courts of jurisdiction over federal personnel matters like this one. *See Hall v. Clinton*, 235 F.3d 202, 205 (4th Cir. 2000) (affirming dismissal of constitutional claims by White House employee because of CSRA preclusion); *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* ("*AFGE*"), 929 F.3d 748, 752 (D.C. Cir. 2019) (ordering a jurisdictional dismissal of a

7

federal-employee-union suit because of the comprehensive statutory scheme).

"A special statutory review scheme, . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter. v. FTC*, 598 U.S. 175, 185 (2023). Thus, when a statute sets out "a particular procedure and time period" for challenging agency actions, a plaintiff may be precluded from relying on a district court suit. *See N.Y. Republican State Comm. v. SEC*, 799 F.3d 1126, 1135–36 (D.C. Cir. 2015). That includes constitutional challenges. *Hall*, 235 F.3d at 205; *Fleming v. Spencer*, 718 F. App'x 185, 189 (4th Cir. 2018) (holding that First Amendment claim was precluded by CSRA); *Mapes v. Reed*, 487 F. Supp. 3d 20, 25–26 (D.D.C. 2020) (separation-of-powers claim precluded by CSRA).

Congress can preclude district court review both explicitly or, as here, implicitly. In the latter case, Congress impliedly divests district courts of jurisdiction "by specifying a different method to resolve claims about agency action." *Axon*, 598 U.S. at 185. To resolve an implicit preclusion question, the Court must determine whether "(i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)). Applying the inquiry here, jurisdiction over any Employee Plaintiffs' claims is precluded; and because the Complaint does not specify whether the named Plaintiffs are employees or PSCs, they have failed to carry their burden.

## 1.    Congress Intended to Preclude District Court Jurisdiction

The first step, Congress's intent to preclude, is well satisfied: Congress established a detailed statutory scheme for adjudicating disputes relating to federal employment. Taken as a whole, it is "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988) (analyzing the CSRA).

It provides for "administrative and judicial review" regarding disputes between employees and the federal government. *Hall*, 235 F.3d at 204. So federal employment disputes must first be administratively exhausted before the employing agency and the applicable administrative review board—the Merit Systems Protection Board ("MSPB") for employment disputes. Judicial review, if any, is available only in a court of appeals. *See AFGE*, 929 F.3d at 752 (citing 5 U.S.C. §§ 7105, 7123(a), (c)); *Graham v. Ashcroft*, 358 F.3d 931, 934 (D.C. Cir. 2004); *see also* 5 U.S.C. § 7703(b) (providing for judicial review in the Federal Circuit or other court of appeals).

"Congress typically chooses . . . review in a court of appeals following the agency's own review process" for an implicit preclusion scheme. *Axon*, 598 U.S. at 185. That is exactly what this scheme does. Accordingly, as courts have repeatedly recognized, the CSRA precludes district court jurisdiction over federal employee disputes. *See Hall*, 235 F.3d at 203; *AFGE*, 929 F.3d at 754. This "enormously complicated and subtle scheme to govern employee relations in the federal sector" does not permit a district court runaround. *AFGE*, 929 F.3d at 755 (citation omitted). Indeed, the Supreme Court has already held that the scheme "forecloses judicial review" for employees "to whom the CSRA grants administrative and judicial review." *Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012). Preclusion occurs "even when" the CSRA "provides no judicial relief—that is, what you get under the CSRA is what you get." *Filebark v. DOT*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (Tatel, J.) (citation omitted). That satisfies the first step.

### 2.    These Claims Are of the Type Congress Intended to be Reviewed Within the Scheme

The second step asks whether particular claims in a suit are of the type Congress intended to be reviewed in this scheme. As explained below, the answer to that question is yes.

To determine whether Congress's preclusion scheme reaches the claims in this case, the Court must evaluate "three considerations designed to aid in that inquiry, commonly known now

as the *Thunder Basin* factors." *Axon*, 598 U.S. at 186. The factors are: (1) "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim"; (2) "is the claim wholly collateral to the statute's review provisions"; and (3) "is the claim outside the agency's expertise?" *Id.* (citation and alteration omitted). These "considerations" are ultimately merely guideposts to best "understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim." *Id.* And as discussed above, it is critical to remember that a constitutional claim is as amenable to channeling as any other type. *See, e.g.*, *Hall*, 235 F.3d at 205. It is the content of the claim that matters—not the manner in which a plaintiff attempts to raise it.

Indeed, as Judge Nichols explained in a case raising fundamentally the same claims (including constitutional claims), these are the sort of claims that must go through the CSRA. In *American Foreign Serv. Assoc.*, 2025 WL 573762, plaintiffs, two unions that represented USAID employees, raised Administrative Procedure Act and constitutional challenges alleging that a "series" of executive branch actions was resulting in the "systemic[] dismantl[ing]" of USAID. *Id.* at *1, *3. The district court first noted that the plaintiffs' harms "flow essentially from their members' existing employment relationship with USAID." *Id.* at *7. The district court further concluded that "plaintiffs would not be deprived of 'meaningful judicial review' if their claims are channeled out of this court and into the applicable administrative body." *Id.* at *9. This is because "plaintiffs' challenges to the government's actions are not 'wholly collateral' to the statutory review provisions at issue," since plaintiffs sought the cessation of certain employment conditions that allegedly harmed their members. *Id.* at *10. Finally, the district court held that "plaintiffs' claims fall within the scope of 'expertise' of the applicable agencies. *Id.* The court explained that "even if the farthest reaches of plaintiffs' lawsuit involve 'separation-of-powers issues' and

"whether a statute or the Constitution has authorized the President to act in a particular way,' the 'preliminary' questions the lawsuit poses are plainly employment-related—such as the lawfulness of the government's change to plaintiffs' members employment conditions." *Id.*

The same holds true in this case. Indeed, both this Court and the Fourth Circuit have recognized that Plaintiffs' claims sound in employment and contract. *See . J. Does 1-26 v. Musk,* ---F. Supp. 3d---, 2025 WL 840574 , at *10 (D. Md. Mar. 18, 2025) (holding that the "personnel and contract actions" alleged by Plaintiffs were sufficient at the preliminary injunction stage to support the conclusion that they occurred at least in part because of Defendants' actions); *J. Does 1-26 v. Musk,* No. 25-1273, 2025 WL 1020995, at *5 (4th Cir. Mar. 28, 2025) ("plaintiffs allege emotional distress based largely on loss of employment or contract status."). Plaintiffs challenge a variety of employment-related harms, such as the unauthorized access to or disclosure of their USAID information by Defendants, "interruptions to the ordinary course of their employment," and alleged reputational and dignitary harm based on their current or former employment with USAID. Am. Compl. ¶¶ 4–9. These paradigmatic employment harms are reviewable, if at all, through the CSRA.

