# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 4 et al., *individually and on behalf of all others similarly situated*,

**Plaintiffs**,

**v.**

ELON MUSK *et al.*,

**Defendants**.

Case No.  8:25-cv-00462-TDC

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

Table of Contents

Page

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 2

        A.      USAID Prior to January 20, 2025 .......................................................... 3

        B.      Defendant Musk Controls DOGE. .......................................................... 5

        C.      Defendants are Swiftly Dismantling USAID. ......................................... 7

                1.      Phase One of Dismantling USAID. ............................................. 7

                2.      Phase Two of Dismantling USAID. ........................................... 10

                3.      Phase Three of Dismantling USAID. ......................................... 12

III.    PROCEDURAL HISTORY ................................................................................ 13

IV.     LEGAL STANDARD ....................................................................................... 15

V.      ARGUMENT ................................................................................................... 16

        A.      Plaintiffs Satisfy Rule 23(a) Factors .................................................... 17

                1.      The Proposed Class Is Sufficiently Numerous. ....................... 17

                2.      There Are Common Questions of Law and Fact. ..................... 17

                3.      Plaintiffs' Claims are Typical of the Class. ............................. 20

                4.      Plaintiffs and Proposed Class Counsel Adequately Represent the
                        Class. ......................................................................................... 21

        B.      Plaintiffs Satisfy Rule 23(b)(2) ............................................................ 23

                1.      Classwide Relief to Vindicate Separation of Powers Claims .................. 24

                2.      Classwide Relief to Vindicate Appointments Clause Claims .................. 26

VI.     CONCLUSION ................................................................................................. 27

Plaintiffs respectfully submit this memorandum of points and authorities in support of their Motion for Class Certification.

## I.   <u>INTRODUCTION</u>

Following the filing of the Amended Class Action Complaint (ECF No. 93) ("Amend. Compl." or "Amended Complaint"), this matter is now a proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2). Plaintiffs—all of whom were duly employed by the United States Agency for International Development ("USAID") as of January 20, 2025—seek *only* declaratory and corresponding injunctive relief based on two constitutional claims on behalf of themselves and all other similarly situated personnel.[1]

Class certification is, at bottom, a procedural tool to enable the Court to "select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (cleaned up); *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (noting that one primary purpose of class actions is to advance judicial economy and promote efficiency); Fed. R. Civ. P. 1 (Federal Rules "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). Here, there can be no question that class certification is the most fair and efficient way to adjudicate these claims.

Plaintiffs seek to represent a clearly defined class of "[a]ll persons who, between January 20, 2025 through the present (the 'Class Period'), worked at any time as employees of USAID, including as personal services contractors," excluding Defendants and anyone who served as the

---

[1] In addition to Defendants Musk and DOGE (the collective name used for Defendants United States DOGE Service and the Department of Government Efficiency), Plaintiffs bring the amended action against USAID; the United States Department of State ("State Department"); key decision-makers at USAID; President Donald J. Trump; and Amy Gleason, the Acting Administrator of United States DOGE Service. *See* Amend. Compl.

Administrator or Deputy Administrator.[2]  Amend. Compl. ¶ 22.  Plaintiffs' constitutional claims—

and all relevant facts—are necessarily common to all members of the proposed Class, and

Defendants "acted or refused to act on grounds that generally apply to the class," such that final

injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a

whole.  Fed. R. Civ. P. 23(b)(2).  At the broadest level, deciding Plaintiffs' two claims involve

binary questions, the determination of which will "generate common *answers*" not only "apt to

drive the resolution of the litigation," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)

(cleaned up) (emphasis in original), but, here, *actually resolve* the litigation in full.  Accordingly,

not only will all members of the proposed Class benefit from a successful outcome, Defendants

will avoid the cost and risk of defending duplicative litigation and facing potentially inconsistent

rulings, and the federal courts will avoid a multiplicity of cases all litigating the same issues.

For these reasons, and as explained more fully below, Plaintiffs respectfully request that

the Court grant their motion and certify the proposed Class.

## II.     FACTUAL BACKGROUND

This Motion incorporates the factual allegations of Plaintiffs' Amended Complaint, which

describes in detail the unprecedented and unauthorized power of Defendant Musk at USAID and

the unconstitutional actions of all Defendants in seeking to dismantle an independent agency

created by Congress.  *See generally* Amend. Compl. ¶¶ 59-127.

---

[2] The USAID Office of Inspector General has identified eight categories of personnel in total: "(1) civil service; (2) Foreign Service; (3) Foreign Service National; (4) Foreign Service Limited; (5) institutional support contractors; (6) personal service contractors . . . (7) Participating Agency Service Agreement officers; and (8) Fellows." USAID, Office of Inspector Gen., *Strategic Workforce Planning, Audit Rep. No. 9-000-22-001-P* (May 25, 2022).

## A.     <u>USAID Prior to January 20, 2025</u>

USAID "has served as the lead international humanitarian and development arm of the U.S. government." Emily M. McCabe, CONG. RSCH. SERV., IF10261, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT: AN OVERVIEW (updated March 14, 2025). It was first established in 1961 by Executive Order No. 10,973, 26 Fed Reg. 10,469, § 102 (Nov. 3, 1961), to implement components of the Foreign Assistance Act of 1961. Congress codified the agency in the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. 105-277, which defined USAID as an independent agency, distinct from the State Department. *See* 22 U.S.C. § 6563(a) ("[T]here is within the Executive branch of Government the United States Agency for International Development."). The FARRA invited then-President Clinton to submit to Congress a written "reorganization plan and report" for USAID. Specifically, the FARRA provided the President with the option to "provide for the abolition of [USAID] and the transfer of all its functions to the Department of State" or to propose a plan for the "transfer to and consolidation" of certain functions along with "additional consolidation, reorganization, and streamlining" of the agency. 22 U.S.C. § 6601(a)-(d). But President Clinton's report to Congress instead confirmed that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the FARRA, *as contained in* Pub. L. 105-277, 112 Stat. 2681 (1998).

