**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

J. DOE 4, *et al.*,

                    Plaintiffs,

          v.                                               Civil Action No. 25-462-TDC

ELON MUSK, *et al.*,

                    Defendants.

**BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER**
**AS *AMICUS CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
miriam@theusconstitution.org

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* Constitutional Accountability Center states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF *AMICUS CURIAE* .............................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................. 1

ARGUMENT ................................................................................................ 3

    I.    As Text and Structure Make Clear, the Constitution Vests Congress with the Exclusive Authority to Establish Offices "by Law" .................................. 3

    II.    Seeking to Break with the British Model and Stave Off Tyranny and Corruption, the Framers Separated the Power to Create Offices from the Power to Fill Them ............................................................................. 6

    III.    Unilateral Executive Establishment of an Office Is a Substantive Violation of the Appointments Clause, not an Exemption from the Clause .................... 12

CONCLUSION ............................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Buckley v. Valeo*,
424 U.S. 1 (1976) ................................................................................. 6, 14

*Does 1-26 v. Musk*,
No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ...................... 13

*Edmond v. United States*,
520 U.S. 651 (1997) .................................................................................. 6

*Freytag v. Comm'r*,
501 U.S. 868 (1991) ....................................................... 1, 3, 6, 9, 12

*INS v. Chadha*,
462 U.S. 919 (1983) .................................................................................. 5

*Landry v. FDIC*,
204 F.3d 1125 (D.C. Cir. 2000) .............................................................. 12

*Lucia v. SEC*,
585 U.S. 237 (2018) ........................................................................... 13, 14

*Morrison v. Olson*,
487 U.S. 654 (1988) .................................................................................. 6

*Myers v. United States*,
272 U.S. 52 (1926) .................................................................................... 5

*State v. Kennon*,
7 Ohio St. 546 (1857) .............................................................................. 15

*Trump v. United States*,
603 U.S. 593 (2024) ........................................................................... 6, 10

*Tucker v. Comm'r*,
676 F.3d 1129 (D.C. Cir. 2012) ........................................................ 13, 14

*United States v. Arthrex, Inc.*,
594 U.S. 1 (2021) ..................................................................................... 14

*United States v. Germaine*,
99 U.S. 508 (1878) ................................................................................... 14

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*United States v. Maurice*,
　26 F. Cas. 1211 (C.C.D. Va. 1823) (No. 15,747)........................................................ 2, 3, 11

*United States v. Midwest Oil Co.*,
　236 U.S. 459 (1915) ........................................................................................................ 5

*Weiss v. United States*,
　510 U.S. 163 (1994) ........................................................................................................ 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
　343 U.S. 579 (1952) ........................................................................................................ 5


CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1, cl. 1............................................................................................ 4

U.S. Const. art. I, § 6, cl. 2............................................................................................ 5

U.S. Const. art. I, § 7, cl. 2............................................................................................ 5

U.S. Const. art. I, § 8, cl. 18.......................................................................................... 6

U.S. Const. art. II, § 2, cl. 2 .......................................................................................... 1-4

U.S. Const. art. II, § 3 ................................................................................................... 5


STATUTES AND LEGISLATIVE MATERIALS

Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 ........................................................................ 11

An Act to Establish an Executive Department to Be Denominated the Department
　of War, ch. 7, 1 Stat. 49 (1789) ................................................................................. 10

An Act to Establish the Treasury Department, ch. 12, 1 Stat. 65 (1789) ..................... 10

Regency Act of 1705, 4 & 5 Ann. c. 8.......................................................................... 7

**TABLE OF AUTHORITIES – cont'd**

**Page(s)**

<u>BOOKS, ARTICLES, AND OTHER AUTHORITIES</u>

William Blackstone, *Commentaries on the Laws of England* ....................................... 7

Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*,
79 Cornell L. Rev. 1045 (1994) ............................................................... 7-9

Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*,
132 U. Pa. L. Rev. 741 (1984).................................................................. 5

The Declaration of Independence (U.S. 1776) ............................................. 9

