# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 4 *et al.*, *individually and on behalf of all others similarly situated*,

                       ***Plaintiffs***,

                       **v.**

ELON MUSK *et al.*,

                       ***Defendants***.

Case No. 8:25-cv-00462-TDC


# PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Introduction ......................................................................................................... 1

Argument ............................................................................................................. 2

I.    This Court Has Subject Matter Jurisdiction. ........................................... 2

    A.    Plaintiffs Have Standing to Sue. ................................................ 3

        1.    Plaintiffs are injured by unauthorized access to or disclosure of their private data. ......................................... 4

        2.    Plaintiffs suffered severe interruptions to their lives and livelihoods. ........................................................................... 5

        3.    Plaintiffs suffered cognizable reputational harm, and other dignitary harm. ................................................................. 7

    B.    Defendants Do Not Argue, and There Is No Colorable Argument, That the Court Lacks Jurisdiction Over Appointments Clause Claims or Claims by FSL Plaintiffs. ............................................. 7

    C.    The CRSA Does Not Preclude Civil Service Plaintiffs' claims. ............... 8

        1.    Plaintiffs' claims are not covered by the CSRA's plain language. ........................................................................... 9

            i.    Plaintiffs do not allege any "prohibited personnel practices." .......................................................... 11

            ii.    Plaintiffs do not allege any "adverse actions." ................ 12

        2.    Plaintiffs' claims are not channeled under a *Thunder Basin* analysis. ........................................................................... 15

            i.    Precluding the civil service Plaintiffs' claims would, "as a practical matter" deprive them from obtaining meaningful judicial review. .............................. 16

            ii.    Plaintiffs' broad structural constitutional claims are wholly collateral to any individualized administrative review process. ............................. 19

            iii.    Plaintiffs raise only "standard issues of constitutional law" unrelated to "considerations of agency policy." ....... 21

            iv.    Defendants' reliance on AFSA is misplaced. .................. 22

D.   The CDA and Tucker Act Do Not Preclude PSC employees' claims. .................................................................................... 24

E.   Defendants' Inchoate Reference to Claim Splitting is Misplaced. ........... 26

II.   Plaintiffs Properly Plead Their Constitutional Claims .......................................... 27

A.   Plaintiffs Properly Allege an Appointments Clause Claim. .................... 28

1.   The Complaint Sufficiently Alleges that Defendant Musk is an "Officer." ............................................................................ 28

i.   Naming Secretary Rubio and Defendant Lewin is Immaterial .......................................................... 30

ii.   Defendant Musk's authority exceeds an advisory role. ............................................................................ 32

2.   Defendant Musk occupies a continuing position. ......................... 32

B.   Plaintiffs Allege a Cognizable Separation-of-Powers Claim Against all Defendants. .......................................................................... 33

III.   Plaintiffs' Claims Against the President Need Not be Dismissed. ....................... 35

# INTRODUCTION

This Court has already considered the merits of Plaintiffs' constitutional arguments at length and determined that they are likely to succeed on both their claims. See generally Memorandum Opinion at 3, ECF No. 73 (March 18, 2025) ("Mem. Op.") at 24-53. Though the Fourth Circuit panel stayed the preliminary injunction pending appeal, one judge indicated agreement on the underlying merit arguments, while two judges indicated Plaintiffs might succeed if allowed to develop the record, implying at least that Plaintiffs' claims are not implausible as a matter of law. See Order at 9, ECF No. 88 ("Stay Order"). ("[N]one of this is to say that plaintiffs will not be able to develop evidence of unconstitutional conduct as the case progresses. . . . Our holding is merely that, at this time, the record does not support the district court's finding of a likelihood of constitutional violations."). Thus, the sufficiency of Plaintiffs' constitutional claims to survive a motion to dismiss is not in serious doubt.

Understanding this, Defendants instead lean into challenging subject matter jurisdiction on two main grounds—namely, that Plaintiffs lack standing and that their claims are channeled into administrative review processes that preclude this Court's review. MTD at 6. But it cannot seriously be argued that Plaintiffs lack standing to bring their Appointments Clause claim against Defendants Musk and DOGE or their Separations of Powers claim against all Defendants.[1] After all, it is uncontested that Defendants are working to eliminate the independent agency to which Plaintiffs dedicated years of service, which gives rise to the plethora of particularized injuries Plaintiffs have voluminously described.

Defendants invoke the Civil Service Reform Act ("CSRA") as a talisman that would preclude federal courts from ever reviewing any dispute "between employees and the federal

---

[1] In fact, this Court already found that Plaintiffs J. Doe 4, J. Doe 7, J. Doe 22 likely have standing to bring their constitutional claims against Defendants Musk and DOGE. Mem. Op. at 24.

government," MTD at 9, or ever issuing injunctive relief to remedy "structural constitutional" violations before such relief is "too late to be meaningful." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023). But this attempt fails on several grounds. Even if Defendants' broad interpretation of CSRA were correct, it has no application here. First, Plaintiffs do not understand Defendants to be arguing that the Appointment Clause claims against Defendants Musk and DOGE are channeled, nor could they given Defendants Musk's and DOGE's relationship to the Plaintiffs. Second, Defendants ignore a main USAID hiring classification—Foreign Service Limited ("FSL") personnel—which is not subject to either the CSRA or Contract Disputes Act ("CDA"). Third, Defendants fail to provide any analysis of the CSRA's statutory text or identify which specific provisions they claim have preclusive effects. Doing so reveals that Plaintiffs do not even challenge CSRA-covered actions. Similarly, Plaintiffs do not bring contract claims or damages claims against the United States that would be subject to the CDA or Tucker Act. Finally, the CSRA statutory scheme does not "display[] a 'fairly discernible' intent to limit jurisdiction" over Plaintiffs' claims which are based on the "structural protections" of the Appointments Clause and Separation of Powers violations. *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 489, 501 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)).

## ARGUMENT[2]

### I. This Court Has Subject Matter Jurisdiction.

We begin with standing given the importance of Plaintiffs' claims and injuries to understanding why channeling concerns pose no barrier. Plaintiffs agree with Defendants that

---

[2] This Motion incorporates the factual allegations of Plaintiffs' Amended Complaint, ECF No. 93, as well as the additional facts provided in Plaintiffs' Motion for Class Certification and Memorandum of Points and Authorities in Support, ECF No. 111 ("Cert. Mot." or "Class Certification Motion"), and the accompanying exhibits. For ease, Plaintiffs cite to the Joint Record from that motion when incorporating the accompanying exhibits.

when considering a challenge to subject matter jurisdiction, courts may "consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *La Unión del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 389 (D. Md. 2018) (quoting *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999)); *see also* MTD at 6. As this Court recently explained:

> When a defendant asserts that facts outside of the complaint deprive the court of jurisdiction, the Court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." The court should grant a Rule 12(b)(1) motion based on a factual challenge to subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."

*MAO-MSO Recovery II, LLC, Series PMPI v. Gov't Emps. Ins. Co.*, No. CV TDC-17-0711, 2024 WL 2924063, at *4 (D. Md. June 10, 2024) (quoting *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d 187, 192 (4th Cir. 2009); *Evans*, 166 F.3d at 647).

### A. Plaintiffs Have Standing to Sue.

In a class action, standing is "based on the allegations of personal injury made by the named plaintiffs." At the pleadings stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018) (citations omitted). Thus, courts "accept as true the allegations for which there is sufficient factual matter to render them plausible on their face." *Id.* (internal quotation marks and citation omitted). Defendants point to facts outside of the Amended Complaint to argue Plaintiffs lack standing, *see, e.g.*, MTD at 18 (citing Marocco Declaration), 19 (citing Mem. Op.). Court may consider other "evidence outside the pleadings" to determine whether Defendants are "entitled to prevail as a matter of law" on their jurisdictional challenge. *MAO-MSO Recovery II*, 2024 WL 2924063, at *4.

Whether the Court considers only the allegations of the Amended Complaint or also evidence outside of the pleadings, Plaintiffs have standing to bring each of their claims. Plaintiffs provide detailed facts of the circumstances supporting their allegations of injury, *see, e.g.*, Amend. Compl. ¶¶ 59-127,[3] and corroborate these allegations in Plaintiffs' Class Certification Motion, *see* Cert. Mot. at 10, 12, 20-21, including with Plaintiff declarations. *See generally* ECF No. 111-1 at Ex. 1-6 (J.R. 00002-00031). Together, the pleadings and this additional evidence make clear that this Court has subject matter jurisdiction.

