## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

J. DOE 4, *et al.*,

   *Plaintiffs*,

   v.

ELON MUSK, *et al.*,

   *Defendants*.

Case No. 8:25-cv-00462-TDC

## <u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 1

I.      This Court Should Dismiss for Lack of Jurisdiction ........................................... 1

       A.     Plaintiffs Improperly Rely upon Materials Outside the Amended
             Complaint ................................................................................................ 1

       B.     The CSRA Precludes Employee Plaintiffs' Claims ................................. 2

       C.     This Court Lacks Jurisdiction over any PSC Plaintiffs' Claims ............. 9

       D.     Plaintiffs Have Failed to Plead any Named Plaintiff Is an FSL ........... 12

       E.     Plaintiffs Have Failed to Plead Article III Standing. ............................ 13

       F.     Plaintiffs' Claims Raise Claim-Splitting Concerns ............................... 16

II.     Plaintiffs' Complaint Fails to State a Claim .................................................... 17

       A.     Plaintiffs' Appointments Clause Claim Against Musk Fails to State a
             Claim .................................................................................................... 17

       B.     Plaintiffs Fail to State a Separation-of-Powers Claim ......................... 23

       C.     Plaintiffs' Claim Against the President Should Be Dismissed ............. 25

CONCLUSION ..................................................................................................... 25

## INTRODUCTION

Defendants' opening brief showed that Plaintiffs have alleged no facts that would establish jurisdiction over their claims. In opposition, Plaintiffs impermissibly rely on facts neither alleged nor incorporated in their Amended Complaint, effectively conceding their pleading failure. More fundamentally, the Court is without jurisdiction because Plaintiffs' claims are channeled through the comprehensive scheme for resolving federal employment claims and any contractors' claims must be brought in the Court of Federal Claims. And as their attempt to rely on extra-complaint materials demonstrates, Plaintiffs failed to plead standing.

Their claims fare no better on the merits. Plaintiffs' Appointments Clause claim fails because Plaintiffs concede that validly serving officials are overseeing the ongoing alleged "dismantling" of USAID and because they concededly do not contend that Mr. Musk occupies an office with legal authority. And their separation-of-powers claims fails because Plaintiffs seek to have this Court pretermit Congress from determining how its own requirement that it be consulted should be fulfilled and because they improperly seek to constitutionalize a purely statutory claim. Plaintiffs' claims against the President also fail for the reasons stated below.

## ARGUMENT

### I.    This Court Should Dismiss for Lack of Jurisdiction

#### A.    Plaintiffs Improperly Rely upon Materials Outside the Amended Complaint

Although Defendants' motion to dismiss facially challenged the Court's subject matter jurisdiction, Plaintiffs' Opposition improperly seeks to "incorporate[] . . . the additional facts" provided in their motion for class certification. Pl.'s Opp'n to Defs.' Mot. to Dismiss at 2 n.2, ECF No. 121. But Defendants did not "assert[] that facts outside the complaint deprive the court of jurisdiction," so it is improper to "consider evidence outside the pleadings." *Id.* at 3 (citations omitted). Plaintiffs suggest that Defendants' reliance on the declaration of Peter Marocco and a

1

judicial decision convert this facial challenge into a factual one. *Id.* at 3. But Plaintiffs incorporated the Marocco declaration into their Amended Complaint, *see* Am. Compl. ¶ 73, and discussion of such incorporated documents does not convert Defendants' facial subject matter jurisdiction challenge into a factual one. *Wikimedia Found. v. National Sec. Agency*, 857 F.3d 193, 212-13 (4th Cir. 2017); *Sanders v. United States*, 493 F. Supp. 3d 470, 482 (D.S.C. 2020). Nor, quite obviously, does citing caselaw. Rather, Defendants' facial challenge means that the Court should confine its review to facts pled on the face of the Amended Complaint or incorporated by reference therein. *See, e.g., Evans v. United States,* 105 F.4th 606, 615 (4th Cir. 2024) (facial challenge subject to "the same standard as [a motion] brought under Rule 12(b)(6)").

### B.    The CSRA Precludes Employee Plaintiffs' Claims

**1.** Plaintiffs first allege that their claims fall outside the Civil Service Reform Act's ("CSRA") scope. Plaintiffs are wrong. Although their generic description of "interruptions to the ordinary course of their employment," Am. Compl. ¶¶ 4-9, is vague and unelaborated, the remaining allegations suggest that this includes being placed on administrative leave. *See id.* ¶ 110 (alleging that "all USAID direct hire personnel" with limited exceptions "would be placed on administrative leave" effective February 23, 2025); *see also id.* ¶¶ 60, 65,70, 75, 78, 81, 126 (referencing placement of employees on administrative leave or their suspension or furlough). This falls directly into the "comprehensive statutory scheme[] for adjudicating employment disputes with the federal government," which "provide[s] the exclusive procedures by which federal employees may pursue employment- and contractor-related claims." *Widakuswara v. Lake,* No. 25-5144, 2025 WL 1288817, at *2 (D.C. Cir. May 3, 2025) (quoting *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("*AFGE*")). Indeed, it was precisely such an action

that the D.C. Circuit recently found precluded in *Widakuswara*.[1] *See id.* at *1 (finding district court likely lacked jurisdiction to challenge United States Agency for Global Media's "plac[ing] over 1,000 employees on administrative leave").

But whatever "interruptions to the course of their employment" may mean, it is covered by the CSRA, because it is a "personnel action" under the CSRA's comprehensive preclusive scheme. As the Supreme Court has explained, Congress established a "comprehensive system for reviewing *personnel action[s]* taken against federal employees." *United States v. Fausto*, 484 U.S. 439, 455 (1988) (emphasis added). The statutory term "personnel action," as Plaintiffs acknowledge, is defined in the statute to include "any . . . significant change in duties, responsibilities, or working conditions." 5 U.S.C. § 2302(a)(2)(A)(xii). Placing an employee on administrative leave unquestionably qualifies as a "personnel action" under this scheme.[2] *See Carducci v. Regan*, 714 F.2d 171, 174 n.3 (D.C. Cir. 1983) (Scalia, J.) ("The *types* of personnel action which can constitute grounds for a prohibited personnel practice claim are extremely broad, if not exhaustive").

