**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-2235**

---

NATIONAL ASSOCIATION OF IMMIGRATION JUDGES, affiliated with the International Federation of Professional and Technical Engineers,

　　　　Plaintiff - Appellant,

　v.

SIRCE E. OWEN, in her official capacity as Acting Director of the Executive Office for Immigration Review,

　　　　Defendant - Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia at Alexandria. Leonie M. Brinkema, District Judge. (1:20-cv-00731-LMB-JFA)

---

Argued: December 11, 2024　　　　　　　　　　Decided: June 3, 2025

---

Before HARRIS, HEYTENS and BERNER, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Berner wrote the opinion, in which Judge Harris and Judge Heytens joined.

---

**ARGUED:** Ramya Krishnan, COLUMBIA UNIVERSITY, New York, New York, for Appellant. Jennifer L. Utrecht, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Alexia Ramirez, Xiangnong Wang, Alex Abdo, Knight First Amendment Institute, COLUMBIA UNIVERSITY, New York, New York; Victor M. Glasberg, Nickera Simone Rodriguez, VICTOR M. GLASBERG &

ASSOCIATES, Alexandria, Virginia, for Appellant. Brian M. Boynton, Principal Deputy Assistant Attorney General, Michael S. Raab, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee.

BERNER, Circuit Judge:

The National Association of Immigration Judges brought this challenge to an employee policy that requires immigration judges to obtain permission before speaking publicly on issues relating to immigration. The National Association of Immigration Judges argues that the policy violates the First and Fifth Amendment rights of its members. The district court dismissed the case for lack of subject matter jurisdiction, concluding that the policy could only be challenged through the administrative procedures established by the Civil Service Reform Act.

Congress enacted the Civil Service Reform Act to create a uniform scheme for administrative and judicial review of covered federal employee personnel actions. That scheme sets forth the protections and remedies available to such employees as well as the procedural process they must follow. When a federal employee seeks relief from an action covered by the Civil Service Reform Act, she is required to comply with the prescribed scheme of administrative and judicial review and may not generally bring an initial claim in federal court. Constitutional challenges and pre-enforcement challenges are no exception.

When the Civil Service Reform Act functions as designed, we agree with the district court that the National Association of Immigration Judges would be required to bring its case through its administrative scheme. It is not clear, however, that the Civil Service Reform Act is currently so functioning. The Civil Service Reform Act requires a strong and independent Merit Systems Protections Board and Special Counsel. That foundational principle, that functioning and independent bodies would receive, review, and decide in the

first instance challenges to adverse personnel actions affecting covered federal employees, has recently been called into question. Because Congress intended for the Civil Service Reform Act to strip district courts of jurisdiction only if federal employees were otherwise able to receive adequate and independent review of their claims, we vacate and remand to the district court to consider whether the text, structure, and purpose of the Civil Service Reform Act has been so undermined that the jurisdiction stripping scheme no longer controls.

## I. Background

The Executive Office for Immigration Review (EOIR) oversees the operation of the United States immigration courts. EOIR employs about 750 immigration judges (IJs). These IJs exercise the authority of the United States Attorney General to adjudicate immigration proceedings. Until 2022, when IJs were stripped of the right to union representation, the National Association of Immigration Judges (NAIJ) served as the certified bargaining representative for all non-supervisory IJs. Today, NAIJ is a non-profit voluntary association of IJs with hundreds of dues paying members, including members who are required to comply with the challenged speech policy.

### A. The EOIR Speech Policy

On October 12, 2021, EOIR issued a personnel policy that requires immigration judges to obtain prior approval before any official speech (the Speech Policy). The Speech Policy defines an official speech as one in which an IJ "is invited to participate in an event because of their official position, is expected to discuss agency policies, programs, or a

subject matter that directly relates to their official duties or otherwise appear on behalf of the agency." J.A. 57.

To determine whether speech is "official," "[s]upervisors must consider the nature and purpose of the engagement, the host(s) and sponsor(s) of the event, and whether the event provides an appropriate forum for the dissemination of the information to be presented." J.A. 57. The Speech Policy includes an attachment, Attachment A, which lists examples of official capacity engagements. These include "[i]mmigration conferences or similar events where the subject is immigration (including litigation)," "[m]eetings with [s]takeholders," "[p]ro bono training related to immigration," and the "EOIR Model Hearing Program." J.A. 62. Attachment A also provides examples of personal capacity speech, such as "[m]oot court judge - not immigration related," "[c]ommencement speaker when topic is unrelated to immigration or official duties," "[i]nterview based on book written in appropriate personal capacity," and "[s]peaking at community, religious, youth, or small social groups (e.g., book club) and meetings, not directly related to immigration law or advocacy." J.A. 62.

When an IJ seeks approval to speak or write in an official capacity, that request is subject to a multi-step review process. First, the IJ submits the speech request to her supervisor. If the supervisor determines that the request relates to an IJ's official duties, the request is forwarded to EOIR's Speaking Engagement Team (SET)—comprised of personnel from the Office of Policy, the Office of the General Counsel, and the Office of the Director. The EOIR's Ethics Program, also conducts a review to "offer[ ] guidance" on the request. J.A. 58. The Speech Policy ultimately permits supervisors, relying on the SET

and Ethics Program's guidance, to make the final decision about whether a judge may speak or write in her official or personal capacity and whether to approve official capacity requests. Although the Speech Policy contains no specific timeframe for review, supervisors are encouraged to submit requests relating to an IJ's official duties at least ten days before the event at which the IJ wishes to speak or the date by which a written piece is due. While the Speech Policy does not require IJs to obtain supervisory approval to speak in a personal capacity on topics unrelated to their official duties, it does encourage them to consult with EOIR's Ethics Program regarding such speaking engagements.

