# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

J. DOES 4, 7, 22, 27, 28, and 29, *on behalf of themselves and all others similarly situated,*

     Plaintiffs,

     v.

ELON MUSK, *in his official capacity,*
UNITED STATES DOGE SERVICE,
THE DEPARTMENT OF
GOVERNMENT EFFICIENCY,
UNITED STATES
DEPARTMENT OF STATE,
UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT,
DONALD J. TRUMP, *in his official capacity,*
MARCO RUBIO, *in his official capacity,*
PETER MAROCCO, *in his official capacity,*
JEREMY LEWIN, *in his official capacity,*
KENNETH JACKSON, *in his official capacity,* and
AMY GLEASON, *in her official capacity,*

     Defendants.

Civil Action No. 25-0462-TDC

## MEMORANDUM OPINION

Plaintiffs J. Does 4, 7, 22, 27, 28, and 29, who are current or recently terminated employees and contractors of the United States Agency for International Development ("USAID"), have filed this putative class action on behalf of themselves and similarly situated individuals against Defendants Elon Musk, the United States DOGE Service, the Department of Government Efficiency ("DOGE"), the United States Department of State ("State"), USAID, President Donald J. Trump, and five other government officials with leadership positions at State, USAID, or DOGE for alleged violations of the United States Constitution arising from Defendants' actions to

effectuate the dismantling and shutdown of USAID. Defendants have filed a Motion to Dismiss, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion to Dismiss will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

On February 15, 2025, Plaintiffs J. Does 1–26 filed the original Complaint in this case against Musk, the United States DOGE Service, and DOGE (collectively, "the Original Defendants"), alleging violations of the Appointments Clause of Article II of the United States Constitution, U.S. Const. art. II, § 2, cl. 2, and of the constitutional principle of the Separation of Powers, arising from actions taken to shut down USAID. On March 18, 2025, the Court granted in part and denied in part a Motion for a Preliminary Injunction. Prior factual background is set forth in the Court's Memorandum Opinion relating to that ruling, which is incorporated by reference. *Does 1–26 v. Musk* ("*Does I*"), 771 F. Supp. 3d 637, 649–57 (D. Md. 2025). On March 28, 2025, the United States Court of Appeals for the Fourth Circuit entered an Order staying this Court's preliminary injunction in this case. *See Does 1–26 v. Musk* ("*Does II*"), No. 25-1273, 2025 WL 1020995, at \*1 (4th Cir. Mar. 28, 2025).

On April 17, 2025,  Plaintiffs, now consisting of J. Does 4, 7, 22, 27, 28, and 29, filed an Amended Complaint which asserts a class action, on behalf of all persons who worked for USAID as an employee or personal services contractor from January 20, 2025 to the present, against the Original Defendants as well as the following additional defendants:  USAID; State; President Trump; Secretary of State Marco Rubio; Peter Marocco, an official who was previously delegated the duties of the USAID Deputy Administrator; Jeremy Lewin, a former DOGE Team Lead at USAID who has been delegated the duties of the USAID Deputy Administrator for Policy and

2

Programming and the USAID Chief Operating Officer; Kenneth Jackson, who has been delegated the duties of the USAID Deputy Administrator for Management and Resources; and Amy Gleason, the Acting Administrator of the U.S. DOGE Service.

Plaintiffs belong to various personnel classifications at USAID: J. Does 7 and 27 are civil service employees, J. Doe 22 is a Foreign Service ("FS") employee, J. Does 4 and 28 are Foreign Service Limited ("FSL") employees, and J. Doe 29 is a personal services contractor ("PSC"). Although much of the relevant factual background is set forth in *Does I* and will not be repeated here, *see Does I*, 771 F. Supp. 3d at 649–57, additional factual background contained in the currently operative Second Amended Complaint, which the Court accepts as true for purposes of resolving the present Motion, is set forth below.

## I.    New Allegations on DOGE's USAID Activities

The Second Amended Complaint contains certain new allegations about DOGE's role in the events that took place at USAID. On Monday, January 27, 2025, DOGE team members Gavin Kliger, Luke Farritor, Clayton Comer, and Noah Peters arrived at USAID headquarters at the Ronald Reagan Building in Washington, D.C. Kliger and Farritor were then given "the highest level of access to USAID digital systems and infrastructure," which included "access to even the most sensitive personal information" of USAID employees. Second Am. Compl. ("SAC") ¶ 64, ECF No. 135.

Plaintiffs allege that although Marocco has stated in a declaration that on January 30, 2025, President Trump directed Secretary Rubio to perform the duties of the Administrator of USAID, there is no official instrument documenting the date of that transition, and there was no public reporting of the transition until February 3, 2025. Similarly, despite Marocco's statement in a declaration that Secretary Rubio delegated to him the duties of the Deputy Administrator of

3

USAID on January 30, 2025, the "official delegation of duties document signed by Secretary Rubio" states that Marocco was not delegated these authorities until February 2, 2025, which, according to Plaintiffs, "mean[s] that there was no person acting with the authority of the Deputy Administrator" of USAID from January 30, 2025 through February 2, 2025. *Id.* ¶ 73.

During this period, various actions took place at USAID. *See Does I*, 771 F. Supp. 3d at 653–54. On Thursday, January 30, 2025, DOGE team members, including Lewin, informed USAID Chief Human Capital Officer Bill Malyszka and USAID Director of Employee and Labor Relations Nicholas Gottlieb of DOGE's intent to conduct a reduction-in-force ("RIF") within USAID and "ordered" them to have USAID officials "prioritize preparing and implementing RIF notices" while DOGE team members worked to gather sufficient information to justify the terminations. SAC ¶ 69. Lewin also instructed Gottlieb immediately to prepare termination notices for five identified USAID employees. Gottlieb refused to comply based on the view that the terminations would be effected "without due process" and also objected, through a written memorandum, to the prior placement of 57 officials on administrative leave because, in his view, "there was no legal justification" for that action. *Id.* ¶ 70. Upon his refusals to comply, Gottlieb was "placed on administrative leave, effective immediately." *Id.*

On Friday, January 31, 2025, the plaques containing USAID's official seal were removed from the agency's headquarters, and on Saturday, February 1, 2025, DOGE team members shut down the USAID website and another 57 USAID employees were placed on administrative leave. Also on February 1, the DOGE team members, including Lewin, again arrived at USAID headquarters and demanded access to USAID's offices, including access to highly restricted areas such as sensitive compartmented information facilities ("SCIFs") for which they lacked the required security clearances to enter. USAID security personnel, including USAID Director of

4

Security John Vorhees and Deputy Director of Security Brian McGill, tried to prevent the DOGE team members from accessing the SCIFs. In response to this conduct, DOGE team member Steve Davis called Musk, and Musk and Davis then directly called USAID senior leadership and, according to Plaintiffs, "yelled at the officials, threatened them with the [United States] Marshals Service," "demanded that members of DOGE be granted immediate access to" sensitive USAID data systems and restricted areas within USAID headquarters," and "insisted that dozens of USAID officials be suspended from duty." *Id.* ¶ 78.

Amidst this back-and-forth, Farritor used the administrative access to USAID systems that he had obtained earlier to give himself and other DOGE team members access to all of USAID headquarters, including the restricted areas for which they did not have the required clearance to enter. Plaintiffs assert that Farritor "took these actions unilaterally, on the spot." *Id.* ¶ 80. Following these events, Vorhees and McGill were placed on administrative leave, and in response to a post on the social media platform X describing their placement on leave, Musk himself posted on X: "USAID is a criminal organization. Time for it to die." *Id.* ¶ 88.

On Sunday, February 2, 2025, DOGE team members cut off access to email and other government computer systems for thousands of USAID employees, and USAID staff were informed that the agency would be terminating the contracts of 791 PSCs. Shortly after midnight, at 12:42 a.m. on Monday, February 3, 2025, Kliger sent an email to all USAID staff which stated that USAID headquarters would be closed and that employees should work remotely for the day. Minutes after Kliger sent that email, Musk posted on X: "We spent the weekend feeding USAID into the wood chipper." *Id.* ¶ 87. On February 2 and February 3, Musk made other statements on X about USAID, including "we're in the process of . . . shutting down USAID" because USAID has "got to go, it's beyond repair," and that he "went over" USAID "in detail" with the President,

and he "agreed that we should shut it down." *Id.* ¶ 88b-c. Between February 3 and February 7, approximately 45 percent of USAID employees were placed on administrative leave, and on February 7, a notice was issued that all USAID direct hire personnel, with limited exceptions, would be placed on administrative leave, such that about 90 percent of the workforce would be on administrative leave. The latter action was blocked by a temporary restraining order ("TRO") issued by another federal court. Also on February 7, Musk announced on X that United States Customs and Border Protection had taken over USAID headquarters and posted a picture of the building entrance which no longer had the USAID name over the door.

Musk, assisted by his DOGE subordinates, "continued to exercise control over USAID systems . . . to systematically block access to all systems by USAID personnel." *Id.* ¶ 91. On February 8, 2025, Lewin, who had become the DOGE Team Lead for USAID, drafted an "Action Memo for Secretary Rubio" directing the termination of approximately $1 billion in USAID contracts and $660 million in USAID grants. *Id.* ¶ 99. When a USAID contracting officer asked a USAID Senior Procurement Executive who had issued the orders to terminate the contracts, the officer received a response directly from Lewin, and after a high ranking USAID employee began conducting reviews of the contracts and grants set for termination, Lewin "reprimanded" that employee and wrote to the employee that "bureaus should not be conducting their own policy and program reviews before acting on these termination instructions." *Id.* ¶ 101.

On February 21, 2025, following the dissolution of the TRO, Musk responded to a post on X that "President Trump and DOGE can now DISMANTLE USAID" by stating that "the world will be better for this." *Id.* ¶ 108. Over the next five days, nearly all USAID staff were placed on administrative leave, approximately 2,000 USAID personnel received RIF notices, and approximately 5,700 contracts and grants were terminated.

