**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**J. DOE 4,**

**J. DOE 7,**

**J. DOE 22**

**J. DOE 27,**

**J. DOE 28,**

**J. DOE 30, on behalf of themselves and all others similarly situated,**

***Plaintiffs***

**v.**

**ELON MUSK, in his official capacity,**

**UNITED STATES DOGE SERVICE,**

**DEPARTMENT OF GOVERNMENT EFFICIENCY,**

**UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT,**

**UNITED STATES DEPARTMENT OF STATE,**

**DONALD J. TRUMP, in his official capacity,**

**MARCO RUBIO, in his official capacity,**

**PETER MAROCCO, in his official capacity,**

**JEREMEY LEWIN, in his official capacity,**

**KENNETH JACKSON, in his official capacity,**

**AMY GLEASON, in her official capacity,**

***Defendants.***

**Case No. 8:25-cv-00462-TDC**

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs, J. Doe 4, J. Doe 7, J. Doe 22, J. Doe 27, J. Doe 28 and J. Doe 30,[1] on behalf of themselves and all others similarly situated, hereby bring this Amended Class Action Complaint against Elon Musk, in his official capacity as the *de facto* leader of DOGE; United States DOGE Service and the Department of Government Efficiency (collectively "DOGE"); the United States Agency for International Development ("USAID"); the United States Department of State ("State Department"); President Donald J. Trump; four key decision-makers at USAID—Secretary of State Marco Rubio, who also serves as the Acting Administrator of USAID; Peter Marocco, who performed the duties of Deputy Administrator of USAID; Jeremy Lewin, the Deputy Administrator for Policy and Programming and the Chief Operating Officer for USAID;[2] Kenneth Jackson, the Deputy Administrator for Management and Resources at USAID;[3] and Amy Gleason, the Acting Administrator of Defendant US DOGE Service.

## NATURE OF THE ACTION

"Since it was established by Executive Order on January 20, 2025, the 'Department of Government Efficiency,' or 'DOGE,' has sent teams of personnel to numerous federal departments and agencies, taken control of their computer systems, and in many instances, taken the lead in terminating numerous contracts and employees. In the case of [USAID], DOGE and its leader, Elon Musk, have also played a leading role in actions taken to shut down and dismantle the agency, which have included permanently closing its headquarters, taking down its website,

[1] The Court previously granted a motion waiving the requirements of Local Rule 102.2(a) and permitting Plaintiffs to proceed under pseudonyms. ECF No. 81.
[2] Or has been delegated and is performing the duties and functions of Deputy Administrator for Policy and Programming and Chief Operating Officer.
[3] Or has been delegated and is performing the duties and functions of Deputy Administrator for Management and Resources.

and engaging in mass terminations of contracts, grants, and personnel." Mem. Op. at 1, ECF No. 73.

Defendant Musk's exercise of extraordinary—and seemingly unprecedented—authority has included USAID decisions on "matter[s] of great significance" that required "substantial discretion," of the type that must be performed by a duly appointed officer. *Id*. at 29-30. Moreover, as the *de facto* head of DOGE, Defendant Musk's position has required ongoing, "around-the-clock" work that constitutes a "continuing position" under Appointments Clause jurisprudence. *Id*. at 34-36. Accordingly, this Court previously ruled that Plaintiffs have "demonstrated a likelihood of success on the merits of the Appointments Clause claim as to the decision to permanently close USAID headquarters." *Id*. at 36.

Additionally, the record compiled on the preliminary injunction motion demonstrates that "Defendants, as well as other government officials, have acted swiftly to shut down, dismantle, and effectively eliminate USAID as an independent agency." *Id*. at 37. In February alone, this included "physically clos[ing] USAID headquarters and shut[ting] down key functionalities of the agency," taking the website offline, "eliminat[ing] or sidelining [] almost its entire workforce," terminating substantially all USAID grants and contracts, and preventing USAID from fulfilling even its statutorily required activities. *Id*. at 37-40. Indeed, by February 19, 2025, President Trump claimed, "we have effectively eliminated" the agency. *Id*. at 40. Days later, Defendant Musk added, "the world will be better for this," referring to DOGE's dismantling of USAID. *Id*.

But,

> Where Congress has consistently reserved for itself the power to create and abolish federal agencies, specifically established USAID as an agency by statute, and has not previously permitted actions taken toward a reorganization or elimination of the agency without first providing a detailed justification to Congress, Defendants' actions taken to abolish or dismantle USAID are "incompatible with the express or implied will of Congress."

*Id*. at 46-47 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Thus, this Court also previously found a likelihood of success on the merits of the Separation of Powers claim.

Plaintiffs and those similarly situated to them have had their lives upended as a result of Defendants' actions, which were made wholly outside the bounds of the Constitution. Defendant Musk in particular has repeatedly publicly besmirched the good names of these dedicated, loyal civil servants to justify Defendants' power grab, causing reputational injury to Plaintiffs that will threaten their ability to obtain future employment. Defendants have also unlawfully accessed and disclosed Plaintiffs' personal data. In an affront to their dignity, Defendants have pulled the rug out from under Plaintiffs professionally and financially, without explanation or warning.

Moreover, the impact of this unauthorized dismantling of USAID has had disastrous consequences for the American and global public, effectively paralyzing operations that delivered life-saving aid across more than 100 countries. Critical humanitarian programs—such as HIV treatment initiatives, malaria prevention efforts, infectious disease strategies that prevent the transnational spread of disease, and efforts supporting the Gaza-Israeli ceasefire—were simply shut off, as Plaintiffs and those similarly situated to them abruptly lost access to their USAID systems. Defendants left vulnerable communities in the lurch. Without essential medical care or other necessities USAID previously provided, Defendants exposed these populations to easily preventable harm, including death. Moreover, billions of dollars in development projects—ranging from significant support for Ukrainian security infrastructure to programs aimed at supporting education for girls in repressive regimes—are at risk of collapse. Defendants' actions not only undermine decades of progress in global health and economic stability but also diminish U.S. power and strategic influence abroad.

For all these reasons, Plaintiffs seek declaratory and injunctive relief to set aside the unlawful dismantling of USAID, and to declare that Defendant Musk's significant and wide-ranging activities at USAID violate the Appointments Clause and Separation of Powers principles of the U.S. Constitution.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201.
2. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) and (e) because at least one of the Plaintiffs resides in this district.

## INDIVIDUAL PARTY ALLEGATIONS

3. Plaintiffs were all duly employed by USAID as of January 20, 2025.[4]
4. J. Doe 4 is a Foreign Service Limited employee of USAID and has been an employee for 10 years. As a result of Defendants' unconstitutional actions, J. Doe 4 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 4 represents.
5. J. Doe 7 is a civil service employee of USAID and has been an employee for over 10 years. As a result of Defendants' unconstitutional actions, J. Doe 7 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 7 represents.

---

[4] For the purposes of this Amended Complaint and the Class allegations, Plaintiffs use "employee" and "employed" to cover all USAID employees, including personal services contractors ("PSCs").

6. J. Doe 22 is a Foreign Service Officer employee of USAID and has been an employee for 5 years. As a result of Defendants' unconstitutional actions, J. Doe 22 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 22 represents.

