# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 4 *et al.*, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>ELON MUSK *et al.*,<br><br>Defendants. | Civil Action No. 25-0462-TDC |

## PLAINTIFFS' MOTION FOR LEAVE TO DEPOSE
## KENNETH JACKSON AND STEVE DAVIS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS ....................................................................................................... 4

ARGUMENT ....................................................................................................................... 4

I.        Kenneth Jackson Has Personal Knowledge of Essential Information Not Obtainable from Another Available Source ........................................................................................... 5

A.        Who Made the Decision to Put USAID Employees on Administrative Leave? ............. 6

B.        Who Made the Decision to Shut Down USAID's Website? ........................................... 9

C.        Who Made the Decision to Shut Down USAID Headquarters? .................................... 11

D.        Who Made the Decision to Remove USAID's Official Seal? ....................................... 13

E.        Jackson's Role in the Decision to Grant DOGE Access to USAID Systems ............... 14

F.        Plaintiffs Require Jackson's Testimony as to His Positions, Responsibilities, and Authority .......................................................................................................................... 16

II.       Steve Davis Has Personal Knowledge of Essential Information Not Obtainable from Another Available Source ........................................................................................... 19

A.        Davis Was Directly Involved in Key Decisions Underlying the Dismantling of USAID. 19

B.        What was Davis's Position, Responsibilities, and Authority? ....................................... 19

C.        What was Davis's Involvement in USAID's DOGE Team? .......................................... 21

D.        What was Davis's Involvement in Accessing USAID Systems and Cutting Access to USAID Employees? ........................................................................................................ 22

E.        What was Davis's Role in Shutting Down USAID's Website and Social Media? ...... 23

CONCLUSION ................................................................................................................... 24

**INTRODUCTION**

For more than six decades, the United States Agency for International Development (USAID) served a vital role in promoting U.S. interests abroad, including global health and safety, until it was abruptly shuttered by the so-called Department of Government Efficiency (DOGE), led by Defendant Elon Musk. Since the outset of this case, Plaintiffs have sought to answer the core question that lies at the heart of their claim under the Appointments Clause: who made the decision to shutter USAID?

Although the Fourth Circuit's March 4, 2026 mandamus ruling temporarily blocked the depositions of the highest-ranking officials likely to have knowledge of this question—Marocco, Lewin, and Musk—that decision expressly contemplated deposing lower-ranking officials as necessary steps. Plaintiffs have now exhausted those alternative discovery mechanisms. As detailed below, Plaintiffs have served multiple rounds of targeted interrogatories, obtained voluminous document productions, and conducted multiple fact and two agency designee depositions. Together, these efforts have yielded evidence that is inconsistent, incomplete, and vague concerning the critical events underlying their claims.

Following the Fourth Circuit's guidance, Plaintiffs now seek the next step in exhausting available discovery by taking the depositions of two other, lower-ranking individuals, Steve Davis and Defendant Kenneth Jackson, who were directly involved in or privy to the decision to shutter USAID. Plaintiffs' ability to depose Jackson and Davis is essential to discovering who made the decision to shutter USAID and to exhausting alternatives to deposing Musk, Lewin, and/or Marocco, per the Fourth Circuit's March 4, 2026 Mandamus Order.

On May 21, 2026, the Court held a Case Management Conference to discuss the Parties' dispute regarding Plaintiffs' ability to take the depositions of Davis and Jackson. ECF No. 222. As

1

discussed at the conference, Defendants object to these depositions on the grounds that they are precluded by the Fourth Circuit's March 4, 2026 Mandamus Order and subject to the "apex" doctrine, which Plaintiffs dispute. The Court directed Plaintiffs to file a motion to set forth the information Plaintiffs seek from Jackson and Davis and to demonstrate that information from them is "essential" to their case and "not obtainable from another source." Order, May 22, 2026 (ECF No. 223); *see also* Order Denying Mot. for Protective Order, Feb. 4, 2026 (ECF No. 200) at 4 (quoting *In re United States (Reno)*, 187 F.3d 310, 313-14 (8th Cir. 1999)).

Pursuant to the Fourth Circuit's instructions, Plaintiffs have continued to depose "lower level" officials and conduct written discovery. The Rule 30(b)(6) designee from the State Department and USAID made abundantly clear that for certain key facts, other than deposing the three witnesses who were subject to the Fourth Circuit ruling, the information is "not obtainable from" sources other than Jackson or Davis. For example:

- Q: Who would know why Mr. Jackson was asking Mr. Marocco for the approval in this email chain on the 1st [of February that reads, in part, "Jeremy and his team would like access to the USAID building today to physically plug into the network"]?

  A: That would be either Mr. Jackson or Mr. Marocco. Ex. 10, Dep. of Adam Korzeniewski (USAID/State 30b6 witness) Dep. 266:6-10, 264:18-21, March 26-27, 2026.

- Q: You talked about Mr. Davis and that you don't know who was the USDS administrator at the time, but who -- who at USDS was consulted in making the decision about who to make the DOGE team?

  A: The only person that I know of who would have that sort of authority would have been Steve Davis. *Id.* at 57:12-18.

