**EXHIBIT INDEX**

| Exhibit # | Exhibit Title | Reference Page(s) |
|---|---|---|
| 1 | 1/27/25 Gottlieb Email DOE4vUSDS_004243-004244 | 6 |
| 2 | 1/30/25 Gottlieb Action Memo to Jason Gray DOE4vUSDS_009537-009539 | 7 |
| 3 | 1/30/25 Gottlieb Email DOE4vUSDS_002832-002833 | 7 |
| 4 | 1/30/25 Gottlieb Memorandum DOE4vUSDS_004127 | 7 |
| 5 | 2/1/25 Email Chain DOE4vUSDS_000594-000601 | 8 |
| 6 | 1/21/25 Delegation of Authority to Ken Jackson DOE4vUSDS_000576-000578 | 17 |
| 7 | U.S. Dept. of State & Marco Rubio Objs. & Resps. to Pls.' 1st Set Interrogs. No. 13 (Nov. 12, 2025) ("State/Rubio Interrog. Resp.") | 8,9,11,12,13,17 |
| 8 | U.S. DOGE Service, Department of Government Efficiency, and Gleason Objs and Resps. to 2d. Set of Interrogs. No. 4 (Feb. 25, 2026) ("DOGE 2d. Interrog. Resp."). | 20 |
| 9 | U.S. DOGE Service, Department of Government Efficiency, and Gleason Objs. and Resps. to 3d. Set of Interrogs. No. 7 (March 31, 2026) ("DOGE 3d. Interrog. Resp.") | 20 |
| 10 | Annotated Dep. of Adam Korzeniewski (USAID/State 30b6 witness), March 26-27, 2026. | 10,12,13,14,20,21, 23 |
| 11 | Annotated Dep. of Nicholas Gottlieb, April 22, 2026 | 7 |
| 12 | Annotated Dep. of Jason Gray, Feb. 3, 2026 | 7 |
| 13 | Annotated Dep. of Matt Hopson, May 7, 2026 | 8,22 |
| 14 | Annotated Dep. of Kliger, Jan. 6, 2026 | 10,12,14,15,16,21, 22 |
| 15 | Annotated Dep. of Brian McGill, Dec. 9, 2025 | 22 |

# Exhibit 1

| | |
|---|---|
| **From:** | Nicholas Gottlieb████████████ |
| **Sent:** | Mon 1/27/2025 9:31:12 PM (UTC) |
| **To:** | undisclosed-recipients: |
| **Bcc:** | ████████████████████████ |
| **Subject:** | Action Requested: Placement on Administrative Leave |
| **Attachment:** | 1-27-25 Admin Leave Notices.pdf |

Enclosed, please find a memorandum placing you on administrative leave, effective immediately.  This action is taken pursuant to instructions from Acting Administrator Jason Gray.

As noted in the memorandum, please send me an email at ██████████████ as soon as possible **from your personal email** with your personal contact information.  This will assist us in providing you with updates as matters develop and contacting you with next steps when appropriate.

Please contact me by email or at the number below with any questions or concerns you may have.

Sincerely,


**Nicholas Gottlieb**
Director, Employee and Labor Relations
U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
HCTM, Rm. 4.07A RRB, 1300 Pennsylvania Avenue, NW, Washington, DC 20523
T ██████████ | ████████████████ | USAID.gov | @USAID


Visit LaunchPad, your HR one-stop shop! | ████████████ option 2

DOE4vUSDS_004243



MEMORANDUM

Date:        January 27, 2025

FROM:        Nicholas Gottlieb
             Director, Employee and Labor Relations
             USAID/HCTM

Subject:     PLACEMENT ON ADMINISTRATIVE LEAVE

The purpose of this memorandum is to inform you that you are being placed on excused absence (also known as administrative leave) with pay effective immediately, pursuant to ADS 480. You will remain on administrative leave with pay until otherwise notified.

While you are on administrative leave with pay, you must be available by telephone and e-mail during your normal duty hours, as it may be necessary for Agency officials to contact you. To that end, as soon as possible from your personal email, please email me at ▐�eval your contact information, including your phone number, email, and mailing address.

You also must remain available to report to work if directed to do so. If you wish to request other leave (annual, sick or leave without pay) during this period, you should contact me to make your request.

During the period that you are on administrative leave you are not to enter USAID premises, access USAID systems, or attempt to use your position or authority with USAID in any way without my prior permission or the prior permission of a supervisor in your chain of command.

The agency's Staff Care Program is available to you during this time for free, confidential counseling and assistance. You can obtain assistance by calling ▐▐▐▐▐▐. Participation in this program is voluntary.

Any questions regarding the above information should be directed to me.

# Exhibit 2

 

FOR OFFICIAL USE ONLY

**ACTION MEMO FOR ACTING ADMINISTRATOR JASON GRAY**

**Date:**          **January 30, 2025**

**From:**          **Nicholas Gottlieb, Director, Employee and Labor Relations, USAID/HCTM**

**Subject:**       **Cancellation of Administration Leave and Cessation of Illegal Activities**

         **Recommendation:** That you do not interfere in the statutory, regulatory, and policy requirements that govern the appropriate consideration of allegations of misconduct, including what, if any disciplinary action is appropriate.  Furthermore, that you instruct your subordinate staff to cease and desist from such misconduct.

         **Approve_____    Disapprove_____**

         **Recommendation:** That you authorize the cancellation of administrative leave for all employees placed in that status on January 27, 2025, barring substantiated evidence of misconduct in receipt this day.  Please note that I will notify impacted staff of my cancellation of their administrative leave status today at 2:00 p.m.  Their systems access will remain severed; you may make a determination under your authority as Acting Administrator to reinstate their administrative leave status thereafter.

         **Approve_____    Disapprove_____**

**BACKGROUND:**

**Background**

On January 27, 2025, at approximately 3:30 p.m.  I received instructions from you, through Joel Borkert, the Deputy Chief of Staff, to place approximately 57 USAID personnel on administrative leave.  No justification was provided for this instruction.  I did so by 4:30 p.m that day.  M/CIO and SEC subsequently terminated their physical and systems accesses.  That evening, you sent an Agency-wide announcement to the following effect:

> We have identified several actions within USAID that appear to be designed to circumvent the President's Executive Orders and the mandate from the American people. As a result, we have placed a number of USAID employees on administrative leave with full pay and benefits until further notice while we complete our analysis of these actions.

On January 30, 2025, Noah Peters of the Office of Personnel Management transmitted to me a list of 11 names, forwarded to him by Luke Farritor with the Department of Health and Human Services (DHHS).  The email is timestamped January 27, 2025, at 4:28 a.m.  Mr. Farritor noted in his email that the list provided contains all users who logged into DHHS's payments system in

the past year. He repeatedly noted that his analysis is preliminary and could be wrong.  He noted some 350 payment requests in the system since January 20, 2025.  He attached a letter from USAID, dated Friday, January 24, 2025, in which Reginald Mitchell, the Chief Financial Officer, requested that DHHS pause payments to USAID grantees.

At 9:35 a.m. on January 30, 2025, Bill Malyszka, CHCO, asked me by G-Chat to come to his office.  There in his office were Noah Peters, Tera Dahl, and Jeremy Lewin.  Mr. Peters and Mr. Lewin are stationed with the Office of Personnel Management through the Department of Government Ethics.  Mr. Peters informed me that he had sent me a list of names and informed me that the people on that list are to receive letters of reprimand.  Not having seen the names, I informed him of the various procedures for reprimands.  I then asked if employees who are not on that list but who are currently on administrative leave can be returned back to regular duty.  Mr. Peters said no.  He then informed Bill and me of the intent to conduct a RIF on USAID/IPI.  We informed the parties involved that decisions of this nature must be in writing and come from USAID leadership.

At 10:32 a.m., Bill Malyszka again asked me by G-Chat to come to his office.  There in his office were Tera Dahl and Jeremy Lewin.  Jeremy Lewin instructed me to prepare termination notices for the senior leaders who are listed on the letter from USAID, dated January 24, 2025.  These employees are:  Reginald Mitchell, Chief Financial Officer, ES-0505-00, James Dubois, Lead Accountant, GS-0510-13, Alfred Sandy, Supervisory Accountant, GS-0510-15, and Nancie Kebioh-Gray, Supervisory Accountant, GS-0510-15.  Jeremy's statements to me indicated that the instructions also included Colleen Allen and others, however, Ms. Allen's name is not on the memorandum, nor is anyone else's.

Bill and I informed these parties that doing so based on the received information would be illegal.  We noted that predetermining the outcome of a disciplinary action is violative of due process.  We noted that the materials provided do not make a colorable argument that any party engaged in misconduct, nor do they provide indications that there may be evidence of misconduct elsewhere.  We also noted that these employees are entitled to due process rights by statute, rights that would preclude the legal termination of these employees today.

Jeremy Lewin stated that he would consult with the Front Office regarding what additional information may be available.  He separately pressed the need to proceed with the RIF Notices as soon as possible.  At 12:46 p.m. this same day, Mr. Lewin contacted my personal phone and informed me that while he and his team work to gather sufficient information to warrant the termination of employees, the Agency is to continue to prioritize the RIF notices.

**Next Steps**

Upon review of the materials submitted, there is no colorable allegation of misconduct by any of the 57 employees I placed on administrative leave on January 27, 2025.  There is no evidence any of them attempted to circumvent the President's orders.  Therefore, there is not a standing business reason for these employees to be on administrative leave. At 2:00 p.m. today, I will notify them of the cancellation of administrative leave under my orders, effective immediately.

FOR OFFICIAL USE ONLY

Their accesses will remain severed and you may, under your own signature of course, adjust their status in accordance with your own determination.

Furthermore, the Office of Employee and Labor Relations will not facilitate the termination of any personnel absent due process.  The issuance of instructions to do so constitutes a prohibited personnel practice.  This will be reported to the Office of Special Counsel accordingly.

While HCTM leadership is aware of this memorandum, I have not requested their approval. This analysis and these recommendations are mine alone.

FOR OFFICIAL USE ONLY

# Exhibit 3

| | |
|---|---|
| **From:** | William Malyszka█████████████████ |
| **Sent:** | Fri 1/31/2025 2:41:12 AM (UTC) |
| **To:** | Kenneth Jackson████████████████ |
| **Cc:** | Brian McGill████████████; John Voorhees█████████████; John Cardena████████████; Bruce McPherson████████████; Matthew Hopson████████████ |
| **Subject:** | Re: Update: Cancellation of Your Administrative Leave Status Under My Authority |

Message received and understood.

On Thu, Jan 30, 2025 at 9:02 PM Kenneth Jackson █████████████████ wrote:

> Bill,
>
> I am directing you to move forward with potential adverse action against this employee and I am willing to serve as the Proposing Officer.
>
> I have reason to believe that he sent the email below to the 58 employees on Administrative Leave in an attempt to rescind that Administration Leave, putting the employees back on regular duty without authorization.
>
> Additionally, I verbally placed Mr. Gottlieb on Administrative Leave this afternoon while we work to address this issue.
>
> If, by chance, Nick Gottlieb sent an email to resign, please inform your staff NOT to accept it and to forward it to the Front Office.
>
> Regards,
> Ken

On Thu, Jan 30, 2025 at 4:06 PM William Malyszka █████████████████ wrote:

> Per your request.
>
> ---------- Forwarded message ---------
> From: **Nicholas Gottlieb**█████████████
> Date: Thu, Jan 30, 2025 at 2:04 PM
> Subject: Update: Cancellation of Your Administrative Leave Status Under My Authority
> To: William Malyszka █████████████████ Sepideh Keyvanshad
> █████████████████, Sheila Wright ████████████████ Jason Gray
> ████████████

    DOE4vUSDS_002832

All:

Attached, please find a memorandum documenting the cancellation of your administrative leave status under my authority.  Before you get your hopes up, your systems accesses remain severed; you may receive another email within the day reinstating your leave status. However, that notice will not come from me.

I have reviewed the materials that served as the purported basis for your placement in this status.  Most of you had no role whatsoever in those materials.  For the small number of you actually involved, the materials show no evidence that you engaged in misconduct.

As a result, I no longer have authority to maintain you in this status.  Someone else may claim to have that authority and I wish them the best in making a colorable argument to that end.  I may not maintain my own accesses for much longer, so if you would like to stay in touch, I can be reached at ███████████████████

I wish you all the best - you do not deserve this.

Sincerely,


**Nicholas Gottlieb**
Director, Employee and Labor Relations
U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT
HCTM, Rm. 4.07A RRB, 1300 Pennsylvania Avenue, NW, Washington, DC 20523
████████████ | ████████████ | USAID.gov | @USAID


Visit LaunchPad, your HR one-stop shop! | ███████████ option 2

CONFIDENTIAL                    DOE4vUSDS_002833

# Exhibit 4



MEMORANDUM

Date:         January 30, 2025

FROM:         Nicholas Gottlieb *Nicholas Gottlieb*
              Director, Employee and Labor Relations
              USAID/HCTM

Subject:      CANCELLATION OF ADMINISTRATIVE LEAVE

The purpose of this memorandum is to inform you that I have rescinded my memorandum of January 27, 2025.  You are no longer under administrative leave due to my instruction.  Your access may remain severed and you may receive a separate notice from other parties informing you of the reinstatement of your administrative leave.  However, at this time I do not have any justification to support your placement in this status.  Therefore, I must in good conscience rescind my prior instruction.

Thank you all for your service to this Agency, which I treasure. You are exemplary leaders and professionals, and I wish you the best.

CONFIDENTIAL                    DOE4vUSDS_004127

# Exhibit 5



**Kenneth Jackson** ███████████████████

# LPA Leave Template + Names

8 messages

---

**Laken Rapier** ███████████████████
To: Kenneth Jackson ███████████████████
Cc: Jeremy Lewin ███████████████████

Fri, Jan 31, 2025 at 7:31 PM

--
**Laken Avonne Rapier**
Senior Advisor | USAID
███████████████

---------- Forwarded message ----------
From: Jeremy Lewin ███████████████████
To: ███████████████████ "Marocco, Peter W" ███████████████████
Cc: Kenneth Jackson ███████████████████, Laken Rapier ███████████████████
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

**3 attachments**

 **LPA Admin Leave Template.docx**
92K

 **USAID LPA Admin Leave 1.31.2025.docx**
17K

**AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

---

**Kenneth Jackson** ███████████████████
To: "Marocco, Peter W" ███████████████████

Sat, Feb 1, 2025 at 7:15 PM

Pete,

CONFIDENTIAL

DOE4vUSDS_000594

Sending to you on final clearance based on current delegations and that this administrative action will not reflect in a negative way on these employees.

Please approve or disapprove.

HCTM, CISO, Security are standing by.

Thank you,
Ken

[Quoted text hidden]

---------- Forwarded message ----------
From: Jeremy Lewin ▓▓▓▓▓▓▓▓▓▓▓▓▓
To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ "Marocco, Peter W" ▓▓▓▓▓▓▓▓▓▓
Cc: Kenneth Jackson ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Laken Rapier ▓▓▓▓▓▓▓▓▓▓▓
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

---------- Forwarded message ----------
From: Jeremy Lewin ▓▓▓▓▓▓▓▓▓▓▓▓▓
To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ "Marocco, Peter W" ▓▓▓▓▓▓▓▓▓▓
Cc: Kenneth Jackson ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Laken Rapier ▓▓▓▓▓▓▓▓▓▓▓
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

**4 attachments**

CONFIDENTIAL

DOE4vUSDS_000595

**LPA Admin Leave Template.docx**
92K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

**AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

---

**Kenneth Jackson** ███████████████████████                                      Sat, Feb 1, 2025 at 8:22 PM
To: William Malyszka ███████████████████ Jason Gray ██████████████████

CONFIDENTIAL

DOE4vUSDS_000596

Bill,

There was a verbal conversation tonight with Pete to approve these employees to be put on Admin Leave. Please ensure they will receive full pay and benefits and this will not reflect negatively in their service record.

Some on this list may be contractors, please only place employees on leave.

Regards,
[Quoted text hidden]


---------- Forwarded message ----------
From: Jeremy Lewin ████████████████
To: ███████████████████ "Marocco, Peter W" ████████████████
Cc: Kenneth Jackson ███████████████    Laken Rapier ████████████████
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy


**4 attachments**

**LPA Admin Leave Template.docx**
92K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

**AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

---

**William Malyszka** ████████████████████                    Sat, Feb 1, 2025 at 8:26 PM
To: Steven Hernandez ◄████████████████████
Cc: Kenneth Jackson ████████████████

Steve, see attached list of Federal employees being placed on administrative leave and contractors. All are to have logical access revoked.
[Quoted text hidden]


---------- Forwarded message ----------
From: Jeremy Lewin ████████████████
To: ████████████████████ "Marocco, Peter W" ████████████████
Cc: Kenneth Jackson ██████████████    Laken Rapier ████████████████

CONFIDENTIAL                                    DOE4vUSDS_000597

Case 8:25-cv-00462-TDC       Document 229       Filed 06/03/26       Page 19 of 720

Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

---

**4 attachments**

 **LPA Admin Leave Template.docx**
92K

 **USAID LPA Admin Leave 1.31.2025.docx**
17K

**AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

---

**Steven Hernandez** ██████████████████                                    Sat, Feb 1, 2025 at 8:33 PM
To: William Malyszka ████████████████████
Cc: Kenneth Jackson ████████████████████

On it!

Steven G Hernandez
MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL
Acting CIO
DCIO|CISO|CPO
United States Agency for International Development
My Availability: HTML

*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can*
-- John Wesley
[Quoted te t hidden]

---

**Kenneth Jackson** ██████████████████████                                 Sat, Feb 1, 2025 at 8:54 PM
To: ████████████████████

[Quoted te t hidden]

---------- Forwarded message ----------
From: Jeremy Lewin ████████████████
To: ██████████████████ "Marocco, Peter W" ███████████████

DOE4vUSDS_000598

Cc: Kenneth Jackson ███████████████ Laken Rapier ██████████████

Bcc:

Date: Fri, 31 Jan 2025 19:04:25 -0500

Subject: AID Intended Comms/LPA Admin Leave & RIF Activities

Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

**4 attachments**

📄 **LPA Admin Leave Template.docx**
92K

📄 **USAID LPA Admin Leave 1.31.2025.docx**
17K

📄 **AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

📄 **USAID LPA Admin Leave 1.31.2025.docx**
17K

---

**Steven Hernandez** ███████████████████                                    Sat, Feb 1, 2025 at 10:39 PM
To: William Malyszka ██████████████████████
Cc: Kenneth Jackson ████████████████████

Confirmed done.  I'll have the receipt in a bit.

Steven G Hernandez

MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL

Acting CIO

DCIO|CISO|CPO

United States Agency for International Development

My Availability  HTML

*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can.*

John Wesley

On Sat, Feb 1, 2025 at 8:26 PM William Malyszka ██████████████████████ wrote:

[Quoted te t hidden]

---

**William Malyszka** ███████████████████                                    Sat, Feb 1, 2025 at 11:06 PM
To: Leo Ruth ██████████████████
Cc: Kenneth Jackson ████████████████████

CONFIDENTIAL                                          DOE4vUSDS_000599

Case 8:25-cv-00462-TDC     Document 229     Filed 06/03/26     Page 21 of 720

Confirming that John V. and Brian M. have been placed on admin leave. My understand was that Ken had support from DOGE to remove physical access. Please verify.

On Sat, Feb 1, 2025 at 10:07 PM Leo Ruth ███████████ wrote:
> Bill,
> Am I to remove physical access for Voorhees and McGill, too?
>
>
> Leo J. Ruth II
> Deputy Director (Support)
> USAID Office of Security
> Rm 4.06 RRB
> 1300 Pennsylvania Ave.
> Washington DC 20523
> Office: ███████████
> CELL ███████████
> UNCLAS: ███████████
>
>
>
> On Sat, Feb 1, 2025 at 9:40 PM Steven Hernandez ███████████ wrote:
>> Confirmed,
>>
>> DOGE will remove physical access.  Thank you,
>>
>> Steven G Hernandez
>> MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL
>> Acting CIO
>> DCIO|CISO|CPO
>> United States Agency for International Development
>> My Availability: HTML
>>
>> *Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can*
>> -- John Wesley
>>
>>
>> On Sat, Feb 1, 2025 at 9:39 PM Leo Ruth ███████████ wrote:
>>> Steve,
>>>
>>> Zach informed me DOGE will remove the physical access for the individuals on the list.
>>>
>>> Please confirm you do NOT want SEC to continue with physical access restriction.
>>>
>>>
>>> Leo J. Ruth II
>>> Deputy Director (Support)
>>> USAID Office of Security
>>> Rm 4.06 RRB
>>> 1300 Pennsylvania Ave.
>>> Washington DC 20523
>>> Office: ███████████
>>> CELL: ███████████
>>> UNCLAS: ███████████
>>>
>>>
>>> On Sat, Feb 1, 2025 at 9:13 PM Zecharia Kahn ███████████ wrote:
>>>> Hi Bill,
>>>>
>>>> Can you provide guidance to Charles and Leo to remove physical access for the staff listed below and attached.
>>>>
>>>> We're working logical access in parallel.

CONFIDENTIAL                                              DOE4vUSDS_000600

Thanks!!

Zack


--
Zecharia (Zack) Kahn
Office of the Chief Information Officer
U.S. Agency for International Development
Office - █████████████
Ce██████████████████
███████████████

---------- Forwarded message ---------
From: **Steven Hernandez** ███████████████████
Date: Sat, Feb 1, 2025 at 8:34 PM
Subject: Fwd: LPA Leave Template + Names
To: William Morgan ████████████████  Jeffrey Anouilh ███████████████


Please execute asap, but ensure priority for the first two names provided.


Steven G Hernandez

MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL

Acting CIO

DCIO|CISO|CPO

United States Agency for International Development

My Availability: HTML


*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can*

-- John Wesley


---------- Forwarded message ---------
From: **William Malyszka** ███████████████████
Date: Sat, Feb 1, 2025 at 8:26 PM
Subject: Fwd: LPA Leave Template + Names
To: Steven Hernandez ████████████████████
CC: Kenneth Jackson ███████████████████


[Quoted te t hidden]
[Quoted text hidden]

CONFIDENTIAL

# Exhibit 6

FOR OFFICIAL USE ONLY

**ACTION MEMO FOR ACTING ADMINISTRATOR JASON GRAY**

Date:        **January 21, 2025**

From:        **Chief of Staff Matt Hopson**

Subject:     Delegation of Authority to Mr. Kenneth Jackson to serve as Assistant to the Administrator for Management and Resources of USAID

**Recommendation:** That you sign the attached delegation to Mr. Kenneth Jackson to serve as Assistant to the Administrator for Management and Resources of USAID.

Approve:    _____        Disapprove: _____

**BACKGROUND:**

Following the inauguration of President Trump as the 47th President of the United States, Mr. Jackson was appointed to USAID to serve as a Senior Advisor to perform the duties of the Deputy Administrator for Management and Resources (DA/MR). Because the DA/MR position does not have a first assistant position into which he can be placed to assume the authorities of that position under the Federal Vacancies Reform Act, the only way Mr. Jackson can properly exercise the duties of this position is for the Acting Administrator to delegate all of the duties of the position to Mr. Jackson in a delegation of authority memorandum.

While the Federal Vacancies Reform Act prohibits you from making Mr. Jackson the Acting DA/MR, you have the authority under the Foreign Assistance Act to do a general delegation of all authorities necessary to perform all the duties of the Acting DA/MR while giving him a title that is something other than DA/MR.

This course of action has been coordinated with, and approved by, the White House.

**AUTHORITIES:**

Pursuant to Section 621 of the Foreign Assistance Act, you may delegate whatever authorities you deem necessary to carry out the functions of the Agency. ADS 103.3.4.1 is the memorialization of your delegations to the position of the Deputy Administrator for Management and Resources. You may further delegate these same authorities to Mr. Jackson to perform the duties of the DA/MR but give him a different title while performing those duties. You retain the authority to cancel this delegation at any time.

**RESOURCE IMPLICATIONS, ADMINISTRATIVE BURDEN, AND REPORTING REQUIREMENTS:**

Implementing this action results in the least disruption to existing reporting and leadership structures, providing USAID staff during the beginning of the Trump administration until a DA/MR nominee can be confirmed. There are no budgetary implications. There will be no announcement of this delegation.

[January 21, 2025] 1

DOE4vUSDS_000576

Attachments:

> Tab 1—Delegation of Authority to Mr. Kenneth Jackson to be Assistant to the Administrator for Management and Resources of USAID

**Drafter & Approver**: AID/OWHL/ECarr, 01/21/2025

| **Bureau-Level Clearances** | **Clearance Status** | **Date** |
| --- | --- | --- |
| A/DGC: JOhlweiler | Clear | 01/22/2025 |
| ES: ECarr | Clear w/edits | 01/22/2025 |
| CoS: MHopson | Clear w/ edits | 01/23/2025 |

FOR OFFICIAL USE ONLY

## Delegation of Authority to Kenneth Jackson to be
## Assistant to the Administrator for Management and Resources of the United
## States Agency for International Development

### SECTION 1: FUNCTIONS

Pursuant to my authority under Section 621 of the Foreign Assistance Act, I hereby delegate to Mr. Kenneth Jackson all delegable authorities described in ADS 103.3.4.1 related to all aspects of USAID.  When Mr. Jackson is exercising authorities under this delegation he will use the title Assistant to the Administrator for Management and Resources.

### SECTION 2: PROCEDURES AND LIMITATIONS

1) Mr. Jackson may not redelegate any authority provided for in this Delegation of Authority; and
2) This delegation shall remain in effect until such time as Mr. Jackson vacates the Assistant to the Administrator for Management and Resources position, unless the Administrator or Deputy Administrator revokes it sooner.


Jason Gray
United States Agency for International Development
Acting Administrator

FOR OFFICIAL USE ONLY

[January 21, 2025] 3

DOE4vUSDS_000578

# Exhibit 7

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 4, *et al.*, *on behalf of themselves and all others similarly situated*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>ELON MUSK, *in his official capacity*, et *al.*,<br><br>    *Defendants*. | Case No. 8:25-cv-00462-TDC |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES TO DEFENDANTS UNITED STATES DEPARTMENT OF STATE AND MARCO RUBIO**

Defendants United States Department of State and Marco Rubio (hereinafter, "State") hereby respond to Plaintiffs' First Set of Interrogatories to Defendants United States Department of State and Marco Rubio as follows:

**Objections to Instructions**

1.      Defendants object to all Plaintiffs' instructions, and Instruction No. 1 in particular, to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure.

2.      Defendants object to Instruction No. 7 to the extent that it is both inconsistent with the dates set forth in specific interrogatories and to the extent the phrase "complete responses" is vague and ambiguous.  Unless otherwise indicated, Defendants will specify the dates relevant to each response to a particular interrogatory in any response to that interrogatory.

1

**Objections to Definitions**

1.      Defendants object to Definition No. 1 as vague and ambiguous, as it refers to "operations" and "functions" without qualification, as well as referencing "any . . . action mandated by federal statute, including, but not limited to" certain statutes or categories of statutes, without purporting to identify each and every statute intended or statutory provision at issue.

2.      Defendants object to Definition No. 5 as vague and ambiguous and as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure to the extent it refers to a "general course of action the specifics of which can be determined later." Defendants will identify specific decisions to formally approve the Defendant agency to take any specific actions in their responses to particular interrogatories.

3.      Defendants object to Definition No. 6 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.

4.      Defendants object to Definition No. 8 to the extent it refers it incorrectly identifies the U.S. DOGE Service Temporary Organization as the "U.S. DOGE Temporary Service." Defendants will construe the term "DOGE" to include the U.S. DOGE Service Temporary Organization.

5.      Defendants object to Definition No. 9 as vague and ambiguous, as it refers to any individual who "otherwise works or worked for DOGE." Defendants will construe the term to include any individual who has or had a primary employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization, whether in a paid or unpaid capacity.

6.      Defendants object to Definition No. 11 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.

2

7.      Defendants object to Definition No. 15 on the ground that it is overbroad and not proportional to the needs of the case because it includes, among other individuals, all of Defendants' thousands of current and former employees regardless of their position and regardless of their involvement in the events giving rise to the claims or defenses in these cases. Defendants will construe this definition, and the requests generally, to be limited to seek information from persons who are reasonably likely to have information relevant to the claims or defenses in these cases and responsive to Plaintiffs' interrogatories.

## Objections to All Interrogatories

1.      Defendants object to Plaintiffs' interrogatories because discovery is inappropriate at this time in light of Defendants' pending motion to stay discovery during the pendency of any interlocutory appeal, ECF No. 166. Defendants further object to being obligated to respond to discovery requests during the ongoing lapse in appropriations for most federal agencies. Defendants are prejudiced by being required to respond to discovery during a lapse of appropriations, during which certain personnel necessary to facilitate Defendants' responses are unavailable. In addition, discovery is inappropriate, inefficient, and unduly burdensome, because for the reasons set forth in Defendants' motion to dismiss and Motion for Certification, the court has no jurisdiction over Plaintiffs' claims and the material facts are undisputed and Plaintiffs' claims thus present pure questions of law. *See also* Pls. Request for Leave to File Mot. for Partial Summ. J. at 2, ECF No. 159.

2.      Defendants object to Plaintiffs' interrogatories to the extent that they seek information protected against disclosure by: (a) the attorney work product doctrine; (b) the attorney-client privilege; (c) the deliberative process privilege, the joint defense privilege, the common interest privilege, the law enforcement privilege, or the state secrets privilege; (d) any

3

other form of executive privilege; or (e) any other applicable privilege or protection.

3.      Defendants do not waive, and hereby expressly reserve their rights to assert any and all objections to the admissibility of such responses into evidence at the trial of this action, or in any other proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, and privilege. Further, Defendants make the responses herein without in any manner implying or admitting that the discovery requests are relevant or material to the subject matter of this action.

4.      Defendants object to these interrogatories to the extent that they seek information protected against disclosure by the Privacy Act, *see* 5 U.S.C. § 552a, and the privacy interests and expectations of persons not party to this litigation.

5.      Defendants object to any discovery taking place in this case to the extent Plaintiffs assert cognizable claims seeking review of governmental agency action, including claims under Administrative Procedure Act, because resolution of any such claims should be based upon the "administrative record" in this case. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That said, Defendants understand that the Court has allowed discovery to proceed. Thus, while preserving their broad objection to any and all discovery, Defendants make further specific objections stated below.

5.      Defendants incorporate all of the foregoing objections in each of the responses below regardless of whether a specific objection is reasserted with respect to a specific interrogatory. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that interrogatory. Moreover, the assertion of the same, similar, or additional

objections in response to a specific interrogatory does not waive, limit, or modify any of Defendants' general objections or similar or separate specific objections raised in response to an interrogatory.

6.    Defendants expressly reserve the right to supplement, clarify, review, or correct any or all of the responses and objections here, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

**Objections and Responses to Specific Interrogatories**

**INTERROGATORY NO. 1:** Identify the individual(s) who made the decision to shut down USAID's website, which occurred on or about February 1, 2025, when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**:  Defendants incorporate by reference the above objections.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Defendants further object that this request is unduly burdensome and not proportional to the needs of this case, insofar as Plaintiffs claims are limited to the Appointments Clause and the separation of powers, neither of which are implicated by the decision whether to maintain a website in operation.  In keeping with those objections, State will construe this interrogatory as requesting the identity of the individual who formally authorized USAID to shut down its website on or about February 1, 2025.

**Response**:  Gavin Kliger effectuated the changes to the USAID website on or about February 1, 2025, in consultation with USAID leadership including Kenneth Jackson, who was then performing the duties of Assistant to the Administrator for Management and Resources.

Since that time, both Secretary of State Rubio and Director of the Office of Management and Budget Russell Vought have been notified that the USAID website has been down and have not taken action to restore it.

**INTERROGATORY NO. 2:** Identify the individual(s) who made the decision to place approximately 57 USAID employees on administrative leave on or about February 1, 2025, when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**:  Defendants incorporate by reference the above objections.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). State further objects to this interrogatory as vague and ambiguous, as it does not identify the specific individuals placed on administrative leave by name or office.  In keeping with those objections, State will interpret this interrogatory as requesting the identity of the individual who formally approved the placement of approximately 57 USAID employees on administrative leave on or about February 1, 2025.

**Response**:  Kenneth Jackson, then performing the duties of Assistant to the Administrator for Management and Resources, authorized the transmittal of administrative leave notices to 57 USAID employees in the Bureau of Legislative and Public Affairs on January 31, 2025.  The decision was memorialized and communicated by the documents previously disclosed to the Court.  *See* ECF No. 70-2.

**INTERROGATORY NO. 3:** Identify the individual(s) who made the decision for U.S.

6

Customs and Border Protection to take control of USAID headquarters, including the removal of plaques with USAID's official seal from USAID headquarters on or about January 31, 2025, and the removal of the words "U.S. Agency for International Development" from above the main entrance of USAID headquarters on or about February 7, 2025, when the decision(s) was made, and how the decision(s) was officially memorialized and communicated to those responsible for implementation.

**Objections**:  Defendants incorporate by reference the above objections.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Defendants further object to this interrogatory because it requests information outside the custody or control of any Defendant.

**Response**:  On February 7, 2025, Michael Peters, Commissioner of Public Buildings Service, U.S. General Services Administration ("GSA"), notified USAID that GSA was terminating USAID's occupancies at the Ronald Reagan Building and International Trade Center in Washington, D.C.  That same day, GSA and the U.S. Customs and Border Protection entered into a temporary license to occupy government space.  These decisions were officially memorialized and communicated by the documents previously submitted to the Court.  *See* ECF Nos. 69-3, 69-4.  Consistent with these developments, USAID then undertook actions to vacate its office space.

**INTERROGATORY NO. 4:** Identify the individual(s) who made the decision to have DOGE personnel, including Steve Davis, Gavin Kliger, Luke Farritor, Noah Peters, and Clayton Cromer, arrive at USAID headquarters between on or about January 27 and February 1, 2025

7

seeking access to USAID data security systems and physical access to highly restricted areas, including sensitive compartmented information facilities, when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**:  Defendants incorporate by reference the above objections.  Defendants object to describing all the listed individuals as "DOGE personnel," insofar as certain of those individuals are not and were not employed by the United States DOGE Service or the U.S. DOGE Service Temporary Organization.  If the term "DOGE personnel" is construed to include individuals who are not or were not at relevant times employed by the United States DOGE Service or the U.S. DOGE Service Temporary Organization, Defendants object to that term as vague and ambiguous.  Defendants further object to this interrogatory to the extent it assumes without evidence that the listed individuals sought "access" to "sensitive compartmented information facilities."  Defendants incorporate their objection to definition No. 5.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

State will construe this interrogatory to request the identity of the individual who authorized the listed individuals to obtain access to USAID data security systems and physical access to USAID spaces.

**Response**:  State denies that any unauthorized individual accessed any sensitive compartmented information facility or otherwise accessed classified information.  The decision to invite the listed individuals to access USAID physical spaces and unclassified data systems was made by then-Acting Administrator Jason Gray, consistent with the provisions of Executive Order 14,158.

8

**INTERROGATORY NO. 5:** Identify the individual(s) who made the decision to give DOGE personnel access to USAID data systems between on or about January 20 and March 31, 2025, when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**:  Defendants incorporate by reference the above objections. Defendants object to the term "DOGE personnel" as vague and ambiguous if it is construed to include individuals who are not or were not at relevant times employed by the United States DOGE Service or the U.S. DOGE Service Temporary Organization. Defendants further incorporate their objection to definition No. 5.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

State will construe this interrogatory to request the identity of the individual who authorized any of Steve Davis, Gavin Kliger, Luke Farritor, Noah Peters, or Clayton Cromer to obtain access to USAID data security systems and physical access to USAID spaces.

**Response**:  Jason Gray, who was then Acting Administrator of USAID, and Kenneth Jackson, Assistant to the Administrator for Management and Resources, consistent with the provisions of Executive Order 14,158.

**INTERROGATORY NO. 6:** Identify the individual(s) who made the decision to systematically block access to USAID data systems by USAID personnel between on or about January 20 and March 31, 2025, including cutting off access to email and other government computer systems for thousands of USAID employees and personal service contractors

("PSCs"), when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**: Defendants incorporate by reference the above objections. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Defendants further object to this interrogatory to the extent it takes as established that all USAID personnel were systematically blocked from access to USAID data systems.

**Response**: State denies that "USAID personnel" were "systematically block[ed from] access to USAID data systems" outside of specific changes to their employment status. Instead, USAID employees and PSCs who were placed on administrative leave, subject to a reduction-in-force, or had their personal service contract terminated would have relevant account access suspended during the term of that action. Such access restrictions were authorized by the individual who authorized USAID to take the underlying employment action, as reflected in the documents previously submitted to the Court. *See, e.g.,* ECF No. 70-1 at 4; ECF No. 70-2 at 2; ECF No. 70-6 at 2; ECF No. 70-7 at 2.

**INTERROGATORY NO. 7:** Identify the individual(s) who made the decision to place USAID Director of Security John Vorhees and USAID Deputy Director Brian McGill on administrative leave in February of 2025, when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**: Defendants incorporate by reference the above objections. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

10

**Response**:  On or about February 1–2, 2025, Kenneth Jackson, Assistant to the Administrator for Management and Resources, authorized the placement of John Voorhees and Brian McGill on administrative leave.  On February 11, 2025, Peter Marocco, who was then performing the duties of Deputy Administrator for Policy and Programming and Management and Resources of USAID, authorized the issuance of administrative leave notices to John Voorhees and Brian McGill.  The notices were then issued to Mr. Voorhees and Mr. McGill the next day.  The decision was officially memorialized and communicated to those responsible for implementation by email.

**INTERROGATORY NO. 8:** Identify the individual(s) who made the decision to terminate approximately 791 PSCs who were informed that their contracts had been terminated on or about February 2, 2025, when the decision was made, and how the decision was officially memorialized.

**Objections**: Defendants incorporate by reference the above objections.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

**Response**:  On February 2, 2025, Secretary of State Marco Rubio, who was then also performing the duties and functions of the Administrator of USAID, authorized the termination of approximately 791 Personal Service Contracts in high-income and medium-income countries as defined by the World Bank.  The decision was memorialized and communicated by the documents previously disclosed to the Court.  *See* ECF No. 70-9.

**INTERROGATORY NO. 9:** Identify the individual(s) who made the decision to place

11

approximately 2,140 USAID employees on administrative leave between on or about February 3-7, 2025, when the decision was made, and how the decision was officially memorialized.

**Objections**: Defendants incorporate by reference the above objections. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

**Response**: Peter Marocco, who was then performing the duties of Deputy Administrator for Policy and Programming and Management and Resources of USAID, made the decision to place approximately 2,140 USAID employees on administrative leave. The decision was made on February 4, 2025, as memorialized and communicated by the documents previously disclosed to the Court. *See* ECF No. 70-8.

**INTERROGATORY NO. 10:** Identify the individual(s) who made the decision to send an email from "USAID Press" to all USAID staff, on or about February 3, 2025, telling them to work remotely for the day, as USAID headquarters would be closed, when the decision was made, and how the decision was officially memorialized.

**Objections**: Defendants incorporate by reference the above objections. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

**Response**: Peter Marocco, who was then performing the duties of Deputy Administrator for Policy and Programming and Management and Resources of USAID, verbally authorized the closure of the USAID building and directed Gavin Kliger to send the described email communication.

12

**INTERROGATORY NO. 11:** On or about February 4, 2025, an internal communications notice was sent to USAID employees stating that, effective February 7, 2025 at 11:59 P.M., "all USAID direct hire personnel will be placed on administrative leave globally, with the exception of designated personnel responsible for mission-critical functions, core leadership and specially designated programs," affecting approximately 2,104 additional USAID employees. Identify the individual(s) who made this decision to place these employees on administrative leave, when the decision was made, how the decision was officially memorialized, as well as the individual(s) responsible for determining the excepted "designated personnel responsible for mission-critical functions, core leadership, and specially designated programs."

**Objections**: Defendants incorporate by reference the above objections. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

**Response**: Peter Marocco, who was then performing the duties of Deputy Administrator for Policy and Programming and Management and Resources of USAID, made the decision to place the described employees on administrative leave. That decision was memorialized in the documents previously submitted to the Court. *See* ECF No. 70-8. Mr. Marocco was also the individual responsible for determining the personnel who would be excepted from that action.

**INTERROGATORY NO. 12:** Identify who served as USAID Administrator between January 30 and February 2, 2025, the individual(s) who made that decision, when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**: Defendants incorporate by reference the above objections.

13

**Response**:  On January 30, 2025, President Donald J. Trump designated Secretary of State Marco Rubio Acting Administrator of USAID, pursuant to the Federal Vacancies Reform Act.

**INTERROGATORY NO. 13:** Identify who served as USAID Deputy Administrator between January 30 and February 2, 2025, the individual(s) who made that decision, when the decision was made, and how the decision was officially memorialized and communicated to those responsible for implementation.

**Objections**: Defendants incorporate by reference the above objections.

**Response**:  Prior to the time Peter Marocco performed the duties of USAID Deputy Administrator, the duties of the Deputy Administrator for Management and Resources were performed by Kenneth Jackson.

**INTERROGATORY NO. 14:** Identify all meetings and discussions with government officials (including other Defendants) that Defendant Elon Musk attended or took part in between December 1, 2024 and May 31, 2025 concerning the dismantling, closing[], reorganizing, or restructuring of USAID, including terminating USAID employees or placing them on administrative leave, terminating PSCs, or terminating USAID contacts or grants.

**Objections**:  Defendants incorporate by reference the above objections. Defendants object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for the United States Department of State and Marco Rubio to identify "all meetings and discussions" that "Elon Musk attended or took part in." Defendants cannot comprehensively catalogue every conversation Mr. Musk had with any individual

14

connected to State or USAID, including every conversation Mr. Musk, then a Senior White House advisor, had with Secretary of State Rubio.  Mr. Musk is not and has never been within the control or employ of the parties to whom these requests are directed.  Defendants also object to the Interrogatory to the extent a response requires review of internal, deliberative documents discussing such communications, attorney client documents, or other privileged materials relating to communications. Defendants further object to this Interrogatory to the extent it seeks information protected by the deliberative process privilege, attorney-client privilege, presidential communications privilege or any other applicable privilege. Specifically, Defendants object to this Interrogatory's incorporation of the definition of "identify", which purports to require a "description of the facts and circumstances" of any communication that is subject to a relevant privilege. Defendants further object to the vague and ambiguous undefined term "dismantling," which is unclear in this context. Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Defendants also object to the time period of this request, which includes dates prior to Mr. Musk's commencement of government service.  Defendants object to the use of the undefined term "Meeting" in a manner incompatible with, and calculating to expand the obligations imposed by, the Government in the Sunshine Act, 5 U.S.C. 552b.

Consistent with the above-stated objections, Defendants will construe this Interrogatory as requesting identification of any meetings or non-privileged communications between Mr. Musk and anyone employed by or detailed to the Department of State "concerning the. . . closing[], reorganizing, or restructuring of USAID, including terminating USAID employees or placing them on administrative leave, terminating PSCs, or terminating USAID contacts or grants" between January 20, 2025 and May 31, 2025.

15

**Response**:  To State's current knowledge, Mr. Musk had several conversations with Secretary of State Rubio, Jeremy Lewin, Michael A. Needham, Counselor of the Department and then Secretary Rubio's Chief of Staff, Tarak Maketcha, and Daniel Joseph Holler, Sr., Chief of Staff of the Department of State, during the time period covered by this request.  State also currently understands that Mr. Musk spoke to Jason Gray and Peter Marocco on at least one occasion.  State will update this response as further information is developed.

**INTERROGATORY NO. 15:** Identify any DOGE personnel who have been detailed to or otherwise worked at USAID, including providing a general description of their duties and responsibilities at USAID.

**Objections**:  Defendants incorporate by reference the above objections. Defendants object to Interrogatory No. 15, as it incorporates the definition of DOGE that incorrectly identifies the U.S. DOGE Service Temporary Organization as the "U.S. DOGE Temporary Service." Defendants will construe the term "DOGE" to include the U.S. DOGE Service Temporary Organization.  Defendants further object to Interrogatory No. 15 as vague and ambiguous, as it incorporates the definition of DOGE personnel that refers to any individual who "otherwise works or worked for DOGE."  Defendants will construe the term to include any individual who has or had a primary employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization, whether in a paid or unpaid capacity.  Defendants also object to the phrase "detailed to or otherwise worked at USAID" as vague and ambiguous.

State will construe that phrase to include any individual who was detailed to or employed by USAID who has or had a primary employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization.

16

**Response**:  Subject to and without waiving the foregoing objections, State is unaware of any individual who was detailed to or employed by USAID who had a primary employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization.

**INTERROGATORY NO. 16:** Describe the current operations of USAID by bureau, office, division or component, including the total number of employees and PSCs, current contracts and grants, operational computer systems, and other information relevant to whether USAID is performing its Core Functions and other statutorily required activities.

**Objections**: Defendants incorporate by reference the above objections. Defendants further object to this interrogatory as vague and ambiguous to the extent it requests unspecified "other information" which Plaintiffs may deem "relevant," which is unknown to Defendants at this time. Defendants also object to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of this case. This Interrogatory calls for a description of the current operations of every office of USAID, every computer system, and compliance with an unknown number of functions and statutorily required activities, whether or not related to the facts and circumstances alleged in Plaintiffs' Second Amended Complaint. State will construe this Interrogatory as limited to the total number of employees currently employed by USAID and a description of their functions.

**Response**:  USAID currently employs approximately 74 direct-hire employees, in addition to other appointees and contract support staff.  Those personnel support five lines of effort for USAID functions: legal, financial management, human capital, closeout of contracts and grants that are not transferring to State, and remaining general operations, including statutory mandated functions. USAID also continues to fulfill its statutorily mandated functions as an

17

independent agency until such time as Congress adopts legislation to allow the Secretary of State to transfer those functions to appropriate portions of State.

**INTERROGATORY NO. 17:** Describe any dismantling, closing, reorganizing, or restructuring of USAID, including the closing, downsizing, or combining of any USAID bureau, office, division, or component, and how that information concerning such dismantling, closing, reorganizing, or restructuring was officially memorialized and communicated to those responsible for implementation.

**Objections**: Defendants incorporate by reference the above objections.  Defendants further object to the vague and ambiguous undefined term "dismantling," which is unclear in this context.

**Response**:  Pursuant to Federal Rule of Civil Procedure 33(d), please see the attached documents.

**INTERROGATORY NO. 18:** State USAID's total actual or projected spending for Fiscal Years 2024 (October 1, 2024 through September 30, 2025) and 2025 (October 1, 2025 through September 30, 2026), broken down and itemized by each subordinate bureau, office, division, or component. For each amount of spending, identify the authorizing statutory appropriation.

**Objections**: Defendants incorporate by reference the above objections.  Defendants further object to this interrogatory as overly burdensome and disproportionate to the needs of this case, as it would require detailed accounting of each expenditure by portion of a federal agency and the identification of legal authority for each amount of spending.  Defendants further object

18

to the undefined term "spending," which is vague, ambiguous, and inconsistent with relevant appropriations laws.  Defendants will construe the term to mean "obligation of funds."

**Response**:  Pursuant to Federal Rule of Civil Procedure 33(d), please see the attached documents.

**INTERROGATORY NO. 19:** Describe the manner(s) that USAID has used or presently uses to ensure that any and all USAID spending for Fiscal Years 2024 or 2025 complied or complies with the relevant statutory appropriations authorizing such spending.

**Objections**: Defendants incorporate by reference the above objections.  Defendants further object to the undefined term "spending," which is vague, ambiguous, and inconsistent with relevant appropriations laws.  Defendants will construe the term to mean "obligation of funds."

**Response**:  Pursuant to Federal Rule of Civil Procedure 33(d), please see the attached documents.

Dated: November 12, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

*/s/ Jacob S. Siler*
CHRISTOPHER M. LYNCH
(DC Bar No. 1049152)
JACOB S. SILER (DC Bar No. 1003383)

19

JAMES J. WEN (NY Bar No. 5422126)
*By Special Appearance*
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-4556
Email: jacob.s.siler@usdoj.gov

*Attorneys for Defendants*

20

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing interrogatory responses of the United States Department of State and Marco Rubio to Plaintiffs' First Set of Interrogatories, dated October 7, 2025, are true and correct, to the best of my knowledge based solely on information that was made known to me in the course of my official duties.

Dated: November 12, 2025

/s/ _____

21

# Exhibit 8

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| J. DOE 4, *et al.*,<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>United States DOGE Service, *et al.*,<br><br>　　　*Defendants*. | Case No. 8:25-cv-00462-TDC |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES TO DEFENDANTS UNITED STATES DOGE SERVICE, DEPARTMENT OF GOVERNMENT EFFICIENCY, AND AMY GLEASON**

Defendants United States DOGE Service, Department of Government Efficiency, and Amy Gleason (collectively, "Defendants"), respond to Plaintiffs' First Set of Interrogatories as follows:

**Objections to Instructions**

1. Defendants object to all Plaintiffs' instructions, and Instruction No. 1 in particular, to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure.

2. Defendants object to Instruction No. 7 to the extent that it is both inconsistent with the dates set forth in specific interrogatories and to the extent the phrase "complete responses" is vague and ambiguous. Unless otherwise indicated, Defendants will specify the dates relevant to each response to a particular interrogatory in any response to that interrogatory.

**Objections to Definitions**

1. Defendants object to Definition No. 6 to the extent it refers it to a "Department of

1

Government Efficiency," which is not the name of any government agency or entity. Defendants will construe definition No. 6 to refer to the United States DOGE Service and the U.S. Doge Service Temporary Organization.

2. Defendants object to Definition No. 7 as vague and ambiguous, as it refers to any individual who could be said to work on the undefined "DOGE agenda" or "otherwise works or worked for DOGE." Defendants also object to the Definition No. 6 on the grounds that the inclusion of "volunteers" within its scope is vague and ambiguous. Defendants further object to Definition No. 7 as vague and ambiguous to the extent it refers to "any persons working, directly or indirectly, in concert with" any of the other individuals subject to the definition. Defendants will construe the term to include any individual who has or had a formal employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization (collectively "USDS"), whether in a paid or unpaid capacity.

3. Defendants object to Definition No. 9 and 10 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.  With respect to Definition No. 9, Defendants will not provide phone numbers for former employees or address their potential employment outside of Defendant agencies.

4. Defendants object to Definition No. 10 on the ground that it is overbroad and not proportional to the needs of the case because it includes, among other individuals, all of Defendants' thousands of current and former employees regardless of their position and regardless of their involvement in the events giving rise to the claims or defenses in these cases. Defendants will construe this definition, and the requests generally, to be limited to seek information from persons who are reasonably likely to have information relevant to the claims or defenses in these cases and responsive to Plaintiffs' interrogatories.

2

**Objections to All Interrogatories**

1. Defendants object to Plaintiffs' interrogatories because discovery is inappropriate, inefficient, and unduly burdensome because, for the reasons set forth in Defendants' motion to dismiss, the court has no jurisdiction over Plaintiffs' claims and the material facts are undisputed and Plaintiffs' claims thus present pure questions of law. *See also* Pls. Request for Leave to File Mot. for Partial Summ. J. at 2, ECF No. 159.

2. Defendants object to Plaintiffs' interrogatories to the extent that they seek information protected against disclosure by: (a) the attorney work product doctrine; (b) the attorney-client privilege; (c) the deliberative process privilege, the joint defense privilege, the common interest privilege, the law enforcement privilege, or the state secrets privilege; (d) any other form of executive privilege; or (e) any other applicable privilege or protection.

3. Defendants do not waive, and hereby expressly reserve their rights to assert any and all objections to the admissibility of such responses into evidence at the trial of this action, or in any other proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, and privilege. Further, Defendants make the responses herein without in any manner implying or admitting that the discovery requests are relevant or material to the subject matter of this action.

4. Defendants object to these interrogatories to the extent that they seek information protected against disclosure by the Privacy Act, *see* 5 U.S.C. § 552a, and the privacy interests and expectations of persons not party to this litigation.

5. Defendants object to any discovery taking place in this case to the extent Plaintiffs assert cognizable claims seeking review of governmental agency action, including claims under Administrative Procedure Act, because resolution of any such claims should be based upon the

3

"administrative record" in this case. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That said, Defendants understand that the Court has allowed discovery to proceed. Thus, while preserving their broad objection to any and all discovery, Defendants make further specific objections stated below.

5. Defendants incorporate all of the foregoing objections in each of the responses below regardless of whether a specific objection is reasserted with respect to a specific interrogatory. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that interrogatory. Moreover, the assertion of the same, similar, or additional objections in response to a specific interrogatory does not waive, limit, or modify any of Defendants' general objections or similar or separate specific objections raised in response to an interrogatory.

6. Defendants expressly reserve the right to supplement, clarify, review, or correct any or all of the responses and objections here, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

## Objections and Responses to Specific Interrogatories

**Interrogatory No. 3**: Identify the individual(s) responsible for creating, operating, or maintaining the www.doge.gov website, including all pages on the website, from its creation date through March 31, 2025. If the individual(s) responsible for operating the website changed during this time frame, indicate the person(s) responsible and the date(s) on which they were responsible.

**Objections**: Defendants incorporate by reference all objections set forth elsewhere in these Responses.  Defendants can only answer with respect to individuals who work or worked as officers or employees of USDS, and not any other agencies. Subject to and without waiving the foregoing objections, Defendants respond as follows:

**Response**:  Kyle Schutt, a GSA employee detailed to USDS on January 22, 2025, set up the www.doge.gov website on the week of January 20, 2025.  Shortly after the creation of the website, the General Services Administration ("GSA") took over the operations and maintenance of the website to provide a service to collect and update information for all agency DOGE teams and USDS.  Ed Coristine, a GSA employee, was responsible for oversight of the website and oversight of GSA employees involved in its operation and maintenance. USDS does not have knowledge about any other individual or individuals at GSA who might have been responsible for the tasks listed above once GSA took over operation and maintenance of the website.

**Interrogatory No.** 4: Identify the individual(s) responsible for creating, operating, maintaining, or posting on DOGE's social media accounts, including DOGE's X account [user name: @doge], from the account(s) creation date through March 31, 2025. If the individual(s) responsible for operating the social media account(s) changed during this time frame, indicate the person(s) responsible and the date(s) on which they were responsible.

**Objections**: Defendants incorporate by reference all objections set forth elsewhere in these Responses, in particular to the definition of "DOGE." Defendants can only answer with respect to individuals who work or worked as officers or employees of USDS, and not any other agencies. Subject to and without waiving the foregoing objections, Defendants respond as follows:

5

**Response**: Steve Davis was a USDS employee.  He was also detailed to GSA on January 28, 2025.  He established the @DOGE X account the week of January 20, 2025 and then operated the @DOGE account as a GSA representative once it transitioned to GSA.  Similar to the www.doge.gov website, GSA offered to run the X account as a service, to allow for updates from all agency DOGE teams and from USDS.  Kyle Schutt also posted occasionally to the X account, especially in January/February 2025. To the extent Mr. Davis supervised other GSA employees in connection with this task, USDS does not have knowledge about any other individual or individuals at GSA who might have been responsible for the tasks listed above once GSA took over operation and maintenance of the website.

USDS also has a US DOGE Service X account (@USDS), an Instagram account, and a LinkedIn Account that existed as part of US Digital Service prior to January 20, 2025 and transitioned to US DOGE Service the week of January 20, 2025.  These accounts were run by Allison Witty from January 20, 2025 until February 14, 2025.  Kendall Lindemann, Kyle Schutt, and Amy Gleason were also given access during the time period at issue in this interrogatory but did not actively post.

**Interrogatory No.** 5: Identify:

a.  the individual(s) to whom the responses on the form accessed at https://doge.gov/join are sent after the form is submitted;

b.  the individual(s) who is responsible for use of information provided by responders to the form accessed at https://doge.gov/join; and

c.  the steps taken after receipt of a form submitted through https://doge.gov/join and how the information provided by responders on that form is used.

6

**Objections**: Defendants incorporate by reference all objections set forth elsewhere in these Responses. Defendants can only answer with respect to individuals who work or worked as officers or employees of USDS, and not any other agencies. Subject to and without waiving the foregoing objections, Defendants respond as follows:

**Response**: During the time period from January 20, 2025 to January 26, 2026:

a. Responses to the form accessed at https://doge.gov/join are sent to Emily Bryant and Kendall Lindemann, both USDS employees, after the form is submitted. Emily Bryant was also detailed to GSA and primarily accessed the form responses in connection with her duties at GSA.

b. Emily Bryant, Kendall Lindemann, and, after June 2026, Kaydee James were responsible for taking action with respect to all the applicants coming in from the form accessed at https://doge.gov/join and from https://usds.gov/apply.

c. Once an application was received through the form accessed at https://doge.gov/join, Emily Brant or Kendall Lindemann would email applicants at the email address they provided in their application and ask them to set up an interview if they determined that the applicant was a fit either for the U.S. DOGE Service itself or for an agency who was looking for DOGE staff to hire directly into their agency as employees. If the initial conversation went well, further interviews were scheduled by USDS or the applicable agency that was hiring.

**Interrogatory No. 6:** Describe DOGE personnel's use of third-party server Cloudflare with respect to any documents or data held by USAID to which DOGE personnel had access and subsequently sent to or shared with Cloudflare.

**Objections**: Defendants incorporate by reference all objections set forth elsewhere in these Responses, in particular to the definitions of "DOGE" and "DOGE personnel." Defendants

7

can only answer with respect to individuals who work or worked as officers or employees of USDS, and not any other agencies. Subject to and without waiving the foregoing objections, Defendants respond as follows:

**Response**:  To the best of Defendants' knowledge, after a reasonable search, USDS did not use third-party server Cloudflare with respect to any documents or data held by USAID to which USDS personnel had access and subsequently sent to or shared with Cloudflare at any time between January 20, 2025 and January 26, 2026, the date Plaintiffs served these interrogatories.


As to the responses, see attached Verification.

As to the objections:

Dated: February 25, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General, Civil Division

                                            DIANE KELLEHER
                                            Director, Federal Programs Branch

                                            CHRISTOPHER R. HALL
                                            Assistant Branch Director, Federal Programs Branch

                                            */s/ Christopher M. Lynch*

                                            CHRISTOPHER M. LYNCH
                                            (DC Bar No. 1049152)
                                            JACOB S. SILER (DC Bar No. 1003383)
                                            JAMES J. WEN (NY Bar No. 5422126)
                                            *By Special Appearance*
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street NW
                                            Washington, DC 20005
                                            Phone: (202) 353-4537

8

Email: christopher.m.lynch@usdoj.gov

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing interrogatory responses of the United States DOGE Service, Department of Government Efficiency, and Amy Gleason to Plaintiffs' First Set of Interrogatories, dated October 7, 2025, are true and correct, to the best of my knowledge based on information that was made known to me in the course of my official duties.

Dated: February 25, 2025

                                                                   
Amy Gleason

10

# Exhibit 9

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| J. DOE 4, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>United States DOGE Service, *et al.*,<br><br>    *Defendants*. | Case No. 8:25-cv-00462-TDC |

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' THIRD SET OF INTERROGATORIES TO DEFENDANTS UNITED STATES DOGE SERVICE, DEPARTMENT OF GOVERNMENT EFFICIENCY, AND AMY GLEASON**

Defendants United States DOGE Service, Department of Government Efficiency, and Amy Gleason (collectively, "Defendants"), respond to Plaintiffs' Third Set of Interrogatories as follows:

**Objections to Instructions**

1. Defendants object to all Plaintiffs' instructions, and Instruction No. 1 in particular, to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure.

2. Defendants object to Instruction No. 7 to the extent that it is both inconsistent with the dates set forth in specific interrogatories and to the extent the phrase "complete responses" is vague and ambiguous. Unless otherwise indicated, Defendants will specify the dates relevant to each response to a particular interrogatory in any response to that interrogatory.

**Objections to Definitions**

1. Defendants object to Definition No. 4 as vague and ambiguous and as purporting to

1

impose obligations beyond those established by the Federal Rules of Civil Procedure to the extent it refers to a "general course of action the specifics of which can be determined later."

2. Defendants object to Definition No. 5 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.

3.Defendants object to Definition No. 7 to the extent it refers it to a "Department of Government Efficiency" and a "U.S. DOGE Temporary Service," neither of which is the name of any government agency or entity. Defendants will construe definition No. 7 to refer to the United States DOGE Service and the U.S. DOGE Service Temporary Organization.

4. Defendants object to Definition No. 8 as vague and ambiguous and overbroad, as it refers to any individual who could be said to be "consulting[,] working on or implementing" the undefined "DOGE agenda" or "affiliated in any way with DOGE." Defendants further object to Definition No. 8 as vague, ambiguous, overbroad, and outside of Defendants' knowledge to the extent it purports to incorporate "anyone who has been granted access by USAID to USAID records for the purpose of implementing" the undefined "DOGE agenda[.]" Defendants further object to Definition No. 8 as vague and ambiguous and overbroad to the extent it refers to "any persons working, directly or indirectly, in concert with" any of the other individuals subject to the definition. Defendants will construe the term to include any individual who has or had a formal employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization, whether in a paid or unpaid capacity.

5. Defendants object to Definition No. 9 as vague and ambiguous to the extent it refers to "any individual assigned or detailed to any government agency to fulfill" the undefined "DOGE agenda," to the extent it uses the undefined term "to fulfill," and to the extent it refers to individuals who "otherwise worked at DOGE." Defendants further object to Definition No. 9 as

2

overbroad to the extent it purports to encompass any individual who did not do any work involving USAID.

6. Defendants object to Definition No. 10 and 11 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure. With respect to Definition No. 10, Defendants will not provide phone numbers for former employees or address their potential employment outside of Defendant agencies.

7. Defendants object to Definition No. 14 on the ground that it is overbroad and not proportional to the needs of the case because it includes, among other individuals, all of Defendants' current and former employees regardless of their position and regardless of their involvement in the events giving rise to the claims or defenses in these cases. Defendants will construe this definition, and the requests generally, to be limited to seek information from persons who are reasonably likely to have information relevant to the claims or defenses in these cases and responsive to Plaintiffs' interrogatories.

### Objections to All Interrogatories

1. Defendants object to Plaintiffs' interrogatories because discovery is inappropriate, inefficient, and unduly burdensome because, for the reasons set forth in Defendants' motion to dismiss, the court has no jurisdiction over Plaintiffs' claims and the material facts are undisputed and Plaintiffs' claims thus present pure questions of law. *See also* Pls. Request for Leave to File Mot. for Partial Summ. J. at 2, ECF No. 159.

2. Defendants object to Plaintiffs' interrogatories to the extent that they seek information protected against disclosure by: (a) the attorney work product doctrine; (b) the attorney-client privilege; (c) the deliberative process privilege, the joint defense privilege, the common interest privilege, the law enforcement privilege, or the state secrets privilege; (d) any other form of

3

executive privilege; or (e) any other applicable privilege or protection.

3. Defendants do not waive, and hereby expressly reserve their rights to assert any and all objections to the admissibility of such responses into evidence at the trial of this action, or in any other proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, and privilege. Further, Defendants make the responses herein without in any manner implying or admitting that the discovery requests are relevant or material to the subject matter of this action.

4. Defendants object to these interrogatories to the extent that they seek information protected against disclosure by the Privacy Act, *see* 5 U.S.C. § 552a, and the privacy interests and expectations of persons not party to this litigation.

5. Defendants object to any discovery taking place in this case to the extent Plaintiffs assert cognizable claims seeking review of governmental agency action, including claims under Administrative Procedure Act, because resolution of any such claims should be based upon the "administrative record" in this case. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That said, Defendants understand that the Court has allowed discovery to proceed. Thus, while preserving their broad objection to any and all discovery, Defendants make further specific objections stated below.

6. Defendants incorporate all of the foregoing objections in each of the responses below regardless of whether a specific objection is reasserted with respect to a specific interrogatory. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that interrogatory. Moreover, the assertion of the same, similar, or additional objections in

response to a specific interrogatory does not waive, limit, or modify any of Defendants' general objections or similar or separate specific objections raised in response to an interrogatory.

7. Defendants expressly reserve the right to supplement, clarify, review, or correct any or all of the responses and objections here, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

### Objections and Responses to Specific Interrogatories

**Interrogatory No. 7**: Identify every individual who has served as DOGE Administrator or as the functional head of DOGE, and every individual who has served as USDS Administrator or as the functional head of USDS, including in an acting capacity, since January 20, 2025, and the dates served in that capacity. As part of this response, identify all individuals with authority to hire or terminate employment of DOGE personnel since January 20, 2025.

**Objections**: Defendants incorporate by reference all objections set forth elsewhere in these Responses, in particular to the definition of "DOGE" and "DOGE Administrator," the latter of which is not a position that exists in the United States government. Defendants further object to the use of the phrases "USDS" and "USDS Administrator" as used in this Interrogatory as vague and ambiguous, as Plaintiffs' interrogatories do not define these terms. For purposes of this response, Defendants construe "USDS" to refer to the United States DOGE Service and "USDS Administrator" to refer to the position of the Administrator of the United States DOGE Service. Subject to and without waiving the foregoing objections, Defendants respond as follows:

5

**Response:** Ted Carstensen served as Deputy Administrator of the U.S. DOGE Service ("USDS") from January 20, 2025, until his departure on February 6, 2025. During that period, Mr. Carstensen appears to have served as Acting Administrator of USDS, since no other individual was designated Acting Administrator. During this period Steve Davis was the highest-ranking political appointee at USDS and served as the functional head of the entity. Mr. Davis also served as the functional head of USDS from Mr. Carstensen's departure on February 6, 2025, until February 18, 2025. On February 18, 2025, Amy Gleason began serving as Acting Administrator of USDS. Ms. Gleason continues to serve in that capacity.

The Administrator of USDS has authority to hire or terminate employees of USDS. The Administrator of USDS reports to the White House Chief of Staff and the President. See Exec. Order 14210, Implementing the President's "Department of Government Efficiency" Workforce Optimization Rule (Jan. 20, 2025). Accordingly, both the White House Chief of Staff and the President also have authority over employment decisions in USDS, which sits within the Executive Office of the President.

With respect to individuals serving on agency DOGE teams, authority to hire or terminate the employment of such individuals rests with each agency. Were an employee of USDS detailed to an agency, that agency would have authority to supervise the work of the detailee, to assign or remove the detailee from a project at the agency and work at the agency, and to recommend removal of the employee from federal service. The ultimate ability to remove a detailee from federal service rests with a given employee's home agency of employment, rather than the agency to which that federal employee is detailed.

As to the responses, see attached Verification.

As to the objections:

Dated: March 31, 2026                    Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General, Civil Division

                                         DIANE KELLEHER
                                         Director, Federal Programs Branch

                                         CHRISTOPHER R. HALL
                                         Assistant Branch Director, Federal Programs Branch

                                         */s/ Christopher M. Lynch*

                                         CHRISTOPHER M. LYNCH
                                         (DC Bar No. 1049152)
                                         JACOB S. SILER (DC Bar No. 1003383)
                                         JAMES J. WEN (NY Bar No. 5422126)
                                         *By Special Appearance*
                                         Trial Attorney
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L Street NW
                                         Washington, DC 20005
                                         Phone: (202) 353-4537
                                         Email: christopher.m.lynch@usdoj.gov

7

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing interrogatory responses of the United States DOGE Service, Department of Government Efficiency, and Amy Gleason to Plaintiffs' Third Set of Interrogatories are true and correct, to the best of my knowledge based on information that was made known to me in the course of my official duties.

Dated: March 31, 2026

Amy Gleason

8

# Exhibit 10

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


J. DOE 4, et al., individually and

on behalf of all others similarly

situated,

        Plaintiffs,

v.                  Case No. 8:25-cv-00462-TDC

ELON MUSK, et al.,

        Defendants.

_____


30(b)(6) VIDEOTAPED DEPOSITION OF

UNITED STATES DEPARTMENT OF STATE BY

ADAM KORZENIEWSKI

DAY 1 AND DAY 2


TAKEN ON

THURSDAY, MARCH 26, 2026 AT 10:05 A.M.

FRIDAY, MARCH 27, 20206 AT 11:06 A.M.


WINSTON AND STRAWN LLP

1901 L STREET NORTHWEST

WASHINGTON DC 20036

Page 2

APPEARANCES

Appearing on behalf of the Plaintiffs, J. Doe 4, et al.:

ANDREW H. WARREN, ESQUIRE

State Democracy Defenders Fund

600 Pennsylvania Avenue SE, Suite 15180

Washington DC 20003

(202) 594-9958

andrew@democracydefenders.org

Appearing on behalf of the Plaintiffs, J. Doe 4, et al.:

REBECCA STEVENS, ESQUIRE

JOAQUIN GONZALEZ, ESQUIRE

Marziani Stevens and Gonzalez PLLC

1533 Austin Highway, Suite 102-402

San Antonio, Texas 78218

(210) 343-5604

BStevens@msgpllc.com

JGonzalez@msgpllc.com

Page 3

APPEARANCES CONTINUED

Appearing on behalf of the Plaintiffs, J. Doe 4, et al.:

ANDREW SILBERSTEIN, ESQUIRE (via Zoom)

Marziani Stevens and Gonzalez PLLC

1533 Austin Highway, Suite 102-402

San Antonio, Texas 78218

(210) 343-5604

ASilberstein@msgpllc.com

Appearing on behalf of the Plaintiffs, J. Doe 4, et al.:

RICHARD M. HEIMANN, ESQUIRE (via Zoom)

NICOLE RUBIN, ESQUIRE (via Zoom)

Lieff Cabraser Heimann and Bernstein LLP

275 Battery Street, 29th Floor

San Francisco, California 94111

(415) 956-1000

rheimann@lchb.com

nrubin@lchb.com

Page 4

APPEARANCES CONTINUED

Appearing on behalf of the Defendants, Elon Musk, et al.:

JACOB S. SILER, ESQUIRE

CHRISTOPHER M. LYNCH, ESQUIRE

U.S. Department of Justice - Civil Division

1100 L Street NW

Washington DC 20005

(202) 353-4537

Jacob.S.Siler@usdoj.gov

Christopher.M.Lynch@usdoj.gov

Also Present:

Maya Cook, Legal Program Associate, State Democracy Defenders Fund (via Zoom)

Melody Dodoo, Intern, State Democracy Defenders Fund

Jehieli Luevanos-Ovalle, Paralegal, State Democracy Defenders Fund

Max Mathew, Legal Advisor, State Department

Michael Tierney, Legal Advisor, State Department

Jess Bryan, Naegeli Technician

Page 5

EXAMINATION INDEX

PAGE

EXAMINATION BY MS. STEVENS                    9

CONTINUED EXAMINATION BY MS. STEVENS        234

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Page 6

EXHIBIT INDEX

| EXHIBIT | | PAGE |
|---|---|---|
| 1 | NOTICE OF INTENT TO TAKE DEPOSITION | 15 |
| 2 | PRESIDENTIAL ACTIONS | 38 |
| 3 | REEVALUATING AND REALIGNING US FOREIGN AID | 80 |
| 4 | CALENDAR 2025 | 87 |
| 5 | EMAIL MAKE THAT CALL | 142 |
| 6 | EMAIL USAID | 145 |
| 7 | EMAIL IMPENDING USAID PERSONNEL ACTIONS | 182 |
| 8 | EMAIL ADDITIONAL DOGE TEMP BADGE | 186 |
| 9 | EMAIL ACTION MEMO TO SECRETARY | 189 |
| 10 | ELON X POST | 217 |
| 11 | EMAIL PHYSICAL AND LOGICAL ADMIN FOR GAVIN | 218 |
| 12 | BRIAN MCGILL EMAIL CHAIN | 245 |
| 13 | USAID ERICA CARR EMAIL CHAIN | 263 |
| 14 | GMAIL KIRSTEN GUNSOLUS EMAIL CHAIN | 266 |
| 15 | PETER MAROCCO EMAIL CHAIN | 269 |
| 16 | PETER MAROCCO APPOINTMENT AS AN OFFICER | 272 |
| 17 | USAID ACTION MEMO FOR SECRETARY OF STATE RUBIO | 289 |

Page 7

EXHIBIT INDEX CONTINUED

| EXHIBIT | | PAGE |
|---|---|---|
| 18 | WHISTLEBLOWER AID US COMMITTEE ON FOREIGN AFFAIRS | 308 |
| 19 | DAVID NATION EMAIL CHAIN | 291 |
| 20 | MARCO RUBIO POST | 299 |
| 21 | USAID NOTIFICATION OF ADMINISTRATIVE LEAVE | 339 |
| 22 | USAID FINAL MISSION | 343 |
| 23 | CONGRESSIONAL NOTIFICATION TRANSMITTAL LETTER | 345 |
| 24 | SECRETARY OF STATE NOTES | 355 |
| 25 | UNCLASSIFIED ACTIVITY MEMO FOR ERIC UELAND | 367 |

Page 8

30(b)(6) VIDEOTAPED DEPOSITION OF
UNITED STATES DEPARTMENT OF STATE BY
ADAM KORZENIEWSKI
TAKEN ON
THURSDAY, MARCH 26, 2026
10:05 A.M.

THE VIDEOGRAPHER:  We are on the record. The time is 10:05 a.m.  The date is March 26, 2026. This is the beginning of the deposition of Adam Korzeniewski.  The case caption is J. Doe 4 et al versus Elon Musk et al.

Will Counsel introduce yourselves and state whom you represent?

MS. STEVENS:  Beth Stevens for the plaintiffs.

MR. GONZALEZ:  Joaquin Gonzalez for the plaintiffs.

MR. WARREN:  Andrew Warren for the plaintiffs.

MS. LUEVANOS:  Jehieli Luevanos for the plaintiffs.

MR. SILER:  Jacob Siler for the defendants.

MR. LYNCH:  Chris Lynch for the

Page 9

defendants.

MR. TIERNEY:  Michael Tierney for defendants.

MR. MATHEW:  Max Mathew for defendants.

THE VIDEOGRAPHER:  The court reporter will now swear in the witness.

THE REPORTER:  Mr. Korzeniewski, please raise your right hand.  Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MR. KORZENIEWSKI:  So help me God, yes.

THE REPORTER:  All right.  You may proceed.

MS. STEVENS:  Great.

ADAM KORZENIEWSKI, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MS. STEVENS:

Q.  Good morning.

A.  Good morning.

Q.  Could you please state your full name for the record?

A.  Sure.  Adam Michael Korzeniewski.  Tell me

ADAM KORZENIEWSKI                        March 26, 2026                        10 to 13
95350                                                                          30(b)(6)

Page 10

if I'm speaking too loud.

Q. Sounds great to me. She'll let us know if we --

A. Okay.

Q. -- need to tone things up or down for people.

A. Yeah.

Q. So my name is Beth Stevens. Today is the first time we've met; is that correct?

A. That's correct.

Q. Great. So to start the deposition we'll go over a few background rules and expectations for the deposition, then we'll talk about your background a little bit, and then we'll move into the substance of why you're here today. Does that sound like a good plan?

A. Yes.

Q. Great. Have you had your deposition taken before?

A. No.

Q. You hesitated a little bit.

A. Well, I just couldn't remember if I did a deposition or what I have done before, so.

Q. Understood, understood. All right. Well, there are a few ground rules for the deposition

Page 11

which our court reporter hinted at one of them. I'll just go over those now. One is if you'll let me finish asking my question before you start answering, even if you anticipate where I'm going, I will try to do the same when you answer your -- make your answers for the record. Does that sound good?

A. Sounds good.

Q. Okay, great. Our court reporter is taking down everything that you say so your answers have to be out loud, so a yes or a no versus a -- a shake of the head or a nod of the head. Does that sound good?

A. Yes.

Q. Thank you. If you don't understand a question that I ask, if you will ask me to rephrase it that would -- will help us make sure that you only answer questions that you understand. Does that make sense?

A. Yes.

Q. If you answer the question as posed, I will assume that you understood that question. Does that also make sense?

A. Yes.

Q. You understand that you're here today on behalf of the United States -- let's see -- Agency

Page 12

for International Development, also known as USAID or U-S-A-I-D. Do you understand that?

A. Yes.

Q. And that your answers today are on behalf of the organization.

A. Yes.

Q. You've been sworn in, which of course means that you're under oath today. You recognize the obligation to tell the truth. Yes?

A. Yes.

Q. All right. Is there any reason that you cannot tell the truth fully and accurately today?

A. No.

Q. If you need to take a break while we go through the deposition, that's totally fine, if you'll just answer the last question that I posed before we take the break so that the record can remain intact. Does that make sense?

A. Sounds good.

Q. And you'll let me know if you need a break.

A. Sounds good.

Q. Okay.

A. Or yes. Pardon me.

Q. The other --

Page 13

A. Less ambiguity.

Q. I'm sorry?

A. Less ambiguity.

Q. The attorneys in the room, especially Mr. Siler to your left, might have objections to a question that I pose. Unless he instructs you not -- instructs you not to answer that question, you'll go ahead and answer the question even though there's been an objection lodged. Do you understand that?

A. Yes.

Q. And then lastly, the -- Mr. Siler might make an objection based on privilege. We've worked out -- the attorneys have worked out a process by which you can -- you can actually answer questions that are claimed by the DOJ to be subject to that privilege, and we'll go through that process if and when we need to get there.

A. Yes. Or, I understand.

Q. Thank you. All right. Do you have any documents in front of you today?

A. Yes. I have a handy-dandy binder that I believe my Justice friends have for you.

MS. STEVENS: Thank you. Mr. Siler handed me what I assume is a full copy of the binder that's in front of the witness.

ADAM KORZENIEWSKI                    March 26, 2026                    14 to 17
95350                                                                  30(b)(6)

Page 14

MR. SILER: Correct. I made that binder myself. So with the mild reservation that I might have made an unintentional error, it is intended to be exactly the same. If that comes up, we can address that.

MS. STEVENS: Okay, great. And give me just a few minutes to just glance through it, and then I'll start asking you some more questions, okay?

THE DEPONENT: Yeah, take your time.

MR. SILER: I can represent to you that those are all documents that are either, you know, discovery responses or have been produced in this case prior to today.

MS. STEVENS: Okay, great.

If there is not -- if there is not a document behind a number, is that --

MR. SILER: That's intentional.

MS. STEVENS: Intentional. Is that because it's privileged for a reason, or --

MR. SILER: Nothing is being withheld for privilege --

MS. STEVENS: Okay.

MR. SILER: -- that, you know, is in his binder that wouldn't be in your binder, but more

Page 15

than that I'm not going to get into like how the binder was constructed, although you can ask him about his knowledge of that.

MS. STEVENS: Okay. Well, let's do this, let's make this binder Exhibit 1. Can we go ahead and do that?

THE REPORTER: Okay. Marking as Exhibit 1.

MS. STEVENS: Great.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MS. STEVENS:

Q. And let's -- let's talk a little bit about your preparation for the deposition. I'm sure we'll get to this binder.

A. Absolutely.

Q. Can you talk to me about what you did to prepare for the deposition?

A. I spent hours with the lawyers and read through hundreds of memos and emails, and I think that's it, basically the -- and executive orders.

Q. Did you talk with anyone besides the attorneys for the Department of Justice in preparation for the deposition?

A. I did speak briefly with Jeremy Lewin.

Page 16

Q. Did you speak with anyone else besides the attorneys for the Department of Justice or Mr. Lewin to prepare for your deposition?

A. The gentleman from State Department over here. They were present in the room.

Q. They were present in the room for which conversation?

A. Oh, for the preparation with the Department of Justice.

Q. Understood. Would you just say out loud the -- since she's taking down the testimony --

A. Oh, I apologize. So Michael Tierney is one, and I'm sorry, I'm just drawing a blank on names.

MR. MATHEW: Max Mathew.

THE DEPONENT: Max Mathew.

BY MS. STEVENS:

Q. Max Mathew was also in the room, okay.

A. Yes.

Q. Was Mr. Lewin part of that conversation or was that a separate conversation with him?

A. The way I would understand it is like there was the four of them at different parts. Obviously folks had to go take -- use bathroom breaks, grab lunch periodically, but Jeremy Lewin

Page 17

would come in -- came in for the course of like a half hour or 45 minutes to my knowledge, you know. We just talked about a couple of things that he was involved in.

Q. Just to make sure I get it fully understood in my head, was that you had one meeting that included Mr. Siler, Mr. Lynch, the other two gentlemen that you've identified, and Mr. Lewin just with people coming in and out of the room at various times?

A. Yes.

Q. Okay, great. Was there -- is that the only meeting that you've had to prepare for the deposition?

A. No. There was -- it was a course of two days that we had, plus also just general review of the publicly available material on this case.

Q. Did you talk with anyone besides the gentlemen that you have articulated so far in preparation for your deposition?

A. No.

Q. Let's talk about your background a little bit before we get into these documents. Could you describe your educational background for me?

A. I attended undergraduate education at

Page 18

Columbia University. I started but I did not complete an executive education at Wharton -- or sorry, University of Pennsylvania at Wharton, for the Securities Industry Institutes. Jeez, I can't even remember what it was about. It's a financial executive certificate, but I didn't stay in the financial services industry and there was no reason for me to continue for the next two years.

And then currently I'm also taking some classes on cyber security management through University of Maryland.

Q. Understood. On the -- so the degree that you articulated was an undergraduate degree; is that correct?

A. Yeah, I attended it. I did not complete either.

Q. Understood. And then on the certificates, you started that program but didn't --

A. Did not.

Q. Okay.

A. Complete.

Q. And are you currently employed?

A. Yes.

Q. Where -- where are you employed?

A. U.S. Department of State.

Page 19

Q. How long have you worked for the State Department?

A. Oh, I'd -- I'd have to take a look at a calendar, but I started February 2026, like the 24th comes to my mind. It would have been the Monday of that week.

Q. So about a month ago?

A. Yeah, about four weeks ago, five weeks ago.

Q. Where did you -- what's your role at the State Department?

A. So I'm the AUKUS liaison, so I work as the senior advisor for AUKUS, because I know it's going to be asked. AUKUS is the trilateral security agreement between Australia, the United Kingdom, and the United States. So I work under the Under Secretary for International Security and Arms Control. So that's what I currently do.

Q. How do you spell AUKUS?

A. A-U-K-U-S.

Q. And what is your -- what would you -- just a brief description of your duties.

A. That's a -- that's a really good question, because it -- I do have like a very broad set of duties, but generally I would categorize did in the

Page 20

more of the advisory capacity, but also a regulatory capacity, likely do regulatory review working with our counterparts in different offices that I can go to if you want me to explain more.

But also I attend meetings on -- when we are working -- doing work in level trilateral meetings. So for example, there's going to be a number of meetings coming up this -- actually, I think it's in April, not this month -- that is going to be trilaterally held between the United States, Australia, and the United Kingdom, but also during meetings with individuals such as like the Counselor of State of the United Kingdom. Like I sit as like an advisor to him when he's speaking with other equity holders such as Department of War, also known as Department of Defense, statutorily. So does that answer your question?

Q. I think so. That -- that's helpful, thank you. Do you report directly to the Under Secretary?

A. Fortunately, yes.

Q. Can you describe that a little more?

A. So -- so he is like my direct super -- would be my direct supervisor, but the person I mostly deal -- interact with would be his chief of staff.

Page 21

Q. Who is his chief of staff?

A. John Zadrozny. That's Z-A-D-R-O-Z-N-Y. I apologize for -- if I got that wrong, but.

Q. Thank you for that.

A. Yeah.

Q. Before you moved up to State, or started working for State in February of 2026, what was your employment before that?

A. I was the White House liaison at USAID -- US -- United States Agency for International Development. Am I allowed to use the short half for you guys?

Q. Yes.

A. Okay.

Q. When were you -- when did you become the White House liaison for USAID?

A. I believe my hire date was January 27th, 2025. My first full day in office was January 30th, 2025.

Q. And how long -- what -- until what date were you the White House liaison for USAID?

A. Just -- it would be the date before I started in State, so if -- if I started on the 20 -- let's say 24th, it would have been the 23rd. So I transitioned from one department to another, or

Page 22

agency to a department.

Q.    Describe for us your duties in the role as White House liaison for USAID.

A.    Yeah.  So this is one of those like more vague positions as a result of -- the title is kind of ambiguous but its primary role of the White House liaison, I don't -- is -- is to basically do hiring, fire, human resource type management for the political appointees at an agency or department.

So any individual who came in after my time there, I was -- I did their hiring or firing paperwork, or their transition paperwork for that matter.  You know, individuals that came in before, another White House liaison took care of it.

And then, so that's like the primary role.  However, we had only 15 politicals at our peak in our front office so I'd periodically do other duties as assigned since in our job descriptions, and I re-wrote that job description for every other political appointee to include the great senior advisor caveat which is other duties as assigned, so.

Q.    What other duties were you assigned?

A.    One of the things that I did was -- it's a little complicated to explain, but typically there's a position -- there's a role for somebody underneath

Page 23

the deputy administrator for policy programming, I can't remember what the title is, where they functionally oversee policy when it comes to regional bureaus.

So I was assigned to interact as a -- the political policy lead for dealing with items related to the -- the regional bureaus of USAID.  So anything where they had concerns coming up or like if I had directives coming down, we'd meet almost daily on items like that.  Yeah, I think that suffices.

Q.    So that covers your other duties as assigned?

A.    Other things that included was, you know, periodically I would function sort of like office manager when other more senior political appointees weren't available.  You know, for example, we had a -- you know, USAID is an agency that does foreign diplomacy, has a foreign mission, had offices overseas.  So when another more senior political appointee would travel overseas, I would oftentimes be the one that's sort of making sure the ship was continued forward inside the office.

So things like if there's an emergency that comes up, that was -- would have been my

Page 24

responsibility to manage that.  What else.  You know, just finding resources in general.  So like -- because I have one of those "choose your own adventure" for lack of a better term.  It's titled Ted Titles, I would kind of assist other political appointees in solving issues, everything from finding pens and paper to, you know, helping -- helping resolve, you know, issues that our comms department would be working on.

So if they needed some sort of knowledge or expertise that I either didn't have or someone that they didn't directly have contact with, I would go find that person in the building just through that.

Other items, sort of a more normative HR function.  For example, and this is a super specific example, but I don't know what to call it.  We -- a number of our persons are victims of Havana syndrome, and a number of individuals also have other similar traumas such as TBIs and such as that, and so as -- as the foreign assistance was moving towards -- to State Department, one of the functions was to make sure that individuals who wanted to submit applications for Havana syndrome's claims department were able to do so, and it was relatively

Page 25

uninterrupted, primarily because the State Department is actually the one that mostly runs most of those functions.

Another instance was we had a -- when we were returning U.S. persons home overseas, you know, U.S. government employees and their loved ones, one of the big issues that came up that wasn't really -- wasn't really something that you would think of as a top issue, was people's pets, for example.

So in order to bring -- repatriate a dog to the United States, they would have to prove levels of vaccinations, chronic care, et cetera.  So typically what the CDC asked for is like a blood panel as well as the certificates of vaccinations.

And so -- but they at periodic -- different times they actually would grant waivers.  So during the -- one of the waives of people PCSing, or permanent change of station, from their duty assignment overseas back to the United States, they would -- they would just periodically just waive certain requirements so it would make it easier, because certain individuals were like based in Africa.  They can't get to a U.S. approved lab.

No one's really -- no one's really -- has the means or time to go to London, sit there for

ADAM KORZENIEWSKI                    March 26, 2026                         26 to 29
95350                                                                       30(b)(6)

Page 26

like two weeks with their dog, and then go home -- go back to Africa to pack themselves up to move back to the United States. So we -- one of the things that I did was I followed up with State Department office that handles that. They actually have an office that handles that kind of stuff, which is -- which surprised me at first.

That person said that they couldn't get another CDC waiver, so because I'm the political appointee, I contacted Health and Human Services, my counterpart there, and I got ahold of one of the Senior Careers at CDC and they were like, yeah, we can grant another waiver. Tell us how long you need and, you know, the only thing that we can't grant waivers for are guinea pigs.

Q.   That is fascinating. The -- so the -- the guinea pig part.

A.   Oh, yeah.

Q.   The rest, I'm glad that that exists. So as far as the sort of choose your own adventure where you just described a very specific example of --

A.   Yeah.

Q.   -- doing that, did that start right when you first became the White House liaison or was it

Page 27

something that developed over time?

A.   It more developed over time, you know, because of the -- the various phases that we went through, and I think that's one of the things we're going to get into with the questions. But it really sort of developed as, you know, these are unusual circumstances and it takes an unusual person to do unusual things. So that was -- that was me and a lot of other colleagues, that we just kind of stepped up into different roles.

You know, for a lot of the career staff, you know, there was a lot of uncertainty so there you had to show some leadership. And so even if it was outside of your purview, even if it's something that you weren't -- like weren't -- wasn't in your specific job description like, you know, if there's some -- if there was nobody else, it was your job to go make sure that things were taken care of.

So, you know, that's the thing is repatriating thousands of Americans from overseas was very hard work, and, you know, I'm actually very proud of the fact that we didn't have a -- like disasters. Like we didn't have any U.S. persons get stopped by local authorities.

We didn't have anybody get lost in

Page 28

transit, to my knowledge, although I haven't really checked in on it in the last couple months. I don't think anybody's stuff got lost, but other household materials. You know, I'm also very proud of the fact that like the team at USAID, that the career staff are D.C. based were able to come together, kind of find creative solutions to an unusual circumstances.

Q.   Could you tell us -- sorry. Could you tell us where in -- well, first of all, what building did you have an office in?

A.   So my first office was in the Ronald Reagan Building. I forget the address off the top of my head, but it's across the street from Commerce.

Q.   Go ahead.

A.   And so USAID does not own all of Ronald Reagan, or did not own all of Ronald Reagan. We had a space that we functioned at least from GSA out of it.

Q.   Did -- where in the -- in the building was your office situated?

A.   It was on the administrator's floor. I'm -- I -- I can't remember the flooring plan, but I think that was 5 or 6, but I was -- I'm -- I was

Page 29

about to start describing it, but like I don't know if it would sort of help.

Q.   I think you said you were in the administrator's floor. Were you in the administrator's suite?

A.   No. So the administrator's suite was like there's a giant conference room and it's -- otherwise it's kind of small. Like it's -- there's a lot of open space but there's not a lot of work stations.

So when you're -- when you're -- now, this is me overexplaining it, but I think it's towards your questions, is when you're facing the -- the door that says Administrator's Office for USAID, to the right is the actual suite. To the front is the conference center doors that are -- when there's more of a -- when there's -- foreign dignitaries come in, that's unlocked for them to come into so that they don't have to walk through the -- the actual office part of the office.

You know, in the back corner in that administrator's suite, the far back corner is the administrator's office itself. And then when you take a look -- going back to that door, that glass door, the last -- you would -- to the left, you

Page 30

would -- there's another door, so you go down that hallway, first right is one of the SCIFs in the building.

You go down a little bit further, the next right would have been one of the -- it would be like the deputy administrators, plural, suites. I have an office in there. There was -- there was a bunch of different offices, like I -- I'm not -- I don't recall who all would sit in there.

And then the final door in that little hallway at the very end was the executive secretary's suite, so like all the people who worked in the executive secretary or ES for short, and plus the executive secretary and all the enabling folks for that would be in that suite.

Q. Understood. Were you -- when you were the White House liaison for USAID, were you technically a -- an employee of USAID or the White House or --

A. I was an employee of USAID.

Q. Okay.

A. So, and that's -- that's very typical. I -- I was a White House liaison in the Trump 45 administration, and that also comported -- that also was the case for White House liaisons in Biden 46, so my knowledge everything before my time in 47 --

Page 31

45.

Q. That brings up a good point. Can you very briefly go over your work history between the time that you were White House liaison and when you were -- completed or stopped doing the undergrad degree?

A. Sure. I'm going to add extra, because of vanity, for you so apologies in advance. So after high school I joined the Marine Corps, did five years. Was a defense contractor for about a year. Was accepted to Columbia University, attended school there. Interned at a number -- number of places in finance ministry.

Then after that I got -- I got the political bug, you know, so as I joke I took my vow of poverty to work in politics and policy. I worked on a number of campaigns. I actually helped consult for a number of campaigns.

So come 2020 I got extremely frustrated by politicians, you know, apologies, but the -- you were with the Florida guy, right?

Q. Let's talk about it on a break.

A. Yeah. So the -- I mean it in a positive way.

Q. No, yeah, I didn't -- we are -- we are timed on our --

Page 32

A. Oh, so --

Q. -- our conversation, so that's why --

A. Yeah, yeah, I gotcha.

Q. -- we only have so much time to talk.

A. I didn't mean to be insulting, that's my point.

Q. No, it's all right.

A. So the -- so I decided to take the safest job I could ever imagine, so I go -- went to go work for the 2020 Census. And then I get a phone call some time into it asking if I would be interested in a political appointment, I so go work for the Secretary of Commerce at the time as a senior advisor in his office, working on a number of issues to include the census.

Took a short jaunt at the Census Bureau. Then I became the White House liaison at the Treasury Department. After that I went to Dallas, Texas. I worked for a media startup company. That didn't go very far, so I went into conservative nonprofit world. I worked for folks like Don Huffines.

I then left that. I was approached to go back to D.C. for another conservative nonprofit. I wanted to create my own firm for political risk

Page 33

advisory, so I left that and that didn't go very far. It was, you know, lessons learned. Failure is a good teacher, but meanwhile to pay bills I was a defense contractor.

And I'm happy to explain the defense contracting.

Q. What's the company you worked for?

A. It's called DarkStar. They did surveillance, countersurveillance, instruction for the Joint Counterintelligence Training Academy down in Quantico, Virginia. I didn't actually work down in Quantico, so my -- all over your trades. Like I worked out of Quantico but none of the courses were at Quantico. They're largely actually out of town. So like I -- we'd play spy -- spy, running around here actually.

Q. Here being D.C.?

A. Yeah, like actually this street, in fact, so that -- when -- when I came down -- actually, I don't want to waste your time, sorry.

Q. We'll talk about it on a break, or maybe come back to it. Turning your attention back to your White House liaison duties at USAID, who was your supervisor?

A. That's a -- that's a great question. So

Page 34

at first it was Jason Gray so it's typically whatsoever's the agency or department head, you know. They will periodically put people for various supervisor roles along the way.

I understood that like, you know, while Jason Gray at the -- that initial portion was my boss, like, you know, I still had to report to the chiefs of staff for various day-to-day, things such as a -- just being physically present, but, you know, and as the record shows that that administrator role changed multiple times across that time.

Q. So were you -- so you initially reported to Mr. Gray.

A. Yes.

Q. Who did you report to next?

A. It would be Ken Jackson functionally.

Q. On what date did you start reporting to Mr. Jackson?

A. It would have been January 30th. So it would have been the same day that I basically started. My understanding is that, you know, Jason Gray was removed as acting administrator and Secretary Rubio became it, so -- and practically, I'm not going to report to the Secretary of State,

Page 35

so the next senior person physically in the building would be Ken Jackson.

Q. So -- and is it correct that you didn't report to Mr. Gray at all, or did you report to him for part of the day on the 30th? Or help me work that out.

A. My understanding when I came in there was to check in with Jason Gray, and when I left that building I was told that Jason Gray -- by the time I left the building Jason Gray was in longer acting administrator, so it was a wild ride.

Q. And you say when you left the building you understood Mr. Gray was no longer the acting administrator. Was that on the 30th?

A. Yes.

Q. We're going to get into more --

A. Oh, I left the building actually probably on the 31st. I was there until like 2:00 a.m., so -- but by the conclusion of the day I knew that Jason Gray was no longer acting administrator.

Q. Understood.

A. Maybe it was later that I left.

Q. Pardon?

A. It might have been -- pardon me, sorry. It might have been even even later that I left the

Page 36

building, so.

Q. Later than 2:00 a.m. on the 31st?

A. Yes.

Q. So when you left building then, Mr. -- you understood Mr. Jackson was your supervisor?

A. Yes, he was functionally my supervisor, so he basically the next highest ranking person that was physically present.

Q. And for how long did you -- for how long was Mr. Jackson your supervisor?

A. I would say until February 2026. I basically reported to him on a -- a daily basis.

Q. So even when other personnel were put in place, of the two deputies you still reported to Mr. Jackson?

A. Yes, just because he was physically present in the office every single day and available whenever there was something that I needed from a direct supervisor.

Q. And did you supervise anyone while you were the White House liaison?

A. No. Pardon me?

Q. Did you supervise anyone while you were the White House liaison for USAID?

A. No.

Page 37

Q. Did you have, in that role, a USAID computer?

A. Yes.

Q. Did you have access to USAID digital systems?

A. Currently or --

Q. No, at the time.

A. Yes.

Q. Did you have a badge, a USAID badge?

A. Yes.

Q. On what date were you given that badge?

A. It was either the day I showed up January 30th or the 31st. I can't remember. They gave me a temp badge while they were making my badge, I remember that.

Q. Did you have any communications with anyone at USAID before you showed up on the 31st? Right -- the inauguration was on the 20th, this is --

A. Yeah.

Q. -- ten days later.

A. So once I was -- my hiring was official on January 27th, I contact -- I was put in contact with two of the political appointees there, Tera Dahl and Matt Hopson who was the then chief of staff, just

ADAM KORZENIEWSKI                    March 26, 2026                    38 to 41
95350                                                                  30(b)(6)

Page 38

for -- so that they can arrange for me being let into the building for my first day when I was -- when my HSPD-12 -- I don't know what that stands for, it's like basically the basic allowing you into the building access -- was approved.

Q. Did you have access to classified information at USAID?

A. I have classified briefings, but I never went into the USAID SCIF while it was -- while it was actually a SCIF. Like when it was demobilized or decommissioned, I have been in it, mostly just to inspect when we were giving it over to GSA, but I don't want to belabor that.

But most all my classified items that I dealt with was either at EEOB -- sorry, the Eisenhower Executive Office Building for mutual aid to the National Security Council or State Department.

Q. Thank you. All right. She's got to mark it.

A. Oh, I apologize. I'm getting a little excited here.

THE REPORTER: Marking as Exhibit 2.

(WHEREUPON, Exhibit 2 was marked for identification.)

Page 39

MR. SILER: This is 2?

MS. STEVENS: It's 2, yeah.

BY MS. STEVENS:

Q. Take a sec to look through the exhibit, just let me know if you recognize it.

A. Yes, I recognize it. It's also in the binder that we gave you.

Q. I figured. I didn't see it right at the very beginning, so --

A. There's like a tab for executive orders, but.

Q. We're going to take a break here in a minute and I'm going to look through the binder, and we may not duplicate exhibits much further.

So looking at -- well, actually, could you identify the exhibit for the record, please.

A. Yes. This is Executive Order -- sorry, I don't remember the number off the top of my head. It's probably somewhere on this, but it's an executive order, quote, establishing and implementing the president's Department of Government Efficiency, the executive order -- or end quote, at the government efficiency portion. Dated January 20th, 2025.

Q. Thank you. You're familiar with this

Page 40

executive order; is that correct?

A. I think the camera is not working anymore.

Q. Oh, you are frozen. Could anybody on the other end of this Zoom tell us if you can --

THE TECHNICIAN: Yeah, the -- you guys are frozen.

MS. STEVENS: Okay.

MR. SILER: Do you want to take a break and fix this?

MS. STEVENS: Yeah, let's -- let's do it. I need to look at this binder anyway. Let's go off the record, take a hopefully brief break.

MR. SILER: Sure.

THE DEPONENT: Sounds good.

THE VIDEOGRAPHER: Please stand by. The time is 10:42 and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 10:55 a.m. You may now proceed.

BY MS. STEVENS:

Q. All right. So turning your attention back to Exhibit 2, the executive order that we talked about right before the break, you said that you're familiar with it.

A. Not all of it.

Page 41

Q. Okay. You said you're familiar with the executive order?

A. Yes, and the executive order we're talking about is establishing and implementing DOGE.

Q. I want to turn your attention to section 3C. This -- take -- take a sec to look at it.

A. Yeah.

Q. And then I'll ask you my question. So this part of the order directs the agency head of agencies, right, to establish a DOGE team of four members including a team lead; is that correct?

A. Correct.

Q. And they're -- the agent head is supposed to do that in connection with the USDS administrator; is that correct?

A. Correct.

Q. Did that happen at USAID?

A. To my understanding, yes.

Q. What does that mean, to your understanding?

A. That Jason Gray appointed four detailees from GSA and OPM to be the -- the DOGE team, for lack of a person term.

Q. Let's -- let's unpack that a little bit. When you say your -- to your understanding, you mean

Page 42

to USAID's understanding since you're representing --

A. Yes.

Q. -- the organization.

A. Yeah, and also --

Q. Let me just get the question --

A. I'm sorry.

Q. -- all the way out. It's okay. When you say to your understanding, you mean to the organization's, to USAID's understanding; is that correct?

A. Correct.

Q. Okay. And then what were you going to say?

A. And also my personal understanding.

Q. Okay, thank you. So you said that to USAID's understanding, Mr. Gray appointed a DOGE team.

A. Yes.

Q. Is that correct? Okay. And who were those team members?

A. They were Jeremy Lewin, Clay Cromer, Luke Farritor, and Gavin Kliger.

Q. Were there any other people that you under -- that USAID understands were members of the DOGE

Page 43

team at USAID?

A. The DOGE team members -- other DOGE persons, DOGE related people did come to the building, but they -- to my understanding as USAID and my personal understanding, is that they weren't part of that specific team that were USAID DOGE teams.

Q. We'll circle back to the team. Who were the other DOGE affiliated people who were not part of that team but who came to the building?

A. Steve Davis, the USDS. I believe he worked out of the executive office -- or sorry -- yeah, executive office building, the Eisenhower Building.

Q. Is Mr. Davis the only additional DOGE person that you -- that came besides the DOGE team members?

A. James Burnham who was their general counsel, he also worked out of EEOB to my knowledge. And I -- I think there might have been -- might have been more, but I can't recall at all. They're somewhere in the -- in our items that talk about who had access, but I don't -- they didn't all necessarily come into the building, to my knowledge.

Q. Okay. I have two follow-up questions to

Page 44

that. When you say that Mr. Burnham was their general counsel. Whose general counsel?

A. Apologies. The USDS.

Q. Mr. Burnham was USDS general counsel.

A. Yes.

Q. Okay. And then you said that there's some documentation in the binder in front of you that talks about different levels of access by DOGE team members, but not all of them came into the building. Can you tell me a little more about that?

A. Yeah. I mean, like I'm not trying to be pedantic, but it's just as the question was phrased, is that just because someone had access doesn't mean they necessarily used it.

Q. Okay. Can you give me an example of someone who had access that didn't use it?

A. I would have to refer back to the binder to remember all the names.

Q. The binder in front of you?

A. Yes.

Q. Okay, go ahead.

A. And just for the record, the binder is organized based off of the deposition topics in the -- in the civil action document thing.

Okay. Actually it is tab 8 on -- just

Page 45

past it, the one that I'm -- the document I'm specifically referring to. It is from John Voorhees, V-O-O-H -- sorry, V-O-O-R-H-E-E-S, like the -- yeah, and it was sent on Saturday February 1st, 2025.

Do you need me to go through all the line or --

Q. No, actually a good way to identify these, assuming they all have them, is at the bottom right.

A. Okay.

Q. The last four or five digits of the Bates number is what we call it.

A. Oh, okay. 2600 is the Bates number. So here there's seven people listed. Jeremy Lewin, Luke Farritor, Gavin Kliger, Tarak Makecha, Steve Davis, Noah Peters, James Burnham.

Q. And are these -- are some or all of these people an example that you were talking about that they had access but didn't use it?

A. I don't believe Tarak used the access. I -- I've only -- personally only saw him at State Department, and I only personally saw him once. And I've never -- I wouldn't be able to pick Noah Peters out of a lineup. I don't -- I don't think I've ever seen that person before.

ADAM KORZENIEWSKI                    March 26, 2026                           46 to 49
95350                                                                         30(b)(6)

Page 46

Q.   Sitting here on behalf of USAID, has anyone associated with USAID seen Mr. Peters at the USAID building?

A.   I don't know.  I don't believe so.  I don't have like access logs or -- in front of me or anything like that.

Q.   Did you attempt to get access -- access logs in preparation for this deposition?

A.   I did not, no.

Q.   The -- you talked about the binder being organized in terms of the list of topics for this deposition.  So just -- just to make clear for the record, you have at the front of your binder the notice of this deposition which has as attached as Exhibit A, the -- excuse me -- the topics for USAID; is that correct?

A.   Correct.

Q.   Okay.  And then right behind that you also have the notice for the State Department deposition with -- with those attached topics as well.

A.   Yes, it's according to the USAID topics.

Q.   Got it, okay.  I think there are more numbers here than there are topics, so can you talk me through that a minute?

A.   Yeah.  So there's, for lack of better

Page 47

terms, a -- added items like addendums that may be relevant for topics that might be discussed.  So in this initial document, I apologize I don't know what this is called, the question numbers or topics numbers end at 27.

So this goes on, this binder that we're talking about, goes on to 28, 29, 30, 31, and 32.  Underneath some of these are included, for example this presidential executive order on the DOGE service one, the executive order on realigning AID -- I'm just going to skip around a little bit for the sake of brevity -- Action Memos to and from various individuals who are part of the -- the current team at USAID.

And also the -- I believe this is the deposition or declaration of Jeremy Lewin which constitutes like a big bulk of the -- the last panel of it since -- there's -- anyways, I thought it would be relevant for this discussion.

Q.   Understood.  So the document you have at the front of the deposition is called the notice.

A.   Yeah.

Q.   So just to make it very clear.  The notice has 27 topics for USAID.  You're saying that the numbers 1 through 27 correspond with each of those

Page 48

topics.

A.   Yes.

Q.   Okay, thank you.  So turning your attention to 6, 7, and 8, those tabs, there are no documents behind each of those tabs because you didn't find a document -- let me finish my sentence -- because there were no documents relevant to that topic when you were preparing; is that correct?

A.   Yes.

Q.   Okay, thank you.  The tab 8 in Exhibit 1 that you were just walking me through with the different peoples' names listed, are all of those people that you listed -- they're -- not out loud, but listed on 2600, that's the Bates number, are all of those individuals part of the DOGE team that were not like assigned to USAID?

MR. SILER:  Objection, vague.

You can answer.

THE DEPONENT:  Oh, thank you.

I would -- I would categorize them as -- they would be DOGE and DOGE adjacent.  Like they would be part of that category of persons, but not every single one of these were the DOGE USAID team.

BY MS. STEVENS:

Q.   Which ones are DOGE and which ones are

Page 49

DOGE adjacent?

A.   So the persons that I know for a fact are part of the USDS are Steve Davis, James Burnham.  I don't know enough about Noah Peters to be able to say one way or the other what agency he actually worked for.  I -- once again, I don't think I've ever actually seen him personally, but in terms of USAID, DOGE people was -- at that time on February 1st, 2025, it was Jeremy Lewin, Gavin Kliger, Luke Farritor.  And the days before that it included Clay Cromer.  Tarak Makecha was a state DOGE team.

Q.   Okay.  Would you -- after each person's name, and again you've already read the names out loud, but after each person's name there is a -- an acronym.

A.   Yes.

Q.   Could you -- could you just walk us through those different acronyms please?

A.   Yes.  And this is one of the terms that is -- I think it's important to clarify is that the people who did not belong to the Executive Office of the President, to my understanding are all detailees, whether they are detailed to a different agency or if they were detailed to USAID.

Jeremy Lewin is from the Government

ADAM KORZENIEWSKI
95350

March 26, 2026

50 to 53
30(b)(6)

Page 50

Services Administration, I believe it's administration, which is GSA. He was detailed to USAID. Luke Farritor was from GSA. He was -- I don't -- I'm pretty sure -- I'm almost certain that he was not EOP, at the time at least.

Q. Let me pause you for a sec. You're saying you're almost certain he's not EOP, because it does have EOP/GSA behind his name here?

A. Well, I also remember that he was a detailee was from GSA. Personally, this is -- this is where his home agency was. So Luke Farritor also came from GSA. Gavin Kliger was -- was a detailee from OPM, Office of Personnel Management. And it says USDA there, I don't know if he had additional duties as assigned with the USDA, but to my understanding his home agency was OPM. And Clay Cromer, if I recall correctly, was a GSA employee.

Q. Also detailed to USAID?

A. Yes.

Q. Okay. And then did you say what the EOP stands for?

A. Executive Office of the President. I don't know if that's -- I never worked in the White House. I've never -- I really don't want to. The -- I don't know if EOP is technically correct, but

Page 51

that -- I think that's -- like when you take a look at their email addresses for anybody that works on the White House grounds, it typically has EOP on it, so.

Q. That makes sense, okay. For the detailees, is there a document that -- that gives them their detail to whatever agency they're detailed too, and in this case USAID?

A. Yeah there -- I believe there are detail documents but they're not in this binder, just -- but I'm sure that our Justice colleague friends can find it.

Q. Right. Was there a similar document for your assignment as White House liaison?

A. I had a job description document. So each of these individuals, I'm about to assume that someone did their paperwork correctly at their home agency, so apologies if I'm incorrect, but they should have received a position description from their home agency prior -- when they got onboarded. And then they -- when they became detailees then their job description changes.

Q. The position description you're talking about is for their initial work at their home agency?

Page 52

A. Yes.

Q. And then is there a separate new position description that you get for -- to be a detailee or is there some other --

A. It's in the detail document of like do -- most detail documents are duties as assigned, or roughly thereof, which is -- for the record is like sort of a generalized senior advisor type statement. But I'm -- I'm not familiar enough with their detail documents off the top of my head personally to be able to speak to what their assignments said at various different times.

Q. When a detailee gets detailed, does that -- that document is created by the home agency and then sent to the detailed agency; is that correct?

A. That's not correct according to my understanding. There's documents -- there's a very -- there's a lot of documents. There's -- but there's detail memos that are created at both ends, and then there's a -- sort of a memorandum of understanding of the length of time of the detail, what this person is going to be doing, how they're compensated, and all of that.

Like for example, there's two types of details. This is really getting into the weeds.

Page 53

Paid and unpaid, or not -- it's paid and unpaid, I don't remember the specific terms, but it's whether or not the agency that's received them where they detail is, is reimbursing the home agency for cost of salaries, for example, or some portion of salaries. They don't have to cover a hundred percent.

Q. If it's unpaid, does that mean that the home agency is paying in full the person's salary?

A. Yes.

Q. Okay. And if it's paid, there might be some reimbursement process with the detailed agency.

A. Yes.

Q. Was there a DOGE team lead for USAID?

A. Yes.

Q. And who was that?

A. Jeremy Lewin.

Q. Was he the first DOGE team lead for USAID?

A. To my agency's understanding and myself, yes, and only lead -- team lead.

Q. So after Mr. Lewin moved on to a different role, which we'll get into later, there was no subsequent DOGE team lead designated?

A. Correct, and they're -- the DOGE team ceased to functionally exist.

ADAM KORZENIEWSKI                    March 26, 2026                         54 to 57
95350                                                                      30(b)(6)

Page 54

Q.   After Mr. -- you're saying it ceased to functionally exist after Mr. Lewin moved into his new role?

A.   Yes.

Q.   Okay.  And that was I believe on or about March 18th of 2025; is that correct?

A.   It's definitely sometime mid March, but I would have to refer back to documents.

Q.   What date was Mr. Lewin designated as team lead?

A.   To my understanding as the agency, it was on or about the 30th of January.  And personally, just from my knowledge, he was the lead when I showed up that day on January 30th.

Q.   Does USAID know whether he was designated as team lead before the 30th?

A.   I -- I don't know.  I don't -- I don't have any way to verify that beforehand without asking Mr. Gray.

Q.   Could you ask Mr. Lewin?

A.   I could, yeah, so -- but it's my understanding personally that he was in charge of the DOGE team as of the day that I got there.

Q.   And if we need to know whether he was in charge of the DOGE team before the 30th, you --

Page 55

you'd be able to, on a break, call Mr. Lewin or -- I don't know if you'd talk to Mr. Gray, but you'd be able to track that information down; is that correct?

A.   I probably won't be able to do it over a break because he is extremely busy, but I can send a message to somebody in his office and hope they can catch him.  But I -- I have no way of saying -- be able to give you that information -- guarantee that information today.

Q.   Understood.  And "he" here is Mr. Lewin; is that correct?

A.   That's correct.  Apologies.

Q.   No, that's okay.  Is there a -- a document designating the team lead?

A.   I don't know.  I don't -- I don't think I've ever seen something like that.

Q.   The -- the DOGE EO which we've looked at a couple of times, Exhibit 2.

A.   Yeah.

Q.   That paragraph C that we looked at before says that the agency head will select the DOGE team members in consultation with the USDS administrator.  Who was the USDS administrator as of January 27th, 2025?

Page 56

A.   I do not know.  I think it would have been Steve Davis.

Q.   Did Mr. Davis provide this -- this consultation that is required by the EO to USAID in determining the DOGE team members?

A.   I don't know what the -- their conversations entailed between Mr. Gray and the USDS.

Q.   This is very much part of the topics that are --

A.   Absolutely.

Q.   -- identified, and so would you be able to obtain that information on a break from maybe a conversation with Mr. Davis?

A.   I don't have Mr. Davis' personal phone number.  He's -- to my understanding he's no longer a government employee, but that's something that I'm going to have to refer to my Justice colleagues to find out.  But my understanding is a lot of the communication was verbal, over the phone, so I don't know when that exactly occurred.

Q.   If Mr. Gray testified that -- that there was no DOGE team that he designated, how does -- how does that sit with your understanding of what you described earlier?

Page 57

A.   Well, my understanding was that the DOGE team was the four of them, and Clay Cromer left quite quickly, so.

Q.   But I think earlier you testified that Mr. Gray did that designation in accordance with the DOGE EO.

A.   Yeah.

Q.   But he's testified otherwise, so what is USAID's position on that?

A.   I -- I don't have a position on it as USAID, so.

Q.   You talked about Mr. Davis and that you don't know who was the USDS administrator at the time, but who -- who at USDS was consulted in making the decision about who to make the DOGE team?

A.   The only person that I know of who would have that sort of authority would have been Steve Davis.  There's other people that worked in that office, but I'm not familiar with them that closely or their responsibilities.

Q.   Was Mr. Burnham also in that office?

A.   Yes.  I also -- specifically related to Mr. Burnham, I actually am not entirely sure what his portfolio looked like for work.

Q.   Are you familiar with Amy Gleason being

ADAM KORZENIEWSKI                    March 26, 2026                           58 to 61
95350                                                                        30(b)(6)

Page 58

appointed as the acting administrator of USDS on or about February 25th of 2025?

A. I'm not familiar.

Q. Do you know who Amy Gleason is?

A. The name sounds familiar, but I -- it's going to be just something in passing. That's my personal recollection, but USAID doesn't know.

Q. What -- on the first day that Mr. Lewin arrived at USAID, what was -- what was his role on the first day that he arrived there?

A. I -- there was a -- I would say it's -- like he was -- my understanding of his role was it was analytic and advisory work. He was there to analyze USAID and provide advice, and -- with his team.

Q. As the DOGE team lead; is that correct?

A. Yes.

Q. Describe for me a little more Mr. Lewin's duties as the DOGE team lead for USAID.

A. So his duties changed up slightly as the time went on prior to him becoming appointed at the U.S. Department of State, but he would look at various functions of the government. So concurrent -- not concurrent, but at the same time of this executive order there was an executive order

Page 59

mandating a review of foreign assistance, and so that was part of their job, but also to find places where the U.S. government could save -- save money, and also streamline and make more efficient the agency at the time, so that's why there's an analytical and an advisory role he had.

Q. Was he the supervisor for the other members that you have named as the DOGE team?

A. That was my understanding.

Q. Is that USAID's understanding?

A. Yes. That's both of our understandings.

Q. And to whom did Mr. Lewin report?

A. He would report to the acting administrator, so Jason Gray and then Secretary Rubio. Back at -- and actually this is an important part too, is back at GSA I don't know who his supervisor would have been.

Q. Do you know what day he was hired at GSA?

A. I -- I don't.

Q. The DOGE team members that you -- you've articulated, Mr. Kliger, Mr. Farritor, Mr. --

A. Cromer.

Q. -- Lewin, and Mr. -- sorry, go ahead.

A. Clay Cromer.

Q. And Mr. Cromer, on what day were they

Page 60

designated as DOGE team members?

A. I believe they were designated the week prior, during that first week of -- of the administration, but there's -- I think there's some mention of it in this document, but I don't -- I can't recall the exact date off the top of my head.

Q. Is there a document that -- that says they are hereby designated ad DOGE team members?

A. I've never seen anything like that that specifically lays it out that directly.

Q. And who designated -- we talked about Mr. Lewin's designation, but who designated the other three DOGE team members at USAID?

A. It would have been -- it would have been their home agency, and then saying that we can get -- we can let these people go, but it would have been to my understanding the acting administrator and in consultation with USDS.

Q. So -- and that would have been Mr. Gray at the time.

A. Yes.

Q. Again, Mr. Gray's testified that he -- that didn't happen, and so who at USAID gave -- gave authority for the DOGE team members to be designated as the DOGE team members for USAID?

Page 61

MR. SILER: Objection, argumentative.

You can answer.

THE DEPONENT: Oh. I don't know. Like, I don't have an answer that solves that gap.

BY MS. STEVENS:

Q. Was Noah Peters part of DOGE team at USAID or -- or DOGE team at all?

A. I don't know if he was ever part of the DOGE team at all, but I -- I have no other record other than his name listed here, and I -- me myself personally, I don't think I've ever met him.

Q. Do you -- you talked earlier about folks who goat access to things but don't end up coming to the building. To your -- to USAID's understanding, did Mr. Peters -- was he involved in any of this work at -- at USAID?

A. To my knowledge, both -- both sides of it, agency and personal, no.

Q. How were the -- how was the information about who was on the DOGE team communicated to USAID staff?

A. That's a -- that's a very good question. I don't have any emails prior to this, but when I -- when me myself started that day, the individuals who were the DOGE team made themselves -- introduced

ADAM KORZENIEWSKI                    March 26, 2026                    62 to 65
95350                                                                 30(b)(6)

Page 62

themselves as the DOGE team.

Q.   They introduced themselves in person with you?

A.   Yes.

Q.   And can you just say who those people were?

A.   Yes.  They were Jeremy Lewin, Clay Cromer, Luke Farritor, Gavin Kliger.

Q.   And that introduction happened on your first day of January 30th; is that correct?

A.   Yes.  It was sometime in the morning, in fact.

Q.   Give me a brief overview of what you did your first day there on the 30th.

MR. SILER:  Objection, vague, but --

THE DEPONENT:  Okay.  So I -- tell me to be more specific, because I -- I can get really specific, but I had an appointment at the VA that morning so I came in about -- on or about 9:30-ish in the morning on January 30th, 2025.

When I got there, I was led up by one of the Careers who were waiting there for me, and I was brought up to the administrative suite.  I was shown where my office was.  I was able to drop my bag, and then I was immediately walked over to -- pardon me

Page 63

-- the administrator's suite, and that's where I met most of the other political appointees including the -- the DOGE team members, the detailees specifically.

BY MS. STEVENS:

Q.   And what happened after that?

A.   There was --

(Computer notification interruption.)

THE DEPONENT:  I think someone joined or left.

BY MS. STEVENS:

Q.   It's okay.

A.   Yeah.  Sorry.  The -- so -- we all talked.  We sort of -- we -- they communicated what their roles and responsibilities were, like -- and sort of like what the background -- their background is briefly.  And -- and so they were set to work doing whatever they were already working on.  Then I continued my onboarding process.

So when I -- when I first met them, the other politicals that were in the room were Tera Dahl, Joel Borkert, Matt Hopson, but, you know, like I was -- I was probably there for like a half hour, 15 minutes tops, somewhere between those two times just before I went back to my onboarding process.

Page 64

Q.   Did you exchange contact information with them?

A.   Yes.  They -- but not at that time because I didn't have my phone or email yet.

Q.   What did you do next for your onboarding process?

A.   I was sworn in.  Then I -- I think I -- I think the thing I was -- I had a number of pieces of paper I had to work through, and then I believe I would -- so I received -- received a briefing.  I think it was -- may have been ethics or -- no, it was benefits.

I had a benefits briefing.  Then -- then I went over to finish my paperwork for my phone ID and laptop.  Went -- went and grabbed lunch, came back.  Then I think I had an ethics briefing and then I received my phone.  Laptop requires the PIV card to be ready, so I was still using a temporary access badge to get in and out of the suite.

Then -- then I think I got my badge like shortly thereafter, and then I received my laptop.  And then I was -- then an individual with IT helped me log in to my laptop and phone for the first time.  And then, I don't know, I think that brings us to like 3:00, 4:00, maybe 5:00 at night by now.

Page 65

And then -- then it's inside this binder, and I'm sure we're going to get to it.  There's the Nick Gottlieb email that came out, and so my attention was turned from my onboarding process to whatever was going on at that time.

Q.   Tell me about that.  What -- what happened after -- we will get to the email itself.

A.   Yeah.

Q.   But what -- what happened after Mr. Gottlieb's email came out, to you?

A.   Well, after Nick Gottlieb's email, when he -- let me ask you to rephrase the question.  Does it -- including things related to Nick Gottlieb, or?

Q.   No.  I just generally want to understand what happened after the 3:00, 4:00 time frame.

A.   Yes.

MR. SILER:  Objection, calls for a narrative, but again you can answer.

THE DEPONENT:  Oh, okay.  So, yeah.  Sometime that late afternoon Nick Gottlieb sends this email out.  Then I think it was Clay Cromer, I was talking to him, and he comes in -- and he comes and says, I just got off the phone, saying that from somebody else in the building, saying that this email went out.

Page 66

We had to, you know, we had to go find Nick Gottlieb. So he disappears, I don't know where to at that time. And I go -- I walk over to the executive secretary and I was like hey, where does Nick Gottlieb work. And they're like, oh, he works in admin. They give me the floor, they give me the room numbers.

Like, so I took the elevator, went down there. Came across Mr. Gottlieb. He already had like banker's box full of his stuff. I introduced myself to him. Sabeda who ended up being one of our HR persons later -- well, she was our HR person then, but she was the head of HR for a time at -- at USAID, and then a couple other people.

Clay comes up finally finding us, and then security comes up. And the security and I think it was -- it might have been -- actually, that would be me speculating a little too much about which security guard it was, but they're like, oh, yeah, you know, they have to walk you out. And he's like yeah, I get it. So they walked him out.

And then I went back up to the suite with Clay, and that's when I thought -- I think I exchanged my contact information with the DOGE people, at least with Jeremy Lewin and Clay Cromer

Page 67

at the time. We swapped government numbers. And then I don't think I had -- well, I could find their email because they -- they were getting USAID emails as well.

And then I was talking to Ken Jackson and Matt Hopson and Joel Borkert about just various things. And then, you know, Ken and I walked over to the general counsel's office.

MR. SILER: I'm going to instruct you not to get into substantive conversations with the general counsel's office --

THE DEPONENT: Yeah.

MR. SILER: -- for purposes of this -- this answer.

THE DEPONENT: Yeah.

BY MS. STEVENS:

Q. Before you get into what happens after the general counsel's office, you said you had conversations with Mr. Jackson, Mr. Hopson. What were y'all talking about?

A. Various things like what's been going on since I got there, because I was like, this is -- this went from very slow and boring to insane and fast paced really fast. So they kind of were like, oh, you know, these -- they told me about that we

Page 68

had a DOGE team, and that they are -- they are looking at different things in the agency, that, you know, that was sort of how the EO was being implemented.

And then -- and just like basic knowledge of like what do -- what did you guys do before this, did you know each other, sort of like reflections on the day thus far. Sorry. And then -- and then I went with Mr. Jackson to speak with the general counsel's office.

Q. Don't tell me the substance of the conversation, but who -- who was in the meeting?

A. So one of the individuals was Bruce McPherson. I think his -- his rank was I think assistant general counsel. And then the other one was -- oh, God, I can see his face right now. It's John -- I'll remember it in a few seconds. I apologize, like this -- it's one of those like things. It's like -- it's like a very vivid detail.

Like I used to talk to him almost every day too, wow, but anyways, yeah, so we had discussions about happenings were going on sort of like, you know, what the hell was happening type of thing. And then we then -- after that we went back to our offices.

Page 69

Q. Hold on just a sec, let me interrupt you there. For that conversation with the general counsel folks, it was Mr. McPherson, John whose last name you don't know, who were both part of general counsel's office?

A. Yes. He was also assistant general counsel.

Q. And then yourself and Mr. Jackson; is that correct?

A. That's correct.

Q. Nobody else present?

A. No.

Q. Okay.

A. And I -- I also left first because it wasn't really germane to my job beyond just like wanting to know what was going on.

Q. Okay. What happens after you left the general counsel's office?

A. I waited for Ken Jackson to return. I was talking to just like folks in the front office, introducing myself. Some time around, I don't know, like 10:00-ish stands out in my head for some reason, the DOGE people left to go wherever they go, to a different building.

Not sure, I think they just went home

Page 70

frankly. And they were like, yeah contact us if there -- anything comes up or whatever. It's like yeah, okay, I'll get right on that, you know. And then so the front office staff, which are the political appointees and a couple of the Careers that were still working there, we stayed there. We talked with Ken about sort of his thoughts and what he gleaned out of the general counsel's conversation without getting into too much personal detail.

And then, you know, he, you know, he made whatever decision he paid out of that conversation, but we were there staying in place until about 10:00. Sometime in the afternoon or early evening, I would say around -- actually, I would be just making things up if I had to guess the time specifically, but it was definitely afternoon or evening somewhat.

Either Matt or Ken told me that Jason Gray was no longer acting administrator, and that it was going to be Secretary Rubio. I hadn't seen -- personally hadn't seen the document yet, but there's no reason me -- for me to doubt that. And so functionally at that time Ken Jackson was the highest ranking individual in the office, so that was why -- that was sort of the -- how everything

Page 71

kind of mutated in terms of organizational structure.

Q. What was your understanding of Mr. Jackson's role after Mr. Gray was no longer the administrator?

A. He was the next person in charge after the Secretary who was the acting administrator.

Q. But what was his role?

A. So his job title -- it's like -- I think he was -- this is just me kind of going off the cuff.

Q. You could -- you're free to look at any document you want in there.

A. Oh, thank you. It's -- I believe it was -- his title is assistant administrator for -- there's a -- there's a specific document that I remember his title being mentioned in, but I apologize for not remembering off the top of my head.

Q. It's okay.

A. There -- here we go. So under -- I think this is 6 -- oh, no, sorry, tab 5, sub tab 3, document 1761, the document is titled Memorandum for John Voorhees. This is where I'm reading Ken Jackson's title, only his title. Kenneth Jackson,

Page 72

Assistant to the Administrator for Management Resources.

So he was the next highest ranking person and -- in that office, and functionally was like basically an executive figure anyways, so we were -- we deferred to him on certain judgments.

Q. When Mr. Jackson specifically -- he was delegated the duties of the deputy administrator that you -- role you just --

A. Yes.

Q. -- articulated by Mr. Gray previously; is that right?

A. That's my understanding too, yes.

Q. Is it your understanding that he was still delegated those duties even after Mr. Gray was removed as acting administrator?

A. Yes.

Q. That -- that the -- that the delegation sort of held even though Mr. Gray was taken out of the role of acting?

A. Yes.

Q. You understand that Mr. Marocco was later delegated those same duties?

A. Yes, I believe it was next -- the following week. There's a document in here that

Page 73

details when that occurred.

Q. Before we get into the delegation documents --

A. Sorry.

Q. That's okay. You were talking about the time frame between about 3:00 to 4:00 to 5:00 in the afternoon to 10:00 in the evening on the -- on the 30th. Where was Mr. Lewin at that time?

A. He left around -- with the -- the DOGE team at the same time, so it would have been -- it would have been -- I mean, technically it's late night but it -- it was definitely -- it was definitely unreasonably late, so somewhere around between 8:00, 10:00 p.m. that the -- all the DOGE folks left, the DOGE detailees.

Q. It sounds like you're going off of your own memory. Does USAID know what time Mr. Lewin left?

A. No, we don't know off the top of our head either.

Q. What was Mr. Gray doing during that 5:00 to 10:00 time frame?

A. I don't recall personally. I don't -- I don't remember actually seeing him that evening, that late evening, but I'm sure he was doing

Page 74

something, so.

Q. Do you recall what time Mr. Gray left the office that evening?

A. I don't.

Q. And when I say "you," I mean you as USAID representative.

A. Yep. Both. We don't know.

Q. Was Mr. Lewin part of those conversations that you were having with the DOGE team members before -- before they left that evening?

A. Yes, he -- we swapped our contact information. Me personally swapped my contact information with Jeremy and Clay -- or Jeremy Lewin and Clay Cromer. Apologies.

Q. For Mr. Lewin, that was his work phone number; is that correct?

A. That's correct.

Q. In your Exhibit 1 in your binder on page 15 -- no, not page 15, I'm sorry, tab 15. Tell me when you're there.

A. You said Exhibit 1, tab --

Q. That whole binder is Exhibit 1, so --

A. Oh, sorry.

Q. -- the tab 15.

A. Oh, apologies, tab 15. Yep. I am in the

Page 75

first document.

Q. Turning your attention to the Bates at the bottom, 00059 -- excuse me -- 569. Do you see that?

A. Yes.

Q. Can you identify this document?

A. This is the -- this is the delegation of authority to Secretary Marco Rubio to be acting administrator for the U.S. Agency for International Development by the President of the United States, President Donald J. Trump, sorry.

Q. What's the date on this document?

A. January 30th, 2025.

Q. I think you said this earlier, but you -- you had not seen this document on the 30th; is that correct?

A. That's correct.

Q. What time of day was this document signed?

A. I do not know. Both ways, agency and personal. I do not know. We do not know.

Q. You --

A. I'm going to start using "we."

Q. Well, I'll still -- I'll still have to clarify. Is it correct that USAID doesn't know what time this document was signed?

A. That's correct.

Page 76

Q. What time was USAID made aware that Mr. -- Secretary Rubio was being given the role as acting administrator for USAID?

A. We do not know, but when the conversation with -- between Jason Gray and whomever at the White House occurred for -- to let him know that that was no longer --

MR. HEIMANN: -- conversation.

THE DEPONENT: Excuse me?

MS. STEVENS: Sorry? Hello? There's some background noise on the Zoom.

MR. SILER: Yeah, it sounded like somebody was talking on the Zoom.

THE DEPONENT: Yeah.

MR. SILER: Which --

THE REPORTER: Richard, I believe your mic is on.

MR. SILER: Yeah.

THE REPORTER: Oh, he's gone.

MR. SILER: All right.

BY MS. STEVENS:

Q. Okay. Back to our question and answers.

A. Yes.

Q. The -- so you said that you're unaware of when Mr. Gray was informed that he was removed as

Page 77

acting administrator; is that correct?

A. That's correct.

Q. Okay. When was USAID informed that Secretary Rubio was the new acting administrator?

A. We don't know

MR. SILER: I'm sorry. Sorry. Objection to form. You can -- you can answer.

THE DEPONENT: We don't know, and I -- I don't know personally, but it happened sometime early before the 5:00-ish time frame when I found out.

BY MS. STEVENS:

Q. You found out that Mr. Gray was in longer acting administrator of as of 5:00 on the 30th?

A. It was like sometime after normal working hours, yeah.

Q. I think you testified that you were there until at least 2:00 a.m. on the 31st, so was it closer to the 5:00 time frame or the 2:00 a.m. on the 31st time frame?

A. It was -- it was still around -- it wasn't -- it was still around when Nick Gottlieb did his memo that's in this binder, but I don't specifically remember a time, but basically I was told that he was no longer acting administrator, so.

Page 78

Q.   Who relayed that to you?

A.   It was either Ken Jackson, Matt Hopson.  I don't think it was Joel Borkert.  Ken Jackson, we already have his title.  Matt Hopson at the time was chief of staff.

Q.   Did they relay that to you over email or verbally or --

A.   Verbally --

Q.   -- some other way?

A.   I'm sorry.  Verbally.

Q.   When did USAID receive this document, the one we've been talking about?  The 569 Bates?

A.   I do not know.  We do not know.

Q.   You talked about either Mr. Jackson or Mr. Hopson let you know that Mr. Gray was no longer acting administrator.  What did they say with respect to Secretary Rubio?

A.   They said Secretary Rubio is going to be -- or is the acting administrator for now.

Q.   Did they say he's going to be or is?

A.   They -- I don't -- I don't recall specifically.  This is me talking as a person.

Q.   Does -- does USAID know one way or the other?

A.   No, we don't know.

Page 79

Q.   What was Mr. Lewin's role on the -- on January 30th?

A.   Analysis and advisory.

Q.   As DOGE team lead?

A.   Yes.

Q.   What was Mr. Marocco's role, if any, with respect to USAID on the 30th of January?

A.   We don't know, and I don't know.  Talked to him briefly, and he just said welcome aboard, because that's my first day there, so.

Q.   Mr. Marocco was there on the same day, on the 30th?

A.   No, no, no.  He -- he either emailed or called me.  I can't remember which one he did, so.

Q.   But you talked to him on the 30th; is that correct?

A.   Yes, personally.

Q.   Do you know what time that was?

A.   It would have been sometime in the morning.

Q.   Do you recognize the name Ed Coristine?

A.   Yes.

Q.   Is he part of the DOGE team or DOGE adjacent?

MR. SILER:  Objection, compound.

Page 80

You can answer.

THE DEPONENT:  Ed Coristine was definitely DOGE adjacent, but I don't recall, and we don't recall if he was ever part of the USAID DOGE details.  Personally I don't know when I first heard his name.

BY MS. STEVENS:

Q.   Do you recognize having heard his name in conjunction with work at USAID though?

A.   Oh, man, I can't recall personally.  Like I -- I may have -- part of the problem is like there was so much media around the same time that I don't know when I first heard in the context of work versus the context of media stories.

Q.   Did you ever meet him at USAID?

A.   I don't believe so.  That's me as a person.

Q.   Did he ever go to the USAID building?  Does USAID know the answer to that?

A.   USAID does not know the answer.

Q.   Okay.

THE REPORTER:  Marking Exhibit 3.

(WHEREUPON, Exhibit 3 was marked for identification.)

BY MS. STEVENS:

Page 81

Q.   All right.  We're looking at Exhibit 3.  Let me know if you recognize that document.

A.   I do recognize this document.

Q.   What is it?

A.   It's a Presidential Executive Order titled Reevaluating and Realigning United States Foreign Aid.  It was signed -- or it says Presidential Document by Executive Office of the President on 30th of January 2025.

Q.   And apologies, I thought I had pulled the Bates version.

A.   There's also another date that says January 20th, 2025.

Q.   Are you familiar with the Federal Register?

A.   Yes, so I was just reading the top line.  Apologies.

Q.   No, no, that's okay.  It's my understanding is that the Federal Register publishes it usually several days after the initial publication on the White House website; is that right?

A.   I -- I can't speak to the -- when they publish these documents.  I just normally get them from the website when they come out, or someone

Page 82

emails me usually. Now -- but...

Q. Did -- did USAID work to implement this executive order?

A. Yes.

Q. Who at USAID was responsible for implementation of the -- of this EO?

A. Any U.S. government employee.

Q. Was there a USAID member who was responsible for making sure that it actually was implemented? I understand that everyone is responsible for --

A. Right.

Q. -- doing that, but was there a -- a key person who's -- who was in charge of making sure it happened?

A. The individual that's ultimately in charge is the acting administrator, and so as of -- well, as of this time it would have been Jason Gray when it was first signed. And then -- then it became Secretary Rubio.

Q. As a part of this -- of implementing this EO, USAID undertook an effort to review payments to USAID grantees; is that correct?

A. Correct.

Q. And in the defendant's answer in this

Page 83

case, the defendants have acknowledged that that payment evaluation was happening, and it says that it was done, USAID leadership commenced that review.

A. Yes.

Q. Who -- who is USAID leadership in that sentence?

A. It would have been inclusive of the acting administrator, but also anybody in the front office. Front office, colloquialism for the people who are at the senior management levels. That includes the political appointees, you know, that's inclusive of the DOGE detailees to USAID because they are political appointees as well, and any sort of senior Careers who had been running like bureaus or offices.

Q. So that -- so USAID leadership in this sentence were the -- all of the political appointees, the DOGE team members as they were also political appointees. And then are you talking like the deputy administrative administer level as far as Careers, or -- or some other --

A. We -- I mean, to my knowledge prior -- from January 20th onwards we didn't have a Career at that rank. However, there -- the bureaus which would typically get a political appointee at some

Page 84

point, normally Senate confirmed for many of them, were all acting Senior Careers.

Q. The USAID leadership phrase here included Mr. Lewin; is that correct?

A. Yes.

Q. As well as Mr. Kliger?

A. Yes.

Q. And Mr. Farritor?

A. Yes.

Q. What about Mr. Musk?

A. No.

Q. What about Mr. Davis?

A. No.

Q. Would it have included you?

A. Yes.

Q. Was there anyone on the DOGE team put in charge of making sure that this EO was implemented?

A. No. Let me ask a clarification question. It's -- how do you mean making sure it was implemented?

Q. Was there a -- a DOGE team member designated as the lead for ensuring across departments that this EO was implemented?

MR. SILER: Objection, vague.

You can answer.

Page 85

THE DEPONENT: No.

BY MS. STEVENS:

Q. What was Mr. Lewin's role with respect to implementation of this EO?

A. It's back to the -- not -- pardon me -- analysis and advisory role, so amongst his executive orders he was looking at the foreign assistance through the guise of that -- that DOGE executive order and looking at where programmatic efficiencies and redundancies were, and that's how they streamlined government, looking at how payment systems worked, how payments left, how payments came in, when -- when applicable when they came in, as well as just general understanding of how the agency was run, managed as well.

Q. This EO required a sort of pause on -- on foreign aid assistance funds going out; is that correct?

A. Yes.

Q. Mr. Lewin, as DOGE team lead, played a role in enforcing that pause at USAID; is that correct?

A. No, he wasn't the one that enforced it.

Q. Are you familiar with an email from Mr. Lewin to a Mr. -- I think it's pronunciation is

ADAM KORZENIEWSKI                    March 26, 2026                        86 to 89
95350                                                                      30(b)(6)

Page 86

Enrich, E-N-R-I-C-H?

A.   Yep.

Q.   Where Mr. Lewin instructed Mr. Enrich not to do -- to do additional evaluations under the payments that were paused by this EO?

A.   I am not familiar with an email, but I'm not really sure of the circumstances of why the email occurred.

Q.   Does USAID know about the email from Mr. Lewin to Mr. Enrich telling him not to do additional evaluation under this EO?

A.   No.

Q.   There was a -- there was supposed to be a process to obtain waiver for lifesaving assistance under this EO; is that correct?

A.   That's correct.

Q.   Are you familiar with -- with Mr. Lewin instructing Mr. Enrich not to do an additional evaluation of whether that section applied to any of the potential payments going out?

A.   No.

Q.   And that's an answer for USAID?

A.   Yes.  USAID's unaware of that.

MR. SILER:  I don't want to interrupt.

MS. STEVENS:  Yeah.

Page 87

MR. SILER:  But could we take a quick break, maybe?

MS. STEVENS:  Yeah.  How are you doing on -- do you want to take a long break?

THE DEPONENT:  I can -- I need some water because I'm starting to get a little tired.

MS. STEVENS:  How about we take a break and we can talk about whether it turns into a longer break.

THE DEPONENT:  Yeah.

MS. STEVENS:  Does that work?

THE DEPONENT:  Yeah, break for the break.

THE VIDEOGRAPHER:  All right.  Please stand by.  The time is now 11:55 and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is now 12:15 and we are on the record.

MR. SILER:  Okay.  And just before we go back for questioning, Defendants would like to read and sign.

MS. STEVENS:  All right.  I'm going to hand you Exhibit 4.

THE REPORTER:  Marking Exhibit 4.

(WHEREUPON, Exhibit 4 was marked for

Page 88

identification.)

THE DEPONENT:  Thank you.

BY MS. STEVENS:

Q.   Exhibit 4 is a January through March 2025 blank calendar.  I like to have a calendar for reference when we're talking about dates, so that's why --

A.   Sounds good.

Q.   All right.  So turning your attention to Monday the 27th of January --

A.   Yes.

Q.   -- I know that you as an individual didn't start at USAID until the 30th, but these are going to be questions of course for USAID, and so turning your attention to that time frame.  On the 27th there were people that were associated with the DOGE team that arrived at USAID; is that correct?

A.   Yes.

Q.   Who from the -- from DOGE arrived that day?

A.   To my recollection, it would have been -- sorry, I know it's in my book somewhere.

Q.   You can --

A.   Oh.

Q.   You're free to look through.

Page 89

A.   Yes, I think I found it.

Q.   Which document in your binder are you looking at?

A.   So under tab 5, 3263 is the number, and then there's follow-on documents past that, still on the tab 5.

Q.   Okay.  And so what -- what have you gleaned from that that is the answer to the question of which DOGE members went to USAID that day?

A.   Looks like on -- says for this one, those are accounts being created, sorry.  Actually, this doesn't really say who was in the building that day.  Let's -- yeah, I apologize.  This actually doesn't -- this only talks about account creation.  I had the contents of that wrong.

Don't recall off the top of my head if I actually have anything that talks about their -- who was here.  Sorry, not who was here -- who was there.

Q.   If there has been testimony that Mr. Farritor was present that day, does USAID have any reason to contradict that?

A.   No, I -- we don't dispute it.

Q.   Was Mr. Lewin there that day?

A.   No.  And that's actually a really good point.  I need to make a clarification, is that Mr.

Page 90

Lewin did not start until also January the 30th.

Q. Didn't start at DOGE team lead at USAID until January 30th?

A. Yes.

Q. Before Mr. Lewin was there as DOGE team lead, I think you said there were no DOGE team leads at USAID prior to him; is that correct?

A. That's correct.

Q. Who was --

A. To my understanding.

Q. Sorry, go ahead.

A. To our understanding.

Q. Who was in charge of the DOGE team at USAID before January 30th?

A. I'm not sure if there was a team lead designated. We are not sure either as USAID; however, ultimately the peoples' responsibility in the building is for the acting administrator.

Q. For Mr. Farritor specifically, who was there prior to the 30th, correct?

A. Yes.

Q. Who did he report to before Mr. Lewin started work at USAID?

A. I don't know who through, but he would have been reporting to the acting administrator.

Page 91

Q. I understand that, like in theory --

A. Yeah.

Q. -- that a person is supposed to report to the acting administrator, but who did he report to?

A. I don't have any documentation or knowledge of that, so -- and my -- as myself, I -- I don't recall any of those details.

Q. For Mr. Kliger who was also there before the 30th, correct?

A. Yes.

Q. Who did he report to?

A. I'm not sure. The only -- the one thing I do want to point to, this document that I did mention at 3263, is there's a mention of Joel Borkert, so anyways, Joel Borkert was deputy chief of staff, so the deputy chief or the chief of staff probably would have more knowledge on who was the direct supervisor at the time.

Q. You're saying like as far as someone to testify about the answer to that question, Mr. Borkert would have that information?

A. I -- I -- like I don't feel comfortable telling you who you should have testify, but they may have additional documents that mention that, or documents are not in the record that would have

Page 92

something to do with that.

Q. And in your position as representative for USAID here, could you talk to Mr. Borkert and answer that question?

A. Yes, I can send a message. I don't know if I can get the answer today because he works in a SCIF most days.

Q. Where is he now?

A. State Department, counterterrorism.

Q. On the 27th --

A. Yeah.

Q. -- there was a meeting at USAID among USAID career staff as well as the DOGE team members that we've talk about to include Mr. Farritor. Who else was at that meeting?

A. I don't -- we don't know.

Q. Did you talk to -- in preparation for the deposition today, did you talk to anyone who was at that meeting?

A. Not to my knowledge.

Q. The DOGE team members who were present at USAID on the 27th, including Mr. Farritor, they were there in their role as DOGE team members; is that correct?

A. That's correct. Let me stop you real

Page 93

quick. Is -- is this in reference to document 5266 that you're trying -- that were -- there's a reference to a meeting there. I don't know if that's -- I don't -- that you're referring to.

Q. Can you tell me what tab you're looking at?

A. I'm sorry, tab 5, second blank tab underneath it, as far as where it's at.

MR. SILER: I think it's the first blank --

THE DEPONENT: First blank tab. Apologies.

BY MS. STEVENS:

Q. Okay, go ahead. Sorry. What was your -- what --

A. Oh, is this the meeting you might be referring to?

Q. This is the meeting that I'm referring to.

A. Okay. So I am -- I apologize. I am aware of this meeting. I have -- so document 5266, it's an email from Brian McGill who was Deputy Director of Security for USAID, referring in a note to himself referring to a meeting he had with the front office staff, quote-unquote representatives from White House OPM CIO, Deputy Chief.

Page 94

Q. In the document that you're referencing it says that two of the White House staff were given access to -- I think it said the -- yeah, the Phoenix system. Why were they given access to the Phoenix system?

A. I --

MR. SILER: Objection. Objection, form.

You can answer.

THE DEPONENT: Okay.

MR. SILER: Sorry for interrupting.

THE DEPONENT: I disagree with the characterization that they're White House. This was Luke Farritor and Gavin Kliger. They were details -- detailees to USAID from -- I think one of them was GSA, one of them was OPM. I don't recall off the top of my head.

BY MS. STEVENS:

Q. So you disagree with the characterization, but why were these individuals given access to Phoenix?

A. To comport with the executive order on DOGE.

Q. What level of -- of administrative access or other type of access were they given to the Phoenix system on the 27th?

Page 95

A. I think they had some degree of administrator access, but it wasn't like they got access where they could control how -- how the system even worked.

Q. Gotcha.

A. I'm not an IT expert so that's one thing I'm going to caveat, anything related to IT is that I'm not going to be able to speak to its technical ability.

Q. But I think we can muddle through on the layman's terms --

A. Yeah, that's fine.

Q. -- for now at least. So the access on the 27th was not the -- the full admin access where you can make, I think you said like God-like decision making within the system. It was the more just user access. Does that sound right?

A. I think it was above user access because I think they could see -- my understanding of the Phoenix system, and also this is my personal understanding of the Phoenix system and to caveat that, like I have never logged into Phoenix personally. I did not want to.

I guess that's -- the whole acquisitions and financial management process I try to stay away

Page 96

from because that's really complicated, and is that your -- they -- these -- the payment systems generally are siloed based off of responsibilities. So like usually these -- like you only can see or access information that is pertaining to your role and responsibilities. So if you're a contracts manager, that -- and I don't know if this specifically just Phoenix or all of the systems off the top of my head, by say if your projects that you are dealing with are in the Middle East and you don't really -- you really can't access anything that's -- you may know that they exist, but you can't access details on things that are going to like Ukraine or Africa, or that are necessarily centrally administered out of D.C., if that helps for context.

Q. That makes sense. So you see what you need to see, but not -- not other parts of the system.

A. And you -- you can edit what you're allowed to edit. And so this -- my understanding is it was above like a typical user's access, but it wasn't like God-tier access where somebody like Jason Gray had as a fact of his position as CIO.

Q. Okay. So on this day, on the 27th, Mr.

Page 97

Farritor was given this elevated access to the Phoenix system; is that correct?

A. That's correct. That's my understanding, or our understanding.

Q. On -- also on the 27th, there were -- depending on which email you're looking at, there are 57 people which I think eventually was 58 people put on administrative leave. You're familiar with that, correct?

A. Correct.

Q. And the basis for that, putting those folks on administrative leave on the 27th was allegedly improper financial transactions; is that correct?

A. Correct.

Q. And that investigation into those financial transactions was -- was initiated by the DOGE team; is that correct?

A. Correct.

Q. And DOGE personnel actually did the evaluations of those transactions; is that correct?

A. Yes, the DOGE detailees, yes.

Q. Did I -- I said DOGE personnel, sorry.

A. Yeah, yeah.

Q. Okay. The DOGE team members.

Page 98

A.   I just want to -- yeah, I just want to make sure that -- because there's the DOGE Executive Order, there's the broad ethereal concept of it, then there's the particular people, and I don't have a better term than detailee, handy.

Q.   In -- on the -- also on the 27th in -- in working out the administrative leave for those 58 people, there was some advice provided by Mr. Cromer who was -- who we've talked about before; is that correct?

A.   Yeah.

MR. SILER:  Objection.  Objection, argumentative, and vague.

BY MS. STEVENS:

Q.   I'll -- I'll just read from Defendant's answer.  It admits that Mr. Cromer advised USAID leadership on personnel matters as deputy general counsel of OPM; is that correct?

A.   I am not aware of his position as deputy general counsel at the OPM, but I don't dispute that he's advised on personnel matters.

Q.   And he was part of the DOGE team; is that correct?

A.   At USAID?

Q.   Yes.

Page 99

A.   Correct.

Q.   On what day discontinue being part of the DOGE team at USAID?

A.   That's a -- that's a great question.  I'm not particularly sure, and same thing with we are not particularly sure as USAID; however, the last day I saw him as a person was Friday the 31st.

Q.   So you didn't see Mr. Cromer back in the USAID facilities after the 31st; is that correct?

A.   That's correct.  I didn't see him again until he was in a new role at the U.S. Attorney's office, a permanent seat.

Q.   When was that?

A.   I can't recall specifically.  Some time in the spring of last year.

MR. SILER:  Objection.  I just want to make clear that -- that that answer is your personal capacity and not through your --

THE DEPONENT:  Oh, that's -- that's me as Adam, the person, Adam Korzeniewski.

BY MS. STEVENS:

Q.   You saw Mr. Cromer outside of the USAID context?

A.   Yes.

Q.   Okay.  All right.  I'm going to ask you

Page 100

some questions about DOGE team member Luke Farritor seeking access to USAID digital systems on January 30th now.

A.   Okay.

Q.   Okay?  So we're shifting.  Before -- sorry.  Before I get to my questions about the 30th, I have a few questions about what happened in the days leading up to the 30th.

A.   Yes.

Q.   On January 28th, so this is Tuesday, right?  You talked about the 27th.  On the 28th, what conversations did Mr. Musk and Mr. Farritor have about DOGE being granted access to USAID digital systems?

A.   USAID is unaware of conversations between the two of those individuals.  And I'm unaware personally.

Q.   For the same date, the 28th, what conversations did Mr. Musk have with anyone in USAID leadership?

A.   I'm unaware of any conversations Mr. Musk had with anybody at USAID, and I'm personally unaware.  Both as USAID and as myself I'm unaware.

Q.   That includes USAID's leadership and anyone outside of leadership, but also at USAID?

Page 101

A.   Yes.

Q.   On January 29th, so that's Wednesday.

A.   Yes.

Q.   What conversations did Mr. Musk and Mr. Farritor have about DOGE being granted access to USAID digital systems?

A.   USAID has no knowledge of any conversations between Mr. Musk or Mr. Farritor.  And I have no personal knowledge of it.

Q.   Sorry.  Also on the 29th, what conversations did Mr. Musk have with -- with USAID leadership?

A.   On the 29th, I -- I am unaware -- we are unaware of any conversations between Mr. Musk and anybody at USAID leadership or staff.

Q.   What conversations did Mr. Musk have with USDS leadership about USAID?

MR. SILER:  Objection, it's outside the scope of -- of these deponents' knowledge, but you can answer.

THE DEPONENT:  USAID and Adam have no knowledge of any conversation between USDS and Elon Musk.

BY MS. STEVENS:

Q.   Okay.  Turning your attention to the 30th.

Page 102

So Thursday the 30th, we've talked a lot about it because it was your first day. I'm going to go have some -- a different line of questioning.

A. Roger.

Q. DOGE team member Luke Farritor, on the 30th, sought access to USAID digital systems more broadly than just the Phoenix system; is that correct?

A. I believe so, on the 30th.

Q. Are you looking for a specific document in your binder?

A. I think I recall seeing something like -- about that specifically, but I have to really make sure that I -- I'm in the right spot first. There's a -- under tab 5, second soft tab, document number 1761 titled Memorandum for John Voorhees, Director of Security, dated January 30th, 2025 from Ken Jackson. It specifically refers to a -- refers to access is granted to Mr. Farritor and Mr. Kliger for a particular system.

Q. And just to be clear, this is -- I think you said this is, just for my own edification, this is 1761 is the Bates at the bottom right?

A. That's correct. Apologize if I mispronounced it.

Page 103

Q. No, you might have said it. I just didn't get there in time. Is -- is it your understanding that this document, this memorandum for Mr. Voorhees is -- it's a draft of the document. This was never actually signed and put into place, correct?

A. I wasn't aware of that, but I can't dispute it or avow it.

Q. If there's already been testimony by -- by one of the security personnel Under Mr. Voorhees direction that they drafted this but it was not approved by Mr. Jackson, do you have any reason to dispute that?

A. I have -- I can't -- I can neither dispute nor avow it.

Q. So back to my original question, DOGE team member Luke Farritor sought access to USAID digital systems further than Phoenix on January 30th, correct?

A. That's my understanding, yes, or our understanding.

Q. What systems did he seek access to that day?

A. My -- to my understanding, one of the systems is C-CURE. I don't know what the admin breaks out to, but it's basically the door accesses

Page 104

at the Ronald Reagan Building for USAID specifically. I don't know about the other building doors.

Q. Is it correct that C-CURE was the -- the digital system through which access was given and taken away for folks' badges within the building, as you just described?

A. To our understanding and my understanding that's what -- that is correct.

Q. Elon Musk spoke with USAID staff member PJ Butler to instruct him to give Mr. Farritor access to C-CURE; is that correct?

A. I have no knowledge of conversations between Elon Musk and PJ -- sorry, PJ Butler.

Q. Mr. Butler was a USAID staff member during this time frame, correct?

A. Correct.

Q. And you understand that you're here today to talk about, including access to USAID systems granted to DOGE team members including Mr. Farritor.

A. Yes.

Q. And you understand that you're also here to talk about Mr. Musk's involvement in a number of things, but including the digital access given to DOGE team members.

Page 105

A. Correct.

Q. In that conversation with Mr. Butler, Mr. Musk directed Mr. Farritor to be given elevated access to C-CURE.

MR. SILER: Objection, argumentative.

THE DEPONENT: I'm allowed to answer that?

MR. SILER: Yeah.

THE DEPONENT: Oh, sorry. I can neither affirm or deny, but he -- Luke Farritor did have elevated access, to my personal knowledge.

BY MS. STEVENS:

Q. And to USAID's knowledge?

A. Yes.

Q. Do you have Elon Musk's phone number?

A. No.

Q. Do you have Mr. Farritor's phone number?

A. No.

Q. The additional access that was given to Mr. Farritor for C-CURE, what level of access was that?

A. Neither myself as USAID or personally, I don't know what it would be categorized but it's basically the ability to read and write privileges specifically for classified environments, or non-classified environments, non -- on the SCIFs.

Page 106

I don't know how to phrase, because not every -- not every door that's locked is a SCIF, but blah blah blah, but the SCIFs in particular were separately handled, from my understanding.

Q. Let me see if I could paraphrase that back to see if I'm just following.

A. Please.

Q. The SCIFs themselves had doors that were controlled by something other than C-CURE? Is that what you're saying?

A. I'm not sure how they were secured, but I understand that it was a whole different level or -- or possibly a different system. I'm -- I'm just not familiar enough with SCIF access.

Q. To your knowledge -- sorry. Mr. Farritor's access within C-CURE included the ability to make assignments to access various doors throughout the USAID building, including restricted areas just not SCIFs; is that correct?

A. Yes, that's my understanding. Our understanding.

Q. Who besides Elon Musk gave approval for Mr. Farritor to get that level of access?

A. It's my understanding that it was from the senior leadership of the building.

Page 107

Q. Okay. And let's be specific about --

A. Yeah.

Q. -- the senior leadership. Who was that?

A. It would have been the acting administrator. So at that point it would have been -- so we're talking January 30th, it would have been either Jason Gray or Secretary Rubio, likely through Ken Jackson or Matt Hopson.

Q. Since you're here, sitting here talking on behalf of USAID, who was it?

A. I'm not sure.

Q. When I asked you about the question of Mr. Musk's conversation with -- with --

A. Actually, I think I am -- found that email actually, apologies. So -- I'm sorry to interrupt.

Q. It's all right.

A. Okay. So on -- I think it's 0602 which is the following page from what I was just referring to in the -- under tab 5, this -- this is the fiscal logical administration for Gavin. This is actually a -- a request approval from Jason gray on the 31st of January 2025 to his deputy -- as CIO to his deputy -- deputies, pardon me, Steven Hernandez and Zecharia Kahn, granting -- granting access for Gavin. Gavin Kliger, pardon me.

Page 108

Q. Appreciate that. This is Mr. Kliger's access, but we're -- we're focused on the 30th for Mr. Farritor's access.

A. Oh, I apologize.

Q. That's okay. So who within USAID gave approval for Mr. Farritor to have the C-CURE level of access that we've been talking about, on the 30th?

A. It would have been Ken Jackson in his role as performing the duties of deputy administrator for management resources.

Q. And I've just got to push on that.

A. Yeah, go nuts.

Q. You said it would have been, but -- and I understand that's -- that's sort of how the process should work, but --

A. Yeah.

Q. -- who was it?

A. I -- I don't know. I don't have emails or records specifically referring to a specific conversation with it.

Q. Regarding the conversation between Mr. Musk and Mr. Butler, thank you, I'm paraphrasing here, but I think you said you can neither confirm nor avow --

Page 109

A. Yeah.

Q. -- that, anything about that conversation. Is there someone you can direct us to who does know that?

A. It would be PJ Butler or Elon Musk. Like I -- I have no way to say that conversation happened or not happened. I don't even know how PJ or Elon Musk would have gotten each other's numbers.

Q. Based on the testimony we do have, Mr. Farritor was also involved in the conversation.

A. I don't know if Mr. Farritor has Elon Musk's number, so.

Q. As of the 30th, Mr. Lewin was DOGE team lead at USAID, right?

A. Correct.

Q. What was his involvement in getting Mr. Farritor access to USAID systems?

A. I don't have the -- as USAID, I don't have any record of this but in terms of personal knowledge, I think he would be aware of it, but he wouldn't have the ability to approve it himself.

Q. Because that authority would need to come from someone -- someone higher up than him?

A. It would have to come from someone who has been delegated the authority to do so, either

ADAM KORZENIEWSKI
95350

March 26, 2026

110 to 113
30(b)(6)

Page 110

through statute or the ADS, automated directive system which is the internal regulations of USAID, or -- or just by virtue of the fact that they were told that they have these powers by someone who was granting it to them.

Q.   You're saying that -- a person with those type of authorities needs to be the person that would give approval for Mr. Farritor to have this level of access within C-CURE?

A.   Yes, or I think the CIO also has the ability to give that access, if I recall correctly. There's -- I think actually I just mentioned it. There is a -- there is an email from Jason Gray as -- as CIO talking about I approve administrative access for Gavin Kliger to Phoenix HR systems, badging, cloud environments, et cetera.  And so as CIO that would be under his purview as well.

Q.   Again, you're looking at the document that's for the 31st, not anything to do with the 30th, correct?

A.   That's correct, but my understanding is -- of the role of the CIO, I don't have ADS in front of me to refer back to, but he did have the ability to approve such accesses.

Q.   Throughout the day on the 30th, there's

Page 111

been testimony there were conversations about whether to bring the 57, 58 people from Monday who were put on administrative leave, back from administrative leave.  Who participated in those conversations?

MR. SILER:  Objection, vague.

THE DEPONENT:  I don't recall either as USAID or personally any conversations related to that.  I did -- personally I did not find out there was people on administrative leave until someone told me about what Mr. Gottlieb did, and then someone explained what he did in the context of the administrative leave aspect.

BY MS. STEVENS:

Q.   Mr. Lewin, Mr. Jackson, and Mr. Gray and Mr. Hopson had a meeting that evening of the 30th, correct?

A.   I believe so, yes.

Q.   Does USAID say that that meeting happened?

A.   USAID doesn't dispute it.  Adam personally believes that happened.

Q.   There's been testimony in the case that Mr. Lewin told Mr. Gray to shut the agency down, to cut access to USAID systems, to USAID personnel around the world.  And then that Mr. Acting

Page 112

Administrator Gray refused to do so.  There is also testimony that Mr. Lewin stepped out off the room and was on a phone call for a period of time, and then came back to that meeting.  Who was Mr. Lewin talking to on the phone?

A.   I -- both as USAID and personally, I have no idea.  And also I -- I don't have any record to show the phone call occurred.

Q.   Do you have Mr. Lewin's phone number?

A.   I have his current State Department phone number accessible.  I don't have it right like on my phone-phone.

Q.   Is it the same number he had at USAID?

A.   No.  Since -- I don't even know if it's the same phone number he had when he started at State Department.  I wasn't -- I wasn't regularly contacting him and -- because he's in an Under Secretarial role, I have no reason to talk to him directly in the course of my duties other than saying hi in the chow hall.

Q.   For the --

A.   My current duties.  Apologies.

Q.   For the phone at USAID, did he have both a work phone and a personal phone?

A.   My understanding is that he did.

Page 113

Q.   Did you have his person phone number?

A.   I don't.

Q.   Who is the telephone carrier for the USAID phones?

A.   Oh, God.  I used to even know this one.  I don't recall off the top of my head, and USAID can't remember off the top of its head, but we can ask USAID.  They still, I mean, USAID still exists and they still have the same telephone carrier.

Q.   Does USAID still have access to the -- the C-CURE system?

A.   I -- I can't -- as USAID I can't say one way or the other.  Personally, I don't know if C-CURE is a universal product or if it's just a government agency related thing.

MR. SILER:  I'm going to object to this as outside the topics, whether USAID currently has access to C-CURE.

MS. STEVENS:  I'll write the question down and look at the topics in a minute.  Might be in the last couple lists.

THE DEPONENT:  Just personally as me, I'm not a systems expert on every single -- on any of the systems, frankly.

BY MS. STEVENS:

Page 114

Q.   What conversations did Mr. Lewin have with Mr. Musk on the 30th?

A.   I don't know, both as USAID and as myself. I don't know if he -- what conversations or even if they spoke on the phone.

Q.   What conversations did Mr. Lewin have with Steve Davis on the 30th?

A.   I don't know what conversations occurred between Jeremy Lewin and Steve Davis.

Q.   That's a USAID answer, correct?

A.   Yes, and -- and Adam answer too.

Q.   Shortly after this conversation, Mr. Gray was removed from his post as acting administrator, and you've talked about that a little bit, correct?

MR. SILER:  Objection to the form.

BY MS. STEVENS:

Q.   I'll rephrase.  It was badly formed. Shortly after this conversation between Mr. Gray and Mr. Lewin, Mr. Jackson, Mr. Hopson, Mr. Gray was removed from his post as acting administrator, correct?

MR. SILER:  I'll object again to form, but you can answer.

THE DEPONENT:  Okay.  I don't know.  I don't know what precipitated the decision exactly to

Page 115

-- to make Secretary Rubio the acting administrator and remove Jason Gray as the acting administrator.

BY MS. STEVENS:

Q.   You said you don't know exactly.  Do you know --?

A.   Yes.

Q.   -- more broadly?

A.   Yes.  It was the order from the president making Secretary Rubio the acting administrator.

Q.   But the events that led the president to designate Secretary Rubio, do you know about that?

A.   I -- it's basically the events that we have been speaking of, like that there was a -- I don't want to describe it as a loss of confidence in Jason Gray, because he's a very competent person, but it's basically that the president wanted a senior political leadership over the agency, is my understanding, both as USAID and personally.

Q.   And what would -- you said you don't want to call it lack of confidence, but I mean, what are you getting at when you -- when you say that?

A.   That the president of the United States had -- it's my understanding, I'm not obviously talking about any conversations the president has had -- has more confidence in Secretary Rubio's

Page 116

ability to do government administration.

Q.   Who made the decision to -- to recommend to the president that Mr. Gray be removed as acting administrator?

MR. SILER:  Objection, the question calls for information that would be protected by the deliberative process privilege.

MS. STEVENS:  We'll get to -- we'll get to those --

MR. SILER:  And the presidential privilege.

MS. STEVENS:  Under both privileges, I think we get to know the who of the conversation, not the actual conversation itself.

MR. SILER:  Well, the -- the -- he can answer if he --

MR. LYNCH:  If he knows.

MR. SILER:  If he knows.

THE DEPONENT:  I don't know.  That's USAID and personally.

BY MS. STEVENS:

Q.   How was the decision to remove Mr. Gray as acting administrator communicated to Mr. Gray?

A.   I have -- I believe I sort of danced around it or mentioned it before, but both USAID and

Page 117

Adam don't know specifically.

Q.   What did -- who was with you past 10:00 at USAID on the 30th?

A.   I have -- I've spoken to this before, but with -- with me Adam, not USAID, as I was with Ken Jackson, Matt Hopson, Joel Borkert.  I believe -- believe Mary Tyler Holmes might have been still there.  She's a civil -- or sorry, foreign service Career.  Paul Seong might have been still there.  He was a -- he's a foreign service officer as well, Career.

I can't recall which -- which if any of the contractors who functioned in like an executive assistant role were there.  There probably were by that point, just because they have very set hours. I think that's all I can recall off the top of my head.

Q.   And what were you all doing from 10:00 p.m. until 2:00 a.m. or whatever time you left?

A.   I know Joel was still focusing on items related to the executive order on the foreign assistance pause, but also starting the review process, or continuing the review process, pardon me.  I'm not sure what Matt and Ken were all up to.

I know Ken was dealing with some aspect of

Page 118

the Nick Gottlieb part, but I both excused myself and wasn't allowed to participate in those conversations because they were -- they could constitute PII. And Matt Hopson, I'm not really sure what he was up to the whole time, but, you know, as chief of staff he was likely supporting a little bit of everybody at that time.

Mary Tyler Holmes was just -- had just came back from -- I think we detailed her from our LPA section or she just rotated from LPA to our front office sometime before I got there, so she's working on whatever task is assigned. Paul Seong was -- to my understanding was helping Joel Borkert in collecting information based on all the programs that were used for that.

I don't remember when Jason Gray left, but I know he still had his duties to attend to as CIO at least, even at -- well, depending on when he was no longer acting administrator. I'm trying to think who else could have been there. Frankly it was sort of a blur, so.

Q.   And what were you doing?

A.   So just -- well, one pause. I think I turned purple.

Q.   On the Zoom, not in real life.

Page 119

A.   Well, actually, yeah, but let the record show that I'm not purple.

Q.   We're going to take a break soon so we can fix it then.

A.   Yeah, it's --

Q.   I'm going to ask just like two more questions.

A.   Yeah, yeah, let's -- let's -- let's just be purple.

Q.   Okay.

A.   But I -- I largely stood -- stayed there and was just with the team, so it was my first day. I'm a big believer of die at your desk. You probably work in white shoe law and you understand that mentality, but also, you know, as White House liaison sort of my role is to make sure that like there's a -- I don't want to say good morale because there definitely has been low points, but more of a -- the welfare and health of the staff I'm sort of like responsible for.

And that was one of the directives that I was told when I came to be a White House liaison for this -- this administration is that we're, you know, it's like your responsibility to make sure that, you know, folks if they -- if they're working too long

Page 120

that they go home, you know, that, you know, people are like taking care of themselves.

Because people have a -- every political -- every political administration, left, right, purple, it doesn't matter, their people burn themselves out and hit the -- love to hit the wall at 500 miles per how.

I know that really doesn't specifically answer your question, but I was sitting around talking to people quite a bit.

Q.   So we talked about the decision making for who decided to designate Secretary Rubio as the new acting administrator. Who made the decision to remove Mr. Gray as the acting administrator before the president decided to designate Secretary Rubio?

MR. SILER: Objection, argumentative.

THE DEPONENT: I don't know if there was a decision as USAID or as myself, that there was a decision to remove him before, and what the -- if there was any time lag between the two of them.

All I have is that one declaration where it says Secretary Rubio is now the acting administrator. So my understanding and the agency's understanding is these occurred consecutively as soon as like the order went out.

Page 121

So in order for Secretary Rubio to be made acting administrator, the previous acting administrator has to no longer be acting.

BY MS. STEVENS:

Q.   Was there any other document besides the designation of Secretary Rubio, the document we've talked about, any other document that removed Mr. Gray as -- from his acting administrator role?

A.   For that time frame? Oh, for -- for that -- from acting administrator, oh, pardon. Just to reiterate your question, was there any document pertaining to removing of Jason Gray. I -- I personally and I as USAID have not seen any other documents. I don't -- I also don't know when he received the notification that Secretary Rubio would be the acting administrator.

MS. STEVENS: All right. I think that's a good place to pause us for a lunch break. It's 1:00. What do y'all think on time? Let's go off the record and then we can talk about it.

THE VIDEOGRAPHER: All right. Please stand by. The time is now 1:01 and we are off the record.

(WHEREUPON, a recess was taken.)

BY MS. STEVENS:

Page 122

Q.   All right.  So turning your attention back to the time frame of the 30th.  We talked a lot about what happened on January 30th, and Mr. McGill -- you know Mr. McGill?  Do you recognize that name?

A.   Yeah.  Or yes, pardon me.

Q.   He's with the security office at USAID.

A.   Yes, deputy director at the time.

Q.   Yes.  Mr. McGill testified that he, when Mr. Farritor was seeking approval to have that elevated access to C-CURE that we talked about --

A.   Mm-hmm.

Q.   -- on the 30th, that he would need either permission from Mr. Gray as acting administrator or Mr. Jackson who at the time was one of the deputies.  Is that correct?

MR. SILER:  Objection, mischaracterizes.

You can answer.

THE DEPONENT:  Sorry.  It is correct that he would have to get approval from Mr. Jackson or Mr. Gray.

BY MS. STEVENS:

Q.   And neither Mr. Jackson nor Mr. Gray gave that approval on the 30th, correct?

A.   I don't have any documents that speak to that on the 30th.

Page 123

Q.   And it's USAID's understanding that neither of them, Mr. Gray or Mr. Jackson, gave that approval on the 30th?

MR. SILER:  Objection.  Can you just clarify that approval?

BY MS. STEVENS:

Q.   Approval for the elevated access for C-CURE.

A.   To my knowledge I don't have any record of that, so we -- I know there's approval for that on Friday the 30 -- or pardon me -- January 31st, but I don't have any documents that talk about it on the 30th that's not a draft.

And this actually pertains to something I just realized as I was flipping through this stuff.  I do have a document in front of me that does grant -- I apologize.  Let me backtrack half a step.  I do have a document that's in front of me on -- under tab 5 right away as you open it at 3263 is the thing.  It's emails from Zack Kahn and Steve Hernandez, about account creation for Phoenix for Luke Farritor, and so that's where he had full -- full read access to all records in the Phoenix.

So I believe I testified or misspoke earlier that I don't have anything from before that,

Page 124

or I can't remember exactly what I said, but I just want to make sure that was clear.

Q.   And I think that's in line with what we were talking about from the 27th where Mr. Farritor was given not the elevated God-like access to Phoenix, but rather the -- one of these types of user access; is that --

A.   That's correct.

Q.   Okay.

A.   That's -- basically he had the ability to read a lot of things, so, is the way to understand it.  I don't -- like just to re-clarify, I'm not an IT guy so I don't know all the terms.

Q.   Understood.  But this -- this email that you're pointing us to is 3263 is the Bates number, correct?

A.   Yes.

Q.   Okay.

A.   3263.

Q.   Turning your attention back to the 30th, we talked a little bit about after Secretary Rubio was designated as the acting administrator, that Mr. Jackson was the next highest person at USAID.  Do you remember talking about that?

A.   Yes.

Page 125

Q.   Okay.  Who at State was Mr. Jackson taking direction?

MR. SILER:  Objection to form.

You can answer.

(Knocking interruption.)

THE DEPONENT:  I was going to say come in, but they can't hear me.  I think -- I think I can talk about this one.

BY MS. STEVENS:

Q.   We can --

A.   Yeah, so the question was who did Mr. Jackson report to at the State Department.

Q.   Who was he taking direction from at State?

A.   I don't --

MR. SILER:  Objection, foundation.

THE DEPONENT:  Oh.  I don't know off the top of my head who he spoke to at the State Department, but Secretary Rubio would have been his direct report under the -- under the structure of the current -- the delegation he had at the time.

BY MS. STEVENS:

Q.   Understood.  So on -- in the sort of documented hierarchy --

A.   Yes.

Q.   -- it would be Secretary Rubio, Mr.

Page 126

Jackson. But Mr. Jackson who worked at USAID at the time, right?

A. Mm-hmm.

Q. Who was he taking direction from at State?

MR. SILER: Objection, assumes -- foundation.

THE DEPONENT: Like his direction would be coming from the Secretary and the orders of the Secretary at the time.

BY MS. STEVENS:

Q. And I keep asking it just because you're saying would be coming --

A. Yeah.

Q. -- and I -- I need to know what is USAID's answer to who did he contact.

MR. SILER: Objection, asked and answered.

THE DEPONENT: It would be coming from the Secretary, but I don't know of any specific orders that would have been coming from the Secretary that were above and beyond what Ken Jackson would have been doing in his normative functions sua sponte, of his own accord.

BY MS. STEVENS:

Q. Who at DOGE was Mr. Jackson taking direction from?

Page 127

MR. SILER: Objection, argumentative.

THE DEPONENT: Mr. Jackson -- wow. Mr. Jackson did not take orders from DOGE.

BY MS. STEVENS:

Q. Okay. Who at the State Department did Mr. Jackson talk to after he became the next highest person in charge at USAID according to your prior testimony?

A. We -- we have to narrow the time frame down, because like if I could -- like up until today, like it would be dozens and dozens of people, but for like -- can we -- can I have a window?

Q. Yes. On the 30th after Secretary Rubio was designated as the acting administrator, and according to your prior testimony Mr. Jackson was the next highest person in charge at USAID, who at the State Department was Mr. Jackson talking to?

MR. SILER: Objection, vague, but you can answer.

THE DEPONENT: At the -- I don't know who he was talking to directly. I don't have any record to show of any emails, but the individuals he would have been talking to include Pete Marocco who was at the time director of F -- F Office, and later past that time frame it would have included individuals

Page 128

like Counselor of State Mike Needham, Chief of Staff -- or Deputy Chief of Staff Dan Holler.

BY MS. STEVENS:

Q. And again, you're saying would have talked to. Do you -- does USAID have an answer of who Mr. Jackson did talk to?

MR. SILER: Objection, vague. Form.

THE DEPONENT: No, I don't have any records of any communications in front of me or I've reviewed that's of Ken Jackson speaking to anybody at State Department on January the 30th.

BY MS. STEVENS:

Q. Okay.

A. Of 2025.

Q. Thank you. Same question as to January 31st.

MR. SILER: Same objection.

THE DEPONENT: Excellent. So, let's see. Oh, at State Department this is -- this is something I can also attest to personally. Mr. Marocco, Pete Marocco, came in on the early morning of Friday January 31st with bagels, I believe. So -- so he definitely spoke to Pete Marocco by that point.

BY MS. STEVENS:

Q. What was the conversation that Mr. Jackson

Page 129

definitely had with Mr. Marocco before that point?

A. I don't -- I can't say for sure, other than here's bagels or something to that effect. They spoke behind closed doors directly with one another. If I recall correctly, Pete, after bringing the bagels, spoke to Mr. Gray one on one, and then I think he spoke to a bunch of the -- like Ken Jackson and Matt Hopson as a group with Mr. Gray. If I recall correctly. This is from my personal recollection.

Q. What's the answer as to USAID's understanding?

MR. SILER: Objection to form insofar as this witness can't today testify to every conversation that these individuals had on undefined topics, but you can answer.

THE DEPONENT: Pardon me, I don't know how to phrase this without sounding as pedantic as it's going to come off, but because I'm the same person, I think that could be considered USAID's response, is that they did have a conversation on the morning of January 31st in person at the Ronald Reagan Building in the administrative suite.

BY MS. STEVENS:

Q. And have you talked to Mr. Jackson about

ADAM KORZENIEWSKI                  March 26, 2026                  130 to 133
95350                                                             30(b)(6)

Page 130

that conversation?

A.   No, not in a very long time, potentially, if ever.  I -- I -- frankly, it was one -- it just happened.  He brought bagels, I was hungry.  They talked.  And then, you know, that was the time when Pete Marocco -- this is the first time I know for a fact personally that Jason Gray knows that he's no longer acting administrator, because my understanding is that Pete Marocco told him personally.

So I don't know when Mr. Marocco knew, and I don't know when Jason Gray knew.  I assume it was prior to this, but I -- that's the -- that's the first time that an official from State Department to my personal knowledge talked to Jason Gray about it.

Q.   How did you come by that knowledge?

A.   They -- Jason came out and told people about the conversation, and Pete talked about the conversation, just so that -- basically the -- the rationale for it was so that it wasn't a surprise to anybody.

Q.   What wasn't a surprise to anybody?

A.   That Jason Gray was no longer acting administrator.

Q.   And who -- you're talking about people

Page 131

sort of standing around.  Who was standing around?  Who heard that information?

A.   It would have been -- there would be a number of contractors in that office who were functioning as personal assistants.  The -- it would include the foreign service officers I have mentioned prior who are Careers who have worked in that office.  It would include some of the political appointees that were physically present.

Q.   Besides those individuals who were present when Mr. Marco and Mr. Gray were talking about the conversation, how was the fact that Mr. Gray was no longer the acting administrator, how was that information shared out?

A.   Verbally at the time.

Q.   Can you be more specific?

A.   We kind of did like a little half circle.  I mean, there really wasn't enough of us to do like a real semi-circle, but -- and basically Pete said, hey this is not no reflection of Jason, Jason's done a great job here, you know, but the president has made Marco Rubio the acting administrator of USAID.

Q.   How was it shared beyond the folks that were in that semi-circle I just described?

A.   Verbally to my -- to my direct knowledge,

Page 132

my personal knowledge, but I don't know if I have any emails that I received for that, so.  I can flip through this during the break to double check to make sure, but I don't think I have anything like that.

Q.   Well, I mean, you -- you prepared many hours of prep for this deposition, so documents are not the only way to prepare; is that right?  You've spoken with people.

A.   No, I did not speak to anybody that would have about disseminated the agency-wide notice or any emails that would have been forwarded on to staff or personnel.

Q.   Mr. Gray testified that it was "not public knowledge" that he'd been removed as acting administrator.  Why was it not public knowledge?

A.   I don't know why he would --

MR. SILER:  Objection, vague.

You can answer.

THE DEPONENT:  Okay.  Sorry, I lost my train of thought for a second.  I don't know why he would characterize it as not public knowledge.  And frankly, because of my prior knowledge that this was occurring, I don't know -- frankly I just don't know the extent of the knowledge of anybody else outside

Page 133

that room.  I just can't really speak to it either way.

At some point later it was very clear that Marco Rubio was our acting administrator as Secretary of State, everything else that he was.

BY MS. STEVENS:

Q.   Is that later when it was publicly announced on Monday the 3rd of February?

A.   I tell you, it would be the 3rd.  It would -- it would be -- if it was publicly announced on the 3rd, then it would be public knowledge at that point.

Q.   What was Mr. Marocco's role on the 31st, January 31st?

A.   As USAID, I can't really speak to what he was doing.  He was there for a very limited time, maybe an hour.  Personally I -- he was there -- his answer why he was there specifically was to deliver foodstuffs and coffee for the team who -- some of whom were up all night.  Well, most of the night.  Some of us, we -- we did get sleep.

Q.   And you're saying you can't speak to him -- his role because of your -- your speaking on behalf of USAID; is that your point?

A.   Yes.  I -- and I don't know the substance

ADAM KORZENIEWSKI                      March 26, 2026                    134 to 137
95350                                                                    30(b)(6)

Page 134

of the conversations he had.

Q.   I want to go through, these are -- this is the same question, it's just for over the course of a few days, and so I'll go through each day and a different time of each day, so just bear with me because it's --

A.   It's tedious, yeah, I get that.

Q.   What was the chain of command for the top like three sort of rungs on the ladder at USAID on Thursday January 30th at noon?

A.   I don't know when Jason Gray was informed that he was no longer acting administrator.

Q.   Was your testimony -- previous not that he was informed sometime in the afternoon around 5:00?

A.   I was -- that is my personal knowledge. I wasn't told until sometime in the late afternoon or early evening time frame.

Q.   Does USAID know when Mr. Gray was removed from his role as acting administrator?

A.   I don't have any documents that say specifically when he was notified of this.

Q.   But you -- you know -- I mean, sitting here today at the USAID representative, that -- that you were to be able to articulate what USAID the entity knows, not just what's in documents in front

Page 135

of you, right?

A.   Right, but I also -- and this -- I'm not trying to be pedantic, I just didn't read Jason Gray's emails from that time frame, or his text messages or phone number, phone call conversations.

Q.   Right. But my point is that documents, whether they're emails or -- or text messages or any communication like that, they're not the only way that you, you, the USAID representative, obtain knowledge to speak on behalf of the organization.

A.   That's correct, yes.

Q.   So do you -- well, let me rephrase it. What was the chain of command at USAID on Thursday January 30th at 5:00 p.m.?

A.   My understanding around 5:00 p.m. time frame was that it was -- it became Secretary Rubio and then Ken Jackson as his previously appointed -- or sorry, delegated authorities as acting or PPTO Deputy Administrator for Management Resources.

And then the next highest ranking, highest billeted person would have been Matt Hopson as Chief of Staff, pardon me.

Q.   For the previous question where I asked what the chain of command was on Thursday January 30th at noon, you said you don't know whether Mr.

Page 136

Gray had been taken out of the acting administrator role at the time. Who would know besides Mr. Gray himself?

A.   I would -- I mean, I would probably be -- I frankly actually don't know off the top of my head of when he -- what time he -- who would know what time he was informed. I mean, I guess you would probably -- I would -- I would definitely look at emails, but I guess maybe Ken Jackson would probably have -- have a rough idea of what time it would have been, and then maybe Matt Hopson would have been also. I'm trying to think who else would have been -- been in the know.

I would also -- obviously Secretary Rubio would -- would be aware and know what time that he was made acting administrator. This is pure speculation on my part both as USAID and as Adam. I guess Counselor of State Mike Needham would -- would know, but it's -- there's a chance that he wasn't necessarily party to any of those conversations at the time because he has other duties at this time.

Q.   And Mr. Needham reports directly to Secretary Rubio; is that correct?

A.   That's correct, he's the Counselor of State.

Page 137

Q.   Okay. Turning -- turning to a little later on Thursday, what was the chain of command at USAID on Thursday January 30th at 10:00 p.m.?

A.   My understanding, it was Secretary Rubio, Ken Jackson, and it would have been Matt Hopson as the next highest ranking, highest billeted person. Just in terms of the rank, like most political appointees were GS-15s so that didn't really -- there was -- there was almost no distinction on the GS scale, but there was definitely like a -- an authority aspect to it, especially for the positions that had the supervisory role already.

Q.   And you're saying that because Mr. Hopson has chief of staff was slightly elevated on the supervisor role but might have been a GS-15 the same as the other political appointees? Is that your point?

A.   That's correct.

Q.   Okay. What was the chain of command at USAID on Friday January 31st at 8:00 a.m.?

A.   It would have been Secretary Rubio, Ken Jackson, Matt Hopson.

Q.   What was the chain of command at USAID on Friday January 31st at noon?

A.   It would have been Secretary Rubio, Ken

ADAM KORZENIEWSKI                    March 26, 2026                    138 to 141
95350                                                                  30(b)(6)

Page 138

Jackson, Matt Hopson.

Q. Sorry for the repetition.

A. Oh, no, not --

Q. What was the chain of command at USAID on Friday January 31st at 6:00 p.m.?

A. My understanding is it would be -- pardon me. It wasn't "would be," it was Marco Rubio, Ken Jackson, Matt Hopson.

Q. What was the chain of command at USAID on Friday January 31st at 10:00 p.m.?

A. I'm trying to recall when Matt Hopson resigned his position. Might have been the day after. It's been -- been a while since I had to discuss his resignation, but if it -- if it wasn't that night that he resigned, it would have been Marco Rubio, Ken Jackson, Matt Hopson. Sorry. Marco Rubio, Ken Jackson, Matt Hopson, yes.

Q. What was the chain of command at USAID on Saturday February 1st at 8:00 a.m.?

A. Once again if -- I don't remember if Matt Hopson -- this is me personally and USAID -- resigned on Friday or Saturday, but it would -- if Matt Hopson hadn't resigned yet it would be Secretary Rubio, Ken Jackson, Matt Hopson.

Q. There has been testimony that he resigned

Page 139

on Friday the 31st, just --

A. Yeah, some time probably in the evening, yeah.

Q. What was the chain of command at -- sorry. So on the morning of the 1st at 8:00 a.m., what was the chain of command?

A. It would be Secretary Rubio, Ken Jackson, Joel Borkert.

Q. When was the next time that that -- that the chain of command changed from those three folks to anyone else?

A. I believe it was the 3rd when -- Monday the 3rd when -- I believe that was the day that Pete Marocco was delegated the authorities of deputy administrator.

Q. You're touching your binder. Do you want to --

A. Yeah, I'm -- I think it's in here, but -- it's a tab with all the -- or appointments. I think it's like somewhere in the middle.

MR. SILER: It's the -- it's the top exhibit.

THE DEPONENT: Thank you.

MR. SILER: 14.

THE DEPONENT: Oh, 14? Let me give you

Page 140

the document number when I have it. Okay. That's later, that's later. That's before. Okay. I actually -- so correction. It appears that Pete Marocco was made an officer of USAID and deputy administrators for policy and programming, and management resources, and chief operating officer, on February 2nd which would have been a Sunday. And the document number is 0574. It's underneath tab 14, couple pages in.

BY MS. STEVENS:

Q. Thank you. What time on February 2nd was the document that you just referenced signed?

A. I don't know. I have no way of knowing as USAID.

Q. Can you unpack that a little more? What do you mean you have no way of knowing as USAID?

A. That was signed by -- in the Secretary's suite. I don't -- I'm not familiar what time he was going through his documents.

Q. Was this document transmitted to USAID?

A. Yes.

Q. At what time -- well, was it transmitted to USAID on February 2nd?

A. That, I cannot recall, but by -- by February 3rd I know for a fact that we knew that

Page 141

Pete Marocco was deputy administrator.

Q. How -- how do you know that for a fact?

A. That's personal -- the personal knowledge. That was something that we were told when we got into the office.

Q. When you got into the office on Monday February 3rd, you were told that Mr. Marocco has been delegated these authorities?

A. Yes.

Q. Was this document that you've just been referencing provided to USAID on the 3rd?

A. I didn't see it on the 3rd. I don't -- personally don't recall when I first saw it.

Q. When did USAID get the document?

A. It would have been -- pardon me, sorry. It would have been by February 3rd we received this.

Q. Do you know what time?

A. No, not off the top of my head, and also USAID doesn't know.

Q. When you came into the office on Monday February 3rd, who announced that Mr. Marocco had been delegated those authorities?

A. Ken Jackson told me personally.

Q. I'm sorry, say that again?

A. Personally told me, Ken -- Ken Jackson

Page 142

personally told me that Mr. Marocco was now the deputy administrator, or acting.

MS. STEVENS: What number exhibit are we on?

THE REPORTER: 5.

MS. STEVENS: I'm going to hand you -- sorry.

THE REPORTER: Marking exhibit 5.

(WHEREUPON, Exhibit 5 was marked for identification.)

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Okay. Take a look at that. Let me know once you've had a minute to read through.

A. Read through.

Q. All right. Would you identify this document, please?

A. Yes. This is an email chain between Katie Miller at the EOP, Executive Office of the President, and Mike Needham, Michael A. Needham, the Counselor of State at State Department.

Q. You sort of addressed this a little bit, but could you tell us who -- who is Michael Needham?

A. Yeah. Michael Needham is the Counselor of State. He was, and still is.

Page 143

Q. And, sorry, who is Katie Miller?

A. That's -- like I actually don't really know what her position title was, but she was a senior leader in the USDS is my understanding. I don't know if she was at that time specifically, but I know at one point she did make her way through that office.

Q. And in the email Ms. Miller tells Mr. Needham to call Steve Davis, correct?

A. Yes.

Q. What did Mr. Davis and Mr. Needham talk about?

MR. SILER: Objection, content of that as indicated here, is covered by the deliberative process privilege. Instruct the witness not to answer in his representative capacity, but he can testify if he knows.

BY MS. STEVENS:

Q. Do you know what they talked about?

A. Adam does not know what they talked about.

Q. Does USAID know what they talked about?

A. My attorney just said don't answer that because of the DPP.

Q. I think he's saying, correct me if I'm wrong, Jake, not to tell the substance of it, but

Page 144

what's the general topic of the conversation?

MR. SILER: The witness for USAID can answer whether USAID knows, I agree with that.

BY MS. STEVENS:

Q. Does USAID know the --

A. No.

Q. -- content of the conversation?

A. USAID does not know the content of the conversation. Apologies for cutting you off.

Q. That's okay. The top part of the email says that the Secretary was trying to reach Elon but has not been able to do so. Do you see that part?

A. Yes.

Q. Why was the Secretary trying to reach Mr. Musk?

A. Said does not know. Adam has no idea.

Q. Were you involved in this email exchange in any way?

A. Neither USAID nor myself as a person was involved in this email exchange.

Q. Did you see this email exchange before your preparation for today's deposition?

A. No. Oh, can you say that question one more time? I'm sorry. I did see this during my prep, but not -- not prior to the preparation.

Page 145

Q. I -- I asked if you had seen it prior to your prep.

A. Okay, good. Yeah, that's -- that's what I -- I did not see it prior to my preparation.

(WHEREUPON, Exhibit 6 was marked for identification.)

THE REPORTER: Exhibit 6 marked.

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Take a sec to look at that. Let me know once you've had a minute to read through it.

A. I have -- I have read it. I'm just trying to follow who's talking to whom. Okay.

Q. Okay. And you'll see if we get into many of the emails, some start at the top and go towards the bottom in time order, and then some start at the bottom and go towards the top.

A. Yeah, I can -- if you want, I can just speak to that real quick for the record.

Q. Sure.

A. There's a -- this is a fundamental problem between Gmail being used at USAID and State Department using Microsoft Outlook. And so sometimes -- and these are -- seem to be -- the documents I've reviewed are reasonably clear, but

ADAM KORZENIEWSKI                    March 26, 2026                    146 to 149
95350                                                                 30(b)(6)

Page 146

sometimes you'll see conversations where like there's a whole separate conversation in the middle of it, and that's because of people constantly switching from one system to another.

Q. There is once such email that we might go over at some point. At least this one is more reasonably fair. Could you identify the document for the record, please?

A. Yes. The document that I received is numbered 0592, and it's titled AID Intended Comms/LPA Admin Leave and RIF Activities. Do you need me to summarize it real quick?

Q. Yes.

A. This is a conversation between a number of individuals to include Jeremy Lewin, Pete Marocco, Ken Jackson, Laken Rapier, about individual -- or employees of our Legislative and Public Affairs office, or LPA, that were going to be placed on administrative leave following a review for redundancies, and the rest.

Q. I'm sorry. And what?

A. I -- I can keep going if you want me to keep -- summarize the rest of the email.

Q. No, you're fine. The -- the email is -- is directing the putting on administrative leave of

Page 147

these folks that you justified, right?

MR. SILER: Objection, argumentative.

You can answer.

THE DEPONENT: Yes, I would characterize it as a -- as an order being issued here.

BY MS. STEVENS:

Q. The --

A. It --

Q. This --

A. Well, it refers to an order that Ken Jackson will -- will have made later, but it is -- there is an order in here.

Q. This email, the first email is from Mr. Lewin to Mr. Davis, Mr. Marocco, Mr. Jackson, and Ms. Rapier, correct?

A. That's correct.

Q. Okay. Where Mr. Lewin talks about putting these folks on administrative leave, correct?

A. Yes.

Q. Is there a response from Mr. Jackson from this email chain?

A. No.

Q. Is there a response from anyone besides Mr. Lewin in the email chain?

A. Yes, Pete Marocco, or Peter Marocco.

Page 148

Q. And he says "no objection," correct?

A. That's correct.

Q. The date of this email, I think all of the emails in this chain, is January 31st, correct?

A. Yes.

Q. On the second page, the second to last email, Mr. Lewin says: Thank you, Pete. Ken will formally authorize shortly and our team will assist Laken with execution tonight. Did I read that correctly?

A. Yes.

Q. Who is "our team" in that sentence?

A. USAID. USAID leadership team.

Q. Who specifically, what individuals are on the team that Mr. Lewin's referring to?

A. It was -- specifically in this instance it was Jeremy Lewin, Ken Jackson, Laken Rapier.

Q. Well, and let's read that sentence a little -- a little more deliberately, I suppose. Ken will formally authorize.

A. Yes.

Q. That's Mr. Jackson, right?

A. Yes.

Q. Shortly. Ken will formally authorize shortly, and our team will assist Laken with

Page 149

execution tonight.

A. Oh, my apologies. It would be -- it would be USAID still, but that's also inclusive of the detailees that are part of the DOGE team.

Q. Meaning that the DOGE team would help execute whatever the next steps were; is that correct?

A. That's correct.

Q. Also on January 31st the signage that had USAID's official seal was taken down off of the office. Do you recall that?

A. Personally I don't remember the exact date, but USAID doesn't disagree.

Q. And I'll represent to you that the answer submitted by the defendants in this case said that they admit that USAID removed signage bearing the agency's official seal from the Ronald Reagan Building on or about January 31st, 2025.

A. It sounds correct from my position as USAID.

Q. Who made the decision to remove the seal?

A. I don't have any emails, and I haven't reviewed any documents that had someone with a specific direction of that.

Q. I will agree with you that we haven't seen

ADAM KORZENIEWSKI                March 26, 2026                    150 to 153
95350                                                             30(b)(6)

Page 150

any document that answers this question.

A.   Yeah.

Q.   Which is why I'm asking you.

A.   Yeah.

Q.   What does USAID say as to who made the decision to remove the seal from the building?

A.   It was coming from some portion of the leadership team.  I don't know who specifically gave the order, but it would have been at least Ken Jackson's level, it not Secretary Rubio issuing the order downward.

Q.   And you say it would have been.

A.   Yeah.

Q.   I have to, just to make sure I'm making the correct record --

A.   Absolutely.

Q.   -- parse words here.  You say it would have been because you're assuming that sort of chain of command you're articulated was followed, but you -- you can't say that either Mr. Jackson or Mr. Rubio -- I'm sorry, Secretary Rubio gave that order, correct?

A.   That's correct.

Q.   So who was the decision to take down the seal conveyed within USAID?

Page 151

A.   I can't -- personally I can't recall to the -- to the staff.  I'm -- as USAID, I'm not able to give an answer to that.

Q.   Was the removal of the seal directed by any of the DOGE team members?

A.   Not to my knowledge, no.

Q.   But you don't know who did it?

A.   I don't know who did it, but they -- they weren't in an advisory capacity.  They didn't have the authority to issue those orders.

Q.   Was Secretary Rubio consulted before the removal of the seal?

A.   I don't know as the agency, and Adam doesn't know at all.

Q.   Turning your attention to February -- Saturday February 1st.

A.   Yes.

Q.   On that date, DOGE team members arrived at USAID headquarters at the Ronald Reagan Building, correct?

A.   Yes.  I think I even have documents of this.

Q.   Tell me when you're there.

A.   Okay.

MR. SILER:  I think at tab 8.

Page 152

THE DEPONENT:  That's why I'm -- I think I'm just making sure it doesn't continue.

So we're on tab 8, the first document in the series under tab 8 is 2600.

Apologies for opening a soda next to the mic.

BY MS. STEVENS:

Q.   On February -- Saturday February 1st, who were the DOGE team members who arrived at USAID headquarters at the Ronald Reagan Building?

A.   I'm familiar with Luke Farritor being there.  Oh, pardon me.  Luke Farritor, Gavin Kliger, Jeremy Lewin, and it says Tarak Makecha requested access for Saturday February 1st at 11:10 a.m., and writes Brian McGill on document 2606 and 2607.

Q.   Did Mr. Davis also go to the USAID headquarters at the Ronald Reagan Building that day?

A.   Stand by.  They mention Steve Davis, Noah Peters, and James Burnham on page 2605 going into 2606.  I don't know who specifically came into the building.  I just know who had -- who requested access.

Q.   And the folks that -- the additional folks that requested access to the building were Mr. Davis, Mr. Peters, and Mr. Burnham?

Page 153

A.   My -- my interpretation of the email from reading it, the one that's dated Saturday February 1st, 2025, at 1:45 p.m. from Brian McGill, he says these are additional people we have granted access for.

I believe he was referring, like in my reading of the email, the people I believe he's referring to are Jeremy Lewin, Luke Farritor, Gavin Kliger, and Tarak wanting -- for the access that day as opposed to Steve Davis, Noah Peters, and James Burnham.

I think it makes it sound like James -- those -- that Davis/Peters/Burnham group already had access.

Q.   Is USAID aware that all seven of these individuals went to the USAID headquarters at the Ronald Reagan Building on Saturday the 1st?

A.   I don't dispute it.  I -- I believe you're correct.

Q.   There was a confrontation over access to the Ronald Reagan Building that day.

A.   Yes.

Q.   Mr. --

MR. SILER:  Hold on, let -- let her finish the question, and then I'll object.

**NAEGELI**
DEPOSITION & TRIAL

**(800) 528-3335**
NAEGELIUSA.COM

Page 154

BY MS. STEVENS:

Q.   Mr. Davis engaged in a phone call with Mr. Gray about the building access.

MR. SILER:  Just to be clear, I'm sorry, I don't mean to interrupt your question.

MS. STEVENS:  I'm not done yet.

MR. SILER:  Okay.

BY MS. STEVENS:

Q.   Tell us about the contents of that phone call.

MR. SILER:  Okay.  I'm going to object to the confrontation as a characterization, but you can answer.  I apologize.

THE DEPONENT:  Yeah, I don't know about a confrontation whatsoever, but I'm not aware of the phone conversation between -- you said Steve Davis, correct, and Jason Gray?

BY MS. STEVENS:

Q.   Are you aware of Mr. Musk engaging in a phone conversation with respect to access to the USAID building that day?

A.   You're asking if Elon Musk did?  I'm not aware of any conversations between Elon Musk and Jason Gray.

Q.   Sorry, I should have -- not you, Adam, you

Page 155

--

A.   Or USAID.

Q.   From USAID's perspective, was there a conversation between Mr. Musk and Mr. Gray or any other career USAID staff about access to the building that day?

A.   USAID does not -- is not aware of a conversation between Elon Musk and Jason Gray, or Elon Musk and any other career staff at USAID.

Q.   Did Mr. Musk have a conversation with any of the DOGE team that were assigned to USAID about access to the USAID building that day?

A.   The -- sorry, the question is did Elon Musk have conversations with the USAID detail DOGE team?

Q.   About access to the building that day.

A.   I -- I don't know if he's -- he communicated with them about that access, or that day.  As USAID, I don't know.  Adam doesn't know either.

Q.   Mr. Gray has testified that he spoke with Mr. Davis that day, and I am paraphrasing, but I'll try to do so without being argumentative, that Mr. Davis was frustrated about the -- some team members' ability to access the building.

Page 156

Now, my question is how did Mr. Davis know that there were DOGE team members who had -- weren't able to get access to the building?

MR. SILER:  Objection to form and to, you know, Mr. Davis is not a USAID employee, therefore that's outside the scope of knowledge of the agencies that are being deposed here, but you can answer if you know.

And speculation.  You can answer if you know.

THE DEPONENT:  Sounds good.  So I -- there -- just to -- there's -- I feel like this is -- there's actually a number of questions being asked with this question, but I think the attitude of frustration is sort of reflected in these emails.

So I think that's a correct characterization of possibly Steve Davis' mentality at the time.  However, I don't know the contents of the conversation, and I don't know the -- the details of what they were -- what they discussed or why they discussed it.

BY MS. STEVENS:

Q.   Do -- does -- sorry.  From USAID's perspective, did Mr. Davis speak with any of the DOGE team members who were assigned to USAID about

Page 157

their ability to access the building?

A.   USAID doesn't know if he spoke to them specifically about access to the building.

Q.   Why was Mr. Davis involved in obtaining abscess to the USAID building on that day when, as Counsel pointed out, he was not an employee of USAID?

MR. SILER:  Object to form.  And speculation.

THE DEPONENT:  Steve Davis was a U.S. government official, and as an official at the White House he does have some degree of being able to go into government offices as invited.

BY MS. STEVENS:

Q.   Invited by whom?

A.   The -- presumably by -- this is me speculating, and me as USAID speculating -- but the USAID/DOGE detailees.

Q.   Is it USAID's understanding that Mr. Davis reported to Mr. Musk?

MR. SILER:  Objection, it's -- the scope of the reporting relationship between Musk and Davis I think are outside the topics, but you can answer if you know.

THE DEPONENT:  Yeah.  Yeah.  As myself,

Page 158

like I didn't -- I don't know the exact structure of USDS, the U.S. DOGE Service as it was called during that time. I don't -- I believe Steve Davis was the next person in line in terms of leadership chain after Elon Musk, but traditionally and historically like Steve Davis has been a direct report to Elon Musk for years of various other capacities. This is my personal knowledge. Yeah.

I think just for clarity's purposes, I've never seen an org chart for USDS, and in my role as White House liaison I would never have.

BY MS. STEVENS:

Q. We've talked a little bit about, or quite a lot, a bit about Mr. Farritor's access to C-CURE on the 30th and then the 31st.

Turning your attention to the 1st, Mr. Farritor used his C-CURE administrative access to give himself access to controlled spaces within the USAID building, correct?

A. The email specifically I think you're going to refer to is document 2600. The determine that John Voorhees used was restricted space.

Q. So is that a yes or a no?

A. I --

MR. SILER: Can you -- can you restate the

Page 159

question?

MS. STEVENS: Sure.

BY MS. STEVENS:

Q. Mr. Farritor used his C-CURE administrative access to give himself access to controlled spaces.

MR. SILER: Objection, vague, but you can answer.

THE DEPONENT: Yeah. So I -- I don't -- like all spaces are controlled at the Reagan Building, so I -- using the word "controlled" is a little too vague for those purposes, which is why I'm focusing on the term -- the term of art that John Voorhees used, because I think that's probably the more accurate depiction of the case.

BY MS. STEVENS:

Q. Well taken, so I'm going to rephrase. Mr. Farritor used his C-CURE administrative access to give himself access to restricted spaces at USAID -- the USAID building, correct?

A. Yes, USAID affirms that.

Q. And Mr. Farritor gave himself that access without authorization.

MR. SILER: Objection, calls for a legal conclusion.

Page 160

THE DEPONENT: Yeah, I -- I don't know if it was with or without. This is me as USAID, without a prior authorization. Like he had access to the system.

BY MS. STEVENS:

Q. Did anyone at USAID give him authority to give himself access to restricted spaces at the USAID building?

A. He was granted access to the C sure system prior to that, so USAID's interpretation is that yes, he had the ability to do so.

Q. And I --

A. Was allowed to do so.

Q. And I want to distinguish a little bit --

A. Yeah.

Q. -- between the ability, because you have the useability of a system versus authorization to do it.

A. Yes.

Q. My question is focused on the authorization.

A. Yes.

Q. Mr. -- go ahead.

A. Oh, sorry, no. Go ahead. I don't want --

Q. Mr. Farritor gave himself that access

Page 161

through the C-CURE system to restricted spaces without authorization, correct?

MR. SILER: Objection, calls for a legal conclusion. You can answer.

THE DEPONENT: USAID is not aware of him getting the prior approval to create the access to -- before -- before giving himself access to forward attack 06 restricted space. I'm not aware as USAID of any blanket policy that gave him that -- that authority.

BY MS. STEVENS:

Q. Also on February 1st, Saturday February 1st, the USAID website was taken offline; is that correct?

A. Correct.

Q. The decision to take the website offline was made by DOGE team members, correct?

MR. SILER: Objection to form.

THE DEPONENT: I don't agree with the premise of the question. I've got to find the email.

Well, I don't have specific emails related to this, but the DOGE team members wouldn't have the authority to approve that of their own accord. They would have to go through, at the time, Ken Jackson

Page 162

for approval.

BY MS. STEVENS:

Q.   What document are you looking at?

A.   I'm -- I'm actually not referring to a document.

Q.   Okay.

A.   But the document that was -- I was looking at a second ago, so sorry, is 0604, but that has very little material items related to it.

MR. SILER:  Should we take a break so he can get some water?  It sounds like his voice is --

MS. STEVENS:  Yes, can I just -- let me finish --

MR. SILER:  Yes.

MS. STEVENS:  -- this like couple of questions.

BY MS. STEVENS:

Q.   You said that the DOGE team members would not have had the authority to approve it.  They would need to ask for that through Mr. Jackson.  But my question is, did they make the decision, not did they have the authority to do it.  Did a DOGE team member or members make the decision to said the USAID website offline?

A.   So I'm -- I'm trying to figure out a way

Page 163

without this sounding very pedantic, but they can decide whatever they please, but they still had to get permission from somebody in charge to do so.

So they would have said, it's our recommendation, we have decided that it's for us to take down the USAID website, but somebody else would have had to approve it along the way, and that would have been -- would have been either -- would have to be at the time Ken Jackson or Secretary Rubio.

Q.   And I understand that that's like the chain of command, that's how it should go --

A.   Right.

Q.   Or shouldn't have done.  My question is, did they make the decision sort of outside of what should have happened, did any of the DOGE team member or members make the decision to take the USAID website offline, like by themselves?

MR. SILER:  Objection, asked and answered.

Go ahead.

THE DEPONENT:  Once again, they can decide whatever they please, but they didn't have the authority to do it of their own accord.  Like they could not -- they could not just issue the order directly to the Career and for the Career to know who this person is.

Page 164

BY MS. STEVENS:

Q.   What would prevent them from doing that?

A.   The Career's knowledge of the chain of command.  I don't mean to be trying to be circular here.  It's -- if you -- like there's people in charge and then there's the folks that are advising.  There's a -- there's people who are allowed to make decisions and there's people who are not allowed to make decisions.

Q.   Who authorized the take the -- the decision to take the website offline?

A.   This is me speculating a little, because I don't have a document in front of me, but I believe it was Ken Jackson is the one that made the order.

Q.   Do you have the list of topics in front of you in your binder?  At the very front.

A.   Yes, deposition topics, yes.

Q.   Topic number 9.

A.   Number 9.

Q.   Says events and decisions precipitating the USAID website being taken offline on or about February 1st, 2025.  Did I read that correctly?

A.   You did.

Q.   Okay.  So this is one of the very specific topics you've been designated as the USAID

Page 165

representative on.

MR. SILER:  Objection, characterization.  Argumentative.

You can answer.

BY MS. STEVENS:

Q.   Is that -- is that correct?

A.   That -- can you restate the question?  I'm sorry.

Q.   Sure.  This is one of the topics you've been designated at the representative for USAID to talk about.

A.   Yes.

Q.   But the answer to my question about what made the decision to take the USAID website offline, you said I'm going to have to speculate some, and then you did.

A.   Yes.

Q.   Do you know the answer to the question -- sorry.  From USAID, not Adam.

A.   Yes.

Q.   Who made the decision to take the USAID -- USAID website offline?

A.   USAID does not know.  I -- USAID has not seen a document that says one person or another made the decision.

Page 166

Q.   Does USAID know the answer to the question absent a document that would demonstrate the answer?

A.   Like USAID is -- is an organization, so speaking as the organization without documentation of it, it would -- there would -- I would have no way of being able to say who did it or not.

MR. SILER:  Why don't -- why don't we take a break now.

MS. STEVENS:  Okay.  Let's take a break now.  Sorry, that went a little longer.

THE DEPONENT:  Oh, go nuts.

THE VIDEOGRAPHER:  Please stand by.  The time is now 3:08 and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  3:29, and we are on the record.

THE DEPONENT:  Sound works.

BY MS. STEVENS:

Q.   Oh, thank you for saying that.

A.   Let me filibuster while we all make sure mics work.

Q.   Appreciate it.  Okay.

A.   Since I -- if -- if you don't mind I would like to clarify a couple points after flipping through my documents a little bit.  So in terms of

Page 167

-- this is already clipping ahead.

If you go to, I believe it's tab 29, sub tab 1, there's a Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories, et cetera, et cetera.  It's not -- doesn't have one of those little tiny doc numbers that I can't remember what it's called, like a pacer, number, right?  Yeah.

Q.   Bates.

A.   Bates, that guy.  But on page 5 it says, Objections and Responses to specific derogatories -- interrogatories, there's a -- the question that was asked when it comes down to the website on or about February 1st, who made the decision, our response was Gavin Kliger effectuated the changes to the USAID website on or about February the 1st, 2025, in consultation with USAID leadership to include Ken Jackson who was performing the duties of his role.

And so just to give clarity to our last question that we were talking about, it was Ken Jackson gave the order to Gavin Kliger to -- to take that down.

And then another point of clarity --

Q.   Well, hold on.  Let me ask a follow-up question before you --

Page 168

A.   Yeah.

Q.   -- do any more clarifying.  I'll let you clarify.  You just said that Mr. Jackson gave Mr. Kliger an order, but that's not what this answer says, is it?  It says, in consultation with USAID leadership including Ken Jackson --

A.   Yes.

Q.   -- is that correct?

A.   Yes.

Q.   Okay.  So --

A.   That's what the -- yes, that's what the response says.

Q.   Okay.  And -- go ahead.

A.   My -- my interpretation of is that it's Ken Jackson that did it.

Q.   Your Adam's interpretation of it?

A.   USAID's interpretation of it.

Q.   Okay.

A.   Because Gavin -- yeah, Gavin Kliger doesn't have the authority to do it on his own accord.

Q.   The -- this interrogatory that you've directed our attention to says, in consultation with USAID's leadership including Jackson, who else in USAID leadership was part of that consultation?

Page 169

A.   I do not know as USAID or my personal self who would have been there.  I can speculate, but that would just be speculation.

Q.   Earlier before we took the break, you answered that USAID didn't know who gave the -- the direction to take USAID's website offline.  After the break you've clarified based on this interrogatory on page 5, right?

A.   Yes.

Q.   What contemporaneous documents or speaking to people with personal knowledge, did you do to change your recollection?

A.   Yeah.  I read it.  That's the -- that's the item that changed my mind.

Q.   Who directed your attention to read that?

A.   Part of it was just kind of taking a break and remembering that there was a document there, but, you know, I was just flipping through our -- one of the spare binders in the other room, because I knew there was a bunch of questions and answers in the back, and I was seeing if that had anything to do with what we were discussing prior.

Q.   Did Counsel point that out to you or did you decide to do that of your own accord?

MR. SILER:  I'm going to object and

Page 170

instruct the witness not to answer on the basis of attorney-client privilege and work product.

MS. STEVENS: How is it privileged and work product if you're pointing out facts? You can't withhold facts based on privilege.

MR. SILER: You can ask about the facts. You can't ask about Counsel did and what communications he had with Counsel.

BY MS. STEVENS:

Q. Don't tell me what was said, but were you point directed to look at the interrogatories by Counsel?

MR. SILER: I -- same objection, same instruction not to answer.

BY MS. STEVENS:

Q. Did you of your own accord look at those interrogatories when we took a break?

MR. SILER: Same objection, same instruction.

MS. STEVENS: I haven't asked anything about privilege. He can answer yes or no.

MR. SILER: He can -- to the extent the answer involves communication between the attorney-client -- between an attorney and the client, and reflects the work product of an attorney, I believe

Page 171

it is until privileged and I still instruct the witness not to answer.

BY MS. STEVENS:

Q. Okay. Don't tell me anything that Counsel told you. Did you leave this room on the break and go look at the interrogatories in this case of your own accord, meaning you decided to do that?

A. Yes, I flip through these when we have -- every time we take a break. That's why I kind of come back with like a refreshed memory.

And then may I go to my second clarification point?

Q. Is it about the website?

A. No.

Q. Then, no. I have follow-up questions but I will let you, I promise.

A. Yeah.

Q. Did -- was Mr. Jackson told by Mr. Davis to take down the website?

A. No.

Q. Was Mr. Jackson told by any DOGE team member total take down the website?

A. No.

Q. Was Mr. Jackson told by Mr. Musk to take down the website?

Page 172

A. No.

Q. What communications did Mr. Jackson have with Mr. Musk about the website?

MR. SILER: Objection to the extent the -- the question calls for the description of a substance of any communications between Mr. Jackson and Mr. Musk. The witness can answer if he knows of any such communications.

THE DEPONENT: I don't know of any such communications.

BY MS. STEVENS:

Q. USAID doesn't know of any such communications?

A. USAID does not know. Adam does not know.

Q. What communications did Mr. Jackson have with Mr. Davis about taking down the website?

A. USAID does not know. Adam does not know.

Q. I asked you if Mr. Musk told Mr. Jackson to take down the website, and you said no. What's the basis for the -- that answer?

A. I don't -- oh, part of it is I just don't believe that Elon Musk told him to do it. Like our answer is that Gavin Kliger, in consultation with Kenneth Jackson, took down the website and Kenneth Jackson told him to do so.

Page 173

Q. When you say you don't believe, you mean USAID or Adam?

A. Both.

Q. This interrogatory doesn't speak to Mr. Musk one way or the other though; is that correct?

MR. SILER: Objection, characterization. You can answer.

THE DEPONENT: No, this interrogatory number 1 on page 5, I don't know how many number ones there are in this binder, does not refer to Mr. Musk at all.

BY MS. STEVENS:

Q. When I asked you if Mr. Davis told Mr. Jackson to take down the USAID website, you said no. What's the basis for that answer?

A. Mr. Davis is not in the position to give orders to Ken Jackson, or was not in a position to give orders to Kenneth -- Kenneth Jackson.

Q. And that's based on your understanding of the normal chain of command?

A. Yes, and -- and the DOGE order where the detailees that were assigned to USAID were in an advisory role.

Q. Are you aware that this lawsuit includes allegations about people without proper

Page 174

authorization doing things that they would need authorization to do?

A. Yes.

Q. Okay. So when you say what should have happened in a given situation based on the proper chain of command, that's not where my question is focused. It's on what did happen.

A. Yes.

Q. Okay. And so with respect to my question about did Mr. Musk give Mr. Jackson direction to take down the USAID website, you said no. My question is what's the basis for that answer.

A. It's USAID's position that Kenneth Jackson ordered the website to be taken down.

Q. What is USAID's position with respect to whether Mr. Musk told Mr. Jackson to order the website to be taken down?

A. It is USAID's position that Mr. Musk did not order Kenneth Jackson to take down the website.

Q. What is USAID's position with respect to whether Mr. Davis told Mr. Jackson to take the website down?

A. It is USAID's position that Mr. Davis did not instruct Kenneth Jackson to take down the website, or order.

Page 175

Q. Did any of the DOGE team members at USAID tell Mr. Jackson to take the website down?

MR. SILER: Objection, vague, but you can answer.

THE DEPONENT: None of the DOGE detailees ordered Mr. Jackson to take down the website. Mr. Jackson made the order to one of the DOGE detailees, Gavin Kliger, to take down the website.

BY MS. STEVENS:

Q. Was that communicated in writing?

A. I don't have a record of it in front of me. Let me take a look, see if we mentioned it prior.

I -- I can't speak to what records exist on it right now. I'd have to keep looking through this for a while just to double check.

Q. Do you have -- does USAID have any documentation showing that Secretary Rubio was consulted before the website was taken down?

A. USAID does not have any documentation related to consultations with the Secretary.

Q. Okay. I think you were going to clarify something else.

A. Yes. I mentioned earlier my view -- my view of Steve Davis as likely being a direct report

Page 176

to Elon Musk. I just want to emphasize that's my personal speculation based off of my knowledge of their relationship prior to their government service together.

Q. Is that it?

A. That's it.

Q. Okay.

A. Yeah.

Q. From USAID's perspective, who was at the top of DOGE?

MR. SILER: Objection, outside the scope.

You can answer. In your personal capacity.

MR. LYNCH: Speculation.

MR. SILER: And speculation.

BY MS. STEVENS:

Q. I want -- I want USAID's answer to this question.

A. Yes.

Q. Not Adam's.

A. USAID --

MR. SILER: Same objection.

THE DEPONENT: USAID's understanding of USDS was that Elon Musk was the leader of it, but at the end of the day the president was the one that's

Page 177

in charge of the Executive Office of the President.

BY MS. STEVENS:

Q. Okay. And what was Mr. Davis' role at USDS with respect to USAID? What's USAID's understanding of that?

MR. SILER: Same -- same objections.

THE DEPONENT: USAID does not know the complete details of Steve Davis' job description even with USDS, but as a member of USDS his role, as we understand it, is that he was there to provide advice and analysis, and to support the overall executive order on DOGE.

BY MS. STEVENS:

Q. If USAID had a -- had an issue with a DOGE team member detailed to USAID and they needed to contact someone at USDS about that, who would they contact?

A. I don't know why they would contact someone at USDS. We would contact the person -- the -- we are the receiving agency, so it would be the -- the home agency of the individual that was sent to us.

So say there was -- say if one of the detailees from GSA we had some sort of issue, like just -- let's just say that their phone's not

Page 178

working or the PIV -- their PIV certificates are not reading clearly. We would have to contact GSA.

Q. Okay. What if you had -- what if USAID had had an issue with respect to the implementation of the DOGE EO such that the home agency would not have the best information. Who at USDS would USAID contact?

MR. SILER: I'm going to have a continuing objection to questions of this witness about the structure and reporting relationship of USDS, which is not among the topics listed and is not full knowledge of these deponents.

MS. STEVENS: Can I respond?

MR. SILER: Sure.

MS. STEVENS: The second topic is about the implementation of the DOGE EO, and this is directly tied to that.

MR. SILER: I -- I disagree. The implementation at USAID of the DOGE EO is not -- it is not fairly encompassed within that, a structure of the USDS itself which is separate from USAID. However, you can ask the witness questions about his personal knowledge, and that's fine.

I'm just, for the record I don't believe that the structure of USDS is within the scope of

Page 179

how the DOGE serve the, you know, Executive Order 14158 is within -- within USAID. I just don't think that's within these topics.

BY MS. STEVENS:

Q. I -- I am not asking you for an org chart of USDS. I want to know, and I'll restate it since it's been a minute, who at USDS would USAID contact about implementation of the DOGE EO if the DOGE team members were not able to answers the questions about that?

A. So you're asking a question about performance, like they're not performing their duties or they're performing their duties incorrectly, right? In a hypothetical?

Q. No. I'm asking about like the implementation of the DOGE EO.

A. Yes.

Q. Who at USDS, right, this --

A. Yes.

Q. The DOGE EO goes over --

A. Yeah, yeah, yeah. I -- I see where you're going with this.

Q. Work with the USDS, right? The USDS is supposed to work in consult to designate the DOGE team members. Who at USDS would USAID contact to

Page 180

talk about the DOGE EO?

MR. SILER: Objection, speculation, and form.

You can answer.

THE DEPONENT: Thank you. I don't know specifically who, but in the office of USDS would advise on the team organization at the agency leadership and USDS level. I assume one of the people would include either someone like James Burnham as general counsel or Steve Davis in his capacity as Steve Davis, but I don't have any specific persons at the top of my mind when it comes down to that arrangement and consultation between the agency at -- and USDS.

Is this my second water?

MR. SILER: Yes.

THE DEPONENT: Okay.

BY MS. STEVENS:

Q. Who was the USDS administrator during this weekend we've been talking about, January 31st through February 3rd?

MR. SILER: Objection to the scope of the topics and to that not being within the agency's knowledge, but you can answer if you know.

THE DEPONENT: I don't know. I think you

Page 181

mentioned earlier someone named Gleason, but I don't know if that was the person during that time.

MS. STEVENS: I have lost my exhibit. The last exhibit that we looked at...

THE DEPONENT: Was 6, was it? I have all the exhibits right here of the last ones that you handed me.

MS. STEVENS: In theory, I would have my own copy of it.

THE DEPONENT: So I have 2.

MR. SILER: I have 6 as well.

THE DEPONENT: 4, 3.

MS. STEVENS: 6 is the January 31st email chain?

THE DEPONENT: Yes, the title of which is AID Intended Comms.

BY MS. STEVENS:

Q. What was Mr. Musk involved in with the decisions articulated in this email?

A. I'm not aware of any activities or decisions made with Elon Musk. It was entirely at the office level, at the agency level.

Q. The agency being USAID?

A. Yes. Apologies for not being specific.

Q. That's okay. All right.

Page 182

(WHEREUPON, Exhibit 7 was marked for identification.)

THE REPORTER:  Exhibit 7 marked.

THE DEPONENT:  Thank you.  Do you want these documents back at any time for -- just hold them?

THE REPORTER:  I do.

THE DEPONENT:  Okay.

MS. STEVENS:  Your copy will be the official copy, so she'll take everything.

THE DEPONENT:  Oh, you guys can keep it all.

MR. SILER:  I'm sorry.  Just to confirm, this is 7?

THE DEPONENT:  Yeah.

MS. STEVENS:  This is 7, yes.

MR. SILER:  I'm sorry.

BY MS. STEVENS:

Q.  Take a sec to read through there, tell me when you're done.

A.  All set, ready to go.

Q.  Could you identify that for the record, please?

A.  Yeah.  The number is 9107.  It's an email chain between Mike Needham who is the Counselor of

Page 183

State and Alex Wong who is the Then Deputy National Security Advisor when Mike Waltz was the National Security Advisor, Ambassador Mike Waltz.

Q.  What's the subject line?

A.  Impending USAID personnel actions.

Q.  What impending USAID personnel actions is this email about?

A.  USAID does not know.

Q.  Did USAID communicate with Mike Needham about the impending USAID personnel actions in this email?

A.  Sorry.  Can you ask that question one more time?

Q.  Did USAID communicate with Mr. Needham about the impending USAID personnel actions referenced in this email?

A.  I don't know what personnel actions that they're referring to.  I -- I'm assuming that's what's been blacked out, but Mike Needham being the Counselor of State will very likely know any actions that were being planned by Secretary Rubio.

Q.  On January -- sorry, not January.  On February 1st, so this -- this same date, Saturday February 1st, Mr. Musk tweeted that only 10 percent of USAID money reaches the intended beneficiaries.

Page 184

Why did he say that?

MR. SILER:  Objection, speculation.

THE DEPONENT:  I can answer that?

MR. SILER:  If you -- if you can answer the question.

THE DEPONENT:  Yeah.  USAID doesn't know, and Adam has no idea either.

BY MS. STEVENS:

Q.  What was the basis for that statement?

MR. SILER:  Objection, speculation.

THE DEPONENT:  You -- USAID and Adam do not know.

BY MS. STEVENS:

Q.  Who at USAID leadership did Mr. Musk speak with before he made that USAID, the 10 percent of USAID money tweet?

MR. SILER:  Objection to form.  I'm not sure that's within the scope of the topics either, but you can answer if you know.

THE DEPONENT:  USAID and Adam do not know.

BY MS. STEVENS:

Q.  Does USAID believe that statement was true?

MR. SILER:  Objection to form.  Could you just repeat the statement?  I'm sorry.  I lost

Page 185

track.

BY MS. STEVENS:

Q.  Elon Musk tweeted that only 10 percent of USAID money reaches the intended beneficiaries.  Does USAID believe that statement is true?

A.  USAID does not agree with that tweet.

Q.  Between January 30th and the end of the day on February 3rd, so January 30th is Thursday?

A.  Yeah.

Q.  February 3rd is Monday.  Was Elon Musk physically present at USAID headquarters?

A.  No.

Q.  Was he physically present at any other USAID facilities?

A.  No.

Q.  What's the basis for your "no" answer?

A.  I never heard him being physically present at any of the USAID facilities.

Q.  Were you at the USAID building on February 1st?

A.  That's the Saturday?

Q.  Mm-hmm.

A.  No, I don't believe so.

Q.  Were you there on February 2nd?

A.  That's the Sunday, correct?

ADAM KORZENIEWSKI                    March 26, 2026                    186 to 189
95350                                                                  30(b)(6)

Page 186

Q. Yes.

A. No, I definitely was not.

(WHEREUPON, Exhibit 8 was marked for identification.)

THE REPORTER: Exhibit 8 marked.

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Take a sec to look. Let me know when you're done.

A. All set.

Q. Can you identify the document, please?

A. Yeah. This is the number of 1748 on the document number, and this is an email thread featuring PJ Butler, Domestic Security Branch Chief at the time for USAID, Jeremy Lewin, and there's a number of people cc'd.

Q. Could you read the initial email from Mr. Lewin out loud, please?

A. Sounds good. Let me see one which is the actual beginning. I think it's on the second page --

Q. Yes.

A. -- that is the beginning? On Sunday February 2nd, 2025, at 11:33 a.m. Jeremy Lewin writes: Hi PJ, thank you very much for all your

Page 187

help during the last few chaotic days. We greatly appreciate it.

We were hoping to get a temp badge for one additional employee. His name is Adam Ramada, strong first name, and he is an employee of EOP and Education. He will be assisting our team today -- is someone saying something? Oh.

I don't know his clearance status but he needs -- he does not need any access to classified space, just a badge that allow him through the turnstiles on weekends and into unclassified spaces so he can collaborate with us, and we'll take responsibility for him as needed and will be with him during the entire time he will be in the building today. Please let us know if you have any questions. Thanks, Jeremy.

Q. Mr. Lewin describes the last few days as chaotic. What -- what does that mean here?

MR. SILER: Objection, speculation.

You can answer.

THE DEPONENT: Yeah. So I don't know if USAID has an opinion on what's chaotic and not, but in my personal assessment I would say that's -- I would characterize that as correct. A lot of things occurred in a very short period of time to include

Page 188

leadership changes.

We -- when I arrived at -- for example, when I arrived at USAID on the 30th I was under -- I was under the impression that Jason Gray was the acting administrator. By the time I got through the day, my impression was that Secretary Rubio was the acting administrator.

We had -- sorry, I'm trying to remember his name -- Nick Gottlieb's email which -- and his attempt to pull people off of administrative leave, and then us having to put him on administrative leave and then put the folks back on administrative leave.

And so -- so I would -- I would definitely agree that the last -- the previous few days were chaotic. Probably not the craziest I've seen in government, but like it's definitely -- it's definitely chaotic.

BY MS. STEVENS:

Q. There were additional folks put on administrative leave on Saturday the 1st as well, right?

A. Yes.

Q. Who is Adam Ramada?

A. I don't know.

Page 189

Q. Does USAID know?

A. USAID does not know.

(WHEREUPON, Exhibit 9 was marked for identification.)

THE REPORTER: Exhibit 9 marked.

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Same as the rest. Take a -- take a minute to read through, let me know when you're done.

A. Ready.

Q. Can you identify this document, please?

A. Yeah. This is a -- both an email chain as well as an Action Memo attached from -- or sorry -- between Pete Marocco who was the director of the F Office, F meaning Foreign Assistance -- Counselor of State Mike Needham. There -- also included in this email are are Dan Holler who is Deputy Chief of Staff, Marik String. I'm not sure what this person's job role was. I don't remember that person.

And they were -- the subject was Action Memo to the Secretary regarding USAID personal services contractor -- personal service contractors, plural, pardon me.

And the document number is 0648.

Page 190

Q.   Several pages, but that's the first page --

A.   Yeah.

Q.   -- that you just read?  What was Mr. Lewin's role at the time of this email?

A.   So this was February 2nd.  He was still the head of the DOGE team at USAID.

Q.   Who participated in the discussions precipitating this email about the PSC, personal services contractors, termination?

A.   Just double check, make sure I don't have anything extra that clarifies.  So this was a -- prior to this being sent out to State Department, this was internal discussions between -- between the leadership and -- and to include the USAID DOGE detailees.

Q.   Who else is part of that USAID leadership?

A.   So that would be including -- I'm sorry, Ken -- Ken Jackson, Joel Borkert.  It would include Jason Gray.  It would include Laken Rapier.  Oh, actually the people are listed here.

Jeremy Lewin, and then -- I think that's fairly exhaustive, but very likely given the fact that I know we're going to get into the contents in a minute, but reference to World Bank numbers, I think another political appointee named Tim Meisburger probably had some input into how this -- how the determinations were made.

Q.   That leads me to my next question.  Who made the decision to termination the PSCs?

A.   It was -- at this juncture it's Secretary of State, Acting Administrator Marco Rubio.

Q.   And how do you know who made the decision?

A.   The Action Memo that went out to him.

Q.   Are you talking about the memo that's attached to this email?

A.   I believe so, yes.

Q.   On the last page there's a short of small spreadsheet at the end of the memo.

A.   Yes.

Q.   Do you see that?  And it has the different bureaus and names of people involved and the status of the memo; is that correct?

A.   Yes.

Q.   Mr. Hopson is listed on there; is that correct?

A.   That's correct.

Q.   As of February 2nd, Mr. Hopson had left USAID at least 24 hours before that, right?

A.   That's -- that's correct.

Page 192

Q.   When -- at the bottom of the first page it says from Mr. Marocco:  I'm sure it's fine.  Just managing White House -- or excuse me -- WH expectations.  I spoke with Jacob to assist.

What White House expectations is he talking about?

MR. SILER:  Objection, speculation.

You can answer.

THE DEPONENT:  USAID and Adam don't know.

BY MS. STEVENS:

Q.   Were the PSCs that were affected by this termination given prior notice?

A.   This is their notice.

Q.   Were USAID contracting officers consulted before the terminations?

A.   No, not to my knowledge.

Q.   What role did Mr. Musk have with respect to these PSC terminations?

A.   None.

Q.   What's the basis for your answer of none?

A.   Personally I was in the room, not -- not the whole time but when they were starting to discussion how to categorize the different PSCs.

Q.   Can you explain that a little bit more for me?  What do you mean?

Page 193

A.   So -- so here -- here I am in the administrative suite.  I'll -- I'll set the stage, but to -- as you walk in, to the right there's three offices.  One is Ken Jackson's.  That became Jason Gray when he moved back into it.  It was his before he moved into the administrative suite.

Matt Hopson's old office, that became Ken Jackson's office as he moved down the row.  And then Joel Borkert, and then -- and then there's a -- in the back there's like a open floor work space for lack of a better term.  We called it the bull pen or the boiler room because it was ungodly hot.  And then in the middle of this like L shape there's a bunch of open cubicles, so they're not really even full cubicles.  They -- they're like semi-cubicles.

So as -- in order to effect both the DOGE order and also the foreign assistance review, or foreign assistance pause and review, a number of items were being analyzed concurrently with all this chaos as that previous email that we discussed characterized.

And so part of that is analyzing work -- workforce needs, prioritizing where foreign assistance should go, how foreign assistance is going to be distributed, who manages it, how it's

Page 194

managed.

And one of the decisions that came out of that analysis was that there was a significant bloat of the personal services contractors and that the personal services contractors who were stationed in higher income countries were not necessary.

Q. Who made that decision?

A. The decision itself to terminate them was made by Secretary Rubio, but in term -- you mean the analysis?

Q. I think you said the analysis concluded --

A. Yeah.

Q. Who made that?

MR. SILER: Objection, calls for information protected by the deliberative process privilege.

MS. STEVENS: I'm sorry?

MR. SILER: Sorry. Objection, calls for information covered by the deliberative process privilege and instruct the witness not to answer to the extent it would be pre-decisional deliberations.

MS. STEVENS: We agreed that I can ask who was involved in the conversation.

MR. SILER: You can ask who was involved in the conversation, but not who concluded to make a

Page 195

recommendation.

MS. STEVENS: Fine.

MR. SILER: The decision was made by the Secretary as he just testified. Who recommended what is deliberative to the extent it's pre-decisional.

MS. STEVENS: The who -- the -- I think we have in our -- articulated in our agreement on the privilege that the who involved in the conversation, so take away the analysis and the conversation with the Secretary, that -- maybe that content is deliberative, but the who is involved in the conversation is not. Like, that's part of us ascertaining whether the privilege applies.

MR. SILER: I agree with that. I may have misheard your question. I -- I understood your question to be who recommended, you know, to be a content-based question, and that's the basis of my objection.

If I misheard, we can -- we can reevaluate or if you change the form of the question, or we can restate it or whatever. I don't mean to -- I agree with you that who was in the room, who was -- who was, you know, participating in the decision is not privileged, but the content of their recommendations

Page 196

is privileged.

So I may have misheard, and I apologize if so.

BY MS. STEVENS:

Q. So you described for us this conversation about different -- I'm just paraphrasing.

A. Yeah.

Q. Described it for a while, about different decisions that needed to be made at USAID, and one of them had to do with the PSC folks.

Who made the decision -- don't tell me what they said -- to take this recommendation to Secretary Rubio?

MR. SILER: You're good, right?

THE DEPONENT: Yeah, yeah, yeah.

MR. SILER: Go ahead.

THE DEPONENT: Sorry. The -- so I'm not -- I don't remember off the top of my head and I don't have documentation as USAID, but it's my -- my understanding is that was one of Joel Borkert's duties when I -- when we were working on everything else at the same time, going through these analyses.

But the reason why I brought up all these other individuals is that I remember various parts of the conversation to include the World Bank

Page 197

designations of income-based countries from Tim Meisburger, but the recommendation would have gone from USAID through Ken Jackson to Pete Marocco before getting to the Secretary.

So I would characterize it as Ken Jackson gave the final approval for the recommend -- recommended action to move forward to the Secretary of State.

BY MS. STEVENS:

Q. What's the basis for your -- that answer?

A. So -- well, actually, so if you look at -- if you look at this document --

MR. SILER: We're on 652, Bates 652.

THE DEPONENT: Oh, I'm sorry. Yeah.

MR. SILER: I --

THE DEPONENT: Yeah, 652, we -- same -- same exhibit, 9, I apologize if I made anyone confused. It says drafted by Ken Jackson. So he was not -- he was not -- he was not just a draftee, but he was also integral to having this thing go forward and proving it to be created in the process.

That's not typical for someone of that rank to draft it himself, except for the fact that this was a decision he was -- he was backing and he approved to move forward.

Page 198

BY MS. STEVENS:

Q. Who else was in the -- the meeting that you described around the -- what did you call it? Bull pen?

A. It's a bull pen, yeah. I wouldn't call it a -- one single meeting. It was a number of conversations related to this topic. There would be individuals like Joel Borkert. For a lot of this work Joel was like -- was the Point at the time, until Matt Hopson resigned, and then he had to take more of Matt's responsibilities.

You had some of the Career staff in the front office, Mary Tyler Holmes. I'm not sure if she was directly involved in this at all, but Paul Seong who worked closely with Joel Borkert sort of as like a foreign service officer personal assistant type -- personal advisor type of capacity.

I'm not sure if the personal assistants or the executive assistants in the room that were contractors were party to these conversations. They probably heard some of it. They got to read a lot of other peoples' emails, so they probably were vaguely aware of it.

Timothy Meisburger, he was the acting head of the Bureau for Humanitarian Affairs. He

Page 199

definitely gave input into this of like how -- how to measure need versus want in terms of like what kind of personnel that we needed.

But there was also other ongoing conversations with a bunch of leadership staff like who are these people, what do they do, how -- how do they do their -- what is a PSC, how is it distinguished from other types of contractors.

So -- and the conclusion of this was in order to align the policy agenda of what the DOGE want and also America First Foreign Assistance, that -- that we needed to reduce the number of personal services contractors overseas.

Q. What was Mr. Lewin's role with respect to this decision making?

A. He was in an advisory capacity. So he would like -- so he was oftentimes -- the way that he was working specifically was he was -- he was there, you know, arguing different points, finding out more details about -- about how -- how and how this should happen, how should this work, what is a personal services contractor.

So he was in the thick of it with the rest of the political appointees discussing the merits of different ways that this could be decided.

Page 200

Q. And this email chain is from February 2nd.

A. Correct.

Q. Those meetings that you've described, when did they occur?

A. Some of them did occur on the 30th, but most of them occurred on the 31st. And I believe that was drafted on the 31st, from personal knowledge that -- what I recall.

Q. Drafted by whom?

A. Kenneth Jackson.

Q. And how do you know that?

A. Just from being in the same room as they were drafting it, as he was specifically drafting it.

Q. Did you observe him drafting this document?

A. On a couple of occasions, but he was primarily going through the decision making process. Like there was a white board behind him with the different options. We were kind of just like hammering out like what -- what's optimal versus what -- what do we want versus what do we need.

Q. Also on February 2nd, Mr. Musk tweeted out, "USAID is a criminal organization. Time for it to die." Why did he say that?

Page 201

MR. SILER: Objection, speculation.

THE DEPONENT: USAID has no idea why he said that. Adam does not know why he said that.

BY MS. STEVENS:

Q. What's the basis for the statement he made in the tweet?

MR. SILER: Objection, speculation.

THE DEPONENT: USAID has no idea what the basis of that statement is, nor does Adam.

And I just want to -- since it's on the record, you know, USAID's OIG which is technically a different agency independent of USAID, is very aggressive in pursuing criminal accusations, and they have a number of convictions, even in this past year, of people who were defrauding the U.S. government, so the -- the oversight arm of USAID has worked very well.

BY MS. STEVENS:

Q. Who at USAID leadership did Mr. Musk speak with about making sure that statement was followed through on?

MR. SILER: Excuse me. Objection, ambiguous as to which statement. What -- and follow through.

THE DEPONENT: Which statement are you

ADAM KORZENIEWSKI
95350

March 26, 2026

202 to 205
30(b)(6)

Page 202

referring to?

BY MS. STEVENS:

Q.   His tweet.

A.   The -- is it the one that you just said, the criminal one?

Q.   Yeah, the time for it to die.

A.   No one.  I don't -- USAID has no idea who he spoke to, and Adam, he definitely didn't speak to Adam.

Q.   Okay.  Also on February 2nd --

A.   Yeah.

Q.   -- Kliger sent an email to USAID staff instructing them to work remotely, and that headquarters would be closed; is that correct?

A.   That's correct.  Or that's my understanding, yes, that's correct.

Q.   Is that USAID's understanding?

A.   It's USAID's understanding and it's my understanding as well.

Q.   I'll represent to you that in the answer --

A.   Yeah.

Q.   -- defendant's acknowledge Mr. Kliger sent that email out.

A.   Yes.

Page 203

Q.   The answer also says that Mr. Kliger sent the email "at the direction of USAID leadership."  Who is USAID leadership in that sentence?

A.   It would be -- you said that's February 2nd?  It would be either Ken Jackson or Pete Marocco or Secretary Rubio.

Q.   From USAID's perspective, who said it?  Not who should have said it based on chain of command; who did say it.

A.   Let me see if it's in our interrogatories real quick.  I -- I apologize for not having them quite as well memorized as I should.

Q.   That's okay.

A.   Sorry, there's quite a few of these.  Just to clarify, what's the date that we're talking about?  Is that February 3rd?

Q.   2nd.

A.   I have in this interrogatory, it says February 3rd, but according to our response Pete Marocco -- or Peter Marocco, pardon me, was performing duties of deputy administrator for policy and programming, and management, and resources of USAID, verbally authorized closure of the USAID building and directed Gavin Kliger to send the described email communication, page 12 of

Page 204

interrogatory, underneath the tab 29, sub tab 1 -- or sorry, page 12, yeah, page 12.  Sorry.

Q.   Is your basis for the answer to this question only the interrogatory that you just read to us?

A.   That's USAID's, yes.

Q.   You don't have any other documentary or conversation with anyone knowledgeable?

A.   No.  Oh, the email went out the 2nd.  I see what you're saying, sorry.  Pardon me.

Q.   You're talking about the difference between the 2nd and the 3rd?

A.   Yeah, I'm sorry...

Q.   Was the decision to close headquarters documented in writing?

MR. SILER:  Objection, ambiguous.

THE DEPONENT:  Yeah, I -- I can answer that, right?

MR. SILER:  Oh, yeah.

THE DEPONENT:  So yes, in the fact that the email was sent out, but in terms of like there was no -- to my knowledge there wasn't like an Action Memo that went out to Pete Marocco asking permission to do it.  I think this is something that he -- he decided to do verbally as -- with his

Page 205

powers as deputy administrator for both roles, for both deputy administrator roles.

BY MS. STEVENS:

Q.   You think that, or that's what USAID's position on that question is?

A.   Let's see.  I -- both.

Q.   Is there any documentation in writing that demonstrates that Mr. Marocco made that decision, make the decision to close headquarters?

A.   That day, you mean like send people home for remote work or like close it -- are you talking about when the Reagan Building was no longer housing USAID, or?

Q.   Let's take them separately.

A.   Yeah.

Q.   Is there a document, any documentation in writing that Mr. Marocco made the decision to tell folks not to come in on the 3rd?

A.   I don't have anything.  I haven't seen anything, but --

Q.   Does -- does USAID know of a document that exists that demonstrates that?

A.   USAID is not aware.

Q.   Is there a document in -- is there written documentation -- well, actually, I don't think

Page 206

you've answered this question.  You're talking about the decision to not have USAID personnel work within the Reagan Building any -- any longer.

A.   Yes.

Q.   Who made that decision?

A.   It's my understanding it is -- GSA made that decision, General Services Administration.

Q.   When was that decision made?

A.   There -- I have a record in here of it, but I believe it was -- we were notified, I believe it was actually the from I that we were -- we were no longer residing -- I have -- I have to look it up.

Q.   Okay, pause on that.

A.   Pausing.

Q.   On the -- the question -- the answer that you've read to us in interrogatory number 10 about Mr. Marocco verbally authorizing the closure of the USAID building.  Are you with me?

A.   I -- I'm getting there.  Pardon me.

Q.   How was Mr. Musk involved in that decision to authorize closure of the USAID building?

A.   For February 3rd?  I'm not aware of any involvement of Elon Musk in Mr. Marocco's decision making.

Page 207

Q.   Is that true with respect to all decisions made by Mr. Marocco?

A.   I'm -- if I recall correctly, I believe I received it -- I have a document that does mention that Mr. Marocco may have spoken to Elon Musk in the past, or in the past meaning before today, but I don't know if he ever was consulted on this aspect.

Q.   Was Mr. Musk a part of any of the conversation -- conversations, excuse me, about the closure of USAID headquarters?

MR. SILER:  Objection to form, but you can answer.

THE DEPONENT:  To USAID's knowledge, we don't know that he was ever participating in any of those conversations.

BY MS. STEVENS:

Q.   In preparation for this deposition, did you or anyone at USAID ask Mr. Musk or Mr. Marocco whether they spoke to each other about this?

A.   No, I have no way of contacting either Mr. Marocco or Mr. Musk.

Q.   I understand that you, Adam, don't have any way of contacting them.

A.   Yeah.

Q.   But did you, through your preparations for

Page 208

this deposition, contact them to ask them those questions?

A.   No.

Q.   There have been various documents produced in this litigation that are called Action Memos.

A.   Yes.

Q.   I think we have talked about some, but have you seen some of those documents?

A.   Yes, and I have written Action Memos.

Q.   Okay.  What is an Action Memo?

A.   Action Memo, trying to think of a way to not use the same phrase in it, in its -- the explanation.  Action Memo is a memo that -- with some sort of background of -- of a pending decision that's being put up to a senior principle, and with a note -- usually with a -- at least one yes/no up/down, or yes/no let's discuss-type decision by that principle.

And this is in order to show deliberative process of high level, high -- highly important decisions, but also, you know, to basically give -- like not deliberative process like in terms of this like italicized phrase, but like allow for careful deliberations of what you're asking the principle to do so you're not inundating them with pointless

Page 209

questions.

And also figuring out who was actually the most appropriate person to be asking this question, as well as allows other, you know, equity holdings in the decision to have input on it, and also make sure it's been cleared for everything from spelling and grammar to correct facts to the correct question that's being asked.

Q.   That's why there's kind of the multiple sign-offs at the end of these memos; is that --

A.   That's correct.

Q.   Under -- I think you described for me, but at a high level what dictates the need for the Action Memo?

A.   That's a very good question.  So there's a -- there's sort of a best practices argument, but there's also what the principle wants to see.  So in terms of best practices, decisions that are of consequence, meaning that the ripple effect has -- or the consequence of the decision has -- affects other decisions down the road.  That's a -- that's a best practice for turning that into an Action Memo.

Items that -- I can use my specific office at State Department as an example, but for example like there are certain things that my office is

ADAM KORZENIEWSKI                  March 26, 2026                  210 to 213
95350                                                              30(b)(6)

Page 210

delegated the authorities of under by statute and by policy, but there's other -- there's people with the actual powers in their hands and their authorities to actually perform those duties.

So when you elevate it to the principle level that actually has that, they can articulate and make a decision that has a broader impact across the organization. I -- I think -- let me know if that suffices.

Q. I think I'm following, yeah. The decision to shut down USAID headquarters is the type of decision that would typically be memorialized in an Action Memo, correct?

MR. SILER: Objection, ambiguous as to which decision.

BY MS. STEVENS:

Q. The decision to not have folks come in to the building on the 3rd, is that the type of action that would normally be memorialized in an Action Memo?

A. No.

Q. The decision to fully shut down USAID's headquarters is the type of decision that would normally be -- or sorry -- typically memorialized in an Action Memo, correct?

Page 211

A. I -- I would recharacterize it and terminate the lease of USAID, the building, would be an Action Memo, yes, but my understanding is that would be the Action Memo that would occur at GSA.

Q. Did GSA have conversations with USAID about discontinuing the lease of the building?

A. I'd have to refer back to this, but personally I don't recall any of that.

Q. Refer, please.

A. I know I saw some memo here here related to it, but I don't -- don't know if it's -- I don't believe it was an Action Memo. I -- I'm going to still look for it.

Q. We can look at, if you want to, the topic since -- since your tabs tie to the topics. There is a topic about the closure of headquarters.

A. Yeah.

MR. SILER: I think it's 18.

MR. LYNCH: I believe it's 18.

THE DEPONENT: 18?

MR. SILER: Yeah, is the topic.

THE DEPONENT: I was about to ask if I could ask the Counsel. That's the correct tab, right?

Yeah, I -- I found it, it's on tab 18. It

Page 212

is not numbered with a --

BY MS. STEVENS:

Q. Bates number?

A. Thank you, Bates number.

Q. Could you just describe for the record what we're looking at?

A. Yep, that's a letter dated February 7th, 2025, from General Services Administration to Ken Jackson. It was a letter from Michael Peters, Commissioner, Public Building Service, cc'ing Dr. Deb Schneider. So it was the day when me personally found out about the -- us no longer residing in the Reagan Building as of that evening.

Q. The email that went out on the 2nd that instructed USAID personnel not to come to the Reagan Building on Monday the 3rd, USAID personnel weren't allowed back in the building between the 3rd and the 7th; is that correct?

A. There were USAID personnel there, but by and large most people weren't coming in to the office.

Q. Who was allowed into the building at the time?

A. Security staff, critical persons that were needed to be physically in the office.

Page 213

Q. Can you be specific about those critical persons?

A. Most of them were front office staff or executive secretariate staff. Basically people who were needed to -- for either subject matter expertise, historical knowledge, or just for like the aspect that -- to conduct work was vastly improved by being physically in person. But other offices, it wasn't necessary for them to be in the office.

Q. And the front office, that was almost exclusively political appointees; is that right?

A. At the time I would not -- I'm trying to -- I'm trying to do the numbers in my head. It would have been almost half of the front office would have been political appointees. We didn't make -- the administrative assistants, the contractors there always come into the office, but they would have come into the office periodically.

Q. So almost the entirety of the folks that before the 3rd worked at the USAID Reagan Building, almost the entirety of them were told to stay home and not come back to the building; is that correct?

A. That's my understanding, yes.

Q. Why would instructing the -- almost the

Page 214

entirety of the USAID workforce for that building so no longer report to headquarters, not be the type of decision that would warrant an Action Memo?

A. Because that was a decision that was taken upon by Pete Marocco, and he didn't necessarily -- to exercise his own authorities, he wouldn't need an Action Memo to him to do it. It's -- that goes into that personal preference aspect.

Other principles have fast -- well, if -- if I'm going to do something, that very main decision for let's -- I need somebody to propose it in an Action Memo so I can approve it so that there's a documentation trail.

Q. Did Mr. Marocco give this direction to Mr. Kliger to send out that email before or after the document that delegated the duties to Mr. Marocco was signed?

A. I believe it was after.

Q. What is the basis for that answer?

A. The date of it. It said -- I believe the document stated it was -- the email went for the 2nd, and for -- for purposes of the 3rd, so -- and I believe he was assigned the duties of deputy administrator prior to that point.

Q. Could you look at the -- his delegation?

Page 215

I think it's in your binder.

A. It's tab 15, if I could recall correctly.

MR. SILER: 14.

THE DEPONENT: Oh, 14, pardon me. So the number is 0574, and it's double sided to 0575. It's dated 2/2/2025.

BY MS. STEVENS:

Q. So the same day that the email went out to Mr. Kliger; is that correct?

A. That's correct.

Q. And you don't know the time that -- or USAID doesn't know the time that this document was signed by Mr. Marocco; is that correct?

A. The -- USAID does not know what time Secretary Rubio signed this document.

Q. Thank you, thank you, cleared up my question.

Regarding the decision to close headquarters permanently, we talked about the GSA document that you referenced. Who participated in conversations with the GSA personnel prior to the closure of USAID headquarters permanently?

A. USAID is not aware of any conversations with GSA prior to that.

Q. What about conversations between Mr. Musk

Page 216

and anyone from USAID about the closure of headquarters?

A. USAID is not aware of Elon Musk discussing anything related to the closure of USAID headquarters at Ronald Reagan Building between Elon Musk or -- and -- pardon me -- any USAID staff.

Q. And that includes DOGE team members?

A. That's correct. We're not aware. We as USAID, or we.

Q. USAID employees, after the closure of the building, were unable to retrieve their personal belongings for weeks after that; is that correct?

A. That's correct.

Q. Where were the remaining USAID employees who were not placed on administrative leave sent to work, at what physical building?

A. The State Department. There is a conference center that's in the building. It's very large, so I -- I think it's called the George Marshall Center. I don't remember its name off the top of my head, but I'm pretty sure it's the Marshall Center.

Q. And when were they assigned to -- to go into the Marshall Center building?

A. It was -- so February the 7th was when we

Page 217

lost the Reagan Building, so 8th was Saturday, 9th was Sunday, so 10th we reported to State Department that day. You have the --

Q. We have an exhibit.

(WHEREUPON, Exhibit 10 was marked for identification.)

THE REPORTER: Exhibit 10 marked.

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. The -- I'm going to direct your attention to the middle of the page because tweets or whatever we call them now, posts are -- they're -- it's -- the relevant part is in the middle of the page.

A. Right.

Q. Just read through that and tell me when you are done.

A. Yeah, this is a tweet. I don't know what it's called for X, so I'm going to use the Twitter parlance. So this is a tweet from Elon Musk dated February the 2nd, 2025, at 10:40 -- wow, 10:40 -- 10:54 p.m. where he's quote tweeting, Mike Benz, that Elon Musk specifically says: We spent the weekend feeding USAID into the wood chipper. Could gone to some great parties. Did that instead.

And that's the end of the quotation from

ADAM KORZENIEWSKI 95350     March 26, 2026     218 to 221 30(b)(6)

Page 218

Musk.

Q. What was Mr. Musk's role over that weekend?

A. USAID does not know what he did that weekend, nor does Adam.

Q. Did Mr. Musk speak with personnel -- did Mr. Musk speak with USAID staff over the course of that weekend, at any point?

A. USAID is not aware of any conversations Elon Musk had with USAID staff over that weekend.

Q. Did Mr. Musk speak with any of the USAID DOGE team detailees over the course of that weekend?

A. USAID is unaware of conversations Elon Musk had or did not have with the detailees of the USAID DOGE team.

(WHEREUPON, Exhibit 11 was marked for identification.)

THE REPORTER: Exhibit 11 marked.

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Just take a sec to read through that and let me know when you're done.

A. I'm all set.

Q. Would you identify the document for the record, please?

Page 219

A. Yeah. The number is on the bottom right, 9110, Exhibit 11. It's an email chain including Gavin Kliger, Jeremy Lewin, Jason Gray, Luke Farritor, and it's -- the subject line is Physical and Logical Administration for Gavin. I have -- I have a version of it in my documents here somewhere.

Q. The -- the last email in the exchange, or -- sorry, the last substantive email in the exchange from Mr. Gray, could you tell us what that says?

A. Yeah, and we're talking about the one dated Sunday February 2nd, 2025, at 10:25 p.m., correct?

Q. Yes.

A. So Jason Gray to Zecharia Kahn, Patrick Butler, Lindsey Willis, cc'ing Gavin Kliger, Jeremy Lewin, Luke Farritor, Steven Hernandez. Jason Gray says: Hello, I approve of administrative access for Jeremy Lewin to all unclassified information systems, including but not limited to Phoenix, HR systems, Badge and Access systems, cloud environments, all systems related to grants, payments, vouchers, and all HR read/write user permissions as well as account management permissions to manage USAID HRConnect user permission. Thank you, Jason.

And, well.

Page 220

Q. I'll represent to you this document was produced I think last week. Would you look at your interrogatory responses from USAID, please?

A. Yep, turning to interrogatories. Do you have a specific interrogatory?

Q. Yes. Page -- well, the interrogatory itself is number 1.

MR. SILER: Just to clarify, you're talking about the USAID --

MS. STEVENS: Yes.

MR. SILER: -- interrogatory responses?

MS. STEVENS: Yes.

MR. SILER: Yeah, so it's I think the next tab.

THE DEPONENT: Oh. Tab 30?

MR. SILER: No, no, no. The blank tab.

THE DEPONENT: Oh.

MR. SILER: It should say United States Agency for International Development in the title.

THE DEPONENT: Oh, this is -- the question, interrogatory question, obviously all questions are interrogatory. Identify the level of access?

BY MS. STEVENS:

Q. Yes.

Page 221

A. Okay.

Q. And then the question is identify the level of access of various systems. It includes various people to -- to identify the access for, and then on page 7 is the relevant one which is Mr. Lewin.

A. Correct.

Q. Okay. You see there it says Jeremy Lewin did not gain new access to systems or elevated permissions within the time period?

A. Yes, and the time period is -- apologies, is Jan 20th to March 31st.

Q. And that's -- that is in contrast to the part of the email that you just read us from Exhibit 11; is that correct?

A. That -- that appears correct, yes.

Q. Is it accurate that Mr. Lewin did have access to the systems as articulated by Mr. Gray in the email in Exhibit 11?

A. To my knowledge he had the accesses to them. I don't know what ones he logged into.

Q. As of the January -- sorry, not January -- Sunday February 2nd where Mr. Gray is giving permission for Mr. Lewin to have this access, Mr. Gray is not acting administrator at the time,

Page 222

correct?

A.   That's correct.

Q.   He's the --

A.   CIO.

Q.   The CIO.

A.   Chief information officer.

Q.   Is it -- we talked earlier about Mr. McGill seeking permission from Mr. Farritor to have the elevated C-CURE access from either Mr. Jackson who was the deputy -- one of the deputy administrator roles, or Mr. Gray.

A.   Mm-hmm.

Q.   Do you remember talking about that?

A.   That's correct.

Q.   And you said it was correct that Mr. McGill should seek permission from one of those two individuals.

A.   Yes.

Q.   Do you remember that?  In this situation though, the person signing -- excuse me -- giving that permission is Mr. Gray who is the CIO.  He's not in the deputy administrator or the acting administrator role, correct?

A.   That's correct.

Q.   Why the change in the -- the permission

Page 223

structure?

MR. SILER:  Objection, mischaracterizes prior testimony.

You can answer.

THE DEPONENT:  Thank you.  I -- so I -- so my understanding is the CIO also had the power to do the -- grant these accesses.

BY MS. STEVENS:

Q.   And what's the basis for that understanding?

A.   I don't have the ADS in front of me, but this is from conversations with Jason Gray about his powers as CIO.  Part of this is personal knowledge.

Q.   When did you have that conversation with Mr. Gray?

A.   I'd say it was sometime towards the end of winter, beginning of spring of 2025, so before his departure, U.S. government.

Q.   Mr. Gray continued to work at USAID until the summer of 2025; isn't that correct?

A.   That's correct.

Q.   Okay.

A.   But it was -- the conversation occurred before that, before his departure.

Q.   Okay.  But you said you think it was in

Page 224

the -- the winter or spring of 2025?

A.   Yes.

Q.   Does that mean like right around the time of this email, or does that mean --

A.   It would have been -- it would have been after the fact, because we -- there was a number of just questions.

MS. STEVENS:  We need to -- it's decent timing.  We need to take a short break.  I'm having mic issues.

MR. SILER:  Sure.

THE DEPONENT:  Sounds good.

MS. STEVENS:  We can talk about next steps.

MR. SILER:  Yeah, understood, understood.

THE VIDEOGRAPHER:  All right.  Please stand --

MS. STEVENS:  Wait, actually, I'm so sorry.  I will speak loudly, but I need to say this before we go off the record.

So I know you mentioned reviewing documents on your own during the break, which is fine.

THE DEPONENT:  Mm-hmm.

MS. STEVENS:  But especially given this is

Page 225

your first deposition, I want to make sure that it's clear on the record, the Maryland local rules state, quote, During breaks in the taking of a deposition, no one should discuss with the deponent the substance of the prior testimony given by the deponent during the deposition.

Counsel for the deponent may discuss with the deponent at such time whether a privilege should be asserted or otherwise engage in discussion not regarding the substance of the witness' prior testimony.

THE DEPONENT:  Okay.  And --

MS. STEVENS:  Do you understand?

THE DEPONENT:  I understand, but this is --

MR. SILER:  Yeah, I --

THE DEPONENT:  -- Washington D.C.

MR. SILER:  Well, so, hold on.

THE DEPONENT:  I'm sorry.  I just -- someone needs to clarify that.

MR. SILER:  Yeah, the witness is not a lawyer.  He's -- he's, you know.

MS. STEVENS:  Of course.

MR. SILER:  He doesn't understand maybe how exactly this works, but just to clarify.  I

ADAM KORZENIEWSKI                    March 26, 2026                    226 to 229
95350                                                                 30(b)(6)

Page 226

understand the local guidance with respect to conferral on prior testimony. However, this is -- a 30(b)(6) deposition as you yourself kind of indicated, if there a phone call or a document that could be looked at, you know, to refresh the witness' recollection I don't believe that would be improper. And so what the witness testified to is that he reviewed documents and that refreshed his recollection.

MS. STEVENS: Well, and I -- I started that sentence by it's fine for him to look at documents. I just want to be very clear about looking at documents is one thing. Discuss about the substance of the prior testimony is a different thing.

I realize we didn't get into anything privileged, and so we don't know what you discussed. I'm just making clear what the rule says.

MR. LYNCH: So just -- just for clarity, it's your position that, for example, if you ask a question of something he doesn't know, we have no ability to educate him in the break.

MS. STEVENS: I think that education is fine, but that needs to be provided -- like if you were providing factual information to the witness,

Page 227

we get to know what you provided to the witness.

MR. LYNCH: That's your prerogative.

MS. STEVENS: That's the -- right? That's the difference between attorney-client communication.

Yeah, the other -- another section of the Discovery rules of the local rule says: While the interrogation of the deponent is in progress, neither an attorney nor the deponent should initiate a private conversation except for the purpose of determining whether privilege should be asserted. To do so otherwise is presumptively improper.

And so I think that's where we're --

MR. SILER: I -- on that, I believe that applies to during the deposition. That's the difference between the deposition and the break. We're not allowed to initiate a side conversation in the middle of the deposition. I have not done that, and I agree with that, and I -- I mean, I don't think there's a real issue here.

The witness viewed documents during a break, and his -- his -- his memory was refreshed. He identified the documents he looked at during the break, so you have that. That's all.

MS. STEVENS: Yeah. This statement is

Page 228

prophylactic.

MR. SILER: Understood.

MS. STEVENS: And just want to make sure the witness understands what the rules say.

We are -- this case is filed in the District of Maryland, that's why I was --

THE DEPONENT: I was going to ask for them to unpack it during the -- during the break.

MR. SILER: Yeah, again, you wouldn't have any objection to us explaining that to him during the break.

THE DEPONENT: Oh, that -- she just did.

MS. STEVENS: That it's --

MR. SILER: That it's a -- I mean --

MS. STEVENS: No --

MR. SILER: -- you just don't mean we don't need to talk about it.

MS. STEVENS: Correct. Yeah. Okay, let's go off the record so we can fix this.

THE VIDEOGRAPHER: All right. Please stand by. The time is now 4:51 and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: All right. The time is 5:26 and we are on the record.

Page 229

MR. SILER: Okay. So just to clarify, up until now I think the questions have been focused on USAID. The defendants are proffering that the answers would not change if they were also deemed to be the responses of the State Department.

Without prejudice of you asking follow-up questions, we would just offer to deem the prior responses as also on the State Department's streamlined 30(b)(6) deposition, and then we would continue the deposition going forward, but that's the understanding.

MS. STEVENS: And I think we've -- I asked you some questions that -- that would make this clear for the record, but just to be very, very clear for the record. We have noticed -- the plaintiffs have noticed 30(b)(6) depositions both for USAID as well as the State Department.

Counsel is right. Thus far my questions have been focused on the answers by USAID, and just to reiterate the proposal, the proposal is that all of the prior testimony up to now is -- will be deemed -- defendants agree that those answers are the same -- they are the State's answers --

MR. SILER: It would be --

MS. STEVENS: -- to the same questions.

Page 230

MR. SILER:  Correct, yes.

MS. STEVENS:  Okay.  And that going forward we are going to come back on the record tomorrow.  The State Department answers will be the same as the USAID question -- answers, unless the witness articulates a difference in those answers.

MR. SILER:  Unless otherwise indicated, yes.

THE DEPONENT:  I agree.  Sorry.  I don't know if I should say something.

MS. STEVENS:  No, I -- I --

MR. SILER:  That is important, yes.

MS. STEVENS:  Yes, that is helpful, yes.  All right.  I think that -- that will do it for today, and we will go on break until tomorrow morning.

THE REPORTER:  Okay.  So that being said, Attorney Warren, since you were the scheduling attorney will you be ordering today's original transcript?

MR. WARREN:  Yes.

THE REPORTER:  Attorney Stevens, would you like a copy?

MS. STEVENS:  I'll get a copy from him.

THE REPORTER:  Okay.  Let's see.  Attorney

Page 231

Siler, will you be ordering a copy?

MR. SILER:  Yes.

THE REPORTER:  All right.  And are these expedited, normal time?

MR. WARREN:  Yes.

MR. LYNCH:  Yes.

MR. SILER:  Expedited.

MS. STEVENS:  Expedited.

THE REPORTER:  Expedited, okay.  For everybody?  All right.  Would -- is -- let's see.  A week from today, so April 2nd, would that work for everybody?

MR. WARREN:  Yes, that's fine.

MR. SILER:  Sure.  Yes.

MR. LYNCH:  Sounds good.

THE REPORTER:  All right.  Videographer?

THE VIDEOGRAPHER:  Yeah.  So Attorney Warren is getting the video of today's deposition included with your appearance fee.

Attorney Siler, would you like to order a copy of today's video?

MR. SILER:  No.  No.

THE VIDEOGRAPHER:  Attorney Stevens, would you like to order a copy of today's video?

MS. STEVENS:  No thank you.

Page 232

THE VIDEOGRAPHER:  Attorney Mathew, would you like to order a copy of today's video?

MR. MATHEW:  No thank you.

THE VIDEOGRAPHER:  And Attorney Heimann, would you like to order a copy of today's video?

MR. SILER:  I don't see him.

MS. STEVENS:  I think he's no longer on, but I'm going to go ahead and speak for him and say no.

THE VIDEOGRAPHER:  No?  Okay.  All right.  The time is 5:29 and we are off the record.

(WHEREUPON, the 30(b)(6) videotaped deposition of UNITED STATES DEPARTMENT OF STATE, BY ADAM KORZENIEWSKI, was concluded at 5:29 p.m.)

//
//
//
//
//
//
//
//
//
//
//
//
//

Page 233

30(b)(6) VIDEOTAPED DEPOSITION OF
UNITED STATES DEPARTMENT OF STATE AND USAID BY
ADAM MICHAEL KORZENIEWSKI
FRIDAY, MARCH 27, 2026
11:06 A.M.
DAY 2

THE VIDEOGRAPHER:  We are on the record.  The time is now 11:06.  The date is March 27th, 2026.

This is the beginning of the deposition of Adam Korzeniewski.  The case caption is J. Doe 4, et al. versus Elon Musk, et al.

Will counsel introduce yourselves and state whom you represent.

MS. STEVENS:  Beth Stevens, on behalf of the plaintiffs.

MR. GONZALEZ:  Joaquin Gonzalez, on behalf of the plaintiffs.

MR. WARREN:  Andrew Warren, on behalf of the plaintiffs.

MS. LUEVANOS:  Jehieli Luevanos, on behalf of the plaintiffs.

MS. DODOO:  Melody Dodoo, on behalf of the plaintiffs.

ADAM KORZENIEWSKI                    March 26, 2026                    234 to 237
95350                                                                  30(b)(6)

Page 234

MR. SILER: Jacob Siler, for the defendants.

MR. LYNCH: Chris Lynch, for the defendants.

MR. TIERNEY: Michael Tierney, for Defendants.

MR. MATHEWS: Max Mathews, for Defendants.

THE VIDEOGRAPHER: The court reporter will now swear in the witness.

THE REPORTER: Mr. Korzeniewski, please raise your right hand.

Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT: So help me God, yes.

THE REPORTER: All right. You may proceed.

ADAM MICHAEL KORZENIEWSKI, having been first duly affirmed to tell the truth, was examined, and testified as follows:

CONTINUED EXAMINATION

BY MS. STEVENS:

Q. All right. We just went through some of the same things we went through at the beginning of yesterday, so I just want to make it clear for the

Page 235

record that we are in continuation of our deposition from yesterday. Do you understand that?

A. Correct, yes.

Q. Okay. And, to be clear for the record, our agreement with Counsel that this -- your deposition today is on behalf of both the 30(b)(6) deposition for USAID, as well as the 30(b)(6) deposition for State Department.

A. Yes.

Q. Can you please confirm that?

A. Yeah, I confirm.

MR. SILER: Yeah, same. Confirmed.

MS. STEVENS: Thank you.

BY MS. STEVENS:

Q. Okay. Have you read any additional documents since the break that we had yesterday?

A. No.

Q. Okay. Did you look --

MR. SILER: Just to be clear, related to this case?

MS. STEVENS: Right.

BY MS. STEVENS:

Q. In preparation for the continuation of your deposition.

A. Yes. No, I have not read any additional

Page 236

documents related to this case in preparation for this, documents between yesterday and today.

Q. Okay. Did you look back at Exhibit 1, the binder that we talked a bunch about yesterday, between the break yesterday and today?

A. Briefly, I looked at the initial questions that -- or the topics that were going to be discussed.

Q. And have you spoken with anyone since the break yesterday about your deposition?

A. No.

Q. All right. We're going to revisit a few things from yesterday, and then we'll move into some new topics.

Regarding the USAID website taken down, so just to orient you on my questions. You testified yesterday that Mr. Jackson told Mr. Kliger to take the website down. Did you talk to Mr. Jackson in preparation for this deposition?

A. No.

Q. Did you talk with Mr. Jackson at all about the website being taken down?

A. Not in preparation for this deposition.

Q. But you've spoken to Mr. Jackson before about the website being taken down?

Page 237

A. Yes, in my personal capacity. Just in brief -- in passing, that -- while I was an employee of USAID, that the website was taken down.

Q. Can you describe for us the actual conversation?

A. I was walking past Ken Jackson in the hallway, and Ken Jackson told us -- told me and a couple other people that the website was taken down.

Q. And what day was that?

A. I can't recall. It would have been early February.

Q. Is that conversation or that statement in passing the only information you have that substantiates the notion that Mr. Jackson is who directed Mr. Kliger to take down the website?

A. No, I have the interrogatory responses.

Q. Besides the interrogatory responses and that statement in passing, are those the only information that forms the basis of the statement that Mr. Jackson instructed Mr. Kliger to take the website down?

A. Yes.

Q. All right. Yeah. I'm handing you Exhibit 9. Sorry.

A. I have Exhibit 9.

ADAM KORZENIEWSKI                    March 26, 2026                    238 to 241
95350                                                                  30(b)(6)

Page 238

Q.   Yes.  And this is the 9 from yesterday.

A.   The email thread?

Q.   This is the email thread about the PSC terminations, correct?

A.   Correct.

Q.   On the -- I think it's the second page, Mr. Marocco describes a sense of urgency from the White House.  Do you see that?

A.   Yes.

Q.   From whom at the White House was there a sense of urgency?

MR. SILER:  Objection, speculation.

But you can answer.

THE DEPONENT:  USAID, State Department does not know who he was speaking with at the White House.

BY MS. STEVENS:

Q.   At the time that Mr. Marocco sent that email, he was working on behalf of the State Department, correct?

A.   Yes, he was -- yes.

Q.   Who on behalf of the State Department would be able to speak to this question of who Mr. Marocco was talking to at the White House?

A.   Well, that person would be Mr. Marocco

Page 239

himself.

Q.   All right.  I'm handing you yesterday's Exhibit 5.

A.   Exhibit 5 is an email thread between Katie Miller and Michael Needham.

Q.   Do you recall that we looked at this yesterday?

A.   Yes.

Q.   What did Mr. Davis and Mr. Needham speak about?

MR. SILER:  Objection, calls for information protected by the deliberative process privilege.  I mean, well, to the extent it covers information protected by the deliberative process privilege as reflected in this redacted communication.

To the extent the witness knows of non-deliberative, pre-decisional information, he can answer.

THE DEPONENT:  Adam does not know, and State, USAID can't comment because of the DPP.

BY MS. STEVENS:

Q.   Okay.  Put aside Adam's knowledge.  The -- so, yesterday, you said USAID did not know the content of this conversation.  Is that still

Page 240

correct?

A.   That's correct.

Q.   Okay.  And so, is it correct that State does know the content of this conversation?

A.   Yes, that's my understanding.

Q.   Okay.  What is the program or activity in which this deliberative process advice or decision-making was focused on?

MR. SILER:  You can answer if you know.

THE DEPONENT:  I don't know.

BY MS. STEVENS:

Q.   Does State know?

A.   I don't know if State knows.

Q.   Well, you're here on behalf of State, so --

A.   Yeah, I don't know.

Q.   But "I" is not Adam, "I" is State.

A.   Yeah, we -- we don't know.

MR. SILER:  Okay.

THE DEPONENT:  Okay.  Sorry.

BY MS. STEVENS:

Q.   What was the decision-making process and methodology for that process that this conversation was a part of?

A.   I don't know if there was any decision-

Page 241

making process necessarily to this conversation.

Q.   Well, core to the deliberative process privilege assertion is that there was a decision-making process underway and that the conversation is tied into that.  And so, for me to be able to ascertain whether we think that the deliberative process privilege applies, I have to walk through these questions with you.

A.   Yeah.

MR. SILER:  So I think the --

MS. STEVENS:  Or --

MR. SILER:  -- just -- sorry.  If you want to finish your question.

MS. STEVENS:  Go ahead.

MR. SILER:  I think the witness has testified that he does not know the underlying circumstances of this.  Obviously, there are State Department people on the email, those people would know, but I think the witness has just testified he doesn't know.

MS. STEVENS:  Well, he said he didn't know what the decision-making process was or whether there was one at all, but he said that State knows the content of the conversation.

MR. SILER:  Yes.

Page 242

MS. STEVENS: Right? Agree?

MR. SILER: Yes.

BY MS. STEVENS:

Q. So, just to finish the questions, what role did this communication have in the course of that decision-making process?

MR. SILER: Objection, asked and answered, but go ahead.

THE DEPONENT: I don't know.

BY MS. STEVENS:

Q. State doesn't know?

A. State doesn't know.

Q. And on what date was this communication?

A. 31 January 2025.

Q. What's the status of the decision that this conversation was a part of?

MR. SILER: Objection, asked and answered. Go ahead.

THE DEPONENT: I don't know.

BY MS. STEVENS:

Q. State doesn't know?

A. State doesn't know.

Q. What's the status of the personnel involved in this conversation?

MR. SILER: Objection, foundation -- oh,

Page 243

sorry. Vague.

THE DEPONENT: So like their current -- you're asking their current employment status with the U.S. government, right?

MS. STEVENS: Yes.

THE DEPONENT: Specifically about their current employment status with the U.S. government, I personally and State Department can affirm that Mike -- Michael Needham is still Counselor of State. Other individuals mentioned in here, I can't say for certain.

But Adam believes that Elon Musk is no longer an employee or SGE of the U.S. government. Adam believes that Katie Miller is no longer an employee of the U.S. government. And Adam also believes that Steve Davis is no longer an employee of the U.S. government.

BY MS. STEVENS:

Q. Does State or USAID, in your capacity of speaking on those -- their behalf, know the status of Ms. Miller's employment with the government?

MR. SILER: I'm going to renew my objection that the structure of White House offices and individuals or their employment status are not properly within the scope.

Page 244

But the witness can answer to the extent he knows.

THE DEPONENT: Yeah, State Department does not know. USAID does not know.

BY MS. STEVENS:

Q. Does State or USAID know the status of Mr. Davis's position within the government?

MR. SILER: Same objection.

THE DEPONENT: Comparable answer. USAID and State does not know the current employment status with the U.S. government of Steven Davis.

BY MS. STEVENS:

Q. Okay. So we've been talking about this conversation between Mr. Davis and Mr. Needham. The top of the email says, "Steve agrees with the secretary," and then it's redacted. "Secretary has been trying to reach Elon, but has been unable to" -- excuse me -- "has not been able to." What was the secretary attempting to reach Mr. Musk about?

A. I don't know. State Department does not know. Well, the secretary knows what he was trying to reach the -- Mr. Musk for.

Q. Did he reach Mr. Musk at some point?

A. I don't know.

Q. Does the State Department know?

Page 245

A. No, but I am -- I know that the Secretary of State has had conversations with Elon Musk in Elon Musk's capacity as a senior advisor to the president.

Q. For this email, is there anyone at State besides the secretary who would be able to answer the question of whether the secretary got in touch with Mr. Musk in response to this email?

A. This is a little bit of speculation, but possibly the Counselor of State, Mike Needham, and any possible schedulers for the secretary. I don't know their names. They cycle quite quickly through because it's high-intensity work.

MS. STEVENS: I'm going to mark a new exhibit. Marking Exhibit 12.

(WHEREUPON, Exhibit 12 was marked for identification.)

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. If you'll just read through there and familiarize yourself with the exhibit.

THE DEPONENT: Do you guys need to like a 5-minute break --

MS. STEVENS: No, no, no --

THE DEPONENT: -- to argue?

ADAM KORZENIEWSKI                    March 26, 2026                    246 to 249
95350                                                                  30(b)(6)

Page 246

MS. STEVENS: We're fine.

THE DEPONENT: Okay.

MS. STEVENS: No, we don't need to argue.

MR. WARREN: Maybe we should talk about this on a break rather than on the record. I don't mean to not have the conversation, but yeah.

BY MS. STEVENS:

Q. Tell me when you're ready with your exhibit.

A. Okay. Completed reading the Exhibit 12.

Q. All right. Would you identify the exhibit for the record?

A. Can you say that one more time, please?

Q. Sorry. Would you identify the exhibit?

A. Yes, this is Exhibit 12. It's an email thread involving a number of individuals, including Brian McGill, Patrick Butler, or PJ Butler. Let's see. And there's a couple folks CC'd, but I don't see them actually responding, or there's at least one person CC'd.

Q. You remember we talked quite a bit yesterday about access that Mr. Farritor had to C-CURE on the 30th of January. Do you remember that?

A. Yes.

Q. And we talked about -- I think you

Page 247

testified about Mr. Farritor, his getting access to the higher elevation of -- sorry, let me start over. You testified that Mr. Farritor, in order for him to get that elevated access to C-CURE on the 30th, would have needed some authorization from a proper authority. Do you remember talking about that?

A. That's correct.

Q. In here -- and, actually, can you say the time of the -- of Mr. McGill's last email on the 31st?

A. Yes, the last email from Mr. McGill is Friday, January 31st at 2:42 a.m. Wow, that was early in the morning.

Q. And that's kind of in line with what you testified about your own experience at USAID that night, right? Like people stayed into the early morning hours of the 31st before going home. Does that sound right?

A. That's correct.

Q. Okay. Will you read the second paragraph, like the larger paragraph from Mr. McGill?

A. Sounds good. Do you want me to break out the acronyms or just --

Q. That would be great. Could you just --

A. Just read it first?

Page 248

Q. -- read it all the way through and then we'll do the acronyms.

A. Okay. "We had the AtA M&R, DOGE rep" -- let me restart. "We had the AtA M&R, DOGE rep, and FO rep in my office all night. They're working f the authorization from the WH/VPOTUS before M&R authorize the full -- authorizes the full app write access. State L reviewing TAC. All tracking closely, and I expect we'll hear from M&R once good to go," concluding up that paragraph.

Q. Go ahead with the acronyms.

A. Sounds good. ATA is assistant to the administrator. M&R is management and resources. DOGE refers to Department of Government Efficiency. FO is for -- front office. Wow. WH is White House. VPOTUS is shorthand for Vice President of the United States. M&R, once again, is management and resources. State L, is the Office of the Senior Legal Advisor at State Department, which is a general counsel equivalent. And once again, M&R.

Q. The assistant to the administrator M&R at the time was Ken Jackson?

A. That's correct.

Q. And so, this, if I can summarize, says that they'll hear from M&R, Mr. Jackson, once good

Page 249

to go, I mean, to provide that access?

A. That's correct.

MR. SILER: Objections, mischaracterizes.

THE DEPONENT: Sorry.

BY MS. STEVENS:

Q. Is that what USAID understands this email to mean?

A. Yes, it says M&R -- before M&R authorizes the full write access.

Q. So as of 2 a.m. on the morning of the 31st, there had not been approval given to provide the full write access from a person authorized to do so?

MR. SILER: Objection, I'll just note that the email has a UTC sort of time zone, and so that may not necessarily be Eastern. I'm just not sure.

MS. STEVENS: Okay.

THE DEPONENT: Yeah. I -- I'm sorry to not answer your question, but what does -- do we know what time zones UTC is?

MS. STEVENS: How about on a break we will -- I will -- we -- you and I will talk about that.

BY MS. STEVENS:

Q. How about this, as of 2:42 a.m. UTC --

A. Yeah.

Page 250

Q. -- the approval had not been provided to give the elevated access to C-CURE?

A. According to Brian McGill, yes.

Q. Okay. Is that also according to USAID?

A. I would have to refer back to my documents of when the authorization was given to C-CURE for -- actually, I'm not even sure for whom this email is referring to.

Yeah. I'm just trying to -- let me double check to see if it mentions any particular individual that needs the access. Doesn't -- doesn't specifically say whose access it was going for, but I have all their emails -- well, you also have the emails in both Exhibit 1, but also I guess there was discovery with the other dates of when certain individuals were received -- had received access.

Q. I think you're talking about the interrogatory responses?

A. And also -- sorry, I had to flip back. I just don't remember all the places where these things were. I'll stop --

Q. Well, before you do that, you were saying that this email doesn't indicate what individual or individuals are seeking that elevated access. Is

Page 251

there someone other than Mr. Farritor who was seeking that access on the night of the 30th of January?

A. I don't know. It would be -- I know Mr. Farritor and -- eventually, Mr. Farritor, Mr. Kliger, and Mr. Lewin got access to this -- received authorization to have higher level access for C-CURE.

Q. But on the night of the 30th of January of 2025, is it correct that Mr. Farritor was the person of those three that you just described, who was seeking the elevated access to C-CURE?

A. I would have to --

MR. SILER: I'm going to object again to the time -- to ambiguous as to the time given the document.

MS. STEVENS: No, no. I'm putting aside the document --

MR. SILER: Okay. Understood.

MS. STEVENS: -- USAID's understanding.

THE DEPONENT: I would have to refer back, so if you'd give me one second. Pardon me.

Do we also remember which exhibit also mentioned it?

MS. STEVENS: If you're talking about the

Page 252

interrogatories, I can -- I know where that is in your --

THE DEPONENT: It's one of the exhibits that -- it also has the physical access email or the --

MS. STEVENS: C-CURE?

THE DEPONENT: Yeah, physical access and logical, whatever, email if I recall correctly.

MS. STEVENS: It was -- there's an email from the 31st from Mr. Gray. Is that the one you're talking about?

MR. SILER: I think -- I think he may be thinking about Exhibit 8, which should be in that pile.

THE DEPONENT: I have -- I don't have Exhibit A.

MS. STEVENS: Or Attachment A.

MR. SILER: Oh, I'm sorry. That's wrong.

THE DEPONENT: Yeah.

MR. SILER: I'm wrong with that. It's Exhibit 11.

THE DEPONENT: Thank you. I just want to compare and contrast to make sure these -- where this one ends and where this one begins, because I know these are the exact same copies. Actually,

Page 253

they're the exact same copies. Yeah, so my understanding is as of -- as of Friday, January 31st, Luke Farritor had secure access according to this.

BY MS. STEVENS:

Q. What is this?

A. I'm sorry. I -- it's Exhibit 11. It's an email thread between Jason Gray and Luke Farritor, with a number of individuals CC'd. It's called, "Forward: Physical and Logical Administration for Gavin."

Q. What time was that approval provided?

A. I've got to keep flipping through --

Q. Okay.

A. -- for --

Q. -- looking at an email on Exhibit 11?

A. Yeah. So this is the -- this is where Luke Farritor mentions that he -- he should also have full read and write administrative access for managing physical, logical access, like myself. That's Luke Farritor saying that he has the access already by January 31st, 2025 at 4:46 p.m.

Q. Okay. And now you're looking for the document that gives Mr. Farritor permission to have that access in the first place?

Page 254

A.   Yes, and also -- or any sort of mention of it prior.

I can't find anything right this second, so I apologize.

Q.   Your -- the interrogatory responses, I think you were referring to earlier, are in your Exhibit 1.

A.   Yep.  I --

Q.   Did you find them?

MR. SILER:  I'm going to object that that mischaracterizes his testimony, but you can look at the responses.

MS. STEVENS:  Sorry, I wasn't trying to ask a question.

MR. SILER:  Okay.

MS. STEVENS:  I was trying to direct him to where the --

MR. SILER:  I was -- I was -- just as to the comment about, "You were referring to earlier." I think it's -- but, you know --

THE DEPONENT:  So I'm currently looking at tab 29, which is the USAID interrogatories on -- oh, boy.  I think this machine froze.

THE REPORTER:  Hold on just a sec.  Go off the record.  Yeah.  Can we go off the record for a

Page 255

moment?

THE VIDEOGRAPHER:  All right.  The time is 11:33, and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 11:36.  We are on the record.

BY MS. STEVENS:

Q.   Okay.  I think we were going to -- you were looking at the interrogatory responses with respect to when Mr. Farritor -- when the interrogatories saying that Mr. Farritor got access to systems that we asked about.  Is that where you are?

A.   Yeah.  I'm -- I'm sorry.  I was looking for it.  That was where I was.

Q.   Okay.  In the USAID interrogatory response?

A.   I'm pretty sure I'm on the USAID interrogatory responses.

Q.   Page 5 is where the answer for Mr. Farritor is located.

A.   Is it -- decision to shut down the website?

Q.   You might be in the --

A.   That's --

Page 256

MR. SILER:  Yeah, next tab.

THE DEPONENT:  I'm so sorry.

MS. STEVENS:  It's all right.

THE DEPONENT:  Okay.  All right.  I'm ready.  Sorry.

BY MS. STEVENS:

Q.   Okay.  So here it says, "Mr. Farritor received account access with admin rights on 1/31 to C-CURE."  Is that right?

A.   Yes.

Q.   Okay.  1/31 being January 31st --

A.   Yes.

Q.   -- 2025?

A.   That's correct.

Q.   Okay.  And then we talked on the break about what the proper time of the email we were talking about, so let's look back at that.

MR. SILER:  Which email?

MS. STEVENS:  The --

MR. SILER:  Is that right?  Is it Exhibit 11?

THE DEPONENT:  Or is it Exhibit 12?

MS. STEVENS:  It's 12.  Yeah, 12 is where Mr. McGill is talking about the level of access at the top.

Page 257

MR. SILER:  Yeah.  Okay.  So, just to be clear, we're talking about the time of Exhibit 12?

MS. STEVENS:  Correct.

BY MS. STEVENS:

Q.   Are you looking at this?

A.   Yes.

Q.   Okay.  And then the -- I asked you a question about as of January 31st at 2 a.m., right, that's how I started that questioning?  We've gone off the record, and UTC is not Eastern Time, so we're subtracting 5 hours from the time on that email, which makes it about 9:45 p.m. on the 30th. Does that sound correct?

A.   That sounds correct.

Q.   Okay.  So my question that I asked you before, I'll just ask it with respect to 945 p.m. on the 30th.  According to Mr. McGill's email, there had not been given authorization for Mr. Farritor to get that heightened level of access to C-CURE by the folks with authority to do so, correct?

MR. SILER:  Objection to the form.

But you can answer.

THE DEPONENT:  USAID's understanding is that Mr. Farritor has not received authorization for full read and write access with C-CURE as of this

ADAM KORZENIEWSKI                          March 26, 2026                          258 to 261
95350                                                                              30(b)(6)

Page 258

email on January 30th.

BY MS. STEVENS:

Q.   And then directing your attention to Exhibit 11 --

A.   Yes.

Q.   -- where on January 31st at -- in the afternoon, Mr. Gray provides that authorization you read into the record earlier.  Do you -- are you at that part of the email?

A.   Yes, by 4:46 p.m. on the 31st, Luke Farritor has -- Luke Farritor has C-CURE access.

Q.   Can you read what other access does he have?

A.   It's also -- the email's called physical and logical administration for Gavin Kliger, and it would be not limited to Phoenix HR systems, badging and access systems, cloud environments, and all systems related to grants, payments, and vouchers.

Q.   And what type of access?

A.   Administrative access.  Pardon me.

Q.   Administrative access is that higher level of access that we talked about yesterday for a long time?

MR. SILER:  Objection.  Just for the record, are we talking about Gavin or C-CURE?

Page 259

MS. STEVENS:  Oh, I'm just trying to understand the statement that's being made in that email --

MR. SILER:  From --

MS. STEVENS:  -- USAID's perspective.

MR. SILER:  Understood.  But which party are you now referring to?

MS. STEVENS:  Can I see?  Yeah.  The read/write administrative access that Mr. -- that Luke is talking about and then Mr. Gray is responding to.

THE DEPONENT:  Thank you.

BY MS. STEVENS:

Q.   So the read/write access is that elevated level of access to the systems that we talked about generally yesterday.  Do you remember that?  You called it God something --

MR. SILER:  Objection, mischaracterizes.

THE DEPONENT:  Yeah.  So I don't like -- this is -- I'm not an IT guy, so bear with me.  Salt to taste.  But there's -- my understanding is there's a user access, so just somebody would be using a database.  And then there's read/write.

I don't know if I could characterize C-CURE access and a God tier.  I've never heard it

Page 260

used in that context before.  But it would be -- it's an administrative access.  So they were able to read and write their own permissions in -- for doors.

BY MS. STEVENS:

Q.   Okay.  And these other systems, not just C-CIRE in here, right?

A.   My understanding is that they received additional elevated access in March for some of these other systems.  Well, Luke Farritor did.  The other one -- the other individuals, Gavin Kliger, you know, I think he -- his were slightly off in terms of time, but I haven't -- I would have to look at the dates one-to-one.  But it looks -- they look pretty comparable in terms of timing.

Q.   Putting the interrogatory aside, that email, though, gives them the authorization to read/right --

A.   Yes.

Q.   -- access?

A.   The -- specifically what it says is, "A full read/write administrative access for managing physical, logical access, like myself," a quotation, Luke Farritor in an email to Jason Gray.

Q.   And what does Mr. Gray say in response?

Page 261

A.   I -- I don't know if he's responding directly to a loop, or if he's forwarding the email on, it could -- it looks like it could be either.  It says, "Hello.  Yes, I approve of the administrative access to all unclassified systems, including, but not limited to Phoenix HR systems, badging and access systems, cloud environments, and all systems related to grants, payments, and vouchers."  That's from Jason Gray.

Q.   Okay.  So he's approving administrative access to all of those systems?

A.   Yes.

Q.   And yesterday we talked about at the time of this email, Mr. Gray is no longer acting administrator.  He's the CIO, correct?

A.   Correct.

Q.   Is it USAID's testimony that this level of access approved did not need to come from someone higher up than the CIO?

A.   No, it did not have to.  The CIO -- it's my understanding the CIO has the power to grant those accesses as virtue of being CIO.

Q.   And it's USAID's testimony that the CIO could give that level of approval for that level of access to C-CURE, even though C-CURE, the system,

Page 262

was not within the CIO's department?

MR. SILER: Objection, form.

You can answer.

THE DEPONENT: My understanding is the CIO, because it is a database or information system, that the CIO can grant access to C-CURE with his powers that were granted to him as -- by virtue of being CIO.

BY MS. STEVENS:

Q. The -- USAID knows, though, that C-CURE is a system that is under the security department of USAID, not the CIO department, right?

A. Well --

MR. SILER: So, at this point, I'm going to object that this line of questioning again is outside the scope, because who is managing what system is not one of the topics that's identified.

But if you know, you can answer.

THE DEPONENT: All information systems at any U.S. government agency falls under the purview of the CIO of the agency. This -- I'm not a lawyer, but this might even be statutory, if not executive policy.

BY MS. STEVENS:

Q. The -- so you talked about Mr. Gray having

Page 263

the power as the CIO to provide this level of -- provide approval for this level of access. Is that -- I'm talking about legal authority, not just power. Did he have legal authority to provide that?

MR. SILER: Objection, calls for a legal conclusion, form.

You can answer if you know.

THE DEPONENT: I'm not a lawyer, but my understanding is the CIO has the power granted to him by law and regulations to control all accesses and systems inside their agency, except for certain cases.

THE REPORTER: Exhibit 13 marked.

(WHEREUPON, Exhibit 13 was marked for identification.)

THE REPORTER: Exhibit 13 marked.

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Did you have a second to look at it?

A. I did. I think we actually may have discussed this document yesterday, or at least I've read it.

Q. Okay. Great. Great. Because it's in your binder --

A. Yeah.

Page 264

Q. -- is that what you're saying?

A. It's 2647 under tab 8.

Q. Okay. Could you identify the document?

A. Yeah.

MR. SILER: This is 13, just to be clear.

MS. STEVENS: Exhibit 13.

THE DEPONENT: Yeah. Exhibit 13 -- Exhibit 13 is an email titled, "FWD Building Access." It's an email thread between -- just starting from the bottom, Ken Jackson -- I think that's still Ken Jackson -- Pete Marocco, Erica Carr, Brian -- and I think this is from Brian McGill's email address. And there's a number of CC'd individuals along the way. Oh, the email was addressed to -- final email was addressed to Brian McGill and John Voorhees.

BY MS. STEVENS:

Q. Okay. The original email from Mr. Jackson to Mr. Marocco says, "Jeremy and his team would like access to the USAID building today to physically plug into the network. I asked him for a list of names of the individuals and agency affiliation. When I have the full list, I will send to you, and I would like direction to come from you if this is approved or not."

Page 265

And then Mr. Jackson forwards a list to Mr. Marocco, says, "With the new State/USAID delegations, I'm running this through for you for approval." Did I read all that right?

A. Yes.

Q. This is Saturday, February 1st, right?

A. Correct.

Q. Okay. What were the new State/USAID delegations?

A. The new State/USAID delegations was that on January 30th, 2025, Secretary Rubio became acting administrator of USAID by that point.

Q. Is that the end of the sentence?

A. Yes, that's the end of the sentence.

Q. Okay. And so, why is Mr. Jackson asking Mr. Marocco for the approval?

MR. SILER: Objection, speculation.

THE DEPONENT: I can answer?

MR. SILER: Yeah --

MS. STEVENS: Yeah.

THE DEPONENT: Sorry. Go ahead -- do you --

MS. STEVENS: No, go ahead.

THE DEPONENT: I don't know why, both USAID, State, and Adam.

ADAM KORZENIEWSKI                    March 26, 2026                         266 to 269
95350                                                                        30(b)(6)

Page 266

BY MS. STEVENS:

Q. What was Mr. Marocco's position as of this February 1st email?

A. Mr. Marocco was the director of F Office at State Department, foreign assistance.

Q. Who would know why Mr. Jackson was asking Mr. Marocco for the approval in this email chain on the 1st?

A. That would be either Mr. Jackson or Mr. Marocco.

Q. It's correct that as of the 1st, Mr. Gray was no longer acting administrator, correct?

A. That's correct.

Q. How about -- we're getting an exhibit, so --

A. Okay. Do you want to take a break?

Q. Do you need a break?

A. I'm good, but we can break for the exhibit.

Q. No, no, no, she's right here.

A. Oh, that was a fast exhibiting.

THE REPORTER: Exhibit 14 marked.

(WHEREUPON, Exhibit 14 was marked for identification.)

THE DEPONENT: Thank you.

Page 267

BY MS. STEVENS:

Q. Take a second to look through that.

A. Roger.

Okay.

Q. Great. Could you identify the exhibit, please?

A. Yep. Exhibit 14 is an email thread titled, "Request Information on My Duty Status." It is an email thread, looks like originated by Brian McGill from his personal Gmail to William Malyszka. We call him Bill, but that's how he was referred to shorthand. And also included in the email is a Kirsten Gunsolus. And also it appears that there's -- I think that's all the persons involved in it.

Q. You're -- USAID is aware that Mr. Vorhees -- not Mr. Vorhees -- Mr. McGill was put on administrative leave on Saturday, February 1st, correct?

A. I believe so. Yes. I would -- it's somewhere in here, but I recall seeing that.

Q. That Mr. McGill was put on administrative leave?

A. That's correct. And I, as Adam, I remember he was put on administrative leave sometime that weekend.

Page 268

Q. Do you need a second to find out when he was put on leave?

A. No. I was just getting ready to flip to it.

Q. Okay. This email says that the action to put Mr. McGill and -- on leave was "pursuant to instructions from Acting Administrator Jason Gray." Do you see that?

A. Yes.

Q. He was not the acting administrator at the time though, correct?

A. That's correct.

MR. SILER: Objection, ambiguous.

THE DEPONENT: That is correct. He was -- Jason Gray was not the acting administrator on Saturday or Sunday, February 2nd -- or 1st or 2nd, 2025.

BY MS. STEVENS:

Q. He was also not the acting administrator on January 31st, correct?

A. Correct.

Q. Why was someone from USAID's human resources team saying that Jason Gray was acting administrator at the time -- at the time of this email?

Page 269

MR. SILER: Objection, speculation.

Go ahead.

THE DEPONENT: It's USAID's position that he was mistaken.

BY MS. STEVENS:

Q. That that Kirsten was mistaken.

A. Was it Kirsten? Yes, Kirsten.

Q. Kirsten.

A. Yeah, I believe that individual was mistaken. If I recall correctly, somewhere in here, it states that Jason Gray made the decision -- or not Jason Gray -- Ken Jackson made this decision. I'm looking for it.

Q. Was the fact that Mr. Gray was no longer the acting administrator of USAID conveyed to HR personnel as of January 31st?

A. I don't know.

Yep. So there's a -- there is an interrogatory on this, but I don't want to waste time.

Q. Okay. Exhibit 15 -- handing you Exhibit 15.

(WHEREUPON, Exhibit 15 was marked for identification.)

THE REPORTER: Exhibit 15 marked.

ADAM KORZENIEWSKI                    March 26, 2026                        270 to 273
95350                                                                     30(b)(6)

Page 270

THE DEPONENT:  Thank you.

BY MS. STEVENS:

Q.   This is an email from February -- Monday, February 3rd from Mr. Marocco to Ken Jackson, Jason Gray, Joel Borkert, Jeremy Lewin, Steve Davis, Luke Farritor, CC'd Daniel Holler.  Is that correct?

A.   Yes.

Q.   On this date, in accordance with this email, approximately 14 -- well, 1,412 USAID employees were placed on administrative leave.  Is that correct?

A.   Yes.

Q.   Who made that decision?

A.   I believe it was Pete Marocco.

Q.   Believe it was Pete Marocco, or was Pete Marocco?

A.   It was Pete Marocco.  Pardon me.

Q.   What was Jeremy Lewin's role in this decision?

A.   In this initial memo, it says he drafted it, but he also provided advice as part of his role as DOGE team member/leader -- leader/member.

Q.   What was Elon Musk's role in making this decision?

A.   I don't know as USAID, State Department,

Page 271

and Adam, if Elon Musk had any role in this.

Q.   Did Mr. Lewin speak with Mr. Musk about this decision?

A.   I don't know as USAID, State Department, or Adam, if Jeremy Lewin spoke with Elon Musk about this decision or this draft or his advice that was provided.

Q.   Were any of the DOGE team members involved with respect to this decision about putting these 1,412 USAID members on -- employees, excuse me, on administrative leave?

MR. SILER:  Objection, ambiguous.

You can answer.

THE DEPONENT:  To my understanding, the DOGE detailees, as part of their role, provide advice that Jeremy Lewin was responsible for.  And -- but Jeremy Lewin is the one that provides the advice to whichever principal that asked for it.  So they could have came up with this decision as a concert by team or -- but, you know, there was an analysis done.  I'm just not familiar with what the -- what was discussed at the time.

BY MS. STEVENS:

Q.   For the question of Mr. Musk's involvement in this decision-making, who would be able to answer

Page 272

that question?

A.   I would -- I mean, it would be Pete Marocco, and -- I mean, it would be Pete Marocco basically, because he's the one that states very clearly, "Today, pursuant to ADS 480, I am placing," et cetera.  Like he -- it's a very affirmative "I am doing this" statement, so --

Q.   This document was drafted by Mr. Lewin, though?

A.   Yes.

Q.   Would Mr. Lewin be able to speak to this question of Mr. Musk's involvement?

MR. SILER:  Objection, asked and answered.

THE DEPONENT:  I don't know, but I think he would be able to say whether or not he had a conversation with Mr. Musk.

BY MS. STEVENS:

Q.   I'm handing you Exhibit 16.

(WHEREUPON, Exhibit 16 was marked for identification.)

BY MS. STEVENS:

Q.   This is in your binder, but I wanted it as a separate exhibit.

THE REPORTER:  Exhibit 16 marked.

THE DEPONENT:  Thank you.

Page 273

BY MS. STEVENS:

Q.   These are the two documents we -- I think we touched on a little bit yesterday, delegating duties to Mr. Marocco from Secretary Rubio on February 2nd.  Can you see that?

A.   Yes.

Q.   What time on February 2nd was this document signed?

A.   I don't know as AID, State, or Adam.

Q.   What like time of day?  Morning, afternoon, night was it signed?

A.   As AID, State, and Adam, I don't know.

Q.   It's correct, though, that this -- that Mr. Marocco was not delegated these duties until February 2nd, 2025, correct?

A.   That's correct.

Q.   In Defendant's answer, Defendant said that, "USAID leadership discussed the possibility of a reduction in force and disciplinary actions with USAID in consultation with the U.S. Office of Personnel Management."  Who is the -- who are the USAID leadership members there?

A.   Can you tell me which -- where's the interrogatory?

Q.   It's not an interrogatory.  It's in the

Page 274

answer provided by the defendants.

A. Oh, okay. Can you repeat one more time? I apologize.

Q. That's fine. It says, "USAID leadership discussed the possibility of a reduction in force and disciplinary actions within USAID in consultation with U.S. Office of Personnel Management." Who is the USAID leadership?

MR. SILER: Objection, ambiguous as to time period.

You can answer.

THE DEPONENT: I would need a date for that to be helpful.

MS. STEVENS: It's late January, early February is the time frame.

THE DEPONENT: Late January, early February, depending on who was appointed to what, if it was post-February 2nd, the individuals would include Pete Marocco, Ken Jackson, Joel Borkert, Jeremy Lewin. Personally, I don't recall that conversation at that time, but I would have probably been in the room or something like that.

Prior to that -- prior to February 2nd, between January 30th, February 1st would have been Ken Jackson, Joel Borkert, maybe Matt Hopson,

Page 275

possibly myself, and then probably -- and then possibly Jason Gray, because he would have been still -- he would be CIO. And then prior to that, it would have been including Jason Gray as his CIO, or his acting administrator position. So, yes.

BY MS. STEVENS:

Q. The reduction in forces is sometimes called a RIF. Is that correct?

A. That's correct. That's the shorthand.

Q. What role did Elon Musk play in trying to make a decision about whether USAID would move forward with the RIF?

A. USAID is not aware of any input by Elon Musk in the RIF -- the RIFs, plural, excuse me, that occurred at USAID.

Q. USAID isn't aware? Can you say affirmatively that Mr. Musk did not participate in it, or you just don't know the answer to the question?

MR. SILER: Objection. Any involvement that Mr. Musk had outside of the knowledge of the organizational components here would obviously not be in their knowledge if he was having conversations with other people.

But to the extent that USAID is aware, or

Page 276

State is aware, you can answer.

THE DEPONENT: I -- USAID can't say that -- we can't deny that -- whether or not Elon Musk had a conversation with anybody at any given point about anything. But USAID is unaware of any input or advice Elon Musk gave personally to USAID regarding the RIF.

BY MS. STEVENS:

Q. Who would be aware about whether Mr. Musk had a role in determining whether USAID would move forward with the RIF?

MR. SILER: Objection, calls for information outside this deponent's knowledge.

Go ahead.

THE DEPONENT: It would -- other than Mr. Musk, it would also -- it would possibly include Ken Jackson, possibly include Pete Marocco, possibly include Jason Gray.

BY MS. STEVENS:

Q. Did you speak with Mr. Lewin about whether Mr. Musk was involved in these decisions?

A. I'm sorry. Could you just restate that?

Q. Yep. Did you speak with Mr. Lewin about whether Mr. Musk was involved in these decisions?

A. No.

Page 277

Q. Did you speak to Mr. Marocco about whether Mr. Musk was involved in these decisions?

A. No.

Q. Yesterday, we talked some about the GSA memo ending the lease with USAID at the Ronald Reagan Building. Do you remember talking about that?

A. Yes, I remember.

Q. Document 18 in Exhibit 1, your binder --

A. Yep.

Q. -- is the document you're referring to?

A. Yes.

Q. Did anyone at USAID have a conversation with Mr. Peters, the person who signed off on this letter to Mr. Jackson, about the end of the lease with GSA prior to the issuance of this letter on February 7th?

A. That's -- not to my knowledge.

Q. Not to USAID's knowledge?

A. Not to USAID's knowledge. Not to Adam's knowledge.

Q. Okay. Did any DOGE team members assigned to USAID discuss the revocation of the lease with GSA?

A. USAID does not know if they spoke to GSA

Page 278

at all about revoking the lease.

Q.   Did any DOGE team members assigned to USAID discuss revocation of the lease with Elon Musk?

A.   USAID is unaware of conversations with Elon Musk about the revocation of the lease.

Q.   Who would be able to answer that question?

MR. SILER:  Objection, mischaracterizes.

THE DEPONENT:  I can answer?

MR. SILER:  Yeah.

THE DEPONENT:  Okay.  What I -- who I would -- I'm sorry.  Can you just say that one more time?  I got myself sidetracked.

BY MS. STEVENS:

Q.   My question -- the original question was: Did any DOGE team members assigned to USAID discuss revocation of the lease with Elon Musk?  And you said USAID is unaware of conversations with Elon Musk about the revocation of the lease.  And so, my follow-up question is: Who would be able to speak to that?

MR. SILER:  Same objection, but go ahead.

THE DEPONENT:  Gotcha.  I would -- individuals involved in the GSA would be Michael Peters, who was the commissioner at the time.  I

Page 279

don't know if he still is the commissioner.  Dr. Deborah Schneider would probably be individuals that would understand the circumstances around it, and I would say Mr. Ken Jackson may have knowledge.

BY MS. STEVENS:

Q.   My question -- my previous question, I did touch on whether Mr. Musk spoke with GSA, but the immediate previous question was about DOGE team members talking to Elon Musk about the end of the lease with GSA.  Who would be able to answer the question about whether those conversations happened?

MR. SILER:  Objection, ambiguous.

You may answer.

THE DEPONENT:  The DOGE team members themselves, so the detailees as of this document would have been Jeremy Lewin, Luke Farritor, and Gavin Kliger.  I'm not sure -- I don't know if at that time -- by that time that Clay Cromer was still with DOGE.

BY MS. STEVENS:

Q.   Did Mr. Lewin have a conversation or conversations with Elon Musk about the end of USAID lease from GSA before this letter on February 7th, 2025?

A.   USAID's unaware of the conversations that

Page 280

Jeremy Lewin had with Elon Musk about the revocation of the lease.

Q.   Did --

A.   Or State.

Q.   Did Mr. Marocco have a conversation with Mr. Musk about the end of the USAID lease of the Reagan Building from GSA before this February 7th letter?

A.   USAID's unaware of conversations between Mr. Marocco and Mr. Musk regarding the lease or the revocation of the lease prior to this letter going out to Ken Jackson on February 7th.  Same thing for State.

Q.   You're -- State and USAID are unaware of whether that conversation occurred, but it does not deny that it could have occurred or that it did occur?

MR. SILER:  Objection, mischaracterizes.

You can answer.

THE DEPONENT:  I'm trying to think of a way to explain this without being overly pedantic. Like I can't  -- I can't disprove a negative, right? Like so -- like, there's a -- there's a -- is there a possibility that Team Marocco has had a conversation with Elon Musk about the lease?

Page 281

Absolutely.  But I have no documentation, proof, or I've not been made aware of any conversation that's in any of my capacities today, to include my personal.

BY MS. STEVENS:

Q.   Who would be able to answer the question of whether Mr. Marocco and Mr. Musk discussed the end of the USAID lease with the Reagan Building?

A.   It would have been Mr. Marocco, Mr. Musk, or -- I guess that would be it.

Q.   On Friday, February 7th, the same date as this letter, Mr. Musk announced on X that USAID headquarters was now occupied by U.S. Customs and Border Protection and posted a picture of the headquarters main entrance with the USAID seal, I guess, removed from the door.  Who at USAID leadership did Mr. Musk communicate with about this before that posting on X?

MR. SILER:  Objection, assumes facts.

THE DEPONENT:  USAID's not aware that Elon Musk consulted anyone at USAID about that.  It's also -- it's factually not correct that CBP or any DHS agency occupied that space that day.

BY MS. STEVENS:

Q.   Is it correct that CBP was taking over the

Page 282

space going forward?

A.   We were told by -- this is me speaking as my personal capacity, I guess, is USAID knowledge too.  GSA and some subsequent phone calls said that CBP may take it over.  Personally, when I -- where I found out was when a bunch of border patrol agents came to our administrator suite asking for a tour. I had to turn them away because we have classified material in some of the rooms that we -- they didn't have a need to know to see.

So -- but since then, in my personal capacity like, I've known that there's been speculation of other government agencies taking over that space to include the Federal Bureau of Investigation, et cetera.  But there's a lot of complication in the use of that space.  Partly because USAID -- OIG is still there.

The EPA spaces that would be also consumed by the new incoming agency would -- is not -- it's not up to snuff in terms of typical creature comforts that would be required of a federal building.  It's very rundown.  And then also the GSA construction in parts of the USAID space had not been completed last I spoke with GSA sometime, say, March.

Page 283

Q.   When did the border patrol agents -- when did you have that interaction you just described?

A.   It was close of business, so sometime around 5, 5:30 on Friday, February 7th.

Q.   And the attachment to this, at least behind tab 18 in Exhibit 1, the document behind the letter is a temporary license between GSA and the Customs and Border Patrol.  Is that right?

A.   That's true.

Q.   Who at State Department did Mr. Musk speak to before -- about the lease at the Reagan Building for USAID before he posted that tweet?  I'm sorry, that X post on February 7th.

MR. SILER:  Objection, form.

You can answer.

THE DEPONENT:  State Department and USAID and Adam are unaware of any conversation.  Elon Musk -- oh, I'm so sorry.  That was gross.  Elon -- or sorry, Jesus Christ.

MR. SILER:  Take -- take a second.

THE DEPONENT:  Yeah.

MR. SILER:  Do you need a drink of water or something?

THE DEPONENT:  No, no, no.  State Department -- this is more embarrassing than

Page 284

anything.

So State Department, USAID, and Adam are unaware of any conversation that Elon Musk had with any person at State Department regarding the contents of that tweet or -- or the tweet that went out.  And I don't know what the X terms are.

MR. SILER:  Why don't we take a second just so he's --

MS. STEVENS:  I have one more question about --

MR. SILER:  Are you okay?

THE DEPONENT:  I'm golden.

MR. SILER:  Okay.

THE DEPONENT:  I'm just more embarrassed than anything.

MR. SILER:  Okay.

MS. STEVENS:  We're all human.

THE DEPONENT:  Well, I mean, God forbid, there's going to be some poor worker that makes less than all of us that has to transcribe this probably.

MS. STEVENS:  She's transcribing it.

BY MS. STEVENS:

Q.   Okay.  Let's orient back to this.  Was there -- sorry.  What conversations, if any, did Mr. Musk have with any of the DOGE team members assigned

Page 285

to USAID about the end of the lease with GSA before this post that he made on February 7th?

MR. SILER:  Objection, form.

You can answer.

THE DEPONENT:  State Department, USAID, Adam are unaware of conversations Elon Musk had with the DOGE detailees to USAID prior to the creation, posting, or the contents of that tweet.

MS. STEVENS:  Okay.  Let's take a 5-minute break.

THE DEPONENT:  Sure.

THE VIDEOGRAPHER:  All right.  Please stand by.  The time is now 12:17, and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is now 12:29. We are on the record.

BY MS. STEVENS:

Q.   All right.  I'd like to turn your attention to later in February.  Starting in early February, USAID contracts, right?

A.   Yes.

Q.   External contracts were being terminated sort of en masse, correct?

MR. SILER:  Objection, characterization.

Page 286

Go ahead.

THE DEPONENT: Yeah. There was a -- there was a review and certain contracts were moved towards termination, but termination is a very long process for contracts and contract disclosures, so many of them are actually still technically open today.

BY MS. STEVENS:

Q. There was a process by which many of the contracts that USAID had in place prior to January 20th were reviewed and then determined to terminate them. Is that correct?

A. That they were reviewed -- that they were determined that they did not fit the executive order and other orders and other criteria that we made. But, yes, they were -- there was a determination of what will continue and what will not continue.

Q. Who did USAID consult with to determine that those decisions -- whether those decisions about contract terminations were legal?

MR. SILER: Objection, calls for information protected by the attorney-client privilege.

MS. STEVENS: Just the who, not the content.

Page 287

MR. SILER: Okay.

MS. STEVENS: Sorry.

THE DEPONENT: Okay. Our general counsel's office at USAID.

BY MS. STEVENS:

Q. Who was that? What specific individuals?

A. At the time, it was -- general counsel of USAID was a guy named Frederick Guy.

Q. Can you spell the last name?

A. G-U-Y.

And various other legal reviews thereof. That was on the USAID side. Items that pertain to programs that were -- I don't want to say State-run, but jointly held with State Department or State Department expressed interest in obtaining these programs. Those reviews would also go through State L, which is the Office of the Senior Legal Advisor. I don't know specifically who at L. It was outside of my scope of responsibilities, personally, to interact with State L.

Q. Who within USAID would have done that interaction with State L?

A. It would have been Rick Guy -- Frederick Guy. He goes by Rick for short, or any of the other general counsel members, team members, so any of the

Page 288

associates, assistant general counsels. I don't remember all the legal rank terms for every single position.

Q. Who in Congress did USAID consult with about whether to cancel these contracts?

MR. SILER: Objection to the extent these questions are outside of any contracts that are referenced in what's USAID 22, which is a particular memo. That would be outside the scope of the listed topics.

But the witness can answer in his personal knowledge.

THE DEPONENT: I don't know. This is one of those things that like I don't know if it's personal or if it's something I read in this binder. But I know that there was conversations with specific individuals on the Hill to include -- sorry, I got a -- I can't remember the person's name off the top of my head, which makes me wonder if it's even a personal knowledge.

I'd have to -- oh, Paul Grove was somebody that I know our Legislative Affairs Office had spoken with at various junctures, but I don't know when they would have been speaking. It was outside of my direct purview.

Page 289

THE REPORTER: Exhibit 17 marked.

(WHEREUPON, Exhibit 17 was marked for identification.)

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Do you recognize Exhibit 17?

A. One second. I just want to read the front page first.

I do recognize it.

Q. This is an action memo to Secretary Marocco from -- sorry, Secretary Rubio from Mr. Marocco. Is that correct?

A. That's correct.

Q. And it's, well -- the recommendation is the authorization that USAID to seek OPM approval to establish competitive areas for and execute a reduction in force -- what we call a RIF, right -- of domestic USAID personnel? Do you see that?

A. Yes. You're talking about recommendation 1?

Q. Mm-hmm.

What is -- was Mr. Lewin's role in this document?

A. I know he provided advice of how this was to be done. And according to the clearance status,

ADAM KORZENIEWSKI                   March 26, 2026                    290 to 293
95350                                                                 30(b)(6)

Page 290

he was a drafter on this.

Q.   The memo says, "With DOGE's assistance, USAID has prepared relevant, ready-to-send documents to commence the process upon senior leadership sign-off."  What was the assistance that DOGE provided?

A.   Can you just direct me to that quote?

Q.   Yeah.

A.   I think you're talking about the second page, 1686, under the RIF process?

Q.   Mm-hmm.

A.   Yeah.  So this continues the DOGE detailees, the team that was assigned to USAID, their role in providing assistance and -- sorry, advice and analysis for  decision-makers for the agency.

Q.   What was Mr. Musk's role in this decision-making articulated in this memo?

MR. SILER:  Objection, assumes facts.

You can answer.

THE DEPONENT:  USAID and State Department are unaware of any role Elon Musk played in the creation of this document or the decision for this particular competitive RIF.  And Adam doesn't know either.

BY MS. STEVENS:

Page 291

Q.   Who would be able to speak to Mr. Musk's involvement in the decision-making underlying this document?

A.   It would be Pete Marocco specifically.  He's the originator of the action memo.  Perhaps Ken Jackson in his role as ATA, but that one I'm less clear about.

THE REPORTER:  Exhibit 19 marked.

(WHEREUPON, Exhibit 19 was marked for identification.)

THE DEPONENT:  This was 17.  Do I have 18 somewhere?

MS. STEVENS:  I'm holding 18.  Sorry, I just haven't offered it yet.

THE DEPONENT:  Oh, okay.

MS. STEVENS:  It's just -- we're going to go out of order a little.

THE DEPONENT:  Okay.  Yes.  So I just wanted to make sure I --

MR. SILER:  Can I be clear?  Because I'm not.  17 of 7 is -- what'd you call that?  So the document that starts on pages Bates --

THE DEPONENT:  This is 19.

MR. SILER:  This is 19?

THE DEPONENT:  Yep.  It's from David

Page 292

Nation to Jeremy Lewin, blah, blah, blah.  It's Bates number 1707.  It's the front page.

MR. SILER:  Okay.  And I have not been handed what's been marked Exhibit 18.

MS. STEVENS:  Right.

MR. SILER:  Okay.

THE DEPONENT:  Nor has Adam or USAID/State.

MS. STEVENS:  We're just going to do 19.

MR. SILER:  It's fine.  I just wanted to be clear.

THE DEPONENT:  Yeah.  And I just wanted to make sure I wasn't disorganized.

BY MS. STEVENS:

Q.   Would you read through that email just to make sure you're familiar with it, please?

A.   Yes.

MR. SILER:  Exhibit 19?

MS. STEVENS:  19.  Thank you.

THE DEPONENT:  This is a long one.  Okay.

BY MS. STEVENS:

Q.   This --

A.   Sorry.

Q.   No, that's okay.

This is an email exchange, mostly taking

Page 293

place on March 9th of 2025.  But there's a last email from March 10th of 2025, correct?

A.   That's correct.

Q.   And the email chain, at least initially is from  -- the initial email's from Mr. Lewin to Mr. Gray, copying Mr. Marocco, Mr. Jackson, Mr. Farritor and Mr. Kliger.  Do you see that?

A.   Yes.  I'm trying to turn to that page again.

Q.   It's got 1710 at the bottom, right?

A.   Yep.  Yes, I have it.

BY MS. STEVENS:

Q.   Okay.  And in this email -- I'm just going to paraphrase and then ask you some questions -- Mr. Lewin is asking for some additional access to some of the systems at USAID.  Is that correct?

MR. SILER:  Objection, ambiguous.

BY MS. STEVENS:

Q.   Let's do it this way.  Could you summarize what Mr. Lewin is asking for in this email?

A.   Yeah.  Jeremy Lewin is sending an email on March 9th to Jason Gray, asking for additional access requests for Luke Farritor and Gavin Kliger.  For first one's Phoenix and GLAAS back-end access, including user controls, ability to provision VMs

ADAM KORZENIEWSKI
95350

March 26, 2026

294 to 297
30(b)(6)

Page 294

and access that EG, C-CURE, Admin PAW, or excuse me, IE, and then Active Directory Super Admin.

They already have admin direct access, but Luke believes that there's additional privileges he does not have, or permissions, pardon me, that he does not have. So I almost read it word-for-word. Pardon me.

Q. And then on the next page, Mr. Lewin says -- the second to last paragraph -- "Let me know of any questions or concerns. These are considered high priority from our leadership." Are you seeing that? Are you following with me?

A. Are you -- you're one page before, correct? Or two pages before?

Q. I'm on the next page, like the continuation of the email that you were reading out loud.

A. Oh, sorry.

MR. SILER: 1711.

MS. STEVENS: Yes.

THE DEPONENT: Yes, I'm there.

BY MS. STEVENS:

Q. Okay. Mr. Lewin says, "Let me know of any questions or concerns. These are considered high priority from our leadership." Then he says, "Pete,

Page 295

Ken, we would be grateful if you would provide approval for these as well, just so that the chain of command is clear." Did I read that correctly?

A. That's correct.

Q. Who is "our leadership" that Mr. Lewin is referring to?

MR. SILER: Objection, speculation.

THE DEPONENT: It's our position that he's referring to our mutual leadership in State Department, USAID. So Secretary Rubio is probably the person that he's referring to specifically in terms of "our leadership."

BY MS. STEVENS:

Q. In this message, he's saying "our leadership," but then he addresses the next sentence to Mr. Marocco and Mr. Jackson, who are representatives of USAID and State themselves, correct?

A. That's correct. Oh, Mr. Jackson is not a representative of State, he's a representative of the USAID.

Q. Sorry. US -- Pete -- "Mr. Marocco representing USAID and State, Mr. Jackson representing USAID," correct?

A. That's correct.

Page 296

Q. Okay. So the previous sentence, where Mr. Lewin says "our leadership," it's your position, the 30(b)(6) deponent's position that "our leadership" is referring to someone that's in a department with Mr. Marocco?

A. The way that I'm reading it, all -- all -- me, is that it's in an email from Jeremy Lewin to Jason Gray, "our leadership" is the leadership that they mutually have, which is the Secretary of State/Pete Marocco.

Q. And then right after that, he says --

A. "Pete, Ken would be grateful if you could provide approval as well." That's why I say that it's likely referring to the Secretary of State there.

Q. Was Mr. Lewin in contact with the Secretary of State about this additional access?

A. I know he -- at some point in March, he does begin to regularly interact with Counselor of State and Secretary of State.

Q. Who is "he" in that sentence?

A. Oh, Jeremy Lewin. Pardon me.

Q. Okay. And how do you know that?

A. Just from attendance of various meetings at the State Department, I would see Jeremy Lewin

Page 297

speaking to Counselor Needham, and they would sometimes be coming from -- they would -- how should I put it? In meetings that I would attend with the Counselor of State and Jeremy Lewin, they will -- they would be coming from meetings with Secretary of State.

Q. And Mr. Marocco was not in those meetings?

A. He was in those meetings.

Q. He was in those meetings?

A. That's correct.

Q. Okay. So --

A. In the meetings I was participating in, not always in the meetings with Secretary of State.

Q. In this email, though, he refers to "our leadership," and then he separately addresses this statement to Mr. Marocco and Mr. Jackson about needing the approval "so that the chain of command is clear here."

A. Yes.

Q. Okay. And you're saying that that all makes sense or --

A. Yes.

Q. -- referring to "our leadership" as the Secretary of State?

MR. SILER: Objection, asked and answered.

Page 298

THE DEPONENT: Yes, because like if Ken and Pete doesn't say yay or nay, and if it's Jeremy that's saying that, "I got this from the Secretary of State," or referring to the Secretary of State, there's no -- like, in paperwork, there's no reason to believe necessarily he spoke to Secretary of State about any particular individual action.

MS. STEVENS: Right.

THE DEPONENT: So, you know, this is -- this is an example of -- we talked about this yesterday, if APA lend and action memos are used and when they're not. This is obviously not an action memo, but this is a process by which people are making sure that the chain of command and that decisions are actually managed properly in documentation so that it's not ambiguous who's actually making the decisions.

BY MS. STEVENS:

Q. You're just -- you're describing why it's important to have approvals such as this in writing?

A. Yeah. And this -- and this, specifically, is an example of it.

Q. On that same day -- sorry -- the same day as the last email exchange on March 10th --

A. Yep.

Page 299

Q. I am going to come back to Exhibit 18. I'm just in the middle of --

A. That's fine.

THE REPORTER: Exhibit 20 marked.

(WHEREUPON, Exhibit 20 was marked for identification.)

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Just take a second to read. That's a tweet chain, maybe, I'm not quite sure what you call it. But there are a couple of tweets in there for you to read.

A. Yep. We can call it a tweet chain. All right. Ready.

Q. Okay. In here, Mr. Marocco makes a tweet on March 10th --

MR. SILER: You said "Marocco," I think you mean Rubio.

MS. STEVENS: Rubio, I'm sorry. Gosh. Marco and Marocco, it's really hard for my brain. I apologize.

MR. SILER: I'm sorry. I apologize for interrupting.

MS. STEVENS: No, thank you.

THE DEPONENT: I've -- with Gavin Kliger,

Page 300

I have to remind myself not stumble because I want to say a different name every single time.

BY MS. STEVENS:

Q. Okay. Let me start my question over. On March 10th, Secretary Rubio posted this tweet about USAID. Do you see that?

A. That's correct.

Q. Okay. And here, I'll just read it. "After a 6-week review, we are officially canceling 83 percent of the programs at USAID." And then he goes on to detail some. Elon Musk then responds to that tweet a little further down the page. Do you see that?

A. Yes.

Q. He says, "Tough but necessary. Good working with you."

A. Yes.

Q. In what ways did Elon Musk work with Secretary Rubio with respect to these decisions made at -- about USAID?

MR. SILER: So, again, I'm going to have a general objection to questions that are outside the scope of the specific memo that was identified in the topics with respect to grant and contract terminations.

Page 301

But the witness can answer if he knows.

THE DEPONENT: Personally, just starting from there, because that'll be the easiest, I don't know. But, you know, State Department doesn't know any -- about any specific conversations Secretary of State and Elon Musk had, especially in Elon Musk's capacity as an advisor to the president.

However, you know, it's well known that Secretary Rubio and Elon Musk did communicate from time to time, and that Elon Musk did provide advice as capacity of -- frankly, I don't remember what his title was at the time, but as an advisor to the president in relation to the U.S. DOGE Service -- DOGE Service.

BY MS. STEVENS:

Q. Directing your attention to Exhibit -- your Exhibit 1, your binder --

A. Yes.

Q. -- at tab 14. I think you have sort of all of the delegations in there. I want you to look at the low-end delegation of duties from Secretary Rubio.

A. It's the one dated 3/18?

Q. Yes. I think it's the first one on the tab.

ADAM KORZENIEWSKI                    March 26, 2026                    302 to 305
95350                                                                  30(b)(6)

Page 302

A. That's correct.

Q. The -- this delegation of duties from Secretary Rubio to Mr. Lewin is dated March 18, 2025, correct?

A. That's correct.

MR. SILER: Can you just confirm what Bates number you're talking about?

MS. STEVENS: Yes.

MR. SILER: It would be clear for the record.

THE DEPONENT: 0570.

MS. STEVENS: 0570 and 0571.

BY MS. STEVENS:

Q. This delegation of duties was signed on March 18, 2025, correct?

A. Yes.

Q. Who requested that Mr. Lewin be delegated these duties?

MR. SILER: Objection, calls for information protected by the deliberative process privilege.

Instruct the witness not to answer.

MS. STEVENS: Well, who --

MR. SILER: Well, you -- I believe you said, "Who made the recommendation to assign these

Page 303

duties?" And, therefore, the answer to that question is going to really reveal pre-decisional deliberative information. And --

BY MS. STEVENS:

Q. Who was involved in conversations about whether Mr. Lewin should be delegated the duties that are delegated in this document?

A. And that's not --

MR. SILER: You can answer.

THE DEPONENT: Thank you. Sorry.

Secretary Rubio, you know, judging from personal knowledge, Mike Needham the Counselor of State, would probably be at least generally aware of the conversation. And then -- and probably Jeremy Lewin himself. I don't know who else would have been participating in that conversation.

BY MS. STEVENS:

Q. Was Mr. Musk involved in the conversations about whether to designate Mr. Lewin as a -- sorry, delegate these duties to Mr. Lewin?

A. State Department, USAID, and Adam don't know if Elon Musk was part of the conversation regarding the -- delegating the authorities or duties to Jeremy Lewin or appointing him as an officer at USAID.

Page 304

Q. Whose idea was it to delegate duties -- these duties to Mr. Lewin?

MR. SILER: Objection. Again, calls for information protected by the deliberative process privilege.

Instruct the witness not to answer.

I think you're asking who made the recommendation.

MS. STEVENS: I think we get to know the individuals, not the substance of why they made the recommendation, right? To the extent that you claim that that's protected by privilege, but the who is involved in the conversation or even the person who does the recommending is allowable so that we can determine whether we think it is privileged or not.

MR. SILER: I think you can know who made the decision.

MS. STEVENS: Well, that's on the paper --

MR. SILER: Yeah, exactly. So I'm not sure what additional information is relevant or material other than who's making the recommendation and whether it's acted upon or not. And those are pre-decisional and deliberative.

MS. STEVENS: But the who is not the pre-decisional that's protected by privilege, right?

Page 305

The privilege is protecting the substance.

THE DEPONENT: So you've already asked who was involved in the decision. He's already answered that question. Anything more than that, I think, is about who was making the recommendations and why they were making recommendations.

BY MS. STEVENS:

Q. How about this? Do you -- does USAID or State know who made the recommendation that it should be Mr. Lewin? The answer is no, but we don't --

A. Sure.

Q. -- the answer is yes?

A. No.

Q. Okay. At what time on March 18th was this -- were these two documents, the delegation of authority and the appointment of Mr. Lewin as an officer, at what time on the 18th were these signed?

A. USAID, State Department, and Adam don't know.

Q. Who would be able to answer that question?

A. It would be -- it would probably -- it would likely be Jeremy Lewin, Secretary Rubio, maybe Michael Needham, maybe Dan Holler, possibly Lisa Kenna, who is the executive secretary of State

Page 306

Department currently. However, I don't know if she was still in her role as acting key -- acting -- I think acting undersecretary was her title.

But whoever was running the executive secretary at the time for State Department would -- would likely know because this would have to be cataloged in a system called Cascades. Or they would have access to the document.

Q. Topic number 22 in -- in the USAID topics, which I think is also copied over for State, talks about a February 8th memo. And this is Mr. Lewin's memo that was drafted on or about February 8th for Secretary Rubio to approve recommending USAID terminate USAID contracts totaling a little over $1 billion and 68 grants totaling a little over $660 million in aggregate value. This memorandum was drafted by Mr. Lewin. Is that correct?

A. I'm trying to -- I'm trying to remember if I have the memorandum in here. Pretty -- I think I do. It would -- it should say at the back or it should at least have an addressee on it.

Q. The topic is 22, and there's nothing behind that in your binder.

A. Gotcha. I think it's maybe in the declaration of Jeremy Lewin under tab 32. I

Page 307

apologize. This thing is -- this thing is thick and detailed, so I don't remember specifically what page that would be on.

THE DEPONENT: If -- I don't know if my counsel knows off the top of their head.

MR. SILER: I mean, I can tell you the memo is not in the binder.

THE DEPONENT: Oh, okay. That's all -- would be helpful.

Good Lord, there's a lot of declaration back here.

You said -- what's the -- what's the date again? It's early February, correct?

MS. STEVENS: February 8th.

THE DEPONENT: 8th. Oh, that's 18th. It's got to be something -- I can try to speak generally to your question.

MR. SILER: Well, do you want to restate the question so that we're all --

MS. STEVENS: Okay.

BY MS. STEVENS:

Q. My question was: Did Mr. Lewin draft the memorandum?

A. Without looking at the memorandum, I wouldn't be able to tell you who the draftee is. In

Page 308

my personal capacity, I don't remember ever seeing that memo.

Q. Before February -- excuse me, March 18th -- you can put aside your --

A. Yep.

Q. Before March 18th of 2025, Mr. Lewin's role, with respect to USAID, was as team lead for the DOGE team at USAID, correct?

A. That's correct.

Q. And in that role, in mid-February, he chastised some USAID personnel over an email for conducting independent reviews for life-saving humanitarian assistance waivers, is that correct?

MR. SILER: Objection, characterization.

You can answer.

THE DEPONENT: I'm not really familiar with the emails themselves, but I don't deny that he may have said that he didn't want somebody else to do an independent review.

MS. STEVENS: Exhibit 18.

(WHEREUPON, Exhibit 18 was marked for identification.)

THE DEPONENT: Thank you.

THE REPORTER: Exhibit 18 marked.

BY MS. STEVENS:

Page 309

Q. On page 13 -- we're not going to go through this whole thing -- this is a -- it's titled "United States House Committee on Foreign Affairs Statement of Nicholas" -- I think it's Enrich.

A. Enrich.

Q. Enrich.

A. I'm very familiar with him.

Q. Okay. March 25th, 2025, again, this thing is long, I'm not -- I don't want to go through the whole thing, but this talks about that email chain that -- or the email that I was talking to you about on page 13. I'm sorry.

A. Yeah. I'm on it. It's starting -- the paragraph begins on February 11th, 2025.

Q. Okay. So it says, "On February 11th, 2025, I received a warning email from Jeremy Lewin, a DOGE staff member. The email said, 'I am hearing that Global Health is conducting supplemental reviews of awards slated for termination by Secretary Rubio and Acting Deputy Administrator Marocco. This is delaying the timely processing of this termination notices and is unacceptable.'"

According to Mr. Lewin's email, he was telling Mr. Enrich not to engage in this additional review that would have been required to determine

Page 310

whether the life-saving humanitarian assistance waiver applied, correct?

MR. SILER: Objection, vague and ambiguous.

I'm sorry. Were you done?

MS. STEVENS: I said, "Correct."

THE DEPONENT: And I can answer that?

MR. SILER: Yeah, yeah.

THE DEPONENT: Thank you. Sorry.

I don't -- it's not an order. He's just -- he's specifically telling them that this is delaying the timely processing of termination notices and is unacceptable. That's perfectly within the realm of his function as an advisor to the front office. And this is a -- you know, to supplement that, I don't specifically remember this -- the delay, but USAID does not contradict that this would cause a timely delay -- or sorry, processing delay of these termination notices and would be unacceptable to the front office.

BY MS. STEVENS:

Q. The -- apologies that I didn't realize there was additional quotations. He says, "Further, Lewin specified that, 'Bureaus should not be conducting their own policy and program reviews

Page 311

before acting on these termination instructions.'"

A. Yeah.

Q. So Mr. Lewin is not just opining, he is directing him to not continue these additional reviews. Is that correct?

MR. SILER: Objection to the characterization. It misstates the testimony.

THE DEPONENT: Yeah. This -- it says "bureaus should not," rather than, "Nick Enrich, stop what you're doing, or Global Health, stop what you're doing." And that's -- that's really good advice. They -- they should not have been conducting their own independent reviews without criteria from the front office.

BY MS. STEVENS:

Q. They shouldn't have been conducting independent reviews on whether the life-saving assistance waiver applied, or should apply?

MR. SILER: Objection, argumentative.

THE DEPONENT: Well, the -- we already had done a review of which -- which items constituted the life-saving review underneath the policy guidance that we received. Anything else on top of it was completely subjective of the individuals who are running their own review, and it was outside the

Page 312

scope of the assigned -- their assigned duties at that moment. If they -- if it was on their own free time, they can do as they please.

But, you know, this is -- this is good advice. You should -- you know, unless if there's some sort of legal issue here, like a -- an employee is supposed to, you know, follow policy guidance to the best of their ability.

BY MS. STEVENS:

Q. The USAID personnel were not consulted before life-saving humanitarian assistance waiver decisions were made. Is that correct?

A. That's false.

Q. Who was consulted?

A. Nick Enrich, for one.

Q. Are you saying that, on the one hand, Mr. Lewin is telling him not to do the additional reviews, but that he was also consulted?

A. He was -- every single major functional head that was available and who'd cooperate with the review were consulted. Nick Enrich -- I specifically sat in the Global Health one because I'm a big -- personally, I'm a big anti-malarial activist in a sense. So I was very fascinated to hear about anti-malarial activities.

Page 313

And during, he was given -- he presented a presentation, and there was a number of back and forth. I know that he had at least with Joel Borkert about questions that Joel Borkert had with -- about these various projects that Nick Enrich did. So I think I would characterize this as -- I would characterize the -- that statement as being false and uncharitable to the fact that the process -- there wasn't a review.

Q. Implementing partners and contractors performed work under existing USAID awards during the pause period that we've talked about. Is that correct?

A. The -- we're going to -- we have to dive down a little bit deeper in the question. Can you -- you said -- you're asking whether or not contractors continue to work under the pause or -- or -- or I don't know where you're -- what the question actually is.

Q. Under the existing USAID awards as they existed at the time.

A. Well, some of that was determined by the internal processes of these contracting firms. You know, some things like, you know, there was a halt on certain items because they were -- required

ADAM KORZENIEWSKI                    March 26, 2026                    314 to 317
95350                                                                  30(b)(6)

Page 314

manufacturing overseas especially. Other items continued -- other services continued throughout the time, such as like personal service -- or not personal service contractors, individual support contractors who helped run the office.

So it was all -- it was largely determined upon their availability of resources, the mission, and what contracts we were telling them to continue operation on or pause all work. It's a -- in short, the question is so broad that I can't really answer it without taking up hours of your time.

Q.   Some of the implementing partners for USAID are collectively owed hundreds of millions of dollars for work that has already been performed, correct?

MR. SILER:  Objection.  That's outside the scope of the topics.

You can answer if you know.

THE DEPONENT:  I don't know if I would -- like, I can't really speaking to the ongoing -- the ongoing litigation at USAID, partly because I've been outside of like even talking with the people in the leadership roles there.  But this was part of the reason why I brought up earlier that a termination notice doesn't mean the contract's

Page 315

terminated.

There's actually -- as the art of -- the term of art is the tail.  Like there's contract negotiation closeouts, contract closeout settlements, all that.  So, you know, there's people -- and there's individuals as well as firms who are probably expecting some sort of settlement in terms of -- in the ongoing days.  So I can't -- I can't speak to any one particular one or like broadly as a category.

BY MS. STEVENS:

Q.   Turning back to your statement that the -- what Mr. Lewin said in that email to Mr. Enrich was -- I think you used the phrase, good advice, is that Adam saying that, or is that USAID, State saying that?

A.   That's Adam saying it.

Q.   While Mr. Lewin was DOGE's team lead, how often did he talk with Elon Musk about his work at USAID?

MR. SILER:  Objection, assumes facts.

You can answer.

THE DEPONENT:  USAID, State does not know how often he spoke with Elon Musk, if at all, at any given point along the way.  Same thing with any

Page 316

other principal.  Adam has no idea.

Frankly, Adam is under the impression that he -- I -- like, personally, I don't even know when was -- when or if he spoke with Elon Musk other than what's been presented in front of me in the paperwork.

BY MS. STEVENS:

Q.   But in terms of USAID and State's 30(b)(6) answer, is it correct that you can say one way or the other how often --

A.   Yes.

Q.   -- Mr. Musk and Mr. Lewin spoke about Mr. Lewin's work at USAID?

A.   That's correct.

Q.   Was there a regular team meeting of the DOGE team at USAID?

A.   I'd say the first couple days of my being present there -- this is me speaking as me, but as USAID as well -- the detailees of our DOGE team did meet with each other.  But that's dropped off after that weekend, at least inside the office.

Largely, the person that would be physically seen most often in the office was Jeremy Lewin himself.  In part, because it wasn't necessary for -- my understanding is, it wasn't necessary for

Page 317

Gavin and -- Gavin Kliger and Luke Farritor to be interacting with everybody on a regular basis, since their role was advising and analysis that was fed through Jeremy as a team leader.

And then after USAID lost the Reagan Building -- well, the office is in the Reagan building.  Pardon me.  We -- you know, it was -- it was entirely Jeremy Lewin at that point.  So, functionally -- and this is coming from my perspective -- like, Jeremy Lewin was himself and all of the DOGE detail, I'd say, from about February 10th time frame on or about onwards.  Like, most of us did not have interactions with Luke Farritor or Gavin Kliger after that point.

Q.   Over that first weekend, the 31st, 1st, 2nd, what have -- what meetings did the DOGE team members have with each other?

A.   USAID's unaware of any particular meetings other than what's been listed in these documents, which -- and that weekend, I know some of them went to the USAID offices in the Reagan Building.  So I don't know if that constitutes meetings, but they met physically.

Q.   Are there calendar invites on the USAID like Google Suite about DOGE team member meetings --

ADAM KORZENIEWSKI                    March 26, 2026                    318 to 321
95350                                                                  30(b)(6)

Page 318

MR. SILER: Objection --

BY MS. STEVENS:

Q. -- for the time --

MR. SILER: I'm sorry. I apologize.

BY MS. STEVENS:

Q. -- for the late January to mid-February timeframe?

MR. SILER: Objection, form. And, again, outside the scope of what's reasonable to compare with respect to these topics.

But you can answer if you can.

THE DEPONENT: USAID hasn't reviewed -- Adam hasn't reviewed any documents on behalf of USAID that has calendar invites for that, or State Department for that matter. And me, personally, I would have no access to be able to look that up just of my own accord. I never -- never had access to Jeremy's calendar to my knowledge.

BY MS. STEVENS:

Q. Was it the practice of USAID personnel to send calendar invites to hold time on each other's calendars?

A. Yes.

MR. SILER: Objection, vague.

But go ahead.

Page 319

THE DEPONENT: Yes. I do that routinely to -- as a USAID person and a State person and as personal practice.

BY MS. STEVENS:

Q. Was there a regular meeting of the DOGE team members and Mr. Musk during the same timeframe?

MR. SILER: Objection. Again, outside the scope.

But you can answer if you can.

THE DEPONENT: I -- I can't speak to any meetings that -- outside of my personal responsibilities that occurred with -- within the White House or many of the White House offices. I wouldn't -- wouldn't be read into it. I wouldn't be -- I wouldn't be invited if it's outside of my responsibilities.

BY MS. STEVENS:

Q. But does USAID know the answer to the question?

A. No.

MR. SILER: Same objection.

But go ahead.

THE DEPONENT: And same answer. USAID doesn't -- doesn't have the ability to know what EOPs or EEOB or any of the White House facilities

Page 320

are doing on a day-to-day basis.

BY MS. STEVENS:

Q. But it would have the ability to know what DOGE team members were doing on a day-to-day basis?

MR. SILER: Objection, argumentative.

Go ahead.

THE DEPONENT: If the DOGE team members let USAID know in a calendar invite. But if they were invited to the White House to do a White House tour, for example, you know, in their personal capacities, there would be no way for us to even know that they toured the Rose Garden or anything like that.

BY MS. STEVENS:

Q. That's fair. I'm less interested or maybe uninterested completely in anything they were doing in their personal capacities.

Focusing on the DOGE team members' professional capacity, it's correct, is it not, that the DOGE team members, I think you testified that -- that they're -- they're actually USAID personnel --

A. Yes.

Q. -- while they're detailed to USAID. Is that correct?

MR. SILER: Objection, mischaracterizes.

Page 321

But go ahead.

THE DEPONENT: Yes, they're detailees to USAID while they are detailed to USAID. Sorry, I didn't mean to be so pedantic.

BY MS. STEVENS:

Q. Okay. And so, does USAID know whether there were regular meetings between the DOGE team members assigned to USAID and Mr. Musk?

A. No. USAID does not know if there was regular meetings with USAID detailees and Elon Musk.

Q. Who would know the answer to that question?

A. It would be -- any of the DOGE detailees would be able to answer. I would -- I'm assuming somebody at U.S. DOGE Service would be able to articulate whether or not they held regular meetings. The Secret Service would be able to tell you if they held meetings in person at EEOB or White House. I think that's -- that's all I can think of off the top of my head.

Q. And Mr. Musk himself would be able to answer that question?

A. Oh, yes. Yeah. Sorry. I thought I already said his name.

Q. That's okay. I was just trying to parse

Page 322

through your response.

The reason you referenced the Secret Service is because Mr. Musk has Secret Service personnel or what?  I don't understand --

MR. SILER:  Objection.  We're quite far outside the scope in my view.

But you can answer if you know.

THE DEPONENT:  Yes.  Secret Service dictates control and access to White House grounds.

BY MS. STEVENS:

Q.  Oh, I see.  Okay.  Thank you.

What direction did Mr. Musk give to Jeremy Lewin as team lead for DOGE at USAID?

A.  USAID's unaware of any direction given to Jeremy Lewin by Elon Musk.

Q.  What is the DOGE team access chat?

A.  I'm unfamiliar with a DOGE team access chat.

Q.  Tab 20 of your binder.

A.  Yep.  I'm back on tab 20.

Q.  Okay.  The Bates is 001753.  Would you just read through it and then identify the document?

A.  This is a website FAQ text email thread involving Jeremy Lewin, Robert Carter, Gavin Kliger. Well, Gavin Kliger is CC'd on the emails.  But it

Page 323

appears that this is primarily between Rob Carter and Jeremy Lewin.

Q.  Do you know who Rob Carter is?

A.  He was a -- I haven't seen him in a long time, so I don't know if he still works at USAID, but he was an individual support contractor working in the CIO's office.

Q.  And you see here this email from Mr. Carter back to Mr. Lewin on February 6th?  In part, Mr. Carter says, "I'll mention that in the DOGE team access chat as well" --

MR. SILER:  Objection.

MR. SILER:  Sorry, I thought he was going to answer.  I'll object -- I'm going to have a general objection to this whole line of questioning insofar as it's outside the scope of the topics, what the name of various chats that people were in.

But you can answer if you know.

THE DEPONENT:  Sorry, do you want to finish your question?

BY MS. STEVENS:

Q.  Does this help you like identify what the DOGE team access chat was?

A.  It definitely helps me be able to identify it, yes.

Page 324

Q.  Okay.  And so, what was it or is it?

A.  It appears to be a chat that CIO -- I'm assuming contractors, because Rob Carter is in it, but maybe direct hires were involved in.

Q.  In your binder, there's an interrogatory response I have a question about.  Interrogatories are --

A.  Tab 29?

Q.  Yeah, 29 State's, which is the one I want to talk to you about.

A.  Roger.

Q.  Number 14.  Yes, it starts on page 15. Well, that's not true.  It starts on page 14, the question does.  Then there are a page or a little more than a page of objections.  And then the response starts at the top of page 16.  Orient yourself to that question and then -- and the response and then I'll ask you the question.

A.  Okay.

Q.  Okay.  So the response says that Mr. Musk spoke with Secretary of State Rubio, Jeremy Lewin, Mike Needham, Tarak Makecha, Daniel Holler, Jason Jay, and Peter Marocco "concerning the closing, reorganizing, or restructuring of USAID, including terminating USAID employees or placing them on

Page 325

administrative leave, terminating PSCs, or terminating USAID contracts or grants between January 20th, 2025 and May 31st, 2025."  That's -- that's taking the answer and the question to put them together.  Does that make sense?

MR. SILER:  I object to the question insofar as it misstates the document.

But you can answer.

THE DEPONENT:  I understand your question, but I also disagree with the characterization of the response.

BY MS. STEVENS:

Q.  Go ahead.  Tell me what's wrong with my characterization.

A.  So you are correct in what the question is.  The objections are lengthy and borderline nauseating.  The response though says -- the response specifically is to State's knowledge.

"Mr. Musk had several conversations with Secretary of State Rubio, Jeremy Lewin, Mike Needham, who's the Counselor of State, Secretary Rubio's chief of staff, then at the time, Tara Makecha, and Daniel Joseph Holler, chief of staff, as well -- during that time, State also currently understand that Mr. Musk spoke to Jason Gray and

ADAM KORZENIEWSKI                    March 26, 2026                    326 to 329
95350                                                                   30(b)(6)

Page 326

Pete Marocco on at least one occasion. State will update this response as further develops."

State Department is responding and affirming that during that time, Elon Musk had conversations with these individuals, but did not -- does not specify what the conversations included or -- or what the contents of the conversation were, or what specifically they discussed, or what situation they may have talked about at the time.

Q. So you're saying that the State Department is identifying conversations in the world, but not in response to the specific question posed?

A. It's -- State Department's acknowledging that Mr. Musk had conversations with these individuals who worked at State Department and USAID during the time frame, and that's it.

Q. How many conversations did Mr. Musk have with Secretary of State Rubio during that time frame?

A. State Department is not able to give you an answer for that because that would also include -- pardon me -- personal -- verbal conversations as well.

Q. I would like to know the answer to that with respect to verbal conversations. So how --

Page 327

what's the answer to how many of those conversations happened?

A. State Department is unable to give you an answer.

Q. Unable to why?

A. I don't have any ability -- I don't have any records to show conversations between Secretary of State Rubio and Elon Musk.

Q. Who would be able to answer that question?

A. It would be Elon Musk, Secretary of State Rubio.

Q. How many conversations did Mr. Musk have with Mr. Lewin during this time frame?

A. State Department and USAID are unable to provide a number of conversations between Mr. Musk and Mr. Lewin at this moment for the same reasons.

Q. What was the subject of -- topics of conversation between Mr. Lewin and Mr. Musk during this time frame?

A. State Department and USAID are -- don't know the specific topics discussed between Mr. Musk and Mr. Lewin during this time frame.

Q. And who would be able to answer that question?

A. Mr. Musk, Mr. Lewin.

Page 328

Q. What conversations did Mr. Musk have with Mike Needham during this time frame?

A. Mr. Musk -- sorry, the State Department doesn't -- and -- State Department does -- is not able to give the contents or the number of conversations that Mr. Musk had with Mr. Needham. We don't have the record of that available for us.

Q. Who would be able to --

MS. STEVENS: Let me finish this one, and I'll let you --

MR. SILER: Okay. Yeah, yeah.

BY MS. STEVENS:

Q. Who would be able to answer that question?

A. Mr. Musk, Mr. Needham.

MR. SILER: Just to the extent the questions are asking about the content of any conversation, position would be the content of those conversations would be protected by the presidential communications privilege and potentially other privileges.

But if the witnesses has testified that he doesn't know -- so I just want to be clear on the record on that. And we'll go forward on that basis.

MS. STEVENS: Okay.

BY MS. STEVENS:

Page 329

Q. The -- what was the topic and time frame of conversations between Mr. Musk and Mr. Makecha?

MR. SILER: Same -- same comment I made earlier. I'll just apply that to future questions on this line that we're not talking --

THE DEPONENT: The timeline between any of these conversations occurred between December 1 and May 31, which is -- I assume is your interrogatory. I don't have any sort of finer time frame for that. And I don't know the contents or the frequency that these conversations may have occurred.

BY MS. STEVENS:

Q. What conversations did Mr. Musk have with Daniel Holler during this time frame?

A. Same -- same or similar answer. State Department doesn't have any records in front of them to show how many -- what the frequency or the contents of the conversations were with -- between Mr. Musk and Mr. Holler.

Q. Who would be able to answer that question?

A. Mr. Musk, Mr. Holler.

Q. What conversations did Mr. Musk have with Mr. Marocco during this time frame?

A. State Department -- well, State Department doesn't know the contents of the conversations

ADAM KORZENIEWSKI                    March 26, 2026                    330 to 333
95350                                                                 30(b)(6)

Page 330

between Mr. Marocco, Mr. Musk during this time frame, nor do we -- we only can state that at least one time that they spoke on -- and to -- actually, I don't want to beg the question. Go ahead.

Q. What was the substance of that conversation?

MR. SILER: Just to reiterate, same objection.

You can answer if you know.

THE DEPONENT: Similar answer. State Department can't speak to the contents of the conversation between Mr. Musk and Mr. Marocco.

BY MS. STEVENS:

Q. When did the one conversation that State Department knows of occur?

A. Somewhere between December 21st, 2024 and May 31st, 2025. However, I don't have a finer detail than that.

Q. Who else was present for that conversation between Mr. Marocco and Mr. Musk?

A. State Department doesn't know. USAID doesn't know who else was present in the room during these conversations.

Q. In what -- by what manner, meaning in person, over the phone -- by what way of

Page 331

communication was this conversation between Mr. Marocco and Mr. Musk?

A. I don't have any records to indicate, but the conversation was either verbal -- I guess all conversations are verbal. But it was either in person or telephonically.

Q. How do you know that?

A. I'm trying to -- because that's -- like, that's the only two ways you could have a conversation, like a verbal conversation.

Q. You could have a video chat, could you not?

A. But then that would be verbal.

Q. Oh, I thought you were distinguishing between in person and the telephone.

A. Oh, yeah. I guess it could be a video chat as well. I apologize for that. I'm sort of losing my touch.

Q. Let me ask you a couple more questions on this line, and then we'll take a break.

What's that basis for State Department's answer that Mr. Marocco and Mr. Musk spoke at least one time?

A. I don't have further detail, as State Department or USAID, on the basis of that. I would

Page 332

have to speculate. I can speculate personally.

Q. No need to speculate personally. Just who would be able to tell us how this answer was derived?

A. Mr. Marocco would be the best person to ask. Mr. Musk as well, possibly. Assuming -- yeah, assuming that this is -- wait, it says Mr. Musk, Jason Gray, and Peter Marocco. I don't know if this sentence implies that the conversation happened between -- the way -- I can't differentiate in this sentence whether or not the conversation was three-way, meaning Jason Gray was also a participant in the same said conversation or these are discrete conversations.

Q. Understood.

To prepare for your testimony today, did you speak with Mr. Musk?

A. No.

Q. To prepare for your testimony today, did you speak with Mr. Marocco?

A. No.

Q. To prepare for your testimony today, did you speak with Mr. Jackson?

A. No.

Q. I believe you testified that you did speak

Page 333

with Mr. Lewin briefly. Is that correct?

A. That's correct.

MR. SILER: Objection, mischaracterizes.

You can answer.

THE DEPONENT: Yes, it was briefly, about 30, 45 minutes.

BY MS. STEVENS:

Q. Did you speak to anyone who was in a position to tell you about the nature and content of Mr. Musk's conversations with individuals at State and USAID?

A. No.

Q. Did you review any text messages, Signal chats, email, or any other form of written communication to or from Mr. Musk concerning USAID?

MR. SILER: Objection, assumes facts.

But you can answer.

THE DEPONENT: No.

BY MS. STEVENS:

Q. Has USAID searched for and compiled written communications involving Mr. Musk related to USAID?

MR. SILER: Objection. The document search that USAID or State Department did with respect to any discovery requests are outside the

ADAM KORZENIEWSKI                 March 26, 2026                           334 to 337
95350                                                                      30(b)(6)

Page 334

scope of the topics.

MS. STEVENS: To prepare for his deposition.

MR. SILER: Okay. That's fine.

THE DEPONENT: I did not compile any sort of brief, special searches of contents related to it.

BY MS. STEVENS:

Q. Let me say it one more time, and I'll make it more clear.

A. Yeah.

Q. Has USAID searched for and compiled written communications involving Mr. Musk related to USAID to prepare you for your deposition?

MR. SILER: Now I'm going to object that it assumes facts, to the form.

But you can answer.

THE DEPONENT: No.

BY MS. STEVENS:

Q. Has State searched for and compiled written communications involving Mr. Musk related to USAID to prepare you for your deposition?

MR. SILER: Same objections. And I'm going to add attorney work product.

But you can answer to the extent you know.

Page 335

THE DEPONENT: No.

MS. STEVENS: Okay. I want to take a short break.

THE VIDEOGRAPHER: Please stand by. The time is now 1:35. We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 1:58.

BY MS. STEVENS:

Q. Okay. We're back on. Following up on some of the -- let me go through these questions. Have you spoken to Gavin Kliger since March of 2025?

A. No.

Q. Have you spoken with Mr. Davis since March of 2025?

A. No.

Q. Have you spoken with Mr. Jackson since March of 2025?

A. Yes.

Q. When was the last time you spoke with him?

A. February 2026.

Q. In preparation for this deposition?

A. No.

Q. Okay. About goings on at USAID?

A. That's correct. And in my function as

Page 336

White House liaison at USAID.

Q. Before you transitioned to State?

A. That's correct.

Q. Okay. Understood.

Have you spoken with Mr. Marocco since March of 2025?

A. No.

Q. Turning your attention back to -- and I'm sorry I can't tell you the tab number -- but the State interrogatories. Maybe that's still up in front of you.

A. Yes. It would be tab 29, first sub-tab, the State interrogatories.

Q. Directing your attention back to that same interrogatory we went over earlier, interrogatory 14.

A. Yes.

MR. SILER: Can you just give me a page number?

MS. STEVENS: Also page 14.

THE DEPONENT: 14, 15, 16.

BY MS. STEVENS:

Q. When I asked the original question, where I sort of spliced together the answer from State with the question --

Page 337

A. Yes.

Q. -- you took issue with my question, right?

A. Yeah.

Q. And said that the answer is encompassing just conversations generally that State's able to say that Mr. Musk had with the various individuals in the answer that we went over. Do you remember that?

A. That's correct.

Q. Okay. Turning your attention to the bottom of page 15, the last paragraph.

A. Yep.

Q. You see it says, "Consistent with the above-stated objections, Defendants will construe this interrogatory as requesting identification of any meeting or nonprivileged communication between Mr. Musk and anyone employed by or detailed to the Department of State 'concerning the ... closing, reorganization'" -- excuse me -- "'reorganizing, or restructuring of USAID, including terminating USAID employees or placing them on administrative leave, terminating PSCs or terminating USAID contracts or grants' between January 20th, 2025 and May 31st, 2025"?

MR. SILER: Objection. I'm just going to

ADAM KORZENIEWSKI                    March 26, 2026                      338 to 341
95350                                                                    30(b)(6)

Page 338

reiterate my objections to the scope of the 30(b)(6) deposition insofar as the interrogatory responses are not a listed topic as distinct from -- you know, obviously, there are topics that touch upon Mr. Musk's involvement. So questions that go to, you know, how the interrogatory was prepared and the meaning of those interrogatory responses, I believe, are outside the scope.

But you can answer to the extent you know.

THE DEPONENT: Very well.

Yes, that's what it says.

BY MS. STEVENS:

Q. Okay. So when we talked about -- we went over what does State or USAID know about conversations with Mr. Musk and these individuals, the communications identified in the response to this interrogatory were focused on communications around the closing, reorganization, or restructuring of USAID, not just generally out-in-the-world conversations?

A. Yes.

MR. SILER: Same objection.

You can answer.

THE DEPONENT: Yes.

BY MS. STEVENS:

Page 339

Q. Okay. I just want to make sure we're applying the questions I asked you about the substance and the existence of conversations to the same thing, so that's why --

A. Yes.

Q. -- I didn't clarify. Okay.

THE REPORTER: Exhibit 21 marked.

(WHEREUPON, Exhibit 21 was marked for identification.)

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Do you recognize this exhibit?

A. Yes.

Q. Could you identify it for the record, please?

A. It's the notification of administrative leave.

Q. On February 23rd, 2025, this notification was posted on the USAID.gov website, stating that all direct hire personnel would be placed on administrative leave globally. Is that correct?

A. Yes.

Q. Who made the decision to post this on the website?

A. I think there's a -- there might be a memo

Page 340

in this, if I recall correctly, that actually speaks to that. Apologies.

I have an older memo related to the 1412 administrative leave, but I don't have this specific -- a memo specifically for this, so I apologize. Sorry, your question was?

Q. Who made the decision to post this notice on the website?

A. I believe it was Pete Marocco. Let me take a look at the interrogatories real quick while we're -- while I'm -- so I'm not speculating.

This is -- this is not in the interrogatories, or is it? This is February the 23rd.

Q. It's specifically one of the topics of the deposition.

A. Yeah. I'm just making sure I have all my t's crossed and i's dotted. If I -- if I recall correctly, this is me, having been an employee of USAID at the time, I believe it was Pete Marocco that made it, but I don't know for certain.

Q. It's topic 23, if that helps you.

A. Yeah, that will definitely help.

Oh, okay. Oh, sorry, I apologize. It's -- Secretary Rubio, I believe, made the

Page 341

determination for the RIF.

Q. RIF notices then were sent out the same day from the email account hr_announcements@USAID.gov, correct?

A. Correct, to my recollection.

Q. To USAID's recollection?

A. Yes, me personally too.

Q. That email account was created by DOGE team member Gavin Kliger, correct?

A. I believe so.

Q. USAID believes so?

A. Yes.

MR. SILER: I'm sorry, could you repeat the question?

MS. STEVENS: The email account, the hr_announcements@USAID.gov, that was created by DOGE team member Gavin Kliger, correct?

MR. SILER: I'm going to object to the question. It's outside the scope of the topics insofar as only the notification of administrative leave is identified as a topic and not email account creation with respect to that.

But you can answer if you know.

THE DEPONENT: I don't know for certain, but I believe that's correct.

Page 342

BY MS. STEVENS:

Q. The RIF notices that went out after this, the notification on the website were not approved by USAID's Employment -- Employee and Labor Relations Office. Is that correct?

MR. SILER: Objection. I don't believe the RIF notices are within the topics either.

But you can answer if you know.

THE DEPONENT: I'm not familiar with the decisions ELR may or may not have made. If I recall -- this is me personally, if I recall correctly, we had a very junior ELR lawyer, so I'm pretty sure -- I'm pretty sure they were done in consultation with other legal tool -- legal arms to include OPM's internal decision.

MR. SILER: And, just to be clear, don't reveal the content of any advice that a lawyer gave.

THE DEPONENT: Yeah. I --

MR. SILER: I don't think you did, but I just want to caution you not to.

THE DEPONENT: Yeah, I'm -- I'm intentionally --

MR. SILER: Okay.

THE DEPONENT: -- making sure that I'm not saying what the lawyer may or may not have said.

Page 343

BY MS. STEVENS:

Q. Are you aware that USAID's -- personnel from USAID's Employee and Labor Relations Office disclaimed having sent those notices out?

MR. SILER: Objection, scope.

But you can answer if you know.

THE DEPONENT: I'm not aware, but I don't object -- I don't -- I don't just -- I don't agree or disagree with it.

THE REPORTER: Exhibit 22 marked.

(WHEREUPON, Exhibit 22 was marked for identification.)

THE DEPONENT: Thank you.

BY MS. STEVENS:

Q. Would you identify this exhibit, please?

A. Yes. This is an email thread -- or, sorry, this is from an email to Bruce McPherson from the USAID Office of the Administrator. It's one of the front office email addresses. Detail -- called USAID's final mission.

Q. You're familiar with this document?

A. Yes.

Q. Who drafted it?

A. I believe Jeremy Lewin did.

Q. Is it -- is it USAID's testimony that

Page 344

Jeremy Lewin drafted the document?

A. Yes. I believe he was the drafter and the titular person that's addressed from.

Q. Did anyone besides Mr. Lewin authorize this communication?

A. I -- I would have to take a look through the binder to see if there's an action memo. But, you know, at the time, I believe Mr. Lewin had the authority to send that out on his own accord.

Q. Do you mean because he was already delegated the duties from Secretary Rubio?

A. Yes.

Q. There were subsequent RIF notices sent out after this communication was made. Is that correct?

A. That's correct.

Q. Who sent out those notices?

A. I believe it's OPM that sends out RIF notices.

Q. Are you aware that there -- USAID personnel say that those notices were riddled with errors?

MR. SILER: I'm going to object again to scope insofar as RIF notices. The process of RIFing individuals is not an identified topic.

But you can answer if you know.

Page 345

THE DEPONENT: Yes. I'm aware that there was errors with RIF notices. Me personally, me, USAID.

BY MS. STEVENS:

Q. But you're saying that OPM is the one that sent them out?

A. Yes.

Q. What personnel at OPM sent them out?

MR. SILER: Again, objection, and outside the scope necessarily of the organizational components.

You can answer if you know.

THE DEPONENT: USAID is not aware of which person sent them out at OPM.

THE REPORTER: Exhibit 23 marked.

(WHEREUPON, Exhibit 23 was marked for identification.)

THE DEPONENT: Thank you.

MS. STEVENS: Sorry. What number?

THE DEPONENT: 23.

MR. SILER: 23.

BY MS. STEVENS:

Q. Once you've had a chance to look through, let me know.

A. Sounds good.

ADAM KORZENIEWSKI                    March 26, 2026                    346 to 349
95350                                                                 30(b)(6)

Page 346

I'm ready whenever you are.

Q.   Okay.  Could you identify the exhibit, please?

A.   Yes.  This is a congressional -- congressional notice from State Department to the Hill -- to Congress about the restricting of foreign assistance into State Department from USAID.

Q.   Who drafted this letter?

A.   I believe -- I don't see clearance on this, so like there's -- I don't actually have the actual draft in front of me.  But definitely -- there definitely would have been quite a few people work on this.  I know Jeremy Lewin is one of them.

This is me speaking from my personal knowledge of working on this, but also State H, which is our Hill office.  They're the individuals that liaise with Congress.  But also I know a political appointee at USAID also contributed to answering some questions from State H periodically on terms of use and sort of -- and different analyses we came to.

Q.   So you worked on this notification letter?

A.   I was there when it was being worked on. I didn't work on it directly, but it was -- there was a collaboration for drafts that we sent up to

Page 347

the State Department at USAID.

Q.   From USAID and State's perspectives -- and answer them separately if you need to --

A.   Yeah.

Q.   -- who, besides Mr. Lewin, worked on the draft of this letter?

A.   So at USAID in particular, I know Ryan Shrum, who was, at the time, senior advisor for Legislative Affairs contributed, especially on the portions that State H had the pen on.  "Had the pen" is a colloquialism for draft -- they were -- they had it in their queue for clearance drafting.

MR. SILER:  Okay.  Just to avoid a privilege problem, can you just identify the people and then maybe --

THE DEPONENT:  Oh, what they're --

MR. SILER:  Yeah, rather than the content -- yeah, rather than the content.

THE DEPONENT:  Okay.  Ryan Shrum at the time was senior advisor for Legislative Affairs. He's now at State Department.  Paul -- I can never get his name correctly, and he'll hate if he ever sees this -- Paul Guaglianone, the head of H, senior bureau official.

I don't remember other -- who were senior

Page 348

principals in that office at this moment.  It's been a while.  I know Ken Jackson had a hand in looking at this, at least for clearance out of the office. Jeremy Lewin, I think, drafted the lion's share of how the information was going to be organized in consultation with State H.

I can -- I can speculate as to other individuals -- other offices that would have some sort of contributing material to this, but it might be outside the scope of the question.

BY MS. STEVENS:

Q.   No need to speculate.

Who approved this document before it went out?

A.   Secretary of State Marco Rubio.  Sorry.

Q.   The reorganization actions described in this letter were already underway when this was sent to Congress, correct?

MR. SILER:  Objection, argument.

THE DEPONENT:  I -- it's not a yes or no question.

So on -- about a month prior or maybe a little bit further back, State Department made notice that -- oh, here we go.  Introduction following Secretary Rubio's February 3rd letter

Page 349

initiating consultations.

So there was a pre-decisional process that we were going through, which -- to come to how -- how to align foreign assistance best with the executive order.  At some juncture, Jeremy Lewin consulted with Secretary Rubio, they made the decision -- Secretary Rubio made the decision to reorganize foreign assistance that USAID used to do into State Department.

BY MS. STEVENS:

Q.   But the reorganization -- this is my question, I think still the same.  The reorganization actions described in the letter were already underway before this letter went to Congress.

MR. SILER:  Same objection.

You can answer.

THE DEPONENT:  The reorganization -- this -- the reorganization of putting USAID programs into State Department did not occur before this because we hadn't had the team set up for it under Ambassador Ben Franken (phonetic):, I don't believe. That's me speaking as me, not State Department.

BY MS. STEVENS:

Q.   What does State Department have to say

ADAM KORZENIEWSKI                          March 26, 2026                          350 to 353
95350                                                                              30(b)(6)

Page 350

about it?

A.   I'd have -- let me -- I would have to refer back to this.  Where is the CST -- not CST -- Ambassador Ben Frankin?  That would be tab 27, I think, on Exhibit 1.  Well, referring to it.

I don't have a specific document detailing the start of -- what do you call it?  The Assistance Transition Working Group specifically, but with my recollection, it didn't occur -- it wasn't created until April time frame, if I -- if I'm correct.  But that's relying purely off my personal memory.

Q.   The top of page 6 of this memo, or this -- I think it's actually a letter -- a cover letter, and then it's got the title of the document, which is "Congressional Notification," page 6 of that document --

MR. SILER:  And just to avoid the characterization, you're talking about Exhibit 23?

MS. STEVENS:  Yes, yes.

MR. SILER:  Okay.

MS. STEVENS:  And the Bates is 000265.

THE DEPONENT:  Okay.  265?

BY MS. STEVENS:

Q.   At the top of that, under USAID personnel, just read through those three paragraphs.

Page 351

A.   Sounds good.  I'm going to take a swig.

Under the heading USAID personnel, "Substantially all USAID personnel will be separated from federal service within current fiscal year via reduction in force procedures consistent with applicable law.  As part of this process, USAID missions overseas will be closed, USAID direct hire personnel overseas will be returned to the United States, and most USAID locally employed staff will be separated from U.S. government service in accordance with local law.

"USAID and the Department of State would dedicate significant resources to ensuring that affected U.S. direct hire personnel posted overseas would receive safe, timely, and accessible -- accessible repatriation, travel, and other arrangements.  The Department intends" -- the Department means State Department, "intends to commence, consistent with applicable law, appropriate hiring processes to bring in relevant civil servants -- civil service and foreign service personnel with relevant skills and expertise to build foreign assistance capacity and administer USAID programs and activities.

"The Department anticipates making these

Page 352

processes available for eligible USAID personnel and external candidates after the USAID reduction in forced process has been completed consistent with applicable law.  The Department is not currently in a position to accurately project its needs or exact number of USAID personnel to be hired in connection with the realignment of USAID's programs and services.

"The Department also anticipates assigning or assuming contracts of certain former USAID domestic and foreign -- and foreign personal services contractors that possess relevant experience and/or are located in strategic areas."

Do you want me to continue?

Q.   No.  Thank you.

The first two sentences of this section, which speaks to substantially all USAID personnel being separated from the federal service via RIFs, and that USAID positions overseas would be closed, direct hire personnel overseas would be returned, and most USAID locally-employed staff would be separated, that process that says these things would happen had already started when this letter was sent to Congress, correct?

MR. SILER:  Objection, argumentative.

Page 353

You can answer.

THE DEPONENT:  I don't believe the locally-employed staff was being terminated at the time.  USAID personnel -- you know, the PCS movements hadn't really began by that point.

BY MS. STEVENS:

Q.   Had or had not?

A.   Had not.

And the USAID missions overseas, that's one of those -- I -- like it -- like, for example, we had to close a couple USAID missions because of safety concerns prior to this time, Azerbaijan and DRC, for example.  So while there were missions that haven't been closed by that point, it was not necessarily related to this action.

Q.   The RIF process had already been started, correct?

A.   Yeah.  There were RIFs already -- had been made prior to this, yes.

Q.   Prior to this letter to Congress?

A.   Yes.

Q.   And Congress wasn't given the opportunity to object to that part of the process before those actions were taken --

MR. SILER:  Objection, form.

ADAM KORZENIEWSKI
95350

March 26, 2026

354 to 357
30(b)(6)

Page 354

BY MS. STEVENS:

Q.  -- correct?

THE DEPONENT:  I can answer that?

MR. SILER:  Yeah, yeah.

THE DEPONENT:  I'm not a legislative affairs expert, and so this is -- this is me speaking as Adam, but Congress has the right to speak at any time they want about any sort of current situation.  There's nothing that stopped them from calling Secretary Rubio and telling -- giving their personal objections or the objections of them as their position.

BY MS. STEVENS:

Q.  What is State's answer to the question of whether Congress -- that Congress was not given an opportunity to object to those actions before they were taken?

MR. SILER:  Same objection.

You can answer.

THE DEPONENT:  My -- State's understanding is that's not correct, because we followed the notification process to -- to the T.  But also, I think between the February 3rd and March 28th messages, we've actually had more than enough time for them to reach out and speak with us.

Page 355

THE REPORTER:  Exhibit 24 marked.

(WHEREUPON, Exhibit 24 was marked for identification.)

THE DEPONENT:  Wonderful.  Thank you.

BY MS. STEVENS:

Q.  Would you read that -- not read the document out loud -- but would you read it to be able to identify it?

A.  Yes.

Okay.

Q.  Could you identify it, please?

A.  Yes.  This is a letter -- official letter from the Secretary of State to both the Senate and the House of Representatives so both -- both SF -- including committee heads.  I don't mean to belabor that then.  Go ahead.

Q.  This was the first communication to Congress from Secretary Rubio regarding the reorganization of USAID, correct?

A.  Correct, that's -- that's my understanding across the board of my capacities.  This is the first consultation notice from Secretary Rubio.

Q.  By February 3rd, the date of this letter, actions with respect to the reorganization of USAID had already been undertaken.  Is that correct?

Page 356

MR. SILER:  Objection, vague and ambiguous.

You can answer.

THE DEPONENT:  Well, the analysis was being done, and there was -- let's see -- what -- the analysis was being done at USAID for aligning USAID's mission with the executive orders and the intentions of the president and his cabinet-level officials, but this is materially different.

BY MS. STEVENS:

Q.  Materially different in what way?

A.  If you go to 0037, the last paragraph. "Department of State and other pertinent entities will be consulting with Congress and appropriate committees to reorganize and absorb certain bureaus, offices, and missions of USAID.  Such consultation shall occur on behalf of the heads of such agencies as directed by the president.  In consultation with Congress, USAID may move, reorganize, and integrate missions, bureaus, and offices into the State Department or Department of State.  The remainder of the agency may be abolished, consistent with applicable law."

This is the first official notice or mention of the abolishment or getting rid of USAID

Page 357

as a -- U.S. government agency.

Q.  By February 3rd, there had already been thousands of people put on administrative leave that worked for USAID, correct?

A.  That's correct.

Q.  By February 3rd, the vast majority of staff that worked at the Ronald Reagan Building for USAID were not allowed to come into the building, correct?

MR. SILER:  Objection, characterization.

You can answer.

THE DEPONENT:  Yes.

BY MS. STEVENS:

Q.  By February 3rd, the USAID -- wait.  By February 3rd, the USAID website had been taken down, correct?

A.  I believe that's correct, yes.  I'd have to look it back up, but I think that's -- just for the sake of moving forward, I think that's correct.

Q.  Well, I'm going to quote you.  I need something that's not, "I believe that's correct." February 3rd is Monday.  You may recall that we discussed sort of at length that the website was taken down at the beginning --

A.  Yeah.

ADAM KORZENIEWSKI                    March 26, 2026                    358 to 361
95350                                                                  30(b)(6)

Page 358

Q.   But take your time.

MR. SILER:  I'll object to --

MS. STEVENS:  The sidebar?

MR. SILER:  Yeah.

MS. STEVENS:  That's fine.  I don't plan to quote myself.

THE DEPONENT:  I apologize.  I just don't remember which day that the website was officially taken down.

MR. LYNCH:  Does it say it in 'rog 1 --

MR. SILER:  I mean, I don't think this is -- we're not going to dispute it -- the date on which --

THE DEPONENT:  All right.  I assume on advice of my counsel --

MR. SILER:  Don't do that.  I will look it up.  I think I can find it.

Yeah.  It's State 'rog 1, page 5.  If there's no objection, I will just read for a second that it says, "Gavin Kliger effectuated the changes to the USAID website on or about February 1st, 2025."  Defendants are not contesting that the website was effected on May -- on February 1st, 2025.  So --

MS. STEVENS:  I'll say my question again.

Page 359

MR. SILER:  Yes.

BY MS. STEVENS:

Q.   As of February 3rd, the USAID website had been taken down?

A.   Yes.

Q.   As of February 3rd, the thousands of USAID employees who had been put on administrative leave had their access to USAID systems cut --

MR. SILER:  Objection --

BY MS. STEVENS:

Q.   -- correct?

MR. SILER:  -- vague and ambiguous.

But you can answer.

THE DEPONENT:  Yes, that's consistent with administrative leave policies.

BY MS. STEVENS:

Q.   But yes, that happened?

A.   Yes.

Q.   Okay.  By February 3rd, PSC terminations had been announced, correct?

A.   Correct.

Q.   The Appropriations Act requires prior consultation with Congress before any reorganization of USAID, correct?

MR. SILER:  Objection, calls for a legal

Page 360

conclusion.

You can answer.

THE DEPONENT:  USAID and State Department notified State Department -- or, sorry, Congress on February 3rd that there was going to be a reorganization, which State Department sends another congressional notice -- transmittal letter to continue the infatuation of this on March 25th.  And I think there's further documents, if I recall correctly.  So we did provide more than adequate time for Congress to react to this.

BY MS. STEVENS:

Q.   I'll restate my question, because I think you went to my next question maybe.  But the Appropriations Act requires prior consultation with Congress before reorganization of USAID, yes?

MR. SILER:  Same objection.

You can answer.

THE DEPONENT:  Yes.

BY MS. STEVENS:

Q.   USAID was established as an independent agency by the Foreign Affairs Reform and Restructuring Act, correct?

MR. SILER:  Objection, calls for a legal conclusion.

Page 361

You can answer.

THE DEPONENT:  I don't -- I would have to refer to the Foreign Assistance Act.  I don't remember it off the top of my head.  But I believe it was originally formed as an executive order by President Kennedy, also if I recall correctly.

BY MS. STEVENS:

Q.   That statute has not been repealed, correct?

MR. SILER:  I'm going to object.  In addition to legal conclusion, outside the scope, the history, and legal status of USAID, I don't believe is a topic that was identified for this deposition.

But you can answer to the extent you know.

THE DEPONENT:  The question was: Has the statute related to the Foreign Assistance Act been appealed or repealed?

MS. STEVENS:  Correct.

THE DEPONENT:  No.

MS. STEVENS:  These are foundational questions.  I'm about to get into the transfer.

MR. SILER:  I'm just making objections for the record.  I'm not instructing him not to answer or anything, so the deposition will proceed as normal.

Page 362

BY MS. STEVENS:

Q.  Congress has not enacted any legislation authorizing the executive branch to transfer its functions to the State Department, correct?

MR. SILER:  The same objections.

You can answer.

THE DEPONENT:  It's our understanding that USAID -- sorry, transferring functions are completely consistent with existing law, especially since much of the authorities of USAID are direct -- are given to -- delegated to -- through the Secretary of State.

BY MS. STEVENS:

Q.  What statutory text are you relying on for that proposition?

MR. SILER:  Objection, scope, legal conclusion.

You can answer if you know in your personal capacity.

THE DEPONENT:  I can't quote it directly, but I know a number of the Foreign Assistance Act items give the power to the Secretary of State because he's a    cabinet-level official, or she.

BY MS. STEVENS:

Q.  Substantially, all of USAID's remaining

Page 363

functions have been transferred to the State Department, correct?

A.  Yes.  I would say the vast majority, if not all of them.

Q.  Which functions have not been transferred to State?

A.  You can make an argument that IT services haven't completely moved over to State.  They're co-managed between USAID and State Department.

Q.  Where does the IT at USAID reside?

A.  At the USAID facility and also in the cloud.  The -- USAID's current address is 555 12th Street.

Q.  And that's different from the big space at State Department you described yesterday?

A.  Yes.

Q.  Okay.  Who leads the IT department at USAID right now?

A.  Oh, God.  The CIO is also the federal CIO. I can't remember his name right now.  But he -- the federal CIO was made acting CIO or the CIO of USAID sometime at the end of last year.

Q.  Are there other functions that haven't been transferred to State?

A.  Once again, arguably, you can say that

Page 364

some of the acquisitions processes are still co-managed by State and USAID.  But I think that's -- you know, the State Department still has final pen, and they were appropriated the money by Congress for it.

Q.  Is the acquisitions department also held in the same building with the CIO?

A.  Well, the federal CIO's office is not in 555 12th Street.  But he does maintain -- I mean, he still runs it from his actual office, which I think might be at one of the executive office buildings. But the acquisitions exists at 555 12th Street.

Q.  Are there any other functions that remain with USAID?

A.  To my knowledge, no, and to USAID's knowledge as well.

Q.  And State?

A.  State believes it has control over all the functions to include the ones that USAID is co-managing.

Q.  Is there a plan to move the remaining functions, the CIO and the acquisitions, to State?

MR. SILER:  Objection, deliberative to the extent there's not a final decision.

If there is a final decision you're aware

Page 365

of, you can answer.

THE DEPONENT:  Yeah.  I was going to say I'm not aware of a final decision at this moment. It's been also personally months since I've talked to State CIO or global acquisitions about any of the USAID items.

BY MS. STEVENS:

Q.  Well, one of the topics for this 30(b)(6) is the specific steps taken to transfer responsibility from USAID's programming personnel and operations to State.  And so --

A.  Yeah.

Q.  -- you did preparation for being able to answer that --

A.  Yes.

Q.  -- topic, right?

A.  Absolutely.

Q.  Okay.  And so, I'm not asking about a non-final decision, but let me paraphrase back to you. Currently, there's no final decision that's been made whether to transfer that CIO function and acquisition function you said is still housed in USAID into State.  Is that correct?

MR. SILER:  Can I just clarify.  Which topic is this?  The 27th?

Page 366

MS. STEVENS: I think it's the last one -- yeah, 27.

MR. SILER: Okay.

BY MS. STEVENS:

Q. **Did I say that correctly?**

A. I'm going to have to like paraphrase the answer, but ask the question in my answer. There's no final decision of when that will be effectuated, that State Department has sole control of those functions. This is a distinction between attitudes about ownership between USAID personnel and State personnel.

State Department believes because it owns cybersecurity element of and protection of the systems, that it's functionally in control of it all. State -- USAID still has persons that work on those things day to day, and they are still partly administered through USAID's personnel. So it's a little -- it's one of those weird government territory fights where everybody says that they do the same exact thing.

Q. **Is there a plan for the personnel in those departments to move over to or be transferred to State?**

A. At this time, State Department hasn't --

Page 367

MR. SILER: Yeah. So just objection. Don't answer anything that's pre-decisional --

MS. STEVENS: Right.

THE DEPONENT: Yeah.

MR. SILER: -- just to be clear.

THE DEPONENT: At this time, State Department hasn't -- has not announced any additional transfers or Schedule A hirings of prior USAID personnel. I can't speak to the contractors because the individual ISCs, individual support contractors, can come and go from jobs as they please.

BY MS. STEVENS:

Q. **Okay. For the transfers that have taken place, so putting aside the CIO and acquisition functions, what statutory authority does USAID rely on for that transfer?**

MR. SILER: Objection, calls for legal conclusion. But you can answer.

THE DEPONENT: I don't know what the specific statutory authority would be.

THE REPORTER: Exhibit 25 marked.

(WHEREUPON, Exhibit 25 was marked for

Page 368

identification.)

THE REPORTER: Thank you.

BY MS. STEVENS:

Q. **Take a second to orient yourself to this.**

A. I'm familiar with this document. I was even on the clearance line.

Q. **So you said you are familiar?**

A. Yeah. I was -- I'm even on the clearance line.

Q. **Got it. So would you identify the document for the record?**

A. This is an activity memo for Eric Ueland, and it's -- the subject is "Activity for Institutional Support Contracts for USAID." I believe it's dated -- oh, it's right there -- dated January 6th, 2026.

Q. **Okay. As of -- putting aside the exhibit for a moment -- as of January 20th, 2025, USAID previously had nearly 4,500 U.S. direct hire staff, 5,000 locally employed staff, and more than 1,000 PSCs. Is that correct?**

MR. SILER: Objection to scope. But you can answer if you know.

THE DEPONENT: I don't recall off the top of my head the total number of PSCs, but that number

Page 369

sounds correct or close to correct.

BY MS. STEVENS:

Q. **And the other numbers sound correct as well?**

A. Yes.

Q. **How many USAID employees have been separated through RIF as of today?**

MR. SILER: Objection to scope. You can answer if you know.

THE DEPONENT: Trying to -- trying to do the math roughly in my head, several thousand -- a handful, like a handful of thousands. So like there's about 70-ish civil service careers and foreign service officers remaining at USAID. So I'd say if there's 5,000, at least 4,500.

BY MS. STEVENS:

Q. **And when you say they're remaining at USAID, are they in that -- the acquisition in CIO, or are they within State?**

A. They are -- they're USAID personnel whose job is at USAID, not State. And they are -- there's a number of functions outside of acquisitions and CIO that still exist at USAID for its own self-perpetuation, such as payroll services. Executive Secretariat still has one U.S. direct hire and a

ADAM KORZENIEWSKI                          March 26, 2026                          370 to 373
95350                                                                              30(b)(6)

Page 370

number of institutional support contractors. Human resources still, I think, has one of the lion's share of careers to effectuate human resource issues, such as retirements, items related to things such as benefits. I'm trying to think of the other offices.

Front office leadership that USAID still has a -- has a -- still a senior career leadership there that works hand-in-hand with the PTPO administrator. And then CIO -- CIO's office. Oh, there's also a resource management office, which was -- what -- is responsible for planning and allocation of primarily financial resources. So they -- that's actually a not insignificant number of civil service careers.

But largely in Acquisitions Office is probably where you see the most civil service careers. Up until March, most of the attorneys present at the General Counsel's Office were civil service careers. I think they're down to one civil service or foreign service lawyer.

The rest are contractors, I believe, ISCs. And then, yeah -- so I think I've hit all the different offices.

Q. So, still at USAID, differentiating

Page 371

between things that have been transferred over to State, I'm just going to --

A. Yeah.

Q. -- phrase those back to make sure I'm following you. CIO, acquisitions, HR, front office, one person in -- one career person in the General Counsel's Office. Any other function -- like at the function level that I didn't say that's still at USAID?

MR. SILER: Objection to form, mischaracterizes.

You can answer.

THE DEPONENT: Resource management, that's another place where there's plenty of civil service careers -- civil service and foreign service careers. I'm -- in my head right now, I'm walking around the floorplan, so trying to look at different items. I think that -- I think that's an exhaustive list, to my knowledge.

BY MS. STEVENS:

Q. If I mischaracterize anything in my list, please tell me.

A. Will do.

Q. No like for that question.

A. No.

Page 372

MR. SILER: Objection. He's not answering a specific question. It'd be hard for him to remember, so I don't think it's a fair question.

But you can answer if you can.

THE DEPONENT: Yes. I believe the exhaustive list that you mentioned and that I just amplified is front office leadership, resource management, CIO, Executive Secretariat, human resources, acquisitions, General Counsel's Office.

BY MS. STEVENS:

Q. How many people is that?

A. To my knowledge -- the number changes from week to week, depending on when people choose to resign their -- their employment. But when I last was there, I'd say it was probably about 70 individuals.

We also -- there's also a non-functional office that was part of the program that we're transferring over to State Department called Children and Adversity. That's largely already been transferred. But those same individuals have a -- the same RIF date as the rest of the employees. So they're still employed.

Q. The US -- the remaining 70-ish employees at USAID have a RIF date of what?

Page 373

A. I don't recall correct -- I don't recall at -- my -- top of my head, but it's the end of the pay period directly before the end of the fiscal year in September.

Q. Of this year?

A. Of this year.

Q. Okay. How many former USAID employees have been hired by the State Department?

A. I think there was -- I think there was like about 300 initial Schedule As, maybe more hired. But I believe there's more than that because there's a number of individuals who transferred to other government agencies out of there. So they've definitely -- they've backfilled some of the positions.

So I can't say for certain, but I'd say it's over 300 individuals, and this is including civil service, direct hires, and foreign service officers.

Q. That were hired -- does Schedule A dictate something that --

A. Yes. So Schedule A hiring authority is a --

MR. SILER: Hold on.

Objection, ambiguous.

ADAM KORZENIEWSKI                    March 26, 2026                      374 to 377
95350                                                                   30(b)(6)

Page 374

But you can answer.

THE DEPONENT:  So Schedule A hiring authority is a type of hiring authority that allows for different types of -- this is going to sound really stupid -- different types of hiring that are outside the traditional, "I'm applying on USAJobs for the positions."  And it grants the agency's head, in this case, the Secretary of State, the ability to make what's technically considered non-competitive hires, meaning they don't have to compete against all the federal government or for experienced hires or all -- any eligible person for inexperienced hires on USAJobs, for example.

So this allows for individuals, such as lawyers -- that's a big place that a lot of Schedule As are hired through, especially places like -- with specialty law backgrounds, doctors, certain exotic professional skills, individuals with disabilities who would otherwise not qualify under normal civil service protections for hiring processes.  And then also, there's a number of other subdivisions, and I can't remember them all.

But one of them is for sort of like special purpose programs as needed -- as determined by need of exigent circumstances.  And this

Page 375

transition of USAID foreign assistance functions to State Department qualified, so that was the process by which U.S. direct hires and foreign service officers were hired into State Department non-competitively in, at the time, temporary positions.

BY MS. STEVENS:

Q.  Thank you.

USAID employees -- and I'm looking at this memo now --

A.  Okay.

Q.  -- are engaged in the activity entitled Institutional Support for USAID Closeout.  That was approved by Mr. -- is it Ueland?

A.  Yes.

Q.  And --

MR. SILER:  But objection, ambiguous.

What were you saying yes to?

THE DEPONENT:  Oh, Eric Ueland approved this.

MS. STEVENS:  Sorry, I hadn't finished the broader question.

BY MS. STEVENS:

Q.  Mr. Ueland.  USAID employees are engaged in the activity entitled Institutional Support for USAID Closeout, that was approved by Eric Ueland in

Page 376

early January of this year, correct?

A.  Correct.  USAID personnel helped with drafting this memo.

Q.  But are they the ones engaging in this -- this is the quote from the memo, "Activity entitled Institutional Support for USAID Closeout"?

A.  So they would be -- so U.S. direct hires, or U.S. government employees, as defined under the personnel rules of the U.S. government, have to supervise what are called institutional support contractors.  Institutional support contractors are not allowed to supervise themselves.

And so, yes is the short answer.  But it's a little bit more complicated than just a yes or no.  So this is -- this specifically is something that would specifically function in support of the current U.S. direct hires and foreign service officers at USAID.

Q.  The institutional support contractors helping to effectuate with this memo is saying will be effectuated, report directly up to civil service or foreign service officers.  Is that what you're saying?

MR. SILER:  Objection, vague.

But you can answer.

Page 377

THE DEPONENT:  Yes, that's a good summary of what I said.  Basically, this is a memo requesting approval for a new institutional support contract for personnel to support the overall mission of USAID.

BY MS. STEVENS:

Q.  Which in this memo is the closeout of USAID?

A.  That's correct.

Q.  Did any of the -- of these employees that are working on the closeout of USAID work at USAID prior to September of 2025?

A.  You're talking about the U.S. government employees?  Not for this --

Q.  -- for the -- either one.

A.  Categorically like they're treated differently.  So anybody who is currently employed by USAID and only USAID were employees prior to September 1 or 2 or 3, whatever the date may be true.  They were -- they were employed before the September RIFs.

Individual support contractors, it is the -- up to the discretion of the institutional support contractor, like as in the firm, to make a determination of who's best suited for the position

ADAM KORZENIEWSKI                    March 26, 2026                    378 to 381
95350                                                                 30(b)(6)

Page 378

with recommendations and also guidelines from the agency. So while the agency can't say for sure like, "You can -- we need" -- they can make a request, like, "We need this type of expertise." But, generally speaking, the agencies do not go through and handpick people for institutional support contracts themselves.

Q. But who was actually hired? What did the ISCs hired under this -- did any of them work at USAID prior to September of 2025?

MR. SILER: Objection to form.

THE DEPONENT: I can't answer that question. I don't have -- I don't have any documentation listing all the institutional support contractors and their work histories.

MR. SILER: And also -- and I'm also, just for the record, going to object to this being outside the scope.

MS. STEVENS: You think it's outside the scope of the last -- 27?

MR. SILER: I think who was hired to perform current duties at USAID is outside the scope of the topic that is about transferring functions from USAID to State, yes.

THE DEPONENT: Also, this is a -- I'm --

Page 379

MR. SILER: Let her ask questions.

THE DEPONENT: Yeah. I'll just stop.

BY MS. STEVENS:

Q. The last paragraph on this first page, under the word "background," talks about, "A body of work to complete before USAID will cease to exist." What is that body of work?

MR. SILER: Same objection as to scope.

But you can answer.

THE DEPONENT: I think, at least yesterday, but maybe earlier today, I've discussed with you all the tail of contracts. So a lot of these items are massively complex, whether we're talking about retirements and   off-boarding processes to include, you know, dealing with items related to like anybody making a claim for Havana Syndrome. Or closing out a contract like, for example, there's -- you know, contracts are negotiated, their settlements are agreed to, and these things require quite a bit of work in the meantime.

And also, when you talk about items such as -- that the General Counsel's Office deals with, it's litigation, it's contract analysis. But -- and then also too, with a -- when you talk resource

Page 380

management, for example, like financial experts on government financial operations is important to have available for it.

Payroll personnel, payroll is a highly specialized, weirdly highly specialized skillset that is -- that is -- you just need someone that knows how to do payroll with the National Finance Center, because for some reason, that's the most complex thing in the world, and no one can explain why.

BY MS. STEVENS:

Q. Thank you for that.

The USAID's data on its personnel, has that been transferred to State Department?

A. Do you mean any person that had worked for USAID in the past?

Q. Yes.

A. To some extent, some of that information made its way to State Department, but the rest of it sits with the National Archives, according to the Archives Act.

Q. Was the data in USAID's financial systems transferred to State?

A. Yes.

Q. Was the data for USAID's security system

Page 381

transferred to State?

A. When you talk about C-CURE, I'm not specifically aware if State Department uses C-CURE, whether that would exist at the Archives. But State Department administered a lot of the classified material out of USAID. So they -- it's the same system on that front.

And also -- I don't have my badge on me -- but the USAID TAV (phonetic) badge is technically a State Department credential. So these have the ability to talk to each other, and they may actually be, in fact, the same exact system.

Q. For the C-CUR system, I don't -- I'm not asking whether State uses that system or not. I mean, the data that was within the C-CURE system, the various data that's contained in there, was that transferred to State?

MR. SILER: I'm going to object to that as outside the scope.

But you can answer if you know.

THE DEPONENT: I don't know specifically. It's sort of outside my knowledge and expertise. But if it's not at State, the National Archives would have such information if it's considered a federal record.

Page 382

BY MS. STEVENS:

Q. Is the USAID website currently operational?

A. I haven't checked it today, but last time I looked it up, it wasn't functional in the way that it was on January 19, 2025.

Q. Is USAID currently fulfilling any of its statutory obligations?

MR. SILER: Objection, calls for legal conclusion.

THE DEPONENT: I can't speak to statutory obligations of USAID.

BY MS. STEVENS:

Q. As we sit here today, based on the transfers of responsibility that have occurred to State, which executive agency is currently primarily responsible for administering subchapter I of the Foreign Assistance Act?

MR. SILER: Objection, calls for legal conclusion.

You can answer.

THE DEPONENT: I would have to see what subchapter, what the letter of the law says, or -- to be able to make an articulation of it.

BY MS. STEVENS:

Page 383

Q. Okay. As we sit here today, which executive agency -- based on the transfers of responsibility that have already occurred to State, which executive agency currently has the responsibility for coordinating all United States development-related activities?

MR. SILER: Objection, calls for legal conclusion.

You can answer.

THE DEPONENT: The State Department is responsible for coordinating all foreign assistance.

MS. STEVENS: Very close. Can we take a few minute break and go off the record?

MR. SILER: We can go off the record.

MS. STEVENS: Yeah.

THE VIDEOGRAPHER: All right. The time is 3:05, and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 3:31.

BY MS. STEVENS:

Q. All right. Okay. After the transfers that we've been talking about from USAID to State, is USAID primarily responsible for administering any foreign assistance?

Page 384

A. No.

Q. In transferring responsibilities from USAID to State, what steps did USAID and State take to preserve data within the C-CURE system?

MR. SILER: I'll object to scope.

But you can answer if you can.

THE DEPONENT: I'm not particularly certain about where C-CURE data lives, but anything was placed on legislation -- litigation hold, that was a record that was created by USAID, and it would exist at USAID, but also National Archives will eventually get a copy of it as well if they don't -- haven't gotten it yet, but it should reside at USAID. I just can't say for certain in my capacity here today.

BY MS. STEVENS:

Q. What steps -- in making this transfer over to State, what steps did USAID and State take to generally speaking preserve data within USAID's systems? Just talk at like a high level.

MR. SILER: Same objection.

But you can answer.

THE DEPONENT: So data that was important for State Department that State Department did not already have went to State Department so that -- for

Page 385

things that State Department needed to continue on. Items that belonged to USAID, my understanding, and I'm not a lawyer, is that most of the data, or at least emails pertaining -- memos pertaining to it, are on litigation hold.

So they exist at USAID, but all federal records will be moved or made in the National Archive at some juncture. And there's also the older records that are physical copies or older mediums of data are being digitized.

BY MS. STEVENS:

Q. Turning your attention to Exhibit 5 --

A. 5, yeah.

Q. And this is -- we're going back to just talk through some of the deliberative process angle, just to make sure we're on the same page. So Exhibit 5. Is it correct that you did not know the content of the conversation between Mr. Needham and Mr. Davis referenced in this email?

A. That's correct. I do not know the blacked-out portions, or the conversation that they may have had.

Q. Okay. Yes. I'm focused on the Mr. Davis and Mr. Needham conversation.

A. I don't know the contents of the

Page 386

conversation.

Q. Okay. Is it also correct that you don't know if Mr. Musk and Secretary Rubio spoke about the subject matter of this email?

A. That's correct. I do not know.

Q. Is it correct that you don't know the content -- oh, wait. Sorry. Exhibit 7.

A. Exhibit 7.

MR. SILER: Can you just hold on a minute for him to look?

MS. STEVENS: Yes.

MR. SILER: It's the Mike Needham, Alex Wong --

THE DEPONENT: Okay. I found it.

BY MS. STEVENS:

Q. Is it correct that you do not know the content of the conversation between Mr. Burnham and Mr. Wong?

A. That's correct.

Q. Is it correct -- or sorry. Do you know if the Secretary spoke to Mr. Waltz about the subject matter of this email?

A. I do not know if he spoke -- if they spoke about the contents of this email.

MS. STEVENS: Okay. We are concluding.

Page 387

And I will pass the witness.

MR. SILER: Yeah. We have no redirect. You're free to go.

MS. STEVENS: We are.

THE REPORTER: Before going off the record, I do need to put the orders in even though they will be with yesterday's since it's a continuation.

MR. SILER: May I just before, the read and sign that I said yesterday, just so there's no confusion, applies today as well.

THE REPORTER: Okay. Perfect.

All right. So it's safe to assume, Attorney Warren, you would like the original?

MR. WARREN: Please.

THE REPORTER: Attorney Stevens, no copy. Is that right?

MS. STEVENS: Correct.

THE REPORTER: Same thing applies for you gentlemen from yesterday?

MR. SILER: Yes.

THE REPORTER: Perfect.

THE VIDEOGRAPHER: Yes. Attorney Warren is getting the video of today's deposition included with their appearance.

Page 388

Attorney Stevens, would you like a copy of today's deposition?

MS. STEVENS: No, thank you.

THE VIDEOGRAPHER: Attorney Siler, would you like a copy of today's deposition?

MR. SILER: No.

THE VIDEOGRAPHER: All right. And with that, the time is 3:36, and we are off the record.

(WHEREUPON, the deposition of ADAM MICHAEL KORZENIEWSKI was concluded at 3:36 p.m.)

Page 389

CERTIFICATE

I, the undersigned Salim Ibrahim, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the 30(b)(6) deposition of Adam Korzeniewski, in the above captioned matter on the 26th and 27th day of March, 2026 taken at the location of Winston and Strawn LLP, 1901 L Street NW, Washington, DC 20036.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

Salim Ibrahim

Page 390

CERTIFICATE

I, Sheila Hidalgo, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 2nd day of April, 2026.

Sheila Hidalgo

Page 391

Date: March 26, 2026                    Assignment #: 95350
Deponent:  Adam Korzeniewski
Case:   J. Doe 4 vs Elon Musk, et al.

DEPONENT:
It has been requested that your read and sign your transcript. This is to be read only by you.  Please make any corrections necessary on the Correction Sheet ONLY.  You are to sign the Correction Sheet ONLY, and ONLY where indicated. After signing the Correction Sheet, do the following:
1. The ORIGINAL executed Correction Sheet needs to be returned to our corporation.
2. Forward a COPY of the executed Correction Sheet directly to the attorney(s) listed below. (The address(es) can be found on the Appearance Page of your deposition.)
3. Retain a copy for your records.

C C: Naegeli Deposition and Trial
     Andrew Warren, Esquire
     Jacob Siler, Esquire
     Christopher Lynch, Esquire

Page 392

CORRECTION SHEET

Deposition of: Adam Korzeniewski    Date: 03/26/2026
Regarding: J. Doe 4 vs Elon Musk, et al.
Reporter: Hidalgo/Breezee
_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page  Line  Reason for Change
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

        Signature: _____
                Adam Korzeniewski
Email to: Production@NaegeliUSA.com

Page 393

DECLARATION

Deposition of: Adam Korzeniewski    Date: 03/26/2026
Regarding: J. Doe 4, et al. vs Elon Musk, et al.
Reporter:  Sheila Hidalgo
_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____
on the _____ day of _____, 20____.

        Signature: _____
                Adam Korzeniewski
Email to: Production@NaegeliUSA.com

**Exhibits**

**EX001 NOTICE OF INTENT TO TAKE DEPOSITION**  15:5,7,8, 10 48:10 74:18,21, 22 236:3 250:14 254:7 277:9 283:6 301:17 350:5

**EX002 PRESIDENTIAL ACTIONS**  38:23, 24 40:22 55:19

**EX003 REEVALUATING AND REALIGNING US FOREIGN AID**  80:22,23 81:1

**EX004 CALENDAR 2025**  87:23,24,25 88:4

**EX005 EMAIL MAKE THAT CALL**  142:8, 9 239:3,4 385:12,17

**EX006 EMAIL USAID**  145:5,7

**EX007 EMAIL IMPENDING USAID PERSONNEL ACTIONS**  182:1,3 386:7,8

**EX008 EMAIL ADDITIONAL DOGE TEMP BADGE**  186:3,5 252:13

**EX009 EMAIL ACTION MEMO TO SECRETARY**  189:3,5 237:23,24,25

**EX010 ELON X POST**  217:5,7

**EX011 EMAIL PHYSICAL AND LOGICAL ADMIN FOR GAVIN**  218:16,18 219:2 221:14,15,19 252:21 253:7,16 256:20,21 258:4

**EX012 BRIAN MCGILL EMAIL CHAIN**  245:15,16 246:10, 15 256:22 257:2

**EX013 USAID ERICA CARR EMAIL CHAIN**  263:13,14,16 264:6,7,8

**EX014 GMAIL KIRSTEN GUNSOLUS EMAIL CHAIN**  266:22,23 267:7

**EX015 PETER MAROCCO EMAIL CHAIN**  269:21,22,23,25

**EX016 PETER MAROCCO APPOINTMENT AS AN OFFICER**  272:18,19,24

**EX017 USAID ACTION MEMO FOR SECRETARY OF STATE RUBIO**  289:1,2,6

**EX018 WHISTLEBLOWER AID US COMMITTEE ON FOREIGN AFFAIRS**  292:4 299:1 308:20,21,24

**EX019 DAVID NATION EMAIL CHAIN**  291:8,9 292:18

**EX020 MARCO RUBIO POST**  299:4,5

**EX021 USAID NOTIFICATION OF ADMINISTRATIVE LEAVE**  339:7,8

**EX022 USAID FINAL MISSION**  343:10,11

**EX023 CONGRESSIONAL NOTIFICATION TRANSMITTAL LETTER**  345:15,16 350:18

**EX024 SECRETARY OF STATE NOTES**  355:1,2

**EX025 UNCLASSIFIED ACTIVITY MEMO FOR ERIC UELAND**  367:24,25

---

**$**

**$1**  306:14

**$660**  306:15

---

**0**

**000265**  350:21

**00059**  75:3

**001753**  322:21

**0037**  356:12

**0570**  302:11,12

**0571**  302:12

**0574**  140:8 215:5

**0575**  215:5

**0592**  146:10

**06**  161:8

**0602**  107:17

**0604**  162:8

**0648**  189:25

---

**1**

**1**  15:5,8,10 47:25 48:10 74:18,21,22 167:3 173:9 204:1 220:7 236:3 250:14 254:7 277:9 283:6 289:20 301:17 329:7 350:5 358:10, 18 377:19

**1,000**  368:20

**1,412**  270:9 271:10

**1/31**  256:8,11

**10**  183:24 184:15 185:3 206:17 217:5, 7

**10:00**  70:13 73:7,14, 22 117:2,18 137:3 138:10

**10:00-ish**  69:22

**10:05**  8:9

**10:25**  219:11

**10:40**  217:20

**10:42**  40:16

**10:54**  217:21

**10:55**  40:19

**10th**  217:2 293:2 298:24 299:16 300:5 317:12

**11**  218:16,18 219:2 221:15,19 252:21 253:7,16 256:21 258:4

**11:06** 233:5,9

**11:10** 152:14

**11:33** 186:24 255:3

**11:36** 255:5

**11:55** 87:14

**11th** 309:14,15

**12** 203:25 204:2 245:15,16 246:10, 15 256:22,23 257:2

**12:15** 87:17

**12:17** 285:13

**12:29** 285:16

**12th** 363:12 364:9, 12

**13** 263:13,14,16 264:5,6,7,8 309:1, 12

**14** 139:24,25 140:9 215:3,4 266:22,23 267:7 270:9 301:19 324:12,13 336:16, 20,21

**1412** 340:3

**14158** 179:2

**15** 22:16 63:24 74:19,24,25 215:2 269:21,22,23,25 324:12 336:21 337:11

**16** 272:18,19,24 324:16 336:21

**1686** 290:9

**17** 289:1,2,6 291:11, 21

**1707** 292:2

**1710** 293:10

**1711** 294:19

**1748** 186:12

**1761** 71:23 102:16, 23

**18** 211:18,19,20,25 277:9 283:6 291:11, 13 292:4 299:1 302:3,15 308:20,21, 24

**18th** 54:6 305:15,18 307:15 308:3,6

**19** 291:8,9,23,24 292:9,18,19 382:6

**1:00** 121:19

**1:01** 121:22

**1:35** 335:5

**1:45** 153:3

**1:58** 335:8

**1st** 45:5 49:9 138:19 139:5 151:16 152:8, 14 153:3,17 158:16 161:12,13 164:22 167:14,16 183:23, 24 185:20 188:21 265:6 266:3,8,11 267:17 268:16 274:24 317:15 358:21,23

---

**2**

---

**2** 38:23,24 39:1,2 40:22 55:19 181:10 233:6 249:10 257:8 377:19

**2/2/2025** 215:6

**20** 21:23 299:4,5 322:19,20

**2020** 31:18 32:10

**2024** 330:16

**2025** 21:18,19 39:24 45:5 49:9 54:6 55:25 58:2 62:20 75:12 81:9,13 88:4 102:17 107:22 128:14 149:18 153:3 164:22 167:16 186:24 212:8 217:20 219:11 223:17,20 224:1 242:14 251:10 253:22 256:13 265:11 268:17 273:15 279:24 293:1,2 302:4,15 308:6 309:8,14,16 325:3 330:17 335:12,15, 18 336:6 337:23,24 339:18 358:22,24 368:18 377:12 378:10 382:6

**2026** 8:9 19:4 21:7 36:11 233:4,10 335:21 368:16

**20th** 37:18 39:24 81:13 83:23 221:12 286:11 325:3 337:23 368:18

**21** 339:7,8

**21st** 330:16

**22** 288:8 306:9,22 343:10,11

**23** 340:22 345:15, 16,20,21 350:18

**23rd** 21:24 339:18 340:14

**24** 191:24 355:1,2

**24th** 19:4 21:24

**25** 367:24,25

**25th** 58:2 309:8 360:8

**26** 8:9

**2600** 45:13 48:14 152:4 158:21

**2605** 152:19

**2606** 152:15,20

**2607** 152:15

**2647** 264:2

**265** 350:22

**27** 47:5,24,25 233:4 350:4 366:2 378:20

**27th** 21:17 37:23 55:24 88:10,15 92:10,22 94:25 95:14 96:25 97:5,12 98:6 100:11 124:4 233:9 365:25

**28** 47:7

**28th** 100:10,11,18 354:23

**29** 47:7 167:2 204:1 254:22 324:8,9 336:12

**29th** 101:2,10,13

**2:00** 35:18 36:2 77:18,19 117:19

**2:42** 247:12 249:24

**2nd** 140:7,11,23 185:24 186:24 190:6 191:23 200:1,

23 202:10 203:5,17 204:9,12 212:14 214:22 217:20 219:11 221:23 231:11 268:16 273:5,7,15 274:18, 23 317:16

## 3

**3** 71:22 80:22,23 81:1 181:12 377:19

**3/18** 301:23

**30** 47:7 123:11 220:15 333:6

**30(b)(6)** 226:3 229:9,16 232:12 233:1 235:6,7 296:3 316:8 338:1 365:8

**300** 373:10,17

**30th** 21:18 34:20 35:5,14 37:13 54:12,14,16,25 62:10,14,20 73:8 75:12,14 77:14 79:2,7,12,15 81:9 88:13 90:1,3,14,20 91:9 100:3,6,8 101:25 102:1,6,9,17 103:17 107:6 108:2, 8 109:13 110:20,25 111:16 114:2,7 117:3 122:2,3,12, 23,25 123:3,13 124:20 127:13 128:11 134:10 135:14,25 137:3 158:15 185:7,8 188:3 200:5 246:23 247:4 251:2,9 257:12,17 258:1

265:11 274:24

**31** 47:7 242:14 329:8

**31st** 35:18 36:2 37:13,17 77:18,20 99:7,9 107:21 110:19 123:11 128:16,22 129:22 133:13,14 137:20, 24 138:5,10 139:1 148:4 149:9,18 158:15 180:20 181:13 200:6,7 221:12 247:10,12, 17 249:11 252:10 253:3,22 256:11 257:8 258:6,10 268:20 269:16 317:15 325:3 330:17 337:23

**32** 47:7 306:25

**3263** 89:4 91:14 123:19 124:15,19

**3:00** 64:25 65:15 73:6

**3:05** 383:17

**3:08** 166:13

**3:29** 166:15

**3:31** 383:20

**3:36** 388:8

**3C** 41:6

**3rd** 133:8,9,11 139:12,13 140:25 141:7,11,12,16,21 180:21 185:8,10 203:16,19 204:12 205:18 206:23 210:18 212:16,17 213:21 214:22

270:4 348:25 354:23 355:23 357:2,6,14,15,22 359:3,6,19 360:5

## 4

**4** 8:11 87:23,24,25 88:4 181:12 233:12

**4,500** 368:19 369:15

**45** 17:2 30:22 31:1 333:6

**46** 30:24

**47** 30:25

**480** 272:5

**4:00** 64:25 65:15 73:6

**4:46** 253:22 258:10

**4:51** 228:21

## 5

**5** 28:25 71:22 89:4,6 93:7 102:15 107:19 123:19 142:5,8,9 167:10 169:8 173:9 239:3,4 255:20 257:11 283:4 358:18 385:12,13, 17

**5,000** 368:20 369:15

**5-minute** 245:23 285:9

**500** 120:7

**5266** 93:1,20

**555** 363:12 364:9,12

**569** 75:3 78:12

**57** 97:7 111:2

**58** 97:7 98:7 111:2

**5:00** 64:25 73:6,21 77:14,19 134:14 135:14,15

**5:00-ish** 77:10

**5:26** 228:25

**5:29** 232:11,14

**5:30** 283:4

## 6

**6** 28:25 48:4 71:22 145:5,7 181:5,11,13 350:12,15

**6-week** 300:9

**652** 197:13,16

**68** 306:15

**6:00** 138:5

**6th** 323:9 368:16

## 7

**7** 48:4 182:1,3,14,16 221:5 291:21 386:7, 8

**70** 372:15

**70-ish** 369:13 372:24

**7th** 212:7,18 216:25 277:17 279:23 280:7,12 281:11 283:4,13 285:2

## 8

**8** 44:25 48:4,10

151:25 152:3,4 186:3,5 252:13 264:2

**83** 300:10

**8:00** 73:14 137:20 138:19 139:5

**8th** 217:1 306:11,12 307:14,15

---

## 9

**9** 164:18,19 189:3,5 197:17 237:24,25 238:1

**9107** 182:24

**9110** 219:2

**945** 257:16

**9:30-ish** 62:19

**9:45** 257:12

**9th** 217:1 293:1,22

---

## A

**A-U-K-U-S** 19:20

**a.m.** 8:9 35:18 36:2 40:19 77:18,19 117:19 137:20 138:19 139:5 152:14 186:24 233:5 247:12 249:10,24 257:8

**ability** 95:9 105:23 106:16 109:21 110:11,23 116:1 124:10 155:25 157:1 160:11,16 226:22 293:25 312:8 319:24 320:3 327:6 374:9 381:11

**aboard** 79:9

**abolished** 356:22

**abolishment** 356:25

**above-stated** 337:14

**abscess** 157:5

**absent** 166:2

**Absolutely** 15:16 56:11 150:16 281:1 365:17

**absorb** 356:15

**Academy** 33:10

**accepted** 31:10

**access** 37:4 38:5,6 43:23 44:8,13,16 45:19,20 46:5,7 61:13 64:18 94:3,4, 19,23,24 95:2,3,13, 14,17,18 96:5,11, 13,22,23 97:1 100:2,13 101:5 102:6,19 103:16,21 104:5,11,19,24 105:4,10,18,19 106:14,16,17,23 107:24 108:2,3,7 109:17 110:9,11,15 111:24 113:10,18 122:10 123:7,23 124:5,7 152:14,22, 24 153:4,9,14,20 154:3,20 155:5,12, 16,18,25 156:3 157:1,3 158:14,17, 18 159:5,18,19,22 160:3,7,9,25 161:6, 7 187:9 219:17,20 220:23 221:3,4,9, 18,24 222:9 246:22 247:1,4 248:8

249:1,9,12 250:2, 11,12,17,25 251:2, 6,7,12 252:4,7 253:3,19,20,21,25 255:11 256:8,24 257:19,25 258:11, 12,17,19,20,21,22 259:9,14,15,22,25 260:2,9,20,22,23 261:5,7,11,18,25 262:6 263:2 264:9, 20 293:15,23,24 294:1,3 296:17 306:8 318:16,17 322:9,16,17 323:11, 23 359:8

**accesses** 103:25 110:24 221:20 223:7 261:22 263:10

**accessible** 112:11 351:15,16

**accord** 126:22 161:24 163:22 168:21 169:24 170:16 171:7 318:17 344:9

**accordance** 57:5 270:8 351:11

**account** 89:14 123:21 219:22 256:8 341:3,8,15,21

**accounts** 89:11

**accurate** 159:15 221:17

**accurately** 12:12 352:5

**accusations** 201:13

**acknowledge** 202:23

**acknowledged** 83:1

**acknowledging** 326:13

**acquisition** 365:22 367:16 369:18

**acquisitions** 95:24 364:1,6,12,22 365:5 369:22 370:16 371:5 372:9

**acronym** 49:15

**acronyms** 49:18 247:23 248:2,11

**Act** 359:22 360:15, 23 361:3,16 362:21 380:21 382:18

**acted** 304:22

**acting** 34:23 35:10, 13,20 58:1 59:13 60:17 70:19 71:7 72:16,20 75:7 76:2 77:1,4,14,25 78:16, 19 82:17 83:7 84:2 90:18,25 91:4 107:4 111:25 114:13,20 115:1,2,9 116:3,23 118:19 120:13,14, 22 121:2,3,8,10,16 122:13 124:22 127:14 130:8,23 131:13,22 132:15 133:4 134:12,19 135:18 136:1,16 142:2 188:5,7 191:7 198:24 221:25 222:22 261:14 265:11 266:12 268:7,10,15,19,23 269:15 275:5 306:2, 3 309:20 311:1 363:21

**action** 44:24 47:12 189:13,21 191:9 197:7 204:23 208:5, 9,10,11,13 209:14, 22 210:13,18,19,25 211:3,4,12 214:3,7, 12 268:5 289:10 291:5 298:7,11,12 344:7 353:15

**actions** 183:5,6,10, 15,17,20 273:19 274:6 348:16 349:13 353:24 354:16 355:24

**Active** 294:2

**activist** 312:24

**activities** 146:11 181:20 312:25 351:24 383:6

**activity** 240:6 368:12,13 375:11, 24 376:5

**actual** 29:15,20 116:14 186:20 210:3 237:4 346:11 364:10

**ad** 60:8

**Adam** 8:10 9:16,25 99:20 101:21 111:20 114:11 117:1,5 136:17 143:20 144:16 151:13 154:25 155:19 165:19 172:14,17 173:2 184:7,11,20 187:4 188:24 192:9 201:3, 9 202:8,9 207:22 218:5 232:14 233:3, 12 234:18 239:20 240:17 243:12,14,

15 265:25 267:23 271:1,5 273:9,12 283:17 284:2 285:6 290:23 292:7 303:21 305:19 315:15,17 316:1,2 318:13 354:7

**Adam's** 168:16 176:20 239:23 277:20

**add** 31:6 334:24

**added** 47:1

**addendums** 47:1

**addition** 361:11

**additional** 43:15 50:14 86:4,10,18 91:24 105:18 152:23 153:4 187:4 188:20 235:15,25 260:9 293:15,22 294:4 296:17 304:20 309:24 310:23 311:4 312:17 367:9

**address** 14:5 28:13 264:13 363:12

**addressed** 142:22 264:15 344:3

**addressee** 306:21

**addresses** 51:2 295:15 297:15 343:19

**adequate** 360:10

**adjacent** 48:21 49:1 79:24 80:3

**admin** 66:6 95:14 103:24 146:11 256:8 294:1,2,3

**administer** 83:20 351:23

**administered** 96:15 366:18 381:5

**administering** 382:17 383:24

**administration** 30:23 50:1,2 60:4 107:20 116:1 119:23 120:4 206:7 212:8 219:5 253:10 258:15

**administrative** 62:23 83:20 94:23 97:8,12 98:7 110:14 111:3,4,10,13 129:23 146:19,25 147:18 158:17 159:5,18 188:10,11, 12,21 193:2,6 213:17 216:15 219:17 253:19 258:20,21 259:9 260:2,22 261:5,10 267:17,21,24 270:10 271:11 325:1 337:21 339:16,21 340:4 341:20 357:3 359:7, 15

**administrator** 23:1 34:11,23 35:11,14, 20 41:15 55:23,24 57:13 58:1 59:14 60:17 70:19 71:5,7, 15 72:1,8,16 75:8 76:3 77:1,4,14,25 78:16,19 82:17 83:8 90:18,25 91:4 95:2 107:5 108:10 112:1 114:13,20 115:1,2,9 116:4,23 118:19

120:13,14,23 121:2, 3,8,10,16 122:13 124:22 127:14 130:8,24 131:13,22 132:16 133:4 134:12,19 135:19 136:1,16 139:15 141:1 142:2 180:19 188:5,7 191:7 203:21 205:1,2 214:24 221:25 222:11,22,23 248:13,21 261:15 265:12 266:12 268:7,10,15,19,24 269:15 275:5 282:7 309:20 343:18 370:10

**administrator's** 28:23 29:4,5,6,14, 22,23 63:1

**administrators** 30:6 140:5

**admit** 149:16

**admits** 98:16

**ADS** 110:1,22 223:11 272:5

**advance** 31:7

**adventure** 24:4 26:20

**Adversity** 372:20

**advice** 58:14 98:8 177:11 240:7 270:21 271:6,16,18 276:6 289:24 290:14 301:10 311:12 312:5 315:14 342:17 358:15

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

ADAM KORZENIEWSKI
95350

March 26, 2026

399
30(b)(6)Index: advise..answers

**advise** 180:7

**advised** 98:16,21

**advising** 164:6 317:3

**advisor** 19:13 20:14 22:20 32:14 52:8 183:2,3 198:17 245:3 248:19 287:17 301:7,12 310:14 347:8,20

**advisory** 20:1 33:1 58:13 59:6 79:3 85:6 151:9 173:23 199:16

**affairs** 146:17 198:25 288:22 309:3 347:9,20 354:6 360:22

**affected** 192:11 351:14

**affects** 209:20

**affiliated** 43:9

**affiliation** 264:22

**affirm** 9:8 105:9 234:12 243:8

**affirmative** 272:6

**affirmatively** 275:17

**affirmed** 9:16 234:19

**affirming** 326:4

**affirms** 159:21

**Africa** 25:23 26:2 96:14

**afternoon** 65:20 70:13,16 73:7 134:14,16 258:7 273:11

**agencies** 41:10 156:7 282:13 356:17 373:13 378:5

**agency** 11:25 21:10 22:1,9 23:18 34:2 41:9 49:5,24 50:11, 16 51:7,18,20,25 52:14,15 53:3,4,9, 12 54:11 55:22 59:5 60:15 61:18 68:2 75:8,18 85:14 111:23 113:15 115:17 151:13 177:20,21 178:5 180:7,14 181:22,23 201:12 220:19 262:20,21 263:11 264:22 281:23 282:19 290:15 356:22 357:1 360:22 378:2 382:16 383:2,4

**agency's** 53:19 120:23 149:17 180:23 374:7

**agency-wide** 132:11

**agenda** 199:10

**agent** 41:13

**agents** 282:6 283:1

**aggregate** 306:16

**aggressive** 201:13

**agree** 144:3 149:25 161:19 185:6 188:15 195:15,22 227:19 229:22 230:9 242:1 343:8

**agreed** 194:22 379:19

**agreement** 19:15 195:8 235:5

**agrees** 244:15

**ahead** 13:8 15:5 28:16 44:21 59:23 90:11 93:14 160:23, 24 163:19 167:1 168:13 196:16 232:8 241:14 242:8, 18 248:11 265:21, 23 269:2 276:14 278:22 286:1 318:25 319:22 320:6 321:1 325:13 330:4 355:16

**ahold** 26:11

**aid** 38:16 47:10 81:7 85:17 146:10 181:16 273:9,12

**Alex** 183:1 386:12

**align** 199:10 349:4

**aligning** 356:6

**allegations** 173:25

**allegedly** 97:13

**allocation** 370:13

**allowable** 304:14

**allowed** 21:11 96:21 105:6 118:2 160:13 164:7,8 212:17,22 227:17 357:8 376:12

**allowing** 38:4

**Ambassador** 183:3 349:22 350:4

**ambiguity** 13:1,3

**ambiguous** 22:6 201:23 204:16

210:14 251:15 268:13 271:12 274:9 279:12 293:17 298:16 310:4 356:2 359:12 373:25 375:16

**America** 199:11

**Americans** 27:20

**amplified** 372:7

**Amy** 57:25 58:4

**analyses** 196:22 346:21

**analysis** 79:3 85:6 177:11 194:3,10,11 195:10 271:21 290:14 317:3 356:4, 6 379:24

**analytic** 58:13

**analytical** 59:6

**analyze** 58:14

**analyzed** 193:19

**analyzing** 193:22

**and/or** 352:13

**Andrew** 8:19 233:20

**angle** 385:15

**announced** 133:8, 10 141:21 281:12 359:20 367:8

**announcements@ usaid.gov** 341:4

**answering** 11:4 346:19 372:1

**answers** 11:6,9 12:4 76:22 150:1 169:20 179:9 229:4,19,22, 23 230:4,5,6

**anti-malarial** 312:23,25

**anticipate** 11:4

**anticipates** 351:25 352:9

**anybody's** 28:3

**anymore** 40:2

**APA** 298:11

**apologies** 31:7,19 44:3 51:18 55:13 74:14,25 81:10,17 93:12 107:15 112:22 144:9 149:2 152:5 181:24 221:11 310:22 340:2

**apologize** 16:12 21:3 38:21 47:3 68:18 71:18 89:13 93:19 102:24 108:4 123:17 154:13 196:2 197:17 203:11 254:4 274:3 299:21,22 307:1 318:4 331:17 340:5, 24 358:7

**app** 248:7

**appealed** 361:17

**appearance** 231:19 387:25

**appears** 140:3 221:16 267:13 323:1 324:2

**applicable** 85:13 351:6,19 352:4 356:23

**applications** 24:24

**applied** 86:19 310:2

311:18

**applies** 195:14 227:15 241:7 387:11,19

**apply** 311:18 329:4

**applying** 339:2 374:6

**appointed** 41:21 42:17 58:1,21 135:17 274:17

**appointee** 22:20 23:21 26:10 83:25 191:1 346:18

**appointees** 22:9 23:16 24:6 37:24 63:2 70:5 83:11,13, 18,19 131:9 137:8, 16 199:24 213:12, 16

**appointing** 303:24

**appointment** 32:12 62:18 305:17

**appointments** 139:19

**approached** 32:23

**appropriated** 364:4

**Appropriations** 359:22 360:15

**approval** 106:22 107:21 108:6 110:8 122:9,19,23 123:3, 5,7,10 161:6 162:1 197:6 249:11 250:1 253:12 261:24 263:2 265:4,16 266:7 289:15 295:2 296:13 297:17 377:3

**approvals** 298:20

**approve** 109:21 110:14,24 161:24 162:19 163:7 214:12 219:17 261:4 306:13

**approved** 25:23 38:5 103:11 197:25 261:18 264:25 342:3 348:13 375:13,18,25

**approving** 261:10

**approximately** 270:9

**April** 20:9 231:11 350:10

**Archive** 385:8

**Archives** 380:20,21 381:4,23 384:11

**areas** 106:19 289:16 352:13

**arguably** 363:25

**argue** 245:25 246:3

**arguing** 199:19

**argument** 209:16 348:19 363:7

**argumentative** 61:1 98:13 105:5 120:16 127:1 147:2 155:23 165:3 311:19 320:5 352:25

**arm** 201:16

**arms** 19:17 342:14

**arrange** 38:1

**arrangement** 180:13

**arrangements**

351:17

**arrived** 58:9,10 88:17,19 151:18 152:9 188:2,3

**art** 159:13 315:2,3

**articulate** 134:24 210:6 321:16

**articulated** 17:19 18:13 59:21 72:11 150:19 181:19 195:8 221:18 290:17

**articulates** 230:6

**articulation** 382:24

**ascertain** 241:6

**ascertaining** 195:14

**aspect** 111:13 117:25 137:11 207:7 213:7 214:8

**asserted** 225:9 227:11

**assertion** 241:3

**assessment** 187:23

**assign** 302:25

**assigned** 22:18,21, 22 23:5,13 48:16 50:15 52:6 118:12 155:11 156:25 173:22 214:23 216:23 277:22 278:2,16 284:25 290:12 312:1 321:8

**assigning** 352:9

**assignment** 25:19 51:14

**assignments** 52:11 106:17

ADAM KORZENIEWSKI
95350

March 26, 2026

401

30(b)(6)Index: assist..backfilled

**assist** 24:5 148:8,25 192:4

**assistance** 24:21 59:1 85:7,17 86:14 117:22 189:15 193:17,18,24 199:11 266:5 290:2, 5,13 308:13 310:1 311:18 312:11 346:7 349:4,8 350:7 351:23 361:3,16 362:21 375:1 382:18 383:11,25

**assistant** 68:15 69:6 71:15 72:1 117:14 198:16 248:12,21 288:1

**assistants** 131:5 198:18,19 213:17

**assisting** 187:6

**associates** 288:1

**assume** 11:21 13:24 51:16 130:12 180:8 329:8 358:14 387:13

**assumes** 126:5 281:19 290:18 315:21 333:16 334:16

**assuming** 45:9 150:18 183:18 321:14 324:3 332:6, 7 352:10

**Ata** 248:3,4,12 291:6

**attached** 46:14,20 189:13 191:11

**attachment** 252:17 283:5

**attack** 161:8

**attempt** 46:7 188:10

**attempting** 244:19

**attend** 20:5 118:17 297:3

**attendance** 296:24

**attended** 17:25 18:15 31:10

**attention** 33:22 40:21 41:5 48:4 65:4 75:2 88:9,15 101:25 122:1 124:20 151:15 158:16 168:23 169:15 217:10 258:3 285:20 301:16 336:8,14 337:10 385:12

**attest** 128:20

**attitude** 156:14

**attitudes** 366:10

**attorney** 143:22 170:24,25 227:9 230:18,19,22,25 231:17,20,23 232:1, 4 334:24 387:14,16, 23 388:1,4

**Attorney's** 99:11

**attorney-** 170:23

**attorney-client** 170:2 227:4 286:22

**attorneys** 13:4,13 15:23 16:2 370:18

**AUKUS** 19:12,13,14, 19

**Australia** 19:15 20:11

**authorities** 27:24 110:7 135:18 139:14 141:8,22 210:1,3 214:6 303:23 362:10

**authority** 57:17 60:24 75:7 109:22, 25 137:11 151:10 160:6 161:10,24 162:19,22 163:22 168:20 247:6 257:20 263:3,4 305:17 344:9 367:17,23 373:22 374:3

**authorization** 159:23 160:3,17,21 161:2 174:1,2 247:5 248:6 250:6 251:7 257:18,24 258:7 260:17 289:15

**authorize** 148:8,20, 24 206:22 248:7 344:4

**authorized** 164:10 203:23 249:12

**authorizes** 248:7 249:8

**authorizing** 206:18 362:3

**automated** 110:1

**availability** 314:7

**avoid** 347:13 350:17

**avow** 103:7,14 108:25

**awards** 309:19 313:11,20

**aware** 76:1 93:19 98:19 103:6 109:20

136:15 153:15 154:15,19,23 155:7 161:5,8 173:24 181:20 198:23 205:23 206:23 215:23 216:3,8 218:9 267:15 275:13,16,25 276:1, 9 281:2,20 303:13 343:2,7 344:19 345:1,13 364:25 365:3 381:3

**Azerbaijan** 353:12

---

**B**

**back** 25:19 26:2 29:21,22,24 32:24 33:22 40:21 43:8 44:17 54:8 59:15,16 63:25 64:15 66:22 68:24 76:22 85:5 87:20 99:8 103:15 106:5 110:23 111:3 112:4 118:9 122:1 124:20 169:21 171:10 182:5 188:12 193:5,10 211:7 212:17 213:23 230:3 236:3 250:5,20 251:21 256:17 284:23 299:1 306:20 307:11 313:2 315:12 322:20 323:9 335:10 336:8, 14 348:23 350:3 357:18 365:19 371:4 385:14

**back-end** 293:24

**backfilled** 373:14

**background** 10:12, 14 17:22,24 63:16 76:11 208:14 379:5

**backgrounds** 374:17

**backing** 197:24

**backtrack** 123:17

**badge** 37:9,11,14 64:19,20 187:3,10 219:20 381:8,9

**badges** 104:6

**badging** 110:16 258:16 261:7

**badly** 114:17

**bag** 62:24

**bagels** 128:22 129:3,6 130:4

**Bank** 190:25 196:25

**banker's** 66:10

**based** 13:12 25:22 28:6 44:23 96:3 109:9 118:14 169:7 170:5 173:19 174:5 176:2 203:8 382:14 383:2

**basic** 38:4 68:5

**basically** 15:21 22:7 34:21 36:7,12 38:4 72:5 77:24 103:25 105:23 115:12,16 124:10 130:19 131:19 208:21 213:4 272:4 377:2

**basis** 36:12 97:11 170:1 172:20 173:15 174:12 184:9 185:16 192:20 195:18

197:10 201:5,9 204:3 214:19 223:9 237:19 317:2 320:1, 4 328:23 331:21,25

**Bates** 45:11,13 48:14 75:2 78:12 81:11 102:23 124:15 167:9,10 197:13 212:3,4 291:22 292:2 302:7 322:21 350:21

**bathroom** 16:24

**bear** 134:5 259:20

**bearing** 149:16

**beg** 330:4

**began** 353:5

**begin** 296:19

**beginning** 8:10 39:9 186:20,23 223:17 233:11 234:24 357:24

**begins** 252:24 309:14

**behalf** 11:25 12:4 46:1 107:10 133:24 135:10 233:16,18, 20,22,24 235:6 238:19,22 240:14 243:20 318:13 356:17

**belabor** 38:13 355:15

**believer** 119:13

**believes** 111:21 243:12,14,16 294:4 341:11 364:18 366:13

**belong** 49:21

**belonged** 385:2

**belongings** 216:12

**Ben** 349:22 350:4

**beneficiaries** 183:25 185:4

**benefits** 64:12,13 370:5

**Benz** 217:21

**Beth** 8:15 10:8 233:16

**Biden** 30:24

**big** 25:7 47:17 119:13 312:23 363:14 374:15

**Bill** 267:11

**billeted** 135:21 137:6

**billion** 306:15

**bills** 33:3

**binder** 13:21,24 14:1,25 15:2,5,15 39:7,13 40:11 44:7, 17,19,22 46:10,13 47:6 51:10 65:1 74:18,22 77:23 89:2 102:11 139:16 164:16 173:10 215:1 236:4 263:24 272:22 277:9 288:15 301:17 306:23 307:7 322:19 324:5 344:7

**binders** 169:19

**bit** 10:14,21 15:13 17:23 30:4 41:24 47:11 114:14 118:7 120:10 124:21 142:22 158:13,14

160:14 166:25 192:24 245:9 246:21 273:3 313:15 348:23 376:14 379:20

**blacked** 183:19

**blacked-out** 385:21

**blah** 106:3 292:1

**blank** 16:13 88:5 93:7,9,11 220:16

**blanket** 161:9

**bloat** 194:3

**blood** 25:13

**blur** 118:21

**board** 200:19 355:21

**body** 379:5,7

**boiler** 193:12

**book** 88:22

**border** 281:14 282:6 283:1,8

**borderline** 325:16

**boring** 67:23

**Borkert** 63:22 67:6 78:3 91:15,21 92:3 117:6 118:13 139:8 190:19 193:9 198:8, 15 270:5 274:19,25 313:4

**Borkert's** 196:20

**boss** 34:7

**bottom** 45:9 75:3 102:23 145:16,17 192:1 219:1 264:10 293:10 337:11

**box** 66:10

**boy** 254:23

**brain** 299:20

**branch** 186:14 362:3

**break** 12:14,17,21 31:21 33:21 39:12 40:8,12,23 55:1,6 56:13 87:2,4,7,9,12 119:3 121:18 132:3 162:10 166:8,9 169:4,7,16 170:17 171:5,9 224:9,22 226:22 227:16,22, 24 228:8,11 230:15 235:16 236:5,10 245:23 246:5 247:22 249:21 256:15 266:16,17, 18 285:10 331:20 335:3 383:13

**breaks** 16:25 103:25 225:3

**brevity** 47:12

**Brian** 93:21 152:15 153:3 246:17 250:3 264:12,15 267:9

**briefing** 64:10,13,16

**briefings** 38:8

**briefly** 15:25 31:3 63:17 79:9 236:6 333:1,5

**bring** 25:10 111:2 351:20

**bringing** 129:6

**brings** 31:2 64:24

**broad** 19:24 98:3 314:10

**broader** 210:7 375:21

**broadly** 102:7 115:7 315:9

**brought** 62:23 130:4 196:23 314:24

**Bruce** 68:13 343:17

**bug** 31:14

**build** 351:23

**building** 24:13 28:11,13,21 30:3 35:1,9,10,12,17 36:1,4 38:2,5,16 43:4,10,13,14,24 44:9 46:3 61:14 65:24 69:24 80:18 89:12 90:18 104:1, 2,6 106:18,25 129:23 149:18 150:6 151:19 152:10,17,21,24 153:17,21 154:3,21 155:6,12,16,25 156:3 157:1,3,5 158:19 159:11,20 160:8 185:19 187:15 203:24 205:12 206:3,19,22 210:18 211:2,6 212:10,13,16,17,22 213:21,23 214:1 216:5,11,16,18,24 217:1 264:8,20 277:6 280:7 281:8 282:22 283:11 317:6,7,21 357:7,8 364:7

**buildings** 364:11

**bulk** 47:17

**bull** 193:11 198:4,5

**bunch** 30:7 129:7 169:20 193:14 199:5 236:4 282:6

**bureau** 32:16 198:25 282:14 347:24

**bureaus** 23:4,7 83:14,24 191:17 310:24 311:9 356:15,20

**burn** 120:5

**Burnham** 43:18 44:1,4 45:16 49:3 57:21,23 152:19,25 153:11 180:10 386:17

**business** 283:3

**busy** 55:6

**Butler** 104:11,14,15 105:2 108:23 109:5 186:14 219:15 246:17

---

**C**

**C-** 113:13 123:7 246:22 251:7 259:24

**C-CIRE** 260:7

**C-CUR** 381:13

**C-CURE** 103:24 104:4,12 105:4,19 106:9,16 108:6 110:9 113:11,18 122:10 158:14,17 159:4,18 161:1 222:9 247:4 250:2,6 251:12 252:6 256:9 257:19,25 258:11,

25 261:25 262:6,10 294:1 381:2,3,15 384:4,8

**cabinet-level** 356:8 362:23

**calendar** 19:4 88:5 317:24 318:14,18, 21 320:8

**calendars** 318:22

**call** 24:17 32:10 45:12 55:1 112:3,8 115:20 135:5 143:9 154:2,10 198:3,5 217:12 226:4 267:11 289:17 291:21 299:10,13 350:7

**called** 33:8 47:4,21 79:14 158:2 167:7 193:11 208:5 216:19 217:18 253:9 258:14 259:17 275:8 306:7 343:19 372:19 376:10

**calling** 354:10

**calls** 65:17 116:5 159:24 161:3 172:5 194:14,18 239:11 263:5 276:12 282:4 286:21 302:19 304:3 359:25 360:24 367:19 382:9,19 383:7

**camera** 40:2

**campaigns** 31:16,17

**cancel** 288:5

**canceling** 300:10

**candidates** 352:2

**capacities** 158:7 281:3 320:11,17 355:21

**capacity** 20:1,2 99:18 143:16 151:9 176:13 180:11 198:17 199:16 237:1 243:19 245:3 282:3,12 301:7,11 308:1 320:19 351:23 362:19 384:14

**caption** 8:11 233:12

**card** 64:17

**care** 22:14 25:12 27:18 120:2

**career** 27:11 28:5 83:23 92:13 117:9, 11 155:5,9 163:24 198:12 370:8 371:6

**Career's** 164:3

**careers** 26:12 62:22 70:5 83:14,21 84:2 131:7 369:13 370:3, 15,18,20 371:15,16

**careful** 208:23

**Carr** 264:12

**carrier** 113:3,9

**Carter** 322:24 323:1, 3,9,10 324:3

**Cascades** 306:7

**case** 8:11 14:14 17:17 30:24 51:8 83:1 111:22 149:15 159:15 171:6 228:5 233:12 235:20 236:1 374:8

**cases** 263:12

**cataloged** 306:7

**catch** 55:8

**Categorically** 377:16

**categorize** 19:25 48:20 192:23

**categorized** 105:22

**category** 48:22 315:10

**caution** 342:20

**caveat** 22:20 95:7, 21

**CBP** 281:22,25 282:5

**cc'd** 186:16 246:18, 20 253:9 264:14 270:6 322:25

**cc'ing** 212:10 219:15

**CDC** 25:13 26:9,12

**cease** 379:6

**ceased** 53:25 54:1

**census** 32:10,15,16

**center** 29:16 216:18, 20,22,24 380:8

**centrally** 96:15

**certificate** 18:6

**certificates** 18:17 25:14 178:1

**cetera** 25:12 110:16 167:5 272:6 282:15

**chain** 134:8 135:13, 24 137:2,19,23 138:4,9,18 139:4,6,

10 142:18 147:21, 24 148:4 150:18 158:4 163:11 164:3 173:20 174:6 181:14 182:25 189:12 200:1 203:8 219:2 266:7 293:4 295:2 297:17 298:14 299:10,13 309:10

**chance** 136:19 345:23

**change** 25:18 169:12 195:21 222:25 229:4

**changed** 34:11 58:20 139:10 169:14

**chaos** 193:20

**chaotic** 187:1,18,22 188:16,18

**characterization** 94:12,18 154:12 156:17 165:2 173:6 285:25 308:14 311:7 325:10,14 350:18 357:10

**characterize** 132:22 147:4 187:24 197:5 259:24 313:6,7

**characterized** 193:21

**charge** 54:22,25 71:6 82:14,16 84:17 90:13 127:7,16 163:3 164:6 177:1

**chart** 158:10 179:5

**chastised** 308:11

**chat** 322:16,18 323:11,23 324:2 331:11,17

**chats** 323:17 333:14

**check** 35:8 132:3 175:16 190:11 250:10

**checked** 28:2 382:4

**chief** 20:24 21:1 37:25 78:5 91:15,16 93:25 118:6 128:1,2 135:21 137:14 140:6 186:14 189:17 222:6 325:22,23

**chiefs** 34:8

**Children** 372:20

**chipper** 217:23

**choose** 24:3 26:20 372:13

**chow** 112:20

**Chris** 8:25 234:3

**Christ** 283:19

**chronic** 25:12

**CIO** 93:25 96:24 107:22 110:10,14, 17,22 118:17 222:4, 5,21 223:6,13 261:15,19,20,21,22, 23 262:5,6,8,12,21 263:1,9 275:3,4 324:2 363:19,21 364:7,22 365:5,21 367:16 369:18,23 370:10 371:5 372:8

**CIO's** 262:1 323:7 364:8 370:10

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**circle** 43:8 131:17

**circular** 164:4

**circumstances** 27:7 28:8 86:7 241:17 279:3 374:25

**civil** 44:24 117:8 351:21 369:13 370:15,17,19,20 371:14,15 373:18 374:19 376:21

**claim** 304:11 379:16

**claimed** 13:15

**claims** 24:24

**clarification** 84:18 89:25 171:12

**clarified** 169:7

**clarifies** 190:12

**clarify** 49:20 75:23 123:5 166:24 168:3 175:22 203:15 220:8 225:20,25 229:1 339:6 365:24

**clarifying** 168:2

**clarity** 167:19,23 226:19

**clarity's** 158:9

**classes** 18:10

**classified** 38:6,8,14 105:24,25 187:9 282:8 381:5

**Clay** 42:22 49:10 50:16 57:2 59:24 62:7 65:21 66:15, 23,25 74:13,14 279:18

**clear** 46:12 47:23 99:17 102:21 124:2

133:3 145:25 154:4 225:2 226:12,18 229:14,15 234:25 235:4,19 257:2 264:5 291:7,20 292:11 295:3 297:18 302:9 328:22 334:10 342:16 367:6

**clearance** 187:8 289:25 346:9 347:12 348:3 368:6, 8

**cleared** 209:6 215:16

**client** 170:24

**clipping** 167:1

**close** 204:14 205:9, 11 215:18 283:3 353:11 369:1 383:12

**closed** 129:4 202:14 351:7 352:19 353:14

**closely** 57:19 198:15 248:9

**closeout** 315:4 375:12,25 376:6 377:7,11

**closeouts** 315:4

**closer** 77:19

**closing** 324:23 337:18 338:18 379:17

**closure** 203:23 206:18,22 207:10 211:16 215:22 216:1,4,10

**cloud** 110:16 219:20 258:17 261:7 363:12

**co-** 363:8 364:1,19

**coffee** 133:19

**collaborate** 187:12

**collaboration** 346:25

**colleague** 51:11

**colleagues** 27:9 56:18

**collecting** 118:14

**collectively** 314:13

**colloquialism** 83:9 347:11

**Columbia** 18:1 31:10

**comfortable** 91:22

**comforts** 282:21

**command** 134:8 135:13,24 137:2,19, 23 138:4,9,18 139:4,6,10 150:19 163:11 164:4 173:20 174:6 203:9 295:3 297:17 298:14

**commence** 290:4 351:19

**commenced** 83:3

**comment** 239:21 254:19 329:3

**Commerce** 28:15 32:13

**commissioner** 212:10 278:25

279:1

**committee** 309:3 355:15

**committees** 356:15

**comms** 24:8 181:16

**Comms/lpa** 146:11

**communicate** 183:9,14 281:17 301:9

**communicated** 61:20 63:14 116:23 155:18 175:10

**communication** 56:20 135:8 170:23 203:25 227:5 239:16 242:5,13 331:1 333:15 337:16 344:5,14 355:17

**communications** 37:16 128:9 170:8 172:2,6,8,10,13,15 328:19 333:21 334:13,21 338:16, 17

**company** 32:19 33:7

**comparable** 244:9 260:15

**compare** 252:23 318:9

**compensated** 52:23

**compete** 374:11

**competent** 115:15

**competitive** 289:16 290:23

**competitively** 375:5

**compile** 334:5

**compiled** 333:20 334:12,20

**complete** 18:2,15,21 177:8 379:6

**completed** 31:5 246:10 282:24 352:3

**completely** 311:24 320:16 362:9 363:8

**complex** 379:13 380:9

**complicated** 22:24 96:1 376:14

**complication** 282:16

**components** 275:22 345:11

**comport** 94:21

**comported** 30:23

**compound** 79:25

**computer** 37:2 63:8

**concept** 98:3

**concerns** 23:8 294:10,24 353:12

**concert** 271:20

**concluded** 194:11, 25 232:14

**concluding** 248:10 386:25

**conclusion** 35:19 159:25 161:4 199:9 263:6 360:1,25 361:11 362:17 367:20 382:10,20 383:8

**concurrent** 58:23,24

**concurrently** 193:19

**conduct** 213:7

**conducting** 308:12 309:18 310:25 311:13,16

**conference** 29:7,16 216:18

**conferral** 226:2

**confidence** 115:14, 20,25

**confirm** 108:24 182:13 235:10,11 302:6

**confirmed** 84:1 235:12

**confrontation** 153:20 154:12,15

**confused** 197:18

**confusion** 387:11

**Congress** 288:4 346:6,17 348:18 349:15 352:24 353:20,22 354:7,15 355:18 356:14,19 359:23 360:4,11,16 362:2 364:4

**congressional** 346:4,5 350:15 360:7

**conjunction** 80:9

**connection** 41:14 352:6

**consecutively** 120:24

**consequence** 209:19,20

**conservative** 32:20, 24

**considered** 129:20 294:10,24 374:9 381:24

**consistent** 337:13 351:5,19 352:3 356:22 359:14 362:9

**constantly** 146:3

**constitute** 118:4

**constituted** 311:21

**constitutes** 47:17 317:22

**constructed** 15:2

**construction** 282:23

**construe** 337:14

**consult** 31:16 179:24 286:18 288:4

**consultation** 55:23 56:4 60:18 167:17 168:5,23,25 172:23 180:13 273:20 274:7 342:13 348:6 355:22 356:16,18 359:23 360:15

**consultations** 175:21 349:1

**consulted** 57:14 151:11 175:19 192:14 207:7 281:21 312:10,14, 18,21 349:6

**consulting** 356:14

**consumed** 282:18

**contact** 24:12 37:23

**64:1** 66:24 70:1 74:11,12 126:15 177:16,17,18,19 178:2,7 179:7,25 208:1 296:16

**contacted** 26:10

**contacting** 112:17 207:20,23

**contained** 381:16

**contemporaneous** 169:10

**content** 143:13 144:7,8 195:11,25 239:25 240:4 241:24 286:25 328:16,17 333:9 342:17 347:17,18 385:18 386:7,17

**content-based** 195:18

**contents** 89:15 154:9 156:18 190:24 284:5 285:8 326:7 328:5 329:10, 18,25 330:11 334:6 385:25 386:24

**contesting** 358:22

**context** 80:13,14 96:16 99:23 111:12 260:1

**continuation** 235:1, 23 294:16 387:8

**continue** 18:8 152:2 229:10 286:17 311:4 313:17 314:8 352:14 360:8 385:1

**continued** 23:23 63:19 223:19 234:21 314:2

**continues** 290:11

**continuing** 117:23 178:8

**contract** 286:5,20 300:24 315:3,4 377:4 379:17,24

**contract's** 314:25

**contracting** 33:6 192:14 313:23

**contractor** 31:9 33:4 189:23 199:22 323:6 377:24

**contractors** 117:13 131:4 189:23 190:10 194:4,5 198:20 199:8,13 213:18 313:10,17 314:4,5 324:3 352:12 367:10,12 370:1,22 376:11,19 377:22 378:15

**contracts** 96:6 285:21,23 286:3,5, 10 288:5,7 306:14 314:8 325:2 337:22 352:10 368:14 378:7 379:12,18

**contradict** 89:21 310:17

**contrast** 221:13 252:23

**contributed** 346:18 347:9

**contributing** 348:9

**control** 19:18 95:3 263:10 322:9 364:18 366:9,15

**controlled** 106:9

158:18 159:6,10,11

**controls** 293:25

**conversation** 16:7, 20,21 32:2 56:14 68:12 69:2 70:8,11 76:4,8 101:22 105:2 107:13 108:21,22 109:2,6,10 114:12, 18 116:13,14 128:25 129:15,21 130:1,18,19 131:12 144:1,7,9 146:2,14 154:16,20 155:4,8, 10 156:19 194:23, 25 195:9,10,13 196:5,25 204:8 207:9 223:14,23 227:10,17 237:5,12 239:25 240:4,23 241:1,4,24 242:16, 24 244:14 246:6 272:16 274:21 276:4 277:13 279:21 280:5,15,25 281:2 283:17 284:3 303:14,16,22 304:13 326:7 327:18 328:17 330:6,12,14,19 331:1,4,10 332:9, 11,13 385:18,21,24 386:1,17

**conversations** 56:7 67:10,19 74:8 100:12,15,19,21 101:4,8,11,14,16 104:13 111:1,5,8 114:1,4,6,8 115:24 118:3 134:1 135:5 136:20 146:1 154:23 155:14 198:7,20 199:5 207:9,15 211:5

215:21,23,25 218:9, 13 223:12 245:2 275:23 278:5,18 279:11,22,25 280:9 284:24 285:6 288:16 301:5 303:5, 18 325:19 326:5,6, 11,14,17,22,25 327:1,7,12,15 328:1,6,18 329:2,7, 11,13,18,22,25 330:23 331:5 332:14 333:10 337:5 338:15,20 339:3

**conveyed** 150:25 269:15

**convictions** 201:14

**cooperate** 312:20

**coordinating** 383:5, 11

**copied** 306:10

**copies** 252:25 253:1 385:9

**copy** 13:24 181:9 182:9,10 230:23,24 231:1,21,24 232:2,5 384:12 387:16 388:1,5

**copying** 293:6

**core** 241:2

**Coristine** 79:21 80:2

**corner** 29:21,22

**Corps** 31:8

**correct** 10:9,10 14:1 18:14 35:3 40:1 41:11,12,15,16 42:11,12,20 46:16,

17 48:8 50:25 52:15,16 53:24 54:6 55:4,12,13 58:16 62:10 69:9,10 74:16,17 75:15,16, 23,25 77:1,2 79:16 82:23,24 84:4 85:18,22 86:15,16 88:17 90:7,8,20 91:9 92:24,25 97:2, 3,9,10,14,15,18,19, 21 98:10,18,23 99:1,9,10 102:8,24 103:5,18 104:4,9, 12,16,17 105:1 106:19 109:15 110:20,21 111:17 114:10,14,21 122:15,18,23 124:8, 16 135:11 136:23, 24 137:18 143:9,24 147:15,16,18 148:1, 2,4 149:7,8,19 150:15,22,23 151:20 153:19 154:17 156:16 158:19 159:20 161:2,14,15,17 165:6 168:8 173:5 185:25 187:24 191:18,21,22,25 200:2 202:14,15,16 209:7,11 210:13,25 211:23 212:18 213:23 215:9,10,13 216:8,12,13 219:12 221:7,15,16 222:1, 2,14,15,23,24 223:20,21 228:18 230:1 235:3 238:4, 5,20 240:1,2,3 247:7,19 248:23 249:2 251:10 256:14 257:3,13,14,

20 261:15,16 265:7 266:11,12,13 267:18,23 268:11, 12,14,20,21 270:6, 11 273:13,15,16 275:8,9 281:22,25 285:24 286:12 289:12,13 293:2,3, 16 294:14 295:4,18, 19,24,25 297:10 300:7 302:1,4,5,15 306:17 307:13 308:8,9,13 310:2,6 311:5 312:12 313:13 314:15 316:9,14 320:19,24 325:15 333:1,2 335:25 336:3 337:9 339:21 341:4,5,9, 17,25 342:5 344:14, 15 348:18 350:10 352:24 353:17 354:2,21 355:19,20, 25 357:4,5,9,16,17, 19,21 359:11,20,21, 24 360:23 361:9,18 362:4 363:2 365:23 368:21 369:1,3 373:1 376:1,2 377:9 385:17,20 386:2,5, 6,16,19,20 387:18

**correction** 140:3

**correctly** 50:17 51:17 110:11 129:5, 9 148:10 164:22 207:3 215:2 252:8 269:10 295:3 340:1, 19 342:11 347:22 360:10 361:6 366:5

**correspond** 47:25

**cost** 53:4

**Council** 38:17

**counsel** 8:13 43:19 44:2,4 68:15 69:3,7 98:18,20 157:6 169:23 170:7,8,12 171:4 180:10 211:23 225:7 229:18 233:14 235:5 248:20 287:7, 25 307:5 358:15

**counsel's** 67:8,11, 18 68:10 69:5,18 70:8 287:4 370:19 371:7 372:9 379:23

**Counselor** 20:12 128:1 136:18,24 142:21,24 182:25 183:20 189:15 243:9 245:10 296:19 297:1,4 303:12 325:21

**counsels** 288:1

**Counterintelligence** 33:10

**counterpart** 26:11

**counterparts** 20:3

**countersurveillance** 33:9

**counterterrorism** 92:9

**countries** 194:6 197:1

**couple** 17:3 28:2 55:19 66:14 70:5 113:21 140:9 162:15 166:24 200:17 237:8 246:18 299:11 316:17 331:19

353:11

**courses** 33:13

**court** 9:5 11:1,8 234:8

**cover** 53:6 350:13

**covered** 143:14 194:19

**covers** 23:12 239:13

**craziest** 188:16

**create** 32:25 161:6

**created** 52:14,19 89:11 197:21 341:8, 16 350:9 384:10

**creation** 89:14 123:21 285:7 290:22 341:22

**creative** 28:7

**creature** 282:20

**credential** 381:10

**criminal** 200:24 201:13 202:5

**criteria** 286:15 311:14

**critical** 212:24 213:1

**Cromer** 42:22 49:11 50:17 57:2 59:22, 24,25 62:7 65:21 66:25 74:14 98:8,16 99:8,22 279:18

**crossed** 340:18

**CST** 350:3

**cubicles** 193:14,15

**cuff** 71:11

**CURE** 113:14 123:8 246:23 251:8

259:25

**current** 47:14 112:10,22 125:20 243:2,3,7 244:10 351:4 354:9 363:12 376:17 378:22

**Customs** 281:13 283:8

**cut** 111:24 359:8

**cutting** 144:9

**cyber** 18:10

**cybersecurity** 366:14

**cycle** 245:12

---

### D

**D.C.** 28:6 32:24 33:17 96:15 225:17

**Dahl** 37:24 63:22

**daily** 23:10 36:12

**Dallas** 32:18

**Dan** 128:2 189:17 305:24

**danced** 116:24

**Daniel** 270:6 324:22 325:23 329:14

**Darkstar** 33:8

**data** 380:13,22,25 381:15,16 384:4,8, 19,23 385:3,10

**database** 259:23 262:5

**date** 8:9 21:17,20,22 34:18 37:11 54:9 60:6 75:11 81:12 100:18 148:3

149:13 151:18 183:23 203:15 214:20 233:9 242:13 270:8 274:12 281:11 307:12 355:23 358:12 372:22,25 377:19

**dated** 39:23 102:17 153:2 212:7 215:6 217:19 219:11 301:23 302:3 368:15

**dates** 88:6 250:15 260:14

**David** 291:25

**Davis** 43:11,15 45:16 49:3 56:2,3, 14 57:12,18 84:12 114:7,9 143:9,11 147:14 152:16,18, 25 153:10 154:2,16 155:22,24 156:1,5, 24 157:4,10,19,22 158:3,6 171:18 172:16 173:13,16 174:21,23 175:25 180:10,11 239:9 243:16 244:11,14 270:5 335:14 385:19,23

**Davis'** 56:15 156:17 177:3,8

**Davis's** 244:7

**Davis/peters/ burnham** 153:13

**day** 21:18 34:21 35:5,19 36:17 37:12 38:2 54:14,23 58:8, 10 59:18,25 61:24 62:10,14 68:8,21

75:17 79:10,11 88:20 89:9,12,20,23 96:25 99:2,7 102:2 103:22 110:25 119:12 134:4,5 138:12 139:13 152:17 153:9,21 154:21 155:6,12,16, 19,22 157:5 176:25 185:8 188:6 205:10 212:11 215:8 217:3 233:6 237:9 273:10 281:23 298:23 341:3 358:8 366:17

**day-to-day** 34:8 320:1,4

**days** 17:16 37:21 49:10 81:20 92:7 100:8 134:4 187:1, 17 188:15 315:8 316:17

**deal** 20:24

**dealing** 23:6 96:10 117:25 379:15

**deals** 379:23

**dealt** 38:15

**Deb** 212:11

**Deborah** 279:2

**December** 329:7 330:16

**decent** 224:8

**decide** 163:2,20 169:24

**decided** 32:8 120:12,15 163:5 171:7 199:25 204:25

**decision** 57:15

70:11 95:15 114:25 116:2,22 120:11,13, 18,19 149:21 150:6, 24 161:16 162:21, 23 163:14,16 164:11 165:14,21, 25 167:14 191:5,8 194:7,8 195:3,24 196:11 197:24 199:15 200:18 204:14 205:8,9,17 206:2,5,7,8,21,24 208:14,17 209:5,20 210:7,10,12,15,17, 22,23 214:3,4,11 215:18 242:15 255:22 269:11,12 270:13,19,24 271:3, 6,9,19 275:11 290:22 304:17 305:3 339:23 340:7 342:15 349:7 364:24,25 365:3,19, 20 366:8

**decision-** 240:7,25 241:3 290:16

**decision-makers** 290:14

**decision-making** 240:22 241:22 242:6 271:25 291:2

**decisional** 195:6 367:3

**decisions** 164:8,9, 20 181:19,21 194:2 196:9 207:1 208:21 209:18,21 276:21, 24 277:2 286:19 298:15,17 300:19 312:12 342:10

**declaration** 47:16

120:21 306:25 307:10

**decommissioned** 38:11

**dedicate** 351:13

**deem** 229:7

**deemed** 229:4,22

**deeper** 313:15

**Defendant** 273:17

**defendant's** 82:25 98:15 167:3 202:23 273:17

**defendants** 8:24 9:1,3,4 83:1 87:20 149:15 229:3,22 234:2,4,6,7 274:1 337:14 358:22

**defense** 20:16 31:9 33:4,5

**deferred** 72:6

**defined** 376:8

**defrauding** 201:15

**degree** 18:12,13 31:5 95:1 157:12

**delay** 310:16,18

**delaying** 309:21 310:12

**delegate** 303:20 304:1

**delegated** 72:8,15, 23 109:25 135:18 139:14 141:8,22 210:1 214:16 273:14 302:17 303:6,7 344:11 362:11

**delegating** 273:3 303:23

**delegation** 72:18 73:2 75:6 125:20 214:25 301:21 302:2,14 305:16

**delegations** 265:3, 9,10 301:20

**deliberately** 148:19

**deliberations** 194:21 208:24

**deliberative** 116:7 143:14 194:15,19 195:5,12 208:19,22 239:12,14 240:7 241:2,6 302:20 303:3 304:4,23 364:23 385:15

**deliver** 133:18

**demobilized** 38:10

**demonstrate** 166:2

**demonstrates** 205:8,22

**deny** 105:9 276:3 280:16 308:17

**department** 15:23 16:2,4,9 18:25 19:2, 11 20:15,16 21:25 22:1,9 24:9,22,25 25:2 26:4 32:18 34:2 38:18 39:21 45:22 46:19 58:22 92:9 112:10,16 125:12,18 127:5,17 128:11,19 130:14 142:21 145:23 190:13 209:24 216:17 217:2 229:5, 17 230:4 232:13

233:2 235:8 238:14, 20,22 241:18 243:8 244:3,20,25 248:14, 19 262:1,11,12 266:5 270:25 271:4 283:10,16,25 284:2, 4 285:5 287:14,15 290:20 295:10 296:4,25 301:4 303:21 305:19 306:1,5 318:15 326:3,10,15,20 327:3,14,20 328:3,4 329:16,24 330:11, 15,21 331:25 333:24 337:18 346:5,7 347:1,21 348:23 349:9,20,23, 25 351:12,17,18,25 352:4,9 356:13,21 360:3,4,6 362:4 363:2,9,15,17 364:3,6 366:9,13,25 367:8 372:19 373:8 375:2,4 380:14,19 381:3,5,10 383:10 384:24,25 385:1

**Department's** 229:8 326:13 331:21

**departments** 84:23 366:23

**departure** 223:18,24

**depending** 97:6 118:18 274:17 372:13

**depiction** 159:15

**deponent** 14:10 16:16 40:14 48:19 61:3 62:16 63:9 65:19 67:12,15 76:9,14 77:8 80:2

85:1 87:5,10,12 88:2 93:11 94:9,11 99:19 101:21 105:6, 8 111:7 113:22 114:24 116:19 120:17 122:18 125:6,16 126:7,17 127:2,20 128:8,18 129:17 132:20 139:23,25 142:11 145:8 147:4 152:1 154:14 156:11 157:10,25 159:9 160:1 161:5,19 163:20 166:11,17 172:9 173:8 175:5 176:23 177:7 180:5, 17,25 181:5,10,12, 15 182:4,8,11,15 184:3,6,11,20 186:6 187:21 189:6 192:9 196:15,17 197:14, 16 201:2,8,25 204:17,20 207:13 211:20,22 215:4 217:8 218:19 220:15,17,20 223:5 224:12,24 225:4,6, 7,8,12,14,17,19 227:8,9 228:7,12 230:9 234:15 238:14 239:20 240:10,20 242:9,19 243:2,6 244:3,9 245:18,22,25 246:2 249:4,18 251:21 252:3,7,15,19,22 254:21 256:2,4,22 257:23 259:12,19 262:4,19 263:8,17 264:7 265:18,21,24 266:25 268:14 269:3 270:1 271:14 272:14,25 274:12,

16 276:2,15 278:9, 11,23 279:14 280:20 281:20 283:16,21,24 284:12,14,18 285:5, 11 286:2 287:3 288:13 289:4 290:20 291:11,15, 18,23,25 292:7,12, 20 294:21 295:8 298:1,9 299:7,25 301:2 302:11 303:10 305:2 307:4, 8,15 308:16,23 310:7,9 311:8,20 314:19 315:23 318:12 319:1,10,23 320:7 321:2 322:8 323:19 325:9 329:6 330:10 333:5,18 334:5,18 335:1 336:21 338:10,24 339:10 341:24 342:9,18,21,24 343:7,13 345:1,13, 18,20 347:16,19 348:20 349:18 350:22 353:2 354:3, 5,20 355:4 356:4 357:12 358:7,14 359:14 360:3,19 361:2,15,19 362:7, 20 365:2 367:5,7,22 368:24 369:10 371:13 372:5 374:2 375:18 377:1 378:12,25 379:2,10 381:21 382:11,22 383:10 384:7,23 386:14

**deponent's** 276:13 296:3

**deponents** 178:12

**deponents'** 101:19

**deposed** 156:7

**deposition** 8:10 10:11,13,18,23,25 12:15 15:14,18,24 16:3 17:14,20 44:23 46:8,12,14,19 47:16,21 92:18 132:7 144:22 164:17 207:17 208:1 225:1,3,6 226:3 227:15,16,18 229:9,10 231:18 232:13 233:1,11 235:1,6,7,8,24 236:10,19,23 334:3, 14,22 335:22 338:2 340:16 361:13,24 387:24 388:2,5

**depositions** 229:16

**deputies** 36:14 107:23 122:14

**deputy** 23:1 30:6 72:8 83:20 91:15,16 93:21,25 98:17,19 107:22,23 108:10 122:7 128:2 135:19 139:14 140:4 141:1 142:2 183:1 189:17 203:21 205:1,2 214:23 222:10,22 309:20

**derived** 332:4

**derogatories** 167:11

**describe** 17:24 20:21 22:2 58:18 115:14 212:5 237:4

**describes** 187:17 238:7

**describing** 29:1 298:19

**description** 19:22 22:19 27:16 51:15, 19,22,23 52:3 172:5 177:8

**descriptions** 22:18

**designate** 115:11 120:12,15 179:24 303:19

**designated** 53:23 54:9,15 56:23 60:1, 2,8,11,12,24 84:22 90:16 124:22 127:14 164:25 165:10

**designating** 55:15

**designation** 57:5 60:12 121:6

**designations** 197:1

**desk** 119:13

**detail** 51:7,9 52:5,6, 9,19,21 53:4 68:19 70:9 155:14 300:11 317:11 330:18 331:24 343:19

**detailed** 49:23,24 50:2,18 51:8 52:13, 15 53:12 118:9 177:15 307:2 320:23 321:3 337:17

**detailee** 50:10,12 52:3,13 98:5

**detailees** 41:21 49:23 51:6,21 63:3 73:15 83:12 94:14 97:22 149:4 157:18 173:22 175:5,7

177:24 190:16 218:12,14 271:15 279:15 285:7 290:12 316:19 321:2,10,13

**detailing** 350:6

**details** 52:25 73:1 80:5 91:7 94:13 96:13 156:20 177:8 199:20

**determination** 286:16 341:1 377:25

**determinations** 191:3

**determine** 158:21 286:18 304:15 309:25

**determined** 286:11, 14 313:22 314:6 374:24

**determining** 56:5 227:11 276:10

**developed** 27:1,2,6

**Development** 12:1 21:11 75:9 220:19

**development-related** 383:6

**develops** 326:2

**DHS** 281:23

**dictate** 373:20

**dictates** 209:13 322:9

**die** 119:13 200:25 202:6

**difference** 204:11 227:4,16 230:6

**differentiate** 332:10

**differentiating** 370:25

**differently** 377:17

**digital** 37:4 100:2,14 101:6 102:6 103:16 104:5,24

**digitized** 385:10

**digits** 45:11

**dignitaries** 29:17

**diplomacy** 23:19

**direct** 20:22,23 36:19 91:18 109:3 125:19 131:25 158:6 175:25 217:10 254:16 288:25 290:6 294:3 324:4 339:20 351:7, 14 352:20 362:10 368:19 369:25 373:18 375:3 376:7, 17

**directed** 105:3 151:4 168:23 169:15 170:11 203:24 237:15 356:18

**directing** 146:25 258:3 301:16 311:4 336:14

**direction** 103:10 125:2,13 126:4,7,25 149:24 169:6 174:10 203:2 214:14 264:24 322:12,14

**directive** 110:1

**directives** 23:9

119:21

**directly** 20:19 24:12 60:10 112:19 127:21 129:4 136:22 163:24 178:17 198:14 261:2 346:24 362:20 373:3 376:21

**director** 93:21 102:16 122:7 127:24 189:14 266:4

**Directory** 294:2

**directs** 41:9

**disabilities** 374:18

**disagree** 94:11,18 149:13 178:18 325:10 343:9

**disappears** 66:2

**disasters** 27:23

**disciplinary** 273:19 274:6

**disclaimed** 343:4

**disclosures** 286:5

**discontinue** 99:2

**discontinuing** 211:6

**discovery** 14:13 227:7 250:15 333:25

**discrete** 332:13

**discretion** 377:23

**discuss** 138:14 225:4,7 226:13 277:23 278:3,16

**discuss-type**

208:17

**discussed** 47:2 156:20,21 193:20 226:17 236:8 263:21 271:22 273:18 274:5 281:7 326:8 327:21 357:23 379:11

**discussing** 169:22 199:24 216:3

**discussion** 47:19 192:23 225:9

**discussions** 68:22 190:8,14

**disorganized** 292:13

**disprove** 280:22

**dispute** 89:22 98:20 103:7,12,13 111:20 153:18 358:12

**disseminated** 132:11

**distinct** 338:3

**distinction** 137:9 366:10

**distinguish** 160:14

**distinguished** 199:8

**distinguishing** 331:14

**distributed** 193:25

**District** 228:6

**dive** 313:14

**doc** 167:6

**doctors** 374:17

**document** 14:17 44:24 45:1 47:3,20

48:6 51:6,13,15 52:5,14 55:14 60:5, 7 70:21 71:13,16,23 72:25 75:1,5,11,14, 17,24 78:11 81:2,3, 8 89:2 91:13 93:1, 20 94:1 102:10,15 103:3,4 110:18 121:5,6,7,11 123:16,18 140:1,8, 12,20 141:10,14 142:17 146:7,9 150:1 152:3,15 158:21 162:3,5,7 164:13 165:24 166:2 169:17 186:11,13 189:11, 25 197:12 200:16 205:16,21,24 207:4 214:16,21 215:12, 15,20 218:24 220:1 226:4 251:16,18 253:24 263:21 264:3 272:8 273:8 277:9,11 279:15 283:6 289:23 290:22 291:3,22 303:7 306:8 322:22 325:7 333:23 343:21 344:1 348:13 350:6,14,16 355:7 368:5,11

**documentary** 204:7

**documentation** 44:7 91:5 166:4 175:18, 20 196:19 205:7,16, 25 214:13 281:1 298:16 378:14

**documented** 125:23 204:15

**documents** 13:20 14:12 17:23 48:5,7

51:10 52:6,10,17,18 54:8 73:3 81:24 89:5 91:24,25 121:14 122:24 123:12 132:7 134:20,25 135:6 140:19 145:25 149:23 151:21 166:25 169:10 182:5 208:4,8 219:6 224:22 226:8,12,13 227:21,23 235:16 236:1,2 250:5 273:2 290:3 305:16 317:19 318:13 360:9

**Dodoo** 233:24

**Doe** 8:11 233:12

**doesn't** 328:22

**dog** 25:10 26:1

**DOGE** 41:4,10,22 42:17,25 43:2,3,6,9, 15,16 44:8 47:9 48:15,21,23,25 49:1,8,11 53:14,18, 23,24 54:23,25 55:18,22 56:5,23 57:1,6,15 58:16,19 59:8,20 60:1,8,13, 24,25 61:6,7,9,20, 25 62:1 63:3 66:24 68:1 69:23 73:9,14, 15 74:9 79:4,23 80:3,4 83:12,18 84:16,21 85:8,20 88:16,19 89:9 90:2, 5,6,13 92:13,21,23 94:22 97:18,20,22, 23,25 98:2,22 99:3 100:1,13 101:5 102:5 103:15 104:20,25 109:13

126:24 127:3 149:4, 5 151:5,18 152:9 155:11,14 156:2,25 158:2 161:17,23 162:18,22 163:15 171:21 173:21 175:1,5,7 176:10 177:12,14 178:5,16, 19 179:1,8,16,20,24 180:1 190:7,15 193:16 199:10 216:7 218:12,15 248:3,4,14 270:22 271:8,15 277:22 278:2,16 279:8,14, 19 284:25 285:7 290:5,11 301:13,14 308:8 309:17 316:16,19 317:11, 16,25 319:5 320:4, 7,18,20 321:7,13,15 322:13,16,17 323:10,23 341:8,16

**DOGE's** 290:2 315:18

**DOJ** 13:15

**dollars** 314:14

**domestic** 186:14 289:18 352:11

**Don** 32:21

**Donald** 75:10

**door** 29:14,24,25 30:1,10 103:25 106:2 281:16

**doors** 29:16 104:3 106:8,17 129:4 260:4

**dotted** 340:18

**double** 132:3 175:16 190:11 215:5 250:9

**doubt** 70:22

**downward** 150:11

**dozens** 127:11

**DPP** 143:23 239:21

**draft** 103:4 123:13 197:23 271:6 307:22 346:11 347:6,11

**drafted** 103:10 197:18 200:7,9 270:20 272:8 306:12,17 343:23 344:1 346:8 348:4

**draftee** 197:19 307:25

**drafter** 290:1 344:2

**drafting** 200:13,15 347:12 376:3

**drafts** 346:25

**drawing** 16:13

**DRC** 353:13

**drink** 283:22

**drop** 62:24

**dropped** 316:20

**duly** 9:16 234:18

**duplicate** 39:14

**duties** 19:22,25 22:2,17,21,22 23:12 33:23 50:15 52:6 58:19,20 72:8,15,23 108:10 112:19,22 118:17 136:21 167:18 179:13 196:21 203:21 210:4 214:16,23 273:4,14 301:21 302:2,14,18 303:1,

6,20,24 304:1,2 312:1 344:11 378:22

**duty** 25:18 267:8

---

**E**

---

**E-N-R-I-C-H** 86:1

**earlier** 56:25 57:4 61:12 75:13 123:25 169:4 175:24 181:1 222:7 254:6,19 258:8 314:24 329:4 336:15 379:11

**early** 70:13 77:10 128:21 134:17 237:10 247:13,16 274:14,16 285:20 307:13 376:1

**easier** 25:21

**easiest** 301:3

**East** 96:10

**Eastern** 249:16 257:10

**Ed** 79:21 80:2

**edification** 102:22

**edit** 96:20,21

**educate** 226:22

**education** 17:25 18:2 187:6 226:23

**educational** 17:24

**EEOB** 38:15 43:19 319:25 321:18

**effect** 129:3 193:16 209:19

**effected** 358:23

**effectuate** 370:3 376:20

**effectuated** 167:15 358:20 366:8 376:21

**efficiencies** 85:9

**efficiency** 39:22,23 248:14

**efficient** 59:4

**effort** 82:22

**Eisenhower** 38:16 43:13

**element** 366:14

**elevate** 210:5

**elevated** 97:1 105:3, 10 122:10 123:7 124:5 137:14 221:9 222:9 247:4 250:2, 25 251:12 259:14 260:9

**elevation** 247:2

**elevator** 66:8

**eligible** 352:1 374:12

**Elon** 8:12 101:22 104:10,14 105:14 106:22 109:5,7,11 144:11 154:22,23 155:8,9,13 158:5,6 172:22 176:1,24 181:21 185:3,10 206:24 207:5 216:3, 5 217:19,22 218:10, 13 233:13 243:12 244:17 245:2,3 270:23 271:1,5 275:10,13 276:3,6 278:3,6,17,18

279:9,22 280:1,25 281:20 283:17,18 284:3 285:6 290:21 300:11,18 301:6,9, 10 303:22 315:19, 24 316:4 321:10 322:15 326:4 327:8, 10

**ELR** 342:10,12

**email** 51:2 64:4 65:3,7,10,11,21,25 67:3 78:6 85:24 86:6,8,9 93:21 97:6 107:14 110:13 124:14 142:18 143:8 144:10,17,20, 21 146:5,23,24 147:13,21,24 148:3, 7 153:1,7 158:20 161:21 181:13,19 182:24 183:7,11,16 186:13,17 188:9 189:12,17 190:5,9 191:11 193:20 200:1 202:12,24 203:2,25 204:9,21 212:14 214:15,21 215:8 219:2,7,8 221:14,19 224:4 238:2,3,19 239:4 241:18 244:15 245:5,8 246:15 247:9,11 249:6,15 250:7,24 252:4,8,9 253:8,16 256:16,18 257:12,17 258:1,9 259:3 260:17,24 261:2,14 264:8,9, 13,14,15,18 266:3,7 267:7,9,12 268:5,25 270:3,9 292:15,25 293:2,4,13,20,21 294:16 296:7

297:14 298:24 308:11 309:10,11, 16,17,23 315:13 322:23 323:8 333:14 341:3,8,15, 21 343:16,17,19 385:19 386:4,22,24

**email's** 258:14 293:5

**emailed** 79:13

**emails** 15:20 61:23 67:3 82:1 108:19 123:20 127:22 132:2,12 135:4,7 136:9 145:15 148:4 149:22 156:15 161:22 198:22 250:13,14 308:17 322:25 385:4

**embarrassed** 284:14

**embarrassing** 283:25

**emergency** 23:24

**emphasize** 176:1

**employed** 18:22,24 337:17 351:9 368:20 372:23 377:17,20

**employee** 30:18,19 50:17 56:17 82:7 156:5 157:6 187:4,5 237:2 243:13,15,16 312:6 340:19 342:4 343:3

**employees** 25:6 146:17 216:10,14 270:10 271:10 324:25 337:21 359:7 369:6 372:22,

24 373:7 375:8,23 376:8 377:10,14,18

**employment** 21:8 243:3,7,21,24 244:10 342:4 372:14

**en** 285:24

**enabling** 30:14

**enacted** 362:2

**encompassed** 178:20

**encompassing** 337:4

**end** 30:11 39:22 40:4 47:5 61:13 176:25 185:7 191:14 209:10 217:25 223:16 265:13,14 277:15 279:9,22 280:6 281:8 285:1 363:22 373:2,3

**ended** 66:11

**ending** 277:5

**ends** 52:19 252:24

**enforced** 85:23

**enforcing** 85:21

**engage** 225:9 309:24

**engaged** 154:2 375:11,23

**engaging** 154:19 376:4

**Enrich** 86:1,3,10,18 309:4,5,6,24 311:9 312:15,21 313:5 315:13

**ensuring** 84:22 351:13

**entailed** 56:7

**entire** 187:14

**entirety** 213:20,22 214:1

**entities** 356:13

**entitled** 375:11,24 376:5

**entity** 134:25

**entrance** 281:15

**environments** 105:24,25 110:16 219:20 258:17 261:7

**EO** 55:18 56:4 57:6 68:3 82:6,22 84:17, 23 85:4,16 86:5,11, 15 178:5,16,19 179:8,16,20 180:1

**EOP** 50:5,7,20,25 51:3 142:19 187:5

**EOP/GSA** 50:8

**EOPS** 319:25

**EPA** 282:18

**equity** 20:15 209:4

**equivalent** 248:20

**Eric** 368:12 375:18, 25

**Erica** 264:11

**error** 14:3

**errors** 344:21 345:2

**ES** 30:13

**establish** 41:10 289:16

**established** 360:21

**establishing** 39:20 41:4

**et al** 8:11,12 233:13

**ethereal** 98:3

**ethics** 64:11,16

**evaluation** 83:2 86:11,19

**evaluations** 86:4 97:21

**evening** 70:13,17 73:7,24,25 74:3,10 111:16 134:17 139:2 212:13

**events** 115:10,12 164:20

**eventually** 97:7 251:5 384:12

**exact** 60:6 149:12 158:1 252:25 253:1 352:5 366:21 381:12

**EXAMINATION** 9:19 234:21

**examined** 9:17 234:19

**Excellent** 128:18

**exchange** 64:1 144:17,20,21 219:7, 8 292:25 298:24

**exchanged** 66:24

**excited** 38:22

**exclusively** 213:12

**excuse** 46:15 75:3 76:9 192:3 201:22 207:9 222:20

244:18 271:10 275:14 294:1 308:3 337:19

**excused** 118:1

**execute** 149:6 289:16

**execution** 148:9 149:1

**executive** 15:21 18:2,6 30:11,13,14 38:16 39:10,17,20, 22 40:1,22 41:2,3 43:12,13 47:9,10 49:21 50:22 58:25 66:4 72:5 81:5,8 82:3 85:6,8 94:21 98:2 117:13,21 142:19 177:1,12 179:1 198:19 213:4 262:22 286:14 305:25 306:4 349:5 356:7 361:5 362:3 364:11 369:24 372:8 382:16 383:2, 4

**exercise** 214:6

**exhaustive** 190:23 371:18 372:6

**exhibit** 15:5,7,10 38:23,24 39:4,16 40:22 46:15 48:10 55:19 74:18,21,22 80:22,23 81:1 87:23,24,25 88:4 139:22 142:3,8,9 145:5,7 181:3,4 182:1,3 186:3,5 189:3,5 197:17 217:4,5,7 218:16,18 219:2 221:14,19 236:3 237:23,25

239:3,4 245:15,16, 21 246:9,10,11,14, 15 250:14 251:23 252:13,16,21 253:7, 16 254:7 256:20,22 257:2 258:4 263:13, 14,16 264:6,7,8 266:14,19,22,23 267:5,7 269:21,23, 25 272:18,19,23,24 277:9 283:6 289:1, 2,6 291:8,9 292:4, 18 299:1,4,5 301:16,17 308:20, 21,24 339:7,8,12 343:10,11,15 345:15,16 346:2 350:5,18 355:1,2 367:24,25 368:17 385:12,17 386:7,8

**exhibiting** 266:21

**exhibits** 39:14 181:6 252:3

**exigent** 374:25

**exist** 53:25 54:2 96:12 175:14 369:23 379:6 381:4 384:11 385:6

**existed** 313:21

**existence** 339:3

**existing** 313:11,20 362:9

**exists** 26:19 113:8 205:22 364:12

**exotic** 374:17

**expect** 248:9

**expectations** 10:12 192:4,5

**expecting** 315:7

**expedited** 231:4,7,8, 9

**experience** 247:15 352:13

**experienced** 374:12

**expert** 95:6 113:23 354:6

**expertise** 24:11 213:6 351:22 378:4 381:22

**experts** 380:1

**explain** 20:4 22:24 33:5 192:24 280:21 380:9

**explained** 111:12

**explaining** 228:10

**explanation** 208:13

**expressed** 287:15

**extent** 132:25 170:22 172:4 194:21 195:5 239:13,17 244:1 275:25 288:6 304:11 328:15 334:25 338:9 361:14 364:24 380:18

**external** 285:23 352:2

**extra** 31:6 190:12

**extremely** 31:18 55:6

---

**F**

**face** 68:16

Case 8:25-cv-00462-TDC   Document 229   Filed 06/03/26   Page 191 of 720

ADAM KORZENIEWSKI
95350
March 26, 2026
416
30(b)(6)Index: facilities..floor

facilities 99:9 185:14,18 319:25

facility 363:11

facing 29:13

fact 27:22 28:5 33:18 49:2 62:12 96:24 110:3 130:7 131:12 140:25 141:2 190:23 197:23 204:20 224:6 269:14 313:8 381:12

facts 170:4,5,6 209:7 281:19 290:18 315:21 333:16 334:16

factual 226:25

factually 281:22

Failure 33:2

fair 146:7 320:15 372:3

fairly 178:20 190:23

falls 262:20

false 312:13 313:8

familiar 39:25 40:24 41:1 52:9 57:19,25 58:3,5 81:14 85:24 86:6,17 97:8 106:14 140:18 152:11 271:21 292:16 308:16 309:7 342:9 343:21 368:5,7

familiarize 245:21

FAQ 322:23

Farritor 42:23 45:15 49:10 50:3,11 59:21 62:8 84:8 89:20 90:19 92:14,22

94:13 97:1 100:1,12 101:5,8 102:5,19 103:16 104:11,20 105:3,9,19 106:23 108:6 109:10,11,17 110:8 122:9 123:22 124:4 152:11,12 153:8 158:17 159:4, 18,22 160:25 219:4, 16 222:8 246:22 247:1,3 251:1,5,10 253:3,8,18,21,24 255:10,11,21 256:7 257:18,24 258:11 260:10,24 270:6 279:16 293:6,23 317:1,13

Farritor's 105:16 106:16 108:3 158:14

fascinated 312:24

fascinating 26:16

fast 67:24 214:9 266:21

featuring 186:14

February 19:4 21:7 36:11 45:4 49:8 58:2 133:8 138:19 140:7,11,23,25 141:7,16,21 151:15, 16 152:8,14 153:2 161:12 164:22 167:14,16 180:21 183:23,24 185:8,10, 19,24 186:24 190:6 191:23 200:1,23 202:10 203:4,16,19 206:23 212:7 216:25 217:20 219:11 221:23 237:11 265:6 266:3

267:17 268:16 270:3,4 273:5,7,15 274:15,17,23,24 277:17 279:23 280:7,12 281:11 283:4,13 285:2,20, 21 306:11,12 307:13,14 308:3 309:14,15 317:11 323:9 335:21 339:18 340:13 348:25 354:23 355:23 357:2,6,14, 15,22 358:21,23 359:3,6,19 360:5

fed 317:3

federal 81:14,19 282:14,21 351:4 352:18 363:19,21 364:8 374:11 381:25 385:6

fee 231:19

feeding 217:23

feel 91:22 156:12

fights 366:20

figure 72:5 162:25

figured 39:8

figuring 209:2

filed 228:5

filibuster 166:20

final 30:10 197:6 264:15 343:20 364:3,24,25 365:3, 19,20 366:8

finally 66:15

finance 31:12 380:7

financial 18:5,7 95:25 97:13,17

370:13 380:1,2,22

find 24:13 28:7 48:6 51:12 56:19 59:2 66:1 67:2 111:9 161:20 254:3,9 268:1 358:17

finding 24:2,7 66:15 199:19

fine 12:15 95:12 146:24 178:23 192:2 195:2 224:23 226:11,24 231:13 246:1 274:4 292:10 299:3 334:4 358:5

finer 329:9 330:17

finish 11:3 48:6 64:14 153:24 162:13 241:13 242:4 323:20 328:9

finished 375:20

fire 22:8

firing 22:11

firm 32:25 377:24

firms 313:23 315:6

fiscal 107:19 351:4 373:3

fit 286:14

fix 40:9 119:4 228:19

flip 132:2 171:8 250:20 268:3

flipping 123:15 166:24 169:18 253:13

floor 28:23 29:4 66:6 193:10

**flooring** 28:24

**floorplan** 371:17

**Florida** 31:20

**FO** 248:5,15

**focused** 108:2 160:20 174:7 229:2, 19 240:8 338:17 385:23

**focusing** 117:20 159:13 320:18

**folks** 16:24 30:14 32:21 61:12 69:3,20 73:15 97:12 119:25 131:23 139:10 147:1,18 152:23 164:6 188:12,20 196:10 205:18 210:17 213:20 246:18 257:20

**folks'** 104:6

**follow** 145:13 201:23 312:7

**follow-on** 89:5

**follow-up** 43:25 167:24 171:15 229:6 278:20

**foodstuffs** 133:19

**forbid** 284:18

**force** 273:19 274:5 289:17 351:5

**forced** 352:3

**forces** 275:7

**foreign** 23:18,19 24:21 29:17 59:1 81:6 85:7,17 117:8, 10,21 131:6 189:15 193:17,18,23,24

198:16 199:11 266:5 309:3 346:6 349:4,8 351:21,23 352:11 360:22 361:3,16 362:21 369:14 370:21 371:15 373:18 375:1,3 376:17,22 382:18 383:11,25

**forget** 28:13

**form** 77:7 94:7 114:15,22 125:3 128:7 129:13 156:4 157:8 161:18 180:3 184:17,24 195:21 207:11 257:21 262:2 263:6 283:14 285:3 318:8 333:14 334:16 353:25 371:10 378:11

**formally** 148:8,20, 24

**formed** 114:17 361:5

**forms** 237:19

**Fortunately** 20:20

**forward** 23:23 161:7 197:7,21,25 229:10 230:3 253:10 275:12 276:11 282:1 328:23 357:19

**forwarded** 132:12

**forwarding** 261:2

**forwards** 265:1

**found** 77:10,13 89:1 107:14 211:25 212:12 282:6 386:14

**foundation** 125:15 126:6 242:25

**foundational** 361:20

**frame** 65:15 73:6,22 77:10,19,20 88:15 104:16 121:9 122:2 127:9,25 134:17 135:4,16 274:15 317:12 326:16,19 327:13,19,22 328:2 329:1,9,14,23 330:2 350:10

**Franken** 349:22

**Frankin** 350:4

**frankly** 70:1 113:24 118:20 130:3 132:23,24 136:5 301:11 316:2

**Frederick** 287:8,23

**free** 71:12 88:25 312:2 387:3

**frequency** 329:10, 17

**Friday** 99:7 123:11 128:21 137:20,24 138:5,10,22 139:1 233:4 247:12 253:2 281:11 283:4

**friends** 13:22 51:11

**front** 13:20,25 22:17 29:15 44:7,19 46:5, 13 47:21 69:20 70:4 83:8,9 93:23 110:22 118:11 123:16,18 128:9 134:25 164:13,15,16 175:11 198:13 213:3,11,15 223:11 248:15 289:7 292:2

310:14,20 311:14 316:5 329:16 336:11 343:19 346:11 370:7 371:5 372:7 381:7

**froze** 254:23

**frozen** 40:3,6

**frustrated** 31:18 155:24

**frustration** 156:15

**fulfilling** 382:7

**full** 9:23 13:24 21:18 53:9 66:10 95:14 123:22,23 178:11 193:15 248:7 249:9, 12 253:19 257:25 260:22 264:23

**fully** 12:12 17:5 210:22

**function** 23:15 24:16 310:14 335:25 365:21,22 371:7,8 376:16

**functional** 312:19 382:5

**functionally** 23:3 34:17 36:6 53:25 54:2 70:23 72:4 317:9 366:15

**functioned** 28:19 117:13

**functioning** 131:5

**functions** 24:22 25:3 58:23 126:21 362:4,8 363:1,5,23 364:13,19,22 366:10 367:17 369:22 375:1

378:23

**fundamental** 145:21

**funds** 85:17

**future** 329:4

**FWD** 264:8

---

### G

---

**G-U-Y** 287:10

**gain** 221:9

**gap** 61:4

**Garden** 320:12

**gave** 37:13 39:7 60:23 106:22 108:5 122:22 123:2 150:8, 21 159:22 160:25 161:9 167:21 168:3 169:5 197:6 199:1 276:6 342:17

**Gavin** 42:23 45:15 49:9 50:12 62:8 94:13 107:20,25 110:15 152:12 153:8 167:15,21 168:19 172:23 175:8 203:24 219:3, 5,15 253:11 258:15, 25 260:11 279:17 293:23 299:25 317:1,14 322:24,25 335:12 341:9,17 358:20

**general** 17:16 24:2 43:18 44:2,4 67:8, 11,18 68:9,15 69:2, 4,6,18 70:8 85:14 98:17,20 144:1 180:10 206:7 212:8 248:20 287:3,7,25

288:1 300:22 323:15 370:19 371:6 372:9 379:23

**generalized** 52:8

**generally** 19:25 65:14 96:3 259:16 303:13 307:17 337:5 338:19 378:5 384:19

**gentleman** 16:4

**gentlemen** 17:8,19 387:20

**George** 216:19

**germane** 69:15

**giant** 29:7

**give** 9:9 14:6 44:15 55:9 62:13 66:6 104:11 110:8,11 139:25 151:3 158:18 159:5,19 160:6,7 167:19 173:16,18 174:10 208:21 214:14 234:13 250:2 251:22 261:24 322:12 326:20 327:3 328:5 336:18 362:22

**giving** 38:12 161:7 221:23 222:20 354:11

**GLAAS** 293:24

**glad** 26:19

**glance** 14:7

**glass** 29:24

**gleaned** 70:8 89:8

**Gleason** 57:25 58:4 181:1

**global** 309:18 311:10 312:22 365:5

**globally** 339:21

**Gmail** 145:22 267:10

**goat** 61:13

**God** 9:12 68:16 113:5 234:15 259:17,25 284:18 363:19

**God-like** 95:15 124:5

**God-tier** 96:23

**goings** 335:24

**golden** 284:12

**Gonzalez** 8:17 233:18

**good** 9:21,22 10:16 11:6,7,12 12:19,22 19:23 31:2 33:3 40:14 45:8 61:22 88:8 89:24 119:17 121:18 145:3 156:11 186:19 196:14 209:15 224:12 231:15 247:22 248:9,12,25 266:18 300:15 307:10 311:11 312:4 315:14 345:25 351:1 377:1

**Google** 317:25

**Gosh** 299:19

**gotcha** 32:3 95:5 278:23 306:24

**Gottlieb** 65:3,13,20 66:2,5,9 77:22

111:11 118:1

**Gottlieb's** 65:10,11 188:9

**government** 25:6 39:22,23 49:25 56:17 58:23 59:3 67:1 82:7 85:11 113:15 116:1 157:11,13 176:3 188:17 201:16 223:18 243:4,7,13, 15,17,21 244:7,11 248:14 262:20 282:13 351:10 357:1 366:19 373:13 374:11 376:8,9 377:13 380:2

**grab** 16:25

**grabbed** 64:15

**grammar** 209:7

**grant** 25:16 26:13, 14 123:16 223:7 261:21 262:6 300:24

**granted** 100:13 101:5 102:19 104:20 153:4 160:9 262:7 263:9

**grantees** 82:23

**granting** 107:24 110:5

**grants** 219:21 258:18 261:8 306:15 325:2 374:7

**grants'** 337:23

**grateful** 295:1 296:12

March 26, 2026

**gray** 34:1,6,14,23 35:4,8,9,10,13,20 41:21 42:17 54:19 55:2 56:7,22 57:5 59:14 60:19 70:18 71:4 72:11,15,19 73:21 74:2 76:5,25 77:13 78:15 82:18 96:24 107:7,21 110:13 111:15,23 112:1 114:12,18,19 115:2,15 116:3,22, 23 118:16 120:14 121:8,12 122:13,20, 22 123:2 129:6,9 130:7,12,15,23 131:11,12 132:14 134:11,18 136:1,2 154:3,17,24 155:4, 8,21 188:4 190:20 193:5 219:3,9,14,16 221:18,23,25 222:11,21 223:12, 15,19 252:10 253:8 258:7 259:10 260:24,25 261:9,14 262:25 266:11 268:7,15,23 269:11, 12,14 270:5 275:2,4 276:18 293:6,22 296:8 325:25 332:8, 12

**Gray's** 60:22 135:4

**great** 9:15 10:2,11, 18 11:8 14:6,15 15:9 17:12 22:20 33:25 99:4 131:21 217:24 247:24 263:23 267:5

**greatly** 187:1

**gross** 283:18

**ground** 10:25

**grounds** 51:3 322:9

**group** 129:8 153:13 350:8

**Grove** 288:21

**GS** 137:10

**GS-15** 137:15

**GS-15S** 137:8

**GSA** 28:19 38:12 41:22 50:2,3,10,12, 17 59:16,18 94:15 177:24 178:2 206:6 211:4,5 215:19,21, 24 277:4,16,24,25 278:24 279:7,10,23 280:7 282:4,22,24 283:7 285:1

**Guaglianone** 347:23

**guarantee** 55:9

**guard** 66:19

**guess** 70:15 95:24 136:7,9,18 250:14 281:10,16 282:3 331:4,16

**guidance** 226:1 311:23 312:7

**guidelines** 378:1

**guinea** 26:15,17

**guise** 85:8

**Gunsolus** 267:13

**guy** 31:20 124:13 167:10 259:20 287:8,23,24

**guys** 21:12 40:5 68:6 182:11 245:22

**H**

**half** 17:2 21:11 63:23 123:17 131:17 213:15

**hall** 112:20

**hallway** 30:2,11 237:7

**halt** 313:24

**hammering** 200:21

**hand** 9:8 87:23 142:6 234:11 312:16 348:2

**hand-in-hand** 370:9

**handed** 13:23 181:7 292:4

**handful** 369:12

**handing** 237:23 239:2 269:21 272:18

**handled** 106:4

**handles** 26:5,6

**handpick** 378:6

**hands** 210:3

**handy** 98:5

**handy-dandy** 13:21

**happen** 41:17 60:23 174:7 199:21 352:23

**happened** 62:9 63:6 65:6,9,15 77:9 82:15 100:7 109:6,7 111:19,21 122:3 130:4 163:15 174:5 279:11 327:2 332:9 359:17

**happening** 68:23 83:2

**happenings** 68:22

**happy** 33:5

**hard** 27:21 299:20 372:2

**hate** 347:22

**Havana** 24:18,24 379:16

**he'll** 347:22

**head** 11:11 17:6 28:14 34:2 39:18 41:9,13 52:10 55:22 60:6 66:13 69:22 71:19 73:19 89:16 94:16 96:9 113:6,7 117:17 125:17 136:5 141:18 190:7 196:18 198:24 213:14 216:21 288:19 307:5 312:20 321:20 347:23 361:4 368:25 369:11 371:16 373:2 374:8

**heading** 351:2

**headquarters** 151:19 152:10,17 153:16 185:11 202:14 204:14 205:9 207:10 210:11,23 211:16 214:2 215:19,22 216:2,5 281:13,15

**heads** 355:15 356:17

**health** 26:10 119:19 309:18 311:10 312:22

**hear** 125:7 248:9,25 312:25

**heard** 80:5,8,13 131:2 185:17 198:21 259:25

**hearing** 309:17

**heightened** 257:19

**Heimann** 76:8 232:4

**held** 20:10 72:19 287:14 321:16,18 364:6

**hell** 68:23

**helped** 31:16 64:22 314:5 376:2

**helpful** 20:18 230:13 274:13 307:9

**helping** 24:7,8 118:13 376:20

**helps** 96:15 323:24 340:22

**Hernandez** 107:23 123:21 219:16

**hesitated** 10:21

**hey** 66:4 131:20

**hierarchy** 125:23

**high** 31:8 208:20 209:13 294:11,24 384:20

**high-intensity** 245:13

**higher** 109:23 194:6 247:2 251:7 258:21 261:19

**highest** 36:7 70:24 72:3 124:23 127:6, 16 135:20 137:6

**highly** 208:20 380:4, 5

**Hill** 288:17 346:6,16

**hinted** 11:1

**hire** 21:17 339:20 351:7,14 352:20 368:19 369:25

**hired** 59:18 352:6 373:8,11,20 374:16 375:4 378:8,9,21

**hires** 324:4 373:18 374:10,12,13 375:3 376:7,17

**hiring** 22:7,11 37:22 351:20 373:22 374:2,3,5,20

**hirings** 367:9

**historical** 213:6

**historically** 158:5

**histories** 378:15

**history** 31:3 361:12

**hit** 120:6 370:23

**hold** 69:1 153:24 167:24 182:5 225:18 254:24 318:21 373:24 384:9 385:5 386:9

**holders** 20:15

**holding** 291:13

**holdings** 209:4

**Holler** 128:2 189:17 270:6 305:24 324:22 325:23 329:14,19,21

**Holmes** 117:7 118:8 198:13

**home** 25:5 26:1 50:11,16 51:17,20, 24 52:14 53:4,9 60:15 69:25 120:1 177:21 178:5 205:10 213:22 247:17

**hope** 55:7

**hoping** 187:3

**Hopson** 37:25 63:22 67:6,19 78:2,4,15 107:8 111:16 114:19 117:6 118:4 129:8 135:21 136:11 137:5,13,22 138:1,8,11,16,17, 21,23,24 191:20,23 198:10 274:25

**Hopson's** 193:7

**hot** 193:12

**hour** 17:2 63:23 133:17

**hours** 15:19 77:16 117:15 132:7 191:24 247:17 257:11 314:11

**House** 21:9,16,21 22:3,6,14 26:25 30:17,18,22,24 31:4 32:17 33:23 36:21, 24 50:24 51:3,14 76:6 81:21 93:25 94:2,12 119:15,22 157:12 158:11 192:3,5 238:8,10, 16,24 243:23 248:16 309:3 319:13,25 320:9 321:19 322:9 336:1 355:14

**housed** 365:22

**household** 28:3

**housing** 205:12

**hr** 24:15 66:12,13 110:15 219:19,22 258:16 261:6 269:15 341:3 371:5

**hr_announcements@usaid.gov** 341:16

**HRCONNECT** 219:23

**HSPD-12** 38:3

**Huffines** 32:22

**human** 22:8 26:10 268:22 284:17 370:1,3 372:8

**humanitarian** 198:25 308:13 310:1 312:11

**hundred** 53:6

**hundreds** 15:20 314:13

**hungry** 130:4

**hypothetical** 179:14

---

**I**

---

**i's** 340:18

**ID** 64:14

**idea** 112:7 136:10 144:16 184:7 201:2, 8 202:7 304:1 316:1

**identification** 15:11 38:25 80:24 88:1 142:10 145:6 182:2 186:4 189:4 217:6

218:17 245:17 263:15 266:24 269:24 272:20 289:3 291:10 299:6 308:22 337:15 339:9 343:12 345:17 355:3 368:1

**identified** 17:8 56:12 227:23 262:17 300:23 338:16 341:21 344:24 361:13

**identify** 39:16 45:8 75:5 142:16 146:7 182:22 186:11 189:11 218:24 220:22 221:2,4 246:11,14 264:3 267:5 322:22 323:22,24 339:14 343:15 346:2 347:14 355:8,11 368:10

**identifying** 326:11

**imagine** 32:9

**immediately** 62:25

**impact** 210:7

**impending** 183:5,6, 10,15

**implement** 82:2

**implementation** 82:6 85:4 178:4,16, 19 179:8,16

**implemented** 68:4 82:10 84:17,20,23

**implementing** 39:21 41:4 82:21 313:10 314:12

**implies** 332:9

**important** 49:20 59:15 208:20 230:12 298:20 380:2 384:23

**impression** 188:4,6 316:2

**improper** 97:13 226:7 227:12

**improved** 213:8

**inauguration** 37:18

**include** 22:20 32:15 92:14 127:23 131:6, 8 146:15 167:17 180:9 187:25 190:15,19,20 196:25 274:19 276:16,17,18 281:3 282:14 288:17 326:21 342:14 364:19 379:15

**included** 17:7 23:14 47:8 49:10 84:3,14 106:16 127:25 189:16 231:19 267:12 326:6 387:24

**includes** 83:10 100:24 173:24 216:7 221:3

**including** 41:11 63:2 65:13 92:22 104:19,20,24 106:18 168:6,24 190:18 219:2,19 246:16 261:6 275:4 293:25 324:24 337:20 355:15 373:17

**inclusive** 83:7,11 149:3

**income** 194:6

**income-based** 197:1

**incoming** 282:19

**incorrect** 51:18

**incorrectly** 179:14

**independent** 201:12 308:12,19 311:13, 17 360:21

**individual** 22:10 64:22 70:24 82:16 88:12 146:16 177:21 250:11,24 269:9 298:7 314:4 323:6 367:11 377:22

**individuals** 20:12 22:13 24:19,23 25:22 47:13 48:15 51:16 61:24 68:13 94:19 100:16 127:22,25 129:15 131:10 146:15 148:14 153:16 196:24 198:8 222:17 243:10,24 246:16 250:16,25 253:9 260:11 264:14,22 274:18 278:24 279:2 287:6 288:17 304:10 311:24 315:6 326:5, 15 333:10 337:6 338:15 344:24 346:16 348:8 372:16,21 373:12, 17 374:14,18

**industry** 18:4,7

**inexperienced** 374:13

**infatuation** 360:8

**information** 38:7 55:3,9,10 56:13 61:19 64:1 66:24 74:12,13 91:21 96:5 116:6 118:14 131:2, 14 178:6 194:15,19 219:18 222:6 226:25 237:13,19 239:12,14,18 262:5, 19 267:8 276:13 286:22 302:20 303:3 304:4,20 348:5 380:18 381:24

**informed** 76:25 77:3 134:11,14 136:7

**initial** 34:6 47:3 51:24 81:20 186:17 236:6 270:20 293:5 373:10

**initially** 34:13 293:4

**initiate** 227:9,17

**initiated** 97:17

**initiating** 349:1

**input** 191:2 199:1 209:5 275:13 276:5

**insane** 67:23

**inside** 23:23 65:1 263:11 316:21

**insignificant** 370:14

**inspect** 38:12

**instance** 25:4 148:16

**Institutes** 18:4

**institutional** 368:14 370:1 375:12,24 376:6,10,11,19 377:3,23 378:6,14

**instruct** 67:9 104:11 143:15 170:1 171:1 174:24 194:20 302:22 304:6

**instructed** 86:3 212:15 237:20

**instructing** 86:18 202:13 213:25 361:23

**instruction** 33:9 170:14,19

**instructions** 268:7

**instructions.'** 311:1

**instructs** 13:6,7

**insulting** 32:5

**intact** 12:18

**integral** 197:20

**integrate** 356:19

**intended** 14:3 146:10 181:16 183:25 185:4

**intends** 351:17,18

**intentional** 14:18,19

**intentionally** 342:22

**intentions** 356:8

**interact** 20:24 23:5 287:20 296:19

**interacting** 317:2

**interaction** 283:2 287:22

**interactions** 317:13

**interest** 287:15

**interested** 32:11 320:15

**internal** 110:2 190:14 313:23 342:15

**International** 12:1 19:17 21:10 75:8 220:19

**Interned** 31:11

**interpretation** 153:1 160:10 168:14,16, 17

**interrogation** 227:8

**interrogatories** 167:5,12 170:11,17 171:6 203:10 220:4 252:1 254:22 255:11 324:6 336:10,13 340:10, 13

**interrogatory** 168:22 169:8 173:4, 8 203:18 204:1,4 206:17 220:3,5,6, 11,21,22 237:16,17 250:19 254:5 255:9, 16,19 260:16 269:19 273:24,25 324:5 329:8 336:15 337:15 338:2,6,7,17

**interrupt** 69:1 86:24 107:15 154:5

**interrupting** 94:10 299:23

**interruption** 63:8 125:5

**introduce** 8:13 233:14

**introduced** 61:25 62:2 66:10

**introducing** 69:21

**introduction** 62:9 348:24

**inundating** 208:25

**investigation** 97:16 282:15

**invite** 320:8

**invited** 157:13,15 319:15 320:9

**invites** 317:24 318:14,21

**involved** 17:4 61:15 109:10 144:17,20 157:4 181:18 191:17 194:23,24 195:9,12 198:14 206:21 242:24 267:14 271:8 276:21,24 277:2 278:24 303:5,18 304:13 305:3 324:4

**involvement** 104:23 109:16 206:24 271:24 272:12 275:20 291:2 338:5

**involves** 170:23

**involving** 246:16 322:24 333:21 334:13,21

**ISCS** 367:11 370:22 378:9

**issuance** 277:16

**issue** 25:9 151:10 163:23 177:14,24 178:4 227:20 312:6 337:2

**issued** 147:5

**issues** 24:6,8 25:7 32:14 224:10 370:4

**issuing** 150:10

**italicized** 208:23

**item** 169:14

**items** 23:6,10 24:15 38:14 43:22 47:1 117:20 162:9 193:19 209:23 287:12 311:21 313:25 314:1 362:22 365:6 370:4 371:18 379:13,15, 22 385:2

## J

**Jackson** 34:17,19 35:2 36:5,10,15 67:5,19 68:9 69:8, 19 70:23 71:25 72:7 78:2,3,14 102:18 103:11 107:8 108:9 111:15 114:19 117:6 122:14,19,22 123:2 124:23 125:1, 12 126:1,20,24 127:2,3,6,15,17 128:6,10,25 129:8, 25 135:17 136:9 137:5,22 138:1,8, 16,17,24 139:7 141:23,25 146:16 147:11,14,20 148:17,22 150:20 161:25 162:20 163:9 164:14 167:18,21 168:3,6, 15,24 171:18,21,24 172:2,6,15,18,24,25

173:14,17,18
174:10,13,16,19,21,
24 175:2,6,7 190:19
197:3,5,18 200:10
203:5 212:9 222:9
236:17,18,21,24
237:6,7,14,20
248:22,25 264:10,
11,18 265:1,15
266:6,9 269:12
270:4 274:19,25
276:17 277:15
279:4 280:12 291:6
293:6 295:16,19,23
297:16 332:23
335:17 348:2

**Jackson's** 71:4,25
150:10 193:4,8

**Jacob** 8:23 192:4
234:1

**Jake** 143:25

**James** 43:18 45:16
49:3 152:19 153:10,
12 180:9

**Jan** 221:12

**January** 21:17,18
34:20 37:12,23
39:24 54:12,14
55:24 62:10,20
75:12 79:2,7 81:9,
13 83:23 88:4,10
90:1,3,14 100:2,10
101:2 102:17
103:17 107:6,22
122:3 123:11
128:11,15,22
129:22 133:14
134:10 135:14,24
137:3,20,24 138:5,
10 148:4 149:9,18
180:20 181:13

183:22 185:7,8
221:22 242:14
246:23 247:12
251:3,9 253:2,22
256:11 257:8 258:1,
6 265:11 268:20
269:16 274:14,16,
24 286:10 318:6
325:3 337:23
368:16,18 376:1
382:6

**Jason** 34:1,6,22
35:8,9,10,20 41:21
59:14 70:18 76:5
82:18 96:24 107:7,
21 110:13 115:2,15
118:16 121:12
130:7,12,15,17,23
131:20 134:11
135:3 154:17,24
155:8 188:4 190:20
193:4 219:3,14,16,
24 223:12 253:8
260:24 261:9 268:7,
15,23 269:11,12
270:4 275:2,4
276:18 293:22
296:8 324:22
325:25 332:8,12

**Jason's** 131:20

**jaunt** 32:16

**Jay** 324:23

**Jeez** 18:4

**Jehieli** 8:21 233:22

**Jeremy** 15:25 16:25
42:22 45:14 47:16
49:9,25 53:17 62:7
66:25 74:13 114:9
146:15 148:17
152:13 153:8
186:15,24 187:16

190:22 219:3,15,18
221:8 264:19 270:5,
18 271:5,16,17
274:20 279:16
280:1 292:1 293:21
296:7,22,25 297:4
298:2 303:14,24
305:23 306:25
309:16 316:23
317:4,8,10 322:12,
15,24 323:2 324:21
325:20 343:24
344:1 346:13 348:4
349:5

**Jeremy's** 318:18

**Jesus** 283:19

**Joaquin** 8:17 233:18

**job** 22:18,19 27:16,
17 32:9 51:15,22
59:2 69:15 71:9
131:21 177:8
189:19 369:21

**jobs** 367:12

**Joel** 63:22 67:6 78:3
91:14,15 117:6,20
118:13 139:8
190:19 193:9
196:20 198:8,9,15
270:5 274:19,25
313:3,4

**John** 21:2 45:2
68:17 69:3 71:24
102:16 158:22
159:14 264:16

**joined** 31:8 63:9

**Joint** 33:10

**jointly** 287:14

**joke** 31:14

**Joseph** 325:23

**judging** 303:11

**judgments** 72:6

**juncture** 191:6
349:5 385:8

**junctures** 288:23

**junior** 342:12

**Justice** 13:22 15:23
16:2,9 51:11 56:18

**justified** 147:1

---

**K**

**Kahn** 107:24 123:20
219:14

**Katie** 142:18 143:1
239:4 243:14

**Ken** 34:17 35:2 67:5,
7 69:19 70:7,18,23
71:24 78:2,3 102:17
107:8 108:9 117:5,
24,25 126:20
128:10 129:8
135:17 136:9 137:5,
21,25 138:7,16,17,
24 139:7 141:23,25
146:16 147:10
148:7,17,20,24
150:9 161:25 163:9
164:14 167:17,20
168:6,15 173:17
190:19 193:4,7
197:3,5,18 203:5
212:8 237:6,7
248:22 264:10,11
269:12 270:4
274:19,25 276:16
279:4 280:12 291:5
295:1 296:12 298:1
348:2

**Kenna** 305:25

**Kennedy** 361:6

**Kenneth** 71:25
172:24 173:18
174:13,19,24
200:10

**key** 82:13 306:2

**kind** 22:5 24:5 26:6
27:9 28:7 29:8
67:24 71:1,10
131:17 169:16
171:9 199:3 200:20
209:9 226:3 247:14

**Kingdom** 19:15
20:11,13

**Kirsten** 267:13
269:6,7,8

**Kliger** 42:23 45:15
49:9 50:12 59:21
62:8 84:6 91:8
94:13 102:19
107:25 110:15
152:12 153:9
167:15,21 168:4,19
172:23 175:8
202:12,23 203:1,24
214:15 215:9 219:3,
15 236:17 237:15,
20 251:6 258:15
260:11 279:17
293:7,23 299:25
317:1,14 322:24,25
335:12 341:9,17
358:20

**Kliger's** 108:1

**knew** 35:19 130:11,
12 140:25 169:20

**knocking** 125:5

**knowing** 140:13,16

**knowledge** 15:3
17:2 24:10 28:1
30:25 43:19,24
54:13 61:17 68:5
83:22 91:6,17 92:20
101:7,9,19,22
104:13 105:10,12
106:15 109:20
123:9 130:15,16
131:25 132:1,15,16,
22,23,25 133:11
134:15 135:10
141:3 151:6 156:6
158:8 164:3 169:11
176:2 178:12,23
180:24 192:16
200:8 204:22
207:13 213:6
221:20 223:13
239:23 275:21,23
276:13 277:18,19,
20,21 279:4 282:3
288:12,20 303:12
318:18 325:18
346:15 364:15,16
371:19 372:12
381:22

**knowledgeable**
204:8

**Korzeniewski** 8:11
9:7,12,16,25 99:20
232:14 233:3,12
234:10,18

---

**L**

**lab** 25:23

**Labor** 342:4 343:3

**lack** 24:4 41:23
46:25 115:20
193:11

**ladder** 134:9

**lag** 120:20

**Laken** 146:16 148:9,
17,25 190:20

**laptop** 64:15,17,21,
23

**large** 212:20 216:19

**largely** 33:14 119:11
314:6 316:22
370:16 372:20

**larger** 247:21

**lastly** 13:11

**late** 65:20 73:11,13,
25 134:16 274:14,
16 318:6

**law** 119:14 263:10
351:6,11,19 352:4
356:23 362:9
374:17 382:23

**lawsuit** 173:24

**lawyer** 225:22
262:21 263:8
342:12,17,25
370:21 385:3

**lawyers** 15:19
374:15

**layman's** 95:11

**lays** 60:10

**lead** 23:6 41:11
53:14,18,20,23
54:10,13,16 55:15
58:16,19 79:4 84:22
85:20 90:2,6,15
109:14 308:7
315:18 322:13

**leader** 143:4 176:24
317:4

**leader/member**
270:22

**leadership** 27:13
83:3,5,16 84:3
98:17 100:20,24,25
101:12,15,17
106:25 107:3
115:17 148:13
150:8 158:4 167:17
168:6,24,25 180:8
184:14 188:1
190:15,17 199:5
201:19 203:2,3
273:18,22 274:4,8
281:17 290:4
294:11,25 295:5,9,
12,15 296:2,3,8
297:15,23 314:23
370:7,8 372:7

**leading** 100:8

**leads** 90:6 191:4
363:17

**learned** 33:2

**lease** 211:2,6 277:5,
15,23 278:1,3,6,17,
19 279:10,23 280:2,
6,10,11,25 281:8
283:11 285:1

**leave** 97:8,12 98:7
111:3,4,10,13
146:11,19,25
147:18 171:5
188:10,12,13,21
216:15 267:17,22,
24 268:2,6 270:10
271:11 325:1
337:21 339:17,21
340:4 341:21 357:3
359:7,15

**led** 62:21 115:10

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**left** 13:5 29:25 32:23 33:1 35:8,10,12,17, 22,25 36:4 57:2 63:10 69:14,17,23 73:9,15,18 74:2,10 85:12 117:19 118:16 120:4 191:23

**legal** 159:24 161:3 248:19 263:3,4,5 286:20 287:11,17 288:2 312:6 342:14 359:25 360:24 361:11,12 362:16 367:19 382:9,19 383:7

**legislation** 362:2 384:9

**legislative** 146:17 288:22 347:9,20 354:5

**lend** 298:11

**length** 52:21 357:23

**lengthy** 325:16

**lessons** 33:2

**letter** 212:7,9 277:15,16 279:23 280:8,11 281:12 283:7 346:8,22 347:6 348:17,25 349:13,14 350:13 352:23 353:20 355:12,23 360:7 382:23

**level** 20:6 83:20 94:23 105:19 106:12,23 108:6 110:9 150:10 180:8 181:22 208:20 209:13 210:6

220:22 221:3 251:7 256:24 257:19 258:21 259:15 261:17,24 263:1,2 371:8 384:20

**levels** 25:12 44:8 83:10

**Lewin** 15:25 16:2, 20,25 17:8 42:22 45:14 47:16 49:9,25 53:17,21 54:2,9,20 55:1,11 58:8 59:12, 23 62:7 66:25 73:8, 17 74:8,13,15 84:4 85:20,25 86:3,10,17 89:23 90:1,5,22 109:13 111:15,23 112:2,4 114:1,6,9, 19 146:15 147:14, 17,24 148:7,17 152:13 153:8 186:15,18,24 187:17 190:22 219:3,16,18 221:6, 8,17,24 251:6 270:5 271:2,5,16,17 272:8,11 274:20 276:20,23 279:16, 21 280:1 292:1 293:5,15,20,21 294:8,23 295:5 296:2,7,16,22,25 297:4 302:3,17 303:6,15,19,20,24 304:2 305:10,17,23 306:17,25 307:22 309:16 310:24 311:3 312:17 315:13,18 316:12, 24 317:8,10 322:13, 15,24 323:2,9 324:21 325:20 327:13,16,18,22,25

333:1 343:24 344:1, 4,8 346:13 347:5 348:4 349:5

**Lewin's** 58:18 60:12 79:1 85:3 112:9 148:15 190:5 199:14 270:18 289:22 306:11 308:6 309:23 316:13

**liaise** 346:17

**liaison** 19:12 21:9, 16,21 22:3,7,14 26:25 30:17,22 31:4 32:17 33:23 36:21, 24 51:14 119:16,22 158:11 336:1

**liaisons** 30:24

**license** 283:7

**life** 118:25

**life-saving** 308:12 310:1 311:17,22 312:11

**lifesaving** 86:14

**limited** 133:16 219:19 258:16 261:6

**Lindsey** 219:15

**lineup** 45:24

**lion's** 348:4 370:2

**Lisa** 305:24

**list** 46:11 164:15 264:21,23 265:1 371:19,21 372:6

**listed** 45:14 48:12, 13,14 61:10 178:11 190:21 191:20 288:9 317:19 338:3

**listing** 378:14

**lists** 113:21

**litigation** 208:5 314:21 379:24 384:9 385:5

**lives** 384:8

**local** 27:24 225:2 226:1 227:7 351:11

**locally** 351:9 368:20

**locally-employed** 352:21 353:3

**located** 255:21 352:13

**locked** 106:2

**lodged** 13:9

**log** 64:23

**logged** 95:22 221:21

**logical** 107:20 219:5 252:8 253:10,20 258:15 260:23

**logs** 46:5,8

**London** 25:25

**long** 19:1 21:20 26:13 36:9 87:4 119:25 130:2 258:22 286:4 292:20 309:9 323:4

**longer** 35:10,13,20 56:16 70:19 71:4 76:7 77:13,25 78:15 87:8 118:19 121:3 130:8,23 131:13 134:12 166:10 205:12 206:3,12 212:12 214:2 232:7 243:13,14,16 261:14 266:12

269:14

**looked** 55:18,21 57:24 181:4 226:5 227:23 236:6 239:6 382:5

**loop** 261:2

**Lord** 307:10

**losing** 331:18

**loss** 115:14

**lost** 27:25 28:3 132:20 181:3 184:25 217:1 317:5

**lot** 27:9,11,12 29:9 52:18 56:19 102:1 122:2 124:11 158:14 187:24 198:8,21 282:15 307:10 374:15 379:12 381:5

**loud** 10:1 11:10 16:10 48:13 49:14 186:18 294:17 355:7

**loudly** 224:19

**love** 120:6

**loved** 25:6

**low** 119:18

**low-end** 301:21

**LPA** 118:10 146:18

**Luevanos** 8:21 233:22

**Luke** 42:22 45:15 49:9 50:3,11 62:8 94:13 100:1 102:5 103:16 105:9 123:22 152:11,12 153:8 219:3,16

253:3,8,18,21 258:10,11 259:10 260:10,24 270:5 279:16 293:23 294:4 317:1,13

**lunch** 16:25 64:15 121:18

**Lynch** 8:25 17:7 116:17 176:14 211:19 226:19 227:2 231:6,15 234:3 358:10

### M

**M&r** 248:3,4,6,9,13, 17,20,21,25 249:8

**machine** 254:23

**made** 14:1,3 61:25 70:10 76:1 116:2 120:13 121:1 131:22 136:16 140:4 147:11 149:21 150:5 161:17 164:14 165:14,21,24 167:14 175:7 181:21 184:15 191:3,5,8 194:7,9, 13 195:3 196:9,11 197:17 201:5 205:8, 17 206:5,6,8 207:2 259:2 269:11,12 270:13 281:2 285:2 286:15 300:19 302:25 304:7,10,16 305:9 312:12 329:3 339:23 340:7,21,25 342:10 344:14 348:23 349:6,7 353:19 363:21 365:21 380:19

385:7

**main** 214:10 281:15

**maintain** 364:9

**major** 312:19

**majority** 357:6 363:3

**make** 11:5,16,18,22 12:18 13:12 15:5 17:5 24:23 25:21 27:18 46:12 47:23 57:15 59:4 89:25 95:15 98:2 99:17 102:13 106:17 115:1 119:16,24 124:2 132:4 143:6 150:14 162:21,23 163:14,16 164:7,9 166:20 190:11 194:25 205:9 209:5 210:7 213:17 225:1 228:3 229:13 234:25 252:23 275:11 291:19 292:13,16 325:5 334:9 339:1 363:7 371:4 374:9 377:24 378:3 382:24 385:16

**Makecha** 45:15 49:11 152:13 324:22 325:23 329:2

**makes** 51:5 96:17 153:12 257:12 284:19 288:19 297:21 299:15

**making** 23:22 37:14 57:14 70:15 82:9,14 84:17,19 95:16 115:9 120:11 150:14 152:2

199:15 200:18 201:20 206:25 226:18 240:8 241:1, 4 270:23 290:17 298:14,17 304:21 305:5,6 340:17 342:24 351:25 361:22 379:16 384:17

**Malyszka** 267:10

**man** 80:10

**manage** 24:1 219:23

**managed** 85:15 194:1 298:15 363:9 364:2

**management** 18:10 22:8 50:13 72:1 83:10 95:25 108:11 135:19 140:6 203:22 219:23 248:13,17 273:21 274:8 370:11 371:13 372:8 380:1

**manager** 23:16 96:7

**manages** 193:25

**managing** 192:3 253:20 260:22 262:16 364:20

**mandating** 59:1

**manner** 330:24

**manufacturing** 314:1

**March** 8:9 54:6,7 88:4 221:12 233:4,9 260:9 282:25 293:1, 2,22 296:18 298:24 299:16 300:5 302:3, 15 305:15 308:3,6 309:8 335:12,14,18

ADAM KORZENIEWSKI
95350

March 26, 2026

427

30(b)(6)Index: Marco..memo

336:6 354:23 360:8 370:18

**Marco** 75:7 131:11, 22 133:4 138:7,16, 17 191:7 299:20 348:15

**Marik** 189:18

**Marine** 31:8

**mark** 38:19 245:14

**marked** 15:10 38:24 80:23 87:25 142:9 145:5,7 182:1,3 186:3,5 189:3,5 217:5,7 218:16,18 245:16 263:13,14, 16 266:22,23 269:23,25 272:19, 24 289:1,2 291:8,9 292:4 299:4,5 308:21,24 339:7,8 343:10,11 345:15, 16 355:1,2 367:24, 25

**Marking** 15:7 38:23 80:22 87:24 142:8 245:15

**Marocco** 72:22 79:11 127:23 128:20,21,23 129:1 130:6,9,11 139:14 140:4 141:1,7,21 142:1 146:15 147:14,25 189:14 192:2 197:3 203:5, 20 204:23 205:8,17 206:18 207:2,5,18, 21 214:5,14,16 215:13 238:7,18,24, 25 264:11,19 265:2, 16 266:4,7,10 270:4,14,15,16,17

272:3 273:4,14 274:19 276:17 277:1 280:5,10,24 281:7,9 289:11,12 291:4 293:6 295:16, 22 296:5,10 297:7, 16 299:15,17,20 309:21 324:23 326:1 329:23 330:1, 12,20 331:2,22 332:5,8,20 336:5 340:9,20

**Marocco's** 79:6 133:13 206:24 266:2

**Marshall** 216:20,22, 24

**Mary** 117:7 118:8 198:13

**Maryland** 18:11 225:2 228:6

**masse** 285:24

**massively** 379:13

**material** 17:17 162:9 282:9 304:21 348:9 381:6

**materially** 356:9,11

**materials** 28:4

**math** 369:11

**Mathew** 9:4 16:15, 16,18 232:1,3

**Mathews** 234:7

**Matt** 37:25 63:22 67:6 70:18 78:2,4 107:8 117:6,24 118:4 129:8 135:21 136:11 137:5,22 138:1,8,11,16,17,

20,23,24 193:7 198:10 274:25

**Matt's** 198:11

**matter** 22:13 120:5 213:5 318:15 386:4, 22

**matters** 98:17,21

**Max** 9:4 16:15,16,18 234:7

**Mcgill** 93:21 122:3, 4,8 152:15 153:3 222:8,16 246:17 247:11,21 250:3 256:24 264:16 267:10,16,21 268:6

**Mcgill's** 247:9 257:17 264:13

**Mcpherson** 68:14 69:3 343:17

**meaning** 149:5 171:7 189:15 207:6 209:19 330:24 332:12 338:7 374:10

**means** 12:8 25:25 351:18

**meantime** 379:21

**measure** 199:2

**media** 32:19 80:12, 14

**mediums** 385:10

**meet** 80:15 316:20

**meet almost** 23:9

**meeting** 17:6,13 68:12 92:12,15,19 93:3,16,18,20,23 111:16,19 112:4

198:2,6 316:15 319:5 337:16

**meetings** 20:5,7,8, 12 200:3 296:24 297:3,5,7,8,9,12,13 317:16,18,22,25 319:11 321:7,10,17, 18

**Meisburger** 191:2 197:2 198:24

**Melody** 233:24

**member** 82:8 84:21 100:1 102:5 103:16 104:10,15 162:23 163:16 171:22 177:9,15 309:17 317:25 341:9,17

**member/leader** 270:22

**members** 41:11 42:21,25 43:2,17 44:9 55:23 56:5 59:8,20 60:1,8,13, 24,25 63:3 74:9 83:18 89:9 92:13, 21,23 97:25 104:20, 25 151:5,18 152:9 156:2,25 161:17,23 162:18,23 163:16 175:1 179:9,25 216:7 271:8,10 273:22 277:22 278:2,16 279:9,14 284:25 287:25 317:17 319:6 320:4, 7,20 321:8

**members'** 155:24 320:18

**memo** 77:23 189:13, 22 191:9,10,14,18 204:23 208:10,11,

13 209:14,22
210:13,20,25 211:3,
4,10,12 214:3,7,12
270:20 277:5 288:9
289:10 290:2,17
291:5 298:13
300:23 306:11,12
307:7 308:2 339:25
340:3,5 344:7
350:12 368:12
375:9 376:3,5,20
377:2,7

**memorandum** 52:20
71:23 102:16 103:3
306:16,19 307:23,
24

**memorialized**
210:12,19,24

**memorized** 203:12

**memory** 73:17
171:10 227:22
350:11

**memos** 15:20 47:12
52:19 208:5,9
209:10 298:11
385:4

**mentality** 119:15
156:17

**mention** 60:5 91:14,
24 152:18 207:4
254:1 323:10
356:25

**mentioned** 71:17
110:12 116:25
131:7 175:12,24
181:1 224:21
243:10 251:24
372:6

**mentions** 250:10
253:18

**merits** 199:24

**message** 55:7 92:5
295:14

**messages** 135:5,7
333:13 354:24

**met** 10:9 61:11 63:1,
20 317:23

**methodology**
240:23

**mic** 76:16 152:6
224:10

**Michael** 9:2,25
16:12 142:20,23,24
212:9 233:3 234:5,
18 239:5 243:9
278:24 305:24

**Microsoft** 145:23

**mics** 166:21

**mid** 54:7

**mid-february**
308:10 318:6

**middle** 96:10 139:20
146:2 193:13
217:11,13 227:18
299:2

**Mike** 128:1 136:18
142:20 182:25
183:2,3,9,19 189:16
217:21 243:9
245:10 303:12
324:22 325:20
328:2 386:12

**mild** 14:2

**miles** 120:7

**Miller** 142:19 143:1,
8 239:5 243:14

**Miller's** 243:21

**million** 306:16

**millions** 314:13

**mind** 19:5 166:23
169:14 180:12

**ministry** 31:12

**minute** 39:13 46:24
113:20 142:14
145:11 179:7 189:8
190:25 383:13
386:9

**minutes** 14:7 17:2
63:24 333:6

**mischaracterize**
371:21

**mischaracterizes**
122:16 223:2 249:3
254:11 259:18
278:8 280:18
320:25 333:3
371:11

**misheard** 195:16,20
196:2

**mispronounced**
102:25

**mission** 23:19 314:7
343:20 356:7 377:5

**missions** 351:7
353:9,11,13 356:16,
20

**misspoke** 123:24

**misstates** 311:7
325:7

**mistaken** 269:4,6,10

**Mm-hmm** 122:11
126:3 185:22
222:12 224:24
289:21 290:10

**moment** 255:1
312:2 327:16 348:1
365:3 368:18

**Monday** 19:5 88:10
111:2 133:8 139:12
141:6,20 185:10
212:16 270:3
357:22

**money** 59:3 183:25
184:16 185:4 364:4

**month** 19:7 20:9
348:22

**months** 28:2 365:4

**morale** 119:17

**morning** 9:21,22
62:11,19,20 79:20
128:21 129:21
139:5 230:16
247:13,17 249:10
273:10

**move** 10:14 26:2
197:7,25 236:13
275:11 276:10
356:19 364:21
366:23

**moved** 21:6 53:21
54:2 193:5,6,8
286:3 363:8 385:7

**movements** 353:5

**moving** 24:21
357:19

**muddle** 95:10

**multiple** 34:11 209:9

**Musk** 8:12 84:10
100:12,19,21 101:4,
8,11,14,16,23
104:10,14 105:3
106:22 108:23

ADAM KORZENIEWSKI
95350

March 26, 2026

429
30(b)(6)Index: Musk's..number

109:5,8 114:2 144:15 154:19,22, 23 155:4,8,9,10,14 157:20,22 158:5,7 171:24 172:3,7,18, 22 173:5,11 174:10, 16,18 176:1,24 181:18,21 183:24 184:14 185:3,10 192:17 200:23 201:19 206:21,24 207:5,8,18,21 215:25 216:3,6 217:19,22 218:1,6, 7,10,11,14 233:13 243:12 244:19,22, 23 245:2,8 271:1,2, 5 272:16 275:10,14, 17,21 276:3,6,9,16, 21,24 277:2 278:4, 6,17,19 279:7,9,22 280:1,6,10,25 281:7,9,12,17,21 283:10,17 284:3,25 285:6 290:21 300:11,18 301:6,9, 10 303:18,22 315:19,24 316:4,12 319:6 321:8,10,21 322:3,12,15 324:20 325:19,25 326:4,14, 17 327:8,10,12,15, 18,21,25 328:1,3,6, 14 329:2,13,19,21, 22 330:1,12,20 331:2,22 332:6,7,17 333:15,21 334:13, 21 337:6,17 338:15 386:3

**Musk's** 104:23 105:14 107:13 109:12 218:2 245:3 270:23 271:24

272:12 290:16 291:1 301:6 333:10 338:5

**mutated** 71:1

**mutual** 38:16 295:9

**mutually** 296:9

---

**N**

---

**named** 59:8 181:1 191:1 287:8

**names** 16:14 44:18 48:12 49:13 191:17 245:12 264:22

**narrative** 65:18

**narrow** 127:9

**Nation** 292:1

**National** 38:17 183:1,2 380:7,20 381:23 384:11 385:7

**nature** 333:9

**nauseating** 325:17

**nay** 298:2

**necessarily** 43:24 44:14 96:14 136:20 214:5 241:1 249:16 298:6 345:10 353:15

**needed** 24:10 36:18 177:15 187:13 196:9 199:3,12 212:25 213:5 247:5 374:24 385:1

**Needham** 128:1 136:18,22 142:20, 23,24 143:9,11 182:25 183:9,14,19

189:16 239:5,9 243:9 244:14 245:10 297:1 303:12 305:24 324:22 325:21 328:2,6,14 385:18, 24 386:12

**needing** 297:17

**negative** 280:22

**negotiated** 379:19

**negotiation** 315:4

**network** 264:21

**Nicholas** 309:4

**Nick** 65:3,11,13,20 66:2,5 77:22 118:1 188:9 311:9 312:15, 21 313:5

**night** 64:25 73:12 133:20 138:15 247:16 248:5 251:2, 9 273:11

**Noah** 45:16,23 49:4 61:6 152:18 153:10

**nod** 11:11

**noise** 76:11

**non-** 105:24 365:18 375:4

**non-competitive** 374:10

**non-deliberative** 239:18

**non-functional** 372:17

**nonprivileged** 337:16

**nonprofit** 32:21,24

**noon** 134:10 135:25 137:24

**normal** 77:15 173:20 231:4 361:25 374:19

**normative** 24:15 126:21

**note** 93:22 208:16 249:14

**notice** 46:14,19 47:21,23 132:11 192:12,13 314:25 340:7 346:5 348:24 355:22 356:24 360:7

**noticed** 229:15,16

**notices** 309:22 310:12,19 341:2 342:2,7 343:4 344:13,16,18,20,23 345:2

**notification** 63:8 121:15 339:16,18 341:20 342:3 346:22 350:15 354:22

**notified** 134:21 206:10 360:4

**notion** 237:14

**number** 14:17 20:8 24:18,19 31:11,16, 17 32:14 39:18 45:12,13 48:14 56:16 64:8 74:16 89:4 102:15 104:23 105:14,16 109:12 112:9,11,13,15 113:1 124:15 131:4 135:5 140:1,8 142:3 146:14 156:13

164:18,19 167:8 173:9 182:24 186:12,13,16 189:25 193:18 198:6 199:12 201:14 206:17 212:3,4 215:5 219:1 220:7 224:6 246:16 253:9 264:13 292:2 302:7 306:9 313:2 324:12 327:15 328:5 336:9,19 345:19 352:6 362:21 368:25 369:22 370:1,14 372:12 373:12 374:21

**numbered** 146:10 212:1

**numbers** 46:23 47:4,5,25 66:7 67:1 109:8 167:6 190:25 213:14 369:3

**nuts** 108:13 166:11

---

**O**

---

**oath** 12:8

**object** 113:16 114:22 153:25 154:11 157:8 169:25 251:14 254:10 262:15 323:14 325:6 334:15 341:18 343:8 344:22 353:23 354:16 358:2 361:10 378:17 381:18 384:5

**objection** 13:9,12

48:17 61:1 62:15 65:17 77:6 79:25 84:24 94:7 98:12 99:16 101:18 105:5 111:6 114:15 116:5 120:16 122:16 123:4 125:3,15 126:5,16 127:1,18 128:7,17 129:13 132:18 143:13 147:2 148:1 156:4 157:21 159:7,24 161:3,18 163:18 165:2 170:13,18 172:4 173:6 175:3 176:11,22 178:9 180:2,22 184:2,10, 17,24 187:19 192:7 194:14,18 195:19 201:1,7,22 204:16 207:11 210:14 223:2 228:10 238:12 239:11 242:7,17,25 243:23 244:8 249:14 257:21 258:24 259:18 262:2 263:5 265:17 268:13 269:1 271:12 272:13 274:9 275:20 276:12 278:8,22 279:12 280:18 281:19 283:14 285:3,25 286:21 288:6 290:18 293:17 295:7 297:25 300:22 302:19 304:3 308:14 310:3 311:6,19 314:16 315:21 318:1,8,24 319:7,21 320:5,25 322:5 323:12,15 330:8 333:3,16,23

337:25 338:22 342:6 343:5 345:9 348:19 349:16 352:25 353:25 354:18 356:1 357:10 358:19 359:9,25 360:17,24 362:16 364:23 367:1,19 368:22 369:8 371:10 372:1 373:25 375:16 376:24 378:11 379:8 382:9,19 383:7 384:21

**objections** 13:5 167:3,11 177:6 249:3 324:15 325:16 334:23 337:14 338:1 354:11 361:22 362:5

**obligation** 12:9

**obligations** 382:8, 12

**observe** 200:15

**obtain** 56:13 86:14 135:9

**obtaining** 157:4 287:15

**occasion** 326:1

**occasions** 200:17

**occupied** 281:13,23

**occur** 200:4,5 211:4 280:17 330:15 349:20 350:9 356:17

**occurred** 56:21 73:1 76:6 86:8 112:8 114:8 120:24

187:25 200:6 223:23 275:15 280:15,16 319:12 329:7,11 382:15 383:3

**occurring** 132:24

**off-boarding** 379:14

**offer** 229:7

**offered** 291:14

**office** 21:18 22:17 23:15,23 26:5,6 28:11,12,22 29:14, 20,23 30:7 32:14 36:17 38:16 43:12, 13 49:21 50:13,22 55:7 57:19,21 62:24 67:8,11,18 68:10 69:5,18,20 70:4,24 72:4 74:3 81:8 83:8, 9 93:24 99:12 118:11 122:6 127:24 131:4,8 141:5,6,20 142:19 143:7 146:18 149:11 177:1 180:6 181:22 189:15 193:7,8 198:13 209:23,25 212:21, 25 213:3,10,11,15, 18,19 248:5,15,18 266:4 273:20 274:7 287:4,17 288:22 310:15,20 311:14 314:5 316:21,23 317:6 323:7 342:5 343:3,18,19 346:16 348:1,3 364:8,10,11 370:7,10,11,16,19 371:5,7 372:7,9,18 379:23

**officer** 117:10

140:4,6 198:16 222:6 303:25 305:18

**officers** 131:6 192:14 369:14 373:19 375:4 376:18,22

**offices** 20:3 23:19 30:8 68:25 83:15 157:13 193:4 213:9 243:23 317:21 319:13 348:8 356:16,20 370:6,24

**official** 37:22 130:14 149:10,17 157:11 182:10 347:24 355:12 356:24 362:23

**officially** 300:9 358:8

**officials** 356:9

**offline** 161:13,16 162:24 163:17 164:11,21 165:14, 22 169:6

**oftentimes** 23:21 199:17

**OIG** 201:11 282:17

**older** 340:3 385:9

**onboarded** 51:20

**onboarding** 63:19, 25 64:5 65:4

**one's** 25:24 293:24

**one-to-one** 260:14

**ongoing** 199:4 314:20,21 315:8

**onwards** 83:23 317:12

**open** 29:9 123:19 193:10,14 286:6

**opening** 152:5

**operating** 140:6

**operation** 314:9

**operational** 382:3

**operations** 365:11 380:2

**opining** 311:3

**opinion** 187:22

**OPM** 41:22 50:13,16 93:25 94:15 98:18, 20 289:15 344:17 345:5,8,14

**OPM's** 342:14

**opportunity** 353:22 354:16

**opposed** 153:10

**optimal** 200:21

**options** 200:20

**order** 25:10 39:17, 20,22 40:1,22 41:2, 3,9 47:9,10 58:25 81:5 82:3 85:9 94:21 98:3 115:8 117:21 120:25 121:1 145:16 147:5, 10,12 150:9,11,21 163:23 164:14 167:21 168:4 173:21 174:16,19, 25 175:7 177:12 179:1 193:16,17 199:10 208:19 231:20,24 232:2,5 247:3 286:14 291:17 310:10 349:5 361:5

**ordered** 174:14 175:6

**ordering** 230:19 231:1

**orders** 15:21 39:10 85:7 126:8,18 127:3 151:10 173:17,18 286:15 356:7 387:6

**org** 158:10 179:5

**organization** 12:5 42:4 135:10 166:3,4 180:7 200:24 210:8

**organization's** 42:10

**organizational** 71:1 275:22 345:10

**organized** 44:23 46:11 348:5

**orient** 236:16 284:23 324:16 368:4

**original** 103:15 230:19 264:18 278:15 336:23 387:14

**originally** 361:5

**originated** 267:9

**originator** 291:5

**other's** 109:8 318:21

**out-in-the-world** 338:19

**Outlook** 145:23

**overexplaining** 29:12

**overly** 280:21

**overseas** 23:20,21 25:5,19 27:20 199:13 314:1 351:7, 8,14 352:19,20 353:9

**oversee** 23:3

**oversight** 201:16

**overview** 62:13

**owed** 314:13

**ownership** 366:11

**owns** 366:13

---

**P**

**p.m.** 73:14 117:19 135:14,15 137:3 138:5,10 153:3 217:21 219:11 232:14 253:22 257:12,16 258:10

**paced** 67:24

**pacer** 167:8

**pack** 26:2

**pages** 140:9 190:1 291:22 294:14

**paid** 53:1,11 70:11

**panel** 25:14 47:17

**paper** 24:7 64:9 304:18

**paperwork** 22:12 51:17 64:14 298:5 316:6

**paragraph** 55:21 247:20,21 248:10 294:9 309:14 337:11 356:12 379:4

**paragraphs** 350:25

**paraphrase** 106:5 293:14 365:19 366:6

**paraphrasing** 108:23 155:22 196:6

**pardon** 12:24 35:23, 24 36:22 62:25 85:5 107:23,25 117:23 121:10 122:5 123:11 129:17 135:22 138:6 141:15 152:12 189:24 203:20 204:10 206:20 215:4 216:6 251:22 258:20 270:17 294:5,7 296:22 317:7 326:22

**parlance** 217:19

**parse** 150:17 321:25

**part** 16:20 26:17 29:20 35:5 41:9 43:6,9 47:13 48:15, 22 49:3 56:9 59:2, 16 61:6,8 69:4 74:8 79:23 80:4,11 82:21 98:22 99:2 118:1 136:17 144:10,12 149:4 168:25 169:16 172:21 190:17 193:22 195:13 207:8 217:13 221:14 223:13 240:24 242:16 258:9 270:21 271:15 303:22 314:23 316:24 323:9 351:6 353:23 372:18

**participant** 332:12

**participate** 118:2 275:17

**participated** 111:4 190:8 215:20

**participating** 195:24 207:14 297:12 303:16

**parties** 217:24

**partly** 282:16 314:21 366:17

**partners** 313:10 314:12

**parts** 16:23 96:18 196:24 282:23

**party** 136:20 198:20 259:6

**pass** 387:1

**passing** 58:6 237:2, 13,18

**past** 45:1 89:5 117:2 127:24 201:14 207:6 237:6 380:16

**Patrick** 219:14 246:17

**patrol** 282:6 283:1,8

**Paul** 117:9 118:12 198:14 288:21 347:21,23

**pause** 50:6 85:16,21 117:22 118:23 121:18 193:18 206:14 313:12,17 314:9

**paused** 86:5

**Pausing** 206:15

**PAW** 294:1

**pay** 33:3 373:3

**paying** 53:9

**payment** 83:2 85:11 96:2

**payments** 82:22 85:12 86:5,20 219:21 258:18 261:8

**payroll** 369:24 380:4,7

**PCS** 353:4

**PCSING** 25:17

**peak** 22:16

**pedantic** 44:12 129:18 135:3 163:1 280:21 321:4

**pen** 193:11 198:4,5 347:10 364:3

**penalty** 9:8 234:12

**pending** 208:14

**Pennsylvania** 18:3

**pens** 24:7

**people** 10:6 17:9 25:17 30:12 34:3 42:24 43:3,9 45:14, 18 48:13 49:8,21 57:18 60:16 62:5 66:14,25 69:23 83:9 88:16 97:7 98:4,8 111:2,10 120:1,3,5, 10 127:11 130:17, 25 132:9 146:3 153:4,7 164:5,7,8 169:11 173:25 180:9 186:16 188:10 190:21 191:17 199:6

201:15 205:10 210:2 212:20 213:4 221:4 237:8 241:18 247:16 275:24 298:13 314:22 315:5 323:17 346:12 347:14 357:3 372:11,13 378:6

**people's** 25:9

**peoples'** 48:12 90:17 198:22

**percent** 53:7 183:24 184:15 185:3 300:10

**Perfect** 387:12,22

**perfectly** 310:13

**perform** 210:4 378:22

**performance** 179:12

**performed** 313:11 314:14

**performing** 108:10 167:18 179:12,13 203:21

**period** 112:3 187:25 221:10,11 274:10 313:12 373:3

**periodic** 25:15

**periodically** 16:25 22:17 23:15 25:20 34:3 213:19 346:19

**perjury** 9:9 234:12

**permanent** 25:18 99:12

**permanently** 215:19,22

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**permission** 122:13 163:3 204:24 219:24 221:24 222:8,16,21,25 253:24

**permissions** 219:22,23 221:10 260:3 294:5

**perpetuation** 369:24

**person** 20:23 24:13 26:8 27:7 35:1 36:7 41:23 43:16 45:25 52:22 57:16 62:2 66:12 71:6 72:3 78:22 80:17 82:14 91:3 99:7,20 110:6, 7 113:1 115:15 124:23 127:7,16 129:19,22 135:21 137:6 144:19 158:4 163:25 165:24 177:19 181:2 189:20 209:3 213:8 222:20 238:25 246:20 249:12 251:10 277:14 284:4 295:11 304:13 316:22 319:2 321:18 330:25 331:6,15 332:5 344:3 345:14 371:6 374:12 380:15

**person's** 49:12,14 53:9 189:19 288:18

**personal** 42:15 43:5 56:15 58:7 61:18 70:9 75:19 95:20 99:17 101:9 105:10 109:19 112:24 129:10 130:15 131:5 132:1 134:15

141:3 158:8 169:1, 11 176:2,12 178:23 187:23 189:22,23 190:9 194:4,5 198:16,17,18 199:12,22 200:7 214:8 216:11 223:13 237:1 267:10 281:4 282:3, 11 288:11,15,20 303:12 308:1 314:3, 4 319:3,11 320:10, 17 326:22 346:14 350:11 352:11 354:11 362:19

**personally** 45:21,22 49:7 50:10 52:10 54:12,22 61:11 70:21 73:23 74:12 77:9 79:17 80:5,10 95:23 100:17,22 105:21 111:8,9,20 112:6 113:13,22 115:18 116:20 121:13 128:20 130:7,10 133:17 138:21 141:13,23, 25 142:1 149:12 151:1 192:21 211:8 212:11 243:8 274:20 276:6 282:5 287:19 301:2 312:23 316:3 318:15 332:1,2 341:7 342:11 345:2 365:4

**personnel** 36:13 50:13 97:20,23 98:17,21 103:9 111:24 132:13 183:5,6,10,15,17 199:3 206:2 212:15, 16,19 215:21 218:6

242:23 269:16 273:21 274:7 289:18 308:11 312:10 318:20 320:21 322:4 339:20 343:2 344:20 345:8 350:24 351:2,3,8, 14,22 352:1,6,17,20 353:4 365:10 366:11,12,18,22 367:10 369:20 376:2,9 377:4 380:4,13

**persons** 24:18 25:5 27:23 43:3 48:22 49:2 66:12 180:12 212:24 213:2 267:14 366:16

**perspective** 155:3 156:24 176:9 203:7 259:5 317:10

**perspectives** 347:2

**pertain** 287:12

**pertaining** 96:5 121:12 385:4

**pertains** 123:14

**pertinent** 356:13

**Pete** 127:23 128:20, 23 129:5 130:6,9,18 131:19 139:13 140:3 141:1 146:15 147:25 148:7 189:14 197:3 203:5, 19 204:23 214:5 264:11 270:14,15, 17 272:2,3 274:19 276:17 291:4 294:25 295:22 296:12 298:2 326:1 340:9,20

**Peter** 147:25 203:20 324:23 332:8

**Peters** 45:16,23 46:2 49:4 61:6,15 152:19,25 153:10 212:9 277:14 278:25

**pets** 25:9

**phases** 27:3

**Phoenix** 94:4,5,20, 25 95:20,21,22 96:8 97:2 102:7 103:17 110:15 123:21,23 124:6 219:19 258:16 261:6 293:24

**phone** 32:10 56:15, 20 64:4,14,17,23 65:23 74:15 105:14, 16 112:3,5,8,9,10, 15,23,24 113:1 114:5 135:5 154:2, 9,16,20 226:4 282:4 330:25

**phone's** 177:25

**phone-phone** 112:12

**phones** 113:4

**phonetic** 349:22 381:9

**phrase** 84:3 106:1 129:18 208:12,23 315:14 371:4

**phrased** 44:12

**physical** 216:16 219:4 252:4,7 253:10,20 258:14 260:23 385:9

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**physically** 34:9 35:1 36:8,16 131:9 185:11,13,17 212:25 213:8 264:20 316:23 317:23

**pick** 45:23

**picture** 281:14

**pieces** 64:8

**pig** 26:17

**pigs** 26:15

**PII** 118:4

**pile** 252:14

**PIV** 64:17 178:1

**PJ** 104:10,14 109:5, 7 186:14,25 246:17

**place** 36:14 70:12 103:5 121:18 253:25 286:10 293:1 367:16 371:14 374:15

**places** 31:11 59:2 250:21 374:16

**placing** 272:5 324:25 337:21

**Plaintiff's** 167:4

**plaintiffs** 8:16,18, 20,22 229:16 233:17,19,21,23,25

**plan** 10:16 28:24 358:5 364:21 366:22

**planned** 183:21

**planning** 370:12

**play** 33:15 275:10

**played** 85:20 290:21

**plenty** 371:14

**plug** 264:21

**plural** 30:6 189:24 275:14

**point** 31:2 32:6 84:1 89:25 91:13 107:5 117:15 128:23 129:1 133:3,12,24 135:6 137:17 143:6 146:6 167:23 169:23 170:11 171:12 198:9 214:24 218:8 244:23 262:14 265:12 276:4 296:18 315:25 317:8,14 353:5,14

**pointed** 157:6

**pointing** 124:15 170:4

**pointless** 208:25

**points** 119:18 166:24 199:19

**policies** 359:15

**policy** 23:1,3,6 31:15 140:5 161:9 199:10 203:21 210:2 262:23 310:25 311:22 312:7

**political** 22:9,19 23:6,16,20 24:5 26:9 31:14 32:12,25 37:24 63:2 70:5 83:11,13,17,19,25 115:17 120:3,4 131:8 137:7,16 191:1 199:24 213:12,16 346:18

**politicals** 22:16 63:21

**politicians** 31:19

**politics** 31:15

**poor** 284:19

**portfolio** 57:24

**portion** 34:6 39:23 53:5 150:7

**portions** 347:10 385:21

**pose** 13:6

**posed** 11:20 12:16 326:12

**position** 22:25 51:19,23 52:2 57:9, 10 92:2 96:24 98:19 138:12 143:3 149:19 173:16,17 174:13,15,18,20,23 205:5 226:20 244:7 266:2 269:3 275:5 288:3 295:8 296:2,3 328:17 333:9 352:5 354:12 377:25

**positions** 22:5 137:11 352:19 373:15 374:7 375:5

**positive** 31:22

**possess** 352:12

**possibility** 273:18 274:5 280:24

**possibly** 106:13 156:17 245:10 275:1,2 276:16,17 305:24 332:6

**post** 114:13,20 283:13 285:2 339:23 340:7

**post-february** 274:18

**posted** 281:14 283:12 300:5 339:19 351:14

**posting** 281:18 285:8

**posts** 217:12

**potential** 86:20

**potentially** 130:2 328:19

**poverty** 31:15

**power** 223:6 261:21 263:1,4,9 362:22

**powers** 110:4 205:1 210:3 223:13 262:7

**PPTO** 135:18

**practically** 34:24

**practice** 209:22 318:20 319:3

**practices** 209:16,18

**pre-** 195:5 367:2

**pre-decisional** 194:21 239:18 303:2 304:23,25 349:2

**precipitated** 114:25

**precipitating** 164:20 190:9

**preference** 214:8

**prejudice** 229:6

**premise** 161:20

**prep** 132:7 144:25 145:2

**preparation** 15:14,

24 16:8 17:20 46:8 92:17 144:22,25 145:4 207:17 235:23 236:1,19,23 335:22 365:13

**preparations** 207:25

**prepare** 15:18 16:3 17:13 132:8 332:16, 19,22 334:2,14,22

**prepared** 132:6 290:3 338:6

**preparing** 48:8

**prerogative** 227:2

**present** 16:5,6 34:9 36:8,17 69:11 89:20 92:21 131:9,10 185:11,13,17 316:18 330:19,22 370:19

**presentation** 313:2

**presented** 313:1 316:5

**preserve** 384:4,19

**president** 49:22 50:22 75:9,10 81:8 115:8,10,16,22,24 116:3 120:15 131:21 142:20 176:25 177:1 245:4 248:16 301:7,13 356:8,18 361:6

**president's** 39:21

**presidential** 47:9 81:5,7 116:10 328:18

**presumptively** 227:12

**pretty** 50:4 216:21

255:18 260:15 306:19 342:12,13

**prevent** 164:2

**previous** 121:2 134:13 135:23 188:15 193:20 279:6,8 296:1

**previously** 72:11 135:17 368:19

**primarily** 25:1 200:18 323:1 370:13 382:16 383:24

**primary** 22:6,15

**principal** 271:18 316:1

**principals** 348:1

**principle** 208:15,18, 24 209:17 210:5

**principles** 214:9

**prior** 14:14 51:20 58:21 60:3 61:23 83:22 90:7,20 127:7,15 130:13 131:7 132:23 144:25 145:1,4 160:3,10 161:6 169:22 175:13 176:3 190:13 192:12 214:24 215:21,24 223:3 225:5,10 226:2,14 229:7,21 254:2 274:23 275:3 277:16 280:11 285:7 286:10 348:22 353:12,19, 20 359:22 360:15 367:9 377:12,18 378:10

**prioritizing** 193:23

**priority** 294:11,25

**private** 227:10

**privilege** 13:12,16 14:22 116:7,11 143:15 170:2,5,21 194:16,20 195:9,14 225:8 227:11 239:13,15 241:3,7 286:23 302:21 304:5,12,25 305:1 328:19 347:14

**privileged** 14:20 170:3 171:1 195:25 196:1 226:17 304:15

**privileges** 105:23 116:12 294:4 328:20

**problem** 80:11 145:21 347:14

**procedures** 351:5

**proceed** 9:14 40:19 234:17 361:24

**process** 13:13,16 53:12 63:19,25 64:6 65:4 86:14 95:25 108:15 116:7 117:23 143:15 194:15,19 197:21 200:18 208:20,22 239:12,14 240:7,22, 23 241:1,2,4,7,22 242:6 286:5,9 290:4,9 298:13 302:20 304:4 313:8 344:23 349:2 351:6 352:3,22 353:16,23 354:22 375:2 385:15

**processes** 313:23 351:20 352:1 364:1 374:20 379:15

**processing** 309:21 310:12,18

**produced** 14:13 208:4 220:2

**product** 113:14 170:2,4,25 334:24

**professional** 320:19 374:18

**proffering** 229:3

**program** 18:18 240:6 310:25 372:18

**programmatic** 85:9

**programming** 23:1 140:5 203:22 365:10

**programs** 118:14 287:13,16 300:10 349:19 351:24 352:7 374:24

**progress** 227:8

**project** 352:5

**projects** 96:9 313:5

**promise** 171:16

**pronunciation** 85:25

**proof** 281:1

**proper** 173:25 174:5 247:5 256:16

**properly** 243:25 298:15

**prophylactic** 228:1

**proposal** 229:20

**propose** 214:11

**proposition** 362:15

**protected** 116:6 194:15 239:12,14 286:22 302:20 304:4,12,25 328:18

**protecting** 305:1

**protection** 281:14 366:14

**protections** 374:20

**proud** 27:22 28:4

**prove** 25:11

**provide** 56:3 58:14 177:10 249:1,11 263:1,2,4 271:15 295:1 296:13 301:10 327:15 360:10

**provided** 98:8 141:11 226:24 227:1 250:1 253:12 270:21 271:7 274:1 289:24 290:5

**providing** 226:25 290:13

**proving** 197:21

**provision** 293:25

**PSC** 190:9 192:18 196:10 199:7 238:3 359:19

**PSCS** 191:5 192:11, 23 325:1 337:22 368:21,25

**PTPO** 370:9

**public** 132:14,16,22 133:11 146:17 212:10

**publication** 81:21

**publicly** 17:17 133:7,10

**publish** 81:24

**publishes** 81:19

**pull** 188:10

**pulled** 81:10

**pure** 136:16

**purely** 350:11

**purple** 118:24 119:2,9 120:5

**purpose** 227:10 374:24

**purposes** 67:13 158:9 159:12 214:22

**pursuant** 268:6 272:5

**pursuing** 201:13

**purview** 27:14 110:17 262:20 288:25

**push** 108:12

**put** 34:3 36:13 37:23 84:16 97:8 103:5 111:3 188:11,12,20 208:15 239:23 267:16,21,24 268:2, 6 297:3 308:4 325:4 357:3 359:7 387:6

**putting** 97:11 146:25 147:17 251:17 260:16 271:9 349:19 367:16 368:17

**Q**

**qualified** 375:2

**qualify** 374:19

**Quantico** 33:11,12, 13,14

**question** 11:3,15, 20,21 12:16 13:6,7, 8 19:23 20:17 33:25 41:8 42:6 44:12 47:4 61:22 65:12 76:22 84:18 89:8 91:20 92:4 99:4 103:15 107:12 113:19 116:5 120:9 121:11 125:11 128:15 134:3 135:23 144:23 150:1 153:25 154:5 155:13 156:1,14 159:1 160:20 161:20 162:21 163:13 165:7,13,18 166:1 167:12,20,25 172:5 174:6,9,12 176:18 179:11 183:12 184:5 191:4 195:16,17,18,21 204:4 205:5 206:1, 16 209:3,7,15 215:17 220:21 221:2 226:21 230:5 238:23 241:13 245:7 249:19 254:14 257:8,15 271:24 272:1,12 275:19 278:7,15,20 279:6,8,11 281:6 284:9 300:4 303:2 305:4,21 307:17,19, 22 313:15,19 314:10 319:19

321:12,22 323:20 324:6,14,17,18 325:4,6,9,15 326:12 327:9,24 328:13 329:20 330:4 336:23,25 337:2 340:6 341:14,19 348:10,21 349:12 354:14 358:25 360:13,14 361:15 366:7 371:24 372:2, 3 375:21 378:13

**questioning** 87:20 102:3 257:9 262:15 323:15

**questions** 11:17 13:14 14:8 27:5 29:13 43:25 88:14 100:1,6,7 119:7 156:13 162:16 169:20 171:15 178:9,22 179:9 187:16 208:2 209:1 220:22 224:7 229:2, 7,13,18,25 236:6,16 241:8 242:4 288:7 293:14 294:10,24 300:22 313:4 328:16 329:4 331:19 335:11 338:5 339:2 346:19 361:21 379:1

**queue** 347:12

**quick** 87:1 93:1 145:19 146:12 203:11 340:10

**quickly** 57:3 245:12

**quotation** 217:25 260:23

**quotations** 310:23

**quote** 39:20,23 217:21 225:3 290:6 357:20 358:6 362:20 376:5

**quote-unquote** 93:24

---

**R**

**raise** 9:8 234:11

**Ramada** 187:4 188:24

**rank** 68:14 83:24 137:7 197:23 288:2

**ranking** 36:7 70:24 72:3 135:20 137:6

**Rapier** 146:16 147:15 148:17 190:20

**rationale** 130:20

**re-** 22:18

**re-clarify** 124:12

**reach** 144:11,14 244:17,19,22,23 354:25

**reaches** 183:25 185:4

**react** 360:11

**read** 15:19 49:13 87:20 98:15 105:23 123:23 124:11 135:3 142:14,15 145:11,12 148:9,18 164:22 169:13,15 182:19 186:17 189:9 190:4 198:21 204:4 206:17 217:15 218:21 221:14 235:15,25

245:20 247:20,25 248:1 253:19 257:25 258:8,12 260:3 263:22 265:4 288:15 289:7 292:15 294:6 295:3 299:9,12 300:8 319:14 322:22 350:25 355:6,7 358:19 387:9

**read/right** 260:18

**read/write** 219:22 259:9,14,23 260:22

**reading** 71:24 81:16 153:2,7 178:2 246:10 294:16 296:6

**ready** 64:18 182:21 189:10 246:8 256:5 268:3 299:14 346:1

**ready-to-send** 290:3

**Reagan** 28:13,18 104:1 129:22 149:17 151:19 152:10,17 153:17, 21 159:10 205:12 206:3 212:13,15 213:21 216:5 217:1 277:6 280:7 281:8 283:11 317:5,6,21 357:7

**real** 92:25 118:25 131:19 145:19 146:12 203:11 227:20 340:10

**realigning** 47:10 81:6

**realignment** 352:7

**realize** 226:16 310:22

**realized** 123:15

**realm** 310:14

**reason** 12:11 14:20 18:7 69:23 70:22 89:21 103:11 112:18 196:23 298:5 314:24 322:2 380:8

**reasonable** 318:9

**reasons** 327:16

**recall** 30:9 43:21 50:17 60:6 73:23 74:2 78:21 80:3,4, 10 89:16 91:7 94:15 99:14 102:12 110:11 111:7 113:6 117:12,16 129:5,9 138:11 140:24 141:13 149:11 151:1 200:8 207:3 211:8 215:2 237:10 239:6 252:8 267:20 269:10 274:20 340:1,18 342:10,11 357:22 360:9 361:6 368:24 373:1

**receive** 78:11 351:15

**received** 51:19 53:3 64:10,17,21 121:15 132:2 141:16 146:9 207:4 250:16 251:6 256:8 257:24 260:8 309:16 311:23

**receiving** 177:20

**recess** 40:17 87:16 121:24 166:14 228:23 255:4 285:15 335:6 383:18

**recharacterize** 211:1

**recognize** 12:8 39:5, 6 79:21 80:8 81:2,3 122:4 289:6,9 339:12

**recollection** 58:7 88:21 129:10 169:12 226:6,9 341:5,6 350:9

**recommend** 116:2 197:6

**recommendation** 163:5 195:1 196:12 197:2 289:14,19 302:25 304:8,11,21 305:9

**recommendations** 195:25 305:5,6 378:1

**recommended** 195:4,17 197:7

**recommending** 304:14 306:13

**record** 8:8 9:24 11:6 12:17 34:10 39:16 40:12,16,18 44:22 46:13 52:7 61:9 87:15,18 91:25 109:19 112:7 119:1 121:20,23 123:9 127:21 145:19 146:8 150:15 166:13,16 175:11 178:24 182:22 201:11 206:9 212:5 218:25 224:20 225:2 228:19,22,25 229:14,15 230:3 232:11 233:8 235:1, 4 246:5,12 254:25

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

255:3,6 257:10 258:8,25 285:14,17 302:10 328:7,23 335:5,7 339:14 361:23 368:11 378:17 381:25 383:13,14,17,19 384:10 387:6 388:8

**records** 108:20 123:23 128:9 175:14 327:7 329:16 331:3 385:7, 9

**redacted** 239:15 244:16

**redirect** 387:2

**reduce** 199:12

**reduction** 273:19 274:5 275:7 289:17 351:5 352:2

**redundancies** 85:10 146:20

**reevaluate** 195:20

**Reevaluating** 81:6

**refer** 44:17 54:8 56:18 110:23 158:21 173:10 211:7,9 250:5 251:21 350:3 361:3

**reference** 88:6 93:1, 3 190:25

**referenced** 140:12 183:16 215:20 288:8 322:2 385:19

**referencing** 94:1 141:11

**referred** 267:11

**referring** 45:2 93:4,

17,18,22,23 107:18 108:20 148:15 153:6,8 162:4 183:18 202:1 250:8 254:6,19 259:7 277:11 295:6,9,11 296:4,14 297:23 298:4 350:5

**refers** 102:18 147:10 248:14 297:14

**reflected** 156:15 239:15

**reflection** 131:20

**reflections** 68:7

**reflects** 170:25

**Reform** 360:22

**refresh** 226:5

**refreshed** 171:10 226:8 227:22

**refused** 112:1

**regional** 23:4,7

**Register** 81:15,19

**regular** 316:15 317:2 319:5 321:7, 10,16

**regularly** 112:16 296:19

**regulations** 110:2 263:10

**regulatory** 20:1,2

**reimbursement** 53:12

**reimbursing** 53:4

**reiterate** 121:11 229:20 330:7 338:1

**related** 23:6 43:3 57:22 65:13 95:7 111:8 113:15 117:21 161:22 162:9 175:21 198:7 211:10 216:4 219:21 235:19 236:1 258:18 261:8 333:21 334:6,13,21 340:3 353:15 361:16 370:4 379:16

**relation** 301:13

**Relations** 342:4 343:3

**relationship** 157:22 176:3 178:10

**relay** 78:6

**relayed** 78:1

**relevant** 47:2,19 48:7 217:13 221:5 290:3 304:20 351:20,22 352:12

**rely** 367:17

**relying** 350:11 362:14

**remain** 12:18 364:13

**remainder** 356:21

**remaining** 216:14 362:25 364:21 369:14,17 372:24

**remember** 10:22 18:5 23:2 28:24 37:13,15 39:18 44:18 50:9 53:2 68:17 71:17 73:24 77:24 79:14 113:7 118:16 124:1,24 138:20 149:12

167:7 188:8 189:19 196:18,24 216:20 222:13,19 246:21, 23 247:6 250:21 251:23 259:16 267:24 277:6,8 288:2,18 301:11 306:18 307:2 308:1 310:16 337:7 347:25 358:8 361:4 363:20 372:3 374:22

**remembering** 71:18 169:17

**remind** 300:1

**remote** 205:11

**remotely** 202:13

**removal** 151:4,12

**remove** 115:2 116:22 120:14,19 149:21 150:6

**removed** 34:23 72:16 76:25 114:13, 20 116:3 121:7 132:15 134:18 149:16 281:16

**removing** 121:12

**renew** 243:22

**reorganization** 338:18 348:16 349:11,13,18,19 355:19,24 359:23 360:6,16

**reorganization'** 337:19

**reorganize** 349:8 356:15,19

**reorganizing** 324:24

337:19

**rep** 248:3,4,5

**repatriate** 25:10

**repatriating** 27:20

**repatriation** 351:16

**repealed** 361:8,17

**repeat** 184:25 274:2 341:13

**repetition** 138:2

**rephrase** 11:15 65:12 114:17 135:12 159:17

**report** 20:19 34:7, 16,25 35:4 59:12,13 90:22 91:3,4,11 125:12,19 158:6 175:25 214:2 376:21

**reported** 34:13 36:12,14 157:20 217:2

**reporter** 9:5,7,13 11:1,8 15:7 38:23 76:16,19 80:22 87:24 142:5,8 145:7 182:3,7 186:5 189:5 217:7 218:18 230:17,22,25 231:3, 9,16 234:8,10,16 254:24 263:13,16 266:22 269:25 272:24 289:1 291:8 299:4 308:24 339:7 343:10 345:15 355:1 367:24 368:2 387:5,12,16,19,22

**reporting** 34:18 90:25 157:22 178:10

**reports** 136:22

**represent** 8:14 14:11 149:14 202:20 220:1 233:15

**representative** 74:6 92:2 134:23 135:9 143:16 165:1,10 295:20

**representatives** 93:24 295:17 355:14

**representing** 42:1 295:23,24

**request** 107:21 267:8 378:4

**requested** 152:13, 21,24 302:17

**requesting** 337:15 377:3

**requests** 293:23 333:25

**require** 379:20

**required** 56:4 85:16 282:21 309:25 313:25

**requirements** 25:21

**requires** 64:17 359:22 360:15

**reservation** 14:2

**reside** 363:10 384:13

**residing** 206:12 212:12

**resign** 372:14

**resignation** 138:14

**resigned** 138:12,15, 22,23,25 198:10

**resolve** 24:8

**resource** 22:8 370:3,11 371:13 372:7 379:25

**resources** 24:2 72:2 108:11 135:19 140:6 203:22 248:13,18 268:23 314:7 351:13 370:2, 13 372:9

**respect** 78:17 79:7 85:3 154:20 174:9, 15,20 177:4 178:4 192:17 199:14 207:1 226:1 255:10 257:16 271:9 300:19,24 308:7 318:10 326:25 333:25 341:22 355:24

**respond** 178:13

**responding** 246:19 259:11 261:1 326:3

**responds** 300:12

**response** 129:20 147:20,23 167:14 168:12 203:19 245:8 255:17 260:25 322:1 324:6, 16,18,20 325:11,17, 18 326:2,12 338:16

**responses** 14:13 167:4,11 220:3,11 229:5,8 237:16,17 250:19 254:5,12 255:9,19 338:2,7

**responsibilities** 57:20 63:15 96:3,6

198:11 287:19 319:12,16 384:2

**responsibility** 24:1 90:17 119:24 187:13 365:10 382:15 383:3,5

**responsible** 82:5,9, 11 119:20 271:16 370:12 382:17 383:11,24

**rest** 26:19 146:20,23 189:8 199:23 370:22 372:22 380:19

**restart** 248:4

**restate** 158:25 165:7 179:6 195:22 276:22 307:18 360:13

**restricted** 106:18 158:22 159:19 160:7 161:1,8

**restricting** 346:6

**restructuring** 324:24 337:20 338:18 360:23

**result** 22:5

**retirements** 370:4 379:14

**retrieve** 216:11

**return** 69:19

**returned** 351:8 352:20

**returning** 25:5

**reveal** 303:2 342:17

**review** 17:16 20:2 59:1 82:22 83:3

117:22,23 146:19 193:17,18 286:3 300:9 308:19 309:25 311:21,22, 25 312:21 313:9 333:13

**reviewed** 128:10 145:25 149:23 226:8 286:11,13 318:12,13

**reviewing** 224:21 248:8

**reviews** 287:11,16 308:12 309:19 310:25 311:5,13,17 312:18

**revisit** 236:12

**revocation** 277:23 278:3,6,17,19 280:1,11

**revoking** 278:1

**Richard** 76:16

**Rick** 287:23,24

**rid** 356:25

**riddled** 344:20

**ride** 35:11

**RIF** 146:11 275:8,12, 14 276:7,11 289:17 290:9,23 341:1,2 342:2,7 344:13,17, 23 345:2 353:16 369:7 372:22,25

**RIFING** 344:23

**RIFS** 275:14 352:18 353:18 377:21

**rights** 256:8

**ripple** 209:19

**risk** 32:25

**road** 209:21

**Rob** 323:1,3 324:3

**Robert** 322:24

**rog** 358:10,18

**Roger** 102:4 267:3 324:11

**role** 19:10 22:2,6,15, 25 34:11 37:1 53:22 54:3 58:9,12 59:6 71:4,8 72:9,20 76:2 79:1,6 85:3,6,21 92:23 96:5 99:11 108:9 110:22 112:18 117:14 119:16 121:8 133:13,23 134:19 136:2 137:12,15 158:10 167:18 173:23 177:3,9 189:19 190:5 192:17 199:14 218:2 222:23 242:5 270:18,21,23 271:1, 15 275:10 276:10 289:22 290:13,16, 21 291:6 306:2 308:7,10 317:3

**roles** 27:10 34:4 63:15 205:1,2 222:11 314:23

**Ronald** 28:12,17,18 104:1 129:22 149:17 151:19 152:10,17 153:17, 21 216:5 277:5 357:7

**room** 13:4 16:5,6,18 17:9 29:7 63:21 66:7 112:2 133:1

169:19 171:5 192:21 193:12 195:23 198:19 200:12 274:22 330:22

**rooms** 282:9

**Rose** 320:12

**rotated** 118:10

**rough** 136:10

**roughly** 52:7 369:11

**routinely** 319:1

**row** 193:8

**Rubio** 34:24 59:15 70:20 75:7 76:2 77:4 78:17,18 82:20 107:7 115:1,9,11 120:12,15,22 121:1, 6,15 124:21 125:18, 25 127:13 131:22 133:4 135:16 136:14,23 137:4,21, 25 138:7,16,17,24 139:7 150:10,21 151:11 163:9 175:18 183:21 188:6 191:7 194:9 196:13 203:6 215:15 265:11 273:4 289:11 295:10 299:18,19 300:5,19 301:9,22 302:3 303:11 305:23 306:13 309:20 324:21 325:20 326:18 327:8,11 340:25 344:11 348:15 349:6,7 354:10 355:18,22 386:3

**Rubio's** 115:25

325:22 348:25

**rule** 226:18 227:7

**rules** 10:12,25 225:2 227:7 228:4 376:9

**run** 85:15 314:5

**rundown** 282:22

**rungs** 134:9

**running** 33:15 83:14 265:3 306:4 311:25

**runs** 25:2 364:10

**Ryan** 347:7,19

## S

**Sabeda** 66:11

**safe** 351:15 387:13

**safest** 32:8

**safety** 353:12

**sake** 47:12 357:19

**salaries** 53:5,6

**salary** 53:9

**Salt** 259:20

**sat** 312:22

**Saturday** 45:4 138:19,22 151:16 152:8,14 153:2,17 161:12 183:23 185:21 188:21 217:1 265:6 267:17 268:16

**save** 59:3

**scale** 137:10

**Schedule** 367:9 373:10,20,22 374:2, 15

**schedulers** 245:11

**scheduling** 230:18

**Schneider** 212:11 279:2

**school** 31:8,10

**SCIF** 38:9,10 92:7 106:2,14

**SCIFS** 30:2 105:25 106:3,8,19

**scope** 101:19 156:6 157:21 176:11 178:25 180:22 184:18 243:25 262:16 287:19 288:9 300:23 312:1 314:17 318:9 319:8 322:6 323:16 334:1 338:1,8 341:19 343:5 344:23 345:10 348:10 361:11 362:16 368:22 369:8 378:18,20,22 379:8 381:19 384:5

**seal** 149:10,17,21 150:6,25 151:4,12 281:15

**search** 333:24

**searched** 333:20 334:12,20

**searches** 334:6

**seat** 99:12

**sec** 39:4 41:6 50:6 69:1 145:10 182:19 186:8 218:21 254:24

**seconds** 68:17

**Secret** 321:17

322:2,3,8

**Secretarial** 112:18

**Secretariat** 369:25 372:8

**secretariate** 213:4

**secretary** 19:17 20:19 30:13,14 32:13 34:24,25 59:14 66:4 70:20 71:7 75:7 76:2 77:4 78:17,18 82:20 107:7 115:1,9,11,25 120:12,15,22 121:1, 6,15 124:21 125:18, 25 126:8,9,18,19 127:13 133:5 135:16 136:14,23 137:4,21,25 138:24 139:7 144:11,14 150:10,21 151:11 163:9 175:18,21 183:21 188:6 189:22 191:6 194:9 195:4,11 196:13 197:4,7 203:6 215:15 244:16,19, 21 245:1,6,7,11 265:11 273:4 289:10,11 295:10 296:9,14,17,20 297:5,13,24 298:3, 4,6 300:5,19 301:5, 9,22 302:3 303:11 305:23,25 306:5,13 309:20 324:21 325:20,21 326:18 327:7,10 340:25 344:11 348:15,25 349:6,7 354:10 355:13,18,22 362:12,22 374:8 386:3,21

**secretary's** 30:12 140:17

**section** 41:5 86:19 118:10 227:6 352:16

**secure** 253:3

**secured** 106:11

**Securities** 18:4

**security** 18:10 19:14,17 38:17 66:16,19 93:22 102:17 103:9 122:6 183:2,3 186:14 212:24 262:11 380:25

**seek** 103:21 222:16 289:15

**seeking** 100:2 122:9 222:8 250:25 251:2, 12

**sees** 347:23

**select** 55:22

**self-** 369:23

**semi-circle** 131:19, 24

**semi-cubicles** 193:15

**Senate** 84:1 355:13

**send** 55:6 92:5 203:24 205:10 214:15 264:23 318:21 344:9

**sending** 293:21

**sends** 65:20 344:17 360:6

**senior** 19:13 22:20 23:16,20 26:12

32:13 35:1 52:8 83:10,13 84:2 106:25 107:3 115:17 143:4 208:15 245:3 248:18 287:17 290:4 347:8,20,23, 25 370:8

**sense** 11:18,22 12:18 51:5 96:17 238:7,11 297:21 312:24 325:5

**sentence** 48:6 83:6, 17 148:12,18 203:3 226:11 265:13,14 295:15 296:1,21 332:9,11

**sentences** 352:16

**Seong** 117:9 118:12 198:15

**separate** 16:21 52:2 146:2 178:21 272:23

**separated** 351:3,10 352:18,22 369:7

**separately** 106:4 205:14 297:15 347:3

**September** 373:4 377:12,19,21 378:10

**series** 152:4

**servants** 351:21

**serve** 179:1

**service** 47:10 117:8, 10 131:6 158:2 176:3 189:23 198:16 212:10 301:13,14 314:3,4

321:15,17 322:3,8 351:4,10,21 352:18 369:13,14 370:15, 17,20,21 371:14,15 373:18 374:20 375:3 376:17,21,22

**services** 18:7 26:10 50:1 189:23 190:10 194:4,5 199:13,22 206:7 212:8 314:2 352:8,12 363:7 369:24

**set** 19:24 63:17 117:15 167:4 182:21 186:10 193:2 218:23 349:21

**settlement** 315:7

**settlements** 315:5 379:19

**SF** 355:14

**SGE** 243:13

**shake** 11:10

**shape** 193:13

**share** 348:4 370:3

**shared** 131:14,23

**she'll** 10:2 182:10

**shifting** 100:5

**ship** 23:22

**shoe** 119:14

**short** 21:11 30:13 32:16 187:25 191:13 224:9 287:24 314:9 335:3 376:13

**shorthand** 248:16 267:12 275:9

**shortly** 64:21 114:12,18 148:8,24, 25

**show** 27:13 112:8 119:2 127:22 208:19 327:7 329:17

**showed** 37:12,17 54:14

**showing** 175:18

**shown** 62:23

**shows** 34:10

**Shrum** 347:8,19

**shut** 111:23 210:11, 22 255:22

**side** 227:17 287:12

**sidebar** 358:3

**sided** 215:5

**sides** 61:17

**sidetracked** 278:13

**sign** 87:21 387:10

**sign-** 290:4

**sign-offs** 209:10

**signage** 149:9,16

**Signal** 333:13

**signed** 75:17,24 81:7 82:19 103:5 140:12,17 214:17 215:13,15 273:8,11 277:14 302:14 305:18

**significant** 194:3 351:13

**signing** 222:20

**Siler** 8:23 13:5,11,23

14:1,11,18,21,24 17:7 39:1 40:8,13 48:17 61:1 62:15 65:17 67:9,13 76:12,15,18,20 77:6 79:25 84:24 86:24 87:1,19 93:9 94:7, 10 98:12 99:16 101:18 105:5,7 111:6 113:16 114:15,22 116:5,10, 15,18 120:16 122:16 123:4 125:3, 15 126:5,16 127:1, 18 128:7,17 129:13 132:18 139:21,24 143:13 144:2 147:2 151:25 153:24 154:4,7,11 156:4 157:8,21 158:25 159:7,24 161:3,18 162:10,14 163:18 165:2 166:7 169:25 170:6,13,18,22 172:4 173:6 175:3 176:11,15,22 177:6 178:8,14,18 180:2, 16,22 181:11 182:13,17 184:2,4, 10,17,24 187:19 192:7 194:14,18,24 195:3,15 196:14,16 197:13,15 201:1,7, 22 204:16,19 207:11 210:14 211:18,21 215:3 220:8,11,13,16,18 223:2 224:11,15 225:16,18,21,24 227:14 228:2,9,14, 16 229:1,24 230:1, 7,12 231:1,2,7,14, 20,22 232:6 234:1 235:12,19 238:12

239:11 240:9,19 241:10,12,15,25 242:2,7,17,25 243:22 244:8 249:3, 14 251:14,19 252:12,18,20 254:10,15,18 256:1, 18,20 257:1,21 258:24 259:4,6,18 262:2,14 263:5 264:5 265:17,19 268:13 269:1 271:12 272:13 274:9 275:20 276:12 278:8,10,22 279:12 280:18 281:19 283:14,20, 22 284:7,11,13,16 285:3,25 286:21 287:1 288:6 290:18 291:20,24 292:3,6, 10,18 293:17 294:19 295:7 297:25 299:17,22 300:21 302:6,9,19, 24 303:9 304:3,16, 19 307:6,18 308:14 310:3,8 311:6,19 314:16 315:21 318:1,4,8,24 319:7, 21 320:5,25 322:5 323:12,13 325:6 328:11,15 329:3 330:7 333:3,16,23 334:4,15,23 336:18 337:25 338:22 341:13,18 342:6,16, 19,23 343:5 344:22 345:9,21 347:13,17 348:19 349:16 350:17,20 352:25 353:25 354:4,18 356:1 357:10 358:2, 4,11,16 359:1,9,12,

March 26, 2026

25 360:17,24
361:10,22 362:5,16
364:23 365:24
366:3 367:1,6,19
368:22 369:8
371:10 372:1
373:24 375:16
376:24 378:11,16,
21 379:1,8 381:18
382:9,19 383:7,14
384:5,21 386:9,12
387:2,9,21 388:4,6

**siloed** 96:3

**similar** 24:20 51:13
329:15 330:10

**single** 36:17 48:23
113:23 198:6 288:2
300:2 312:19

**sit** 20:13 25:25 30:9
56:24 382:14 383:1

**sits** 380:20

**sitting** 46:1 107:9
120:9 134:22

**situated** 28:22

**situation** 174:5
222:19 326:8 354:9

**skills** 351:22 374:18

**skillset** 380:5

**skip** 47:11

**slated** 309:19

**sleep** 133:21

**slightly** 58:20
137:14 260:12

**slow** 67:23

**small** 29:8 191:13

**snuff** 282:20

**soda** 152:5

**soft** 102:15

**sole** 366:9

**solutions** 28:7

**solves** 61:4

**solving** 24:6

**sort** 23:15,22 24:10,
15 26:20 27:6 29:2
52:8,20 57:17
63:14,15 68:3,7,22
70:7,25 72:19 83:13
85:16 108:15
116:24 118:20
119:16,19 125:22
131:1 134:9 142:22
150:18 156:15
163:14 177:24
198:15 208:14
209:16 249:15
254:1 285:24
301:19 312:6 315:7
329:9 331:17 334:5
336:24 346:20
348:9 354:8 357:23
374:23 381:22

**sought** 102:6
103:16

**sound** 10:16 11:6,11
95:17 153:12
166:17 247:18
257:13 369:3 374:4

**sounded** 76:12

**sounding** 129:18
163:1

**sounds** 10:2 11:7
12:19,22 40:14 58:5
73:16 88:8 149:19
156:11 162:11
186:19 224:12

231:15 247:22
248:12 257:14
345:25 351:1 369:1

**space** 28:19 29:9
158:22 161:8
187:10 193:10
281:23 282:1,14,16,
23 363:14

**spaces** 158:18
159:6,10,19 160:7
161:1 187:11
282:18

**spare** 169:19

**speak** 15:25 16:1
52:11 68:9 81:23
95:8 122:24 132:10
133:1,15,22 135:10
145:19 156:24
173:4 175:14
184:14 201:19
202:8 218:6,7,11
224:19 232:8
238:23 239:9 271:2
272:11 276:20,23
277:1 278:20
283:10 291:1
307:16 315:9
319:10 330:11
332:17,20,23,25
333:8 354:8,25
367:10 382:11

**speaking** 10:1 20:14
115:13 128:10
133:23 166:4
169:10 238:15
243:20 282:2
288:24 297:1
314:20 316:18
346:14 349:23
354:7 378:5 384:19

**speaks** 340:1

352:17

**special** 334:6
374:24

**specialized** 380:5

**specialty** 374:17

**specific** 24:16 26:21
27:16 43:6 53:2
62:17,18 71:16
102:10 107:1
108:20 126:18
131:16 149:24
161:22 164:24
167:11 180:12
181:24 209:23
213:1 220:5 287:6
288:17 300:23
301:5 326:12
327:21 340:4 350:6
365:9 367:23 372:2

**specifically** 45:2
57:22 60:10 63:4
70:16 72:7 77:23
78:22 90:19 96:8
99:14 102:13,18
104:2 105:24
108:20 117:1 120:8
133:18 134:21
143:5 148:14,16
150:8 152:20 157:3
158:20 180:6
199:18 200:13
217:22 243:6
250:12 260:21
287:18 291:4
295:11 298:21
307:2 310:11,16
312:22 325:18
326:8 340:5,15
350:8 376:15,16
381:3,21

**speculate** 165:15

169:2 332:1,2
348:7,12

**speculating** 66:18
157:17 164:12
340:11

**speculation** 136:17
156:9 157:9 169:3
176:2,14,15 180:2
184:2,10 187:19
192:7 201:1,7
238:12 245:9
265:17 269:1
282:13 295:7

**spell** 19:19 287:9

**spelling** 209:6

**spent** 15:19 217:22

**spliced** 336:24

**spoke** 104:10 114:5
125:17 128:23
129:4,6,7 155:21
157:2 192:4 202:8
207:19 271:5
277:25 279:7
282:24 298:6
315:24 316:4,12
324:21 325:25
330:3 331:22
335:20 386:3,21,23

**spoken** 117:4 132:9
207:5 236:9,24
288:23 335:12,14,
17 336:5

**sponte** 126:21

**spot** 102:14

**spreadsheet** 191:14

**spring** 99:15 223:17
224:1

**spy** 33:15

**staff** 20:25 21:1
27:11 28:6 34:8
37:25 61:21 70:4
78:5 91:16 92:13
93:24 94:2 101:15
104:10,15 118:6
119:19 128:1,2
132:13 135:22
137:14 151:2 155:5,
9 189:18 198:12
199:5 202:12
212:24 213:3,4
216:6 218:7,10
309:17 325:22,23
351:9 352:21 353:3
357:7 368:19,20

**stage** 193:2

**stand** 40:15 87:14
121:22 152:18
166:12 224:17
228:21 285:13
335:4

**standing** 131:1

**stands** 38:3 50:21
69:22

**start** 10:11 11:3 14:8
26:24 29:1 34:18
75:21 88:13 90:1,2
145:15,16 247:2
300:4 350:7

**started** 18:1,18 19:4
21:6,23 34:22 61:24
90:23 112:15
226:10 257:9
352:23 353:16

**starting** 87:6 117:22
192:22 264:10
285:20 301:2
309:13

**starts** 291:22
324:12,13,16

**startup** 32:19

**state** 8:14 9:23 16:4
18:25 19:1,11 20:13
21:6,7,23 24:22
25:1 26:4 34:25
38:17 45:21 46:19
49:11 58:22 92:9
112:10,16 125:1,12,
13,17 126:4 127:5,
17 128:1,11,19
130:14 133:5
136:18,25 142:21,
25 145:22 183:1,20
189:16 190:13
191:7 197:8 209:24
216:17 217:2 225:2
229:5,8,17 230:4
232:13 233:2,15
235:8 238:14,19,22
239:21 240:3,12,13,
14,17 241:17,23
242:11,12,21,22
243:8,9,19 244:3,6,
10,20,25 245:2,5,10
248:8,18,19 265:25
266:5 270:25 271:4
273:9,12 276:1
280:4,13,14 283:10,
16,24 284:2,4 285:5
287:14,16,20,22
290:20 295:9,17,20,
23 296:14,17,20,25
297:4,6,13,24
298:4,7 301:4,6
303:13,21 305:9,19,
25 306:5,10 315:15,
23 318:14 319:2
324:21 325:20,21,
24 326:1,3,10,13,
15,18,20 327:3,8,
10,14,20 328:3,4
329:15,24 330:2,10,
14,21 331:21,24

333:10,24 334:20
336:2,10,13,24
337:18 338:14
346:5,7,15,19
347:1,10,21 348:6,
15,23 349:9,20,23,
25 351:12,18
355:13 356:13,20,
21 358:18 360:3,4,6
362:4,12,22 363:1,
6,8,9,15,24 364:2,3,
17,18,22 365:5,11,
23 366:9,11,13,16,
24,25 367:7 369:19,
21 371:2 372:19
373:8 374:8 375:2,4
378:24 380:14,19,
23 381:1,3,4,10,14,
17,23 382:16 383:3,
10,23 384:3,18,24,
25 385:1

**State's** 229:23 316:8
324:9 325:18 337:5
347:2 354:14,20

**State-run** 287:13

**State/pete** 296:10

**State/usaid** 265:2,8,
10

**stated** 214:21

**statement** 52:8
184:9,22,25 185:5
201:5,9,20,23,25
227:25 237:12,18,
19 259:2 272:7
297:16 309:4 313:7
315:12

**states** 11:25 19:16
20:10 21:10 25:11,
19 26:3 75:9 81:6
115:22 220:18
232:13 233:2

ADAM KORZENIEWSKI
95350

March 26, 2026

445
30(b)(6)Index: stating..strong

248:17 269:11 272:4 309:3 351:9 383:5

**stating** 339:19

**station** 25:18

**stationed** 194:5

**stations** 29:10

**status** 187:8 191:17 242:15,23 243:3,7, 20,24 244:6,11 267:8 289:25 361:12

**statute** 110:1 210:1 361:8,16

**statutorily** 20:16

**statutory** 262:22 362:14 367:17,23 382:8,11

**stay** 18:6 95:25 213:22

**stayed** 70:6 119:11 247:16

**staying** 70:12

**step** 123:17

**stepped** 27:10 112:2

**steps** 149:6 224:14 365:9 384:3,17,18

**Steve** 43:11 45:15 49:3 56:2 57:17 114:7,9 123:20 143:9 152:18 153:10 154:16 156:17 157:10 158:3,6 175:25 177:8 180:10,11 243:16 244:15 270:5

**Steven** 107:23 219:16 244:11

**Stevens** 8:15 9:15, 20 10:8 13:23 14:6, 15,19,23 15:4,9,12 16:17 39:2,3 40:7, 10,20 48:24 61:5 63:5,11 67:16 76:10,21 77:12 80:7,25 85:2 86:25 87:3,7,11,22 88:3 93:13 94:17 98:14 99:21 101:24 105:11 111:14 113:19,25 114:16 115:3 116:8,12,21 121:4,17,25 122:21 123:6 125:9,21 126:10,23 127:4 128:3,12,24 129:24 133:6 140:10 142:3, 6,12 143:18 144:4 145:9 147:6 152:7 154:1,6,8,18 156:22 157:14 158:12 159:2,3,16 160:5 161:11 162:2,12,15, 17 164:1 165:5 166:9,18 170:3,9, 15,20 171:3 172:11 173:12 175:9 176:16 177:2,13 178:13,15 179:4 180:18 181:3,8,13, 17 182:9,16,18 184:8,13,21 185:2 186:7 188:19 189:7 192:10 194:17,22 195:2,7 196:4 197:9 198:1 201:4,18 202:2 205:3 207:16 210:16 212:2 215:7 217:9 218:20

220:10,12,24 223:8 224:8,13,18,25 225:13,23 226:10, 23 227:3,25 228:3, 13,15,18 229:12,25 230:2,11,13,22,24 231:8,23,25 232:7 233:16 234:22 235:13,14,21,22 238:17 239:22 240:11,21 241:11, 14,21 242:1,3,10,20 243:5,18 244:5,12 245:14,19,24 246:1, 3,7 249:5,17,21,23 251:17,20,25 252:6, 9,17 253:5 254:13, 16 255:7 256:3,6, 19,23 257:3,4 258:2 259:1,5,8,13 260:5 262:9,24 263:18 264:6,17 265:20,23 266:1 267:1 268:18 269:5 270:2 271:23 272:17,21 273:1 274:14 275:6 276:8, 19 278:14 279:5,20 281:5,24 284:9,17, 21,22 285:9,18 286:8,24 287:2,5 289:5 290:25 291:13,16 292:5,9, 14,19,21 293:12,18 294:20,22 295:13 298:8,18 299:8,19, 24 300:3 301:15 302:8,12,13,23 303:4,17 304:9,18, 24 305:7 307:14,20, 21 308:20,25 310:6, 21 311:15 312:9 315:11 316:7 318:2, 5,19 319:4,17 320:2,14 321:5

322:10 323:21 325:12 328:9,12,24, 25 329:12 330:13 333:7,19 334:2,8,19 335:2,9 336:20,22 338:12,25 339:11 341:15 342:1 343:1, 14 345:4,19,22 348:11 349:10,24 350:19,21,23 353:6 354:1,13 355:5 356:10 357:13 358:3,5,25 359:2, 10,16 360:12,20 361:7,18,20 362:1, 13,24 365:7 366:1,4 367:4,14 368:3 369:2,16 371:20 372:10 375:6,20,22 377:6 378:19 379:3 380:11 382:1,13,25 383:12,15,21 384:16 385:11 386:11,15,25 387:4, 16,18 388:1,3

**stood** 119:11

**stop** 92:25 250:22 311:10 379:2

**stopped** 27:24 31:5 354:9

**stories** 80:14

**strategic** 352:13

**streamline** 59:4

**streamlined** 85:11 229:9

**street** 28:14 33:18 363:13 364:9,12

**String** 189:18

**strong** 187:5

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**structure** 71:2 125:19 158:1 178:10,20,25 223:1 243:23

**stuff** 26:6 28:3 66:10 123:15

**stumble** 300:1

**stupid** 374:5

**sua** 126:21

**sub-tab** 336:12

**subchapter** 382:17, 23

**subdivisions** 374:21

**subject** 13:15 183:4 189:21 213:5 219:4 327:17 368:13 386:4,21

**subjective** 311:24

**submit** 24:24

**submitted** 149:15

**subsequent** 53:23 282:4 344:13

**substance** 10:15 68:11 133:25 143:25 172:6 225:5, 10 226:14 304:10 305:1 330:5 339:3

**substantially** 351:3 352:17 362:25

**substantiates** 237:14

**substantive** 67:10 219:8

**subtracting** 257:11

**suffices** 23:11 210:9

**suite** 29:5,6,15,22 30:12,15 62:23 63:1 64:19 66:22 129:23 140:18 193:2,6 282:7 317:25

**suited** 377:25

**suites** 30:6

**summarize** 146:12, 23 248:24 293:19

**summary** 377:1

**summer** 223:20

**Sunday** 140:7 185:25 186:23 217:2 219:11 221:23 268:16

**super** 20:22 24:16 294:2

**supervise** 36:20,23 376:10,12

**supervisor** 20:23 33:24 34:4 36:5,6, 10,19 59:7,17 91:18 137:15

**supervisory** 137:12

**supplement** 310:15

**supplemental** 309:18

**support** 177:11 314:4 323:6 367:11 368:14 370:1 375:12,24 376:6,10, 11,16,19 377:3,4, 22,23 378:7,14

**supporting** 118:6

**suppose** 148:19

**supposed** 41:13 86:13 91:3 179:24

312:7

**surprise** 130:20,22

**surprised** 26:7

**surveillance** 33:9

**swapped** 67:1 74:11,12

**swear** 9:6 234:9

**swig** 351:1

**switching** 146:4

**sworn** 12:7 64:7

**syndrome** 24:19 379:17

**syndrome's** 24:24

**system** 94:4,5,25 95:4,16,20,21 96:19 97:2 102:7,20 104:5 106:13 110:2 113:11 146:4 160:4, 9,17 161:1 261:25 262:5,11,17 306:7 380:25 381:7,12,13, 14,15 384:4

**systems** 37:5 85:12 96:2,8 100:2,14 101:6 102:6 103:17, 21,24 104:19 109:17 110:15 111:24 113:23,24 219:18,19,20,21 221:3,9,18 255:12 258:16,17,18 259:15 260:6,10 261:5,6,7,8,11 262:19 263:11 293:16 359:8 366:15 380:22 384:20

**T**

**tab** 39:10 44:25 48:10 71:22 74:19, 21,24,25 89:4,6 93:5,7,11 102:15 107:19 123:19 139:19 140:8 151:25 152:3,4 167:2,3 204:1 211:23,25 215:2 220:14,15,16 254:22 256:1 264:2 283:6 301:19,25 306:25 322:19,20 324:8 336:9,12 350:4

**tabs** 48:4,5 211:15

**TAC** 248:8

**tail** 315:3 379:12

**takes** 27:7

**taking** 11:8 16:11 18:9 120:2 125:1,13 126:4,24 169:16 172:16 225:3 281:25 282:13 292:25 314:11 325:4

**talk** 10:13 15:13,17, 22 17:18,22 31:21 32:4 33:21 43:22 46:23 55:2 68:20 87:8 92:3,14,17,18 104:19,23 112:18 121:20 123:12 125:8 127:6 128:6 143:11 165:11 180:1 224:13 228:17 236:18,21 246:4 249:22

315:19 324:10 379:22,25 381:2,11 384:20 385:15

**talked** 17:3 40:22 46:10 57:12 60:11 61:12 63:13 70:7 78:14 79:8,15 98:9 100:11 102:1 114:14 120:11 121:7 122:2,10 124:21 128:4 129:25 130:5,15,18 143:19,20,21 158:13 208:7 215:19 222:7 236:4 246:21,25 256:15 258:22 259:15 261:13 262:25 277:4 298:10 313:12 326:9 338:13 365:4

**talking** 41:3 45:18 47:7 51:23 65:22 67:5,20 69:20 73:5 76:13 78:12,22 83:19 88:6 107:6,9 108:7 110:14 112:5 115:24 120:10 124:4,24 127:17,21, 23 130:25 131:11 145:13 167:20 180:20 191:10 192:6 203:15 204:11 205:11 206:1 219:10 220:9 222:13 238:24 244:13 247:6 250:18 251:25 252:11 256:17,24 257:2 258:25 259:10 263:3 277:6 279:9 289:19 290:8 302:7 309:11

314:22 329:5 350:18 377:13 379:14 383:23

**talks** 44:8 89:14,17 147:17 306:10 309:10 379:5

**Tara** 325:22

**Tarak** 45:15,20 49:11 152:13 153:9 324:22

**task** 118:12

**taste** 259:21

**TAV** 381:9

**TBIS** 24:20

**teacher** 33:3

**team** 28:5 41:10,11, 22 42:18,21 43:1,2, 6,8,10,16 44:8 47:14 48:15,23 49:11 53:14,18,20, 23,24 54:9,16,23,25 55:15,22 56:5,23 57:2,15 58:15,16,19 59:8,20 60:1,8,13, 24,25 61:6,7,9,20, 25 62:1 63:3 68:1 73:10 74:9 79:4,23 83:18 84:16,21 85:20 88:17 90:2,5, 6,13,15 92:13,21,23 97:18,25 98:22 99:3 100:1 102:5 103:15 104:20,25 109:13 119:12 133:19 148:8,12,13,15,25 149:4,5 150:8 151:5,18 152:9 155:11,15,24 156:2, 25 161:17,23 162:18,22 163:15

171:21 175:1 177:15 179:8,25 180:7 187:6 190:7 216:7 218:12,15 264:19 268:23 270:22 271:8,20 277:22 278:2,16 279:8,14 280:24 284:25 287:25 290:12 308:7,8 315:18 316:15,16, 19 317:4,16,25 319:6 320:4,7,18,20 321:7 322:13,16,17 323:10,23 341:9,17 349:21

**teams** 43:7

**technical** 95:8

**technically** 30:17 50:25 73:11 201:11 286:6 374:9 381:9

**TECHNICIAN** 40:5

**Ted** 24:5

**tedious** 134:7

**telephone** 113:3,9 331:15

**telephonically** 331:6

**telling** 86:10 91:23 309:24 310:11 312:17 314:8 354:10

**tells** 143:8

**temp** 37:14 187:3

**temporary** 64:18 283:7 375:5

**ten** 37:21

**Tera** 37:24 63:21

**term** 24:4 41:23 98:5 159:13 193:11 194:9 315:3

**terminate** 194:8 211:2 286:11 306:14

**terminated** 285:23 315:1 353:3

**terminating** 324:25 325:1,2 337:20,22

**termination** 190:10 191:5 192:12 286:4 309:19,22 310:12, 19 311:1 314:25

**terminations** 192:15,18 238:4 286:20 300:25 359:19

**terms** 46:11 47:1 49:7,19 53:2 71:1 95:11 109:19 124:13 137:7 158:4 166:25 199:2 204:21 208:22 209:18 260:13,15 282:20 284:6 288:2 295:12 315:7 316:8 346:20

**territory** 366:20

**testified** 9:17 56:22 57:4,8 60:22 77:17 122:8 123:24 132:14 155:21 195:4 226:7 234:20 236:16 241:16,19 247:1,3,15 320:20 328:21 332:25

**testify** 91:20,23 129:14 143:17

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

ADAM KORZENIEWSKI
95350

March 26, 2026

448

30(b)(6)Index: testimony..today

**testimony** 9:9 16:11 89:19 103:8 109:9 111:1,22 112:2 127:8,15 134:13 138:25 223:3 225:5, 11 226:2,14 229:21 234:13 254:11 261:17,23 311:7 332:16,19,22 343:25

**Texas** 32:19

**text** 135:4,7 322:23 333:13 362:14

**that'll** 301:3

**theory** 91:1 181:8

**thereof** 52:7 287:11

**thick** 199:23 307:1

**thing** 26:14 27:19 44:24 64:8 68:24 91:12 95:6 99:5 113:15 123:20 197:20 226:13,15 280:12 307:1 309:2, 8,10 315:25 339:4 366:21 380:9 387:19

**things** 10:5 17:3 22:23 23:14,24 26:3 27:4,8,18 34:8 61:13 65:13 67:7,21 68:2,19 70:15 96:13 104:24 124:11 174:1 187:24 209:25 234:24 236:13 250:22 288:14 313:24 352:22 366:17 370:4 371:1 379:20 385:1

**thinking** 252:13

**thought** 47:18 66:23 81:10 132:21 321:23 323:13 331:14

**thoughts** 70:7

**thousand** 369:11

**thousands** 27:20 357:3 359:6 369:12

**thread** 186:13 238:2,3 239:4 246:16 253:8 264:9 267:7,9 322:23 343:16

**three-** 332:11

**Thursday** 102:1 134:10 135:13,24 137:2,3 185:8

**tie** 211:15

**tied** 178:17 241:5

**tier** 259:25

**Tierney** 9:2 16:12 234:5

**Tim** 191:1 197:1

**time** 8:9 10:9 14:10 22:11 25:25 27:1,2 30:25 31:3 32:4,11, 13 33:20 34:12 35:9 37:7 40:16,19 49:8 50:5 52:21 57:14 58:21,24 59:5 60:20 64:3,23 65:5,15 66:3,13 67:1 69:21 70:15,23 73:6,8,10, 17,22 74:2 75:17,24 76:1 77:10,19,20,24 78:4 79:18 80:12 82:18 87:14,17 88:15 91:18 99:14 103:2 104:16 112:3

117:19 118:5,7 120:20 121:9,19,22 122:2,7,14 125:20 126:2,9 127:9,24,25 130:2,5,6,14 131:15 133:16 134:5,17 135:4,15 136:2,6,7, 10,15,21 139:2,9 140:11,18,22 141:17 143:5 144:24 145:16 156:18 158:3 161:25 163:9 166:13 171:9 181:2 182:5 183:13 186:15 187:14,25 188:5 190:5 192:22 196:22 198:9 200:24 202:6 212:23 213:13 215:11,12,14 221:10,11,25 224:3 225:8 228:21,24 231:4 232:11 233:9 238:18 246:13 247:9 248:22 249:15,20 251:15 253:12 255:2,5 256:16 257:2,10,11 258:23 260:13 261:13 268:11,24 269:20 271:22 273:7,10 274:2,10, 15,21 278:13,25 279:18 285:13,16 287:7 300:2 301:10, 12 305:15,18 306:5 312:3 313:21 314:3, 11 317:12 318:3,21 323:5 325:22,24 326:4,9,16,18 327:13,19,22 328:2 329:1,9,14,23 330:1,3 331:23

334:9 335:5,8,20 340:20 344:8 347:8, 20 350:10 353:4,12 354:8,24 358:1 360:11 366:25 367:7 375:5 382:4 383:16,20 388:8

**timed** 31:25

**timeframe** 318:7 319:6

**timeline** 329:6

**timely** 309:21 310:12,18 351:15

**times** 17:10 25:16 34:11 52:12 55:19 63:24

**timing** 224:9 260:15

**Timothy** 198:24

**tiny** 167:6

**tired** 87:6

**title** 22:5 23:2 71:9, 15,17,25 78:4 143:3 181:15 220:19 301:12 306:3 350:14

**titled** 24:4 71:23 81:5 102:16 146:10 264:8 267:8 309:2

**Titles** 24:5

**titular** 344:3

**today** 10:8,15 11:24 12:4,8,12 13:20 14:14 55:10 92:6,18 104:18 127:11 129:14 134:23 187:6,15 207:6 230:15 231:11 235:6 236:2,5

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

ADAM KORZENIEWSKI
95350

March 26, 2026

449
30(b)(6)Index: today's..type

264:20 272:5 281:3 286:7 332:16,19,22 369:7 379:11 382:4, 14 383:1 384:15 387:11

**today's** 144:22 230:19 231:18,21, 24 232:2,5 387:24 388:2,5

**told** 35:9 67:25 70:18 77:24 110:4 111:11,23 119:22 130:9,17 134:16 141:4,7,23,25 142:1 171:5,18,21,24 172:18,22,25 173:13 174:16,21 213:22 236:17 237:7 282:2

**tomorrow** 230:4,15

**tone** 10:5

**tonight** 148:9 149:1

**tool** 342:14

**top** 25:9 28:13 39:18 52:10 60:6 71:18 73:19 81:16 89:16 94:16 96:9 113:6,7 117:16 125:17 134:8 136:5 139:21 141:18 144:10 145:15,17 176:10 180:12 196:18 216:21 244:15 256:25 288:19 307:5 311:23 321:20 324:16 350:12,24 361:4 368:24 373:2

**topic** 48:8 144:1 164:18 178:15 198:7 211:14,16,21

306:9,22 329:1 338:3 340:22 341:21 344:24 361:13 365:16,25 378:23

**topics** 44:23 46:11, 15,20,21,23 47:2,4, 24 48:1 56:9 113:17,20 129:16 157:23 164:15,17, 25 165:9 178:11 179:3 180:23 184:18 211:15 236:7,14 262:17 288:10 300:24 306:9 314:17 318:10 323:16 327:17,21 334:1 338:4 340:15 341:19 342:7 365:8

**tops** 63:24

**total** 171:22 368:25

**totaling** 306:14,15

**totally** 12:15

**touch** 245:7 279:7 331:18 338:4

**touched** 273:3

**touching** 139:16

**Tough** 300:15

**tour** 282:7 320:10

**toured** 320:12

**town** 33:14

**track** 55:3 185:1

**tracking** 248:8

**trades** 33:12

**traditional** 374:6

**traditionally** 158:5

**trail** 214:13

**train** 132:21

**Training** 33:10

**transactions** 97:13, 17,21

**transcribe** 284:20

**transcribing** 284:21

**transcript** 230:20

**transfer** 361:21 362:3 365:9,21 367:18 384:17

**transferred** 363:1,5, 24 366:23 371:1 372:21 373:12 380:14,23 381:1,17

**transferring** 362:8 372:19 378:23 384:2

**transfers** 367:9,15 382:15 383:2,22

**transit** 28:1

**transition** 22:12 350:8 375:1

**transitioned** 21:25 336:2

**transmittal** 360:7

**transmitted** 140:20, 22

**traumas** 24:20

**travel** 23:21 351:16

**Treasury** 32:18

**treated** 377:16

**trilateral** 19:14 20:6

**trilaterally** 20:10

**true** 184:23 185:5 207:1 283:9 324:13 377:20

**Trump** 30:22 75:10

**truth** 9:10,11,17 12:9,12 234:14,19

**Tuesday** 100:10

**turn** 41:5 282:8 285:19 293:8

**turned** 65:4 118:24

**turning** 33:22 40:21 48:3 75:2 88:9,14 101:25 122:1 124:20 137:1 151:15 158:16 209:22 220:4 315:12 336:8 337:10 385:12

**turns** 87:8

**turnstiles** 187:11

**tweet** 184:16 185:6 201:6 202:3 217:17, 19 283:12 284:5 285:8 299:10,13,15 300:5,12

**tweeted** 183:24 185:3 200:23

**tweeting** 217:21

**tweets** 217:11 299:11

**Twitter** 217:18

**Tyler** 117:7 118:8 198:13

**type** 22:8 52:8 68:23 94:24 110:7 198:17 210:11,18,23 214:2

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

258:19 374:3 378:4

**types** 52:24 124:6 199:8 374:4,5

**typical** 30:21 96:22 197:22 282:20

**typically** 22:24 25:13 34:1 51:3 83:25 210:12,24

---

**U**

**U-S-A-I-D** 12:2

**U.S.** 18:25 25:5,6,23 27:23 58:22 59:3 75:8 82:7 99:11 157:10 158:2 201:15 223:18 243:4,7,13,15,17 244:11 262:20 273:20 274:7 281:13 301:13 321:15 351:10,14 357:1 368:19 369:25 375:3 376:7, 8,9,17 377:13

**Ueland** 368:12 375:13,18,23,25

**Ukraine** 96:14

**ultimately** 82:16 90:17

**unable** 216:11 244:17 327:3,5,14

**unacceptable** 310:13,19

**unacceptable.'** 309:22

**unaware** 76:24 86:23 100:15,16,21, 23 101:13,14

218:13 276:5 278:5, 18 279:25 280:9,14 283:17 284:3 285:6 290:21 317:18 322:14

**uncertainty** 27:12

**uncharitable** 313:8

**unclassified** 187:11 219:18 261:5

**undefined** 129:15

**undergrad** 31:5

**undergraduate** 17:25 18:13

**underlying** 241:16 291:2

**underneath** 22:25 47:8 93:8 140:8 204:1 311:22

**undersecretary** 306:3

**understand** 11:14, 17,24 12:2 13:9,18 16:22 65:14 72:22 82:10 91:1 104:18, 22 106:12 108:15 119:14 124:11 163:10 177:10 207:22 225:13,14, 24 226:1 235:2 259:2 279:3 322:4 325:9,25

**understanding** 34:22 35:7 41:18, 20,25 42:1,9,10,15, 17 43:4,5 49:22 50:16 52:17,21 53:19 54:11,22 56:16,19,24 57:1 58:12 59:9,10 60:17

61:14 71:3 72:13,14 81:19 85:14 90:10, 12 95:19,21 96:21 97:3,4 103:2,19,20, 23 104:8 106:4,20, 21,24 110:21 112:25 115:18,23 118:13 120:23,24 123:1 129:12 130:9 135:15 137:4 138:6 143:4 157:19 173:19 176:23 177:5 196:20 202:16,17,18,19 206:6 211:3 213:24 223:6,10 229:11 240:5 251:20 253:2 257:23 259:21 260:8 261:21 262:4 263:9 271:14 316:25 354:20 355:20 362:7 385:2

**understandings** 59:11

**understands** 42:25 228:4 249:6

**understood** 10:24 11:21 16:10 17:6 18:12,17 30:16 34:5 35:13,21 36:5 47:20 55:11 124:14 125:22 195:16 224:15 228:2 251:19 259:6 332:15 336:4

**undertaken** 355:25

**undertook** 82:22

**underway** 241:4 348:17 349:14

**unfamiliar** 322:17

**ungodly** 193:12

**unintentional** 14:3

**uninterested** 320:16

**uninterrupted** 25:1

**United** 11:25 19:15, 16 20:10,11,13 21:10 25:11,19 26:3 75:9 81:6 115:22 220:18 232:13 233:2 248:17 309:3 351:8 383:5

**universal** 113:14

**University** 18:1,3,11 31:10

**unlocked** 29:18

**unpack** 41:24 140:15 228:8

**unpaid** 53:1,8

**unreasonably** 73:13

**unusual** 27:6,7,8 28:7

**up/down** 208:17

**update** 326:2

**urgency** 238:7,11

**USAID** 12:1 21:9,16, 21 22:3 23:7,18 28:5,17 29:14 30:17,18,19 33:23 36:24 37:1,4,9,17 38:7,9 41:17 42:25 43:1,4,6 46:1,2,3, 15,21 47:14,24 48:16,23 49:8,24 50:3,18 51:8 53:14, 18 54:15 56:4 57:11 58:7,9,14,19 60:13, 23,25 61:6,16,20 66:14 67:3 73:17

74:5 75:23 76:1,3 77:3 78:11,23 79:7 80:4,9,15,18,19,20 82:2,5,8,22,23 83:3,5,12,16 84:3 85:21 86:9,22 88:13,14,17 89:9,20 90:2,7,14,16,23 92:3,12,13,22 93:22 94:14 98:16,24 99:3,6,9,22 100:2,13,15,19,22,23,25 101:6,7,11,15,17,21 102:6 103:16 104:1,10,15,19 105:21 106:18 107:10 108:5 109:14,17,18 110:2 111:8,19,20,24 112:6,13,23 113:3,6,8,10,12,17 114:3,10 115:18 116:19,25 117:3,5 120:18 121:13 122:6 124:23 126:1 127:7,16 128:5 131:22 133:15,24 134:9,18,23,24 135:9,13 136:17 137:3,20,23 138:4,9,18,21 140:4,14,16,20,23 141:11,14,19 143:21 144:2,3,5,8,19 145:22 148:13 149:3,13,16,20 150:5,25 151:2,19 152:9,16 153:15,16 154:21 155:2,5,7,9,11,12,14,19 156:5,25 157:2,5,7,17 158:19 159:19,20,21 160:2,6,8 161:5,8,13 162:24 163:6,17 164:21,25 165:10,14,19,21,22,

23 166:1,3 167:16,17 168:5,25 169:1,5 172:12,14,17 173:2,14,22 174:11 175:1,17,20 176:21 177:4,7,14,15 178:3,6,19,21 179:2,7,25 181:23 183:5,6,8,9,10,14,15,25 184:6,11,14,15,16,20,22 185:4,5,6,11,14,18,19 186:15 187:22 188:3 189:1,2,22 190:7,15,17 191:24 192:9,14 196:9,19 197:3 200:24 201:2,8,12,16,19 202:7,12 203:2,3,23 205:13,21,23 206:2,19,22 207:10,18 210:11 211:2,5 212:15,16,19 213:21 214:1 215:12,14,22,23 216:1,3,4,6,9,10,14 217:23 218:4,7,9,10,11,13,15 219:23 220:3,9 223:19 229:3,17,19 230:5 233:2 235:7 236:15 237:3 238:14 239:21,24 243:19 244:4,6,9 247:15 249:6 250:4 254:22 255:16,18 262:10,12 264:20 265:12,25 267:15 269:15 270:9,25 271:4,10 273:18,20,22 274:4,6,8 275:11,13,15,16,25 276:2,5,6,10 277:5,13,23,25 278:3,5,16,18 279:22 280:6,14 281:8,12,15,16,21

282:3,17,23 283:12,16 284:2 285:1,5,7,21 286:10,18 287:4,8,12,21 288:4,8 289:15,18 290:3,12,20 293:16 295:10,17,21,23,24 300:6,10,20 303:21,25 305:8,19 306:9,13,14 308:7,8,11 310:17 312:10 313:11,20 314:13,21 315:15,20,23 316:8,13,16,19 317:5,21,24 318:12,14,20 319:2,18,23 320:8,21,23 321:3,6,8,9,10 322:13 323:5 324:24,25 325:2 326:15 327:14,20 330:21 331:25 333:11,15,20,22,24 334:12,14,22 335:24 336:1 337:20,22 338:14,19 340:20 341:11 343:18 344:19 345:3,13 346:7,18 347:1,2,7 349:8,19 350:24 351:2,3,6,7,9,12,24 352:1,2,6,10,17,19,21 353:4,9,11 355:19,24 356:6,16,19,25 357:4,8,14,15 358:21 359:3,6,8,24 360:3,16,21 361:12 362:8,10 363:9,10,11,18,21 364:2,14,19 365:6,23 366:11,16 367:10,17 368:14,18 369:6,14,18,20,21,23 370:7,25 371:9 372:25

373:7 375:1,8,12,23,25 376:2,6,18 377:5,8,11,18 378:10,22,24 379:6 380:16 381:6,9 382:2,7,12 383:23,24 384:3,10,11,14,18 385:2,6

**USAID's** 42:1,10,17 57:9 59:10 61:14 86:23 100:24 105:12 123:1 126:14 129:11,20 149:10 155:3 156:23 157:19 160:10 168:17,24 169:6 174:13,15,18,20,23 176:9,17,23 177:4 201:11 202:17,18 203:7 204:6 205:4 207:13 210:22 251:20 257:23 259:5 261:17,23 268:22 269:3 277:19,20 279:25 280:9 281:20 317:18 322:14 341:6 342:4 343:2,3,20,25 352:7 356:7 362:25 363:12 364:15 365:10 366:18 380:13,22,25 384:19

**USAID.GOV** 339:19

**USAID/DOGE** 157:18

**USAID/STATE** 292:8

**USAJOBS** 374:6,13

**USDA** 50:14,15

**USDS** 41:14 43:11 44:3,4 49:3 55:23, 24 56:8 57:13,14 58:1 60:18 101:17, 22 143:4 158:2,10 176:24 177:4,9,16, 19 178:6,10,21,25 179:6,7,18,23,25 180:6,8,14,19

**useability** 160:17

**user** 95:16,18 124:7 219:22,23 259:22 293:25

**user's** 96:22

**UTC** 249:15,20,24 257:10

## V

**V-O-O-H** 45:3

**V-O-O-R-H-E-E-S** 45:3

**VA** 62:18

**vaccinations** 25:12, 14

**vague** 22:5 48:17 62:15 84:24 98:13 111:6 127:18 128:7 132:18 159:7,12 175:3 243:1 310:3 318:24 356:1 359:12 376:24

**vaguely** 198:23

**vanity** 31:7

**vast** 357:6 363:3

**vastly** 213:7

**verbal** 56:20 326:22, 25 331:4,5,10,13

**verbally** 78:7,8,10 131:15,25 203:23 204:25 206:18

**verify** 54:18

**version** 81:11 219:6

**versus** 8:12 11:10 80:14 160:17 199:2 200:21,22 233:13

**Vice** 248:16

**victims** 24:18

**video** 231:18,21,24 232:2,5 331:11,16 387:24

**view** 175:24,25 322:6

**viewed** 227:21

**Virginia** 33:11

**virtue** 110:3 261:22 262:7

**vivid** 68:19

**VMS** 293:25

**voice** 162:11

**Voorhees** 45:3 71:24 102:16 103:3, 9 158:22 159:14 264:16

**Vorhees** 267:15,16

**vouchers** 219:21 258:18 261:9

**vow** 31:14

**VPOTUS** 248:16

## W

**wait** 224:18 332:7 357:14 386:7

**waited** 69:19

**waiting** 62:22

**waive** 25:20

**waiver** 26:9,13 86:14 310:2 311:18 312:11

**waivers** 25:16 26:15 308:13

**waives** 25:17

**walk** 29:19 49:17 66:3,20 193:3 241:7

**walked** 62:25 66:21 67:7

**walking** 48:11 237:6 371:16

**wall** 120:6

**Waltz** 183:2,3 386:21

**wanted** 24:23 32:25 115:16 272:22 291:19 292:10,12

**wanting** 69:16 153:9

**War** 20:15

**warning** 309:16

**warrant** 214:3

**Warren** 8:19 230:18, 21 231:5,13,18 233:20 246:4 387:14,15,23

**Washington** 225:17

**waste** 33:20 269:19

**water** 87:5 162:11 180:15 283:22

**ways** 75:18 199:25 300:18 331:9

**website** 81:21,25 161:13,16 162:24 163:6,17 164:11,21 165:14,22 167:13, 16 169:6 171:13,19, 22,25 172:3,16,19, 24 173:14 174:11, 14,17,19,22,25 175:2,6,8,19 236:15,18,22,25 237:3,8,15,21 255:23 322:23 339:19,24 340:8 342:3 357:15,23 358:8,21,23 359:3 382:2

**Wednesday** 101:2

**weeds** 52:25

**week** 19:6 60:2,3 72:25 220:2 231:11 372:13

**weekend** 180:20 217:23 218:3,5,8, 10,12 267:25 316:21 317:15,20

**weekends** 187:11

**weeks** 19:8 26:1 216:12

**weird** 366:19

**weirdly** 380:5

**welfare** 119:19

**WH** 192:3 248:15

**WH/VPOTUS** 248:6

**Wharton** 18:2,3

**what'd** 291:21

**whatsoever** 154:15

**whatsoever's** 34:2

ADAM KORZENIEWSKI
95350

March 26, 2026

453
30(b)(6)Index: whichever..Zoom

**whichever** 271:18

**white** 21:9,16,21 22:3,6,14 26:25 30:17,18,22,24 31:4 32:17 33:23 36:21, 24 50:23 51:3,14 76:5 81:21 93:25 94:2,12 119:14,15, 22 157:11 158:11 192:3,5 200:19 238:8,10,15,24 243:23 248:15 319:13,25 320:9 321:18 322:9 336:1

**who'd** 312:20

**whomever** 76:5

**wild** 35:11

**William** 267:10

**Willis** 219:15

**window** 127:12

**winter** 223:17 224:1

**withheld** 14:21

**withhold** 170:5

**witness'** 225:10 226:6

**witnesses** 328:21

**Wonderful** 355:4

**Wong** 183:1 386:13, 18

**wood** 217:23

**word** 159:11 379:5

**word-for-word** 294:6

**words** 150:17

**work** 19:12,16 20:6 27:21 29:9 31:3,15

32:9,12 33:11 35:5 51:24 57:24 58:13 61:16 63:17 64:9 66:5 74:15 80:9,13 82:2 87:11 90:23 108:16 112:24 119:14 166:21 170:2,4,25 179:23, 24 193:10,22 198:9 199:21 202:13 205:11 206:2 213:7 216:16 223:19 231:11 245:13 300:18 313:11,17 314:9,14 315:19 316:13 334:24 346:13,24 366:16 377:11 378:9,15 379:6,7,20

**worked** 13:12,13 19:1 30:12 31:15 32:19,21 33:7,13 43:12,19 49:6 50:23 57:18 85:12 95:4 126:1 131:7 198:15 201:17 213:21 326:15 346:22,23 347:5 357:4,7 380:15

**worker** 284:19

**workforce** 193:23 214:1

**working** 20:2,6 21:7 24:9 32:14 40:2 63:18 70:6 77:15 98:7 118:12 119:25 178:1 196:21 199:18 238:19 248:5 300:16 323:6 346:15 350:8 377:11

**works** 51:2 66:5 92:6 166:17 225:25 323:5 370:9

**world** 32:21 111:25 190:25 196:25 326:11 380:9

**wow** 68:21 127:2 217:20 247:12 248:15

**write** 105:23 113:19 248:7 249:9,12 253:19 257:25 260:3

**writes** 152:15 186:25

**writing** 175:10 204:15 205:7,17 298:20

**written** 205:24 208:9 333:14,21 334:13, 21

**wrong** 21:3 89:15 143:25 252:18,20 325:13

**wrote** 22:19

**Y**

**y'all** 67:20 121:19

**yay** 298:2

**year** 31:9 99:15 201:15 351:4 363:22 373:4,5,6 376:1

**years** 18:8 31:9 158:7

**yes/no** 208:16,17

**yesterday** 234:25

235:2,16 236:2,4,5, 10,13,17 238:1 239:7,24 246:22 258:22 259:16 261:13 263:21 273:3 277:4 298:11 363:15 379:11 387:10,20

**yesterday's** 239:2 387:7

**Z**

**Z-A-D-R-O-Z-N-Y** 21:2

**Zack** 123:20

**Zadrozny** 21:2

**Zecharia** 107:24 219:14

**zone** 249:15

**zones** 249:20

**Zoom** 40:4 76:11,13 118:25

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

# Exhibit 11

UNITED STATES DISTRICT COURT

for the

District of Maryland


J. DOE 4 et al.,

      Plaintiff,

v.             Civil Action No. 8:25-cv-00462-TDC

ELON MUSK et al,

      Defendant.

_____


CONFIDENTIAL

REMOTE VIDEOTAPED DEPOSITION OF


NICHOLAS GOTTLIEB


TAKEN ON

WEDNESDAY, APRIL 22, 2026

3:02 P.M.


DEPARTMENT OF JUSTICE - CIVIL DIVISION

1100 NEW YORK AVENUE, SUITE 800

WASHINGTON, D.C. 20005

NICHOLAS GOTTLIEB REDACTED                April 22, 2026                                    2 to 5
96528                                                                                 Confidential

Page 2

APPEARANCES

Appearing on behalf of the Plaintiffs:

ANDREW H. WARREN, ESQUIRE

ZSA'QUERIA B. MARTIN, ESQUIRE (via Zoom)

Democracy Defenders Fund

600 Pennsylvania Avenue Southeast, Unit 15180

Washington, D.C. 20003

(208) 602-9182

andrew@democracydefenders.org

zsaqueria@democracydefenders.org

Appearing on behalf of the Plaintiffs:

JOAQUIN R. GONZALEZ, ESQUIRE

REBECCA "BETH" STEVENS, ESQUIRE (via Zoom)

Marziani Stevens Gonzalez, PLLC

1533 Austin Highway, Suite 102-402

San Antonio, Texas 78218

(202) 343-5604

jgonzalez@msgpllc.com

bstevens@msgpllc.com

Page 3

APPEARANCES (CONTINUED)

Appearing on behalf of the Plaintiffs:

NICOLE RUBIN, ESQUIRE (via Zoom)

Lief Cabraser Heimann Bernstein

275 Battery Street, 29th Floor

San Francisco, California 94111

(415) 956-1000

nrubin@lchb.com

Appearing on behalf of the Defendants:

JACOB S. SILER, ESQUIRE

JAMES J. WEN, ESQUIRE

Department of Justice - Civil Division

1100 L Street Northwest, Room 11206

Washington, D.C. 20005

(202) 305-7538

jacob.s.siler@usdoj.gov

james.j.wen@usdoj.gov

Page 4

APPEARANCES (CONTINUED)

Appearing on behalf of Nicholas Gottlieb:

CONOR D. DIRKS, ESQUIRE

Shaw Bransford & Roth, PC

1101 Connecticut Avenue Northwest, Suite 1000

Washington, D.C. 20036

(202) 463-8400

cdd@shawbransford.com

cdirks@shawbransford.com

Also Present:

Maya Cook, Democracy Defenders Fund

Jehieli Luevanos-Ovalle, Democracy Defenders Fund

Mark Nilson, Naegeli Technician

Page 5

EXAMINATION INDEX

                                                    PAGE

EXAMINATION BY MR. WARREN                             8

EXAMINATION BY MR. SILER                            162

Page 6

EXHIBIT INDEX

EXHIBIT                                          PAGE

1    MEMORANDUM                              36
2    EMAIL JAN 27 2025                       45
3    EMAIL JAN 27 2025                       55
4    OBJECTIONS AND RESPONSES                68
5    EMAIL JAN 27 2025                       72
6    EMAIL JAN 27 2025                       76
7    EMAIL JAN 30 2025                       93
8    ACTION MEMO                             95
9    ARTICLE                                108
10   EMAIL JAN 31 2025                      120
11   MEMO                                   122
12   EMAIL SCREENSHOT                       139
13   EMAIL JAN 31 2025                      146

Page 7

VIDEOTAPED DEPOSITION OF

NICHOLAS GOTTLIEB

TAKEN ON

WEDNESDAY, APRIL 22, 2026

3:02 P.M.

THE VIDEOGRAPHER:  We are on the record. The time is 3:02 p.m.  The date is April 22nd, 2026. This is the deposition of Mr. Nicholas Gottlieb. The case caption is J. Does 1-26 versus Department of Government Efficiency, Musk.

Will counsel introduce yourselves and state whom you represent?

MR. WARREN:  Andrew Warren on behalf of the Plaintiffs.

MR. GONZALEZ:  Joaquin Gonzalez on behalf of Plaintiffs.

MR. SILER:  Jacob Siler for the Defendants.

MR. WEN:  James Wen for Defendants.

MR. DIRKS:  Conor Dirks for the witness.

MS. STEVENS:  Beth Stevens for the Plaintiffs.

MS. RUBIN:  Nicole Rubin for the Plaintiffs.

Page 8

THE VIDEOGRAPHER:  The court reporter will now swear in the witness.

THE REPORTER:  Mr. Gottlieb, please raise your right hand.

Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  I do.

THE REPORTER:  Thank you.

THE VIDEOGRAPHER:  You may now proceed.

MR. WARREN:  Thank you.

NICHOLAS MACKENZIE GOTTLIEB, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. WARREN:

Q.   Mr. Gottlieb, good afternoon.  My name is Andrew Warren.  We had spoken before.  I'm here with my colleagues, both in the room and online, who represent the Plaintiffs in this case, as you heard the caption, J. Doe v. Musk.  This is a class action case on behalf of people who worked at USAID from January 20th, 2025, to the present.

Can you please state your full name for the record?

Page 9

A.   Yes.  Nicholas Mackenzie Gottlieb.

Q.   Mr. Gottlieb, were you subpoenaed to be here today?

A.   Yes.

Q.   I just want to go over a few ground rules for today.  I'm going to ask -- I'm going to start asking you questions.  Towards the end of the deposition, other parties may ask you questions as well.  Counsel can object, either your attorney or Government counsel.  Just let them make their objection, and then you can go ahead and answer the question, unless you're instructed not to by your counsel.

I'm trying to figure out things that you know and things that you don't know today.  I don't want you to speculate or guess unless you're specifically asked.

If you don't understand the questions I'm asking, just please ask me to clarify so that we're on the same page; otherwise, I'm going to assume that you understood.  Does that make sense?

A.   Yes.

Q.   So, as you know, there's a court reporter transcribing, there's a videographer recording today, and you've been placed under oath.  Is there

Page 10

any reason you cannot be truthful today with your testimony?

A. No.

Q. During the deposition, we can take breaks at, really, any point in time. I'd ask that we not take a break while a question is pending. Just let me know if you need to take a break for any reason, but I have a feeling we'll take a couple just to make sure everybody stays rested. You can, of course, speak with your counsel during breaks.

And with that, I think we can get started. Do you have any questions before we begin?

A. No.

Q. Okay. Have you ever been deposed before?

A. No.

Q. Have you ever testified under penalty of perjury before?

A. Yes.

Q. Where?

A. In arbitration hearings and EO administrative hearings.

Q. How many times?

A. Dozens.

Q. How recently was the most recent time you testified?

Page 11

A. Two years ago.

Q. Okay. Have you ever provided information to criminal or civil authorities as part of your investigation?

A. I don't recall.

Q. Have you ever submitted legal declarations under penalty of perjury, not like a loan application or a government personnel form, but related to a civil or criminal case?

A. I could have submitted affidavits in support of a court case, I just don't recall.

Q. Okay. And you're represented today by counsel?

A. Yes.

Q. Have you ever met with or spoke -- spoken with the government counsel who is here today?

A. No.

Q. Do you have an understanding of the nature of this case in broad strokes?

A. In broad strokes, yes.

Q. All right. And what's your understanding of the case?

A. This is a case of current and former USAID personnel and potentially contractors who were impacted by its shutdown in January -- in early

Page 12

2025, and on the grounds that the shutdown was not within the confines of law.

Q. Have you reviewed any of the filings in this case?

A. Maybe one.

Q. Do you recall what it was?

A. I think it -- I don't recall, no.

Q. Where do you live currently?

A. 421 15th Street Northwest.

Q. Okay. And I just want to get a little bit into your background. Where are you from?

A. I was born in a town called Sharon, Connecticut -- or no. Sorry. I was born in New York. I grew up in Sharon, Connecticut, and -- but I've lived in the District for the past 19 years.

Q. And how old are you?

A. I am 45 years old.

Q. You got your BA from the University of Vermont; is that correct?

A. Yes.

Q. What year?

A. In 2003.

Q. And you have a JD from Indiana University?

A. Yes.

Q. Could you walk me through your employment

Page 13

history, starting farthest back to the most recent?

A. So working from the end of law school -- during law school I had internships, but from the end of law school, I started with the Department of Homeland Security and the U.S. Customs and Border Protection. I spent five years there on their employee relations team addressing their most serious cases of adverse actions.

After that, I spent six years with U.S. Citizenship and Immigration Services, another division of Department of Homeland Security. The first two were as a manager of their employee relations function, and then the remaining four was as their associate chief negotiator negotiating collective bargaining agreements for the workforce of some 17-, 20,000 employees.

At that -- at the end of that, in 2019, I was promoted to -- transferred to the USAID to serve as their director for employee and labor relations where we had two functions. Primarily, the employer relation side, which addressed issues of performance management and addressing poor performance and -- poor performance and misconduct in the workforce, and then labor relations, which was a continuation of negotiations, grievances, and unfair labor

Page 14

practices for the agency.

Q. And currently?

A. Oh. So after USAID closed, I started a small sole proprietor consulting firm, and did that from June 2025 through February 2026, and then in February -- on February 23rd, 2026, I started with the DC Government as their chief human resource officer in the Department of Human Services.

Q. You were a labor and relation specialist at DHS, right, from -- starting 2007, you said?

A. A employee in labor relations, yeah.

Q. Employee in labor relations?

A. Yeah.

Q. And then you had discipline review board manager at DHS after that?

A. Yes. So that was the manager of the employee relations function. But disciplinary review board at USCIS, I came over to stand that up. It was a -- a panel of objective agency leadership whose job it was to review allegations of most serious misconduct in the agency and serve as proposing officials on those actions. So I came to USCIS to stand that up, and -- and then managed it for a couple years before I shifted over into the labor relations function.

Page 15

Q. So your experience addressing serious conduct within the government agency crossed over from CBP to CIS?

A. Correct.

Q. Now, let's come back your work at USAID then. When did you start?

A. February 2019.

Q. And that was as the director of employee and labor relations?

A. Yes.

Q. Walk us through your responsibilities.

A. So starting with the -- we had three primary functions. One was leave administration, which was addressing requests for family medical leave, paid parental leave, what is generally considered to the government entitlement leave. Our office managed that portfolio.

We also managed the employee relations portfolio. There, we established, soon after my arrival, a global intake system for misconduct at USAID. It was a single source case management system for all allegations of misconduct at the agency, which ran through our shop and were reviewed and adjudicated by my office. And so all allegations of misconduct at the agency came through

Page 16

our office into our system, and then our -- we would do initial review, triage for investigation as necessary, and then either determine to close that action out, what was -- not technical, but it was just called close, no action -- to issue a close, no action letter resolving the allegation or to take a due process action as appropriate.

And so all allegations that came in through USAID went through this system for investigation and then were closed in one way or the other through my office, either with a notice of close, no action or with disciplinary action or counseling of some kind.

We also address performance -- issues of poor performance in this -- on this side of the house, which would be, you know, counseling, and then through due process, a performance improvement plan and a performance-based action, if necessary.

And the last part of it that we -- during my time there we never addressed was our office would technically be responsible for addressing reductions of force, just as a matter of -- we play -- we are a key stakeholder in that type of action.

Q. So I --

A. Apologies. I left off the last portion --

Q. Sure.

Page 17

A. -- of the portfolio, which is the labor relations side, which was we were the management representative for all engagements with our two unions, which was the American Federation of Government Employees and the American Foreign Service Association. We address all grievances, negotiated the collective bargaining agreements on behalf of management, and represented the agency in third-party proceedings.

THE REPORTER: Last word, please.

THE DEPONENT: Third-party proceedings.

BY MR. WARREN:

Q. Including your time at CBP, Immigration, and USAID, what was your total experience in investigating and addressing allegations of employee misconduct at the government?

A. In years or in --

Q. Years.

A. In years? So the five years at CBP, two years leading the efforts at USCIS, and then I would be called in as a sort of subject matter expert in the -- while I was serving as the associate chief negotiator the other four years. And then at USAID, it was another five years. So all total, that's 12, 14 years, but of my 17 years running through my --

Page 18

the end of my career, addressing allegations of misconduct ran all the way through. It played a major role in every year.

Q. At USAID, did you have any responsibility regarding providing global training?

A. Yes. As part of establishing the global intake system, we provided training to the workforce to -- to the workforce worldwide and especially to supervisors on how to address and -- and process allegations of misconduct. So we provided annual -- at least annual but often quarterly training to supervisors on how to address instances of misconduct in the workforce.

Q. And with regard to the COVID-19 pandemic, did you have any responsibilities as USAID for how to manage the workforce during that time?

A. Yes. I played a lead role during the COVID-19 pandemic in first just transitioning to the remote workplace. A lot of our engagements on the labor relations side touch on alternative work schedules, leave, and telework arrangements to manage through. And so we played -- I played a significant role in establishing the workplace policies to help the workplace continue to perform through that time. And then I played a lead role in

Page 19

the return-to-office efforts that followed, from vaccination to days in the office to arranging the hybrid work arrangements -- the design and implementation of that.

Q. And during your time at USAID, can you describe the reporting structure? Who did you report to, the position more than the -- the individual?

A. Right. So my office was a discrete suite at USAID within the ACTM footprint. We had our own door and arrangement. We reported directly to the deputy chief human capital officer, who reported to the chief human capital officer, who reported to the administrator.

Q. And how many direct reports did you have?

A. I think at the end I had 10 direct reports.

Q. All right.

A. Oh, I'd like to qualify that.

Q. Of course.

A. I had a deputy who had subordinance. So direct reports, I think I had four, and he had, you know, five subordinates.

Q. And how many people overall did you see in the employment -- employee and labor relations

Page 20

group?

A. In the -- including myself, about 11.

Q. And that's total employees in --

A. Employees and contractors, yes.

Q. Okay.

A. Yeah.

Q. All right. Let's shift gears for a minute. Are you familiar with an entity called DOGE, D-O-G-E?

A. Yes.

Q. What's your understanding of DOGE?

A. My understanding of it was that it was an office created after the -- after the election of Donald Trump, led by -- or Elon Musk to eliminate fraud, waste, and abuse in the federal government.

Q. Did --

THE REPORTER: Sentence, please.

THE DEPONENT: Oh. To eliminate fraud, waste, and abuse in the federal government.

BY MR. WARREN:

Q. Did the structure that you described a moment ago change after January 20th, 2025?

MR. SILER: Objection. Vague.

BY MR. WARREN:

Q. You can answer.

Page 21

A. Okay. I need -- I need that clarified.

Q. Sure. The reporting structure you described of reporting up to deputy chief --

A. Mm-hmm.

Q. -- chief of human capital up to the administrator's office and your direct reports, did that change after January 20th of 2025?

A. Right. So with any administration changeover, there is, in the federal government, a sort of transition period where the political appointees of the prior administration typically move out and acting or interim leaders step in to -- career personnel step in to manage the shop until new political appointees come in to steer in accordance with the administration's priorities.

So over the fall, especially over the course of the winter, our leadership changed. In December of 2025, we -- new -- we just hired a new career chief human capital officer, but above him, the front office leadership transitioned from acting career personnel to, in January 2020, new appointee personnel came -- or new Trump -- new representatives of the Trump administration came in at those leadership roles.

Q. And we'll come back to that --

NICHOLAS GOTTLIEB REDACTED                April 22, 2026                22 to 25
96528                                                                 Confidential

Page 22

A. Yeah.

Q. -- in a little bit.

You described DOGE as an office created after President Trump was elected, led by Elon Musk, to eliminate fraud, waste, and abuse. Did you have any interactions with DOGE at USAID?

A. Yes.

Q. All right. Can you describe -- first, when did that begin?

A. Mm-hmm.

Q. And then describe, in broad strokes, those interactions.

MR. SILER: Objection to form.

Go ahead.

THE DEPONENT: Okay. Thank you.

So the President was -- inauguration was Tuesday. On Wednesday, we had a government-wide meeting with the Office of Personnel Management at which DOGE representatives or employees -- individuals who claimed to be from DOGE were present and speaking; in particular, Clayton Cromer, and I think was the -- that Wednesday was my first meeting with a DOGE personnel.

At that meeting, the focus was placing employees who engaged in DEIA-type work on

Page 23

administrative leave.

BY MR. WARREN:

Q. Just pause for one moment, please.

A. Yes.

Q. What do you mean by DEIA-type work?

A. Diversity, equity, inclusion, and accessibility. And at those early stages, the effort was centered on -- and we had an office of DEIA at USAID, but we also had personnel around the world who engaged in that -- in work centered on DEIA issues. That Wednesday, we received instructions to place all the employees engaged in that type of work on administrative leave. The instructions at that time were to maintain -- for them to maintain their systems access, but those instructions came from Clayton Cromer, who was a DOGE representative. That was my first engagement with DOGE.

Q. Where was that meeting?

A. That was virtual.

Q. This is on Wednesday the 22nd of January, 2025?

A. I believe it -- it was no later than Thursday, but I believe it was Wednesday.

Q. You said the meeting was virtual. Do you

Page 24

recall who else was on it?

A. It was a -- it was a -- if I recall, it was a CHCO level meeting. So this was OPM had a distribution where they would ask all chief human capital officers across the federal government to attend the meeting, but -- but at that meeting, typically, were practitioners like myself who were subject matter experts in the area being discussed. And so there were hundreds of individuals on that call.

Q. Were there other individuals that you understood from DOGE on that call?

A. I recall Mr. Cromer. I don't -- I don't recall the names of the other individuals, no.

Q. You had --

A. Well, let me -- I believe Noah Peters was on that call, but I am not sure.

Q. You had testified earlier that you understood DOGE was led by Elon Musk. Was Mr. Musk on that call?

A. Not that I'm aware of.

Q. Are you aware of any conversations that Mr. Musk had with Mr. Cromer prior to that meeting?

A. No.

Q. You said that the guidance came from Mr.

Page 25

Cromer to place people who were -- excuse me -- employees who were involved in DEIA-type work on administrative leave. Did that instruction come at the meeting?

MR. SILER: Objection. Mischaracterizes.

You can answer.

THE DEPONENT: Yes.

BY MR. WARREN:

Q. From Mr. Cromer?

A. Yes.

Q. And what happened next with regard to your work at USAID following that meeting?

A. I worked with a few key stakeholders to identify our list of personnel who met that criteria. And we held a meeting, I think that evening, with the people identified to inform them that we'd be placing them on administrative leave, to explain what the rules are, what the -- you know, what this meant for them in a -- for a pay -- from a pay perspective, from a life perspective, from a career perspective, and give them a chance to ask any questions they could.

So we held that meeting that afternoon, I want to say, and then we moved to get them placed onto administrative leave immediately following that

NICHOLAS GOTTLIEB REDACTED                  April 22, 2026                    26 to 29
96528                                                                         Confidential

Page 26

meeting.

Q.    What was the authority under which Mr. Cromer was acting, as you understood it?

MR. SILER:  Objection.  Calls for legal conclusion, speculation.

THE DEPONENT:  I was not aware of any.  I was not aware that he was with the Office of Personnel Management.  As opposed to difficult issues of this nature, we didn't receive instructions in writing or, you know, typically from OPM in these situations, it -- a call like that would be a sort of specialist -- a conversation with the subject matter experts about how to accomplish an order that's in writing.  And we were working without a lot of that material at that time, without that sort of clarity on authority.

BY MR. WARREN:

Q.    Did Mr. Cromer identify himself during that meeting as having any authority with DOGE?

A.    I don't recall.

Q.    Why did you follow the -- the guidance or the instructions that he gave?  He wasn't in your chain of command, correct?

A.    Yeah.

MR. SILER:  Objection to form.

Page 27

Go ahead.

THE DEPONENT:  Can you rephrase the question?

BY MR. WARREN:

Q.    Sure.  Why did you follow the instruction that Mr. Cromer gave about placing USAID employees who worked in the DEIA space on administrative leave?

A.    Yeah.  Present on the call were representatives from the Office of Personnel Management, and the instruction itself -- administrative leave is not a -- what we consider in our world a adverse action.  It's not a pay-impacting action.  It's not a career-impacting action.  It's not -- ideally, it's not a career-impacting action, but it is -- has a -- prior to -- earlier that week, I think actually that Tuesday or that Monday, the White House had issued a memo about administrative leave, explaining that the agencies could place employees on administrative leave without consideration of certain limiting criteria that had recently been implemented, which was you had -- they had limited the authority to put people on administrative leave to investigative leave, or -- I forgot the other term for it -- weather and

Page 28

safety leave.  They had established criteria to limit its use.  The memo that came out earlier that week had waived that -- those restrictions.

And so during that OPM call, when the instructions went out with OPM personnel on the line, CHCOs across the government viewed that as a instruction to abide by and move forward on.

Q.    What was your understanding of the -- strike that.

Aside from that initial interaction with DOGE, what other interactions do you recall having with DOGE in the context of your work at USAID?

A.    I was called into a meeting with them on -- with representatives from DOGE on Monday morning, Monday the 26th of -- the week of -- the following Monday.  The Monday after inauguration.  So I was called into a meeting on Monday after inauguration at which DOGE representatives were present.  I had additional engagements with them on Wednesday on another group OPM call after the fork in the road was announced.  And then I had two meetings with them, with DOGE representatives, on Thursday morning, and exchanged text communications, or I believe text communications, with a representative prior to being escorted out of the building by DOGE

Page 29

representatives that afternoon.

Q.    Okay.  And we're going to walk through some of that in detail.

A.    Yeah.

Q.    I'd like to go back to the initial meeting -- excuse me -- the meeting you described.  This is the Monday after inauguration.  Do you recall who was there, and what was the meeting about?

A.    So that meeting was led by an individual named Anthony Armstrong, or at least my conversations were primarily with him.  Present at the meeting were other DOGE representatives, but I don't recall their names.  It was a -- there was a good number of people on that call.  I was attending virtually, and I don't believe the cameras were on.  No, cameras were on.  Cameras were on for that call.  For that call.

So, yeah.  So Anthony Armstrong and I -- it was primarily a conversation between Anthony Armstrong and I.

Q.    About what?

A.    Administrative leave procedures.  They were very interested in the exact procedures for placing individuals on administrative leave.  We had a section of our -- of our standard operating

Page 30

procedures addressed how to do this. So I walked them through step by step how you place employees on administrative leave, how we engage with the Office of Security on how to do so, and what templates we use in -- in -- in accomplishing this.

And then once the meeting was over, I forwarded them the templates and the RSO from the section of the SOP on how to do so.

Q. Who's Mr. Armstrong? What was his position?

A. I was not aware of what his position was.

Q. How do you know he was with DOGE?

A. I was introduced into the call by our Chief Human Capital Officer, Bill Malyszka, and he explained that representatives of DOGE were here to ask me questions about administrative leave.

Q. What came of that meeting?

A. I sent over the template, and then as the day went on, I received communications that they intended to instruct me to -- they would want me to place employees on administrative leave by the end of the day. That number started at somewhere like 12 or 17 employees, grew to 30 in the early afternoon, and then the actual instruction came at around 3:30, and it was 57 people, just about. They

Page 31

-- the number changed slightly as -- after receiving the initial email.

Q. Were the -- this group of people, the number of which increased from --

A. About 12 to 17.

Q. -- 12 or 17 up to 57 --

A. Yeah.

Q. -- what was the reason why they were being placed on an admin leave?

A. I did not receive one.

Q. At that time?

A. At that time through to placing them on administrative leave.

Q. This initial meeting with Mr. Armstrong, did he instruct you or order you to put people on leave at that time?

A. No.

Q. You said you had additional engagements with DOGE representatives on Wednesday. That would be Wednesday the 29th?

A. (Nods head.)

Q. What was that about?

A. So Tuesday night, an email went out to all staff announcing what was referred to as the fork in the road, the opportunity for employees to place

Page 32

them -- you know, essentially volunteer to be placed on administrative leave through a set date, at which point they would resign. And so that Wednesday call was from OPM to explain sort of -- to address questions from HR representatives across the federal government and explain how this would all work. I spoke during the call, asking -- one of the key factors that came up was we had placed 57 senior leaders on administrative leave on Monday.

When Tuesday's email came out, a number of our people were retirement eligible or closing in on being retirement eligible. And they were sending me emails asking, you know, does this apply to them? So during the call, I asked if employees on administrative leave were eligible to -- to take the fork, and received the answer that they were. So that was my -- my primary engagement with them on that Wednesday.

Q. And who did you --

MR. SILAR: Sorry. I'm sorry.

THE DEPONENT: Yeah.

MR. SILAR: I just couldn't hear you. Did you say they were or they were not?

THE DEPONENT: They -- the answer was that they were eligible to take the fork.

Page 33

MR. SILAR: Thank you.

THE DEPONENT: Yeah.

BY MR. WARREN:

Q. Who is that meeting with? Who from DOGE?

A. I believe Noah Peters was the lead on that.

Q. Was that in person or virtual?

A. That was virtual.

Q. What was your understanding of Noah Peters' role at DOGE?

MR. SILAR: Objection. Speculation.

You can answer.

THE DEPONENT: I knew at that time that he had prior experience with the Federal Labor Relations Authority. That was the extent of my understanding of his role with DOGE, though.

BY MR. WARREN:

Q. We're going to come back to the discussion of the 57 employees placed on administrative leave. For the moment, you've identified three different individuals that you've interacted with from DOGE: Noah Peters, Anthony Armstrong, and Clayton Cromer. Do you know what the chain of command was within DOGE underneath    Mr. Musk?

MR. SILAR: Objection. Argumentative,

Page 34

lack of foundation.

You can answer.

THE DEPONENT: No.

BY MR. WARREN:

Q. What authority did Mr. Armstrong have with regard to USAID?

A. None.

Q. What authority did --

A. Let me rephrase that. I do not know. I said none, but I don't know what -- what his appointment or what his authority was at that time. He was not a USAID employee at that time.

Q. What about that of Mr. Peters?

A. Similarly, he was not USAID personnel during this time period.

Q. So why are you interacting with him?

A. Because my boss asked me to attend the meeting.

Q. Your boss at the time was?

A. Bill Malyszka

Q. And what was Mr. Malyszka's position then?

A. He was the chief human capital officer.

Q. Was he your direct report?

A. He was my second level, but he was my -- he was my primary engagement through this process.

Page 35

Q. Did you deal with any other individuals that you understood to be from DOGE during your time at USAID?

A. Yes. That Thursday, the Thursday after inauguration. In my meetings -- I had two meetings with DOGE.

Q. Sorry. To be clear, a week after inauguration?

A. A week after inauguration. On that Thursday, I met in the morning with Noah Peters, who had -- that I had seen previously, but I met with him in person. And at that meeting, I first met Jeremy Lewin. That was at 9:30 on Thursday morning. And I met with Mr. Lewin again at approximately 10:30 that morning.

Q. And what did you understand Mr. Lewin's role at DOGE to be?

A. I did not understand. I -- actually, I knew at that time that there was interest in Mr. Lewin being the USAID-specific representative. There was interest on him onboarding with us in some way, but he had not yet. He didn't have -- he needed an escort. He didn't have paperwork or anything like that. He wasn't USAID yet.

Q. Were you involved in any attempts by

Page 36

individuals from DOGE to obtain physical access or systems access to USAID?

A. No.

Q. Ever have discussions with Brian McGill, John Voorhees, or Patrick Butler about incidents involving DOGE and access to USAID?

A. Not until after -- not until after everything -- not until maybe April or May of last year, I guess is what I'd say. I met with Mr. McGill and Mr. Voorhees for drinks.

MR. WARREN: Okay. Do you have exhibit stickers?

MR. SILER: Old fashioned way?

MR. WARREN: Old fashioned way.

For the record, I'm marking Plaintiffs' Exhibit 1.

(WHEREUPON, Exhibit 1 was marked for identification.)

THE REPORTER: Exhibit 1.

MR. WARREN: There's an extra copy there, Jake.

MR. SILER: Oh. Thank you.

BY MR. WARREN:

Q. Mr. Gottlieb, can you take a moment to review this?

Page 37

A. Yeah. Yes.

Q. Let me know if you recognize the exhibit.

A. I do.

Q. What is it?

A. This is the memorandum I referenced earlier that, in my reference, was specific to administrative leave, but also adjust probationary periods and details. It came from the Office of Personnel Management.

MR. SILER: Can I just -- what -- I mean, the -- the -- the document is dated March 4th. Just -- okay.

MR. WARREN: Yep.

BY MR. WARREN:

Q. Mr. Gottlieb, you can see the title of this document is Memorandum Guidance on Probationary Periods, Administrative Leave and Details, correct?

A. Yes.

Q. And it's to the heads and acting heads of departments and agencies. And it's listed as from Charles Ezell, the acting director of the U.S. Office of Personnel Management, correct?

A. Yes.

Q. And the date is initially listed as January 20th, 2025, and then revised date of March

NICHOLAS GOTTLIEB REDACTED                April 22, 2026                38 to 41
96528                                                              Confidential

Page 38

4th, 2025. And the memo you were referring to previously, you understood that to be dated from when?

A. January 20th, 2025.

Q. I'm not going to quiz you on changes that were made in the March 4th revision. I'm asking you if this memo is familiar to you, consistent with a memo that you had received, that you're aware of, from January 20th.

A. May I take two minutes just to read through the key section?

Q. Please.

A. Thank you.

It broadly aligns with my recollection, but I wouldn't be able to highlight how it's changed since.

Q. Understood. Thank you.

You described before the -- this represented a change in policy in terms of administrative leave from the Biden administration, correct?

A. (Nods head.)

Q. And just what did you mean by that?

A. There was -- the administrative leave has long been a difficult subject for federal employee

Page 39

relations. And at some point in the past five years, Congress actually stepped in and passed law to sort of control its use, and -- because there were circumstances where employees were on administrative leave for years without action. And so the law passed established a couple different categories of administrative leave from notice and investigative leave, which was, you know, employee is arrested for a crime and we're going to place them on the administrative leave till the investigation's complete and then take action or just we're going to place them on administrative leave because we've issued a notice of proposed removal, and from that notice period to the action, they'll be on administrative leave.

Then a separate category for weather and safety leave. This was heavy during the pandemic, situations where the employee didn't have telework friendly work and -- but the workplace was not safe for them to report to due to a blizzard, due to a pandemic, due to whatever the case may be.

That law was passed; however, it had sort of an implementation window that dragged on a good amount. But towards the end of the Biden administration, the regulations were passed

Page 40

implementing it. And I -- I may be botching all of this, and apologies for a hazy memory, but OPM passed regulations implementing it, and then had a cascading policy implementation stage of, okay, now agencies, update your policy and address limitations on -- address how you're going to be using administrative leave moving forward. This basically said, Waive all of that. Here are the grounds for using administrative leave at --across the federal government.

Q. And what was the impact of the changes made that are represented in what you remember as the January 20th memo?

A. It lifted the guardrails.

Q. How so?

A. It -- what this memo did, from my perspective at that time, was say you can place some people on administrative leave for the foreseeable future, and -- you know, because they may no longer need their jobs.

Q. Did you understand the January 20th OPM memo as a way to allow the federal government to use administrative leave to lay off portions of the federal workforce?

MR. SILER: Objection to form.

Page 41

You can go ahead.

THE DEPONENT: At the time, I viewed -- when this memo was released and then the following meeting about identifying the DEIA personnel, I viewed this as a -- as specific to that strategy as part of an effort to eliminate DEIA offices across the federal government and take immediate action to stop their work.

Typically, with a reduction in force action, employees continue to work in their roles until the reduction in force takes place. In this circumstance, what I was seeing, what I understood this to be, as we're aiming to end DEIA work in the federal government. We want a process to stop that work immediately and then move through the RIF process to separate those employees.

Q. And --

THE REPORTER: RIF process?

THE DEPONENT: Oh, yes. RIF, R-I-F, reduction in force.

BY MR. WARREN:

Q. And I believe you said at the time. Sitting here today, do you have a different view of the impact of the January 20th OPM memo on a strategy to reduce the federal workforce,

Page 42

specifically with regard to USAID?

A.   And this is -- is this a question specific to my opinion now?

Q.   Yes.

A.   Okay.  In my -- well, I am still not sure if there was a larger plan to reduce the federal government's -- to use this as part of the reduction in the overall federal government footprint.  But as part of their efforts on DEIA, they quickly -- the DOGE team, from my perspective, quickly realized that reduction in force procedures were too complicated to accomplish their goals.  In essence, that a -- most reductions in forces would require a transfer of function.  That work will move from here to there.

What they identified over the course of -- from that Wednesday through that Friday, from my perspective, was that the cleanest thing they could do is shut down offices of DEIA.  And that transition of realizing that you could -- that through RIF procedures you could abolish an office, and in doing so, you eliminate some amount of the need for retention registers and other work, opened eyes to taking a similar approach on a larger scale in -- across the executive branch.

Page 43

Q.   And the explanation that you just gave, that's your observation based on what happened at USAID?

A.   Yes.  The facts that sort of informed it, and this is -- this is only my opinion, but the facts that informed it were the move -- in that initial administrative leave placement, we placed everyone who just had engaged in DEIA work as a -- I think our metric was like 51 percent of their work was sort of our data call out, was do you do more -- is the majority of your work in this arena?  And so this impacted people who were overseas, who had just transferred to a new job, who had worked on DEIA councils for the agency, what have you.

In the following days, orders came from -- from DOGE to just carve it down -- or I think within that week, to carve it down to just people who work for the office of DEIA.  And so we released from administrative leave the chunk of people who didn't work for the office of DEIA but just did DEIA work in other parts of USAID.  That transition was the first realization of they were moving to use abolishment of an office as the driving -- as the way to handle RIFs on this scale.

And then that was for the -- the other

Page 44

fact that added into my opinion on the subject was when I met with DOGE on Thursday, the Thursday after our inauguration, they gave me -- you know, they told me that there were going to be 12 -- they had sent me an email of 12 people who needed a reprimand based on the allegations of misconduct that were apparently the source of administrative leave.  I asked Noah Peters --

Q.   Let me --

A.   Oh, sorry.

Q.   Let me stop you there for a minute because we're going to -- we're going to get through that --

A.   Okay.

Q.   -- episode in just a moment.

You said that orders came from DOGE to carve it down to just people who worked in the office of DEIA.  From what people in DOGE did those orders come?

A.   I don't remember.

Q.   Was it one of the individuals that you've identified already that you had interacted with at USAID from DOGE, Mr. Peters, Mr. Cromer, Mr. Armstrong, or was it somebody else?

A.   I don't remember.

Q.   And do you know where those orders were

Page 45

coming from in terms of up the chain of command at DOGE?

MR. SILER:  Objection to form.

THE DEPONENT:  No.

BY MR. WARREN:

Q.   Who would know that, based on what you saw and understood?

A.   I don't know.

Q.   You can set the document aside.

A.   Okay.

Q.   Yeah.  Actually --

A.   Okay.

Q.   -- I'll hold onto it because we're going to keep it for the court reporter.

Mr. Gottlieb, I'm handing you what's been marked as Gottlieb Exhibit 2.

(WHEREUPON, Exhibit 2 was marked for identification.)

THE REPORTER:  Exhibit 2.

MR. SILER:  Just for the record, you're -- you're just writing over Plaintiffs and saying Gottlieb.  That's fine.  I just want to make that clear for the record.

MR. WARREN:  Yeah.  Thank you.

And for the record, I've redesignated

NICHOLAS GOTTLIEB REDACTED                    April 22, 2026                    46 to 49
96528                                                                          Confidential

Page 46

Exhibit 1 as Gottlieb Exhibit 1.

BY MR. WARREN:

Q.   Mr. Gottlieb, I want to turn your attention to the second to last page of the exhibit.

A.   Mm-hmm.

Q.   The bottom of the page, a reference to an email from John Voorhees on Wednesday, January 22nd, 2025, at 11:32 a.m., that continues on to the next page.  Do you see that?

So first, let's -- I want to make sure we get our date straight.  This is Wednesday, January 22nd, the day after inauguration?

A.   Yes.

MR. SILER:  Inauguration is January 20th.

MR. WARREN:  Oh, is the -- Monday, the 20th.  Sorry.

MR. SILER:  Yeah.  Two days after inauguration.

BY MR. WARREN:

Q.   Two days.  This is the day after the -- the day after inauguration.  Now, you're not copied on this initial email, are you?

A.   I can't see the full thread, the CC list, so I'm not sure.

Q.   You see the reference to -- this is at the

Page 47

top of the last page.  Mr. Voorhees writes:  I need a list of all staff DH and ISCs that will be terminated, removed, or put on admin leave.

A.   Yes.

Q.   Okay.  Just to get our bearings straight.  And then working up from there, towards the top of the second to last page, 3220, there's an email from Sepideh Keyvanshad.  Do you know who that is?

A.   Yes.

Q.   Who is that?

A.   That's -- she was the -- I have to get the title right.

Q.   Is it listed right below?

A.   Yes, it is.  Thank you.  Senior deputy assistant administrator.  She was the head of our foreign service HR function.

Q.   And she wrote:  Adding Anya and Nick to make sure they're in the loop as HCTM finalizes that list.

A.   Okay.

Q.   HCTM being human capital and talent management?

A.   Yes.

Q.   So now here we can see that you are copied on this?

Page 48

A.   Yes.

Q.   And if we go up a page, we see your email from Friday, January 24th.  This is on page 3219.  Do you see that?

A.   Yes.

Q.   Okay.  So tell me what's going on here.  When you get involved, and going through the email to the beginning, to the most recent, what's happening?

A.   Yes.  And so this actually corrects my timeline slightly.  I had mentioned it was -- my call with OPM was either Wednesday or Thursday.  The call was apparently Thursday.  So on -- what is this?  On Wednesday, John Voorhees, who's our head of security, asks for the list of all staff who are going to be placed on -- you know, who are going to either be terminated or placed on administrative leave because his office was responsible for shutting down logical access to the building and to our systems.

So he would -- his -- typically, the way we would do an administrative leave or separations of any kind is we would notify the Office of Security.  Office of Security would turn off their physical badge and then notify CIO, who would turn

Page 49

off their IT access, their email, you know, their whole network access.  Office of Security would also administratively suspend their clearances, their -- you know, if they have a top-secret clearance, if they have a secret clearance, whatever the level is, that would be administratively suspended for the duration of administrative leave or especially for a termination.  And so he's asking for that information then.

By Wednesday, they copy me in because we're putting together that list, and this is the list of DEIA personnel.  And so this is where we're doing that call out and attempting to compile who fits within the broad buckets we had of who qualified for administrative leave.

And then Friday, I give the update on the systems piece, which is that when we spoke on -- on Thursday -- I write OPM here, but the individual involved, it was Clayton Cromer, who informed agencies that they must maintain administrative leave -- or they must maintain access to their government email account.

Q.   That instruction came from Mr. Cromer?

A.   Yes.

Q.   Who you understood to be at DOGE?

Page 50

A.   Yes.

Q.   **Again, at that time, and with regard to that instruction, what authority did Mr. Cromer of DOGE have to tell USAID what level of email access people who are placed on administrative leave needed to have?**

MR. SILER:  Objection.

Go ahead.

THE DEPONENT:  I am not aware of any.

BY MR. WARREN:

Q.   **Well, why did you -- did you follow what he said?**

A.   Yes.

Q.   **Why?**

A.   Because the -- his -- his guidance came through a call with OPM, and our leadership complied with those -- with that instruction.

Q.   **During this time, in regard to this issue, placing people on admin leave and the impact of it with regard to DEIA, do you recall any -- did you have any conversations with people at USAID about whether you should be taking instruction from members of DOGE?**

A.   I don't recall any specific conversation, no.

Page 51

Q.   **At the time, did you understand DOGE to be affiliated with the United States Digital Service in any way?**

A.   I don't recall if that argument was made that week or it came later.  I -- I recall that argument being made at some point, but at that time, I don't -- I don't know what my understanding was.

Q.   **What do you mean, the argument being made?**

A.   There were, the following week, questions regarding DOGE's authority, just in between -- this was a very fluid stretch of time, in between Monday, when we placed everyone on administrative leave, to Thursday.  By Thursday, there were deliberate efforts to ensure that at any meeting where DOGE representatives were issuing instructions or -- or talking to us, that there was a political appointee present at that meeting.  They typically didn't talk very much, but they -- there was a much more deliberate effort by Thursday to ensure that the Trump political appointee was engaged in those meetings, than there was on Monday or in the week prior.

Q.   **What was your understanding of why?**

A.   My understanding by that Thursday was that there were concerns regarding orders or instructions

Page 52

being issued by people without the authority to issue them.

Q.   **Concerns from whom?**

A.   From, generally speaking, these -- that -- I do not know who raised those concerns.  Generally speaking, concerns like that come from lawyers.

Q.   **Did you have concerns?**

A.   I don't recall having -- I -- I think by the second week, there were -- I had growing concerns, yes.

Q.   **And what were those?**

A.   Yeah.

Q.   **And to be clear, I want to focus on the authority that was being exercised by members of DOGE.  What were your concerns about that authority?**

MR. SILER:  Objection.  Argumentative, assumes facts.

But go ahead.

THE DEPONENT:  So my concerns by the following week were specific to who -- as we're getting to the place where we're taking more direction to -- towards termination, was the feeling of that week, that as we started to go down that road, it became much more important that there be a clear paper trail of who instructed us to take

Page 53

action.  And so on that Monday afternoon, when we received instructions to place employees on administrative leave, that instruction came from Mr. Borkert on behalf of Jason Gray, who was the acting administrator at that time.  We started to press for clearer paper trails of instructions by that second week, after the experiences of that Thursday, Friday.  And so -- yeah.  Well, go ahead.

Q.   **To -- to stop you there.**

A.   Yeah.

Q.   **So you said "we" a couple times in there. Who's the "we"?**

A.   I was working closely, during that period, with Bill Malyszka, who was our chief human capital officer, and just discussing the potential risks and consequences of our actions.  So when I say we, my primary lines of communication during that time were with Mr. Malyszka.

Q.   **And a few minutes ago, I asked you about the United States Digital Service.  Did you -- and forgive me, I forget the answer.  Did you understand DOGE to have any connection with the U.S. Digital Service?**

A.   I don't recall having any understanding of that at that time.  I'm not sure if articles had

Page 54

come out with that argument yet.

Q. Prior to January 20th of 2025, during your six years at USAID, had you ever had interaction with the United States Digital Service?

A. No.

Q. During your time at CBP and CIS, did you ever have interaction with the U.S. Digital Service?

A. No.

Q. Had anyone from the U.S. Digital Service, in all your time at the government, ever -- had they ever been involved in decisions made about personnel at the agencies where you worked?

A. No.

Q. And I believe you answered this, but just to make sure it's clear, the email that we're looking at, the people being placed on leave, that's in regard to DEIA?

A. Yes.

Q. Mr. Gottlieb, you can put that aside.

A. Okay.

MR. SILER: Yeah. That needs to go to you, I think.

MR. WARREN: Yes. Thank you.

BY MR. WARREN:

Q. I'm handing you what's been marked as

Page 55

Gottlieb Exhibit 3.

(WHEREUPON, Exhibit 3 was marked for identification.)

THE REPORTER: Exhibit 3.

BY MR. WARREN:

Q. And for the record, the Bates stamp range is 586 to 591. And for the record, the witness is reviewing the document.

Have you had a chance to review the document?

A. Yes.

Q. All right. So Exhibit 3 is an email chain from Monday, January 27th, at 3:41 p.m., and it ends Monday, January 27th at 6:24 p.m., the last page. Do you see that?

A. Yes.

Q. And this is in regard to 57 people to be placed on admin leave, correct?

A. Correct.

Q. All right. Now, you had testified before that the number of people that eventually became 57 started somewhere 10 to 17.

A. Yes.

Q. I'd like to go back. What was your first conversation that you recall having about placing

Page 56

what grew to become 57 people on administrative leave?

A. I don't recall specifics. I recall -- because it was a highly fluid situation with people in and out of meetings that day. We would get quick calls or texts or texts -- G chats, Google chats with quick updates on what was happening. So I think if I got -- when I got that note, that update, it might have been just a quick phone call and an update on kind of what to keep an eye out for that afternoon.

Q. Did you have an understanding of why the 12 to 17 people, as it started, were to be put on admin leave?

A. No. We had -- we did not receive -- until that evening, we did not receive any information regarding why, or I did not receive any information regarding why.

Q. Until the evening of the 27th?

A. Correct.

Q. So with this email, that is the first email on Exhibit 3, 3:41 p.m. -- this is from Joel Borkert, who is deputy chief of staff at USAID, correct?

A. Correct.

Page 57

Q. And he writes: Please see the list below of employees being placed on administrative leave approved by Acting Administrator Gray. Who is he referring to?

A. Our acting administrator in those early weeks was Jason Gray. He was our former chief information officer.

Q. What authority, at the time, did Mr. Gray have to place these 57 people on admin leave?

MR. SILER: Objection. Calls for legal conclusion.

You can answer.

THE DEPONENT: As the acting administrator of the agency, there were some limits on his authority but not much. It was within the chain of command. Based on the OPM memo that had come out the previous week, he had significant authority to take -- to place employees -- to instruct employee -- made to place employees on administrative leave.

BY MR. WARREN:

Q. And you understood that it was on Mr. Gray's authority that these people were being placed on leave; is that correct?

A. Yes.

Q. Do you know who made the decision to place

NICHOLAS GOTTLIEB REDACTED                April 22, 2026                    58 to 61
96528                                                                     Confidential

Page 58

them on leave?

MR. SILER: Objection. Form.

You can answer.

THE DEPONENT: My understanding is that Mr. Gray was provided with the list of employees and informed -- and subsequently, or sometime in that period of time, was told that they are to be placed on administrative leave pending an investigation, that DOGE had, over the course of the week, had uncovered evidence that these -- that there had been insubordination among USAID leadership, that DOGE would be looking into it and provide them with additional information that Thursday, but that in the interim, he was to place them on administrative leave and send out an agency notice announcing why.

My understanding is he did so with the belief that this was purely to allow time for investigation, and that if there was no evidence to support the allegation, that they would be removed from administrative leave.

BY MR. WARREN:

Q. You said that your understanding was that this came from DOGE. Were you involved in any discussions at this time with people from DOGE about placing these individuals on leave? And to be

Page 59

clear, I mean on Monday the 27th?

A. No.

Q. Do you know what conversations that Mr. Gray had had with anyone from DOGE?

A. I -- my -- the extent of my knowledge of those conversations came from a conversation with Mr. Gray that occurred on Tuesday the 28th.

Q. What was that -- tell me that conversation.

A. So I received the list of 57 employees, and we moved, as you can see from the email thread, as fast as we could to get them placed on administrative leave.

I then did my best to gather an understanding of who these employees were. We didn't really have that on the -- you know, it was just a text list. So we put it into a spreadsheet, ranked them -- or I put it into a spreadsheet, assigned them their ranks, and started to determine the scope of this action.

The following day, I met with Mr. Gray in his conference room on the sixth floor and walked him through who these people were and my concerns that this couldn't be tied to an allegation of misconduct based on the scale of the people listed.

Page 60

He gave me the background on his decision making, on the thought process regarding his decision making during that conversation. I expressed to him at that time that it was highly unlikely that on Thursday, DOGE would come to us with evidence of misconduct. And the reason being that the people involved on this list were from such a wide swath of the agency, but were primarily our executive leadership team and our Office of General Counsel and employment lawyers, people who weren't involved in funding -- you know, disobeying the President's orders on funding disbursements. We had -- one of the people involved here was a employment lawyer who had been with the agency for two or three weeks at the time. A couple of the people hadn't worked for the agency for several years.

And so we discussed that, and we discussed what -- you know, if on Thursday we -- no evidence came of misconduct, what would be necessary in that situation from a due process standpoint. And -- and it -- but it was at that time that Mr. Gray outlined what his conversations had been the prior day, and that as best he understood, it was related to funding disbursements in violation of the President's orders.

Page 61

Q. That Tuesday meeting you're describing with Mr. Gray was the first time you understood that the 57 people who were to be placed on admin leave had something to do with violating -- disbursements in violation of the President's executive order?

A. The very first impression I had of that was that the Monday evening at the end of -- after the end of business. Mr. Gray sent out an agency-wide notice -- we call them agency notices, an email that goes to all staff -- that stated that a number of employees had been placed on administrative leave. I'll not get the language exactly right, but in violation of -- for -- for violating the President's orders, or on allegations that they had violated the President's orders.

Q. If you turn to page 4 of Exhibit 3, in the middle of the page, there's an email from Brian McGill, copying you and others. It says: Copy. On call with Nick, Bill and CIO, tracking.

What's Mr. McGill referring to?

A. So at 3:53, seven minutes earlier, Mr. Borkert added our agency counselor, Clinton White, to the list. And so he was -- Mr. McGill was just noting to Mr. Borkert that we are tracking the addition of Mr. White's name.

Page 62

Q.   And the 4/13 email below that from Mr. McGill again says:  Joel, providing status update. Nick is drafting the guidance to send out to all employees now.

Were you tasked with sending out guidance to the employees?

A.   Yeah.  So at USAID, I -- while decisions might be made to place employees on administrative leave, I was the one who placed them on administrative leave.  So it was a memo from me to the employees stating that I was placing them on administrative leave for -- and typically providing an explanation of the why.

So that was what we were working on in those 20 minutes, was getting a memorandum ready for issuance to the 57, and then getting ready to cut -- and -- and then scheduling out when that would be delivered, and then cutting access thereafter.

Q.   And then we see responses on page 5 at the top and middle, correct?

A.   Correct.  Yes.  Yes.

Q.   You write:  Prepping the notice now.

And in the subsequent email you write: All notices have been transmitted.

That's at 4:32 p.m.?

Page 63

A.   Correct.

Q.   So that's -- if we look back at the first email in the exhibit, 3:41 to 4:32, 51 minutes, and now you have transmitted all notices to the employees who have been placed on leave?

A.   Yes.

Q.   Did you have concerns that you didn't know why you were placing 57 people on leave?

A.   Yes.  It was a break from standard practice in these cases.

Q.   How so?

A.   When we place -- by -- to give an example of this is the meeting I had the prior week with the DEIA team where I sat with them and explained that they were going to be placed on administrative leave, the reason why, and what this meant for them from a personnel -- from a pay perspective, from a security perspective, and what would happen next. That we do for instances of -- you know, if we can reach the employee, that is our typical practice, is to have a call with them, explain the purpose of the memo, explain what's going to happen, answer questions, and then we issue.  And the memo -- typically, the template has a -- had a spot for the reason why, pending the outcome of investigation,

Page 64

due to whatever the reason might be.  There's typically a section where we would include that. This was our first time we had done a memo of this nature that did not have a reason, and that break from practice was concerning.

Q.   Did you -- did you discuss those concerns or raise them with Mr. Gray during the meeting on Tuesday the 28th?

A.   No, because at that time, he explained to me what the reason was.  I may have, but at that time, our conversation was, you know, about what the reason was.  But you know -- yes, because I went to him with the explanation -- with the concerns regarding the nature of the roles of the people involved and the fact that we gave no reason.  We were trying, in our conversation, to figure out what the reason was.  So it was a driving concern for that conversation.

Q.   To be clear, your concerns about not knowing the reason was a driving concern for the conversation with  Mr. Gray.  And did he address those concerns by telling you what the reason was?

A.   Yes.

Q.   And the reason he provided was the investigation of potential violations of the

Page 65

President's executive order with regard to disbursements; is that accurate?

A.   Yes.

Q.   You had testified that the number of people to be placed on leave for this reason started between 12 and 17.  Did it grow immediately to 57? To be precise, was there another number in there somewhere, or was the -- the next growth from 12 to 17 up to 57 people?

A.   It was -- there was a 30 in between, and then it went to 57.  I think the 30 came at around 1:30 or so.

Q.   During your discussion with Mr. Gray on the 28th, you testified you raised concerns to him about the evidence that would come out.  Who was gathering this evidence?

A.   My understanding from Mr. Gray was that it was representatives from DOGE.

Q.   Was DOGE's role, as you understood it, to marshal the evidence, or were they making the decisions about who was to be placed on leave?

A.   I can't say.

Q.   What was your understanding of what evidence they were gathering at that time, that is during the meeting with Mr. Gray on Tuesday morning?

Page 66

A.    So at that time, my understanding was that there were concerns regarding funding disbursements. We vaguely had a grip on that.  And that they were going to go through our systems and -- and come with evidence of, you know, insubordinate behavior on Thursday.  We didn't have a lot of specifics, though.

Q.    "They" being DOGE?

A.    DOGE, yes.

Q.    Do you know who the DOGE individuals were who were compiling this information?

A.    No.

Q.    Did you later come to learn who they were?

A.    By Thursday, I knew one new name, which was Luke Farritor.

Q.    The meeting was in this -- the meeting that we're describing on Tuesday, the 28th, was in Mr. Gray's office?

A.    His conference room.

Q.    His conference room.  Who else was there?

A.    His aide.  I don't remember the young man's name, though.

Q.    And you can set that aside.

A.    Okay.  Do I hand it to you or --

Q.    Yes.  Thank you.

Page 67

MR. SILER:  Andrew, is this --

THE REPORTER:  What was that, please?

MR. SILER:  -- a good time to take a break?

MR. WARREN:  We're going to take a break.

THE VIDEOGRAPHER:  Please stand by.

THE REPORTER:  And our videographer will take us off the record.

THE VIDEOGRAPHER:  Please stand by.

The time is 4:26.  Sorry, the time is 4:27 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 4:34 p.m., and we are on the record.

BY MR. WARREN:

Q.    Mr. Gottlieb, I'm handing you Gottlieb Exhibit 2.  Turn to page 3220, the fourth page of the exhibit.  There's a reference in a message we looked at to USDH.  What is USDH?

A.    USDH stands for U.S. direct hire.  At USAID, we had a variety of employment categories ranging from contractors to locally employed staff overseas, what have you.  A U.S. direct hire is a federal employee, and that was our acronym for that.

Q.    All right.  Thank you.  I'll take that

Page 68

back.

So before the break, we were talking about the 57 USAID officials placed on leave.  And I just want to make sure that I understood the testimony, so please correct me if this is a -- the summary is inaccurate.  Your understanding is that someone at DOGE presented USAID with a list of people to be placed on leave.  The stated reason being allegations regarding the funding freeze and violations of the executive order, and that Mr. Gray ultimately approved the decision to place the 57 people placed on leave, correct?

A.    Yes.

Q.    And that occurred on January 27th, the email we just looked at, Exhibit 3?

A.    That would be the Monday -- if that's the Monday, then yes.

Q.    Yes.  I'm handing you what I'm marking as Gottlieb Exhibit 4.

(WHEREUPON, Exhibit 4 was marked for identification.)

THE REPORTER:  Exhibit 4.

BY MR. WARREN:

Q.    This is a copy of Defendants' Objections and Responses to Plaintiffs' First Set of

Page 69

Interrogatories to Defendants United States Department of State and Marco Rubio in this case. You said you hadn't reviewed filings in this case except one.  Let me know if you recognize having seen this document before.

A.    I do not believe I've ever seen this document before.

Q.    I'd like you to turn to page 5 -- I'm sorry, page 6 of the exhibit.  You can see where it says Interrogatory No. 2.  And the question here posed by Plaintiffs to the United States Department of State and Defendant Secretary of State Rubio is: Identify the individual or individuals who made the decision to place approximately 57 USAID employees on admin leave on or about February 1st.

And the interrogatory continues.  And if you look down at the response from the Defendants, the response is: Kenneth Jackson, then performing the duties of assistant to the administrator for management and resources, authorized the transmittal of admin leave notices to 57 USAID employees.

First of all, who is Kenneth Jackson at the time?

A.    Mr. Jackson was a political appointee from the Trump administration, was my understanding.

Page 70

Period.

THE REPORTER: Last two words?

THE DEPONENT: Period.

BY MR. WARREN:

Q. Was it your understanding that at this time, around February 1st, 2025, and specifically as of January 27th, the date the 57 employees were placed on leave, as you testified, was Mr. Jackson the assistant to the administrator for management resources?

MR. SILER: Objection. Ambiguous.

THE DEPONENT: Yeah. I don't recall him having that role at that -- well, so there -- there are a few issues with this sentence.

BY MR. WARREN:

Q. All right. Tell me what they are.

A. I don't understand -- the 57 employees in the Bureau of Legislative and Public Affairs. The Bureau of Legislative and Public affairs didn't have a role in this engagement, as best I understood it. And the 57 employees were not in the Bureau of Legislative and Public Affairs. So there's that.

January 31st occurred -- you know, was however many days, four days, after the administrative leave notices actually were issued,

Page 71

then the decision was made. The decision was made the Monday after inauguration. January 31st was, I think, the Friday of that week.

And then my understanding -- at that time, Colleen Allen was the assistant to the -- was the -- I think she was the assistant to the administrator for management and resources. She was one of the 57, but I believe at that time she was the -- she was the AA for management resources. Mr. Jackson was in the front office. Management resources is a bureau of our -- of our agency at the time, and Colleen Allen was in that role at that time, to my recollection, up until being placed on administrative leave.

Q. As you understood it from your involvement in this incident, the placement of the 57 people on leave, is anything in this response accurate?

MR. SILER: Objection.

Ambiguous.

THE DEPONENT: I am not aware of anything in this sentence that's accurate.

MR. WARREN: I'll take that back. Thank you.

I'm handing you what's been marked as Gottlieb Exhibit 5.

Page 72

(WHEREUPON, Exhibit 5 was marked for identification.)

THE REPORTER: Exhibit 5.

BY MR. WARREN:

Q. Bates stamped 4243 to 4244.

A. Yeah.

Q. Mr. Gottlieb, is this the email that you sent out to the 57 individuals you placed on leave on Monday, January 27th?

A. It appears to be, yes.

Q. Notice the time says 9:31 p.m. UTC. The email we just looked at in Government's Exhibit 3 was at 4:32 p.m.

MR. SILER: I'm sorry. It's Gottlieb Exhibit. You said Government's Exhibit.

MR. WARREN: I said Government?

MR. SILER: You did.

MR. WARREN: Sorry. Gottlieb Exhibit.

MR. SILER: I apologize. I -- I -- yeah.

BY MR. WARREN:

Q. I'm not going to quiz you, Mr. Gottlieb, on what UTC is. But again, based on your recollection and the prior exhibit we looked at, is your understanding that you sent the email out at approximately 4:31 p.m. Eastern time?

Page 73

A. Yes.

Q. Okay. And this -- the attachment to this exhibit, Gottlieb Exhibit 5, is this the memo that accompanied the email that you sent out to the 57 people placed on leave?

A. Yes.

Q. And I've referred to the 57 a few times in my questions. Did the email actually go out to more people than that?

A. The -- as I mentioned earlier, the number changed slightly through that 45 minutes. There were, I think, two people who were no longer with the agency. There was then the addition of Mr. White, but we, over the course of that week, we colloquially referred to them as the 57.

Q. On the first page of the exhibit, your email says, second paragraph: This will assist you in -- this will assist us in providing you with updates as matters develop and contacting you with the next steps when appropriate.

What updates, as matters develop, are you referring to?

A. So to the note that this was a break from our common practice, typically when -- the common -- the common practice is that we have a call or a

NICHOLAS GOTTLIEB REDACTED          April 22, 2026                    74 to 77
96528                                                              Confidential

Page 74

meeting with the person being placed on administrative leave, and during that engagement, we make sure to gather the employee's personal contact information, because once we issue the memo, Brian McGill or the security team cuts off their building access, and their -- the CIO team cuts off their system access.  And if we don't have a good contact, personal contact information, we have no way of getting ahold of them.

In this situation, where just in the course of the -- that week, we had seen such fluidity and decision making, I wanted to ensure that we got that information because we knew that these 57 were going to have their system access cut without that early call.  So I didn't have all their personal contact information.  And so if we didn't have -- and we had people who were traveling overseas on that list of 57.  We had one employee who had just taken a new job with the agency, a new position, and was in the midst of reporting to her new role in Germany when she received the email.  And so trying to stay in contact with these people who were traveling on their diplomatic passport, who were traveling overseas was tricky.  I was attempting to ensure that we stay in touch so I can

Page 75

follow up with them as we figure out what's going on.  Because what I knew at that time was I didn't know what was going on.

Q.   If you turn to the second page of the exhibit.

A.   Mm-hmm.

Q.   Was this a form memo, or was this something that was created specifically in regard to this incident?

A.   So this is based off of our template; however, it's missing -- usually in the first paragraph, there's a bracketed section for "insert the reason for administrative leave".  The rest of it is -- are fairly close to, if not exactly, our template language.

Q.   In that first paragraph, the bracketed reason for the administrative leave, is absent here because you didn't know it?

A.   We did not know, yes.

Q.   Did you draft the template?

A.   Yes.

Q.   And did you draft this email?

A.   Yes.

Q.   This -- excuse me, this memo?

A.   Yes.

Page 76

Q.   I'll take that back from you.

I'm handing you what's been marked as Gottlieb Exhibit 6, Bates stamped 4142.

(WHEREUPON, Exhibit 6 was marked for identification.)

THE REPORTER:  Exhibit 6.

THE DEPONENT:  Yes.

BY MR. WARREN:

Q.   This is an email chain.  The first email is from Luke Farritor on Monday, January 7th, 2025, at 4:28 a.m.  Do you see that?

A.   Yes.

Q.   Luke Farritor, you testified, was someone who you understood worked at DOGE?

A.   Yes.

Q.   What was his involvement at USAID at this time?

A.   I did not know his involvement.  My understanding was that he was a data engineer or a data -- he was a computer -- a young man who knew how to use a computer.

Q.   The subject is USAID Context.  Do you see that?

A.   Yes.

Q.   And I just want to walk through the people

Page 77

who are -- received this initial email.  Steven M. Davis.  Do you know -- who is Mr. Davis?

A.   I do not know.

Q.   Brad Smith?

A.   I do not know.

Q.   Tarak Makecha?

A.   I do not know.

Q.   Edward Coristine?

A.   I believe Mr. Coristine -- and similar with    Mr. Davis.  I believe Mr. Coristine and Mr. Davis were involved with DOGE, but I didn't have significant involvement with either.

Q.   Mr. Peters?  That's who you've identified before?

A.   Mm-hmm.

Q.   Same with Mr. Armstrong?

A.   Yes.

THE REPORTER:  Was that a yes?

THE DEPONENT:  Yes.

BY MR. WARREN:

Q.   Same with Mr. Armstrong?

A.   Yes.

Q.   And same with Mr. Cromer?

A.   Yes.

Q.   All three of whom you've testified you

Page 78

understood worked with DOGE, correct?

A. Yes.

Q. Or I should say for DOGE?

A. I was never clear how to say that.

Q. At the top of the exhibit, we can see that the --Mr. Peters forwards the email to Bill Malyszka and to you?

A. Yes.

Q. All right. So what's going on here?

A. So I knew -- I was informed over the course of Monday and Tuesday that Monday morning, very early in the morning, a team from DOGE had arrived at USAID facilities and came in very aggressively to hold a series of meetings with USAID leadership, of which I was a small part. I knew that on --

Q. Did you attend any of those meetings?

A. I attended the one where I explained to them how the administrative leave process worked.

On Thursday and during that -- and on Thursday -- so by Tuesday, I knew that they were coming back on Thursday with the evidence of misconduct. That's what they had committed to Mr. Gray to do. So Thursday morning, I arrived very early at work in anticipation of that engagement.

Page 79

And at 9:30, I received -- around 9:30, I received a call from Mr. Malyszka asking me to report to his office because representatives from DOGE were there. I went, and in Mr. Malyszka's office were Mr. Peters, Tera Dahl, who was a Trump political appointee, the administrative -- administration's political appointee, and Jeremy Lewin. Mr. Peters informed me --

Q. I'm sorry. Who is Mr. Lewin, as you understood?

A. Oh. Jeremy Lewin? He was a -- he was on the DOGE team. There was some conversation, I believe, in that early meeting that he was going to be embedded with USAID, but that that had not happened yet.

So in that meeting, Mr. Peters drove the conversation and informed me that --

MR. SILER: Hold on. My understanding of this meeting is that -- what we're going to get into now is covered by the deliberative process privilege. I've obviously, as we established earlier, I've not spoken to the witness prior to this, so I obviously don't know exactly what I was going to say -- what he is going to say, but my understanding of that meeting is that deliberative

Page 80

information was shared, and therefore, I would instruct him not to answer any recommendations, suggestions, discussions about actions that these individuals were going to recommend to senior agency leaderships.

Obviously, you're entitled to ask questions just to explore the scope of that, but that is my understanding, and so I'm going to offer that instruction at this time.

BY MR. WARREN:

Q. Okay. You can continue.

A. How do I address an instruction from government lawyers on the subject?

Q. Well, I don't think Counsel is instructing you yet not to answer. I think he's highlighting the potential, and we'll go in small steps to make sure.

MR. SILER: Sure. Well, I mean, I am instructing you not to answer to the extent that it would reveal who made suggestions, recommendations about certain actions that the agency take with respect to people on administrative leave and whether they should -- you know, what actions should be taken with respect to those people. In terms of the facts of what happened, who was there, you know,

Page 81

obviously you have this Exhibit 6 in front of you, who was there, the general subject matter of the conversation, that's all okay. So it's hard to give a more specific instruction, as Andrew just said.

But maybe if you ask some more questions, we can get more specific.

BY MR. WARREN:

Q. Let's start with who else was there.

A. Noah Peters, Tera Dahl, Jeremy Lewin, and Bill Malyszka.

Q. You said Mr. Peters drove the conversation. What was the nature of the discussion? What was the topic?

A. The topic of the discussion was that they had provided evidence that Mr. Peters had just emailed me evidence of misconduct. He said that I would -- I would have an email in my inbox with a list of names. And he instructed me on what I was to do with -- what corrective action I was to take against those employees.

Q. Is this in regard to the people who'd already been placed on leave three days prior, on Monday the 27th?

A. During the meeting, I was not sure. However, this list is -- does not include -- there

Page 82

are people on this list who are not on the list of people who are on administrative leave; there are people who are.

Q. Was this -- was the discussion about justifying or explaining or discussing a prior decision that had been made, or was the nature of the conversation to discuss a future decision to be made?

A. It was to discuss a future decision.

Q. And what decision was that?

A. What discipline these employees were to receive.

Q. Okay. Was a decision made at that meeting as to what discipline these employees were -- what disciplinary action these employees were to receive?

A. A instruction was issued. Mr. Malyszka and I provided context regarding the process relating to that instruction and committed to review the information received and -- and take action accordingly.

Q. Okay. And to be clear, we don't want to, at this time, get into discussions that led up to the decision being made, but was a decision made at that meeting about what was to happen to the individuals?

Page 83

MR. SILER: You can answer yes or no, just --

MR. WARREN: Yep.

THE DEPONENT: Yes.

BY MR. WARREN:

Q. And what was that decision?

MR. SILER: So I -- I don't think there's a way to solve this that will satisfy us that this isn't deliberative, our position, meaning I -- I think we're just going to have a fundamental legal disagreement about whether this was a decision or whether this was about a recommendation to be given to agency leadership that they ultimately took the decision. I think that's just the difference in the parties. And so, therefore, I think I need to instruct the witness not to answer and go into this -- this process with respect to what action, you know, people in this meeting are taking.

MR. WARREN: Okay. Well, we can ask the witness.

BY MR. WARREN:

Q. Mr. Gottlieb, the decision that you understood to be made, was it the decision to implement disciplinary action, or was it a recommendation to go up to different people to make

Page 84

that decision?

A. It was a -- so it was initially framed as a decision; however, when we explained the due process associated with the action and explained that the people with the authority to take that action were not in the room, we committed to going back, looking at the information, and engaging with the people who had the proper authority to take that action accordingly. But -- so if that answers the question to a degree.

Q. Okay. Let's go back to the email then.

A. Yes.

Q. Mr. Farritor writes -- Bullet Point No. 1, what does he mean there, as you understood it?

A. So Bullet Point 1 reads: Below is a list of all users with a usaid.gov email address who have logged into the HHS payment system in the past year.

HHS stands for health and human services. They are one of our payment processors. USAID has some amount of payment capability, but we process a huge amount of money in any given year. The actual processing of that money, the delivery of funds from the U.S. government bank accounts to vendors is handled by health and human -- or a chunk of that is handled by health and human services.

Page 85

And so what is being said here is: Here's a list of all USAID, you know, personnel, anyone with a USAID -- and that could include contractors. That could include U.S. direct hires, as we mentioned earlier, but USAID personnel who logged into HHS's payment processing system, the system that delivers funds from U.S. government to vendors.

Q. And Bullet Point No. 2, Mr. Farritor writes: I just ran some numbers. I could be wrong, but it seems like the HHS payment system has had over 350 payment requests and continues.

What's your understanding of that?

A. So it read -- reads to me like he looked at a spreadsheet and saw just a payment processing date on it and sorted from January 20th forward and gave account. What stood out from that is that payment requests come in from around the world, and the process for starting a payment request, HHS, is kind of the last piece. A payment -- payment processing can begin weeks or months earlier. And then when it gets to HHS for processing is the final part of getting the money from the U.S. government to the vendors, is my -- was my understanding.

Q. Mr. Farritor wrote at the end of that bullet point: My numbers could be off, so don't

Page 86

repeat this figure widely.

What's your understanding of that?

MR. SILER: Objection. Speculation.

THE DEPONENT: Yeah. I read it that that's what he said.

BY MR. WARREN:

Q. Now, what was your reaction to seeing this email?

A. Surprise.

Q. Why?

A. During the meeting preceding, we'd been expecting evidence of an investigation that came from Monday forward to Thursday. Mr. Peters informed me that he had forwarded me the information to support an action and explained that -- and explained what we were to do next.

I returned to my desk and opened the email and the only evidence provided was an email that predated any -- the administrative leave action that occurred on Monday at 4:28 in the morning, before DOGE arrived at USAID facilities. That there wasn't any investigation that occurred from Monday forward to Thursday, or at least for I -- that I had no information regarding that. So I was surprised when I received this.

Page 87

Q. What did you do?

A. I began work identifying who was on the -- who these 12 people were. They weren't names that stood out to me as leaders of the agency. And the reason why was that a healthy chunk of these employees were IT contractors, just people who manage our payment processing system. They're not people who make decisions in any impactful way.

So I spent my initial moments just trying to figure out who are these people and trying to understand what the attached CFO letter was before I met again with DOGE representatives at 10:30.

Q. Before we set the email aside, there are several people copied on the -- excuse me, recipients of the initial email with OMB email addresses. In your experience at the government, what role would OMB individuals usually make in personnel decisions at an agency level?

A. Typically, OMB is much more involved on budget than personnel. I've rarely experienced them being involved on personnel issues.

Q. You just testified to a meeting at 10:30. What was that meeting?

And you can set that aside. I'll take it.

A. Okay. So I received -- in between

Page 88

returning to my office after the 9:30 meeting, or after returning to my office at the -- after the 9:30 meeting, I received another call from Mr. Malyszka asking him to -- asking me to return to his office. And present at this meeting were just Mr. Lewin and Ms. Dahl. Mr. Peters was no longer present.

Q. What happened at that meeting?

A. I -- Mr. Malyszka and I informed Mr. Lewin of concerns regarding the evidence provided. Mr. Lewin -- or I should rephrase it. Mr. Lewin instructed us to terminate everyone on that list by close of business that day, as well as, best I can recall, Colleen Allen and a few other senior leaders. Mr. Malyszka and I raised concerns that based on the evidence we received, these -- the evidence received barely -- doesn't support a reprimand.

And we also expressed concern that terminating any of the civil servants involved or -- including the senior executive service employees involved by close of business that day would violate their due process rights. Mr. Lewin stated that he would look into that and -- and get back to us, but that we were to proceed with the reduction in force

Page 89

action for the DEIA personnel, which was going on concurrently, in the meantime.

Q. Can you explain that, the -- you just referenced the DEIA action being taken. That's separate than what's happening to these 11 people?

A. Yes.

Q. Okay.

A. Yeah. So while -- while this was going on with the 57, we were still dealing with the -- I think it was maybe 10 to 17 employees we had placed on administrative leave who worked in the office of DEIA. Those employees, we had received instructions -- or government wide had received instructions to issue reduction in force notices by, I think, that Thursday, by like noon that day. And so there was -- while we were working on all these other issues, there was a major push to get a retention register in place to get a draft reduction in force notice ready and to get that issued to the office of DEIA personnel in compliance with OPM's instructions.

Q. So Mr. Lewin, at this meeting -- this is now the 10:30 a.m. meeting on --

A. Yes.

Q. -- Thursday the 30th. He's giving you instructions as to two different groups of

Page 90

employees, the people listed in exhibit -- the exhibit we just looked at and a separate group regarding DEIA, correct?

A.   Yes.

Q.   Okay.  What authority did Mr. Lewin have at that time?

MR. SILER:  Objection.  Calls for a legal conclusion.

THE DEPONENT:  I was not aware of an authority he had.

BY MR. WARREN:

Q.   What was your understanding of his position at the time?

A.   I understood that he was scheduled to -- or intended to become embedded at USAID, but that he had not yet been.

Q.   And you had testified previously you understood him to have a role with DOGE.  Do you -- during this 10:30 a.m. meeting on the 30th, was that your understanding, that he was associated with DOGE, worked for DOGE in some capacity?

A.   Yes, that was my understanding from the grounds that Tera Dahl was there as the, sort of, USAID political appointee cover for Mr. Lewin's actions.

Page 91

Q.   You use the word "terminate".  The people Mr. Lewin instructed you to terminate, this was not to be placed on leave?  This was to terminate them from the agency?

A.   To fire them by close of business, yes.

Q.   Did you raise questions during that meeting about Mr. Lewin's authority?

A.   Yes.  We raised -- we highlighted the standard due process and who did and who did not have authority to take an action of this nature.

Q.   And what was the outcome, or what was the response to the concerns you raised about the authority?

A.   He stated that he would look into it.

Q.   The number of people who had been placed on admin leave was approximately 57.  You had been waiting for evidence of the violations that they'd committed with regard to disbursements.  Had you received any other evidence besides the email we just looked at in Gottlieb Exhibit 6?

A.   No.

Q.   There were 11 people listed in Gottlieb Exhibit 6.  Were there conversations -- strike that.

Did you have concerns about the fact that you had placed 57 people on administrative leave and

Page 92

then the evidence you were presented with only concerned 11 employees?

A.   Yes.  I raised that during the 9:30 meeting.

Q.   And what was the response?

A.   During the 9:30 call -- or meeting with Mr. Peters, when they made their recommendation regarding the 12 people listed, I raised that that left over some -- I'm bad at math, but some 45 people who are not the subject of an allegation of misconduct anymore.  And so I asked -- you know, I informed that I'd like to proceed with returning them off of administrative leave, which is our standard protocol if there's an unsubstantiated allegation.  I would typically be the one to issue the close, no action to get them back on duty.

And so I raised that with Mr. Peters and Mr. Lewin, and they denied my request.  They stated that the leaders of any office with more than two DAAs on administrative leave was going to be abolished, which was the Bureaus of Africa.  It was USAID.  That these people would remain on administrative leave until the -- until the end of their careers with the -- until the end of USAID, basically.

Page 93

THE REPORTER:  U.S. 8?

THE DEPONENT:  USAID.  Sorry.  Thank you.

BY MR. WARREN:

Q.   Did you ever raise those concerns again following the 9:30 meeting on the 30th?

A.   Yes.

Q.   When and with whom?

A.   So --

MR. SILER:  So --

THE DEPONENT:  Go ahead.

MR. SILER:  -- I'm going to -- I'm going to object and instruct not to answer any sort of formal recommendations made to agency leadership, which I think are called for by that question.  But outside of that, I think you can answer.

THE DEPONENT:  I submitted an action memo to the administrators subsequent to this -- the 10:30 meeting.

BY MR. WARREN:

Q.   All right.  Let's look at the action memo.  I'm handing you Gottlieb Exhibit 7.

(WHEREUPON, Exhibit 7 was marked for identification.)

THE REPORTER:  Exhibit 7.

BY MR. WARREN:

NICHOLAS GOTTLIEB REDACTED          April 22, 2026                    94 to 97
96528                                                                 Confidential

Page 94

Q.   This document is Bates stamped 4131 and 4132.  Mr. Gottlieb, what is this?

A.   This is my submission of an action memo to Mr. Gray, copying Bill Malyszka, our chief human capital officer, and Sepideh Keyvanshad, who is our senior deputy assistant administrator for HCTM, as well as Sheila Wright, who is our deputy chief human capital officer.

Q.   The subject of this email is:  Action Memo.  Cancellation of Administrative Leave and Cessation of Illegal Activity.

What's the cancellation of administrative leave referred to?

A.   So at USAID, action memos generally were a request for action from a senior leader.  You outlined what you wanted them to do.  You gave them -- occasionally you would give them options or you just give them a yes or no.  And so the two items in this memo were -- were the ones listed, and you would list them in the subject, what are you asking them to do.  Those are the two things I asked them -- the administrator to do.

Q.   At the top of this exhibit, you forward the email to Mr. Voorhees and Mr. McGill.  Why?

A.   Because -- when did I do that?  That was

Page 95

-- oh, it's UTC, so it's impossible -- I think --

Q.   I think we've determined that it was five hours before.

A.   Oh, thank you.

MR. SILER:  Well, UTC is five hours later than Eastern time.  Yeah.

THE DEPONENT:  Yeah.  Thank you.

So this would have been 2:20 --

BY MR. WARREN:

Q.   So to our best guess, this is around 2:20.

A.   So yeah.  So John and Brian were -- are the heads of our Office of Security.  I was copying them in for literally what I was saying my reason, which was for their awareness, because they are key stakeholders with administrative leave actions, but also for their awareness regarding the overall context of what was going on.

Q.   I'll take that back.  And I'm handing you Gottlieb Exhibit 8.

(WHEREUPON, Exhibit 8 was marked for identification.)

THE REPORTER:  Admitted 8.

BY MR. WARREN:

Q.   Bates stamped 9191 to 9193.  Is this the action memo that was attached to the email we just

Page 96

looked at?

A.   Yes.  Appears to be.

Q.   You drafted this?

A.   Yes.

Q.   Did you discuss drafting this with anyone before you did so?

A.   Yes, I did.

Q.   With whom?

A.   I informed Bill Malyszka and Sheila Wright.  I included our -- who was left from our Office of General Counsel as I drafted it, and they raised no concerns regarding its language.  But I did not request that either Sheila or Bill officially approve or clear it.  Yeah.

Q.   And the memo was sent to Mr. Gray?

A.   Yes.

Q.   In the background section, there's a reference to January 27th, at approximately 3:30 p.m.  You state you received instructions from you, Mr. Gray, through     Mr. Borkert, this -- describing what we've discussed before and what we saw in one of the prior exhibits regarding placing 57 people on leave.

A.   Yeah.

Q.   You state:  No justification was provided

Page 97

for that instruction -- excuse me -- for this instruction.

Is that what you testified to before, that you were not given the reason for placing the 57 people on leave at the time you were told to do so?

A.   Correct.

Q.   There's a reference to an agency-wide announcement that evening.  This is what you testified to earlier?

A.   (Nods head.)

Q.   Yes?

A.   Yes.

Q.   There's a reference to the January 30th transmission to you by Noah Peters.

A.   Yes.

Q.   Here you refer to Mr. Peters as of the Office of Personnel Management.  Before, you described him as working for or being associated with the DOGE.  Why do you refer to him as OPM here?

A.   We did not have a lot of information at that time.  I was working off of his -- where his emails were coming from, and he was on the OPM calls earlier.  So my -- I was working off of that assessment in referring to him as OPM.

Q.   Does this change your prior testimony that

Page 98

your understanding was that he was associated or affiliated with DOGE?

A.  No, it does not.

Q.  What about Mr. Farritor?  You refer to him as with the Department of Health and Human Services.  You had previously identified Mr. Farritor as someone working for or associated with DOGE.  Same question.

A.  I believe I was working off of the -- again, his email address, but that I knew at that time that he was a DOGE representative or DOGE personnel.

Q.  The unredacted parts of the memo then continue to describe a meeting at 9:35 a.m. on January 30th, a meeting at 10:32, or a meeting that was precipitated by a 10:32 a.m. request.  Those are the meetings we just discussed a few minutes ago?

A.  Yes.

Q.  Why did you put this action memo in writing?

A.  During this period of time, we were working very hard to comply with administration priorities and instructions.  There was -- during this period of time, there were very few instructions that we were receiving that came in

Page 99

writing, which is government practices.  You put everything in writing.  This was my effort to try to capture, in a short period of time, what had happened that week while my memory was fresh.

In our work, we view it very important to have memos for the record that document a lot of instructions and a lot of conversations and a lot of engagements that people try to have off the record.  This -- because at this time, I was -- over the course of those 10 days, the environment became one where they were looking for an excuse to put people on administrative leave.

By the 10:30 meeting, I was aware that I had had two somewhat contentious meeting with DOGE -- meetings with DOGE personnel, and I was increasingly concerned that I was going to lose my access in 15 minutes and that I was not going to make it through the day and that there would be no record if I did not take a moment to write down what had occurred.

But also, the primary reason was that I wanted to give Mr. Gray as much context for conversations because these engagements were so siloed, and because these engagements were with so little written information, I wanted to make sure

Page 100

that Mr. Gray had clear information on what was going on in our offices, what instructions we were receiving, so that he could make an informed decision on what to do next.  With the action memos at USAID, that was the essential part of an action memo, was to build a clear record of the fact pattern and our recommendation so that our principal could make an informed decision on what to do next.  So the -- the way this is laid out is in the USAID tradition of building a clear, transparent record of our thought process before we make any big decision.  So that's where this came from.

Q.  I just want to follow up on a few things you just described.  First, you said you had had two contentious meetings with DOGE.  Why do you describe them as contentious?

A.  Up until that point, we were doing everything we could to say yes.  Over the course of those 10 days, we worked very hard to build trust and comply with -- and -- and deliver on administration priorities.  Those two meetings were the first time that we had not immediately said yes, and so that's why I frame them as more contentious than our prior engagements.

Q.  Was there -- was there anything else about

Page 101

the meetings that led you to describe them as contentious in terms of was there argument?  Was it people's tone?  Was it, you know, profanity used?

A.  No.  Nothing of that nature.

Q.  Contentious just because of the disagreement?

A.  Just because of the disagreement.

Q.  A moment ago you described what was happening as -- you use the -- the word "siloed" and "off the record".  Did you come to form a conclusion as to why things were happening in silos and off the record?

MR. SILER:  Objection.  Speculation.

You can answer.

THE DEPONENT:  I think up until -- it is very rare for a person in employee relations or discussing an employment law issue to have that conversation absent the presence of agency counsel.  There is a reason we do that.  We placed nearly all of our agency counsel who engage in this work on administrative leave.  And my impression was that the purpose of -- of those efforts were to remove the guardrails on what was coming next.

BY MR. WARREN:

Q.  Which was what?

Page 102

A.    Actions that an employment law attorney would say slow down or hold on.  And so that -- that impression -- and again, going to the -- the allegations stated to the agency was that there was concern regarding disbursements, and yet we had a list of employment lawyers who were placed on administrative leave who never touched a foreign aid disbursement in the course of their careers.

That impression carried through in conversations that were very small in scope for very big issues.  Rare do you have a meeting where it's just me, our CHCO, and two people from another agency talking about an individual personnel action at our agency.  We never discuss disciplinary actions at our agency with people outside of our agency.  That fact pattern was very unique.  And in my 17-year career of processing a great number of adverse actions, I cannot think of a comparator. And so those were -- those engagements, those engagements in small rooms with no written record and -- and no formal instructions from agency representatives drive my consideration that these were siloed conversations.

Q.    Earlier in the deposition you testified about concerns you had about DOGE -- individuals

Page 103

from DOGE having the authority to make decisions. At this point, by the midmorning of January 30th, had those concerns about DOGE's authority peaked, or did they continue?

A.    I think the subject of my -- of this memo addresses where we were at that point.

Q.    What do you mean by that?

A.    That in this memo, I'm asking for a cessation of illegal activities.

Q.    And what did you mean by illegal activities?

A.    So it would address aspects of the redacted section of this memo.

MR. SILER:  Yeah.  So I -- I think if it's going to reveal stuff that's subject to redaction, I would instruct the witness not to answer, and we can go address those -- those -- any questions in the -- the procedure that the parties have agreed to, which we can do later, if that would be your preference.

MR. WARREN:  Okay.  Well, I'm going to try to ask questions so we don't get into --

MR. SILER:  Understood.

MR. WARREN:  This is redacted based on DPP, right?

MR. SILER:  Correct.

Page 104

MR. WARREN:  Okay.  So as long as we're not getting into the recommendations?

MR. SILER:  Yeah.  I think if you are asking about his concerns and his views, that's fine.  If you're asking about what he put in this memo, what he recommended, you know, what was before the agency decision makers, that's a different matter.

MR. WARREN:  That's -- that's fine.

MR. SILER:  So that's the line I'm drawing.

MR. WARREN:  Understood.

MR. SILER:  Okay.

BY MR. WARREN:

Q.    So, Mr. Gottlieb, I want to, for the moment, stay away from specifically what you recommended --

A.    Okay.

Q.    -- to others, but I just want to ask you about your concerns.  You've described things as illegal activities.  What, in your mind, was illegal about what was going on?

A.    Yeah.  So at that time, my concern was that I was receiving instructions to fire career federal employees by close of business that day,

Page 105

which would -- they have a constitutional right to due process.  To take any action to fire them by close that day would be a violation of their constitutional right to due process.

Q.    So you had concerns about the due process before firing employees?

A.    I had that concern, and I had concern that I was receiving these instructions from individuals who I could not determine their authority.

Q.    When you say "their authority," do you mean their legal authority, and do you mean their practical and operational authority?

A.    I mean legal authority.  So for us to take a removal action against -- let's keep it simple and just say a career civil servant.  For us to take a removal action against a career civil servant, we have a -- policies that identify who are the individuals with delegated authority to take that action, because the administrator has that authority, and then the administrator delegates that authority down to -- I can't remember off the top of my head, but let's say the first-line supervisor would have the authority to propose an employee's removal.

That -- where I was in this situation was

Page 106

I was receiving instructions to take this action that were outside of that delegation of authority. And so this engagement with Mr. Gray, who has that administrative level of authority, was sort of circling up to him on, here's our fact pattern and here's your authority in this situation. And these people, as best as I understand, do not have that authority to take this action.

So there was the due process aspect of, I can't -- I would be violating their constitutional right in taking this action and violating the law and violating regulation. So it'd be that piece, but then there was a separate piece of and I'd be doing so on I don't know whose orders, on Jeremy Lewin or whoever. Yeah.

Q. Why do you say Jeremy Lewin?

A. He was in the 10:30 meeting.

Q. But why did you have those concerns if Mr. Gray, according to one of the exhibits we looked at before, had approved the decision to place the 57 people on leave?

A. It goes back to that siloed engagement. Mr. Gray had placed those employees on administrative leave, but he was absent from any of the meetings that morning where we were talking

Page 107

about what to do with the employees on administrative leave next. He had the authority. He was the one who, one, ordered them out on administrative leave, but two, had the delegated authority -- or had the, you know, inherent authority to take a disciplinary- or termination-based action or removal-level action. He wasn't there. The only people there were Noah Peters, Tera Dahl, and Jeremy Lewin. And it was very unclear in those engagements to what extent, if any, he was being briefed in on the instructions being issued in that -- that morning.

And so again, going back to building out this record, it was to inform Mr. Gray, because I -- there was no evidence that any communication was going up to him about what was occurring. And so this was the effort to provide Mr. Gray with information and a clear record of what was going on that day that would interfere with his authority.

MR. WARREN: Why don't we take a break for five minutes?

MR. SILER: Sure.

THE VIDEOGRAPHER: Please stand by.

The time is 5:31 p.m., and we are off the record.

Page 108

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: The time is 5:40 p.m., and we are back on the record.

BY MR. WARREN:

Q. Mr. Gottlieb, I've handed you what's been marked as Gottlieb Exhibit 9. This is --

(WHEREUPON, Exhibit 9 was marked for identification.)

THE REPORTER: Exhibit 9

BY MR. WARREN:

Q. -- a copy of a New -- New -- New York times article dated June 22nd, 2025.

A. Yes.

Q. The title of the article is: Missteps, Confusion, and Viral Waste. The 14 days that doomed USAID.

Do you see that at the top?

A. Yes.

Q. Have you ever read this article?

A. Yes.

Q. I'd like to turn your attention to page 21 of the exhibit. About halfway down the page, there's a reference to Mr. Farritor writing "I could be wrong" in an email. That's in one of the exhibits we just looked at. Below that, it says:

Page 109

The members of DOGE also said they would not allow the senior employees who had been put on leave to come back, regardless of the evidence, according to an internal memo reviewed by the New York Times.

Were you aware of DOGE members saying they would not allow senior employees who had been put on leave to come back to USAID?

A. Yes.

Q. What members of DOGE said that?

A. Noah Peters. I don't recall if it was exactly Noah Peters or Luke Farritor -- or not Luke -- Noah Peters or Jeremy Lewin. I believe it was Noah Peters who said that neither of them were going to come back -- none of them were coming back.

Q. Was that said to you?

A. Yes.

Q. When?

A. During the 9:30 meeting on Thursday.

Q. The article continues: They demanded that some of those people be fired.

Is that accurate? They, being members of DOGE, demanded that some of those people be fired?

A. Yes.

Q. And who's the "they"?

A. That would be referring to the 10:30

Page 110

meeting with Jeremy Lewin and Tera Dahl.

Q.    Was it Mr. Lewin or Ms. Dahl who demanded that some of those people be fired?

A.    It was Mr. Lewin.

Q.    Is the use of the word "demand" here consistent with your understanding that this was not a recommendation or discussion, but it was a demand, an order that people be fired?

MR. SILER:  Objection to form.

You can answer.

THE DEPONENT:  I don't recall that being the word I used in the memo, however, that was the impression received.  That -- that is a accurate impression of the -- of the conversation at that meeting.

BY MR. WARREN:

Q.    That was your impression?

A.    That was my impression, yes.

Q.    The next paragraph says:  Senior career staff members pushed back.  Nick Gottlieb, USAID's director of employee and labor relations, and the person who had put the 57 people on leave three days before, told Mr. Gray in the memo that he believed keeping the people on leave was unjustified.

Did you believe that keeping the people on

Page 111

leave was unjustified?

MR. SILER:  I'm going to object to form.

And to be clear, you can answer what you believed, not what is in the formal memo.

THE DEPONENT:  Okay.

MR. SILER:  Well, I understand that to be your question.

BY MR. WARREN:

Q.    That's my first question.  Is that what you believed?

A.    I believed that -- that we no longer have the justification to place those employees on administrative leave, yes.

Q.    Okay.  Did you convey that to Mr. Gray in the memo?

MR. SILER:  Now I'm going to object and instruct him not to answer on the basis of the deliberative process privilege.

MR. WARREN:  For something that's been printed in the New York Times?  You're claiming privilege over this is confidential?

MR. SILER:  I am claiming that the memo itself is confidential and subject to the deliberative process privilege.

MR. WARREN:  Okay.

Page 112

MR. SILER:  We can get into a debate at another time about whether that privilege is -- is waived --

MR. WARREN:  Okay.

MR. SILER:  -- or whether it has been publicly acknowledged by the government or -- you know, there's a doctrine on that, but, you know, we're not going to resolve that here.

BY MR. WARREN:

Q.    Okay.  I'll rephrase.  Is it true, as the New York Times reports, that you told Mr. Gray in the memo that he believed keeping the people on leave was unjustified?

MR. SILER:  Same objection.  I instruct the witness not to answer on the basis of the deliberative process privilege.

BY MR. WARREN:

Q.    Is the New York Times reporting that you told Mr. Gray in the memo that DOGE's orders to fire some of them were unlawful?

MR. SILER:  I'm sorry.  You're asking is it the New York Times reporting that that --

MR. WARREN:  Is the -- is the reporting accurate?

MR. SILER:  Oh, yeah.  Then same objection

Page 113

and same instruction.

BY MR. WARREN:

Q.    Was it your belief that DOGE's orders to fire some of those people were unlawful?

MR. SILER:  You can answer.

THE DEPONENT:  Yes.

BY MR. WARREN:

Q.    The next sentence says:  There is no evidence any of them attempted to circumvent the President's orders,  Mr. Gottlieb wrote.

Was it your belief that there was no evidence that any of them attempted to circumvent the President's orders?

A.    Yes.

Q.    Did you convey that in the memo?

MR. SILER:  Objection and instruct the witness not to answer on the basis of the deliberative process privilege.

MR. WARREN:  And again, for the record, we'll disagree about the application --

MR. SILER:  Yep.

MR. WARREN:  -- of privilege for something that's been printed in the New York Times.  Confidentiality has been lost.

BY MR. WARREN:

Page 114

Q.   Did you convey that there's no evidence any of them attempted to circumvent the President's orders to anyone in your chain of command?

MR. SILER:  I'm -- I'm going to make the same objection and instruct the witness not to answer on the basis of the deliberative process privilege to the extent it was a recommendation made to his chain of command.

BY MR. WARREN:

Q.   The next sentence says:  He added that he would report DOGE's actions to the Office of Special Counsel, an independent federal agency that protects federal employees.

Did you -- were you prepared or had you contemplated reporting DOGE's actions to the Office of the Special Counsel?

A.   I think in that moment, I was not prepared to.  Things were moving very quickly, but that -- that was my intent at that time.  I -- I didn't have -- to your question, I didn't have anything prepared to do so.  I informed them my intent to do so.

Q.   You had contemplated doing so?

A.   I contemplated doing so.

Q.   Why?

A.   Because the Office of Special Counsel is

Page 115

where you go for allegations of this nature, of -- of violations of due process on this scale, Office of Special Counsel was the best third-party venue that I could bring an -- an issue of this nature.

BY MR. WARREN:

Q.   By "this nature," are you describing -- are you referring to what you've described previously as your concern about illegal activities?

A.   Yes.

Q.   Well, unlawful activities --

A.   Unlawful.  Unlawful.

Q.   -- I think, is the phrase used.

A.   Yeah.

Q.   I'm sorry.

A.   Unlawful, yeah.

Q.   Is it true that -- strike that.

Is the New York Times article accurate that you added in the memo that you would report DOGE's actions to the Office of the Special Counsel?

MR. SILER:  Objection.  Instruct the witness not to answer on the basis of the deliberative process privilege.

BY MR. WAWRREN:

Q.   On the next page, the fourth paragraph, the article says:  Mr. Cromer, one of the DOGE

Page 116

members, immediately began running around looking for Mr. Gottlieb's office.

We're going to -- first of all, is that accurate?

A.   I've heard stories.  I -- the -- the stories I've heard don't actually line up quite that way.  I'm not sure that Mr. Cromer was in the building when -- the timeline that the Times is laying out is that I sent an email that afternoon taking folks off leave, and that would have been 2:15 or so.  I wasn't placed on administrative leave until 4:15.  I don't think he was running around for two full hours, so I -- I disagree with the term, immediately began running around looking for me.  There was a two-hour gap with intervening actions before -- before I heard stories of DOGE representatives -- the stories go that DOGE representatives were running around the building trying to find my suite.

Q.   And -- and we'll come back to this.  I just -- for convenience sake --

A.   Yeah.

Q.   -- as we have the exhibit in front of us.

The article continues describing:  That evening, members of DOGE, including Mr. Lewin, who

Page 117

was then part of the DOGE operation, accused Mr. Gray of losing control of the agency.

Do you have any knowledge of that conversation?

A.   No firsthand knowledge of that, no.

Q.   Have you talked to people about that conversation?

A.   Yes.

Q.   Who?

A.   I don't recall.  Colleagues.  I think maybe it came up when I was talking with Mr. Voorhees and Mr. McGill.  We had cocktails a few months later.  Because they -- they were still heavily involved in that through the end of that weekend.

Q.   The next two paragraphs describe: DOGE made a striking demand ordering Mr. Gray to consent to locking every USAID employee worldwide out of the agency systems.

And then it continues to say:  Mr. Gray refused.  Mr. Lewin then called Mr. Musk and handed the phone to Mr. Gray.  Mr. Musk repeated the demand.

Were you involved in any of that?

A.   No.

Page 118

Q.   Do you have any firsthand knowledge of any of that?

A.   No.

Q.   Did you ever speak with Mr. Musk about any demands, anything regarding USAID?

A.   No.

Q.   Have you ever met Elon Musk?

A.   He was on a -- I was told he was on a phone call that I was on.  I -- I was not -- I did not speak with him or hear his voice.

Q.   What phone call was that?

A.   The Monday call with Anthony Armstrong about administrative leave.

Q.   This is on Monday the -- the 27th that we -- you testified about earlier?

A.   Yes.

Q.   Who told you Mr. Musk was on the call?

A.   Bill Malyszka.

Q.   And what was this --

A.   The chief human capital officer.

Q.   What were the circumstances?  I mean, was there a speakerphone?  Did someone have a phone out?

A.   He stated that Mr. Musk was -- had been on speakerphone, and it was more just an amusing note that I had just finished a phone call that Elon Musk

Page 119

had been listening in on.  But that Mr. Malyszka was aware that -- knew that -- because the call came from Mr. Malyszka's office.  Mr. Malyszka was aware that Mr. Musk was on the phone, and he called to let me know after the meeting.

Q.   What was your understanding of why Mr. Musk was on that call?

MR. SILER:  Objection.  Speculation.

THE DEPONENT:  I -- I don't know why he would have been on that -- I know -- or my understanding is that that weekend he became more involved in -- in figuring out the disbursements issue or getting involved -- he was involved in those early conversations about the financial system and about, yeah, our potential improper disbursements.

BY MR. WARREN:

Q.   You don't have any personal knowledge of Mr. Musk's involvement other than the call that you believe him -- believe that he was on, correct?

A.   My -- the full extent of my personal knowledge is that Bill Malyszka called me after that -- after that Monday morning meeting and told me that Mr. Musk was on the phone.

Q.   I'll take that back.

Page 120

A.   Okay.

THE REPORTER:  What was said, please?

MR. WARREN:  I'll take that back.

BY MR. WARREN:

Q.   I'm handing you Gottlieb Exhibit 10.

(WHEREUPON, Exhibit 10 was marked for identification.)

THE REPORTER:  Exhibit 10.

BY MR. WARREN:

Q.   Bates stamped 2832 to 2833.  Mr. Gottlieb, do you recognize this email chain?

A.   No.

Q.   Direct your attention to the bottom of the first page and onto the second page.  Do you see the email that you sent on January 30th, 2025 --

A.   Yeah.

Q.   -- at 2:04 p.m.?

A.   Yes.

Q.   The subject is:  Update.  Cancellation of Your Administrative Leave Status Under My Authority.

Do you see that?

A.   Yes.

Q.   What's happening here?

A.   It requires discussion of my earlier memo to   Mr. Gray, but -- for context, but this, just

Page 121

going off the email alone, this email is a -- is a email to the 50- -- the 57, again, colloquially, the number moved around, but the 57, notifying them that I was rescinding their administrative leave under my authority.  That I no longer was comfortable with them remaining in administrative leave under my name based on the evidence received.

And this is, again, going back to just standard protocol of if we received an allegation of misconduct, we receive the investigation of misconduct, it was typically my role to resolve unsubstantiated allegations.  And so I was proceeding accordingly, that I had received the evidence.  These folks were not involved in any misconduct, so I no longer had the authority to place them on administrative leave.  I did provide context that there wasn't -- you know, this wasn't the magic wand, that the CIO's office had not returned their system access and that someone else may place them on administrative leave.

But the administrative leave memo was not under Jason Gray's authority or under anyone else.  The memo that went to these employees was my name.  It was from me to them saying that they're -- they're being placed on administrative leave.  And I

NICHOLAS GOTTLIEB REDACTED          April 22, 2026                122 to 125
96528                                                           Confidential

Page 122

was explaining that I no longer was comfortable with that and explained why. And -- and then I explained this is what's going to kind of happen next. And I attached a memo that was just -- my recollection is it a was a fairly straightforward memo saying -- it was our standard return from the administrative leave memo. Welcome back.

MR. WARREN: That's Government -- excuse me. That's Gottlieb Exhibit 10?

MR. SILER: Yes.

BY MR. WARREN:

Q.   I'll hand you what I'm marking as Gottlieb Exhibit 11.

(WHEREUPON, Exhibit 11 was marked for identification.)

THE REPORTER: Exhibit 11.

BY MR. WARREN:

Q.   Please keep 10 in front of you for a moment.

A.   Okay.

Q.   What is Gottlieb Exhibit 11?

A.   It was my note -- the attachment to this email. It's not as standard as I explained. This is more specific to these 57 circumstances. But it is rescinding my memo of January -- forgiving the

Page 123

employees' official record that I've rescinded my memo of January 27th, informing them that they're no longer under administrative leave due to my instruction, and letting them know that that doesn't mean they won't be under administrative leave under someone else's instruction in short order, but that I no longer have any justification to support their placement in that status, and therefore, I have to, in good conscience, rescind my prior instruction.

Q.   In the email, Gottlieb Exhibit 10, you write: Please find a memo documenting the cancellation of your admin leave under my authority.

What authority did you have?

A.   So under ADS 480, which was our leave policy, that's what we typically used as grounds for administrative leave, and as a practice at the agency, I was the authority to place people on administrative leave. It came -- I was the person who made the decision and issued them the notice and -- and took the action, then ended the action as necessary.

Q.   And ADS 480, that's Automated Directive System Chapter 480 --

A.   Yes.

Q.   -- regarding leave policy and procedures

Page 124

at USAID?

A.   Yes.

Q.   In the second paragraph of the email, Gottlieb Exhibit 10, you wrote: I have reviewed the materials that served as the purported basis for your placement in the status.

What is that referring to?

A.   The Luke Farritor email and the attached memorandum.

Q.   You had testified before that was all the evidence that you had been made aware of. Was there other evidence that you had not seen?

MR. SILER: Objection. Speculation.

THE DEPONENT: Yeah. We requested that. We had not received any.

BY MR. WARREN:

Q.   You write: Most of you had no role whatsoever in those materials.

What do you mean?

A.   There was that list of 12 people, and there were additional people who were mentioned in the memorandum that was attached to Mr. Farritor's email, but for the 57, 45 of them had no role in Mr. Farritor's email and had no role in -- or are not copied or cc'd or mentioned in the -- in   Mr.

Page 125

Mitchell's memorandum.

Q.   You continue writing: For the small number of you actually involved, the materials show no evidence that you engaged in misconduct.

What do you mean?

A.   So there were two pieces of -- two -- two documents in that -- related to that email. One was a memorandum from Reggie Mitchell to HHS telling them to stop all payments. Because if you imagine stopping a cruise ship, that happens faster than stopping a federal payment system on -- you know, no -- you know, in a week. Just -- so Mr. Mitchell had drafted the memo, signed it, and got it issued to HHS on Friday, the week of inauguration, instructing HHS to cease payments. He did so -- I had subsequent conversations with Mr. Mitchell where he explained that he had previously told them to stop, but they said they can't stop for liability reasons unless they receive a memo from him in writing. So he got it in writing, and he sent it to them. He was trying to stop the cruise ship and comply with the orders. What I had was evidence that he was working to do so, and that's what that memo was. And so the allegation that he was engaged in misconduct in that is -- you know, it's really the

Page 126

opposite.  He was trying to stop the HHS payment machine.

And then for the other folks, the -- the poor list of 12 contractors and low-level IT -- IT specialists, they -- they were doing their jobs, that their area was the HSS payment, covered the HHS payment system.  They weren't involved in distributing foreign aid in violation of the President's orders.  They -- they had no -- there was no evidence that they had engaged in misconduct.  There was evidence they were just doing their job.  And Luke Farritor just didn't know what he was looking at.

Q.   In the next paragraph you write: As a result, I no longer have authority to maintain you in this status.  Someone else may claim to have that authority.  I wish them the best in making a colorable argument to that end.

First of all, when you write you "no longer have the authority," you've explained that that's because there was no misconduct, no evidence of misconduct.  When you initially placed people on administrative leave, you weren't aware of allegations of misconduct, correct?

A.   Yes.

Page 127

Q.   Why wouldn't you have had the authority to keep people in administrative leave even if there was no misconduct?

A.   My view of the matter changed with the agency notice that went out that night.  While I had not had a reason when I placed them on administrative leave, the agency reason that my action was apparently taken pursuant to was that they -- there was an allegation that they had engaged in misconduct.  That's what changed from Monday -- on Monday, it could well have been within the buckets of the OPM memo about administrative leave can be used for shutting down an office.  It can be used for doing this, for doing that.  But what we placed these people on administrative leave for was, according to that agency notice, an allegation of misconduct.  And that changed my role in that conversation.  Had it been that they were placed on administrative leave pending a RIF, I -- I -- I wouldn't have had the same argument or concern.

Q.   You write: Someone else may claim to have that authority.

What did you mean?

A.   At that time, again, due to the siloed nature of the conversations, I was not sure or aware

Page 128

to the -- to what extent Mr. Gray was still at the agency -- you know, that he wasn't on the list, too, or had not been shown the door, too.

Q.   This is addressing testimony -- reflecting testimony prior about concerns about who actually was exercising the authority?

A.   Yeah.  I was not sure who was -- who would be left by the end of the day to keep moving forward on behalf of USAID.  I wasn't sure if I would be there, if Bill would be our -- our chief human capital officer would be there or if Jason would be there, but what I was stating was I -- I'm no longer comfortable with them being on administrative leave on this stated reason under my authority.  Someone else can make an argument.

Q.   You've testified about your authority to issue this email and memo.  Were you -- were you instructed not to send it?

A.   No.

Q.   What happened after you sent the email out?  I'm sorry.  Strike that.

A.   Yeah.

Q.   Did you discuss this particular email and memo or the cancellation of administrative leave, before sending it, in any other context besides what

Page 129

we've already discussed today?

MR. SILER:  Objection.  Ambiguous.

You can answer.

THE DEPONENT:  Okay.  In draft -- in working towards the action memo, as mentioned earlier, involved -- I involved the chief human capital officer who -- a remaining attorney at the -- at our Office of General Counsel and our deputy chief human capital officer.  And I -- the -- this was included in those efforts.  This -- this next step was clear in those efforts.

BY MR. WARREN:

Q.   What happened after you sent the email?

A.   All right.  So as mentioned, this was made clear in -- in my prior communications that this would be the next step.  I took this step, and I received a phone call a little later from our chief human capital officer informing me that the front office was very upset with me.

Q.   Front office referring to?

A.   Oh.  I don't recall that a name was used.  It was just -- at USAID, we often just said the front office.  In this case, it was the front office was very upset with me, however, that Jason agreed with my -- my recommendation.  And I received an

NICHOLAS GOTTLIEB REDACTED                April 22, 2026                    130 to 133
96528                                                                        Confidential

Page 130

instruction to draft a follow-up email on Jason's authority canceling everyone's administrative leave. So that was at, I think, 3 -- I think like 3:30 or -- in the 3:00 o'clock hour, I want to say, I received a call from Mr. Malyszka instructing me to -- that -- telling me that Jason wanted a memo from me on his name canceling everyone's administrative leave.

Q.   What was your understanding of why Mr. Gray wanted to cancel everyone's administrative leave?

A.   That he agreed with my -- with my findings that there was no misconduct involved.  As he and I had discussed on Tuesday, we were waiting on evidence of misconduct.  We had gotten what we were going to get, apparently, and he agreed that there were not grounds to keep these people on administrative leave.

Q.   So after you find out that the front office is upset, you explain to them that, again, Mr. Gray had agreed with your recommendation and asked you to write the email and send the memo?

MR. SILER:  Objection.  Mischaracterizes.

THE DEPONENT:  Yeah.  I -- I didn't put that forward.  I got a phone call, as I was -- I got

Page 131

a phone call in my office after having sent this memorandum out and this email out.  I received a phone call from Bill Malyszka informing me that the front office was upset but that Jason agrees, and that I -- and Bill instructed me to draft a new memo under Jason's name canceling everyone's administrative leave.

Q.   Okay.  Did you do that?

A.   Yes.

Q.   And what happened next?

A.   I think that was -- I don't know.  I think that was like almost 4:00 o'clock on the dot.  I sent that out at about 4:13, and at 4:15, there was a knock on my door.

Q.   Who was there?

A.   Clayton Cromer.

Q.   At this time, did you still understand Mr. Cromer to be associated with DOGE?

A.   Yes.

Q.   Was anyone with Mr. Cromer?

A.   There was a large group of people out in the hallway outside of my suite.

Q.   Did you recognize any of them?

A.   I believe Jeremy Lewin was in the crowd, but I'm not sure of that.  Representatives of the

Page 132

Office of Security, Brian McGill, was there.  A person who later -- who, in moments later, identified themself as Ken Jackson was there.  I don't -- there were maybe six to ten other people there.  It was not a -- not a -- in my memory, it wasn't a small crowd.

Q.   What happened then?

A.   Clayton introduced himself, said -- said words to the effect of:  Well, you've had a big day, haven't you?  And escorted -- asked me to come with him for a walk.

I looked outside and said, Oh -- and said that:  I have a nice conference room right here if we'd like to step in and have a conversation.

He said:  No.  We're going to do this out here in the hallway.

I followed him along in the hallway.  And I can't recall who said it, but someone said:  We are placing you on administrative leave.

I asked:  Who is placing me on administrative leave?

And that's when Ken Jackson introduced himself.  And I said:  Thank you.

And then security moved forward.  Brian McGill escorted me back to my office.  I sent a

Page 133

email to the administrative officers of the agency, like sort of that -- they're not -- they're not secretaries.  They're -- they're often called XOs or AMS officers.  They're the ones who run every office.  And so I sent an email to all of our XOs and AMS officers saying that I was not going to be available and that in my absence, contact Kirsten Gunsolus, my deputy, because, as mentioned, my office covers a lot of different areas.  We're often the first contact for issues of really serious -- really serious nature, like deaths, shootings, unpleasant things.  And so when you get placed on administrative leave, your emails to me would just die, and they wouldn't get out of office.  There's no -- they just bounce.

Q.   So you're trying to make sure that --

A.   Yeah.

Q.   -- they're -- someone knows who to go to --

A.   Yeah.  So I was --

Q.   -- in those important matters?

A.   Yeah.  So I sent that email out, informed them why, and then collected a few personal belongings and was -- and Mr. McGill escorted me out.

NICHOLAS GOTTLIEB REDACTED                    April 22, 2026                    134 to 137
96528                                                                         Confidential

Page 134

Q.   When Mr. Jackson introduced himself, did he tell you what his position was?

A.   No, I don't believe he did.  I don't recall that he did.

Q.   Did you have an understanding of where he was on the chain of command?

A.   Yes.  I had heard -- I had heard people talk about him.  I had not met him yet or -- and I hadn't had fulsome engagement with him, but I understood that he was in the front office, kind of at our deputy administrator level.  He was not the administrator.  He was the -- to the earlier note where they referred to him as the assistant administrator for management resources, there's a deputy administrator role that kind of covers that ground.  I vaguely understood him to be over in that role.

Q.   When Mr. Cromer came to your office and knocked on your door --

A.   Yeah.

Q.   -- did you have a feeling that you were in some sort of trouble?

A.   Yes.

Q.   Why didn't you say to Mr. Cromer:  With all due respect, sir, I don't work for you.  You

Page 135

have no authority here.  You work for DOGE, which has no authority over USAID.  You can go pound sand.  Have a nice day, sir.

Why not say any of those things to him?

A.   Because when they informed me that they were placing me on administrative leave, I did ask: Who is?

And it wasn't Clayton Cromer.  It was Kenneth Jackson.  And I received a memorandum to that effect afterwards.

Q.   In your understanding, did Mr. Jackson have the authority to place you on administrative leave --

MR. SILER:  Objection.

BY MR. WARREN:

Q.   -- as the deputy administrator?

MR. SILER:  Objection.  Calls for a legal conclusion.

You can answer.

THE DEPONENT:  Okay.  It would be rare, but as I mentioned earlier, authority -- all authority and all personnel actions cascade from the administrator.  The deputy administrator is a -- a real job with USAID.  He -- he runs up -- he is part of, vaguely, my chain.  So it's not something that

Page 136

I'd be nearly as comfortable objecting to as someone from OPM saying I'm on administrative leave.  This is -- this is someone who actually is a senior leader, a -- a political appointee at the agency in our front office.

BY MR. WARREN:

Q.   What was your understanding of why Mr. Cromer and Mr. Lewin were there when you were placed on leave?

A.   I have only heard stories about why.

Q.   And what was your understanding at the time?

A.   Oh, at the -- at the time, my understanding was that they were driving the ship, and they were telling people what to say and do.

Q.   What were the stories you heard after the fact?

A.   That there were DOGE -- these are somewhat ridiculous stories, but I've heard stories of DOGE representatives running from the White House to the Reagan Building, that -- the part I believe is that they had some kind of siren going off on their phones, and they were running around our floor.  Because I mentioned earlier, my suite is not actually part of HCTM.  So they're running through

Page 137

the HCTM suite trying to find my office, not aware that I was down, more near at the Office of Security.  And that's when people heard the sirens on their phones and heard them -- saw them running around.  And I remember noticing that Mr. Cromer was a little out of breath when I opened the door.

The other part that makes me remember them driving the ship is that I had just finished acting on the administrator's orders.  I had just received, within half an hour earlier, instructions from the administrator to return everyone to administrative leave.  I had received feedback, you know, from my boss that they're upset with me, but we'll work it out.  These -- this was an intervention on those actions.

Q.   To be clear, the authority -- the confirmation of what you did, you're saying from the acting administrators, is from Mr. Gray?

A.   Yes.

Q.   And you said, your boss saying that it'd be worked out, that's Mr. Malyszka?

A.   Yes.

Q.   Did you say to Mr. Cromer, Mr. Jackson, or anyone else in that group of people who showed up at your door:  But Acting Administrator Jason Gray

Page 138

authorized this?

A. No.

Q. And not in those exact words but in substance?

A. No.

Q. Did you try to reach out to Mr. Gray to -- or Mr. Malyszka to ask, What's happening? Why are you being placed on administrative leave when you did what your supervisors had authorized you to do?

A. No.

MR. SILER: Objection. Mischaracterizes, argumentative.

But you can answer.

THE DEPONENT: I did not.

BY MR. WARREN:

Q. Why not?

A. In that moment, I -- I did not see that there -- that it was a point -- an argument that I could win, an argument that I could make, you know, successfully.

Q. Because you understood that people other than the acting administrator were calling the shots at USAID?

A. Correct.

Q. And specifically because people associated

Page 139

with DOGE were calling the shots at USAID?

A. Yes. The evidence I had of that was that I had received an instruction from the -- the administrator, and within 15 minutes, I had DOGE at my door and Ken Jackson, who was not the administrator, telling me I'm out on administrative leave.

Q. I'll take those back from you.

I'm handing you what's been marked as Gottlieb Exhibit --

A. Can I borrow your --

Q. -- 12. Thank you.

(WHEREUPON, Exhibit 12 was marked for identification.)

THE REPORTER: Exhibit 12.

THE DEPONENT: I broke your paperclip.

MR. WARREN: I have others.

THE DEPONENT: Okay.

BY MR. WARREN:

Q. Let me know if you recognize this.

A. Yes, I do.

Q. What is it?

A. This is the email I sent -- this is the email I sent after being informed that I was being placed on administrative leave.

Page 140

Q. This is an email from you to -- my apologies. It's hard to read in the printout, but can you see the first email address there?

A. Yeah. That's the AMS officer council. It's a distribution list for all of the administrative management support specialists, the office managers of the agency.

Q. And this is -- who did you send this email to?

A. So the AMS officer council; the XO shop, which is the "all". Their -- their distribution list just has a shorter title, but it's -- it was the XO Shop, is my recollection, at least; and then HCTMELR is my team, because we had people who were out of the office that day; Alpana Gupta and Danielle -- I don't recall Danielle's last name, but they were Office of General Counsel attorneys who remained with -- who were -- had not been placed on leave yet; Sheila is Sheila Wright, the deputy chief human capital officer; Sepideh is Sepideh Kayvanshad, the assistant -- the senior deputy assistant administrator; William is Bill Malyszka; Anya is Anya Glenn, who was the head of our operations unit. She -- at HCTM. She would -- she ran our -- significant parts of our work; and

Page 141

similarly, Stephanie is the head of our IT -- HR information systems and another big chunk of our work. No, that is not Stephanie. I'm sorry. Lindsey is head of our information systems. Stephanie is -- I don't remember who Stephanie is.

Q. This was sent from your USAID government email address?

A. Yes.

Q. And it's -- we can't see the date on this, but this was sent on what day?

A. This was sent on Thursday -- I believe it was the 30th.

Q. At 4:19 p.m.?

A. Correct.

Q. And the subject: Farewell and Thanks Again. Illegal Activity in the USAID Front Office.

Is that correct?

A. Yes.

Q. You write: Today, representatives of the agency's front office and DOGE instructed me to violate the due process of our employees by issuing immediate termination notices to a group of employees without due process.

Is this describing what you've testified about previously?

Page 142

A. Yes.

Q. I refused and have provided Acting Administrator Gray with written notification of my refusal.

Is that referring to the memo that we discussed before or another document, or was your providing Mr. Gray with notification done verbally? Done orally, not in writing?

A. It was done in writing. It's referring to the action memorandum.

Q. I have recommended in that written notification that his office cease and desist from further illegal activity.

Did you make that recommendation?

A. Yes.

Q. It is and always has been my office's commitment to the workforce that we ensure all employees receive their due process in any of our actions. I will not be a party to a violation of that commitment.

What are you referring to?

A. Termination in violation of their due process rights.

Q. I was notified moments ago that I will be placed on administrative leave effective

Page 143

immediately.

What you just testified to a moment ago?

A. Yes.

Q. It had been an honor working with all of you at this agency, which I treasure.

And then you conclude: Please be kind and considerate of my staff at -- and there's an email address -- who will be very short staffed and pressed over the coming months. Until you hear otherwise -- this is Kirsten here referenced -- will be acting in my absence.

A. Correct.

Q. Is this your last communication from your government email?

A. Yes.

Q. Mr. Gottlieb, is there any other information that you can think of now that we have not discussed today that you believe is relevant to what was happening at USAID from January 20th to January 30th, 2025, that you were involved with?

A. Not that I can think of right now, no.

Q. I just have a couple more brief topics to go through, and I think we'll be done very shortly.

In your capacity at USAID, did you have any role in the appointments or the -- the

Page 144

establishment of acting or interim positions?

A. No.

Q. What's your understanding of the term "acting" in the context of USAID? We've used the word acting referring to the acting administrator.

A. You know, acting can have a few different meanings. When an administrator is out sick or on vacation for a week, we'll have a, you know, acting -- someone's acting in their capacity. But acting administrator in this context would be much more there is a vacancy. And so -- when it -- when it's appended to the front of their name, as like part of their title, that means that there's a -- generally means there's a -- in my -- this is my understanding, that there's a vacancy and that this person is acting not on someone else's behalf but acting in the -- until there is a new -- that vacancy is filled. Jason Gray is the acting administrator.

Q. In your experience as employment and labor relations in the government, do you have an understanding of what preconditions there are to make someone the acting administrator?

MR. SILER: Objection. Calls for a legal conclusion.

Page 145

Go ahead.

THE DEPONENT: No.

BY MR. WARREN:

Q. Do you know what necessary steps there are to legitimately effectuate someone becoming an acting -- in an acting capacity?

MR. SILER: Same objection.

THE DEPONENT: Wasn't part of our office, no.

BY MR. WARREN:

Q. What's your understanding of the term "interim"?

A. Just the plain language and understanding. I don't have an understanding of it as a technical term.

Q. What about "performing the duties of"?

A. I know that has a technical meaning. It's a way of working around some of the legal restrictions on acting roles. I don't remember the legal niceties of why "performing the duties of" is an important term.

Q. Is that something that would have been within your understanding and your experience and your -- of your responsibilities, understanding "acting" versus "interim" versus "performing the

Page 146

duties of"?

A.    No.  That was -- that was typically outside of our jurisdiction.

Q.    During your time at USAID, did you ever have any role in dealing with the media?

A.    No.

Q.    Did you have any role in crafting internal guidance or policies about employees dealing with the media?

A.    No.  Not that I can think of.

Q.    I'm handing you Gottlieb Exhibit 13.

(WHEREUPON, Exhibit 13 was marked for identification.)

THE REPORTER:  Exhibit 13.

BY MR. WARREN:

Q.    Bates stamp 2773.  Sorry.

What is this document?

A.    This was -- I had forgotten about this. This was an email I sent Bill Malyszka, the chief human capital officer, and John Voorhees, the chief security officer for the agency, offering -- you know, letting them know, here's my contact information.  As mentioned, when you place them on administrative leave, you always ask:  What's your personal contact information?

Page 147

In the rush of the day prior, I had not provided that, and so I was sending them:  Here's my Gmail.  I was letting them know if they needed anything from me, you know, good civil servant, happy to help any way I can.

And then I was letting them know that like there is -- you know, at that point, articles had been coming out, and I was starting to get contacts from the media, and I don't do that for a living. So I was telling them what I had sort of built out as whenever I got an inquiry on LinkedIn or on what have you, this was the text I was sending to them, and that I look forward to getting back to work.

Q.    Did you ever have conversations with anyone at USAID about not responding to the media outside of this email?

A.    Regarding my personal approach to responding to the media or others?

Q.    Anything involving USAID or USAID employees talking with the media?

A.    I had the conversation -- I think I had maybe two check-ins with -- after I had been placed on administrative leave.  And I think two, maybe three, at most, people reached out to me about talking to the media or whether they should or not.

Page 148

I think the one I can -- like -- so yes, I think I had like one -- honestly, I think maybe -- I think it might have only been one but maybe two conversations about how about how -- about people dealing with the press, just from people who reached out and asked -- wanted my opinion.

Q.    Is that before or after January 20th, 2025?

A.    These were all after January 31st, 2025, that I remember.

Q.    Did you have any role at USAID in dealing with communications with Congress, members of Congress, congressional committees, staffers?

A.    And apologies.  I'm just trying to think. When it comes to the DEIA team, the -- the only folks who -- I don't recall saying anything to the DEIA team about media when they -- while they were on administrative leave.

When it comes to Congress, we had some role.  Issues would arise where they were looking at -- and I think earlier that fall I had briefed senators' staff about remote work accountability. How do you track people who are on remote work?  How do you -- how do you track how many people are actually in -- in the building on a given day?

Page 149

So we -- in my role, I occasionally gave briefings to congressional staff or, you know, worked on messages that were going to go to the House of Foreign Affairs Committee or to the Senate Foreign Relations Committee.

Q.    We've covered several different topics and incidents between January 20th and January 30th, 2025.  I just want to follow up to make sure I haven't missed anything.  You testified before you never had any conversation with Elon Musk except for the one conversation that you were later informed he was on the phone call with, correct?

A.    Yes.

Q.    No email, no text, no in-person meetings with Mr. Musk?

A.    None that I'm aware of.

Q.    Okay.  What about -- do you know the name Peter Marocco?

A.    Yes.

Q.    Who's Peter Marocco?

A.    Peter Marocco was a political appointee during the first Trump administration in our Bureau for Conflict Prevention and Stabilization.  I worked with him in an advisory capacity on a few issues in his office during that time.

Page 150

Q.   During the first administration?

A.   During the first administration.

And he returned in a state department capacity in what we call the F Bureau -- I think that's his role -- which is a, sort of, merged state department USA bureau housed over at state.  He came in as the head of what we called F, is my memory, under Trump, the second Trump administration.

Q.   Did you have any interaction with Mr. Marocco between January 20th and January 30th, 2025?

A.   No.

Q.   Do you have an understanding as to what Mr. Marocco's role was with regard to USAID during that time, if any?

A.   As -- F handles a lot of our money, or sort of oversees our money distributions, so that's my understanding of where he would have played a role, but I had no interaction with him during that stretch.

Q.   And you've testified previously -- you testified earlier today about interactions with Jeremy Lewin.  Any conversations, communications with Mr. Lewin that we have not discussed today, that you can recall?

A.   So we had the 9:30 and the 10:30.  We --

Page 151

he sent me a text, I believe, at -- or maybe it was a phone call, I don't recall, at around 12:30 or so, stating that he was still working on the removal list issue, but that in the meantime, I was to keep working on the reduction in force notices.

Q.   Was that the only other communication you recall with Mr. Lewin?

A.   For the -- for that day, yes.  I think that was it.

Q.   And what about for the other 11 days --

A.   I --

Q.   -- during the second administration when you were there?

A.   Yeah.  That was -- that was the first time I met him, was that Thursday.

MR. WARREN:  Mr. Gottlieb, if you'd just give me one moment.  I -- I think I may be done with my questioning.  I just want to confirm.

I have no further questions for you.

MR. SILER:  Can we take just a couple minutes?

MR. WARREN:  Of course.

MR. SILER:  Thank you.

THE DEPONENT:  Would you like these back?

MR. SILER:  Yeah, off the record.

Page 152

MR. WARREN:  Thank you.

THE VIDEOGRAPHER:  Oh.  Please stand by.

The time is 6:37 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 6:45 p.m., and we are back on the record.

MR. WARREN:  Mr. Gottlieb, I'm going to ask you a series of questions that Government counsel has either instructed you not to answer previously on the basis of deliberative process privilege or will renew that objection.  I'm going to ask the questions, and then the Plaintiffs' counsel will leave the room for you to answer the questions as they're read back to by the court reporter.

First question is in regard to Gottlieb Exhibit 9, which is the New York Times article on page 21.  My question is:  Are -- is the -- are the references in the New York Times article to what you put in the memo accurate?

Then with regard to Gottlieb Exhibit 7, at the bottom of the page, you write Mr. Gray -- this is on January 30th, 2025 -- "In this action memo, I request blank."  What is it that you requested?

Page 153

With regard to Gottlieb Exhibit 8, which is the action memo for Mr. Gray, what were the two recommendations you made in the memo?

Describe the -- your reasons for canceling administrative leave in the memo.

What were the illegal activities that you described in the memo?

Why were you asking Mr. Gray to stop illegal activities?

And what were the next steps that you proposed?

MR. SILER:  Is that it?

Okay.  I maintain our -- the Government's objections based on privilege.  I have no further objections at this time to the substance of the -- to the form of the questions, so I think we could go into the -- the private session now where the Plaintiffs' counsel leave, and you can answer the questions after they're read back.

MR. WARREN:  Okay.  Great.  Thank you.

MR. SILER:  And just ask someone to confirm that Beth is -- is -- and any other counsel for Plaintiffs that are on the Zoom are -- are placed in a breakout room where they can't hear the substance of this testimony.  And you can just

Page 154

confirm that -- the court reporter can confirm that for me when that happens.

MR. WARREN: Okay.

THE REPORTER: I will be adding Ms. Stevens to the breakout room. Please stand by.

(WHEREUPON, in camera proceedings commenced:)

//

Page 155

//

Page 156

//

Page 157

//

NICHOLAS GOTTLIEB REDACTED          April 22, 2026                    158 to 161
96528                                                                Confidential

Page 158

//

Page 159

//

Page 160

//

Page 161

(WHEREUPON, in camera proceedings concluded.)

MR. SILER:  All right.  I was just making sure it was you guys.

I think we are on the record, just for the -- I think -- I don't think we went off the record when I came out to get you.

MR. WARREN:  Okay.  I'm just asking you if there was any back and forth other than the questions that pertain to him.

MR. SILER:  I'll -- I'll explain that on the record.

MR. WARREN:  Okay.

MR. SILER:  Yeah.  Are we still on the record?

THE VIDEOGRAPHER:  Yeah.

MR. SILER:  Okay.  Just for the record, during the session in which the Plaintiffs' counsel were outside, in answering some of the questions, Mr. Gottlieb asked me if he could see a unredacted copy of Exhibit 8.  I responded, because of our protocol, that I did not feel comfortable responding without Plaintiffs present.

And so now I will say that I do not have a copy of the unredacted memo and -- and I could not

Page 162

share it with you outside their presence anyway for purposes of this deposition.  So the answer to your question would be, no.

THE DEPONENT:  Okay.

MR. SILER:  And so he was testifying in the session and throughout purely based on his memory and not -- no document -- no additional documents were given to him.

I did want to make that clear for the record, but that was the only conversation we had other than        Mr. Gottlieb's testimony in response to your questions that were read back to him.

MR. WARREN:  Okay.  Thank you.

MR. SILER:  And so am I right that you're now --

MR. WARREN:  Plaintiffs have no --

MR. SILER:  Okay.

MR. WARREN:  -- further questions.  Thank you.

THE DEPONENT:  Yeah.

EXAMINATION

BY MR. SILER:

Q.  Thank you for your time, Mr. Gottlieb.  We met earlier today.  I'm Jacob Siler.  I'm an

Page 163

attorney for the -- for the Government.

I just have a few questions for you to clear up some of your testimony that you had with Mr. Warren.  To start this, I think it would be helpful if -- if you could pull up Exhibit 4.

A.  Thank you.

Q.  And these are -- just to refresh your memory, these are Defendants' Objections and Responses to Plaintiffs' First Set of Interrogatories to Defendants' United States Department of State and Marco Rubio, right?

A.  Okay.

Q.  And if you could turn to page 6.

A.  Okay.

Q.  Okay.  So -- so just I can get the timeline straight, the -- the 57 individuals who were placed on administrative leave on your order that you've been testifying about today, that occurred on January 27th, 2025; is that correct?

A.  Yes.

Q.  Okay.  And you were placed on administrative leave on January 30th; is that right?

A.  If that's the Thursday, yes.

Q.  Okay.  After you were placed on administrative leave, you lost access to your USAID

Page 164

systems, your USAID email, and your other work material; is that correct?

A.  Yes.

Q.  Okay.  And you -- do you have any knowledge of administrative leave actions in terms of insight -- were you -- strike that.

You were not part of the -- you were -- you did not participate in the decision-making process with respect to administrative leave actions that happened after you were placed on administrative leave; is -- is that fair to say?

A.  Okay.  No.  No, I was not involved in -- in any official business after I was placed on administrative leave.

Q.  Okay.  So now turning to Exhibit 4, and specifically page 6 of Exhibit 4 --

A.  Okay.

Q.  -- which is Interrogatory 2.  This interrogatory asks to identify the individuals who made the decision to place approximately 57 USAID employees on administrative leave on or about February 1st, 2025.

Did I read that correctly?

A.  You did, yes.

Q.  Okay.  And then going down to the

Page 165

response, the response says:  Kenneth Jackson, then performing the duties of assistant to the administrator for management and resources, authorized the transmittal of administrative leave notices to 57 USAID employees in the Bureau of Legislative and Public Affairs on January 31st, 2025; is that correct?

A.  Yes, it does.

Q.  So the 57 employees that were placed on administrative leave that you did have participation in the -- in the -- the placement of those 57 on administrative leaves, those people were not in the Bureau of Legislative and Public affairs, right?

A.  Correct.

Q.  So in other words, if there were a separate administrative leave action, with respect to the Bureau of Legislative and Public Affairs, that happened to have the same number of employees subject to that action, you don't have any information about that type of action?

A.  I have no information about that, no.

Q.  And so I think you testified earlier that you -- the -- and I don't have the exact words in front of me, but the substance of this was that you thought that this response was incorrect; is that --

Page 166

is that fair to say?

A.   Yes.  My -- my -- in stating so, my understanding was the 57 were the 57 from January 27th.

Q.   Okay.  So -- and again, if this were a different group of 57 people, you don't have any information about that?

A.   No.

Q.   And so you can't say this is incorrect with respect to that separate set of 57 people?

A.   If such a thing exists, then yeah.

Q.   All right.

A.   Yeah.

MR. SILER:  I have no further questions.

THE REPORTER:  Redirect?

MR. WARREN:  None.

THE REPORTER:  Mr. Warren, would you like to order the original?

MR. WARREN:  Please.

THE REPORTER:  Mr. Gonzalez, would you like to order a copy?

MR. WARREN:  He does not -- he does not need one.

THE REPORTER:  Mr. Siler, would you like to order a copy?

Page 167

MR. SILER:  I would, yes.

THE REPORTER:  Let's see.  Mr. Dirks, would you like to order a copy?

MR. DIRKS:  No.

THE REPORTER:  And the videographer will take records for his video.

THE VIDEOGRAPHER:  Okay.  Mr. Siler, the -- the scheduling attorney is getting a copy of today's deposition included in their appearance fee.  Would you like to order a copy of today's deposition?

MR. SILER:  The video?  No, we don't.  We don't need the video.

THE VIDEOGRAPHER:  Mr. Wen, same question?

MR. WEN:  No.  No need.

THE VIDEOGRAPHER:  Mr. Dirks, same question?

MR. DIRKS:  No.

THE VIDEOGRAPHER:  Is Ms. Rubin still on the phone?

THE REPORTER:  Only Ms. Stevens is on the phone, and she's with Mr. Gonzalez's office.

THE VIDEOGRAPHER:  Ms. Stevens?

MR. WARREN:  I don't think she --

THE REPORTER:  You can ask Mr. Gonzalez.

Page 168

MR. WARREN:  Yeah.  She --

THE VIDEOGRAPHER:  He's not here.

MR. WARREN:  She doesn't need one.

MR. SILER:  I think she just typed on the Zoom chat, "No, thank you."

THE REPORTER:  She just said, "No, thank you."

MR. SILER:  Yeah.

THE VIDEOGRAPHER:  Okay.

MR. WARREN:  I think she's still in the breakout room.

THE VIDEOGRAPHER:  And I think that I have everybody covered.

So the time is 7:07 p.m., and we are off the record.

(WHEREUPON, the deposition of NICHOLAS MACKENZIE GOTTLIEB concluded at 7:07 p.m.)

Page 169

CERTIFICATE

I, the undersigned Phillip Francis, am a videographer on behalf of NAEGELI Deposition & Trial.  I do hereby certify that I have accurately made the videorecording of the deposition of Nicholas Gottlieb, in the above captioned matter on the 22nd day of April, 2026 taken at the location of Washington, DC.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

Phillip Francis

Page 170

CERTIFICATE

I, Brittany Douglas, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 8th day of May, 2026.

_Bv_

Brittany Douglas, CER No. 4235

Page 171

CORRECTION SHEET

Deposition of: Nicholas Gottlieb   Date: 4/22/26

Regarding: Doe 4 et al. vs Musk et al.

Reporter: Douglas/Gardner

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page  Line  Reason for Change

____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

         Signature: _____

              Nicholas Gottlieb

Email to: Production@NaegeliUSA.com

Page 172

DECLARATION

Deposition of: Nicholas Gottlieb Redacted    Date: 04/22/2026

Regarding: J. DOE 4 et al. vs ELON MUSK et al

Reporter:  Brittany Douglas

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____

on the _____ day of _____, 20____.

         Signature: _____

              Nicholas Gottlieb Redacted

Email to: Production@NaegeliUSA.com

## Exhibits

**EX001 MEMORAND UM** 36:16,17,19 46:1

**EX002 EMAIL JAN 2 7 2025** 45:16,17,19 67:17

**EX003 EMAIL JAN 2 7 2025** 55:1,2,4,12 56:22 61:16 68:15 72:12

**EX004 OBJECTION S AND RESPONSES** 68:19,20,22 163:5 164:15,16

**EX005 EMAIL JAN 2 7 2025** 71:25 72:1,3 73:3

**EX006 EMAIL JAN 2 7 2025** 76:3,4,6 81:1 91:20,23

**EX007 EMAIL JAN 3 0 2025** 93:21,22,24 152:22

**EX008 ACTION ME MO** 95:19,20 153:1 161:21

**EX009 ARTICLE** 108:6,7,9 152:18

**EX010 EMAIL JAN 3 1 2025** 120:5,6,8 122:9 123:10 124:4

**EX011 MEMO** 122:13,14,16,21

**EX012 EMAIL SCRE ENSHOT** 139:13,15

**EX013 EMAIL JAN 3 1 2025** 146:11,12,14

## -

**--across** 40:9

**--mr** 78:6

## 1

**1** 36:16,17,19 46:1 84:13,15

**1-26** 7:10

**10** 19:16 55:22 89:10 99:10 100:19 120:5,6,8 122:9,18 123:10 124:4

**10:30** 35:15 87:12, 22 89:22 90:19 93:18 99:13 106:17 109:25 150:25

**10:32** 98:15,16

**11** 20:2 89:5 91:22 92:2 122:13,14,16, 21 151:10

**11:32** 46:8

**12** 17:24 30:23 31:5, 6 44:4,5 56:13 65:6, 8 87:3 92:8 124:20 126:4 139:12,13,15

**12:30** 151:2

**13** 146:11,12,14

**14** 17:25 108:15

**15** 99:17 139:4

**15th** 12:9

**17** 17:25 30:23 31:5, 6 55:22 56:13 65:6, 9 89:10

**17-** 13:16

**17-year** 102:17

**19** 12:15

**1:30** 65:12

**1st** 69:15 70:6 164:22

## 2

**2** 45:16,17,19 67:17 69:10 85:8 164:18

**20** 62:15

**20,000** 13:16

**2003** 12:22

**2007** 14:10

**2019** 13:17 15:7

**2020** 21:21

**2025** 8:23 12:1 14:5 20:22 21:7,18 23:22 37:25 38:1,4 46:8 54:2 70:6 76:10 108:12 120:15 143:20 148:8,9 149:8 150:10 152:24 163:19 164:22 165:7

**2026** 7:8 14:5,6

**20th** 8:23 20:22 21:7 37:25 38:4,9 40:13, 21 41:24 46:14,16 54:2 85:15 143:19 148:7 149:7 150:10

**21** 108:21 152:19

**22nd** 7:8 23:21 46:7, 12 108:12

**23rd** 14:6

**24th** 48:3

**26th** 28:15

**2773** 146:16

**27th** 55:13,14 56:19 59:1 68:14 70:7 72:9 81:23 96:18 118:14 123:2 163:19 166:4

**2832** 120:10

**2833** 120:10

**28th** 59:7 64:8 65:14 66:17

**29th** 31:20

**2:04** 120:17

**2:15** 116:11

**2:20** 95:8,10

## 3

**3** 55:1,2,4,12 56:22 61:16 68:15 72:12 130:3

**30** 30:23 65:10,11

**30th** 89:24 90:19 93:5 97:13 98:15 103:2 120:15 141:12 143:20 149:7 150:10 152:24 163:22

**31st** 70:23 71:2 148:9 165:6

**3219** 48:3

**3220** 47:7 67:17

**350** 85:11

**3:00** 130:4

**3:02** 7:8

**3:30** 30:25 96:18

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

130:3

**3:41** 55:13 56:22 63:3

**3:53** 61:21

---

**4**

**4** 61:16 68:19,20,22 163:5 164:15,16

**4/13** 62:1

**4131** 94:1

**4132** 94:2

**4142** 76:3

**421** 12:9

**4243** 72:5

**4244** 72:5

**45** 12:17 73:11 92:9 124:23

**480** 123:14,22,23

**4:00** 131:12

**4:13** 131:13

**4:15** 116:12 131:13

**4:19** 141:13

**4:26** 67:10

**4:27** 67:10

**4:28** 76:11 86:20

**4:31** 72:25

**4:32** 62:25 63:3 72:13

**4:34** 67:13

**4th** 37:11 38:1,6

---

**5**

**5** 62:19 69:8 71:25 72:1,3 73:3

**50-** 121:2

**51** 43:9 63:3

**57** 30:25 31:6 32:8 33:19 55:17,21 56:1 57:9 59:10 61:3 62:16 63:8 65:6,9, 11 68:3,11 69:14,21 70:7,17,21 71:8,16 72:8 73:4,7,15 74:14,18 89:9 91:16,25 96:23 97:4 106:20 110:22 121:2,3 122:24 124:23 163:16 164:20 165:5,9,11 166:3,6,10

**586** 55:7

**591** 55:7

**5:31** 107:24

**5:40** 108:2

---

**6**

**6** 69:9 76:3,4,6 81:1 91:20,23 163:13 164:16

**6:24** 55:14

**6:37** 152:3

**6:45** 152:6

---

**7**

**7** 93:21,22,24 152:22

**7:07** 168:14

**7th** 76:10

---

**8**

**8** 93:1 95:19,20,22 153:1 161:21

---

**9**

**9** 108:6,7,9 152:18

**9191** 95:24

**9193** 95:24

**9:30** 35:13 79:1 88:1,3 92:3,6 93:5 109:18 150:25

**9:31** 72:11

**9:35** 98:14

---

**A**

**a.m.** 46:8 76:11 89:22 90:19 98:14, 16

**AA** 71:9

**abide** 28:7

**abolish** 42:21

**abolished** 92:21

**abolishment** 43:23

**absence** 133:7 143:11

**absent** 75:17 101:18 106:24

**abuse** 20:15,19 22:5

**access** 23:15 36:1, 2,6 48:19 49:1,2,21 50:4 62:18 74:6,7,

14 99:17 121:19 163:25

**accessibility** 23:7

**accompanied** 73:4

**accomplish** 26:13 42:12

**accomplishing** 30:5

**accordance** 21:15

**account** 49:22 85:16

**accountability** 148:22

**accounts** 84:23

**accurate** 65:2 71:17, 21 109:21 110:13 112:24 115:17 116:4 152:21

**accused** 117:1

**acknowledged** 112:6

**acronym** 67:24

**acting** 21:12,20 26:3 37:19,21 53:4 57:3, 5,13 137:8,18,25 138:22 142:2 143:11 144:1,4,5,6, 8,9,16,17,18,23 145:6,19,25

**action** 8:21 16:4,5,6, 7,11,12,17,22 27:13,14,15,16 39:5,11,14 41:7,10 53:1 59:20 81:19 82:15,19 83:17,24 84:4,6,9 86:15,19 89:1,4 91:10 92:16 93:16,20 94:3,9,14, 15 95:25 98:19 100:4,5 102:13

105:2,14,16,19 106:1,8,11 107:7 123:20 127:8 129:5 142:10 152:24 153:2 165:16,19,20

**actions** 13:8 14:22 53:16 80:3,21,23 90:25 95:15 102:1, 15,18 114:11,15 115:19 116:15 135:22 137:15 142:19 164:5,9

**activities** 103:9,11 104:21 115:8,10 153:6,9

**activity** 94:11 141:16 142:13

**ACTM** 19:10

**actual** 30:24 84:21

**added** 44:1 61:22 114:10 115:18

**adding** 47:17 154:4

**addition** 61:25 73:13

**additional** 28:19 31:18 58:13 124:21 162:7

**address** 16:13 17:6 18:9,12 32:4 40:5,6 64:21 80:12 84:16 98:10 103:12,17 140:3 141:7 143:8

**addressed** 13:21 16:19 30:1

**addresses** 87:16 103:6

**addressing** 13:7,22 15:1,14 16:20 17:15

18:1 128:4

**adjudicated** 15:24

**adjust** 37:7

**admin** 31:9 47:3 50:19 55:18 56:14 57:9 61:3 69:15,21 91:16 123:12

**administration** 15:13 21:8,11,23 38:20 39:25 69:25 98:22 100:21 149:22 150:1,2,8 151:12

**administration's** 79:6

**administration's** 21:15

**administrative** 10:21 23:1,13 25:3, 17,25 27:7,12,19, 20,24 29:22,24 30:3,16,21 31:13 32:2,9,15 33:19 37:7,17 38:20,24 39:5,7,10,12,15 40:7,9,18,23 43:7, 19 44:7 48:17,22 49:7,15,20 50:5 51:12 53:3 56:1 57:2,19 58:8,14,20 59:13 61:11 62:8, 10,12 63:15 70:25 71:14 74:2 75:13,17 78:19 79:6 80:22 82:2 86:19 89:11 91:25 92:13,20,23 94:10,12 95:15 99:12 101:21 102:7 106:4,24 107:2,4 111:13 116:11 118:13 120:20

121:4,6,16,20,21,25 122:6 123:3,5,16,18 126:23 127:2,7,12, 15,19 128:13,24 130:2,7,10,18 131:7 132:19,21 133:1,13 135:6,12 136:2 137:11 138:8 139:6, 25 140:6 142:25 146:24 147:23 148:18 153:5 163:17,22,25 164:5, 9,11,14,21 165:4, 10,12,16

**administratively** 49:3,6

**administrator** 19:14 47:15 53:5 57:3,5, 13 69:19 70:9 71:6 94:6,22 105:19,20 134:11,12,14,15 135:16,23 137:11, 25 138:22 139:4,6 140:22 142:3 144:5, 7,10,19,23 165:3

**administrator's** 137:9

**administrators** 93:17 137:18

**administrator's** 21:6

**Admitted** 95:22

**ADS** 123:14,22

**adverse** 13:8 27:13 102:18

**advisory** 149:24

**affairs** 70:18,19,22 149:4 165:6,13,17

**affidavits** 11:10

**affiliated** 51:2 98:2

**affirm** 8:5

**affirmed** 8:13

**Africa** 92:21

**afternoon** 8:17 25:23 29:1 30:24 53:1 56:11 116:9

**agencies** 27:19 37:20 40:5 49:20 54:12

**agency** 14:1,19,21 15:2,23,25 17:8 43:14 57:14 58:15 60:8,14,16 61:9,22 71:11 73:13 74:19 80:4,21 83:13 87:4, 18 91:4 93:13 101:18,20 102:4,13, 14,15,16,21 104:7 114:12 117:2,19 123:17 127:5,7,16 128:2 133:1 136:4 140:7 143:5 146:21

**agency-** 61:8

**agency-wide** 97:7

**agency's** 141:20

**aggressively** 78:14

**agreed** 103:18 129:24 130:12,16, 21

**agreements** 13:15 17:7

**agrees** 131:4

**ahead** 9:11 22:14 27:1 41:1 50:8 52:18 53:8 93:10 145:1

**ahold** 74:9

**aid** 102:7 126:8

**aide** 66:21

**aiming** 41:13

**aligns** 38:14

**allegation** 16:6 58:19 59:24 92:10, 15 121:9 125:24 127:9,17

**allegations** 14:20 15:22,25 16:8 17:15 18:1,10 44:6 61:14 68:9 102:4 115:1 121:12 126:24

**Allen** 71:5,12 88:14

**Alpana** 140:15

**alternative** 18:20

**Ambiguous** 70:11 71:19 129:2

**American** 17:4,5

**amount** 39:24 42:22 84:20,21

**AMS** 133:4,6 140:4, 10

**amusing** 118:24

**Andrew** 7:14 8:18 67:1 81:4

**announced** 28:21

**announcement** 97:8

**announcing** 31:24 58:15

**annual** 18:10,11

**answering** 161:19

**answers** 84:9

**Anthony** 29:10,18, 19 33:22 118:12

**anticipation** 78:25

**Anya** 47:17 140:23

**anymore** 92:11

**apologies** 16:24 40:2 140:2 148:14

**apologize** 72:19

**apparently** 44:7 48:13 127:8 130:16

**appearance** 167:9

**appears** 72:10 96:2

**appended** 144:12

**application** 11:8 113:20

**apply** 32:13

**appointee** 21:21 51:16,20 69:24 79:6,7 90:24 136:4 149:21

**appointees** 21:11, 14

**appointment** 34:11

**appointments** 143:25

**approach** 42:24 147:17

**approve** 96:14

**approved** 57:3 68:11 106:20

**approximately** 35:14 69:14 72:25 91:16 96:18 164:20

**April** 7:8 36:8

**arbitration** 10:20

**area** 24:8 126:6

**areas** 133:9

**arena** 43:11

**argument** 51:4,6,8 54:1 101:2 126:18 127:20 128:15 138:18,19

**argumentative** 33:25 52:16 138:12

**arise** 148:20

**Armstrong** 29:10, 18,20 30:9 31:14 33:22 34:5 44:23 77:16,21 118:12

**arrangement** 19:11

**arrangements** 18:21 19:3

**arranging** 19:2

**arrested** 39:9

**arrival** 15:20

**arrived** 78:13,24 86:21

**article** 108:12,14,19 109:19 115:17,25 116:24 152:18,20

**articles** 53:25 147:7

**asks** 48:15 164:19

**aspect** 106:9

**aspects** 103:12

**assessment** 97:24

**assigned** 59:19

**assist** 73:17,18

**assistant** 47:15 69:19 70:9 71:5,6 94:6 134:13 140:21,

22 165:2

**associate** 13:14 17:22

**Association** 17:6

**assume** 9:20

**assumes** 52:17

**attached** 87:11 95:25 122:4 124:8, 22

**attachment** 73:2 122:22

**attempted** 113:9,12 114:2

**attempting** 49:13 74:25

**attempts** 35:25

**attend** 24:6 34:17 78:17

**attended** 78:18

**attending** 29:14

**attention** 46:4 108:21 120:13

**attorney** 9:9 102:1 129:7 163:1 167:8

**attorneys** 140:17

**authorities** 11:3

**authority** 26:2,16,19 27:23 33:15 34:5,8, 11 50:3 51:10 52:1, 14,15 57:8,15,17,22 84:5,8 90:5,10 91:7, 10,13 103:1,3 105:9,10,11,12,13, 18,20,21,23 106:2, 4,6,8 107:2,5,6,19 120:20 121:5,15,22 123:12,13,17

126:15,17,20 127:1,
22 128:6,14,16
130:2 135:1,2,12,
21,22 137:16

**authorized** 69:20
138:1,9 165:4

**Automated** 123:22

**aware** 24:21,22
26:6,7 30:11 38:8
50:9 71:20 90:9
99:13 109:5 119:2,3
124:11 126:23
127:25 137:1
149:16

**awareness** 95:14,16

**B**

**BA** 12:18

**back** 13:1 15:5
21:25 29:5 33:18
55:24 63:2 68:1
71:22 76:1 78:22
84:7,11 88:24 92:16
95:18 106:22
107:13 108:3 109:3,
7,14 110:20 116:20
119:25 120:3 121:8
122:7 132:25 139:8
147:13 151:24
152:7,15 153:19
161:9 162:12

**background** 12:11
60:1 96:17

**bad** 92:9

**badge** 48:25

**bank** 84:23

**barely** 88:17

**bargaining** 13:15

17:7

**based** 43:2 44:6
45:6 57:16 59:25
72:22 75:10 88:16
103:23 107:7 121:7
153:14 162:6

**basically** 40:7 92:25

**basis** 111:17 112:15
113:17 114:6
115:21 124:5
152:11

**Bates** 55:6 72:5 76:3
94:1 95:24 120:10
146:16

**bearings** 47:5

**began** 87:2 116:1,14

**begin** 10:12 22:9
85:20

**beginning** 48:8

**behalf** 7:14,16 8:22
17:8 53:4 128:9
144:16

**behavior** 66:5

**belief** 58:17 113:3,
11

**believed** 110:23
111:4,10,11 112:12

**belongings** 133:24

**Beth** 7:22 153:22

**Biden** 38:20 39:24

**big** 100:11 102:11
132:9 141:2

**Bill** 30:14 34:20
53:14 61:19 78:6
81:10 94:4 96:9,13
118:18 119:22
128:10 131:3,5

140:22 146:19

**bit** 12:10 22:2

**blank** 152:25

**blizzard** 39:20

**board** 14:14,18

**Border** 13:5

**Borkert** 53:4 56:23
61:22,24 96:20

**born** 12:12,13

**borrow** 139:11

**boss** 34:17,19
137:13,20

**botching** 40:1

**bottom** 46:6 120:13
152:23

**bounce** 133:15

**bracketed** 75:12,16

**Brad** 77:4

**branch** 42:25

**break** 10:6,7 63:9
64:4 67:4,5 68:2
73:23 107:20

**breakout** 153:24
154:5 168:11

**breaks** 10:4,10

**breath** 137:6

**Brian** 36:4 61:17
74:4 95:11 132:1,24

**briefed** 107:11
148:21

**briefings** 149:2

**bring** 115:4

**broad** 11:19,20
22:11 49:14

**broadly** 38:14

**broke** 139:16

**buckets** 49:14
127:12

**budget** 87:20

**build** 100:6,19

**building** 28:25
48:19 74:5 100:10
107:13 116:8,18
136:21 148:25

**built** 147:10

**bullet** 84:13,15 85:8,
25

**bureau** 70:18,19,21
71:11 149:22 150:4,
6 165:5,13,17

**Bureaus** 92:21

**business** 61:8
88:13,22 91:5
104:25 164:13

**Butler** 36:5

**C**

**call** 24:10,12,17,20
26:11 27:9 28:4,20
29:14,16,17 30:13
32:3,7,14 43:10
48:12,13 49:13
50:16 56:9 61:9,19
63:21 73:25 74:15
79:2 88:3 92:6
118:9,11,12,17,25
119:2,7,19 129:17
130:5,25 131:1,3
149:12 150:4 151:2

**called** 12:12 16:5
17:21 20:8 28:13,17
93:14 117:21 119:4,

22 133:3 150:7

**calling** 138:22 139:1

**calls** 26:4 56:6
57:10 90:7 97:22
135:17 144:24

**camera** 154:6 161:1

**cameras** 29:15,16

**cancel** 130:10

**canceling** 130:2,7
131:6 153:4

**cancellation** 94:10,
12 120:19 123:12
128:24

**can't** 105:21 106:10

**capability** 84:20

**capacity** 90:21
143:24 144:9 145:6
149:24 150:4

**capital** 19:12,13
21:5,19 24:5 30:14
34:22 47:21 53:14
94:5,8 118:20
128:11 129:7,9,18
140:20 146:20

**caption** 7:10 8:21

**capture** 99:3

**career** 18:1 21:13,
19,21 25:21 102:17
104:24 105:15,16
110:19

**career-** 27:15

**career-impacting**
27:14

**careers** 92:24 102:8

**carried** 102:9

**carve** 43:16,17

44:16

**cascade** 135:22

**cascading** 40:4

**case** 7:10 8:20,22
11:9,11,19,22,23
12:4 15:21 39:21
69:2,3 129:23

**cases** 13:8 63:10

**categories** 39:7
67:21

**category** 39:16

**CBP** 15:3 17:13,19
54:6

**cc'd** 124:25

**cease** 125:15
142:12

**centered** 23:8,10

**cessation** 94:11
103:9

**CFO** 87:11

**chain** 26:23 33:23
45:1 55:12 57:15
76:9 114:3,8 120:11
134:6 135:25

**chance** 25:21 55:9

**change** 20:22 21:7
38:19 97:25

**changed** 21:17 31:1
38:15 73:11 127:4,
10,17

**changeover** 21:9

**Chapter** 123:23

**Charles** 37:21

**chat** 168:5

**chats** 56:6

**CHCO** 24:3 102:12

**CHCOS** 28:6

**check-ins** 147:22

**chief** 13:14 14:7
17:22 19:12,13
21:3,5,19 24:4
30:14 34:22 53:14
56:23 57:6 94:4,7
118:20 128:10
129:6,9,17 140:19
146:19,20

**chunk** 43:19 84:24
87:5 141:2

**CIO** 48:25 61:19
74:6

**CIO's** 121:18

**circling** 106:5

**circumstance** 41:12

**circumstances** 39:4
118:21 122:24

**circumvent** 113:9,
12 114:2

**CIS** 15:3 54:6

**Citizenship** 13:10

**civil** 11:3,9 88:20
105:15,16 147:4

**claim** 126:16 127:21

**claimed** 22:20

**claiming** 111:20,22

**clarified** 21:1

**clarify** 9:19

**clarity** 26:16

**class** 8:21

**Clayton** 22:21 23:16
33:23 49:19 131:16

132:8 135:8

**cleanest** 42:18

**clear** 35:7 45:23
52:13,25 54:15 59:1
64:19 78:4 82:21
96:14 100:1,6,10
107:18 111:3
129:11,15 137:16
162:9 163:3

**clearance** 49:4,5

**clearances** 49:3

**clearer** 53:6

**Clinton** 61:22

**close** 16:3,5,11
75:14 88:13,22 91:5
92:16 104:25 105:3

**closed** 14:3 16:10

**closely** 53:13

**closing** 32:11

**cocktails** 117:12

**colleagues** 8:19
117:10

**collected** 133:23

**collective** 13:15
17:7

**Colleen** 71:5,12
88:14

**colloquially** 73:15
121:2

**colorable** 126:18

**comfortable** 121:5
122:1 128:13 136:1
161:22

**command** 26:23
33:24 45:1 57:16
114:3,8 134:6

**commenced** 154:7

**commitment** 142:17,20

**committed** 78:23 82:18 84:6 91:18

**Committee** 149:4,5

**committees** 148:13

**common** 73:24,25

**communication** 53:17 107:15 143:13 151:6

**communications** 28:23,24 30:19 129:15 148:12 150:22

**comparator** 102:18

**compile** 49:13

**compiling** 66:11

**complete** 39:11

**compliance** 89:20

**complicated** 42:12

**complied** 50:16

**comply** 98:22 100:20 125:21

**computer** 76:20,21

**concern** 64:17,20 88:19 102:5 104:23 105:7 115:8 127:20

**concerned** 92:2 99:16

**concerns** 51:25 52:3,5,6,7,10,15,19 59:23 63:7 64:6,13, 19,22 65:14 66:2 88:10,15 91:12,24 93:4 96:12 102:25

103:3 104:4,20 105:5 106:18 128:5

**conclude** 143:6

**concluded** 161:2

**conclusion** 26:5 57:11 90:8 101:10 135:18 144:25

**concurrently** 89:2

**conduct** 15:2

**conference** 59:22 66:19,20 132:13

**confidential** 111:21, 23

**Confidentiality** 113:24

**confines** 12:2

**confirm** 151:18 153:22 154:1

**confirmation** 137:17

**Conflict** 149:23

**Confusion** 108:15

**Congress** 39:2 148:12,13,19

**congressional** 148:13 149:2

**Connecticut** 12:13, 14

**connection** 53:22

**Conor** 7:21

**conscience** 123:9

**consent** 117:17

**consequences** 53:16

**considerate** 143:7

**consideration** 27:21 102:22

**considered** 15:16

**consistent** 38:7 110:6

**constitutional** 105:1,4 106:10

**consulting** 14:4

**contact** 74:3,7,8,16, 22 133:7,10 146:22, 25

**contacting** 73:19

**contacts** 147:8

**contemplated** 114:15,22,23

**contentious** 99:14 100:15,16,23 101:2, 5

**context** 28:12 76:22 82:17 95:17 99:22 120:25 121:17 128:25 144:4,10

**continuation** 13:24

**continue** 18:24 41:10 80:11 98:14 103:4 125:2

**continues** 46:8 69:16 85:11 109:19 116:24 117:20

**contractors** 11:24 20:4 67:22 85:3 87:6 126:4

**control** 39:3 117:2

**convenience** 116:21

**conversation** 26:12 29:19 50:24 55:25 59:6,9 60:3 64:11,

16,18,21 79:12,17 81:3,12 82:7 101:18 110:14 117:4,7 127:18 132:14 147:21 149:10,11 162:10

**conversations** 24:22 29:11 50:21 59:3,6 60:22 91:23 99:7,23 102:10,23 119:14 125:16 127:25 147:14 148:4 150:22

**convey** 111:14 113:15 114:1

**copied** 46:21 47:24 87:14 124:25

**copy** 36:20 49:10 61:18 68:24 108:11 161:21,25 166:21, 25 167:3,8,10

**copying** 61:18 94:4 95:12

**Coristine** 77:8,9,10

**correct** 12:19 15:4 26:23 37:17,22 38:21 55:18,19 56:20,24,25 57:23 62:20,21 63:1 68:5, 12 78:1 90:3 97:6 103:25 119:20 126:24 138:24 141:14,17 143:12 149:12 163:19 164:2 165:7,14

**corrective** 81:19

**correctly** 164:23

**corrects** 48:10

**couldn't** 32:22

**council** 140:4,10

**councils** 43:14

**counsel** 7:12 9:9,10, 13 10:10 11:13,16 60:10 80:14 96:11 101:18,20 114:12, 16,25 115:3,19 129:8 140:17 152:10,14 153:18, 22 161:18

**counseling** 16:12, 15

**counselor** 61:22

**couple** 10:8 14:24 39:6 53:11 60:15 143:22 151:20

**court** 8:1 9:23 11:11 45:14 152:15 154:1

**cover** 90:24

**covered** 79:20 126:6 149:6 168:13

**covers** 133:9 134:15

**COVID-19** 18:14,18

**crafting** 146:7

**created** 20:13 22:3 75:8

**crime** 39:9

**criminal** 11:3,9

**criteria** 25:15 27:21 28:1

**Cromer** 22:21 23:16 24:13,23 25:1,9 26:3,18 27:6 33:23 44:22 49:19,23 50:3 77:23 115:25 116:7 131:16,18,20 134:18,24 135:8

136:8 137:5,23

**crossed** 15:2

**crowd** 131:24 132:6

**cruise** 125:10,21

**current** 11:23

**Customs** 13:5

**cut** 62:16 74:14

**cuts** 74:5,6

**cutting** 62:18

---

**D**

**D-O-G-E** 20:9

**DAAS** 92:20

**Dahl** 79:5 81:9 88:6 90:23 107:9 110:1,2

**Danielle** 140:16

**Danielle's** 140:16

**data** 43:10 76:19,20

**date** 7:8 32:2 37:24, 25 46:11 70:7 85:15 141:9

**dated** 37:11 38:2 108:12

**Davis** 77:2,10,11

**day** 30:19,22 46:12, 20,21 56:5 59:21 60:22 88:13,22 89:15 99:18 104:25 105:3 107:19 128:8 132:9 135:3 140:15 141:10 147:1 148:25 151:8

**days** 19:2 43:15 46:17,20 70:24 81:22 99:10 100:19

108:15 110:22 151:10

**DC** 14:7

**deal** 35:1

**dealing** 89:9 146:5,8 148:5,11

**deaths** 133:11

**debate** 112:1

**December** 21:18

**decision** 57:25 60:1, 3 68:11 69:14 71:1 74:12 82:6,7,9,10, 13,23 83:6,11,14, 22,23 84:1,3 100:4, 8,11 104:7 106:20 123:19 164:20

**decision-making** 164:8

**decisions** 54:11 62:7 65:21 87:8,18 103:1

**declarations** 11:6

**Defendant** 69:12

**Defendants** 7:19,20 68:24 69:1,17 163:8,10

**degree** 84:10

**DEIA** 23:9,11 27:7 41:4,6,13 42:9,19 43:8,13,18,20 44:17 49:12 50:20 54:17 63:14 89:1,4,12,19 90:3 148:15,17

**DEIA-TYPE** 22:25 23:5 25:2

**delegated** 105:18 107:4

**delegates** 105:20

**delegation** 106:2

**deliberate** 51:13,19

**deliberative** 79:20, 25 83:9 111:18,24 112:16 113:18 114:6 115:22 152:11

**deliver** 100:20

**delivered** 62:18

**delivers** 85:7

**delivery** 84:22

**demand** 110:5,7 117:17,23

**demanded** 109:19, 22 110:2

**demands** 118:5

**denied** 92:18

**department** 7:10 13:4,11 14:8 69:2, 11 98:5 150:3,6 163:11

**departments** 37:20

**DEPONENT** 8:8 17:11 20:18 22:15 25:7 26:6 27:2 32:21,24 33:2,13 34:3 41:2,19 45:4 50:9 52:19 57:13 58:4 70:3,12 71:20 76:7 77:19 83:4 86:4 90:9 93:2,10, 16 95:7 101:15 110:11 111:5 113:6 119:9 124:14 129:4 130:24 135:20 138:14 139:16,18 145:2,8 151:24

162:4,21

**deposed** 10:14

**deposition** 7:9 9:8 10:4 102:24 162:2 167:9,11

**deputy** 19:12,21 21:3 47:14 56:23 94:6,7 129:8 133:8 134:11,15 135:16, 23 140:19,21

**describe** 19:6 22:8, 11 98:14 100:15 101:1 117:16 153:4

**describing** 61:1 66:17 96:21 115:6 116:24 141:24

**design** 19:3

**desist** 142:12

**desk** 86:17

**detail** 29:3

**details** 37:8,17

**determine** 16:3 59:19 105:9

**determined** 95:2

**develop** 73:19,21

**DH** 47:2

**DHS** 14:10,15

**die** 133:14

**difference** 83:14

**difficult** 26:8 38:25

**Digital** 51:2 53:20, 22 54:4,7,9

**diplomatic** 74:23

**direct** 19:15,16,22 21:6 34:23 67:20,23

85:4 120:13

**direction** 52:22

**Directive** 123:22

**directly** 19:11

**director** 13:19 15:8 37:21 110:21

**Dirks** 7:21 167:2,4, 16,18

**disagree** 113:20 116:13

**disagreement** 83:11 101:6,7

**disbursement** 102:8

**disbursements** 60:12,24 61:4 65:2 66:2 91:18 102:5 119:12,16

**disciplinary** 14:17 16:12 82:15 83:24 102:14

**disciplinary-** 107:6

**discipline** 14:14 82:11,14

**discrete** 19:9

**discuss** 64:6 82:7,9 96:5 102:14 128:23

**discussed** 24:8 60:17 96:21 98:17 129:1 130:14 142:6 143:18 150:23

**discussing** 53:15 82:5 101:17

**discussion** 33:18 65:13 81:13,14 82:4 110:7 120:24

**discussions** 36:4

58:24 80:3 82:22

**disobeying** 60:11

**distributing** 126:8

**distribution** 24:4 140:5,11

**distributions** 150:16

**District** 12:15

**Diversity** 23:6

**division** 13:11

**doctrine** 112:7

**document** 37:11,16 45:9 55:8,10 69:5,7 94:1 99:6 142:6 146:17 162:7

**documenting** 123:11

**documents** 125:7 162:8

**Doe** 8:21

**doesn't** 88:17 168:3

**DOGE** 20:9,11 22:3, 6,19,20,23 23:17,18 24:12,19 26:19 28:11,12,14,18,22, 25 29:12 30:12,15 31:19 33:4,10,16, 22,24 35:2,6,17 36:1,6 42:10 43:16 44:2,15,17,22 45:2 49:25 50:4,23 51:1, 14 52:15 53:22 58:9,11,23,24 59:4 60:5 65:18 66:8,9, 10 68:7 76:14 77:11 78:1,3,12 79:3,12 86:21 87:12 90:18, 21 97:19 98:2,7,11

99:14,15 100:15 102:25 103:1 109:1, 5,9,22 115:25 116:16,17,25 117:1, 16 131:18 135:1 136:18,19 139:1,4 141:20

**DOGE's** 51:10 65:19 112:19 113:3 114:11,15 115:19

**DOGE'S** 103:3

**Donald** 20:14

**don't** 9:15,18 11:5, 11 12:7 24:13 85:25 106:14 109:10 119:9,18 161:6 167:24

**doomed** 108:15

**door** 19:11 128:3 131:14 134:19 137:6,25 139:5

**dot** 131:12

**Dozens** 10:23

**DPP** 103:24

**draft** 75:20,22 89:18 129:4 130:1 131:5

**drafted** 96:3,11 125:13

**drafting** 62:3 96:5

**dragged** 39:23

**drawing** 104:11

**drinks** 36:10

**drive** 102:22

**driving** 43:23 64:17, 20 136:14 137:8

**drove** 79:16 81:11

**due** 16:7,16 39:20, 21 60:20 64:1 84:3 88:23 91:9 105:2,4, 5 106:9 115:2 123:3 127:24 134:25 141:21,23 142:18, 22

**duly** 8:12

**duration** 49:7

**duties** 69:19 145:16, 20 146:1 165:2

**duty** 92:16

**E**

**earlier** 24:18 27:17 28:2 37:6 61:21 73:10 79:22 85:5,20 97:9,23 102:24 118:15 120:24 129:6 134:12 135:21 136:24 137:10 148:21 150:21 162:25 165:22

**early** 11:25 23:7 30:23 57:5 74:15 78:12,25 79:13 119:14

**Eastern** 72:25 95:6

**Edward** 77:8

**effect** 132:9 135:10

**effective** 142:25

**effectuate** 145:5

**Efficiency** 7:11

**effort** 23:8 41:6 51:19 99:2 107:17

**efforts** 17:20 19:1

42:9 51:14 101:22 129:10,11

**elected** 22:4

**election** 20:13

**eligible** 32:11,12,15, 25

**eliminate** 20:14,18 22:5 41:6 42:22

**Elon** 20:14 22:4 24:19 118:7,25 149:10

**else's** 123:6 144:16

**email** 31:2,23 32:10 44:5 46:7,22 47:7 48:2,7 49:1,22 50:4 54:15 55:12 56:21, 22 59:11 61:9,17 62:1,23 63:3 68:15 72:7,12,24 73:4,8, 17 74:21 75:22 76:9 77:1 78:6 81:17 84:11,16 86:8,17,18 87:13,15 91:19 94:9,24 95:25 98:10 108:24 116:9 120:11,15 121:1,2 122:23 123:10 124:3,8,23,24 125:7 128:17,20,23 129:13 130:1,22 131:2 133:1,5,22 139:23,24 140:1,3,8 141:7 143:7,14 146:19 147:16 149:14 164:1

**emailed** 81:16

**emails** 32:13 97:22 133:13

**embedded** 79:14 90:15

**employed** 67:22

**employee** 13:7,12, 19 14:11,12,17 15:8,18 17:15 19:25 34:12 38:25 39:8,18 57:18 63:20 67:24 74:18 101:16 110:21 117:18

**employee's** 74:3

**employees** 13:16 17:5 20:3,4 22:19, 25 23:12 25:2 27:6, 20 30:2,21,23 31:25 32:14 33:19 39:4 41:10,16 53:2 57:2, 18,19 58:5 59:10,15 61:11 62:4,6,8,11 63:5 69:14,21 70:7, 17,21 81:20 82:11, 14,15 87:6 88:21 89:10,12 90:1 92:2 104:25 105:6 106:23 107:1 109:2, 6 111:12 114:13 121:23 123:1 141:21,23 142:18 146:8 147:20 164:21 165:5,9,18

**employee's** 105:23

**employer** 13:20

**employment** 12:25 19:25 60:10,13 67:21 101:17 102:1, 6 144:20

**end** 9:7 13:2,4,17 18:1 19:16 30:21 39:24 41:13 61:7,8 85:24 92:23,24 117:14 126:18 128:8

**ended** 123:20

**ends** 55:13

**engage** 30:3 101:20

**engaged** 22:25 23:10,12 43:8 51:20 125:4,24 126:10 127:10

**engagement** 23:17 32:17 34:25 70:20 74:2 78:25 106:3,22 134:9

**engagements** 17:3 18:19 28:19 31:18 99:8,23,24 100:24 102:19,20 107:10

**engaging** 84:7

**engineer** 76:19

**ensure** 51:14,19 74:12,25 142:17

**entitled** 80:6

**entitlement** 15:16

**entity** 20:8

**environment** 99:10

**EO** 10:20

**episode** 44:14

**equity** 23:6

**escort** 35:23

**escorted** 28:25 132:10,25 133:24

**essence** 42:12

**essential** 100:5

**essentially** 32:1

**established** 15:19 28:1 39:6 79:21

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**establishing** 18:6, 23

**establishment** 144:1

**evening** 25:16 56:16,19 61:7 97:8 116:25

**eventually** 55:21

**everyone's** 130:2,7, 10 131:6

**evidence** 58:10,18 60:6,18 65:15,16, 20,24 66:5 78:22 81:15,16 86:12,18 88:10,16,17 91:17, 19 92:1 107:15 109:3 113:9,12 114:1 121:7,14 124:11,12 125:4,22 126:10,11,21 130:15 139:2

**exact** 29:23 138:3 165:23

**EXAMINATION** 8:15 162:22

**examined** 8:13

**exchanged** 28:23

**excuse** 25:1 29:6 75:24 87:14 97:1 99:11 122:8

**executive** 42:25 60:9 61:5 65:1 68:10 88:21

**exercised** 52:14

**exercising** 128:6

**exhibit** 36:11,16,17, 19 37:2 45:16,17,19 46:1,4 55:1,2,4,12

**56:22 61:16 63:3 67:17,18 68:15,19, 20,22 69:9 71:25 72:1,3,12,15,18,23 73:3,16 75:5 76:3,4, 6 78:5 81:1 90:1,2 91:20,23 93:21,22, 24 94:23 95:19,20 108:6,7,9,22 116:23 120:5,6,8 122:9,13, 14,16,21 123:10 124:4 139:10,13,15 146:11,12,14 152:18,22 153:1 161:21 163:5 164:15,16**

**exhibits** 96:22 106:19 108:25

**exists** 166:11

**expecting** 86:12

**experience** 15:1 17:14 33:14 87:16 144:20 145:23

**experienced** 87:20

**experiences** 53:7

**expert** 17:21

**experts** 24:8 26:13

**explain** 25:18 32:4,6 63:21,22 89:3 130:20 161:11

**explained** 30:15 63:14 64:9 78:18 84:3,4 86:15,16 122:2,23 125:17 126:20

**explaining** 27:19 82:5 122:1

**explanation** 43:1 62:13 64:13

**explore** 80:7

**expressed** 60:4 88:19

**extent** 33:15 59:5 80:19 107:10 114:7 119:21 128:1

**extra** 36:20

**eye** 56:10

**eyes** 42:24

**Ezell** 37:21

**F**

**facilities** 78:13 86:21

**fact** 44:1 64:15 91:24 100:6 102:16 106:5 136:17

**factors** 32:8

**facts** 43:4,6 52:17 80:25

**fair** 164:11 166:1

**fairly** 75:14 122:5

**fall** 21:16 148:21

**familiar** 20:8 38:7

**family** 15:14

**Farewell** 141:15

**Farritor** 66:15 76:10, 13 84:13 85:8,24 98:4,6 108:23 109:11 124:8 126:12

**Farritor's** 124:22

**Farritor's** 124:24

**farthest** 13:1

**fashioned** 36:13,14

**fast** 59:12

**faster** 125:10

**February** 14:5,6 15:7 69:15 70:6 164:22

**federal** 20:15,19 21:9 24:5 32:5 33:14 38:25 40:9, 22,24 41:7,14,25 42:6,8 67:24 104:25 114:12,13 125:11

**Federation** 17:4

**fee** 167:9

**feedback** 137:12

**feel** 161:22

**feeling** 10:8 52:22 134:21

**figure** 9:14 64:16 75:1 86:1 87:10

**figuring** 119:12

**filings** 12:3 69:3

**filled** 144:18

**final** 85:21

**finalizes** 47:18

**financial** 119:14

**find** 116:19 123:11 130:19 137:1

**findings** 130:12

**fine** 45:22 104:5,9

**finished** 118:25 137:8

**fire** 91:5 104:24 105:2 112:19 113:4

**NAEGELI**
DEPOSITION & TRIAL

**(800) 528-3335**
NAEGELIUSA.COM

NICHOLAS GOTTLIEB REDACTED                 April 22, 2026                        184
96528                                                   ConfidentialIndex: fired..Gray

**fired** 109:20,22 110:3,8

**firing** 105:6

**firm** 14:4

**first-line** 105:22

**firsthand** 117:5 118:1

**fits** 49:14

**floor** 59:22 136:23

**fluid** 51:11 56:4

**fluidity** 74:12

**focus** 22:24 52:13

**folks** 116:10 121:14 126:3 148:16

**follow** 26:21 27:5 50:11 75:1 100:13 149:8

**follow-up** 130:1

**footprint** 19:10 42:8

**force** 16:21 41:9,11, 20 42:11 88:25 89:14,18 151:5

**forces** 42:13

**foreign** 17:5 47:16 102:7 126:8 149:4,5

**foreseeable** 40:18

**forget** 53:21

**forgive** 53:21

**forgiving** 122:25

**forgot** 27:25

**forgotten** 146:18

**fork** 28:20 31:24 32:16,25

**form** 11:8 22:13

26:25 40:25 45:3 58:2 75:7 101:10 110:9 111:2 153:16

**formal** 93:13 102:21 111:4

**forward** 28:7 40:7 85:15 86:13,22 94:23 128:8 130:25 132:24 147:13

**forwarded** 30:7 86:14

**forwards** 78:6

**foundation** 34:1

**fourth** 67:17 115:24

**frame** 100:23

**framed** 84:2

**fraud** 20:15,18 22:5

**freeze** 68:9

**fresh** 99:4

**Friday** 42:17 48:3 49:16 53:8 71:3 125:14

**friendly** 39:19

**front** 21:20 71:10 81:1 116:23 122:18 129:18,20,23 130:19 131:4 134:10 136:5 141:16,20 144:12 165:24

**full** 8:24 46:23 116:13 119:21

**fulsome** 134:9

**function** 13:13 14:17,25 42:14 47:16

**functions** 13:20 15:13

**fundamental** 83:10

**funding** 60:11,12,24 66:2 68:9

**funds** 84:22 85:7

**future** 40:19 82:7,9

---

## G

**gap** 116:15

**gather** 59:14 74:3

**gathering** 65:16,24

**gave** 26:22 27:6 43:1 44:3 60:1 64:15 85:16 94:16 149:1

**gears** 20:7

**general** 60:9 81:2 96:11 129:8 140:17

**generally** 15:15 52:4,5 94:14 144:13

**Germany** 74:21

**give** 8:6 25:21 49:16 63:12 81:3 94:17,18 99:22 151:17

**giving** 89:24

**Glenn** 140:23

**global** 15:20 18:5,6

**Gmail** 147:3

**goals** 42:12

**Gonzalez** 7:16 166:20 167:25

**Gonzalez's** 167:22

**good** 8:17 29:14

39:23 67:3 74:7 123:9 147:4

**Google** 56:6

**Gottlieb** 7:9 8:3,12, 17 9:1,2 36:24 37:15 45:15,16,22 46:1,3 54:19 55:1 67:16 68:19 71:25 72:7,14,18,21 73:3 76:3 83:22 91:20,22 93:21 94:2 95:19 104:15 108:5,6 110:20 113:10 120:5,10 122:9,12, 21 123:10 124:4 139:10 143:16 146:11 151:16 152:8,17,22 153:1 161:20 162:24

**Gottlieb's** 116:2 162:11

**government** 7:11 9:10 11:8,16 14:7 15:2,16 17:5,16 20:15,19 21:9 24:5 28:6 32:6 40:10,22 41:7,14 42:8 49:22 54:10 72:16 80:13 84:23 85:7,22 87:16 89:13 99:1 112:6 122:8 141:6 143:14 144:21 152:9 163:1

**government's** 42:7 72:12,15

**government-wide** 22:17

**Government's** 153:13

**Gray** 53:4 57:3,6,8 58:5 59:4,7,21 60:21 61:2,8 64:7,

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

NICHOLAS GOTTLIEB REDACTED
96528

April 22, 2026

185

21 65:13,17,25 68:10 78:24 94:4 96:15,20 99:22 100:1 106:3,19,23 107:14,17 110:23 111:14 112:11,19 117:2,17,20,22 120:25 128:1 130:10,21 137:18, 25 138:6 142:3,7 144:18 152:23 153:2,8

**Gray's** 57:22 66:18 121:22

**great** 102:17 153:20

**grew** 12:14 30:23 56:1

**grievances** 13:25 17:6

**grip** 66:3

**ground** 9:5 134:16

**grounds** 12:1 40:8 90:23 123:15 130:17

**group** 20:1 28:20 31:3 90:2 131:21 137:24 141:22 166:6

**groups** 89:25

**grow** 65:6

**growing** 52:9

**growth** 65:8

**guardrails** 40:14 101:23

**guess** 9:16 36:9 95:10

**guidance** 24:25 26:21 37:16 50:15

62:3,5 146:8

**Gunsolus** 133:8

**Gupta** 140:15

**guys** 161:4

---

**H**

**hadn't** 134:9

**half** 137:10

**halfway** 108:22

**hallway** 131:22 132:16,17

**hand** 8:4 66:24 122:12

**handed** 108:5 117:21

**handing** 45:15 54:25 67:16 68:18 71:24 76:2 93:21 95:18 120:5 139:9 146:11

**handle** 43:24

**handled** 84:24,25

**handles** 150:15

**happen** 63:18,22 82:24 122:3

**happened** 25:11 43:2 79:15 80:25 88:8 99:4 128:20 129:13 131:10 132:7 164:10 165:18

**happening** 48:9 56:7 89:5 101:9,11 120:23 138:7 143:19

**happy** 147:5

**hard** 81:3 98:22 100:19 140:2

**hazy** 40:2

**HCTM** 47:18,21 94:6 136:25 137:1 140:24

**HCTMELR** 140:14

**head** 31:21 38:22 47:15 48:14 97:10 105:22 140:23 141:1,4 150:7

**heads** 37:19 95:12

**health** 84:18,24,25 98:5

**healthy** 87:5

**hear** 32:22 118:10 143:9 153:24

**heard** 8:20 116:5,6, 16 134:7 136:10,16, 19 137:3,4

**hearings** 10:20,21

**heavily** 117:14

**heavy** 39:17

**held** 25:15,23

**helpful** 163:5

**here's** 85:1 106:5,6

**He's** 168:2

**HHS** 84:17,18 85:10, 18,21 125:8,14,15 126:1,6

**HHS'S** 85:6

**highlight** 38:15

**highlighted** 91:8

**highlighting** 80:15

**highly** 56:4 60:4

**hire** 67:20,23

**hired** 21:18

**hires** 85:4

**history** 13:1

**hold** 45:13 78:14 79:18 102:2

**Homeland** 13:5,11

**honestly** 148:2

**honor** 143:4

**hour** 130:4 137:10

**hours** 95:3,5 116:13

**house** 16:15 27:18 136:20 149:4

**housed** 150:6

**HR** 32:5 47:16 141:1

**HSS** 126:6

**huge** 84:21

**human** 14:7,8 19:12, 13 21:5,19 24:4 30:14 34:22 47:21 53:14 84:18,24,25 94:4,7 98:5 118:20 128:10 129:6,9,18 140:20 146:20

**hundreds** 24:9

**hybrid** 19:3

---

**I**

**ideally** 27:15

**identification** 36:18 45:18 55:3 68:21 72:2 76:5 93:23

NICHOLAS GOTTLIEB REDACTED 96528

95:21 108:8 120:7 122:15 139:14 146:13

**identified** 25:16 33:20 42:16 44:21 77:13 98:6 132:3

**identify** 25:14 26:18 69:13 105:17 164:19

**identifying** 41:4 87:2

**illegal** 94:11 103:9, 10 104:21 115:8 141:16 142:13 153:6,9

**imagine** 125:9

**immediately** 25:25 41:15 65:6 100:22 116:1,14 143:1

**Immigration** 13:10 17:13

**impact** 40:11 41:24 50:19

**impacted** 11:25 43:12

**impactful** 87:8

**impacting** 27:14,16

**implement** 83:24

**implementation** 19:4 39:23 40:4

**implemented** 27:22

**implementing** 40:1, 3

**important** 52:24 99:5 133:21 145:21

**impossible** 95:1

**impression** 61:6 101:21 102:3,9 110:13,14,17,18

**improper** 119:15

**improvement** 16:16

**in-person** 149:14

**inaccurate** 68:6

**inauguration** 22:16 28:16,17 29:7 35:5, 8,9 44:3 46:12,14, 18,21 71:2 125:14

**inbox** 81:17

**incident** 71:16 75:9

**incidents** 36:5 149:7

**include** 64:2 81:25 85:3,4

**included** 96:10 129:10 167:9

**including** 17:13 20:2 88:21 116:25

**inclusion** 23:6

**incorrect** 165:25 166:9

**increased** 31:4

**increasingly** 99:16

**independent** 114:12

**Indiana** 12:23

**individual** 19:8 29:9 49:18 69:13 102:13

**individuals** 22:20 24:9,11,14 29:24 33:21 35:1 36:1 44:20 58:25 66:10 69:13 72:8 80:4 82:25 87:17 102:25 105:8,18 163:16

164:19

**inform** 25:16 107:14

**information** 11:2 49:9 56:16,17 57:7 58:13 66:11 74:4,8, 13,16 80:1 82:19 84:7 86:14,24 97:20 99:25 100:1 107:18 141:2,4 143:17 146:23,25 165:20, 21 166:7

**informed** 43:4,6 49:19 58:6 78:10 79:8,17 86:14 88:9 92:12 96:9 100:3,8 114:21 133:22 135:5 139:24 149:11

**informing** 123:2 129:18 131:3

**inherent** 107:5

**initial** 16:2 28:10 29:5 31:2,14 43:7 46:22 77:1 87:9,15

**initially** 37:24 84:2 126:22

**inquiry** 147:11

**insert** 75:12

**insight** 164:6

**instances** 18:12 63:19

**instruct** 30:20 31:15 57:18 80:2 83:16 93:12 103:16 111:17 112:14 113:16 114:5 115:20

**instructed** 9:12

52:25 81:18 88:12 91:2 128:18 131:5 141:20 152:10

**instructing** 80:14,19 125:14 130:5

**instruction** 25:3 27:5,11 28:7 30:24 49:23 50:3,17,22 53:3 80:9,12 81:4 82:16,18 97:1,2 113:1 123:4,6,9 130:1 139:3

**instructions** 23:12, 14,16 26:10,22 28:5 51:15,25 53:2,6 89:12,13,20,25 96:19 98:23,25 99:7 100:2 102:21 104:24 105:8 106:1 107:11 137:10

**insubordinate** 66:5

**insubordination** 58:11

**intake** 15:20 18:7

**intended** 30:20 90:15

**intent** 114:19,21

**interacted** 33:21 44:21

**interacting** 34:16

**interaction** 28:10 54:3,7 150:9,18

**interactions** 22:6,12 28:11 150:21

**interest** 35:19,21

**interested** 29:23

**interfere** 107:19

**interim** 21:12 58:14 144:1 145:12,25

**internal** 109:4 146:7

**internships** 13:3

**Interrogatories** 69:1 163:10

**interrogatory** 69:10, 16 164:18,19

**intervening** 116:15

**intervention** 137:14

**introduce** 7:12

**introduced** 30:13 132:8,22 134:1

**investigating** 17:15

**investigation** 11:4 16:2,9 58:8,18 63:25 64:25 86:12, 22 121:10

**investigation's** 39:11

**investigative** 27:24 39:8

**involved** 25:2 35:25 48:7 49:19 54:11 58:23 60:7,11,13 64:15 77:11 87:19, 21 88:20,22 117:14, 24 119:12,13 121:14 125:3 126:7 129:6 130:13 143:20 164:12

**involvement** 71:15 76:16,18 77:12 119:19

**involving** 36:6 147:19

**ISCS** 47:2

**issuance** 62:16

**issue** 16:5 50:18 52:2 63:23 74:4 89:14 92:15 101:17 115:4 119:13 128:17 151:4

**issued** 27:18 39:13 52:1 70:25 82:16 89:19 107:11 123:19 125:13

**issues** 13:21 16:13 23:11 26:9 70:14 87:21 89:16 102:11 133:10 148:20 149:24

**issuing** 51:15 141:21

**items** 94:18

**it'd** 106:12

**it's** 95:1 142:9 144:11

**I'd** 10:5 19:19 29:5 36:9 106:13

**I'll** 87:24 95:18 112:10 119:25 120:3 161:11

**I'm** 8:18 9:6,14,18, 20 24:21 32:20 79:9 93:11 95:18 104:10 114:4 115:14 120:5 122:12 141:3 146:11 149:16 152:8 161:8

**I've** 12:15 45:25

**J**

**Jackson** 69:18,22, 24 70:8 71:9 132:3,

22 134:1 135:9,11 137:23 139:5 165:1

**Jacob** 7:18 162:25

**Jake** 36:21

**James** 7:20

**January** 8:23 11:25 20:22 21:7,21 23:21 37:25 38:4,9 40:13, 21 41:24 46:7,11,14 48:3 54:2 55:13,14 68:14 70:7,23 71:2 72:9 76:10 85:15 96:18 97:13 98:15 103:2 120:15 122:25 123:2 143:19,20 148:7,9 149:7 150:10 152:24 163:19,22 165:6 166:3

**Jason** 53:4 57:6 121:22 128:11 129:24 130:6 131:4 137:25 144:18

**Jason's** 130:1 131:6

**JD** 12:23

**Jeremy** 35:13 79:7, 11 81:9 106:14,16 107:9 109:12 110:1 131:24 150:22

**Joaquin** 7:16

**job** 14:20 43:13 74:19 126:11 135:24

**jobs** 40:20 126:5

**Joel** 56:22 62:2

**John** 36:5 46:7 48:14 95:11 146:20

**June** 14:5 108:12

**jurisdiction** 146:3

**justification** 96:25 111:12 123:7

**justifying** 82:5

**K**

**Kayvanshad** 140:21

**keeping** 110:24,25 112:12

**Ken** 132:3,22 139:5

**Kenneth** 69:18,22 135:9 165:1

**key** 16:22 25:13 32:7 38:11 95:14

**Keyvanshad** 47:8 94:5

**kind** 16:12 48:23 56:10 85:19 122:3 134:10,15 136:22 143:6

**Kirsten** 133:7 143:10

**knew** 33:13 35:19 66:14 74:13 75:2 76:20 78:10,15,21 98:10 119:2

**knock** 131:14

**knocked** 134:19

**knowing** 64:20

**knowledge** 59:5 117:3,5 118:1 119:18,22 164:5

**L**

**labor** 13:19,24,25

NICHOLAS GOTTLIEB REDACTED          April 22, 2026                    188
96528                                          ConfidentialIndex: lack..lose

14:9,11,12,25 15:9
17:1 18:20 19:25
33:14 110:21
144:20

**lack** 34:1

**laid** 100:9

**language** 61:12
75:15 96:12 145:13

**large** 131:21

**larger** 42:6,24

**law** 12:2 13:2,3,4
39:2,6,22 101:17
102:1 106:11

**lawyer** 60:14

**lawyers** 52:6 60:10
80:13 102:6

**lay** 40:23

**laying** 116:9

**lead** 18:17,25 33:5

**leader** 94:15 136:4

**leaders** 21:12 32:9
87:4 88:15 92:19

**leadership** 14:19
21:17,20,24 50:16
58:11 60:9 78:15
83:13 93:13

**leaderships** 80:5

**leading** 17:20

**learn** 66:13

**leave** 15:13,15,16
18:21 23:1,13 25:3,
17,25 27:8,12,19,
20,24 28:1 29:22,24
30:3,16,21 31:9,13,
16 32:2,9,15 33:19
37:7,17 38:20,24

39:5,7,8,10,13,15,
17 40:7,9,18,23
43:7,19 44:7 47:3
48:18,22 49:7,15,21
50:5,19 51:12 53:3
54:16 55:18 56:2,14
57:2,9,19,23 58:1,8,
15,20,25 59:13
61:3,12 62:9,10,12
63:5,8,16 65:5,21
68:3,8,12 69:15,21
70:8,25 71:14,17
72:8 73:5 74:2
75:13,17 78:19
80:22 81:22 82:2
86:19 89:11 91:3,
16,25 92:13,20,23
94:10,13 95:15
96:23 97:5 99:12
101:21 102:7
106:21,24 107:2,4
109:2,7 110:22,24
111:1,13 112:13
116:10,11 118:13
120:20 121:4,6,16,
20,21,25 122:7
123:3,5,12,14,16,
18,25 126:23 127:2,
7,13,15,19 128:13,
24 130:2,8,11,18
131:7 132:19,21
133:13 135:6,13
136:2,9 137:12
138:8 139:7,25
140:19 142:25
146:24 147:23
148:18 152:14
153:5,18 163:17,22,
25 164:5,9,11,14,21
165:4,10,16

**leaves** 165:12

**led** 20:14 22:4 24:19
29:9 82:22 101:1

**left** 16:24 92:9 96:10
128:8

**legal** 11:6 26:4
57:10 83:10 90:7
105:11,13 135:17
144:24 145:18,20

**Legislative** 70:18,
19,22 165:6,13,17

**legitimately** 145:5

**letter** 16:6 87:11

**letting** 123:4 146:22
147:3,6

**let's** 15:5 20:7 81:8
93:20 105:14,22

**level** 24:3 34:24
49:5 50:4 87:18
106:4 134:11

**Lewin** 35:13,14,20
79:7,9,11 81:9 88:6,
9,11,23 89:21 90:5
91:2 92:18 106:15,
16 107:9 109:12
110:1,2,4 116:25
117:21 131:24
136:8 150:22,23
151:7

**Lewin's** 35:16 90:24
91:7

**liability** 125:18

**life** 25:20

**lifted** 40:14

**limit** 28:2

**limitations** 40:5

**limited** 27:23

**limiting** 27:21

**limits** 57:14

**Lindsey** 141:4

**lines** 53:17

**Linkedin** 147:11

**list** 25:14 46:23
47:2,19 48:15
49:11,12 57:1 58:5
59:10,17 60:7 61:23
68:7 74:18 81:18,25
82:1 84:15 85:2
88:12 94:20 102:6
124:20 126:4 128:2
140:5,12 151:4

**listed** 37:20,24
47:13 59:25 90:1
91:22 92:8 94:19

**listening** 119:1

**literally** 95:13

**live** 12:8

**lived** 12:15

**living** 147:9

**loan** 11:7

**locally** 67:22

**locking** 117:18

**logged** 84:17 85:5

**logical** 48:19

**long** 38:25 104:1

**longer** 40:19 73:12
88:6 111:11 121:5,
15 122:1 123:3,7
126:15,20 128:12

**looked** 67:19 68:15
72:12,23 85:13 90:2
91:20 96:1 106:19
108:25 132:12

**loop** 47:18

**lose** 99:16

**losing** 117:2

**lost** 113:24 163:25

**lot** 18:19 26:15 66:6 97:20 99:6,7 133:9 150:15

**low-level** 126:4

**Luke** 66:15 76:10,13 109:11 124:8 126:12

### M

**machine** 126:2

**Mackenzie** 8:12 9:1

**made** 38:6 40:12 51:4,6,8 54:11 57:19,25 62:8 69:13 71:1 80:20 82:6,8, 13,23 83:23 92:7 93:13 114:7 117:17 123:19 124:11 129:14 153:3 164:20

**magic** 121:18

**maintain** 23:14,15 49:20,21 126:15 153:13

**major** 18:3 89:17

**majority** 43:11

**make** 9:10,21 10:9 45:22 46:10 47:18 54:15 68:4 74:3 80:16 83:25 87:8,17 99:18,25 100:3,8,11 103:1 114:4 128:15 133:16 138:19 142:14 144:23 149:8 162:9

**Makecha** 77:6

**makers** 104:7

**makes** 137:7

**making** 60:2,3 65:20 74:12 126:17 161:3

**Malyszka** 30:14 34:20 53:14,18 78:6 79:2 81:10 82:16 88:4,9,15 94:4 96:9 118:18 119:1,3,22 130:5 131:3 137:21 138:7 140:22 146:19

**Malyszka's** 34:21 79:4

**Malyszka's** 119:3

**man** 76:20

**man's** 66:22

**manage** 18:16,22 21:13 87:7

**managed** 14:23 15:17,18

**management** 13:22 15:21 17:2,8 22:18 26:8 27:11 37:9,22 47:22 69:20 70:9 71:7,9,10 97:17 134:14 140:6 165:3

**manager** 13:12 14:15,16

**managers** 140:7

**March** 37:11,25 38:6

**Marco** 69:2 163:11

**marked** 36:17 45:16, 17 54:25 55:2 68:20 71:24 72:1 76:2,4 93:22 95:20 108:6,7

120:6 122:14 139:9, 13 146:12

**marking** 36:15 68:18 122:12

**Marocco** 149:18,20, 21 150:10

**Marocco's** 150:13

**marshal** 65:20

**material** 26:15 164:2

**materials** 124:5,18 125:3

**math** 92:9

**matter** 16:21 17:21 24:8 26:13 81:2 104:8 127:4

**matters** 73:19,21 133:21

**Mcgill** 36:4,10 61:18,20,23 62:2 74:5 94:24 117:12 132:1,25 133:24

**meaning** 83:9 145:17

**meanings** 144:7

**means** 144:13,14

**meant** 25:19 63:16

**meantime** 89:2 151:4

**media** 146:5,9 147:9,15,18,20,25 148:17

**medical** 15:14

**meeting** 22:18,22,24 23:19,25 24:3,6,23 25:4,12,15,23 26:1, 19 28:13,17 29:5,6,

8,9,12 30:6,17 31:14 33:4 34:18 35:12 41:4 51:14,17 61:1 63:13 64:7 65:25 66:16 74:1 79:13,16,19,25 81:24 82:13,24 83:18 86:11 87:22, 23 88:1,3,5,8 89:21, 22 90:19 91:7 92:4, 6 93:5,18 98:14,15 99:13,14 102:11 106:17 109:18 110:1,15 119:5,23

**meetings** 28:21 35:5 51:21 56:5 78:14,17 98:17 99:15 100:15, 21 101:1 106:25 149:14

**members** 50:23 52:14 109:1,5,9,21 110:20 116:1,25 148:12

**memo** 27:18 28:2 38:1,7,8 40:13,16, 22 41:3,24 57:16 62:10 63:22,23 64:3 73:3 74:4 75:7,24 93:16,20 94:3,10,19 95:25 96:15 98:13, 19 100:6 103:5,8,13 104:6 109:4 110:12, 23 111:4,15,22 112:12,19 113:15 115:18 120:24 121:21,23 122:4,5, 7,25 123:2,11 125:13,19,23 127:12 128:17,24 129:5 130:6,22 131:5 142:5 152:21, 24 153:2,3,5,7 161:25

**memorandum** 37:5, 16 62:15 124:9,22 125:1,8 131:2 135:9 142:10

**memory** 40:2 99:4 132:5 150:7 162:7 163:8

**memos** 94:14 99:6 100:4

**mentioned** 48:11 73:10 85:5 124:21, 25 129:5,14 133:8 135:21 136:24 146:23

**merged** 150:5

**message** 67:18

**messages** 149:3

**met** 11:15 25:14 35:10,11,12,14 36:9 44:2 59:21 87:12 118:7 134:8 151:15 162:25

**metric** 43:9

**middle** 61:17 62:20

**midmorning** 103:2

**midst** 74:20

**mind** 104:21

**minute** 20:8 44:11

**minutes** 38:10 53:19 61:21 62:15 63:3 73:11 98:17 99:17 107:21 139:4 151:21

**Mischaracterizes** 25:5 130:23 138:11

**misconduct** 13:23 14:21 15:20,22,25

17:16 18:2,10,13 44:6 59:25 60:6,19 78:23 81:16 92:11 121:10,11,15 125:4, 25 126:10,21,22,24 127:3,10,17 130:13, 15

**missed** 149:9

**missing** 75:11

**Missteps** 108:14

**Mitchell** 125:8,12,16

**Mitchell's** 125:1

**Mm-hmm** 21:4 22:10 46:5 75:6 77:15

**moment** 20:22 23:3 33:20 36:24 44:14 99:19 101:8 104:16 114:17 122:19 138:17 143:2 151:17

**moments** 87:9 132:2 142:24

**Monday** 27:18 28:14,15,16,17 29:7 32:9 46:15 51:11,21 53:1 55:13,14 59:1 61:7 68:16,17 71:2 72:9 76:10 78:11 81:23 86:13,20,22 118:12,14 119:23 127:11

**money** 84:21,22 85:22 150:15,16

**months** 85:20 117:13 143:9

**morning** 28:14,23 35:10,13,15 65:25 78:11,12,24 86:20

106:25 107:12 119:23

**move** 21:12 28:7 41:15 42:14 43:6

**moved** 25:24 59:11 121:3 132:24

**moving** 40:7 43:22 114:18 128:8

**Musk** 7:11 8:21 20:14 22:4 24:19,23 33:24 117:21,22 118:4,7,17,23,25 119:4,7,24 149:10, 15

**Musk's** 119:19

---

### N

**named** 29:10

**names** 24:14 29:13 81:18 87:3

**nature** 11:18 26:9 64:4,14 81:12 82:6 91:10 101:4 115:1, 4,6 127:25 133:11

**needed** 35:23 44:5 50:5 147:3

**negotiated** 17:7

**negotiating** 13:14

**negotiations** 13:25

**negotiator** 13:14 17:23

**network** 49:2

**nice** 132:13 135:3

**niceties** 145:20

**Nicholas** 7:9 8:12 9:1

**Nick** 47:17 61:19 62:3 110:20

**Nicole** 7:24

**night** 31:23 127:5

**Noah** 24:16 33:5,9, 22 35:10 44:8 81:9 97:14 107:8 109:10, 11,12,13

**nods** 31:21 38:22 97:10

**noon** 89:15

**Northwest** 12:9

**note** 56:8 73:23 118:24 122:22 134:12

**notice** 16:11 39:7, 13,14 58:15 61:9 62:22 72:11 89:18 123:19 127:5,16

**notices** 61:9 62:24 63:4 69:21 70:25 89:14 141:22 151:5 165:5

**noticing** 137:5

**notification** 142:3,7, 12

**notified** 142:24

**notify** 48:23,25

**notifying** 121:3

**noting** 61:24

**number** 29:14 30:22 31:1,4 32:10 55:21 61:10 65:4,7 73:10 91:15 102:17 121:3 125:3 165:18

**numbers** 85:9,25

## O

**oath** 9:25

**object** 9:9 93:12 111:2,16

**objecting** 136:1

**objection** 9:11 20:23 22:13 25:5 26:4,25 33:11,25 40:25 45:3 50:7 52:16 57:10 58:2 70:11 71:18 86:3 90:7 101:13 110:9 112:14,25 113:16 114:5 115:20 119:8 124:13 129:2 130:23 135:14,17 138:11 144:24 145:7 152:12

**objections** 68:24 153:14,15 163:8

**objective** 14:19

**observation** 43:2

**obtain** 36:1

**occasionally** 94:17 149:1

**occurred** 59:7 68:14 70:23 86:20,22 99:20 163:19

**occurring** 107:16

**offer** 80:8

**offering** 146:21

**office** 15:17,24 16:1, 11,19 19:2,9 20:13 21:6,20 22:3,18 23:8 26:7 27:10 30:3 37:8,22 42:21 43:18,20,23 44:17 48:18,23,24 49:2 60:9 66:18 71:10 79:3,4 88:1,2,5 89:11,19 92:19 95:12 96:11 97:17 114:11,15,25 115:2, 19 116:2 119:3 121:18 127:13 129:8,19,20,23 130:20 131:1,4 132:1,25 133:5,9,14 134:10,18 136:5 137:1,2 140:7,15,17 141:16,20 142:12 145:8 149:25 167:22

**office's** 142:16

**officer** 14:8 19:12, 13 21:19 30:14 34:22 53:15 57:7 94:5,8 118:20 128:11 129:7,9,18 140:4,10,20 146:20, 21

**officers** 24:5 133:1, 4,6

**offices** 41:6 42:19 100:2

**official** 123:1 164:13

**officially** 96:14

**officials** 14:22 68:3

**OMB** 87:15,17,19

**onboarding** 35:21

**online** 8:19

**opened** 42:23 86:17 137:6

**operating** 29:25

**operation** 117:1

**operational** 105:12

**operations** 140:24

**opinion** 42:3 43:5 44:1 148:6

**OPM** 24:3 26:11 28:4,5,20 32:4 40:2, 21 41:24 48:12 49:18 50:16 57:16 97:19,22,24 127:12 136:2

**OPM'S** 89:20

**opportunity** 31:25

**opposed** 26:8

**opposite** 126:1

**options** 94:17

**orally** 142:8

**order** 26:14 31:15 61:5 65:1 68:10 110:8 123:6 163:17 166:18,21,25 167:3, 10

**ordered** 107:3

**ordering** 117:17

**orders** 43:15 44:15, 18,25 51:25 60:12, 25 61:14,15 106:14 112:19 113:3,10,13 114:3 125:22 126:9 137:9

**original** 166:18

**outcome** 63:25 91:11

**outlined** 60:21 94:16

**overseas** 43:12 67:23 74:18,24

**oversees** 150:16

**o'clock** 130:4

## P

**p.m.** 7:8 55:13,14 56:22 62:25 67:11, 13 72:11,13,25 96:19 107:24 108:2 120:17 141:13 152:3,6 168:14

**paid** 15:15

**pandemic** 18:14,18 39:17,21

**panel** 14:19

**paper** 52:25 53:6

**paperclip** 139:16

**paperwork** 35:23

**paragraph** 73:17 75:12,16 110:19 115:24 124:3 126:14

**paragraphs** 117:16

**parental** 15:15

**part** 11:3 16:18 18:6 41:6 42:7,9 78:15 85:22 100:5 117:1 135:24 136:21,25 137:7 144:12 145:8 164:7

**participate** 164:8

**participation** 165:10

**parties** 9:8 83:15 103:18

**parts** 43:21 98:13 140:25

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**party** 142:19

**passed** 39:2,6,22,25 40:3

**passport** 74:23

**past** 12:15 39:1 84:17

**Patrick** 36:5

**pattern** 100:7 102:16 106:5

**pause** 23:3

**pay** 25:19,20 63:17

**pay-** 27:13

**payment** 84:17,19, 20 85:6,10,11,14, 17,18,19 87:7 125:11 126:1,6,7

**payments** 125:9,15

**peaked** 103:3

**penalty** 8:5 10:16 11:7

**pending** 10:6 58:8 63:25 127:19

**people** 8:22 19:24 25:1,16 27:23 29:14 30:25 31:3,15 32:11 40:18 43:12,17,19 44:5,16,17 50:5,19, 21 52:1 54:16 55:17,21 56:1,4,13 57:9,22 58:24 59:23,25 60:7,10, 13,15 61:3 63:8 64:14 65:5,9 68:7, 12 71:16 73:5,9,12 74:17,22 76:25 80:22,24 81:21 82:1,2,3 83:18,25 84:5,8 87:3,6,8,10,

14 89:5 90:1 91:1, 15,22,25 92:8,10,22 96:23 97:5 99:8,11 102:12,15 106:7,21 107:8 109:20,22 110:3,8,22,24,25 112:12 113:4 117:6 123:17 124:20,21 126:22 127:2,15 130:17 131:21 132:4 134:7 136:15 137:3,24 138:21,25 140:14 147:24 148:4,5,23,24 165:12 166:6,10

**people's** 101:3

**percent** 43:9

**perform** 18:24

**performance** 13:21, 22,23 16:13,14,16

**performance-based** 16:17

**performing** 69:18 145:16,20,25 165:2

**period** 21:10 34:15 39:14 53:13 58:7 70:1,3 98:21,24 99:3

**periods** 37:8,17

**perjury** 8:5 10:17 11:7

**person** 33:7 35:12 74:1 101:16 110:22 123:18 132:2 144:16

**personal** 74:3,8,16 119:18,21 133:23 146:25 147:17

**personnel** 11:8,24 21:13,21,22 22:18, 23 23:9 25:14 26:8 27:10 28:5 34:14 37:9,22 41:4 49:12 54:11 63:17 85:2,5 87:18,20,21 89:1,20 97:17 98:12 99:15 102:13 135:22

**perspective** 25:20, 21 40:17 42:10,18 63:17,18

**pertain** 161:10

**Peter** 149:18,20,21

**Peters** 24:16 33:5, 10,22 34:13 35:10 44:8,22 77:13 78:6 79:5,7,16 81:9,11, 15 86:13 88:6 92:7, 17 97:14,16 107:8 109:10,11,12,13

**phone** 56:9 117:22 118:9,11,22,25 119:4,24 129:17 130:25 131:1,3 149:12 151:2 167:20,22

**phones** 136:23 137:4

**phrase** 115:12

**physical** 36:1 48:25

**piece** 49:17 85:19 106:12,13

**pieces** 125:6

**place** 23:12 25:1 27:20 30:2,21 31:25 39:9,12 40:17 41:11 52:21 53:2 57:9,18, 19,25 58:14 62:8

63:12 68:11 69:14 89:18 106:20 111:12 121:16,20 123:17 135:12 146:23 164:20

**placement** 43:7 71:16 123:8 124:6 165:11

**placing** 22:24 25:17 27:6 29:24 31:12 50:19 55:25 58:25 62:11 63:8 96:22 97:4 132:19,20 135:6

**plain** 145:13

**Plaintiffs** 7:15,17, 23,25 8:20 36:15 45:21 68:25 69:11 152:13 153:18,23 161:18,23 162:17 163:9

**plan** 16:17 42:6

**play** 16:21

**played** 18:2,17,22, 25 150:17

**point** 10:5 32:3 39:1 51:6 84:13,15 85:8, 25 100:17 103:2,6 138:18 147:7

**policies** 18:24 105:17 146:8

**policy** 38:19 40:4,5 123:15,25

**political** 21:10,14 51:16,20 69:24 79:5,7 90:24 136:4 149:21

**poor** 13:22,23 16:14 126:4

portfolio 15:17,19 17:1

portion 16:24

portions 40:23

posed 69:11

position 19:7 30:10, 11 34:21 74:20 83:9 90:13 134:2

positions 144:1

potential 53:15 64:25 80:16 119:15

potentially 11:24

pound 135:2

practical 105:12

practice 63:10,20 64:5 73:24,25 123:16

practices 14:1 99:1

practitioners 24:7

preceding 86:11

precipitated 98:16

precise 65:7

preconditions 144:22

predated 86:19

preference 103:19

prepared 114:14,17, 20

Prepping 62:22

presence 101:18 162:1

present 8:23 22:20 27:9 28:18 29:11 51:17 88:5,7 161:23

presented 68:7 92:1

President 22:4,16

President's 60:12, 25 61:5,14,15 65:1 113:10,13 114:2 126:9

press 53:5 148:5

pressed 143:9

Prevention 149:23

previous 57:17

previously 35:11 38:2 90:17 98:6 115:8 125:17 141:25 150:20 152:11

primarily 13:20 29:11,19 60:8

primary 15:13 32:17 34:25 53:17 99:21

principal 100:7

printed 111:20 113:23

printout 140:2

prior 21:11 24:23 27:16 28:25 33:14 51:22 54:2 60:22 63:13 72:23 79:22 81:22 82:5 96:22 97:25 100:24 123:9 128:5 129:15 147:1

priorities 21:15 98:23 100:21

private 153:17

privilege 79:21 111:18,21,24 112:2, 16 113:18,22 114:7 115:22 152:12

153:14

probationary 37:7, 16

procedure 103:18

procedures 29:22, 23 30:1 42:11,21 123:25

proceed 8:10 88:25 92:12

proceeding 121:13

proceedings 17:9, 11 154:6 161:1

process 16:7,16 18:9 34:25 41:14, 16,18 60:2,20 78:19 79:20 82:17 83:17 84:4,20 85:18 88:23 91:9 100:11 105:2, 4,5 106:9 111:18,24 112:16 113:18 114:6 115:2,22 141:21,23 142:18, 23 152:11 164:9

processing 84:22 85:6,14,20,21 87:7 102:17

processors 84:19

profanity 101:3

promoted 13:18

proper 84:8

propose 105:23

proposed 39:13 153:11

proposing 14:22

proprietor 14:4

Protection 13:6

protects 114:12

protocol 92:14 121:9 161:22

provide 58:12 107:17 121:16

provided 11:2 18:7, 10 58:5 64:24 81:15 82:17 86:18 88:10 96:25 142:2 147:2

providing 18:5 62:2, 12 73:18 142:7

Public 70:18,19,22 165:6,13,17

publicly 112:6

pull 163:5

purely 58:17 162:6

purported 124:5

purpose 63:21 101:22

purposes 162:2

pursuant 127:8

push 89:17

pushed 110:20

put 27:23 31:15 47:3 54:19 56:13 59:17, 18 98:19 99:1,11 104:5 109:2,6 110:22 130:24 152:21

putting 49:11

## Q

qualified 49:15

qualify 19:19

quarterly 18:11

**question** 9:12 10:6 27:3 42:2 69:10 84:10 93:14 98:8 111:7,9 114:20 152:17,19 162:3 167:14,17

**questioning** 151:18

**questions** 9:7,8,18 10:12 25:22 30:16 32:5 51:9 63:23 73:8 80:7 81:5 91:6 103:17,21 151:19 152:9,13,15 153:16, 19 161:10,19 162:12,19 163:2 166:14

**quick** 56:5,7,9

**quickly** 42:9,10 114:18

**quiz** 38:5 72:21

---

**R**

**R-I-F** 41:19

**raise** 8:3 64:7 91:6 93:4

**raised** 52:5 65:14 88:15 91:8,12 92:3, 8,17 96:12

**ran** 15:23 18:2 85:9 140:25

**range** 55:6

**ranging** 67:22

**ranked** 59:18

**ranks** 59:19

**rare** 101:16 102:11 135:20

**rarely** 87:20

**reach** 63:20 138:6

**reached** 147:24 148:5

**reaction** 86:7

**read** 38:10 85:13 86:4 108:19 140:2 152:15 153:19 162:12 164:23

**reads** 84:15 85:13

**ready** 62:15,16 89:19

**Reagan** 136:21

**real** 135:24

**realization** 43:22

**realized** 42:10

**realizing** 42:20

**reason** 10:1,7 31:8 60:6 63:16,25 64:1, 4,10,12,15,17,20, 22,24 65:5 68:8 75:13,17 87:5 95:13 97:4 99:21 101:19 127:6,7 128:14

**reasons** 125:18 153:4

**recall** 11:5,11 12:6,7 24:1,2,13,14 26:20 28:11 29:7,13 50:20,24 51:4,5 52:8 53:24 55:25 56:3 70:12 88:14 109:10 110:11 117:10 129:21 132:18 134:4 140:16 148:16 150:24 151:2,7

**receive** 26:9 31:10 56:15,16,17 82:12, 15 121:10 125:19 142:18

**received** 23:11 30:19 32:16 38:8 53:2 59:10 74:21 77:1 79:1 82:19 86:25 87:25 88:3, 16,17 89:12,13 91:19 96:19 110:13 121:7,9,13 124:15 129:17,25 130:5 131:2 135:9 137:9, 12 139:3

**receiving** 31:1 98:25 100:3 104:24 105:8 106:1

**recent** 10:24 13:1 48:8

**recently** 10:24 27:22

**recess** 67:12 108:1 152:5

**recipients** 87:15

**recognize** 37:2 69:4 120:11 131:23 139:20

**recollection** 38:14 71:13 72:23 122:4 140:13

**recommend** 80:4

**recommendation** 83:12,25 92:7 100:7 110:7 114:7 129:25 130:21 142:14

**recommendations** 80:2,20 93:13 104:2 153:3

**recommended** 104:6,17 142:11

**record** 7:7 8:25 36:15 45:20,23,25 55:6,7 67:8,11,14 99:6,8,19 100:6,10 101:10,12 102:20 107:14,18,25 108:3 113:19 123:1 151:25 152:4,7 161:5,6,12,15,17 162:10 168:15

**recording** 9:24

**records** 167:6

**redacted** 103:13,23

**redaction** 103:15

**redesignated** 45:25

**Redirect** 166:15

**reduce** 41:25 42:6

**reduction** 41:9,11, 20 42:7,11 88:25 89:14,18 151:5

**reductions** 16:21 42:13

**refer** 97:16,19 98:4

**reference** 37:6 46:6, 25 67:18 96:18 97:7,13 108:23

**referenced** 37:5 89:4 143:10

**references** 152:20

**referred** 31:24 73:7, 15 94:13 134:13

**referring** 38:1 57:4 61:20 73:22 97:24 109:25 115:7 124:7 129:20 142:5,9,21

144:5

**reflecting** 128:4

**refresh** 163:7

**refusal** 142:4

**refused** 117:21 142:2

**regard** 18:14 25:11 34:6 42:1 50:2,18, 20 54:17 55:17 65:1 75:8 81:21 91:18 150:13 152:17,22 153:1

**Reggie** 125:8

**register** 89:17

**registers** 42:23

**regulation** 106:12

**regulations** 39:25 40:3

**related** 11:9 60:23 125:7

**relating** 82:18

**relation** 13:21 14:9

**relations** 13:7,13, 19,24 14:11,12,17, 25 15:9,18 17:2 18:20 19:25 33:15 39:1 101:16 110:21 144:21 149:5

**released** 41:3 43:18

**relevant** 143:18

**remain** 92:22

**remained** 140:18

**remaining** 13:13 121:6 129:7

**remember** 40:12 44:19,24 66:21

105:21 137:5,7 141:5 145:19 148:10

**remote** 18:19 148:22,23

**removal** 39:14 105:14,16,24 151:3

**removal-level** 107:7

**remove** 101:22

**removed** 47:3 58:19

**renew** 152:12

**repeat** 86:1

**repeated** 117:22

**rephrase** 27:2 34:9 88:11 112:10

**report** 19:7 34:23 39:20 79:2 114:11 115:18

**reported** 19:11,12, 13

**reporter** 8:1,3,9 9:23 17:10 20:17 36:19 41:18 45:14,19 55:4 67:2,7 68:22 70:2 72:3 76:6 77:18 93:1,24 95:22 108:9 120:2,8 122:16 139:15 146:14 152:16 154:1,4 166:15,17,20,24 167:2,5,21,25 168:6

**reporting** 19:6 21:2, 3 74:20 112:18,22, 23 114:15

**reports** 19:15,17,22 21:6 112:11

**represent** 7:13 8:20

**representative** 17:3 23:17 28:24 35:20 98:11

**representatives** 21:23 22:19 27:10 28:14,18,22 29:1,12 30:15 31:19 32:5 51:15 65:18 79:3 87:12 102:22 116:17,18 131:25 136:20 141:19

**represented** 11:12 17:8 38:19 40:12

**reprimand** 44:5 88:18

**request** 85:18 92:18 94:15 96:13 98:16 152:25

**requested** 124:14 152:25

**requests** 15:14 85:11,17

**require** 42:13

**requires** 120:24

**rescind** 123:9

**rescinded** 123:1

**rescinding** 121:4 122:25

**resign** 32:3

**resolve** 112:8 121:11

**resolving** 16:6

**resource** 14:7

**resources** 69:20 70:10 71:7,9,10 134:14 165:3

**respect** 80:22,24 83:17 134:25 164:9 165:16 166:10

**responded** 161:21

**responding** 147:15, 18 161:22

**response** 69:17,18 71:17 91:12 92:5 162:12 165:1,25

**responses** 62:19 68:25 163:9

**responsibilities** 15:11 18:15 145:24

**responsibility** 18:4

**responsible** 16:20 48:18

**rest** 75:13

**rested** 10:9

**restrictions** 28:3 145:19

**result** 126:15

**retention** 42:23 89:17

**retirement** 32:11,12

**return** 88:4 122:6 137:11

**return-to-office** 19:1

**returned** 86:17 121:19 150:3

**returning** 88:1,2 92:12

**reveal** 80:20 103:15

**review** 14:14,18,20 16:2 36:25 55:9 82:18

**reviewed** 12:3 15:23 69:3 109:4 124:4

**reviewing** 55:8

**revised** 37:25

**revision** 38:6

**ridiculous** 136:19

**RIF** 41:15,18,19 42:21 127:19

**RIFS** 43:24

**rights** 88:23 142:23

**risks** 53:15

**road** 28:20 31:25 52:24

**role** 18:3,17,23,25 33:10,16 35:17 65:19 70:13,20 71:12 74:21 87:17 90:18 121:11 124:17,23,24 127:17 134:15,17 143:25 146:5,7 148:11,20 149:1 150:5,13,18

**roles** 21:24 41:10 64:14 145:19

**room** 8:19 59:22 66:19,20 84:6 132:13 152:14 153:24 154:5 168:11

**rooms** 102:20

**RSO** 30:7

**Rubin** 7:24 167:19

**Rubio** 69:2,12 163:11

**rules** 9:5 25:18

**run** 133:4

**running** 17:25 116:1,12,14,18 136:20,23,25 137:4

**runs** 135:24

**rush** 147:1

---

## S

**safe** 39:19

**safety** 28:1 39:17

**sake** 116:21

**sand** 135:2

**sat** 63:14

**satisfy** 83:8

**scale** 42:24 43:24 59:25 115:2

**scheduled** 90:14

**schedules** 18:21

**scheduling** 62:17 167:8

**school** 13:2,3,4

**scope** 59:20 80:7 102:10

**secret** 49:5

**secretaries** 133:3

**Secretary** 69:12

**section** 29:25 30:8 38:11 64:2 75:12 96:17 103:13

**security** 13:5,11 30:4 48:15,24 49:2 63:18 74:5 95:12 132:1,24 137:3 146:21

**Senate** 149:4

**senators** 148:22

**send** 58:15 62:3 128:18 130:22 140:8

**sending** 32:12 62:5 128:25 147:2,12

**senior** 32:8 47:14 80:4 88:14,21 94:6, 15 109:2,6 110:19 136:3 140:21

**sense** 9:21

**sentence** 20:17 70:14 71:21 113:8 114:10

**separate** 39:16 41:16 89:5 90:2 106:13 165:16 166:10

**separations** 48:22

**Sepideh** 47:8 94:5 140:20

**series** 78:14 152:9

**servant** 105:15,16 147:4

**servants** 88:20

**serve** 13:18 14:21

**served** 124:5

**service** 17:6 47:16 51:2 53:20,23 54:4, 7,9 88:21

**services** 13:10 14:8 84:18,25 98:5

**serving** 17:22

**session** 153:17 161:18 162:6

**set** 32:2 45:9 66:23 68:25 87:13,24 163:9 166:10

**share** 162:1

**shared** 80:1

**Sharon** 12:12,14

**Sheila** 94:7 96:9,13 140:19

**she's** 167:22 168:10

**shift** 20:7

**shifted** 14:24

**ship** 125:10,21 136:14 137:8

**shootings** 133:11

**shop** 15:23 21:13 140:10,13

**short** 99:3 123:6 143:8

**shorter** 140:12

**shortly** 143:23

**shots** 138:22 139:1

**show** 125:3

**showed** 137:24

**shown** 128:3

**shut** 42:19

**shutdown** 11:25 12:1

**shutting** 48:19 127:13

**sick** 144:7

**side** 13:21 16:14 17:2 18:20

**signed** 125:13

**significant** 18:23 57:17 77:12 140:25

**SILAR** 32:20,22 33:1,11,25

**Siler** 7:18 20:23 22:13 25:5 26:4,25 36:13,22 37:10 40:25 45:3,20 46:14,17 50:7 52:16 54:21 57:10 58:2 67:1,3 70:11 71:18 72:14,17,19 79:18 80:18 83:1,7 86:3 90:7 93:9,11 95:5 101:13 103:14,22, 25 104:3,10,13 107:22 110:9 111:2, 6,16,22 112:1,5,14, 21,25 113:5,16,21 114:4 115:20 119:8 122:10 124:13 129:2 130:23 135:14,17 138:11 144:24 145:7 151:20,23,25 153:12,21 161:3,11, 14,17 162:5,15,18, 23,25 166:14,24 167:1,7,12 168:4,8

**siloed** 99:24 101:9 102:23 106:22 127:24

**silos** 101:11

**similar** 42:24 77:9

**similarly** 34:14 141:1

**simple** 105:14

**single** 15:21

**sir** 134:25 135:3

**siren** 136:22

**sirens** 137:3

**Sitting** 41:23

**situation** 56:4 60:20 74:10 105:25 106:6

**situations** 26:11 39:18

**sixth** 59:22

**slightly** 31:1 48:11 73:11

**slow** 102:2

**small** 14:4 78:15 80:16 102:10,20 125:2 132:6

**Smith** 77:4

**sole** 14:4

**solve** 83:8

**someone's** 144:9

**SOP** 30:8

**sort** 17:21 21:10 26:12,16 32:4 39:3, 22 43:4,10 90:23 93:12 106:4 133:2 134:22 147:10 150:5,16

**sorted** 85:15

**source** 15:21 44:7

**space** 27:7

**speak** 10:10 118:4, 10

**speakerphone** 118:22,24

**speaking** 22:21 52:4,6

**Special** 114:11,16,

25 115:3,19

**specialist** 14:9 26:12

**specialists** 126:5 140:6

**specific** 37:6 41:5 42:2 50:24 52:20 81:4,6 122:24

**specifically** 9:17 42:1 70:6 75:8 104:16 138:25 164:16

**specifics** 56:3 66:6

**speculate** 9:16

**speculation** 26:5 33:11 86:3 101:13 119:8 124:13

**spent** 13:6,9 87:9

**spoke** 11:15 32:7 49:17

**spoken** 8:18 11:15 79:22

**spot** 63:24

**spreadsheet** 59:17, 18 85:14

**Stabilization** 149:23

**staff** 31:24 47:2 48:15 56:23 61:10 67:22 110:20 143:7 148:22 149:2

**staffed** 143:8

**staffers** 148:13

**stage** 40:4

**stages** 23:7

**stakeholder** 16:22

**stakeholders** 25:13 95:15

**stamp** 55:6 146:16

**stamped** 72:5 76:3 94:1 95:24 120:10

**stand** 14:18,23 67:6, 9 107:23 152:2 154:5

**standard** 29:25 63:9 91:9 92:14 121:9 122:6,23

**standpoint** 60:20

**stands** 67:20 84:18

**start** 9:6 15:6 81:8 163:4

**started** 10:11 13:4 14:3,6 30:22 52:23 53:5 55:22 56:13 59:19 65:5

**starting** 13:1 14:10 15:12 85:18 147:8

**state** 7:13 8:24 69:2, 12 96:19,25 150:3, 5,6 163:11

**stated** 61:10 68:8 88:23 91:14 92:18 102:4 118:23 128:14

**States** 51:2 53:20 54:4 69:1,11 163:10

**stating** 62:11 128:12 151:3 166:2

**status** 62:2 120:20 123:8 124:6 126:16

**stay** 74:22,25 104:16

**stays** 10:9

NICHOLAS GOTTLIEB REDACTED                    April 22, 2026                    198
96528                                                   ConfidentialIndex: steer..text

**steer** 21:14

**step** 21:12,13 30:2 129:11,16 132:14

**Stephanie** 141:1,3,5

**stepped** 39:2

**steps** 73:20 80:16 145:4 153:10

**Steven** 77:1

**Stevens** 7:22 154:5 167:21,23

**stickers** 36:12

**stood** 85:16 87:4

**stop** 41:8,14 44:11 53:9 125:9,17,18,21 126:1 153:8

**stopping** 125:10,11

**stories** 116:5,6,16, 17 136:10,16,19

**straight** 46:11 47:5 163:16

**straightforward** 122:5

**strategy** 41:5,25

**Street** 12:9

**stretch** 51:11 150:19

**strike** 28:9 91:23 115:16 128:21 164:6

**striking** 117:17

**strokes** 11:19,20 22:11

**structure** 19:6 20:21 21:2

**stuff** 103:15

**subject** 17:21 24:8 26:13 38:25 44:1 76:22 80:13 81:2 92:10 94:9,20 103:5,15 111:23 120:19 141:15 165:19

**submission** 94:3

**submitted** 11:6,10 93:16

**subordinance** 19:21

**subordinates** 19:23

**subpoenaed** 9:2

**subsequent** 62:23 93:17 125:16

**subsequently** 58:6

**substance** 138:4 153:15,25 165:24

**successfully** 138:20

**suggestions** 80:3, 20

**suite** 19:9 116:19 131:22 136:24 137:1

**summary** 68:5

**supervisor** 105:22

**supervisors** 18:9,12 138:9

**support** 11:11 58:19 86:15 88:17 123:7 140:6

**Surprise** 86:9

**surprised** 86:24

**suspend** 49:3

**suspended** 49:6

**swath** 60:8

**swear** 8:2

**system** 15:20,22 16:1,9 18:7 74:7,14 84:17 85:6,10 87:7 119:14 121:19 123:23 125:11 126:7

**systems** 23:15 36:2 48:20 49:17 66:4 117:19 141:2,4 164:1

---

**T**

**takes** 41:11

**taking** 42:24 50:22 52:21 83:18 106:11 116:10

**talent** 47:21

**talk** 51:17 134:8

**talked** 117:6

**talking** 51:16 68:2 102:13 106:25 117:11 147:20,25

**Tarak** 77:6

**tasked** 62:5

**team** 13:7 42:10 60:9 63:14 74:5,6 78:12 79:12 140:14 148:15,17

**technical** 16:4 145:14,17

**technically** 16:20

**telework** 18:21 39:18

**telling** 64:22 125:8

130:6 136:15 139:6 147:10

**template** 30:18 63:24 75:10,15,20

**templates** 30:4,7

**ten** 132:4

**Tera** 79:5 81:9 90:23 107:8 110:1

**term** 27:25 116:13 144:3 145:11,15,21

**terminate** 88:12 91:1,2,3

**terminated** 47:3 48:17

**terminating** 88:20

**termination** 49:8 52:22 141:22 142:22

**termination-** 107:6

**terms** 38:19 45:1 80:24 101:2 164:5

**testified** 8:14 10:16, 25 24:18 55:20 65:4,14 70:8 76:13 77:25 87:22 90:17 97:3,9 102:24 118:15 124:10 128:16 141:24 143:2 149:9 150:20, 21 165:22

**testifying** 162:5 163:18

**testimony** 8:6 10:2 68:4 97:25 128:4,5 153:25 162:11 163:3

**text** 28:23,24 59:17 147:12 149:14

**NAEGELI**
DEPOSITION & TRIAL

**(800) 528-3335**
NAEGELIUSA.COM

NICHOLAS GOTTLIEB REDACTED          April 22, 2026                        199
96528                                         ConfidentialIndex: texts..typically

151:1

texts 56:6

that's 17:24 20:3 45:22 81:3 86:5 89:4 104:9,10 108:24 137:21 150:5

themself 132:3

there's 9:23,24 36:20 64:1 70:22 143:7

they're 121:25 133:2,18 153:19

thing 42:18 166:11

things 9:14,15 94:21 100:13 101:11 104:20 114:18 133:12 135:4

third-party 17:9,11 115:3

thought 60:2 100:11 165:25

thread 46:23 59:11

Thursday 23:24 28:22 35:4,10,13 44:2 48:12,13 49:18 51:13,19,24 53:7 58:13 60:5,18 66:6, 14 78:20,21,22,24 86:13,23 89:15,24 109:18 141:11 151:15 163:23

tied 59:24

till 39:10

time 7:8 10:5,24 16:19 17:13 18:16, 25 19:5 23:14 26:15 31:11,12,16 33:13

34:11,12,15,19 35:2,19 40:17 41:2, 22 50:2,18 51:1,6, 11 53:5,17,25 54:6, 10 57:8 58:7,17,24 60:4,15,21 61:2 64:3,9,11 65:24 66:1 67:3,10,13 69:23 70:6 71:4,8, 11,12 72:11,25 75:2 76:17 80:9 82:22 90:6,13 95:6 97:5, 21 98:11,21,24 99:3,9 100:22 104:23 107:24 108:2 112:2 114:19 127:24 131:17 136:12,13 146:4 149:25 150:14 151:14 152:3,6 153:15 162:24 168:14

timeline 48:11 116:8 163:16

times 10:22 53:11 73:7 108:12 109:4 111:20 112:11,18, 22 113:23 115:17 116:8 152:18,20

title 37:15 47:12 108:14 140:12 144:13

today 9:3,6,15,25 10:1 11:12,16 41:23 129:1 141:19 143:18 150:21,23 162:25 163:18

today's 167:9,10

told 44:4 58:7 97:5 110:23 112:11,19 118:8,17 119:23

125:17

tone 101:3

top 47:1,6 62:20 78:5 94:23 105:21 108:17

top-secret 49:4

topic 81:13,14

topics 143:22 149:6

total 17:14,24 20:3

touch 18:20 74:25

touched 102:7

town 12:12

track 148:23,24

tracking 61:19,24

tradition 100:10

trail 52:25

trails 53:6

training 18:5,7,11

transcribing 9:24

transfer 42:14

transferred 13:18 43:13

transition 21:10 42:20 43:21

transitioned 21:20

transitioning 18:18

transmission 97:14

transmittal 69:20 165:4

transmitted 62:24 63:4

transparent 100:10

traveling 74:17,23,

24

treasure 143:5

triage 16:2

tricky 74:24

trouble 134:22

true 112:10 115:16

Trump 20:14 21:22, 23 22:4 51:20 69:25 79:5 149:22 150:8

trust 100:19

truth 8:7,13

truthful 10:1

Tuesday 22:17 27:17 31:23 59:7 61:1 64:8 65:25 66:17 78:11,21 130:14

Tuesday's 32:10

turn 46:3 48:24,25 61:16 67:17 69:8 75:4 108:21 163:13

turning 164:15

two-hour 116:15

type 16:22 23:13 165:20

typed 168:4

typical 63:20

typically 21:11 24:7 26:10 41:9 48:21 51:17 62:12 63:24 64:2 73:24 87:19 92:15 121:11 123:15 146:2

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

## U

**U.S.** 13:5,9 37:21 53:22 54:7,9 67:20, 23 84:23 85:4,7,22 93:1

**ultimately** 68:11 83:13

**unclear** 107:9

**uncovered** 58:10

**underneath** 33:24

**understand** 9:18 35:16,18 40:21 51:1 53:21 70:17 87:11 106:7 111:6 131:17

**understanding** 11:18,21 20:11,12 28:8 33:9,16 51:7, 23,24 53:24 56:12 58:4,16,22 59:15 65:17,23 66:1 68:6 69:25 70:5 71:4 72:24 76:19 79:18, 25 80:8 85:12,23 86:2 90:12,20,22 98:1 110:6 119:6,11 130:9 134:5 135:11 136:7,11,14 144:3, 15,22 145:11,13,14, 23,24 150:12,17 166:3

**understood** 9:21 24:12,19 26:3 35:2 38:2,17 41:12 45:7 49:25 57:21 60:23 61:2 65:19 68:4 70:20 71:15 76:14 78:1 79:10 83:23 84:14 90:14,18 103:22 104:12

134:10,16 138:21

**unfair** 13:25

**unions** 17:4

**unique** 102:16

**unit** 140:24

**United** 51:2 53:20 54:4 69:1,11 163:10

**University** 12:18,23

**unjustified** 110:24 111:1 112:13

**unlawful** 112:20 113:4 115:10,11,15

**unpleasant** 133:12

**unredacted** 98:13 161:20,25

**unsubstantiated** 92:14 121:12

**update** 40:5 49:16 56:8,10 62:2 120:19

**updates** 56:7 73:19, 21

**upset** 129:19,24 130:20 131:4 137:13

**USA** 150:6

**USAID** 8:22 11:23 13:18 14:3 15:5,21 16:9 17:14,23 18:4, 15 19:5,10 22:6 23:9 25:12 27:6 28:12 34:6,12,14 35:3,24 36:2,6 42:1 43:3,21 44:22 50:4, 21 54:3 56:23 58:11 62:7 67:21 68:3,7 69:14,21 76:16,22 78:13,14 79:14

84:19 85:2,3,5 86:21 90:15,24 92:22,24 93:2 94:14 100:5,9 108:16 109:7 117:18 118:5 124:1 128:9 129:22 135:2,24 138:23 139:1 141:6,16 143:19,24 144:4 146:4 147:15,19 148:11 150:13 163:25 164:1,20 165:5

**USAID's** 110:20

**USAID-SPECIFIC** 35:20

**usaid.gov** 84:16

**USCIS** 14:18,23 17:20

**USDH** 67:19,20

**users** 84:16

**UTC** 72:11,22 95:1,5

## V

**vacancy** 144:11,15, 18

**vacation** 144:8

**vaccination** 19:2

**Vague** 20:23

**vaguely** 66:3 134:16 135:25

**variety** 67:21

**vendors** 84:23 85:7, 23

**venue** 115:3

**verbally** 142:7

**Vermont** 12:19

**versus** 7:10 145:25

**video** 167:6,12,13

**view** 41:23 99:5 127:4

**viewed** 28:6 41:2,5

**views** 104:4

**violate** 88:22 141:21

**violated** 61:15

**violating** 61:4,13 106:10,11,12

**violation** 60:24 61:5, 13 105:3 126:8 142:19,22

**violations** 64:25 68:10 91:17 115:2

**Viral** 108:15

**virtual** 23:20,25 33:7,8

**virtually** 29:15

**voice** 118:10

**volunteer** 32:1

**Voorhees** 36:5,10 46:7 47:1 48:14 94:24 117:12 146:20

## W

**waiting** 91:17 130:14

**Waive** 40:8

**waived** 28:3 112:3

**walk** 12:25 15:11 29:2 76:25 132:11

**walked** 30:1 59:22

**wand** 121:18

**wanted** 74:12 94:16 99:22,25 130:6,10 148:6

**Warren** 7:14 8:11, 16,18 17:12 20:20, 24 23:2 25:8 26:17 27:4 33:3,17 34:4 36:11,14,20,23 37:13,14 41:21 45:5,24 46:2,15,19 50:10 54:23,24 55:5 57:20 58:21 67:5,15 68:23 70:4,15 71:22 72:4,16,18,20 76:8 77:20 80:10 81:7 83:3,5,19,21 86:6 90:11 93:3,19,25 95:9,23 101:24 103:20,23 104:1,9, 12,14 107:20 108:4, 10 110:16 111:8,19, 25 112:4,9,17,23 113:2,7,19,22,25 114:9 115:5 119:17 120:3,4,9 122:8,11, 17 124:16 129:12 135:15 136:6 138:15 139:17,19 145:3,10 146:15 151:16,22 152:1,8 153:20 154:3 161:8, 13 162:14,17,19 163:4 166:16,17,19, 22 167:24 168:1,3, 10

**waste** 20:15,19 22:5 108:15

**WAWRREN** 115:23

**weather** 27:25 39:16

**Wednesday** 22:17, 22 23:11,21,24 28:19 31:19,20 32:3,18 42:17 46:7, 11 48:12,14 49:10

**week** 27:17 28:3,15 35:7,9 43:17 51:5,9, 21 52:9,20,23 53:7 57:17 58:9 63:13 71:3 73:14 74:11 99:4 125:12,14 144:8

**weekend** 117:15 119:11

**weeks** 57:6 60:15 85:20

**Wen** 7:20 167:14,15

**we'll** 10:8 21:25

**we're** 9:19 29:2 44:12 52:21 67:5

**whatsoever** 124:18

**what's** 11:21 20:11 85:12 86:2 89:5 94:12

**White** 27:18 61:22 73:14 136:20

**White's** 61:25

**who'd** 81:21

**wide** 60:8 61:9 89:13

**widely** 86:1

**William** 140:22

**win** 138:19

**window** 39:23

**winter** 21:17

**word** 17:10 91:1

101:9 110:5,12 144:5

**words** 70:2 132:9 138:3 165:15,23

**work** 15:5 18:20 19:3 22:25 23:5,10, 13 25:2,12 28:12 32:6 39:19 41:8,10, 13,15 42:14,23 43:8,9,11,17,20 78:25 87:2 99:5 101:20 134:25 135:1 137:13 140:25 141:3 147:13 148:22,23 164:1

**worked** 8:22 25:13 27:7 43:13 44:16 54:12 60:16 76:14 78:1,19 89:11 90:21 100:19 137:21 149:3,23

**workforce** 13:15,23 18:7,8,13,16 40:24 41:25 142:17

**working** 13:2 26:14 47:6 53:13 62:14 89:16 97:18,21,23 98:7,9,22 125:23 129:5 143:4 145:18 151:3,5

**workplace** 18:19,23, 24 39:19

**world** 23:10 27:13 85:17

**worldwide** 18:8 117:18

**Wright** 94:7 96:10 140:19

**write** 49:18 62:22,23 99:19 123:11 124:17 126:14,19 127:21 130:22 141:19 152:23

**writes** 47:1 57:1 84:13 85:9

**writing** 26:10,14 45:21 98:20 99:1,2 108:23 125:2,19,20 142:8,9

**written** 99:25 102:20 142:3,11

**wrong** 85:9 108:24

**wrote** 47:17 85:24 113:10 124:4

---

**X**

---

**XO** 140:10,13

**XOS** 133:3,5

---

**Y**

---

**year** 12:21 18:3 36:9 84:17,21

**years** 11:1 12:15,17 13:6,9 14:24 17:17, 18,19,20,23,24,25 39:2,5 54:3 60:16

**York** 12:14 108:11 109:4 111:20 112:11,18,22 113:23 115:17 152:18,20

**young** 66:21 76:20

**you're** 8:6 9:12,16 11:12 45:21

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**you've** 9:25 104:20
  141:24

---

### Z

---

**Zoom**  153:23 168:5

NAEGELI | (800) 528-3335
DEPOSITION & TRIAL | NAEGELIUSA.COM

# Exhibit 12

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


J. DOE 4, ET AL.,

      Plaintiffs,

vs.                    CIVIL ACTION NO. 8:25-cv-00462-TDC

ELON MUSK, ET AL.,

      Defendants.

_____


REMOTE VIDEOTAPED DEPOSITION OF

JASON K. GRAY

TAKEN ON

TUESDAY, FEBRUARY 3, 2026

11:11 A.M.

SHULMAN ROGERS

1100 NEW YORK AVENUE NORTHWEST, SUITE 800

WASHINGTON, DC 20005

JASON GRAY                           February 03, 2026                                    2 to 5
93681

Page 2

REMOTE APPEARANCES

Appearing on behalf of the Plaintiffs:

REBECCA "BETH" STEVENS, ESQUIRE

ANDREW SILBERSTEIN, ESQUIRE

Marziani, Stevens & Gonzalez, PLLC

500 West Second Street, Suite 1900

Austin, Texas 78701

(361) 437-9081

bstevens@msgpllc.com

-AND-

ANDREW H. WARREN, ESQUIRE

TIANNA J. MAYS, ESQUIRE

Democracy Defenders Fund

600 Pennsylvania Avenue Southeast, Suite 15180

Washington, DC 20005

(202) 662-8383

andrew@democracydefenders.org

tianna@democracydefenders.org

Page 4

REMOTE APPEARANCES (CONTINUED)

Also Present:

Jehieli Luevanos-Ovalle, Paralegal, Democracy

Defenders Fund

Christine Tolver, Onsite Laptop Support

Page 3

REMOTE APPEARANCES (CONTINUED)

Appearing on behalf of the Plaintiffs:

RICHARD H. HEIMANN, ESQUIRE

NICOLE RUBIN, ESQUIRE

Lieff, Cabraser, Heimann & Bernstein, LLP

275 Battery Street, Suite 2900

San Francisco, California 94111

(415) 956-1000

rheimann@lchb.com

nrubin@lchb.com

Appearing on behalf of the Defendants:

JAMES J. WEN, ESQUIRE

CHRISTOPHER M. LYNCH, ESQUIRE

JACOB S. SILER, ESQUIRE

United States Department of Justice

1100 L Street Northwest, Room 11206

Washington, DC 20005

(202) 616-8185

james.j.wen@usdoj.gov

christopher.m.lynch@usdoj.gov

jacob.s.siler@usdoj.gov

Page 5

EXAMINATION INDEX

PAGE

EXAMINATION BY MS. STEVENS                    9

JASON GRAY
93681

February 03, 2026

6 to 9

Page 6

EXHIBIT INDEX

| EXHIBIT NO. | | PAGE |
|---|---|---|
| 1 | ORGANIZATION CHART | 24 |
| 2 | CALENDAR | 56 |
| 3 | DOCUMENT | 72 |
| 4 | DOCUMENT | 72 |
| 5 | ACTION MEMO | 75 |
| 6 | ADMINISTRATIVE LEAVE NOTICE | 92 |
| 7 | ORDER | 141 |
| 8 | EMAIL AUTHORIZATION FOR ACCESS CONTROL INFORMATION | 152 |
| 9 | EMAIL PHYSICAL AND LOGICAL ADMINISTRATION FOR GAVIN | 156 |
| 10 | EMAIL AID INTENDED COMMS | 164 |
| 11 | EMAIL BUILDING ACCESS | 170 |
| 12 | EMAIL ACCESS TODAY | 178 |
| 13 | EMAIL LPA LEAVE TEMPLATE | 189 |
| 14 | GMAIL CHAT | 195 |
| 15 | EMAIL REQUEST INFORMATION | 197 |
| 16 | EMAIL REQUEST INFORMATION | 198 |
| 17 | APPOINTMENT OF PETER MAROCCO | 199 |
| 18 | EMAIL ACTION MEMO | 204 |
| 19 | EMAIL FYI | 207 |
| 20 | EMAIL FYI | |

Page 7

207

EXHIBIT INDEX CONTINUED

| EXHIBIT NO. | | PAGE |
|---|---|---|
| 21 | EMAIL USAID MEMO | 210 |
| 22 | EMAIL PLACEMENT OF CHCO | 215 |
| 23 | EMAIL INVESTIGATIVE LEAVE NOTICES | 217 |
| 24 | ACCESS REQUESTS | 223 |
| 25 | EMAIL 507-2 FOIA ACTION | 230 |

Page 8

REMOTE VIDEOTAPED DEPOSITION OF

JASON K. GRAY

TAKEN ON

TUESDAY, FEBRUARY 3, 2026

11:11 A.M.

THE VIDEOGRAPHER:  We are on the record. The time is 11:11 a.m.  The date is February 3rd, 2026. This is the beginning of the deposition of Jason Gray. Case caption is J.  Does 1-26 versus Department of Government Efficiency.

Will counsel please introduce themselves and state whom they represent.

MS. STEVENS:  Beth Stevens on behalf of the plaintiffs.

MR. WARREN:  Andrew Warren on behalf of the plaintiffs.

MS. MAYS:  Tianna Mays on behalf of the plaintiffs.

MS. LUEVANOS:  Jehieli Luevanos on behalf of the plaintiffs.

MR. WEN:  James Wen on behalf of defendants.

MR. LYNCH:  Chris Lynch on behalf of defendants.

Page 9

MR. SILER:  Jacob Siler for the defendants.

THE VIDEOGRAPHER:  Our court reporter will swear in the witness.

THE REPORTER:  All right.  Mr. Gray, please raise your right hand.  Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  I do.

THE REPORTER:  Thank you so much.

Counsel, please proceed.

MS. STEVENS:  Okay.  Thank you.

JASON K. GRAY, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MS. STEVENS:

Q.  Good morning, Mr. Gray.  Thank you so much for being here with us.  Could you please state your full name for the record?

A.  Yes.  It's Jason Kirk Gray, G-R-A-Y.

Q.  Okay.  Thank you. First, we're going to go over some expectations for how the deposition will go, talk about some general ground rules.  Then

Page 10

we'll get into your background. And then finally, we'll get to what this case is about and your recollection of events that occurred mostly in early 2025. Does that sound okay?

A. Yes.

Q. Okay. Great. Have you had your deposition taken before?

A. No.

Q. So, there are a few ground rules. The court reporter mentioned one of them, which is that we should make sure to finish our sentences before the other person starts talking. So I'll do my best to allow you to finish your answer before I start my next question. If you will allow me to finish my question before you answer, that would be very helpful. Does that make sense?

A. Yes.

Q. Okay. And then for the court reporter, and just for clarity, it is important that you answer questions in the affirmative or the negative rather than huh-uh or uh-huh or nodding your head. If you'll just say your answer out loud, does that make sense?

A. Yes.

Q. Okay. And then if -- if I phrase a

Page 11

question poorly, which might happen, if you don't understand my question, will you please ask me to rephrase it if you don't understand it?

A. Yes.

Q. Okay. And if you -- if you don't ask me to rephrase it, is it fair to assume that you did understand my question?

A. Yes.

Q. I will be asking about, especially when we get into early 2025, I'll be asking about your recollection of events from that time frame. And there is, of course, a difference between, no, I don't know, and the answer no. And so I just ask you to be clear in your response on which one of those is the answer at the time. Does that make sense?

A. Yes.

Q. All right. You've been sworn in, which means you're under oath today. Is there any reason that you cannot give a true and a -- a truthful testimony today?

A. No.

Q. Do you understand that during the course of our deposition, we'll take breaks. We'll come back on the record. During the course of our time

Page 12

today, that you shouldn't communicate with anyone else about the substance of your testimony. Do you understand that?

A. Yes.

Q. Okay. As I mentioned, we might take breaks through the course of your testimony. If you need a break, if you will just let me know, we can pause. I just ask you to finish answering the question that's on the table before we take that break. Does that make sense?

A. Yes.

Q. Okay. And then finally, you see there are lots of attorneys in the room, both physically in the room, and then we've got folks on the -- attending by Zoom.

As I ask questions, opposing counsel, the government, they might object to some of the questions that I ask. That's normal for the course of a deposition. But unless someone specifically instructs you not to answer, you'll go ahead and answer the question. Does that make sense to you?

A. Yes.

Q. Okay. All right. Did you bring any documents with you today?

A. No.

Page 13

Q. All right. Do you understand that through the course of the deposition, you shouldn't look at any documents that -- that you don't share with me while we're --

A. Yes.

Q. -- talking? Okay. All right. So let's turn to today's deposition. What did you do to prepare for the deposition?

A. Just a lot of reflection.

Q. Okay. And can you tell me a little bit more about that, just --

A. Well, given that it was close on the anniversary of when everything happened, there was a lot of reflection, just naturally on what happened, how it happened, where I am, the events that happened. Just a lot of, like, internal reflection about the -- the last year of my life.

Q. Is it fair to say that the -- the word reflection here means thinking about --

A. Yes.

Q. -- the last year? Okay. And did you talk to anybody as you were going through those preparations?

A. I -- I talked to my wife to say that I was reflecting, but not actually on the events.

Page 14

Q.   Okay.  Talked to her about the -- not about the substance of this --

A.   Correct.

Q.   Did you review any documents in preparation for today?

A.   No.

Q.   Did you talk with the counsel for the Department of Justice?

A.   Yes.

Q.   Did you -- can you tell me when you all spoke?

A.   Yesterday.

Q.   Okay.  And how long was that conversation?

A.   An hour and a half.

Q.   Okay.  Was that in -- to prepare you for today's deposition?

A.   Yes.  It was to get inform -- I've never been through a deposition before, and I wanted to know what to expect.

Q.   Okay.  So you talked about expectations for the deposition?

A.   Objection.  Calls for information protected by attorney-client privilege.

Q.   Okay.  So you talked with the DOJ for about an hour and a half.  Did they show you any

Page 15

documents?

A.   Yes.

Q.   Okay.  Were those documents -- just don't tell me exactly what documents.  Can you generally describe the types of documents that you looked at?

A.   An email.

Q.   Just one email?

A.   Two.

Q.   Okay.  And from when were those emails?

A.   One was February 1st, and I don't remember the second.  I didn't look at the date.

Q.   Okay.  And did you read through those email?

A.   I did.

Q.   Do you have them with you today?

A.   I do not.

Q.   Did you -- a second.  Are those the only documents that you looked at during the course of your conversation with --

A.   Yes.

Q.   -- the DOJ?

MR. WEN:  Objection.  Asked and answered.

BY MS. STEVENS:

Q.   Go ahead.  You can answer.

A.   Yes.

Page 16

Q.   Besides the about an hour and a half conversation with the DOJ yesterday, did you have any other discussions with them?

A.   A phone conversation, yes.

Q.   And how long was that?

A.   Maybe a few minutes.

Q.   And who was that conversation with?

A.   I believe -- I'm not entirely sure.  I think it was --

Q.   Chris?

A.   -- Chris.

Q.   Okay.  Thank you.  And was anyone else besides yourself present with the DOJ during the conversation yesterday?

A.   No.

Q.   All right.  Did you talk to anyone else in preparation for today?

A.   No.

Q.   During the conversation with the DOJ, were you instructed on how to answer specific questions?

MR. WEN:  Objection.  That's information protected by the attorney-client privilege.

MS. STEVENS:  I disagree.  The attorney can't tell the witness how to answer.  I didn't ask if you gave advice or --

Page 17

MR. WEN:  I think you're asking about what we talked about.

MS. STEVENS:  I'm specifically not asking what you talked about.  I'm specifically asking were -- were you given direction about how to answer specific questions.  He can answer yes or no questions.

MR. WEN:  Can -- rephrase.

THE REPORTER:  I'm sorry.  I'm sorry to interrupt.  Who was making the objections?  I just want to make sure I'm clear.

MR. WEN:  Sorry.  That -- that's James Wen, W-E-N, Department of Justice for defendants.

THE REPORTER:  Got it.  Thank you.

MS. STEVENS:  What was the -- what was the end result of that?

MR. WEN:  I think -- I think you can rephrase the question to make that clear.

BY MS. STEVENS:

Q.   Mr. Gray, did -- were you given specific instruction about how to answer specific questions during the conversation with the DOJ?

A.   No.

Q.   Okay.  Turning to the case at hand.  So you're here to provide some testimony in a case

Page 18

where we are challenging a couple of things that the -- that are related to the dismantling of the United States Agency for International Development, which I will call USAID, probably from here on out, okay?

A. Okay. Yes.

Q. All right. So you don't need to know the full details of the entire case, but it's helpful to kind of narrow in on -- on the two claims that we're making.

One is, we're challenging the dismantling of USAID because we believe the decisions around that should have been made by Congress, rather than the executive branch. So that's a separation of powers claim.

And then we're also challenging some actions made -- taken by Elon Musk and DOGE with respect to the closing of USAID because we think that those -- that conduct violates the appointments clause of the Constitution.

So that's just sort of some background information as we as we go in.

A. Okay.

Q. You understand that you're not a defendant in this case?

A. Yes.

Page 19

Q. Okay. And that you're -- you're a witness?

A. Yes.

Q. All right. Okay. Let's talk about you.

A. Okay.

Q. So where are you originally from?

A. So I was born in Canada, and at age 4 moved to California, and at age 9 moved to Hawaii and grew up in Hawaii on the Big Island.

Q. Great. And do you -- go ahead.

A. I was just -- sorry. That's a -- it's a complicated life, so -- but --

Q. It sounds exciting. Did you -- do you have any degrees or certificates?

A. Yes. I have a bachelor's degree in information technology from American Intercontinental University, and a master's degree in business administration from Colorado Technical University.

And I also have a certified information system security professional, CISSP, from ISC Squared. And I have a PMP, a project management professional certification. Those are the majority of them.

Q. Okay. And the bachelor's degree from

Page 20

American -- it's a long name -- where is that university located?

A. It was an online university, but they're in Illinois.

Q. Okay. And about what year did you receive your bachelor's?

A. 2007, 6 or 7.

Q. And the master's?

A. The following year. So 2000 -- so it was maybe 2005 for the bachelor's and 2007 for the master's.

Q. Okay. After you obtained those degrees, can you -- can you give me, like, a high level overview of your professional experience?

A. So I was working for Lockheed Martin at the time. And when I graduated, I ended up transitioning to become a federal employee working for the National Naval Medical Center in Bethesda as a chief technology officer there. I transitioned from there after a couple of years to the Joint Task Force, which was a -- a joint task force cabinet, specifically with the base realignment and construction of Walter Reed to the National Naval Medical Center.

And then from there, I transitioned to

Page 21

Miami to work for the VA as a CIO of the Miami VA Healthcare Hospital down there in Miami.

And after about a year, I transitioned to the acting associate director of the hospital down there for about seven months. And then after that, I transitioned -- sorry, this is going to be a bit.

Q. No, that's okay.

A. After that, I transitioned to work for the Defense Department in Monterrey, California for DMDC. And I did that for one year and then transitioned to work for the Veterans Administration as a senior advisor customer advocate for benefits between the CIO and the undersecretary for benefits.

And then after that, I transitioned to the Department of Transportation to be the associate CIO for portfolio, basically portfolio management of the IT portfolio. And after that, I transitioned to the Department of Education for about six years, a little over six years as their CIO. And then I transitioned to US A-I-D or USAID for three years until I was RIF'ed.

Q. The DMDC, can you tell us what that stands for?

A. Defense Manpower Data Center. It is the defense agency that manages the human resource

Page 22

system for all of the defense department called DEERS.

Q.   Is it -- do I have it correct that you were working at Lockheed Martin at the time that you were going to school to get your bachelor's and master's?

A.   Yes.

Q.   Okay.  And is it correct to say that after you received your master's degree, all of the other work experience that you just described is in the information technology space?

A.   Yes.

Q.   Where do you work now?

A.   I work for a company called Box, Incorporated.

Q.   And since when have you worked there?

A.   Since -- since September 8th of 2025.

Q.   All right.  Turning your attention back to -- did you -- do you call it USAID or US A-I-D?

A.   All of the above.  Aid, USAID, US A-I-D, either --

Q.   Okay.

A.   -- or all is fine.

Q.   Well, we'll see -- we'll see how it flows. Turning your attention back to USAID.  For how long

Page 23

-- I think you might have touched on this, but to -- to narrow in, can you describe your -- what I estimate are three different roles at USAID, starting with CIO and then -- and then what you covered for the time that you were there in the -- the years there?

A.   Yes.  So when I first got there, which was in August of 2022, I was appointed as their CIO. And then in January of 2025, in during inauguration, I found out that I was going to be the acting administrator, which lasted for 11 days.

And then I was told I was being transitioned back to being the CIO, but that I was also going to be kept in the front office as, like, a senior advisor for the agency.  So those are the three roles while also being the CIO.

Q.   A dual role at the end, correct?

A.   Correct.  Yes.

Q.   Okay.  So, I want to turn your attention -- first, we'll talk about your roles and responsibilities with respect to being chief information officer.  And then we will get to, of course, the time that you were acting, and then we'll also touch on your dual roles after that.

But first, pre January 20th of 2025, and

Page 24

if I say a date that you don't know the year for, I will probably be talking about 2025.  But if you -- ask me if I -- if I state it in a way that you don't understand.

A.   Yes.

Q.   Okay.  So first, These are --

MR. WEN:  These are blanks.

MS. STEVENS:  Oh.

MR. WEN:  Yep.

MS. STEVENS:  Okay.  We are on the fly. Doing exhibit stickers with blank stickers.  Thank you. Yeah.

MR. WEN:  Plaintiffs.

MS. STEVENS:  All right.  So I'm handing you what we are right now marking as Plaintiff's Exhibit 1.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MS. STEVENS:

Q.   And this is an organization chart, and it has at the bottom right, I'm just going to do the numbers, but the Bates numbers are 270.  So this is produced by -- by the government to us.  That's how you know at the bottom right, it's got those numbers on it.

Page 25

A.   This says 271.

Q.   Oh, well, printed off the wrong copy. Okay.  All right.  I'm going to give you my copy.

MR. WEN:  We want 270?

MS. STEVENS:  We need -- we need 270.  But I'm going to show this to the government.  We will print you all copies.

MR. WEN:  (Inaudible) print a copy?

MS. STEVENS:  Yeah.  Well, could we print it from the -- the production so I can talk with him about it?  I can -- I can also do it on a break if you all are comfortable --

MR. LYNCH:  Do you want to take a break?

MR. WEN:  Yeah.  Whatever -- that works.

MR. LYNCH:  You just want to take a break just to get this sorted out and --

MS. STEVENS:  Well, it'll -- it will -- I only have, like, two questions.

MR. LYNCH:  Yeah.  Go for it.

MS. STEVENS:  Okay.

MR. LYNCH:  So we -- we rebranding, this is number one and --

MS. STEVENS:  Yes.

MR. LYNCH:  -- forgetting about that. Okay.

JASON GRAY                          February 03, 2026                          26 to 29
93681

Page 26

MS. STEVENS: That's right.

MR. LYNCH: Just keeping track.

MS. STEVENS: So 271, Bates 271, we are not using. We're using Bates 270, which we've marked as Plaintiff's Exhibit 1.

BY MS. STEVENS:

Q. Could you look -- look over this for a moment, Mr. Gray, and tell me if it reflects the way the organization was organized as of January 20th, 2025?

A. Yes.

Q. Can you tell me which -- which square or rectangle the chief information office and your -- your position fit?

A. Yes, I can. So it's obviously missing from this because it was dual -- a dual aligned position, meaning I reported directly to the administrator. So it was another box here on this, and then through the Bureau for Management.

So that would be -- sorry, this looks actually a little blurry to me, but the Bureau for Management right here, the CIO for -- technically fell under the Bureau for Management, but I reported through and had my performance plan done through the administrator and the deputy administrator for

Page 27

resource management.

Q. Understood. Okay. And so I just want to articulate for the record a little bit about what you've just been pointing at on the exhibit.

So on the exhibit, right up top in the middle, it says, administrator, and shooting off to the right is Office of the General Counsel and Executive Secretariat. And you're saying the CIO would -- would also have a little branch off to the right?

A. Yes, they would.

Q. Okay. Thank you. All right. So you -- you addressed this a little bit, but your -- who was your direct supervisor when you were CIO?

A. My direct supervisor was Paloma Adams-Allen, the deputy administrator for resource management -- or management of resources, DAMR.

Q. And is that a political appointee?

A. Yes.

Q. Was that person the deputy administrator for resource management throughout your time as CIO?

A. The majority, but she ended up leaving, and then Dennis Vega took over as acting, and then Dennis ended up leaving, and then Michele Sumilas took over and was there through the end of the prior

Page 28

administration.

Q. So there until January 19th, 2025?

A. Yes.

Q. Okay. And that role, I -- I said it was political, but to be a little more clear about that, that's a political appointment that's also confirmed by the senate; is that right?

A. I believe so, yes.

Q. So that's who your direct supervisor was. Who -- what roles did you supervise as CIO?

A. So I supervised the director for operations and the governance team that did governance, portfolio management, budget, and acquisition. I supervised the chief technologist. I supervised the chief data officer. I also supervised the cybersecurity information assurance branch, all within the office of the CIO.

Q. And could you describe for us at a high level, what your duties and responsibilities were as CIO?

A. Yes. So it was delivering IT services, operational services, specifically to the 80 plus countries that we operated out of, meaning email services, laptops, cell phone services, protecting and securing that information, and making sure that

Page 29

it was up and operational.

Also, on the security side, making sure that threats were, you know, detected and prevented and secured and mitigated. And then on the governance side, doing portfolio management, making sure I understood all of our IT investments and how much we spent on them, the cost, schedule, risk, performance.

And then on the acquisition side, managing IT acquisitions, meaning people who manage the IT acquisitions. And then as AI became clear, working through the chief data officer who also reported to me and the chief technologist to strategically plan for the future and make sure that IT services could be delivered to support the mission of humanitarian assistance, global health, and the work that was done at USAID.

Q. How big was your team that you supervised?

A. So I had a -- a staffing count of 105 civil servants. I don't believe I actually -- I waited over a year, sometimes two years to try and fill. So I don't think I ever got to 105. And that was primarily a direct hire as it's called at USAID, which are civil service. And I had one foreign service officer who was my deputy and -- or senior

Page 30

deputy is what he was called.

And then there are -- was around 250 foreign service nationals all around the world who delivered IT support and services at each of the missions. They didn't directly report through me and my team, but there was a, you know, we worked very, very closely together. They got their guidance and direction from me and my team as it relates to security, governance, and operations.

Q. Did you have any contractors that worked --

A. Yes.

Q. -- for your team?

A. So we had around 800 contractors that also supported services. I would say the majority of them were all in the US, and that was the 24/7 365 help desk because we needed to make sure that we could answer calls through all time zones.

Also, like, the security services, the governance services that I talked about, doing portfolio management, responding to, like, project management, those types of activities, even administrative services, like my executive assistant was a contractor, so yes.

Q. Your senior deputy, what -- who was that?

Page 31

A. Luis Hernandez.

Q. And was Luis there -- well, how long was Luis there?

A. I believe he came in July of '24, I believe. He wasn't there very long. It might have been 20 -- I think it was July. I want to say July of '24. It might have been July of '23, but I think it was July of '24. And then he was RIF'ed, you know, like everyone else.

Q. What is the CIO Council?

A. It says low battery.

Q. Well, that's a problem.

A. Yeah.

MS. STEVENS: Let's see. We're pausing for low battery issues.

How's that?

THE VIDEOGRAPHER: Would you like to go off the record, Counsel?

MS. STEVENS: Well, let's see. Maybe. No. I think we're good.

THE VIDEOGRAPHER: Okay.

MS. STEVENS: Okay. So maybe the outlet.

BY MS. STEVENS:

Q. Okay. I think my last question was, and I will re-ask it, is: What is the CIO Council?

Page 32

A. So the CIO Council is a government-wide council where cabinet level CIOs attend usually monthly to collaborate and work together and ideally deliver better IT services across the federal government.

Q. Can you explain just for those of us outside the government, what cabinet level CIO means?

A. So the -- I think that is different now. But at the time, there were 20-some cabinet level agencies, meaning they sat -- again, my understanding is that they sat and attended the president's management council with the senior leadership from the White House to represent the -- the cabinet of the president.

Q. And so the CIO -- I'm just rephrasing to make sure I'm understanding you correctly. The CIOs for those agencies made up the CIO Council?

A. Yes.

Q. Okay. Well --

A. There was also a representative from the smalls, as they called it, which are the smaller agencies which were not. But yes, there was -- so yes.

Q. One -- one representative from the smalls;

Page 33

is that correct?

A. Yes. That is correct.

Q. Okay. And what was your role on the council?

A. So I was a member, but I was also the co-chair and then the tri-chair of the workforce committee for multiple years. Four or five years, maybe -- so maybe six or seven years. It was -- I don't remember exactly when.

Q. And that spanned your time at USAID and the Department of Education.

A. Department of Education.

Q. Okay. What is the -- what was the -- did you say workforce?

A. The workforce committee.

Q. What did the committee do?

A. It was primarily focused on the workforce. So looking at reskilling and upskilling the workforce from a technology standpoint. We did women in IT events to recognize women and promote, you know, events for -- for female IT professionals across government. Looked at standardizing workforce-related activities, like developing standardized position descriptions for technologists so that we could share across all of government and

Page 34

-- so do once and use many.

Q.   So the focus was on -- is -- is this correct -- the tech -- information technology workforce, not the entire government's workforce; is that correct?

A.   That is correct.  But we did work with, like, the CHCO Council as well because we wanted to make sure we weren't operating in a vacuum.

Q.   And would you unpack CHCO?

A.   The Chief Human Capital Officer.

Q.   And they have a --

A.   Council.  They have a similar council, and we realized that it's great for us to have a workforce committee, but we should collaborate with the people who are running the workforce for the whole federal government.

Q.   Understood.  All right.  So back -- back to you specifically.  What -- what -- at the -- in January of 2025, what was your level of security clearance?

A.   Top Secret SCI, Special Compartmental Information.

Q.   Is that still your -- your clearance level?

A.   Yes.

Page 35

Q.   Okay.  When did you obtain that level?

A.   I obtained that level, I want to say it was October of 2016.

Q.   Where were you working at the time?

A.   The Department of Education.

Q.   What did you -- what process did you undergo to obtain that clearance?

A.   So I started the process when I worked for the Department of the Navy and went through and applied for a -- a clearance, which was going through and submitting an e-QIP, I think it is what it's called, and filling out a bunch of information for the last ten years of my life, going through that process.

Q.   Does e-QIP stand for the name of the form that you were filling out?

A.   Yes.

Q.   Okay.

A.   E-Q-I-P, I think it is what it is.

Q.   Okay.  And after you filled out the form, did you have to engage with anyone asking follow-up questions?  What happened next?

A.   Yeah.  So well, I'm not a professional on that process, but --

Q.   Right.

Page 36

A.   -- what -- what ended up happening is they go -- and there's investigators that go and validate the information that you submit.  And then you have to part of the process is providing names of people and addresses and phone numbers, and they go and talk to them.

And then they have a follow-up interview with you, and then they ask you a bunch of questions that are standardized.  And after that, they then go and talk to people who know you, witnesses, people you work with, friends, family, friends of friends, to learn about you, your background, yeah.

Q.   Okay.  After all the -- the conversations, did you have to do anything else with respect to the investigation before they determined your level of clearance?

A.   Yes.  So first, you get a top secret, and then once you get that, then I believe it goes to the CIA for a further investigation.  Again, I'm not a professional on this.  This is just my understanding.

And then however long that process takes, and whatever they do, I don't know.  And then it comes back to your security office and they tell you that you're cleared, and then you go in and are read

Page 37

in -- in a SCIF, a secured compartmental information F.  I'm not sure what it stands for, but you go in and they give you the rules.  You sign and swear, and then you have the clearance.

Q.   And the -- the process you just described of going into the SCIF and being read the rules, is that for top secret or top secret plus that other --

A.   It's for both.

Q.   -- designation?  Okay.  Did you have to undergo any sort of training related to the clearance?

A.   Yes.  There's online training that you have to do and in person training that you're given inside of a SCIF as you're giving your clearance.

Q.   Are the -- can you just describe the, like, at a high level, what the -- the topics of the training are?

A.   So I'm -- I don't know if it's classified material.  So I -- the -- the types of training are, like, insider threat.  It -- it varies based on the agency.  But in essence, it's being aware about the importance of having access to national security information, roles, responsibilities, types of things that you should look for, you know, people, you know, foreign influence, those types of things,

Page 38

gifts.

So it's -- it's, I would say, basic security training that is given, but just more in depth, specific to the types of threats that you may face in the role that you're in.

Q. So did you undergo two different readings on the rules that you just described at the Department of Education and then --

A. Yes.

Q. -- another one at US A-I-D?

A. Yes.

Q. Okay. Did you have to sign any documents acknowledging that you went through that rules read in?

A. Yes.

Q. Did the -- did the person who provided that rule read in to you also have to sign any documents?

A. I believe so. I'm not entirely sure, but I know we were given forms. It was, I want to say a class. It was a small group of people. It wasn't just me. You're given a standard form, I believe it was, and you sign it that you've attended the training, and they sign it saying that you have attended, but you don't -- I don't get a copy of

Page 39

that form that is kept. But I believe they signed it, yes.

Q. Understood. When you were at USAID, could you give us a rundown of the systems that you -- that were under your purview as CIO?

A. So I can't give you a full list because when it was only two and a half years and there's over 100 systems that were there. But for example, the Google Suite was a key one, which was our email services, our document, you know, management and collaboration, creation tool, spreadsheets.

So the Google Suite also it managed all of our meetings and calendars, our virtual meeting, BTC. There's something called Aidnet, which is the actual network, the government network, that was authorized. There was the financial management system called Phoenix.

There's another system called Glass, which is an acquisition system. There, like, GovTA, it was webTA, then became GovTA. So those types, another one called DIS. So there's a full range of different types of IT services and systems. ServiceNow was another.

We use Salesforce for our customer relationship management tool. We used E2 Travel to

Page 40

manage travel for the agency. So there's -- there's a lot of them, and I don't -- I don't know all of them. If you showed me a list, I could -- I could tell you, but yeah.

Q. I'm going to ask you about a few of them.

A. Okay.

Q. If you'll just give me the high level of what this thing does.

A. Okay.

Q. Sort of like you were just doing with Glass and Phoenix. You said, I think, DIS. What what was that system?

A. So that is a really good question. I had a lot of problems with that. Which again, when I first got there, I wasn't sure what it did. I started digging into it. We created a modernization plan to figure out what it did.

But in essence, it was where missions reported information about how the specific mission was actually performing as it related to each of their specific missions at their specific location. And that information then got fed to a thing called FaxInfo over at the State Department for, like, congressional reporting.

Q. Got it. Okay. So a reporting in system

Page 41

from the various missions across the world?

A. Yes.

Q. Okay. What about active directory?

A. So active directory is basically, it is a Windows product, Microsoft Windows product, that every network around the world that uses Windows or is really a network for the most part, uses active directory. It controls users.

So when someone is logging into an account, there's an active directory account that controls users, permissions, rights, responsibilities. So if I were an admin, which I haven't been in many, many, many years, probably decades, active directory would identify me as that individual.

Active directory also controls a lot more. Like, it manages whether or not you have a mail server or file share. So it's -- it is really, like, the -- the central nervous system of a computer network.

Q. Understood. So the -- well, let me go to a couple more and I'll come back to that. The AWS, which I also know is pretty broad, what -- can you describe that for us?

A. Yeah. So AWS, which is Amazon Web

Page 42

Services, is a cloud service provider.  They're used throughout government and they provide mostly storage and different types of services, but mostly storage is what I believe we used it for at USAID. Putting stuff in the cloud.

Q.   Yeah.  I watched a interview you did about moving to the cloud.  Was AWS the -- the cloud system that you used once when USAID moved to the cloud?

A.   So we used a couple.  We used AWS and we used Azure, which is Microsoft because we wanted to have diversity as it relates to any redundancy.  So if one cloud goes down, you're not down.  So we used primarily Microsoft Azure, and AWS.

Q.   For AWS, are there different -- were there different instances of the system such that if you're on the CIO side, maybe a developer, you're -- you're working in a system that is different from what the -- the end users are -- are utilizing?

A.   So --

Q.   I can ask my question --

A.   Yeah.  I'm not sure I understand the question.

Q.   Were there -- was there, like, a development or test instance of within AWS that your

Page 43

folks might utilize before the -- the end users had access to a specific change being made?

A.   So there was supposed to be.  And that was something I would find out through my time as a CIO that oftentimes they were not because that contractor workforce that really managed IT operations in terms of the actual delivery of services, I would find that they were actually doing development on live systems, which you should never do, and then correct that to have them establish a test environment.

Q.   Are -- is it -- am I correct in understanding that most of the development, like, engineers doing software engineering were contractors?

A.   Primarily, yes.

Q.   Okay.  What is -- I think this relates to AWS, but if not, please tell me -- Cloud and then it sounds like the word PAW, P-A-W, all caps?

A.   I don't know.

Q.   Okay.  That's fine.  Turning your attention to -- I'm going to mispronounce this, so I'm going to spell it, A-K-A-M-A-I.

A.   Okay.

Q.   Akama -- Akamai.

Page 44

A.   Akamai?

Q.   Mm-hmm.  What is that system?

A.   So I -- I don't know what that -- I -- I know it is a -- I believe it's like a cloud brokerage service.  I -- so I'm not I'm not entirely sure.  So I -- I'm not really sure.  That I would have to look it up to -- to be honest.  I -- I'm not really sure. It's -- it is a it provides, like, network services of some type.  I know at every agency I've been at, we've used Akamai.  I'm just not entirely sure what it does because I didn't dig into that aspect of it.

Q.   On the Google Suite, you talked a little bit about the calendar system, the doc sharing, the emails. What does it mean to have super admin access on the Google Suite?

A.   So there's -- I -- I don't do and have not done systems administration in decades, so -- but what I believe it means is it gives people the ability to add other users, to remove users, to delete users, to promote other users to admin, typically.

There -- for super admin, I believe the differentiator, again, I believe, is that it would allow you to basically destroy the -- the email

Page 45

system or delete the email system itself, which is a non-recoverable error.

Q.   Did the folks that were -- you -- you said you -- you have not been a systems administrator in decades.  Were the folks that were systems administrators on the CIO team?

A.   Yes.  There -- there were, I believe, one or maybe two federal employees, and the rest were government employ -- or contractor employees working for government.

Q.   And who were the two that -- that worked for -- that were employees?

A.   I believe it was Brian Herson.  I know for -- I know he is one of them.  The other might have been Danny You.  I'm not -- I'm not entirely sure. I -- I know that Brian Herson for sure was one.

Q.   And who did they report to?

A.   They reported to Zack Kahn, who was the director for operations, IT operations.

Q.   And who did Zack report to?

A.   Me.

Q.   Okay.  Okay.  I'm going to go through a few more systems to again, on a high level, what they -- what they do.  Simicon Now (phonetic)?

A.   No idea.

Page 46

Q. Okay. Do you know what system the HR professionals in the office used?

A. I believe it was -- that system did not fall under the CIO. It was developed by HR and a contract they had, but I believe they primarily used ServiceNow.

Q. Okay. When -- if -- if that happens within the agency where a department outside of the CIO is contracting for information technology, would the CIO still be involved in some way with either the establishment of that technology or the maintenance of it?

A. So the authorization of it, absolutely, as the authorizing official. Again, that happened before I got to USAID. Otherwise, I would have never had that happen. They would have come through the CIO organization.

But for the authorization, yes. The authorizing official, which is the CIO of every -- almost every federal agency, I would say, is -- has to authorize the system to operate on the network.

Q. Got it. Understood. All right. And then just two more. Do you know what's SIDs, S-I-D?

A. I have heard it. I -- I don't really know.

Page 47

Q. That's fine. And then JWICS?

A. Yes. JWICS is a classified email system at the top secret level, which we did not administrate. I did not -- I had a JWICS account. I think I used it maybe two or three times. But yeah, we did not administrate that. That was administrated through SEC.

Q. Okay. Moving on from the systems themselves, what does it mean to have, "full administrative access," to an IT system?

A. So it would mean that they would have a full -- to be an administrator, you would have the ability to go through and modify and delete and edit.

But one of the things that all agencies had to do is have logs that were not actually tied to, from a network standpoint, they were tied to the system. Splunk is what it was and it was it is, to log actions that if people did something.

So if someone had full admin access, they would have the ability to add users, delete users, change users, demote them, and roles and permissions.

But Splunk would log those changes when that happened, which oftentimes when something

Page 48

inadvertently was broken, we would check the logs and find out that, oh, so and so inadvertently made this change, and then we would undo that change and fix what was broken.

Q. Does Splunk stand for something?

A. No. It is a product.

Q. I'm sorry?

A. It is a product.

Q. It is a product.

A. It's the name.

Q. Was that a system that you -- that was under your purview?

A. Splunk, yes.

Q. Is the -- was the sole function to track this admin changes --

A. No.

Q. -- or what else did it do?

A. So every agency was required to log everything, not just admin rights. So you -- system logs of other systems would be fed into Splunk. Splunk's entire purpose was to monitor logging.

To give you an example, for cybersecurity, I believe, on average, we would have, I want to say about 1 billion events that would happen per month. And again, those are -- this address sends this

Page 49

packet to this place, and all of those were logged every month into Splunk.

So it was at the granular technology level that that system monitored. So it wasn't -- it wasn't just for admin access. It was -- I -- I know I primarily was briefed on it for security incidents every two weeks.

Q. Thank you. When a -- a new person would come work at USAID, what protocols were in place to ensure proper authorization for access to IT systems?

A. So for -- there's a couple of processes. One I can speak to, from the first thing that would have to happen is they would have to go through HR, or HCTM, as it was called at USAID, Human Capital Talent Management. And they would put them through a vetting process that security would do.

Once security vetted them and said that they had a clear background, whether it was just a background investigation, depended on role, responsibility, which was different, meaning if someone was being vetted for a secret clearance or top secret clearance, then it would be a longer process.

Once security said they're a vetted

Page 50

employee, then we would go and create them a -- a domain account so that they could be provisioned email and access to Aidnet.

Q.   Would -- once they get to your part of that process you just described, would they -- would they be filling out any forms with the CIO's office?

A.   Yes.  So everyone would have to do training, and then there's a roles and responsibilities form that they have to fill out.  There was, like, a user acceptance form that they had to fill out.  So there are two primary forms.  It was, like, roles and responsibilities, and I think it's a user acceptance form that they have to fill out after they've done their training, which they typically do on the first day of employment when they're onboarding.

Q.   Who -- the process that you just described for new folks coming into USAID, does that apply to employees, contractors, folks transferring over from other agencies?

A.   Yes.  But for people transferring, for example, from the State Department, we had worked on collaborating where we shared, like, training, so that if they had been through state training, they didn't have to go through our training.  They would

Page 51

still have to sign roles and responsibilities form that my team would typically manage.

Q.   And you described when -- when they get to your team and getting access to the computer systems, did they have any physical paraphernalia designating their access to specific systems?  Like --

MR. WEN:  Objection.  Vague.  You can answer.

MS. STEVENS:  I'm not done with the question.

BY MS. STEVENS:

Q.   I'm talking like a card or anything physical that would be utilized to get access to the systems?

A.   Yes.

Q.   Can you describe that?

A.   Yes.  They either had a PIV card, or in DOD, it's called a CAC card, but it's the same thing.  We also provided UB keys because some of the foreign nationals that we had did not have PIV cards.  So we would provision them UB keys to access our environment using them.

Q.   Can -- for the record, can you describe very briefly what a PIV card is?

Page 52

A.   A PIV card is -- it's basically a flat like ID card with a chip in it that you would stick into a computer with a PIV reader to -- it's a biometric phishing resistant, multifactor authentication device that allows people that you put your email certificates on there, you put your email address on there, and it is linked with your active directory account so that when you put that card in, it is validated that you are you as a person.

Meaning, before you get the PIV card, you have your fingerprints taken, you have your picture on the card.  So it -- it is a card that basically identifies physically identifies that you are who you say you are as part of the multifactor authentication that you would put into a slot on your computer and then be prompted for a pin to log into your computer and have access to the environment.

Q.   And -- and to get access to the environment at USAID, you needed to go through that process, including with the PIV card; is that correct?

A.   Yes.  With rare exceptions.  So for example, if someone forgot their PIV card, we would

Page 53

typically give them a day or two waive them from the PIV requirement where they would log in with a username and password.  But that was all logged and we had to report on it every quarter, I believe.

So it was not -- usually it was go home and get your PIV card if you forgot it unless it was lost and someone needed access temporarily.

Q.   Okay.  And who would provide that specific authorization if -- if someone forgot their PIV card and needed to do this sort of workaround temporarily?

A.   I would say either information assurance or -- meaning the security team or operations, a director at that level could make the call.

Q.   And operations means with --

A.   IT operations.

Q.   Thank you.  Okay.  Turning your attention to January of 2025.  Prior to January 20th, 2025, what was your understanding of the US Digital Service, which is sometimes called USDS?

A.   My understanding was that they were a team of individuals who worked out of 18F over at GSA that primarily was brought in to help -- help government.

And I -- I say that because most of the

Page 54

time they were the people that I interacted with were visionaries and they didn't understand government processes that -- so they would come in and say, we -- we want to do all these great things. And as a CIO, it would be like, that's wonderful, but here are all the rules that you have to do now, figure out how to do that. And they would.

But they were a team of individuals who worked across government to help agencies with their IT modernization journey and the challenges that they faced with the technical expertise that were brought in to work for USDS.

Q. Did -- did you interact with any of them during your time as CIO at -- at USAID?

A. I can't recall. I -- I don't -- I don't recall actually ever actually engaging with them to solve challenges. No. I know at education I did, but yeah.

Q. I think I know the answer to this question, but it's still worth asking. Any -- any person from USDS prior to January 20th of 2025 ever detailed to USAID, to your knowledge?

A. Not to the CIO shop.

Q. Do you know what shop they --

A. So again, I don't know. And I didn't say

Page 55

that, but I just -- I saying -- speaking from the CIO shop, I know that USDS was never deployed or detailed or brought to the CIO shop or MCIO as it was called.

I do know there were other pieces within USAID that prior to my arrival had focused on IT, like Bureau for Humanitarian Assistance had focused -- they had an IT shop. I don't remember what it was called, but it was rolled up under the CIO before I got there. They might have interacted with USDS, but I wouldn't know.

MS. STEVENS: Understood. That makes sense. All right. So we are now at our second exhibit, which I think is the correct one. We'll mark it as Plaintiff's 2.

(WHEREUPON, Exhibit 2 was marked for identification.)

BY MS. STEVENS:

Q. I'm handing you what we've marked as Exhibit 2. This is a blank calendar for early 2025. It's January, February, and March. It is helpful for me to be able to look at a calendar when I'm talking about dates. And so that's -- that is the use of this exhibit in case it is helpful for your recollection.

Page 56

Q. Okay. So turning your attention to January 2025, before inauguration day, which was January 20th, did anyone from the incoming Trump administration contact you?

A. Yes.

Q. Okay. Who contacted you?

A. I don't know. I know that Clinton White, who was the counselor at USAID, had reached out and said that someone from the transition team wanted to speak to me. I don't remember their name, but I do know they were on the transition team, and I know it's in my email, meaning whoever was leading the transition team for Aid and State because it was one individual initially doing both. If I heard the probably know it, but I -- I do not know.

I was told someone from the transition team wanted to talk to me, and they called me, I want to say, maybe two weeks before inauguration, which was not uncommon because we had to provide lots of information. Every bureau and independent office had to provide, here's what our organization does, and here's how this process works.

So being told I was going to get a call from someone from the transition team was a normal thing. When they talked to me, he basically asked me

Page 57

if I would be willing to serve in a -- in a management or leadership role if the administration needed. And I said yes.

Specifically, that as a, you know, IT, you know, public servant throughout my entire career, 21 years, 20 years at the time, that I would serve where I was needed. And that was how that conversation went.

Q. You said it would -- the name would be in your email. Is that because they emailed in advance or how --

A. No. The name would be in the email because I was on a distribution list that identified individuals from the transition team. So we knew Hope Williams was the woman who actually led our transition orchestration on the federal employee side, career civil servant.

And the -- and again, I don't know his name, but he is the one that Clinton said, so and so wants to talk to you. Again, I don't remember his name, but he is the one who called me.

Q. Is the name Cartwright Weiland?

A. That is who it is.

Q. Okay. And in this conversation with Cartwright a couple of weeks before the

Page 58

inauguration, was acting administrator mentioned at all?

A.   No.  And as a matter of fact, at the end of that conversation, he said, I just want to be really clear that this is not to imply or infer anything about any possible future position.  I just wanted to check with you to see if you were willing to serve if needed.

Q.   After that conversation, did you have any follow-up conversations about that topic of leadership?

A.   Yes.  I want to say maybe a day or two later, I got another call from them.  And -- and it might have -- I don't recall.  It might have been the same day.  It was very close.  At the end of the first call, they said, you know, I may call you back.

They called me back and I was on speaker. I do not know who else was in the room, but the questions were how do you deal under pressure?  Have you had to speak to the press before?  And I, at the time, talked about my congressional testimony that I had done and said, this is how I deal with this.

They asked me what my focus would be if I were in a leadership position, and I said it was two

Page 59

things. It was one, going to be on the transition itself, and two was going to be on creating stability within the workforce because transitions can be bumpy.

And that, again, at the end of that conversation, he said, I'm not saying anything is going to happen.  I'm not promising anything.  This could be going nowhere, but thank you.  And that I think that conversation lasted maybe three minutes.

Q.   Did you all have any follow up conversations after that second call?

A.   No.

Q.   At the time, you were CIO and there were two deputy administrators sort of above you in the pyramid, is that -- pyramid -- organization chart?

A.   Yes.

Q.   Okay.  And then from there would have been the administrator; is that correct?

A.   Yes.  So there's -- there's three individuals. There's two deputy administrators, the DAPP, deputy administrator for policy and planning, I believe it is what it might be, policy and programs, PP.  And then Isobel Coleman was in that role up until the very end.

And then the deputy administrator for

Page 60

Management Resources, which at the time was Michele Sumilas, and then the senior foreign service officer, which is Clinton White, who was considered a part of that same level of leadership.

Q.   Understood.  All right.  So let's turn to -- actually, did you have any conversations besides those two you talked about with Mr. Wainwright --

A.   Cartwright.

Q.   Cartwright.  Sorry.  Cartwright Weiland. Did you have any conversations with any other folks from the incoming Trump administration before January 20th of 25?

A.   No.

Q.   So I think we all know you were appointed acting administrator at some point on the 20th.  Can you -- can you tell us how that came to be?

A.   Yes.  So as the CIO, every administration change, I have gone in during inauguration, primarily to focus and make sure that IT services are delivered, meaning that they get their laptops, they get their PIV cards, that they have access, and that they know how to, you know, use equipment, they get cell phones. That is standard.  I would say, almost all CIOs do that, every transition.

I did that on the 20th, came in with a

Page 61

small group of my team to help support the new political team coming in.  I met with them all, when -- was there when they were sworn in.  Introduced myself, asked them if they needed IT to let them know who to reach, gave them my contact information, made sure they had their cell phones or laptops, that there was no issues, they could get to the VPN, that type of thing.

Towards the end of the day, I want to say maybe it was around 2:15, 2 or 3 or so, somewhere around then, when I thought we were coming close to the end of the day, I talked to one of my employees and I said, when the last political leaves, let me know.  And once they leave, we will all leave.

And then he told me that, hey, the -- the chief of staff, the acting chief of staff, the political, Matt Hopson, wanted to talk to me or needed to talk to me.  I was in my office on the ninth floor of the Annex, the USAID Annex.  And I said, what did you want to talk about, because I wanted to come prepared.  He said, he thinks it's about telework metrics.  And I said, okay, but all of the team are on leave, so I'm not going to have anything, but I'll be right down.

I went down as I was going through the

Page 62

turnstile, Jack Ohlweiler and Clinton White said, hey, we need to talk to you real quick. And I was like, I can talk to you after I talked to the chief of staff. And then they're like, no, we need to talk to you right now. And then they pulled me aside and said, your name is on the White House web page. You're the acting administrator, so that's what he's probably going to talk to you about.

And I was in shock, of course. I had no idea. The -- the idea of being acting administrator had never actually been talked to me specifically. It was just a leadership role. That was not what I was thinking. And then I went and talked to Matt Hopson. He explained what happened, and that's how I found out.

Q. I'm going to unpack some of that a little bit. You talked about you were at the USAID Annex --

A. Yes.

Q. -- at the time that you got the phone call to come in to talk to Matt. The -- is it correct that the CIO was housed at the Annex versus the USAID Reagan building?

A. Yes.

Q. Okay. And when you talked to Mr. Hopson, what did he say about your appointment?

Page 63

A. He asked me if I had heard, which I had literally just heard. I said, yes, I heard this. And he says, we're going to work together, and I'm going to support you. And that was basically the -- that conversation.

Q. Did you have -- was your appointment in writing?

A. Not -- I -- I never saw it, meaning I never saw -- I saw the follow one, meaning when the president appointed Secretary Rubio. I saw that because I asked for a copy of that, and I know I was emailed a copy of that. But I never actually saw the one for me. I saw it on the White House web page, but I never actually saw in writing that this is you.

Q. And you talked about Mr. Ohlweiler and Mr. White.

A. Yes.

Q. Those are both folks from the -- are they both attorneys for USAID?

A. No. Jack Ohlweiler, John Ohlweiler, but he goes by Jack, was a senior attorney for USAID. And I had worked very closely with him throughout my time there through numerous technology issues and personnel issues. And then Clinton White was the

Page 64

counselor, which is a senior foreign service officer, the most senior foreign service officer.

Q. Understood. Okay. The -- what time of day was that? You said around 3 o'clock?

A. I would say around 3 o'clock.

Q. After you found out that you were appointed, what did you do from there?

A. Yeah. I'm -- I'm not really sure. I think I -- it was a blur. I mean, that whole event, I don't -- I don't really recall.

Q. Did you eventually notify folks in the agency that you were acting?

A. So I -- I'm not sure. I -- I want to say I believe Laken drafted a message to send out to let everyone know that I was going to be the acting administrator. And I don't -- I don't know if it came out -- it probably came out that day. I -- I don't have that email, but it probably came out that day. I would be shocked if it didn't come out that day. But if -- if it did, it -- it wasn't drafted by me, but it was definitely approved by me to be sent.

Q. And for the record, can you say who Laken is?

A. Laken Rapier, R-A-P-I-E-R, I believe is

Page 65

how you spell her last name, was brought in, my understanding, to basically lead the public affairs organization within USAID.

Q. After you were appointed as acting, I assume, but please correct me if I'm wrong, the CIO position, it's now empty. What happened with respect to that?

A. So at that point, I talked to Steven Hernandez, who had come over and had been my CISO over -- chief information security officer at education for around five years that I was there. He had come over to be one of my deputies to serve as a chief information security officer at USAID.

And I had asked him if he would serve in my stead in that role, and he, of course, said yes. So I let people know that for CIO responsibilities because that I couldn't do both, that Steven Hernandez was going to be the acting CIO.

Q. And was that effective also on the 20th?

A. I'm not sure if it was that day. Again, it was a bit blurry. I was -- it was overwhelming or the following week because there wasn't a lot, meaning, there wasn't a lot that I would be doing aside from the next day. So it -- it was -- I don't know if it was that Monday or Tuesday, but --

Page 66

Q. And who reported -- once you became acting, you know, you talked about some politicals in the -- the deputy positions who I assume were no longer in those positions as of the 20th; is that correct?

A. What do you mean by deputy?

Q. Deputies to the administrator.

A. So no. The deputies to the administrator, they were not there. The politicals were there, meaning Ken Jackson was there. And my understanding was that he was scheduled to be in the DAMR position, which in essence would have eventually become my boss.

I reported directly to the administrator, but for all, like, performance appraisals and reporting, I met regularly with the administrator, but they -- that individual is the person who actually did my evaluation, so -- but Ken Jackson was -- was a part of that team. And I do not believe there was a DAPP.

Q. Who were the others politicals there with Mr. Jackson that morning?

A. So it was Matt Hopson, Joel Borkert, who was the deputy chief of staff, and Matt was the chief of staff. There was Laken Rapier. There was

Page 67

Tim Meisburger, I don't know how to spell his last name, but he was going to be leading Bureau for Humanitarian Assistance.

There was a Frank Lloyd (phonetic) who was, I believe, going to be leading, I believe, Global Health or OTI and Global Health. There -- I'm trying to think who else was there. There was another -- there was another woman. I don't remember their names, but there were -- I think there were -- there was another woman there as well who was going to help with Press. I don't remember her name.

Q. That's helpful. Thank you.

A. Megan. Megan was her name.

Q. Okay. The process that you described very briefly about getting them their laptops and their phones, you -- you separately talked about the process that you go through to get a PIV card and all of that. How -- how did those two processes relate to each other for CIO purposes?

A. So downstairs in the Annex, which is where we provisioned PIV cards and access to the network, there were two offices side-by-side where security managed one of them, which is doing the vetting and making sure that they were cleared and issuing the

Page 68

pin -- issuing the PIV card. I think it was someone from HCTM and security.

And then after that happened, the PIV card would then be given to my team, who would then add the credentials to the PIV card based on what was there. So they -- they worked really hand in hand. Like, I want to say they're actually in the same office, but, like, one big cube. On one side it was one, on the other it was the other.

Q. The -- the -- is there a standard access level on the PIV card depending on what clearance level you have, depending on what office you're in? Like, what -- what dictates the, once it comes over to the CIO side, the level of access?

A. So usually, I would say almost always, you are given just general network access with an email account and access. You don't -- when they -- when you need additional access, and I think -- and I -- I could be wrong, but I think that's where that gets to that PAW thing that you mentioned, where that is actually requesting additional access for certain systems, which again, was routed through the information assurance branch.

They didn't, of course, come to me to actually vet that, but that would go through --

Page 69

yeah, I think it was called a PAW -- to actually give them additional access.

Q. So there's a base level of access, if I'm coming to USAID to get a laptop and a phone, I need a base level of access to access -- access email, for example.

A. Yes.

Q. And then it can kind of step up from there depending on -- on access levels and --

A. So I'll say kind of. And the reason I say that is because the -- the only access levels that we really had was, to my knowledge, was basic access. There -- and then there's admin access. There weren't -- there weren't other layers of access in there. It was -- it was admin access. I think there was a super admin access, and -- which is what I explained earlier about where you could actually break your entire system that's non-recoverable.

And just to show how sensitive and controlled that was, which, to my knowledge, we never gave that access to anyone ever. And even when it was given, and I'm talking specifically to anyone who wasn't a contractor, and when the contractors who worked for me did have that access,

Page 70

it was, like, given for 15 minutes to do something and then taken away because they didn't want something inadvertently to break and destroy everything.

But those are the only three access levels. The other access that I'm talking about would be access to specific systems. But that was on a case-by-case basis depending on role and responsibility.

So for example, if you worked for Global Health and you needed access to a global health system, then they would route an approval process to get, hey, so and so needs access to this system, or, like, a HR system, hey, so and so is a timekeeper, then they would route the approval process to get access to being able to supervise people within the time and attendance system.

Q. Understood. Different levels of access within specific systems versus basic level admin and super admin?

A. Yes.

Q. Okay. Understood.

MR. WEN: Hey, Beth?

MS. STEVENS: Yes.

MR. WEN: Can we take a quick break?

Page 71

MS. STEVENS: Yeah. I was actually about to ask if you needed one, so that's a good timing. Yeah. Let's go -- can we go off the record for ten minutes?

THE VIDEOGRAPHER: Absolutely. Please stand by. The time is 12:27 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 12:36 p.m. You may now proceed.

MS. STEVENS: Okay. Great. Thank you.

BY MS. STEVENS:

Q. Mr. Gray, when did you first hear about the Department of Government Efficiency, which I'll probably call DOGE from here on?

A. When did I first hear about them?

Q. Yes.

A. Like in the news, I heard about them. Probably right -- right after around inauguration is when I first heard about them.

Q. And pre January 20th, 2025, did anyone identifying themselves with DOGE contact you?

A. No.

Q. Starting on the January 20th, 2025, did anyone who said that they were affiliated with DOGE

Page 72

reach out to you?

A. No.

Q. Okay. What was the first -- what's the first time that you remember interacting with anyone who you understood was affiliated with DOGE?

A. It would be on the 27th of January.

MS. STEVENS: Okay. Before we -- we will get to the 27th shortly, but before that, two -- two exhibits. I'm handing you Plaintiff's Exhibit 3 and Plaintiff's Exhibit 4.

(WHEREUPON, Exhibit 3, Exhibit 4 were marked for identification.)

BY MS. STEVENS:

Q. Let's -- let's go through 3 or just look at 3 first. If you just glance through all the pages and then I'll ask you a question about it.

A. Okay.

Q. The first exhibit, Exhibit 3, is the -- an executive order from January 20th entitled, Establishing and Implementing the President's "Department of Government Efficiency." Did I read that correctly?

A. Yes. I believe you said January 20th. It was January 29th or is it the 20th?

Q. If you'll turn to the second page, it has

Page 73

the signing date to -- near the top, says January 20th.

A. Thank you.

Q. Did you see the -- this executive order on the 20th of January '25?

A. I did not. I -- I don't recall.

Q. You said that you had heard about DOGE from news sources --

A. Yes.

Q. -- before you actually met anyone that you understood was affiliated with DOGE. What did you understand to be the purpose of DOGE?

A. So I -- it seemed like DOGE was going to be the next USDS, that they were coming in and bringing people to evaluate technology and look for ways to modernize government.

Q. All right. Turning your attention to Exhibit 4. Did you have a second to look at this one already?

A. I have not yet.

MS. STEVENS: Okay. Before we turn to Exhibit 4, just for the record, now, counsel for the government has a copy of Exhibit 1, the org chart.

BY MS. STEVENS:

Q. Okay. Turning back to Exhibit 4, this is

JASON GRAY                          February 03, 2026                          74 to 77
93681

Page 74

another executive order, this one entitled Reevaluating and Realigning United States Foreign Aid, also signed on January 20th. Did I read that correctly?

A.   Yes.

Q.   Okay.  And are you familiar with this executive order?

A.   I am familiar with it, yes.

Q.   Okay.  When's the first time that you read this EO?

A.   If I had to guess, it's probably the evening of inauguration.  I did not read it prior.

Q.   What was your understanding of the -- of how the EO related to your work at USAID?

A.   In the acting role as administrator?

Q.   Yes.

A.   It would be that the -- an evaluation would be done through the State Department of the foreign aid programs within USAID for over a 90-day period.

Q.   And did you issue any guidance related to -- to this executive order?

A.   No.  Not -- not during -- not that I recall.

Q.   On the -- the 20th, inauguration day,

Page 75

after you found out that you were acting administrator, I think you said everything was sort of a blur from that. Is there anything else specific that -- that jumps out in your mind before we move into the 21st?

A.   Not really, no.

MS. STEVENS:  All right.  Turning your attention to January 21st.  I'm going to hand you Exhibit 5.

(WHEREUPON, Exhibit 5 was marked for identification.)

BY MS. STEVENS:

Q.   And the first page of Exhibit 5 at the bottom right has Bates 000576.  If you would just look at that and identify it for the record.

Okay.  This is a memorandum and then a delegation attached to that memo where wherein you, Jason Gray, acting administrator, delegate some duties to Kenneth Jackson; is that correct?

A.   Yes.

Q.   And it's dated January 21st, '25, correct?

A.   Yes.

Q.   This is -- correct me if I'm wrong, but this is a memorandum from Matt Hopson, the chief of staff at the time, to you as the acting

Page 76

administrator; is that correct?

A.   Yes.

Q.   And does the chief of staff report directly to the acting administrator?

A.   Yes.

Q.   Can you just describe very briefly what this memorandum and the accompanying delegation sought to do?

A.   It was to -- to put a political appointee in one of the deputy positions to the administrator.

Q.   And that political appointee was Mr. Jackson; is that correct?

A.   Yes.

Q.   The other deputy role with that -- I think you said this before, but just to clarify, that remained there was no -- no one with those duties for the duration of your tenure as acting administrator; is that correct?

A.   That is correct.

Q.   You see there's a background section on this memo on the first page.  And at the end of the background section, it says, "This course of action has been coordinated with and approved by the White House." Do you see that?

A.   I do.

Page 77

Q.   Who at the White House approved the action?

A.   I do not know.  I would depend on the chief of staff to validate that.  So I don't know who at the White House.  I did not engage with the White House.

Q.   For this memo and delegation to Mr. Jackson, can you just describe a little bit about how it came about?  Like, how did you get this memorandum and how did you come about signing it?

A.   So because we were just starting a new administration and I was put into this role, it was, okay, we need to have a delegation so that people can actually start managing and supervising and conducting their work.

And what happened is this would have come into the office I was sitting in and sat on my desk, and we would walk through, hey, this is a delegation memo to make sure that Ken has the ability to perform his duties in this acting or this designated or delegated role.  And I read through this, signed it to approve it so that he could start performing in that role.

Q.   And when you say you were physically sitting in the office, is that the CIO office, or

Page 78

are you in a new office at headquarters?

A. Yeah. I was in a new office at the Ronald Reagan building in the administrator's office as of Tuesday morning.

Yeah, I don't -- I don't have one.

Q. This one's yours.

A. Okay.

Q. Okay. In talking through Mr. Jackson's -- the -- the duties that you were delegating to him here, and then looking at Exhibit 1, he would -- he was getting the duties, although he wasn't the acting for deputy administrator for Management and Resources, which is just under the administrator; is that correct?

A. Yes.

Q. Okay. And that position is sort of over all of the -- the subsequent positions down at the bottom right of the organizational chart; is that correct?

A. Yes.

Q. So does that mean that all these different departments would report up to, in this case, Mr. Jackson?

A. All of these bureaus, as they're called, would report through to Mr. Jackson.

Page 79

Q. And then on the left side, there are another handful of bureaus that, according to the org chart, report up to the deputy administrator for policy and programming, which we've talked through, did not have anyone with those duties or responsibilities for the duration of your tenure as acting administrator, correct?

A. Yes.

Q. So who -- who performs the function of the deputy administrator for policy and programming. Does that just default to the administrator?

A. My understanding was, yes, which is what the primary focus of the first two weeks and the time in the acting role was getting briefed by each of these bureau heads so that I actually knew what was going on, what was critical, what the issues were.

Q. And when you say these bureau heads, that's for the left side of the organization?

A. It is for the left side of the organization, yes.

Q. Thank you.

A. Yeah. I want to say we had meetings. I'm not sure if it was everyone, but almost all of them came -- came to the administrator's office through

Page 80

the conference room, which the name escapes me right now, but to brief me on their programs.

Q. And then you talked about Mr. Hernandez was your acting CIO once you moved up to acting administrator.

A. Yes.

Q. Can we just actually -- let's -- let's mark on this. Could you pencil into the side where CIO would be on that org chart?

A. I don't know if that -- will that -- okay.

Q. The court reporter will get a copy.

MS. STEVENS: For the record, Mr. Gray has drawn underneath Executive Secretariat a rectangle that says CIO with a dotted line over to Bureau for Management.

BY MS. STEVENS:

Q. And then is it correct that the CIO reports directly to the deputy administrator for Management and Resources?

A. So by position description, the CIO reports directly to the administrator.

Q. Administrator. Okay.

A. But for all practicality, the -- the position reports through the deputy administrator.

Q. Okay.

Page 81

A. And that is, I will say, rather standard, even in education. When I was there as a CIO, I technically reported directly to the secretary, but worked through the deputy secretary through every administration that I was there.

Q. Understood. Okay. Thank you for that. All right. Tell me about what you remember. So from the 21st through the -- that first week, tell me the sort of major things that stand out in your mind about that time.

A. So the -- the primary focus was focusing as much as I could on learning as much as I could because while I had two and a half years at USAID, my primary focus was working on IT and technology.

So it was really scheduling as many meetings as possible during the first couple of weeks to engage and learn as much about the daily operations of what was going on.

I would say every day through -- was at least an hour, maybe two, in the SCIF reading materials in there about things that were going on around the world. And really engaging with leaders across the agency to -- to do two things.

One was to learn about what are the things I don't know that I need to know, but also, you

JASON GRAY                          February 03, 2026                     82 to 85
93681

Page 82

know, building relationships with them to have them ideally, help me navigate some of the challenges that I was expecting to run into through the time there.

Q. Can you be -- describe a little bit what you mean about those challenges you're expecting to run into?

A. Yes. So for example, one of the -- one of the last things -- I don't remember exactly when it is. I know it's available online, but, like, meeting with the president of Yemen is something that happened and that took a lot of time to prepare. I needed to read about all the things that were going on there that I had no visibility or insight into at all. And then really, what were the key messages that I needed to bring to that meeting.

So it was those types of challenges of, hey, you know, how -- how do I respond to this or a couple, and I know we'll get there, was the order of departure from DRC. Those are things I had supported from an IT standpoint, but never as acting administrator, and I needed to understand what are the logistics or the Ebola outbreak that was going on -- was in I think Uganda.

And I was -- so it was those types of

Page 83

unexpected things that over the two and a half years prior being the CIO, I supported tangentially and directly, in some cases, from a staff or IT services or account access. So it was really to learn as much from them and, you know, develop clear communications with them to -- to be able to be successful in that role.

Q. Throughout that -- that first week, you know, as you're preparing to be able to speak on these important issues that you were working on as acting administrator, did there come a point in time where folks connected, like, whose work was connected to DEI were put on administrative leave?

A. Yes. I'm trying to think when that was. I -- I don't exactly remember if it was the first week or the second week that that happened. I know it was one of them, but I don't -- I don't recall what week it was, but I -- I do know that that conversation came up.

Q. We'll come back to that.

A. Okay.

Q. Later, towards the end of that first week of the administration, did there come a time when you understood that Pete Marocco had identified some issues he was having with funds that were going out

Page 84

of USAID?

A. So that would be Monday morning on the 27th is when I recall that I was made aware. Early in the morning, Matt Hopson had shared with me that, hey, we have been made aware -- at the time, I did not know that Pete Marocco had anything to do with this, but that we had been made aware that there was something, at least I don't recall.

But that -- that there was something going on and some transactions that happened that shouldn't have happened, and that they were planning on bringing someone in from DOGE to evaluate, is what I was told.

That they were going to be coming in Monday morning at 9 o'clock and they were going to be assessing what happened because stuff had happened over the weekend.

Q. Okay. So the -- so before that conversation with Matt Hopson, no information provided to you over the course of Thursday, Friday, Saturday, or Sunday related to money going out of USAID that -- that anyone had a problem with?

A. Yeah. I -- I'm not entirely sure. I don't -- meaning, I -- I feel like I'm not sure if it happened on Saturday or Sunday because to be

Page 85

honest, we were working every day. We were working Saturday and Sunday for the first couple of months. Like, every day was a workday.

So I -- the days kind of blur together. I don't know if it happened before then. I just know that Monday morning is when I knew that DOGE was coming in to address some allegations of transactions happening over the weekend. So that's why my presumption is it's Monday because how could they have known if it wasn't -- if it was over the weekend, if the weekend hadn't happened.

Q. That conversation with Mr. Hopson, you know, I think you said it was early Monday. Do you -- what time frame?

A. I don't know. It would probably be around 7:30-ish or so if I had to guess. And I was told that DOGE was -- that people were coming in from DOGE to evaluate what had happened.

Q. So I preface this because it's going to become a theme. Like many of the exhibits we're going to go over and the conversation we're going to have, there -- there's sort of two different strands I'm teasing apart, even though these things happened on the same day.

One is about USAID personnel being put on

Page 86

administrative leave and -- and, you know, everything that was involved there. And then the other is about access to -- to various systems provided to folks who are affiliated with DOGE.

So I'm just saying that because it's going to get kind of complicated on one and then we're going to come back and do it on -- on the other strand.

A.   Okay.

Q.   All right. So on the 27th, after you talked to Mr. Hopson, did he -- or during that conversation with him, did he identify who from DOGE would be coming over to USAID?

A.   No, he did not. He said that a team was coming over in the morning to evaluate what was going on. And later on in that morning, maybe an hour at most, he shared that it was looking like they were going to be requesting to put a handful of people, maybe 16, I think is what he said, of people on admin leave, but that -- that would depend on what people found.

And at the time, I had said, okay, I have used admin leave before in my career when I was at the VA. I know how and when it can be used. I was like, okay, if we need to evaluate or investigate

Page 87

what's going on, let me know what's going on. And then I carried out the rest of the day with meetings.

Q.   That conversation with Mr. Hopson, was it in person?

A.   Yes.

Q.   Did he follow up or did you follow up with anything in writing, like via email?

A.   Not at that time. I think later on in the day, maybe in the afternoon, he shared with me that the number was going to be bigger than 16.

Again, I don't remember exactly when, but sometime later in the day, maybe around noonish or so, is when he shared that it was looking like it was going to be a bigger number. And I was like, okay. And then I continued meetings and later on would find out that it was the 57 people, which would be, I believe, 58.

Q.   The meetings that you carried on with throughout the day, what were -- were any of those meetings with or related to what was happening with respect to the folks that Mr. Hopson identified that were coming over to USAID from DOGE?

A.   Can you clarify that question?

Q.   Sure. Did you -- how about you generally

Page 88

describe the type of meetings you were having throughout the day.

A.   So the -- the meetings that I had were specific about getting background investigation or background information about the -- the things that were going on in that bureau. So it had nothing to do with anything of why DOGE was there, so it wasn't about transactions.

It was all about, tell me about your bureau and tell me, you know, what support you need. And usually it resulted in them saying, great, tell me what support you need from me. So it was those types of meetings throughout that entire week.

Q.   Was -- were any folks that were, to your understanding, were affiliated with DOGE in any of those meetings on the 27th?

A.   No.

Q.   Did you come to find out that there had been a meeting with DOGE personnel or people affiliated with DOGE, Mr. Hopson, and others from USAID on the -- on the 27th?

A.   My understanding was that there was going to be a meeting at 9 o'clock in the morning with DOGE and Matt Hopson, and I believe that Steven Hernandez got pulled into those discussions as well.

Page 89

Q.   And you were -- you did not participate in that meeting?

A.   I did not.

Q.   Do you know who else from USAID was in that meeting?

A.   I do not. Yeah. I would be guessing. I do not.

Q.   That's fine. Did you meet any of the people that were affiliated with DOGE that day?

A.   Which day are we talking about?

Q.   The 27th still.

A.   I might have met them. I probably did meet them just as a meet and greet as I was walking by to my next meeting. Yeah. I would say -- or asking someone, like, who are these people and why are they in this conference room, but yes.

Q.   Do you remember who -- who that were affiliated with DOGE were there?

A.   Yes. The two people that I remember in that week, I can't attest to it being on the 27th, but it probably was, was Jeremy Lewin and Luke Farritor.

Q.   What was your understanding of -- of their role with respect to USAID as of that date?

A.   My understanding was that they were coming

Page 90

to evaluate what those, you know, transactions had been over the weekend to determine if something happened that shouldn't have happened.

Q.   After your meetings that you described with the bureau folks throughout the day, what happened next?

A.   So I talked to -- there was a direct hire employee named Brandon who was a senior advisor to me, and we strategized for the following week. There was a security summit that was coming up in Munich that we were preparing for and planning to go to because USAID typically had gone there.

We were talking about supporting the bureaus and making sure, again, talking about stuff in the SCIF, about, you know, classified material and events that were going on that were relevant to USAID.

I mean, again, it was just absorption of learning as much as I could.

Q.   With respect to the activities that you understood Mr. Farritor and Mr. Lewin to be present for, did you come to understand that they had received access to USAID systems at some point?

A.   I came to understand that they were going -- they were asking for access, and I talked to

Page 91

Steven Hernandez about it on the phone and had said -- he asked me, are you okay with them getting access.

And my guidance to him was, as long as they're vetted employees because there was rumblings across about we didn't want volunteers having access who weren't vetted or allowed access to the systems. And he said that he had validated that, yes, they're cleared employees, they're actually government employees. And I was like, okay.

Q.   And when you say access, like, he called you about whether he should give them access. What specifically -- what type of access? We talked --

A.   Yeah.

Q.   -- that word can be multiple things. What -- what type of word are you talking about?

A.   At the time, it was domain access, meaning access to the network so they could evaluate and look at -- and again, I didn't -- I don't know what they did on the network or through the network, but it was so that they would have access to Aidnet to conduct an investigation into the transactions, which would then lead into the conversation about getting higher level access for systems like Glass and Phoenix.

Page 92

Q.   Did that conversation about higher level access to Glass and Phoenix happen on the 27th or later that week?

A.   I believe it was later that week. And it -- it wasn't -- again, I was not acting as the CIO anymore, so Steven Hernandez was having those conversations, but briefing me to let me know what was going on.

MS. STEVENS:   I want to turn your attention to -- handing you Plaintiff's Exhibit 6. The bottom right of this has the Bates 000586, and it goes on for several pages.

(WHEREUPON, Exhibit 6 was marked for identification.)

BY MS. STEVENS:

Q.   I will warn you now as we get into emails, that it's a little bit of mental gymnastics because sometimes the emails are ascending and sometimes they are descending with no rhyme or reason that I can tell. So --

A.   Okay.

Q.   -- I will try to point that out at the beginning of our -- going over the exhibits. This one is descending.

A.   Okay.

Page 93

Q.   Okay. Do you -- do you -- well, this is an email chain starting on Monday, January 27th, 2025, and you are copied on this email; is that correct?

A.   Yes.

Q.   All right. Could you describe this email chain a little bit for us?

A.   Yes. So later on in the day is -- as a follow on to the conversation with Matt Hopson, it was identified that there were 57 individuals, which later actually became a 58th individual, which I presume you have that email as well because there was a follow on email for this.

And the -- what was explained to me is that these were individuals who were being evaluated, who were decision makers for transactions that had been identified through the initial assessment by DOGE, and that I was going to get a follow-up meeting Thursday morning to talk through what happened.

So in essence, I was given the list by Matt Hopson and told, hey, these are the individuals that are in the names. And he even let me know, he said it's much bigger than what we thought. And I was like, okay, but these are a lot of people and a

Page 94

lot of them are in leadership positions in the agency. So I need a briefing Thursday morning to know what they found or we're going to take people off of admin leave.

Q. You said it was explained to you about this list of 57, was that exclusively from Mr. Hopson or were the others involved in that explanation?

A. It -- I believe it was primarily Matt Hopson.

Q. Okay. Is it correct to characterize the rest of the email chain as implementing the placing on admin leave by the various personnel within USAID?

A. Yes. And I do see that extra person was added on the fourth page where Joel says, Clinton White Agency Counselor at -- so you have the email.

Q. It says that it was approved by acting administrator Gray. This is in that paragraph. It starts at the top of the first page; is that correct?

A. Yes.

Q. And what was the basis of the -- your decision to do that?

A. The basis was I was told that there were

Page 95

millions of dollars of financial transactions that had happened over the weekend that should not have happened, and that DOGE was gathering the evidence to explain what happened and why it happened.

And that while they gathered the evidence, the request was made by Matt that, hey, we should -- we're going to put these people who are requesting to put them on admin leave while we do the investigation to make sure that there's no interference with the investigation.

Q. And you said in your -- in your career, you had familiarity with administrative leave; is that correct?

A. Yes.

Q. Okay. And so when you decided to put these folks on admin leave, did that -- did that explanation for we need a few days to do this investigation make sense to you?

A. It did because the systems were very complex. It was not just USAID systems. It was interacting with the State Department, Treasury, and HHS.

So it was, okay, you know, we -- we're talking about Monday afternoon that this happened, thinking Tuesday, Wednesday, they're going to know

Page 96

and have an idea of what's going on. And Thursday, they will know this is when I should be able to see evidence of something happening on why we would keep them on admin leave.

And even at that time, it was like, if we don't have evidence, they're going to be taken off of admin leave and put back in their role.

Q. You -- you said that on the --

A. Yes.

Q. -- the 27th?

A. Twenty seventh.

Q. Was that conversation exclusively with Mr. Hopson or were there others involved?

A. I believe Ken Jackson was in that conversation as well.

Q. Did you do anything to document your reasons for approving the administrative leave?

A. Not to my recollection, no.

Q. Are you the sort who writes themselves notes via email like I am?

A. So I sometimes have. And if I have, they're in USAID email, but I -- I don't -- I -- I feel like there's probably a couple of times in throughout those 11 days that I did jot notes down and put them either in a draft folder or an email to

Page 97

myself.

Q. For this -- make sure I'm on the right -- for this decision related to administrative leave -- or scratch that. Let me back up. What we have seen in the Exhibit 5 with you designating or delegating, excuse me, some duties to Mr. Jackson, there's a memo involved.

And then we'll see in subsequent exhibits there -- there's often a memo to the person in charge saying, here's why we're going to do a thing, proposing here's why we should do a thing, and then giving the person in charge the opportunity to sign off on that. Is that a familiar process at USAID?

A. Yes.

Q. Okay. Was there an associated memo for this administrative leave?

A. So I -- I don't know, but I do know that in this conversation, talking with Bill Malyszka, I don't know -- I never know how to say his last name, but talking with Bill, who was the chief human capital officer, my understanding was that him and his team were the individuals who were actually giving the notification and the memo that placed individuals on admin leave.

Q. Pre-memo -- sorry. The memo you're

Page 98

describing is -- is something that would go to the administrative leave -- no, that's a bad phrasing. The memo you're describing would be something that would go to the personnel placed on administrative leave or a different type of memo?

A.    It would be the memo that was given to the personnel notifying them that they are being put on admin leave.

Q.    And there's often a pre-memo before that that goes to the person in charge deciding whether to do the action of putting someone on administrative leave; is that correct?

A.    I -- for an investigation, I don't -- I don't know.  I mean, for an investigation -- yeah. I -- I don't -- I don't know.

Q.    Okay.  On that afternoon into the evening on the 27th, you talked about you talked to Mr. Hopson.  I think Mr. Jackson was in that meeting. Did you talk to anybody else about the administrative leave situation?

A.    Brandon, who was the -- who was my senior advisor, he was in a lot of those conversations or -- and I talked with him about things that were going on, so he had awareness.

Q.    And what -- sorry, what's Brandon's last

Page 99

name?

A.    I -- I don't recall.  It starts with a G, like Gajetona or --

Q.    We may come across his name at some point.

A.    You probably will.

Q.    Okay.  Anything else from the 27th?  Did you have any further conversations with anyone else on the 27th related to this?

A.    Not to my recollection.

Q.    What about more generally, did you have any conversations with anyone related to DOGE being present at USAID, sort of irrespective of the administrative leave?

A.    I -- I may have talked to Steven Hernandez just to kind of sync with him to see how things were going from a technology standpoint and ask from, you know, like, how are things going.  But it wouldn't be the specifics about putting people on admin leave.

It would just more to get a sense of -- I mean, at the time, I had no insight or really, aside from what I had read about what DOGE was going to be doing, and this was our first interaction with them. So it would have been mostly to get a sense of how are things going, how's your day.

Page 100

Q.    What was the sense that you got from Mr. Hernandez on that question?

A.    He said that a couple of the individuals were really, really sharp and really good.  I don't know who.  He indicated that one of them was rather rude and offensive.  I don't know who.  I didn't ask.

And I -- yeah, I -- but that was, in essence, that how the conversation went.  And I was like, okay, let's navigate this carefully.  But it wasn't -- there was no specifics aside from just kind of an overall sense of, hey, we're doing this, this is what we're focused on.

Q.    With respect to the folks on -- the 57 people, 57 or 58.

A.    Yeah.

Q.    I think back to 57, actually, people put on administrative leave, did you talk with USAID counsel, like, attorneys?

A.    So I had several conversations throughout that, like, talking with Jun, which I forget his last name, but he was acting general counsel and Jack Ohlweiler.

Q.    Did you also I think you -- you said you talked with Bill M --

Page 101

A.    Yes.

Q.    -- who was the acting --

A.    Chief Human Capital Officer.

Q.    Okay.

A.    And Nick Gottlieb, both.

Q.    And what did -- what did that conversation entail?

A.    So the conversation with Nick, Nick was very upset, and he was expressed -- he wanted to meet with me or he -- I actually asked to meet with him because I wanted to get a sense of what was going on because I heard he was very upset about things that were going on.

So he came to my office.  I actually wanted to have a witness there, but he wanted to talk to me without anyone in the room, which was fine.  And he said that he was being asked to do things that he shouldn't do.

And I asked him specifically, like, what are you doing or what are you being asked to do. And he said that, you know, that some of the things that were asked were just not according to policy or even to law.  And I said, I'm not going to break the law.  I'm not going to do anything against this.

So -- and I also reminded him that the

JASON GRAY                    February 03, 2026                    102 to 105
93681

Page 102

reality is people who are new coming into government don't know all the rules. They don't know all the laws, and it's our responsibility to teach them, but I'm not -- I'm not going to break the law. And he was, like, okay.

And I told him that I would talk to Bill. And I did talk to Bill. Bill also came to my office later, and I explained to him the same exact thing. Bill is blind, but he walked up, came in, saw me, we sat and talked initially about kind of all the events that were going on.

And I was, like, make sure we're documenting everything, we're following policy. And I reassured him as well that I was not going to be breaking the law or doing anything illegal.

Q. And both of those conversations you just articulated were on the 27th; is that correct?

A. I believe so.

Q. Bill is Mr. Gottlieb's -- or was Mr. Gottlieb's boss; is that correct?

A. Yes. And it would probably be on the 28th. I say that only because the 27th, when people got put on admin leave was rather late in the afternoon. So I'm not -- I don't -- I believe it was the following day is when I met with Bill and

Page 103

Nick.

Q. Just a second. Did you think -- leave those meetings with Mr. Gottlieb and Bill M, you know, sort of with the understanding that they were going to let this play out?

A. So I heard their frustration and how upset they were about things, specifically Nick. But I also tried to reassure that I wasn't going to do anything illegal. And -- but the understanding that I had was that he was going to do and -- and we were going to continue to execute this.

And I also explained that I was told I was going to be getting a briefing Thursday morning to outline kind of the evidence of what was found, and that what I would expect if I didn't get any evidence is that I was going to be removing those people from admin leave.

I even asked Nick Gottlieb to draft an email for me to remove people from admin leave, which he did. And I told him this would be later on in the week, that if I didn't get evidence, that I was going to send that email at 4:30 in the afternoon to let people know that they were being taken off of admin leave.

Q. Also, on the 28th, what was your

Page 104

understanding of the level of -- of systems accessed by Mr. Farritor and any other DOGE folks?

A. So I knew they had network access. I don't know, meaning, I -- I didn't -- I didn't get into the weeds about whether they had elevated privileges on there. I know at some point, Steven Hernandez let me know that they were requesting administrative access so they could navigate the network and not have to do system by system.

Although there's two layers of access. You would have the ability to access, like, log files, but not actually get into the system to assess what was going on. But yeah, I -- I didn't actually get into the specifics of -- that was really Steve's role and responsibility at the time.

Q. What was your understanding of Mr. Farritor's role on this date, the 28th?

A. So was that he was a federal employee, a DOGE employee who was coming in to primarily do the investigation because he was the -- the person who was going in through the systems and evaluating.

And the impression I had was that Jeremy wasn't -- my understanding is that Jeremy wasn't asking for additional access, but that Luke was just to help navigate and learn and gain access to the

Page 105

systems.

Q. And Jeremy is Jeremy Lewin; is that correct?

A. Yes.

Q. Okay. What was your understanding of Mr. Lewin's role at that time?

A. I thought he was really the lead from DOGE that was coming into oversee what was happening. And that was the only interaction or the only person I really even spoke to. Later on, again, that day, I might have seen him and, you know, I know I've seen -- I saw him, but I -- there was no real conversation until the following days.

Q. I want to turn your attention back to Exhibit 3.

A. Okay.

Q. This is the DOGE EO. Would you read -- you don't have to read it out loud. Silently. Section 3C on Page 3.

A. Okay.

Q. Did you, in consultation with anyone else or yourself, establish a DOGE team at USAID?

A. No.

Q. Did you have a conversation about establishing a DOGE team at USAID?

Page 106

A.   No.

Q.   Do you -- to your knowledge, did you have a DOGE team lead at USAID?

A.   No.

Q.   You paused a little bit there, where you going to say something else?

A.   What I was going to say is that I knew that when DOGE came in to evaluate what was going on, that Jeremy was going to be the lead of that team.  But it wasn't something that I said, yes, this is the DOGE lead, and this is the DOGE team that's here.

It was that there was suspected some, you know, nefarious financial transactions with millions of dollars that were happening or happened over the weekend that was going to be investigated.

Q.   How did you know that Jeremy was the lead?

A.   Just by virtue of seeing him and how he interacted with people because he wasn't, you know, Luke was carrying around a bag with, like, five different laptops from different agencies and going in and actually, like, doing work, where Jeremy was more talking to different individuals.

Q.   Do you know who the USDS administrator was as of January 28th?

Page 107

A.   I did not -- do not.

Q.   Okay.  What else do you remember from the 28th?  You had this conversation with Mr. Gottlieb and Bill M.  What else do you recall from that date?  This is -- no, Tuesday, sorry, the 28th.

A.   Yeah.  I, again, I feel like I had more conversations about we -- as part of the assessment process, they were looking at stopping payments.  I know we had a -- a conversation about the impact of that because the federal government has to pay what it owes, and it was talking about this -- there's risk associated with this.  While the intent may be to save money, the reality is you're going to then have to pay penalties and interest and what you owe anyway.

So that was one of the conversations.  And again, just following -- continuing additional -- I believe -- yeah, I guess it would be Wednesday because the following day is when we had pulled everyone together.  Because on the 22nd, every Wednesday, there was something called the SMM, the senior management meeting, where all of the heads of the bureaus and independent offices would meet with the administrator and deputy administrators.

And on the 22nd, I had that meeting.  And

Page 108

then the plan was a preparation for -- to have that same meeting on the 29th.  There was a lot of conversation on the 28th about, should we have the meeting, should we not have the meeting.  And I was like, we're absolutely going to have the meeting because now we need the rest of the agency to know that someone is in charge of these -- these bureaus and independent offices.

So that was another conversation that was had on the 28th, preparing for the 29th.

Q.   Who was the conversation of do we have the meeting, do we not have the meeting with?

A.   That was with the political team, meaning, this was a conversation with Ken Jackson, Matt Hopson, Joel, and Laken was there as well.

Q.   And correct me if I'm wrong, but you said that you decided we are --

A.   Yes.

Q.   -- having this meeting?  Okay.  So you decided to have the meeting on the 29th with all the -- all the bureaus.  What else did you do on the 28th before then?

A.   I -- I'm not sure when the meeting with Yemen was.  It might have been that day.  It was -- they kind of all blurred together, but I -- I

Page 109

believe it was maybe that day.

So there was a lot of conversation with, like, the Middle East Bureau to talk about and prepare for that meeting because there were key points they specifically wanted me to make on behalf of USAID and the government.  And -- and I know there was -- there was a lot of conversation about that.

Q.   Turning your attention to the 29th, so did you have the big bureau meeting?

A.   We did.  I -- I'm not 100 percent sure if it was the 29th or the 30th, but given everything that happened on the 30th, I would definitely say it was probably the 29th.

But yes, and it was to make sure that everyone knew that, yes, this is what's happening.  I walked through and explained to them that there, you know, there was an allegation that some services or transactions happened over the weekend.  This is why people were put here.  You are in charge.

I told them about -- again, the same conversation I had had the week before with the people who were permanently in that role.  Now, there were actings in every one -- almost every one to let them know that my focus was on transition and

Page 110

stability.

Q.  When you say they were acting in all of those roles, is that because some -- the folks put on admin leave were leadership and so their roles needed in acting, or can you describe that a little more?

A.  Many of the people in Exhibit 3, I think it is, were -- not all, but many of them were -- like, for example, the CFO, we needed to make sure that someone was acting as a CFO.  And in those -- and in the bureaus for, like, global health and humanitarian assistance, that those individuals were -- had an acting that they were in an acting role.

Now, a lot of the -- because remember, when an administration changes, all of the assistant administrators, most of them, I won't say all, but most of them are political appointees.  They transition and resign, and then career staff are usually temporarily put in acting roles.

So for that one week, the acting roles were senior individuals in that role.  That was not their permanent job.  It was usually the most senior person in that bureau or independent office.  And when many of them were put on admin leave because they were the deciders, it -- you know, which again,

Page 111

was that these are people who maybe did these transactions.  I didn't know at the time.  But I wanted to establish continuity and again, stability.

There was a lot of turmoil that was going on and stress of what's happening, why are these people here?  Why did people get put on admin leave?  A lot of, you know, side conversations were going on.

So I wanted to pull everyone together to explain what I knew and let them know that this is where we're at, and this is what's going on, and I need them to support, you know, me with what I am doing, specifically as acting administrator, not as it relates to the investigation, and that I will get briefed on Thursday to let me know what happened, and we'll follow up the following week.

MR. WEN:  Just before you go on, for the record, at some point in that answer, you referred to you thought it was Exhibit 3 before you had it.  It's Exhibit 6.

THE DEPONENT:  Six.  Sorry.  Yes.  Exhibit 6.

BY MS. STEVENS:

Q.  On the 28th or 29th -- or actually, that meeting, so you're expressing the, you know, sort of

Page 112

show of stability.  And what response did you get, just briefly?

A.  I think it was mixed.  I think everyone was kind of -- it was definitely mixed.  There was a lot of shock.  People didn't know what was going on.  Some of the people who were in the roles found out about it last minute.

I forget who, but one of the individuals who was leading, like, the -- I think it was the Asia Bureau, was done -- had been on travel and came back and found out that now he was the acting.

So it was -- it was those types of conversations where people are like, hey, I'm new to this, and I'm still learning this too, but we still needed someone -- I still needed someone in charge of those bureaus and independent offices.

Q.  Did you on the 28th or 29th, find out any more information about the fruits of the investigation?

A.  No.

Q.  Did you get any status update from -- from anyone?

A.  The only status update I would have gotten would have been from Matt Hopson saying they were continuing to investigate and needed a little more

Page 113

time, but I knew that I was going to be getting briefed on the 30th, so I was like, okay.

Q.  Did you talk to anyone affiliated with DOGE before the 30th about the investigation?

A.  About the investigation?

Q.  Mm-hmm.

A.  I -- I want to say there was a meeting with Jeremy, basically saying, which again, it was Jeremy and Ken Jackson in my office at the time.  Not really an update, just saying that they're continuing to dig into transactions, and again, referencing that millions of dollars had gone out from the agency that shouldn't have gone out.

A question that was asked or that I asked about was, was those transactions for services prior to inauguration, which again, they were still investigating, and I didn't get an answer then, but again, was assuming or presuming I would get it on Thursday.

Q.  Did you talk to anyone affiliated with DOGE about anything else outside of the investigation on those -- those days preceding the 30th?

A.  So I -- so yes, Steve Davis came to the building.  I'm not exactly sure when it was.  It

Page 114

might have been the 28th or 29th. I don't think it was the 30th. So it had to have been one of those two day -- two days really to introduce himself. And he asked me if I was the IT person. I said, yes, my permanent job, I am the IT person.

And he asked me about IT systems, and if he said, if you had to pick a couple of IT systems that you would eliminate today, what would they be? And I told him, I said, well, I -- I won't pick a couple of systems, but I would definitely pick DIS because I felt like it's something I even after six weeks in, I briefed Samantha Power. And I told her, if I had to make a snap judge right -- judgment right now at six weeks in, I would -- I would kill this program.

And I was told by the deputy chief of staff to her, no, no, no, you don't understand the program. And I'm like, that might be true because I was new, but just a snap judgment based. But when I talked to Steve Davis, I told him that I would -- I would definitely pause and eliminate DIS.

Q. Was that conversation with Mr. Davis just one-on-one?

A. It -- it was -- it wasn't really one on one. It was in the administrators suite, meaning

Page 115

this -- but it was -- it wasn't like in the office. It was just in -- in the hall. He came, introduced himself, who he was, identified that he worked with DOGE or for DOGE, and I was -- I, again, had no idea who he was at the time. Yeah.

Q. How did -- can you be more specific about how he introduced himself?

A. He said he was a part of DOGE, introduced himself as Steve Davis, is really how he introduced himself. And then I looked because I was curious, who was this person and saw his relation or, you know, structurally from a Elon Musk standpoint, but we didn't talk about that. He didn't.

Q. The question of what would you -- what system would you cut right now, besides that question, did -- did you talk about anything else?

A. Just in general, technology, like how things were going. And I explained to him that we had a really good team here that would support and knew their stuff. And I talked briefly about services we delivered around the world and just how important it was to secure them. Yeah. So it was just a very maybe a five-minute conversation. It wasn't very long.

Q. Did you have any other conversations with

Page 116

anyone from -- affiliated with DOGE that -- not the conversation with Mr. Davis and not about the ongoing investigation?

A. No.

Q. Did anything else of -- of import in your mind occur on the 28th or 29th that you haven't already talked about?

A. Not that I can recall.

Q. Okay. Turning your attention to the 30th, Thursday, January 30th, 2025. Again, two different strand -- two different but interwoven strands, one about administrative leave and one about DOGE people affiliated with DOGE and their access to USAID systems. We'll kind of get into both of them.

So you're supposed to have this meeting on the morning of January 30th about the results of the investigation. Did that meeting happen?

A. So it happened, but it was later, meaning it wasn't at 9 o'clock. I want to say it was maybe at 11-ish or so. And I got pulled into that conference room. Point 4 is the name of the conference room.

And I asked to see, like, okay, what have you found?And there was a lot of that one, the investigation was still going on, but they had found

Page 117

and they gave me some of the values and the dates of the transactions of what happened and when it happened, which again, I -- I don't recall what those are, but they were primarily focused in the CFO shop.

So in that conversation, I had said, and my chief of staff, Matt Hopson, was there as well, and he was very supportive. I will say -- I don't want to say it was adversarial with DOGE, but he was very supportive of me -- me and wanting to make sure that he was protecting me and doing what needed to be done in his role of the chief of staff. And it -- there was tension there.

But at the end of that conversation, it -- the result was, well, I need to see more or additional evidence to prove that all of these people should be on admin leave. And if I don't get that, I'm fine with leaving these five or six -- I think it was five -- CFO employees on admin leave, but everyone else, I'm going to remove off of admin leave. That is how that conversation ended.

Q. Let me pause you there before we move on to more. Who participated in the conversation?

A. So that was -- Matt Hopson was there, Ken Jackson was there, and I -- and Jeremy Lewin was

Page 118

there.

Q. Was Mr. Farritor there?

A. I don't recall. He might have been there. I don't recall. He might have been there.

Q. The -- how long was this meeting?

A. Very -- maybe 20 minutes. It wasn't very long.

Q. When you described, you know, sort of Mr. Hopson was -- was running interference between you and DOGE a little bit, where does Mr. Jackson fit into that description?

A. So I think he -- at the time, I think he was trying to figure out his role. I don't -- so he was -- he was there, but it was rather passive at the time.

Q. And who did most of the talking?

A. The majority of talking was primarily between Jeremy and Matt with me asking questions and specifics. And the -- the comment was made that, in essence, if we don't have evidence, we -- I will take them off of admin leave, and then if you find evidence, we can put them back on admin leave. But the idea wasn't that we were just going to keep them indefinitely on admin leave.

Q. And how did that sit?

Page 119

A. I felt at the time it -- it sat fine. I -- I didn't -- I didn't hear any objections. I didn't hear any issues. Matt and I talked about it after in my office, and he was, like, yeah, no, this makes sense. He said, if they don't have anything, then we'll leave the -- the CFO team there and everyone else we'll bring back. And I'm like, okay.

Q. Were there any documents involved in that -- in the meeting in the Point 4?

A. So I -- I don't believe so. I do know, again, the conversation that I had with Nick, I did ask him to draft me a message so that I could send to remove people from admin leave.

Q. That was a conversation from a couple of days before where you -- where he expressed concern and --

A. Yes.

Q. -- you -- you asked him to draft that email?

A. Yeah.

Q. Okay. Okay. What happened after this meeting in -- in Point 4?

A. Point 4 --

Q. Point 4.

A. -- is the name of the conference room.

Page 120

Okay. So after that meeting on the 30th, The day progressed. I attended meetings. I as I mentioned, I spent an hour or two in this SCIF every day because of things that were going on.

And at the end of that meeting, I want to say I had a -- or at the end of that -- towards the end of that day, I had a conversation with Bill because Bill was expressing concern on wanting to -- they were talking about putting additional people on admin leave. I didn't have the specifics because they were still working through the process on what that was that I believe Ken was working on.

Again, I -- I don't know the specifics of that. I -- I know now that it would be several people from, I believe, the LPA, the legislative team that worked under Laken.

But we had those conversations. I talked to Bill. I let him know, what we're going to do is we're -- if we don't have any evidence by the end of the -- by close of business at 4:30, I'm going to send this message. I'm going to remove people from admin leave, except these handful of people that I was told and shown that, hey, there's these transactions that happened over the weekend and these are the people who authorized the transaction.

Page 121

And I'm like, okay, we'll keep them on a little bit longer until we get more evidence.

So that's kind of how it went. And then Nick sent the email to everyone removing them from admin leave on his own.

Q. Okay. Let me stop you there.

A. Okay.

Q. Before we get to the next email. So you described the conversation in Point 4. You and Matt sort of debriefed that conversation afterwards.

A. Yes.

Q. Did you have any conversation with anyone about the investigation for admin leave between that conversation with Mr. Hopson and this conversation you just described with Bill M?

A. So yes, I talked with Ken Jackson because a lot of this would be typically run through his organization. It would not be from the administrator or acting administrator. It would be from the DAMR.

Q. You just -- do you mean that in terms of just where the -- the process normally flows in terms of the org chart? Is that what you mean by --

A. Yes.

Q. -- from him? Okay.

Page 122

A. Yes. HCTM, which falls under the DAMR, Deputy Administrator for Management of Resources, that all falls under that lane. So it would have primarily come from Ken and through Ken.

Q. How did that conversation with Ken go? Agree, disagree? What -- how did it go?

A. I don't -- I, again, I think he was still adjusting to roles, responsibilities. The impression I got it is just an impression. The conversation went fine. The impression I got was that if I can sign it, do it. If he needs to sign it, he'll do it.

But again, we were talking about I had heard that, hey, I understand we're looking at other things that are going on. And it was, let me know what's going on. But if those are specific to your bureaus and independent offices, I need to know because of everything that's going on, but that's going to be your responsibility.

Q. Okay. So you had -- you described the Point 4 conversation, conversation with Mr. Hopson, conversation with Bill M, and also with Mr. Jackson. Any other conversations about the investigation in this lead up to what you're about to tell us with respect to Mr. Gottlieb?

Page 123

A. I can't -- I don't recall any other conversations about the investigation specifically.

Q. Did you get any emails in that time frame about the investigation?

A. Yeah. I -- I wish I had my emails because then I would -- I would say yes or no. Yeah. I don't -- I don't recall getting emails. If I did get an email because I do remember getting emails, but not specifically that day, but more of the, hey, I don't have access. When I am I going to find out? Here's my personal email, so that you can let me know what's going on.

Then I talked with Bill about that to say, hey, do we have personal emails for everyone? And then the reality was, in some cases, they did not have personal emails, and it was figuring out how do we get personal emails for everyone to let them know if they're on admin leave because they didn't have access to their government stuff.

Q. Did you get an email from or do you recall getting an email from Mr. Farritor describing the "evidence" related to the 57 folks on admin leave?

A. I do not recall that, no.

Q. Okay. You're going to describe what happened next in -- in the sort of saga of the 30th.

Page 124

Please go ahead.

A. So then Nick sent an email to the masses. The politicals were copied, and I got called. Ken is like, hey, did you see what happened? And was told that I needed to immediately remove them off of admin leave. And that is -- I was like, well, hold on.

There was a -- someone made a comment, I think it was Ken, who was, like, there's a concern about losing control of the agency. And I said no. I said, what we have is a labor and employee relations specialist who I've known for the two-and a half years I was here. He was very passionate about this, and he sent an email out. I can remove them, but the reality is, most of them were going to be removed from admin leave that afternoon anyway.

And that is when really things changed in that I had a conversation with Jeremy. Jeremy told me that I needed to shut the agency down.

Q. Okay. We'll get to the conversation with Jeremy. With respect to Mr. Gottlieb's email, what -- what time was that of the day, do you have an estimate?

A. Probably 3 something, maybe ish.

Q. Okay. And that email that he sent out,

Page 125

that was sort of in the vein of what you -- you said you would do, but he jumped the gun --

A. Yes.

Q. -- so to speak, before you could make that decision yourself; is that correct?

A. Yes.

Q. Okay.

A. He -- I believe in the email, and again, it's been a year, but I believe he said that it was within his authority as the person who actually put them on admin leave through HCTM, that he was using that authority to remove them from being on admin leave.

Q. Had you gotten any more information or evidence -- actually, that was a bad question. Had you -- were you still on the path that you described earlier of if you didn't have any additional information with respect to this investigation by 4:30, you were going to leave the couple of folks from the CFO's office on admin leave, but remove everyone else from admin leave. Was that still your -- the path you were on?

A. Absolutely, yes.

Q. Okay. So Mr. Gottlieb sends his email. You get a -- how did Mr. Jackson contact you?

NAEGELI DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

JASON GRAY                          February 03, 2026                          126 to 129
93681

Page 126

A.   I believe he walked into the office.  We were all kind of in the administrator suite together.

Q.   Okay.  And then how did that conversation with Mr. Jackson transition to a conversation with Mr. Lewin?

A.   So at that point, they're like, hey, we need to have a meeting with you.  And then Jeremy and Ken came into my office.  At that point, I made a comment saying, hey, should my chief of staff be here?  And the -- I was told no by Ken.

And then I told Brandon, who was a senior advisor, you know, direct hire employee, go and get Matt.  And then Matt came in and we all sat down, me, Matt, Jeremy, and Ken.

And that's when Jeremy said, you know, the concern is that there's a loss of control at the agency, and you need to put the entire agency on admin leave, and you can pick, you know, 12 to 15 people to keep, and everyone else is going to go on admin leave.  And I said, no.

Q.   Was there further conversation?

A.   Yes.  After that, it -- Jeremy said, well, if I have to call Pete Marocco, then I'll call him.  And I'm like, I don't care if you call Pete because

Page 127

Pete has nothing to do with USAID.  He's in State F.  It's a completely different agency.  And I thought it was really just Jeremy's misunderstanding of government agencies and how that worked.

And then Jeremy said, okay, well, if I have to call Secretary Rubio and have him to order you to do this.  And I told him, I don't care if you have the Secretary Rubio tell me because he's not in charge of this agency.

And the reason why I'm not putting people -- the whole agency on admin leave was because we had just done an order of departure from the Democratic Republic of Congo, which I don't remember the exact number of people, but they were in transit from there back to the US.  And I wasn't going to disable all of their accounts and forbid them from having access to USAID resources.

We also had a team, I believe it was in -- this was regarding Ebola.  And I'm like, we -- we -- Uganda, I believe it was.  I'm like, we've got people there.  I can't just shut the agency down.

So I expressed that.  And then I was told, well, if we have to call POTUS, we can do that.  And I was very clear and Matt was there with me.  And I'm like, I don't care who you get to tell me to do

Page 128

this, this will kill people if we do this.  I'm not doing this.

And then we just kind of waited there.  And then Jeremy left the room and then came back around 45 minutes later, at the time, me and Matt were talking, and I'm like, I'm not doing this.  If they remove me, they remove me, but I'm not doing this.  About 45 minutes later, Jeremy came back and said, oh, okay, well, you know, we'll resolve this later.  And I was like, okay.

MR. WEN:  Hey, Beth, can we take a quick break?

MS. STEVENS:  Yeah.  Let me finish this train -- I'm almost done.

BY MS. STEVENS:

Q.   So the position that you were describing of not wanting to put people in harm's way with respect to the agency, you articulated that to Mr. Lewin; is that correct?

A.   Yes.

Q.   And you said -- you didn't say who said this, so I want to understand.  He said, if we have to call POTUS, we will.  And you said, I don't care who tells me.  Who said that?

A.   That was probably a misspeak.  It was, if

Page 129

I have to call POTUS.

Q.   And was --

A.   That was Jeremy.

Q.   After -- let me get two more questions in.  After Mr. Lewin came back from the 45 minutes out of the room, was there more conversation that happened?  I'll ask you questions about that if there were, but --

A.   Aside from me and Matt saying, there's no way I'm doing that, that was it.

Q.   Did -- during that time frame, before or after Mr. Lewin left for 45 minutes, was there a phone call with Mr. Musk?

A.   No.

Q.   Was there a phone call with anyone outside of the four of you that were in the room?

A.   Not to my knowledge.

Q.   Like, you didn't -- you didn't have anyone on the phone with you all?

A.   Absolutely not.  No.

Q.   Was there a response with respect to the -- your statement of, like, this -- people would die?

A.   What do you mean by response?

Q.   Well, you -- you made that statement.

Page 130

A.   Yeah, I did.

Q.   Did -- was there a -- did Mr. Lewin or Mr. Jackson or Mr. Hopson respond specifically to that statement?

A.   So Mr. Hopson, Matt, was quite honestly, he was, like, there's no F'ing way we're doing this, is what he said.  So I was again, I was not going to do it anyway, but that is the only comment that I really recall.  Meaning, I didn't -- I didn't get an impression one way or the other from either Ken or Jeremy about my comment.

Q.   And then your understanding of, like, shut the agency down and that meant to take away access from all the folks around the world you -- you described earlier --

A.   Yes.

Q.   -- folks around the world.  Okay.

A.   Are you okay to take a break?

Q.   Yes.

A.   Okay.  All right.

THE VIDEOGRAPHER:  Okay.  Please stand by.  The time is 1:54 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record.  The time is 2:13 p.m.  You may now proceed.

Page 131

BY MS. STEVENS:

Q.   Okay.  Mr. Gray, we were talking about events from January 30th of 2025.  You had just described for us this meeting with Mr. Hopson, Mr. Jackson, Mr. Lewin.  And then you talked about Mr. Lewin left for 45 minutes, came back in, and then the conversation ended.  Could you tell us what happened next?

A.   So Jeremy left and Ken left, and me and Matt talked a little bit, basically just reaffirming the why and no.  And then I went home fully expecting to lose my job.

Q.   And did you lose your job?

A.   So the following morning, the 31st, I came into the office, and Pete Marocco was there, and he said, hey, and he had brought coffee.  And he said, hey, I want to have a conversation with you.  I just want to let you know that effective last night, POTUS signed and put Secretary Rubio in charge.  You're no longer the acting administrator.

And I was like, okay.  And I -- I really, at that time, was thinking I would be put on admin leave, but I wasn't.  And I was told that I was going to be going back to being the CIO and maybe into the DAPP position, but that they were keeping

Page 132

me in the front office.

And that was pretty much the extent of that conversation, and that we would have a follow on conversation later on, which we did, which I'll get into in a moment.

But the impression I had is that, again, at this point, I hadn't really interacted with Pete, but I -- the impression I was left with was that he understood that -- that I made the right call.  I don't want to speak for him, but that was the impression I was left with, is that yep, this is why we're keeping you here.  So it wasn't that you did something you shouldn't do.  It was that, you know, we're keeping you in the front office.

And then that was pretty much everyone started coming in, and then we had a meeting in Point 4 and Pete basically, you know, introduced him to -- himself to people who had not met him, which I don't know who they were or that didn't know him or not, to let everyone know that Secretary Rubio was now appointed to be the acting administrator and that he was going to be the principal deputy.

And then I was just basically sitting there listening to what happened.  And he also -- he, again, reaffirmed with everyone, I didn't do

Page 133

anything wrong. It was just this is a decision that was made, and Jason is going to go back to being the CIO, but it's going to stay in the front office.  So he kind of outlined all of that, and that was how the day went.

Q.   Okay.

A.   Or that morning.

Q.   Before the -- so that's the morning of the 31st, this meeting with Mr. Marocco, right.  The night before the day before on the 30th, after your conversation with Mr. Hopson, sort of debriefing this larger conversation with Mr. Lewin, Mr. Hopson, and Mr. Jackson, was there anything else before you went home that -- that occurred with respect to that -- that meeting?

A.   I -- I did talk to Brandon to let him know, hey, not to go into the details, but to let him know that I would probably not be in the position the next day and wouldn't be surprised if I went on admin leave.

Q.   Why did you have that impression walking out of the meeting?

A.   Because the impression I had is that when -- when I'm told to do something, again, by someone who really has no authority to tell me to do

Page 134

something, and that it's escalated to we're going to talk to Pete, which again, as I mentioned, makes it sound like they just really didn't understand how government or agencies worked.

And then when I said no to that and then escalating it to Secretary Rubio, it's just the impression I was left with is that it was whoever high enough could convince me to make this decision. And then, of course, they realized that I wouldn't. So I didn't -- I felt like I -- I pushed back because it was just something I wouldn't do.

And I -- I having seen the massive use of administrative leave because one of the first things that happened, which I dug into more about administrative leave and how many calendar -- calendar days can be used in a year before people have to come in.

There was conversation about, you know, the time of, like, how much time people are going to be on admin leave because I was very set on not wanting to go beyond, which I forget what the length, I think it's ten calendar days a year or something like that.

So I -- but the -- the perception I had was that it was very easy to put people on admin

Page 135

leave. So I thought I pushed back and said I wasn't going to do this. And I thought, oh, I'll be on admin leave.

Q. At the time of that conversation in your office on the 30th with Mr. Lewin, Mr. Jackson, and Mr. Hopson, Mr. Lewin was still the DOGE team lead?

A. So yes, but he was also, I would find out this later, I did not know at the time, but actually had come into and become a USAID employee.

Q. And do you know when that happened?

A. I -- I don't. I don't know the specifics. I just know that he was put on the rosters of my team, meaning within the CIO organization.

Q. And you -- you said you found that out later?

A. Later, yes. When I forget, I saw some report and it said that I saw my numbers, and it said that there was, you know, 98 or whatever versus the 97 on board. And I'm like, that doesn't make sense. And I looked and it's like, yeah, why is Jeremy on.

And it said, and again, in Google Suite, you know, in the active directory, it'll identify what office or bureau they're in, and it said MCIO beside his name. And I thought, why is he an MCIO?

Page 136

Q. Did he -- when he came back from the 45 minutes gone, did he say what he did while he was gone for those 45 minutes?

A. He was on the phone.

Q. With who?

A. I don't know who with, but I know he was on the phone.

Q. How do you know he was on the phone?

A. Because he walked out of the room and picked up the phone to make a call.

Q. And he didn't tell you who he was on the phone with?

A. No.

Q. Okay. At any time on the 30th, did you have a conversation with Elon Musk?

A. No.

Q. And then let's see. I don't why I keep taking that out. Exhibit -- yeah. When you were describing the interactions with Mr. Lewin and saying that you pushed back against someone who doesn't have the authority to tell you what to do, what they were telling you to do, can you -- can you describe that a little more?

A. So the impression I was left with is that he thought, and I'm speculating because I don't

Page 137

know, but the impression I was left with is that he thought by referencing Pete Marocco, that that was going to influence my decision. And it didn't and I explained that State Department has nothing to do with US A-I-D. They're different agencies.

And then when the reference to Secretary Rubio was made and the specific that was said, if we have to pull Secretary Rubio out of the SCIF to order you to do this, which it was a strange thing. And it just made me think he didn't understand because why would Secretary Rubio be in a SCIF. And why would he know he was in a SCIF.

It was just -- it was a -- it was a -- it made me think that he didn't understand how that whole process worked. But I was like, no. And that was when it was, if I have to call -- if I have to call POTUS, then -- and I'm like, I don't care who you tell to tell me or direct me to do this, I'm not going to do this. And that's how that ended.

Q. The part where he talked about Secretary Rubio, can you say again exactly what he said, to your recollection?

A. To my recollection, he said, if -- if I have to call Secretary Rubio or get or pull Secretary Rubio out of the SCIF to direct you to do

Page 138

this, and that's when I said, I don't care who you call, this is going to -- I'm not going to do this because we have an order of departure that is ongoing right now.

We had been spending part of the week planning on going and meeting people who were evacuated because that was the typical thing that we did. I had done that once before, jointly with the State Department. And then it escalated to the, again, specifically mentioning POTUS, and I was like, I don't care who, I'm not going to make that decision.

Q. And why did you say that he doesn't have the -- Secretary of Rubio didn't have the authority to do that?

A. Because USAID and the State Department are two separate agencies, and the administrator for USAID is responsible for USAID.

And I know the collaboration and partnership between the Secretary of State and USAID are very close. I know there's a shared joint strategic plan between them both, but in the end, the -- those decisions are -- rest in the responsibility of the acting administrator in that time.

Page 139

Q. And Mr. Lewin himself, at the time we talked about him being DOGE team lead, did he have authority to tell you -- you, the acting administrator, what to do?

A. No.

Q. Did -- what was your understanding of Mr. Lewin, like, the reporting structure for Mr. Lewin? Like, who did he report to?

MR. WEN: Objection. Calls for speculation.

MS. STEVENS: I asked for his understanding.

BY MS. STEVENS:

Q. Go ahead.

A. I don't know. I don't know who he reported to. I just knew that he was from the DOGE team.

Q. Did you ever talk to or -- yeah. Did you ever talk to Amy Gleason?

A. No. I have no idea who that is.

Q. Did Mr. Lewin ever tell you who he reported to?

A. He did not.

Q. How would you characterize the feeling in the room at the end of that meeting on the night of

Page 140

the 30th or afternoon of the 30th?

MR. WEN: Objection. Vague.

MS. STEVENS: Sorry. Go ahead with your objection.

MR. WEN: Objection. Vague.

BY MS. STEVENS:

Q. If you understand the question, you can answer.

A. Yeah. It was just in an intense meeting. I will say it was intense for me because I was thinking not really from the role of the administrator, but really from a technologist, thinking about removing access to email and accounts and just the sheer logistics of all of that and the impact of that.

So it -- I don't think anything was said as in, do this or do that. It was just, you need to shut the agency down.

Q. And then after you said no, you wouldn't shut the agency down, you were put in a subordinate role; is that correct?

MR. WEN: Objection. Argumentative.

BY MS. STEVENS:

Q. You can answer.

A. So I don't know why, meaning, my

Page 141

presumption is that I was removed from that position because of my decision. But I -- I don't know that. I just know Pete Marocco came in and said the next day that you are going back to your role as the CIO.

So I -- I didn't see it as a subordinate because I felt like my role was temporary anyway. I understand the responsibilities, but it was temporary and I was going back to my -- my real role with, in essence, added responsibilities by being a part of the front office.

Q. Is it correct, though, that basically your -- not basically. Is it correct that your last decision made on the night of the 30th not to shut down the agency was followed by you being removed as acting administrator?

A. Yes.

MS. STEVENS: Okay. Let's look at Exhibit 7.

(WHEREUPON, Exhibit 7 was marked for identification.)

BY MS. STEVENS:

Q. Okay. Are you familiar with this document?

A. Yes.

Q. And what is it?

Page 142

A. This was the document that I was given when I asked for proof that the president had used, I believe, the Vacancies Act to appoint Marco Rubio as the acting administrator for USAID.

Q. And this is dated January 30th, so that same -- that same day that we've been talking about, right?

A. Yes.

Q. You didn't have notice of this designation on the 30th though, correct?

A. No.

Q. Okay. You found out on the 31st?

A. No.

Q. Oh.

A. I found out on the 31st this had happened, and I asked for a copy of it. It was several days later, maybe even a week later, that I actually received a copy of it.

Q. Did you have to follow up to get that copy?

A. I don't recall. I don't even -- I just asked. I said I want it for my records, and it was emailed to me.

Q. In the meeting that you described with Mr. Marocco on the 31st in the -- in Point 4, who else

Page 143

was in that meeting?

A. The -- okay. So Adam, which I don't know how to spell his last name, but, like, Korzeniewski or something like that, who was the White House liaison, he was in that meeting. Ken Jackson was in the meeting. Joel Borkert -- Brokert -- or I don't know how to say his last name. He was in the meeting.

I guess it's on one of these messages. Frank Lloyd was in the meeting. Tim Meisburger was in the meeting. Megan was in the meeting. Laken was in the meeting. So it was like all of the -- and Matt Hopson was in the meeting.

Q. Did you -- you -- you talked to us about what Mr. Marocco said. How long was that meeting?

A. Maybe 10, 15 minutes. It was -- the impression I got of the meeting was just to let people know that -- that Secretary Rubio was going to be the acting administrator and that Pete was going to be basically running operations and spending more time at USAID to, you know, start running the organization.

Q. Describe that a little bit more for us. What does it mean -- what role is the person who's running operations?

Page 144

A. Primarily, the deputy administrators are the roles that perform the day-to-day operations, like having the meetings, doing the HR activities, doing the acquisitions, all of the administrative functions and operational functions of an agency.

Q. And those two -- one of those roles was vacant and the other had the duties were assigned to Mr. Jackson, correct?

A. Yes.

Q. Okay. So Mr. Marocco didn't take on either of those roles?

MR. WEN: Objection. Calls for speculation.

BY MS. STEVENS:

Q. To your knowledge, was Mr. Marocco given the duties of either of those roles as of January 31st?

A. I don't believe so.

Q. What was your understanding of Mr. Jackson's role as of -- as of that date?

A. So that's a good question because I -- I don't know. I -- I don't even think he knew at the time. I -- the impression I was left with was prior to the last administration, my understanding was that there was an administrator and a deputy

Page 145

administrator. And during the last administration, they transitioned to having two deputy administrators because there's a lot of work and a lot of activities that was going on.

So they -- and I don't know if this happened. When -- I don't know how it happened. It happened before I got there. But the impression I was left with was that the model was going back to having the administrator and a deputy, and that Pete Marocco was that deputy.

Q. That's the impression you were left with at the end of that meeting that you described on the 31st?

A. Yes.

Q. Okay. Who did you -- when you left that meeting, who did you tell about the fact that you had been removed as acting administrator?

A. I don't recall telling anyone because I was -- it was not public knowledge. It wasn't shared with, and I was worried about it getting to the press.

Q. When you say it wasn't public knowledge, does that include for, like, internal to USAID, like, other staff members who weren't in that meeting?

Page 146

A. Yes. Yes, no one knew.

Q. Was that a, like, a decision made or you just knew that no one knew?

A. I don't believe that anyone knew that I had been removed from that position at that point in time.

Q. But was that a purposeful choice or is that just -- I'm trying to understand why -- when you walked out of that meeting, why not go to tell people?

A. I didn't -- I didn't really actually think about it. I thought I was, you know, when I look at the overall mechanics of it, the president decided to put Rubio in the role, and I was reassigned back to my original role with, you know, front office responsibilities being kept there as an advisor.

I -- I didn't really think much about I should go and tell people that this happened or I -- I do know that there was conversations, as we were talking about earlier, about additional people on admin leave. And it originally, on the 31st, people had come to me to say, oh, we want you to send this message out. And I was like, no, I'm no longer in that role, so I cannot do that.

Q. Okay. You see anything in writing on that

Page 147

date as to Mr. Marocco's goal?

A. No. I do believe later on, probably the following week, I'm not exactly sure when, but there was a follow up that showed that he was designated the duties as, I think, the acting deputy. I don't remember exactly what it said, but I do believe there was a follow up email that did come from -- I believe it was Pete Marocco sent it to the team showing where Secretary Rubio had identified him in that role, so people knew that it was legitimate.

Q. What authorities does someone who's not been delegated responsibilities -- let me scratch that. Without an actual designation from now acting administrator, Mr. Rubio, what authority did Mr. Marocco have prior to actually being delegated?

MR. WEN: Objection. Calls for a legal conclusion.

BY MS. STEVENS:

Q. You're lay answer to that question.

A. I don't know.

Q. As -- as someone who would be directed by Mr. Marocco, what was your understanding of his authority to give you direction?

MR. WEN: Objection. Calls for speculation.

Page 148

MS. STEVENS: I'm asking for his understanding of this person's ability to give direction.

THE DEPONENT: So I will say historically, the -- the administrator didn't give direction to the CIO. The CIOs, when they come into an agency, they know their roles, and they know their responsibilities, and they know the laws that they need to adhere by.

So the -- the direction that is given, it's not, like, operational direction, at least in any of the agencies I've been in. It is really, like, strategically, these are the things I want you to focus on. So the -- I -- I wasn't given, like, any sort of specific direction from Pete Marocco. So -- which is -- is typical.

I mean, even in education, the secretary of education didn't tell me you -- you need to do this. It was more me giving updates on this is where we're at, these are the security concerns, this is the money that I need, these are the resources.

So there -- there really isn't a lot of direction. Usually, what happens is the CIO will look at, like, the president's management agenda and then create their own plan with the strategic plan

Page 149

for IT and the agency and say, this is what I'm doing, this is how I'm doing it, this is why, this is the impact.

So you don't -- I never got from any agency, like, specific direction from an agency head, you need to do this.

BY MS. STEVENS:

Q. Okay. That makes sense. Also, on the 30th -- let me make sure. Before the meeting with Mr. Lewin, Mr. Hopson, and Mr. Jackson, did you know that there were -- actually, sorry.

Unrelated to the meeting that I just described on the 30th, did you have any understanding as to additional accesses that folks from DOGE were working on getting in USAID systems?

A. What do you mean by access to systems?

Q. Let's do -- so there -- specifically, with respect to some of the system -- the IT systems you described earlier, Phoenix, badging, cloud environments, did -- do you have, as you sit here now, any recollection that Mr. Farritor from DOGE was working on getting additional access to those systems?

A. Yes. I did know that there was a request that came in to give Luke access to, I believe it

Page 150

was Phoenix, which was, of course, a very -- I did not give access. I did not control access to that. So it was really brought to me of, hey, we need to find out who we can give access to because my understanding is what they wanted to do was to be able to see transactions and traffic that was coming from that system.

The impression I was left with at the time was it was just a further part of the investigation to figure out what happened from a transaction standpoint. So there was -- the question was, hey, how do we get him access to, which in essence was me trying to figure out who -- who had access to -- to get access to Phoenix.

And I believed, and I still believe that it was Danny You, who was actually on my team, who had access, but wasn't, like -- I think it was more of a like a backup administrator, but that he had the ability to actually give access to which they wanted to use to monitor traffic that was coming from that system.

Q. Did you have any understanding of other systems that -- sorry, did you have any understanding that Mr. Farritor or other DOGE affiliated people were trying to get access to other

Page 151

USAID systems?

A. So the impression I had is that even when they first came in, that they were wanting to have access to our network, which access to our network virtually gave them access to all of the systems that were not classified, of course. But the actual applications themselves, meaning, and I'll use Phoenix as an example, they already had access to Phoenix by virtue of having access to the network.

Q. The front end of Phoenix, like, they could interact with the -- but they --

A. No. On the back end --

Q. Okay. Okay.

A. -- they could, like, look at log files, they could pull down the database. There's things that they could do on it. But the impression or what I was told is that they wanted access to actually access the application.

Q. Okay. And what was your understanding of how that conversation developed?

A. Was that they were, again, trying to dig in and find these transactions that happened and illuminate really what happened, which again, I never actually saw that anything happened, but that I was -- that -- that's why they were getting access

Page 152

to validate or verify that some nefarious transactions had happened that shouldn't have happened.

MS. STEVENS: All right. Handing you Plaintiff's Exhibit 8. On the bottom right, the Bates number starts with 1774.

(WHEREUPON, Exhibit 8 was marked for identification.)

BY MS. STEVENS:

Q. Just glance -- you can read -- take a minute to read through there.

A. Okay.

Q. Okay. This is a email chain with, let's see, Ken Jackson, Matt Hopson, Brian McGill, John Voorhees, and some other folks. It starts on the 30th. Sorry, this is one that is us ending. It starts on the 30th; is that right?

A. Okay.

Q. You see that Mr. McGill is relating -- relaying that Mr. Farritor is asking for specific access. Did you read that?

A. Yes.

Q. Okay. Did you -- this is also on the day of the 30th, which you've just articulated a bunch of events from that date. Did you have any

Page 153

knowledge that this conversation about access for Mr. Farritor was going on?

A. No.

Q. Were you told later about this back and forth about access to Mr. Farritor?

A. I don't believe so because for C-Cure, as an example, that is a system that is -- is administrated by security and not administrated by the CIO organization. So I -- I understand what the system is because I authorize the system from an administrative standpoint, but I -- yeah.

So I wouldn't have actually ever been in that conversation, even a year before for access to it. That would have been a security thing.

Q. What about on the 30th with respect to your role as acting administrator? Would it have just not come up to that level of --

A. It -- it probably would have been escalated because of asking for and having to explain why because that system is what controlled access to the building and all of the different rooms in the building. So it -- it probably would have, but as I see, those all happened after the fact of me no longer being -- meaning, I -- that was on a Thursday. I had left for the day. None of

Page 154

this got to me.

Yeah. I don't and again -- yeah. Even looking at the following or the -- the one that's dated at 7:04, Brian is, in essence, asking Ken for his or my authorization to verify to do this, which again, I wasn't on the email, so I never saw that.

Q. And you had -- this is in the evening on the 30th and you --

A. Had already gone home and knew or suspected I wasn't going to be in that role.

Q. All right. Let's go to the next one. Before we move to the next exhibit, after the meeting on the 31st with Mr. Marocco and the other folks that you described that were in the Point 4 meeting, what happened next? You said you left that meeting, and then what happened next that day?

A. The morning of I know I went and talked to my team to get a sense of what was going on because I had been out-of-pocket for a couple of weeks. I know I talked to Steven Hernandez. I talked to Zack Kahn, who ran IT operations, just to -- to get a sense of what was going on. But again, I -- I didn't share this is what happened. Yeah.

Q. Are you saying, like, they -- you didn't tell them you weren't acting administrator anymore,

Page 155

or you didn't share the substance of how you got to not be acting administrator anymore?

A. Both.

Q. Okay.

A. Yeah.

Q. Okay. So from their perspective, you're -- you're still the acting administrator at that time?

A. I would presume, yes.

Q. Okay. So you went to talk to your team, understand what's going on. What happened after that?

A. Yeah. I -- I wish I had access to my email, I would know. but I'm I'm not really sure. I know there were, you know, other meetings that were had, meaning -- and again, I don't know what those meetings are, but I know my day was pretty busy.

I know some of the -- so for example, I was no longer getting briefings in the SCIF anymore. So it was going in meeting with the analyst to let them know that, hey, I'm not going to be getting these briefings anymore on the high side.

So they -- because we employed people from other agencies to come in and give briefings to the

Page 156

administrator. And I didn't want them prepping for stuff that I had asked for in prior meetings.

Q. This is in some other document that we may or may not get to, but what does on the high side mean?

A. Meaning classified material, top secret -- secret material.

Q. Okay. Do you have a recollection around that day about DOGE access, Mr. Kliger and Mr. Farritor seeking different types of access on the 31st versus my questions about the 30th?

A. Different types of access for what?

MS. STEVENS: Let's -- let's -- I'll give you Exhibit 9.

(WHEREUPON, Exhibit 9 was marked for identification.)

BY MS. STEVENS:

Q. There you go. And take -- take a minute to read through it.

A. Okay. Yes, I recall this.

Q. Okay. Can you describe for us the events leading up to this email chain?

A. My understanding was that they wanted to be able to access the log data to see information that the application itself wouldn't reveal.

Page 157

Because the way an application works is on the front end, the user interface that people see, there's a lot more on the back end that you can see of, like, time stamps of when something was done or when an action was taken.

And my understanding is that they wanted to have access to those systems so that they could actually identify when exactly something happened, that the application wouldn't actually say. And that was for both Gavin and Luke.

I do remember this because the initial question was about Jeremy as well. And I asked Jeremy about, do you need access to this, and he said, no. But yes, so it was giving them access to the back end of the system so they actually could see more than what the front end would actually show.

Q. That question from Jeremy or about Jeremy, was that on this day or was that on the 30th?

A. That was on this day.

Q. Anything else around that conversation?

A. So the -- one of the things that I did ask my team because I wanted to make sure I understood is that we -- as I mentioned earlier about Splunk, Splunk controls all of this, meaning it logs all of

JASON GRAY                      February 03, 2026                    158 to 161
93681

Page 158

this. So if someone changed something in a system somewhere, we would know about it. And those -- you can't just go and undo or edit or delete that because if you do delete it, it marks that it was deleted.

So the -- and again, it was done intentionally so that government could make sure that insider threat wasn't inadvertently changing the numbers or removing access logs, which is why one of the reasons all agencies do this, but USAID used Splunk to monitor all the time.

So when I looked at this and I did talk to Steven Hernandez about this, and Zack, I asked, I'm like, I just want to make sure that Splunk can still track all this. The answer was yes. And I'm like, that's great. We'll give them access. They can do what they're doing.

They were very clear in the conversations because Luke -- I don't -- it wasn't Gavin. Gavin wasn't there. I think he was remote or something. The question was, what are you doing. It was, like, we're just we want to pull information. We don't want to change anything. We're not going to edit anything. I validated with Zack and Steven that if they did change something, that we would know about

Page 159

it.

And which, again -- so that was the rationale behind, okay, we'll give them access. They can see what they want to see, pull logs, review, see what happened. Yeah.

Q. When you say that if they did make any of those changes, you would know about it, are you -- are you suggesting that Splunk had, like, an alarm to let you know, or you're saying you could know about it by going --

A. I would say you could know about it because as I mentioned earlier, in one month, we would get a billion transactions, events that happen. So searching through a billion is -- is a really difficult thing to do, even if you narrow it down.

Every month, they would end up searching through millions, which then turned to hundreds of thousands, which then turned people looking through tens of thousands of events to validate what happened.

For me, though, it was just making sure that we historically would know what happened, when it happened, who did it, because Splunk logged all of that.

Page 160

Q. What team was responsible for viewing the changes in Splunk?

A. The information assurance team.

Q. And that's under CIO?

A. It is under the CIO.

Q. Who was the head of that team at the time?

A. Bill Morgan.

Q. So on the 31st, when you gave this permission over email or approval over email, were you doing that as the CIO or some other capacity?

A. As the CIO.

Q. Did you talk with anyone, outside of the folks that you've just identified, Zack and --

A. Steven.

Q. -- Steven. Did you talk with anyone else about that before giving them access?

A. I talked with Ken about it to let him know because he asked me about it and I was like, yeah, we will make that happen.

Q. To your knowledge, did Mr. Farritor or Mr. Kliger misuse that access in any way?

A. No. I -- I do not think they did. Even -- because the systems were new to them, they often were talking to my team members, asking them to help navigate some of the systems. So they were -- I

Page 161

never got the impression that they were trying to do anything nefarious, that they were really trying to discover and understand how the systems worked and operated together.

Meaning, as I mentioned earlier, Phoenix communicates with a system called PMS at HHS. It also communicates with State Department. It also communicates with treasury. So there's -- there's numerous systems, and understanding how all of those connect together is, like, really important when you're trying to analyze traffic and what went where, and when.

And I know that Luke spent a lot of time with, like, Steven Hernandez and team to dig into how do these systems work, why does this do this. So no, I did not get the impression ever that -- that they were using it for anything else.

Q. With this access that was approved on the -- that you approved on the 31st, were they -- were -- just, yeah, Mr. Kliger and Mr. Farritor, did they have the ability to, like, create new users in these systems?

A. Yes, they would.

Q. And give those -- the ability to give those users different levels of ability within the

Page 162

system?

A. They would be able to do that, but all of that would be logged in Splunk.

Q. Understood. Was the 31st the first day that you heard of Mr. Kliger?

A. I believe so. I don't recall hearing about him or seeing him. I don't know if he was in the building or not. I mean, yeah, but I had not really heard that name before.

Q. Did you understand that Mr. Kliger was also affiliated with DOGE?

A. Yes.

Q. Would it surprise you to know that Mr. Kliger has testified he was not a member of DOGE?

A. That would surprise me.

Q. I think you testified earlier, but I just wanted to clarify. You -- you did not talk with Ms. Gleason, Amy Gleason?

A. No, I did not. I don't even know who that is.

Q. When did it become -- not with -- agency wide knowledge that you were no longer the acting administrator?

A. I believe it was the following week, like that Monday. I would probably say it was probably

Page 163

that Monday.

Q. February 3rd?

A. Yeah. If I had to guess. I -- I don't think it was long. I think they let people know. Yeah. I would have to say the 3rd. Again, I -- I don't -- I don't really know and I wish I had an email, and maybe you have it, but --

Q. No, I don't unfortunately.

A. But I do know that a message was sent out, meetings were had to let people know. Meaning the SMM that we had, I believe that there was debate or conversation about, should we have it, shouldn't we have it again? And I'm like, yes, we should.

And I believe that Pete Marocco pulled everyone together to let them know that Secretary Rubio was now the acting administrator, and that I was going back to being the CIO, but working in the front office, and everything was going to be going through him and Ken.

Q. And that meeting you're describing as the Wednesday sort of bureau -- all the bureau --

A. Yes.

Q. -- heads meeting?

A. I -- yes. I'm not sure if it was Wednesday or not, but I -- that would be the meeting

Page 164

that we would have typically had. And I believe -- I -- I know that meeting happened. I just don't know if it was that day or not.

MS. STEVENS: Okay. Still on the 31st, let's do Exhibit 10.

(WHEREUPON, Exhibit 10 was marked for identification.)

BY MS. STEVENS:

Q. All right. You go and just read through and then describe what the exhibit is.

A. Okay.

Q. Will you describe what the exhibit is?

A. So one, I -- I wasn't on this, but I knew of this happening. This is when Laken was planning on putting 57 people on admin leave. I knew about that because she had asked me to do it, and I said I couldn't do it because I was no longer in the position, and that the only person that could do it was either Pete or Ken in his role, which again, I wasn't sure where he was with what happened with Pete because I hadn't seen anything at that point, designating him to what role he was in because originally, I -- I thought, well, maybe he was going into the deputy PP role, the DAPP. I don't -- I don't -- I didn't know.

Page 165

So -- but it was brought to me by Laken and said, hey, can you send this out and can you do this? And I said, no, I can't. That's beyond my role and responsibility as CIO. So -- but my understanding is that this is the message. Yeah. And I -- I was not aware of a RIF plan. It was just an admin leave plan.

Q. These are the same 57 employees from earlier in the week that --

A. No.

Q. -- Mr. Gottlieb had taken off or had -- had Mr. Gottlieb taking folks off, had those people been put back on and this is a new 57?

A. This is a new 57 people that are specifically within the LPA organization that worked under Laken.

Q. And what happened to the 57 that Mr. Gottlieb had -- had taken off of admin leave?

A. They were put back -- I believe it was Ken Jackson who put them back on admin leave to let them know that, no, you're not on -- you are on admin leave.

Q. But that was not during the time that you were still acting director?

A. No, I do not believe so.

Page 166

Q. As of the 31st, what was your understanding of Mr. Davis' role with respect to USAID?

A. I -- I don't think he had a role at USAID. I thought he was a part of DOGE, and I presumed he was a part of DOGE that had come in to ask me technology questions at the time when I met with him. And I -- but I -- I knew he was just a part of DOGE. I don't know what or what level.

Again, as I mentioned, I did look him up to find out who he was and knew or had heard that he was Musk's number two. But again, as it relates to USAID, I wasn't aware of any role at all.

Q. He is copied on this email --

A. I see that.

Q. -- right? Okay. What was your understanding of Mr. Lewin's role as of this date?

A. As of this date, I was still under the impression that he was a part of DOGE.

Q. At the -- the -- this one is descending. The last email in the train from 8/23 from Mr. Lewin. The -- the body of the email is on the second page.

A. Okay.

Q. It says, "Thank you, Pete. Ken will

Page 167

formally authorize shortly, and our team will assist Laken with execution tonight." Who is our team?

A. So my presumption there, which I believe is actually what happened, is that Luke and -- what is the -- Gavin. Because they had access, they could remove network access from people without going through my team. Because they had admin access or admin access to Aidnet. So, and specifically in this case, I know that's exactly what happened, is because I was not aware of this.

I knew that they were planning on putting admin leave and would later find out that they removed access, which we ended up, I don't want to say fixing the process, but we fixed the process because while they did that on the back end, it broke things because we actually had to follow our process to make sure that they were removed from other applications.

There was a set process that NTT, who is the vendor who managed our IT systems, would go through to remove access. And we needed to follow that process because it, you know, we had people deployed all over the world. There was replication that had to happen, and what they were doing is going on the back end and just removing access that

Page 168

way.

So -- but -- so that's that's what happened, is the -- the my team was Gavin and Luke going in and removing access to those 57 individuals, which are a different number of 57 people.

Q. When did your team realize that you needed to fix this access situation that you just described?

A. That might have been a few days later because we -- we really didn't -- at the time, I didn't even know about it. I didn't know that they had done that. Later on, probably the following week is when I was told, oh, by the way, they were -- they put these people on admin leave. I didn't know. I knew that it was coming.

And then I talked to Zack, who typically would, from an operation standpoint, his team would go and do that. And he is the one who told me, oh, no, they already did it on the back end.

And then -- his name escapes me at the moment. The -- the lead for NTT, which was the contractor who did that, let me know, hey, we need to do this because there's a script that we can run, and we -- it will make it easier and sync across the

Page 169

world. So that's -- I want to say it was probably a few days later is when I found out that their access was removed.

Q. Also, on the 31st, it's my understanding that Mr. Hopson decided to quit his position. Do you recall that happening?

A. I do. On Friday, he -- Friday afternoon, he met with me and told me that he was thinking over -- thinking about resigning, and he wanted to give me professional courtesy and let me know. I asked him not to because I really valued his input, and I felt like the team would be -- that he would help the team, the political team who was there. And I want to say it was Friday evening is when the message got sent out that he was resigning.

Q. Did he tell you why he was resigning?

A. He did. He said that his -- that he was worried about -- he said he was worried about DOGE and that DOGE -- that and I'm presuming the DOGE people who were there, were -- seemed willing to go beyond, and hopefully you can talk to him, but that seemed to be willing to go beyond where they should go. Not that they had, but they seemed like they were willing to.

And I told him that from what I've seen, I

Page 170

had not seen that, which is why I really wanted him to stay because I needed really strong political leadership in the agency to -- to do the right thing and keep doing the right thing. And -- but he said he felt that he was worried that they would -- they would do something, and I told him I didn't think that would happen, but he still left.

MS. STEVENS: Okay. Turning your attention to February 1st. All right. Handing your Exhibit 11.

(WHEREUPON, Exhibit 11 was marked for identification.)

BY MS. STEVENS:

Q. Take your -- take a minute to read through it and then let me know when you're done.

A. Okay.

Q. All right. This one is in ascending order, so we'll start at the second page where Ken is indicating that -- that there's some folks coming to the USAID building. Do you remember this sort of situation --

A. Absolutely.

Q. -- in time. And then Ken replies -- or sorry, Pete -- Ken replies and says, "With the new state/USAID delegations, I'm running this through

Page 171

you for approval." Do you know what that means?

A. My understanding is that is Ken now communicating to Pete to get Pete's sign off that, yes, this can happen.

Q. And -- but do you understand the, like, State/USAID delegations?

A. Yes. My understanding for that is, again, Pete was still a part of the State Department and still holding his role in State F. And that because -- I mean, to my recollection, we didn't actually have guidance on was Pete part of Aid, was Pete part of State. We didn't really know. I didn't know. I don't want to speak for Ken, but my understanding is that Ken sent this to make sure that Pete was approving this versus Ken approving it.

Q. You said that you recall this situation on the morning of February 1st. Can you -- outside of just what's in this email, can you tell us what you recall?

A. Yes. I got a phone call from Steve Davis, basically saying that he was in the Ronald Reagan building trying to get access and did not have access, and that I had, I think his number was 12 minutes to get him access, or he was going to call the US Marshals Service and have everyone escorted

Page 172

out of the building.

Q. Okay. What time -- around what time was this?

A. I do -- I do not recall.

Q. Morning, afternoon?

A. It was probably when all this was happening. I -- probably, like, midmorning, afternoonish.

Q. Okay. And this was the -- the first phone call you'd had --

A. The first --

Q. -- about this situation?

A. Yeah, absolutely. First phone call.

Q. What was your response to Mr. Davis?

A. Let me find out what's going on. I'll get back to you. And then I got on the phone. I got off the phone and talked to PJ. Butler, who was managing physical security and -- at the Ronald Reagan building.

As I mentioned earlier, we were working every day, so there was -- there was no weekend. So that's why it all kind of blurs together. And I told PJ, I said, hey, what is going on? And he said, we -- we just need to make sure that, you know, there's a badged person there. I will get

Page 173

them access. I'll take care of this. And that happened very quickly.

I let Steve know, hey, this is being taken care of. And then they got access. And then shortly after, I got another phone call because apparently, Steve had access and the access was removed. And I, you know, was asked about the removal, and I'm like, I have no idea. Let me talk to PJ Butler.

And then we actually did a three-way conversation where it was me, Steve Davis, and PJ to talk about this, to find out what was going on. And Steve asked PJ, did you remove my access? And PJ kind of hemmed and hawed about it a bit.

And then Steve was, like, I have my team right here that can easily see that PJ Butler or whatever -- I -- I think he had a different name. I don't think it went -- PJ was a -- a separate name for him, but that, you know, basically, PJ had removed his access at this time, and he gave the specific date time stamps of when that happened, which, as I mentioned earlier, is the log access that they would have access to so they could easily see.

And this was Steve Davis letting PJ know

Page 174

that, yes, I can see that you removed my access. And then Steve asked him were you ordered to remove my access to this? I don't -- and -- and PJ would not answer the question. And I actually appreciated it. And he was very clear. He's like, listen, I -- that puts me in a tough spot because now you're asking me to talk about my boss. And, you know, I -- I really can't answer that question.

And then the question came up on, hey, we need to have access. It was access to what. And the conversation was having access to the administrator suite, which is where all the politicals were sitting on the fourth floor. They were like, we want to have access to that suite. We don't have access to that suite.

PJ said they didn't have access to the suite because the suite had been flagged as secret. And I let PJ know that that floor we had a temporary, a one month basically waiver basically saying that that entire area was not going to be having classified material from two weeks before, from the week of inauguration, that was removed because everyone needed to have access to their phones.

And historically, in that suite, you would

Page 175

not have access to anything. You wouldn't have your phones, you wouldn't have your computer. All the computers that were there were in there and would never leave there because there could have been classified material.

There was not classified material in there. And then I let PJ know, I said, if we're talking about access to the administrator suite, that's fine. That is what they want. And then I specifically said, we are not talking about access to classified material. And Steve Davis said, yes, we don't want access to classified material. We just want access to the suite. And then he got access to the suite.

Q. In the -- in the email that's in front of you where Mr. Marocco says, "That's fine. They just need one USAID badge with access for any guest." What was your understanding of the badge situation for the folks that were trying to get access to the USAID building that day?

A. Typically, for guest access to the Ronald Reagan building, you just needed to have a USAID badged employee that could then sponsor people through to get them access through the turnstile to get up to the floors.

Page 176

Q. And did Mr. Davis say that they had -- when he called you originally demanding access to the building, did they have -- did Mr. Davis or anyone else with him have that?

A. A USAID badge?

Q. Mm-hmm.

A. I do not know. I -- again, this was a couple of weeks in. I don't know, like, even Jeremy. I don't know if Jeremy had a USAID badge or a GSA badge. I -- I'm not really sure.

Q. What was Mr. Davis' role, as you understood it, that morning, or on the 1st, when he called you?

A. I -- to me, it was the same impression, was that he was a member of DOGE and was working with the DOGE team, which are the individuals who were mentioned, Tarak, which I had never met, Gavin and Luke and Jeremy.

Q. What was your reaction to Mr. Davis threatening to call the US Marshals?

A. What do you mean by reaction?

Q. Your -- what did you think about that?

A. I thought it was excessive and I thought, let me solve this problem because it's really easy to get access to a building. Again, I -- so it was

Page 177

-- it just -- it just seemed like, you know, it's all going to happen, you know, and it's like, talking about calling the Marshal service and having people escorted out for accessing in.

The thing that caught me was really the timeline, that you've got 12 minutes to get this fixed. And I'm like, okay. But it got fixed within 12 minutes, and people didn't get escorted. So that was -- it was good. Yeah. It just seemed -- yeah, just very intense.

Q. When you're on that phone call with Mr. Davis, why did the -- the threat of the 12 minutes or the call to US Marshals have any weight to it if you didn't have any authority?

MR. WEN: Objection. Vague. BY MS. STEVENS:

Q. If you know the -- if you understand the question.

A. Because to me, the impression I had was that he was a member of DOGE and they were trying to get access to the systems as was mentioned in this message.

Again, we already know that Luke and Jeremy and Gavin already had access. It just sounded like he wanted to have access to come in and

Page 178

see the facility and see what was going on, what they were doing. Again, I don't know the Tarak person.

So it was really -- it wasn't from -- the authority was more of that, here's someone from USDS or DOGE that was coming in who wanted to continue investigating what was going on, and it sounded like he was perturbed by being forbidden access to something that he should have access to.

MS. STEVENS: Let's do this one. Okay. Handing you Exhibit 12. At the bottom, it starts with 00059.

(WHEREUPON, Exhibit 12 was marked for identification.)

BY MS. STEVENS:

Q. And take a second. This is a couple of pages long.

A. Okay. And this starts from the back.

Q. Mm-hmm. Sorry.

A. No, I'm just --

Q. Okay. Did you have enough time to go through it?

A. Yes.

Q. Okay. So this is a series of emails from February 1st, 2025, related to access to different

Page 179

areas at USAID at the -- at the building; is that correct?

A. Yes.

Q. Okay. And you're -- you're on this email chain?

A. Yes.

Q. Okay. Turning to the last substantive page, which is the third page, this email, like the -- the email, the exhibit that we just went through, lists Jeremy Lewin, Luke Farritor, Gavin Kliger and Tarak Makecha, right, as the folks seeking access to the building?

A. Yes.

Q. Okay. And then up above, it further lists, Steve Davis, Noah Peters, and James Burnham. Do you see that?

A. I do.

Q. Okay. Is this the general time frame that the Mr. Davis' phone call to you --

A. It must have been.

Q. -- occurred?

A. Yes.

Q. Okay. And were you in communication with any of the folks on this email chain about that -- that conversation with Mr. Davis, I think --

Page 180

A. PJ Butler was -- which he's on this thread. I was talking directly to him, and he was on the call with Steve Davis.

Q. On the second page at the bottom, there's a -- a message from Mr. McGill. Can you just read that -- or have you already read that section?

A. Yes.

Q. Okay. The last sentence where it says, "We still don't have paperwork on them to verify clearance, we've asked ES for that info." Who is ES?

A. The executive secretariat, of which Erica Carr is the acting executive secretary for the agency.

Q. And the next sentence where -- where Erica says, "Brian, to be clear, ES is restricted." Is that -- does the executive secretary have their own space within USAID -- the USA building?

A. Yes, they do. It's on the same floor as the administrator, opposite halls.

Q. So she makes clear that that area is restricted, and then Brian responds, "We'll make sure that's corrected." Are you interacting with any of them sort of on the side of this email chain, or are you just observing this as it's happening?

A. I'm just observing it as it's happening

Page 181

because as a CIO, I had no access to any of these systems, like C-Cure. I -- I didn't have access to that. My team didn't manage that. I got called, and I don't -- I don't know why, but Steve Davis called me. I called PJ. And then that's when the conversation happened about, this is what we're talking about. We want access to the administrator suite.

And I was explaining, okay, but there's -- there were several, I think, three or four floors that were actually classified, labeled as classified, meaning SEC. I think on the fifth floor had classified space, meaning the -- the area itself, as Erica had mentioned about Exec Sec, had classified systems, meaning systems with basically a red label on it saying that it was connected to a classified network.

You wouldn't be able to get access to it, but the fact that those systems were actually in there meant that they were restricted. That is when I had the conversation with Steve Davis saying, listen, I am perfectly fine with you having access from an administrator suite standpoint, and I talked to PJ because he was on the call with the three of us, that this is what that means. It's not access

Page 182

to classified spaces.

Q.   And Mr. Davis, on the phone call, was fine with that?

A.   He was.  And he said, we don't want access to classified material.  We just want to get access to the administrator suite.  And I told him, I said, like, the SCIF as an example, that has -- it's all secured and safe.  So even if you got access, it's not stuff laying around that you could have access to.  But he was like, no, we don't want access to that.  We just want access to the administrator suite.

I think the confusion was that the administrator suite was labeled as restricted, secret, because it historically had been, but we had received a waiver for one month from Brian McGill saying, yep, we'll waive that because we understand that people need to bring their phones in there. There was no classified material in there anyway, but that's -- that is my recollection and understanding of all of this.

It just at the time, it seemed like a massive misunderstanding, was that they were accessing or trying to access the administrator suite, which is what PJ got pulled into and where

Page 183

Steve Davis said, I see that you removed my access at this time.  It was when he was specifically trying to badge into the administrator suite.

If it's something beyond that, I'm not aware of it because that was the only piece that I talked to PJ and Steve Davis about.

Q.   This third to last email, right in the middle of the -- of the front page here, it's addressed to you and Ken from Mr. McGill, where he says, he would "appreciate a communication to them reminding not to access classified areas.  As we're checking the changes, we can see they are going through restricted areas to include giving themselves access to restricted areas."

Did -- did you respond to that?  What -- what was the sort of next steps from that?

A.   Yeah.  I did not respond to that because, again, I don't have access to that system.  I did not manage that system.  That was managed by -- I couldn't even see if they were doing that at all. And at that time, I'm presuming that the reason Brian included me on that message is he wasn't aware yet that I wasn't the acting administrator anymore. So I think that's why I got brought into this.

Q.   And then did you have a conversation with

Page 184

him that day about whether you were the acting administrator or not?

A.   I did not.

Q.   Okay.

MR. WEN:  Hey, Beth, can we take another short break?

MS. STEVENS:  Yes.

Is that okay with you?

THE DEPONENT:  Yes.

MS. STEVENS:  Yes.

THE VIDEOGRAPHER:  Okay.  Please stand by. The time is 3:25 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record. The time is 3:33 p.m.  You may now proceed.

BY MS. STEVENS:

Q.   The conversation you had with Mr. Davis and Mr. Butler, the three-way phone call.

A.   Yes.

Q.   And Mr. Butler, you know, expressed that he -- he felt awkward having to talk about his boss. Who is his boss?

MR. WEN:  Objection.  Objection. Mischaracterizing the testimony.

BY MS. STEVENS:

Page 185

Q.   Mr. Butler was expressing some hesitation to answering Mr. Davis' question.  Who is Mr. Butler's boss?

A.   I'm not -- it was either Brian McGill or John Voorhees.  It was one or the other.  If I had to guess because Brian was the deputy, I would guess that it was Brian.  And the question specifically asked was, did your boss tell you to remove my access?  And that's what PJ would refuse to answer.

Q.   After the -- you got off that phone call and then had this back and forth over email that you were observing, what -- what happened next with respect to this disagreement about access inside of the USAID's building?

A.   My -- so what happened after that was I got a phone call from Ken saying that they were going to be putting more people on admin leave, and to -- and one of them was going to be John Voorhees, and the other was going to be Brian McGill.

So I couldn't get a hold of John, but I did call Brian to give him a heads up that, hey, this is going to happen.  And the reason I was involved is because my team would remove access to the network and to his cell.  So I wanted to, as a professional courtesy, let him know, hey, this is --

Page 186

is going to happen.

Q. Did Ken explain why they were putting Mr. Voorhees and Mr. McGill on admin leave?

A. No.

Q. Did you ask why?

A. I did not ask why. Typically, if it -- if there's something from a CIO standpoint, you -- it doesn't really matter why. If you're told by your leadership, hey, remove so and so from access, you remove so and so from access.

Q. What did Mr. McGill say when you let him know?

A. He thanked me. He said, thanks for giving me a heads up. And he said that he -- he accepted responsibility, and he said that if he could prevent PJ from being put on admin leave because the presumption was that PJ would be put on admin leave as well because of the circumstances, that he said that PJ shouldn't be put on admin leave, that he is fine being put on admin leave for that.

Q. Did Mr. Jackson give you anything in writing related to Mr. McGill and Mr. Voorhees being put on admin leave?

A. I don't -- I don't know. I would have to check my email that I don't have access to now. But

Page 187

at that point, we had started documenting and I wrote to NTT to let them know, hey, put, you know, remove access from so and so on this date and time because they wanted to make sure they had something official in writing.

So I believe -- I don't know if I received official notification, but I do believe I sent an email to NTT to let them know. Excuse me.

MS. STEVENS: Bless you.

MR. WEN: Bless you.

THE DEPONENT: Excuse me. If -- which gosh, it really bothers me. I can't remember his name, but I know that I would have sent an email saying to remove access.

BY MS. STEVENS:

Q. And NTT is the third party?

A. The vendor who does -- who really administrates the network and does all the IT services.

Q. Is the -- the department or bureau within USAID that is responsible for the website, was that within the CIO's purview?

A. No.

Q. Okay.

A. The website fell under LPA, which Laken

Page 188

was in charge of, and I forget the gentleman's name also who ran that. I didn't interact with him much, but I do know that -- I forget his name, but it was all in LPA.

Q. At the time that you talked to Mr. McGill on the first to let him know that he was going to be put on admin leave, had you told him that you weren't acting administrator yet?

A. I did.

Q. Is that when you told him?

A. Probably.

Q. And so under whose authority was he being put on admin leave?

MR. WEN: Objection. Calls for speculation. Also calls for a legal conclusion.

BY MS. STEVENS:

Q. I'm not asking for your legal opinion. I'd like to know, to your knowledge, under whose authority Mr. McGill was being put on admin leave?

A. To my knowledge, Ken is the one who talked to me and told me to do this. So it was Ken's authority that was directing as, again, presuming the delegated roles of DAMR, which in essence is my boss, saying, do this.

Q. And DAMR is the --

Page 189

A. Deputy Administrator Resource Management.

Q. Okay. Thank you. And, you know, we talked about Mr. Jackson's role being less than clear since you were taken out of the acting administrator role. As of the first, did you understand what Mr. Jackson's role was?

MR. WEN: Objection. Vague. Also, that mischaracterizes the prior testimony.

BY MS. STEVENS:

Q. How about this? As of the first, did you understand what Mr. Jackson's role was?

A. My presumption was that he was still in the role until I heard or saw otherwise.

MS. STEVENS: All right. Handing you Exhibit 13.

(WHEREUPON, Exhibit 13 was marked for identification.)

BY MS. STEVENS:

Q. Okay. I said there were some mental gymnastics in some of these emails. This is the worst one by far. So my apologies in advance. So at the top, it says, January 31st. We are concerned with things that happened on the 1st, which are inexplicably in the middle of this email chain.

So I'm going to turn your attention to --

Page 190

actually, if you could just read through all of it, and then I will ask you questions.

A.   Okay.  Okay.

Q.   On Page 6, at the bottom, at the very bottom, it starts an email that goes onto Page 7. From Bill -- or sorry, William.  But this is -- this Bill M --

A.   Bill M.

Q.   -- who we've been talking about, right? To Leo Ruth and CC'ing Ken Jackson.  Can you tell us who Leo Ruth is or remind us?

A.   He -- Leo Ruth is a deputy director.  I mean, his title is here.  So he was in essence, John Voorhees had two deputies.  One was Brian McGill, the other was Leo Ruth.

Q.   And in this email, Bill said -- Bill? Yes, Bill.  It says, "Confirming that John V.  And Brian M. have been placed on the admin leave.  My understanding was that Ken had support from DOGE to remove physical access.  Please verify."

And then two emails down from Steven Hernandez, who is on your team, correct?

A.   Yes.

Q.   It says, "Confirmed, DOGE will remove physical access." What -- what does it mean to

Page 191

remove physical access first?  Go ahead.

A.   So what that means is the -- the system, C-Cure that actually controls physical access to the buildings, DOGE had access to, and it was letting Leo Ruth know because normally physical access would go to SEC, that independent office, the security office, to remove physical access.  They would log in a C-Cure and remove their access.

When I read that, my understanding is that DOGE is removing physical access, meaning they're either a) using C-Cure to remove the names and the access of those individuals so that they don't have physical access to the building, or they're going into the database of C-Cure and removing the name that way. But I don't know.

But it's that DOGE was using the application and access that they had to remove physical access to the buildings.

Q.   And at this point in time, Steven Hernandez, what's his -- his role?

A.   His role -- this is on the 31st, right?

Q.   The 1st.

A.   The 1st.  Yeah.  I -- what I believe is that -- this was on the 1st.  One, Steve, at this point, I don't think, really knew that, hey, things

Page 192

are changing because that was that Friday or Saturday.  And Ken was letting Steven know that, hey, take care of this.  These people are being put on admin leave.

And what that means is that Steven is going to let Zack know or another Bill, Bill Morgan, he put Jeff Anouilh on here to let him know, hey, remove their access, which that's on the logical side, which is the active directory side, which is removing access to the IT systems.

Q.   Which is in the CIOs?

A.   Which is in the CIO's area.  The physical access was all SEC.

Q.   The -- he -- Steven Hernandez even still has acting CIO here on his -- on his signature block, right?

A.   Yes.  He kept that there for several weeks after because there was a lot of ambiguity because originally, as I mentioned earlier, I knew I was going back to the CIO role, but it was mentioned that I might be going into the DAPP role, so we weren't really sure.

Q.   So his role was sort of influx based on what your role might become?

A.   Yes.

Page 193

Q.   Okay.  At this time, though, did Steven know that -- that you weren't acting administrator?

A.   I don't recall, but probably.  I tried to keep very close with Steven so he knew what was going on from an IT standpoint and support.  So -- but I'm not -- not entirely sure if he knew then or not.

Q.   Did anyone tell you not to tell people that you weren't acting administrator anymore?

MR. WEN:  Objection.  Asked and answered.

MS. STEVENS:  I don't think I've asked that question just like that.

THE DEPONENT:  No.  No -- no one told me to say, don't do this.  The -- the impression I had was that it wasn't -- I mean, on that -- certainly that Friday and that weekend, was that as the -- an announcement hadn't gone out to let people know.

BY MS. STEVENS:

Q.   Did you have -- did anyone suggest not to tell anyone that you weren't acting administrator?

A.   I can't recall.  I don't -- I don't believe so.  I think it was the -- the concern I had is, at least from my view, it was I didn't want to start a rumor mill with no official communication going out.  And if I started sharing with people,

Page 194

oh, by the way, I'm not the acting administrator, then that would have spread like wildfire. And then there would have been no opportunity to get in front of the communication and say, this is what's going on.

And that's where -- when Pete got there, that -- and the message eventually went out. And again, I -- I can't check or validate when that happened to let people know that Secretary Rubio was acting administrator and Pete was the deputy. Until that happened, I didn't want me to cause confusion because as I mentioned earlier, stability was everything. I didn't -- I didn't want to disrupt anything more than was already being disrupted.

Q. Understood. On that same -- screw that up. The same document you're looking at, 13, what's your understanding of why Mr. Lewin is -- his first email is to Steve Davis about these 57 folks?

MR. WEN: Objection. Calls for speculation.

BY MS. STEVENS:

Q. You can answer.

A. My presumption, again, this is all new to me two weeks in, is that Jeremy is a part of DOGE and Steve Davis is a part of DOGE, and there's some

Page 195

sort of reporting relationship between Jeremy and Steve Davis is my presumption, but I do not know.

MS. STEVENS: Handing you Exhibit 13.

THE REPORTER: Did you -- could you confirm the exhibit number? Did you say 13?

MS. STEVENS: Oh, sorry, 14.

THE REPORTER: Thank you. I just wanted to confirm. So that will be Exhibit 14.

MS. STEVENS: That's a good catch.

(WHEREUPON, Exhibit 14 was marked for identification.)

BY MS. STEVENS:

Q. Mr. Gray, this is a Google chat that was produced by Mr. McGill -- that's why it's got McGill down there at the bottom right -- between himself and Steven Hernandez and Zack. Could you just read through, read the notes there on the right, and then tell me when you're done.

A. Okay.

Q. So you see a couple of times it says, "Full administrative access," and then a different one says, "Highest possible level of administrative access." Can you tell me your understanding of what each of those means?

A. So I'll start with USAID as an example,

Page 196

dot gov. That is the -- the active directory. And the highest possible level of administrative access, as I mentioned before, there's a super admin access. But that's the one where if you destroyed the -- the domain as an example, there's no way to recover it. And all of the data, everything, all the access would be -- you would not be able to reconstitute it.

So the -- the highest possible level of access would have been a domain admin, which would have given them the ability to -- to do everything but destroy the domain and shut the domain down and lock it down.

The same thing as it goes for the Google Workspace, because if they basically deleted the Google Workspace, that would delete everyone's email. It would -- all of the -- the shares and permissions to all the files for decades would have been deleted.

So my understanding is that it was we need the highest possible level of access, not just give them, like, the top. So that's what my understanding was.

The same thing for Azure and Entra ID, which I don't exactly recall what that is, but it's

Page 197

a way to validate. It is a system within the active directory through the Azure Cloud, but it's a system within active directory.

MS. STEVENS: Okay. I'm going to hand you -- try not to confuse myself here. Hold on just a sec. Exhibit 15.

(WHEREUPON, Exhibit 15 was marked for identification.)

THE DEPONENT: Okay.

BY MS. STEVENS:

Q. So this email is from Mr. McGill to Bill W, the HR person, right? And copies -- and to other people, but also copies you; is that correct?

A. Yes.

Q. Okay. Bill M. Did I say W? Sorry. Bill M. Did you respond to this email from Mr. McGill?

A. I did not.

Q. Okay. Did you talk to anyone else about how to respond to this email from Mr. McGill?

A. No. Usually, if -- if I'm copied on an email versus sent to the email, it's more for awareness versus direct action.

Q. The evening before, you said that you called Mr. McGill to let him know he was going to be put on administrative leave. Did anything else

Page 198

happen after that discussion with him? Not necessarily about him, but anything else stand out in your mind about that Saturday?

A.   Not to my knowledge.

MS. STEVENS:  The next email is Exhibit 16.

(WHEREUPON, Exhibit 16 was marked for identification.)

BY MS. STEVENS:

Q.   Which is a response to Mr. McGill, but you're not copied on this one, so that's why I had the two different exhibits.

A.   Okay.

Q.   Did you talk with -- with Kirsten Gunsolus before she --

A.   No.

Q.   -- or before they sent this email?

A.   No.

Q.   Did you give anyone permission to say that you were, as acting administrator, you were putting Mr. McGill on leave?

A.   No.  My -- yeah, my presumption here is that the information just hadn't gotten there yet. So yeah, I'm assuming she was presuming it was me. I don't know what that attachment looks like.  I

Page 199

don't know what that attachment said that's referenced in this email.

But I was very clear with Ken, with Laken, and with the whole political team that I would not be doing anything as the acting administrator as of Thursday evening because I was no longer in that role.

MS. STEVENS:  Okay.  We had referenced this -- or you've referenced this document a few times, so we'll get to it.  Handing you Plaintiff's Exhibit 17.

(WHEREUPON, Exhibit 17 was marked for identification.)

BY MS. STEVENS:

Q.   And just read those two pages.

A.   Okay.

Q.   I think you said that you asked for documentation indicating that both that Secretary Rubio was designated as acting administrator and that Mr. Marocco had been delegated authorities. You talked about asking for those documents, right?

A.   Yes.

Q.   And you eventually got them over email; is that correct?

A.   I -- I do not actually recall this email

Page 200

or this document, but I do know the one that was signed by the president, I did get.

Q.   And that's the one that's designating Secretary Rubio as acting administrator?

A.   Yes.

Q.   Okay.  Do you see the date on these -- well, it's on both pages.

A.   I do.

Q.   It's February 2nd, 2025, correct?

A.   Yes.

Q.   And that's Sunday, February 2nd, correct?

A.   Yes.

Q.   You were no longer acting administrator as the morning of February -- or excuse me, January 31st, correct?

A.   Yes.  My understanding is as of the evening of the 30th, yes.

Q.   And we talked a little bit about your presumptions of what authorities Mr. Marocco had from the 31st and the 1st.  Does this document help shed light on that in any way?

A.   So yes, in that it explains to me that he was delegated the responsibilities for both the DAPP and the DAMR, not just one.

Q.   And delegated those responsibilities on

Page 201

the February 2nd?

A.   Yes.  That is when this is done.  And I was relooking at this because this is the 30th is when that was effective.  So -- but yes.

Q.   Just for the record, when you say that was effective, you're talking about the --

A.   Appointment of Secretary Rubio as acting administrator.  And the reason I say that is that it was -- that was effective, I'm assuming, sometime that Thursday evening.  So I was not the acting administrator at all on Friday.

Q.   Thank you.  Okay.  I know you didn't see this document on the 2nd, and we've gone over that email with Mr. McGill.  What is your recollection of the events that unfolded on Sunday the 2nd?

A.   So the -- the only thing I'd really add is, I -- I do believe, and I -- I don't know if someone would have to check or validate that Secretary Rubio was on a trip somewhere, and that might have been the reason behind the delay of the documentation because as mentioned earlier, I -- I don't think it was very clear Ken's role, if you will, from the 30th or 31st on because my presumption was that he was still the acting or delegated duties of the DAMR.

Page 202

And as mentioned, the -- I was aware of the other administrative acts, you know, admin leave that people were going to be put on from a CIO lens, meaning that I was going to be removing their logical access or system access. But it was very clear that it would not be from me.

I -- I just don't -- I don't have an answer of where that came from or who that came from or what authority that came from, especially if this was dated the second. I don't -- I don't understand the mechanics behind that, but yeah. So I -- I don't really have any other recollections for that Sunday.

Q. Do you have recollections outside of this -- the emails that we've gone over related to folks sort of more broadly being put on administrative leave or losing access to their systems?

MR. WEN: Objection. Vague.

THE DEPONENT: So, I mean, the -- the only -- at this point in time, I would say no. But as time progressed, you know, when you're removing people from their computer access, you learn that, oh, these people are being put on admin leave. I know that the 57 is an example because when I first saw that, I thought, wow, is that the same 57

Page 203

because it just happens to be the same number. And then I would learn that, no, that was LPA, but I was not in those conversations. That was Laken and Ken conversation.

And I -- I know and I don't remember what the number was, but there were more people that were going to be put on admin leave. But I -- I don't recall the specifics, but I do know there was more conversation about it.

I don't -- I don't recall any conversation about a RIF as an example. I saw it in the emails, but I don't -- there was no -- no big conversation about it. I -- I do think that -- I know earlier when the conversation was coming up about the RIF for DEIA, the -- I -- I really feel like people were trying to figure out what a RIF was and how RIFs worked. And I don't think they really understood that how RIFs were done.

Not that I'm an expert at RIFs at all, just having been through one. But I -- I feel like they were just trying to figure out mechanisms and government processes on how to affect the changes that they were bringing about. I wish I had my email in front of me because it -- it told me everything.

Page 204

BY MS. STEVENS:

Q. I'm going to show you a few more.

A. Okay.

Q. I've only -- we don't have all of them, but --

MS. STEVENS: Okay. So this is also from the 2nd. I'm handing you Exhibit 18.

(WHEREUPON, Exhibit 18 was marked for identification.)

BY MS. STEVENS:

Q. You are copied on these.

A. Okay.

Q. Okay. So you're -- you're copied on this final email; is that correct?

A. I see that, yes.

Q. Okay. And do you recall understanding that the CSC contracts were going to be terminated as -- as is articulated by this email chain?

A. I do recall.

Q. And what was your understanding of -- of the required next steps there?

A. So as it -- as mentioned earlier, I am copied on it, which I often would take as for awareness. To me, it was a heads up that these contracts were about to be terminated, which would

Page 205

result in a follow-up action by me getting a list of email accounts that belong to people who were contractors working for USAID to terminate their access is what would typically happen.

Q. Is that what happened in this situation?

A. I don't -- I don't actually recall because I don't -- I don't -- yeah. I don't -- I guess the answer is going to be yes, that it happened, but I don't -- I don't really recall. There was -- there were so many people put on admin leave and so many accounts that were removed and added, and it was -- there was a lot of moving pieces that were going on.

I do remember this. But I don't -- I don't recall if I got the list or if that was something that was provided to Steven. So I don't -- I don't know if I actually got a list of names to actually put there.

At the time, again, this is the 2nd. We were still in that phase of trying to figure out how to basically get DOGE not to just remove people's access and to go through the process, which we got there. But I don't -- I don't know if that happened for this or it didn't.

Q. On the second page, the -- the email at the bottom from Mr. Marocco to various folks, he

Page 206

says, "I know there's a sense of urgency at the White House." Did you have any understanding as to what that meant?

MR. WEN: Objection. Calls for speculation.

THE DEPONENT: Yes. So I -- it sounds to me, but again, I -- I don't definitively know, that Pete is trying to get Mike Needham and Dan Holler to get approval for this by saying the White House wants something is what it sounds like when I read this. There's an urgency there, but I don't know who.

I -- I don't have any insight into that because as you see, I just get copied on it, which when I read this, it was really for an awareness that, hey, something is coming where you may get a list of names that you're going to be removing access to the network.

BY MS. STEVENS:

Q. Do you have any recollection of seeing either in the news or if you're on X yourself, post on this date, February 2nd, about -- about USAID?

A. No. I do -- I am not on X. And to be honest, I -- I took my news app and moved it to the very, very end of my phone because I wasn't really

Page 207

interested in reading the news at that time, even now.

Q. Okay. On the -- is there anything else about the 2nd that -- that you recall happening? You said you all were working every weekend, but anything else happening at the agency then?

A. Not really. I mean, it was -- we were just -- it was 24/7 365. We were busy. Again, trying to keep track of who -- who to remove, what -- what was coming. Just didn't really know.

MS. STEVENS: I'm going to hand you 19 and 20. They're the -- the same thing, just one of them has the attachment to it and the other doesn't.

(WHEREUPON, Exhibit 19, Exhibit 20 were marked for identification.)

MR. WEN: So which one is 19 and which one is 20?

MS. STEVENS: Twenty has the -- or sorry, 19 has the attachment.

THE DEPONENT: I remember this.

BY MS. STEVENS:

Q. Okay. Tell us what you remember about it.

A. So this -- this was all about being a federal employee. So the press was reaching out trying to get information. Everyone was reaching

Page 208

out to try and get information. And what I didn't want was the perception that I was feeding, which is not authorized, information to the press.

So when I got that, I shared that with Pete, Laken, Joel, and Ken, so that if something happened because obviously someone was communicating that something was happening, that I didn't -- I didn't want the perception to be that I was sharing information.

So it was a proactive measure, which I did several times during my time there. Even -- when was this? This was in February, right? So even when the New York Times article came out, as soon as I got an inquiry that was sent to my personal, sent to my work, I took copies of that screenshots and sent them to say, hey, they're reaching out, I'm not talking to them. So that's what this is.

Q. In the responsive email, the Exhibit 20, Mr. Marocco responds and says, "Thanks for sharing. Please come in, and we'll need your help identifying essential personnel."

First, this is the -- the Monday where the email went out telling USAID staff to work from home. Did -- were -- had you previously been given that direction? Or do you recall?

Page 209

A. I -- I do not recall that. I do know there were several times where people were told to work from home because of events that were happening, and the guidance was really not wanting to impact, you know, staff to -- there was a lot of protests and people were upset and angry, and the conversations were about having people work remote to, you know, let things settle before subjecting employees to that at the time.

Q. Do you recall that a mass email went out to all staff telling them not to come into headquarters on the 3rd?

A. I -- I don't know. I mean, that happened several times, so I'm not sure if it happened on the 3rd, but I do know that happened several times.

Q. Do you recall that staff generally were not allowed to come back in except to collect their personal belongings, basically starting after the 3rd?

A. So I know -- I think there were 1,400 people that were put on admin leave. Yes, I do recall when that happened.

Q. And is your conclusion there that they, of course, they weren't allowed to come into the office because they were on admin leave? Is that what

Page 210

you're saying?

A.   That is correct.

MR. WEN:  Objection.

BY MS. STEVENS:

Q.   When Mr. Marocco said, please come in, we'll need your help identifying essential personnel, what did you understand that to mean?

A.   So my understanding was, and I remember coming in and walking through what are the core essential people that we need to maintain operations at USAID because a large group, I think it was 1,400 people, got put on admin leave.  And it was to walk through to see if there were individuals who were on admin leave that were needed for operations because I -- I was not involved in that conversation to put those people on admin leave.

Q.   But you're -- you're helping decide whether any of those individuals needed to come off of admin leave to help do essential functions.  Is that --

A.   Yes.

Q.   -- what you're saying?  Okay.

MS. STEVENS:  And we'll go to the next exhibit.  Exhibit 21.

(WHEREUPON, Exhibit 21 was marked for

Page 211

identification.)

BY MS. STEVENS:

Q.   Are these the -- is this the 1,400 --

A.   Yes.

Q.   -- that you're referencing?  So you weren't involved in the conversations to put any of these folks on admin leave; is that correct?

A.   Correct.

Q.   Okay.  And your understanding of Mr. Marocco's direction in the previous exhibit, 20 -- 20, was to help identify essential personnel to come off of that list, basically?

A.   Yes.

Q.   Okay.  And did you do that?

A.   I did do that.

Q.   Who did you have those conversations with?

A.   Pete Marocco and Ken Jackson and Joel, who was filling in for Matt Hopson because Matt had resigned.

Q.   Did you have any interaction with Mr. Lewin as to the 1,400 folks put on admin leave?

A.   Not to my knowledge, aside from getting a list of 1,400 people to remove administrative access, but I don't think that actually came from him at all.  It was more -- I think that came from

Page 212

Ken or Pete saying here's a list of people to put on or to remove administrative access or USAID access, Aidnet access.

Q.   I need a five-minute break, and then we only have a few more exhibits, so we're going to --

A.   Okay.

THE VIDEOGRAPHER:  Okay.  Please stand by.  The time is 4:20 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record.  The time is 4:29 p.m.  You may now proceed.

BY MS. STEVENS:

Q.   Mr. Gray, you talked about not wanting to watch the news or look at the news around the time of the events we're talking about and even until now.  How come?

A.   So at the -- at the moment, at that time, there's just so much going on and there's so much speculation that's going on in the news that is not accurate.  And it was very frustrating to see and know that things were not accurate, but not actually be able to say anything.  And it was easier just to not hear what was going on.

It doesn't mean I completely avoid the news, but it was one of those things that was you

Page 213

know, just looking at all the events and why I'm here today, I -- there's a lot of emotion and feelings and thoughts on all of this, and it's just a lot to contain.

So for me, avoiding the news was a good way to compromise on the -- I'm not going to be inundated with a bunch of stuff that I know because then you resist the urge to actually say something that maybe as a federal employee, you shouldn't say, so --

Q.   Let's do this next exhibit.  Oh, actually -- actually, on the last exhibit, I'm sorry.  The one that talks about the 1,400 employees?

A.   Yes.

Q.   On the second page, which is the beginning of the -- of the memo, it has at the bottom, which seems to be pretty typical for these memos, this -- this sort of chart that says Bureau and then the name of a person and then clearance status.  Are you familiar with that sort of set up of it in the memos --

A.   Yes.

Q.   -- for USAID?  Is that fairly typical?

A.   Standard, yes.

Q.   Okay.  In this one, it's -- it says the --

Page 214

sorry, the first person is Jeremy Lewin, and it says, "Drafted and cleared." What was your understanding of Mr. Lewin's role at this time on the 3rd?

A.   So AID/A is saying that it's 1) a part of AID, and then slash A is part of the administrator's front office.  So the way this looks, just reading it as it is, is that they are from GSA and A, whatever that is, I'm assuming it's the administrator of GSA.  I don't know.

And AID/A, it's primarily used from a organizational structure.  So it -- it -- like mine, the whole time said MCIO because I'm in the M Bureau, meaning my organization is the M Bureau, the management bureau, the Bureau for Management.  And I -- so mine would say M/CIO because I'm in that organization.  My organization was within there, and -- but I reported to the administrator as mentioned.

So to me, looking at this, my presumption is, and that's just how this was done, is to let whoever is reading this know that this is coming from someone within the administrator's office.

Q.   Independent of this memo, what was your understanding of Mr. Lewin's position as of the 3rd, February 3?

Page 215

A.   That he was a member of DOGE that was coming from GSA because DOGE at that point, was -- there were numerous people all over.  They were in different agencies.  My understanding at the time was that he was a DOGE member from GSA that was within -- operating within the USAID environment.

Q.   Had you ever encountered anyone detailed to USAID from other agencies?

A.   Yes.  I had an employee that was detailed for a SES Candidate Development Program to my organization from the Nuclear Regulatory Commission.

Q.   And was that documented in writing?

A.   Yes.

Q.   Would it be typical for it to be documented in writing when someone's delegated from another agency?

A.   Yes.

MS. STEVENS:  Handing you Exhibit 22.

(WHEREUPON, Exhibit 22 was marked for identification.)

BY MS. STEVENS:

Q.   Do you recall this email?

A.   I do recall it.

Q.   And can you tell us what you remember about it?

Page 216

A.   I -- so the -- it's not really this piece that I remember.  It's -- it's really the piece after this because then it kind of filled in the gaps.  But my understanding, which I did not know what was going on at the time, I was, again, copied here, which for me, looks at awareness as a heads up, hey, we're about to remove his access.

So to me, it's flagging it.  As soon as I get the go ahead to remove access, I'll have my team -- team remove access.  But my understanding was that he was asking specific questions about policy.  And again, I wasn't there, but that he was asking specific questions that he was not getting answers to, which is why there was a perception that he was not cooperating.

And the way that I got to that, because I didn't get that here, is that when he did get put on admin leave, Lindsey Willis, who at that point became kind of the deputy because everyone else was on admin leave, also was put for a brief stint on admin leave because of the same exact thing.

Meaning, she started asking the same question of, show me, you know, where the -- and again, I don't know what that is, but she was asking for some sort of rationale or explanation and didn't

Page 217

get it.  Both of them got put on admin leave.  And then my understanding is later, they actually brought Bill back and took him off of admin leave, realizing that he was asking for stuff that he needed to do his job.

So I -- if I had to speculate here, this was a preemptive thinking that he wasn't being cooperative when in reality, he was just performing the duties of his job, wanting to validate and make sure stuff -- that he had what he needed to put people on admin leave.

Q.   Robert Carter, was he in the CIO office?

A.   It does not ring a bell.

MS. STEVENS:  All right.  Handing you Exhibit 23.

(WHEREUPON, Exhibit 23 was marked for identification.)

BY MS. STEVENS:

Q.   This one is in ascending order.  It starts with that.  Okay.  Do you recall this email --

A.   Yes.

Q.   -- chain?  Okay.  What is -- what's your recollection of the time frame around this email chain?

A.   So I believe this substantiates what I was

Page 218

saying earlier about Bill getting brought back off of admin leave because this is several days after that event. And my understanding was that the rules are different for investigative admin leave versus admin leave.

And with admin leave -- again, I don't know the rules, but with admin leave, in essence, there would be a way for it to just be in perpetuity until whatever was happening unless they were on investigative admin leave, which would put a time constraint on the length of time that they could be on any investigative admin leave and could result in some negative action being taken.

Q. What was your understanding of why Mr. McGill and Mr. Voorhees were being switched from not admin leave -- or sorry, admin leave to this investigative leave?

A. I have no idea.

Q. Okay. On the second page, this is the first email from Mr. Lewin. He's last and it says, "As soon as there's a final written sign off, our engineers will immediately cut access." Who is our engineers?

MR. WEN: Objection. Calls for speculation.

Page 219

BY MS. STEVENS:

Q. You can answer.

A. So it would either be the DOGE people that had access to remove access or my team. It would be either/or is probably again, I'm speculating, but either/or.

Q. Do you know if your team is the one who cut off access or adjusted access?

A. I believe at this point, they were already -- they had already had their access removed. So that doesn't actually make sense because there -- there would have been no -- they weren't taken off of admin leave, so there would have been nothing to -- to remove access to.

Q. Taking your attention back to the time when you were acting administrator, we went over Exhibit 3 is the DOGE executive order.

A. Okay.

Q. So 3C is what we talked about earlier, but I -- I think I tied my question in time to a specific date. So my question is: Under 3C, it says, "In consultation with USGS, each agency head shall establish within their respective agencies a DOGE team of at least four employees, which may include special government and employees hired or

Page 220

assigned within 30 days of the date of this order."

Did -- did you, in consultation with anyone else or not, establish a DOGE team within USAID during the duration of your time as acting administrator?

MR. WEN: Objection. I believe this is asked and answered.

MS. STEVENS: I think I tied it in time to January 30th. I'm asking for the duration of --

THE DEPONENT: No.

BY MS. STEVENS:

Q. Okay. This next sentence says, "Agency head shall select the Doge team members in consultation with the USGS administrator." Also, that did not occur; is that correct?

A. No, it did not occur.

Q. Okay. The last sentence of that same paragraph says, "Agency heads shall ensure that DOGE team leads coordinate their work with USGS and advise their respective agency heads on implementing the president's -- presidents, excuse me, DOGE agenda."

Did you do anything with respect to making sure that the DOGE team leads worked with USGS during that time frame?

Page 221

A. No, because I -- I didn't see this as a DOGE team that was being stood up within USAID. I saw this as a DOGE team coming to investigate some traffic that was going on that was suspected of being, you know, nefarious.

So it wasn't -- when I read the executive order, the way that I read this was that this is letting the rest of government, everyone know that, hey, there are going to be DOGE teams that are going to become a part of each of the agencies, and that that is what all of this would make sense to.

So I did not see the team coming from DOGE as a way to establish a DOGE team within USAID. It -- so I -- so there was no consultation. There was no discussion. It was just they were coming in to investigate what happened.

Q. So is this a fair characterization of your description there that -- that the folks from DOGE that came over during your time as acting administrator were a sort of DOGE team specifically working on this investigation as opposed to what you've just described in the EO?

A. Yes.

Q. Okay. And then did that -- did your understanding of that situation change with respect

Page 222

to DOGE given that they stayed on past that time?

A. So I -- I don't know because I wasn't involved with the continuation of them being there or the work that they were doing to -- to do the things that they did.

So I -- I don't know. I just know that during my time as acting administrator, it was never a discussion or a thought that that was the DOGE team coming in to do DOGE stuff. It was meaning to look at how do we modernize government and how do we collaborate with agencies to affect positive change, which is my impression of what those DOGE teams were supposed to do. But that was not the whole time I was acting administrator. That was not what they were there for.

Q. When Mr. Hopson was telling you that he was thinking about leaving on the 31st, you said that he expressed concern with the potential that DOGE would go beyond what was appropriate. What did you say back to him?

A. So he specifically was talking about Jeremy and that Jeremy -- again, this is my characterization of what he said to me, was that Jeremy was willing to -- that he was worried, that he was willing to cross a line that he shouldn't

Page 223

cross. And what I told him was that I had not seen that in the time that I was there.

I know that there was a lot of different things that were going on that was not typical, but that every time so far, being able to walk through this is why this should or shouldn't happen, that -- that we were there.

So I -- I was trying to reinforce to him that I didn't believe it would go that far or that they would cross that line. And I -- I even believe it -- I want to say it might have been that week where the -- the TRO got issued, and there was a lot of speculation at the time of, will that even matter. And it did matter.

The things that needed to -- to stop to resolve that did, or at least were addressed by that did. So I was trying to reinforce to Matt, listen, I -- I know it looks that way, but having been in government for a long time, I -- I have a hard time believing that that would happen, and I was really hoping to keep him.

MS. STEVENS: I'm handing you Plaintiff's Exhibit 24.

(WHEREUPON, Exhibit 24 was marked for identification.)

Page 224

THE DEPONENT: Dave Nation. That's the NTT guy.

BY MS. STEVENS:

Q. Oh, there we go. Mystery solved.

A. Yes. That was driving me crazy.

Q. This is a few pages, so take -- take a minute to read through.

A. Okay.

Q. Let's turn to the first, like the request itself, on the 9th. This is from Mr. Lewin to you, correct?

A. Yes.

Q. And he asks for some additional access for Luke Farritor and Gavin Kliger, correct?

A. Yes.

Q. The second to last sentence says -- excuse me. No, that's right. "These are considered high priority from our leadership." Who is "our leadership?"

MR. WEN: Objection. Calls for speculation.

BY MS. STEVENS:

Q. You can answer.

A. My presumption would have been Pete Marocco, because there's no other leadership there.

Page 225

Q. But the following sentence says --

A. I know.

Q. "Pete, Ken, we would be grateful if you would approve -- excuse me, -- provide approval for these as well, just so the chain of command is clear here."

A. Yeah. I -- I don't know.

Q. This email is written to you --

A. I know.

Q. -- from Mr. Lewin, right? Do you know -- what do you take his meaning to be for "our leadership" since it's not Pete and Ken?

A. If I had to speculate, it would be that Secretary Rubio. But again, I -- I don't know. I wasn't in those conversations. When I saw this, the -- the reason why I acted on it is because I had both Pete saying to do it and Ken saying to do it, which was my leadership.

Q. On the third page, there's an all caps word, sort of towards the middle, SITMAN?

A. Yes.

Q. What does that mean?

A. It's situation something. Situation management, which is the -- the -- or situation manager, the person who is actually running the

Page 226

operations. Yeah. So -- and I -- I know you see, but Jeremy wrote the email at 2:04. At ten minutes later, Pete responded yes. You know, a minute later, Ken said yes. And then, you know, 15, 16, 18 minutes later, I responded.

So, to be honest, I -- I'm not even sure within that amount of time if I had actually read the email versus seeing Pete and Ken both saying do this.

Q.   I -- you're saying you followed Pete and Ken's direction?

A.   Yes.

Q.   I -- I got you.

A.   Yeah.

Q.   All right. This email chain includes a lot from David Nation, who you said a moment ago is from the -- the vendor; is that correct?

A.   Yes.

Q.   Did -- did you have any, like yourself, have any participation in getting this additional access?

A.   Aside from talking to Dave Nation to -- because, again, him and I talked all the time when we'd get a request. And he, usually, and I'm sure he did it for this, would walk me through, hey,

Page 227

these are the issues because they're basically saying they don't have access to this.

And then what Dave would do is tell me exactly -- he would walk through this with me to let me know, hey, we already checked. This is the issue, you know, they -- they don't have access to this. They do have access, their certificate is wrong. So he would walk through me, and I know he did this. He walked through and said, hey, this is where we're at. I'm going to send a response to Jeremy.

Q.   In the -- in -- you're sort of pointing to the bulk of this, which is Mr. -- David responding to each of the requests from Jeremy. And on the second page of that, number three, it says, "Ability to provision VMs and access." Can -- can you tell us what VM stands for?

A.   Yeah. Virtual machine.

Q.   What -- what is it for those of us not working on IT systems, what does it mean to have --

A.   Sorry.

Q.   No, that's okay.

A.   Yeah.

Q.   Have a virtual machine, and what do you use it for?

Page 228

A.   So in essence, it's the ability to stand up a system within the environment. A virtual machine would be basically an operating system like Windows 10, Windows 11, or a server, so they could actually install an application and run an application from within the environment.

And then when they're saying an access, so it to me, it's the impression I have is that they want to, again, dig in and -- and be able to -- so I -- I know specifically for this, the -- the focus was on trying to really manage and monitor the traffic for transactions for working between the agency and treasury and HHS and state.

And they wanted to put a layer, a buffer in between so that there was an approval process that could be validated before the transaction actually went because what they didn't want was financial transactions and money going out of the agency that wasn't -- didn't have another layer of approval.

At the time, it was, we don't want to shut everything off. We want to monitor and manage what gets approved, what doesn't get approved by adding another layer.

To do that, they -- my understanding was

Page 229

that they wanted to spin up a virtual machine that could connect to those other machines that -- or other systems that prevented them from being able to send directly to them and to get another layer of approval for that.

Q.   And you said a couple of times that they wanted that. Who -- who specifically?

A.   DOGE.

Q.   As told to you by?

A.   As told to me by my team who was talking with DOGE about them, for example, Brian Herson, Steven Hernandez, on this is -- we want to -- meaning DOGE wants to be able to ensure that the financial payments that are going out of this agency are vetted.

Q.   Mr. Hernandez, and then what's the other person's name that was on your team documented?

A.   Brian Herson --

Q.   Herson.

A.   -- who now works for State Department for Diplomatic Technology.

Q.   And they were both on your team?

A.   Yes.

Q.   And talked more substantively, it sounds like, with some of the DOGE team members?

Page 230

A.   Yes.

Q.   Okay.  And those -- those DOGE team members are Jeremy, Luke, and Gavin; is that correct?

A.   I -- I don't know who they would talk to, but my presumption would be that it would primarily be Luke and Gavin, not Jeremy, because Jeremy didn't really get into the technical pieces.

Q.   Okay.  You have four minutes until your -- your call.

A.   Okay.

Q.   Shall we take a break so you can do your call and then come back on?

A.   That would be great.

MS. STEVENS:  Okay.  Sorry about that.  I'm really very -- almost close to the end.

THE VIDEOGRAPHER:  Okay.  Please stand by.  The time is 4:56 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  And the time is 5:32 p.m. We are on the record.  You may proceed.

MS. STEVENS:  Okay.  Great.  Mr. Gray, I'm going to hand you what I think is our last exhibit, which is number 25.

(WHEREUPON, Exhibit 25 was marked for

Page 231

identification.)

BY MS. STEVENS:

Q.   Take a minute and read through there and then -- excuse me.  Let me know when you're done.

A.   Okay.  I remember this.

Q.   Okay.  Can you tell us what you remember about it?

A.   So we got a FOIA, as mentioned here, asking for all records, emails, communications from January 1st through the present of DOGE personnel access in classified or restricted USAID data.

So that piece, there -- I know that Leo Ruth went and looked and checked the logs on all the SCIFs to make sure that no one had accessed any of that material and confirmed that they hadn't.

The next was internal memos, complaints, or reports concerning USAID employees being placed on admin leave, reassigned in connection with those personnel.  I can't speak to that.  I didn't provide any of that because I didn't have those -- access to those memos.

And then security audit reports detailing unauthorized access to USAID systems.  The -- all of the access for these systems, meaning that we gave them domain admin, as we saw earlier in exhibits,

Page 232

that was all authorized, meaning they were vetted, requested access, and were given access to it.

So there wasn't -- which again, is which is why I wrote to Brian Herson, which is the person I've mentioned several times today.  Danny You is on here as well, asking really, like, do we have anything or is there -- the only access that DOGE would have would be access that we gave them, which was authorized.

Q.   Thank you for that.  On your response, you -- this is towards the top of the first page.  You talked about the high side of things, which you explained a little earlier, but can you explain that again?

A.   Yes.  The high side of things means anything that is secret or top secret with any of the additional flags that go with it, like SCI, and there's, you know, no form.  There's a bunch of different labels that can follow top secret.

So when I talk about high side, it is anything that is classified as secret or above.  Which all of that, as a CIO, I did not have access to.  I did have a ClassNet account, which was a State secret account, and I did have, as mentioned earlier, access to JWICS, which is the top secret

Page 233

side.

But all of that is run through -- it was at USAID, but State systems, meaning they administrated it and SEC, John Voorhees, Brian McGill, and Leo Ruth are the ones who -- their teams provided access.  I did not -- did not have access to even provision access to.

Q.   Okay.  So is it -- here where Brian says, "I agree with you, Jason.  All access by DOGE staff for class and unclass was authorized." For class, that means classified, correct?

A.   Yes.

Q.   Are you saying, based on your just -- just prior testimony, that anything that was under class, classified, would have been under the SEC sort of department?

A.   It would have, but I will say in my entire time there, no one from DOGE accessed classified material.  And to -- to give an example, when Pete Marocco came over, I remember us going into SCIF to have a conversation about some events that were going on.

We called other agencies, but he had a clearance and was vetted before he was even allowed into the SCIF.  But I -- I have never seen or heard

JASON GRAY                                    February 03, 2026                                    234 to 237
93681

Page 234

of anyone from DOGE accessing a SCIF or classified space.

Q. So you -- you have no knowledge of that, but you don't know for sure that that didn't happen, correct?

A. Correct.

Q. Okay.

A. But SEC would be the ones who would know.

Q. Got it. As far as access to unclassified systems, some of which would have been in the CIO domain, correct? That we've talked about --

A. Yes.

Q. -- today, right? You talked about all of the DOGE access that was provided was authorized based on the -- like, for example, the email chains we've gone over where authorization was given.

A. Yes.

Q. Is that what you're talking about?

A. Yes.

Q. Okay. If there were misuse of that access, so I understand that the access is authorized, but if there's misuse, it's -- it's your understanding that that would be -- would be able to see that in the systems log that you described in -- in Splunk?

Page 235

MR. WEN: Objection. Calls for speculation.

THE DEPONENT: Yeah. So It depends on what you mean by misuse.

BY MS. STEVENS:

Q. Okay.

A. Because I wouldn't know -- you would have to look for it, right? Because I will -- I will give you an example that is not to do with AID because I think it -- it demonstrates what I'm talking about. When I was at the VA, at the Miami VA, we had a -- I was the CIO there. We had an appointment clerk who was going in and pulling out patient data from an appointment system and selling it online.

The -- the challenges, what they were doing was actually their job, meaning that they -- the use of the system was they were supposed to access this patient information. They were not supposed to take it and sell it online, which again, they were found out, the IG investigated, and I think they went to jail.

But the -- the misuse only happened after because she was actually doing her job, using the system as it was supposed to be used, but using it

Page 236

beyond. But until that beyond was understood, there was no way to tell.

The same thing with DOGE and Splunk. Meaning, what we saw, at least when I was there, was they were trying to access to monitor traffic between two systems and understand the flow of traffic between two systems. They had gone in and as in all of this or many of this, demonstrated to remove access to or prevent access to or -- or add access to. All of that would be logged in Splunk, yes.

But in terms of identifying misuse, I couldn't say -- and I don't know whether it was misuse or not, that would require some sort of analysis to be done on the logs.

Q. The -- there have been allegations around DOGE's use of USAID data to, like, take data out of systems and, like, put it on systems outside of USAID systems. Is that an example of something that Splunk wouldn't tell you happened?

MR. WEN: Objection. Calls for speculation. Lack of foundation.

THE DEPONENT: So it -- it depends. The security policy of the systems, and I'm not talking about a document, I'm talking about the -- the

Page 237

policy that is within the computer environment, prevents someone from, like, plugging a USB device in to extract data.

If it was put in that virtual machine as an example, I don't know, but if they created a virtual machine and decided to move that data there, that would be logged in Splunk. So you would be able to go through and see exfiltration of data, and the tools, the security tools that we had in place would certainly monitor that as well.

So I -- I couldn't say definitively that did or didn't happen, but I know that the tools that were in place would have caught that and monitored that. I will also say that when there were leaks of information, people sharing stuff they shouldn't have shared, I was always talked to and asked, go and find out who did this or how this happened so -- using the tools.

So I -- I would I say that to say that I -- I don't think DOGE understood our environment at all, meaning because they could have easily done what I did and worked through Dave Nation to actually do to monitor who did what if someone leaks something as an example. But yeah, so I -- I wouldn't know.

Page 238

And -- and Splunk, just by default, wouldn't say, yes, this is, you know, some behavior that shouldn't happen, but it would be logged that it did happen. BY MS. STEVENS:

Q.   Is Splunk the only tool -- you just described tools to identify when -- when issues are happening. Is Splunk the only --

A.   No.

Q.   Okay.  What are the other?

A.   So for example, there's something called DLP, which is data loss prevention, which federal agencies are required to have.  And we primarily used Google for the Google Suite, which is a mechanism within the Google Suite that monitors to make sure that people don't inadvertently send PII or PHI outside of the system.

So if I used an email and I tried to send my Social Security number, which I would do if I had a SF 50 official record that I wanted to send out, our system would flag it.  It would pick up that that was happening.  It would send a message to the security team, the information assurance team, which was on my team, letting them know, hey, so and so did this.

And then they had the option to either

Page 239

release that because it didn't actually go anywhere. It just got put into a queue that got monitored by people to determine whether or not it did or didn't or should or shouldn't go.

And those were still in place even when I left USAID because as an example, Ken Jackson tried to send something with his information out to his personal account, and he's like, hey, I'm trying to send this and I can't and then I would talk to my team and they would talk to Dave Nation specifically, and he would help him navigate being able to send that information to himself.

Q.   Any other tools in place?

A.   There was a lot.  There was a lot of different tools.  I don't know all of them, but there -- we used a cool -- a tool called Tanium. There's -- I -- I would have to look through the list of security tools because I didn't dig into that.  That wasn't a part of my job.

But I do know we had a lot of tools that looked for, for example, the analysis that was done on the Splunk logs.  Every couple of weeks, NTT would perform an analysis on the billion hits of traffic or sessions that happened or events that happened to analyze and determine were they legit?

Page 240

Were they going to addresses that were outside of the country?  And if because we operated outside of the country, oftentimes the answer would be yes, but it would be doing, like, a deeper analysis.

But we had tools that would actually do that and a team that was primarily through Accenture.  At the time, I think it was a, I want to say a several hundred million dollar ten year contract to actually perform that, which I will say like, the first, maybe this was March or April, I was told we should cancel that contract.

And I -- because it was several hundred million dollars, and I went to the team, to Jeremy, and to Pete Marocco to say, listen, you can cancel this, but these are all the capabilities that you're going to lose that we're not going to be able to defend against.  And they didn't cancel it, which was good, until we actually transitioned those services to State Department.

Q.   When were the services transitioned to state?

A.   Yeah, that's a good question.  So even when I was there, a lot of the services had not been transitioned to State because -- so there were different types of services, meaning help desk as an

Page 241

example.  We were using NTT for help desk, and they -- State Department, when in July, when they wanted to do the reorg and transition everything over to State Department, they -- they couldn't provide support at the time because we still had people that were still across -- that were on the process of transitioning back to the US, but we still needed to provide that. So that's an example.

And even when I left, the -- this company called Cloudshape that was providing all of the networking trafficking traffic and analysis and configuration and sharing and permissions as it relates to communication between different systems and agencies, which NTT was the primary and Cloudshape was the sub.  They were still being used even when I left in September.  I don't know where they're at now.

Q.   You don't know where they're at in terms of the system switchover?

A.   Yes.

Q.   When you were removed as acting administrator and went back to be the CIO, could you -- could you restate what -- how you characterized your -- an additional role that was in the administrative office?

Page 242

A. Yeah. So I know there's documents in USAID. I don't know where they're at, but I know Erica Carr was working on a delegation memo or a designation memo of -- I don't remember what it's called, but it's basically a senior advisor role to the front office.

I know there were several documents that went through clearance that had that role identified. It never actually got signed. So I always was the CIO, but was primarily the CIO, but also working in the front office. So the front office meetings, the engagement, the -- a lot of the conversations, not the typical political only conversations.

But I know, for example, when we were talking about the -- doing the -- the AID programs, review and working with the State Department, there's a team that got stood up, and they brought several detailees over from State. I was included in all of those conversations.

So as the senior person, even as an example, when Joel would go on leave when he was there, he would often have me run the leadership meeting in the morning that we had every morning, so --

Page 243

Q. About what time did, like, day on the calendar, did that role really solidify versus that weekend after you were no longer acting administrator? It doesn't seem like you were as involved in the conversations, or maybe you were. Can you tell --

A. No. I would say it was I think things were very fluid, certainly for a couple of weeks. I would say by -- because Matt Hopson leaving, I think there weren't -- there wasn't -- there weren't backups. It was a really small political bench that would typically come in to run an agency.

And so I would say within a few weeks is when it really solidified and it was very clear that I was the CIO. And -- but with additional duties, which was basically sitting in the front office and being there for consultation, largely on IT types of things or as I mentioned, if someone leaks something of figuring out who or working with diplomatic security over a State Department because it was usually a combination of issues where you'd have something leaks that was on an email between State and AID to try and figure out who did what.

Q. What -- what type of leaks? Can you just describe that a little bit more?

Page 244

A. Yeah. So there were, like, the list, a good example is the list of contracts that were being cut that information leaked, and I got asked, how did this information leak. And I talked to Dave Nation. And his team is phenomenal and was able to prove definitively that it wasn't someone from USAID that had to be on the State side.

And State couldn't identify because they didn't have the same skill set or the and their systems were different. I don't know their systems because I don't work there. But I just could definitively say, I don't know where this leaked, but it didn't leak from here.

Q. I was going to ask if you went back to your CIO office in the Annex, but it sounds like you did not.

A. Just to clear it out.

Q. Okay.

A. I had, for the most part, cleared it out within the -- the first week or so. A lot of the stuff that I had, I took out of there. And then when everyone went back to the Annex to clear out, because I think we gave a day or a half a day to clear out the different floors, I went to validate that all the stuff that I needed was out of there.

Page 245

Q. Okay. I'm going to -- I'm kind of closing down some of the questions, but we're going to jump all over the place a little bit to --

A. Okay.

Q. -- clean some stuff up. To your knowledge, did Gavin Kliger ever have access to any of these systems? We'll go one by one. IDMS?

A. I -- I don't know.

Q. Okay. SIG?

A. I don't know.

Q. Okay. And then JWICS you wouldn't know because that's not your system; is that correct?

A. I would say I wouldn't know because that's not my system, but I do not believe any DOGE staff had access to classified systems. But I -- I don't know. But SEC would know for sure.

Q. Okay.

A. And so would State Department because all our JWICS services were provided by State Department. Actually, I don't think they were provided by State Department. They might have been provided by the CIA. But our JWICS services were provided by somewhere else, wherever that else was because it was managed through SEC.

So SEC would know. Leo Ruth as an example

Page 246

because he was there through the end. And wherever that other agency was, which I think -- I think it was the CIA, but I'm not entirely sure.

Q. And then, to your knowledge, did Luke Farritor ever have access to IDMS?

A. I don't know.

Q. Same question, but for SID?

A. I -- I don't know.

Q. During your time -- well, the whole time at USAID from January 20th to September when you left, what -- can you tell me that the individuals that you interacted with that you understood as being affiliated with DOGE?

A. Yes. Jeremy, Luke, Gavin, and there were -- someone named Gabby who got brought in to help execute some scripts to send out RIF notifications later on. I think this was maybe April or May.

And there was one other person that I didn't interact with, but got brought in from DOGE as, like, a special advisor to Jeremy. But I -- I don't really know what their role was, but I know an account was provisioned for them, just a regular email address, an account was provisioned for them.

Q. And what was their name?

A. I -- I don't remember her name.

Page 247

Q. What about Steve Davis?

A. Steve Davis, I am not aware of. I mean, I -- I knew him, but he wasn't -- so yes, Steve Davis is one, but didn't have access to the network and account. I don't ever recall account ever being created for him.

Q. Throughout any of the time since January 20th, did you ever talk with anyone about actions taken by DOGE members before January 20th of 2025?

MR. WEN: Objection. Vague.

BY MS. STEVENS:

Q. That's -- I'll rephrase it.

Did you talk with anyone about -- did you talk with anyone about DOGE member's actions that they took with respect to USAID pre January 20th, 2025?

A. No.

Q. Did you ever hear of anybody talking about that?

A. No.

Q. Did you participate in your role as -- I keep flubbing this, but the -- your -- your secondary role after you were not acting administrator anymore, did you participate in any conversation about the RIFs that eventually

Page 248

occurred?

A. So the -- the only conversations I participated in was about the IT technology related to making sure that the RIFs actually got to people at the same time. Because a challenge, as an example, was that Google only allows an account to send 1,000 emails a day per 24 hour period.

And it was brought to me, for example, the 1,400 number, they wanted to send to more than 1,000 people. And it was, how do we do this? Which is -- so that got brought to me, and that's where I plugged in Brian Herson, and he solved that problem and said, oh, this is the way that you need to do this.

So that's the only types of conversation about RIF that I was involved in. I will say that there was a morning meeting every morning with all of the leaders of the bureaus and independent offices, of which the CIO was a part of that.

And there was regular updates given by HCTM of X number of RIF notices went out, but just from an awareness standpoint of what was going on, but not -- nothing substantial about we're going to RIF this or we're going to do that, no.

Q. Those morning meetings, when did those

Page 249

start, you know, when did those start?

A. I want to say right as soon as we moved, and I don't know exactly when, but it was when we moved from the RRB because I -- I want to say that was very quickly. It might have been the 14th or so. I forget because we just found out very suddenly on an afternoon that the lease was over and we had to move out. And then we moved to the 555 building on 12th Street. And when that happened, those meetings started happening every day.

Q. How did you find out you were moving to the 555 building?

A. I -- I want to say it was that -- it was a Thursday or Friday. It was -- it was whenever we found out that we -- that the lease had been canceled. I was told that -- again, it was told to me and Ken or Ken is the one that actually told me that DOGE had canceled the lease of the Ronald Reagan Building and we needed to find a new place to put people.

There was a conversation that happened at the RRB that -- that evening because it was nighttime. And it was, okay, where do we put people. And what we talked about was initially everyone working remote. And I let people know, we

JASON GRAY                            February 03, 2026                    250 to 253
93681

Page 250

can work remote. The VPN works. Everyone did it during the pandemic. So that's what we were going to do.

And then a follow on conversation was had that we were going to move to 555 because BHA, most of them were on admin leave and there was lots of space there.

Q.   There's been reporting that, at least early on in the administration, including during your time as acting administrator, that there was direction to USAID staff not to talk with anyone outside of the agency to include Congress or, you know, like, AID groups that folks work with. Did that direction occur?

MR. WEN: Objection. Lack of foundation and vague.

THE DEPONENT: Yes.

BY MS. STEVENS:

Q.   Okay. How did -- tell us about that?

A.   So the only example I can think of is there were tons of calls and emails that were coming in from Congress and asking to talk to me. And at the time, this is, I believe, after I was no longer in the position. And I was -- I got an email from Paul Grove, Senator Graham's senior staffer, asking

Page 251

me specifically if I was being told not to communicate with him.

And I took that email and I forwarded it to Pete Marocco. And I said, hey, I'm getting asked this question. And the response was, do not communicate. It's all an email, so it's there.

Q.   Did did do you know of any direction given to anyone besides yourself --

A.   No.

Q.   -- within USAID that was similar?

A.   No, not to my knowledge.

Q.   Okay. Did you message, in any form, text message, email, phone calls, communicate, is a better word, with anyone in Congress?

A.   No.

Q.   Is the email that you just described the only substantive communication you received from -- from anyone in Congress?

A.   I believe there were others. I know that, like, Senator Rand had made a request for a Congressional of different names. I don't remember what it was. And I knew at that point, the Ronald Reagan Building, we were standing up space to -- so they could come and do whatever they were doing. I don't know what it was because for me, it was about

Page 252

IT systems at that point.

And -- but yeah, so there were numerous that came through, but none of them point blank asked me that question.

Q.   I -- I guess I -- I jumped over my assumption, but I'll say it out loud. Did -- did you respond after Mr. Marocco told you not to respond?

A.   No, I did not.

Q.   About when was that?

A.   I -- I don't recall. It's all a blur. I'm sorry, but I -- I know it's an email because it was documented.

Q.   Do you have any documents from -- from January 20th of 2025 through now related to USAID?

A.   Not that aren't in USAID systems, meaning in the email from USAID. So no, I do not.

Q.   Did you keep copies of any of those -- those documents?

A.   No. I tried to be really good at that just from doing this for so long, no.

Q.   Did you have -- well, let me come back to that. So you -- you've talked a number of times about you left in September, left USAID, and have gone to work in the private sector. Can you tell us

Page 253

why did you leave USAID?

A.   Yeah. It was timing. I had been offered a position over at State Department to be -- they created a new position called Enterprise Applications, and it was going to be managing consular affairs, which had a CIO that was taking the fork and leaving, which that -- that bureau within the State Department is bigger than USAID from a budget standpoint, multiple times. So -- and the staff was more staff. So that was one.

There were several other -- their health, IT, their Foreign Service Institute. So there was a group -- that group or that organization did get stood up, but I -- the plan was for me to actually go and be a deputy CIO leading that organization.

It got to the point where they were going to make an offer to me, and they -- someone had forgotten to get approval from the White House for the hiring exception. So that put a delay in that.

When that delay happened, oddly enough, I got an email from Box saying, hey, we're looking to hire someone and we want to know if you want to have a conversation. I had no idea what was going on with -- aside from, yes, this will eventually happen, but it was months, several months, maybe two

Page 254

or three months, where nothing was happening. And I just was coming up on a RIF date, and I'm like, I don't want to just wait and hope that this happens.

So -- and then part of the RIF process is you can ask OPM to do placement for you. I submitted that to say, yes, place me somewhere. And for -- I want to say it's good for 45 days. The first few weeks, I heard nothing.

So Box reached out all at that same time and I said, well, this is the thing. I said, if I end up transitioning to State Department, then financially, it will not make sense for me to leave. So if you're going to make me an offer, the offer has to happen within the next 30 days because I believe I will get an offer by then.

The rationale behind that is 1) I had 21 years of government service, and I'm over 50. I'm 54. And the idea was I -- because I'm RIF'ed, there's something called DSR, dissolution of service retirement, that I would be able to get basically a penalty free pension for the service that I had.

And it was really measuring the -- if that can happen before. But if I transitioned to State Department, I would not be eligible for that because if I left and went to Box or any company, it would

Page 255

be voluntary, so I would not be eligible to get a pension. So it -- the primary reason was because of that.

Within 29 days, Box actually made me an offer. After that happened, because there was still time, Social Security Administration reached out to me. The Department of Interior reached out to me to express if I was interested in being their CIO, and ICE actually reached out to me, and I had already accepted the job offer at Box and made the decision.

So sorry for the long story --

Q.  No, no, no.

A.  -- but that's -- that's why the decision was made. So if -- if Box wouldn't have -- because I was not looking. I did not apply to Box. Box reached out to me.

Q.  And you said the -- the -- what was your RIF date?

A.  September 2nd.

Q.  And that was the -- the sort of second tranche of --

A.  Yes.

Q.  -- RIFs; is that correct?

A.  July 1st, I think, was the first tranche, and the second tranche was September 2nd.

Page 256

Q.  You mentioned a hiring exception. Can you --

A.  Yes.

Q.  -- articulate what that was about?

A.  So when the administration took over, they put a government-wide hiring freeze. And the only way you could hire a federal employee from a civil service direct hire standpoint, aside from political appointees and Schedule A hiring, would be to get an exception from the White House for approval.

And that request was made through the State Department to the White House, was approved, but I want to say it was maybe two days or three days after I received my final offer.

So I talked to Kelly Fletcher, who's the CIO of State, and -- because her and I worked together for three years, and I'm like, I would love to come and support you. This is a big role. I know it's important, but I've already accepted this job and I can't wait anymore. She knew I had waited a few months to try and land that, and it just didn't happen until a few days after I already accepted my job with Box.

Q.  Can you describe your time from -- from March when you all get -- that's when you get notice

Page 257

of the -- that the RIFs are coming; is that correct?

A.  I believe, yeah.

Q.  Okay. Can you describe your time from March through September, just generally what you're working on at USAID.

A.  Yeah. So it may not be obvious, but the whole agency hated me, wouldn't talk to me. There would be, you know, parties, events that I was excluded from because I was a part of whatever this was. So it was isolation. It was, you know, having meetings with my team, but also being there for the front office if they had a question about how do we share this or how do we do that.

And being in the -- that, you know, daily leadership meeting to listen to and, you know, try to navigate and help the political team navigate some of the, this is a challenge because of this, or they're having an IT problem because of that.

So a lot of it I don't want to say it was, like, concierge IT services for the staff, but it really became that because for the most part, the day-to-day operations, Zack Kahn, because at that point, Steven Hernandez had taken the fork, I -- when he told me he was taking the fork, he asked me, you know, because I -- supervisors were given the

Page 258

ability to not allow people to take the fork.  I talked to him and he said just let me go, and I did.

Q.   The -- the Paul -- Paul Grove email that you --

A.   Yes.

Q.   -- referenced, what precipitated the email saying that they understood Mr. Marocco had told you not to respond to them?

A.   They -- it did not say --

MR. WEN:  Objection.  Lack of foundation.

THE DEPONENT:  Yeah.  It did not say that.  What they said was that -- they asked me, are you being given instruction not to communicate with us.  It did not say that Pete Marocco said that.

BY MS. STEVENS:

Q.   Apologies.

A.   Yeah, sorry.

Q.   Before that, what -- when before they said, have you been given instruction not to talk to us, what -- what were the questions before that or what was the communication before that?

A.   The communication was, in essence, my understanding, was that they wanted to know what was going on at USAID because there was no communication about what was going on.  I think they were reading

Page 259

the news about what was going on.  They had read about people being on admin leave and wanted to say, hey, what is going on?  We want to know what's going on.

And I think the -- again, they didn't they weren't specific.  They said I want to talk to you.  And I -- I want to say I once had maybe a conversation with Paul Grove before about technology and, you know, budget requests and what we're doing for foreign aid from a technology standpoint.  So I didn't -- I didn't know him.  And -- but I started getting emails asking, hey, can you tell us what's going on?  Please take a call.  Here's my cell phone.

Q.   When Mr. Marocco responded to you and said don't reply, was that over email?

A.   Yes.

Q.   You described, you know, sort of this feeling of being isolated from March through September based on, you know, your -- your work connected with what was going on at USAID.  How did you feel about the fact that the agency was being -- was going through the process it was going through?

A.   So yeah, that's an interesting question.  I felt horrible.  I left the Department of Education

Page 260

because I'd always wanted to work, -- as I talked through my career earlier, going through Defense, VA, you know, education, transportation, or transportation education, USAID, I sort of felt like USAID was the -- the end of my career, of where I wanted to be because the mission was awesome, you know, helping those who couldn't help themselves.  Yeah.  So horrible.

Q.   I'm sorry.

A.   Sorry, I'm emotional.  So I -- I do feel -- and again, I know having worked in government and government agencies for a long time, there's always an opportunity to improve.  There's always a way to be efficient and effective with what you do.

And so when all of this started happening, I thought, hey, this is what we're doing.  I did not know at all or even have any hint that it was to shut the agency down.  So yeah, that was -- I planned on working there.

Q.   When did you realize that it was to shut the agency down?

MR. WEN:  Objection.  Argumentative.

THE DEPONENT:  I feel like when they started cutting all the contracts.  Even when everyone got put on admin leave, it seemed like that

Page 261

the writing was on the wall that, you know, if you take 1,400 people and put them on admin leave, you can't actually perform the job.

And even the, you know, the 90-day assessment, that's great.  And I was looking forward to that so that we could find ways to improve.  You want to do that.  As a technologist, you want to improve.  I had been to Ukraine in November, got to see, like, firsthand the -- the impact of the agency.

BY MS. STEVENS:

Q.   Let's -- actually, let's -- let's take a little break.

A.   Okay.

Q.   I -- I'm almost done.

A.   Okay.

Q.   I know I'm almost done.

A.   Okay.

MS. STEVENS:  All right.  We're going to take a break.

THE VIDEOGRAPHER:  All right.  We are off the record at 6:15 p.m.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  And the time is 6:20 p.m. We are on the record.  You may proceed.

Page 262

MS. STEVENS: Thank you.

BY MS. STEVENS:

Q. Mr. Gray, when was the last time that you spoke with Mr. Lewin?

A. It was, I believe, shortly before maybe -- maybe about a month before I left USAID.

Q. And what was the topic of conversation?

A. It was to -- he had heard that I was not coming over to the State Department, and I don't remember how we ended up talking, but he said he was, you know, disappointed and sad that I wasn't coming over there because he thought that I would bring about positive change that needed to happen there. And I said, no, I'm -- I'm leaving, and that was the conversation.

Q. Did you work closely with him during, like, the March to September time frame?

A. No.

Q. Or I guess August.

A. Yeah. No. Rare -- rarely.

Q. When's the last time that you talked with Mr. Davis?

A. It had to be early February, like, that -- that weekend, maybe for a week or so.

Q. What about Mr. Hopson?

Page 263

A. Unfortunately, the last time I talked to him was when he resigned.

Q. Mr. Musk?

A. Never.

Q. Mr. Marocco?

A. The last time I talked to Pete was when the New York Times article was going to come out, when the reporter reached out to me, and I let, as I did with this prior message, let them know, hey, they're asking me these questions. They had six questions they wanted to ask me, and I sent that to -- I know it was Pete, Ken, and Laken because she ran communications and press inquiries. And I said, hey, just FYI, I am not talking to them.

And I got pulled into a meeting with them to talk about it and asked if I was talking to the press. And I said, no, I wasn't and I shared with you the moment they reached out and sent screenshots to them so they knew. Yeah, that was the last time.

Q. Was that a, like, an accusatory asked question or --

A. I think it was an exploratory question. I -- I didn't get the impression. I think they just wanted to ask me point blank if I was, and I was, like, absolutely not.

Page 264

Q. Okay. When's the last time you talked to Mr. Hernandez?

A. Probably a few weeks ago, just to ask Steven Hernandez, I'm assuming, yes.

Q. Yes.

A. He's -- I've known him for a long time at Education. I wanted to make sure he was doing okay with his job because he's now the deputy CISO over at Caterpillar in Texas, doing really good. So I wanted to see -- check in on how he was doing because I know this was really impactful for him in his career. He grew up in this area or his career in this area and was not planning to leave or move, and his whole family relocated to Texas.

Q. At the time that you left USAID in September, how many staff members were there?

A. Like, for the whole agency?

Q. Mm-hmm.

A. I -- I don't know. Maybe a few hundred from a direct hire standpoint or for -- yeah.

Q. And how many were on your team?

A. I had nine on my team.

Q. And that's down from the -- well --

A. Yeah. It was 96 or 7 that were on staff. Yeah. I had I think it was nine.

Page 265

Q. Who took your -- did -- did someone take your place as -- as acting CIO when you left?

A. Yes. Zack Kahn took over initially until, I believe it was October 3rd, and then he left. And then Anna Yao took over when he left. Her name isn't really Anna. It's, like, M-E-N-G, I think, or something like that, but she goes by Anna.

Q. And is she still in that role, to your knowledge?

A. To my knowledge, yes. I have checked in with her to see how she's doing, if she's okay, so yeah.

Q. She was on your team before?

A. Yes. She, ironically, was the individual who was the lead for DIS, that system that I said I really wanted to get rid of, so yeah.

MS. STEVENS: Okay. I still haven't quite figured this out on our fourth deposition, but in Texas, we say pass the witness, meaning hand you over to the other side, so --

MR. WEN: No redirect from the government.

MS. STEVENS: Okay. That means we're done.

THE DEPONENT: Okay.

MS. STEVENS: Okay. Great. Thank you so

JASON GRAY                    February 03, 2026                    266 to 269
93681

Page 266

much for being with us today. I know it's many more hours than any of us were expecting, but we really appreciate your time.

THE DEPONENT: Certainly. Glad to be here.

THE VIDEOGRAPHER: Okay. Counsel, please stand by, and the court reporter may have spellings in just a moment, but before that, we will take orders.

This is the end of the deposition of Jason Gray. The court reporter will take orders for the transcript, and I'll take orders for the video.

THE REPORTER: All right. Ms. Stevens, would you like to order the original transcript?

MS. STEVENS: Yes, please.

THE REPORTER: And the -- all the attorneys with the Democracy Defenders Fund, are you guys all together? Did you guys want to order a copy of the transcript?

MS. MAYS: No, just the one.

THE REPORTER: Just the one. Got it. Thank you.

And does the government, Mr. Wen, would you guys like to order a copy of the transcript at this time?

Page 267

MR. WEN: Yes. Yes, please.

THE REPORTER: All right. Noted. And I think -- oh, it looks like Mr. Heimann and Ms. Rubin are no longer present. Thank you so much.

MS. STEVENS: Thank you.

THE VIDEOGRAPHER: Okay. And I would ask the same for the video of today's deposition. I understand Mr. Warren's name is who we have as a contact for the Democracy Defenders Fund. He's getting the original copy of the video.

Would anyone else on the Zoom call like to order a copy of the video? Okay.

MS. STEVENS: No, thank you.

THE VIDEOGRAPHER: And with that, the time is 6:27 p.m. We are off the record.

(WHEREUPON, the deposition of JASON K. GRAY was concluded at 6:27 p.m.)

Page 268

CERTIFICATE

I, the undersigned, Vincent Guerrera, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Jason Gray, in the above captioned matter on the 3rd day of February, 2026, taken at the location of Shulman Rogers, 1100 New York Ave. NM, Ste. 800, Washington, DC 20005.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.


Vincent Guerrera

Page 269

CERTIFICATE

I, the undersigned Benjamin Pitts, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the videorecording of the deposition of Jason Gray, in the above captioned matter on the 3rd day of February, 2026, taken at the location of Shulman Rogers, 1100 New York Ave. NM, Ste. 800, Washington, DC 20005.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.


Benjamin Pitts

JASON GRAY                              February 03, 2026                              270 to 272
93681

Page 270

CERTIFICATE

I, Sarah Parr, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 13th day of February, 2026.

Sarah Parr, CER No. 3985

Page 271

CORRECTION SHEET

Deposition of: Jason Gray     Date: 02/03/26

Regarding: Doe 4 vs. Musk

Reporter: Parr/Seaman

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page  Line  Reason for Change

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

____  ____  _____

Signature: _____

Jason Gray

Email to: Production@NaegeliUSA.com

Page 272

DECLARATION

Deposition of: Jason Gray    Date: 02/03/2026

Regarding: J. DOE 4 et al. vs ELON MUSK et al.

Reporter:  Sarah Parr

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____ on the _____ day of _____, 20____.

Signature: _____

Jason Gray

Email to: Production@NaegeliUSA.com

JASON GRAY
93681

February 03, 2026

273
Index: 000576..2025

## Exhibits

**EX001 ORGANIZATION CHART**  24:16, 17 26:5 73:23 78:10

**EX002 CALENDAR**  55:16,20

**EX003 DOCUMENT**  72:9,11,18 105:15 110:7 111:19 219:17

**EX004 DOCUMENT**  72:10,11 73:18,22, 25

**EX005 ACTION MEMO**  75:9,10,13 97:5

**EX006 ADMINISTRATIVE LEAVE NOTICE**  92:10,13 111:20, 21,22

**EX007 ORDER**  141:17,18,19

**EX008 EMAIL AUTHORIZATION FOR ACCESS CONTROL INFORMATION**  152:5, 7

**EX009 EMAIL PHYSICAL AND LOGICAL ADMINISTRATION FOR GAVIN**  156:14, 15

**EX010 EMAIL AID INTENDED COMMS**  164:5,6

**EX011 EMAIL BUILDING ACCESS**  170:10,11

**EX012 EMAIL ACCESS TODAY**  178:11, 13

**EX013 EMAIL LPA LEAVE TEMPLATE**  189:15,16 195:3

**EX014 GMAIL CHAT**  195:8,10

**EX015 EMAIL REQUEST INFORMATION**  197:6,7

**EX016 EMAIL REQUEST INFORMATION**  198:5,6,7

**EX017 APPOINTMENT OF PETER MAROCCO**  199:11,12

**EX018 EMAIL ACTION MEMO**  204:7,8

**EX019 EMAIL FYI**  207:14

**EX020 EMAIL FYI**  207:14 208:18

**EX021 EMAIL USAID MEMO**  210:24,25

**EX022 EMAIL PLACEMENT OF CHCO**  215:18,19

**EX023 EMAIL INVESTIGATIVE LEAVE NOTICES**  217:15,16

**EX024 ACCESS REQUESTS**  223:23,24

**EX025 EMAIL 507-2 FOIA ACTION**  230:25

## 0

**000576**  75:14

**000586**  92:11

**00059**  178:12

## 1

**1**  24:16,17 26:5 48:24 73:23 78:10 214:5 254:16

**1,000**  248:7,9

**1,400**  209:20 210:11 211:3,21,23 213:13 248:9 261:2

**1-26**  8:10

**10**  143:16 164:5,6 228:4

**100**  39:8 109:11

**105**  29:19,22

**11**  23:11 96:24 170:10,11 228:4

**11-ish**  116:20

**11:11**  8:8

**12**  126:19 171:23 177:6,8,12 178:11, 13

**12:27**  71:6

**12:36**  71:10

**12th**  249:9

**13**  189:15,16 194:16 195:3,5

**14**  195:6,8,10

**14th**  249:5

## 15

**15**  70:1 126:19 143:16 197:6,7 226:4

**16**  86:19 87:11 198:6,7 226:4

**17**  199:11,12

**1774**  152:6

**18**  204:7,8 226:4

**18F**  53:22

**19**  207:11,14,16,19

**19th**  28:2

**1:54**  130:22

**1st**  15:10 170:9 171:17 176:12 178:25 189:23 191:22,23,24 200:20 231:10 255:24

## 2

**2**  55:15,16,20 61:10

**20**  31:6 57:6 118:6 207:12,14,17 208:18 211:10,11

**20-some**  32:10

**2000**  20:9

**2005**  20:10

**2007**  20:7,10

**2016**  35:3

**2022**  23:8

**2025**  10:4 11:10 22:17 23:9,25 24:2 26:10 28:2 34:19 53:18 54:21 55:20 56:2 71:21,24 93:3 116:10 131:3

178:25 200:9 247:9, 16 252:15

**2026**  8:9

**20th**  23:25 26:9 53:18 54:21 56:3 60:12,15,25 65:19 66:4 71:21,24 72:19,23,24 73:2,5 74:3,25 246:10 247:8,9,15 252:15

**21**  57:5 210:24,25 254:16

**21st**  75:5,8,21 81:8

**22**  215:18,19

**22nd**  107:20,25

**23**  31:7 217:15,16

**24**  31:4,7,8 223:23, 24 248:7

**24/7**  30:16 207:8

**25**  60:12 73:5 75:21 230:24,25

**250**  30:2

**270**  24:22 25:4,5 26:4

**271**  25:1 26:3

**27th**  72:6,8 84:3 86:10 88:16,21 89:11,20 92:2 93:2 96:10 98:17 99:6,8 102:17,22

**28th**  102:22 103:25 104:17 106:25 107:3,5 108:3,10,22 111:24 112:17 114:1 116:6

**29**  255:4

**29th**  72:24 108:2,10, 20 109:9,12,14 111:24 112:17 114:1 116:6

**2:04**  226:2

**2:13**  130:25

**2:15**  61:10

**2nd**  200:9,11 201:1, 13,15 204:7 205:18 206:22 207:4 255:19,25

---

**3**

**3**  61:10 64:4,5 72:9, 11,14,15,18 105:15, 19 110:7 111:19 124:24 214:25 219:17

**30**  220:1 254:14

**30th**  109:12,13 113:2,4,23 114:2 116:9,10,16 120:1 123:25 131:3 133:10 135:5 136:14 140:1 141:13 142:5,10 149:9,13 152:16,17, 24 153:15 154:8 156:11 157:19 200:17 201:3,23 220:9

**31st**  131:14 133:9 142:12,15,25 144:17 145:13 146:21 154:13 156:11 160:8 161:19 162:4 164:4 166:1 169:4 189:22 191:21 200:15,20 201:23 222:17

---

**365**  30:16 207:8

**3:25**  184:12

**3:33**  184:15

**3C**  105:19 219:19,21

**3rd**  8:8 163:2,5 209:12,15,19 214:4, 24 265:4

---

**4**

**4**  19:7 72:10,11 73:18,22,25 116:21 119:9,22,23,24 121:9 122:21 132:17 142:25 154:14

**45**  128:5,8 129:5,12 131:6 136:1,3 254:7

**4:20**  212:8

**4:29**  212:11

**4:30**  103:22 120:20 125:19

**4:56**  230:18

---

**5**

**5**  75:9,10,13 97:5

**50**  238:19 254:17

**54**  254:18

**555**  249:8,12 250:5

**57**  87:17 93:10 94:6 100:14,15,17 123:22 164:15 165:8,13,14,17 168:4,5 194:18 202:24,25

**58**  87:18 100:15

---

**58th**  93:11

**5:32**  230:20

---

**6**

**6**  20:7 92:10,13 111:20,22 190:4

**6:15**  261:22

**6:20**  261:24

**6:27**  267:15

---

**7**

**7**  20:7 141:18,19 190:5 264:24

**7:04**  154:4

**7:30-ish**  85:16

---

**8**

**8**  152:5,7

**8/23**  166:21

**80**  28:22

**800**  30:14

**8th**  22:17

---

**9**

**9**  19:8 84:15 88:23 116:19 156:14,15

**90-day**  74:19 261:4

**96**  264:24

**97**  135:19

**98**  135:18

**9th**  224:10

---

JASON GRAY
93681

February 03, 2026

275
Index: A-I-D..address

**A**

**A-I-D** 21:20 22:19,20 38:10 137:5

**A-K-A-M-A-I** 43:23

**a.m.** 8:8

**ability** 44:20 47:13, 21 77:19 104:11 148:2 150:19 161:21,24,25 196:11 227:15 228:1 258:1

**absolutely** 46:13 71:5 108:5 125:23 129:20 170:22 172:13 263:25

**absorption** 90:18

**Accenture** 240:7

**acceptance** 50:10, 13

**accepted** 186:14 255:10 256:19,23

**access** 37:22 43:2 44:15 47:10,20 49:5,10 50:3 51:4,6, 14,22 52:18,20 53:7 60:21 67:22 68:10, 14,16,17,18,21 69:2,3,5,9,11,13,15, 16,22,25 70:5,6,7, 11,13,16,18 83:4 86:3 90:23,25 91:3, 6,7,11,12,13,17,18, 21,24 92:2 104:3,8, 10,11,24,25 116:13 123:10,19 127:17 130:13 140:13 149:16,22,25 150:2, 4,12,13,14,17,19,25

151:4,5,8,9,17,18, 25 152:21 153:1,5, 13,21 155:13 156:9, 10,12,24 157:7,13, 14 158:9,16 159:3 160:16,21 161:18 167:5,6,8,13,21,25 168:4,8 169:2 171:22,23,24 173:1, 4,6,13,20,22,23 174:1,3,10,11,14, 15,16,23 175:1,8, 10,12,13,14,17,19, 21,24 176:2,25 177:21,24,25 178:8, 9,25 179:11 181:1, 2,7,18,22,25 182:4, 5,8,9,10,11,24 183:1,11,14,18 185:9,13,23 186:9, 10,25 187:3,14 190:20,25 191:1,3, 4,5,7,8,10,12,13,17, 18 192:8,10,13 195:21,23 196:2,3, 6,10,21 202:5,17,22 205:4,21 206:18 211:24 212:2,3 216:7,9,10 218:22 219:4,8,10,14 224:13 226:21 227:2,6,7,16 228:7 231:11,20,23,24 232:2,7,8,22,25 233:6,7,9 234:9,14, 21 235:19 236:5,9, 10 245:6,15 246:5 247:4

**accessed** 104:1 231:14 233:18

**accesses** 149:14

**accessing** 177:4 182:24 234:1

**accompanying** 76:7

**account** 41:10 47:4 50:2 52:8 68:17 83:4 232:23,24 239:8 246:22,23 247:5 248:6

**accounts** 127:16 140:13 205:2,11

**accurate** 212:20,21

**accusatory** 263:20

**acknowledging** 38:13

**acquisition** 28:14 29:9 39:19

**acquisitions** 29:10, 11 144:4

**Act** 142:3

**acted** 225:16

**acting** 21:4 23:10,23 27:23 58:1 60:15 61:16 62:7,10 64:12,15 65:4,18 66:2 74:15 75:1,18, 25 76:4,17 77:20 78:12 79:7,14 80:4 82:21 83:11 92:5 94:18 100:22 101:2 110:2,5,10,13,19,20 111:13 112:11 121:19 131:20 132:21 138:24 139:3 141:15 142:4 143:19 145:17 147:5,13 153:16 154:25 155:2,7 162:22 163:16 165:24 180:12 183:23 184:1 188:8 189:4 192:15 193:2, 9,20 194:1,10

198:20 199:5,19 200:4,13 201:7,10, 24 219:16 220:4 221:19 222:7,14 241:21 243:3 247:23 250:10 265:2

**actings** 109:24

**action** 76:22 77:2 98:11 157:5 197:22 205:1 218:13

**actions** 18:16 47:19 247:8,14

**active** 41:3,4,7,10, 14,16 52:8 135:23 192:9 196:1 197:1,3

**activities** 30:22 33:23 90:20 144:3 145:4

**acts** 202:2

**actual** 39:15 43:7 147:13 151:6

**Adam** 143:2

**Adams-** 27:15

**add** 44:20 47:21 68:4 201:16 236:9

**added** 94:16 141:9 205:11

**adding** 228:23

**additional** 68:18,21 69:2 104:24 107:17 117:16 120:9 125:17 146:20 149:14,22 224:13 226:20 232:17 241:24 243:15

**address** 48:25 52:7 85:7 246:23

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Case 8:25-cv-00462-TDC   Document 229   Filed 06/03/26   Page 377 of 720

JASON GRAY
93681

February 03, 2026

276
Index: addressed..agenda

**addressed** 27:13 183:9 223:16

**addresses** 36:5 240:1

**adhere** 148:9

**adjusted** 219:8

**adjusting** 122:8

**admin** 41:12 44:15, 21,23 47:20 48:15, 19 49:5 69:13,15,16 70:19,20 86:20,23 94:4,13 95:8,16 96:4,7 97:24 98:8 99:18 102:23 103:17,19,24 110:4, 24 111:6 117:17,19, 20 118:21,22,24 119:13 120:10,22 121:5,13 123:18,22 124:6,16 125:11,12, 20,21 126:19,21 127:11 131:22 133:20 134:20,25 135:3 146:21 164:15 165:7,18,20, 21 167:7,8,12 168:15 185:17 186:3,16,17,19,20, 23 188:7,13,19 190:18 192:4 196:3, 10 202:2,23 203:7 205:10 209:21,25 210:12,14,16,19 211:7,21 216:18,20, 21 217:1,3,11 218:2,4,5,6,7,10,12, 16 219:13 231:18, 25 250:6 259:2 260:25 261:2

**administrate** 47:4,6

**administrated** 47:7 153:8 233:4

**administrates** 187:18

**administration** 19:18 21:11 28:1 44:18 56:4 57:2 60:11,17 77:12 81:5 83:23 110:15 144:24 145:1 250:9 255:6 256:5

**administrative** 30:23 47:10 83:13 86:1 95:12 96:17 97:3,16 98:2,4,12, 20 99:13 100:18 104:8 116:12 134:13,15 144:4 153:11 195:21,22 196:2 197:25 202:2, 16 211:23 212:2 241:25

**administrator** 23:11 26:18,25 27:6,16,20 45:4 47:12 58:1 59:18,21,25 60:15 62:7,10 64:16 66:7, 8,14,16 74:15 75:2, 18 76:1,4,10,18 78:12,13 79:3,7,10, 11 80:5,18,21,22,24 82:22 83:11 94:19 106:24 107:24 111:13 121:19 122:2 126:2 131:20 132:21 138:17,24 139:4 140:12 141:15 142:4 143:19 144:25 145:1,9,17 147:14 148:5 150:18 153:16 154:25

155:2,7 156:1 162:23 163:16 174:12 175:8 180:19 181:7,23 182:6,11,14,24 183:3,23 184:2 188:8 189:1,5 193:2,9,20 194:1,10 198:20 199:5,19 200:4,13 201:8,11 214:10,18 219:16 220:5,14 221:20 222:7,14 241:22 243:4 247:24 250:10

**administrator's** 78:3 79:25 214:6,22

**administrators** 45:6 59:14,20 107:24 110:16 114:25 144:1 145:3

**advance** 57:10 189:21

**adversarial** 117:9

**advice** 16:25

**advise** 220:20

**advisor** 21:12 23:15 90:8 98:22 126:13 146:16 242:5 246:20

**advocate** 21:12

**affairs** 65:2 253:6

**affect** 203:22 222:11

**affiliated** 71:25 72:5 73:11 86:4 88:15,20 89:9,18 113:3,20 116:1,13 150:25 162:11 246:13

**affirm** 9:6

**affirmative** 10:20

**affirmed** 9:14

**afternoon** 87:10 95:24 98:16 102:24 103:23 124:16 140:1 169:7 172:5 249:7

**afternoonish** 172:8

**age** 19:7,8

**agencies** 32:11,18, 23 47:15 50:20 54:9 106:21 127:4 134:4 137:5 138:17 148:12 155:25 158:10 215:4,8 219:23 221:10 222:11 233:23 238:12 241:14 260:12

**agency** 18:3 21:25 23:15 37:21 40:1 44:10 46:8,20 48:18 64:12 81:23 94:2,17 108:6 113:13 124:10,19 126:18 127:2,9,11,21 128:18 130:13 140:18,20 141:14 144:5 148:6 149:1,5 162:21 170:3 180:13 207:6 215:16 219:22 220:12,18,20 228:13,19 229:14 243:12 246:2 250:12 257:7 259:22 260:18,21 261:10 264:17

**agenda** 148:24 220:22

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

agree 122:6 233:9

ahead 12:20 15:24 19:10 124:1 139:14 140:3 191:1 216:9

AI 29:11

aid 22:20 56:13 74:3,19 171:11 214:6 235:9 242:16 243:23 250:13 259:10

AID/A 214:5,11

Aidnet 39:14 50:3 91:21 167:8 212:3

Akama 43:25

Akamai 43:25 44:1, 10

alarm 159:8

aligned 26:16

allegation 109:18

allegations 85:7 236:16

Allen 27:16

allowed 91:7 209:17,24 233:24

Amazon 41:25

ambiguity 192:18

American 19:16 20:1

amount 226:7

Amy 139:19 162:18

analysis 236:15 239:21,23 240:4 241:11

analyst 155:21

analyze 161:11

239:25

Andrew 8:16

angry 209:6

Anna 265:5,6,7

Annex 61:19 62:17, 21 67:21 244:15,22

anniversary 13:13

announcement 193:17

Anouilh 192:7

answering 12:8 185:2

answers 216:13

anymore 92:6 154:25 155:2,20,23 183:23 193:9 247:24 256:20

apologies 189:21 258:16

app 206:24

apparently 173:6

application 151:18 156:25 157:1,9 191:17 228:5,6

applications 151:7 167:18 253:5

applied 35:10

apply 50:18 255:15

appoint 142:3

appointed 23:8 60:14 63:10 64:7 65:4 132:21

appointee 27:18 76:9,11

appointees 110:17

256:9

appointment 28:6 62:25 63:6 201:7 235:13,14

appointments 18:18

appraisals 66:15

appreciated 174:4

approval 70:12,15 160:9 171:1 206:9 225:4 228:15,20 229:5 253:18 256:10

approve 77:22 225:4

approved 64:21 76:23 77:1 94:18 161:18,19 228:23 256:12

approving 96:17 171:15

April 240:10 246:17

area 174:20 180:20 181:13 192:12 264:12,13

areas 179:1 183:11, 13,14

Argumentative 140:22 260:22

arrival 55:6

article 208:13 263:7

articulate 27:3 256:4

articulated 102:17 128:18 152:24 204:18

ascending 92:18 170:17 217:19

Asia 112:10

asks 224:13

aspect 44:12

assess 104:13

assessing 84:16

assessment 93:18 107:7 261:5

assigned 144:7 220:1

assist 167:1

assistance 29:16 55:7 67:3 110:12

assistant 30:23 110:15

associate 21:4,15

assume 11:6 65:5 66:3

assuming 113:18 198:24 201:9 214:9 264:4

assumption 252:6

assurance 28:16 53:12 68:23 160:3 238:22

attached 75:17

attachment 198:25 199:1 207:13,19

attend 32:2

attendance 70:17

attended 32:12 38:23,25 120:2

attending 12:15

attention 22:18,25 23:19 43:22 53:17 56:1 73:17 75:8

92:10 105:14 109:9 116:9 170:9 189:25 219:15

**attest** 89:20

**attorney** 16:23 63:22

**attorney-client** 14:23 16:22

**attorneys** 12:13 63:20 100:19 266:17

**audit** 231:22

**August** 23:8 262:19

**authentication** 52:5, 16

**authorities** 147:11 199:20 200:19

**authority** 125:10,12 133:25 136:21 138:14 139:3 147:14,23 177:14 178:5 188:12,19,22 202:9

**authorization** 46:13, 18 49:10 53:9 154:5 234:16

**authorize** 46:21 153:10 167:1

**authorized** 39:16 120:25 208:3 232:1, 9 233:10 234:14,22

**authorizing** 46:14, 19

**average** 48:23

**avoid** 212:24

**avoiding** 213:5

**aware** 37:21 84:3,5, 7 165:6 166:13 167:10 183:5,22 202:1 247:2

**awareness** 98:24 197:22 204:24 206:15 216:6 248:22

**awesome** 260:6

**awkward** 184:21

**AWS** 41:22,25 42:7, 10,14,15,25 43:18

**Azure** 42:11,14 196:24 197:2

---

**B**

**bachelor's** 19:15,25 20:6,10 22:5

**back** 11:25 22:18,25 23:13 34:17 36:24 41:22 58:17,18 73:25 83:20 86:7 96:7 97:4 100:17 105:14 112:11 118:22 119:7 127:15 128:4,8 129:5 131:6,24 133:2 134:10 135:1 136:1,20 141:4,8 145:8 146:14 151:12 153:4 157:3, 15 163:17 165:13, 19,20 167:15,25 168:20 172:16 178:18 185:11 192:20 209:17 217:3 218:1 219:15 222:20 230:13 241:7,22 244:14,22 252:22

**background** 10:1 18:20 36:12 49:19, 20 76:20,22 88:4,5

**backup** 150:18

**backups** 243:11

**bad** 98:2 125:15

**badge** 175:17,18 176:5,9,10 183:3

**badged** 172:25 175:23

**badging** 149:19

**bag** 106:20

**base** 20:22 69:3,5

**based** 37:20 68:5 114:19 192:23 233:13 234:15 259:20

**basic** 38:2 69:12 70:19

**basically** 21:16 41:4 44:25 52:1,13 56:25 63:4 65:2 113:8 131:10 132:17,23 141:11,12 143:20 171:21 173:19 174:19 181:15 196:15 205:20 209:18 211:12 227:1 228:3 242:5 243:16 254:20

**basis** 70:8 94:23,25

**Bates** 24:22 26:3,4 75:14 92:11 152:6

**battery** 31:11,15

**beginning** 8:9 92:23 213:15

**behalf** 8:14,16,18,

20,22,24 109:5

**behavior** 238:2

**believed** 150:15

**believing** 223:20

**bell** 217:13

**belong** 205:2

**belongings** 209:18

**bench** 243:11

**benefits** 21:12,13

**Beth** 8:14 70:23 128:11 184:5

**Bethesda** 20:18

**BHA** 250:5

**big** 19:9 29:18 68:8 109:10 203:12 256:18

**bigger** 87:11,15 93:24 253:8

**Bill** 97:18,20 100:25 102:6,7,9,19,25 103:3 107:4 120:7, 8,18 121:15 122:22 123:13 160:7 190:6, 7,8,16,17 192:6 197:11,15 217:3 218:1

**billion** 48:24 159:13, 14 239:23

**biometric** 52:4

**bit** 13:10 21:6 27:3, 13 44:14 62:17 65:21 77:8 82:5 92:17 93:7 106:5 118:10 121:1 131:10 143:23 173:14 200:18 243:25 245:3

**blank** 24:11 55:20 252:3 263:24

**blanks** 24:7

**Bless** 187:9,10

**blind** 102:9

**block** 192:16

**blur** 64:9 75:3 85:4 252:11

**blurred** 108:25

**blurry** 26:21 65:21

**blurs** 172:22

**board** 135:19

**body** 166:22

**Borkert** 66:23 143:6

**born** 19:7

**boss** 66:13 102:20 174:7 184:21,22 185:3,8 188:24

**bothers** 187:12

**bottom** 24:21,24 75:14 78:18 92:11 152:5 178:11 180:4 190:4,5 195:15 205:25 213:16

**box** 22:14 26:18 253:21 254:9,25 255:4,10,14,15 256:23

**branch** 18:13 27:9 28:17 68:23

**Brandon** 90:8 98:21 126:12 133:16

**Brandon's** 98:25

**break** 12:7,10 25:11, 13,15 69:18 70:3,25 101:23 102:4

128:12 130:18 184:6 212:4 230:12 261:13,20

**breaking** 102:15

**breaks** 11:24 12:6

**Brian** 45:13,16 152:14 154:4 180:15,21 182:16 183:22 185:4,6,7, 19,21 190:14,18 229:11,18 232:4 233:4,8 248:12

**briefed** 49:6 79:14 111:15 113:2 114:12

**briefing** 92:7 94:2 103:13

**briefings** 155:20,23, 25

**briefly** 51:25 67:16 76:6 112:2 115:20

**bring** 12:23 82:16 119:7 182:18 262:13

**bringing** 73:15 84:12 203:23

**broad** 41:23

**broadly** 202:16

**broke** 167:16

**broken** 48:1,4

**brokerage** 44:5

**Brokert** 143:6

**brought** 53:23 54:12 55:3 65:1 131:16 150:3 165:1 183:24 217:3 218:1 242:18 246:15,19 248:8,11

**BTC** 39:14

**budget** 28:13 253:9 259:9

**buffer** 228:14

**building** 62:22 78:3 82:1 113:25 153:21, 22 162:8 170:20 171:22 172:1,19 175:20,22 176:3,25 179:1,12 180:17 185:14 191:13 249:9,12,19 251:23

**buildings** 191:4,18

**bulk** 227:13

**bumpy** 59:4

**bunch** 35:12 36:8 152:24 213:7 232:18

**bureau** 26:19,21,23 55:7 56:20 67:2 79:15,18 80:14 88:6,10 90:5 109:3, 10 110:23 112:10 135:24 163:21 187:20 213:18 214:14,15 253:7

**bureaus** 78:24 79:2 90:14 107:23 108:7, 21 110:11 112:16 122:17 248:18

**Burnham** 179:15

**business** 19:18 120:20

**busy** 155:18 207:8

**Butler** 172:17 173:9, 16 180:1 184:18,20 185:1

**Butler's** 185:3

### C

**C-CURE** 153:6 181:2 191:3,8,11,14

**cabinet** 20:21 32:2, 7,10,15

**CAC** 51:19

**calendar** 44:14 55:20,22 134:15,16, 22 243:2

**calendars** 39:13

**California** 19:8 21:9

**call** 18:4 22:19 53:14 56:23 58:13, 16 59:11 62:19 71:15 126:24,25 127:6,23 128:23 129:1,13,15 132:9 136:10 137:16,17, 24 138:2 171:20,24 172:10,13 173:5 176:20 177:11,13 179:19 180:3 181:24 182:2 184:18 185:10,16, 21 230:10,13 259:13 267:11

**called** 22:1,14 29:23 30:1 32:22 35:12 39:14,17,18,21 40:22 49:15 51:19 53:20 55:4,9 56:17 57:21 58:18 69:1 78:24 91:11 107:21 124:3 161:6 176:2, 13 181:3,5 197:24 233:23 238:10 239:16 241:10 242:5 253:4 254:19

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**calling** 177:3

**calls** 14:22 30:18 139:9 144:12 147:16,24 188:14, 15 194:19 206:4 218:24 224:20 235:1 236:21 250:21 251:13

**Canada** 19:7

**cancel** 240:11,14,17

**canceled** 249:16,18

**Candidate** 215:10

**capabilities** 240:15

**capacity** 160:10

**capital** 34:10 49:15 97:21 101:3

**caps** 43:19 225:19

**caption** 8:10

**card** 51:13,18,19,25 52:1,2,9,11,13,22, 25 53:6,9 67:18 68:1,3,5,11

**cards** 51:22 60:21 67:22

**care** 126:25 127:7, 25 128:23 137:17 138:1,11 173:1,4 192:3

**career** 57:5,17 86:23 95:11 110:18 260:2, 5 264:12

**carefully** 100:10

**Carr** 180:12 242:3

**carried** 87:2,19

**carrying** 106:20

**Carter** 217:12

**Cartwright** 57:22,25 60:8,9

**case** 8:10 10:2 17:24,25 18:7,24 55:24 78:22 167:9

**case-by-case** 70:8

**cases** 83:3 123:15

**catch** 195:9

**Caterpillar** 264:9

**caught** 177:5 237:13

**CC'ING** 190:10

**cell** 28:24 60:23 61:6 185:24 259:13

**Center** 20:18,24 21:24

**central** 41:19

**certificate** 227:7

**certificates** 19:14 52:6

**certification** 19:23

**certified** 19:20

**CFO** 110:9,10 117:5, 19 119:6

**CFO's** 125:20

**chain** 93:2,7 94:12 152:13 156:22 179:5,24 180:23 189:24 204:18 217:22,24 225:5 226:15

**chains** 234:15

**chair** 33:6

**challenge** 248:5 257:17

**challenges** 54:10,17

82:2,6,17 235:16

**challenging** 18:1, 10,15

**change** 43:2 47:22 48:3 60:18 158:23, 25 221:25 222:11 262:13

**changed** 124:17 158:1

**changing** 158:8 192:1

**characterization** 221:17 222:23

**characterize** 94:11 139:24

**characterized** 241:23

**charge** 97:10,12 98:10 108:7 109:20 112:15 127:9 131:19 188:1

**chart** 24:20 59:15 73:23 78:18 79:3 80:9 121:23 213:18

**chat** 195:13

**CHCO** 34:7,9

**check** 48:1 58:7 186:25 194:8 201:18 264:10

**checked** 227:5 231:13 265:10

**checking** 183:12

**chief** 20:19 23:21 26:13 28:14,15 29:12,13 34:10 61:16 62:3 65:10,13 66:24,25 75:24 76:3 77:4 97:20 101:3

114:16 117:7,12 126:10

**chip** 52:2

**choice** 146:7

**Chris** 8:24 16:10,11

**CIA** 36:19 245:22 246:3

**CIO** 21:1,13,15,19 23:4,8,13,16 26:22 27:8,14,21 28:10, 17,20 31:10,25 32:1,7,16,18 39:5 42:17 43:4 45:6 46:4,9,10,17,19 54:5,14,23 55:2,3,9 59:13 60:17 62:21 65:5,16,18 67:20 68:14 77:25 80:4,9, 14,17,20 81:2 83:2 92:5 131:24 133:3 135:13 141:4 148:6, 23 153:9 160:4,5, 10,11 163:17 165:4 181:1 186:7 192:15, 20 202:3 217:12 232:22 234:10 235:12 241:22 242:10 243:15 244:15 248:19 253:6,15 255:8 256:16 265:2

**CIO's** 50:6 187:22 192:12

**CIOS** 32:2,17 60:24 148:6 192:11

**circumstances** 186:18

**CISO** 65:9 264:8

**CISSP** 19:21

JASON GRAY
93681

February 03, 2026

281

Index: civil..contact

**civil** 29:20,24 57:17 256:7

**claim** 18:14

**claims** 18:8

**clarify** 76:15 87:24 162:17

**clarity** 10:19

**class** 38:21 233:10, 14

**classified** 37:18 47:2 90:15 151:6 156:6 174:21 175:5, 6,11,12 181:11,12, 13,15,17 182:1,5,19 183:11 231:11 232:21 233:11,15, 18 234:1 245:15

**Classnet** 232:23

**clause** 18:19

**clean** 245:5

**clear** 11:14 17:11,18 28:5 29:11 49:19 58:5 83:5 127:24 158:18 174:5 180:15,20 189:4 199:3 201:22 202:6 225:5 243:14 244:17,22,24

**clearance** 34:20,23 35:7,10 36:16 37:4, 11,14 49:22,23 68:11 180:10 213:19 233:24 242:8

**cleared** 36:25 67:25 91:9 214:2 244:19

**clerk** 235:13

**Clinton** 56:7 57:19

60:3 62:1 63:25 94:16

**close** 13:12 58:15 61:11 120:20 138:21 193:4 230:16

**closely** 30:7 63:23 262:16

**closing** 18:17 245:1

**cloud** 42:1,5,7,9,13 43:18 44:4 149:19 197:2

**Cloudshape** 241:10, 15

**co-** 33:5

**coffee** 131:16

**Coleman** 59:23

**collaborate** 32:3 34:14 222:11

**collaborating** 50:23

**collaboration** 39:11 138:19

**collect** 209:17

**Colorado** 19:18

**combination** 243:21

**comfortable** 25:12

**command** 225:5

**comment** 118:19 124:8 126:10 130:8, 11

**Commission** 215:11

**committee** 33:7,15, 16 34:14

**communicate** 12:1 251:2,6,13 258:13

**communicates** 161:6,7,8

**communicating** 171:3 208:6

**communication** 179:23 183:10 193:24 194:4 241:13 251:17 258:21,22,24

**communications** 83:6 231:9 263:13

**company** 22:14 241:9 254:25

**compartmental** 34:21 37:1

**complaints** 231:16

**completely** 127:2 212:24

**complex** 95:20

**complicated** 19:12 86:6

**compromise** 213:6

**computer** 41:20 51:4 52:3,17,18 175:2 202:22 237:1

**computers** 175:3

**concern** 119:15 120:8 124:9 126:17 193:22 222:18

**concerned** 189:22

**concerns** 148:20

**concierge** 257:20

**conclusion** 147:17 188:15 209:23

**conduct** 18:18 91:22

**conducting** 77:15

**conference** 80:1 89:16 116:21,22 119:25

**configuration** 241:12

**confirm** 195:5,8

**confirmed** 28:6 190:24 231:15

**Confirming** 190:17

**confuse** 197:5

**confusion** 182:13 194:11

**Congo** 127:13

**Congress** 18:12 250:12,22 251:14, 18

**congressional** 40:24 58:22 251:21

**connect** 161:10 229:2

**connected** 83:12,13 181:16 259:21

**connection** 231:18

**considered** 60:3 224:17

**Constitution** 18:19

**constraint** 218:11

**construction** 20:23

**consular** 253:6

**consultation** 105:21 219:22 220:2,14 221:14 243:17

**contact** 56:4 61:5 71:22 125:25 267:9

**contacted** 56:6

**continuation** 222:3

**continue** 103:11
178:6

**continued** 87:16

**continuing** 107:17
112:25 113:11

**continuity** 111:3

**contract** 46:5 240:9,
11

**contracting** 46:9

**contractor** 30:24
43:6 45:9 69:24
168:23

**contractors** 30:10,
14 43:15 50:19
69:25 205:3

**contracts** 204:17,25
244:2 260:24

**control** 124:10
126:17 150:2

**controlled** 69:21
153:20

**controls** 41:8,11,16
157:25 191:3

**conversation** 14:13
15:19 16:2,4,7,14,
19 17:22 57:8,24
58:4,9 59:6,9 63:5
83:19 84:19 85:12,
21 86:12 87:4 91:23
92:1 93:9 96:12,15
97:18 100:9 101:6,8
105:13,24 107:3,9
108:3,9,11,14
109:2,7,22 114:22
115:23 116:2 117:6,
14,21,23 119:11,14

120:7 121:9,10,12,
14 122:5,10,21,22
124:18,20 126:4,5,
22 129:6 131:7,17
132:3,4 133:11,12
134:18 135:4
136:15 151:20
153:1,13 157:21
163:12 173:11
174:11 179:25
181:6,21 183:25
184:17 203:4,9,10,
12,14 210:15
233:21 247:25
248:15 249:21
250:4 253:23 259:8
262:7,15

**conversations**
36:13 58:10 59:11
60:6,10 92:7 98:22
99:7,11 100:20
102:16 107:7,16
111:7 112:13
115:25 120:17
122:23 123:2
146:19 158:18
203:3 209:7 211:6,
16 225:15 242:13,
14,20 243:5 248:2

**convince** 134:8

**cool** 239:16

**cooperating** 216:15

**cooperative** 217:8

**coordinate** 220:19

**coordinated** 76:23

**copied** 93:3 124:3
166:14 197:20
198:11 204:11,13,
23 206:14 216:5

**copies** 25:7 197:12,

13 208:15 252:18

**copy** 25:2,3,8 38:25
63:11,12 73:23
80:11 142:16,18,20
266:19,24 267:10,
12

**core** 210:9

**correct** 14:3 22:3,8
23:17,18 33:1,2
34:3,5,6 43:10,12
52:23 55:14 59:18
62:20 65:5 66:5
75:19,21,23 76:1,
12,18,19 78:14,19
79:7 80:17 93:4
94:11,21 95:13
98:12 102:17,20
105:3 108:16 125:5
128:19 140:21
141:11,12 142:10
144:8 179:2 190:22
197:13 199:24
200:9,11,15 204:14
210:2 211:7,8
220:15 224:11,14
226:17 230:4
233:11 234:5,6,11
245:12 255:23
257:1

**corrected** 180:22

**correctly** 32:17
72:22 74:4

**cost** 29:7

**council** 31:10,25
32:1,2,13,18 33:4
34:7,12

**counsel** 8:12 9:12
12:16 14:7 27:7
31:18 73:22 100:19,
22 266:6

**counselor** 56:8 64:1
94:17

**count** 29:19

**countries** 28:23

**country** 240:2,3

**couple** 18:1 20:20
41:22 42:10 49:12
57:25 81:16 82:19
85:2 96:23 100:3
114:7,10 119:14
125:19 154:19
176:8 178:16
195:20 229:6
239:22 243:8

**court** 9:3 10:10,18
80:11 266:7,11

**courtesy** 169:10
185:25

**covered** 23:5

**crazy** 224:5

**create** 50:1 148:25
161:21

**created** 40:16 237:5
247:6 253:4

**creating** 59:2

**creation** 39:11

**credentials** 68:5

**critical** 79:16

**cross** 222:25 223:1,
10

**CSC** 204:17

**cube** 68:8

**curious** 115:10

**customer** 21:12
39:24

**cut** 115:15 218:22 219:8 244:3

**cutting** 260:24

**cybersecurity** 28:16 48:22

---

### D

**daily** 81:17 257:14

**DAMR** 27:17 66:11 121:20 122:1 188:23,25 200:24 201:25

**Dan** 206:8

**Danny** 45:15 150:16 232:5

**DAPP** 59:21 66:20 131:25 164:24 192:21 200:23

**data** 21:24 28:15 29:12 156:24 196:6 231:11 235:14 236:17 237:3,6,8 238:11

**database** 151:15 191:14

**date** 8:8 15:11 24:1 73:1 89:24 104:17 107:4 144:20 147:1 152:25 166:17,18 173:21 187:3 200:6 206:22 219:21 220:1 254:2 255:18

**dated** 75:21 142:5 154:4 202:10

**dates** 55:23 117:1

**Dave** 224:1 226:22 227:3 237:22 239:10 244:4

**David** 226:16 227:13

**Davis** 113:24 114:20,22 115:9 116:2 171:20 172:14 173:11,25 175:11 176:1,3,19 177:12 179:15,25 180:3 181:4,21 182:2 183:1,6 184:17 194:18,25 195:2 247:1,2,3 262:22

**Davis'** 166:2 176:11 179:19 185:2

**day** 50:15 53:1 56:2 58:12,15 61:9,12 64:4,17,19,20 65:20,24 74:25 81:19 85:1,3,24 87:2,10,13,20 88:2 89:9,10 90:5 93:8 99:25 102:25 105:10 107:19 108:24 109:1 114:3 120:2,4,7 123:9 124:22 133:5,10,19 141:4 142:6 152:23 153:25 154:16 155:17 156:9 157:19,20 162:4 164:3 172:21 175:20 184:1 243:1 244:23 248:7 249:10

**day-to-day** 144:2 257:22

**days** 23:11 85:4 95:17 96:24 105:13 113:22 114:3 119:15 134:16,22 142:16 168:10 169:2 218:2 220:1

254:7,14 255:4 256:13,14,22

**deal** 58:20,23

**debate** 163:11

**debriefed** 121:10

**debriefing** 133:11

**decades** 41:14 44:18 45:5 196:18

**decide** 210:17

**decided** 95:15 108:17,20 146:13 169:5 237:6

**deciders** 110:25

**deciding** 98:10

**decision** 93:16 94:24 97:3 125:5 133:1 134:8 137:3 138:12 141:2,13 146:2 255:10,13

**decisions** 18:11 138:23

**deeper** 240:4

**DEERS** 22:2

**default** 79:11 238:1

**defend** 240:17

**defendant** 18:23

**defendants** 8:23,25 9:2 17:13

**Defenders** 266:17 267:9

**defense** 21:9,24,25 22:1 260:2

**definitively** 206:7 237:11 244:6,12

**degree** 19:15,17,25

22:9

**degrees** 19:14 20:12

**DEI** 83:13

**DEIA** 203:15

**delay** 201:20 253:19,20

**delegate** 75:18

**delegated** 77:21 147:12,15 188:23 199:20 200:23,25 201:25 215:15

**delegating** 78:9 97:5

**delegation** 75:17 76:7 77:7,13,18 242:3

**delegations** 170:25 171:6

**delete** 44:21 45:1 47:13,21 158:3,4 196:16

**deleted** 158:5 196:15,19

**deliver** 32:4

**delivered** 29:15 30:4 60:20 115:21

**delivering** 28:21

**delivery** 43:7

**demanding** 176:2

**Democracy** 266:17 267:9

**Democratic** 127:13

**demonstrated** 236:8

**demonstrates** 235:10

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**demote** 47:22

**Dennis** 27:23,24

**department** 8:11 14:8 17:13 21:9,15, 18 22:1 33:11,12 35:5,9 38:8 40:23 46:8 50:22 71:14 72:21 74:18 95:21 137:4 138:9,16 161:7 171:8 187:20 229:20 233:16 240:19 241:2,4 242:17 243:20 245:18,20,21 253:3, 8 254:11,24 255:7 256:12 259:25 262:9

**departments** 78:22

**departure** 82:20 127:12 138:3

**depend** 77:3 86:20

**depended** 49:20

**depending** 68:11,12 69:9 70:8

**depends** 235:3 236:23

**deployed** 55:2 167:23

**DEPONENT** 9:10 111:21 148:4 184:9 187:11 193:13 197:9 202:19 206:6 207:20 220:10 224:1 235:3 236:23 250:17 258:11 260:23 265:24 266:4

**deposition** 8:9 9:24 10:7 11:24 12:19

13:2,7,8 14:16,18, 21 265:18 266:10 267:7

**depth** 38:4

**deputies** 65:12 66:7, 8 190:14

**deputy** 26:25 27:16, 20 29:25 30:1,25 59:14,20,21,25 66:3,6,24 76:10,14 78:12 79:3,10 80:18,24 81:4 107:24 114:16 122:2 132:22 144:1, 25 145:2,9,10 147:5 164:24 185:6 189:1 190:12 194:10 216:19 253:15 264:8

**descending** 92:19, 24 166:20

**describe** 15:5 23:2 28:18 37:15 41:24 51:17,24 76:6 77:8 82:5 88:1 93:6 110:5 123:24 136:23 143:23 156:21 164:10,12 243:25 256:24 257:3

**describing** 98:1,3 123:21 128:16 136:19 163:20

**description** 80:20 118:11 221:18

**descriptions** 33:24

**designated** 77:20 147:4 199:19

**designating** 51:6 97:5 164:22 200:3

**designation** 37:9 142:9 147:13 242:4

**desk** 30:17 77:17 240:25 241:1

**destroy** 44:25 70:3 196:12

**destroyed** 196:4

**detailed** 54:22 55:3 215:7,9

**detailees** 242:19

**detailing** 231:22

**details** 18:7 133:17

**detected** 29:3

**determine** 90:2 239:3,25

**determined** 36:15

**develop** 83:5

**developed** 46:4 151:20

**developer** 42:17

**developing** 33:23

**development** 18:3 42:25 43:9,13 215:10

**device** 52:5 237:2

**dictates** 68:13

**die** 129:23

**difference** 11:12

**differentiator** 44:24

**difficult** 159:15

**dig** 44:11 113:11 151:21 161:14 228:9 239:18

**digging** 40:16

**Digital** 53:19

**diplomatic** 229:21 243:19

**direct** 27:14,15 28:9 29:23 90:7 126:13 137:18,25 197:22 256:8 264:20

**directed** 147:21

**directing** 188:22

**direction** 17:5 30:8 147:23 148:3,5,10, 11,15,23 149:5 208:25 211:10 226:11 250:11,14 251:7

**directly** 26:17 30:5 66:14 76:4 80:18,21 81:3 83:3 180:2 229:4

**director** 21:4 28:11 45:19 53:14 165:24 190:12

**directory** 41:3,4,8, 10,14,16 52:8 135:23 192:9 196:1 197:2,3

**DIS** 39:21 40:11 114:10,21 265:15

**disable** 127:16

**disagree** 16:23 122:6

**disagreement** 185:13

**disappointed** 262:11

**discover** 161:3

**discussion** 198:1 221:15 222:8

**discussions** 16:3 88:25

**dismantling** 18:2,10

**disrupt** 194:13

**disrupted** 194:14

**dissolution** 254:19

**distribution** 57:13

**diversity** 42:12

**DLP** 238:11

**DMDC** 21:10,22

**doc** 44:14

**document** 39:10 96:16 141:23 142:1 156:3 194:16 199:9 200:1,20 201:13 236:25

**documentation** 199:18 201:21

**documented** 215:12,15 229:17 252:13

**documenting** 102:13 187:1

**documents** 12:24 13:3 14:4 15:1,3,4, 5,18 38:12,18 119:8 199:21 242:1,7 252:14,19

**DOD** 51:19

**Doge** 18:16 71:15, 22,25 72:5 73:7,11, 12,13 84:12 85:6, 17,18 86:4,12 87:23 88:7,15,19,20,24 89:9,18 93:18 95:3 99:11,22 104:2,19 105:7,17,22,25

106:3,8,11 113:4,21 115:4,8 116:1,12,13 117:9 118:10 135:6 139:2,16 149:15,21 150:24 156:9 162:11,14 166:5,6, 9,19 169:18,19 176:15,16 177:20 178:6 190:19,24 191:4,10,16 194:24, 25 205:20 215:1,2,5 219:3,17,24 220:3, 13,18,21,24 221:2, 3,9,12,13,18,20 222:1,8,9,12,19 229:8,11,13,25 230:2 231:10 232:7 233:9,18 234:1,14 236:3 237:20 245:14 246:13,19 247:9,14 249:18

**DOGE's** 236:17

**DOJ** 14:24 15:21 16:2,13,19 17:22

**dollar** 240:8

**dollars** 95:1 106:15 113:12 240:13

**domain** 50:2 91:17 196:5,10,12 231:25 234:11

**dot** 196:1

**dotted** 80:14

**downstairs** 67:21

**draft** 96:25 103:18 119:12,18

**drafted** 64:14,20 214:2

**drawn** 80:13

**DRC** 82:20

**driving** 224:5

**DSR** 254:19

**dual** 23:17,24 26:16

**dug** 134:14

**duly** 9:14

**duration** 76:17 79:6 220:4,9

**duties** 28:19 75:19 76:16 77:20 78:9,11 79:5 97:6 144:7,16 147:5 201:25 217:9 243:15

**E**

**E-Q-I-P** 35:19

**e-qip** 35:11,15

**E2** 39:25

**earlier** 69:17 125:17 130:15 146:20 149:19 157:24 159:12 161:5 162:16 165:9 172:20 173:22 192:19 194:12 201:21 203:13 204:22 218:1 219:19 231:25 232:13,25 260:2

**early** 10:3 11:10 55:20 84:3 85:13 250:9 262:23

**easier** 168:25 212:22

**easily** 173:16,23 237:21

**East** 109:3

**easy** 134:25 176:24

**Ebola** 82:23 127:19

**edit** 47:14 158:3,23

**education** 21:18 33:11,12 35:5 38:8 54:17 65:11 81:2 148:17,18 259:25 260:3,4 264:7

**effective** 65:19 131:18 201:4,6,9 260:14

**Efficiency** 8:11 71:14 72:21

**efficient** 260:14

**either/or** 219:5,6

**elevated** 104:5

**eligible** 254:24 255:1

**eliminate** 114:8,21

**Elon** 18:16 115:12 136:15

**email** 15:6,7,13 28:23 39:9 44:25 45:1 47:2 50:3 52:6, 7 56:12 57:10,12 64:18 68:16 69:5 87:8 93:2,3,6,12,13 94:12,17 96:20,22, 25 103:19,22 119:19 121:4,8 123:8,11,20,21 124:2,14,21,25 125:8,24 140:13 147:7 152:13 154:6 155:14 156:22 160:9 163:7 166:14, 21,22 171:18

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 387 of 720

JASON GRAY
93681

February 03, 2026

286
Index: emailed..exact

175:15 179:4,8,9,24 180:23 183:7 185:11 186:25 187:8,13 189:24 190:5,16 194:18 196:17 197:11,16, 19,21 198:5,17 199:2,23,25 201:14 203:24 204:14,18 205:2,24 208:18,23 209:10 215:22 217:20,23 218:20 225:8 226:2,8,15 234:15 238:17 243:22 246:23 250:24 251:3,6,13, 16 252:12,17 253:21 258:3,6 259:16

**emailed** 57:10 63:12 142:23

**emails** 15:9 44:15 92:16,18 123:3,5,7, 8,14,16,17 178:24 189:20 190:21 202:15 203:11 231:9 248:7 250:21 259:12

**emotion** 213:2

**emotional** 260:10

**employ** 45:9

**employed** 155:24

**employee** 20:17 50:1 57:16 90:8 104:18,19 124:11 126:13 135:9 175:23 207:24 213:9 215:9 256:7

**employees** 45:8,9, 12 50:19 61:12 91:5,9,10 117:19

165:8 209:9 213:13 219:24,25 231:17

**employment** 50:15

**empty** 65:6

**encountered** 215:7

**end** 17:16 23:17 27:25 42:19 43:1 58:3,15 59:5,24 61:9,12 76:21 83:22 117:14 120:5,6,7,19 138:22 139:25 145:12 151:10,12 157:2,3,15,16 159:17 167:15,25 168:20 206:25 230:16 246:1 254:11 260:5 266:10

**ended** 20:16 27:22, 24 36:1 117:21 131:7 137:19 167:13 262:10

**ending** 152:16

**engage** 35:21 77:5 81:17

**engagement** 242:12

**engaging** 54:16 81:22

**engineering** 43:14

**engineers** 43:14 218:22,23

**ensure** 49:10 220:18 229:13

**entail** 101:7

**Enterprise** 253:4

**entire** 18:7 34:4 48:21 57:5 69:18 88:13 126:18

174:20 233:17

**entitled** 72:19 74:1

**Entra** 196:24

**environment** 43:11 51:23 52:19,21 215:6 228:2,6 237:1,20

**environments** 149:20

**EO** 74:10,14 105:17 221:22

**equipment** 60:22

**Erica** 180:11,14 181:14 242:3

**error** 45:2

**ES** 180:10,15

**escalated** 134:1 138:9 153:19

**escalating** 134:6

**escapes** 80:1 168:21

**escorted** 171:25 177:4,8

**essence** 37:21 40:18 66:12 93:21 100:9 118:20 141:9 150:12 154:4 188:23 190:13 218:7 228:1 258:22

**essential** 208:21 210:6,10,19 211:11

**establish** 43:10 105:22 111:3 219:23 220:3 221:13

**establishing** 72:20 105:25

**establishment** 46:11

**estimate** 23:3 124:23

**evacuated** 138:7

**evaluate** 73:15 84:12 85:18 86:15, 25 90:1 91:18 106:8

**evaluated** 93:16

**evaluating** 104:21

**evaluation** 66:18 74:17

**evening** 74:12 98:16 154:7 169:14 197:23 199:6 200:17 201:10 249:22

**event** 64:9 218:3

**events** 10:3 11:11 13:15,25 33:20,21 48:24 90:16 102:11 131:3 152:25 156:21 159:13,20 201:15 209:3 212:15 213:1 233:21 239:24 257:8

**eventually** 64:11 66:12 194:7 199:23 247:25 253:24

**everyone's** 196:16

**evidence** 95:3,5 96:3,6 103:14,16,21 117:16 118:20,22 120:19 121:2 123:22 125:15

**exact** 102:8 127:14 216:21

**EXAMINATION** 9:17

**examined** 9:15

**exception** 253:19 256:1,10

**exceptions** 52:24

**excessive** 176:23

**exciting** 19:13

**excluded** 257:9

**exclusively** 94:6 96:12

**excuse** 97:6 187:8, 11 200:14 220:21 224:16 225:4 231:4

**Exec** 181:14

**execute** 103:11 246:16

**execution** 167:2

**executive** 18:13 27:8 30:23 72:19 73:4 74:1,7,22 80:13 180:11,12,16 219:17 221:6

**exfiltration** 237:8

**exhibit** 24:11,16,17 26:5 27:4,5 55:14, 16,20,24 72:9,10, 11,18 73:18,22,23, 25 75:9,10,13 78:10 92:10,13 97:5 105:15 110:7 111:19,20,21 136:18 141:17,19 152:5,7 154:12 156:14,15 164:5,6, 10,12 170:10,11 178:11,13 179:9 189:15,16 195:3,5, 8,10 197:6,7 198:5,

7 199:11,12 204:7,8 207:14 208:18 210:24,25 211:10 213:11,12 215:18, 19 217:15,16 219:17 223:23,24 230:23,25

**exhibits** 72:9 85:20 92:23 97:8 198:12 212:5 231:25

**expect** 14:19 103:15

**expectations** 9:24 14:20

**expecting** 82:3,6 131:12 266:2

**experience** 20:14 22:10

**expert** 203:19

**expertise** 54:11

**explain** 32:6 95:4 111:10 153:20 186:2 232:13

**explained** 62:14 69:17 93:14 94:5 102:8 103:12 109:17 115:18 137:4 232:13

**explaining** 181:9

**explains** 200:22

**explanation** 94:8 95:17 216:25

**exploratory** 263:22

**express** 255:8

**expressed** 101:9 119:15 127:22 184:20 222:18

**expressing** 111:25

120:8 185:1

**extent** 132:2

**extra** 94:15

**extract** 237:3

---

**F**

---

**F'ING** 130:6

**face** 38:5

**faced** 54:11

**facility** 178:1

**fact** 58:3 145:16 153:24 181:19 259:22

**fair** 11:6 13:18 221:17

**fairly** 213:23

**fall** 46:4

**falls** 122:1,3

**familiar** 74:6,8 97:13 141:22 213:20

**familiarity** 95:12

**family** 36:11 264:14

**Farritor** 89:22 90:21 104:2 118:2 123:21 149:21 150:24 152:20 153:2,5 156:10 160:20 161:20 179:10 224:14 246:5

**Farritor's** 104:17

**Faxinfo** 40:23

**February** 8:8 15:10 55:21 163:2 170:9 171:17 178:25 200:9,11,14 201:1

206:22 208:12 214:25 262:23

**fed** 40:22 48:20

**federal** 20:17 32:4 34:16 45:8 46:20 57:16 104:18 107:10 207:24 213:9 238:11 256:7

**feeding** 208:2

**feel** 84:24 96:23 107:6 203:15,20 259:22 260:10,23

**feeling** 139:24 259:19

**feelings** 213:3

**fell** 26:23 187:25

**felt** 114:11 119:1 134:10 141:6 169:12 170:5 184:21 259:25 260:4

**female** 33:21

**figure** 40:17 54:7 118:13 150:10,13 203:16,21 205:19 243:23

**figured** 265:18

**figuring** 123:16 243:19

**file** 41:18

**files** 104:12 151:14 196:18

**fill** 29:22 50:9,11,14

**filled** 35:20 216:3

**filling** 35:12,16 50:6 211:18

**final** 204:14 218:21 256:14

**finally** 10:1 12:12

**financial** 39:16 95:1 106:14 228:18 229:14

**financially** 254:12

**find** 43:4,8 48:2 87:17 88:18 112:17 118:21 123:10 135:7 150:4 151:22 166:11 167:12 172:15 173:12 237:17 249:11,19 261:6

**fine** 22:23 43:21 47:1 89:8 101:17 117:18 119:1 122:10 175:9,16 181:22 182:2 186:20

**fingerprints** 52:12

**finish** 10:11,13,14 12:8 128:13

**firsthand** 261:9

**fit** 26:14 118:10

**five-minute** 115:23 212:4

**fix** 48:4 168:8

**fixed** 167:14 177:7

**fixing** 167:14

**flag** 238:20

**flagged** 174:17

**flagging** 216:8

**flags** 232:17

**flat** 52:1

**Fletcher** 256:15

**floor** 61:19 174:13, 18 180:18 181:12

**floors** 175:25 181:10 244:24

**flow** 236:6

**flows** 22:24 121:22

**flubbing** 247:22

**fluid** 243:8

**fly** 24:10

**focus** 34:2 58:24 60:19 79:13 81:11, 14 109:25 148:14 228:10

**focused** 33:17 55:6, 7 100:13 117:4

**focusing** 81:11

**FOIA** 231:8

**folder** 96:25

**folks** 12:14 43:1 45:3,5 50:18,19 60:10 63:19 64:11 83:12 86:4 87:22 88:14 90:5 95:16 100:14 104:2 110:3 123:22 125:19 130:14,17 149:14 152:15 154:14 160:13 165:12 170:19 175:19 179:11,24 194:18 202:15 205:25 211:7,21 221:18 250:13

**follow** 59:10 63:9 87:7 93:9,13 111:16 132:3 142:19 147:4, 7 167:16,21 232:19

250:4

**follow-up** 35:21 36:7 58:10 93:19 205:1

**forbid** 127:16

**forbidden** 178:8

**force** 20:21

**foreign** 29:24 30:3 37:25 51:21 60:2 64:1,2 74:2,19 253:12 259:10

**forget** 100:21 112:8 134:21 135:16 188:1,3 249:6

**forgetting** 25:24

**forgot** 52:25 53:6,9

**forgotten** 253:18

**fork** 253:7 257:23,24 258:1

**form** 35:15,20 38:22 39:1 50:9,10,13 51:1 232:18 251:12

**formally** 167:1

**forms** 38:20 50:6,11

**forward** 261:5

**forwarded** 251:3

**found** 23:10 62:15 64:6 75:1 86:21 94:3 103:14 112:6, 11 116:25 135:14 142:12,15 169:2 235:21 249:6,15

**found?and** 116:24

**foundation** 236:22 250:15 258:10

**fourth** 94:16 174:13

265:18

**frame** 11:11 85:14 123:3 129:11 179:18 217:23 220:25 262:17

**Frank** 67:4 143:10

**free** 254:21

**freeze** 256:6

**Friday** 84:20 169:7, 14 192:1 193:16 201:11 249:14

**friends** 36:11

**front** 23:14 132:1,14 133:3 141:10 146:15 151:10 157:1,16 163:18 175:15 183:8 194:3 203:24 214:7 242:6, 11 243:16 257:12

**fruits** 112:18

**frustrating** 212:20

**frustration** 103:6

**full** 9:21 18:7 39:6, 21 47:9,12,20 195:21

**fully** 131:11

**function** 48:14 79:9

**functions** 144:5 210:19

**Fund** 266:17 267:9

**funds** 83:25

**future** 29:14 58:6

**FYI** 263:14

**G**

**G-R-A-Y** 9:22

**Gabby** 246:15

**gain** 104:25

**Gajetona** 99:3

**gaps** 216:4

**gathered** 95:5

**gathering** 95:3

**gave** 16:25 61:5 69:22 117:1 151:5 160:8 173:20 231:24 232:8 244:23

**Gavin** 157:10 158:19 167:5 168:3 176:17 177:24 179:10 224:14 230:3,7 245:6 246:14

**general** 9:25 27:7 68:16 100:22 115:17 179:18

**generally** 15:4 87:25 99:10 209:16 257:4

**gentleman's** 188:1

**gifts** 38:1

**give** 9:8 11:20 20:13 25:3 37:3 39:4,6 40:7 48:22 53:1 69:2 91:12 147:23 148:2,5 149:25 150:2,4,19 155:25 156:13 158:16 159:3 161:24 169:9 185:21 186:21 196:21 198:19 233:19 235:9

**giving** 37:14 97:12, 23 148:19 157:14 160:16 183:13 186:13

**Glad** 266:4

**glance** 72:15 152:10

**Glass** 39:18 40:11 91:24 92:2

**Gleason** 139:19 162:18

**global** 29:16 67:6 70:10,11 110:11

**goal** 147:1

**good** 9:19 31:20 40:13 71:2 100:4 115:19 144:21 177:9 195:9 213:5 240:18,22 244:2 252:20 254:7 264:9

**Google** 39:9,12 44:13,16 135:22 195:13 196:14,16 238:13,14 248:6

**gosh** 187:12

**Gottlieb** 101:5 103:3,18 107:3 122:25 125:24 165:11,12,18

**Gottlieb's** 102:19,20 124:21

**gov** 196:1

**governance** 28:12, 13 29:5 30:9,20

**government** 8:11 12:17 24:23 25:6 32:5,7 33:22,25 34:16 39:15 42:2 45:9,10 53:24 54:3,

9 71:14 72:21 73:16,23 91:9 102:1 107:10 109:6 123:19 127:4 134:4 158:7 203:22 219:25 221:8 222:10 223:19 254:17 260:11,12 265:21 266:23

**government's** 34:4

**government-wide** 32:1 256:6

**Govta** 39:19,20

**graduated** 20:16

**Graham's** 250:25

**granular** 49:3

**grateful** 225:3

**Gray** 8:10 9:5,14,19, 22 17:20 26:8 71:13 75:18 80:12 94:19 131:2 195:13 212:13 230:22 262:3 266:11

**great** 10:6 19:10 34:13 54:4 71:11 88:11 158:16 230:14,22 261:5 265:25

**greet** 89:13

**grew** 19:9 264:12

**ground** 9:25 10:9

**group** 38:21 61:1 210:11 253:13

**groups** 250:13

**Grove** 250:25 258:3 259:8

**GSA** 53:22 176:10

214:8,10 215:2,5

**guess** 74:11 85:16 107:18 143:9 163:3 185:6 205:7 252:5 262:19

**guessing** 89:6

**guest** 175:17,21

**guidance** 30:8 74:21 91:4 171:11 209:4

**gun** 125:2

**Gunsolus** 198:14

**guy** 224:2

**guys** 266:18,24

**gymnastics** 92:17 189:20

**H**

**half** 14:14,25 16:1 39:7 81:13 83:1 124:13 244:23

**hall** 115:2

**halls** 180:19

**hand** 9:6 17:24 68:6 75:8 197:4 207:11 230:23 265:19

**handful** 79:2 86:18 120:22

**handing** 24:14 55:19 72:9 92:10 152:4 170:9 178:11 189:14 195:3 199:10 204:7 215:18 217:14 223:22

**happen** 11:1 46:16 48:24 49:14 59:7

92:2 116:17 159:14 160:19 167:24 170:7 171:4 177:2 185:22 186:1 198:1 205:4 223:6,20 234:4 237:12 238:3, 4 253:25 254:14,23 256:22 262:13

**happened** 13:13,14, 15,16 35:22 46:14 47:25 62:14 65:6 68:3 77:16 82:12 83:16 84:10,11,16, 17,25 85:5,11,18,23 90:3,6 93:20 95:2,3, 4,24 106:15 109:13, 19 111:15 116:18 117:2,3 119:21 120:24 123:25 124:4 129:6 131:8 132:24 134:14 135:10 142:15 145:6,7 146:18 150:10 151:22,23, 24 152:2,3 153:23 154:15,16,23 155:11 157:8 159:5, 21,23,24 164:2,20 165:17 167:4,10 168:3 173:2,21 181:6 185:12,15 189:23 194:9,11 205:5,8,22 208:6 209:13,14,15,22 221:16 235:23 236:20 237:17 239:24,25 249:9,21 253:20 255:5

**happening** 36:1 85:8 87:21 96:3 105:8 106:15 109:16 111:5 164:14 169:6 172:7

180:24,25 207:4,6 208:7 209:4 218:9 238:7,21 249:10 254:1 260:15

**hard** 223:19

**harm's** 128:17

**hated** 257:7

**Hawaii** 19:8,9

**hawed** 173:14

**HCTM** 49:15 68:2 122:1 125:11 248:21

**he'll** 122:12

**head** 10:21 149:6 160:6 219:22 220:13

**headquarters** 78:1 209:12

**heads** 79:15,18 107:22 163:23 185:21 186:14 204:24 216:6 220:18,20

**health** 29:16 67:6 70:11 110:11 253:11

**Healthcare** 21:2

**hear** 71:13,16 119:2, 3 212:23 247:18

**heard** 46:24 56:14 63:1,2 71:18,20 73:7 101:12 103:6 122:14 162:5,9 166:11 189:13 233:25 254:8 262:8

**hearing** 162:6

**Heimann** 267:3

**helpful** 10:16 18:7 55:21,24 67:13

**helping** 210:17 260:7

**hemmed** 173:14

**Hernandez** 31:1 65:9,18 80:3 88:25 91:1 92:6 99:14 100:2 104:7 154:20 158:13 161:14 190:22 191:20 192:14 195:16 229:12,16 257:23 264:2,4

**Herson** 45:13,16 229:11,18,19 232:4 248:12

**hesitation** 185:1

**hey** 61:15 62:2 70:13,14,23 77:18 82:18 84:5 93:22 95:6 100:12 112:13 120:23 122:14 123:9,14 124:4 126:7,10 128:11 131:16,17 133:17 150:3,11 155:22 165:2 168:23 172:23 173:3 174:9 184:5 185:21,25 186:9 187:2 191:25 192:3,7 206:16 208:16 216:7 221:9 226:25 227:5,9 238:23 239:8 251:4 253:21 259:3,12 260:16 263:9,14

**HHS** 95:22 161:6 228:13

**high** 20:13 28:18 37:16 40:7 45:23

134:8 155:23 156:4 224:17 232:12,15, 20

**higher** 91:24 92:1

**highest** 195:22 196:2,9,21

**hint** 260:17

**hire** 29:23 90:7 126:13 253:22 256:7,8 264:20

**hired** 219:25

**hiring** 253:19 256:1, 6,9

**historically** 148:4 159:23 174:25 182:15

**hits** 239:23

**hold** 124:6 185:20 197:5

**holding** 171:9

**Holler** 206:8

**home** 53:5 131:11 133:14 154:9 208:24 209:3

**honest** 44:7 85:1 206:24 226:6

**honestly** 130:5

**hope** 57:15 254:3

**hoping** 223:21

**Hopson** 61:17 62:14,24 66:23 75:24 84:4,19 85:12 86:11 87:4,22 88:20,24 93:9,22 94:7,10 96:13 98:18 108:15 112:24 117:7,24 118:9

February 03, 2026

121:14 122:21 130:3,5 131:4 133:11,12 135:6 143:13 149:10 152:14 169:5 211:18 222:16 243:9 262:25

**horrible** 259:25 260:8

**hospital** 21:2,4

**hour** 14:14,25 16:1 81:20 86:17 120:3 248:7

**hours** 266:2

**House** 32:14 62:6 63:13 76:24 77:1,5, 6 143:4 206:2,9 253:18 256:10,12

**housed** 62:21

**how's** 31:16 99:25

**HR** 46:1,4 49:14 70:14 144:3 197:12

**huh-uh** 10:21

**human** 21:25 34:10 49:15 97:20 101:3

**humanitarian** 29:15 55:7 67:3 110:12

**hundred** 240:8,12 264:19

**hundreds** 159:18

---

**I**

**ICE** 255:9

**ID** 52:2 196:24

**idea** 45:25 62:10 96:1 115:4 118:23

139:20 173:8 218:18 253:23 254:18

**ideally** 32:3 82:2

**identification** 24:18 55:17 72:12 75:11 92:14 141:20 152:8 156:16 164:7 170:12 178:14 189:17 195:11 197:8 198:8 199:13 204:9 207:15 211:1 215:20 217:17 223:25 231:1

**identified** 57:13 83:24 87:22 93:10, 17 115:3 147:9 160:13 242:9

**identifies** 52:14

**identify** 41:14 75:15 86:12 135:23 157:8 211:11 238:6 244:8

**identifying** 71:22 208:20 210:6 236:12

**IDMS** 245:7 246:5

**IG** 235:21

**illegal** 102:15 103:9

**Illinois** 20:4

**illuminate** 151:23

**immediately** 124:5 218:22

**impact** 107:9 140:15 149:3 209:5 261:9

**impactful** 264:11

**implementing** 72:20 94:12 220:20

**imply** 58:5

**import** 116:5

**importance** 37:22

**important** 10:19 83:10 115:22 161:10 256:19

**impression** 104:22 122:9,10 130:10 132:6,8,11 133:21, 23 134:7 136:24 137:1 143:17 144:23 145:7,11 150:8 151:2,16 161:1,16 166:19 176:14 177:19 193:14 222:12 228:8 263:23

**improve** 260:13 261:6,8

**inadvertently** 48:1,2 70:3 158:8 238:15

**Inaudible** 25:8

**inauguration** 23:9 56:2,18 58:1 60:18 71:19 74:12,25 113:16 174:22

**incidents** 49:6

**include** 145:23 183:13 219:25 250:12

**included** 183:22 242:19

**includes** 226:15

**including** 52:22 250:9

**incoming** 56:3 60:11

**Incorporated** 22:15

**indefinitely** 118:24

**independent** 56:20 107:23 108:8 110:23 112:16 122:17 191:6 214:23 248:18

**indicating** 170:19 199:18

**individual** 41:15 56:14 66:17 93:11 265:14

**individuals** 53:22 54:8 57:14 59:20 93:10,15,22 97:22, 24 100:3 106:23 110:12,21 112:8 168:5 176:16 191:12 210:13,18 246:11

**inexplicably** 189:24

**infer** 58:5

**influence** 37:25 137:3

**influx** 192:23

**info** 180:10

**inform** 14:17

**information** 14:22 16:21 18:21 19:16, 20 22:11 23:22 26:13 28:16,25 34:3,22 35:12 36:3 37:1,23 40:19,22 46:9 53:12 56:20 61:5 65:10,13 68:23 84:19 88:5 112:18 125:14,18 156:24 158:22 160:3 198:23 207:25

208:1,3,9 235:19 237:15 238:22 239:7,12 244:3,4

**initial** 93:17 157:11

**initially** 56:14 102:10 249:24 265:3

**input** 169:11

**inquiries** 263:13

**inquiry** 208:14

**inside** 37:14 185:13

**insider** 37:20 158:8

**insight** 82:15 99:21 206:13

**install** 228:5

**instance** 42:25

**instances** 42:16

**Institute** 253:12

**instructed** 16:20

**instruction** 17:21 258:13,19

**instructs** 12:20

**intense** 140:9,10 177:10

**intent** 107:12

**intentionally** 158:7

**interact** 54:13 151:11 188:2 246:19

**interacted** 54:1 55:10 106:19 132:7 246:12

**interacting** 72:4 95:21 180:22

**interaction** 99:23 105:9 211:20

**interactions** 136:19

**Intercontinental** 19:17

**interest** 107:14

**interested** 207:1 255:8

**interesting** 259:24

**interface** 157:2

**interference** 95:10 118:9

**Interior** 255:7

**internal** 13:16 145:23 231:16

**International** 18:3

**interrupt** 17:10

**interview** 36:7 42:6

**interwoven** 116:11

**introduce** 8:12 114:3

**introduced** 61:3 115:2,7,8,9 132:17

**inundated** 213:7

**investigate** 86:25 112:25 221:3,16

**investigated** 106:16 235:21

**investigating** 113:17 178:7

**investigation** 36:15, 19 49:20 88:4 91:22 95:9,10,18 98:13,14 104:20 111:14 112:19 113:4,5,22 116:3,17,25 121:13

122:23 123:2,4 125:18 150:9 221:21

**investigative** 218:4, 10,12,17

**investigators** 36:2

**investments** 29:6

**involved** 46:10 86:2 94:7 96:13 97:7 119:8 185:23 210:15 211:6 222:3 243:5 248:16

**ironically** 265:14

**irrespective** 99:12

**ISC** 19:21

**ish** 124:24

**Island** 19:9

**Isobel** 59:23

**isolated** 259:19

**isolation** 257:10

**issue** 74:21 227:6

**issued** 223:12

**issues** 31:15 61:7 63:24,25 79:16 83:10,25 119:3 227:1 238:6 243:21

**issuing** 67:25 68:1

---

**J**

---

**Jack** 62:1 63:21,22 100:23

**Jackson** 66:10,18, 22 75:19 76:12 77:8 78:23,25 96:14 97:6 98:18 108:14 113:9 117:25 118:10

121:16 122:22 125:25 126:5 130:3 131:5 133:13 135:5 143:5 144:8 149:10 152:14 165:20 186:21 190:10 211:17 239:6

**Jackson's** 78:8 144:20 189:3,6,11

**Jacob** 9:1

**jail** 235:22

**James** 8:22 17:12 179:15

**January** 23:9,25 26:9 28:2 34:19 53:18 54:21 55:21 56:2,3 60:12 71:21, 24 72:6,19,23,24 73:1,5 74:3 75:8,21 93:2 106:25 116:10, 16 131:3 142:5 144:16 189:22 200:14 220:9 231:10 246:10 247:7,9,15 252:15

**Jason** 8:10 9:14,22 75:18 133:2 233:9 266:10

**Jeff** 192:7

**Jehieli** 8:20

**Jeremy** 89:21 104:22,23 105:2 106:9,17,22 113:8,9 117:25 118:18 124:18,21 126:8,15, 16,23 127:5 128:4,8 129:3 130:11 131:9 135:21 157:12,13, 18 176:9,18 177:24 179:10 194:24

195:1 214:1 222:22, 24 226:2 227:11,14 230:3,7 240:13 246:14,20

**Jeremy's** 127:3

**job** 110:22 114:5 131:12,13 217:5,9 235:17,24 239:19 255:10 256:20,23 261:3 264:8

**Joel** 66:23 94:16 108:15 143:6 208:5 211:17 242:22

**John** 63:21 152:14 185:5,18,20 190:13, 17 233:4

**joint** 20:20,21 138:21

**jointly** 138:8

**jot** 96:24

**journey** 54:10

**judge** 114:13

**judgment** 114:13,19

**July** 31:4,6,7,8 241:2 255:24

**jump** 245:2

**jumped** 125:2 252:5

**jumps** 75:4

**Jun** 100:21

**Justice** 14:8 17:13

**JWICS** 47:1,2,4 232:25 245:11,19, 22

### K

**Kahn** 45:18 154:21 257:22 265:3

**keeping** 26:2 131:25 132:12,14

**Kelly** 256:15

**Ken** 66:10,18 77:19 96:14 108:14 113:9 117:24 120:12 121:16 122:4,5 124:3,9 126:9,11,15 130:10 131:9 143:5 152:14 154:4 160:17 163:19 164:19 165:19 166:25 170:18,23, 24 171:2,13,14,15 183:9 185:16 186:2 188:20 190:10,19 192:2 199:3 203:3 208:5 211:17 212:1 225:3,12,17 226:4,8 239:6 249:17 263:12

**Ken's** 188:21 201:22 226:11

**Kenneth** 75:19

**key** 39:9 82:16 109:4

**keys** 51:20,22

**kill** 114:14 128:1

**kind** 18:8 69:8,10 85:4 86:6 99:15 100:12 102:10 103:14 108:25 112:4 116:14 121:3 126:2 128:3 133:4 172:22 173:14

216:3,19 245:1

**Kirk** 9:22

**Kirsten** 198:14

**Kliger** 156:9 160:21 161:20 162:5,10,14 179:10 224:14 245:6

**knew** 57:14 79:15 85:6 104:3 106:7 109:16 111:10 113:1 115:20 139:16 144:22 146:1,3,4 147:10 154:9 164:13,15 166:8,11 167:11 168:16 191:25 192:19 193:4,6 247:3 251:22 256:20 263:19

**knowledge** 54:22 69:12,21 106:2 129:17 144:15 145:19,22 153:1 160:20 162:22 188:18,20 198:4 211:22 234:3 245:6 246:4 251:11 265:9, 10

**Korzeniewski** 143:3

### L

**label** 181:16

**labeled** 181:11 182:14

**labels** 232:19

**labor** 124:11

**Lack** 236:22 250:15 258:10

**Laken** 64:14,23,25 66:25 108:15 120:16 143:11 164:14 165:1,16 167:2 187:25 199:3 203:3 208:5 263:12

**land** 256:21

**lane** 122:3

**laptop** 69:4

**laptops** 28:24 60:20 61:6 67:16 106:21

**large** 210:11

**largely** 243:17

**larger** 133:12

**lasted** 23:11 59:9

**late** 102:23

**law** 101:23,24 102:4, 15

**laws** 102:3 148:8

**lay** 147:19

**layer** 228:14,19,24 229:4

**layers** 69:14 104:10

**laying** 182:9

**lead** 65:2 91:23 105:7 106:3,9,11,17 122:24 135:6 139:2 168:22 265:15

**leaders** 81:22 248:18

**leadership** 32:14 57:2 58:11,25 60:4 62:12 94:1 110:4 170:3 186:9 224:18, 19,25 225:12,18 242:23 257:15

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

**leading** 56:12 67:2,5 112:9 156:22 253:15

**leads** 220:19,24

**leak** 244:4,13

**leaked** 244:3,12

**leaks** 237:14,23 243:18,22,24

**learn** 36:12 81:17,24 83:4 104:25 202:22 203:2

**learning** 81:12 90:19 112:14

**lease** 249:7,15,18

**leave** 61:14,23 83:13 86:1,20,23 94:4,13 95:8,12,16 96:4,7,17 97:3,16, 24 98:2,5,8,12,20 99:13,19 100:18 102:23 103:2,17,19, 24 110:4,24 111:6 116:12 117:17,19, 21 118:21,22,24 119:6,13 120:10,22 121:5,13 123:18,22 124:6,16 125:11,13, 19,20,21 126:19,21 127:11 131:23 133:20 134:13,15, 20 135:1,3 146:21 164:15 165:7,18,20, 22 167:12 168:15 175:4 185:17 186:3, 16,17,19,20,23 188:7,13,19 190:18 192:4 197:25 198:21 202:2,17,23 203:7 205:10 209:21,25 210:12, 14,16,19 211:7,21

216:18,20,21 217:1, 3,11 218:2,4,5,6,7, 10,12,16,17 219:13 231:18 242:22 250:6 253:1 254:12 259:2 260:25 261:2 264:13

**leaves** 61:13

**leaving** 27:22,24 117:18 222:17 243:9 253:7 262:14

**led** 57:15

**left** 79:1,19,20 128:4 129:12 131:6,9 132:8,11 134:7 136:24 137:1 144:23 145:8,11,15 150:8 153:25 154:15 170:7 239:6 241:9,16 246:11 252:24 254:25 259:25 262:6 264:15 265:2,4,5

**legal** 147:16 188:15, 17

**legislative** 120:15

**legit** 239:25

**legitimate** 147:10

**length** 134:22 218:11

**lens** 202:3

**Leo** 190:10,11,12,15 191:5 231:12 233:5 245:25

**letting** 173:25 191:4 192:2 221:8 238:23

**level** 20:13 28:19 32:2,7,10 34:19,24

35:1,2 36:15 37:16 40:7 45:23 47:3 49:3 53:14 60:4 68:11,12,14 69:3,5 70:19 91:24 92:1 104:1 153:17 166:9 195:22 196:2,9,21

**levels** 69:9,11 70:6, 18 161:25

**Lewin** 89:21 90:21 105:2 117:25 126:6 128:19 129:5,12 130:2 131:5,6 133:12 135:5,6 136:19 139:1,7,21 149:10 166:22 179:10 194:17 211:21 214:1 218:20 224:10 225:10 262:4

**Lewin's** 105:6 166:17 214:3,24

**liaison** 143:5

**life** 13:17 19:12 35:13

**light** 200:21

**Lindsey** 216:18

**linked** 52:7

**list** 39:6 40:3 57:13 93:21 94:6 205:1, 14,16 206:17 211:12,23 212:1 239:18 244:1,2

**listen** 174:5 181:22 223:17 240:14 257:15

**listening** 132:24

**lists** 179:10,15

**literally** 63:2

**live** 43:9

**Lloyd** 67:4 143:10

**located** 20:2

**location** 40:21

**lock** 196:13

**Lockheed** 20:15 22:4

**log** 47:19,24 48:18 52:17 53:2 104:11 151:14 156:24 173:22 191:7 234:24

**logged** 49:1 53:3 159:24 162:3 236:10 237:7 238:3

**logging** 41:9 48:21

**logical** 192:8 202:5

**logistics** 82:23 140:14

**logs** 47:16 48:1,20 157:25 158:9 159:4 231:13 236:15 239:22

**long** 14:13 16:5 20:1 22:25 31:2,5 36:22 91:4 115:24 118:5,7 143:15 163:4 178:17 223:19 252:21 255:11 260:12 264:6

**longer** 49:23 66:4 121:2 131:20 146:23 153:24 155:20 162:22 164:17 199:6 200:13 243:3 250:23 267:4

**looked** 15:5,18 33:22 115:10 135:20 158:12 231:13 239:21

**lose** 131:12,13 240:16

**losing** 124:10 202:17

**loss** 126:17 238:11

**lost** 53:7

**lot** 13:9,14,16 40:2, 14 41:16 65:22,23 82:12 93:25 94:1 98:22 108:2 109:2,7 110:14 111:4,7 112:5 116:24 121:17 145:3,4 148:22 157:3 161:13 192:18 205:12 209:5 213:2, 4 223:3,12 226:16 239:14,20 240:23 242:12 244:20 257:19

**lots** 12:13 56:20 250:6

**loud** 10:22 105:18 252:6

**love** 256:17

**low** 31:11,15

**LPA** 120:15 165:15 187:25 188:4 203:2

**Luevanos** 8:20

**Luis** 31:1,2,3

**Luke** 89:21 104:24 106:20 149:25 157:10 158:19 161:13 167:4 168:3

176:18 177:23 179:10 224:14 230:3,7 246:4,14

**Lynch** 8:24 25:13, 15,19,21,24 26:2

---

**M**

**M-E-N-G** 265:6

**M/cio** 214:16

**machine** 227:18,24 228:3 229:1 237:4,6

**machines** 229:2

**made** 18:12,16 32:18 43:2 48:2 61:6 84:3,5,7 95:6 118:19 124:8 126:9 129:25 132:9 133:2 137:7,10,14 141:13 146:2 251:20 255:4, 10,14 256:11

**mail** 41:17

**maintain** 210:10

**maintenance** 46:12

**major** 81:9

**majority** 19:23 27:22 30:15 118:17

**make** 10:11,16,23 11:15 12:10,21 17:11,18 29:14 30:17 32:17 34:8 53:14 60:19 77:19 95:9,18 97:2 102:12 109:5,15 110:9 114:13 117:10 125:4 134:8 135:19 136:10 138:11 149:9 157:23 158:7, 14 159:6 160:19

167:17 168:25 171:14 172:24 180:21 187:4 217:9 219:11 221:11 231:14 238:15 253:17 254:12,13 264:7

**Makecha** 179:11

**makers** 93:16

**makes** 55:12 119:5 134:2 149:8 180:20

**making** 17:10 18:9 28:25 29:2,5 67:25 90:14 159:22 220:23 248:4

**Malyszka** 97:18

**manage** 29:10 40:1 51:2 181:3 183:19 228:11,22

**managed** 39:12 43:6 67:24 167:20 183:19 245:24

**management** 19:22 21:16 26:19,22,23 27:1,17,21 28:13 29:5 30:21,22 32:13 39:10,16,25 49:16 57:2 60:1 78:12 80:15,19 107:22 122:2 148:24 189:1 214:15 225:24

**manager** 225:25

**manages** 21:25 41:17

**managing** 29:9 77:14 172:18 253:5

**Manpower** 21:24

**March** 55:21 240:10

256:25 257:4 259:19 262:17

**Marco** 142:3

**mark** 55:15 80:8

**marked** 24:17 26:5 55:16,19 72:12 75:10 92:13 141:19 152:7 156:15 164:6 170:11 178:13 189:16 195:10 197:7 198:7 199:12 204:8 207:15 210:25 215:19 217:16 223:24 230:25

**marking** 24:15

**marks** 158:4

**Marocco** 83:24 84:6 126:24 131:15 133:9 137:2 141:3 142:25 143:15 144:10,15 145:10 147:8,15,22 148:15 154:13 163:14 175:16 199:20 200:19 205:25 208:19 210:5 211:17 224:25 233:20 240:14 251:4 252:7 258:7, 14 259:15 263:5

**Marocco's** 147:1 211:10

**Marshal** 177:3

**Marshals** 171:25 176:20 177:13

**Martin** 20:15 22:4

**mass** 209:10

JASON GRAY
93681

February 03, 2026

296
Index: masses..mill

**masses** 124:2

**massive** 134:12 182:23

**master's** 19:17 20:8, 11 22:6,9

**material** 37:19 90:15 156:6,7 174:21 175:5,6,11,12 182:5,19 231:15 233:19

**materials** 81:21

**Matt** 61:17 62:13,20 66:23,24 75:24 84:4,19 88:24 93:9, 22 94:9 95:6 108:14 112:24 117:7,24 118:18 119:3 121:9 126:14,15 127:24 128:5 129:9 130:5 131:10 143:13 152:14 211:18 223:17 243:9

**matter** 58:3 186:8 223:14

**Mays** 8:18 266:20

**Mcgill** 152:14,19 180:5 182:16 183:9 185:4,19 186:3,11, 22 188:5,19 190:14 195:14 197:11,16, 19,24 198:10,21 201:14 218:15 233:5

**MCIO** 55:3 135:24, 25 214:13

**meaning** 26:17 28:23 29:10 32:11 49:21 52:11 53:13 56:12 60:20 63:8,9 65:23 66:10 84:24

91:17 104:4 108:13 114:25 116:18 130:9 135:13 140:25 151:7 153:24 155:16 156:6 157:25 161:5 163:10 181:12,13, 15 191:10 202:4 214:14 216:22 222:9 225:11 229:13 231:24 232:1 233:3 235:17 236:4 237:21 240:25 252:16 265:19

**means** 11:19 13:19 32:8 44:19 53:15 171:1 181:25 191:2 192:5 195:24 232:15 233:11 265:22

**meant** 130:13 181:20 206:3

**measure** 208:10

**measuring** 254:22

**mechanics** 146:13 202:11

**mechanism** 238:14

**mechanisms** 203:21

**Medical** 20:18,24

**meet** 89:8,13 101:10 107:23

**meeting** 39:13 82:11,16 88:19,23 89:2,5,14 93:19 98:18 107:22,25 108:2,4,5,12,19,20, 23 109:4,10 111:25 113:7 116:15,17 118:5 119:9,22

120:1,5 126:8 131:4 132:16 133:9,15,22 138:6 139:25 140:9 142:24 143:1,5,6,8, 10,11,12,13,15,17 145:12,16,25 146:9 149:9,12 154:13,15, 16 155:21 163:20, 23,25 164:2 242:24 248:17 257:15 263:15

**meetings** 39:13 79:23 81:16 87:3, 16,19,21 88:1,3,13, 16 90:4 103:3 120:2 144:3 155:15,17 156:2 163:10 242:12 248:25 249:10 257:11

**Megan** 67:14 143:11

**Meisburger** 67:1 143:10

**member** 33:5 162:14 176:15 177:20 215:1,5

**member's** 247:14

**members** 145:24 160:24 220:13 229:25 230:3 247:9 264:16

**memo** 75:17 76:21 77:7,19 97:7,9,15, 23,25 98:3,5,6 213:16 214:23 242:3,4

**memorandum** 75:16,24 76:7 77:10

**memos** 213:17,20 231:16,21

**mental** 92:17 189:19

**mentioned** 10:10 12:5 58:1 68:20 120:3 134:2 157:24 159:12 161:5 166:10 172:20 173:22 176:17 177:21 181:14 192:19,20 194:12 196:3 201:21 202:1 204:22 214:18 231:8 232:5,24 243:18 256:1

**mentioning** 138:10

**message** 64:14 119:12 120:21 146:23 163:9 165:5 169:15 177:22 180:5 183:22 194:7 238:21 251:12,13 263:9

**messages** 82:16 143:9

**met** 61:2 66:16 73:10 89:12 102:25 132:18 166:7 169:8 176:17

**metrics** 61:22

**Miami** 21:1,2 235:11

**Michele** 27:24 60:1

**Microsoft** 41:5 42:11,14

**middle** 27:6 109:3 183:8 189:24 225:20

**midmorning** 172:7

**Mike** 206:8

**mill** 193:24

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**million** 240:8,13

**millions** 95:1 106:14 113:12 159:18

**mind** 75:4 81:10 116:6 198:3

**mine** 214:12,16

**minute** 112:7 152:11 156:18 170:14 224:7 226:3 231:3

**minutes** 16:6 59:9 70:1 71:4 118:6 128:5,8 129:5,12 131:6 136:2,3 143:16 171:24 177:6,8,12 226:2,5 230:9

**mischaracterizes** 189:8

**Mischaracterizing** 184:24

**mispronounce** 43:22

**missing** 26:15

**mission** 29:15 40:19 260:6

**missions** 30:5 40:18,21 41:1

**misspeak** 128:25

**misunderstanding** 127:3 182:23

**misuse** 160:21 234:20,22 235:4,23 236:12,14

**mitigated** 29:4

**mixed** 112:3,4

**Mm-hmm** 44:2 113:6 176:6 178:19

264:18

**model** 145:8

**modernization** 40:16 54:10

**modernize** 73:16 222:10

**modify** 47:13

**moment** 26:8 132:5 168:22 212:17 226:16 263:18 266:8

**Monday** 65:25 84:2, 15 85:6,9,13 93:2 95:24 162:25 163:1 208:22

**money** 84:21 107:13 148:21 228:18

**monitor** 48:21 150:20 158:11 228:11,22 236:5 237:10,23

**monitored** 49:4 237:13 239:2

**monitors** 238:14

**Monterrey** 21:9

**month** 48:24 49:2 159:12,17 174:19 182:16 262:6

**monthly** 32:3

**months** 21:5 85:2 253:25 254:1 256:21

**Morgan** 160:7 192:6

**morning** 9:19 66:22 78:4 84:2,4,15 85:6 86:15,16 88:23 93:19 94:2 103:13

116:16 131:14 133:7,8 154:17 171:17 172:5 176:12 200:14 242:24 248:17,25

**move** 75:4 117:22 154:12 237:6 249:8 250:5 264:13

**moved** 19:8 42:8 80:4 206:24 249:2, 4,8

**moving** 42:7 47:8 205:12 249:11

**multifactor** 52:4,15

**multiple** 33:7 91:15 253:9

**Munich** 90:11

**Musk** 18:16 115:12 129:13 136:15 263:3

**Musk's** 166:12

**Mystery** 224:4

---

**N**

**named** 90:8 246:15

**names** 36:4 67:9 93:23 191:11 205:16 206:17 251:21

**narrow** 18:8 23:2 159:15

**Nation** 224:1 226:16,22 237:22 239:10 244:5

**national** 20:18,23 37:22

**nationals** 30:3 51:21

**naturally** 13:14

**Naval** 20:18,23

**navigate** 82:2 100:10 104:8,25 160:25 239:11 257:16

**Navy** 35:9

**necessarily** 198:2

**needed** 30:17 52:21 53:7,10 57:3,7 58:8 61:4,18 70:11 71:2 82:13,16,22 110:5,9 112:15,25 117:11 124:5,19 167:21 168:7 170:2 174:23 175:22 210:14,18 217:5,10 223:15 241:7 244:25 249:19 262:13

**Needham** 206:8

**nefarious** 106:14 152:1 161:2 221:5

**negative** 10:20 218:13

**nervous** 41:19

**network** 39:15 41:6, 7,20 44:9 46:21 47:17 67:22 68:16 91:18,20 104:3,9 151:4,9 167:6 181:17 185:24 187:18 206:18 247:4

**networking** 241:11

**news** 71:18 73:8 206:21,24 207:1 212:14,19,25 213:5

259:1

**Nick** 101:5,8 103:1, 7,18 119:11 121:4 124:2

**night** 131:18 133:10 139:25 141:13

**nighttime** 249:23

**ninth** 61:19

**Noah** 179:15

**nodding** 10:21

**non-** 69:18

**non-recoverable** 45:2

**noonish** 87:13

**normal** 12:18 56:24

**Noted** 267:2

**notes** 96:20,24 195:17

**notice** 142:9 256:25

**notices** 248:21

**notification** 97:23 187:7

**notifications** 246:16

**notify** 64:11

**notifying** 98:7

**November** 261:8

**NTT** 167:19 168:22 187:2,8,16 224:2 239:22 241:1,14

**Nuclear** 215:11

**number** 25:22 87:11,15 127:14 152:6 166:12 168:5 171:23 195:5 203:1, 6 227:15 230:24

238:18 248:9,21 252:23

**numbers** 24:22,24 36:5 135:17 158:9

**numerous** 63:24 161:9 215:3 252:2

---

**O**

**oath** 11:19

**object** 12:17

**objection** 14:22 15:22 16:21 51:8 139:9 140:2,4,5,22 144:12 147:16,24 177:15 184:23 188:14 189:7 193:10 194:19 202:18 206:4 210:3 218:24 220:6 224:20 235:1 236:21 247:10 250:15 258:10 260:22

**objections** 17:10 119:2

**observing** 180:24, 25 185:12

**obtain** 35:1,7

**obtained** 20:12 35:2

**obvious** 257:6

**occur** 116:6 220:15, 16 250:14

**occurred** 10:3 133:14 179:21 248:1

**October** 35:3 265:4

**oddly** 253:20

**offensive** 100:6

**offer** 253:17 254:13, 15 255:5,10 256:14

**offered** 253:2

**office** 23:14 26:13 27:7 28:17 36:24 46:2 50:6 56:21 61:18 68:8,12 77:17,25 78:1,2,3 79:25 101:14 102:7 110:23 113:9 115:1 119:4 125:20 126:1, 9 131:15 132:1,14 133:3 135:5,24 141:10 146:15 163:18 191:6,7 209:24 214:7,22 217:12 241:25 242:6,11,12 243:16 244:15 257:12

**officer** 20:19 23:22 28:15 29:12,25 34:10 60:3 64:2 65:10,13 97:21 101:3

**offices** 67:23 107:23 108:8 112:16 122:17 248:19

**official** 46:14,19 187:5,7 193:24 238:19

**oftentimes** 43:5 47:25 240:3

**Ohlweiler** 62:1 63:16,21 100:23

**onboarding** 50:16

**one's** 78:6

**one-on-one** 114:23

**ongoing** 116:3 138:4

**online** 20:3 37:12 82:10 235:15,20

**operate** 46:21

**operated** 28:23 161:4 240:2

**operating** 34:8 215:6 228:3

**operation** 168:18

**operational** 28:22 29:1 144:5 148:11

**operations** 28:12 30:9 43:7 45:19 53:13,15,16 81:18 143:20,25 144:2 154:21 210:10,14 226:1 257:22

**opinion** 188:17

**OPM** 254:5

**opportunity** 97:12 194:3 260:13

**opposed** 221:21

**opposing** 12:16

**opposite** 180:19

**option** 238:25

**orchestration** 57:16

**order** 72:19 73:4 74:1,7,22 82:19 127:6,12 137:9 138:3 170:18 217:19 219:17 220:1 221:7 266:14, 18,24 267:12

**ordered** 174:2

**orders** 266:9,11,12

**org** 73:23 79:3 80:9 121:23

**organization** 24:20 26:9 46:17 56:21 59:15 65:3 79:19,21 121:18 135:13 143:22 153:9 165:15 214:14,17 215:11 253:13,15

**organizational** 78:18 214:12

**organized** 26:9

**original** 146:15 266:14 267:10

**originally** 19:6 146:21 164:23 176:2 192:19

**OTI** 67:6

**out-of-pocket** 154:19

**outbreak** 82:23

**outlet** 31:22

**outline** 103:14

**outlined** 133:4

**oversee** 105:8

**overview** 20:14

**overwhelming** 65:21

**owe** 107:14

**owes** 107:11

**P**

**P-A-W** 43:19

**p.m.** 71:6,10 130:22, 25 184:12,15 212:8, 11 230:18,21

261:22,25 267:15

**packet** 49:1

**pages** 72:16 92:12 178:17 199:15 200:7 224:6

**Paloma** 27:15

**pandemic** 250:2

**paperwork** 180:9

**paragraph** 94:19 220:18

**paraphernalia** 51:5

**part** 36:4 41:7 50:4 52:15 60:4 66:19 107:7 115:8 137:20 138:5 141:10 150:9 166:5,6,8,19 171:8, 11 194:24,25 214:5, 6 221:10 239:19 244:19 248:19 254:4 257:9,21

**participate** 89:1 247:21,24

**participated** 117:23 248:3

**participation** 226:20

**parties** 257:8

**partnership** 138:20

**party** 187:16

**pass** 265:19

**passionate** 124:13

**passive** 118:14

**password** 53:3

**past** 222:1

**path** 125:16,22

**patient** 235:14,19

**Paul** 250:25 258:3 259:8

**pause** 12:8 114:21 117:22

**paused** 106:5

**pausing** 31:14

**PAW** 43:19 68:20 69:1

**pay** 107:10,14

**payments** 107:8 229:14

**penalties** 107:14

**penalty** 9:7 254:21

**pencil** 80:8

**pension** 254:21 255:2

**people** 29:10 34:15 36:4,10 37:24 38:21 44:19 47:19 50:21 52:5 54:1 65:16 70:16 73:15 77:13 85:17 86:19,21 87:17 88:19 89:9, 15,19 93:25 94:3 95:7 99:18 100:15, 17 102:1,22 103:17, 19,23 106:19 109:20,23 110:7 111:1,6 112:5,6,13 116:12 117:17 119:13 120:9,15,21, 22,25 126:20 127:10,14,21 128:1, 17 129:22 132:18 134:16,19,25 138:6 143:18 146:10,18, 20,21 147:10 150:25 155:24 157:2 159:19 163:4,

10 164:15 165:12, 14 167:6,22 168:6, 15 169:20 175:23 177:4,8 182:18 185:17 192:3 193:8, 17,25 194:9 197:13 202:3,22,23 203:6, 15 205:2,10 209:2, 6,7,21 210:10,12,16 211:23 212:1 215:3 217:11 219:3 237:15 238:15 239:3 241:5 248:4, 10 249:20,24,25 258:1 259:2 261:2

**people's** 205:20

**percent** 109:11

**perception** 134:24 208:2,8 216:14

**perfectly** 181:22

**perform** 77:20 144:2 239:23 240:9 261:3

**performance** 26:24 29:8 66:15

**performing** 40:20 77:22 217:8

**performs** 79:9

**period** 74:20 248:7

**perjury** 9:7

**permanent** 110:22 114:5

**permanently** 109:23

**permission** 160:9 198:19

**permissions** 41:11 47:23 196:18 241:12

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 401 of 720

JASON GRAY
93681

February 03, 2026
300
Index: perpetuity..position

**perpetuity** 218:8

**person** 10:12 27:20 37:13 38:16 49:8 52:10 54:21 66:17 87:5 94:15 97:9,12 98:10 104:20 105:9 110:23 114:4,5 115:11 125:10 143:24 164:18 172:25 178:3 197:12 213:19 214:1 225:25 232:4 242:21 246:18

**person's** 148:2 229:17

**personal** 123:11,14, 16,17 208:14 209:18 239:8

**personnel** 63:25 85:25 88:19 94:13 98:4,7 208:21 210:7 211:11 231:10,19

**perspective** 155:6

**perturbed** 178:8

**Pete** 83:24 84:6 126:24,25 127:1 131:15 132:7,17 134:2 137:2 141:3 143:19 145:9 147:8 148:15 163:14 164:19,21 166:25 170:24 171:3,8,11, 14 194:6,10 206:8 208:5 211:17 212:1 224:24 225:3,12,17 226:3,8,10 233:19 240:14 251:4 258:14 263:6,12

**Pete's** 171:3

**Peters** 179:15

**phase** 205:19

**phenomenal** 244:5

**PHI** 238:16

**phishing** 52:4

**Phoenix** 39:17 40:11 91:25 92:2 149:19 150:1,14 151:8,9,10 161:5

**phone** 16:4 28:24 36:5 62:19 69:4 91:1 129:13,15,19 136:4,7,8,10,12 171:20 172:9,13,16, 17 173:5 177:11 179:19 182:2 184:18 185:10,16 206:25 251:13 259:14

**phones** 60:23 61:6 67:17 174:24 175:2 182:18

**phonetic** 45:24 67:4

**phrase** 10:25

**phrasing** 98:2

**physical** 51:5,14 172:18 190:20,25 191:1,3,5,7,10,13, 18 192:12

**physically** 12:13 52:14 77:24

**pick** 114:7,9,10 126:19 238:20

**picked** 136:10

**picture** 52:12

**piece** 183:5 216:1,2 231:12

**pieces** 55:5 205:12

230:8

**PII** 238:15

**pin** 52:17 68:1

**PIV** 51:18,21,25 52:1,3,11,22,25 53:2,6,9 60:21 67:18,22 68:1,3,5, 11

**PJ** 172:17,23 173:9, 11,13,16,18,19,25 174:3,16,18 175:7 180:1 181:5,24 182:25 183:6 185:9 186:16,17,19

**place** 49:1,9 237:9, 13 239:5,13 245:3 249:19 254:6 265:2

**placement** 254:5

**placing** 94:12

**Plaintiff's** 24:15 26:5 55:15 72:9,10 92:10 152:5 199:10 223:22

**plaintiffs** 8:15,17, 19,21 24:13

**plan** 26:24 29:13 40:17 108:1 138:22 148:25 165:6,7 253:14

**planned** 260:19

**planning** 59:21 84:11 90:11 138:6 164:14 167:11 264:13

**play** 103:5

**plugged** 248:12

**plugging** 237:2

**PMP** 19:22

**PMS** 161:6

**point** 60:15 65:8 83:11 90:23 92:22 99:4 104:6 111:18 116:21 119:9,22,23, 24 121:9 122:21 126:7,9 132:7,17 142:25 146:5 154:14 164:21 187:1 191:19,25 202:20 215:2 216:18 219:9 251:22 252:1,3 253:16 257:23 263:24

**pointing** 27:4 227:12

**points** 109:5

**policy** 59:21,22 79:4,10 101:22 102:13 216:11 236:24 237:1

**political** 27:18 28:5, 6 61:2,13,17 76:9, 11 108:13 110:17 169:13 170:2 199:4 242:13 243:11 256:8 257:16

**politicals** 66:2,9,21 124:3 174:13

**poorly** 11:1

**portfolio** 21:16,17 28:13 29:5 30:21

**position** 26:14,17 33:24 58:6,25 65:6 66:12 78:16 80:20, 24 128:16 131:25 133:19 141:1 146:5 164:18 169:5

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

214:24 250:24 253:3,4

positions 66:3,4 76:10 78:17 94:1

positive 222:11 262:13

post 206:21

potential 222:18

POTUS 127:23 128:23 129:1 131:19 137:17 138:10

Power 114:12

powers 18:14

PP 59:23 164:24

practicality 80:23

pre 23:25 71:21 247:15

pre-memo 97:25 98:9

preceding 113:22

precipitated 258:6

preemptive 217:7

preface 85:19

preparation 14:5 16:17 108:1

preparations 13:23

prepare 13:8 14:15 82:13 109:4

prepared 61:21

preparing 83:9 90:11 108:10

prepping 156:1

present 16:13 90:21 99:12 231:10 267:4

president 32:15 63:10 82:11 142:2 146:13 200:2

president's 32:13 72:20 148:24 220:21

presidents 220:21

press 58:21 67:11 145:21 207:24 208:3 263:13,17

pressure 58:20

presume 93:12 155:9

presumed 166:5

presuming 113:18 169:19 183:21 188:22 198:24

presumption 85:9 141:1 167:3 186:17 189:12 194:23 195:2 198:22 201:24 214:19 224:24 230:6

presumptions 200:19

pretty 41:23 132:2, 15 155:17 213:17

prevent 186:15 236:9

prevented 29:3 229:3

prevention 238:11

prevents 237:2

previous 211:10

previously 208:24

primarily 29:23 33:17 42:14 43:16

46:5 49:6 53:23 60:19 94:9 104:19 117:4 118:17 122:4 144:1 214:11 230:6 238:12 240:6 242:10

primary 50:11 79:13 81:11,14 241:14 255:2

principal 132:22

print 25:7,8,9

printed 25:2

prior 27:25 53:18 54:21 55:6 74:12 83:2 113:15 144:23 147:15 156:2 189:8 233:14 263:9

priority 224:18

private 252:25

privilege 14:23 16:22

privileges 104:6

proactive 208:10

problem 31:12 84:22 176:24 248:12 257:18

problems 40:14

proceed 9:12 71:10 130:25 184:15 212:11 230:21 261:25

process 35:6,8,14, 24 36:4,22 37:5 49:17,24 50:5,17 52:22 56:22 67:15, 18 70:12,15 97:13 107:8 120:11 121:22 137:15

167:14,17,19,22 205:21 228:15 241:6 254:4 259:23

processes 49:12 54:3 67:19 203:22

produced 24:23 195:14

product 41:5 48:6,8, 9

production 25:10

professional 19:21, 23 20:14 35:23 36:20 169:10 185:25

professionals 33:21 46:2

program 114:15,18 215:10

programming 79:4, 10

programs 59:23 74:19 80:2 242:16

progressed 120:2 202:21

project 19:22 30:21

promising 59:7

promote 33:20 44:21

prompted 52:17

proof 142:2

proper 49:10

proposing 97:11

protected 14:23 16:22

protecting 28:24 117:11

**protests** 209:6

**protocols** 49:9

**prove** 117:16 244:6

**provide** 17:25 42:2 53:8 56:19,21 225:4 231:19 241:4,8

**provided** 38:16 51:20 84:20 86:4 205:15 233:6 234:14 245:19,21, 22,23

**provider** 42:1

**providing** 36:4 241:10

**provision** 51:22 227:16 233:7

**provisioned** 50:2 67:22 246:22,23

**public** 57:5 65:2 145:19,22

**pull** 111:9 137:8,24 151:15 158:22 159:4

**pulled** 62:5 88:25 107:19 116:20 163:14 182:25 263:15

**pulling** 235:13

**purpose** 48:21 73:12

**purposeful** 146:7

**purposes** 67:20

**purview** 39:5 48:12 187:22

**pushed** 134:10 135:1 136:20

**put** 49:16 52:6,8,16 76:9 77:12 83:13 85:25 86:18 95:7,8, 15 96:7,25 98:7 100:17 102:23 109:20 110:3,19,24 111:6 118:22 125:10 126:18 128:17 131:19,22 134:25 135:12 140:20 146:14 165:13,19,20 168:15 186:16,17, 19,20,23 187:2 188:7,13,19 192:3,7 197:25 202:3,16,23 203:7 205:10,17 209:21 210:12,15 211:6,21 212:1 216:17,20 217:1,10 218:10 228:14 236:18 237:4 239:2 249:20,23 253:19 256:6 260:25 261:2

**puts** 174:6

**putting** 42:5 98:11 99:18 120:9 127:10 164:15 167:11 185:17 186:2 198:20

**pyramid** 59:15

---

**Q**

**quarter** 53:4

**question** 10:14,15 11:1,2,7 12:9,21 17:18 31:24 40:13 42:21,23 51:11 54:20 72:16 87:24 100:2 113:14 115:14,16 125:15

140:7 144:21 147:19 150:11 157:12,18 158:21 174:4,8,9 177:18 185:2,7 193:12 216:23 219:20,21 240:22 246:7 251:5 252:4 257:12 259:24 263:21,22

**questions** 10:20 12:16,18 16:20 17:6,7,21 25:18 35:22 36:8 58:20 118:18 129:4,7 156:11 166:7 190:2 216:11,13 245:2 258:20 263:10,11

**queue** 239:2

**quick** 62:2 70:25 128:11

**quickly** 173:2 249:5

**quit** 169:5

---

**R**

**R-A-P-I-E-R** 64:25

**raise** 9:6

**ran** 154:21 188:2 263:13

**Rand** 251:20

**range** 39:21

**Rapier** 64:25 66:25

**rare** 52:24 262:20

**rarely** 262:20

**rationale** 159:3 216:25 254:16

**re-ask** 31:25

**reach** 61:5 72:1

**reached** 56:8 254:9 255:6,7,9,16 263:8, 18

**reaching** 207:24,25 208:16

**reaction** 176:19,21

**read** 15:12 36:25 37:6 38:13,17 72:21 74:3,9,12 77:21 82:13 99:22 105:17, 18 152:10,11,21 156:19 164:9 170:14 180:5,6 190:1 191:9 195:16, 17 199:15 206:10, 15 221:6,7 224:7 226:7 231:3 259:1

**reader** 52:3

**reading** 81:20 207:1 214:7,21 258:25

**readings** 38:6

**reaffirmed** 132:25

**reaffirming** 131:10

**Reagan** 62:22 78:3 171:21 172:19 175:22 249:19 251:23

**real** 62:2 105:12 141:8

**Realigning** 74:2

**realignment** 20:22

**reality** 102:1 107:13 123:15 124:15 217:8

**realize** 168:7 260:20

**realized** 34:13 134:9

**realizing** 217:4

**reason** 11:19 69:10 92:19 127:10 183:21 185:22 201:8,20 225:16 255:2

**reasons** 96:17 158:10

**reassigned** 146:14 231:18

**reassure** 103:8

**reassured** 102:14

**rebranding** 25:21

**recall** 54:15,16 58:14 64:10 73:6 74:24 83:17 84:3,8 99:2 107:4 116:8 117:3 118:3,4 123:1,7,20,23 130:9 142:21 145:18 156:20 162:6 169:6 171:16,19 172:4 193:3,21 196:25 199:25 203:8,10 204:16,19 205:6,9, 14 207:4 208:25 209:1,10,16,22 215:22,23 217:20 247:5 252:11

**receive** 20:5

**received** 22:9 90:23 142:18 182:16 187:6 251:17 256:14

**recess** 71:8 130:23 184:13 212:9 230:19 261:23

**recognize** 33:20

**recollection** 10:3 11:11 55:25 96:18 99:9 137:22,23 149:21 156:8 171:10 182:20 201:14 206:20 217:23

**recollections** 202:12,14

**reconstitute** 196:7

**record** 8:7 9:21 11:25 27:3 31:18 51:24 64:23 71:3,7, 9 73:22 75:15 80:12 111:18 130:22,24 184:12,14 201:5 212:8,10 230:18,21 238:19 261:22,25 267:15

**records** 142:22 231:9

**recover** 196:5

**recoverable** 69:19

**rectangle** 26:13 80:13

**red** 181:16

**redirect** 265:21

**redundancy** 42:12

**Reed** 20:23

**Reevaluating** 74:2

**reference** 137:6

**referenced** 199:2,8, 9 258:6

**referencing** 113:12 137:2 211:5

**referred** 111:18

**reflecting** 13:25

**reflection** 13:9,14, 16,19

**reflects** 26:8

**refuse** 185:9

**regular** 246:22 248:20

**regularly** 66:16

**Regulatory** 215:11

**reinforce** 223:8,17

**relate** 67:20

**related** 18:2 37:10 40:20 74:14,21 84:21 87:21 97:3 99:8,11 123:22 178:25 186:22 202:15 248:3 252:15

**relates** 30:9 42:12 43:17 111:14 166:12 241:13

**relating** 152:19

**relation** 115:11

**relations** 124:12

**relationship** 39:25 195:1

**relationships** 82:1

**relaying** 152:20

**release** 239:1

**relevant** 90:16

**relocated** 264:14

**relooking** 201:3

**remained** 76:16

**remember** 15:10 33:9 55:8 56:10

57:20 67:9,11 72:4 81:7 82:9 83:15 87:12 89:17,19 107:2 110:14 123:8 127:13 147:6 157:11 170:20 187:12 203:5 205:13 207:20,22 210:8 215:24 216:2 231:5,6 233:20 242:4 246:25 251:21 262:10

**remind** 190:11

**reminded** 101:25

**reminding** 183:11

**remote** 158:20 209:7 249:25 250:1

**removal** 173:8

**remove** 44:20 103:19 117:20 119:13 120:21 124:5,14 125:12,20 128:7 167:6,21 173:13 174:2 185:8, 23 186:9,10 187:3, 14 190:20,24 191:1, 7,8,11,17 192:8 205:20 207:9 211:23 212:2 216:7, 9,10 219:4,14 236:9

**removed** 124:16 141:1,14 145:17 146:5 167:13,17 169:3 173:7,20 174:1,22 183:1 205:11 219:10 241:21

**removing** 103:16 121:4 140:13 158:9 167:25 168:4 191:10,14 192:10

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

202:4,21 206:17

**reorg** 241:3

**rephrase** 11:3,6 17:8,18 247:12

**rephrasing** 32:16

**replication** 167:23

**replies** 170:23,24

**reply** 259:16

**report** 30:5 45:17,20 53:4 76:3 78:22,25 79:3 135:17 139:8

**reported** 26:17,23 29:12 40:19 45:18 66:1,14 81:3 139:16,22 214:18

**reporter** 9:3,5,11 10:10,18 17:9,14 80:11 195:4,7 263:8 266:7,11,13,16,21 267:2

**reporting** 40:24,25 66:16 139:7 195:1 250:8

**reports** 80:18,21,24 231:17,22

**represent** 8:13 32:14

**representative** 32:21,25

**Republic** 127:13

**request** 95:6 149:24 224:9 226:24 251:20 256:11

**requested** 232:2

**requesting** 68:21 86:18 95:7 104:7

**requests** 227:14 259:9

**require** 236:14

**required** 48:18 204:21 238:12

**requirement** 53:2

**resign** 110:18

**resigned** 211:19 263:2

**resigning** 169:9,15, 16

**resist** 213:8

**resistant** 52:4

**reskilling** 33:18

**resolve** 128:9 223:16

**resource** 21:25 27:1,16,21 189:1

**resources** 27:17 60:1 78:13 80:19 122:2 127:17 148:21

**respect** 18:17 23:21 36:14 65:7 87:22 89:24 90:20 100:14 122:25 124:21 125:18 128:18 129:21 133:14 149:18 153:15 166:2 185:13 220:23 221:25 247:15

**respective** 219:23 220:20

**respond** 82:18 130:3 183:15,17 197:16,19 252:7,8 258:8

**responded** 226:3,5 259:15

**responding** 30:21 227:13

**responds** 180:21 208:19

**response** 11:14 112:1 129:21,24 172:14 198:10 227:10 232:10 251:5

**responsibilities** 23:21 28:19 37:23 41:12 50:9,12 51:1 65:16 79:6 122:8 141:7,9 146:16 147:12 148:8 200:23,25

**responsibility** 49:21 70:9 102:3 104:15 122:19 138:24 165:4 186:15

**responsible** 138:18 160:1 187:21

**responsive** 208:18

**rest** 45:8 87:2 94:12 108:6 138:23 221:8

**restate** 241:23

**restricted** 180:15,21 181:20 182:14 183:13,14 231:11

**result** 17:16 117:15 205:1 218:12

**resulted** 88:11

**results** 116:16

**retirement** 254:20

**reveal** 156:25

**review** 14:4 159:5 242:17

**rhyme** 92:19

**rid** 265:16

**RIF** 165:6 203:11,14, 16 246:16 248:16, 21,24 254:2,4 255:18

**RIF'ED** 21:21 31:8 254:18

**RIFS** 203:16,18,19 247:25 248:4 255:23 257:1

**rights** 41:11 48:19

**ring** 217:13

**risk** 29:7 107:12

**Robert** 217:12

**role** 23:17 28:4 33:3 38:5 49:20 57:2 59:24 62:12 65:15 70:8 74:15 76:14 77:12,21,23 79:14 83:7 89:24 96:7 104:15,17 105:6 109:23 110:13,21 117:12 118:13 140:11,21 141:4,6,8 143:24 144:20 146:14,15,24 147:10 153:16 154:10 164:19,22, 24 165:4 166:2,4, 13,17 171:9 176:11 189:3,5,6,11,13 191:20,21 192:20, 21,23,24 199:7 201:22 214:3 241:24 242:5,8 243:2 246:21 247:21,23 256:18

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

265:8

**roles** 23:3,16,20,24 28:10 37:23 47:22 50:8,12 51:1 110:3, 4,19,20 112:6 122:8 144:2,6,11,16 148:7 188:23

**rolled** 55:9

**Ronald** 78:2 171:21 172:18 175:21 249:18 251:22

**room** 12:13,14 58:19 80:1 89:16 101:16 116:21,22 119:25 128:4 129:6, 16 136:9 139:25

**rooms** 153:22

**rosters** 135:12

**route** 70:12,15

**routed** 68:22

**RRB** 249:4,22

**Rubin** 267:3

**Rubio** 63:10 127:6,8 131:19 132:20 134:6 137:7,8,11, 21,24,25 138:14 142:3 143:18 146:14 147:9,14 163:16 194:9 199:19 200:4 201:7, 19 225:14

**rude** 100:6

**rule** 38:17

**rules** 9:25 10:9 37:3, 6 38:7,13 54:6 102:2 218:3,7

**rumblings** 91:5

**rumor** 193:24

**run** 82:3,7 121:17 168:24 228:5 233:2 242:23 243:12

**rundown** 39:4

**running** 34:15 118:9 143:20,22,25 170:25 225:25

**Ruth** 190:10,11,12, 15 191:5 231:13 233:5 245:25

**S**

**S-I-D** 46:23

**sad** 262:11

**safe** 182:8

**saga** 123:25

**Salesforce** 39:24

**Samantha** 114:12

**sat** 32:11,12 77:17 102:10 119:1 126:14

**Saturday** 84:21,25 85:2 192:2 198:3

**save** 107:13

**schedule** 29:7 256:9

**scheduled** 66:11

**scheduling** 81:15

**school** 22:5

**SCI** 34:21 232:17

**SCIF** 37:1,6,14 81:20 90:15 120:3 137:8,11,12,25 155:20 182:7 233:20,25 234:1

**SCIFS** 231:14

**scratch** 97:4 147:12

**screenshots** 208:15 263:18

**screw** 194:15

**script** 168:24

**scripts** 246:16

**searching** 159:14, 17

**sec** 47:7 181:12,14 191:6 192:13 197:6 233:4,15 234:8 245:16,24,25

**secondary** 247:23

**secret** 34:21 36:17 37:7 47:3 49:22,23 156:6,7 174:17 182:15 232:16,19, 21,24,25

**secretariat** 27:8 80:13 180:11

**secretary** 63:10 81:3,4 127:6,8 131:19 132:20 134:6 137:6,8,11, 20,24,25 138:14,20 143:18 147:9 148:17 163:15 180:12,16 194:9 199:18 200:4 201:7, 19 225:14

**section** 76:20,22 105:19 180:6

**sector** 252:25

**secure** 115:22

**secured** 29:4 37:1 182:8

**securing** 28:25

**security** 19:21 29:2 30:9,19 34:19 36:24 37:22 38:3 49:6,17, 18,25 53:13 65:10, 13 67:23 68:2 90:10 148:20 153:8,14 172:18 191:6 231:22 236:24 237:9 238:18,22 239:18 243:20 255:6

**seeking** 156:10 179:11

**select** 220:13

**sell** 235:20

**selling** 235:14

**senate** 28:7

**Senator** 250:25 251:20

**send** 64:14 103:22 119:12 120:21 146:22 165:2 227:10 229:4 238:15,17,19,21 239:7,9,12 246:16 248:7,9

**sends** 48:25 125:24

**senior** 21:12 23:15 29:25 30:25 32:13 60:2 63:22 64:1,2 90:8 98:21 107:22 110:21,22 126:12 242:5,21 250:25

**sense** 10:16,23 11:16 12:10,21 55:13 95:18 99:20, 24 100:1,12 101:11 119:5 135:20 149:8

**NAEGELI**
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

JASON GRAY
93681

February 03, 2026

306
Index: sensitive..sort

154:18,22 206:1 219:11 221:11 254:12

**sensitive** 69:20

**sentence** 180:8,14 220:12,17 224:16 225:1

**sentences** 10:11

**separate** 138:17 173:18

**separately** 67:17

**separation** 18:13

**September** 22:17 241:16 246:10 252:24 255:19,25 257:4 259:20 262:17 264:16

**series** 178:24

**servant** 57:5,17

**servants** 29:20

**serve** 57:1,6 58:8 65:12,14

**server** 41:18 228:4

**service** 29:24,25 30:3 42:1 44:5 53:20 60:2 64:1,2 171:25 177:3 253:12 254:17,19, 21 256:8

**Servicenow** 39:23 46:6

**services** 28:21,22, 24 29:14 30:4,15, 19,20,23 32:4 39:10,22 42:1,3 43:8 44:9 60:19 83:3 109:18 113:15 115:21 187:19

240:19,20,23,25 245:19,22 257:20

**SES** 215:10

**sessions** 239:24

**set** 134:20 167:19 213:20 244:9

**settle** 209:8

**seventh** 96:11

**SF** 238:19

**share** 13:3 33:25 41:18 154:23 155:1 257:13

**shared** 50:23 84:4 86:17 87:10,14 138:21 145:20 208:4 237:16 263:17

**shares** 196:17

**sharing** 44:14 193:25 208:8,19 237:15 241:12

**sharp** 100:4

**shed** 200:21

**sheer** 140:14

**shock** 62:9 112:5

**shocked** 64:19

**shooting** 27:6

**shop** 54:23,24 55:2, 3,8 117:5

**short** 184:6

**shortly** 72:8 167:1 173:5 262:5

**show** 14:25 25:6 69:20 112:1 157:17 204:2 216:23

**showed** 40:3 147:4

**showing** 147:9

**shown** 120:23

**shut** 124:19 127:21 130:12 140:18,20 141:13 196:12 228:21 260:18,20

**SID** 246:7

**side** 29:2,5,9 42:17 57:17 68:8,14 79:1, 19,20 80:8 111:7 155:23 156:4 180:23 192:9 232:12,15,20 233:1 244:7 265:20

**side-by-side** 67:23

**SIDS** 46:23

**SIG** 245:9

**sign** 37:3 38:12,17, 23,24 51:1 97:12 122:11 171:3 218:21

**signature** 192:15

**signed** 39:1 74:3 77:21 131:19 200:2 242:9

**signing** 73:1 77:10

**Silently** 105:18

**Siler** 9:1

**Simicon** 45:24

**similar** 34:12 251:10

**sit** 118:25 149:20

**SITMAN** 225:20

**sitting** 77:17,25 132:23 174:13 243:16

**situation** 98:20 168:8 170:21 171:16 172:12 175:18 205:5 221:25 225:23,24

**skill** 244:9

**slash** 214:6

**slot** 52:16

**small** 38:21 61:1 243:11

**smaller** 32:22

**smalls** 32:22,25

**SMM** 107:21 163:11

**snap** 114:13,19

**Social** 238:18 255:6

**software** 43:14

**sole** 48:14

**solidified** 243:14

**solidify** 243:2

**solve** 54:17 176:24

**solved** 224:4 248:12

**someone's** 215:15

**sort** 18:20 37:10 40:10 53:10 59:14 75:2 78:16 81:9 85:22 96:19 99:12 103:4 111:25 118:8 121:10 123:25 125:1 133:11 148:15 163:21 170:20 180:23 183:16 192:23 195:1 202:16 213:18,20 216:25 221:20 225:20 227:12 233:15 236:14 255:20

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

259:18 260:4

**sorted** 25:16

**sought** 76:8

**sound** 10:4 134:3

**sounded** 177:25 178:7

**sounds** 19:13 43:19 206:6,10 229:24 244:15

**sources** 73:8

**space** 22:11 180:17 181:13 234:2 250:7 251:23

**spaces** 182:1

**spanned** 33:10

**speak** 49:13 56:10 58:21 83:9 125:4 132:10 171:13 231:19

**speaker** 58:18

**speaking** 55:1

**special** 34:21 219:25 246:20

**specialist** 124:12

**specific** 16:20 17:6, 20,21 38:4 40:19,21 43:2 51:6 53:8 70:7, 19 75:3 88:4 115:6 122:16 137:7 148:15 149:5 152:20 173:21 216:11,13 219:21 259:6

**specifically** 12:19 17:3,4 20:22 28:22 34:18 57:4 62:11 69:23 91:13 101:19

103:7 109:5 111:13 123:2,9 130:3 138:10 149:17 165:15 167:9 175:10 183:2 185:7 221:20 222:21 228:10 229:7 239:11 251:1

**specifics** 99:18 100:11 104:14 118:19 120:10,13 135:11 203:8

**speculate** 217:6 225:13

**speculating** 136:25 219:5

**speculation** 139:10 144:13 147:25 188:15 194:20 206:5 212:19 218:25 223:13 224:21 235:2 236:22

**spell** 43:23 65:1 67:1 143:3

**spellings** 266:7

**spending** 138:5 143:21

**spent** 29:7 120:3 161:13

**spin** 229:1

**Splunk** 47:18,24 48:5,13,20 49:2 157:24,25 158:11, 14 159:8,24 160:2 162:3 234:25 236:3, 10,20 237:7 238:1, 5,7 239:22

**Splunk's** 48:21

**spoke** 14:11 105:10 262:4

**sponsor** 175:23

**spot** 174:6

**spread** 194:2

**spreadsheets** 39:11

**square** 26:12

**Squared** 19:22

**stability** 59:3 110:1 111:3 112:1 194:12

**staff** 61:16 62:4 66:24,25 75:25 76:3 77:4 83:3 110:18 114:17 117:7,12 126:10 145:24 208:23 209:5,11,16 233:9 245:14 250:11 253:10 257:20 264:16,24

**staffer** 250:25

**staffing** 29:19

**stamps** 157:4 173:21

**stand** 35:15 48:5 71:6 81:9 130:21 184:11 198:2 212:7 228:1 230:17 266:7

**standard** 38:22 60:23 68:10 81:1 213:24

**standardized** 33:24 36:9

**standardizing** 33:22

**standing** 251:23

**standpoint** 33:19 47:17 82:21 99:16 115:12 150:11

153:11 168:18 181:23 186:7 193:5 248:22 253:9 256:8 259:10 264:20

**stands** 21:22 37:2 227:17

**start** 10:13 77:14,22 143:21 170:18 193:24 195:25 249:1

**started** 35:8 40:16 132:16 187:1 193:25 216:22 249:10 259:11 260:15,24

**starting** 23:4 71:24 77:11 93:2 209:18

**starts** 10:12 94:20 99:2 152:6,15,17 178:11,18 190:5 217:19

**state** 8:13 9:20 24:3 40:23 50:22,24 56:13 74:18 95:21 127:1 137:4 138:9, 16,20 161:7 171:8, 9,12 228:13 229:20 232:24 233:3 240:19,21,24 241:2, 4 242:17,19 243:20, 22 244:7,8 245:18, 19,21 253:3,8 254:11,23 256:12, 16 262:9

**state/usaid** 170:25 171:6

**statement** 129:22, 25 130:4

**States** 18:3 74:2

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**status** 112:21,23 213:19

**stay** 133:3 170:2

**stayed** 222:1

**stead** 65:15

**step** 69:8

**steps** 183:16 204:21

**Steve** 113:24 114:20 115:9 171:20 173:3, 6,11,13,15,25 174:2 175:11 179:15 180:3 181:4,21 183:1,6 191:24 194:18,25 195:2 247:1,2,3

**Steve's** 104:15

**Steven** 65:8,17 88:24 91:1 92:6 99:14 104:6 154:20 158:13,24 160:14, 15 161:14 190:21 191:19 192:2,5,14 193:1,4 195:16 205:15 229:12 257:23 264:4

**Stevens** 8:14 9:13, 18 15:23 16:23 17:3,15,19 24:8,10, 14,19 25:5,9,17,20, 23 26:1,3,6 31:14, 19,22,23 51:10,12 55:12,18 70:24 71:1,11,12 72:7,13 73:21,24 75:7,12 80:12,16 92:9,15 111:23 128:13,15 131:1 139:11,13 140:3,6,23 141:17, 21 144:14 147:18 148:1 149:7 152:4,9

156:13,17 164:4,8 170:8,13 177:16 178:10,15 184:7,10, 16,25 187:9,15 188:16 189:9,14,18 193:11,18 194:21 195:3,6,9,12 197:4, 10 198:5,9 199:8,14 204:1,6,10 206:19 207:11,18,21 210:4, 23 211:2 212:12 215:18,21 217:14, 18 219:1 220:8,11 223:22 224:3,22 230:15,22 231:2 235:5 238:4 247:11 250:18 258:15 261:11,19 262:1,2 265:17,22,25 266:13,15 267:5,13

**stick** 52:2

**stickers** 24:11

**stint** 216:20

**stood** 221:2 242:18 253:14

**stop** 121:6 223:15

**stopping** 107:8

**storage** 42:3,4

**story** 255:11

**strand** 86:8 116:11

**strands** 85:22 116:11

**strange** 137:9

**strategic** 138:22 148:25

**strategically** 29:13 148:13

**strategized** 90:9

**Street** 249:9

**stress** 111:5

**strong** 170:2

**structurally** 115:12

**structure** 139:7 214:12

**stuff** 42:5 84:16 90:14 115:20 123:19 156:2 182:9 213:7 217:4,10 222:9 237:15 244:21,25 245:5

**subjecting** 209:8

**submit** 36:3

**submitted** 254:6

**submitting** 35:11

**subordinate** 140:20 141:5

**subsequent** 78:17 97:8

**substance** 12:2 14:2 155:1

**substantial** 248:23

**substantiates** 217:25

**substantive** 179:7 251:17

**substantively** 229:24

**successful** 83:7

**suddenly** 249:7

**suggest** 193:19

**suggesting** 159:8

**suite** 39:9,12 44:13, 16 114:25 126:2

135:22 174:12,14, 15,17,25 175:8,13, 14 181:8,23 182:6, 12,14,25 183:3 238:13,14

**Sumilas** 27:24 60:2

**summit** 90:10

**Sunday** 84:21,25 85:2 200:11 201:15 202:13

**super** 44:15,23 69:16 70:20 196:3

**supervise** 28:10 70:16

**supervised** 28:11, 14,15,16 29:18

**supervising** 77:14

**supervisor** 27:14,15 28:9

**supervisors** 257:25

**support** 29:15 30:4 61:1 63:4 88:10,12 111:12 115:19 190:19 193:5 241:5 256:18

**supported** 30:15 82:21 83:2

**supporting** 90:13

**supportive** 117:8,10

**supposed** 43:3 116:15 222:13 235:18,20,25

**surprise** 162:13,15

**surprised** 133:19

**suspected** 106:13 154:10 221:4

**swear** 9:4 37:3

**switched** 218:15

**switchover** 241:19

**sworn** 11:18 61:3

**sync** 99:15 168:25

**system** 19:21 22:1 39:17,18,19 40:12, 25 41:19 42:8,16,18 44:2,14 45:1 46:1,3, 21 47:2,10,18 48:11,19 49:4 69:18 70:12,13,14,17 104:9,12 115:15 149:18 150:7,21 153:7,10,20 157:15 158:1 161:6 162:1 183:18,19 191:2 197:1,2 202:5 228:2,3 235:14,18, 25 238:16,20 241:19 245:12,14 265:15

**systems** 39:4,8,22 43:9 44:18 45:4,5, 23 47:8 48:20 49:11 51:5,6,15 68:22 70:7,19 86:3 90:23 91:7,24 95:19,20 104:1,21 105:1 114:6,7,10 116:14 149:15,16,18,23 150:23 151:1,5 157:7 160:23,25 161:3,9,15,22 167:20 177:21 181:2,15,19 192:10 202:17 227:20 229:3 231:23,24 233:3 234:10,24 236:6,7,18,19,24 241:13 244:10

245:7,15 252:1,16

---

**T**

**table** 12:9

**takes** 36:22

**taking** 136:18 165:12 219:15 253:6 257:24

**Talent** 49:16

**talk** 9:25 13:21 14:7 16:16 19:4 23:20 25:10 36:6,10 56:17 57:20 61:17,18,20 62:2,3,5,8,20 93:19 98:19 100:18 101:16 102:6,7 109:3 113:3,20 115:13,16 133:16 134:2 139:18,19 155:10 158:12 160:12,15 162:17 169:21 173:8,12 174:7 184:21 197:18 198:14 230:5 232:20 239:9, 10 247:8,13,14 250:11,22 257:7 258:19 259:6 263:16

**talked** 13:24 14:1, 20,24 17:2,4 30:20 44:13 56:25 58:22 60:7 61:12 62:3,11, 13,17,24 63:16 65:8 66:2 67:17 79:4 80:3 86:11 90:7,25 91:13 98:17,23 99:14 100:25 102:10 114:20 115:20 116:7 119:3

120:17 121:16 123:13 131:5,10 137:20 139:2 143:14 154:17,20 160:17 168:17 172:17 181:23 183:6 188:5,20 189:3 199:21 200:18 212:13 219:19 226:23 229:24 232:12 234:11,13 237:16 244:4 249:24 252:23 256:15 258:2 260:1 262:21 263:1,6 264:1

**talking** 10:12 13:6 24:2 51:13 55:23 69:23 70:6 78:8 89:10 90:13,14 91:16 95:24 97:18, 20 100:21 106:23 107:11 118:16,17 120:9 122:13 128:6 131:2 142:6 146:20 160:24 175:8,10 177:3 180:2 181:7 190:9 201:6 208:17 212:15 222:21 226:22 229:10 234:18 235:11 236:24,25 242:16 247:18 262:10 263:14,16

**talks** 213:13

**tangentially** 83:2

**Tanium** 239:16

**Tarak** 176:17 178:2 179:11

**task** 20:20,21

**teach** 102:3

**team** 28:12 29:18 30:6,8,13 45:6 51:2, 4 53:13,21 54:8 56:9,11,13,17,24 57:14 61:1,2,23 66:19 68:4 86:14 97:22 105:22,25 106:3,10,11 108:13 115:19 119:6 120:16 127:18 135:6,13 139:2,17 147:8 150:16 154:18 155:10 157:23 160:1,3,6,24 161:14 167:1,2,7 168:3,7,18 169:12, 13 173:15 176:16 181:3 185:23 190:22 199:4 216:9, 10 219:4,7,24 220:3,13,19,24 221:2,3,12,13,20 222:9 229:10,17,22, 25 230:2 238:22,23 239:10 240:6,13 242:18 244:5 257:11,16 264:21, 22 265:13

**teams** 221:9 222:12 233:5

**teasing** 85:23

**tech** 34:3

**technical** 19:18 54:11 230:8

**technically** 26:22 81:3

**technologist** 28:14 29:13 140:12 261:7

**technologists** 33:24

**technology** 19:16 20:19 22:11 33:19 34:3 46:9,11 49:3 63:24 73:15 81:14 99:16 115:17 166:7 229:21 248:3 259:8, 10

**telework** 61:22

**telling** 136:22 145:18 208:23 209:11 222:16

**tells** 128:24

**temporarily** 53:7,11 110:19

**temporary** 141:6,8 174:19

**ten** 35:13 71:3 134:22 226:2 240:8

**tens** 159:20

**tension** 117:13

**tenure** 76:17 79:6

**terminate** 205:3

**terminated** 204:17, 25

**terms** 43:7 121:21, 23 236:12 241:18

**test** 42:25 43:11

**testified** 9:15 162:14,16

**testimony** 9:7 11:21 12:2,6 17:25 58:22 184:24 189:8 233:14

**Texas** 264:9,14 265:19

**text** 251:12

**thanked** 186:13

**theme** 85:20

**thing** 40:8,22 49:13 51:20 56:25 61:8 68:20 97:10,11 102:8 137:9 138:7 153:14 159:15 170:3,4 177:5 196:14,24 201:16 207:12 216:21 236:3 254:10

**things** 18:1 37:24,25 47:15 54:4 59:1 81:9,21,23,24 82:9, 13,20 83:1 85:23 88:5 91:15 98:23 99:15,17,25 101:13, 18,21 103:7 115:18 120:4 122:15 124:17 134:13 148:13 151:15 157:22 167:16 189:23 191:25 209:8 212:21,25 222:5 223:4,15 232:12,15 243:7,18

**thinking** 13:19 62:13 95:25 131:22 140:11,13 169:8,9 217:7 222:17

**thinks** 61:21

**thought** 61:11 93:24 105:7 111:19 127:2 135:1,2,25 136:25 137:2 146:12 164:23 166:5 176:23 202:25 222:8 260:16 262:12

**thoughts** 213:3

**thousands** 159:19, 20

**thread** 180:2

**threat** 37:20 158:8 177:12

**threatening** 176:20

**threats** 29:3 38:4

**three-way** 173:10 184:18

**Thursday** 84:20 93:19 94:2 96:1 103:13 111:15 113:19 116:10 153:25 199:6 201:10 249:14

**Tianna** 8:18

**tied** 47:16,17 219:20 220:8

**Tim** 67:1 143:10

**time** 8:8 11:11,15,25 20:16 22:4 23:5,23 27:21 30:18 32:10 33:10 35:4 43:4 54:1,14 57:6 58:22 59:13 60:1 62:19 63:24 64:3 70:17 71:6,10 72:4 74:9 75:25 79:14 81:10 82:3,12 83:11,23 84:5 85:14 86:22 87:9 91:17 96:5 99:21 104:15 105:6 111:2 113:1,9 115:5 118:12,15 119:1 123:3 124:22 128:5 129:11 130:22,25 131:22 134:19 135:4,8 136:14 138:25 139:1 143:21 144:23

146:6 150:8 155:8 157:4 158:11 160:6 161:13 165:23 166:7 168:11 170:23 172:2 173:20,21 178:21 179:18 182:22 183:2,21 184:12,15 187:3 188:5 191:19 193:1 202:20,21 205:18 207:1 208:11 209:9 212:8, 11,14,17 214:3,13 215:4 216:5 217:23 218:10,11 219:15, 20 220:4,8,25 221:19 222:1,7,13 223:2,5,13,19 226:7,23 228:21 230:18,20 233:18 240:7 241:5 243:1 246:9 247:7 248:5 250:10,23 254:9 255:6 256:24 257:3 260:12 261:24 262:3,17,21 263:1, 6,19 264:1,6,15 266:3,25 267:14

**timekeeper** 70:14

**timeline** 177:6

**times** 47:5 96:23 195:20 199:10 208:11,13 209:2,14, 15 229:6 232:5 252:23 253:9 263:7

**timing** 71:2 253:2

**title** 190:13

**today** 11:19,21 12:1, 24 14:5 15:15 16:17 114:8 213:2 232:5 234:13 266:1

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**today's** 13:7 14:16 267:7

**told** 23:12 56:16,23 61:15 84:13 85:16 93:22 94:25 102:6 103:12,20 109:21 114:9,12,16,20 120:23 124:5,18 126:11,12 127:7,22 131:23 133:24 151:17 153:4 168:14,19 169:8,25 170:6 172:23 182:6 186:8 188:7,10,21 193:13 203:24 209:2 223:1 229:9, 10 240:11 249:16, 17 251:1 252:7 257:24 258:7

**tonight** 167:2

**tons** 250:21

**tool** 39:11,25 238:5 239:16

**tools** 237:9,12,18 238:6 239:13,15,18, 20 240:5

**top** 27:5 34:21 36:17 37:7 47:3 49:23 73:1 94:20 156:6 189:22 196:22 232:11,16,19,25

**topic** 58:10 262:7

**topics** 37:16

**touch** 23:24

**touched** 23:1

**tough** 174:6

**track** 26:2 48:14 158:15 207:9

**traffic** 150:6,20 161:11 221:4 228:12 236:5,7 239:24 241:11

**trafficking** 241:11

**train** 128:14 166:21

**training** 37:10,12, 13,17,19 38:3,24 50:8,14,23,24,25

**tranche** 255:21,24, 25

**transaction** 120:25 150:10 228:16

**transactions** 84:10 85:8 88:8 90:1 91:22 93:16 95:1 106:14 109:19 111:2 113:11,15 117:2 120:24 150:6 151:22 152:2 159:13 228:12,18

**transcript** 266:12, 14,19,24

**transferring** 50:19, 21

**transit** 127:14

**transition** 56:9,11, 13,16,24 57:14,16 59:1 60:24 109:25 110:18 126:5 241:3

**transitioned** 20:19, 25 21:3,6,8,11,14, 17,20 23:13 145:2 240:18,20,24 254:23

**transitioning** 20:17 241:7 254:11

**transitions** 59:3

**transportation** 21:15 260:3,4

**travel** 39:25 40:1 112:10

**treasury** 95:21 161:8 228:13

**tri-chair** 33:6

**trip** 201:19

**TRO** 223:12

**true** 11:20 114:18

**Trump** 56:3 60:11

**truth** 9:8,9,15

**truthful** 11:20

**Tuesday** 65:25 78:4 95:25 107:5

**turmoil** 111:4

**turn** 13:7 23:19 60:5 72:25 73:21 92:9 105:14 189:25 224:9

**turned** 159:18,19

**turning** 17:24 22:18, 25 43:21 53:17 56:1 73:17,25 75:7 109:9 116:9 170:8 179:7

**turnstile** 62:1 175:24

**Twenty** 96:11 207:18

**two-and** 124:12

**type** 44:9 61:8 88:1 91:13,16 98:5 243:24

**types** 15:5 30:22 37:19,23,25 38:4 39:20,22 42:3

82:17,25 88:13 112:12 156:10,12 240:25 243:17 248:15

**typical** 138:7 148:16 213:17,23 215:14 223:4 242:13

**typically** 44:22 50:15 51:2 53:1 90:12 121:17 164:1 168:17 175:21 186:6 205:4 243:12

---

**U**

**UB** 51:20,22

**Uganda** 82:24 127:20

**uh-huh** 10:21

**Ukraine** 261:8

**unauthorized** 231:23

**unclass** 233:10

**unclassified** 234:9

**uncommon** 56:19

**undergo** 35:7 37:10 38:6

**underneath** 80:13

**undersecretary** 21:13

**understand** 11:2,3, 7,23 12:3 13:1 18:23 24:4 42:22 54:2 73:12 82:22 90:22,24 114:17 122:14 128:22 134:3 137:10,14 140:7 141:7 146:8

153:9 155:11 161:3 162:10 171:5 177:17 182:17 189:6,11 202:10 210:7 234:21 236:6 267:8

**understanding** 32:12,17 36:21 43:13 53:19,21 65:2 66:10 74:13 79:12 88:15,22 89:23,25 97:21 103:4,9 104:1,16,23 105:5 130:12 139:6,12 144:19,24 147:22 148:2 149:14 150:5, 22,24 151:19 156:23 157:6 161:9 165:5 166:2,17 169:4 171:2,7,13 175:18 182:21 190:19 191:9 194:17 195:23 196:20,23 200:16 204:16,20 206:2 210:8 211:9 214:3, 24 215:4 216:4,10 217:2 218:3,14 221:25 228:25 234:23 258:23

**understood** 27:2 29:6 34:17 39:3 41:21 46:22 55:12 60:5 64:3 70:18,22 72:5 73:11 81:6 83:24 90:21 132:9 157:23 162:4 176:12 194:15 203:17 236:1 237:20 246:12 258:7

**undo** 48:3 158:3

**unexpected** 83:1

**unfolded** 201:15

**United** 18:2 74:2

**university** 19:17,19 20:2,3

**unpack** 34:9 62:16

**Unrelated** 149:12

**update** 112:21,23 113:10

**updates** 148:19 248:20

**upset** 101:9,12 103:6 209:6

**upskilling** 33:18

**urge** 213:8

**urgency** 206:1,11

**USA** 180:17

**USAID** 18:4,11,17 21:20 22:19,20,25 23:3 29:17,23 33:10 39:3 42:4,8 46:15 49:9,15 50:18 52:21 54:14,22 55:6 56:8 61:19 62:17,22 63:20,22 65:3,13 69:4 74:14,19 81:13 84:1,22 85:25 86:13 87:23 88:21 89:4,24 90:12,17,23 94:14 95:20 96:22 97:13 99:12 100:18 105:22,25 106:3 109:6 116:13 127:1, 17 135:9 138:16,18, 20 142:4 143:21 145:23 149:15 151:1 158:10 166:3, 4,13 170:20 175:17,

20,22 176:5,9 179:1 180:17 187:21 195:25 205:3 206:22 208:23 210:11 212:2 213:23 215:6,8 220:4 221:2,13 231:11,17,23 233:3 236:17,19 239:6 242:2 244:6 246:10 247:15 250:11 251:10 252:15,16, 17,24 253:1,8 257:5 258:24 259:21 260:4,5 262:6 264:15

**USAID's** 185:14

**USB** 237:2

**USDS** 53:20 54:12, 21 55:2,11 73:14 106:24 178:5

**user** 50:10,13 157:2

**username** 53:3

**users** 41:8,11 42:19 43:1 44:20,21 47:21,22 161:21,25

**USGS** 219:22 220:14,19,24

**utilize** 43:1

**utilized** 51:14

**utilizing** 42:19

---

**V**

---

**VA** 21:1 86:24 235:11,12 260:3

**Vacancies** 142:3

**vacant** 144:7

**vacuum** 34:8

**vague** 51:8 140:2,5 177:15 189:7 202:18 247:10 250:16

**validate** 36:2 77:4 152:1 159:20 194:8 197:1 201:18 217:9 244:24

**validated** 52:9 91:8 158:24 228:16

**valued** 169:11

**values** 117:1

**varies** 37:20

**Vega** 27:23

**vein** 125:1

**vendor** 167:20 187:17 226:17

**verify** 152:1 154:5 180:9 190:20

**versus** 8:10 62:21 70:19 135:18 156:11 171:15 197:21,22 218:4 226:8 243:2

**vet** 68:25

**Veterans** 21:11

**vetted** 49:18,22,25 91:5,7 229:15 232:1 233:24

**vetting** 49:17 67:24

**video** 266:12 267:7, 10,12

**view** 193:23

**viewing** 160:1

**violates** 18:18

**virtual** 39:13 227:18, 24 228:2 229:1 237:4,6

**virtually** 151:5

**virtue** 106:18 151:9

**visibility** 82:14

**visionaries** 54:2

**VM** 227:17

**VMS** 227:16

**voluntary** 255:1

**volunteers** 91:6

**Voorhees** 152:15 185:5,18 186:3,22 190:14 218:15 233:4

**VPN** 61:7 250:1

**W**

**W-E-N** 17:13

**Wainwright** 60:7

**wait** 254:3 256:20

**waited** 29:21 128:3 256:20

**waive** 53:1 182:17

**waiver** 174:19 182:16

**walk** 77:18 210:12 223:5 226:25 227:4, 8

**walked** 102:9 109:17 126:1 136:9 146:9 227:9

**walking** 89:13 133:21 210:9

**wall** 261:1

**Walter** 20:23

**wanted** 14:18 34:7 42:11 56:9,17 58:7 61:17,21 101:9,11, 15 109:5 111:3,9 150:5,20 151:17 156:23 157:6,23 162:17 169:9 170:1 177:25 178:6 185:24 187:4 195:7 228:14 229:1,7 238:19 241:2 248:9 258:23 259:2 260:1, 6 263:11,24 264:7, 10 265:16

**wanting** 117:10 120:8 128:17 134:21 151:3 209:4 212:13 217:9

**warn** 92:16

**Warren** 8:16

**Warren's** 267:8

**watch** 212:14

**watched** 42:6

**ways** 73:16 261:6

**web** 41:25 62:6 63:13

**website** 187:21,25

**webta** 39:20

**Wednesday** 95:25 107:18,21 163:21, 25

**weeds** 104:5

**week** 65:22 81:8 83:8,16,18,22 88:13 89:20 90:9 92:3,4 103:21 109:22

110:20 111:16 138:5 142:17 147:3 162:24 165:9 168:13 174:22 223:11 244:20 262:24

**weekend** 84:17 85:8,11 90:2 95:2 106:16 109:19 120:24 172:21 193:16 207:5 243:3 262:24

**weeks** 49:7 56:18 57:25 79:13 81:17 114:12,14 154:19 174:21 176:8 192:17 194:24 239:22 243:8,13 254:8 264:3

**weight** 177:13

**Weiland** 57:22 60:9

**Wen** 8:22 15:22 16:21 17:1,8,12,13, 17 24:7,9,13 25:4,8, 14 51:8 70:23,25 111:17 128:11 139:9 140:2,5,22 144:12 147:16,24 177:15 184:5,23 187:10 188:14 189:7 193:10 194:19 202:18 206:4 207:16 210:3 218:24 220:6 224:20 235:1 236:21 247:10 250:15 258:10 260:22 265:21 266:23 267:1

**When's** 74:9 262:21 264:1

**White** 32:14 56:7 60:3 62:1,6 63:13, 17,25 76:23 77:1,5, 6 94:17 143:4 206:2,9 253:18 256:10,12

**wide** 162:22

**wife** 13:24

**wildfire** 194:2

**William** 190:6

**Williams** 57:15

**Willis** 216:18

**Windows** 41:5,6 228:4

**witnesses** 36:10

**woman** 57:15 67:8, 10

**women** 33:20

**wonderful** 54:5

**word** 13:18 43:19 91:15,16 225:20 251:14

**work** 21:1,8,11 22:10,13,14 29:16 32:3 34:6 36:11 49:9 54:12 63:3 74:14 77:15 83:12 106:22 145:3 161:15 208:15,23 209:3,7 220:19 222:4 244:11 250:1, 13 252:25 259:20 260:1 262:16

**workaround** 53:10

**workday** 85:3

**worked** 22:16 30:6, 10 35:8 45:11 50:22

53:22 54:9 63:23 68:6 69:25 70:10 81:4 115:3 120:16 127:4 134:4 137:15 161:3 165:15 203:17 220:24 237:22 256:16 260:11

**workforce**  33:6,14, 15,17,19 34:4,14,15 43:6 59:3

**workforce-related**  33:23

**working**  20:15,17 22:4 29:11 35:4 42:18 45:9 81:14 83:10 85:1 120:11, 12 149:15,22 163:17 172:20 176:15 205:3 207:5 221:21 227:20 228:12 242:3,11,17 243:19 249:25 257:5 260:19

**works**  25:14 56:22 157:1 229:20 250:1

**Workspace**  196:15, 16

**world**  30:3 41:1,6 81:22 115:21 130:14,17 167:23 169:1

**worried**  145:20 169:18 170:5 222:24

**worst**  189:21

**worth**  54:20

**wow**  202:25

**writes**  96:19

**writing**  63:7,14 87:8 146:25 186:22 187:5 215:12,15 261:1

**written**  218:21 225:8

**wrong**  25:2 65:5 68:19 75:23 108:16 133:1 227:8

**wrote**  187:2 226:2 232:4

---

## Y

**Yao**  265:5

**year**  13:17,21 20:5,9 21:3,10 24:1 29:21 125:9 134:16,22 153:13 240:8

**years**  20:20 21:18, 19,20 23:6 29:21 33:7,8 35:13 39:7 41:13 57:6 65:11 81:13 83:1 124:13 254:17 256:17

**Yemen**  82:11 108:24

**yesterday**  14:12 16:2,14

**York**  208:13 263:7

---

## Z

**Zack**  45:18,20 154:20 158:13,24 160:13 168:17 192:6 195:16 257:22 265:3

**zones**  30:18

**Zoom**  12:15 267:11

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

# Exhibit 13

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

_____

J. DOE 4, et al.,

    Plaintiffs,

v.                 Civil Action No.:

ELON MUSK, et al.,        8:25-cv-00462-TDC

    Defendants.

_____

VIDEOTAPED DEPOSITION

_____

WITNESS:        MATTHEW HOPSON

DATE:        Thursday, May 7, 2026

START TIME:        9:09 a.m., ET

END TIME:        2:48 p.m., ET

REMOTE LOCATION:     Remote Legal platform

PROCEEDINGS OFFICER:    Elene Sowl, CER-1604

JOB NO.:        49268

CONFIDENTIAL REDACTED PORTIONS

SUBJECT TO PROTECTIVE ORDER

This transcript has been redacted pursuant to the

parties' agreed-upon Protective Order.

Page 2

A P P E A R A N C E S

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

275 Battery Street

29th Floor

San Francisco, California 94111

By:  NICOLE M. RUBIN, ESQUIRE

    nrubin@lchb.com

    RICHARD M. HEIMANN, ESQUIRE

    rheimann@lchb.com

Appearing for Plaintiffs

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

250 Hudson Street

8th Floor

New York, New York 10013

By:  LUCAS ISSACHAROFF, ESQUIRE, OF COUNSEL

    lissacharoff@lchb.com

Appearing for Plaintiffs

Page 3

A P P E A R A N C E S (Continued)

DEMOCRACY DEFENDERS FUND

600 Pennsylvania Avenue Southeast

Suite 15180

Washington, DC 20003

By:  ANDREW H. WARREN, ESQUIRE

    andrew@democracydefenders.org

Appearing for Plaintiffs

MARZIANI, STEVENS & GONZALEZ, PLLC

500 West 2nd Street

Suite 1900

Austin, Texas 78701

By:  BETH STEVENS, ESQUIRE

    bstevens@msgpllc.com

Appearing for Plaintiffs

Page 4

A P P E A R A N C E S (Continued)

U.S. DEPARTMENT OF JUSTICE

Civil Division

Federal Programs Branch

1100 L Street Northwest

Washington, DC 20005

By:  JAMES J. WEN, ESQUIRE

    james.j.wen@usdoj.gov

    JACOB S. SILER, ESQUIRE

    jacob.s.siler@usdoj.gov

    MAX T. MATHEU, ESQUIRE

    max.t.matheu@usdoj.gov

    CHRISTOPHER M. LYNCH, ESQUIRE

    Christopher.m.lynch@usdoj.gov

Appearing for Defendants

ALSO PRESENT:

Jehieli Luevanos, Paralegal, Democracy Defenders Fund

Maya Cook, Observer



Page 5

INDEX OF TESTIMONY

EXAMINATION OF MATTHEW HOPSON:          PAGE

By Ms. Rubin          12

By Mr. Wen          256

Page 6

INDEX OF EXHIBITS

(available for download)

EXHIBIT   DESCRIPTION                    PAGE

1      LinkedIn profile              18

2      Blank calendar                21

3      DOGE Executive Order              45

4      Email chain                   86

5      Memo to Jason Gray                92

6      Messages between Hopson and McGill       190

7      Email chain authorization access       205

8      Order appointing Marco Rubio as acting     207

       Administrator of USAID

Page 7

CONFIDENTIAL PORTIONS

DESCRIPTION                    PAGE

Portion 1                     246

Page 8

PROCEEDINGS

THE PROCEEDINGS OFFICER:  Good morning. We are now on the record.  Today's date is May 7, 2026, and the time is approximately 9:09 a.m., Eastern Time.

My name is Elene Sowl, and I am the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the video-recorded deposition of Matthew Hopson taken in the matter of Doe 4, et al., versus Musk, et al., Civil Action Number 8:25-cv-00462-TDC, filed in the United States District Court for the District of Maryland.

Would all counsel please identify themselves for the record and state who they represent, starting with the noticing attorney.

MS. RUBIN:  Good morning.  Nicole Rubin on behalf of the plaintiffs.

MR. ISSACHAROFF:  Lucas Issacharoff on behalf of the plaintiffs.

MR. WARREN:  Andrew Warren on behalf of the plaintiffs.

MR. WEN:  Good morning.  This is James Wen on behalf of defendants.

MR. SILER:  Jacob Siler for the

Page 9

defendants.

MR. MATHEU: Max Matheu for defendants.

THE PROCEEDINGS OFFICER: Is there anyone else?

MS. STEVENS: Beth Stevens for the defendants -- sorry. For the plaintiffs. I'm mixing up cases.

THE PROCEEDINGS OFFICER: Is that everyone?

MS. LUEVANOS: Jehieli Luevanos for the plaintiffs. I'm also here --

THE PROCEEDINGS OFFICER: I'm sorry. Could you repeat that once more? I'm sorry.

MS. LUEVANOS: Of course. Mine's on mute.

Jehieli Luevanos for the plaintiffs, as well as Maya Cook.

THE PROCEEDINGS OFFICER: And are there any other observers in the room that need to be identified for the record?

MS. RUBIN: I don't think so, no.

THE PROCEEDINGS OFFICER: Okay. Very good.

This video-recorded deposition is being taken remotely on behalf of the plaintiff and is being

Page 10

conducted pursuant to the procedural rules and laws governing this matter.

As such, all parties agree to this means of capturing the official record, which may include recording by audio, audiovisual, and/or stenographic means, and agree not to oppose admissibility of the testimony in this proceeding on the basis of the personnel or method by which the testimony was captured.

Further, all parties agree that the proceedings officer or person administering the oath may be authorized to administer the oath under the rules where they reside.

Could all attorneys stipulate one at a time?

MS. RUBIN: Yes.

MR. WARREN: Yes.

MR. ISSACHAROFF: Yes.

MR. SILER: Yes.

MR. MATHEU: Yes.

MR. WEN: Yes.

MS. STEVENS: Yes.

THE PROCEEDINGS OFFICER: Is that everyone?

MS. RUBIN: Yes.

THE PROCEEDINGS OFFICER: Okay. Thank

Page 11

you.

I'll now swear in our witness.

Would the witness please state and spell your full name for the record?

MR. HOPSON: Matthew Hopson. M-A-T-T-H-E-W H-O-P-S-O-N.

THE PROCEEDINGS OFFICER: And could you indicate for the record where you are testifying from today?

MR. HOPSON: The Westin Hotel in Old Town Alexandria, Carlyle area.

THE PROCEEDINGS OFFICER: Thank you.

Please raise your right hand.

Do you swear or affirm that the testimony you shall give today in this proceeding will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. HOPSON: I do. Yes.

WHEREUPON,

M A T T H E W  H O P S O N ,

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDINGS OFFICER: Thank you.

The witness is sworn.

Counsel, you may proceed.

Page 12

EXAMINATION

BY MS. RUBIN:

Q   Good morning. Mr. Hopson, my name is Nicole Rubin. I am with Lieff Cabraser Heimann & Bernstein, and I am going to be taking the deposition.

So I'm going to go over some ground rules for the deposition, then we can talk about the background -- your own background, and then we'll move into the topics that are the subject of --

THE PROCEEDINGS OFFICER: I'm sorry. Ms. Hopson, we've -- our audio is not --

MS. RUBIN: The audio is not coming in?

THE PROCEEDINGS OFFICER: I can hear you now. For some reason, it just dropped out for a minute. I apologize.

MS. RUBIN: No worries.

THE PROCEEDINGS OFFICER: Go ahead.

BY MS. RUBIN:

Q   Mr. Hopson, have you ever had your deposition taken before?

A   No.

Q   Okay. So I'm going to walk through some of the ground rules.

It is important for the court reporter to be able to take down exactly what we're saying. So I will

Page 13

try not to speak over you and I'll ask that you let me finish my full question before you answer so that we are not talking over each other. And I will try to take a beat after I finish my question so that we can all, you know, kind of distinguish the end of that.

For the record, it is important that you answer out loud, Yes, or, No, rather than, you know, Uh-huh, or nodding a head or shaking your head. So -- because we need to make sure that the court reporter can take down your answer clearly.

So there's a difference between, No, I don't know, and, I don't recall. Please try to just keep those differences in mind to be clear which one you mean. If you don't know something, please just say that.

So I'll be asking the questions today --

**A    What's the difference between, I don't know, and I don't recall?**

Q    Just that you -- you know, you never knew the information, you don't know the information, or maybe you knew it at some point, you don't recall now.

**A    Good.**

Q    So I'm going to plan to take short breaks every hour, hour and a half. But if you'd like to break sooner than that for any reason, just let me know and

Page 14

we'll find a good spot. I just ask that you let me finish the question and you answer the question pending before we take any break and go off record.

And one other thing on breaks, while the deposition is going on today, including during the breaks, please don't communicate with anyone about the substance of your testimony. That includes calls, texts, emails, messages of any kind about what we're discussing in here.

Does that make sense?

**A    Yes.**

Q    Great. Let's see -- so before we get into the substance, let me just give you -- this lawsuit is challenging the dismantling of the United States Agency for International Development, which I will refer to as "USAID" throughout the deposition.

There are two basic claims. The first, plaintiffs are challenging that USAID, a congressionally created agency, was dismantled by the executive branch rather than by a decision of Congress, which is what we're calling our "separation of powers" claim.

Second, we are challenging actions we believe were taken by Elon Musk and the entity I will refer to as "DOGE," the Department of Government Efficiency, in connection with closing USAID, which we contend violates

Page 15

the Appointments Clause of the Constitution.

And just to confirm, you understand that you are not a defendant in this case, and you are here today as a witness, correct?

**A    Yes.**

Q    And you were subpoenaed to appear today; is that right?

**A    Yes.**

Q    What did you do to prepare for this deposition?

**A    Nothing in particular.**

Q    Did anybody talk to you as you were preparing?

**A    I had a phone call with you to talk about how the procedure would happen, but otherwise, no.**

Q    Documents in preparation?

THE PROCEEDINGS OFFICER: Sorry. I'm sorry, Ms. Rubin.

MS. RUBIN: Yes.

THE PROCEEDINGS OFFICER: For some reason, his audio dropped again as he answered that question. If you could repeat the answer.

MS. RUBIN: Yes. Sorry.

BY MS. RUBIN:

Q    So I said, did you talk to anybody as you were preparing?

Page 16

**A    And my answer was that I had talked to Nicole to discuss how the -- for would happen and where we would meet. But otherwise, no. And there was no further preparation.**

Q    And without telling me the substance of any conversations, did you speak with defense counsel in preparation for today's deposition?

**A    No.**

Q    Before we go any further, I just want to put the privilege protocol on the record.

MS. RUBIN: The court has instructed the parties in this matter to institute a process through which deponent testimony that defendants maintain as confidential pursuant to either the presidential communications privilege or the deliberative process privilege is provided, recorded, and transcribed and maintained as confidential from plaintiffs' counsel.

Any such testimony will be taken outside the presence of plaintiffs' counsel. The transcribed testimony will not be provided to plaintiffs' counsel unless the court determines otherwise.

The following protocol will be in place.

For testimony purported to be covered by the presidential communications privilege or deliberative process privilege, I will ask certain

Page 17

agreed-upon questions to explore the application of the privilege.

After I have asked those questions, if government counsel determines that an instruction not to answer on the grounds of privilege is appropriate and instructs you not to answer, I will provide the question and any related questions to defense counsel, the court reporter, and to you.

Plaintiffs' counsel will then leave the deposition room, which the court -- after I leave, you will answer the questions, which will be recorded and transcribed. No break will be permitted before you answer, and neither government counsel nor anyone else will be permitted to consult with you or make any additional objection or statement on the record in my absence. All the parties and the court reporter, videographer, and court reporting company have agreed to abide by this protocol.

BY MS. RUBIN:

Q   Does that make sense?

A   Yes.

Q   Great. As I ask questions, defense counsel may object to my questions. That is normal. If they object, we're just going to pause to let them -- you should go ahead and answer the question. The only time

Page 18

that you should not answer a question is if someone affirmatively instructs you not to answer the question.

A   Okay.

Q   You've been sworn in by our court reporter, which means that you're under oath and you have to tell the truth today.

Is there anything that would prevent you from telling the truth under oath today?

A   No.

Q   Great. So I'm going to be asking you about some events on particular dates. Unless I specify otherwise, the dates that I'm referring to are in 2025.

Do you understand that?

A   Yes.

Q   Okay. So I'm just going to ask a bit about your background to start out. I'm introducing Exhibit 1. Plaintiffs' Exhibit 1.

THE PROCEEDINGS OFFICER: Ms. Rubin, are, are exhibits uploaded to the platform?

MS. RUBIN: They're in paper.

THE PROCEEDINGS OFFICER: Okay. If you'd like to send them to my email address afterwards, I can have them marked and attached to the transcript.

MS. RUBIN: Yes, will do.

(Exhibit 1 marked for identification.)

Page 19

BY MS. RUBIN:

Q   Okay. So this is Plaintiffs' Exhibit 1. This is your LinkedIn profile; is that correct?

A   Yes, looks like it.

Q   So you received your bachelor's degree from Norwich University; is that correct?

A   Correct.

Q   You graduated in 1994?

A   Yes.

Q   And after graduating you joined the Navy for what period of time?

A   Until retirement, 26 years afterwards. So that was 2020. August -- or the end of August. September 1st was my retirement date. 2020.

Q   And what positions did you hold in the Navy during that time?

A   I was an intel officer by trade, so I held standard staff jobs, different leadership roles, management jobs.

Q   During your service in the Navy, you attended graduate school; is that correct?

A   Twice. One at the Naval Postgraduate School and once at National Intelligence University.

Q   Great. (Indiscernible - audio disruption) of arts, respectively?

Page 20

A   Yes.

Q   So on the second page here, around 2010, it says you worked for a NATO-led International Security Assistance Force; is that correct?

A   Correct.

Q   Was that part of your time in the Navy?

A   Yes.

Q   Okay. And you left that position in 2011?

A   Correct.

Q   Program manager in Fleet Operations in the Naval Criminal Investigative Service; is that correct?

A   Yes.

Q   From about 2011 to 2013?

A   Correct. Or yes.

Q   Correct is good too. And after that, a program manager in the Joint Collections Unit at the Defense Intelligence Agency?

A   Yes.

Q   Great. And after that, the Brooke Center for Maritime Engagement in the Office of Naval Intelligence?

A   Correct.

Q   And what positions did you hold at the Brooke Center?

A   I stood the command up and became the commanding officer.

Page 21

Q   And then in about 2019 to 2020, is it correct that you served as the Chief of Staff at the National Geospatial-Intelligence Agency?

A   Yes.

Q   And from about October 2021 to Jan -- October 2020 to January '21, you were a senior advisor at the U.S. Department of Homeland Security?

A   Correct.

Q   And this was during the first Trump --

A   First Trump administration, yes.

Q   And you came in as a political appointee?

A   Correct.

Q   And what did you do after that?

A   I ended up at basic, which ended up as a government contractor which -- working for the Director of Navy Intelligence, running a team of cybersecurity people.

Q   And after that, you worked at the United States Agency for International Development?

A   Correct.

Q   And what do you do now?

A   Stay-at-home dad.  Best job I've had to date.

Q   So I'm going to introduce Exhibit 2.

(Exhibit 2 marked for identification.)

BY MS. RUBIN:

Page 22

Q   This is just a blank calendar so that you can use it as a reference for the dates.

A   Thank you.

Q   That's just to keep throughout the deposition as a reference in case it's helpful.

So now I'm going to jump into a bit of the substance here.  You served as the chief of state at USAID; is that correct?

A   Chief of Staff.

Q   Sorry.  Chief of Staff.  And what time period was that?

A   We were sworn in on the 20th of January, and I submitted my resignation letter to the State Department the evening of the 31st.

Q   And what were your responsibilities as Chief of Staff?

A   Well, it was a brief period of time.  So it -- the first week was -- the duties of the Chief of Staff is essentially to run the operations of the organization on behalf of the deputy and/or the deputies, as AID was originally -- or whatever title that they, you know, changed to, but the Number 1, and then they had two deputies, and then the Chief of Staff.

Q   And is Chief of Staff the only role you served?

Page 23

THE PROCEEDINGS OFFICER:  I apologize.

MS. RUBIN:  Oh.  Sorry.

THE PROCEEDINGS OFFICER:  Counsel Rubin?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  I'm so sorry.  But there does seem to be a little glitch in the audio.  May I suggest that we go off the record to rectify it?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  Thank you.

Hearing no objection, I'll pause the record at 9:24 a.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER:  We're back on the record at 9:25 a.m., Eastern Time.

Proceed.

BY MS. RUBIN:

Q   Is Chief of Staff the only position that you held at USAID?

A   Yes.

Q   Tell me a bit about the hiring process for the role?

A   It was an interview with the White House Personnel Office.  I -- I don't remember if it was one or two phone calls, Zoom interviews.  It was you submit your resume to the PPO, and then they decide if they're

Page 24

going to screen you.

I don't remember whether it was one call and then the interview, or if it was an interview and then a call.  But it was one or two calls, and then I got the notification that I had been selected and offered that job, which I accepted.

Q   So when did you interview, around?

A   I do not recall the exact date.  It was likely somewhere at the end of December.

Q   And when were you --

A   And -- yeah.  End of December, maybe the beginning of January.  I don't remember if it was right after the holidays or in the holidays or right afterwards, but it was in that time frame.  It was a very compressed time frame of when it all percolated to execute.

Q   And when were you offered the position?

A   I don't remember the date.  It was sometime in -- sometime in January, from what I remember.

Q   Can you tell me why USAID?  Did you submit for that position, or was that suggested by somebody else?

A   Yeah.  It was suggested by PPO.  And I don't remember the -- I believe there was two people on the line.  I don't know if there was anyone, you know, being -- that was also on the line.  I know there's two people

Page 25

on the screen that I was looking at, and that was one of the things that came up, which was very similar to the last appointment, which is, you know, I'm willing to take and serve, which was kind of my opening salvo to -- to that PPO team.

And then in the dialogue came out AID as a potential option. And so I did some research on AID and had been aware of AID and AID's mission, but what the -- what the White House was proposing or what I was looking to -- what I was told to be due to come into was something that I was interested in doing.

Q    So what were you told about the role?

A    It would be the Chief of Staff, and it would be to relook at the USAID mission across the full spectrum. So whether it was location, personnel, contract-to-government workload or population, overall funding, et cetera, with the intent of making sure that we are maximizing, you know, under the current administration "America First" campaign slogan or intention.

Q    And what were your expectations for the role? I guess, how were you imagining your time?

A    Busy. It's a Chief of Staff role. But I was excited about it. I mean, it seemed -- it was a great opportunity. I mean, anytime you can, you know, lead an

Page 26

organization that has impact mission for the U.S. government is worthwhile in my opinion. I spent a career doing it, so -- so I was excited for it.

Q    And did your experience match those expectations?

A    What do you mean?

Q    I guess I mean, did you -- when you left your position, did you feel that it was as described to you when you were initially told about it?

A    I left the position because I did not feel that it was going to be the right fit for me moving forward with the implied objective that I had when I took the position to what was unfolding or how things were unfolding as the administration -- as the administration transitioned.

Q    And what was that implied objective?

A    I think there -- it was a lot of movement to change things quickly, which always causes pause for me, again, given, you know, the bureaucracy that we work within. It was a new area for me. I'm -- I'm an intelligence officer, so I know intelligence law. I've had lawyers that were intel lawyers. And so then I had a new team of people and it was AID.

And though management and leadership is very similar, learning the mission of AID and what that

Page 27

actually entailed and digging into it was -- you know, was what I was starting to do as I went in, to then look at how to re-scope the organization and decide what should happen with AID.

Q    And what did you feel conflicted with that implied objective?

MR. WEN: Objection. Argumentative.

BY MS. RUBIN:

Q    Did anything feel like it conflicted with that implied objective?

A    Can you say it again?

Q    Did anything conflict with what you felt was that implied objective?

A    I think the objective was the same while I was there. What I didn't feel comfortable with was the means, speed, and level of staffing, which in this case it was a level of non-staffing, which primarily goes back to speed that I did not feel comfortable as the -- you had -- you had Jason Gray, who was the administrator. They go by administrator, not director. Sorry. And then you had Ken Jackson, who was the senior political, who was in a special advisory role, and then there was me.

And so I was the senior political on the ground, and -- which ultimately anything through the

Page 28

organization should come up through the Chief of Staff. Like, that's how a proper functional organization works.

Anytime you have a transition, there tends to be a lot of chaos and a lot of churn. And so that's very normal. But the pace of how things were turning over was so fast and so quick that I did not feel like I had firm ground to stand on to make decisions that were starting to percolate up, and -- but the pressure to make decisions and to execute things was increasing. And that was something that I felt would have put myself at jeopardy. And quite frankly, it's -- it wasn't worth my effort. It wasn't worth my time.

Q    It's a little -- we'll get back to that in a bit. I'm going to step back and just clarify for the record. You were Chief of Staff to Jason Gray. That's correct?

A    Correct.

Q    Who served as the acting administrator for the --

A    Correct.

Q    -- time period you were Chief of Staff?

A    Yes.

Q    And what was your chain of command?

A    It was a bifurcated one because the White House said we're putting Ken there as a special advisor

Page 29

and he will be the senior -- essentially PPO designee, and then Jason's the acting. And so when I got on the ground and we had -- the three of us had our first meeting, it -- I think it might have been a self-proclaimed chain of command where I said, I see my role as serving the current administration. That's the -- the -- I'm not pointing to you, by the way. I talk with my hands. Drives my wife crazy.

The administration-administering roles, that's the purpose of politicals, is to work quickly through that, which is why I did take the appointment. And then the other side is the standard bureaucracy chain of command, which Jason was running as the acting.

And so I said, Both of you, as far as I'm concerned, are who I am serving and working towards, and I will be fully transparent to both of you on all those things and all those efforts. So my chain of command, as I saw it, was both to Ken and to Jason.

Q    Just to clarify, you said that Ken Jackson was a PPO. Can you just state for the record what that means?

A    The White House person -- that's Personnel Placement Office, I think is what it stands for. So he was also a political appointee, so.

Q    Got it. And was Elon Musk in that chain of

Page 30

command?

A    No. Not in my chain, no. As far as I was concerned.

Q    Was there any -- did you feel that he was having any indirect influence on your chain of command?

MR. WEN: Objection. Argumentative and foundation.

BY MS. RUBIN:

Q    You can answer.

A    Okay. State it again.

Q    So, informally, did you feel that Elon Musk had any indirect influence on your chain of command?

A    Not -- that's -- I don't know because I can't state what Jason or Ken signed in that time period that they felt compelled to do anything. I did not feel compelled to do anything. I never had contact with Elon, so I don't -- I didn't have any phone call or email or anything with him.

The team which is now represented as DOGE, or the team that came in to assist that second week, so they came in on the 27th, was a team comprised of people that -- and I don't know whether it was -- it was definitely -- it was when -- when the team came in, it was proposed that they were a U.S. government entity to look at efficiencies. In my head that goes to what was

Page 31

being reported as DOGE.

And so I don't -- I don't know the answer to whether or not that formulated how those decisions were made, but there was definitely, in my opinion, a push from the DOGE entity which, you know, according to the White House and according to the press was -- you know, Musk was involved in.

Q    Yeah. So that was -- so in your impression of it, did you perceive Musk as involved in anything related to that DOGE team?

A    There was -- there was one phone call that we took, and I don't remember whether it was at the beginning of that week, which would have been -- what is it the 27th or 28th? I think it might have been the 30th.

One of the first -- the person that was the lead for the team, and I'll just call it the "Efficiency team" because they didn't come in with, like, DOGE nameplates or DOGE letterhead, so I'll call it the "Efficiency team" because that's the way it was -- it was first spoken about.

And I don't remember the gentleman's last name, I'd have to Google. But his first name was Steve, and he was the -- he was the individual that helped Musk refocus Twitter or redo for Twitter or break Twitter

Page 32

down or however it was.

While in a meeting, he took a phone call, and he had got off that phone call. Steve was pretty agitated, and it was based on, from what it sounded like, a one-way conversation. I did not hear the conversation, didn't hear oversight of the conversation, but Steve's comment was, you know, that it was Elon that he had just spoken to, and the answer --

MR. WEN: Objection.

Sorry. I'm just making a protective invocation of the presidential communications privilege, you know, because I've not spoken to this witness and I have no -- I do not know what he's going to say.

I just think we should, you know, ask further questions to develop context. But any questions regarding substance about what was communicated by -- you know, by senior advisors of the White House, such as Elon Musk, I would ask that you -- you do not answer questions regarding -- regarding substance of those communications.

THE WITNESS: Okay.

MS. RUBIN: Okay. I will come back to that. Will you just restate the objection at that time? I'm just going to come back to that later.

MR. WEN: Yes, that's fair.

Page 33

MS. RUBIN: And I'll ask those questions later. Just want to cover some -- some more basics first.

BY MS. RUBIN:

Q   Yeah. So when you mentioned Steve, is that Steve Davis?

A   Yeah, that's it. Correct.

Q   So I want to talk a little bit about your first week. So, again, just stepping back a little bit. So what was your first day working at USAID?

A   We were sworn in. So I think that was the extent of it, was niceties, meeting seniors. I don't think we did anything. Got our computers -- you know, phones, computers. I think they might even gave us our badges then or something. It was an admin day and a swearing-in. We didn't swear in until after the President swears in, of course. So, you know, that happens -- that was around noon, or whatever it was. 11:30, something like that.

Q   And that's on January 20th?

A   Correct.

Q   And how did you feel about the job that first week?

A   Oh. It was good. Yeah. I was excited for it, yeah.

Page 34

Q   You worked well with other political appointees?

A   Yeah. We had a small team, but it was about six or seven of us, and we seemed to immediately start to gel and get along. Jason Gray and Ken Jackson, my deputy Joel, were the four of us, I -- I would say, were pretty lockstep on how to -- how to run an organization or how to do leadership.

I think each of us had different strengths and weaknesses, and we spent that week kind of pulling that stuff out, like, What are you -- what are you good at? What are you good at? And kind of getting to know each other as you're, you know, essentially stepping into the breach of running an organization for, you know, however long.

Q   And you said about six to seven. So you mentioned Jason Gray, Ken Jackson, Joel. Is that Borkert?

A   Yeah.

Q   Yourself. And then who would you say were the other two to three people?

A   Well, I just realized -- Tim was his name because it's on the sheet here and it reminded me. I'm like, who is that guy?

Q   In the suggested to --

Page 35

A   Yeah. Meisburger -- or Meisburger. I'm not sure how to pronounce --

Q   I'm looking at Exhibit 1.

A   -- how to pronounce his name. There was -- our press person was Larkin Jones (phonetic). Adam, and his name ends with -- begins with a K. I think it's a Polish name, and it's a lot --

Q   Korzeniewski? Does that sound right?

A   Yeah, probably. He -- he was the White House liaison, and he had just joined the team, I think, that second week, like, maybe that Monday or Tuesday. And there might have been one or -- there might have been -- there was definitely another gentleman, but I don't remember his name. I think that was the original team that we started with.

And Jason wasn't political, though. He was -- I guess he was appointed as acting, but it wasn't through the standard. He was a careerist that was then filling the role on behalf of the White House. The other ones were straight political appointees.

Q   Got it. So if I use the term "DOGE," do you know what I'm referring to?

A   I know what I think of when I think of DOGE, which is the team that the White House put together under -- under Elon Musk to look at efficiencies across

Page 36

the government.

Q   And you said you referred to that as the "Efficiency team" at the time?

A   Yeah. Excuse me. When it was -- when it was first proposed that there was going to be a team coming, you know, to help assess what AID is doing and to help look at contracts and real estate footprint and things like that, it was essentially a -- an Efficiency team, right? It was not labeled as "This is DOGE."

And it was representatives of -- like, they had a couple general counselors from, like, OPM Clay -- and I would have to look at my phone for his last name. He was one. Jeremy was one. Obviously, Steve. There's a gentleman named Tarak, there was a gentleman named Gavin, Luke, and there might have been a few other ones.

Matter of fact, I know there were a few other on that either first or second day that was talking to the staff, not necessarily to -- that I first met in the first time.

Does that answer the question? I kind of --

Q   Yes.

A   -- snaked my way through that, but.

Q   All good. I'm just going to clarify some last names just to be sure we're on the same page. So when you say Gavin, is that Gavin Kliger? Does that sound

Page 37

right?

A   It sounds right, but it -- I don't -- I don't know.

Q   So I'll just roll off some of the names and you can just tell me if it sounds about right.

Luke Farritor?

A   Yeah, that sounds right.

Q   Jeremy Lewin?

A   Yes.

Q   Tarak Makecha, I believe?

A   Yes.

Q   And you mentioned Clay.  Clayton Cromer?

A   Yes.  Yeah, that's it.

Q   When was the first time you interacted with someone who you perceived as affiliated with DOGE at USAID?

A   I think it was in the -- the call on either that Saturday or Sunday, which would have been the 24th or 25th.  I believe Steve and Tarak were on the call, which essentially was a, Hey, you know, we're going to be meeting with you guys on Monday.

It was just more or less of a, you know, we have a small team that's coming in representing different departments and they have different expertise and it's a smattering of people that will be coming -- a

Page 38

small team, and we'll meet on Monday morning.  And then I met the people on Monday morning.

Q   And that's Monday the 27th?

A   Correct.  Monday the 27th.  I don't remember whether that -- it was like a Zoom.  I don't remember if it was on the 25th or 26th.

Q   So you mentioned the Efficiency team.  I will try to call them the "Efficiency team."  I may refer to those same people as the "DOGE team."

Will you understand what I mean if I say the "DOGE team"?

A   Yes.

Q   And when you spoke to Mr. Davis and Mr. Makecha on -- over the weekend, how did they --

A   Could you -- if I could ask, could you use their first names in there?

Q   Yes.

A   Because I'm going to remember the first names, not necessarily the last.

Q   Honestly, easier for me.  So when you spoke with Steve and Tarak over the weekend before the 27th, how did they describe what the team would be doing?

A   The best I can recall, it was more -- it was, they were going to bring a team of people in to take a look at computers and systems and contracts and help

Page 39

identify areas that would speed up the process of what we were looking to do, which is, you know, reshape or refocus AID -- AID's mission -- I mean, the entirety of -- of AID.

And it was -- so it was kind of the -- to help us prime the pump.  We -- we definitely had a small political team for a drop-in team.  I -- I don't think we had anybody work the profile prior to that was on the ground on the team.  Maybe the two gentlemen, they were brought in, Tim -- and I forget the other guy's name. And so it was put forth as like, Yeah.  We're going to help you with -- with pulling that information and presenting with you with -- with data.

Q   Did anyone mention at that point, so the weekend before the 27th, any idea of shutting down USAID?

A   I think it was a conversation -- I definitely had that conversation with the PPO folks along the lines of when you look at an organization and organization mission, the way I've done it before and what I was, you know, being told, I was being hired to do, was you look at -- if -- if you have a bell curve on any bureaucracy, there's generally a percentage, and I'll just say 10 percent, that everyone would agree, you know, you tell your mom who doesn't work in the government what's going

Page 40

on and they would say, like, I don't want my money going there.  It's not -- it's not good.  And -- and I think every organization has that.

And then you have, you know, the -- conversely, the -- the 10 percent or 15 percent that I think everybody universally agrees is in alignment with American values and what we're doing and why we should be doing things.

And then you get to a squishy part in the middle, and that's where your decision-making starts happening, where you have to look at programs, you have to look at return on investment, you have to look at -- at all those different aspects.  So -- can you repeat your question again on that?

Q   Yes.

A   Because I kind of lost myself on that train of thought.

Q   That's okay.  It's always helpful to kind of talk through the background of it.

So did anyone mention to you the idea --

A   Oh.  Yeah.  The breaking down of AID?

Q   Yes.

A   I know I had brought it up in the -- in -- in the -- in the meeting of, you know, you have to look at the missions.  Like, for example, if you're going to do

Page 41

something in Africa, maybe AFRICOM is a better entity to do it because it's -- it's generally more of a hostile environment depending on what country it is.

Or you might look at State Department taking over certain aspects of a mission, and I don't remember what bureau, but you know, the humanitarian bureau at State Department. Or you might look at TRANSCOM if you're talking about, you know, moving shipments of goods and things like that, which AID does a lot of.

And so, ultimately, across the entirety of the U.S. government, there may be mission sets that are better nestled somewhere else which could, at the end of that evolution of looking at the middle of that bell curve, end up with a very small organization which might not be best poised to be on its own, and it might be nestled under State Department, under Department of Defense, or anything like that.

And what I had said in the interview was the government steward should be agnostic to where it is and what it's doing if it's doing the mission that the executive branch is -- is focused on completing.

So to answer the question of that, I know I brought that up, and so there was conversation about that. I don't know if it was brought up to me specifically. But I know that was part of my interview

Page 42

process because I actually said, like, Yeah. You could also -- you could go to the full end of the spectrum. You can keep everything as is or go to the full end of the spectrum which is completely take apart and -- and refigure out. And there's a continuation in between all those options.

Q  So when you were contemplating the idea of kind of, I'm just going to say, breaking down into parts or breaking down USAID, how did you envision that going?

And, actually, let me clarify. How much time did you envision it would take to reformulate, break down or --

A  A year.

Q  -- analyze the programs? About a year?

A  A year with -- with considerable effort. Maybe eight months. I think that somewhere in that -- I don't remember if it was the end of the first week or the beginning of the second week, but it was -- well, it was early because it was only two weeks, so it was early on anyways.

Joel and I actually sat down and we were talking, I think, you know, I -- I -- we were talking about how quick can we really do something and how fast can you implement change and understand the organization.

Page 43

And whether Joel offered it or someone else in the room, and I don't remember who was in the room, but we were more or less verbally proposing to ourselves, like, We could probably do this by the end of the year. We could probably do this by, you know, the holiday break when everything stops for essentially two months.

Which at the time, I -- I agreed. I said, Yeah. We -- we can do it. That's a big lift for a 15,000-person global organization. Like, it's a huge lift to -- to step through all those hurdles.

But it was very clear the White House was keen on us moving fast. And so that -- we were trying to position -- we, the small team of politicals there, were trying to figure out how could we get a 15,000-person organization to -- to turn enough where we can then start making those decisions.

So, yeah. We weren't -- if you had asked me before that week, you know, turning an organization you know, years, couple years, three years. You know, unless you had some sort of intervention where there was, you know, essentially top cover. And I'm going back to my DoD days. When you want to implement change, you have to not only get your team to do it, you get your leadership team to do it and implement it, but then you also have to get your bosses and everyone else. And

Page 44

if that's all in alignment, then the bureaucracy can run pretty smoothly and quicker.

But anywhere in there, you could have, you know, antibodies that slow the system down and things like that. And for -- in this case, it was very clear the White House, with, you know, the ultimate mission maker, was saying, Move -- move quicker.

So -- but if you'd asked me beforehand, I probably would have said, Probably a couple years. After a week in the job, probably a year.

MR. WEN: Hey, Nikki, can we take a quick break?

MS. RUBIN: Yes.

THE PROCEEDINGS OFFICER: Would you like me to take us off the record?

MS. RUBIN: Yes.

THE PROCEEDINGS OFFICER: Hearing no objection, I'll pause the record at 9:49 a.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER: We're back on the record at 9:53 a.m., Eastern Time.

Proceed.

MR. LYNCH: I just -- I came in.

Chris Lynch from the Department of

Page 45

Justice for defendants.

BY MS. RUBIN:

Q   Okay.  So -- just take a minute.

Mr. Hopson, what is your understanding of how DOGE was created?

A   I don't -- yeah.  I -- I don't know.  Outside of what was, like -- I -- I had -- I had -- I have no -- I have no factual information, just news and press articles.  I don't have any inside information, I'd say.

Q   I'd like to show you Exhibit 3.

(Exhibit 3 marked for identification.)

BY MS. RUBIN:

Q   Plaintiffs' Exhibit 3?

A   Yeah, the executive order.  So I am -- I am aware of the executive -- I've read this many times.

When I was answering the question that you just proposed, I was not thinking executive order.  I think I was thinking composition of the local team that was involved with what we were doing at AID.  But I am familiar with the executive order.

Q   All right.  So I'm just going to have to ask for the record, you do recognize this as Executive Order -- I don't think it says on the text here, so I'm just going to represent it as Executive Order 14158.

A   Yes.  If that is the DOGE establishing,

Page 46

implementing the President's Department of Government Efficiency.

Q   Yes.

A   Because I don't know the number.  But I am familiar with the piece of paper which is the presidential -- the presidential action, the executive order for establishing DOGE.

Q   So I'm just going to take a look at -- Section 1 says this -- I'm just going to read it for the record.

This executive order establishes the Department of Government Efficiency to implement the President's DOGE agenda by modernizing federal technology and software to maximize governmental efficiency and productivity.

Do you see that?

A   Yes.

Q   Great.  And then it -- in the Section 2 it defines "agency head" as the highest-ranking official of an agency, such as the secretary, administrator, chairman, or director, unless otherwise specified in this order.

Do you see that?

A   Mm-hmm.

Q   So who was the agency head, as defined here, of USAID between January 20 and January 27, --

Page 47

MR. WEN:  Objection.

BY MS. RUBIN:

Q   -- 2025?

MR. WEN:  Sorry.

Objection.  Calls for a legal conclusion.

But you may answer.

BY MS. RUBIN:

Q   Who did you understand the agency head to be of USAID during the time?

A   The administrator -- acting administrator, Jason Gray.

Q   And Section 3(c) is entitled "DOGE Teams." And so it states, In consultation with USDS, which I believe is defined earlier as the United States Digital Service renamed as the United States DOGE Service --

MR. WEN:  Objection.  Foundation.

BY MS. RUBIN:

Q   I'm just going to read the executive order.

In consultation with USDS, each agency head shall establish within their respective agencies a DOGE team of at least four employees, which may include special government employees, hired or assigned within 30 days of the date of this order.

Agency heads shall select the DOGE team members in consultation with the USDS administrator.

Page 48

And then I'm just skipping a sentence.

Agency heads shall ensure that the DOGE team leads coordinate their work with USDS and advise their respective agency heads on implementing the President's DOGE agenda.

As the -- and I'm going to say -- I'm going to refer to Administrator Gray as the agency head, which you had just stated.  As the agency head of USAID, did Acting Administrator Gray establish a DOGE team within USAID, to your knowledge?

MR. WEN:  Objection.  Argumentative.

But you may answer.

THE WITNESS:  No.  We -- we did not establish a -- as far as I know, I was not waiting or aware of any establishment of a DOGE team by USAID -- by the administrator.

BY MS. RUBIN:

Q   But there was a DOGE team at USAID; is that correct?

A   Correct.  And -- so similar to what I was saying about the amount of political appointees that we had to do this lift, I was -- my complaint to the -- as a Chief of Staff to the White House PPO liaison at State Department, her name was Kate (phonetic), I don't remember the rest of her name, but she was essentially,

**Remote Legal Court Reporting**
**646.461.3400   info@remotelegal.com**

Page 49

which is, from what I understand, pretty normal where you have certain key White House personnel people covering multiple organizations until you fully staffed up your politicals, which could take -- you know, could take a long -- could take years, depending on the administration, to staff everyone up.

So we had a small team at AID. AID's a small organization. And that was the -- maybe my assumption was that the team that was coming to us was going to help, as I said before, jump start. They were never appointed. During the conversations during that second week I did ask some of those members that were there on behalf of the team, the Efficiency team, whether they wanted to come over and be detailed to AID, because they were detailed to, like, OPM, Treasury.

There was a couple other organizations that they're -- that, like, their CAC card was valid to, because that was one of the things I was concerned before bringing anyone into a government organization, even though the executive order says to fully support, was making sure that they just weren't somebody walking in off the street.

So they all were affiliated with different government organizations. A couple I just named were just a few that I -- I remember. But I looked at that

Page 50

team, because they had engineers, they had a leader, as, like, our jump start DOGE team, but that we would have eventually transitioned to our own DOGE team. So that is the way I was tracking how we would move things. But the -- the short answer is I do not know of any DOGE-appointed team by Jason Gray.

Q   Can you clarify what you mean by "they were not politically appointed"? Sorry. Let me restate that.

You testified about a minute ago that the DOGE team were never appointed. Can you clarify what you mean?

A   They were not appointed by USAID as the USAID DOGE team, to my knowledge. Whether or not their hiring process through OPM, Treasury, pick a place, I have no idea how they were hired into those organizations. That I don't know.

In -- in the sense of a White House PPO political appointee, one of the 3,000 or 3,500 political appointees that can come in with each administration, I don't -- I don't know. I don't have any concrete knowledge to know how they -- how they arrived at their jobs.

Q   So to clarify, did Acting Administrator Jason Gray select the DOGE team members at USAID?

Page 51

A   As far as I know, he did not.

Q   And if he had established or selected the DOGE team at USAID, is that something that you think that you would have been involved in as Chief of Staff?

A   Yes. I would have assumed that I would have been involved in any selection or designation of a -- a formal USAID team.

Q   Do you know who the USDS administrator was as of January 20th?

A   No. I can't for say -- for certain say who it was.

Q   Do you know who the USAID -- sorry.

Do you know who the USDS administrator was as of January 27th?

A   No.

Q   To your knowledge, did Acting Administrator Gray consult with the USDS administrator about a DOGE team at any point while you served as his Chief of Staff?

A   Not to my knowledge.

Q   So we spoke about this a bit, but when did you first learn that DOGE or the Efficiency team would have a presence at USAID?

A   It was at -- the 25th or the 26th when I took that phone call, which -- which I think had Tarak and

Page 52

Steve on the line.

Q   That's Steve Davis and Tarak Makecha?

A   Correct. It was one of those two days. It was a pretty brief phone call. Or Zoom call or FaceTime. I don't remember what the medium was.

Q   And I believe you spoke about this a little bit, but what did they tell you about this group, you know, why they were coming in or their purpose?

A   I think it was to help look at different ways of being efficient and to bring some -- you know, some folks in. I don't know if they said software engineer like the executive order states here. But in layman's speak, it was more or less of a team to come in and help triage the amount of data that needs to be processed.

Q   And under what authority was -- sorry.

Which entity was bringing in this team? So, I guess, that's to say, bringing into USAID. Who -- from which organization did they -- sorry. Let me restart over that.

Under what authority was this efficiency group -- Efficiency team placed at USAID?

MR. WEN: Objection. Calls for a legal conclusion.

But you may answer.

THE WITNESS: I don't know.

Page 53

BY MS. RUBIN:

Q   Did Steve Davis or Tarak Makecha explain the scope of the Efficiency team's role at USAID?

A   Not to my knowledge.

Q   And what was your initial reaction to the news that a -- an Efficiency team would be coming into USAID?

A   It was the first time I've seen something like that happen, you know, in my career. So it was a little bit of curiosity. It was a little bit of wonderment, if that's the right word, of, like, -- because I've never -- I never saw something like that with that much pressure.

And, again, I think in my head I was going to the assumption of like, This is the DOGE team. Whether they came out and said, We're DOGE, they -- they didn't have name tags, there was no ID cards, et cetera. In my head I was thinking, Yeah. This -- this -- this tracks, right? You would have a team come in with these, you know, folks that have unique skill sets that can help with triaging the -- the data and such.

Q   And what do you mean when you say "that much pressure"?

A   What do you mean by "pressure"? Like, what -- can you use the -- because I don't know what I just said to you with respect to that sentence. So I'll need

Page 54

clarification on --

Q   Yes. You had testified that you had -- there was a sense of wonderment because you had never seen something like that with that much pressure?

A   Oh. Just meaning that a small organization like that had that much attention from an administration that just took over. So I -- I did not expect that AID would be such a massive focus as a launchpad for the administration. Just did not see that coming. So that's what I mean by pressure. The amount of data calls that we had to put out within that first week

And it was on a smattering of different topics. DEI clearly was one of them that the administration was very eager, you know, to -- to figure out or to -- you know, how they -- how they were going to address DEI, DEI initiatives and what that all meant. So there was just a lot of driven data coming from the new administration. It was a voracious appetite.

So that's what I mean by the pressure of, like, We need to move faster, quicker. Which is not uncommon with -- I mean, I had worked with the administration before but I was just a little surprised for USAID to have that much scrutiny or that much focus.

Q   You said there were a few data calls. Can you just explain what you mean by that?

Page 55

A   Like, OPM would say, How many people do you have working in DEI shop? Or whatever the shop was called, right? But it was under the moniker of DEI. You know, different aspects of the government change their offices to different things. But it was DEI-ish. What do you have that's DEI-ish? Like, that was one data call. Movements of, you know, people within the organization.

So there was just a lot of -- and I don't remember, like, all of them. You know, looking at like politicals, if -- were there political holdovers and stuff like that? Some of them are by -- you know, allowed, some of them have to be granted again. And I've never saw it, but from what I was told, sometimes people just, like, don't leave their organization. So like, that was a data call because that sparked a conversation of how do you just squat, like, a government senior and just not leave? But apparently it's happened.

But yeah. There -- there was a constant -- and the -- and the timelines on some of the stuff. There was a lot of contract data calls. How much money do we have going to this? How much money do you have going to -- to that? Where is this, you know, money going to? One of the things that blew up, like, the

Page 56

whole, you know, $50 million of condoms going to Gaza. It's just a headline that was in the news that I think a lot of people remember that headline.

But it was those types of things, like, What are the shipments for? What are we giving money for? And there were some things of we don't want money going towards certain programs that are, you know, not supportive of the American First agenda.

And Joel pulled a lot of that. But we had to bring somebody up to the front office just to help with collecting data calls and then -- and then sending them back to OPM at the time was probably one of the most staffed, I think, organizations from pulling in data calls. And so a lot of stuff that had to go to -- to, like, OPM.

Q   So backtracking just a little bit, what position did Steve Davis hold in the government around the time that he called you? So let's say the 25th or the 26th of January.

A   I don't know.

Q   Did you know at the time?

A   What do you mean?

Q   So when --

A   I didn't know when he -- like, when I met him on the Zoom call. And once he was there, my assumption

Page 57

was he was part of the Efficiency team, regardless of what the name was.

Q    And what about Tarak Makecha?  Did you know what position he --

A    He was at State Department.  And from -- you know, he was a data guy.  So I think he was similarly doing -- I know one project he did.  He highlighted to us that we had a bunch of commercial -- us, USAID, a bunch of commercial leases for spaces that were at, like, an extremely low occupancy rate, which, again, that was part of the administration's drive is to bring people back to the workforce, maximize your footprint, et cetera.

And I think AID had a lot of real estate that was being -- and had been developed, because bureaucracies project forward, and then it was never filled.  And so, Tarak, he ended up finding, like, a contract.  He's like, This contract could be canceled within 45 days, which was for a commercial building.  I'm like, Wow.  That's a pretty bad contract on the commercial side.

So I was taken back by that.  And then the lawyers looked at it and they're like, Yeah.  We could cancel that contract.  We looked at -- this is just an example.  We looked at facilities and they're like,

Page 58

Yeah.  We probably could -- even if we brought everybody back tomorrow, because that was another thing that we were working on doing is, you know, by summer, get everybody back into some sort of concrete building.

The organization in a very fast time, because they wanted -- the decision was to be made quickly of whether the contract was going to be terminated.  And, ultimately, I think it was either Ken or Jason signed it and they did terminate the contract.  Tarak was part of that.  And he did it by through -- like, going through, like, the contracts, looking at whatever script he ran against the thing.  But it was very clear and it was verified, like, Yeah.  That contract could be canceled and it is being underutilized at this point in time.

Q    So what role did you understand Steve Davis to have with respect to that Efficiency team or DOGE team?

A    He was definitely in the -- in my opinion, was in the leadership role.  He was deferred to as the person that was in charge by all the -- all the folks that came in.  And he was the one that, you know, led the -- led the discussion or drove the agenda of those meetings.

Q    So when you say, "he was the person in charge of all the folks that came in," would you consider Jeremy Lewin to be one of those folks?

Page 59

A    Yeah.  Jeremy was a bit of -- so Jeremy and Clay were kind of some outliers that showed up.  They weren't -- I don't remember if Jeremy was on the original team or not, but they were involved in the conversation from day one.

I think Jeremy was in the meeting.  Clay probably was too.  But I think Jeremy more than -- I think I looked at Jeremy as essentially having the DOGE portfolio for AID.  I don't remember where Jeremy was, whether he was, like, at State or Treasury or what have you.  I know Clay was OPM.

Q    Would you consider Luke Farritor to be one of the people that worked under Steve Davis?

A    He -- yeah.  He was a tech guy, and I would definitely say he was under Steve.  So to -- the thing with Jeremy, I think Jeremy was certainly deferential to Steve.  But I don't know whether Steve would have counted him as part of his team that he brought in.  But he was definitely -- I definitely viewed Jeremy as part of that interlocutor of us with DOGE.

Because at -- at one point in time, I told Jeremy I'd bring him on board as my one of our lawyers under AID to help suss out the what was being -- what could be proposed as we were going through looking at the different databases and canceling contracts and

Page 60

doing those types of things, like, from a legal perspective of before we sign these because that's -- that's something I needed.

I needed somebody that was legally under my authority to then legally advise me, whether they give good legal advice or not.  But, otherwise, it's just a person walking down the street telling me, You know, you can go ahead and do that.  And that was not comfortable for me.  I did not feel comfortable with that.

Q    Would you consider Gavin Kliger under -- in that team under Steve Davis?

A    I didn't really talk to -- yeah.  Gavin was -- he was another -- I put Gavin and Luke as the two tech people.  The reason, like, I knew Luke -- didn't know him.  I think I had maybe three words with him.  I think Gavin showed up, but then he went to, like, other buildings or another area.  But Luke was kind of at the headquarters.

Q    So at the time that you received that call from Steve Davis and Tarak Makecha telling you that a team would be coming in, what role did you understand Elon Musk to have with respect to the group that was coming in?

A    I didn't -- I didn't have -- oh.  Sorry.

MR. WEN:  No.

Page 61

Objection.  Sorry.  Just calls for a legal conclusion.

MS. RUBIN:  I can rephrase.

MR. WEN:  You don't have to.

MS. RUBIN:  Okay.

BY MS. RUBIN:

Q   So I'll just repeat the question.

As of the date that you got the phone call on January 25th or 26th, what role did you understand Elon Musk to have with respect to that group?

A   I didn't know any role.

Q   And sitting here today, what role do you understand Elon Musk to have had with that group?

A   My assumption is that he was leading the group based on what -- you know, again my duration was short.  I mentioned there was a phone call that Steve had self-proclaimed that it was Musk that he had been talking to, and then just the news and reporting that came out after -- you know, after the fact.  But I was out of government service at that point in time.

So at the first phone call, I don't know if I thought anything of it.  As the week progressed, I would say, Well, if he's the person -- he, Musk, is the person in charge of DOGE, then he is likely involved in the conversations happening.

Page 62

And then the only data point that I had in my time there was that one phone call that, you know, Steve had said that -- you know, that he had been talking or he had just spoken to and hung up with -- with Musk.

But, otherwise, there was -- I didn't -- I didn't have any -- I don't have anything I could say, Yes, this is blank, or he was directly involved, or he was directly on that.  It's my -- my assessment -- or my assumption.

Q   Is it -- and just let me know if I'm -- I'm mischaracterizing it in any way.  But is it correct, as you testified, that you thought at the time that the team was coming in, the DOGE team, would be to help move contract reviews more efficiently?

Is that how you described it?

A   Yeah.  I think -- I think it was the entirety of the -- you know, the mission.  And so I think when it was proposed, I don't -- I mean, I've never seen that.  So I didn't really have, like, what was my thought?  Like, I don't know.  I didn't know what it was -- I didn't know what was actually going to come out of that.

The example I gave of Tarak -- and I know that there were other -- some examples of where they were able to quickly look at data that would take just a long time to percolate up through an organization.  So I was

Page 63

excited about, Oh.  Good.  We'll have some people that can drive data analysis to help us make decisions quicker.

Q   And sitting here today, why do you think the DOGE team was brought into USAID?

MR. WEN:  Objection.  Calls for speculation.

BY MS. RUBIN:

Q   Just from your personal perspective.

A   Yeah.  I think it was just -- well, at the time or in hindsight?  Because --

Q   In hindsight.

A   In hindsight, I think it was the test case for the administration to really press what can be done with organizational change.  It was one of the reasons I left because it -- it was, in my opinion -- it was unprecedented how quick things were moving and how fast they were moving, which made me extremely uncomfortable being a person that was essentially in the senior leadership billet.  And -- so, yeah.

Q   All right.  You stated earlier that you had a meeting with the DOGE team on January 27th; is that correct?

A   Yes, Monday.

Q   Do you know around what time?

Page 64

A   9:00.  Morning meeting.

Q   Who was at this first meeting?

A   It was, I think, the members that we kind of spoke about.  You know, Steve, Tarak, I think Luke was there.  I believe Gavin was there.  I don't remember whether Jeremy was there, whether Clay was there.  Jason was there.  I think I had all the politicals in there.  Pete -- I think Pete Marocco was there.  In fact, I know Pete Marocco was there from State Department.  And I don't know.  Jason was there.  I think that's -- that's kind of it.  So it was probably -- probably 15 people thereabouts.

Q   So during this initial period of contact, so January, you know, 25th to 27th, that first call and the first meeting, where did you understand Steve Davis to sit in USAID's chain of command?

MR. WEN:  Objection.  Calls for a legal conclusion.

THE WITNESS:  As far as I was --

BY MS. RUBIN:

Q   Go ahead.

A   Sorry.  I didn't mean to step on you.  As far as I was concerned, he was not in the chain of command.

Q   So was it your understanding that he could give orders to you directly?

Page 65

MR. WEN: Objection. Calls for a legal conclusion.

But you can answer.

THE WITNESS: The -- let me think how -- so I never saw Steve as someone in my chain of command because he wasn't, right? I worked for Ken Jackson, who was a political appointee under USAID, and I worked for Jason Gray. So Steve was an -- as far as I was concerned, as an advisor. And so until your senior -- you know, until -- you can either take the advice or you can leave that advice.

So I did not see him -- "chain of command" is a very specific word for me, being a DoD -- you know, a military officer. Those are all legally binding my words -- well, actually, I think that's UCMJ words, but those are legally binding things that you have to do as long as it's legal, moral, and ethical. And you can drop the last two, as long as it's a legal order. You can take and execute it. He was not in my chain of command. So I didn't -- I never viewed anybody from that team as my legal chain of command.

Now from a perspective of access to seniors who would be in my chain of command, which is the White House, right, then you have people that may not be in your immediate chain of command. The

Page 66

President's Chief of Staff. I just use that as a -- probably the ultimate example of somebody who is not the President, they can wield a lot of power, right? And so you don't need the President to call you, but the Chief of Staff calls you, you're probably going to take action based on that alone.

So it does -- and that's kind of why I hesitated a little bit. We knew Steve was coming in with top cover from what I would say was the White House based on this team. But I still did not see him as a direct chain-of-command participant for me.

BY MS. RUBIN:

Q   So when I use the phrase "chain of command," I'll be referring to, you know, the official chain of command. And if I mean, you know, indirect, I'll try to indicate that.

A   Yes. Okay.

Q   So as to the official chain of command, did you see Steve Davis as in Jason Gray's chain of command?

A   No.

Q   As a practical matter at the beginning of the week, did you feel, let's say, free to ignore the advice that you were being given by Steve Davis?

MR. WEN: Objection. Vague.

THE WITNESS: Can I --

Page 67

BY MS. RUBIN:

Q   If you understand the question, you can answer.

A   Yeah. State it again, please.

Q   As a practical matter -- you know, you stated that -- you testified that Steve Davis had a role as an advisor --

A   Yes.

Q   -- and you could take or --

A   Yes.

Q   -- leave advice. As a practical matter, did you feel free to, let's say, leave that advice or to ignore the advice or requests?

A   We certainly took the advice at the beginning of the week. As we were moving towards the end of the week, there was other advice that was given that I -- I did not take, and I advised Ken and Jason not to take that.

I think that -- and my assessment or how I felt was, if you have someone who is a senior advisor, and I'll go back to the White House Chief of Staff because that's more of a -- an analogy for this, not specific to the -- and I can answer more specifics if you need that for -- for both of you, but if -- if the - - if the White House Chief of Staff calls you and you're

Page 68

a senior in an organization and says, Do blank. If you don't do blank, you better make sure that you -- you are correct and your -- your -- your stuff is wired tight, because the amount of scrutiny can come extremely quick and extremely fast.

So I would say that I had a healthy -- skepticism's not the right word. A healthy respect for positional power with the -- not necessarily the juniors, but with -- with Steve and Tarak, because I saw them as kind of the senior people in that group. And I certainly was going to take notice to anything that they advised me to -- to do or to consider.

Q   And did this change at any point during that second week?

MR. WEN: Objection. Vague.

BY MS. RUBIN:

Q   Did your understanding of Steve Davis's, you know, role change at all during the week?

A   No. I think it stayed steady. I think that personally, you know, why I ended up leaving was the advice that I was getting -- or the recommendations were carried much more risk organizationally, and then professionally, personally to sign things out because I did not have an understanding -- I was not comfortable enough that what was being recommended -- I use that

Page 69

contract example.

First thing I did was turn to the -- the lawyer that did contract and said, Can we even do this? Right? Because I don't -- I don't know. There was a lot of, Can we even do this? Towards the end of the week of some of the things that Steve was proposing.

Q   When you're asking something like, Can we even do this? Who were you asking?

A   A lot -- well, it was the -- some of the AID lawyers that were there when we -- they -- and I don't remember how it came about, which was removing DEI offices, whether that came from OPM in a memo or what have you. That was the first call I, like, I made was I brought the lawyers in and said, Can you wholesale just relieve government workers that have no PIP in their file.

They have no -- you know, outside of they work in this specific office? And then I didn't know that, and the lawyer said, Yeah. You can actually -- you can do that. If you're wholesale removing mission set, you can wholesale remove those parts of the government.

And so -- but as the -- again, as the week progressed, there was -- that's a great example where it didn't feel right to me based on my experience. And then I brought in the people that were the experts in it

Page 70

and they said, Yeah, that's -- that's good. Same thing with that, like, contract with the building.

I've never seen government contracts where the government can get out of something that quick or that easy. I know the government ultimately can get out of anything, but generally that stuff does not happen. And the fact that the -- we, as the government, were moving forward to do those things was -- was interesting.

Q   Just to clarify for the record, when you were talking about terminating DEI positions, you said without a PIP in their file.

Could you state what a PIP is?

A   Oh. Performance Improvement Plan. I don't know if they use that at AID or what it's called, but it's when you have government -- PIP is government civilians that have poor performance, and you put them on a plan to basically get them better, right? It's a remediation plan. It's called a "PIP."

Q   Got it. And I know there's a lot of acronyms in government, so I'm just going to try to clarify those.

A   Yeah.

Q   Was Elon Musk at this first meeting with the DOGE team on January 27th?

A   No.

Page 71

Q   And what was the meeting about?

A   I think it was that they were going to -- it was them essentially saying, Hey, we're going to look to put some people on systems, look at contracts, look at how money was being moved through the organization.

So it was just a -- I think it was a -- I think it was an hour or two hours of, We're going to move forward. So we need to have people, designees. They had some other people that were going to do interviews, like, interviewing people. But specifics and details, I just -- I didn't -- excuse me. I didn't dig into.

Q   When you say, "interviewing people," do you mean like a job interview?

A   No, like USAID employees. Like, -- I think more of like, So who does contracts? And so if I meet you and you're like, Do you do contracts? And then you're like, No. I'm just in charge of the contracting officer. You really need to talk to Hugh (phonetic), because he's the one that's going to -- that type of thing.

It was trying to figure out, I think, to get their team up to speed or quick, because there was, like, organizations -- like, I remember we had to print some organization charts to give to them so they could

Page 72

figure out who in the zoo they wanted to take and talk to.

Q   Would you say it was mostly about information gathering, that first meeting?

A   My -- as far -- yes.

Q   And what was your perception about the members of the DOGE team? So the people we described as working under Steve Davis or affiliated with DOGE?

A   I think -- there was a couple -- like, there was a couple gentlemen that were there that were senior, as in they were older. And then it was -- so it was almost like -- and then they had, like, a bunch of young guys, like in their 20s, and that was like the Gavin and the Luke and stuff like that.

And so I remember thinking, like, at the table, I'm like, you got a ton of experience with, like, some graybeard. Like, one guy worked for -- he was, like, an investment banker or something.

And I don't know where he was, and I don't remember what his name is, and I don't know if I could pick him up in a lineup, but it was, like, JPMorgan. Like, he was, like, a senior -- because I remember asking someone, I'm like, Who is that guy?

And the answer someone gave me was like, Oh. He's, blank. Yeah. He was the VP at -- I think it was

JPMorgan. It was -- it was something that I was like, Well, that's a pretty big step down in pay if you're now working as a government employee. But, okay. So it was -- it was a unique thing.

And then Steve, unto himself, working for -- you know, having worked for Musk and Twitter. I mean, I didn't know Steve. I didn't know the story about Twitter. I don't have much social media presence. I have very little social media presence. But I got on and Googled, and I was like, Oh. Well, that's -- that's a unique character.

Q   And so you said on one side of the table there was a lot of experience. And how would you describe, I guess, that other side of the table?

A   Well, I don't think that --

Q   Not necessarily --

A   My -- my words -- like, they might have experience. They could have been on keyboards since they were 10 years old. And if they're 25, that's more experience than I have working, you know, coding and stuff like that.

So I don't mean experience as in a pejorative way in any -- so it was more of an age gap, right, between folks that were doing interviews and guys that were crunching computers. Not -- my assumption was they

were all competent when they walked in because, again, my assumption is it was being pushed through the White House, or at least winningly through the White House. Where in the White House? I don't know. It's going to be a amorphous the White House type of thing. So, yeah. So it wasn't an experience as in they weren't competent or that. It was just an age thing.

Q   What about government experience? Did you -- did you know any of these people to have government experience?

A   I don't think any of them had mentioned government experience, whether it's civilian or military, that I remember.

Q   And what impression did you get about the members of the DOGE team's understanding of the differences in -- in working in government versus in a private business?

A   I definitely did not --

MR. WEN:  Sorry.

THE WITNESS:  Sorry.

MR. WEN:  Objection. Vague, and calls for speculation.

But you can answer.

THE WITNESS:  In my opinion, they had not worked in a bureaucracy and were not familiar with

government rules and regulations and laws and -- and things.

BY MS. RUBIN:

Q   Do you have any example of that? Maybe just something to kind of illustrate this difference about working in government and private business?

A   Yeah. The gisting of things. I think I can give two examples. I probably could end up giving three. The one that -- there was initial -- there was a group of people that were put on leave. And when Steve came back, which I think was the meeting on the 30th, one of the first questions he asked was, Have these people been terminated? Or, Has terminated been initiated?

And my response was, No. Because what was proposed on the 27th was we were going to find some stuff. They -- they -- the amorphous -- the folks that came in from the Efficiency team had found, compiled a list. That list came to the -- to the head shed and of -- to -- with the ask to put them on administrative leave until more information could be pulled about how money was moved through the system and whether or not fraud had been committed.

There was a -- from what I remember, like, fraud was kind of -- that was, like, the words that

were, like, misuse of government funds or fraud or -- basically, not doing due diligence in how they were spending the government's money. Which, okay, we make -- that did not startle me at all.

We put them on leave. What did startle me, and it goes back to that question of competency or -- understanding of government, was, you know, to be -- to ask the Chief of Staff at the time, Have you terminated them? And I said, No. I haven't even started termination procedures, which Steve was not happy with.

And I put that back to Steve and said, You haven't provided anything that would legally allow me to terminate these government employees unless you are changing the rules of how we can terminate government employees, and I still haven't been provided that yet either. So I'm not going to take action on any of that until I am provided more information, because otherwise I don't know if I'm operating in a legal environment.

That was, like, one example where I was thinking, Wow. You really don't understand that. And then from that conversation it was, Well, how long does it take? I think someone said, you know, there was a lawyer in the room --

MR. WEN:  Sorry.

Objection.

Page 77

Just -- you know, just want to warn about, like, making -- talking about communications between attorneys and legal advice that you received from attorneys. So I want to assert a protective invocation of the attorney-client privilege, but.

THE WITNESS: Okay. Can I talk about what I was thinking, though, or what I was feeling on -- on that? I'm not -- I'm not trying to trick you. You guys are lawyers. I'm just trying to -- I don't want to --

MS. RUBIN: I understand.

THE WITNESS: I don't want to step on something and inadvertently be back in a room with you guys.

MR. WEN: So maybe it would be more helpful if we just take a break.

MS. RUBIN: We can take a quick break, yes.

THE PROCEEDINGS OFFICER: Hearing no objection, I'll pause the record at 10:30 a.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER: We're back on the record at 10:34 a.m., Eastern Time.

Proceed.

Page 78

BY MS. RUBIN:

Q   Okay. So talking about the Efficiency team or the DOGE team again -- and we had talked about this a little bit, but what, if anything, did you know or hear about their connection to Elon Musk?

A   The only connection that I can definitively state was Steve's comment. So the connection that I -- speculation on my part based on news media and stuff like that, maybe that week or after the week, that I -- I cannot say because it was a while ago, but certainly during the two weeks, the only thing that I could say that I was aware of at all was the Steve making a comment that he had just hung up the phone with -- with Elon Musk.

Q   Did you ever hear members of the DOGE team discussing Musk?

A   I don't know.

Q   So a group of about 57 or 58 USAID personnel were placed on administrative leave on January 27th; is that correct?

A   Yes.

Q   And I'm going to talk about them as 58, but please let me know if that is incorrect.

When did you first learn about this? About the fact that USAID would be placing about 58 people on

Page 79

administrative leave?

A   I think it was in an email or something, or maybe a phone call came in. I don't -- I don't remember who told me or how I found out.

Q   Did you find out on or before January 27th?

A   I think it was on the 27th. I don't think it was -- yeah. It was after they had been there. I think it was, like, a close-up at the end of the day. So I think it was the 27th.

Q   So the same day that they were --

A   That they showed, yeah. That they -- that the team showed up.

Q   Got it. So the same day the team showed up and -- the same day the team showed up, the 58 people were placed on administrative leave?

A   Yeah. If -- as far as I remember, that's what it is.

Q   And that's the same day --

A   The 27th.

Q   -- you found out that they would be placed on administrative leave?

A   Yeah. I think that's when they were placed on administrative leave. I don't -- unfortunately, I don't have any notes or any things on that, so.

Q   That's okay.

Page 80

A   It was definitely the beginning of the week, but I think it was the -- I think it was that Monday.

Q   Who told you that there would be a group placed on administrative leave that day?

A   I don't remember who told me at first. I don't remember whether it came in an email. I don't remember if there was, like, a quick meeting at the end of the day or touchpoint. I do remember emails coming in. I remember having conversations with Joel, who was my deputy. But I don't -- I don't remember, like, the first touchpoint of where it came in.

Q   Was it Acting Administrator Gray that told you that people would be placed on administrative leave?

A   Well, I think he was the ultimate -- the one that had the ultimate decision. I don't think he was the first to tell me, from -- from what I remember. But, ultimately, I think he is the one that signed the paperwork putting them on administrative leave or gave the -- gave the order to do that.

Q   Did you -- do you know who initiated the conversation about placing these people on administrative leave?

A   No.

Q   Any general team?

A   Well, the list came in from the -- you know,

Page 81

the team that -- the Efficiency team that came in, which was, you know, We've been looking, and I think -- and again, I'm, you know, big hand, little map, broad brush, it was a, Hey, we're seeing some anomalies, or, We're seeing some discrepancies in recordkeeping and how things -- how money was being spent.

And these are the hands that it's touched up through, because it was a pretty wide spectrum of folks from, you know, worker bees, if you will, up through leadership, up to, like, the legal team. Which, of course, from my experience, that all would make sense if you had people that -- and -- and I wasn't -- I definitely did not look at it. I didn't -- was not at the time thinking that there was, like, nefarious behavior or anything like that.

It was more of -- you know, because there are a lot of bad practices in government, and that this team had uncovered some bad accounting or bad -- how things were being done that was transferring all the way up through what I would say is the legal chain of command. If you're the button pusher, it goes to your leadership, the leadership looks at it, and it goes to the lawyer, right? And then the lawyer signs off on it, and then it goes to the person that makes the decision.

And so all of that kind of made sense to me of

Page 82

why you'd have a -- a spattering across the board. But I don't know who. I mean, the list was proposed by the team.

Q    And that's the DOGE team?

A    By the -- yeah. Well, the -- yeah. The Efficiency team or whatever.

Q    The Efficiency team?

A    It was on that day, or -- or whatever I recalled it, or was calling it on that day. But yes. The Efficiency team, the DOGE team in my mind either -- and then I think it was Jason that signed it out.

Q    And you said that -- so what did they tell you was the reason for placing 58 individuals on administrative leave?

A    I think it was just the -- what I had just said, which is they were looking at anomalies -- my word, not necessarily theirs -- or deficiencies or discrepancies.

It was a pejorative word of, you know, There's something amiss and we need to -- to really look at this. Which, again, for me, tracked with common sense approach of putting somebody on leave, et cetera. So -- so you could take and do that -- that triage and look at the information.

Q    Was there an investigation conducted into this

Page 83

issue to identify the 58 people placed on leave?

A    What do you mean by an "investigation"?

Q    How were the 58 identified as potentially being involved with the --

A    My understanding, they were identified by the team that came in. Who on the team? Like, whether or not --

Q    Like, the DOGE team?

A    -- the DOGE team, like you'd have to look at my email. I remember getting an email from someone who was not in AID, which was part of the group. He was one of the older gentlemen that I don't remember. But I'm pretty sure there was an email that had -- because then I think there was a back and forth.

Joel wrote something back, and I was more or less watching it unfold, type of thing. So who specifically, you know, said, Susie Jones (phonetic) needs to be on the list stuff, I don't -- I don't have the information on that. I don't have the details.

Q    Did the number of people on the list surprise you at all?

A    No. I don't -- I don't think so at the time. And, again, we were talking administrative leave, which is something I -- I had used in my career. So it -- it was -- I don't know if it was -- I think I was probably

Page 84

neutral on it. I don't think I really had an opinion one way or the other.

Q    So at that point on January 27th at the time these people are placed on administrative leave, did you have evidence that all of these individuals engaged in any wrongdoing?

A    I did not have any evidence. As far as I know, I did not have any body of evidence that was attached to, like, the emails and things like that. It was more or less verbal. I don't remember if we asked -- and I say we, Joel or I said, You need to put it in writing, or whether it was done beforehand.

But I know that there was some sort of trail of where it -- to go back to where did it come from, because I knew I wanted that. Like, I wasn't going to verbally transcribe names on a Post-it note and execute. So I needed something. I just don't remember what it was. But I know there's electronic, you know, correspondence on it.

Q    And I believe you might have said this, but would it be accurate to say that it was this list of 58 people -- was a list of people who would be investigated for potential wrongdoing?

MR. WEN: Objection. Calls for legal conclusion, speculation.

Page 85

THE WITNESS: Yeah. When -- so if I can jump on your bandwagon on that. Investigation might mean different things. Like, this unto itself, to put them on administrative leave, can be, like, that's an investigation, right? A triage of how they did it. I don't know. I -- I don't think we got to that point. I think that meeting, which I believe was on that Thursday when Steve came back.

Now the DOGErs or the Efficiency teamers, they were out doing their stuff in the organization for those couple days, but then it was another, Hey, we're coming back for, like, a pulse check to find out where we are, you know, type of thing. And that was when Steve was saying, like, What's been done?

And that was where I said, Well, nothing, because as far as I know, nothing more has been done, which would go back to an investigation of looking into what we're doing to terminate, not to keep them on admin leave. Because to me that was a -- a extreme chasm between putting a person on admin leave and terminating from government service. There's a lot of ground in the middle that needed to be covered and it had not been.

BY MS. RUBIN:

Q   Okay.

A   As far as I knew.

Page 86

Q   But as of the time that they were placed on administrative leave, you didn't have any evidence of wrongdoing; is that correct?

MR. WEN: Objection. Argumentative.

BY MS. RUBIN:

Q   Of wrongdoing by any of the specific individuals on the list?

A   Personally?

Q   Did you have any evidence?

A   No. Outside, I did not have any evidence, no.

Q   Okay. I'm going to introduce Plaintiffs' Exhibit 4.

(Exhibit 4 marked for identification.)

BY MS. RUBIN:

Q   Have you -- actually, can we turn to the second page, which is on the back of the first page?

A   Second page on the back.

Q   Just -- yeah, right there.

A   Okay.

Q   And so I'm looking at an email on Monday, January 27, 2025, at 3:41 p.m. sent by Joel Borkert -- Joel Borkert.

Do you see that?

A   Mm-hmm.

Q   And that is -- okay. And on the -- sorry. On

Page 87

the first page, that's your email on the cc line mhopson@usaid.gov?

A   Yes.

Q   Okay. Sorry about that. Turning back to this page. If you look at this and the next page, is this the list of individuals placed on administrative leave on January 27th?

A   As far as I know, yes. To my recollection.

Q   And how would you characterize the people on this list in terms of, I guess, senior positions, lower-level positions?

A   I think it was a --

MR. WEN: Objection. Vague.

You can answer.

THE WITNESS: There -- I mean, there were a lot of leadership positions, which to my statement earlier, there's also some lower-level folks or what I would deem as lower-level folks. But it was a lot of the leadership which -- what was proposed or what -- the information that I was acting on was that there was misuse of funds, or a -- you know, the lack of due diligence and stuff.

So having senior folks -- and I believe there's, like, there was attorneys and stuff like that on the list somewhere. Yeah. It's towards the bottom

Page 88

there. So that tracked to have senior folks and again some other lower-level folks that were reportedly misusing or misappropriating -- not misappropriating, because that's a congressional term, but not doing their due diligence. Not good stewards of American taxpayers. I think that might be the better way to caveat that.

BY MS. RUBIN:

Q   And you said that included some senior legal counsel at USAID?

A   Yeah. I think --

Q   Feel free to obviously --

A   I think that they're on here. Yeah. Yeah. I mean, there's counsel, counsel, counsel, counsel. There's a whole bunch of them on here. But I -- yeah. I mean, out of the -- I probably met some. I mean, certainly some of them, like Jack Allweiler (phonetic), I met him. There's certain people on here that I had met as part of the onboarding and, you know, senior individuals. But a lot of them I didn't know or I don't know.

Q   And you can set that aside. How were the names on this list selected? We talked about this a bit, but do you know how the names on this list were selected?

A   No.

Page 89

Q   So do you know the process by which they were selected?

MR. WEN:  Objection.  Asked and answered.

THE WITNESS:  Yeah.  No.

BY MS. RUBIN:

Q   Do you know what documents were reviewed when coming to the determination of selecting these individuals?

MR. WEN:  Objection.  Asked and answered.

You can answer.

THE WITNESS:  Yeah.  Specifically, no.  I do remember having conversations, and I don't know what was written.  I know we asked for a list to be, you know, sent or forwarded.

What I recall was the verbal conversation of, they've looked at contracts in the -- you know, when they were looking at things, and there are, whether it's anomalies -- again, my words looking back a year and a half -- where there might have been wrongdoing, and we need to further look into that.

BY MS. RUBIN:

Q   When you say --

A   But that was how I was told that list had been built.

Q   When you say "they," are you referring to the

Page 90

DOGE team?

A   Yeah.  I don't remember specifically who, whether it was a conversation I had with, like, whether Jeremy was there, whether it was a DOGE person there, whether Joel was there.  I don't remember.

I just remember the feeling -- again, things were moving very quickly, and so there was a lot of staff work that the paper trails and things were going to have to be filled in after the fact.  But I remember feeling that there was a lot of trust that we were putting in to execute based on a team that just showed up at the organization.

But I did not feel it was at all illegal.  I did not feel that it would be damaging to people's careers, et cetera, et cetera, so.  But, specifically, how did that happen outside of a broad hand brush, I don't know.

Does that answer the question more thoroughly?

Q   Yes.  You were not involved in selecting the names on this list; is that correct?

A   Correct.

Q   To your knowledge, was Jason Gray involved in selecting the names on this list?

A   No.  I do -- I do not believe he was.

Q   To your knowledge, was Steve Davis involved in

Page 91

selecting the names on this list?

A   I can't --

MR. WEN:  Objection.  Calls for speculation.

THE WITNESS:  Yeah.  I -- it'd be speculative for me to say that.  Yeah.  I can't --

BY MS. RUBIN:

Q   Yeah.

A   I don't -- I don't know.  Sorry.

Q   I'm asking to your knowledge.  So if you don't know --

A   Yeah.  To my knowledge, no.

Q   Okay.  And to your knowledge, was Elon Musk involved in the creation of this list?

A   I don't know.

MR. WEN:  Objection.  Same objection.

THE WITNESS:  Sorry.  I didn't mean to step on you again.

BY MS. RUBIN:

Q   To your knowledge, did anyone primarily working at USAID, so an employee of USAID, have any involvement in selecting the members on this list?

MR. WEN:  Same objection.

BY MS. RUBIN:

Q   Sorry.  Selecting the individuals on this

Page 92

list, but noted.

A   My assumption -- I don't know.

Q   To your knowledge?

A   To my knowledge, yeah, I -- I don't -- I don't know.  It would be pure assumption on my part to say otherwise.

Q   So you don't know exactly who was involved in creating this list?

A   No.  I'd have to triage the emails and look at, like, the badge access and who came in and things like that.

Q   Okay.  I'm going to introduce Plaintiffs' Exhibit 5.

(Exhibit 5 marked for identification.)

BY MS. RUBIN:

Q   And you could take a minute to look at it.  At any point, let me know if you need to pause to take a look.  This is an action memo for Acting Administrator Jason Gray from Nicholas Gottlieb, the Director of Employee and Labor Relations at USAID; is that correct?

A   Yes, correct.

Q   And it's dated January 30th?

A   Yes.

Q   Have you seen this document before?

A   I'm certain I have, yes.  Sure I -- I'm sure I

Page 93

read it. I'm sure I saw it.

Q   So just to be clear, there are redactions on this document made by the government. "DPP" means deliberative process privilege. So I'm -- I'm going to be asking you about the non-redacted portions --

A   Okay.

Q   -- just to be clear about that. So looking to the last paragraph on page 1, the sentence beginning on January 30th. And I'm going to read this for the record.

On January 30, 2025, Noah Peters of the Office of Personnel Management transmitted to me a list of 11 names forwarded to him by Luke Farritor with the Department of Health and Human Services, DHHS.

Do you know who Noah Peters is?

A   I think he might have been that guy I was vaguely referring to. One of the older gentlemen. I'd have to Google his name. But he might have been part of the DOGE team -- or the Efficiency team.

Q   That's what I was going to ask. To your recollection, was he affiliated with DOGE? To your understanding.

A   Yeah. I -- I'm not awesome with names, especially not a year and a half later. But Luke certainly was. But I -- I think -- I mean, --

Page 94

Q   That's okay.

A   Yeah. I'm -- I'm not -- I'm not positive. I can't tell you what I was thinking at the time.

Q   So the next sentence says, The email is timestamped January 27, 2025, at 4:28 a.m. Mr. Farritor noted in his email that the list provided contains all users who logged into DHHS's payment system in the past year. He repeatedly noted that his analysis and -- is preliminary and could be wrong.

You see that?

A   Correct. I do.

Q   Did you ever receive that email from Luke Farritor?

A   Not that I remember.

Q   Do you ever -- do you recall ever seeing that email from Mr. Farritor?

A   No.

Q   All right. So as written here according to Mr. Gottlieb, Luke Farritor created an initial list of people who logged into DHHS's payment system; is that correct as you see it?

A   Yes.

Q   And as written here, that list contained 11 names?

A   Yes. I don't -- I don't -- based on what's

Page 95

written in front of me. I don't remember that. I know that there was some rolling and it was a roll-up of -- of names that came in at the end of the day.

Q   Yeah. And so as it's written here according to Mr. Gottlieb, it was 11 names forwarded to him?

A   Okay.

Q   The list we discussed and with exhibit -- with the last exhibit, that was 58 names; is that correct?

A   Yes. To the best of my knowledge.

Q   And when he's talking about Mr. Farritor noted that the list provided contains all users who logged into DHHS's payment system, do you understand that to be the same conduct we were discussing with regard to that list of 58 people?

A   Say that again.

Q   Sorry. Let me rephrase that. In discussing this list of 11 people who Mr. Farritor said were the users who logged into DHHS's payment system, is it your understanding that the list of 58 people was related to users who logged into DHHS's payment system?

A   My understanding was they were involved in the payment approval -- payment and/or approval process, not necessarily whether they were logging into the system. That -- that detail is -- does not ring a bell to me.

It's here in black and white and I was -- you

Page 96

know, I'm sure I saw this memo. But the overarching reason was that they -- those people were touching payments or were approving payments and things like that.

Q   Okay. So according to this memorandum, this initial list had to do with users who logged into DHHS's payment system. Getting tongue twisted. That's correct as written here?

A   Yes.

Q   Do you know how that list went from 11 names to 58 names?

A   No.

Q   Did you ever see the list of 11 people?

A   I don't know. I don't think so. I don't remember.

Q   Do you have any reason to believe that Nick Gottlieb's description of this email is inaccurate?

A   I can't answer that because I have no idea what's written in black and I don't remember all of that. So what is written, or what's not redacted?

Q   Yes. I'm just asking if you have any reason to believe that what -- his description would be inaccurate.

A   Do you want me to go, like, line by line of things? Or do you -- in general? Like, the one thing,

Page 97

like, that is written here is no justification was provided for this instruction. I think a verbal from the team that came in saying, Hey, there's potential wrongdoing, that was enough for Justin -- or Jason to sign it out. That is justification enough for an administrator head to -- to put someone on. He can take that advice. So, like, the nuance in that, I don't think this letter --

Q   I can be more specific.

A   But the facts of it specific -- like, the other facts all tracks with what I know.

Q   Yes. And more specifically his description of this specific email of 11 names. When it was sent, who it was sent by, that it contained --

A   Well, the when it was sent -- this doesn't jibe because it's 4:30 a.m. So maybe that was a typo, because the morning of the 27th would be before any of us got to work that day. So -- but that -- you know, outside of that, this all tracks with what I knew was what was happening or what would be -- what was stated would happen and then what was happening, which is we're looking at the databases and who's approving payments and who's paying things. So that -- that all tracks.

Q   Did you ask anyone where the list of 58 individuals came from?

Page 98

MR. WEN: Objection. Asked and answered.

THE WITNESS: Yeah. The -- the assumption -- I think I asked, How did this list get compiled? And it was the -- the vague answers that I was -- that I have -- you know, have been saying, which is, you know, potential malfeasance or misuse, et cetera.

Outside of that, I don't know. Like, how individual -- pick a name -- how did this person get placed on the list and why? I didn't have the fidelity of -- of data.

BY MS. RUBIN:

Q   You stated that Acting Administrator Jason Gray signed off on placing these individuals on administrative leave; is that correct?

A   Yes.

Q   If he had wanted to -- if he had wanted to push back, who would he have voiced that opinion to?

MR. WEN: Objection. Calls for speculation.

But you can answer.

THE WITNESS: I think as the acting administrator, he simply could have just not done that. He was not legally bound to execute that. If he was to grieve or if he was -- I think he would have to bring

Page 99

that up through his chain of command which would probably be the first step I would advise him -- would have advised him to do is probably state or reaching in, like, via Ken to the political side to make sure that -- I think that would be -- if he -- if he was to balk, those would -- if he's -- if he came in -- if he -- sorry. I'm kind of stammering on how I'm answering.

If he brought me in and said, Matt, should I put these people on leave? I would have advised -- and he said, I don't want to do this, I would have advised, You don't have to do this. You are going to be under scrutiny for not doing that, so let's make sure that -- and this didn't -- this conversation didn't happen.

Should that have happened, I would have advised them to either go the chain of command or a political chain of command. And I don't know what I would have at that time advised at that point, but it would have been some scrambling to -- as my job was to make sure the administrator was doing the right things for the administration, but then also for the organization and -- and the U.S. government.

And I would have advised him to probably pause or to -- you know, should he -- if he had asked that. I did not raise that objection because from what

Page 100

we were seeing or what I was seeing -- I won't speculate on others, was, although it was moving very quickly, I did not see it as an action that was not, like, a reversible thing or not something that we could spend more time looking at.

BY MS. RUBIN:

Q   Okay. So you understood -- or generally understand placing someone on administrative leave is a decision that is reversible?

A   Correct.

Q   Versus termination, which is not reversible, at least easily?

A   Correct. Yes.

Q   Did you ask for any evidence on January 27th to show that the individuals on the list -- or that placing the individuals on administrative leave was justified?

MR. WEN: Objection. Argumentative.

You can answer.

THE WITNESS: I'm certain I asked somewhere in the process how this list was compiled, and I think it was all verbal of, We're just seeing -- and -- and it wasn't with Luke, but, like, the statement using this letter, which is, you know, Hey, this is an initial look, and so we're not really sure. Given the

**Remote Legal Court Reporting**
**646.461.3400   info@remotelegal.com**

Page 101

nature of admin leave, like, I was comfortable enough with that verbal.

So I'm -- I'm positive that I asked someone, right? Whether it might have been Joel, if Joel at the time was -- Joel was a lot of the interlocutor for me, you know, with -- with the actions that were -- were happening. So I don't know who was in that, but I'm -- I'm certain I had posed the -- the question to someone at some point.

BY MS. RUBIN:

Q   Was it your understanding that you would be shown evidence of any misconduct before anybody was terminated?

A   Well, yeah, certainly. Yes, yeah.

Q   Who did you expect to see evidence from?

A   I think that -- that the team said, you know, they had initial --

Q   The DOGE team? Sorry. I just have to make it clear --

A   The DOGE team or the Efficiency team. It was, We're going to compile, right? I don't remember exactly what it was, but, Put on leave and then we will take and -- and look to find, you know, the body of evidence or the data or whether we were wrong, right? Whatever that is, but then that will come back for decisions, right?

Page 102

Whatever those decisions, whether it's, you know, punitive actions or whether it's legal actions, you know, depending on what nature of the offense or the malfeasance was.

Q   And at least somebody from the DOGE team or the DOGE team generally represented that they would be looking into it further?

A   Yeah. I -- I think that was certainly insinuated at the beginning was that we would -- we -- that they would get -- they, the efficiency, would provide that.

But in my mind, it was they're just workhorses to give me a file on 58 people that we would then look at to make a decision of whether or not we're going to move forward with some sort of action. Whatever that action is, be it full reinstatement, be it reinstate with some sort of, you know, performance improvement.

Or if it was legal, then bringing in -- whether you brought in criminal charges or, you know, terminated, whatever. But I was definitely looking for the team who initiated the list to help, you know, flesh out some of those things.

Q   Who made the official recommendation to place these individuals on administrative leave?

MR. WEN: Objection. Calls for a legal

Page 103

conclusion and speculation.

But you can answer.

THE WITNESS: The note came -- I mean, if we look back on the email trail, I mean, I think it came from -- from Joel to put it together.

BY MS. RUBIN:

Q   And we're looking at?

A   Yeah. On the -- the 341 from Joel, I think, Exhibit Number 4. I am certain that I was involved in telling Joel to put the list together, or to compile it to send it to -- because this is -- this was -- this was putting it into an official capacity for the record. And that would have been within his scope of duties of, Hey, just put together a memo with the list. But the list itself, I believe, was emailed from one of the members of the team. I -- I don't -- I don't recall.

Q   The DOGE team?

A   Correct. Right. The DOGE team. But this is where we then put it into, you know, practice, if you will, because he's sending it to Bill (phonetic), Nick, Steven, and Brian, all the people that would have to initiate the leave of absence, terminate physical access, and terminate physical security -- or, cyber access, computer access. But the preamble to that, that's the email that would be before this one, and I

Page 104

don't remember who sent it.

Q   You stated that you had a meeting with Steve Davis on January -- on Thursday, January 30th where you discussed the 58 individuals placed on administrative leave; is that correct?

A   Yeah. I believe it was that Thursday. Correct.

Q   Do you know around what time that was?

A   It would have been --

Q   Could be morning, afternoon, evening.

A   I want to say it was late morning. I -- I don't know for sure. But I want to say it was late morning. It was definitely not --

Q   So earlier part of the day?

A   Yeah, yeah. Between 10:00 -- I think -- I think it was between, like, 10:00 and 1:00. My initial thought was, like, 10:00-ish, but it might have been right after lunch. So that window. Middle of the day window.

Q   That's all good. Who was at this meeting?

A   I think it was the same group of people that were really there at the beginning. I think the -- like, the politicals that were under me, I think I had all of them there. And then Steve had his team there. I believe Jason was there. I think Ken was there. They

Page 105

-- they --

Q   When you say, "the politicals under you," who do you mean?

A   So that was like Tim Meisburger, you know, --

Q   Joel Borkert?

A   Joel, yeah.  And I'm pretty sure Ken was there.  Ken wasn't under me.  Tim -- there's another gentleman, I don't remember his name.  So there was other politicals.  When I say "politicals," people that had been appointed by the White House.

Q   And was this meeting held at the USAID office?

A   At the -- at the main conference room there.

Q   Was this virtual or in person?

A   In person.  I don't think there was any virtual dial-ins.  I think it was all in person.

Q   Who asked for this meeting?

MR. WEN:  Objection.  Calls for speculation.

BY MS. RUBIN:

Q   Who scheduled this meeting?

A   I don't know.  Yeah.  I don't know what initiated the -- I know the gist of it as it came to me was, Hey, we're going to get back together with the folks that were here on Monday to -- to kind of go over or look at what has been produced or what, you know,

Page 106

what has been found.  But who started it or who initiated it, I don't know.

Q   But the purpose of the meeting, as you understood it at the time, was to discuss the 58 individuals placed on administrative leave?

A   No.  I don't think that.  I think just in general.  I don't think I was going into it with a -- a list of 58 in mind.  I think I was, What have you guys been doing for the last four days?  I think it was more or less of an update.

I mean, the meeting might have been scheduled on Monday, like, Hey, we'll come back.  We'll reconvene this group on Thursday.  I -- I don't remember.  But I do not recall walking into that meeting thinking we were going to specifically talk about the list of 58.  It might have been something on an agenda item, but other things, which is, you know, what they were looking at, what they were finding, was what -- what I was focused on.

Q   So when you say, "what they were looking at and what they were finding," --

A   The DOGE team.

Q   -- the DOGE team, can you just be a little bit more specific about what you understood the purpose of that meeting to be?  Or what would be discussed at that

Page 107

meeting?

A   I think it was, like, how to move forward, like, taking whatever information they were going to provide to us and then, you know, in my mind, it would be then to help give guidance or rudder to them to, Hey, well, can you figure this out?  Can you -- so then we can start making actionable decisions across the organization.  Like I had said, there was decisions on contracts, there was decisions on, you know, like, buildings and leases.

So there was a -- a larger portfolio that my understanding was that would be discussed.  What parts they had gotten to during the week, that was kind of what the meeting was about.

Q   Okay.  So it would be -- would it be fair to say that the meeting was to discuss what the DOGE team had done at USAID that week?

A   Yeah.  What they found, right?

Q   Okay.

A   The -- the findings or -- or what have you, yeah.

Q   The findings from looking at contracts and personnel?

A   Anything that they were looking at, yeah.

Q   Did you ultimately discuss those 58

Page 108

individuals during this meeting?

A   Steve, I -- to the best of my knowledge, Steve did raise, Hey, what is the status with the 58?  And I think my flippant response was, They're on administrative leave.  And he asked, How come -- have you started termination procedures?  Of which I responded, No.

And, again, there might have been some other words, but the question that was posed was, Why?  It might have been wrapped up in other words.  And my -- the response was, Because I don't have anything that I feel I can legally terminate these people.  And then he had turned to Jeremy Lewin and said, Well, I think Jeremy has that information.

And I remember thinking, Poor Jeremy is really on the spot right now.  Jeremy didn't have the information, and I think it was very clear in how he physically reacted in the meeting.  So, yeah.  So that was -- that was -- that was the -- that's how the 58 did come up.

Q   Okay.  And I'm just going to backtrack and just clarify some things for the record.  So just confirm if this is correct.

Steve Davis asked you at this meeting whether you had terminated the 58 individuals on the list?

Page 109

A   I think he asked whether -- I think he asked for -- I think if you're going to have keywords, it was the status and then, Have you initiated?  And then, Why not?  I think those were --

Q   Initiated?

A   Termination.

Q   Okay.  So he asked if you had initiated termination?  Initiated termination?

A   Yeah.  What -- what's been done with them and have you initiated?  That is the best of my knowledge, that's how he posed the question.  I'm positive my response was I've done nothing with them because of the reasons I just stated.

Q   Was it your understanding that when he asked this question -- did you get the impression that he had expected you to initiate termination by that point?

MR. WEN:  Objection.  Calls for speculation, and vague.

But you can answer.

THE WITNESS:  Yeah.  My -- my assumption was that he was expecting that I was going to take and execute that.  I believe part of that conversation was me saying if he feels that he has the legal authority to do that, I would bring him on board as my chief of HR and then he could take and generate those and sign his

Page 110

recommendation to the then-acting, and then we'd consider it.

But with what we had, it was -- it was a non-starter as far as I was concerned.  It was -- it was actually a kind of a light moment because Steve laughed.  He's like, Well, that's not going to happen.  I said, Okay.  Well.

BY MS. RUBIN:

Q   You did not feel at that time when he asked you on the 30th that you had seen evidence to justify initiating termination for these individuals?

A   I did not have any evidence that I would have felt comfortable terminating those individuals.

Q   And he -- you offered for him to come on staff?

A   Yeah.  It was -- it was somewhat of a flippant comment.  I'd offered Clay to come on staff.  I had offered Jeremy to come on staff, because they were advising, but they were advising as outside advisors.  And I told them that I didn't feel comfortable executing the things that they were asking unless they gave me more information.  Or if they were willing to commit their signatures to the paper documenting those things.

Q   But David --

A   It was -- it was more or less my smart-ass

Page 111

humor of, like, If we want to move forward with this, like, I need more people on staff to take and do that, and I need more evidence.  Like, I need more to do this than -- than what's been provided.

Q   And Steve Davis responded, no, he would not come on staff?

A   I think he just -- I think he might have just chuckled and said -- and, you know, and then moved on with the conversation.  I don't remember what he had said.  I know my -- my thought after making this statement was, Yeah.  Of course you don't want to, right?

Because you're not looking at it either if you're saying Jeremy has it, and Jeremy hasn't given it to me and he's been outside my office for, well, a week.  So we're at -- we're still at the start line.  We haven't moved forward yet.

Q   Why did it matter to you to see evidence before putting --

A   I wanted something in writing.  I wanted more in writing to initiate termination because all I had was, like, this -- you know, whether it was this email or a couple other emails or a list.  But it was too speculative in my opinion for me to sign my name -- or to go to Jason to say, I believe that these people

Page 112

should be terminated for cause.  I did not have that.  So as a -- as the Chief of Staff, I didn't feel I could give that recommendation.

Q   But you didn't feel at that time that you -- you personally had seen enough to sign off on it.

A   I definitely did not have enough to sign off on that.  Again, that's personal.  Whether it was legal or not, I don't -- that I can't -- that is speculative.  But I knew I did not have a warm fuzzy that I was going to sign off on that.

Q   And did that have anything to do with any legal concerns?  Or what was the concern that --

A   I think due process and -- and legality, right?  Like, it's -- they were my employees, right?  So I'm not going to terminate someone unless I know why I'm terminating them.  And then I think I grew up in a bureaucracy.

I worked in a bureaucracy for 30 years.  There's a lot of rules that are written that can stymie fast progress, but they're also rules that are legally binding and, you know, need to be -- need to be followed.

You can do anything you want in the government.  You just have to follow the rules, or just change them, or get an exception to it.  And I did not

Page 113

have any evidence that showed that the body of evidence would have fit under the current rules, that the rule had been changed, or I was being directed by my chain of command, right, to -- you know, to take and execute that.

Q   You said that Jeremy had been sitting outside your office for a week.

A   He'd just been involved. Like, he -- he was hot-desking in different areas. And so he'd been just in the head shed of the -- the office suite set up where Joel had an office, I had an office, I had a little bullpen, you know, this size with, like, six desks, and I think I had three people in there. So he would use one of the desks in there. And so he was just kind of floating in and out. He would -- he --

Q   Did you discuss the list of 58 individuals with Jeremy Lewin that week?

A   I'm sure we did. Nothing notable. I'm sure -- I'm sure he was involved in conversations. I know in that -- the 30th meeting, Steve had specifically pointed that to him. I know I had multiple meet -- multiple discussions with Jeremy about making sure that any actions that were taken needed to be properly documented.

I don't -- I'll assume that in that

Page 114

conversation was things on -- like, the people on that list. But I don't remember, like, a 58 meeting with Jeremy. But I do remember talking to Jeremy about the speed of how things were moving and what I was going to need from primarily him and Clay, which is the legal justification and the documentation and, you know, the -- the OPM memos.

Like, something, like, you know, this executive order gives you one step closer to what you can take and do because you'd have explicit and you'd have implied tasks and all those things.

And I had told Jeremy from day one that we would need -- that he was not going to have a cooperative partner and that it wasn't personal. I -- I just knew my personality enough that if I was going to be brought stuff that didn't meet a certain level of comfort for myself, I would push it back.

And I wanted him to know it's not -- it wasn't me not supporting a plan to move forward, to even move forward quickly, it's just that we weren't going to do it recklessly. And so I had a lot of conversations with Jeremy on -- on that. How did the list get brought in there? I don't -- I don't remember.

Q   You discussed putting things in writing. Putting directions or advice in writing?

Page 115

A   Sure. Absolutely.

Q   And how did Jeremy respond to that? Jeremy Lewin?

A   I think he agreed. He's like, Yeah, yeah. I get it. I get it. I know. I know. I know. And because part of that was also the conversation -- and I'm -- I'm bridging conversations that happened over those couple days -- but I told him, I said, Look, you know, a lot of the counsels that we have approved a lot of these decisions that, you know, may be fraudulent or may be, you know, based on the knowledge I had.

I said, But I can't act on -- I can't make legal recommendations to the director without having someone who's a lawyer support me in making those decisions.

And I told Jeremy, I'm like, Why don't you come over? Like, be -- you know, you can be our lead attorney, you can be our head shed special advisor but come up under AID so then I have full control over the authorities that you're then executing under.

Q   And how did he respond to that?

A   I think he said, like, Yeah. Maybe we could do that. He didn't say no. He didn't say yes. It was more or less like, Yeah. I don't know how. And I said, Well, if we want to do that, I'm like, I'll take you.

Page 116

I'll take Clay.

So it was a -- I don't remember there being any friction to it. It was not a, Yes. I want to jump at the opportunity, but it wasn't no. It was like, Yeah. I'm like, you know, we're trying to move quickly. There's a lot of my words, like, a mealy-mouthed conversation where there's not a lot of substance there. My substance was I'm not going to move forward on certain things unless I'm comfortable with those.

Q   And to be comfortable with it, you felt that you needed legal advice from the agency?

MR. WEN: Objection. Mischaracterizes prior testimony.

But you can answer it.

THE WITNESS: I wouldn't make a decision to terminate someone without having a lawyer on my staff, you know, shy of, like, the bureau coming in and arresting someone, right, or pick a -- law enforcement, that's a total different matter.

But if you're going to look to terminate somebody internally, that termination authority comes from the director or the administrator. And as the Chief of Staff, I would need -- I would need more than a name on a list specifically tying individuals to specific actions.

Page 117

Does that answer the question or?

BY MS. RUBIN:

Q   Yes.

A   But, so, like, whether it was a lawyer or not -- I -- I can tell you that in my experience, I would like a lawyer in the room.  Could there have been such egregious body of evidence put forward to me that I'd be like, Ugh.  Like, we're definitely taking action?  Maybe.  I don't -- I don't know.  I just did --

Q   But that didn't happen?

A   I did not have anything that I could take -- I personally was going to take action with what I had.

Q   You testified earlier that Elon Musk called Steve Davis during this meeting; is that correct?

A   I -- from my understanding, when Steve hung the phone up, he had said that he had just talked to Elon Musk.  I could not hear the conversation, and I was not privy to the -- I was not on the phone.

Q   That was --

A   I didn't see the caller ID or anything come up.  It was -- so the -- the connection I have is from Steve making that statement.

Q   That was during the January 30th meeting we were just discussing?

A   Correct.  Yeah.

Page 118

Q   Okay.

A   To the best of my knowledge, that was the day the meeting was on.

Q   Steve Davis took a phone call?

A   Yes, during the meeting.

Q   During the meeting.  About how long was the phone call?

A   A couple minutes.

Q   And you knew it was Elon Musk on the call because Steve Davis had told you after getting off the call?

A   Correct.

Q   You had testified earlier that you perceived it as a one-sided conversation; is that correct?

A   I remember -- I don't remember Steve talking a lot, right, outside of answering the phone.  And I just remember that he was more or less quiet.  But, again, I don't -- could -- I don't know who was on the other end, right?  I don't -- I have no idea.

Q   When Steve Davis got off the phone, what exactly did he say?

MR. WEN:  Objection.  I'm just going to make another protective invocation of the presidential communications privilege.  As I said already, I haven't spoken to the witness and I don't know what he's going

Page 119

to say.  But, you know, -- and he's -- I would, as to the substance of any conversations that, you know, Mr. Davis relayed to you about his conversations with the special -- the advisor to the President, I would just say don't -- not answer.

THE WITNESS:  Okay.

MS. RUBIN:  Explain how this fits within the presidential communication privilege, for the record.

MR. WEN:  Yes.  So this is -- it fits within the presidential communications privilege because Elon Musk is a senior advisor to the President.  He is -- and he -- he is -- he can, you know, make -- he can make investigations and he can have communications regarding the formulation of advice to the President.

But like I said, I haven't spoken to the witness before.  I don't know what he's going to say.  I don't know what kind of communications came out.  We have a protocol.  We can follow the protocol if we have to, but.

MS. RUBIN:  Yeah.  Okay.  So how we're going to do this is -- I think when challenges like this come up -- like I said, I'm going to ask specific, agreed-upon questions, and then I think it just makes the most sense to save for the end of the deposition.

Page 120

I'll give you guys the questions and we'll follow the protocol.

MR. WEN:  You mean you want us to read the questions, or you want to say -- you could say them into the record?

MS. RUBIN:  I can say them into the record.

MR. WEN:  And he can answer after you leave.  How about -- how about that?

MS. RUBIN:  That's what I was going to ask.  Yeah.  Sorry.

MR. SILER:  You want to ask your questions for you.

MS. RUBIN:  Sorry if that was unclear.

MR. SILER:  I don't -- I don't know if you were on the call for this point, but what we did in the last deposition that occurred was the court reporter read them back for the witness.  We'd be fine with that if that works for the court reporter.  That seemed to work okay.

MS. RUBIN:  I can read them because I think we have this real-time that might be useful.  But anyway, this is all just to say, let's handle this at the end.

MR. SILER:  At the end?  Yeah, that's

Page 121

okay.

MS. RUBIN: Okay.

MR. ISSACHAROFF: Can I follow up just on the invocation? To the extent that Elon Musk is conveying instructions on this call, would -- would that fit within your understanding of the presidential communications privilege?

MR. WEN: No. Explicit directives, we would not stand on that objection under the presidential communications privilege.

MR. ISSACHAROFF: Can we go ahead and ask now whether this consisted of explicit directives and maybe circumvent this whole thing, at least with respect to this phone call?

MR. WEN: Yes.

BY MS. RUBIN:

Q    Did this call involve directives made by Mr. Musk -- by Elon Musk?

A    **When Steve -- Steve notified the group or whatever that, you know, that it was Musk that he had just talking to. The -- what he was -- Steve was essentially saying, like, "he," referring to the person that he had just spoken to, which to my knowledge was Musk, he -- he's not happy that things aren't moving quick enough.**

Page 122

**And, you know, I don't know if he said something like you guys or there was a gist of, like, We need to move forward. And I'll just stop at that.**

Q    So to be clear -- yeah. Sorry. So to be clear, this is Mr. -- to your knowledge, this is Elon Musk talking to Steve Davis and giving his own opinions?

A    **Wait, say this -- so whose opinions?**

Q    I'll -- I'll move it.

A    **Steve's comment was his interpretation --**

Q    Sorry.

MR. WEN: I'm sorry. I'm just going to make my objection again under the presidential communications privilege.

MS. RUBIN: I'll step back and --

MR. WEN: I think we're getting a little close to the substance.

MS. RUBIN: I'll step back and start with these questions.

BY MS. RUBIN:

Q    So sorry to repeat this, but to your knowledge, we are currently discussing a conversation between Steve Davis and Elon Musk?

A    **To my knowledge.**

Q    And Elon Musk was a special advisor to the President. And what was Steve Davis's role? Did we

Page 123

discuss that?

A    **I don't know what his official role was. I -- I viewed Steve as the leader of this team, the on-the-ground team that was coming from what I assume was DOGE or made the assumption or after the fact, but the Efficiency team as I was, you know --**

Q    To your knowledge, was Steve Davis a special advisor to the President or an advisor to the President?

A    **I -- I don't know. I don't know.**

Q    But to your knowledge, was he an advisor?

A    **To my knowledge, I don't know where he fell into the special advisor or if he had, like, a different title or something. I don't know.**

Q    How did the communication between -- from Mr. Musk to Mr. Davis, or between them, fit into the process of advising the President?

MR. WEN: Sorry.

Objection. That calls for a legal conclusion.

MS. RUBIN: Isn't that one of the questions we agreed on?

MR. WEN: And speculation.

But --

BY MS. RUBIN:

Q    Okay. You can answer --

Page 124

MR. WEN: Just rephrase. Just --

MS. RUBIN: Okay.

BY MS. RUBIN:

Q    To your knowledge, did the communication consist of any advice given to the President?

A    **I have no idea.**

Q    To your knowledge, did the communication -- was the communication involved in the process of advising the President?

A    **I don't know.**

Q    As you understood it in that meeting, was Elon Musk advising the President on something?

A    **Can I answer it in two parts?**

Q    Yeah.

MR. WEN: Just real quick, I'm just going to speculate -- I'm just going to object on speculation.

But you can try to answer.

THE WITNESS: Yeah. I don't -- ask your question again.

BY MS. RUBIN:

Q    To your knowledge, did the communication between Mr. Davis and Mr. Musk during that meeting -- Steve Davis and Elon Musk during the January 30th meeting, was that part of a process of advising the President?

Page 125

A   I don't know.  Sorry.  It took me a while to understand that aspect.

Q   To your knowledge, did Elon Musk obtain any information from Steve Davis in this call?

MR. WEN:  Objection.  Calls for speculation.

THE WITNESS:  Yeah.  I don't remember exactly what Steve said, but my assumption is that if the --

MR. WEN:  Objection.

Sorry.  It -- you know, again, I'm just going to lodge my objection based on the presidential communications privilege because I -- you know, our view is that the presidential communications privilege travels both ways, up, you know, to the advisor and down from the advisor of the President.

MR. ISSACHAROFF:  Right.  I thought -- I thought we just had a colloquy where we determined that if he -- if the -- if the call is to give instructions, it's not part of the President -- from Musk down to Davis is not part of the communications privilege.  If it's to obtain or seek information to be used upward in the course of crafting advice, it could be.

So we're trying to understand, was this a call to obtain information or was this a call to provide

Page 126

instructions?  I think that's kind of what we're --

MR. SILER:  I think -- I think the witness has just said he's -- he doesn't know.

MR. ISSACHAROFF:  Well, he -- what Steve -- he -- he was present for what Steve said on the call.  So he can answer to the extent of his knowledge.

MR. SILER:  I understand, but I think the -- one of the purposes of the protocol is to avoid, you know, where we haven't been able to talk to the witness and don't know what he's going to say.  Like, we're at risk of waiving a privilege if we don't make a protective assertion because it's possible that these conversations are, and so are protected.

And, therefore, having this process where, you know, you may leave, he may say it, and we may say, Okay.  That's not privileged.  That's part of the -- part of the process here and in fact is incorporated in the --

MS. RUBIN:  Sorry.  Not to interrupt.

Just to clarify, if -- we're only discussing the potential statements made by Elon Musk that Steve Davis said to Mr. Hopson.  So if that specific piece of information was not -- a presidential communication was not for gathering advice for the President or giving instruction or advice to the

Page 127

President, then does that specific statement fall under the privilege?

MR. SILER:  I'm not sure I'm following.

MS. RUBIN:  I guess what I'm saying is, I'm not asking Mr. Hopson about the entire content of Mr. -- of Steve Davis's call with Elon Musk.  I'm asking about the specific part of the conversation that Steve Davis relayed to Mr. Hopson.

MR. SILER:  Yeah, understood.  I don't know what -- I don't -- I don't think we know what the scope of that is.  And that's the problem.  If Steve Davis -- just purely hypothetical.  If Steve Davis is saying, Hey, Elon Musk wants to know XYZ, we need to get that information for him, that might be covered.

MS. RUBIN:  If it's gathering information -- if it's giving instruction --

MR. MATHEU:  So I think if you --

MS. RUBIN:  -- downward --

MR. MATHEU:  -- ask a question that is limited to a, Yes, No, or, I don't know answer about what he understood from what Steve Davis said about the conversation, whether -- what the purpose was for.  I don't think you can ask him beyond that, and I don't think he can answer beyond that.

MS. RUBIN:  Okay.

Page 128

BY MS. RUBIN:

Q   Of what Mr. Davis -- of what Steve Davis relayed to you about his conversation with Elon Musk, did he ask you for any information to relay back to Mr. Musk?

A   No.

Q   Did he give an instruction from Mr. Musk?

A   Can I go off the, Yes, No, not aspect of it?  Because -- or if --

MR. MATHEU:  No.

MS. RUBIN:  I'll -- sorry.

MR. WEN:  Keep it to say yes or no.

BY MS. RUBIN:

Q   Yeah.  An instruction.  Did he give an expectation, a personal opinion?

A   Steve?

Q   Mr. Musk.  Of what -- you know, of what Elon Musk said to Steve Davis.

A   I don't know.  I don't know.

Q   Who else was the information shared with?

A   It was the same group of people that was in the room.  I don't think it was a --

Q   Okay.

A   Like, it wasn't just me and Steve.  It was broad-brush type of thing.

Page 129

Q   So was that allowed to everyone in the room, which included --

A   As far as I -- from what I remember, yeah. It was not a, Hey, Matt, I need to speak to you, or -- it was definitely not that.

It might have been, you know, five or six of us. I mean, that -- people were using it as a bathroom break and things like that. But I don't remember.

Q   Just this is -- and so just to be clear, specific about any statement Steve Davis made about his conversation with Elon Musk, that was shared with Jason Gray?

A   If Jason was in that meeting, he would have -- he would have been, you know, privy to that. I don't remember everyone that was in the meeting.

Q   He said it aloud to a meeting of --

A   People that would have been senior leaders of AID, primarily the politicals, if Jason was there and members of the Efficiency team.

Q   As a result of this call, did Steve Davis request any information from anyone in the room?

A   I do not remember any requests for information.

Q   Did you come away from this conversation with an understanding that you or anyone else should gather

Page 130

or provide information that would ultimately go to Elon Musk or the President?

A   Say that again.

Q   Was your understanding from the conversation that you or anybody else should gather or provide any information that would ultimately go to Elon Musk?

A   Am I still in the yes or no category only?

MR. WEN: Yes. Yes or no, please.

THE WITNESS: State your question one more time.

BY MS. RUBIN:

Q   Sorry. I totally get it. It's very -- this is very legal.

So did you come away from the conversation with an understanding, or did you -- did you get the impression --

A   That there was a request for information?

Q   Yes.

A   No.

Q   Okay.

MR. WEN: I feel like we've made the predicate that there's no advice -- that there's no information being gathered for the purposes of advice. I mean, what's the -- what's the purpose of --

MR. ISSACHAROFF: Well, you're welcome to

Page 131

litigate that before the court when you can ask the question and we can hear what he says after you leave and we can make a decision about what that is. But he doesn't know half the -- half of the side of the --

MR. MATHEU: He can't breach -- if the half he doesn't know is the, you know, concern about the presidential communications privilege, and by definition, he can't breach any of that privilege because he can't tell us what he doesn't know.

MR. ISSACHAROFF: That's right. We're not going to argue about it here. You can -- you can bring it up -- we can see what's in the transcript. You can get the information onto the record. You've got what you've got.

BY MS. RUBIN:

Q   Okay. Without revealing the substance of -- you don't know the substance.

Without revealing the substance of what Steve Davis said to you about what he discussed with Elon Musk, so without discussing that, what did Steve Davis say to you when he got off the phone?

A   So this is a non-yes or no?

Q   This is a non -- we're off the yes and no.

A   So I just want to -- I want to be mindful of where you guys are trying to navigate while you guys are

Page 132

trying to navigate and --

Q   Let me actually try to make this, like, super clear. I'm just -- okay.

So like I said, I don't want you to say right now what it is that Steve Davis relayed to you about what Elon Musk relayed to him on the call.

A   Okay.

Q   Okay. Outside of that, what did Steve Davis say to you as Steve Davis?

A   So I don't know the exact words, but what I do remember is the feeling that there was pressure to move forward faster and to --

MR. WEN: Sorry.

Again, I'm going to object on the basis of the presidential communications privilege.

MS. RUBIN: But Steve Davis is not in the --

MR. SILER: Hold on. Can we take, like, a five-minute break?

MS. RUBIN: Yes. Let's go off the record for a few minutes.

THE PROCEEDINGS OFFICER: Sorry.

Hearing no objection, I'll pause the record at 11:37 a.m., Eastern Time.

(Off the record.)

Page 133

THE PROCEEDINGS OFFICER: We're back on the record at 11:45 a.m., Eastern Time.

Proceed.

MR. WEN: All right. Sorry.

And defendants just want to make a record that -- you know, provide a little bit of guidance. But if plaintiffs can ask the same question.

And what we would say regarding the privilege issues that we were just discussing before we went on the break, or the guidance we would offer is, you know, you can offer your impressions, but we would just ask that you do not say what Mr. Davis said -- what Mr. Musk said.

MS. RUBIN: But he can say what Mr. Davis said speaking as Mr. Davis, not relaying a message from Musk.

MR. WEN: He can -- he can -- if that was clear -- if that's clear to him that Mr. Davis was saying something as Mr. Davis?

MS. RUBIN: Okay.

MR. WEN: Yes. He can say -- he can say that. But he can offer it -- and he can offer his impressions, but he cannot get into what -- you know, what Mr. Davis was relaying, you know, -- you know, in terms of his substantive communications with Mr. Musk.

Page 134

MR. ISSACHAROFF: Okay.

MR. WEN: If that makes sense.

MR. ISSACHAROFF: It does. Thank you.

BY MS. RUBIN:

Q    So I'm just going to pick up pretty much right where we left off.

Without discussing specifically what Elon Musk said to Steve Davis on this call, what did Steve Davis say to the room when he got off the phone? Skipping right over any --

A    I -- I do not remember -- I could not give you a verbatim recollection of what Steve said. What I can tell you is that my impression, or how I felt, was there was -- there would be pressure to move forward faster than what USAID had done to date.

Q    And move forward on what faster?

A    I think on anything and everything, right? So there was -- and, like, whether it's DEI, whether it's stripping out -- you know, looking at contracts, whether it's pulling people back from overseas locations to make a smaller footprint.

There was a lot of discussions of that each single thing, in my opinion, would have been a -- not Herculean, but would have been an effort for a bureaucracy to do fast. And there was multiple coming

Page 135

out of the newly seated administration. Because if you look at executive orders, a lot of them would touch down through AID.

So not knowing specifically -- well, the -- I know a couple words, but I don't think that I could say a couple words, so I'll hold them. But I can tell you that my impression was that we need -- we were going to need to move faster. And I remember thinking, How the heck am I going to do that?

Q    So you said that in -- was with everything. Do you mean everything related to what the DOGE team was doing at USAID?

A    DOGE was -- yes. That was part of it. That was the current, you know, crocodile in the boat, right? Which is the DOGE team and recommendations and what they were going to do. And, you know, the personnel action, the DEI -- and I think DEI was even independent of what DOGE was doing -- the contracts and reviewing contracts and canceling contracts, the justification of things that were actually ongoing and happening that, you know, money had been appropriated and stuff.

So things that I just had not been involved in that are all extensive data calls internally, organization, especially for a team like Joel because he was my only workhorse, right, to try to pull that from

Page 136

an organization that we were literally learning because we -- we didn't know. And I just remember thinking, like, This is -- this is going to be rough. This is going to be hard to do quickly.

Q    Was it your understanding that this included initiating the termination of the 58 individuals on administrative leave?

A    Yes.

Q    Was it your impression --

A    Well, can I -- can I -- sorry. Can I fill more in?

Q    Please.

A    State your question again. Was it my impression --

Q    I'm just -- sorry. I wanted to make sure I got the right words.

Was it your impression that part of this effort to move things faster, or this pressure to move things faster, one of those things was the 58 -- initiating the termination of the 58 individuals on administrative leave, or placed on administrative leave on January 27th?

A    I think that would have been the desire of Steve, based on what he had said earlier in the meeting, of questioning what I had not done, essentially, or why.

Page 137

So, yes. I would say that would have been in the bucket.

The reason I asked you to -- to say the question was, even at that point in time, post the phone call, post -- I did not feel compelled that we had to do -- you know, had to do anything because they were recommendations. But I do remember thinking, That's a lot -- there's a lot on the table that we're going to have to chew through.

Q   And when you say, "you don't have to because it's a recommendation," --

A   Because they weren't in my legal chain of command based on what I had. I mean, we have an executive order that says that we will take and support them. And to the best of my knowledge and ability, I was supporting them, and they were making recommendations up to us. And -- so, yeah.

Q   But if you had -- okay. If you had not taken the recommendation, rejected the recommendation, how do you think that would have played out?

MR. WEN: Objection. Calls for speculation, and vague.

THE WITNESS: So you're -- you're talking specific to 58? To the 58 -- to the list of -- of people, or in general?

Page 138

BY MS. RUBIN:

Q   That or just in general. So, in general, Steve Davis says -- or there's generally pressure to move things forward quicker.

A   Correct.

Q   And you said that you felt free to say no. If you had said, No. We will not be doing anything quicker?

A   I think I did in that meeting. I said no, right? I said, You know, I don't have -- I'm not doing that. So I think I did say no.

It goes back to the part that we were in -- I don't remember why we rambled or I rambled into it. It goes back to -- and the -- and the analogy or the -- you know, that I made is that, you know, when the President's Chief Of Staff calls you, there is impetus. Doesn't matter if it's written down in a order or not, right?

When the commander says -- you know, military commander says, Move, right? Depends on what's going on. Verbal orders are legal orders, depending on where they come from and where they stem. At that point in time, I didn't have anything in hand that made me comfortable to execute. So the answer I gave in the meeting was -- was, No. For -- from where I stood.

Page 139

Q   And why was that?

A   I just didn't have the body of evidence that I needed to take and initiate termination based on my experience in the government.

Q   And what was Steve Davis's response to that?

A   Displeasure, I think, would've been -- yeah. I can definitively state he was not happy with that answer.

Q   And earlier you referenced a conversation, whether it was in jest or otherwise, about Steve Davis coming on as a USAID employee to take some sort of action.

Is this the conversation where that happened?

A   I believe -- yeah. I think I believe that meeting was that same time -- or in that same meeting.

Q   Did you ask for the recommendation to move things forward faster in writing?

A   Yeah. That was the -- I don't know my exact words, but that would've been the meeting I would've wanted it in, right? So whatever I said, which is, I need that body of evidence, or, I need that material, I would've -- I would've required it in writing outside of other -- excuse me. Other actions from, you know, higher entities.

Q   Did Steve Davis or someone else agree to put

Page 140

the body of evidence and recommendation in writing?

A   I think that's where I alluded to it earlier where I think he kind of nudged Jeremy in front of the bus with respect to, Jeremy's supposed to put that together, or, Jeremy has that. He's supposed to give it to him. And it was a little leaning down the table of, Right. We've got this. And I think Jeremy was flat-footed. And, again, this is my interpretation of what I watched with the conversation. And I think my comment back to that group was, Great. Let's see that.

Q   Did you see it?

A   No. Not before I left.

Q   Why do you think that nobody gave you that evidence and recommendation in writing?

MR. WEN: Objection. Argumentative, and calls for speculation.

BY MS. RUBIN:

Q   What was your impression of why this was not put in writing?

A   I'm going to answer with two answers.

Q   Always good.

A   My initial is because you don't have it, right? Jeremy, you don't have what your boss -- Steve is his boss or whatever. Your person is telling you to do -- like, that -- that's not available.

Page 141

The other part is the -- the bureaucrat in me, which is because it's just been three days, and that's a lot to. Terminate 50-some people, you know, starting on a Monday and have them -- like, that's a lot, right?

I'm mean, I've never seen anything, to include criminal terminations, happen that fast unless they get arrested. And even then, my experience, they usually remain on the government dole for a while until they kind of fall off type of thing.

So -- so I think it was two reasons. I think one was a, Yeah. Because you don't have it. That's, like, my personal -- like, what -- what I was seeing. But then the other one is, But it's also because you guys might not have the ability to get it that quickly.

Which goes back to why I was -- I felt on pretty firm ground, because I didn't have blame of, You don't have it, or, You just didn't have enough time. I was looking at it as we just need to have that, right? It was an agnostic thing of, Let's just get it how we ever have to do it so then we can take action.

Does that answer the question?

Q   Yes. Is it fair to say that it was abnormal to give verbal recommendation to initiate terminations for government workers verbally without a corresponding recommendation or evidence in writing?

Page 142

MR. WEN: Objection. Argumentative.

But you can answer.

THE WITNESS: In my career, in -- in uniform as a civilian, as a contractor, I've never been privy or involved in something where you could terminate an employee for cause without any paper trail or any -- I keep calling -- like, a body of evidence, right? I am not aware that is common practice anywhere in the U.S. government.

BY MS. RUBIN:

Q   Do you have any sense that Steve Davis or Jeremy Lewin did not want documentation that they were the ones directing or recommending this action?

MR. WEN: Objection. Foundation.

But you can answer.

THE WITNESS: I can answer?

Okay. Say it again, because I have to listen to you and then I -- I'm not sure what I'm supposed to do, so.

BY MS. RUBIN:

Q   Yeah, of course. I understand.

A   Sorry about -- I'm -- I'm dragging this on myself.

Q   No. Don't worry about it. From your impression, did you have any sense that Steve Davis or

Page 143

Jeremy Lewin did not want documentation that they were the ones making this recommendation?

A   I can't speak to --

MR. WEN: I'm going to renew my objection, but -- and also add that calls for speculation.

But you can answer.

THE WITNESS: Yeah. So being somewhat speculative, right, on how I'm -- I'm -- the reasonable man, if you will, is if they were witting, which I think Jeremy as a lawyer knew yeah, they probably didn't want, right? It's easy if you give a verbal and then you can walk away and it's a -- it's a done deal, whatever that deal is, right?

I think both of those are smart people and successful people in their own rights. I don't know if they had the body of evidence whether they -- I can't tell you if they had it, if they would have given it to me. If the folder, you know, sitting here, had the information, would they sign their name? Probably, right?

But what I don't think is that they had enough to sign their name to, and they were asking me to do that on -- under my authority. And that was where the rub came in with that -- with that.

Page 144

Does that -- I don't know if I fully answered your question or not.

BY MS. RUBIN:

Q   You did. What's the significance of putting one's name to the action? So you're saying, you know, whether it was Steve Davis, Jeremy Lewin, or -- or your name.

A   Well, I think anytime you have a --

MR. WEN: Sorry.

Just -- objection. Calls for a legal conclusion.

But you can answer.

THE WITNESS: Because I think if -- it's -- it's -- if you give someone a verbal, right? I mean, you guys are lawyers, right? You can -- you can argue, What did the word mean, right? But when it's in writing, now we can only argue what's written. And it's -- you could still argue the words and what's there, and it can be misrepresented or typos and things, but this is much more concrete that anybody can look at rather than a verbal, right? A conversation.

So in writing is always going to be the best bet for any kind of action, especially if it comes into the -- like, the legal world, right? In my opinion.

Page 145

Now that -- that said, I mean, as a military guy, I've executed multiple operations on verbals. It's just, Do you have time to have a written, right? But the verbals usually do nest up under something else that is written, right?

You have an intent, you have a purpose, and then it continues down from there. But like you know, a lowly private is not going to wait for the memo to come from a sergeant, right? To execute something. So I think you have to look at the different levels of where you are. From where I was sitting as the chief of staff of an organization, I wanted stuff in writing.

BY MS. RUBIN:

Q   Did you have any concern for legal risk with putting your name on something?

A   Yeah. Absolutely. Yes, 100 percent.

Q   And why is that?

A   Because --

MR. WEN: Objection. Calls for speculation, argumentative.

But you can answer.

THE WITNESS: Because my experience is that the litigious nature of a lot of government employees is such that you end up in a room like this, where I am now -- I'm the only person in this room

Page 146

that's not getting paid, right?

BY MS. RUBIN:

Q   Fair point.

A   So my -- my daily wage is $40. I am willing to bet no one at this table makes $40 a day, right? So, yeah. It's cautious optimism of people that you are leading so you don't end up squandering more government resources and time litigating things that could easily be shored up by following the processes to go through those. I don't think I'm telling you -- like, I don't think that -- that's not rocket science, right?

Q   No.

A   That's -- but that is my opinion. If I'm going to put my name to it, I -- I want to have a bit more -- a comfortable feeling that I am operating legally, ethically, and morally.

Q   Now you can tell me if I'm mischaracterizing this, but you testified earlier that it -- did you say rubbed you the wrong way? That it --

A   Yeah. I use all sorts of --

Q   You definitely said the word "rub."

A   Yeah. So it gets under your skin, whatever analogy you want to make. What was the specific thing?

Q   I was just going to ask, did -- how did you take that? Did it --

Page 147

A   What part, though? I don't know when I said it. Sorry.

Q   Okay. With respect to Steve Davis asking or recommending that you put your name on --

A   I don't think he ever asked me to put my name on it. He was implying I should take action, which would -- which would mean I would have to put my name on something, right? Or in that case, it would be Jason, right? Because I actually -- like, Joel sent this email, right? I'm not -- I'm on the email trail, like I'm listed here, but I didn't execute that.

But this going into Jason would have been like a meeting at the end of the day where he's like, Hey, Matt, are you tracking? Yes. Should we? Yeah. The lawyers have talked -- like, we can do this. You are not putting yourself as the administrator or the organization in harm's way based on that.

So, like, in that case, like, Jason can take something verbally. I don't know if I'm fishtailing around on --

Q   No, I understand.

A   -- on answering the question for you. But yes. When Steve said that, it rubbed the wrong way or is an irritant -- or is like, I don't work for you, right? So you have your opinion, you have something

Page 148

that your people have provided. You may have other people telling you, right? It could be the barista at Starbucks what you should or shouldn't do. It's not going to impact how I'm doing my mission or my support to, you know, Ken and -- and Jason and the organization.

Q   Was it your opinion that the -- Steve Davis implying that you take action or implying that you recommend to Jason Gray that he take action, was it your opinion that taking action at that time would, as you put it, put Jason as the acting administrator or the agency in harm's way?

MR. WEN: Objection. Argumentative, and calls for speculation, and foundation.

But you can answer.

MS. RUBIN: I can rephrase.

BY MS. RUBIN:

Q   You testified earlier that in general when you make a recommendation to Administrator Gray, if you were making the recommendation or affirming a recommendation, you had to feel certain that -- or you felt that there was no risk or little risk of Jason as administrator or the agency being put in harm's way.

A   "Mitigated risk" is the word I would use.

Q   Okay.

A   And, yes, -- and I think so.

Page 149

Q   And so the implication that you -- or acting on initiating these terminations with the evidence or lack thereof that you had --

A   Yeah.

Q   -- was it your opinion that signing off on that would put either Jason as administrator or the agency in harm's way?

MR. WEN: Objection. Calls for legal conclusion and calls for speculation.

But you can answer.

THE WITNESS: Yes.

BY MS. RUBIN:

Q   Why is that?

A   Because I think we would be back in a room with a bunch of lawyers talking about what happened and how did it happen, and then there's not -- there's a single email, right? So I would have advised not as a lawyer, but as a bureaucrat of we just need to have more staffing.

Q   How did you feel walking away from this meeting?

MR. WEN: Objection. Vague.

But you can answer if you -- if you know.

THE WITNESS: I think it goes back to my statement earlier, which is my head was probably a

Page 150

little bit reeling, which is like, crap, like, This is a lot. This is not what I expected. So I probably was walking out thinking, like, how did I not see this coming or how did I not even anticipate? I think I was a little flat-footed, so I was a little taken back.

I definitely felt okay in the sense -- like, I didn't feel at odds. I felt good in my conviction and good in my decision-making and good in my recommendation to the organization. So then -- so that probably led a little bit of frustration. So if I can give you a kind of a spectrum of emotion.

BY MS. RUBIN:

Q   Were there other instances during your time as Chief of Staff at USAID that left you feeling this way with respect to verbal instructions not being put in writing?

MR. WEN: Objection.

BY MS. RUBIN:

Q   Or were there other instances where someone affiliated with the DOGE team gave you verbal recommendation or instruction but did not provide that in writing?

A   I won't say instruction --

MR. WEN: Objection. Vague, and compound, and argumentative.

Page 151

But you can answer.

THE WITNESS: That's a lot.

BY MS. RUBIN:

Q   If you understand it, you can answer.

A   No. I never took it as instruction. So that -- like, that is a -- for me, I did not take it as instruction. But given positional authority, back to that Chief of Staff, you know, White House Chief of Staff, I knew that we would do our due diligence to execute anything that came out of the team that was being sent from -- from the White House, which is how I viewed this team, so.

Q   Were there other instances when --

A   Where there was verbals? Because I think -- Yeah.

Q   Where -- yes. Were there some that were verbals?

A   The contracts one -- the contracts one was one that pops to mind. And on that one, did we take and go ahead and execute off of that, off of verbals? Yes, we did. And I was comfortable with it because we went to our legal team and the contractors --

MR. WEN: Just making a protective objection based on attorney-client privilege.

MS. RUBIN: Sorry. Why? Can you just

Page 152

explain?

MR. WEN: Because he's talking about -- he's starting to allude to communications that he's having with lawyers.

THE WITNESS: It was our -- well, it was our internal -- it was basically a recommendation, Hey, there's a building out there, because I think I already mentioned it. I don't mean --

BY MS. RUBIN:

Q   Was there -- was there legal advice involved?

A   I'm sure I asked, like, Can we do this? Like, is that how the -- because the contracts officer would have said, like, Yeah, this is how it's written. Trust the COTR on that. And then trust the lawyer to make sure the COTR is actually doing the right thing. You know, trust but verify type of thing.

MR. WEN: So --

THE WITNESS: So that -- in that --

MS. RUBIN: We can move on from that. It's okay.

MR. WEN: But just to cut through it, if -- you know, you can say something like legal signed off, but if there's any kind of discussion with the lawyers, the substance of that, just don't.

BY MS. RUBIN:

Page 153

Q   But only if it's involving legal advice, not just if a lawyer's --

A   Yeah.  So legal -- legal signed off.  Like, in that verbal thing, legal --

MR. WEN:  (Indiscernible - simultaneous speech.)

MS. RUBIN:  That's fine, yeah.

THE WITNESS:  How and why like the contract and line number, the COTR -- as where I was in the organization.  Sorry.  I don't -- sorry.  I'm on the record twice for swearing.

BY MS. RUBIN:

Q   Not at all.

A   I don't -- I don't -- I didn't care, right?  I just needed to have that.  So that's an instance where a verbal came in where I thought the threshold was low, right?  I have a person looking at it legally saying, We think this is solid, right?  This is not a bad decision.  And the contract officer saying, It's legal, or, you know, It's -- it's bound by how we do contracts.  That was enough for me to be like, Okay.

And then I -- I talked to my leadership team, which would have included Jason and Ken and Joel.  Hey, they're recommending shutting down, you know, building 1, 2, 3.  Are we okay with that?  And the

Page 154

answer was like, Yeah.  Low-hanging fruit, right?  Because it goes back to that 10 -- that -- you know, the bell curve I spoke about earlier, which is we knew there was going to be low-hanging fruit.  And so in this case, Tarak had kind of teed up, Hey, here's some low-hanging fruit.  Like, you can get, like, a win, right, if you will, of making action and moving forward.

And so that one verbal -- and I'm sure the contracts -- like, they had to write stuff, and I know things went across my desk that the contracts of how they were going to put it in legal terms and write it and formulate, you got to notify the contractors.  And all that stuff happened, and that was all documented.  But for my vantage to go to Jason -- using you as Jason -- I felt comfortable.  Jason, I have talked to your people who should be in the room, and we advise you this is okay.  And --

BY MS. RUBIN:

Q   Were there other instances where you were given verbal recommendation or advice where you did not feel comfortable acting on the verbal?

A   Yeah.  I think the terminating, you know, however that was characterized in conversations of what, you know, what movement has been done, where are we going with that?

Page 155

I definitely didn't feel comfortable on the DEI, right?  The wholesale termination of the DEI shop, just because I didn't know that was even doable.  But it's very similar to how that came in.  Now there was some written guidance from OPM on, you know, reducing -- I'd have to pull, you know, those correspondences.

So there was some written government-ese in there.  But from my perspective, I brought in the people that I needed to, you know, feel -- which was the team, the legal team -- saying, Can I sign off in this?  And the answer was, Yes.  Right?

So there was multiple things in those -- that -- that week or the two weeks, really, that put me outside of my comfort level.  But with the one with respect to the 58 or whatever, like, that was -- that had not got resolved, right?  And so I did not take any action on that outside of being witting and participating in the initial, We can put these people on admin leave.

Q   Outside of that example, was there another -- or can you recall another example where you were similarly not comfortable acting on the verbal recommendation?

A   How do you answer, I don't remember, but if you tell me something, I might, type of thing?  Those

Page 156

kind of ring a bell to -- or those -- those that come to mind.  I don't -- I don't recall any other ones.

Q   Okay.  Did you have any other meetings involving Steve Davis or Jeremy Lewin that day, Thursday, January 30th?

A   Not with Steve.  I think Steve left shortly after the meeting.  Later that evening there was -- there were Jeremy, the director, the administrator, and Ken were in Jason's office.  I was in my office, and Jason's EA, Brendan (phonetic) was his name, came in and said, Hey, are you coming to this meeting?  And I said, What meeting?  I think it was -- it was late at night, 6:00 or whatever it was.  6:30.

Anyways, I went in their meeting and had asked, like, Hey, what's going on?  And I think it was Jason that said, Jeremy is recommending that we put all of USAID on administrative leave.

And then I said, Well, -- my response was, again, flat-footed.  Never had witnessed something like that.  And then was trying to process the words that were said.  I think I probably said something -- I probably had some colorful language inquiring what that actually meant.  And then the conversation ended with that not happening.  Prior to that, I had said specifically to Ken and Jason, As your Chief Of Staff, I

Page 157

cannot advise you to do that right now. I don't know if that is the right course of action for us, but it does not one that I can recommend based on what I know to date.

Somewhere in there, Jeremy took a phone call, and he came back and said, Hey, nothing's going to happen. We're going to, you know, stop everything. Like, we're just going to come back tomorrow morning type of thing. And that was -- that was the other meeting. Steve was not involved in there.

Q Okay. So just to backtrack a little bit, you said this was Jeremy Lewin, Jason Gray, Ken Jackson, someone named Brendan, did you say?

A Brendan was Jason's EA --

Q EA.

A -- and I do not think he was in that -- executive assistant. His -- you know, his person that does the scheduling and stuff. I do not believe Brendan came into the room with us.

Q Okay. So just you, Ken Jackson, Jason Gray, and Jeremy Lewin?

A Jeremy -- yes. That is what I recall.

Q And did you say you were not involved at the beginning of that meeting?

A Yeah. Brendan ended up grabbing me and

Page 158

saying, Hey, are you coming to -- are you coming to this? Or you need to -- you need to come to this, or whatever it was. I don't remember what he said. I just remember crossing the office and going into the meeting.

Q And by the time you came into the meeting, Jason Gray told you that Jeremy Lewin had told him to put the entire agency on administrative leave?

A Had made the recommendation.

Q Had made the recommendation?

A Had made the -- had made the recommendation, yes. I think that's -- I believe that's pretty darn close to what Jason said was, I'm being recommended to blank. Because the -- my response -- and, again, there might have been some other words because I don't have a transcript, but I do know that I specifically looked at him and I said, Well, I do not make that recommendation.

Q And so when that recommendation was made, you were not in the room?

A Correct. I did not -- I was not privy to the first part of the meeting.

Q You don't know the exact words Jeremy Lewin used?

A I have no -- no idea what he said. I don't know how the meeting started. When I walked in, I know that Jason said -- because I had inquired, What are we

Page 159

doing here? Because I was -- I was probably a little miffed that I was not involved in any meeting that involves -- with the administrator as the Chief Of Staff. You know, the Chief of Staff and the administrator get to pick and choose who goes to the administrator's meetings.

And so I was miffed at the fact that there was a meeting happening that I was not involved, and then I was definitely like, Oh. That's -- this is a big deal. The fact that it's just three people in a room talking about that, and that just put my comfort level not high, low. And that's why -- that's what drove me to say to Jason, like, This needs to, like, pause, breathe, whatever words I used in there.

Q Why do you think you weren't initially involved in this meeting?

MR. WEN: Objection. Calls for speculation.

But you can answer if you know.

THE WITNESS: Oh. Because I think I was a pain in the ass, and Jeremy knew exactly what I was going to say.

BY MS. RUBIN:

Q And by "pain in the ass," what do you mean by that?

Page 160

A Because I was not going to advise Jason to do anything that was going to put the organization in jeopardy. And I don't think that there was body of evidence or enough clout behind what was coming in to advise that.

And I think that that was -- I don't think it was very well known. I -- I think that was known from probably the first meeting on the 27th. If not, I might have even mentioned stuff on the 25th or 26th when I had the Zoom call. And so my -- my take is I was purposely not invited to the meeting.

Q Do you know -- do you know if anybody gave Jeremy Lewin that recommendation to pass along to Jason Gray?

MR. WEN: Objection. Calls for speculation.

THE WITNESS: Yeah. And I don't -- I -- I -- I don't -- I don't -- I think Jeremy referred it to, like, the amorphous White House, right? And, again, it's just two weeks into a brand-new administration. So a lot of stuff is happening. Like, that unto itself is not -- like, saying -- saying something like, The White House wants, no problem. Got it.

Now we're going to start moving forward to execute. But then that's when you then do paper.

Page 161

Like, you don't just execute. You still have to do your due diligence and go through things to make sure -- repeat your question again.

BY MS. RUBIN:

Q   Do you know whether --

A   Who -- if anyone else provided --

Q   -- anybody else, I guess, asked Jeremy Lewin -- told Jeremy Lewin to relay that information?

A   Jeremy definitely painted a picture -- a picture that it wasn't Jeremy. That it was, you know, the -- the "they."

Now do I know who "they" is? No, I do not. I think given the events, the run-up, it was coming from the White House or the team. But that's my assessment of the week and what happened. But Jeremy was not -- Jeremy was not putting anything forward like, I believe, blank. It was, you know, We need to -- it was -- so it was more of group speak.

Q   It was your impression that this recommendation was coming, let's say, through Jeremy Lewin rather than from --

A   Yes.

Q   Jeremy Lewin?

A   Yes.

Q   But you don't know who specifically --

Page 162

A   I don't --

Q   -- he was relaying that information on behalf of?

A   If Jeremy relayed it -- I recall it being more of just the White House, whether it was specifically, like, the Vice President's office or not. That might be me filling in details after, because the following Friday, a team came from the Vice President's office. So I don't know specifically. But I know that my impression was Jeremy was a conduit.

Q   But you don't know for who?

A   No, I do not.

Q   Do you know if Elon Musk was involved?

A   I don't.

Q   And your reaction was that you did not advise Jason Gray to take Jeremy Lewin's or the recommendation that came from Jeremy Lewin?

A   Correct.

Q   Did anyone speak to what the consequences of putting the entire agency on administrative leave would be?

MR. WEN: Objection. Calls for speculation, and argumentative.

BY MS. RUBIN:

Q   Did anybody say in that meeting --

Page 163

A   Jason did.

Q   Okay.

A   Jason was -- my opinion of his body, and I only knew the guy for 10 days. I think he was, like, exasperated, like, with his body language and how he was talking. He made a couple comments. Again, I don't know all of AID, but he started naming off programs which, again, have -- now I am more familiar, even though I left the organization, just because they -- those programs have been in the news, and my curiosity of finding out when something's mentioned in the news to look at it.

But there's programs like AIDS intervention, some of the programs with, like, the -- the cattle, the screwworm, stuff that you have that's coming now through USAID, executed the contracts for USDA. I don't know if he actually said that one. But there was -- he made a comment about like, food on wharfs, like, you know, food not making it to its destination and, like, rotting on the pier.

And I think when he made some comment about that, I think my answer -- then I jumped on and I said something to Jeremy. I'm like, This isn't -- this cannot be what we -- we want to do. Like, there has to be another way, or something along those lines.

Page 164

And that was what Jason was essentially throwing out is, There's a lot at stake. At the time, we were doing -- we were involved in the stuff with the peace negotiations in Lebanon, and so big-ticket items for the administration that, in my opinion, just really put the administration at risk.

I did not -- I was concerned that there was drive by a nascent group of people to do that could have cascading poor implications for the U.S. government, to include -- to include the White House.

And that goes back to -- and I know I'm meandering, I apologize. But it goes back to just, like, the President wants it. Okay. Like, that's okay. President wants it, we're doing it, right? It's not illegal, so we're going to do it.

But does the President -- because -- because he's the one that's going to get called, you know, to the newsroom or -- right? It's -- it's his administration.

So, like, who -- who is doing it? Like, who is fully witting at what point in time? And I just didn't have that in -- you know, that for -- for me to confirm to Jason to -- to execute. I don't know if that answers your question or just begs a whole bunch of other questions, but.

Page 165

Q   You mentioned a nascent group of people.

A   Just all your politicals, right?  Your administration just turned over.  So everybody is eager to kind of move forward and take over new jobs.  And obviously, the -- the Efficiency team or the DOGE team would have been all new to government, right?  And as the week was progressing, it was very clear, week two of the administration, this -- and now DOGE is here.

It's like, Oh.  This is -- this is our -- like, that -- we're the test case for what -- if -- my words, not anybody else's -- like, Oh.  We're the test case for how can you utilize this new body that the President has emboldened to execute change throughout the government and recommend -- you know, make recommendations, as it says in the executive order, to the administrators and the department heads to move forward.  That -- that's the body I was referring to.

So I -- I would loop in all your politicals, I would loop in any of your seniors that are trying to jockey in position in their organizations to get close to new politicals, right?  Because that's a whole whirlwind of activity.  And then the DOGE team, which was their own whirlwind of activity.

So all of that is just, you know, more chaos upon chaos and moving parts --

Page 166

Q   How --

A   -- in my opinion.

Q   Sorry.  How did Jeremy Lewin or anyone else in the meeting respond to your and Jason Gray's comments about the consequences of shutting down the agency?

A   I will -- I -- I can only answer how I think that he -- I guess I can.  I -- I think he was hearing Jason's objections.  I think Jeremy was -- I think he was more concerned with the pushback that I had been giving him through the week and that I definitely gave in that meeting.  But that's completely my opinion.

He -- he was definitely -- it was definitely not -- which is why I also, in my opinion, why I wasn't first invited to the meeting, was I think Jeremy knew that it would be harder to move me off dead center because we -- we had those conversations throughout the week of doing things, and -- and I kept going back to, No problem.  We'll do it all once we put it in the proper channel.

So I think Jeremy knew -- Jeremy's not an idiot.  I just think that he knew that I would be a -- a pretty tough sell on that.  But, again, that's my -- you know, my opinion.

Q   When -- so I understand you weren't in the room when Jeremy Lewin gave a recommendation.  When you

Page 167

heard that there was a recommendation made to put the entire agency on leave, did you understand that to mean functionally shutting down USAID?

MR. WEN:  Objection.  Argumentative, and vague.

THE WITNESS:  Yeah.  I -- I mean, by definition, if no one goes to work, then you are stopping mission.  So I did 100 percent think that whether that was the intent, translating that to my position, doing so would have been effectively shuttering -- shutting down operations that are -- were happening real-time.  It's a global mission.

And that was where the risk really came in for -- because you're shutting down things that I don't even know about, and I don't know how that would then reflect back upon the administration.  Again, if it's a calculated decision, no problem, right?  But -- but I -- we didn't have -- I didn't have that.

BY MS. RUBIN:

Q   This didn't come off to you as a calculated decision?

MR. WEN:  Objection.  Argumentative.

THE WITNESS:  I could not make a calculated decision based on what I had.  And -- and I'm not -- I'm not naive enough to think that there was

Page 168

obviously lots of conversations that happened, and I wasn't -- chief of staff of AID is not the most important job in the world.  I just did not have that information.

BY MS. RUBIN:

Q   And you mentioned -- again, you've said a few times risk to the U.S. government.

Can you explain what you mean by risk?

A   All right.  Sure.  Like whether it's political fallout, whether it's -- which would be risk to the administration, like making bad, you know, making decisions that are deemed in -- in hindsight and, you know, historically as poor, tarnishing an administration.  You can also take risk as in life and limb.  You can talk risk as in international relationships, and you can talk treaties, you can talk -- like all those things are potentially impacted.

None of those things might be impacted, right?  If it's a risk that goes to the administration and the administration says, I don't care.  I'm willing to stand up in front of the newsroom and -- and state -- that's exactly what we did, that's okay.

But just make sure it's a -- like, it's a mitigated -- you're mitigating your risk through a proper decision-making process.  And so I don't -- I

Page 169

don't know if there was a arbitrated process prior to that meeting. I had not been privy to it and had not witnessed it.

Q   You had concern about risk relating to, you said, political fallout?

A   Mm-hmm.

Q   You had concern with -- and this is again all going to the idea of putting the entire agency on leave. You said you had concern of risk relating to -- did you say bodily harm?

A   No. Like, human life, right?

Q   Did you have that concern as to this?

A   Sure. Because the programs that they were doing were helping support medical clinics and food clinics and stuff like that globally. And, again, I don't even know the different aspects at that point in time where AID's most critical, right?

On the bell curve, what's that 10 percent that everyone agrees you should not touch? If you're wholesale -- you know, putting an entire organization on leave, something is going to be swept up in there that's -- and I won't go into an unclassified forum, but there are potential pitfalls that you could walk into. You don't know that they're there, and you don't know because that's the purpose of the way the bureaucracy is

Page 170

set up. So we just need to make sure other people are fully involved in having these conversations.

And we did have some of -- some conversations earlier in the week to tease out -- not specific to that decision, but just in general, where other government interests lie within AID's mission.

Q   Did you ask for this recommendation -- did you or Jason Gray ask for this recommendation to be put in writing?

MR. WEN: Objection. Vague.

THE WITNESS: I don't know what Jason asked for. Did I specifically say I needed it in writing? I don't know. Did I ask for more than what, like, Jeremy -- or Jeremy's comments? I'm positive I did.

BY MS. RUBIN:

Q   What more did you ask for?

A   That I don't know. Like, I -- I probably -- and it -- because it was probably big hand, little map of, like, I -- we can't -- like, we need to know where this is coming from. The vagueness of, It's the White House, you know, or whatever the words were, it's like, You need to have more -- a more senior discussion and dialogue that all the stakeholders are fully witting of the decision that we're about to make.

Page 171

And I did not know at that point in time whether that conversation -- so the speed bump I was throwing out was to make sure that was -- that that would end up happening. And that goes back to the risk mitigation from an organization and a USG perspective.

Q   So not necessarily what you specifically said or asked for, but, you know, standing in your shoes in that moment --

A   Yeah. We need more. We can't --

Q   -- what did you want to see?

A   We -- we -- more --

Q   Ideally, what would you have wanted?

A   More information, more paperwork, more authority. Who's this coming from, right? The -- like, It's coming from the Vice President. Okay. Right? Now we know from a political fallout perspective, the White House -- the White House, right? The two guys in charge are fully witting and on board, right, not a person who is just conveying some sort of message.

So I don't know. Would it have been, you know, a, I want this and this and this? I think it was more of, like, We need a lot more to execute that. I don't know if I called it out, I need it in writing, I need an executive memo, I need, et cetera, et cetera, et cetera.

Page 172

Q   Just to clarify, you did not know who this came from --

A   No.

Q   -- correct? I just wanted to clarify in terms of coming from the Vice President was just an example of something --

A   Correct.

Q   Okay.

A   Yeah. I don't know -- I mean, I don't remember exactly what Jeremy said. In my mind, regardless of the words -- and this might be speculative because I don't know what Jeremy said, you'd have to talk to Jeremy -- it was like, This is White House driven.

The concern I had is where in the White House, right? Is it a -- low-level staffer who is trying to interpret the direction of their boss? Doesn't matter who the boss is. Pick any of the seniors at the White House. Or is this the seniors themselves? Like, that was the -- like, that's the rub. And I'm getting it from another party without any insight into that. And so I'm certain I balked at that entirety of all of that.

Q   And so, again, in that moment, you could not -- is it fair to say you could not confirm who from the White House, if anybody, was giving that instruction?

Page 173

Or was giving -- sorry.

A   Correct.  Outside of what Jeremy had relayed --

Q   Yes.

A   -- I did not have anything more -- to my recollection, I didn't have anything else.

Q   Did Jeremy Lewin give any reason why Jason Gray should shut down the agency?

MR. WEN: Objection. Argumentative.

THE WITNESS: Yeah, I don't know. I -- yeah, I don't know.

BY MS. RUBIN:

Q   In terms of your concerns about needing more, did you have any concerns beyond who specifically wanted this?  In other words, even if -- hypothetical, if you were told the President did want this specifically, and you had the evidence in front of you that you needed, that he is the one that said it, did you -- would you have had any concerns about putting this into action?

A   I didn't have --

MR. WEN: Objection.  This calls for hypothetical, speculative.

THE WITNESS: I was just going to -- I'm not trying to pick a side on how to answer these questions.

Page 174

BY MS. RUBIN:

Q   I understand.

A   But I don't know, right?  Like, if I had -- if I had Susie Wiles, right, the White House Chief of Staff, call me and say, Matt, you're the Chief of Staff, AID.  Yes, ma'am, I am.  I just walked out of the Oval Office.  The President wants you to shut down AID.  I would probably be like, Oh.  Crap.

What would I have done?  I don't know.  I probably would call her back just to make sure it was her that was calling me and, like, get the White House switchboard and have them patch them in, and I'd be like, All right.  Because it's not just, you know, Brenda (phonetic) from the bakery down the road or something who has a beef with AID.

So I probably -- like, I don't know.  I don't know what that warm fuzzy would have been.  Susie Wiles calling me would put me way further down the line of, Execute, Jason.  I think you need to put this organization on leave, right?  Like, it's coming from the White House.  We're an executive branch mission.

I think that would have been a very hard thing to not execute off of.  But that didn't happen, right?  So I don't know.  Like, what level of -- would it be any -- would it have been last line in the executive order

Page 175

of, you know, -- because I think there's some orders on AID and refocusing USAID overseas, like Emmett (phonetic) said, And we will abolish USAID.  That probably would have been like, All right.  We're -- because that's our direction, right?

But that executive order which dealt with USAID didn't have that, right?  It was -- it was broader in terms, and I suspect it was -- if that was the intent, it was probably watered down through the executive order drafting.  Again, that's speculative on my part, right?  Having been involved in this stuff.  But I wasn't involved in that intent, and so I -- I didn't have it.

So that is a very long-winded -- I don't know.  I don't know how I would have behaved given all sorts of things that could have been given to me.  But at the time, I definitely did not have them.

Q   I think you alluded to this, but based on your -- was it 30 years working in government?

A   Yeah.

Q   Had you ever witnessed any person direct that an agency be shut down in this manner?

MR. WEN: Objection. Argumentative.

BY MS. RUBIN:

Q   Let me rephrase.

Page 176

A   But I can answer?  Oh.

MR. WEN: Yeah, you can answer.

THE WITNESS: We're going to -- well, hold on --

BY MS. RUBIN:

Q   If you understood, please go ahead.

A   I'm just waiting to get -- if sometimes you rephrase and go back again, so you guys decide.

Q   No, I'm all set.  You got it.

A   No.  I don't think I've ever seen anything like that.  I've never been privy or part of.  I've seen organizations shuttered internally.  I -- you know, I know that, like, NGA, the National Geospatial Agency, when it was formed, it consumed and sucked up a lot of other smaller entities to make whole.

So I've seen the repurposing.  It goes back to the first part of this deposition when -- when I spoke to the White House of, maybe you end up with a fraction of what AID is, or maybe you end up with no AID, maybe you end up with double the AID, right?  Because those other organizations, AFRICOM, shouldn't have that mission in Africa.  It needs to go to AID.  We're better positioned.  I didn't have any of that data.

Q   When you had those conversations, did you have in mind that that would take longer than, say, a week?

Page 177

MR. WEN: Objection. Calls for speculation, and argumentative.

But you can answer.

THE WITNESS: Yeah. So for me to lead an organization through organizational change that large would be a year-plus program, unless there was the resources provided. And resources might be AID efficiency or a DOGE team, resources might be more money, resources might be exceptions to rules of how to do whatever it is, right?

It's changing the rule set. Based on how I know the government works and how I've worked in the government, a year would have been a Herculean effort. Anything less is even more Herculean. I don't know what that becomes. Zeus-like? I mean, --

BY MS. RUBIN:

Q   By this -- by the time you're having this meeting or during this meeting, did Jeremy Lewin or anybody else show you evidence as to -- evidence that would justify terminating the 58 individuals placed on administrative leave on January 27th?

A   Not to my recollection.

Q   Did Jeremy Lewin or anybody else show you evidence to justify putting the entire United States International Development Agency on administrative

Page 178

leave?

A   No.

Q   And just to clarify, did you -- is it fair to say that you had concerns about the legality of shutting down the agency at Jeremy Lewin's verbal recommendation?

A   I think it's --

MR. WEN: Objection. Argumentative.

THE WITNESS: Can I answer that?

MR. WEN: Yeah.

THE WITNESS: I think it's more -- I don't know if it was based on the legality, because administrative leave's pretty broad, right? It's a tool. It's one of the great tools you can use in U.S. government for investigative purposes -- not investigation as in a crime, but, you know, to inquire. I just never saw it used wholesale across an organization. And AID was involved in a lot of missions that could impact people.

There was definitely -- I think in the meeting I said to Jeremy or to the group, I'm like, the White House does not want week two of its administration to talk about the food that's rotting on a dock, right, in pick-a-place, it doesn't matter. That was my assumption of the administration and how administrations generally in the first part of their -- any of their

Page 179

term, they don't want to bring on pain without purpose, right? If it's purposeful pain, then that's their decision to make. I did not have enough of that purpose based on what Jeremy was providing.

BY MS. RUBIN:

Q   You said at some point during this meeting that Jeremy Lewin stepped out to take a phone call; is that correct?

A   He did. He took a phone call.

Q   About how long was he gone?

A   A couple minutes. Three minutes, four minutes. It wasn't very long.

Q   Did you have any discussion with anyone else in the room while he was gone?

A   It was with Ken and Jason. I'm sure we were like, you know, What -- what the heck? Like, Are we -- like, Is this about -- is this really being proposed?

And so it was probably more of flabbergasted, surprise, shock. I know that I can speak for myself. I -- I -- I think I was -- kept repeating, like, I don't think this is a good idea. I don't think this is a good idea.

So I definitely was way outside of my comfort level based on what I knew. And my -- as I saw, job was to advise Ken, because Ken would be the first political

Page 180

to get removed if the White House disagreed with our actions, and Jason as the acting would certainly be removed. And -- yeah. So that was --

Q   Did you get the impression that Ken Jackson knew prior to this meeting that Jeremy Lewin was going to recommend putting the entire agency on administrative leave or?

A   I don't know.

MR. WEN: Objection. Calls for speculation.

THE WITNESS: Yeah. I don't -- I don't -- I don't know.

BY MS. RUBIN:

Q   Was this the first time you had heard that there would be a recommendation to put everyone on administrative leave --

A   If there had been --

Q   -- on January 30th?

A   Still answer the same way. It doesn't matter the date. If someone had mentioned that, I probably would have -- I -- it might not have even registered because in my opinion it -- it was so bombastic of a move, right? Or with where we were and what we had to date I just -- I just didn't see -- it's like saying, Hey, we're going to go have lunch on Mars.

Page 181

Okay. Well, probably not, right? Like, you're not going to end up in Mars. And -- but -- so it -- it was the first time that I -- if -- if I had heard it before, I didn't take it seriously. Went in -- went in one ear and out the other. I definitely heard it and it was serious on the 30th.

Q   You said you felt shocked, flabbergasted?

A   Yeah. That it was being proposed.

Q   And was it your perception that Jason Gray, from your perception, also felt that sort of shock?

A   Yes, yes.

Q   And was it your perception that Ken Jackson also felt the same sort of shock?

A   I think Ken -- I think Jason and I were more vocal. I knew what I was thinking. I know what Jason said. I think Ken was optimistically cautious, which goes back to the speculative comment that you -- the question. I don't think Ken was involved. Like, if he had a pre-meeting before that meeting. My opinion is no.

I think he was probably also looking at it as a very senior political and a brand-new administration saying, If we're going to do this, like, what does this mean? I think he was probably working through that. But that's completely speculative in my opinion of

Page 182

knowing Ken for only 10 days as well.

Q   Again, from your perception, was it your impression that Ken Jackson was or was not read into what Lewin was going to say during this meeting?

A   I don't know.

MR. WEN: Objection. Calls for speculation.

THE WITNESS: I don't know. My -- my opinion -- because I do know my opinion sitting here. I don't know for a fact. I have no -- my opinion is based on the totality of everything I witnessed and -- and watched and stuff.

I would suspect that Ken was not -- was not fully witting. Whether Ken speculated or has his opinion, we did not have conversations about. But I can't tell you one way or the other.

BY MS. RUBIN:

Q   So Lewin -- Jeremy Lewin left to take a phone call. He came back?

A   Mm-hmm.

Q   And what did he say when he came back? Sorry. Did he say who he was on the phone with?

A   I -- not the person. I do not recall a person. I don't know the words he used. So I'll state that my opinion was it was coming from, you know, the --

Page 183

the White House, but I don't -- I don't know who, or by any -- I don't even know who he was on the phone with, right? I don't even know if he took a phone call. I mean, it's just -- I know he picked up his cell phone and said, I'll be right back. I have to take this, and he walked out and walked back in. So I -- I don't know.

Q   And what did he say when he came back?

A   The meeting was essentially -- he said, Hey, we're going to adjourn. We're going to wait. You know, whatever words. I -- I remember feeling like a sense of relief that we weren't going to pitch this battle at 7:00 on a Thursday night or whatever it was.

So his exact words I don't know, but it was more or less of -- the gist was, We're going to -- you know, we're going to stop right now. Let's come back at this later.

Q   And you said this ended around 7:00?

A   I want to remember my wife was pretty upset that I was home much later than I told her. So I think it was about 7:30 by the time I got home. So, yeah. The meeting would have been about 6:30, 7:00, I think.

Q   And did you -- so you -- did you leave, like, work for the day after that meeting?

A   Yeah. Maybe it was -- maybe it was closer to 6:00, 6:30. Yes. After that meeting, whatever odds and

Page 184

ends and stuff like that, I then departed the building.

Q   How did you feel about the way things were left after this meeting? Or, you know, what were you thinking would come of this conversation? Kind of your impression walking out.

MR. WEN: Objection. I think this was answered. But she'll follow.

THE WITNESS: Yeah. I was surprised, right? All those words. Surprised, shocked, you know concerned for my -- like, How -- how are we going to do this? Like, What are we going to do?

So there was a lot of unknown unknowns, which are the most -- you know, the dangerous -- the dangerous things when you're trying to lead. The positive side of my brain was like, we just stopped a decision or a recommendation from happening that I did not think at the time was the right decision to make.

And so I remember being pretty happy with the fact that I was the person that was in a room -- in a position of authority to have an objection that then stopped things from moving forward.

BY MS. RUBIN:

Q   And you said --

A   With respect to putting everyone on leave,

Page 185

right? So -- so part of me was the confused, the flat-footed person, and then the other part was like, Well, I'm glad I took this appointment because my, you know, 30 years of experience just came to advise the acting administrator and protect the White House, because that was what I -- you know, so that was what I thought I -- I had done.

And so I walked out and I walked home. And my wife was not happy with me being late. And -- but I more or less said, like, This is worth it for the U.S. Like, this is why we serve and we work, is to -- is to really come up with the right solutions for the, you know, for the U.S. government and the country. So this was a proud part. Yeah.

Q   And you said that was the proud, positive side. So you were -- are you saying you were proud of the role you played in what you perceived to be --

A   Yeah. I was personally happy with me, like, holding fast in which could have been or could -- like, if we were going to proceed with this, because I didn't know what was going to happen the next day, it could end up with my removal from my position, which that was -- which was okay.

Q   That was a risk you were willing to take?

A   Oh. Yeah, yeah, yeah. Yeah. That wasn't --

Page 186

that wasn't an issue. Yeah. No. That wasn't an issue.

Q   Stepping back for a moment, when you said that Jeremy Lewin talked to what you understood to be vaguely, you know, the White House, was it your understanding then that this could potentially include Elon Musk in that definition of the White House?

A   I can't --

MR. WEN: Objection. Speculation.

THE WITNESS: Yeah. And I can't state that.

BY MS. RUBIN:

Q   And sitting here today?

A   I can give you --

MR. WEN: Same objection.

THE WITNESS: Yeah. I can't give you any official position or anything that I had outside of any person walking down the street.

BY MS. RUBIN:

Q   Just your opinion or understanding.

A   At the time or today?

MR. WEN: Objection.

BY MS. RUBIN:

Q   Both. So first at the time.

A   I don't think I gave it -- I don't think I gave any thought to that because ultimately --

Page 187

ultimately, in my opinion, even if Musk was recommending that, the President or the Vice President would be witting.

Again, I don't know the relationships that they have, right? But I know that Musk was part of the administration special advisor team. So it wouldn't have mattered to me. I just need to know where that was coming from and that those -- the Vice President, the President, the Chief Of Staff, whoever in there -- was okay with it.

Does that make sense?

Q   Yeah.

A   Like, even if it was Musk himself as a special advisor on TV with the President, all that stuff, I -- that would have been a very -- I don't know whether I would have executed if he was standing in the room. I think I would have needed something more from the administration to make sure that the administration was fully -- it was an administration's decision, not an advisor's decision. In hindsight, what do I have an opinion on? I'm sure. I mean, Musk runs a very tight organization and he has a style of leadership and how he does things.

My opinion is that he -- his underlings would not execute without him being aware. Whether or not how

Page 188

aware and what decisions and guidance, I have no idea. But I think sitting here today, watching a year and a half play out, yeah, I'm willing to bet that there was at least some witting-ness to what was going on.

But, ultimately, what I needed was the -- the -- you know, I call them "blue badge" if you're in the intel community. I needed the government person, right? The -- the legal assigned person to a government seat.

Q   You said if Elon Musk was standing in the room and made the recommendation himself, you still would have wanted confirmation.

A   I don't know.

MR. WEN: Objection. Calls for a hypothetical, and --

THE WITNESS: It is hypothetical. And I'll go back to my hypothetical -- hypothetical answer, which is, I don't know. But it would have been -- I didn't have it, so the decision was easy.

If Elon was there directing it, it would have made it a lot more hard. I, as a leader, probably would have turned to Joel and say, Make some phone calls, and I would have got confirmation that Elon was there on behalf of a legal order from the executive branch. Not saying Elon's doing anything illegal or anything -- I'm not -- any of that stuff.

Page 189

BY MS. RUBIN:

Q   So just would you ask for?

A   I -- I would probably -- because everything was so new, I probably would have asked for more. Or at least would have had Joel probably do some due diligence and digging around.

Joel was pretty politically connected. I'm not -- I was not politically connected. I didn't campaign. But Joel knew a lot of people, which is one why I love Joel, because I didn't know all these people in all these other positions.

Joel had worked on the campaign, he had worked in the think tanks with them, he had worked on the last -- so he had history with, you know, these hundreds of senior people, and I didn't. So I probably would have had Joel make some phone calls. I speculate that's what I would have done.

Q   And that is to say -- you know, so we had talked about your comfort levels about executing an action on, as you described it, Jeremy Lewin's verbal.

A   Yes.

Q   And so I am asking in terms of, would you feel discomfort acting on Elon Musk's verbal had he been the one making the recommendation personally?

MR. WEN:   Again, calls for speculation.

Page 190

Calls for a hypothetical.

THE WITNESS:   Yeah. I would have been --

BY MS. RUBIN:

Q   Just your comfort level.

A   Yeah. I -- I still would have been uncomfortable. I still would have been uncomfortable.

MS. RUBIN:   Is now a good time -- should we break for lunch?

MR. WEN:   Sure.

MR. ISSACHAROFF:   Short lunch.

MS. RUBIN:   Short lunch? Because I know we're on a -- yes. We can go off the record.

THE PROCEEDINGS OFFICER:   Okay. Hearing no objection. I'll pause the record at 12:52 p.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER:   Okay. We're back on the record at 1:32 p.m., Eastern Time.

Proceed.

MS. RUBIN:   I'm going to introduce Plaintiffs' Exhibit 6.

(Exhibit 6 marked for identification.)

BY MS. RUBIN:

Q   So this is labeled -- and I realize I had not read the Bates stamps for the previous exhibits, but we

Page 191

will make sure that's provided. This is Bates stamp DOE4VUSDS_002557.

A   Get me a calendar. Can I just put this out just to -- to share with you?

Q   You can have my copy. I don't need it.

A   Yeah, that's fine.

Q   Okay. This is a document showing messages between you and Brian McGill; is that correct?

A   Correct.

Q   What platforms did you use to send these messages?

A   Whatever -- I don't know. It's from -- I don't know. I don't remember what they used there.

Q   That's fine. So that first message to you -- or that first message from you is January 30th at 7:10 p.m., GMT-5. And I'll represent to you that GMT-5 is Eastern Time.

So do you see that?

A   Yeah. I'm -- I'm confused that the header on top says, "Friday the 31st," but the text -- I know the text -- I know the text that I wrote. I know I met with Brian after sending the text. And the time frame 7:00 at night jibes with when I walked out of the meeting before -- before I departed the building. So I'm tracking that.

Page 192

Q   I understand.

A   You know what the first part is? Because I don't know what that is.

Q   I'm not sure, but I know that UTC is, like, a universal time, and if you subtract five, it's Eastern Time. So the timing lines up. I'm not sure why the date is incorrect on the sent line.

MR. WEN:   I think it's because it's five hours, or it would in Greenwich Mean Time be --

MS. RUBIN:   Oh. That's true.

MR. WEN:   -- 12:00 a.m., 12:30 a.m. Friday.

MS. RUBIN:   Because UTC-5.

THE WITNESS:   And that's a log. Okay. Sure. That makes sense.

Oh. Yeah. So I'm familiar with the text then.

BY MS. RUBIN:

Q   Okay. So you sent -- you sent the message January 30th at 7:10 p.m.?

A   Yes.

Q   And the message just says, "Call me."

A   Mm-hmm.

Q   And Brian McGill responded January 30th at 7:13 p.m.; is that correct?

Page 193

A   Yes.

Q   And he responded, "I'm on my way up.  Want phone.  I can peel off."

Do you recall having these -- this back and forth with Mr. McGill --

A   Yes.

Q   -- with Brian?  Why did you ask Brian McGill to call you?

A   Because I was getting ready to leave the office.  The conversation that we ended up having was from a request that Luke, part of the assessment team, had made -- which was to gain access to the security software where all the clearances and things are held.  I don't remember the name of the database.

But, generally, that's -- as an intel guy, I'm familiar enough with security databases and protocols and things to know that that is something that you generally don't screw with because it impacts careers.

There's -- there's a lot of information in there that could be used -- you know, it's a lot of personal information, it's history.  Like, I've never been in the database before, that type of database, from what I understand it is.  And Luke was pushing to get access into that.

The conversation started earlier in the day

Page 194

sometime because it was -- it was in my office because he said something about getting into the -- the database security, which I think it was Brian, maybe it was an underling in the office, or maybe it was two of them, made a comment about -- basically, they were saying, like, No, can't do it.  And, of course, as you guys know, like, unless it's against the laws of physics, right, or the Constitution, usually you can do things in government.

So it's not a, I can't do it.  It's a, Do you need to go through some steps?  And so we had part of that conversation where the security guy's like, Can't.  Luke's like, I can.  And then Joel, my deputy, said, like, Hey, wait a minute.  Like, what you're asking for is -- like, this is not a trivial thing.  And this goes back to the sophomoric nature of some of the requests from the -- the team that came in.

As an intel professional, I would not walk in and say, I need to get on security system and have full access to it, because you just know, like, that's -- like, you don't -- we -- the system generally does not give that access.  It's just not a normal thing.

That conversation was ongoing.  We said, Well, hey, we need to document this for them -- for the record, or get a memo that, like, Jason would allow,

Page 195

because you're administrator, department head -- or secretary level, not department head level.

The -- the person in charge of the organization owns clearances and they own the process, because it's the organization giving that clearance.  So, ultimately, it was a Jason Gray decision.

And so somewhere in that chattering, Joel was there.  I don't remember who else was there.  At least somebody from security there.  And Luke was the one asking for it, was we'd have to put a letter together.  And -- and I remember that detail because Joel had said it, and Luke made a pretty pithy comment back to the deputy chief of staff of the organization that he was currently standing in.

And so it struck me as not only a weird request, but his tone and demeanor was -- was not professional, in my opinion.  Certainly not to a senior officer -- a senior political officer at that organization.  The team marched off.  I went about --

Q   What did he say?

A   Something -- it was something about the memo.  It's like, Well, that shouldn't take very long.  Just do that.  And it was very curt.  It was -- it was just very unrespectful.  It wasn't -- it wasn't how you would speak to someone even as a peer.  It's not how I would

Page 196

speak to a subordinate, right?  And Joel was neither of them to this guy Luke.

Anyways I don't remember how that ended, but that group went off.  And then somewhere in there, I ended up going into the other meeting, which is the one we just talked about, where Jeremy was in there.  And I don't remember all the impetus.  I just remember there was a driving force.

And, Brian, because the -- the chief of security had been put on admin leave earlier in the week, was the acting.  And before I left that night, because people were still working after I knew I was going home, I brought him up and said to him -- which I was giving what I would say was sage advice, which is, Don't start the conversation -- like, first of all, we're going to support the team that's here.

Second of all, don't start a conversation off with, No, because if it's legal and it's coming from the White House, the answer's going to be, Yes.

It might be unprecedented, but don't say no.  But in the same breath, make sure you're getting it in writing and make sure you have the steps that you're not violating any rules -- internal rules or bigger security rules, DNI rules.

And there's another organization that holds

Page 197

certain clearances for AID. I don't know if the classification level -- that itself is not unclassified because that happens across the government where, you know, like, a small organization might not need to have a clearance for -- to have a security shop because there's only one or two people.

But maybe the head of -- you know, pick a small organization, might have to have clearance. Other organizations, State Department, DOD, et cetera, will hold their clearance on their behalf. And on certain clearances, our clearances were held.

So that means you got other organizations involved in -- at least my assumption or speculation, you have more equities than internal to our home alone. So make sure we're not screwing up others. And -- but don't start -- the conversation was, Don't start off with, No, because security and counterintelligence folks, as an intel guy, that's generally the position they'd rather go. It's kind of like lawyers, right? If you start with no, there's no action, there's really no harm.

And I'm not -- meant as a little bit of a joke, but it's true, right? If you take no action, you're probably safer than taking action. And so what I was telling Brian was, in this case, that's not a good

Page 198

enough answer. You need to do more due diligence. You need to seek through your security means, how can you satisfy this request and get it to the point where if you can't, it has to be more than -- because we've never done it before. It has to be tied and specifically and specifically embedded.

And I said, And then that's a decision that the administrator makes. It's not yours to make. You can say as your security advisor, No, but ultimately you're a security advisor for the -- and so that was the gist of the conversation, which I'm leaving, not sure what conversations are going to transpire, but make sure that you start off with, I want to work with you.

Whoever that "you" is for the team that was there, and to make sure that you're doing the due diligence. Don't take -- don't just do things based on verbals if you are not professionally comfortable with that.

Q   And why did you give him that advice?

A   I -- during the meeting, he was clearly shaken up. I've worked with security guys my whole career. I could tell this was -- like I mentioned before about me being in an uncomfortable zone, like security and counterintelligence guys, you push them outside of their normal bubble. They're really concerned with that

Page 199

stuff, right?

And so I just knew he was a good -- Brian's a good dude, and I just wanted to make sure, like, I am going to support the requests if we can get to yes. So, internally, your answer's not going to meet my muster until you have more to bring. But I also don't know if the answer's, yes.

So, like, I don't know. Like, this is your -- I got the request, I got your world. I'm going to combine these two, and my job will be at some point to bring this to Jason or -- or whatever. And Jason can, if I was -- if it happened after hours, he can make his own decision. He's a professional as well.

But I was letting Brian know that I support you, but I would not recommend starting off with, No. And I would try to get to, Yes, doing all the things that are legally, morally, and ethically, you know, allowed.

So that was -- that was what that conversation -- that is, in my opinion, was way too nuanced to put into a chat, right? Because it would just be misinterpreted and stuff like that. And it was more -- yeah. So that -- that was why.

So the impetus was I wanted to make sure that Brian knew that we were going to continue to support the

Page 200

interests of -- of this team or DOGE but we were also going to do it under what I had been stating, which is we're going to do it legally, morally, and ethically.

Q   You said you were shaken up after a meeting.

Was that -- that wasn't the meeting that you were describing before with Jeremy Lewin; is that correct?

A   Yeah. I think that meeting ended up finishing, and then I think this conversation then took place if -- timeline-wise.

Q   So the meeting --

A   But the meeting -- the conversation with Brian, there was no cross-pollination of the meeting I just had with Jeremy and -- and Ken and Jason. Two separate -- two separate things.

Q   So when you say Brian McGill was shaken up, that was about a conversation I believe you said with (indiscernible - simultaneous speech)?

A   Yeah. Earlier in the day when Luke's -- when Luke -- the --

Q   Go ahead.

A   When Luke Farritor said, I want -- I need to be full admin system. And it's like, that's as -- a career intel guy, like, that's a big deal. Like, you put one little check on there, your career is over,

Page 201

right?

An inadvertent clicking on a button or deleting of a paragraph from investigatory work, like, that has cascading impacts not only to the individual in the seat, has cascading impacts on mission, right? If you start losing people because you're making decisions, like, that's a policy decision of what's allowed, what's not, because it all goes back to the risk of the senior at the time, that was Jason.

So -- so, yeah. Brian, as a security guy in a newly risen position, because his boss was on admin leave, I think he was -- my words, he seemed like he was like, Oh. Crap. Like, I don't think I -- like, I can't do that. I think that was the words that came out. And this was a follow-up of, like, let's not start off with, No. Let's start -- you know, start with, Maybe. And those exact words -- that was definitely the gist of what I put out.

So it was -- it was a pretty brief conversation, and it was mostly one way to make sure he knew that that was the way I was going to navigate through, like, that question in hand, which is a security thing.

Q  You had stated that, you know, inadvertent clicking a button or deleting of a paragraph from

Page 202

investigatory work, like might be on this system, has -- is a policy decision; is that correct?

A  Well, meaning like if you're -- the -- they have no -- from what I understand, there's notes in your -- like, it's a profile. It's like your HR record, but security keeps it and has all your security stuff, which is your investigation, all your financial records, all your -- you know, non-disclosure things, the financial disclosure, like, all of that stuff, from what I understand.

I don't know the system that he was looking to go on. In my career, I've never been in those systems. I've never looked over anybody's shoulders on those system. But I do know that security is a big deal for people to have a clearance. Like, as an intel guy, like, it is -- that's it. Like, when you take a polygraph, it's one person that could say, No, and that's it. Your career -- and you actually have other ways you can get around that, but it's a really long process that literally goes to an agency head.

And then that agency head, as a human, says, I am willing to take all of that risk. You, as a security person, just told me he should not have a clearance. I'm personally willing to take that on. Not a lot of agency heads out there that are willing to do that.

Page 203

Security holds a lot of power when it comes to clearances. You had a -- you know, Luke not a former government employee, as far as I know, asking to get into, you know, the keys to the crypt, if you will.

What the organization -- to answer your policy question, that's Jason Gray's risk with respect to the clearances that he could buy into. There's another organization that bought into other clearances, and they weren't in that room. And they -- as far as I know, they get a vote. They at least get a phone call before we're letting other people on systems that might impact their equities. It's just good staffing and just -- it's the right way of doing business.

Q  And you were concerned that without, as you kind of say, the proper channels or the process you were describing that you wanted to see from Brian McGill, that Luke Farritor would be able to make these potentially policy decisions without consulting --

A  I have no idea what --

MR. WEN: Objection. Misstates prior testimony, but --

THE WITNESS: Yeah. I have no idea what he could do. I just know that that's --

BY MS. RUBIN:

Q  It was not a --

Page 204

A  It's a red -- it's a -- I don't know. Red flag, yellow flag. It's a flag. It's not a green flag, "run," right? It's a, Hold on for a second. This could impact a lot. The person, the mission, the equities, other organizational equities, et cetera.

So -- and I did not have a warm fuzzy from Luke as a human being professional, given what just transpired before of, like, Well, just make that happen, right? Sorry to be, like, snapping fingers. But, like, that is something you generally don't see at that level of staffing, you know, with multiple SEs' sitting in a room, you know, senior executives, and then having a -- you know, a younger kid come in and be, like, dismissive and directive of a room full of people saying, Maybe, but let's work through the process.

So I don't know what Luke would have done, but leaving, I felt enough to call Brian, my security guy, to say, you know, You will make your decisions, and I empower you as our security person, but I am going to try to get to yes, but I am also not going to do it willy-nilly, and I would recommend you do the same.

Q  So I'm going to introduce Exhibit 8 to the record. This is -- oh. Sorry. This is Plaintiffs' Exhibit 7 to the record. And this is Bates stamp MCGILL_000025.

Page 205

(Exhibit 7 marked for identification.)

BY MS. RUBIN:

Q   This is an email chain with the subject line "Authorization for Access Control Information."

Do you see that?

A   Yes.

Q   Okay.  And that's your name on the cc line and your email address?

A   Yes.

Q   And the other people listed on the cc line here on the front are Ken Jackson -- or, sorry.  Ken Jackson on the "To:" line, cc yourself, John Voorhees, and Joel Borkert?

A   Yes.

Q   And this top email is an email from Brian McGill?

A   Yeah.

Q   Okay.  So looking at this last email on the first page.  From Brian McGill, sent on January 30th at 7:04 p.m.  See that?

A   Yeah.

Q   It says, Ken, as a follow-up, Luke is requesting full administrative rights beyond read rights to be able to make changes.  We have concerns granting administrative rights without knowing the purpose, as

Page 206

this would enable the user to make access decisions to include allowing people to access restricted space without checking their clearance.

While I was upstairs, Luke had Mr. Elon Musk call our staff who was working with him to verbally authorize and direct them to give Luke access.  Luke offered to call Mr. Musk back to talk with me.

Is this the situation you were referring to when you asked Brian McGill to call you?

A   Yeah.  I don't -- I actually don't remember this note, the one from 7:04.  I don't know.  I -- I don't know if I -- I mean, timewise it comes on the heel of it.  I don't remember if I read this and that prompted me or -- but I don't -- until I just read that right now, I don't -- I don't remember that.

Q   Okay.  Do you recall Brian McGill telling you about Luke having Mr. Elon Musk call the staff that evening?

A   I don't.

Q   Okay.

A   I don't remember.

Q   So in the interest of time, I'm going to move forward a little bit, but if we have extra time, I'm going to come back.

Okay.  Jason Gray was removed as the acting

Page 207

administrator of USAID; is that correct?

MR. WEN: Objection.  Argumentative.

BY MS. RUBIN:

Q   Was Jason Gray removed as the acting administrator of USAID?

A   As far as I know, yes.

Q   And Secretary Marco Rubio was made the acting administrator of USAID?

A   Yes.

Q   When did that happen?

A   I think that was Friday.

Q   Friday -- that would be January 31st?

A   Friday morning.  Correct.  The 31st, yeah.

Q   Introducing Plaintiffs' Exhibit 8.  The Bates stamp on this is DOE4VUSDS_000569.

(Exhibit 8 marked for identification.)

BY MS. RUBIN:

Q   Yes.  Sorry.  Tab nine.

MR. WEN: Exhibit 8?

MS. RUBIN: Yes, Exhibit 8.

BY MS. RUBIN:

Q   Have you seen this document before?

A   I don't -- I don't remember if I saw that on that Friday, which is when I assume it would have been promulgated.  It's dated on the 30th, so it's the night

Page 208

before, so.

Q   And from what you can tell -- or you can see that this is the order signed by President Trump appointing Marco Rubio Acting Administrator of USAID.

A   Yeah.

Q   Do you know what time this was signed on January 30th?

A   I don't.  I don't.

Q   So you don't know the time that Jason Gray was officially removed and Rubio officially appointed?

A   No.  Not that I remember.

Q   You can put that to the side.  When did you find out?

A   I think it was Friday morning is what -- I think there was discussion of whether or not USAID would go to State at -- at some point in time from starting when I had my first interviews with them.  I don't think I knew that it was a done deal, that it was happening, until that Friday morning when we had another meeting.  Friday morning, the Vice President's team came in.  So it was a mid-morning meeting, and they made the statement, The decision has been made.

MR. WEN: Objection.  Objection.

Sorry.

I'm making a protective invocation of the

Page 209

presidential communications privilege as to the Vice President and his staff about those kinds of communications regarding -- and advice to the Vice President or the President. I'm going to instruct the witness not to answer.

BY MS. RUBIN:

Q   Who was at this meeting?

MR. WEN:  He can answer who was at the meeting.

THE WITNESS:  There was a couple guys that came from the Vice President's office. I don't remember their names. Jason was there. I was there. I know Joel was there. And I think other -- I think folks from the DOGE team were there. I don't remember all of the ones that were -- I don't remember everyone in the room.

BY MS. RUBIN:

Q   Okay. And I'm not asking what specifically was said, but during this meeting, you were informed that Jason Gray was removed as the acting administrator. This is a yes or no.

MR. WEN:  Yes or no.

THE WITNESS:  Yes. As far as I remember, that was when I -- it was -- to me, it was official that that was a -- a done deal. I don't know. Yeah. No.

Page 210

That was -- for me, that was like, Oh. This is happening. So whether it was spoken about or mentioned earlier in the week at any point in time during -- like, that was definitely, for me, a, Oh. This is -- we're now state part of it.

BY MS. RUBIN:

Q   So this was the first time that you heard that Jason Gray was removed from his position as acting administrator?

A   As far as I remember, yeah. I don't -- I don't think I had any indication of that prior.

Q   And from your perception, did it seem like it was the first time that others in the room had heard this as well? And by that, I'm talking about Ken Jackson, Joel Borkert, Jason Gray.

Do you have the impression that Jason Gray had found out beforehand?

A   I don't know.

Q   Okay.

A   Yeah, I don't know.

Q   Who made the decision to remove Jason Gray as acting administrator?

A   I don't know.

Q   Could it have been Elon Musk?

MR. WEN:  Objection. Calls for

Page 211

speculation.

THE WITNESS:  I don't know.

BY MS. RUBIN:

Q   Did Elon Musk have any involvement in the decision to remove Jason Gray as acting administrator?

A   I don't know.

MR. WEN:  Objection. Calls for speculation.

BY MS. RUBIN:

Q   Did Steve Davis have any involvement in the decision to remove Jason Gray as acting administrator?

MR. WEN:  Same objection.

THE WITNESS:  Same answer. I don't know.

BY MS. RUBIN:

Q   Did Jeremy Lewin have any involvement in the decision to remove Jason Gray as acting administrator?

MR. WEN:  Same objection.

THE WITNESS:  And I don't know.

BY MS. RUBIN:

Q   Were you told anything about the decision to remove Jason Gray as acting administrator? Or the reasons for removing Jason Gray?

A   No.

Q   If you had to speculate, what -- why are you --

Page 212

MR. WEN:  Objection. Calls for speculation.

THE WITNESS:  That was the best one so far.

MS. RUBIN:  I'm going to put that one on the record myself.

THE WITNESS:  She's agreeing with you.

BY MS. RUBIN:

Q   From your impression.

A   Yeah. I think he -- so in my opinion, and speculating, if that -- like, not knowing any of the other things, because I didn't -- I don't -- I don't know those aspects. It's borrowed time when you're an acting, right? And you're an expendable asset. And Jason and I talked about it. He knew that, which is why Jason and I were so close, because his thing was like, Hey, you're the political, so I want to do the right thing by the organization and the administration.

But he knew at any point in time that he could be, you know, told to exit stage left. Throughout that week, I know my name came up through, like, some of the political set stuff, like, Hey, people are wondering why this Hopson guy is, like, running a coup.

And so there was -- there was information leaving our organization, which -- opinion, speculation

Page 213

was, it was being leaked up into the administration seniors, whether it's Stephen Miller, Stephen Miller's wife, because those were names that were just kind of floated out.

But politicals are like, you know, a lot of other people that have ego. Like, people like to drop names and stuff. You never really know, right, until -- because you don't know. You don't know what everyone says that's happening. Sometimes it's true, sometimes it's not. So you go back to, I want it in writing, I want stuff.

But it was very clear that I was not getting wonderful press in some circles that were at least attributed to White House circles. And I -- I'll -- I'll leave it at that.

So I don't have -- I don't have inside sausage-making ability. The reason I'm giving you that preamble was that was how I felt. And I think from a -- it was not a shock. Jason's time -- he's the head of the organization, and if there is, if there is anyone saying that he is being poorly advised, right, and he's executing, it's his decisions, sure, the administration would remove him.

So it was not a shock that -- you know, especially if you're going to move it to another

Page 214

organization, you don't need to keep a -- a careerist in there when you can move it under a political appointee.

Q   So you just said that there were some, let's say, statements floating around about you, and I know you used the word here about a coup.

Could you tell me a little bit more about that? Like, what was your awareness of statements that were being passed, and how you felt about it?

MR. WEN: Objection. Calls for speculation, but.

THE WITNESS: Yeah. How I felt about it, I didn't really -- I was just like, Well, that's interesting. Like, it didn't -- I don't think it changed much of that. It definitely heightened my sense of, like, there are senior people that are potentially witnessing or watching, or their staffs, right? Because that was the part I don't -- like, if Jeremy has a direct connection to pick a person who has a direct connection to pick a -- one of the two senior people, right? Like, that's a very fast chain of command and path.

But I didn't have insight into that world. But like, Joel, my deputy, who, like, does know people, and -- and Pete Marocco, who I knew -- and I'm trying to think of the other politicals -- but there had

Page 215

been, you know, things of like, Hey, like, is everything okay? Like, what are you guys doing? Like, -- and myself, Ken, and Jason were all like, No, no. We're -- we're moving forward. We have our marching orders, which is to look at all of AID's mission and -- and to move forward with that.

But I knew that, like, there was at least -- and I attributed it to -- I think a largely attribute to Jeremy, because he had been around in some conversations where we would hear like, Oh. You know so-and-so is -- you know, so-and-so has said -- you know, posing a question or is saying like, Oh. AID's not working, or, AID's not doing things.

The only way I could figure out how would that even get into the White House, right? Because no one on my staff had those direct entries, and the only other people in the room were the folks from the DOGE team.

So, again, I took that as a neutral, right? I just said, Oh. Okay. Like, they are close, right? If -- if there's -- if, for example, Stephen Miller, and I don't know if he was involved, having a conversation about what's going on here, he's finding out somehow, because Stephen Miller's not in the meeting. So all it did to me was say, like, Oh. Like,

Page 216

we are playing a varsity sport here, and there are senior people that are watching this. So it didn't -- it did nothing but more or less tune my optic towards, How do we get to yes?

BY MS. RUBIN:

Q   You resigned later that day on January 31st; is that correct?

A   Mm-hmm.

Q   Around what time?

A   I think it was, like, 7:00 at night.

Q   Before we get to that, can you just tell me a little bit about what the rest of your day was like on January 31st? You know, what --

A   Yeah. Went to work, we had the meeting earlier in the morning. I think I got my staff together, a couple taskers and questions and stuff. So just your grind. We had a meeting with the Vice President's team, and that was when things were drastically going to change. They went off, those few individuals that came in, and -- excuse me.

I was largely -- largely in my office, and I ended up getting read in for my clearances that day. There wasn't a lot of substantive meetings. I think that that meeting in the morning kind of grenaded out, like, what the plan of the day was.

Page 217

**I just remember personally, like, I did some -- had a lot of admin stuff that we were working on and doing and reviewing stuff, but nothing substantive to the 58 or to the security thing, or -- it was more or less like, what -- what is going -- from me and my seat sitting, Like, what's going on? Like, what is actually happening here? Because I'd never been in that situation before where, you know, something like this had -- has happened.**

Q   Did you have a sense that there were -- or did you know there to be meetings that were happening that were more substantive about USAID operations that you were not part of?

A   I felt it was --

MR. WEN: Objection. Vague, and also calls for speculation.

THE WITNESS: Yeah. I -- I definitely -- I mean, I was receiving, I don't know, 3,000 emails in a day. Everybody put's -- as soon as you start off as a senior in an organization, everyone -- everyone wants to CC you with their pet project, right?

So I was getting, like, thousands of -- you guys have the record, you can pull -- thousands of emails, which goes back to -- like, I don't know whether I saw that note from Brian, because it's 7:00 at night,

Page 218

I've been, you know, probably at work since 6:00 that morning. You know, my brain gets mushy too.

But I know that Friday I definitely was -- my email queue was very quiet, right? There was not a lot coming to me. So it was a notable thing as an observation. But it was a -- it was more or less a quiet day for me.

BY MS. RUBIN:

Q   Do you think there's any reason for that?

MR. WEN: Objection. Calls for speculation.

THE WITNESS: Okay. Yeah. My -- my initial thought was my access or -- you know, has been curtailed or cut off. When the team that came from the White House, I mean, they had Vice President badges and stuff, so they -- they were -- they were the real deal. The conversation was not through me. Jason they just fired, right? Jason was in the room, which they actually made a comment, like, Well, that guy's gone. And I mean, he literally was sitting right there. So from a professional thing, it wasn't the best way to -- and I don't know if Jason knew it beforehand, but we all did at that point in time.

I don't think I was in the center of the conversation the way I would expect as the Chief of

Page 219

Staff, as the second most political and only political -- the most senior political in an assigned position. Ken was more senior, but he was a special advisor. So he wasn't in a Senate-confirmed seat, he wasn't in one of the -- you guys probably know the names of them. I was in a designated billet bin number type thing for Chief of Staff. I would have expected to be more involved in the conversation, and I felt that I was a witness to the conversation. So that was unsettling.

And then as the day kind of progressed, not knowing what was going on, and -- just made that unsettled feeling even more like you're irrelevant to this conversation. And the conversation I had with my wife, which was, If I'm not here to do the job that I'm supposed to be doing, then I'm not waking up in the morning, commuting in the dark in February to downtown, making my wife stressed out, putting my kids in aftercare for the amount of money I'm getting paid to do this. So that does not equal family happiness.

And it was a pretty quick from -- I think I talked to her at lunchtime, 1:00, and I said, Hey, I don't know how long this is for me. I don't think -- this does not appear to be moving forward in the job I signed up in. She had said, Well, I support either decision, whatever you want to make.

Page 220

And then ultimately I talked to her after work and I said, I just -- I just don't see this being advantageous to what I wanted to do, as in personally. And it's definitely not advantageous to our family, right? It's way more stress and -- and so my wife said, Well, you just got to make your decision. And then, you know, however many hours after that phone call, it was probably 5:00 at night, and I think it was around 7:00, 7:30, I -- I sent the letter.

BY MS. RUBIN:

Q   Was there anything that happened in those few hours that made up your mind to resign?

MR. WEN: Objection. I think this was answered.

But you can repeat.

THE WITNESS: Yeah. No. I mean, it was -- I didn't agree with how fast things were moving. I didn't like -- like that comment. You know, Luke might be a wonderful kid, human, you know, not to be pejorative of his age, right? Because age doesn't necessarily equal wisdom. And I've taken orders from people much junior in age to me because they were the smarter kids in the room.

I didn't think that what I was signed -- what I signed up for, which was to have impactful change

Page 221

on a big organization that's -- that kind of has been lumbering for a while and turn that focus towards utilizing those funds and money to better US interests, which, when you do intelligence work, the whole purpose of helping other people is to get something back.

If I give you a dollar, I'm expecting to get two dollars of goods and services. It's an uneven, disproportionate deal. And what -- as an intel guy, I was seeing AID is, I think we were giving more than we were getting. So I was excited for that opportunity to help bring about a change that I could go to my mom -- my mom has Alzheimer's, so she wouldn't know now -- where I could say, Hey, this is what we're spending money on, and her be like, We should, right?

And, again, it's a bell curve, right? Some people are never going to agree, some people are going to always agree. The -- the reasonable man in the middle of, like, Does this make sense for the United States and for -- for Americans? That's why I took the job.

What I was watching happen was not necessarily that. The intent might have been there, the process in doing it, I did not feel that I wanted to be involved in that -- what I would say is the melee of how it was going about being done.

Page 222

It was very clear to me that this was being directed, right? I mean, the President showed me this paper, I don't remember seeing that, but it was very clear Rubio was in charge of it.

So as senior as you can get, right? These guys are like, Yeah. Mission's going there. And I wasn't an active part of any of that conversation. So I felt like that would have been the time for me to leave, right?

Does that answer the question? Does that --

BY MS. RUBIN:

Q   Yes. Just pausing to think about the next one.

You've mentioned a few times about engaging in conduct that you view as -- I think you've said, legal, ethical, and moral; is that correct?

A   Correct.

Q   Did you have concerns that the things you were being asked to do were not legal?

A   Yes.

MR. WEN: Objection. Calls for a legal conclusion.

BY MS. RUBIN:

Q   Did you have concerns that the things you were

Page 223

being asked to do were not in line with your ethical standards -- or were unethical from your perspective?

A   Yes.

Q   Did you have any concerns that the things you were being asked to do were not moral from your perspective?

MR. WEN: Objection. Argumentative.

THE WITNESS: Can I answer that?

MR. WEN: Yes.

BY MS. RUBIN:

Q   Yes.

A   Okay. I think ethical and moral, the short answer is, yes. It did not sit with how I would do that. But I've spent a career doing things that didn't set with me. So that's not out of the trifecta of those things.

And I said it before -- because I said it throughout my whole career, those three things. And then if it's not against the laws of physics and the Constitution, it's probably the doable in the government. And so -- and I believe that. I -- I firmly believe that the U.S. government is the greatest institution that we can take in and -- and move our country forward.

I've been in part of government things that I

Page 224

didn't agree, but it wasn't my decision to make and it wasn't illegal. And I think morally and ethical are things that as an intelligence officer and as a military officer are very personal. So I didn't like how things were being carried out. I didn't like that. The concern I had was the legality.

If that's -- that is a long -- I answered the statements, but I think that that's important is that I think it's the first one, the legal part is the most -- the most important.

Q   Your concern as to the legality, whether something was legal is what differentiated this situation from situations in the past where you've been asked to do things you don't personally agree with?

MR. WEN: Objection. Vague.

THE WITNESS: Yeah. But --

BY MS. RUBIN:

Q   You're good.

A   Okay. So, yes. Yes. I -- I may have spent a career being outside of my comfort zone doing things, and I -- I'm okay with that as long as I have those data points. Whether it's the verbal from the commander in chief, you know, or your commander, who is your chief, right? Doesn't have to be the President. Or, you know, getting lawyers involved in conversation, getting

Page 225

contract officers, HR people. It's mitigating all those things because if we're doing -- if it's legal, then we can do it.

And then you go into the bucket of, Should we? Right? And that's the ethical -- the ethics and the morality and things like that. And, you know, those are very different for very different people.

Q   What were your legal concerns? The extent you're able to specify.

A   Oh. Well, I think on the --

MR. WEN: Objection. Just calls for a legal conclusion, and speculation.

But you can answer if you --

THE WITNESS: I think everything we've talked about today, right? Like, Can Luke get on the system? I don't know. Can he? I've never seen it before, right? Can you allow access to SCIF spaces without checking, just taking personal verification? Never witnessed it before, right? Super high DVs? Sure. But they're escorted in, right?

And -- and there's more to it. Like, no one's going to check the President's clearance, right? But -- but everyone else, yeah, you -- you got to go through the process. Everyone submits their clearance stuff.

Page 226

The -- really -- no. Excuse me. Removing people from federal service? I never saw that without some sort of -- excuse me. Investigation or a body of evidence that shows, you know, consistent, sustained poor performance over time. And I do think those go into legal things. So ethical and moral, but from a legal perspective.

I think any decision you make as a senior, I need to be grounded by my lawyer team to make sure I am advising things so Jason doesn't have to go through that or Ken, right? That should be my -- my cross to bear to figure out what is allowable.

And then it goes to their decision. They should not be deciding legal -- whether it's legal or not, right? They should be getting a decision. If it's illegal, they shouldn't get the decision. If they're getting it, then that's where they bring in their -- their moral compass and their ethics. And that's what they're being paid for as the people that own that mission set. And those parts can disagree.

BY MS. RUBIN:

Q   Did you have a team of lawyers at USAID that you could ask about these questions?

A   We -- we -- there was -- yes. The -- after the initial group was put on leave, we had less lawyers

Page 227

to ask. So did I have access to resources? Yes. Did I have information from those resources to make those decisions? No. That's why they were pushed back or prolonged.

Like the DEI example that I gave earlier, we did have the lawyers look at it. The lawyers did write up that it was allowed. And that was a very easy decision to go to Jason and saying, It's -- this is legal. Right? Whether we personally disagree that Susie should be relieved because she's in that shop doesn't matter. Like, we can do this and the administration says is doing it. So it's done, right?

It doesn't matter whether it sits -- it sits well with me. My personal opinion and legal -- or in ethics or morality has nothing to do with it. But I'm not a lawyer, so I don't get to interpret the law, right? And that's what you have, you know, the legal team do.

Q   Was it your impression that there was a narrative that you and/or Jason Gray were resisting the shutdown of USAID?

MR. WEN: Objection. Vague and argumentative.

THE WITNESS: I definitely had that opinion, right, because of what had transpired primarily

Page 228

from that Thursday forward. I knew earlier in the week there's a couple comments that would, you know, pop here and there and stuff like that. USAID was the talk of -- the beltway for that, like, week, right? It was everywhere. Nobody was not talking about AID if you were in government.

I don't know what Jason was thinking on that. I know that I felt I was in safe harbor with respect to doing the right thing for the job I was given by the White House and that there was going to be some growing pains that we would eventually work through on all these things, but I was going to maintain a steady course to -- to do that.

As the week progressed, I think I remained where I was personally. I think that they just moved the game to a different field and I wasn't -- I wasn't playing on that field anymore.

BY MS. RUBIN:

Q   To clarify, you said you would have that opinion. When -- I guess when you say that, do you mean that from your perception you felt that there was a public narrative for -- that --

A   Not -- I don't think -- just public.

MR. WEN: Objection. Just vague, and speculative, but.

Page 229

THE WITNESS: Yeah. I don't know public. Like, if you asked my brother and sister, they would know. They're based in New York.

BY MS. RUBIN:

Q I guess I mean a narrative among you?

A But I -- I think within the -- the circle of folk, like the -- the little tidbit. Like Joel would be like, Hey, you know, like, I don't think people are happy with this. And I don't remember the things because I didn't really care. Like, it was just something I -- I keyed on it in the sense of like, Make sure -- like, Don't say no.

Like, it -- it's -- whatever the thing is, it might not seem right. Your 30-year career might not get you to yes right away in that conversation. All it did was put a check valve in me saying, like, Make sure you're doing your due diligence to -- to get to yes. Because it was clear the administration wanted to move forward on all these initiatives across the government, and -- and I was looking to support that. Or I was trying to.

Q You testified earlier that when you first discussed the USAID position, you -- and also very recently, you testified that you envisioned a process of, like, evaluating the agency's functions. You know,

Page 230

we talked about the bell curve and the 10 percent on each side which should be kept, what should be eliminated. That's correct? That's --

A That's how I viewed what we were going to be doing for the next year.

Q And you talked about some initial conversations with the other political appointees around that time when you started.

Was it your impression that they shared this vision for USAID?

MR. WEN: Objection. Calls for speculation.

But you can answer.

THE WITNESS: Yeah. I think there was agreement. I mean, I think we're -- all of us, we were brand new and along the lines of we're going to take and look at the organization and make the most sense out of what we should be doing for this administration's agenda. So I don't think anybody was not on board with effectively executing change.

What their individual end states look like in their head, I can't say definitively. I can say that Ken and Joel and I talked about, like, We'll have to look at what mission stays, what mission goes. So -- because we were starting to dig into that.

Page 231

Like, you know, I gave, like, Joel, not direction because Joel's already on top of it. I didn't have to tell him to do anything. He was already doing it before I even thought it half the time. In a good way, right? Not, like, -- he's just, like, -- he's a great -- he's a good deputy, right? He's like, Hey, you want me to do this? You're like, I didn't even think about that until now. And, yeah, I do.

And so Joel had already started putting a process in place to, like, how do we look at things and what do we look at and what's going to be the best bang for the buck? So I think we all generally were in agreement on that that we were going to -- we were going to do some change. The meetings I had the week before, I think I started off with -- they -- you know, they brought in 50 executives and then I don't know how many were on the VTC or the -- the Zoom land.

And that was essentially my intro, which is things are going to change in this sort -- like, Do not expect status quo. But I don't know what that looks like. And then I gave those three things again. But we'll do it in this way. You will have -- you know, we'll have visibility. We're going to have visibility with our oversight mechanisms on the Hill.

We're going to -- you know, and our

Page 232

budgeteers will have oversight of our political, you know, direction through the White House. Like, we're going to be transparent. We're going to be communicative across the board, and that's up, down, sideways, everything. So I think everybody was on board with that, yeah.

BY MS. RUBIN:

Q And you had this process kind of laid out that there would be a way to do this?

A In my -- in my head, maybe on a sticky note that Joel and I talked about. But we did not have anything formally implemented and we didn't have anything done at that point in time.

Q But you understood that there was -- were constraints on the way that you would go about analyzing the agency eliminating certain programs?

A Yeah. I don't know if they're constraints. I just -- I had steps that we would do due diligence to which would take time and resources to do.

So if you're looking at time and resources as a constraint, then, yes. There's constraints to getting to an answer quickly because it was a big task.

Q When you first encountered DOGE, did you perceive that they shared this objective?

MR. WEN: Objection. Vague, and calls

Page 233

for speculation.

But you can answer.

THE WITNESS: No. Because I think that they weren't government bureaucrats. So, you know, using these couple examples -- because I'm sure there's a lot of other examples that I don't remember anymore, but may remember if you guys bring them up. But, like, Luke's thing about, Just let me in the database with the security stuff, they might not have shared that, you know, you're saying constraint, I'm saying time, resources, because they don't know, right?

Like, if -- if you're from the commercial sector or if you're a junior person that's doing coding, right, and you're the Number 1 coder for -- and you say, Hey, I want this, and your boss is like, Yeah. You're making me $1 billion a day coding -- and I'm not, like, talking Luke, but, like, they don't know. Like, there's a whole system that doesn't just give you everything instantly, right? And that takes, you know, if you're a bureaucrat, your time and attention and stuff in the system.

So I don't know if they shared it because I don't think they understood in a sophomoric way what they were proposing or asking. I don't know if that's clear as mud, but in my head, it's made sense before.

Page 234

BY MS. RUBIN:

Q   Everyone at some point is new to government, correct? Like when you start out?

A   Correct.

Q   So how does someone generally come to understand the way things are done in government when they begin?

MR. WEN: Objection. Vague.

BY MS. RUBIN:

Q   Is that something you think you get through experience or is there a training, orientations?

A   I think yes in all of them. I think some of it's training on the front end for basics. I think some of it's mentoring as you come up through the system. And it's at an individual level of whether you're watching not only your portfolio, but your boss's portfolio. Like, that's how you learn, right? Like, how do you become your boss? You figure out how your boss does things and then you learn how to do it.

So I think it's a -- it's growth. It's time, it -- you know, it's contact time, right? Like, you guys immediately were like, We can't have your lunch, and you're like, Ah. Like, yeah, because you probably haven't been in the government. Like, that's a big deal, especially for government lawyers, to take a lunch

Page 235

type of thing, right? Doesn't mean that you're a bad person.

Like, you probably won't offer government lawyers lunch next time, right? I -- when I was on this side of the table, I'm like, Well, was that lunch only 5 bucks? Can I -- can I give you 5 bucks? Because it looks like a good sandwich.

So that doesn't mean that you're not brilliant as a lawyer or as a -- you know, anything, host. You -- you don't know, right? And so I think part of that is time in the government, learning that what sounds super easy, like organizational change, well, we'll just do this. Sometimes it's not that easy.

Q   To your knowledge, did members of the DOGE team at USAID have a formal training about working in government?

A   Oh. I have no idea what training they went to. Sorry. I cut you off. Yeah, sorry.

Q   Was it your perception that anybody spoke -- was it your perception that -- actually, scratch that.

Just turning back to the resignation, could you just tell me how exactly you resigned? Just the -- you know, was it an email?

A   I just wrote a letter. Yeah. I just said -- you know, it was, like, three lines. I don't have it in

Page 236

front of me. I do have a draft, which I think is the exact same one I sent. I think I sent it from my work computer, so I don't have -- you guys probably have a copy of it.

But it was more or less like, You know, at this point in time, I'm submitting my resignation for consideration. It's been an honor to serve, you know, the people. It's -- it's -- it's almost a templated thing. And that was it.

Q   And who did you send it to?

A   I know -- I know I sent it to Adam -- big long name -- the White House liaison.

Q   White House liaison?

A   Right. Because I know on Friday at some point, he and Ken and I were talking, and I was -- I made a comment about like, This -- like, Stuff is just moving really quick. This -- like, I'm not sure I'm the person that should be helping lead this charge type of thing.

Adam was very much like, You need to stick around. Ken. You know, everyone was like, Hey. I said, I'm personally not sure I'm going to do it. Like, I get everything that's happening. I don't know if this is the right thing for me and my family.

I know I sent it to Adam because during the

Page 237

day I'm like, Hey, by the way, how do you decide to get off this ride? Like, what -- because last time we all got evicted, right? The last time I got fired, right? It was 11:00 in the morning. I turned my computer in and I'm like --

Q   That's because a new administration came in?

A   Right. So I got fired. So that one was a forced firing. Got it. How do you do it when it's voluntary? Resign. And his comment was, You just need to send it to me and we'll notify the people and stuff like that. And so having not been political, I -- so I know I sent it to him. I know I sent, like, either a text or a phone call to Ken. And I think I did the same thing, you know, professional courtesy to Jason, Joel.

And then I sent a -- I believe it might have been an email, it might have been a text to the politicals on my team saying, Hey, just to let you know, I've resigned, or, I'm submitting -- I -- I might have sent like, I just submitted my resignation -- whatever the words were.

Q   Not exactly verbatim.

Did you discuss with anyone else outside of your wife your reason for resigning?

A   Well, I think in that meeting with -- with Adam and Ken, you know, I said that this stuff's moving

Page 238

really fast, I'm not that comfortable. And I don't know how that's going to play. I -- I don't think I tied things, like, because of A, I'm not doing it, like, I will resign. I -- I think it was a -- I didn't know at that point in time. I think I truly didn't know, and I don't think I was given -- like, holding those cards out. It was more of like, This is bothering me, and I got to spend some time to think about whether this is the rodeo I'm going to participate in.

I definitely had that conversation. I do not recall saying the if A, then B. They were all involved in the meeting. So even if I was thinking it at the time, the words wouldn't have to have been spoken, I don't think. But I do not believe that I said anything like that. It was more of, I don't know if this is for me.

MS. RUBIN: Oh. Yes. Okay. I think -- just to -- interest of time, let's do the privilege protocol, and if there's time after that, I'll use the rest of the time.

MR. WEN: We may have a question or two as well.

MS. RUBIN: Okay. So I'll just -- I'll just ask it before I go. Okay.

CONFIDENTIAL TESTIMONY BEGINS

Page 239

(This page intentionally left blank. This page serves as a separator for confidential content that follows. It may be removed if the subsequent confidential material is redacted or excluded.)

Page 240

BY MS. RUBIN:

Q   So I'm going to ask you a question, and then we're going to step out of the room, and the court reporter is going to place any plaintiffs' counsel that is on the call in a separate room, and then you can answer the question --

A   Okay.

Q   -- with defense counsel in the room.

On January 30th, you said you had a meeting where Steve Davis took a phone call from who he said was Elon Musk?

A   Yes.

Q   Okay.

MR. ISSACHAROFF: Well, I don't think you need to answer. She just --

THE WITNESS: Oh. Sorry.

MS. RUBIN: Yeah. No, no, no. Sorry. I'm formulating the --

THE WITNESS: That's what you were hesitating on, so. Okay.

BY MS. RUBIN:

Q   All right. I'm formulating the question, and then when I'm done with the question, I will step out.

To your knowledge, what did Elon Musk say on that phone call? What was discussed between Steve Davis

Page 241

and Elon Musk on that phone call, to your knowledge?

Second question. What exactly did Steve Davis tell you that Elon Musk said on the phone? And as close to verbatim as you can get.

A   Okay.

Q   Okay.

MS. RUBIN: I'm just going to put this down; is that fine?

MR. WEN: And if the court reporter can tell us when everybody is in a separate room, because we can't see. So just announce for us.

THE PROCEEDINGS OFFICER: Right. So if I'm understanding correctly, the people who are on the screen in the -- in the platform, are they going to go into a break room or --

MR. WEN: I think --

MS. RUBIN: I believe everybody that's --

MR. ISSACHAROFF: Everybody, yeah.

THE WITNESS: You want to see?

MS. SILER: Yeah.

THE WITNESS: Or do you want to sit here?

MR. SILER: No. I don't want to sit there.

THE WITNESS: Or you can --

MR. SILER: Yeah. So I don't know if the

Page 242

court --

MR. WEN: So, guys, is everybody out?

THE PROCEEDINGS OFFICER: So I'm not sure how -- okay. It looks like they have gone now. We just have -- so Beth and --

MR. WARREN: Jake (phonetic), I --

THE PROCEEDINGS OFFICER: You have to tell if the people who are supposed to be here are here and the others gone.

MR. SILER: So everyone who's on the Zoom is not permitted to be in this part of the deposition. I don't know how you have it technologically set up.

THE PROCEEDINGS OFFICER: So if --

MR. SILER: I can see that Andrew's trying to speak.

THE PROCEEDINGS OFFICER: So if Andrew and Richard and Beth could go into Break Room 1, please. Just go to the break room tab on the bottom of the screen and into Break Room 1.

MR. WARREN: Got it.

MR. WEN: Asking lawyers to make their own technical --

THE PROCEEDINGS OFFICER: Yeah. They should appear gone when they are in the break room.

MR. WARREN: So it's saying the

Page 243

deposition needs to be off the record for me to be into the break room.

THE PROCEEDINGS OFFICER: Oh. Okay.

MR. WEN: Can't he just leave the deposition and come back?

MR. SILER: Andrew, would it be possible for you to log off and then we can email you when we're done so that you could log back in?

MR. WARREN: Yeah, that's fine.

MR. SILER: And the same goes for Beth and Richard.

MR. WARREN: If -- Jake, if you just -- you don't even need to -- when you bring Nikki (phonetic) and Lucas back in the room, they can just text us and we'll jump back on.

MR. SILER: Okay. We're just waiting for Beth.

THE PROCEEDINGS OFFICER: And, Beth, you're in the room --

MR. SILER: I guess I'm concerned she might not be at her desk.

THE PROCEEDINGS OFFICER: Yeah.

MR. SILER: Let me just talk to the plaintiffs' counsel.

THE PROCEEDINGS OFFICER: Okay. Thank

Page 244

you.

(Pause.)

MS. RUBIN: She didn't answer. Is there any way --

MR. SILER: Is there a way to remove her, you know, --

MS. RUBIN: Just remove her from it?

THE PROCEEDINGS OFFICER: I actually can't. I could -- I could ask someone at Remote Legal. If you'd let me pause the record and ask someone to --

MR. SILER: Yeah.

MS. RUBIN: Let me just try to give her another call. But, yes.

THE PROCEEDINGS OFFICER: You'd like me to pause the record then?

MS. RUBIN: Yes.

THE PROCEEDINGS OFFICER: Okay. Hearing no objection, I'll pause the record at 2:32 p.m., Eastern Time.

(Off the record.)

CONFIDENTIAL TESTIMONY

Page 245

(Confidential Section.

This page intentionally left blank to indicate confidential material. This page may be removed if the confidential section is excluded.)

Page 246

BY MS. RUBIN:

Q   Okay. I know we only have a few minutes, so I'm going to ask quick yes or no questions, and if you can answer quickly yes or no, that would be great.

Are you aware that the USAID website was taken down?

A   Yes.

Q   Do you know who made that decision to take it down?

A   No.

Q   Do you know that USAID headquarters was shut down?

A   Yes.

MR. WEN: Objection. Argumentative.

BY MS. RUBIN:

Q   Do you know that the signage noting that USAID was in the Reagan Building was taken off of the Reagan Building?

A   Yes.

Q   And that no USAID personnel currently work in what was formerly the headquarters of USAID?

A   I didn't know that.

MR. WEN: Objection. Argumentative.

THE WITNESS: That I didn't know.

BY MS. RUBIN:

Page 247

Q   Okay.

A   As in did they float back in afterwards? I don't know. I was gone.

Q   You're aware that the building is no longer the USAID building -- or the USAID office?

A   Yes.

Q   Do you know who made the decision to remove the signage?

A   No.

Q   Do you know who made the decision to move USAID headquarters out of that office?

A   No.

Q   Are you aware that --

A   The only thing I was told on that was that it came from the Vice President's office, that the decision was made that we're going to move --

MR. WEN: Objection.

Sorry. Sorry.

I'm just going to make a protective invocation of the presidential communications privilege.

MS. RUBIN: That's fine. That's fine.

THE WITNESS: So, no.

BY MS. RUBIN:

Q   Are you aware that substantially all of USAID has been put on administrative leave?

Page 248

A   Yes.

Q   Do you know who made the decision to put virtually all of USAID staff on administrative leave?

A   No.

Q   Okay. We have -- we have three minutes. I'm going to ask one more question.

We were talking about -- and again, I understand the time limit, so keep it short -- but we talked a little bit about restructuring, reorganizing USAID as an objective you were told about on your hiring; is that correct?

A   Yes.

Q   What ended up occurring with USAID -- are you -- so we talked about everyone was placed on administrative leave.

Would you agree that -- or, let me rephrase.

Would it be fair to say that placing the entirety of USAID on administrative leave is functionally shutting down the agency?

MR. WEN: Objection. Argumentative. But if you follow --

THE WITNESS: My opinion is if you send everyone home, you have no one to do the work. So by default, yes. That shuts the organization down.

MS. RUBIN: That is all of my questions.

Page 249

THE WITNESS: Okay.

MR. LISER: Let's take a five-minute break.

MR. MATHEU: One minute break. I know -- and I know your time is running short, but -- but it will take no more than probably --

MR. SILER: Actually, probably less.

MR. WEN: Five more.

THE WITNESS: Yeah. Okay. We can do that. It saves me a trip. I'm going to just text my wife and let her know that --

MS. RUBIN: Oh. Yes. Can we please go off the record?

THE PROCEEDINGS OFFICER: Are we completed? Because I'll just need to get orders on the record.

MS. RUBIN: No.

MR. WEN: No. No.

MR. RUBIN: Just a break.

THE PROCEEDINGS OFFICER: Very good. Hearing no objection, I'll pause the record at 2:44 p.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER: We're back on the record at 2:45 p.m., Eastern Time.

Page 250

Proceed.

EXAMINATION

BY MR. WEN:

Q   So I'm the counsel for defendants. I just have one question.

MS. RUBIN: Sorry.

Just for the record, this is James Wen for defendants.

BY MR. WEN:

Q   James Wen for defendants. And I just have one question. And when you testified earlier today about talking with Brian McGill about Luke Farritor, do you remember exactly the specific application that Luke was seeking access to?

A   No.

Q   And it was -- this was a security --

A   It was -- yeah, no.

Q   Okay.

A   Yeah. I -- I don't, yeah.

MR. WEN: That's all I have.

THE WITNESS: You mean application -- like, -- yeah. No, I don't. Yeah, I don't.

MS. RUBIN: Okay. That's the end for us. We can go off the record.

THE PROCEEDINGS OFFICER: Okay. Just

Page 251

before we go off the record, I just need to confirm orders as best we can. I don't know if a lot of people are -- have gone, but I'd like to confirm. Counsel Rubin, as the takin attorney --

THE WITNESS: Yeah. Good luck to you -- all of you.

MS. RUBIN: We're just -- the witness is going to leave, but we -- we're staying here.

THE PROCEEDINGS OFFICER: Okay.

THE WITNESS: Good luck. Good luck to you. Good luck.

MS. RUBIN: Nice meeting you. Thanks for your time.

THE WITNESS: I hopefully don't see you guys again.

MR. SILER: I get that a lot.

THE WITNESS: I'm going to steal another bottle. I'm going to take a cookie for my son. He's got a performance right now.

THE PROCEEDINGS OFFICER: Just so long as you don't close down the screen there.

MS. RUBIN: Okay. We're all still here.

THE PROCEEDINGS OFFICER: Okay. Sorry. I'd like to just confirm.

Counsel Rubin, as the taking attorney,

Page 252

you'll be receiving the original transcript since it's included in your order, correct?

MS. RUBIN: Yes.

THE PROCEEDINGS OFFICER: And, Counsel Wen, will you be purchasing a copy of the transcript?

MS. RUBIN: Do we know?

MR. WEN: I guess we'll see it.

MS. RUBIN: Oh. Sorry. Yeah.

MR. SILER: No. I -- sorry. Is that a question --

MS. RUBIN: Sorry. Are you asking us, or are you asking --

THE PROCEEDINGS OFFICER: Counsel Wen.

MS. RUBIN: So when are --

MR. SILER: The answer is yes. We are buying, yes.

MS. RUBIN: Okay.

MR. WEN: The defendants will also be purchasing.

MR. MATHEU: Counsel James Wen will be purchasing.

THE PROCEEDINGS OFFICER: Okay. Since I can't see everyone, if you could, like, spell out for me which attorneys need a copy? Will more attorneys be purchasing copies?

Page 253

MS. RUBIN: No. We're just -- you can just send it to me and to Mr. Wen, and we'll circulate within our teams.

THE PROCEEDINGS OFFICER: Perfect. Very good. Thank you. Okay.

MS. RUBIN: Thank you so much.

THE PROCEEDINGS OFFICER: Okay. Hearing no objection, I'll close the record of the deposition at 2:48 p.m., Eastern Time.

(Proceedings concluded at 2:48 p.m., ET)

* * * * *

Page 254

CERTIFICATE OF PROCEEDINGS OFFICER

I, Elene Sowl, hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the proceedings were recorded by me and thereafter transcribed, and that the foregoing transcript is a true and accurate record of said proceedings to the best of the transcriber's ability;

I further certify that I am neither counsel for nor related to any parties to said action, nor in any way interested in the outcome thereof.

DATED, this 22nd day of May 2026.

_Elene Sowl_

Elene Sowl

Certification #CER-1604

Proceedings Officer

**WORD**
**INDEX**

**< $ >**
**$1**
  233:*16*
**$40**
  146:*4, 5*
**$50**   56:*1*

**< 1 >**
**1**   6:*5*
  7:*4*
  18:*17,*
*25*   19:*2*
  22:*22*
  35:*3*
  46:*9*
  93:*8*
  153:*25*
  233:*14*
  242:*17,*
*19*
**1:00**
  104:*16*
  219:*21*
**1:32**
  190:*18*
**10**
  39:*23*
  40:*5*
  73:*19*
  154:*2*
  163:*4*
  169:*18*
  182:*1*
  230:*1*
**10:00**
  104:*15,*
*16*
**10:00-ish**
  104:*17*

**10:30**
  77:*20*
**10:34**
  77:*24*
**100**
  145:*16*
  167:*8*
**10013**
  2:*16*
**11**   8:*6*
  93:*12*
  94:*23*
  95:*5, 17*
  96:*10,*
*13*   97:*13*
**11:00**
  237:*4*
**11:30**
  33:*19*
**11:37**
  132:*24*
**11:45**
  133:*2*
**1100**   4:*6*
**12**   5:*4*
**12:00**
  192:*11*
**12:30**
  192:*11*
**12:52**
  190:*14*
**14158**
  45:*24*
**15**   40:*5*
  64:*11*
**15,000-**
**person**
  43:*9, 14*
**15180**
  3:*5*
**18**   6:*5*
**190**   6:*10*

**1900**
  3:*13*
**1994**
  19:*8*
**1st**
  19:*14*

**< 2 >**
**2**   6:*6*
  21:*23,*
*24*
  46:*17*
  153:*25*
**2:32**
  244:*18*
**2:44**
  249:*21*
**2:45**
  249:*25*
**2:48**
  1:*16*
  253:*9, 10*
**20**   46:*25*
**20003**
  3:*6*
**20005**
  4:*7*
**2010**
  20:*2*
**2011**
  20:*8, 13*
**2013**
  20:*13*
**2019**
  21:*1*
**2020**
  19:*13,*
*14*   21:*1,*
*6*
**2021**
  21:*5*

**2025**
  18:*12*
  47:*3*
  86:*21*
  93:*11*
  94:*5*
**2026**
  1:*14*
  8:*3*
  254:*14*
**205**   6:*11*
**207**   6:*12*
**20s**
  72:*13*
**20th**
  22:*12*
  33:*20*
  51:*9*
**21**   6:*6*
  21:*6*
**22nd**
  254:*14*
**246**   7:*4*
**24th**
  37:*18*
**25**   73:*19*
**250**   2:*14*
**256**   5:*5*
**25th**
  37:*19*
  38:*6*
  51:*24*
  56:*18*
  61:*9*
  64:*14*
  160:*9*
**26**   19:*12*
**26th**
  38:*6*
  51:*24*
  56:*19*

**61:*9***
  160:*9*
**27**
  46:*25*
  86:*21*
  94:*5*
**275**   2:*4*
**27th**
  30:*21*
  31:*14*
  38:*3, 4,*
*21*
  39:*15*
  51:*14*
  63:*22*
  64:*14*
  70:*24*
  75:*16*
  78:*19*
  79:*5, 6,*
*9, 19*
  84:*3*
  87:*7*
  97:*17*
  100:*14*
  136:*22*
  160:*8*
  177:*21*
**28th**
  31:*14*
**29th**   2:*5*
**2nd**   3:*12*

**< 3 >**
**3**   6:*7*
  45:*10,*
*11, 13*
  153:*25*
**3(c**
  47:*12*

| | | | | |
|---|---|---|---|---|
| **3,000** | **341** | 97:*24* | 217:*25* | **9:53** |
| 50:*19* | 103:*8* | 102:*13* | 220:*8* | 44:*22* |
| 217:*18* | | 104:*4* | **7:04** | **92**   6:*9* |
| **3,500** | **< 4 >** | 106:*4, 8,* | 205:*20* | **94111** |
| 50:*19* | **4**   1:*4* | *15* | 206:*11* | 2:*6* |
| **3:41** | 6:*8* | 107:*25* | **7:10** | |
| 86:*21* | 8:*10* | 108:*3,* | 191:*15* | **< A >** |
| **30** | 86:*12,* | *19, 25* | 192:*20* | **a.m** |
| 47:*23* | *13*   103:*9* | 113:*16* | **7:13** | 1:*15* |
| 93:*11* | **4:28** | 114:*2* | 192:*25* | 8:*4* |
| 112:*18* | 94:*5* | 136:*6,* | **7:30** | 23:*11,* |
| 175:*19* | **4:30** | *19, 20* | 183:*20* | *14* |
| 185:*4* | 97:*16* | 137:*24* | 220:*9* | 44:*18,* |
| **30th** | **45**   6:*7* | 155:*15* | **78701** | *22* |
| 31:*15* | 57:*19* | 177:*20* | 3:*14* | 77:*20,* |
| 75:*11* | **468**   8:*7* | 217:*4* | | *24*   94:*5* |
| 92:*22* | **49268** | | **< 8 >** | 97:*16* |
| 93:*9* | 1:*19* | **< 6 >** | **8**   6:*12* | 132:*24* |
| 104:*3* | | **6**   6:*10* | 204:*22* | 133:*2* |
| 110:*10* | **< 5 >** | 190:*21,* | 207:*14,* | 192:*11* |
| 113:*20* | **5**   6:*9* | *22* | *16, 19, 20* | **abide** |
| 117:*23* | 92:*13,* | **6:00** | **8:25-cv-** | 17:*18* |
| 124:*23* | *14* | 156:*13* | **00462** | **ability** |
| 156:*5* | 235:*5, 6* | 183:*25* | 8:*11* | 137:*15* |
| 180:*18* | **5:00** | 218:*1* | **8:25-cv-** | 141:*14* |
| 181:*6* | 220:*8* | **6:30** | **00462-TDC** | 213:*17* |
| 191:*15* | **50** | 156:*13* | 1:*7* | 254:*9* |
| 192:*20,* | 231:*16* | 183:*21,* | **86**   6:*8* | **able** |
| *24* | **500**   3:*12* | *25* | **8th**   2:*15* | 12:*25* |
| 205:*19* | **50-some** | **600**   3:*4* | | 62:*24* |
| 207:*25* | 141:*3* | | **< 9 >** | 126:*9* |
| 208:*7* | **57**   78:*18* | **< 7 >** | **9:00** | 203:*17* |
| 240:*9* | **58** | **7**   1:*14* | 64:*1* | 205:*24* |
| **30-year** | 78:*18,* | 6:*11* | **9:09** | 225:*9* |
| 229:*14* | *22, 25* | 8:*3* | 1:*15* | **abnormal** |
| **31st** | 79:*14* | 204:*24* | 8:*4* | 141:*22* |
| 22:*14* | 82:*13* | 205:*1* | **9:24** | **abolish** |
| 191:*20* | 83:*1, 3* | **7:00** | 23:*11* | 175:*3* |
| 207:*12,* | 84:*21* | 183:*12,* | **9:25** | **absence** |
| *13* | 95:*8, 14,* | *17, 21* | 23:*14* | 17:*16* |
| 216:*6, 13* | *19* | 191:*22* | **9:49** | 103:*22* |
| | 96:*11* | 216:*10* | 44:*18* | |

| | | | | |
|---|---|---|---|---|
| **Absolutely** | 80:*12* | 148:*7, 8,* | **admin** | *18* |
| 115:*1* | 87:*20* | *9*   154:*7* | 33:*15* | 212:*18* |
| 145:*16* | 92:*18* | 155:*17* | 85:*18,* | 213:*1,* |
| **accepted** | 98:*13,* | 157:*2* | *20* | *22* |
| 24:*6* | *22* | 173:*19* | 101:*1* | 227:*12* |
| **access** | 148:*10* | 189:*20* | 155:*19* | 229:*18* |
| 6:*11* | 149:*1* | 197:*20,* | 196:*10* | 237:*6* |
| 65:*22* | 154:*21* | *23, 24* | 200:*23* | **administra** |
| 92:*10* | 155:*22* | 254:*11* | 201:*11* | **tion-** |
| 103:*23,* | 180:*2* | | 217:*2* | **administer** |
| *24* | 185:*4* | **actionable** | | **ing**   29:*9* |
| 193:*12,* | 189:*23* | 107:*7* | **administer** | **administra** |
| *24* | 196:*11* | **actions** | 10:*11* | **tions** |
| 194:*20,* | 206:*25* | 14:*22* | **administer** | 178:*24* |
| *22* | 207:*4, 7* | 101:*6* | **ing** | **administra** |
| 205:*4* | 208:*4* | 102:*2* | 10:*10* | **tion's** |
| 206:*1, 2,* | 209:*20* | 113:*23* | **administra** | 57:*11* |
| *6* | 210:*8,* | 116:*25* | **tion** | 187:*19* |
| 218:*13* | *22* | 139:*23* | 21:*10* | 230:*18* |
| 225:*17* | 211:*5,* | 180:*2* | 25:*19* | **administra** |
| 227:*1* | *11, 16,* | **active** | 26:*14,* | **tive** |
| 250:*14* | *21* | 222:*7* | *15*   29:*6* | 75:*20* |
| | 212:*14* | **activity** | 49:*6* | 78:*19* |
| **accounting** | **Action** | 165:*22,* | 50:*20* | 79:*1, 15,* |
| 81:*18* | 1:*6* | *23* | 54:*6, 9,* | *21, 23* |
| **accurate** | 8:*11* | **Adam** | *14, 18,* | 80:*4, 13,* |
| 84:*21* | 46:*6* | 35:*5* | *22* | *18, 22* |
| 254:*8* | 66:*5* | 236:*11,* | 63:*14* | 82:*14* |
| **acronyms** | 76:*16* | *20, 25* | 99:*21* | 83:*23* |
| 70:*19* | 92:*18* | 237:*25* | 135:*1* | 84:*4* |
| **act** | 100:*3* | **add** | 160:*20* | 85:*4* |
| 115:*12* | 102:*15,* | 143:*5* | 164:*5, 6,* | 86:*2* |
| **acting** | *16* | | *19* | 87:*6* |
| 6:*12* | 117:*8,* | **additional** | 165:*3, 8* | 98:*15* |
| 28:*18* | *12* | 17:*15* | 167:*16* | 100:*8,* |
| 29:*2, 13* | 135:*16* | **address** | 168:*11,* | *16* |
| 35:*17* | 139:*12* | 18:*22* | *14, 19,* | 102:*24* |
| 47:*10* | 141:*20* | 54:*16* | *20* | 104:*4* |
| 48:*9* | 142:*13* | 205:*8* | 178:*21,* | 106:*5* |
| 50:*24* | 144:*5,* | **adjourn** | *24* | 108:*5* |
| 51:*16* | *23* | 183:*9* | 181:*22* | 136:*7,* |
| | 147:*6* | | 187:*6,* | *21* |

156:*17*
158:*7*
162:*20*
177:*21,*
*25*
178:*12*
180:*6,*
*16*
205:*23,*
*25*
247:*25*
248:*3,*
*15, 18*
**Administra**
**tor**
6:*13*
27:*20*
28:*18*
46:*19*
47:*10,*
*25*  48:*7,*
*9, 16*
50:*24*
51:*8, 13,*
*16, 17*
80:*12*
92:*18*
97:*6*
98:*13,*
*23*
99:*20*
116:*22*
147:*16*
148:*10,*
*18, 21*
149:*6*
156:*8*
159:*3, 5*
185:*5*
195:*1*
198:*8*
207:*1, 5,*

*8*   208:*4*
209:*20*
210:*9,*
*22*
211:*5,*
*11, 16, 21*
**administra**
**tors**
165:*16*
**administra**
**tor's**
159:*6*
**admissibil**
**ity**   10:*6*
**advantageo**
**us**
220:*3, 4*
**advice**
60:*6*
65:*10,*
*11*
66:*22*
67:*11,*
*12, 13,*
*14, 16*
68:*21*
77:*3*
97:*7*
114:*25*
116:*11*
119:*15*
124:*5*
125:*23*
126:*24,*
*25*
130:*22,*
*23*
152:*10*
153:*1*
154:*20*
196:*14*

198:*19*
209:*3*
**advise**
48:*3*
60:*5*
99:*2*
154:*17*
157:*1*
160:*1, 5*
162:*15*
179:*25*
185:*4*
**advised**
67:*17*
68:*12*
99:*3, 10,*
*11, 16,*
*18, 23*
149:*17*
213:*21*
**advising**
110:*19*
123:*16*
124:*9,*
*12, 24*
226:*10*
**advisor**
21:*6*
28:*25*
65:*9*
67:*7, 20*
115:*18*
119:*4,*
*12*
122:*24*
123:*8,*
*10, 12*
125:*15,*
*16*
187:*6,*
*14*

198:*9,*
*10*   219:*3*
**advisors**
32:*17*
110:*19*
**advisor's**
187:*20*
**advisory**
27:*22*

**affiliated**
37:*15*
49:*23*
72:*8*
93:*21*
150:*20*
**affirm**
11:*14*
**affirmativ**
**ely**   18:*2*
**affirming**
148:*19*
**Africa**
41:*1*
176:*22*
**AFRICOM**
41:*1*
176:*21*
**aftercare**
219:*18*
**afternoon**
104:*10*
**age**
73:*23*
74:*7*
220:*20,*
*22*
**agencies**
47:*20*
**Agency**
14:*14,*
*19*

20:*17*
21:*3, 19*
46:*18,*
*19, 24*
47:*8, 19,*
*24*   48:*2,*
*4, 7, 8*
116:*11*
148:*11,*
*22*
149:*7*
158:*7*
162:*20*
166:*5*
167:*2*
169:*8*
173:*8*
175:*22*
176:*13*
177:*25*
178:*5*
180:*6*
202:*20,*
*21, 25*
232:*16*
248:*19*
**agency's**
229:*25*
**agenda**
46:*12*
48:*5*
56:*8*
58:*21*
106:*16*
230:*19*
**agitated**
32:*4*
**agnostic**
41:*19*
141:*19*

ago
  50:*10*
  78:*10*
**agree**
  10:*3, 6,*
*9*   39:*24*
  139:*25*
  220:*17*
  221:*16,*
*17*
  224:*1,*
*14*
  248:*16*
**agreed**
  17:*17*
  43:*7*
  115:*4*
  123:*21*
**agreed-**
**upon**
  1:*24*
  17:*1*
  119:*24*
**agreeing**
  212:*7*
**agreement**
  230:*15*
  231:*13*
**agrees**
  40:*6*
  169:*19*
**Ah**
  234:*23*
**ahead**
  12:*17*
  17:*25*
  60:*8*
  64:*21*
  121:*11*
  151:*20*
  176:*6*
  200:*21*

**AID**
  22:*20*
  25:*6, 7,*
*8*   26:*23,*
*25*   27:*4*
  36:*6*
  39:*3, 4*
  40:*21*
  41:*9*
  45:*19*
  49:*7, 14*
  54:*7*
  57:*14*
  59:*9, 23*
  69:*9*
  70:*14*
  83:*11*
  115:*19*
  129:*18*
  135:*3*
  163:*7*
  168:*2*
  174:*6, 7,*
*15*
  175:*2*
  176:*19,*
*20, 22*
  177:*7*
  178:*17*
  197:*1*
  221:*9*
  228:*5*
**AIDS**
  163:*13*
**AID's**
  25:*8*
  39:*3*
  49:*7*
  169:*17*
  170:*6*
  215:*5,*
*12, 13*

**al**   1:*4,*
*7*   8:*10,*
*11*

**Alexandria**
  11:*11*
**alignment**
  40:*6*
  44:*1*
**allow**
  76:*12*
  194:*25*
  225:*17*
**allowable**
  226:*12*
**allowed**
  55:*13*
  129:*1*
  199:*18*
  201:*7*
  227:*7*
**allowing**
  206:*2*
**allude**
  152:*3*
**alluded**
  140:*2*
  175:*18*
**Allweiler**
  88:*16*
**aloud**
  129:*16*
**Alzheimer'**
**s**   221:*12*
**America**
  25:*19*
**American**
  40:*7*
  56:*8*
  88:*5*
**Americans**
  221:*19*

**amiss**
  82:*20*
**amorphous**
  74:*5*
  75:*17*
  160:*19*
**amount**
  48:*21*
  52:*14*
  54:*10*
  68:*4*
  219:*18*
**analogy**
  67:*22*
  138:*14*
  146:*23*
**analysis**
  63:*2*
  94:*8*
**analyze**
  42:*14*
**analyzing**
  232:*15*
**and/or**
  10:*5*
  22:*20*
  95:*22*
  227:*20*
**ANDREW**
  3:*7*
  8:*21*
  242:*16*
  243:*6*
**andrew@dem**
**ocracydefe**
**nders.org**
  3:*8*
**Andrew's**
  242:*14*
**announce**
  241:*11*

**anomalies**
  81:*4*
  82:*16*
  89:*18*
**answer**
  13:*2, 7,*
*10*   14:*2*
  15:*21*
  16:*1*
  17:*5, 6,*
*11, 13,*
*25*   18:*1,*
*2*   30:*9*
  31:*2*
  32:*8, 18*
  36:*20*
  41:*22*
  47:*6*
  48:*12*
  50:*5*
  52:*24*
  65:*3*
  67:*3, 23*
  72:*24*
  74:*23*
  87:*14*
  89:*10*
  90:*18*
  96:*18*
  98:*21*
  100:*19*
  103:*2*
  109:*19*
  116:*14*
  117:*1*
  119:*5*
  120:*8*
  123:*25*
  124:*13,*
*17*
  126:*6*
  127:*20,*

*24*
138:*24*
139:*8*
140:*20*
141:*21*
142:*2,*
*15, 16*
143:*7*
144:*12*
145:*21*
148:*14*
149:*10,*
*23*
151:*1, 4*
154:*1*
155:*11,*
*24*
159:*19*
163:*22*
166:*6*
173:*24*
176:*1, 2*
177:*3*
178:*8*
180:*19*
188:*16*
198:*1*
203:*5*
209:*5, 8*
211:*13*
222:*10*
223:*8,*
*13*
225:*13*
230:*13*
232:*22*
233:*2*
240:*6,*
*15*
244:*3*
246:*4*
252:*15*

**answered**
15:*20*
89:*3, 9*
98:*1*
144:*2*
184:*7*
220:*14*
224:*7*
**answering**
45:*16*
99:*7*
118:*16*
147:*22*
**answers**
98:*4*
140:*20*
164:*24*
**answer's**
196:*19*
199:*5, 7*

**antibodies**
44:*4*

**anticipate**
150:*4*
**anybody**
15:*12,*
*24*  39:*8*
65:*20*
101:*12*
130:*5*
144:*20*
160:*12*
161:*7*
162:*25*
165:*11*
172:*25*
177:*19,*
*23*
230:*19*
235:*19*

**anybody's**
202:*13*
**anymore**
228:*17*
233:*6*
**anytime**
25:*25*
28:*3*
144:*8*
**anyway**
120:*23*
**anyways**
42:*20*
156:*14*
196:*3*
**apart**
42:*4*
**apologize**
12:*15*
23:*1*
164:*12*

**apparently**
55:*18*
**appear**
15:*6*
219:*23*
242:*24*
**Appearing**
2:*11, 19*
3:*9, 17*
4:*16*
**appetite**
54:*18*
**application**
n   17:*1*
250:*13,*
*21*
**appointed**
35:*17*
49:*11*
50:*6, 8,*

*11, 13*
105:*10*
208:*10*
**appointee**
21:*11*
29:*24*
50:*19*
65:*7*
214:*2*

**appointees**
34:*2*
35:*20*
48:*21*
50:*20*
230:*7*

**appointing**
6:*12*
208:*4*
**appointment**
t   25:*3*
29:*11*
185:*3*
**Appointments**
ts   15:*1*
**approach**
82:*22*
**appropriate**
e   17:*5*
**appropriated**
ed
135:*21*
**approval**
95:*22*
**approved**
115:*9*
**approving**
96:*3*
97:*22*
**approximately**
ely   8:*4*

**arbitrated**
169:*1*
**area**
11:*11*
26:*20*
60:*17*
**areas**
39:*1*
113:*9*
**argue**
131:*11*
144:*15,*
*17, 18*
**Argumentative**
ive
27:*7*
30:*6*
48:*11*
86:*4*
100:*18*
140:*15*
142:*1*
145:*20*
148:*12*
150:*25*
162:*23*
167:*4,*
*22*
173:*9*
175:*23*
177:*2*
178:*7*
207:*2*
223:*7*
227:*23*
246:*14,*
*23*
248:*20*
**arrested**
141:*7*

arresting
116:18
arrived
50:22
articles
45:9
arts
19:25
aside
88:21
asked
17:3
43:17
44:8
75:12
84:10
89:3, 9,
13    98:1,
3    99:24
100:20
101:3
105:16
108:5,
24
109:1, 7,
14
110:9
137:3
147:5
152:11
156:15
161:7
170:12
171:7
189:4
206:9
222:20
223:1, 5
224:14
229:2
asking
13:16

18:10
69:7, 8
72:23
91:10
93:5
96:21
110:21
127:5, 6
143:23
147:3
189:22
194:14
195:10
203:3
209:18
233:24
242:21
252:11,
12
aspect
125:2
128:8
aspects
40:13
41:5
55:4
169:16
212:13
ass
159:21,
24
assert
77:4
assertion
126:12
assess
36:6

assessment
62:8
67:19

161:14
193:11
asset
212:14
assigned
47:22
188:8
219:2
assist
30:20

Assistance
20:4
assistant
157:17
assume
113:25
123:4
207:24
assumed
51:5

assumption
49:8
53:14
56:25
61:14
62:9
73:25
74:2
92:2, 5
98:3
109:20
123:5
125:8
178:24
197:13
attached
18:23
84:9
attended
19:20

attention
54:6
233:20
attorney
8:16
115:18
251:4, 25
attorney-
client
77:5
151:24
attorneys
10:13
77:3, 4
87:24
252:24
attribute
215:8

attributed
213:14
215:8
audio
10:5
12:11,
12
15:20
19:24
23:6
audiovisua
l    10:5
August
19:13
Austin
3:14
authoritie
s    115:20
authority
52:15,
20    60:5
109:23
116:21

143:24
151:7
171:14
184:21
authorizat
ion
6:11
205:4
authorize
206:6

authorized
10:11
available
6:2
140:25
Avenue
3:4
avoid
126:8
aware
25:8
45:15
48:15
78:12
142:8
187:25
188:1
246:5
247:4,
13, 24
awareness
214:7
awesome
93:23

< B >

bachelor's
19:5
back
23:13

27:18 28:13, 14 32:22, 24 33:9 43:22 44:21 56:12 57:12, 22 58:2, 4 67:21 75:11 76:6, 11 77:13, 23 83:14, 15 84:14 85:8, 12, 17 86:16, 17 87:4 89:18 98:18 101:25 103:4 105:23 106:12 114:17 120:18 122:14, 17 128:4 133:1 134:20 138:12, 14 140:10 141:15 149:14, 24 150:5 151:7 154:2 157:6, 8 164:11, 12 166:17 167:16 171:4 174:10 176:8, 16 181:17 182:19, 21 183:5, 6, 7, 15 186:2 188:16 190:18 193:4 194:16 195:12 201:8 206:7, 24 213:10 217:24 221:5 227:3 235:21 243:5, 8, 14, 15 247:2 249:24

**background**
12:7, 8 18:16 40:19

**backtrack**
108:21 157:11

**backtracking** 56:16

**bad**
57:20 81:17, 18 153:18 168:11 235:1

**badge**
92:10 188:6

**badges**
33:15 218:15

**bakery**
174:14

**balk**
99:5

**balked**
172:22

**bandwagon**
85:2

**bang**
231:11

**banker**
72:18

**barista**
148:2

**based**
32:4 61:15 66:6, 10 69:24 78:8 90:11 94:25 115:11 125:12 136:24 137:13 139:3

147:17 151:24 157:3 167:24 175:18 177:11 178:11 179:4, 24 182:10 198:16 229:3

**basic**
14:17 21:14

**basically**
70:17 76:2 152:6 194:5

**basics**
33:2 234:13

**basis**
10:7 132:14

**Bates**
190:25 191:1 204:24 207:14

**bathroom**
129:7

**Battery**
2:4

**battle**
183:11

**bear**
226:12

**beat**
13:4

**beef**
174:15

**bees**
81:9

**beginning**
24:12 31:13 42:18 66:21 67:14 80:1 93:8 102:9 104:22 157:24

**begins**
35:6 238:25

**begs**
164:24

**behalf**
8:18, 20, 21, 24 9:25 22:20 35:19 49:13 162:2 188:23 197:10

**behaved**
175:15

**behavior**
81:15

**believe**
14:22 24:23 37:10, 19 47:14 52:6 64:5

84:*20*
85:*7*
87:*23*
90:*24*
96:*16*, *22*
103:*15*
104:*6*, *25*
109:*22*
111:*25*
139:*14*
157:*18*
158:*11*
161:*16*
200:*17*
223:*21*, *22*
237:*15*
238:*14*
241:*17*
**bell**
39:*22*
41:*13*
95:*24*
154:*3*
156:*1*
169:*18*
221:*15*
230:*1*
**beltway**
228:*4*
**BERNSTEIN**
2:*3*, *13*
12:*4*
**Best**
21:*22*
38:*23*
41:*15*
95:*9*
108:*2*
109:*10*

118:*2*
137:*15*
144:*23*
212:*3*
218:*21*
231:*11*
251:*2*
254:*9*
**bet**
144:*23*
146:*5*
188:*3*
**BETH**
3:*15*
9:*5*
242:*5*, *17*
243:*10*, *17*, *18*
**better**
41:*1*, *12*
68:*2*
70:*17*
88:*6*
176:*22*
221:*3*
**beyond**
127:*23*, *24*
173:*14*
205:*23*

**bifurcated**
28:*24*
**big**
43:*8*
73:*2*
81:*3*
159:*9*
170:*19*
200:*24*
202:*14*

221:*1*
232:*22*
234:*24*
236:*11*
**bigger**
196:*23*
**big-
ticket**
164:*4*
**Bill**
103:*20*
**billet**
63:*20*
219:*6*
**billion**
233:*16*
**bin**
219:*6*
**binding**
65:*15*, *16*
112:*21*
**bit**
18:*15*
22:*6*
23:*20*
28:*14*
33:*8*, *9*
51:*21*
52:*7*
53:*9*
56:*16*
59:*1*
66:*8*
78:*4*
88:*23*
106:*23*
133:*6*
146:*14*
150:*1*, *10*
157:*11*

197:*22*
206:*23*
214:*6*
216:*12*
248:*9*
**black**
95:*25*
96:*19*
**blame**
141:*16*
**Blank**
6:*6*
22:*1*
62:*7*
68:*1*, *2*
72:*25*
158:*13*
161:*17*
239:*12*
245:*12*
**blew**
55:*25*
**blue**
188:*6*
**board**
59:*22*
82:*1*
109:*24*
171:*18*
230:*19*
232:*4*, *5*
**boat**
135:*14*
**bodily**
169:*10*
**body**
84:*8*
101:*23*
113:*1*
117:*7*
139:*2*, *21*

140:*1*
142:*7*
143:*17*
160:*3*
163:*3*, *5*
165:*12*, *17*    226:*4*
**bombastic**
180:*22*
**Borkert**
34:*18*
86:*21*, *22*
105:*5*
205:*13*
210:*15*
**borrowed**
212:*13*
**boss**
140:*23*, *24*
172:*17*, *18*
201:*11*
233:*15*
234:*18*, *19*
**bosses**
43:*25*
**boss's**
234:*16*
**bothering**
238:*7*
**bottle**
251:*18*
**bottom**
87:*25*
242:*18*
**bought**
203:*8*

bound
98:*24*
153:*20*
brain
184:*16*
218:*2*
Branch
4:*5*
14:*19*
41:*21*
174:*21*
188:*24*
brand
230:*16*
brand-new
160:*20*
181:*22*
breach
34:*14*
131:*5, 8*
break
13:*24*
14:*3*
17:*12*
31:*25*
42:*11*
43:*6*
44:*12*
77:*16,*
*17*
129:*8*
132:*19*
133:*10*
190:*8*
241:*15*
242:*17,*
*18, 19,*
*24*
243:*2*
249:*3, 4,*
*19*

breaking
40:*21*
42:*8, 9*
breaks
13:*23*
14:*4, 6*
breath
196:*21*
breathe
159:*13*
Brenda
174:*14*
Brendan
156:*10*
157:*13,*
*14, 18, 25*
Brian
103:*21*
191:*8,*
*22*
192:*24*
193:*7*
194:*3*
196:*9*
197:*25*
199:*14,*
*25*
200:*13,*
*16*
201:*10*
203:*16*
204:*17*
205:*15,*
*19*
206:*9,*
*16*
217:*25*
250:*12*
Brian's
199:*2*
bridging
115:*7*

brief
22:*17*
52:*4*
201:*19*
brilliant
235:*8*
bring
38:*24*
52:*10*
56:*10*
57:*11*
59:*22*
98:*25*
109:*24*
131:*12*
179:*1*
199:*6,*
*11*
221:*11*
226:*17*
233:*7*
243:*13*
bringing
49:*19*
52:*16,*
*17*
102:*18*
broad
81:*3*
90:*16*
178:*12*
broad-
brush
128:*25*
broader
175:*7*
Broadway
8:*6*
Brooke
20:*19, 22*
brother
229:*2*

brought
39:*10*
40:*23*
41:*23,*
*24*   58:*1*
59:*18*
63:*5*
69:*14,*
*25*   99:*8*
102:*19*
114:*16,*
*22*
155:*8*
196:*13*
231:*16*
brush
81:*3*
90:*16*
bstevens@m

sgpllc.com
3:*16*
bubble
198:*25*
buck
231:*12*
bucket
137:*2*
225:*4*
bucks
235:*6*

budgeteers
232:*1*
building
57:*19*
58:*4*
70:*2*
152:*7*
153:*25*
184:*1*
191:*24*

246:*17,*
*18*
247:*4, 5*
buildings
60:*17*
107:*10*
built
89:*24*
bullpen
113:*12*
bump
171:*2*
bunch
57:*8, 9*
72:*12*
88:*14*
149:*15*
164:*24*
bureau
41:*6*
116:*17*
bureaucrac
ies
57:*16*
bureaucrac
y    26:*19*
29:*12*
39:*22*
44:*1*
74:*25*
112:*17,*
*18*
134:*25*
169:*25*

bureaucrat
141:*1*
149:*18*
233:*20*
bureaucrat
s    233:*4*

| | | | | |
|---|---|---|---|---|
| bus | 51:*25* | 241:*1* | 123:*18* | canceling |
| 140:*4* | 52:*4* | 244:*13* | 125:*5* | 59:*25* |
| business | 55:7, *16* | called | 135:*23* | 135:*19* |
| 74:*17* | 56:*25* | 11:*21* | 137:*21* | capacity |
| 75:*6* | 60:*19* | 55:*3* | 138:*16* | 103:*12* |
| 203:*13* | 61:*8, 16,* | 56:*18* | 140:*16* | captured |
| Busy | *21*   62:*2* | 70:*14,* | 143:*5* | 10:*8* |
| 25:*23* | 64:*14* | *18* | 144:*10* | capturing |
| button | 66:*4* | 117:*13* | 145:*19* | 10:*4* |
| 81:*21* | 69:*13* | 164:*17* | 148:*13* | card |
| 201:*2, 25* | 79:*3* | 171:*23* | 149:*8, 9* | 49:*17* |
| buy | 118:*4, 7,* | caller | 159:*17* | cards |
| 203:*7* | *9, 11* | 117:*20* | 160:*15* | 53:*16* |
| buying | 120:*16* | calling | 162:*22* | 238:*6* |
| 252:*16* | 121:*5,* | 14:*21* | 173:*21* | care |
| | *14, 17* | 82:*9* | 177:*1* | 153:*14* |
| < C > | 125:*4,* | 142:*7* | 180:*9* | 168:*20* |
| CABRASER | *19, 25* | 174:*11,* | 182:*6* | 229:*10* |
| 2:*3, 13* | 126:*5* | *18* | 188:*13,* | career |
| 12:*4* | 127:*6* | calls | *22* | 26:*3* |
| CAC | 129:*20* | 14:*7* | 189:*16,* | 53:*8* |
| 49:*17* | 132:*6* | 23:*24* | *25* | 83:*24* |
| | 134:*8* | 24:*4* | 190:*1* | 142:*3* |
| calculated | 137:*5* | 47:*5* | 210:*25* | 198:*21* |
| 167:*17,* | 157:*5* | 52:*22* | 211:*7* | 200:*24,* |
| *20, 24* | 160:*10* | 54:*11,* | 212:*1* | *25* |
| calendar | 174:*5,* | *24* | 214:*9* | 202:*12,* |
| 6:*6* | *10* | 55:*22* | 217:*16* | *18* |
| 22:*1* | 179:7, *9* | 56:*11,* | 218:*10* | 223:*14,* |
| 191:*3* | 182:*19* | *14*   61:*1* | 222:*22* | *18* |
| | 183:*3* | 63:*6* | 225:*11* | 224:*20* |
| California | 188:*6* | 64:*17* | 230:*11* | 229:*14* |
| 2:*6* | 192:*22* | 65:*1* | 232:*25* | careerist |
| call | 193:*8* | 66:*5* | campaign | 35:*18* |
| 15:*13* | 203:*10* | 67:*25* | 25:*19* | 214:*1* |
| 24:*2, 4* | 204:*17* | 74:*21* | 189:*9, 12* | careers |
| 30:*17* | 206:*5, 7,* | 84:*24* | cancel | 90:*15* |
| 31:*11,* | *9, 17* | 91:*3* | 57:*24* | 193:*18* |
| *17, 19* | 220:*7* | 98:*19* | canceled | Carlyle |
| 32:*2, 3* | 237:*13* | 102:*25* | 57:*18* | 11:*11* |
| 37:*17,* | 240:*5,* | 105:*17* | 58:*13* | |
| *19*   38:*8* | *10, 25* | 109:*17* | | |

carried
 68:*22*
 224:*5*
cascading
 164:*9*
 201:*4, 5*
case
 15:*3*
 22:*5*
 27:*16*
 44:*5*
 63:*13*
 147:*8,*
*18*
 154:*4*
 165:*10,*
*12*
 197:*25*
cases
 9:*7*
category
 130:*7*
cattle
 163:*14*
cause
 112:*1*
 142:*6*
causes
 26:*18*
cautious
 146:*6*
 181:*16*
caveat
 88:*6*
cc   87:*1*
 205:*7,*
*10, 12*
 217:*21*
cell
 183:*4*
Center
 20:*19,*

*23*
 166:*15*
 218:*24*
CER-1604
 1:*18*
 254:*19*
certain
 16:*25*
 41:*5*
 49:*2*
 51:*10*
 56:*7*
 88:*17*
 92:*25*
 100:*20*
 101:*8*
 103:*9*
 114:*16*
 116:*9*
 148:*20*
 172:*22*
 197:*1,*
*10*
 232:*16*
certainly
 59:*16*
 67:*14*
 68:*11*
 78:*10*
 88:*16*
 93:*25*
 101:*14*
 102:*8*
 180:*2*
 195:*17*
CERTIFICAT
E   254:*1*
Certificat
ion
 254:*19*
certify
 254:*3, 10*

cetera
 25:*17*
 53:*16*
 57:*13*
 82:*22*
 90:*15*
 98:*7*
 171:*24,*
*25*
 197:*9*
 204:*5*
chain
 6:*8, 11*
 28:*23*
 29:*5, 12,*
*17, 25*
 30:*2, 5,*
*12*
 64:*16,*
*23   65:5,*
*12, 20,*
*21, 23,*
*25*
 66:*13,*
*14, 18,*
*19*
 81:*20*
 99:*1, 16,*
*17*
 113:*3*
 137:*12*
 205:*3*
 214:*20*
chain-of-
command
 66:*11*
chairman
 46:*20*

challenges
 119:*22*

challengin
g   14:*14,*
*18, 22*
change
 26:*18*
 42:*24*
 43:*22*
 55:*4*
 63:*15*
 68:*13,*
*18*
 112:*25*
 165:*13*
 177:*5*
 216:*19*
 220:*25*
 221:*11*
 230:*20*
 231:*14,*
*19*
 235:*12*
changed
 22:*22*
 113:*3*
 214:*14*
changes
 205:*24*
changing
 76:*14*
 177:*11*
channel
 166:*19*
channels
 203:*15*
chaos
 28:*4*
 165:*24,*
*25*
character
 73:*11*
characteri
ze   87:*9*

characteri
zed
 154:*23*
charge
 58:*19,*
*23*
 61:*24*
 71:*18*
 171:*17*
 195:*3*
 222:*4*
 236:*18*
charges
 102:*19*
charts
 71:*25*
chasm
 85:*19*
chat
 199:*21*

chattering
 195:*7*
check
 85:*12*
 200:*25*
 225:*22*
 229:*16*
checking
 206:*3*
 225:*18*
chew
 137:*9*
Chief
 21:*2*
 22:*7, 9,*
*10, 15,*
*18, 23,*
*24*
 23:*17*
 25:*13,*
*23   28:1,*

| | | | | |
|---|---|---|---|---|
| *15, 21* | circulate | *11   64:6* | 54:*13* | come |
| 48:*23* | 253:*2* | 110:*17* | 198:*20* | 25:*10* |
| 51:*4, 18* | | 114:*5* | clicking | 28:*1* |
| 66:*1, 4* | circumvent | 116:*1* | 201:*2, 25* | 31:*18* |
| 67:*21,* | 121:*13* | Clayton | clinics | 32:*22,* |
| *25   76:8* | Civil | 37:*12* | 169:*14,* | *24* |
| 109:*24* | 1:*6* | clear | *15* | 49:*14* |
| 112:*2* | 4:*4* | 13:*13* | close | 50:*20* |
| 116:*23* | 8:*11* | 43:*11* | 122:*16* | 52:*13* |
| 138:*16* | civilian | 44:*5* | 158:*12* | 53:*18* |
| 145:*11* | 74:*12* | 58:*12* | 165:*20* | 62:*21* |
| 150:*14* | 142:*4* | 93:*2, 7* | 212:*16* | 68:*4* |
| 151:*8* | civilians | 101:*19* | 215:*20* | 84:*14* |
| 156:*25* | 70:*16* | 108:*17* | 241:*3* | 101:*25* |
| 159:*3, 4* | claim | 122:*4, 5* | 251:*21* | 106:*12* |
| 168:*2* | 14:*21* | 129:*9* | 253:*8* | 108:*5,* |
| 174:*4, 5* | claims | 132:*3* | closer | *20* |
| 187:*9* | 14:*17* | 133:*18* | 114:*9* | 110:*14,* |
| 195:*13* | clarificat | 165:*7* | 183:*24* | *17, 18* |
| 196:*9* | ion   54:*1* | 213:*12* | close-up | 111:*6* |
| 218:*25* | clarify | 222:*1, 4* | 79:*8* | 115:*17,* |
| 219:*7* | 28:*14* | 229:*18* | closing | *19* |
| 224:*23* | 29:*19* | 233:*25* | 14:*25* | 117:*20* |
| choose | 36:*23* | clearance | clout | 119:*23* |
| 159:*5* | 42:*10* | 195:*5* | 160:*4* | 129:*24* |
| Chris | 50:*7, 11,* | 197:*5, 8,* | coder | 130:*14* |
| 44:*25* | *24   70:9,* | *10* | 233:*14* | 138:*22* |
| CHRISTOPHE | *20* | 202:*15,* | coding | 145:*9* |
| R   4:*14* | 108:*22* | *23* | 73:*20* | 156:*1* |
| Christophe | 126:*20* | 206:*3* | 233:*13,* | 157:*8* |
| r.m.lynch@ | 172:*1, 4* | 225:*22,* | *16* | 158:*2* |
| usdoj.gov | 178:*3* | *24* | | 167:*20* |
| 4:*15* | 228:*19* | | collecting | 183:*15* |
| chuckled | classifica | clearances | 56:*11* | 184:*4* |
| 111:*8* | tion | 193:*13* | Collection | 185:*12* |
| churn | 197:*2* | 195:*4* | s   20:*16* | 204:*13* |
| 28:*4* | Clause | 197:*1,* | colloquy | 206:*24* |
| circle | 15:*1* | *11* | 125:*18* | 234:*5,* |
| 229:*6* | Clay | 203:*2, 7,* | colorful | *14   243:5* |
| circles | 36:*11* | *8   216:22* | 156:*22* | comes |
| 213:*13,* | 37:*12* | clearly | combine | 116:*21* |
| *14* | 59:*2, 6,* | 13:*10* | 199:*10* | 144:*23* |

203:*1*
206:*12*
**comfort**
114:*17*
155:*14*
159:*11*
179:*23*
189:*19*
190:*4*
224:*20*
**comfortabl**
**e**   27:*15*,
*18*   60:*8*,
*9*   68:*24*
101:*1*
110:*13*,
*20*
116:*9*,
*10*
138:*24*
146:*15*
151:*21*
154:*15*,
*21*
155:*1*,
*22*
198:*17*
238:*1*
**coming**
12:*12*
36:*5*
37:*23*,
*25*   49:*9*
52:*8*
53:*6*
54:*9*, *17*
60:*21*,
*23*
62:*13*
66:*8*
80:*8*
85:*12*

89:*7*
116:*17*
123:*4*
134:*25*
139:*11*
150:*4*
156:*11*
158:*1*
160:*4*
161:*13*,
*20*
163:*15*
170:*21*
171:*14*,
*15*
172:*5*
174:*20*
182:*25*
187:*8*
196:*18*
218:*5*
**command**
20:*24*
28:*23*
29:*5*, *13*,
*17*   30:*1*,
*5*, *12*
64:*16*,
*23*   65:*5*,
*13*, *20*,
*21*, *23*,
*25*
66:*13*,
*15*, *18*,
*19*
81:*20*
99:*1*, *16*,
*17*
113:*4*
137:*13*
214:*20*

**commander**
138:*19*,
*20*
224:*22*,
*23*

**commanding**
20:*25*
**comment**
32:*7*
78:*7*, *13*
110:*17*
122:*9*
140:*9*
163:*18*,
*21*
181:*17*
194:*5*
195:*12*
218:*19*
220:*18*
236:*16*
237:*9*
**comments**
163:*6*
166:*4*
170:*14*
228:*2*

**commercial**
57:*8*, *9*,
*19*, *21*
233:*12*
**commit**
110:*22*
**committed**
75:*23*
**common**
82:*21*
142:*8*
**communicat**
**e**   14:*6*

**communicat**
**ed**   32:*16*
**communicat**
**ion**
119:*8*
123:*14*
124:*4*, *7*,
*8*, *21*
126:*24*
**communicat**
**ions**
16:*15*,
*24*
32:*11*,
*20*   77:*2*
118:*24*
119:*11*,
*14*, *18*
121:*7*,
*10*
122:*13*
125:*13*,
*14*, *21*
131:*7*
132:*15*
133:*25*
152:*3*
209:*1*, *3*
247:*20*
**communicat**
**ive**
232:*4*
**community**
188:*7*
**commuting**
219:*16*
**company**
17:*17*
**compass**
226:*18*

**compelled**
30:*15*,
*16*   137:*5*

**competency**
76:*6*
**competent**
74:*1*, *6*
**compile**
101:*21*
103:*10*
**compiled**
75:*18*
98:*4*
100:*21*
**complaint**
48:*22*
**completed**
249:*15*

**completely**
42:*4*
166:*11*
181:*25*

**completing**
41:*21*
**compositio**
**n**   45:*18*
**compound**
150:*25*

**compressed**
24:*15*
**comprised**
30:*21*
**computer**
103:*24*
236:*3*
237:*4*
**computers**
33:*13*,
*14*

38:*25*
73:*25*
**concern**
112:*12*
131:*6*
145:*14*
169:*4, 7,*
*9, 12*
172:*15*
224:*6, 11*
**concerned**
29:*15*
30:*3*
49:*18*
64:*23*
65:*9*
110:*4*
164:*7*
166:*9*
184:*11*
198:*25*
203:*14*
243:*20*
**concerns**
112:*12*
173:*13,*
*14, 19*
178:*4*
205:*24*
222:*19,*
*25*
223:*4*
225:*8*
**concluded**
253:*10*

**conclusion**
47:*5*
52:*23*
61:*2*
64:*18*
65:*2*

84:*25*
103:*1*
123:*19*
144:*11*
149:*9*
222:*23*
225:*12*
**concrete**
50:*21*
58:*4*
144:*20*
**condoms**
56:*1*
**conduct**
95:*13*
222:*16*
**conducted**
10:*1*
82:*25*
**conduit**
162:*10*

**conference**
105:*12*
**CONFIDENTI
AL**   1:*21*
16:*14,
17*
238:*25*
239:*13,
15*
244:*21*
245:*11,
13, 14*
**confirm**
15:*2*
108:*23*
164:*23*
172:*24*
251:*1, 3,
24*

**confirmati
on**
188:*11,
22*
**conflict**
27:*12*

**conflicted**
27:*5, 9*
**confused**
185:*1*
191:*19*
**Congress**
14:*20*
**congressio
nal**   88:*4*
**congressio
nally**
14:*18*
**connected**
189:*7, 8*

**connection**
14:*25*
78:*5, 6,
7*
117:*21*
214:*18,
19*
**consequenc
es**
162:*19*
166:*5*
**consider**
58:*24*
59:*12*
60:*10*
68:*12*
110:*2*
**considerab
le**   42:*15*

**considerat
ion**
236:*7*
**consist**
124:*5*
**consisted**
121:*12*

**consistent**
226:*4*
**constant**
55:*20*
**Constituti
on**   15:*1*
194:*8*
223:*20*

**constraint**
232:*21*
233:*10*
**constraint
s**
232:*15,
17, 21*
**consult**
17:*14*
51:*17*
**consultati
on**
47:*13,
19, 25*

**consulting**
203:*18*
**consumed**
176:*14*
**contact**
30:*16*
64:*13*
234:*21*

**contained**
94:*23*
97:*14*
**contains**
94:*6*
95:*11*
**contemplat
ing**   42:*7*
**contend**
14:*25*
**content**
127:*5*
239:*13*
**context**
32:*15*
**continuati
on**   42:*5*
**continue**
199:*25*
**Continued**
3:*1*   4:*1*
**continues**
145:*7*
**contract**
55:*22*
57:*18,
20, 24*
58:*7, 9,
13*
62:*14*
69:*1, 3*
70:*2*
153:*9,
19*   225:*1*
**contractin
g**   71:*18*

**contractor**
21:*15*
142:*4*
**contractor
s**

151:*22*
154:*12*

**contracts**
36:*7*
38:*25*
58:*11*
59:*25*
70:*3*
71:*4, 16, 17*
89:*16*
107:*9, 22*
134:*19*
135:*18, 19*
151:*18*
152:*12*
153:*20*
154:*9, 10*
163:*16*

**contract-to-government**
25:*16*

**control**
115:*19*
205:*4*

**conversation** 32:*5, 6* 39:*17, 18*
41:*23*
55:*17*
59:*5*
76:*21*
80:*21*
89:*15*
90:*3*
99:*13*
109:*22*

111:*9*
114:*1*
115:*6*
116:*7*
117:*17*
118:*14*
122:*21*
127:*7, 22*
128:*3*
129:*11, 24*
130:*4, 14*
139:*9, 13*
140:*9*
144:*21*
156:*23*
171:*2*
184:*4*
193:*10, 25*
194:*12, 23*
196:*15, 17*
197:*16*
198:*11*
199:*19*
200:*9, 12, 17*
201:*20*
215:*23*
218:*17, 25*
219:*8, 9, 13*
222:*7*
224:*25*
229:*15*
238:*10*

**conversations**
16:*6*
49:*11*
61:*25*
80:*9*
89:*12*
113:*19*
114:*21*
115:*7*
119:*2, 3*
126:*13*
154:*23*
166:*16*
168:*1*
170:*2, 3*
176:*24*
182:*15*
198:*12*
215:*10*
230:*7*

**conversely**
40:*5*

**conveying**
121:*5*
171:*19*

**conviction**
150:*8*

**Cook**
4:*21*
9:*17*

**cookie**
251:*18*

**cooperative** 114:*14*

**coordinate**
48:*3*

**copies**
252:*25*

**copy**
191:*5*
236:*4*
252:*5, 24*

**correct**
15:*4*
19:*3, 6, 7, 21*
20:*4, 5, 9, 11, 14, 15, 21*
21:*1, 8, 12, 20*
22:*8*
28:*16, 17, 20*
33:*7, 21*
38:*4*
48:*19, 20* 52:*3*
62:*11*
63:*23*
68:*3*
78:*20*
86:*3*
90:*20, 21*
92:*20, 21*
94:*11, 21* 95:*8*
96:*7*
98:*15*
100:*10, 13*
103:*18*
104:*5, 7*
108:*23*
117:*14, 25*
118:*12, 14*

138:*5*
158:*19*
162:*18*
172:*4, 7*
173:*2*
179:*8*
191:*8, 9*
192:*25*
200:*7*
202:*2*
207:*1, 13*
216:*7*
222:*17, 18*
230:*3*
234:*3, 4*
248:*11*
252:*2*

**correctly**
241:*13*

**correspondence**
84:*19*

**correspondences**
155:*6*

**corresponding**
141:*24*

**COTR**
152:*14, 15* 153:*9*

**COUNSEL**
2:*17*
8:*14*
11:*25*
16:*6, 17, 19, 20*
17:*4, 7, 9, 13, 22*
23:*3*

88:*9, 13*
240:*4, 8*
243:*24*
250:*4*
251:*3, 25*
252:*4, 13, 20*
254:*10*

**counselors**
36:*11*
**counsels**
115:*9*
**counted**
59:*18*
**counterint elligence**
197:*17*
198:*24*
**country**
41:*3*
185:*13*
223:*24*
**coup**
212:*23*
214:*5*
**couple**
36:*11*
43:*19*
44:*9*
49:*16, 24*   72:*9, 10*
85:*11*
111:*23*
115:*8*
118:*8*
135:*5, 6*
163:*6*
179:*11*
209:*10*

216:*16*
228:*2*
233:*5*
**course**
9:*14*
33:*17*
81:*11*
111:*11*
125:*23*
142:*21*
157:*2*
194:*6*
228:*13*
**COURT**
1:*1*
8:*12*
12:*24*
13:*9*
16:*11, 21*   17:*7, 10, 16, 17*   18:*4*
120:*17, 19*
131:*1*
240:*3*
241:*9*
242:*1*
**courtesy**
237:*14*
**cover**
33:*2*
43:*21*
66:*9*
**covered**
16:*23*
85:*22*
127:*14*
**covering**
49:*3*
**crafting**
125:*23*

**crap**
150:*1*
174:*8*
201:*13*
**crazy**
29:*8*
**created**
14:*19*
45:*5*
94:*19*
**creating**
92:*8*
**creation**
91:*14*
**crime**
178:*15*
**Criminal**
20:*11*
102:*19*
141:*6*
**critical**
169:*17*
**crocodile**
135:*14*
**Cromer**
37:*12*
**cross**
226:*12*
**crossing**
158:*4*
**cross-pollinatio n**   200:*13*
**crunching**
73:*25*
**crypt**
203:*4*
**curiosity**
53:*9*
163:*10*
**current**
25:*18*

29:*6*
113:*2*
135:*14*
**currently**
122:*21*
195:*14*
246:*20*
**curt**
195:*23*
**curtailed**
218:*14*
**curve**
39:*22*
41:*14*
154:*3*
169:*18*
221:*15*
230:*1*
**cut**
152:*21*
218:*14*
235:*18*
**cyber**
103:*23*
**cybersecur ity**
21:*16*

**< D >**
**dad**
21:*22*
**daily**
146:*4*
**damaging**
90:*14*
**dangerous**
184:*14, 15*
**dark**
219:*16*
**darn**
158:*11*

**data**
39:*13*
52:*14*
53:*20*
54:*10, 17, 24*
55:*7, 16, 22*
56:*11, 13*   57:*6*
62:*1, 24*
63:*2*
98:*11*
101:*24*
135:*23*
176:*23*
224:*21*
**database**
193:*14, 22*
194:*2*
233:*8*
**databases**
59:*25*
97:*22*
193:*16*
**DATE**
1:*14*
8:*3*
19:*14*
21:*22*
24:*8, 18*
47:*23*
61:*8*
134:*15*
157:*4*
180:*20, 24*   192:*7*
**dated**
92:*22*
207:*25*
254:*14*

| | | | | |
|---|---|---|---|---|
| **dates** | 131:*19,* | 147:*13* | **dealt** | 220:*6* |
| 18:*11,* | *20* | 156:*4* | 175:*6* | 224:*1* |
| *12* 22:*2* | 132:*5, 8,* | 183:*23* | **December** | 226:*8,* |
| **David** | *9, 16* | 185:*21* | 24:*9, 11* | *13, 15,* |
| 110:*24* | 133:*12,* | 193:*25* | **decide** | *16* |
| **Davis** | *14, 15,* | 200:*19* | 23:*25* | 227:*8* |
| 33:*6* | *18, 19,* | 216:*6,* | 27:*3* | 246:*8* |
| 38:*13* | *24* | *12, 22,* | 176:*8* | 247:*7,* |
| 52:*2* | 134:*8* | *25* | 237:*1* | *10, 15* |
| 53:*2* | 138:*3* | 217:*19* | **deciding** | 248:*2* |
| 56:*17* | 139:*10,* | 218:*7* | 226:*14* | **decision-** |
| 58:*15* | *25* | 219:*10* | **decision** | **making** |
| 59:*13* | 142:*11,* | 233:*16* | 14:*20* | 40:*10* |
| 60:*11,* | *25* | 237:*1* | 58:*6* | 150:*8* |
| *20* | 144:*6* | 254:*14* | 80:*15* | 168:*25* |
| 64:*15* | 147:*3* | **days** | 81:*24* | **decisions** |
| 66:*19,* | 148:*6* | 43:*22* | 100:*9* | 28:*7, 9* |
| *23* 67:*6* | 156:*4* | 47:*23* | 102:*14* | 31:*3* |
| 72:*8* | 211:*10* | 52:*3* | 116:*15* | 43:*16* |
| 90:*25* | 240:*10,* | 57:*19* | 131:*3* | 63:*2* |
| 104:*3* | *25* 241:*2* | 85:*11* | 153:*18* | 101:*25* |
| 108:*24* | **Davis's** | 106:*9* | 167:*17,* | 102:*1* |
| 111:*5* | 68:*17* | 115:*8* | *21, 24* | 107:*7, 8,* |
| 117:*14* | 122:*25* | 141:*2* | 170:*5,* | *9* |
| 118:*4,* | 127:*6* | 163:*4* | *25* | 115:*10,* |
| *10, 20* | 139:*5* | 182:*1* | 179:*3* | *15* |
| 119:*3* | **day** | **DC** 3:*6* | 184:*17,* | 168:*12* |
| 122:*6,* | 33:*10,* | 4:*7* | *18* | 188:*1* |
| *22* | *15* | **dead** | 187:*19,* | 201:*6* |
| 123:*7,* | 36:*17* | 166:*15* | *20* | 203:*18* |
| *15* | 59:*5* | **deal** | 188:*18* | 204:*18* |
| 124:*22,* | 79:*8, 10,* | 143:*13,* | 195:*6* | 206:*1* |
| *23* | *13, 14,* | *14* | 198:*7* | 213:*22* |
| 125:*4,* | *18* 80:*4,* | 159:*9* | 199:*13* | 227:*3* |
| *21* | *8* 82:*8,* | 200:*24* | 201:*7* | **deem** |
| 126:*22* | *9* 95:*3* | 202:*14* | 202:*2* | 87:*18* |
| 127:*8,* | 97:*18* | 208:*18* | 208:*22* | **deemed** |
| *12, 21* | 104:*14,* | 209:*25* | 210:*21* | 168:*12* |
| 128:*2,* | *18* | 218:*16* | 211:*5,* | **default** |
| *18* | 114:*12* | 221:*8* | *11, 16,* | 248:*24* |
| 129:*10,* | 118:*2* | 234:*25* | *20* | **defendant** |
| *20* | 146:*5* | | 219:*25* | 15:*3* |

Defendants
 1:8
 4:16
 8:24
 9:1, 2,
6   16:13
 45:1
 133:5
 250:4, 8,
10
 252:18
DEFENDERS
 3:3
 4:19
defense
 16:6
 17:7, 22
 20:17
 41:17
 240:8
deferentia
l   59:16
deferred
 58:18
deficienci
es   82:17
defined
 46:24
 47:14
defines
 46:18

definitely
 30:23
 31:4
 35:13
 39:6, 17
 58:17
 59:15,
19
 74:18

 80:1
 81:13
 102:20
 104:13
 112:6
 117:8
 129:5
 146:21
 150:6
 155:1
 159:9
 161:9
 166:10,
12
 175:17
 178:19
 179:23
 181:5
 201:17
 210:4
 214:14
 217:17
 218:3
 220:4
 227:24
 238:10

definition
 131:8
 167:7
 186:6
definitive
ly   78:6
 139:7
 230:22
degree
 19:5
DEI
 54:13,
16   55:2,
3   69:11
 70:10

 134:18
 135:17
 155:2
 227:5
DEI-ish
 55:5, 6
deleting
 201:3, 25
deliberati
ve
 16:15,
25   93:4
demeanor
 195:16
DEMOCRACY
 3:3
 4:19
departed
 184:1
 191:24

DEPARTMENT
 4:3
 14:24
 21:7
 22:13
 41:4, 7,
16
 44:25
 46:1, 11
 48:24
 57:5
 64:9
 93:14
 165:16
 195:1, 2
 197:9
department
s   37:24
depending
 41:3
 49:5

 102:3
 138:21
Depends
 138:20
deponent
 16:13

DEPOSITION
 1:10
 8:9
 9:24
 12:5, 7,
19   14:5,
16
 15:10
 16:7
 17:10
 22:4
 119:25
 120:17
 176:17
 242:11
 243:1, 5
 253:8
deputies
 22:20, 23
deputy
 22:20
 34:6
 80:10
 194:13
 195:13
 214:23
 231:6
describe
 38:22
 73:13
described
 26:8
 62:15
 72:7
 189:20

describing
 200:6
 203:16
DESCRIPTIO
N   6:4
 7:3
 96:17,
22   97:12

designated
 8:6
 219:6
designatio
n   51:6
designee
 29:1
designees
 71:8
desire
 136:23
desk
 154:10
 243:21
desks
 113:12,
14
destinatio
n   163:19
detail
 95:24
 195:11
detailed
 49:14, 15
details
 71:11
 83:19
 162:7
determinat
ion   89:7

determined
 125:18

determines
 16:21
 17:4
develop
 32:15
developed
 57:15
Development    14:15
 21:19
 177:25
DHHS
 93:14
DHHS's
 94:7, 20
 95:12,
18, 20
 96:6
dial-ins
 105:15
dialogue
 25:6
 170:24

difference
 13:11,
17    75:5
differences    13:13
 74:16
different
 19:18
 34:9
 37:24
 40:13
 49:23
 52:9
 54:12

55:4, 5
59:25
85:3
113:9
116:19
123:12
145:10
169:16
225:7
228:16
differentiated
 224:12
dig
 71:12
 230:25
digging
 27:1
 189:6
Digital
 47:14
diligence
 76:2
 87:22
 88:5
 151:9
 161:2
 189:5
 198:1,
16
 229:17
 232:18
direct
 66:11
 175:21
 206:6
 214:18
 215:16
directed
 113:3
 222:2

directing
 142:13
 188:19
direction
 172:17
 175:5
 231:2
 232:2

directions
 114:25
directive
 204:14

directives
 121:8,
12, 17
directly
 62:7, 8
 64:25
Director
 21:15
 27:20
 46:20
 92:19
 115:13
 116:22
 156:8
disagree
 226:20
 227:9
disagreed
 180:1

disclosure
 202:9

discomfort
 189:23
discrepancies
 81:5
 82:18

discuss
 16:2
 106:4
 107:16,
25
 113:16
 123:1
 237:22
discussed
 95:7
 104:4
 106:25
 107:12
 114:24
 131:19
 229:23
 240:25

discussing
 14:9
 78:16
 95:13,
16
 117:24
 122:21
 126:21
 131:20
 133:9
 134:7

discussion
 58:21
 152:23
 170:23
 179:13
 208:15
discussions
 113:22
 134:22

dismantled
 14:19
dismantling    14:14

dismissive
 204:13
Displeasure    139:6
disproportionate
 221:8

disruption
 19:24
distinguish    13:5
DISTRICT
 1:1, 2
 8:12, 13
Division
 4:4
DNI
 196:24
doable
 155:3
 223:20
dock
 178:22
document
 92:24
 93:3
 191:7
 194:24
 207:22
documentation
 114:6
 142:12
 143:1

documented

113:*24*
154:*14*
**documentin**
**g**  110:*23*
**Documents**
15:*15*
89:*6*
**DoD**
43:*22*
65:*13*
197:*9*
**DOE**  1:*4*
8:*10*
**DOE4VUSDS_**
**000569**
207:*15*
**DOE4VUSDS_**
**002557**
191:*2*
**DOGE**
6:*7*
14:*24*
30:*19*
31:*1, 5,*
*10, 18,*
*19*
35:*21,*
*23*  36:*9*
37:*15*
38:*9, 11*
45:*5, 25*
46:*7, 12*
47:*12,*
*15, 20,*
*24*  48:*2,*
*5, 9, 15,*
*18*  50:*2,*
*3, 5, 10,*
*14, 25*
51:*2, 17,*
*22*
53:*14,*

*15*
58:*16*
59:*8, 20*
61:*24*
62:*13*
63:*5, 22*
70:*24*
72:*7, 8*
74:*15*
78:*3, 15*
82:*4, 10*
83:*8, 9*
90:*1, 4*
93:*19,*
*21*
101:*18,*
*20*
102:*5, 6*
103:*17,*
*18*
106:*22,*
*23*
107:*16*
123:*4*
135:*11,*
*13, 15,*
*18*
150:*20*
165:*5, 8,*
*22*
177:*8*
200:*1*
209:*14*
215:*17*
232:*23*
235:*14*
**DOGErs**
85:*9*
**doing**
25:*11*
26:*3*
36:*6*

38:*22*
40:*7, 8*
41:*20*
45:*19*
57:*7*
58:*3*
60:*1*
73:*24*
76:*2*
85:*10,*
*18*  88:*4*
99:*12,*
*20*
106:*9*
135:*12,*
*18*
138:*7,*
*10*
148:*4*
152:*15*
159:*1*
164:*3,*
*14, 20*
166:*17*
167:*10*
169:*14*
188:*24*
198:*15*
199:*16*
203:*13*
215:*2,*
*13*
217:*3*
219:*15*
221:*23*
223:*14*
224:*20*
225:*2*
227:*12*
228:*9*
229:*17*
230:*5,*

*18*
231:*3*
233:*13*
238:*3*
**dole**
141:*8*
**dollar**
221:*6*
**dollars**
221:7
**double**
176:*20*
**download**
6:*2*
**downtown**
219:*16*
**downward**
127:*18*
**DPP**  93:*3*
**draft**
236:*1*
**drafting**
175:*10*
**dragging**
142:*22*
**drasticall**
**y**  216:*19*
**drive**
57:*11*
63:*2*
164:*8*
**driven**
54:*17*
172:*14*
**Drives**
29:*8*
**driving**
196:*8*
**drop**
65:*18*
213:*6*

**drop-in**
39:*7*
**dropped**
12:*14*
15:*20*
**drove**
58:*21*
159:*12*
**dude**
199:*3*
**due**
25:*10*
76:*2*
87:*21*
88:*5*
112:*13*
151:*9*
161:*2*
189:*5*
198:*1,*
*15*
229:*17*
232:*18*
**duly**
11:*21*
**duration**
61:*15*
**duties**
22:*18*
103:*13*
**DVs**
225:*19*

**< E >**
**EA**
156:*10*
157:*14,*
*15*
**eager**
54:*14*
165:*3*

ear
181:5
earlier
47:14
63:21
87:17
104:14
117:13
118:13
136:24
139:9
140:2
146:18
148:17
149:25
154:3
170:4
193:25
196:10
200:19
210:3
216:15
227:5
228:1
229:22
250:11
early
42:19
easier
38:20
easily
100:12
146:8
Eastern
8:4
23:11, 14
44:18, 22
77:20, 24
132:24

133:2
190:15, 18
191:17
192:5
244:19
249:22, 25   253:9
easy
70:5
143:12
188:18
227:7
235:12, 13
effectively
167:10
230:20
efficiencies
30:25
35:25
Efficiency
14:24
31:17, 20   36:3, 8   38:7, 8   46:2, 11, 14
49:13
51:22
52:20, 21   53:3, 6   57:1
58:16
75:18
78:2
81:1
82:6, 7, 10   85:9

93:19
101:20
102:10
123:6
129:19
165:5
177:8
efficient
52:10
efficiently   62:14
effort
28:12
42:15
134:24
136:18
177:13
efforts
29:17
ego
213:6
egregious
117:7
eight
42:16
either
16:14
36:17
37:17
58:8
65:10
76:16
82:10
99:16
111:13
149:6
219:24
237:12

electronic
84:18

Elene
1:18
8:5
254:3, 18

eliminated
230:3
eliminating   232:16
ELON
1:7
14:23
29:25
30:11, 17   32:7, 18
35:25
60:22
61:9, 13
70:23
78:5, 14
91:13
117:13, 17
118:9
119:12
121:4, 18
122:5, 22, 24
124:11, 23
125:3
126:21
127:6, 13
128:3, 17
129:11
130:1, 6
131:19
132:6

134:7
162:13
186:6
188:9, 19, 22
189:23
206:4, 17
210:24
211:4
240:11, 24
241:1, 3
Elon's
188:24
else's
165:11
Email
6:8, 11
18:22
30:18
79:2
80:6
83:10, 13
86:20
87:1
94:4, 6, 12, 16
96:17
97:13
103:4, 25
111:22
147:10
149:17
205:3, 8, 15, 18
218:4
235:23
237:16
243:7

emailed
103:*15*
emails
14:*8*
80:*8*
84:*9*
92:*9*
111:*23*
217:*18,*
*24*
embedded
198:*6*

emboldened
165:*13*
Emmett
175:*2*
emotion
150:*11*
employee
73:*3*
91:*21*
92:*20*
139:*11*
142:*6*
203:*3*
employees
47:*21,*
*22*
71:*15*
76:*13,*
*15*
112:*14*
145:*24*
empower
204:*19*
enable
206:*1*
encountere
d    232:*23*
ended
21:*14*

57:*17*
68:*20*
156:*23*
157:*25*
183:*17*
193:*10*
196:*3, 5*
200:*8*
216:*22*
248:*13*
ends
35:*6*
184:*1*

enforcemen
t    116:*18*
engaged
84:*5*

Engagement
20:*20*
engaging
222:*15*
engineer
52:*11*
engineers
50:*1*
ensure
48:*2*
entailed
27:*1*
entire
127:*5*
158:*7*
162:*20*
167:*2*
169:*8,*
*20*
177:*24*
180:*6*
entirety
39:*3*
41:*10*

62:*16*
172:*22*
248:*18*
entities
139:*24*
176:*15*
entitled
47:*12*
entity
14:*23*
30:*24*
31:*5*
41:*1*
52:*16*
entries
215:*16*
environmen
t    41:*3*
76:*18*
envision
42:*9, 11*

envisioned
229:*24*
equal
219:*19*
220:*21*
equities
197:*14*
203:*12*
204:*4, 5*
escorted
225:*20*

especially
93:*24*
135:*24*
144:*23*
213:*25*
234:*25*
ESQUIRE
2:*7, 9,*

*17    3:7,*
*15    4:8,*
*10, 12, 14*
essentiall
y    22:*19*
29:*1*
34:*13*
36:*8*
37:*20*
43:*6, 21*
48:*25*
59:*8*
63:*19*
71:*3*
121:*22*
136:*25*
164:*1*
183:*8*
231:*18*
establish
47:*20*
48:*9, 14*
establishe
d    51:*2*
establishe
s    46:*10*
establishi
ng
45:*25*
46:*7*
establishm
ent
48:*15*
estate
36:*7*
57:*14*
et    1:*4,*
*7, 15, 16*
8:*10, 11*
25:*17*
53:*16*
57:*13*

82:*22*
90:*15*
98:*6*
171:*24*
197:*9*
204:*5*
253:*10*
ethical
65:*17*
222:*17*
223:*1,*
*12*
224:*2*
225:*5*
226:*6*
ethically
146:*16*
199:*17*
200:*3*
ethics
225:*5*
226:*18*
227:*15*

evaluating
229:*25*
evening
22:*14*
104:*10*
156:*7*
206:*18*
events
18:*11*
161:*13*

eventually
50:*3*
228:*11*
everybody
40:*6*
58:*1, 4*
165:*3*

| | | | | |
|---|---|---|---|---|
| 217:*19* | 201:*17* | | 163:*16* | 45:*10,* |
| 232:*5* | 236:*2* | **exceptions** | 187:*16* | *11, 13* |
| 241:*10,* | **exactly** | 177:*9* | **executing** | 86:*12,* |
| *17, 18* | 12:*25* | **excited** | 110:*20* | *13* |
| 242:*2* | 92:*7* | 25:*24* | 115:*20* | 92:*13,* |
| **evicted** | 101:*21* | 26:*3* | 189:*19* | *14* 95:*7,* |
| 237:*3* | 118:*21* | 33:*24* | 213:*22* | *8* 103:*9* |
| **evidence** | 125:*8* | 63:*1* | 230:*20* | 190:*21,* |
| 84:*5, 7,* | 159:*21* | 221:*10* | **Executive** | *22* |
| *8* 86:*2,* | 168:*22* | **excluded** | 6:*7* | 204:*22,* |
| *9, 10* | 172:*10* | 239:*15* | 14:*19* | *24* |
| 100:*14* | 235:*22* | 245:*14* | 41:*21* | 205:*1* |
| 101:*12,* | 237:*21* | **Excuse** | 45:*14,* | 207:*14,* |
| *15, 23* | 241:*2* | 36:*4* | *15, 17,* | *16, 19, 20* |
| 110:*10,* | 250:*13* | 71:*11* | *20, 22,* | **exhibits** |
| *12* | **EXAMINATIO** | 139:*23* | *24* 46:*6,* | 18:*19* |
| 111:*3,* | **N** 5:*3* | 216:*20* | *10* | 190:*25* |
| *18* | 12:*1* | 226:*1, 3* | 47:*18* | **exit** |
| 113:*1* | 250:*2* | **execute** | 49:*20* | 212:*20* |
| 117:*7* | **example** | 24:*16* | 52:*12* | **expect** |
| 139:*2,* | 40:*25* | 28:*9* | 114:*9* | 54:*7* |
| *21* | 57:*25* | 65:*19* | 135:*2* | 101:*15* |
| 140:*1,* | 62:*22* | 84:*16* | 137:*14* | 218:*25* |
| *14* | 66:*2* | 90:*11* | 157:*17* | 231:*20* |
| 141:*25* | 69:*1, 23* | 98:*24* | 165:*15* | **expectatio** |
| 142:*7* | 75:*4* | 109:*22* | 171:*24* | **n** 128:*15* |
| 143:*17* | 76:*19* | 113:*4* | 174:*21,* | **expectatio** |
| 149:*2* | 155:*20,* | 138:*24* | *25* | **ns** |
| 160:*4* | *21* | 145:*9* | 175:*6,* | 25:*21* |
| 173:*17* | 172:*5* | 147:*11* | *10* | 26:*5* |
| 177:*19,* | 215:*21* | 151:*10,* | 188:*23* | **expected** |
| *24* 226:*4* | 227:*5* | *20* | | 109:*16* |
| **evolution** | **examples** | 160:*25* | **executives** | 150:*2* |
| 41:*13* | 62:*23* | 161:*1* | 204:*12* | 219:*7* |
| **E-W** 11:*6* | 75:*8* | 164:*23* | 231:*16* | **expecting** |
| **exact** | 233:*5, 6* | 165:*13* | **EXHIBIT** | 109:*21* |
| 24:*8* | **exasperate** | 171:*22* | 6:*4* | 221:*6* |
| 132:*10* | **d** 163:*5* | 174:*19,* | 18:*16,* | |
| 139:*18* | **exception** | *23* | *17, 25* | **expendable** |
| 158:*21* | 112:*25* | 187:*25* | 19:*2* | 212:*14* |
| 183:*13* | | **executed** | 21:*23,* | |
| | | 145:*2* | *24* 35:*3* | **experience** |

26:4
69:24
72:16
73:13, 18, 20, 22  74:6, 8, 10, 12
81:11
117:5
139:4
141:7
145:22
185:4
234:11
**expertise**
37:24
**experts**
69:25
**explain**
53:2
54:25
119:7
152:1
168:8
**explicit**
114:10
121:8, 12
**explore**
17:1
**extensive**
135:23
**extent**
33:12
121:4
126:6
225:8
**extra**
206:23
**extreme**
85:19
**extremely**
57:10

63:18
68:4, 5

< F >
**FaceTime**
52:5

**facilities**
57:25
**fact**
36:16
61:19
64:8
70:7
78:25
90:9
123:5
126:17
159:7, 10
182:10
184:20
**facts**
97:10, 11
**factual**
45:8
**fair**
32:25
107:15
141:22
146:3
172:24
178:3
248:17
**fall**
127:1
141:9
**fallout**
168:10
169:5
171:16

**familiar**
45:20
46:5
74:25
163:8
192:16
193:16
**family**
219:19
220:4
236:24
**far**
29:14
30:2
48:14
51:1
64:19, 22  65:8
72:5
79:16
84:7
85:16, 25  87:8
110:4
129:3
203:3, 9
207:6
209:23
210:10
212:4
**Farritor**
37:6
59:12
93:13
94:5, 13, 16, 19
95:10, 17
200:22
203:17
250:12

**fast**
28:6
42:23
43:12
58:5
63:17
68:5
112:20
134:25
141:6
185:19
214:20
220:17
238:1
**faster**
54:20
132:12
134:14, 16
135:8
136:18, 19
139:17
**February**
219:16
**Federal**
4:5
46:12
226:2
**feel**
26:8, 10
27:5, 9, 15, 18
28:6
30:4, 11, 15
33:22
60:9
66:22
67:12
69:24
88:11

90:13, 14
108:12
110:9, 20
112:2, 4
130:21
137:5
148:20
149:20
150:7
154:21
155:1, 9
184:2
189:22
221:23
**feeling**
77:7
90:6, 10
132:11
146:15
150:14
183:10
219:12
**feels**
109:23
**fell**
123:11
**felt**
27:12
28:10
30:15
67:20
110:13
116:10
134:13
138:6
141:15
148:20
150:6, 7
154:15
181:7,

10, 13
204:17
213:18
214:8,
11
217:14
219:8
222:8
228:8, 21
**fidelity**
98:10
**field**
228:16,
17
**figure**
43:14
54:14
71:22
72:1
107:6
215:14
226:12
234:18
**file**
69:16
70:11
102:13
**filed**
8:12
**fill**
136:10
**filled**
57:17
90:9
**filling**
35:19
162:7
**financial**
202:7, 8
**find**
14:1
75:16

79:5
85:12
101:23
208:13
**finding**
57:17
106:18,
21
163:11
215:23
**findings**
107:20,
22
**fine**
120:18
153:7
191:6,
14
241:8
243:9
247:21
**fingers**
204:9
**finish**
13:2, 4
14:2
**finishing**
200:9
**fired**
218:18
237:3, 7
**firing**
237:8
**firm**
28:7
141:16
**firmly**
223:22
**first**
14:17
21:9, 10
22:18

25:19
29:3
31:16,
21, 23
33:3, 9,
10, 22
36:5, 17,
18, 19
37:14
38:16,
18
42:17
51:22
53:7
54:11
56:8
61:21
64:2, 14,
15    69:2,
13
70:23
72:4
75:12
78:24
80:5, 11,
16
86:16
87:1
99:2
158:20
160:8
166:14
176:17
178:25
179:25
180:14
181:3
186:23
191:14,
15
192:2
196:15

205:19
208:17
210:7,
13
224:9
229:22
232:23
**fishtailin
g**    147:19
**fit**
26:11
113:2
121:6
123:15
**fits**
119:7, 10
**five**
129:6
192:5, 8
249:8
**five-
minute**
132:19
249:2
**flabbergas
ted**
179:18
181:7
**flag**
204:2
**flat**
140:7
185:1
**flat-
footed**
150:5
156:19
**Fleet**
20:10
**flesh**
102:21

**flippant**
108:4
110:16
**float**
247:2
**floated**
213:4
**floating**
113:15
214:4
**Floor**
2:5, 15
**focus**
54:8, 23
221:2
**focused**
41:21
106:18
**folder**
143:19
**folk**
229:7
**folks**
39:18
52:11
53:19
58:19,
24, 25
73:24
75:17
81:8
87:17,
18, 23
88:1, 2
105:24
197:18
209:13
215:17
**follow**
112:24
119:19
120:1

121:*3*
184:*8*
248:*21*
**followed**
112:*22*
**following**
16:*22*
127:*3*
146:*9*
162:*7*
**follows**
11:*22*
239:*14*
**follow-up**
201:*15*
205:*22*
**food**
163:*18*
169:*14*
178:*22*
**footed**
140:*8*
185:*2*
**footprint**
36:*7*
57:*12*
134:*21*
**Force**
20:*4*
196:*8*
**forced**
237:*8*
**foregoing**
254:*4, 7*
**forget**
39:*10*
**formal**
51:*7*
235:*15*
**formally**
232:*12*

**formed**
176:*14*
**former**
203:*2*
**formerly**
246:*21*
**formulate**
154:*12*

**formulated**
31:*3*
**formulatin**
**g**
240:*18,*
*22*
**formulatio**
**n**    119:*15*
**forth**
39:*11*
83:*14*
193:*5*
254:*5*
**forum**
169:*22*
**forward**
26:*12*
57:*16*
70:*8*
71:*8*
102:*15*
107:*2*
111:*1,*
*17*
114:*19,*
*20*
116:*8*
117:*7*
122:*3*
132:*12*
134:*14,*
*16*
138:*4*

139:*17*
154:*7*
160:*24*
161:*16*
165:*4,*
*17*
184:*22*
206:*23*
215:*4, 6*
219:*23*
223:*24*
228:*1*
229:*19*
**forwarded**
89:*14*
93:*13*
95:*5*
**found**
75:*18*
79:*4, 20*
106:*1*
107:*18*
210:*17*

**foundation**
30:*7*
47:*16*
142:*14*
148:*13*
**four**
34:*6*
47:*21*
106:*9*
179:*11*
**fraction**
176:*18*
**frame**
24:*14,*
*15*
191:*22*
**Francisco**
2:*6*

**frankly**
28:*11*
**fraud**
75:*23,*
*25*    76:*1*

**fraudulent**
115:*10*
**free**
66:*22*
67:*12*
88:*11*
138:*6*
**friction**
116:*3*
**Friday**
162:*8*
191:*20*
192:*12*
207:*11,*
*12, 13,*
*24*
208:*14,*
*19, 20*
218:*3*
236:*14*
**front**
56:*10*
95:*1*
140:*3*
168:*21*
173:*17*
205:*11*
234:*13*
236:*1*
**fruit**
154:*1, 4,*
*6*
**frustratio**
**n**    150:*10*
**full**
11:*4*

13:*2*
25:*14*
42:*2, 3*
102:*16*
115:*19*
194:*19*
200:*23*
204:*14*
205:*23*
**fully**
29:*16*
49:*3, 20*
144:*1*
164:*21*
170:*2,*
*24*
171:*18*
182:*14*
187:*19*

**functional**
28:*2*
**functional**
**ly**
167:*3*
248:*19*
**functions**
229:*25*
**FUND**
3:*3*
4:*20*
**funding**
25:*17*
**funds**
76:*1*
87:*21*
221:*3*
**Further**
10:*9*
16:*4, 9*
32:*14*
89:*20*

102:7
174:18
254:10
**fuzzy**
112:9
174:17
204:6

**< G >**
**gain**
193:12
**game**
228:16
**gap**
73:23
**gather**
129:25
130:5
**gathered**
130:23
**gathering**
72:4
126:24
127:15
**Gavin**
36:15,
25
60:10,
12, 13,
16   64:5
72:13
**Gaza**
56:1
**gel**   34:5
**general**
36:11
80:24
96:25
106:7
137:25
138:2

148:17
170:5
**generally**
39:23
41:2
70:6
100:7
102:6
138:3
178:25
193:15,
18
194:21
197:18
204:10
231:12
234:5
**generate**
109:25
**gentleman**
35:13
36:14
105:8
**gentleman'**
**s**   31:22
**gentlemen**
39:9
72:10
83:12
93:17

**Geospatial**
176:13
**Geospatial**
**-**
**Intelligen**
**ce**   21:3
**getting**
34:12
68:21
83:10
96:7

118:10
122:15
146:1
172:20
193:9
194:2
196:21
213:12
216:22
217:22
219:18
221:10
224:25
226:15,
17
232:21
**gist**
105:22
122:2
183:14
198:11
201:17
**gisting**
75:7
**give**
11:15
14:13
60:5
64:25
71:25
75:8
102:13
107:5
112:3
120:1
125:19
128:7,
14
134:11
140:5
141:23
143:12

144:14
150:11
173:7
186:13,
15
194:22
198:19
206:6
221:6
233:18
235:6
244:12
**given**
26:19
66:23
67:16
100:25
111:14
124:5
143:18
151:7
154:20
161:13
175:15,
16
204:7
228:9
238:6
**gives**
114:9
**giving**
56:5
75:8
122:6
126:25
127:16
166:10
172:25
173:1
195:5
196:14

213:17
221:9
**glad**
185:3
**glitch**
23:6
**global**
43:9
167:12
**globally**
169:15
**GMT-5**
191:16
**go**   12:6,
17   14:3
16:9
17:25
23:7
27:20
42:2, 3
56:14
60:8
64:21
67:21
84:14
85:17
96:24
99:16
105:24
111:25
121:11
128:8
130:1, 6
132:20
146:9
151:19
154:14
161:2
169:22
176:6, 8,
22
180:25

188:*16*
190:*12*
194:*11*
197:*19*
200:*21*
202:*12*
208:*16*
213:*10*
221:*11*
225:*4,*
*23*
226:*6,*
*10*
227:*8*
232:*15*
238:*24*
241:*14*
242:*17,*
*18*
249:*12*
250:*24*
251:*1*

**God**
11:*17*

**goes**
27:*17*
30:*25*
76:*6*
81:*21,*
*22, 24*
138:*12,*
*14*
141:*15*
149:*24*
154:*2*
159:*5*
164:*11,*
*12*
167:*7*
168:*19*
171:*4*
176:*16*

181:*17*
194:*15*
201:*8*
202:*20*
217:*24*
226:*13*
230:*24*
243:*10*

**going**
12:*5, 6,*
*22*
13:*23*
14:*5*
17:*24*
18:*10,*
*15*
21:*23*
22:*6*
24:*1*
26:*11*
28:*14*
32:*13,*
*24*  36:*5,*
*23*
37:*20*
38:*18,*
*24*
39:*11,*
*25*  40:*1,*
*25*  42:*8,*
*9*  43:*21*
45:*21,*
*24*  46:*8,*
*9*  47:*18*
48:*6*
49:*9*
53:*13*
54:*15*
55:*23,*
*24, 25*
56:*1, 6*
58:*7, 10*

59:*24*
62:*21*
66:*5*
68:*11*
70:*20*
71:*2, 3,*
*7, 9, 20*
74:*4*
75:*16*
76:*16*
78:*22*
84:*15*
86:*11*
90:*8*
92:*12*
93:*4, 9,*
*20*
99:*11*
101:*21*
102:*14*
105:*23*
106:*7,*
*15*
107:*3*
108:*21*
109:*2,*
*21*
110:*6*
112:*9,*
*15*
114:*4,*
*13, 15,*
*20*
116:*8,*
*20*
117:*12*
118:*22,*
*25*
119:*17,*
*22, 23*
120:*10*
122:*11*

124:*15,*
*16*
125:*12*
126:*10*
131:*11*
132:*14*
134:*5*
135:*7, 9,*
*16*
136:*3, 4*
137:*8*
138:*20*
140:*20*
143:*4*
144:*22*
145:*8*
146:*14,*
*24*
147:*12*
148:*4*
154:*4,*
*11, 25*
156:*15*
157:*6, 7,*
*8*  158:*4*
159:*22*
160:*1, 2,*
*24*
164:*15,*
*17*
166:*17*
169:*8,*
*21*
173:*23*
176:*3*
180:*5,*
*25*
181:*2,*
*23*
182:*4*
183:*9,*
*11, 14,*

*15*
184:*11,*
*12*
185:*20,*
*21*
188:*4*
190:*20*
196:*5,*
*13, 16,*
*19*
198:*12*
199:*4, 5,*
*9, 25*
200:*2, 3*
201:*21*
204:*19,*
*20, 22*
206:*22,*
*24*
209:*4*
212:*5*
213:*25*
215:*23*
216:*19*
217:*5, 6*
219:*11*
221:*16,*
*17, 25*
222:*6*
225:*22*
228:*10,*
*12*
230:*4,*
*16*
231:*11,*
*13, 19,*
*23, 25*
232:*3*
236:*22*
238:*2, 9*
240:*2, 3,*
*4*  241:*7,*

14
246:3
247:16, 19
248:6
249:10
251:8, 17, 18
**GONZALEZ**
3:11
**Good**
8:2, 17, 23   9:23
12:3
13:22
14:1
20:15
33:24
34:11, 12
36:23
40:2
60:6
63:1
70:1
88:5
104:20
140:21
150:7, 8
179:21
190:7
197:25
199:2, 3
203:12
224:18
231:4, 6
235:7
249:20
251:5, 10, 11
253:5

**goods**
41:9
221:7
**Google**
31:23
93:18
**Googled**
73:10
**gotten**
107:13
**Gottlieb**
92:19
94:19
95:5

**Gottlieb's**
96:17
**governing**
10:2

**Government**
14:24
17:4, 13
21:15
26:2
30:24
36:1
39:25
41:11, 19   46:1, 11
47:22
49:19, 24   55:4, 18
56:17
61:20
69:15, 21   70:3, 4, 5, 7, 15, 20
73:3

74:8, 9, 12, 16
75:1, 6
76:1, 7, 13, 14
81:17
85:21
93:3
99:22
112:24
139:4
141:8, 24
142:9
145:23
146:7
164:9
165:6, 14
168:7
170:5
175:19
177:12, 13
178:14
185:13
188:7, 8
194:9
197:3
203:3
223:21, 22, 25
228:6
229:19
233:4
234:2, 6, 24, 25
235:3, 11, 16
**governmental**   46:13

**government-ese**
155:7

**government's**   76:3
**grabbing**
157:25
**graduate**
19:21
**graduated**
19:8
**graduating**
19:10
**granted**
55:13
**granting**
205:24
**Gray**
6:9
27:19
28:15
34:5, 17
47:11
48:7, 9
50:6, 25
51:17
65:8
80:12
90:22
92:19
98:14
129:12
148:8, 18
157:12, 20
158:6
160:14
162:16
170:8

173:8
181:9
195:6
206:25
207:4
208:9
209:20
210:8, 15, 16, 21
211:5, 11, 16, 21, 22
227:20
**graybeard**
72:17
**Gray's**
66:19
166:4
203:6
**Great**
14:12
17:22
18:10
19:24
20:19
25:24
46:17
69:23
140:10
178:13
231:6
246:4
**greatest**
223:22
**green**
204:2
**Greenwich**
192:9
**grenaded**
216:24

| | | | | |
|---|---|---|---|---|
| **grew** | **growth** | 72:*13* | 170:*19* | *21* |
| 112:*16* | 234:*20* | 73:*24* | 201:*22* | 101:*7* |
| **grieve** | **guess** | 77:*9, 14* | **handle** | 135:*20* |
| 98:*25* | 25:*22* | 106:*8* | 120:*23* | 156:*24* |
| **grind** | 26:*7* | 120:*1* | **hands** | 159:*8* |
| 216:*17* | 35:*17* | 122:*2* | 29:*8* | 160:*21* |
| **ground** | 52:*17* | 131:*25* | 81:*7* | 167:*12* |
| 12:*6, 23* | 73:*14* | 141:*14* | **happen** | 171:*4* |
| 27:*25* | 87:*10* | 144:*15* | 15:*14* | 184:*17* |
| 28:*7* | 127:*4* | 171:*17* | 16:*2* | 208:*18* |
| 29:*3* | 161:*7* | 176:*8* | 27:*4* | 210:*2* |
| 39:*9* | 166:*7* | 194:*6* | 53:*8* | 213:*9* |
| 85:*21* | 228:*20* | 198:*21,* | 70:*6* | 217:*7,* |
| 123:*4* | 229:*5* | *24* | 90:*16* | *11* |
| 141:*16* | 243:*20* | 209:*10* | 97:*21* | 236:*23* |
| **grounded** | 252:*7* | 215:*2* | 99:*14* | **happens** |
| 226:*9* | **guidance** | 217:*23* | 110:*6* | 33:*18* |
| **grounds** | 107:*5* | 219:*5* | 117:*10* | 197:*3* |
| 17:*5* | 133:*6,* | 222:*6* | 141:*6* | **happiness** |
| **group** | *10* | 233:*7* | 149:*16* | 219:*19* |
| 52:*7, 20* | 155:*5* | 234:*22* | 157:*7* | **happy** |
| 60:*22* | 188:*1* | 236:*3* | 174:*23* | 76:*10* |
| 61:*10,* | **guy** | 242:*2* | 185:*21* | 121:*24* |
| *13, 14* | 34:*24* | 251:*15* | 204:*8* | 139:*7* |
| 68:*10* | 57:*6* | **guy's** | 207:*10* | 184:*19* |
| 75:*10* | 59:*14* | 39:*10* | 221:*21* | 185:*9,* |
| 78:*18* | 72:*17,* | 194:*12* | **happened** | *18*    229:*9* |
| 80:*3* | *23* | 218:*19* | 55:*19* | **harbor** |
| 83:*11* | 93:*16* | | 99:*15* | 228:*8* |
| 104:*21* | 145:*2* | **< H >** | 115:*7* | **hard** |
| 106:*13* | 163:*4* | **half** | 139:*13* | 136:*4* |
| 121:*19* | 193:*15* | 13:*24* | 149:*15* | 174:*22* |
| 128:*21* | 196:*2* | 89:*19* | 154:*13* | 188:*20* |
| 140:*10* | 197:*18* | 93:*24* | 161:*15* | **harder** |
| 161:*18* | 200:*24* | 131:*4, 6* | 168:*1* | 166:*15* |
| 164:*8* | 201:*10* | 188:*3* | 199:*12* | **harm** |
| 165:*1* | 202:*15* | 231:*4* | 217:*9* | 169:*10* |
| 178:*20* | 204:*17* | **hand** | 220:*11* | 197:*21* |
| 196:*4* | 212:*23* | 11:*13* | **happening** | **harm's** |
| 226:*25* | 221:*8* | 81:*3* | 40:*11* | 147:*17* |
| **growing** | **guys** | 90:*16* | 61:*25* | 148:*11,* |
| 228:*11* | 37:*21* | 138:*23* | 97:*20,* | *22*    149:*7* |

head
 13:*8*
 30:*25*
 46:*18,*
*24*    47:*8,*
*19*    48:*7,*
*8*    53:*13,*
*17*
 75:*19*
 97:*6*
 113:*10*
 115:*18*
 149:*25*
 195:*1, 2*
 197:*7*
 202:*20,*
*21*
 213:*19*
 230:*22*
 232:*10*
 233:*25*
header
 191:*19*
headline
 56:*2, 3*
headquarte
rs
 60:*18*
 246:*11,*
*21*
 247:*11*
heads
 47:*24*
 48:*2, 4*
 165:*16*
 202:*25*
Health
 93:*14*
healthy
 68:*6, 7*
hear
 12:*13*

32:*5, 6*
78:*4, 15*
117:*17*
131:*2*
215:*10*
heard
 167:*1*
 180:*14*
 181:*3, 5*
 210:*7, 13*
Hearing
 23:*10*
 44:*17*
 77:*19*
 132:*23*
 166:*7*
 190:*13*
 244:*17*
 249:*21*
 253:*7*
heck
 135:*9*
 179:*16*
He'd
 113:*8, 9*
heel
 206:*12*

heightened
 214:*14*
HEIMANN
 2:*3, 9,*
*13*    12:*4*
held
 19:*17*
 23:*18*
 105:*11*
 193:*13*
 197:*11*
help
 11:*17*
 36:*6*

38:*25*
39:*5, 12*
49:*10*
52:*9, 13*
53:*19*
56:*10*
59:*23*
62:*13*
63:*2*
102:*21*
107:*5*
221:*11*
helped
 31:*24*
helpful
 22:*5*
 40:*18*
 77:*16*
helping
 169:*14*
 221:*5*
 236:*18*
Herculean
 134:*24*
 177:*13,*
*14*
hesitated
 66:*8*

hesitating
 240:*20*
Hey
 37:*20*
 44:*11*
 71:*3*
 81:*4*
 85:*11*
 97:*3*
 100:*24*
 103:*14*
 105:*23*
 106:*12*

107:*5*
108:*3*
127:*13*
129:*4*
147:*13*
152:*6*
153:*24*
154:*5*
156:*11,*
*15*
157:*6*
158:*1*
180:*25*
183:*8*
194:*14,*
*24*
 212:*17,*
*22*
 215:*1*
 219:*21*
 221:*13*
 229:*8*
 231:*6*
 233:*15*
 236:*21*
 237:*1, 17*
high
 159:*11*
 225:*19*
higher
 139:*24*
highest-
ranking
 46:*18*
highlighte
d    57:*7*
Hill
 231:*24*
hindsight
 63:*11,*
*12, 13*

168:*12*
187:*20*
hired
 39:*21*
 47:*22*
 50:*16*
hiring
 23:*20*
 50:*14*
 248:*11*
historical
ly
 168:*13*
history
 189:*14*
 193:*21*
hold
 19:*15*
 20:*22*
 56:*17*
 132:*18*
 135:*6*
 176:*4*
 197:*10*
 204:*3*
holding
 185:*19*
 238:*6*
holdovers
 55:*11*
holds
 196:*25*
 203:*1*
holiday
 43:*5*
holidays
 24:*13*
home
 183:*19,*
*20*
 185:*8*
 196:*13*

197:*14*
248:*23*
**Homeland**
21:7
**Honestly**
38:*20*
**honor**
236:7
**hopefully**
251:*14*
**HOPSON**
1:*13*
5:*3*
6:*10*
8:*10*
11:*5, 10,*
*18*  12:*3,*
*11, 19*
45:*4*
126:*22*
127:*5, 8*
212:*23*
**H-O-P-S-O-**
**N**  11:*6*
**host**
235:*9*
**hostile**
41:*2*
**hot-**
**desking**
113:*9*
**Hotel**
11:*10*
**hour**
13:*24*
71:7
**hours**
71:7
192:*9*
199:*12*
220:7, *12*

**House**
23:*22*
25:*9*
28:*25*
29:*22*
31:*6*
32:*17*
35:*9, 19,*
*24*
43:*11*
44:*6*
48:*23*
49:*2*
50:*18*
65:*24*
66:*9*
67:*21,*
*25*  74:*3,*
*4, 5*
105:*10*
151:*8,*
*11*
160:*19,*
*23*
161:*14*
162:*5*
164:*10*
170:*22*
171:*17*
172:*13,*
*15, 19,*
*25*
174:*4,*
*11, 21*
176:*18*
178:*21*
180:*1*
183:*1*
185:*5*
186:*4, 6*
196:*19*
213:*14*

215:*15*
218:*15*
228:*10*
232:*2*
236:*12,*
*13*
**HR**
109:*24*
202:5
225:*1*
**Hudson**
2:*14*
**huge**
43:*9*
**Hugh**
71:*19*
**huh**   13:*8*
**Human**
93:*14*
169:*11*
202:*21*
204:7
220:*19*
**humanitari**
**an**   41:*6*
**humor**
111:*1*
**hundreds**
189:*14*
**hung**
62:*4*
78:*13*
117:*15*
**hurdles**
43:*10*
**hypothetic**
**al**
127:*12*
173:*15,*
*22*
188:*14,*

*15, 16*
190:*1*

**< I >**
**ID**
53:*16*
117:*20*
**idea**
39:*15*
40:*20*
42:7
50:*16*
96:*18*
118:*19*
124:*6*
158:*23*
169:*8*
179:*21,*
*22*
188:*1*
203:*19,*
*22*
235:*17*
**Ideally**
171:*12*
**identifica**
**tion**
18:*25*
21:*24*
45:*11*
86:*13*
92:*14*
190:*22*
205:*1*
207:*16*

**identified**
9:*20*
83:*3, 5*
**identify**
8:*14*

39:*1*
83:*1*
**idiot**
166:*21*
**ignore**
66:*22*
67:*13*
**illegal**
90:*13*
164:*15*
188:*24*
224:*2*
226:*16*

**illustrate**
75:*5*
**imagining**
25:*22*
**immediate**
65:*25*
**immediatel**
**y**   34:*4*
234:*22*
**impact**
26:*1*
148:*4*
178:*18*
203:*11*
204:*4*
**impacted**
168:*17,*
*18*
**impactful**
220:*25*
**impacts**
193:*18*
201:*4, 5*
**impetus**
138:*16*
196:7
199:*24*

implement
 42:24
 43:22,
24   46:11
implemente
d   232:12
implementi
ng   46:1
 48:4
implicatio
n   149:1
implicatio
ns   164:9
implied
 26:12,
16   27:6,
10, 13
 114:11
implying
 147:6
 148:7
important
 12:24
 13:6
 168:3
 224:8, 10

impression
 31:8
 74:14
 109:15
 130:16
 134:13
 135:7
 136:9,
14, 17
 140:18
 142:25
 161:19
 162:10
 180:4
 182:3

 184:5
 210:16
 212:9
 227:19
 230:9
impression
s
 133:11,
23
Improvemen
t   70:13
 102:17

inaccurate
 96:17, 23
inadverten
t   201:2,
24
inadverten
tly
 77:13
include
 10:4
 47:21
 141:5
 164:10
 186:5
 206:2
included
 88:8
 129:2
 136:5
 153:23
 252:2
includes
 14:7
including
 14:5
incorporat
ed
 126:18

incorrect
 78:23
 192:7

increasing
 28:9
independen
t   135:17
indicate
 11:8
 66:16
 245:12

indication
 210:11
indirect
 30:5, 12
 66:15
Indiscerni
ble
 19:24
 153:5
 200:18

individual
 31:24
 98:9
 201:4
 230:21
 234:15
individual
s   82:13
 84:5
 86:7
 87:6
 88:19
 89:8
 91:25
 97:25
 98:14
 100:15,
16

102:24
 104:4
 106:5
 108:1,
25
 110:11,
13
 113:16
 116:24
 136:6,
20
 177:20
 216:20
influence
 30:5, 12

informally
 30:11
informatio
n   13:20
 39:12
 45:8, 9
 72:3
 75:21
 76:17
 82:24
 83:19
 87:20
 107:3
 108:14,
17
 110:22
 125:4,
22, 25
 126:23
 127:14,
15
 128:4,
20
 129:21,
23
 130:1, 6,

17, 23
 131:13
 143:20
 161:8
 162:2
 168:4
 171:13
 193:19,
21
 205:4
 212:24
 227:2
informed
 209:19
initial
 53:5
 64:13
 75:9
 94:19
 96:6
 100:25
 101:17
 104:16
 140:22
 155:18
 218:13
 226:25
 230:6
initially
 26:9
 159:15
initiate
 103:22
 109:16
 111:21
 139:3
 141:23
initiated
 75:14
 80:20
 102:21
 105:22

106:*2*

109:*3, 5, 7, 8, 10*

initiating

110:*11*

136:*6, 20*   149:*2*

initiatives   54:*16*

229:*19*

inquire

178:*15*

inquired

158:*25*

inquiring

156:*22*

inside

45:*9*

213:*16*

insight

172:*21*

214:*22*

insinuated

102:*9*

instance

153:*15*

instances

150:*13, 19*

151:*13*

154:*19*

instantly

233:*19*

institute

16:*12*

institution   223:*23*

instruct

209:*4*

instructed

16:*11*

instruction   17:*4*

97:*2*

126:*25*

127:*16*

128:*7, 14*

150:*21, 23*

151:*5, 7*

172:*25*

instructions

121:*5*

125:*19*

126:*1*

150:*15*

instructs

17:*6*

18:*2*

intel

19:*17*

26:*22*

188:*7*

193:*15*

194:*18*

197:*18*

200:*24*

202:*15*

221:*8*

Intelligence

19:*23*

20:*17, 20*

21:*16*

26:*21*

221:*4*

224:*3*

intent

25:*17*

145:*6*

167:*9*

175:*9, 12*

221:*22*

intention

25:*20*

intentionally

239:*12*

245:*12*

interacted

37:*14*

interest

206:*22*

238:*18*

interested

25:*11*

254:*12*

interesting   70:*8*

214:*13*

interests

170:*6*

200:*1*

221:*3*

interlocutor

59:*20*

101:*6*

internal

152:*6*

196:*23*

197:*14*

internally

116:*21*

135:*23*

176:*12*

199:*5*

International

14:*15*

20:*3*

21:*19*

168:*15*

177:*25*

interpret

172:*17*

227:*16*

interpretation

122:*9*

140:*8*

interrupt

126:*19*

intervention

43:*20*

163:*13*

interview

23:*22*

24:*3, 7*

41:*18, 25*   71:*14*

interviewing

71:*10, 13*

interviews

23:*24*

71:*10*

73:*24*

208:*17*

intro

231:*18*

introduce

21:*23*

86:*11*

92:*12*

190:*20*

204:*22*

introducing   18:*16*

207:*14*

investigated   84:*22*

investigation

82:*25*

83:*2*

85:*2, 5, 17*

178:*15*

202:*7*

226:*3*

investigations

119:*14*

Investigative

20:*11*

178:*14*

investigatory

201:*3*

202:*1*

investment

40:*12*

72:*18*

invited

160:*11*

166:*14*

invocation

32:*11*

77:*5*

118:*23*

121:*4*

208:*25*

247:*20*

36

involve
121:17
involved
31:7, 9
45:19
51:4, 6
59:4
61:24
62:7
83:4
90:19,
22, 25
91:14
92:7
95:21
103:9
113:8,
19
124:8
135:22
142:5
152:10
157:10,
23
159:2, 8,
16
162:13
164:3
170:2
175:11,
12
178:17
181:18
197:13
215:22
219:8
221:24
224:25
238:11
involvemen
t   91:22

211:4,
10, 15
involves
159:3
involving
153:1
156:4

irrelevant
219:12
irritant
147:24
ISSACHAROF
F   2:17
8:19
10:17
121:3,
11
125:17
126:4
130:25
131:10
134:1, 3
190:10
240:14
241:18
issue
83:1
186:1
issues
133:9
it'd
91:5
item
106:16
items
164:4
its
41:15
163:19
178:21

< J >
Jack
88:16
Jackson
27:21
29:19
34:5, 17
65:6
157:12,
20
180:4
181:12
182:3
205:11,
12
210:15
JACOB
4:10
8:25
jacob.s.si
ler@usdoj.
gov   4:11
Jake
242:6
243:12
JAMES
4:8
8:23
250:7,
10
252:20
james.j.we
n@usdoj.go
v   4:9
Jan   21:5
January
21:6
22:12
24:12,
19
33:20

46:25
51:9, 14
56:19
61:9
63:22
64:14
70:24
78:19
79:5
84:3
86:21
87:7
92:22
93:9, 11
94:5
100:14
104:3
117:23
124:23
136:22
156:5
177:21
180:18
191:15
192:20,
24
205:19
207:12
208:7
216:6,
13   240:9
Jason
6:9
27:19
28:15
29:13,
18
30:14
34:5, 17
35:16
47:11
50:6, 24

58:8
64:6, 10
65:8
66:19
67:17
82:11
90:22
92:19
97:4
98:13
104:25
111:25
129:11,
13, 18
147:8,
12, 18
148:5, 8,
10, 21
149:6
153:23
154:14,
15
156:16,
25
157:12,
20
158:6,
12, 25
159:13
160:1,
13
162:16
163:1, 3
164:1,
23
166:4
170:8,
11
173:7
174:19
179:15
180:2

181:*9, 14, 15*
194:*25*
195:*6*
199:*11*
200:*14*
201:*9*
203:*6*
206:*25*
207:*4*
208:*9*
209:*12, 20*
210:*8, 15, 16, 21*
211:*5, 11, 16, 21, 22*
212:*15, 16*
215:*3*
218:*17, 18, 22*
226:*10*
227:*8, 20*
228:*7*
237:*14*

**Jason's**
29:*2*
156:*9, 10*
157:*14*
166:*8*
213:*19*

**Jehieli**
4:*19*
9:*10, 16*

**jeopardy**
28:*11*
160:*3*

**Jeremy**
36:*13*
37:*8*
58:*25*
59:*1, 3, 6, 7, 8, 9, 16, 19, 22*    64:*6*
90:*4*
108:*13, 14, 15, 16*
110:*18*
111:*14*
113:*6, 17, 22*
114:*3, 12, 22*
115:*2, 16*
140:*3, 5, 7, 23*
142:*12*
143:*1, 11*
144:*6*
156:*4, 8, 16*
157:*5, 12, 21, 22*
158:*6, 21*
159:*21*
160:*13, 18*
161:*7, 8, 9, 10, 15, 16, 20, 23*
162:*4, 10, 16,*

17
163:*23*
166:*3, 8, 14, 20, 25*
170:*14*
172:*10, 12, 13*
173:*2, 7*
177:*18, 23*
178:*5, 20*
179:*4, 7*
180:*5*
182:*18*
186:*3*
189:*20*
196:*6*
200:*6, 14*
211:*15*
214:*17*
215:*9*

**Jeremy's**
140:*4*
166:*20*
170:*14*

**jest**
139:*10*

**jibe**
97:*16*

**jibes**
191:*23*

**JOB**
1:*19*
21:*22*
24:*6*
33:*22*
44:*10*
71:*14*
99:*19*

168:*3*
179:*24*
199:*10*
219:*14, 23*
221:*20*
228:*9*

**jobs**
19:*18, 19*
50:*23*
165:*4*

**jockey**
165:*20*

**Joel**
34:*6, 17*
42:*21*
43:*1*
56:*9*
80:*9*
83:*15*
84:*11*
86:*21, 22*    90:*5*
101:*4, 5*
103:*5, 8, 10*
105:*5, 6*
113:*11*
135:*24*
147:*9*
153:*23*
188:*21*
189:*5, 7, 9, 10, 12, 16*
194:*13*
195:*7, 11*
196:*1*
205:*13*
209:*13*

210:*15*
214:*23*
229:*7*
230:*23*
231:*1, 9*
232:*11*
237:*14*

**Joel's**
231:*2*

**John**
205:*12*

**joined**
19:*10*
35:*10*

**Joint**
20:*16*

**joke**
197:*23*

**Jones**
35:*5*
83:*17*

**JPMorgan**
72:*21*
73:*1*

**jump**
22:*6*
49:*10*
50:*2*
85:*2*
116:*3*
243:*15*

**jumped**
163:*22*

**junior**
220:*22*
233:*13*

**juniors**
68:*9*

**JUSTICE**
4:*3*
45:*1*

| | | | | |
|---|---|---|---|---|
| **justificat ion** | 105:*6*, *7* | **kid** | 216:*24* | **know** |
| 97:*1*, *5* | 148:*5* | 204:*13* | 219:*10* | 13:*5*, *7*, |
| 114:*6* | 153:*23* | 220:*19* | 221:*1* | *12*, *14*, |
| 135:*19* | 156:*9*, | **kids** | 232:*8* | *17*, *19*, |
| **justified** | *25* | 219:*17* | **kinds** | *20*, *25* |
| 100:*17* | 157:*12*, | 220:*23* | 209:*2* | 22:*21* |
| **justify** | *20* | **kind** | **Kliger** | 24:*24*, |
| 110:*10* | 179:*15*, | 13:*5* | 36:*25* | *25*  25:*3*, |
| 177:*20*, | *25* | 14:*8* | 60:*10* | *18*, *25* |
| *24* | 180:*4* | 25:*4* | **knew** | 26:*19*, |
| **Justin** | 181:*12*, | 34:*10*, | 13:*19*, | *21*  27:*1* |
| 97:*4* | *14*, *16*, | *12* | *21* | 30:*13*, |
| | *18* | 36:*20* | 60:*14* | *22*  31:*2*, |
| **< K >** | 182:*1*, *3*, | 39:*5* | 66:*8* | *5*, *6* |
| **Kate** | *13*, *14* | 40:*16*, | 84:*15* | 32:*7*, *12*, |
| 48:*24* | 200:*14* | *18*  42:*8* | 85:*25* | *13*, *14*, |
| **keen** | 205:*11*, | 59:*2* | 97:*19* | *17* |
| 43:*11* | *22* | 60:*17* | 112:*9* | 33:*13*, |
| **keep** | 210:*14* | 64:*3*, *11* | 114:*15* | *17* |
| 13:*12* | 215:*3* | 66:*7* | 118:*9* | 34:*12*, |
| 22:*4* | 219:*3* | 68:*10* | 143:*11* | *13*, *14* |
| 42:*3* | 226:*11* | 75:*5*, *25* | 151:*9* | 35:*22*, |
| 85:*18* | 230:*23* | 81:*25* | 154:*3* | *23*  36:*6*, |
| 128:*12* | 236:*15*, | 99:*7* | 159:*21* | *16*  37:*3*, |
| 142:*7* | *21* | 105:*24* | 163:*4* | *20*, *22* |
| 214:*1* | 237:*13*, | 107:*13* | 166:*14*, | 39:*2*, *21*, |
| 248:*8* | *25* | 110:*5* | *20*, *21* | *24*  40:*4*, |
| **keeps** | **kept** | 113:*14* | 179:*24* | *23*, *24* |
| 202:*6* | 166:*17* | 119:*18* | 180:*5* | 41:*6*, *8*, |
| **Ken** | 179:*20* | 126:*1* | 181:*15* | *22*, *24*, |
| 27:*21* | 230:*2* | 140:*3* | 189:*9* | *25* |
| 28:*25* | **key**   49:*2* | 141:*9* | 196:*12* | 42:*22* |
| 29:*18*, | **keyboards** | 144:*23* | 199:*2*, | 43:*5*, *18*, |
| *19* | 73:*18* | 150:*11* | *25* | *19*, *21* |
| 30:*14* | **keyed** | 152:*23* | 201:*21* | 44:*4*, *6* |
| 34:*5*, *17* | 229:*11* | 154:*5* | 208:*18* | 45:*6* |
| 58:*8* | **keys** | 156:*1* | 212:*15*, | 46:*4* |
| 65:*6* | 203:*4* | 165:*4* | *19* | 48:*14* |
| 67:*17* | **keywords** | 184:*4* | 214:*24* | 49:*4* |
| 99:*4* | 109:*2* | 197:*19* | 215:*7* | 50:*5*, *17*, |
| 104:*25* | | 203:*15* | 218:*22* | *21*, *22* |
| | | 213:*3* | 228:*1* | 51:*1*, *8*, |

12, 13
52:8, 10, 11, 25
53:8, 19, 24
54:14, 15  55:4, 7, 10, 12, 24  56:1, 7, 20, 21, 24  57:3, 6, 7
58:3, 20
59:11, 17  60:7, 14
61:11, 15, 19, 21  62:2, 3, 10, 17, 20, 21, 22
63:25
64:4, 8, 10, 14
65:10, 14
66:14, 15  67:5
68:18, 20  69:4, 17, 18
70:5, 14, 19
72:19, 20  73:6, 7, 20
74:4, 9
76:7, 18, 22  77:1
78:4, 17, 23

80:20, 25  81:2, 3, 9, 16
82:2, 19
83:17, 25  84:8, 13, 18
85:6, 13, 16  87:8, 21
88:18, 19, 20, 23  89:1, 6, 12, 13, 14, 16
90:17
91:9, 11, 15  92:2, 5, 7, 17
93:15
95:1
96:1, 10, 14
97:11, 18  98:5, 6, 8
99:17, 24
100:24
101:6, 7, 16, 23
102:1, 3, 17, 19, 21
103:19
104:8, 12
105:4, 21, 22, 25
106:2, 17

107:4, 9
111:8, 10, 22
112:15, 21
113:4, 12, 19, 21
114:6, 8, 18
115:5, 9, 10, 11, 17, 24
116:5, 17
117:9
118:18, 25
119:1, 2, 13, 17, 18
120:15
121:20
122:1
123:2, 6, 9, 11, 13
124:10
125:1, 11, 13, 15
126:3, 9, 10, 15
127:10, 13, 20
128:17, 19
129:6, 14
131:4, 6, 9, 17
132:10
133:6,

11, 23, 24
134:19
135:5, 14, 16, 20
136:2
137:6
138:10, 15, 19
139:18, 23
141:3
143:16, 19
144:1, 5
145:8
147:1, 19
148:5
149:23
151:8
152:16, 22
153:20, 24
154:2, 10, 22, 24
155:3, 5, 6, 9
157:1, 3, 7, 17
158:15, 21, 24
159:4, 19
160:12
161:5, 10, 12, 17, 25
162:9,

11, 13
163:7, 16, 18
164:11, 17, 22, 23
165:14, 24
166:23
167:15
168:11, 13
169:1, 16, 20, 24
170:11, 13, 18, 20, 22
171:1, 7, 16, 20, 21, 23
172:1, 9, 12
173:10, 11
174:3, 9, 13, 16, 17, 24
175:1, 14, 15
176:12, 13
177:12, 14
178:11, 15
179:16, 19
180:8, 12
181:15
182:5, 8,

9, 10, 24, 25
183:1, 2, 3, 4, 6, 9, 13, 15
184:3, 10, 14
185:3, 6, 13, 21
186:4
187:4, 5, 7, 15
188:6, 12, 17
189:10, 14, 18
190:11
191:12, 13, 20, 21
192:2, 3, 4
193:17, 20
194:7, 20
197:1, 4, 7   199:6, 8, 14, 17
201:16, 24
202:8, 11, 14
203:2, 3, 4, 9, 23
204:1, 11, 12, 13, 16, 18
206:11, 12
207:6

208:6, 9
209:13, 25
210:18, 20, 23
211:2, 6, 13, 18
212:13, 20, 21
213:5, 7, 8, 24
214:4, 23
215:1, 10, 11, 12, 22
216:13
217:8, 11, 18, 24
218:1, 2, 3, 13, 22
219:5, 22
220:7, 18, 19
221:12
224:23, 24
225:6, 16
226:4
227:17
228:2, 7, 8   229:1, 3, 8, 25
231:1, 15, 16, 20, 22, 25
232:2, 17

233:4, 10, 11, 17, 19, 22, 24
234:21
235:9, 10, 23, 25
236:5, 7, 11, 14, 21, 23, 25
237:12, 14, 17, 25
238:1, 4, 5, 15
241:25
242:12
244:6
246:2, 8, 11, 16, 22, 24
247:3, 7, 10
248:2
249:4, 5, 11
251:2
252:6
**knowing**
135:4
182:1
205:25
212:11
219:11
**knowledge**
48:10
50:14, 22
51:16, 20   53:4

90:22, 25
91:10, 12, 13, 20   92:3, 4   95:9
108:2
109:10
115:11
118:2
121:23
122:5, 21, 23
123:7, 10, 11
124:4, 7, 21
125:3
126:6
137:15
235:14
240:24
241:1
**known**
160:7
**Korzeniewski**   35:8

**< L >**
**labeled**
36:9
190:24
**Labor**
92:20
**lack**
87:21
149:3
**laid**
232:8
**land**
231:17

**language**
156:22
163:5
**large**
177:5
**largely**
215:8
216:21
**larger**
107:11
**Larkin**
35:5
**late**
104:11, 12
156:12
185:9
**laughed**
110:5
**launchpad**
54:8
**law**
26:21
116:18
227:16
**laws**
10:1
75:1
194:7
223:19
**lawsuit**
14:13
**lawyer**
69:3, 19
76:23
81:22, 23
115:14
116:16
117:4, 6
143:11
149:18

152:14
226:9
227:16
235:9
**lawyers**
26:22
57:23
59:22
69:10,
14    77:9
144:15
147:15
149:15
152:4,
24
197:19
224:25
226:22,
25
227:6
234:25
235:4
242:21
**lawyer's**
153:2
**layman's**
52:12
**lead**
25:25
31:17
115:17
177:4
184:15
236:18
**leader**
50:1
123:3
188:20
**leaders**
129:17
**leadership**

19:18
26:24
34:8
43:24
58:18
63:20
81:10,
21, 22
87:16,
19
153:22
187:22
**leading**
61:14
146:7
**leads**
48:3
**leaked**
213:1
**leaning**
140:6
**learn**
51:22
78:24
234:17,
19
**learning**
26:25
136:1
235:11
**leases**
57:9
107:10
**leave**
17:9, 10
55:15,
18
65:11
67:11,
12
75:10,
21    76:5

78:19
79:1, 15,
21, 23
80:4, 13,
18, 22
82:14,
22    83:1,
23    84:4
85:4, 19,
20    86:2
87:6
98:15
99:9
100:8,
16
101:1,
22
102:24
103:22
104:5
106:5
108:5
120:9
126:15
131:2
136:7,
21
155:19
156:17
158:7
162:20
167:2
169:8,
21
174:20
177:21
178:1
180:7,
16
183:22
184:25
193:9

196:10
201:12
213:15
222:9
226:25
243:4
247:25
248:3,
15, 18
251:8
**leave's**
178:12
**leaving**
68:20
198:11
204:17
212:25
**Lebanon**
164:4
**led**
58:20,
21
150:10
**left**
20:8
26:7, 10
63:15
134:6
140:12
150:14
156:6
163:9
182:18
184:3
196:11
212:20
239:12
245:12
**Legal**
1:17
8:6
47:5

52:22
60:1, 6
61:2
64:17
65:1, 17,
18, 21
76:18
77:3
81:10,
20
84:24
88:8
102:2,
18, 25
109:23
112:7,
12
114:5
115:13
116:11
123:18
130:13
137:12
138:21
144:10,
24
145:14
149:8
151:22
152:10,
22
153:1, 3,
4, 19
154:11
155:10
188:8,
23
196:18
222:16,
20, 22
224:9,
12

| | | | | |
|---|---|---|---|---|
| 225:2, 8, 12 | 155:14 | **Lewin's** | **lines** | 98:3, 10 |
| 226:6, 7, 14 | 159:11 | 162:16 | 39:18 | 100:15, 21 |
| 227:9, 14, 17 | 174:24 | 178:5 | 163:25 | 102:21 |
| 244:9 | 179:24 | 189:20 | 192:6 | 103:10, 14, 15 |
| **legality** | 190:4 | **liaison** | 230:16 | 106:8, 15 |
| 112:13 | 195:2 | 35:10 | 235:25 | 108:25 |
| 178:4, 11 | 197:2 | 48:23 | **lineup** | 111:23 |
| 224:6, 11 | 204:10 | 236:12, 13 | 72:21 | 113:16 |
| **legally** | 234:15 | **lie** | **LinkedIn** | 114:2, 22 |
| 60:4, 5 | **levels** | 170:6 | 6:5 | 116:24 |
| 65:14, 16 | 145:10 | **LIEFF** | 19:3 | 137:24 |
| 76:12 | 189:19 | 2:3, 13 | **LISER** | **listed** |
| 98:24 | **Lewin** | 12:4 | 249:2 | 147:11 |
| 108:12 | 37:8 | **life** | **lissacharo** | 205:10 |
| 112:20 | 58:25 | 168:14 | **ff@lchb.co** | **listen** |
| 146:16 | 108:13 | 169:11 | **m** 2:18 | 142:18 |
| 153:17 | 113:17 | **lift** | **list** | **literally** |
| 199:17 | 115:3 | 43:8, 10 | 75:19 | 136:1 |
| 200:3 | 142:12 | 48:22 | 80:25 | 202:20 |
| **letter** | 143:1 | **light** | 82:2 | 218:20 |
| 22:13 | 144:6 | 110:5 | 83:18, 20 | **litigate** |
| 97:8 | 156:4 | **limb** | 84:21, 22  86:7 | 131:1 |
| 100:24 | 157:12, 21 | 168:15 | 87:6, 10, 25 | **litigating** |
| 195:10 | 158:6, 21 | **limit** | 88:22, 23 | 146:8 |
| 220:9 | 160:13 | 248:8 | 89:13, 23 | **litigious** |
| 235:24 | 161:7, 8, 21, 23 | **limited** | 90:20, 23  91:1, 14, 22 | 145:23 |
| | 162:17 | 127:20 | 92:1, 8 | **little** |
| **letterhead** | 166:3, 25 | **line** | 93:12 | 23:6 |
| 31:19 | 173:7 | 24:24, 25  52:1 | 94:6, 19, 23  95:7, 11, 14, 17, 19 | 28:13 |
| **letting** | 177:18, 23 | 87:1 | | 33:8, 9 |
| 199:14 | 179:7 | 96:24 | | 52:6 |
| 203:11 | 180:5 | 111:16 | | 53:8, 9 |
| **level** | 182:4, 18 | 153:9 | | 54:22 |
| 27:16, 17 | 186:3 | 174:18, 25 | 96:6, 10, 13 | 56:16 |
| 87:11 | 200:6 | 192:7 | | 66:8 |
| 114:16 | 211:15 | 205:3, 7, 10, 12 | | 73:9 |
| | | 223:1 | 97:24 | 78:4 |

81:*3*
106:*23*
113:*11*
122:*15*
133:*6*
140:*6*
148:*21*
150:*1, 5,
10*
157:*11*
159:*1*
170:*19*
197:*22*
200:*25*
206:*23*
214:*6*
216:*12*
229:*7*
248:*9*
**LLP**   2:*3,
13*
**local**
45:*18*
**LOCATION**
1:*17*
25:*15*
**locations**
134:*20*
**lockstep**
34:*7*
**lodge**
125:*12*
**log**
192:*14*
243:*7, 8*
**logged**
94:*7, 20*
95:*11,
18, 20*
96:*6*
**logging**
95:*23*

**long**
34:*15*
49:*5*
62:*24*
65:*17,
18*
76:*21*
118:*6*
179:*10,
12*
195:*22*
202:*19*
219:*22*
224:*7,
21*
236:*11*
251:*20*
**longer**
176:*25*
247:*4*
**long-
winded**
175:*14*
**look**
27:*2*
30:*25*
35:*25*
36:*7, 12*
38:*25*
39:*19,
21*
40:*11,
12, 24*
41:*4, 7*
46:*8*
52:*9*
62:*24*
71:*3, 4*
81:*13*
82:*20,
23*   83:*9*
87:*5*

89:*20*
92:*9, 16,
18*
100:*25*
101:*23*
102:*13*
103:*4*
105:*25*
115:*8*
116:*20*
135:*2*
144:*20*
145:*10*
163:*12*
215:*5*
227:*6*
230:*17,
21, 24*
231:*10,
11*
**looked**
49:*25*
57:*23,
24, 25*
59:*8*
89:*16*
158:*15*
202:*13*
**looking**
25:*1, 9*
35:*3*
39:*2*
41:*13*
55:*10*
58:*11*
59:*24*
81:*2*
82:*16*
85:*17*
86:*20*
89:*17,
18*   93:*7*

97:*22*
100:*5*
102:*7,
20*
103:*7*
106:*17,
20*
107:*22,
24*
111:*13*
134:*19*
141:*18*
153:*17*
181:*21*
202:*11*
205:*18*
229:*20*
232:*20*
**looks**
19:*4*
81:*22*
231:*20*
235:*7*
242:*4*
**loop**
165:*18,
19*
**losing**
201:*6*
**lost**
40:*16*
**lot**
26:*17*
28:*4*
35:*7*
41:*9*
54:*17*
55:*9, 22*
56:*3, 9,
14*
57:*14*
66:*3*

69:*5, 9*
70:*19*
73:*13*
81:*17*
85:*21*
87:*16,
18*
88:*19*
90:*7, 10*
101:*5*
112:*19*
114:*21*
115:*9*
116:*6, 7*
118:*16*
134:*22*
135:*2*
137:*8*
141:*3, 4*
145:*23*
150:*2*
151:*2*
160:*21*
164:*2*
171:*22*
176:*14*
178:*17*
184:*13*
188:*20*
189:*9*
193:*19,
20*
202:*24*
203:*1*
204:*4*
213:*5*
216:*23*
217:*2*
218:*5*
233:*6*
251:*2, 16*

lots
168:*1*
loud
13:*7*
love
189:*10*
low
57:*10*
153:*16*
159:*12*
lower
87:*10*
lower-
level
87:*17,*
*18*   88:*2*
Low-
hanging
154:*1, 4,*
*5*
low-level
172:*16*
lowly
145:*8*
LUCAS
2:*17*
8:*19*
243:*14*
luck
251:*5,*
*10, 11*
Luevanos
4:*19*
9:*10, 14,*
*16*
Luke
36:*15*
37:*6*
59:*12*
60:*13,*
*14, 17*
64:*4*

72:*14*
93:*13,*
*24*
94:*12,*
*19*
100:*23*
193:*11,*
*23*
195:*9,*
*12*
196:*2*
200:*20,*
*22*
203:*2,*
*17*
204:*7,*
*16*
205:*22*
206:*4, 6,*
*17*
220:*18*
225:*15*
233:*17*
250:*12,*
*13*
Luke's
194:*13*
200:*19*
233:*8*
lumbering
221:*2*
lunch
104:*18*
180:*25*
190:*8,*
*10, 11*
234:*22,*
*25*
235:*4, 5*
lunchtime
219:*21*

LYNCH
4:*14*
44:*24, 25*

< M >
ma'am
174:*6*
main
105:*12*
maintain
16:*13*
228:*12*

maintained
16:*17*
Makecha
37:*10*
38:*14*
52:*2*
53:*2*
57:*3*
60:*20*
maker
44:*7*
making
25:*17*
32:*10*
43:*16*
49:*21*
77:*2*
78:*12*
107:*7*
111:*10*
113:*22*
115:*14*
117:*22*
137:*16*
143:*2*
148:*19*
151:*23*
154:*7*
163:*19*

168:*11*
189:*24*
201:*6*
208:*25*
219:*17*
233:*16*
malfeasanc
e   98:*6*
102:*4*
man
143:*10*
221:*17*
management
19:*19*
26:*24*
93:*12*
manager
20:*10, 16*
manner
175:*22*
map
81:*3*
170:*19*
marched
195:*19*
marching
215:*4*
Marco
6:*12*
207:*7*
208:*4*
Maritime
20:*20*
marked
18:*23,*
*25*
21:*24*
45:*11*
86:*13*
92:*14*
190:*22*

205:*1*
207:*16*
Marocco
64:*8, 9*
214:*24*
Mars
180:*25*
181:*2*
MARYLAND
1:*2*
8:*13*
MARZIANI
3:*11*
massive
54:*8*
match
26:*4*
material
139:*21*
239:*15*
245:*13*
MATHEU
4:*12*
9:*2*
10:*19*
127:*17,*
*19*
128:*10*
131:*5*
249:*4*
252:*20*
Matt
99:*8*
129:*4*
147:*14*
174:*5*
matter
8:*10*
10:*2*
16:*12*
36:*16*
66:*21*

67:5, 11
111:18
116:19
138:17
172:17
178:23
180:19
227:11, 13

**mattered**
187:7

**M-A-T-T-H**
11:5

**MATTHEW**
1:13
5:3
8:10
11:5

**MAX**
4:12
9:2

**max.t.math eu@usdoj.g ov**   4:13

**maximize**
46:13
57:12

**maximizing**
25:18

**Maya**
4:21
9:17

**McGill**
6:10
191:8
192:24
193:5, 7
200:16
203:16
205:16, 19

206:9, 16
250:12

**MCGILL_000 025**
204:25

**mealy- mouthed**
116:6

**mean**
13:14
25:24, 25   26:6, 7   38:10
39:3
50:7, 12
53:21, 23
54:10, 19, 21, 25
56:22
62:18
64:22
66:15
71:14
73:6, 22
82:2
83:2
85:3
87:15
88:13, 15
91:17
93:25
103:3, 4
105:3
106:11
120:3
129:7
130:24
135:11

137:13
141:5
144:14, 16
145:1
147:7
152:8
159:24
167:2, 6
168:8
172:9
177:15
181:24
183:4
187:21
192:9
206:12
217:18
218:15, 20
220:16
222:2
228:20
229:5
230:15
235:1, 8
250:21

**meandering**
164:12

**meaning**
54:5
202:3

**means**
10:3, 6
18:5
27:16
29:21
93:3
197:12
198:2

**meant**
54:16
156:23
197:22

**mechanisms**
231:24

**media**
73:8, 9
78:8

**medical**
169:14

**medium**
52:5

**meet**
16:3
38:1
71:16
113:21
114:16
199:5

**meeting**
29:4
32:2
33:12
37:21
40:24
59:6
63:22
64:1, 2, 15
70:23
71:1
72:4
75:11
80:7
85:7
104:2, 20
105:11, 16, 20
106:3,

11, 14, 25
107:1, 14, 16
108:1, 18, 24
113:20
114:2
117:14, 23
118:3, 5, 6
124:11, 22, 24
129:13, 15, 16
136:24
138:9, 25
139:15, 19
147:13
149:21
156:7, 11, 12, 14
157:10, 24
158:4, 5, 20, 24
159:2, 8, 16
160:8, 11
162:25
166:4, 11, 14
169:2
177:18
178:20
179:6
180:5

181:*19*
182:*4*
183:*8,*
*21, 23,*
*25*
184:*3*
191:*23*
196:*5*
198:*20*
200:*4, 5,*
*8, 11, 12,*
*13*
208:*19,*
*21*
209:*7, 9,*
*19*
215:*25*
216:*14,*
*17, 24*
237:*24*
238:*12*
240:*9*
251:*12*
**meetings**
58:*22*
156:*3*
159:*6*
216:*23*
217:*11*
231:*14*

**Meisburger**
35:*1*
105:*4*
**melee**
221:*24*
**members**
47:*25*
49:*12*
50:*25*
64:*3*
72:*6*

74:*15*
78:*15*
91:*22*
103:*16*
129:*19*
235:*14*
**Memo**
6:*9*
69:*12*
92:*18*
96:*1*
103:*14*
145:*8*
171:*24*
194:*25*
195:*21*

**memorandum**
96:*5*
**memos**
114:*7*
**mention**
39:*14*
40:*20*
**mentioned**
33:*5*
34:*17*
37:*12*
38:*7*
61:*16*
74:*11*
152:*8*
160:*9*
163:*11*
165:*1*
168:*6*
180:*20*
198:*22*
210:*3*
222:*15*
**mentoring**
234:*14*

**message**
133:*15*
171:*19*
191:*14,*
*15*
192:*19,*
*22*
**Messages**
6:*10*
14:*8*
191:*7, 11*
**met**
36:*18*
38:*2*
56:*24*
88:*15,*
*17, 18*
191:*21*
**method**
10:*8*
**mhopson@us
aid.gov**
87:*2*
**middle**
40:*10*
41:*13*
85:*22*
104:*18*
221:*18*
**mid-
morning**
208:*21*
**miffed**
159:*2, 7*
**military**
65:*14*
74:*13*
138:*19*
145:*2*
224:*3*

**Miller**
213:*2*
215:*22*
**Miller's**
213:*2*
215:*24*
**million**
56:*1*
**mind**
13:*13*
82:*10*
102:*12*
106:*8*
107:*4*
151:*19*
156:*2*
172:*10*
176:*25*
220:*12*
**mindful**
131:*24*
**Mine's**
9:*14*
**minute**
12:*14*
45:*3*
50:*10*
92:*16*
194:*14*
249:*4*
**minutes**
118:*8*
132:*21*
179:*11,*
*12*
246:*2*
248:*5*
**misappropr
iating**
88:*3*

**Mischaract
erizes**
116:*12*
**mischaract
erizing**
62:*11*
146:*17*

**misconduct**
101:*12*
**misinterpr
eted**
199:*22*
**misreprese
nted**
144:*19*
**mission**
25:*8, 14*
26:*1, 25*
39:*3, 20*
41:*5, 11,*
*20*    44:*6*
62:*17*
69:*20*
148:*4*
167:*8,*
*12*
170:*6*
174:*21*
176:*22*
201:*5*
204:*4*
215:*5*
226:*20*
230:*24*
**missions**
40:*25*
178:*17*
**Mission's**
222:*6*
**Misstates**
203:*20*

| | | | | |
|---|---|---|---|---|
| **misuse** | 80:*2* | 97:*17* | 223:*23* | 145:*2* |
| 76:*1* | 86:*20* | 104:*10,* | 229:*18* | 155:*12* |
| 87:*21* | 105:*24* | *11, 13* | 247:*10,* | 204:*11* |
| 98:*6* | 106:*12* | 157:*8* | *16* | **mushy** |
| **misusing** | 141:*4* | 207:*13* | **moved** | 218:*2* |
| 88:*3* | **money** | 208:*14,* | 71:*5* | **MUSK** |
| **Mitigated** | 40:*1* | *19, 20* | 75:*22* | 1:*7* |
| 148:*23* | 55:*22,* | 216:*15,* | 111:*8,* | 8:*11* |
| 168:*24* | *23, 24* | *24* | *17* | 14:*23* |
| | 56:*5, 6* | 218:*2* | 228:*16* | 29:*25* |
| **mitigating** | 71:*5* | 219:*16* | **movement** | 30:*11* |
| 168:*24* | 75:*22* | 237:*4* | 26:*17* | 31:*7, 9,* |
| 225:*1* | 76:*3* | **move** | 154:*24* | *24* |
| | 81:*6* | 12:*8* | **Movements** | 32:*18* |
| **mitigation** | 135:*21* | 44:*7* | 55:*7* | 35:*25* |
| 171:*5* | 177:*9* | 50:*4* | **moving** | 60:*22* |
| **mixing** | 219:*18* | 54:*20* | 26:*11* | 61:*10,* |
| 9:*6* | 221:*3, 14* | 62:*13* | 41:*8* | *13, 17,* |
| **Mm-hmm** | **moniker** | 71:*8* | 43:*12* | *23*  62:*4* |
| 46:*23* | 55:*3* | 102:*15* | 63:*17,* | 70:*23* |
| 86:*24* | **months** | 107:*2* | *18* | 73:*6* |
| 169:*6* | 42:*16* | 111:*1* | 67:*15* | 78:*5, 14,* |
| 182:*20* | 43:*6* | 114:*19* | 70:*7* | *16* |
| 192:*23* | **moral** | 116:*5, 8* | 90:*7* | 91:*13* |
| 216:*8* | 65:*17* | 122:*3, 8* | 100:*2* | 117:*13,* |
| **modernizin** | 222:*17* | 132:*11* | 114:*4* | *17* |
| **g**  46:*12* | 223:*5,* | 134:*14,* | 121:*24* | 118:*9* |
| **mom** | *12* | *16* | 154:*7* | 119:*12* |
| 39:*25* | 226:*6, 18* | 135:*8* | 160:*24* | 121:*4,* |
| 221:*11,* | **morality** | 136:*18* | 165:*25* | *18, 20,* |
| *12* | 225:*6* | 138:*4,* | 184:*22* | *24* |
| **moment** | 227:*15* | *20* | 215:*4* | 122:*6,* |
| 110:*5* | **morally** | 139:*16* | 219:*23* | *22, 24* |
| 171:*8* | 146:*16* | 152:*19* | 220:*17* | 123:*15* |
| 172:*23* | 199:*17* | 165:*4,* | 236:*17* | 124:*12,* |
| 186:*2* | 200:*3* | *16* | 237:*25* | *22, 23* |
| **Monday** | 224:*2* | 166:*15* | **mud** | 125:*3,* |
| 35:*11* | **morning** | 180:*23* | 233:*25* | *20* |
| 37:*21* | 8:*2, 17,* | 206:*22* | **multiple** | 126:*21* |
| 38:*1, 2,* | *23*  12:*3* | 213:*25* | 49:*3* | 127:*6,* |
| *3, 4* | 38:*1, 2* | 214:*2* | 113:*21* | *13* |
| 63:*24* | 64:*1* | 215:*6* | 134:*25* | 128:*3, 5,* |

| | | | | |
|---|---|---|---|---|
| 7, 17, 18 | 53:16 | 11 | 82:17 | 198:1, 2 |
| 129:11 | 57:2 | 97:13 | 95:23 | 200:22 |
| 130:2, 6 | 72:20 | 209:12 | 171:6 | 214:1 |
| 131:20 | 93:18 | 213:3, 7 | 220:21 | 226:9 |
| 132:6 | 98:9 | 219:5 | 221:22 | 236:20 |
| 133:13, 16, 25 | 105:8 | **naming** | **need** | 237:9 |
| 134:7 | 111:24 | 163:7 | 9:19 | 240:15 |
| 162:13 | 116:24 | **narrative** | 13:9 | 243:13 |
| 186:6 | 143:20, 23 | 227:20 | 53:25 | 249:15 |
| 187:1, 5, 13, 21 | 144:5, 7 | 228:22 | 54:20 | 251:1 |
| 188:9 | 145:15 | 229:5 | 66:4 | 252:24 |
| 206:4, 7, 17 | 146:14 | **nascent** | 67:24 | **needed** |
| 210:24 | 147:4, 5, 7 | 164:8 | 71:8, 19 | 60:3, 4 |
| 211:4 | 156:10 | 165:1 | 82:20 | 84:17 |
| 240:11, 24 | 193:14 | **National** | 84:11 | 85:22 |
| 241:1, 3 | 205:7 | 19:23 | 89:20 | 113:23 |
| **Musk's** | 212:21 | 21:2 | 92:17 | 116:11 |
| 189:23 | 236:12 | 176:13 | 111:2, 3 | 139:3 |
| **muster** | **named** | **NATO-led** | 112:21 | 153:15 |
| 199:5 | 36:14 | 20:3 | 114:5, 13 | 155:9 |
| **mute** | 49:24 | **nature** | 116:23 | 170:12 |
| 9:15 | 157:13 | 101:1 | 122:3 | 173:17 |
| | | 102:3 | 127:13 | 187:17 |
| **< N >** | **nameplates** | 145:23 | 129:4 | 188:5, 7 |
| **naive** | 31:19 | 194:16 | 135:7, 8 | **needing** |
| 167:25 | **names** | **Naval** | 139:21 | 173:13 |
| **name** | 36:24 | 19:22 | 141:18 | **needs** |
| 8:5 | 37:4 | 20:11, 20 | 149:18 | 52:14 |
| 11:4 | 38:16, 18 | **navigate** | 158:2 | 83:18 |
| 12:3 | 84:16 | 131:25 | 161:17 | 159:13 |
| 31:23 | 88:22, 23 | 132:1 | 170:1, 20, 23 | 176:22 |
| 34:22 | 90:20, 23  91:1 | 201:21 | 171:9, 22, 23, 24 | 243:1 |
| 35:4, 6, 7, 14 | 93:13, 23 | **Navy** | 174:19 | **nefarious** |
| 36:12 | 94:24 | 19:10, 15, 20 | 187:7 | 81:14 |
| 39:10 | 95:3, 5, 8  96:10, | 20:6 | 191:5 | **negotiations**  164:4 |
| 48:24, 25 | | 21:16 | 194:11, 19, 24 | **neither** |
| | | **necessarily**  36:18 | 197:4 | 17:13 |
| | | 38:19 | | 196:1 |
| | | 68:8 | | 254:10 |
| | | 73:16 | | **nest** |
| | | | | 145:4 |

**nestled**
41:*12*, *16*
**neutral**
84:*1*
215:*19*
**never**
13:*19*
30:*16*
49:*10*
50:*11*
53:*10*, *11*   54:*3*
55:*14*
57:*16*
62:*18*
65:*5*, *20*
70:*3*
141:*5*
142:*4*
151:*5*
156:*19*
176:*11*
178:*16*
193:*21*
198:*4*
202:*12*, *13*
213:*7*
217:*7*
221:*16*
225:*16*, *19*   226:*2*
**New**
2:*16*
8:*7*
26:*20*, *23*
54:*18*
165:*4*, *6*, *12*, *21*
189:*4*
229:*3*

230:*16*
234:*2*
237:*6*
**newly**
135:*1*
201:*11*
**news**
45:*8*
53:*5*
56:*2*
61:*18*
78:*8*
163:*10*, *11*
**newsroom**
164:*18*
168:*21*
**NGA**
176:*13*
**Nice**
251:*12*
**niceties**
33:*12*
**Nicholas**
92:*19*
**Nick**
96:*16*
103:*20*
**NICOLE**
2:*7*
8:*17*
12:*3*
16:*1*
**night**
156:*12*
183:*12*
191:*23*
196:*11*
207:*25*
216:*10*
217:*25*
220:*8*

**Nikki**
44:*11*
243:*13*
**nine**
207:*18*
**Noah**
93:*11*, *15*
**nodding**
13:*8*
**non**
131:*23*
**non-disclosure**
202:*8*
**non-redacted**
93:*5*
**non-staffing**
27:*17*
**non-starter**
110:*4*
**non-yes**
131:*22*
**noon**
33:*18*
**normal**
17:*23*
28:*5*
49:*1*
194:*22*
198:*25*
**Northwest**
4:*6*
**Norwich**
19:*6*
**notable**
113:*18*
218:*5*
**notary**
11:*22*

**note**
84:*16*
103:*3*
206:*11*
217:*25*
232:*10*
**noted**
92:*1*
94:*6*, *8*
95:*10*
**notes**
79:*24*
202:*4*
**nothing's**
157:*6*
**notice**
68:*11*
**noticing**
8:*16*
**notificati on**   24:*5*
**notified**
121:*19*
**notify**
154:*12*
237:*10*
**noting**
246:*16*
**nrubin@lch b.com**
2:*8*
**nuance**
97:*7*
**nuanced**
199:*20*
**nudged**
140:*3*
**Number**
8:*11*
22:*22*
46:*4*
83:*20*

103:*9*
153:*9*
219:*6*
233:*14*

**< O >**
**oath**
10:*10*, *11*   18:*5*, *8*
**object**
17:*23*, *24*
124:*16*
132:*14*
**objection**
17:*15*
23:*10*
27:*7*
30:*6*
32:*9*, *23*
44:*18*
47:*1*, *5*, *16*
48:*11*
52:*22*
61:*1*
63:*6*
64:*17*
65:*1*
66:*24*
68:*15*
74:*21*
76:*25*
77:*20*
84:*24*
86:*4*
87:*13*
89:*3*, *9*
91:*3*, *16*, *23*   98:*1*, *19*

| | | | | |
|---|---|---|---|---|
| 99:*25* | *14, 21* | **Observer** | 105:*11* | 133:*1* |
| 100:*18* | 188:*13* | 4:*21* | 111:*15* | 152:*12* |
| 102:*25* | 190:*14* | **observers** | 113:*7,* | 153:*19* |
| 105:*17* | 203:*20* | 9:*19* | *10, 11* | 190:*13,* |
| 109:*17* | 207:*2* | **obtain** | 156:*9* | *17* |
| 116:*12* | 208:*23* | 125:*3,* | 158:*4* | 195:*18* |
| 118:*22* | 210:*25* | *22, 25* | 162:*6, 8* | 224:*3, 4* |
| 121:*9* | 211:*7,* | **Obviously** | 174:*7* | 241:*12* |
| 122:*12* | *12, 17* | 36:*13* | 193:*10* | 242:*3, 7,* |
| 123:*18* | 212:*1* | 88:*11* | 194:*1, 4* | *13, 16,* |
| 125:*5,* | 214:*9* | 165:*5* | 209:*11* | *23* |
| *10, 12* | 217:*15* | 168:*1* | 216:*21* | 243:*3,* |
| 132:*23* | 218:*10* | **occupancy** | 247:*5,* | *18, 22,* |
| 137:*21* | 220:*13* | 57:*10* | *11, 15* | *25* |
| 140:*15* | 222:*22* | **occurred** | **OFFICER** | 244:*8,* |
| 142:*1,* | 223:*7* | 120:*17* | 1:*18* | *14, 17* |
| *14* | 224:*15* | **occurring** | 8:*2, 6* | 249:*14,* |
| 143:*5* | 225:*11* | 248:*13* | 9:*3, 8,* | *20, 24* |
| 144:*10* | 227:*22* | **October** | *12, 18,* | 250:*25* |
| 145:*19* | 228:*24* | 21:*5* | *22* | 251:*9,* |
| 148:*12* | 230:*11* | **odds** | 10:*10,* | *20, 23* |
| 149:*8,* | 232:*25* | 150:*7* | *22, 25* | 252:*4,* |
| *22* | 234:*8* | 183:*25* | 11:*7, 12,* | *13, 22* |
| 150:*17,* | 244:*18* | **offense** | *23* | 253:*4, 7* |
| *24* | 246:*14,* | 102:*3* | 12:*10,* | 254:*1, 20* |
| 151:*24* | *23* | **offer** | *13, 17* | **officers** |
| 159:*17* | 247:*17* | 133:*10,* | 15:*16,* | 225:*1* |
| 160:*15* | 248:*20* | *11, 22* | *19* | **offices** |
| 162:*22* | 249:*21* | 235:*3* | 18:*18,* | 55:*5* |
| 167:*4,* | 253:*8* | **offered** | *21* | 69:*12* |
| *22* | | 24:*5, 17* | 19:*17* | **official** |
| 170:*10* | **objections** | 43:*1* | 20:*25* | 10:*4* |
| 173:*9,* | 166:*8* | 110:*14,* | 23:*1, 3,* | 46:*18* |
| *21* | **objective** | *17, 18* | *5, 9, 13* | 66:*14,* |
| 175:*23* | 26:*12,* | 206:*7* | 26:*21* | *18* |
| 177:*1* | *16* 27:*6,* | **Office** | 44:*14,* | 102:*23* |
| 178:*7* | *10, 13,* | 20:*20* | *17, 21* | 103:*12* |
| 180:*9* | *14* | 23:*23* | 65:*14* | 123:*2* |
| 182:*6* | 232:*24* | 29:*23* | 71:*19* | 186:*16* |
| 184:*6,* | 248:*10* | 56:*10* | 77:*19,* | 209:*24* |
| *21* | **observatio** | 69:*18* | *23* | |
| 186:*8,* | **n**  218:*6* | 93:*11* | 132:*22* | |

| | | | | |
|---|---|---|---|---|
| **officially** | 32:*21, 22* | 134:*1* | 241:*5, 6* | **one-sided** |
| 208:*10* | 40:*18* | 137:*18* | 242:*4* | 118:*14* |
| **Oh**  23:*2* | 45:*3* | 142:*17* | 243:*3, 16, 25* | **one-way** |
| 33:*24* | 61:*5* | 147:*3* | 244:*17* | 32:*5* |
| 40:*21* | 66:*17* | 148:*24* | 246:*2* | **ongoing** |
| 54:*5* | 73:*3* | 150:*6* | 247:*1* | 135:*20* |
| 60:*24* | 76:*3* | 152:*20* | 248:*5* | 194:*23* |
| 63:*1* | 77:*6* | 153:*21, 25* | 249:*1, 9* | **on-the** |
| 70:*13* | 78:*2* | 154:*17* | 250:*18, 23, 25* | 123:*3* |
| 72:*24* | 79:*25* | 156:*3* | 251:*9, 22, 23* | **opening** |
| 73:*10* | 85:*24* | 157:*11, 20* | 252:*17, 22* | 25:*4* |
| 159:*9, 20* | 86:*11, 19, 25* | 163:*2* | 253:*5, 7* | **operating** |
| 165:*9, 11* | 87:*4* | 164:*13* | **Old** | 76:*18* |
| 174:*8* | 91:*13* | 168:*22* | 11:*10* | 146:*15* |
| 176:*1* | 92:*12* | 171:*15* | 73:*19* | |
| 185:*25* | 93:*6* | 172:*8* | **older** | **Operations** |
| 192:*10, 16* | 94:*1* | 181:*1* | 72:*11* | 20:*10* |
| 201:*13* | 95:*6* | 185:*23* | 83:*12* | 22:*19* |
| 204:*23* | 96:*5* | 187:*10* | 93:*17* | 145:*2* |
| 210:*1, 4* | 100:*7* | 190:*13, 17* | | 167:*11* |
| 215:*10, 12, 20, 25* | 107:*15, 19* | 191:*7* | **onboarding** | 217:*12* |
| 225:*10* | 108:*21* | 192:*14, 19* | 88:*18* | **opinion** |
| 235:*17* | 109:*7* | 205:*7, 18* | **once** | 26:*2* |
| 238:*17* | 110:*7* | 206:*16, 20, 25* | 9:*13* | 31:*4* |
| 240:*16* | 118:*1* | 209:*18* | 19:*23* | 58:*17* |
| 243:*3* | 119:*6, 21* | 210:*19* | 56:*25* | 63:*16* |
| 249:*12* | 120:*20* | 215:*2, 20* | 166:*18* | 74:*24* |
| 252:*8* | 121:*1, 2* | 218:*12* | **ones** | 84:*1* |
| **Okay** | 123:*25* | 223:*12* | 35:*20* | 98:*18* |
| 9:*22* | 124:*2* | 224:*19, 21* | 36:*15* | 111:*24* |
| 10:*25* | 126:*16* | 238:*17, 23, 24* | 142:*13* | 128:*15* |
| 12:*22* | 127:*25* | 240:*7, 13, 20* | 143:*2* | 134:*23* |
| 18:*3, 15, 21*  19:*2* | 128:*23* | | 156:*2* | 144:*25* |
| 20:*8* | 130:*20* | | 209:*15* | 146:*13* |
| 30:*10* | 131:*16* | | **one's** | 147:*25* |
| | 132:*3, 7, 8* | | 144:*5* | 148:*6, 9* |
| | 133:*20* | | 225:*22* | 149:*5* |
| | | | | 163:*3* |
| | | | | 164:*5* |
| | | | | 166:*2, 11, 13, 23* |

| | | | | |
|---|---|---|---|---|
| 180:*22* | **optimistic** | 22:*19* | 203:*5, 8* | **outliers** |
| 181:*19,* | **ally** | 26:*1* | 212:*18,* | 59:*2* |
| *25* | 181:*16* | 27:*3* | *25* | **outside** |
| 182:*9,* | **option** | 28:*1, 2* | 213:*20* | 16:*18* |
| *10, 15,* | 25:*7* | 34:*7, 14* | 214:*1* | 45:*6* |
| *25* | **options** | 39:*19* | 217:*20* | 69:*17* |
| 186:*19* | 42:*6* | 40:*3* | 221:*1* | 86:*10* |
| 187:*1,* | **ORDER** | 41:*14* | 230:*17* | 90:*16* |
| *21, 24* | 1:*22, 24* | 42:*25* | 248:*24* | 97:*19* |
| 195:*17* | 6:*7, 12* | 43:*9, 15,* | **organizati** | 98:*8* |
| 199:*20* | 45:*14,* | *18    49:8,* | **onal** | 110:*19* |
| 212:*10,* | *17, 20,* | *19* | 63:*15* | 111:*15* |
| *25* | *22, 24* | 52:*18* | 177:*5* | 113:*6* |
| 227:*14,* | 46:*7, 10,* | 54:*5* | 204:*5* | 118:*16* |
| *25* | *21* | 55:*8, 15* | 235:*12* | 132:*8* |
| 228:*20* | 47:*18,* | 58:*5* | **organizati** | 139:*22* |
| 248:*22* | *23* | 62:*25* | **onally** | 155:*14,* |
| **opinions** | 49:*20* | 68:*1* | 68:*22* | *17, 20* |
| 122:*6, 7* | 52:*12* | 71:*5, 25* | **organizati** | 173:*2* |
| **OPM** | 65:*19* | 85:*10* | **ons** | 179:*23* |
| 36:*11* | 80:*19* | 90:*12* | 49:*3, 16,* | 186:*16* |
| 49:*15* | 114:*9* | 99:*22* | *24* | 198:*24* |
| 50:*15* | 137:*14* | 107:*8* | 50:*16* | 224:*20* |
| 55:*1* | 138:*17* | 135:*24* | 56:*13* | 237:*22* |
| 56:*12,* | 165:*15* | 136:*1* | 71:*24* | **Oval** |
| *15* | 174:*25* | 145:*12* | 165:*20* | 174:*6* |
| 59:*11* | 175:*6,* | 147:*17* | 176:*12,* | **overall** |
| 69:*12* | *10* | 148:*5* | *21* | 25:*16* |
| 114:*7* | 188:*23* | 150:*9* | 197:*9, 12* | **overarchin** |
| 155:*5* | 208:*3* | 153:*10* | **orientatio** | **g    96:***1* |
| **opportunit** | 252:*2* | 160:*2* | **ns** | **overseas** |
| **y    25:***25* | **orders** | 163:*9* | 234:*11* | 134:*20* |
| 116:*4* | 64:*25* | 169:*20* | **original** | 175:*2* |
| 221:*10* | 135:*2* | 171:*5* | 35:*14* | **oversight** |
| **oppose** | 138:*21* | 174:*20* | 59:*4* | 32:*6* |
| 10:*6* | 175:*1* | 177:*5* | 252:*1* | 231:*24* |
| **optic** | 215:*4* | 178:*17* | | 232:*1* |
| 216:*3* | 220:*21* | 187:*22* | **originally** | **owns** |
| **optimism** | 249:*15* | 195:*4, 5,* | 22:*21* | 195:*4* |
| 146:*6* | 251:*2* | *13, 19* | **outcome** | |
| | **organizati** | 196:*25* | 254:*12* | **< P >** |
| | **on** | 197:*4, 8* | | |

p.m
 1:16
 86:21
 190:14,
18
 191:16
 192:20,
25
 205:20
 244:18
 249:22,
25
 253:9, 10
pace
 28:5
PAGE
 5:3
 6:4
 7:3
 20:2
 36:24
 86:16,
17   87:1,
5   93:8
 205:19
 239:12,
13
 245:12,
13
paid
 146:1
 219:18
 226:19
pain
 159:21,
24
 179:1, 2
pains
 228:11
painted
 161:9

paper
 18:20
 46:5
 90:8
 110:23
 142:6
 160:25
 222:3
paperwork
 80:18
 171:13
paragraph
 93:8
 201:3, 25
Paralegal
 4:19
part
 20:6
 40:9
 41:25
 57:1, 11
 58:9
 59:18,
19   78:8
 83:11
 88:18
 92:5
 93:18
 104:14
 109:22
 115:6
 124:24
 125:20,
21
 126:16,
17
 127:7
 135:13
 136:17
 138:12
 141:1
 147:1

 158:20
 175:11
 176:11,
17
 178:25
 185:1, 2,
14
 187:5
 192:2
 193:11
 194:11
 210:5
 214:17
 217:13
 222:7
 223:25
 224:9
 235:10
 242:11
participan
t   66:11
participat
e   238:9
participat
ing
 155:18

particular
 15:11
 18:11
parties
 10:3, 9
 16:12
 17:16
 254:11
partiesâ
 1:24
partner
 114:14
parts
 42:8
 69:21

 107:12
 124:13
 165:25
 226:20
party
 172:21
pass
 160:13
passed
 214:8
patch
 174:12
path
 214:21
pause
 17:24
 23:10
 26:18
 44:18
 77:20
 92:17
 99:24
 132:23
 159:13
 190:14
 244:2,
10, 15,
18
 249:21
pausing
 222:13
pay   73:2
paying
 97:23
payment
 94:7, 20
 95:12,
18, 20,
22   96:7
payments
 96:3
 97:22

peace
 164:4
peel
 193:3
peer
 195:25

pejorative
 73:22
 82:19
 220:20
pending
 14:2
Pennsylvan
ia   3:4
people
 21:17
 24:23,
25
 26:23
 30:21
 34:21
 37:25
 38:2, 9,
24   49:2
 55:1, 7,
15   56:3
 57:12
 59:13
 60:14
 63:1
 64:11
 65:24
 68:10
 69:25
 71:4, 8,
9, 10, 13
 72:7
 74:9
 75:10,
13
 78:25

79:*14*
80:*13, 21*
81:*12*
83:*1, 20*
84:*4, 22*
87:*9*
88:*17*
94:*20*
95:*14, 17, 19*
96:*2, 13*
99:*9*
102:*13*
103:*21*
104:*21*
105:*9*
108:*12*
111:*2, 25*
113:*13*
114:*1*
128:*21*
129:*7, 17*
134:*20*
137:*25*
141:*3*
143:*15, 16*
146:*6*
148:*1, 2*
154:*16*
155:*8, 18*
159:*10*
164:*8*
165:*1*
170:*1*
178:*18*
189:*9, 10, 15*

196:*12*
197:*6*
201:*6*
202:*15*
203:*11*
204:*14*
205:*10*
206:*2*
212:*22*
213:*6*
214:*15, 19, 24*
215:*17*
216:*2*
220:*22*
221:*5, 16*
225:*1, 7*
226:*2, 19*
229:*8*
236:*8*
237:*10*
241:*13*
242:*8*
251:*2*

**people's**
90:*14*

**perceive**
31:*9*
232:*24*

**perceived**
37:*15*
118:*13*
185:*17*

**percent**
39:*24*
40:*5*
145:*16*
167:*8*
169:*18*
230:*1*

**percentage**
39:*23*

**perception**
72:*6*
181:*9, 10, 12*
182:*2*
210:*12*
228:*21*
235:*19, 20*

**percolate**
28:*8*
62:*25*

**percolated**
24:*15*

**Perfect**
253:*4*

**Performance**    70:*13, 16*
102:*17*
226:*5*
251:*19*

**period**
19:*11*
22:*10, 17*
28:*21*
30:*14*
64:*13*

**permitted**
17:*12, 14*
242:*11*

**person**
10:*10*
29:*22*
31:*16*

35:*5*
58:*19, 23*    60:*7*
61:*23*
63:*19*
81:*24*
85:*20*
90:*4*
98:*9*
105:*13, 14, 15*
121:*22*
140:*24*
145:*25*
153:*17*
157:*17*
171:*18*
175:*21*
182:*23, 24*
184:*20*
185:*2*
186:*17*
188:*7, 8*
195:*3*
202:*17, 23*
204:*4, 19*
214:*18*
233:*13*
235:*2*
236:*18*

**personal**
63:*9*
112:*7*
114:*14*
128:*15*
141:*12*
193:*21*
224:*4*

225:*18*
227:*14*

**personality**    114:*15*

**personally**
68:*20, 23*    86:*8*
112:*5*
117:*12*
185:*18*
189:*24*
202:*24*
217:*1*
220:*3*
224:*14*
227:*9*
228:*15*
236:*22*

**personnel**
10:*8*
23:*23*
25:*15*
29:*22*
49:*2*
78:*18*
93:*12*
107:*23*
135:*16*
246:*20*

**perspective**    60:*2*
63:*9*
65:*22*
155:*8*
171:*5, 16*
223:*2, 6*
226:*7*

**pet**
217:*21*

**Pete**
64:*8, 9*
214:*24*
**Peters**
93:*11, 15*
**phone**
15:*13*
23:*24*
30:*17*
31:*11*
32:*2, 3*
36:*12*
51:*25*
52:*4*
61:*8, 16, 21*    62:*2*
78:*13*
79:*3*
117:*16, 18*
118:*4, 7, 16, 20*
121:*14*
131:*21*
134:*9*
137:*4*
157:*5*
179:*7, 9*
182:*18, 22*
183:*2, 3, 4*
188:*21*
189:*16*
193:*3*
203:*10*
220:*7*
237:*13*
240:*10, 25*
241:*1, 3*

**phones**
33:*14*
**phonetic**
35:*5*
48:*24*
71:*19*
83:*17*
88:*16*
103:*20*
156:*10*
174:*14*
175:*3*
242:*6*
243:*14*
**phrase**
66:*13*
**physical**
103:*22, 23*

**physically**
108:*18*
**physics**
194:*7*
223:*19*
**pick**
50:*15*
72:*21*
98:*9*
116:*18*
134:*5*
159:*5*
172:*18*
173:*24*
197:*7*
214:*18, 19*
**pick-a-place**
178:*23*
**picked**
183:*4*

**picture**
161:*9, 10*
**piece**
46:*5*
126:*23*
**pier**
163:*20*
**PIP**
69:*15*
70:*11, 12, 15, 18*
**pitch**
183:*11*
**pitfalls**
169:*23*
**pithy**
195:*12*
**place**
16:*22*
50:*15*
102:*23*
200:*10*
231:*10*
240:*4*
254:*5*
**placed**
52:*21*
78:*19*
79:*15, 20, 22*
80:*4, 13*
83:*1*
84:*4*
86:*1*
87:*6*
98:*10*
104:*4*
106:*5*
136:*21*
177:*20*
248:*14*

**Placement**
29:*23*
**placing**
78:*25*
80:*21*
82:*13*
98:*14*
100:*8, 16*
248:*17*
**plaintiff**
9:*25*

**Plaintiffs**
1:*5*
2:*11, 19*
3:*9, 17*
8:*18, 20, 22*    9:*6, 11, 16*
14:*18*
16:*17, 19, 20*
17:*9*
18:*17*
19:*2*
45:*13*
86:*11*
92:*12*
133:*7*
190:*21*
204:*23*
207:*14*
240:*4*
243:*24*
**plan**
13:*23*
70:*13, 17, 18*
114:*19*
216:*25*

**platform**
1:*17*
18:*19*
241:*14*
**platforms**
191:*10*
**play**
188:*3*
238:*2*
**played**
137:*20*
185:*17*
**playing**
216:*1*
228:*17*
**please**
8:*14*
11:*3, 13*
13:*12, 14*    14:*6*
67:*4*
78:*23*
130:*8*
136:*12*
176:*6*
242:*17*
249:*12*
**PLLC**
3:*11*
**point**
13:*21*
39:*14*
51:*18*
58:*14*
59:*21*
61:*20*
62:*1*
68:*13*
84:*3*
85:*6*
92:*17*
99:*18*

101:*9*
109:*16*
120:*16*
137:*4*
138:*22*
146:*3*
164:*21*
169:*16*
171:*1*
179:*6*
198:*3*
199:*10*
208:*16*
210:*3*
212:*19*
218:*23*
232:*13*
234:*2*
236:*6,*
*15*   238:*5*

**pointed**
113:*20*

**pointing**
29:*7*

**points**
224:*22*

**poised**
41:*15*

**policy**
201:*7*
202:*2*
203:*5, 18*

**Polish**
35:*7*

**political**
21:*11*
27:*22,*
*24*
29:*24*
34:*1*
35:*16,*
*20*   39:*7*

48:*21*
50:*19*
55:*11*
65:*7*
99:*4, 17*
168:*9*
169:*5*
171:*16*
179:*25*
181:*22*
195:*18*
212:*17,*
*22*
214:*2*
219:*1, 2*
230:*7*
232:*1*
237:*11*

**politicall**
**y**   50:*8*
189:*7, 8*

**politicals**
29:*10*
43:*13*
49:*4*
55:*11*
64:*7*
104:*23*
105:*2, 9*
129:*18*
165:*2,*
*18, 21*
213:*5*
214:*25*
237:*17*

**polygraph**
202:*17*

**poor**
70:*16*
108:*15*
164:*9*

168:*13*
226:*5*

**poorly**
213:*21*

**pop**
228:*2*

**pops**
151:*19*

**population**
25:*16*

**portfolio**
59:*9*
107:*11*
234:*16,*
*17*

**Portion**
7:*4*

**PORTIONS**
1:*21*
93:*5*

**posed**
101:*8*
108:*9*
109:*11*

**posing**
215:*12*

**position**
20:*8*
23:*17*
24:*17,*
*21*   26:*8,*
*10, 13*
43:*13*
56:*17*
57:*4*
165:*20*
167:*10*
184:*21*
185:*22*
186:*16*
197:*18*

201:*11*
210:*8*
219:*2*
229:*23*

**positional**
68:*8*
151:*7*

**positioned**
176:*23*

**positions**
19:*15*
20:*22*
70:*10*
87:*10,*
*11, 16*
189:*11*

**positive**
94:*2*
101:*3*
109:*11*
170:*14*
184:*16*
185:*15*

**possible**
126:*12*
243:*6*

**post**
137:*4, 5*

**Postgradua**
**te**   19:*22*

**Post-it**
84:*16*

**potential**
25:*7*
84:*23*
97:*3*
98:*6*
126:*21*
169:*23*

**potentiall**
**y**   83:*3*
168:*17*
186:*5*
203:*18*
214:*15*

**power**
66:*3*
68:*8*
203:*1*

**powers**
14:*21*

**PPO**
23:*25*
24:*22*
25:*5*
29:*1, 20*
39:*18*
48:*23*
50:*18*

**practical**
66:*21*
67:*5, 11*

**practice**
103:*19*
142:*8*

**practices**
81:*17*

**preamble**
103:*24*
213:*18*

**predicate**
130:*22*

**preliminar**
**y**   94:*9*

**pre-**
**meeting**
181:*19*

**preparatio**
**n**   15:*15*
16:*4, 7*

| | | | | |
|---|---|---|---|---|
| prepare | 222:*2* | *19* | prior | 129:*14* |
| 15:*9* | 224:*24* | 132:*11* | 39:*8* | 142:*5* |
| preparing | presidenti | 134:*14* | 116:*13* | 158:*19* |
| 15:*12, 25* | al | 136:*18* | 156:*24* | 169:*2* |
| presence | 16:*14,* | 138:*3* | 169:*1* | 176:*11* |
| 16:*19* | *24* | pretty | 180:*5* | probably |
| 51:*23* | 32:*11* | 32:*3* | 203:*20* | 35:*9* |
| 73:*8, 9* | 46:*6* | 34:*7* | 210:*11* | 43:*4, 5* |
| PRESENT | 118:*23* | 44:*2* | private | 44:*9, 10* |
| 4:*18* | 119:*8,* | 49:*1* | 74:*17* | 56:*12* |
| 11:*22* | *11* | 52:*4* | 75:*6* | 58:*1* |
| 126:*5* | 121:*6, 9* | 57:*20* | 145:*8* | 59:*7* |
| | 122:*12* | 73:*2* | privilege | 64:*11* |
| presenting | 125:*12,* | 81:*8* | 16:*10,* | 66:*2, 5* |
| 39:*13* | *14* | 83:*13* | *15, 16,* | 75:*8* |
| President | 126:*23* | 105:*6* | *24, 25* | 83:*25* |
| 33:*17* | 131:*7* | 134:*5* | 17:*2, 5* | 88:*15* |
| 66:*3, 4* | 132:*15* | 141:*16* | 32:*11* | 99:*2, 3,* |
| 119:*4,* | 209:*1* | 158:*11* | 77:*5* | *23* |
| *12, 15* | 247:*20* | 166:*22* | 93:*4* | 143:*11,* |
| 122:*25* | President' | 178:*12* | 118:*24* | *20* |
| 123:*8,* | s   46:*1,* | 183:*18* | 119:*8,* | 149:*25* |
| *16* | *12*   48:*4* | 184:*19* | *11* | 150:*2,* |
| 124:*5, 9,* | 66:*1* | 189:*7* | 121:*7,* | *10* |
| *12, 25* | 138:*16* | 195:*12* | *10* | 156:*21,* |
| 125:*16,* | 162:*6, 8* | 201:*19* | 122:*13* | *22* |
| *20* | 208:*20* | 219:*20* | 125:*13,* | 159:*1* |
| 126:*25* | 209:*11* | prevent | *14, 21* | 160:*8* |
| 127:*1* | 216:*18* | 18:*7* | 126:*11* | 170:*18,* |
| 130:*2* | 225:*22* | previous | 127:*2* | *19* |
| 164:*13,* | 247:*15* | 190:*25* | 131:*7, 8* | 174:*8,* |
| *14, 16* | press | primarily | 132:*15* | *10, 16* |
| 165:*13* | 31:*6* | 27:*17* | 133:*9* | 175:*4, 9* |
| 171:*15* | 35:*5* | 91:*20* | 151:*24* | 179:*18* |
| 172:*5* | 45:*8* | 114:*5* | 209:*1* | 180:*20* |
| 173:*16* | 63:*14* | 129:*18* | 238:*18* | 181:*1,* |
| 174:*7* | 213:*13* | 227:*25* | 247:*20* | *21, 24* |
| 187:*2, 8,* | pressure | prime | | 188:*20* |
| *9, 14* | 28:*8* | 39:*6* | privileged | 189:*3, 4,* |
| 208:*3* | 53:*12,* | print | 126:*16* | *5, 15* |
| 209:*2, 4* | *22, 23* | 71:*24* | privy | 197:*24* |
| 218:*15* | 54:*4, 10,* | | 117:*18* | 218:*1* |

219:5
220:8
223:20
234:23
235:3
236:3
249:6, 7

**problem**
127:11
160:23
166:18
167:17

**procedural**
10:1

**procedure**
15:14

**procedures**
76:10
108:6

**proceed**
11:25
23:15
44:23
77:25
133:3
185:20
190:19
250:1

**proceeding**
8:8
10:7
11:15

**PROCEEDING
S**  1:18
8:2
9:3, 8,
12, 18,
22
10:10,

22, 25
11:7, 12,
23
12:10,
13, 17
15:16,
19
18:18,
21   23:1,
3, 5, 9,
13
44:14,
17, 21
77:19,
23
132:22
133:1
190:13,
17
241:12
242:3, 7,
13, 16,
23
243:3,
18, 22,
25
244:8,
14, 17
249:14,
20, 24
250:25
251:9,
20, 23
252:4,
13, 22
253:4, 7,
10
254:1, 4,
6, 9, 20

**process**
16:12,
15, 25

23:20
39:1
42:1
50:15
89:1
93:4
95:22
100:21
112:13
123:15
124:8,
24
126:14,
17
156:20
168:25
169:1
195:4
202:20
203:15
204:15
221:23
225:24
229:24
231:10
232:8

**processed**
52:14

**processes**
146:9

**proclaimed**
29:5
61:17

**produced**
105:25

**productivi
ty**   46:14

**profession
al**
194:18
195:17

199:13
204:7
218:21
237:14

**profession
ally**
68:23
198:17

**profile**
6:5
19:3
39:8
202:5

**Program**
20:10,
16   177:6

**Programs**
4:5
40:11
42:14
56:7
163:7,
10, 13,
14
169:13
232:16

**progress**
112:20

**progressed**
61:22
69:23
219:10
228:14

**progressin
g**   165:7

**project**
57:7, 16
217:21

**prolonged**
227:4

**prompted**
206:14

**promulgate
d**   207:25

**pronounce**
35:2, 4

**proper**
28:2
166:19
168:25
203:15

**properly**
113:23

**proposed**
30:24
36:5
45:17
59:24
62:18
75:16
82:2
87:19
179:17
181:8

**proposing**
25:9
43:3
69:6
233:24

**protect**
185:5

**protected**
126:13

**PROTECTIVE**
1:22, 24
32:10
77:4
118:23
126:12
151:23

| | | | |
|---|---|---|---|
| 208:*25* | **pull** | | 99:*9* | 247:*25* |

208:*25*
247:*19*
**protocol**
16:*10*,
*22*
17:*18*
119:*19*
120:*2*
126:*8*
238:*19*
**protocols**
193:*16*
**proud**
185:*14*,
*15, 16*
**provide**
17:*6*
102:*11*
107:*4*
125:*25*
130:*1, 5*
133:*6*
150:*21*
**provided**
16:*16*,
*20*
76:*12*,
*15, 17*
94:*6*
95:*11*
97:*2*
111:*4*
148:*1*
161:*6*
177:*7*
191:*1*
**providing**
179:*4*
**public**
11:*22*
228:*22*,
*23*    229:*1*

**pull**
135:*25*
155:*6*
217:*23*
**pulled**
56:*9*
75:*21*
**pulling**
34:*10*
39:*12*
56:*13*
134:*20*
**pulse**
85:*12*
**pump**
39:*6*
**punitive**
102:*2*

**purchasing**
252:*5*,
*19, 21, 25*
**pure**
92:*5*
**purely**
127:*12*
**purported**
16:*23*
**purpose**
29:*10*
52:*8*
106:*3*,
*24*
127:*22*
130:*24*
145:*6*
169:*25*
179:*1, 3*
205:*25*
221:*4*

99:*9*
101:*22*
103:*5*,
*10, 14,*
*19*
117:7
139:*25*
140:*4*,
*19*
146:*14*
147:*4, 5,*
7
148:*10*,
*22*
149:*6*
150:*15*
154:*11*
155:*13*,
*18*
156:*16*
158:7
159:*11*
160:*2*
164:*6*
166:*18*
167:*1*
170:*8*
174:*18*,
*19*
180:*15*
191:*3*
195:*10*
196:*10*
199:*20*
200:*25*
201:*18*
208:*12*
212:*5*
226:*25*
229:*16*
241:7

247:*25*
248:*2*
**put's**
217:*19*
**putting**
28:*25*
80:*18*
82:*22*
85:*20*
90:*11*
103:*12*
111:*19*
114:*24*,
*25*
144:*4*
145:*15*
147:*16*
161:*16*
162:*20*
169:*8*,
*20*
173:*19*
177:*24*
180:*6*
184:*25*
219:*17*
231:*9*

**< Q >**
**question**
13:*2, 4*
14:*2*
15:*21*
17:*6, 25*
18:*1, 2*
36:*20*
40:*14*
41:*22*
45:*16*
61:7
67:*2*
76:*6*

**purposeful**
179:*2*
**purposely**
160:*10*
**purposes**
126:*8*
130:*23*
178:*14*
**pursuant**
1:*23*
10:*1*
16:*14*
**push**
31:*4*
98:*18*
114:*17*
198:*24*
**pushback**
166:*9*
**pushed**
74:*2*
227:*3*
**pusher**
81:*21*
**pushing**
193:*23*
**put**
16:*9*
28:*10*
35:*24*
39:*11*
54:*11*
60:*13*
70:*16*
71:*4*
75:*10*,
*20*    76:*5*,
*11*
84:*11*
85:*3*
97:*6*

| | | | | |
|---|---|---|---|---|
| 90:*18* | 120:*1, 4,* | 141:*14* | **ready** | **reason** |
| 101:*9* | *13* | 232:*22* | 193:*9* | 12:*14* |
| 108:*9* | 122:*18* | 246:*4* | **Reagan** | 13:*25* |
| 109:*11,* | 123:*21* | **quiet** | 246:*17* | 15:*20* |
| *15* | 164:*25* | 118:*17* | **real** | 60:*14* |
| 117:*1* | 173:*25* | 218:*4, 7* | 36:*7* | 82:*13* |
| 124:*19* | 216:*16* | **quite** | 57:*14* | 96:*2, 16,* |
| 127:*19* | 226:*23* | 28:*11* | 124:*15* | *21* |
| 130:*9* | 246:*3* | **quo** | 218:*16* | 137:*3* |
| 131:*2* | 248:*25* | 231:*20* | **realize** | 173:*7* |
| 133:*7* | **queue** | | 190:*24* | 213:*17* |
| 136:*13* | 218:*4* | **< R >** | **realized** | 218:*9* |
| 137:*4* | **quick** | **raise** | 34:*22* | 237:*23* |
| 141:*21* | 28:*6* | 11:*13* | **really** | |
| 144:*2* | 42:*23* | 99:*25* | 42:*23* | **reasonable** |
| 147:*22* | 44:*11* | 108:*3* | 60:*12* | 143:*9* |
| 161:*3* | 63:*17* | **rambled** | 62:*19* | 221:*17* |
| 164:*24* | 68:*4* | 138:*13* | 63:*14* | **reasons** |
| 181:*18* | 70:*4* | **ran** | 71:*19* | 63:*15* |
| 201:*22* | 71:*23* | 58:*11* | 76:*20* | 109:*13* |
| 203:*6* | 77:*17* | **rate** | 82:*20* | 141:*10* |
| 215:*12* | 80:*7* | 57:*10* | 84:*1* | 211:*22* |
| 222:*10* | 121:*25* | **reaching** | 100:*25* | **recall** |
| 238:*21* | 124:*15* | 99:*3* | 104:*22* | 13:*12,* |
| 240:*2, 6,* | 219:*20* | **reacted** | 108:*15* | *18, 21* |
| *22, 23* | 236:*17* | 108:*18* | 155:*13* | 24:*8* |
| 241:*2* | 246:*3* | **reaction** | 164:*5* | 38:*23* |
| 248:*6* | **quicker** | 53:*5* | 167:*13* | 89:*15* |
| 250:*5,* | 44:*2, 7* | 162:*15* | 179:*17* | 94:*15* |
| *11* | 54:*20* | **read** | 185:*12* | 103:*16* |
| 252:*10* | 63:*3* | 45:*15* | 197:*20* | 106:*14* |
| **questionin** | 138:*4, 8* | 46:*9* | 198:*25* | 155:*21* |
| **g**   136:*25* | **quickly** | 47:*18* | 202:*19* | 156:*2* |
| **questions** | 26:*18* | 93:*1, 9* | 213:*7* | 157:*22* |
| 13:*16* | 29:*10* | 120:*3,* | 214:*12* | 162:*4* |
| 17:*1, 3,* | 58:*6* | *18, 21* | 226:*1* | 182:*23* |
| *7, 11, 22,* | 62:*24* | 182:*3* | 229:*10* | 193:*4* |
| *23* | 90:*7* | 190:*25* | 236:*17* | 206:*16* |
| 32:*15,* | 100:*2* | 205:*23* | 238:*1* | 238:*11* |
| *19*   33:*1* | 114:*20* | 206:*13,* | **real-time** | **recalled** |
| 75:*12* | 116:*5* | *14* | 120:*22* | 82:*9* |
| 119:*24* | 136:*4* | 216:*22* | 167:*12* | |

receive
94:*12*
received
19:*5*
60:*19*
77:*3*
receiving
217:*18*
252:*1*

recklessly
114:*21*
recognize
45:*22*
recollecti
on    87:*8*
93:*21*
134:*12*
173:*6*
177:*22*
recommend
148:*8*
157:*3*
165:*14*
180:*6*
199:*15*
204:*21*
recommenda
tion
102:*23*
110:*1*
112:*3*
137:*11*,
*19*
139:*16*
140:*1*,
*14*
141:*23*,
*25*
143:*2*
148:*18*,
*19*

150:*9*,
*21*
152:*6*
154:*20*
155:*23*
158:*8*, *9*,
*10*, *16*,
*17*
160:*13*
161:*20*
162:*16*
166:*25*
167:*1*
170:*7*, *8*
178:*5*
180:*15*
184:*17*
188:*10*
189:*24*
recommenda
tions
68:*21*
115:*13*
135:*15*
137:*7*,
*17*
165:*15*
recommende
d    68:*25*
158:*12*
recommendi
ng
142:*13*
147:*4*
153:*24*
156:*16*
187:*1*
reconvene
106:*12*
record
8:*3*, *7*,
*15*   9:*20*

10:*4*
11:*4*, *8*
13:*6*
14:*3*
16:*10*
17:*15*
23:*7*, *11*,
*12*, *14*
28:*15*
29:*20*
44:*15*,
*18*, *20*,
*22*
45:*22*
46:*9*
70:*9*
77:*20*,
*22*, *24*
93:*10*
103:*12*
108:*22*
119:*9*
120:*5*, *7*
131:*13*
132:*20*,
*24*, *25*
133:*2*, *5*
153:*11*
190:*12*,
*14*, *16*,
*18*
194:*25*
202:*5*
204:*23*,
*24*
212:*6*
217:*23*
243:*1*
244:*10*,
*15*, *18*,
*20*
249:*13*,

*16*, *21*,
*23*, *25*
250:*7*,
*24*
251:*1*
253:*8*
254:*8*
recorded
16:*16*
17:*11*
254:*6*
recording
10:*5*
recordkeep
ing    81:*5*
records
202:*7*
rectify
23:*7*
red
204:*1*
REDACTED
1:*21*, *23*
96:*20*
239:*15*

redactions
93:*2*
redo
31:*25*
reducing
155:*5*
reeling
150:*1*
refer
14:*15*,
*23*   38:*8*
48:*7*
reference
22:*2*, *5*

referenced
139:*9*
referred
36:*2*
160:*18*
referring
18:*12*
35:*22*
66:*14*
89:*25*
93:*17*
121:*22*
165:*17*
206:*8*
refigure
42:*5*
reflect
167:*16*
refocus
31:*25*
39:*3*

refocusing
175:*2*
reformulat
e    42:*11*
regard
95:*13*
regarding
32:*16*,
*19*
119:*15*
133:*8*
209:*3*

regardless
57:*1*
172:*11*

registered
180:*21*

regulations 75:1
reinstate
  102:16
reinstatement
  102:16
rejected
  137:19
related
  17:7
  31:10
  95:19
  135:11
  254:11
relating
  169:4, 9
Relations
  92:20
relationships
  168:16
  187:4
relay
  128:4
  161:8
relayed
  119:3
  127:8
  128:3
  132:5, 6
  162:4
  173:2
relaying
  133:15,
24   162:2
relief
  183:11
relieve
  69:15
relieved
  227:10

relook
  25:14
remain
  141:8
remained
  228:15
remediation   70:18
remember
  23:23
  24:2, 12,
18, 19,
23
  31:12,
22
  35:14
  38:4, 5,
18   41:5
  42:17
  43:2
  48:25
  49:25
  52:5
  55:10
  56:3
  59:3, 9
  64:5
  69:11
  71:24
  72:15,
20, 22
  74:13
  75:24
  79:3, 16
  80:5, 6,
7, 8, 9,
10, 16
  83:10,
12
  84:10,
17
  89:12

90:2, 5,
6, 9
  94:14
  95:1
  96:15,
19
  101:21
  104:1
  105:8
  106:13
  108:15
  111:9
  114:2, 3,
23
  116:2
  118:15,
17
  125:7
  129:3, 8,
15, 22
  132:11
  134:11
  135:8
  136:2
  137:7
  138:13
  155:24
  158:3, 4
  172:10
  183:10,
18
  184:19
  191:13
  193:14
  195:8,
11
  196:3, 7
  206:10,
13, 15,
21
  207:23
  208:11

209:12,
14, 15,
23
  210:10
  217:1
  222:3
  229:9
  233:6, 7
  250:13
reminded
  34:23
REMOTE
  1:17
  8:6
  244:9
remotely
  9:25
removal
  185:22
remove
  69:21
  210:21
  211:5,
11, 16,
21
  213:23
  244:5, 7
  247:7
removed
  180:1, 3
  206:25
  207:4
  208:10
  209:20
  210:8
  239:14
  245:13
removing
  69:11,
20
  211:22
  226:2

renamed
  47:15
renew
  143:4
reorganizing   248:9
repeat
  9:13
  15:21
  40:13
  61:7
  122:20
  161:3
  220:15

repeatedly
  94:8
repeating
  179:20
rephrase
  61:3
  95:16
  124:1
  148:15
  175:25
  176:8
  248:16
reported
  31:1

reportedly
  88:2
reporter
  12:24
  13:9
  17:8, 16
  18:4
  120:17,
19
  240:4
  241:9

reporting
  17:17
  61:18
represent
  8:15
  45:24
  191:16
representatives
  36:10
represented   30:19
  102:6
representing   37:23
repurposing   176:16
request
  129:21
  130:17
  193:11
  195:16
  198:3
  199:9

requesting
  205:23
requests
  67:13
  129:22
  194:16
  199:4
required
  139:22
re-scope
  27:3
research
  25:7
reshape
  39:2
reside
  10:12

resign
  220:12
  237:9
  238:4
resignation   22:13
  235:21
  236:6
  237:19
resigned
  216:6
  235:22
  237:18
resigning
  237:23
resisting
  227:20
resolved
  155:16
resources
  146:8
  177:7, 8,
  9   227:1,
  2
  232:19,
  20
  233:11
respect
  53:25
  58:16
  60:22
  61:10
  68:7
  121:13
  140:4
  147:3
  150:15
  155:15
  184:25
  203:6
  228:9

respective
  47:20
  48:4
respectively   19:25
respond
  115:2,
  21   166:4
responded
  108:7
  111:5
  192:24
  193:2
response
  75:15
  108:4,
  11
  109:12
  139:5
  156:18
  158:13
responsibilities
  22:15
rest
  48:25
  216:12
  238:20
restart
  52:18
restate
  32:23
  50:8

restricted
  206:2
restructuring
  248:9
result
  129:20

resume
  23:25

retirement
  19:12, 14
return
  40:12
revealing
  131:16,
  18

reversible
  100:4, 9,
  11
reviewed
  89:6
reviewing
  135:18
  217:3
reviews
  62:14
rheimann@lchb.com
  2:10
RICHARD
  2:9
  242:17
  243:11
ride
  237:2
right
  11:13
  15:7
  24:12,
  13
  26:11
  35:8
  36:9
  37:1, 2,
  5, 7
  45:21
  53:10,

18    55:3
  63:21
  65:6, 24
  66:3
  68:7
  69:4, 24
  70:17
  73:23
  81:23
  85:5
  86:18
  94:18
  99:20
  101:4,
  21, 24,
  25
  103:18
  104:18
  107:18
  108:16
  111:12
  112:14
  113:4
  116:18
  118:16,
  19
  125:17
  131:10
  132:4
  133:4
  134:5,
  10, 17
  135:14,
  25
  136:16
  138:10,
  18, 20
  139:20
  140:7,
  23
  141:4,
  18

142:7
143:9, 12, 14, 21
144:14, 15, 16, 21, 24
145:4, 5, 9  146:1, 5, 11
147:8, 9, 10, 25
148:2
149:17
152:15
153:14, 17, 18
154:1, 6
155:2, 11, 16
157:1, 2
160:19
164:14, 18
165:2, 6, 21
167:17
168:9, 18
169:11, 17
171:14, 15, 17, 18
172:16
174:3, 4, 13, 20, 23
175:4, 5, 7, 11
176:20
177:10

178:12, 22
179:2
180:23
181:1
183:3, 5, 15
184:10, 18
185:1, 12
187:5
188:7
194:8
196:1
197:19, 23
199:1, 21
201:1, 5
203:13
204:3, 9
206:15
212:14, 17
213:7, 21
214:16, 20
215:15, 20, 21
217:21
218:4, 18, 20
220:5, 20
221:14, 15
222:2, 5, 9
224:24
225:5,

15, 17, 19, 20, 22
226:11, 15
227:9, 12, 17, 25
228:4, 9
229:14, 15
231:5, 6
233:11, 14, 19
234:17, 21
235:1, 4, 10
236:14, 24
237:3, 7
240:22
241:12
251:19

**rights**
143:16
205:23, 25

**ring**
95:24
156:1

**risen**
201:11

**risk**
68:22
126:11
145:14
148:21, 23
164:6
167:13
168:7, 8,

10, 14, 15, 19, 24
169:4, 9
171:4
185:24
201:8
202:22
203:6

**road**
174:14

**rocket**
146:11

**rodeo**
238:9

**role**
22:24
23:21
25:12, 21, 23
27:22
29:5
35:19
53:3
58:15, 18
60:21
61:9, 11, 12  67:6
68:18
122:25
123:2
185:17

**roles**
19:18
29:9

**roll**
37:4

**rolling**
95:2

**roll-up**
95:2

**room**
9:19
17:10
43:2
76:23
77:13
105:12
117:6
128:22
129:1, 21
134:9
145:24, 25
149:14
154:16
157:19
158:18
159:10
166:25
179:14
184:20
187:16
188:9
203:9
204:12, 14
209:16
210:13
215:17
218:18
220:23
240:3, 5, 8
241:10, 15
242:17, 18, 19, 24
243:2, 14, 19

| | | | | |
|---|---|---|---|---|
| **rotting** | 61:*3, 5,* | 130:*11* | *18, 22* | 248:*25* |
| 163:*19* | *6*  63:*8* | 131:*15* | 189:*1* | 249:*12,* |
| 178:*22* | 64:*20* | 132:*16,* | 190:*3, 7,* | *17, 19* |
| **rough** | 66:*12* | *20* | *11, 20,* | 250:*6,* |
| 136:*3* | 67:*1* | 133:*14,* | *23* | *23* |
| **rub** | 68:*16* | *20* | 192:*10,* | 251:*4, 7,* |
| 143:*25* | 75:*3* | 134:*4* | *13, 18* | *12, 22,* |
| 146:*21* | 77:*11,* | 138:*1* | 203:*24* | *25* |
| 172:*20* | *17*  78:*1* | 140:*17* | 205:*2* | 252:*3, 6,* |
| **rubbed** | 85:*23* | 142:*10,* | 207:*3,* | *8, 11, 14,* |
| 146:*19* | 86:*5, 14* | *20* | *17, 20,* | *17* |
| 147:*23* | 88:*7* | 144:*3* | *21* | 253:*1, 6* |
| **RUBIN** | 89:*5, 21* | 145:*13* | 209:*6,* | **Rubio** |
| 2:*7* | 91:*7, 19,* | 146:*2* | *17* | 6:*12* |
| 5:*4* | *24* | 148:*15,* | 210:*6* | 207:*7* |
| 8:*17* | 92:*15* | *16* | 211:*3, 9,* | 208:*4,* |
| 9:*21* | 98:*12* | 149:*12* | *14, 19* | *10*  222:*4* |
| 10:*15,* | 100:*6* | 150:*12,* | 212:*5, 8* | **rudder** |
| *24*  12:*2,* | 101:*10* | *18* | 216:*5* | 107:*5* |
| *4, 12, 16,* | 103:*6* | 151:*3,* | 218:*8* | **rule** |
| *18* | 105:*19* | *25* | 220:*10* | 113:*2* |
| 15:*17,* | 110:*8* | 152:*9,* | 222:*12,* | 177:*11* |
| *18, 22,* | 117:*2* | *19, 25* | *24* | **rules** |
| *23* | 119:*7,* | 153:*7,* | 223:*10* | 10:*1, 11* |
| 16:*11* | *21* | *12* | 224:*17* | 12:*6, 23* |
| 17:*19* | 120:*6,* | 154:*18* | 226:*21* | 75:*1* |
| 18:*18,* | *10, 14,* | 159:*23* | 228:*18* | 76:*14* |
| *20, 24* | *21* | 161:*4* | 229:*4* | 112:*19,* |
| 19:*1* | 121:*2,* | 162:*24* | 232:*7* | *20, 24* |
| 21:*25* | *16* | 167:*19* | 234:*1, 9* | 113:*2* |
| 23:*2, 3,* | 122:*14,* | 168:*5* | 238:*17,* | 177:*9* |
| *4, 8, 16* | *17, 19* | 170:*16* | *23* | 196:*23,* |
| 27:*8* | 123:*20,* | 173:*12* | 240:*1,* | *24* |
| 30:*8* | *24* | 174:*1* | *17, 21* | **run** |
| 32:*22* | 124:*2, 3,* | 175:*24* | 241:*7,* | 22:*19* |
| 33:*1, 4* | *20* | 176:*5* | *17* | 34:*7* |
| 44:*13,* | 126:*19* | 177:*16* | 244:*3, 7,* | 44:*1* |
| *16*  45:*2,* | 127:*4,* | 179:*5* | *12, 16* | 204:*3* |
| *12*  47:*2,* | *15, 18,* | 180:*13* | 246:*1,* | **running** |
| *7, 17* | *25* | 182:*17* | *15, 25* | 21:*16* |
| 48:*17* | 128:*1,* | 184:*23* | 247:*21,* | 29:*13* |
| 53:*1* | *11, 13* | 186:*11,* | *23* | 34:*14* |

212:*23*
249:*5*
**runs**
187:*21*
**run-up**
161:*13*

**< S >**
**safe**
228:*8*
**safer**
197:*24*
**sage**
196:*14*
**salvo**
25:*4*
**San**    2:*6*
**sandwich**
235:*7*
**sat**
42:*21*
**satisfy**
198:*3*
**Saturday**
37:*18*
**sausage-**
**making**
213:*17*
**save**
119:*25*
**saves**
249:*10*
**saw**
29:*18*
53:*11*
55:*14*
65:*5*
68:*9*
93:*1*
96:*1*
178:*16*
179:*24*

207:*23*
217:*25*
226:*2*
**saying**
12:*25*
44:*7*
48:*21*
71:*3*
85:*14*
97:*3*
98:*5*
109:*23*
111:*14*
121:*22*
127:*4,*
*13*
133:*19*
144:*5*
153:*17,*
*19*
155:*10*
158:*1*
160:*22*
180:*24*
181:*23*
185:*16*
188:*24*
194:*5*
204:*14*
213:*21*
215:*12*
227:*8*
229:*16*
233:*10*
237:*17*
238:*11*
242:*25*
**says**
20:*3*
45:*23*
46:*9*
49:*20*

68:*1*
94:*4*
131:*2*
137:*14*
138:*3,*
*19, 20*
165:*15*
168:*20*
191:*20*
192:*22*
202:*21*
205:*22*
213:*9*
227:*12*
**scheduled**
105:*20*
106:*11*

**scheduling**
157:*18*
**school**
19:*21, 22*
**science**
146:*11*
**SCIF**
225:*17*
**scope**
53:*3*
103:*13*
127:*11*

**scrambling**
99:*19*
**scratch**
235:*20*
**screen**
24:*1*
25:*1*
241:*14*
242:*19*
251:*21*

**screw**
193:*18*
**screwing**
197:*15*
**screwworm**
163:*15*
**script**
58:*11*
**scrutiny**
54:*23*
68:*4*
99:*12*
**seat**
188:*8*
201:*5*
217:*5*
219:*4*
**seated**
135:*1*
**Second**
14:*22*
20:*2*
30:*20*
35:*11*
36:*17*
42:*18*
49:*11*
68:*14*
86:*16,*
*17*
196:*17*
204:*3*
219:*1*
241:*2*
**secretary**
46:*19*
195:*2*
207:*7*
**Section**
46:*8, 17*
47:*12*

245:*11,*
*14*
**sector**
233:*13*
**Security**
20:*3*
21:*7*
103:*23*
193:*12,*
*16*
194:*3,*
*12, 19*
195:*9*
196:*10,*
*23*
197:*5,*
*17*
198:*2, 9,*
*10, 21,*
*23*
201:*10,*
*23*
202:*6,*
*14, 22*
203:*1*
204:*17,*
*19*
217:*4*
233:*9*
250:*16*
**see**
14:*12*
29:*5*
46:*15,*
*22*    54:*9*
65:*12*
66:*10,*
*19*
86:*23*
94:*10,*
*21*
96:*13*

100:3
101:15
111:18
117:20
131:12
140:10, 11
150:3
171:10
180:24
191:18
203:16
204:10
205:5, 20
208:2
220:2
241:11, 19
242:14
251:14
252:7, 23

**seeing**
81:4, 5
94:15
100:1, 22
141:12
221:9
222:3

**seek**
125:22
198:2

**seeking**
250:14

**seen**
53:7
54:3
62:18
70:3
92:24
110:10

112:5
141:5
176:10, 11, 16
207:22
225:16

**select**
47:24
50:25

**selected**
24:5
51:2
88:22, 24    89:2

**selecting**
89:7
90:19, 23    91:1, 22, 25

**selection**
51:6

**self**
29:4
61:16

**sell**
166:22

**Senate-confirmed**
219:4

**send**
18:22
103:11
191:10
236:10
237:10
248:22
253:2

**sending**
56:11
103:20
191:22

**senior**
21:6
27:21, 24    29:1
32:17
55:18
63:19
65:9
67:20
68:1, 10
72:10, 22
87:10, 23    88:1, 8, 18
119:12
129:17
170:23
181:22
189:15
195:17, 18
201:8
204:12
214:15, 19
216:2
217:20
219:2, 3
222:5
226:9

**seniors**
33:12
65:23
165:19
172:18, 19    213:2

**sense**
14:10
17:20
50:18
54:3

81:11, 25
82:21
119:25
134:2
142:11, 25
150:6
183:10
187:11
192:15
214:14
217:10
221:18
229:11
230:17
233:25

**sent**
86:21
89:14
97:13, 14, 15
104:1
147:9
151:11
192:7, 19
205:19
220:9
236:2, 11, 25
237:12, 15, 19

**sentence**
48:1
53:25
93:8
94:4

**separate**
200:15
240:5
241:10

**separation**
14:21

**separator**
239:13

**September**
19:14

**sergeant**
145:9

**serious**
181:6

**seriously**
181:4

**serve**
25:4
185:11
236:7

**served**
21:2
22:7, 25
28:18
51:18

**serves**
239:13

**service**
19:20
20:11
47:15
61:20
85:21
226:2

**Services**
93:14
221:7

**serving**
29:6, 15

**SEs**
204:11

**set**
69:20
88:21
113:10

170:*1*
176:*9*
177:*11*
212:*22*
223:*15*
226:*20*
242:*12*
254:*5*

**sets**
41:*11*
53:*19*

**seven**
34:*4, 16*

**shaken**
198:*20*
200:*4, 16*

**shaking**
13:*8*

**share**
191:*4*

**shared**
128:*20*
129:*11*
230:*9*
232:*24*
233:*9, 22*

**shed**
75:*19*
113:*10*
115:*18*

**sheet**
34:*23*

**she'll**
184:*8*

**shipments**
41:*8*
56:*5*

**shock**
179:*19*
181:*10, 13*

213:*19, 24*

**shocked**
181:*7*
184:*10*

**shoes**
171:*7*

**shop**
55:*2*
155:*2*
197:*5*
227:*10*

**shored**
146:*9*

**short**
13:*23*
50:*5*
61:*15*
190:*10, 11*
223:*12*
248:*8*
249:*5*

**shortly**
156:*6*

**shoulders**
202:*13*

**show**
45:*10*
100:*15*
177:*19, 23*

**showed**
59:*2*
60:*16*
79:*11, 12, 13, 14*
90:*11*
113:*1*
222:*2*

**showing**
191:*7*

**shown**
101:*12*

**shows**
226:*4*

**shut**
173:*8*
174:*7*
175:*22*
246:*11*

**shutdown**
227:*21*

**shuts**
248:*24*

**shuttered**
176:*12*

**shuttering**
167:*11*

**shutting**
39:*15*
153:*24*
166:*5*
167:*3, 11, 14*
178:*4*
248:*19*

**shy**
116:*17*

**side**
29:*12*
57:*21*
73:*12, 14*    99:*4*
131:*4*
173:*24*
184:*16*
185:*16*
208:*12*
230:*2*
235:*5*

**sideways**
232:*5*

**sign**
60:*2*
68:*23*
97:*5*
109:*25*
111:*24*
112:*5, 6, 10*
143:*20, 23*
155:*10*

**signage**
246:*16*
247:*8*

**signatures**
110:*23*

**signed**
30:*14*
58:*8*
80:*17*
82:*11*
98:*14*
152:*22*
153:*3*
208:*3, 6*
219:*24*
220:*24, 25*

**significance**    144:*4*

**signing**
149:*5*

**signs**
81:*23*

**SILER**
4:*10*
8:*25*
10:*18*
120:*12,*

*15, 25*
126:*2, 7*
127:*3, 9*
132:*18*
241:*20, 22, 25*
242:*10, 14*
243:*6, 10, 16, 20, 23*
244:*5, 11*
249:*7*
251:*16*
252:*9, 15*

**similar**
25:*2*
26:*25*
48:*20*
155:*4*

**similarly**
57:*6*
155:*22*

**simply**
98:*23*

**simultaneous**
153:*5*
200:*18*

**single**
134:*23*
149:*17*

**sister**
229:*2*

**sit**
64:*16*
223:*13*
241:*21, 22*

**sits**
227:*13*

sitting
 61:12
 63:4
 113:6
 143:19
 145:11
 182:9
 186:12
 188:2
 204:11
 217:6
 218:20
situation
 206:8
 217:8
 224:13

situations
 224:13
six
 34:4, 16
 113:12
 129:6
size
 113:12

skepticism'
s    68:7
skill
 53:19
skin
 146:22
skipping
 48:1
 134:9
slogan
 25:19
slow
 44:4
small
 34:3
 37:23

38:1
39:6
41:14
43:13
49:7
54:5
197:4, 8
smaller
 134:21
 176:15
smart
 143:15
smart-ass
 110:25
smarter
 220:23

smattering
 37:25
 54:12
smoothly
 44:2
snaked
 36:22
snapping
 204:9
so-and-so
 215:11
social
 73:8, 9
software
 46:13
 52:11
 193:13
solid
 153:18
solutions
 185:12
somebody
 24:21
 49:21
 56:10

60:4
66:2
82:22
102:5
116:21
195:9
something'
s    163:11
somewhat
 110:16
 143:8
son
 251:18
soon
 217:19
sooner
 13:25

sophomoric
 194:16
 233:23
sorry
 9:6, 12,
13
 12:10
 15:16,
17, 22
 22:10
 23:2, 5
 27:21
 32:10
 47:4
 50:8
 51:12
 52:15,
18
 60:24
 61:1
 64:22
 74:19,
20
 76:24

86:25
87:4
91:9, 17,
25
95:16
99:7
101:18
120:11,
14
122:4,
10, 11,
20
123:17
125:1,
11
126:19
128:11
130:12
132:13,
22
133:4
136:10,
15
142:22
144:9
147:2
151:25
153:10
166:3
173:1
182:21
204:9,
23
205:11
207:18
208:24
235:18
240:16,
17
247:18
250:6
251:23

252:8, 9,
11
sort
 43:20
 58:4
 84:13
 102:15,
17
 139:11
 171:19
 181:10,
13
 226:3
 231:19
sorts
 146:20
 175:15
sound
 35:8
 36:25
sounded
 32:4
sounds
 37:2, 5,
7    235:11
Southeast
 3:4
Sowl
 1:18
 8:5
 254:3, 18
space
 206:2
spaces
 57:9
 225:17
sparked
 55:16

spattering
 82:1

**speak**
13:*1*
16:*6*
52:*13*
129:*4*
143:*3*
161:*18*
162:*19*
179:*19*
195:*25*
196:*1*
242:*15*
**speaking**
133:*15*
**special**
27:*22*
28:*25*
47:*22*
115:*18*
119:*4*
122:*24*
123:*7,
12*
187:*6,
13*   219:*3*
**specific**
65:*13*
67:*23*
69:*18*
86:*6*
97:*9, 10,
13*
106:*24*
116:*25*
119:*23*
126:*23*
127:*1, 7*
129:*10*
137:*24*
146:*23*
170:*4*
250:*13*

**specifical
ly**
41:*25*
83:*17*
89:*11*
90:*2, 15*
97:*12*
106:*15*
113:*20*
116:*24*
134:*7*
135:*4*
156:*25*
158:*15*
161:*25*
162:*5, 9*
170:*12*
171:*6*
173:*14,
16*
198:*5, 6*
209:*18*
**specifics**
67:*23*
71:*10*
**specified**
46:*20*
**specify**
18:*11*
225:*9*
**spectrum**
25:*15*
42:*2, 4*
81:*8*
150:*11*
**speculate**
100:*1*
124:*16*
189:*16*
211:*24*

**speculated**
182:*14*
**speculatin
g**   212:*11*
**speculatio
n**   63:*7*
74:*22*
78:*8*
84:*25*
91:*4*
98:*20*
103:*1*
105:*18*
109:*18*
123:*22*
124:*16*
125:*6*
137:*22*
140:*16*
143:*6*
145:*20*
148:*13*
149:*9*
159:*18*
160:*16*
162:*23*
177:*2*
180:*10*
182:*7*
186:*8*
189:*25*
197:*13*
211:*1, 8*
212:*2,
25*
214:*10*
217:*16*
218:*11*
225:*12*
230:*12*
233:*1*

**speculativ
e**   91:*6*
111:*24*
112:*8*
143:*9*
172:*11*
173:*22*
175:*10*
181:*17,
25*
228:*25*
**speech**
153:*6*
200:*18*
**speed**
27:*16,
18*   39:*1*
71:*23*
114:*4*
171:*2*
**spell**
11:*3*
252:*23*
**spend**
100:*4*
238:*8*
**spending**
76:*3*
221:*13*
**spent**
26:*2*
34:*10*
81:*6*
223:*14*
224:*19*
**spoke**
38:*13,
20*
51:*21*
52:*6*
64:*4*
154:*3*

176:*17*
235:*19*
**spoken**
31:*21*
32:*8, 12*
62:*4*
118:*25*
119:*16*
121:*23*
210:*2*
238:*13*
**sport**
216:*1*
**spot**
14:*1*
108:*16*
**squanderin
g**   146:*7*
**squat**
55:*17*
**squishy**
40:*9*
**staff**
19:*18*
21:*2*
22:*9, 10,
16, 18,
23, 24*
23:*17*
25:*13,
23*   28:*1,
15, 21*
36:*18*
48:*23*
49:*6*
51:*4, 19*
66:*1, 5*
67:*21,
25*   76:*8*
90:*8*
110:*15,
17, 18*

111:*2, 6*
112:*2*
116:*17,*
*23*
138:*16*
145:*12*
150:*14*
151:*8, 9*
156:*25*
159:*4*
168:*2*
174:*5*
187:*9*
195:*13*
206:*5,*
*17*
209:*2*
215:*16*
216:*15*
219:*1, 7*
248:*3*
**staffed**
49:*3*
56:*13*
**staffer**
172:*16*
**staffing**
27:*16*
149:*19*
203:*12*
204:*11*
**staffs**
214:*16*
**stage**
212:*20*
**stake**
164:*2*
**stakeholde**
**rs**
170:*24*

**stammering**
99:*7*
**stamp**
191:*1*
204:*24*
207:*15*
**stamps**
190:*25*
**stand**
28:*7*
121:*9*
168:*20*
**standard**
19:*18*
29:*12*
35:*18*
**standards**
223:*2*
**standing**
171:*7*
187:*16*
188:*9*
195:*14*
**stands**
29:*23*
**Starbucks**
148:*3*
**START**
1:*15*
18:*16*
34:*4*
43:*16*
49:*10*
50:*2*
107:*7*
111:*16*
122:*17*
160:*24*
196:*15,*
*17*
197:*16,*

*20*
198:*13*
201:*6,*
*15, 16*
217:*19*
234:*3*
**started**
35:*15*
76:*9*
106:*1*
108:*6*
158:*24*
163:*7*
193:*25*
230:*8*
231:*9, 15*
**starting**
8:*16*
27:*2*
28:*8*
141:*3*
152:*3*
199:*15*
208:*16*
230:*25*
**startle**
76:*4, 5*
**starts**
40:*10*
**state**
8:*15*
11:*3*
22:*7, 13*
29:*20*
30:*10,*
*14*   41:*4,*
*7, 16*
48:*23*
57:*5*
59:*10*
64:*9*
67:*4*

70:*12*
78:*7*
99:*3*
130:*9*
136:*13*
139:*7*
168:*21*
182:*24*
186:*9*
197:*9*
208:*16*
210:*5*
**stated**
48:*8*
63:*21*
67:*5*
97:*20*
98:*13*
104:*2*
109:*13*
201:*24*
**statement**
17:*15*
87:*16*
100:*23*
111:*11*
117:*22*
127:*1*
129:*10*
149:*25*
208:*22*

**statements**
126:*21*
214:*4, 7*
224:*8*
**STATES**
1:*1*
8:*12*
14:*14*
21:*19*
47:*13,*

*14, 15*
52:*12*
177:*24*
221:*19*
230:*21*
**stating**
200:*2*
**status**
108:*3*
109:*3*
231:*20*
**Stay-at-**
**home**
21:*22*
**stayed**
68:*19*
**staying**
251:*8*
**stays**
230:*24*
**steady**
68:*19*
228:*12*
**steal**
251:*17*
**stem**
138:*22*
**stenograph**
**ic**   10:*5*
**step**
28:*14*
43:*10*
64:*22*
73:*2*
77:*12*
91:*18*
99:*2*
114:*9*
122:*14,*
*17*
240:*3, 23*

Stephen
 213:*2*
 215:*21,*
*24*
**stepped**
 179:*7*
**stepping**
 33:*9*
 34:*13*
 186:*2*
**steps**
 194:*11*
 196:*22*
 232:*18*
**Steve**
 31:*23*
 32:*3*
 33:*5, 6*
 36:*13*
 37:*19*
 38:*21*
 52:*1, 2*
 53:*2*
 56:*17*
 58:*15*
 59:*13,*
*15, 17*
 60:*11,*
*20*
 61:*16*
 62:*2*
 64:*4, 15*
 65:*5, 8*
 66:*8, 19,*
*23*   67:*6*
 68:*9, 17*
 69:*6*
 72:*8*
 73:*5, 7*
 75:*10*
 76:*10,*
*11*

 78:*12*
 85:*8, 14*
 90:*25*
 104:*2,*
*24*
 108:*2,*
*24*
 110:*5*
 111:*5*
 113:*20*
 117:*14,*
*15, 22*
 118:*4,*
*10, 15,*
*20*
 121:*19,*
*21*
 122:*6,*
*22, 25*
 123:*3, 7*
 124:*23*
 125:*4, 8*
 126:*4, 5,*
*22*
 127:*6, 7,*
*11, 12,*
*21*
 128:*2,*
*16, 18,*
*24*
 129:*10,*
*20*
 131:*18,*
*20*
 132:*5, 8,*
*9, 16*
 134:*8,*
*12*
 136:*24*
 138:*3*
 139:*5,*
*10, 25*

 140:*23*
 142:*11,*
*25*
 144:*6*
 147:*3,*
*23*
 148:*6*
 156:*4, 6*
 157:*10*
 211:*10*
 240:*10,*
*25*   241:*2*
**Steven**
 103:*21*
**STEVENS**
 3:*11, 15*
 9:*5*
 10:*21*
**Steve's**
 32:*7*
 78:*7*
 122:*9*
**steward**
 41:*19*
**stewards**
 88:*5*
**stick**
 236:*20*
**sticky**
 232:*10*
**stipulate**
 10:*13*
**stood**
 20:*24*
 138:*25*
**stop**
 122:*3*
 157:*7*
 183:*15*
**stopped**
 184:*16,*
*22*

**stopping**
 167:*8*
**stops**
 43:*6*
**story**
 73:*7*
**straight**
 35:*20*
**Street**
 2:*4, 14*
 3:*12*
 4:*6*
 49:*22*
 60:*7*
 186:*17*
**strengths**
 34:*9*
**stress**
 220:*5*
**stressed**
 219:*17*
**stripping**
 134:*19*
**struck**
 195:*15*
**stuff**
 34:*11*
 55:*12,*
*21*
 56:*14*
 68:*3*
 70:*6*
 72:*14*
 73:*21*
 75:*17*
 78:*8*
 83:*18*
 85:*10*
 87:*22,*
*24*
 114:*16*
 135:*21*

 145:*12*
 154:*9,*
*13*
 157:*18*
 160:*9,*
*21*
 163:*15*
 164:*3*
 169:*15*
 175:*11*
 182:*12*
 184:*1*
 187:*14*
 188:*25*
 199:*1,*
*22*
 202:*6, 9*
 212:*22*
 213:*7,*
*11*
 216:*16*
 217:*2, 3*
 218:*16*
 225:*25*
 228:*3*
 233:*9,*
*20*
 236:*16*
 237:*10*
**stuff's**
 237:*25*
**style**
 187:*22*
**stymie**
 112:*19*
**SUBJECT**
 1:*22*
 12:*9*
 205:*3*
**submit**
 23:*24*
 24:*20*

| | | | | |
|---|---|---|---|---|
| submits | sucked | sure | 198:*11,* | switchboar |
| 225:*24* | 176:*14* | 13:*9* | *12, 15* | d   174:*12* |
| submitted | suggest | 25:*17* | 199:*3,* | sworn |
| 22:*13* | 23:*7* | 35:*2* | *24* | 11:*21,* |
| 237:*19* | suggested | 36:*24* | 201:*20* | *24*   18:*4* |
| | 24:*21,* | 49:*21* | 213:*22* | 22:*12* |
| submitting | *22*   34:*25* | 68:*2* | 225:*20* | 33:*11* |
| 236:*6* | Suite | 83:*13* | 226:*10* | system |
| 237:*18* | 3:*5, 13* | 92:*25* | 229:*12,* | 44:*4* |
| subordinat | 8:*6* | 93:*1* | *16* | 75:*22* |
| e   196:*1* | 113:*10* | 96:*1* | 233:*5* | 94:*7, 20* |
| | summer | 99:*4, 13,* | 236:*17,* | 95:*12,* |
| subpoenaed | 58:*3* | *20* | *22*   242:*3* | *18, 20,* |
| 15:*6* | Sunday | 100:*25* | surprise | *23*   96:*7* |
| | 37:*18* | 104:*12* | 83:*20* | 194:*19,* |
| subsequent | super | 105:*6* | 179:*19* | *21* |
| 239:*14* | 132:*2* | 113:*18,* | surprised | 200:*23* |
| substance | 225:*19* | *19, 22* | 54:*22* | 202:*1,* |
| 14:*7, 13* | 235:*11* | 115:*1* | 184:*9, 10* | *11, 14* |
| 16:*5* | support | 127:*3* | Susie | 225:*16* |
| 22:*7* | 49:*20* | 136:*15* | 83:*17* | 233:*18,* |
| 32:*16,* | 115:*14* | 142:*18* | 174:*4,* | *21* |
| *19* | 137:*14* | 152:*11,* | *17* | 234:*14* |
| 116:*7, 8* | 148:*4* | *15* | 227:*10* | systems |
| 119:*2* | 169:*14* | 154:*8* | suspect | 38:*25* |
| 122:*16* | 196:*16* | 161:*2* | 175:*8* | 71:*4* |
| 131:*16,* | 199:*4,* | 168:*9,* | 182:*13* | 202:*12* |
| *17, 18* | *14, 25* | *23* | suss | 203:*11* |
| 152:*24* | 219:*24* | 169:*13* | 59:*23* | |
| substantia | 229:*20* | 170:*1* | sustained | < T > |
| lly | | 171:*3* | 226:*5* | Tab |
| 247:*24* | supporting | 174:*10* | swear | 207:*18* |
| substantiv | 114:*19* | 179:*15* | 11:*2, 14* | 242:*18* |
| e | 137:*16* | 187:*18,* | 33:*16* | table |
| 133:*25* | | *21* | swearing | 72:*16* |
| 216:*23* | supportive | 190:*9* | 153:*11* | 73:*12,* |
| 217:*3, 12* | 56:*8* | 191:*1* | swearing- | *14* |
| subtract | supposed | 192:*4, 6,* | in   33:*16* | 137:*8* |
| 192:*5* | 140:*4, 5* | *15* | swears | 140:*6* |
| | 142:*19* | 196:*21,* | 33:*17* | 146:*5* |
| successful | 219:*15* | *22* | swept | 235:*5* |
| 143:*16* | 242:*8* | 197:*15* | 169:*21* | |

tags
 53:16
take
 8:7
 12:25
 13:3, 10,
23   14:3
 25:4
 29:11
 38:24
 42:4, 11
 44:11,
15   45:3
 46:8
 49:4, 5
 62:24
 65:10,
19   66:5
 67:9, 17
 68:11
 72:1
 76:16,
22
 77:16,
17
 82:23
 92:16,
17   97:6
 101:22
 109:21,
25
 111:2
 113:4
 114:10
 115:25
 116:1
 117:11,
12
 132:18
 137:14
 139:3,
11

 141:20
 146:25
 147:6,
18
 148:7, 8
 151:6,
19
 155:16
 160:10
 162:16
 165:4
 168:14
 176:25
 179:7
 181:4
 182:18
 183:5
 185:24
 195:22
 197:23
 198:16
 202:16,
22, 24
 223:23
 230:16
 232:19
 234:25
 246:8
 249:2, 6
 251:18
taken
 8:10
 9:25
 12:20
 14:23
 16:18
 57:22
 113:23
 137:18
 150:5
 220:21

 246:5,
17   254:4
takes
 233:19
takin
 251:4
talk
 12:7
 15:12,
13, 24
 29:7
 33:8
 40:19
 60:12
 71:19
 72:1
 77:6
 78:22
 106:15
 126:9
 168:15,
16
 172:13
 178:22
 206:7
 228:3
 243:23
talked
 16:1
 78:3
 88:22
 117:16
 147:15
 153:22
 154:16
 186:3
 189:19
 196:6
 212:15
 219:21
 220:1
 225:15

 230:1, 6,
23
 232:11
 248:9, 14
talking
 13:3
 36:17
 41:8
 42:22
 61:17
 62:3
 70:10
 77:2
 78:2
 83:23
 95:10
 114:3
 118:15
 121:21
 122:6
 137:23
 149:15
 152:2
 159:10
 163:6
 210:14
 228:5
 233:17
 236:15
 248:7
 250:12
tanks
 189:13
Tarak
 36:14
 37:10,
19
 38:21
 51:25
 52:2
 53:2
 57:3, 17

 58:9
 60:20
 62:22
 64:4
 68:9
 154:5

tarnishing
 168:13
task
 232:22
taskers
 216:16
tasks
 114:11
taxpayers
 88:5
TDC   8:12
team
 21:16
 25:5
 26:23
 30:19,
20, 21,
23
 31:10,
17, 18,
20   34:3
 35:10,
14, 24
 36:3, 5,
8   37:23
 38:1, 7,
8, 9, 11,
22, 24
 39:7, 9
 43:13,
23, 24
 45:18
 47:21,
24   48:2,
9, 15, 18

49:7, *9,*
*13*  50:*1,*
*2, 3, 6,*
*11, 14,*
*25*  51:*3,*
*7, 18, 22*
52:*13,*
*16, 21*
53:*6, 14,*
*18*  57:*1*
58:*16*
59:*4, 18*
60:*11,*
*21*
62:*13*
63:*5, 22*
65:*21*
66:*10*
70:*24*
71:*23*
72:7
75:*18*
78:*2, 3,*
*15*
79:*12,*
*13, 14*
80:*24*
81:*1, 10,*
*17*  82:*3,*
*4, 6, 7,*
*10*  83:*6,*
*8, 9*
90:*1, 11*
93:*19*
97:3
101:*16,*
*18, 20*
102:*5, 6,*
*21*
103:*16,*
*17, 18*
104:*24*

106:*22,*
*23*
107:*16*
123:*3, 4,*
*6*
129:*19*
135:*11,*
*15, 24*
150:*20*
151:*10,*
*12, 22*
153:*23*
155:*9,*
*10*
161:*14*
162:*8*
165:*5,*
*22*
177:*8*
187:*6*
193:*11*
194:*17*
195:*19*
196:*16*
198:*14*
200:*1*
208:*20*
209:*14*
215:*18*
216:*18*
218:*14*
226:*9,*
*22*
227:*18*
235:*15*
237:*17*
**teamers**
85:*9*
**Teams**
47:*12*
253:3

**team's**
53:3
74:*15*
**tease**
170:*4*
**tech**
59:*14*
60:*13*
**technical**
242:*22*
**technologi
cally**
242:*12*

**technology**
46:*13*
**teed**
154:*5*
**tell**
18:*5*
23:*20*
24:*20*
37:5
39:*24*
52:7
80:*16*
82:*12*
94:3
117:5
131:*9*
134:*13*
135:*6*
143:*18*
146:*17*
155:*25*
182:*16*
198:*22*
208:*2*
214:*6*
216:*11*
231:3
235:*22*

241:*3,*
*10*  242:*8*
**telling**
16:*5*
18:*8*
60:*7, 20*
103:*10*
140:*24*
146:*10*
148:*2*
197:*25*
206:*16*
**templated**
236:*8*
**tends**
28:3
**term**
35:*21*
88:*4*
179:*1*
**terminate**
58:*9*
76:*13,*
*14*
85:*18*
103:*22,*
*23*
108:*12*
112:*15*
116:*16,*
*20*
141:3
142:5

**terminated**
58:7
75:*13*
76:*8*
101:*13*
102:*20*
108:*25*
112:*1*

**terminatin
g**  70:*10*
85:*20*
110:*13*
112:*16*
154:*22*
177:*20*
**terminatio
n**  76:*10*
100:*11*
108:*6*
109:*6, 8,*
*16*
110:*11*
111:*21*
116:*21*
136:*6,*
*20*
139:3
155:*2*
**terminatio
ns**
141:*6,*
*23*  149:*2*
**terms**
87:*10*
133:*25*
154:*11*
172:*4*
173:*13*
175:*8*
189:*22*
**test**
63:*13*
165:*10,*
*11*
**testified**
11:*22*
50:*10*
54:*2*
62:*12*
67:*6*

117:*13*
118:*13*
146:*18*
148:*17*
229:*22*,
*24*
250:*11*

**testifying**
11:*8*
**testimony**
10:7, *8*
11:*14*
14:7
16:*13*,
*18, 20,*
*23*
116:*13*
203:*21*
238:*25*
244:*21*
**Texas**
3:*14*
**text**
45:*23*
191:*20*,
*21, 22*
192:*16*
237:*13*,
*16*
243:*15*
249:*10*
**texts**
14:*8*
**Thank**
10:*25*
11:*12*,
*23*   22:3
23:*9*
134:*3*
243:*25*
253:5, *6*

**Thanks**
251:*12*
**theirs**
82:*17*
**then-**
**acting**
110:*1*
**thereabout**
**s**  64:*12*
**thereof**
149:*3*
254:*12*
**thing**
14:*4*
58:2, *12*
59:*15*
69:*2*
70:*1*
71:*21*
73:*4*
74:5, *7*
78:*11*
83:*16*
85:*13*
96:*25*
100:*4*
121:*13*
128:*25*
134:*23*
141:*9*,
*19*
146:*23*
152:*15*,
*16*
153:*4*
155:*25*
157:*9*
174:*22*
194:*15*,
*22*
201:*23*
212:*16*,

*18*
217:*4*
218:*5*,
*21*
219:*6*
228:*9*
229:*13*
233:*8*
235:*1*
236:*9*,
*19, 24*
237:*14*
247:*14*
**things**
25:*2*
26:*13*,
*18*   28:5,
*9*   29:*17*
36:*7*
40:*8*
41:*9*
44:*4*
49:*18*
50:*4*
55:5, *25*
56:4, *6*
60:*1*
63:*17*
65:*16*
68:*23*
69:*6*
70:*8*
75:2, *7*
79:*24*
81:6, *18*
84:*9*
85:*3*
89:*17*
90:6, *8*
92:*10*
96:3, *25*
97:*23*

99:*20*
102:*22*
106:*17*
108:*22*
110:*21*,
*23*
114:1, 4,
*11, 24*
116:*9*
121:*24*
129:*8*
135:*19*,
*22*
136:*18*,
*19*
138:*4*
139:*17*
144:*19*
146:*8*
154:*10*
155:*12*
161:*2*
166:*17*
167:*14*
168:*17*,
*18*
175:*16*
184:*2*,
*15, 22*
187:*23*
193:*13*,
*17*
194:*8*
198:*16*
199:*16*
200:*15*
202:*8*
212:*12*
215:*1*,
*13*
216:*18*
220:*17*

222:*19*,
*25*
223:*4*,
*14, 16,*
*18, 25*
224:3, 4,
*14, 20*
225:2, *6*
226:*6*,
*10*
228:*12*
229:*9*
231:*10*,
*19, 21*
234:*6*,
*19*   238:*3*
**think**
9:*21*
26:*17*
27:*14*
29:4, *23*
31:*14*
32:*14*
33:*11*,
*13, 14*
34:*9*
35:6, *10,*
*14, 23*
37:*17*
39:7, *17*
40:2, *6*
42:*16*,
*22*
45:*18*,
*23*   51:3,
*25*   52:9
53:*13*
56:2, *13*
57:6, *14*
58:8
59:6, 7,
*8, 16*

60:*15*
62:*16,*
*17*  63:*4,*
*10, 13*
64:*3, 4,*
*7, 8, 10*
65:*4, 15*
67:*19*
68:*19*
71:*2, 6,*
*7, 15, 22*
72:*9, 25*
73:*15*
74:*11*
75:*7, 11*
76:*22*
79:*2, 6,*
*7, 9, 22*
80:*2, 14,*
*15, 17*
81:*2*
82:*11,*
*15*
83:*14,*
*22, 25*
84:*1*
85:*6, 7*
87:*12*
88:*6, 10,*
*12*
93:*16,*
*25*
96:*14*
97:*2, 8*
98:*3, 22,*
*25*  99:*5*
100:*22*
101:*16*
102:*8*
103:*4, 8*
104:*15,*
*16, 21,*

*22, 23,*
*25*
105:*14,*
*15*
106:*6, 7,*
*8, 9*
107:*2*
108:*4,*
*13, 17*
109:*1, 2,*
*4*  111:*7*
112:*13,*
*16*
113:*13*
115:*4,*
*22*
119:*22,*
*24*
120:*22*
122:*15*
126:*1, 2,*
*7*
127:*10,*
*17, 23,*
*24*
128:*22*
134:*17*
135:*5,*
*17*
136:*23*
137:*20*
138:*9,*
*11*
139:*6,*
*14*
140:*2, 3,*
*7, 9, 13*
141:*10*
143:*10,*
*15, 22*
144:*8,*
*13*

145:*10*
146:*10,*
*11*
147:*5*
148:*25*
149:*14,*
*24*
150:*4*
151:*14*
152:*7*
153:*18*
154:*22*
156:*6,*
*12, 15,*
*21*
157:*16*
158:*11*
159:*15,*
*20*
160:*3, 6,*
*7, 18*
161:*13*
163:*4,*
*21, 22*
166:*6, 7,*
*8, 14, 20,*
*21*
167:*8,*
*25*
171:*21*
174:*19,*
*22*
175:*1,*
*18*
176:*10*
178:*6,*
*10, 19*
179:*20,*
*21*
181:*14,*
*16, 18,*
*21, 24*

183:*19,*
*21*
184:*6,*
*18*
186:*24*
187:*17*
188:*2*
189:*13*
192:*8*
194:*3*
200:*8, 9*
201:*12,*
*13, 14*
207:*11*
208:*14,*
*15, 17*
209:*13*
210:*11*
212:*10*
213:*18*
214:*13,*
*25*
215:*8*
216:*10,*
*15, 23*
218:*9,*
*24*
219:*20,*
*22*
220:*8,*
*13, 24*
221:*9*
222:*13,*
*16*
223:*12*
224:*2, 8,*
*9*
225:*10,*
*14*
226:*5, 8*
228:*14,*
*15, 23*

229:*6, 8*
230:*14,*
*15, 19*
231:*7,*
*12, 15*
232:*5*
233:*3,*
*23*
234:*10,*
*12, 13,*
*20*
235:*10*
236:*1, 2*
237:*13,*
*24*
238:*2, 4,*
*5, 6, 8,*
*14, 17*
240:*14*
241:*16*

**thinking**
45:*17,*
*18*
53:*17*
72:*15*
76:*20*
77:*7*
81:*14*
94:*3*
106:*14*
108:*15*
135:*8*
136:*2*
137:*7*
150:*3*
181:*15*
184:*4*
228:*7*
238:*12*

**thoroughly**
90:*18*

| | | | | |
|---|---|---|---|---|
| **thought** | 183:*12* | 59:*21* | 184:*18* | 253:*9* |
| 40:*17* | 228:*1* | 60:*19* | 186:*20,* | 254:*5* |
| 61:*22* | **tidbit** | 61:*20* | *23* | **timelines** |
| 62:*12,* | 229:*7* | 62:*2, 12,* | 190:*7,* | 55:*21* |
| *19* | **tied** | *25* | *15, 18* | **timeline-** |
| 104:*17* | 198:*5* | 63:*11,* | 191:*17,* | **wise** |
| 111:*10* | 238:*2* | *25*  76:*8* | *22* | 200:*10* |
| 125:*17,* | **tight** | 77:*21,* | 192:*5, 6,* | **times** |
| *18* | 68:*3* | *24* | *9*  201:*9* | 45:*15* |
| 153:*16* | 187:*21* | 81:*14* | 206:*22,* | 168:*7* |
| 185:*6* | **Tim** | 83:*22* | *23* | 222:*15* |
| 186:*25* | 34:*22* | 84:*3* | 208:*6, 9,* | **timestampe** |
| 218:*13* | 39:*10* | 86:*1* | *16* | **d**  94:*5* |
| 231:*4* | 105:*4, 7* | 94:*3* | 210:*3, 7,* | **timewise** |
| **thousands** | **TIME** | 99:*18* | *13* | 206:*12* |
| 217:*22,* | 1:*15, 16* | 100:*5* | 212:*13,* | **timing** |
| *23* | 8:*4* | 101:*5* | *19* | 192:*6* |
| **three** | 10:*14* | 104:*8* | 213:*19* | **title** |
| 29:*3* | 17:*25* | 106:*4* | 216:*9* | 22:*21* |
| 34:*21* | 19:*11,* | 110:*9* | 218:*23* | 123:*13* |
| 43:*19* | *16*  20:*6* | 112:*4* | 222:*8* | **today** |
| 60:*15* | 22:*10,* | 130:*10* | 226:*5* | 11:*9, 15* |
| 75:*9* | *17* | 132:*24* | 230:*8* | 13:*16* |
| 113:*13* | 23:*11,* | 133:*2* | 231:*4* | 14:*5* |
| 141:*2* | *14* | 137:*4* | 232:*13,* | 15:*3, 6* |
| 159:*10* | 24:*14,* | 138:*23* | *19, 20* | 18:*6, 8* |
| 179:*11* | *15* | 139:*15* | 233:*10,* | 61:*12* |
| 223:*18* | 25:*22* | 141:*17* | *20* | 63:*4* |
| 231:*21* | 28:*12,* | 145:*3* | 234:*20,* | 186:*12,* |
| 235:*25* | *21* | 146:*8* | *21* | *20* |
| 248:*5* | 30:*14* | 148:*9* | 235:*4,* | 188:*2* |
| **threshold** | 32:*23* | 150:*13* | *11* | 225:*15* |
| 153:*16* | 36:*3, 19* | 158:*5* | 236:*6* | 250:*11* |
| **throwing** | 37:*14* | 164:*2,* | 237:*2, 3* | **Today's** |
| 164:*2* | 42:*10* | *21* | 238:*5, 8,* | 8:*3* |
| 171:*3* | 43:*7* | 169:*17* | *13, 18,* | 16:*7* |
| **Thursday** | 44:*19,* | 171:*1* | *19, 20* | **told** |
| 1:*14* | *22*  47:*9* | 175:*17* | 244:*19* | 25:*10,* |
| 85:*7* | 53:*7* | 177:*17* | 248:*8* | *12*  26:*9* |
| 104:*3, 6* | 56:*12,* | 180:*14* | 249:*5,* | 39:*21* |
| 106:*13* | *18, 21* | 181:*3* | *22, 25* | 55:*14* |
| 156:*5* | 58:*5, 14* | 183:*20* | 251:*13* | 59:*21* |

| | | | | |
|---|---|---|---|---|
| 79:*4* | **totality** | *13* | **transpired** | **truth** |
| 80:*3*, *5*, | 182:*11* | 235:*15*, | 204:*8* | 11:*16* |
| *12* | **totally** | *17* | 227:*25* | 18:*6*, *8* |
| 89:*23* | 130:*12* | **TRANSCOM** | **travels** | **try** |
| 110:*20* | **touch** | 41:*7* | 125:*15* | 13:*1*, *3*, |
| 114:*12* | 135:*2* | | **Treasury** | *12*   38:*8* |
| 115:*8*, | 169:*19* | **transcribe** | 49:*15* | 66:*15* |
| *16* | **touched** | 84:*16* | 50:*15* | 70:*20* |
| 118:*10* | 81:*7* | **transcribe** | 59:*10* | 124:*17* |
| 158:*6* | **touching** | **d**   16:*16*, | **treaties** | 132:*2* |
| 161:*8* | 96:*2* | *19* | 168:*16* | 135:*25* |
| 173:*16* | | 17:*12* | **triage** | 199:*16* |
| 183:*19* | **touchpoint** | 254:*7* | 52:*14* | 204:*20* |
| 202:*23* | 80:*8*, *11* | **transcribe** | 82:*23* | 244:*12* |
| 211:*20* | **tough** | **r's** | 85:*5* | **trying** |
| 212:*20* | 166:*22* | 254:*9* | 92:*9* | 43:*12*, |
| 247:*14* | **Town** | | **triaging** | *14* |
| 248:*10* | 11:*10* | **transcript** | 53:*20* | 71:*22* |
| **tomorrow** | **tracked** | 1:*23* | **trick** | 77:*8*, *9* |
| 58:*2* | 82:*21* | 18:*23* | 77:*8* | 116:*5* |
| 157:*8* | 88:*1* | 131:*12* | **trifecta** | 125:*24* |
| **ton** | **tracking** | 158:*15* | 223:*15* | 131:*25* |
| 72:*16* | 50:*4* | 252:*1*, *5* | **trip** | 132:*1* |
| **tone** | 147:*14* | 254:*8* | 249:*10* | 156:*20* |
| 195:*16* | 191:*25* | **transferri** | **trivial** | 165:*19* |
| **tongue** | **tracks** | **ng**   81:*19* | 194:*15* | 172:*16* |
| 96:*7* | 53:*17* | | **true** | 173:*24* |
| **tool** | 97:*11*, | **transition** | 192:*10* | 184:*15* |
| 178:*13* | *19*, *23* | 28:*3* | 197:*23* | 214:*25* |
| **tools** | **trade** | **transition** | 213:*9* | 229:*21* |
| 178:*13* | 19:*17* | **ed** | 254:*8* | 242:*15* |
| **top** | **trail** | 26:*15* | **truly** | **Tuesday** |
| 43:*21* | 84:*13* | 50:*3* | 238:*5* | 35:*11* |
| 66:*9* | 103:*4* | **translatin** | **Trump** | **tune** |
| 191:*20* | 142:*6* | **g**   167:*9* | 21:*9*, *10* | 216:*3* |
| 205:*15* | 147:*10* | **transmitte** | 208:*3* | **turn** |
| 231:*2* | **trails** | **d**   93:*12* | **trust** | 43:*15* |
| **topics** | 90:*8* | **transparen** | 90:*10* | 69:*2* |
| 12:*8* | **train** | **t**   29:*16* | 152:*13*, | 86:*15* |
| 54:*13* | 40:*16* | 232:*3* | *14*, *16* | 221:*2* |
| **total** | **training** | **transpire** | | **turned** |
| 116:*19* | 234:*11*, | 198:*12* | | 108:*13* |

165:3
188:21
237:4
**turning**
28:5
43:18
87:4
235:21
**TV**
187:14
**Twice**
19:22
153:11
**twisted**
96:7
**Twitter**
31:25
73:6, 8
**two**
14:17
22:22
23:24
24:4, 23, 25
34:21
39:9
42:19
43:6
52:3
60:13
65:18
71:7
75:8
78:11
124:13
140:20
141:10
155:13
160:20
165:7
171:17
178:21

194:4
197:6
199:10
200:14, 15
214:19
221:7
238:21
**tying**
116:24
**type**
71:20
74:5
83:16
85:13
128:25
141:9
152:16
155:25
157:9
193:22
219:6
235:1
236:18
**types**
56:4
60:1
**typo**
97:16
**typos**
144:19

**< U >**
**U.S**    4:3
21:7
26:1
30:24
41:11
99:22
142:8
164:9
168:7

178:13
185:10, 13
223:22
**UCMJ**
65:15
**Ugh**
117:8
**Uh**    13:7
**ultimate**
44:6
66:2
80:14, 15

**ultimately**
27:25
41:10
58:8
70:5
80:17
107:25
130:1, 6
186:25
187:1
188:5
195:6
198:9
220:1
**unclassifi
ed**
169:22
197:2
**unclear**
120:14
**uncomforta
ble**
63:18
190:6
198:23
**uncommon**
54:21

**uncovered**
81:18
**underling**
194:4

**underlings**
187:24

**understand**
15:2
18:13
38:10
42:24
47:8
49:1
58:15
60:21
61:9, 13
64:15
67:2
76:20
77:11
95:12
100:8
125:2, 24
126:7
142:21
147:21
151:4
166:24
167:2
174:2
192:1
193:23
202:4, 10
234:6
248:8
**understand
ing**
45:4

64:24
68:17, 24
74:15
76:7
83:5
93:22
95:19, 21
101:11
107:12
109:14
117:15
121:6
129:25
130:4, 15
136:5
186:5, 19
241:13

**understood**
100:7
106:4, 24
124:11
127:9, 21
176:6
186:3
232:14
233:23
**underutili
zed**
58:14
**unethical**
223:2
**uneven**
221:7
**unfold**
83:16

unfolding
  26:13, 14
unfortunat
ely
  79:23
uniform
  142:4
unique
  53:19
  73:4, 11
Unit
  20:16
UNITED
  1:1
  8:12
  14:14
  21:18
  47:14,
15
  177:24
  221:18
universal
  192:5
universall
y   40:6

University
  19:6, 23
unknown
  184:13
unknowns
  184:13
unpreceden
ted
  63:17
  196:20
unrespectf
ul
  195:24
unsettled
  219:12

unsettling
  219:9
update
  106:10
uploaded
  18:19
upset
  183:18
upstairs
  206:4
upward
  125:22
USAID
  6:13
  14:16,
18, 25
  22:8
  23:18
  24:20
  25:14
  33:10
  37:16
  39:16
  42:9
  46:25
  47:9
  48:8, 10,
15, 18
  50:13,
25   51:3,
7, 12, 23
  52:17,
21   53:3,
6   54:23
  57:8
  63:5
  65:7
  71:15
  78:18,
25   88:9
  91:21

  92:20
  105:11
  107:17
  134:15
  135:12
  139:11
  150:14
  156:17
  163:16
  167:3
  175:2, 3,
7   207:1,
5, 8
  208:4,
15
  217:12
  226:22
  227:21
  228:3
  229:23
  230:10
  235:15
  246:5,
11, 16,
20, 21
  247:5,
11, 24
  248:3,
10, 13, 18
USAID's
  64:16
USDA
  163:16
USDS
  47:13,
19, 25
  48:3
  51:8, 13,
17
use
  22:2
  35:21

  38:15
  53:24
  66:1, 13
  68:25
  70:14
  113:13
  146:20
  148:23
  178:13
  191:10
  238:19
useful
  120:22
user
  206:1
users
  94:7
  95:11,
18, 20
  96:6
USG
  171:5
usually
  141:7
  145:4
  194:8
UTC
  192:4
UTC-5
  192:13
utilize
  165:12
utilizing
  221:3

< V >
Vague
  66:24
  68:15
  74:21
  87:13
  98:4

  109:18
  137:22
  149:22
  150:24
  167:5
  170:10
  217:15
  224:15
  227:22
  228:24
  232:25
  234:8
vaguely
  93:17
  186:4
vagueness
  170:21
valid
  49:17
values
  40:7
valve
  229:16
vantage
  154:14
varsity
  216:1
verbal
  84:10
  89:15
  97:2
  100:22
  101:2
  138:21
  141:23
  143:12
  144:14,
21
  150:15,
20
  153:4,
16

154:*8, 20, 21*
155:*22*
178:*5*
189:*20, 23*
224:*22*
**verbally**
43:*3*
84:*16*
141:*24*
147:*19*
206:*5*
**verbals**
145:*3, 4*
151:*14, 17, 20*
198:*17*
**verbatim**
134:*12*
237:*21*
241:*4*
**verification**
225:*18*
**verified**
58:*13*
**verify**
152:*16*
**versus**
8:*11*
74:*16*
100:*11*
**Vice**
162:*6, 8*
171:*15*
172:*5*
187:*2, 8*
208:*20*
209:*1, 3, 11*
216:*17*

218:*15*
247:*15*
**videographer** 17:*17*
**video-recorded**
8:*9*
9:*24*

**VIDEOTAPED**
1:*10*
**view**
125:*13*
222:*16*
**viewed**
59:*19*
65:*20*
123:*3*
151:*12*
230:*4*
**violates**
14:*25*
**violating**
196:*23*
**virtual**
105:*13, 15*
**virtually**
248:*3*

**visibility**
231:*23*
**vision**
230:*10*
**vocal**
181:*15*
**voiced**
98:*18*
**voluntary**
237:*9*
**Voorhees**
205:*12*

**voracious**
54:*18*
**vote**
203:*10*
**VP** 72:*25*
**VTC**
231:*17*

**< W >**
**wage**
146:*4*
**Wait**
122:*7*
145:*8*
183:*9*
194:*14*
**waiting**
48:*14*
176:*7*
243:*16*
**waiving**
126:*11*
**waking**
219:*15*
**walk**
12:*22*
143:*13*
169:*23*
194:*18*
**walked**
74:*1*
158:*24*
174:*6*
183:*6*
185:*8*
191:*23*
**walking**
49:*21*
60:*7*
106:*14*
149:*20*
150:*3*

184:*5*
186:*17*
**want**
16:*9*
33:*2, 8*
40:*1*
43:*22*
56:*6*
77:*1, 4, 9, 12*
96:*24*
99:*10*
104:*11, 12*
111:*1, 11*
112:*23*
115:*25*
116:*3*
120:*3, 4, 12*
131:*24*
132:*4*
133:*5*
142:*12*
143:*1, 11*
146:*14, 23*
163:*24*
171:*10, 21*
173:*16*
178:*21*
179:*1*
183:*18*
193:*2*
198:*13*
200:*22*
212:*17*
213:*10, 11*

219:*25*
231:7
233:*15*
241:*19, 21, 22*
**wanted**
49:*14*
58:*6*
72:*1*
84:*15*
98:*17*
111:*20*
114:*18*
136:*15*
139:*20*
145:*12*
171:*12*
172:*4*
173:*14*
188:*11*
199:*3, 24*
203:*16*
220:*3*
221:*23*
229:*18*
**wants**
127:*13*
160:*23*
164:*13, 14*
174:*7*
217:*20*
**warm**
112:*9*
174:*17*
204:*6*
**warn**
77:*1*
**WARREN**
3:7
8:*21*

10:*16*
242:*6,*
*20, 25*
243:*9, 12*

**Washington**
3:*6*    4:*7*
**watched**
140:*9*
182:*12*
**watching**
83:*16*
188:*2*
214:*16*
216:*2*
221:*21*
234:*16*
**watered**
175:*9*
**way**
29:*7*
31:*20*
36:*22*
39:*20*
50:*4*
62:*11*
73:*23*
81:*19*
84:*2*
88:*6*
146:*19*
147:*17,*
*23*
148:*11,*
*22*
149:*7*
150:*14*
163:*25*
169:*25*
174:*18*
179:*23*
180:*19*

182:*16*
184:*2*
193:*2*
199:*20*
201:*20,*
*21*
203:*13*
215:*14*
218:*21,*
*25*
220:*5*
231:*5,*
*22*
232:*9,*
*15*
233:*23*
234:*6*
237:*1*
244:*4, 5*
254:*12*
**ways**
52:*9*
125:*15*
202:*19*

**weaknesses**
34:*10*
**website**
246:*5*
**week**
22:*18*
30:*20*
31:*13*
33:*9, 23*
34:*10*
35:*11*
42:*17,*
*18*
43:*18*
44:*10*
49:*12*
54:*11*

61:*22*
66:*22*
67:*15,*
*16*
68:*14,*
*18*    69:*6,*
*22*    78:*9*
80:*1*
107:*13,*
*17*
111:*15*
113:*7,*
*17*
155:*13*
161:*15*
165:*7*
166:*10,*
*17*
170:*4*
176:*25*
178:*21*
196:*11*
210:*3*
212:*21*
228:*1, 4,*
*14*
231:*14*
**weekend**
38:*14,*
*21*    39:*15*
**weeks**
42:*19*
78:*11*
155:*13*
160:*20*
**weird**
195:*15*
**welcome**
130:*25*
**well**
9:*17*
22:*17*

34:*1, 22*
42:*18*
61:*23*
63:*10*
65:*15*
69:*9*
73:*2, 10,*
*15*
76:*21*
80:*14,*
*25*    82:*5*
85:*15*
97:*15*
101:*14*
107:*6*
108:*13*
110:*6, 7*
111:*15*
115:*25*
126:*4*
130:*25*
135:*4*
136:*10*
144:*8*
152:*5*
156:*18*
158:*16*
160:*7*
176:*3*
181:*1*
182:*1*
185:*2*
194:*23*
195:*22*
199:*13*
202:*3*
204:*8*
210:*14*
214:*12*
218:*19*
219:*24*
220:*6*

225:*10*
227:*14*
235:*5,*
*12*
237:*24*
238:*22*
240:*14*
**WEN**    4:*8*
5:*5*
8:*23, 24*
10:*20*
27:*7*
30:*6*
32:*9, 25*
44:*11*
47:*1, 4,*
*16*
48:*11*
52:*22*
60:*25*
61:*4*
63:*6*
64:*17*
65:*1*
66:*24*
68:*15*
74:*19,*
*21*
76:*24*
77:*15*
84:*24*
86:*4*
87:*13*
89:*3, 9*
91:*3, 16,*
*23*    98:*1,*
*19*
100:*18*
102:*25*
105:*17*
109:*17*
116:*12*

118:22
119:10
120:3, 8
121:8, 15
122:11, 15
123:17, 22
124:1, 15
125:5, 10
128:12
130:8, 21
132:13
133:4, 17, 21
134:2
137:21
140:15
142:1, 14
143:4
144:9
145:19
148:12
149:8, 22
150:17, 24
151:23
152:2, 17, 21
153:5
159:17
160:15
162:22
167:4, 22
170:10

173:9, 21
175:23
176:2
177:1
178:7, 9
180:9
182:6
184:6
186:8, 14, 21
188:13
189:25
190:9
192:8, 11
203:20
207:2, 19
208:23
209:8, 22
210:25
211:7, 12, 17
212:1
214:9
217:15
218:10
220:13
222:22
223:7, 9
224:15
225:11
227:22
228:24
230:11
232:25
234:8
238:21
241:9, 16

242:2, 21
243:4
246:14, 23
247:17
248:20
249:8, 18
250:3, 7, 9, 10, 20
252:5, 7, 13, 18, 20   253:2

**went**
27:2
60:16
96:10
133:10
151:21
154:10
156:14
181:4
195:19
196:4
216:14, 19
235:17

**we're**
12:25
14:8, 21
17:24
23:13
28:25
36:24
37:20
39:11
40:7
44:21
53:15
71:3, 7
77:23

81:4
85:11, 18
97:21
100:22, 25
101:21
102:14
103:7
105:23
111:16
116:5
117:8
119:21
122:15
125:24
126:1, 10, 20
131:10, 23
133:1
137:8
157:7, 8
160:24
164:14, 15
165:10, 11
170:25
174:21
175:4
176:3, 22
180:25
181:23
183:9, 14, 15
190:12, 17
196:16
197:15
200:3

203:11
210:5
215:3, 4
221:13
225:2
230:15, 16
231:23, 25
232:2, 3
240:3
243:7, 16
247:16
249:24
251:7, 8, 22   253:1

**West**
3:12

**Westin**
11:10

**we've**
12:11
81:2
130:21
140:7
198:4
225:14

**wharfs**
163:18

**whirlwind**
165:22, 23

**White**
23:22
25:9
28:24
29:22
31:6
32:17
35:9, 19, 24

| | | | | |
|---|---|---|---|---|
| 43:*11* | **wholesale** | **wired** | *24* | 240:*16,* |
| 44:*6* | 69:*14,* | 68:*3* | 151:*2* | *19* |
| 48:*23* | *20, 21* | **wisdom** | 152:*5,* | 241:*19,* |
| 49:*2* | 155:*2* | 220:*21* | *18* | *21, 24* |
| 50:*18* | 169:*20* | **WITNESS** | 153:*8* | 246:*24* |
| 65:*24* | 178:*16* | 1:*13* | 159:*20* | 247:*22* |
| 66:*9* | **wide** | 11:*2, 3,* | 160:*17* | 248:*22* |
| 67:*21,* | 81:*8* | *21, 24* | 167:*6,* | 249:*1, 9* |
| *25* 74:*2,* | **wield** | 15:*4* | *23* | 250:*21* |
| *3, 4, 5* | 66:*3* | 32:*12,* | 170:*11* | 251:*5, 7,* |
| 95:*25* | **wife** | *21* | 173:*10,* | *10, 14, 17* |
| 105:*10* | 29:*8* | 48:*13* | *23* | **witnessed** |
| 151:*8,* | 183:*18* | 52:*25* | 176:*3* | 156:*19* |
| *11* | 185:*9* | 64:*19* | 177:*4* | 169:*3* |
| 160:*19,* | 213:*3* | 65:*4* | 178:*8,* | 175:*21* |
| *22* | 219:*14,* | 66:*25* | *10* | 182:*11* |
| 161:*14* | *17* | 74:*20,* | 180:*11* | 225:*19* |
| 162:*5* | 220:*5* | *24* 77:*6,* | 182:*8* | |
| 164:*10* | 237:*23* | *12* 85:*1* | 184:*9* | **witnessing** |
| 170:*21* | 249:*11* | 87:*15* | 186:*9,* | 214:*16* |
| 171:*16,* | **Wiles** | 89:*4, 11* | *15* | **witting** |
| *17* | 174:*4, 17* | 91:*5, 17* | 188:*15* | 143:*10* |
| 172:*13,* | **willing** | 98:*2, 22* | 190:*2* | 155:*17* |
| *15, 18,* | 25:*3* | 100:*20* | 192:*14* | 164:*21* |
| *25* | 110:*22* | 103:*3* | 203:*22* | 170:*24* |
| 174:*4,* | 146:*4* | 109:*20* | 209:*5,* | 171:*18* |
| *11, 21* | 168:*20* | 116:*15* | *10, 23* | 182:*14* |
| 176:*18* | 185:*24* | 118:*25* | 211:*2,* | 187:*3* |
| 178:*21* | 188:*3* | 119:*6,* | *13, 18* | **witting-** |
| 180:*1* | 202:*22,* | *17* | 212:*3, 7* | **ness** |
| 183:*1* | *24, 25* | 120:*18* | 214:*11* | 188:*4* |
| 185:*5* | **willy-** | 124:*18* | 217:*17* | **wonderful** |
| 186:*4, 6* | **nilly** | 125:*7* | 218:*12* | 213:*13* |
| 196:*19* | 204:*21* | 126:*3, 9* | 219:*9* | 220:*19* |
| 213:*14* | **win** | 130:*9* | 220:*16* | **wondering** |
| 215:*15* | 154:*6* | 137:*23* | 223:*8* | 212:*22* |
| 218:*15* | **window** | 142:*3,* | 224:*16* | |
| 228:*10* | 104:*18,* | *16* | 225:*14* | **wonderment** |
| 232:*2* | *19* | 143:*8* | 227:*24* | 53:*9* |
| 236:*12,* | **winningly** | 144:*13* | 229:*1* | 54:*3* |
| *13* | 74:*3* | 145:*22* | 230:*14* | **word** |
| | | 149:*11,* | 233:*3* | 53:*10* |

65:*13*
68:7
82:*17, 19*
144:*16*
146:*21*
148:*23*
214:*5*
**words**
60:*15*
65:*15, 16*
73:*17*
75:*25*
89:*18*
108:*9, 10*
116:*6*
132:*10*
135:*5, 6*
136:*16*
139:*19*
144:*18*
156:*20*
158:*14, 21*
159:*14*
165:*11*
170:*22*
172:*11*
173:*15*
182:*24*
183:*10, 13*
184:*10*
201:*12, 14, 17*
237:*20*
238:*13*
**work**
26:*19*
29:*10*

39:*8, 25*
48:*3*
69:*17*
90:*8*
97:*18*
120:*20*
147:*24*
167:*7*
183:*23*
185:*11*
198:*13*
201:*3*
202:*1*
204:*15*
216:*14*
218:*1*
220:*2*
221:*4*
228:*11*
236:*2*
246:*20*
248:*23*
**worked**
20:*3*
21:*18*
34:*1*
54:*21*
59:*13*
65:*6, 7*
72:*17*
73:*6*
74:*25*
112:*18*
177:*12*
189:*12, 13*
198:*21*
**worker**
81:*9*
**workers**
69:*15*
141:*24*

**workforce**
57:*12*
**workhorse**
135:*25*

**workhorses**
102:*12*
**working**
21:*15*
29:*15*
33:*10*
55:*2*
58:*3*
72:*7*
73:*3, 5, 20*
74:*16*
75:*6*
91:*21*
175:*19*
181:*24*
196:*12*
206:*5*
215:*13*
217:*2*
235:*15*
**workload**
25:*16*
**works**
28:*2*
120:*19*
177:*12*
**world**
144:*24*
168:*3*
199:*9*
214:*23*
**worries**
12:*16*
**worry**
142:*24*

**worth**
28:*11, 12*
185:*10*

**worthwhile**
26:*2*
**would've**
139:*6, 19, 22*
**Wow**
57:*20*
76:*20*
**wrapped**
108:*10*
**write**
154:*9, 11*   227:*6*
**writing**
84:*12*
111:*20, 21*
114:*24, 25*
139:*17, 22*
140:*1, 14, 19*
141:*25*
144:*17, 22*
145:*12*
150:*16, 22*
170:*9, 13*
171:*23*
196:*22*
213:*10*
**written**
89:*13*
94:*18,*

*23*   95:*1, 4*   96:*8, 19, 20*
97:*1*
112:*19*
138:*17*
144:*17*
145:*3, 5*
152:*13*
155:*5, 7*
**wrong**
94:*9*
101:*24*
146:*19*
147:*23*

**wrongdoing**
84:*6, 23*
86:*3, 6*
89:*19*
97:*4*
**wrote**
83:*15*
191:*21*
235:*24*

**< X >**
**XYZ**
127:*13*

**< Y >**
**yeah**
24:*11, 22*   31:*8*
33:*5, 7, 24, 25*
34:*3, 19*
35:*1, 9*
36:*4*
37:*7, 13*
39:*11*
40:*21*

42:*1*
43:*8, 17*
45:*6, 14*
53:*17*
55:*20*
57:*23*
58:*1, 13*
59:*1, 14*
60:*12*
62:*16*
63:*10, 20*   67:*4*
69:*19*
70:*1, 22*
72:*25*
74:*5*
75:*7*
79:*7, 11, 16, 22*
82:*5*
85:*1*
86:*18*
87:*25*
88:*10, 12, 14*
89:*4, 11*
90:*2*
91:*5, 6, 8, 12*
92:*4*
93:*23*
94:*2*
95:*4*
98:*2*
101:*14*
102:*8*
103:*8*
104:*6, 15*
105:*6, 21*
107:*18,*

*21, 24*
108:*18*
109:*9, 20*
110:*16*
111:*11*
115:*4, 22, 24*
116:*5*
117:*25*
119:*21*
120:*11, 25*
122:*4*
124:*14, 18*
125:*7*
127:*9*
128:*14*
129:*3*
137:*17*
139:*6, 14, 18*
141:*11*
142:*21*
143:*8, 11*
145:*16*
146:*6, 20, 22*
147:*14*
149:*4*
151:*15*
152:*13*
153:*3, 7*
154:*1, 22*
157:*25*
160:*17*
167:*6*
171:*9*
172:*9*

173:*10, 11*
175:*20*
176:*2*
177:*4*
178:*9*
180:*3, 11*
181:*8*
183:*20, 24*
184:*9*
185:*14, 18, 25*
186:*1, 9, 15*
187:*12*
188:*3*
190:*2, 5*
191:*6, 19*
192:*16*
199:*23*
200:*8, 19*
201:*10*
203:*22*
205:*17, 21*
206:*10*
207:*13*
208:*5*
209:*25*
210:*10, 20*
212:*10*
214:*11*
216:*14*
217:*17*
218:*12*
220:*16*
222:*6*

224:*16*
225:*23*
229:*1*
230:*14*
231:*8*
232:*6, 17*
233:*15*
234:*23*
235:*18, 24*
240:*17*
241:*18, 20, 25*
242:*23*
243:*9, 22*
244:*11*
249:*9*
250:*17, 19, 22*
251:*5*
252:*8*
**year**
42:*13, 14, 15*
43:*4*
44:*10*
89:*18*
93:*24*
94:*8*
177:*13*
188:*2*
230:*5*
**year-plus**
177:*6*
**years**
19:*12*
43:*19*
44:*9*
49:*5*
73:*19*

112:*18*
175:*19*
185:*4*
**yellow**
204:*2*
**York**
2:*16*
8:*7*
229:*3*
**young**
72:*12*
**younger**
204:*13*

**< Z >**
**Zeus-like**
177:*15*
**zone**
198:*23*
224:*20*
**zoo**    72:*1*
**Zoom**
23:*24*
38:*5*
52:*4*
56:*25*
160:*10*
231:*17*
242:*10*

# Exhibit 14

UNITED STATES DISTRICT COURT

for the

District of Maryland


J. DOE 4 et al.

       Plaintiff

v.             Civil Action No. 8:25-cv-00462-TDC

ELON MUSK et al.

       Defendant

_____


VIDEOTAPED DEPOSITION OF


GAVIN KLIGER


TAKEN ON

TUESDAY, JANUARY 6, 2026

2:06 P.M.


COHEN MILSTEIN SELLERS AND TOLL PLLC

1100 NEW YORK AVENUE NORTHWEST, SUITE 800

WASHINGTON, DC 20005

Page 2

APPEARANCES

Appearing on behalf of the Plaintiffs:

ANDREW WARREN, ESQUIRE

TIANNA MAYS, ESQUIRE

State Democracy Defenders Fund

600 Pennsylvania Avenue Southeast, Suite 15180

Washington, DC 20003

(202) 594-9958

andrew@democracydefenders.org

tianna@democracydefenders.org

-and-

REBECCA (BETH) STEVENS, ESQUIRE

JOAQUIN GONZALEZ, ESQUIRE

Marziani Stevens & Gonzalez, PLLC

1533 Austin Highway, Suite 102-402

San Antonio, TX 78218

(210) 343-5604

bstevens@msgpllc.com

jgonzalez@msgpllc.com

Page 4

APPEARANCES (CONTINUED)

Appearing on behalf of the Defendants:

CHRISTOPHER LYNCH, ESQUIRE

JACOB SILER, ESQUIRE

JAMES WEN, ESQUIRE

SARAH WELCH, ESQUIRE

U.S. Department of Justice - Civil Division

1100 L Street Northwest, Rm 11206

Washington, DC 20005

(202) 353-4537

christopher.m.lynch@usdoj.gov

jacob.s.siler@usdoj.gov

james.j.wen@usdoj.gov

Appearing on behalf of the Deponent:

BRADLEY P. HUMPHREYS, ESQUIRE

King Street Legal, PLLC

800 Connecticut Avenue Northwest, Suite 300

Washington, DC 20006

(276) 696-1981

brad@kingstlegal.com

Page 3

APPEARANCES (CONTINUED)

Appearing on behalf of the Plaintiffs:

RICHARD HEIMANN, ESQUIRE

NICOLE RUBIN, ESQUIRE

KELLY DERMODY, ESQUIRE

Lieff Cabraser Heimann & Bernstein, LLP

275 Battery Street, 29th Floor

San Francisco, CA 94111

(415) 956-1000

rheimann@lchb.com

nrubin@lchb.com

kdermody@lchb.com

Page 5

APPEARANCES (CONTINUED)

Also Present:

Jehieli Luevanos-Ovalle, Paralegal, State Democracy

Defenders Fund

Maya Cook, Legal Program Associate, State Democracy

Defenders Fund

Page 6

EXAMINATION INDEX

                                                    PAGE

EXAMINATION BY MR. WARREN                            10

Page 7

EXHIBIT INDEX

EXHIBIT                                              PAGE

1  ESTABLISHING AND IMPLEMENTING THE       52
   PRESIDENT'S DEPARTMENT OF GOVERNMENT
   EFFICIENCY
2  EMAILS REGARDING (SBU) ADMINISTRATIVE    78
   LEAVE NOTICE
3  EMAILS REGARDING PHYSICAL AND LOGICAL    82
   ADMINISTRATION FOR GAVIN
4  USAID CCURE 9000 USER ACCOUNT REQUEST    89
5  DECISION TO PUT USAID EMPLOYEES ON      108
   ADMINISTRATIVE LEAVE ON FEBRUARY 3, 2025
6  DECISION TO PUT USAID EMPLOYEES ON      108
   ADMINISTRATIVE LEAVE ON FEBRUARY 4, 2025
7  MESSAGE FROM SAM STEIN                  120
8  MESSAGES FROM ELON MUSSK AND MIKE BENZ  134
9  MESSAGE FROM ELON MUSK                  138
10 EMAIL REGARDING WHAT DID YOU DO         141
   LAST WEEK
11 HR ANNOUNCEMENT REGARDING INCIDENT      147
   INC3715338
12 MEMORANDUM REGARDING SPECIFIC NOTICE    150
   OF REDUCTION OF FORCE
13 EMAILS REGARDING CFPB RIF WORK          177

Page 8

EXHIBIT INDEX CONTINUED

EXHIBIT                                              PAGE

14 PUBLIC FINANCIAL DISCLOSURE REPORT      179
   (OGE FORM 278E)
15 X POST                                  186

Page 9

VIDEOTAPED DEPOSITION OF

GAVIN KLIGER

TAKEN ON

TUESDAY, JANUARY 6, 2026

2:06 P.M.

THE VIDEOGRAPHER:  We are on the record. The time is 2:06 p.m., and the date is January 6, 2026.

This is the beginning of the deposition of Gavin Kliger.  The case caption is J. Does 1 through 26 vs. Department of Government Efficiency DOGE.

Will counsel introduce yourselves and state whom you represent.

MR. WARREN:  Andrew Warren from Democracy Defenders Fund.

MS. STEVENS:  Beth Stevens for the plaintiffs.

MS. MAYS:  Tianna Mays for the plaintiffs.

MR. GONZALEZ:  Joaquin Gonzalez for the plaintiffs.

MS. LUEVANOS:  Jehieli Luevanos for the plaintiffs.

MR. SILER:  Jacob Siler for the defendants.

Page 10

MR. HUMPHREYS: Bradley Humphreys for Mr. Kliger.

MR. LYNCH: Chris Lynch for Defendants.

MR. WEN: James Wen for Defendants.

MS. WELCH: Sarah Welch for Defendants.

THE VIDEOGRAPHER: The court reporter will now swear in the witness.

THE REPORTER: All right. Mr. Kliger, would you please raise your right hand.

Do you affirm under the penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MR. KLIGER: Yes.

THE REPORTER: All right. We may proceed.

MR. WARREN: Thank you.

GAVIN KLIGER, having duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. WARREN:

Q. Mr. Kliger, good afternoon again. My name is Andrew Warren. I'm an attorney with Democracy Defenders Fund. I'm here representing the plaintiffs in the case.                    Can you please state your full name for the record?

A. Gavin Kliger.

Page 11

Q. And you were subpoenaed to be here today to testify; correct?

A. Correct.

Q. I'm going to be asking you questions. At the end of the deposition other parties may ask you questions as well. Counsel may object to questions that I ask. You're still required to answer unless instructed to do so. Do you understand?

A. Unless instructed not to do so?

Q. Unless instructed not to answer the question.

A. Yes, I understand.

Q. I'm going to be asking you about things that you know and some things you may not know today. Please don't speculate or guess unless you're specifically asked. Does that make sense?

A. Yes.

Q. If you don't understand a question you can ask me to clarify it. Otherwise I'm going to assume you understood the question. Agreed?

A. Yes.

Q. And as you know, the court reporter is transcribing. There's a videographer recording. And you've been placed under oath; correct?

A. Yes.

Page 12

Q. Any reason why you can't be truthful today?

A. No.

Q. During the deposition if we need to take a break we can do so. I'd ask that you not communicate with anyone else except for your counsel regarding the deposition. That's talking, messaging -- nothing. Do you understand?

A. Yes.

Q. And if you talk with counsel I'd ask that you not discuss the substance of your testimony or of the issues that we're discussing today. Do you understand?

A. Yes.

Q. Have you been deposed before?

A. No.

Q. Have you ever given prior testimony under oath?

A. Not that I'm aware of.

Q. You don't remember or not that you're aware of?

A. Can you define "prior testimony"?

Q. Sure. Have you testified in a court hearing before?

A. No.

Page 13

Q. Have you testified before a congressional committee or a state-level committee?

A. No.

Q. Have you ever provided information to criminal or civil authorities as part of a criminal or civil investigation?

A. An investigation? Not that I'm aware of.

Q. Before coming here today did you have conversations with anyone about your deposition?

A. Yes.

Q. Who did you speak with?

A. I spoke with my attorney.

Q. Who else?

A. The DOJ legal team.

Q. Reporting to Mr. Siler?

A. The whole DOJ legal team.

Q. Let's talk about your discussions with Mr. Humphreys. Not going to get into the substance of anything you discussed. But did you review any documents in preparation for your testimony that he provided to you?

A. The DOJ team provided documents.

Q. DOJ provided documents? Okay. So Mr. Humphreys did not provide you with any documents in preparation for your testimony?

Page 14

A.    Not that I'm aware of.

Q.    Okay.  So you said you had conversations with government counsel.  When did you first meet them?

A.    Yesterday.

Q.    How long did you meet with them for?

A.    I couldn't say the exact length.  Several hours.

Q.    Okay.  And tell me the nature of the discussion and the meeting?

MR. SILER:  Objection.  Calls for information protected by the attorney work product and attorney-client privilege.  Instruct the witness not to answer.

BY MR. WARREN:

Q.    Well, let's get into some specifics.  You talked about your preparation for this deposition --

A.    Yes.

Q.    -- with government counsel?  You talked about facts regarding your time with the government?

MR. SILER:  Objection.  Calls for information protected by the attorney-client privilege, the attorney work product doctrine.  Instruct the witness not to answer.

BY MR. WARREN:

Page 15

Q.    Were you shown any documents by government counsel?

A.    How --

MR. SILER:  You can answer yes or no.

THE DEPONENT:  I think I -- we already answered that.

BY MR. WARREN:

Q.    Okay.  Did those documents help refresh your recollection in any way -- help you remember the things that were relevant today -- to today?

A.    To an extent certainly.

Q.    Okay.  I would like to have a copy of those documents under Rule 612.  Without providing substantive answers, did the Government provide you with any information to assist in your being deposed today?

MR. SILER:  Objection.  Calls for information protected by the attorney-client privilege, the attorney work product doctrine.  Instruct the witness not to answer.

MR. WARREN:  I'm not asking him about the substance.  I'm asking if he was given any information.

MR. SILER:  Okay.  All right.

MR. WARREN:  It's a yes or no.

Page 16

MR. SILER:  You can answer yes or no.

THE DEPONENT:  We were -- can you elaborate?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.    Did the Government provide you with any information -- tell you any facts, give you any documents, show you any materials --

A.    We've already established that the Government provided documents.  And therefore your question was answered.

Q.    Okay.  In addition to the documents that they provided did they provide you orally with any information relevant to your testimony today?  And this is factual information.

A.    Not that I'm aware of.  I mean, we discussed basic, general facts certainly.

Q.    Okay.  Did you speak with anyone about the deposition after your meeting with government counsel?

A.    Yes.

Q.    Anyone other than Mr. Humphreys?

A.    You're talking did I discuss which -- what with --

Q.    After you met with government counsel

Page 17

yesterday in preparation for today did you speak with anyone else about that meeting?

A.    About the meeting?  No.

Q.    What's your understanding of this case?

MR. SILER:  Objection, vague and ambiguous.

MR. WARREN:  You can answer.

THE DEPONENT:  Can you clarify your question?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.    What do you understand this case is about?

A.    Thank you.  My understanding is that this case is about the United States Agency for International Development -- actions that took place there.

Q.    Do you know who the plaintiffs in the case are?

A.    I believe the plaintiffs are the Doe 4.  I assume USA employees.

Q.    Have you reviewed any filings in this case -- the complaint, any of the motion papers filed by counsel?

A.    It's possible I've like glanced at some.  Nothing in any detail.

Page 18

Q.  Have you done any other research into the facts or allegations in this case?

A.  No.

Q.  Have you read any of the Judge's orders or opinions on the case?

A.  Not in any detail.

Q.  But you have reviewed them?

A.  A judge's order like a piece of paper like written by a judge or something?

Q.  Yes.

A.  No, I don't think so.

Q.  What's your current address?

A.  

Q.  

A.  

Q.  And Mr. Kliger, where are you from originally?

A.  Originally from Orange County.

Q.  How old are you?

A.  I am 26.

Q.  We'll talk a little bit about your

Page 19

education and your employment history.  I'll try to go through this quickly.  But please correct me if I'm wrong in anything.  You have a degree in electrical engineering and computer science from UC Berkeley?

A.  Yes.

Q.  That's from May 2020?

A.  That is correct.

Q.  And that's your only post-secondary degree like after high school?

A.  Yes.

Q.  Your employment history -- you were an engineering intern at Twitter from May to August 2019; is that correct?

A.  I couldn't say the exact months.  But yes.

Q.  2019?

A.  Yes.

Q.  For less than a year?

A.  In 2019, yes.  I think May to August would be less than a year; correct.

Q.  I'm sorry.  I wasn't asking whether May to August is less than a year.  I'm asking whether your time at Twitter -- your employment history -- was less than a year?

A.  Okay.  So to clarify, I said yes, I worked

Page 20

at Twitter from May to August in that time.  And I'm confirming that yes, that time period would be less than one year.

Q.  Understood.  Thank you.  You were an Excel Scholar from August '19 to July of 2020?

A.  I mean, I couldn't tell you the exact end date.  That's like a program at Berkeley.  I mean, once you're inducted you're like -- I don't know. I'm probably still sort of a member.

Q.  You worked at Databricks as a senior software engineer?

A.  Correct.

Q.  From when to when?

A.  It would have been when I graduated in 2020 until my -- joined government service.

Q.  Do you know Elon Musk?

A.  Define "know."

Q.  Have you ever met him?

A.  Yes.

Q.  When did you first meet him?

A.  Likely early January of 2025.

Q.  You never met him prior during your time at Twitter?

A.  At that time Twitter was not connected to Elon Musk.  That acquisition was a different time

Page 21

period.

Q.  So that's a no?

A.  Yes.

Q.  Okay.  And you'd not met him prior to January 2020 -- 2025?

A.  Correct.

Q.  Okay.  What was the nature of your first meeting?

A.  I don't recall.

Q.  Where did you meet him?

A.  Likely the SpaceX building in DC.

Q.  What was the purpose of the meeting?

A.  To the best of my recollection the purpose of the meeting would have been likely a group meeting to talk about, you know, kind of the ideals that would underpin kind of the DOGE movement.

Q.  And you said January 2025; correct?

A.  Correct.

Q.  Do you recall the exact date?

A.  No.

Q.  Was it prior to or after the inauguration --

A.  This would have been prior to the inauguration.

Q.  What else can you tell me about that

Page 22

meeting?  How long was it?

A.   I don't recall.

MR. SILER:  Objection, compound.

BY MR. WARREN:

Q.   Who else was there?

A.   I don't recall.

Q.   Can you estimate the number of people who were there?

A.   It would be probably more than like five.

Q.   Fewer than ten?

A.   Don't recall.

Q.   How many times have you met Mr. Musk?

A.   Probably fewer than 20.

Q.   Well, let's talk about some of the other 19 then.

MR. HUMPHREYS:  Objection.

MR. SILER:  Objection, misstates prior testimony.

BY MR. WARREN:

Q.   Describe your relationship with Mr. Musk?

A.   I, you know, knew him as he was involved in kind of the thought leadership behind the ideas of DOGE and was tasked with the President with, you know, making the government efficient -- combating waste, fraud, and abuse.

Page 23

Q.   Is your relationship with Mr. Musk -- would you describe it as professional, social, or both?

A.   Professional.

Q.   The roughly 20 times or so -- or fewer than 20 times that you've met with him -- they've been all professional?

A.   Correct.

Q.   Ever had a meal with him?

A.   Not that I recall.

Q.   Ever attended a social event with him?

A.   Social events meaning?

Q.   As opposed to a professional meeting.

A.   Yeah, I think there's a lot of overlap between, you know, what a -- certainly prior to January 20th like what would be considered like professional or social.  Like if you go to some dinner and you're discussing the ideologies of DOGE that's how I kind of characterize that.

Q.   And did you have those types of meetings with Mr. Musk?

A.   These would be like a group dinner certainly.

Q.   Have you ever interacted with him outside of those meetings?  For example over email, text, or

Page 24

call.

A.   Not that I recall.

Q.   Do you have his cell phone?

A.   No.

Q.   Do you have any way to contact him other than face-to-face meetings?

A.   No.

Q.   Email address?

A.   It's possible I knew some government email address at some point.  But I don't think I ever sent to it.  And I never called him.

Q.   And to the best of your recollection you've never done email, texted, spoken with him over the phone -- anything like that?

A.   Not to my recollection.

Q.   Okay.  So to be clear, all your interactions with him -- again I'm ballparking the 20 times.  I know you said approximately --

A.   I said fewer than --

Q.   -- fewer than 20 have been in person?

A.   Correct.

Q.   No Signal -- anything like that or similar application?

A.   Correct.

Q.   Okay.  What's the last -- when was your

Page 25

last interaction with him?

A.   I suppose it would have been in October.

Q.   Okay.  What was that?

A.   It might have been November.  It would have been the kind of reunion event for DOGE.

Q.   Tell me about the reunion event, please.  What was it?  Where was it?  Who was there?

MR. SILER:  Objection, compound.

THE DEPONENT:  Can you restate the question?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.   Do you remember what I asked?

A.   Can you restate it?

Q.   Yeah.  Where was that meeting?

A.   Where was that meeting?  It would have been in Austin, Texas.  And when we say "meeting" I assume we're referring to just the general reunion.

Q.   And how many people were there?

A.   More than 50.

Q.   And what was the purpose of it?

A.   Social reunion.

Q.   Mr. Kliger, what's your current position with the government?

A.   I am the Chief Data Officer of the

Page 26

Department of War.

Q. I'm sorry, the Department of?

A. War.

Q. Your LinkedIn page says you're a special advisor at OPM. Is that no longer accurate?

A. That is correct.

Q. Were you a special advisor at OPM?

A. I was a senior advisor to the director for technology and delivery at the Office of Personnel Management.

Q. Since when?

A. Since January 20th.

Q. And when did you stop in that position?

A. I believe the handoff was December 28th of last year. But I could be off.

Q. And how long have you been at the -- what you described as the Department of War?

A. Approximately six months.

Q. What are your responsibilities there?

A. The responsibilities vary. I oversee data policy. I oversee some of the AI strategy as it relates to data for the department across war fighting, intelligence, enterprise.

Q. What's the Department of Government Efficiency?

Page 27

A. I think it can be defined many different ways.

Q. How would you define it?

A. You know, a group of like-minded individuals who serve at the behest of the President.

Q. What's the purpose of the Department of Government Efficiency as you understand it?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Sure.

BY MR. WARREN:

Q. What's the purpose or mission of the Department of Government Efficiency?

A. I understand the purpose of the group that I described as like a kind of ideological group. I think the purpose is just to connect like-minded people who are concerned about fraud, waste, and abuse.

Q. And who is in charge of the Department of Government Efficiency?

MR. SILER: Objection, vague and ambiguous as to DOGE.

Page 28

THE DEPONENT: As I noted earlier, Department of Government Efficiency is a group of like-minded individuals. I mean, and you're asking what the purpose of that is. The purpose is to --

BY MR. WARREN:

Q. My question was who's in charge?

A. Who's in charge? There's no one in charge of something like that.

Q. Have you ever heard of the US DOGE Service?

A. Yes.

Q. What's the US DOGE Service?

A. My understanding is it's an office tasked with carrying out digital work across government.

Q. Who's in charge of the US DOGE Service?

A. I believe the administrator is Amy Gleason.

Q. Are you familiar with the US Digital Service?

A. At a high level.

Q. What's your understanding of what that is?

A. A group to employ technology across the government.

Q. Are you aware of the -- something called the US DOGE Service Temporary Organization?

Page 29

A. No.

Q. We talked about the Department of Government Efficiency and the US DOGE Service. Is there a difference between the two in your mind?

A. Yes.

Q. And what is it?

A. One is kind of a group of people who, you know, work in government at the behest of the President and share similar ideas around fraud, waste, and abuse. The other would be a group that's like a formal, structured organization under the Executive Office of the President.

Q. Your prior position at OPM that we discussed -- did that overlap with your position -- your current position?

A. No, I believe there was a transition on the 20th.

Q. Did you ever work for the Department of Government Efficiency -- DOGE?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: You're referring to the US Digital Service?

MR. WARREN: I'm referring to Department of Government Efficiency.

Page 30

THE DEPONENT: Okay. Then the answer is no.

BY MR. WARREN:

Q. Okay. Were you a member of the Department of Government Efficiency?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Yeah, there's no formal membership for a group of like-minded ideals.

BY MR. WARREN:

Q. You consider yourself a part of this group --

A. I certainly ascribe to the general ideology around fraud, waste, and abuse within the Federal Government, yes.

Q. Did you do work for the US DOGE Service?

A. No, not that I recall.

Q. Did you work for the US Digital Service?

A. No, not that I recall.

Q. Ever do work for the United States DOGE Service Temporary Organization?

A. I don't know what that is.

Q. I want to turn your attention to work you did with regards to the US Agency for International Development, USAID.

Page 31

When did you first start doing any work with regard to USAID?

MR. SILER: Objection, foundation.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Sure.

BY MR. WARREN:

Q. Have you ever done work regarding USAID?

A. Yes.

Q. When did that first start?

A. To the best of my recollection on or around January 31st of twenty -- January 31st of 2025.

Q. And at the time what was your employment?

A. I was a Schedule C political appointee employed at the behest of the President of the Office of Personnel Management.

Q. And when did you start in that position?

A. January 20th.

Q. How did you get that position?

A. I received that position in the same way any other political appointee would receive that position. We were recruited and screened by the Presidential Personnel Office and then hired by the President.

Page 32

Q. Did you apply for it?

A. I'm sure there was some online form, yeah.

Q. That you filled out?

A. Yes.

Q. And I'm sorry -- what was the first day that you recall starting that position?

MR. SILER: Objection, vague and ambiguous. And which position are we talking about?

MR. WARREN: The Schedule C appointee.

MR. SILER: Okay.

THE DEPONENT: January 20th.

BY MR. WARREN:

Q. January 20th? You ever discuss with Mr. Musk that position?

A. No.

Q. Who is your supervisor?

A. The Director of the Office of Personnel Management. You're asking now or when I was at OPM?

Q. I'm sorry. We're going to first talk about the Schedule C appointment.

A. Okay.

Q. So on January 20, 2025, you said you started as a Schedule C appointee; correct?

A. Yeah.

Q. Okay. So your first day of work who was

Page 33

your direct supervisor?

A. The Director of the Office of Personnel Management.

Q. Which was who?

A. Chuck Ezell.

Q. Is that who you reported to?

A. Yes.

Q. And what were your responsibilities?

A. My responsibilities were to, you know, execute on the directives from the head of that agency.

Q. And give me some examples of the work you were asked to execute then?

A. I was asked to work on setting up infrastructure to send an email to all of government.

Q. All right. So I want to pause there for a moment. You had mentioned you recall your first day working with USAID was January 31st approximately; correct?

A. Correct.

Q. So let's talk about the time period from January 20th to January 31st. Can you describe generally what you were doing, where you were working?

Page 34

A.   I was working on engineering work at the Office of Personnel Management to prepare the infrastructure and requisite technology in order to send an email across the Federal Government.

Q.   What was that about -- the email?

A.   The email was the initial offer of the deferred resignation program.

Q.   And at the time Chuck Ezell is your direct supervisor?

A.   That is correct.

Q.   And who instructed you to work on that project?

A.   That would have come from Chuck Ezell and senior leadership at the White House.

Q.   What senior leadership?

A.   I can't recall exactly.  But, you know, it would be senior leadership in the White House.

Q.   Where were you working out of?

A.   The OPM building.

Q.   And were you embedded in or working with any agency other than OPM at that time?

A.   Can you define "working with"?

Q.   Yeah, were you -- you've described your work as government infrastructure.  Were you working directly with any specific agency during that

Page 35

roughly 11-day time period -- January 20th to --

A.   I believe --

Q.   -- January 31st?

A.   -- somewhere in that time period I went to the United States Department of Agriculture.  Couldn't give exact dates.

Q.   Is that the only agency?

A.   To my recollection, yes.

Q.   You mentioned other senior leadership that you were reporting to.  Do you remember any of the individuals involved in --

A.   I reported to the --

MR. SILER:  Objection, misstates prior testimony.

THE DEPONENT:  Correct.  Yeah, I disagree with the premise of that question.

BY MR. WARREN:

Q.   Okay.  Who was the senior leadership you referenced?

A.   So I stated I reported to the Director of the Office of Personnel Management.

Q.   And then you mentioned that you were given instructions or -- I want to -- I can't recall your testimony word-for-word.  You mentioned senior leadership with regard to the tasks you were asked

Page 36

to do.  I'm asking if you can identify individuals among that senior leadership?

A.   I don't recall exactly who that would have been.

Q.   Okay.  Was the President involved?

A.   Involved?  My understanding is the President --

MR. SILER:  I'm going to object on the basis --

THE DEPONENT:  Yeah.

MR. SILER:  -- of the presidential communications privilege and instruct the witness --

BY MR. WARREN:

Q.   Did you ever --

MR. SILER:  Excuse me.  Instruct the witness not to answer.

BY MR. WARREN:

Q.   Did you ever speak with the President about any of those duties?

MR. SILER:  Objection, calls for the --

MR. WARREN:  It's a yes or no question.

MR. SILER:  All right.  Yes or no.

THE DEPONENT:  Can you -- what was the question?

BY MR. WARREN:

Page 37

Q.   Did you ever speak with the President about your duties that you've described roughly between January 20th and January 31st?

A.   No.

Q.   Elon Musk?

A.   Yes.

Q.   Describe those communications?

MR. SILER:  Objection, calls for information protected by the presidential communications privilege.  Instruct the witness not to answer.

MR. WARREN:  All right.  So on whose behalf were you serving?

MR. SILER:  Well, of the United States.

MR. WARREN:  On behalf of what official?

MR. SILER:  I'm saying that the question calls for information that's protected by the presidential communications privilege.  And I'm instructing the witness not to answer.

MR. WARREN:  I understand.  But in order for us to actually have a record of whether it's protected by privilege that we can go to the Court, I'm asking you if you're willing to memorialize on the record the basis for which you're asserting privilege.  So I'm asking on whose behalf are you

Page 38

asserting it?

MR. SILER: Well, ultimately the President holds the presidential communications privilege.

MR. WARREN: He said he had no communications with the President.

MR. SILER: That privilege, as we discussed previously, covers more than just communications with the President. It covers his close White House advisors --

MR. WARREN: So which advisor are you asserting on behalf of?

MR. SILER: You asked about Elon Musk.

MR. WARREN: Okay.

MR. SILER: He said yes.

MR. WARREN: All right. So if you --

MR. SILER: That's all we need for that.

MR. WARREN: If you can represent then how this was made in performance of the presidential's -- the President's official duties -- this communication?

MR. SILER: I --

MR. WARREN: How does this fall within --

MR. SILER: I'm not going to --

MR. WARREN: -- presidential decision-making?

Page 39

MR. SILER: You can ask the witness questions.

MR. WARREN: I'm asking you to state it for the record. You don't have to.

Okay. Let the record reflect no response from government counsel. He shook his head.

Can you establish how that communication was confidential?

MR. SILER: I'm not being deposed here.

MR. WARREN: You've made the objection. There's not a sufficient basis for the objection --

MR. HUMPHREYS: That's nonsense.

MR. WARREN: -- instruction.

MR. HUMPHREYS: And you can --

MR. SILER: Excuse me.

MR. WARREN: One at a time.

MR. SILER: We've established who the communication is with. I've explained the legal basis for our objection and the instruction not to answer. That's --

MR. WARREN: And you're providing no further information for us to be able to test the boundaries of that privilege; correct?

MR. SILER: You can ask the witness questions to test the boundaries of the privilege.

Page 40

I'm not here to make legal arguments other than make objections to the questions that you ask and the relevant responses.

MR. WARREN: Understood.

BY MR. WARREN:

Q. Was Steve Davis involved in any of those discussions?

MR. HUMPHREYS: Objection. We've had a lot of colloquy here. Can you refresh the witness's --

MR. WARREN: Sure.

MR. HUMPHREYS: -- recollection? Thank you.

BY MR. WARREN:

Q. Talking about your duties generally between January 20th and January 31st, you said you had discussions with senior leadership. We established that you never spoke with President Trump, that you did speak with Elon Musk. I'm asking if you ever spoke with Steve Davis during that time about your --

A. As it related to our, you know, mandate to combat waste, fraud, and abuse. When I received those directives from senior agency leadership I would occasionally give updates. Steve Davis at the

Page 41

time was a government employee.

Q. Yes, you spoke with him?

A. Yes.

Q. Let's turn to your time at USAID starting January 31st. What were your responsibilities generally?

A. My understanding was that I was being brought to ensure available access for senior agency leadership to information and technology systems administered by USAID.

Q. Can you describe -- I'm sorry. And how long were you working at or with USAID for?

A. A few weeks. It's difficult to recall exactly.

Q. Okay. I'm just trying to ballpark it so that my questions are pertaining to that timeframe. So during that few weeks was that the only major project you worked on?

MR. SILER: Objection, vague and ambiguous. Do you mean just for USAID or do you mean generally?

THE DEPONENT: Yeah, the answer --

MR. WARREN: For USAID. I'm sorry. I'm going to focus my questions for the moment on USAID.

THE DEPONENT: Can you repeat?

Page 42

MR. WARREN: Sure.

BY MR. WARREN:

Q. So you described one project that you were doing. I'm asking about other projects -- other work you did during those few weeks at USAID.

A. At that point in time I was working long hours. And so likely I was working on other projects. I don't recall exactly what was happening in that time period.

Q. When you say "other projects" -- at USAID or at other agencies?

A. I was at the -- potentially at other agencies. I'm sure, for example, OPM work -- there was still likely some random follow-ups that would come up relating to the system we built to email all of government and the surrounding responses and so forth.

Q. Who was your direct supervisor during those few weeks? Again I'm focused on the time period at USAID.

A. So I was a detailee. So through OPM leadership I reported to the director of that agency, Chuck Ezell. And at USAID I reported to senior agency leadership.

Q. And to the extent you had a typical day,

Page 43

can you walk me through what your days were like? We're going to get into some specifics. But I'm trying to get a general --

A. I think it would be very difficult to establish a typical day.

Q. How often during the day were you talking with Mr. Ezell?

A. As it pertains to?

Q. Your work at USAID.

A. Infrequently if at all.

Q. You were exercising discretion in what you're doing?

A. Can you elaborate?

Q. Sure. You said you were only talking to your direct supervisor infrequently. Were you given instructions to --

A. So as I explained, I was a detailee from OPM to USAID. At USAID for USAID matters I report to agency leadership for USAID. It would not be proper to report to other agency leadership for actions carried out there.

Q. Who were you reporting to at USAID?

MR. SILER: Objection, asked and answered.

MR. WARREN: You can answer.

THE DEPONENT: Yeah, I think we answered

Page 44

senior agency leadership.

BY MR. WARREN:

Q. Such as?

A. Such as Ken Jackson.

Q. Ken Jackson was the person that you reported to --

A. There was a mix of individuals. I can't recall exactly who at what point.

Q. How did you communicate during your time at USAID?

MR. SILER: Objection, vague.

MR. WARREN: Sir --

THE DEPONENT: Like in English.

MR. WARREN: Thank you.

BY MR. WARREN:

Q. What media did you use? That is did you use email, Signal, text, in-person communication, all of the above?

A. For official government communication I used email on agency email. And I used calls on agency phones and face-to-face communication.

Q. Did you have an email address at the government at that time?

A. Yes.

Q. At USAID?

Page 45

A. Did I have an email address at USAID? Yes.

Q. Yes. Do you have email addresses at other government agencies?

A. Yes.

Q. We briefly mentioned Amy Gleason before. What was her position and responsibilities?

A. My understanding is that she was the administrator of the United States DOGE Service.

Q. Did you have interactions with her?

A. In this time period not that I recall.

Q. Ever?

A. Yes.

Q. When? Or in what context if you can't remember the timeframe.

A. I'm sure we've -- like I've bumped into her like at a social gathering or two.

Q. Any professional interaction with Ms. Gleason?

A. It's possible that, you know, at some point an email was exchanged or something over the course of, you know, a year of government work. But no, not really.

Q. You don't recall discussing projects with her?

Page 46

A.   No.

Q.   You didn't report to her as to what you were doing?

A.   Correct.

Q.   No frequent or infrequent email or other communication with her?

A.   Correct.

Q.   You mentioned official communications were done over government email address.  What about unofficial communications?

A.   Unofficial communications just in general?

Q.   Right.

A.   I mean, are you talking about like how did I talk to my parents?

Q.   For your work at USAID.

A.   All work -- all communications related to work at USAID were conducted via, as I explained earlier, government email, government phone, or in person.

Q.   And when you say "government phone" what apps did you use?

A.   Some Google app.

Q.   Signal?

A.   No.

Q.   Text messaging?

Page 47

A.   It's possible there was text messaging.  But not that I recall.  And the Google app, to be clear, is the official chat app of USAID.  It's like their Microsoft Teams equivalent.

Q.   Did you ever interact with Secretary Rubio during your time at USAID?

A.   Not that I recall.

Q.   Have you ever met him?

A.   Not that I recall.

Q.   Peter Marocco?

A.   Yes.

Q.   What's your understanding of Mr. Marocco's position?

A.   My understanding is that he was part of senior agency leadership.

Q.   And describe the nature of your interactions with him during the time at USAID?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah, I was going to ask.  Can you elaborate?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   You said you interacted with Mr. Marocco.  I'm asking you to describe those interactions during

Page 48

the three weeks or so --

A.   Okay.

Q.   -- that you were at US --

A.   They --

Q.   -- AID.

A.   -- were cordial.

Q.   Okay.  What did you discuss with him?

A.   Matters relating to USAID.  I don't recall specifics.

Q.   Did you report to him?

A.   I reported to senior agency leadership.  My understanding was that in some cases senior agency leadership expected me to adhere to instructions from Pete Marocco that were originating from that senior agency leadership.

Q.   So if I have that right, you indirectly reported to him but not directly?

A.   I think it's kind of like a vague distinction.  But, you know, directives would originate from senior agency leadership and, you know, promulgate to me, you know, either directly or indirectly.

Q.   Well, let's be specific.  Did Mr. Marocco ever give you instruction about work you should be doing at USAID?

Page 49

A.   I don't recall like --

Q.   Did you ever communicate with him orally, verbally, or otherwise about work you were doing or would be doing --

A.   Yes.

Q.   -- at USAID?  Okay.  Such as what?

A.   I don't recall.  Things like foreign assistance likely.

Q.   What do you mean by that?

A.   For example, if there was foreign aid that the State Department wanted to be disbursed and there was some technical effect needed for that that's something we would have discussed.

Q.   Steve Davis.  What's his position?

A.   Steve Davis, to my understanding, was a federal employee at GSA.  And my understanding he was detailed over USAID, perhaps.

Q.   Did you have interactions with him at all during your time at USAID?

A.   Yes.

Q.   And what's the nature of the -- of those interactions?

A.   Discussions, you know, at a high level about, you know, kind of the status of work at USAID in accordance with the directives we received from

Page 50

senior agency leadership.

Q.    Did Mr. Davis ever give you instructions about work you should be doing at USAID?

A.    Not that I recall.

Q.    Did you ever report back to him?  That is communicate with him verbally, orally, or otherwise about work you were doing or would be doing at USAID?

MR. SILER:  Objection, compound.

THE DEPONENT:  Yeah.  What was the question?

BY MR. WARREN:

Q.    You ever report back to Mr. Davis about work you were doing at USAID?

A.    To be clear, Mr. Davis was sometimes in the building.  And yes, we would occasionally discuss --

Q.    And can you give an example of the type of work you discussed with Mr. Davis?

A.    It would have been discussing status of various directives we had received from senior agency leadership.

Q.    Can you estimate how often you spoke with Mr. Davis during those three weeks?

A.    I don't recall precisely.

Page 51

Q.    More than five?

A.    Over?

Q.    Three weeks.

A.    Yes, I'm sure it was more than five over three weeks.

Q.    More than ten?

A.    Yeah, I would say probably once every day or two days.  Something like that, yeah.

Q.    During the time that you were at USAID -- and again so talking approximately January 31st through mid to late February; is that correct?

A.    That sounds approximate, yeah.

Q.    Okay.  What was your understanding of the chain of command at the agency?

A.    My --

MR. SILER:  Objection, calls for a legal conclusion.

MR. WARREN:  You can answer.

MR. SILER:  You can answer.

THE DEPONENT:  Okay.  My understanding was that the President was the ultimate executive authority in that he had appointed, you know, Ken Jackson and other senior agency officials like Pete Marocco with the intent of carrying out his directives as they related to USAID.

Page 52

BY MR. WARREN:

Q.    During the time that you were there did you understand that the chain of command changed in any way?

A.    I don't recall.

Q.    I'm going to show you what will be marked as Plaintiffs' Exhibit 1.

(WHEREUPON, Plaintiffs' Exhibit 1 was marked for identification.)

A.    Thank you.

THE REPORTER:  Okay.  Exhibit 1 marked.

BY MR. WARREN:

Q.    This is a January 20, 2025 -- copy of a January 20, 2025 executive order entitled "Establishing and Implementing the President's Department of Government Efficiency."  Have you seen this document before?

A.    Perhaps.

Q.    Do you see on the first page where it says the title that I just read; the White House; January 20, 2025?

A.    I --

MR. HUMPHREYS:  Excuse me, Andrew.

Do you need a --

THE DEPONENT:  Yeah, I was about to --

Page 53

MR. HUMPHREYS:  -- just have him flip through it.

MR. WARREN:  Of course.

BY MR. WARREN:

Q.    You see on the first page where it says under Section 1 -- three lines down -- "This Executive Order establishes the Department of Government Efficiency to implement the President's DOGE agenda"?  You see that?

A.    Yes.

Q.    What's your understanding of what the President's DOGE agenda is?

A.    You know, insofar as I have personal knowledge of the President's understanding, it would be that there was fraud, waste, and abuse within the Federal Government in certain places and that we would like there to be less fraud, waste, and abuse.

Q.    As you understood it does that purpose encompass policy?

A.    I don't know.

Q.    Budget decisions?

A.    Can you explain what your question is?

Q.    Sure.  Does the DOGE agenda referenced here encompass budget decisions?

MR. SILER:  Objection, lack of foundation.

Page 54

THE DEPONENT:  Are you asking me if in the President's mind DOGE --

MR. WARREN:  I'm asking in your mind.

THE DEPONENT:  Okay.  Can we get a -- in my mind -- in your mind -- like whatever -- what's the full question?

BY MR. WARREN:

Q.  So to be clear, the questions I'm asking you today are always asking what's in your mind unless I ask you --

A.  You just asked me what the President's DOGE agenda was as the prior question so I'm just asking for some clarification.  Thank you.

Q.  Of course, Mr. Kliger.  Again what is your understanding -- excuse me.  Based on your understanding of the DOGE agenda does that include budget decisions?

A.  Insofar as combating fraud, waste, and abuse would involve a budget decision.

Q.  Personnel decisions?

A.  Again insofar as combating fraud, waste, and abuse would involve a personnel decision.

Q.  Operational decisions?

A.  Insofar as combating fraud, waste, and abuse would involve an operational decision.

Page 55

Q.  Can you turn to the second page of this document?  You see Section 4?

A.  Yes.

Q.  I'm paraphrasing.  But it says "The USDS Administrator shall commence an initiative to improve the quality and efficiency of government-wide software, network infrastructure, and IT systems."  Did you understand modernizing federal technology as part of the DOGE agenda?

MR. HUMPHREYS:  Objection, foundation.

THE DEPONENT:  Yes.  As I mentioned earlier, very first thing I worked on and what I generally worked on were matters of technology.

BY MR. WARREN:

Q.  And the matters of technology that you worked on then were to combat fraud, waste, and abuse?

A.  You know, as directed by senior agency leadership I'm sure I used technology, you know, to their directive.

Q.  To combat fraud, waste, and abuse as you understood it?

A.  Among many other things, certainly.

Q.  What are the other things?

A.  You're asking me everything that I've ever

Page 56

been directed to do with respect to technology over a year of federal service?

Q.  No.  First of all, we're focused on your time at USAID.  And I'm asking you --

A.  Okay.

Q.  -- what your understanding of the mission was of the work that you were doing.  You've used the phrase "fraud, waste, and abuse" at least a dozen times today by my count.  And then you just said other objectives as well.  So I'm asking what were some of those other objectives beyond fraud, waste, and abuse?

A.  Modernizing IT technology and then, you know, being useful to senior agency leadership.

Q.  In Section 3C on page 2 --

A.  We're going up?

Q.  Yes.  Up above.

A.  Okay.

Q.  I'm sorry, second page --

A.  Second page.

Q.  -- 3C.

A.  Okay.

Q.  The DOGE teams.  It says "In consultation with USDS, each agency head shall establish within their respective agencies a DOGE team."  You can

Page 57

keep reading if you want.  Were you on one of these DOGE teams?

A.  At this time I'm not sure, no.

Q.  I'm sorry.  To be clear, not as of January 20th.  As of your time at USAID.

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.

BY MR. WARREN:

Q.  The work you did at USAID -- during those three weeks were you a member of a DOGE team?

A.  To my understanding I was a Schedule C political appointee working at the behest of the President at the Office of Personnel Management who was detailed to the United States Agency for International Development to work under agency leadership there to accomplish what they wanted.

Q.  Okay.  And in your understanding what you just described -- does that fall within the DOGE team as described in Section 3C of this executive order?

MR. SILER:  Objection, lack of foundation.

THE DEPONENT:  Yeah, I guess that would go to like the nature of why I was brought on.  And I couldn't tell you.

Page 58

BY MR. WARREN:

Q.   No, I'm asking in your understanding the explanation you gave a couple questions back about the work that you were doing -- did you consider that to be part of the DOGE team that's referenced and described here?

A.   No.

Q.   We're going up in the document a few lines above Section 3C.  So this is in Section 3B but it's on the same page too.  There's a reference to the President's 18-month DOGE agenda.  Do you see that?

A.   Mm-hmm.

Q.   Do you have an understanding of the President's 18-month DOGE agenda?

A.   Combating fraud, waste, and abuse.

Q.   In your mind is that any different than the DOGE agenda that's referenced in Section 1?

A.   Where in Section 1?

Q.   What we just looked at not two minutes ago.

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah, we've looked at like five pieces.

MR. WARREN:  Okay.

Page 59

THE DEPONENT:  That's --

BY MR. WARREN:

Q.   If you turn back to the first page there's a reference to the EO establishes the Department of Efficiency to implement the President's DOGE agenda.

A.   Okay.

Q.   Then later there's a reference to the President's 18-month DOGE agenda.  Do you have any understanding of the difference between the President's DOGE agenda --

A.   And the President's 18-month --

Q.   -- and 18-month --

MR. SILER:  Objection, vague and ambiguous, calls for speculation, lack of foundation.

You can answer.

THE DEPONENT:  Yeah.  No, I have no idea.

BY MR. WARREN:

Q.   Okay.  Section 4B.  It says "Agency head shall take all necessary steps" -- and I'm paraphrasing -- "to ensure full and prompt access to unclassified agency records, software systems, and IT systems.

"USDS shall adhere to rigorous data protection standards."  During your time at USAID

Page 60

did you adhere to rigorous data protection standards?

MR. SILER:  Objection, argumentative, lack of foundation.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Did you adhere to rigorous data protection standards --

A.   Can you define "rigorous" data --

Q.   -- during your time at USAID --

A.   -- protection standards?

Q.   -- as it's referenced here?

MR. SILER:  Objection, lack of foundation.

THE DEPONENT:  Can you -- as it's referenced here?  Can you repeat the question?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.   During your time at USAID did you adhere to rigorous data protection standards?

A.   Yes.

Q.   What steps did you take to adhere to those standards?

A.   Followed agency guidelines.

Page 61

Q.   Such as?

A.   Such as using an agency device to access agency infrastructure.

Q.   How were you made aware of those guidelines?

A.   The CIO likely told us about them.

Q.   Did the CIO at USAID tell you about guidelines that you should adhere to?

A.   I don't recall exactly.

Q.   What about your work at other government agencies?

MR. HUMPHREYS:  Objection, vague.

BY MR. WARREN:

Q.   With regard to any work you did at any other government --

A.   Yes.

Q.   -- agency --

A.   We took numerous cybersecurity trainings, et cetera.  Yeah, I've taken --

Q.   Thank you.

A.   -- more cybersecurity trainings in the federal government than probably anyone.

Q.   Before you started on January 31st at USAID did you attend any meetings, discussions, trainings to prepare you for your work?

Page 62

A.   Can you repeat that?

Q.   Yes.  Prior to starting work at USAID --

A.   Okay.

Q.   -- did you attend any meetings, trainings, conversations with people about the work that you were going to be doing at USAID?

A.   Not that I recall.

Q.   When did you first find out that you were going to be assigned, for lack of a better term, to USAID?

MR. SILER:  Objection.  Lack of foundation, vague and ambiguous.

THE DEPONENT:  When I found out I was being detailed over there would have been around January 31st -- somewhere in that.

BY MR. WARREN:

Q.   Prior to your work for the government as of January 20th did you attend any meetings or have any conversations about the type of work you would be doing with the government?

A.   Prior to January 20th did I have any conversations -- can you repeat the second half?

Q.   Yes.  So now we're moving outside of USAID context for a moment.

A.   Yeah.

Page 63

Q.   Prior to your work that began on January 20th did you have any meetings or communications about the type of work you would be doing at the government?

A.   At a high level sounds likely.

Q.   Who did you meet with?

A.   Other individuals who shared the DOGE ideology and planned to join the administration in support of the President.

Q.   So what meetings with other members or people involved in the Department of Government Efficiency?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.  Again as I've said before, you know, there's the US DOGE Service, which was like a real thing that has members.

And then there's like a loose collection of shared values and principles oriented around the President's, you know, DOGE agenda I guess is what it's called in this document.

MR. WARREN:  Sure.

BY MR. WARREN:

Q.   And you made clear you had no work with US DOGE Service; correct?

Page 64

A.   Correct.

Q.   So I'm focused on the other category -- this loose affiliation --

A.   So you're asking -- again there's no formal membership.  It's nothing like that.

Q.   Right.  But you met with other people who shared these -- this DOGE agenda vision, et cetera?

A.   Certainly.

Q.   Was there some bootcamp that you ever attended regarding DOGE agenda?

A.   Nothing that I would characterize as a bootcamp.

Q.   What would you characterize it as?

A.   Characterize what as?

Q.   Any meetings you had.

A.   As meetings.

Q.   Trainings?

A.   Like-minded individuals.  No, I would not consider it a training.

Q.   How many of these meetings were there?

A.   I can't recall.

Q.   Formal or informal meetings?

MR. HUMPHREYS:  Objection, vague.

MR. WARREN:  And to be clear, that's a meeting where people gather and there's a -- either

Page 65

an agenda or a set topics that you're discussing versus casual conversation.

THE DEPONENT:  The former -- kind of unstructured.

BY MR. WARREN:

Q.   Okay.  So with regard to that unstructured meeting -- unstructured type of meeting -- how many of those meetings did you have?

A.   Again, I don't recall exact numbers.

Q.   More than five?

A.   It would have been -- you know, like if you've been to what "We Work" -- like we've been to a We Work for like a day, you know, how many meetings did you have in your We Work?  I don't know.  You talk to the guy next to you.  You wander around.  It's like that sort of situation.

Q.   Were you at a We Work --

A.   No --

Q.   -- this --

A.   -- no.  I'm giving you an example.

MR. SILER:  Why don't we take a break?

MR. WARREN:  Okay.

THE DEPONENT:  Okay.

THE REPORTER:  Okay.

MR. WARREN:  It's --

GAVIN KLIGER                           January 06, 2026                           66 to 69
92792

Page 66

MR. SILER:  Off the record?

MR. WARREN:  Sure.

THE REPORTER:  All right.  Off the record -- go ahead.

THE VIDEOGRAPHER:  Please stand by.  The time is one -- oh, excuse me.  The time is 3:04 p.m.  We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 3:12 p.m.  We are on the record.

BY MR. WARREN:

Q.  During the break did you discuss the substance of any testimony with counsel?

A.  No.

Q.  We were talking about meetings with like-minded group of people who subscribe to the DOGE agenda.  So that I don't have to repeat that phrase if I call those "DOGE meetings" are we on the same page?  I'm talking about meetings in the before January 20th timeframe.

A.  You could use that term.  I don't think it's how exactly I'd characterize them.

Q.  How would you characterize it?

A.  Just meetings of like-minded individuals.

Q.  Okay.  You said other individuals who

Page 67

shared the DOGE ideology were at those meetings.  Who were some of those people?

A.  It would have been people like -- I don't remember everyone's name anymore.  It's been some time.  But like a Luke Farritor or -- let's see.  Like Steve Davis would have been there occasionally.  As I mentioned before every now and then an Elon.  And yeah.

Q.  Edward Coristine?

A.  Yes.

Q.  How did you get invited?  How did you know to attend these meetings?

A.  When I learned, you know, in like November the President was -- you know, won the election and that, you know, the -- there was going to be some kind of organization to bring in people with a background in technology to help the federal government I wanted to, you know, find other people who were doing the same thing.  So it would have been, you know, calling around basically until finding those people.

Q.  Who'd you call?

A.  I don't recall.

Q.  Did someone call you or reach out to you to invite you to any of these meetings?

Page 68

A.  No.

Q.  You mentioned a few people at those meetings.  Was Jeremy Lewin ever there?

A.  To my recollection, occasionally.

Q.  Did you get any written guidance, instructions at any of these meetings?

A.  No.

Q.  What types of things did you discuss?  Strike that.

What type of things were discussed at these meetings with regard to work that was going to be done to further the DOGE agenda?

A.  Things were talked about at a high level.  You know, what can we do from a technology perspective to ensure that, you know, payments are not fraudulent.  What can you do from a technology perspective to give the public more transparency into where money's going, et cetera, et cetera, et cetera.

Q.  Any discussion of particular agencies within the government?

A.  It's certainly possible.

Q.  Discussions about how to deal with government employees?

A.  Can you -- "how to deal with" meaning?

Page 69

Q.  How to interact with existing government employees --

A.  Well, certainly we were, you know, instructed, you know, about chain of command, you know, how to follow the hierarchical structure of an organization and work for senior leadership -- that sort of thing.

Q.  And these meetings all pre-dated January 20th; correct?

A.  Yes.

Q.  And during these meetings between the election in November and January 20th were any current government employees in attendance?

A.  So I was not at meetings from November to January 20th.  This would be basically from end of December to January 20th.  They would happen in that window.

Q.  So during that window -- end of December through January 20th -- any current government employees?  That is individuals who were then employed with the government.

A.  No, not to my understanding.

Q.  I want to turn your attention to January 20th.  That's the inauguration.  Where were you?

A.  I was being sworn in at the Office of

Page 70

Personnel Management in their, you know, main federal building.

Q.   Where were you working out of during that week -- excuse me, during that 11-day period -- January 20th to January 31st?

MR. SILER:  Objection, vague and ambiguous.

BY MR. WARREN:

Q.   What building were you working out of?

A.   The OPM Teddy Roosevelt.

Q.   Where --

A.   I think it's called Teddy Roosevelt building.

Q.   Did you ever have interaction with anyone from USAID during that week?

A.   No.

Q.   And again I'm focused on time January 20th to January 31st.  As you identified, no interaction with anyone from -- who is currently in USAID?

MR. HUMPHREYS:  Objection, vague.

MR. SILER:  Yeah, objection, vague.  I'm just confused as to the specific dates.  I think they changed for the last few questions.

BY MR. WARREN:

Q.   So before January 31st any interaction

Page 71

with anyone who was then at USAID?

A.   Not to my recollection.

Q.   Do you know Brian McGill?

A.   Who?

Q.   Brian McGill.

A.   No.

Q.   Do you know John Voorhees?

MR. SILER:  Objection, vague and ambiguous as to "know."

BY MR. WARREN:

Q.   Do you understand the word "know"?

A.   Well, I mean, it can mean any things.  It can mean that you're very close to someone, that you have a personal relationship with them, that you've heard their name somewhere.  You know, earlier when you asked me if I knew Elon Musk I think you clarified that.  So yeah, I'd be curious.

Q.   Okay.  Do you know John Vorhees?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.  What do you mean by "know"?

BY MR. WARREN:

Q.   Have you ever met him?

A.   Probably.  But I don't recall.

Page 72

Q.   Have you ever met Brian McGill?

A.   I don't recall.

Q.   Have you ever met PJ Butler?

A.   Believe so.

Q.   Who's PJ Butler?

A.   My understanding is he works in the Security Office at USAID.

Q.   Did you meet PJ Butler in the context of his working at the Security Office at USAID?

A.   I believe so, yeah.

Q.   Did you meet with anyone else or ever deal with anyone else from USAID Security?

A.   I mean, who knows.  I'm sure.  You walk through the front gate -- there's a guy who hands you a badge, et cetera, et cetera.  I mean, it's a giant building full of people.  Probably.

Q.   As you understood was there a DOGE team that was detailed or assigned to USAID?

MR. SILER:  Objection, lack of foundation. Vague and ambiguous.

THE DEPONENT:  Yeah, how are you defining "DOGE team"?

MR. WARREN:  People who share like-minded ideology about reforming government to combat waste, fraud, and abuse and modernize technology --

Page 73

THE DEPONENT:  Yeah.  So if you're using it not in the context of this document but in the context of that then yes, I would say there was a group of like-minded individuals who shared that ideology around fraud, waste, and abuse --

BY MR. WARREN:

Q.   Detailed to -- were assigned to USAID?

MR. SILER:  Objection, vague and ambiguous.

BY MR. WARREN:

Q.   Who were they?

A.   To be clear, I wasn't answering your question.  I was saying yeah, I found that vague and ambiguous.

Q.   Okay.  Was there a team of those like-minded individuals working at, assigned to, detailed to USAID during the time you were there?

A.   Yes.

Q.   Who else?

MR. SILER:  Objection, vague and ambiguous.  Are you asking about a specific group of people who were assigned as a DOGE team or, as the witness has testified, a loose group of like-minded individuals that ascribe to the DOGE agenda?

MR. WARREN:  I'm asking him about if there

Page 74

were other individuals who you've identified as sharing that like-minded agenda who were detailed, tasked, assigned, to USAID.

MR. SILER: Objection, vague and ambiguous.

MR. WARREN: You can answer the question.

THE DEPONENT: You're asking if there are other people who share my values who were working at USAID?

MR. WARREN: That wasn't the question.

BY MR. WARREN:

Q. The question is in what you've described as this group of people who share your -- this ideology about reforming government, which you agreed we could loosely call DOGE team -- DOGE meetings -- people at the meetings -- were any of these people assigned to USAID?

MR. SILER: Objection, misstates prior testimony --

THE DEPONENT: I don't agree --

MR. SILER: -- vague and -- hold on. Vague and ambiguous.

You can answer if you understand.

THE DEPONENT: Yeah. I was going to say I don't agree with your characterization of my prior

Page 75

statement.

BY MR. WARREN:

Q. Was Ed Coristine working at USAID during the time you were there?

A. I believe there was some brief overlap.

Q. Jeremy Lewin?

A. Yes.

Q. Luke Farritor?

A. Yes.

Q. Anyone else who you had met with prior to January 20th who you understood to share this DOGE agenda ideology?

A. Yeah, I --

MR. SILER: I'm sorry. Is there a question?

MR. WARREN: Yes. That was the question.

THE DEPONENT: Can you repeat it?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Was there anyone else at USAID in addition to those individuals?

A. Was there anyone else at USAID? Yes, there were a number of other employees. There was someone at the desk who would take your badge --

Q. Mr. Kliger, I'm talking about with regard

Page 76

to people who attended the DOGE meetings that we discussed.

A. In that case it would be names you mentioned.

Q. Right. And I'm asking if there are other individuals who you remember?

A. Who were officially -- my understanding was -- I mean, Steven Davis, as I said earlier, would be there on occasion. And he had been in some of those prior meetings.

Q. Were you aware -- or excuse me, are you aware of an incident approximately May -- excuse me. Are you aware of an incident or situation on approximately January 27, 2025, with DOGE members arriving at USAID headquarters and trying to obtain access to the building and data systems?

MR. SILER: Objection, assumes facts not in evidence.

You can answer.

THE DEPONENT: Am I aware of something that happened on the -- no.

BY MR. WARREN:

Q. Are you aware of any incident regarding people from DOGE team or working on behalf of the DOGE agenda who were demanding access to USAID

Page 77

headquarters and access to USAID data systems on or about January 27, 2025?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Not to my recollection.

BY MR. WARREN:

Q. Are you aware of discussions around cutting off access to USAID employees -- people being placed on administrative leave on or about January 27, 2025?

MR. SILER: Objection, compound.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Sure.

BY MR. WARREN:

Q. Are you aware of people who were placed on administrative leave from USAID around January 27, 2025?

A. My understanding to the best of my recollection was that prior to my arrival there had been some administrative leave action carried out.

Q. And how do you know that?

A. I'm sure I was told it by senior agency leadership.

Q. Do you recall who?

Page 78

A.   No.

MR. WARREN:  Have this marked as Plaintiffs' Exhibit 2.  Thank you.

THE REPORTER:  All right.  And Exhibit 2 marked.

(WHEREUPON, Plaintiffs' Exhibit 2 was marked for identification.)

BY MR. WARREN:

Q.   Okay.  And for the record this is an email chain from January 27, 2025.  The subject line "SBU Administrative Leave Notice."  And Mr. Kliger, I will represent to you that your name does not appear on this email chain.

A.   Is it in chronological order descending or ascending?

Q.   It is in ascending --

A.   It reads --

Q.   So you read this --

A.   Front to back?

Q.   -- front to back.

A.   Okay.  Yeah, if I could have a few minutes.  Thank you.

Q.   And my question for you is --

A.   If I could have a few minutes to read the document.  Thank you.

Page 79

Q.   And I'm going to ask you the question before you look at the document so that you know what I'm going to ask you about.

My question for you is did you have any involvement or discussion about the employees being placed on administrative leave that's referenced here beside what you just described to me?

A.   Can you repeat the question?  I was reading.

Q.   Did you have any involvement in the individuals being placed on administrative leave that's referenced in this document beyond what you just answered a couple moments ago?

MR. SILER:  Objection, misstates prior testimony.

THE DEPONENT:  Yeah, can you repeat the question?

BY MR. WARREN:

Q.   Before we looked at this document you said that you had some understanding that people were placed on administrative leave before you came to USAID?

A.   To be clear, I didn't have understanding of that before I came to USAID.  I had understanding of that after I arrived at USAID that it had

Page 80

happened before my arrival -- just to be clear for the record.

Q.   Thank you.  And I'm asking you after you've reviewed this document do you recall any further conversations you had about those individuals being placed on administrative leave?

A.   So you want me to review the document and then I'll answer?

Q.   Sure.

A.   If you can repeat the question.

Q.   I'll rephrase it.

A.   All right.

Q.   What do you know about what's referenced in this document beyond what you've already testified to today?

A.   What's referenced in this document -- it appears to be a group of individuals being placed on administrative leave at the direction of senior agency leadership.

Q.   I'm asking what you know about that beyond what you've already testified to today?

A.   To my recollection I know that some group was placed on administrative leave prior to my arrival by senior agency leadership.

Q.   Now when you say "senior agency

Page 81

leadership" who are you referring to?

A.   I don't know who in senior agency leadership carried out this action.  From this email, I mean, obviously Joel was the named agency leadership.

Q.   You mentioned Luke Farritor before.  How do you know Luke Farritor?

A.   I met Luke Farritor in those meet-ups we had described earlier in probably early January.

Q.   Was that the first time you had met him?

A.   Yes.

Q.   What about Ed Coristine?

A.   Similar timeframe.  I can't speak to exact dates but --

Q.   Jeremy Lewin?

A.   Yep, same thing.

Q.   Now I want to turn your attention to Friday, January 31st of 2025 that you testified to as your first day working at USAID.  Tell me about that first day?

MR. SILER:  Objection, vague.

THE DEPONENT:  Can you repeat?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Tell me about your day.  What were you

Page 82

doing at USAID?

A.   Okay.  At USAID I don't recall exactly.  I imagine trying to get a laptop set up, trying to work with the IT Department to have an email configured, working with the IT Department to see if they could provision a government phone.

Q.   Where were you physically located?

A.   This would be the USAID headquarters building.

Q.   How did you first gain access to the building?  It's a secure building; correct?

MR. SILER:  Objection, compound.

THE DEPONENT:  Yeah, can you repeat?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   It's a secure building.  So on your first day there how were you -- were you badged through?  Did someone walk you in?  How'd you get past security?

A.   I don't recall.

Q.   This is Government -- excuse me -- Plaintiffs' Exhibit 3.

THE REPORTER:  Exhibit 3 marked.

(WHEREUPON, Plaintiffs' Exhibit 3 was marked for identification.)

Page 83

BY MR. WARREN:

Q.   Mr. Kliger, that email goes backwards to forwards.  So if you --

A.   I got it, yeah.

Q.   -- start looking at the bottom of the first page.

A.   Just be one minute here.  Okay.

Q.   The email that's sent from Luke Farritor at the bottom of the first page --

A.   Yep.

Q.   -- he says "Just want to confirm -- just want you to confirm that Gavin Kliger of DOGE should also have full read/write administrative access for managing physical and logical access like myself."  What's your understanding of what Mr. Farritor is asking of Jason Gray?

MR. SILER:  Objection, calls for speculation.

THE DEPONENT:  My answer would be I don't.  I couldn't tell you.

BY MR. WARREN:

Q.   Do you know what full read/write administrative access is?

A.   Yes.

Q.   What is it?

Page 84

A.   That would be a computer science term that refers to the ability to, you know, read data and write data.

Q.   And what about "managing physical and logical access"?

A.   That would refer to, in my understanding, managing facilities access or access to information systems.

Q.   And if you look at the subsequent email, Mr. Gray's response, he says -- and I'm paraphrasing -- "I approve of administrative access to all unclassified information systems."  See that?

A.   Yes.

Q.   Were you granted access -- excuse me.  Were you granted administrative access to all unclassified information systems at USAID?

A.   No.

Q.   What systems were you granted access to?

A.   Systems that would manage payments.  I think a system that would, you know, manage like whether your email account works.  I believe a system that would manage whether your badge would let you in at the front door of the building -- these sorts of systems.

Q.   What's the Phoenix system?

Page 85

A.   Phoenix was a -- to my understanding a payment system -- basically a piece of software that you would use to disperse funds.

Q.   Were you given access to that?

A.   Yes.

Q.   Admin access?

A.   I don't know exactly how they defined the access.  But yes, I had access to that system.

Q.   Did you have access to HR systems?

A.   I don't recall.  But probably.

Q.   Access to badging in access systems?

A.   Yes.  To be clear, the access to the system that is used to, you know, deny someone access to the building.

Q.   Are you familiar with a system called CCURE?

A.   Yes.

Q.   What's CCURE?  And for the record that's C-C-U-R-E; correct?  It's not in the document.  I'm asking.

A.   You're asking me if I'm familiar with them and how it's spelled.  I couldn't tell you.  What's the question?

Q.   The question is what is CCURE?

A.   My understanding is that it's basically a

Page 86

virtual machine that is used to manage facilities access at USAID.

Q. Are there any systems at USAID that you were not granted access to?

A. That I was not granted access to?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Yeah, I couldn't -- I'm sure I didn't have the password for the air conditioning or, you know, I could name a million systems probably.

BY MR. WARREN:

Q. Any computer infrastructure systems regarding the operations of the agency that you were not granted access to?

A. I'm sure there were.

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Yeah. Again I can't speak to all of the systems that are under the purveyance of a federal agency employing 10,000 people.

BY MR. WARREN:

Q. If you turn to the second -- back to the second page of that document you'll see that Mr. Farritor writes "Gavin Kliger of DOGE"?

Page 87

A. Mm-hmm.

Q. What's your understanding of why he wrote "Gavin Kliger of DOGE"?

A. I --

MR. SILER: Objection, calls for speculation.

THE DEPONENT: Yeah, I can't speak to that.

BY MR. WARREN:

Q. You don't know why he would have written that?

A. I could certainly speculate wildly as to why, yeah.

Q. Prior to January 31st you said you had met Mr. Farritor; correct?

A. Prior to January 20th; correct.

Q. I'm sorry, prior to January 31st?

A. Ah, yes. Yeah.

Q. Had you spoken -- ever spoken with him before this day about the work that you would be doing at USAID?

A. No.

Q. Ever talk with him about work you would be doing -- strike that.

Did you ever speak with Mr. Farritor about

Page 88

the US Digital Service?

A. I don't recall.

Q. Ever speak with Mr. Farritor about the US DOGE Service Temporary Organization?

A. I don't recall.

Q. You ever speak with him about the President's executive order that we looked at previously?

A. It may have come up in conversation. But I don't recall some specific situation, no.

Q. You had spoken with Mr. Farritor about the work that you, he, and other like-minded individuals would be doing at the government; correct?

A. None of us knew the work we would be doing. Again we work at the behest of senior agency leadership. But certainly we discussed our ideas.

Q. And he was at some of those meetings that you described -- those DOGE meetings; correct?

A. Again you characterize them as DOGE meetings. My characterization was meetings of like-minded individuals.

Q. But he was there?

A. Yes.

Q. Okay. But again you have no idea why he said "Gavin Kliger of DOGE"?

Page 89

A. I'm sure he was probably referring to the ideological affiliation. But again that's speculation.

Q. Plaintiffs' Exhibit 4.

THE REPORTER: Exhibit 4 marked.

(WHEREUPON, Plaintiffs' Exhibit 4 was marked for identification.)

THE DEPONENT: Thank you.

BY MR. WARREN:

Q. I'm sorry, before you look at that document -- talking about the -- what I've characterized as the DOGE meetings prior to January 20, 2025 -- did you ever keep -- take any notes of the meetings you had with these like-minded individuals?

A. Not that I recall.

Q. All right. If you look at Government's Exhibit 4, please.

MR. SILER: Plaintiffs'.

MR. WARREN: Sorry. Old habits die hard.

MR. SILER: I understand.

MR. WARREN: That'll happen at least three more times today.

MR. SILER: Don't take it the wrong way if I correct you.

Page 90

BY MR. WARREN:

Q.    Mr. Kliger, while you're reviewing that document, my question for you is going to be do you recall -- did you ever sign a document similar to this?

(Interruption in proceedings.)

THE DEPONENT:  Sorry.  Someone's coming through the door.

MR. WARREN:  Of course.

MR. SILER:  Do we need to take a break or are we --

THE DEPONENT:  If we could take a break --

MR. SILER:  Okay.  Yeah.

THE DEPONENT:  -- I would appreciate it.

BY MR. WARREN:

Q.    Actually, before we take a break can we just -- let's answer the question on this document and then we'll move on.

A.    I'm sorry.  There's someone from -- in the room to fix the air conditioner --

MR. SILER:  Yeah.

THE DEPONENT:  -- right now.

MR. SILER:  Maybe if he could step out for a minute or two and then we'll finish the question. I'm fine with that.

Page 91

What was the question?

MR. HUMPHREYS:  Are you okay to proceed?

THE DEPONENT:  It's pretty hot in here.  I would certainly appreciate --

(Speaking simultaneously.)

MR. WARREN:  There's a question pending. Just answer the question and then move on.

BY MR. WARREN:

Q.    And the question is did you ever sign a similar document --

A.    Again --

Q.    -- like this for --

A.    -- we've just been interrupted by someone coming in to fix the air conditioning, walking around the building, two people stood to raise the door.  It's 74 degrees.  I would appreciate it if we could take a minute here to try and fix the air conditioning.  It is not comfortable here.

Q.    Okay.  And I'd appreciate it if you could answer my question before we take a break.

MR. HUMPHREYS:  Come on.

THE DEPONENT:  Well, I need to use the restroom.  I'm sorry.  It's too hot.  Thank you.

MR. WARREN:  Sure.  Record will reflect --

THE VIDEOGRAPHER:  Please stand by.

Page 92

MR. WARREN:  -- the witness refused to answer the question before taking a break.

THE DEPONENT:  Yeah, it's 74 degrees.

MR. SILER:  We're off the record.

THE VIDEOGRAPHER:  Please stand by.  The time is 3:42 p.m.  We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time is 3:49 p.m.

BY MR. WARREN:

Q.    Mr. Kliger, before we look at Exhibit 4, I want to look -- ask you again about Exhibit 3.

A.    Before can I -- just a point of clarification.  Earlier you stated I refused to answer a question.  I want to be clear I'm happy to answer that question.  So please feel free to refuse it -- or repeat it.

Q.    Repeat it.  Thank you.

So Exhibit 3 -- do you disagree with Mr. Farritor's characterization of you as --

A.    To be --

Q.    -- quote "of DOGE"?

A.    So to be clear, you've given me Exhibit 4 just now.  But we're referencing Exhibit 3?

Q.    Yes.

A.    Okay.  Can you repeat the question?

Page 93

Q.    Yes.  Do you disagree with Mr. Farritor's characterization of you as, quote, "of DOGE"?

A.    No, not in the sense that we were part of the same group that shared the same values and that I've espoused earlier -- working at the behest of the President in accordance with the directives of senior agency leadership.

Q.    Are you aware of the website DOGE.gov?

A.    I am aware of it, yes.

Q.    Have you ever visited the website?

A.    Probably.

Q.    What's your understanding of what the website is?

A.    A website --

Q.    For?

A.    -- for displaying information about the federal government spending, things that, you know, are beneficial for the public to know.

Q.    Is that information limited to the loosely-affiliated group of like-minded people?

MR. SILER:  Objection, lack of foundation.

THE DEPONENT:  I don't understand your question.

BY MR. WARREN:

Q.    Is the website DOGE.gov that you just

GAVIN KLIGER                    January 06, 2026                    94 to 97
92792

Page 94

described limited to the loose affiliation of like-minded people who share ideology --

A.   Limited in what way?

Q.   -- that you just --

MR. SILER:  Same objection.

THE DEPONENT:  Yeah, limited in what way?

MR. WARREN:  In terms of the information provided.

MR. SILER:  Same objection.

THE DEPONENT:  What do you mean?

MR. WARREN:  The information that's contained there.  You said information --

THE DEPONENT:  Is the information -- like do people have to log in to view the -- like I don't understand what you're trying to ask.

BY MR. WARREN:

Q.   I'm asking whether the information on that page as you described -- government spending and other information -- is part of this loose group -- loosely-affiliated group of like-minded individuals?

MR. SILER:  Objection, lack of foundation.

THE DEPONENT:  I genuinely don't understand your questioning.

BY MR. WARREN:

Q.   Is the website DOGE.gov meant for the

Page 95

loose affiliation of like-minded individuals that you've described before?

A.   Meant for as in its intended audience?

Q.   Yes.

A.   No.  The intended audience of that website would be the general public.

Q.   Did you have any involvement with building that website?

A.   No.

Q.   Maintaining the website?

A.   Not to my recollection.

Q.   Putting information on the website?

A.   Not to my recollection.

Q.   If you look at Government Exhibit 4 --

MR. SILER:  Plaintiffs'.

MR. WARREN:  Sorry.

MR. SILER:  Again Plaintiffs'.

MR. WARREN:  Jesus.  Sorry.

BY MR. WARREN:

Q.   Mr. Kliger, my apologies.  Plaintiffs' Exhibit 4 -- if you could review that.  And my question for you is -- actually for the record this is a USAID CCURE 9000 User Account Request Form.

It appears to be filled out and signed by Luke Farritor.  My question for you is did you fill

Page 96

out and sign a similar form with regard to USAID CCURE 9000?

A.   I do not recall.

Q.   Do you recall filling out any forms like this for data systems and information systems to which you had access to at USAID?

A.   I've probably filled out over a thousand such forms over the course of my work in the federal government.  And no, I don't recall --

Q.   When you say --

A.   -- specifics.

Q.   Sorry.  I didn't mean to talk over you. When you say over a thousand is that hyperbole --

A.   Yes.

Q.   -- or do you literally mean over --

A.   Hyperbole.

Q.   -- a thousand?

A.   But you can imagine there's a lot of paperwork in the federal government.

Q.   All right.  You can put that up.  Thank you.  We talked a little bit about the systems access you had at USAID, the -- that included access to grant payments?

A.   In what way?

Q.   The systems access that you had to Phoenix

Page 97

as well as other systems -- did that include access to USAID's disbursement of grants?

A.   Yes.

Q.   Payments to vendors?

A.   Yes.

Q.   Payments to staff?

A.   Not sure.

Q.   Payments to employees?

A.   Not sure.

Q.   Payments to private service contractors?

A.   Not sure.

Q.   The work that you did at USAID -- strike that.

Why did you need access to those systems? Speaking broadly.

A.   My understanding was that senior agency leadership had confirmed their intent that I have access to those systems.

Q.   For what purpose?

A.   I --

MR. SILER:  Objection, speculation.

BY MR. WARREN:

Q.   As you understood your job?

A.   I can't speculate as to their intent.  As I stated earlier, my initial understanding was that

Page 98

I was being brought to the agency to ensure that they had continued access to those systems.

Q. I'm sorry, that who had continued access --

A. Senior agency leadership.

Q. I want to turn your attention to Saturday, February 1, 2025. Did you work that day?

A. It's very likely.

Q. And this would have been your second day at USAID do you recall?

A. I don't.

Q. Do you recall working that first Saturday that you were there?

A. I worked, you know, a lot. So my assumption would be yes.

Q. Were you present during a situation involving Steve Davis, Luke Farritor, Jeremy Lewin, and others who were seeking physical access to USAID's offices on Saturday, February 1, 2025?

A. Can you be more specific?

Q. Yes. There was, as I understand, a situation that happened at USAID's headquarters -- the Ronald Reagan building -- where Steve Davis, Luke Farritor, other individuals who you have identified were trying to get access to -- into the

Page 99

building on that Saturday. Were you with that group of people on that day?

A. I don't recall.

Q. Did you have access to SCIFs at USAID?

A. Not to my understanding.

Q. Your testimony is you've never been inside a SCIF at USAID?

A. That is my --

MR. SILER: Objection, misstates prior testimony.

THE DEPONENT: Yeah, you can repeat it.

MR. WARREN: Yeah.

BY MR. WARREN:

Q. You've never been inside a SCIF at USAID?

A. No, not to my understanding. To be clear, I've never been inside a classified space at USAID like if a room was formerly a SCIF or something like that.

Q. Thank you. Do you recall were you in attendance at USAID's headquarters on Sunday, February 2nd -- the following day?

A. It's very likely.

Q. Were you aware that around February 2, 2025, email systems and computer access systems for thousands of USAID employees and contractors were

Page 100

cut off? Yes or no.

MR. HUMPHREYS: Objection, foundation.

THE DEPONENT: Can you repeat the question?

BY MR. WARREN:

Q. Are you aware that around February 2, 2025, email access and computer systems access for thousands of USAID employees and contractors was cut off?

A. My understanding and recollection is that at some point senior agency leadership directed that a number of USAID employees be placed on an administrative leave, which is fully paid with benefits.

And as part of that administrative leave senior agency leadership would direct that those employees lose physical keycard access and email access in accordance with standard administrative leave procedures.

Q. How did you become aware of that?

A. It is likely, although I don't recall exactly, that in carrying out some of those specific procedures associated with the administrative leave, senior agency leadership would have directed me or others to, you know, revoke physical access and to,

Page 101

you know, temporarily revoke digital access in accordance with the privileges we had been granted.

Q. In your first few days at USAID -- so I'm focused on the time period of January 31st through February 2nd -- did you do that?

A. I can't speak as to which day this happened. It certainly happened.

Q. In the first few days?

A. I can't speak to the exact -- it might have been day four or day five. I couldn't tell you.

Q. Was it something that happened more than once? And to be clear I'm referring to what you just described as being directed to -- my phrase -- cut off access to people, physical or --

A. Yeah.

Q. -- electronic access --

A. My understanding --

Q. -- at USAID?

A. Sorry.

Q. Do you understand the question?

A. Yeah, I cut you off. Can you repeat it?

Q. Yep. So what you just described as being directed to assist with cutting off people's access, either physical or electronic, you said you don't

Page 102

recall whether it was the first three days or day four. I'm asking were there multiple occasions where you were asked to do that during your three weeks at USAID?

A. There were -- yes. I believe there were at least two instances where employees were placed on administrative leave at the direction of senior agency leadership.

Q. And what were you asked to do specifically?

A. I would have been asked to, for example, you know, physically revoke -- revoke physical access to ensure safety of the building and employees within the building. And I would have been asked to, you know, remove access to email as part of standard administrative leave procedures.

Q. You said you recall that happening on two occasions; correct?

A. I don't want to give an exact number. You can imagine one day might have been "Hey, there's these 23 that we want" from senior agency leadership. But in terms of large scale probably two or three.

Q. Who directed you to do that on those occasions?

Page 103

A. That would have been senior agency leadership.

Q. Who?

A. I could not recall.

Q. Who was typically directing your work at USAID at that time?

A. It would have been the administrator or the deputy administrator, the chief of staff -- someone like that.

Q. And who was the administrator at that time?

A. I don't recall exactly who was exactly who. Obviously Ken Jackson, Joel on kind of the chief of staff side. Pete Marocco was kind of like, you know, somewhere in that chain. But --

Q. Sorry. Joel's last name?

A. I couldn't recall it. I think it's in your email.

Q. Was it the same person within senior leadership who instructed you to cut off, limit peoples' access on the multiple times you did it?

A. No. It would have been -- I don't recall exactly who. But I'm sure it was kind of some mix. In general, you know, there was -- some of them would be in the buildings some days, others not.

Page 104

You know, it's kind of who was around you would tell you what to do.

Q. Was there ever an occasion where somebody asked you to do something at USAID and because that person wasn't your direct supervisor or you didn't believe they had the authority to tell you to do something you went and asked somebody else to confirm that you were supposed to be doing what the person asked you to do?

MR. HUMPHREYS: Objection, vague.

THE DEPONENT: Yeah. Can you repeat the question?

MR. WARREN: Sure.

BY MR. WARREN:

Q. Was there ever a time during your three weeks at USAID where somebody asked you to do work regarding USAID and you went to somebody else to confirm that you were supposed to do it?

A. Only senior agency leadership asked me to perform work during my time at USAID.

Q. And any time someone from senior -- you would say leadership as you've described -- asked you to do that work you did it?

A. Presumably, yeah.

Q. We talked about Peter Marocco before

Page 105

generally. In the context of now what we're describing -- sort of cutting access off for people -- did Mr. Marocco ever instruct you to cut access off for USAID individuals?

A. I don't recall.

Q. Jeremy Lewin?

A. I don't recall.

Q. Elon Musk?

A. No, I think I'd remember that one.

Q. Did you ever cut off access for -- in the manner that you've described for USAID employees who were abroad?

MR. SILER: Objection, vague.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Did you ever -- the access that you cut off as you described for USAID employees -- did you ever do that for USAID employees who were located abroad -- outside the United States?

MR. SILER: Objection, vague, misstates prior testimony.

You can answer.

THE DEPONENT: So if someone's on vacation

Page 106

in London did I cut their access?

MR. WARREN:  No.  For USAID employees who were stationed abroad.

THE DEPONENT:  Ah.  I don't recall.  My role was to implement the directives that were given to me by senior agency leadership.

BY MR. WARREN:

Q.   And the senior agency leadership we just -- I asked you about some specific individuals.  What about Steve Davis?  Did he ever instruct you to cut off access from people?

A.   No.

Q.   How were the instructions communicated to you?

A.   Usually in person.

Q.   Did you have an office at USAID?

A.   We would -- the group of senior agency leadership would typically occupy the administrator's suite.

Q.   Were you included in that senior leadership --

A.   No.

Q.   -- including yourself?

A.   No.

Q.   So where were you located?

Page 107

A.   I would work alongside them in that suite.

Q.   So you said typically they would -- it would be in person.  Did you ever receive written instructions about cutting people off of their access to USAID?

A.   It wouldn't surprise me if I had.  But I don't recall.

Q.   Your recollection is that the instructions were typically --

A.   In general --

Q.   -- in person?

A.   -- yeah.  People would just be standing next to you and give you a directive.  "People" being senior agency leadership.

THE DEPONENT:  Does anyone have a read on the thermostat?  Are we still at 75?

(Speaking simultaneously.)

THE DEPONENT:  74.6.

MR. SILER:  Yeah, it was pretty flat.

THE DEPONENT:  Okay.  So it went down because we had the door open earlier.  It's unfortunate.

MR. SILER:  I mean, would anyone object to opening the door?

THE DEPONENT:  Let's open the door.

Page 108

MR. HUMPHREYS:  There are a lot of us in a room this size --

THE DEPONENT:  Yeah.  I'm wearing a sweater vest and it's brutal.  Maybe in like flat ten.

BY MR. WARREN:

Q.   Mr. Kliger, I'm handing you what's being marked as Plaintiffs' Exhibit 6 -- 5.

THE REPORTER:  Exhibit 5 marked.

(WHEREUPON, Plaintiffs' Exhibit 5 was marked for identification.)

MR. HUMPHREYS:  Can we have another copy down here for --

And for the record, is this cover page yours or --

MR. WARREN:  The cover page can actually come out.  Let's put the -- the document's what we care about.

MS. MAYS:  Actually, that's the Government --

MR. WARREN:  Oh, it's the Government's cover page?  Then we'll leave it on.

BY MR. WARREN:

Q.   Mr. Kliger, for the record I handed you Plaintiffs' Exhibit 6, which is a cover page and then a 20-page memo dated February 2, 2025.  And the

Page 109

substance of 19 pages of it are blocked out.

A.   It's actually a 19-page memo just for clarity.

Q.   Oh, thank you.  Thank you.

A.   The cover page is page 1 for me.

Q.   Oh, there's a --

A.   This is a public filing.  So that's why the numbering is messed up.  Could you repeat the question if there was one?

Q.   There wasn't one.  My question for you is have you ever seen this document before?

A.   I don't recall.

Q.   This is dated February 2, 2025.  You see that?

A.   Yes.

MR. SILER:  Just to be clear, the memorandum -- not the cover page or --

MR. WARREN:  Correct.  Sorry, the memo.

BY MR. WARREN:

Q.   And it says "internal memorandum PII sensitive.  Not for external distribution."  You see that at the top?

A.   Yes.

Q.   It's to William Malyszka, Chief Human Capital Officer, and Ken Jackson, Assistant to the

Page 110

Administrator for Management and Resources; correct?

A. Mm-hmm.

Q. And it's from Pete Marocco. You see that?

A. Yes.

Q. And I'm sorry, on February 2, 2025 -- strike that.

What was your understanding of Pete Marocco's position on February 2, 2025?

A. My understanding was that he was a part of senior agency leadership.

Q. And the subject line is "Personnel placed on administrative leave"; correct?

A. Correct.

Q. And the memo references in the first line that "I" -- apparently from Pete Marocco -- "placed the following 633 USAID personnel on excused absence, also known as administrative leave." You see that?

A. Yes.

Q. Were you involved in the termination of access for the 633 people put on administrative leave here? And I know that their names are blocked out.

A. Yes, I'll take your word on the 633 -- and I guess Pete's word.

Page 111

MR. SILER: Maybe you should re-ask the question.

MR. WARREN: Sure.

MR. SILER: Just --

BY MR. WARREN:

Q. So were you involved in cutting off access -- systems access for the USAID personnel --

A. I --

Q. -- in this memo?

A. Sorry to cut you off. I believe so, yes.

Q. This would be one of the two or three large-scale cutoffs that you were involved in?

A. Yes.

Q. Okay. But you don't recall this memo?

A. Again because there were two or three of these things -- I'm sure each one had a memo. I've seen similar memos. I may have seen this one.

Q. Did you have any role in drafting it -- this memo or a memo like this?

A. Not to my recollection.

Q. Did you ever draft memos for other people at USAID?

A. No.

Q. You drafted memos on your own behalf?

MR. SILER: Objection --

Page 112

THE DEPONENT: Is that a question?

MR. WARREN: Yes.

THE DEPONENT: Can you repeat it?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Did you ever draft a memo while you were at USAID?

A. Not to my recollection.

Q. All right. You can put that aside. And Mr. Kliger, I'm handing you what is going to be marked as Plaintiffs' Exhibit 6.

THE REPORTER: Exhibit 6 marked.

(WHEREUPON, Plaintiffs' Exhibit 6 was marked for identification.)

THE DEPONENT: Thank you.

BY MR. WARREN:

Q. For the record, this is a cover sheet and then a memo dated February 3, 2025, that is 40 pages with almost the entirety of the menu -- memo blacked out.

A. Is that because it's peoples' personal information?

Q. It doesn't matter.

A. So just to be clear, the memo's blacked out. I'm just trying to understand its context or

Page 113

is this just a list of peoples' personal information presumably? And so that's why it would be blacked out.

Q. Presumably.

A. Okay.

MR. HUMPHREYS: And let's be clear on the record. Did you black this out? Was it the Government or you guys?

MR. WARREN: This is the Government's production. The --

MR. SILER: To be clear for the record --

MR. HUMPHREYS: Yeah.

MR. SILER: -- this was a filing that was put on the public docket --

MR. WARREN: Yeah.

MR. SILER: -- but this was a filing in connection with a response to a court order that we produced. And it was redacted to remove certain individuals' names for privacy reasons.

MR. WARREN: Thank you.

BY MR. WARREN:

Q. You see the memo is dated February 3, 2025?

A. Yes.

Q. And it's again to Mr. Malyszka and Mr.

Page 114

Jackson -- the same as the last memo we looked at?

A. Yes.

Q. From Mr. Marocco?

A. Yes.

Q. And the subject is "Personnel placed on administrative leave"; correct?

A. Yes.

Q. And this references placing 1,412 USAID personnel on excused absence, also known as administrative leave, with pay effective immediately; correct?

A. Yes.

Q. And based on your prior testimony I presume you had no involvement in drafting this memo?

MR. SILER: Objection, argumentative.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Did you draft this memo?

A. No.

Q. Did you have any involvement in drafting the memo?

A. Not that I recall.

Page 115

Q. Were you involved in cutting off access to the 1,412 USAID personnel?

A. Yes.

Q. Again this is consistent with your testimony before where you said there were two or three large-scale --

A. Yes. And this would be --

Q. -- cutoffs.

A. -- one of them. Unless there was like another one I didn't know about that's all of them.

Q. And Mr. Kliger, we've talked about -- I've used the phrase "cutting off access." You had described that before.

Was there anything else that you did with regard to placing individuals on administrative leave in addition to cutting off physical access to the building or electronic access to USAID systems to effectuate their being placed on leave?

A. I believe we would also send a notice generally to employees informing them that they were being placed on administrative leave. Because there would be like 1,400 people it required a technologist in order to send those emails and generate them and so forth.

Q. And you were involved in sending those

Page 116

emails?

A. Yes, we would work to generate -- we would be provided a template. We would then work to, you know, populate the template. It needs like a name. It needs your, you know, years of service, et cetera -- other information about employees. Oh, for admin leave? I was thinking of RIF notices.

Q. For admin leave?

A. I'm not sure. We may have generated notices to let people know they were on admin leave. It would be that same thing where like if we did generate a document it was we were given a template by senior agency leadership. We, you know, it needs employee names, you know, just like the IT function.

Q. And the times that you did that who instructed you to do it?

A. It --

MR. SILER: Objection, vague and ambiguous just as -- I want to be clear -- are we asking about administrative leave here?

MR. WARREN: Yes, about the administrative leave that Mr. Kliger just testified to about potentially sending out an email to people to let them know they were on admin leave.

THE DEPONENT: Can you repeat the

Page 117

question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Who instructed you to do that?

A. It would have been senior agency leadership.

Q. And again that would include?

A. Joel.

Q. Joel Borkert?

A. Pete Marocco.

Q. Peter Marocco.

A. Ken Jackson.

Q. Joel? I'm sorry, Joel Borkert could be --

MR. SILER: Could you maybe ask a question? These are all --

MR. WARREN: Yes.

BY MR. WARREN:

Q. Joel Borkert, yes?

A. He was the deputy chief of staff --

Q. Yep.

A. Yes.

Q. Who else?

A. Probably, you know, like a deputy administrator or something. But, you know, that's what I recall.

Page 118

Q.   Have you ever been to the USAID website?

A.   Yes.

Q.   During the time that you worked at USAID did you ever have -- did you do any work with regard to the USAID website?

A.   Yes.

Q.   What work did you do?

A.   At one point in consultation with senior agency leadership I was asked to take the website down, to put it back up, and ultimately to post a statement drafted by senior agency leadership.

Q.   Who was the senior agency leadership who asked you to do that?

A.   I don't recall.

Q.   When was that?

A.   I --

Q.   When were you asked to take down the website?

A.   I don't recall exact dates.

Q.   Were you told why you were taking down the website?

A.   I don't recall.

Q.   Were you told how quickly to take down the website?

A.   I mean, generally if someone told me to do

Page 119

something my understanding was that it was to be done in a prompt fashion.

Q.   How long did it take you to shut down the website?

A.   I don't recall.

Q.   Was it something that took days or hours?

A.   I believe it was largely executed by the IT team and -- of USAID.  And I don't know exactly.

Q.   What was your involvement in it?

A.   I would talk to the IT team and convey what I heard from senior leadership and, you know, if they needed -- like how do you take down a website?  Well, there's a lot of options you can imagine.

So we walk through the technical options available and see which would make sense to accomplish the directives of senior agency leadership.

Q.   So you supervised the website being taken down as opposed to you did the manual taking down of the website?

MR. SILER:  Objection to the characterization.

THE DEPONENT:  Yeah.  Just to reiterate, I would be instructed by senior agency leadership in

Page 120

some way, you know, take down the website.

And then I would work with the IT team to convey that instruction and say "Well, you know, do we want to pull the DNS record?  Do we want to, you know, change the homepage?"  Like there's a lot of, you know, technical things there.

BY MR. WARREN:

Q.   You mentioned that you were asked to take down the website and then put it back up; is that correct?

A.   I don't recall exactly.  I certainly at some point was directed to take the website down.  I assume it went back up or -- I don't totally remember the specifics on that.  Like again this is more like "Hey, IT team, X, Y, Z."

Q.   Were you involved in putting the website back up?

A.   I don't recall.  Probably.  I would imagine.  But I don't recall.

Q.   I'm handing you what's being marked as Plaintiffs' Exhibit 7.

THE REPORTER:  Exhibit 7 marked.

(WHEREUPON, Plaintiffs' Exhibit 7 was marked for identification.)

BY MR. WARREN:

Page 121

Q.   Mr. Kliger, for the record this is a printout of a Twitter post from the account @SamStein dated February 3, 2025.  And within the post there's a -- what appears to be a screenshot of an email.  Do you see that?

A.   Yes.

Q.   You see the screenshot of the email?  The "from" address of the email is listed as USAID Press; correct?

A.   Yes.

Q.   And then there's a website listed.  Excuse me, there's an email address listed -- press@usaid.gov?

A.   Yes.

Q.   Do you know what website that is?  Excuse me.  Do you know what email address that is?

A.   Presumably the press -- the handle they would -- USAID would use to send emails to employees about press or something.

Q.   Did you have access to that email address?

A.   We had asked to be delegated access to some email address capable of addressing, you know, employees across USAID.  And this is probably it.  But I don't recall exactly.

Q.   Do you recall using that email address to

Page 122

send or receive emails?

A.    Again I don't know if it was this exact email address or whether this Twitter post is, you know, altered, et cetera.  But we certainly used an email address of this form to send an email of this nature, yes.

Q.    You said "we."  Who's "we"?

A.    Senior agency leadership and myself.

Q.    The "reply to" in the exhibit says gkliger@usaid.gov.  Did you have an email address gkliger@usaid.gov?

A.    Yes.

Q.    Is that the email address you used while at USAID?

A.    Yes.

Q.    Is there any other email address you used while at USAID?

A.    Not to my knowledge.  Well, again like press@usaid -- they may have -- when we were sending things like a notice to all employees, et cetera, I would have been delegated some handle to send that mass communication.

Q.    I appreciate the clarification.  This was the only personal, individual email address you had at USAID; correct?

Page 123

A.    Yes.

Q.    This was sent to "All USAID."  Does that "All USAID" email address go to everybody at USAID.gov?

A.    That was my understanding.

Q.    Do you know who sent this email?

A.    I sent the email.

Q.    And the email says below --

A.    Sorry, just to have a little --

Q.    Sure.

A.    -- clarification when I say I sent the email -- I sent the email at the direction of senior agency leadership using language that was provided to me by senior agency leadership.

Q.    Okay.  So let's break that down for a minute.  You said you sent it at the direction of senior agency leadership.  Do you recall who specifically told you to send it?

A.    I do not.

Q.    Do you recall how you were told to send it?

A.    Can you clarify?

Q.    Yeah.  How did someone --

A.    How did they communicate it to me?  I don't recall.

Page 124

Q.    How long after you were told to send it did you send the email?

A.    I don't recall.

Q.    Is this to the best of your recollection an accurate representation of the email that you sent?

MR. HUMPHREYS:  Objection.  I would just state for the record it looks like the full text of the email may be cut off in the screenshot.

THE DEPONENT:  Yeah.  From what I can see of it, it looks similar to the email I sent and may be the same.

BY MR. WARREN:

Q.    And the email says, as represented here to all personnel at the direction of agency leadership --

A.    I forgot the senior.  It's a joke.  I said they forgot the senior.

Q.    The USAID headquarters at the Ronald Reagan building in Washington, DC will be closed to agency personnel on Monday, February 3, 2025.

"Agency personnel normally assigned to work at USAID headquarters will work remotely tomorrow with the exception of personnel with essential onsite and building maintenance functions

Page 125

individually."  And then the rest is cut off from here.  You said you don't recall who told you to send it; correct?

A.    It was someone in senior agency leadership.

Q.    You don't recall specifically who?

A.    Correct.

Q.    You said that the language was provided to you.  By who?

A.    I don't recall.

Q.    Someone in senior agency leadership?

A.    Yes.

Q.    But you --

A.    -- someone in senior agency leadership.

Q.    All right.  And how was it communicated to you? A.    I don't recall.

Q.    Did someone tell you this and you wrote it down?

A.    It's possible someone dictated it to me.  It's possible.  I don't recall.

Q.    You were saying it's possible someone dictated to you and it's possible that someone sent it to you --

A.    Yes, that --

Q.    -- sent the language to you?

Page 126

A.   Exactly.  We were working -- senior agency leadership was and the administrators -- so was I. It's certainly possible someone came up to me and said, "Here's the dictation."  It's possible someone communicated it in another way.  I don't recall.

Q.   **The email purports to be sent at 00:42. That would be 42 minutes past midnight on February 3rd.  Is that when you sent the email?**

MR. SILER:  Objection, argumentative, compound.

THE DEPONENT:  Can you repeat?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.   **Is that when you sent the email?**

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  I don't recall when I sent this email.

BY MR. WARREN:

Q.   **Do you recall whether it was late at night?**

A.   I do not.

Q.   **You don't recall whether it was during the business day or whether it was close to midnight?**

A.   At this point in time I was working

Page 127

probably 18 hours a day nonstop.  So no, I don't know if I sent this during the day, at night.  You know, we worked all hours.

Q.   **How long after you were told to send the email did you send it?**

MR. SILER:  Objection, asked and answered.

MR. WARREN:  You can answer.

THE DEPONENT:  I don't recall.  Generally we do things promptly.  But again something like this has technical stuff that's required to actually execute.

You have to say "Okay.  Do I have access to some email I can send through" and then task -- we would have then tried to like send the actual mass email.  So I'm sure it took time.

BY MR. WARREN:

Q.   **You said you don't remember whether you were told orally or in writing the text of the email here.  When there were written communications sent to you -- and I know we discussed this before.  But I want to focus particularly on this email.  When there were written communications sent to you were those written communications over email?**

A.   It would have been over official government email or over official government chat.

Page 128

Q.   **Okay.  The chat being the --**

A.   Whatever --

Q.   **-- Google chat --**

A.   -- Google thing --

Q.   **-- platform --**

A.   -- yeah.

Q.   **-- that you identified before?**

A.   Yeah.

Q.   **Do you know if that platform maintains the records?**

A.   I do not.

Q.   **Do you know whether the email records were maintained?**

A.   I do not.  I would assume that the agency, you know, complies with federal records acts.  But you know --

Q.   **Were you ever told -- were you ever instructed to delete emails that you received at USAID?**

A.   No.

Q.   **Were you ever instructed to delete texts or the Google chat messages you received?**

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  I don't believe I was ever

Page 129

instructed to delete anything, no.

BY MR. WARREN:

Q.   **You said that you were told to send this email.  What's your understanding of why you were sending it?**

MR. SILER:  Objection, speculation.

THE DEPONENT:  One --

MR. WARREN:  You can answer.

BY MR. WARREN:

Q.   **What's your understanding of why you were sending it?**

A.   I don't totally recall.  Presumably because senior agency leadership wanted to close the headquarters on a Friday.  Given the nature of the large-scale personnel actions that were taking place at this time they may have felt there was a physical safety risk.

Like when you fire 1,400 people, you know, you probably don't want to open the office the next day -- whatever -- fire, administrative leave -- you understand that -- the point being made.

MR. SILER:  Do you need a break?  You said a while ago you needed --

THE DEPONENT:  I'm okay for -- let's do maybe five more minutes.

Page 130

MR. WARREN: Okay.

BY MR. WARREN:

Q. I know I've asked you generally about who instructed you to send the email. Prior to sending this email did you have other communications with anyone at USAID about the decision to shut the headquarters on Monday the 3rd?

A. Did I have other communications with them about this decision? It may have been discussed or communicated through official government channels. I don't recall. I would expect that given the fact that we were placing large numbers of people on administrative leave that I'm sure we had discussed things like physical security and so forth as we -- but I don't recall --

Q. And when you say --

A. -- specifics here.

Q. Sorry. And when you say "we" who do you mean?

A. Senior agency leadership and myself.

Q. That include Jeremy Lewin?

A. I would not include Jeremy Lewin necessarily in my definition of senior agency leadership. If I did take a directive from Jeremy Lewin my understanding would be that it was being

Page 131

conveyed from senior agency leadership through him to me.

Q. And specifically with regard to this email and the decision to close headquarters -- did you ever discuss that with Mr. Lewin?

A. Likely. But I don't recall specifics.

Q. Mr. Davis?

A. I don't recall.

Q. Mr. Musk?

A. No, I think I would remember that.

Q. Ms. Gleason?

A. Not that I recall.

Q. Secretary Rubio?

A. Not that I recall.

Q. Mr. Marocco?

A. Likely. But I'm not sure.

Q. Do you recall any communications with anyone else at USAID after this email was sent about the email or about the decision to close headquarters?

A. Oh, definitely. You know, we would have been discussing did it go out, did people receive the email, why is the "Reply To" at gkliger@usaid.gov, what did we misconfigure, how do we not do that next time, you know, et cetera.

Page 132

Q. Well, let's break that down a little bit. Why was the "Reply To" at -- to you?

A. The IT work made a misconfiguration when they delegated the account to me.

Q. Who was the "Reply To" supposed to be?

A. It should have just been press@usaid.gov.

Q. You said you had many conversations after this was sent with USAID senior leadership; correct? I don't want to --

A. Yeah, I wouldn't --

Q. -- mischaracterize --

A. -- characterize it that way. My point was there would be conversations of a technical nature regarding whether it went out, et cetera, et cetera. And then the "Reply To" piece -- you know, I don't think there were like long, long discussions or anything like that.

Q. And any of those conversations with Mr. Lewin?

A. And these conversations we're referring to are?

Q. Sorry, conversations after the email was sent about the email and about the closing of USAID as you just described --

A. I'm sure Jeremy and I discussed the, you

Page 133

know, physical closure of USAID, yes.

Q. Mr. Davis?

A. I don't recall.

Q. Mr. Musk?

A. No.

Q. Ms. Gleason?

A. Not to my recollection.

Q. Mr. Rubio?

A. No.

Q. Mr. Marocco?

A. Likely.

Q. One more document --

A. It's possible it was discussed also with Joel and with Ken Jackson.

Q. Thank you.

A. Senior agency leadership.

Q. One more document related to this and then we can take a break if that's fine?

MR. SILER: Is that all right?

THE DEPONENT: Yeah.

MR. WARREN: Okay. I'm not going to ask you more questions about that. But you might want to keep it handy.

THE DEPONENT: Okay.

MR. WARREN: I'm handing you what's being

Page 134

marked as Plaintiffs' Exhibit 8.

THE REPORTER: Exhibit 8 marked.

(WHEREUPON, Plaintiffs' Exhibit 8 was marked for identification.)

BY MR. WARREN:

Q. For the record this is a screenshot of a tweet from @ElonMusk dated February 3, 2025, at 1:54 a.m. It's in the joint record at page 197. Mr. Kliger, are you familiar with this tweet from Mr. Musk?

A. I may have seen it before, yeah. To be clear, this gets into some weird -- I don't recall if I saw this tweet at the time it was posted.

Q. You recall seeing it after?

A. Yeah, I definitely remember like the line "wood chipper" so it's possible.

Q. And you see this was sent at 1:54 a.m., which is 62 minutes after your email was sent according to the last exhibit we looked at?

A. Yeah, it looks to be about an hour after assuming these are the same time zones and so forth.

MR. SILER: Actually I think it's 72 but --

THE DEPONENT: Seventy-two minutes, yeah. Hour and 12.

Page 135

BY MR. WARREN:

Q. Do you recall where you were when that -- when the last email was sent?

A. I believe I was at the USAID headquarters.

Q. Do you recall who else from USAID senior leadership was at DOGE -- excuse me, at USAID headquarters with you that night?

A. No.

Q. Did you ever discuss this Elon Musk tweet with anyone at USAID in the --

A. I --

Q. -- three weeks you were at USAID?

A. I don't recall. I don't even recall if I saw the tweet. It's certainly possible. But I don't remember this particular thing.

Q. And in the time between your email was sent out in Exhibit 3 and Mr. Musk's tweet did you discuss the email in exhibit -- excuse me, the prior exhibit -- with Mr. Musk?

A. Not to my recollection, no.

Q. Mr. Musk writes "We spent the weekend feeding USAID into the wood chipper." What was your interaction with Mr. Musk over that weekend -- the weekend of February 2nd and 3rd?

MR. SILER: Objection, lack of foundation.

Page 136

THE DEPONENT: Can you repeat the question?

MR. WARREN: Yep.

BY MR. WARREN:

Q. What was your interaction, if any, with Mr. Musk during that weekend?

A. On that particular weekend I don't recall.

Q. And then Mr. Musk wrote "Could have gone to some great parties. Did that instead." You see that?

A. Yeah.

Q. Do you know what he's referring to?

MR. SILER: Objection, calls for speculation.

THE DEPONENT: Yeah. Would you like me to speculate?

BY MR. WARREN:

Q. I'm asking you if you know?

A. Then no.

MR. WARREN: All right. We'll take a break.

THE DEPONENT: All right.

THE VIDEOGRAPHER: Please stand by. The time is 4:35 p.m. We are off the record.

(WHEREUPON, a recess was taken.)

Page 137

THE VIDEOGRAPHER: We are on the record. The time is 4:45 p.m.

BY MR. WARREN:

Q. Mr. Kliger, during the last break did you discuss the substance of your testimony with anyone?

A. No.

Q. On Thursday, February 20, 2025, DOGE reportedly put a $1 spending limit on government credit cards used at USAID and other agencies. Are you aware of that?

MR. SILER: Objection, argumentative. Assumes facts not in evidence.

THE DEPONENT: Am I aware of a specific credit card limit on February 20th? I mean, no. I'm generally aware that, you know, part of, you know, reducing wasteful spending was to reduce limits on, you know, employee credit cards of federal agencies. I'm sure each agency was, you know, doing that in accordance with their senior leadership.

BY MR. WARREN:

Q. Were you involved in putting spending limits on USAID credit cards? That is credit cards by USAID employees.

A. I don't recall.

Page 138

Q.   You don't recall one way or the other?

A.   I've probably done credit cards at like five agencies.  I don't recall.

Q.   What other agencies do you think you've limited credit card spending at?

A.   The United States Department of Agriculture as an example.  Probably the Internal Revenue Service.  Yeah.

Q.   I'm showing you what's been -- being marked as Government Exhibit -- Plaintiffs' Exhibit 9.

THE REPORTER:  Exhibit 9 marked.

(WHEREUPON, Plaintiffs' Exhibit 9 was marked for identification.)

MR. WARREN:  Oh, no.  It's done too.  We nipped it in the bud.

BY MR. WARREN:

Q.   For the record this is a tweet from Elon Musk's account dated February 22, 2025, at 2:46 p.m.  It's in the record at JR702.

Mr. Kliger, you can see that the document says -- the tweet reads, quote, "Consistent with President @RealDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last

Page 139

week.

"Failure to respond will be taken as a resignation."  You ever see this tweet around the time that it was posted?

A.   I don't recall.

Q.   Are you aware that Mr. Musk after the fact sent out a tweet -- sent out this tweet?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  No, I don't recall whether I was aware of random tweets.

BY MR. WARREN:

Q.   Were you involved in decisions at USAID -- strike that.

Were you involved in a decision at USAID to require employees to document what they had done or accomplished in the recent -- in the prior week?

A.   I don't recall.

Q.   Were you involved in that directive or that task at any other federal agency?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Was I involved in what task?

MR. WARREN:  Sending an email out to

Page 140

employees at the agency or requiring employees to submit documentation of what they had done or accomplished.

MR. SILER:  Objection, vague and ambiguous.  Compound.

THE DEPONENT:  Can you repeat it?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Were you involved in that directive about requiring federal employees to document what they had done or accomplished at any other agency outside of USAID?

MR. SILER:  Same objection.

THE DEPONENT:  Yeah, when you say "were you involved in that directive" -- are you asking if I was involved in issuing that directive?  Are you asking if I was involved in carrying out that directive?

MR. WARREN:  All of the above.

THE DEPONENT:  Okay.  I was not involved in issuing that directive.  My understanding is that senior agency leadership would have asked for that on an agency-by-agency basis and that senior leadership would have been responsible for that and deciding how it was implemented.

Page 141

But on the implementation side to perform some technical work or something with respect to like what email I have no recollection.  But it's certainly possible.

MR. WARREN:  We are marking Plaintiffs' Exhibit 10.

THE REPORTER:  Exhibit 10 marked.

(WHEREUPON, Plaintiffs' Exhibit 10 was marked for identification.)

THE DEPONENT:  Thank you.

BY MR. WARREN:

Q.   This is an email dated February 22, 2025, from the email address HR@opm.gov.  "Reply To" same address.  The subject line is "What did you do last week"; correct?

A.   Yes.

Q.   And the email asks "Please reply to this email with approximately five bullets of what you accomplished last week and CC your manager.  Please do not send any classified information, links, or attachments.  Deadline is this Monday at 11:59 p.m. Eastern."  Did you send out this email from the OPM.gov email address?

A.   No.

Q.   Do you know who did?

GAVIN KLIGER                    January 06, 2026                    142 to 145
92792

Page 142

A.    My understanding was that this would have been using the system I built my first week and that it would have been at the direction of senior agency leadership within OPM, likely the director.  But that would be speculation.  And that would have been carried out likely by the technical team.  But this is all speculation.

Q.    And when you say your first week you're referring to that -- the period from January 20th to January 31st?

A.    Yeah, in that time.  But I'm sure -- I might have tooled around with it in like early February or whatever.  There were a lot of kinks to sort out.

Q.    During the time you were at USAID do you know if any email like this was sent to USAID staff?

A.    I mean, you're showing me one.  Right?  Are you asking me if this email exists or what was the question?

Q.    No, specifically to USAID.

A.    Isn't this to USAID or am I missing that?

Q.    Yes, I'm sorry.  Sorry, at the time you were at USAID do you think --

A.    Are you asking if I was at USAID when this came in?

Page 143

Q.    Yes.

A.    I don't recall.

Q.    Okay.  During the time that you've been at the government have you received any email asking you to respond with some documentation of what you accomplished last week?

A.    My understanding was that generally -- I guess to directly answer your question I don't recall.

Q.    Do you recall -- did you ever respond to an email like this?

A.    If I don't recall if I received one I probably don't recall if I replied to one.

Q.    You ever have to document five bullets or something similar of what you accomplished last week --

MR. SILER:  Objection --

BY MR. WARREN:

Q.    -- during your time with the government?

MR. SILER:  Objection, vague and ambiguous.  Compound.

THE DEPONENT:  Can you repeat?

BY MR. WARREN:

Q.    Did you ever have to document what you accomplished at the government?

Page 144

A.    Did I ever have to document what I accomplished at the government?

Q.    Yeah, in an -- responding to an email like this?

A.    Responding --

MR. SILER:  Objection, vague, ambiguous, compound.

THE DEPONENT:  Yeah.  Can you repeat that?

BY MR. WARREN:

Q.    Did you ever respond to an email like this documenting what you did at the government?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.  Did I ever respond to an email like this?  What does "like this" mean?  I mean, ask -- an email asking what you've done -- of course people get emails like that all the time in their standard course of work.

BY MR. WARREN:

Q.    You received those emails during your time at the government?

A.    "Those emails" referring to what?  People asking "Hey, what's the status on X" or "How are we doing on Y"?  Yes, I received emails like that at my time in government.

Page 145

Q.    Mr. Kliger, my question is a little bit different.  But I appreciate your answer to that question.  Have you ever responded to an email similar to this in form or in substance asking you to document, for example with approximately five bullets, of what you accomplished last week?

MR. SILER:  Objection, vague, ambiguous.

THE DEPONENT:  I feel --

MR. WARREN:  And the answer is yes, no, or don't know.

THE DEPONENT:  -- my answer to the prior question applies to this as well.  And I will repeat it.

BY MR. WARREN:

Q.    If you could answer it for the record, please?

A.    The record -- can someone read from the record my prior answer --

Q.    No, if you'd just answer the question again, sir.

MR. HUMPHREYS:  Objection, asked and answered.

THE DEPONENT:  I'm not going to answer the same question twice here.

MR. WARREN:  It's a different question.

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Page 146

THE DEPONENT: Okay. Can you repeat the question, please?

BY MR. WARREN:

Q. During your time at the government did you ever respond to an email similar in substance or form to this one asking you to document what you accomplished last week --

A. Again --

MR. SILER: Objection, vague, ambiguous --

THE DEPONENT: Yeah.

MR. SILER: -- asked and answered.

THE DEPONENT: This is -- I'll answer it for the third time, which is we have -- in the course of business in the federal government it is very common to receive an email asking the status of objectives or what you've done or et cetera.

Whether they ask in bullet points or some other form is arbitrary. This is actually very common in the workplace -- not just in federal government but everywhere. And so as a result I'm sure I have replied to emails in this form of someone asking what I've done in a given time period, yes. And again in a form as I described it there.

MR. WARREN: We are marking Plaintiffs'

Page 147

Exhibit 11.

THE REPORTER: Exhibit 11 marked.

(WHEREUPON, Plaintiffs' Exhibit 11 was marked for identification.)

BY MR. WARREN:

Q. Mr. Kliger, I know the document's a little bit hazy. For the record this is a screenshot of an ID service center incident announcement. It is in the joint record at page 431. Do you see where it says near the top "This new user added alert is to inform you that a new user has been added to your domain"? Do you see that?

A. This is fuzzy. Yes.

Q. It says "The alert details include user HR_Announcements@usaid.gov." And then below that "by gkliger@usaid.gov." You see that?

A. Yes.

Q. Do you know what this is in reference to?

A. Presumably we had been asked to set up some mailbox. As we looked at before, we were like sending from some existing press handle. And I'm sure senior agency leadership -- well, speculating a little bit.

But senior agency leadership probably was like "It would be nice if instead of sending from a

Page 148

press handle we had an official human resources handle from which to send emails."

Q. Did you create this email address?

A. I don't recall. But it would appear that way from this.

Q. It's dated Sunday, February 23, 2025. Were you still working at USAID at that time?

MR. SILER: Objection, compound.

THE DEPONENT: I was working at a number of federal agencies at this period in time.

BY MR. WARREN:

Q. Including USAID?

A. Presumably, yeah.

Q. Did you ever use this email address -- HR_Announcements@usaid.gov -- to send out email?

A. I don't recall. But it's certainly possible.

Q. When you created it --

A. To be clear, when I say it's certainly possible, that would be at the behest of senior agency leadership if they had mass communications or similar they wanted to handle via an HR, you know, kind of focused email.

Q. You don't recall one way or the other whether you actually sent out emails from the

Page 149

address?

A. So there were a lot of email addresses and accounts. I don't know if this particular email address -- you know, there might be one without a space. There might be one that was lowercase. They might have decided they want to go with a different email handle. So no, I don't know at this point in particular.

Q. Do you know who else used the account?

A. No.

Q. Do you know who had the authority to send out emails from this account?

MR. SILER: Objection, calls for a legal conclusion.

THE DEPONENT: Yeah. And when you say "authority" are you referring to like a legal authority?

BY MR. WARREN:

Q. Who had the ability to send emails --

A. So you're referring to like a technical -- who was technically permitted to do it like in a system?

Q. I'm asking who could send emails out from this account?

A. I don't recall. Presumably it would be

Page 150

senior agency leadership or their designee.

Q.   You can put that document to the side. Plaintiffs' Exhibit 12 I'm handing you.

A.   Sorry.

THE REPORTER:  Exhibit 12 marked.

(WHEREUPON, Plaintiffs' Exhibit 12 was marked for identification.)

BY MR. WARREN:

Q.   For the record this is a memo.  The recipient is blacked out.  It is from Peter Marocco and dated February 23, 2025.  The subject is "Specific notice of reduction in force."

And it is in the joint record at pages 448 to 451.  Mr. Kliger, if you could just take a moment to review that document.  Let me know if you've ever seen it before?

A.   I don't think I have -- okay.  And this document looks like a notification of reduction in force that would be sent to federal employees upon reduction in force.  I've seen a lot of documents to this effect -- dozens -- that one probably literal.

And I would say whether I've seen -- I mean, this specific one I don't know.  This one's redacted for an individual employee.  Have I seen the general template of these kinds of notices?

Page 151

Yes.

Q.   Were you involved in drafting memos or notices like this at USAID?

A.   No, we would have been provided this by senior agency leadership or their designee.  And then we would have, you know, from a technical perspective, if asked, populated it with, you know, employee information that they're entitled to receive by staff as part of this notice.

Q.   You said that you were not involved in the drafting of this or similar notices or memos.  Do you know who typically drafted them?

MR. SILER:  Objection, misstates prior testimony.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Do you know who drafted this memo?

A.   I mean, it says it's from Pete Marocco.

Q.   Do you know who drafted it?

A.   No.

Q.   Do you know who drafted similar memos that were sent out as you described -- the RIF memos?

MR. SILER:  Objection, vague, ambiguous.

Page 152

THE DEPONENT:  You can repeat.

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Do you know who drafted other RIF notices -- excuse me, other memos like this pertaining to RIF notices as you just described?

A.   Again --

MR. SILER:  Same --

THE DEPONENT:  -- across federal --

MR. SILER:  Same objection.

THE DEPONENT:  Yeah.  So across federal government, I mean, there's probably 300,000 of these scattered around or whatever.  I couldn't -- I mean, not 300,000.  But --

MR. WARREN:  At --

THE DEPONENT:  -- thousand.

MR. WARREN:  At USAID.

THE DEPONENT:  Oh, specifically at USAID? Got it.  No, my guess would be, you know, if it's from Pete Marocco, Pete Marocco -- it's possible OPM would have consulted.  I couldn't tell you.

MR. WARREN:  You can set that aside. Thank you.

BY MR. WARREN:

Q.   I want to go back for a moment to

Page 153

something we discussed previously in the first exhibit.  It was the executive order concerning the creation of the Department of Government Efficiency that we looked at.  And I can hand you the exhibit if you want to look at it?

A.   Could you do that?

Q.   Of course.

A.   Thank you.

Q.   Exhibit 1.  And if you recall we looked at the second page.  Section 3B from -- on the top of the second page -- excuse me.  Section 3C.

A.   Starting DOGE teams?

Q.   Yes.  And it references DOGE teams being placed at agencies and agency heads will ensure that the DOGE team coordinates their work with the USDS, which refers to the US Digital Service.  Are you aware of a DOGE team consistent with what's described in Section 3C being assigned to USAID during the time you were there?

MR. SILER:  Objection, misstates the document.

You can answer.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Yeah.

Page 154

BY MR. WARREN:

Q. Are you aware of a DOGE team being assigned to USAID during the time you were there?

A. Again how do we define DOGE team? Are you defining it as defined in this document? Then the answer is no.

Q. Okay. Thank you. And as defined in that document, just to be clear, you're not aware of any other group of people who were working at USAID during the roughly three weeks you were at USAID that could fit within the description of a DOGE team mentioned here?

MR. SILER: Objection, calls for speculation. Misstates prior testimony, characterization.

THE DEPONENT: Yeah. Can you repeat that?

MR. WARREN: Yep. Just want to make sure that I'm understanding your answer.

BY MR. WARREN:

Q. As the DOGE team is defined here you're not aware of any DOGE team that was working at USAID during the time you were there?

A. Yeah, I was an employee -- I don't think anyone was an official employee at USAID. They were employees at other agencies. So I don't think this

Page 155

is applicable.

Q. All right. Thank you. During the time you were at USAID did you have an understanding of its general operations?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: I was going to say if that could be rephrased --

BY MR. WARREN:

Q. Did you --

A. Its general operations?

Q. Yep.

A. Okay. I guess --

Q. We'll start with its --

A. You want to know if I'm familiar --

Q. -- mission --

A. -- with facilities maintenance?

Q. With its mission?

A. With its mission. With its stated mission or its practical, real one?

Q. With its stated mission.

A. I was familiar with its stated mission at a high level, yes.

Q. Were you familiar with its -- USAID's goals and objectives?

Page 156

A. With its stated goals and objectives --

Q. Yes.

A. -- or the goals and objectives it had in effect?

Q. Its stated goals and objectives.

A. Yes, I was familiar with the stated goals and objectives.

Q. Did you have an understanding -- and again I'm not focused on anything you may have learned from counsel or subsequent to your departure from USAID. Just focusing on your time at USAID, did you have an understanding of laws that pertained to USAID's operations?

MR. SILER: Objection, calls for a legal conclusion.

MR. WARREN: You can answer.

THE DEPONENT: Can you repeat it?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Do you have an understanding about laws that governed USAID?

MR. SILER: Same objection.

THE DEPONENT: I mean, I'm sure there's a million laws that govern USAID. Do I understand them? Right? There's a degree to which someone can

Page 157

understand law. You know, I think it's kind of vague.

BY MR. WARREN:

Q. Are you familiar with the Foreign Affairs Reform and Restructuring Act of 1998?

A. Can you repeat that?

Q. Are you familiar with the Foreign Affairs Reform and Restructuring Act of 1998?

A. Am I familiar with it?

Q. Do you know of that law?

A. No, I am not familiar with it.

Q. Do you know how that law governs USAID's operations?

MR. SILER: Objection, calls for a legal conclusion.

THE DEPONENT: Can you repeat that?

BY MR. WARREN:

Q. Do you know how that law governs USAID's operations?

MR. SILER: Same objection.

THE DEPONENT: I would say do I know how that law -- one particular law -- I was generally familiar with the law. I can't say if I recall whether I was familiar with that law at the given time.

Page 158

BY MR. WARREN:

Q.   Do you know what operations of USAID are mandated by the Foreign Affairs Reform and Restructuring Act of 1998?

MR. SILER:  Objection, calls for a legal conclusion.  Lack of foundation.

THE DEPONENT:  Can we slowly read the names of these laws just so I can --

MR. WARREN:  Sure.  So it's the same --

THE DEPONENT:  -- follow along here?

MR. WARREN:  -- law.  It's the Foreign Affairs Reform and Restructuring Act of 1998.

THE DEPONENT:  Okay.  So this is the same --

MR. WARREN:  It's known as --

THE DEPONENT:  -- law as --

MR. WARREN:  -- FARRA.

THE DEPONENT:  Okay.

BY MR. WARREN:

Q.   And the question --

MR. WARREN:  Go ahead, sir.

MR. HUMPHREYS:  I generally object to this line of questioning.  My client's not a lawyer and can't be expected to know what these laws are.

BY MR. WARREN:

Page 159

Q.   And my question is do you know anything about FARRA's requirements on the operations of USAID?

MR. SILER:  Objection, calls for a legal conclusion.

THE DEPONENT:  I would say we frequently consulted with government counsel and we acted accordingly.

BY MR. WARREN:

Q.   "We" being who?

A.   "We" being myself, senior agency leadership.

Q.   I don't want to get into substance of conversations you had with government counsel during your time at USAID.  But give an example of the type -- the topic of discussion that you would -- you just referenced your discussions with government counsel of USAID to make sure you were complying with the law?

MR. SILER:  Objection to the extent it calls for the revealing of any attorney-client communications.  And I instruct the witness not to answer revealing any of the substance of any such conversations.

THE DEPONENT:  Yeah, I won't.

Page 160

MR. WARREN:  I'm not going -- not getting into the substance.  I'm asking about the topic.

MR. SILER:  I'm not sure I understand the distinction between topic and substance.

MR. WARREN:  For example, if the topic is computer infrastructure, I'm not asking him what government lawyers told him --

THE DEPONENT:  Okay.  The topic was the law.

BY MR. WARREN:

Q.   Well, you said you talked with lawyers about compliance --

A.   With the law.

Q.   Right.  In what capacity?  That is in what context of the work you did at USAID?

A.   I can't speak to specific work.  Just in general as work was performed that was done in consultation.

Q.   With regard to your work regarding any information technology?

A.   Yes.  And again earlier when I say "we" I'm referring to senior agency leadership and myself.  So also refers to senior agency leadership.

Q.   Did you have communications with government counsel to make sure you, as you said,

Page 161

were in compliance with the law during your time at USAID with regard to any operations other than regarding information technology?

MR. SILER:  Yeah, I'm going to object to this on the basis of the attorney-client communications privilege and instruct the witness not to answer.

MR. WARREN:  Not getting into the substance of any conversation.  Just he said he talked to lawyers to make sure he was complying with the law.  I want to make sure we understand what context he was talking to the lawyers.

MR. SILER:  Yeah, I understand.  You can ask about the time and context of certain questions.  But I don't think you can ask about like whether he consulted on particular -- you know, whether certain actions were legal.  And that's --

MR. WARREN:  Understood.  We're not going there.

BY MR. WARREN:

Q.   How many meetings did you have with government counsel to make sure you were complying with the law?

A.   Define a meeting.

Q.   A conversation with more than one person.

Page 162

A. So how many conversations did I have with people?

Q. Sure, let's start there.

A. Can you repeat the question?

Q. Yeah. How many meetings did you have with government lawyers to make sure you were complying with the law during your time at USAID?

A. I don't recall.

Q. Did you have written communications with government lawyers to make sure you were complying with the law during your time at USAID?

A. I don't recall.

Q. You have communications with other individuals who were working at USAID, either on detail or assigned or formally employed by USAID, about your compliance with the law?

A. I don't recall.

Q. And do you recall having any conversations with lawyers or colleagues at USAID about complying with the law outside of the context of information technology?

A. Can you repeat the question?

Q. Yes. Did you have any conversations with anyone about complying with the law at USAID concerning something other than information

Page 163

technology?

MR. HUMPHREYS: Objection, vague.

THE DEPONENT: Yeah, to give an example of why there's some ambiguity here, it was generally for information technology.

It's possible, for example, I would say "What are the valid delivery mechanisms for this notice under the law" and you would consult with, for example, senior counsel of the Office of Personnel Management.

And they would say "Yes, it can be delivered by email. We recommend that you leave the account enabled for X hours to ensure delivery." Whatever. You may have these kind of accounts. But again this is illustrative. Right? And so that was the general nature of these discussions.

BY MR. WARREN:

Q. What's your level of understanding about the budget appropriation process for USAID?

MR. SILER: Objection, lack of foundation.

THE DEPONENT: Can you repeat again?

BY MR. WARREN:

Q. What's your understanding about budget appropriations for USAID at the time you were at USAID?

Page 164

MR. SILER: Again it's objection, vague.

THE DEPONENT: Yeah. Can you repeat this?

MR. WARREN: For the third time --

THE DEPONENT: The first time, just to be clear for the record, you asked my level. The second time you asked my understanding. So I'm looking forward to hearing the third question.

MR. WARREN: Sure.

BY MR. WARREN:

Q. What is your understanding, including your level of understanding, of budget appropriations for USAID?

A. My understanding is that funds are generally appropriated by Congress and then exercised at the discretion of the executive at a high level.

Q. Are you familiar with the Further Consolidated Appropriations Act of 2024?

MR. HUMPHREYS: I'm going to renew my objection. He's not a lawyer. Do you want to know if he has heard the statute or to opine on what it means?

MR. WARREN: I'm just asking if he's familiar with the law.

THE DEPONENT: You want to know if I'm

Page 165

familiar with that specific --

MR. WARREN: Yep.

THE DEPONENT: And then --

MR. WARREN: Yeah, the Further Consolidated Appropriations Act of 2024.

THE DEPONENT: Yeah, I don't recall it.

BY MR. WARREN:

Q. Are you familiar with the Full Year Continuing Appropriations and Extensions Act of 2025?

A. It's possible. I don't recall.

Q. Are you familiar with any other laws that govern USAID spending appropriations?

MR. SILER: Objection, calls for a legal conclusion.

THE DEPONENT: What was the question?

BY MR. WARREN:

Q. Are you aware of or familiar with any other laws that govern USAID's appropriations and spendings?

A. There are probably --

MR. SILER: Same objection.

THE DEPONENT: -- a billion laws that apply to that. And so whether I'm familiar with some subset of them -- certainly possible.

Page 166

BY MR. WARREN:

Q. Did you ever have meetings, communications, or discussions with members of Congress regarding your work at USAID?

A. Can you repeat that?

Q. Did you ever meet -- strike that. Did you ever have meetings, communications, or discussions with any members of Congress concerning your work at USAID?

A. Not that I recall.

Q. With members of Congress staff?

A. Not that I recall.

Q. With congressional committee members or their staff?

A. Not that I recall.

Q. Do you participate in any written correspondence with Congress, congressional staff, or congressional committees about your work at USAID?

A. I don't recall.

Q. Have you given any news interviews or podcasts regarding your work at USAID?

A. Any news interviews or podcasts. No podcasts that I'm aware of. I think there was some Fox News interview at some point where I was at a

Page 167

table. And it was not focused on USAID.

Q. When you say "not focused on USAID" you mean it was -- did it discuss USAID?

A. I don't recall.

Q. Have you done any -- have you written or published anything -- op ads, articles -- regarding your work at USAID?

A. Not that I recall.

Q. Have you sent any emails about your work at USAID to anyone outside of professional colleagues -- friends, family?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Can you repeat?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Have you sent any emails about your work at USAID to anyone outside of the professional -- outside of your professional contacts at USAID?

MR. SILER: Same objection.

MR. WARREN: Meaning friends or family.

MR. SILER: Same objection.

THE DEPONENT: Again when you say "professional contacts meaning friends or family" -- the implication to me is that you are referring to

Page 168

friends and family as professional contacts. And I am confused.

MR. WARREN: No, I'm sorry. I'll try to clarify.

BY MR. WARREN:

Q. I mean, did you ever anyone -- a friend, a family member -- to be like "Hey, guess what I'm doing at USAID?" Or did you talk about work --

MR. SILER: Objection, vague.

BY MR. WARREN:

Q. -- the way normal humans speak to each other --

MR. SILER: Objection, vague.

BY MR. WARREN:

Q. -- from time to time?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Yeah, I would say that's like too vague to answer. If someone calls home and says "Man, I'm really tired. My day at USAID was really long" or I'm -- has that ever been -- I don't recall. But it's certainly possible. I would say nothing substantive.

BY MR. WARREN:

Q. Your testimony is you've never sent an

Page 169

email containing anything substantive about your work at USAID?

A. Correct.

Q. Okay.

A. In fact I would almost testify I've never sent an email about USAID. But earlier you mentioned conversations. So again when I say "email" I mean like on a personal device or, you know, to a nongovernment official.

MR. WARREN: Okay. Brad, why don't we take five minutes? And I think we can wrap it up shortly after.

MR. HUMPHREYS: Good with you?

THE DEPONENT: Yeah.

THE VIDEOGRAPHER: Please stand by. The time is 5:17 p.m.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 5:24 p.m.

BY MR. WARREN:

Q. Mr. Kliger, I want to go back to something we discussed earlier. You testified that you met Mr. Lewin, Mr. Farritor, Mr. Coristine during those meetings in late December, early January; correct?

A. Correct.

Page 170

Q.   And do you ever communicate with them before the in-person meetings over email -- in any written form?  Over email, Signal, text.

A.   I don't recall.

Q.   You ever communicate with them before those meetings orally, over the phone --

A.   I don't recall.

Q.   Thank you.  We're almost at the end.  I just want to cover a couple topics real briefly before we finish.  During your time in the government you did work in the Consumer Financial Protection Bureau; correct?

A.   Yes.

Q.   And when were you there?

A.   I don't recall exact dates.

Q.   General time period?

A.   Early 2025.  CFPB, you know, was kind of a long, ongoing thing.

Q.   In what capacity were you there?

A.   I was brought in as a senior advisor to the acting director Russ Vought and other senior agency leadership.

Q.   Who did you report to?

A.   Senior agency leadership.

Q.   Mr. Vought?

Page 171

A.   I think technically on paper probably.  But I think generally I was communicated to through the -- Mark Coletta, the general counsel, or other senior agency leadership.

Q.   Did you discuss any of your work -- strike that.

For approximately how long were you doing work at CFPB?

A.   Things were kind of on-and-off because of various TROs and so forth.  So what do you mean by like "work"?  Can you rephrase the question?

Q.   Yeah.  Sure.  For how long were you doing work at CFPB?

A.   Probably less than 90 days.

Q.   Did you ever discuss that work with Amy Gleason?

A.   And I want to make just a couple points clear.  When we say how long did I work, for 90 days -- the reason I, you know, was asking for clarification earlier is that within that 90-day window you would be working at other agencies as well.

And CFPB would kind of be on again, off again.  And so it would not be like 90 continuous days of CFPB work just for clarity.

Page 172

Q.   Thank you.  Did you discuss your work at CFPB with Amy Gleason?

A.   Not that I recall.

Q.   Jeremy Lewin?

A.   Yes, I believe Jeremy was also detailed there to my recollection.

Q.   Steve Davis?

A.   I don't recall.

Q.   Was Luke Farritor at CFPB with you?

A.   I don't recall.

Q.   Ed Coristine?

A.   Don't think so.  It's possible Luke onboarded at some point.  I don't recall.

Q.   Did you discuss you work at CFPB with Elon Musk?

A.   Discuss it?  It's possible he, you know, in context of some, you know, meeting received like some update on what had happened or something.  But certainly if there were any communications it was of that nature -- just a heads-up.

Q.   And at the beginning of your testimony today you said that you had had fewer than 20 conversations I think you estimated with Mr. Musk.  That correct?

A.   Yes.

Page 173

Q.   And those were all regarding your work at the government?

A.   This was when --

MR. SILER:  Objection, misstates prior testimony.

THE DEPONENT:  Yeah, can you repeat the question?

BY MR. WARREN:

Q.   That was regarding your work at the government?

MR. SILER:  Are you asking what he testified to previously or are you asking a new question?

BY MR. WARREN:

Q.   I'm asking you the question substantively about your conversations -- the approximately 20 conversations with Mr. Musk -- what you guys talked about?

A.   I can't exactly recall.  It would have been general updates on, you know, the happenings around, you know, government since he was also in government as a special advisor to the President.

Q.   Do you recall discussing work you did at USAID with him?

A.   It's possible he received some kind of

Page 174

update as part of those, you know, kind of one-off meetings, yeah.

Q. And just to be clear I understand your answer -- you said it's possible he received an update. I'm talking about your conversations with him regarding USAID. Did you have conversations with Mr. Musk about your work or any operations of USAID?

MR. SILER: Objection, compound.

THE DEPONENT: I don't recall. These are kind of group meetings. And so --

BY MR. WARREN:

Q. Are you aware that CFPB was effectively shut down in February 2025?

MR. SILER: Objection to the characterization.

THE DEPONENT: Yeah, I also disagree with that characterization.

BY MR. WARREN:

Q. Were you involved in large-scale reduction in force at CFPB?

A. Was I involved in a large-scale reduction in force? My understanding is that the acting director in consultation with the President wanted to execute a reduction in force to bring the CFPB to

Page 175

its -- you know, to a more reasonable size.

And so there were planned reductions in force to effectuate that directive from the President and from senior -- yeah.

Q. And what's your basis for that understanding?

A. What's my basis? The President appointed Russ Vought. And, you know, Russ Vought directed that the CFPB be, you know, reduced to a more reasonable level.

Q. Did you have conversations with the President about that?

MR. SILER: You can answer yes or no.

THE DEPONENT: No.

BY MR. WARREN:

Q. Did you have conversations with Mr. Vought about that or are you basing it on things that you read or communications with other people?

A. Am I basing the fact that Russ Vought was appointed by the President that I saw assigned delegation from the President?

Q. No, not the fact that Mr. Vought was appointed based on the RIFs at CFPB.

A. Okay. Then repeat the question.

Q. Sure. You said you understood that the

Page 176

RIFs at CFPB were directed from the President through Mr. Vought. I'm asking if you knew that based on conversations with Mr. Vought --

A. I'm basing it on the fact that the President appointed Russ Vought and Russ Vought, you know, arrived and directed those reductions.

Q. And what was your involvement in executing those reductions in force?

MR. SILER: Objection, assumes facts not in evidence.

THE DEPONENT: Can you repeat?

BY MR. WARREN:

Q. What was your involvement in executing the reductions in force at CFPB?

A. Which reductions in force are we talking about?

Q. Any of them that you were involved in.

MR. SILER: Objection, assumes facts not in evidence.

THE DEPONENT: Involvement would vary case-by-case.

BY MR. WARREN:

Q. All right. Well, let's start with the first case.

A. Okay. In the first case my understanding

Page 177

is that Russ Vought --

Q. I'm sorry, to be clear -- I'm asking about your involvement, not your understanding. Like what did you do?

A. So to be clear, my recollection about which case is exactly the first is fuzzy because, as we've established on the record, you know, this has happened before. Can you repeat the question?

Q. Yep. What was your role in executing the reduction in force or multiple reductions in force at CFPB?

MR. SILER: Objection, lack of foundation.

THE DEPONENT: It would generally be similar to the USAID role, which would be to ensure access to information and technology systems and to, you know, use those systems as directed by senior agency leadership to effectuate a reduction in force or administrative leave, et cetera.

MR. WARREN: I'm handing you what's being marked as Plaintiffs' 13.

THE REPORTER: Exhibit 13 marked.

(WHEREUPON, Plaintiffs' Exhibit 13 was marked for identification.)

BY MR. WARREN:

Q. Mr. Kliger, for the record this is an

Page 178

email chain between April 13th and April 17, 2025. It bears Bates Stamp CFPB 01520 through 22.

A.   Okay.  It's taking me a minute to review this one.

MR. HUMPHREYS:  While he's doing that, can I ask, Andrew, are these the Government's redactions or yours?

MR. WARREN:  This was filed in a different case.  And I believe the -- this was filed by the Government and these are the Government's redactions.  But I'm not sure.

MR. HUMPHREYS:  Thank you.

MR. WARREN:  And Brad, obviously the document number for the case is up top.

MR. HUMPHREYS:  I see that, thank you.

MR. WARREN:  We can check.  I just don't recall off the top of my head.

THE DEPONENT:  Is this going front-to-back or back-to-front?

MR. WARREN:  This is going back-to-front.

THE DEPONENT:  Okay.  It's difficult to understand in context given the redaction.

BY MR. WARREN:

Q.   I want to focus your attention on the second page of the email starting halfway down the

Page 179

page from Christpher Chilbert dated April 13, 2025 --

A.   Yep.

Q.   -- sent to you, gavin.kliger@cfpb.gov.  Was that an email address that you used at CFPB?

A.   Yes.

Q.   To Jeremy Lewin at CFPB; correct?

A.   That is the second email on that line, yes.

Q.   And to Thomas McCarty?  Do you know who Thomas McCarty is?

A.   I don't recall.

Q.   And Mr. Chilbert writes in the email to you and Jeremy -- and I'm paraphrasing -- "As we discussed yesterday, there is not something called 'full global administrative access' that lets you do the things you requested.

"But the rules we provided should allow you to do what you need to do."  Do you know what this is in reference to?

A.   I don't recall.

Q.   Okay.  Thank you.  You can put that aside.  Handing you Plaintiffs' 14.

THE REPORTER:  Exhibit 14 marked.

(WHEREUPON, Plaintiffs' Exhibit 14 was

Page 180

marked for identification.)

BY MR. WARREN:

Q.   Mr. Kliger, this is a copy of your public financial disclosure report -- the form 278-E; correct?

A.   That's what it appears to be.

Q.   Did you fill out a form 278-E when you started with the government?

A.   Yes.

Q.   On the first page toward the bottom there's an electronic signature that says -- I'm paraphrasing -- "I certify the statements I've made are true, complete, and correct to the best of my knowledge."  And then it says it was electronically signed by you on February 10th.  Did you electronically sign this document?

A.   This document in particular I couldn't say.  I've certainly signed an OGE 278-E.

Q.   I'm going to turn your attention to page 4 of the document, heading six.  At the bottom of the page it refers to other assets and income.  And you're being asked to disclose your assets and income; correct?

A.   I am being asked now or --

Q.   On this form.

Page 181

A.   On this form, yes, you would be asked to provide your assets and income.

Q.   And you listed -- the first asset listed is Bitcoin, a value of between 15 and $50,000.  Correct?

A.   Yes.

Q.   As of the time you filled this out do you know how much your Bitcoin was worth?

A.   No.

Q.   The second asset listed is Solana, S-O-L-A-N-A, with a value between 1,000 and $15,000.  Do you see that?

A.   Yeah.

Q.   Did you own Solana cryptocurrency as of February 10, 2025?

A.   It would certainly appear so.

Q.   And to be clear, I'm asking your recollection -- not what the document says.  Did you own Solana?

A.   To my recollection, yes.

Q.   And other assets are listed throughout that page, including Apple stock between 15 and $50,000.  You see that?

A.   Yeah.

Q.   Did you own Apple stock in that value

Page 182

range?

A. At this -- at the time this was filed, presumably.

Q. Tesla stock as well between a hundred and $250,000 worth?

A. Again presumably at the time this was filed.

Q. Were you working at CFPB as of February 10, 2025?

MR. SILER: Objection, vague, ambiguous.

THE DEPONENT: Yeah. One, I'm not sure what "working" means in this context. And two, I don't recall exact time in which -- you know, like on that date I have no clue.

BY MR. WARREN:

Q. So you don't recall whether that was -- February 10th you were doing work at CFPB. But you were working for the government, correct, at other agencies?

A. Yes, certainly.

Q. You're aware of laws and regulations that prohibit executive branch employees from working on matters that affect their personal financial interests; correct?

MR. SILER: Objection, calls for a legal

Page 183

conclusion. Lack of foundation.

THE DEPONENT: What's the question?

BY MR. WARREN:

Q. Are you aware of laws and regulations that prohibit executive branch employees from working on matters that affect their personal financial interests?

A. Yes, I've been very careful to work closely with agency ethics officials to ensure compliance with those laws.

Q. Did you work with the CFPB officials about assets that you were prohibited from owning?

A. Yes.

Q. Were you informed by CFPB officials that you were not allowed to own Apple and Tesla?

A. No.

Q. Were you informed by CFPB --

A. To clarify, I was informed that within a 90-day window -- after 90 days of working at that agency under the law you would have to divest of those assets unless you received a waiver from agency ethics officials.

In this case the agency ethics officials had been subject to a reduction in force and then rehired by court order. So of course they were, you

Page 184

know, heavily biased and, you know, could not make such a judgment. But that was my understanding of the law.

Q. Do you understand that Apple and Tesla were on a list of prohibited holdings for anyone working at CFPB?

A. Again you have a 90-day window as I was told within which to divest. And so if you stay longer than 90 days you would have to divest or seek basically, you know, an opinion from their ethics branch.

It would be very common to receive such a waiver and then say "I'm not going to participate in matters pertaining to that." In this case I did not work at the CFPB 90 days or longer. So it's a moot point.

Q. Do you still own Apple and Tesla stock?

A. I couldn't tell you off the top of my head.

Q. Did you end up selling your positions in Apple and Tesla based on conversations you had with the CFPB guidance that you received?

MR. HUMPHREYS: I'm going to object to this line of questioning, which I think is starting to border on harassing because it's personal

Page 185

financial interest in an agency -- with respect to an agency that isn't particularly relevant to this case.

MR. WARREN: Okay. You can answer.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Sure.

BY MR. WARREN:

Q. Did you sell your stock in Apple based on guidance you received from CFPB?

A. The guidance I received was that I did not have to sell anything within that 90-day window.

Q. Did you --

A. That's the law.

Q. Did you sell your stock in Tesla based on guidance you received?

A. So I've made very clear I never received such guidance. And therefore I'm not sure what our question is trying to get at.

Q. Are you aware of whether cryptocurrency ownership was prohibited under CFPB guidance?

A. Again within 90 days you have 90 days with which to divest of assets or receive a waiver. And so if you work at an agency -- in this case the CFPB was in those 90 days. You were not required to

Page 186

divest.

In this case I was brought in for a very limited role, which was basically to send out RIF notices to employees and leave. And so there was obviously no conflict. And any reasonable ethics officer would have waived it. But of course in this case no waiver was needed as the tenure was less than 90 days.

Q. Sorry, you said you were brought in to CFPB for the limited purpose of sending out RIF notices?

A. I was to maintain the IT systems and the technical equipment required to, you know, carry out that action, yes. And again this would be at the direction of senior agency leadership.

They would give you a RIF notice template, as we've kind of repeated numerous times. You would run some IT system with which to do a mail merge and send emails, et cetera, et cetera, manage access in general.

Q. We talked about your work at OPM January 20th. You know what? Strike that.

MR. WARREN: This is Plaintiffs' 15.

THE REPORTER: Exhibit 15 marked.

(WHEREUPON, Plaintiffs' Exhibit 15 was

Page 187

marked for identification.)

MR. HUMPHREYS: Can I have copies or are they all in there?

MR. WARREN: It's all -- those are multiple copies of the same page.

BY MR. WARREN:

Q. For the record this is a screenshot of a tweet from the account @AnnWokeness dated December 3, 2024.

A. Okay.

Q. Mr. Kliger, do you see that it says "Breaking -- Biden announces $1 billion to help African nations rebuild homes hit by national disasters"?

A. Yes.

Q. Do you recall seeing this tweet?

A. I don't recall arbitrary tweets, no.

Q. Do you recall responding to this tweet saying, quote, "Wonder what the kickbacks on this latest grift look like"?

A. I don't recall that. But that is certainly what my response would typically be to something like this announced by President Biden.

Q. Mr. Kliger, do you remember the case involving Laken Riley?

Page 188

MR. HUMPHREYS: Objection, foundation.

THE DEPONENT: Can you elaborate on the case you're referring to?

MR. WARREN: Laken Riley was an American woman who was murdered. A man was convicted --

THE DEPONENT: Was she also raped?

MR. WARREN: Is that --

THE DEPONENT: I'm asking you was she also raped?

BY MR. WARREN:

Q. My question for you is do you recall a case involving her prosecution of a man for --

A. If she was raped maybe. If not, not sure. I remember or recall a general case about someone being raped and murdered. I don't know if that's this.

Q. Do you recall tweeting --

A. And it would have been raped and murdered by like an illegal immigrant or something similar -- the case I'm thinking of.

Q. Okay. In response to a case involving a woman who was raped and murdered by an illegal immigrant as you said, do you recall posting a tweet that said "A military-aged male invaded our country to murder our women and children.

Page 189

"Under the NCA and precedent of ex-parte Quinn he is an unlawful combatant and can be tried and executed by a military tribunal. @RealDonaldTrump @ElonMusk to make it happen."

A. What's the question?

Q. Do you recall writing that tweet?

A. Do I recall referring to an illegal immigrant who entered our country illegally and then raped and murdered a woman to face military justice in a lawful tribunal and, you know, be executed if found guilty? You certainly -- if you have a tweet to that effect, that sounds probably.

Q. I'm asking if you recall writing that and posting it?

MR. SILER: Objection, asked and answered.

THE DEPONENT: Yeah, I don't recall a specific tweet to that effect. But that certainly sounds in line with something I would believe in, yeah.

BY MR. WARREN:

Q. Why would you ask Donald Trump and Elon Musk to make that happen?

A. Why would I ask --

MR. SILER: Objection --

MR. HUMPHREYS: Objection. This is

Page 190

starting to get very far afield for -- from the facts of the case, particularly for a Rule 45 witness. I mean, can you explain any sort of nexus between the facts here and what Mr. Kliger may or may not have not said in a tweet?

MR. WARREN: Yeah. I mean, first of all, this is character evidence under Rule 404. It goes to credibility and bias under a 607; truthfulness under 608. It's all relevant.

MR. HUMPHREYS: Well, for the record I think it's harassing. And we'll keep the deposition going for now. But we may have to shut it down if you're going to be asking him about his personal views in a tweet that I don't see any personal, you know, connection to the nexus of facts here.

MR. WARREN: Okay. Mr. Humphreys, I didn't ask him about his personal views. I asked him if he recalled sending the tweet. And my question to him was why -- I can repeat the question because I don't think it was answered.

BY MR. WARREN:

Q. Why did you ask Elon Musk to make it happen?

A. I didn't. I asked the President to make it happen. And I think I tagged a senior advisor or

Page 191

something similar just for visibility. I can't speak as to why I would have done that at the time. I don't recall.

Q. Mr. Kliger, is there anything that we've discussed today that you wish to elaborate on or clarify to present a clear and accurate picture of your testimony?

A. Can you repeat the question?

Q. Sure. Is there any other information you want to provide or any answer you want to revise or elaborate on to make sure that the record reflects a clear and accurate picture of your testimony?

MR. SILER: Objection, vague and ambiguous. Excuse me. Vague and ambiguous.

THE DEPONENT: Any other -- one more time.

MR. WARREN: Sure.

BY MR. WARREN:

Q. Any information you want to add today to make sure that the topics we've discussed represent your knowledge of the issues that we've been discussing?

MR. SILER: Same objection.

THE DEPONENT: Yeah, I mean, I imagine we'll -- I can't think of anything immediately at top of mind. I will note, you know, it was 75 to 76

Page 192

in here and no one seemed to be able to get the air conditioning to run while I was wearing a sweater.

So that was unfortunate. But no, I think given the circumstances at the moment I certainly can't think of something to add in there.

BY MR. WARREN:

Q. Were you asked or directed to preserve any communications in response to this litigation?

A. Can you repeat the question?

Q. Yes. Were you asked or directed to preserve any written communications or any written documentation in response to this litigation?

A. Yes.

Q. And did you do so?

A. Yes.

Q. What types of documents did you preserve?

A. I would have --

MR. SILER: Objection. No, withdrawn.

THE DEPONENT: Okay. Can you repeat the question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. What types of documents did you preserve?

A. This assumes the existence of documents to be preserved. So I would say I did not find

Page 193

documents to be preserved.

MR. WARREN: Okay. Thank you. I think we're done. Let me just take two minutes to confer with counsel.

THE DEPONENT: Sure.

MR. WARREN: I'm not planning on --

MR. SILER: Well --

MR. WARREN: -- as well.

MR. HUMPHREYS: Before we go off the record can I just go ahead and say we'd like to read and sign the transcript.

THE REPORTER: Are we --

MR. WARREN: We're not quite done. But --

MR. HUMPHREYS: Well, it's on --

MR. WARREN: -- we may be finished --

MR. HUMPHREYS: -- there now on the record.

MR. WARREN: -- twice we'll get it a third time I'm sure.

MR. SILER: I thought it was off the record.

MR. HUMPHREYS: All right. Are we off the record now?

THE REPORTER: Are we going off the record?

Page 194

MR. HUMPHREYS:  Are we off the record now?

MR. WARREN:  Yes, we're going off the record.

THE VIDEOGRAPHER:  Please stand by.  The time is 5:51 p.m.  We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record. The time is 5:56 p.m.

MR. WARREN:  I don't believe that I have any further questions for Mr. Kliger.

Jake, I want to go back.  At the beginning of the deposition I asked about conversations between Mr. Kliger and government counsel in preparation for deposition.  You instructed the witness not to answer on grounds of privilege.  Were you asserting both attorney work product and attorney-client privilege?

MR. SILER:  Yes.

MR. WARREN:  Okay.  Do you have a common interest agreement with the witness?

MR. SILER:  No.

MR. WARREN:  Or is the Government's position that he's in the control group of the defendant agencies USAID, State, and DOGE?

MR. SILER:  I'm not going -- like if you

Page 195

want to have a meet and confer on this at an appropriate time, that's fine.  I'm not going to get into this today.

MR. WARREN:  Okay.  I'm asking because you instructed him not to answer on basis of attorney-client privilege.  He's not your client.

So I'm just making sure that there's a clean record of your basis for instructing a witness not to answer so we avoid having to bring Mr. Kliger back to answer questions about your communications with him.

MR. SILER:  I think it would be covered by the work product regardless so --

MR. WARREN:  But that's why I asked.  And you just said it's work product and attorney-client privilege.

MR. SILER:  I don't think we're excluding anything.  My point is it's moot because everything we would exclude would be excluded on the attorney work product.

MR. WARREN:  Your communications with him are not covered under your attorney work product.

MR. LYNCH:  We'll talk about it at some subsequent point.

MR. WARREN:  Okay.

Page 196

MR. LYNCH:  We don't need to make an argument on the record about this.

MR. WARREN:  I'm not making -- understood. Not trying to make an argument.  Just trying to understand the basis --

MR. SILER:  Our position -- I mean, our position is we represent the United States, and that means our interest extends to certain communications with employees acting within the scope of their employment by the United States Government, which in many cases extends the attorney-client privilege to employees of the United States.

MR. LYNCH:  Yes.

MR. SILER:  That's our position.

MR. WARREN:  Okay.

MR. HUMPHREYS:  I would also add for the record that we -- Mr. Kliger in his personal capacity would object to being brought back in because of this issue.  As a Rule 45 witness, it's incumbent upon all the parties to reduce burdens on him.

MR. WARREN:  Agreed.  I have no further questions for the witness.

MR. SILER:  No questions.

MR. HUMPHREYS:  I'm good.  Thank you.

Page 197

THE VIDEOGRAPHER:  All right.  Please stand by.

MR. HUMPHREYS:  Read and sign.

THE VIDEOGRAPHER:  Please stand by.  This is the end of the deposition of Gavin Kliger.

The court reporter will now take the orders for the transcript.

THE REPORTER:  Yes.

So Attorney Warren, will you order the original?

MR. WARREN:  Yes.

THE REPORTER:  Okay.  Is there -- is it supposed to be a rush or --

MR. WARREN:  No.  I don't think we need a rush.  These are questions that are above my pay grade.

THE REPORTER:  Okay.  So normal is fine?

MR. WARREN:  I think on this one.

THE REPORTER:  Okay.

MS. MAYS:  What's the normal turnaround --

THE REPORTER:  It's about 10 to 12 business days.

MS. MAYS:  Let's rush it.

THE REPORTER:  Okay.  So then is there a specific date you would like it by?

Page 198

MS. MAYS:  Just as soon as possible is fine.

THE REPORTER:  Would January 14th work for you?

MS. MAYS:  Works.  Thank you.

THE REPORTER:  All right.  Attorney Siler, would you --

MR. SILER:  Yes, normal course is fine.

THE REPORTER:  Oh, copies since they were ordered.

MR. SILER:  Sure.

THE REPORTER:  Okay.  Is there a rush to that one or is normal okay?

MR. SILER:  No, normal is fine.  I'm sorry.  I didn't understand your first question.

THE REPORTER:  No, if you were going to order a copy?

MR. SILER:  Yes, I want to order a copy.  But it does not need to be rushed.

THE REPORTER:  Okay.  So normal delivery.  Got it.

MR. WARREN:  We want that five-day headstart.

THE REPORTER:  Attorney Humphreys, will you be ordering a copy?

Page 199

MR. HUMPHREYS:  Yes, we'd like a copy --

THE REPORTER:  Okay.

MR. HUMPHREYS:  -- and it does not need to be rushed.

THE REPORTER:  And the read and sign?

MR. HUMPHREYS:  Yes, we would like to read and sign.

THE REPORTER:  Okay.  Where am I sending that?

MR. HUMPHREYS:  You can send it -- can you send it by email?

THE REPORTER:  Yep.

MR. HUMPHREYS:  You can send it to the address on my card if you --

THE REPORTER:  Got it.  Okay.  So normal.  All right.  Would anybody else like a copy?

MR. LYNCH:  Presumably you'll furnish me a copy?

MR. SILER:  Yes, I will.

MR. LYNCH:  Okay.

THE REPORTER:  Okay.  Awesome.  All right.  Jeremiah?

THE VIDEOGRAPHER:  Okay.  So Mr. Humphreys, Mr. Warren is getting the video of today's deposition.  Would you like to order a copy

Page 200

of today's video?

MR. HUMPHREYS:  Gavin, do you want the video?

THE DEPONENT:  Yes.

MR. HUMPHREYS:  We'll have a copy of the video, please.

THE VIDEOGRAPHER:  Okay.  And is there another attorney in the room who would like to also order a copy of today's video?

MR. SILER:  Not for the Government, no.

THE VIDEOGRAPHER:  Any other attorney in the room need the video?

MR. WARREN:  Not from the plaintiffs.

THE VIDEOGRAPHER:  Okay.  Mr. Warren, yeah, you are getting the video because you scheduled the -- just so you know.  Okay.  The time is 6:01 p.m.

MR. SILER:  Whether you like it or not.

THE VIDEOGRAPHER:  And we are off the record.

(WHEREUPON, the deposition of GAVIN KLIGER was concluded at 6:01 p.m.)

Page 201

CERTIFICATE

I, the undersigned Jeremiah Landes, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Gavin Kliger, in the above captioned matter on the 6th day of January, 2026 taken at the location of Cohen Milstein Sellers and Toll PLLC, 1100 New York Ave., Ste. 500, Washington, DC 20005.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

*Jeremiah Landes*

Jeremiah Landes

Page 202

CERTIFICATE

I, Sheila Hidalgo, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 15th day of January, 2026.

Sheila Hidalgo

Page 203

Date: January 6, 2026      Assignment #: 92792
Deponent: Gavin Kliger
Case: Doe 4 vs. Musk

ATTORNEY - TRANSCRIPT ENCLOSED:
signature of your client is required.  Please have your client make any corrections necessary. Sign the Correction Sheet where indicated.  Forward a COPY of the executed Correction Sheet directly to the attorney(s) listed below.  (The Address(es) can be found on the Appearance page of the deposition.)

Also, send a COPY of the executed Correction Sheet to our corporation.

CC:  Naegeli Deposition and Trial
     Andrew Warren, Esquire
     Tianna Mays, Esquire
     Christopher Lynch, Esquire
     Jacob Silner, Esquire
     Sarah Welch, Esquire

Page 204

CORRECTION SHEET

Deposition of: Gavin Kliger      Date: 01/06/26
Regarding: Doe 4 vs. Musk
Reporter: Hidalgo/Trumble
_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page  Line  Reason for Change
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

          Signature: _____
                    Gavin Kliger

Email to: Production@NaegeliUSA.com

Page 205

DECLARATION

Deposition of: Gavin Kliger      Date: 01/06/2026
Regarding: J. DOE 4 et al. vs ELON MUSK et al.
Reporter:  Sheila Hidalgo
_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____
on the _____ day of _____, 20____.

          Signature: _____
                    Gavin Kliger

Email to: Production@NaegeliUSA.com

January 06, 2026

## Exhibits

**EX001 ESTABLISHING AND IMPLEMENTING THE PRESIDENT'S DEPARTMENT OF GOVERNMENT EFFICIENCY** 52:7,8,11 153:9

**EX002 EMAILS REGARDING (SBU) ADMINISTRATIVE LEAVE NOTICE** 78:3,4,6

**EX003 EMAILS REGARDING PHYSICAL AND LOGICAL ADMINISTRATION FOR GAVIN** 82:22,23,24 92:11,18,23 135:17

**EX004 USAID CCURE 9000 USER ACCOUNT REQUEST** 89:4,5,6,18 92:10,22 95:14,21

**EX005 DECISION TO PUT USAID EMPLOYEES ON ADMINISTRATIVE LEAVE ON FEBRUARY 3, 2025** 108:8,9

**EX006 DECISION TO PUT USAID EMPLOYEES ON ADMINISTRATIVE LEAVE ON FEBRUARY 4, 2025** 108:7,24 112:11,12,13

**EX007 MESSAGE FROM SAM STEIN** 120:21,22,23

**EX008 MESSAGES FROM ELON MUSSK AND MIKE BENZ** 134:1,2,3

**EX009 MESSAGE FROM ELON MUSK** 138:10,11,12,13

**EX010 EMAIL REGARDING WHAT DID YOU DO LAST WEEK** 141:6,7,8

**EX011 HR ANNOUNCEMENT REGARDING INCIDENT INC3715338** 147:1,2,3

**EX012 MEMORANDUM REGARDING SPECIFIC NOTICE OF REDUCTION OF FORCE** 150:3,5,6

**EX013 EMAILS REGARDING CFPB RIF WORK** 177:21,22

**EX014 PUBLIC FINANCIAL DISCLOSURE REPORT (OGE FORM 278E)** 179:24,25

**EX015 X POST** 186:24,25

---

## $

**$1** 137:8 187:12

**$15,000** 181:11

**$250,000** 182:5

**$50,000** 181:4,23

---

## 0

**00:42** 126:6

**01520** 178:2

---

## 1

**1** 9:11 18:13 52:7,8,11 53:6 58:17,18 98:7,19 109:5 153:9

**1,000** 181:11

**1,400** 115:22 129:18

**1,412** 114:8 115:2

**10** 141:6,7,8 181:15 182:9 197:21

**10,000** 86:21

**10th** 180:15 182:17

**11** 147:1,2,3

**11-day** 35:1 70:4

**1157** 18:18

**11:59** 141:21

**12** 134:25 150:3,5,6 197:21

**13** 177:20,21,22 179:1

**13th** 178:1

**14** 179:23,24,25

**14th** 198:3

**15** 181:4,22 186:23,24,25

**17** 178:1

**18** 127:1

**18-month** 58:11,14

**59:8,11,12**

**19** 20:5 22:15 109:1

**19-page** 109:2

**197** 134:8

**1998** 157:5,8 158:4,12

**1:54** 134:7,17

---

## 2

**2** 56:15 78:3,4,6 99:23 100:6 108:25 109:13 110:5,8

**20** 22:13 23:5,6 24:18,20 32:22 52:13,14,21 89:13 137:7 172:22 173:16

**20-page** 108:25

**2019** 19:14,16,19

**2020** 19:7 20:5,15 21:5

**2024** 164:18 165:5 187:9

**2025** 20:21 21:5,17 31:13 32:22 52:13,14,21 76:14 77:2,10,18 78:10 81:18 89:13 98:7,19 99:24 100:7 108:25 109:13 110:5,8 112:18 113:23 121:3 124:21 134:7 137:7 138:19 141:12 148:6 150:11 165:10 170:17 174:14 178:1 179:1 181:15 182:9

GAVIN KLIGER
92792

January 06, 2026

207
Index: 2026..access

**2026** 9:9

**20th** 23:16 26:12 29:17 31:19 32:11, 13 33:23 35:1 37:3 40:16 57:5 62:18,21 63:2 66:20 69:9,12, 15,16,19,24 70:5,17 75:11 87:16 137:14 142:9 186:22

**22** 138:19 141:12 178:2

**23** 102:21 148:6 150:11

**26** 9:12 18:24

**27** 76:14 77:2,10,17 78:10

**278-E** 180:4,7,18

**28th** 26:14

**2:06** 9:8

**2:46** 138:19

**2nd** 99:21 101:5 135:24

---

**3**

**3** 82:22,23,24 92:11, 18,23 112:18 113:22 121:3 124:21 134:7 135:17 187:9

**300,000** 152:12,14

**31st** 31:12 33:19,23 35:3 37:3 40:16 41:5 51:10 61:23 62:15 70:5,18,25 81:18 87:14,17 101:4 142:10

**3:04** 66:6

**3:12** 66:9

**3:42** 92:6

**3:49** 92:8

**3B** 58:9 153:10

**3C** 56:15,21 57:20 58:9 153:11,18

**3rd** 126:8 130:7 135:24

---

**4**

**4** 17:19 55:2 89:4,5, 6,18 92:10,22 95:14,21 180:19

**40** 112:18

**404** 190:7

**42** 126:7

**431** 147:9

**448** 150:13

**45** 190:2 196:19

**451** 150:14

**4:35** 136:24

**4:45** 137:2

**4B** 59:19

---

**5**

**5** 108:7,8,9

**50** 25:20

**5:17** 169:16

**5:24** 169:19

**5:51** 194:5

**5:56** 194:8

---

**6**

**6** 9:8 108:7,24 112:11,12,13

**607** 190:8

**608** 190:9

**612** 15:13

**62** 134:18

**633** 110:16,21,24

**6:01** 200:17

---

**7**

**7** 120:21,22,23

**72** 134:22

**74** 91:16 92:3

**74.6** 107:18

**75** 107:16 191:25

**76** 191:25

---

**8**

**8** 134:1,2,3

---

**9**

**9** 138:11,12,13

**90** 171:14,18,24 183:19 184:9,15 185:22,25 186:8

**90-day** 171:20 183:19 184:7 185:12

**9000** 95:23 96:2

**92679** 18:14

---

**@**

**@annwokeness** 187:8

**@elonmusk** 134:7 189:4

**@realdonaldtrump** 189:4

**@realdonaldtrump's** 138:23

**@samstein** 121:3

---

**A**

**A-N-A** 181:11

**a.m.** 134:8,17

**ability** 84:2 149:19

**abroad** 105:12,21 106:3

**absence** 110:17 114:9

**abuse** 22:25 27:21 29:10 30:14 40:23 53:15,17 54:19,22, 25 55:17,21 56:8,12 58:15 72:25 73:5

**access** 41:8 59:21 61:2 76:16,25 77:1, 8 82:10 83:13,14,23 84:5,7,11,14,15,18 85:4,6,8,9,11,12,14 86:2,4,5,15 96:6,22, 25 97:1,14,18 98:2, 3,18,25 99:4,24 100:7,17,18,25 101:1,15,17,24 102:13,15 103:21 105:2,3,10,18 106:1,11 107:5

110:21 111:6,7
115:1,12,16,17
121:20,21 127:12
177:15 179:16
186:19

**accomplish** 57:17
119:17

**accomplished**
139:17 140:3,11
141:19 143:6,15,25
144:2 145:6 146:7

**accordance** 49:25
93:6 100:18 101:2
137:19

**account** 84:21 95:23
121:2 132:4 138:19
149:9,12,24 163:13
187:8

**accounts** 149:3
163:14

**accurate** 26:5 124:5
191:6,12

**acquisition** 20:25

**Act** 157:5,8 158:4,12
164:18 165:5,9

**acted** 159:7

**acting** 170:21
174:23 196:9

**action** 77:21 81:3
186:14

**actions** 17:15 43:21
129:15 161:17

**acts** 128:15

**actual** 127:14

**add** 191:18 192:5
196:16

**added** 147:10,11

**addition** 16:12
75:20 115:16

**address** 18:12,13,17
24:8,10 44:22 45:1
46:9 121:8,12,16,
20,22,25 122:3,5,
10,13,16,24 123:3
141:13,14,23 148:3,
14 149:1,4 179:5
199:14

**addresses** 45:3
149:2

**addressing** 121:22

**adhere** 48:13 59:24
60:1,9,20,23 61:8

**admin** 85:6 116:6,8,
10,24

**administered** 41:10

**administration** 63:8

**administrative** 77:9,
17,21 78:11 79:6,
11,21 80:6,18,23
83:13,23 84:11,15
100:13,15,18,23
102:7,16 110:12,17,
21 114:6,10 115:15,
21 116:20,21
129:20 130:13
177:18 179:16

**administrator** 28:16
45:9 55:5 103:7,8,
10 110:1 117:24

**administrator's**
106:19

**administrators**
126:2

**ads** 167:6

**advisor** 26:5,7,8

38:10 170:20
173:22 190:25

**advisors** 38:9

**Affairs** 157:4,7
158:3,12

**affect** 182:23 183:6

**affiliation** 64:3 89:2
94:1 95:1

**affirm** 10:10

**affirmed** 10:16

**afield** 190:1

**African** 187:13

**afternoon** 10:20

**agencies** 42:11,13
45:4 56:25 61:11
68:20 137:9,18
138:3,4 148:10
153:14 154:25
171:21 182:19
194:24

**agency** 17:14 30:24
33:11 34:21,25 35:7
40:24 41:8 42:23,24
43:19,20 44:1,20,21
47:15 48:11,13,15,
20 50:1,22 51:14,23
55:18 56:14,24
57:15,16 59:19,22
60:25 61:2,3,17
77:23 80:19,24,25
81:2,4 86:14,21
88:15 93:7 97:16
98:1,5 100:11,16,24
102:8,21 103:1
104:19 106:6,8,17
107:14 110:10
116:13 117:5 118:9,
11,12 119:17,25
122:8 123:13,14,17

124:15,21,22 125:4,
11,14 126:1 128:14
129:13 130:20,23
131:1 133:16
137:18 139:20
140:1,11,22 142:3
147:22,24 148:21
150:1 151:5 153:14
159:11 160:22,23
170:22,24 171:4
177:17 183:9,20,22,
23 185:1,2,24
186:15

**agency-by-agency**
140:23

**agenda** 53:9,12,23
54:12,16 55:9
58:11,14,17 59:5,8,
10 63:20 64:7,10
65:1 66:17 68:12
73:24 74:2 75:12
76:25

**agree** 74:20,25

**agreed** 11:20 74:15
196:22

**agreement** 194:20

**Agriculture** 35:5
138:7

**ahead** 66:4 158:21
193:10

**AI** 26:21

**aid** 48:5 49:10

**air** 86:9 90:20 91:14,
17 192:1

**alert** 147:10,14

**allegations** 18:2

**allowed** 183:15

**alongside** 107:1

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 624 of 720

GAVIN KLIGER
92792

January 06, 2026

209
Index: altered..back

**altered** 122:4

**ambiguity** 163:4

**ambiguous** 17:6 27:10,24 29:21 30:7 32:8 41:20 47:19 57:7 58:22 59:14 62:12 63:14 70:7 71:8,20 72:20 73:9, 14,21 74:5,22 77:4 86:7,18 116:18 126:16 128:24 139:9,22 140:5 143:21 144:6,13 145:7 146:9 151:25 155:6 167:13 168:17 182:10 191:14

**American** 188:4

**Amy** 28:16 45:6 171:15 172:2

**Andrew** 9:15 10:21 52:23 178:6

**announced** 187:23

**announcement** 147:8

**announces** 187:12

**answering** 73:12

**answers** 15:14

**anymore** 67:4

**apologies** 95:20

**app** 46:22 47:2,3

**apparently** 110:15

**appears** 80:17 95:24 121:4 180:6

**Apple** 181:22,25 183:15 184:4,17,21 185:9

**applicable** 155:1

**application** 24:23

**applies** 145:12

**apply** 32:1 165:24

**appointed** 51:22 175:7,20,23 176:5

**appointee** 31:15,22 32:9,23 57:13

**appointment** 32:20

**appropriated** 164:14

**appropriation** 163:19

**appropriations** 163:24 164:11,18 165:5,9,13,19

**approve** 84:11

**approximate** 51:12

**approximately** 24:18 26:18 33:19 51:10 76:12,14 141:18 145:5 171:7 173:16

**apps** 46:21

**April** 178:1 179:1

**arbitrary** 146:18 187:17

**argument** 196:2,4

**argumentative** 60:3 114:16 126:9 137:11

**arguments** 40:1

**arrival** 77:20 80:1,24

**arrived** 79:25 176:6

**arriving** 76:15

**articles** 167:6

**ascending** 78:15,16

**ascribe** 30:13 73:24

**asks** 141:17

**asserting** 37:24 38:1,11 194:16

**asset** 181:3,10

**assets** 180:21,22 181:2,21 183:12,21 185:23

**assigned** 62:9 72:18 73:7,16,22 74:3,17 124:22 153:18 154:3 162:15 175:20

**assist** 15:15 101:24

**assistance** 49:8

**Assistant** 109:25

**assume** 11:19 17:20 25:18 120:13 128:14

**assumes** 76:17 137:12 176:9,18 192:24

**assuming** 134:21

**assumption** 98:15

**attachments** 141:21

**attend** 61:24 62:4,18 67:12

**attendance** 69:13 99:20

**attended** 23:11 64:10 76:1

**attention** 30:23 69:23 81:17 98:6 178:24 180:19

**attorney** 10:21 13:12 14:12,23 15:19 194:16 195:19,22 197:9 198:6,24 200:8,11

**attorney-** 195:5

**attorney-client** 14:13,22 15:18 159:21 161:5 194:17 195:15 196:11

**audience** 95:3,5

**August** 19:13,19,22 20:1,5

**Austin** 25:17

**authorities** 13:5

**authority** 51:22 104:6 149:11,16,17

**avoid** 195:9

**aware** 12:19,21 13:7 14:1 16:16 28:24 61:4 76:11,12,13, 20,23 77:7,16 93:8, 9 99:23 100:6,20 137:10,13,15 139:6, 11 153:17 154:2,8, 21 165:18 166:24 174:13 182:21 183:4 185:20

**Awesome** 199:21

---

**B**

**back** 50:5,13 58:3 59:3 78:19,20 86:23 118:10 120:9,13,17 152:25 169:21 194:11 195:10 196:18

back-to-front 178:19,20

background 67:17

backwards 83:2

badge 72:15 75:24 84:22

badged 82:17

badging 85:11

ballpark 41:15

ballparking 24:17

based 54:15 114:13 175:23 176:3 184:21 185:9,15

basic 16:17

basically 67:20 69:15 85:2,25 184:10 186:3

basing 175:17,19 176:4

basis 36:9 37:24 39:11,19 140:23 161:5 175:5,7 195:5,8 196:5

Bates 178:2

bears 178:2

began 63:1

beginning 9:10 172:21 194:11

behalf 37:13,15,25 38:11 76:24 111:24

behest 27:5 29:8 31:16 57:13 88:15 93:5 148:20

beneficial 93:18

benefits 100:14

Berkeley 19:5 20:7

Beth 9:17

bias 190:8

biased 184:1

Biden 187:12,23

billion 165:23 187:12

bit 18:25 96:21 132:1 145:1 147:7, 23

Bitcoin 181:4,8

black 113:7

blacked 112:19,24 113:2 150:10

blocked 109:1 110:22

bootcamp 64:9,12

border 184:25

Borkert 117:9,13,18

bottom 83:5,9 180:10,20

boundaries 39:23, 25

Brad 169:10 178:13

Bradley 10:1

branch 182:22 183:5 184:11

break 12:5 65:21 66:12 90:10,12,16 91:20 92:2 123:15 129:22 132:1 133:18 136:21 137:4

Breaking 187:12

Brian 71:3,5 72:1

briefly 45:6 170:9

bring 67:16 174:25 195:9

broadly 97:15

brought 41:8 57:24 98:1 170:20 186:2,9 196:18

brutal 108:4

bud 138:16

budget 53:21,24 54:17,19 163:19,23 164:11

building 21:11 34:19 50:16 70:2,9, 13 72:16 76:16 82:9,11,16 84:23 85:14 91:15 95:7 98:23 99:1 102:13, 14 115:17 124:20, 25

buildings 103:25

built 42:15 142:2

bullet 146:17

bullets 141:18 143:14 145:6

bumped 45:16

burdens 196:20

Bureau 170:12

business 126:24 146:14 197:22

Butler 72:3,5,8

**C**

C-C-U-R-E 85:19

CA 18:14

California 18:13

call 24:1 66:18 67:22,24 74:15

called 24:11 28:24 63:21 70:12 85:15 179:15

calling 67:20

calls 14:11,21 15:17 36:20 37:8,17 44:20 51:16 59:14 83:17 87:5 136:13 149:13 154:13 156:14 157:14 158:5 159:4, 21 165:14 168:19 182:25

Cambridge 18:19

Canyon 18:14

capable 121:22

capacity 160:14 170:19 196:18

Capital 109:25

caption 9:11

card 137:14 138:5 199:14

cards 137:9,17,23 138:2

care 108:17

careful 183:8

carried 43:21 77:21 81:3 142:6

carry 186:13

carrying 28:14 51:24 100:22 140:17

case 9:11 10:23 17:4,12,14,17,21

18:2,5 76:3 176:24,
25 177:6 178:9,14
183:23 184:14
185:3,24 186:2,7
187:24 188:3,12,14,
20,21 190:2

**case-by-case**
176:21

**cases** 48:12 196:11

**casual** 65:2

**category** 64:2

**CCURE** 85:16,18,24
95:23 96:2

**cell** 24:3

**center** 147:8

**certify** 180:12

**cetera** 61:19 64:7
68:18,19 72:15
116:5 122:4,20
131:25 132:14
146:16 177:18
186:19

**CFPB** 170:17 171:8,
13,23,25 172:2,9,14
174:13,21,25 175:9,
23 176:1,14 177:11
178:2 179:5,7
182:8,17 183:11,14,
17 184:6,15,22
185:10,21,24
186:10

**chain** 51:14 52:3
69:4 78:10,13
103:15 178:1

**change** 120:5

**changed** 52:3 70:23

**channels** 130:10

**character** 190:7

**characterization**
74:25 88:20 92:19
93:2 119:23 154:15
174:16,18

**characterize** 23:19
64:11,13,14 66:22,
23 88:19 132:12

**characterized** 89:12

**charge** 27:22 28:6,7,
15

**chat** 47:3 127:25
128:1,3,22

**check** 178:16

**chief** 25:25 103:8,14
109:24 117:19

**Chilbert** 179:1,13

**children** 188:25

**chipper** 134:16
135:22

**Chris** 10:3

**Christpher** 179:1

**chronological** 78:14

**Chuck** 33:5 34:8,13
42:23

**CIO** 61:6,7

**circumstances**
192:4

**civil** 13:5,6

**clarification** 54:13
92:13 122:23
123:11 171:20

**clarified** 71:17

**clarify** 11:19 17:8
19:25 123:22 168:4
183:18 191:6

**clarity** 109:3 171:25

**classified** 99:16
141:20

**clean** 195:8

**clear** 24:16 47:3
50:15 54:8 57:4
63:24 64:24 73:12
79:23 80:1 85:12
92:14,22 99:15
101:13 109:16
112:24 113:6,11
116:19 134:12
148:19 154:8 164:5
171:18 174:3 177:2,
5 181:17 185:17
191:6,12

**client** 195:6

**client's** 158:23

**close** 38:9 71:13
126:24 129:13
131:4,19

**closed** 124:20

**closely** 183:9

**closing** 132:23

**closure** 133:1

**clue** 182:14

**Coletta** 171:3

**colleagues** 162:19
167:11

**collection** 63:18

**colloquy** 40:9

**combat** 40:23 55:16,
21 72:24

**combatant** 189:2

**combating** 22:24
54:18,21,24 58:15

**comfortable** 91:18

**command** 51:14
52:3 69:4

**commence** 55:5

**committee** 13:2
166:13

**committees** 166:18

**common** 146:15,19
184:12 194:19

**communicate** 12:6
44:9 49:2 50:6
123:24 170:1,5

**communicated**
106:13 125:15
126:5 130:10 171:2

**communication**
38:20 39:7,18
44:17,19,21 46:6
122:22

**communications**
36:12 37:7,10,18
38:3,5,8 46:8,10,11,
16 63:2 127:19,22,
23 130:5,8 131:17
148:21 159:22
160:24 161:6 162:9,
13 166:3,8 172:19
175:18 192:8,11
195:10,21 196:8

**complaint** 17:22

**complete** 180:13

**compliance** 160:12
161:1 162:16
183:10

**complies** 128:15

**complying** 159:18
161:10,22 162:6,10,
19,24

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 627 of 720

GAVIN KLIGER
92792

January 06, 2026

212
Index: compound..cutoffs

**compound** 22:3 25:8 50:9 77:11 82:12 126:10 140:5 143:21 144:7 148:8 174:9

**computer** 19:4 84:1 86:13 99:24 100:7 160:6

**concerned** 27:20

**conclusion** 51:17 149:14 156:15 157:15 158:6 159:5 165:15 183:1

**conditioner** 90:20

**conditioning** 86:10 91:14,18 192:2

**conducted** 46:17

**confer** 193:3 195:1

**confidential** 39:8

**configured** 82:5

**confirm** 83:11,12 104:8,18

**confirmed** 97:17

**confirming** 20:2

**conflict** 186:5

**confused** 70:22 168:2

**Congress** 164:14 166:4,9,11,17

**congressional** 13:1 166:13,17,18

**connect** 27:19

**connected** 20:24

**connection** 113:17 190:15

**considered** 23:16

**consistent** 115:4 138:22 153:17

**Consolidated** 164:18 165:5

**consult** 163:8

**consultation** 56:23 118:8 160:18 174:24

**consulted** 152:21 159:7 161:16

**Consumer** 170:11

**contact** 24:5

**contacts** 167:19,24 168:1

**contained** 94:12

**context** 45:14 62:24 72:8 73:2,3 105:1 112:25 160:15 161:12,14 162:20 172:17 178:22 182:12

**continued** 98:2,3

**Continuing** 165:9

**continuous** 171:24

**contractors** 97:10 99:25 100:8

**control** 194:23

**conversation** 65:2 88:9 161:9,25

**conversations** 13:9 14:2 62:5,19,22 80:5 132:7,13,18, 20,22 159:14,24 162:1,18,23 169:7 172:23 173:16,17 174:5,6 175:11,16

176:3 184:21 194:12

**convey** 119:10 120:3

**conveyed** 131:1

**convicted** 188:5

**coordinates** 153:15

**copies** 187:2,5 198:9

**copy** 15:12 52:13 108:11 180:3 198:17,18,25 199:1, 16,18,25 200:5,9

**cordial** 48:6

**Coristine** 67:9 75:3 81:12 169:23 172:11

**correct** 11:2,3,24 19:2,8,14,20 20:12 21:6,17,18 23:8 24:21,24 26:6 32:23 33:20,21 34:10 35:15 39:23 46:4,7 51:11 63:25 64:1 69:9 82:11 85:19 87:15,16 88:13,18 89:25 102:18 109:18 110:1,12,13 114:6,11 120:10 121:9 122:25 125:3, 7 132:8 141:15 169:3,24,25 170:12 172:24 179:7 180:5, 13,23 181:5 182:18, 24

**correspondence** 166:17

**counsel** 9:13 11:6 12:6,10 14:3,19

15:2 16:20,25 17:23 39:6 66:13 156:10 159:7,14,18 160:25 161:22 163:9 171:3 193:4 194:13

**count** 56:9

**country** 188:24 189:8

**County** 18:19,22

**couple** 58:3 79:13 170:9 171:17

**court** 10:6 11:22 12:23 37:22 113:17 183:25 197:6

**cover** 108:13,15,21, 24 109:5,17 112:17 170:9

**covered** 195:12,22

**covers** 38:7,8

**create** 148:3

**created** 148:18

**creation** 153:3

**credibility** 190:8

**credit** 137:9,14,17, 23 138:2,5

**criminal** 13:5

**cryptocurrency** 181:14 185:20

**curious** 71:17

**current** 18:12 25:23 29:15 69:13,19

**cut** 100:1,8 101:15, 22 103:20 105:3,10, 18 106:1,10 111:10 124:9 125:1

**cutoffs** 111:12

GAVIN KLIGER
92792

January 06, 2026

213
Index: cutting..deputy

115:8

**cutting** 77:8 101:24 105:2 107:4 111:6 115:1,12,16

**cybersecurity** 61:18,21

**D**

**data** 25:25 26:20,22 59:24 60:1,9,11,21 76:16 77:1 84:2,3 96:5

**Databricks** 20:10

**date** 9:8 20:7 21:19 182:14 197:25

**dated** 108:25 109:13 112:18 113:22 121:3 134:7 138:19 141:12 148:6 150:11 179:1 187:8

**dates** 35:6 70:22 81:14 118:19 170:15

**Davis** 40:6,20,25 49:14,15 50:2,13, 15,19,24 67:6 76:8 98:17,23 106:10 131:7 133:2 172:7

**day** 32:5,25 33:18 42:25 43:5,6 51:7 65:13 81:19,20,25 82:17 87:20 98:7,9 99:2,21 101:6,10 102:1,20 126:24 127:1,2 129:20 168:20

**days** 43:1 51:8 101:3,8 102:1 103:25 119:6

**171:14,18,25 183:19 184:9,15 185:22,25 186:8 197:22**

**DC** 18:15 21:11 124:20

**Deadline** 141:21

**deal** 68:23,25 72:11

**December** 26:14 69:16,18 169:24 187:8

**decided** 149:6

**deciding** 140:25

**decision** 54:19,22, 25 130:6,9 131:4,19 139:15

**decision-making** 38:25

**decisions** 53:21,24 54:17,20,23 139:13

**defendant** 194:24

**defendants** 9:25 10:3,4,5

**Defenders** 9:16 10:22

**deferred** 34:7

**define** 12:22 20:17 27:3 34:22 60:11 154:4 161:24

**defined** 27:1 85:7 154:5,7,20

**defining** 72:21 154:5

**definition** 130:23

**degree** 19:3,9 156:25

**degrees** 91:16 92:3

**delegated** 121:21 122:21 132:4

**delegation** 175:21

**delete** 128:18,21 129:1

**delivered** 163:12

**delivery** 26:9 163:7, 13 198:20

**demanding** 76:25

**Democracy** 9:15 10:21

**deny** 85:13

**department** 9:12 26:1,2,17,22,24 27:7,16,22 28:2 29:2,18,24 30:4 35:5 49:11 52:16 53:7 59:4 63:11 82:4,5 138:6 153:3

**departure** 156:10

**DEPONENT** 15:5 16:2 17:8 25:9 27:11 28:1 29:22 30:1,8 31:4 32:11 35:15 36:10,23 41:22,25 43:25 44:13 47:20 50:10 51:20 52:25 54:1,4 55:11 57:8,23 58:23 59:1,17 60:5,16 62:13 63:15 65:3,23 71:21 72:21 73:1 74:7,20,24 75:17 76:20 77:5,12 79:16 81:22 82:13 83:19 86:8,19 87:7 89:8 90:7,12,14,22 91:3, 22 92:3 93:22 94:6,

**10,13,22** 99:11 100:3 104:11 105:14,25 106:4 107:15,18,20,25 108:3 112:1,3,15 114:17 116:25 119:24 124:10 126:11,17 127:8 128:25 129:7,24 133:20,24 134:24 136:1,15,22 137:13 139:10,23 140:6,14, 20 141:10 143:22 144:8,14 145:8,11, 23 146:1,10,12 148:9 149:15 151:15 152:1,9,11, 16,18 153:23 154:16 155:7 156:17,23 157:16, 21 158:7,10,13,16, 18 159:6,25 160:8 163:3,21 164:2,4,25 165:3,6,16,23 167:14,23 168:18 169:14 173:6 174:10,17 175:14 176:11,20 177:13 178:18,21 182:11 183:2 185:5 188:2, 6,8 189:16 191:15, 23 192:19 193:5 200:4

**deposed** 12:15 15:15 39:9

**deposition** 9:10 11:5 12:4,7 13:9 14:17 16:19 190:11 194:12,14 197:5 199:25

**deputy** 103:8 117:19,23

**descending** 78:14

**describe** 22:20 23:2 33:23 37:7 41:11 47:16,25

**describing** 105:2

**description** 154:11

**designee** 150:1 151:5

**desk** 75:24

**detail** 17:25 18:6 162:15

**detailed** 49:17 57:15 62:14 72:18 73:7,16 74:2 172:5

**detailee** 42:21 43:17

**details** 147:14

**Development** 17:15 30:25 57:16

**device** 61:2 169:8

**dictated** 125:19,22

**dictation** 126:4

**die** 89:20

**difference** 29:4 59:9

**difficult** 41:13 43:4 178:21

**digital** 28:14,18 29:23 30:18 88:1 101:1 153:16

**dinner** 23:18,22

**direct** 33:1 34:8 42:18 43:15 100:16 104:5

**directed** 55:18 56:1 100:11,24 101:14, 24 102:24 120:12 175:8 176:1,6

177:16 192:7,10

**directing** 103:5

**direction** 80:18 102:7 123:12,16 124:15 142:3 186:15

**directive** 55:20 107:13 130:24 139:19 140:9,15,16, 18,21 175:3

**directives** 33:10 40:24 48:19 49:25 50:21 51:25 93:6 106:5 119:17

**directly** 34:25 48:17, 21 143:8

**director** 26:8 32:17 33:2 35:20 42:22 142:4 170:21 174:24

**disagree** 35:15 92:18 93:1 174:17

**disasters** 187:14

**disbursed** 49:11

**disbursement** 97:2

**disclose** 180:22

**disclosure** 180:4

**discretion** 43:11 164:15

**discuss** 12:11 16:23 32:13 48:7 50:17 66:12 68:8 131:5 135:9,18 137:5 167:3 171:5,15 172:1,14,16

**discussed** 13:19 16:17 29:14 38:7 49:13 50:19 68:10

76:2 88:16 127:20 130:9,13 132:25 133:13 153:1 169:22 179:15 191:5,19

**discussing** 12:12 23:18 45:24 50:20 65:1 131:22 173:23 191:21

**discussion** 14:10 68:20 79:5 159:16

**discussions** 13:17 40:7,17 49:23 61:24 68:23 77:7 132:16 159:17 163:16 166:3,8

**disperse** 85:3

**displaying** 93:16

**distinction** 48:19 160:4

**distribution** 109:21

**divest** 183:20 184:8, 9 185:23 186:1

**DNS** 120:4

**docket** 113:14

**doctrine** 14:23 15:19

**document** 52:17 55:2 58:8 63:21 73:2 78:25 79:2,12, 19 80:4,7,14,16 85:19 86:24 89:11 90:3,4,17 91:10 109:11 116:12 133:12,17 138:21 139:16 140:10 143:14,24 144:1 145:5 146:6 150:2, 15,18 153:21 154:5,

8 178:14 180:16,17, 20 181:18

**document's** 108:16 147:6

**documentation** 140:2 143:5 192:12

**documenting** 144:11

**documents** 13:20, 22,23,24 15:1,8,13 16:8,10,12 150:20 192:16,23,24 193:1

**Doe** 17:19

**DOGE** 9:12 21:16 22:23 23:18 25:5 27:25 28:9,12,15,25 29:3,19 30:16,20 45:9 53:9,12,23 54:2,12,16 55:9 56:23,25 57:2,11,19 58:5,11,14,17 59:5, 8,10 63:7,16,20,25 64:7,10 66:17,18 67:1 68:12 72:17,22 73:22,24 74:15 75:11 76:1,14,24,25 83:12 86:25 87:3 88:4,18,19,25 89:12 92:21 93:2 135:6 137:7 153:12,13,15, 17 154:2,4,11,20,21 194:24

**DOGE.GOV** 93:8,25 94:25

**DOJ** 13:14,16,22,23

**domain** 147:12

**Donald** 189:21

**door** 84:23 90:8 91:16 107:21,24,25

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 630 of 720

GAVIN KLIGER
92792

January 06, 2026

215
Index: Dove..event

**Dove** 18:14

**dozen** 56:9

**dozens** 150:21

**draft** 111:21 112:6 114:21

**drafted** 111:24 118:11 151:12,19, 21,23 152:4

**drafting** 111:18 114:14,23 151:2,11

**duly** 10:16

**duties** 36:19 37:2 38:19 40:15

**E**

**earlier** 28:1 46:18 55:12 71:15 76:8 81:9 92:13 93:5 97:25 107:21 160:21 169:6,22 171:20

**early** 20:21 81:9 142:12 169:24 170:17

**East** 18:14

**Eastern** 141:22

**Ed** 75:3 81:12 172:11

**education** 19:1

**Edward** 67:9

**effect** 49:12 150:21 156:4 189:12,17

**effective** 114:10

**effectively** 174:13

**effectuate** 115:18 175:3 177:17

**efficiency** 9:12 26:25 27:8,16,23 28:2 29:3,19,25 30:5 52:16 53:8 55:6 59:5 63:12 153:3

**efficient** 22:24

**elaborate** 16:3 43:13 47:21 188:2 191:5,11

**election** 67:14 69:12

**electrical** 19:4

**electronic** 101:17, 25 115:17 180:11

**electronically** 180:14,16

**Elon** 20:16,25 37:5 38:12 40:19 67:7 71:16 105:8 135:9 138:18 172:14 189:21 190:22

**email** 23:25 24:8,9, 13 33:15 34:4,5,6 42:15 44:17,20,22 45:1,3,21 46:5,9,18 78:9,13 81:4 82:4 83:2,8 84:9,21 99:24 100:7,17 102:15 103:18 116:23 121:5,7,8, 12,16,20,22,25 122:3,5,10,13,16,24 123:3,6,7,8,12 124:2,5,9,11,14 126:6,8,14,18 127:5,13,15,18,21, 23,25 128:12 129:4 130:4,5 131:3,18, 19,23 132:22,23 134:18 135:3,16,18 138:24 139:25

141:3,12,13,17,18, 22,23 142:16,18 143:4,11 144:3,10, 15,16 145:3 146:5, 15 148:3,14,15,23 149:2,3,7 163:12 169:1,6,8 170:2,3 178:1,25 179:5,8,13 199:11

**emails** 115:23 116:1 121:18 122:1 128:18 144:17,20, 22,24 146:21 148:2, 25 149:12,19,23 167:9,17 186:19

**embedded** 34:20

**employ** 28:22

**employed** 31:16 69:21 162:15

**employee** 41:1 49:16 116:14 137:17 150:24 151:8 154:23,24

**employees** 17:20 68:24 69:2,13,20 75:23 77:8 79:5 97:8 99:25 100:8, 12,17 102:6,14 105:11,19,20 106:2 115:20 116:6 121:18,23 122:20 137:24 138:24 139:16 140:1,10 150:19 154:25 182:22 183:5 186:4 196:9,12

**employing** 86:21

**employment** 19:1, 12,23 31:14 196:10

**enabled** 163:13

**encompass** 53:19, 24

**end** 11:5 20:6 69:15, 18 170:8 184:20 197:5

**engineer** 20:11

**engineering** 19:4,13 34:1

**English** 44:13

**ensure** 41:8 59:21 68:15 98:1 102:13 153:14 163:13 177:14 183:9

**entered** 189:8

**enterprise** 26:23

**entirety** 112:19

**entitled** 52:14 151:8

**EO** 59:4

**equipment** 186:13

**equivalent** 47:4

**espoused** 93:5

**essential** 124:25

**establish** 39:7 43:5 56:24

**established** 16:9 39:17 40:18 177:7

**establishes** 53:7 59:4

**Establishing** 52:15

**estimate** 22:7 50:23

**estimated** 172:23

**ethics** 183:9,22,23 184:10 186:5

**event** 23:11 25:5,6

**events** 23:12

**everyone's** 67:4

**evidence** 76:18 137:12 176:10,19 190:7

**ex-parte** 189:1

**exact** 14:7 19:15 20:6 21:19 35:6 65:9 81:13 101:9 102:19 118:19 122:2 170:15 182:13

**EXAMINATION** 10:18

**examined** 10:17

**examples** 33:12

**Excel** 20:4

**exception** 124:24

**exchanged** 45:21

**exclude** 195:19

**excluded** 195:19

**excluding** 195:17

**excuse** 36:15 39:15 52:23 54:15 66:6 70:4 76:11,12 82:21 84:14 121:11,15 135:6,18 152:5 153:11 191:14

**excused** 110:16 114:9

**execute** 33:10,13 127:11 174:25

**executed** 119:7 189:3,10

**executing** 176:7,13 177:9

**executive** 29:12 51:21 52:14 53:7 57:20 88:7 153:2 164:15 182:22 183:5

**exercised** 164:15

**exercising** 43:11

**exhibit** 52:7,8,11 78:3,4,6 82:22,23, 24 89:4,5,6,18 92:10,11,18,22,23 95:14,21 108:7,8,9, 24 112:11,12,13 120:21,22,23 122:9 134:1,2,3,19 135:17,18,19 138:10,12,13 141:6, 7,8 147:1,2,3 150:3, 5,6 153:2,4,9 177:21,22 179:24, 25 186:24,25

**existence** 192:24

**existing** 69:1 147:21

**exists** 142:18

**expect** 130:11

**expected** 48:13 158:24

**explain** 53:22 190:3

**explained** 39:18 43:17 46:17

**explanation** 58:3

**extends** 196:8,11

**Extensions** 165:9

**extent** 15:11 42:25 159:20

**external** 109:21

**Ezell** 33:5 34:8,13

42:23 43:7

---

**F**

---

**face** 189:9

**face-to-face** 24:6 44:21

**facilities** 84:7 86:1 155:17

**fact** 130:11 139:6 169:5 175:19,22 176:4

**facts** 14:20 16:7,17 18:2 76:17 137:12 176:9,18 190:2,4,15

**factual** 16:15

**Failure** 139:2

**fall** 38:22 57:19

**familiar** 28:18 85:15, 21 134:9 155:15,22, 24 156:6 157:4,7,9, 11,23,24 164:17,24 165:1,8,12,18,24

**family** 167:11,21,24 168:1,7

**FARRA** 158:17

**FARRA's** 159:2

**Farritor** 67:5 75:8 81:6,7,8 83:8,15 86:25 87:15,25 88:3,11 95:25 98:17,24 169:23 172:9

**Farritor's** 92:19 93:1

**fashion** 119:2

**February** 51:11 98:7,19 99:21,23

100:6 101:5 108:25 109:13 110:5,8 112:18 113:22 121:3 124:21 126:7 134:7 135:24 137:7, 14 138:19 141:12 142:13 148:6 150:11 174:14 180:15 181:15 182:8,17

**federal** 30:15 34:4 49:16 53:16 55:8 56:2 61:22 67:17 70:2 86:21 93:17 96:8,19 128:15 137:18 138:24 139:20 140:10 146:14,19 148:10 150:19 152:9,11

**feeding** 135:22

**feel** 92:15 145:8

**felt** 129:16

**fewer** 22:10,13 23:5 24:19,20 172:22

**fighting** 26:23

**filed** 17:22 178:8,9 182:2,7

**filing** 109:7 113:13, 16

**filings** 17:21

**fill** 95:25 180:7

**filled** 32:3 95:24 96:7 181:7

**filling** 96:4

**financial** 170:11 180:4 182:23 183:6 185:1

**find** 62:8 67:18

192:25

**finding** 67:21

**fine** 90:25 133:18 195:2 197:17 198:2, 8,14

**finish** 90:24 170:10

**finished** 193:15

**fire** 129:18,20

**fit** 154:11

**five-day** 198:22

**fix** 90:20 91:14,17

**flat** 107:19 108:4

**flip** 53:1

**focus** 41:24 127:21 178:24

**focused** 42:19 56:3 64:2 70:17 101:4 148:23 156:9 167:1, 2

**focusing** 156:11

**follow** 69:5 158:10

**follow-ups** 42:14

**force** 150:12,19,20 174:21,23,25 175:3 176:8,14,15 177:10, 17 183:24

**foreign** 49:7,10 157:4,7 158:3,11

**forgot** 124:17,18

**form** 32:2 95:23 96:1 122:5 145:4 146:6,18,21,23 170:3 180:4,7,25 181:1

**formal** 29:11 30:8 64:5,22

**formally** 162:15

**forms** 96:4,8

**forward** 164:7

**forwards** 83:3

**found** 62:13 73:13 189:11

**foundation** 31:3 53:25 55:10 57:22 59:15 60:4,15 62:12 72:19 93:21 94:21 100:2 135:25 158:6 163:20 177:12 183:1 188:1

**Fox** 166:25

**fraud** 22:25 27:20 29:9 30:14 40:23 53:15,17 54:18,21, 24 55:16,21 56:8,11 58:15 72:25 73:5

**fraudulent** 68:16

**free** 92:15

**frequent** 46:5

**frequently** 159:6

**Friday** 81:18 129:14

**friend** 168:6

**friends** 167:11,21, 24 168:1

**front** 72:14 78:19,20 84:23

**front-to-back** 178:18

**full** 10:24 54:6 59:21 72:16 83:13,22 124:8 165:8 179:16

**fully** 100:13

**function** 116:14

**functions** 124:25

**Fund** 9:16 10:22

**funds** 85:3 164:13

**furnish** 199:17

**fuzzy** 147:13 177:6

---

**G**

**gain** 82:10

**gate** 72:14

**gather** 64:25

**gathering** 45:17

**gave** 58:3

**Gavin** 9:11 10:16,25 83:12 86:25 87:3 88:25 197:5 200:2

**gavin.kliger@cfpb. gov.** 179:4

**general** 16:17 25:18 30:13 43:3 46:11 95:6 103:24 107:10 150:25 155:4,11 160:17 163:16 170:16 171:3 173:20 186:20 188:14

**generally** 33:24 40:15 41:6,21 55:13 105:1 115:20 118:25 127:8 130:3 137:15 143:7 157:22 158:22 163:4 164:14 171:2 177:13

**generate** 115:24 116:2,12

**generated** 116:9

**genuinely** 94:22

**giant** 72:16

**give** 10:11 16:7 33:12 35:6 40:25 48:24 50:2,18 68:17 102:19 107:13 159:15 163:3 186:16

**giving** 65:20

**gkliger@usaid.gov** 122:11 131:24

**gkliger@usaid.gov.** 122:10 147:16

**glanced** 17:24

**Gleason** 28:17 45:6, 19 131:11 133:6 171:16 172:2

**global** 179:16

**goals** 155:25 156:1, 3,5,6

**Gonzalez** 9:20

**good** 10:20 169:13 196:25

**Google** 46:22 47:2 128:3,4,22

**govern** 156:24 165:13,19

**governed** 156:21

**government** 9:12 14:3,19,20 15:1,14 16:6,10,19,25 20:15 22:24 24:9 25:24 26:24 27:8,16,23 28:2,14,23 29:3,8, 19,25 30:5,15 33:16 34:4,24 39:6 41:1 42:16 44:19,23 45:4,22 46:9,18,20

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 633 of 720

GAVIN KLIGER
92792

January 06, 2026

218

Index: Government's..Humphreys

52:16 53:8,16 61:10,15,22 62:17, 20 63:4,11 67:18 68:21,24 69:1,13, 19,21 72:24 74:14 82:6,21 88:13 93:17 94:18 95:14 96:9,19 108:18 113:8 127:25 130:10 137:8 138:10 143:4, 19,25 144:2,11,21, 25 146:4,14,20 152:12 153:3 159:7, 14,17 160:7,25 161:22 162:6,10 170:11 173:2,10,21, 22 178:10 180:8 182:18 194:13 196:10 200:10

**Government's** 89:17 108:20 113:9 178:6,10 194:22

**government-** 55:6

**governs** 157:12,18

**grade** 197:16

**graduated** 20:14

**grant** 96:23

**granted** 84:14,15,18 86:4,5,15 101:2

**grants** 97:2

**Gray** 83:16

**Gray's** 84:10

**great** 136:9

**Greenbrier** 18:14

**grift** 187:20

**grounds** 194:15

**group** 21:14 23:22 27:4,17,18 28:2,22

29:7,10 30:9,11 66:16 73:4,21,23 74:13 80:17,22 93:4,20 94:19,20 99:1 106:17 154:9 174:11 194:23

**GSA** 49:16

**guess** 11:15 57:23 63:20 110:25 143:8 152:19 155:13 168:7

**guidance** 68:5 184:22 185:10,11, 16,18,21

**guidelines** 60:25 61:5,8

**guilty** 189:11

**guy** 65:15 72:14

**guys** 113:8 173:17

---

### H

**habits** 89:20

**half** 62:22

**halfway** 178:25

**hand** 10:9 153:4

**handed** 108:23

**handing** 108:6 112:10 120:20 133:25 150:3 177:19 179:23

**handle** 121:17 122:21 147:21 148:1,2,22 149:7

**handoff** 26:14

**hands** 72:14

**handy** 133:23

**happen** 69:16 89:22 189:4,22 190:23,25

**happened** 76:21 80:1 98:22 101:7,12 172:18 177:8

**happening** 42:8 102:17

**happenings** 173:20

**happy** 92:14

**harassing** 184:25 190:11

**hard** 89:20

**hazy** 147:7

**head** 33:10 39:6 56:24 59:19 178:17 184:19

**heading** 180:20

**headquarters** 76:15 77:1 82:8 98:22 99:20 124:19,23 129:14 130:7 131:4, 20 135:4,7

**heads** 153:14

**heads-up** 172:20

**headstart** 198:23

**heard** 28:9 71:15 119:11 164:21

**hearing** 12:24 164:7

**heavily** 184:1

**Hey** 102:20 120:15 144:23 168:7

**hierarchical** 69:5

**high** 19:10 28:20 49:23 63:5 68:13 155:23 164:16

**hired** 31:24

**history** 19:1,12,23

**hit** 187:13

**hold** 74:21

**holdings** 184:5

**holds** 38:3

**home** 168:19

**homepage** 120:5

**homes** 187:13

**hot** 91:3,23

**hour** 134:20,25

**hours** 14:8 42:7 119:6 127:1,3 163:13

**House** 34:14,17 38:9 52:20

**How'd** 82:18

**HR** 85:9 148:22

**Hr@opm.gov.** 141:13

**HR_ ANNOUNCEMENTS @USAID.GOV** 148:15

**Hr_ announcements@ usaid.gov.** 147:15

**human** 109:24 148:1

**humans** 168:11

**Humphreys** 10:1 13:18,24 16:22 22:16 39:12,14 40:8,12 52:23 53:1 55:10 61:12 64:23 70:20 91:2,21 100:2 104:10 108:1,11

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 634 of 720

GAVIN KLIGER
92792

January 06, 2026

219

Index: hundred..interests

113:6,12 124:7 145:21 158:22 163:2 164:19 169:13 178:5,12,15 184:23 187:2 188:1 189:25 190:10,16 193:9,14,16,22 194:1 196:16,25 197:3 198:24 199:1,3,6,10,13,24 200:2,5

**hundred** 182:4

**hyperbole** 96:13,16

**I**

**ID** 147:8

**idea** 59:17 88:24

**ideals** 21:15 30:9

**ideas** 22:22 29:9 88:16

**identification** 52:9 78:7 82:25 89:7 108:10 112:14 120:24 134:4 138:14 141:9 147:4 150:7 177:23 180:1 187:1

**identified** 70:18 74:1 98:25 128:7

**identify** 36:1

**ideological** 27:18 89:2

**ideologies** 23:18

**ideology** 30:14 63:8 67:1 72:24 73:5 74:14 75:12 94:2

**illegal** 188:19,22 189:7

**illegally** 189:8

**illustrative** 163:15

**imagine** 82:3 96:18 102:20 119:14 120:19 191:23

**immediately** 114:11 191:24

**immigrant** 188:19, 23 189:8

**implement** 53:8 59:5 106:5

**implementation** 141:1

**implemented** 140:25

**Implementing** 52:15

**implication** 167:25

**improve** 55:6

**in-person** 44:17 170:2

**inauguration** 21:21, 24 69:24

**incident** 76:12,13,23 147:8

**include** 54:16 97:1 117:7 130:21,22 147:14

**included** 96:22 106:20

**including** 106:23 148:12 164:10 181:22

**income** 180:21,23 181:2

**incumbent** 196:20

**indirectly** 48:16,22

**individual** 122:24 150:24

**individually** 125:1

**individuals** 27:5 28:3 35:11 36:1 44:7 63:7 64:18 66:24,25 69:20 73:4,16,24 74:1 75:21 76:6 79:11 80:6,17 88:12,21 89:15 94:20 95:1 98:24 105:4 106:9 115:15 162:14

**individuals'** 113:19

**inducted** 20:8

**inform** 147:11

**informal** 64:22

**information** 13:4 14:12,22 15:15,18, 23 16:7,14,15 37:9, 17 39:22 41:9 84:7, 12,16 93:16,19 94:7,11,12,13,17,19 95:12 96:5 112:22 113:1 116:6 141:20 151:8 160:20 161:3 162:20,25 163:5 177:15 191:9,18

**informed** 183:14,17, 18

**informing** 115:20

**infrastructure** 33:15 34:3,24 55:7 61:3 86:13 160:6

**infrequent** 46:5

**infrequently** 43:10, 15

**initial** 34:6 97:25

**initiative** 55:5

**inside** 99:6,14,16

**instances** 102:6

**instruct** 14:13,24 15:20 36:12,15 37:10 105:3 106:10 159:22 161:6

**instructed** 11:8,9,10 34:11 69:4 103:20 116:16 117:4 119:25 128:18,21 129:1 130:4 194:14 195:5

**instructing** 37:19 195:8

**instruction** 39:13,19 48:24 120:3

**instructions** 35:23 43:16 48:14 50:2 68:6 106:13 107:4,8 138:23

**intelligence** 26:23

**intended** 95:3,5

**intent** 51:24 97:17, 24

**interact** 47:5 69:1

**interacted** 23:24 47:24

**interaction** 25:1 45:18 70:14,18,25 135:23 136:5

**interactions** 24:17 45:10 47:17,25 49:18,22

**interest** 185:1 194:20 196:8

**interests** 182:24

183:7

**intern** 19:13

**internal** 109:20 138:7

**International** 17:15 30:24 57:16

**interrupted** 91:13

**interruption** 90:6

**interview** 166:25

**interviews** 166:21, 23

**introduce** 9:13

**invaded** 188:24

**investigation** 13:6,7

**invite** 67:25

**invited** 67:11

**involve** 54:19,22,25

**involved** 22:21 35:11 36:5,6 40:6 63:11 110:20 111:6, 12 115:1,25 120:16 137:22 139:13,15, 19,23 140:9,15,16, 17,20 151:2,10 174:20,22 176:17

**involvement** 79:5, 10 95:7 114:14,23 119:9 176:7,13,20 177:3

**involving** 98:17 187:25 188:12,21

**issue** 196:19

**issues** 12:12 191:20

**issuing** 140:16,21

**It's** 107:21

**I'm** 108:3 127:15

---

**J**

**Jackson** 44:4,5 51:23 103:13 109:25 114:1 117:12 133:14

**Jacob** 9:24

**Jake** 194:11

**James** 10:4

**January** 9:8 20:21 21:5,17 23:16 26:12 31:12,19 32:11,13, 22 33:19,23 35:1,3 37:3 40:16 41:5 51:10 52:13,14,20 57:4 61:23 62:15, 18,21 63:1 66:20 69:8,12,15,16,19,23 70:5,17,18,25 75:11 76:14 77:2,10,17 78:10 81:9,18 87:14,16,17 89:12 101:4 142:9,10 169:24 186:21 198:3

**Jason** 83:16

**Jehieli** 9:22

**Jeremiah** 199:22

**Jeremy** 68:3 75:6 81:15 98:17 105:6 130:21,22,24 132:25 172:4,5 179:7,14

**Jesus** 95:18

**Joaquin** 9:20

**job** 97:23

**Joel** 81:4 103:13 117:8,9,13,18 133:14

**Joel's** 103:16

**John** 71:7,18

**join** 63:8

**joined** 20:15

**joint** 134:8 147:9 150:13

**joke** 124:17

**JR702** 138:20

**judge** 18:9

**judge's** 18:4,8

**judgment** 184:2

**July** 20:5

**justice** 189:9

---

**K**

**Ken** 44:4,5 51:22 103:13 109:25 117:12 133:14

**keycard** 100:17

**kickbacks** 187:19

**kind** 21:15,16 22:22 23:19 25:5 27:18 29:7 48:18 49:24 65:3 67:16 103:13, 14,23 104:1 148:23 157:1 163:14 170:17 171:9,23 173:25 174:1,11 186:17

**kinds** 150:25

**kinks** 142:13

**Kliger** 9:11 10:2,8,

13,16,20,25 18:20 25:23 54:14 75:25 78:11 83:2,12 86:25 87:3 88:25 90:2 92:10 95:20 108:6, 23 112:10 115:11 116:22 121:1 134:9 137:4 138:21 145:1 147:6 150:14 169:21 177:25 180:3 187:11,24 190:4 191:4 194:10, 13 195:9 196:17 197:5

**knew** 22:21 24:9 71:16 88:14 176:2

**knowledge** 53:14 122:18 180:14 191:20

---

**L**

**lack** 53:25 57:22 59:14 60:3,15 62:9, 11 72:19 93:21 94:21 135:25 158:6 163:20 177:12 183:1

**Laken** 187:25 188:4

**language** 123:13 125:8,25

**laptop** 82:3

**large** 102:22 130:12

**large-scale** 111:12 115:6 129:15 174:20,22

**largely** 119:7

**late** 51:11 126:20 169:24

**latest** 187:20

**law** 157:1,10,12,18, 22,23,24 158:11,16 159:19 160:9,13 161:1,11,23 162:7, 11,16,20,24 163:8 164:24 183:20 184:3 185:14

**lawful** 189:10

**laws** 156:12,20,24 158:8,24 165:12,19, 23 182:21 183:4,10

**lawyer** 158:23 164:20

**lawyers** 160:7,11 161:10,12 162:6,10, 19

**leadership** 22:22 34:14,15,17 35:9, 18,25 36:2 40:17,24 41:9 42:22,24 43:19,20 44:1 47:15 48:11,13,15,20 50:1,22 55:19 56:14 57:17 69:6 77:24 80:19,24 81:1,3,5 88:16 93:7 97:17 98:5 100:11,16,24 102:8,22 103:2,20 104:19,22 106:6,8, 18,21 107:14 110:10 116:13 117:6 118:9,11,12 119:11,18,25 122:8 123:13,14,17 124:15 125:5,11,14 126:2 129:13 130:20,24 131:1 132:8 133:16 135:6 137:20 140:22,24 142:4 147:22,24

148:21 150:1 151:5 159:12 160:22,23 170:22,24 171:4 177:17 186:15

**learned** 67:13 156:9

**leave** 77:9,17,21 78:11 79:6,11,21 80:6,18,23 100:13, 15,19,23 102:7,16 108:21 110:12,17, 22 114:6,10 115:16, 18,21 116:7,8,10, 20,22,24 129:20 130:13 163:12 177:18 186:4

**legal** 13:14,16 39:18 40:1 51:16 149:13, 16 156:14 157:14 158:5 159:4 161:17 165:14 182:25

**length** 14:7

**lets** 179:16

**Let's** 107:25

**level** 28:20 49:23 63:5 68:13 155:23 163:18 164:5,11,16 175:10

**Lewin** 68:3 75:6 81:15 98:17 105:6 130:21,22,25 131:5 132:19 169:23 172:4 179:7

**like-** 73:15 88:20 94:1

**like-minded** 27:4,19 28:3 30:9 64:18 66:16,24 72:23 73:4,23 74:2 88:12 89:14 93:20 94:20 95:1

**limit** 103:20 137:8, 14

**limited** 93:19 94:1,3, 6 138:5 186:3,10

**limits** 137:17,23

**lines** 53:6 58:8

**Linkedin** 26:4

**links** 141:20

**list** 113:1 184:5

**listed** 121:8,11,12 181:3,10,21

**literal** 150:21

**literally** 96:15

**litigation** 192:8,12

**located** 82:7 105:20 106:25

**log** 94:14

**logical** 83:14 84:5

**London** 106:1

**long** 14:6 22:1 26:16 41:12 42:6 119:3 124:1 127:4 132:16 168:21 170:18 171:7,12,18

**longer** 26:5 184:9, 15

**looked** 58:19,23 79:19 88:7 114:1 134:19 147:20 153:4,9

**loose** 63:18 64:3 73:23 94:1,19 95:1

**loosely** 74:15

**loosely-affiliated** 93:20 94:20

**lose** 100:17

**lot** 23:14 40:9 96:18 98:14 108:1 119:13 120:5 142:13 149:2 150:20

**lowercase** 149:5

**Luevanos** 9:22

**Luke** 67:5 75:8 81:6, 7,8 83:8 95:25 98:17,24 172:9,12

**Lynch** 10:3 195:23 196:1,13 199:17,20

**M**

**machine** 86:1

**made** 38:18 39:10 61:4 63:24 129:21 132:3 180:12 185:17

**mail** 186:18

**mailbox** 147:20

**main** 70:1

**maintain** 186:12

**maintained** 128:13

**Maintaining** 95:10

**maintains** 128:9

**maintenance** 124:25 155:17

**major** 41:17

**make** 11:16 40:1 119:16 154:17 159:18 160:25 161:10,11,22 162:6, 10 171:17 184:1 189:4,22 190:22,24 191:11,19 196:1,4

**making** 22:24 195:7 196:3

**male** 188:24

**Malyszka** 109:24 113:25

**man** 168:20 188:5, 12

**manage** 84:19,20,22 86:1 186:19

**Management** 26:10 31:17 32:18 33:3 34:2 35:21 57:14 70:1 110:1 163:10

**manager** 141:19

**managing** 83:14 84:4,7

**mandate** 40:22

**mandated** 158:3

**manner** 105:11

**manual** 119:20

**Mark** 171:3

**marked** 52:6,9,11 78:2,5,7 82:23,25 89:5,7 108:7,8,10 112:11,12,14 120:20,22,24 134:1, 2,4 138:10,12,14 141:7,9 147:2,4 150:5,7 177:20,21, 23 179:24 180:1 186:24 187:1

**marking** 141:5 146:25

**Marocco** 47:10,24 48:14,23 51:24 103:14 104:25 105:3 110:3,15 114:3 117:10,11

131:15 133:10 150:10 151:20 152:20

**Marocco's** 47:12 110:8

**mass** 122:22 127:15 148:21

**materials** 16:8

**matter** 112:23

**matters** 43:18 48:8 55:13,15 182:23 183:6 184:14

**Mays** 9:19 108:18 197:20,23 198:1,5

**Mccarty** 179:10,11

**Mcgill** 71:3,5 72:1

**Mclean** 18:19

**meal** 23:9

**meaning** 23:12 68:25 167:21,24

**means** 164:22 182:12 196:8

**meant** 94:25 95:3

**mechanisms** 163:7

**media** 44:16

**meet** 14:3,6 20:20 21:10 63:6 72:8,11 166:6 195:1

**meet-ups** 81:8

**meeting** 14:10 16:19 17:2,3 21:8,12,14, 15 22:1 23:13 25:15,16,17 64:25 65:7 161:24 172:17

**meetings** 23:20,25 24:6 61:24 62:4,18

63:2,10 64:15,16, 20,22 65:8,14 66:15,18,19,24 67:1,12,25 68:3,6, 11 69:8,11,14 74:16 76:1,10 88:17,18,20 89:12,14 161:21 162:5 166:2,7 169:24 170:2,6 174:2,11

**member** 20:9 30:4 57:11 168:7

**members** 63:10,17 76:14 166:3,8,11,13

**membership** 30:9 64:5

**memo** 108:25 109:2, 18 110:14 111:9,14, 16,19 112:6,18,19 113:22 114:1,15,21, 24 150:9 151:19

**memo's** 112:24

**memorandum** 109:17,20

**memorialize** 37:23

**memos** 111:17,21, 24 151:2,11,23,24 152:5

**mentioned** 33:18 35:9,22,24 45:6 46:8 55:11 67:7 68:2 76:4 81:6 120:8 154:12 169:7

**menu** 112:19

**merge** 186:18

**messages** 128:22

**messaging** 12:7 46:25 47:1

**messed** 109:8

**met** 16:25 20:18,22 21:4 22:12 23:6 47:8 64:6 71:24 72:1,3 75:10 81:8, 10 87:14 169:22

**Microsoft** 47:4

**mid** 51:11

**midnight** 126:7,24

**military** 189:3,9

**military-aged** 188:24

**million** 86:10 156:24

**mind** 29:4 54:2,3,5,9 58:16 191:25

**minded** 73:16 88:21 94:2

**minute** 83:7 90:24 91:17 123:16 178:3

**minutes** 58:19 78:22,24 126:7 129:25 134:18,24 169:11 193:3

**mischaracterize** 132:11

**misconfiguration** 132:3

**misconfigure** 131:24

**missing** 142:21

**mission** 27:15 56:6 155:16,18,19,21,22

**misstates** 22:17 35:13 74:18 79:14 99:9 105:22 151:13 153:20 154:14 173:4

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 638 of 720

GAVIN KLIGER
92792

January 06, 2026

223
Index: mix..occupy

**mix** 44:7 103:23

**Mm-hmm** 58:12 87:1 110:2

**modernize** 72:25

**modernizing** 55:8 56:13

**moment** 33:18 41:24 62:24 150:14 152:25 192:4

**moments** 79:13

**Monday** 124:21 130:7 141:21

**money's** 68:18

**months** 19:15 26:18

**moot** 184:15 195:18

**motion** 17:22

**move** 90:18 91:7

**moved** 18:15

**movement** 21:16

**moving** 62:23

**multiple** 102:2 103:21 177:10 187:5

**murder** 188:25

**murdered** 188:5,15, 18,22 189:9

**Musk** 20:16,25 22:12,20 23:1,21 32:14 37:5 38:12 40:19 71:16 105:8 131:9 133:4 134:10 135:9,19,21,23 136:6,8 139:6 172:15,23 173:17 174:7 189:22 190:22

**Musk's** 135:17 138:19

---

**N**

---

**named** 81:4

**names** 76:3 110:22 113:19 116:14 158:8

**national** 187:13

**nations** 187:13

**nature** 14:9 21:7 47:16 49:21 57:24 122:6 129:14 132:13 163:16 172:20

**NCA** 189:1

**necessarily** 130:23

**needed** 49:12 119:12 129:23 186:7

**network** 55:7

**news** 166:21,23,25

**nexus** 190:3,15

**nice** 147:25

**night** 126:21 127:2 135:7

**nipped** 138:16

**nongovernment** 169:9

**nonsense** 39:12

**nonstop** 127:1

**normal** 168:11 197:17,20 198:8,13, 14,20 199:15

**note** 191:25

**noted** 28:1

**notes** 89:13

**notice** 78:11 115:19 122:20 150:12 151:9 163:8 186:16

**notices** 116:7,10 150:25 151:3,11 152:4,6 186:4,11

**notification** 150:18

**November** 25:4 67:13 69:12,14

**number** 22:7 75:23 100:12 102:19 148:9 178:14

**numbering** 109:8

**numbers** 65:9 130:12

**numerous** 61:18 186:17

---

**O**

---

**oath** 11:24 12:18

**object** 11:6 36:8 107:23 158:22 161:4 184:23 196:18

**objection** 14:11,21 15:17 17:5 22:3,16, 17 25:8 27:9,24 29:20 30:6 31:3 32:7 35:13 36:20 37:8 39:10,11,19 40:8 41:19 43:23 44:11 47:18 50:9 51:16 53:25 55:10 57:6,22 58:21 59:13 60:3,15 61:12 62:11 63:13 64:23 70:6, 20,21 71:8,19 72:19 73:8,20 74:4,18 76:17 77:3,11 79:14 81:21 82:12 83:17 86:6,17 87:5 93:21 94:5,9,21 97:21 99:9 100:2 104:10 105:13,22 111:25 114:16 116:18 119:22 124:7 126:9, 15 127:6 128:23 129:6 135:25 136:13 137:11 139:8,21 140:4,13 143:17,20 144:6,12 145:7,21 146:9 148:8 149:13 151:13,25 152:10 153:20 154:13 155:5 156:14,22 157:14,20 158:5 159:4,20 163:2,20 164:1,20 165:14,22 167:12,20,22 168:9, 13,16 173:4 174:9, 15 176:9,18 177:12 182:10,25 188:1 189:15,24,25 191:13,22 192:18

**objections** 40:2

**objectives** 56:10,11 146:16 155:25 156:1,3,5,7

**obtain** 76:15

**occasion** 76:9 104:3

**occasionally** 40:25 50:16 67:6 68:4

**occasions** 102:2,18, 25

**occupy** 106:18

**October** 25:2

**offer** 34:6

**office** 26:9 28:13 29:12 31:17,24 32:17 33:2 34:2 35:21 57:14 69:25 72:7,9 106:16 129:19 163:9

**officer** 25:25 109:25 186:6

**offices** 98:19

**official** 37:15 38:19 44:19 46:8 47:3 127:24,25 130:10 148:1 154:24 169:9

**officially** 76:7

**officials** 51:23 183:9,11,14,22,23

**OGE** 180:18

**on-and-off** 171:9

**onboarded** 172:13

**one's** 150:23

**one-off** 174:1

**ongoing** 170:18

**online** 32:2

**onsite** 124:25

**op** 167:6

**open** 107:21,25 129:19

**opening** 107:24

**operational** 54:23, 25

**operations** 86:14 155:4,11 156:13 157:13,19 158:2 159:2 161:2 174:7

**opine** 164:21

**opinion** 184:10

**opinions** 18:5

**OPM** 26:5,7 29:13 32:18 34:19,21 42:13,21 43:18 70:10 142:4 152:20 186:21

**OPM.GOV** 141:23

**opposed** 23:13 119:20

**options** 119:13,15

**orally** 16:13 49:2 50:6 127:18 170:6

**Orange** 18:22

**order** 18:8 34:3 37:20 52:14 53:7 57:21 78:14 88:7 113:17 115:23 153:2 183:25 197:9 198:17,18 199:25 200:9

**ordered** 198:10

**ordering** 198:25

**orders** 18:4 197:7

**organization** 28:25 29:11 30:21 67:16 69:6 88:4

**oriented** 63:19

**original** 197:10

**originally** 18:21,22

**originate** 48:20

**originating** 48:14

**overlap** 23:14 29:14 75:5

**oversee** 26:20,21

**ownership** 185:21

**owning** 183:12

———————

**P**

**p.m.** 9:8 66:6,9 92:6, 8 136:24 137:2 138:19 141:21 169:16,19 194:5,8 200:17

**pages** 109:1 112:18 150:13

**paid** 100:13

**paper** 18:8 171:1

**papers** 17:22

**paperwork** 96:19

**paraphrasing** 55:4 59:21 84:10 179:14 180:12

**parents** 46:14

**part** 13:5 30:11 47:14 55:9 58:5 93:3 94:19 100:15 102:16 110:9 137:15 151:9 174:1

**participate** 166:16 184:13

**parties** 11:5 136:9 196:20

**password** 86:9

**past** 82:18 126:7

**pause** 33:17

**pay** 114:10 197:15

**payment** 85:2

**payments** 68:15

84:19 96:23 97:4,6, 8,10

**penalty** 10:10

**pending** 91:6

**people** 22:7 25:19 27:20 29:7 62:5 63:11 64:6,25 66:16 67:2,3,16,18,21 68:2 72:16,23 73:22 74:8,13,16,17 76:1, 24 77:8,16 79:20 86:21 91:15 93:20 94:2,14 99:2 101:15 105:2 106:11 107:4, 12,13 110:21 111:21 115:22 116:10,23 129:18 130:12 131:22 144:17,22 154:9 162:2 175:18

**people's** 101:24

**peoples'** 103:21 112:21 113:1

**perform** 104:20 141:1

**performance** 38:18

**performed** 160:17

**period** 20:2 21:1 33:22 35:1,4 42:9, 20 45:11 70:4 101:4 142:9 146:23 148:10 170:16

**perjury** 10:10

**permanent** 18:13

**permitted** 149:21

**person** 24:20 44:5 46:19 103:19 104:5, 9 106:15 107:3,11

161:25

**personal** 53:13 71:14 112:21 113:1 122:24 169:8 182:23 183:6 184:25 190:13,14, 17 196:17

**personnel** 26:9 31:17,24 32:17 33:2 34:2 35:21 54:20,22 57:14 70:1 110:11, 16 111:7 114:5,9 115:2 124:15,21,22, 24 129:15 163:10

**perspective** 68:15, 17 151:7

**pertained** 156:12

**pertaining** 41:16 152:5 184:14

**pertains** 43:8

**Pete** 48:14 51:23 103:14 110:3,7,15 117:10 151:20 152:20

**Pete's** 110:25

**Peter** 47:10 104:25 117:11 150:10

**Phoenix** 84:25 85:1 96:25

**phone** 24:3,14 46:18,20 82:6 170:6

**phones** 44:21

**phrase** 56:8 66:18 101:14 115:12

**physical** 83:14 84:4 98:18 100:17,25 101:15,25 102:12 115:16 129:16

130:14 133:1

**physically** 82:7 102:12

**picture** 191:6,12

**piece** 18:8 85:2 132:15

**pieces** 58:24

**PII** 109:20

**PJ** 72:3,5,8

**place** 17:15 129:15

**places** 53:16

**placing** 114:8 115:15 130:12

**plaintiffs** 9:18,19, 21,23 10:23 17:17, 19 52:7,8 78:3,6 82:22,24 89:4,6,19 95:15,17,20 108:7, 9,24 112:11,13 120:21,23 134:1,3 138:10,13 141:5,8 146:25 147:3 150:3, 6 177:20,22 179:23, 25 186:23,25 200:13

**planned** 63:8 175:2

**planning** 193:6

**platform** 128:5,9

**podcasts** 166:22,23, 24

**point** 24:10 42:6 44:8 45:21 92:12 100:11 118:8 120:12 126:25 129:21 132:12 149:7 166:25 172:13 184:16 195:18,24

**points** 146:17 171:17

**policy** 26:21 53:19

**political** 31:15,22 57:13

**populate** 116:4

**populated** 151:7

**position** 25:23 26:13 29:13,14,15 31:18,20,21,23 32:6,8,14 45:7 47:13 49:14 110:8 194:23 196:6,7,14

**positions** 184:20

**post** 118:10 121:2,4 122:3

**post-secondary** 19:9

**posted** 134:13 139:4

**posting** 188:23 189:14

**potentially** 42:12 116:23

**practical** 155:20

**pre-dated** 69:8

**precedent** 189:1

**precisely** 50:25

**premise** 35:16

**preparation** 13:20, 25 14:17 17:1 194:14

**prepare** 34:2 61:25

**present** 98:16 191:6

**preserve** 192:7,11, 16,23

**preserved** 192:25 193:1

**President** 22:23 27:6 29:9,12 31:16, 25 36:5,7,18 37:1 38:2,5,8 40:18 51:21 57:14 63:9 67:14 93:6 138:23 173:22 174:24 175:4,7,12,20,21 176:1,5 187:23 190:24

**President's** 38:19 52:15 53:8,12,14 54:2,11 58:11,14 59:5,8,10,11 63:20 88:7

**presidential** 31:24 36:11 37:9,18 38:3, 24

**presidential's** 38:18

**press** 121:9,17,19 147:21 148:1

**press@usaid** 122:19

**press@usaid.gov** 121:13

**press@usaid.gov.** 132:6

**presume** 114:14

**pretty** 91:3 107:19

**previously** 38:7 88:8 153:1 173:12

**principles** 63:19

**printout** 121:2

**prior** 12:17,22 20:22 21:4,21,23 22:17 23:15 29:13 35:13

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 641 of 720

GAVIN KLIGER
92792

January 06, 2026

226
Index: privacy..rebuild

54:12 62:2,17,21 63:1 74:18,25 75:10 76:10 77:20 79:14 80:23 87:14,16,17 89:12 99:9 105:23 114:13 130:4 135:18 139:17 145:11,18 151:13 154:14 173:4

**privacy** 113:19

**private** 97:10

**privilege** 14:13,23 15:19 36:12 37:10, 18,22,25 38:3,6 39:23,25 161:6 194:15,17 195:6,16 196:11

**privileges** 101:2

**procedures** 100:19, 23 102:16

**proceed** 10:14 91:2

**proceedings** 90:6

**process** 163:19

**produced** 113:18

**product** 14:12,23 15:19 194:16 195:13,15,20,22

**production** 113:10

**professional** 23:2,4, 7,13,17 45:18 167:10,18,19,24 168:1

**program** 20:7 34:7

**prohibit** 182:22 183:5

**prohibited** 183:12 184:5 185:21

**project** 34:12 41:18 42:3

**projects** 42:4,8,10 45:24

**prompt** 59:21 119:2

**promptly** 127:9

**promulgate** 48:21

**proper** 43:20

**prosecution** 188:12

**protected** 14:12,22 15:18 37:9,17,22

**protection** 59:25 60:1,9,13,21 170:12

**provide** 13:24 15:14 16:6,13 181:2 191:10

**provided** 13:4,21, 22,23 16:10,13 94:8 116:3 123:13 125:8 151:4 179:18

**providing** 15:13 39:21

**provision** 82:6

**public** 68:17 93:18 95:6 109:7 113:14 180:3

**published** 167:6

**pull** 120:4

**purports** 126:6

**purpose** 21:12,13 25:21 27:7,15,17,19 28:4 53:18 97:19 186:10

**purveyance** 86:20

**put** 96:20 108:16 110:21 112:9

113:14 118:10 120:9 137:8 150:2 179:22

**putting** 95:12 120:16 137:22

---

**Q**

**quality** 55:6

**question** 11:11,18, 20 16:11 17:9 25:10 27:12 28:6 31:5 35:16 36:21,24 37:16 50:11 53:22 54:6,12 60:6,17 73:13 74:6,10,12 75:15,16 77:13 78:23 79:1,4,8,17 80:10 85:23,24 90:3,17,24 91:1,6,7, 9,20 92:2,14,15,25 93:23 95:22,25 100:4 101:21 104:12 105:15 109:9,10 111:2 112:1 114:18 117:1, 15 136:2 142:19 143:8 145:1,3,12, 19,24,25 146:2 151:16 153:24 158:20 159:1 162:4, 22 164:7 165:16 171:11 173:7,13,15 175:24 177:8 183:2 185:6,19 188:11 189:5 190:19 191:8 192:9,20 198:15

**questioning** 94:23 158:23 184:24

**questions** 11:4,6 39:2,25 40:2 41:16, 24 54:8 58:3 70:23

133:22 161:14 194:10 195:10 196:23,24 197:15

**quickly** 19:2 118:23

**Quinn** 189:2

**quote** 92:21 93:2 138:22 187:19

---

**R**

**raise** 10:9 91:15

**random** 42:14 139:11

**range** 182:1

**raped** 188:6,9,13,15, 18,22 189:9

**re-ask** 111:1

**reach** 67:24

**read** 18:4 52:20 78:18,24 84:2 107:15 145:17 158:7 175:18 193:10 197:3 199:5, 6

**read/write** 83:13,22

**reading** 57:1 79:9

**reads** 78:17 138:22

**Reagan** 98:23 124:20

**real** 63:17 155:20 170:9

**reason** 12:1 171:19

**reasonable** 175:1, 10 186:5

**reasons** 113:19

**rebuild** 187:13

**recall** 21:9,19 22:2, 6,11 23:10 24:2 30:17,19 32:6 33:18 34:16 35:23 36:3 41:13 42:8 44:8 45:11,24 47:2,7,9 48:8 49:1,7 50:4,25 52:5 61:9 62:7 64:21 65:9 67:23 71:25 72:2 77:25 80:4 82:2,20 85:10 88:2,5,10 89:16 90:4 96:3,4,9 98:10, 12 99:3,19 100:21 102:1,17 103:4,12, 17,22 105:5,7 106:4 107:7 109:12 111:14 114:25 117:25 118:14,19, 22 119:5 120:11,18, 19 121:24,25 123:17,20,25 124:3 125:2,6,10,16,20 126:5,17,20,23 127:8 129:12 130:11,15 131:6,8, 12,14,17 133:3 134:12,14 135:2,5, 13 136:7 137:25 138:1,3 139:5,10,18 143:2,9,10,12,13 148:4,16,24 149:25 153:9 157:23 162:8, 12,17,18 165:6,11 166:10,12,15,20 167:4,8 168:22 170:4,7,15 172:3,8, 10,13 173:19,23 174:10 178:17 179:12,21 182:13, 16 187:16,17,18,21 188:11,14,17,23 189:6,7,13,16 191:3

**recalled** 190:18

**receive** 31:22 107:3 122:1 131:22 138:24 146:15 151:9 184:12 185:23

**received** 31:21 40:23 49:25 50:21 128:18,22 143:4,12 144:20,24 172:17 173:25 174:4 183:21 184:22 185:10,11,16,17

**recent** 139:17

**recess** 66:8 92:7 136:25 169:17 194:6

**recipient** 150:10

**recollection** 15:9 21:13 24:12,15 31:11 35:8 40:12 68:4 71:2 77:5,20 80:22 95:11,13 100:10 107:8 111:20 112:8 124:4 133:7 135:20 141:3 172:6 177:5 181:18, 20

**recommend** 163:12

**record** 9:7 10:24 37:21,24 39:4,5 66:1,3,7,10 78:9 80:2 85:18 91:24 92:4,6 95:22 108:13,23 112:17 113:7,11 120:4 121:1 124:8 134:6,8 136:24 137:1 138:18,20 145:15, 17,18 147:7,9 150:9,13 164:5

169:18 177:7,25 187:7 190:10 191:11 193:10,17, 21,23,25 194:1,3,5, 7 195:8 196:2,17 200:20

**recording** 11:23

**records** 59:22 128:10,12,15

**recruited** 31:23

**redacted** 113:18 150:24

**redaction** 178:22

**redactions** 178:6,11

**reduce** 137:16 196:20

**reduced** 175:9

**reducing** 137:16

**reduction** 150:12, 18,20 174:20,22,25 177:10,17 183:24

**reductions** 175:2 176:6,8,14,15 177:10

**refer** 84:6

**reference** 58:10 59:4,7 147:18 179:20

**referenced** 35:19 53:23 58:5,17 60:14,17 79:6,12 80:13,16 159:17

**references** 110:14 114:8 153:13

**referencing** 92:23

**referring** 25:18 29:22,24 81:1 89:1

101:13 132:20 136:12 142:9 144:22 149:16,20 160:22 167:25 188:3 189:7

**refers** 84:2 153:16 160:23 180:21

**reflect** 39:5 91:24

**reflects** 191:11

**Reform** 157:5,8 158:3,12

**reforming** 72:24 74:14

**refresh** 15:8 40:9

**refuse** 92:15

**refused** 92:1,13

**regard** 31:2 35:25 61:14 65:6 68:11 75:25 96:1 115:15 118:4 131:3 160:19 161:2

**regulations** 182:21 183:4

**rehired** 183:25

**reiterate** 119:24

**related** 40:22 46:16 51:25 133:17

**relates** 26:22

**relating** 42:15 48:8

**relationship** 22:20 23:1 71:14

**relevant** 15:10 16:14 40:3 185:2 190:9

**remember** 12:20 15:9 25:13 35:10 45:15 67:4 76:6

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 643 of 720

GAVIN KLIGER
92792

January 06, 2026

228
Index: remotely..rushed

105:9 120:14 127:17 131:10 134:15 135:15 187:24 188:14

**remotely** 124:23

**remove** 102:15 113:18

**renew** 164:19

**repeat** 27:11 31:4 41:25 60:5,17 62:1, 22 66:17 75:17 77:12 79:8,16 80:10 81:22 82:13 92:16, 17,25 99:11 100:3 101:22 104:11 105:14 109:8 112:3 114:17 116:25 126:11 136:1 140:6 143:22 144:8 145:12 146:1 151:15 152:1 153:23 154:16 156:17 157:6,16 162:4,22 163:21 164:2 166:5 167:14 173:6 175:24 176:11 177:8 185:5 190:19 191:8 192:9, 19

**repeated** 186:17

**rephrase** 80:11 171:11

**rephrased** 155:8

**replied** 143:13 146:21

**reply** 122:9 131:23 132:2,5,15 141:13, 17

**report** 43:18,20 46:2 48:10 50:5,13

170:23 180:4

**reported** 33:6 35:12, 20 42:22,23 44:6 48:11,17

**reportedly** 137:8

**reporter** 10:6,8,14 11:22 52:11 65:24 66:3 78:4 82:23 89:5 108:8 112:12 120:22 134:2 138:12 141:7 147:2 150:5 177:21 179:24 186:24 193:12,24 197:6,8, 12,17,19,21,24 198:3,6,9,12,16,20, 24 199:2,5,8,12,15, 21

**reporting** 13:15 35:10 43:22

**represent** 9:14 38:17 78:12 191:19 196:7

**representation** 124:5

**represented** 124:14

**representing** 10:22

**Request** 95:23

**requested** 179:17

**requesting** 138:25

**require** 139:16

**required** 11:7 115:22 127:10 185:25 186:13

**requirements** 159:2

**requiring** 140:1,10

**requisite** 34:3

**research** 18:1

**residence** 18:15,16, 18

**resignation** 34:7 139:3

**resources** 110:1 148:1

**respect** 56:1 141:2 185:1

**respective** 56:25

**respond** 139:2 143:5,10 144:10,14 146:5

**responded** 145:3

**responding** 144:3,5 187:18

**response** 39:5 84:10 113:17 187:22 188:21 192:8,12

**responses** 40:3 42:16

**responsibilities** 26:19,20 33:8,9 41:5 45:7

**responsible** 140:24

**rest** 125:1

**restate** 25:9,14

**restroom** 91:23

**Restructuring** 157:5,8 158:4,12

**result** 146:20

**reunion** 25:5,6,18, 22

**revealing** 159:21,23

**Revenue** 138:8

**review** 13:19 80:7 95:21 150:15 178:3

**reviewed** 17:21 18:7 80:4

**reviewing** 90:2

**revise** 191:10

**revoke** 100:25 101:1 102:12

**RIF** 116:7 151:24 152:4,6 186:3,10,16

**RIFS** 175:23 176:1

**rigorous** 59:24 60:1, 9,11,21

**Riley** 187:25 188:4

**risk** 129:17

**role** 106:5 111:18 177:9,14 186:3

**Ronald** 98:23 124:19

**room** 90:20 99:17 108:2 200:8,12

**Roosevelt** 70:10,12

**roughly** 23:5 35:1 37:2 154:10

**Rubio** 47:5 131:13 133:8

**Rule** 15:13 190:2,7 196:19

**rules** 179:18

**run** 186:18 192:2

**rush** 197:13,15,23 198:12

**rushed** 198:19 199:4

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**Russ** 170:21 175:8, 19 176:5 177:1

**S**

**S-O-L-** 181:10

**safety** 102:13 129:17

**Sarah** 10:5

**Saturday** 98:6,12,19 99:1

**SBU** 78:10

**scale** 102:22

**scattered** 152:13

**Schedule** 31:15 32:9,20,23 57:12

**scheduled** 200:16

**Scholar** 20:5

**school** 19:10

**science** 19:4 84:1

**SCIF** 99:7,14,17

**SCIFS** 99:4

**scope** 196:9

**screened** 31:23

**screenshot** 121:4,7 124:9 134:6 147:7 187:7

**Secretary** 47:5 131:13

**Section** 53:6 55:2 56:15 57:20 58:9, 17,18 59:19 153:10, 11,18

**secure** 82:11,16

**security** 72:7,9,12

82:19 130:14

**seek** 184:9

**seeking** 98:18

**sell** 185:9,12,15

**selling** 184:20

**send** 33:15 34:4 115:19,23 121:18 122:1,5,21 123:18, 20 124:1,2 125:3 127:4,5,13,14 129:3 130:4 141:20,22 148:2,15 149:11,19, 23 186:3,19 199:10, 11,13

**sending** 115:25 116:23 122:19 129:5,11 130:4 139:25 147:21,25 186:10 190:18 199:8

**senior** 20:10 26:8 34:14,15,17 35:9, 18,24 36:2 40:17,24 41:8 42:24 44:1 47:15 48:11,12,15, 20 50:1,21 51:23 55:18 56:14 69:6 77:23 80:18,24,25 81:2 88:15 93:7 97:16 98:5 100:11, 16,24 102:7,21 103:1,19 104:19,21 106:6,8,17,20 107:14 110:10 116:13 117:5 118:8, 11,12 119:11,17,25 122:8 123:12,14,17 124:17,18 125:4,11, 14 126:1 129:13 130:20,23 131:1 132:8 133:16 135:5

137:19 140:22,23 142:3 147:22,24 148:20 150:1 151:5 159:11 160:22,23 163:9 170:20,21,24 171:4 175:4 177:16 186:15 190:25

**sense** 11:16 93:3 119:16

**sensitive** 109:21

**serve** 27:5

**service** 20:15 28:10, 12,15,19,25 29:3,23 30:16,18,21 45:9 56:2 63:16,25 88:1, 4 97:10 116:5 138:8 147:8 153:16

**serving** 37:13

**set** 65:1 82:3 147:19 152:22

**setting** 33:14

**Seventy-two** 134:24

**share** 29:9 72:23 74:8,13 75:11 94:2

**shared** 63:7,19 64:7 67:1 73:4 93:4

**sharing** 74:2

**sheet** 112:17

**shook** 39:6

**shortly** 138:24 169:12

**show** 16:8 52:6

**showing** 138:9 142:17

**shown** 15:1

**shut** 119:3 130:6

174:14 190:12

**side** 103:14 141:1 150:2

**sign** 90:4 91:9 96:1 180:16 193:11 197:3 199:5,7

**Signal** 24:22 44:17 46:23 170:3

**signature** 180:11

**signed** 95:24 180:15,18

**Siler** 9:24 13:15 14:11,21 15:4,17,24 16:1 17:5 22:3,17 25:8 27:9,24 29:20 30:6 31:3 32:7,10 35:13 36:8,11,15, 20,22 37:8,14,16 38:2,6,12,14,16,21, 23 39:1,9,15,17,24 41:19 43:23 44:11 47:18 50:9 51:16,19 53:25 57:6,22 58:21 59:13 60:3,15 62:11 63:13 65:21 66:1 70:6,21 71:8,19 72:19 73:8,20 74:4, 18,21 75:14 76:17 77:3,11 79:14 81:21 82:12 83:17 86:6,17 87:5 89:19,21,24 90:10,13,21,23 92:4 93:21 94:5,9,21 95:15,17 97:21 99:9 105:13,22 107:19, 23 109:16 111:1,4, 25 113:11,13,16 114:16 116:18 117:14 119:22 126:9,15 127:6 128:23 129:6,22

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

133:19 134:22 135:25 136:13 137:11 139:8,21 140:4,13 143:17,20 144:6,12 145:7 146:9,11 148:8 149:13 151:13,25 152:8,10 153:20 154:13 155:5 156:14,22 157:14, 20 158:5 159:4,20 160:3 161:4,13 163:20 164:1 165:14,22 167:12, 20,22 168:9,13,16 173:4,11 174:9,15 175:13 176:9,18 177:12 182:10,25 189:15,24 191:13, 22 192:18 193:7,20 194:18,21,25 195:12,17 196:6,14, 24 198:6,8,11,14,18 199:19 200:10,18

**similar** 24:22 29:9 81:13 90:4 91:10 96:1 111:17 124:11 143:15 145:4 146:5 148:22 151:11,23 177:14 188:19 191:1

**simultaneously** 91:5 107:17

**sir** 44:12 145:20 158:21

**situation** 65:16 76:13 88:10 98:16, 22

**size** 108:2 175:1

**slowly** 158:7

**social** 23:2,11,12,17 25:22 45:17

**software** 20:11 55:7 59:22 85:2

**Solana** 181:10,14,19

**someone's** 90:7 105:25

**sort** 20:9 65:16 69:7 105:2 142:14 190:3

**sorts** 84:24

**sounds** 51:12 63:5 189:12,18

**space** 99:16 149:5

**Spacex** 21:11

**speak** 13:11 16:18 17:1 36:18 37:1 40:19 81:13 86:19 87:7,25 88:3,6 101:6,9 160:16 168:11 191:2

**speaking** 91:5 97:15 107:17

**special** 26:4,7 173:22

**specific** 34:25 48:23 70:22 73:21 88:10 98:20 100:22 106:9 137:13 150:12,23 160:16 165:1 189:17 197:25

**specifically** 11:16 102:10 123:18 125:6 131:3 142:20 152:18

**specifics** 14:16 43:2 48:9 96:11 120:14 130:17 131:6

**speculate** 11:15 87:12 97:24 136:16

**speculating** 147:22

**speculation** 59:14 83:18 87:6 89:3 97:21 129:6 136:14 142:5,7 154:14

**spelled** 85:22

**spending** 93:17 94:18 137:8,16,22 138:5 165:13

**spendings** 165:20

**spent** 135:21

**spoke** 13:12 40:18, 20 41:2 50:23

**spoken** 24:13 87:19 88:11

**staff** 97:6 103:8,14 117:19 142:16 151:9 166:11,14,17

**Stamp** 178:2

**stand** 66:5 91:25 92:5 136:23 169:15 194:4 197:2,4

**standard** 100:18 102:16 144:18

**standards** 59:25 60:2,10,13,21,24

**standing** 107:12

**start** 31:1,10,18 83:5 155:14 162:3 176:23

**started** 32:23 61:23 180:8

**starting** 32:6 41:4 62:2 153:12 178:25 184:24 190:1

**state** 9:14 10:24 39:3 49:11 124:8 194:24

**state-level** 13:2

**stated** 35:20 92:13 97:25 155:19,21,22 156:1,5,6

**statement** 75:1 118:11

**statements** 180:12

**States** 17:14 30:20 35:5 37:14 45:9 57:15 105:21 138:6 196:7,10,12

**stationed** 106:3

**status** 49:24 50:20 144:23 146:15

**statute** 164:21

**stay** 184:8

**step** 90:23

**steps** 59:20 60:23

**Steve** 40:6,20,25 49:14,15 67:6 98:17,23 106:10 172:7

**Steven** 76:8

**Stevens** 9:17

**stock** 181:22,25 182:4 184:17 185:9, 15

**stood** 91:15

**stop** 26:13

**strategy** 26:21

**strike** 68:9 87:24 97:12 110:6 139:14 166:6 171:5 186:22

**structure** 69:5

**structured** 29:11

**stuff** 127:10

**subject** 78:10 110:11 114:5 141:14 150:11 183:24

**submit** 140:2

**subpoenaed** 11:1

**subscribe** 66:16

**subsequent** 84:9 156:10 195:24

**subset** 165:25

**substance** 12:11 13:18 15:22 66:13 109:1 137:5 145:4 146:5 159:13,23 160:2,4 161:9

**substantive** 15:14 168:23 169:1

**substantively** 173:15

**sufficient** 39:11

**suite** 106:19 107:1

**Sunday** 99:20 148:6

**supervised** 119:19

**supervisor** 32:16 33:1 34:9 42:18 43:15 104:5

**support** 63:9

**suppose** 25:2

**supposed** 104:8,18 132:5 197:13

**surprise** 107:6

**surrounding** 42:16

**swear** 10:7

**sweater** 108:3 192:2

**sworn** 69:25

**system** 42:15 84:20, 22,25 85:2,8,13,15 142:2 149:22 186:18

**systems** 41:9 55:8 59:22,23 76:16 77:1 84:8,12,16,18,19,24 85:9,11 86:3,11,13, 20 96:5,21,25 97:1, 14,18 98:2 99:24 100:7 111:7 115:17 177:15,16 186:12

---

**T**

**table** 167:1

**tagged** 190:25

**taking** 92:2 118:20 119:20 129:15 178:3

**talk** 12:10 13:17 18:25 21:15 22:14 32:19 33:22 46:14 65:15 87:23 96:12 119:10 168:8 195:23

**talked** 14:17,19 29:2 68:13 96:21 104:25 115:11 160:11 161:10 173:17 186:21

**talking** 12:7 16:23 32:8 40:15 43:6,14 46:13 51:10 66:15, 19 75:25 89:11 161:12 174:5 176:15

**task** 127:13 139:20, 24

**tasked** 22:23 28:13 74:3

**tasks** 35:25

**team** 13:14,16,22 56:25 57:11,20 58:5 72:17,22 73:15,22 74:15 76:24 119:8, 10 120:2,15 142:6 153:15,17 154:2,4, 11,20,21

**teams** 47:4 56:23 57:2 153:12,13

**technical** 49:12 119:15 120:6 127:10 132:13 141:2 142:6 149:20 151:6 186:13

**technically** 149:21 171:1

**technologist** 115:23

**technology** 26:9 28:22 34:3 41:9 55:9,13,15,19 56:1, 13 67:17 68:14,16 72:25 160:20 161:3 162:21 163:1,5 177:15

**Teddy** 70:10,12

**template** 116:3,4,12 150:25 186:16

**temporarily** 101:1

**temporary** 18:15,16, 18 28:25 30:21 88:4

**ten** 22:10 51:6 108:4

**tenure** 186:7

**term** 62:9 66:21 84:1

**termination** 110:20

**terms** 94:7 102:22

**Tesla** 182:4 183:15 184:4,17,21 185:15

**test** 39:22,25

**testified** 10:17 12:23 13:1 73:23 80:15,21 81:18 116:22 169:22 173:12

**testify** 11:2 169:5

**testimony** 10:11 12:11,17,22 13:20, 25 16:14 22:18 35:14,24 66:13 74:19 79:15 99:6,10 105:23 114:13 115:5 137:5 151:14 154:14 168:25 172:21 173:5 191:7, 12

**Texas** 25:17

**text** 23:25 44:17 46:25 47:1 124:8 127:18 170:3

**texted** 24:13

**texts** 128:21

**That'll** 89:22

**thermostat** 107:16

**thing** 55:12 63:17 67:19 69:7 81:16 116:11 128:4 135:15 170:18

**things** 11:13,14 15:10 49:7 55:23,24 68:8,10,13 71:12 93:17 111:16 120:6 122:20 127:9

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

130:14 171:9
175:17 179:17

**thinking** 116:7
188:20

**Thomas** 179:10,11

**thought** 22:22
193:20

**thousand** 96:7,13,
17 152:16

**thousands** 99:25
100:8

**Thursday** 137:7

**Tianna** 9:19

**time** 9:8 14:20 19:23
20:1,2,22,24,25
31:14 33:22 34:8,21
35:1,4 39:16 40:21
41:1,4 42:6,9,19
44:9,23 45:11 47:6,
17 49:19 51:9 52:2
56:4 57:3,5 59:25
60:12,20 66:6,9
67:5 70:17 73:17
75:4 81:10 92:6,8
101:4 103:6,11
104:15,20,21 118:3
126:25 127:15
129:16 131:25
134:13,21 135:16
136:24 137:2 139:4
142:11,15,22 143:3,
19 144:17,20,25
146:4,13,22 148:7,
10 153:19 154:3,22
155:2 156:11
157:25 159:15
161:1,14 162:7,11
163:24 164:3,4,6
168:15 169:16,19
170:10,16 181:7
182:2,6,13 191:2,15

193:19 194:5,8
195:2 200:16

**timeframe** 41:16
45:15 66:20 81:13

**times** 22:12 23:5,6
24:18 56:9 89:23
103:21 116:15
186:17

**tired** 168:20

**title** 52:20

**today** 11:1,15 12:2,
12 13:8 15:10,16
16:14 17:1 54:9
56:9 80:15,21 89:23
172:22 191:5,18
195:3

**today's** 199:25
200:1,9

**told** 61:6 77:23
118:20,23,25
123:18,20 124:1
125:2 127:4,18
128:17 129:3 160:7
184:8

**tomorrow** 124:24

**tooled** 142:12

**top** 109:22 147:10
153:10 178:14,17
184:18 191:25

**topic** 159:16 160:2,
4,5,8

**topics** 65:1 170:9
191:19

**totally** 120:13
129:12

**training** 64:19

**trainings** 61:18,21,
25 62:4 64:17

**transcribing** 11:23

**transcript** 193:11
197:7

**transition** 29:16

**transparency** 68:17

**tribunal** 189:3,10

**TROS** 171:10

**true** 180:13

**Trump** 40:19 189:21

**truth** 10:12,17

**truthful** 12:1

**truthfulness** 190:8

**turn** 30:23 41:4 55:1
59:3 69:23 81:17
86:23 98:6 180:19

**turnaround** 197:20

**tweet** 134:7,9,13
135:9,14,17 138:18,
22 139:3,7 187:8,
16,18 188:23 189:6,
11,17 190:5,14,18

**tweeting** 188:17

**tweets** 139:11
187:17

**twenty** 31:12

**Twitter** 19:13,23
20:1,23,24 121:2
122:3

**type** 50:18 62:19
63:3 65:7 68:10
159:15

**types** 23:20 68:8
192:16,23

**typical** 42:25 43:5

**typically** 103:5

106:18 107:2,9
151:12 187:22

———————

**U**

———————

**UC** 19:4

**ultimate** 51:21

**ultimately** 38:2
118:10

**unclassified** 59:22
84:12,16

**underpin** 21:16

**understand** 11:8,12,
18 12:8,13 17:12
27:8,17 37:20 52:3
55:8 71:11 74:23
89:21 93:22 94:15,
23 98:21 101:21
112:25 129:21
138:25 156:24
157:1 160:3 161:11,
13 174:3 178:22
184:4 196:5 198:15

**understanding**
17:4,13 28:13,21
36:6 41:7 45:8
47:12,14 48:12
49:15,16 51:13,20
53:11,14 54:15,16
56:6 57:12,18 58:2,
13 59:9 69:22 72:6
76:7 77:19 79:20,
23,24 83:15 84:6
85:1,25 87:2 93:12
97:16,25 99:5,15
100:10 101:18
110:7,9 119:1 123:5
129:4,10 130:25
140:21 142:1 143:7
154:18 155:3 156:8,
12,20 163:18,23

164:6,10,11,13
174:23 175:6
176:25 177:3 184:2

**understood** 11:20
20:4 40:4 53:18
55:22 72:17 75:11
97:23 161:18
175:25 196:3

**unfortunate** 107:22
192:3

**United** 17:14 30:20
35:5 37:14 45:9
57:15 105:21 138:6
196:7,10,12

**unlawful** 189:2

**unofficial** 46:10,11

**unstructured** 65:4,
6,7

**update** 172:18
174:1,5

**updates** 40:25
173:20

**USA** 17:20

**USAID** 30:25 31:2,8
33:19 41:4,10,12,
20,23,24 42:5,10,
20,23 43:9,18,19,22
44:10,25 45:1
46:15,17 47:3,6,17
48:8,25 49:6,17,19,
24 50:3,8,14 51:9,
25 56:4 57:5,10
59:25 60:12,20
61:7,24 62:2,6,10,
23 70:15,19 71:1
72:7,9,12,18 73:7,
17 74:3,9,17 75:3,
20,22 76:15,25
77:1,8,17 79:22,24,
25 81:19 82:1,2,8

84:16 86:2,3 87:21
95:23 96:1,6,22
97:12 98:10 99:4,7,
14,16,25 100:8,12
101:3,19 102:4
103:6 104:4,16,17,
20 105:4,11,19,20
106:2,16 107:5
110:16 111:7,22
112:7 114:8 115:2,
17 118:1,3,5 119:8
121:8,18,23 122:14,
17,25 123:2,3
124:19,23 128:19
130:6 131:18 132:8,
23 133:1 135:4,5,6,
10,12,22 137:9,23,
24 139:13,15
140:12 142:15,16,
20,21,23,24 148:7,
12 151:3 152:17,18
153:18 154:3,9,10,
21,24 155:3 156:11,
21,24 158:2 159:3,
15,18 160:15 161:2
162:7,11,14,15,19,
24 163:19,24,25
164:12 165:13
166:4,9,19,22
167:1,2,3,7,10,18,
19 168:8,20 169:2,6
173:24 174:6,8
177:14 194:24

**USAID's** 97:2 98:19,
22 99:20 155:24
156:13 157:12,18
165:19

**USAID.GOV** 123:4

**USDS** 55:4 56:24
59:24 153:15

**user** 95:23 147:10,
11,14

---

### V

**vacation** 105:25

**vague** 17:5 27:9,24
29:20 30:6 32:7
41:19 44:11 47:18
48:18 57:6 58:21
59:13 61:12 62:12
63:13 64:23 70:6,
20,21 71:8,19 72:20
73:8,13,20 74:4,21,
22 77:3 81:21 86:6,
17 104:10 105:13,
22 116:18 126:15
128:23 139:8,21
140:4 143:20 144:6,
12 145:7 146:9
151:25 155:5 157:2
163:2 164:1 167:12
168:9,13,16,19
182:10 191:13,14

**valid** 163:7

**values** 63:19 74:8
93:4

**vary** 26:20 176:20

**vendors** 97:4

**verbally** 49:3 50:6

**versus** 65:2

**vest** 108:4

**video** 199:24 200:1,
3,6,9,12,15

**view** 94:14

**views** 190:14,17

**Virginia** 18:16,18

**virtual** 86:1

**visibility** 191:1

**vision** 64:7

**visited** 93:10

**Voorhees** 71:7

**Vorhees** 71:18

**Vought** 170:21,25
175:8,16,19,22
176:2,3,5 177:1

---

### W

**waived** 186:6

**waiver** 183:21
184:13 185:23
186:7

**walk** 43:1 72:13
82:18 119:15

**walking** 91:14

**wander** 65:15

**wanted** 49:11 57:17
67:18 129:13
148:22 174:24

**war** 26:1,3,17,22

**Warren** 9:15 10:15,
19,21 14:15,25
15:7,21,25 16:4,5
17:7,10,11 22:4,19
25:11,12 27:13,14
28:5 29:24 30:3,10
31:6,7 32:9,12
35:17 36:13,17,21,
25 37:12,15,20
38:4,10,13,15,17,
22,24 39:3,10,13,
16,21 40:4,5,11,14
41:23 42:1,2 43:24
44:2,12,14,15
47:22,23 50:12
51:18 52:1,12 53:3,
4 54:3,7 55:14 57:9

58:1,25 59:2,18 60:7,8,18,19 61:13 62:16 63:22,23 64:24 65:5,22,25 66:2,11 70:8,24 71:10,23 72:23 73:6,10,25 74:6,10,11 75:2,16,18,19 76:22 77:6,14,15 78:2,8 79:18 81:23,24 82:14,15 83:1,21 86:12,22 87:9 89:9,20,22 90:1,9,15 91:6,8,24 92:1,9 93:24 94:7,11,16,24 95:16,18,19 97:22 99:12,13 100:5 104:13,14 105:16,17 106:2,7 108:5,15,20,22 109:18,19 111:3,5 112:2,4,5,16 113:9,15,20,21 114:19,20 116:21 117:2,3,16,17 120:7,25 124:13 126:12,13,19 127:7,16 129:2,8,9 130:1,2 133:21,25 134:5 135:1 136:3,4,17,20 137:3,21 138:15,17 139:12,25 140:7,8,19 141:5,11 143:18,23 144:9,19 145:9,14,25 146:3,25 147:5 148:11 149:18 150:8 151:17,18 152:2,3,15,17,22,24 153:25 154:1,17,19 155:9 156:16,18,19 157:3,17 158:1,9,11,15,17,19,21,25 159:9 160:1,5,10 161:8,18,20 163:17,22

164:3,8,9,23 165:2,4,7,17 166:1 167:15,16,21 168:3,5,10,14,24 169:10,20 173:8,14 174:12,19 175:15 176:12,22 177:19,24 178:8,13,16,20,23 180:2 182:15 183:3 185:4,7,8 186:23 187:4,6 188:4,7,10 189:20 190:6,16,21 191:16,17 192:6,21,22 193:2,6,8,13,15,18 194:2,9,19,22 195:4,14,21,25 196:3,15,22 197:9,11,14,18 198:22 199:24 200:13,14

**Washington** 124:20

**waste** 22:25 27:20 29:10 30:14 40:23 53:15,17 54:18,21,24 55:16,21 56:8,12 58:15 72:24 73:5

**wasteful** 137:16

**ways** 27:2

**wearing** 108:3 192:2

**website** 93:8,10,13,14,25 94:25 95:5,8,10,12 118:1,5,9,18,21,24 119:4,13,19,21 120:1,9,12,16 121:11,15

**week** 70:4,15 139:1,17 141:15,19 142:2,8 143:6,15 145:6 146:7

**weekend** 135:21,23,24 136:6,7

**weeks** 41:13,17 42:5,19 48:1 50:24 51:3,5 57:11 102:4 104:16 135:12 154:10

**weird** 134:12

**Welch** 10:5

**Wen** 10:4

**we'll** 90:18

**we've** 65:12

**White** 34:14,17 38:9 52:20

**Who'd** 67:22

**wide** 55:7

**wildly** 87:12

**William** 109:24

**window** 69:17,18 171:21 183:19 184:7 185:12

**withdrawn** 192:18

**witness's** 40:9

**woman** 188:5,22 189:9

**women** 188:25

**won** 67:14

**wood** 134:16 135:22

**word** 71:11 110:24,25

**word-for-word** 35:24

**work** 14:12,23 15:19 28:14 29:8,18 30:16,18,20,23 31:1,8 32:25 33:12,14 34:1,11,24 42:5,13 43:9 45:22

46:15,16,17 48:24 49:3,24 50:3,7,14,19 56:7 57:10,16 58:4 61:10,14,25 62:2,5,17,19 63:1,3,24 65:12,13,14,17 68:11 69:6 82:4 87:20,23 88:12,14,15 96:8 97:12 98:7 103:5 104:16,20,23 107:1 116:2,3 118:4,7 120:2 124:23 132:3 141:2 144:18 153:15 160:15,16,17,19 166:4,9,18,22 167:7,9,17 168:8 169:2 170:11 171:5,8,11,13,15,18,25 172:1,14 173:1,9,23 174:7 182:17 183:8,11 184:15 185:24 186:21 194:16 195:13,15,20,22 198:3

**worked** 19:25 20:10 41:18 55:12,13,16 98:14 118:3 127:3

**working** 33:19,25 34:1,18,20,22,24 41:12 42:6,7 57:13 70:3,9 72:9 73:16 74:8 75:3 76:24 81:19 82:5 93:5 98:12 126:1,25 148:7,9 154:9,21 162:14 171:21 182:8,12,18,22 183:5,19 184:6

**workplace** 146:19

**works** 72:6 84:21 198:5

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**worth**  181:8 182:5

**wrap**  169:11

**write**  84:3

**writes**  86:25 135:21
  179:13

**writing**  127:18
  189:6,13

**written**  18:9 68:5
  87:10 107:3 127:19,
  22,23 162:9 166:16
  167:5 170:3 192:11

**wrong**  19:3 89:24

**wrote**  87:2 125:17
  136:8

**Y**

**year**  19:18,20,22,24
  20:3 26:15 45:22
  56:2 165:8

**years**  116:5

**yesterday**  14:5 17:1
  179:15

**Z**

**zones**  134:21

NAEGELI
DEPOSITION & TRIAL  |  (800) 528-3335
NAEGELIUSA.COM

# Exhibit 15

UNITED STATES DISTRICT COURT

for the

District of Maryland


J. DOE 4 et al.

      Plaintiff,

v.           Civil Action No. 8:25-cv-00462-TDC

ELON MUSK et al.

      Defendant.

_____


VIDEOTAPED DEPOSITION OF

BRIAN T. MCGILL


TAKEN ON

TUESDAY, DECEMBER 9, 2025

10:01 A.M.


COHEN MILSTEIN SELLERS AND TOLL PLLC

1100 NEW YORK AVENUE NW, SUITE 800

WASHINGTON D.C. 20005

Page 2

APPEARANCES

Appearing on behalf of the Plaintiffs, J. Doe 4 et al.:

MIMI MARZIANI, ESQUIRE

REBECCA (BETH) STEVENS, ESQUIRE

Marziani Stevens & Gonzalez, PLLC

1533 Austin Highway, Suite 102-402

San Antonio, Texas 78218

(210) 343-5604

mmarziani@msgpllc.com

bstevens@msgpllc.com

asilberstein@msgpllc.com

Appearing on behalf of the Plaintiffs, J. Doe 4 et al.:

ANDREW SILBERSTEIN, ESQUIRE (via Zoom)

Marziani Stevens & Gonzalez, PLLC

1533 Austin Highway, Suite 102-402

San Antonio, Texas 78218

(210) 343-5604

mmarziani@msgpllc.com

bstevens@msgpllc.com

asilberstein@msgpllc.com

Page 3

APPEARANCES CONTINUED

Appearing on behalf of the Plaintiffs, J. Doe 4 et al.:

RICHARD M. HEIMANN, ESQUIRE (via Zoom)

NICOLE RUBIN, ESQUIRE (via Zoom)

Lieff Cabraser Heimann & Bernstein, LLP

275 Battery Street, 29th Floor

San Francisco, California 94111

(415) 956-1000

rheimann@lchb.com

nrubin@lchb.com

Appearing on behalf of the Plaintiffs, J. Doe 4 et al.:

ANDREW WARREN, ESQUIRE

TIANNA MAYS, ESQUIRE

State Democracy Defenders Fund

600 Pennsylvania Avenue SE, Suite 15180

Washington D.C. 20003

(202) 594-9958

andrew@democracydefenders.org

Page 4

APPEARANCES CONTINUED

Appearing on behalf of the Defendants, Elon Musk, et al.:

CHRISTOPHER M. LYNCH, ESQUIRE

JACOB S. SILER, ESQUIRE

U.S. Department of Justice - Civil Division

1100 L Street NW

Washington D.C. 20005

(202) 353-4537

christopher.m.lynch@usdoj.gov

jacob.s.siler@usdoj.gov

james.j.wen@usdoj.gov

Appearing on behalf of the Defendants, Elon Musk, et al.:

JAMES J. WEN, ESQUIRE

U.S. Department of Justice - Civil Division

1100 L Street NW

Washington D.C. 20005

(202) 353-4537

christopher.m.lynch@usdoj.gov

jacob.s.siler@usdoj.gov

james.j.wen@usdoj.gov

Page 5

APPEARANCES CONTINUED

Also Present:

Maya Cook, Legal Program Associate, Democracy Defenders Fund (via Zoom)

Jehieli Luevanos, Paralegal, Democracy Defenders Fund

Jess Bryan, Naegeli Technician

Page 6

EXAMINATION INDEX

                                              PAGE

EXAMINATION BY MS. MARZIANI                     9

Page 7

EXHIBIT INDEX

EXHIBIT                                         PAGE

1   CALENDARS                                   47
2   ADMIN LEAVE NOTICE                          59
3   ADMIN FOR GAVIN                             95
4   LPA LEAVE TEMPLATE                         138
5   INVESTIGATIVE LEAVE NOTICE                 142
6   NOTICE                                     144

Page 8

VIDEOTAPED DEPOSITION OF

BRIAN T. MCGILL

TAKEN ON

TUESDAY, DECEMBER 9, 2025

10:01 A.M.

THE VIDEOGRAPHER:  We are now on the record.  The time is 10:01 a.m.  Today's date is December 9, 2025.

This is the beginning of the deposition of Brian McGill.  The case caption is J. Does 1 through 26 versus Department of Government Efficiency.

Will Counsel introduce yourselves and state whom you represent.

MS. MARZIANI:  Mimi Marziani for the Plaintiffs.

MS. STEVENS:  Beth Stevens for the Plaintiffs.

MR. WARREN:  Andrew Warren for the Plaintiffs.

MS. MAYS:  Tianna Mays for the Plaintiffs.

MS. LEMUS:  Jehieli Lemus --

MR. HEIMANN:  Richard -- Richard Heimann for the Plaintiffs.

MS. LEMUS:  Jehieli Lemus for the

Page 9

Plaintiffs.

MR. SILER:  Jacob Siler for the Defendants.

MR. LYNCH:  Chris Lynch for the Defendants.

MR. WEN:  James Wen for the Defendants.

THE VIDEOGRAPHER:  Okay.  If that is it, the court reporter will now administer the oath to the witness.

THE REPORTER:  Okay.  Mr. McGill, please raise your right hand.

Do you affirm under penalty of perjury that the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

MR. MCGILL:  I do.

THE REPORTER:  Okay.

THE VIDEOGRAPHER:  Okay.  Counsel, you may proceed.

MS. MARZIANI:  Wonderful.

BRIAN T. MCGILL, having been first duly affirmed to tell the truth, was examined and testified as follows:

EXAMINATION

BY MS. MARZIANI:

Q.   All right.  Good morning.

BRIAN MCGILL
92132

December 09, 2025

10 to 13

Page 10

A.    Good morning.

Q.    We have obviously already met, but again, Mimi Marziani, and I really appreciate your time here today.

Would you first start out by saying your full name for the record.

A.    Brian Thomas McGill.

Q.    Thank you.  So I'm going to start by going over just some ground rules for the deposition, and then we'll jump into a little background about yourself, and then we'll actually go into the events of late January, early February, which are the focus of this lawsuit.

As I said before, my hope and expectation is that this takes about three hours, although I'm not going to guarantee that, but I understand your time is valuable, so I'm going to try to -- try to keep it around there.

So to start, have you been deposed before?

A.    I have.

Q.    Okay.  Can -- so you're likely familiar with some of the ground rules.  I think I'll go through the ground rules first, and then I'll want to circle back and hear a little bit about when you've been deposed.

Page 11

So first, of course, our lovely court reporter is taking down everything that we say, and so to that end I'm going to ask that you give me audible responses rather than, you know, a hand gesture or shaking your head.  And also that you allow me to finish my question before you answer.  Does that make sense?

A.    It does.

Q.    If you don't understand something that I ask, if you will please ask me to rephrase it, I'd be more than happy to do that.  If you answer a question, I'm going to assume that you understood it.  Is that good?

A.    Yes.

Q.    Okay.  So I'm going to be asking questions about your knowledge of certain events.  Sometimes I'm going to be asking about your impression of certain events.  If you don't remember something or you really don't know, you can say that and that's obviously a different answer than saying no.  So also I want you to understand that if you say no, I'm going to interpret that differently than if you say I don't recall.

A.    Okay.

Q.    Do you understand?  You've been sworn in

Page 12

today, which means that you are under oath and -- and need to tell the truth.  Is there anything that would prevent you from giving accurate and truthful testimony today?

A.    No.

Q.    Great.  And, while we do expect accurate and truthful testimony, at no point will I want you to reveal anything that is covered by attorney-client privilege.  Do you understand that?

A.    I do.

Q.    Thank you.  Do you also understand that you cannot communicate with anybody else during your deposition today, be that there is no attorney here with you, but you can't, you know, call somebody, text somebody, et cetera, during the deposition.

A.    I understand.

Q.    It does not look like you have documents in front of you today.  Is that correct?

A.    That is correct.

Q.    Okay.  If you need to take a break, that's fine, just ask me, but I will ask that you answer whatever question is pending before we take a break, but at any time, and again that goes for everybody, if we need to take a break, happy to do that.

So speaking of these gentlemen over here,

Page 13

they may object to a question that I ask you.  That's fine if they do that.  We'll pause to let the court reporter get that on the record.  However, unless you're instructed otherwise, you should answer the question.

A.    Okay.

Q.    Great.  All right.  So tell me a little bit about the depositions you've done before.

A.    The one deposition that I was involved in was a civil case between a private business, McGill Aviation, and the City of Fernandina Beach.  This would have been, I don't know, ten or more years ago.

Q.    Okay.

A.    And I was just a witness as part of that deposition.

Q.    Okay, great.  And will you give me one more sentence about what the case was about?

A.    The -- it was a contract dispute between McGill Aviation and their leasehold with the City of Fernandina --

Q.    Okay.

A.    Beach.  That's Florida.

Q.    Great.  So I want to ask you a little bit about what you did to prepare for today.  Did you

Page 14

review any documents?

A. I reviewed personal notes.

Q. Can -- what are the form of those personal notes?

A. Like a memo for record to myself, something that I've saved, what I recall of the events of late January and February.

Q. And am I correct in understanding that these are notes that you have in your personal possession?

A. Correct.

Q. Do you have access, and I'll probably ask this again later too, or cover this later, but do you have access to any USAID documents?

A. I have access to some emails that I had around that time. I do not have access to any documents per se.

Q. Did you review any of those emails in advance of today?

A. I reviewed -- I reviewed the emails that I had -- that I have, yes.

Q. Did you speak with attorneys from the Department of Justice before today?

A. No. I have not spoken with any of the Department of Justice attorneys.

Page 15

(Interruption in proceedings.)

THE REPORTER: That's just somebody in the waiting room.

MS. MARZIANI: Should we pause and let them in?

THE REPORTER: I think he let them in already.

MS. MARZIANI: Okay.

THE REPORTER: Sorry. Excuse me.

THE DEPONENT: Sure.

THE REPORTER: Okay. We have Attorney Rubin.

MS. MARZIANI: Great.

THE REPORTER: And Ilberstein (sic)?

MS. MARZIANI: Wonderful, thank you. And they're both on behalf of the Plaintiffs.

(WHEREUPON, Attorney Nicole Rubin and Attorney Andrew Silberstein joined the deposition.)

BY MS. MARZIANI:

Q. Did you talk with any former colleagues prior to today's deposition?

A. Can you be more specific with the time frame?

Q. Oh, yes. Of course. Let's see. In the last 30 days, have you spoken with any former USAID

Page 16

colleagues about this lawsuit?

A. I have spoken with John Voorhees, the former director of security. I don't recall speaking with any other colleagues from USAID within that period.

Q. What was the nature of your conversation with Mr. Voorhees?

A. It's mostly social. We stay in regular communication. We both acknowledged we had this deposition coming. And I'm sure, although I can't remember the specific details, we had kind of discussed this day in -- like these events over the end of January, as well, to kind of refresh our collection -- or refresh our memory on it.

Q. Understood. Did you discuss your potential testimony?

A. I discussed -- I discussed that I would be deposed with him. When John and I originally met, I had not been scheduled for a deposition yet.

Q. Did you -- in addition to Mr. Voorhees, did you speak with any other colleagues from USAID in the last, I guess, three months?

A. Yes. I've been in touch with some other USAID colleagues.

Q. Okay. Will you tell me -- tell me whom?

Page 17

A. More regularly Mark Santaw. Leo Ruth. Nathan Alcazari (phonetic), and I cannot spell that last name.

Q. That's okay.

A. Infrequently I've had a few text messages with Steve Shih. I think I've had one or two phone calls with Tara Debnam. I have seen at one point Nick Gottlieb along with some members of this group, and Clint Howard.

Q. Broadly speaking, what is the nature of your interactions with these individuals?

A. Mostly social.

Q. Okay. Thank you. In advance of today's deposition, did any of these individuals or any other individuals give you any documents to review?

A. No.

Q. Okay. So as I think you know, you're here today to provide testimony in a case challenging several things related to the dismantling of the United States Agency for International Development. I'm going to call that USAID for short.

A. Okay.

Q. I'm happy to answer more questions about the case, but suffice to say for our purposes, the Plaintiffs have sued Mr. Elon Musk, the Department

Page 18

of Government Efficiency, and other members of the Trump administration, arguing that there have been two constitutional violations, one a violation of separation of powers by dismantling the agency, and then separately a violation of the constitutions of appointment clause by having DOGE and Mr. Musk make significant decisions that they were not authorized to do.

So one thing that is -- I do want to make sure you understand is that you are not a defendant in this case, and you're here today as a witness. Do you understand all of that?

A.   I understand.

Q.   Okay.  All right.  So let's talk about you a little bit.

A.   Okay.

Q.   And then we will jump to the events of earlier this year.

So where are you from?

A.   Originally from Ohio.

Q.   Okay.

A.   And then Atlanta where the majority of my family still reside.

Q.   Okay.

A.   I live here in the D.C. area.  I've been

Page 19

here mostly since 1996.

Q.   Okay.

A.   With a couple years in Florida.

Q.   Great.  Do you have any degrees or certificates?

A.   I have an undergraduate degree from Georgetown University and a master's degree from George Washington University.

Q.   All right.  What is the master's in?

A.   It's in the security and public safety leadership.

Q.   Wonderful.  Will you give me, it can be decently high level, but a brief overview of your employment experience?

A.   Sure.  The majority of my career has been in the federal government.  I -- I started with the Department of Justice while I was still an undergraduate.  I worked in private industry for a few years, running a small business at an airport in Florida.

Returned here, a few odd jobs and ultimately worked with the U.S. Capitol Police as a law enforcement officer for six years.  And moved to private industry as a consultant for two years, working at the Pentagon.  Re-entered federal

Page 20

service.  Worked then for 10 years with the Pentagon Force Protection Agency.

Then for five years with USAID.  And now I'm with the Department of Health and Human Services.

Q.   Going back, will you just give me -- and that's okay if you don't know precisely, but I'm going to ask you for a date range --

A.   Sure.

Q.   -- for each of these.  So when were you at the Department of Justice?

A.   I was there from 90 -- 1999 until 2000. And then I was with McGill Aviation from 2000 to 2002, and that's in Fernandina Beach, Florida.  I was with the U.S. Capitol Police from 2003 until 2009.  I was with Battelle Memorial Institute from 2009 to 2010.  And then I was with the Pentagon Force Protection Agency from 2010 until 2020.  USAID 2020 to 2025.  And most recently with Health and Human Services of August of this year, 2025.

Q.   And am I correct in understanding that with the two roles associated with the Pentagon, the first one was as a private contractor --

A.   Correct.

Q.   -- and then the second was one the

Page 21

Pentagon?

A.   So from the -- from 2009 to 2010 when I was that private contractor, I was working with the Pentagon Force Protection Agency and one other organization in the -- in the same space within the Pentagon.

Q.   And what was your title when you worked within the Pentagon?

A.   I had multiple roles.  I started with the Pentagon Force Protection Agency as a law enforcement policy analyst and strategic planner. And then I served for -- and each of these positions, these first two are approximately two years.  The deputy chief of staff for the agency, and then I served as the chief of staff for the agency.  And then from 2015 to 2020 I was their assistant director for threat management.

Q.   Okay.  And so -- and then you went to USAID.

A.   Yes.

Q.   What was your title at USAID?

A.   I was the deputy director of security.

Q.   And was that your title throughout your tenure there?

A.   Correct.

Page 22

Q. Okay. What is your title now at HHS?

A. It is the deputy director of the program support center.

Q. Okay. What do you -- what do you do at HHS? Like, what does that entail day to day?

A. It's a shared service provider. So they provide financial management services, building operations, security, mail logistics, as well as the federal occupation health program for the government.

Q. Okay, great. Okay. So let's go to -- so USAID. Who -- to whom did you report in your role as deputy director of security?

A. I reported directly to John Voorhees, the director of security.

Q. And did you supervise anyone in that role?

A. I did. I supervised -- do you want the names --

Q. Yes, please.

A. -- or the positions? Okay.

Q. Both. Both, please.

A. Rich Polley who was the director of our international security programs. Tara Debnam who was the director of our personal security program. Clint Howard who had a few different roles, first as

Page 23

our intelligence division director and then as our Washington security programs director. He had since left the agency and there has been like a few other people in those various roles. They were vacant though at the end.

Charles Turner, he goes by Skip. He was, at the end, the director of Washington security programs. And I'm just -- I'm thinking who I'm missing. We had a few reorganizations while I was there where we consolidated some of these divisions, so I had supervised other people, and I'm blanking on their names at the moment. I apologize, but that was to include our command center.

Yeah, that's -- those are the names I recall at the moment.

Q. Okay.

A. I may be missing a few.

Q. Okay. Well, if it comes to you, just let me know.

A. Sure.

Q. So will you -- why don't you go ahead and describe your job duties at USAID.

A. Sure. So as the deputy director of security, I was -- I was essentially responsible for the security operations of the agency. So from the

Page 24

Washington security program, it was any of our daily security interactions, badging, information security, so that's protection of classified information.

Physical security, your cameras and your alarms. Tenent communications, what's going on in the area. From overseeing our command center, it was just the responsibility and the awareness of what -- the security events around the world that may effect our people, our facilities, or our operations, and making sure that leadership had the information.

From our intelligence programs, it was having -- ensuring staff was monitoring classified information to make sure that leadership was aware so they could make informed decisions on our programs.

From our international security programs, it was liaising with our staff in a hundred-plus countries as well as with diplomatic security to be aware of what security situations were ongoing, and then to identify what we can assist with, to include training and information or more support.

We also communicated directly with what we call the implementing partners. These were the

Page 25

funded programs that USAID did, and it was the same; what information do they need, what security information or training that would further assure their programs. And then overseeing what was called counterterrorism vetting where we would vet some of these implementing partners in high-risk areas, to make sure that we weren't funding terrorists or supporters of terrorism.

Q. Tell me a little bit more about the information security portion of your portfolio.

A. Sure. So the information security aligned within our -- what we called our Washington Security Programs Division, so basically our local organization. Their mission was to make sure that the people understood how to protect classified information, how it was marked.

If there was any security incident where someone didn't have or someone took information out of the right area, they would investigate it to see if it was a security infraction.

They were our main points of contact for any of our staff who needed to access secure information facilities, security compartmented information facilities, otherwise known as SCIFs. So they would schedule all the meetings for that,

BRIAN MCGILL                    December 09, 2025                    26 to 29
92132

Page 26

check people's clearances, and control that aspect.

Q.   And who -- did you supervise someone who oversaw this information security portfolio?

A.   The -- the direct supervisor would have been two layers below me.  So their Washington Security Programs would have been their direct supervisors, and then our information program branch itself would have been right under them.

Q.   Okay.  And who -- who was running the information security branch?

A.   So at the -- at -- when I departed USAID, it was Phillip Dixon was the last branch chief.  It had been vacant for many years.  We had different acting ones.  And then when I first arrived at USAID, it was Diane Sloan.

Q.   Okay.

A.   Who had since been promoted out of that position.

Q.   And within this information security portfolio, am I correct to understand that the focus was on USAID systems as opposed to other systems in the federal government?

A.   The information security program was actually mostly -- it was mostly focused on kind of print information to some extent.  And I'll -- I'll

Page 27

be clearer in my response here, because our classified systems were provided by other government agencies.

So the Department of State provided us our secret level classified information.  And we would follow their rules, and this information security branch would -- would make sure that people understood the rules.  They would initially sign off to verify your clearance, and then our chief information officer would then sign off to set up the account with State Department.

This branch also was a coordinating point for getting an account on JWICS which is the Top Secret system.  Those are the systems in the SCIF that were provided by an intelligence community provider.

Q.   So -- so what is the JWICS?  What's contained in there?

A.   So --

Q.   Obviously without disclosing anything that's top secret.

A.   No.  JWICS --

Q.   But as a general matter.

A.   JWICS would be top secret sensitive compartment information that would be available,

Page 28

whether it's email or posted on government sites.  So, one, you would need to have that level of clearance.  And then two, you need to have a need to know.  So why specifically.  And then we, through us, we would request that account access to then our intelligence community provider.

And once you have a JWICS account, you are not automatically given access to all that information.  For each site you actually have to request permission from whoever owns that information.  So it's looked at each and every time.

Q.   I'm going to ask what is probably a silly question, but bear with me.  I know nothing about security and cyber issues.  For this JWICS system, can you access it remotely or do you have to be in a SCIF?

A.   You have to be in a -- well, from what I know, you have to be in a SCIF.

Q.   Okay.  Is it correct, at least, at USAID --

A.   At USAID you have to be in a SCIF.

Q.   To access JWICS?

A.   Correct.

Q.   Were there other either top secret or highly sensitive databases that you dealt with at

Page 29

USAID?

A.   The other top secret or sensitive databases would have been through our counterterrorism vetting program that was located at the FBI's terrorist screening center.  So those 21-ish people would request and get access directly to those databases.  Those would be the only other top secret level systems that we had access to that I was aware of.

Q.   So you also spoke about a Washington command center.  What happened there?

A.   I just --

Q.   Yes.

A.   I want to go back to that last question.  We did have other members of the intelligence community that were assigned to our office.  I'm not able to specify who because of the level of classification.  They did have systems within our SCIF as well.

Q.   And when you say --

A.   That they only would have had access to.

Q.   I see.

A.   Their network.

Q.   I see.  What about the -- I'm going to talk in a minute about security clearances,

Page 30

something else I only kind of understand, but when these, you know, individuals with highly classified knowledge and top security clearances were assigned to USAID, would you -- would USAID have personnel information on them?  Or like their own personal information?

A.  Yes.  We would have personal information for badging, so to give them one of our badges we would have personal information on them in our badging system.

Q.  Let's actually jump to badging for a second, or maybe longer than a second.  Tell me, because my understanding is that badges was also a significant role of the security division.

A.  Mm-hmm.

Q.  Tell me how the badging process worked.

A.  Sure.  So it involves multiple organizations.  The starting point before you request a badge, whether it's a new hire and our office is told about that, or if it's someone coming from another agency, the starting point is typically the security clearance process.

So I'll just start with a new hire.  So there's -- there are federal requirements, and it depends on what's your level of access, that you

Page 31

have a background investigation.  On one hand it can be for a security clearance.  For all federal employees and contractors there's also a suitability check which is more, is it appropriate for you to be a member.  It's not just about trust, it's appropriateness to work for the federal government.

And then there's what's called colloquially an HSPD-12 check which is a safety and security check.  Some people fall into all three buckets.  If you don't have a security clearance, you're going to go through a suitability and an HSPD-12 or safety security background investigation.

So very often it will start with our office --

(Internet connection interruption.)

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  The time on the monitor is 10:32 a.m. and we're back on the record.

BY MS. MARZIANI:

Q.  All right.  As long as I didn't have to fix anything related to that.  All right.  So let's get back.

We were talking about badging, and we were talking about badging and you were talking about the process for security clearances.

Page 32

A.  So the -- the starting process, it starts with a request.  Whether it's from an HR new employee or someone coming from another agency.  It starts with that background check.  And then it moves along to actually, once they clear whatever level of check, it could be Top Secret, it could be Secret, it would be a Public Trust Sensitive, it could be a Non-Public Trust Sensitive.

Once they clear that investigative process, it will move along to our badging folks who check and determine what level of access they should have, schedule an appointment to come in and get your badge.  And then the badge itself will indicate on it what level of access you have.

If you're coming from another government agency, normally we'll have their security staff send us their clearance level.  We are able to go in and check in different databases to see if their clearance levels are reflected.  And then we will grant that access on the badge as well.

Q.  So how portable, then, is your security clearance?  So let's say actually I worked for the Department of Justice once, briefly.  Let's say I had whatever security clearance I got at the Department of Justice, and then twenty years later I

Page 33

go and apply for a job at HHS.  Does -- would HHS automatically credit my security clearance?

A.  So there is a federal policy that is called reciprocity.  And the Office of Director of National Intelligence in coordination with the Office of Personnel Management will set a lot of these policies around credentialing and then national security standards.

The policy on reciprocity, I don't know when that started, is just that.  If you have a clearance, whether it's a security clearance or a public trust, if you have an active clearance then the other agencies are to reciprocate and honor that level.

Typically if you've left federal service, they'll honor it within two years.  You just need to update that information.  When you come to USAID even with a current clearance, whether it's national security or just suitability, the personnel security division under our office at USAID would ask you if you'd had any life changing events between your last investigation, even if you had a current one, just to see if we needed to trigger any additional investigation to make sure that we knew what was going on.

Page 34

Q.   Okay.  I'm correct in assuming that I couldn't just, you know, take a security clearance that I got somewhere else and walk into USAID and it automatically --

A.   You --

Q.   -- gives me some level.

MR. LYNCH:  Object to form.

THE DEPONENT:  You can with the right coordination, walk into USAID with a current clearance if the Office of Security was notified or could see that clearance.

BY MS. MARZIANI:

Q.   Okay.  How long did you -- did it normally take for a -- a new hire to go through the badging process?

A.   So if we include the entire security clearance process, it truly varies.  If you had an existing clearance, it could be the same day or three days, just depending on our ability to check.

If you were starting from the very kind of beginning of it, anywhere from 60 days to many months if there were complicated matters in your background.

Q.   What is your level of security clearance?

A.   I have a top secret security clearance

Page 35

with CI access.

Q.   And is that the level you had at USAID?

A.   It is.

Q.   So let me go -- I'm going to go back to something that you mentioned before.  You alluded to certain spaces at USAID being restricted.  Can you tell me what types of restrictions were put on spaces?

A.   Correct.  So we had three different demarcations for spaces.  We had what was considered unrestricted space which is where you could access unclassified information.  We had what was called restricted space where you would see a mark on the door before you go in that was red, and that was for secret level access.  And then we had our SCIFs, which was top secret and -- and above.

Q.   If I went to USAID as a -- as a visitor without any security clearance, which of these areas would I be allowed access to?

A.   You would only be allowed access to unrestricted space with an escort.

Q.   And why is that --

A.   From USAID staff.

Q.   What -- what was the policy?

A.   It was our security policy, because even

Page 36

in unrestricted space you have -- you may have official use information.  You may have protected information to include PII information of staff and other programs.

Q.   What -- I mean, from a security perspective, what would be your concern with unauthorized access to a restricted space?

MR. LYNCH:  Objection, vague.

THE DEPONENT:  My concerns with unauthorized access to restricted space would be somebody without the proper clearance or the need to know, coming into a space and overhearing classified information, or being able to physically see classified information, whether it's on a system or on a printout.

BY MS. MARZIANI:

Q.   As a physical matter, where were USAID's SCIFs located?

A.   We had a SCIF on the second floor which was previously our Office of Security.  We had a SCIF within our fourth floor which is where our office was when I left.  And then we had a SCIF on the sixth floor near the administrator's suite.

Q.   And you're referring to the Reagan Building.

Page 37

A.   The Reagan Building, correct.  We had SCIFs at an offsite location that we used for our continuity of operations.  We were in the process of building a SCIF in an annex building over in the Southwest, and that should be all our SCIFs.

Q.   When you said there was a SCIF in the -- on the fourth floor, was that part of the security team's offices or was it separate?

A.   And just -- I'm sorry, I did miss.  We had a SCIF on the seventh floor as well.

Q.   Okay.

A.   The -- to answer your question, the SCIF on the fourth floor was within our office which was restricted space.  So you had to enter restricted space to then be permitted into the SCIF, which was top secret space.

Q.   When -- when political appointees come in with a new administration, is there any difference to the badging process?

A.   We normally expedite the badging process for political appointees or if we get a special request.  So yes, they're expedited.  They're prioritized.  For a new administration, it may be that, you know, we wait to get their experience information.  Typically your incoming political

Page 38

appointees will be investigated by the FBI prior to an inauguration. And then afterwards it would be up to us to do the investigation.

We would expedite the investigations from a timing point, and there were very few cases where John Voorhees as the director would even authorize interim access for some of the political appointees once we had all their information as well.

It was very common to authorize interim access for Secret level. It was less common to do it for the safety, security, or suitability level.

Q. And when you authorized interim access, was it typical that that person had a security clearance?

A. It was typical that we had all their information for requesting a security clearance, and that we had run their information in a criminal database to see if there was any concerning returns. If they already had a clearance, they more likely would have had reciprocity and have been granted access right away.

Q. And am I correct in understanding that typically at least, the background files would come from the FBI to USAID?

A. If it was a political appointee that was

Page 39

identified prior to inauguration, would we get it from the FBI.

Q. I see what about a new political -- a political appointee?

A. It -- if it was, and I may be misremembering this. What I'm trying to recall is if our Senate confirmed appointees, which we had about nine of them, whether or not -- I believe the FBI may have done the investigation for them and then gave us the files.

That would be very typical of the administrator or the deputy administrator if they needed an investigation, if they didn't have an active clearance, but otherwise we would have then been responsible for doing the investigation for the majority of all of our political appointees.

Q. Got it. So I want to talk a little bit about USAID's security data systems. The first I want to talk about is, I understand it's called C-CURE.

A. Okay.

Q. Are you familiar with the system?

A. I am. That is our access control system.

Q. Okay. And what does that mean?

A. So that means to -- it's an access control

Page 40

system where we can put people's information in, have an identification card that you could then use to swipe in and out of secure spaces. Meaning like a turnstile to come in to a building, a door that has a card reader.

It would record and log all of those events and set permissions. So when you get a badge, you would be -- it would be identified within your badge of where you're allowed to go in or not go in based on whoever -- whatever supervisor requested that access.

Q. And then if I had a badge, would the C-CURE system show that I went to the fourth floor at the Reagan Building one day?

A. We could -- the Office of Security, and specifically our domestic security branch who managed that access control system could go into that system and see that -- those logged events, whether you went in or whether you didn't.

Q. How long does the C-CURE system hold that sort of data?

A. I don't recall.

Q. Who at USAID was responsible for overseeing the C-CURE system?

A. So directly, Mr. PJ or Patrick Butler was

Page 41

our lead over that system.

Q. Who did Mr. Butler report to?

A. By the time I left, he reported directly to Charles Turner, or Skip Turner.

Q. And then -- and Charles Turner reported to you?

A. Correct.

Q. Did you work closely with Mr. Butler?

A. I did.

Q. What was your personal interaction with the C-CURE system, as a general matter?

A. Limited. I -- I -- like infrequently would I go in and ask them to show me or have a question of how could I see access, or could you check swipe access for somebody.

Q. So --

A. But I never personally used the system myself.

Q. Was -- is it correct to say that PJ Butler was an administrator of the system?

A. I believe he was.

Q. Okay. Are you aware of any other administrators of the C-CURE system?

A. We had contract staff who assisted us. I do not know their names, but I believe there would

Page 42

have been at least two others that would have had that administrative access. There could be other staff, I'm just not aware.

Q. Am I correct in understanding that your access to C-CURE was at some level other than administrator, like your personal access?

A. I did not have a C-CURE account.

Q. Okay.

A. So I don't believe I had direct access.

Q. So I guess the C-CURE system was -- scratch that. Would you consider the C-CURE system to be restricted?

A. Yes.

Q. Would you consider it to be classified?

A. No.

Q. How would you describe the kind of level of secrecy for the C-CURE system?

A. Sure. I believe that it was PII information, so protected identity information, so that was controlled. It was sensitive to that -- probably that regard.

It was not deemed or determined from a threat to national security to be classified at a higher level.

Q. Would you need a security clearance to be

Page 43

an administrator of C-CURE?

MR. LYNCH: Objection, calls for speculation. Lack of foundation.

THE DEPONENT: I don't know what our policy was to that end.

BY MS. MARZIANI:

Q. To the best of your knowledge, did Mr. Butler have a security clearance?

A. He did. I believe he had a top secret security clearance.

Q. I want to turn your attention to a different data security system, IDMS. Are you familiar with that system?

A. It needs to come back to me for a second. What does it stand for?

Q. Yeah, ID management system, I believe.

A. We so commonly refer to anything with access control to C-CURE -- in terms of identity management system -- okay. I believe that was our State Department credentialing system. So we had -- we had an agreement with the State Department to use their identity management system to essentially put your information on a card, so that was your logical access so that you can access commuter -- computer systems.

Page 44

And that, which I omitted before, is a part of the badging process. When you go through the badge, as you're going through the actual process, it would hand off physically to CIO who would enroll the individual in the IDMS system. And then it moved right back to us to then issue the badge to the individual.

Q. Why -- why two different systems?

A. One is for logical access and credentialing and policies and mandates that are associated with the chief information officer. And that's as, you know, the extent of my knowledge on that.

Q. Okay. And then what about the SIDs system, the secure -- okay.

A. Yeah.

Q. What is -- you tell me what that stands for.

A. That is our -- that is our security clearance database.

Q. Okay.

A. So all individuals who would submit a request, whether it's for a national security position, suitability, or HSPD-12, we would have their information and file in that system.

Page 45

Q. And was the SID system overseen by the security team or by the HR team, or by some other team?

A. It was overseen -- it was primarily overseen by our personal security team, but within our office we had an IT team that Mark Santaw led that we gave the ultimate program responsibility for overseeing the system.

Q. Understood. So we talked a little bit, I want to go back to C-CURE for a second. Do you know what alerts C-CURE had for unauthorized use?

A. Not specifically.

Q. Do you know whether C-CURE has an alert if somebody tries to download or export data?

A. Not that I'm aware of.

Q. Do you know if the SID system has an alert for unauthorized use?

A. I believe it does.

Q. Does the SID system, to your knowledge, produce a record of user access?

A. I believe it does.

Q. Do you know how long those records are held?

A. I do not.

Q. For SIDs, does it have an alert system in

Page 46

place for downloading or exporting data?

A.   I'm not aware.

Q.   So if -- if I said that someone was going to have full administrative access to one of these information technology systems, what does that mean to you?

A.   That means that they could create accounts, delete accounts, potentially even add or change code to what the actual system does.

Q.   Is it correct to say that full administrative access is the highest level of control over these data systems?

MR. LYNCH:  Objection.

THE DEPONENT:  As far as I know, yes.

BY MS. MARZIANI:

Q.   Who would be the best technical custodian to understand C-CURE and its -- and its records?

A.   By name?

Q.   Yes, please.

A.   I believe Patrick Butler.

Q.   What about the best technical custodian for SIDs?

A.   Mark Santaw or Tara Debnam or Kelly McClellan.

Q.   And then what about for IDMS?

Page 47

A.   Possibly William Morgan, or another representative from the Office of the Chief Information Officer, CIO.

Q.   Okay.  So prior to January 20th, 2025, were you familiar with the U.S. Digital Service?

A.   No.

Q.   Is it -- did you have any understanding of what USDS did?

A.   No.

Q.   Did you ever interact with any USDS personnel?

A.   Not that I recall.

Q.   To the best of your knowledge, do you recall any USDS personnel being detailed to USAID?

A.   Not that I was aware of.

Q.   Okay.  So I am going to do our first exhibit here, and this is just a calendar.

A.   Okay.

Q.   Exhibit 1, please.

(WHEREUPON, Exhibit 1 was marked for identification.)

THE REPORTER:  Exhibit 1 marked.

BY MS. MARZIANI:

Q.   So the reason for the calendar is we are going to turn our attention to the events of earlier

Page 48

this year, and at least for me and my feeble brain, looking at a calendar can be helpful in helping me remember things that happened.

With this next series of questions, I want to be clear that I'm asking about your interactions during the current Trump administration as opposed to the previous Trump administration.  And also that I'm going to be asking questions within this time frame of January 2025, February 2025, possibly March 2025.

A.   Okay.

Q.   If you -- if at any time you're unclear about which Trump administration or the time frame, just ask me.

A.   I understand.

Q.   Great.  What was the first time you interacted with any political appointee from the current Trump administration?

A.   I had interacted with -- with some members of the Transition Team prior to Inauguration on the 20th.  I don't recall all their names.  I believe some of them had moved on to be political appointees within the current administration.

Following that, and to elaborate for a second, that is normally -- we do awareness briefs

Page 49

for the Transition Teams just to understand our office and ask questions.

On the 20th, on Inauguration Day itself, I was in the office.  That morning we essentially assisted and helped our immediate political appointees who came in.  Ken Jackson, who we understood to be the assistant to the administrator for Management and Resources, Matt Hopson who was the chief of staff, Joel Borkert who was the deputy chief of staff, and I believe there were a couple other individuals that day who all onboarded.

Saw them in the morning.  Participated in their security brief that we had a member of our staff provide them.  Talked to them while they were waiting for their badges.  Mostly just social interaction that day.

Q.   Thank you for that.  So do you recall when you met with the Transition Team prior to January 20th?

A.   I don't recall the exact days when I met with the Transition Team.  There was, I recall, at least one meeting where they had -- where we had kind of scheduled a briefing.  I remember there was an individual, I believe his name was Cart, maybe Wainwright, I don't remember specifically.  I

Page 50

believe there were two other individuals involved. There was nothing too remarkable about that interaction.

I did have -- I did receive a call from Cart I think around January 15th. He had called me on my desk phone at USAID during that morning. He -- it was a series of calls, maybe three calls. He had asked me -- he just -- he asked me more about my background. He wanted to know about my experience.

He asked me about my involvement in transformational changes. He asked me what John Voorhees and I did during January 6th in Black Lives Matter, if we had changed any of the security posture. And then he asked me if I would be willing to serve as the acting administrator for USAID.

I had told him -- I declined. I said that I did not believe I was the right person for the job based on my experience, that I lacked foreign affairs expertise, time on The Hill. That I would serve in any capacity they saw fit, but I thought I was the wrong person for the job. And he pressed me on an actual answer, and then I said no, I don't think it's the right thing.

Q. When you said that Cart asked about transformational changes, what do you mean by that

Page 51

phrase?

A. I don't know.

Q. Those were his words?

A. Those were his words.

Q. And when you said that he asked about January 6th security, what did he mean by that?

A. I did not ask him to elaborate. I recall stating, I believe that this is a very charged matter and it seems to be political, and I'm not going to go into that. Both myself and speaking on behalf of John Voorhees, we remain very apolitical in our approach.

And anything we did would be about the safety and security of folks within our facilities and just making them aware of what's happening around them.

Q. Was his question directed at your political views around January 6th?

A. That was not my impression.

Q. Your impression was that the question involved the security measures.

A. Correct.

Q. Okay. And similarly when you say he had some questions about the Black Lives Matter protests, was -- were the questions directed at your

Page 52

political opinion?

A. That was not my impression.

Q. Okay. Did you have any interaction with Cart Wainwright following that January 15th phone call?

A. I did not.

Q. And in addition to Mr. Wainwright, do you recall the other two individuals?

A. I do not recall at this time.

Q. So on January 20th, you mentioned that Mr. Jackson, Mr. Hopson, Mr. Borkert, and a couple of more individuals came to USAID. Do you remember those other individuals?

A. I -- I don't remember by name at this moment. I could see some of the faces, but again I don't remember by name.

Q. Did you -- did you meet with these individuals?

A. I did. Met them in the morning just to greet them. We always have staff provide a security brief which includes how you should handle classified information, how you should report incidents. I don't recall specifically who we had briefing that day, but both myself and John Voorhees attended that briefing. And then we ended up

Page 53

speaking with the attendees to make sure they understood some of the security rules and regulations.

Q. When did you first hear about the idea of the Department of Government Efficiency, which I'm going to refer to as DOGE?

A. I don't remember specifically, but it would be some time around that time post inauguration.

Q. During the afternoon meeting on January 20th, were -- did any individuals identify as being part of DOGE?

A. No.

Q. Were there any individuals there who you now identify as being part of DOGE?

A. Not that I recall.

Q. When you first heard about DOGE, what was your understanding of what DOGE was meant to be?

MR. LYNCH: Objection. Vague as to DOGE.

THE DEPONENT: I understood it to be to look for cutting waste and finding inefficiencies within the government.

BY MS. MARZIANI:

Q. What is your understanding of what DOGE means?

Page 54

A.   My understanding was the Department of Government Efficiency.

Q.   Are you familiar with the executive order that created DOGE?

A.   I -- yes, I am.

Q.   Do you understand there to be a difference between DOGE and USDS, the U.S. Digital Service?

A.   No.  I believe that DOGE was a re-branding of the U.S. Digital Service.

Q.   Sitting here today, how would you define a member of DOGE?

MR. LYNCH:  Objection, lack of foundation. Calls for speculation.

THE DEPONENT:  I -- I would assume that they were somehow selected as a government or some affiliated contract employee to work for this federal entity, that they would have gone through a process, that they would have had a supervisor, and they would have assigned work specific to the goals, roles, and responsibilities of DOGE.

BY MS. MARZIANI:

Q.   In this, this first week period between January 20th and January 27th, what official USAID communications did you receive about DOGE?

A.   I don't recall.  Between -- just to be

Page 55

specific, between the 20th and 27th or the 20th and the 25th?

Q.   Say the 20th and the 27th.

A.   Okay.  So what I do recall was on the 27th of coming into work and, so the morning -- that Monday.  I don't recall specifically what time, but I was told that we had DOGE who wanted to understand our access control process, that we had DOGE representatives.

I saw John Voorhees who said he had already sent Leo Ruth and Charles Turner up to the sixth floor where these individuals were.  He was going to go to the badge office where he believed they were then going to proceed, and he asked me to go upstairs to the sixth floor so that I could be our lead point of contact to answer any questions.

When I went up to the sixth floor, I saw Matt Hopson.  I saw Peter Marocco, and then I later met Steve Davis.  I didn't know who Steve Davis was and I didn't know who were DOGE staff or not, but we just -- I explained to Steve how the badging -- really badging revocation process worked, because that was one of the questions they had.

Q.   Do you now view Steve Davis as a DOGE member?

Page 56

A.   Yes.

Q.   Who told you that DOGE was on premises on January 27th?

A.   I believe it was John when I saw him that morning.

Q.   Do you know how John was informed?

A.   No.

Q.   What else happened on January 27th?

A.   So when I spoke with Steve Davis, it was in the hallway outside of the administrator's suite. There were other staff from our office to include PJ Butler, or Patrick Butler.  Erica Carr who was the acting executive secretary was there, and a member of her staff, Tyrone Miles.

When he was asking about revocations, it seemed to focus more on the IT side, and he wanted to speak with the acting CIO.  When we informed Mr. Davis that they were in a different building, he told us all to -- to proceed to that building.  So there was about ten of us who went over to our Annex building in the Southwest.  We took a bus together.

I spoke with Steve explaining kind of the revocation process, and then we all went into a conference room.  Additional members who were there were Joel Borkert, who was the deputy chief of

Page 57

staff.  Laken Rapier who I believe was in charge of our public affairs at the time, that's a political appointee.  Steven Hernandez, who was our acting CIO.  Zack Kahn, who was one of our deputy CIOs who ran operations.  Peter Marocco.  An individual who I believe is named Tariq Makia, I could be incorrect on his last name, who was coming from the State Department.  Luke Farritor and Gavin Kliger, and then there were two other individuals there who I did not -- I do not recall their names.  I believe they said they were from OPM.

Steve Davis opened the meeting, saying that they were calling this meeting to identify who made illegal payments, and that was their mission, which I was not aware of -- of what was going on.

And then they had asked specifically for Luke Farritor -- and I'm sorry, Edward Coristine. Did I say Edward Coristine or Gavin Kliger?

Q.   You said Gavin.

A.   No, Gavin was not there.  It was Edward Coristine, that is a correction.  They wanted to provide Luke Farritor and Edward Coristine logical access to our payment system.  And Laken Rapier said, we do not need to follow rules.  We need to expedite this.

BRIAN MCGILL                    December 09, 2025                    58 to 61
92132

Page 58

Zack Kahn objected, just asking what access these individuals had. I asked to see their IDs. This was for Luke Farritor and Edward Coristine to have access to the payment system. They both produced GSA credentials. These are identity cards.

I remarked to the group that typically to get this identity card, you have to go through some form of a background investigation. I said we could check their clearances. I had Patrick Butler who was in the room personally collect their PII information, name, date of birth, place of birth, so he could later check their clearance level in the system.

And then Steve Hernandez made a decision to go ahead and grant them access, administrative access to our payment system that I believe is called Phoenix. I stayed there the entire day. I stayed outside of the conference room. I spoke with Peter Marocco who said they owed an answer to Secretary Rubio by 5:00 that night.

After waiting for a few hours, Steve Davis came out to see me and said that they were planning on revoking access, both physical and logical access to around 30 people, and asked if I would make sure

Page 59

that both the Office of Security and that the chief information officer coordinate to get it done that day once we got the names.

I gave Joel Borkert my information, Patrick Butler's information, and Zack Kahn's information to make sure that we receive the names, because we typically coordinate if there's a revocation of access.

Later that afternoon, I did receive a list of around 57 or 58 names from Joel Borkert, and I then coordinated with both Steve Hernandez, Zack Kahn, and then Nick Gottlieb from our employee labor relations, as the three of our offices are typically all involved in kind of removing access. ELR would notify the employee, both CIO and the Office of Security would remove their two different logical for CIO, physical for the Office of Security access.

Q.   I'm going to introduce Exhibit 2. Thank you.

(WHEREUPON, Exhibit 2 was marked for identification.)

THE REPORTER: Exhibit 2 marked.

BY MS. MARZIANI:

Q.   Are you familiar with this email?

A.   Yes.

Page 60

Q.   Will you please tell me what this email is?

A.   This is an email that was from Joel Borkert that lists the names -- the list of 57 individuals to be placed on administrative leave, that we would then remove their logical and physical access.

Q.   And so when you previously said that you received an email with 57 names, is this the email you recall?

A.   Correct.

Q.   If you look at the -- I'll give you a minute.

A.   Okay.

Q.   Emails -- emails come out in kind of a funny way, so I'm just going to say that the physical top of this document --

A.   Okay.

Q.   -- this email that was sent on Monday January 27th at 3:41 p.m., says: Hi Bill, Nick, Steven, and Brian. Brian is you, correct?

A.   Correct.

Q.   Steven is Steve -- Steven Hernandez, correct?

A.   Correct.

Page 61

Q.   Nick Gottlieb --

A.   Correct.

Q.   -- is Nick. And Bill, I don't want to butcher his name, but --

A.   Bill Malyszka.

Q.   Okay, Malyszka. And what was his role at this point?

A.   He was the Chief Human Capital officer, otherwise the head of HR, Human Resources for USAID.

Q.   And so at this point, you know, later in the afternoon, had Mr. Farritor and more Coristine been given access, systems access?

A.   Yes.

Q.   Do you know --

A.   I -- I'm sorry. Can you clarify what system?

Q.   I was going to ask you that. Would you know which system access -- which systems they were able to access?

A.   I believe they were given access to the Phoenix system.

Q.   And is the Phoenix system USAID's main payment system?

A.   That is my understanding. Our financial management and contracting system.

Page 62

Q. At this point what level of security clearance did Mr. Farritor and Mr. Coristine have?

MR. LYNCH: Objection, calls for speculation. Lack of foundation.

THE DEPONENT: I was not aware until the next day of what clearance we believed they had.

BY MS. MARZIANI:

Q. And then the next day, which -- what clearance?

A. The next day Mr. Butler had brought to me and sent me an email as well, identifying that he had checked OPM's, or he had other staff check OPM's clearance verification system, and for both individuals it said that SAC was completed, and that their T4 investigation was pending.

So to my understanding, a SAC is your initial criminal check, and an organization may give you interim access based on the SAC, but their high risk public trust investigation, the T4 investigation, which is not a national security investigation, was still underway.

That was based on a review of the system, not speaking with any other individuals.

Q. As of January 28th, did either Mr. Farritor or Mr. Coristine have USAID badges?

Page 63

A. No, not to my knowledge.

Q. During this big meeting on January 27th, who was the primary decision maker?

MR. LYNCH: Objection, calls for speculation. Lack of foundation.

THE DEPONENT: Decision for what? Could you clarify?

BY MS. MARZIANI:

Q. Of course. Who was making the decision to -- who made the decision to give Mr. Farritor and Mr. Coristine Phoenix access?

MR. LYNCH: Same objection.

THE DEPONENT: It was my impression that Steven Hernandez made that decision in the room.

BY MS. MARZIANI:

Q. Mr. Hernandez at the point was the acting chief information officer, correct?

A. That's correct.

Q. Did he have authority to provide that level of access?

A. I don't know who authorizes the Phoenix access.

Q. On January 27th, to whom did Mr. Hernandez report?

A. I believe he -- he likely reported to

Page 64

Colleen Allen who was the acting -- or who was the administrator for management. He -- but I could be incorrect. CIO often had a dotted line up to the front office of an organization, so they may have directly reported to the -- normally the deputy administrator for management, but in this case the acting to the assistant to management.

Q. And -- and at this point who was the deputy administrator?

A. We believed at that time that Ken Jackson was in that -- was in that role. Although he was, I believe, titled assistant to the administrator for management, we were not aware of any -- normally that's a Senate confirmed position and we had not had any Senate confirmed politicals at that time.

Q. Am I correct in recalling that you were, in your position as deputy director of security as USAID, in the previous presidential transition; is that correct?

A. Correct.

Q. So based on that experience, was it unusual not to know who the acting administrator or deputy administrator was?

MR. LYNCH: Objection, lack of foundation. Calls for speculation.

Page 65

THE DEPONENT: I did not -- it was not unusual that it was a transition period and things would be unclear during that transition period.

BY MS. MARZIANI:

Q. In a transition period when authority may be unclear, what was the best way for your team to ensure that you had proper authorization?

MR. LYNCH: Objection, vague.

THE DEPONENT: At that time I would look for the ultimate authority to be from the acting administrator, that was Jason Gray.

BY MS. MARZIANI:

Q. What was Peter Marocco's role at this time?

A. I understood Peter Marocco to be the appointee over state foreign assistance, which I understood their role to be more of a governing or pass-through office to help determine what funding USAID as well as other foreign assistance agencies across the executive branch.

Q. When you look back at this list of attendees in this January 27th meeting, who would you identify as DOGE members?

MR. LYNCH: Objection.

THE DEPONENT: I don't have a list of

Page 66

attendees of the January 27th meeting. Of the names that I stated?

BY MS. MARZIANI:

Q. Of the names that you -- yes.

A. It was not clear to me who specifically was DOGE or not DOGE. I don't recall anyone identifying themselves as DOGE at that time.

Q. It is correct, however, that you were previously told that DOGE personnel --

A. Correct.

Q. -- were in the building?

A. I was assuming Steve Davis as well as Luke Farritor and Gavin Kliger were possibly DOGE, but I -- I didn't understand who specifically was or wasn't at that time.

Q. Is it typical that a person's role would be identified when you were asked to give them security access?

MR. LYNCH: Objection, vague.

THE DEPONENT: When we ask for security access, we do normally require them to fill out information on a form that would not only identify their personal information, but it would identify their government or contract organization as well.

BY MS. MARZIANI:

Page 67

Q. You mentioned that at some point in the day there were, you thought, 30 people give or take who were going to be -- whose access was going to be revoked. And then you received this email with 57 names. Were you told -- were you given any information as to why the list expanded?

A. No.

Q. Were you told why these particular individuals were put on -- and I'm sorry, I'm gesturing to Exhibit 2, there's a list of -- it says list of employees to be placed on administrative leave, 57 names, many of them have titles. Were you -- did anyone explain to you why these individuals were being put on administrative leave?

A. Not these specific individuals. The explanation that I received at the start of the meeting on the 27th was they wanted to identify who made illegal payments that was against the executive order to stop foreign assistance.

And when Mr. Davis told me I would get 30 names, I assumed those were the individuals they identified that they believed were making those payments.

Q. Did Mr. Davis tell you that he was going to provide 30 names?

Page 68

A. He said they had -- I don't recall who he said was going to provide me the names.

Q. Let's -- so at this point, January 27th, did you have any understanding of DOGE's plans with regard to USAID?

A. No.

Q. Were you ever told about plans that DOGE had for USAID?

A. No.

Q. Were you ever told about preparations that DOGE made in advance of coming to USAID?

A. No.

Q. Let's move forward and proceed with the week. So we spoke about the meeting on January 27th. Tell me what happened on January 28th. You've already testified that you got more information about Mr. Farritor and Mr. Coristine.

A. So on January 28th, the chief of staff Matt Hopson, I believe Joel Borkert was probably copied, contacted me both by email and possibly phone about changing the locks on the offices of the general counsel.

So I had staff do that. Later that afternoon, I received notice from John Voorhees that he had requested Laken Rapier have greater access to

Page 69

the entire building, that she needed swipe access in the same manner that he did to attend meetings and events, in her role.

That night around 9:00 at night I had a phone call from Joel Borkert, the deputy chief of staff, who was specifically asking me how they could access, if somebody wanted to get access, into those general counsel offices at that point of the night, if that is something that I would be able to do or not do.

I discussed with him that we would need a review process, and considerations for determining any reasonable expectation of private. We agreed that it was not something we could do at that point of the night, and he mentioned to me that I might be getting a call from someone else, and that that's the exact answer that I should give.

I did not receive any other calls that night.

Q. Did he insinuate who might be calling you?

A. I don't recall.

Q. And why did you and Mr. -- I don't want to butcher his name -- Boekert, Borkert. Why did you and Mr. Borkert agree that access to the general counsel's office would not be available that

Page 70

evening?

MR. LYNCH: Objection, asked and answered.

THE DEPONENT: I was not in a position to physically give access, and as I explained to him, I would recommend he have a review process in place for giving someone access just to make sure that there was a reason that they were doing it.

BY MS. MARZIANI:

Q. In your experience, what would such review process entail?

A. Normally consultation with your general counsel.

Q. Did USAID have a general counsel at this -- on this date?

A. I don't recall who -- we had attorneys, yes. I don't recall specifically who the assigned general counsel was at that moment.

Q. So did anything else happen on January 28th with respect to USAID --

A. No.

Q. -- and DOGE? Okay. So what about January 29th?

A. January 29th, based on the unusual call at night and the access to the general counsel space, combined with the late afternoon request for access

Page 71

for Laken Rapier, I did ask our staff to review our C-CURE system, our access control system, to see if there was any unusual swipes or anything else in the general counsel space.

They did note that Laken Rapier did swipe in to that general counsel space around 5:00. There was nothing -- no other kind of reports from that.

Q. Was the general counsel's office considered a restricted space?

A. I don't --

MR. LYNCH: Objection as to restricted, that it's vague. You can answer.

THE DEPONENT: I don't recall -- I believe parts of the general counsel were restricted in a secret space, and other parts were not restricted. It did require swipe access, so the only individuals who were encoded on their card to be able to swipe in, which would have been determined by the supervisor or office manager who controlled that space ordinarily.

So it would have had swipe access to get in essentially, but I don't recall whether it was restricted from a security experience or unrestricted.

BY MS. MARZIANI:

Page 72

Q. Am I correct in understanding that C-CURE captures the badge swipe?

A. Correct.

Q. So if -- if somebody swipes but they hold open the door and five people come in with them, that is not captured by C-CURE, correct?

A. Correct.

Q. Are there -- did USAID have security cameras or other devices that would, you know, capture unauthorized access to restricted spaces?

A. We -- we had security cameras. Typically for a restricted space, meaning it was a secret level space, there would be a security camera on the door so that you could then see who has access. That footage is limited by a time period of how long it's kept, which I do not know.

Q. In addition to searching C-CURE on Wednesday January 29th, did you review any security camera footage?

A. No, I did not.

Q. When you said that you asked staff to review C-CURE, was that Mr. Butler?

A. I -- I originally attempted to reach out to Mr. Butler. He was not physically there. I had one of the security officers, so these federal

Page 73

protective service contract security officers that does security for the Reagan Building, we also had a security operations center within our office which is a place where they could see the access control system, and they could see the cameras.

Since that was within our space, I went into that operations center and I asked the officer to check in the system. We then both called PJ Butler on the phone to make sure we were doing it right. So PJ Butler was on the phone making sure that -- that the officer knew how to go into the system and look at the information.

Q. Who granted Ms. -- sorry, Laken's last name?

A. Rapier, I believe.

Q. Rapier -- Ms. Rapier's expanded access?

A. The chief of staff Matt Hopson is who I would say granted that access by his direction to John Voorhees to give her expanded access to the building.

Q. Was that authorization in writing?

A. I don't know.

Q. Is such authorization typically in writing?

A. It depends. For John or myself it could

Page 74

be an email or it could be a phone call.

Q.   Am I correct in understanding that C-CURE can only be accessed from certain physical locations?

MR. LYNCH:  Objection, vague.

THE DEPONENT:  I believe it can be accessed remotely as well.

BY MS. MARZIANI:

Q.   Okay.  And am I correct in understanding that because you did not have direct access to C-CURE, you needed to go somewhere physically?

A.   Correct.

Q.   Okay, thank you.  Okay, so, all right. Moving right along to January 30th.  So tell me -- tell me what happened that day.

A.   So at the start of January 30th, I recall Nick Gottlieb reaching out to both John Voorhees and myself.  I believe John was able to meet with Nick in the morning.

I later met with Nick virtually as he was sharing that he was preparing a letter -- that they were waiting on Acting Administrator Gray to make a decision to pull many but not all of the staff on administrative leave off of administrative leave. That he had sent a memo up to Jason, and he was

Page 75

starting to draft a letter to them to take them off administrative leave.

I remember reviewing that to -- to specifically note that this does not necessarily mean an investigation is over, that you may still be under investigation.  Later that afternoon, I received either a -- I believe I received a message from Joel Borkert to call him, which I did.

I remember them -- I don't remember the specific details, but he asked me to come upstairs. As I was walking down the hallway to come upstairs, I ran into Ken Jackson and two other individuals who I do not know.  Actually, let me correct that.

Before I ran into Ken Jackson, I -- I ran into an individual who I do not know.  He told me his name and that he was looking for Nick Gottlieb. So then I -- Nick Gottlieb's office was near our office on the same floor in the Ronald Reagan Building.

I knocked on Nick's door.  I introduced this individual to Nick, and I walked away.  As I was walking down the hall, I ran into Ken Jackson with another individual.  We then walked and intersected with both Nick and this other individual.  And then Ken told Nick that he was

Page 76

being placed on administrative leave, and that I was to then escort Nick out of the building.

I recall Nick asking who Ken was, because he I guess had not met Ken, and that he understood. And then I escorted Nick to his office to collect his belongings.  And then I escorted Nick out of the building.

Following that, later that afternoon around 5:30, Luke Farritor and Tera Dahl who was a political appointee assigned as our national security coordinator, came down to our office.  They came down to the office.  I met with them.  They came into my office, and Luke had requested access to our C-CURE system, our access control system.

I shared with Luke that I did not have the authority to grant that, but I would make that request.  And with him and Tera in the room, I drafted an email to Ken Jackson with the request, and identifying my concerns to Ken.  I communicated that both to Luke and Farritor -- I'm excuse me, to Luke Farritor and Tera Dahl.

Luke said he could not wait for an answer, so we went upstairs to look for Ken together.  I met with Matt Hopson and Joel Borkert.  I shared the same request in front of Luke.  Both Matt Hopson and

Page 77

I discussed our concerns with it.

Matt had identified that he was not in a position to make that decision, but he was concerned, and that I should document, as we discussed how, you know, how can we help Luke, that I should document like what I would be okay with, what level of access Luke would be for Ken or Jason Gray's decision.

Luke did indicate originally when he was in my office that they wanted access to be able to see and independently verify who was placed on administrative leave.

Returning back down to my office to draft a memo authorizing, you know, kind of making a recommendation for what level of access, I did review the executive order on the DOGE and I used that as an authorizing language.  I had a lot of email exchanges -- not a lot.  I had some level of email exchange with Ken Jackson who -- who originally authorized access.

I believed that access to be like a user account so you can go in and look and see.

Q.   For C-CURE.

A.   For C-CURE, to be able to see access. While we were going through this process, I offered

Page 78

to Luke Farritor, after receiving the initial approval from Ken Jackson, to look over-the-shoulder to independently verify the access restrictions, which was he was amenable to at first.

And then when -- when we granted him, when I told him we were going to get him an account, I also had him fill out a user request form where you put your information. You have to agree to these rules, some rules like you will not change anything in the system without the authority of the system administrator.

It's a two-page document that he signed that I believe Mr. Butler may have signed, and then I signed on behalf of our personal security division that actually normally checks your clearance level before we do that.

At one point he was not satisfied -- Luke Farritor was not satisfied with just read-only access, and I shared that I would need additional authority. I -- I did go back upstairs and back down to my office. I don't have the exact sequence, but at one point coming down when I told him I didn't have the authority to grant that access, Mr. Butler had mentioned that Mr. Musk, referring to whom I assumed Elon Musk, had just called.

Page 79

And then Mr. Farritor was insistent that I speak with Musk to grant this -- with Elon specifically, here, talk to Elon, talk to Elon. I shared that I -- I would not talk to Mr. Musk, that I needed authority from the acting administrator to be able to grant this. And Mr. Musk was welcome to talk to the acting administrator to expedite this process.

I later received an email from Ken Jackson saying do not grant that level of authority, that we, you know, I'm paraphrasing but, you know, must have protections in place and that he would come and see me.

Ken Jackson, Jeremy Lewin, and Laken Rapier all came down into my office. Mr. Jackson had conveyed kind of the -- the level of concern that was raised earlier with a message from Nick Gottlieb that had made it to the press, taking people off of administrative leave without the administrator's authority.

He had referenced that -- that the president was angry about this, and that he was personally tasking Secretary Rubio to look into this and fix this. And then he had shared that he was going to coordinate with State L, which is the

Page 80

general counsel of the State Department to review this level of access that was requested for Luke Farritor, that I should do nothing.

Q. And this was all from Mr. Jackson, right?
A. This was all from Mr. --
Q. You're saying "he."
A. -- Jackson --
Q. Okay.
A. -- sitting in my office. At a later point John Voorhees came after having a meeting in the office that day, came back to my office. Working with Mr. Jackson, we then contacted Bill Malyszka, the CHCO, and I'm sure I was emailing the acting CIO because part of our efforts were to make sure that the people who were taken off administrative leave by Nick Gottlieb's note were back on administrative leave, and making sure that Bill Malyszka was communicating that.

And then later when Luke Farritor came back into my office with Jeremy and Laken and Ken and John, Ken had mentioned that they were waiting on a memo from the White House, that they were expecting the vice president to issue a memo authorizing Luke access.

So we left that night waiting for that

Page 81

authorization of access. Not having received it that might, I checked in again the next morning with Ken Jackson, have we gotten that access yet. And we still had not received kind of any memo or direction.

Q. Thank you so much for all of that. Before we go to the 31st, just a couple of questions. Did -- you said that when you signed the user -- the C-CURE user request form, that you normally check security clearance when you sign. Did I understand that correctly?
A. There is a -- I had no previous experience in signing these forms. When I looked at the form and looking at the different signature blocks, there was a block from our personal security division to sign off on.
Q. At this point, what was Mr. Farritor's level of security clearance?
A. I was not aware of any changes from his SAC being completed and his tier 4 investigation still being under way.
Q. So then what were the concerns, the specific concerns that you raised to Mr. Jackson?
A. The concern we raised was the fact that our access control system also controls access to

Page 82

our restricted spaces, our secret level spaces, and by granting someone this level of access and them not knowing our process of how do you review someone's clearance and make sure you check before you give them that level of access, that you are presenting a national security risk, that then whether intentionally or inadvertently that an individual may grant someone access to a space where they should not have access, jeopardizing national security information.

Q. You referenced several documents when you were relaying the sequence of events. One is a memo that you drafted, correct?

A. Correct.

Q. In addition to an email to Mr. Jackson?

A. Multiple emails, correct.

Q. Multiple emails to -- and these were all on your work email account, correct?

A. Correct.

Q. Were there any other -- any -- strike that. On January 30th, were there any other significant written materials that you recall?

A. Not that I recall.

Q. Did Mr. Farritor explain why he needed expanded access?

Page 83

A. His original explanation -- so, excuse me, no, he didn't. I pressed him multiple times on why he needed that access, and he said it was confidential, and he repeated that it was confidential multiple times. And I openly shared with him that that elevated my concerns because of the security issues associated with the system.

Q. At this point did you understand Mr. Farritor to be working for USAID?

A. No.

Q. Who was Mr. Farritor working for?

MR. LYNCH: Objection, calls for speculation. Lack of foundation.

THE DEPONENT: I don't know specifically who he is working for. At the time I believe he was associated with Steve Davis who I believe was associated with the DOGE service.

BY MS. MARZIANI:

Q. Am I correct in understanding that according to Mr. Farritor, Mr. Musk was communicating directly with Mr. Farritor?

A. I -- that was my impression.

Q. Was Mr. Musk communicating with Mr. Butler?

A. Mr. Butler said that he spoke with Mr.

Page 84

Musk on the phone.

Q. Did -- what did Mr. Butler say Mr. Musk said?

MR. LYNCH: Objection. I'm going to instruct the witness not to answer on the presidential communications privilege grounds.

MS. STEVENS: Maybe it's time to take a break.

MS. MARZIANI: Yeah, let's take -- that's a great time to take a break, and we'll come back to that.

THE VIDEOGRAPHER: Okay. Please stand by. The time on the monitor is 11:48 a.m. We're going off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: The monitor says 12:03 p.m. and we're back on the record.

MS. MARZIANI: Okay. So we want to go back to the objection. So it's our understanding that this only applies to communications between the president and his advisors. And perhaps could be extended, but only in the course of preparing advice for the president. I have some case law here.

So I wanted to understand exactly what your position is with regard to this objection.

Page 85

MR. LYNCH: So communications solicited and received by the president or his White House advisors that have broad and significant responsibility for investigating and formulating advice to be given to the president. And Elon Musk clearly qualifies as that.

Material that an agency submitted to the Office of the President, which again Elon Musk was in, can travel up the chain of command whether or not the president receives it, so we don't think it has to go to the president or not.

MS. MARZIANI: So is it your position though that this specific conversation between Mr. Butler and Mr. Musk was for the purpose of giving advice to the president regarding USAID?

MR. LYNCH: For -- my position is that because of the way that you guys have chosen to litigate, including making a class that includes witnesses that are government employees, who then I can't talk to, I can only know what I know and I know what you've elicited in testimony the last couple of days.

So I may learn more in the future about this conversation, but right now I have to make a protective assertion because that's what I know.

Page 86

And of course, I ultimately cannot make a formal assertion if the presidential communication is privileged. That has -- that belongs to the White House, and so I would need to confer with them in the future about it, you know, at a time -- if they decline to assert, then it wouldn't be an issue with respect to -- for Mr. McGill, we might have to ask for a few more minutes of his time in the future if they decline to do that, but that's an option.

But from what I know, I have to assert from right now.

MS. MARZIANI: It's also our understanding that the privilege does not extend to staff and other executive agencies. And there is no question based on the record that Mr. Patrick Butler worked for USAID.

MR. LYNCH: Well, that's absolutely incorrect based on the American First legal case, DC Circuit of this year.

MS. MARZIANI: And what does that say?

MR. LYNCH: Says that communications that are between an agency and the White House can be included in the presidential communications privilege.

MS. MARZIANI: And those are

Page 87

communications with the president's close advisors for the purpose of providing advice to the president?

MR. LYNCH: That particular holding says that material that is submitted to the White House by an agency, information, can fall into the presidential communications privilege.

MS. MARZIANI: And then last question here is, what is your position as to -- actually, scratch that. All right. Let's -- yeah, that's exactly what I was going to say. Let's move on for purposes of timing.

MR. LYNCH: Sure.

MS. MARZIANI: And then we might come back to this.

MR. LYNCH: One other thing, you know, that could obviate this, I don't know, but you could ask him a strictly yes or no question, like does he know or have any understanding of what Mr. Musk and Mr. Butler discussed, and he says no, that's sort of the end of it because we don't have to bring him back, because he doesn't have the information.

BY MS. MARZIANI:

Q. Do you -- do you have any understanding of the communications, the content of the conversation

Page 88

between Mr. Musk and Mr. Butler?

A. No.

Q. So I want to go back to Mr. Farritor's security clearance as of January 30th. Am I correct in understanding that he did not have a security clearance?

MR. LYNCH: Objection --

MS. MARZIANI: From USAID.

MR. LYNCH: Lack of foundation. Calls for speculation.

THE DEPONENT: He did not have one from USAID.

BY MS. MARZIANI:

Q. Or, am I also correct in understanding that based on your records, Mr. Farritor did not have a security clearance from any other agency for which he would offer reciprocity?

MR. LYNCH: Same objection.

THE DEPONENT: I -- I did not have the details on what his level of clearance was, other than a SAC was completed and a tier 4 was pending.

BY MS. MARZIANI:

Q. Did you ever speak with Mr. Musk?

A. No.

Q. In addition to Mr. Musk's conversation

Page 89

with Mr. Farritor and with Mr. Butler, are you aware of Mr. Musk speaking with any other members of the security team on Thursday January 30th?

A. I am not aware of him speaking with anyone else from USAID security.

Q. Did Mr. Farritor tell Mr. Butler about DOGE's plans with regard to the federal government?

MR. LYNCH: Objection, lack of foundation. Calls for speculation. And you can answer yes or no.

THE DEPONENT: I'm not aware specifically of Mr. Farritor saying DOGE's plans to Mr. Butler.

BY MS. MARZIANI:

Q. Do you have a general sense of plans that Mr. Farritor described to Mr. Butler with regards to DOGE?

MR. LYNCH: You can answer yes or no.

THE DEPONENT: No.

BY MS. MARZIANI:

Q. Sitting here today, do you have -- have you been told about any advance preparations that DOGE took prior to arriving at USAID?

MR. LYNCH: You can answer yes or no.

THE DEPONENT: Can you restate the question?

BRIAN MCGILL                    December 09, 2025                    90 to 93
92132

Page 90

BY MS. MARZIANI:

Q. Sure. Did you ever come to learn about any advance preparations DOGE took prior to arriving at USAID?

A. Yes.

Q. Will you please describe your understanding of those preparations?

MR. LYNCH: Objection. I'm going to instruct the witness not to answer on the basis of the deliberative process privilege.

MS. MARZIANI: On whose -- is it your position that Mr. Farritor holds that privilege?

MR. LYNCH: The United States holds the privilege. At this point you haven't elicited how he got the understanding, what the -- who the understanding came from in any respect, directly from him or others.

BY MS. MARZIANI:

Q. How did you come to gain an understanding of DOGE's advanced preparations with -- with respect to USAID?

A. Mr. Butler, on Friday the 31st -- in a conversation I had with Mr. Butler on Friday the 31st, he shared conversations he had with Luke Farritor that previous night.

Page 91

Q. And will you please describe the content of those conversations?

MR. LYNCH: And I'm going to instruct the witness not to answer on the basis of the deliberative process privilege.

MR. WARREN: We should take a break.

MS. MARZIANI: Yeah, let's take a break. Thank you for your patience.

THE DEPONENT: Sure.

THE VIDEOGRAPHER: All right. Please stand by. The time on the monitor is 12:12 p.m. We're going off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: Please stand by. The time on the monitor is 12:22 p.m. and we're back on the record.

MS. MARZIANI: Wonderful. Okay. So it is my one goal to make you not have to come back and sit for a deposition, and so we're going to move on right now and then we can revisit --

MR. LYNCH: Okay.

MS. MARZIANI: -- the basis for the legislative privilege assertion later.

MR. LYNCH: Deliberative process.

MS. MARZIANI: Deliberative process, thank

Page 92

you.

BY MS. MARZIANI:

Q. Okay. So let's get back to the morning of January 31st. We started to talk about that. So tell me what happened on January 31st when you went in to the office.

A. When I went in to the office, probably normal morning routine to some extent where we had daily meetings with all of our staff to find out what was going on.

I had -- based on what was going on the previous night, I did ask our staff, I asked PJ Butler, Patrick Butler, Victor Williams who was a recent employee that we assigned over domestic security that PJ Butler was previously responsible for and we made, at the time delineated PJ as solely responsible for access control.

And then Leo Ruth who was the other deputy director for support, I wanted to hot wash the previous night to understand what events took place and where we stood.

Q. Excuse me. Can you explain that term?

A. Hot wash. Sorry. To review. To review the -- to quickly review, immediately afterwards review what occurred the previous night.

Page 93

Q. Okay.

A. Before I had that meeting, I reached out to Mark Santaw who was -- who was our chief technology officer in the office and directly responsible for our IT systems. And I asked Mark to check what level of access Mr. Butler had granted the previous night, before I met with Mr. Butler to understand what occurred.

When I met with them, I asked -- I asked Mr. Butler what occurred. Mr. Butler mentioned that he talked to Elon Musk twice. He -- when I asked him what level of access he granted Luke Farritor, he admitted that he granted him administrative access.

I reminded him that I had told him multiple times to his face that he was not authorized to do so. I had put in writing the previous night to him on email that he -- that we were still waiting for authorization from the White House before granting Luke access, and thanking him for all his support that night.

I shared with him that he would be responsible for any issues that occur because of inappropriately giving that access. And then I asked him why he did it. He shared with me that he

BRIAN MCGILL                    December 09, 2025                    94 to 97
92132

Page 94

believed he was ordered to from his calls with Mr. Musk, and that he essentially was under duress, that he believed he had to do it even though we were telling him not to.

With the group present, I said, well let's wait. We know this request is with all of our leadership. Before we immediately turn off this access, let's wait a couple hours and see if we get a decision out of concern that if we did it, then there would -- that would cause problems.

Later that afternoon an email was forwarded to me. I believe it was from Zack Kahn of the CIO's office. The email was an exchange between -- well, it was Jason Gray, the acting administrator, authorizing Gavin Kliger full access to the same systems that Luke Farritor had.

The email exchange showed Luke reaching out to Jason asking to provide this level of access to Gavin Kliger, which included the C-CURE access control system. I had then forwarded the email to Ken Jackson and John Voorhees, noting to Ken who was my main point of contact for waiting for the permissions, that this appears that Jason has already authorized this, and that we'll do it.

And then I instructed our staff in an

Page 95

email exchange to make sure that we get Gavin to fill out the same form we had Luke fill out.

At some point during that day, PJ Butler would have made me aware that Luke and some of these other individuals, I don't remember specifically who, had visitor badges to our facility. These are not the same badges with your picture on it. It's something that we would hand out while you're there that permitted them swipe access.

And we had made requests that day to our executive secretary office to get the information of these individuals so we can formally issue them a USAID badge. We still had not gotten that information.

Q. Thank you for that. When -- let's look at Exhibit 3.

(WHEREUPON, Exhibit 3 was marked for identification.)

THE REPORTER: Exhibit 3 marked.

MS. MARZIANI: Thank you.

BY MS. MARZIANI:

Q. Mr. McGill, will you please take a minute to review this and let me know if you're familiar with this email.

A. So this is the email that I referenced

Page 96

receiving from Zack Kahn that is a forwarded message from Jason Gray responding to Luke Farritor granting that access for Gavin Kliger.

Q. What was Mr. Gray's role when he sent this email?

A. Mr. Gray's role?

Q. Yes.

A. Was the acting administrator of USAID, to my knowledge.

Q. And so on January 31st, was it your understanding that Mr. Gray had authorization to grant this level of access?

A. Yes.

Q. Did Mr. Gray have authorization as acting administrator to grant this level of access even when security clearances were still pending?

A. I believe so.

Q. Am I correct that the memo, the authorization memo that you drafted for Mr. Jackson's signature, was never signed?

A. I never received a signed memo.

Q. As of Friday morning when Mr. Farritor had C-CURE -- actually, strike that. Based on your conversation with Mr. Butler, when was Mr. Farritor granted administrator level access to C-CURE?

Page 97

A. I believe it was Thursday night on January 30th.

Q. When you came into the office on Friday morning to do your -- what was that term you used?

A. Hot wash.

Q. Hot wash, I love that. When you came in to do the hot wash, what did the C-CURE system tell you about Mr. Farritor's activities?

A. I -- I did not -- I don't recall in terms of I didn't ask that question or if it was given, I don't recall.

Q. As administrator of C-CURE, what would that enable Mr. Farritor to do?

A. I believe it would allow him to create accounts, to delete accounts, and I -- and to control people's access and change people's access. And I don't know what other capabilities, not being familiar with the system, beyond that.

Q. What is the normal process that precedes the decision to grant someone administrator level access to C-CURE?

MR. LYNCH: Objection, lack of foundation. Calls for speculation.

THE DEPONENT: Typically it would have been through our domestic security branch chief,

Page 98

Patrick Butler themselves, who was our main point of contact for the system. The technical details beyond that, I'm not familiar with.

BY MS. MARZIANI:

Q. When you told Mr. Butler that he would be responsible for the ramifications of Mr. Farritor having this level of access, what did you mean by that?

A. In terms of not following a direct order from a supervisor, and then if this individual has done anything incorrectly with our system, that that would then be associated with his actions.

Q. And it's your understanding that Mr. Butler granted access because of a direct order from Mr. Musk.

MR. LYNCH: Asked and answered.

BY MS. MARZIANI:

Q. You can still answer.

A. I believe so.

Q. You -- did you come to learn -- did you ever come to learn that Mr. Gray's role had changed?

A. Yes.

Q. And when did you come to learn that it had changed?

A. Saturday afternoon.

Page 99

Q. What -- what did you learn at that point as with regards to his role?

A. Based on a phone call that I was having with Jason Gray and John Voorhees, all three of us on the call, Jason had stated that his role had changed on Friday, and that he had it in writing from the White House that he was now the acting administrator for policy and programming.

Q. At what --

A. Acting assistant to the administrator for policy and programming.

Q. At what point on Friday did Mr. Gray's role change?

A. I don't know.

Q. Do you have reason to believe Mr. Gray's role changed prior to 4:49 when he sent this email entitled physical and logical administration for Gavin?

MR. LYNCH: Objection, calls for speculation. Lack of foundation.

THE DEPONENT: I -- I don't know specifically when it changed.

BY MS. MARZIANI:

Q. If Mr. Gray's role had changed prior to sending this email, would he have had proper

Page 100

authority to grant this level of access for Mr. Farritor and Mr. Kliger?

MR. LYNCH: Same objections.

THE DEPONENT: Potentially.

BY MS. MARZIANI:

Q. What would it depend upon?

A. Whoever was in the role of the administrator to then delegate that responsibility to him.

Q. Who ultimately has the decision making -- decision making authority to approve this level of access?

A. My understanding at that time would have been the administrator or the acting administrator, or we would have followed the deputy administrator for management or the acting assistant to the administrator for management, at that time being Ken Jackson.

Q. After Mr. Gray's role changed, who was the acting administrator?

A. In the phone call, Mr. Gray had mentioned that Secretary Rubio would be the acting administrator and delegate his responsibilities to Peter Marocco.

Q. Did you have any contact with Secretary

Page 101

Rubio on January 30th or 31st?

A. I did not.

Q. This email from the 31st, if I can direct your attention to what Mr. Gray wrote. He said: I approve of administrative access to all unclassified information systems including but not limited to.

What is your understanding of why he wrote all unclassified information systems?

MR. LYNCH: Objection, calls for speculation. Lack of foundation.

THE DEPONENT: The classified -- so my only understanding of this is what's in front of us.

BY MS. MARZIANI:

Q. Of course.

A. So these are the systems that are on US AIDnet which was our unclassified network.

Q. Did Mr. Butler, by virtue of being the C-CURE administrator, have access to all of the SCIFs?

A. Not by -- not by his C-CURE administrative rights. The SCIFs had a different access control system than C-CURE.

Q. Okay. So in other words, even if you were granted administrator level access for these data systems, that does not correspond with your ability to access various restricted areas on the premises.

BRIAN MCGILL                    December 09, 2025                    102 to 105
92132

Page 102

A.    So just to delineate, it doesn't give you ability to access a SCIF, but the C-CURE system still gave you access to restricted areas which was secret level areas.

Q.    When -- but because C-CURE has the potential to give someone physical access to these -- to SCIF areas and other highly classified areas, is it correct that you depend on the discretion and judgment of the administrator to make sure that's not abused?

MR. LYNCH:  Objection, mischaracterized the prior testimony.

THE DEPONENT:  The -- could you restate the question?

BY MS. MARZIANI:

Q.    Sure.  What I'm trying to get at is my understanding of C-CURE is that as an administrator of C-CURE you can physically grant access into various secure spaces.

A.    Correct.  You can -- you can grant access into both unrestricted and restricted, meaning secret level areas.  It does not give you the ability to grant access into a SCIF.

Q.    Okay.  So --

A.    It could -- and to be very specific, it

Page 103

can grant you access into the foyer before you physically get into a SCIF.

Q.    I see.

A.    Those are -- then there's a different access control that's controlled inside the SCIF.

Q.    I see.

A.    To prevent that level of access.

Q.    What are the systems in place to make sure somebody doesn't abuse their discretion as the C-CURE administrator?

A.    I -- I don't recall specifically what that is, other than our security branch granting and limiting that access for administrators.  I don't know technically then what could happen.

Q.    What is the other system that grants physical access to a SCIF?

A.    I -- I don't --

Q.    In USAID.

A.    It's -- I don't know -- I don't know the specific instance.  I don't know if it's a different module of C-CURE or if it's a different company's access control system.  It could be C-CURE but it's completely separate.  It's not on -- it's not on the same network.  So you physically have to be in the SCIF to log on to the program to then grant access

Page 104

to that card --

Q.    I see.

A.    -- for them to then be able to access the SCIF.  And -- and depending on what time of day, there's also a dial lock that you must know the combination for to be able to get into the SCIF.

Q.    I see, I see.  And then you said C-CURE could get you into the lobby of the SCIF.

A.    Correct.

Q.    What gets you into the SCIF itself?

A.    So one, you would need to have the -- the combination to the combination lock if the SCIF is closed either from the beginning or the end of the day.  And then two, you would need to have swipe access authorized on the system that's managed out of the SCIF.

So one of our -- our information security specialists that we mentioned before, as well as some of our domestic security who would have access.  We had very few people that have access that then could program your card from within the SCIF to then be able to swipe into the SCIF.

Q.    I see.

A.    That would include a PIN number that you knew, so you would have to swipe and put in your PIN

Page 105

as well.

Q.    I see.  So by Friday morning, Mr. Farritor had C-CURE access.  What about access to the other USAID security systems, SID and IDMS?

A.    I'm not aware of him having access to those symptoms.

Q.    What about Mr. Kliger, do you know when he gained C-CURE access?

A.    I don't recall specifically when he gained access.  If they -- if they gave it to him that Friday evening based on this email, or if they waited for him to sign a form as we had Mr. Farritor do.

Q.    Why did Mr. Butler feel that he had to follow Mr. Musk's directives?

A.    I don't --

MR. LYNCH:  Objection, calls for speculation.  Lack of foundation.

BY MS. MARZIANI:

Q.    You can answer.

A.    I don't know.

Q.    On Friday morning when you learned that Mr. Farritor had indeed been granted administrator level access to C-CURE, did you have the same concerns you had had the day before?

Page 106

A. They -- I had -- I had the similar concerns, but my impression was that we were on a trajectory to get Luke that level of access.

Q. And by "we" you mean --

A. Like our office was based on the fact that we were awaiting for a memo that authorized that level of access.

Q. And who did you understand to be making these decisions?

MR. LYNCH: Objection, calls for speculation.

THE DEPONENT: What I was told the previous night by Ken Jackson, that vice -- the vice president himself was going to be the authorizer of it.

BY MS. MARZIANI:

Q. Did you ever see a memo from Vice President Vance?

A. I did not.

Q. It's been publicly reported that certain plaques with USAID's official seal were removed from the Reagan Building on January 31st. Were you aware of that?

A. I do recall that, now that you're mentioning it, yes.

Page 107

Q. Did you witness that happening?

A. There was a plaque, USAID logo plaque even outside of my office between me and John Voorhees that was removed.

Q. Do you know who removed it?

A. I believe our administrative staff did.

Q. Is there anything else that happened on Friday January 31st that we haven't discussed?

A. No, not that I recall.

Q. After receiving this email from Mr. Gray, what steps did you take on Friday late afternoon?

A. I -- I forwarded and notified Ken Jackson and John Voorhees of this email noting Acting Administrator Gray who I believed to be acting administrator at the time, his decision to grant access.

I then alerted our staff, so that would have been Mr. Butler and possibly Mr. Williams and Mr. Turner, to grant that access based on the administrator's authorization. And I made a note at some point that they should have Mr. Kliger sign the same C-CURE form that Mr. Farritor did.

Q. So if you look at the second page of Exhibit 3, sorry the printing's a little funky, but Mr. Farritor writes to Mr. Gray: Just want you to

Page 108

confirm that Gavin Kliger of DOGE should also have full read/write administrative access for managing physical and logical access, like myself.

Do you know why Mr. Lewin wanted this level of administrative access?

MR. LYNCH: Objection, misstates the document.

BY MS. MARZIANI:

Q. I mean Mr. -- sorry. Mr. Kliger.

A. No.

Q. You previously testified that on Thursday January 30th you weren't sure why Mr. Farritor wanted first -- scratch that.

You previously testified that on January 30th, Mr. Farritor seemingly accepted having view access to C-CURE, and then at some point Mr. Farritor decided that he needed or wanted expanded access. Is that correct?

A. Yes, and if I can clarify. Mr. Farritor always wanted access. The -- the view-only -- the read-over-the-shoulder and the view-only seemed to placate him while he was waiting for approval.

Q. Understood.

A. And then -- and then he escalated it.

Q. Understood. Once we get to Friday, did

Page 109

you come to understand why Mr. Farritor wanted this expanded administrative level access into C-CURE?

A. No.

MR. LYNCH: Objection, calls for --

BY MS. MARZIANI:

Q. Did you ever come to understand why Mr. Kliger wanted administrative access into C-CURE?

MR. LYNCH: Calls for speculation, lack of foundation.

THE DEPONENT: No.

BY MS. MARZIANI:

Q. Okay. So let's go to Saturday February 1st. As of Saturday morning, who was the highest decision making for USAID to the best of your knowledge?

A. At the time I believe that was Acting Administrator Jason Gray.

Q. As of Saturday morning?

A. Correct.

Q. And is that -- is that still your understanding sitting here today based on the conversation you had with him prior -- or later on Saturday?

A. Later on he had told me that he was no longer the acting administrator as of at some point

Page 110

on Friday.

Q. So sitting here today, when you look back at the events of February 1st, what is your understanding of the highest decision maker for USAID?

A. For me it was most clear it would be Ken Jackson at that time.

Q. Okay. So why don't you just go ahead and tell me what happened on February 1st.

A. Sometime around 10:30 that morning I was alerted by John Voorhees of an email that we had received from Erica Carr, the acting executive secretary. And it was exchanged between Ken Jackson and Peter Marocco noting four individuals that needed access into USAID that day.

I believe they were Jerry Lewin, Luke Farritor, Gavin Kliger, and Tariq, and I -- Molack (phonetic) -- I am not sure of his last name, but it begins with an M.

I recall the email actually identifying organizations that they were affiliated with, whether it was GSA. I think GSA for Jeremy. EOP, meaning the executive office of the president and GSA for Luke, and I believe it was state for Tariq.

The email included that they should have

Page 111

someone with a USAID badge to get them access or escort them, or that they would need to register their cards at the desk for access. So this -- sometime around 10:30 -- John and I had multiple phone calls initially just to make sure they had access.

I had reached out to my own staff being Charles Skip Turner, Victor Williams, PJ Butler, and -- and Mark Santaw kind of noting that we need to make sure these folks have access.

I had -- I had received a call from Mark first. It had been some time, almost a half an hour to get a response from anyone. So I also alerted our command center to try to get them to reach out to people.

Once around maybe 11:20, I got a call from Patrick Butler, so I asked him to make sure that they had access. We had no staff working, it was a Saturday. The only staff that were there were the federal protective service contract guards.

Mr. Butler said -- at that time I learned he had -- they still had their visitor cards and that their visitor cards had swipe access. So he said three of the four individuals that I named were already in the building.

Page 112

Following that conversation, we discussed -- we had discussions in terms of where do they need to be, making sure that the security guards know that they're there. At -- at some point -- so that was around 11:20-ish that we knew they were in the building.

At some point Mr. Butler was getting phone calls from other people, because he called me back within an hour saying that he was getting calls from Steve Davis, from Pete Marocco, and from Jason Gray. And there was some kind of issues with access.

You know, it was confusing as we assumed all the individuals that needed to be there that day were already physically there so we didn't understand what the kind of access problems were.

Q. Were you physically there?

A. I was -- no, I was not.

Q. Were you there at any point?

A. Not at any point, and to my knowledge none of our staff was there at any point.

Q. Dug Mr. Butler?

A. Including Mr. Butler.

Q. Okay, thank you. Sorry, I didn't mean to interrupt, so --

A. We discussed -- just in terms of them

Page 113

being there, we discussed what level of access they had. We understood that they were working out of an office within the legislative and public affairs space, that they should have access to, and we understood that they were -- had been working all week out of the administrator's office which is ordinarily restricted space, meaning Secret only, Secret clearance, but we had essentially sanitized that space more or less to grant that level of access.

They were not processing any classified material on that space. So at some point in those phone calls, I was also getting calls from Jason Gray who said that there was an issue with Steve Davis getting in.

And he said to me that Steve said he was going to call the U.S. Marshalls and that he was going to have everyone fired in the Office of Security if he cannot get in. I had called Patrick Butler, and then I had personally called the security guards, their front desk, saying you need to make sure that Mr. Davis gets in, you know, because of my earlier interaction with Mr. Davis that week, I had more familiarity with who he was and I believed he was supporting the DOGE service,

Page 114

and we wanted to make sure he had unimpeded access.

I told them to document, I said put in the log that I called you and my name, and to give him access.

I received another call from Jason later, you know, within minutes, saying that there were still problems and he was not able to get in. Actually that second call is then when I called and spoke with the guards to make sure that he got in.

In one of these calls with Jason, that's where we actually had a longer discussion, and that's where I called John. I think it was the first call with Jason where Jason then shared with us events of the previous day, that he was no longer in the position. He had shared that the chief of staff Matt Hopson had resigned the previous night, and that all decisions should go to Ken Jackson. So he was specific about that.

He had shared that Pete Marocco had authorized these individuals to be in the building, and he had shared that, as I mentioned before, that he believed that Secretary Rubio would be the acting -- would be the administrator and delegate his responsibilities to Pete Marocco, and that Pete Marocco wanted us to grant access for these

Page 115

individuals to all unclassified spaces in the building.

He was specific, and repeated himself multiple times, saying unclassified space to include the Office of General Counsel space and the Office of the Inspector General space.

We did have some discussions and concerns over granting access to any privileged information space within the general counsel. There's ongoing cases, but more specifically to the Office of Inspector General where they could have weapons as well as evidence to ongoing criminal investigations.

And we discussed that with Jason. After getting off the phone, John and I discussed that a little bit further to understand what our bright line would be if we believed anything would be, you know, potentially violating the law, and that we -- we had our concerns with the Office of Inspector General's space.

Going -- going back to the calls with Jason, after the second or third call, Jason communicated to me, and I can't remember if it was email, chat, or on the phone, that things had calmed down, that Steve had access, and that Steve Davis was going to text him what areas in the building

Page 116

they needed access to so that we could make sure we program that.

Q. At this point did you understand -- you had said previously that somebody from USAID should be there to escort them. Who from USAID was there with them?

MR. LYNCH: Objection, mischaracterizes the testimony.

THE DEPONENT: Yeah, I believe the email from Mr. Marocco said that somebody with a USAID badge should be there, and I was -- I was not aware whether or not there was already staff from USAID that was there to include any one of our front office staff, whether it's any of the individuals I named earlier in this or someone from the executive secretary's office.

It would be very common for anyone working in the -- the administrator suite or front office to just have some of that office staff available to them.

BY MS. MARZIANI:

Q. Do you know of anyone from USAID who was there?

A. No, I don't.

Q. Okay, thank you. Keep -- keep going.

Page 117

A. The -- so Jason had mentioned that Mr. Davis would send a text with potential rooms. We -- we never did receive any of that.

As the day progressed, and I don't have the exact sequence of events, but it was shortly thereafter that I was alerted by Mr. Butler who said that Luke Farritor went to one of the security officers and asked to have him show him how to load his GSA card on to our security system, and to specifically not tell Patrick Butler about it.

So he told the guard not to tell Patrick about it. And then PJ Butler had said that he could see that he went in -- into the system and did it, and that he was checking -- or apparently swiping that card at doors which was granting him access.

Q. "He" being Mr. Farritor.

A. Correct. I had sent out a communication to Jason Gray and Kent Jackson and Erica Carr. I believe I responded back to one of Erica Carr's earlier emails with everyone on it, noting that we granted -- that I understand where the confusion was, that there were I believe three additional people that we were not told that were showing up, that being Steve Davis, I believe Noah Peters, and I believe James Burnham, who were there based on what

Page 118

I was told from PJ Butler.

I noted that we still need information on the additional space, where do they need access, and -- and I don't know if it was in that communication or a subsequent one where I was communicating please remind them not to access any -- any restricted areas.

In my conversations with PJ that afternoon is when I learned when PJ Butler had given them these visitor badges, that he must have coded them with the 24/7 all access code in the system which gave them access to all space including restricted spaces.

Q. Mr. Butler did that.

A. Mr. Butler did that. How I learned that was he shared with me that he started to see them, and I don't have the order of events, started to see Luke Farritor swiping in to restricted space, particularly the executive secretary's suite which is red and restricted, and it's for secret only, and that's when I was, well how is this possible? Well, they have 24/7 all access. Well, what does that mean? That means they can get into restricted space.

We're under -- well, one, they're not

Page 119

authorized for that and we're under direct direction to make sure they do not access classified space. So at the time it was still, they should only have access to the LPA suite, which is the legislative and public affairs suite, the front office. And then if they have any other spaces.

I had asked Jason and Ken to communicate to them to make sure they understood they should not be accessing restricted areas, that there's a red sign that they should not go into. I believe John had calls with Ken Jackson as well to reiterate that point. I think there were two emails on that.

At the same time I communicated to Ken and Jason that we would correct the system to make sure that they can only access unclassified spaces, as they ordered. Both of them said thank you and acknowledged what we were doing along the way.

I received a text message at some point from PJ Butler confirming that he was going to change them to what's called 24/7 unrestricted access, meaning they can't go into those restricted spaces, and I confirmed that, letting everyone know.

And then I think later that day -- there was a pause after that. PJ Butler did mention that he had a call with Steve Davis. He didn't give me

Page 120

any details of that call originally. I received a call from a member of the Office of the Inspector General, one of their executives, one of the deputy inspector generals over investigation.

I believe he was calling me just based on the news of the day. There was news about USAID's website going down. Since he called me, I did share with him what was going on, that we had received a request to grant individuals access to their spaces. I said we were not honoring that, and that I believed at the time John and Ken had talked about that, and that was the line.

He said yep, you know, that's exactly what we would ask of you guys. And then later I received a call from Jason Gray, this is probably around 6:00 that night, asking if I knew about the call that PJ got from Steve Davis, and -- which I did not. I knew he called him. I didn't know the details.

He had relayed to me what he understood based on his communications with Steve Davis, that Steve had asked PJ why -- like who -- if -- who revoked their access. And at first PJ said nobody revoked your access. And then Steve told PJ, I'm looking at the system right now and I can see that it was you, PJ Butler, who revoked my access.

Page 121

And he tried to explain kind of the confusion that your access was never revoked. It shows 24/7 all access revoked, but you still have 24/7 unrestricted access. So it's not that your access was revoked, you just can't go into classified space.

And then Mr. Davis wanted names of who -- he asked PJ, were you ordered to do this. He said yes. And he wanted names of who ordered him to do it. And according to Mr. Gray, PJ would not give any names of who did it.

Mr. Gray shared with me at the time that he needed to provide names because he believed they wanted to put people on administrative leave. I shared with Mr. Gray that I take full responsibility, that I was ultimately in charge that day so I should be the only one placed on administrative leave, and any mistakes made by PJ, he should not be punished for his mistakes in this particular case.

Jason thanked me and -- and that was our last communication that day. I did then speak with PJ Butler who accounted the exact same story to me of his call with Steve Davis. I later heard from -- after speaking with John, I shared with John

BRIAN MCGILL                December 09, 2025                    122 to 125
92132

Page 122

Voorhees, you know, what was going on.  I believe John had reached out to either Ken or Jason to ask for more information.

I was told that -- by John that myself and PJ Butler would likely be placed on administrative leave.  I believe he was seeing an email from Jason to Pete Marocco saying Brian McGill and PJ Butler are responsible.  And then -- and then I sent a note out to just some of my immediate staff responsible for access control, PJ Butler, Charles Turner, Victor Williams, just saying, I understand more people are going to be placed on administrative leave.  Please be ready to support, to provide that immediate system.

And then at some point shortly thereafter, I lost access to my network where I couldn't email from there.

Q.    Thank you.  During this conversation with Mr. Gray, he said, they wanted to put people on administrative leave.  Who is the "they"?

MR. LYNCH:  Calls for speculation.

THE DEPONENT:  It's not clear to me.

BY MS. MARZIANI:

Q.    Was it your impression that it was someone other than Mr. Gray?

Page 123

A.    My impression was Steve Davis based on the call.

Q.    You've talked a bit in this description of events on February 1st about various types of communications.  I mean, you've relayed a lot of communication with people, and I -- you said at one point that there was a chat message.  What was -- what system -- on what system was that chat sent to?

A.    Sure.  So there's -- there were email communications over the USAID email.  There were phone calls between my government issued phone.  There were Google chat messages on the email system, and then at the point when Mr. Butler reached out to me and asked me to call me on my personal cell phone.

So he called me from what I believe his personal cell phone on my personal cell phone, to share that what he was seeing in the system with Luke Farritor giving himself access and the other point of this is he gave himself then access in the system to our space, to the Office of Security space, which was on a different floor than where they were, which was restricted space for people who have Secret clearances.

Q.    What would be your concern with someone

Page 124

having access to the security team space?

A.    Same level of concern.  I mean, you have a classified network at the Secret level which is the State Department's network.  And we have agreements with the State Department of making sure that only Secret people are cleared.

Typically in USAID you are not -- you are not permitted to leave out classified information.  It must all be stored and locked up.  So as long as everyone was following that rule, but if it wasn't, which I do not have any reason to believe we had classified information left out in our office at that time, that individual could have had access or could have granted other individuals access to that without our knowledge.

Q.    Why did Mr. Butler originally give Mr. Farritor and others 24/7 restricted access?

MR. LYNCH:  Objection.

THE DEPONENT:  I don't know.

MR. LYNCH:  Calls for speculation.

BY MS. MARZIANI:

Q.    Is it your impression that it was a mistake or intentional?

A.    I don't know.

Q.    Did Mr. Butler express remorse for having

Page 125

given them 24/7 restricted access?

A.    No.

Q.    You testified that Mr. Farritor had a conversation with one of the guards who was physically on the premises in order to obtain some sort of expanded access.  Is that correct?  Will you explain that interaction to me --

A.    Sure.

Q.    -- one more time?

A.    From my understanding, which this came from Mr. Butler, that Mr. Farritor asked the guard to show him how to load his GSA badge into the access control system so that he could use his GSA badge to swipe.

That was a capability of the system where we could take a -- a similar badge from another government agency, load that information into our system so they could use their badge to swipe in and out as opposed to being issued a badge.

Q.    Was that an unusual request?

A.    Yes.

Q.    Why did the guard grant it?

A.    I don't know.

MR. LYNCH:  Can we take a quick break?  He may have to leave in a second, and I just want to --

Page 126

MR. WARREN: Yeah, sorry.

MR. LYNCH: Just five minutes.

MS. MARZIANI: Sure.

THE VIDEOGRAPHER: Sorry, I couldn't hear you. Let me take us off the record.

MS. MARZIANI: Yeah, we're going to go off the record for about five minutes.

THE VIDEOGRAPHER: Okay, no problem. The time on the monitor is 1:11 p.m. and we're going off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: The time on the monitor is 1:15 p.m. and we're back on the record.

MS. MARZIANI: Thank you.

BY MS. MARZIANI:

Q. I'm sorry this is taking a little longer --

A. Understandable.

Q. -- than anticipated. So just going back to the events of Saturday February 1st, when you refer to text messages, were these generally on your work phone?

A. The majority of like the Google chats were on my work phone. I do have text messages on my personal phone from Mr. Butler's personal phone.

Page 127

Q. Understood. Did the USAID work email accounts have any sort of auto delete function?

A. I don't know.

Q. What is the name of the guard who Mr. Farritor interacted with?

A. I don't recall.

Q. Where -- I -- I -- am I correct in assuming that USAID kept records of guards who were contracted to provide security?

A. They were FPS records where the records we may -- I don't know specifically other than badges that we would issue, you know, the guards.

Q. Okay. And do those badges go through the C-CURE system?

A. Correct.

Q. Who sent the email Saturday morning identifying the individuals you listed as needing access to the building?

A. It was an email exchange from -- between Ken Jackson and Pete Marocco that was forwarded to us from Erica Carr.

Q. What was Pete Marocco's role at this time?

A. I was only aware of him as the State F, the foreign assistance political lead for the State Department.

Page 128

Q. In this email exchange, I know that you testified that these individuals were -- many of them had affiliations with other government agencies. Were they identified as being part of DOGE?

A. I don't recall them being identified as part of DOGE.

Q. How did Mr. Davis have C-CURE access to confirm that their -- their access levels had been altered?

MR. LYNCH: Objection, mischaracterizes, lack of foundation.

THE DEPONENT: I don't know.

BY MS. MARZIANI:

Q. Is it your understanding that Mr. Davis had to have had some C-CURE access in order to glean that information?

MR. LYNCH: Objection, lack of foundation.

THE DEPONENT: Not necessarily.

BY MS. MARZIANI:

Q. What would be another way he could glean that information?

A. If he was viewing it off somebody else accessing the system.

Q. We've spoken a bit about your concerns

Page 129

with individuals accessing restricted areas outside of the normal operating procedures. Are you aware of any confidential information being accessed on February 1st?

A. I'm not aware of any confidential information being accessed.

Q. Who from the attorney's -- Inspector General's office did you speak with?

A. I spoke with Eric Maddox.

Q. Was that call on your work phone?

A. I don't recall.

Q. You testified that Mr. Maddox agreed with your rationale and decision making. Was that documented anywhere?

A. Not -- not that I'm aware of, other than my personal notes that I had mentioned at the beginning of this.

Q. Am I correct in understanding that Mr. Voorhees recommended to Mr. Jackson not to give DOGE expanded access, and that this was in writing?

MR. LYNCH: Objection, vague.

THE DEPONENT: Could you be more specific as to --

BY MS. MARZIANI:

Q. Sure.

Page 130

A. -- when? And how?

Q. So on Saturday February 1st, you -- during the time that there was a dispute about the access for DOGE, did Mr. Voorhees make a recommendation to Mr. Jackson that DOGE should not be given access to restricted areas including the Inspector General's office?

A. Yeah, it -- it was my understanding that they did discuss not giving access to the Inspector General's office. Based on my conversations with Mr. Voorhees.

Q. Was Mr. Voorhees' recommendation in writing?

A. I recall emails, even following my emails with Mr. Jackson and Mr. Gray stating, remind them not to access these areas. And I remember a specific one that Mr. Voorhees sent after I sent my email saying, again, colloquially, let's get this back in the box, make sure they do this to protect everyone.

Q. What was Mr. Jackson's role as of February 1st?

A. I believed him to be the acting assistant to the administrator for management.

Q. Did you ever come to learn that his role

Page 131

had changed on or around February 1st?

A. Not that I recall.

Q. Did you have direct communication with any DOGE member on February 1st?

A. No.

Q. Is it your understanding that Mr. Butler had direct communication with members of DOGE?

A. Yes.

Q. Is it your understanding that Mr. Butler had direct communication on February 1st with Mr. Farritor?

A. I believe he did.

Q. Is it your understanding that Mr. Butler had direct communication on February 1st with Mr. Davis?

A. Yes.

Q. Is it your understanding that Mr. Butler had direct communication on February 1st with Mr. Kliger?

A. I -- I do not recall him having direct -- I -- not to my knowledge.

Q. What was your understanding of Mr. Musk's role on February 1st?

MR. LYNCH: Objection, calls for speculation. Lack of foundation.

Page 132

THE DEPONENT: I believed Mr. Musk to be in charge of the DOGE or supporting the DOGE, and to be either a special assistant or senior advisor to the president.

BY MS. MARZIANI:

Q. Why was Mr. Butler in such close communication with DOGE?

MR. LYNCH: Objection to the characterization.

THE DEPONENT: Could you be more specific?

BY MS. MARZIANI:

Q. We've discussed that of the security team, Mr. Butler was in direct communication with members from DOGE, and I'm just wondering why Mr. Butler and not somebody else.

A. I -- I believe following his original assistance to Mr. Farritor Thursday night, and then having his information, that they -- they were reaching out to Mr. Butler for any support instead of reaching out to anyone else.

Q. Was Mr. Butler put on leave following the events of February 1st?

A. Not to my knowledge.

Q. Do you know why?

A. No.

Page 133

Q. Do you know where Mr. Butler works now?

A. I -- I believe he works for the Customs and Border Protection agency.

Q. When was the last time you communicated with Mr. Butler?

A. I believe it was on February 10th, briefly.

Q. Can you tell me a little bit about that interaction?

A. Sure. I was -- I was previously placed on administrative leave as I described, on February 1st. Then confirmed on February 2nd. And then following receiving access again at some point on the 9th, and there were communications that I didn't receive regarding an injunction for anyone on administrative leave to be taken off administrative leave.

My systems access was restored. I was coming in to the -- to work on Monday the 10th. And as I came in, physically came in, I saw Mr. Butler in the lobby of the 14th Street -- or the 14th Street lobby of the Ronald Reagan Building along with Phil Dixon, and just said good morning to him. That was the extent of our exchange.

Q. Do you know why Matt Hopson resigned?

Page 134

A.   I don't.

Q.   Do you -- did Mr. Hopson ever tell you any reasons for his resignation?

A.   Not for his resignation.

Q.   Did Mr. Hopson ever share with you any concerns about what was happening at USAID?

A.   The -- the night of -- the night of January 30th, that Thursday night when Mr. Farritor was asking for access to our system, I had two separate interactions with Mr. Hopson.  On my second interaction, he shared with me just his general concerns with what's going on, nothing specific, and that this is not what he signed up for.  And that we needed to be cautious with what we were doing and what decisions we were making.

Q.   What were the nature of his general concerns?

A.   He didn't specify.  I don't recall anything specific in that conversation.

Q.   What was your sense of why you needed to be cautious?

A.   Before getting a request to grant access control to someone that we didn't know why they wanted it or what they would do with it, and we didn't know even if they had a security clearance.

Page 135

Q.   Were you concerned that was unlawful?

A.   Yes.  I certainly knew it was against our policy, and I was concerned with the security risks of it.

Q.   So USAID's website went dark on February 1st.  This has been publicly reported.  Do you know how that happened?

A.   I -- I don't know specifically how it happened.

Q.   What do you -- generally, what do you believe happened?

A.   I -- I was sent a Google chat at some point that day from Steven Hernandez.  I believe it was a picture of an exchange between him and Gavin Kliger where Gavin was asking for full administrative access.  It's called something like USAID dot gov, and then to all our systems.

That exchange included full administrative access to the C-CURE system as well as many of the other systems we've talked about today, and it specifically noted that they wanted to be able to then remove other administrators as well.

My only communication back to Steve Hernandez at the time was that he needed -- I recommended he go to Ken Jackson, and as well as get

Page 136

a general counsel review.  He said that Jason approved it.  I said we need to go to Ken.  I didn't share with Steve what Jason had told me because of, just in -- just to respect that Jason had said this was private at the time, but I was trying to emphasize to say you still need to go through Ken Jackson for it.

He didn't feel the need to based on Jason's approval from the previous day.

Q.   Is that -- is it a -- do you understand it to be a different level of access to be able to remove other administrators?

A.   It --

MR. LYNCH:  Objection, vague.

THE DEPONENT:  I -- I understand it -- my impression was that it's the highest level of access.

BY MS. MARZIANI:

Q.   Have you been told that Mr. Musk directly interacted with anybody on site on that day, on February 1st?

A.   No.

Q.   Do you believe Mr. Musk communicated with anybody on site on February 1st?

A.   I don't know.

Page 137

Q.   How did you learn you were being put on administrative leave on February 1st?

A.   So John had warned me based on his communication with, I believe, Jason at the time that PJ and I may be placed on administrative leave.  And then he later shared he believed that wasn't going to be the case.

And then I lost system access that night.  Since it was late at night, I waited to the next day and I emailed Bill Malyszka on my personal email to his government email, and I believe probably one other individual from our Human Capital account management shop, asking what is my status, that I've lost access to the system, that Jason indicated that I may be put on administrative leave.

And then I noted I was following everything that Jason told me to do and Ken had told me to do.  I put Jason in the email saying, you can ask Jason yourself.  I did exactly what they asked me to do.  And Bill Malyszka confirmed I had been placed on administrative leave, and then -- for no specified reason.

And then later that day I received -- I believe it was that day, February 2nd, I received a memo from our acting head of employee labor

BRIAN MCGILL
92132
December 09, 2025
138 to 141

Page 138

relations whose name I forget at the moment, with a memo saying I'd been placed on administrative leave.

Q. And that was on February 2nd?

A. Correct.

Q. Did -- when you spoke with Bill, did he tell you who directed him to put you on administrative leave?

A. So I emailed with Bill, so this would be -- this should be in the email. He did say this was by order of the acting administrator Jason Gray.

Q. And you believe you got that email on February 2nd?

A. I believe so.

Q. I'm going to introduce Exhibit 4.

(WHEREUPON, Exhibit 4 was marked for identification.)

THE REPORTER: Exhibit 4 marked.

BY MS. MARZIANI:

Q. Let me give you a minute to look at this, and again apologies for the way that emails come out as documents, but I'd like to direct your attention in particular to the last two pages.

A. Okay.

Q. But I'm going to give you a second to go through this.

Page 139

A. Okay.

Q. Have you seen any portion of this document before?

A. I have not.

Q. I wanted to draw your attention to the Bates stamp number is 000599, it's the second -- third to the last page.

A. Okay.

Q. And here Mr. Malyszka, if I'm not butchering his name right, and it goes to the next page, confirming that John V. and Brian M. have been placed on admin leave. My understanding was that Ken had support from DOGE to remove physical access. This was written at 11:06. Mr. Ruth says, am I to remove physical access? And then said -- actually, maybe I have the --

A. The order wrong.

Q. -- the time -- the order wrong, the order wrong, yeah. So first on -- so scratch that. On 9:39 Mr. Ruth said: Zack informed me DOGE will remove the physical access for the individuals on the list. And then later confirmed that this includes Mr. Voorhees and yourself. My -- my question is, at this time, you know, February 1st in the evening, how was DOGE able

Page 140

to remove physical access?

MR. LYNCH: Objection, calls for speculation.

THE DEPONENT: I would believe it's due to their level of access they received within the C-CURE system, their administrative access.

BY MS. MARZIANI:

Q. Would there be -- was there any other way to remove physical access?

A. Not that I'm aware of.

Q. Approximately what time on February 1st did you lose systems access?

A. It was late that evening. I would assume some time between 9:30 and 11 p.m.

Q. Do you know when you lost physical access?

A. I -- I don't recall specifically when.

Q. So immediately -- so you've described some contact you had with USAID employees on February 2nd. On February 2nd, what other contact did you have with, you know, former or current USAID employees?

A. I had -- I had spoken that morning to two former -- or two colleagues I believe were on administrative leave based on their outreach, Clinton White and Sonali Korde. I had -- I had a

Page 141

text exchange with other senior executives that were put on leave that had a kind of text group, just, you know, saying what happened to me and what was going on.

Q. Did you have any interaction with any DOGE personnel?

A. No.

Q. At some point were you informed that your administrative leave was now an investigatory leave?

A. So after I returned to work on February 10th, and then worked again on February 11th to include communicating the resolution of an issue to Ken Jackson over an email, later that night my access was cut off again. And then I believe on Wednesday the 12th I received a personal email with an administrative leave letter signed by Peter Marocco, and I -- I can't recall if the email or the letter noted that my access was revoked at 11 p.m. on the 11th, and it said that I was placed on investigative administrative leave for violating the executive order or stopping foreign assistance, and that my involvement in making unauthorized foreign payments. It said I'd be on leave for 10 days while they had the investigation, and some other kind of

Page 142

administrative details in that letter.

Q.   I'm going to share with you Exhibit 5.

(WHEREUPON, Exhibit 5 was marked for identification.)

THE REPORTER:  Exhibit 5 marked.

MS. MARZIANI:  Thank you.

BY MS. MARZIANI:

Q.   Mr. McGill, I'll give you a second to look at this.

A.   Okay.

Q.   So the title of this email is investigative leave notices for four rogue employees, and there are four individuals who are listed.  Mr. Voorhees was the director of security; is that correct?

A.   Correct.

Q.   Brian McGill is you.  Who is Jack Ohlweiler?

A.   Jack Ohlweiler was one of our, I believe, was one of our general counsel, our senior ethics official within the agency.

Q.   Do you -- do you know why Mr. Ohlweiler was put on investigative leave?

A.   Not specifically.

Q.   Was Mr. Ohlweiler involved with any of the

Page 143

events you previously described on January 30th, 31st, February 1st?

A.   Not to my knowledge.

Q.   Who is Colleen Allen?

A.   She was the -- she was previously the assistant administrator for management.  And with the administration change, I don't -- I don't recall if she was then the deputy administrator for management again, but she was in our management bureau as the senior career leader.

Q.   Are you aware of why she would be on investigative leave?

A.   No.

Q.   Do you understand what it means to say four rogue employees?

A.   No.

Q.   Was -- did you have any interaction with Ms. Allen on January 30th, 31st, or February 1st?

A.   No.

Q.   This email references that an investigation will be forthcoming.  Are you aware of any investigation into your conduct on or around February 1st?

A.   No.

Q.   Okay, one more.  Here is Exhibit 6.

Page 144

(WHEREUPON, Exhibit 6 was marked for identification.)

THE REPORTER:  Exhibit 6 marked.

MS. MARZIANI:  Thank you.

THE DEPONENT:  Okay.

BY MS. MARZIANI:

Q.   Do you recognize this email and the attachment?

A.   I do.  This is the second memo placing me on administrative leave.  This -- the first being on investigative administrative leave that was given to me on February 12th.

Q.   After receiving this email and the attachment, what communications, if any, have you received from USAID?

A.   I don't recall specifically.  I recall getting some general emergency alerts, like full -- like all-agency time communications, how to turn in your equipment for RIF'ed employees, but nothing specific to this.

Q.   Is it correct that you were technically employed by USAID until August of 2025?

A.   That's correct.

Q.   What happened in August?

A.   The -- so earlier -- so, thank you.  To

Page 145

correct some of the information, earlier we were given notice that all executives were being RIF'ed.  And we had meetings, we had collective meetings with the Executive Resources Team within Human Capital Talent Management to tell us what the RIF process was.

And because of being in the senior executive service, that we're afforded a placement opportunity.  They shared with us how to apply to that process.  And then they shared with us if we weren't placed, that they would make efforts to then find us GS-15 level jobs.

I did go through that OPM process.  I was interviewed and then placed at the current agency I'm with within Health and Human Services, so I just transferred from USAID prior to my assigned RIF date which was around September 2nd.

Q.   Are you aware of any way in which the investigative leave affected your security clearance?

A.   Normally when we're put -- when we -- when an individual is placed on administrative leave, after 30 days their clearance is suspended, meaning you can't access.  I don't recall receiving any notification of any change in my clearance status.

Page 146

And when I moved to Health and Human Services, they were able, working with USAID staff, to then apply reciprocity, because my current position has the same requirement for the clearance level.

Q.    I want to go back to Mr. Ohlweiler for a minute.

A.    Okay.

Q.    What was his role in the general counsel's office?

A.    He was the agency's ethics official, so just that, any -- kind of providing advice to the senior leadership on anything that would be an ethics issue, overseeing our 278s for no conflict of interest.  And then more specifically he and his team of employment lawyers were our office's direct counsel.

So any issue we had with anything that we were doing, security clearances or anything else, we would normally talk to Mr. Ohlweiler or members of his team.

Q.    During the period of time between January 20th and February 12th, so the entirety of your time at USAID prior to administrative leave, can you describe to me what issues you brought to Mr.

Page 147

Ohlweiler from your team?

A.    I -- I don't remember bringing Mr. Ohlweiler -- I don't remember specifically, and I believe he was -- I thought he might have been one of the individuals originally placed on administrative leave.

Q.    57.

A.    Right.  I would have to go back and verify.  Yeah.  So he was placed on administrative leave on the 27th.  But it would have been usual for anything going on with our office to then have consulted with Mr. Ohlweiler.

Q.    So it's been publicly reported that members of DOGE stayed and worked at USAID on Sunday February 2nd.  Do you have any knowledge of -- of what happened on Sunday February 2nd?

A.    No.

Q.    Did Mr. Butler go into USAID headquarters at any point in person that weekend?

A.    Not that I'm aware, but I would have no knowledge on February 2nd.  I know he was not there on February 1st.

Q.    I want to go back to -- well, actually, scratch that.  Is there anything else we should know about DOGE and USAID?

Page 148

MR. LYNCH:  Objection, vague.

THE DEPONENT:  Not that I could recall at the moment.

BY MS. MARZIANI:

Q.    Do you have any knowledge of DOGE's work at USAID between February 3rd and February 12th?

A.    No.

Q.    What did you do when you went back in the office on February 11th?

A.    The -- when I returned to the office on February 10th, I was told by Leo Ruth coming in that -- that he was having problems coming into the building.  I believe -- I don't recall specifically.  I believe there was some message about having all staff telework that Monday the 10th.  It was common whenever, whether it was telework or closures, we were always there from the Office of Security, so that -- that wasn't something that suggested to me not to come in.

When I came into the building the 10th, Leo told that he had lost his access and went up to see Jason Gray, and Jason had to come down to help him get access, but Leo had some other staff member get him in.

Leo had mentioned to me that Mr. Butler

Page 149

and then Phillip Dixon were controlling access, and they wouldn't share who they received notice for to not let anyone in the building, and Leo was not on the list to let in the building.  And I shared with Leo that before I get there, they better make sure I can get in the building.

I came in the 14th Street entrance.  I, you know, I greeted and talked with Phillip Dixon.  I shook hands with Mr. Butler, and then they had an officer walk with me to make sure we had access into our space.

Walking with the officer, I asked him if he was here for that or if he was instructed that he needed to stay and monitor me, and he said yes.  And that is something only reserved for individuals that are only being removed from office.

Q.    Meaning yes, he was sent to monitor.

A.    Yes, he was sent to escort me and monitor me, and physically watch me.  And that PJ Butler had given him those instructions.  Based on that, I went in and I collected just my immediate personal belongings, like my diplomas and pictures on the wall, not knowing if I would have access any time soon to the office.

And then I left.  I took no, you know,

Page 150

government papers or information, and left with my personal belongings. Following that, I worked remotely. I had routine meetings with staff.

I recalled on that Tuesday a political appointee trying to get processed and fingerprints, and assisting with that. And then letting Ken Jackson know, and I was intentioned, that we had assisted and I had assisted, just so that, you know, he recognized that, you know, he recognized that I was working.

At the time John Voorhees still had not been granted access, and he had no information, so I was assuming the role of leadership in the Office of Security.

Q. Who else should we talk to to learn more about DOGE's actions at USAID?

MR. LYNCH: Calls for speculation. Foundation.

THE DEPONENT: From the -- Erica Carr is the acting executive secretary, would normally be directly involved in -- in kind of assisting front office actions. Jason Gray, who I was looking to for decisions and authority, I think would have more information.

Patrick Butler, as I mentioned, for having

Page 151

that kind of direct interaction with Luke and -- and -- and his conversations that I were not a part of, and kind of what I was involved with would be most -- most immediate to me.

Laken Rapier's involvement, Joel Borkert's, and Matt Hopson's involvement. They were all present to some extent in my interactions with the individuals that I believed to be supporting the DOGE effort.

BY MS. MARZIANI:

Q. Do you know of any evidence, other than what we've discussed, that leads you to believe Mr. Musk and DOGE were making decisions on significant issues at USAID during the time period?

MR. LYNCH: Objection, calls for speculation. Lack of foundation. Calls for a legal conclusion.

THE DEPONENT: Not that I'm aware of.

BY MS. MARZIANI:

Q. You previously testified that you're not familiar with whether a person necessarily needs a security clearance to be an administrator of C-CURE. Are you aware of any policies that would answer that question?

A. Our practice at the time was only our

Page 152

staff, and our minimum requirement with our staff was a secret level clearance and our contractors to have a secret level clearance, so that was the common practice at the time. I don't know if we had that in writing anywhere.

Q. For logical access as opposed to physical access, is there a card or another device to obtain logical access on a USAID computer system?

A. There is.

Q. What is that called?

A. I believe it's called a UB key, which the CIO can issue and does issue in select times that would give someone that same level of access as if you had a -- a PIV card, personal identity verification card that you put into the computer.

Q. Did you ever come to learn about a DOGE boot camp in December?

A. PJ Butler mentioned Luke Farritor mentioning a boot camp, of attending a boot camp. I thought Mr. Butler said it was November of the previous year.

Q. Do you know where that boot camp occurred?

A. I thought he said in -- and I don't remember specifically. I -- I pause because I thought he said California, but PJ also mentioned

Page 153

Mr. Farritor arriving early to D.C. too, so I don't recall which place it may have occurred.

Q. Thank you. Let's take a short break, and then -- yeah, I think we're getting really close.

THE VIDEOGRAPHER: Please stand by. The time on the monitor is 1:56 p.m. We're going off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: The time on the monitor is 2:06 p.m. and we're back on the record.

MS. MARZIANI: Wonderful.

BY MS. MARZIANI:

Q. All right. So my last thing for you is I would like to get copies of the notes that you've referenced that -- and other pertinent materials. We can follow up with you and arrange a way for us to get those.

A. Okay.

Q. Would you be agreeable with that?

A. Yes.

Q. To that? Thank you.

MR. LYNCH: We would ask that we be able to review for government privileges before they are passed over.

MS. STEVENS: We need to talk about that.

Page 154

MS. MARZIANI: Yeah, we might need to talk about that. I mean, he's -- these are his personal notes.

MR. LYNCH: That's ostensibly about government information.

MS. MARZIANI: No, they're about his impressions of events.

MR. LYNCH: I don't know.

THE DEPONENT: I -- I would want to confer with some level of counsel --

MS. MARZIANI: Yes.

THE DEPONENT: -- before passing anything.

MS. MARZIANI: Yes.

THE DEPONENT: So I would share that --

MS. MARZIANI: Yes.

THE DEPONENT: -- as well.

MS. MARZIANI: Yeah. What about -- okay. Let's do this, perhaps. You can confer with the counsel, and we can follow up with you. I mean, it might be cleaner for us to issue a subpoena, or we can just all coordinate, yeah, that's correct. Okay, that's great.

Thank you very much, and as Beth said yesterday, as we say in Texas, pass the witness, but I'm never -- I'm never quite sure if that's

Page 155

everybody's nomenclature.

MR. LYNCH: Nothing -- nothing more from us, so you're free to go. Thanks.

THE DEPONENT: Okay. All right.

MS. MARZIANI: Okay.

THE DEPONENT: These are your exhibits.

MS. MARZIANI: One thing, before we're off the record, though.

So we have discussed today and yesterday a number of documents, some of which are responsive in our view to previous document requests. And so just want to flag that for you. I mean --

MR. LYNCH: Sure, send us a list specifically.

MS. MARZIANI: Okay. We'll send a list, thank you.

MR. LYNCH: That's easier, and we can then search for --

MS. MARZIANI: That's great, yeah.

MR. LYNCH: -- the stuff that you actually want, especially since we won't have the transcript for some days.

MS. MARZIANI: Yes, yes. We did do a rush, so we should have it early next week.

MR. LYNCH: Okay.

Page 156

MS. MARZIANI: All right?

THE REPORTER: All right. Before going off the record, would you like to order the original transcript?

MS. STEVENS: Yes.

MS. MARZIANI: Yes, please.

THE REPORTER: And you said rush, right? Okay.

All right. Would you guys like a copy?

MR. LYNCH: Yeah, but just in the ordinary course is fine.

THE REPORTER: Okay. Would you ladies like a copy?

MS. STEVENS: We're all together.

THE REPORTER: Oh, you guys are on the same -- okay. And would you want -- all right.

So are we getting off the record?

MS. MARZIANI: Yes, we're all done.

THE REPORTER: Okay. We're off the record.

THE VIDEOGRAPHER: Actually, we're still on. Were there any video orders at this time? Sorry.

MS. MARZIANI: We'll let you know.

MS. STEVENS: Yeah.

Page 157

MS. MARZIANI: Not right this moment. Sorry.

THE VIDEOGRAPHER: Okay. No problem.

MS. MARZIANI: Thanks.

THE VIDEOGRAPHER: All right. The time on the monitor is 2:08 p.m. and we're going off the record.

(WHEREUPON, the deposition of BRIAN T. MCGILL was concluded at 2:08 p.m.)

NAEGELI
DEPOSITION & TRIAL | (800) 528-3335
NAEGELIUSA.COM

Page 158

CERTIFICATE

I, the undersigned Roosevelt Harrison, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the videorecording of the deposition of Brian McGill, in the above captioned matter on the 9th day of December, 2025 taken at the location of 1100 New York Ave NW, Suite 800, WA, DC 20005.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

*Roosevelt Harrison*

Roosevelt Harrison

Page 159

CERTIFICATE

I, Sheila Hidalgo, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 16th day of December, 2025.

*Sheila Hidalgo*

Sheila Hidalgo

Page 160

CORRECTION SHEET

Deposition of: Brian McGill        Date: 12/09/2025

Regarding: J. Doe 4, et al. vs Elon Musk, et al.

Reporter: Hidalgo/Breezee

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number. If there are no changes, write "none" across the page. Sign this sheet on the line provided.

Page  Line  Reason for Change
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

        Signature: _____
                    Brian McGill

Page 161

DECLARATION

Deposition of: Brian McGill    Date: 12/09/2025

Regarding: J. Doe 4, et al. vs Elon Musk, et al.

Reporter:  Sheila Hidalgo

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____

on the _____ day of _____, 20____.

        Signature: _____
                    Brian McGill

## Exhibits

**EX001 CALENDARS**
47:19,20,22

**EX002 ADMIN LEAVE NOTICE**  59:18,20,
22 67:10

**EX003 ADMIN FOR GAVIN**  95:16,17,19
107:24

**EX004 LPA LEAVE TEMPLATE**  138:14,
15,17

**EX005 INVESTIGATIVE LEAVE NOTICE**
142:2,3,5

**EX006 NOTICE**
143:25 144:1,3

## 0

**000599**  139:6

## 1

**1**  8:11 47:19,20,22

**10**  20:1 141:24

**10:01**  8:8

**10:30**  110:10 111:4

**10:32**  31:18

**10th**  133:6,19
141:11 148:11,15,
20

**11**  140:14 141:19

**11:06**  139:14

**11:20**  111:16

**11:20-ish**  112:5

**11:48**  84:13

**11th**  141:11,19
148:9

**12:03**  84:16

**12:12**  91:11

**12:22**  91:15

**12th**  141:15 144:12
146:23 148:6

**14th**  133:21 149:7

**15th**  50:5 52:4

**1996**  19:1

**1999**  20:12

**1:11**  126:9

**1:15**  126:13

**1:56**  153:6

**1st**  109:13 110:3,9
123:4 126:20 129:4
130:2,22 131:1,4,
10,14,18,23 132:22
133:12 135:6
136:21,24 137:2
139:25 140:11
143:2,18,23 147:22

## 2

**2**  59:18,20,22 67:10

**2000**  20:12,13

**2002**  20:14

**2003**  20:15

**2009**  20:16,17 21:2

**2010**  20:17,18 21:2

**2015**  21:16

**2020**  20:18,19 21:16

**2025**  8:9 20:19,20
47:4 48:9,10 144:22

**20th**  47:4 48:21
49:3,19 52:10 53:11
54:23 55:1,3 146:23

**21-**  29:5

**24/7**  118:11,22
119:20 121:3,4
124:17 125:1

**25th**  55:2

**26**  8:12

**278s**  146:14

**27th**  54:23 55:1,3,4
56:3,8 60:20 63:2,
23 65:22 66:1 67:17
68:3,15 147:10

**28th**  62:24 68:15,18
70:19

**29th**  70:22,23 72:18

**2:06**  153:10

**2:08**  157:6

**2nd**  133:12 137:24
138:3,12 140:19
145:17 147:15,16,
21

## 3

**3**  95:16,17,19
107:24

**30**  15:25 58:25 67:2,
20,25 145:23

**30th**  74:14,16 82:21
88:4 89:3 97:2
101:1 108:12,15
134:8 143:1,18

**31st**  81:7 90:22,24
92:4,5 96:10 101:1,
3 106:22 107:8
143:2,18

**3:41**  60:20

**3rd**  148:6

## 4

**4**  81:20 88:21
138:14,15,17

**4:49**  99:16

## 5

**5**  142:2,3,5

**57**  59:10 60:4,9
67:4,12 147:7

**58**  59:10

**5:00**  58:21 71:6

**5:30**  76:9

## 6

**6**  143:25 144:1,3

**60**  34:21

**6:00**  120:15

**6th**  50:12 51:6,18

## 9

**9**  8:9

**90**  20:12

**9:00**  69:4

**9:30**  140:14

**9:39**  139:20

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**9th** 133:14

## A

**a.m.** 8:8 31:18 84:13

**ability** 34:19 101:24 102:2,23

**absolutely** 86:17

**abuse** 103:9

**abused** 102:10

**accepted** 108:15

**access** 14:12,14,15, 16 25:22 28:5,8,15, 22 29:6,8,21 30:25 32:11,14,20 35:1, 11,15,19,20 36:7,10 38:7,10,12,21 39:23,25 40:11,17 41:14,15 42:2,5,6,9 43:18,24 44:9 45:20 46:4,11 55:8 57:23 58:2,4,16,17,24 59:8,14,17 60:7 61:12,18,19,20 62:18 63:11,20,22 66:18,21 67:3 68:25 69:1,7,24 70:4,6,24, 25 71:2,16,21 72:10,14 73:4,16, 18,19 74:10 76:13, 14 77:7,10,15,20, 21,24 78:3,19,23 80:2,24 81:1,3,25 82:2,5,8,9,25 83:3 92:17 93:6,12,14, 20,24 94:8,15,18,19 95:9 96:3,12,15,25 97:16,21 98:7,14 100:1,12 101:5,18, 20,23,25 102:2,3,6, 18,20,23 103:1,5,7, 13,16,22,25 104:3, 15,19,20 105:3,5,8, 10,24 106:3,7 107:16,19 108:2,3, 5,16,18,20 109:2,7 110:15 111:1,3,6, 10,18,23 112:11,15 113:1,4,10 114:1,4, 25 115:8,24 116:1 117:15 118:3,6,11, 12,22 119:2,4,15,21 120:9,22,23,25 121:2,3,4,5 122:10, 16 123:19,20 124:1, 13,14,17 125:1,6,13 127:18 128:8,9,16 129:20 130:3,5,9,16 133:13,18 134:9,22 135:16,19 136:11, 17 137:8,14 139:13, 15,21 140:1,5,6,9, 12,15 141:14,19 145:24 148:21,23 149:1,10,23 150:12 152:6,7,8,13

**accessed** 74:3,7 129:3,6

**accessing** 119:9 128:24 129:1

**account** 27:11,13 28:5,7 42:7 77:22 78:6 82:18 137:12

**accounted** 121:23

**accounts** 46:8 97:15 127:2

**accurate** 12:3,6

**acknowledged** 16:9 119:17

**acting** 26:14 50:15 56:13,17 57:3 63:16 64:1,7,22 65:10

74:22 79:5,7 80:13 94:14 96:8,14 99:7, 10 100:14,16,20,22 107:13,14 109:16, 25 110:12 114:22 130:23 137:25 138:10 150:20

**actions** 98:12 150:16,22

**active** 33:12 39:14

**activities** 97:8

**actual** 44:3 46:9 50:22

**add** 46:8

**addition** 16:20 52:7 72:17 82:15 88:25

**additional** 33:23 56:24 78:19 117:22 118:3

**admin** 139:12

**administer** 9:8

**administration** 18:2 37:18,23 48:6,7,13, 18,23 99:17 143:7

**administrative** 42:2 46:4,11 58:16 60:5 67:11,14 74:24 75:2 76:1 77:12 79:19 80:15,16 93:13 101:5,19 107:6 108:2,5 109:2,7 121:14,18 122:5,12, 20 133:11,16 135:16,18 137:2,5, 15,21 138:2,7 140:6,24 141:9,16, 21 142:1 144:10,11 145:22 146:24 147:6,9

**administrator** 39:12 41:20 42:6 43:1 49:7 50:15 64:2,6,9, 12,22,23 65:11 74:22 78:11 79:5,7 94:15 96:8,15,25 97:12,20 99:8,10 100:8,14,15,17,20, 23 101:18,23 102:9, 17 103:10 105:23 107:14,15 109:17, 25 114:23 116:18 130:24 138:10 143:6,8 151:22

**administrator's** 36:23 56:10 79:20 107:20 113:6

**administrators** 41:23 103:13 135:22 136:12

**admitted** 93:13

**advance** 14:19 17:13 68:11 89:21 90:3

**advanced** 90:20

**advice** 84:22 85:5, 15 87:2 146:12

**advisor** 132:3

**advisors** 84:21 85:3 87:1

**affairs** 50:19 57:2 113:3 119:5

**affected** 145:19

**affiliated** 54:16 110:21

**affiliations** 128:3

**affirm** 9:12

**affirmed** 9:20

**afforded** 145:8

**afternoon** 53:10 59:9 61:11 68:24 70:25 75:6 76:8 94:11 98:25 107:11 118:8

**agencies** 27:3 33:13 65:19 86:14 128:4

**agency** 17:20 18:4 20:2,18 21:4,10,14, 16 23:3,25 30:21 32:3,16 85:7 86:22 87:6 88:16 125:17 133:3 142:21 145:14

**agency's** 146:11

**agree** 69:24 78:8

**agreeable** 153:19

**agreed** 69:13 129:12

**agreement** 43:21

**agreements** 124:4

**ahead** 23:21 58:16 110:8

**AIDNET** 101:16

**airport** 19:19

**alarms** 24:6

**Alcazari** 17:2

**alert** 45:13,16,25

**alerted** 107:17 110:11 111:13 117:6

**alerts** 45:11 144:17

**aligned** 25:11

**all-agency** 144:18

**Allen** 64:1 143:4,18

**allowed** 35:19,20 40:9

**alluded** 35:5

**altered** 128:10

**amenable** 78:4

**American** 86:18

**analyst** 21:11

**Andrew** 8:19 15:18

**angry** 79:22

**annex** 37:4 56:20

**anticipated** 126:19

**apolitical** 51:11

**apologies** 138:20

**apologize** 23:12

**apparently** 117:14

**appears** 94:23

**applies** 84:20

**apply** 33:1 145:9 146:3

**appointee** 38:25 39:4 48:17 57:3 65:16 76:10 150:5

**appointees** 37:17, 21 38:1,7 39:7,16 48:22 49:6

**appointment** 18:6 32:12

**approach** 51:12

**appropriateness** 31:6

**approval** 78:2 108:22 136:9

**approve** 100:11 101:5

**approved** 136:2

**approximately** 21:13 140:11

**area** 18:25 24:7 25:19

**areas** 25:6 35:18 101:25 102:3,4,7,22 115:25 118:7 119:9 129:1 130:6,16

**arguing** 18:2

**arrange** 153:16

**arrived** 26:14

**arriving** 89:22 90:3 153:1

**aspect** 26:1

**assert** 86:6,10

**assertion** 85:25 86:2 91:23

**assigned** 29:16 30:3 54:19 70:16 76:10 92:14 145:16

**assist** 24:22

**assistance** 65:16,19 67:19 127:24 132:17 141:22

**assistant** 21:17 49:7 64:7,12 99:10 100:16 130:23 132:3 143:6

**assisted** 41:24 49:5 150:8

**assisting** 150:6,21

**assume** 11:12 54:14 140:13

**assumed** 67:21 78:25 112:12

**approved** 136:2

**assuming** 34:1 66:12 127:8 150:13

**assure** 25:3

**Atlanta** 18:22

**attachment** 144:8, 14

**attempted** 72:23

**attend** 69:2

**attended** 52:25

**attendees** 53:1 65:22 66:1

**attending** 152:19

**attention** 43:11 47:25 101:4 138:21 139:5

**attorney** 12:13 15:11,17,18

**attorney's** 129:7

**attorney-** 12:8

**attorneys** 14:22,25 70:15

**audible** 11:4

**August** 20:20 144:22,24

**authority** 63:19 65:5,10 76:16 78:10,20,23 79:5, 10,20 100:1,11 150:23

**authorization** 65:7 73:21,23 81:1 93:19 96:11,14,19 107:20

**authorize** 38:6,9

**authorized** 18:7 38:12 77:20 93:17 94:24 104:15 106:6

114:20 119:1

**authorizer** 106:14

**authorizes** 63:21

**authorizing** 77:14, 17 80:24 94:15

**auto** 127:2

**automatically** 28:8 33:2 34:4

**Aviation** 13:11,20 20:13

**awaiting** 106:6

**aware** 24:15,21 29:9 41:22 42:3 45:15 46:2 47:15 51:15 57:15 62:5 64:13 81:19 89:1,4,11 95:4 105:5 106:22 116:11 127:23 129:2,5,15 140:10 143:11,21 145:18 147:20 151:18,23

**awareness** 24:8 48:25

**B**

**back** 10:24 20:6 29:14 31:18,22 35:4 43:14 44:6 45:10 65:21 77:13 78:20 80:11,16,20 84:10, 17,19 87:14,22 88:3 91:15,18 92:3 110:2 112:8 115:20 117:19 126:13,19 130:19 135:23 146:6 147:8,23 148:8 153:10

**background** 10:10

31:1,12 32:4 34:23 38:23 50:9 58:9

**badge** 30:19 32:13, 20 40:8,9,12 44:3,7 55:13 72:2 95:13 111:1 116:11 125:12,14,16,18,19

**badges** 30:8,13 49:15 62:25 95:6,7 118:10 127:11,13

**badging** 24:2 30:8, 10,11,16 31:23,24 32:10 34:14 37:19, 20 44:2 55:21,22

**based** 40:10 50:18 62:18,22 64:21 70:23 86:15,18 88:15 92:11 96:23 99:3 105:11 106:5 107:19 109:21 117:25 120:5,20 123:1 130:10 136:8 137:3 140:24 149:20

**basically** 25:13

**basis** 90:9 91:4,22

**Bates** 139:6

**Battelle** 20:16

**Beach** 13:11,23 20:14

**bear** 28:13

**beginning** 8:10 34:21 104:13 129:17

**begins** 110:19

**behalf** 15:16 51:11 78:14

**believed** 55:13 62:6

64:10 67:22 77:21 94:1,3 107:14 113:25 114:22 115:16 120:11 121:13 130:23 132:1 137:6 151:8

**belongings** 76:6 149:22 150:2

**belongs** 86:3

**Beth** 8:17 154:23

**big** 63:2

**Bill** 60:20 61:3,5 80:12,17 137:10,20 138:5,8

**birth** 58:12

**bit** 10:24 13:8,24 18:15 25:9 39:17 45:9 115:15 123:3 128:25 133:8

**Black** 50:12 51:24

**blanking** 23:11

**block** 81:15

**blocks** 81:14

**Boekert** 69:23

**boot** 152:17,19,22

**Border** 133:3

**Borkert** 49:9 52:11 56:25 59:4,10 60:4 68:19 69:5,23,24 75:8 76:24

**Borkert's** 151:6

**box** 130:19

**brain** 48:1

**branch** 26:7,10,12 27:7,12 40:16 65:20 97:25 103:12

**break** 12:20,22,24 84:8,10 91:6,7 125:24 153:3

**Brian** 8:11 9:20 10:7 60:21 122:7 139:11 142:17

**briefing** 49:23 52:24,25

**briefly** 32:23 133:7

**briefs** 48:25

**bright** 115:15

**bring** 87:21

**bringing** 147:2

**broad** 85:3

**Broadly** 17:10

**brought** 62:10 146:25

**buckets** 31:10

**building** 22:7 36:25 37:1,4 40:4,14 56:18,19,21 66:11 69:1 73:2,20 75:19 76:2,7 106:22 111:25 112:6 114:20 115:2,25 127:18 133:22 148:13,20 149:3,4,6

**bureau** 143:10

**Burnham** 117:25

**bus** 56:21

**business** 13:10 19:19

**butcher** 61:4 69:23

**butchering** 139:10

**Butler** 40:25 41:2,8, 19 43:8 46:20 56:12

58:10 62:10 72:22, 24 73:9,10 78:13,24 83:24,25 84:2 85:14 86:15 87:20 88:1 89:1,6,12,15 90:22, 23 92:13,15 93:6,7, 10 95:3 96:24 98:1, 5,14 101:17 105:14 107:18 111:8,17,21 112:7,21,22 113:20 117:6,10,12 118:1, 9,14,15 119:19,24 120:25 121:23 122:5,7,10 123:13 124:16,25 125:11 131:6,9,13,17 132:6,13,14,19,21 133:1,5,20 147:18 148:25 149:9,19 150:25 152:18,20

**Butler's** 59:5 126:25

---

### C

**C-** 39:19 40:12 74:10 81:8 101:17 103:9 140:5

**C-CURE** 40:20,24 41:11,23 42:5,7,10, 11,17 43:1,18 45:10,11,13 46:17 71:2 72:1,6,17,22 74:2 76:14 77:23,24 94:19 96:23,25 97:7,12,21 101:19, 21 102:2,5,17,18 103:21,22 104:7 105:3,8,24 107:22 108:16 109:2,7 127:14 128:8,16 135:19 151:22

**calendar** 47:17,24

48:2

**California** 152:25

**call** 12:14 17:21 24:25 50:4 52:5 69:5,16 70:23 74:1 75:8 99:3,5 100:21 111:11,16 113:17 114:5,8,13 115:21 119:25 120:1,2,15, 16 121:24 123:2,14 129:10

**called** 25:4,12 31:7 33:4 35:12 39:19 50:5 58:18 73:8 78:25 112:8 113:19, 20 114:3,8,12 119:20 120:7,18 123:16 135:16 152:10,11

**calling** 57:13 69:20 120:5

**calls** 17:7 43:2 50:7 54:13 62:3 63:4 64:25 69:18 83:12 88:9 89:9 94:1 97:23 99:19 101:9 105:17 106:10 109:4,8 111:5 112:8,9 113:13 114:10 115:20 119:11 122:21 123:11 124:20 131:24 140:2 150:17 151:15,16

**calmed** 115:23

**camera** 72:13,19

**cameras** 24:5 72:9, 11 73:5

**camp** 152:17,19,22

**capabilities** 97:17

**capability** 125:15

**capacity** 50:20

**Capital** 61:8 137:12 145:4

**Capitol** 19:22 20:15

**caption** 8:11

**capture** 72:10

**captured** 72:6

**captures** 72:2

**card** 40:2,5 43:23 58:8 71:17 104:1,21 117:9,15 152:7,14, 15

**cards** 58:6 111:3,22, 23

**career** 19:15 143:10

**Carr** 56:12 110:12 117:18 127:21 150:19

**Carr's** 117:19

**Cart** 49:24 50:5,24 52:4

**case** 8:11 13:10,18 17:18,24 18:11 64:6 84:23 86:18 121:20 137:7

**cases** 38:5 115:10

**cautious** 134:14,21

**cell** 123:14,17

**center** 22:3 23:13 24:7 29:5,11 73:3,7 111:14

**certificates** 19:5

**cetera** 12:15

**chain** 85:9

**challenging** 17:18

**change** 46:9 78:9 97:16 99:13 119:20 143:7 145:25

**changed** 50:13 98:21,24 99:6,16, 22,24 100:19 131:1

**changing** 33:21 68:21

**characterization** 132:9

**charge** 57:1 121:16 132:2

**charged** 51:8

**Charles** 23:6 41:4,5 55:11 111:8 122:10

**chat** 115:23 123:7,8, 12 135:12

**chats** 126:23

**CHCO** 80:13

**check** 26:1 31:4,8,9 32:4,6,11,18 34:19 41:15 58:10,13 62:12,17 73:8 81:9 82:4 93:6

**checked** 62:12 81:2

**checking** 117:14

**checks** 78:15

**chief** 21:14,15 26:12 27:9 44:11 47:2 49:9,10 56:25 59:1 61:8 63:17 68:18 69:5 73:17 93:3 97:25 114:15

**chosen** 85:17

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 698 of 720

BRIAN MCGILL
92132
December 09, 2025

167
Index: Chris..constitutional

**Chris** 9:4

**CI** 35:1

**CIO** 44:4 47:3 56:17 57:4 59:15,17 64:3 80:13 152:12

**CIO's** 94:13

**CIOS** 57:4

**circle** 10:24

**Circuit** 86:19

**City** 13:11,20

**civil** 13:10

**clarify** 61:15 63:7 108:19

**class** 85:18

**classification** 29:18

**classified** 24:3,14 25:15 27:2,5 30:2 36:12,14 42:14,23 52:22 101:11 102:7 113:11 119:2 121:6 124:3,8,12

**clause** 18:6

**cleaner** 154:20

**clear** 32:5,9 48:5 66:5 110:6 122:22

**clearance** 27:9 28:3 30:22 31:2,10 32:17,19,22,24 33:2,11,12,18 34:2, 10,11,17,18,24,25 35:18 36:11 38:14, 16,19 39:14 42:25 43:8,10 44:20 58:13 62:2,6,9,13 78:15 81:10,18 82:4 88:4, 6,16,20 113:8 134:25 145:20,23,

25 146:4 151:22 152:2,3

**clearances** 26:1 29:25 30:3 31:25 58:10 96:16 123:24 146:19

**cleared** 124:6

**clearer** 27:1

**client** 12:9

**Clint** 17:9 22:25

**Clinton** 140:25

**close** 87:1 132:6 153:4

**closed** 104:13

**closely** 41:8

**closures** 148:16

**code** 46:9 118:11

**coded** 118:10

**colleagues** 15:20 16:1,4,21,24 140:23

**collect** 58:11 76:5

**collected** 149:21

**collection** 16:14

**collective** 145:3

**Colleen** 64:1 143:4

**colloquially** 31:8 130:18

**combination** 104:6, 12

**combined** 70:25

**command** 23:13 24:7 29:11 85:9 111:14

**common** 38:9,10

116:17 148:15 152:4

**commonly** 43:17

**communicate** 12:12 119:7

**communicated** 24:24 76:19 115:22 119:13 133:4 136:23

**communicating** 80:18 83:21,23 118:5 141:12

**communication** 16:9 86:2 117:17 118:4 121:22 123:6 131:3,7,10,14,18 132:7,13 135:23 137:4

**communications** 24:6 54:24 84:6,20 85:1 86:21,23 87:1, 7,25 120:20 123:5, 10 133:14 144:14, 18

**community** 27:15 28:6 29:16

**commuter** 43:24

**company's** 103:21

**compartment** 27:25

**compartmented** 25:23

**completed** 62:14 81:20 88:21

**completely** 103:23

**complicated** 34:22

**computer** 43:24 152:8,15

**concern** 36:6 79:16 81:24 94:9 123:25 124:2

**concerned** 77:4 135:1,3

**concerns** 36:9 76:19 77:1 81:22,23 83:6 105:25 106:2 115:7,18 128:25 134:6,12,17

**conclusion** 151:17

**conduct** 143:22

**confer** 86:4 154:9, 18

**conference** 56:24 58:19

**confidential** 83:4,5 129:3,5

**confirm** 108:1 128:9

**confirmed** 39:7 64:14,15 119:22 133:12 137:20 139:22

**confirming** 119:19 139:11

**conflict** 146:14

**confusing** 112:12

**confusion** 117:21 121:2

**connection** 31:15

**considerations** 69:12

**considered** 35:10 71:9

**consolidated** 23:10

**constitutional** 18:3

constitutions 18:5

consultant 19:24

consultation 70:11

consulted 147:12

contact 25:21 55:16 94:22 98:2 100:25 140:18,19

contacted 68:20 80:12

contained 27:18

content 87:25 91:1

continuity 37:3

contract 13:19 41:24 54:16 66:24 73:1 111:20

contracted 127:9

contracting 61:25

contractor 20:23 21:3

contractors 31:3 152:2

control 26:1 39:23, 25 40:17 43:18 46:12 55:8 71:2 73:4 76:14 81:25 92:17 94:20 97:16 101:20 103:5,22 122:10 125:13 134:23

controlled 42:20 71:19 103:5

controlling 149:1

controls 81:25

conversation 16:6 85:13,24 87:25 88:25 90:23 96:24

109:22 112:1 122:18 125:4 134:19

conversations 90:24 91:2 118:8 130:10 151:2

conveyed 79:16

coordinate 59:2,7 79:25 154:21

coordinated 59:11

coordinating 27:12

coordination 33:5 34:9

coordinator 76:11

copied 68:20

copies 153:14

copy 156:9,13

Coristine 57:17,18, 21,22 58:4 61:11 62:2,25 63:11 68:17

correct 12:18,19 14:8,11 20:21,24 21:25 26:20 28:19, 23 34:1 35:9 37:1 38:22 41:7,19 42:4 46:10 51:22 60:11, 21,22,24,25 61:2 63:17,18 64:16,19, 20 66:8,10 72:1,3,6, 7 74:2,9,12 75:13 82:13,14,16,18,19 83:19 88:4,14 96:18 102:8,20 104:9 108:18 109:19 117:17 119:14 125:6 127:7,15 129:18 138:4 142:15,16 144:21, 23 145:1 154:21

correction 57:21

correctly 81:11

correspond 101:24

counsel 8:13 9:17 68:22 69:8 70:12, 13,17,24 71:4,6,14 80:1 115:5,9 136:1 142:20 146:17 154:10,19

counsel's 69:25 71:8 146:9

counterterrorism 25:5 29:4

countries 24:20

couple 19:3 49:10 52:11 81:7 85:22 94:8

court 9:8 11:1 13:3

cover 14:13

covered 12:8

create 46:7 97:14

created 54:4

credentialing 33:7 43:20 44:10

credentials 58:5

credit 33:2

criminal 38:17 62:17 115:12

CURE 39:20 40:13 74:11 81:9 101:18 103:10 140:6

current 33:18,22 34:9 48:6,18,23 140:20 145:14 146:3

custodian 46:16,21

Customs 133:2

cut 141:14

cutting 53:21

cyber 28:14

---

### D

D.C. 18:25 153:1

Dahl 76:9,21

daily 24:1 92:9

dark 135:5

data 39:18 40:21 43:12 45:14 46:1,12 101:23

database 38:18 44:20

databases 28:25 29:3,7 32:18

date 8:8 20:8 58:12 70:14 145:16

Davis 55:19,24 56:9, 18 57:12 58:22 66:12 67:20,24 83:16 112:10 113:15,22,23 115:24 117:2,24 119:25 120:17,20 121:7,24 123:1 128:8,15 131:15

day 16:12 22:5 34:18 40:14 49:3, 11,16 52:24 58:18 59:3 62:6,8,10 67:2 74:15 80:11 95:3,10 104:4,14 105:25 110:15 112:13 114:14 117:4 119:23 120:6 121:17,22 135:13

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

BRIAN MCGILL
92132

December 09, 2025

169
Index: days..division

136:9,20 137:9,23,
24

**days** 15:25 34:19,21
49:20 85:22 141:24
145:23 155:22

**DC** 86:18

**dealt** 28:25

**Debnam** 17:7 22:23
46:23

**December** 8:9
152:17

**decently** 19:13

**decided** 108:17

**decision** 58:15 63:3,
6,9,10,14 74:23
77:3,8 94:9 97:20
100:10,11 107:15
109:14 110:4
129:13

**decisions** 18:7
24:16 106:9 114:17
134:15 150:23
151:13

**decline** 86:6,9

**declined** 50:16

**deemed** 42:22

**defendant** 18:10

**Defendants** 9:3,5,6

**define** 54:10

**degree** 19:6,7

**degrees** 19:4

**delegate** 100:8,23
114:23

**delete** 46:8 97:15
127:2

**deliberative** 90:10
91:5,24,25

**delineate** 102:1

**delineated** 92:16

**demarcations** 35:10

**departed** 26:11

**Department** 8:12
14:23,25 17:25
19:17 20:4,11 27:4,
11 32:23,25 43:20,
21 53:5 54:1 57:8
80:1 124:5 127:25

**Department's** 124:4

**depend** 100:6 102:8

**depending** 34:19
104:4

**depends** 30:25
73:25

**DEPONENT** 15:10
34:8 36:9 43:4
46:14 53:20 54:14
62:5 63:6,13 65:1,9,
25 66:20 70:3 71:13
74:6 83:14 88:11,19
89:11,18,24 91:9
97:24 99:21 100:4
101:11 102:13
106:12 109:10
116:9 122:22
124:19 128:13,19
129:22 132:1,10
136:15 140:4 144:5
148:2 150:19
151:18 154:9,12,14,
16 155:4,6

**deposed** 10:19,25
16:18

**deposition** 8:10
10:9 12:13,15 13:9,

16 15:18,21 16:10,
19 17:14 91:19

**depositions** 13:8

**deputy** 21:14,22
22:2,13 23:23 39:12
49:9 56:25 57:4
64:5,9,17,23 69:5
92:18 100:15 120:3
143:8

**describe** 23:22
42:16 90:6 91:1
146:25

**description** 123:3

**desk** 50:6 111:3
113:21

**detailed** 47:14

**details** 16:11 75:10
88:20 98:2 120:1,18
142:1

**determine** 32:11
65:18

**determined** 42:22
71:18

**determining** 69:12

**Development** 17:20

**device** 152:7

**devices** 72:9

**dial** 104:5

**Diane** 26:15

**difference** 37:18
54:6

**differently** 11:22

**Digital** 47:5 54:7,9

**diplomas** 149:22

**diplomatic** 24:20

**direct** 26:4,6 42:9
74:10 98:9,14 101:3
119:1 131:3,7,10,
14,18,20 132:13
138:21 146:16
151:1

**directed** 51:17,25
138:6

**direction** 73:18 81:5
119:1

**directives** 105:15

**directly** 22:14 24:24
29:6 40:25 41:3
64:5 83:21 90:16
93:4 136:19 150:21

**director** 16:3 21:17,
22 22:2,13,15,22,24
23:1,2,7,23 33:4
38:6 64:17 92:19
142:14

**disclosing** 27:20

**discretion** 102:8
103:9

**discuss** 16:15 130:9

**discussed** 16:12,17
69:11 77:1,5 87:20
107:8 112:1,25
113:1 115:13,14
132:12 151:12
155:9

**discussion** 114:11

**discussions** 112:2
115:7

**dismantling** 17:19
18:4

**dispute** 13:19 130:3

**division** 23:1 25:13
30:14 33:20 78:14

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 701 of 720

BRIAN MCGILL
92132

December 09, 2025

170

Index: divisions..events

81:15

**divisions** 23:10

**Dixon** 26:12 133:23 149:1,8

**document** 60:17 77:4,6 78:12 108:7 114:2 139:2 155:11

**documented** 129:14

**documents** 12:17 14:1,14,17 17:15 82:11 138:21 155:10

**DOGE** 18:6 53:6,12, 15,17,18,19,24 54:4,7,8,11,20,24 55:7,8,20,24 56:2 65:23 66:6,7,9,13 68:7,11 70:21 77:16 83:17 89:16,22 90:3 108:1 113:25 128:5, 7 129:19 130:4,5 131:4,7 132:2,7,14 139:13,21,25 141:5 147:14,25 151:9,13 152:16

**DOGE's** 68:4 89:7, 12 90:20 148:5 150:16

**domestic** 40:16 92:14 97:25 104:19

**door** 35:14 40:4 72:5,14 75:20

**doors** 117:15

**dot** 135:17

**dotted** 64:3

**download** 45:14

**downloading** 46:1

**draft** 75:1 77:13

**drafted** 76:18 82:13 96:19

**draw** 139:5

**due** 140:4

**Dug** 112:21

**duly** 9:20

**duress** 94:2

**duties** 23:22

---

### E

**earlier** 18:18 47:25 79:17 113:23 116:15 117:20 144:25 145:1

**early** 10:12 153:1 155:24

**easier** 155:17

**Edward** 57:17,18, 20,22 58:3

**effect** 24:10

**Efficiency** 8:12 18:1 53:5 54:2

**effort** 151:9

**efforts** 80:14 145:11

**elaborate** 48:24 51:7

**elevated** 83:6

**elicited** 85:21 90:14

**Elon** 17:25 78:25 79:2,3 85:5,8 93:11

**ELR** 59:14

**email** 28:1 59:24 60:1,3,9,19 62:11

67:4 68:20 74:1 76:18 77:18,19 79:9 82:15,18 93:18 94:11,13,17,20 95:1,24,25 96:5 99:16,25 101:3 105:11 107:10,13 110:11,20,25 115:23 116:9 122:6, 16 123:9,10,12 127:1,16,19 128:1 130:18 137:10,11, 18 138:9,11 141:13, 16,18 142:11 143:20 144:7,13

**emailed** 137:10 138:8

**emailing** 80:13

**emails** 14:15,18,20 60:15 82:16,17 117:20 119:12 130:14 138:20

**emergency** 144:17

**emphasize** 136:6

**employed** 144:22

**employee** 32:3 54:16 59:12,15 92:14 137:25

**employees** 31:3 67:11 85:19 140:18, 21 142:13 143:15 144:19

**employment** 19:14 146:16

**enable** 97:13

**encoded** 71:17

**end** 11:3 16:13 23:5, 7 43:5 87:21 104:13

**ended** 52:25

**enforcement** 19:23 21:11

**enroll** 44:5

**ensure** 65:7

**ensuring** 24:14

**entail** 22:5 70:10

**enter** 37:14

**entire** 34:16 58:18 69:1

**entirety** 146:23

**entitled** 99:17

**entity** 54:17

**entrance** 149:7

**EOP** 110:22

**equipment** 144:19

**Eric** 129:9

**Erica** 56:12 110:12 117:18,19 127:21 150:19

**escalated** 108:24

**escort** 35:21 76:2 111:2 116:5 149:18

**escorted** 76:5,6

**essentially** 23:24 43:22 49:4 71:22 94:2 113:8

**ethics** 142:20 146:11,14

**evening** 70:1 105:11 139:25 140:13

**events** 10:11 11:16, 18 14:7 16:12 18:17 24:9 33:21 40:7,18 47:25 69:3 82:12

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

92:20 110:3 114:14 117:5 118:17 123:4 126:20 132:22 143:1 154:7

**everybody's** 155:1

**evidence** 115:12 151:11

**exact** 49:20 69:17 78:21 117:5 121:23

**EXAMINATION** 9:23

**examined** 9:21

**exchange** 77:19 94:13,17 95:1 127:19 128:1 133:24 135:14,18 141:1

**exchanged** 110:13

**exchanges** 77:18

**excuse** 15:9 76:20 83:1 92:22

**executive** 54:3 56:13 65:20 67:18 77:16 86:14 95:11 110:12,23 116:15 118:19 141:21 145:4,8 150:20

**executives** 120:3 141:1 145:2

**exhibit** 47:17,19,20, 22 59:18,20,22 67:10 95:16,17,19 107:24 138:14,15, 17 142:2,3,5 143:25 144:1,3

**exhibits** 155:6

**existing** 34:18

**expanded** 67:6 73:16,19 82:25

108:17 109:2 125:6 129:20

**expect** 12:6

**expectation** 10:14 69:13

**expecting** 80:23

**expedite** 37:20 38:4 57:25 79:7

**expedited** 37:22

**experience** 19:14 37:24 50:9,18 64:21 70:9 71:23 81:12

**expertise** 50:19

**explain** 67:13 82:24 92:22 121:1 125:7

**explained** 55:21 70:4

**explaining** 56:22

**explanation** 67:16 83:1

**export** 45:14

**exporting** 46:1

**express** 124:25

**extend** 86:13

**extended** 84:22

**extent** 26:25 44:12 92:8 133:24 151:7

---

**F**

**face** 93:16

**faces** 52:15

**facilities** 24:10 25:23,24 51:14

**facility** 95:6

**fact** 81:24 106:5

**fall** 31:9 87:6

**familiar** 10:21 39:22 43:13 47:5 54:3 59:24 95:23 97:18 98:3 151:21

**familiarity** 113:24

**family** 18:23

**Farritor** 57:8,17,22 58:3 61:11 62:2,25 63:10 66:13 68:17 76:9,20,21 78:1,18 79:1 80:3,19 82:24 83:9,11,20,21 88:15 89:1,6,12,15 90:12, 25 93:12 94:16 96:2,22,24 97:13 98:6 100:2 105:2, 12,23 107:22,25 108:12,15,17,19 109:1 110:17 117:7, 16 118:18 123:19 124:17 125:3,11 127:5 131:11 132:17 134:8 152:18 153:1

**Farritor's** 81:17 88:3 97:8

**FBI** 38:1,24 39:2,9

**FBI's** 29:5

**February** 10:12 14:7 48:9 109:12 110:3,9 123:4 126:20 129:4 130:2,21 131:1,4, 10,14,18,23 132:22 133:6,11,12 135:5 136:21,24 137:2,24 138:3,12 139:25 140:11,18,19 141:10,11 143:2,18,

23 144:12 146:23 147:15,16,21,22 148:6,9,11

**federal** 19:16,25 22:9 26:22 30:24 31:2,6 33:3,15 54:17 72:25 89:7 111:20

**feeble** 48:1

**feel** 105:14 136:8

**Fernandina** 13:11, 21 20:14

**file** 44:25

**files** 38:23 39:10

**fill** 66:21 78:7 95:2

**financial** 22:7 61:24

**find** 92:9 145:12

**finding** 53:21

**fine** 12:21 13:2 156:11

**fingerprints** 150:5

**finish** 11:6

**fired** 113:18

**fit** 50:20

**fix** 31:21 79:24

**flag** 155:12

**floor** 36:19,21,23 37:7,10,13 40:13 55:12,15,17 75:18 123:22

**Florida** 13:23 19:3, 20 20:14

**focus** 10:12 26:20 56:16

**focused** 26:24

**folks** 32:10 51:14 111:10

**follow** 27:6 57:24 105:15 153:16 154:19

**footage** 72:15,19

**Force** 20:2,18 21:4, 10

**foreign** 50:18 65:16, 19 67:19 127:24 141:22,23

**forget** 138:1

**form** 14:3 34:7 58:9 66:22 78:7 81:9,13 95:2 105:12 107:22

**formal** 86:2

**formally** 95:12

**forms** 81:13

**formulating** 85:4

**forthcoming** 143:21

**forward** 68:13

**forwarded** 94:12,20 96:1 107:12 127:20

**foundation** 43:3 54:12 62:4 63:5 64:24 83:13 88:9 89:8 97:22 99:20 101:10 105:18 109:9 128:12,18 131:25 150:18 151:16

**fourth** 36:21 37:7,13 40:13

**foyer** 103:1

**FPS** 127:10

**frame** 15:23 48:9,13

**free** 155:3

**Friday** 90:22,23 96:22 97:3 99:6,12 105:2,11,22 107:8, 11 108:25 110:1

**front** 12:18 64:4 76:25 101:12 113:21 116:13,18 119:5 150:21

**full** 10:6 46:4,10 94:15 108:2 121:15 135:15,18 144:17

**function** 127:2

**funded** 25:1

**funding** 25:7 65:18

**funky** 107:24

**funny** 60:16

**future** 85:23 86:5,8

---

### G

**gain** 90:19

**gained** 105:8,9

**gave** 39:10 45:7 59:4 102:3 105:10 118:12 123:20

**Gavin** 57:8,18,19,20 66:13 94:15,19 95:1 96:3 99:18 108:1 110:17 135:14,15

**general** 27:23 41:11 68:22 69:8,24 70:11,13,17,24 71:4,6,8,14 80:1 89:14 115:5,6,9,11 120:3 134:11,16 136:1 142:20 144:17 146:9

**General's** 115:19 129:8 130:6,10

**generally** 126:21 135:10

**generals** 120:4

**gentlemen** 12:25

**George** 19:8

**Georgetown** 19:7

**gesture** 11:5

**gesturing** 67:10

**give** 9:13 11:3 13:17 17:15 19:12 20:6 30:8 60:12 62:17 63:10 66:17 67:2 69:17 70:4 73:19 82:5 102:1,6,22 114:3 119:25 121:10 124:16 129:19 138:19,24 142:8 152:13

**giving** 12:3 70:6 85:14 93:24 123:19 130:9

**glean** 128:16,21

**goal** 91:18

**goals** 54:19

**good** 9:25 10:1 11:13 133:23

**Google** 123:12 126:23 135:12

**Gottlieb** 17:8 59:12 61:1 74:17 75:16 79:18

**Gottlieb's** 75:17 80:16

**gov** 135:17

**governing** 65:17

**government** 8:12 18:1 19:16 22:10 26:22 27:2 28:1 31:6 32:15 53:5,22 54:2,15 66:24 85:19 89:7 123:11 125:17 128:3 137:11 150:1 153:23 154:5

**grant** 32:20 58:16 76:16 78:23 79:2,6, 10 82:8 96:12,15 97:20 100:1 102:18, 20,23 103:1,25 107:15,19 113:9 114:25 120:9 125:22 134:22

**granted** 38:20 73:13,18 78:5 93:6, 12,13 96:25 98:14 101:23 105:23 117:21 124:14 150:12

**granting** 82:2 93:20 96:2 103:12 115:8 117:15

**grants** 103:15

**Gray** 65:11 74:22 94:14 96:2,11,14 99:4 100:21 101:4 107:10,14,25 109:17 112:10 113:14 117:18 120:15 121:10,12, 15 122:19,25 130:15 138:10 148:22 150:22

**Gray's** 77:8 96:4,6 98:21 99:12,15,24 100:19

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**great** 12:6 13:7,17, 24 15:13 19:4 22:11 48:16 84:10 154:22 155:19

**greater** 68:25

**greet** 52:20

**greeted** 149:8

**ground** 10:9,22,23

**grounds** 84:6

**group** 17:8 58:7 94:5 141:2

**GS-15** 145:12

**GSA** 58:5 110:22,24 117:9 125:12,13

**guarantee** 10:16

**guard** 117:11 125:11,22 127:4

**guards** 111:20 112:3 113:21 114:9 125:4 127:8,12

**guess** 16:22 42:10 76:4

**guys** 85:17 120:14 156:9,15

---

**H**

---

**half** 111:12

**hall** 75:22

**hallway** 56:10 75:11

**hand** 9:11 11:4 31:1 44:4 95:8

**handle** 52:21

**hands** 149:9

**happen** 70:18 103:14

**happened** 29:11 48:3 56:8 68:15 74:15 92:5 107:7 110:9 135:7,9,11 141:3 144:24 147:16

**happening** 51:15 107:1 134:6

**happy** 11:11 12:24 17:23

**head** 11:5 61:9 137:25

**headquarters** 147:18

**health** 20:4,19 22:9 145:15 146:1

**hear** 10:24 53:4 126:4

**heard** 53:17 121:24

**Heimann** 8:23

**held** 45:23

**helped** 49:5

**helpful** 48:2

**helping** 48:2

**Hernandez** 57:3 58:15 59:11 60:23 63:14,16,23 135:13, 24

**HHS** 22:1,5 33:1

**high** 19:13 62:18

**high-risk** 25:6

**higher** 42:24

**highest** 46:11 109:13 110:4 136:16

**highly** 28:25 30:2

102:7

**Hill** 50:19

**hire** 30:19,23 34:14

**hold** 40:20 72:4

**holding** 87:4

**holds** 90:12,13

**honor** 33:13,16

**honoring** 120:10

**hope** 10:14

**Hopson** 49:8 52:11 55:18 68:19 73:17 76:24,25 114:16 133:25 134:2,5,10

**Hopson's** 151:6

**hot** 92:19,23 97:5,6, 7

**hour** 111:12 112:9

**hours** 10:15 58:22 94:8

**House** 80:22 85:2 86:4,22 87:5 93:20 99:7

**Howard** 17:9 22:25

**HR** 32:2 45:2 61:9

**HSPD-12** 31:8,12 44:24

**Human** 20:4,20 61:8,9 137:12 145:4,15 146:1

**hundred-plus** 24:19

---

**I**

---

**ID** 43:16

**idea** 53:4

**identification** 40:2 47:21 59:21 95:18 138:16 142:4 144:2

**identified** 39:1 40:8 66:17 67:22 77:2 128:4,6

**identify** 24:22 53:11, 15 57:13 65:23 66:22,23 67:17

**identifying** 62:11 66:7 76:19 110:20 127:17

**identity** 42:19 43:18, 22 58:6,8 152:14

**IDMS** 43:12 44:5 46:25 105:4

**IDS** 58:3

**Ilberstein** 15:14

**illegal** 57:14 67:18

**immediately** 92:24 94:7 140:17

**implementing** 24:25 25:6

**impression** 11:17 51:19,20 52:2 63:13 83:22 106:2 122:24 123:1 124:22 136:16

**impressions** 154:7

**inadvertently** 82:7

**inappropriately** 93:24

**inauguration** 38:2 39:1 48:20 49:3 53:9

**incident** 25:17

**incidents** 52:23

**include** 23:13 24:22 34:16 36:3 56:11 104:24 115:4 116:13 141:12

**included** 86:23 94:19 110:25 135:18

**includes** 52:21 85:18 139:23

**including** 85:18 101:6 112:22 118:12 130:6

**incoming** 37:25

**incorrect** 57:6 64:3 86:18

**incorrectly** 98:11

**independently** 77:11 78:3

**individual** 44:5,7 49:24 57:5 75:15, 21,23,25 82:8 98:10 124:13 137:12 145:22

**individuals** 17:11, 14,15 30:2 44:22 49:11 50:1 52:8,12, 13,18 53:11,14 55:12 57:9 58:2 60:5 62:14,23 67:9, 13,15,21 71:16 75:12 95:5,12 110:14 111:24 112:13 114:20 115:1 116:14 120:9 124:14 127:17 128:2 129:1 139:22 142:13 147:5 149:15 151:8

**industry** 19:18,24

**inefficiencies** 53:21

**information** 24:2,4, 12,15,23 25:2,3,10, 11,16,18,23,24 26:3,7,10,19,23,25 27:5,6,10,25 28:9, 11 30:5,6,7,9 33:17 35:12 36:2,3,13,14 37:25 38:8,16,17 40:1 42:19 43:23 44:11,25 46:5 47:3 52:22 58:12 59:2,4, 5,6 63:17 66:22,23 67:6 68:17 73:12 78:8 82:10 87:6,22 95:11,14 101:6,8 104:17 115:8 118:2 122:3 124:8,12 125:17 128:17,22 129:3,6 132:18 145:1 150:1,12,24 154:5

**informed** 24:16 56:6,17 139:20 141:8

**infraction** 25:20

**infrequently** 17:5 41:12

**initial** 62:17 78:1

**initially** 27:8 111:5

**injunction** 133:15

**inside** 103:5

**insinuate** 69:20

**insistent** 79:1

**inspector** 115:6,11, 18 120:2,4 129:7 130:6,9

**instance** 103:20

**Institute** 20:16

**instruct** 84:5 90:9 91:3

**instructed** 13:4 94:25 149:13

**instructions** 149:20

**intelligence** 23:1 24:13 27:15 28:6 29:15 33:5

**intentional** 124:23

**intentionally** 82:7

**intentioned** 150:7

**interact** 47:10

**interacted** 48:17,19 127:5 136:20

**interaction** 41:10 49:16 50:3 52:3 113:23 125:7 133:9 134:11 141:5 143:17 151:1

**interactions** 17:11 24:2 48:5 134:10 151:7

**interest** 146:15

**interim** 38:7,9,12 62:18

**international** 17:20 22:23 24:18

**internet** 31:15

**interpret** 11:22

**interrupt** 112:24

**interruption** 15:1 31:15

**intersected** 75:24

**interviewed** 145:14

**introduce** 8:13 59:18 138:14

**introduced** 75:20

**investigate** 25:19

**investigated** 38:1

**investigating** 85:4

**investigation** 31:1, 12 33:22,24 38:3 39:9,13,15 58:9 62:15,19,20,21 75:5,6 81:20 120:4 141:25 143:21,22

**investigations** 38:4 115:12

**investigative** 32:9 141:20 142:12,23 143:12 144:11 145:19

**investigatory** 141:9

**involved** 13:9 50:1 51:21 59:14 142:25 150:21 151:3

**involvement** 50:10 141:23 151:5,6

**involves** 30:17

**ish** 29:6

**issue** 44:6 80:23 86:6 95:12 113:14 127:12 141:12 146:14,18 152:12 154:20

**issued** 123:11 125:19

**issues** 28:14 83:7 93:23 112:11 146:25 151:14

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 706 of 720

BRIAN MCGILL
92132

December 09, 2025

175
Index: Jack..lead

## J

**Jack** 142:17,19

**Jackson** 49:6 52:11 64:10 75:12,14,22 76:18 77:19 78:2 79:9,14,15 80:4,7, 12 81:3,23 82:15 94:21 100:18 106:13 107:12 110:7,13 114:17 117:18 119:11 127:20 129:19 130:5,15 135:25 136:7 141:13 150:7

**Jackson's** 96:20 130:21

**Jacob** 9:2

**James** 9:6 117:25

**January** 10:12 14:7 16:13 47:4 48:9 49:18 50:5,12 51:6, 18 52:4,10 53:10 54:23 56:3,8 60:20 62:24 63:2,23 65:22 66:1 68:3,14,15,18 70:18,21,23 72:18 74:14,16 82:21 88:4 89:3 92:4,5 96:10 97:1 101:1 106:22 107:8 108:12,14 134:8 143:1,18 146:22

**Jason** 65:11 74:25 77:7 94:14,18,23 96:2 99:4,5 109:17 112:10 113:13 114:5,10,13 115:13, 21 117:1,18 119:7, 14 120:15 121:21

122:2,6 136:1,3,4 137:4,14,17,18,19 138:10 148:22 150:22

**Jason's** 136:9

**Jehieli** 8:22,25

**jeopardizing** 82:9

**Jeremy** 79:14 80:20 110:22

**Jerry** 110:16

**job** 23:22 33:1 50:17,21

**jobs** 19:21 145:12

**Joel** 49:9 56:25 59:4,10 60:3 68:19 69:5 75:8 76:24 151:5

**John** 16:2,18 22:14 38:6 50:11 51:11 52:24 55:10 56:4,6 68:24 73:19,25 74:17,18 80:10,21 94:21 99:4 107:3,13 110:11 111:4 114:12 115:14 119:10 120:11 121:25 122:2,4 137:3 139:11 150:11

**joined** 15:18

**judgment** 102:9

**jump** 10:10 18:17 30:11

**Justice** 14:23,25 19:17 20:11 32:23, 25

**JWICS** 27:13,17,22, 24 28:7,14,22

## K

**Kahn** 57:4 58:1 59:12 94:12 96:1

**Kahn's** 59:5

**Kelly** 46:23

**Ken** 49:6 64:10 75:12,14,22,25 76:3,4,18,19,23 77:7,19 78:2 79:9, 14 80:20,21 81:3 94:21 100:17 106:13 107:12 110:6,13 114:17 119:7,11,13 120:11 122:2 127:20 135:25 136:2,6 137:17 139:13 141:13 150:6

**Kent** 117:18

**key** 152:11

**kind** 16:11,13 26:24 30:1 34:20 42:16 49:23 56:22 59:14 60:15 71:7 77:14 79:16 81:4 111:9 112:11,15 121:1 141:2,25 146:12 150:21 151:1,3

**Kliger** 57:8,18 66:13 94:15,19 96:3 100:2 105:7 107:21 108:1, 9 109:7 110:17 131:19 135:15

**knew** 33:24 73:11 104:25 112:5 120:16,18 135:2

**knocked** 75:20

**knowing** 82:3 149:23

**knowledge** 11:16 30:3 43:7 44:12 45:19 47:13 63:1 96:9 109:15 112:19 124:15 131:21 132:23 143:3 147:15,21 148:5

**Korde** 140:25

## L

**labor** 59:12 137:25

**lack** 43:3 54:12 62:4 63:5 64:24 83:13 88:9 89:8 97:22 99:20 101:10 105:18 109:8 128:12,18 131:25 151:16

**lacked** 50:18

**ladies** 156:12

**Laken** 57:1,23 68:25 71:1,5 79:14 80:20 151:5

**Laken's** 73:13

**language** 77:17

**late** 10:12 14:7 70:25 107:11 137:9 140:13

**law** 19:23 21:10 84:23 115:17

**lawsuit** 10:13 16:1

**lawyers** 146:16

**layers** 26:5

**lead** 41:1 55:16 127:24

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**leader** 143:10

**leadership** 19:11 24:11,15 94:7 146:13 150:13

**leads** 151:12

**learn** 85:23 90:2 98:20,21,23 99:1 130:25 137:1 150:15 152:16

**learned** 105:22 111:21 118:9,15

**leasehold** 13:20

**leave** 60:5 67:12,14 74:24 75:2 76:1 77:12 79:19 80:15, 17 121:14,18 122:6, 13,20 124:8 125:25 132:21 133:11,16, 17 137:2,5,15,21 138:2,7 139:12 140:24 141:2,9,17, 21,24 142:12,23 143:12 144:10,11 145:19,22 146:24 147:6,10

**led** 45:6

**left** 23:3 33:15 36:22 41:3 80:25 124:12 149:25 150:1

**legal** 86:18 151:16

**legislative** 91:23 113:3 119:4

**Lemus** 8:22,25

**Leo** 17:1 55:11 92:18 148:11,21,23, 25 149:3,5

**letter** 74:21 75:1 141:17,18 142:1

**letting** 119:22 150:6

**level** 19:13 27:5 28:2 29:8,17 30:25 32:6,11,14,17 33:14 34:6,24 35:2,15 38:10,11 42:5,16,24 46:11 58:13 62:1 63:20 72:13 77:7, 15,18 78:15 79:10, 16 80:2 81:18 82:1, 2,5 88:20 93:6,12 94:18 96:12,15,25 97:20 98:7 100:1,11 101:23 102:4,22 103:7 105:24 106:3, 7 108:5 109:2 113:1,9 124:2,3 136:11,16 140:5 145:12 146:5 152:2, 3,13 154:10

**levels** 32:19 128:9

**Lewin** 79:14 108:4 110:16

**liaising** 24:19

**life** 33:21

**limited** 41:12 72:15 101:6

**limiting** 103:13

**list** 59:9 60:4 65:21, 25 67:6,10,11 139:22 149:4 155:13,15

**listed** 127:17 142:14

**lists** 60:4

**litigate** 85:18

**live** 18:25

**Lives** 50:12 51:24

**load** 117:8 125:12,

17

**lobby** 104:8 133:21, 22

**local** 25:13

**located** 29:4 36:18

**location** 37:2

**locations** 74:4

**lock** 104:5,12

**locked** 124:9

**locks** 68:21

**log** 40:6 103:25 114:3

**logged** 40:18

**logical** 43:23 44:9 57:22 58:24 59:16 60:6 99:17 108:3 152:6,8

**logistics** 22:8

**logo** 107:2

**long** 31:20 34:13 40:20 45:22 72:15 124:9

**longer** 30:12 109:25 114:11,14 126:16

**looked** 28:11 81:13

**lose** 140:12

**lost** 122:16 137:8,14 140:15 148:21

**lot** 33:6 77:17,18 123:5

**love** 97:6

**lovely** 11:1

**LPA** 119:4

**Luke** 57:8,17,22

58:3 66:12 76:9,13, 15,20,21,22,25 77:5,7,9 78:1,17 80:2,19,24 90:24 93:12,20 94:16,17 95:2,4 96:2 106:3 110:16,24 117:7 118:18 123:19 151:1 152:18

**Lynch** 9:4 34:7 36:8 43:2 46:13 53:19 54:12 62:3 63:4,12 64:24 65:8,24 66:19 70:2 71:11 74:5 83:12 84:4 85:1,16 86:17,21 87:4,13,16 88:7,9,18 89:8,17, 23 90:8,13 91:3,21, 24 97:22 98:16 99:19 100:3 101:9 102:11 105:17 106:10 108:6 109:4, 8 116:7 122:21 124:18,20 125:24 126:2 128:11,18 129:21 131:24 132:8 136:14 140:2 148:1 150:17 151:15 153:22 154:4,8 155:2,13, 17,20,25 156:10

---

**M**

**Maddox** 129:9,12

**made** 57:14 58:15 63:10,14 67:18 68:11 79:18 92:16 95:4,10 107:20 121:18

**mail** 22:8

BRIAN MCGILL
92132

December 09, 2025

177
Index: main..Mimi

**main** 25:21 61:22 94:22 98:1

**majority** 18:22 19:15 39:16 126:23

**make** 11:7 18:6,9 24:15,16 25:7,14 27:7 33:24 53:1 58:25 59:6 70:6 73:9 74:22 76:16 77:3 80:14 82:4 85:24 86:1 91:18 95:1 102:9 103:8 111:5,10,17 113:22 114:1,9 116:1 119:2,8,14 130:4,19 145:11 149:5,10

**maker** 63:3 110:4

**Makia** 57:6

**making** 24:11 51:15 63:9 67:22 73:10 77:14 80:17 85:18 100:10,11 106:8 109:14 112:3 124:5 129:13 134:15 141:23 151:13

**Malyszka** 61:5,6 80:12,17 137:10,20 139:9

**managed** 40:17 104:15

**management** 21:17 22:7 33:6 43:16,19, 22 49:8 61:25 64:2, 6,7,13 100:16,17 130:24 137:13 143:6,9 145:5

**manager** 71:19

**managing** 108:2

**mandates** 44:10

**manner** 69:2

**March** 48:9

**mark** 17:1 35:13 45:6 46:23 93:3,5 111:9,11

**marked** 25:16 47:20, 22 59:20,22 95:17, 19 138:15,17 142:3, 5 144:1,3

**Marocco** 55:18 57:5 58:20 65:15 100:24 110:14 112:10 114:19,24,25 116:10 122:7 127:20 141:17

**Marocco's** 65:13 127:22

**Marshalls** 113:17

**Marziani** 8:15 9:19, 24 10:3 15:4,8,13, 15,19 31:19 34:12 36:16 43:6 46:15 47:23 53:23 54:21 59:23 62:7 63:8,15 65:4,12 66:3,25 70:8 71:25 74:8 83:18 84:9,18 85:12 86:12,20,25 87:8, 14,23 88:8,13,22 89:13,19 90:1,11,18 91:7,17,22,25 92:2 95:20,21 98:4,17 99:23 100:5 101:13 102:15 105:19 106:16 108:8 109:5, 11 116:21 122:23 124:21 126:3,6,14, 15 128:14,20 129:24 132:5,11 136:18 138:18 140:7 142:6,7

144:4,6 148:4 151:10,19 153:11, 12 154:1,6,11,13, 15,17 155:5,7,15, 19,23 156:1,6,18,24 157:1,4

**master's** 19:7,9

**material** 85:7 87:5 113:12

**materials** 82:22 153:15

**Matt** 49:8 55:18 68:19 73:17 76:24, 25 77:2 114:16 133:25 151:6

**matter** 27:23 36:17 41:11 50:13 51:9,24

**matters** 34:22

**Mays** 8:21

**Mcclellan** 46:24

**Mcgill** 8:11 9:10,15, 20 10:7 13:10,20 20:13 86:7 95:22 122:7 142:8,17

**meaning** 40:3 72:12 102:21 110:23 113:7 119:21 145:23 149:17

**means** 12:1 39:25 46:7 53:25 118:23 143:14

**meant** 53:18

**measures** 51:21

**meet** 52:17 74:18

**meeting** 49:22 53:10 57:12,13 63:2 65:22 66:1 67:17 68:14 80:10 93:2

**meetings** 25:25 69:2 92:9 145:3 150:3

**member** 31:5 49:13 54:11 55:25 56:13 120:2 131:4 148:23

**members** 17:8 18:1 29:15 48:19 56:24 65:23 89:2 131:7 132:13 146:20 147:14

**memo** 14:5 74:25 77:14 80:22,23 81:4 82:12 96:18,19,21 106:6,17 137:25 138:2 144:9

**Memorial** 20:16

**memory** 16:14

**mention** 119:24

**mentioned** 35:5 52:10 67:1 69:15 78:24 80:21 93:10 100:21 104:18 114:21 117:1 129:16 148:25 150:25 152:18,25

**mentioning** 106:25 152:19

**message** 75:7 79:17 96:1 119:18 123:7 148:14

**messages** 17:5 123:12 126:21,24

**met** 10:2 16:18 49:18,20 52:19 55:19 74:20 76:4, 12,23 93:7,9

**Miles** 56:14

**Mimi** 8:15 10:3

December 09, 2025

**minimum** 152:1

**minute** 29:25 60:13 95:22 138:19 146:7

**minutes** 86:8 114:6 126:2,7

**mischaracterized** 102:11

**mischaracterizes** 116:7 128:11

**misremembering** 39:6

**missing** 23:9,17

**mission** 25:14 57:14

**misstates** 108:6

**mistake** 124:23

**mistakes** 121:18,19

**Mm-hmm** 30:15

**module** 103:21

**Molack** 110:17

**moment** 23:12,15 52:15 70:17 138:1 148:3 157:1

**Monday** 55:6 60:19 133:19 148:15

**monitor** 31:17 84:13,16 91:11,15 126:9,12 149:14,17, 18 153:6,9 157:6

**monitoring** 24:14

**months** 16:22 34:22

**Morgan** 47:1

**morning** 9:25 10:1 49:4,12 50:6 52:19 55:5 56:5 74:19 81:2 92:3,8 96:22 97:4 105:2,22

109:13,18 110:10 127:16 133:23 140:22

**move** 32:10 68:13 87:11 91:19

**moved** 19:23 44:6 48:22 146:1

**moves** 32:5

**Moving** 74:14

**multiple** 21:9 30:17 82:16,17 83:2,5 93:16 111:4 115:4

**Musk** 17:25 18:6 78:24,25 79:2,4,6 83:20,23 84:1,2 85:5,8,14 87:19 88:1,23 89:2 93:11 94:2 98:15 132:1 136:19,23 151:13

**Musk's** 88:25 105:15 131:22

**N**

**named** 57:6 111:24 116:15

**names** 22:18 23:12, 14 41:25 48:21 57:10 59:3,6,10 60:4,9 66:1,4 67:5, 12,21,25 68:2 121:7,9,11,13

**Nathan** 17:2

**national** 33:5,8,18 42:23 44:23 62:20 76:10 82:6,9

**nature** 16:6 17:10 134:16

**necessarily** 75:4 128:19 151:21

**needed** 25:22 33:23 39:13 69:1 74:11 79:5 82:24 83:3 108:17 110:15 112:13 116:1 121:13 134:14,20 135:24 149:14

**needing** 127:17

**network** 29:23 101:16 103:24 122:16 124:3,4

**news** 120:6

**Nick** 17:8 59:12 60:20 61:1,3 74:17, 18,20 75:16,17,21, 24,25 76:2,3,5,6 79:17 80:16

**Nick's** 75:20

**Nicole** 15:17

**night** 58:21 69:4,8, 15,19 70:24 80:25 90:25 92:12,20,25 93:7,18,21 97:1 106:13 114:16 120:16 132:17 134:7,8 137:8,9 141:13

**Noah** 117:24

**nomenclature** 155:1

**Non-public** 32:8

**normal** 92:8 97:19 129:2

**note** 71:5 75:4 80:16 107:20 122:8

**noted** 118:2 135:21 137:16 141:18

**notes** 14:2,4,9 129:16 153:14 154:3

**notice** 68:24 145:2 149:2

**notices** 142:12

**notification** 145:25

**notified** 34:10 107:12

**notify** 59:15

**noting** 94:21 107:13 110:14 111:9 117:20

**November** 152:20

**number** 104:24 139:6 155:10

**O**

**oath** 9:8 12:1

**object** 13:1 34:7

**objected** 58:1

**objection** 36:8 43:2 46:13 53:19 54:12 62:3 63:4,12 64:24 65:8,24 66:19 70:2 71:11 74:5 83:12 84:4,19,25 88:7,18 89:8 90:8 97:22 99:19 101:9 102:11 105:17 106:10 108:6 109:4 116:7 124:18 128:11,18 129:21 131:24 132:8 136:14 140:2 148:1 151:15

**objections** 100:3

**obtain** 125:5 152:7

**obviate** 87:17

**occupation** 22:9

**occur** 93:23

**occurred** 92:25 93:8,10 152:22 153:2

**odd** 19:21

**offer** 88:17

**offered** 77:25

**office** 29:16 30:20 31:14 33:4,6,20 34:10 36:20,22 37:13 40:15 45:6 47:2 49:2,4 55:13 56:11 59:1,15,17 64:4 65:18 69:25 71:8,19 73:3 75:17, 18 76:5,11,12,13 77:10,13 78:21 79:15 80:9,11,20 85:8 92:6,7 93:4 94:13 95:11 97:3 106:5 107:3 110:23 113:3,6,18 115:5, 10,18 116:14,16,18, 19 119:5 120:2 123:21 124:12 129:8 130:7,10 146:10 147:11 148:9,10,17 149:16, 24 150:13,22

**office's** 146:16

**officer** 19:23 27:10 44:11 47:3 59:2 61:8 63:17 73:7,11 93:4 149:10,12

**officers** 72:25 73:1 117:8

**offices** 37:8 59:13

68:21 69:8

**official** 36:2 54:23 106:21 142:21 146:11

**offsite** 37:2

**Ohio** 18:20

**Ohlweiler** 142:18, 19,22,25 146:6,20 147:1,3,12

**omitted** 44:1

**onboarded** 49:11

**ongoing** 24:21 115:9,12

**open** 72:5

**opened** 57:12

**openly** 83:5

**operating** 129:2

**operations** 22:8 23:25 24:11 37:3 57:5 73:3,7

**opinion** 52:1

**OPM** 57:11 145:13

**OPM's** 62:12

**opportunity** 145:9

**opposed** 26:21 48:6 125:19 152:6

**option** 86:9

**order** 54:3 67:19 77:16 98:9,14 118:17 125:5 128:16 138:10 139:17,18 141:22 156:3

**ordered** 94:1 119:16 121:8,9

**orders** 156:22

**ordinarily** 71:20 113:7

**ordinary** 156:10

**organization** 21:5 25:14 62:17 64:4 66:24

**organizations** 30:18 110:21

**original** 83:1 132:16 156:3

**originally** 16:18 18:20 72:23 77:9,20 120:1 124:16 147:5

**ostensibly** 154:4

**outreach** 140:24

**over-the-shoulder** 78:2

**overhearing** 36:12

**oversaw** 26:3

**overseeing** 24:7 25:4 40:24 45:8 146:14

**overseen** 45:1,4,5

**overview** 19:13

**owed** 58:20

**owns** 28:10

**P**

**p.m.** 60:20 84:17 91:11,15 126:9,13 140:14 141:19 153:6,10 157:6

**pages** 138:22

**papers** 150:1

**paraphrasing** 79:11

**part** 13:15 37:7 44:2 53:12,15 80:14 128:4,7 151:2

**Participated** 49:12

**partners** 24:25 25:6

**parts** 71:14,15

**pass** 154:24

**pass-through** 65:18

**passed** 153:24

**passing** 154:12

**patience** 91:8

**Patrick** 40:25 46:20 56:12 58:10 59:5 86:15 92:13 98:1 111:17 113:19 117:10,11 150:25

**pause** 13:2 15:4 119:24 152:24

**payment** 57:23 58:4, 17 61:23

**payments** 57:14 67:18,23 141:23

**penalty** 9:12

**pending** 12:22 62:15 88:21 96:16

**Pentagon** 19:25 20:1,17,22 21:1,4,6, 8,10

**people** 23:4,11 24:10 25:15 27:7 29:6 31:9 58:25 67:2 72:5 79:19 80:15 104:20 111:15 112:8 117:23 121:14 122:12,19 123:6,23

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

124:6

**people's** 26:1 40:1 97:16

**period** 16:5 54:22 65:2,3,5 72:15 146:22 151:14

**perjury** 9:12

**permission** 28:10

**permissions** 40:7 94:23

**permitted** 37:15 95:9 124:8

**person** 38:13 50:17, 21 147:19 151:21

**person's** 66:16

**personal** 14:2,3,9 22:24 30:5,7,9 41:10 42:6 45:5 66:23 78:14 81:15 123:14,17 126:25 129:16 137:10 141:16 149:21 150:2 152:14 154:2

**personally** 41:17 58:11 79:23 113:20

**personnel** 30:4 33:6,19 47:11,14 66:9 141:6

**perspective** 36:6

**pertinent** 153:15

**Pete** 112:10 114:19, 24 122:7 127:20,22

**Peter** 55:18 57:5 58:20 65:13,15 100:24 110:14 141:17

**Peters** 117:24

**Phil** 133:23

**Phillip** 26:12 149:1,8

**Phoenix** 58:18 61:21,22 63:11,21

**phone** 17:6 50:6 52:4 68:21 69:5 73:9,10 74:1 84:1 99:3 100:21 111:5 112:7 113:13 115:14,23 123:11, 15,17 126:22,24,25 129:10

**phonetic** 17:2 110:18

**phrase** 51:1

**physical** 24:5 36:17 58:24 59:17 60:6,17 74:3 99:17 102:6 103:16 108:3 139:13,15,21 140:1, 9,15 152:6

**physically** 36:13 44:4 70:4 72:24 74:11 102:18 103:2, 24 112:14,16 125:5 133:20 149:19

**picture** 95:7 135:14

**pictures** 149:22

**PII** 36:3 42:18 58:11

**PIN** 104:24,25

**PIV** 152:14

**PJ** 40:25 41:19 56:11 73:8,10 92:12,15,16 95:3 111:8 117:12 118:1, 8,9 119:19,24 120:16,21,22,23,25 121:8,10,18,23

122:5,7,10 137:5 149:19 152:18,25

**placate** 108:22

**place** 46:1 58:12 70:5 73:4 79:12 92:20 103:8 153:2

**placement** 145:8

**placing** 144:9

**Plaintiffs** 8:16,18, 20,21,24 9:1 15:16 17:25

**planner** 21:11

**planning** 58:23

**plans** 68:4,7 89:7, 12,14

**plaque** 107:2

**plaques** 106:21

**point** 12:7 17:7 27:12 30:18,21 38:5 55:16 61:7,10 62:1 63:16 64:8 67:1 68:3 69:8,14 78:17, 22 80:9 81:17 83:8 90:14 94:22 95:3 98:1 99:1,12 107:21 108:16 109:25 112:4,7,18,19,20 113:12 116:3 119:12,18 122:15 123:7,13,20 133:13 135:13 141:8 147:19

**points** 25:21

**Police** 19:22 20:15

**policies** 33:7 44:10 151:23

**policy** 21:11 33:3,9 35:24,25 43:5 99:8,

11 135:3

**political** 37:17,21,25 38:7,25 39:3,4,16 48:17,22 49:5 51:9, 18 52:1 57:2 76:10 127:24 150:4

**politicals** 64:15

**Polley** 22:22

**portable** 32:21

**portfolio** 25:10 26:3, 20

**portion** 25:10 139:2

**position** 26:18 44:24 64:14,17 70:3 77:3 84:25 85:12,16 87:9 90:12 114:15 146:4

**positions** 21:13 22:20

**possession** 14:10

**possibly** 47:1 48:9 66:13 68:20 107:18

**post** 53:8

**posted** 28:1

**posture** 50:14

**potential** 16:16 102:6 117:2

**potentially** 46:8 100:4 115:17

**powers** 18:4

**practice** 151:25 152:4

**precedes** 97:19

**precisely** 20:7

**premises** 56:2 101:25 125:5

**preparations** 68:10 89:21 90:3,7,20

**prepare** 13:25

**preparing** 74:21 84:22

**present** 94:5 151:7

**presenting** 82:6

**president** 79:22 80:23 84:21,23 85:2,5,8,10,11,15 87:3 106:14,18 110:23 132:4

**president's** 87:1

**presidential** 64:18 84:6 86:2,23 87:7

**press** 79:18

**pressed** 50:21 83:2

**prevent** 12:3 103:7

**previous** 48:7 64:18 81:12 90:25 92:12, 20,25 93:7,18 106:13 114:14,16 136:9 152:21 155:11

**previously** 36:20 60:8 66:9 92:15 108:11,14 116:4 133:10 143:1,5 151:20

**primarily** 45:4

**primary** 63:3

**print** 26:25

**printing's** 107:24

**printout** 36:15

**prior** 15:21 38:1 39:1 47:4 48:20

**49:18 89:22 90:3** 99:16,24 102:12 109:22 145:16 146:24

**prioritized** 37:23

**private** 13:10 19:18, 24 20:23 21:3 69:13 136:5

**privilege** 12:9 84:6 86:13,24 87:7 90:10,12,14 91:5,23

**privileged** 86:3 115:8

**privileges** 153:23

**problem** 126:8 157:3

**problems** 94:10 112:15 114:7 148:12

**procedures** 129:2

**proceed** 9:18 55:14 56:19 68:13

**proceedings** 15:1

**process** 30:16,22 31:25 32:1,10 34:15,17 37:3,19,20 44:2,4 54:18 55:8, 22 56:23 69:12 70:5,10 77:25 79:8 82:3 90:10 91:5,24, 25 97:19 145:5,10, 13

**processed** 150:5

**processing** 113:11

**produce** 45:20

**produced** 58:5

**program** 22:2,9,24

24:1 26:7,23 29:4 45:7 103:25 104:21 116:2

**programming** 99:8, 11

**programs** 22:23 23:2,8 24:13,17,18 25:1,4,13 26:6 36:4

**progressed** 117:4

**promoted** 26:17

**proper** 36:11 65:7 99:25

**protect** 25:15 130:19

**protected** 36:2 42:19

**protection** 20:2,18 21:4,10 24:3 133:3

**protections** 79:12

**protective** 73:1 85:25 111:20

**protests** 51:25

**provide** 17:18 22:7 49:14 52:20 57:22 63:19 67:25 68:2 94:18 121:13 122:13 127:9

**provided** 27:2,4,15

**provider** 22:6 27:16 28:6

**providing** 87:2 146:12

**public** 19:10 32:7 33:12 57:2 62:19 113:3 119:5

**publicly** 106:20 135:6 147:13

**pull** 74:23

**punished** 121:19

**purpose** 85:14 87:2

**purposes** 17:24 87:11

**put** 35:7 40:1 43:22 67:9,14 78:8 93:17 104:25 114:2 121:14 122:19 132:21 137:1,15,18 138:6 141:2 142:23 145:21 152:15

**Q**

**qualifies** 85:6

**question** 11:6,12 12:22 13:1,5 28:13 29:14 37:12 41:14 51:17,20 86:14 87:8,18 89:25 97:10 102:14 139:24 151:24

**questions** 11:15 17:23 48:4,8 49:2 51:24,25 55:16,23 81:7

**quick** 125:24

**quickly** 92:24

**R**

**raise** 9:11

**raised** 79:17 81:23, 24

**ramifications** 98:6

**ran** 57:5 75:12,14,22

**range** 20:8

**Rapier** 57:1,23 68:25 71:1,5 73:15, 16 79:15

**Rapier's** 73:16 151:5

**rationale** 129:13

**re-branding** 54:8

**Re-entered** 19:25

**reach** 72:23 111:14

**reached** 93:2 111:7 122:2 123:13

**reaching** 74:17 94:17 132:19,20

**read-only** 78:18

**read-over-the-shoulder** 108:21

**read/write** 108:2

**reader** 40:5

**ready** 122:13

**Reagan** 36:24 37:1 40:14 73:2 75:18 106:22 133:22

**reason** 47:24 70:7 99:15 124:11 137:22

**reasonable** 69:13

**reasons** 134:3

**recall** 11:23 14:6 16:3 23:15 39:6 40:22 47:12,14 48:21 49:17,20,21 51:7 52:8,9,23 53:16 54:25 55:4,6 57:10 60:10 66:6 68:1 69:21 70:15,16 71:13,22 74:16 76:3 82:22,23 97:9,11

103:11 105:9 106:24 107:9 110:20 127:6 128:6 129:11 130:14 131:2,20 134:18 140:16 141:18 143:7 144:16 145:24 148:2,13 153:2

**recalled** 150:4

**recalling** 64:16

**receive** 50:4 54:24 59:6,9 69:18 117:3 133:15

**received** 60:9 67:4, 16 68:24 75:7 79:9 81:1,4 85:2 96:21 110:12 111:11 114:5 119:18 120:1, 8,14 137:23,24 140:5 141:16 144:15 149:2

**receives** 85:10

**receiving** 78:1 96:1 107:10 133:13 144:13 145:24

**recent** 92:14

**recently** 20:19

**recess** 31:16 84:15 91:13 126:11 153:8

**reciprocate** 33:13

**reciprocity** 33:4,9 38:20 88:17 146:3

**recognize** 144:7

**recognized** 150:9

**recommend** 70:5

**recommendation** 77:15 130:4,12

**recommended** 129:19 135:25

**record** 8:8 10:6 13:3 14:5 31:18 40:6 45:20 84:14,17 86:15 91:12,16 126:5,7,10,13 153:7,10 155:8 156:3,17,20 157:7

**records** 45:22 46:17 88:15 127:8,10

**red** 35:14 118:20 119:9

**refer** 43:17 53:6 126:21

**referenced** 79:21 82:11 95:25 153:15

**references** 143:20

**referring** 36:24 78:24

**reflected** 32:19

**refresh** 16:13,14

**regard** 42:21 68:5 84:25 89:7

**register** 111:2

**regular** 16:8

**regularly** 17:1

**regulations** 53:3

**reiterate** 119:11

**related** 17:19 31:21

**relations** 59:13 138:1

**relayed** 120:19 123:5

**relaying** 82:12

**remain** 51:11

**remarkable** 50:2

**remarked** 58:7

**remember** 11:18 16:11 48:3 49:23,25 52:12,14,16 53:7 75:3,9 95:5 115:22 130:16 147:2,3 152:24

**remind** 118:6 130:15

**reminded** 93:15

**remorse** 124:25

**remotely** 28:15 74:7 150:3

**remove** 59:16 60:6 135:22 136:12 139:13,15,21 140:1, 9

**removed** 106:21 107:4,5 149:16

**removing** 59:14

**reorganizations** 23:9

**repeated** 83:4 115:3

**rephrase** 11:10

**report** 22:12 41:2 52:22 63:24

**reported** 22:14 41:3, 5 63:25 64:5 106:20 135:6 147:13

**reporter** 9:8,10,16 11:2 13:3 15:2,6,9, 11,14 47:22 59:22 95:19 138:17 142:5 144:3 156:2,7,12, 15,19

reports 71:7

represent 8:14

representative 47:2

representatives 55:9

request 28:5,10 29:6 30:19 32:2 37:22 44:23 70:25 76:17,18,25 78:7 81:9 94:6 120:9 125:20 134:22

requested 40:11 68:25 76:13 80:2

requesting 38:16

requests 95:10 155:11

require 66:21 71:16

requirement 146:4 152:1

requirements 30:24

reserved 149:15

reside 18:23

resignation 134:3,4

resigned 114:16 133:25

resolution 141:12

Resources 49:8 61:9 145:4

respect 70:19 86:7 90:16,20 136:4

responded 117:19

responding 96:2

response 27:1 111:13

responses 11:4

responsibilities 54:20 100:23 114:24

responsibility 24:8 45:7 85:4 100:8 121:16

responsible 23:24 39:15 40:23 92:15, 17 93:5,23 98:6 122:8,9

responsive 155:10

restate 89:24 102:13

restored 133:18

restricted 35:6,13 36:7,10 37:14 42:12 71:9,11,14,15,23 72:10,12 82:1 101:25 102:3,21 113:7 118:6,12,18, 20,23 119:9,21 123:23 124:17 125:1 129:1 130:6

restrictions 35:7 78:3

returned 19:21 141:10 148:10

Returning 77:13

returns 38:18

reveal 12:8

review 14:1,18 17:15 62:22 69:12 70:5,9 71:1 72:18, 22 77:16 80:1 82:3 92:23,24,25 95:23 136:1 153:23

reviewed 14:2,20

reviewing 75:3

revisit 91:20

revocation 55:22 56:23 59:8

revocations 56:15

revoked 67:4 120:22,23,25 121:2, 3,5 141:19

revoking 58:24

Rich 22:22

Richard 8:23

RIF 145:5,16

RIF'ED 144:19 145:2

rights 101:20

risk 62:19 82:6

risks 135:3

rogue 142:12 143:15

role 22:12,16 30:14 61:6 64:11 65:13,17 66:16 69:3 96:4,6 98:21 99:2,5,13,16, 24 100:7,19 127:22 130:21,25 131:23 146:9 150:13

roles 20:22 21:9 22:25 23:4 54:20

Ronald 75:18 133:22

room 15:3 56:24 58:11,19 63:14 76:17

rooms 117:2

routine 92:8 150:3

Rubin 15:12,17

Rubio 58:21 79:23 100:22 101:1

114:22

rule 124:10

rules 10:9,22,23 27:6,8 53:2 57:24 78:9

run 38:17

running 19:19 26:9

rush 155:24 156:7

Ruth 17:1 55:11 92:18 139:14,20 148:11

---

**S**

SAC 62:14,16,18 81:20 88:21

safety 19:10 31:8,12 38:11 51:14

sanitized 113:8

Santaw 17:1 45:6 46:23 93:3 111:9

satisfied 78:17,18

Saturday 98:25 109:12,13,18,23 111:19 126:20 127:16 130:2

saved 14:6

schedule 25:25 32:12

scheduled 16:19 49:23

SCIF 27:14 28:16, 18,21 29:19 36:19, 21,22 37:4,6,10,12, 15 102:2,7,23 103:2,5,16,25 104:4,6,8,10,12,16,

21,22

**SCIFS** 25:24 35:15 36:18 37:2,5 101:18,20

**scratch** 42:11 87:9 108:13 139:19 147:24

**screening** 29:5

**seal** 106:21

**search** 155:18

**searching** 72:17

**secrecy** 42:17

**secret** 27:5,14,21,24 28:24 29:2,8 32:6,7 34:25 35:15,16 37:16 38:10 43:9 71:15 72:12 82:1 102:4,22 113:7,8 118:20 123:24 124:3,6 152:2,3

**secretary** 56:13 58:21 79:23 95:11 100:22,25 110:13 114:22 150:20

**secretary's** 116:16 118:19

**secure** 25:22 40:3 44:15 102:19

**security** 16:3 19:10 21:22 22:8,13,15, 23,24 23:2,7,24,25 24:1,2,3,5,9,18,20, 21 25:2,10,11,12, 17,20,23 26:3,6,10, 19,23 27:6 28:14 29:25 30:3,14,22 31:2,9,10,12,25 32:16,21,24 33:2,8, 11,19 34:2,10,16,

24,25 35:18,25 36:5,20 37:7 38:11, 13,16 39:18 40:15, 16 42:23,25 43:8, 10,12 44:19,23 45:2,5 49:13 50:13 51:6,14,21 52:20 53:2 59:1,16,17 62:1,20 64:17 66:18,20 71:23 72:8,11,13,18,25 73:1,2,3 76:11 78:14 81:10,15,18 82:6,10 83:7 88:4,5, 16 89:3,5 92:15 96:16 97:25 103:12 104:17,19 105:4 112:3 113:19,21 117:7,9 123:21 124:1 127:9 132:12 134:25 135:3 142:14 145:19 146:19 148:17 150:14 151:22

**seemingly** 108:15

**select** 152:12

**selected** 54:15

**Senate** 39:7 64:14, 15

**send** 32:17 117:2 155:13,15

**sending** 99:25

**senior** 132:3 141:1 142:20 143:10 145:7 146:13

**sense** 11:7 89:14 134:20

**sensitive** 27:24 28:25 29:2 32:7,8 42:20

**sentence** 13:18

**separate** 37:8 103:23 134:10

**separately** 18:5

**separation** 18:4

**September** 145:17

**sequence** 78:21 82:12 117:5

**series** 48:4 50:7

**serve** 50:15,20

**served** 21:12,15

**service** 20:1 22:6 33:15 47:5 54:7,9 73:1 83:17 111:20 113:25 145:8

**services** 20:5,20 22:7 145:15 146:2

**set** 27:10 33:6 40:7

**seventh** 37:10

**shaking** 11:5

**share** 120:7 123:18 134:5 136:3 142:2 149:2 154:14

**shared** 22:6 76:15, 24 78:19 79:4,24 83:5 90:24 93:22,25 114:13,15,19,21 118:16 121:12,15, 25 134:11 137:6 145:9,10 149:4

**sharing** 74:21

**Shih** 17:6

**shook** 149:9

**shop** 137:13

**short** 17:21 153:3

**shortly** 117:5 122:15

**show** 40:13 41:13 117:8 125:12

**showed** 94:17

**showing** 117:23

**shows** 121:3

**sic** 15:14

**SID** 45:1,16,19 105:4

**side** 56:16

**SIDS** 44:14 45:25 46:22

**sign** 27:8,10 81:10, 16 105:12 107:21 119:10

**signature** 81:14 96:20

**signed** 78:12,13,14 81:8 96:20,21 134:13 141:17

**significant** 18:7 30:14 82:22 85:3 151:13

**signing** 81:13

**Silberstein** 15:18

**Siler** 9:2

**silly** 28:12

**similar** 106:1 125:16

**similarly** 51:23

**sit** 91:19

**site** 28:9 136:20,24

**sites** 28:1

**sitting** 54:10 80:9 89:20 109:21 110:2

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

Case 8:25-cv-00462-TDC    Document 229    Filed 06/03/26    Page 716 of 720

BRIAN MCGILL
92132

December 09, 2025

185
Index: situations..suite

situations 24:21

sixth 36:23 55:12, 15,17

Skip 23:6 41:4 111:8

Sloan 26:15

small 19:19

social 16:8 17:12 49:15

solely 92:16

solicited 85:1

someone's 82:4

Sonali 140:25

sort 40:21 87:20 125:6 127:2

Southwest 37:5 56:21

space 21:5 35:11, 13,21 36:1,7,10,12 37:14,15,16 70:24 71:4,6,9,15,20 72:12,13 73:6 82:8 113:4,7,9,12 115:4, 5,6,9,19 118:3,12, 18,24 119:2 121:6 123:21,22,23 124:1 149:11

spaces 35:6,8,10 40:3 72:10 82:1 102:19 115:1 118:13 119:6,15,22 120:9

speak 14:22 16:21 56:17 79:2 88:23 121:22 129:8

speaking 12:25 16:4 17:10 51:10 53:1 62:23 89:2,4 121:25

special 37:21 132:3

specialists 104:18

specific 15:22 16:11 54:19 55:1 67:15 75:10 81:23 85:13 102:25 103:20 114:18 115:3 129:22 130:17 132:10 134:12,19 144:20

specifically 28:4 40:16 45:12 49:25 52:23 53:7 55:6 57:16 66:5,14 69:6 70:16 75:4 79:3 83:14 89:11 95:5 99:22 103:11 105:9 115:10 117:10 127:11 135:8,21 140:16 142:24 144:16 146:15 147:3 148:13 152:24 155:14

speculation 43:3 54:13 62:4 63:5 64:25 83:13 88:10 89:9 97:23 99:20 101:10 105:18 106:11 109:8 122:21 124:20 131:25 140:3 150:17 151:16

spell 17:2

spoke 29:10 56:9,22 58:19 68:14 83:25 114:9 129:9 138:5

spoken 14:24 15:25 16:2 128:25 140:22

staff 21:14,15 24:14, 19 25:22 32:16 35:23 36:3 41:24

42:3 49:9,10,14 52:20 55:20 56:11, 14 57:1 62:12 68:18,23 69:6 71:1 72:21 73:17 74:23 86:13 92:9,12 94:25 107:6,17 111:7,18, 19 112:20 114:16 116:12,14,19 122:9 146:2 148:15,23 150:3 152:1

stamp 139:6

stand 43:15 84:12 91:11,14 153:5

standards 33:8

stands 44:17

start 10:5,8,19 30:23 31:13 67:16 74:16

started 19:16 21:9 33:10 92:4 118:16, 17

starting 30:18,21 32:1 34:20 75:1

starts 32:1,4

state 8:14 27:4,11 43:20,21 57:7 65:16 79:25 80:1 110:24 124:4,5 127:23,24

stated 66:2 99:5

States 17:20 90:13

stating 51:8 130:15

status 137:13 145:25

stay 16:8 149:14

stayed 58:18,19 147:14

steps 107:11

Steve 17:6 55:19,21, 24 56:9,22 57:12 58:15,22 59:11 60:23 66:12 83:16 112:10 113:14,16 115:24 117:24 119:25 120:17,20, 21,23 121:24 123:1 135:23 136:3

Steven 57:3 60:21, 23 63:14 135:13

Stevens 8:17 84:7 153:25 156:5,14,25

stood 92:21

stop 67:19

stopping 141:22

stored 124:9

story 121:23

strategic 21:11

Street 133:21,22 149:7

strictly 87:18

strike 82:20 96:23

stuff 155:20

submit 44:22

submitted 85:7 87:5

subpoena 154:20

subsequent 118:5

sued 17:25

suffice 17:24

suggested 148:18

suitability 31:3,11 33:19 38:11 44:24

suite 36:23 56:10 116:18 118:19

119:4,5

**Sunday** 147:14,16

**supervise** 22:16 26:2

**supervised** 22:17 23:11

**supervisor** 26:4 40:10 54:18 71:19 98:10

**supervisors** 26:7

**support** 22:3 24:23 92:19 93:21 122:13 132:19 139:13

**supporters** 25:8

**supporting** 113:25 132:2 151:8

**suspended** 145:23

**swipe** 40:3 41:15 69:1 71:5,16,17,21 72:2 95:9 104:14, 22,25 111:23 125:14,18

**swipes** 71:3 72:4

**swiping** 117:14 118:18

**sworn** 11:25

**symptoms** 105:6

**system** 27:14 28:14 30:10 36:14 39:22, 23 40:1,13,17,18, 20,24 41:1,11,17, 20,23 42:10,11,17 43:12,13,16,19,20, 22 44:5,15,25 45:1, 8,16,19,25 46:9 57:23 58:4,14,17 61:16,18,21,22,23, 25 62:13,22 71:2

73:5,8,12 76:14 78:10 81:25 83:7 94:20 97:7,18 98:2, 11 101:21 102:2 103:15,22 104:15 117:9,13 118:11 119:14 120:24 122:14 123:8,12,18, 21 125:13,15,18 127:14 128:24 134:9 135:19 137:8, 14 140:6 152:8

**systems** 26:21 27:2, 14 29:8,18 39:18 43:25 44:8 46:5,12 61:12,18 93:5 94:16 101:6,8,15,24 103:8 105:4 133:18 135:17,20 140:12

---

**T**

**T4** 62:15,19

**takes** 10:15

**taking** 11:2 79:18 126:16

**Talent** 145:5

**talk** 15:20 18:14 29:25 39:17,19 79:3,4,7 85:20 92:4 146:20 150:15 153:25 154:1

**talked** 45:9 49:14 93:11 120:11 123:3 135:20 149:8

**talking** 31:23,24

**Tara** 17:7 22:23 46:23

**Tariq** 57:6 110:17,24

**tasking** 79:23

**team** 45:2,3,5,6 48:20 49:18,21 65:6 89:3 124:1 132:12 145:4 146:16,21 147:1

**team's** 37:8

**Teams** 49:1

**technical** 46:16,21 98:2

**technically** 103:14 144:21

**technology** 46:5 93:4

**telework** 148:15,16

**telling** 94:4

**ten** 13:12 56:20

**Tenent** 24:6

**tenure** 21:24

**Tera** 76:9,17,21

**term** 92:22 97:4

**terms** 43:18 97:9 98:9 112:2,25

**terrorism** 25:8

**terrorist** 29:5

**terrorists** 25:7

**testified** 9:21 68:16 108:11,14 125:3 128:2 129:12 151:20

**testimony** 9:13 12:4,7 16:16 17:18 85:21 102:12 116:8

**Texas** 154:24

**text** 12:15 17:5

115:25 117:2 119:18 126:21,24 141:1,2

**thanked** 121:21

**thanking** 93:20

**thing** 18:9 50:23 87:16 153:13 155:7

**things** 17:19 48:3 65:2 115:23

**thinking** 23:8

**Thomas** 10:7

**thought** 50:20 67:2 147:4 152:20,23,25

**threat** 21:17 42:23

**Thursday** 89:3 97:1 108:11 132:17 134:8

**Tianna** 8:21

**tier** 81:20 88:21

**time** 8:8 10:3,17 12:23 14:16 15:22 28:11 31:17 41:3 48:8,12,13,16 50:19 52:9 53:8 55:6 57:2 64:10,15 65:9,14 66:7,15 72:15 83:15 84:7,10,13 86:5,8 91:11,15 92:16 100:13,17 104:4 107:15 109:16 110:7 111:12,21 119:3,13 120:11 121:12 124:13 125:9 126:9,12 127:22 130:3 133:4 135:24 136:5 137:4 139:18,24 140:11, 14 144:18 146:22, 23 149:23 150:11

BRIAN MCGILL
92132

December 09, 2025

187
Index: times..USAID

151:14,25 152:4
153:6,9 156:22
157:5

**times** 83:2,5 93:16
115:4 152:12

**timing** 38:5 87:12

**title** 21:7,21,23 22:1
142:11

**titled** 64:12

**titles** 67:12

**today** 10:4 12:1,4,
13,18 13:25 14:19,
23 17:18 18:11
54:10 89:20 109:21
110:2 135:20 155:9

**today's** 8:8 15:21
17:13

**told** 30:20 50:16
55:7 56:2,19 66:9
67:5,8,20 68:7,10
75:15,25 78:6,22
89:21 93:15 98:5
106:12 109:24
114:2 117:11,23
118:1 120:23 122:4
136:3,19 137:17
148:11,21

**top** 27:13,21,24
28:24 29:2,7 30:3
32:6 34:25 35:16
37:16 43:9 60:17

**touch** 16:23

**training** 24:23 25:3

**trajectory** 106:3

**transcript** 155:21
156:4

**transferred** 145:16

**transformational**
50:11,25

**transition** 48:20
49:1,18,21 64:18
65:2,3,5

**travel** 85:9

**trigger** 33:23

**Trump** 18:2 48:6,7,
13,18

**trust** 31:5 32:7,8
33:12 62:19

**truth** 9:14,21 12:2

**truthful** 12:3,7

**Tuesday** 150:4

**turn** 43:11 47:25
94:7 144:18

**Turner** 23:6 41:4,5
55:11 107:19 111:8
122:10

**turnstile** 40:4

**twenty** 32:25

**two-page** 78:12

**types** 35:7 123:4

**typical** 38:13,15
39:11 66:16

**typically** 30:21
33:15 37:25 38:23
58:7 59:7,13 72:11
73:23 97:24 124:7

**Tyrone** 56:14

**U**

**U.S.** 19:22 20:15
47:5 54:7,9 113:17

**UB** 152:11

**ultimate** 45:7 65:10

**ultimately** 19:22
86:1 100:10 121:16

**unauthorized** 36:7,
10 45:11,17 72:10
141:23

**unclassified** 35:12
101:5,8,16 115:1,4
119:15

**unclear** 48:12 65:3,6

**undergraduate**
19:6,18

**understand** 10:16
11:9,21,25 12:9,11,
16 18:10,12,13
26:20 30:1 39:19
46:17 48:15 49:1
54:6 55:7 66:14
81:10 83:8 84:24
92:20 93:8 106:8
109:1,6 112:15
115:15 116:3
117:21 122:11
136:10,15 143:14

**Understandable**
126:18

**understanding** 14:8
20:21 30:13 38:22
42:4 47:7 53:18,24
54:1 61:24 62:16
68:4 72:1 74:2,9
83:19 84:19 86:12
87:19,24 88:5,14
90:7,15,16,19 96:11
98:13 100:13 101:7,
12 102:17 109:21
110:4 125:10
128:15 129:18
130:8 131:6,9,13,
17,22 139:12

**understood** 11:12
16:15 25:15 27:8
45:9 49:7 53:2,20
65:15,17 76:4
108:23,25 113:2,5
119:8 120:19 127:1

**underway** 62:21

**unimpeded** 114:1

**United** 17:20 90:13

**University** 19:7,8

**unlawful** 135:1

**unrestricted** 35:11,
21 36:1 71:24
102:21 119:20
121:4

**unusual** 64:22 65:2
70:23 71:3 125:20

**update** 33:17

**upstairs** 55:15
75:10,11 76:23
78:20

**USAID** 14:14 15:25
16:4,21,24 17:21
20:3,18 21:19,21
22:12 23:22 25:1
26:11,15,21 28:19,
21 29:1 30:4 33:17,
20 34:3,9 35:2,6,17,
23 38:24 40:23
47:14 50:6,15 52:12
54:23 61:9 62:25
64:18 65:19 68:5,8,
11 70:13,19 72:8
83:9 85:15 86:16
88:8,12 89:5,22
90:4,21 95:13 96:8
103:18 105:4 107:2
109:14 110:5,15
111:1 116:4,5,10,
12,22 123:10 124:7

127:1,8 134:6 135:17 140:18,20 144:15,22 145:16 146:2,24 147:14,18, 25 148:6 150:16 151:14 152:8

**USAID's** 36:17 39:18 61:22 106:21 120:6 135:5

**USDS** 47:8,10,14 54:7

**user** 45:20 77:21 78:7 81:8,9

**usual** 147:10

## V

**vacant** 23:4 26:13

**vague** 36:8 53:19 65:8 66:19 71:12 74:5 129:21 136:14 148:1

**valuable** 10:17

**Vance** 106:18

**varies** 34:17

**verification** 62:13 152:15

**verify** 27:9 77:11 78:3 147:9

**versus** 8:12

**vet** 25:5

**vetting** 25:5 29:4

**vice** 80:23 106:13, 17

**Victor** 92:13 111:8 122:11

**video** 156:22

**view** 55:24 108:15 155:11

**view-only** 108:20,21

**viewing** 128:23

**views** 51:18

**violating** 115:17 141:21

**violation** 18:3,5

**violations** 18:3

**virtually** 74:20

**virtue** 101:17

**visitor** 35:17 95:6 111:22,23 118:10

**Voorhees** 16:2,7,20 22:14 38:6 50:12 51:11 52:24 55:10 68:24 73:19 74:17 80:10 94:21 99:4 107:3,13 110:11 122:1 129:19 130:4, 11,17 139:23 142:14 150:11

**Voorhees'** 130:12

## W

**Wainwright** 49:25 52:4,7

**wait** 37:24 76:22 94:6,8

**waited** 105:12 137:9

**waiting** 15:3 49:15 58:22 74:22 80:21, 25 93:19 94:22 108:22

**walk** 34:3,9 149:10

**walked** 75:21,23

**walking** 75:11,22 149:12

**wall** 149:23

**wanted** 50:9 55:7 56:16 57:21 67:17 69:7 77:10 84:24 92:19 108:4,13,17, 20 109:1,7 114:1,25 121:7,9,14 122:19 134:24 135:21 139:5

**warned** 137:3

**Warren** 8:19 91:6 126:1

**wash** 92:19,23 97:5, 6,7

**Washington** 19:8 23:2,7 24:1 25:12 26:5 29:10

**waste** 53:21

**watch** 149:19

**weapons** 115:11

**website** 120:7 135:5

**Wednesday** 72:18 141:15

**week** 54:22 68:14 113:6,24 155:24

**weekend** 147:19

**Wen** 9:6

**White** 80:22 85:2 86:4,22 87:5 93:19 99:7 140:25

**William** 47:1

**Williams** 92:13

107:18 111:8 122:11

**witnesses** 85:19

**Wonderful** 9:19 15:15 19:12 91:17 153:11

**wondering** 132:14

**words** 51:3,4 101:22

**work** 31:6 41:8 54:16,19 55:5 82:18 126:22,24 127:1 129:10 133:19 141:10 148:5

**worked** 19:18,22 20:1 21:7 30:16 32:22 55:22 86:15 141:11 147:14 150:2

**working** 19:25 21:3 80:11 83:9,11,15 111:18 113:2,5 116:17 146:2 150:10

**works** 133:1,2

**world** 24:9

**writes** 107:25

**writing** 73:21,24 93:17 99:6 129:20 130:13 152:5

**written** 82:22 139:14

**wrong** 50:21 139:17, 18,19

**wrote** 101:4,7

## Y

**year** 18:18 20:20 48:1 86:19 152:21

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**years** 13:12 19:3,19,
23,24 20:1,3 21:14
26:13 32:25 33:16

**yesterday** 154:24
155:9

---

**Z**

---

**Zack** 57:4 58:1 59:5,
11 94:12 96:1
139:20

NAEGELI
DEPOSITION & TRIAL   (800) 528-3335
NAEGELIUSA.COM