**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| J. DOE 4, *et al.*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>U.S. DOGE Service, *et al.*,<br><br>    *Defendants*. | Case No. 8:25-cv-00462-TDC |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO DEPOSE KENNETH JACKSON AND STEVEN DAVIS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 2

I.      KENNETH JACKSON............................................................................................ 2

II.     STEVEN DAVIS .................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.      THE LIMITATION ON DEPOSITIONS OF HIGH-RANKING GOVERNMENT
        OFFICIALS APPLIES TO MESSRS. DAVIS AND JACKSON ....................................... 4

II.     PLAINTIFFS HAVE NOT ESTABLISHED THAT THE INFORMATION THEY
        SEEK IS UNAVAILABLE FROM ALTERNATIVE SOURCES OF
        DISCOVERY ....................................................................................................... 7

III.    PLAINTIFFS ARE NOT ENTITLED TO DEPOSITIONS FOR ANSWERS TO
        QUESTIONS THEY HAVE NOT ASKED ................................................................... 9

IV.     PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY INTO ACTIONS
        IMMATERIAL TO THEIR CLAIMS AND FAR BEYOND THE SCOPE OF
        THEIR ASSERTED INJURIES................................................................................ 21

        A.      Plaintiffs' Questions About Removal of Plaques, Changes to a Website,
                and Others Are Immaterial to their Appointments Clause and Separation of
                Powers Claims .......................................................................................... 21

        B.      Plaintiffs Cannot Establish a Need for Depositions into Decisions They
                Lack Standing to Challenge ........................................................................ 22

CONCLUSION.................................................................................................................... 24

# TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

*Alexander v. FBI*,
   186 F.R.D. 1 (D.D.C. 1998).................................................................................................. 5, 13

*Am. Foreign Serv. Ass'n v. Trump*,
   766 F. Supp. 3d 25 (D.D.C. 2025) ...........................................................................................11

*Am. Foreign Serv. Ass'n v. Trump*,
   792 F. Supp. 3d 116 (D.D.C. 2025) ........................................................................................ 24

*Atterbury v. U.S. Marshals Serv.*,
   805 F.3d 398 (2d Cir. 2015)................................................................................................... 24

*Buckley v. Valeo*,
   424 U.S. 1 (1976)................................................................................................................... 21

*Cheney v. U.S. Dist. Court for D.C.*,
   542 U.S. 367 (2004) ................................................................................................................ 6

*Clinton v. Jones*,
   520 U.S. 681 (1997)................................................................................................................. 6

*Cunagin as Next Friend of J.C. v. Cabell Huntington, Hosp., Inc.*,
   No. 3:19-cv-00250, 2021 WL 1518877 (S.D. W. Va. Apr. 16, 2021) ....................................... 6

*Dalton v. Specter*,
   511 U.S. 462 (1994)............................................................................................................... 22

*Does 1-26 v. Musk*,
   No. 25-1273, 2025 WL 1020995 (4th Cir. Mar. 28, 2025) ...................................................... 22

*In re Musk*,
   169 F.4th 445 (4th Cir. 2026)..................................................................................... 1, 4, 7, 8

*In re Murthy*,
   No. 22-30697, 2023 U.S. App. LEXIS 36375 (5th Cir. Jan. 5, 2023) ....................................... 5

*In re United States*,
   197 F.3d 310 (8th Cir. 1999).................................................................................................. 21

*Lewis v. Clarke*,
   581 U.S. 155 (2017)................................................................................................................. 7

*Lucia v. SEC*,
   585 U.S. 237 (2018) ................................................................................................................ 22

*Margolin v. Nat'l Ass'n of Immigration Judges v. Margolin*,
   608 U.S. ---, 2026 WL 1463466 (U.S. May 26, 2026) ......................................................... 24

*Nat'l Ass'n of Immigration Judges v. Owen*,
   139 F.4th 293 (4th Cir. 2025) ............................................................................................... 24

*New Mexico v. Musk*,
   --- F. Supp. 3d ---, 2026 WL 799635 (D.D.C. Mar. 23, 2026) ........................................ 22, 23

*Sustainability Inst. v. Trump*,
   165 F.4th 817 (4th Cir. 2026) ............................................................................................... 22

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .............................................................................................................. 23

*Trull v. Mag Mutual Ins. Co.*,
   No. 3:24-cv-00202, 2025 WL 2550049 (S.D. W. Va. Sep. 4, 2025) ..................................... 6

*U.S. Bd. of Parole v. Merhige*,
   487 F.2d 25 (4th Cir. 1973) .................................................................................................. 21

*U.S. Info. Agency v. Krc*,
   989 F.2d 1211 (D.C. Cir. 1993) ........................................................................................... 23

*United States v. Fausto*,
   484 U.S. 439 (1988) .............................................................................................................. 23

*United States v. Newman*,
   531 F. Supp. 3d 181 (D.D.C. 2021) ....................................................................................... 5

**RULES**

Fed. R. Civ. P. 30(b)(6) .................................................................................................................. 9

Fed. R. Civ. P. 25(d) ...................................................................................................................... 6

**EXECUTIVE ORDERS**

Exec. Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 20, 2025) ............................................... 3, 15

**OTHER AUTHORITIES**

About Us – Office of Foreign Assistance, Office of Foreign Assistance,
  https://perma.cc/834T-KLF9 ................................................................................ 3

Offices of the Deputy Secretaries of State (D and D-MR), 1 FAM 033.1(a)–(d),
  https://perma.cc/4CUR-XLAW ............................................................................ 3

Notification of Administrative Leave, USAID,
  https://www.USAID.gov........................................................................................ 12

Plum Reporting, OPM,
  https://www.opm.gov/about-us/open-government/plum-reporting/plum-data........................... 4

Policy and Supporting Positions, 118th Cong. (2024),
  https://www.govinfo.gov/content/pkg/GPO-PLUMBOOK-2024/pdf/GPO-PLUMBOOK-
  2024.pdf. ............................................................................................................. 4

**INTRODUCTION**

Less than three months ago, the Fourth Circuit held that Plaintiffs in this case had not made the "extraordinary" showing required to depose high-ranking government officials. *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026). It did so because Plaintiffs had not exhausted other readily available discovery devices or diligently pursued "the options available under the Federal Rules of Civil Procedure" for any claimed discovery inadequacies. *Id.* at 449. Everything about that holding remains true to this day. Plaintiffs may have propounded more interrogatories, served more document requests, and taken three more depositions, but nothing in the voluminous record they put forth demonstrates the extraordinary circumstances they must show to depose high-ranking government officials.

