IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| J. DOE 4 *et al.*, *individually and on behalf of all others similarly situated*,<br><br>*Plaintiffs*,<br><br>v.<br><br>ELON MUSK *et al.*,<br><br>*Defendants*. | Case No. 8:25-cv-00462-TDC |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO DEPOSE
KENNETH JACKSON AND STEVE DAVIS**

1

**INTRODUCTION**

Since the beginning of this case, Plaintiffs have sought to answer a single factual question with constitutional significance: who made the decision to shut down USAID? Yet throughout the litigation, Defendants have provided half-truths in response to written discovery: not who made the decision, but who formally authorized or transmitted it; not who made the decision, but who executed it. As Plaintiffs described in the Motion for Leave to Depose Kenneth Jackson and Steve Davis, ECF No. 226 ("the Motion"), Defendants' 30(b)(6) witness testimony contradicted Defendants' written discovery responses. Mot. at 13. Now, eight months after those written responses and almost three months after the deposition, Defendants submit a declaration from the same 30(b)(6) designee that not only contradicts his own deposition testimony, but also some of Defendants' written discovery responses. Defendants then turn around and say, in theory, Plaintiffs could obtain answers they need through written discovery. But this declaration demonstrates the precise reason written discovery is insufficient: live testimony can reveal what lawyer-prepared documents do not. All the same, Plaintiffs are actively pursuing complete interrogatory responses. But Plaintiffs are not required to indefinitely postpone depositions to wait for written answers that have still not materialized one and half years into this litigation.

In short, the Court should grant the Motion because Defendants failed to meet their burden to demonstrate Jackson and Davis are sufficiently high ranking for the doctrine to apply, and, even if they were able to sustain that burden, "extraordinary circumstances" compelling Jackson and Davis's depositions exist because (1) Jackson and Davis have personal knowledge of events

material to this case and (2) the information they have is not available through other forms of discovery.[1]

**ARGUMENT**

### I.    Neither Jackson nor Davis is Sufficiently High Ranking to be Shielded from Normal Discovery Rules.

Defendants are required to demonstrate the applicability of the limitations on deposing high-level Executive Branch personnel (the so-called "apex doctrine"), *see generally* Mot. at 4, and have failed to do so here. Defendants rely on the Fourth Circuit's decision temporarily preventing Plaintiffs from taking the depositions of Musk, Morocco, and Lewin, to argue the same ruling should be extended to Jackson and Davis. *See* Resp. at 1, 5, 7.  But the Fourth Circuit did not grapple with the facts of whether those witnesses were, in fact, sufficiently high ranking for protection from discovery to apply. Instead, like this Court, ECF. 200 at 6, the Court of Appeals assumed that Musk, Marocco and Lewin are sufficiently high ranking to qualify for protection, before proceeding to find that the Plaintiffs had failed—at that juncture in the litigation—to demonstrate "extraordinary circumstances." *See In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026). Notably, the Fourth Circuit did not automatically extend mandamus protections to Amy Gleason, despite her role as Acting Administrator of USDS since February 18, 2025. *Id*. at 447, n.1; *see also* Resp. at 3.  Defendants now seek to do precisely what the Fourth Circuit refused to do—summarily shield Jackson and Davis from deposition. But Defendants cannot support that these individuals are sufficiently high ranking to qualify for protection.

---

[1] Defendants add a standing argument to the end of their response. The Court has already rejected Defendants' arguments in this vein, *see* Mem. Op., denying the motion to dismiss, ECF No. 150, and should not entertain Defendants' attempt at a second bite at the apple here.