First, the CSRA provides for meaningful judicial review. This is so even if the scheme Congress established does not allow for Plaintiff "to obtain 'pre-implementation' review" "or immediate relief." *See AFGE,* 929 F.3d at 755. Indeed, meaningful judicial review is still available for purposes of this prong even if the statutory scheme "ma[kes] it *impossible* to obtain particular forms of review or relief." *Id.* at 756. Here, as in *AFGE* itself, certain parties can bring certain claims through the administrative process "in the context of concrete . . . disputes." *Id.* at 757. And this is true even where the claim is not against the employee's supervisor. *See Hall*, 235 F.3d at 205 (rejecting argument that *Bivens* claim was not precluded under CSRA because claim was not

against supervisor and holding "[t]hat the CSRA does not provide the remedy that she would prefer is of no moment.").

It is well established that an employee may bring constitutional challenges to employment actions taken through the CSRA's comprehensive scheme. *See Elgin*, 567 U.S. at 16–17 ("That issue, . . . could be meaningfully addressed in the Court of Appeals that Congress had authorized to conduct judicial review." (citation omitted)). Plaintiffs' claims fall comfortably within the MSPB's authority to "review the record and hold unlawful and set aside any agency action, findings, or conclusions" that are "obtained without procedures required by law, rule, or regulation having been followed" or that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 7703(c)(1), (2). In sum, Plaintiffs may obtain relief on these very topics.

Second, the asserted claims are not wholly collateral. The Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. Law Enforcement Officers Assoc. v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court recently explained, a claim may be sufficiently collateral when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices," and "business merger" that constituted the subject matter of the agency actions because those claims ultimately "challeng[ed] the Commissions' power to proceed [with enforcement actions against them] at all, rather than the actions taken in agency proceedings." *Id.*; *see also Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 490 (2010) (constitutional objection to PEACOB's "existence," rather than the "auditing standards" it was investigating Plaintiffs for violating, was

collateral)*. Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits decision." *Id.*

No such separation exists here. Rather than challenging the statutory scheme that establishes USAID (like the Plaintiffs in *Axon* and *Free Enterprise Fund*), Plaintiffs challenge a host of personnel actions. For example, each of the named Plaintiffs claims as harms the "unauthorized access to or disclosure of their private data by Defendants," and "interruptions to the ordinary course of their employment." *See* Am. Compl. ¶¶ 4–9. And as relief Plaintiffs seek to "set aside" "any actions taken by Defendants to unlawfully modify, reorganize, or eliminate USAID or its bureaus, departments, offices, or subdivisions." *Id.* ¶ 141(a). Thus, Plaintiffs' "constitutional claims are the vehicle by which they seek to reverse" RIFs and other employment decisions and thus not "wholly collateral" to the CSRA scheme. *Elgin*, 567 U.S. at 22. Rather, Plaintiffs' claims lie at the heart of the CSRA and accordingly satisfy the second prong.

Third, and for similar reasons, the agencies may bring their expertise to bear on many of the questions raised. Indeed, *Elgin* directly addresses the point. As the Court noted: "preliminary questions unique to the employment context" include fact questions about any action taken as well as "statutory or constitutional claims that the MSPB routinely considers." *See Elgin*, 567 U.S. at 22–23. Even if some of the claims could move beyond the administrative expertise of the agency these "threshold questions" may "alleviate [the other] concerns." *Id.*

For all these reasons, the Court lacks jurisdiction over the Employee Plaintiffs' claims.

### B.    PSC Plaintiffs Must Pursue the Contractual Claims Advanced Here Through Established Agreement-Specific Procedures

As noted above, Plaintiffs' Amended Complaint fails to identify whether any (or all) named Plaintiffs are former PSCs. *See* Am. Compl. ¶ 3 & n.4. This is fatal, because there is an independent defect with the Court's jurisdiction with respect to any claims by PSCs. Plaintiffs seek to "set aside

any actions taken at USAID . . . on behalf of or at the direction of Defendant Musk or DOGE." Am. Compl. ¶ 141 (c) (Prayer for Relief). Those alleged actions, as described in the Amended Complaint, relate to their employment status as USAID contractors. *Id.* ¶¶ 4–9 (claiming "interruptions to the ordinary course of their employment"). At bottom, the source of the right (the PSC contracts) and the type of relief sought (reinstatement of those contracts, among other things, *see id.* ¶ 141 (a), (c)) both point toward this action raising a contract claim at its essence, and this Court therefore lacks jurisdiction over the case.

"[A]n action against the United States which is *at its essence* a contract claim lies within the [exclusive jurisdiction of the Court of Federal Claims] and . . . a district court has no power to grant injunctive relief in such a case." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). "Whether a claim is 'at its essence' contractual . . . 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Id.* (quoting *Megapulse*, 672 F.2d at 968).

Whether the PSCs Plaintiffs' claims would be jurisdictionally barred hinges on the precise terms of each individual's contract. Yet Plaintiffs' Amended Complaint does not attach those contracts or even quote the provisions of those documents. It is Plaintiffs' burden to establish this Court's jurisdiction. *See Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir. 1999) (citing *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). Given those omissions, the proper remedy is dismissal of the case.

First and foremost, the PSC Plaintiffs fail to establish that their claims will not ripen into the type of disputes that can *only* be brought through the procedures of the Contract Disputes Act, 41 U.S.C. §§ 7101–09 ("CDA"), and over which this Court would lack subject-matter jurisdiction.