Since that time, Congress extended no further statutory authority to the Executive Branch to reorganize, reconstitute, consolidate, abolish USAID, or otherwise unilaterally alter its status. Rather, Congress has expressly *rejected* attempts to eliminate the agency and has continuously reinforced USAID's independent status through direct appropriations. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, prohibits the use of appropriated funds for any reorganization, redesign, or similar plan affecting the State Department,

USAID, or related entities without prior consultation with the appropriate congressional committees. *See id.* § 7015. This includes plans to restructure agencies, alter overseas presence, or change staffing levels from those previously justified to Congress. *See id.* It also bars financial commitments to eliminate or modify programs, offices, or activities without prior justification or advance notice to appropriators. *See id.*

Prior to Defendants' actions described below, USAID employed up to 10,000 staff, with approximately two-thirds posted at the Agency's more than 60 overseas missions. Amend. Compl. ¶ 53.[3] USAID hires personnel under various hiring mechanisms, resulting in different employment classifications.[4] These classifications include but are not limited to Civil Service, Foreign Service, Foreign Service Limited, and Personal Services Contractor. Named Plaintiffs in this action include the following hiring classifications:

- **Civil Service (Excepted Service and Competitive Service)**: "Civil Service" employees are appointed under Title 5 of the U.S. Code into competitive-service (and certain excepted-service) positions based primarily at USAID's Washington, D.C., headquarters (with short-term overseas assignments as needed). They perform a variety of governmental functions across the agency. *See* Ex. 1, Decl. of J. Doe 7, J.R. 00002; Ex. 2, Decl. of J. Doe 27, J.R. 00007.

---

[3] *See also* Emily M. McCabe, CONG. RSCH. SERV., IF10261, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT: AN OVERVIEW (updated March 14, 2025) ("According to the FY2023 Agency Financial Report . . . USAID's workforce totaled more than 10,000 at the end of FY2023, with approximately two-thirds serving overseas (not including institutional support contractors). The agency maintained more than 60 country and regional missions[.]").
[4] *See* USAID, Office of Inspector Gen., *Strategic Workforce Planning, Audit Rep. No. 9-000-22-001-P* (May 25, 2022).

- **Foreign Service Officer**:  "FSO" employees are appointed under the Foreign Service Act to develop and manage USAID's foreign assistance programs.  They serve on domestic and overseas tours as tenured officers.  *See* Ex. 3, Decl. of J. Doe 22, J.R. 00012.

- **Foreign Service Limited**:  "FSL" employees are hired under the Foreign Service Act to time-limited positions (up to five years).  They serve on domestic and overseas tours.  *See* Ex. 4, Decl. of J. Doe 4, J.R. 00017; Ex. 5, Decl. of J. Doe 28, J.R. 00022.

- **Personal Services Contractor**:  "PSC" employees are hired under Foreign Assistance Act authority to perform a variety of government functions, and many are stationed overseas.  Their status as employees is recognized by the Federal Acquisition Regulations, among other sources.  48 C.F.R. 37.104.  *See* Ex. 6, Decl. of J. Doe 29, J.R. 00027.

### B.       Defendant Musk Controls DOGE.[5]

President Trump created the United States Department of Government Efficiency in the Executive Office of the President on January 20, 2025.  Executive Order No. 14158, 90 FR 8441 (2025) (the "First Executive Order"); *see* Amend. Compl. ¶ 39.  The First Executive Order created DOGE teams within each federal agency, including an embedded "DOGE Team member" who can only be hired by the agency "in consultation with" the DOGE Administrator.  Executive Order No. 14158, § 3(c).  However, the DOGE mission itself, on paper, was supposed to be limited to commencing "a Software Modernization Initiative" with the goal of "improv[ing] the quality and efficiency" of government systems.  *Id*. § 4(a).

---

[5] Again, "DOGE" includes the United States DOGE Service; the Department of Government Efficiency; and their officers, agents, servants and employees. The term also includes all individuals who at any time from January 20, 2025 through the present have been designated as, or have served in the role as, a DOGE Team Lead or DOGE Team Member, regardless of the formal personnel status of that individual. *See* ECF No. 106 at n.2; ECF No. 75.

Since its inception, Defendant Musk has exercised seemingly plenary control over DOGE operations, which have far exceeded anything explicitly provided for in the Executive Order. Amend. Compl. ¶¶ 31-38. In fact, President Trump has regularly and repeatedly identified Defendant Musk as the leader of DOGE, including during a February 11, 2025, press conference held jointly by President Trump and Musk. *Id*. ¶ 41; *see* Memorandum Opinion at 3, ECF No. 73 (March 18, 2025) ("Mem. Op.") ("President Trump has identified Musk as the leader of DOGE."). And Musk has regularly and repeatedly identified *himself* as the leader of DOGE, including through a series of statements on X, the social media platform Musk owns and operates, and during press interviews. Amend. Compl. ¶ 42. Even further, Musk's personal lawyers identified him as a "high-ranking government official" who is "in charge of" DOGE, in March 23, 2025, filings in front of a Delaware court. *Id*. Although the government has at times disputed that Musk leads DOGE and exercises significant authority through doing so, this Court and numerous others have concluded otherwise. *See* Mem. Op. at 1 ("In the case of [USAID], DOGE and its leader, Elon Musk, have also played a leading role in actions taken to shut down and dismantle the agency."); *State of New Mexico v. Musk*, Case No. 1:25-cv-00429, 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025) ("Musk has rapidly taken steps to fundamentally reshape the Executive Branch. Even Defendants concede there is no apparent 'source of legal authority granting [DOGE] the power' to take some of the actions challenged here.") (internal citations omitted); *Nat'l Treasury Emps. Union v. Vought*, Case No. 1:25-cv-00381, 2025 WL 942772, at *7 (D.D.C. Mar. 28, 2025) ("Count One alleges that the defendants' actions to dismantle and shut down the CFPB are unconstitutional because they exceed the executive's authority and usurp the legislature's authority . . . . This claim is likely to succeed as there is no mystery about what is going on as the

President and his delegees, Elon Musk and Russell Vought, have made their actions and intentions clear.").