The Federalist No. 69 (Clinton Rossiter ed., 1961) ....................................... 2

John Jay, Address to the People of Great Britain (Sept. 5, 1774),
https://tinyurl.com/4kf3bx89 .................................................................. 8

David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485* (9th ed. 1969) ................................................................................... 7

Letter from George Washington to the Senate (Sept. 11, 1789),
https://tinyurl.com/y35f9mpt.................................................................. 11

Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* (2020) ................................................................ 7, 10

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* (Chicago, Callaghan & Co. 1890) .................................................................................. 15

*Officers of the United States Within the Meaning of the Appointments Clause*,
31 Op. O.L.C. 73 (2007) ........................................................................ 15

*The Records of the Federal Convention of 1787* (Max Farrand ed., 1911).................. 10

Robert J. Reinstein, *The Limits of Executive Power*,
59 Am. U. L. Rev. 259 (2009).................................................................. 7, 8

Thomas Pitt Taswell-Langmead, *English Constitutional History from the Teutonic Conquest to the Present Time* (4th ed. 1905) ............................................. 8

## TABLE OF AUTHORITIES – cont'd

**Page(s)**

*The Test for Determining "Officer" Status Under the Appointments Clause,*
41 Op. O.L.C. __ (2025) ........................................................................... 13

David S. Yellin, *The Elements of Constitutional Style: A Comprehensive Analysis of Punctuation in the Constitution,*
79 Tenn. L. Rev. 687 (2012) ..................................................................... 4

E. Garrett West, *Congressional Power over Office Creation,*
128 Yale L.J. 166 (2018) ........................................................................ 6, 8, 11

Gordon S. Wood, *The Creation of the American Republic 1776-1787* (1969) ............ 8, 9

## INTEREST OF *AMICUS CURIAE*

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to fulfilling the progressive promise of the Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and preserve the rights, freedoms, and structural safeguards that it guarantees, and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

According to Defendants, the fact that Elon Musk does not occupy an office "established by Law" is a *defense* to Plaintiffs' Appointments Clause claim. That gets it precisely backwards. The Executive's unilateral creation of Musk's office is a substantive *violation* of the Appointments Clause separate and apart from the fact that Musk was not appointed in accordance with the procedures that Clause mandates.

The text of the Appointments Clause makes this clear. The Clause prescribes two distinct requirements. First, except for offices created by the Constitution itself, all other offices of the United States "*shall* be established *by Law*." U.S. Const. art. II, § 2, cl. 2 (emphases added). Second, once Congress creates an office, the President may fill that office only "with the Advice and Consent of the Senate," unless Congress prescribes "by Law" a streamlined appointment process, available only for "inferior Officers." *Id.* Violation of either of those requirements is a violation of the Appointments Clause and the fundamental "principle of separation of powers . . . embedded in [it]." *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991).

The separation of the power to create offices from the power to fill them was born out of centuries of suffering under British rule. In seventeenth- and eighteenth-century England, the consolidation of these powers in the Crown was the chief source of corruption and patronage that plagued the British government. Over time, outrage with this system intensified on both sides of

1

the Atlantic—American colonists even cited the King's unilateral control over offices as a justification for the Declaration of Independence.

In rejection of the British model, all the early state constitutions vested the office-creation power in the legislature, and many also gave the legislature unilateral appointment authority. But before long, the Founders recognized that consolidation in the legislature of the power to create offices and to fill them posed nearly as many problems as consolidation of those powers in the executive. They thus separated these powers in the Appointments Clause. As Alexander Hamilton put it, by requiring that offices be "established by Law," U.S. Const. art. II, § 2, cl. 2, the Constitution provides "a great inferiority in the power of the President, in this particular, to that of the British king," who "not only appoint[ed] to all offices, but [could] create offices" as well. *The Federalist No. 69*, at 421 (Clinton Rossiter ed., 1961).