   1. **Plaintiffs are injured by unauthorized access to or disclosure of their private data.**

The Amended Complaint alleges in detail how Defendants Musk and DOGE obtained "complete administrative access" to USAID systems and headquarters in late January, allowing them unfettered, unauthorized access to Plaintiffs' personnel files, financial records, email accounts and other private data and information. *See* Amend. Compl. ¶¶ 62, 64, 76-80, 83-84. DOGE continues to have unauthorized access to and control over USAID digital infrastructure. *Id.* ¶¶ 91, 110-113. This unauthorized access to Plaintiffs' personally identifiable information, which flows from Defendants' constitutional violations but may also violate the Privacy Act and other statutes, *see* Amend. Compl. ¶ 127, has harmed Plaintiffs. For instance, in a declaration filed with their preliminary injunction motion, J. Doe 7 describes discovering that DOGE affiliates had access to their "personnel, medical, and security clearance files," which contain "extremely sensitive information" about J. Doe 7 and their family members, and being "extremely worried" about their unauthorized access. ECF No. 17-2, Ex. 5, Decl. of J. Doe 7 ¶ 15, J.R. 00239.

---

[3] Plaintiffs' allegations are a far cry from those in *Spokeo, Inc. v. Robins*. 578 U.S. 330 (2016) There, the Court opined that allegations of "a bare procedural violation" of a consumer protection statute would be insufficiently concrete. *See id.* at 342.

Particularly in light of federal statutory protections, Plaintiffs had a reasonable expectation that their personnel files and other sensitive records would be kept within USAID and in accordance with the law. As several courts recognized in analogous cases, Defendants Musk's and DOGE's unlawful access to protected, personally identifiable information harms Plaintiffs in a manner comparable to the common law tort of intrusion upon seclusion, and confers standing. Judge Ellen Lipton Hollander recently concluded that "[b]y enacting the Privacy Act, . . . Congress recognized, in general, that improper access to or disclosure of personally identifiable information—even to government employees—poses a harm to legitimate privacy interests." *Am. Federation of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. CV ELH-25-0596, 2025 WL 1206246, at *41 (D. Md. Apr. 17, 2025); *id*. at *27-43 (discussing privacy injuries and collecting authorities). Because of Plaintiffs' privacy interests, "[a]ccess to those records by unauthorized government officials intrudes into their private lives. This intrusion is not speculative; it is actual." *Am. Fed'n of Tchrs. v. Bessent*, No. CV DLB-25-0430, 2025 WL 895326, at *10 (D. Md. Mar. 24, 2025).

## 2. Plaintiffs suffered severe interruptions to their lives and livelihoods.

Each Plaintiff but one received the "Final Mission" email on March 28, 2025 and was given a last day of either July 1, 2025 or September 2, 2025 due to Defendants' collective efforts to unconstitutionally "wind-down [] the Agency's independent operations." Amend. Compl. ¶¶ 120-122.[4] Defendant Lewin *himself* explained that "[s]ubstantially all non-statutory positions at USAID will be eliminated," leaving only 15 positions left at USAID—necessarily implicating

---

[4] Plaintiff J. Doe 29 is the only exception, as their employment status was wholly unclear as of the filing of the Amended Complaint. *Id*. ¶ 9 & n.5. But that lack of clarity itself indicates injury. Confusingly, they never received any formal notification of whether or not their PSC contract was being renewed. While they are not now being paid by USAID, they retain access to USAID systems. ECF No. 111-1, Ex. 6, Decl. of J. Doe 29 ¶¶ 7-9, J.R. 00029 - J.R. 00030.

Plaintiffs and the Class members. *Id*. ¶¶ 120-121. The Amended Complaint also alleges in detail how, as a direct result of Defendants' unconstitutional conduct: Plaintiffs lost access to their personal email and other USAID systems, *id*. ¶¶ 83, 91; received various, sometimes conflicting, termination and/or stop-work notices, causing confusion and distress, *id*. ¶¶ 95, 109-112, 126;[5] were abruptly vacated from foreign counties, *id*. ¶ 98; and were suddenly shut out of their agency's headquarters while DOGE defendants searched their personal belongings. *Id*. ¶¶ 83, 86, 93. The Amended Complaint specifically alleges that the initial interruptions to Plaintiffs' employment were caused by the decisions of Defendant Musk in late January and early February made in violation of the Appointments Clause. *Compare* Amend. Compl. ¶¶ 59-90 *with* MTD at 17. Furthermore, Plaintiffs provided declarations with additional details about the interruptions to their employment, including the dates of their impending termination due to USAID's dismantling. *See* ECF No. 111-1, Ex. 4, Decl. of J. Doe 4, ¶ 10 (July 1), J.R. 00020; Ex. 1, Decl. of J. Doe 7, ¶ 10 (July 1), J.R. 00005; Ex. 3, Decl. of J. Doe 22, ¶ 8 (Sept. 2), J.R. 00014; Ex. 2, Decl. of J. Doe 27, ¶ 9 (July 1), J.R. 00010; Ex. 5, Decl. of J. Doe 28, ¶ 12 (July 1), J.R. 00025.

Plaintiffs' direct, concrete, specific, and ongoing harms are wholly unlike those Defendants point to in *Murthy v. Missouri*, 603 U.S. 43, 59 (2024). MTD at 17. In *Murthy*, the plaintiffs advanced vague "censorship injuries" to try to enjoin U.S. Government defendants for a variety of past content moderation decisions made by independent social media companies. *Id.* at 58-59. But without pointing to any ongoing pressure campaign, it was "entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the [state actors]." *Id.* at 69. Plaintiffs here allege ongoing injuries flowing from both Defendants Musk's and DOGE's

---

[5] As this Court previously noted, "Plaintiff J. Doe 22, a USAID employee stationed abroad in a high-risk area who has now been placed on administrative leave, no longer has home electricity, cell phone, and internet bills paid by USAID . . . ." MTD at 18.

unconstitutional exercise of authority and the larger effort to dismantle the agency. These can be remedied by setting aside previous unlawful actions and enjoining continuing ones.

**3. <u>Plaintiffs suffered cognizable reputational harm, and other dignitary harm.</u>**

The Amended Complaint describes multiple instances when Defendants, in the context of deleting Plaintiffs' agency, have publicly defamed and belittled Plaintiffs and the Class, claiming, for instance, that USAID is a "criminal organization" that should "die," "a ball of worms" that is "beyond repair," and that the "world will be better" without USAID. Amend. Compl. ¶¶ 88, 108 Moreover, "[i]n addition to being disrespected and humiliated, Class members have been left in a state of complete uncertainty as to their current status and are unable to properly plan for themselves and their families," as a direct result of Defendants' numerous attempts to variously place them on administrative leave, shut them off from agency communication, and/or terminate their employment. Amend. Compl. ¶ 122. Courts within the Fourth Circuit have found standing to challenge governmental actions that cause public reputational injuries as well as other dignitary injuries, such as humiliation and embarrassment. *See, e.g.*, *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (affirming irreparable injury when termination was "a particularly heinous brand of discharge" that "bears no relationship to their ability to perform [their] job[s]" and "compounded by stigma"); *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 709 (D. Md. 2018) (allowing case to proceed when student alleged "humiliation and embarrassment" due to school policy).

**B. Defendants Do Not Argue, and There Is No Colorable Argument, That the Court Lacks Jurisdiction Over Appointments Clause Claims or Claims by FSL Plaintiffs.**

Defendants did not previously challenge, and do not appear to contend that Plaintiffs' Appointments Clause claim against Defendants Musk and DOGE—who are not and never were

Plaintiffs' employers—are channeled by the CSRA or CDA. Plaintiffs agree. This Court has jurisdiction to address the Appointments Clause claims. *See generally*, *Axon*, 598 U.S. 175.

Moreover, named Plaintiffs represent four types of hiring classifications: civil service, Foreign Service Officer ("FSO"), Personal Service Contractor ("PSC"), and Foreign Service Limited ("FSL"). *See* Cert. Mot. at 4-5. Plaintiffs J. Doe 4 and J. Doe 28 are FSL employees appointed under the Foreign Service Act of 1980, *see* ECF 111-1, Ex. 4, Decl. of J. Doe 4, J.R. 00017; *id.*, Ex. 5, Decl. of J. Doe 28, J.R. 00022. They may be "terminate[d] at any time," 22 U.S.C.A. § 4011, and have no rights of appeal. *Coster v. United States*, 485 F.2d 649, 651 (Ct. Cl. 1973) (holding FSL employee "was subject to termination at any time by the Secretary of State without prior notice and without a right of appeal"). Any rights are governed by agency policy, which mirrors the statutory law, allowing for termination "[w]hen the need no longer exists for the employee's service" as well as other reasons. USAID, ADS ch. 450, Termination of Time-Limited Appointments (Oct. 1, 2023). The termination letters received by Plaintiffs state that the "need for your position no longer exists" and are thus allowable agency action not subject to any administrative challenge. Thus, federal courts are the only venue available for FSL Plaintiffs, and they face no channeling or other exhaustion concerns.