Plaintiffs instead argue that their claims "are … not covered under the CSRA because they are not part of a 'prohibited personnel practice'" under 5 U.S.C. § 2302 or an "adverse action" under 5 U.S.C. §§ 7501-7515. Pls.' Opp. at 12. But the scope of CSRA preclusion is not limited to prohibited personnel practices and adverse actions—the CSRA is a comprehensive preclusive scheme. Indeed, *Carducci*, the primary case on which Plaintiffs rely for the distinction between

---

[1] The D.C. Circuit *en banc* subsequently vacated the portions of the panel opinion regarding grant funding but left undisturbed the portion of the opinion concerning USAGM's personnel decisions. *Middle E. Broad. Networks, Inc. v. United States*, Nos. 25-5150, 25-5151, 25-5158 (D.C. Cir. May 28, 2025).

[2] Plaintiffs' reliance on *Turner v. USAGM*, 502 F. Supp. 3d 333, 369 (D.D.C. 2020), is therefore misplaced. There, the court concluded the CSRA precluded review of most of plaintiffs' claims but found (for preliminary injunction purposes) potential jurisdiction on a single claim where the relevant plaintiffs "ha[d] not been the subject of any covered personnel action." *Id.*

"prohibited personnel practices" and other "personnel actions," explicitly holds that the latter remain within the preclusive reach of the CSRA. ECF No. 121 at 10. As the court explained, for the former—which are "personnel actions [specified in 5 U.S.C. § 2302] infected by particularly heinous motivations or disregard of law"—the CSRA prescribes review by the Office of Special Counsel with potential judicial review following administrative exhaustion. *Carducci*, 714 F.2d at 175. For the remainder of personnel actions identified in Section 2302 "and for all other minor personnel actions," the CSRA permits "review by neither OSC nor the courts." *Id.* Plaintiffs do not dispute that their claims concern such personnel actions, and their claims are thus precluded from judicial review.

Nor can Plaintiffs escape preclusion by arguing that they bring constitutional claims. As the Supreme Court decided in *Elgin v. Department of Treasury*, the CSRA's "comprehensive system for reviewing personnel action taken against federal employees," "precludes district court jurisdiction" even over "constitutional claims for equitable relief."[3] 567 U.S. 1, 5, 8 (2012) (citation omitted). And even where a particular plaintiff has no right or remedy under the CSRA (which Plaintiffs have not shown here), they must fully exhaust any claims via the OSC complaint process before seeking relief in district court. *See Fleming v. Spencer*, 718 Fed. App'x 185, 188 (4th Cir. 2018) ("The CSRA plainly precludes extrastatutory judicial review of constitutional claims that are asserted before an employee has exhausted his remedies available under the statute").

Plaintiffs primarily rely on *Feds for Medical Freedom v. Biden*, a decision in which the

---

[3] The Court in *Carducci* was constrained to analyze constitutional claims outside of the CSRA's preclusive framework because of earlier circuit precedent, *Borrell v. U.S. Int'l Commc'ns Agency*, 682 F.2d 981 (D.C. Cir. 1982), which held the "exclusivity of CSRA remedies did not extend to constitutional claims." *Carducci*, 714 F.2d at 175-76. But that holding, on which Plaintiffs also rely, is not consistent with *Elgin* and thus no longer good law.

Fifth Circuit concluded that workplace vaccine requirements—"private, irreversible medical decisions made in consultation with private medical professionals outside the federal workplace"—do not constitute "personnel action[s]" under the CSRA. 63 F.4th 366, 375-76 (5th Cir. 2023). But regardless of whether this outside-workplace activity qualifies as a "personnel action," the "interruptions to the ordinary course of [Plaintiffs'] employment" alleged here certainly do. *See, e.g.*, Am. Compl. ¶ 63 (alleging USAID senior managers "stripped of their authority to approve payments"); *id.* ¶ 98 (alleging USAID personnel serving overseas were recalled to United States). And, like other authority cited by Plaintiffs, *Feds for Medical Freedom* is not good law: the decision was vacated by the Supreme Court and it cannot be relied on as precedent. *See Biden v. Feds for Med. Freedom*, 144 S. Ct. 480 (2023).[4]

Plaintiffs' attempt to exclude planned reductions in force ("RIFs") from the scope of CSRA preclusion fails for similar reasons. As a preliminary matter, the comprehensive nature of the CSRA's preclusion scheme means that some personnel actions may, as explained above, trigger "review by neither OSC nor the courts." *Carducci*, 714 F.2d at 175. And in any event, Plaintiffs do not dispute that employees who are "furloughed for more than 30 days, separated, or demoted by a [RIF] may appeal to the" MSPB and its exclusive Federal Circuit review process. 5 C.F.R. § 351.901; *see* Pls.' Opp. at 13. Instead, they contend that Congress did not intend to include RIFs within the MSPB's jurisdiction because OPM regulations—not the text of the CSRA—channels specified RIF challenges through MSPB review. But it was *Congress* that gave OPM the authority to enact those regulations and subject those actions to MSPB review. As part of the Federal Labor-Management Relations Statute, Congress provided that the MSPB may hear "any action which is

---

[4] Moreover, *Feds for Medical Freedom* is also at odds with the Fourth Circuit's decision in *Rydie v. Biden*, No. 21-2359, 2022 WL 1153249 (4th Cir. Apr. 19, 2022).

appealable to the Board under any law, rule, *or regulation*. 5 U.S.C. § 7701 (emphasis added). So even though RIFs themselves are not "adverse actions" under 5 U.S.C. § 7512, they remain subject to the "exclusive" "enormously complicated and subtle scheme to govern employee relations in the federal sector." *AFGE v. Trump*, 929 F.3d 748 (D.C. Cir. 2019).

Plaintiffs' further argument that their pre-enforcement challenge to any RIF is not precluded because there is no pre-enforcement avenue to administrative review is meritless. As the D.C. Circuit explained when rejecting a similar argument in *AFGE*, 929 F.3d at 755-56, the Supreme Court's decision in *Thunder Basin* held that district court jurisdiction was precluded by a statutory scheme that did not permit pre-enforcement review at all.[5] *See* 510 U.S. 200, 212-16 (1994).

**2.** Plaintiffs are also wrong that the *Thunder Basin* factors support this case continuing here. Each of the *Thunder Basin* factors favors Defendants.

On the first factor, the CSRA provides for meaningful judicial review. *See Elgin*, 567 U.S. at 5, 8. Plaintiffs argue that the "CSRA is inadequate to provide meaningful review" because "there is arguably no way to bring a direct challenge to a mass employment action." ECF No. 121 at 16 (cleaned up). But that is just a concession that their challenges are to an *employment action*. That concession is fatal because the CSRA, again, "establishe[s] a comprehensive system for reviewing personnel action taken against federal employees." *Fausto*, 484 U.S. at 455. And that system "provides the exclusive means of review for" not just statutory or regulatory challenges to employment actions, but also "constitutional claims" regarding those actions. *See Elgin*, 567 U.S.