B. NAIJ's First and Fifth Amendment Challenge[1]

NAIJ's members seek to contribute to public and scholarly discourse concerning developments in immigration law and policy. They contend, however, that the Speech Policy restricts their ability to speak about their professional experiences, prevents them from expressing their personal views at legal conferences, and deters them from publishing scholarship on immigration law. Some IJs have ceased seeking approval altogether because they understand the Speech Policy to forbid them from speaking about immigration issues in a private capacity, and speaking in their official capacity "would require [them] to recite the agency's talking points." J.A. 29.

---

[1] Because this is an appeal from an order granting the Government's motion to dismiss, we accept as true the factual allegations in NAIJ's amended complaint. *De'lonta v. Johnson*, 708 F.3d 520, 522 (4th Cir. 2013). Accordingly, we state the facts as alleged by NAIJ.

EOIR has required IJs who attempt to publish written work on topics of immigration law to revise their writing to accord with EOIR's official positions. In one instance, an IJ attempted to publish an article about immigration court bond hearings. EOIR determined the article was an official capacity speech and a member of the EOIR Office of Policy "made several edits to the tone and substance of the piece." J.A. 31. The reviewing official conveyed that "certain observations made in the piece were not appropriate because they were not the official view of the agency." J.A. 31. In a section of the article described as the "author's opinion," the reviewing official asked whether the view conformed with EOIR's official position. If it did, the IJ was told that it "should not be expressed as [the] author's opinion." J.A. 31. If it did not, the reviewing official suggested that an "evaluation must be done as to whether [the opinion was] appropriate." J.A. 31.

Beyond outright restrictions on speech, IJs are sometimes constructively denied permission to speak because SET's decisions on speaking requests come too late. On one occasion, an NAIJ member requested approval to teach a law school course on immigration law. Although the Speech Policy provides that an immigration judge need only to receive supervisory approval to teach courses on immigration law, requests to teach are routinely routed to SET, "and judges who have sought approval often receive no decision." The judge submitted a request to teach a course during the Spring 2023 semester on November 3, 2022. She received no response before the end of the year, making it impossible for her to accept the teaching position or prepare a course. On other occasions, IJs submitted speaking requests or requests for approval to publish written work and heard no response for months.

NAIJ challenges the Speech Policy as a prior restraint on speech that is not tailored to a legitimate government interest, and as void for vagueness under both the First and Fifth Amendments.

### C. The Civil Service Reform Act of 1978

At issue in this case is whether the district court had jurisdiction over NAIJ's claims or whether the Civil Service Reform Act of 1978 (CSRA) stripped the district court of jurisdiction. The CSRA "comprehensively overhauled the civil service system." *Lindahl v. Off. of Pers. Mgmt.*, 470 U.S. 768, 773 (1985). It created an entirely "new framework for evaluating adverse personnel actions against 'employees' and 'applicants for employment'" within the federal government. *Id.* at 774. A critical purpose of the CSRA was to fix the "haphazard arrangements for administrative and judicial review of personnel action," part of the "outdated patchwork of statutes and rules built up over almost a century" that had been the civil service system. *United States v. Fausto*, 484 U.S. 439, 444 (1988). The CSRA sets out "in great detail the protections and remedies applicable to such [adverse actions], including the availability of administrative and judicial review." *Id.* at 443.

The CSRA created two agencies: (1) the Office of Personnel Management (OPM), which has central responsibility for administering the civil service rules and regulations established under the CSRA; and (2) the Merit System Protection Board (MSPB), which serves as the adjudicatory arm with jurisdiction over the personnel system. *See* 5 U.S.C. §§ 1101, 1204. The MSPB was established as an independent agency consisting of three members, each appointed by the President with the advice and consent of the Senate to

USCA4 Appeal: 23-2235   Doc: 41   Filed: 06/03/2025   Pg: 9 of 32
Case 8:25-cv-00462-TDC   Document 138-1   Filed 06/04/25   Page 9 of 32

serve seven-year terms. 5 U.S.C. §§ 1201, 1202(a)–(c). The MSPB is a quasi-judicial body, adjudicating conflicts between civil servants and their employing agencies. The MSPB resolves disputes including federal employees' allegations that their government employer discriminated against them, retaliated against them for whistleblowing, violated protections for veterans, or otherwise subjected them to an unlawful adverse employment action or prohibited personnel practice. 5 U.S.C. §§ 1204(a)(1), 1221, 2302(b)(1), (8)–(9), 3330a(d), 7512.

The CSRA also created the position of "Special Counsel." 5 U.S.C. § 1211. The Special Counsel receives and investigates allegations of prohibited personnel practices in violation of the merit system, reviews OPM rules and regulations, conducts investigations, and prevents reprisals against government "whistle blowers." *Id.* § 1212. The statute protects federal employees who disclose "mismanagement," "gross waste of funds," "abuse of authority," "danger[s] to public health or safety," and "violation[s] of law" to the Special Counsel. 5 U.S.C. § 1213. If the Special Counsel determines that there are "reasonable grounds" to believe a prohibited practice occurred, he or she is required to report that determination to the MSPB and the Special Counsel may "request" that the MSPB take corrective action. *Id.* § 1214(b)(1)(A)(i), (b)(2)(B).