6

## II.    New Allegations on Recent Actions to Dismantle USAID

In the Second Amended Complaint, Plaintiffs allege that by March 19, 2025, a document had been drafted that set forth a plan to effectuate the "winding down" of USAID and the "[c]odifying" of it under a new name as "a subsidiary of the State Department," as well as the "abolishing" of "its legal status as an 'independent establishment.'" *Id.* ¶ 119. On March 28, 2025, Lewin, who at that point had been delegated the duties and functions of the USAID Deputy Administrator for Policy and Programming and the USAID Chief Operating Officer, sent an email containing a memorandum ("the Lewin Memorandum") to all USAID personnel entitled "Final Mission," which stated that "[s]ubstantially all non-statutory positions at USAID will be eliminated," and that all USAID personnel will receive a reduction-in-force notice via email which contains a separation date of either July 1, 2025 or September 2, 2025. *Id.* ¶ 120. It further provided that by July 1, 2025, State "will have assumed responsibility for USAID's remaining programming," and that USAID employees who had not already been separated by July 1, 2025 would "supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations." *Id.* USAID employees began receiving RIF notices shortly after Lewin sent this email.

Also on March 28, 2025, Paul Guaglianone, a Senior Bureau Official in the USAID Bureau of Legislative Affairs, sent a "Congressional Notification Transmittal Letter and Congressional Notification" to Congress ("the Congressional Notification Letter"), which stated that "substantially all USAID personnel will be separated from federal service within the current fiscal year via [RIF] procedures"; existing USAID bureaus and offices would either be "abolished" or "realigned to" State; to replace USAID, State would initiate a "separate and independent hiring process to build foreign assistance capacity" in State; and congressionally appropriated funds

7

would be "transfer[red]" from USAID to State while the USAID operations are "closed out in a smooth and orderly transition." *Id.* ¶ 123. Secretary Rubio issued an accompanying public statement confirming that State had "notified Congress on [its] intent to undertake a reorganization that would involve realigning certain USAID functions to [State] by July 1, 2025, and discontinuing the remaining USAID functions that do not align with Administration priorities." *Id.* ¶ 124.

## DISCUSSION

In the Motion to Dismiss, Defendants argue that: (1) the Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95–454, 92 Stat. 1111, precludes the Court from exercising jurisdiction over the claims of Plaintiffs who are federal employees ("the Employee Plaintiffs"); (2) the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 7101–7109, or, in the alternative, the Tucker Act, 28 U.S.C. §§ 1346(a), 1491, precludes the Court from exercising jurisdiction over the claims of Plaintiffs who are PSCs; (3) Plaintiffs have not pleaded sufficient facts to establish standing; (4) Plaintiffs' claims constitute impermissible claim-splitting; (5) Plaintiffs have not pleaded sufficient facts to state plausible claims for violations of the Appointments Clause or the constitutional principle of the Separation of Powers; and (6) President Trump should be dismissed as a defendant. The Court addresses each of these arguments in turn.

## I. Legal Standards

Defendants seek dismissal both for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).

As to Rule 12(b)(1), it is the plaintiff's burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Rule 12(b)(1) allows a defendant to move for dismissal when it believes that the plaintiff has failed

to make that showing. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). On a Rule 12(b)(1) motion, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192.

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

## II.    Statutory Preclusion

Defendants first argue that Plaintiffs claims must be dismissed because, in light of their status as federal employees or contractors, their claims must be asserted through certain statutorily designated procedures. Specifically, Defendants argue that the claims of the plaintiffs who are civil service employees, specifically J. Does 7 and 27 ("the Civil Service Employee Plaintiffs"), are precluded by the CSRA, and that the claims of J. Doe 29, a PSC, are precluded by the CDA.

9

As a preliminary matter, Plaintiffs assert, and Defendants do not directly contest, that the CSRA does not preclude the Court from exercising jurisdiction over Plaintiffs' Appointments Clause claims against the Original Defendants because those defendants are not the employers of any Plaintiffs. Though courts applying the CSRA do not appear to have considered this precise issue, they have noted generally that the CSRA applies to claims challenging personnel actions brought by federal employees against their employers. *See Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 495–96 (D.C. Cir. 2009) (stating that the CSRA "is the proper statutory vehicle for covered federal employees to challenge personnel actions by their employers"); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 795 n.5 (3d Cir. 2003) (noting that the CSRA is intended to extend "to the kind of decisions that are endemic in the daily dynamics of the employee/employer relationship"). Notably, when Plaintiffs asserted in their brief that Defendants had not contested this issue, Defendants did not address that claim in their reply brief. *See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) ("A party's failure to raise or discuss an issue in [a] brief is to be deemed an abandonment of that issue." (quoting *11126 Balt. Blvd., Inc. v. Prince George's Cnty.*, 58 F.3d 988, 993 n.7 (4th Cir. 1995)); *Grant v. Shapiro & Burson, LLP*, 871 F. Supp. 2d 462, 470–71 n.10 (D. Md. 2012) (noting that one party's failure to respond to an argument raised by the opposing party is deemed to be an abandonment of that argument). The Court therefore finds no basis upon which to conclude that the Appointments Clause claims against the Original Defendants are precluded by the CSRA or another statute.

## A.   Civil Service Employees

Defendants argue that the CSRA precludes the Court from exercising jurisdiction over the Civil Service Employee Plaintiffs' claims. The CSRA establishes a "framework for evaluating

10

adverse personnel actions against" federal civil service employees by detailing "the protections and remedies applicable to such action[s], including the availability of administrative and judicial review." *United States v. Fausto*, 484 U.S. 439, 443 (1988) (quoting *Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 774 (1985)). As relevant here, Chapter 75 of the CSRA allows civil service employees to appeal certain adverse employment actions, including removals, suspensions of over 14 days, reductions in grade or pay, and furloughs of 30 days or less, to the three-member United States Merit Systems Protection Board ("MSPB"), an independent agency established within the Executive Branch to address disputes between federal civil servants and their employing agencies. *See* 5 U.S.C. §§ 1201, 7512, 7513(d), 7701; *Nat'l Ass'n of Immigr. Judges v. Owen* ("*NAIJ*"), 139 F.4th 293, 302–03 (4th Cir. 2025).

Separately, Chapter 23 of the CSRA outlines specific "merit system principles" applicable to the management of all civil service employees, which include that employees should not be subjected to discrimination, reprisal for reporting violations of law, or coercion for partisan political purposes. 5 U.S.C § 2301(b). When an agency takes a "personnel action," including an adverse action covered by Chapter 75 or "any other significant change in duties, responsibilities, or working conditions," which violates one of the merit system principles, that action constitutes a "prohibited personnel practice." 5 U.S.C. § 2302(a), (b); *NAIJ*, 139 F.4th at 303. An employee may file a charge about a prohibited personnel practice with the Office of Special Counsel, which is charged with investigating such practices. *Id.* §§ 1212(a)(2), 1214(b)(2)(A)(i); *NAIJ*, 139 F.4th at 302. If the Special Counsel determines that there are "reasonable grounds" to believe such practices have occurred, the Special Counsel must "report that determination to the MSPB" and may "'request' that the MSPB take corrective action." *NAIJ*, 139 F.4th at 302 (quoting 5 U.S.C §§ 1214(b)(1)(A)(i), (b)(2)(B)).

11

As relevant here, the United States Court of Appeals for the Federal Circuit has jurisdiction over appeals of decisions issued by the MSPB in relation to either Chapter 75 or certain prohibited personnel practices defined in Chapter 23.  5 U.S.C. §§ 7703(b)(1); 1214(c); *NAIJ*, 139 F.4th at 303.

Whether the CSRA precludes this Court from exercising jurisdiction over the Civil Service Employee Plaintiffs' claims depends on a two-step test established by the United States Supreme Court in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), which consists of asking (1) whether Congress's intent to preclude district court jurisdiction is "fairly discernible in the statutory scheme," and (2) whether the claims "are of the type Congress intended to be reviewed within this statutory structure." *Id.* at 207, 212 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)); *see Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010); *NAIJ*, 139 F.4th at 303–04.  If the answer to both questions is yes, then the CSRA precludes jurisdiction over the claims.  *See NAIJ*, 139 F.4th at 313.

*Thunder Basin* also identified three factors ("the *Thunder Basin* factors") to consider in assessing the second step of the inquiry:  (1) whether precluding district court jurisdiction "could foreclose all meaningful judicial review" of the claim; (2) whether the claim is "'wholly collateral' to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212–13 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)); *see Free Enter. Fund*, 561 U.S. at 489; *Axon Enter. Inc. v. Fed. Trade Comm'n*, 143 S. Ct. 890, 900 (2023) (noting that these factors are known as "the *Thunder Basin* factors").  When all three factors weigh in favor of maintaining jurisdiction, courts "presume that Congress does not intend to limit jurisdiction," but "the same conclusion might follow if the factors point in different directions." *Axon*, 143 S. Ct. at 900 (quoting *Free Enter. Fund*, 561 U.S. at 489).

### 1.    First Step:  Intent to Preclude Jurisdiction

As to the first step of the test, in *NAIJ*, the Fourth Circuit held that although the Supreme Court "has recognized that the CSRA, when functioning as Congress intended, was designed to strip district courts of jurisdiction," that conclusion may no longer be true because recent events, including President Trump's removal of the Special Counsel and of two members of the MSPB such that it lacks a quorum, "raise serious questions as to whether the CSRA's adjudicatory scheme continues to function as intended." *NAIJ*, 139 F.4th at 304–05.  Based on this conclusion, the Fourth Circuit remanded that case to the district court "to conduct a factual inquiry whether the CSRA continues to provide a functional adjudicatory scheme," and, if warranted, "a new examination of Congressional intent" as to the CSRA in light of these recent events. *Id.* at 308. Where the Fourth Circuit's decision in *NAIJ* was released after briefing on the Motion concluded, and where the Court finds, as discussed below, that the Civil Service Employee Plaintiffs' claims do not meet the second step of the *Thunder Basin* test, the Court declines to make a determination on whether the CSRA meets the first step of the *Thunder Basin* test. *See Free Enter. Fund*, 561 U.S. at 489 (noting that the Supreme Court presumes "that Congress does not intend to limit jurisdiction" if the three *Thunder Basin* factors at step two of the inquiry weigh in favor of that result).