7. J. Doe 27 is a civil service employee of USAID and has been an employee for over 2 years. As a result of Defendants' unconstitutional actions, J. Doe 27 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 27 represents.

8. J. Doe 28 is a Foreign Service Limited employee of USAID and has been an employee for over 1.5 years. As a result of Defendants' unconstitutional actions, J. Doe 28 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 28 represents.

9. J. Doe 30 was a Personal Services Contractor employee of USAID. J. Doe was an employee of USAID through various hiring mechanisms since 2016. As a result of Defendants' unconstitutional actions, J. Doe 30 has suffered and continues to suffer injuries including (1) unauthorized access to or disclosure of their private data by Defendants, (2) interruptions to the ordinary course of their employment, (3) reputational harm, and (4) other dignitary harm. These injuries are typical of the class J. Doe 30 represents.

10. Defendant Musk is, according to White House spokespeople, an unpaid "special government employee" pursuant to 18 U.S.C. § 202. Upon information and belief, Defendant Musk acts as the *de facto* DOGE Administrator. *See* Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency,'" 90 Fed. Reg. 8,441 (2025). In this role, Defendant Musk oversees a DOGE team, including a "DOGE Team Lead" embedded within each federal agency. *See id*. at Sec. 3(c).

11. Defendant United States DOGE Service ("USDS") was established on January 20, 2025 by Executive Order 14158. DOGE's stated purpose is to "implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id*. at Sec. 1. "DOGE . . . shall terminate on July 4, 2026" but that termination "shall not be interpreted to imply the termination, attenuation, or amendment of any other authority or provision of this order." *Id*. at Sec. 3(b).

12. On information and belief, Defendant Musk directs a web of employees working for "the Department of Government Efficiency," or DOGE. Not all members of DOGE are necessarily employees of USDS. For purposes of this Complaint, both Defendant United States DOGE Service, as well as the network of personnel working at the direction of Defendant Musk, are referred to collectively herein as "DOGE."

13. Defendant United States Agency for International Development was created by Congress in 1961. It is an independent executive agency that is primarily responsible for administering civilian foreign aid and development assistance.

14. Defendant United States Department of State is an executive department that is responsible for the country's foreign affairs policy and relations.

15. Defendant Donald J. Trump is the 47th President of the United States of America.

16. Defendant Marco Rubio is the United States Secretary of State. On February 3, 2025, it was publicly reported that President Trump appointed Secretary Rubio to serve as Acting Administrator of USAID.

17. Defendant Peter Marocco either served as or performed the duties and functions of the Acting USAID Deputy Administrator from at least February 2, 2025, to March 18, 2025. In sworn testimony, Defendant Marocco indicated that he assumed those duties on January 30, 2025, but delegation of authority documents signed by Secretary Rubio indicate that Defendant Marocco's delegation occurred no earlier than February 2, 2025.

18. Defendant Jeremy Lewin was the DOGE team lead at USAID prior to being delegated the roles of USAID Deputy Administrator for Policy and Programming and of Chief Operating Officer on March 18, 2025.

19. Defendant Kenneth Jackson was delegated the role of USAID Deputy Administrator for Management and Resources on March 18, 2025.

20. Defendant Amy Gleason is the Acting Administrator of Defendant US DOGE Service. She was appointed the acting administrator in February of 2025.

## CLASS ALLEGATIONS

21. Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class"), pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2), seeking solely final injunctive relief and/or corresponding declaratory relief.

22. The Class is defined as follows:

    a. All persons who, between January 20, 2025 through the present (the "Class Period"), worked at any time as employees of USAID, including as personal services contractors; specifically excluded from this class are Defendants or any

other person who, during the Class Period, acted as Administrator or Deputy Administrator of USAID.

23. Plaintiffs reserve the right to seek to amend or modify the class definition, including by proposing subclasses, as the litigation progresses.

24. This action seeks only declaratory and injunctive relief. Any and all claims for monetary damages are not within the purview of this litigation, including any individual employment claims and/or any claims arising under any individual contract with USAID.

25. ***Fed.R.Civ.P. 23(a)(1) Numerosity*****:** As of January 20, 2025, USAID employed between 5,500 and 10,000 people throughout the United States and internationally, rendering joinder of all Class members impractical. The Class is ascertainable and identifiable from USAID employment records and documents.

26. ***Fed.R.Civ.P. 23(a)(2) Commonality*****:** There are core questions of law and fact common to the Class, resolution of which will generate common answers apt to drive the resolution of the litigation. Those include:

    a. Whether Defendants' exercise of executive power beyond the scope of any legally authorized appointment, specifically decisions made by Defendant Musk and other DOGE members between January 20 and February 3, 2025 pertaining to USAID, violates the Appointments Clause of the U.S. Constitution;

    b. Whether Defendants' exercise of executive power beyond the scope of any constitutional or legislative grant of authority, specifically the ongoing dismantling of USAID, violates fundamental Separation of Powers principles; and

    c. The nature and scope of injunctive and/or declaratory relief appropriate in light of these constitutional violations.

27. ***Fed.R.Civ.P. 23(a)(3) Typicality***: Plaintiffs' claims are typical of the claims of the Class they seek to represent. Plaintiffs J. Doe 4, J. Doe 7, J. Doe 22, J. Doe 27, J. Doe 28, J. Doe 30, like all members of the Class, were employed by USAID between January 20, 2025 and the present (the "Class Period") and suffered unauthorized access to or disclosure of their private data, interruptions to the ordinary course of their employment (including, but not limited to, lost access to critical security systems and basic utilities), reputational harm and/or dignitary harm as a result of Defendants' Appointments Clause and Separation of Powers violations. Plaintiffs and all members of the Class were thus all directly and similarly injured as a result of Defendants' common course of conduct. Plaintiffs' claims all arise from the same conduct and actions as the claims of all Class members, they have and assert the same legal claims arising therefrom, and they are not subject to any unique defenses.

28. ***Fed.R.Civ.P. 23(a)(4) Adequacy***: Plaintiffs are committed to the vigorous prosecution of this action. Plaintiffs understand the nature of class action proceedings and this action specifically, and they are willing and able to fulfill their duties of class representatives. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class, and Plaintiffs have retained counsel competent and experienced in the prosecution of constitutional class action litigation to represent themselves and the Class. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

29. ***Fed.R.Civ.P. 23(b)(2)***: Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole.

## FACTS

***Before January 20, 2025: DOGE's Origin and Defendant Musk's Role***

30. In addition to his government role, Defendant Musk serves as the Chief Executive Officer of automaker Tesla and of rocket manufacturer SpaceX. He also owns the social media company X, formerly known as Twitter. Additionally, he co-founded Neurolink, a neurotechnology startup, and founded xAI, an artificial intelligence company. Defendant Musk's estimated wealth is approximately $370 billion dollars, and he was the largest contributor of the 2024 election cycle, contributing $288 million to support President Trump and other Republican candidates.

31. In August 2024, Defendant Musk proposed the idea of a "government efficiency commission" in a podcast interview with Lex Fridman. As recounted by *Forbes Magazine*, "When Fridman said he wished Musk 'could go into Washington for a week and be the head of the committee for making government smaller,' the billionaire said he has 'discussed with Trump the idea of a government efficiency commission, and I would be willing to be part of that commission.'"