- Q: Who would be aware about whether Mr. Musk had a role in determining whether USAID would move forward with the RIF?

  [objection]

  A: It would -- other than Mr. Musk, it would also -- it would possibly include Ken Jackson, possibly include Pete Marocco, possibly include Jason Gray. *Id.* at 276:9-18.

- Q: What conversations did Mr. Lewin have with Steve Davis on the 30th?

  A: I don't know what conversations occurred between Jeremy Lewin and Steve Davis. *Id.* at 114:6-9.

- Q: My question -- the original question was: Did any DOGE team members assigned to USAID discuss revocation of the lease with Elon Musk? . . . Who would be able to speak to that?

  [objection by counsel]

  A: . . . I would say Mr. Ken Jackson may have knowledge. *Id.* at 278:15-279:4

- Q. Who would be able to speak to Mr. Musk's involvement in the decision-making underlying this document?

  A: It would be Pete Marocco specifically. He's the originator of the action memo. Perhaps Ken Jackson in his role as ATA, but that one I'm less clear about. *Id.* at 291:1-7.

  Plaintiffs now submit this Motion pursuant to the Court's instruction at the May 21, 2026 Case Management Conference.[1]

---

[1] During the May 21, 2026 Case Management Conference, the Court agreed with Plaintiffs that the Court of Appeals Order does not apply to Jackson or Davis, and that the usual procedure to prevent a deposition is to seek a protective order under Rule 26(c). However, to expedite the process, the Court invited Plaintiffs to file an initial brief identifying the reasons for deposing Jackson and Davis. Plaintiffs do so now without waiving any argument that Defendants bear the burden of establishing that Jackson and Davis are high-ranking government officials and

## LEGAL STANDARDS

"To invoke the protection of the apex doctrine, the party resisting discovery must first demonstrate he or she is a high-ranking official." *Cunagin as Next friend of J.C. v. Cabell Huntington, Hosp., Inc.*, No. 3:19-CV-00250, 2021 WL 1518877, at *3 (S.D. W. Va. Apr. 16, 2021). "Typically, 'apex' deponents" sit "at the highest level of . . . government; such as, governors [or] cabinet members," who are "removed from the daily subjects of the litigation and have no unique personal knowledge of the facts at issue." *Cunagin as Next friend of J.C. v. Cabell Huntington, Hosp., Inc.*, No. 3:19-CV-00250, 2021 WL 1518877, *Id.* at *4 (S.D. W. Va. Apr. 16, 2021) (internal citations and quotation marks omitted). "The doctrine 'is bottomed on the apex executive lacking *any* knowledge of the relevant facts'" and "does not prohibit deposing executives who have personal knowledge relevant to the parties' claims and defenses." *Trull*, 2025 WL 2550049, at *3 (quoting *Paice, LLC v. Hyundai Motor Co.*, No. CIV. WDQ-12-0499, 2014 WL 3613394, at *1 (D. Md. June 27, 2014)) (emphasis in original). If the party resisting discovery shows an official is high ranking, courts may still require them to submit to a deposition if "the official has firsthand information relevant and material to the claim, which cannot be reasonably obtained from another source or other modes of discovery." *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026).

## ARGUMENT

Jackson and Davis are not merely supervisors whose knowledge is duplicative of their subordinates. The record shows each was directly involved in the decisions at the heart of this case during the critical period. Each possesses unique, first-hand knowledge concerning who authorized the shutdown of USAID, who controlled access to agency systems and facilities, and how these

---

showing cause for a protective order, as the Rules of Civil Procedure and relevant case law establish.

decisions were made, communicated, and implemented. Defendants' own discovery responses repeatedly identify Jackson and Davis as key actors in the events at issues, and deposition testimony confirms that the current record leaves major factual gaps that cannot be adequately filled through other means of discovery. Under these circumstances, deposing Jackson and Davis are precisely the necessary and tailored steps envisioned by the Fourth Circuit.

Under these circumstances, the apex deposition doctrine—to the extent Defendants can establish that it covers Jackson and Davis at all—is not applicable here because (1) Jackson and Davis were personally involved in the critical decisions at issue and (2) Plaintiffs inability to obtain information through other channels despite their diligent efforts to do so represents the sort of extraordinary circumstances contemplated by courts.

## I.    Kenneth Jackson Has Personal Knowledge of Essential Information Not Obtainable from Another Available Source.

From late January through February 2025, Jackson served in a leadership role at USAID, although as discussed in section I.F below, his specific positions and authority remain unclear. It is clear, however, that Jackson was directly involved in critical decisions underlying the dismantling of the agency.

Though the central question Plaintiffs seek to answer is the identity of the individuals who decided to shut down USAID (and there *is* an answer to this question), there are several key events underlying the dismantling including: putting USAID employees on administrative leave; shutting down USAID's website; shutting down USAID's headquarters; removing USAID's official seal from its headquarters; and granting DOGE wide-ranging access to USAID.  As detailed below, none of the deponents have been able to identify who made these decisions, and Defendants are either unable or unwilling to answer the questions when directly posed through interrogatories. What the deponents and other evidence have demonstrated, however, is Jackson's personal and

direct involvement in each event.  Based on the evidence in the record, Jackson possesses information Plaintiffs are unable to obtain through other available sources, requiring Plaintiffs to take his deposition.