To the contrary, the record already contains extensive documentary and other evidence that addresses nearly every one of the questions they claim a need to pose to the two other individuals at issue in their motion: Steven Davis and Kenneth Jackson. Plaintiffs' suggestions otherwise rely on misleading summaries of preexisting discovery, material omissions from Defendants' discovery responses, and unsupported allegations. Worse, Plaintiffs fault Defendants for not answering questions they never asked. But Plaintiffs' failure to ask the right questions in discovery cannot justify more discovery. Nor are Defendants responsible for Plaintiffs' lack of diligence. And if Plaintiffs desire more information, they need only read the declaration attached to this response or use their remaining interrogatories to find the information they seek.

Finally, Plaintiffs suggest that neither Mr. Davis nor Mr. Jackson is subject to the heightened showing they must make before deposing high-ranking government officials. Mr. Jackson, however, filled a senior role identical to those that led the Fourth Circuit to grant mandamus preventing the deposition of two other witnesses here: Messrs. Marocco and Lewin. And Mr. Davis served as the head of a White House component, which itself implicates increased

separation-of-powers concerns outside the more general rule preventing high-ranking executive depositions.  Because Plaintiffs have not established and cannot establish that these depositions are necessary to develop their case, this Court should not permit them to move forward.

## FACTUAL BACKGROUND

### I.    KENNETH JACKSON

Mr. Jackson began his tenure with the current presidential administration on January 20, 2025, as a Senior Advisor in the Office of Administrator of the U.S. Agency for International Development ("USAID").  *See* Ex. 16.[1]  The next day, then-Acting Administrator Jason Gray delegated to Mr. Jackson the duties and authorities of the position of Deputy Administrator for Management and Resources ("DA-MR") and specified that when exercising those authorities Mr. Jackson was to use the title Assistant to the Administrator for Management and Resources.  *See* Ex. 6.  Mr. Jackson formally performed the duties of DA-MR until February 2, 2025, when those duties—along with the duties of Deputy Administrator for Policy and Programming and Chief Operating Officers—were reassigned to Peter Marocco per a delegation document signed by Secretary of State and Acting USAID Administrator Marco Rubio on that date.  *See* Ex. 17.

Secretary Rubio was himself appointed Acting USAID Administrator on January 30, 2025.  *See* Ex. 18.  Between Secretary Rubio's appointment and February 2, Mr. Marocco, Mr. Jackson, Mr. Lewin, and other USAID leadership were aware that Secretary Rubio was delegating the Deputy Administrator duties to Mr. Marocco.  Ex. 30, Decl. of Adam Korzenewski ("Korzeniewski Decl.") ¶ 18.  As such, Mr. Jackson and other USAID leadership consulted with and sought the approval of Mr. Marocco before taking various USAID-related actions.  *Id.*  At that time, Mr.

---

[1]    Defendants' exhibits are sequentially numbered starting after the highest numbered exhibit submitted by Plaintiffs in the spirit of this Court's Joint Record procedures outlined in its Case Management Order.  ECF No. 7.  Like Plaintiffs', Defendants' pincites refer to internal exhibit pagination.

Marocco's permanent position was the Director of Foreign Assistance for the State Department, a position that was "responsible for the supervision and overall strategic direction of foreign assistance programs administered by . . . USAID." About Us – Office of Foreign Assistance, Office of Foreign Assistance, https://perma.cc/834T-KLF9; Offices of the Deputy Secretaries of State (D and D-MR), 1 FAM 033.1(a)–(d), https://perma.cc/4CUR-XLAW.

Mr. Jackson was again delegated the duties of DA-MR on March 18, 2025, per a delegation document also signed by Secretary Rubio. Ex. 19 at 2, 4. Mr. Jackson retained that role until October 24, 2025, when then-Acting Administrator Russell Vought delegated the duties of DA-MR to Eric Ueland. Ex. 29. After that point, Mr. Jackson has held the title of Principal Advisor, but his official position has at all times remained Senior Advisor in the Office of Administrator of USAID. *See* Ex. 16 (Mr. Jackson's redacted Standard Form-50).

## II.    STEVEN DAVIS

Steven Davis was employed by the United States DOGE Service ("USDS") as a Senior Advisor from January 20, 2025, to May 28, 2025. *See* Ex. 20. USDS is a component of the Executive Office of the President. Exec. Order 14,158, *Establishing and Implementing the President's "Department of Government Efficiency"*, 90 Fed. Reg. 8441 (Jan. 20, 2025). From January 20, 2025, until February 18, 2025, Mr. Davis was the highest-ranking political appointee at USDS and served as the functional head of that entity. *See* Ex. 9 at 6. Between January 20, 2025, and February 6, 2025, a different individual served as Deputy Administrator of the U.S. DOGE Service and appears to have served as Acting Administrator of USDS, since no other individual was designated Acting Administrator. *Id.* After that other individual's departure, Mr. Davis continued to serve as the highest-ranking political appointee and functional head of the entity. *Id.* On February 18, 2025, Amy Gleason began serving as Acting Administrator of USDS,

thereby replacing Mr. Davis in that role. *Id.* Mr. Davis was also detailed to the U.S. General Services Administration ("GSA") on January 28, 2025. *See* Ex. 8 at 6.

During the May 21, 2026 Case Management Conference, the Court suggested it would find references to various positions in the "United States Government Policy and Supporting Positions," commonly known as the Plum Book, useful in resolving the parties' dispute. That document is published every four years just after each Presidential election. *See* Policy and Supporting Positions at iii, 118th Cong. (2024), *available at* https://www.govinfo.gov/content/pkg/GPO-PLUMBOOK-2024/pdf/GPO-PLUMBOOK-2024.pdf. Because USDS's organizational structure was set by Executive Order after the most recent Plum Book was published, however, the data in that document does not include Mr. Davis's position.

Position data for USDS and USAID as of late June 2025 can be found on OPM's website at https://www.opm.gov/about-us/open-government/plum-reporting/plum-data/. Because Mr. Davis's employment with USDS ended prior to that date, however, his position is not listed within that data either. Mr. Jackson's Senior Advisor position can be found on OPM's website by searching for the U.S. Agency for International Development, Office of the Administrator.