*To start*, as Judge Gregory noted in dissent, when high-ranking officials are shielded from deposition, courts routinely look to their immediate subordinates for testimony. *In re Musk*, 169 F.4th 445, 451 (4th Cir. 2026) (dissenting) (collecting cases). Similarly, the Fourth Circuit majority favorably cites a series of cases where a still-high-ranking subordinate's deposition is required or recommended after their principal is subject to a protective order. *See id*. at 448 n. 3. For instance, in *In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008), the D.C. Circuit directed the Vice President's Deputy Chief of Staff to sit for a deposition in lieu of the Chief of Staff himself. *Id*. at 314. In *Bogan v. City of Bos.*, 489 F.3d 417 (1st Cir. 2007), the First Circuit issued a protective order for a city's Mayor while noting that plaintiffs should have first sought discovery from mayoral aides who were involved in the relevant situation. *Id*. at 423-24. In *In re USA*, 624 F.3d 1368 (11th Cir. 2010), the Eleventh Circuit blocked a deposition of the FDA Commissioner while noting that the Senate-confirmed "Assistant Administrator for Water" was a proper substitute, even though he was still "high-ranking". *Id*. at 1373.

Here, for much of the critical time period of January to March 2025, Jackson answered to Acting Administrator Jason Gray (who previously sat for deposition and whose testimony indicates Jackson could fill the gaps in his knowledge as to key decisions made), then to Marocco, and then, starting March 18, 2025, he was on parallel employment with Lewin. *See* Resp. at 2-3. While Defendants try to contend that "Mr. Jackson—is indistinguishable in every material respect from Peter Marocco and Jeremy Lewin," Resp. at 5, they seemingly contradict themselves by also contending that Jackson "consulted with and sought the approval of Marocco before taking various USAID-related actions" during critical time periods. Resp. at 2.

Similarly, Davis, as chief member of DOGE, answered to Musk. Ex. 10, Korzeniewski (USAID/State) Dep. 157:19–158:8 (agencies' Rule 30(b)(6) designee testifying that Davis

reported to Musk and was next in line of leadership after Musk); *id.* at 176:23–24 ("USAID's understanding of USDS was that Elon Musk was the leader of it"). If Musk is shielded by the apex doctrine, then, according to the logic of *In re Cheney*, *Bogan*, and *In re USA* Courts, Davis is the proper substitute for deposition as the lower-ranking of the two.

These are exactly the type of next-in-command positions one would expect to be subjected to deposition following the issuance of a protective order shielding their principals.

***Moreover***, it is "profoundly ordinary that subcabinet officials and former subcabinet officials sit for depositions." *In re Musk*, 169 F.4th 445, 451 (4th Cir. 2026) (Gregory, J., dissenting) (collecting cases). Here, neither Jackson nor Davis held or holds a sufficiently high-ranking title to warrant protection; normal discovery rules thus apply. Jackson's claimed title of Senior Advisor in the Office of Administrator of USAID is far below the level of "cabinet secretaries and other high-ranking government officials" that have been deemed sufficiently high-ranking to trigger protection. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 700 (9th Cir. 2022). Indeed, Jackson's functional role, often with the duties of a deputy assistant, is precisely the type of subordinate position courts find appropriate as an alternate deponent. *See, e.g., In re Cheney*, 544 F.3d at 314.

Davis's former position as a "Senior Advisor" for USDS was informal, undefined, and seemingly novel. Deponents have repeatedly struggled to identify Davis's official position even though they worked with him directly. *See* Ex. 13, Hopson Dep. 56:16-20; Ex. 14, Kliger Dep. 49:14–17; Ex. 11, Gottlieb Dep. 77:1–3.[2]  This amorphous advisory role is, at best, akin to Paul Begala, who worked on a wide range of issues as "Assistant to the President and Counselor to the

---

[2] In addition, Davis acted as the so-called "functional head" of USDS prior to Ms. Gleason's formal appointment. Resp. at 3.

President,"[3] and was subject to deposition because he was "simply an advisor to the President." *Alexander v. F.B.I.*, No. CIV. 96-2123 (RCL), 1998 WL 1048978, at *1 (D.D.C. Mar. 2, 1998). On top of that, although federal courts are "reluctant to distract cabinet secretaries from their executive duties," deposing Davis does not pose any threat of burdening "the executive branch's execution of the laws" because he is no longer a government employee. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 700 (9th Cir. 2022). Instead, as of February 3, 2026, Davis was described by the Boring Company (one of Elon Musk's companies) as its President.[4]

Defendants have failed to demonstrate that the apex doctrine applies to Jackson and Davis in the first instance. The Court should grant Plaintiffs' Motion on this point alone.