*See Systems Application & Tech., Inc. v. United States*, 26 F.4th 163, 170 (4th Cir. 2022) (holding that "[w]hen the Contract Disputes Act applies, it provides the *exclusive* mechanism for dispute resolution." (emphasis in original) (citation omitted)). The CDA applies to certain types of contracts with the Federal Government, including contracts for "the procurement of services." 41 U.S.C. § 7102(a)(2); *see, e.g.*, *Lee v. United States*, 127 Fed. Cl. 734, 736 (2016) (personal service contract dispute heard in the Court of Federal Claims). Categorization as a contract for purposes of the CDA hinges not on the label the parties assigned to the document but rather on the terms of the document itself and the context in which the award arose. "[A]ny agreement can be a contract . . . provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997); *cf. Rick's Mushroom Serv. v. United States*, 521 F.3d 1338, 1343–44 (Fed. Cir. 2008) (special government cost-share agreement fell outside CDA because it did not provide substantive right to recover money damages).

The CDA provides a procedure for resolving any "claim by a contractor . . . relating to a [procurement] contract." 41 U.S.C. § 7103(a)(1); *see also id.* § 7102(a)(1) (defining covered contracts); *see, e.g.*, *Dai Glob. v. Adm'r of USAID*, 945 F.3d 1196, 1199–200 (Fed. Cir. 2019). "The CDA serves two related functions. First, it establishes an administrative system for disputes relating to federal procurement contracts . . .   Second, it waives sovereign immunity over actions 'arising under' that administrative system and vests exclusive jurisdiction over such claims in only two venues: (1) the Court of Federal Claims, 28 U.S.C. § 1491(a)(2); 41 U.S.C. § 7104(b)(1), and (2) agency boards of contract appeals, 41 U.S.C. §§ 7104(a), 7105." *United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1022 (9th Cir. 2023); *see also Systems Application & Tech.*, 26

F.4th at 170. Under the CDA, "[a]n aggrieved contractor who wishes to pursue relief under the Act must first present a valid, written claim to the agency's contracting officer, who will issue a written decision." *Id.* (citing 41 U.S.C. § 7103(a)(1)–(3)). After a properly submitted CDA claim has been exhausted, the proper forum is either the Civilian Board of Contract Appeals, which has jurisdiction to decide any appeal from a decision of a contracting officer on a contract made by USAID or the Department of State, *see* 41 U.S.C. § 7105(e)(1)(B), or the United States Court of Federal Claims, 41 U.S.C. § 7104(b); *Systems Application & Tech.*, 26 F.4th at 170. In that regard, the D.C. Circuit has "recognized a congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes," such that "the Claims Court has exclusive jurisdiction except to the extent that Congress has granted any other court authority to hear the claims that may be decided by the Claims Court." *See A & S Council Oil Co. v. Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995) (cleaned up).

That principle controls here. Any PSC Plaintiff must first obtain a final agency decision on their post-termination claim, and they may also have access to judicial review in the Court of Federal Claims. 41 U.S.C. §§ 7104(b)(1), 7103(g); *see Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 775–76 (Fed. Cir. 2021).

Finally, even if the contracts at issue were determined not to be CDA contracts, the PSC Plaintiffs have failed to establish jurisdiction. As explained, they are asking, in essence, for their employment contracts to be reinstated, or for their payments to be restarted. But any suit seeking more than $10,000 from the federal government (as many if not all of these suits would be doing) must be channeled to the Court of Federal Claims. *See Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*). So here too, by fault alone of Plaintiffs' exceedingly generic pleadings, the complaint fails to establish jurisdiction.

**C.      Plaintiffs Have Failed to Plead Article III Standing.**

"The party invoking federal jurisdiction bears the burden of establishing" the "irreducible constitutional minimum of standing[.]" *Lujan v. Defs. of Wildlife* ("*Defenders*"), 504 U.S. 555, 560-61 (1992). To establish standing—the plaintiffs must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016) (citing *Defenders*, 504 U.S. at 560–61). To establish injury in fact, a plaintiff must show that she has "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Defenders*, 504 U.S. at 560).

    **a.** Start with Plaintiffs' Appointments Clause claim. The primary weakness of Plaintiffs' standing theory "is the lack of" any allegation of "specific causation." *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). For starters, Plaintiffs allege no specific facts of injury as to any named Plaintiff, let alone one that flows from any alleged Appointments Clause violation. According to Plaintiffs, Defendants caused "injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm." Am. Compl., ¶¶ 4–9. That is it. These general and conclusory allegations are plainly inadequate to satisfy their burden. *See Air Excursions LLC v. Yellen*, 66 F.4th 272, 278 (D.C. Cir. 2023) (rejecting reliance on "'general averments' and 'conclusory allegations,' the truth of which we do not assume in evaluating . . . Article III standing") (internal citations omitted); *Spokeo, Inc.*, 578 U.S. at 338 n.6 ("[N]amed plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by unidentified members of the class to which they belong.") (citation omitted).

    Take Plaintiffs' allegations of employment harm. They allege that they have suffered from

17

"interruptions to the ordinary course of their employment." *E.g.*, Am. Compl., ¶¶ 4–9. But that vague averment fails to delineate what "interruptions" they have faced. Plaintiffs do not allege, for example, whether any individual Plaintiff has been subject to some employment action. Instead, the Plaintiffs' allegations are entirely generic. They allege facts about what is happening at USAID *generally* without indicating whether they are themselves subject to any of those actions. *See, e.g.*, Compl. ¶ 122 (alleging that "USAID employees" received RIF notices and that "Class members" faced uncertainty without alleging that anything about an individual Plaintiff). More important, even to the extent the complaint can be read as having the Plaintiffs suffer certain adverse employment actions, it is wholly barren of plausible allegations that show those actions were traceable to a specific unlawful (*i.e.* constitutionally tainted) action—as opposed to the independent exercise of otherwise lawful authority by a duly appointed officer. That is all insufficient; the Plaintiffs must demonstrate that they are "among the injured." *Defenders*, 504 U.S. at 563.