As the leader of DOGE, Defendant Musk reports directly to President Trump but operates DOGE with autonomy. Amend. Compl. ¶ 43. With this unprecedented power, Musk has access to personnel data and sensitive information across agencies and control over computer systems and digital data of agencies. *Id.* ¶ 46. He authorizes and oversees agency personnel decisions, including terminating personnel, canceling government grants and contracts, and ending leases. *Id.* Musk even directed that the USAID building be physically stripped of its name. *Id.*

**C.      Defendants are Swiftly Dismantling USAID.**

Again, when President Donald Trump entered office, USAID employed up to 10,000 people, with approximately two-thirds posted at the Agency's more than 60 missions overseas. Amend. Compl. ¶ 53. On the same day President Trump issued the First Executive Order, January 20, 2025, he released a second Executive Order, entitled "Reevaluating and Realigning United States Foreign Aid." Executive Order No. 14169, 90 FR 8619 (2025) (the "Second Executive Order"). The Second Executive Order called for a pause on all funding for new obligations and disbursements and a 90-day review of all U.S. foreign assistance to assess alignment with American values. *Id.* Shortly thereafter, on January 24, 2025, Secretary Rubio issued a stop work order on all existing foreign assistance awards; in the words of Defendant Marocco, this meant USAID "going 'pencils down'" on most of its ongoing work. Amend. Compl. ¶ 59.

**1.      Phase One of Dismantling USAID.**

On Monday, January 27, 2025, DOGE members, including Gavin Kliger and Luke Farritor, entered USAID headquarters and demanded unrestricted access to USAID's financial, personnel, and administrative data systems. Amend. Compl. ¶ 64. Their demands were granted, and DOGE members received the highest level of access to USAID digital systems and infrastructure,

including the ability to view and alter emails on behalf of all USAID users and access to even the most sensitive personnel information. *Id.* The same day, DOGE member Clayton Cromer presented the then-Acting Administrator of USAID Jason Gray with a list of 57 senior USAID officials and instructed Mr. Gray to place them on administrative leave, which he did. *Id.* ¶ 65. Plaintiffs allege that DOGE members wrote the substance of the agency-wide message sent in the name of Mr. Gray on January 27, which stated that 57 senior USAID officials were being placed on administrative leave because they had been identified as taking actions within USAID "designed to circumvent the President's Executive Orders and the mandate from the American people." *Id.* ¶¶ 65-66.

On January 30, 2025, DOGE members Defendant Lewin and Noah Peters, then purporting to be housed in the Office of Personnel Management, informed USAID Chief Human Capital Officer Bill Malyszka and Director of Employee and Labor Relations Nicholas Gottlieb that DOGE intended to conduct a Reduction in Force ("RIF") within USAID. *Id.* ¶ 68. Shortly thereafter, Defendant Lewin demanded that five specific individuals be terminated from USAID. *Id.* ¶ 69. Though Mr. Malyszka and Mr. Gottlieb informed Defendant Lewin that it would be illegal to terminate these individuals without affording them due process, Defendant Lewin ordered USAID officials to prioritize preparing and implementing RIF notices. *Id.* The same day, Mr. Gottlieb wrote a memorandum explaining that there was no legal justification for keeping the 57 senior officials on administrative leave and noted that he intended to reinstate those officials later that day. *Id.* ¶ 70. After receiving Mr. Gottlieb's memorandum, Mr. Gray was removed from his position at USAID and President Trump purportedly directed Secretary Rubio to perform the duties of USAID Administrator (although Defendants did not make this public until February 3, 2025). *Id.* ¶ 72.

The days that followed included a flurry of actions, taken primarily by DOGE under the leadership of Defendant Musk, to swiftly dismantle USAID outside of any recognized legal channels:

- On Friday, January 31, 2025, plaques with USAID's official seal were removed from the agency's offices, *id*. ¶ 74;

- On Saturday, February 1, 2025, DOGE operatives shut down the USAID website, *id*. ¶ 75; 57 additional USAID employees were placed on administrative leave, *id*.; USAID Director of Security John Vorhees and Deputy Director Brian McGill unsuccessfully tried to prevent the DOGE members—who did not have proper security clearances—from accessing sensitive compartmented information facilities ("SCIFs"), *id*. ¶ 77; Mr. Vorhees and Mr. McGill were placed on administrative leave, *id*. ¶ 81.

- Over the weekend of February 1 and 2, 2025, USAID Chief of Staff Matt Hopson (appointed by President Trump), resigned, *id*. ¶ 82; thousands of USAID Class members lost access to their agency emails and government computer systems without prior notice, *id*. ¶ 83; USAID staff received communications that the contracts for 791 individual PSCs were to be terminated, *id*. ¶ 85; and Defendant Musk posted on X, among other things, that "USAID is a criminal organization" and it was "[t]ime for it to die," *id*. ¶ 88(a);

- Early in the morning of Monday, February 3, 2025, DOGE member Gavin Kliger sent an email to all USAID staff instructing them to work remotely because USAID headquarters were closed, *id*. ¶ 86; and Defendant Musk posted on X immediately thereafter: "We spent the weekend feeding USAID to the woodchipper." *Id*. ¶ 87.

During this period, Defendants Musk and DOGE continued to dismantle the agency's physical and technological infrastructure, searching through employees' personal belongings,

deleting copies of official internal USAID policies and guidance, and destroying USAID classified computer systems. *Id.* ¶ 84. At or around this time, Defendant Lewin began acting as the DOGE team lead for USAID. *Id.* ¶ 90.

### 2. Phase Two of Dismantling USAID.

Defendant Musk and his DOGE subordinates continued to control USAID and systemically block USAID personnel from all of the agency's systems. Amend. Compl. ¶ 91. On February 7, 2025, Defendant Musk announced on X that the U.S. Customs and Border Protection ("CBP") had taken over USAID headquarters, and he posted a photo of the building's main entrance with the words "U.S. Agency for International Development" removed from above the door. *Id.* ¶ 93. USAID employees and contractors were not permitted to enter the building, even to collect their personal belongings. *Id.*

Between February 3 and 7, 2025, Defendants placed approximately 2,140 of the approximately 4,765 direct hire employees of USAID, or 44.9%, on administrative leave. *Id.* ¶ 94. On February 7, 2025, Class members received an internal communication that ordered, effective that night at 11:59 p.m., "all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs." *Id.* ¶ 95. Defendants identified an additional 2,104 USAID employees to place on administrative leave. *Id.* This would have brought the total number of USAID direct hire employees on leave to 4,244 out of 4,765—including several of the Plaintiffs. *Id.; see also* Ex. 4, Decl. of J. Doe 4, ¶ 5, J.R. 00019; Ex. 1, Decl. of J. Doe 7, ¶ 5, J.R. 00004; Ex. 3, Decl. of J. Doe 22, ¶ 6, J.R. 00014; Ex. 2, Decl. of J. Doe 27, ¶ 5, J.R. 00009; Ex. 5, Decl. of J. Doe 28, ¶ 5, J.R. 00024.