Defendants would write this check on executive power out of the Constitution, allowing the President to create as many offices as he likes and to fill them with individuals purely of his own choosing. In their view, when a President unilaterally creates a powerful office in derogation of the Appointments Clause's requirement that Congress establish offices "by Law," the office becomes *exempt* from scrutiny under that very constitutional provision.

Chief Justice Marshall rejected this circular reading of the Appointments Clause two centuries ago when he declared that the Appointments Clause's procedural requirements for the appointment process are not limited to only "those offices . . . established by law." *United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C.D. Va. 1823) (No. 15,747). Such a narrow interpretation of the Clause, Marshall reasoned, would "leav[e] it in the power of the executive . . . to create in all laws of legislative omission, such offices as might be deemed necessary for their execution, and

afterwards to fill those offices," and thus would be inconsistent "with the general spirit of the constitution, which seems to have arranged the creation of office among legislative powers." *Id.*

Controlling case law is consistent with *Maurice*. To be sure, the Supreme Court has frequently scrutinized the text of statutes establishing government positions to help determine whether the individuals filling those positions qualify as "Officers" within the meaning of the Constitution, but the Court has never held that the absence of a statutorily established office immunizes an officer from an Appointments Clause claim. That is because the Supreme Court has never grappled with the issue presented here: a double-barreled assault on *both* of the Appointments Clause's substantive requirements. The novelty of the Trump administration's violation of the Clause should give rise to close judicial scrutiny, not newfangled immunity.

## ARGUMENT

### I.    As Text and Structure Make Clear, the Constitution Vests Congress with the Exclusive Authority to Establish Offices "by Law."

"The structural principles embodied in the Appointments Clause do not speak only, or even primarily, of Executive prerogatives simply because they are located in Article II." *Freytag*, 501 U.S. at 880. Rather, the text of the Clause imposes important limits on executive authority by creating two distinct requirements. *First*, before a person may be appointed as an "Officer of the United States," Congress must create the office through the lawmaking procedures prescribed by the Constitution (unless the Constitution itself has already established the office). U.S. Const., art. II, § 2, cl. 2. *Second*, once Congress has created an office, the President may appoint someone to fill that office only with the advice and consent of the Senate, unless, in the case of an inferior officer, Congress—again, through the constitutionally prescribed lawmaking process—enacts a statute authorizing appointment by the President alone, by a federal court, or by the head of a department. *Id.* In light of these separate requirements, a court may find a substantive

Appointments Clause or separation-of-powers violation arising out of the President's unilateral creation of an office (the first requirement) without even reaching the question of whether the officer was appointed in accordance with the required procedures (the second requirement).

Examination of the text and structure of the Appointments Clause in context makes this clear:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and *all other Officers of the United States, whose Appointments are not herein otherwise provided for,* and *which shall be established by Law*: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

*Id.* (emphases added). The second-emphasized phrase, "which shall be established by Law," modifies, at a minimum, the first-emphasized phrase, "all other Officers of the United States[] whose Appointments are not herein otherwise provided for." It operates as a non-restrictive clause— meaning, a clause that provides additional information about those "other Officers of the United States. The drafters of the Constitution used this type of clause frequently to create mandates, *see* David S. Yellin, *The Elements of Constitutional Style: A Comprehensive Analysis of Punctuation in the Constitution*, 79 Tenn. L. Rev. 687, 723-25 (2012), such as in the Legislative Vesting Clause, which declares that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, *which shall* consist of a Senate and House of Representatives," U.S. Const. art. I, § 1, cl. 1 (emphasis added).

Indeed, the word "shall," as in "shall be established by Law," notably contrasts with the Inferior Officers Clause, which states that Congress "*may* by Law" provide for the appointment of inferior officers by "the President alone," the "Courts of Law," or "the Heads of Departments." U.S. Const. art. II, § 2, cl. 2 (emphasis added). Throughout the Constitution, "shall" conveys an

obligation, while "may" confers discretion. *See, e.g.*, Robert N. Clinton, *A Mandatory View of Federal Court Jurisdiction: A Guided Quest for the Original Understanding of Article III*, 132 U. Pa. L. Rev. 741, 782-86 & n.147 (1984) (cataloging the uses of "shall" and "may" in the Constitution). The juxtaposition of "shall" and "may" within the same Clause underscores the deliberateness of the Framers' choice to make the office-creation power exclusively Congress's. While the Framers were willing to delegate (though notably, only to Congress itself) the decision of whether to prescribe a streamlined appointment process for inferior officers, they left no room for discretion with respect to Congress's paramount and exclusive role in the office-creation process.