### C. The CRSA Does Not Preclude Civil Service Plaintiffs' claims.

This Court is not precluded from reviewing the civil service Plaintiffs' claims given that they do not challenge CSRA-covered personnel actions in the first place, nor are such broad structural constitutional claims the kind Congress intended to exclude from judicial review.

Under 28 U.S.C. § 1331, "district courts shall have original jurisdiction of all civil actions arising under the Constitution." "Not *may* have jurisdiction, but *shall*. Not *some* civil actions arising under federal law, but *all*." *Axon*, 598 U.S. at 205 (2023) (Gorsuch, J., concurring). As a general matter, "where Congress intends to preclude judicial review of constitutional claims its

intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Nevertheless, Congress sometimes precludes district court review "by specifying a different method to resolve claims about agency action," *Axon*, 598 U.S. at 185. In determining whether Congress has removed district court jurisdiction, courts ask two questions: (1) whether "the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction" and (2) whether "the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 207, 212).

Here, Defendants fail to meaningfully analyze *any* "statutory scheme," much less one that evinces a "fairly discernible intent to limit jurisdiction" over the challenged conduct. *Id.* Further, even if Plaintiffs' "structural constitutional challenges" did collaterally implicate some statutory scheme that limits jurisdiction for *some* types of claims, their claims are not of the type Congress intended to be reviewed in any preclusive statutory scheme, and "[e]ach of the three *Thunder Basin* factors signals that a district court has jurisdiction to adjudicate [Plaintiffs'] sweeping constitutional claims." *Axon*, 598 U.S. at 189, 195 (quoting *Carr v. Saul*, 593 U.S. 83, 92 (2021)).

### 1. Plaintiffs' claims are not covered by the CSRA's plain language.

Defendants' argument stumbles at the threshold—identifying and properly analyzing the correct statutory scheme. They fail to "begin" where they should, "with the CSRA's text and structure." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 370 (5th Cir.), *vacated as moot*, 144 S. Ct. 480 (2023). Had they done so, they would have found that the CSRA does not cover the civil service Plaintiffs' claims to begin with.

The CSRA does not "provid[e] the only means of judicial review of any actions affecting federal employees, but rather [it is] the only means of review as to the types of adverse personnel action specifically *covered* by the CSRA.'" *Bosco v. United States*, 931 F.2d 879, 883 (Fed. Cir. 1991). Consistent with that principle, "the Supreme Court has been clear that the CSRA eliminates

§ 1331 jurisdiction only for personnel actions covered by the CSRA" and "federal courts across the country have time and again held that the CSRA does not strip § 1331 jurisdiction when federal employees challenge something other than a CSRA-covered personnel action." *Feds for Med. Freedom*, 63 F.4th at 372; *cf. Elgin v. Dep't of Treasury*, 567 U.S. 1, 5 (2012) (applying CSRA preclusion only to "certain federal employees" directly challenging certain "specified adverse employment actions").

Thus, before even considering whether broad "structural constitutional challenges" that do not typically form the subject of "individual enforcement proceedings" are "of the type Congress intended to be reviewed within" a particular preclusive statutory scheme, *Axon*, 598 U.S. at 186, 195–96 (internal quotation marks and citation omitted), one must determine whether the claims implicate a statutory scheme that displays any congressional intent to limit jurisdiction in the first place. *See Manivannan v. United States Dep't of Energy*, 42 F.4th 163, 172 (3d Cir. 2022) ("[W]hen assessing whether the CSRA bars federal jurisdiction over an otherwise reviewable claim, courts should look to the specific underlying conduct being challenged to determine whether that conduct is an employment action covered by the statute."). They do not.

The CSRA has three main sections:

> Chapter 43 of the CSRA governs personnel actions based on unacceptable job performance. . . . Chapter 23 of the CSRA establishes the principles of the merit system of employment, § 2301, and forbids an agency to engage in certain "prohibited personnel practices," including unlawful discrimination, coercion of political activity, nepotism, and reprisal against so-called whistleblowers. § 2302. . . . Chapter 75 of the Act governs adverse action taken against employees . . . . Subchapter I governs minor adverse action (suspension for 14 days or less), §§ 7501–7504, and Subchapter II governs major adverse action (removal, suspension for more than 14 days, reduction in grade or pay, or furlough for 30 days or less), §§ 7511–7514.

*United States v. Fausto*, 484 U.S. 439, 445–47 (1988). If a personnel grievance implicates conduct outside the CSRA and there is no other pre-existing legal remedy, courts will consider the CSRA

as an exclusive remedy. *See generally id.* at 447. However, if there is an independent, pre-existing cause of action that provides relief for a claim that is otherwise entirely absent from the CSRA scheme, *particularly if it is a pre-existing constitutional cause of acti*on, courts will not find CSRA preclusion. *See, e.g.*, *Gutierrez v. Flores*, 543 F.3d 248, 255 (5th Cir. 2008) ("In sum, because this case does not concern an adverse personnel action or an unfair labor practice, the cases Appellees rely upon are inapposite."); *Borrell v. U.S. Int'l Commc'ns Agency*, 682 F.2d 981, 989 (D.C. Cir. 1982) ("Where newly enacted statutory remedies are unavailable to a particular segment of employees, the Supreme Court appears to have imposed a kind of "clear statement" requirement on Congress, requiring it to indicate explicitly its intent to displace judicially-created remedies for *constitutional* deprivations.") (emphasis added); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 368 (D.D.C. 2020) (holding employee's First Amendment claim was not precluded because it was "sufficiently distinct from any CSRA–covered change in 'working conditions.'"); *see also*, *Fausto*, 484 U.S. at 455 (Blackmun, J., concurring) ("the courts' common-law power to vindicate constitutional rights is not lightly to be set aside.") (citation omitted); *Manivannan*, 42 F.4th at 173 (3d Cir. 2022) (holding that improperly "disclos[ing] an employee's records to state prosecutors is not an adverse action, *see* 5 U.S.C. § 7512, nor does it fall within any of the personnel actions noted in § 2302," and so district court consideration was not "precluded by the CSRA."). Here, the civil service Plaintiffs' claims plainly do not implicate "unacceptable job performance." Nor, on analysis (which Defendants fail to provide), do they implicate "prohibited personnel practices" or "adverse actions." Therefore, they are not covered by the CSRA.

### i. *Plaintiffs do not allege any "prohibited personnel practices."*

There are a number of personnel actions which can serve as a predicate for a prohibited personnel practice claim, including broad actions such as a "significant change in duties." 5 U.S.C. § 2302(a)(2)(A)(xii). *However*, "a prohibited personnel *practice* is not established unless the basis

or motivation for the action is one of those listed in § 2302(b)." *Carducci v. Regan*, 714 F.2d 171, 175, n.3 (D.C. Cir. 1983) (emphasis added). These bases or motivations "include various forms of discrimination (race, age, sex, &c.), nepotism, and retaliation for whistleblowing." *Feds for Med. Freedom*, 63 F.4th at 370. Plaintiffs do not allege, and Defendants do not argue, that anyone at the agency has engaged in a "prohibited personnel practice" as that term is defined in section 2302. Therefore, to the extent that any of Plaintiffs' claims implicate personnel actions, they are still not covered under the CSRA because they are not part of a "prohibited personnel practice."

### ii. *Plaintiffs do not allege any "adverse actions."*

The injuries suffered by the civil service Plaintiffs related to their administrative leave and prospective termination via "reduction-in-force" ("RIF") also do not implicate the CSRA. The CSRA cannot be read to preclude judicial review on these grounds because: (1) only an Office of Personnel Management ("OPM") regulation unrelated to the CSRA provides any path for the Merit Systems Protection Board ("MSPB") to review a RIF action; and (2) that path is currently not open to any Plaintiff because it does not allow for pre-termination review, and there is no path for review of administrative leave pending the RIFs becoming effective.

***First,*** a RIF is not a CSRA-covered action. Although the CSRA covers more major employment actions, it does so only when those actions are "adverse." *See* 5 U.S.C. §§ 7501-7515 ("Adverse Actions"); *see also Fucik v. United States*, 655 F.2d 1089, 1096 (Ct. Cl. 1981) ("'Adverse action' . . . is a technical term that includes only a small number of actions: termination, reduction in rank or pay, suspension, and furlough without pay."). Importantly though, the statute explicitly exempts RIFs from its scheme. 5 U.S.C. § 7512(B) ("does not apply to . . . a reduction-in-force action"). "Unlike adverse actions, RIFs are not aimed at removing particular individuals," but rather "provide the administrative process through which the government eliminates jobs." *Grier v. Dep't of Health & Hum. Servs.*, 750 F.2d 944, 945 (Fed. Cir. 1984).