---

[5] Indeed, *Andrade v. Regnery* explains that it is only "the actual implementation of [a] RIF [that courts] have [the] power to redress." 824 F.2d 1253, 1257 (D.C. Cir. 1987). If Plaintiffs concede that their challenges are to RIFs that have not yet been implemented, it weakens, not strengthens, their claim that this court has jurisdiction.

at 8; *Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990) ("[F]ederal employees may not circumvent that structure even if their claim is based . . . on the Constitution.").

It matters not that CSRA review comes with different procedures and remedies. *Contra* ECF No. 121 at 17–18. For one thing, Plaintiffs cite no authority to support the proposition that CSRA review is necessarily individualized. Indeed, the D.C. Circuit recently rejected precisely this argument, noting that "administrative agencies are not powerless to issue broad-reaching relief in large-scale personnel matters." *Widakuswara*, 2025 WL 1288817, at *2 n.2 (citing MSPB order staying termination of nearly 6,000 employees) (citation omitted). For another, the first *Thunder Basin* factor considers whether channeling will deprive a party of "*all* meaningful judicial review." *Thunder Basin*, 510 U.S. at 212-13 (emphasis added). Even if Plaintiffs bring a broad, structural challenge, Congress can still "require them to litigate their claims solely through the statutory scheme, at least so long as they can eventually obtain review and relief." *AFGE*, 929 F.3d at 756. Indeed, the Supreme Court has been clear that the CSRA's preclusive scope goes even further: Congress's choice to "withhold[]" a remedy for certain employees under the CSRA "preclude[s] judicial review" for those employees—it does not "leave [those employees] free to pursue different remedies in a different forum. *Fausto*, 484 U.S. at 443-44, 448-49.

Here, the garden-variety employment harms Plaintiffs allege are reviewable through the CSRA. Through that scheme Plaintiffs can obtain remedies for those employment harms, including reinstatement, retroactive benefits, backpay, and attorney's fees. 5 U.S.C. §§ 1204(a)(2), 7701(g). And despite Plaintiffs' invocation of supposed irreparable harm (and despite the Fourth Circuit's rejection of their claim of irreparable harm in this case, *see* ECF 88 at 11-12), loss of governmental employment does not ordinarily qualify. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).

7

On the second factor, Plaintiffs' claims are not wholly collateral to the CSRA's review scheme. The prototypical employment harms Plaintiffs seek to redress are within the heartland of CSRA's review scheme, not "wholly collateral" to it. *See Elgin*, 567 U.S. at 22. What matters is whether the subject of Plaintiffs' challenge is a matter covered by the CSRA's review scheme, not how Plaintiffs describe the claims they are advancing. *Id.* Plaintiffs nonetheless protest that "there is a fundamental mismatch between the CSRA administrative remedies and the relief sought." ECF No. 121 at 20. But the precise scope of the remedies available under the CSRA is beside the point. As the D.C. Circuit recognized, "[e]ven plaintiffs with 'nationwide' or 'systemwide' challenges may not 'circumvent' the scheme established by the Statute." *AFGE*, 929 F.3d at 757 (citation omitted). The "comprehensiveness of the statutory scheme involved, not the adequacy of specific remedies thereunder," determines the scope of channeling. *Id.* (citation omitted). At bottom, Plaintiffs' "constitutional claims are the vehicle by which they seek to reverse [Defendants'] decisions," *Elgin*, 567 U.S. at 22, that have allegedly interrupted "the ordinary course of their employment." Am. Compl. ¶¶ 4–9. Because Plaintiffs ask "for the same relief that they could ultimately obtain through the statutory scheme" their "challenge is not wholly collateral." *AFGE*, 929 F.3d at 760.

On the third factor, Plaintiffs' claims are within the agency's expertise. Plaintiffs rely heavily on the Supreme Court's decision in *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), *see* ECF No. 121 at 22, but this case is fundamentally different. While *Axon* involved a challenge to the constitutional structure of the administrative agency that was to hear its claims, Plaintiffs raise no challenge to the MSPB's constitutionality. Here, Plaintiffs' claims are based on the separation of their employment from a federal agency—claims that fall squarely within the relevant agencies' expertise. It matters not that Plaintiffs frame their claims as "structural

constitutional challenges"; the heart of this case is Plaintiffs' employment-related harms, on which they rely to invoke Article III standing. *See* Am. Compl. ¶¶ 4–9; ECF No. 121 at 4–7. Accordingly, the agency's familiarity with such employment matters "is thus more than 'helpful background knowledge.' . . . It is expertise that goes to the core issues in this case." *AFGE*, 929 F.3d at 760 (citation omitted); *see also Rydie*, 2022 WL 1153249, at *7 ("And where an independent body— here, the Merit Systems Protection Board—hears constitutional challenges, it makes little sense to hamstring agencies by limiting the scope of arguments they may consider.").

Finally, Plaintiffs' attempts to distinguish *American Foreign Service Association v. Trump*, No. 1:25-cv-352, 2025 WL 573762 (D.D.C. Feb. 21, 2025), fall short. Nowhere do Plaintiffs meaningfully contest the substance of Judge Nichols' analysis. They suggest only that Judge Nichols' decision was dependent on the fact that it was issued before the defendants took further steps to "fully dismantle the agency." ECF No. 121 at 23. It is not clear why that matters, or why it would affect whether Plaintiffs' employment-based grievances are channeled to the administrative bodies Congress designated to hear such claims. And although they cite later district court cases determining certain claims should not be channeled, half of those were stayed by the relevant Court of Appeals, including the Fourth Circuit. *Maryland v. U.S. Dep't of Agric.*, No. 25-1248, 2025 WL 1073657, at *1 (4th Cir. Apr. 9, 2025); *Widakuswara*, 2025 WL 1288817, at *2. And Plaintiffs ignore other recent decisions that have applied the same preclusion principle to similar federal-employment suits. *See, e.g.*, *Nat'l Treasury Emps. Union v. Trump*, ---F. Supp. 3d- --, 2025 WL 561080, at *5–8 (D.D.C. Feb. 20, 2025); *Am. Fed'n of Gov't Emps., AFL-CIO v. Ezell*, Civ. A. No. 25-10276-GAO, 2025 WL 470459, at *1–3 (D. Mass. Feb. 12, 2025).