Given the critical purpose of their roles, the MSPB and the Special Counsel were established to "be independent of any control or direction by the President." S. Rep. No. 95-969, at 24 (1978). The CSRA expressly provides that the MSPB's members and the Special Counsel can be removed only by the President for "inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. §§ 1202(d), 1211(b). The Whistleblower Protection

Act of 1989, 5 U.S.C. §§ 1211 *et seq.*, strengthened the Special Counsel's role in protecting and assisting government whistleblowers, by further separating the Special Counsel from the MSPB and creating the Office of Special Counsel (OSC) as an independent agency.

The CSRA has three primary sections regulating adverse personnel action, two of which are relevant here: Chapter 75 and Chapter 23. *See* 5 U.S.C. §§ 2301 *et seq., 7501 et seq.*; *Fausto*, 484 U.S. at 445–47. Chapter 75 addresses major adverse actions against employees. The first subchapter governs suspensions of fourteen days or less, 5 U.S.C. §§ 7501–04, and the second subchapter governs more serious actions—involving removal, suspension over fourteen days, grade reduction, pay reduction, and furlough up to thirty days, *see id.* §§ 7511–15. The second subchapter provides that a covered employee "against whom an action is proposed is [generally] entitled to[:]" a minimum of "30 days' advance written notice[;]" the opportunity to respond orally and in writing; representation; and "a written decision and the specific reasons therefor at the earliest practicable date." *Id.* § 7513(b). Decisions under the second subchapter are appealable, first to the MSPB and then to the United States Court of Appeals for the Federal Circuit. *Id.* §§ 7513(d), 7703(b).

Chapter 23 outlines the "merit system principles" agencies must uphold. 5 U.S.C. § 2301(b). Violations of these principles constitute "prohibited personnel practice[s]." *Id.* § 2302(a). An employee alleging a prohibited personnel practice must first file a charge with the OSC. *See id.* § 1214(b)(2)(A)(i). The OSC must then determine within 240 days whether "there are reasonable grounds to believe" that a prohibited personnel practice has occurred, exists, or will occur. *See id*. If the OSC determines that there are reasonable

grounds, the Special Counsel reports that determination to the head of the employing agency, as well as the MSPB and OPM, to provide the agency with an opportunity to remedy the prohibited personnel practice. *Id.* § 1214(b)(2)(B). If the agency fails to take corrective action, the OSC "may petition the [MSPB] for corrective action." *Id.* § 1214(b)(2)(C). Just as in Chapter 75, the CSRA grants the Federal Circuit jurisdiction to review final orders of the MSPB. *See id.* §§ 1214(c), 7703(b)(1)(A).

## II. Procedural History

NAIJ filed this case in the United States District Court for the Eastern District of Virginia. In September 2023, the district court dismissed for lack of jurisdiction,[2] concluding that the CSRA impliedly stripped the district court of jurisdiction to hear NAIJ's claims. *NAIJ v. Neal*, 693 F. Supp. 3d 549, 567–81 (E.D. Va. 2023). The district court concluded that the CSRA provides the sole remedial review scheme for adjudicating NAIJ's claims. *Id.* at 568–70. From this the district court concluded that the IJs must pursue their challenge to the Speech Policy before the MSPB, subject to judicial review in the Federal Circuit. *Id.* at 571–80.

---

[2] The district court first considered NAIJ's standing to bring the constitutional claims at issue. *NAIJ v. Neal*, 693 F. Supp. 3d 549, 563–67 (E.D. Va. 2023). While the Government does not raise standing on appeal, we are required to assure ourselves that standing exists. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). We agree with the district court that NAIJ possesses standing because of the chilling effect the Speech Policy allegedly has on NAIJ's members and the self-censorship it allegedly causes.

III. Analysis

We must answer a single question: Does the CSRA strip the district court of jurisdiction over NAIJ's pre-enforcement challenge to the Speech Policy?[3] If so, NAIJ's members must pursue their claims through the scheme outlined in the CSRA. That broad question requires us to undertake "a two-step inquiry" established by the Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994), to determine whether Congress intended to strip district-court jurisdiction over these claims. *See Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016).

In the first step of the *Thunder Basin* inquiry, we ask whether Congress's intent to preclude district-court jurisdiction is "fairly discernible in the statutory scheme." 510 U.S. at 207. At this step, we look to the statute's language, structure, and purpose to assess whether Congress intended to funnel covered federal employees' claims through the CSRA's administrative scheme, stripping district courts of jurisdiction. *See id.* We conclude that this step requires further examination by the district court. The CSRA's adjudicatory scheme was predicated on the existence of a functioning and independent MSPB and Special Counsel. We take notice that the function of the MSPB and Special Counsel, contrary to the CSRA's text and purpose, has recently been called into question. The district court must address this issue in the first instance.

---

[3] We review *de novo* the district court's dismissal of a complaint for lack of subject-matter jurisdiction. *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 629 (4th Cir. 2018).

In the second step of the *Thunder Basin* test, we determine whether NAIJ's "claims are of the type Congress intended to be reviewed within this statutory structure." *Id.* at 212. At this second step, we consider three factors. We focus on (1) whether the statutory scheme "foreclose[s] all meaningful judicial review." *Id.* at 212–13. We also consider (2) the extent to which the NAIJ's claims are "wholly collateral" to the statute's review provisions, and (3) whether "agency expertise could be brought to bear on the . . . questions presented." *Id.* at 212, 215. On the basis of these three factors, we affirm the district court's conclusion that the claims NAIJ brings would fall within the ambit of the CSRA. We vacate and remand, however, for the district court to evaluate whether the CSRA continues to function as Congress intended.

## A. Congressional Intent

At step one of the *Thunder Basin* test we consider "whether Congress's intent to preclude district court jurisdiction is 'fairly discernible in the statutory scheme.'" *Bennett*, 844 F.3d at 181 (quoting *Thunder Basin*, 510 U.S. at 207). "[W]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin*, 510 U.S. at 207 (internal citation omitted).