### 2.  Second Step:  Intent to be Reviewed within the Statutory Structure

Proceeding to step two of the test, whether a claim is "of the type Congress intended to be reviewed within [the] statutory structure," *Thunder Basin*, 510 U.S. at 212–13, the Court considers the three *Thunder Basin* factors outlined above.  Assessing the first factor—whether precluding district court jurisdiction "could foreclose all meaningful judicial review" of the claim, *id.*— requires a determination of whether the CSRA provides potential avenues to challenge the

dismantling of USAID, and, if so, whether those avenues provide for meaningful judicial review. *See NAIJ*, 139 F.4th at 308, 310 (beginning the analysis of the first factor by "determining which chapter of the CSRA, if any" applies to the plaintiff's claims and then considering whether the applicable chapter "allows for meaningful judicial review"). Plaintiffs argue that in broadly challenging the constitutionality of the dismantling and shutdown of USAID, they are challenging neither "adverse actions" against personnel under Chapter 75 nor "prohibited personnel practices" under Chapter 23, and they specifically note that Chapter 75 excludes RIFs from its coverage. Opp'n at 11–15, ECF No. 121; *see* 5 U.S.C. § 7512(B) ("This subchapter . . . does not apply to . . . a reduction-in-force under section 3502 of this title."). Defendants argue that Plaintiffs are effectively challenging the placement of certain employees on administrative leave or the subjecting of them to RIFs, that such actions are "personnel actions" covered by Chapter 23 as "significant change[s] in duties, responsibilities, or working conditions," 5 U.S.C. § 2302(a)(2)(A)(xii), that a regulation allows employees terminated by a RIF to appeal to the MSPB, 5 C.F.R. § 351.901, and that in light of the CSRA, minor personnel actions not constituting "adverse actions" are committed to agency discretion and thus not subject to judicial review, *see Carducci v. Regan*, 714 F.2d 171, 174 (D.C. Cir. 1983).

Defendants, however, make no specific argument that Plaintiffs' claims challenge "adverse actions" under Chapter 75. To the extent that the identified actions could be construed as "personnel action[s]" under Chapter 23, Defendants have not claimed that those actions violated the merit system principles, so they could not constitute "prohibited personnel practices" under Chapter 23 that are subject to investigation and possible MSPB review. 5 U.S.C. § 2302(a)(1), (b). In light of the statutory exclusion of RIFs from MSPB review set forth in Chapter 75, 5 U.S.C. § 7512(B), the regulation cited by Defendants does not clearly establish the availability of

14

administrative or judicial review. *See Texas v. Env't Protection Agency,* 726 F.3d 180, 195 (D.C. Cir. 2013) (stating that a "valid statute always prevails over a conflicting regulation" (quoting *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829 (D.C. Cir. 2006))). As Defendants acknowledge, any more minor personnel actions are not subject to judicial review. *See Carducci*, 714 F.2d at 174. Thus, it is not at all clear that they have successfully demonstrated that Plaintiffs claims' are reviewable under the CSRA.

Nevertheless, regardless of whether the claims are subject to the CSRA, the Court finds that the CSRA does not provide for meaningful judicial review of Plaintiffs' claims. Specifically, as alleged in the Second Amended Complaint, Plaintiffs' claims, and their injuries, flow not from any specific employment action, but from the decision to dismantle and abolish USAID entirely. Channeling the claims of the Civil Service Employee Plaintiffs to the MSPB would foreclose meaningful judicial review because even if they were able to prevail in the administrative proceedings as to any particular employment action, such as by securing reinstatement to a USAID position, that relief would be meaningless because if the dismantling and abolition of USAID remain unaddressed, the Civil Service Employee Plaintiffs would have no workplace to which to return.

In a recent opinion, the United States Court of Appeals for the Ninth Circuit held that the MSPB could not provide meaningful judicial review of statutory and Separation of Powers challenges to large-scale RIFs across multiple federal agencies because even if an individual plaintiff could pursue an individual claim before the MSPB and appeal to the Federal Circuit, such a procedure would not provide meaningful judicial review because the alleged injury was not from the particular employment action, but "from subjection to [unlawful executive] authority" in violation of the Constitution. *Am. Fed'n of Gov't Emps. v. Trump* ("*AFGE*"), 139 F.4th 1020,

1028, 1032 (9th Cir. 2025) (quoting *Axon*, 143 S. Ct. at 906), *stay granted on other grounds*, *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635, 2635 (2025). Here, Plaintiffs notably seek no damages and do not even specifically request injunctive relief to allow them to retain or recover their positions. Even to the extent that Plaintiffs' general request that the Court "set aside any actions taken by Defendants" to eliminate USAID could be construed as including such relief, SAC ¶ 141a, as in *AFGE*, "such a path to the federal courts would be meaningless where . . . entire offices and functions are being eliminated from federal agencies," such that a successful plaintiff "would return to an empty agency with no infrastructure to support a resumption of their work." *AFGE*, 139 F.4th at 1032 (quoting *Am. Fed'n of Gov't Emps. v. Trump*, No. 25-cv-03698-SI, 2025 WL 1482511, at *14 (N.D. Cal. May 22, 2025)); *see Elev8 Balt.*, *Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. MJM-25-1458, 2025 WL 1865971, at *1, *17 (D. Md. July 7, 2025) (finding that the CSRA could not provide a union representing federal employees meaningful judicial review of its Separation of Powers challenges to the dismantling of AmeriCorps); *cf. New York v. Kennedy*, No. 25-cv-196-MRD-PAS, 2025 WL 1803260, at *1, *9 (D.R.I. July 1, 2025) (finding that the CSRA could not provide meaningful judicial review of states' constitutional and statutory challenges to the large-scale terminations of employees at and reorganization of the United States Department of Health and Human Services, because there was "little to no value" in "requiring employees to bring individual claims about their employment status to MSPB" because even "successful Plaintiffs 'would return to an empty agency'" (quoting *AFGE*, 139 F.4th at 1032)).

As to the second *Thunder Basin* factor, for similar reasons, the Court finds that the Civil Service Employee Plaintiffs' claims are wholly collateral to the CSRA review provisions. In *AFGE*, the court found that challenges to large-scale RIFs were wholly collateral to the CSRA review provisions where the plaintiffs did not challenge any decision made as to an individual

employee and instead contested whether the broad action exceeded constitutional or statutory authority, which the court deemed to be outside the authority of the MSPB to address or, at a minimum, wholly collateral to the CSRA review provisions. *AFGE*, 139 F.4th at 1031. Here, Plaintiffs likewise assert constitutional arguments relating to the Separation of Powers among branches of the federal government and seek relief in the form of barring actions to abolish a federal agency, without seeking specific relief on any particular adverse employment action, prohibited personnel practice, or even broad RIF decision. The claims are therefore wholly collateral to the CSRA review scheme. *See id.*; *Elev8 Balt.*, 2025 WL 1865971, at *17.

Defendants' reliance on *Elgin v. Department of the Treasury*, 567 U.S. 1 (2012), in which former federal employees challenged their terminations from the federal service for failure to register for the Selective Service as grounded in sex discrimination and the issuance of bills of attainder in violation of the Constitution, does not alter this conclusion. *See id.* at 7. In *Elgin*, the Supreme Court held that the employees' constitutional claims were not wholly collateral to the CSRA's review scheme because they were "the vehicle by which they [sought] to reverse the removal decisions" and "receive the compensation they would have earned," and because "[a] challenge to removal" seeking "reinstatement, backpay, and attorney's fees" is "precisely the type of personnel action regularly adjudicated" by the MSPB and the Federal Circuit within the CSRA's review scheme. *Id.* at 22. There, however, the employee's constitutional claims were coterminous with the challenged employment actions in that they were the specific defenses against them. Here, by contrast, Plaintiffs do not contend that the placements on administrative leave or the RIFs alone violate the Constitution; rather, they challenge Defendants' wholesale dismantling and abolition of USAID as a violation of the Constitution and seek relief in the form of the undoing of that abolition, not damages or other relief as to any specific personnel action against any particular

17

plaintiff. Thus, where Plaintiffs' constitutional claims focus on the existence of the agency rather than any individual employment actions, they are wholly collateral to the CSRA review scheme.

As for the third *Thunder Basin* factor, Plaintiffs' claims fall outside the MSPB's expertise. The MSPB's expertise largely consists of addressing adverse employment actions and prohibited personnel practices that violate the merit system principles set forth in 5 U.S.C. § 2301(b). *See* 5 U.S.C. §§ 7513(d), 1214(b)(4)(A); *NAIJ*, 139 F.4th at 313. As discussed above, however, Plaintiffs' claims do not directly or indirectly involve the application of such principles and instead assert structural constitutional challenges grounded in the principle of the Separation of Powers. The Supreme Court has recognized in the context of other administrative review schemes that "agency adjudications are generally ill suited to address structural constitutional challenges." *Axon*, 143 S. Ct. at 905 (quoting *Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021)). In *Axon*, where the plaintiffs brought Separation of Powers challenges to actions by certain federal agencies' administrative law judges ("ALJs") because (1) the ALJs were unconstitutionally insulated from the president's supervision; and (2) combining prosecutorial and adjudicatory functions in a single agency was unconstitutional, the Court found that the claims were outside of the relevant agencies' expertise because they raised questions of constitutional law that were "detached from 'considerations of agency policy'" and "distant" from the agency's "competence and expertise," as the agency "knows . . . nothing special about the separation of powers." *Axon*, 143 S. Ct. at 897, 905 (quoting *Free Enter. Fund*, 561 U.S. at 491).