32. After that, on August 12, 2024, Defendant Musk interviewed then former President Trump on X. Defendant Musk proposed the creation of a "government efficiency commission" that would ensure "taxpayers' money . . . is spent in a good way." Former President Trump expressed support for the idea and indicated that he would consider appointing Defendant Musk to lead such a commission if re-elected.

33. On September 5, 2024, in a speech to the Economic Club of New York, then former President Trump announced his plans to establish a "government efficiency commission" that would be "tasked with conducting a complete financial and performance audit of the entire federal

government, and making recommendations for drastic reforms." Former President Trump also stated that Defendant Musk had agreed to lead this commission.

34. At the time of the 2024 election, Defendant Musk's companies had more than $15 billion in contracts with the United States government, including contracts with nine cabinet departments and three federal agencies. His companies were the subject of at least 20 recent investigations or reviews by five cabinet departments and six independent agencies.

35. On November 12, 2024, President-elect Trump announced that "the Great Elon Musk, working in conjunction with American Patriot Vivek Ramaswamy will lead the Department of Government Efficiency ('DOGE')." The announcement further stated that: "Together, these two wonderful Americans will pave the way for my Administration to dismantle Governmental Bureaucracy, slash excess regulations, cut waste expenditures, and restructure Federal Agencies—Essential to the 'Save America' Movement." "This will send shockwaves through the system, and anyone involved with Government waste, which is a lot of people!" stated Defendant Musk. Defendant Musk posted this same statement to X and then reposted it as the first X post from the Department of Government Efficiency.

36. Defendant Musk and Mr. Ramaswamy made similar points on November 20, 2024 in a *Wall Street Journal* opinion editorial, emphasizing that DOGE would "cut the federal government down to size," through three types of reform: "regulatory rescissions, administrative reductions and cost savings." The editorial criticized "rules and regulations" issued by "millions of unelected, unappointed civil servants (from) within government agencies who view themselves as immune from firing thanks to civil service protections." It said that DOGE will identify the minimum number of employees required at agencies to perform their "constitutionally permissible and statutorily mandated functions" and then reduce agency

staff in proportion to the number of regulations that are cut. Defendant Musk and Mr. Ramaswamy claimed that they would co-lead DOGE as "outside volunteers" and stressed the importance of public support and transparency.

37. On December 4, 2024, President-elect Trump announced that the "team of incredible pioneers at DOGE" would "rebuild a U.S. Government that truly serves the People."

38. On January 8, 2024, Defendant Musk stated that DOGE would seek to cut $2 trillion in government spending with $1 trillion as a realistic goal, and that reducing spending within the federal government would provide a "target rich environment."

***After January 20, 2025: The Creation, Mission, Structure and Staffing of DOGE***

39. President Trump created the United States DOGE Service in the Executive Office of the President on January 20, 2025, in one of his first acts as President. Executive Order 14158, "Establishing and Implementing the President's 'Department of Governmental Efficiency'" 90 Fed. Reg. 8,441 (2025). In pursuit of the stated mission "to implement the President's DOGE Agenda," the order:

    a. Creates DOGE teams within each federal agency, including an embedded "DOGE Team Lead" who can only be hired by the agency "in consultation with" the DOGE Administrator, *id*. at Sec. 3(c);

    b. Orders the DOGE Administrator to commence "a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems. Among other things, the USDS Administrator shall work with Agency Heads to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization," *id*. at Sec. 4(a); and

c. Directs agency leaders to "take all necessary steps, in coordination with the [DOGE] Administrator and to the maximum extent consistent with law, to ensure [DOGE] has full and prompt access to all unclassified agency records, software systems, and IT systems," *id*. at Sec. 4(b).

40. Since issuing Executive Order 14158, President Trump has issued additional executive orders that expand DOGE's role. For instance:

a. On February 11, he signed Executive Order 14,210, "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," which directs agencies to develop data-driven hiring plans and mandates that they shall not fill vacancies that "the DOGE Team Lead assesses should not be filled," unless the agency head determines otherwise. Exec. Order No. 14,210, 90 Fed. Reg. 9,669 (Feb. 11, 2025).

b. On February 26, he signed another executive order directing agencies to consult with DOGE Team Leads on contract and grant reviews, approvals, and terminations. Exec. Order No. 14,222, 90 Fed. Reg. 11,095 (Feb. 26, 2025).

41. Since January 20, President Trump has regularly and repeatedly identified Defendant Musk as the leader of DOGE, including but not limited to:

a. On February 11, during a press conference held jointly by President Trump and Defendant Musk in the Oval Office;

b. On February 18, during an interview with the Sean Hannity Show, where President Trump was joined by Defendant Musk;

c. On February 19, before an audience of investors and company executives at the Future Investment Initiative Priority Summit;

d. On February 26, when President Trump had Defendant Musk present on DOGE activities at length during the first meeting of the President's Cabinet; and

e. On March 4, during his Presidential Address to Congress.

42. Similarly, Defendant Musk has regularly and repeatedly identified himself as the leader of DOGE. Defendant Musk has consistently posted statements on X claiming to be directing DOGE's work and presented himself as the leader of DOGE during numerous press interviews. Indeed, in filings in a Delaware court on March 23, Defendant Musk's personal lawyers identified him as a "high-ranking government official" who is "in charge of" DOGE.

43. As the leader of DOGE, Defendant Musk reports directly to President Trump and often acts unilaterally in directing DOGE operations.

44. On February 25, 2025, the White House named Amy Gleason as the Acting USDS Administrator. That same day, however, White House Press Secretary Karoline Leavitt confirmed that "the President tasked Elon Musk to oversee the DOGE effort" while others, including presumably Ms. Gleason, "are helping run DOGE on a day-to-day basis."

45. The Department of Justice and other administrative officials have, at various times, disputed that Defendant Musk leads DOGE and exercises significant authority. But numerous courts, including this Court, have concluded that the weight of the factual evidence demonstrates that, in fact, Defendant Musk has and still does lead DOGE.

46. The structure of DOGE, including specifically creating and embedding DOGE teams within each administrative agency, has allowed Defendant Musk to amass an unprecedented amount of power. He has access to sensitive information across agencies, despite purportedly lacking security clearances, and control over the computer systems

and digital data of numerous agencies. He authorizes and oversees terminating employees and contractors, canceling government grants and contracts, terminating leases, and (as discussed more below) removing the name from the front of USAID's building.

47. Since January 20, DOGE has taken numerous actions without any apparent advanced approval by agency leadership across nearly every executive department and agency. For example, on February 22, 2025, at 2:46 p.m., Musk posted on X that, in line with President Trump's directive to "GET MORE AGGRESSIVE," all federal employees would soon receive an email asking them to report what they had accomplished during the prior week, and warned that "[f]ailure to respond will be taken as resignation." The email was sent less than three hours later.