### A.  Who Made the Decision to Put USAID Employees on Administrative Leave?

Plaintiffs allege that as part of dismantling USAID, between January 27 and January 31, 2025, DOGE individuals caused 57 senior agency officials to be put on administrative leave on January 27 for an "investigation" and, on January 30 and 31, ultimately caused those 57 individuals to be left on administrative leave without justification. 3rd Am. Compl. (ECF No. 207) ¶¶ 65, 70, 75. It remains unclear who made the decision to leave the 57 on administrative leave and the subsequent decision to place the entirety of USAID, save a small number of employees, on administrative leave.

As detailed below, USAID Director of Employee Labor Relations Nicholas Gottlieb and Acting Administrator Jason Gray testified that DOGE members, acting through Jeremy Lewin, drove these decisions, whereas Defendants maintain that all actions were authorized by proper agency officials, *see generally* Answer to 3d Am. Compl. (ECF No. 212) ¶¶ 71, 73, 76-81, 83-86. Plaintiffs have exhausted all other reasonable discovery mechanisms—obtaining relevant documents and deposing the available witnesses who were involved—and are presently precluded from deposing Lewin. Thus, Jackson is the only available source to provide information regarding this critical event.

- Gottlieb was intimately involved in placing the 57 USAID employees on administrative leave: on January 27, 2025, he sent an email to the 57 to let them know about the administrative leave (Ex. 1); on January 30, 2025 he drafted and submitted an action memo to Acting Director Gray recommending that the 57 be removed from administrative

6

leave based on a lack of evidence of wrongdoing (Ex. 2); on the same day, he emailed the 57 concerning the same (Exs. 3-4).

- Gottlieb testified extensively about the administrative leave decision, which he described as driven by DOGE. Gottlieb was informed that a team from DOGE arrived "very aggressively" in the early morning on Monday, January 27, to "hold a series of meetings with USAID leadership." Ex. 11, Dep. of Nicholas Gottlieb Dep. 78:10-19, April 22, 2026. One such meeting involved placing individuals on administrative leave. Gottlieb testified that he "did not receive" a reason to place the 57 individuals on administrative leave, *id.* at 31:8–10, though he understood that the leave was temporary, pending an investigation of wrongdoing, *id.* at 58:4-20.  He understood that the DOGE team had "committed" to presenting evidence of misconduct by Thursday, January 30. *Id.* at 78:18-25. On January 30, Gottlieb met with DOGE team members, including Lewin. *Id.* at 79:1-8.   The same day, Gottlieb and USAID Chief Human Capital Officer Bill Malyszka met with Lewin—who at the time was affiliated with DOGE and had no official position with USAID—to express concerns about the administrative leave, but "Mr. Lewin instructed [them] to terminate everyone on the list by close of business."  Ex. 11, Gottlieb Dep. 87:22-89:2. Gottlieb's January 30, 2025 Action Memo, entitled "Cancellation of Administrative Leave and Cessation of Illegal Activities," summarizes his involvement in placing the employees on leave. Ex. 2. Consistent with Gottlieb's deposition testimony, the Memo describes Lewin as the decision-maker.

- On the other hand, USAID Acting Administrator Gray testified at length about Jackson's involvement in the investigation into the USAID employees and the resulting decision to place and keep them on administrative leave at the end of January 2025. Ex. 12,

Dep. of Jason Gray 107:2-130:17, Feb. 3, 2026. Gray further testified that it was DOGE team leader Jeremy Lewin who, after speaking with someone else on the telephone, made the call to put the entire agency on administrative leave. *Id.* at 126:4-130:17. Lewin told Gray "you need to put the entire agency on admin leave, and you can pick, you know, 12 to 15 people to keep, and everyone else is going to on admin leave." *Id.* at 126:18-21. According to Gray, the individuals in that meeting were Jackson, Lewin, and Chief of Staff Matt Hopson, *id.* at 126:14-21, but Hopson testified that he entered the meeting only after Lewin had given the instruction. Ex. 13, Dep. of Matt Hopson 157:23-158:8, May 7, 2026.

Therefore, the only person besides Lewin who can potentially shed light on who instructed Jackson to put the entire agency on leave is Jackson.

Plaintiffs also allege that as part of the illegal dismantling of USAID, Director of Security John Vorhees and Deputy Director Brian McGill were placed on administrative leave for trying to prevent DOGE from accessing classified computer systems and physical spaces at USAID headquarters. 3rd Am. Compl. ¶¶ 76-81. Discovery responses are conflicting. A February 1, 2025 email states that Jackson "had support from DOGE to remove physical access" for Vorhees, McGill, and other employees placed on administrative leave. Ex. 5. However, Defendants' interrogatory responses say, "On February 11, 2025, Peter Marocco, who was then performing the duties of Deputy Administrator for Policy and Programming and Management and Resources of USAID, authorized the issuance of administrative leave notices to John Voorhees and Brian McGill." Ex. 7, U.S. Dept. of State & Marco Rubio Objs. & Resps. to Pls.' 1st Set Interrogs. No. 7 (Nov. 12, 2025) ("State/Rubio Interrog. Resp."). Jackson is the only available witness to resolve this inconsistency.