**ARGUMENT**

I.  **THE LIMITATION ON DEPOSITIONS OF HIGH-RANKING GOVERNMENT OFFICIALS APPLIES TO MESSRS. DAVIS AND JACKSON**

To depose "high-ranking government officials, plaintiffs must show extraordinary circumstances." *In re Musk*, 169 F.4th at 448. To meet that burden, "plaintiffs must show that the high-ranking officials have firsthand information that is relevant and material to plaintiffs' claims and that cannot be reasonably obtained from other sources or modes of discovery." *Id.*

The two individuals Plaintiffs seek leave to depose easily fall within the definition of high-ranking government officials, whatever standard applies. One of them—Mr. Davis—was a White House official with the title of Senior Advisor who served as the functional head of a component of the Executive Office of the President. Under longstanding separation-of-powers principles, Plaintiffs have the burden to establish that his deposition is necessary to their case. *See, e.g.*, *In re Murthy*, No. 22-30697, 2023 U.S. App. LEXIS 36375, at *5 (5th Cir. Jan. 5, 2023) (staying deposition of former White House Press Secretary); *United States v. Newman*, 531 F. Supp. 3d 181, 190 (D.D.C. 2021) (granting protective order to prevent deposition of Deputy White House Counsel and Deputy Assistant to the President); *Alexander v. FBI*, 186 F.R.D. 1, 4 & n.1 (D.D.C. 1998) (explaining that rationale applicable to the protection of high-ranking government officials "is equally applicable" to "positions at the White House" including those employed as "Senior Advisors").

The other—Mr. Jackson—is indistinguishable in every material respect from Peter Marocco and Jeremy Lewin. All three held other positions but were delegated the duties of Deputy Administrator of USAID. Mr. Jackson and Mr. Lewin were delegated authorities of the USAID Deputy Administrator positions on the same date to replace Mr. Marocco, who held both positions. *See* Exs. 17, 19. As a result, the reasoning of the Fourth Circuit's mandamus order applies equally to Mr. Jackson.

Although Plaintiffs do not include any argument on this point in their opening brief, they attempt to reserve the argument that "Defendants bear the burden of establishing that Jackson and Davis are high-ranking government officials." Pls.' Mot. for Leave to Depose Kenneth Jackson & Steve Davis ("Mot.") at 3 n.1, ECF No. 226. Plaintiffs' implication that Mr. Davis's and Mr.

Jackson's positions do not qualify seems to flow from the assumption that they are entitled to any discovery they want as if this were a typical case.

That is wrong.  Litigation against the Executive Branch is unlike other disputes.  *See Clinton v. Jones*, 520 U.S. 681, 707 (1997).  Indeed, aside from the Fourth Circuit's mandamus order, Plaintiffs cite only two cases, both of which involve private corporations defending tort or contract claims.  *See* Mot. at 4 (citing *Cunagin as Next Friend of J.C. v. Cabell Huntington, Hosp., Inc.*, No. 3:19-cv-00250, 2021 WL 1518877, at *3 (S.D. W. Va. Apr. 16, 2021) (permitting deposition of employee of private hospital); *Trull v. Mag Mutual Ins. Co.*, No. 3:24-cv-00202, 2025 WL 2550049, at *3 (S.D. W. Va. Sep. 4, 2025) (permitting deposition of member of insurance company's executive leadership).  It is "altogether misplaced" for Plaintiffs to rely on cases that "do not involve senior members of the Executive Branch."  *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 385 (2004).

Mr. Jackson's status with respect to this litigation also supplies no basis to permit his deposition.  Plaintiffs continue to refer to certain individuals—specifically Elon Musk and Mr. Jackson—as "Defendants" in this case.  *See, e.g.*, Mot. at 1.  They are not.  Those individuals were sued only in their official capacities.  *See* Third Am. Class Action Compl. for Declaratory & Injunctive Relief ("TAC") at 1, ECF No. 207.  Aside from Marco Rubio, who remains Secretary of State but is no longer Acting USAID Administrator, and Acting USDS Administrator Amy Gleason, none of the individuals named in their official capacities remains in the role in which they were sued.  *See* ECF No. 180 at 1, n.1.  Because Mr. Musk, Mr. Marocco, Mr. Lewin, and Mr. Jackson have "cease[d] to hold [the] office" that caused them to be official capacity defendants in this suit (to the extent they ever held such office), they are automatically substituted for their successors by Federal Rule of Civil Procedure 25(d).  Fed. R. Civ. P. 25(d); *see* ECF No. 180 at 1

6

n.1; *see generally Lewis v. Clarke*, 581 U.S. 155, 161–62 (2017) (explaining distinction between individual-capacity and official-capacity suits).

Regardless, Plaintiffs make no attempt to distinguish Mr. Jackson from Messrs. Marocco or Lewin.  Nor can they overcome longstanding limits on discovery into the White House. Plaintiffs therefore bear the burden to establish that Mr. Davis and Mr. Jackson have firsthand information relevant and material to their claims that cannot be obtained through other means.

## II.   PLAINTIFFS HAVE NOT ESTABLISHED THAT THE INFORMATION THEY SEEK IS UNAVAILABLE FROM ALTERNATIVE SOURCES OF DISCOVERY

In granting mandamus preventing Plaintiffs from deposing three other high-ranking government officials, the Fourth Circuit explained that it is not enough to show that such officials "have firsthand information that is relevant and material to plaintiffs' claims."  *In re Musk*, 169 F.4th at 448.  The Fourth Circuit could not have been clearer that the "fact that plaintiffs may need the information and that" high-ranking government officials "may have firsthand information" was "not, by itself, extraordinary."  *Id.* at 448–49.  "If it were," the Fourth Circuit reasoned, "the limitation on deposing high-ranking government officials would be no limit at all."  *Id.* at 449. Rather, Plaintiffs must show that the relevant and material information they seek "cannot be reasonably obtained from other sources *or modes of discovery*."  *Id.* at 448 (emphasis added).

It is, therefore, entirely beside the point for Plaintiffs to argue that Mr. Davis and Mr. Jackson have first-hand information about the events Plaintiffs describe in their motion, *see* Mot. at 5–6, 19, which in any event the government does not dispute.  Whether these two men are in sole possession of information essential to Plaintiffs' claims *is* in dispute.  *See infra* at Part III.  But even if Plaintiffs could make that showing, that would still be insufficient to compel Mr. Davis or Mr. Jackson to sit for deposition.  Plaintiffs would still have to show that the information they seek cannot be reasonably obtained through other "modes of discovery."  *In re Musk*, 169 F.4th at 448.