## II.    Jackson and Davis Have Knowledge of Material Facts and Alternative Forms of Discovery are Insufficient.

Plaintiffs have sent a multitude of written discovery and taken nine depositions, which have proven insufficient for at least three reasons: (1) Defendants' written discovery responses conflict with live testimony, (2) Defendants' written discovery responses are incomplete and contradictory, and (3) Jackson and Davis have firsthand knowledge of the answers to questions in this case and Plaintiffs have no other means by which to obtain that information. Together with the facts laid out in the Motion, these circumstances demonstrate that Mr. Jackson and Mr. Davis "ha[ve] firsthand information relevant and material to the claim, which cannot be reasonably obtained from another source or other modes of discovery." *In re Musk*, 169 F.4th 445, 448 (4th Cir. 2026).

---

[3] The White House, *President Appoints Begala as Assistant and Counselor* (July 1, 1997), https://clintonwhitehouse6.archives.gov/1997/07/1997-07-01-president-appoints-begala-as-assistant-and-counselor.html.
[4] The Boring Company, *The Boring Company and Dubai RTA Sign Agreement for Dubai Loop* (February 3, 2026), (press release), https://www.boringcompany.com/dubai.

Therefore Plaintiffs should be allowed to depose Jackson and Davis, even if they are found to be sufficiently high level to invoke the apex doctrine.

### A. There is Irreplaceable Value to Live Testimony.

Defendants fault Plaintiffs for not explaining "why the answers they seek could not be written down." Resp. at 8. However, Plaintiffs have given Defendants many opportunities to simply write down an answer to a straightforward question, and they are either unable or unwilling to do so. Further, where written discovery and deposition testimony consistently produce contradictory answers, more written discovery is not a reasonable means of obtaining the necessary information. At best, it produces only more artfully vague responses drafted in consultation with attorneys that gets no closer to answering the core questions a factfinder will need to decide Plaintiffs' Appointment Clause claim. There is no substitute for live testimony. *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 631 (D.C. Cir. 1973) (observing that live questioning is preferred to "avoid the peril of 'canned' affidavits and counsel-assisted, or even counsel-drafted, responses to interrogatories"). This is especially true given the apparent unprecedented failure to memorialize in writing high stakes government decisions. *See, e.g.*, Koreniewski Dep. 204:14-205:23 (discussing the lack of written documentation concerning the decision to close USAID headquarters on February 3, 2025).

Courts have long recognized oral examination as the "the greatest legal engine ever invented for the discovery of truth," *California v. Green*, 399 U.S. 149, 158 (1970) (citation omitted), whereas "written submissions are a wholly unsatisfactory basis for decision" when "credibility and veracity are at issue." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). Even this country's Founders viewed "written evidence" as "almost useless" because it "very seldom leads to the proper discovery of truth." *Crawford v. Washington*, 541 U.S. 36, 49 (2004) (quoting R.

Lee, Letter IV by the Federal Farmer (Oct. 15, 1787)). By contrast, cross-examination allows counsel to "delve into the witness' story to test the witness' perceptions and memory" and to impeach the witness with prior inconsistent statements as the testimony unfolds. *Davis v. Alaska*, 415 U.S. 308, 316 (1974). And examination of a witness who has no chance to pause and consult counsel between question and answer "is more likely to lead to the discovery of truth" than a form of examination that permits such consultation. *Perry v. Leeke*, 488 U.S. 272, 282 (1989).

The court in *Armstrong v. MGC Mortg., Inc.* summed up reasons why oral depositions are preferred. No. 1:09-cv-00131, 2010 WL 3835703, at *3 (N.D.W. Va. Sept. 28, 2010). The written format "does not permit the probing follow-up questions necessary in all but the simplest litigation." *Id.*; *see also Ruckelshaus*, 478 F.2d at 630 (noting that written questions are "not as satisfactory to counsel as the opportunity to proceed on oral cross-examination, with questions that develop from previous answers."). It deprives counsel of the chance "to observe the demeanor of the witness and evaluate his credibility." *Armstrong*, 2010 WL 3835703, at *3. And it gives counsel the "opportunity…to assist the witness in providing answers so carefully tailored that they are likely to generate additional discovery disputes." *Id.*