Although Plaintiffs mention "lost access to critical security systems and basic utilities" as examples, Am. Compl. ¶ 27, the Amended Complaint fails to allege any specific incidents. Nor, again, do Plaintiffs explain how these systems access issues are traceable to their Appointments Clause claim; by the Complaint's own terms, it is equally plausible that an individual was stripped of access for independent reasons, by an officer exercising independent authority. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (citation omitted)); *see also* Marocco Decl. ¶ 11 (detailing how certain employees were placed on paid administrative leave for, *inter alia* "non-compliance vis-à-vis the funding pause and stop-work orders"). Similarly, though the Amended Complaint alleges that certain USAID data systems were

accessed, *id.* ¶ 64, Plaintiffs provide no factual elaboration whatsoever regarding how Defendants'
access to that data has inflicted harm on each individual Plaintiff, or even that named Plaintiffs'
specific data was accessed. *See Hernandez v. Noom, Inc.*, No. 1:23-cv-00641-JRR, 2023 WL
8934019, at *8 (D. Md. Dec. 27, 2023) (finding lack of standing because "Plaintiff's conclusory
allegation that she disclosed 'personal information' does not allow the Court to determine whether
Plaintiff has a protectable privacy interest in that information."); *see also* Mem. Op. & Order at
11, 13, *Univ. of Cal. Student Assoc. v. Carter*, No. 25-cv-354-RDM (D.D.C. Feb. 17, 2025), ECF
No. 20 (denying TRO motion because Plaintiff failed to show "mere 'access' to personal data by
government employees who are not formally authorized to view it, without more, creates an
irreparable injury").

Finally, regarding the alleged dignitary harms and "the asserted reputation damage,
[P]laintiffs provide the Court only with vague and conclusory claims." *Byrne v. Clinton*, 410 F.
Supp. 3d 109, 118 (D.D.C. 2019). Plaintiffs allege that "Defendant Musk made numerous
statements . . . vilifying Class members[,]" including a post on X that said, "USAID is a criminal
organization." Am. Compl. ¶ 88. But the Amended Complaint fails to explain how those
statements caused reputational injury to each individual Plaintiff, much less how this claimed
injury bears any relationship to the alleged Appointments Clause violation. "Such conjectural or
hypothetical allegations of injury are insufficient to establish standing." *Byrne*, 410 F. Supp. 3d at
118 (citation omitted); *see Price v. City of Charlotte*, 93 F.3d 1241, 1251 (4th Cir. 1996) (rejecting
"seriatim recitations of 'depression' or 'hurt feelings'") (cleaned up); *cf.* Order at 15, *J. Does 1-26
v. Musk*, No. 25-1273, ECF No. 118 (4th Cir. Mar. 28, 2025) (explaining that "Plaintiffs' alleged"
reputational, fear, and employment based harms "are not actual or imminent"). These general
allegations come nowhere close to being sufficient to plead standing. *Air Excursions LLC*, 66 F.4th

at 277.

**b.**  Plaintiffs' assertion of standing as to their separation of powers claim suffers from all the same defects. Again, their generic allegation of undefined "interruptions to the ordinary course of their employment" does not provide the Court with specific facts to determine how their separation of powers claim is related to their specific injury. And their other assertions of injury fare even worse. Plaintiffs do not explain how their data, reputational, or dignitary harms are at all related to their claim that the Executive Branch exceeded its authority in reorganizing the functions performed by USAID.

Indeed, to the extent Plaintiffs are relying on interests beyond their employment or contractual status, Am. Compl. at 4 (relying on the alleged "consequences for the American and global public"), their  interest in vindicating the separation of powers is exactly the sort of abstract and generalized grievance that cannot be redressed by a federal court under Article III. "All citizens" share "an interest in the independence of each branch of Government." *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 220, 226–27 (1974). This "generalized interest . . . is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.* at 227; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982). Such a programmatic injury is also not redressable, as it would require "interpos[ing] the federal courts as virtually continuing monitors of the wisdom and soundness of . . . administration, contrary to the more modest role Article III envisions." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006) (citation omitted).

### D.    Plaintiffs' Claims Raise Claim-Splitting Concerns

These jurisdictional deficiencies are all the more troubling because Plaintiffs' Amended Complaint raises claim-splitting concerns.  *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 452 F. Supp. 2d 621, 626 (D. Md. 2006) (explaining that the doctrine of claim splitting bars

successive lawsuits that "involve[] the same parties or their privies and 'arise[] out of the same transaction or series of transactions'"), *aff'd* 273 F. App'x 256 (4th Cir. 2008). Plaintiffs' claims here are on behalf of a putative class of all employees and PSCs of USAID after January 20, 2025, arising from Defendants' alleged actions to terminate employment, cancel PSC contracts, and otherwise "dismantle" USAID. Am. Compl. ¶ 22. Identical claims based on the same facts are already pending in other courts, including those brought by unions representing USAID employees and an association asserting the interests of PSCs. *See* Compl. ¶¶ 41–42, 47–48, *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (D.D.C. filed Feb. 6, 2025), ECF No. 1 (asserting interests of members of two unions of employees at USAID for harms from alleged dismantling of agency); Compl. ¶¶ 4, 24–26, *Personal Servs. Contractor Ass'n v. Trump*, No. 1:25-cv-469 (D.D.C. filed Feb. 18, 2025), ECF No. 1 (membership organization asserting the interests of PSC members). To the extent the named Plaintiffs are part of these already pending lawsuits, this complaint must be dismissed. This Court should not allow this duplicative litigation to proceed.

## II.    Plaintiffs' Complaint Fails to State a Claim

### A.    Plaintiffs' Appointments Clause Claim Against Musk Fails to State a Claim

Plaintiffs' Amended Complaint pleads away their Appointments Clause Claim. They now allege that Secretary Rubio and Jeremy Lewin, whose legal status they do not challenge, are the ones who are taking steps to "abolish[]" or "realign[]" USAID. Am. Compl. ¶ 123; *see id.* ¶¶ 118–24. Because all these actions—which make up the alleged "effective dismantling" of USAID, *id.* ¶¶ 125, 131—are undisputedly occurring under the oversight of agency officials who are lawfully serving in their respective roles, Plaintiffs' Appointments Clause claim must fail. *See Andrade v. Regnery*, 824 F.2d 1253, 1256–57 (D.C. Cir. 1987).