That same day, a district judge in the U.S. District Court for the District of D.C. issued a temporary restraining order ("TRO") halting Defendants' plans, which prevented those USAID

employees from being placed on administrative leave until the TRO's expiration on February 21, 2025. Amend. Compl. ¶ 96; *see American Foreign Service Ass'n v. Trump*, — F. Supp. 3d —, No. 1:25-CV-352 (CJN), 2025 WL 435415 (D.D.C. Feb. 7, 2025). On February 8, 2025, Defendant Lewin (then the DOGE team lead) drafted a memo directing USAID to terminate 78 contracts and 68 grants totaling $1.02 billion and $660.7 million respectively, and was actively involved in overseeing their termination thereafter. Amend. Compl. ¶¶ 99-101.

By February 22, 2025, and following the dissolution of the TRO enjoining Defendants from placing certain USAID employees on administrative leave, *see American Foreign Service Ass'n v. Trump*, — F. Supp. 3d —, No. 1:25-CV-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025), nearly 75% of the entire PSC workforce had received termination notices. Amend. Compl. ¶ 109. On February 23, 2025, Class members again received notice that, with the exception of certain designated personnel, all USAID direct hire personnel were subject to administrative leave globally. *Id*. ¶ 110. In addition, employees were notified that a RIF impacting 2,000 USAID personnel stationed within the United States would be implemented. *Id*. ¶ 111. That same day, Mr. Kliger created a USAID human resources email account that was subsequently used to notify domestic employees of an April 24, 2025, and overseas employees a May 26, 2025 "separat[ion] from the Federal service" date and to notify all Class members abroad to return to the United States. *Id*. ¶ 112. Finally, on or about February 26, 2025, Defendants sent out 5,700 award termination notices from a previously non-existent or unused SPE@usaid.gov email address without verified digital signatures. *Id*. ¶ 113. By March 10, 2025, Secretary Rubio announced that 5,200 contracts, or roughly 83% of USAID programming, had been canceled, and thanked DOGE for "achiev[ing] . . . historic reform." *Id*. ¶ 116. Based on DOGE's accounting as of March

10, 2025, DOGE claimed direct credit for terminating 2,191 contracts (valued at $26.1 billion) and 2,366 grants (valued at $41.8 billion). *Id.* ¶ 117.

### 3. Phase Three of Dismantling USAID.

On March 18, 2025, this Court substantially granted Plaintiffs' motion for a preliminary injunction of Defendant Musk and DOGE, enjoining them from taking "any action" or engaging in "any work [] relating to the shutdown of USAID," including any workforce reductions, contract terminations, grant recissions, and building closures, and from any disclosure of personal or employment information outside of USAID. ECF No. 75 at 2. Defendants appealed, and the Fourth Circuit Court of Appeals stayed this Court's injunction. *Does 1-26 v. Musk, et al.*, No. 25-1273, 2025 WL 1020995 (4th Cir. March 28, 2025). Within hours of the stay, Defendant Lewin sent an email entitled "Final Mission," which described the final steps in dismantling what remains of USAID: nearly all of remaining USAID personnel would receive Reduction In Force notices, and remaining USAID personnel would remain employed merely to "supervise the [ ] decommissioning of USAID assets and the wind-down of the Agency's independent operations." Amend. Compl. ¶ 120; *see also* ECF No. 106-1 (Exhibit 1). Shortly thereafter, Defendants sent emails to Class members purporting to provide RIF notices, but including incorrect recipient information and inaccurate employment history details. Amend. Compl. ¶ 122. As it stands now, most Class members will be terminated as of July 1, 2025; a smaller number will be kept on until September 2, 2025 for the sole purpose of effectuating the agency's complete winding down. *Id.* ¶ 120; *see* Ex. 4, Decl. of J. Doe 4, ¶ 10 (July 1), J.R. 00020; Ex. 1, Decl. of J. Doe 7, ¶ 10 (July 1), J.R. 00005; Ex. 3, Decl. of J. Doe 22, ¶ 8 (Sept. 2), J.R. 00014; Ex. 2, Decl. of J. Doe 27, ¶ 9 (July 1), J.R. 00010; Ex. 5, Decl. of J. Doe 28, ¶ 12 (July 1), J.R. 00025.

Also on March 28, 2025, a Senior Bureau Official in the Bureau of Legislative Affairs transmitted a Congressional Notification Transmittal Letter to Congress and a Congressional

Notification stating that "[s]ubstantially all USAID personnel will be separated from federal service" and that USAID Bureaus and offices would be "abolished" or "realigned to the State Department." Amend. Compl. ¶ 123. The same day, Secretary Rubio confirmed that the Department had notified Congress of their intent to reorganize USAID and abolish certain USAID functions. *Id.* ¶ 124.

### III. <u>PROCEDURAL HISTORY</u>

Shortly after Defendants' dismantling of USAID began, Plaintiffs initiated this action, alleging Defendants' conduct violated the Separation of Powers doctrine and the Appointments Clause of the Constitution. Compl., ECF No. 1 (Feb. 13, 2025); *see also* Compl. (corrected), ECF No. 14 (Feb. 15, 2025). In light of the immediate and severe effects of Defendants' unconstitutional conduct, Plaintiffs sought emergency relief from this Court. ECF No. 17. Namely, Plaintiffs sought a preliminary injunction, among other things, enjoining Defendants from accessing, sharing, or using Plaintiffs' sensitive information outside of USAID; directing Defendants to reinstate all USAID employees' and PSCs' access to USAID systems, including email, payment, and security systems; and enjoining Defendants from issuing or enforcing further terminations, suspensions, or stop-work orders related to any grants or contracts existing prior to January 19, 2025. *Id.* at 1-2.