The two words "by Law" expressly trigger the Constitution's requirements for the lawmaking process, *see* U.S. Const. art. I, § 7, which must "be exercised in accord with [the] single, finely wrought and exhaustively considered, procedure" of bicameralism and presentment that the Framers selected, *INS v. Chadha*, 462 U.S. 919, 951 (1983). Thus, while the President can recommend that Congress create an executive office, U.S. Const. art. II, § 3, and he can veto a congressional effort to create one, *id.* art. I, § 7, cl. 2, he has no power to establish an executive office on his own, for the Constitution simply "does not confer upon him any power to enact laws," *United States v. Midwest Oil Co.*, 236 U.S. 459, 505 (1915); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) (the President's Article II powers "refute[] the idea that he is to be a lawmaker").

The Ineligibility Clause and the Necessary and Proper Clause underscore this point. The Ineligibility Clause provides that "[n]o Senator or Representative shall, during the Time for which he was elected, be appointed to any civil Office under the Authority of the United States, which shall have been created, or the Emoluments whereof shall have been encreased during such time." *Id.* art. I, § 6, cl. 2. The Clause contemplates that Congress will establish offices and "annex[] a compensation" to them, *Myers v. United States*, 272 U.S. 52, 128 (1926), and its express purpose

5

is to reduce the incentive for members of Congress to create offices with the hope of being appointed to them.  Meanwhile, the Necessary and Proper Clause grants Congress the exclusive power to "carr[y] into Execution" not only the "foregoing Powers" under Article I, Section 8, but also "all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."  U.S. Const. art. I, § 8, cl. 18.  By referencing the Vesting Clauses of Article II and Article III, this affirmative textual grant of congressional power authorizes Congress to pass laws "augmenting and channeling the powers of the executive and judicial branches."  E. Garrett West, *Congressional Power over Office Creation*, 128 Yale L.J. 166, 177 (2018); *see Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (per curiam) (similar).  This in turn reinforces the structural principle that "*Congress* should be first among equals in the construction and definition of the federal government."  West, *supra*, at 178.

The President thus has no unilateral authority to create offices where Congress has not done so by statute.  The Constitution guards against "the danger" posed by such executive "aggrandiz[ement] [of] power at the expense of another branch," *Freytag*, 501 U.S. at 878, thereby ensuring that the Clause remains a "significant structural safeguard[] of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651, 659 (1997); *see Trump v. United States*, 603 U.S. 593, 650 (2024) (Thomas, J., concurring) ("[S]eparation of the powers to create and fill offices, is 'the absolutely central guarantee of a just Government' and the liberty that it secures for us all."  (quoting *Morrison v. Olson*, 487 U.S. 654, 697 (1988) (Scalia, J., dissenting))).

## II.    Seeking to Break with the British Model and Stave Off Tyranny and Corruption, the Framers Separated the Power to Create Offices from the Power to Fill Them.

**A.**  The textual "limitation on the President's power to create offices grew out of the Founders' experience with the English monarch."  *Id.* at 645.  In the seventeenth and eighteenth centuries, British Kings had used their royal prerogatives both to create government offices and to fill them,

all without the oversight of Parliament. *See* 1 William Blackstone, *Commentaries* \*272 ("[A]s the king may create new titles, so may he create new offices . . . ."). The result was the emergence of a royal patronage system with an overwhelming influence on "the conduct of politics in seventeenth- and eighteenth-century England." Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Separation of Personnel?*, 79 Cornell L. Rev. 1045, 1053 (1994). While a "whole generation of young men went to Parliament with the express purpose of making their fortunes by obtaining an office," the Crown exercised near-total control over the lawmaking process. *Id.* For instance, when a majority of the House of Lords did not support her foreign policy agenda, Queen Anne simply created and filled twelve new peers to effectively establish a majority supportive of her efforts. Robert J. Reinstein, *The Limits of Executive Power*, 59 Am. U. L. Rev. 259, 289 (2009).