The only statute governing RIFs, 5 U.S.C. § 3502, entirely predates the CSRA. *See* Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 428. Section 3502 instructs OPM to establish regulations regarding a number of specific parameters governing the release of employees during a RIF—for example, to give "due effect to tenure of employment"—"but does not explicitly speak to such employees' appeal rights." *AFGE v. OPM*, 821 F.2d 761, 768, n.8 (D.C. Cir. 1987). The only source for any appellate right from a RIF action is an OPM regulation, not any statute. *See* 5 C.F.R. 351.901; *see also AFGE v. Trump*, No. 25-CV-03698-SI, 2025 WL 1358477, at *14 (N.D. Cal. May 9, 2025).

Thus, it is OPM's, not Congress's, choice to use the MSPB as a review outlet for RIFs, and OPM can modify that choice at any time without congressional approval. *Cf. AFGE*, 821 F.2d at 769 ("if OPM chooses to use the MSPB for dispute resolutions, it must take that statutory device as it finds it"). Courts should not impute congressional intent to an agency's unilateral action, especially in light of recent Supreme Court precedent clarifying agency deference. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 399 (2024) ("Presumptions have their place . . . only to the extent that they approximate reality."). So, "[w]hen Congress did not directly specify Board review for reductions-in-force claims, it seems unlikely that Congress intended the [MSPB] to be the *exclusive* avenue for such claims, let alone claims that involve broader questions about constitutional and administrative law." *AFGE v. Trump*, 2025 WL 1358477, at *14.

After all, "[w]hether a statute precludes judicial review of agency action…is a question of *congressional* intent." *Koretoff v. Vilsack*, 614 F.3d 532, 536 (D.C. Cir. 2010) (citations omitted and emphasis added). It would create a paradoxical "Schrödinger's Cat" if Article III courts could only discern a past Congress's intent by "opening the box" of mutable agency regulations to determine whether a path for judicial review is alive or dead at the particular moment the suit is filed. *Cf. Auction Co. of Am. v. F.D.I.C.*, 141 F.3d 1198, 1201 (D.C. Cir. 1998) (refusing to impose

exhaustion requirements where the FDIC's position would create "a quantum flux of probabilistic depositories whose identities are revealed only by the filing of a lawsuit."). Further, it would raise delegation doctrine concerns to allow an executive branch agency to unilaterally switch on and off recourse to Article III courts or curtail the meaning of section 1331's command that "district courts shall have original jurisdiction of all civil actions arising under the Constitution."

*Second,* even if a court did conclude that the agency's choice to route RIF-appeals to the MSPB somehow indicated congressional intent, here there is not any pre-enforcement avenue for the civil service Plaintiffs to challenge the RIF, nor is there any avenue to challenge their placement on administrative leave in the interim. Courts routinely refuse to impose CSRA-preclusion to prohibit constitutional pre-enforcement challenges. *See Feds for Med. Freedom*, 63 F.4th at 378–79 (collecting cases); *Fed. L. Enf't Officers Ass'n v. Cabaniss*, No. CV 19-735, 2019 WL 5697168, at *5 (D.D.C. Nov. 4, 2019) (collecting cases and noting that jurisdiction depends on the state of things at the time the action is brought). This contrasts with the plain text of the CSRA's Chapter 75. There "the statute provides the rights and processes afforded to '[a]n employee against whom an action is *proposed*.'" *Payne v. Biden*, 602 F. Supp. 3d 147, 159 (D.D.C. 2022), *cert. granted, judgment vacated*, 144 S. Ct. 480, 217 L. Ed. 2d 248 (2023) (quoting 5 U.S.C. § 7513(b), emphasis in original). On that basis, the court found that "the procedures afforded to a covered employee facing a *proposed* termination similarly insulate him from having to bet the farm . . . to obtain review," and hence his prospective termination under Chapter 75 was CSRA-precluded. *Id.* at 160 (emphasis added). By contrast, OPM's RIF regulation only provides, "[a]n employee who *has been* furloughed for more than 30 days, separated, or demoted by a reduction in force action *may* appeal to the Merit Systems Protection Board." 5 C.F.R. § 351.901 (emphasis added). Further,

there is no method to challenge administrative leave placement pending a RIF, as the RIF regulations specifically do exempt such changes to employment schedules. *See* 5 C.F.R. § 351.202.

Because civil service Plaintiffs claims do not challenge job performance determinations, prohibited personnel practices, or adverse actions, the CSRA does not preclude *pre-existing* equitable constitutional causes of action. *See supra* at 11 (collecting cases); *see also Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433-34 (D.C. Cir. 1996) (holding that Plaintiff's claim over an oral admonishment was precluded as a "prohibited personnel practice," but not her claim over "a simple pre-enforcement attack on a regulation restricting employee speech.").

### 2. **Plaintiffs' claims are not channeled under a *Thunder Basin* analysis.[6]**

Even, for the sake of argument, if one assumed that some of the actions at issue are part of a "statutory scheme [that] displays a 'fairly discernible' intent to limit jurisdiction," Plaintiffs' "structural" constitutional claims are not "of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund*, 561 U.S. at 489, 501 (quoting *Thunder Basin*, 510 U.S. at 207, 212); *cf. Feds for Med. Freedom*, 63 F.4th at 379 ("Because the CSRA's text, structure, and purpose foreclose the Government's implicit-jurisdiction-stripping theory, we need not proceed to an analysis of the factors listed in *Thunder Basin* . . . But even if we reach them, those factors only confirm that the CSRA left intact the district court's jurisdiction over this suit."). Courts must "presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Free Enter. Fund*, 561 U.S. at 489–90 (quoting *Thunder Basin Coal Co.*, 510 U.S. at 212–13 (emphasis added)). The ultimate

---

[6] FSOs are not subject to the CSRA, but are subject to a similar statutory scheme under the Foreign Service Act, which Defendants do not raise. Nevertheless, the *Thunder Basin* analysis herein would apply equally to the FSO Plaintiffs' claims.

question is how best to understand "what Congress has done." *Axon*, 598 U.S. at 186; *see also AFGE v. Trump*, 2025 WL 1358477, at *14-15. At a high level, a court can consider whether Plaintiffs' claims "are more like . . . [a] specific substantive decision [such as] fining a company (*Thunder Basin*) or firing an employee (*Elgin*)" or more like those in *Free Enterprise Fund* that "charge that [Defendants are] wielding authority unconstitutionally in all or a broad swath of [their] work." *Axon*, 598 U.S. at 188-89 (2023).[7] Here, both "the 30,000-foot view of the issue" and "the more granular one" lead to the same conclusion because "[e]ach of the three *Thunder Basin* factors signals that a district court has jurisdiction to adjudicate [Plaintiffs'] sweeping constitutional claims." *Id.* at 189.

### i. Precluding the civil service Plaintiffs' claims would, "as a practical matter" deprive them from obtaining meaningful judicial review.

Plaintiffs' claims should not be precluded because under the statutory scheme Defendants invoke, they would not, "as a *practical matter*[,] be able to obtain *meaningful* judicial review." *Thunder Basin Coal*, 510 U.S. at 213 (emphasis added). Judicial review is not meaningful "where the [party] ha[s] made a colorable showing that full postdeprivation relief c[an] not be obtained." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 331 (1976)). Where a plaintiff must suffer severe consequences before challenging an action, courts "do not consider [it] a 'meaningful' avenue of relief." *See Free Enter. Fund*, 561 U.S. at 490–91 (quoting *Thunder Basin*, 510 U.S. at 212).

The CSRA is inadequate to provide meaningful review because "[u]nder [that] scheme, there is arguably no way to bring a direct challenge to a mass [employment action]." *AFGE v. OPM*, No. C 25-01780, 2025 WL 900057, at *4 (N.D. Cal. Mar. 24, 2025). For example, the

---

[7] Although Plaintiffs are not "challenging the statutory scheme that establishes USAID" itself, Mot. at 13, "a separation-of-powers claim is a separation-of-powers claim. And, these claims still zero in on the "illegitimate decisionmaker" that ordered the terminations, not on any one resulting termination." *AFGE v. OPM*, No. C 25-01780, 2025 WL 900057, at *3 (N.D. Cal. Mar. 24, 2025).

language in 5 U.S.C. § 7701 states "*[a]n* employee, or applicant for employment, may submit *an* appeal to the Merit Systems Protection Board" (emphasis added). This tracks the language the Supreme Court focused on in *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491–92 (1991): "The critical words in § 210(e)(1), however, describe the provision as referring only to review 'of a determination respecting *an application*' . . . . Significantly, the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." Based on that language the court concluded, "[b]ecause the administrative appeals process does not address the kind of procedural and constitutional claims respondents bring in this action, limiting judicial review of these claims to the procedures set forth in § 210(e) is not contemplated by the language of that provision." *Id.* at 493.