### C.    This Court Lacks Jurisdiction over any PSC Plaintiffs' Claims

Defendants explained in their motion to dismiss that claims brought by any Personal Service Contractor ("PSC") Plaintiffs must be pursued through the channels established by

Congress. ECF No. 110-1 at 13–16. Plaintiffs do not dispute that they seek to set aside any actions taken at USAID on behalf of or at the direction of Mr. Musk or USDS, and that these alleged actions relate to their status as USAID contractors. *Id.* at 14. Plaintiffs further do not disagree that they seek to have their PSC contracts reinstated and for any payments on those contracts to be restarted. *Id.* Nevertheless, Plaintiffs make three arguments for jurisdiction over claims raised by any PSC Plaintiff. ECF No. 121 at 24–26. None provides a basis for this Court's jurisdiction.

Plaintiffs first contend that "Defendants apparently argue only that there could be a dispute under the CDA at some later date[.]" *Id.* at 24. Plaintiffs fundamentally misunderstand Defendants' position. Under the channeling procedures established by Congress, any PSC Plaintiff must first obtain a final agency decision on their post-termination claim. *See* ECF No. 110-1 at 16. Once a PSC receives that final agency decision, he may then receive judicial review in the Court of Federal Claims. *Id.* (citing 41 U.S.C. §§ 7104(b)(1), 7103(g); *see Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 775–76 (Fed. Cir. 2021)). Because Plaintiffs have failed to allege that they have pursued the Congressionally mandated means of redress, this court lacks jurisdiction over their claims.

Plaintiffs next argue that their claims do not rely on a contract at all, and that the "crux of the suit is . . . the dismantling of USAID." ECF No. 121 at 24. As already explained, however, the D.C. Circuit in *Widakuswara* rejected a strikingly similar claim. There, a group of plaintiffs—including personal service contractors for another agency—challenged that agency's decision to reduce operations "to the minimum level of operations required by statute" on Appointments Clause and Separation of Powers grounds and sought an injunction to, among other things, "restore its employees and contractors to their pre-March 14 status." *Widakuswara*, 2025 WL 1288817, at *1. The D.C. Circuit held that the district court likely lacked jurisdiction over those

personnel actions—notwithstanding the fact that they were bringing constitutional claims and disclaimed seeking monetary damages—because Congress' comprehensive statutory scheme for adjudicating employment disputes with the federal government applies to "'systemwide challenge[s]' to an agency policy . . . just as it does to the implementation of such a policy in a particular case." *Id.* at *2 (citation omitted). It did not matter that the plaintiffs there argued their claim was "'not simply a collection of employment disputes' because the 'facts . . . on the ground' suggested the relevant agency was being 'dismantl[ed]'" *Id.* at *3 (cleaned up). Rather, the D.C. Circuit held that the alleged "dismantling" was a collection of "many individual actions" that cannot be packaged together to avoid the remedial channels established by Congress. *Id.* That same reasoning should apply here.[6]

The D.C. District Court in *U.S. Conference of Catholic Bishops v. Department of State*, ---F. Supp. 3d---, 2025 WL 763738 (D.D.C. Mar. 11, 2025), similarly found it lacked jurisdiction to ender an injunction that would bar the pause or cancellation of government contracts. *Id.* at *5. The court noted that "the type of relief sought" was dispositive because the nature of the relief— an order requesting that the government continue the payment of funds due under cooperative agreements—"sounds in contract." *Id.* (citation omitted). The Court explained that "[when] stripped of its equitable flair," the plaintiffs' request for an injunction to compel the payment of money due under a contract "must be resolved" by the Court of Federal Claims. *Id.* (citation omitted). So too here. The nature of Plaintiffs' claimed relief, which includes the reinstatement of contracts, Am. Compl. ¶ 141(a), plainly sounds in contract.

---

[6] Plaintiffs' reliance upon *Aids Vaccine Advocacy Coalition v. U.S. Department of State*, ---F. Supp. 3d---, 2025 WL 752378 (D.D.C. Mar. 10, 2025), is misplaced, ECF No. 121 at 26, as that decision pre-dates the D.C. Circuit's decision in *Widakuswara*. And even by its own terms, that decision *rejected* plaintiffs' request to revive terminated contracts on separation of powers grounds. *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *23.

Plaintiffs further contend that they are not seeking monetary damages, and the possibility that granting injunctive relief "could result in some actions with financial effects does not transform this case into one . . . under the Tucker Act." ECF No. 121 at 25–26. The Supreme Court recently rejected a similar claim in *Department of Education v. California*, 605 U.S.---, 145 S. Ct. 966, 968 (2025) (per curiam). In *California,* the Supreme Court held that a claim "to enforce a contractual obligation to pay money" must be brought in the Court of Federal Claims under the Tucker Act. *Id.* (citation omitted); *see Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (holding that district courts lack jurisdiction to enter "an injunction requiring the government to pay monies owed" where "[t]he right to these payments is created in the first instance by [a] contract"). Plaintiffs do not dispute that in the absence of a contract with USAID, the PSC Plaintiffs would have no right to the employment relief they seek. Under these circumstances, Plaintiffs' demand for payment under their contracts with USAID is inherently a claim for damages, and they have failed to meet their burden of establishing subject matter jurisdiction.

Finally, Plaintiffs contend that Defendants "cite no authority for the proposition that a contractor cannot avail herself of the federal courts for injunctive relief to prevent or stop a constitutional injury." ECF No. 121 at 26. But that is precisely what the D.C. Circuit held in *Widakuswara*. Rather, it is Plaintiffs that lack authority for the proposition that a plaintiff whose standing is based upon their contractual relationship with an agency, whose claimed harms are based on their employment relationship with that agency, and who are seeking contractual damages such as payment and reinstatement of contracts, may pursue their claims in district court. The claims of any PSC Plaintiff should be dismissed.

### D. Plaintiffs Have Failed to Plead any Named Plaintiff Is an FSL

Plaintiffs contend that Defendants "ignore" Foreign Service Limited ("FSL") personnel

and claim that these employees' claims are not subject to either the CSRA or the CDA. ECF No. 121 at 2. Defendants have not "ignored" FSLs. Though they assert that the named Plaintiffs "represent four types of hiring classifications," *id.* at 8, Plaintiffs made no allegation in their Amended Complaint that any named Plaintiff is an FSL (or any other employment classification for that matter). *See* Am. Compl. ¶¶ 4–9. Instead, Plaintiffs improperly rely upon declarations in support of their motion for class certification for these allegations. ECF No. 121 at 8. This pleading failure is fatal to their claim, as they cannot establish subject matter jurisdiction based on the well-pled allegations in their Amended Complaint.