The Supreme Court has recognized that the CSRA, when functioning as Congress intended, was designed to strip district courts of jurisdiction. The Court first reached this conclusion in *United States v. Fausto*, which involved a federal employee's claims for back pay. 484 U.S. at 441–42. In *Fausto*, the Court recognized that the CSRA established a comprehensive system for reviewing personnel action taken against federal employees. *Id.*

at 443. The CSRA "prescribes in great detail the protections and remedies applicable to such action, including the availability of administrative and judicial review." *Id.* Looking at the text, structure, and the legislative history of the CSRA, the Supreme Court determined that Congress's intent to foreclose review was "fairly discernible." *Id.* at 443–450. Notably, the Supreme Court held that the structure of the CSRA evinces Congress's intent because of "*the primacy of the MSPB* for administrative resolution of disputes over adverse personnel action." *Id.* at 449 (emphasis added).

Likewise in *Elgin v. Department of Treasury*, the Supreme Court explained why the CSRA's "elaborate" framework and purpose demonstrate that Congress also intended covered employees appealing covered agency actions to proceed exclusively through the statutory review scheme, "even in cases in which the employees raise constitutional challenges to federal statutes." 567 U.S. 1, 10–11 (2012). The Court ultimately concluded that, "[g]iven the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Id.* at 11–12. In creating an administrative review process specifically for civil servants, Congress established administrative pathways to be adjudicated by the OSC and MSPB as the "exclusive forum" for review of agency personnel action. *Id.* at 14.

Those cases would have, until recently, made our analysis at step one of the *Thunder Basin* test simple. It has been well-established that Congress's intent for the CSRA to preclude district court jurisdiction is "fairly discernible in the statutory scheme." *Id.* at 17. That conclusion can only be true, however, when the statute functions as Congress

intended. During the pendency of this case, whether the CSRA functions as Congress intended has been called into question.

To maintain Congress' intent, the MSPB and Special Counsel must function such that they fulfill their roles prescribed by the CSRA. If, for example, the Senate-confirmed roles in the MSPB and Special Counsel go unfilled, or if the agencies fail to perform their duties such that covered employees' claims are not adequately processed, then the framework of the CSRA would be thwarted. Either situation would defeat congressional intent, as Congress enacted the CSRA for the express purpose that the merit system function and that claims be addressed adequately and efficiently. If claims are not so processed, of course, then turning to the MSPB or Special Counsel through the CSRA would be futile.

In reviewing a motion to dismiss, we may properly take judicial notice of matters of public record. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Papasan v. Allain,* 478 U.S. 265, 268 n. 1 (1986) ("Although this case comes to us on a motion to dismiss [. . .], we are not precluded in our review of the complaint from taking notice of items in the public record."). Here, we take notice that during the pendency of this case, the President removed the Special Counsel, *Dellinger v. Bessent*, No. CV-25-0385, 2025 WL 665041 (D.D.C. Mar. 1, 2025), *vacated and remanded*, No. 25-5052, 2025 WL 935211 (D.C. Cir. Mar. 27, 2025), and two members of the MSPB such that it currently lacks a quorum, *Harris v. Bessent*, No. CV-25-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025), *rehearing en banc granted*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025). These removals and the lack of quorum in the MSPB raise serious questions as to

whether the CSRA's adjudicatory scheme continues to function as intended. Such a question, which turns on a factual record, is best addressed by the district court in the first instance. We therefore remand to the district court to assess the functionality of the CSRA's adjudicatory scheme.

In addition to providing a functioning adjudicatory process, the CSRA was designed to protect the independence of the agencies reviewing federal employees' claims. The CSRA devised an adjudication system that was to serve as "a vigorous protector of the merit system"—the crux of this was the "establishment of a *strong and independent* [MSPB] and Special Counsel." S. Rep. 95-969, at 6–7 (emphasis added). Congress was deeply concerned with preventing regression back to the "spoils" system of the 19th century, in which employees advanced on the basis of "political or personal favoritism." *Id.* at 2–3. "The lack of adequate protection [against political will] was painfully obvious during the civil service abuses" of the past. *Id.* at 6–7. Instead, Congress sought to ensure that employees were "hired and removed on the basis of merit" and "competence." *Id.* at 2–3.

The MSPB was hailed as "the Cornerstone of Civil Service Reform." *Id.* at 24. In order to carry out its role of preserving the merit system for all federal employees, Congress recognized that the MSPB must be "insulated from the kind of political pressures that [had] led to violations of merit principles in the past." *Id.* at 7. Congress explained that "*absent such a mandate for independence for the merit board*, it is unlikely that [it] would have granted the Office of Personnel Management the power it has or the latitude to delegate personnel authority to the agencies." *Id.* (emphasis added).

16

The CSRA established the same independence for the Special Counsel, who it tasked to "investigate and prosecute political abuses and merit system violations," and "safeguard the rights" of employees who "'blow the whistle' on violations of laws." President Jimmy Carter, Federal Civil Service Message to Congress (Mar. 2, 1978).[4] In his letter calling for the creation of the Special Counsel, President Carter emphasized the need for "independent and impartial protection" for federal employees. *Id*. The CSRA incorporated President Carter's recommendation by "provid[ing] for an independent merit systems protection board and special counsel to adjudicate employee appeals and protect the merit system." S. Rep. No. 95-969, at 2.