Here, that reasoning applies where Plaintiffs' constitutional claims are similarly detached from the subject matter in which the MSPB has expertise—federal personnel practices and actions—because Plaintiffs' claims challenge the structural issue of whether Defendants' dismantling and abolition of USAID violates the constitutional principle of the Separation of

18

Powers. *See AFGE*, 139 F.4th at 1028, 1032 (finding that Separation of Powers and statutory challenges to an executive order directing federal agencies to engage in large-scale RIFs were outside the MSPB's expertise); *Elev8 Balt.*, 2025 WL 1865971, at *1, *17 (D. Md. July 7, 2025) (finding that Appointments Clause and Separation of Powers challenges to the dismantling of AmeriCorps were outside the MSPB's expertise).

Further, this is not a case that can be deemed to be within the MSPB's expertise because, as Defendants argue, the MSPB "can apply its expertise" to "preliminary questions unique to the employment context." Mot. at 13, ECF No. 110-1 (quoting *Elgin*, 567 U.S. at 22). In *Elgin*, relied upon by Defendants, the Court recognized that the expertise prong can sometimes be satisfied where "preliminary questions unique to the employment context may obviate the need to address the constitutional challenge" and found that to be the case where the claim of one of the plaintiffs was predicated on his assertion that his resignation was a constructive discharge, an issue on which the MSPB has expertise and which, if decided against the plaintiff, could dispose of the case. *Elgin*, 567 U.S. at 22–23. Here, however, Defendants have not identified any such preliminary, employment-related questions that could "obviate the need to address the constitutional challenge[s]," and where Plaintiffs contest the dismantling of USAID, rather than any particular employment actions, based only on constitutional grounds, the Court cannot identify any such questions. *See id.*

Finally, Defendants' citation of *American Foreign Service Association v. Trump* ("*AFSA*"), 768 F. Supp. 3d 6 (D.D.C. 2025), does not alter the Court's conclusion. In *AFSA*, in denying a motion for a preliminary injunction, the court found that it was likely that the CSRA precluded it from exercising jurisdiction over a Separation of Powers challenge to the dismantling of USAID brought by two unions representing USAID employees. *Id.* at 11, 14–15, 21. In so ruling,

19

however, the court noted that even though "in the long run," the unions' harms could flow from "the alleged unlawful 'dismantl[ing]'of USAID," at that time, "the agency [was] still standing, and so" the unions' alleged harms based on which they sought injunctive relief related only to the changes in their members' employment conditions at that early stage of the case, such as placement on administrative leave and requirements to return to the United States on an expedited basis, which were "largely financial" in nature. *Id.* at 20. Since that time, however, through the Lewin Memorandum and the Congressional Notification Letter, Defendants have confirmed their plan imminently to abolish USAID as an independent agency. Thus, the present case differs in that it relates not to employees' specific employment conditions, as was the case at the early stage of *AFSA*, but to the abolition of an entire federal agency.

Where all three *Thunder Basin* factors weigh in Plaintiffs' favor, the Court finds that the CSRA does not preclude the Court from reviewing the Civil Service Employee Plaintiffs' claims. *See Axon*, 143 S. Ct. at 900.

## B.    Foreign Service Employees

Plaintiffs also include FS and FSL employees who are not civil service employees and thus not subject to the CSRA. Plaintiff J. Doe 22, an FS employee, is subject to the Foreign Service Act of 1980, 22 U.S.C. §§ 3901–4226, ("FSA"), which "governs personnel matters related to the United States Foreign Service," and "establishes the Foreign Service Grievance Board [("FSGB")] as the administrative body charged with resolving grievances brought under" the FSA. *Hunter v. United States*, 36 Fed. Cl. 257, 259 (1996); *see also* 22 U.S.C. §§ 4131–4140. The FSGB's decisions are reviewable in a United States District Court. 22 U.S.C. § 4140.

In their Motion, Defendants did not invoke the FSA as a basis to dismiss J. Doe 22's claim. Although they arguably did not need to do so because J. Doe 22 was not specifically identified as

an FS employee until the Second Amended Complaint was filed after briefing on the Motion had concluded, Plaintiffs specifically noted in their memorandum in opposition to the Motion that certain Plaintiffs are FS employees, Opp'n at 8, 15 n.6, yet Defendants did not address the issue in their reply brief. The Court therefore finds that Defendants have made no statutory preclusion challenge as to J. Doe 22 or any other FS employees.

Nevertheless, in their brief, Plaintiffs have acknowledged that FS employees are "subject to a similar statutory scheme under the Foreign Service Act," and that the *Thunder Basin* analysis therefore applies equally to J. Doe 22's claims. *Id.* at 15 n.16. At least one federal court has applied this analysis to assess whether the FSA precludes a district court from exercising jurisdiction over an FS employee's employment-related claim. *See AFSA*, 768 F. Supp. 3d 6, 21–22 (D.D.C. 2025); *cf. U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (analogizing the preclusive effects of the FSA's administrative remedial scheme to the preclusive effects of the CSRA). Where Plaintiffs have acknowledged that the *Thunder Basin* analysis applies to whether the FSA precludes jurisdiction over the claims of J. Doe 22 and other FS employees, the Court finds that even if Defendants had asserted a challenge to the Court's jurisdiction over the claims of FS employees, the Court's prior analysis of the *Thunder Basin* factors in relation to the claims of the Civil Service Employee Plaintiffs would also apply to the claims of J. Doe 22, such that the Court would find no basis to bar the Court's review of those claims.

In addition to FS employees, Plaintiffs include J. Does 4 and 28, who are FSL employees ("the FSL Plaintiffs"). Like FS employees, FSL employees are governed by the FSA rather than the CSRA, but FSL employees who are terminated cannot appeal that decision to the FSGB, unless they are terminated for misconduct. *See* 22 U.S.C. §§ 4010(2)(A)(ii), 4011, 4131(b)(3); *U.S. Info.*

21

*Agency v. Krc*, 905 F.2d 389, 392 (D.C. Cir. 1990). Thus, neither the CSRA nor the FSA precludes the Court's review of an FSL employee's claims.

Defendants nevertheless assert in their reply brief that *United States v. Fausto*, 484 U.S. 439 (1988), prevents the Court from exercising jurisdiction over the FSL Plaintiffs' claims because FSL employees "are not granted administrative review under the CSRA or the CDA." Reply at 13, ECF No. 133. In *Fausto*, the Supreme Court held that the CSRA's exclusion of nonpreference excepted service personnel within the civil service from its provisions allowing for administrative and judicial review by the MSPB and the United States Court of Federal Claims, respectively, of terminations from the civil service precluded such an employee from seeking judicial review of his removal in the Court of Federal Claims pursuant to another federal statute. *Id.* at 441 n.1, 448–49. Defendants' invocation of *Fausto*, however, is inapt where the FSL Plaintiffs are not civil service employees and are subject to the FSA, not the CSRA, and where *Fausto* did not involve constitutional claims, which may be completely precluded from judicial review by a statute only if Congress states its intent to do so clearly. *See Webster v. Doe*, 486 U.S. 592, 603 (1988). Indeed, another court considering constitutional challenges to the removal of an FSL employee has concluded that "[c]ourts have an obligation to listen to those claims," given that such judicial review may "be the *only* check" on an agency action to terminate an FSL employee. *Krc*, 905 F.2d at 400. Where the FSL Plaintiffs have asserted constitutional claims here, the Court finds that neither the CSRA nor the FSA preclude it from exercising jurisdiction over such claims.

## C.    PSCs

Defendants separately argue that the Contract Disputes Act precludes the Court from exercising jurisdiction over the claims asserted by J. Doe 29, a PSC. As relevant here, the CDA "applies to any express or implied contract . . . made by an executive agency for . . . the

22

procurement of services." 41 U.S.C. § 7102(a)(2); *Sys. Applications & Techs., Inc. v. United States*, 26 F.4th 163, 170 (4th Cir. 2022). Under the CDA, a federal contractor who seeks to file a claim "against the Federal Government relating to a contract" must first submit that claim to a contracting officer for a written decision. 41 U.S.C. § 7103. If the contracting officer denies the claim, the contractor then may either "appeal the decision to an agency board" of contract appeals or "bring an action directly on the claim in the United States Court of Federal Claims." *Id.* § 7104(a), (b); *Sys. Applications & Techs., Inc.*, 26 F.4th at 170. When the CDA applies, "it provides the *exclusive* mechanism for dispute resolution." *Id.* (quoting *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995)).

Relatedly, Defendants also argue that even if PSCs are not deemed to be subject to the CDA, the Court still lacks jurisdiction over their claims based on the Tucker Act, 28 U.S.C. § 1491(a)(1), which provides that the Court of Federal Claims has exclusive jurisdiction over any claim against the United States for more than $10,000, including one founded "upon any express or implied contract with the United States." *Id.* §§ 1491(a), 1346(a)(2); *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023). As to the Tucker Act, Defendants argue that J. Doe 29 is "asking, in essence, for their employment contracts to be reinstated" and thus effectively seeks more than $10,000 from the United States. Mot. at 16.

In assessing whether claims are subject to the CDA, federal courts "generally look to whether the dispute at issue is one of contract" by making "rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *United States v. J & E Salvage Co.*, 55 F.3d 985, 987–88 (4th Cir. 1995) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 969–70 (D.C. Cir. 1982)). In *J & E Salvage Co.*, the Fourth Circuit favorably cited the analysis in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), establishing a two-part test to

23

assess whether a claim is founded upon an express or implied contract for purposes of the Tucker Act, which has since also been used by multiple federal courts, including within this circuit, to assess whether a claim is subject to the CDA.  *See J & E Salvage Co.*, 55 F.3d at 988 & n.1; *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 239–40 (D.C. Cir. 1995) (applying the *Megapulse* test to assess whether claims were "related to" contracts and thus subject to the CDA); *CACI, Inc. – Federal v. U.S. Navy*, 674 F. Supp. 3d 257, 270 (E.D. Va. 2023) (same); *Nat'l Job Corps Ass'n v. Dep't of Labor*, No. 25-cv-04641-ALC, 2025 WL 1752414, at *3–4 (S.D.N.Y. June 25, 2025) (same); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State* ("*AVAC*"), 770 F. Supp. 3d 121, 136 (D.D.C. 2025) (same); *see also Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. DLB-25-1363, 2025 WL 1585051, at *22 (D. Md. June 5, 2025) (applying the *Megapulse* test to assess whether the Tucker Act deprived the court of jurisdiction over claims relating to federal contracts).  Under this test, courts consider (1) "the source of the rights upon which the plaintiff bases its claims," and (2) "the type of relief sought (or appropriate)."  *Megapulse*, 672 F.2d at 968.