48. While the members of DOGE have not been consistently identified by the White House or other members of the administration, public reporting has filled in some of the gaps. For instance, the *New York Times* and *Pro Publica* track DOGE-affiliated individuals working within DOGE as well as within other agencies. Reporting shows some DOGE members within USDS itself (seemingly as employees of the Executive Office of the President), as well as embedded within numerous agencies, including the Office of Personnel Management ("OPM"), General Services Administration, Treasury Department, Department of Health and Human Services, Environmental Protection Agency, FBI, Social Security Administration, and USAID. Many of the individuals affiliated with DOGE have had prior professional relationships with Defendant Musk, including previously working at one or more of his companies.

49. For instance, on January 23, 2025, OPM announced it was testing a new capability to communicate with all civilian federal employees. From about January 23, 2025 through

January 26, 2025, OPM sent numerous requests to various federal agencies to collect information on government employees and about diversity, equity, and inclusion initiatives that are now barred. OPM listed an individual named Amanda Scales as the contact for questions about these requests. Until recently, Ms. Scales worked in human resources at xAI, the private artificial intelligence corporation of which Defendant Musk is the founder. *Pro Publica* reports that she is Chief of Staff at OPM, although it is unclear whether she held that role at the time she was collecting such sensitive information, or whether she was still at xAI.

50. Similarly, DOGE member Gavin Kliger has appeared in roles at least at the following agencies: OPM, Treasury Department, Commerce Department, Consumer Financial Protection Bureau, Internal Revenue Service, Department of Agriculture and USAID. *Forbes* reports that, at least as of March 31, 2025, Mr. Kliger was still employed as a senior software engineer at Databricks, a cloud-based AI company, but on a leave of absence.

51. DOGE member Luke Farritor has appeared in roles at least at the following agencies: General Services Administration, Centers for Disease Control, Centers for Medicare and Medicaid Services, Social Security Administration, Department of Energy, Department of Education, Department of Health and Human Services, United States Digital Service, Consumer Financial Protection Bureau and USAID. *Pro Publica* reports that Mr. Farritor interned at SpaceX.

52. Defendant Jeremy Lewin, who is also a member of DOGE, has appeared in roles at least at the following agencies: General Services Administration, State Department, Consumer Financial Protection Bureau and USAID.

***USAID***

53. Prior to Defendants' actions described below, USAID employed up to 10,000 staff, with approximately two-thirds posted at the Agency's more than 60 overseas missions.

54. USAID was first created by an Executive Order in 1961. Exec. Order No. 10,973, 26 Fed Reg. 10,469, § 102 (Nov. 3, 1961).

55. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") set the framework for USAID's operation as an independent agency, distinct from the Department of State. *See* 22 U.S.C. § 6563(a) ("[T]here is within the Executive branch of Government the United States Agency for International Development"). FARRA granted the President a limited 60-day period to submit a written "reorganization plan and report" for USAID to Congress, a process that allowed for options to "provide for the abolition of [USAID] and the transfer of all its functions to the Department of State" or to propose a plan for the "transfer to and consolidation" of certain functions along with "additional consolidation, reorganization, and streamlining" of the agency. 22 U.S.C. § 6601(a)-(d). President Clinton's report, submitted on December 30, 1998, clearly confirmed that "USAID will remain a distinct agency with a separate appropriation." Reorganization Plan and Report Submitted by President Clinton to the Congress on December 30, 1998, Pursuant to Section 1601 of the FARRA, *as contained in* Public Law 105-277, 112 Stat. 2681 (1998), Ex. 19 at J.R. at 000332.

56. Since the enactment of FARRA, Congress has not provided the President with statutory authority to reorganize, reconstitute, consolidate, or abolish USAID; rather, it has expressly rejected attempts to eliminate the agency and continuously reinforced USAID's independent status through repeated direct appropriations.

57. The Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, prohibits the use of appropriated funds for any reorganization, redesign, or similar plan affecting the State Department, USAID, or related entities without prior consultation with the appropriate congressional committees. This includes plans to restructure agencies, alter overseas presence, or change staffing levels from those previously justified to Congress. It also bars financial commitments to eliminate or modify programs, offices, or activities without prior justification or advance notice to appropriators.

58. On March 15, 2025, President Trump signed Pub. L. 119-4, 139 Stat. 9, the Full-Year Continuing Appropriations and Extensions Act of 2025, which continues funding "at the level specified . . . and under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024," including USAID. *Id.* at § 1101.

***January 20, 2025 - February 3, 2025: Initial Dismantling of USAID***

59. On January 20, 2025, in addition to establishing DOGE, President Trump signed Executive Order 14,169, "Reevaluating and Realigning United States Foreign Aid" (the "Foreign Aid Executive Order"). This order directs a "90-day pause" of "new obligations and disbursements" of "foreign development assistance" funds in order to assess "programmatic efficiencies and consistency with United States foreign policy," subject to waivers by the Secretary of State for specific programs. Exec. Order No. 14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025). Thereafter, Secretary Rubio issued a directive (the "Rubio Order") similarly halting "all new obligations of funding . . . for foreign assistance programs" at the State Department and USAID. In Defendant Marocco's words, this involved USAID "going 'pencils down'" on most of its ongoing work.

60. On information and belief, during this same early period, DOGE trained a particular focus

on the Treasury Department because federal payments are made through the Treasury Department's electronic system. David Lebryk, a decades-long non-political employee of the Department, was named Acting Secretary by President Trump and served in that role until Scott Bessent was confirmed as Treasury Secretary on January 27, 2025. On or around January 25, 2025, Defendant Musk's allies began asking Mr. Lebryk about source code information related to the nation's payment system on behalf of DOGE. Mr. Lebryk denied those requests and was put on administrative leave shortly thereafter.

61. In seeking access to Treasury systems, Defendants Musk and DOGE initially stated that their goal was merely to undertake a general review of the system and observe its operations without interfering with disbursements. However, a January 24, 2025 email exchange revealed that the DOGE push for access to the Treasury payment system was actually intended to "receive access to the closely held payment system so that the Treasury could freeze disbursements to [USAID]."

62. At least initially, DOGE members gained administrator-level privileges, including the ability to write code to the Treasury's secure payment system. On information and belief, a DOGE member named Marko Elez made changes to the code base for the payment systems related to blocking payments and making the blocked payments less visible. Per a January 26, 2025 communication between Treasury officials, the payment systems were set up to "intercept USAID payments files prior to ingestion into our PAM/SPS systems," so that they could be reviewed and blocked. On information and belief, Mr. Elez improperly exported data containing personally identifiable information, including information of Class members, outside of the Treasury systems.

63. Around this time, White House officials became aware that certain overseas USAID grantees had received payments via the Department of Health and Human Services ("HHS") payment system. Although this was the standard method for processing such payments and these payments represented obligations for work already completed, DOGE team members insisted that USAID senior managers be stripped of their authority to approve payments and that only DOGE members be permitted to authorize them going forward.

64. On Monday, January 27, 2025, DOGE members arrived at USAID headquarters at the Ronald Reagan Building in Washington, D.C. and demanded unrestricted access to USAID's financial, personnel, and administrative data systems. Soon thereafter, DOGE members, including specifically Mr. Kliger and Mr. Farritor, were given the highest level of access to USAID digital systems and infrastructure, including the ability to view and alter emails on behalf of all USAID users and access to even the most sensitive personnel information. Other DOGE members physically present included Clayton Cromer and Noah Peters.