8

**B.  Who Made the Decision to Shut Down USAID's Website?**

Plaintiffs allege that, as part of the illegal dismantling of USAID, on Saturday, February 1, 2025, DOGE shut down the USAID website. 3d Am. Compl. ¶ 75. It remains unclear who made that decision.

Defendants have stated that DOGE team member Gavin Kliger "effectuated" shutting down the website "in consultation with" Jackson, but this does not answer the question of who *made the decision*. Plaintiffs are left with three sources for this information: Gavin Kliger, Kenneth Jackson, and the agencies' Rule 30(b)(6) designee. As detailed below, Kliger could not answer who directed him, why the site was taken down, or other key details concerning the decision. And the 30(b)(6) designee offered only ambiguous speculation. Because Plaintiffs have exhausted all reasonable, alternative means of discovery, deposing Jackson is the only available source to provide information regarding this critical event.

- In response to Plaintiffs' interrogatory on the issue, Defendants State and Secretary Rubio stated, ambiguously: "Gavin Kliger effectuated the changes to the USAID website on or about February 1, 2025, in consultation with USAID leadership including Kenneth Jackson, who was then performing the duties of Assistant to the Administrator for Management and Resources." Ex. 7, State/Rubio Interrog. Resp. No. 1.

- DOGE team member Gavin Kliger testified that "in consultation with senior agency leadership I was asked to take the website down, to put it back up, and ultimately to post a statement drafted by senior agency leadership." Dep. of Gavin Kliger 118:8-11, Jan. 6, 2026. Kliger provided no further detail in response to many specific questions about taking down the website:

9

Q: Who was the senior agency leadership who asked you to [take down the web-site]?

A: I don't recall.

Q: When was that?

A: I --

Q: When were you asked to take down the website:

A: I don't recall exact dates.

Q: Were you told why you were taking down the website?

A: I don't recall. . . .

Ex. 14, Kliger Dep. 118:12-120:19, Jan 6, 2026.

- The agencies' designee testified he "believe[s] Jackson is the one that made the order" to take down USAID's website but is "speculating a little." Ex. 10, Korzeniewski (USAID/State) Dep. 164:10-14. He later testified that based on "USAID's interpretation" of the interrogatory response that says Kliger "effectuated" taking down the website "in consultation with USAID leadership including Ken Jackson" that "it's Ken Jackson that did it." *Id.* at 168:2-16. When asked who else was consulted, he stated, "I do not know as USAID or my personal self who would have been there. I can speculate, but that would just be speculation." *Id.* at 169:1-3.

- The USAID and State Department designee also testified that USAID does not know whether Jackson spoke with Davis or Musk about taking down the website. Ex. 10, Korzeniewski (USAID/State) Dep. 171:18-25-172:1-10.

**C. Who Made the Decision to Shut Down USAID Headquarters?**

Plaintiffs allege that, as part of the illegal dismantling of USAID, agency headquarters were shut down on February 3, 2025, effectuated by an email from DOGE team member Kliger sent at 12:42 a.m. *See* 3d Am. Compl. ¶ 86. It remains unclear who made that decision. As detailed below, Defendants have failed to adequately answer the straightforward question of who authorized closing USAID headquarters. Kliger could not identify who instructed him to send the email; the 30(b)(6) designee could not a definitive answer; and Plaintiffs are temporarily prohibited from deposing Marocco. Accordingly, Jackson is the only available source of this information.

- In response to Plaintiffs' interrogatory asking who made the decision for U.S. Customs and Border Protection to take control of USAID headquarters on or about January 31, 2025, Defendants State Department and Secretary Rubio skirted the answer:

  > On February 7, 2025, Michael Peters, Commissioner of Public Buildings Service, U.S. General Services Administration ("GSA"), notified USAID that GSA was terminating USAID's occupancies at the Ronald Reagan Building and International Trade Center in Washington, D.C. That same day, GSA and the U.S. Customs and Border Protection entered into a temporary license to occupy government space. These decisions were officially memorialized and communicated by the documents previously submitted to the Court. *See* ECF Nos. 69-3, 69-4. Consistent with these developments, USAID then undertook actions to vacate its office space.

  Ex. 7, State/Rubio Interrog. Resp. No. 3.

- In their Answer, Defendants admit that "Mr. Kliger sent the cited email at the direction of USAID leadership." Answer to 3d Am. Compl. ¶ 86. However, Kliger testified that he did not recall who told him to send the email:

  Q: Do you recall who specifically told you to send it?

  A: I do not.

11

Q: Do you recall how you were told to send it?

A: Can you clarify?

Q: Yeah. How did someone --

A: How did they communicate it to me? I don't recall.

Q: How long after you were told to send it did you send the email?

A: I don't recall.

. . .

Q: You said you don't recall who told you to send it, correct?

A: It was someone in senior agency leadership.

Q: You don't recall specifically who?

A: Correct.

Q. You said that the language was provided to you. By who?

A: I don't recall.

Ex. 14, Kliger Dep. 123:12-126:20.