On that point, Plaintiffs have nothing.  Indeed, their motion entirely fails to address why the information they seek could not be obtained through additional interrogatories or other alternatives to oral depositions.  They instead argue that they are "requir[ed]" to take depositions because they have been unable to get answers that satisfy them "other available sources."  Mot. at 6.  They repeatedly ignore the possibility of interrogatories or other written methods to obtain answers.  *See, e.g.*, *id.* at 6 (arguing that Plaintiffs' have "exhausted all other reasonable discovery mechanisms" because they "obtain[ed] relevant documents and depos[ed] the available witnesses who were involved" but ignoring the possibility of a written interrogatory).  They never explain why the answers they seek could not be written down.  That alone is dispositive under the Fourth Circuit's mandamus decision.  *In re Musk*, 169 F.4th at 449.

Plaintiffs spend much of their brief arguing that Defendants' prior responses to interrogatories were inadequate and the Rule 30(b)(6) designee of the State Department and USAID could not answer certain questions.  "[E]ven if" the government's "discovery responses are inadequate," however, "the Federal Rules of Civil Procedure contain remedies for inadequacies."  *In re Musk*, 169 F.4th at 449.  Plaintiffs have not diligently pursued these remedies.  As to interrogatory responses, *every one* of the State Department's responses Plaintiffs now claim are insufficient was served in November 2025.  *See* Ex. 7 at 19.  These are the same responses the Fourth Circuit wrote were not a basis to depose other high-ranking government officials.  *See In re Musk*, 169 F.4th at 449.  Yet in the over six months since these responses were served—and the nearly three months since the Fourth Circuit's mandamus order—Plaintiffs still have not "pursued the ordinary" remedies for any asserted discovery non-compliance.  *Id.*  Indeed, Plaintiffs only filed a pre-motion letter to raise the issue as an afterthought *after* this Court set a case management conference on the instant motion.  *See* ECF No. 221.  And in the thirteen days since the Court

ordered the parties to confer on the responses raised in that letter, Plaintiffs have not even reached out to begin that process. Plaintiffs continue to seek depositions of high-ranking government personnel *before* exhausting alternative discovery mechanisms. The Court need not go further to deny Plaintiffs' motion.

The same is true of Plaintiffs' assertions about the State Department and USAID's Rule 30(b)(6) designee. Plaintiffs argue that the designee was unable to answer certain questions posed. This is the first Defendants are hearing of it. Plaintiffs have never before advised that they were dissatisfied with the designee's testimony. Notably, they do not argue the designee was unable to "testify about information known or reasonably available to the organization" about the specified topics. Fed. R. Civ. P. 30(b)(6). That is all the rule requires. Regardless, if Plaintiffs have additional information they seek from USDS or the agency defendants, additional Rule 30(b)(6) designees could answer them.

## III.   PLAINTIFFS ARE NOT ENTITLED TO DEPOSITIONS FOR ANSWERS TO QUESTIONS THEY HAVE NOT ASKED

Plaintiffs list a series of ten questions that they seek to answer by deposing Mr. Jackson or Mr. Davis. Many of these questions are not even material to their claims. But even if they were, the information responsive to those questions is either already in Plaintiffs' possession or was not answered because they never asked. Plaintiffs may not like the answers they have received, but they are getting appropriate answers to the questions they ask.

1. Start with Plaintiffs' arguments about administrative leave actions. *See* Mot. 6–8. Plaintiffs assert that they do not know who placed 57 people on leave on January 27, 2025, or who decided to "leave the 57 on administrative leave." *Id.* at 6. As to the initial decision to place those individuals on administrative leave, contemporaneous documents reflect that Acting Administrator Jason Grey made that decision. *See* ECF No. 70-1. Plaintiffs deposed Mr. Gray, who testified that

he made the decision and the basis for it.  Ex. 12 at 94:18–95:10.  On January 30, 2025, a career USAID employee issued a notice purporting to take those 57 individuals off of administrative leave, but he lacked the authority or support of USAID's leadership to do so.  *See, e.g.*, Ex. 12 at 124:2–125:6 (testifying that Mr. Gottlieb "jumped the gun" before Acting Administrator Gray "could make that decision" himself).  Mr. Gottlieb was then himself put on administrative leave.  *See* Ex. 3.  It is the government's position that Mr. Gottlieb's action was ineffective because he lacked authority to countermand the Acting Administrator's leave decision.  *See id.*

Despite their assertions that they need information about this event, Plaintiffs have *never asked* in discovery about the decision to leave those individuals on administrative leave on January 30.  They instead submitted an interrogatory asking the State Department (not USAID) to identify "the individual(s) who made the decision to place approximately 57 USAID employees on administrative leave on or about February 1, 2025."  Ex. 7 at 6.  As it turns out, an entirely separate group—which coincidentally also numbered 57 individuals—was placed on administrative leave on January 31, 2025.  *See* TAC ¶ 75 (explaining that on February 1, 2025, "USAID placed an additional 57 employees on administrative leave"); Ex. 12 at 168:3–6 (Mr. Gray explaining that this was "a different number of 57 people").  Defendants reasonably understood Plaintiffs' interrogatory to refer to the latter 57 individuals and, after noting the ambiguity, explained that Mr. Jackson made the decision to place them on administrative leave and referred to documentary evidence supporting that assertion.  *See* Ex. 7 at 6; *see also* Ex. 5.  In the nearly seven months since that response was served, Plaintiffs have never suggested they instead meant to ask about the 57 individuals Jason Gray had originally placed on administrative leave on January 27.  If Plaintiffs remain uncertain about any aspect of those decisions, that is no fault of Defendants and no basis for additional depositions.