Additionally, written discovery is not adequate when there are already contradictory responses from multiple parties in the record which need to be reconciled. Written questions are "one of the least effective means of challenging a declarant's credibility" because their "predictable and cumbersome nature" makes it "difficult for one to conduct searching examination of a hostile or reluctant witness." *Charleston Med. Therapeutics, Inc. v. AstraZeneca Pharm. LP*, No. 2:13-CV-2078-RMG, 2015 WL 12818824, at *1 (D.S.C. Mar. 17, 2015) (quoting *United States v. Burbank*, 907 F.2d 1140, 1990 WL 86147 at * 4 (4th Cir. 1990)). When written discovery

8

proves "too cumbersome [a] process," oral deposition of even an apex witness is appropriate. *Folwell v. Hernandez*, 210 F.R.D. 169, 175 (M.D.N.C. 2002).

The record in this case confirms that written responses are not adequate substitutes to resolve the questions at issue. Defendants' interrogatory answers have repeatedly identified who "authorized," "acknowledged," or transmitted a decision without identifying who made it. *See, e.g.*, Ex. 7, at 5 (RFP1 "Gavin Kliger *effectuated* the changes to the USAID website…*in consultation with* USAID leadership"), 6 (RFP 2 "Kenneth Jackson . . . *authorized* the transmittal of administrative leave notices…") 8 (RFP4 "State will construe this interrogatory to . . . who *authorized* the listed individual to obtain access…"), 11 (RFP 7 "Kenneth Jackson…*authorized* the placement of John Vorhees and Brian McGill on administrative leave.") (emphasis added throughout).

Each new written account has also changed Defendants' story. For example, Korzeniewski's declaration states that the removal of USAID plaques and signage was "directed by GSA, not USAID" and that Jackson "has no personal knowledge of these events." Ex. 30, Korzeniewski Dec. ¶ 25. At deposition, he testified that the decision came from the leadership team at least at Jackson's level, if not from Secretary Rubio himself. Ex. 10, Korzeniewski Dep. 150:5–11. Similarly, Korzeniewski's declaration states that Jackson and other USAID leadership "consulted with and sought the approval of Mr. Marocco" between January 30 and February 2, 2025. Ex. 30, Korzeniewski Dec. ¶ 18. At deposition, the same witness could not speak to what Marocco was doing during that period, estimated that Marocco was present for "maybe an hour," and described the chain of command at USAID during these critical days without mentioning Marocco at all. Ex. 10, Korzeniewski Dep. 133:13–17, 135–140. To best determine which of these conflicting accounts is accurate, Plaintiffs need to depose Jackson and/or Davis. Cross-

9

examination exists for exactly that purpose, and no further round of written responses can substitute at this juncture in what has already been a protracted case.

Defendants' opposition illustrates precisely why written discovery has been insufficient: they rely on evidence they have not produced in discovery. As detailed above, the contradiction-riddled Korziniewski declaration rewrites the evidence in the record to date. But even disregarding the credibility issues, this is the first time Plaintiffs have heard that Korziniewski's testimony was incorrect or new information has come to light. Similarly, Defendants did not previously produce Exhibits 16 or 20 in discovery, even though they are clearly responsive to Plaintiffs' requests for production and relevant to the litigation, and even though they were clearly in Defendants' possession. And the same night Defendants filed their opposition, they sent Plaintiffs a new document "in connection with [their] filing"—a February 3, 2025 email from Jackson via the "USAID Office of the Administrator"—that they seemingly withheld despite its responsiveness and relevance. Defendants did not produce this responsive information until after Plaintiffs filed this Motion, and to the extent the information is truthful, it only underscores that discovery should not be forced to proceed through motions practice. It has become abundantly clear that written discovery is no adequate substitute for live testimony.

## B. Defendants' Discovery Responses are Deficient and Contradictory.[5]

Defendants incorrectly dismiss questions about the decisions to close USAID's headquarters, take down its website, and remove its plaques as irrelevant. But the Court identified those decisions as key, noting that they "strongly support the inference that Musk directed the actions to shut down USAID without authorization from any USAID official" in denying

---

[5] Plaintiffs are attempting, one final time, to settle these discovery disputes with Defendants through meet and confer following this filing. If those efforts are unsuccessful, Plaintiffs will file their motion to compel.