Plaintiffs' Appointments Clause claim would remain defective even without these allegations. Under the Appointments Clause, individuals are officers, and thus must receive a

constitutional appointment, when they occupy a continuing position that is vested with the authority to "exercis[e] significant authority pursuant to the laws of the United States." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 506 (2010) (citation omitted). Federal employees who do not meet these criteria "need not be selected in compliance with the strict requirements of Article II." *Freytag v. Comm'r*, 501 U.S. 868, 880 (1991). But Plaintiffs concede Mr. Musk does not occupy an "office" or wield any such office's legally vested authority. These concessions, alone, are fatal to Plaintiffs' Appointments Clause claim.

Finally, Plaintiffs' allegations make clear that Mr. Musk's role is unique to him, and not the type of "continuing office" with which the Appointments Clause is concerned. *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022).

### 1. Plaintiffs Concede Validly Serving Agency Officials Are Overseeing the Agency's Reorganization

By Plaintiffs' own allegations, all the major actions making up the "dismantling" of USAID are being done at the direction or under the oversight of validly serving agency officials, namely Acting Administrator Rubio and Mr. Lewin, who has been delegated the duties of Deputy Administrator for Policy and Programming. Those include plans to: order substantial reductions in force; reorganize USAID to realign "certain USAID functions" to the State Department; and "discontinue[e] the remaining USAID functions" that Acting Administrator Rubio or Mr. Lewin believed were no longer in the public interest. Am. Compl. ¶¶ 118, 124; *see id.* ¶¶ 72–73, 116, 120–23.

These allegations foreclose Plaintiffs' Appointments Clause claim. As the Court previously recognized, "the Appointments Clause is not violated when a duly appointed Officer authorizes or ratifies an exercise of significant authority that was otherwise initiated or first approved by a non-officer." Mem. Op. at 26 (citing *Andrade*, 824 F.2d at 1257; *Jooce v. FDA*, 981 F.3d 26, 28 (D.C.

Cir. 2020); *CFPB v. Gordon*, 819 F.3d 1179, 1190–91 (9th Cir. 2016)). Because Acting Administrator Rubio and Mr. Lewin are undisputedly overseeing the alleged reorganization, Plaintiffs' Appointments Clause claim fails.

*Andrade* is particularly instructive. In that case, the court rejected an Appointments Clause challenge asserted in an employment removal action based on the same theory. 824 F.2d at 1256–57. The plaintiffs argued that an official not validly appointed as an officer of the United States "had complete responsibility for crafting and executing" their terminations—*i.e.*, that someone without appointment was pulling the strings, and directing the actions that harmed them. *Id.* at 1257. The court explained that, even if true, that fact was irrelevant: "it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action." *Id.* That principle applies here: whatever "effective dismantling of USAID" is currently ongoing is being overseen by officers with uncontested authority, which is all that *Andrade* requires. Am. Compl. ¶ 131; *see Andrade,* 824 F.2d at 1256–57.

This would be true *even if* (contrary to Plaintiffs' allegations), Mr. Musk advised, recommended, or indeed "directed" these or other actions regarding USAID, because the actual legal authority for such actions is not vested in Mr. Musk, but instead in the actual decisionmakers making those decisions. In other words, even if Mr. Musk or USDS employees "conceive[d of] and even carr[ied] out policies" to which Plaintiffs object, there is no Appointments Clause violation under *Andrade*, because the duly appointed agency head ultimately "take[s] official responsibility" for those actions. *Id.* at 1257. What is needed for an Appointments Clause challenge is a governmental action taken by someone lacking the authority to do so.

Plaintiffs fail to establish any such action that could entitle them to relief on their

23

Appointments Clause claim here. Many of Plaintiffs' allegations related to Mr. Musk are bare assertions or legal conclusions that the Court need not credit. *Compare Iqbal*, 556 U.S. at 680–81 (declining to assume the truth of allegations that Attorney General was the 'principal architect'" of a challenged policy), *with, e.g.,* Am. Compl. ¶ 43 (alleging Mr. Musk "often acts unilaterally in directing DOGE operations"), *id.* ¶ 131 (alleging Mr. Musk "exercised unbridled discretion . . . unilaterally acting outside of any lawfully recognized chain of command"). But at most, those allegations are consistent with properly authorized agency decisions that Mr. Musk (or USDS personnel) conceived. Indeed, the Court found as much as to most challenged decisions in its opinion granting Plaintiffs' motion for preliminary injunction. Mem. Op. at 26. That is no Appointments Clause violation. *See, e.g.*, *Andrade*, 824 F.2d at 1256–57.

Plaintiffs' allegations regarding USAID's website and headquarters cannot save their Appointments Clause claim. To start, none of the named Plaintiffs have alleged any specific injury attributable to those specific decisions, and thus lack standing to challenge them. *See Murthy*, 603 U.S. at 61 ("[P]laintiffs must demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek. Here, for every defendant, there must be at least one plaintiff with standing to seek an injunction." (citation omitted)). But even putting that aside, the Amended Complaint is defective on its own terms.

Namely, Plaintiffs fail to plausibly allege that Mr. Musk authorized these decisions. As the Fourth Circuit found, those actions took place "after Rubio and Marocco assumed their roles at USAID," so Plaintiffs could only state a plausible claim here if "Musk both directed those decisions and did so without the approval or ratification of USAID officials." Stay Order at 7–8. Nowhere does the Amended Complaint allege *that*. If anything, the opposite. *See* Am. Compl. ¶ 72.

## 2.    Plaintiffs Fail to Allege Mr. Musk's Position Satisfies the Elements of an Appointments Clause Claim

Even putting these allegations aside, Plaintiffs' Appointments Clause claim suffers an even more fundamental defect. For there to be an Appointments Clause challenge, there needs to be an office—*i.e.*, "a continuing position established by law" that is vested with "significant authority pursuant to the laws of the United States." *Lucia*, 585 U.S. at 245 (citation omitted); *see Burnap v. United States*, 252 U.S. 512, 516 (1920) ("Whether [a federal official] is an officer or an employé is determined by the manner in which Congress has specifically provided for the creation of the several positions, their duties, and appointment thereto.").