On March 18, 2025, this Court granted Plaintiffs' motion for preliminary injunction, finding that Plaintiffs were likely to succeed on the merits of their constitutional claims, Plaintiffs were likely to suffer irreparable harm in the absence of preliminary relief, and the balance of equities and the public interest tipped in Plaintiffs' favor. Mem. Op. at 24-62. The Court found that Defendants' actions to shutter USAID "likely violated the United States Constitution in multiple ways," harmed Plaintiffs, and also harmed the public interest "because they deprived the public's elected representatives in Congress of their constitutional authority to decide whether,

when, and how to close down" a federal agency. *Id*. at 68. In doing so, the Court narrowly crafted an injunction relating to the Separation of Powers violation enjoining Defendants from taking any further actions to terminate staff or contracts, place employees on administrative leave, create or enforce stop-work orders, and shut down physical locations or technology systems. *Id*. at 65-66. As it relates to the Appointments Clause violation, the Court enjoined Defendants enjoined from engaging in any actions related to USAID without a USAID official's express authorization. *Id*. at 66.

Hours after the Court entered the injunction, Defendants replaced then-acting Administrator Pete Marocco with former DOGE Team Lead at USAID, Defendant Jeremy Lewin. *See* ECF No. 77. That following day, Defendants filed a motion for clarification seeking an order that Lewin and any action of his at USAID fell outside the Court's injunction. *Id*. at 2. Denying Defendants' motion, this Court emphasized the injunction "includes all individuals with a past or present affiliation with Defendants or DOGE" and "excluding Mr. Lewin . . . would undermine" the injunction itself. ECF No. 79.

Defendants subsequently filed an emergency motion for stay of the injunction in the Fourth Circuit, and the Court of Appeals granted Defendants' motion, staying the PI pending the resolution of the appeal. *Does 1-26 v. Musk, et al.*, No. 25-1273, 2025 WL 1020995 (4th Cir. March 28, 2025). In light of Defendants' continuing constitutional violations and the Fourth Circuit's Stay Order, Plaintiffs filed the operative Amended Complaint on April 17, 2025. *See generally* Amend. Compl., ECF No. 93 (corrected). As noted above, the Amended Complaint asserts the same two constitutional claims, but does so against an expanded group of Defendants. Plaintiffs seek only declaratory and injunctive relief, including: (1) a declaration that Defendant Musk's conduct at USAID violates the Appointments Clause, (2) an injunction to declare unlawful

and set aside all actions taken to dismantle USAID by any and all Defendants as violating Separation of Powers principles; (3) an injunction enjoining Defendants from taking further unconstitutional actions at USAID, including actions to unlawfully modify, reorganize, or eliminate USAID or its bureaus, departments, offices, or subdivisions unless and until specifically authorized to do so by Congress; and (4) related injunctive relief. *Id.* ¶ 141.

## IV.    <u>LEGAL STANDARD</u>

"Courts have wide discretion to certify a class based on their familiarity with the issues and potential difficulties arising in class action litigation." *Amaya v. DGS Constr., LLC*, 326 F.R.D. 439, 446 (D. Md. 2018) (Chuang, J.) (citing *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)).  Importantly, "a decision to certify a class is based on whether or not a putative class satisfies the Rule 23 factors, not on a preliminary assessment of the underlying merits of the claim." *Jackson v. Am. Elec. Warfare Assocs., Inc.*, No. CV TDC-22-1456, 2024 WL 556230, at *3 (D. Md. Feb. 12, 2024) (Chuang, J.) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)); *accord Martinez v. Amazon.com Servs. LLC*, No. CV 22-00502-BAH, 2024 WL 4817214, at *7 (D. Md. Nov. 18, 2024) ("Plaintiff need not demonstrate at this stage that the claims are meritorious; it is sufficient that Plaintiff raises common issues of legal viability.").

Plaintiffs seeking class certification must satisfy two inquiries.  *First*, Plaintiffs must demonstrate each of the following under Federal Rule of Civil Procedure 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

*Second*, to certify an injunctive relief class under Rule 23(b)(2), Plaintiffs must establish that "the party opposing the class has acted or refused to act on grounds that apply generally to the

class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the . . . remedy warranted." *Dukes*, 564 U.S. at 360 (internal quotation marks and citation omitted).

## V.     <u>ARGUMENT</u>

Plaintiffs seek to certify the following Class under Rule 23(b)(2):

> All persons who, between January 20, 2025 through the present (the "Class Period"), worked at any time as employees of USAID, including as personal services contractors; specifically excluded from this class are Defendants or any other person who, during the Class Period, acted as Administrator or Deputy Administrator of USAID.

As detailed below, Plaintiffs' proposed Class, which has thousands of geographically dispersed members who have all similarly suffered as a result of Defendants' unconstitutional course of conduct, meets the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. The proposed Class also satisfies Rule 23(b)(2)'s requirement that Defendants "acted or refused to act on grounds" that apply to the proposal Class "as a whole." Fed. R. Civ. P. 23(b)(2). Finally, to the extent that ascertainability is a factor in the Court's analysis,[6] the proposed Class is ascertainable through "objective criteria," *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014), as all members are currently or formerly employed by Defendant USAID and thereby identifiable through USAID employment records. Plaintiffs therefore respectfully request the Court certify the proposed Class.

---

[6] In damages actions, the Fourth Circuit has "recognized an implicit requirement in 23(b)(1) and 23(b)(3) cases that members of a proposed class be 'readily identifiable,'" but that "courts of appeals have consistently declined to impose an ascertainability requirement in 23(b)(2) cases requesting that a party be enjoined from certain actions." *Kadel v. Folwell*, 100 F.4th 122, 160 (4th Cir. 2024) (quoting *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014)).

### A. **Plaintiffs Satisfy Rule 23(a) Factors**

#### 1. **The Proposed Class Is Sufficiently Numerous.**

Plaintiffs must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although "numbers alone are not controlling," *Ballard v. Blue Shield of S.W. Va., Inc.*, 543 F.2d 1075, 1080 (4th Cir. 1976), the Fourth Circuit has stated that "a class as large as 74 persons is well within the range appropriate for class certification," *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984); *see also In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) ("'[A] class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.'") (quoting 1 Newberg on Class Actions § 3:12 (5th ed. 2021). Additionally, "Plaintiffs need not know the exact size of the class but where general knowledge and common sense would indicate that it is large, the numerosity requirement is satisfied." *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 556 (D. Md. 2006). As of January 20, 2025, USAID employed between 5,500 and 10,000 people throughout the United States and internationally, rendering joinder of all Class members impractical. Amend. Compl. ¶ 25; *see also* Emily M. McCabe, CONG. RESEARCH SERV., IF10261, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT: AN OVERVIEW at 1 (updated Mar. 14, 2025). Thus, the proposed Class easily satisfies the numerosity requirement.