After the Glorious Revolution, Parliament made several attempts to insulate itself and the judiciary from the corrupting influence of the King, *e.g.*, Regency Act of 1705, 4 & 5 Ann. c. 8 §§ 24, 25 (requiring ministers appointed from Parliament to stand for reelection), but none were especially successful, *see* Calabresi, *supra*, at 1056. Instead, the patronage system persisted for years because it arguably operated with "remarkable effect" and brought riches to England. David Lindsay Keir, *The Constitutional History of Modern Britain Since 1485*, at 297 (9th ed. 1969).

That all changed, however, with the "disastrous results" of George III's reign. Reinstein, *supra*, at 291. By the time of George III's ascent, nearly 200 members of the House of Commons enjoyed separate offices under the Crown. Michael W. McConnell, *The President Who Would Not Be King: Executive Power Under the Constitution* 153 (2020). Through "his meddlesome energy and restless activity in regulating every affair of State from the greatest to the least, combined with a resolute obstinacy in enforcing his own views against the opinions of his Constitutional advisers,

[George III] succeeded in alienating the affections of his people" and in "reducing the nation from prosperity to the depths of adversity." Thomas Pitt Taswell-Langmead, *English Constitutional History from the Teutonic Conquest to the Present Time* 723 (4th ed. 1905).

Before long, "[a]ll of the parties in England understood that the appointment, removal, and related prerogatives were the source of the King's power," as well as all the abuses attendant to it. Reinstein, *supra*, at 291. The opposition in England grew swiftly and vocally. People were "disgusted by the amount of corruption in the government and . . . fearful of the concentration of power in the Crown," which they "saw as destroying the necessary balance of powers in the British Constitution and violating [their] liberties." *Id.*

**B.** This outrage made its way across the Atlantic and "left an indelible impression on American memories." Calabresi, *supra*, at 1057. At the same time, the Royal Governors of the colonies were "unrestrained in their ability to wield the 'insidious and powerful weapon' of patronage to buy support for the Crown." *Id.* (quoting Gordon S. Wood, *The Creation of the American Republic 1776-1787*, at 143 (1969)). John Jay wrote of these officials: "We might tell of dissolute, weak, and wicked governors having been set over us; . . . of needy and ignorant dependants on great men advanced to the seats of justice, and to other places of trust and importance." John Jay, Address to the People of Great Britain (Sept. 5, 1774), https://tinyurl.com/4kf3bx89 [Ex. A].

Alongside their fears of this growing "artificial inter-colonial aristocracy," Wood, *supra*, at 111, the colonists worried that consolidation of the power to create offices and the power to fill them had created an unbalanced structure of power in the colonies whereby the legislatures were wholly dependent on the executive branch, *see* West, *supra*, at 194; Calabresi, *supra*, at 1055-57. Governors of the colonies had "used their power to influence and control the other parts of the constitution" by "appointing [representatives] to executive or judicial posts, or by offering them

opportunities for profits through the dispensing of government contracts and public money."
Wood, *supra*, at 156-57. This grievance justified the colonists' call for independence: the King
had "erected a multitude of New Offices, and sent hither swarms of Officers to harass our people,
and eat out their substance." The Declaration of Independence para. 12 (U.S. 1776).

Early state constitutions thus took pains to limit executive power with respect to office-
creation and appointment. Every single state constitution vested the power to create offices in a
multimember legislative body. Calabresi, *supra*, at 1058. Most states also granted their legisla-
tures the appointment power, at least with respect to the highest offices, Wood, *supra*, at 148 n.41
(citing Delaware and Virginia as examples), while others kept the appointment power separate
from the office-creation power by vesting the former in the executive branch, *id.* (citing Maryland
and Pennsylvania as examples).