Further, "as a practical matter," Plaintiffs would suffer further irreparable harm without immediate judicial review. *Thunder Basin Coal*, 510 U.S. at 213. Here, even if civil service Plaintiffs were forced to endure separation and had some conceivable path to chart a many-months long trek through administrative and then judicial review, remedying an individual RIF—or even every individual RIF—would not cure the underlying harm at that point because they "would return to an empty agency with no infrastructure to support a resumption of their work." *AFGE v. Trump*, 2025 WL 1358477, at *14 (internal quotation marks and citation omitted). The Court in *Thunder Basin* suggested that judicial review might not be meaningful, and might offend due process, if "[either Petitioner's] compliance with, [or Respondent's] continued violation of, the statute will subject petitioner to a serious prehearing deprivation." *Thunder Basin Coal Co.*, 510 U.S. at 216; *cf. Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 874–75 (3d Cir. 1996) ("In *Mathews*, the Court noted that '[a] claim to a predeprivation hearing as a matter of constitutional right rests on the proposition that full relief cannot be obtained at a postdeprivation hearing.").

This reality is exasperated because President Trump's removal of Cathy Harris has deprived the MSPB of quorum. *See Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *25 (D.C. Cir. Mar. 28, 2025), vacated on reconsideration en banc, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025). Ironically, the Government in that case takes the position that the MSPB as currently structured is unconstitutional. *See id.*, at *18.

Finally, in an MSPB review, the scope of review is limited to the record developed before the MSPB, which itself is confined to the facts and issues relevant to the individual personnel action at issue. Notably, at least in the initial stages of agency review of a RIF action, there is no guarantee of legal representation. *See Washington v. Dep't of Navy*, No. SF03518910016, 1990 WL 33621, at **3 (M.S.P.B. Mar. 19, 1990) ("A . . . RIF is not an adverse action under 5 U.S.C. § 7512 which entitles the affected employee to representation before the agency . . . ."). As the Federal Circuit has recognized, its review is "limited by Congress under 5 U.S.C. § 7703(c) to final orders and decisions of the Board on the *record*." *See Maisonet v. Office of Pers. Mgmt.*, 45 F. App'x 919, 921 (Fed. Cir. 2002) (emphasis in original). Thus, MSPB review is fundamentally limited to and designed for individualized personnel actions, not for broad, structural constitutional challenges. *See Forest v. Merit Sys. Prot. Bd.*, 47 F.3d 409, 410 (Fed. Cir. 1995) ("The board's jurisdiction is not plenary, but is limited to actions made appealable to it by law, rule, or regulation."). When claims concern agency-wide executive actions or the structure of executive authority—such as the claims here—the CSRA's review process is simply inadequate. *See Cruz v. Department of Navy*, 934 F.2d 1240, 1243–44 (Fed. Cir. 1991) (emphasizing that the MSPB cannot decide claims that fall outside its statutory grant of authority).

As a result, where, as here, plaintiffs challenge the legality of agency-wide actions and structure of executive power, the CSRA's individualized, record-based review does not provide a

meaningful avenue for judicial review. This distinguishes the present case from *Elgin*, where the Supreme Court found the CSRA review scheme adequate because the constitutional claims (there, sex discrimination) were inextricably linked to the individual adverse employment action and thus would be fully developed in the MSPB record. *See id.* at 22-23. Here, by contrast, Plaintiffs' Separation of Powers challenge targets the aggregate and structural actions of the Executive—actions that the MSPB is neither empowered nor equipped to address, and which will not be reflected in the administrative record. Indeed, as the Supreme Court recognized in *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492–93 (1991), when a statutory review scheme limits judicial review to the administrative record of individual proceedings, it necessarily precludes meaningful review of broader constitutional or procedural challenges that are not developed in that record. The circumscribed nature of MSPB proceedings and the Federal Circuit's limited review power create a substantial risk that the core constitutional issues raised by Plaintiffs will never be addressed, let alone remedied, within the CSRA framework.

### ii. Plaintiffs' broad structural constitutional claims are wholly collateral to any individualized administrative review process.

Additionally, Plaintiffs' claims should not be precluded because they are "'wholly collateral to a statute's review provisions." *Axon*, 598 U.S. at 190 (internal quotation marks and citation omitted). Determining whether a claim is collateral "requires considering the nature of the claim, not the status (pending or not) of an agency proceeding." *Axon*, 598 U.S. at 194. Review of a broad agency policy is "general[ly] collateral" to "particularized claims" at issue in "individual proceedings." *O.A. v. Trump*, 404 F. Supp. 3d 109, 133-36 (D.D.C. 2019) (quoting *McNary*, 498 U.S. at 492; *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 126-27 (D.C. Cir. 2010)). Further, claims are collateral to an administrative scheme when a "constitutional violation . . . is a continuing one,

and even granting relief . . . would not preclude the same issue arising with respect to other acts of appellees." *Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984).

Here, of course, Plaintiffs "do not challenge the merits of any individual [employment] determination; rather," they challenge Defendants' "policies and practices" of deleting an entire congressionally created agency. *See Haitian Refugee Ctr., Inc. v. Nelson*, 872 F.2d 1555, 1560 (11th Cir. 1989), *aff'd sub nom. McNary*, 498 U.S. 479.  In particular, Plaintiffs do not argue that there was anything infirm about the RIF notices qua RIF notices, or even that they individually ultimately have a right to remain employed. *Cf. Synar v. United States*, 626 F. Supp. 1374, 1381 (D.D.C. 1986), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714 (1986) ("The mere possibility that subsequent [constitutional action] might produce the same harm for which a judicial remedy is sought is not sufficient to eliminate redressability and hence standing."). For example, presumably Defendants could terminate all protected civil servants and replace them with probationary employees without violating separation of powers. It is only as collateral to the overall deletion of a congressionally created agency that eliminating the agency's entire staff—civil service, FSL, FSO, PSC or otherwise—offends the constitutional balance. *Cf. AFGE v. Trump*, 2025 WL 1358477, at *14 (holding union's claim wholly collateral to the CSRA as the "lawsuit involves questions of . . .  separation of powers," and because "employees' rights to appeal an RIF to the [MSPB] comes not directly from the statute but from regulation.").

Even if there was a path for individual civil servants to challenge particular aspects of Defendants' conduct, there is a fundamental mismatch between the CSRA administrative remedies and the relief sought. As in *Seila Law*, where "[the] litigant challenging governmental action as void on the basis of the separation of powers [was] not required to prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government

had acted with constitutional authority," Plaintiffs do not need to prove the counterfactual that they would ultimately remain individually employed if Defendants' unconstitutional conduct were set aside. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211 (2020) (quoting *Free Enter. Fund*, 561 U.S. at 512, n. 12). The remedy they seek hinges on maintaining the "relative influence of the Legislative and Executive Branches over the carrying out of this country's laws," *Andrade v. Lauer*, 729 F.2d 1475, 1491 (D.C. Cir. 1984), rather than on the practical outcome of any "discrete employment decision." *Fed. L. Enf't Officers Ass'n v. Cabaniss*, No. CV 19-735, 2019 WL 5697168, at *6 (D.D.C. Nov. 4, 2019) (distinguishing from the individualized employment issue in *Elgin*). Plaintiffs must be able to *meaningfully* uphold the proper constitutional balance, because, as "the framers recognized[,] structural protections against abuse of power [a]re critical to preserving liberty." *Free Enter. Fund*, 561 U.S. at 501 (quoting *Bowsher*, 478 U.S., at 730). Indeed, even if, for example, a civil servant was eventually terminated via a RIF, and the MSPB found the RIF to be procedurally defective, while the MSPB's determination might remedy that single aspect of one individual's harm, it would actually avoid resolving the underlying constitutional violation that is causing the class's multitudinous injuries. *Cf. Cochran v. S.E.C.*, 20 F.4th 194, 209 (5th Cir. 2021), *aff'd and remanded sub nom. Axon*, 598 U.S. at 175 ("The Exchange Act's statutory-review scheme does not guarantee Cochran meaningful judicial review of her claim because the enforcement proceedings will not necessarily result in a final adverse order; as a final adverse order is a prerequisite for judicial review under § 78y(a)(1).").

### iii. Plaintiffs raise only "standard issues of constitutional law" unrelated to "considerations of agency policy."

Finally, Plaintiffs' claims are entirely "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212–13. A claim is outside the agency expertise when it only raises "'standard questions of administrative' and constitutional law, detached from 'considerations of agency policy.'" *Axon*,

598 U.S. at 194 (quoting *Thunder Basin*, 561 U.S. at 491). And as a general matter, "agency adjudications are generally ill suited to address structural constitutional challenges." *Id.* at 195 (quoting *Carr*, 593 U.S. at 84).