In any event, amending the complaint to add such allegations would make no difference. Even if FSLs are not subject to the CSRA or the CDA, this Court still lacks jurisdiction over their claims. The Supreme Court has explained that "deliberate exclusion of [a group] from the provisions establishing administrative and judicial review for personnel action of the sort at issue . . . prevents [the group] from seeking review." *Fausto*, 484 U.S. at 455. In the *Thunder Basin* context, "the CSRA's 'elaborate' framework . . . demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA *denies* statutory review." *Elgin*, 567 U.S. at 11 (quoting *Fausto*, 484 U.S. at 443). Thus, even if FSLs are not granted administrative review under the CSRA or the CDA, that demonstrates Congress's intent to preclude judicial review of their claims. *See Am. Fed'n of Gov't Emps. v. Sec'y of the Air Force*, 716 F.3d 633, 638 (D.C. Cir. 2013) ("[T]he fact that National AFGE may not pursue a claim through the CSRA does not mean that it has access to the courts. Rather, it means that National AFGE may not raise the claim at all.").

### E.    Plaintiffs Have Failed to Plead Article III Standing

Even if Congress's comprehensive channeling scheme did not deprive this Court of jurisdiction, the Court lacks jurisdiction because Plaintiffs lack standing. As Defendants explained

in their opening brief, the Amended Complaint does not establish Article III standing. ECF No. 110-1 at 17–20; *see Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (plaintiffs must allege "sufficient facts to invoke subject matter jurisdiction" to survive facial challenge). Plaintiffs' opposition does little to rehabilitate their Amended Complaint, which fails on substance and is deficient on pleading.

**1.** As to Plaintiffs' alleged informational injuries, agency employees suffer no cognizable injury based on which government employees have theoretical access to their data. Plaintiffs argue they had a reasonable expectation that their personal records would be kept within USAID "in accordance with the law," such as the requirements of the Privacy Act. ECF No. 121 at 5. But Plaintiffs do not plead any Privacy Act claim (nor could they). And even if they had made such allegations, the mere allegation that a government agency maintained data in violation of a statutory requirement is insufficient to establish standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). "Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).

Under *TransUnion*, plaintiffs must establish a "close relationship" between an asserted common-law tort and the alleged statutory violation. 594 U.S. at 425. Plaintiffs here suggest in passing that they have alleged harm "comparable to the common law tort of intrusion upon seclusion." ECF No. 121 at 5. As the Fourth Circuit recently explained, that tort is simply not comparable to the sharing of government data systems among government employees. *Am. Fed. of Teachers v. Bessent*, No. 25-1282, 2025 WL 1023638, at *2 (4th Cir. Apr. 7, 2025) (Agee, J., concurring); *id.* at *4-5 (Richardson, J., concurring). Intrusion upon seclusion is "an intentional interference with" a person's "private affairs or concerns, of a kind that would be highly offensive to a reasonable man." Restatement (Second) of Torts § 652B(a) (1977). The common thread

14

linking intrusions actionable by that tort is that the plaintiff is "the subject of targeted 'investigation[s] or examination[s] into [their] private concern[s].'" *Bessent*, 2025 WL 1023638, at *5 (Richardson, J., concurring).[7] Plaintiffs here do not allege that they were the subject of any such targeted snooping; they allege only that Defendants had access to certain systems that contained their employment-related data, along with the personal information of thousands of others employees or PSCs. *E.g.*, Am. Compl. ¶ 91.

**2.** Substance aside, the Amended Complaint suffers from fatal pleading deficiencies. Plaintiffs are simply incorrect that the Amended Complaint alleges that any Defendant obtained any of *the named Plaintiffs'* personal data. *See* ECF No. 121 at 4 (citing Am. Compl. ¶¶ 62, 64, 76–80, 83–84). Those paragraphs instead allege that certain individuals accessed USAID systems and obtained personally identifiable information of unnamed Class members. *See* Am. Compl. ¶ 62 ("information of Class members"); *id.* ¶ 64 (alleging access to data systems not particular to any named Plaintiff); *id.* ¶¶ 76–80 (access to "building security systems"); *id.* ¶¶ 83–84 ("thousands of Class members"). That fact alone precludes reliance on any data-based harm. "Without a sufficient allegation of harm to the named plaintiff in particular, plaintiffs cannot meet their burden of establishing standing." *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011).

Plaintiffs' descriptions of "interruptions to their lives and livelihoods" suffer from the same defect. None of the "interruptions" described in the Amended Complaint are alleged to have occurred to particular named Plaintiffs. *See* Am. Compl. ¶¶ 83, 86, 91, 93, 95, 98, 109-12, 120-22, 126 (alleging harm to generic "USAID employees," PSCs, "Class members," "USAID staff," or

---

[7] Plaintiffs omit that the Fourth Circuit stayed the *Bessent* district court's opinion pending appeal. *See* ECF No. 121 at 5. Plaintiffs also cite *AFSCME v. SSA,* ---F. Supp. 3d---, 2025 WL 1206246 (D. Md. Apr. 17, 2025). The Government has sought emergency relief from the Supreme Court in that case, which in any event addressed access to data on a much broader scale and beyond any employment relationship. *Id.* at *3 (distinguishing *Bessent*).

"USAID Foreign Service Officers"). As a fallback, Plaintiffs cite declarations they submitted with their class certification motion. ECF No. 121 at 5–6 & n.4. But as discussed above, Plaintiffs did not incorporate those materials by reference in the Amended Complaint, so relying on them is inappropriate in a facial jurisdictional attack.

So too with Plaintiffs' alleged reputational and dignitary harms. The statements Plaintiffs cite criticizing USAID generally do not establish particularized harm to any named Plaintiff or class member. *See* ECF No. 110-1 at 19–20. A government official's general political speech on a matter of public concern is a far cry from the sorts of actions involved in Plaintiffs' cited cases— governmental actions that would "require" a specific plaintiff to "reveal" to the public that he had HIV, *Roe v. Dep't of Def.*, 947 F.3d 207, 229 (4th Cir. 2020), or "disclose his transgender status to avoid disciplinary action," *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F. Supp. 3d 704, 709 (D. Md. 2018). And neither of those two cases addressed Article III standing in any event.