Congress left little doubt about the importance of an independent MSPB and Special Counsel free from "*any control or direction by the President*." *Id.* at 24 (emphasis added). The MSPB and the Special Counsel "exercise statutory responsibilities independent of any Presidential directives." *Id.* at 7. For this reason, the CSRA mandates that the members of the MSPB and the Special Counsel can be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. §§ 1202(d), 1211(b).

The text and structure of the CSRA likewise demonstrate Congress's intent to foster a strong and independent MSPB and Special Counsel. As noted above, Congress established a bipartite structure to the merit system when it enacted the CSRA. The first agency created was OPM, which serves as "the arm of the President in matters of personnel administration." S. Rep. 95-969, at 24. That agency contrasts starkly with the MSPB, which

---

[4] Available at https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress [https://perma.cc/L266-UJ2L].

provides a quasi-judicial role intended to be fully independent from the president. *Id.*; 5 U.S.C §§ 1204(a), 1202(d). By statute, no more than two members of the MSPB are permitted to be from the same political party, to ensure that federal employees are "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. §§ 2301, 1201. MSPB members serve seven-year terms—a term limit longer than that guaranteed to the appointing President. *Id.* § 1202(a). The Senate must consent to any MSPB member. *Id.* § 1201. Similar protections exist for the Special Counsel, though the Special Counsel's term is limited to five years. *Id.* § 1201(b).

The CSRA also gives the MSPB substantial independent authority to allow it to act outside of the influence of the President. Unlike the MSPB's predecessor agency, the Civil Service Commission, the CSRA gave the MSPB subpoena authority to require "the attendance and presentation of testimony of any such individual, and the production of documentary or other evidence," 5 U.S.C. § 1204(b)(2)(A), that the MSPB determines "essential in conducting investigations and adjudicating appeals by federal workers," S. Rep. 95-969, at 7. The MSPB can wield that authority to "hear, adjudicate, or provide for the hearing or adjudication, of all matters" that fall within its broad jurisdiction over covered federal employees' claims. 5 U.S.C. § 1204(a)(1). The MSPB can then "order any Federal agency or employee to comply" with its resulting decision and can act to "enforce compliance with any such order." *Id.* § 1204(a)(2).

The CSRA gives the Special Counsel similar independent authority. The Special Counsel has the authority to conduct investigations, *id.* § 1214(a)(5), and can "issue subpoenas" and "order the taking of depositions" and "responses to written

interrogatories," *id.* § 1212(b)(2). The Special Counsel is also authorized access to all records or materials "available to the applicable agency that relate to an investigation." *Id.* § 1212(b)(5)(A)(i). If the Special Counsel finds reasonable grounds for a violation of the CSRA, and the employing agency does not take corrective action, the Special Counsel may petition the MSPB for corrective action. *Id.* § 1214(b)(2)(C). The Special Counsel may also initiate disciplinary action against those who violate the merit principles by engaging in prohibited personnel practices. *Id.* § 1212(a)(2).

Put simply, Congress enacted the CSRA on the bedrock principle that the members of the MSPB and the Special Counsel would be protected from removal on political grounds, providing them independence from the President. *See* 5 U.S.C. §§ 1202(d), 1211(b). Additionally, in lawsuits challenging the removals of the Special Counsel and members of the MSPB, the Government has argued that the removal protections enshrined in the CSRA are violations of separation of powers, Gov't Br. at 7–9, *Harris*, 2025 WL 679303; Gov't Br. at 5–8, *Dellinger*, 2025 WL 665041, thereby calling into question the constitutionality of a critical aspect of the CSRA, and the continued vitality of the statute's adjudicatory scheme. This issue has yet to be resolved, however. At present, reinstatement of the MSPB Board members has been stayed by the Supreme Court. *Trump v. Wilcox*, No. 24A966, 605 U.S. ____, 2025 WL 1464804 (May 22, 2025).

The resolution of this issue could also call into question whether the CSRA continues to function as Congress intended for purposes of the *Thunder Basin* analysis. As described above, Congress may well have intended the CSRA to strip district courts of jurisdiction only because it understood that the President could not exercise unfettered

19

control over the Special Counsel and MSPB. If that understanding proves to be incorrect, then a reevaluation of Congress's intent under *Thunder Basin* may be required. We leave that issue, should it arise, to the district court to address in the first instance.

At the time the district court considered its jurisdiction over this matter, the functionality and independence of the MSPB and Special Counsel had not been called into question. This is no longer necessarily true. The Special Counsel and several members of the MSPB have been terminated by the President and the Government has questioned the constitutionality of the removal protections enshrined in the CSRA. Accordingly, we remand to the district court to conduct a factual inquiry whether the CSRA continues to provide a functional adjudicatory scheme. If warranted, a new examination of Congressional intent may be required in light of changing circumstances around the MSPB and Special Counsel's removal protections.

## B. Whether NAIJ's Claims Fall Within the CSRA

Having concluded that questions remain as to the first step of the *Thunder Basin* test, we now turn to the second step, namely "whether plaintiffs' 'claims are of the type Congress intended to be reviewed within this statutory structure.'" *Bennett*, 844 F.3d at 178 (quoting *Thunder Basin*, 510 U.S. at 212). The district court determined that they were, and we agree.

The Supreme Court has identified three factors to determine whether a claim falls within the statutory structure: First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim? *Thunder Basin*, 510 U.S. at 212. Second, is

20

the claim "wholly collateral" to the statute's review provisions? *Id.* Third, does the claim

fall "outside the agency's expertise"? *Id.* We take each of these questions in turn.