Upon consideration of these factors, the Court finds that the CDA does not preclude it from exercising jurisdiction over J. Doe 29's claims.  As to the first prong, "the source of the rights upon which" Plaintiffs base their claims, courts applying this prong have considered whether "the plaintiff's asserted rights and the government's purported authority arise from statute," whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract,'" and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts.'"  *Crowley Gov't Servs. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106–07 (D.C. Cir. 2022) (citations omitted).  Here, J. Doe 29's asserted rights arise out of the Constitution— specifically, the Appointments Clause and the principle of Separation of Powers—not any individual contracts.  Indeed, J. Doe 29 does not allege that Defendants violated any terms of a

24

contract, and the Court does not need to examine any aspect of a contract to adjudicate the merits of the claims. *Compare Crowley*, 38 F.4th at 1108–09 (finding that a plaintiff did not assert rights based on a contract where "determining whether" a federal agency infringed on the plaintiff's right "require[d] primarily an examination of the statutes" allegedly violated, not of the plaintiff's contract) *with J & E Salvage Co.*, 55 F.3d at 988 (finding that claims were subject to the CDA where "[t]he merits question presented [was] one of contract interpretation," "it [was] impossible to ignore the terms of the contract" in deciding that question, and "[e]very aspect of th[e] case relate[d] to these contract questions").

Thus, the first prong weighs against subjecting J. Doe 29's claims to the CDA. *See AVAC*, 770 F. Supp. 3d at 129, 136–37 (applying the *Megapulse* test and finding that the CDA did not preclude the claims of plaintiffs who challenged the cancellation of agreements with State and USAID to receive foreign assistance funding and asserted statutory claims based on "a right 'to be free from government action beyond [its] congressional authority," which did "not at all depend on whether the terms of any particular awards were breached" (quoting *Crowley*, 38 F.4th at 1108)); *Nat'l Job Corps Ass'n*, 2025 WL 1752414, at \*1, \*5 (applying the *Megapulse* test and finding that the CDA did not preclude jurisdiction over statutory claims brought by contractors challenging the closure of a Job Corps center created pursuant to the Federal Job Corps Program where the contractors asserted claims under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, and did not "point to or rely on any of the contract provisions in [their] terminated agreements" "in support of their claims"); *see also Normandy Apartments, Ltd. v. U.S. Dep't of Housing & Urban Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009) (in assessing coverage of the Tucker Act, stating that "[w]hen the source of rights asserted is constitutional . . . in nature, the fact that resolution of the claim requires some reference to contract does not magically 'transform [the]

25

action . . . into one on the contract and deprive the court of jurisdiction it might otherwise have'" (quoting *Megapulse*, 672 F.2d at 968)); *Green & Healthy Home Initiatives, Inc. v. Env't Prot. Agency*, No. 25-cv-1096-ABA, 2025 WL 1697463, at *12 (D. Md. June 17, 2025) (applying the *Megapulse* test in relation to the Tucker Act and finding that where the plaintiffs asserted that the Environmental Protection Agency violated the Constitution, the APA, and federal regulations when terminating grants, the source of their rights was not contractual in nature); *Elev8 Balt.*, 2025 WL 1865971, at *11–12 (applying the *Megapulse* test in relation to the Tucker Act and finding that claims that the dismantling of AmeriCorps violated the Constitution and federal statutes and regulations were "not founded on individual contracts"); *Harris Cnty. v. Kennedy*, No. 25-cv-1275 (CRC), 2025 WL 1707665, at *5 (D.D.C. June 17, 2025).

In *Harris County*, in which the court found that the Tucker Act did not bar jurisdiction over a constitutional challenge to the termination of grants relating to COVID-19 relief, the court drew an important distinction in finding that while the fact that the plaintiffs' grants were terminated established an injury for purposes of Article III standing, the basis for standing is "analytically distinct from the plaintiff's legal rights," which in that case were based on the constitutional principle of the Separation of Powers, not on any contractual provision. *Harris Cnty.*, 2025 WL 1707665, at *1, *5.

As to the second prong, the type of relief sought, courts consider whether the plaintiffs are seeking forms of relief "specific to actions that sound in contract" such as specific performance of the contract or monetary damages. *Crowley*, 38 F.4th at 1107. Here, as relief, Plaintiffs request that the Court declare that the actions taken to modify, reorganize, or eliminate USAID violate the Separation of Powers and set them aside; declare that Musk's actions at USAID violated the Appointments Clause; and declare as unlawful and set aside the actions taken by Musk and DOGE

personnel at USAID. They also seek an injunction barring Defendants from taking further actions to modify, reorganize, or eliminate USAID unless specifically authorized to do so by Congress and barring Musk and DOGE personnel from performing their duties at USAID. Notably, Plaintiffs seek no specific action relating to personal services contracts at USAID, whether requiring performance of any obligations under those contracts or payment of any monies owed under those contracts.

Indeed, the injunctive and declaratory relief sought would not necessarily require Defendants to reinstate any particular personal services contract. As to the Appointments Clause claim, even if Plaintiffs receive the requested relief, duly appointed USAID officers could ratify the termination of any specific contracts. *See Does I*, 771 F. Supp. 3d at 686. As for the Separation of Powers claim, Plaintiffs do not allege that the termination of personal services contracts alone violates the Separation of Powers; rather, the requested relief is aimed at preventing the wholesale dismantling and abolition of USAID as an independent entity, which would not necessarily require the reinstatement of all or any particular personal services contracts. Thus, any resulting positive impact on personal services contracts would be "a mere by-product of th[e] court's primary function" of reviewing whether Defendants' actions comply with the Constitution and thus would not amount to relief that is contractual or monetary in nature. *Cf. Bowen v. Massachusetts*, 487 U.S. 879, 882, 910 (1988) (finding that a state seeking an injunction under the APA against a federal agency's refusal "to reimburse [it] for a category of expenditures under its Medicaid program," did not impermissibly seek "money damages" because the reimbursement of money would be "a mere by-product of th[e] court's primary function of reviewing the [federal government's] interpretation of federal law").

Where Plaintiffs' claims are not grounded in contract and Plaintiffs' requested relief is not of the type provided in a contract action, the Court finds that the claims are not precluded by the CDA. *See CACI, Inc.*, 674 F. Supp. 3d at 270 (finding that the CDA did not preclude a contractor's claim where the claim was based on the Trade Secrets Act and where the contractor sought an injunction, "not specific performance or monetary damages flowing from a contract breach"); *AVAC*, 770 F. Supp. 3d at 136–37; *Nat'l Job Corps Ass'n*, 2025 WL 1752414, at *5.

As for Defendants' invocation of the Tucker Act, the same *Megapulse* analysis discussed above is applicable and does not support preclusion of Plaintiffs' claims. For purposes of the Tucker Act, the inquiry on the second prong "boils down to whether the plaintiff effectively seeks to attain monetary damages in the suit." *Crowley*, 38 F.4th at 1107. As discussed above, Plaintiffs' claims seek injunctive and declaratory relief on the issue of whether Musk's actions at USAID and the dismantling and abolition of USAID violate the Constitution and do not necessarily require the disbursement of funds to J. Doe 29 or other PSCs directly or indirectly. *See Coleman*, 74 F.4th at 615–16 (providing that a claim is not precluded by the Tucker Act if the plaintiff seeks "primarily injunctive relief," in that "the relief requested is 'not . . . an incident of, or collateral to, a monetary award'" (quoting *Randall v. United States*, 95 F.3d 339, 347 (4th Cir. 1996))).

As a result, this case is distinguishable from the recent case law cited by Defendants in which plaintiffs sought or courts issued orders that required the disbursement of certain funds pursuant to specific grants. In *Department of Education v. California*, 145 S. Ct. 966 (2025), the Supreme Court stayed a district court's TRO that required the United States Department of Education "to pay out past-due grant obligations and to continue paying obligations as they accrued," because the claim was effectively seeking to "enforce a contractual obligation to pay money," which is precluded by the Tucker Act, and because the APA, which was the basis of the

28

plaintiffs' claims, does not permit an action seeking such monetary relief. *Id.* at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). In *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025), the court similarly stayed a preliminary injunction that required the United States Agency for Global Media to reinstate employees and contractors and restore Fiscal Year 2025 grants both because the action was precluded by the Tucker Act in that the district court had effectively ordered the "disbursement" of "the money committed by" the grants, which was essentially a "contractual remedy" amounting to "specific performance of the grant agreements," and also because the APA, upon which the challenge was primarily based, allows only challenges to "discrete agency actions" and not a "wholesale correction" of "a collection of many individual actions." *Id.* at *3–4 (citations omitted); *see also Sustainability Institute v. Trump*, No. 25-1575, 2025 WL 1587100, at *1–2 (4th Cir. June 5, 2025) (staying a district court's injunction, which ordered the federal government to "restore [p]laintiffs['] access to grant funds immediately" and prohibited the government from "freezing, terminating, or otherwise interfering with" those grants, because the plaintiffs' claims specifically focused on grants "awarded . . . to specific grantees from a generalized fund," such that the injunction was effectively an "an order[] 'to enforce a contractual obligation to pay money'") (citations omitted).  Here, by contrast, Plaintiffs' claims were not brought under the APA, and they do not seek an order requiring the disbursement of any grants or other funds pursuant to a particular contractual agreement; rather, they seek only injunctive or declaratory relief relating to the unlawful exercise of authority under the Appointments Clause and the shutdown of a federal agency in violation of the Separation of Powers.