65. Also on Monday, January 27, 2025, Mr. Cromer presented to USAID Acting Administrator Jason Gray a list of 57 senior officials at USAID with instructions to place them on paid administrative leave. The stated reason was their involvement in violations of the funding freeze; however, many of the individuals did not have roles related to payments decisions or systems. Mr. Gray ultimately approved the demand and placed the 57 senior officials on administrative leave.

66. An agency-wide message was sent in the name of Mr. Gray stating that the individuals were placed on leave because they had been identified as taking actions within USAID

that appeared to be "designed to circumvent the President's Executive Orders and the mandate from the American people." On information and belief, the substance of this message was composed by DOGE members.

67. On January 30, 2025, Mr. Peters, a DOGE member embedded in the OPM (among other agency assignments), transmitted to Nicholas Gottlieb, USAID Director of Employee and Labor Relations, a list of 11 names. The email indicated that the individuals were users who had logged into HHS's payments systems since the new administration had taken office. These 11 names had been forwarded to Mr. Peters by another DOGE member, Mr. Farritor, operating, for these purposes, with an HHS email address.

68. Early on January 30, 2025, Chief Human Capital Officer Bill Malyszka summoned Mr. Gottlieb to his office. DOGE members Mr. Peters and Defendant Lewin were present. (At the time, they purported to be housed in OPM.) Mr. Peters informed Mr. Malyszka and Mr. Gottlieb of DOGE's intent to conduct a Reduction in Force ("RIF") within USAID.

69. Shortly after that initial meeting, Mr. Gottlieb was resummoned to Mr. Mlyszka's office. This time, Defendant Lewin demanded that five specific individuals be terminated. Defendant Lewin had a written memorandum identifying four of the individuals, and he verbally identified a fifth to Mr. Gottlieb. Defendant Lewin instructed Mr. Gottlieb to immediately prepare termination notices for these individuals. Mr. Malyszka and Mr. Gottlieb informed Defendant Lewin that it would be illegal to terminate those employees without affording them due process. Defendant Lewin indicated that he would speak with others and ordered that, while Defendant Lewin and DOGE members worked to gather sufficient information to warrant the termination of employees, USAID officials were to prioritize preparing and implementing RIF notices.

70. Mr. Gottlieb prepared a memorandum that same day detailing why there was no legal justification for keeping the 57 senior officials individuals on administrative leave and his intention to reinstate those individuals that afternoon. At 4:19 p.m. that day, January 30, 2025, Mr. Gottlieb sent an email to his USAID colleagues stating: "Today, representatives of the Agency's front office and DOGE instructed me to violate the due process of our employees by issuing immediate termination notices to a group of employees without due process. I refused and have provided Acting Administrator Gray with written notification of my refusal. I have recommended in that written notification that his office cease and desist from further illegal activity. . . . I was notified moments ago that I will be placed on administrative leave, effective immediately."

71. Mr. Gottlieb's distribution of his memorandum, and refusal to follow DOGE member Defendant Lewin's orders, sparked the chain of events described below, including the unauthorized physical takeover of USAID headquarters by DOGE.

72. According to statements by Defendant Marocco and Secretary Rubio, including sworn statements by Defendant Marocco, on January 30, 2025, Mr. Gray was removed from his position as Acting Administrator and returned to his former position of Chief Information Officer of USAID. That same day, President Trump purportedly directed Secretary Rubio to perform the duties of USAID Administrator. However, on information and belief, Defendants have never publicly produced an official instrument documenting the date of this transition, and there was no public reporting of the transition, including Secretary Rubio's new role, until February 3, 2025.

73. In sworn declarations filed in multiple legal cases, Defendant Marocco has stated that Secretary Rubio delegated to him the duties and functions of the USAID Deputy

Administrators,[5] in his role as Acting Administrator on January 30, 2025. However, a subsequent official delegation of duties document signed by Secretary Rubio indicates that Defendant Marocco was not delegated this authority until February 2, 2025, which would mean that there was no person acting with the authority of Deputy Administrator during this critical time period (January 30-February 2, 2025).

74. On Friday, January 31, 2025, Defendants removed plaques with USAID's official seal from the agency's headquarters.

75. On Saturday, February 1, 2025, DOGE operatives shut down the USAID website. That same day, USAID placed an additional 57 employees on administrative leave.

76. Also on February 1, 2025, Steve Davis, a very high ranking member of the DOGE apparatus, and a team of other DOGE members (including Messrs. Kliger, Farriter, and Peters), arrived at the Ronald Reagan building demanding physical access to USAID offices. DOGE members Edward Corsitine and Defendant Lewin were also reportedly present. The DOGE team sought access to USAID's data security systems, physical access to highly restricted areas, including sensitive compartmented information facilities ("SCIFs"), despite lacking proper security clearances.

77. Security personnel, including at various points USAID Director of Security John Vorhees and Deputy Director Brian McGill, tried to prevent DOGE from accessing classified spaces. Initially, USAID personnel refused to give DOGE members access to any part of the building. Mr. Davis and other members of DOGE began yelling at the security personnel and threatened to call the U.S. Marshals Service to apprehend the USAID

[5] At various times in agency history, the role of Deputy Administrator has been split between a Deputy Administrator of Policy and Programming and a Deputy Administrator of Management and Resources.

employees. Eventually, the ranking USAID employee at the scene allowed the DOGE team into the main entrance area of the building but not into any restricted areas.

78. The DOGE team continued to yell at the security personnel, demanding greater access to the building. Mr. Davis called Defendant Musk on the phone, and the two made several direct calls to USAID senior leadership. During these calls they yelled at the officials, threatened them with the U.S. Marshals Service, and demanded that members of DOGE be granted immediate access to sensitive agency data systems and physically restricted areas within headquarters. They also insisted that dozens of USAID officials be suspended from duty. On information and belief, Defendant Marocco may also have been involved in these calls and may have been physically present. It is unclear why it was necessary to harass and intimidate Mr. Gray or other USAID leaders, if, as Defendants have claimed, Secretary Rubio was already performing the duties of Administrator and Defendant Marocco was already performing the duties of Deputy Administrator, in which case they would have had the authority to simply order access.

79. At the same time this altercation was occurring, DOGE members began trying to access the USAID building security systems on their computers.

80. At one point, while searching through USAID's computer systems, Messrs. Davis, Farritor, and Peters figured out that a particular security official had restricted their access to the building. Because certain DOGE members, including Mr. Farritor, already had complete administrative access to USAID systems, Mr. Farritor was able to manually remove the building restrictions for himself and other members of DOGE so that they could access the entire building, including restricted, confidential areas for which they had

no clearance to access. The DOGE members took these actions unilaterally, on the spot, and in person.

81. Mr. Vorhees and Mr. McGill were both placed on administrative leave at this time.

82. During this time period, Matt Hopson, the Chief of Staff for USAID, resigned.

83. On Sunday, February 2, 2025, without prior notification, DOGE cut off access to email and other government computer systems for thousands of Class members.

84. Over the course of February 1 and 2, 2025, Defendants Musk and DOGE continued to dismantle both the agency's physical and technological infrastructure. This included searching through the work and personal belongings of USAID employees who worked at the Ronald Reagan building. Current and former copies of USAID's Automated Directive System, which contain the official internal USAID policies and guidance, were deleted from the internet, and the agency's classified computer systems were dismantled.