- Kliger testified to being "sure" that he and Lewin discussed the physical closure of USAID headquarters, that he "likely" discussed it with Marocco, and that it is "possible" he also discussed it with Jackson. Ex. 14, Kliger Dep. 132:22-133:14.

- The USAID and State Department designee testified, when asked directly who was the "USAID leadership" referenced in Kliger's February 3, 2025 email, "It would either be Ken Jackson or Pete Marocco or Secretary Rubio." Ex. 10, Korzeniewski (USAID/State) Dep. 203:1-6. The designee further conceded that although the State Department's and Rubio's interrogatory response claims that Marocco verbally authorized closing USAID headquarters and sending the email, *see* Ex. 7, State/Rubio

12

Interrog. Resp. No. 10,  the agencies lack any independent information to support this claim, have no documentation supporting it, and are unaware of any record memorializing the decision. *Id.* at 203:18-205:23.

**D. Who Made the Decision to Remove USAID's Official Seal?**

Plaintiffs allege that, as part of the illegal dismantling of USAID, on Friday, January 31, 2025, Defendants removed plaques with USAID's official seal from the agency's headquarters, a fact Defendants admit. 3d Am. Compl. ¶ 74; Answer to 3d Am. Compl. ¶ 74. It remains unclear who made that decision.

Defendants' interrogatory response and witness testimony provide conflicting and incomplete accounts regarding the decision to remove USAID's seal. As discussed above in section I.C, Plaintiffs submitted an interrogatory asking to identify who made the decision to "take control of USAID headquarters, including removing the seal." Defendants did not do so. Instead, they responded that the Commissioner of Public Buildings Service "notified USAID that GSA was terminating USAID's occupancies at the Ronald Reagan Building and International Trade Center" and that "GSA and the U.S. Customs and Border Protection entered into a temporary license to occupy government space." Ex. 7, State/Rubio Interrog. Resp. No. 3. The agencies' designee could shed no further light on the decision. He testified that the decision to remove the seal "was coming from some portion of the leadership team," but did not know "who specifically gave the order, but it would have been at least Ken Jackson's level." Ex. 10, Korzeniewski (USAID/State) Dep. 150:5-11. Additionally, the designee could not confirm whether Rubio was consulted, nor could he not rule out whether DOGE team members gave the order. *Id.* at 150:24-151:14. Plaintiffs are therefore left with no alternative but to depose Jackson to obtain any further information about the decision to remove USAID's official seal and signage from the buildings.

13

**E.  Jackson's Role in the Decision to Grant DOGE Access to USAID Systems**

Plaintiffs allege as part of the illegal dismantling of USAID that individuals from DOGE obtained access to USAID's financial, personnel, and administrative data systems, including the highest level of access to USAID digital systems and infrastructure, and later cut off access to USAID computer systems for thousands of Class members. 3rd Am. Compl. ¶¶ 76-80, 83. As detailed below, Defendants' interrogatory response identifies Jackson as granting access, but deposition testimony makes it unclear whether the ultimate instruction came from DOGE. These gaps make Jackson a critical witness to clarify who authorized access and how those decisions were made.

- The agencies' designee testified that Jackson, "in his role as performing the duties of deputy administrator for management resources," approved DOGE member Luke Farritor receiving C-CURE access on January 30. Ex. 10, Korzeniewski (USAID/State) Dep. 108:5-11. However, Korzeniewski later testified that Jackson or Gray would have needed to approve Farritor receiving such access, but that he was unsure whether either of them gave approval. *Id.* at 122:8-123:13.

- DOGE team member Kliger provided vague and evasive testimony regarding the supervision of his work at USAID, repeatedly invoking the generic phrase "senior agency leadership" rather than identifying any individual. For example:
  - Kliger identified Jackson and Marocco as part of "senior agency leadership" to whom he reported but testified that "[t]here was a mix of individuals. I can't recall exactly who at what point." Ex. 14, Kliger Dep. 43:22-44:8; 47:12-15.

14

- o "So through OPM leadership I reported to the director of that agency, Chuck Ezell. And at USAID I reported to senior agency leadership." Ex. 14, Kliger Dep. 42:21-24.

- o "Only senior agency leadership asked me to perform work during my time at USAID." Ex. 14, Kliger Dep. 104:19-20.

- o When asked directly whether he reported to Marocco, Kliger testified: "I reported to senior agency leadership. My understanding was that in some cases senior agency leadership expected me to adhere to instructions from Pete Marocco that were originating from that senior agency leadership. . . . Directives would originate from senior agency leadership and, you know, promulgate to me, you know, either directly or indirectly." Ex. 14, Kliger Dep. 48:10-22. When asked directly about what he discussed with Marocco, Kliger testified they discussed "Matters related to USAID. I don't recall specifics." *Id.* at 48:7-9. When asked directly whether Marocco ever instructed him about his work at USAID, Kliger testified, "I don't recall." *Id.* at 48:23-49:1.

- Kliger provided vague and evasive testimony about his need for access to USAID data systems and who authorized his access, repeatedly invoking the generic phrase "senior agency leadership" rather than identifying any individual. For example:

  - o When asked why Kliger needed access to USAID data systems, Kliger testified, "My understanding was that senior agency leadership had confirmed their intent that I have access to those systems." Ex. 14, Kliger Dep. 97:14-18. Kliger also testified he was brought to USAD to ensure that "senior agency leadership" had continued access to those systems. *Id.* at 98:1-5.