There is also no inconsistency about the facts surrounding USAID's placement of two security employees on administrative leave. *Contra* Mot. at 8. Plaintiffs' summation of Defendants' interrogatory response on this topic is misleading to the point of misrepresentation. *Id.* They omit from their summary the portion of Defendants' response that explained that "[o]n or about February 1–2, 2025, Kenneth Jackson, Assistant to the Administrator for Management and Resources, authorized the placement of John Voorhees and Brian McGill on administrative leave." Ex. 7 at 11. The contemporaneous email Plaintiffs cite supports that by saying that Mr. Jackson "had support" in placing Messrs. Voorhees and McGill on administrative leave from other individuals "to remove physical access." Ex. 5. On February 7, 2025, a court granted a temporary restraining order that required USAID to reinstate employees who had been placed on administrative leave. *See Am. Foreign Serv. Ass'n v. Trump*, 766 F. Supp. 3d 25, 31 (D.D.C. 2025). At that point, Mr. Marocco decided to place Messrs. Voorhees and McGill on investigative leave because of concerns they were undermining the authority of USAID leadership. *See* Ex. 7 at 11; *see also* Ex. 21 (email from Mr. Marocco approving investigative leave notices). To be sure, the government's interrogatory response refers to the second leave decision as "administrative leave" instead of "investigative leave," but the produced underlying documents make the distinction clear. And prior to their motion, Plaintiffs have never indicated to Defendants that this response was ambiguous or inconsistent for this reason.

That leaves only Plaintiffs' arguments about Jeremy Lewin's supposed comment to Mr. Gray that Mr. Gray should "put the entire agency on admin leave." Mot. at 8 (citing Ex. 12 at 126:18–21). But the information about subsequent actions has already been divulged. Even on Mr. Gray's account, Mr. Gray and other USAID leadership refused to take that action, which ended the discussion. *See* Ex. 12 at 127:24–128:10. Mr. Gray was subsequently replaced as Acting

Administrator by Secretary Rubio, and later decisions to terminate contracts, instruct USAID employees to work remotely, and, eventually, to place nearly all USAID direct hire personnel on administrative leave were made by either Secretary Rubio or Mr. Marocco. *See* Ex. 7 at 11–13.

2.  Plaintiffs also claim a need for Mr. Jackson's deposition to gain information about changes that were made to USAID's public-facing website on February 1, 2025. Never mind that the website has since come back online, albeit in altered form, *see* https://www.USAID.gov, which means that any changes that were made on February 1, 2025, cannot possibly have continuing effect now. Plaintiffs also fail to cite the documents Defendants have produced that reflect internal USAID discussions on how to implement subsequent changes, which include the express approval of Mr. Marocco for changes to that website after his delegation came in and reflect Secretary Rubio's "intent." *See, e.g.*, Ex. 22 (discussing changes to be made to the USAID website on February 6, 2025). Even assuming the February 1, 2025, changes to the USAID website were an Appointments Clause problem—which Plaintiffs have not established, and Defendants dispute— any problem would have been cured by later decisions about the website. Defendants have now offered additional clarification of their original interrogatory response. *See* Ex. 30, Korzeniewski Decl. ¶¶ 26–27. Regardless, changes to a website are not the kind of decision with which the Appointments Clause is concerned. *See infra* at Part IV. There is no need for additional depositions on this topic.

3.  Plaintiffs next claim not to know who made certain decisions about USAID headquarters, but they have already obtained exhaustive evidence on these points from other sources. They first assert that it is "unclear" who made the decision to have Gavin Kliger send an email on February 3, 2025, telling USAID staff to work remotely as the headquarters would be closed. Mot. at 11. But Defendants explained in black and white that Mr. Marocco "verbally

authorized the closure of the USAID building and directed Gavin Kliger to send the described email communication." Ex. 7 at 12. Because the instruction was given orally, defendants are unaware of any contemporaneous documentation. Plaintiffs suggest they need more information, but they do not say what additional information they are likely to obtain through oral testimony or why it could not be conveyed in writing; they are merely fishing for more depositions.

Nor do Plaintiffs establish that Mr. Jackson is the only source of information about decisions related to the U.S. Customs and Border Protection ("CBP") occupancy of former USAID space at the Ronald Reagan Building. *See* Mot. at 11. Plaintiffs assert, without support, that CBP took control of that space "on or about January 31, 2025." *Id.* As USAID's designee testified, however, it is "factually not correct that CBP or any [Department of Homeland Security] agency occupied" USAID's space at the Ronald Reagan Building on or before February 7. Ex. 10 at 281:22–283:9. Moreover, the cited interrogatory (consistent with documents already filed in this litigation, *see* ECF No. 70-4) explains that the decision for CBP to occupy the space was made by GSA, not State or USAID. Mot. at 11. Plaintiffs do not explain how this answer "skirts" the question of who made the decision when it directly identifies the agency that made the decision and cites the document effectuating it (which bears the signature of the relevant GSA official issuing it). And because this was a GSA decision, it is unclear why State or USAID would have additional information about it. There is an obvious alternative source of information about this decision: GSA.

Depositions of high-ranking government personnel are only permissible where Plaintiffs can show, in addition to other factors, that the individual has personal knowledge about the information sought. *See Alexander*, 186 F.R.D. at 4. To seek more depositions, Plaintiffs attempt to parlay answers from the Rule 30(b)(6) designee of the State Department and USAID that those

13

agencies are "unaware of conversations with Elon Musk about the revocation of the lease," Ex. 10 at 278:2-6, into an inference that Mr. Musk in fact did have such conversations. *See* Mot. at 3 (citing Ex. 10 at 278:15–279:4). Nothing about that answer, however, demonstrates that Mr. Jackson has personal knowledge of any such conversations.

4. Plaintiffs use the same specious logic to claim a lack of information about the removal of USAID's official seal and its name from the Ronald Reagan Building. *See* Mot. at 13. Those events happened on February 7 and thus were done in connection with GSA's termination of USAID's occupancies of that space, as the State Department has explained. *See* Ex. 7 at 6–7. Plaintiffs separately seek information about a separate incident on January 31, during which certain plaques with USAID's official seal were removed from the Ronald Reagan Building. *See* Mot. at 13; TAC ¶ 74. It is unclear why that event is material to either claim Plaintiffs press. Decisions about what plaques to display in government offices do not implicate the Appointments Clause. And Plaintiffs have not provided any information that Mr. Jackson has personal knowledge of the event. *See also* Ex. 30, Korzeniewski Decl. ¶ 25.

5. As to Plaintiffs' supposed need for more information about who granted certain individuals access to USAID data systems, *see* Mot. at 14–16, Plaintiffs similarly do not meet their burden. First, it is entirely unclear how who had access to various data systems has anything to do with Plaintiffs' Appointments Clause or separation-of-powers claims. An agency decision to grant access to agency data systems that is approved by an authorized agency official does not become an Appointments Clause problem merely because that access was requested by someone from the White House. Which individuals had access to which systems, moreover, is immaterial to whether USAID as it currently exists is in derogation of the powers of Congress.