Defendants' motion to dismiss.  ECF No. 150 at 41.  Since the start of discovery, Defendants have sidestepped these and other critical questions, and Korzeniewski's declaration now contradicts their prior half-answers at multiple turns.

### 1. Shut down of USAID website and closure of headquarters

Initially, in November of 2025, Defendants provided, at best, an incomplete response to the direct question of who decided to shut down USAID's website on February 1, 2025. *See* Motion at 9 (stating that Gavin Kliger "effectuated" the changes to the website "in consultation with USAID leadership, including Kenneth Jackson"). Defendants reiterated that answer in the USAID/State Department agency deposition. *Id.* at 10. Now, more than six months after their initial interrogatory responses and only in response to the present motion, Defendants contend, "Gavin Kliger effectuated that decision by working in coordination with USAID career staff" and "…Mr. Jackson did not issue that direction to Mr. Kliger." Ex. 30, Korzeniewsi Dec. ¶¶ 26, 27. Defendants further state, "Mr. Jackson reports that he cannot provide additional details about any February 1, 2025, changes to USAID's website." *Id.*

In addition to now disclaiming their prior representation that Kliger consulted with Jackson, Defendants originally stated Kliger took down the website "in consultation with USAID leadership" but failed to identify who they meant by USAID leadership." *See* Ex. 7, State Dep't Resp. to Interrogatories at 5-6 (RFP 1). Koreniewski's new declaration, however, describes "USAID leadership" as including "Secretary Rubio, Peter Marocco, and Kenneth Jackson" and "Kenneth Jackson, Matt Hopson, Jeremy Lewin, and Secretary Rubio himself." Ex. 30, Korzeniewski Dec. ¶¶ 5, 12. But *none* of these actors – Secretary Rubio, Marocco, Jackson, Hopson, Lewin – were both part of USAID leadership on February 1 *and* consulted with Kliger about shutting down the website.

Which member of "USAID leadership" decided to shut down the website? Not Secretary Rubio, because he did not know it happened when it happened. *See* Ex. 7, State Dep't Resp. to Interrogatories at 5-6 (after indicating that Kliger effectuated the shutdown "in consultation with USAID leadership including Kenneth Jackson," Defendant State Department said "[s]ince that time…Secretary of State Rubio…[has] *been notified* that the USAID website has been down and [has] not taken action to restore it."). Not Marocco, because he had no authority to do so on February 1. *See* Ex. 30, Korzeniewski Dec. ¶ 18 (admitting that Marocco was not delegated various authorities until at least February 2, 2025).[6] Not Jackson, because he, through Korzeniewski, claims he did not issue the directive to shut down the website and cannot provide details about changes to the website. *Id.* at ¶¶ 26, 27. Not Hopson, as he had already left the agency by February 1. *See* Ex. 13, Hopson Dep. 22:12-14 (Hopson resigned from USAID on January 31, 2025). Not Lewin, because he was only the DOGE Team Lead as of February 1 and had no authority to do so. *See* Ex. 30, Koreniewski Dec. ¶¶ 5, 6 (describing Lewin's role as DODGE Team Lead for USAID until March 18, 2025). Defendants have failed to adequately answer this direct question.

Defendants have similarly hidden the ball with respect to who decided to begin shuttering USAID headquarters. *See* Ex. 7, State Department's Interrogatory Resp. at 6-7 (RFP 3 - indicating that on February 7, 2025, GSA notified USAID that USAID's occupancies were being terminated but wholly failing to answer who decided to "remov[e]...plaques with USAID's official seal from USAID headquarters on or about January 31, 2025…"). During his 30(b)(6) deposition, Koreniewski testified "Ken is the one that actually told me that *DOGE had canceled* the lease of

---

[6] This admission calls into serious question the credibility of Morocco and Lewin's previous sworn testimony in this and other cases, where they attested that Marocco performed the duties of Deputy Administrator for USAID starting on January 30, 2025. Marocco Dec., ECF No. 28-2 ¶ 2, Feb. 22, 2025; Lewin Dec., ECF No 77-2 ¶ 4.

the Ronald Reagan Building and we needed to find a new place to put people." Koreniewski Dep. 249:17-20 (emphasis added).