Both prongs of the test established by the Supreme Court make the "office" requirement clear: the first expressly requires consideration of a *position*, and the second considers the powers *that the law vests in that position*, *i.e.*, what "authority *pursuant to* the laws of the United States" it affords its incumbent. *Lucia*, 585 U.S. at 245 (citation omitted) (emphasis added).

**a.** To state an Appointments Clause violation, the "threshold trigger" is a governmental position that is "'established by Law.'" *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1133 (D.C. Cir. 2000). Once the position is identified, courts analyze whether the authority imbued in that position is significant by reference to the position's duties and powers as reflected in that position's organic law. *See, e.g.*, *Lucia,* 585 U.S. at 248–49 (analyzing whether administrative law judges are officers solely by reference to their duties set forth in statute and regulation); *Freytag*, 501 U.S. at 881; *Landry*, 204 F.3d at 1133. Where the office identified does not reflect a continuing position that exercises significant authority pursuant to the laws of the United States, "the Appointments Clause cares not a whit about who named" a person to that post. *Lucia*, 585 U.S. at 245. As these cases reflect, this is a formalist inquiry: It turns exclusively on the *de jure*—not *de*

*facto*—authority that a person wields.[4]

      Plaintiffs identify no "office" whose authority Mr. Musk allegedly wields. To the contrary, they allege that Mr. Musk serves "as the *de facto* DOGE Administrator," and recognize that he serves as a "'special government employee' pursuant to 18 U.S.C. § 202." Am. Compl. ¶¶ 10, 130. That allegation alone ends their Appointments Clause challenge. As the Court found in its opinion granting in part Plaintiffs' motion for a preliminary injunction, "Congress did not establish either position as an inferior Officer position" and "neither role is that of an Officer."[5] Mem. Op. at 25.

      The Court previously relied on a footnote in *Tucker v. Comm'r*, 676 F.3d 1129, 1133 n.1 (D.C. Cir. 2012), for the proposition that "a claim may proceed even if the office at issue was not formally created by Congress or the Executive Branch." Mem. Op. at 30. But *Tucker* does not authorize an Appointments Clause claim to proceed where no formal "office" is involved. In *Tucker*, the D.C. Circuit explained that determining whether any relevant office was established by law "may but need not be the start of an Appointments Clause analysis." 676 F.3d at 1133 n.1. But far from holding that the determination that an office was "established by law" was not an indispensable requirement for the Appointments Clause, the *Tucker* court's point was procedural: It explained that it did not need to determine whether the plaintiff's claim in that case satisfied the "established by law" element in that case *first,* because it was sufficient to determine that the

---

[4] The private nondelegation sphere involves a similar formalist inquiry. There, so long as a governmental officer is the one formally authorizing the given action there is no constitutional defect—even if that action was conceived of by an independent body composed of private persons that exercised decisive influence. *See, e.g.*, *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). What matters for constitutional purposes is who signed at the dotted line.

[5] This conclusion is well-supported. Regardless of who occupies the role, the actual duties of the USDS Administrator do not make it an office subject to the Appointments Clause. *See* USDS E.O. § 4(a); Workforce E.O. § 2. These duties do not include any formal authority over others and are a far cry from the types of significant authority that other courts have found create an office subject to the Appointments Clause. *Lucia*, 585 U.S. at 246–47; *Freytag*, 501 U.S. at 881.

Appointments Clause claim *failed* for other reasons. *See id.* at 1133 ("[B]ecause we conclude below that Appeals employees do not exercise significant authority within the meaning of the Appointments Clause cases, we need not resolve whether their positions were 'established by Law' for purposes of that clause."). Thus, *Tucker* does not obviate the requirement that an office be "established by law" to trigger the Appointments Clause.

**b.** Relatedly, it is not enough to identify some "office" to plead an Appointments Clause claim; a court must examine the *authority vested by law* in that particular office. Although the Court previously concluded that requiring the Appointments Clause to turn on whether an individual "has no formal legal authority . . . would open the door to an end-run around the Appointments Clause." Mem. Op. at 31, Defendants respectfully disagree. The formal legal authority vested in an office by law is *precisely* the Appointments Clause's focus. *See*, *e.g.*, *Freytag*, 501 U.S. at 881 (looking to statute for office's "duties," and noting that court-appointed special masters are not officers in part because their "duties and functions are not delineated in a statute"). That is why *Lucia* makes clear in the second prong of its test is whether the incumbent of an office is exercising authority vested in that office "*pursuant to the laws* of the United States." 585 U.S. at 245. To exercise the powers vested in a particular office *by law*, the incumbent of the office must be appointed in the manner the constitution requires for *that particular office* to safeguard the accountability of the official authority of the United States.

Here, Plaintiffs concede that Mr. Musk does not occupy an office with any such formal powers. *See, e.g.*, Am. Compl. ¶ 130 ("Musk . . . unilaterally act[ed] far outside any lawfully recognized chain of command."). These allegations are fatal under *Lucia*'s second prong: They are a concession that Mr. Musk is *not* exercising authority vested in an office "*pursuant to the laws* of the United States." *Lucia*, 585 U.S. at 245 (citation omitted) (emphasis added). The very crux of

27

Plaintiffs' case is the contention that Mr. Musk is using power that is not vested in the position he occupies. But this is not an issue with which *the Appointments Clause* is concerned.

**c.** Plaintiffs' alternative theory fundamentally misunderstands the Appointments Clause. On their view, the Court's focus should be not on the powers imbued in the *office* a person occupies but on whether the particular *person* has wielded significant power. *See*, *e.g.* Am. Compl. ¶ 130 (contending that anyone "possessing significant authority on an ongoing basis as judged by the importance of the matters implicated by their actions" is a principal officer); *contra Lucia*, 585 U.S. at 245. Plaintiffs cite no authority for this novel claim, which conflates formal authority and informal influence. Nobody thinks, for instance, that the White House Chief of Staff or White House Counsel are *officers* in any fashion, despite the fact they may exercise *tremendous* influence across the government. This is because they do not occupy a *position* that is equipped with any formal authority. And without that, there is nothing that implicates the Appointments Clause.