#### 2. **There Are Common Questions of Law and Fact.**

The proposed Class satisfies Rule 23's commonality requirement because its members have suffered the same legal wrongs based on the same unconstitutional course of conduct by Defendants. Class certification is appropriate where there are "'questions of law or fact common to the class,' which are capable of classwide resolution, such that the determination of the truth or falsity of the common issue 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Amaya*, 326 F.R.D. at 447 (quoting Fed. R. Civ. P. 23(a)(2)). The rule

requires that class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution." *Dukes*, 564 U.S. at 350. "What matters to class certification" is "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotation marks and citation omitted). Even where there may be factual differences among class members, that "do[es] not preclude certification because 'the class members share the same legal theory.'" *Bulmash v. Travelers Indem. Co.*, 257 F.R.D. 84, 88 (D. Md. 2009) (quoting *Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492, 498 (D. Md. 1998)). Indeed, "[m]inor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law, so long as the common question is one that can be resolved for each class member in a single hearing." *Martinez*, 2024 WL 4817214, at *6 (cleaned up).

Here, Plaintiffs' claims focus *entirely* on Defendants' course of conduct that caused the common, class-wide injuries. Commonality is thus established by the common questions of law and fact related to Defendants' alleged constitutional abuses, including, but not limited to:

- Whether Defendant Musk unlawfully acted as an "Officer" pursuant to the Appointments Clause of the U.S. Constitution in his exercise of significant decisionmaking authority concerning USAID, despite not being nominated by President Trump or confirmed by the Senate, *see* Amend. Compl. ¶¶ 130-32;

- If indeed Defendant Musk exceeded his constitutional authority, which decisions were affected, *cf.* Mem. Op. at 65;

- If indeed Defendant Musk exceeded his constitutional authority, the proper remedy to sufficiently root out the taint of improper decision making, *see* Amend. Compl. ¶ 141;

- Whether Defendants' collective actions to dismantle USAID, a congressionally created independent agency that is provided for with direct appropriations that have specific conditions, without congressional authorization violates Separation of Powers principles, s*ee id*. ¶¶ 134-38;

- Whether DOGE itself, as structured and implemented, operates beyond the bounds of any proper executive power and violated Separation of Powers principles, including by embedding itself into USAID and other federal agencies and wielding significant, coercive power, *see id*. ¶ 139;

- If indeed Defendants violated Separations of Powers in any or all of its actions to dismantle USAID, the proper remedy, s*ee* Amend. Compl. ¶ 141.

Because this "class-wide proceeding [will] generate common answers" to these core questions, which are "apt to drive the resolution of the litigation," class certification is appropriate. *Dukes*, 564 U.S. at 350 (cleaned up) (emphasis removed). Plaintiffs allege, and the record to date supports, that Defendants Musk and DOGE took agency-wide actions without proper authority, affecting every Class member, and that Defendants have officially announced their intention to shutter the entire agency. *See, e.g.*, Amend. Compl. ¶¶ 59-90 (describing Defendant Musk and DOGE's infiltration and takeover of the agency's physical and digital assets, and public defamatory remarks, including calling the class a "ball of worms"); *id.* ¶¶ 120-21 (Defendant Lewin describing the imminent final "decommissioning of USAID assets and the wind-down of the Agency's independent operations," including terminating all but 15 positions). These actions are equally at the core of each Class member's claims, and all that remains is for the Court to "determin[e] the truth or falsity of [those] common issue[s]." *Amaya*, 326 F.R.D. at 447. Plaintiffs satisfy the commonality requirement.

### 3.    Plaintiffs' Claims are Typical of the Class.

Plaintiffs satisfy Rule 23's typicality requirement for similar reasons.  *Cf. Mitchell-Tracey*, 237 F.R.D. at 557 ("The considerations involved in determining whether plaintiffs meet the commonality, typicality and adequacy of representation prongs. . . are similar and overlapping.") (citing *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). To satisfy typicality, "the class representative's claim and defenses must be 'typical of the claims or defenses of the class' in that prosecution of the claim will 'simultaneously tend to advance the interests of the absent class members.'"  *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 5593338, at *13 (D. Md. Sept. 18, 2020) (Chuang., J.) (first quoting Fed. R. Civ. P. 23(a)(3); then quoting *Dieter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)).   Typicality does not require that "the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned," *Dieter*, 436 F.3d at 467, but rather "measures the extent to which the named plaintiffs' interests in the litigation are aligned with the interests of the class," *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 362 (D. Md. 2004).  "'The essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so go the claims of the class.'"  *Goodlaxson v. Mayor & City Council of Baltimore*, No. CV JKB-21-1454, 2025 WL 90034, at *4 (D. Md. Jan. 13, 2025) (quoting *Deiter*, 436 F.3d at 466).

Typicality, like the other Rule 23(a) factors, is not a close call here.  The same course of conduct that injured the Plaintiffs injured all members of the proposed Class: Defendants' unconstitutional actions culminated in the effective dismantling of USAID, including the funding freeze and eventual termination of 5,200 contracts—totaling **approximately 83%** of USAID's programming—and termination, administrative leave, and reductions in force of **approximately 90%** of USAID personnel.  *See* Amend. Compl. ¶¶ 96-97, 116, 126; Mem. Op. at 38-40, 48-49. Further, Defendants Musk and DOGE have subjected Plaintiffs and all members of the proposed

Class to unauthorized access to and control over their sensitive agency systems, including personnel, payment, and communication systems, as well as derogatory public comments imposing dignitary harm. *See* Ex. 4, Decl. of J. Doe 4, ¶ 11, J.R. 00020; Ex. 1, Decl. of J. Doe 7, ¶ 11, J.R. 00005; Ex. 3, Decl. of J. Doe 22, ¶ 10, J.R. 00015; Ex. 2, Decl. of J. Doe 27, ¶ 11, J.R. 00010; Ex. 5, Decl. of J. Doe 28, ¶ 13, J.R. 00025; Ex. 6, Decl. of J. Doe 29, ¶ 10, J.R. 00030; Amend. Compl. ¶¶ 46, 62, 64, 91; Mem. Op. at 57-61.