Giving the legislature the power both to create offices and to fill them was not without its
own problems. The same corruption that had resulted from consolidation of those powers in the
Crown took root anew in the fledgling states, becoming "the principal source of division and fac-
tion" within them. Wood, *supra*, at 407; *see, e.g.*, *Weiss v. United States*, 510 U.S. 163, 184 (1994)
(Souter, J., concurring) (describing the combination of both powers in the legislative branch as an
"overcorrection"); *Freytag*, 501 U.S. at 904 (Scalia, J., concurring in part and concurring in the
judgment) ("The Framers' experience with post revolutionary self-government had taught them
that combining the power to create offices with the power to appoint officers was a recipe for
legislative corruption.").

Thus, when the delegates gathered in Philadelphia to draft a new Constitution, they "could
draw on their experiences with two flawed methods of appointment." *Weiss*, 510 U.S. at 184
(Souter, J., concurring). The answer was a middle ground: the separation of the power to create

offices from the power to fill them, along with a default method of appointment that would involve both the legislative and executive branches.

Though the structuring of the appointment power itself was the subject of significant debate at the Convention, the idea that the power to *create* offices would be vested in Congress was un-controversial. Indeed, there was no record of *any* delegate advocating for the British system of executive creation of offices. When the Committee of Detail's first draft omitted the "established by Law" language, James Madison and Charles Pinckney suggested the Necessary and Proper Clause be amended to give Congress the power to "establish all offices." 1 *The Records of the Federal Convention of 1787*, at 344-45 (Max Farrand ed., 1911). The amendment was rejected, but only because others "urged that [it] could not be necessary," as it was already implicit in the structure of the Constitution. *Id.* at 345. Ultimately, however, the substance of Madison's proposal was adopted in the Committee of Style, which added the phrase "and which shall be established by law" to the Appointments Clause. *Id.* at 628. The result was a "double-barreled repudiation of any presidential prerogative power to create offices." McConnell, *supra*, at 154.

**C.** Early American practice and precedent by all three branches of government reflected the collective understanding that Congress must create offices by law before individuals wielding significant government authority reserved for officers could be appointed to them. The First Congress "routinely and explicitly created offices by statute." *Trump*, 603 U.S. at 646-47 (Thomas, J., concurring); *see, e.g.*, An Act to Establish an Executive Department to Be Denominated the Department of War, ch. 7, §§ 1-2, 1 Stat. 49, 49-50 (1789) (establishing offices of the Secretary of War and his Chief Clerk); An Act to Establish the Treasury Department, ch. 12, § 1, 1 Stat. 65, 65 (1789) (establishing offices of the Treasury Secretary, the Comptroller, and others).

And President Washington made it his practice to appoint officers only after their offices had been created by acts of Congress. West, *supra*, at 189. For instance, despite being in regular communication with Alexander Hamilton about government matters early in his term, Washington waited to nominate Hamilton as Treasury Secretary until shortly *after* Congress had passed a law creating the office. *See* Act of Sept. 2, 1789, ch. 12, 1 Stat. 65 (establishing Treasury Department); Letter from George Washington to the Senate (Sept. 11, 1789), https://tinyurl.com/y35f9mpt [Ex. B] (nominating Hamilton as Treasury Secretary nine days after Congress created the office).