Unlike in *Elgin*, "[t]his not a case where a threshold question requires their expertise — such as whether an employee's 'resignation amounted to a constructive discharge'— before reaching a statutory or constitutional claim about the directive to terminate. *AFGE v. OPM*, 2025 WL 900057, at *2 (quoting *Elgin*, 567 U.S. at 22–23). The MSPB "knows a good deal about [disciplinary actions], but nothing special about the separation of powers." *Axon*, 598 U.S. at 194. Plaintiffs' structural constitutional claims "embod[y] important principles concerning the relative influence of the Legislative and Executive Branches over the carrying out of this country's laws. [Whereas, the] decisionmakers involved in the statutory[] grievance procedure have neither the qualifications nor the expertise to articulate and develop these principles." *Andrade*, 729 F.2d at 1491; *see also AFGE v. Trump*, 2025 WL 1358477, at *15 ("[T]he claims here involve issues related to the appropriate distribution of authority to and within the executive branch, not the individual employee or labor disputes these two administrative bodies customarily handle.").

Here, "postponing conclusive judicial resolution of a disputed issue that affects an entire class of [individuals] until an individual petitioner has the opportunity to" navigate the incomplete, indirect, and currently unavailable CSRA maze "would foster the very delay and procedural redundancy that Congress sought to eliminate in passing [the CSRA]." *Cf. Jean v. Nelson*, 727 F.2d 957, 980 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985).

### iv.  Defendants' reliance on AFSA is misplaced.

Defendants rely heavily on a preliminary injunction denial issued by a D.C. District Court a month into the Trump administration, MTD at 10-11 (citing *AFSA v. Trump*, No. 25-cv-352, —— F.Supp.3d ——, ——, 2025 WL 573762, (D.D.C. Feb. 21, 2025)). However, at that preliminary

posture, the court concluded only that "at present, the agency is still standing, and so the alleged injuries on which plaintiffs rely in seeking injunctive relief flow [from] their members' employment relationships." *Id.*, at *7 (cleaned up). That determination was before USAID's March 28 letter to Congress and Defendant Lewin's "Final Mission" email, which crystalized plans to fully dismantle the agency. Amend. Compl. ¶¶ 120-124.

By contrast, more recently several district courts have determined that structural constitutional challenges to the widespread dismantling of federal agencies are *not* channeled, even in lawsuits brought by unions representing federal workers. For instance:

- In *AFGE v. OPM*, 2025 WL 900057, the Court determined that union plaintiffs' separation of powers claims were not channeled.

- In *Maryland v. U.S. Dep't of Agric.*, CIVIL NO. 25-0748, 2025 WL 800216, *11-15 (D. Md. Mar. 13, 2025), the Court issued a TRO after finding the States' Administrative Procedure Act ("APA") challenges were not CSRA-channeled. The Fourth Circuit later summarily stayed the injunction, briefly noting jurisdictional concern without specifying whether the concern was based on standing or channeling. *See Maryland v. U.S. Dep't of Agric.*, No. 25-1248, Order at 5 (4th Cir. Apr. 9, 2025).

- In *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, *9-11 (D.D.C. Apr. 22, 2025), the court concluded that the plaintiffs' APA claims were "not simply an employment dispute," and not precluded by the Tucker Act, CSRA or other statutes. The D.C. Circuit stayed the order, reasoning that the APA authorizes review only of "discrete agency actions," and the "dismantling…is a collection of many individual actions…[which] cannot be packaged together…under the APA." *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *2-*3 (D.C.C. May 3, 2025) (citations omitted) Here,

by contrast, the aggregate of actions drives the separation of powers claim.

- In *Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL 1303868 (D.R.I. May 6, 2025), the court held the claims were not CSRA-channeled because they were "not the run of the mill challenges to adverse employment actions," but "challenges to various agencies' decisions effectuating "the termination of agency functions, the failure to carry out statutory duties, [and] the refusal to expend appropriations." *Id.*, at *7.

- In *AFGE v. Trump*, 2025 WL 1358477, the Court determined that all three *Thunder Basin* factors favored not channeling the union plaintiffs claims.

**D. The CDA and Tucker Act Do Not Preclude PSC employees' claims.**

Defendants' arguments that the CDA and/or Tucker Act preclude jurisdiction fail for at least three reasons. First, Defendants apparently argue only that there could be a dispute under the CDA at some later date, not that there currently is one. MTD at 14. Second, even assuming Defendants mean to argue that there is currently a contract dispute, they are wrong. The CDA, 41 U.S.C. §§ 7101–09, only applies when the "crux of the case" is a contract dispute, and the merits turn on contract interpretation. *CACI, Inc. - Fed. v. U.S. Navy*, 674 F. Supp. 3d 257, 270 (E.D. Va. 2023) (citing *United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995)). If the claim is not fundamentally about a breach or interpretation of contract terms, the CDA does not apply. Finally, for similar reasons, the Tucker Act does not apply here.

The government acknowledges that the CDA only "applies to certain types of contracts with the Federal Government," MTD at 15, but insists that this case—which presents only broad structural constitutional claims—must be brought under the CDA. Not so. Contrary to Defendants' protestations, the claims in this case do not rely on a contract at all, much less one of the contracts pertinent to any individual PSC plaintiff. Rather, the crux of the suit is whether the constitutional order has been upended in the dismantling of USAID. *See* Amend. Compl. ¶¶ 128-140.

In *CACI*, the court considered the *nature of the claim*, determining that the plaintiffs' trade secrets claim left the court to determine whether the government either violated the Trade Secrets Act ("TSA") or did not violate the TSA *because* of their compliance with the plaintiffs' contract. "In neither scenario is a breach-of-contract inquiry material, meaning that the merits question is *not* 'one of contract interpretation.'" *CACI*, 674 F. Supp. 3d at 270 (citing *J & E Salvage*, 55 F.3d at 988). Similarly, here, Plaintiffs' claims are unrelated to the terms of any specific contract, and do not rest on whether an individual PSC contract would have been properly terminated if Defendants acted with the proper authority.

Likewise, the Tucker Act, 28 U.S.C. § 1491, does not apply where the essence of a litigant's claims is not contractual. That Act provides jurisdiction in the Court of Federal Claims ("CFC") for claims against the United States seeking more than $10,000 in damages, while the Little Tucker Act, 28 U.S.C. § 1346, provides concurrent jurisdiction to district courts and the Court of Federal Claims for actions against the United States seeking amounts under $10,000 in damages.

Plaintiffs seek no money damages, only declaratory and injunctive relief. "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (determining that claims based on governmental infringement of property rights or statutory violations are not within the Tucker Act's exclusive channel). Here, the source of rights upon which Plaintiffs base their claim is not the PSC contract, but rather the Constitution. *See* Amend. Compl. ¶¶ 128-140. Additionally, the type of relief requested is not in essence or actuality one for monetary damages. *See, e.g.*, Cert. Mot. at 1.

Further, the possibility that granting injunctive relief could result in some actions with

financial effects does not transform this case into one for monetary damages under the Tucker Act.

As the D.C. Circuit explained in *Kidwell v. Department of Army*:

> A plaintiff does not in essence seek monetary relief…because success on the merits may obligate the United States to pay the complainant. Even where a monetary claim may be waiting on the sidelines, as long as the plaintiff's complaint only requests non-monetary relief that has considerable value independent of any future potential for monetary relief—that is, as long as the sole remedy requested is declaratory or injunctive relief that is not negligible in comparison with the potential monetary recovery—we respect the plaintiff's choice of remedies[.]

56 F.3d 279, 284 (D.C. Cir. 1995) (citations omitted) (cleaned up); *see also CACI,* 674 F. Supp. 3d at 269-70. Similarly, a D.C. District court recently found "it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-00400, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025).[8]

Finally, Defendants cite no authority for the proposition that a contractor cannot avail herself of the federal courts for injunctive relief to prevent or stop a constitutional injury. Nor can they. *Cf. Axon*, 598 U.S. at 186 ("Congress rarely allows claims about agency action to escape effective judicial review.").

### E. Defendants' Inchoate Reference to Claim Splitting is Misplaced.

Defendants' passing (and vague) argument that Plaintiffs' claims "raise claim-splitting concerns" is meritless. MTD at 20-21. ***First***, the rule against claim-splitting does not apply to a class action suit seeking only declaratory and injunctive relief. *See*, *e.g.*, *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 429, n.16 (6th Cir. 2012) ("A class action, of course, is one of the

---

[8] Defendants' reliance on *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc), is misplaced. *Slattery* addressed whether the FDIC's corporate status disallowed Tucker Act jurisdiction for contract claims against the United States, not whether *every* claim that could have financial consequences is subject to the Act's exclusive channel.

recognized exceptions to the rule against claim-splitting.") (citation omitted and cleaned up).