**3.** Finally, Plaintiffs fail to link any of their alleged harms to their two constitutional claims. Take Plaintiffs' allegations that Defendants have taken down USAID's website in violation of the Appointments Clause. Plaintiffs fail to explain how their claimed injuries, which include "unauthorized access to or disclosure of their private data,"; "interruptions to the ordinary course of their employment"; or reputational and dignitary harms, Am. Compl. ¶¶ 4-9, bear any connection to the take down of USAID's website. The same is true of their allegation that the closure of USAID headquarters violates the Appointments Clause. Plaintiffs must establish standing for each claim they press against each defendant and for each form of relief they seek, *Murthy v. Missouri*, 603 U.S. 43, 61 (2024), and their failure to do so here is fatal to their claims.

### F.    Plaintiffs' Claims Raise Claim-Splitting Concerns

Plaintiffs incorrectly assert that class actions are not subject to the claim-splitting doctrine. A named plaintiff and its privities cannot split individual claims between separate actions, even

when one is pressed on behalf of a putative class. *See Cook v. C.R. England, Inc.*, No. CV 12-3515-GW(CWx), 2012 WL 2373258, at *4 (C.D. Cal. June 21, 2012). Plaintiffs' cases merely explain that *absent* class members are not precluded from asserting individual claims not decided in the class litigation. *See Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 428-29 n.16 (6th Cir. 2012); 18 Moore's Federal Practice § 131.40[3][e][iii]. Nor must the named Plaintiffs here be named in the other actions. Rather, because the entities in those cases must rely on injury to their members to establish associational standing, *see Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007), Plaintiffs are likely in privity with those entities. *Brightview Grp., LP v. Glynn*, Civ. Case No. SAG-21-3027, 2022 WL 743937, at *9 (D. Md. Mar. 11, 2022) (privity exists when "the interests of one party are so identified with the interests of another that representation by one party is representation of the other's legal right" (citation omitted)).

## II. Plaintiffs' Complaint Fails to State a Claim

### A. Plaintiffs' Appointments Clause Claim Against Musk Fails to State a Claim

On the merits, Plaintiffs similarly fail to rebut Defendants' arguments. Defendants' motion to dismiss demonstrated that Plaintiffs' Appointments Clause claim fails for three independent reasons: (1) Plaintiffs concede that the ongoing reorganization of USAID is being overseen by Secretary Rubio, whose authority is undisputed; (2) Plaintiffs concede that Mr. Musk's position is not an "office established by law" and he does not exercise authority vested "pursuant to the laws of the United States," *Lucia v. SEC*, 585 U.S. 237, 245 (2018); and (3) Plaintiffs' allegations establish that Mr. Musk's position is not "continuing" beyond his personal tenure. Plaintiffs' opposition does not change the analysis.

**1.** Plaintiffs contend that "[n]aming" Secretary Rubio and Mr. Lewin is "[i]mmaterial." ECF No. 121 at 30. This misses the point. What matters is not whether these officials are named Defendants; what defeats Plaintiffs' claim is the concession that *those* officials—not Mr. Musk—

17

are overseeing the ongoing reorganization of USAID, including that "[s]ubstantially all USAID personnel will be separated from federal service" and "that existing USAID bureaus and offices would either be 'abolished' or 'realigned to the State Department.'" Am. Compl. ¶ 123 (alteration in original); *see id.* ¶¶ 118–25; *Andrade*, 824 F.2d at 1257. Plaintiffs try to circumvent this defect by attempting to cabin the scope of their Amended Complaint to a *three-day period* allegedly "*before* Secretary Rubio or Defendant Lewin were supposedly in charge." ECF No. 121 at 30-31; *see* Am. Compl. ¶ 73. But that reframing doesn't match the rest of their theory of the case. First, because Plaintiffs' Appointments Clause claim against Mr. Musk is founded on "the effective dismantling of USAID," *id.* ¶ 131, their allegation that Secretary Rubio is overseeing the process of separating all the personnel and "abolish[ing]" or "realign[ing]," *id.* ¶ 123, all its offices—the specific actions that must be taken to implement the "dismantling"—disposes of that claim as a matter of law. *See Andrade*, 824 F.2d at 1257 ("it does not offend the Appointments Clause so long as the duly appointed official has final authority over the implementation of the governmental action."). Second, because Plaintiffs seek only declaratory and injunctive relief, they cannot rely on alleged past violations to justify future injunctive and declaratory relief. *See, e.g., City of L.A. v. Lyons*, 461 U.S. 95, 106-07 (1983); *see also Mem.* Op. ECF No. 124 ("[A] conclusion that one or more of the early actions aimed at dismantling USAID violated the Appointments Clause would not provide a basis to prevent the proposed upcoming actions . . . .").

Next, Plaintiffs attempt to argue that Secretary Rubio's ongoing oversight of USAID's reorganization is a factual issue that is not yet ripe. But "the Amended Complaint does not contain any allegations that demonstrate that Musk or other current DOGE personnel have made the decisions to take the actions described in" Mr. Lewin's March 28 email. *Id.* at 7-8; *see* Am. Compl. ¶ 120. Defendants rely only on Plaintiffs' own allegations, which establish that Secretary Rubio

and Mr. Lewin are overseeing the ongoing efforts to restructure USAID. *See, e.g.*, Am. Compl. ¶¶ 118–25. Plaintiffs concede Secretary Rubio has been overseeing USAID since at least February 2, *id.* ¶ 73; the only allegation as to Mr. Musk since that date is that he posted once on social media. *See id.* ¶ 108; *see generally id.* ¶¶ 91–127. Nor do Plaintiffs challenge the validity of either Secretary Rubio or Mr. Lewin's service. Because Plaintiffs themselves allege that Secretary Rubio and Mr. Lewin—"duly appointed official[s]"—have "final authority over the implementation of the governmental action," their claims fail as a matter of law. *Andrade*, 824 F.2d at 1257.

Finally, Plaintiffs perfunctorily attempt to distinguish *Andrade*, suggesting that it applies only "where the same decision maker ratified his earlier decision[.]"[8] ECF No. 121 at 32. But *Andrade* has no such limitation. Nor does the court's observation that the use of "'acting' officials to avoid making permanent appointments" might be unreasonable have any bearing here. 824 F.2d at 1257; *see* ECF No. 121 at 31–32. Plaintiffs are not challenging the use of an "acting" official. More importantly, *Andrade* holds that, where the action that can be remedied by the court—here, the alleged "dismantling" of USAID, Am. Compl. at 3, 4, 19, 27, 33; *id.* ¶¶ 26, 88, 125, 131—is "carried out" by an official who "was duly installed in his post" at the time it is carried out, there can be no Appointments Clause violation. 824 F.2d at 1257. That is precisely the situation Plaintiffs allege here: that USAID is being "dismantl[ed]" and that Secretary Rubio has been overseeing this process for months under authority that Plaintiffs do not challenge. There can be no violation of the Appointments Clause.