Whether meaningful judicial review of a claim is available is the "most important"

factor in the second step of the *Thunder Basin* test. *Bennett*, 844 F.3d at 183 n.7. This factor

stems from the Supreme Court's recognition "that Congress rarely allows claims about

agency action to escape effective judicial review." *Axon Enter., Inc. v. Fed. Trade Comm'n*,

598 U.S. 175, 186 (2023). We begin our analysis by first determining which chapter of the

CSRA, if any, applies to NAIJ's claims. For the reasons explained below, we agree with

the district court that Chapter 23 applies. We begin with Chapter 75, however, because we

find that Chapter 75 does not apply to NAIJ's claims.

1.    Chapter 75

Chapter 75 of the CSRA governs the most severe adverse employment actions taken

or proposed against covered federal employees. *See* 5 U.S.C. § 7501 *et seq.* NAIJ argues

that Chapter 75 cannot provide an avenue to MSPB review for its members, because no

adverse action has been taken or proposed against them. We agree.

The D.C. Circuit has considered when a Chapter 75 action is "proposed." *Payne v.*

*Biden*, 62 F.4th 598 (D.C. Cir. 2023), *judgment vacated as moot*, 144 S. Ct. 480 (2023).

That case involved pre-enforcement constitutional challenges to an Executive Order and

its implementing policies, which set forth the adverse actions that would be taken against

employees who failed to become current on COVID-19 vaccinations. *Id.* at 600–01; *see*

Exec. Order No. 14043, 86 Fed. Reg. 50968 (Sept. 9, 2021).

In *Payne*, a federal employee refused to comply with the Executive Order and was told that he would be terminated because of his breach of the policy. 62 F.4th at 605; *id.* at 602 (explaining that enforcement of the COVID-19 policy "may include '[a] 5-day period of counseling and education;' a short suspension of up to 14 days without pay; and removal 'for failing to follow a direct order.'"). The D.C. Circuit determined that adverse action had been proposed in response to the employee's failure to comply with the vaccination requirement and Chapter 75 provided meaningful review of the employee's claim. *Id.* at 605; *see also Rydie v. Biden*, No. 21-2359, 2022 WL 1153249, at *6 (4th Cir. Apr. 19, 2022) (explaining that the term "proposed" in Chapter 75 signals congressional "intent to preclude pre-enforcement judicial challenges").

Unlike the employees in *Payne*, NAIJ's members have no route to judicial review through Chapter 75. NAIJ's amended complaint states explicitly that its members have neither violated nor intend to violate the Speech Policy. Employees challenging an employment policy on First Amendment grounds need not first violate the policy before seeking meaningful judicial review under Chapter 75. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010). Government employees are not required to "bet the farm by taking a violative action" in order to bring a constitutional challenge to an agency policy. *Id*. Moreover, NAIJ does not allege that its members have been threatened with any form of adverse action in connection with the Speech Policy. Indeed, the Speech Policy makes no mention of any disciplinary action covered by Chapter 75 that might result from non-compliance, plainly distinguishing this case from *Payne*. Where no action is "taken or proposed," Chapter 75 plainly does not apply.

2.      Chapter 23

The other potential avenue for administrative review of NAIJ's claims is Chapter 23 of the CSRA. Chapter 23 contains a list of "prohibited personnel practices" that supervisors are forbidden from taking against covered federal employees. *See* 5 U.S.C. § 2302(b). The Government argues that NAIJ's challenges are encompassed within this list, which includes a prohibition against employing agencies taking any "*personnel action* . . . [that] violates . . . the *merit system principles* contained in section 2301." *Id.* § 2302(b)(12) (emphasis added).

The CSRA lists twelve "personnel actions" actionable under Chapter 23. The Speech Policy, as described by NAIJ, fits within the final action listed, namely a "significant change in duties, responsibilities, or working conditions." *Id.* § 2302(a)(2)(A)(xii). Chapter 23 also establishes "merit system principles" the violation of which could constitute a prohibited personnel practice. Relevant here is the merit system principle that covered employees must receive "fair and equitable treatment [. . .] with proper regard for their privacy and constitutional rights." *Id.* § 2301(b)(2).

Incorporating these statutory definitions into the Section 2302(b)(12) "prohibited personnel practice," Chapter 23 prohibits covered federal employers from "tak[ing]" "any other personnel action," here, any "significant change in duties, responsibilities, or working conditions," "if the taking of or failure to take such action violates any law," including "proper regard for [the employee's] constitutional rights." *Id.* §§ 2301(b)(2); 2302(a)(2)(A)(xii), (b)(12). We hold that the Speech Policy fits that definition and would constitute a prohibited personnel practice under Chapter 23 based on NAIJ's allegations.

23

The Speech Policy could constitute a significant change in working conditions that NAIJ alleges was adopted without "proper regard for [its members'] constitutional rights." *Id.* § 2301(b)(2).

NAIJ makes two arguments in rejecting this reading of Chapter 23. The first is a matter of statutory interpretation. NAIJ contends that the *ejusdem generis* canon limits the meaning of "any other significant change in duties, responsibilities, or working conditions." This canon counsels that where "general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (internal quotations omitted). NAIJ contends that the eleven personnel actions enumerated before the final action are discrete employment decisions that target individual employees, not policies that cover an entire group in a workforce. We disagree.

Rather than limiting the scope of what constitutes "working conditions," the enumerated personnel actions in Section 2302(a)(2)(A) confirm that "working conditions" encompasses policies like the Speech Policy. For example, Section 2302(a)(2)(A) lists as actionable personnel actions a "disciplinary or corrective action," and any "decision concerning pay, benefits, or awards, or concerning education or training." Neither of these actions requires that the action be taken against a single employee. Both could be levied against a group of employees, and over a prolonged or indefinite period. The list also includes "the implementation or enforcement of any nondisclosure policy." *Id.* § 2302(a)(2)(A)(xi). Nondisclosure policies can altogether prohibit speech on certain

topics. Hence this action is similar to the challenged Speech Policy that limits certain speech, and its inclusion demonstrates that policies like the challenged Speech Policy are covered by the CSRA.