Accordingly, the Court finds that where Plaintiffs do not effectively seek more than $10,000 from the United States, the Tucker Act does not preclude its review of Plaintiffs' claims.

*See Maryland*, 2025 WL 1585051, at \*25 (finding that claims for declaratory and injunctive relief aimed at preventing the dismantling of AmeriCorps did not in essence seek monetary relief under the second prong of the *Megapulse* test); *Elev8 Balt.*, 2025 WL 1865971, at \*13 (same). More broadly, for the reasons set forth above, the Court finds that neither the CDA nor the Tucker Act precludes the Court from exercising jurisdiction over the claims advanced by J. Doe 29 or other PSCs.

## III.   Standing

Defendants also argue that Plaintiffs have not pleaded sufficient facts to demonstrate standing to assert each of their claims. Because Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies," plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted). Standing must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). When there are multiple plaintiffs, the Court need only determine that there is at least one plaintiff with standing for a particular claim in order to consider the claim. *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

In a class action, plaintiffs "cannot meet their burden to establish standing '[w]ithout a sufficient allegation of harm to [a] named plaintiff in particular.'" *Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018) (quoting *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)). At the motion-to-dismiss stage, however, "general factual allegations of

injury resulting from the defendant's conduct may suffice," because at that stage, courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). Further, in assessing standing at the pleading stage, courts must "assum[e] the merits of a dispute will be resolved in favor of the party invoking" the court's jurisdiction. *Equity in Athletics*, 639 F.3d at 99.

In the Motion, Defendants argue that Plaintiffs have not alleged specific injuries connected to any named plaintiff, and that they have not established that their general allegations of injury are traceable to the allegedly unconstitutional conduct underlying their claims. In so arguing, Defendants initially stated in its opening brief that pursuant to Rule 12(b)(1), the "court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established jurisdiction." Mot. at 6 (citing *United States ex. rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 348 (4th Cir. 2009)). However, in their reply brief, they asserted that the Court may not consider any facts outside the four corners of the Second Amended Complaint. The Fourth Circuit has frequently stated, consistent with Defendants' assertion in their opening brief, that on a Rule 12(b)(1) motion, "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco*, 370 F.3d at 398; *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). Although Defendants, in their reply brief, cite *Evans v. United States*, 105 F.4th 606 (4th Cir. 2024), for the proposition that a facial challenge to subject matter jurisdiction is subjected to the same standard applicable to a Rule 12(b)(6) motion, under which the allegations must be viewed in the light most favorable to the plaintiff, *Evans* does not explicitly articulate an exception

31

to the general rule that matters outside the pleadings may be considered on a Rule 12(b)(1) motion. *Id.* at 615.   Nevertheless, where *Evans* notes that for a factual challenge to subject matter jurisdiction, matters outside the pleadings may be considered, *id.*, and where the Fourth Circuit in *Wikimedia Foundation v. National Security Agency*, 857 F.3d 193 (4th Cir. 2017), cited by Defendants, declined to consider facts outside of the pleadings that were also not considered by the district court in assessing a facial challenge to standing, *id.* at 212–13, it is unclear whether outside facts may be considered on the present Motion.

The Court will therefore initially consider only the information in the Second Amended Complaint but notes that where significant additional information relevant to standing has already been presented to the Court, including the allegations in the original Complaint, evidence presented on the issue of standing in relation to the Motion for a Preliminary Injunction, and additional declarations submitted in relation to the Motion for Class Certification, Defendants' facial challenge is one of form rather than substance, as the Court can and would grant leave to amend the complaint to add facts already before the Court to the extent they cannot be considered on the Motion but are necessary to satisfy the pleading requirements relating to standing.

### A.   Injury in Fact

To satisfy the requirement of an "injury in fact," Plaintiffs must identify "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

In the Second Amended Complaint, Plaintiffs have alleged that they each suffered "interruptions to the ordinary course of their employment," SAC ¶¶ 4–9, and that on February 7, 2025, USAID personnel were informed that all USAID employees would be placed on

32

administrative leave, with limited exceptions, amounting to nearly 90 percent of all USAID employees. Although some of those placements were temporarily blocked by a TRO issued by another federal court, once that order was lifted, a similar agency-wide administrative leave notice was issued on or about February 23, 2025 by a DOGE team member. Then, with the March 28, 2025 Lewin Memorandum, all USAID personnel were informed that they would receive a RIF notice stating that they would be terminated on either July 1, 2025 or September 2, 2025, and that USAID's independent operations would be ended. Although Defendants note that the Second Amended Complaint does not provide specific details on whether each individual plaintiff was subjected to one of these actions, these allegations of personnel actions that eventually covered all USAID employees reasonably support the conclusion that the Employee Plaintiffs either were placed on administrative leave, received a RIF notice, or both, which would undisputedly constitute either an actual or imminent injury. *See Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (quoting *Lujan*, 504 U.S. at 561)).

The Court notes that to the extent it may consider the additional facts presented, they even more clearly demonstrate an injury in fact. Such facts include the allegations in the original Complaint that on February 4, 2025, J. Doe 7 was ordered out of USAID headquarters and also received a notification from a DOGE team member that J. Doe 7 was being placed on administrative leave, Compl. ¶ 10, ECF No. 14; the assertions in the declaration of J. Doe 22 submitted with the Motion for a Preliminary Injunction that J. Doe 22, an employee in a high-risk area in Central America who faced security risks because his bills were no longer being paid by USAID due to actions taken by DOGE, was placed on administrative leave on February 23, 2025

33

Mot. Prelim. Inj. Joint Record 456–57, ECF No. 37; and the assertions in the declarations submitted with the Motion for Class Certification that each of the Employee Plaintiffs received, pursuant to the Lewin Memorandum, either a RIF or termination notice, effective either July 1, 2025 or September 2, 2025. Mot. Class Certification Joint Record 5, 10, 14, 19, 25, ECF No. 111-1. To the extent that Plaintiffs seek to solidify the validity of the standing allegations in the complaint under any interpretations of the standards for a facial challenge, the Court would grant leave to amend to insert these additional facts.

### B.    Traceability

Defendants also question whether Plaintiffs have properly alleged that the asserted injuries are fairly traceable to Defendants' actions. *See Lujan*, 504 U.S. at 560. Under this requirement, plaintiffs need not establish that the challenged action is the "proximate cause" of the injury and instead need only show that it is "in part responsible for" the asserted injury. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 315–16 (4th Cir. 2013) (stating that "the concept of concurrent causation" is "useful in evaluating" this element); *see also Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018).

Defendants do not seriously dispute this element in relation to the Separation of Powers claim. Plaintiffs have alleged that Defendants have violated the Separation of Powers through their "collective actions to dismantle USAID" without congressional authorization, and that the placements on administrative leave and RIFs are part of that course of conduct that will culminate in what Lewin referred to as USAID's "Final Mission" of winding down USAID's "independent operations," which includes the elimination of "[s]ubstantially all non-statutory positions at USAID." SAC ¶¶ 120, 137. These allegations are more than sufficient to support the conclusion

34

that Plaintiffs have adequately pleaded that their injuries are traceable to the alleged Separation of
Powers violations.

As for their Appointments Clause claim, Plaintiffs assert that Musk violated the
Appointments Clause in part by directing "the effective dismantling of USAID" beginning during
the weekend of February 1–2, 2025 and include allegations that support the inference that Musk
did so. *Id.* ¶ 131. Plaintiffs allege that during that weekend, Musk was directly involved in efforts
to take control of USAID headquarters and to shut it down, without any apparent approval or
participation by any duly appointed official. That same weekend, almost 800 PSC contracts were
terminated. On February 2, 2025, Musk publicly acknowledged that he was acting to eliminate
USAID as an agency by stating that "USAID is a criminal organization" and that it was "[t]ime
for it to die," and shortly thereafter stating in a livestream broadcast that "we're in the process of .
. . shutting down USAID" because "it's beyond repair." *Id.* ¶ 88. On February 3, 2025, Musk
further acknowledged that he was personally doing so when he posted on X that he had "spent the
weekend feeding USAID into the wood chipper," and over the next four days, notices of placement
on administrative leave were issued for close to 90 percent of USAID employees. *Id.* ¶ 87.

Moreover, in the five days after Musk posted his approval, on February 21, 2025, of a
message on X stating that based on the lifting of a TRO issued by another federal court, "President
Trump and DOGE can now DISMANTLE USAID," *id.* ¶ 108, nearly all USAID staff were placed
on administrative leave, approximately 2,000 USAID personnel received RIF notices, and
approximately 5,700 USAID contracts and grants were terminated. Drawing all reasonable
inferences in favor of Plaintiffs, as is required for a facial challenge to standing, the Court finds
that it is reasonable to infer that the personnel actions, from the placements on and announcements
of administrative leave from February 3 to 7, 2025 to the RIF notices following the Lewin

Memorandum, trace back to Musk's original decision, allegedly without constitutional authority, to shut down USAID.

Although Defendants argue that these actions could instead be the result of "the independent exercise of otherwise lawful authority by a duly appointed officer," Mot. at 18, at the pleading stage, it is premature to reach such a conclusion. Notably, even if Lewin or another USAID official had the authority to take certain personnel or other actions at the time they occurred, it is still reasonable to infer that those actions were causally linked to Musk's original decision and actions to initiate the shutdown of USAID in violation of the Appointments Clause, particularly where Lewin was the DOGE Team Lead at USAID on or about February 3, 2025, at the time that Musk was engaging in his actions to shut down USAID. Viewing the allegations in the light most favorable to the nonmoving party, the Court finds that Plaintiffs have satisfied the traceability requirement as to their Appointments Clause claim by showing that Musk's allegedly unconstitutional actions in initiating the shutdown of USAID are at least "in part responsible for" their asserted injuries. *Libertarian Party of Va.*, 718 F.3d at 316.