85. On February 2, 2025, it was communicated to staff that 791 individual PSCs would have their contracts terminated.

86. At 12:42 AM on Monday, February 3, 2025, Mr. Kliger sent an email to all USAID staff telling them to work remotely for the day, as USAID headquarters would be closed. The email purported to be from "USAID Press" and stated that the directive was "[a]t the direction of Agency leadership," but listed Mr. Kliger as the reply-to recipient. Mr. Kliger gained access to the USAID computer systems as part of the infiltration of digital assets described above and issued to himself an agency email address, gkliger@usaid.gov.

87. Minutes after Mr. Kliger sent that email, Defendant Musk posted on X (at 12:54 AM): "We spent the weekend feeding USAID into the wood chipper."

88. Indeed, Defendant Musk made numerous statements during this time period claiming

responsibility for dismantling USAID and vilifying Class members. For instance,

a. On February 2, 2025, in response to an X post describing Mr. Vorhees and Mr. McGill's placement on leave, Defendant Musk posted "USAID is a criminal organization. Time for it to die."

b. Later on February 2, 2025, in the "First DOGE X Spaces Conversation,"[6] Defendant Musk said, "So to be clear, in shutting down, which we're in the process of doing, shutting down USAID, the reason for that, as opposed to simply trying to do some minor housecleaning, is that, as we dug into USAID, it became apparent that what we have here is not an apple with a worm in it, but we have actually just a ball of worms . . . If you've got an apple that's got a worm in it, maybe you can take the worm out, but if you've got actually just a ball of worms, it's hopeless. And USAID is a ball of worms. There is no apple. And when there is no apple, you've just got to basically get rid of the whole thing . . . That is why it's got to go, it's beyond repair."

c. On February 3, 2025, Defendant Musk stated that, "[w]ith regards to the USAID stuff, I went over it with (the President) in detail, and he agreed that we should shut it down."

89. On February 3, 2025, Edward Martin, then U.S. District Attorney for the District of Columbia, wrote a letter to Defendant Musk which opened with the line, "It was good to work with the DOGE team this weekend."

90. At or around this time, Defendant Jeremy Lewin began acting as the DOGE team lead for USAID.

***February 4, 2025 - March 18, 2025: Second Phase Dismantling of USAID***

91. Defendant Musk, assisted by his DOGE subordinates, continued to exercise control over

[6] This was a live audio discussion held on X, hosted by Defendant Musk and featuring different speakers.

USAID systems—including restricted systems and locations that house sensitive data which the DOGE staff does not have clearance to legally access—to systematically block access to all systems by USAID personnel.

92. For instance, in a joint press conference with President Trump on February 11, 2025, Defendant Musk made clear that he and his DOGE team still controlled the levers of funding at USAID. A journalist asked Defendant Musk: "USAID has been one of your main targets. Are you concerned at all that some of the cuts, or shutting an agency altogether, may lead to disease or other bigger problems starting in other countries that then come to the United States?" In his response, Defendant Musk, referring to DOGE, stated, "we have turned on funding for Ebola prevention and for HIV/PR prevention. And yes, we are moving fast. We will make mistakes, but we'll fix them very quickly."

93. On Friday, February 7, 2025, Musk announced on X that United States Customs and Border Protection ("CBP") had taken over the USAID headquarters. He posted a photo of the building's main entrance with the words "U.S. Agency for International Development" removed from above the door, accompanied by the caption "Unburdened by what has been." USAID staff and contractors who worked in the building were not permitted to enter to collect their personal belongings.

94. Between February 3 and February 7, 2025, approximately 2,140 of the approximately 4,765 (44.9%) direct hire employees of USAID had been placed on administrative leave.

95. An internal communications notice was sent to USAID employees stating that, effective February 7, 2025 at 11:59 P.M., "all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs."

Defendants had identified an additional 2,104 USAID employees and scheduled them to be placed on administrative leave, which would have brought the total number of USAID direct hire employees on leave to 4,244 out of 4,765—nearly 90% of the agency's direct hire workforce.

96. On February 7, 2025, a D.C. District Court Judge issued a temporary restraining order ("TRO") blocking the administration's plan to put additional USAID employees on administrative leave. *See American Foreign Service Ass'n v. Trump*, — F. Supp. 3d —, No. 1:25-CV-352 (CJN), 2025 WL 435415 (D.D.C. Feb. 7, 2025). The district court dissolved this order on February 21, 2025. *See American Foreign Service Ass'n v. Trump*, — F. Supp. 3d —, No. 1:25-CV-352 (CJN), 2025 WL 573762 (D.D.C. Feb. 21, 2025).

97. On or around February 8, 2025, the USAID Office of Inspector General estimated that approximately 90% of USAID's Bureau for Humanitarian Assistance ("BHA") global staff—approximately 1,089 individuals, including direct hires, PSCs, and Institutional Support Contractors—had been or would soon be sidelined through the Trump Administration's actions.

98. Over 1,400 USAID Foreign Service Officers serving overseas were issued a Recall Notice requiring them to return to the United States within 30 days. Typically this would be a six to nine month process.

99. On or around February 8, 2925, DOGE lead for USAID, Defendant Lewin, drafted an "Action Memo for Secretary Rubio" directing USAID to terminate approximately 78 contracts totaling $1.02 billion and 68 grants totaling $660.7 million in aggregate value.

100. Some of these awards contained funding appropriated through the Reinforcing Education Accountability in Development Act of 2017 (the "READ Act"), P.L. 115-56, 131 Stat.

1129, which was originally signed into law on September 8, 2017 by President Trump, and introduced in 2023 for reauthorization by then Senator Marco Rubio. When the USAID contracting officers asked the Agency Front Office about these awards, they were instructed to terminate them without notification to Congress that funds appropriated through a specific Act of Congress were being terminated. Further, after receiving an order to terminate contracts, at least one contracting officer asked the Senior Procurement Executive, Jami Rodgers, who had issued the orders and received a response back directly from DOGE member Defendant Lewin.

101. Defendant Lewin reprimanded at least one high ranking USAID employee for conducting reviews of the awards slated for termination, with Defendant Lewin writing, "bureaus should not be conducting their own policy and program reviews before acting on these termination instructions."

102. Public reports of the initial plans for USAID indicated that the Trump Administration intended to eventually take the agency from a staff of over 10,000 down to a staff of approximately 300. Defendant Marocco has separately stated that it was determined that, at that time, only 611 employees qualified as essential, some of whom were considered essential only in order to continue winding down operations.

103. On February 12, 2025, U.S. Representative Gregory W. Meeks, ranking member of the House Foreign Affairs Committee, sent a letter to Secretary Rubio complaining that the administration had started downsizing and reorganizing USAID without statutorily required consultation and stated, "To be clear: USAID cannot be abolished by the Secretary of State nor the President of the United States without an act of Congress." Upon information and belief, Defendants did not publicly respond to this concern.

104. During a February 13, 2025 video appearance at the World Governments Summit, Defendant Musk stated, "I think we do need to delete entire agencies as opposed to leave [sic] a part of them behind . . . It's kind of like a weed, if we don't remove the roots of the weed, then it's easy for the weed to grow back."