15

- ○ Kliger testified "senior agency leadership" directed him to revoke physical and digital access to employees placed on administrative leave. Ex. 14, Kliger Dep. 100:21-101:22.

- Kliger provided vague and evasive testimony about who authorized his terminating physical and digital access to USAID employees placed on administrative leave. For example:

  - ○ When asked whether he cut off access for employees stationed abroad, Kliger testified, "I don't recall. My role was to implement the directives that were given to me by senior agency leadership." Ex. 14, Kliger Dep. 105:18-106:6.

  - ○ When asked whether he ever received written instructions to cut off USAID employees' access, Kliger testified, "It wouldn't surprise me if I had. But I don't recall. . . . People would just be standing next to you and give you a directive. 'People' being senior agency leadership." *Id.* at 107:2-14.

**F.  Plaintiffs Require Jackson's Testimony as to His Positions, Responsibilities, and Authority.**

The key events in the dismantling of USAID took place in January and February 2025. Although Jackson was directly involved in each of these actions and decisions, Plaintiffs are unable to discern what legal authority Jackson had at any given time because the evidence in the record provides conflicting accounts.  Absent reliable evidence of Jackson's position in the federal government, Plaintiffs cannot determine whether: (1) Jackson possessed the legal authority to make or execute the decision to dismantle USAID or related decisions; (2) Jackson had the authority at the time of any given decision; or (3) any person served as USAID Deputy Administrator from January 30 to February 2, 2025, the period during which critical decisions were

16

made.  Thus, Plaintiffs must be able to depose Jackson to get his sworn testimony regarding his positions and responsibilities.

Documentary evidence describes Jackson's official role during the critical period as Senior Advisor to USAID. Ex. 6. According to a January 21, 2025 Action Memo from USAID Chief of Staff Matt Hopson, Jackson "was appointed to USAID to serve as a Senior Advisor to perform the duties of the Deputy Administrator for Management and Resources (DA/MR)." *Id.* The Action Memo to then-Acting Administrator Jason Gray explains: "While the Federal Vacancies Reform Act prohibits you from making Mr. Jackson the Acting DA/MR, you have the authority under the Foreign Assistance Act to do a general delegation of all authorities necessary to perform all the duties of the Acting DA/MR while giving him a title that is something other than DA/MR." *Id.* The signed Delegation of Authority to Kenneth Jackson names him the "Assistant to the Administrator for Management and Resources" for USAID as of January 21, 2025. *Id.*

However, Defendants' discovery responses and court filings are inconsistent and ambiguous regarding Jackson's specific job titles and the precise dates of his assignment to each role. For example, in response to an interrogatory asking to identify who served as USAID Deputy Administrator between January 30 and February 2, 2025, Defendants stated: "Prior to the time Peter Marocco performed the duties of USAID Deputy Administrator, *the duties of the Deputy Administrator* for Management and Resources *were performed by* Kenneth Jackson." Ex. 7, State/Rubio Interrog. Resp. No. 13 (emphasis added). And in response to a different interrogatory, Defendants stated that as of January 31, 2025, Jackson was "performing *the duties* of *Assistant to the Administrator* for Management and Resources." *Id.* No. 2 (emphasis added). These responses not only provide different titles for Jackson's position, but they do not even answer the question of his official role as opposed to the role for which he was "performing the duties." By

17

way of comparison, Defendants admit that Jackson was "delegated the role of USAID Deputy Administrator for Management and Resources on March 18, 2025." Answer to 3d Am. Compl. ¶¶ 19, 118; *see also* 3d Am. Compl. ¶¶ 19, 118. Whether Jackson officially served as the Deputy Administrator or was unofficially performing the duties of the Deputy Administrator from January 30 through February 2 is a matter of legal significance to the Appointments Clause claim.

Moreover, it is critical for Plaintiffs to be able to determine Jackson's official position from January 30 to February 2 because, as the Court identified in denying Defendants' motion to dismiss, it is not clear whether "there was any individual acting as the Administrator or the Deputy Administrator of USAID" or whether any USAID officials "took any of" the actions to dismantle USAID during this time period. ECF No. 150 at 42. The absence of a Deputy Administrator "strongly support[s] the inference that Musk directed the actions to shut down USAID without authorization from any USAID official." ECF No. 150 at 41. Indeed, the Court declined to dismiss the Appointments Clause claim in part because "additional factual development through discovery is necessary to assess the scope and breadth of the alleged Appointments Clause violation, *including by determining the identity of the actual decisionmakers for any exercises of significant authority.*" ECF No. 150 at 43 (emphasis added). Seven months into discovery, the identities of actual decisionmakers and whether they possessed the requisite legal authority to make those decisions, are still unknown. Defendants have not provided adequate answers through written discovery, and none of the nine deponents, including the 30(b)(6) deponent for USAID, knew the identity of the decisionmakers. Given Jackson's personal and material involvement in the core actions to dismantle USAID, it is likely that he has knowledge as to who made those decisions.