Regardless, Defendants' prior discovery responses are consistent and clear on who granted access. The State Department's interrogatory responses explain that the decision to give certain individuals that Plaintiffs associate with "DOGE"[2] access to USAID data systems between January 20 and March 31, 2025, were made by "Jason Gray, who was then Acting Administrator of USAID, and Kenneth Jackson, Assistant to the Administrator for Management and Resources, consistent with the provisions of Executive Order 14,158." Ex. 7 at 9. A subsequent interrogatory response catalogued USAID's understanding of which agency systems those individuals had access to, when the access was granted, and who approved the access. Ex. 23 at 5–7. Defendants have also produced record evidence supporting those interrogatories. *See, e.g.*, Ex. 24 (Jason Gray, in his capacity as USAID Chief Information Officer, granting "administrative access to all unclassified information systems" to Mr. Kliger and reiterating approval of Mr. Farritor's access). And Mr. Gray himself confirmed in sworn testimony that he had approved the access given to certain individuals Plaintiffs have asked about. Ex. 12 at 158:15–17 ("And I'm like, that's great. We'll give them access. They can do what they're doing.").

Plaintiffs make much about Mr. Farritor and Mr. Kliger having access to a data system called "CCURE," which was the electronic system that controlled physical access to the doors in USAID's space at the Ronald Reagan Building. *See* Ex. 14, Kliger Dep. at 87:24–86:2; Ex. 15, McGill Dep. at 39:17–40:11. There has been significant testimony and written discovery on access to that system. On January 30, 2025, Kenneth Jackson authorized Mr. Farritor to have read-only

---

[2]     Plaintiffs use vague and ambiguous terms like "DOGE member" or "DOGE-affiliate" to conflate (1) individuals employed by the U.S. DOGE Service; (2) individuals employed by agencies other than USAID that performed work related to USAID on behalf of their home agencies; (3) individuals detailed to USAID from other agencies to perform work under the direction of USAID leadership; and (4) other individuals who share the agenda of downsizing government or pursue something that could be characterized as "the DOGE agenda" in other roles. Defendants disagree with many of these characterizations and do not adopt them in their response.

15

access to the CCURE system. *See* Ex. 25 at DOE4vUSDS_001776 (approving "over the shoulder" access to CCURE system). Mr. Gray's authorization for "administrative access to all unclassified information systems" for Mr. Kliger and Mr. Farritor covered the CCURE system. Ex. 24. As USAID has noted, Mr. Farritor may have in fact been permitted to log in to the CCURE system prior to Mr. Gray's authorization due to a miscommunication between a USAID security employee, Patrick Butler, and his supervisor, Brian McGill. But Mr. Butler, Mr. McGill, Mr. Gray, Mr. Farritor, and Mr. Kliger have all been deposed about the event. Again, it is unclear why any of this is material to Plaintiffs' claims. Whatever the case, Plaintiffs have the facts they need to make any argument they wish to make without deposing high-ranking government personnel.

6. Mr. Jackson's oral testimony is also not necessary to supplement available information about his positions and authorities at USAID. *Contra* Mot. at 16–18. Initially, Plaintiffs never served any interrogatory that requested information about Mr. Jackson's positions, responsibilities, or authority. The supposed inconsistencies they cite are cobbled together from disparate interrogatories on other topics that properly answer the specific questions posed. Mot. at 17–18. Plaintiffs can hardly claim they have exhausted alternatives on a question they never asked.

Defendants have already produced the official documentation of Mr. Jackson's position and authority. "Mr. Jackson was appointed to USAID to serve as a Senior Advisor to perform the duties of Deputy Administrator for Management and Resources." Ex. 6; *see also* Ex. 16. On January 21, 2025, Acting Administrator Jason Gray delegated to Mr. Jackson "all delegable authorities" of the DA-MR position while giving him the title "Assistant to the Administrator for Management and Resources of USAID." Ex. 6 at 1. That delegation of authority remained effective until February 2, 2025, when Secretary Rubio signed a delegation of the authority of the

16

DA-MR position and two others to Mr. Marocco.[3]  Ex. 17.  Mr. Jackson then reverted to his permanent position as Senior Advisor until March 18, 2025, when Secretary Rubio again delegated the authorities of the DA-MR position back to Mr. Jackson.  *See* Ex. 19.

Those are the facts.  Plaintiffs argue that whether Mr. Jackson "officially served as the Deputy Administrator or was unofficially performing the duties of Deputy Administrator from January 30 through February 2 is a matter of legal significance," Mot. at 18, but they do not explain why.  During that entire period, Secretary Rubio was serving as Acting Administrator.  *See* Ex. 18. Secretary Rubio himself approved significant actions like the termination of Personal Services Contractors, as reflected in documents previously filed in this case.  *See* ECF No. 70-9; *see also* Ex. 26.  And the remaining decisions Plaintiffs cite—the removal of USAID plaques, the shutdown of the USAID website, and Mr. Jackson's placement of certain individuals on administrative leave—are either not exercises of significant authority or were fully supported by Mr. Jackson's authority at the time.  In any case, Plaintiffs have the factual basis for any legal argument they wish to make.

7.  Similar problems abound with Plaintiffs' arguments as to Mr. Davis.  They begin by asserting that "Defendants have provided only vague and incomplete information about Steve Davis's position in the federal government."  Mot. at 19.  But they fail to mention that they never served an interrogatory on the specific topic of Mr. Davis's role.  They instead cite USDS's response to two unrelated interrogatories about USDS's social media accounts and who served as USDS Administrator, to which USDS fully responded.  *See* Mot. at 20 (citing Exs. 8–9). Neither,

---

[3]    As explained in the accompanying declaration, there was an interim period between January 30 and February 2 when Mr. Jackson and other USAID leadership were aware that Secretary Rubio was delegating Deputy Administrator duties to Mr. Marocco and consulted with and sought approval of Mr. Marocco before taking various actions.  Ex. 30, Korzeniewski Decl. ¶ 18.

of course, has anything to do with USAID.  As Plaintiffs note, they also asked the Rule 30(b)(6) designee of the State Department and USAID various questions about Mr. Davis's role in the leadership structure of USDS and his reporting relationship to Mr. Musk.  *See* Mot. at 20.   Mr. Davis's position and authorities or the structure of USDS (or some nebulous entity Plaintiffs refer to as "DOGE") was not among the topics on which Plaintiffs sought Rule 30(b)(6) testimony.  *See* Exs. 27–28.  The designee, moreover, explained that he did "not know the exact structure of USDS," that he was engaging in "personal speculation," and that "USAID does not know the complete details of Steve Davis'[s] job description even with USDS."  Ex. 10 at 158:1–2, 176:2, 177:7–9.[4]  Plaintiffs cannot establish that there are no alternative sources of this information when they have not served an interrogatory on the topic or sought Rule 30(b)(6) testimony of USDS. Regardless, Defendants have now clarified Mr. Davis's role at USDS.  No live oral deposition testimony is required on this topic.