Defendants' obfuscation of the actual decision-maker(s) behind the shut down of the website and the closure of USAID headquarters demonstrates the need to depose the individuals who Defendants identified as involved in those critical events.

### 2. Administrative leave decisions

Multiple decisions to put various tranches of USAID staff on administrative leave occurred in the early days of the shuttering of USAID. The written discovery responses and deposition testimony thus far do not identify the decision maker for some of those actions. For example, testimony indicates that Jeremy Lewin, as DOGE Team Lead, on January 30, 2025, told then-Acting Administrator Jason Gray to put the entire agency on administrative leave. *See* Mot. at 7-8. Lewin made that instruction after consultation with someone, apparently Elon Musk, on the telephone. Gray. Dep. at 128:4-10; Hopson Dep. at 159:12-23. Gray was unable to say unequivocally who it was. Gray Dep. at 139:21–23. Hopson, the only person besides Gray, Jackson, and Lewin who was in that meeting, was not yet in the room when the instruction was given, and Plaintiffs are currently unable to depose Lewin. Hopson Dep. at 157:17–20. Deposing Jackson is the only way to shed further light on who made this decision – the key decision from which all other decisions to shut down the agency appear to flow. Indeed, almost immediately after Gray refused to shut down the agency, he was relieved of his post as acting administrator and the very next day DOGE and Musk started shutting down the agency themselves. Gray Dep. 131:14-20; *id.* at 141:11-16.

Additionally, underscoring the need to depose Davis is his apparent participation in the February 1, 2026 decision to place "633 USAID personnel on administrative leave" and prepare

"RIF notices for affected offices." Ex. 31, Lewin email to Marocco, February 2, 2025 (Lewin's email says decisions about which categories of USAID personnel should be put on leave were "based on the conversation with Steve [Davis]"). Davis's involvement in key decisions like this one, with Lewin and/or Marocco (who Plaintiffs are currently prohibited from deposing), make the need for his deposition all the more apparent.

### 3.  "USAID leadership" and "Senior agency leadership"

From the outset of this case and continuing through the Response, Defendants have used the phrase "USAID leadership" and "senior agency leadership" to shield the identities of actual decision makers. *See* Morocco Dec., ECF No. 28-2 ¶ 6, Ex. 7, State Interrogatory Resp. at Ex. 7, at 5, Ex. 30, Korzeniewski Dec. ¶¶ 7, 18; Ex. 14, Kliger Dep. at 106:5–6, 118:8–14. Additionally, early in this case, Defendants characterized Jeremy Lewin as DOGE Team Lead at USAID prior to March 18, 2025. Lewin Dec., ECF No. 77-2, ¶ 9. Now, the Korzeniewski declaration describes Lewin as part of "USAID leadership" during that same time frame. *See* Ex. 30, Korzeniewski Dec.¶ 12.

Given the myriad efforts by Defendants to hide who actual decision makers were, Jackson's role as part of "USAID leadership" during the crucial weekend of January 31 - February 2, 2025, and his role, if any, in effectuating the shutdown of USAID, he must be subject to cross-examination by Plaintiffs.

### 4.  New written discovery responses indicate more of the same issues

Further underscoring the need for oral testimony from Jackson is Defendants' position that Jackson is not subject to written discovery requests. On Friday, June 12, 2026, Defendants responded via letter to Plaintiffs' written discovery propounded on Defendant Jackson, indicating that Defendants will not respond to those discovery requests as, in their view, the requests are "null