Indeed, Plaintiffs' theory is contrary to history and practice (not to mention the law). It has long been understood that those acting in a formally advisory role—that is, those who rely on the legal authority of others to actually effectuate a given decision—do not exercise "significant authority" and do not qualify as officers, even where they have significant ability to convince, influence, or cajole others to adopt their proposed policies. *See generally Appointment to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 207 (1984) (Committee members who are limited to "advisory functions" would not become "'officers' of the United States."). Thus, courts have long recognized that the President is entitled to his choice of senior advisors, who can help him execute his agenda, without having to seek approval from Congress. "Article II not only gives the President the ability to consult with his advisers confidentially, but also, as a corollary, it gives him the flexibility to organize his advisers and seek advice from them

as he wishes." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993). And the President may act through these advisors when communicating his decisions.[6]

Nor do the cases cited by the Court in its opinion granting in part the preliminary injunction support the contention that the Appointments Clause is concerned with officials acting beyond the legal authority vested in their particular position. *See* Mem. Op. at 30–31. Both cases expressly did "not reach the question of the constitutionality" of the challenged acts "under the Appointments Clause" because the claims failed for other reasons. *Wille v. Raimondo*, No. 22-cv-0689-BAH, 2024 WL 2832599, at *5 (D. Md. June 3, 2024) (declining to address the Appointments Clause challenge where the court found a valid ratification); *see Jooce*, 981 F.3d at 29 (explaining that the court "need not consider appellants' Appointments Clause objections" to the issuance of a rule).

Besides having no basis in law, there is also nothing to recommend Plaintiffs' functional approach as a practical matter. As Plaintiffs would have it, the constitutional analysis here would turn on how much "*de facto*" power an individual person wields—as determined, of course, by an Article III court. Am. Compl. ¶¶ 10, 130; *id.* at 2–3. But it cannot be, for instance, that a Chief of Staff is an officer in some administrations (when she effectively marshals her agenda), but a mere advisor in others (when people ignore her advice). Nor can it be that the same individual presidential advisor is an officer at one point in time, when they are perceived as close to the President and their proposals are adopted, and then no longer an officer if their influence is perceived as having waned. Such a rule would neither be sensible nor administrable. Yet, that is

---

[6] Thus, since at least the time of President Andrew Jackson, "Presidents have created advisory groups composed of private citizens . . . to meet periodically and advise them . . . ." *Ass'n of Am. Physicians*, 997 F.2d at 908. This has continued from the notable examples of Woodrow Wilson, who described one close advisor as "the only person in the world with whom I can discuss everything," Margaret MacMillan, *Paris 1919*, at 17–18 (2001), to First Lady Clinton.

precisely the type of analysis Plaintiffs appear to contemplate. *See id.* ¶¶ 128–32.

In short, because Plaintiffs concede Mr. Musk neither occupies an office nor has the formal legal authority to take the complained-of actions, their Appointments Clause claim fails.

### 3.    Mr. Musk Does Not Occupy a "Continuing" Office

Plaintiffs' claim also fails for an independent reason: They have not shown that Mr. Musk occupies any continuing office. *See Lucia*, 585 U.S. at 245 ("[A]n individual must occupy a 'continuing' position established by law to qualify as an officer." (citation omitted)). Plaintiffs do not dispute that Mr. Musk is a non-career SGE, Am. Compl. ¶ 10—a status that lacks the duration characteristic of an office. *See United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393 (1867) (explaining the term "office" "embraces the ideas of tenure, duration, emolument, and duties"). As defined by statute, SGEs are necessarily time-limited in their service. *See* 18 U.S.C. § 202. That stands in contrast to the administrative law judges in *Lucia*, for example, who "receive[d] a career appointment." 585 U.S. at 248 (citation omitted). While some nonpermanent positions can qualify as offices, the limited duration of Mr. Musk's SGE status indicates that his position is not an office. *Cf. Special Government Employee Serving as Paid Consultant to Saudi Company*, 40 Op. O.L.C. 1, 8–9 (2016) (SGE "d[id] not appear to hold the essential features of a federal office—in particular, 'tenure,' 'duration,' and 'continuous duties'" (citation omitted)).

To be a continuing office, the position also must not be "personal to a particular individual." *Donziger*, 38 F.4th at 297. Here, there is no allegation that Mr. Musk's role will outlast his tenure. *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (Marshall, Circuit Justice) (explaining that an office has "duties [that] continue, though the person be changed"). Indeed, the entire thrust of the Amended Complaint is that Mr. Musk has achieved a special status, particular to him alone. *See, e.g.*, Am. Compl. at 2 (characterizing Mr. "Musk's exercise of extraordinary—and seemingly unprecedented—authority"); *id.* ¶ 130 (alleging Mr.

Musk is "exercis[ing] an unprecedented level of power"). This does not work. Presidents have long selected advisors based on their "identity"—and thus "who cannot simply be replaced" by others—precisely because the President depends on those advisors' personalized advice and judgment. *Donziger*, 38 F.4th at 297. But those advisors—including Mr. Musk—occupy definitionally *personal*, not *permanent* positions.

### B.    Plaintiffs Fail to State a Separation-of-Powers Claim

Plaintiffs allege that "Defendants' collective actions to dismantle USAID . . . without congressional authorization far exceeds . . . acceptable exercise of executive power," and that "DOGE itself, as structured and implemented, operates beyond the bounds of any proper executive power." Am. Compl. ¶¶ 137, 139.[7] This nebulous separation-of-powers claim—which does not even identify a particular purportedly violated constitutional provision—is insufficiently pled and lacks merit.

First, the Amended Complaint as a whole shows that this claim—at its core—is a statutory violation masquerading as a constitutional claim. *See* Am. Compl. ¶ 127 (alleging Defendants actions prevent USAID from fulfilling requirements as contained in the Further Consolidated Appropriations Act of 2024 ("FCAA"), Pub. L. No. 118-47, 138 Stat. 460, 770, Div F, Title VII, § 7016(b)); *id.* ¶¶ 55–57 (alleging that the FCAA prohibits the use of appropriated funds for any reorganization affecting USAID without prior consultation with congressional committees). But there is no freestanding constitutional claim that an executive actor has violated statutory authority. In *Dalton*, the Supreme Court held that "claims simply alleging that the President [or an executive offer] has exceeded his statutory authority are not 'constitutional' claims, subject to judicial

---

[7] Plaintiffs further contend that their claimed Appointments Clause violation also constitutes a violation of separation of powers. Am. Compl. ¶ 138. As discussed above, Plaintiffs fail to state an Appointments Clause violation, and any separation of powers claim based on the Appointments Clause therefore necessarily fails.

review." 511 U.S. at 473. That is this case: Even if Acting Administrator Rubio and Mr. Lewin misused their authority to make changes at USAID that conflicted with that agency's organic statute, that is *not* a constitutional violation; it is an executive officer acting in excess of statutory authority—the precise sort of *ultra vires* action that does not sound in the separation of powers, or any other constitutional challenge.