Defendants' unconstitutional actions to "feed[ ] USAID to the woodchipper" directly injured Plaintiffs and all Class members in the same ways. Accordingly, the claims arise from the same course of conduct and Plaintiffs and Class members are not subject to any unique defenses. *Cf. Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 188 (D. Md. 2003) ("The typicality requirement is met if the claims of the named plaintiffs arise from the same event or practice or course of conduct that gives rise to the claims of other class members.") (internal citations, alterations, and quotation marks omitted). Here, "plaintiffs meet the typicality requirement for the same reason that they meet the commonality requirement—the relief sought would benefit all class members in an identical manner." *Harris v. Rainey*, 299 F.R.D. 486, 490 (W.D. Va. 2014).

**4.** **Plaintiffs and Proposed Class Counsel Adequately Represent the Class.**

Courts engage in two inquiries when evaluating whether the adequacy requirement of Rule 23(a)(4) is satisfied: (1) whether the named plaintiffs "'fairly and adequately protect the interests of the class' without a conflict of interest with the absent class members," *Coreas*, 2020 WL 5593338 at *14; and (2) whether class counsel is "qualified, experienced, and capable," *Boyd v. Coventry Health Care, Inc.*, 299 F.R.D. 451, 459 (D. Md. 2014).

*First*, the named Plaintiffs have no conflicts of interests with absent Class members because their interests are not antagonistic to one another. Indeed, as discussed above, Plaintiffs'

and absent Class members' claims rise and fall on the same questions of law and fact. Plaintiffs are committed to the vigorous prosecution of this action, as demonstrated by the original plaintiffs' (including three of the current Lead Plaintiffs) pursuit of the preliminary injunction and all Plaintiffs' commitment to zealously litigate this matter despite Defendants' clear patterns of retaliation against those who challenge the Trump administration. *See* Ex. 7, J.R. 00032 (News Articles Regarding Retaliation); Mem. in Supp. for Mot. To Proceed Under Pseudonyms, ECF No. 3-1 at 1-3, 5-7 (Feb. 13, 2025).

*Second*, Plaintiffs have retained highly qualified counsel with extensive experience litigating constitutional claims and complex class actions. Plaintiffs are represented by attorneys at State Democracy Defenders Fund, Marziani, Stevens & Gonzalez PLLC, and Lieff Cabraser Heimann & Bernstein, LLP. State Democracy Defenders Fund ("SDDF") is a pro-bono law firm—led here by seasoned litigators former United States Ambassador Norman Eisen and Tianna Mays—that has expertise litigating high profile matters in the democracy space and is regularly featured on national media outlets. *See* Ex. 8, Decl. of Norman Eisen, J.R. 00055. Marziani, Stevens & Gonzalez PLLC is a nationally recognized boutique firm that concentrates on election, civil-rights, and constitutional litigation; its partners, all counsel in this matter, have shepherded multiple high-profile matters through federal and state courts. *See* Ex. 9, Decl. of Elizabeth Stevens, J.R. 00061. Lieff Cabraser Heimann & Bernstein, LLP—represented here by named partner Richard M. Heimann—has recovered more than $124 billion for clients in scores of landmark class and MDL proceedings and is regularly appointed lead or class counsel. *See* Ex. 10, Decl. of Richard M. Heimann, J.R. 00069. Together, these firms possess the experience, subject-matter expertise, and resources necessary to vigorously prosecute this case on behalf of the proposed Class.

## B.  Plaintiffs Satisfy Rule 23(b)(2)

Rule 23(b)(2) authorizes class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  As noted, the fundamental focus of a Rule 23(b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted." *Dukes*, 564 U.S. at 360 (internal quotation marks and citation omitted).  And actions "alleging systemic administrative failures of government entities," as here, "are frequently granted class action status under Rule 23(b)(2)." *Shakhnes ex rel. Shakhnes v. Eggleston*, 740 F. Supp. 2d 602, 628 (S.D.N.Y. 2010) (collecting cases), *aff'd in part, vacated in part on other grounds sub nom. Shakhnes v. Berlin*, 689 F.3d 244 (2d Cir. 2012); *see also Goodlaxson*, 2025 WL 90034, at \*5; *see also D.V.D. v. U.S. Dep't of Homeland Sec.*, No. CV 25-10676-BEM, 2025 WL 1142968, at \*19 (D. Mass. Apr. 18, 2025) ("In sum, Plaintiffs challenge a policy or practice that impacts all putative class members . . . .  In doing so, Plaintiffs seek injunctive and declaratory relief that applies to the class as a whole, satisfying Rule 23(b)(2)."); *see also Scholl v. Mnuchin*, 489 F. Supp. 3d 1008 (N.D. Cal. 2020) ("Plaintiffs assert that Rule 23(b)(2) is met [ ] because defendants implemented a generally applicable policy of denying CARES Act payments to incarcerated persons. . . . The court agrees with plaintiffs that defendants' policy is generally applicable to the class as a whole.").

Here, Defendants' misconduct injured the Class as a whole and gives rise to the constitutional claims brought in this lawsuit.  Plaintiffs' requested remedies, in turn, are wholly focused on declaratory and injunctive relief, and aimed at stopping and reversing the unconstitutional actions by Defendants.  Thus, "declaring the [Defendants' actions] invalid and preventing the defendants from requiring [ ] implementation" of their unconstitutional decisions will "'provide the same relief to all class members.'" *Planned Parenthood of Maryland, Inc. v.*

*Azar*, No. CV CCB-20-00361, 2020 WL 3893241, at *7 (D. Md. July 10, 2020) (quoting *Healthy Futures of Texas v. Dep't of Health & Human Servs.*, 326 F.R.D. 1, 8 (D.D.C. 2018)); *see also Lyon v. U.S. Immigr. & Customs Enf't*, 308 F.R.D. 203, 214 (N.D. Cal. 2015) (certifying a Rule 23(b)(2) class where "Plaintiffs do not seek individualized relief for each class member, but rather ask for systemic changes consistent with a single overarching constitutional standard that will be applicable to all class members"); *Coreas*, 2020 WL 5593338, at *15 (rejecting the defendants' argument against certification that "different subsets of putative class members may be entitled to relief where others would not" because "there is available relief that would benefit the entire class or an entire subclass") (internal quotation marks omitted).