Not long thereafter, Chief Justice Marshall reaffirmed the exclusive commitment of the office-creation authority to Congress in the first ever judicial interpretation of the Appointments Clause. *See Maurice*, 26 F. Cas. at 1213-14. In deciding whether James Maurice, appointed by the Secretary of War to perform the "important duties" of "a purchasing quartermaster, commissary, and paymaster" should be deemed an "Officer" within the meaning of the Appointments Clause, Marshall grappled with two possible interpretations of the Clause. *Id.* at 1214. Under the first, the Appointments Clause would contain two distinct requirements: (1) that "all offices . . . shall be established by law," and (2) "that the president shall nominate, and by and with the consent of the senate, appoint to all offices of the United States, with such exceptions only as are made in the constitution." *Id.* at 1213. Under the second, the method of appointment of officers prescribed by the Appointments Clause would apply to "those offices only which might be established by law." *Id.* This extraordinarily narrow second reading permitted circumvention of the Appointments Clause through unilateral executive creation of an office—meaning a person wielding the authority of an "Officer of the United States" would be exempt from the requirements of the Appointments Clause if there were no statute creating his office.

11

Marshall rejected the second reading as inconsistent "with the general spirit of the consti-

tution," and instead adopted the first reading, concluding that the Clause contained two distinct

requirements: congressional-office creation, and presidential adherence to the proper method of

appointment. *Id.* Ultimately, he declared that "*[i]f* . . . [Maurice] be an officer of the United States,

in the sense in which that term is used in the constitution," *then* "his office ought to be established

by law," *id.* at 1214 (emphasis added), making clear that the inquiry into whether a person is an

officer subject to the Appointments Clause is separate from the inquiry into whether that person's

office is established by law.

## III.    Unilateral Executive Establishment of an Office Is a Substantive *Violation* of the Appointments Clause, not an *Exemption* from the Clause.

In repudiation of this text and history, Defendants characterize Plaintiffs' acknowledge-

ment that Musk does not occupy an office created by law as a "concession[]" that is "fatal to

Plaintiffs' Appointments Clause claim."  MTD at 22, ECF. No. 110-1.  In Defendants' view, be-

cause Congress did not create the office of DOGE Administrator, Musk cannot possibly be an

officer subject to the Appointments Clause's requirements.  This is precisely the circular interpre-

tation of the Clause that Justice Marshall rejected two centuries ago.  It is equally wrong today.

None of the cases Defendants cite help them on this point.  In *Landry v. FDIC*, 204 F.3d

1125 (D.C. Cir. 2000), the D.C. Circuit mentioned in a passing parenthetical discussing the Su-

preme Court's decision in *Freytag* that whether an office is "established by Law" is a "threshold

trigger for the Appointments Clause."  *Id.* at 1133.  Notably, it was undisputed in both *Landry* and

*Freytag* that the putative officers in those cases occupied positions "established by Law."  *See*

*Freytag*, 501 U.S. at 881; *Landry*, 204 F.3d at 1133.  Thus, neither court had occasion to consider

whether a person might still be deemed an officer if his or her position were established by unilat-

eral executive order, or by *de facto* power bestowed by the President, rather than by statute.

12

It is thus no surprise that, subsequently, the D.C. Circuit expressly disclaimed the *Landry dictum* cited by Defendants. *See Tucker v. Comm'r*, 676 F.3d 1129, 1133 n.1 (D.C. Cir. 2012). Indeed, the Court noted "it would seem anomalous if the Appointments Clause were inapplicable to positions . . . merely because" Congress had not "formally created the positions." *Id.* at 1133. The only judge on the Fourth Circuit panel to address the merits of this issue agreed. *See Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *14 (4th Cir. Mar. 28, 2025) (Gregory, J., concurring only in the result) (finding "unavailing" Defendants' contention "that the lack of formal statutory or regulatory authority granted to Musk" should be "dispositive").

Similarly, in *Lucia v. SEC*, 585 U.S. 237 (2018), the Supreme Court had no occasion to address the question of whether a President violates the Appointments Clause's requirement of congressional establishment of offices when he unilaterally creates an office and bestows upon it significant government authority. Again, in *Lucia*, there was no question that the SEC's administrative law judges occupied offices established by law—all the parties "agree[d] on that point." *Id.* at 247; *accord The Test for Determining "Officer" Status Under the Appointments Clause*, 41 Op. O.L.C. __, slip op. at 3 n.2 (2025) (Supreme Court was "not focused" on the phrase "established by Law" in *Lucia* and subsequent cases). In other words, what sets this case apart from the majority of prior Appointments Clause cases is that Plaintiffs allege violation of *both* of the Appointments Clause's substantive requirements: the requirement that Congress create offices by law, and the requirement of Senate confirmation. As Defendants would have it, violation of the first requirement exempts them from application of the second. That cannot be.