**Second**, and more fundamentally, even if that "recognized exception" does not apply, the rule against claim splitting only applies to claims involving "the same parties or their privies." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 452 F. Supp. 2d 621, 626 (D. Md. 2006), *aff'd*, 273 F. App'x 256 (4th Cir. 2008). The named Plaintiffs here are not named in the cases cited by Defendants, which were brought by entities asserting associational standing (namely, unions representing USAID employees and an association of PSCs). *See Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (D.D.C. filed Feb. 6, 2025), ECF No. 1, Compl. ¶¶ 41–42, 47–48; *Pers. Servs. Contractor Ass'n v. Trump*, No. 1:25-cv-469 (D.D.C. filed Feb. 18, 2025), ECF No. 1, Compl. ¶¶ 4, 24–26.[9] There are only very "limited circumstances" under which a nonparty might suffer from claim splitting, none of which are present here, much less properly raised by Defendants. *See Taylor v. Sturgell*, 553 U.S. 880, 892-96 (2008).[10]

## II.     Plaintiffs Properly Plead Their Constitutional Claims.

The test for legal sufficiency is met where the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff is not required to "rebut other possible explanations for the conduct alleged." 2 Moore's Federal Practice § 12.34(1)(b) (2022); *Houck v. Substitute Tr. Servs.*, 791 F.3d 473, 484 (4th Cir. 2015).

---

[9] Notably, Defendants *challenge* the associational standing of the associations in those cases. *AFSA*, ECF No. 20, at 19-21; *Personal Servs. Contractor Ass'n*, at 13-14.

[10] Defendants fail to argue that any of these limited circumstances are present here, which is itself sufficient grounds for the Court to deny dismissal based on claim splitting. *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006).

### A.  Plaintiffs Properly Allege an Appointments Clause Claim.

Created in response to the colonists' frustration with the "manipulation of official appointments," the Appointments Clause created a check on executive power by ensuring legislative oversight of those who wield power in the executive branch. *Freytag v. C.I.R.*, 501 U.S. 868, 883 (1991) (quoting Gordon Wood, The Creation of The American Republic 1776–1787, 79 (1969)). For Defendant Musk to have lawful authority to dismantle USAID, Congress would have needed to create an executive office with the authority to dismantle the congressionally created and funded agency, and Defendant Musk would have needed to be confirmed by the Senate. Indisputably, neither happened. That Defendant Musk is carrying out functions of an Officer, *see* Mem. Op. at 36, establishes the Appointments Clause violation.

### 1.  <u>The Complaint Sufficiently Alleges that Defendant Musk is an "Officer."</u>

An individual is an "Officer" if they (1) "exercise[] significant authority pursuant to the laws of the United States," and (2) "occupy a 'continuing' position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (cleaned up). In evaluating "significant authority," a court's inquiry focuses on "the extent of power an individual wields in carrying out his assigned functions." *Id.* at 245. The Supreme Court has not "further defined the significant authority" requirement, Mem. Op. at 29, but judicial opinions going back more than 200 years make clear that the inquiry boils down to whether "these are important duties." *United States v. Maurice*, 26 F. Cas. 1211, 1214 (Marshall, Circuit Justice, C.C.D. Va. 1823).[11]

The "main criteria" of significant authority are "(1) the significance of the matters resolved by the official[], (2) the discretion they exercise in reaching their decisions, and (3) the finality of

---

[11] *See also* Office of Legal Counsel, Memorandum Opinion for the General Counsels of the Executive Branch*, The Test for Determining "Officer" Status Under the Appointments Clause,* 49 Op. O.L.C. (Jan. 16, 2025).

those decisions." *Tucker v. C.I.R.*, 676 F.3d 1129, 1133 (D.C. Cir. 2012); *see also Carr*, 593 U.S. at 86. The Amended Complaint is replete with allegations of Defendant Musk exercising vast authority over USAID, including a series of significant decisions made in late January and in February: Defendant Musk was the leader of DOGE during this critical period, Am. Compl. ¶¶ 41-44; he and DOGE sought access to the U.S. Treasury payment system to block disbursements to USAID and conceal the blocked payments, *id.* ¶¶ 61-62; they gained the highest level of access to USAID digital infrastructure, *id.* ¶ 64; directed placing 57 senior USAID officials on administrative leave, *id.* ¶ 65; oversaw a RIF of USAID staff, including directing specific employees' terminations, *id.* ¶¶ 68-69; shut down the USAID website, *id.* ¶ 75; infiltrated USAID headquarters and obtained access to sensitive data systems and physical access to USAID's offices, including highly restricted areas, *id.* ¶¶ 76-80; cut off email and computer access for thousands of USAID employees, *id.* ¶ 83; dismantled USAID's physical and technological infrastructure, and ordered the closing of USAID headquarters, *id.* ¶¶ 84, 86; and they have continued to maintain control over USAID systems. *Id.* ¶ 91. Indeed, separately analyzing the *Tucker* criteria, Judge Gregory wrote in concurrence that "the significance of Musk's actions cannot be overstated," "Musk has wielded considerable discretion," and "Musk's decisions were final."[12] Stay Order at 32-33; *see also* Mem. Op. at 29-30.

Defendants do not actually contend that Musk's actions fall short of significant authority. Instead, they argue that the court should look not at the power that Musk actually wielded but by the authority vested by law in the office. MTD at 28. But Defendants ignore the plain language of

---

[12] The panel majority questioned whether Defendant Musk was responsible for those actions, although as Judge Gregory observed, they provided no evidence to cast doubt on the district court's factual findings. Nevertheless, at this stage, the question is not whether Plaintiffs have proven Musk's responsibility but whether the allegations, accepted as true, establish a plausible violation.

*Lucia*: "the extent of power an individual wields in carrying out his assigned functions." *Lucia*, 585 U.S. at 245. This is no "alternative theory" as Defendants claim, MTD at 28—it is controlling Supreme Court precedent.

Defendants' unsupported interpretation of "significant authority" would decimate the Appointments Clause. For example, Congress has authorized the President to appoint as inferior officers without Senate confirmation members of the Defense Base Closure and Realignment Commission, 10 U.S.C. § 2687 *et. seq.*, and members of the Commission on Presidential Scholars, 20 U.S.C. § 1221 *et. seq*. The relevant statutes clearly define the scope of authority for those positions. Under the Defendants' theory, the President could appoint such a commissioner—or, indeed, the head of the U.S. Digital Service—and authorize him to oversee every executive branch agency with all Cabinet secretaries reporting to him, and there would be no Appointments Clause violation because the formal job description of those positions falls within the congressional grant of authority. This would eviscerate the structural protections of the Appointments Clause, allowing executive branch appointees to wield unchecked power.

### i. *Naming Secretary Rubio and Defendant Lewin is Immaterial*

Bringing Separation of Powers claims against others does not void the Appointments Clause claim against Defendants Musk and DOGE, as Defendants contend. Defendants rely on *Andrade v Regnery*, 824 F.2d 1253 (D.C. Cir. 1987) for this argument, which held, in the context of that case, that there was no Appointments Clause violation where ratification by a duly installed official occurred before the plaintiffs suffered any injury. But Defendants' contention fails for four reasons.

***First***, Defendants erroneously claim that "Administrator Rubio and Mr. Lewin are undisputedly overseeing the alleged reorganization." MTD at 23. Whether or not that is true now, Plaintiffs allege the majority of Appointments Clause violations occurred *before* Secretary Rubio

or Defendant Lewin were supposedly in charge. The dispositive fact as to ratification is that the "official who carried out the injurious government action was duly installed in his post" *before* the plaintiffs' injury. *Andrade*, 824 F. 2d at 1257. Here, the harms —starting with the unauthorized access and disclosure of private data—began on January 20, 2025 and continued through February 3, 2025, Amend. Compl. ¶¶ 59-90, before Secretary Rubio was revealed as Acting Administrator, *id.* ¶¶ 16, 72, and long before Defendant Lewin's leadership role was announced on March 18, 2025. *Id.* ¶ 18.