**2.** As to Mr. Musk's authority, Plaintiffs offer a novel theory of the Appointments Clause:

---

[8] Plaintiffs incorrectly claim *Andrade* involved "ratification." ECF No. 121 at 30. *Andrade*'s holding is not that a decision made *in the past* by an official with a defective appointment can be *ratified* by an official with a valid appointment (although this is also true); it holds instead that so long as the official *authorizing* an action *in the present* when it takes effect is validly serving, there is no Appointments Clause problem, regardless of who planned it. *See* 824 F.2d at 1257.

that anyone whose "actions" a court deems "significant" becomes an officer of the United States for whatever period the "power" he or she allegedly "actually wielded" is adjudged to be "significant," whatever their role and whatever authority they legally possess. ECF No. 121 at 29. But Plaintiffs fail to articulate how such a theory could possibly be managed in practice or how numerous powerful White House advisors, from the Chief of Staff to the White House Counsel— who *no one* contends are "officers of the United States" subject to the Appointments Clause—are any different. This unworkable theory would entail a monumental change to Appointments Clause jurisprudence. Unsurprisingly, it finds no support in law.

Indeed, Plaintiffs' cited cases support Defendants' reading of the law. *Lucia*, as Plaintiffs note, holds that officer status turns on the authority vested "pursuant to the laws of the United States," particularly an office's "assigned functions." *Id.* at 28 (quoting *Lucia*, 585 U.S. at 245). *Lucia* leaves no doubt that this inquiry turns on the legal authority vested in the position. *See* 585 U.S. at 248-49 (analyzing the powers vested in and limits imposed upon ALJ roles pursuant to 17 C.F.R §§ 200.14, 201.111, 201.180, 201.360 & 15 U.S.C § 78d-1). The same is true of *Maurice* and *Tucker*. *See United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. 1823) (No. 15,747) (explaining that the "important duties" Plaintiffs reference are "define[d]" by "army regulations" that are "referred to in acts of congress"); *Tucker v. Comm'r*, 676 F.3d 1129, 1132-34 (D.C. Cir. 2012) (analyzing the powers vested in and limits imposed upon IRS Appeals Office personnel pursuant to specific statutory and regulatory provisions). Plaintiffs' failure to identify any legal authority vested in Mr. Musk—indeed, their concession that he occupies no office with such authority—dooms their Appointments Clause claim. *See* Am. Compl ¶¶ 10, 130-31.

Nor does Plaintiffs' inapt hypothetical about certain commissions (ECF No. 121 at 30) advance their cause. If the President appointed "a commissioner" to a position in which the "scope

of authority" is "clearly define[d]" by Congress, and then instructed that person to take action outside the scope of those clearly defined duties, it might be improper or even actionable if the person did so. *Id.* But it would not violate the *Appointments Clause*. Rather, because Congress vested that office with an inferior officer's duties and prescribed commensurate appointment procedures, the Appointments Clause is satisfied.[9] *See generally* U.S. Const. art. I § 2, cl. 2.

This is why Plaintiffs' confused theory of the Appointments Clause ultimately fails. If an official occupies a position vested with certain legal powers and then takes actions that she is not legally authorized to take pursuant to that position, this would not "allow[] executive branch [officials] to wield unchecked power," as Plaintiffs claim. ECF No. 121 at 30. A validly appointed Commissioner on Presidential Scholars, or member of the Defense Base Closure and Realignment Commission, to use Plaintiffs' examples, could not fire the Secretary of Health and Human Services, precisely because that authority hasn't been granted to her "pursuant to the laws of the United States." *Lucia*, 585 U.S. at 245 (citation omitted). But that has nothing to do with whether that Commissioner was validly appointed, and any claim regarding the validity of that action would not lie under the Appointments Clause. The problem with the action would instead be the actor's lack of legal power to do so because neither Congress nor the Constitution vested that particular power in the Commissioner's particular office. So, too, here. Plaintiffs may be opposed to the actions they believe were taken at Mr. Musk's advice or direction, but that has no bearing on whether his role requires any particular form of appointment.

---

[9] Neither commission identified by Plaintiffs actually fits this description. The Commission of Presidential Scholars was neither created by nor had its duties established by Congress, but by Executive Order. *See* Exec. Order No. 11,155, 29 Fed. Reg. 6909 (May 23, 1964); *cf.* 20 U.S.C. § 1221. And members of the Base Closure and Realignment Commission have been subject to Senate confirmation since 1991. *See* National Defense Authorization Act for Fiscal Year 1991, § 2902(c)(1)(A), Pub. L. No. 101–510, 104 Stat. 1485 (1990).

Likewise, Plaintiffs do *not* dispute that the President may appoint the White House Chief of Staff without any congressional oversight and instruct her to direct cabinet secretaries as to his instructions. And neither Plaintiffs nor *Amicus* explains why the White House Chief of Staff role does not require and has not required Senate confirmation, but Mr. Musk nonetheless should. The Chief of Staff of course "exercises" "significant" authority in some colloquial sense, but no one contends that it "decimate[s]" the Appointments Clause for the President to select his Chief of Staff without Senate input. ECF No. 121 at 30. That is because the Chief of Staff, like Mr. Musk, does not occupy an office vested by Congress with "significant authority *pursuant to the laws of the United States.*" *Lucia*, 585 U.S. at 245 (citation omitted and emphasis added).

**3.** Finally, Plaintiffs argue that "[a]n Appointments Clause Claim can proceed even if the office was not formally created by Congress or the executive branch." ECF No. 121 at 32 (citing *Willy*, 423 F.3d at 491-92, and *Tucker*, 676 F.3d at 1133).[10] This fails to grapple with Defendants' argument, which is that Plaintiffs' Amended Complaint categorically pleads that Mr. Musk's role is unique and personal to him, contrary to the "continuing" requirement of the Appointments Clause. *Id.* Plaintiffs fail to dispute that they plead Mr. Musk's position is personal to him, and do not dispute that this failure is fatal. *See* ECF No. 110-1 at 30–31.