We agree with the district court's apt observation that the Speech Policy broadly affects how immigration judges "interact with their supervisors and the EOIR" and "governs what types of speaking or writing they may do within their official capacities." *NAIJ v. Neal*, 693 F. Supp. 3d at 572. An exchange with a supervisor about what an employee may say or write in an official capacity speech represents a typical exchange between supervisor and employee as to how an employee should represent her employer. As such, the Speech Policy encompasses circumstances that relate directly to an IJ's working conditions.

NAIJ also contends that Congress did not intend for the CSRA to preclude district court jurisdiction over pre-enforcement challenges to vindicate free speech rights. The Supreme Court rejected a similar argument in *Elgin*. 567 U.S. at 5. There, the Supreme Court held that covered federal employees must bring their constitutional challenges through the CSRA's post-enforcement procedures. *Id.* at 15. As this court explained in *Bennett*, "Congress can require persons subject to administrative adjudication to pursue their claims exclusively there first before reaching an Article III court." 844 F.3d at 185 n.12 (citing *Thunder Basin*, 510 U.S. at 216). NAIJ cannot "bypass" this requirement "simply by alleging a constitutional challenge and framing it as 'structural,' 'prophylactic,' or 'preventative.'" *Id.* at 188.

i. Meaningful Judicial Review

Having determined that Chapter 23 provides a potential avenue to challenge the Speech Policy, we next consider whether Chapter 23 allows for meaningful judicial review. Judicial review need not be immediately available. A statutory scheme can provide for meaningful judicial review even if it requires litigants to first seek relief in an administrative forum, so long as an appeal to an Article III court is available "in due course." *Bennett*, 844 F.3d at 186. Meaningful judicial review similarly does not require the involvement of a district court. *Axon Enter., Inc.*, 598 U.S. at 190. Review of an agency's action in a court of appeals can meaningfully address a party's claim. *Id.* (quoting *Thunder Basin*, 510 U.S. at 215). The Supreme Court has held that the CSRA provides meaningful judicial review where its administrative processes authorize the Federal Circuit to consider and decide constitutional claims. *Elgin*, 567 U.S. at 21.

As a first step under Chapter 23, a covered federal employee alleging a "prohibited personnel practice" files a charge with the OSC. 5 U.S.C. § 1214(a). If the Special Counsel finds "reasonable grounds" suggesting a "prohibited personnel practice" occurred, the Special Counsel is required then to report the practice to the MSPB, the employing agency, and OPM. *Id.* § 1214(b)(2)(B). If the agency fails to resolve the problem, "the Special Counsel may petition the MSPB," and the MSPB can order corrective action. *Id.* § 1214(b)(2)(C), (b)(4)(A). Corrective action can include back pay, other compensatory damages, and attorneys' fees. *Id.* § 1214(g). Final orders of the MSPB may be appealed to the Federal Circuit. *Id.* §§ 1214(c), 7703(b)(1)(A).

Although the CRSA provides for meaningful judicial review of MSPB orders, NAIJ correctly points out that the Special Counsel is afforded leeway regarding which claims to bring to the MSPB. The Special Counsel may decline to bring to the MSPB claims it deems truly frivolous. *See id.* § 1214(b)(2)(B). NAIJ argues that this discretion effectively eliminates meaningful judicial review because the Special Counsel could prevent a claim from ever reaching the MSPB, thereby preventing the plaintiff from appealing an adverse determination to the Federal Circuit. That is not, however, the posture of the case before us.

NAIJ declined to bring its claim to the OSC altogether, thereby failing to follow the statutorily prescribed administrative and judicial procedures. That should generally be determinative. The CSRA precludes extra-statutory judicial review of constitutional claims asserted before an employee has utilized remedies that are available under the statute. As the Supreme Court emphasized in *Elgin*, "[t]he CSRA's objective of creating an integrated scheme of review would be seriously undermined if . . . a covered employee could challenge a covered employment action first in a district court, and then again in one of the courts of appeals." 567 U.S. at 13. The requirement that covered federal employees first bring their claims to the OSC is central to Chapter 23's statutory scheme.

NAIJ also argues that no meaningful judicial review is available because its members will suffer irreparable injury because their speech will be chilled in the interim period that it seeks administrative review. NAIJ claims that this is the type of "here-and-now injury" like the Supreme Court considered in *Axon Enterprise, Inc.*, 598 U.S. 175. NAIJ misconstrues the injury at issue in *Axon*. The challenge in *Axon* was not to any

27

"specific substantive decision" made by an agency or to any "commonplace procedures agencies use to make" such decisions. *Id.* at 189. Rather, the challenge in *Axon*—as in *Free Enterprise Fund*—was to "the structure or very existence of an agency." *Id.*; *Free Enter. Fund*, 561 U.S. at 508. The plaintiffs asserted that the agency "wield[ed] authority unconstitutionally in all or a broad swath of its work." *Axon Enter., Inc.*, 598 U.S. at 189.

Thus, the core of the plaintiffs' claim in *Axon* was that they would face "an illegitimate proceeding, led by an illegitimate decisionmaker." *Id.* at 191. Such a harm qualified as a "here-and-now injury" that could not be remedied after the fact by a court of appeals, because "[a] proceeding that has already happened cannot be undone." *Id.* The Supreme Court concluded that such "structural constitutional" challenges need not be channeled through an enforcement proceeding the agency allegedly lacked constitutional authority to conduct, and that they could instead be brought directly in district court. *Id.* at 190–93; *see also Free Enter. Fund*, 561 U.S. at 489–90.