The Court again notes that to the extent it could consider the additional facts submitted to date, they even more definitively establish this element. In particular, the facts alleged in the original Complaint that J. Doe 7 was forced out of USAID headquarters and then placed on administrative leave on February 4, 2025, only days after Musk's direct actions to shut down USAID headquarters and his statement that USAID would be terminated as an agency, describes a specific injury clearly traceable to the alleged Appointments Clause violation. The declarations submitted with the Motion for Class Certification, which state that J. Does 4, 7, 27, and 28 were all placed on administrative leave on February 4, 2025, do the same. To the extent that Plaintiffs

36

seek to solidify the validity of the standing allegations under any interpretations of the standards for a facial challenge, the Court would grant leave to amend to insert these additional facts.

### C.     Redressability

Lastly, although Defendants only briefly contest the third element, the Second Amended Complaint sufficiently alleges that the alleged injuries are redressable. To do so, Plaintiffs must demonstrate that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club*, 899 F.3d at 284 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).    The "second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *FDA v. All. For Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)).    "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."   *Id*.   Further, the "burden imposed by this requirement is not onerous."   *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018).   Plaintiffs "need not show that a favorable decision will relieve [their] every injury."   *Id*. (quoting *Sierra Club*, 899 F.3d at 284).   "Rather, plaintiffs 'need only show that they personally would benefit in a tangible way from the court's intervention.'"   *Id.* (quoting *Sierra Club*, 899 F.3d at 284).   "The removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability."   *Sierra Club*, 899 F.3d at 285.

Here, the requested relief includes an injunction setting aside prior actions and barring further actions by Defendants to "modify, reorganize, or eliminate USAID," as well as an injunction setting aside actions taken at USAID by Musk and DOGE personnel and barring them from "performing their significant and wide-ranging duties at USAID." SAC ¶ 141. Even without a request for specific relief relating to the placements on administrative leave and the RIFs, these

forms of relief could facilitate redress of Plaintiffs' injuries because an order halting the elimination of USAID as an agency pursuant to either the Separation of Powers claim or the Appointments Clause claim would certainly "remov[e]" a significant "obstacle" to Plaintiffs' regaining some form of employment at USAID or other relief. *Sierra Club*, 899 F.3d at 285. In addition, as to the Appointments Clause claim, where Plaintiffs have alleged that Musk directed the shutdown of USAID, an order undoing his actions and barring additional actions by Musk and DOGE at USAID would similarly contribute to providing Plaintiffs with relief by removing a force that has driven forward the process that has caused or will imminently cause Plaintiffs' loss of employment. Accordingly, accepting the allegations as true and construing them in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have satisfied all three requirements to establish standing at this stage of the case.

## IV. Claim Splitting

Defendants also argue that the Second Amended Complaint "raises claim-splitting concerns," because similar claims challenging the dismantling of USAID brought by unions representing USAID employees and by an organization representing the interests of USAID PSCs are already pending in two cases before the United States District Court for the District of Columbia. Mot. at 20; *see AFSA*, 768 F. Supp. 3d at 11 (stating that plaintiffs include "two unions that represent employees of USAID" which challenge the executive branch's dismantling of that agency); Tr. of Ruling on Temporary Restraining Order at 3–4, 6, *Personal Servs. Contractor Ass'n v. Trump*, No. 25-cv-469 (CJN) (D.D.C. Mar. 7, 2025), ECF No. 60-1 (describing claims brought by the Personal Services Contractor Association to "'protect' its PSC members from" the dismantling of USAID).

"The rule against claim splitting 'prohibits a plaintiff from prosecuting its case piecemeal and requires that all claims arising out of a single wrong be presented in one action.'" *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 635 (4th Cir. 2015) (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008)). "In a claim splitting case, as with the traditional res judicata analysis, the second suit will be barred if the claim involves the same parties or their privies and 'arises out of the same transaction or series of transactions' as the first claim." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 452 F. Supp. 2d 621, 626 (D. Md. 2006) (quoting *Trustmark Ins. Co. v. ESLU, Inc.*, 299 F.3d 1265, 1270 (11th Cir. 2002)), *aff'd*, 273 F. App'x 256 (4th Cir. 2008).

Here, Defendants have not provided evidence that Plaintiffs are in privity with the organizations asserting the allegedly related claims in these other lawsuits. Indeed, they have not even demonstrated that Plaintiffs are all members of one of those organizations. The Court therefore declines to dismiss the Second Amended Complaint on this basis. *Cf. Cooper v. Harris*, 581 U.S. 285, 297–98 (2017) (declining to dismiss claims brought by individual plaintiffs as barred by *res judicata* where the party asserting that defense "never satisfied the District Court that" the individual plaintiffs were members of an organization that had brought similar claims in a separate lawsuit).

## V.    Failure to State a Claim

Defendants also seek dismissal of both counts for failure to state a claim. To a significant degree, the Court has already addressed the issue of whether Plaintiffs have alleged plausible claims for relief. In its ruling on the Motion for a Preliminary Injunction, the Court found that Plaintiffs had demonstrated a likelihood of success on the merits of both claims. *Does I*, 771 F. Supp. 3d at 668–69, 678. Where the present claims and allegations do not differ materially, and

even accounting for the factual record considered on that earlier motion that is not applicable to the Motion to Dismiss, that analysis largely establishes that Plaintiffs have met the pleading standard of Rule 12(b)(6) of stating a "plausible claim for relief," *Iqbal*, 556 U.S. at 679, which is a substantially lower bar than a likelihood of success on the merits, *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and which, unlike the preliminary injunction standard, require the Court to draw all reasonable inferences in the plaintiffs' favor, *Iqbal*, 556 U.S. at 678. Although the Fourth Circuit, in staying the preliminary injunction, disagreed with this Court's ruling on the likelihood of success on the merits, it did not address the question of whether Plaintiffs had stated a plausible claim for relief. *See Does II*, 2025 WL 1020995, at *4. Accordingly, the Court incorporates its analysis on both claims in *Does I*, particularly its legal analysis, and will therefore discuss only those arguments and issues that require additional discussion.

### A.    Appointments Clause

In the present Motion, Defendants argue that Plaintiffs have failed to plead a plausible Appointments Clause claim for two reasons. First, Defendants assert that Plaintiffs' allegations do not establish that Musk is subject to the Appointments Clause because his role does not satisfy the requirements for him to be an Officer of the United States, which require that an individual (1) "exercise[] significant authority pursuant to the laws of the United States"; and (2) "occupy a 'continuing' position established by law." *See Lucia v. SEC*, 585 U.S. 237, 245 (2018) (citations omitted). In particular, Defendants reassert two arguments already advanced in relation to the Motion for a Preliminary Injunction: (1) that Musk cannot be an Officer because he does not occupy a position "established by law," with authority vested "pursuant to the laws of the United States"; and (2) that Musk's formal role as a non-career Special Government Employee ("SGE")

is not a "continuing" position. Mot. at 25, 30; *Lucia*, 585 U.S. at 245 (citations omitted); *see also Does I*, 771 F. Supp. 3d at 665–68. In *Does I*, the Court rejected these arguments, and another court considering Appointments Clause claims against Musk has since done so as well. *See Does I*, 771 F. Supp. 3d at 665–68; *New Mexico v. Musk*, Nos. 25-cv-429 (TSC), 25-cv-643 (TSC), 2025 WL 1502747, at *12–14 (D.D.C. May 27, 2025) (rejecting the theory that for a violation of the Appointments Clause to occur "there must first be an office lawfully established and imbued with formal authority" and finding that the plaintiffs had sufficiently alleged that "Musk is DOGE's leader" and that "this position qualifies as" a continuing one). Where the Second Amended Complaint contains allegations substantially replicating the facts on this issue relied upon in *Does I*, *compare* SAC ¶¶ 39-47, *with Does I*, 771 F. Supp. 3d at 666–68, and the Court's prior ruling was based primarily on a legal analysis applicable here, the Court again rejects these arguments for the reasons set forth in *Does I*. *Does I*, 771 F. Supp. 3d at 665–68.

Second, Defendants assert that Plaintiffs have not alleged a viable Appointments Clause claim because, according to Plaintiffs' own allegations, the current actions being taken to effectuate the shutdown of USAID as described in the Lewin Memorandum and the Congressional Notification Letter are occurring at the behest of USAID officials whose status under the Appointments Clause Plaintiffs do not challenge. This argument, however, fails to account for Plaintiffs' allegations which strongly support the inference that Musk directed the actions to shut down USAID without authorization from any USAID official, including the closure of USAID headquarters and the removal of the USAID website, between January 31, 2025 and February 2, 2025. Consistent with its analysis in *Does I*, 771 F. Supp. 3d at 668–69, such an inference is supported by the allegations in the Second Amended Complaint that Musk took a leading role in DOGE's efforts to take physical control of USAID headquarters, including its secured spaces, and

that Musk publicly took credit for the dismantling of USAID during this time period in multiple posts on X, including the February 2 and 3 posts in which he stated that "we spent the weekend feeding USAID into the wood chipper," that "we're in the process of . . . shutting down USAID," that "USAID is a criminal organization," and that it was "[t]ime for it to die." SAC ¶ 87–88. Collectively, these allegations support the inference that, as the *de facto* administrator of DOGE at the time, Musk directed these actions. Significantly, according to Plaintiffs' allegations, the documentary record does not demonstrate that there was any individual acting as the Administrator or the Deputy Administrator of USAID between January 30 and February 2, when these actions took place, and in any event, the Second Amended Complaint contains no allegations that any USAID officials authorized or took any of these actions. Where the Court previously found in *Does I* that Plaintiffs were likely to succeed on the merits of their Appointments Clause claim as to the closure of USAID's headquarters even upon consideration of additional record evidence favorable to Defendants, *see Does I*, 771 F. Supp. 3d at 668–69, the allegations in the Second Amended Complaint, which must be viewed in the light most favorable to Plaintiffs, are sufficient to state a plausible Appointments Clause claim.