105. On February 13, 2025, a D.C. district judge issued an order enjoining the Trump Administration from issuing stop-work orders or preventing the obligation of congressionally appropriated funds for any federal foreign assistance awards that were in existence as of January 19, 2025. *AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, — F. Supp. 3d —, No. CV 25-00400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025), *enforced* 2025 WL 569381 (D.D.C. Feb. 20, 2025).

106. Because agency staffing had been gutted and operating systems, such as USAID's payment system Phoenix, were wholly or partially rendered inoperable by DOGE, compliance with court orders regarding restarting operations has been stymied and incomplete.

107. On February 19, 2025, during the Future Investment Initiative Institute Priority Summit, President Trump stated, "[o]ver the past month, we have effectively eliminated the U.S. Agency for International Development."

108. On February 21, 2025, Defendant Musk responded to a post, regarding the dissolution of the TRO enjoining placing certain USAID staff on leave, that read "President Trump and DOGE can now DISMANTLE USAID." Defendant Musk responded that "the world will be better for this."

109. By February 22, 2025, approximately 800 PSCs, or 75% of the entire PSC workforce, had received termination notices.

110. On February 23, 2025, Defendants posted a "Notification of Administrative Leave" to USAID.gov, stating that as of 11:59 PM, all USAID direct hire personnel, with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, would be placed on administrative leave globally. The notice also announced that, concurrently, USAID would begin implementing RIF actions.

111. At approximately 3:42 PM, USAID employees received a message from usaid_fo@subscribe.usaid.gov stating that, effective 11:59 PM that evening, "all USAID direct hire personnel with the exception of designated personnel responsible for mission-critical functions, core leadership and/or specially designated programs, will be placed on administrative leave globally." The notice further advised: "Concurrently, USAID is beginning to implement a Reduction-in-Force that will affect approximately 2,000 USAID personnel with duty stations in the United States."

112. On Sunday, February 23, 2025, DOGE member Mr. Kliger created the email account hr_announcements@usaid.gov. That same day, employees began receiving RIF notices from hr_announcements@usaid.gov consisting of an unsigned memorandum identified as being from "Peter Marocco, Acting Deputy Administrator, USAID" (despite Defendant Marocco not occupying that position). Those notices stated that the employees would be "separated from the Federal service" effective April 24, 2025 for domestic employees and May 26, 2025 for overseas employees. All staff serving overseas were ordered to return to the United States. The RIF Notice instructed employees to contact USAID Employee and Labor Relations via email for any questions, but when they did, they received an automatic reply stating that the office "only has a skeleton staff at this point and may not be able to

respond to everyone individually," and that it "cannot currently provide information on your individual status." At least one employee later received a message stating that the Employee and Labor Relations office had not, in fact, sent these RIF notices.

113. On or about February 26, 2025, Defendants completed a review of USAID obligation awards and determined that USAID would terminate approximately 5,800 awards and retain only approximately 500 (less than 10%). That same day, approximately 5,700 award termination notices were sent out from a previously non-existent or unused SPE@usaid.gov email address. The notices were signed using a generic cursive font by contracting officers who were not responsible for the awards, rather than verified digital signatures by the appropriate contracting officers, as is typical. The correct USAID personnel responsible for managing the awards were not copied on the notices.

114. On February 27 and 28, 2025, after it was raised as an issue in litigation, Defendants directed USAID staff who had worked at the Ronald Reagan Building to collect their personal belongings in 15-minute intervals.

115. By March 2, 2025, the Bureau for Global Health—which has an annual appropriation of $10 billion from Congress that includes funding for HIV, tuberculosis, malaria, maternal and child health, infectious diseases, global health security, family planning and reproductive health, and nutrition—had been reduced from having an active workforce of 783 down to a workforce of 67 (a 91.4% reduction).

116. On March 10, 2025, Secretary Rubio announced that 5,200 contracts, representing roughly 83% of USAID programming, had been cancelled, and wrote, "[t]hank you to DOGE and our hardworking staff who worked very long hours to achieve this overdue and historic reform."

117. Based on its own accounting as of March 10, 2025, DOGE claimed direct credit for terminating 2,191 contracts valued at $26.1 billion and 2,366 grants valued at $41.8 billion, totaling nearly $68 billion.

***March 18, 2025 - Present: Third Phase Dismantling of USAID***

118. On or around March 18, 2025, Defendant Lewin, who describes himself as the previous DOGE team lead at USAID, and Defendant Jackson were delegated the duties and functions of the USAID Deputy Administrator for Policy and Programming and Deputy Administrator for Management and Resources, respectively. Defendant Lewin was also assigned the duties and functions of USAID Chief Operating Officer.

119. On March 19, 2025, it was publicly reported that unnamed Trump Administration officials had crafted a document outlining their foreign aid policy plans. These plans included winding down USAID and then "[c]odifying the refocused USAID under a new name as a subsidiary of the State Department," and "abolishing its legal status as an 'independent establishment.'" In the "Structural Changes, Short Term" section of the Appendix "Roadmap to Implementation," the document recommended entirely eliminating 12 bureaus and 8 offices within USAID, as well as consolidating other bureaus within the Agency.

120. On March 28, 2025, Defendant Lewin sent an email to USAID personnel entitled "Final Mission." The email stated: "Substantially all non-statutory positions at USAID will be eliminated. As a result, USAID personnel globally will be subject to a consolidated Reduction-in-Force ("RIF") action. Within the next few minutes, USAID personnel will begin receiving RIF notices via email. These notices will specify one of two separation dates: July 1, 2025 or September 2, 2025." It went on to say that "[b]y July 1, 2025, the

State Department will have assumed responsibility for USAID's remaining programming, and many of our colleagues will depart for State or other opportunities. The remaining USAID personnel will then supervise the responsible decommissioning of USAID assets and the wind-down of the Agency's independent operations."

121. If allowed to take effect, Defendants' current plans would take USAID down to a workforce of only approximately 15 positions. As Defendant Lewin's email specifies, any previous USAID employees would have to separately reapply for any "available roles" at the State Department.

122. Shortly after this email, USAID employees began receiving RIF notices via email. Many of these notices appeared to be the result of a sloppy mail merge, containing incorrect recipient information. The details of employment history for individuals were also highly inaccurate. In addition to being disrespected and humiliated, Class members have been left in a state of complete uncertainty as to their current status and are unable to properly plan for themselves and their families.

123. Also on March 28, 2025, a Congressional Notification Transmittal Letter and Congressional Notification was sent by Paul Guaglianone, Senior Bureau Official in the Bureau of Legislative Affairs to Congress. Among other things, the Notification stated that "[s]ubstantially all USAID personnel will be separated from federal service within the current fiscal year via Reduction-In-Force procedures," that "a separate and independent hiring process to build foreign assistance capacity" in the State Department would be initiated to replace USAID, and that existing USAID bureaus and offices would either be "abolished" or "realigned to the State Department." Additionally, congressionally appropriated funds would be "transfer[red]" from USAID to the State Department, which

would manage the funds while operations at USAID are "closed out in a smooth and orderly transition." The letter was framed as simply notifying Congress of Defendants' plans for the Agency and in no way indicated an opportunity for consultation between Congress or congressional committees and the Agency or its leaders.