18

### II.    Steve Davis Has Personal Knowledge of Essential Information Not Obtainable from Another Available Source.

#### A.  Davis Was Directly Involved in Key Decisions Underlying the Dismantling of USAID.

Plaintiffs' Appointments Clause claim revolves around DOGE's involvement in the dismantling of USAID. Defendants identified Steve Davis as DOGE's "functional head," but have provided only vague and incomplete information about his title, his responsibilities, and the DOGE chain of command. Witness testimony confirms Davis's involvement in several key areas that require further factual development: the operations of the DOGE team assigned to USAID; DOGE gaining access to USAID systems and cutting access to USAID employees; and DOGE's role in shutting down USAID's website and social media. Plaintiffs have deposed Gavin Kliger, one of the junior DOGE members operating at USAID, and are set to depose Luke Farritor, another junior DOGE member, on June 2, 2026. But these two junior DOGE members cannot provide the information Plaintiffs need to support their Appointments Clause claim because they did not have insight into the higher-level DOGE operations. Defendants characterize Davis as DOGE leadership and do not identify a single other individual who would have the knowledge of DOGE's inner workings and operational structure. Other than Defendant Musk, Davis is the *only* individual with sufficient knowledge of DOGE to answer critical questions about its role in shutting down USAID.

#### B.  What was Davis's Position, Responsibilities, and Authority?

Given that Defendants have provided only vague and incomplete information about Steve Davis's position in the federal government, Plaintiffs must be afforded the opportunity to depose Davis and obtain his sworn testimony detailing his official titles and responsibilities, as well as his authority within the DOGE chain of command.

- Defendants identified Davis as a "USDS [U.S. DOGE Service] employee" who was "also detailed to GSA on January 28, 2025." Ex. 8. U.S. DOGE Service, Department of Government Efficiency, and Gleason Objs. and Resps. to 2d. Set of Interrogs. No. 4 (Feb. 25, 2026) ("DOGE 2d. Interrog. Resp.").

- In response to a separate interrogatory, Defendants identified Davis as "the highest-ranking political appointee at USDS and served as the functional head of the entity" and "also served as the functional head of USDS from Mr. Carstensen's departure on February 6, 2025, until February 18, 2025." *Id.* Ex. 9, U.S. DOGE Service, Department of Government Efficiency, and Gleason Objs. and Resps. to 3d Set of Interrogs. No. 7 (March 31, 2026) ("DOGE 3d Interrog. Resp."). Within the same response, Defendant stated that Ted Carstensen served as USDS Deputy Administrator (United States DOGE Service, a different entity from the Department of Government Efficiency), and "appears to have served as Acting Administrator of USDS, since no other individual was designated Acting Administrator." *Id.*

- The agencies' designee testified that "USAID's understanding of USDS was that Elon Musk was the leader of it," Ex. 10, Korzeniewski (USAID/State) Dep. 176:23-24, that Davis reported to Musk, *id.* at 157:19-158:8, and that he was next in line of leadership after Musk, *id.*[2] Throughout this litigation, Defendants have denied Musk's role in DOGE.

- The agencies' designee testified that he believed Davis to be the USDS Administrator as of January 27, 2025 but admitted, "USAID does not know the complete details of Steve

---

[2] The agency designee later clarified that "my view of Steve Davis as likely being a direct report to Elon Musk" is his "personal speculation based off my knowledge of their relationship prior to their government service together." Korzeniewski (USAID/State) Dep. 176:1-4.

Davis's job description even with USDS." Ex. 10, Korzeniewski (USAID/State) Dep. Dep. 55:21-56:2, 177:3-12.

- DOGE member Gavin Kliger testified he understood Davis to be "a federal employee at GSA" who "was detailed over to USAID, perhaps." Ex. 14, Kliger Dep. 49:14-17.

- During the May 21, 2026, Case Management Conference, Defendants were unable to clearly identify Davis's official title or role other than that he served as the "functional head" of DOGE. As of the time of this writing, Defendants have not provided Plaintiffs with Davis's official title or role.

## C.  What was Davis's Involvement in USAID's DOGE Team?

Plaintiffs allege that DOGE "played a leading role in actions taken to shut down and dismantle" USAID. 3d Am. Compl. at 1-2. Although Davis's specific position, responsibilities, and authority remain opaque, Defendants admit—and other witnesses confirm—that he served in a leadership role in DOGE and was personally involved in the events underlying and culminating in USAID's dismantling. As detailed below, Plaintiffs have exhausted all other reasonable discovery mechanisms, and deposing Davis is the only available avenue to obtain testimony regarding DOGE's—and potentially Musk's—operations at USAID.[2]

- The agencies' designee testified that Davis was the only person at USDS who had the authority to determine who was on USAID's DOGE team. Ex. 10, Korzeniewski (USAID/State) Dep. 57:16-18.

- Kliger testified that he interacted with Davis regarding his work at USAID and that they spoke "probably once every day or two days." Ex. 14, Kliger Dep. 50:13-51:8. When directly asked to provide an example of their interactions, Kliger stated, "It would have

21

been discussing status of various directives we had received from senior agency leadership." *Id.* at 50:18-22. Kliger could not recall whether Davis ever gave him instructions about Kliger's work at USAID. *Id.* at 50:2-4.