8.  Plaintiffs next argue they have "exhausted all other reasonable discovery mechanisms" to determine Mr. Davis's involvement in USAID's DOGE team.  Mot. at 21–22.  Again, they did not seek this information through an interrogatory directed at Mr. Davis's then-employing entity, USDS.  Their argument thus fails on that point alone.  To repeat, nobody contests that Mr. Davis had some personal involvement in events at USAID or its DOGE team.  But Plaintiffs have not even *tried* to get this information from USDS in other ways.

9.  Next, Plaintiffs assert they have been unable to learn information about Mr. Davis's involvement in accessing USAID systems and cutting access to USAID employees.  Yet Plaintiffs

---

[4]  Plaintiffs also misstate Defendants' position with respect to Mr. Musk.  Defendants do not contend that Mr. Musk had no "role" in something that could be described as "DOGE."  Mot. at 20.   Rather, Defendants take the (correct) position that Mr. Musk was not the USDS Administrator—a particular role related to a particular entity—and was instead a Senior Advisor to the President and advised him on pursuit of the DOGE agenda, a policy initiative.

fail to establish that Mr. Davis exercised any authority over such decisions.  To clarify, the interrogatory response Plaintiffs claim confirms that Mr. Davis was "one of the individuals who granted access to USAID systems and building," Mot. at 22, instead states that Mr. Davis was an individual to whom *Jason Gray and Mr. Jackson authorized* access to USAID data security systems and physical spaces, Ex. 7 at 9.  In other words, Mr. Davis was not a person who *granted* access, but to whom access *was granted*.  And while there is no dispute that Mr. Davis was on site at USAID, Plaintiffs have obtained significant information about the events they cite.  For example, USAID's former Chief of Staff Matt Hopson testified extensively about interactions with Mr. Davis.  As he testified, Mr. Davis was not in the USAID "chain of command" and served merely as an "advisor" whose advice he could take or leave, even while Mr. Davis had substantial influence with people from the White House.  Ex. 13 at 65:4–66:11; *see also id.* at 67:11–14 (explaining that while he "certainly took [certain] advice" offered by Mr. Davis, there was "other advice that was given" by Mr. Davis that Mr. Hopson "did not take").

Mr. Gray also testified about his interactions with Mr. Davis, including the event where Mr. Davis reportedly suggested calling the U.S. Marshals to gain access to the Ronald Reagan Building.  *See* Mot. at 22; Ex. 12 at 176:19–178:9.  That conversation happened after Mr. Gray was no longer the Acting Administrator.  But as Mr. Gray summarized it, Mr. Davis was "perturbed by being forbidden access to something that he should have access to," not making threats.  Ex. 12 at 178:7–8.  Moreover, all the decisions Plaintiffs identify that relate to Mr. Davis—calling meetings to identify individuals responsible for making allegedly improper payments, revocation of physical and logical access, and granting logical access to USAID payment systems—were consummated by others with authority over USAID as described above.  Defendants are not relying on Mr. Davis's authority for any of those decisions—indeed, they were made by others.  In

any case, it is unnecessary for Plaintiffs to obtain testimony about these events from Mr. Davis when the other party to the conversation has already fully testified and the facts are neither material nor in dispute.

10.  Finally, Plaintiffs argue that they need Mr. Davis's deposition testimony to understand his role "in shutting down USAID's website and social media." Mot. at 23–24. The interrogatory response they cite, however, responds to a question about *USDS's* social media accounts, not *USAID's*. *See* Mot. at 23. Defendants never represented that "USAID's social media and website" were assumed by GSA operations, as Plaintiffs falsely state. Mot. at 24. Rather, it was "the www.doge.gov website" and the "@DOGE X account" that were transferred to GSA for operations and maintenance"—as Plaintiffs are aware, because *they propounded the interrogatories* to which this information was responsive. *See* Ex. 8 at 5–6. Plaintiffs served no interrogatories seeking information about USAID's social media accounts. They cannot show a need for depositions when they have not first tried written discovery.

*      *      *

All that Plaintiffs' motion establishes is that they have obtained significant information from Defendants in response to their properly formulated discovery requests. While no one disputes that Mr. Davis and Mr. Jackson have personal knowledge about certain events at USAID in January and February 2025, that is not enough to compel their depositions under the Fourth Circuit's mandamus order. Indeed, even now, months after the Fourth Circuit's decision, Plaintiffs fail to acknowledge obvious alternatives like properly formed interrogatories or other available discovery devices. The Fourth Circuit expressly considered Plaintiffs' identical assertions about Defendants' interrogatory responses they again raise here, yet Plaintiffs have nevertheless rushed to take additional depositions of high-ranking government officials *before* seeking any remedies

20

for any supposed deficiencies (which Defendants do not concede).  And Plaintiffs have not even reached out to confer on these supposed deficiencies that prevent them from information they claim they need in the thirteen days since this Court *ordered* them to do so before filing a motion to compel.  *See* ECF No. 221.  Plaintiffs have simply failed to make the required showing.

These depositions should not proceed.  If the Court concludes otherwise, however, any oral depositions should be strictly limited both in time and to the topics Plaintiffs have here identified.

## IV.   PLAINTIFFS ARE NOT ENTITLED TO DISCOVERY INTO ACTIONS IMMATERIAL TO THEIR CLAIMS AND FAR BEYOND THE SCOPE OF THEIR ASSERTED INJURIES

Beyond their total failure to make the required showing for their requested depositions, Plaintiffs cannot "obtain discovery from high government officials" because they fail to "show an entitlement to the relief sought in the case."  *In re United States*, 197 F.3d 310, 314 (8th Cir. 1999); *see also U.S. Bd. of Parole v. Merhige*, 487 F.2d 25, 29 (4th Cir. 1973) (granting mandamus to prevent depositions where "the complaint rests upon" a "tenuous jurisdictional basis").