and void" as Jackson "[is] not subject to interrogatories or requests for production" and "neither Defendants nor their counsel have any obligation to respond to the purported May 13 discovery requests…" Defendants want it both ways – to shield Jackson from deposition (and now written discovery responses) *and* rely on his hearsay, conclusory statements to the 30(b)(6) witness in an attempt to shut down Plaintiffs' inquiry into key decisions. *See* Ex. 30, Korzeniewski Dec. ¶¶ 25-26 ("Mr. Jackson has informed me that he has no personal knowledge of these events" and "I have since been informed that Mr. Jackson did not issue that direction to Mr. Kliger. Mr. Jackson reports that he cannot provide additional details about any February 1, 2025, changes to USAID's website."). Defendants should not be allowed to continue to obscure the facts through statements they are unwilling to substantiate in written discovery or cross-examination, particularly because Jackson's testimony is crucial to clarifying how, when, and by whom key decisions were made. Additionally, Defendants have declined to produce documents, including some relevant to Davis's position within USDS and his communications about key events, on June 12, 2026 (30 days from the date the requests were served) and instead indicated they will produce documents on June 30, 2026, the current deadline for the end of discovery in this matter.

These recent developments again emphasize the inadequacy of written discovery responses and the need to depose Jackson and Davis.

### C. Defendants' Written Responses Suggest Possible Spoliation of Evidence.[7]

#### 1. USAID's failure to provide CCURE information

Plaintiffs asked Defendant USAID to "[i]dentify the level of security clearance and level of badging access to USAID doors" for several DOGE members, including Luke Farritor, Gavin

---

[7] It appears that Defendants did not provide a litigation hold or other indication that key witnesses should prevent the destruction of documents relevant to this action. Ex. 32, Farritor Dep. at 226:11–227:14 (Farritor testifying, "I don't recall any such conversations" when asked whether

Kliger, Steve Davis, and Jeremy Lewin, between January 27 and March 31, 2025. The information is important because sworn testimony from USAID security personnel establishes that Farritor received elevated CCURE access (the system that controlled physical entry to USAID headquarters) at Musk's urging of Elon Musk and outside of USAID's chain of command. *See* Ex. 15, McGill Dep. at 93:5-94:4. After the parties conferred about the insufficiency of USAID's initial answer, the agency provided a supplemental response that still failed to confirm the access records contained in contemporaneous records, claiming instead that CCURE records are not available or accessible. Ex. 33, USAID Supp. Interrogatory Resp. at 5-6. But CCURE was designed to record badge-access permissions, and USAID had those records when Plaintiffs filed this lawsuit on February 13, 2025. *See* Ex. 15, McGill Dep. 39-40 ("it's an access control system where we put people's information in, have an identification card that you could then use to swipe in and out of secure spaces. . . . It would record and log all of those events and set permissions. "). Parties, of course, have a duty to preserve material evidence even before "litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v General Motors Corp.*, 271 F.3d 583, 591 (4th Cir., 2001). At a minimum, Defendants' shifting responses suggest either a failure to preserve evidence or another attempt to obscure who authorized access and what Farritor did with that access. Deposing Jackson and Davis—both of whom were involved in the decision to grant CCURE access—are therefore necessary to determine who made the decision.

---

"anyone in the government, any lawyer for the government" instructed him "to preserve documents that may be relevant to the lawsuit so that they don't get deleted or lost").

16

**CONCLUSION**

For the reasons stated in Plaintiffs' Motion and herein, Plaintiffs respectfully request that

the Court grant Plaintiffs' Motion for Leave to Depose Kenneth Jackson and Steve Davis.


Respectfully submitted,

*/s/ Norman L. Eisen*
Norman L. Eisen, [9112170186]
Andrew H. Warren*
**DEMOCRACY DEFENDERS FUND**
600 Pennsylvania Avenue SE, Suite 15180
Washington, DC 20003
Tel: (202) 594-9958
Norman@democracydefenders.org
Andrew@democracydefenders.org

Mimi Marziani*
Rebecca (Beth) Stevens*
Joaquin Gonzalez*
**MARZIANI, STEVENS &
GONZALEZ PLLC**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Tel: (210) 343-5604
mmarziani@msgpllc.com
bstevens@msgpllc.com
jgonzalez@msgpllc.com

Richard M. Heimann*
Nicole M. Rubin [30711]
Lucas E. Issacharoff*
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000
rheimann@lchb.com

17

nrubin@lchb.com
lissacharoff@lchb.com

*Attorneys for Plaintiffs*
\*Admitted pro hac vice