Even if Plaintiffs' separation-of-powers claim is separable from alleged violations of the FCAA, it should be dismissed. First, it is plainly lawful for the President to direct the Secretary to act within the agency's discretion to end programs not required by law. *See, e.g.*, *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[A]s an agency under the direction of the executive branch, it must implement the President's policy directives to the extent permitted by law."). Indeed, agencies have "broad discretion to choose how best to marshal [their] limited resources and personnel to carry out [their] delegated responsibilities." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). This is especially true in the foreign-policy sphere, where the President retains inherent Article II authority. *See, e.g.*, *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003). Plaintiffs' subjective views about how to best implement the statutes governing the Department do not serve as a basis for the Court to reorder those priorities itself. *See Heckler v. Chaney*, 470 U.S. 821, 832 (1985) (recognizing it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'") (citation omitted). As the Court explained in *Heckler*, agencies are "far better equipped" to evaluate "the many variables involved in the proper ordering of its priorities" than are the courts. *Id.* at 831–32.

Second, Defendants' restructuring of USAID is consistent with the FCAA. The statute specifically contemplates structural changes to USAID but requires Congressional notice for such changes. *See* Pub. L. No. 118-47, 138 Stat. 461 (Div. F, Tit. II). As Plaintiffs allege, the FCAA

"prohibits the use of appropriated funds for any reorganization . . . affecting the State Department" and "USAID . . . without prior consultation." Am. Compl. ¶ 57. Plaintiffs concede such consultation occurred. *See id.* ¶ 123 (describing contents of a "Congressional Notification Transmittal Letter and Congressional Notification" by Paul Guaglianone dated March 28, 2025); *id.* ¶ 124 (referring to separate statement from Secretary Rubio which "further confirmed that the Department had 'notified Congress on their intent to undertake a reorganization'"). Plaintiffs have, therefore, pled themselves "out of court by pleading facts that show that [they] have no legal claim." *Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 594–95 (E.D. Va. 2013) (citation omitted).

Third, whether Defendants' notice to Congress was sufficient is a political question for Congress, not this Court, to decide. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (political question doctrine factors include "textually demonstrable constitutional commitment of the issue to a coordinate political department"); *see, e.g.*, *Schneider v. Kissinger*, 412 F.3d 190, 195 (D.C. Cir. 2005) ("It cannot . . . be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches."). Congress has the authority and the tools to engage with USAID and the State Department regarding the reorganization plans, especially having inserted notice provisions into the FCAA—and having received notice, as Plaintiffs concede. Am. Compl. ¶¶ 123, 124. There is no judicially manageable standard to assess whether and how Congress may choose to respond to the notice that USAID and the Department of State undisputedly provided. *Cf. Baker*, 369 U.S. at 217. Likewise, it would be impossible for the Court to undertake "independent resolution without expressing lack of the respect due coordinate branches of government," because to insert itself into the evaluating the notices would supplant Congress's ability to respond as it deemed appropriate. *Id.* That Plaintiffs do not like the nature of the notice does not provide a basis for the judiciary to decide these political matters. As such, even

33

if Plaintiffs' claim was properly in this Court, and even if this separation of powers claim was not an impermissible end-run around a statutory claim, the claim would still fail.

### C.    Plaintiffs' Claim Against the President Should Be Dismissed

Finally, Plaintiffs purport to bring their separation-of-powers claim against all Defendants, including President Trump. *See* Am. Compl. ¶¶ 133–40. But Plaintiffs may not obtain—and the Court may not order—injunctive or declaratory relief directly against the President for his official conduct. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) (holding that the Court had "no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992). Indeed, courts in this and other circuits have rejected plaintiffs' demands to enjoin the President in the performance of his official duties, regardless of the claim. *See, e.g., Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010); *Newdow v. Bush*, 355 F. Supp. 2d 265, 282 (D.D.C. 2005) (explaining that court was "not aware of any" cases where "an injunction against the President [was] issued and sustained by the federal courts").[8]

It is undisputed that Plaintiffs sued the President in his official capacity and that Plaintiffs could obtain full relief for their alleged injuries, if any, through injunctive and declaratory relief against the other Defendants they have named. *See* Am. Compl. ¶¶ 10–14; 16–20. Accordingly, the Court should grant judgment to Defendants on Plaintiffs' claim against the President.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed.

---

[8] *See, e.g.*, *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir.), *vacated and remanded on other grounds*, 583 U.S. 941 (2017); *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir.), *vacated and remanded on other grounds sub. nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539–40 (N.D. Cal. 2017).

Dated: May 1, 2025                         Respectfully submitted,

                                           YAAKOV M. ROTH
                                           Acting Assistant Attorney General

                                           DIANE KELLEHER
                                           Director, Federal Programs Branch

                                           CHRISTOPHER R. HALL
                                           Assistant Branch Director, Federal Programs Branch

                                           JOSHUA E. GARDNER (FL Bar No. 302820)
                                           *By Special Appearance*
                                           Special Counsel

                                           */s/ Christopher M. Lynch*
                                           GARRY D. HARTLIEB (IL Bar. No. 6322571)
                                           CHRISTOPHER M. LYNCH
                                           (DC Bar No. 1049152)
                                           JACOB S. SILER (DC Bar No. 1003383)
                                           JAMES J. WEN (NY Bar No. 5422126)
                                           *By Special Appearance*
                                           Trial Attorneys
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street NW
                                           Washington, DC 20005
                                           Phone: (202) 353-4537
                                           Email: christopher.m.lynch@usdoj.gov

                                           *Attorneys for Defendants*