### 1. <u>Classwide Relief to Vindicate Separation of Powers Claims</u>

This Court already recognized that "[t]he record demonstrates that Defendants, as well as other government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency," likely in violation of Separation of Powers doctrine. Mem. Op. at 37. Accordingly, at its broadest, Plaintiffs' requested remedy would be to stop and reverse these efforts to unlawfully shut down, dismantle, and eliminate USAID. Specifically, Plaintiffs seek: (1) a declaration that the Defendants' actions to modify, reorganize, and eliminate USAID (including its bureaus, departments, offices, and subdivisions) are unlawful; (2) an injunction to set aside those actions; and (3) an injunction prohibiting Defendants from taking further actions that constitute unlawful dismantling of USAID unless and until specifically authorized to do so by Congress. Amend. Compl. ¶ 141.

As a practical matter, Defendants have taken several categories of actions in pursuit of their "Final Mission," as Defendant Lewin coined it. All of these actions have been felt across the entire proposed Class, including:

- **The systematic reduction of the USAID workforce, across hiring mechanisms, in an effort to paralyze USAID's ability to function**, s*ee, e.g.*, Mem. Op. at 38 ("The dismantling of USAID has included the elimination or sidelining of almost its entire workforce."); ECF No. 106-1 (Defendant Lewin's "Final Mission" email, focused on personnel reductions); *see also* Amend. Compl. ¶¶ 69, 85, 109, 120;

- **The elimination of USAID grants and contracts across the international development ecosystem, effectively halting substantially all programmatic work**, Mem. Op. at 39 ("The shutdown activities have also included termination of contracts and grants."); Amend. Compl. ¶¶ 97-100, 113, 116-117;

- **The physical shutdown of USAID headquarters, including removing agency plaques and releasing its office**, Mem. Op. at 9, 37; Amend. Compl. ¶¶ 71-90;

- **The ongoing control of USAID digital infrastructure and assets, severely disrupting USAID's ability to communicate, process payments, or engage in disaster response**, Mem. Op. at 39; Amend. Compl. ¶¶ 91-92, 110.  Indeed, a visitor to USAID.gov today sees none of the content historically available about the agency and its mission, but instead a "Notification of Administrative Leave" message that appears to be from February 2025.[7]

Defendants' collective actions violating the Separation of Powers by systematically taking USAID apart demonstrate they have acted "on grounds that generally apply to the class" such that granting final declaratory and injunctive relief is "appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Indeed, if allowed to finalize these actions, Defendants will succeed in wiping out the agency completely—utterly disregarding the expressly stated will of Congress.

---

[7] *See* Ex. 11, USAID.gov (last accessed April 30, 2025), J.R. 00186.

Conversely, relief from this Court to remedy these constitutional violations will benefit the entire proposed Class.

### 2. Classwide Relief to Vindicate Appointments Clause Claims

Although Plaintiffs' requested remedies for the Appointments Clause violations are narrower, the remedies also apply to all Class members. Plaintiffs request that the Court: (1) declare that Defendant Musk's activities at USAID violate the Constitution; (2) declare unlawful and set aside any actions taken at USAID by Defendant Musk, his DOGE subordinates, and any person working on behalf of or at the direction of Defendant Musk or DOGE; and (3) enjoin Defendant Musk and his DOGE subordinates from performing their significant and wide-ranging duties at USAID absent appointment. Amend. Compl. ¶ 141. Defendant Musk, himself and through the DOGE team he directs, has made significant and binding decisions affecting USAID. Particularly during the critical time period between January 30 and February 2, 2025, Defendant Musk appears to have exercised unilateral and unbridled discretion. *See* ECF No. 106 at 9-10. These decisions include, at least, shutting down USAID's headquarters, taking down USAID's website, gaining unfettered (and unlawful) root-level access to USAID data systems and digital infrastructure. *See, e.g.*, Mem. Op. at 28 ("Thus, based on the present record, the only individuals known to be associated with the decisions to initiate a shutdown of USAID by permanently closing USAID headquarters and taking down its website are Musk and DOGE Team Members."); *see also* Amend. Compl. ¶¶ 131-32. Declaring these decisions to be unconstitutional and unwinding them would benefit the entire proposed Class, as well as the greater public interest. *Cf.* Mem. Op. at 28 ("This record must be considered alongside the fact that Musk appears to have been involved in the shutdown of CFPB headquarters as well, and the evidence that shows or strongly suggests that Musk and DOGE, despite their allegedly advisory roles, have taken other unilateral actions without any apparent authorization from agency officials.")

In sum, given Defendants' concerted and ongoing actions to "feed[ ] USAID to the woodchipper," Amend. Compl. ¶ 87, and Plaintiffs' singular entreaty to stop and reverse Defendants' unconstitutional actions, the proposed Class satisfies the requirements of Rule 23(b)(2). *See Coreas*, 2020 WL 5593338, at *15 ("Because there is available relief that would benefit the entire class . . . Rule 23(b)(2) is satisfied."); *Shakhnes*, 740 F. Supp. 2d at 628 (certifying a Rule 23(b)(2) class alleging systemic administrative failures of a government entity, explaining "Defendants are thus alleged to have refused to act on generally applicable grounds, and final injunctive relief with respect to the class as a whole will likely be appropriate").

## VI.   <u>CONCLUSION</u>

For all of these reasons, Plaintiffs respectfully request that the Court grant the motion and certify the Class.


Respectfully submitted,

 */s/ Norman L. Eisen*
Norman L. Eisen [9112170186]
Tianna J. Mays [1112140221]
**STATE DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani*
Rebecca (Beth) Stevens*
Joaquin Gonzalez*
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway
Suite 102-402
San Antonio, TX 78218
Tel: (210) 343-5604

Richard M. Heimann*
Nicole M. Rubin (30711)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000


*Admitted pro hac vice*