To be sure, the Supreme Court has often examined the statute creating a putative office to assess whether a person is in fact an "Officer of the United States." After all, the first prong of the test for determining whether a person is an "Officer of the United States" asks whether a

government official's position embraces "duties [that are] continuing and permanent," *United States v. Germaine*, 99 U.S. 508, 511-12 (1878), so where there *is* a statute creating the position under scrutiny, the text of the statute may provide evidence of the continuing nature of the position in the same manner that the text of the Executive Order creating DOGE provides evidence of the continuing nature of Musk's position.  However, no case has ever held that a statute creating the position is *required* for the position to be continuing in the manner that the Appointments Clause contemplates for officers.

As for the second prong of the officer-status inquiry, again, the text of a statute establishing a government position may provide probative evidence of the significance of the government duties "exercis[ed]" by the holder of the position.  *Lucia*, 585 U.S. at 245 (quotation marks omitted). But the existence of a statute is not dispositive; rather, the "main criteria" are "(1) the significance of the matters resolved by the official[], (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions."  *Tucker*, 676 F.3d at 1133; *see also Lucia*, 585 U.S. at 245 (inquiry into "significant authority . . . focus[es] on the extent of power an individual wields in carrying out his assigned functions"); *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (conducting "an appraisal of how much power an [Administrative Patent Judge] *exercises*" to conclude that such judges are principal officers under the Appointments Clause (emphasis added)).

For instance, in *Buckley*, the Supreme Court analyzed the statutory powers conferred on Federal Election Commissioners who had not been appointed in accordance with the Appointments Clause.  424 U.S. at 137-39 (per curiam).  Noting that the statute "establish[ing]" the Commissioners' offices conferred "substantial powers," including the "discretionary power to seek judicial relief," the Court held that the Commissioners were officers.  *Id.* at 138.  But the Court did not treat the existence of a statute conferring substantial authority—as opposed to, say, presidential

delegation of substantial authority through an executive order or other means—as a *requirement* for officer status. It simply grappled with the evidence presented in the specific case before it. Thus, "as *Buckley* and many other authorities . . . recognize, the source of any such authority, and particularly any statutory delineation by Congress, will unavoidably help to determine whether an office exists," but the "authority of a public officer" may be attached to the office by other means, including even "'by common law as incidents to it.'" *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 118-19 (2007) (quoting Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 570, at 332 (Chicago, Callaghan & Co. 1890)).

At bottom, "[t]he Constitution requires an examination of 'the nature of the functions devolved upon' a position by legal authority, not the way or form in which they are devolved." *Id.* at 118 (quoting *State v. Kennon*, 7 Ohio St. 546, 558 (1857)). When the President unilaterally confers significant government authority on a continuing position sufficient to render it an office within the meaning of the Appointments Clause, he does so in derogation of that Clause and the fundamental separation-of-powers principles embedded in it.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion to Dismiss.

Dated: May 15, 2025                    Respectfully submitted,

/s/ Miriam Becker-Cohen
Elizabeth B. Wydra
Brianne J. Gorod
Miriam Becker-Cohen
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
miriam@theusconstitution.org

*Counsel for Amicus Curiae*

15

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Local Rule 105.12(c) because it does not exceed 15 pages, exclusive of the parts of the brief excluded by Local Rule 105.3.

I further certify that the attached *amicus* brief complies with the requirements of Local Rules 102.2, 105.1, 105.4, and 105.5, because it is double-spaced, in 12-point Times New Roman font, with one-inch margins, on 8 1/2" x 11" paper.

Executed this 15th day of May, 2025.

/s/ Miriam Becker-Cohen
Miriam Becker-Cohen

*Counsel for Amicus Curiae*