*Second*, Defendants' conclusory assertions that Secretary Rubio and Defendant Lewin were overseeing USAID's destruction—what they call a "reorganization"—are not dispositive of ratification. Valid ratification requires the authorized decision maker to exercise "independent judgment" in reaching the subsequent decision. *Wille v. Raimondo*, No. CV 22-0689-BAH, 2024 WL 2832599, at *3 (D. Md. June 3, 2024); *see also Jooce v. Food & Drug Admin.*, No. 18-CV-1615 (CRC), 2020 WL 680143, at *4 (D.D.C. Feb. 11, 2020), *aff'd*, 981 F.3d 26 (D.C. Cir. 2020). Here, Plaintiffs allege that Defendant Musk and his DOGE subordinates were the actual decision makers during that critical period before February 3, 2025 and continued making significant decisions thereafter. *See, e.g.*, Amend. Compl. ¶¶ 92, 99.

*Third*, *Andrade* involved a motion for summary judgment. By contrast, the question at this stage concerns the sufficiency of the allegations. Defendants' contention that Secretary Rubio and Lewin ratified Musk's and DOGE's decisions is a factual determination—an alternative explanation that Plaintiffs need not refute to defeat dismissal. *Houck*, 791 F.3d at 484.

*Fourth*, *Andrade* involved a challenge to personnel decisions made by an acting Justice Department Deputy Administrator before he was duly appointed to the position. The court posited that decisions by acting officials may become "so unreasonable as to offend the Appointments

Clause," but concluded there—where the same decision maker ratified his earlier decision after being properly installed—there was no violation. *Id.* at 1257. *Andrade* does not countenance the ratification of decisions made by officials from a different agency with no legitimate claim to any authority within the agency where they exercised significant authority.

### ii. Defendant Musk's authority exceeds an advisory role.

Defendants continue to maintain that Defendant Musk has merely acted in an advisory role, MTD at 28, but that conclusory assertion is plainly contradicted by the plausible allegations of the complaint. Defendant Musk has not merely offered advice to proper decision makers but rather has exercised that authority himself without accountability to anyone (other than President Trump). Amend. Compl. ¶¶ 59-89; *see also* Mem. Op at 28; Stay Order at 34.

### 2. __Defendant Musk occupies a continuing position.__

This Court has already rightly concluded that the DOGE Administrator is a continuing position, rejecting Defendants' rehashed arguments. Mem. Op. at 31-34.[13] Again, Defendants' incredulous claim that Defendant Musk is "merely" an advisor and not the "formal" DOGE Administrator, MTD at 31, is immaterial. An Appointments Clause Claim can proceed even if the office was not formally created by Congress or the executive branch. *Tucker*, 676 F.3d at 1133; *see also Willy v. Admin. Review Bd.,* 423 F.3d 483, 491-92 (5th Cir. 2005). On top of that, the Amended Complaint plainly alleges, in detail, Defendant Musk's role as the functional head of DOGE. Therefore, even assuming that the Appointments Clause requires that the official in question serves in a position formally created by law—which it does not—Plaintiffs properly

---

[13] The DOGE Administrator position is far from fleeting given how robust, extensive, and ongoing DOGE's activities have been, in contrast with duties that arise only in special circumstances or emergencies. *Contra United States v. Germaine*, 99 U.S. 508, 511–12 (1878); *Auffmordt v. Hedden*, 137 U.S. 310, 326-27 (1890). And the duties of the DOGE leader are "more than incidental to the regular operations of government." *Donziger*, 38 F.4th at 297.

allege that the position of DOGE Administrator was formally created by law and Defendant Musk is or was its *de facto* leader.

**B. Plaintiffs Allege a Cognizable Separation-of-Powers Claim Against all Defendants.**

Plaintiffs allege that Defendants without, congressional authorization, are swiftly taking steps to fully and finally dismantle an independent agency created by Congress. This violates the Separation of Powers doctrine. Detailed allegations clearly establish how Defendants collectively blocked appropriated disbursements, Amend. Compl. ¶¶ 61-63; decimated the agency's workforce by putting nearly 90% of the staff on administrative leave, *id.* ¶¶ 94-95, and recalling over 1,400 Foreign Service Officers, *id.* ¶ 98; cut off email and computer access for thousands of USAID employees and contractors, *id.* ¶ 83; shut down USAID's physical and technological infrastructure, *id.* ¶ 84; closed headquarters, *id.* ¶ 86; and canceled approximately 83% of the agency's total programming. *Id.* ¶ 116. Defendants advance three arguments to contend that the Separation of Powers claim is not reviewable, each of which fails.

*First*, Defendants argue that Plaintiffs advance a statutory claim improperly packaged as a constitutional violation. MTD at 31, citing *Dalton v. Spector*, 511 U.S. 462 (1994). *Dalton* involved a decision to close the Philadelphia Naval Shipyard pursuant to the Defense Base Closure and Realignment Act. The alleged constitutional violation was based entirely on an alleged excess of statutory authority. *Id.* at 473. Unlike in *Dalton*, Plaintiffs here challenge actions taken in the absence of *any* statutory authority and in excess of the President's Article II authority. Amend. Compl. ¶¶ 134, 137, 139. *Dalton* expressly recognized that actions taken in the absence of power are fundamentally different than those involving "a mere excess or abuse of discretion in exerting a power given." *Dalton*, 511 U.S. at 474 (quoting *Dakota Cent. Tel. Co. v. State of S. Dakota ex rel. Payne*, 250 U.S. 163, 184 (1919)).

Defendants also argue that Secretary Rubio and Defendant Lewin "misus[ing] their authority to make changes at USAID" is not a constitutional violation. MTD at 32. But Plaintiffs do not challenge "changes" made at USAID—Plaintiffs challenge the dismantling of USAID. In their own words, Defendants seek the total elimination of USAID: "abolishing its legal status as an 'independent establishment," eliminating "[s]ubstantially all non-statutory positions," and effectuating a "wind-down of the Agency's independent operations." Amend. Compl. ¶¶ 119-120. Plus, Defendants Musk and DOGE have zero valid authority to make *any* changes at USAID.

*Second*, Defendants assert that the President can direct the Secretary of State to end USAID programs not required by law and that the "restructuring of USAID is consistent with the FCAA." MTD at 32. This argument also mischaracterizes the pleadings, which alleges a complete dismantling of the agency—actions far past ending programs. "There is no statute that authorizes the Executive Branch to shut down USAID," Mem. Op. at 41-42; instead, Defendants' actions violate multiple statutes, Mem. Op. at 42-46. The Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. 105-277, Div. G, 112 Stat. 2681-761, requires the President to submit to Congress any reorganization plan *in advance* of restructuring the agency or transferring its function. Congress has placed express restrictions on any "reorganization, redesign or other plan," including downsizing the agency, transferring its responsibilities, or reducing staffing levels. FY24 Appropriations act, § 7063. This section also requires advanced congressional notification *before* certain actions were taken, which indisputably did not occur. Defendants' complete disregard for laws mandating the operation of USAID are not "a mere excess or abuse of discretion in exerting a power given," but rather further illustration of actions taken in the absence of any lawful authority. *Dalton*, 511 U.S. at 474

***Third***, Defendants raise the political question doctrine as a bar to judicial review of "whether Defendants' notice to Congress was sufficient." MTD at 33. But the political question doctrine is a "narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it," *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194-95 (2012), and does deny jurisdiction just because the case "may have significant political overtones, *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230, (1986). Defendants ignore that the gravamen of Plaintiffs' Separation of Powers claim far exceeds a question of congressional notification. *See* Amend. Compl. ¶¶ 134-140. Further, this case involves "familiar principles of constitutional interpretation" with judicially manageable standards for resolving those claims. *Zivotofsky*, 566 U.S. at 201; *cf.* Stay Order at 42 (Gregory, J. concurring) ("Plaintiffs' prayer for relief seeks to enjoin an unconstitutional Executive action to dismantle an agency, much like any other challenge to Executive actions as being unlawful.").

## III. Plaintiffs' Claims Against the President Need Not be Dismissed.

Defendants argue that injunctive and declaratory relief is not available against the President and therefore the claims against President Trump should be dismissed. MTD at 34. The cases they rely on stand for the proposition that *injunctive* relief is generally improper against the President. But courts may award a *declaratory* judgment against the President. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974). So long as declaratory relief is available, neither claim should be dismissed against President Trump.

## CONCLUSION

For the reasons provided herein, this Court should deny Defendants' Motion to Dismiss.

Respectfully submitted,

/s/ Norman L. Eisen
Norman L. Eisen [9112170186]
Tianna J. Mays [1112140221]
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@statedemocracydefenders.org
Tianna@statedemocracydefenders.org

Mimi Marziani*
Rebecca (Beth) Stevens*
Joaquin Gonzalez*
**MARZIANI, STEVENS & GONZALEZ PLLC**
1533 Austin Highway
Suite 102-402
San Antonio, TX 78218
Tel: (210) 343-5604

Richard M. Heimann*
Nicole M. Rubin
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000

* *Admitted pro hac vice*