Instead, they point to the role of the United States DOGE Service ("USDS") Administrator. The duties vested in that role by law (which involve software modernization and consultation on federal hiring) do not constitute "significant authority," even if Mr. Musk did occupy that position. *See* Exec. Order No. 14,158, § 4, 90 Fed. Reg. 8441 (Jan. 20, 2025); Exec. Order No. 14,170, § 2,

---

[10] Plaintiffs' characterization of *Willy* is inaccurate. The role at issue there *was* "formally created by . . . the executive branch," *i.e.*, the Secretary of Labor. ECF No. 121 at 32. *See* 423 F.3d at 491 & nn. 23–24. And *Tucker* does not help Plaintiffs because the court there recognized that Congress vested the office at issue with legal authority, analyzed the limits on that office *pursuant to statute and regulation*, and found that it was not constitutionally "significant." 676 F.3d at 1133–34.

90 Fed. Reg. 8621 (Jan. 20, 2025); *see also* Mem. Op. at 25, ECF No. 73 ("Congress did not establish [the USDS Administrator role] as an inferior Officer position" and the role is not "that of an Officer"). And in any event, Plaintiffs concede Mr. Musk does not occupy that position. *See* Am. Compl. ¶ 20 (naming as USDS Acting Administrator Amy Gleason as a Defendant).

### B.    Plaintiffs Fail to State a Separation-of-Powers Claim

As to Plaintiffs' separation-of-powers claim, Plaintiffs have similarly failed to dispute Defendants' arguments. Defendants demonstrated that Plaintiffs allege a statutory violation masquerading as a constitutional claim and that their claim about the adequacy of the Executive's consultation with Congress is a non-justiciable political question. ECF No. 110-1 at 31-33.

First, Plaintiffs concede that their claim is rooted in an alleged statutory violation. *See* ECF No. 121 at 34 (arguing "Defendants' actions violate multiple statutes," specifically reorganization-related provisions in Foreign Affairs Reform and Restructuring Act of 1998 and FY24 Appropriations Act). Beyond those statutes' provisions regarding reorganizations, the Executive Branch also has statutory authority to implement reductions in force, which lie at the heart of Plaintiffs' claims (and, indeed, their alleged basis for standing). *See id.* at 6-7; Am. Compl. ¶¶ 4-9. Congress has recognized the Executive Branch's authority to carry out reductions in its workforce. *See* 5 U.S.C. § 3502. "It clearly is within the President's constitutional and statutory authority . . . to prescribe reorganizations and reductions in force." *Nixon v. Fitzgerald*, 457 U.S. 731, 757 (1982). The President likewise has constitutional authority to address the underlying employment matters at issue here. *See Seila Law LLC v. Consumer Fin. Prot. Bureau,* 591 U.S. 197, 213 (2020) (the President must have "the power of . . . overseeing[] and controlling those who execute the laws" on his behalf (citations omitted)).

Against this backdrop, Plaintiffs argue that the separation of powers was violated because Defendants did not send reorganization plans to Congress "*in advance* of" or "*before*" "certain

actions were taken." ECF No. 121 at 34; Am. Compl. ¶ 57. Given the Executive Branch's authority to conduct reductions in force and reorganize USAID, Plaintiffs' claim that such actions failed to comply with the statutory notice requirements can only be a claim alleging "mere excess or abuse of discretion in exerting a power given." *Dalton v. Specter*, 511 U.S. 462, 474 (1994) (citation omitted). But that is exactly the type of claim *Dalton* explains cannot proceed.[11] *See id.* at 472-73.

Plaintiffs' focus on the *timing* of Congressional notice also demonstrates that it is Congress, not this Court, that should have the say over whether the notice is adequate. Congress has various resources at its disposal to address the proposed reorganization should it choose to do so. Judicial deference to Congress is especially appropriate here, where the core "dismantling" actions alleged by Plaintiffs have not yet taken effect and concededly will not take place until months after Congress was notified of them. *Id.* ¶¶ 120, 123. Congress has knowledge of Secretary Rubio's plans about USAID, the ability to take action or request further information, and time to do so.

For that reason, courts routinely hold that statutes requiring the Executive Branch to report information to Congress do not create judicially enforceable rights in third parties. Rather, "congressional reporting requirements" are generally "a management tool employed by Congress for its own purposes," and not provisions that "provide[] for judicial scrutiny." *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 316-19 (D.C. Cir. 1988). "Having requested the report, Congress, not the judiciary, is in the best position to decide whether it's gotten what it wants." *Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998). Accordingly, Plaintiffs' claim presents a nonjusticiable political question, because the Court lacks judicially "manageable standards for resolving it." *Baker v. Carr*, 369 U.S. 186, 217 (1962). Judicial review of the sufficiency of

---

[11] As to the substance of that claim, the Amended Complaint alleges the statutorily required consultation is now occurring. *See* Am. Compl. ¶¶ 123 & 124.

Congressional notice would not provide the "respect due coordinate branches of government" in making a nonjudicial "policy determination." *Id.*

**C.    Plaintiffs' Claim Against the President Should Be Dismissed**

As Defendants previously explained, Plaintiffs cannot obtain injunctive *or* declaratory relief against the President. ECF No. 110-1 at 34. Plaintiffs now concede that injunctive relief against the President is unavailable, but claim that declaratory relief is appropriate. ECF No. 121 at 35. But as the D.C. Circuit has held, courts "have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citation omitted); *see Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996).

The sole case relied upon by Plaintiffs in support, *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), is misplaced. As the D.C. Circuit recognized in *Swan*, "[i]t is not entirely clear, of course, whether, and to what extent, [*NTEU*] remains good law after *Franklin*." 100 F.3d at 978. The D.C. Circuit in *Swan* explained that the separation-of-powers concerns with seeking injunctive or declaratory relief against the President can often be avoided by seeking relief against subordinate officials. *Id.* Here, Plaintiffs are seeking injunctive and declaratory relief against Mr. Musk, USDS, USAID and the State Department, Am. Compl. ¶¶ 10–20, and they do not dispute that they could obtain complete relief from those other defendants. Plaintiffs have provided no legal basis or practical reason for seeking a declaration against President Trump in this case, and the claims against him should be dismissed.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Amended Complaint should be dismissed.

Dated: May 29, 2025                    Respectfully submitted,

                                       YAAKOV M. ROTH

Acting Assistant Attorney General

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

JOSHUA E. GARDNER (FL Bar No. 302820)
*By Special Appearance*
Special Counsel

*/s/ Christopher M. Lynch*
GARRY D. HARTLIEB (IL Bar. No. 6322571)
CHRISTOPHER M. LYNCH
(DC Bar No. 1049152)
JACOB S. SILER (DC Bar No. 1003383)
JAMES J. WEN (NY Bar No. 5422126)
*By Special Appearance*
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-4537
Email: christopher.m.lynch@usdoj.gov

*Attorneys for Defendants*