NAIJ's challenge is not a structural constitutional challenge to the authority of the EOIR or the OSC and MSPB. NAIJ likewise does not challenge the structure of or procedures outlined in the CSRA. Plaintiffs cannot avoid jurisdiction stripping statutes like the CSRA by merely alleging an irreparable injury. The Supreme Court explained that covered federal employees must go through the CSRA's administrative process even when doing so would "subject[ ] them to significant burdens" such as "the expense and disruption of protracted adjudicatory proceedings[.]" *Axon Enter., Inc.*, 598 U.S. at 192 (quotation marks omitted). Those routine burdens differ in kind from those suffered by the plaintiffs in *Axon*. NAIJ's claimed injuries fall outside the narrow class of structural constitutional

claims that *Axon* carved out from the *Thunder Basin* framework. Thus, meaningful judicial review is available to NAIJ under Chapter 23.

### ii. Wholly Collateral

The second *Thunder Basin* factor asks us to consider whether NAIJ's claims are "wholly collateral to a statute's review provisions." 510 U.S. at 212 (internal quotation marks and citation omitted). Jurisdiction stripping is less likely for a claim that is wholly collateral to a statute's review provisions. *Id.* "Under this standard, claims are not wholly collateral when they are the vehicle by which petitioners seek to reverse agency action." *Bennett*, 844 F.3d at 186 (cleaned up). Because this factor also focuses on whether a plaintiff challenges a covered action under the CSRA, our analysis follows closely that for the meaningful judicial review factor. *See id.* at 187.

In *Elgin*, federal employees brought a constitutional challenge in federal court to their terminations after they failed to comply with the Military Selective Service Act. 567 U.S. at 6–7. The plaintiffs argued that their constitutional challenge had "nothing to do with the types of day-to-day personnel actions adjudicated by the MSPB," and that they were "not seeking the CSRA's protections and remedies." *Id.* at 22. The Supreme Court looked to the underlying conduct challenged by the plaintiffs and determined that the constitutional claims were merely a vehicle for challenging the terminations. *Id.* Such a dispute was, therefore, "precisely the type of personnel action" covered by the CSRA and regularly heard by the MSPB. *Id.* Because the CSRA was intended to foreclose covered federal employees from contesting covered employment actions outside the CSRA

29

adjudicatory scheme, the Court held that the plaintiffs' constitutional challenge to their terminations must proceed through procedures prescribed by the CSRA. *Id.*

Like the plaintiffs in *Elgin*, NAIJ argues that its constitutional challenge is wholly collateral to the scope of the CSRA. As we have noted, however, that a case presents a constitutional challenge does not mean it necessarily falls beyond the CSRA's scope. The relevant question is whether the claim falls under the CSRA's scheme for personnel actions, and thus whether it is a vehicle to reverse agency personnel action. *See Bennett*, 844 F.3d at 186; *Elgin*, 567 U.S. at 22 (finding a claim not wholly collateral when it was "precisely the type of personnel action regularly adjudicated by the MSPB and the Federal Circuit within the CSRA scheme"). Because NAIJ challenges a significant change to its members' working conditions, its claims are not wholly collateral to the CSRA scheme.

### iii. Agency Expertise

The final *Thunder Basin* factor requires that we consider whether the agency possesses expertise that may help resolve the claim. NAIJ argues that its claims fall outside the agency's expertise because its constitutional challenge is unrelated to the CSRA's procedures. Agency expertise is interpreted broadly, however. *Bennett*, 844 U.S. at 187. Claims do not fall beyond the expertise of the MSPB simply because they raise a constitutional challenge. An agency "can apply its expertise" to "the many threshold questions that may accompany a constitutional claim." *Elgin*, 567 U.S. at 22–23.

We conclude that NAIJ's constitutional claims are sufficiently "intertwined with or embedded in matters on which the MSPB are expert." *Axon Enter., Inc.*, 598 U.S. at 195. The MSPB's expertise lies in "ensur[ing] that Federal employees are protected against

abuses by agency management, that Executive branch agencies make employment decisions in accordance with the merit system principles, and that Federal merit systems are kept free of prohibited personnel practices." Merit Systems Protection Board, An Introduction to the Merit Systems Protection Board 5 (1999). One merit system principle involves the failure to accord "proper regard for [the covered federal employee's] constitutional rights." 5 U.S.C. § 2301(b)(2). Should this case come before the Special Counsel and the MSPB, both would be sufficiently equipped to resolve the underlying challenge because they are familiar with agency speech policies, why they are implemented, and how such policies should best be designed in accordance with the Constitution.

Because all three factors of step two weigh in favor of the Government, we conclude that if the first step of the *Thunder Basin* test is met, then Congress would have intended to strip district court jurisdiction over NAIJ's Chapter 23 claims.

## IV. Conclusion

Congress designed the CSRA to divest district courts of jurisdiction to review legal challenges like those raised by NAIJ. The structure of the CSRA relies fundamentally, however, on a strong and independent MSPB and Special Counsel. Serious questions have recently arisen regarding the functioning of both the MSPB and the Special Counsel. We cannot allow our black robes to insulate us from taking notice of items in the public record, including, relevant here, circumstances that may have undermined the functioning of the CSRA's adjudicatory scheme. We therefore vacate and remand to the district court to

engage in factfinding to determine whether—given current circumstances—it may

properly exercise subject matter jurisdiction over NAIJ's claims.

*VACATED AND REMANDED*