Although Defendants argue that this episode cannot form the basis of the Appointments Clause claim because a past violation cannot justify prospective injunctive relief, at this early stage, where that episode occurred only a few months ago and there is no reason to conclude that DOGE has ceased all activity at USAID, it is premature to conclude that there is no basis or need for injunctive or declaratory relief relating to this claim. Moreover, Plaintiffs have identified later instances in which DOGE team members were the only known personnel announcing and processing decisions relating to the shutdown of USAID, including when on February 8, 2025, Lewin, in his capacity as the DOGE Team Lead for USAID, drafted a memorandum for Secretary

Rubio directing USAID to terminate over $1 billion in contracts and grants, including some previously supported by Rubio, personally responded to an inquiry as to who had ordered the terminations, and "reprimanded at least one high ranking USAID employee" for conducting reviews of the awards slated for termination, SAC ¶ 101; when on February 11, 2025, Musk responded to inquiries about recent grant terminations by stating that "we have turned [back] on funding for Ebola prevention and for HIV/PR prevention," and that "[w]e will make mistakes, but we'll fix them very quickly," *id.* ¶ 92; and when on February 23, 2025, a DOGE team member sent RIF notices out to USAID employees that listed a title for Marocco that he did not have. Accordingly, additional factual development through discovery is necessary to assess the scope and breadth of the alleged Appointments Clause violation, including by determining the identity of the actual decisionmakers for any exercises of significant authority. The Motion will therefore be denied as to the Appointments Clause claim.

### B.     Separation of Powers

In the Separation of Powers claim, Plaintiffs allege that Defendants have acted to eliminate USAID, a federal agency created by statute, where only Congress may do so, and in doing so have usurped Congress's authority to create and abolish offices. In finding a likelihood of success on the merits of this claim in *Does I*, the Court found that Plaintiffs' theory of a Separation of Powers claim was viable primarily because Congress, not the President, has the authority to abolish an agency it created by statute. *Does I*, 771 F. Supp. 3d at 671–78. The Second Amended Complaint contains allegations that substantially replicate the facts adduced in *Does I* to support the conclusion that "USAID has been effectively eliminated," *id.* at 671; *compare* SAC ¶¶ 65, 74–75, 83–88, 93–99, 102–17, *with Does I*, 771 F. Supp. 3d at 669–71, but also includes additional, more concrete allegations demonstrating that Defendants are acting to "eliminate[]" "substantially all

non-statutory positions at USAID," "decommission[]" USAID assets, and "wind-down" the agency's independent operations, as described in the Lewin Memorandum and the Congressional Notification Letter, SAC ¶ 120.  Accordingly, where the Court previously concluded that Plaintiffs were likely to succeed on the merits of their Separation of Powers claim in *Does I*, *see* 771 F. Supp. 3d at 678, and where the Second Amended Complaint contains even more allegations about Defendants' course of conduct to eliminate USAID outright than were available at that time, the Court finds that Plaintiffs have stated a plausible Separation of Powers claim. *See Does I*, 771 F. Supp. 3d at 678.  *Cf. Nat'l Treasury Emps. Union v. Vought*, 774 F. Supp. 3d 1, 57–58 (D.D.C. 2025) (finding that the Executive Branch's actions to shut down of the Consumer Finance Protection Bureau likely violated the Separation of Powers), *stay granted in part*, No. 25-5901, 2025 WL 1721068, at \*1 (D.C. Cir. Apr. 11, 2025).

The new arguments asserted by Defendants in their Motion do not alter this conclusion. As discussed in *Does I*, in the Further Consolidated Appropriations Act of 2024 ("FY24 Appropriations Act"), Pub. L. 118–47, 138 Stat. 460, Congress provided that funds appropriated to USAID "may not be used to implement a reorganization, redesign, or other plan . . . without prior consultation" by the agency head "with the appropriate congressional committees," that "such funds shall be subject to the regular notification procedures of the Committees on Appropriations," and that any such notification must "include a detailed justification for the proposed action." FY24 Appropriations Act, § 7063 ("Section 7063"); *Does I*, 771 F. Supp. 3d at 673.  Based on this provision, Defendants assert that Plaintiffs' Separation of Powers claim fails because Defendants have complied with Section 7063 through the Congressional Notification Letter.

In previously finding a likelihood of success on the merits of this claim, the Court relied on far more than the apparent failure to comply with Section 7063. *Does I*, 771 F. Supp. 3d at 671–78. Moreover, as alleged by Plaintiffs, since the original Complaint was filed, Defendants' actions have now gone well beyond the steps taken at the time of the Court's prior ruling. Indeed, the facts in the Second Amended Complaint, particularly those describing the Lewin Memorandum, demonstrate that Defendants are presently abolishing USAID entirely in contravention of the federal statute that established it. As found in *Does I*, "[w]here Congress has prescribed the existence of USAID in statute pursuant to its legislative powers under Article I, the President's Article II power . . . does not provide authority for the unilateral, drastic actions taken to dismantle the agency." *Does I*, 771 F. Supp. 3d at 677. Relatedly, Defendants' argument that their supposed compliance with Section 7063 defeats Plaintiffs' Separation of Powers claim inappropriately recharacterizes Plaintiffs' claim as amounting only to a claim that Defendants exceeded their statutory authority. The Court rejected that characterization of the Separation of Powers claim in *Does I* and does so again here for the same reasons. *See id.* at 678.

Further, Defendants' reference to the political question doctrine does not provide a basis to dismiss the Separation of Powers claim. The political question doctrine is "a narrow exception" to the rule that courts have an obligation to decide cases properly before them and applies to strip a court of its authority to decide a case "where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)). Defendants argue that to the extent that Plaintiffs' claim focuses on the adequacy of the Congressional Notification Letter under Section 7063, that inquiry "is a political question for Congress, not this Court, to decide,"

because the Court lacks judicially manageable standards to assess the sufficiency of the Congressional Notification Letter and "how Congress may choose to respond to it." Mot. at 33. This argument again mischaracterizes Plaintiffs' Separation of Powers claim as solely arising out of Section 7063, which places restrictions on the use of appropriated funds in relation to a reorganization of USAID but does not provide authorization for the complete abolition of this congressionally established agency. *See Does I*, 771 F. Supp. 3d at 673 ("Defendants . . . generally lack congressional authorization to dismantle, eliminate, or abolish USAID."). The Court's resolution of Plaintiffs' claim thus does not turn on a determination of the sufficiency of the Congressional Notification Letter.

Rather, Plaintiffs' Separation of Powers claim focuses on whether Defendants have exceeded their constitutional authority in acting to shut down USAID, and the framework set forth in Justice Robert Jackson's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952), provides the Court with a judicially manageable standard to adjudicate that question. *See Local 2677, American Fed'n of Gov't Emps. v. Phillips,* 358 F. Supp. 60, 72 (D.D.C. 1973) (finding a Separation of Powers violation pursuant to *Youngstown* when the President sought to terminate the Office of Economic Opportunity). In fact, the Supreme Court has previously applied that framework in a case where it rejected, on other grounds, the argument that the case presented a non-justiciable political question. *See Zivotofsky v. Kerry*, 576 U.S. 1, 9–10 (2015) (applying the *Youngstown* framework to the question of whether a statute requiring that passports for American citizens born in Jerusalem record the place of birth as "Israel" violated the Separation of Powers and noting that the Court had rejected the argument that assessing whether the statute was constitutional was a non-justiciable political question). Though Defendants assert that adjudicating this claim "would supplant Congress's ability to respond" to the Congressional

Notification Letter, Mot. at 33, the Supreme Court has also noted that "the fact that one institution of Government has mechanisms available to guard against incursions into its power by other governmental institutions does not require that the Judiciary remove itself from the controversy by labeling the issue a political question." *United States v. Munoz-Florez*, 495 U.S. 385, 393 (1990). Accordingly, the Court declines to dismiss Plaintiffs' Separation of Powers claim as a non-justiciable political question or based on any of the other reasons advanced by Defendants.

## VI.    President Trump

Finally, Defendants seek dismissal of the claims against President Trump based on the argument that the Court cannot issue injunctive or declaratory relief against the President in his official capacity.    Plaintiffs concede that injunctive relief against the President is generally improper but argue that declaratory relief is available against him pursuant to *National Treasury Employees Union v. Nixon* ("*NTEU*"), 492 F.2d 587 (D.C. Cir. 1974).    *NTEU*, however, does not stand for the proposition that declaratory relief against the President is broadly available; rather, it found declaratory relief against the President available in a circumstance when the presidential duty at issue was a ministerial one in which "nothing [was] left to discretion." *Id.* at 606–08, 616 (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 498 (1866)) (issuing a declaratory judgment providing that the President was required to implement a federal pay raise mandated by Congress).

Here, Plaintiffs' request for declaratory relief against President Trump involves matters that are not as clearly ministerial. *See id.*; *New Mexico*, 2025 WL 1502747, at \*19 (dismissing the President as a defendant from a case seeking declaratory relief where the duties implicated by the relief were "highly discretionary").    Moreover, courts considering whether to issue injunctive or declaratory relief against a President have recognized that the constitutional concerns associated

47

with doing so "can be successfully bypassed" where the plaintiff's injury "can be rectified by injunctive relief against" subordinate Executive Branch officials. *See Swan v. Clinton*, 100 F.3d 973, 976 & n.1, 978–79 (D.C. Cir. 1996) (recognizing that "similar considerations" apply to requests to obtain injunctive or declaratory relief against a President); *NTEU*, 492 F.2d at 606 (noting that "if it were possible" for the plaintiff to "enforce its rights by naming a defendant additional to or in substitution of the President," the court "would exercise its discretion not to answer the question of whether the President is subject to mandamus by a federal court"). Where, as here, Plaintiffs' requests for relief will proceed as to other Executive Branch officials with authority over the relevant issues in this case, the Court will dismiss the claims against President Trump.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART in that the Motion will be granted as to the claims against President Trump and will be otherwise denied. A separate Order shall issue.

Date:   August 13, 2025

THEODORE D. CHUANG
United States District Judge

48