124. Accompanying this development, Secretary Rubio issued a statement in which he claimed, "USAID strayed from its original mission long ago," and characterized its activities as "misguided and fiscally irresponsible." The statement further confirmed that the Department had "notified Congress on their intent to undertake a reorganization that would involve realigning certain USAID functions to the Department by July 1, 2025, and discontinuing the remaining USAID functions that do not align with Administration priorities."

125. Due to its effective dismantling, USAID is "unable to perform its core functions and even certain basic functions of a governmental agency." Mem. Op. at 39, ECF No. 73. For example, on April 4, 2025, in response to a question by a member of the press as to whether the dismantling of USAID had contributed to the lack of an on-the-ground response to the devastating Myanmar earthquake, Secretary Rubio acknowledged that it had. It was also publicly reported that the limited number of USAID workers who had been sent to Myanmar to deal with the humanitarian emergency were then terminated while on assignment.

126. Not only do Defendants' actions injure the Plaintiffs and Class members as described herein, but, according to the USAID Office of Inspector General, the "pause in funding and reductions in staff, including over 90 percent of [the Bureau for Humanitarian Assistance's] workforce furloughed or placed on administrative leave" has "curtailed

USAID's ability to vet humanitarian assistance awards for potential terrorist ties and monitor aid deliveries in high-risk environments."

127. Further, because of Defendants' actions, Defendant USAID is failing to comply with statutory obligations, including those imposed by the Federal Information Technology Acquisition Reform Act, the Federal Information Security Management Act, the Privacy Act, the E-Government Act of 2002, and the Government Performance and Results Act, among others. In addition, the shutdown of the USAID website likely prevents the agency from fulfilling its congressional reporting and transparency requirements, such as those contained in the Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 770, div. F, tit. VII, § 7016(b).

## COUNT ONE:
## VIOLATION OF THE APPOINTMENTS CLAUSE OF THE UNITED STATES CONSTITUTION

128. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

129. The Appointments Clause of the U.S. Constitution states, in relevant part, that the President of the United States "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The President cannot evade the requirements of the Constitution by purporting to vest the powers of a principal officer in a "mere employee."

130. Principal officers are defined by possessing significant authority on an ongoing basis, as

judged by the importance of the matters implicated by their actions, the scope of their discretion and their ability to make final decisions on behalf of the executive branch. Principal officers must always be appointed "by and with the Advice and Consent of the Senate." Defendant Musk was never appointed in this manner, despite serving as the *de facto* DOGE administrator and continuing to exercise an unprecedented level of power and control over the federal government.

131. Through his DOGE subordinates, Defendant Musk directed the closure of USAID headquarters and the effective dismantling of USAID. Especially prior to February 3, 2025, Defendant Musk exercised unbridled discretion in doing so, unilaterally acting far outside any lawfully recognized chain of command.

132. Defendant Musk's actions with regard to USAID have been mirrored throughout the executive branch; indeed, as President Trump has explained, Defendant Musk's responsibility is to ensure that the President's executive orders are immediately implemented, regardless of legal or administrative roadblocks. This arrangement eviscerates the protections that undergird our constitutional system and is not allowed by the Appointments Clause.

**COUNT TWO:**
**VIOLATION OF SEPARATION OF POWERS**

133. Plaintiffs hereby reallege and incorporate all allegations in the above paragraphs as if fully set forth herein.

134. Defendants have violated and continue to violate fundamental Separation of Powers principles by repeatedly subverting and superseding powers reserved for the Legislative Branch.

135. The United States Constitution establishes a system of separated powers, ensuring that

legislative power is vested in Congress (Article I), executive power is vested in the President (Article II), and judicial power is vested in the courts (Article III).

136. This constitutional structure is designed to preserve the fundamental principle that each branch of government operates within its designated sphere, thereby preventing any single individual or entity from amassing the type of unchecked governmental authority that undermines democracy itself.

137. Defendants' collective actions to dismantle USAID, a congressionally created independent agency that is provided for with direct appropriations that have specific conditions, without congressional authorization far exceeds any previously known or acceptable exercise of executive power. In other words, President Trump cannot authorize any Defendant to "delete" USAID—that decision is for Congress alone to make.

138. Additionally, here, Defendants' Appointment Clause violations necessarily constitute a Separations of Powers offense.

139. Further, DOGE itself, as structured and implemented, operates beyond the bounds of any proper executive power. Despite purporting to be an information technology efficiency initiative, DOGE is embedded within USAID and other federal agencies and wields significant, coercive power, including the ability to mandate staffing and key operational changes, override proper channels of agency decision-making, implement new policies with regulatory effect, freeze congressionally appropriated funds, and shut down agencies.

140. In sum, Defendants' actions contravening the expressed will of Congress are a direct affront to the Constitution's structural safeguards against tyranny and violate core Separation of Powers principles.

## PRAYER FOR RELIEF

141. WHEREFORE, Plaintiffs and Class members request that this Court:

a. Declare unlawful and set aside any actions taken by Defendants to unlawfully modify, reorganize, or eliminate USAID or its bureaus, departments, offices, or subdivisions in violation of Separation of Powers principles;

b. Declare that Defendant Musk's significant and wide-ranging activities at USAID violates the Appointments Clause of the U.S. Constitution;

c. Declare unlawful and set aside any actions taken at USAID by Defendant Musk, his DOGE subordinates, and any person working on behalf of or at the direction of Defendant Musk or DOGE;

d. Enjoin Defendants from taking further actions to unlawfully modify, reorganize, or eliminate USAID or its bureaus, departments, offices, or subdivisions unless and until specifically authorized to do so by Congress;

e. Enjoin Defendant Musk and his DOGE subordinates from performing their significant and wide-ranging duties at USAID;

f. Award the Plaintiffs and Class members reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

g. Award such other relief as the Court deems just.

Respectfully submitted,

/s/ Tianna J. Mays
Norman L. Eisen, [09460]
Tianna J. Mays, [21597]
Andrew H. Warren*
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003

Tel: (202) 594-9958
Norman@democracydefenders.org
Tianna@democracydefenders.org
Andrew@democracydefenders.org

Mimi Marziani*
Rebecca (Beth) Stevens*
Joaquin Gonzalez*
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com

Richard M. Heimann*
Nicole M. Rubin [30711]
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000
rheimann@lchb.com
nrubin@lchb.com

*Attorneys for Plaintiffs*
*Admitted pro hac vice

## CERTIFICATE OF CONFERENCE

I hereby certify that, pursuant to Fed. R. Civ. Pro. 15(a)(2), Plaintiffs' counsel conferred with Defendants' counsel about this amendment. Defendants consent to the filing of this amended complaint.

*/s/ Rebecca (Beth) Stevens*
Rebecca (Beth) Stevens
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604
bstevens@msgpllc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of March, 2026, I electronically served the foregoing Plaintiffs' Third Amended Class Action Complaint for Declaratory and Injunction Relief on attorneys for Defendants.

*/s/ Rebecca (Beth) Stevens*
Rebecca (Beth) Stevens
**MARZIANI, STEVENS & GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604
bstevens@msgpllc.com