- When directly asked whether he discussed the decision to close USAID headquarters with Davis, Kliger testified, "I don't recall." Ex. 14, Kliger Dep. 131:3-8; 133:2-3.

- USAID Chief of Staff Hopson testified that Steve Davis, with respect to the DOGE team, "was in the leadership role." He noted that he was "deferred to as the person that was in charge by...all the folks that came in," and that he "led the discussions or drove the agenda of those meetings." Ex. 13, Hopson Dep. 58:15-22.

**D.  What was Davis's Involvement in Accessing USAID Systems and Cutting Access to USAID Employees?**

Plaintiffs have identified Davis as a central figure in the events surrounding DOGE efforts to obtain access to USAID digital systems and physical facilities, but the facts regarding his actions require further development. Plaintiffs allege that Davis personally participated in the February 1, 2025 confrontation at USAID headquarters, including making threats to involve the U.S. Marshals and contacting Elon Musk to overcome resistance from USAID personnel. 3rd Am. Compl. ¶¶ 77-78. Defendants have confirmed Davis's involvement by identifying him as one of the individuals who granted access to USAID systems and building. Ex. 7, State/Rubio Interrog. Resp. No. 5. Deputy Director Brian McGill's testimony confirmed Davis's involvement in key events, including: calling a meeting to identify individuals responsible for making payments that allegedly violated the executive order suspending foreign assistance, Ex. 15, Dep. of Brian McGill 57:12-14; 67:15-19, Dec. 9, 2025; informing McGill that DOGE planned to revoke physical and logical access for around 30 people, *id.* at 58:22-59:3; and identifying Davis as individual who wanted him to provide DOGE members with logical access to USAID's payment

22

system. *Id.* at 57:21-58:6. However, this is the *only* meaningful evidence about Davis's role in the day-to-day operations of DOGE at USAID, and it does not provide much detail beyond the fact of his involvement. The 30(b)(6) designee could not provide any information about whether Davis was involved in or even discussed with DOGE team members their ability to obtain physical access to the building. Ex. 10, Korzeniewski (USAID/State) Dep. 156:23-157:3. If the individual testifying *as* the Agency cannot answer this question, only Davis can.  Plaintiffs must be able to depose Davis to determine who he was acting with, what authority he exercised, what decisions he did or did not make, and the circumstances surrounding those decisions. Because Plaintiffs have exhausted other discovery mechanisms and no other witness can supply this information, Davis is the only available witness to resolve these critical gaps.

### E.  What was Davis's Role in Shutting Down USAID's Website and Social Media?

Plaintiffs have identified Davis as a key participant in shutting down USAID's website and social media, but the precise role he played, and the other individuals who may have been involved, remains unknown. In response to an interrogatory asking to identify the people responsible for creating and operating DOGE's social media account, Defendants responded:

> Steve Davis was a USDS employee. He was also detailed to GSA on January 28, 2025. He established the @DOGE X account the week of January 20, 2025 and then operated the @DOGE account as a GSA representative once it transitioned to GSA. Similar to the www.doge.gov website, GSA offered to run the X account as a service, to allow for updates from all agency DOGE teams and from USDS. . . . To the extent Mr. Davis supervised other GSA employees in connection with this task, USDS does not have knowledge about any other individual or individuals at GSA who might have been responsible for the tasks listed above once GSA took over operation and maintenance of the website.

Ex. 8, DOGE 2d Interrog. Resp. No. 4.  The agencies' designee testified that the Agency does not know whether Davis (or Jackson, for that matter) knew of or were involved in taking down the website. Ex. 10, Korzeniewski (USAID/State) Dep. 171:18-172:10.

The evidence leaves critical gaps regarding who ultimately controlled and directed USAID's social media and website following GSA's assumption to operations. Plaintiffs have exhausted all other reasonable discovery mechanisms, and deposing Davis is the only available avenue to obtain testimony regarding DOGE's involvement in shutting down USAID's website and social media.

## CONCLUSION

For the reasons stated herein, Jackson and Davis have unique personal knowledge of the central disputed facts in this litigation. To the extent that the Government can show that they are high-ranking officials subject to the apex deposition doctrine, Plaintiffs have met their burden to show that the doctrine does not apply due to (1) their personal involvement and (2) the extraordinary circumstances of this case, including but not limited to Defendants' failure to provide the requested information through other discovery mechanisms. Plaintiffs therefore respectfully request that the Court deny any request for a protective order.

Respectfully submitted,
Norman L. Eisen, [9112170186]
Andrew H. Warren*
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@democracydefenders.org
Andrew@democracydefenders.org

Mimi Marziani*
Rebecca (Beth) Stevens*
Joaquin Gonzalez*
**MARZIANI, STEVENS &**
**GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701

24

Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com

Richard M. Heimann*
Nicole M. Rubin [30711]
Lucas E. Issacharoff*
**LIEFF CABRASER HEIMANN & BERN-STEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000
rheimann@lchb.com
nrubin@lchb.com
lissacharoff@lchb.com

*Attorneys for Plaintiffs*
*Admitted pro hac vice

25