### A.   Plaintiffs' Questions About Removal of Plaques, Changes to a Website, and Others Are Immaterial to their Appointments Clause and Separation of Powers Claims

The discovery Plaintiffs seek is immaterial to the claims they have here presented.  The Appointments Clause is concerned only with the exercise of "significant authority pursuant to the laws of the United States."  *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).  Defendants have already identified the individuals who are responsible for the exercise of all significant exercises of authority, as explained above.  Plaintiffs argue that those decisionmakers made those decisions for improper reasons:  *i.e.*, the influence or pressure of individuals they associate with DOGE.  But even if Plaintiffs believe USAID decisionmakers made decisions for bad reasons, that does not mean they lacked authority to make those decisions.  And the Appointments Clause is entirely unconcerned with many of the decisions Plaintiffs seek discovery into here, such as website

21

changes and the removal of plaques. *See Lucia v. SEC*, 585 U.S. 237, 245 (2018). Further discovery into Mr. Musk or Mr. Davis's informal influence in the Executive Branch is thus immaterial.

Plaintiffs also fail to state a separation-of-powers claim. They assert that USAID has been dismantled as an independent agency distinct from the State Department, contrary to the Foreign Affairs Reform and Restructuring Act of 1998. TAC ¶ 55. But Plaintiffs do not identify any way in which the proposed depositions would advance their separation-of-powers claim. *See* ECF No. 159 (Plaintiffs arguing that "there remains no genuine issue of material fact as to Plaintiffs' Separation of Powers claim"). Those depositions, therefore, cannot be essential. Regardless, the claim that an agency is not being operated in accordance with its organic statute is a statutory claim, not a constitutional one. *See Dalton v. Specter*, 511 U.S. 462, 473 (1994); *Sustainability Inst. v. Trump*, 165 F.4th 817, 831–32 (4th Cir. 2026). Indeed, another district court recently dismissed a similar claim against Mr. Musk and USDS based on this reasoning. *See New Mexico v. Musk*, --- F. Supp. 3d ---, 2026 WL 799635, at *9 (D.D.C. Mar. 23, 2026).

### B.    Plaintiffs Cannot Establish a Need for Depositions into Decisions They Lack Standing to Challenge

Finally, Plaintiffs cannot establish a need to depose Mr. Davis or Mr. Jackson because they lack standing to challenge actions outside their particular employment harms, which are subject to mandatory channeling. Defendants acknowledge that this Court has previously rejected similar arguments, but reassert them here to preserve them for potential appellate review.

This case challenges efforts to restructure the Nation's foreign aid programs. Plaintiffs broadly challenge those efforts as violating the Appointments Clause and the separation of powers, inviting the district court to require "vast and detailed actions related to the operation of USAID, an Executive agency." *Does 1-26 v. Musk*, No. 25-1273, 2025 WL 1020995, at *6 (4th Cir. Mar.

22

28, 2025) (Quattlebaum, J., concurring).  Yet Plaintiffs' only potentially cognizable injuries are personnel actions.  Plaintiffs lack standing to assert their sweeping claims, which challenge a slew of agency actions that did not cause their alleged injuries and which seek broad remedies untethered to those injuries.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek.").

Much of the discovery Plaintiffs seek is immaterial to their claims and untethered from the employment injuries for which they seek relief.  The sole basis on which this Court found Plaintiffs have standing to sue was that they "suffered 'interruptions to the ordinary course of their employment.'"  ECF No. 150 at 32–34 (citation omitted).  Even assuming the wrong individual made the decision to shut down USAID's website, terminate USAID's lease to space in the Ronald Reagan Building, or remove USAID's official seal, Plaintiffs have not explained how those decisions inflicted on them concrete and particularized harm.  Nor have they established how an order requiring the website to be reinstated, USAID to reoccupy the Ronald Reagan Building, or the replacement of USAID's seal could possibly redress their employment-based harms.

Moreover, while Plaintiffs may have standing to challenge the concrete personnel actions that they experienced, those claims are subject to mandatory statutory frameworks that deprive the district court of subject-matter jurisdiction.  *See New Mexico*, 2026 WL 799635, at *4 (holding that "the CSRA displaces this court's jurisdiction over [similar claims against Mr. Musk and USDS] insofar as they concern employment issues").  Congress enacted the Civil Service Reform Act and the Foreign Service Act to provide "a comprehensive system for reviewing personnel action taken against federal employees."  *United States v. Fausto*, 484 U.S. 439, 455 (1988); *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993).  Congress likewise enacted the Contract

23

Disputes Act to create "a comprehensive procedural framework for the resolution of disputes arising from contracts with the federal government." *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 404 (2d Cir. 2015). Plaintiffs' claims are squarely covered by these frameworks, as another court held in two cases brought by employee and contractor unions challenging the alleged closure of USAID. *Am. Foreign Serv. Ass'n v. Trump*, 792 F. Supp. 3d 116 (D.D.C. 2025), *appeals filed* Nos. 25-5290, 25-5291 (D.C. Cir.). As this Court has noted, the Fourth Circuit previously ruled that recent events called into question the functioning of the CSRA's adjudicatory scheme. *See* ECF No. 150 at 13 (citing *Nat'l Ass'n of Immigration Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025)); ECF No. 196 at 9 (same). But *NAIJ* is no longer any bar to mandatory channeling after the Supreme Court's reversal of the Fourth Circuit's decision. *Margolin v. Nat'l Ass'n of Immigration Judges v. Margolin*, 608 U.S. ---, 2026 WL 1463466, at *3 (U.S. May 26, 2026). Plaintiffs' claims therefore fall outside the scope of this Court's subject-matter jurisdiction. Additional discovery into claims this Court lacks jurisdiction to hear cannot be essential.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for leave to take the depositions of Steven Davis and Kenneth Jackson and grant a protective order precluding those depositions.

Dated: June 4, 2026                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

24

CHRISTOPHER M. LYNCH
Chief Litigation Counsel, Federal Programs Branch

*/s/ Jacob S. Siler*
JACOB S. SILER (DC Bar No. 1003383)
JAMES J. WEN (NY Bar No. 5422126)

*By Special Appearance*
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-4556
Email: jacob.s.siler@usdoj.gov

*Attorneys for Defendants*

25