**SUPPLEMENTAL EXHIBIT INDEX**

| Exhibit # | Exhibit Title | Reference Page(s) |
|---|---|---|
| 31 | 02/02/2025 Lewin Email, USAID_00000070 | 13 |
| 32 | Dep. of Luke Farritor, June 2, 2026 | 15 |
| 33 | United States Agency for International Development ("USAID") Supp. Objs. and Resps. to Interrog. No. 2 (February 26, 2026) | 15 |

# EXHIBIT 31

| | |
|---|---|
| **From:** | Jeremy Lewin |
| **Sent:** | Sun 2/2/2025 6:00:23 PM (UTC-05:00) |
| **To:** | Marocco, Peter W |
| **Cc:** | steven.m.davis@eop.omb ▮▮▮ Kenneth Jackson[kensjackson@usaid |
| **Bcc:** | Laken Rapier ▮▮▮ james.burnham@doge.eop |
| **Subject:** | Additional Proposed USAID Admin Leave Actions |
| **Attachment:** | [DRAFT] USAID Admin Leave Authorization Memo (2-2-2025).docx |

Pete,

Please find attached a draft memorandum placing 633 USAID personnel on administrative leave while the team begins the process of preparing restructuring plans and RIF notices for affected offices. These categories are based on the conversation with Steve last night and are focused on domestic and headquarters personnel in order to minimize any potential risk of placing affected personnel in any danger or distress.

As reflected in the memo, the breakdown is as follows:

- Domestic OTI: 114 Personnel
- Other Domestic CPS: 97 Personnel
- IPI: 214 Personnel
- HTCM (focused on recruiters): 53 Personnel
- POL (HQ only): 9 Personnel
- OCE: 41 Personnel
- PLR: 105 Personnel

There is a box at the bottom to record your approval. Please let us know of any questions/concerns and if there is anyone else that should review. If this action is authorized, our team can begin executing the access restrictions for affected personnel.

Thanks,
Jeremy

# EXHIBIT 32



Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

_____

J.DOE 4, et al.,

    Plaintiffs,

v.           Civil Action No.:

ELON MUSK, et al.,    8:25-cv-00468-TDC

    Defendants.

_____

    VIDEOTAPED DEPOSITION

_____

WITNESS:    LUKE FARRITOR

DATE:    Tuesday, June 2, 2026

START TIME:    10:07 a.m., ET

END TIME:    4:16 p.m., ET

REMOTE LOCATION:    Remote Legal platform

PROCEEDINGS OFFICER:    Deidra Estrella, 1593

JOB NO.:    50205

Page 2

A P P E A R A N C E S

DEMOCRACY DEFENDERS FUND

600 Pennsylvania Avenue Southeast

Suite 15180

Washington, District of Columbia 20003

By:  ANDREW WARREN, ESQUIRE

    andrew@democracydefenders.org

    ZSA'QUERIA MARTIN, ESQUIRE

    zsaqueria@democracydefenders.org

Appearing for Plaintiffs

MARZIANI, STEVENS & GONZALEZ, PLLC

500 West 2nd Street

Suite 1900

Austin, Texas 78701

By:  JOAQUIN GONZALEZ, ESQUIRE

    jgonzalez@msgpllc.com

    ANDREW SILBERSTEIN, ESQUIRE

    asilberstein@msgpllc.com

Appearing for Plaintiffs

Page 3

A P P E A R A N C E S (Continued)

KING STREET LEGAL

800 Connecticut Avenue Northwest

Suite 300

Washington, District of Columbia 20006

By:  BRADLEY HUMPHREYS, ESQUIRE

    brad@kingstlegal.com

    PIERCE BABIRAK, ESQUIRE

    pierce@kingstlegal.com

Appearing for Witness

U.S. DEPARTMENT OF JUSTICE

1100 L Street Northwest

Washington, District of Columbia 20005

By:  JACOB S. SILER, ESQUIRE

    jacob.s.siler@usdoj.gov

    CHRIS LYNCH, ESQUIRE

    christopher.m.lynch@usdoj.gov

    SARAH WELCH, ESQUIRE

    arah.e.welch@usdoj.gov

Appearing for Defendants

Page 4

A P P E A R A N C E S (Continued)

ALSO PRESENT:

Jehieli Luevanos, with Democracy Defenders Fund

(Paralegal)

Maya Cook, with Democracy Defenders Fund (Observer)

Griffin Dunn, intern King street Legal (Observer)

Max Matheu, intern Department of State (Observer)

Page 5

INDEX OF TESTIMONY

EXAMINATION OF LUKE FARRITOR:                PAGE

By Mr. Warren                11

Page 6

INDEX OF EXHIBITS

(retained by counsel)

FARRITOR:

EXHIBIT    DESCRIPTION                    PAGE

1      President's executive order date 1/20/25    75

2      One-page document Bates stamp 4142        102

3      Email chain Bates stamp 1774 to 1777      103

4      USAID C-CURE 9000 User Account Request    122
       Bates stamp McGill 87 to 89

5      Single-page document Bates stamp 9110     125

6      Email chain Bates stamp 586 to 591        142

7      Action memo dated 1/30/25              145

8      Internal memo dated 2/2/25             155

9      Internal memo dated 2/3/25             158

10     Article from Politico dated 2/8/25        161

11     Screenshot of a post from X.com           192

12     Printout of an X.com post from @elonmusk   193

13     Email from Jeremy Lewin dated 2/4/2025     196
       Bates stamp 1756

14     Email chain Bates stamp 1715 to 1717       197

15     Executive order from the White House       202
       dated 2/26/25

16     Email chain Bates stamp 1707 to 1714       210

Page 7

PROCEEDINGS

THE PROCEEDINGS OFFICER:  Good morning. We're now on the record.  Today's date is June 2, 2026, and the time is approximately 10:07 a.m., Eastern Time.

My name is Deidra Estrella, and I'm the digital reporter with Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the video recorded deposition of Luke Farritor, taken in the matter of Doe 4, et al., v. Musk, et al., filed in the United States District Court of the District of Maryland, Civil Action Number 825-00462 (sic).

Would all counsel please identify themselves for the record, starting with the noticing attorney?

MR. WARREN:  Good morning.  Andrew Warren on behalf of the plaintiffs.

MR. GONZALEZ:  Joaquin Gonzalez on behalf of the plaintiffs.

MS. LUEVANOS:  Jehieli Luevanos on behalf of the plaintiffs.

MR. HUMPHREYS:  Bradley Humphreys on behalf of Mr. Farritor.

MR. SILER:  Jacob Siler for the

Page 8

defendants.

MR. BABIRAK:  Pierce Babirak on behalf of Mr. Farritor.

MR. LYNCH:  Chris Lynch for Defendants.

MR. MATHEU:  Max Matheu for Defendants.

MS. WELCH:  Sarah Welch for Defendants.

THE PROCEEDINGS OFFICER:  Counsel Martin?

MS. MARTIN:  Zsa'Queria Martin for the plaintiffs.

THE PROCEEDINGS OFFICER:  Counsel Silberstein?

MR. SILBERSTEIN:  Andrew Silberstein for the plaintiffs.

THE PROCEEDINGS OFFICER:  Any observers? Please introduce yourselves.

MS. COOK:  Cook -- Maya Cook for the plaintiffs.

MR. HUMPHREYS:  I'll do -- we also -- I have Griffin Dunn with me, an intern at King Street Legal.  This is Brad Humphreys speaking.

THE PROCEEDINGS OFFICER:  Thank you, sir.

This video recorded deposition is being taken remotely on behalf of the plaintiffs and is being conducted pursuant to the procedural rules and laws governing this matter.

Page 9

As such, all parties agree to the means of capturing the official record, which may include recording by audio, audiovisual, and/or stenographic means, and agree not to oppose admissibility of the testimony in this proceeding based on the personnel or method by which the testimony was captured.

Further, all parties agree that the proceeding officer or person administering the oath may be authorized to administer the oath under the rules where they reside.

Counsel Warren, do you so stipulate?

MR. WARREN: Yes.

THE PROCEEDINGS OFFICER: Counsel Silver (sic), do you so stipulate?

MR. SILBERSTEIN: Do you mean Siler?

MR. SILER: Yes.

MR. SILBERSTEIN: Okay. Sorry.

THE PROCEEDINGS OFFICER: Counsel Martin, do you so stipulate?

MR. WARREN: I'm sorry. I'm not sure who --

MS. MARTIN: Yeah.

THE PROCEEDINGS OFFICER: Go ahead, Counsel.

MR. WARREN: I'm sorry. Go ahead.

Page 10

THE PROCEEDINGS OFFICER: Do we just want to do an agreeance of the rule everybody?

MR. WARREN: Yeah. If anyone doesn't stipulate, they can say so.

THE PROCEEDINGS OFFICER: Thank you, Counsel.

MR. HUMPHREYS: I would just say for the record, plaintiffs' counsel and I -- you can correct me if you disagree, but have an agreement that the video recording will not be shared with Counsel for the parties until the court resolves Mr. Farritor's motion regarding whether video recording is appropriate. But with that caveat, we otherwise stipulate.

MR. WARREN: Agreed.

THE PROCEEDINGS OFFICER: Thank you, Counsel.

Mr. Farritor, can you please state and spell your name for the record?

MR. FARRITOR: Yeah. Luke Farritor, L-U-K-E F-A-R-R-I-T-O-R.

THE PROCEEDINGS OFFICER: Please raise your right hand to be sworn.

Do you swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

Page 11

MR. FARRITOR: I affirm.

WHEREUPON,

L U K E   F A R R I T O R ,

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDINGS OFFICER: Thank you.

Counsel, the witness has been sworn. You may now begin.

MR. WARREN: Thank you.

EXAMINATION

BY MR. WARREN:

Q   Mr. Farritor, good morning. My name is Andrew Warren. I'm with Democracy Defenders Fund. I represent the plaintiffs in this action. I just want to go over some of the ground rules for today before we get into the substance.

I'm going to be asking questions. At the end of my questioning, the defendants and your attorney may ask questions as well.

During my questions, attorneys may object, and unless you're specifically instructed not to answer, you're supposed to answer the question.

My goal today is to figure out what you know and what you don't know in terms of what's relevant to this case. I'd ask that you don't speculate or guess

Page 12

unless you're specifically asked to.

If you don't understand a question, please let me know and I can clarify. Otherwise, I'm going to assume you understood the question. All that makes sense so far?

A   Yes.

Q   Because a court reporter is transcribing, we need to have answers verbally rather than "uh-huh," or head gestures. So if I remind you, that's the only reason is to make sure that we have a written record of your answers. Do you understand?

A   Yes.

Q   You've been placed under oath. Is there any reason that you can't be truthful today?

A   No.

Q   During the deposition, we can take breaks. Just let us know and we'll take breaks, you know, every maybe 60 or 90 minutes for people to get up, relax, use the restroom if needed.

During the breaks, I'd ask that you not communicate with anyone else except your counsel regarding the substance of the deposition. And if you do talk with Counsel, I'm going to ask that you do not discuss the substance. Do you understand?

A   I understand. I might want to call a break in

Page 13

some cases to check my blood sugar.

Q   Understood.  That's not a problem.  We won't -- we'll try not to take breaks when a question is pending, and we'll try to take breaks at the end of a topic just to maintain continuity.  Have you ever been deposed before?

A   No.

Q   Have you ever provided testimony in any case?

A   Not before this one, I believe.

Q   Have you ever provided information to criminal or civil authorities as part of an investigation?

A   Not before government.

Q   Not before government.  Before some other entity?

A   Prior to my service in government, I have no knowledge of being involved in any civil or criminal cases.

Q   Okay.  Have you ever submitted declarations under penalty of perjury in connection with an investigation or a case?  I'm not talking about, like, a loan application or voter registration.

A   Not to my knowledge.

Q   Did you speak with anyone today about your deposition?

A   Yes.

Page 14

Q   Who did you speak with regarding the substance of it?

A   My lawyers.

Q   Anybody else?

A   No.

Q   Did you talk with attorneys from the government, Mr. Siler, Mr. Lynch, or any of their colleagues about your deposition today?

A   Yes.

Q   Okay.  So just to go back, when I asked you whether you spoke with anyone, you said your lawyers.  I believe I asked if anyone else, and you said no.  And then I asked you whether you spoke with the government lawyers.

I'm not trying to point out the mistake.  I'm just trying to show you that when I'm asking questions, I want you to try to answer them as broadly as possible when I'm asking the question broadly, and then I can be more specific to get to the specifics.  Does that make sense?

A   Sorry.  Sorry.  Was there a question there?

Q   Yes.  My question is -- sorry.  There was not a question there.  There was an instruction there about your answering questions.  We can go back to my prior question.

Page 15

So when I asked you about two minutes ago whether you spoke with anyone today and you told me only your lawyers, was that a misstatement?

MR. HUMPHREYS:  Objection.

MR. SILER:  Objection.  Argumentative.

MR. WARREN:  You can answer.

THE PROCEEDINGS OFFICER:  Who made the objection?

MR. SILER:  Mr. Siler.

THE PROCEEDINGS OFFICER:  Thank you.

THE WITNESS:  My understanding is that King Street represents me in my personal capacity, and the government lawyers present today, who I've also spoken with, represent me in my capacity of my service to the government.

BY MR. WARREN:

Q   Okay.  Did you review any documents in preparation for your testimony today?

A   Yes.

Q   Did -- about how many documents did you review?

A   I don't know.  Maybe 10.

Q   Did any of the documents refresh your memory?

A   Not particularly.

Q   What type of documents were they?

Page 16

MR. HUMPHREYS:  Objection as -- attorney-client privilege.

And instruct the witness not to answer.

MR. WARREN:  Not asking him for the specific documents, I'm asking him for the type of documents.

BY MR. WARREN:

Q   For example, were they contemporaneous documents with your work at the government?  Were they documents prior to your time with the government?  If you could just describe them broadly.

A   They were PDFs.

Q   So, Mr. Farritor, I'm not asking you about the form of the document in terms of whether it was a Word document or a PDF, but the type of document.

A   They were contemporaneous with my time in government, to my recollection.

Q   You said you met with government counsel.  Did you -- how many times did you meet with government counsel prior to your deposition today?

A   In relation to the deposition?

Q   Yes.

A   Once.

Q   When?

A   Last week.

Page 17

Q   Did you discuss facts during that meeting?

A   **Yes.**

Q   Did you go over your testimony?  Did you talk about the testimony you would be providing today?

A   **What do you mean by that?  Could you break that down?**

Q   Sure.  Did you talk with the government lawyers about testimony that you would be providing today?

A   **I mean, there was no, like, scripting or anything like that.  It was just reviewing documents.**

Q   And to be clear, your understanding is that Mr. Siler and Mr. Lynch are here today representing you in your official capacity.

MR. SILER:  Objection.  Misstates prior testimony.  Calls for a legal conclusion.

THE WITNESS:  My understanding is that the government lawyers who are present today represent me in my capacity for service to the government.

BY MR. WARREN:

Q   Have you done any research regarding this litigation?

A   **Not extensively.**

Q   What research have you done?

A   **I called my lawyers.**

Page 18

Q   Have you reviewed any documents in connection with the filing of this case?

A   **With my lawyers?  Yes.**

Q   What documents did you review?

MR. SILER:  Objection --

MR. HUMPHREYS:  Objection --

MR. SILER:  Go ahead.

MR. HUMPHREYS:  Objection on the basis of privilege.

Instruct the witness not to answer.

MR. SILER:  The government has the same objection.

BY MR. WARREN:

Q   Have you reviewed the complaint in this case?

A   **I don't recall.**

Q   Have you reviewed any motions filed in this case?

A   **I don't recall.  It's possible.**

Q   When did you first start reviewing documents in preparation for this case?  Excuse me.  In preparation for the deposition?

MR. HUMPHREYS:  Objection.  Misstates prior testimony.

THE WITNESS:  Last week, I believe.

BY MR. WARREN:

Page 19

Q   And your testimony is you don't recall whether you reviewed the complaint or any filings?

A   **I'm not familiar with the legal definition of "complaint" in this context.**

Q   Have you done any -- read any news articles or -- any news articles about the case?

A   **Not that I can recall regarding this case.**

Q   Mr. Farritor, where are you from?

A   **Nebraska.**

Q   Whereabouts?  You don't need to give me your address, but the city, please.

A   **Eastern Nebraska.**

Q   That's the city?  Eastern Nebraska?

A   **No.  The city is Lincoln.**

Q   And where do you presently live?  What city and state do you live in?

A   **I travel every few weeks.**

Q   And, Mr. Farritor, I'm going to ask that you pay attention to the question and you answer the question.  If you don't understand it, please let me know.  The question was, Where do you presently live?  City and state.

A   **My permanent address is in Lincoln, Nebraska.**

Q   How old are you?

A   **24.**

Page 20

Q   Can you walk me through your education, starting with high school?

A   **Yeah.  I attended various high schools, was homeschooled mostly, and then I attended the University of Nebraska for college.**

Q   Did you graduate high school?

A   **Yes.**

Q   What high school?

A   **I don't recall which high school I legally graduated from.  I believe it was legally a homeschool graduation.**

Q   And did you graduate from the University of Nebraska?

A   **No.**

Q   How long were you there?

A   **Depends on how you count.  Probably three and a half years.**

Q   What did you study?  More specifically, did you have a major?

A   **Computer science and business, to my recollection.**

Q   And can you walk me through your employment history following college?

A   **Yeah.  I worked for an investment fund, and then I worked for the government.**

Page 21

Q   What was the name of the investment fund?

A   I don't know the legal name of the fund.

Q   What did you call the name of the fund?

A   NFDG.

Q   When did you start?

A   2024.

Q   Until when?

A   2024.

Q   When did you drop out of Nebraska?

A   I don't recall when I legally submitted whatever relevant papers.  2023 or 2024.

Q   What about internships?

A   I had several.

Q   Where?

A   I don't recall all of them.

Q   Were you an intern at John Deere?

A   A subsidiary.  Yes.

Q   What did you do there?

A   Robotics.

Q   Were you an intern at SpaceX?

A   Yes.

Q   What did you do there?

A   Starlink and Starship.

Q   And, sir, when were you an intern at John Deere?  From approximately when to when?

Page 22

A   I think 2021 to 2021.

Q   And SpaceX?

A   I think 2022 and 2023.

Q   And you mentioned Starlink.  That's -- that was part of the SpaceX internship or that's different?

A   Starlink is a product that is made by SpaceX.

Q   Any other internships?

A   Yes.

Q   Such as?

A   Interned for the city's parking division once.  I interned at a software development consulting firm.  I interned at another robotics startup.  There are probably others that are not coming to my memory at this time.

Q   You're a Thiel fellow, correct?

A   It's pronounced Thiel.  Yes.

Q   When did you obtain that fellowship?

A   I think 2024.

Q   And what did -- describe that for me, please.

A   It's a fellowship for young people who leave college.

Q   Did it pay?

A   Yes.

Q   How much?

A   I don't recall.

Page 23

Q   Ballpark.

A   Less than a million dollars.

Q   Over what period of time was the fellowship?

A   I don't recall.

Q   Can you estimate?

A   More than six months.  I really don't recall.  And they've been changing the terms quite a bit.

Q   You familiar with something called "The Vesuvius Challenge"?

A   Extremely.

Q   Tell me about that, please.

A   It's an archaeology competition.

Q   You had some involvement in it?

A   I won some of the prizes in it.  Yes.

Q   For what?

A   Figuring out how to read manuscripts from Pompeii -- or next to Pompeii.

Q   When was that?

A   Approximately 2023.

Q   Was there a financial prize reward with that?

A   Yes.

Q   How much?

A   I don't recall.  And I split it with teammates.

Q   Can you estimate?

Page 24

A   100,000.  Something like that.

Q   That was the total prize, or that was what you received after splitting it with teammates?

A   I split it with teammates.  I don't recall exactly how much I got.  And there were multiple tranches.

Q   Do you know Elon Musk?

A   What do you mean by "know"?

Q   Do you know who he is?

A   Yep.

Q   Have you ever met him?

A   Yep.

Q   When did you first meet him?

A   I don't recall.

Q   Do you recall the year?

A   What do you mean by "meet"?

Q   The normal, common sense English definition of the word "meet."

A   I first introduced myself to him in 2025, actually.

Q   Where was that, or how did that occur?

A   I met him in a SpaceX office.

Q   You previously testified you had interned with SpaceX from approximately 2022 to 2023.  Did you meet Mr. Musk during that time?

Page 25

A   Not that I can recall.

Q   What were you doing at the SpaceX office in 2025? Was that part of the internship or something else?

A   I previously testified that the internship had ended prior to 2024, so it was not part of the internship.

Q   So, again, the question is, what were you doing in the SpaceX office in 2025?

A   I was there to meet Mr. Musk.

Q   Describe the meeting, please.

A   I don't recall the specifics.

Q   Where did you meet?

A   In the SpaceX office.

Q   In his office? In a different office? In a suite there?

A   He's majority shareholder of SpaceX, so it's his -- it's all his office.

Q   I understand. I'm talking about his particular office, a suite, the lobby of the building, the elevator?

A   I don't recall. I think a conference room.

Q   About how long did the meeting last?

A   I don't recall. Couple hours.

Q   And what was the purpose of the meeting?

Page 26

A   To meet Mr. Musk.

Q   What did you discuss with him for a couple of hours?

A   I don't have a strong recollection.

Q   Was that the only time you've met Mr. Musk in person?

A   No.

Q   About how many times have you met him in person?

A   It's difficult to estimate.

Q   Fewer than 10?

A   Probably more than 10.

Q   More than 20?

A   I don't know.

Q   You said you first met him in a SpaceX office in 2025. Remember what time of year in 2025?

A   January.

Q   Was it before or after President Trump was inaugurated?

A   Before.

Q   How did the meeting come about? That is, who reached out to whom, how was it set up?

A   I don't recall.

Q   Before that 2025 -- January 2025 meeting with Mr. Musk in person, had you ever spoken with Mr. Musk

Page 27

over the phone or talked to him not in person? Email, texting, signaling, direct messaging over social media?

A   Not that I can recall.

Q   You said you've met with him, I believe, somewhere between 10 and 20 times; is that fair?

A   I testified more than 10, to my recollection.

Q   And I'm sorry, I know I asked this, but I'm forgetting your answer. I asked more than 20. What was your response?

A   I don't know if it's more than 20.

Q   Okay. Describe the interactions with him. I mean, it was more than 10 and perhaps more than 20 times?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: Yeah. I'm not sure I understand the question.

BY MR. WARREN:

Q   Well, give me examples of when you're meeting with him and what you're discussing and how long they last and where they occurred.

A   In the context of government service?

Q   No. In the context of your more than 10 meetings with Mr. Musk since January of 2025.

A   We're both in the same conference room at the same time.

Page 28

Q   Discussing what?

A   Depends on the meeting.

Q   Give me examples.

A   Government work during the time of our overlapping government service.

Q   When was the last time you met with Mr. Musk in person?

A   Sometime last year.

Q   When?

A   I don't recall.

Q   What month?

A   I don't recall.

Q   First six months of the year? Second six months?

A   Probably second, but I'm not really sure.

Q   Have you met with Mr. Musk since he left government service?

A   When did he leave government service?

Q   Asking you.

A   I don't know when he left government service, so I don't know if I can provide a factual answer to that question.

Q   So just so I understand, you testified that you had -- all your meetings with Mr. Musk were -- regard to your overlapping government service. Now

Page 29

you're testifying you don't know when he left service. So I'm trying to understand the apparent inconsistency.

MR. SILER: Objection.

MR. HUMPHREYS: Objection. Mischaracterizes.

BY MR. WARREN:

Q   So my question is, help me understand what I'm missing.

A   I don't know when he left government. So, you know, it's hard to say when I -- I last met to him relative to the date of when he left government, if I don't know when he left government.

Q   So it's possible that you met with him after he left government?

A   It's possible.

Q   And you -- your testimony is you still discussed government -- or government work with him, or did you discuss something different?

A   We may have discussed something different.

Q   How'd you characterize your relationship with Mr. Musk?

A   I work with him in government.

Q   Would you consider him a friend?

A   I don't feel like I know him well enough.

Q   A mentor?

Page 30

A   No. Not directly.

Q   You ever attend social events with him?

A   Yes.

Q   Like what?

A   Parties.

Q   Can you give me examples?

A   I go -- go to a party, and then he is also there.

Q   Like what? Like what party did you attend with him?

A   Just parties. I can't recall a specific example.

Q   You don't remember whose party, where, what the occasion was?

A   I remember a birthday party in San Francisco. That's it.

Q   Have you ever -- have you ever had meals with Mr. Musk?

A   Sometimes during government meetings, someone would bring cheeseburgers into the conference room.

Q   Outside of those government meetings where someone brings cheeseburgers into the conference room, you ever have meals from Mr. Musk?

A   Other than the meals I've had with him, I've not had any meals with him.

Page 31

Q   Wasn't my question. My question is, outside of the meals that you described as someone bringing in food to a government conference room, have you ever had meals with him?

A   Not to my recollection.

Q   You text with him?

A   I think once.

Q   Do you email with him or communicate with him over any other media platform?

A   There may have been government emails where we're both on the thread.

Q   But to your recollection, you have not emailed with him outside of government emails where you're both on the thread?

A   Not to my recollection.

Q   What about via Signal or any other temporary messaging application?

A   I don't have him on Signal.

Q   Do you have his cell phone number?

A   Not to my knowledge.

Q   Have you ever called him?

A   Not directly.

Q   Have you ever spoken with him on the phone?

A   There are lots of group calls and similar.

Q   So I just want to be clear. You don't

Page 32

remember ever speaking with Mr. Musk on the phone, outside of group calls, with him?

A   Yes.

Q   I'll rephrase. Do you ever -- have you ever spoken with Mr. Musk on the phone outside of what you described as group calls?

A   Not to my recollection.

Q   Has he ever called you?

A   What do you mean by called me?

Q   The normal meaning of the word "call," using a phone where it rings and you answer it.

A   There've been group calls or, like, Zoom meetings of sorts.

Q   And for the record, a call can be where you didn't answer it, but he tried to call you.

A   I have no recollection of that occurring. I don't have his phone number, so.

Q   Would you consider Mr. Musk a hero of yours?

A   It sounds extremely loaded. I think he's someone you want to copy in many different ways.

Q   You wouldn't use the term "hero," though, to describe him?

A   I don't know if I would frame my moral structure in terms of having heroes, just people that one would want to emulate.

Page 33

Q   Do you recall a tweet in 2024 where you wrote, "It's not every day that your biggest hero sends $2 million to support your archaeology passion project, but today is not every day.  Thanks, Elon Musk"?

A   I don't have a particularly strong recollection of that.

Q   Okay.  Regardless of whether your recollection is strong or not, do you remember it?

A   Not really.

Q   Where do you currently work?

A   I don't have a job currently.

Q   How do you spend your time presently?

A   Most recently on astronomy.

Q   Doing what?

A   Trying hypotheses for novel ways to interpret telescope data from NASA.

Q   What was your last job?  In the government.  Doing what?

A   I believe I was an employee of the GSA the whole time I was in government.

Q   And so let's talk about your government work.  When did you start with the government?

A   I believe January 20, 2025.

Q   What was your official position or title?

A   It was in the GSA.  I don't recall the

Page 34

official title.

Q   And what were your responsibilities?  I'm sorry.  Strike that.

Did the position change during the time you were in the government?

A   I was an employee of the GSA my whole time in government, to my recollection.

Q   And did your title or position change during - - any time?

A   To my knowledge, my title, whatever it was at GSA, did not change over time, to my knowledge.

Q   When did you leave the government?

A   Second half of last year.

Q   What month?

A   I don't recall.

Q   Tell me about your general responsibilities during your time in the government.

A   I helped with political projects that came from leadership of various agencies and helped with presidential directives.

Q   Who did you report to?

A   In what context?

Q   Your job with the government.

A   I reported to the relevant chain of command of whatever location I happened to be in.

Page 35

Q   So it changed depending on where you were working?

A   The chain of command of government is very complex, and depending on where you might be, it might be different.  Yes.

Q   And specifically, the people that you reported to directly, your chain of command, depended on where you were working on a particular project?

A   Well, when I'm at the GSA -- when I'm at the GSA, you know, I believe I reported to the either administrator or deputy administrator.  But if you're somewhere else, then, you know, you're taking directives from someone else.

Q   And to be clear, when you say "when you're somewhere else," you mean -- I'm talking about your time at the government.

So I understand that your testimony is that the entire time you were with GSA and that you did political projects and presidential directives with multiple agencies.

A   Go ahead.

Q   Is that accurate?

A   That is accurate to my knowledge.  Yes.

Q   So during the time you did those projects and presidential directives at different agencies, were you

Page 36

reporting to people within GSA?

A   No.  When I was on detail somewhere else, as I previously testified, I would report into that agency's chain of command.

Q   So you didn't have dual reporting structures then?  You reported only to the agency's chain of command when you were detailed to an agency?

A   To my recollection, I followed directives from senior agency leadership of whatever relevant agencies were involved.

Q   What agencies were you detailed to during your time in government?

A   I don't recall the full list.

Q   How many agencies approximately?

A   I don't know.  I can't recall.

Q   Name what you can.

A   Executive Office of the President, Department of State, Health and Human Services, Department of War, Department of Energy, USAID.  Did I say Department of Energy already?

Q   You did.

A   I did.  Yeah.  Department of War.  Yeah.  Those are the ones I can recall.  State as well, if I didn't say that.

Q   Did you apply for the job with the government?

Page 37

A   Yes.

Q   Tell me about the application process.

A   There was some online form that PPO put together.

Q   PPO being?

A   I believe the acronym stands for "Presidential Personnel Office."

Q   How did you learn about the application process?

A   I don't recall.

Q   Did you speak with anyone about it?

MR. HUMPHREYS:  Objection.  Vague.

THE WITNESS:  I certainly spoke to people about potentially joining the government.  Yes.

BY MR. WARREN:

Q   Who did you speak with?

A   I don't recall the full list.

Q   Name some of the people on the list.

A   There was a woman from PPO, Josh Gruenbaum, Stephen Ehikian.

Q   Who's Josh Gruenbaum?

A   He was a political appointee in GSA.

Q   And you mentioned Stephen.  How do you spell the last name?

A   Steve Ehikian.  I don't recall how to spell

Page 38

his last name.

Q   What letter does it start with?

A   E as in echo.

Q   And where was -- where did he work?

A   He eventually became the acting administrator of the GSA.

Q   So before you applied to GSA you spoke with Josh and Steve who were both within GSA?

A   I don't recall the precise sequence of events as to when I submitted the formal application or not.  And I also spoke with someone in PPO as well as briefly met Mr. Musk, as prior testified.

Q   Did you communicate with Mr. Musk about working with -- in the government?

A   By the time I had met him, it was already assumed that I would be joining.  I believe I had gotten a formal offer already, if I recall correctly.

Q   When did you get a formal offer?

A   I don't recall precisely when.

Q   Was it 2025 or 2024?

A   I don't recall.

Q   When did you apply for the job?

A   I don't recall.

Q   How soon after the election did you apply for the job versus closer to the election or closer to the

Page 39

inauguration?

A   I don't recall.

Q   You can't ballpark between those roughly two-and-a-half months?

A   That's what?  A 75-day window?  No.  It was a very hectic time of my life.

Q   What was going on?

A   I was joining the government.

Q   So the 75 days were hectic because you were joining the government.  That suggests that the -- joining the government started earlier on in the 75-day period, or am I misinterpreting that?

MR. SILER:  Misstates.

THE WITNESS:  Yeah.

MR. HUMPHREYS:  Argumentative.

THE WITNESS:  The reason that that specific window in time you're describing is because I was joining the government.

BY MR. WARREN:

Q   And what was going on during that time?  Why was it hectic?

A   People were scrambling to prepare the administration.

Q   Why was it hectic for you?

A   Because I was, you know, leaving a prior job

Page 40

and then coming to D.C., and then, you know, speaking with relevant administration future officials about potentially joining the government.

Q   What prior job were you leaving?

A   The one already discussed at an investment fund.

Q   You said it was hectic because you were leaving a prior job, speaking with relevant administration officials about joining the government.  Who are you --

A   Future administration officials.

Q   Thank you.  Future administration officials.  Who are you meeting with?

A   The people I already listed in my prior testimony, as well as other names which I don't directly recall at this moment in time.

Q   So I want to go back to the January 2025 in-person meeting with Mr. Musk.  This is, as you've testified, the first time you've met Mr. Musk in person.

A   My first time introducing myself to him.

Q   Sorry.  Was it your first time meeting him in person?

A   We already went over this in -- in prior testimony.  That was my first time introducing myself to him.

Page 41

Q   You're using the phrase "introducing yourself." I'm asking about meeting with him. I don't understand if you're implying a difference, so I'm asking you again, was that the first time you met him in person?

MR. SILER: Objection. Asked and answered.

MR. WARREN: You can answer.

THE WITNESS: Yeah. It depends on what you define as "meet."

BY MR. WARREN:

Q   I define as meet as two people meeting each other.

A   But what -- what do you -- that's tautological. What do you mean by "meet"?

Q   Do you not understand the word "meet"?

A   I believe there are multiple potential interpretations of the definition of the word in this context, and I'm seeking clarification on which definition you'd like to use.

Q   Well, give me one of your understandings of the word "meet."

A   Introducing oneself to another person.

Q   And what's another definition of "meet"?

A   Being in the same company all-hands meeting.

Page 42

Q   Had you ever had -- did you ever meet Mr. Musk beforehand under the second definition of being altogether in a meeting?

A   To my recollection? Yes.

Q   When was that?

A   SpaceX all-hands meetings.

Q   Did you ever attend any meetings with Mr. Musk regarding your work with the government before the January 2025 meeting when you introduced yourself to Mr. Musk for the first time?

A   No.

Q   During that January 2025 meeting with Mr. Musk, what did you discuss?

A   I don't recall. It was mostly people introducing themselves to him in this conference room.

Q   Who else was there?

A   I don't recall.

Q   You don't recall a single person who was at those meetings -- excuse me. At that meeting besides Mr. Musk?

A   It was definitely a singular meeting. I believe it was comprised primarily of future administration officials, with the exception of Vivek Ramaswamy. I believe he was at the same meeting. I don't recall.

Page 43

Q   Can you name any of the future administration officials?

A   I don't recall any specific names from that meeting, but it plausibly included people like the ones I mentioned earlier.

Q   Are you familiar with the term "DOGE"?

A   I've heard it used before. Yes.

Q   What's your understanding of the term?

A   It can refer to many different things.

Q   Like what?

A   Breed of dog, cryptocurrency, the United States DOGE Service, a bunch of different things.

Q   What's the US DOGE Service?

A   To my understanding, it is a component of the Executive Office of the President.

Q   What's the purpose or mission of the US DOGE Service?

A   I don't know the legal definition.

Q   Asking for your understanding of it.

A   Like all government agencies or components of EOP, it has nebulous or, you know, many overlapping or competing purposes.

Q   And my question is, what's your understanding of its purpose?

A   Primarily -- prior -- sorry. Excuse me.

Page 44

Prior to the second Trump administration, it primarily worked on software engineering projects, and that continued throughout my time in government.

Q   Have you ever heard of the Department of Government Efficiency?

A   It's a term I've heard. Yes.

Q   What's your understanding of that term?

A   It refers to a loose definition of an initiative to fight waste, fraud, and abuse in government.

Q   You're familiar with the US Digital Service?

A   Yes.

Q   What's your understanding of the US Digital Service?

A   It's a prior name for the US DOGE Service. It's the same component of EOP.

Q   Are you familiar with the US DOGE Service Temporary Organization?

A   I believe it's the same thing as the prior two names we discussed for the same thing.

Q   All right. So as you understand, the US Digital Service, the US DOGE Service, and the US DOGE Service Temporary Organization are all the same thing?

MR. HUMPHREYS: Objection to the extent it calls for a legal conclusion.

Page 45

But witness can answer to his knowledge.

THE WITNESS: Yeah. I'm -- I'm not a lawyer, and I'm sure there are relevant documents that define this. To my understanding, they broadly refer to the same entity.

BY MR. WARREN:

Q   All right. For purposes of today, I'll try to refer to that as "the US DOGE Service," but I'm including the US Digital Service and the US DOGE Service Temporary Organization as you've described them, understanding them to be the same thing.

A   Yes. Would you have definitions of -- of those three things, or their differences?

Q   Well, we're here today to learn about your understanding, not mine. During your time with the government, did you ever do work with the US DOGE Service?

A   Yes.

Q   Describe the work generally.

A   I was detailed from GSA into USDS.

Q   When did that detail begin?

A   I don't recall.

Q   How soon after you joined the administration?

A   Less than a month.

Q   Who did you report to at the USDS?

Page 46

A   Whoever the acting director was.

Q   Did that change over time?

A   I think so.

Q   And, Mr. Farritor, to be clear, I'm asking about your time in the government. So if I ask a question, "Did it change over time?"-- if there's any ambiguity, I want you to interpret the question as during your time in the government.

I'm not concerned about what's happened with the agency, for example, after you left the government somewhere in the second half of 2025. Do you understand?

A   Yes.

Q   Okay. So I'm sorry. My prior question was who did you report to in the US Digital Service? And you said you think it may have changed?

A   I don't recall who sat in the billet at what specific point in time. I have some vague memory of a person being swapped out.

Q   Okay. Do you recall the names of either one or both people?

A   I believe Amy Gleason was acting director or administrator of the US DOGE Service for an extended period of time.

Q   Did you have interaction with Ms. Gleason --

Page 47

A   Yes.

Q   -- during your time? Describe the nature of your working relationship with her.

A   We worked on projects within USDS and relevant agencies.

Q   You identified before several agencies that you were detailed to including the State Department, the Defense Department, HHS, Energy, USAID.

Is USDS a separate agency that you were detailed to, or were you detailed to USDS and then through USDS to those other agencies, as you understood it?

A   I don't --

MR. HUMPHREYS: Hold on.

Objection. Misstates prior testimony. And the word "agency" is kind of a characterization that has legal effect. So I don't -- I don't understand you to be asking about the legal definition of agency.

THE WITNESS: Could you restate the question?

BY MR. WARREN:

Q   Sure. You had identified several agencies before that you were detailed to, including the State Department, the Department of Defense, HHS, Department of Energy, and USAID.

Page 48

You just, a moment ago, said you were detailed to the US DOGE Service. Do you include US DOGE Service with those other agencies, or was your work at those other agencies through USDS, with USDS being an intermediary?

MR. HUMPHREYS: Objection to the extent it calls for a legal conclusion.

MR. WARREN: Of course. I'm just asking for the witness' understanding.

THE WITNESS: I -- I don't know the precise legal mechanisms which are used to effectuate a detail. So I don't know.

BY MR. WARREN:

Q   What was your understanding?

A   My understanding is I was detailing to relevant agencies.

Q   Okay. So, for example, when you detailed to the State Department, where did you work? Did you go to the State Department building?

A   Frequently. Yes.

Q   When you were detailed to the Department of Defense, did you go to Department of Defense buildings?

A   Frequently.

Q   Same with HHS?

A   Yep.

Page 49

Q  Same with Energy?

A  Yep.  That one was pretty short-lived.

Q  Same with USAID?

A  Yep.

Q  Same with USDS?

A  Yep.

Q  Okay.  Were your details overlapping with the different agencies, or were there -- strike that.

Were your agents -- were your details overlapping with the different agencies?

MR. HUMPHREYS:  Objection.  Vague.

THE WITNESS:  Yeah.  Define "overlapping."

BY MR. WARREN:

Q  So, for example, did a detail to one agency end before a detail to a different agency began?

A  Sometimes.  Sometimes not.

Q  Were you detailed to -- you said you were detailed to USDS within your first month at the government.  When did that detail end, as you understood?

A  I don't recall.

Q  Did it last throughout your time with the government?

A  Maybe.

Page 50

Q  Most of the way?

A  At least most of the way.

Q  So during that time you were detailed to other agencies as well?

A  Yes.  At times.

Q  And your details with the other agencies, those over -- overlapped with each other?

A  Define "overlap."

Q  Same as I -- we defined it a moment ago.

A  Overlapping in what way?

Q  Like the time of it overlap.

A  Time overlap.  Sometimes.  Yes.

Q  Was Ms. Gleason the first -- your first supervisor within USDS?

A  I don't recall.

Q  Did you have a title during your detail to the US DOGE Service?

A  Maybe.

Q  You don't recall?

A  I don't recall.

Q  What was your salary with the government?

A  I don't recall.

Q  Can you ballpark it?

A  I believe I was an SGE for a time, in which case it would be zero dollars.  Then I became a paid

Page 51

employee, and I don't recall.  Maybe it was GS -- yeah. I don't -- I don't remember.

Q  Well, estimate.

A  GS-13, GS-14?  I don't remember.

Q  And what was the annual salary for those of us who don't have the GS scale memorized?

A  I don't either.  That's why I don't recall.

Q  You make more than $100,000 annually?

A  I don't recall.

Q  How long were you an SGE for?

A  I don't recall.

Q  And to be clear, define "SGE."

A  Special Government Employee.

Q  So you don't recall for how long time -- for how long you were an SGE not getting paid with the government?

MR. HUMPHREYS:  Objection.  Asked and answered.

THE WITNESS:  I don't recall the precise dates of my SGE status.

BY MR. WARREN:

Q  Can you estimate when you started getting paid?

A  Q2 of '25?

Q  Was there an interview process for your

Page 52

employment with GSA?

A  Yes.

Q  Who did you interview with?

A  Someone at PPO.

Q  Who?

A  I don't recall.

Q  How many interviews?

A  At least one.

Q  And you don't recall the names of -- strike that.

Were there different interviewers?

A  The one interview I remember was with one person.

Q  When you were detailed to different agencies, how did you learn of the detail?

A  I don't recall.

Q  Were you told orally that you were going to be detailed to an agency?

MR. HUMPHREYS:  Objection.  Vague as to specifics.

THE WITNESS:  It obviously varied by context.

BY MR. WARREN:

Q  Were you informed in writing?

A  Sometimes.

Page 53

Q    Who told you that you were being detailed to different agencies?

A    **PPO generally handles detail and all personnel matters.**

Q    So I'm not concerned about who handles what generally, but in your specific instances of being detailed to five, six, seven agencies that you've identified, who informed you that you were being detailed to those agencies?

A    **You generally work with PPO on details, so probably someone at PPO.**

Q    Your recollection's probably someone at PPO informed you?

MR. SILER:  Objection.  Asked and answered.  Argumentative.

THE WITNESS:  My recollection is that I worked primarily with PPO on detail agreements.  Yes.

BY MR. WARREN:

Q    And you don't recall the name of the person who told you where you're being detailed?

MR. HUMPHREYS:  Objection.  Asked and answered.

THE WITNESS:  It -- it varies by agency because PPO has different people who focus on different functions.

Page 54

BY MR. WARREN:

Q    My question is, do you not remember the person who told you?

A    **It was multiple people, and I don't remember.**

Q    Okay.  Did you ask to be detailed to any particular agency?

A    **Not to my recollection.**

Q    Did you discuss being detailed to an agency before you were informed that you were, in fact, being detailed to that agency?

MR. HUMPHREYS:  Objection.  Vague.

THE WITNESS:  It is typical with personnel appointments to discuss a potential appointment before the appointment is effectuated.  So yes.  Those -- those discussions did happen.

BY MR. WARREN:

Q    Who were those discussions with?

A    **Primarily PPO.**

Q    Anyone outside of PPO?

A    **Potentially.**

Q    Such as?

A    **No specific names come to mind.**

Q    Did you ever discuss with Elon Musk details to any specific agency?

A    **He's not a fan of discussing paperwork.  So**

Page 55

**no.**

Q    You ever discuss -- you know who Steve Davis is?

A    **Yes.**

Q    Did you ever talk with Steve Davis or communicate with Steve Davis about your detail to different agencies?

A    **Yes.**

Q    What agencies?

A    **I don't recall.**

Q    Ms. Gleason?

A    **Yes.**

Q    What agencies?

A    **I don't recall.**

Q    Sorry.  Just so the record is clear, what agencies did you discuss with Ms. Gleason about being detailed to?

A    **I don't recall.**

Q    During the time you were at -- strike that.

During the time you were detailed to the US DOGE Service, did you have any direct reports other than Ms. Gleason or the person who may have succeeded her that you said you couldn't remember if it happened?

MR. HUMPHREYS:  Objection.  Misstates prior testimony.

Page 56

THE WITNESS:  Could you rephrase the question?

BY MR. WARREN:

Q    Sure.  During your detail to the US DOGE Service, did you report to anyone other than Ms. Gleason or whoever may have succeeded her during your time there?

MR. HUMPHREYS:  Same objection.

THE WITNESS:  I may have reported to the person who preceded her.

BY MR. WARREN:

Q    Do you know who that was?

A    **No.**

Q    No one else other than those two people?

A    **Not to my recollection.**

Q    Do you know what Ms. Gleason's title was?

A    **I believe it was Acting Administrator or Director of the USDS.  Or it may not have been acting, actually.**

Q    Now, we discussed Steve Davis for a moment.  Who is Steve Davis?

MR. HUMPHREYS:  Objection.  Vague.

THE WITNESS:  Yeah.  A guy.

BY MR. WARREN:

Q    What do you know about him?

Page 57

A    He likes tunnels.

Q    He likes what?

A    He runs a tunnel digging company.

Q    Did you ever work with Steve Davis prior to your time in government?

A    We may have concurrently been employees at SpaceX.

Q    Did you work with him? Did you interact with him during your time at SpaceX?

A    Not during my time of employment at SpaceX. Not directly interact.

Q    Did you interact with him prior to your time in the government?

A    We met before.

Q    When?

A    2024, 2025.

Q    You used the term "meet." You said "We met before." What do you mean by "met"?

A    Introduce myself to him.

Q    Where was that?

A    I think on the phone.

Q    What did you discuss?

A    I don't recall.

Q    Did you talk about your work with the government?

Page 58

A    I had no work with the government at that time.

Q    Did you talk about your upcoming work with the government?

A    I don't recall.

Q    Did you talk about transitioning to work for the government during the hectic time?

A    Potentially. I don't recall.

Q    What was your understanding of Steve Davis' role with regard to -- as it pertained to your transition to the government during that time?

A    He was a future administration official.

Q    And that's why you were speaking with him?

A    Yes.

Q    Did you -- tell me about your conversations -- the subject of your conversations with him as it pertained to future government service?

A    Could you rephrase the question?

Q    Yeah. Tell me about your conversations with Mr. Davis prior to the time that you joined government about your transition to working for the government, and including the work you anticipated to be doing with the government.

A    Sorry. Could you break that down?

Q    Yeah. What did you talk about with Mr. Davis

Page 59

prior to joining the government?

A    The future administration.

Q    Please explain.

A    General discussions about what mechanisms exist within the government, like how the administration works, and potential social dynamics within the future administration.

Q    Let's break that down. What do you mean by about how government works? The mechanisms of government?

A    He explained to me what an agency was.

Q    Did you not understand what an agency was before speaking to Mr. Davis?

A    Not as well as I did after. For example, here at the table, we don't know if US DOGE Service was an agency. It's a hard term to define.

Q    Did you discuss with Mr. Davis the US DOGE Service?

A    I don't recall.

Q    Did you discuss with him DOGE, as in the Department of Governmental Efficiency, which you characterized, I'm not trying to quote you verbatim, as a group or organization focused on fraud, waste, and abuse in the government?

MR. HUMPHREYS: Objection. Misstates

Page 60

prior testimony.

THE WITNESS: He may have mentioned it.

BY MR. WARREN:

Q    You don't recall specifically?

A    It may have come up. I don't recall a specific conversation.

Q    And how many times did you speak with Mr. Davis? By "speak," I mean communicate. So including over the phone, written communications prior to joining the government regarding your work, potential work, expected work at the government?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: I don't -- yeah. Could you break that question down?

BY MR. WARREN:

Q    Yep. So in the time frame after the election in November of 2024, until you joined the government in January 20, 2025, how many times did you speak with or communicate with Mr. Davis?

A    How many times did I communicate? I don't recall a precise number.

Q    Can you estimate?

A    10 times.

Q    More than one in-person meeting?

A    Yes.

Page 61

Q   More than one telephonic conversation?

A   Yes.

Q   More than one written communication, email or text or some other application?

A   Probably.

Q   And all those conversations were, as you described, general discussions about how the administration works, how agencies work, and potential social interactions?

A   I would more so characterize it as descriptions of how government processes operate in relevant terms as well as ongoing and future social dynamics.

Q   What do you mean by "ongoing and future social dynamics"?

A   It's politics.

Q   Explain.

A   There's a lot of politics in the administration.

Q   What do you mean by that?

A   There's a lot of people working on different projects and -- and the like.

Q   Your testimony is you discussed with Mr. Davis social interactions within the government that you've described as politics, which you've described as

Page 62

different people working on different projects?

MR. HUMPHREYS:  Objection. Argumentative.

THE WITNESS:  Yeah.  Among many other things.  Politics is more than just projects.

BY MR. WARREN:

Q   Well, what else do you mean?  And I'm referring to your discussions with Mr. Davis.

A   Social dynamics.

Q   Such as?

A   Who would occupy what billet.  Like, you know, who's going to be Treasury Secretary.  You know, those kinds of questions.

Q   Was that a specific conversation you had with Mr. Davis, or just giving an example of the type?

A   I'm giving an example.  I don't recall the precise example being discussed.

Q   Do you know who Marco Rubio is?

A   Yes.

Q   Have you ever -- have you ever communicated with him?

A   We're probably on some email chain somewhere.

Q   Have you ever directly spoken with him?

A   Not to my recollection.

Q   Have you ever directly communicated with him?

Page 63

A   Other than the aforementioned stuff?  Not to my recollection.

Q   You ever meet him?

A   Maybe we walked past each other in the hallway.

Q   Who's Peter Marocco?

A   A guy.

Q   What's his position?  How do you know him?

A   I -- I don't know his current position.

Q   How do you know him?

A   Oh.  We met during time in government.

Q   Did you meet prior to your time in government?

A   Maybe.

Q   You don't remember?

A   I don't recall.

Q   How many times have you spoken with him or communicated with Mr. Marocco?

A   I don't recall.

Q   More than 10?

A   Probably.

Q   More than 20?

A   I don't know.

Q   Was your communication with Mr. Marocco limited to the time when you were in government, including -- as you said, potentially including the time

Page 64

before he joined government?

MR. SILER:  Objection.  Form.

THE WITNESS:  Could you rephrase the question?

BY MR. WARREN:

Q   Sure.  When was the last time you spoke with Mr. Marocco?

A   A month or two ago.

Q   When was the last time you communicated with him?

A   I believe a month or two ago.

Q   What were you talking about?

A   I don't recall.

Q   How many times have you communicated with Mr. Marocco since he left the government?

A   I don't recall.

Q   Can you estimate?

A   Twice.

Q   And one you said was a month or two ago.

A   Yes.

Q   And the other?

A   I don't recall.

Q   Do you -- you said you don't recall what you spoke about with him a month or two ago.  Do you recall what you spoke about with him on the prior

Page 65

communication?

A    I don't recall.

Q    Okay. Let's focus on --

MR. WARREN: Oh. Who's speaking?

THE PROCEEDINGS OFFICER: Oh. I'm so sorry, Counsel. I was going to ask, when we have a moment, do you think we could take a restroom break?

MR. WARREN: Yeah. Yes. Of course. Good now?

THE WITNESS: Yeah.

THE PROCEEDINGS OFFICER: Okay. Well, if it's good for everybody else, I'll take us off the record.

MR. WARREN: Off the record. Thank you.

THE WITNESS: How much time was that? An hour?

THE PROCEEDINGS OFFICER: Off the record at 11:13 a.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER: We are back on the record. The time is 11:22 a.m., Eastern Time.

BY MR. WARREN:

Q    Mr. Farritor, we were discussing your interactions with Peter Marocco. Tell me about your interactions with him during the time you were in the

Page 66

government.

A    He was a government official.

Q    What was his position?

A    He was at State and USAID, to my understanding.

Q    Did you interact with him with regard to your details at State and USAID?

A    Yes.

Q    Did you report to him directly?

A    I don't recall.

Q    Did you report to him indirectly?

A    He was a member of agency leadership for both State and USAID.

Q    And as a member of agency leadership at both State and USAID, did you report -- you reported to him indirectly during your details at those agencies?

MR. HUMPHREYS: Objection. Ambiguous as to time period.

But you can answer.

THE WITNESS: He was part of a group that would issue directives as part of senior agency leadership, and I would often be involved with applying those directives.

BY MR. WARREN:

Q    Did you meet or speak with Mr. Marocco before

Page 67

you started in government?

A    Not to my recollection.

Q    Who is Jeremy Lewin?

A    Also a government official.

Q    Have you ever met him?

A    Yes.

Q    When was the first time you met him?

A    I don't recall.

Q    When was the first time you spoke with him or communicated with him?

A    I don't recall.

Q    Was it before your work in the government?

A    I -- I think so. Not sure.

Q    Was it during the transition period from the November 24 election before the inauguration?

A    It was during that period or shortly after inauguration.

Q    How many times have you met Mr. Lewin?

A    A decent number.

Q    Can you estimate?

A    More than 10.

Q    All during your time at the government, including what you just testified that may have been -- some may have been before inauguration?

A    Some may have been before, and we remain

Page 68

social friends afterwards.

Q    When was the last time you spoke or communicated with him?

A    Maybe last week, I'm not sure.

Q    About what?

A    Some kind of foreign policy matter, I don't recall what.

Q    Did you talk with him at all about your deposition today?

A    I may have mentioned that it's occurring.

Q    Did you discuss anything else about the deposition?

A    We did not discuss the substance of my testimony.

Q    Did you discuss anything else about the deposition other than you mentioning -- potentially mentioning that it was happening?

A    He -- I don't recall. He may have referenced records that were uploaded in violation of court orders.

Q    What do you mean?

A    Some records may have been uploaded that do not comply with court orders, and I don't recall specifically, but he may have mentioned that.

Q    You say he may have mentioned that. Did you discuss that topic with somebody else, or is it not

Page 69

clear in your memory whether you discussed that specific topic with Mr. Lewin?

A    It's not clear in my memory if I discussed that specific topic with Mr. Lewin.

Q    During the transition -- and by "transition," I mean the time between the -- excuse me. The time between the election and inauguration.

Did you discuss work that DOGE, in terms of this -- sorry. How do you describe DOGE again? I want to make sure I'm using your characterization.

A    I -- I think it's difficult to give one specific definition of DOGE.

Q    Well, how would you characterize DOGE?

A    I mean, as discussed prior, it can mean many things.

Q    In the context of the government?

A    It can either refer to the United States DOGE Service, which is a component of the Executive Office of the President, or it can refer to a presidential-wide directive to eliminate waste, fraud, and abuse.

Q    Okay. So covering those two definitions, the US DOGE Service or a presidential-wide effort to address fraud, waste, and abuse, did you ever discuss that DOGE? And for the rest of the deposition, when I use the term "DOGE," that's what I'm going to refer to. Do you

Page 70

understand?

A    Yes.

Q    And I'll try to do my best to distinguish between DOGE encompassing those two efforts versus the USDS or US DOGE Service, referring specific to the agency as you've described it. Understood?

A    Understood.

Q    Okay. So during the transition, did you ever communicate with anybody about DOGE?

A    Yes.

Q    When was the first communication you had that you recall?

A    I don't recall a specific communication.

Q    Who did you speak with about DOGE during the transition?

A    Future administration officials and friends.

Q    What future administration officials?

A    Primarily, the ones that have already been discussed in prior testimony.

Q    Such as?

A    Came up briefly with, like, Ehikian, Gruenbaum, that crowd.

Q    So let's stop there for a minute. Describe generally the nature of your communications with the GSA employees that you just defined -- you just identified

Page 71

regarding DOGE.

MR. HUMPHREYS: Objection. Misstates prior testimony.

THE WITNESS: Could you rephrase the question?

BY MR. WARREN:

Q    Yeah. Tell me about your conversations with the GSA officials or future GSA officials about DOGE during the transition.

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: Yeah. It may have been discussed. I don't recall specifics.

BY MR. WARREN:

Q    You don't recall what you were talking about with regard to DOGE?

MR. HUMPHREYS: Objection. Argumentative.

THE WITNESS: Correct.

BY MR. WARREN:

Q    All right. Who else outside of those GSA officials?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: I don't recall the full list.

BY MR. WARREN:

Page 72

Q    You said some of the same people we've discussed. I'm asking you for names.

A    PPO.

Q    Any people's names you reckon -- you remember at PPO with whom you discussed DOGE during the transition?

A    I don't recall any specific names.

Q    Did you just discuss DOGE with -- strike that. During the transition, did you discuss DOGE with Elon Musk?

A    Maybe. I don't recall a specific conversation, though.

Q    About Steve Davis? Same question.

A    Maybe. I don't recall a specific conversation.

Q    Jeremy Lewin?

A    Probably came up at some point, but I don't recall when I first met him.

Q    Peter Marocco?

A    I don't know if I met him prior to inauguration.

Q    Were there any meetings, in person or virtual, with -- discussing DOGE during the transition?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: Could you rephrase the

Page 73

question?

BY MR. WARREN:

Q   Yes.  During the transition, did you attend or participate in any meetings, online or in person, regarding DOGE?

A   **There were meetings about the upcoming Trump administration.**

Q   Specifically regarding DOGE as you've defined it?

MR. HUMPHREYS:  Objection.

I think you defined it.

THE WITNESS:  That is true.

MR. WARREN:  I'm relying on the witness' description of DOGE.  I can go back and have it read from the record if it would help.

THE WITNESS:  Could you rephrase the question?

BY MR. WARREN:

Q   Sure.  First, do you remember how you described DOGE as covering -- and I'm paraphrasing what you said, both the US DOGE Service and a group that was tasked with presidential directives covering fraud, waste, and abuse.

MR. SILER:  Objection.  Misstates prior testimony.

Page 74

You can answer.

THE WITNESS:  Yeah.  I would -- not sure that's exactly what I said.  I would more so characterize the latter portion of that rephrased definition as, like, a presidential directive to eliminate waste, fraud, and abuse.

BY MR. WARREN:

Q   Okay.  So, again, with that definition of DOGE that you have provided, what meetings, if any, did you attend during the transition discussing DOGE?

A   **I don't recall the full list.**

Q   More than one?

A   **I mean, I'm sure it was brought up in my PPO interview.**

Q   What other meetings?

A   **It may have come up in social gatherings or that meeting with Mr. Musk.**

Q   Did you attend any meetings, either in person or online, discussing DOGE's work, this is during the transition, dealing with federal employees?

MR. SILER:  Objection as to form.

THE WITNESS:  Could you rephrase the question?

BY MR. WARREN:

Q   During the transition, did you attend any

Page 75

meetings in any form discussing DOGE with regard to how to deal with federal employees?

MR. SILER:  Objection.  Form.

THE WITNESS:  There were instances where discussions occurred regarding specifics of federal employment, how that works, the social dynamics behind it, how political appointees work, et cetera.  I don't recall any that were in specific relation to DOGE.

BY MR. WARREN:

Q   Did you attend to anything that could be described as training session, boot camp, anything of that sort, during the transition with regard to DOGE?

MR. SILER:  Objection.  Vague.

THE WITNESS:  I may have received the standard ethics briefings or similar.

BY MR. WARREN:

Q   Have you ever seen the presidential -- excuse me.  Have you ever seen the President's executive order establishing the US DOGE Service?

A   **I probably have read it at some point in the past year and a half.**

Q   Mr. Farritor, I'm handing you what's been marked as Farritor Exhibit 1.

(Farritor Exhibit 1 marked for identification.)

BY MR. WARREN:

Page 76

Q   Let me know if you recognize that document.

A   **This appears to be the executive order that we just discussed.**

Q   And the date of the order is January 20, '25?

A   **That's what it says here.**

Q   And the title is "Establishing and Implementing the President's Department of Government Efficiency"?

A   **That appears to be the title.**

Q   And if you look at Section 1 on the first page, the purpose:

"This executive order establishes the Department of Government Efficiency to implement the President's DOGE agenda by modernizing federal technology and software to maximize governmental efficiency and productivity."

Did you have a different understanding of the Department of Government Efficiency?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  Could you rephrase the question?

BY MR. WARREN:

Q   Did you have a different understanding, or do you presently have a different understanding of the Department of Government Efficiency?

Page 77

A   I think my understanding is consistent with this document as provided.

Q   And the rest of that sentence says, "by modernizing" -- oh. I'm sorry. I just read that. The rest of the sentence that describes the work that the Department of Government Efficiency is going to do, is that consistent with your understanding of its purpose?

MR. SILER: Objection.

I'm just not sure what you're referring to.

MR. WARREN: Yeah. I'm sorry. That was clumsy.

BY MR. WARREN:

Q   The end of that sentence, Mr. Farritor, is that consistent with your understanding of the purpose of the Department of Government Efficiency?

A   Well, it says in this sentence that it is -- it establishes the Department of Government Efficiency to implement the President's DOGE agenda by doing the latter part of that sentence, which is modernizing technology and software to maximize government efficiency and productivity.

So I don't think it would be an accurate reading of the English as written to state that only the latter half of the sentence after the -- the word "by,"

Page 78

is the only thing that is being implemented.

Q   My question is, is that consistent with your understanding of the Department of Government Efficiency the purpose thereof?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: This document is consistent with my understanding of the Department of Government Efficiency.

BY MR. WARREN:

Q   If you turn to the second page of the document, subsection 2C under DOGE teams --

MR. SILER: Objection. That's --

MR. WARREN: Is it three?

MR. SILER: It's three. Yes.

MR. WARREN: Sorry. Thank you.

MR. SILER: (Indiscernible.)

MR. WARREN: SubSection 3C. My apologies.

THE WITNESS: 3C. That is --

MR. WARREN: Top of the second.

THE WITNESS: Yeah. Section 3. Yep. Okay. Got you.

BY MR. WARREN:

Q   There's a description there of DOGE teams. I won't read the whole thing, but if you could review

Page 79

that. I'm focused where it says, "Each DOGE team will typically include one DOGE team lead"?

A   Mm-hmm.

Q   Is this consistent with your understanding of how DOGE would operate at different agencies?

MR. SILER: Objection. Ambiguous.

You can answer.

THE WITNESS: This is consistent with my understanding of the executive order, but executive orders are not always followed, or plans might change.

BY MR. WARREN:

Q   Based on your experience at different agencies during the time that you were with the US DOGE Service, was this executive order not followed?

MR. SILER: Objection. Ambiguous. Mischaracterizes.

THE WITNESS: I don't know the precise ins and outs of the executive order, so it's difficult to have a complex opinion on that.

BY MR. WARREN:

Q   Section 4 immediately below describes modernizing federal technology and software to maximize efficiency and productivity. Please read that section.

A   Got you.

Q   Is that consistent with your understanding of

Page 80

work that DOGE teams -- of the work that DOGE teams were expected and required to do?

MR. HUMPHREYS: Objection to lack of foundation.

THE WITNESS: Could you rephrase the question?

BY MR. WARREN:

Q   Sure. Is the definition -- the description under Section 4, consistent with your understanding of what the US DOGE Service was doing?

MR. HUMPHREYS: Same objection.

Go ahead.

THE WITNESS: This appears to be consistent.

BY MR. WARREN:

Q   Does any of the work that you did at the US DOGE Service fall under the work that is referenced in this executive order, as you understand it?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: Yes. My -- my work was done in accordance with presidential directives, including executive orders.

BY MR. WARREN:

Q   And did you consider yourself to be a member - - a member of a DOGE team at any agency?

Page 81

A   In practice, those roles were not well defined.

Q   Did you consider yourself to be, regardless of whether the roles were well defined, a member of a DOGE team at any agency where you were detailed?

A   Yes.

Q   What agencies did you consider yourself a member of a DOGE team at?

A   At the Department of War, the DOGE team is extremely well defined and has a dedicated office and reporting structure.

Q   And you considered yourself to be a member of the DOGE team during your detail to the Defense Department?

MR. HUMPHREYS:  Objection. Mischaracterizes.

THE WITNESS:  Yes.  That is where I was assigned by PPO.

BY MR. WARREN:

Q   My question is, during your detail at the Department of Defense, did you consider yourself to be a member of the DOGE team?  Yes or no?

A   Yes.  I already answered that.

Q   At Department of Energy, same question.

A   I don't recall.

Page 82

Q   At the State Department?

A   I don't recall.

Q   At USAID?

A   I don't recall.

Q   In the last several questions I asked you were about whether you considered yourself to be a member of the DOGE team at any of those agencies.  Did anyone else tell you that you were a member of the DOGE team at any of those agencies?

A   Personnel appointments are generally made by PPO, so they may have had an opinion, but I don't recall specifics.

Q   Do you recall whether somebody told you that you were a member of a DOGE team at any of the agencies we discussed?

A   I don't have a specific recollection.

Q   Who is the DOGE team lead at the Defense Department during the time you were there?

MR. HUMPHREYS:  Objection.  Strike that.

THE WITNESS:  Sorry.  Procedural question.  You're striking the objection?

MR. HUMPHREYS:  Yes.  You can answer.

THE WITNESS:  Okay.

I don't recall.  There was some drama there.

Page 83

BY MR. WARREN:

Q   And those social dynamics, as we've been calling them?

A   Yeah.

Q   Who is the head of the DOGE team -- strike that.

Who is the DOGE team lead at the State Department during the time you were detailed there?

A   I don't recall.

Q   Same question for the Department of Energy?

A   I don't recall.

Q   Same question for USAID?

A   I don't recall.

Q   Did this executive order -- strike that.

Did you understand this executive order to guide the work that you were doing at those agencies during your details?

MR. HUMPHREYS:  Objection to the extent it calls for a legal conclusion.

But you can answer.

THE WITNESS:  I -- I understand all my work that I do in the executive branch of government to be in compliance with executive orders.

BY MR. WARREN:

Q   My question was slightly different.  Question

Page 84

was whether you understood this executive order to guide the work that you were doing at those agencies.

MR. HUMPHREYS:  Same objection.

THE WITNESS:  I would not understand why this executive order would be an exception to that.

BY MR. WARREN:

Q   Let's talk about USAID.  When did you first start discussing any work regarding USAID?

MR. HUMPHREYS:  Objection, vague.

THE WITNESS:  I don't recall.

BY MR. WARREN:

Q   During the transition?

A   I don't recall.

Q   Prior to the transition?

MR. HUMPHREYS:  Objection.  Form.

THE WITNESS:  Not prior to the transition.

BY MR. WARREN:

Q   So it was either during the transition or after, after the inauguration?

A   Yeah.  It depends on how you define the words in the question.  But yeah.

Q   Well, the words in the question are when did you first start discussing USAID?

MR. HUMPHREYS:  Objection.  Form.

Page 85

THE WITNESS: We -- there was some data aggregation that I helped with that listed spending at various agencies, and I'm sure USAID was in some of those lists.

BY MR. WARREN:

Q   That was before the inauguration or after?

A   From publicly available sources, I believe before.

Q   What other conversations do you recall having about USAID, if any, before the time you were detailed there?

A   I -- I don't have specific recollections of any conversations.

Q   What about communications?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: I don't recall.

BY MR. WARREN:

Q   When did you first learn that you were going to be detailed to USAID?

A   I don't recall.

Q   Who told you you were going to be detailed to USAID?

A   I don't recall.

Q   How were you informed you were going to be detailed to USAID?

Page 86

A   I don't recall.

Q   Did you speak with Elon Musk about your detail to USAID prior to detailing?

A   I don't think so.

Q   Did you speak with Steve Davis about your detail to USAID before it began?

A   I don't recall.

Q   Jeremy Lewin?

A   I don't recall.

Q   Peter Marocco?

A   I don't recall.

Q   Amy Gleason?

A   Don't recall.

Q   Before your detail to USAID, did you have an understanding of what your responsibilities were going to be for that detail?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: I -- I don't recall having a discussion one way or another.

BY MR. WARREN:

Q   Or any other communication that would have given you an understanding of your responsibilities?

A   I imagine it would be in compliance with executive orders such as this one. But I don't recall any specific communications.

Page 87

Q   So you don't recall whether when you showed up -- strike that.

So you don't recall whether when your detail to USAID began, you had an idea of what you'd be doing or whether you learned it after?

MR. HUMPHREYS: Objection as to form.

THE WITNESS: I -- I don't recall when I started receiving specific directives.

BY MR. WARREN:

Q   What's the first thing you do recall about your detail to USAID?

A   I recall visiting the building.

Q   That's your earliest recollection of work at USAID?

A   I think so, but I don't have a strong memory here.

Q   Can you tell me about major projects you worked on at USAID?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: Can you rephrase the question?

BY MR. WARREN:

Q   What major projects did you work on at USAID?

A   They were all primarily, senior agency leadership would issue directives, sign memos, whatever.

Page 88

And then myself and many other politicals would work with career officials to implement those directives and to trust but verify that they were implemented as directed.

Q   And describe the nature of the directives.

A   I don't recall any specific instances.

Q   I'm asking about your work at USAID. You've described a process by which you would follow what agency officials told you to do and work to make sure that it was implemented.

I'm trying to understand the nature of those projects. Were you cleaning the floors? Were you writing policy? Were you doing the software improvement modernization?

MR. HUMPHREYS: Objection. Argumentative.

THE WITNESS: I spilled my chips once. So yeah. I think I was cleaning the floor at some point.

BY MR. WARREN:

Q   That was part of your responsibilities at USAID?

A   Yeah. I consider that a responsibility to clean that up.

Q   Well, what other responsibilities did you have

Page 89

at USAID other than cleaning the floors when you spilled your chips?

A   Implementing other agency directives.

Q   Like what?

MR. HUMPHREYS: Objection. Asked and answered.

MR. WARREN: It hasn't been answered.

THE WITNESS: I apologize. Could you -- could you rephrase the question?

BY MR. WARREN:

Q   Like what? That was the question. Like what?

MR. HUMPHREYS: He has answered that he hasn't -- that he does not recall.

THE WITNESS: There -- there were a number of memos, directives, et cetera, that were issued.

BY MR. WARREN:

Q   Like what?

A   I don't recall any specific memos.

Q   You don't recall the nature of the projects that you did at USAID other than cleaning the floors?

MR. HUMPHREYS: Objection. Argumentative. Asked and answered.

THE WITNESS: I don't recall any specific projects or work streams.

Page 90

BY MR. WARREN:

Q   What about general projects or work streams?

A   USAID was folded into the State Department.

Q   That was your responsibility?

A   No.

Q   What was your typical day during your detail at USAID?

A   It was quite chaotic. It's hard to give a general example.

Q   Well, give an example of a chaotic day then, please.

A   Going to lots of meetings.

Q   How much discretion did you have during your work at USAID?

A   Senior agency leadership would issue directives, and then it was our responsibility as the other politicals in the agency to implement those directives.

Q   Were you performing ministerial tasks as you understood them?

A   Could you define that word?

Q   Sure. Ministerial tasks meaning you were following orders in a very specific way as opposed to having discretion to the way that you effectuated the directives you were given?

Page 91

MR. HUMPHREYS: Objection to form. And to the extent it calls for a legal conclusion.

But you can answer.

THE WITNESS: Could you break down the question a bit?

BY MR. WARREN:

Q   If you can just -- we can have it read back too.

A   It varied from case to case, and was often done in consultation with -- with many others.

Q   Explain.

A   Processes are complex and one would have to work with a large number of people to implement something, especially in a place that is as fragmented and inefficient as the federal government.

Q   How did you communicate with people when you were at USAID?

A   It varied.

Q   In-person meetings?

A   Frequently.

Q   Telephone conversations?

A   Sometimes.

Q   Email?

A   Frequently.

Q   Other written communications?

Page 92

A   Like what?

Q   Signal, WhatsApp, similar messaging platforms.

A   To my recollection, substantive matters were not discussed on messaging platforms other than ones within the agency.

Q   Were there messaging platforms within USAID?

A   Yeah. Probably.

Q   Did you use them?

A   Maybe.

Q   Google Meet? Google Chat?

A   It's possible. I -- I don't recall exactly what IT they had and I'm sure they had overlapping and redundant things.

MR. HUMPHREYS: Can I just set the record, because I think you talked over each other. You were answering about Google Meet, right?

THE WITNESS: Yes.

MR. HUMPHREYS: Okay.

THE WITNESS: Yes. Google Meet.

MR. WARREN: And I --

THE WITNESS: Within -- within USAID. Yes.

MR. WARREN: And I added Google Chat.

THE WITNESS: Yeah. Whatever it's called.

Page 93

BY MR. WARREN:

Q   Who was your direct supervisor during the detail to USAID?

A   I don't recall.

Q   Did it change over time?

A   Many politicals were cycled in and out, so potentially.

Q   Your direct supervisor potentially changed over time?

A   I don't recall who my direct supervisor was.

Q   And forgive me if I asked this before.  When was your detail to USAID, from when till when, to the best of your recollection?

A   I don't recall precise dates.

Q   Approximately?

A   Near the beginning of the administration to something like Q2, Q3 '25.

Q   But -- yeah.  And you said you didn't recall whether you identified as a member of the DOGE team at USAID.  Do you know other members of the DOGE team at USAID during your time?

MR. HUMPHREYS:  Objection.  Misstates prior testimony.

THE WITNESS:  Could you rephrase the question?

Page 94

BY MR. WARREN:

Q   You testified that you did not -- did not recall whether you considered yourself to be a member of the DOGE team at USAID.  Do you recall other members of the DOGE team at USAID?

A   There were a number of people who were there to both implement presidential directives surrounding waste, fraud, and abuse.  Yeah.

Q   Such as?

A   I think everyone was there to eliminate waste, fraud, and abuse.

Q   Who were members of the DOGE team at USAID?

A   I think everyone was there to eliminate waste, fraud, and abuse.

Q   Who were members of the DOGE team at USAID, if you can name the names, please?

MR. SILER:  Objection.  Asked and answered.

MR. HUMPHREYS:  And lack of foundation.  But go ahead.

THE WITNESS:  I'm getting into definitions here, of course, but for people implementing presidential directives to eliminate waste, fraud, and abuse, everyone was working on that directive.  At least I don't know of an exception.

Page 95

BY MR. WARREN:

Q   I'm talking about the DOGE team as defined in Exhibit 1, which is in front of you.

A   Yep.  I don't know who was identified as a DOGE -- what does it say?  I don't know who was formally defined to fit within the roles described here in Section 3C.

Q   And outside of formal definitions, who did you consider to be members of the DOGE team?

MR. HUMPHREYS:  Objection.  Foundation.

THE WITNESS:  I don't recall.  I was not trying to go and pick and choose and put a hat on everyone, you know.

BY MR. WARREN:

Q   Was Elon Musk -- strike that.

Did you consider Elon Musk a member of the DOGE team at USAID?

A   My understanding is he was a senior advisor to the President.

Q   Is that a no?

A   To my knowledge, he was not a political appointee at USAID or an employee of any sort.

Q   Steve Davis?

A   I don't recall.

Q   Jeremy Lewin?

Page 96

A   I don't recall a specific role at specific points in time.

Q   And I'm talking about who you considered to be members of the DOGE team at USAID.  Jeremy Lewin?

A   I don't recall if I considered him to be a member of the DOGE team.

Q   Peter Marocco?

A   I -- I don't recall if he was a member of the DOGE team as defined in Section 3C of this exhibit.

Q   Amy Gleason?

A   I don't recall if she was even an employee there.

Q   Gavin Kliger?

A   I don't recall.

Q   Ed Coristine?

A   I don't recall if he was defined to be in -- in the DOGE team as defined in Section 3C.

Q   Again, I'm not -- to be clear, not concerned about whether he's defined to be, but based on your understanding.

MR. SILER:  Objection.  Argumentative.  And lack of foundation.

But go ahead.

THE WITNESS:  To my understanding -- sorry.  Who -- who is the person we're asking about?

Page 97

BY MR. WARREN:

Q   Ed Coristine, I believe, was the last one.

A   **To my understanding, many of these people were never explicitly told that they were in what we defined as Section 3C of this, you know, exhibit, or, like, who was in that and who was not.**

**But everyone was working on presidential directives, or specifically executive orders including ones to eliminate waste, fraud, and abuse.**

Q   You described DOGE as encompassing two functions; presidential directives regarding fraud, waste, and abuse, and the US DOGE Service. You were detailed to the US DOGE Service; is that accurate? That is your --

MR. SILER: Objection. Argumentative. And mischaracterizes.

I'm sorry. I didn't mean to cut you off.

THE WITNESS: So my understanding is that I was detailed to the component of the Executive Office of the President called the United States DOGE Service. That is my understanding.

BY MR. WARREN:

Q   But you don't recall whether you considered yourself a member of the DOGE team at USAID, despite your detail to the US DOGE Service?

Page 98

MR. HUMPHREYS: Objection. Argumentative. And asked and answered.

THE WITNESS: So it says here, "Each agency head shall establish within their respective agencies a DOGE team of at least four employees." Nobody ever told me if I was part of a DOGE team of at least four employees at any agency except for, I guess, the Department of War.

BY MR. WARREN:

Q   I recall -- I believe you testified your earliest memory of work at USAID was when you showed up at the building. When was that?

A   I don't recall.

Q   After inauguration?

A   Yes.

Q   Who did you go there with?

A   I don't recall.

Q   Why did you go?

A   I believe there was a meeting.

Q   To do what? Or to discuss what?

A   I don't recall.

Q   Who attended the meeting?

A   I recall meeting Jason Gray.

Q   How did you get into the building when you first showed up?

Page 99

A   **I don't recall.**

Q   Had you been granted access before the meeting?

A   **What do you mean by that?**

Q   Had you been given a badge or any other ability to walk into the building?

A   **I may have been given a badge. I don't recall.**

Q   The building is secure, correct?

A   **Ostensibly.**

Q   It's not anyone can just walk off the street, in theory, right, into the USAID headquarters?

A   **At that time -- at that point in time, there were no career officials, to my understanding, granting unauthorized access. So I -- to my understanding, that would be a correct statement.**

Q   But you don't recall whether you were given that ability to access the building before or after you showed up?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: Maybe I was on some visitor list or something like that.

BY MR. WARREN:

Q   What happened when you arrived?

A   **To my recollection, I checked in with security**

Page 100

**and then was escorted to the meeting room.**

Q   Who did you meet with?

A   **As already discussed, I recall meeting Jason Gray. I presume other politicals were there.**

Q   Do you remember anyone else there?

A   **Not specifically.**

Q   At a certain point, did you obtain access to be able to enter the building by yourself?

A   **To my recollection? Yes.**

Q   How did you obtain that?

A   **I -- I was a political appointee who was detailed.**

Q   And what was the access? Was it a key card or a code, or they knew you when you walked in the building?

A   **I don't recall.**

Q   You don't recall any of the three, or you don't recall?

A   **I think multiple of those occurred at once. I mean, obviously I was able to access the building in this first instance to attend this meeting. And then I was able to access the building in other instances as well.**

Q   But you don't recall whether you had a badge, a key code, or whether when you walked in they just

Page 101

recognized you and let you through?

A   I believe I either had a badge or I was on some list. I don't recall which.

Q   Did you end up obtaining access to USAID digital systems, computer systems, software systems of any kind?

A   Yes. All employees have a computer generally at USAID -- or formerly at USAID.

Q   What systems within USAID did you get access to?

A   I don't recall a full list, but, you know, everyone has an email, everyone has, like, Microsoft Word, stuff like that.

Q   Systems other than email and Microsoft Word?

A   Google Chat, as previously discussed.

Q   Do you recall having access to USAID's financial system during the time you were detailed there?

A   Yes.

Q   Do you recall the name of that financial system?

A   No.

Q   What other systems beyond the financial system do you recall having access to?

A   To be clear, I believe there were many highly

Page 102

fragmented financial systems, none of which worked super well. I imagine there were other systems as well.

Q   That you had access to?

A   Yes.

Q   And this is outside of email and Microsoft Word and Google Chat?

A   Yes.

Q   Can you name any of them or what they did?

A   I believe it was primarily personnel management and financial.

Q   I'm handing you what's been marked as Farritor Exhibit 2. The Bates stamp is 4142.

(Farritor Exhibit 2 marked for identification.)

THE WITNESS: Cool. Ready when you are.

MR. WARREN: Yes. One moment.

THE WITNESS: Yep.

MR. WARREN: Can we take a break for a moment -- for a moment?

THE WITNESS: I'd prefer to keep going.

MR. WARREN: Okay. Just give me a second, then.

THE WITNESS: Sounds good.

BY MR. WARREN:

Q   Okay. You have Farritor 2 in front of you?

A   Yes.

Page 103

MR. WARREN: I'm sorry, Jake. I need to go off the record for a sec.

MR. SILER: Okay.

THE PROCEEDINGS OFFICER: We're going off the record. The time is 12:10 p.m., Eastern Time. Thank you.

(Off the record.)

THE PROCEEDINGS OFFICER: We are back on the record. The time is 12:16 p.m., Eastern Time. Thank you.

MR. WARREN: Mr. Farritor, I'm taking back from you Farritor Exhibit 2. I'm handing you what's been marked as Farritor Exhibit 3. And share it.

(Farritor Exhibit 3 marked for identification.)

BY MR. WARREN:

Q   This is an email chain, Bates range 1774 to 1777. Mr. Farritor, you can see that it goes in reverse order with the earliest email being at the end of the document.

A   Is this a single email chain?

Q   It is.

A   Okay.

Q   If I could turn your attention to the second-to-last page, the email at the bottom of the page. This is an email from Brian McGill to someone named Ken, who

Page 104

if we look up above, we can see Ken Jackson. Do you know who Brian McGill is?

A   I believe he's listed with his title on this email as deputy of USAID Office of Security.

Q   You ever interact with Mr. McGill?

A   Potentially.

Q   During your time at USAID?

A   That would be most plausible given he worked there.

Q   You don't recall one way or the other?

A   I don't have a strong recollection. No.

Q   The email is dated January 30, 2025. Mr. McGill writes, "I have Luke Farritor representing the Executive Office of the President, DOGE, with me," excuse me. "Requesting access control information to verify the suspension of access control to individuals recently placed on administrative leave."

Do you recall being with Mr. McGill when asking for access control information to verify the suspension of people placed on admin leave?

MR. SILER: Objection. Foundation.

THE WITNESS: Could you rephrase the question?

BY MR. WARREN:

Q   Yeah. Do you recall what Mr. McGill is

Page 105

describing in that first paragraph?

A   I don't have a strong recollection of any such interaction.

Q   Do you have any recollection of it?

A   I recall that senior agency leadership at USAID placed people on administrative leave, and then that administrative leave access was not properly handled, and individuals, who should have been on administrative leave did not properly -- were not properly on administrative leave and had access to information they -- or systems or whatever, that they should not have.

And I recall being asked by senior agency leadership to verify that the administrative leave actions were implemented as described by senior agency leadership.

Q   In the email preceding that, Mr. Jackson responds to Mr. McGill, Please grant him full access as requested overnight.  That's --

A   Tonight.

Q   Thank you.  I'm sorry.  Tonight, from January 30, 2025.  Do you recall needing and having access granted to do what's described down below in the email?

A   I don't have a specific recollection of the directive beyond what I already described.

Page 106

Q   Is this something that you needed to have been granted access to have the authority to verify the suspension?

MR. HUMPHREYS:  Objection.  Vague.  And calls for a legal conclusion.

MR. WARREN:  Yeah.  Same objection.

THE WITNESS:  Could you break down the question?

MR. WARREN:  Yeah.  I hadn't finished it. I'm sorry.

MR. HUMPHREYS:  My apologies.

BY MR. WARREN:

Q   Did you need someone to give you -- to authorize you to have computer access in order to verify the suspension of access to control as described below?

MR. HUMPHREYS:  Objection.  Calls for a legal conclusion.

You can answer.

BY MR. WARREN:

Q   And to be clear, I'm not talking about legal authority.  I'm talking about technological authority.

A   To verify in a computer system if an action has been taken, you need to look in the computer.  So yeah.

Q   And could you have done that before someone

Page 107

granted you some sort of access into the system?

A   Not without interfacing with another person, such as a career official.

Q   At the top of that page, Mr. McGill responds, "Ken, copy.  We have Luke here and he's been working with one of our team based on our account access." What's he talking about?

A   I don't recall.

Q   If we go to the prior page, the bottom of page 1775, 7:04 p.m., January 30th, Mr. McGill wrote, Ken, as a -- as follow-up, Luke is requesting full administrative rights beyond read rights to be able to make changes.  What does that mean?

MR. HUMPHREYS:  Objection.  Calls for speculation.

You can answer.

MR. SILER:  Yeah.  Same objection.

THE WITNESS:  Could you rephrase the question?

BY MR. WARREN:

Q   What is he -- what does he mean in the first sentence of that email?

A   I believe access to the system.

Q   What's the difference between "full administrative rights" as opposed to "read rights"?

Page 108

A   It varies in the context of the software system.

Q   And in the context of this system to which you were requesting access?

A   I don't recall the specific details, but I'm sure it's something where there is a level of access that does not grant all necessary information to implement the directive as -- as discussed prior.

Q   Mr. McGill continues, "We have concerns granting administrative rights without knowing the purpose as this would enable the user to make access decisions to include allowing people to access restricted space without checking their clearance." What does that mean?

MR. HUMPHREYS:  Objection.  Calls for speculation.

THE WITNESS:  My understanding is that it means what it says.

BY MR. WARREN:

Q   Is that consistent with your understanding of what administrative rights would enable the user to do in that context?

A   I don't recall this specific context of this specific system.

Q   Did you discuss why you were requesting

Page 109

administrative rights with Mr. McGill?

A  I don't recall.

Q  You don't recall whether you told him why you needed access?

A  I don't recall.

Q  Mr. McGill continues, "While I was upstairs, Luke had Mr. Elon Musk call our staff who was working with him." Do you recall calling Elon -- excuse me. Do you recall having Mr. Musk call Mr. McGill's staff on January 30th?

A  I don't have a specific recollection of any phone call at this time. It was pretty hectic, and there were a lot of phone calls.

Q  Do you recall ever having Mr. Musk call USAID staff to authorize and give -- grant you access to USAID computer systems?

A  Could you break down that question?

Q  I can ask it again. Do you recall Mr. -- strike that.

Do you recall having Mr. Musk call or talk to USAID staff to verbally authorize and grant you access to any USAID computer system?

A  He may have spoken to staff. Specific authorizations were made by USAID senior officials and the relevant chain of command.

Page 110

Q  I'm asking whether you had Mr. Musk call the staff.

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: He may have spoken to them.

BY MR. WARREN:

Q  Did you have him call them?

A  I don't recall being -- I don't recall directing Elon Musk or any other senior advisor of the President to do anything.

Q  Did you ever ask Mr. Musk to reach out to USAID staff to grant you or other -- others access into USAID computer systems?

A  I don't recall asking, but there were a number of people in the White House who were paying attention to these matters.

Q  Do you recall talking to Mr. Musk about having difficulty being granted -- obtaining access into USAID computer systems?

A  I don't have a specific recollection of that topic.

Q  Do you know whether Mr. Musk indeed called USAID staff to verbally authorize and direct them to give you access?

A  He may have spoken to them. I don't recall him directly calling them. There were a lot of, like,

Page 111

group calls, et cetera.

Q  Were you -- did you listen in on, did you participate in any call between Mr. Musk and USAID staff regarding access authorization?

A  A number of people in the White House spoke to people in USAID about these matters. Mr. Musk may have been one of those people in those conversations.

Q  My question was, did you participate or listen in to any of those conversations?

A  Maybe.

Q  You don't recall?

A  I don't have a specific recollection, but it's certainly possible.

Q  Mr. McGill continues, "Luke offered to call Mr. Musk back to talk with me." Did you offer to call Mr. Musk back to speak with Mr. McGill?

A  I don't have a recollection of that occurring.

Q  Any reason to disagree with anything that Mr. McGill said here?

MR. HUMPHREYS: Objection as to form.

THE WITNESS: Could you rephrase the question?

BY MR. WARREN:

Q  I can ask it again. Do you have any reason to disagree with anything that Mr. McGill wrote in this

Page 112

7:04 p.m. email that we just walked through?

MR. HUMPHREYS: Objection.

If you need to read it more closely.

THE WITNESS: Yeah. I don't recall offering to call Mr. Musk. I don't think I've ever called Mr. Musk directly. But there may have been group calls that Mr. McGill or other officials may have been able to rejoin. I don't have specific recollection of this episode.

BY MR. WARREN:

Q  In the middle of that same page. This is the 7:54 p.m. email from Mr. Jackson to Mr. McGill. He wrote, "Brian, please do not do anything until we get additional documentation."

And it continues, "There are limitations to his access. We must ensure." Did you ever discuss with Mr. Jackson or Mr. McGill limitations to your access that USAID needed to ensure?

MR. HUMPHREYS: Objection to the extent it calls for legal conclusion.

THE WITNESS: I don't recall.

BY MR. WARREN:

Q  If we turn to the first page of the exhibit, the bottom of the page. This is now the next day, January 31st. This is Friday, January 31st. Just in

Page 113

case you don't remember the day of the week.

Mr. McGill at 11:19 a.m. wrote, "Good morning, Ken. I'm checking to learn if we've received further authorization or direction for the right access." Do you understand what he's saying?

A    I understand the words on the page. Yes.

Q    Do you understand the context in which he's asking again the following morning about your access?

A    I understand that that's what he's asking about.

Q    Do you recall whether you were not granted access the evening of the 30th or any evening early in your detail at USAID and access had to be granted -- was not granted until the following morning?

MR. HUMPHREYS: Objection. Form.

You can answer.

THE WITNESS: I don't have specific recollection of any chain of events in that level of detail.

BY MR. WARREN:

Q    At USAID?

A    Yeah.

Q    Mr. McGill continues, "I understand Luke is visiting our staff again this morning." Do you recall visiting USAID staff again the morning of the 31st?

Page 114

A    Not specifically.

Q    If you look up to the preceding email, this is 3:08 p.m. on Friday the 31st. There are now other people copied on the email outside of Mr. McGill and Mr. Jackson. Do you know who Matthew Hobson is or was at the time?

MR. SILER: Objection. Document isn't clear whether other people were copied on the earlier emails, just for the record.

MR. WARREN: Understood.

MR. SILER: Yeah.

MR. WARREN: Yeah.

THE WITNESS: What was the question?

BY MR. WARREN:

Q    Do you know who Mr. Hobson was at this time?

A    I don't recall.

Q    Mr. Voorhees?

A    I don't recall.

Q    Joel Borkert?

A    I believe he was a senior political, but I don't really recall.

Q    Mr. McGill writes in the 3:08 p.m. email, "Ken, one additional note. Our staff received a request from Luke to provide Gavin Kliger a read and write account to our access control system, C-CURE." What is

Page 115

C-CURE?

A    I don't recall.

Q    What's an access control system?

A    A system to manage access.

Q    Physical access or digital access or both?

A    It varies on context, to my understanding.

Q    At USAID, do they have a access control system called C-CURE?

A    Maybe. I don't have a specific recollection.

Q    Gavin Kliger. We've mentioned that name before. Why did you request to provide Mr. Kliger with a read and write account access to C-CURE?

A    I don't recall this specific episode.

Q    The top email in the document is the same Friday, the 31st, Mr. -- excuse me. Mr. Jackson writes to Peter Marocco, "Pete, good afternoon. I want to confirm that Luke and Gavin are cleared to have access to USAID's access control system, C-CURE." Do you recall being granted access to USAID's C-CURE access control system?

A    If it was called that, I think I was granted access at some point, but I don't have specific recollection of the details.

Q    And Mr. Kliger was granted access?

A    I don't recall.

Page 116

Q    You said you don't have specific recollection of it. Were you granted access to USAID's access control system as part of your work with USDS?

A    I was a political appointee at USAID, or some -- some role at USAID, and it flowed through this chain of command as described in detail in this email chain.

Q    Why did you need access to USAID's C-CURE system?

A    To my recollection, it was because a number of people who were supposed to be put on administrative leave, were not properly placed on administrative leave by career officials.

And we were given a directive by senior agency leadership to ensure that actions were being properly taken and that people who were not supposed to have access because they were on administrative leave did indeed -- were properly placed on administrative leave in all relevant systems.

Q    Do you know who ultimately authorized your grant of access to the C-CURE system?

MR. HUMPHREYS: Objection. Foundation.

THE WITNESS: I don't recall.

BY MR. WARREN:

Q    You just mentioned senior agency leadership in response to the question about why you needed access.

Page 117

Who do you mean by "senior agency leadership"?

A    People like Jason Gray or Ken Jackson.  It's just the traditional definition of senior political leadership.

Q    Did you get authorization directly from the White House for C-CURE?

A    My understanding is those access decisions are made by agency leadership within the agency's chain of command.  And those agency leadership may be acting, you know, in coordination with -- with other entities, but ultimately the decision lies with senior agency leadership.

Q    Did you attend a meeting in Brian McGill's office with Jeremy Lewin and Laken Rapier regarding obtaining access to USAID systems?

MR. SILER:  Objection.  Vague.  Time period.

THE WITNESS:  I don't have a specific recollection of a meeting with that cast of characters.

BY MR. WARREN:

Q    Do you know Laken Rapier?

A    I believe she was a political at USAID in some way, shape, or form.  Maybe a career.

Q    Do you recall ever meeting with Mr. McGill and discussing with him a White House memo that was going to

Page 118

provide you with authorization to access USAID systems?

A    I don't recall that.

Q    Do you know Tera Dahl?  T-E-R-A D-A-H-L?

A    I don't recall that name.

Q    Do you recall a meeting with Tera Dahl and Mr. McGill where you requested C-CURE access?

MR. SILER:  Objection.  Form.

THE WITNESS:  I don't recall a meeting with that cast of characters.

BY MR. WARREN:

Q    Do you recall a meeting in which you told Mr. McGill that you wanted to independently verify who was going to be placed on administrative leave?

A    I don't recall that specific conversation, but that sounds consistent with the directives that I've already described from senior agency political leadership.

Q    Were you ever with Mr. McGill when he was writing an email that you understood to be to senior leadership regarding your authorization to access USAID systems?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  I don't have a specific recollection of that.

BY MR. WARREN.

Page 119

Q    Do you recall Mr. McGill telling you that he could not grant you access to USAID systems and that authorization had to come from somebody else, somebody potentially higher up the chain?

A    I don't recall that conversation, but that seems consistent with the exhibit in front of us.

Q    But you don't recall Mr. McGill telling you that?

A    I don't have a specific recollection of that.

Q    Do you recall telling Mr. McGill that you could not wait for an answer and so you had to go and find the person who could authorize the access?

A    I don't have a specific recollection of that conversation.

Q    Do you recall going with Mr. McGill out of his office, upstairs in the USAID building to find Mr. Jackson to see if he could authorize the access?

A    I don't recall that.

Q    Do you recall talking with Mr. Hobson and Mr. Burchett, or being present when Mr. McGill spoke with Mr. Hobson and Mr. Burchett about granting you access to the C-CURE system?

MR. SILER:  Objection.  Form.  Compound.

THE WITNESS:  Could you break down the question?

Page 120

BY MR. WARREN:

Q    Sure.  Did you ever speak with Mr. Hobson and Mr. -- strike that.

Did you ever speak with Mr. Hobson about getting access to USAID's digital systems?

A    I don't have any memory of that.

Q    Mr. Burchett?  Same question.

A    I don't have any specific memory of that.

Q    Did you attend any meeting with Mr. Hobson and Mr. Burchett where your access to USAID systems was discussed?

A    I don't recall that.

Q    You said you didn't recall whether you received authority to the C-CURE system, correct?  But that you received system -- strike that.

Received access to other USAID systems?

A    I -- I don't recall, like the word "C-CURE," really, but I certainly had access to some systems, like Outlook and others that we previously discussed.

Q    What about secure systems, unlike Outlook --

A    Define "secure."

Q    -- or Word?  Systems for which someone needs to grant you access.

A    I mean, access needs to be granted to all USAID systems, right?

Page 121

Q    Access control systems within USAID.

A    Oh.  Access control systems.  What's the question?

Q    You recall having -- you were granted access to USAID access control systems?

A    I believe that's accurate.

Q    Did Mr. McGill ever tell you that you need to agree to certain rules before being granted access to USAID access control systems?

MR. HUMPHREYS:  Objection.  Vague.

THE WITNESS:  I don't recall that conversation if it occurred.

BY MR. WARREN:

Q    Did Mr. McGill tell you that you were not allowed to change anything in the system without the authority of the system administrator?

A    I don't recall.

Q    Did anybody ever tell you, outside of Mr. McGill, with regard to your work at USAID, that you need to agree to certain rules based on your access to USAID access control systems?

MR. HUMPHREYS:  Objection.  Ambiguous.

THE WITNESS:  Could you break down the question?

BY MR. WARREN:

Page 122

Q    Sure.  Same question that I just asked, but not limited to Mr. McGill.  To anybody else within USAID.

A    There were frequent discussions about access and authorities with political leadership council and other parties.

Q    Not focused on the access so much, but being told that you would need to agree to certain rules, sign certain forms, et cetera.

A    I don't have a specific memory of that.

Q    You can put aside Exhibits 1 and 3.  I'm handing you what's being marked as government -- excuse me.  As Farritor Exhibit 4.  Please take a look.

(Farritor Exhibit 4 marked for identification.)

MR. WARREN:  For the record, this is Bates stamped McGill 87 through 89.

BY MR. WARREN:

Q    Do you recognize this form?

A    No.

Q    Is that your handwriting on the first page at the top, where it says "Luke Farritor" and it's handwritten?

A    Maybe.

Q    You don't know one way or the other?

A    I don't know one way or another.  I have

Page 123

really bad handwriting.

Q    But you don't recognize your own bad handwriting?

A    Correct.  And often it's, like, DocuSign where it's not even your handwriting and stuff.

Q    If you look on the second page -- actually, before we get there, the title of this document, as you see, is "USAID C-CURE 9000 User Account Request."  Do you see that?

A    Yep.

Q    And there's information at the top of the page, name, office, clearance level, et cetera?

A    Mm-hmm.

Q    And then there's the C-CURE 9000 User Account Access Receipt and Rules of Behavior, with nine rules listed?

A    Mm-hmm.

Q    And then we turn to the second page, and the header is "Rules of Behavior for C-CURE Systems"?

A    Mm-hmm.

Q    And down below, at the bottom of the second page, there's a user signature.  Is that your signature?

A    I don't know.

Q    Is that your handwriting?

A    I don't know.

Page 124

Q    What about for the date?  Is that your handwriting of January 30th?

A    Maybe.  Looks more like my handwriting than the signature.

Q    Do you recall signing a C-CURE document like this -- C-CURE access request like this?

A    I don't have a specific recollection, but this seems reasonable.

Q    At the bottom of the second page, you see the name Patrick Butler listed and a signature next to it.  Do you recall signing any USAID account request documents that Mr. Butler had signed?

A    I don't have a specific recollection.

Q    And on the third page, Mr. McGill's name is listed with a signature.  Same question; do you recall signing a USAID user account request that Mr. McGill had signed?

A    I don't have a specific recollection.

Q    Meaning, you don't -- you don't recall one way or the other?

A    I don't recall one way or the other.

Q    All right.  You can put that aside.

A    Cool.

Q    I'm handing you Farritor Exhibit --

MR. HUMPHREYS:  5.

Page 125

MR. WARREN:  Did I mess up the numbering?

MR. HUMPHREYS:  Well, we haven't used 2, but we're on 5 now.  Two was the one that we skipped.

MR. WARREN:  Yeah.

MR. HUMPHREYS:  And the last one you said was 4, so I think we're on 5.

MR. WARREN:  Okay.  Thank you.

THE WITNESS:  Yep.  I have 1, 3, and 4 in front of me.

MR. WARREN:  Mr. Farritor, this is, again, Farritor Exhibit 5, Bates stamp 9110, single-page document.

(Farritor Exhibit 5 marked for identification.)

BY MR. WARREN:

Q   If you look at the bottom of the page it reads, "On Friday, January 31, 2025, at 4:46 p.m., Luke Farritor wrote," and then there's an email address.  Is that your email address at USAID?

A   That's my understanding.  Yes.

Q   That was your email address at USAID during the time you were detailed?

A   To my recollection.  Yes.

Q   And the document says, "Jason, just want you to confirm that Gavin Kliger of DOGE should also have full read/write administrative access for managing

Page 126

physical and logical access like myself.  Luke."  Do you recall writing that email?

A   I don't recall one way or another.

Q   "Full read/write administrative access for managing physical and logical access."  What does that mean?

A   Physical is -- deals with physical things, getting in the building.  Logical is computers, like signing into your email, is my understanding.

Q   It references "Gavin Kliger of DOGE."  Why do you refer to "Gavin Kliger of DOGE"?

A   Probably because he was working on presidential directives to combat waste, fraud, and abuse.

Q   Was he detailed to USAID?

A   I believe so.

Q   Was he doing -- describe what Mr. Kliger was doing generally with regard to USAID in comparison to the work that you were doing at USAID.

MR. HUMPHREYS:  Objection.  Lack of foundation.

You can answer.

THE WITNESS:  He was at USAID to implement the directives of senior agency leadership.

BY MR. WARREN:

Page 127

Q   Did you work on similar projects?

A   Sometimes.

Q   Same projects?

A   Sometimes.

Q   Who did Mr. Kliger report to at USAID, as far as you know?

A   I don't recall.

Q   What were some of the same projects you worked on with Mr. Kliger?

A   I don't recall any specific projects.

Q   What projects do you recall Mr. Kliger working on that you did not work on at USAID?

MR. HUMPHREYS:  Objection.  Lack of foundation.

THE WITNESS:  I don't have a specific recollection one way or another.

BY MR. WARREN:

Q   How did you -- how did Mr. -- strike that.

As you understood, how did Mr. Kliger's work at USAID differ from your work at USAID?

A   I don't recall.

Q   The preceding email is from Jason Gray, January 31st, 4:49 p.m., so three minutes later.  It says he wrote, "Hello.  Yes, I approve of administrative access to all unclassified information systems,

Page 128

including but not limited to Phoenix, HR systems, badging and access systems, cloud environments, and all systems related to grants, payments, and vouchers."

Were you granted administrative access to all these unclassified systems at USAID?

A   I don't recall.

Q   What's Phoenix system?

A   I think it was something financial, but I don't have a specific recollection.

Q   What's HR systems?

A   Systems used for managing HR.

Q   What's badging and access systems?

A   Systems used for managing badging and access.

Q   What's cloud environment?

A   Just environments in the cloud, I would presume, but I don't know in this context.

Q   What about all systems related to grants, payments, and vouchers at USAID?

A   It's what you said, which is what is written on the paper.

Q   Why did you need this access?

MR. HUMPHREYS:  Objection.  Foundation.

THE WITNESS:  I don't recall.

BY MR. WARREN:

Q   Why did you need access to Phoenix, which you

Page 129

described as a financial system?

A   I don't recall why the acting administrator was granting access at this specific moment or for what specific purpose.

Q   Why did you need access to USAID HR systems?

A   We can just go through all of them.  I don't recall why specifically I was being granted in the context of this email and for what purpose at that moment in time.

Q   Let's talk about the grants, payments, and vouchers system.  What work were you doing at USAID required you to look at grants, payments, and vouchers in -- as of January 31, 2025?

A   I don't recall what specifically was going on at that date and time with regard to those subjects.

Q   Do you recall who asked you to work on any systems at USAID related to grants, payments, and vouchers as of January 2025?

A   Well, in the case of this email, it's the acting administrator of the agency.

Q   Who asked you to work on it?

A   Well, he's approving of administrative access is what the language says.

Q   Understood.  But I'm talking about outside of this email.  Who asked you to work on those systems?

Page 130

A   Outside of the directives that are right in front of me, I don't recall who specifically.  I presume it was probably the acting administrator, given he's the one approving this.

Q   At the top of the page where it says "forward in message" and we see it's from Jason Gray, and it's sent to several people.  Zechariah Khan.  Who was Zechariah Khan as of February 2, 2025?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  I don't recall.

BY MR. WARREN:

Q   Patrick Butler?

A   I don't recall.

Q   Lindsey Willis?

A   I do not recall.

Q   Gavin Kliger?

A   He was some political on detail as previously discussed.

Q   Jeremy Lewin.  What was his role at USAID at this time?

A   I don't recall specifically at this time.

Q   That's you, Luke Farritor.  Steven Hernandez?

A   Don't recall.

Q   You can put that aside.

A   Okay.

Page 131

Q   I'd like to turn your attention to Saturday, February 1, 2025.  Do you recall going to USAID's offices on that Saturday?

A   I went to the USAID office at many points in time in this, kind of, period.  I don't recall any specific episodes on any specific weekends.

Q   Do you recall arriving at USAID on a Saturday seeking physical access to restricted space within USAID, including SCIFs?  Do you know what a SCIF is?

A   I know what a SCIF is.

MR. HUMPHREYS:  Objection.  Form.

THE WITNESS:  I don't recall attempting to access a SCIF.

BY MR. WARREN:

Q   Do you recall being at USAID on a weekend trying to get -- gain access to restricted areas of USAID?

A   Define "restricted."  We previously established that the whole building was restricted, right?

Q   Yes.  Offices or areas to which you did not previously have access based on your -- when you initially showed up at USAID?

A   I don't recall.

Q   You familiar with something called "a GSA

Page 132

card" as it pertains to USAID's security system?

A   I don't know what GSA would have to do with -- with USAID.

Q   Do you recall asking a security officer how to use your access card to -- at USAID to gain entry into restricted spaces beyond those that you already had had access to?

A   I don't have a specific recollection.

Q   Ever tell anyone in security at USAID not to tell P.J. Butler, what -- where you were trying to gain entry into USAID?

A   I -- I don't recall that.

Q   You don't recall one way or the other?

A   Could you rephrase the question?

Q   Did you ever tell a security officer at USAID not to tell -- or ask a security officer at USAID not to inform Patrick Butler that you were trying to gain entry into spaces within USAID that you did not have physical access to?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  I don't have any memory of me instructing one security official to not speak with another security official.

BY MR. WARREN:

Q   Do you recall any discussion or argument or

Page 133

anything contentious with anyone in USAID security about you having -- being granted physical access to USAID's building?

MR. HUMPHREYS: Objection as to form.

THE WITNESS: I don't think so. I don't have any memory one way or another.

BY MR. WARREN:

Q  Everything was smooth sailing in terms of you trying to get physical access to USAID's building?

MR. SILER: Objection. Form. Characterization.

THE WITNESS: It's plausible that, like, you know, there were difficulties. But yeah.

BY MR. WARREN:

Q  That you were aware of.

A  I mean, it's always a process to, like, you know, get a working badge and, like, you know, get the access or, like, you know, just because Jason Gray writes an email does not mean, you know, people do what the administrator directs. So I wouldn't describe it as smooth sailing.

Q  Sure. Do you recall anything ever being contentious? So not just, you know, the difficulty of the process, but there being arguments, you know, verbal altercations, people yelling, people getting upset about

Page 134

requests for access, the grant -- granting of access at USAID?

MR. SILER: Objection. Form. Ambiguous.

Go ahead.

THE WITNESS: All politics I would consider to be contentious. I don't have any specific recollection of any yelling.

BY MR. WARREN:

Q  Well, what politics were going on with regard -- as you understood, with regard to you getting access to USAID?

A  I just recall -- or sorry. I'm just describing politics in general. Any work involving the government is often complex, contentious, you know, people have different opinions. Yeah.

Q  But, again, you -- maybe I missed the answer, so my apologies. Your testimony is that you don't recall anything ever being contentious or argumentative or anything like that?

A  I would not characterize this period of time as smooth sailing. I would characterize it as quite busy and sometimes chaotic. But to answer your -- your earlier question, I don't recall yelling at anybody or getting particularly heated.

Q  Or anyone else yelling at anyone?

Page 135

A  Maybe. I don't have a specific memory one way or another.

Q  Do you recall an instance where Steve Davis got involved in terms of directing or securing or -- your access to USAID?

MR. SILER: Objection to form.

THE WITNESS: Could you break down the question?

BY MR. WARREN:

Q  Sure. Do you recall an instance where Steve Davis was involved in your gaining physical access to USAID?

A  I don't recall a specific instance of that.

Q  Do you recall any instance where Steve Davis threatened to call the US Marshals if you or others were not granted access to USAID?

A  I don't have a memory of that.

Q  Do you recall anybody threatening to call US Marshals if access was not granted to you at USAID?

A  I don't have any memory of that.

Q  Do -- were you present anytime that Steve Davis was involved in -- was talking about you being granted access at USAID? I don't mean emails, I mean physically there for a conversation that Steve Davis had?

Page 136

MR. SILER: Objection to form.

THE WITNESS: He was physically in the building on occasions. I don't recall any specific discussions.

BY MR. WARREN:

Q  Do you recall any instance in which Steve Davis called Elon Musk about getting you access to USAID?

A  I don't have any specific memory of that.

Q  Now let's turn back to Government Exhibit 2.

MR. WARREN: (Indiscernible.)

MR. HUMPHREYS: Sorry, Andrew.

MR. WARREN: I know. I caught it last time.

MR. HUMPHREYS: I know. Yes.

MR. WARREN: I'm sorry. Farritor Exhibit 2. You're good.

For the record, this is a one-page document, Bates stamp 4142.

BY MR. WARREN:

Q  Mr. Farritor, there are two emails in this chain. The first is dated Monday, January 27, 2025 at 4:28 a.m. from you, Luke Farritor, an HHS.gov address. Did you have an HHS email address?

A  At this point in time? Yes.

Page 137

Q    Your email in -- first of all, the subject is USAID context.  Please do me a favor, look at the email and let me know if you recall sending this email.

A    **I don't have any specific memory of this email.**

Q    You're emailing -- you write below, "Hi all, three things," and then Numbers 1, 2, 3, and there's a list of 11 names below.  And there's an attachment referenced at the bottom, "USAID CFO letter to HHS dated January 24, 2025."  Do you see that?

A    **Yep.**

Q    Okay.  So you write Number 1, and I'm paraphrasing a little bit here, "Below is a list of all users with a usaid.gov email address who've logged into the HHS payment system in the past year."  Why were you looking into USAID -- people with a USAID email address who had logged into the payment system in the past year?

A    **I don't recall.  I -- I presume it was to understand what was going on.**

Q    What do you mean, "what was going on"?

A    **Understand who was on what relevant teams.**

Q    Why would you be looking into HHS payment systems for that?

A    **Many USAID payments were processed through systems held at other agencies.**

Page 138

Q    And you were looking into those payment systems to see who at USAID was on what teams?

A    **That appears to be the information that is provided in this email.**

Q    So you write, Number 2, I just ran some numbers.  I could be wrong.  But it seems like the HHS payment -- payments system has had over 300 requests where USAID is an awarding agency since 1/20.  Again, I'm paraphrasing.  Then you write, "My numbers could be off, so don't repeat this figure widely."  Do you recall writing that?

A    **No.**

Q    What do you mean, "I just ran some numbers.  I could be wrong"?

A    **I procured some data.  The numbers could be wrong.**

Q    What do you mean "350 payment requests where USAID is an awarding agency"?

A    **I don't recall what specifically a payment request means in the context of whatever system this is.**

Q    And then in the italics, what do you mean, "My numbers could be off, so don't repeat this figure widely"?

A    **I presume I mean what I said.**

Q    Number 3, "For your reference, attached is the

Page 139

USAID letter sent to the HHS payments office on Friday asking that their outstanding payments be stopped."  Is that your recollection of what the attachment is?

A    **I believe so.**

Q    "Don't share beyond this group."  Why are you telling people not to share beyond this group?

A    **I don't recall.**

Q    And you don't recall why you're telling people not to repeat this figure widely?

A    **I believe it's established in the first half of that sentence that the numbers could be off.**

Q    The email then lists 11 names; first name, last name, email address.  And the last column, what does that refer to?

A    **I don't know.**

Q    The last space "UPD" space "DTE"?  You don't know what that means?

A    **It's obviously a date of some form.**

Q    The email is sent to several people.  I just want to ask you who these people are if we haven't discussed them so far.  So Steve Davis.  This is the Steve Davis we've discussed?

A    **The White House official.  Yes.**

Q    Brad Smith?

A    **Appears to be an EOP official here.**

Page 140

Q    So I know he's listed as an EOP address.  What was your understanding of who Brad Smith was and what he was doing?

A    **He worked in EOP.**

Q    Tarak Makecha?

A    **Works at State.**

Q    Ed Coristine?

A    **Works at EOP.**

Q    And so you're just telling me what's written on the page.  Do you have any information -- strike that.

Why are you emailing this particular group about what's happening at USAID when -- let's see.  Strike that.

Why are you emailing this particular group about this information at USAID?

A    **I don't recall.  But it seems completely consistent that, you know, White House and State and other officials would want to have information about -- or context about what's going on.**

Q    You don't email anyone from USAID in this, correct?

A    **That appears to be an accurate understanding of the emails that are listed here.**

Q    Were any of the people listed on this email

Page 141

members of USAID senior leadership at the time?

A   I don't recall.

Q   I want to go back to the substance of the email. How did you discover these payments?

A   I don't recall.

Q   Did anyone instruct you to search for them?

A   I don't recall.

Q   Why were you looking for it -- for these payments?

A   I presume someone wanted context.

Q   Was there any discussion of misconduct in terms of why you were looking for these payments?

A   Not that I can recall.

Q   Did you understand what this information was being used for? That is, the people who -- the 11 names you identified.

A   I don't recall.

Q   How is this work connected to the software modernization initiative that's discussed in the executive order we looked at?

MR. HUMPHREYS: Objection. Lack of foundation.

THE WITNESS: Could you break down your question?

BY MR. WARREN:

Page 142

Q   Sure. How is this work that you're describing here connected to the software modernization initiative that's described in Farritor Exhibit 1, the executive order from January 20th?

MR. HUMPHREYS: Same objection.

THE WITNESS: I don't recall which specific directive this email was being sent in relevance to. Yeah.

BY MR. WARREN:

Q   Is this work being done to improve government software, network infrastructure, or IT systems?

A   Seems plausible given that this is potentially useful USAID information that is in another agency.

Q   How was this work -- again, the work referenced in your email here, part of the effort to modernize federal technology?

MR. HUMPHREYS: Objection. Lack of foundation.

THE WITNESS: I don't recall.

MR. WARREN: You can put that aside. Handing you what's being marked as Farritor Exhibit 6.

(Farritor Exhibit 6 marked for identification.)

BY MR. WARREN:

Q   Farritor 6 is Bates stamped 586 to 591. And this is an email chain that goes in forward order, so

Page 143

the earliest email is the first one in the chain.

A   All right.

Q   Mr. Farritor, I'll ask you to take a moment to look over this email chain. I don't believe your name appears on it anywhere. If you see it, please correct me. But let me know if you've ever seen this document before.

A   I don't believe I've seen this document before.

Q   If I could direct you to the top message dated January 27th, 3:41 p.m. from Joel Borkert to others. And Mr. Borkert writes, "Please see the list below of employees being placed on administrative leave approved by Acting Administrator Gray." There's more to the text. And then down below, there's a list of 57 names that continues on to the next page. Do you see that?

A   Yep.

Q   Were you involved in any work connected to this group of 57 people being placed on admin leave?

MR. SILER: Objection. Form.

THE WITNESS: During the time frame of this email chain, I don't believe I was.

BY MR. WARREN:

Q   Did you do any work or have any role in identifying any of the individuals who are named here to

Page 144

be placed on leave?

A   Not to my knowledge.

Q   Were you aware of the decision to place them on leave as it was being made?

A   Not to my recollection.

Q   Did you have any involvement in cutting off access to these people after they were placed on leave?

A   Not during the time period described in this email chain.

Q   If we turn to the third page of the exhibit, in the middle of the page, first you can see Mr. Hernandez writes, "On it now." And then Mr. McGill writes, "Joel, confirming receipt. Next email will confirm access removed." And then continuing on to the next page, there's discussions about access being removed and notices being transmitted. Do you see that?

A   Yep.

Q   Were you involved in any of these actions, transmitting notices to the individuals being placed on leave or cutting off their administrative -- cutting off their access to USAID systems?

MR. SILER: Objection. Form.

THE WITNESS: Not to my recollection in the time period described here.

BY MR. WARREN:

Page 145

Q   Do you know whether the people being listed -- the people listed here in Exhibit 6 are connected with the names that you had identified in Farritor Exhibit 5?

MR. HUMPHREYS:  Objection.  Vague.

THE WITNESS:  They appear to be separate lists.

BY MR. WARREN:

Q   Do you know how this list of 57 people was put together?

A   No.

Q   Were you asked to do or did you do any research into any of these individuals connected with their being placed on administrative leave?

A   Not to my recollection.

Q   Okay.  We can put that aside.  I'm handing you Farritor Exhibit 7.

(Farritor Exhibit 7 marked for identification.)

BY MR. WARREN:

Q   Please take a moment to review and let me know if you've ever seen this before.  Mr. Farritor, do you recognize --

A   I'm still reviewing the document.

Q   Sorry.

A   Okay.

Q   Yes.  Okay.  Have you ever seen this before?

Page 146

A   I don't believe so.

Q   You can see this is an action memo for Acting Administrator Jason Gray.  It's dated January 30, 2025, from Nicholas Gottlieb, Director, Employee, and Labor Relations at USAID.  Do you see that?

A   Yep.

Q   Do you know Nicholas Gottlieb during your time at USAID?

A   I don't recall.

Q   Ever interact with him?

A   I don't recall.

Q   The subject of the memo is "Cancellation of administrative leave and cessation of illegal activities."  Do you see that?

A   Yes.

Q   And he has two recommendations at the top, and then there's a background section at the bottom of the first page.  I want to direct you to the background section.

A   Okay.

Q   And Mr. Gottlieb writes -- this is at the end of the first paragraph into the block quote.  That evening, you sent an agency-wide announcement to the following effect, "We have identified several actions within USAID that appear to be designed to circumvent

Page 147

the President's executive orders," and continues.  Do you know what Mr. Gottlieb is referring to there?

A   No.  I presume it may include this other email.

Q   Why do you presume that?

A   Well, he's describing instructions from you through Joel Borkert to place approximately 57 personnel, and then this is an email from Joel Borkert -- excuse me, providing a list of about 57 personnel.

Q   The next paragraph, Mr. Gottlieb writes, "On January 30, 2025, Noah Peters of the Office of Personnel Management."  Do you know Noah Peters?

A   Yes.

Q   Did you interact with him during your time at USAID?

A   Maybe.

Q   Did you interact with him outside of your time at USAID?

A   Yes.

Q   What was your inter -- what have -- strike that.

Tell me about your interactions with Mr. Peters during the time you've been with the government.

A   He's just a political.  I'd see him in the hallways at various agencies.

Page 148

Q   Did you work with him?

A   Not super directly, to my recollection.

Q   Have you spoken with him since he left the government?

A   Maybe I saw him at, like, a party or something.

Q   Mr. Gottlieb writes, "Noah Peters transmitted to me a list of 11 names forwarded to him by Luke Farritor."  He describes the email.

A   Yep.  He just describes this email over here.

Q   So, first of all, is that -- the paragraph beginning at the bottom of the first page and onto the second page, is there anything inaccurate that you know in what Mr. Gottlieb describes?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  Can you rephrase the question?

BY MR. WARREN:

Q   Sure.  Is there anything that you see that's inaccurate in that paragraph beginning on January 30, 2025?

MR. HUMPHREYS:  Objection as to speculation.

THE WITNESS:  It appears to be an accurate description of the aforementioned email.

Page 149

BY MR. WARREN:

Q   To be clear, you said it appears to be "an accurate"?

A   It appears to be -- yes.  It is accurate, is what it appears to be.

Q   The next paragraph beginning at 9:35 a.m., take a moment to read that.  If you need to reread it.  Mr. Gottlieb is describing a meeting in his office -- excuse me.  In Mr. Maliska's office on January 30, 2025.  Were you at that meeting?

A   Not to my recollection.

Q   The memo describes what happened at that meeting, a meeting involving Mr. Lewin, Mr. Maliska, other individuals.  Do you have any information about what happened at that meeting?  That is, do you have personal knowledge of anything that happened at that meeting?

A   Not to my recollection.

Q   Same question regarding the next paragraph describing a meeting at 10:32 a.m.  Were you at that meeting?

A   Not to my recollection.

Q   And for the record, this is a meeting with Mr. Maliska, Mr. Gottlieb, Tera Dahl, and Jeremy Lewin.  Do you have any personal knowledge of what happened at that

Page 150

meeting?

A   Not to my recollection.

Q   And to be clear, when I'm saying "personal knowledge," I'm including secondhand information, that is, anything anyone told you about the meeting, any documentation you saw about the meeting other than what we're looking at here.

MR. SILER:  I'm going to object as ambiguous because I don't think that's what personal knowledge means.

But he can answer.

THE WITNESS:  As discussed, I -- I don't have any recollection of this meeting.

BY MR. WARREN:

Q   Can you confirm or deny anything that's described here as having occurred in that meeting?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  I -- I wasn't at the meeting.

BY MR. WARREN:

Q   That's a no.  You can neither confirm nor deny what happened at that meeting?

A   I can only confirm or deny with firsthand knowledge, I believe, and, as discussed, I -- I was not at the meeting.

Page 151

Q   At the bottom of the second page of the memo, it says "Next Steps," Mr. Gottlieb writes, "Upon review of the material submitted, there is no colorable allegation of misconduct by any of the 57 employees I placed on administrative leave."

He continues, "There is no evidence any of them attempted to circumvent the President's orders."  Do you have any knowledge as to -- personal knowledge about what Mr. Gottlieb is referring to here?

MR. HUMPHREYS:  Objection.  Lack of foundation.

THE WITNESS:  Yeah.  What -- what are you referring to?  Could you rephrase the question?

BY MR. WARREN:

Q   Sure.  Do you have any personal knowledge about allegations of misconduct by any of the 57 employees that were placed on leave?

MR. SILER:  Objection as to vague.

Do you mean that he personally knows or that he also includes that he heard about?

MR. WARREN:  We'll start with personal knowledge.

THE WITNESS:  What -- what's the distinction between the two?

BY MR. WARREN:

Page 152

Q   We'll start with anything that you had firsthand information about.

A   I mean, I was not on this 57-person email chain.  So I didn't really have knowledge of this.

Q   Sure.  And outside of the 57 -- the email chain listing the 57 people, were you aware of any allegations of misconduct regarding those 57 people?

A   I -- I don't remember one way or another.  I wasn't really in these discussions as detailed in depth here.

Q   Were you asked to evaluate whether any of those 57 people had engaged in misconduct?

MR. SILER:  Objection as to form.

THE WITNESS:  I don't recall.

BY MR. WARREN:

Q   Were you asked to compile any evidence regarding whether any of those 57 employees attempted to circumvent the president's orders?

A   No.  I -- I don't -- I don't recall that.

Q   Do you understand that any of the work that you did while at USAID was used to evidence or document or establish any misconduct or attempt to circumvent the president's orders?

MR. HUMPHREYS:  Objection as to form.  And calls for speculation.

Page 153

THE WITNESS: Could you break down the question?

BY MR. WARREN:

Q Yeah. Based on your understanding of work that you were doing, did you know that anything you were doing was in relation to determining whether these employees had committed any misconduct or violated any executive order?

MR. HUMPHREYS: Same objection.

BY MR. WARREN:

Q Circumvented any order?

MR. HUMPHREYS: Excuse me.

Same objection.

THE WITNESS: I mean, all work you do in a political agency involves directives from agency leadership as well as compliance with executive orders as applicable. So obviously, you know, you're -- you're looking at those -- those matters.

BY MR. WARREN:

Q But you don't recall one way or the other whether you were ever asked to document whether any of these 57 people, or whether to investigate whether any of these 57 people, or to compile any research as to whether any of these 57 people either committed misconduct or attempted to circumvent the president's

Page 154

orders?

MR. SILER: Objection to form.

MR. HUMPHREYS: And asked and answered.

THE WITNESS: I was frequently asked to find or compile data prior to this decision to put these 57 on administrative leave. I have no memory of being asked to compile any evidence as you described.

MR. WARREN: Oh. We can put that document aside.

MR. HUMPHREYS: Let's take a break. About 1:30 -- almost 1:20.

MR. WARREN: Five minutes? I can make --

THE WITNESS: Sure. Fine.

MR. WARREN: -- (indiscernible).

THE WITNESS: That's fine.

THE PROCEEDINGS OFFICER: With no objections, we're going off the record. The time is 1:24 --

MR. WARREN: No. We're --

MR. HUMPHREYS: Sorry. Not -- not yet.

THE PROCEEDINGS OFFICER: Oh. Okay.

MR. HUMPHREYS: We're going to take a break in five minutes. We are still on the record, right? Just to confirm.

THE PROCEEDINGS OFFICER: Yes, sir.

Page 155

We're still on the record.

MR. WARREN: I'm handing you Farritor Exhibit 8.

(Farritor Exhibit 8 marked for identification.)

THE WITNESS: Okay.

BY MR. WARREN:

Q Mr. Farritor, have you ever seen this document before?

MR. SILER: Objection.

Just for the record, this is not a complete document on its face, so the record is clear.

MR. WARREN: Sure. So for the record --

MR. SILER: Sure.

MR. HUMPHREYS: Go ahead.

MR. WARREN: I'll put it on the record.

This is the first page of what's been filed in this case as document ECF Number 70-6. It is a internal memo dated February 2, 2025. And the rest of the pages of this document, I believe, are blank or redacted.

MR. SILER: I'm not sure that's accurate, but I -- it is the first substantive page of the filing. I agree with that.

THE WITNESS: What reason would there be to not include the full document?

Page 156

MR. WARREN: I'm only -- to save paper. I'm only asking about the first page of it.

MR. SILER: Well, I'm just going to object to that.

THE WITNESS: Yeah. I'm -- I'm a little confused. I -- I think it would be helpful to review a full document if I'm going to be asked to testify about it under oath.

BY MR. WARREN:

Q Have you ever seen this page before?

A **Not to my recollection.**

Q You see that the memo describes -- it's from Mr. William Maliska, the Chief Human Capital Officer, to -- strike that.

It's from Peter Marocco to William Maliska and Ken Jackson. Do you see that?

A **I see that.**

Q The subject says, "Personnel placed on administrative leave"?

MR. HUMPHREYS: I'm going to put an objection on the record that, as Mr. Farritor said, this is not the complete document, so his testimony obviously will only be about this page.

MR. WARREN: Yes. Understood.

BY MR. WARREN:

Page 157

Q   Mr. Marocco writes, "Tonight I place the following 633 USAID personnel on excused absence, also known as administrative leave."

And then it continues for a couple paragraphs, and then it starts with a list of names.  Are you aware of 633 people being placed on leave on February 2nd?

MR. HUMPHREYS:  Again, I'm going to object because there is no list of names, so it does not continue with a list of names.

THE WITNESS:  I've not seen this specific document before to my recollection.

BY MR. WARREN:

Q   Were you involved in any way with people being placed on administrative leave on February 2, 2025?

A   My recollection of the sequence of events is not so granular as to know if this was specifically on February 2nd.

Q   Did you do any work in connection with 633 people being placed on leave from USAID on or about February 2, 2025?

A   I don't recall one way or another.

Q   Okay.  Put that aside.  I'm handing you Farritor Exhibit 9, which is the first page of, in this case, ECF Number 70-7, a similar memo from Pete Marocco to William Maliska and Ken Jackson, dated February 3,

Page 158

2025.

(Farritor Exhibit 9 marked for identification.)

BY MR. WARREN:

Q   The subject is "Personnel placed on admin leave."  Do you see that?

MR. HUMPHREYS:  Same objection about this line of questioning on one page of a document.

THE WITNESS:  Yeah.  Again, this is one page of a document.  I don't recall seeing this specific page, but maybe.  I don't know.

BY MR. WARREN:

Q   The document states that, today, February 3, 2025, Mr. Marocco is placing 1,412 USAID personnel on administrative leave.  And then it begins with a list of names at the bottom of the first page.  Did you have any involvement in placing 1,412 USAID personnel on leave on or about February 3, 2025?

A   I don't have any recollection of drafting this memo or helping or anything like that.

Q   And what about any work outside the drafting of the memo?  Did you do any research, investigation, compile any data?  Were you asked to do anything in connection with people being -- that number of people being placed on leave around February 3, 2025?

MR. HUMPHREYS:  Objection.

Page 159

MR. SILER:  Objection to form.  Speculation.

It's not clear who the people are on this list to the witness.

THE WITNESS:  Yeah.  I -- yeah.  It's -- it's hard to answer that.  Could you break the question down?

BY MR. WARREN:

Q   Sure.  Question is, did you have any involvement in any work that you did at USAID regarding a large group of people of over a thousand being placed on admin leave on or about February 3, 2025?

A   Did I what?  Sorry.

Q   Do any work?

A   Maybe.  I don't recall one way or another.

Q   You don't recall doing -- compiling any research about -- leading to more than a thousand people being placed on admin leave?

A   I don't have any specific knowledge.  Maybe I helped procure an org chart or something like that, but I don't recall one way or another.

But, again, I don't know who these people are, so it's really hard to answer the question truthfully with the information I've been provided by plaintiffs.

Q   It would help you to know -- it would help you

Page 160

to remember whether you did work in placing 1,400 people on leave if you saw the list of their names?

A   It's generally helpful to give accurate testimony when I have a complete document.

Q   Okay.  That wasn't my question, though.  My question is, is your testimony that seeing the list of names of people being placed on leave would jog your memory as to whether you did any work about their being placed on leave?

A   Potentially.  Again, it's just helpful to have complete documents.

MR. WARREN:  All right.  We can take a break.

THE WITNESS:  Cool.  I need to go to the --

MR. SILER:  What do you want to say?

THE WITNESS:  How long?

MR. SILER:  Oh.  Sorry.  Can we go off the record?

THE PROCEEDINGS OFFICER:  We're going off the record.  The time is 1:30 p.m.

(Off the record.)

THE PROCEEDINGS OFFICER:  We're back on the record.  The time is 2:38 p.m., Eastern Time.  Thank you.

Page 161

BY MR. WARREN:

Q   Mr. Farritor, over lunch -- did you have lunch?

A   Yes.

Q   Over lunch, did you discuss the substance of your deposition with anyone?

A   No.

Q   I'm handing you what's been marked as Farritor Exhibit 10.

(Farritor Exhibit 10 marked for identification.)

BY MR. WARREN:

Q   This is a article from Politico dated January 8, 2025 (sic).

A   Sorry.  I -- I have a quick procedural question.  What happened to the other exhibits?

Q   Right here?

A   Yeah.  Can we bring them back here in case I want to reference them?

Q   Of course.

A   Thank you.

Q   Again, this is -- Farritor Exhibit 10 is a Politico article dated February 8, 2025.  The title of the article is "How spending 153 million to pay its bills put USAID in DOGE's crosshairs."

Take a look at the article and let me know if

Page 162

you've ever seen it before.  And so you know, I'm not going to question you about the whole article, but, of course, feel free to review it.

THE WITNESS:  Put it there.  Thank you.

BY MR. WARREN:

Q   Mr. Farritor, I see you're looking through other exhibits, and I'll allow you to do so.  My question for you is, have you ever seen this article before?

A   Let me finish jogging my memory here with these documents.  Looks like some of these got stuck together.  And I'll be ready to answer the question.  That's 5, 6.  This one goes with that one.  Okay.  So that's 6.  7, 8, and 9.  Cool.  I don't believe I've seen this article before.

Q   I want to refer you to a few things in the article.  On the second page of the exhibit, so this is the top.  It begins, "It was Thursday, January 23rd, when the Trump administration official had discovered that," I'm paraphrasing, USAID recently made $153 million in payments for a range of expenses.

Does the number "153 million" with regard to USAID mean anything to you in terms of payments that were made at the beginning of your time at USAID?

A   It does not map to anything in my memory.

Page 163

Q   The article continues, "Marocco, who was effectively running the agency from the State Department, demanded to know why the money was sent."

Are you aware of Marocco -- Pete Marocco, demanding to know or asking about or inquiring about approximately $153 million in payments made by USAID around January 23, 2025?

MR. SILER:  Objection to form.

THE WITNESS:  Could you rephrase the question?

BY MR. WARREN:

Q   I can have it repeated.

A   Could you re-ask the question?  I'm not sure I -- I fully understood it.

Q   Sure.  The question is, were you aware of Peter Marocco demanding to know why the $153 million was sent, or asking about it, inquiring about it?

A   I don't recall one way or another.

Q   The article continues, this is now the second paragraph in the middle of the page, "Just three days earlier, President Trump had issued an executive order halting foreign aid spending."

And then it continues, "Was USAID trying to do an end-run?"  Do you recall any concern at USAID during the time you were there about $153 million that had been

Page 164

sent that was an end-run around an executive order halting foreign aid?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  Could you define "end-run"?

BY MR. WARREN:

Q   Sure.  A way to circumvent the president's directive to halt foreign aid.

A   I don't recall one way or another.

Q   And do you recall the 153 million number as anything significant?

MR. HUMPHREYS:  Objection.

MR. SILER:  Asked and answered.

THE WITNESS:  No.

BY MR. WARREN:

Q   The article -- article continues, "In meetings over the next 24 hours, USAID officials tried to explain the situation.  The 153 million, they pointed out, covered numerous payments, including a key set of employee salaries and money owed to organizations for work already done."  First, do you recall USAID officials around this time working to explain the situation about $153 million that was sent?

MR. SILER:  Objection.  Lack of foundation.

THE WITNESS:  Over what period of time?

Page 165

BY MR. WARREN:

Q   Around this period of time, January 23rd.

A   I don't believe -- that would be the third day of the administration?  I don't know if I was at USAID at that point in time.

Q   When you arrived at USAID, do you recall discussions about the $153 million and trying to explain what that money was for?

A   I don't recall a specific $153 million.

Q   Do you recall any amount of money in this range that was being looked into by USAID officials to determine whether it was inconsistent with the presidential directive to halt foreign aid spending?

A   I -- I imagine that was occurring, but I -- I don't specifically recall one way or another.

Q   And were you involved in any of those conversations or any of the work around approximately $153 million in foreign aid payments?

MR. SILER:  Objection to form.

You can answer.

THE WITNESS:  I don't recall anything summing to 153 million.

BY MR. WARREN:

Q   Or in that ballpark?

A   I don't recall people looking for specific

Page 166

amounts of money.

Q   And to be clear, I'm not asking about people looking for a specific amount of money, but after this amount of money or this approximate amount of money had been identified, were you involved in any conversations about it in terms of the authorization for that money?

A   I don't recall any conversations involving something summing to $153 million.

Q   At the end of the first page, the article says, "In the USAID officials' view, the payments did not violate the Trump foreign aid freeze.  Marocco apparently was not convinced."

Were you aware at any time that Mr. Marocco had inquired as to payments that are made by USAID that may have been in violation of the presidential directive on foreign spending?

A   At what point in time again?  Sorry.

Q   Around January 23rd, January 24th of 2025.

A   I imagine it was a topic of conversation, but I don't have specific recollection one way or another.  I mean, obviously, people talk about executive orders.

Q   Have you ever discussed foreign aid payments from USAID with Mr. Marocco?

A   I mean, I would -- you know, there were discussions about handling of finances with USAID senior

Page 167

agency leadership.  I don't recall one way or another, but I imagine that would include Mr. Marocco.

Q   Did you ever discuss with Mr. Marocco money that was paid by USAID that may have been in violation or contrary to any presidential directive regarding foreign aid?

MR. HUMPHREYS:  Objection.  Asked and answered.

THE WITNESS:  I recall, you know, discussing, you know, payment processes and systems.  I -- I don't recall any specific conversations with Marocco.  And I don't recall any specific conversations at -- at this time of around January 23rd.

BY MR. WARREN:

Q   On the top of the next page, the article reads, "On Monday morning, January 27, Marocco arrives at USAID headquarters with more than a dozen people, most, if not all, representatives of the Department of Government Efficiency."  Were you aware that Mr. Marocco showed up at USAID on January 27th?

A   I don't have a recollection of what occurred on January 27th.  Again, it was chaotic.  It's hard to map, you know -- you know, recall in such granularity.

Q   Did you ever go to USAID with Mr. Marocco?

A   I imagine there were cases where I went there

Page 168

and he was as long -- as well as many other politicals were there.  Yeah.

Q   Understood.  But did you ever actually go there with him?  Not you were in the building at the same time, but you went there together.

A   I have no memory of walking through a turnstile with him.

Q   What about showing up at the building?

A   That would be walking through a turnstile.  There's turnstiles outside of these buildings.

Q   We've been talking about $153 million that's referenced in the article.  Let's expand that to unauthorized payments generally.  Did you have any work at USAID or before you got to USAID -- strike that.

Did you ever do any work for the government looking at unauthorized payments by USAID?

A   What -- what verb did you use?  Was it "looking at"?

Q   Yes.

A   There were extensive discussions of USAID payments and payment systems.  I don't recall any specific discussion surrounding any specific legal form of authorization, but more so just compiling -- compiling data and providing it to others as needed.

Q   And outside of specific legal authorization,

Page 169

do you recall or were you involved in any work or any discussions about unauthorized payments in the sense of payments that violated or appeared to violate a presidential directive on foreign aid?

MR. HUMPHREYS: Objection to form.

THE WITNESS: Well, obviously there are a lot of presidential directives on -- on foreign aid, you know, this administration and many others, there's a -- a very long body of -- of that -- of those directives. I imagine they came up at -- at some point in these discussions.

BY MR. WARREN:

Q   You don't recall one way or the other being involved in looking into whether payments made by USAID violated President Trump's executive order, a halt on foreign aid?

A   Maybe. I -- I just don't recall one way or another. It's -- I don't recall any specifics of these conversations.

Q   Okay. You can put that aside. Thank you.

THE WITNESS: Yes. Thank you.

BY MR. WARREN:

Q   Mr. Farritor, I'd like to turn back to Farritor Exhibit 2.

A   Yep.

Page 170

Q   I know we went over this document before, but now that we've been discussing unauthorized payments and specifically the $153 million, I want to see if that discussion has refreshed your recollection as to anything in this exhibit.

A   Well, this is obviously a different time period. This appears to be January 27th and the 30th.

Q   I'm sorry. Different time period than what?

A   The -- on or around January 23rd that you were persistently mentioning a few minutes ago.

Q   Okay. So there're references here -- we've looked through this exhibit before, but the payment systems you're looking at, the HHS payment system where USAID is involved. Were you looking into those payments to determine whether there was any unauthorized payments?

A   Define "authorized."

Q   Unauthorized meaning either in violation of or inconsistent with President Trump's executive order halting foreign aid.

A   I don't recall specifically looking at data in this system at this time in -- in connection with any specific executive order. But, obviously, as you can see from the email, I was doing general data compiling for others.

Page 171

Q   And outside of your knowledge of whether it was in an executive order, do you recall whether the work you were doing that's referenced in Farritor Exhibit 2 was in connection with determining whether any payments made by USAID were not supposed to have been made, either illegally or for policy reasons?

A   Could you restate the question?

Q   Yes. The work that you reference here in Farritor Exhibit 2, was that work in connection with determining whether there were any payments by USAID that were not supposed to have been made? And by "not supposed to," I mean either not authorized or not in compliance with administration policy.

MR. HUMPHREYS: Objection. Form.

THE WITNESS: I don't recall what exactly prompted the data that was compiled in this email. Obviously this is a list of users and their points of contact, not a list of specific payments.

BY MR. WARREN:

Q   Right. But I'm not -- I'm not focused on the list of users, but what you write in Number 2 and 3 in the reference to the USAID CFO letter, which is about payments made. So I'm talking about the payments themselves.

A   So you're referring to bullet point 3 here,

Page 172

"Attached is the letter USAID sent to the HHS payments office"?

Q   I'm talking about what you've described in Numbers 1, 2, and 3, aside from the list of the 11 names.

A   I mean, here I reference that I perceive the HHS payment system to have had over 350 payment requests where USAID is listed as an awarding agency. Yeah. That's -- that's what it is.

Q   Okay. And so, again, just trying to make sure I understand, you don't recall one way or the other whether the work that you did referenced in this document was in connection with looking into unauthorized payments by USAID?

A   I don't recall one way or another.

Q   Okay. What information did the HHS system tell you about payments made by USAID?

MR. HUMPHREYS: Objection. Vague.

THE WITNESS: Which HHS payment system?

BY MR. WARREN:

Q   The system referenced in here.

A   I'm not sure which one this is referencing. I -- I think I might know which specific one, but I'm not sure. What information? I don't really recall. It was a very antiquated and clumsy system.

Page 173

Q   From the HHS system that you reference in Farritor Exhibit 2, could you determine the amount of payments paid by -- made by USAID?

A   **It was counterintuitively unclear, actually.**

Q   Is that a yes or no?  Or it depends?

A   **It was difficult to tell.**

Q   But could you figure it out?

A   **I don't think anybody could figure it out.  I think it was too complicated.**

Q   Were you able to identify through the HHS payment system, who the USAID payment was to?

A   **I don't remember.  It was a very challenging system to work with that was -- you know, I forget the word, but demonstrative of the inefficiencies of the government.**

Q   Could you identify the date that the payment was made from the HHS system?

A   **No.  Because that was also an incredibly complex process.**

Q   Could you identify the amounts from the HHS system?

A   **That was also an incredibly complex process, so it's hard to give a single number.**

Q   Could you identify what the payment was for?

A   **I don't recall.  Probably not, really.**

Page 174

Q   So to make sure I understand, your recollection is from the HHS payment system that you were looking into, you cannot identify who the payment was made to, the date, the amounts, or what the payment was for?

MR. HUMPHREYS:  Objection.  Misstates testimony.

THE WITNESS:  I'm saying that all government payment systems, including ones that happen to be at HHS, are far more complex than they should be, which, in turn, makes them very difficult to interpret.

BY MR. WARREN:

Q   But that's not my question.  My question was, is it your testimony that the HHS payment system that you reference in Farritor Exhibit 2, from that payment system, you could not determine about USAID payments, who the payment was to, the date it was made, the amounts, or what the payment was for?

MR. HUMPHREYS:  Objection to form.

THE WITNESS:  I don't recall the specifics of the system, but I recall that all of these systems were difficult to understand.  As I state explicitly in the -- in this exhibit by saying my numbers could be off.

BY MR. WARREN:

Page 175

Q   Could the payments by USAID that are referenced here --

A   **Referenced where?**

Q   In this exhibit.

A   **The 350 in bullet point 2?**

Q   Yes.

A   **Yep.**

Q   Could those payments be stopped within the HHS system?

A   **I don't recall.**

Q   Would you need access to a USAID system to stop the payments?

MR. HUMPHREYS:  Objection.  Lack of foundation.

THE WITNESS:  I don't recall.

BY MR. WARREN:

Q   Is that why you needed access to USAID financial systems?

MR. HUMPHREYS:  Objection.  Foundation.

THE WITNESS:  I don't recall.

BY MR. WARREN:

Q   Before lunch, we were looking at Farritor Exhibit 3.  I'm going to pull it up, of course.

A   **Yep.  Yep.**

Q   I asked you about this earlier, but I just

Page 176

want to ask you again to see if anything we've discussed after lunch has refreshed your memory.

On the third page of the exhibit, it's the first email that Mr. McGill sends where he describes you requesting access control information to verify the suspension of access control to individuals.  Did that have anything to do with unauthorized payments being made by USAID?

A   **It is explicitly in the exact sentence that you are referencing in regard to individuals recently placed on administrative leave.**

Q   Is that in regard to unauthorized payments that were made by USAID?

A   **As we've already discussed, my understanding is that these individuals were placed on administrative leave is in reference to another email that we have discussed extensively where acting administrator placed them on leave.**

Q   And you testified before that you -- that senior leadership at USAID placed the people on leave and that it was not properly handled and that some people who should have been placed on leave had access they should not have had.

A   **Yes.  In fact, in the exhibit, an individual states explicitly that they are going to do that.**

Page 177

Q   And is that in regard to unauthorized payments?

A   Let's check the exhibit and see.

Q   I'm asking for your recollection.

A   I understand, but if there's evidence in front of us, I think it's best to reference that evidence.

Q   Sure.

A   That's why the evidence is here.  Which one is it?  I guess it would be Farritor 7 is what I'm looking at for the room.  It states here that -- looking at the 1, 2, third paragraph right below background.

It says, "I received instructions from you," you being Jason Gray, "through Joel Burkert, the Deputy Chief of Staff, to place approximately 57 USAID personnel on administrative leave.  No justification was provided for this instruction."

Q   Okay.  Thank you for that.  My question is different.  My question is whether your request for access that's referenced in Farritor Exhibit 3 had anything to do with looking into unauthorized payments made by USAID.

MR. SILER:  Objection.  Vague.

THE WITNESS:  So let's go back to Exhibit 3 here.  It says, "Requesting access control information to verify the suspension of access control to

Page 178

individuals recently placed on administrative leave."

So I believe the request for access, in this email in Exhibit 3, is in regard to these individuals who were recently placed on administrative leave.

BY MR. WARREN:

Q   And to be clear, Mr. Farritor, are you testifying about your memory of events or are you inferring what you're reading from the documents, or both?

A   Both my memory and the evidence presented are consistent.

Q   Okay.  So your memory is that the two are connected?

MR. SILER:  Objection.

MR. HUMPHREYS:  Objection.

THE WITNESS:  Sorry.  What -- what two things?

BY MR. WARREN:

Q   The request for access referenced in Exhibit 3 and the suspension -- placement of people on administrative leave in connection with unauthorized payments.

MR. SILER:  Objection.  Misstates testimony.

Page 179

THE WITNESS:  I -- that's -- that's not what the evidence says as we just went over.  So --

BY MR. WARREN:

Q   Again, I'm not asking what the evidence says.  I'm asking based on your recollection.  Of course, if any document helps refresh your recollection, that's fine.  I'm asking what your memory is.

Was your request for access to USAID digital systems, as referenced in this exhibit, connected with people being placed on administrative leave because of unauthorized payments?

MR. SILER:  Objection as to form.  Speculation.

THE WITNESS:  I believe that's a -- a bit of a compound question, right?  My requests for access -- my requests for access were in connection to individuals that were placed on administrative leave.

But the matter of why they were placed on administrative leave is -- is a separate question that I may not necessarily have knowledge -- may not have had knowledge of at the time or at the present.  So that seems like kind of compound to me.

BY MR. WARREN:

Q   And you testified previously that you were working on this at the direction of senior agency

Page 180

leadership, specifically Mr. Jackson or Mr. Gray; is that correct?

A   And other members of political leadership.  Yes.

Q   What other members?

A   Jackson, Gray, at some point, Marocco was in the mix.  There were others, but their names don't come to mind.  I mean, Joel was there.

Q   We discussed the Phoenix financial system earlier.  Did you end up getting access to USAID's Phoenix financial system to investigate or look into or conduct research in any way regarding unauthorized payments by USAID?

MR. SILER:  Objection to form.  And characterization of the system, which I think is slightly different than the previous testimony on it.

But you can answer.

THE WITNESS:  I concur with that objection, although I'm not a lawyer.  Let me find it here.  Yep.  Yeah.  So here Jason Gray says, I approve of administrative access for dot, dot, dot, dot, dot, "including but not limited to Phoenix."  I -- I don't recall what that specific approval was -- for what specific purpose it was for in the context of this email.

Page 181

BY MR. WARREN:

Q   All right.  So you had testified to that before lunch, you didn't recall what the access to Phoenix was for.  I'm asking whether discussion about unauthorized payments has refreshed your memory and that you were seeking access to Phoenix financial system in order to do any work regarding unauthorized payments.

MR. HUMPHREYS: Objection as to form.

THE WITNESS: My -- my testimony remains the same.  I don't recall specifically asking for access to specifically look at unauthorized or authorized payments.

BY MR. WARREN:

Q   Back to Farritor Exhibit 2.  The email is dated Monday, January 27th at 4:28 a.m.  Is that odd for you to have sent an email at 4:28 in the morning?

A   No.

Q   Were you working at the office then?

A   I don't recall.

Q   Do you know where you were when you sent this?

A   I do not recall exactly where I was on January 27th at 4:28 a.m.  No.  I do not.

Q   Did you work at USAID that weekend?

A   I don't recall.

Q   Did you work at HHS that weekend?

Page 182

A   Maybe.  I don't really recall.

Q   Were you aware whether the work that's reflected in this email, the payment systems you looked into, the names that you've listed here, your admission "I could be wrong, my numbers could be off," were you aware that that was used to justify putting USAID employees on administrative leave?

MR. HUMPHREYS: Objection.

MR. SILER: Objection.  Vague.

THE WITNESS: Aware at what point in time?

BY MR. WARREN:

Q   At any point.

A   Yeah.  I mean, I -- sorry.  Could you repeat the question?

Q   Were you aware that the work that you've referenced in Farritor Exhibit 2, was used to justify putting USAID employees on administrative leave?

A   To my recollection at this point in time, I'm not aware of a connection.

Q   And were you ever aware?

A   Not to my recollection.

Q   Did you interact directly with Ken Jackson during the time you were at USAID?

A   Occasionally.  Yeah.

Page 183

Q   Describe the nature of those interactions.

A   He's a pretty chill guy.  They're pretty -- you know, he's a relaxed guy.  The meetings are pretty relaxed.

Q   And what were you discussing substantively?

A   I don't recall, but yeah.

Q   Your work at USAID?

A   I imagine that came up.  I mean, there are obviously emails we've looked at here where Ken, you know, discusses me.

Q   Did you discuss things other than your work at USAID?

A   We probably discussed, like, the weather or something.

Q   Did you ever discuss with Mr. Jackson unauthorized payments made by USAID?

A   Not to my recollection.

Q   Did you ever discuss with Mr. Jackson people being placed on administrative leave?  I'm talking outside of emails.  I'm referring to in-person or telephonic conversations.

A   It's possible.  I don't recall one way or another.

Q   Ever talk to Mr. Jackson about your getting access to USAID physical or logical systems?

Page 184

A   I imagine we discussed it at some point, but I don't recall the specifics of any given conversation.

Q   If you could turn to Exhibits 8 and 9.  Those are the two -- the first pages of those memos.

A   Yep.

Q   So we talked about this before lunch.  Those memos reference approximately 2,000 people being placed on administrative leave on Sunday, February 2nd, Monday, February 3rd.  Do you recall any work that you did that weekend leading up to 2,000 people being placed on admin leave?

A   That weekend, what -- what day of the year was February 2nd and 3rd?

Q   February 2nd was a Sunday of 2025 and the 3rd was a Monday.

A   I don't have any specific recollection of the events leading up to these memos.

Q   And you don't have any specific recollection of any work you did leading to 2,000 people being placed on admin leave as reflected in those two documents?

MR. HUMPHREYS: Objection.  Argumentative.

THE WITNESS: Could you rephrase your question?

BY MR. WARREN:

Page 185

Q   Sure.  Do you have any recollection of doing any work that led to 2,000 people being placed on admin leave as reflected in those two exhibits?

MR. HUMPHREYS:  Objection.  Misstates testimony.  And argumentative.

THE WITNESS:  I don't have a memory of being part of those deliberations.  Those decisions were not made by me, and I was not really in the loop on them.

Maybe at some point I was asked to provide data, like, maybe provide, like, an org chart or something like that, go find that in the relevant systems, but I don't have any memory of that.  No.

BY MR. WARREN:

Q   You've mentioned finding an org chart a couple times in your testimony today.  Is that an actual example of something you were asked to do or you're just --

A   I'm giving an illustration.

Q   Were you ever asked to find an org chart?

A   Not to my memory.

Q   Presumably other people at USAID, as you understood the organization to function, could have found an org chart?

A   I'm not sure I understood the organization to

Page 186

function, and I'm not sure there was an org chart.

Q   All right.  So why do you keep using that as an example of something you were asked to do if you weren't asked to do it?

MR. HUMPHREYS:  Objection.  Misstates --

THE WITNESS:  Because it's an example.

MR. HUMPHREYS:  Let me object if you would.

THE WITNESS:  Okay.

MR. HUMPHREYS:  Objection.  Misstates testimony.

BY MR. WARREN:

Q   So let's go back.  You said that you don't have any memory of being part of the decisions to put 2,000 people on administrative leave, except perhaps to find an org chart or something like that.  Do you have any examples of work that you recall doing in connection with 2,000 people being placed on leave?

MR. HUMPHREYS:  Objection.  Misstates prior testimony.  Argumentative.

THE WITNESS:  Could you break down the question?

BY MR. WARREN:

Q   Yes.  I asked if you had any recollection of any work that you did that led to the 2,000 people being

Page 187

placed on admin leave.  In your -- in your answer, you provided the example of obtaining an organizational chart, and then you said you never actually obtained an organizational chart.  So I'm asking you --

A   That's -- that's not what I said.  I said --

Q   Let me finish.  Mr. Farritor, let me finish.  You'll have a chance to explain.  I'm asking if you can think of any specific examples of work you actually did at USAID in connection with 2,000 people being placed on leave as reflected in these two exhibits.

MR. HUMPHREYS:  Objection.  Misstates testimony.  And argumentative.

THE WITNESS:  So my understanding of what I said a few minutes ago is that I don't have any specific memory, one way or another, of doing any work for these specific administrative actions.  I was not part of these deliberations.  I was not part of these decisions.  You know, I'm not on these memos or anything like that.

There may have been a point in time where I was asked to, you know, maybe go compile or provide general data such as the example that I -- I gave, but I was not part of any of the decision-making leading up to these two memos being decided upon and signed.

BY MR. WARREN:

Page 188

Q   So you say you may have been asked to provide data.  You gave the example of an org chart, but then said you never were asked to provide an org chart.

A   I -- I --

Q   Can you -- let me finish.  Can you provide me an example of data you actually were asked to compile or provide?

MR. HUMPHREYS:  Objection.  Asked and answered.

THE WITNESS:  I don't have any specific memory of anything I was asked to prepare.  If I was asked for something, it would be something akin to the example that I gave you.  But in the case of USAID, I have no memory of there ever being an org chart in existence at all.

BY MR. WARREN:

Q   Around this time, February 2nd and February 3, 2025, after a large number of people, again, 2,000 referenced in the documents, were placed on admin leave.  Were you aware of whether their email and computer systems access were cut off?

MR. HUMPHREYS:  Objection to form.

THE WITNESS:  I mean, both of these memos state that system access will be restricted.

BY MR. WARREN:

Page 189

Q   To be clear, my question is about whether you remember now what the document says, and if it refreshes your memory, again, that's fine.

But I'm asking, do you have an independent recollection that people who had been placed on admin leave had their systems access terminated?

A   I don't have an independent recollection of these two documents or the actions that came from them. I don't have an independent recollection, but I generally recall that when individuals were placed on administrative leave, they had access restricted.

Q   Did you have any involvement in restricting that access to people who were placed on admin leave?

A   As discussed extensively in the other documents, sometimes I did.

Q   Are you aware of the USAID Automated Directives System, the ADS system?

A   No.  I don't know of any system by that name.

Q   Are you -- are you aware, or were you aware of any USAID system that contained policies and guidance that was on the internet?

MR. HUMPHREYS:  Objection to form.

Are you asking if he knew then or now? Just the way you phrased the question.

MR. WARREN:  Sure.

Page 190

BY MR. WARREN:

Q   I'm asking if at the time you worked at USAID, you were aware of it.

A   Aware of a system that did what precisely?

Q   A system that contained USAID policies and guidance.

A   I mean, there was like email and stuff, and I -- I mean, maybe people kept documents in SharePoint.  I don't know the precise authoritative system to, you know, keep and maintain policies.

Q   Were you involved --

A   I imagine that would be statute, right?  Like -- anyway, sorry.  Keep going.

Q   Were you involved in the dismantling or disabling of any database at USAID or any logical system?

MR. SILER:  Objection to form. Ambiguous.  Compound.

THE WITNESS:  Sorry.  Logical system, to my understanding, can mean any computer system.  Same way logical access means computer access.

BY MR. WARREN:

Q   Right.  So that's what I'm asking about.  The shutting down of any individual system within USAID. I'm not talking about cutting off an individual's access

Page 191

or something like that.

I'm talking about a computer system within USAID, as you've testified there were many, being turned off, dismantled, rendered inoperative, or anything similar to that.

MR. SILER:  Objection.

THE WITNESS:  Go ahead.

MR. SILER:  Misstates prior testimony.

THE WITNESS:  I recall working with specific systems.  I don't recall, you know, turning off or, you know, fully shutting down any systems.  But, obviously, this is extremely loaded and can mean many, many different things, as I'm sure you're now going to dig into.

BY MR. WARREN:

Q   Are you aware that USAID's website was shut down on or about February 1, 2025?

A   No.  I'm not aware it was shut down.  I -- I -- maybe it was changed, but you could still go to a USAID website.

Q   When you say "changed," what do you mean?

A   The thing that was on the website became different than the thing that was on the website prior.

Q   And describe how it is different.  Was.

A   I don't have any specific recollection of

Page 192

changes that were made, but I'm sure changes were made.

Q   Did you have any involvement in any changes to the website made on or around February 1, 2025?

A   Not to my recollection.

Q   Did you ever discuss with anyone effectively shutting down USAID's website?

A   Not to my recollection.

Q   I'm handing you Farritor Exhibit 11.

(Farritor Exhibit 11 marked for identification.)

THE WITNESS:  We've moved to Twitter off of -- what was this?  Politico to Twitter.  Excellent. Or excuse me.  X.com.  The everything app.

MR. HUMPHREYS:  I'm sorry.  Andrew, which exhibit number?

THE WITNESS:  11.

MR. WARREN:  11.

MR. HUMPHREYS:  Thank you very much.

THE WITNESS:  Okay.

BY MR. WARREN:

Q   Exhibit 11 is a screenshot from Twitter of an email sent from a USAID Press address on February 3, 2025, discussing the USAID headquarters being shut down. Have you ever seen this email before?

MR. SILER:  Objection.  Mischaracterizes.

THE WITNESS:  Maybe.  I mean, I assume

Page 193

that it went to all USAID and that would include my email address.

BY MR. WARREN:

Q   Do you recall receiving this email?

A   I don't recall one way or another.

Q   Were you aware whether on or about February 3rd an email was sent to all USAID staff informing them to work from home and that the Ronald Reagan Building in Washington would be closed to agency personnel?

A   I recall at some point the Reagan Building was closed. I don't know if the recollection that is appearing in my mind happened on February 3rd or some other date.

Q   Did you ever discuss with anyone the closing of USAID headquarters?

A   Not to my recollection.

Q   Did you ever talk with anyone about -- strike that.

Did you ever communicate with anyone about an email being sent out informing USAID personnel that headquarters was being closed?

A   I don't recall communicating about that.

Q   Handing you Farritor Exhibit 12.

(Farritor Exhibit 12 marked for identification.)

THE WITNESS:  Another X.com post.

Page 194

BY MR. WARREN:

Q   I'm sorry.  Did you say "another X.compost" or "com post"?

A   X, then a period, then com, space, post.

Q   Okay.  I didn't know if you were opining on the quality of the exhibit or not.

A   Nope.

Q   I heard "compost."  That's a little bit punchy.  Okay.

A   It's my first deposition.  I have no idea what's going on.

Q   So this is -- Farritor Exhibit 12 is a printout of a tweet from @elonmusk.  It says, "We spent the weekend feeding USAID into the woodchipper. Could've gone to some great parties, did that instead." It's dated 1:54 a.m. on February 3, 2025.  Have you ever seen this tweet before?

A   I don't have specific recollection of reading it, but I read a lot of posts on X.

Q   Do you follow Mr. Musk on X?

A   I follow tens of thousands of people on X. I'm sure he's one of them.

Q   The weekend, February 3rd, as we discussed, was a Monday.  Mr. Musk's tweet references the weekend. Were you ever at USAID headquarters when Mr. Musk was

Page 195

there physically?

A   I don't recall being in the Ronald Reagan Building at the same time as Mr. Musk.

Q   Are you aware of Mr. Musk ever stepping foot into the Ronald Reagan Building during the time you were at USAID?

A   Not to my recollection.

Q   What about before you were at USAID?  Are you aware of it?

MR. HUMPHREYS:  Objection.

THE WITNESS:  I would not know.  Maybe he went 10 years ago and I -- I wouldn't know about that.

BY MR. WARREN:

Q   Do you know who from USAID in their senior leadership was at the Ronald Reagan Building on February 2, 2025?

MR. HUMPHREYS:  Objection.  Foundation.

THE WITNESS:  I -- I don't recall anything specific as to who was where on February 2, 2025.

BY MR. WARREN:

Q   Did you ever discuss with Mr. Musk feeding USAID into the woodchipper?

A   Not to my recollection.

Q   Did you ever discuss with Mr. Musk the

Page 196

shutting down of USAID?

A   I imagine it came up as a point of conversation at -- at some point in some meeting, but I don't have any specific recollection of any specific exchange.

Q   I'm handing you Farritor Exhibit 13.  One-page document, Bates stamp 1756.

(Farritor Exhibit 13 marked for identification.)

BY MR. WARREN:

Q   Mr. Farritor, as you see this is an email from Jeremy Lewin to Kenneth Jackson copying several people, yourself included, on February 4, 2025.

The subject is "Placement of CHCO William Maliska on admin leave."  And there's a reference to an attachment describing "admin leave notice."  Do you recall receiving this email?

A   I don't recall receiving this email.

Q   Do you know why Mr. Maliska was placed on admin leave?

A   I don't know why.  I guess Pete in this case made that decision.

Q   Did you ever discuss Mr. Maliska being placed on admin leave with Mr. Marocco?

A   I don't have any recollection of that.

Q   Did you ever discuss with Mr. Lewin, about

Page 197

Maliska being placed on admin leave?

A  Well, obviously there's some email about it, but I don't recall any specific discussion.

Q  What about Mr. Davis?  Did you ever talk with him about it?

A  Not to my recollection.

Q  Mr. Jackson?

A  Not to my recollection beyond this email that's in front of us, which I don't even remember, like, reading in the first place.

Q  You can put that aside.  I'm handing you Farritor Exhibit 14.  The Bates range is 1715 to 1717.

(Farritor Exhibit 14 marked for identification.)

BY MR. WARREN:

Q  Mr. Farritor, this is an email chain that goes in reverse order.  Take a minute to look at it.

A  Yeah.

Q  So on the second page -- (coughs) excuse me. March 4, 2025, 10:22 p.m., you wrote to Nancy Mausolf an email with the subject "Phoenix back-end access."  Who is Nancy Mausolf?

A  I don't recall.  Looks like she has a USAID email address.

Q  You write, "Hi Nancy, per discussion with leadership, I'm reaching out to get back-end access to

Page 198

Phoenix."  This is access to the Phoenix system?

A  That appears to be what is written.

Q  Do you recall why you needed access to the Phoenix financial system in March 2025?

A  I don't recall.

Q  The Phoenix financial system, as we've discussed, is the financial management system at USAID. Is that your recollection?

A  It is -- I would characterize it as, I believe, one of the systems that is used to manage some financial tasks.

Q  And the Phoenix system tracks disbursements made by USAID?

MR. HUMPHREYS:  Objection.  Form.

THE WITNESS:  I think some of them, to my recollection.

BY MR. WARREN:

Q  Are you familiar with a system called "GLAAS," G-L-A-A-S, the Global Acquisition and Assistance System, at USAID?

A  Sounds like something they would have.  I don't recall the specifics of the system.

Q  You write to Ms. Mausolf, "I'm not too familiar with what exact systems are used, but need the ability to add/remove users, add/remove approvers, view

Page 199

all payments in SQL, and similar full administrative abilities for myself and Gavin."  Why did you need that access?

A  I don't recall.

Q  What's SQL?

A  It's a database query language.

Q  What does it mean?

A  You use it to query databases.

Q  Well, you don't recall why you needed the ability to add or remove users from the Phoenix system?

A  I don't recall.

Q  To add or remove approvers?

A  I don't recall.

Q  To view payments in SQL?

A  I don't recall.

Q  And similar full administrative abilities?

A  Still don't recall.

Q  And why were you asking for Gavin to have that access?

A  I don't recall.

Q  That's Gavin Kliger?

A  He is the one CC'd on this email, so I would presume yes.

Q  At the bottom of the first page of the exhibit Ms. Mausolf responds, "Plus Maureen Danso (phonetic) for

Page 200

approval."  Do you know who Maureen Danso is?

A  I don't recall.  Looks like she is using a State email address.

Q  Above that, you see her response, 7:43 a.m. on March 5th.  "Hi Luke, I was not told to provide financial systems access to anyone.  I will need to get approval from Mike Needham to do so."  Do you recall this?

A  I don't recall this specific email.

Q  Do you recall trying to get access to financial systems and being told that she couldn't provide it, or that it couldn't be provided, and that other access was needed?

A  I don't recall this specific exchange.

Q  And do you recall generally this event occurring where you were trying to gain access and told that it wasn't authorized for you to have financial systems access?

A  I mean, lots of people would, you know, say to me that I couldn't have access for various things as we've discussed in these other exhibits.  I don't have specific recollection of this specific exchange.

Q  At the top of the exhibit, Mr. Lewin's email says, "Thanks, Maureen.  Please copy me on that request to Mike Needham.  I can provide additional context

Page 201

directly to Mike."

And then he writes, "Of note, this access is covered by the executive orders requiring full access to all non-classified systems and giving DOGE authority to audit payment systems to 'defend the spend'." What's your understanding of what he meant by "DOGE" there?

MR. SILER: Objection. Speculation.

THE WITNESS: I don't recall this specific email exchange, and I don't know what specifically he's referring to by "DOGE."

BY MR. WARREN:

Q   Do you know what he's referring to by "defend the spend"?

A   No.

Q   Do you know what he's talking about, broadly, when he says DOGE needs authority to audit payment systems?

MR. SILER: Objection. Speculation.

THE WITNESS: He's probably referring to the presidential directives to prevent waste, fraud, and abuse.

BY MR. WARREN:

Q   What was Mr. Lewin's position at USAID at this time?

A   I don't recall.

Page 202

Q   Mr. Farritor, you can put that aside. I'm handing you Farritor Exhibit 15.

(Farritor Exhibit 15 marked for identification.)

MR. WARREN: And for the record, this is an executive order from the White House dated February 26, 2025, titled "Implementing the President's Department of Government Efficiency Cost Efficiency Initiative."

BY MR. WARREN:

Q   Please take a moment to review and let me know if you've ever seen this order before.

A   I believe I've seen this order before at some point in the past.

Q   Starting at Section 2D on the bottom of the first page, there's a reference to the agency's DOGE team lead. And then if you turn to the second page of the exhibit, the section "Review of Covered Contracts and Grants," again, reference to DOGE team lead. Several references to DOGE team lead.

I asked you similar questions in connection with Farritor Exhibit 1, which was the January 20th executive order. Now, in connection with this February 26th executive order, who was the DOGE team lead at USAID when you were detailed there?

A   I don't recall.

Page 203

MR. SILER: Just for the record, that -- the first page of Exhibit 5 (sic), I swear I'm not trying to be petty, but part of the line that you just referred to on the first page is blocked out by the "Join Now" button. I have no independent memory of what that says, so I just object to the extent that it's covered up.

MR. HUMPHREYS: 15.

THE WITNESS: Yes.

MR. HUMPHREYS: 15. Excuse me.

THE WITNESS: And then --

MR. SILER: Yeah. I don't know what it says or if it has anything to do with the context that is the next sentence that you were referring to.

MR. WARREN: Sure.

THE WITNESS: And then the -- on the second page here, the header appears to cover out -- is that true?

MR. SILER: There appears to be a missing sentence or something, but --

THE WITNESS: Yeah.

MR. SILER: Or maybe it's -- is it repeating the same -- yeah.

THE WITNESS: I don't think so. Yeah. I -- I think there's some formatting error as it was

Page 204

printed. Yeah.

MR. SILER: I'm not trying to be -- yeah.

MR. WARREN: No. Understood.

THE WITNESS: There -- there may be a missing sentence or two here.

BY MR. WARREN:

Q   Again, as to this question in context of the January 20, 2025 executive order, but now in connection with the February 26th executive order, did you consider yourself to be a member of the DOGE team at USAID?

MR. HUMPHREYS: Objection. Asked and answered.

THE WITNESS: I considered myself to be a political at the agency implementing senior agency leadership directives that were consistent with presidential directives to fight waste, fraud, and abuse.

BY MR. WARREN:

Q   And in the middle of the second page, the subsections B, C, D are referencing contracts and grants. You see that? Review of covered contracts and grants, contracting and grant process review, covered contracts and grants approval.

At any point in time, did your work at USAID shift to focus from technology modernization to

Page 205

reviewing or grant approval process or anything connected with grants and contracts?

MR. HUMPHREYS: Objection. Compound.

MR. SILER: Objection. Foundation.

THE WITNESS: Obviously there were, you know, discussions about payment processes and systems. That was a persistent theme amongst agency leadership at USAID.

BY MR. WARREN:

Q   Did the focus of the DOGE team at USAID shift after the issuance of this executive order?

MR. HUMPHREYS: Objection. Mischaracterizes testimony.

THE WITNESS: I don't recall how agency leadership or any individuals at USAID -- sorry.

MR. SILER: There's an echo on the Zoom.

THE WITNESS: Yeah.

THE PROCEEDINGS OFFICER: Sorry, Mr. Farritor, you can finish.

THE WITNESS: Yeah. Could you -- could you mute yourself, so there isn't echo? Yeah. Okay. Sorry. Should be good to keep going.

Could you repeat the question?

BY MR. WARREN:

Q   Sure. I was asking about whether the focus of

Page 206

work by the DOGE team at USAID changed after this executive order was issued. And you were starting to say you're not sure about leadership.

A   I don't recall one way or another how leadership or any individuals at USAID changed their directives or behavior on the basis of this executive order.

Q   Did your work personally at USAID change following this executive order?

A   I don't recall one way or another. Go ahead.

MR. SILER: Objection. Ambiguous.

MR. WARREN: Got it. (Indiscernible) --

THE PROCEEDINGS OFFICER: Sorry to interrupt -- sorry to interrupt, Counsel.

If we make an objection, can we please state who is making the objection? Thank you.

MR. SILER: This is Mr. Siler. And yes.

THE WITNESS: Could you repeat the question?

BY MR. WARREN:

Q   I forgot it.

A   All good.

Q   Did your personal work at USAID change in any way after the issuance of this executive order?

Page 207

MR. SILER: This is Mr. Siler.

Objection to form. And ambiguous.

You can answer.

THE WITNESS: I don't recall senior agency leadership directives changing in response to this executive order. I don't recall if that happened one way or another. And similarly, I don't recall if my specific directives were modified one way or another at USAID.

BY MR. WARREN:

Q   What about at any other agency where you worked?

A   I don't recall one way or another.

Q   Did you ever deactivate payments within the Phoenix system?

A   What do you mean by that?

Q   Did you ever shut down payments that were being made within USAID's Phoenix financial system, or make it so that the payments cannot be made?

MR. SILER: Objection. Ambiguous. This is Mr. Siler. Sorry. And vague.

THE WITNESS: There were cases where agency leadership would sign memos regarding payments or executive orders were issued, and at times we would work with career staff to implement those directives. That's

Page 208

what that -- you know, that's the answer.

BY MR. WARREN:

Q   And you were involved in doing so in terms of deactivating payments within the Phoenix system?

A   What do you mean by "deactivated payment in the Phoenix system"?

Q   Make it so that the payment cannot be made.

A   I believe the process is far more complex in any accounting system than for it to be that black and white.

Q   Okay. With that being said, were you ever involved in that process to make it so that a payment cannot be made within Phoenix?

A   I recall agency leadership issuing memos about processes for how payments would be handled. And I recall updating relevant systems with career officials to follow those directives.

Q   Do you recall a particular day where you deactivated hundreds of payments within the Phoenix system?

MR. SILER: Objection.

MR. HUMPHREYS: Objection to form. Mr. Humphreys.

THE WITNESS: I don't recall that happening. I don't believe it did.

Page 209

BY MR. WARREN:

Q   You said senior agency leadership would give directives and you would follow those directives with regard to what I've termed deactivation of payments within the system.  Who was the senior agency leadership who did that?

MR. SILER:  Objection.  Mischaracterizes prior testimony.

But you can answer.

THE WITNESS:  Yeah.  First of all --

MR. SILER:  Mr. Siler.  Apologies.

THE WITNESS:  Yeah.  It's Mr. Siler.

MR. SILER:  You can answer.

THE WITNESS:  Could you repeat the question, sir?

BY MR. WARREN:

Q   Sure.  What senior agency leadership at USAID directed you to deactivate payments within the Phoenix financial system?

MR. SILER:  This is Mr. Siler.  Objection to the extent it misstates prior testimony.

THE WITNESS:  I don't recall who was issuing directives about what payments.

MR. WARREN:  Okay.  I'm sorry.  I'm handing you Farritor Exhibit 16.  Bates range 1707 to

Page 210

1714.  This is an email chain with the subject "Access Requests" and it's in reverse order.

(Farritor Exhibit 16 marked for identification.)

THE WITNESS:  Okay.

MR. SILER:  Just object or note for the record that in some of these emails it's not clear who's copied in which one.

THE WITNESS:  Yep.

BY MR. WARREN:

Q   Mr. Farritor, if you turn to the fourth page of the exhibit, Bates stamp is 1710, there's an email at the bottom of the page from Jeremy Lewin to Jason Gray, copying Peter Marocco, Ken Jackson, you, and Gavin Kliger.  You see that?

A   I see it.

Q   And Mr. Lewin writes, "Hi Jason, we have a few additional access requests for Luke and Gavin that we are hoping can be executed today or tomorrow morning at the latest."

And then he references, there are a few different access requests in bullet points.  "The Phoenix and GLAAS back-end access, including user access controls."  What does that refer to?

A   I don't recall what that means in this context.

Page 211

Q   We've discussed the Phoenix and the GLAAS systems before as financial systems within USAID.  Do you not recall this context in which he's describing these systems or don't understand the "back-end access" term?

A   I don't think anybody understands how these systems fully work.

Q   Okay.  And aside from whether anybody understands how the systems work, I'm just focused on Mr. Lewin's request that you get access -- you and Mr. Kliger receive access to Phoenix and GLAAS back-end access, including user access controls.  What is he describing there?

A   I don't know.  I don't recall.

Q   Do you not know what "back-end access" refers to in this context?

A   Not in this context.

Q   What does "back-end access" refer to generally?

A   It varies from software system to software system.

Q   What about "user access controls"?

A   Those are controls to manage access for users.

Q   Why was Mr. Lewin asking for you and Mr. Kliger to have back-end access to Phoenix and GLAAS on

Page 212

March 9, 2025?

MR. HUMPHREYS:  Objection.  Mr. Humphreys.  Speculation.

THE WITNESS:  I don't know.

BY MR. WARREN:

Q   He asks for you and Mr. Kliger to have the ability to provision VMs and access, i.e., C-CURE, Admin PAW, et cetera.  What's that referring to?

A   Often some software is run inside VMs for some -- maybe there's some good reason, but it seems like a godforsaken reason to me.  So that would be -- potentially be relevant if -- if the software ran in VMs.

Q   What's a VM?

A   Virtual machine.

Q   Why is he asking for you to have this access?

A   As prior discussed, I don't know.

Q   Did you know why you were getting access at the time and you just don't recall today, or you never knew why you were granted access to this?

A   I -- I don't recall the specifics of the circumstance, so I don't know which of the either-or two options you presented would be most factual.

Q   I'm sorry.  I didn't understand your answer, so I'm going to ask again.  At the time, in March of

Page 213

2025, did you have an understanding as to why you were being given access to provision VMs and access to the C-CURE system?

A    I don't recall why this access request was made.

Q    And at the time, did you know?

A    I don't recall if I knew or not.  I just don't recall the specific access request.  Maybe I knew, maybe I didn't, I just don't -- don't recall the sequence of events.

Q    Understood.  The third bullet point says, "Active Directory Super Admin.  They already have admin access, but Luke believes there are additional permissions he does not yet have."  What's that refer to?

A    I don't know.

Q    What does "Active Directory Super Admin" mean?

A    My understanding is AD can be configured many different ways, so it would have different meanings in different contexts.

Q    And in the context of USAID systems?

A    I don't recall.

Q    He writes, Luke believes there are additional permissions he does not have -- yet have.  What's he referring to?

Page 214

A    I don't recall.

Q    If you look above, there's an email from Mr. Gray, Mr. Jackson, and Mr. Marocco, essentially affirming that you should have access and that they'll get the team on this.  Do you see that?

A    Mm-hmm.

Q    And then if we go back to the first page of the exhibit, the bottom of it, it's an email from David Nation (phonetic).  Now, if you turn to the bottom of the second page, you can see Dave Nation was the Senior Director of Program Manager at USAID.

So I want to look at his email for a moment. He says, "Jeremy, following our phone conversation, I'm providing an update on the four requests we discussed."

First, were you -- did you participate or listen into any conversation between Dave Nation and Jeremy Lewin regarding your access to these USAID data systems?

A    Not to my recollection.

Q    Mr. Nation writes regarding Phoenix user access controls that enable controlling what screens users can access in Phoenix.  Then he says, When we spoke, we had --

A    Sorry.  Where are you referencing?

Q    Oh.  I'm sorry.  I'm on the first page.

Page 215

A    Okay.

Q    This is Number 1.

A    Okay.  Thank you.

Q    Yes.  If you could just read to yourself, read what he writes in Number 1, and then I'll ask you about it.

A    Yep.  I've read the -- those two paragraphs.

Q    All right.  Describe what's happening here. What's the update he's providing?

A    He's providing an update that additional roles are granted in these systems, which appears to be consistent with the original request as papered by Mr. Lewin.

Q    And then Number 2, he's talking about GLAAS user access controls and access to audit logs, transaction history, et cetera.  Why did you need access to GLAAS user access controls and access to audit logs, transaction history, et cetera?

MR. HUMPHREYS:  Objection.  Foundation. Mr. Humphreys.

THE WITNESS:  As we already discussed, I don't know why these access requests were initiated, or I don't recall.

BY MR. WARREN:

Q    If you drop down to Number 4, regarding Active

Page 216

Directory Super Admin, Mr. Nation writes, "We have confirmed that Gavin and Luke have all the admin access available except the permission that would allow them to delete all of AD, which we do not give to anyone, which we agreed on the phone call they do not need."  Do you know what that's referring to?

A    No.  What -- what -- specifically is referring to what?

Q    That first bullet point.

A    No.  I believe it's referring to the access request for Active Directory as papered by Mr. Lewin.

Q    The second bullet point under four says, "On the call, we discussed the use case where Luke had attempted to disable an L3 account."  What's that referring to?

A    I don't know what that means in this context.

Q    What's an "L3 account"?

A    I don't know in this context.

Q    If you go up to the first page, so I'm looking at the prior email now from Mr. Lewin on March 9th, 7:04 p.m., he says, "Thank you so much, David."

He continues, "Luke believes there's an SQL database associated with Phoenix.  Does he have access to write to this?  If so, perhaps there's someone who can explain how he can access it."

Page 217

Do you understand -- do you know why they were discussing you having the ability to write -- excuse me. Do you understand why they're discussing your having the ability to write access to the system?

A   Sorry.  I don't recall how -- why this request was initiated or how.

Q   Mr. Farritor, we're coming to a close here of my questioning.  I just want to touch on a couple topics.  We discussed your detail to HHS a little bit. Who did you report to at HHS?

A   At what point in time?

Q   When were you there?

A   I don't recall the precise dates of the detail.

Q   Approximately what dates were you at HHS?

A   January 2025 through Q2 or Q3 2025.

Q   And you were detailed to HHS?

A   That's my understanding.

Q   And so who did you report to during that time, from January 2025 through Q2 or Q3?

A   I don't recall who precisely initially. Eventually -- eventually I reported to the Deputy Secretary.

Q   Who was?

A   Jim O'Neill at the time.

Page 218

Q   What were you being asked to do at HHS?  That is, in broad terms, describe what your work was.

A   There were a variety of projects that were being implemented by senior agency leadership that I assisted with, or presidential directives.

Q   Like what?

A   Combating waste, fraud, and abuse.

Q   Give examples of projects that you were involved with at HHS to combat waste, fraud, and abuse.

A   Understand how payment systems worked.

Q   Explain that to me.

A   There are systems that the government has that process payments.  They're incredibly complex.  They don't work very well.  Often they break.  That's very bad.

That should be fixed.  And at the very least, we were trying to understand how those systems worked so that they could potentially be fixed in the future.

Q   And that was your role at HHS, or one of the projects you were working on was to help other people understand how those systems worked to help them operate more effectively -- more efficiently?

A   Yes.

Q   Did you have access to the payment system at HHS?

Page 219

A   As discussed in these prior exhibits, some of them.  Yes.

Q   And who granted you access to HHS payment systems?

A   I don't recall.

Q   Why did you need access to HHS payment systems?

A   To participate in projects from directives from senior agency leadership to combat waste, fraud, and abuse.

Q   Within HHS, or was the need to have access to HHS payment systems in connection with other agencies? We've already discussed USAID, of course, but I'm talking outside of USAID.

MR. HUMPHREYS:  Objection to form.  Mr. Humphreys.

THE WITNESS:  Yeah.  That question is a bit compound, because, first of all, yes, I needed access to review payments within HHS, but also payment systems that are housed in some agencies interact with systems in other agencies, as we've seen in these exhibits.

So both were sometimes relevant.  And, again, the definition of agency is quite confusing because there are subcomponents within HHS as well.

Page 220

BY MR. WARREN:

Q   At the beginning of the deposition, I was asking you about your conversations with different people and not trying to put words in your mouth, but your testimony was -- I'll strike that.

Now that we've walked through a variety of specifics, I want to ask you some questions again to see if it has refreshed your memory about any conversations or meetings you had with individuals.  I'll start with Secretary Rubio.  Do you ever end up talking with him about your work at USAID?

A   Not to my recollection.

Q   Or communicating with him in any other way aside from perhaps being on the same email chain or something like that?

A   Other --

MR. SILER:  Objection.  Vague.

THE WITNESS:  Yeah.  Other than the potential communications with him that I already described, I'm not aware of any other communications that I had with him.

BY MR. WARREN:

Q   Okay.  Any other additional communications, meetings, conversations, written communications, with Mr. Marocco that you can recall regarding your work at

Page 221

USAID that we have not discussed today?

A   He was a member of senior agency leadership at State and USAID, so obviously I was in a substantial number of meetings with him, as we've gone over extensively.  We're on a lot of email chains together, et cetera.  But yeah.

Q   Mr. Lewin?

A   Same thing.

Q   Mr. Musk?

A   He was a senior advisor to the President in the White House.  And sometimes I met with people in the White House, and I was -- I was also a detailee to the Executive Office of the President.

Q   Who else from the White House did you meet with during your time in the government?

A   A very large number of people, in the White House, in various meetings throughout the many months that I was in government.

Q   Such as?

A   Could you define "White House"?

Q   As you -- as you've answered it.

A   I believe there's a precise legal definition, and I would feel more comfortable if I understood what that definition was.  If we're simply referring to the Executive Office of the President, then obviously I met

Page 222

with a very large number of people in the Executive Office of the President as a member of the Executive Office of the President.

Q   Mr. Davis?  Any other communications with Mr. Davis regarding your work at USAID that we haven't discussed today?

A   You know, sometimes he would be in these White House meetings, but, you know, we've discussed everything else already.

Q   Any meetings you recall Mr. Davis attending at the White House regarding USAID?

A   I don't recall any meetings specific to USAID that he was in attendance of.

Q   Same question for Mr. Jackson.

A   I mean, I -- I'm sure I saw him around the building, but I don't recall any specific meetings.

Q   Or communications with Mr. Jackson, again, aside from the emails that we've looked at regarding your substantive work at USAID?

A   Other than my conversations with Mr. Jackson about the substantive work with USAID, I did not have any substantive conversations with Mr. Jackson about work at USAID.

Q   So my question was different.  My question was, do you recall any other substantive communications

Page 223

with Mr. Jackson regarding your work at USAID that we haven't discussed today?

A   I don't recall any specific conversations. But, you know, he was around.  I saw him in the hallway or whatever.

Q   Who first approached you about the idea of working for the Trump administration?

MR. SILER:  Objection.  Misstates prior testimony.  Lack of foundation.

THE WITNESS:  Why do you think I was --

MR. SILER:  Mr. Siler.  Sorry.

THE WITNESS:  Yeah.  Why -- why are you assuming that I was approached?

MR. WARREN:  I'm not.

THE WITNESS:  But you just asked me who approached me without asking me if I was approached.

BY MR. WARREN:

Q   Mr. Farritor, my question is, who did you first speak with or who first approached you about the idea of working for the Trump administration?

A   I saw that the -- I saw the election results on the news, and then I asked myself if I should join.

Q   And who's the first -- what was the first conversation you had with somebody other than yourself about joining the administration?

Page 224

MR. SILER:  Objection.  Vague.  And ambiguous.  Mr. Siler.

THE WITNESS:  I don't recall.

BY MR. WARREN:

Q   You don't recall the first person you spoke with about joining the administration?

MR. HUMPHREYS:  Objection. Argumentative.  Mr. Humphreys.

THE WITNESS:  I -- I don't recall who I first spoke to about that possibility.  It was probably a social friend.

MR. WARREN:  Counsel, can we just take two minutes?  Let me wrap up and see if I have anything else.

MR. HUMPHREYS:  Yeah.

MR. WARREN:  Take a break?

THE WITNESS:  Yeah.  Fine by me.

MR. SILER:  Yeah.

MR. WARREN:  Yeah.  Off the record. Thank you.

THE PROCEEDINGS OFFICER:  Going off the record, the time is 4:04 p.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER:  We're back on the record.  The time is 4:10 p.m., Eastern Time.  Thank

Page 225

you.

BY MR. WARREN:

Q   Mr. Farritor, were you ever physically present at USAID with Steve Davis?

A   **Maybe once, I think.**

Q   When do you recall that happening?

A   **I don't recall which date that occurred.**

Q   What was the context?

A   **We were both in a meeting together, I believe, but I don't have a strong memory here.**

Q   Do you remember what you were discussing?

A   **No.**

Q   Who else was there?

A   **I don't recall.**

Q   General time period that it was?

A   **First quarter of 2020.**

Q   Any information you can provide about the meeting other than you and Mr. Davis were there and it was at USAID headquarters?

A   **I don't strictly remember if there was a meeting.  Maybe there was one.  I don't recall any other specifics.**

Q   Are you familiar with USAID's Security Information Database?  It's a clearance database that holds individual files for USAID personnel.

Page 226

A   **Doesn't ring a bell.**

Q   Are you familiar with any information database at USAID that contains personal information of USAID employees, including their financial information, net worth, and other private financial information?

A   **I don't recall such a system.**

Q   Did you ever access a system at USAID that contained USAID employees' or USAID contractors' private, personal financial information?

A   **Not to my recollection.**

Q   Were you instructed to preserve any documents in connection with this litigation?

A   **What do you mean by that?**

Q   Did anyone in the government, any lawyer for the government tell you because there's been a lawsuit, you need to preserve documents that may be relevant to the lawsuit so that they don't get deleted or lost?

A   **I mean, I received a lot of different trainings that all kind of blur together.  Obviously I received all the standard, you know, relevant briefings and was in extensive discussions with counsel throughout my time at USAID.**

Q   And I'm talking about specifically in regard to this litigation, not trainings in general that you received.  Were you instructed to preserve documents in

Page 227

connection with this lawsuit?

A   **I -- I don't recall, discussing this lawsuit a year-and-a-half ago.**

Q   Not limiting the question to a year-and-a-half ago.

A   **I don't recall discussing this lawsuit at any time during my time in USAID.**

Q   And what about after?  Did you receive any instructions from anyone about preserving documents in connection with this lawsuit?

A   **I don't know.  What do you mean by "preserving documents"?**

Q   The English meaning of the words.

A   **I don't recall any such conversations.**

Q   You received a subpoena to testify here today, correct?

A   **That is my understanding.**

Q   Sorry.  I don't -- I don't understand that response.  Yes or no, did you receive a subpoena, or you don't know whether you did?

A   **I'm not a lawyer.  That is my understanding of the sequence of events that occurred leading up to this deposition.**

Q   The subpoena required you to search for responsive documents.  Did you understand that?

Page 228

A   **That's my understanding.  Yes.**

Q   What did you do to search for responsive documents that were in your possession?

A   **Well, you know, by the time I was served as such, I was out of government.  And so all the, you know, important stuff, all the emails et cetera were on my government devices, which I did not have access to at the time..  Yeah.  And then could you repeat the question?**

Q   Sure.  What did you do to search for responsive documents?

A   **I searched my personal devices for relevant pieces of information.**

Q   What personal devices?

A   **Cell phones, laptops.**

Q   And how did you -- how did you conduct that search?  Those searches.  Sorry.

A   **Looked through relevant directories that date to the period of discovery and doing keyword searches.**

Q   And what did you find?

A   **Nothing.**

Q   You found nothing responsive on cell phones?

A   **That -- that is my understanding.  Yeah.**

Q   And you mentioned cell phones, plural.  Did I get that right?

Page 229

A   Yeah.

Q   You searched multiple cell phones to review for information that may be relevant to this case that you were required to produce subject to a subpoena?

A   I searched all potentially relevant devices.

Q   And multiple laptops?

A   I think so.  Yeah.

Q   And were you searching both on the hard drive of the laptops as well as cloud storage such as Gmail accounts or something similar?

A   To the best of my ability?  Yes.

Q   Okay.  And you didn't find anything responsive?

A   To my recollection?  Yes.  I did not find anything.

Q   We've covered a lot of topics today.  Is there anything, any other information that you'd like to present to give a clear and accurate picture of anything we've discussed?

MR. HUMPHREYS:  Objection as to form.

THE WITNESS:  I have nothing additional that I would like to present at this time.

MR. WARREN:  All right.  I have no further questions.

MR. SILER:  Nothing from me.

Page 230

MR. HUMPHREYS:  Nothing from me.

MR. SILER:  The first "nothing from me" was from Mr. Siler.

MR. HUMPHREYS:  Nothing from me, Mr. Humphreys.  Yes.  Thank you.  We would like to read and sign the transcript.

MR. WARREN:  Of course.

THE PROCEEDINGS OFFICER:  Okay.  Before we go off the record, Counsel Warren, the certified transcript's included in your order.  Can I confirm that you'd like the transcript to be produced?

MR. WARREN:  Yes, please.

THE PROCEEDINGS OFFICER:  And if it's easier, can I just get everyone that would like a copy of the transcript to announce it on the record?

MR. SILER:  Yes.  This is Mr. Siler from the Department of Justice for the defendants.  We would like a copy.

MR. HUMPHREYS:  Mr. Humphreys for Mr. Farritor.  We would like a copy also, please.

THE WITNESS:  Can I get a copy?  Is that allowed?

MR. HUMPHREYS:  I'll get you a copy.

THE WITNESS:  Okay.  Cool.

MR. WARREN:  It's definitely allowed.

Page 231

THE PROCEEDINGS OFFICER:  If that's -- if that's all the orders, we're going off the record.  The time is 4:16 p.m., Eastern.

(Proceedings concluded at 4:16 p.m., ET)

* * * * *

Page 232

CERTIFICATE OF PROCEEDINGS OFFICER

I, Deidra Estrella, hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the proceedings were recorded by me and thereafter transcribed, and that the foregoing transcript is a true and accurate record of said proceedings to the best of the transcriber's ability;

I further certify that I am neither counsel for nor related to any parties to said action, nor in any way interested in the outcome thereof.

DATED, this 10th day of June 2026.

*Deidra Estrella*

_____

Deidra Estrella

1593

Proceedings Officer

Page 233

ACKNOWLEDGEMENT

I do hereby certify that having been first duly sworn to testify to the truth, I gave the above testimony on June 2, 2026.

I further certify that the foregoing transcript is a true and correct transcript of the testimony given by me at the time and place specified.

_____

LUKE FARRITOR

Sworn to before me this \_\_\_ day of _____, 20\_\_

_____

Notary Public

Page 234

ERRATA SHEET

Deponent:  LUKE FARRITOR

Deposition Date:  Tuesday, June 2, 2026

PAGE  LINE  CHANGE FROM/TO  REASON FOR CHANGE

\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____
\_\_\_\_\_ \_\_\_\_\_ _____ _____

Under penalties of perjury, I declare that I have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____    _____

LUKE FARRITOR          Date

Sworn to before me this \_\_\_ day of _____, 20\_\_

_____

Notary Public

**WORD INDEX**

**< $ >**
**$100,000**
51:*8*
**$153**
162:*20*
163:*6, 16, 25*
164:*22*
165:*7, 9, 18*
166:*8*
168:*11*
170:*3*
**$2**   33:*2*

**< 0 >**
**00462**
7:*13*

**< 1 >**
**1**   6:*6*
75:*23, 24*
76:*10*
95:*3*
122:*11*
125:*8*
131:*2*
137:*7, 12*
142:*3*
172:*4*
177:*11*
191:*17*
192:*3*
202:*21*
215:*2, 5*
**1,400**
160:*1*

**1,412**
158:*13, 16*
**1/20**
138:*8*
**1/20/25**
6:*6*
**1/30/25**
6:*13*
**1:20**
154:*11*
**1:24**
154:*18*
**1:30**
154:*11*
160:*21*
**1:54**
194:*16*
**10**   6:*16*
15:*22*
26:*11, 12*   27:*5, 6, 12, 22*
60:*23*
63:*19*
67:*21*
161:*9, 10, 21*
195:*12*
**10:07**
1:*15*
7:*4*
**10:22**
197:*19*
**10:32**
149:*20*
**100,000**
24:*1*
**102**   6:*7*
**103**   6:*8*
**10th**
232:*14*

**11**   5:*4*
6:*17*
7:*6*
137:*8*
139:*12*
141:*15*
148:*8*
172:*4*
192:*8, 9, 15, 16, 20*
**11:13**
65:*18*
**11:19**
113:*2*
**11:22**
65:*21*
**1100**
3:*14*
**12**   6:*18*
193:*23, 24*
194:*12*
**12:10**
103:*5*
**12:16**
103:*9*
**122**   6:*9*
**125**   6:*11*
**13**   6:*19*
196:*6, 8*
**14**   6:*21*
197:*12, 13*
**142**   6:*12*
**145**   6:*13*
**15**   6:*22*
202:*2, 3*
203:*8, 10*
**15180**
2:*5*
**153**
161:*23*

162:*22*
164:*9, 17*
165:*22*
**155**   6:*14*
**158**   6:*15*
**1593**
1:*18*
232:*19*
**16**   6:*24*
209:*25*
210:*3*
**161**   6:*16*
**1707**
6:*24*
209:*25*
**1710**
210:*11*
**1714**
6:*24*
210:*1*
**1715**
6:*21*
197:*12*
**1717**
6:*21*
197:*12*
**1756**
6:*20*
196:*7*
**1774**
6:*8*
103:*16*
**1775**
107:*10*
**1777**
6:*8*
103:*17*
**1900**
2:*15*
**192**   6:*17*

**193**   6:*18*
**196**   6:*19*
**197**   6:*21*

**< 2 >**
**2**   1:*14*
6:*7*
7:*3*
102:*12, 13, 24*
103:*12*
125:*2*
130:*8*
136:*10, 17*
137:*7*
138:*5*
155:*18*
157:*14, 20*
169:*24*
171:*4, 9, 21*
172:*4*
173:*2*
174:*15*
175:*5*
177:*11*
181:*14*
182:*17*
195:*16, 19*
215:*14*
233:*5*
234:*1*
**2,000**
184:*7, 10, 19*
185:*2*
186:*15, 18, 25*

187:*9*
188:*18*
**2/2/25**
6:*14*
**2/26/25**
6:*23*
**2/3/25**
6:*15*
**2/4/2025**
6:*19*
**2/8/25**
6:*16*
**2:38**
160:*24*
**20**
26:*13*
27:*5, 8,*
*10, 12*
33:*23*
60:*18*
63:*21*
76:*4*
204:*8*
233:*15*
234:*1*
**20003**
2:*6*
**20005**
3:*15*
**20006**
3:*6*
**202**    6:*22*
**2020**
225:*16*
**2021**
22:*1*
**2022**
22:*3*
24:*24*
**2023**
21:*11*
22:*3*

23:*19*
24:*24*
**2024**
21:*6, 8,*
*11*
22:*18*
25:*6*
33:*1*
38:*20*
57:*16*
60:*17*
**2025**
24:*19*
25:*3, 9*
26:*16,*
*24*
27:*23*
33:*23*
38:*20*
40:*17*
42:*9, 12*
46:*11*
57:*16*
60:*18*
104:*12*
105:*22*
125:*16*
129:*13,*
*18*
130:*8*
131:*2*
136:*22*
137:*10*
146:*3*
147:*11*
148:*21*
149:*9*
155:*18*
157:*14,*
*20*
158:*1,*
*13, 17,*

*24*
159:*12*
161:*13,*
*22*
163:*7*
166:*18*
184:*14*
188:*18*
191:*17*
192:*3,*
*22*
194:*16*
195:*16,*
*20*
196:*12*
197:*19*
198:*4*
202:*6*
204:*8*
212:*1*
213:*1*
217:*16,*
*20*
**2026**
1:*14*
7:*3*
232:*14*
233:*5*
234:*1*
**20th**
142:*4*
202:*21*
**210**    6:*24*
**23**    163:*7*
**23rd**
162:*18*
165:*2*
166:*18*
167:*13*
170:*9*
**24**
19:*25*

67:*15*
137:*10*
164:*16*
**24th**
166:*18*
**25**
51:*24*
76:*4*
93:*17*
**26**    202:*6*
**26th**
202:*23*
204:*9*
**27**
136:*22*
167:*16*
**27th**
143:*11*
167:*20,*
*22*
170:*7*
181:*15,*
*22*
**2C**    78:*11*
**2D**
202:*14*
**2nd**
2:*14*
157:*6,*
*17*
184:*8,*
*13, 14*
188:*17*

**< 3 >**
**3**    6:*8*
78:*21*
103:*13,*
*14*
122:*11*
125:*8*
137:*7*

138:*25*
157:*25*
158:*12,*
*17, 24*
159:*12*
171:*21,*
*25*
172:*4*
175:*23*
177:*19,*
*24*
178:*3,*
*20*
188:*17*
192:*21*
194:*16*
**3:08**
114:*3, 22*
**3:41**
143:*11*
**30**
104:*12*
105:*22*
146:*3*
147:*11*
148:*20*
149:*9*
**300**    3:*5*
138:*7*
**30th**
107:*10*
109:*10*
113:*12*
124:*2*
170:*7*
**31**
125:*16*
129:*13*
**31st**
112:*25*
113:*25*
114:*3*

115:*15*
127:*23*
**350**
138:*17*
172:*7*
175:*5*
**3C**
78:*17,*
*19*   95:*7*
96:*9, 17*
97:*5*
**3rd**
184:*9,*
*13, 14*
193:*7,*
*12*
194:*23*

**< 4 >**
**4**   1:*4*
6:*9*
7:*10*
79:*21*
80:*9*
122:*13,*
*14*
125:*6, 8*
196:*12*
197:*19*
215:*25*
**4:04**
224:*22*
**4:10**
224:*25*
**4:16**
1:*16*
231:*3, 4*
**4:28**
136:*23*
181:*15,*
*16, 22*

**4:46**
125:*16*
**4:49**
127:*23*
**4142**
6:*7*
102:*12*
136:*19*
**468**   7:*7*

**< 5 >**
**5**   6:*11*
124:*25*
125:*3, 6,*
*11, 13*
145:*3*
162:*13*
203:*2*
**500**   2:*14*
**50205**
1:*19*
**57**
143:*15,*
*19*
145:*8*
147:*7, 9*
151:*4,*
*16*
152:*5, 6,*
*7, 12, 17*
153:*22,*
*23, 24*
154:*6*
177:*14*
**57-person**
152:*3*
**586**
6:*12*
142:*24*
**591**
6:*12*
142:*24*

**5th**
200:*5*

**< 6 >**
**6**   6:*12*
142:*21,*
*22, 24*
145:*2*
162:*13,*
*14*
**60**   12:*18*
**600**   2:*4*
**633**
157:*2, 6,*
*18*

**< 7 >**
**7**   6:*13*
145:*16,*
*17*
162:*14*
177:*9*
**7:04**
107:*10*
112:*1*
216:*20*
**7:43**
200:*4*
**7:54**
112:*12*
**70-6**
155:*17*
**70-7**
157:*24*
**75**   6:*6*
39:*9*
**75-day**
39:*5, 11*
**78701**
2:*16*

**< 8 >**

**8**   6:*14*
155:*3, 4*
161:*13,*
*22*
162:*14*
184:*3*
**8:25-cv-**
**00468-TDC**
1:*7*
**800**   3:*4*
**825**   7:*12*
**87**   6:*10*
122:*16*
**89**   6:*10*
122:*16*

**< 9 >**
**9**   6:*15*
157:*23*
158:*2*
162:*14*
184:*3*
212:*1*
**9:35**
149:*6*
**90**   12:*18*
**9000**
6:*9*
123:*8, 14*
**9110**
6:*11*
125:*11*
**9th**
216:*20*

**< A >**
**a.m**
1:*15*
7:*4*
65:*18,*
*21*
113:*2*

136:*23*
149:*6,*
*20*
181:*15,*
*22*
194:*16*
200:*4*
**abilities**
199:*2, 16*
**ability**
99:*6, 18*
198:*25*
199:*10*
212:*7*
217:*2, 4*
229:*11*
232:*9*
**able**
100:*8,*
*20, 22*
107:*12*
112:*8*
173:*10*
**absence**
157:*2*
**abuse**
44:*9*
59:*24*
69:*20,*
*23*
73:*23*
74:*6*
94:*8, 11,*
*14, 24*
97:*9, 12*
126:*14*
201:*21*
204:*17*
218:*7, 9*
219:*10*
**access**
99:*2, 15,*

*18* 100:*7, 13, 20, 22* 101:*4, 9, 16, 24* 102:*3* 104:*15, 16, 19* 105:*7, 10, 18, 22* 106:*2, 14, 15* 107:*1, 6, 23* 108:*4, 6, 11, 12* 109:*4, 15, 21* 110:*11, 17, 23* 111:*4* 112:*16, 17* 113:*4, 8, 12, 13* 114:*25* 115:*3, 4, 5, 7, 12, 17, 18, 19, 22, 24* 116:*2, 7, 16, 20, 25* 117:*7, 15* 118:*1, 6, 20* 119:*2, 12, 17,*

*21* 120:*5, 10, 16, 18, 23, 24* 121:*1, 2, 4, 5, 8, 9, 20, 21* 122:*4, 7* 123:*15* 124:*6* 125:*25* 126:*1, 4, 5* 127:*25* 128:*2, 4, 12, 13, 21, 25* 129:*3, 5, 22* 131:*8, 13, 16, 22* 132:*5, 7, 19* 133:*2, 9, 18* 134:*1, 10* 135:*5, 11, 16, 19, 23* 136:*7* 144:*7, 14, 15, 21* 175:*11, 17* 176:*5, 6, 22* 177:*19, 24, 25*

178:*2, 20* 179:*8, 15, 16* 180:*10, 21* 181:*3, 6, 10* 183:*25* 188:*21, 24* 189:*6, 11, 13* 190:*21, 25* 197:*20, 25* 198:*1, 3* 199:*3, 19* 200:*6, 10, 13, 16, 18, 20* 201:*2, 3* 210:*1, 17, 21, 22* 211:*4, 10, 11, 12, 15, 18, 22, 23, 25* 212:*7, 16, 18, 20* 213:*2, 4, 8, 13* 214:*4, 17, 21, 22* 215:*15,*

*16, 17, 22* 216:*2, 10, 23, 25* 217:*4* 218:*24* 219:*3, 6, 11, 19* 226:*7* 228:*7*
**Account** 6:*9* 107:*6* 114:*25* 115:*12* 123:*8, 14* 124:*11, 16* 216:*14, 17*

**accounting** 208:*9*
**accounts** 229:*10*
**accurate** 35:*22, 23* 77:*23* 97:*13* 121:*6* 140:*23* 148:*25* 149:*3, 4* 155:*21* 160:*3* 229:*18* 232:*8*
**Acquisitio n** 198:*19*

**acronym** 37:*6*
**acting** 38:*5* 46:*1, 22* 56:*17, 18* 117:*9* 129:*2, 20* 130:*3* 143:*14* 146:*2* 176:*17*
**Action** 1:*6* 6:*13* 7:*12* 11:*14* 106:*22* 146:*2* 232:*11*
**actions** 105:*15* 116:*14* 144:*18* 146:*24* 187:*16* 189:*8*
**Active** 213:*12, 17* 215:*25* 216:*11*

**activities** 146:*14*
**actual** 185:*16*
**AD** 213:*18* 216:*4*

add
  199:*10*,
*12*

add/remove
  198:*25*
added
  92:*23*

additional
  112:*14*
  114:*23*
  200:*25*
  210:*17*
  213:*13*,
*23*
  215:*10*
  220:*23*
  229:*21*
address
  19:*11*,
*23*
  69:*22*
  125:*17*,
*18, 20*
  136:*23*,
*24*
  137:*14*,
*16*
  139:*13*
  140:*1*
  192:*21*
  193:*2*
  197:*23*
  200:*3*
admin
  104:*20*
  143:*19*
  158:*4*
  159:*12*,
*18*
  184:*10*,

*20*
  185:*2*
  187:*1*
  188:*19*
  189:*5*,
*13*
  196:*14*,
*15, 19,
23*
  197:*1*
  212:*7*
  213:*12*,
*17*
  216:*1, 2*

administer
  9:*9*
administer
ing  9:*8*
administra
tion
  39:*23*
  40:*2, 9,
11, 12*
  42:*23*
  43:*1*
  44:*1*
  45:*23*
  58:*12*
  59:*2, 5,
7   61:8,
19*
  70:*16*,
*17   73:7*
  93:*16*
  162:*19*
  165:*4*
  169:*8*
  171:*13*
  223:*7*,
*20, 25*
  224:*6*

administra
tive
  104:*17*
  105:*6, 7,
9, 10, 14*
  107:*12*,
*25*
  108:*10*,
*21*
  109:*1*
  116:*10*,
*11, 16,
17*
  118:*13*
  125:*25*
  126:*4*
  127:*24*
  128:*4*
  129:*22*
  143:*13*
  144:*20*
  145:*13*
  146:*13*
  151:*5*
  154:*6*
  156:*19*
  157:*3*,
*14*
  158:*14*
  176:*11*,
*15*
  177:*15*
  178:*1, 4,
22*
  179:*10*,
*17, 19*
  180:*21*
  182:*7*,
*18*
  183:*19*
  184:*8*
  186:*15*

  187:*16*
  189:*11*
  199:*1, 16*
administra
tor
  35:*11*
  38:*5*
  46:*23*
  56:*17*
  121:*16*
  129:*2*,
*20*
  130:*3*
  133:*20*
  143:*14*
  146:*3*
  176:*17*
admissibil
ity  9:*4*
admission
  182:*4*
ADS
  189:*17*
advisor
  95:*18*
  110:*8*
  221:*10*
affirm
  10:*23*
  11:*1*
affirming
  214:*4*
affix
  234:*1*
aforementi
oned
  63:*1*
  148:*25*
afternoon
  115:*16*
agencies
  34:*19*

  35:*20*,
*25   36:9,
11, 14*
  43:*20*
  47:*5, 6,
11, 22*
  48:*3, 4,
16   49:8,
10   50:4,
6   52:14*
  53:*2, 7,
9   55:7,
9, 13, 16*
  61:*8*
  66:*16*
  79:*5, 12*
  81:*7*
  82:*7, 9,
14*
  83:*16*
  84:*2*
  85:*3*
  98:*5*
  137:*25*
  147:*25*
  219:*12*,
*20, 21*
agency
  36:*7, 9*
  46:*10*
  47:*9, 16,
18*
  49:*15,
16*
  52:*18*
  53:*23*
  54:*6, 8,
10, 24*
  59:*11,
12, 16*
  66:*12,
14, 21*

| | | | | |
|---|---|---|---|---|
| 70:6 | agency- | 96:23 | altercatio | andrew@dem |
| 80:25 | wide | 134:4 | ns | ocracydefe |
| 81:5 | 146:23 | 155:14 | 133:25 | nders.org |
| 87:24 | agenda | 191:7 | | 2:8 |
| 88:9 | 76:14 | 206:11 | altogether | announce |
| 89:3 | 77:19 | aid | 42:3 | 230:15 |
| 90:15, | agents | 163:22 | ambiguity | announceme |
| 17  92:5 | 49:9 | 164:2, 7 | 46:7 | nt |
| 98:4, 7 | aggregatio | 165:13, | Ambiguous | 146:23 |
| 105:5, | n  85:2 | 18 | 66:17 | annual |
| 13, 15 | ago | 166:11, | 79:6, 15 | 51:5 |
| 116:13, | 15:1 | 22 | 121:22 | annually |
| 24 | 48:1 | 167:6 | 134:3 | 51:8 |
| 117:1, 8, | 50:9 | 169:4, 7, | 150:9 | answer |
| 9, 11 | 64:8, 11, | 16 | 190:18 | 11:21, |
| 118:16 | 19, 24 | 170:20 | 206:12 | 22 |
| 126:24 | 170:10 | akin | 207:2, | 14:17 |
| 129:20 | 187:14 | 188:12 | 20  224:2 | 15:6 |
| 138:8, | 195:12 | al  1:4, | amount | 16:3 |
| 18 | 227:3, 5 | 7  7:10, | 165:10 | 18:10 |
| 142:13 | agree | 11 | 166:3, 4 | 19:19 |
| 153:15 | 9:1, 4, | | 173:2 | 27:8 |
| 163:2 | 7  121:8, | allegation | amounts | 28:21 |
| 167:1 | 20 | 151:4 | 166:1 | 32:11, |
| 172:8 | 122:8 | allegation | 173:20 | 15  41:8 |
| 179:25 | 155:23 | s | 174:4, 18 | 45:1 |
| 193:9 | agreeance | 151:16 | Amy | 66:19 |
| 204:14 | 10:2 | 152:7 | 46:22 | 74:1 |
| 205:7, | Agreed | all-hands | 86:12 | 79:7 |
| 14 | 10:14 | 41:25 | 96:10 | 82:22 |
| 207:5, | 216:5 | 42:6 | and/or | 83:20 |
| 11, 23 | agreement | allow | 9:3 | 91:3 |
| 208:14 | 10:9 | 162:7 | and-a- | 106:18 |
| 209:2, 5, | | 216:3 | half | 107:16 |
| 17 | agreements | allowed | 39:4 | 113:16 |
| 218:4 | 53:17 | 121:15 | ANDREW | 119:11 |
| 219:9, | ahead | 230:22, | 2:7, 19 | 126:22 |
| 24  221:2 | 9:23, 25 | 25 | 7:17 | 134:16, |
| agency's | 18:7 | allowing | 8:12 | 22 |
| 36:3, 6 | 35:21 | 108:12 | 11:12 | 150:11 |
| 117:8 | 80:12 | | 136:12 | 159:6, |
| 202:15 | 94:20 | | 192:13 | 23 |

162:*12*
165:*20*
180:*17*
187:*1*
207:*3*
208:*1*
209:*9,*
*13*
212:*24*
**answered**
41:*7*
51:*18*
53:*15,*
*22*
81:*23*
89:*6, 7,*
*12, 23*
94:*18*
98:*2*
154:*3*
164:*12*
167:*8*
188:*9*
204:*12*
221:*21*
**answering**
14:*24*
92:*16*
**answers**
12:*8, 11*
**anticipate
d**   58:*22*

**antiquated**
172:*25*
**Anybody**
14:*4*
70:*9*
121:*18*
122:*2*
134:*23*
135:*18*

173:*8*
211:*6, 8*
**anytime**
135:*21*
**anyway**
190:*13*
**apologies**
78:*18*
106:*11*
134:*17*
209:*11*
**apologize**
89:*8*
**app**
192:*12*
**apparent**
29:*2*

**apparently**
166:*12*
**appear**
145:*5*
146:*25*
**appeared**
169:*3*
**Appearing**
2:*11, 21*
3:*11, 22*
193:*12*
**appears**
76:*2, 9*
80:*13*
138:*3*
139:*25*
140:*23*
143:*5*
148:*24*
149:*2, 4,*
5   170:*7*
198:*2*
203:*17,*

*19*
215:*11*

**applicable**
153:*17*
**applicatio
n**   13:*21*
31:*17*
37:*2, 8*
38:*10*
61:*4*
**applied**
38:*7*
**apply**
36:*25*
38:*22, 24*
**applying**
66:*22*
**appointee**
37:*22*
95:*22*
100:*11*
116:*4*

**appointees**
75:*7*
**appointmen
t**   54:*14*
**appointmen
ts**
54:*13*
82:*10*

**approached**
223:*6,*
*13, 16, 19*
**appropriat
e**   10:*12*
**approval**
180:*23*
200:*1, 7*

204:*23*
205:*1*
**approve**
127:*24*
180:*20*
**approved**
143:*13*
**approvers**
198:*25*
199:*12*
**approving**
129:*22*
130:*4*
**approximat
e**   166:*4*
**approximat
ely**   7:*4*
21:*25*
23:*19*
24:*24*
36:*14*
93:*15*
147:*7*
163:*6*
165:*17*
177:*14*
184:*7*
217:*15*
**arah.e.wel
ch@usdoj.g
ov**   3:*21*
**archaeolog
y**   23:*12*
33:*3*
**areas**
131:*16,*
*21*
**argument**
132:*25*
**Argumentat
ive**
15:*5*

39:*15*
53:*15*
62:*3*
71:*17*
88:*16*
89:*23*
96:*21*
97:*15*
98:*2*
134:*18*
184:*22*
185:*5*
186:*20*
187:*12*
224:*8*
**arguments**
133:*24*
**arrived**
99:*24*
165:*6*
**arrives**
167:*16*
**arriving**
131:*7*
**Article**
6:*16*
161:*12,*
*22, 23,*
*25*
162:*2, 8,*
*15, 17*
163:*1,*
*19*
164:*15*
166:*9*
167:*15*
168:*12*
**articles**
19:*5, 6*
**aside**
122:*11*
124:*22*

130:*24*
142:*20*
145:*15*
154:*9*
157:*22*
169:*20*
172:*4*
197:*11*
202:*1*
211:*8*
220:*14*
222:*18*

**asilberstein@msgpllc.com**
2:*20*

**asked**
12:*1*
14:*10, 12, 13*
15:*1*
27:*7, 8*
41:*6*
51:*17*
53:*14, 21*   82:*5*
89:*5, 23*
93:*11*
94:*17*
98:*2*
105:*13*
122:*1*
129:*16, 21, 25*
145:*11*
152:*11, 16*
153:*21*
154:*3, 4, 7*   156:*7*
158:*22*
164:*12*

167:*7*
175:*25*
185:*10, 17, 20*
186:*3, 4, 24*
187:*21*
188:*1, 3, 6, 8, 11, 12*
202:*20*
204:*11*
218:*1*
223:*15, 22*

**asking**
11:*17*
14:*16, 18*   16:*4, 5, 13*
28:*19*
41:*2, 4*
43:*19*
46:*4*
47:*18*
48:*8*
72:*2*
88:*7*
96:*25*
104:*19*
110:*1, 13*
113:*8, 9*
132:*4*
139:*2*
156:*2*
163:*5, 17*
166:*2*
177:*4*
179:*4, 5, 7*   181:*4,*

*10*
187:*4, 7*
189:*4, 23*
190:*2, 23*
199:*18*
205:*25*
211:*24*
212:*16*
220:*3*
223:*16*

**asks**
212:*6*

**assigned**
81:*18*

**Assistance**
198:*19*

**assisted**
218:*5*

**associated**
216:*23*

**assume**
12:*4*
192:*25*

**assumed**
38:*16*

**assuming**
223:*13*

**astronomy**
33:*13*

**attached**
138:*25*
172:*1*

**attachment**
137:*8*
139:*3*
196:*15*

**attempt**
152:*22*

**attempted**
151:*7*
152:*17*
153:*25*
216:*14*

**attempting**
131:*12*

**attend**
30:*2, 9*
42:*7*
73:*3*
74:*10, 18, 25*
75:*10*
100:*21*
117:*13*
120:*9*

**attendance**
222:*13*

**attended**
20:*3, 4*
98:*22*

**attending**
222:*10*

**attention**
19:*19*
103:*23*
110:*14*
131:*1*

**attorney**
7:*16*
11:*18*
16:*1*

**attorneys**
11:*20*
14:*6*

**audio**
9:*3*

**audiovisual**   9:*3*

**audit**
201:*5, 16*
215:*15, 17*

**Austin**
2:*16*

**authoritative**
190:*9*

**authorities**   13:*11*
122:*5*

**authority**
106:*2, 21*
120:*14*
121:*16*
201:*4, 16*

**authorization**
111:*4*
113:*4*
117:*5*
118:*1, 20*
119:*3*
166:*6*
168:*23, 25*

**authorizations**
109:*24*

**authorize**
106:*14*
109:*15, 21*
110:*22*
119:*12, 17*

| | | | | |
|---|---|---|---|---|
| authorized | BABIRAK | 101:*2* | beginning | 102:*9* |
| 9:*9* | 3:*9*  8:*2* | 133:*17* | 93:*16* | 104:*3* |
| 116:*19* | back | badging | 148:*12,* | 107:*23* |
| 170:*17* | 14:*10,* | 128:*2,* | *20* | 114:*20* |
| 171:*12* | *24* | *12, 13* | 149:*6* | 117:*22* |
| 181:*11* | 40:*17* | Ballpark | 162:*24* | 121:*6* |
| 200:*17* | 65:*20* | 23:*1* | 220:*2* | 126:*16* |
| Automated | 73:*14* | 39:*3* | begins | 139:*4,* |
| 189:*16* | 91:*7* | 50:*23* | 158:*14* | *10* |
| available | 103:*8,* | 165:*24* | 162:*18* | 143:*4, 8,* |
| 85:*7* | *12* | based | behalf | *22* |
| 216:*3* | 111:*15,* | 9:*5* | 7:*18, 19,* | 146:*1* |
| Avenue | *16* | 79:*12* | *21, 24* | 150:*24* |
| 2:*4*  3:*4* | 136:*10* | 96:*19* | 8:*2, 23* | 155:*19* |
| awarding | 141:*3* | 107:*6* | Behavior | 162:*14* |
| 138:*8,* | 160:*23* | 121:*20* | 123:*15,* | 165:*3* |
| *18*  172:*8* | 161:*17* | 131:*22* | *19*  206:*6* | 178:*2* |
| aware | 169:*23* | 153:*4* | believe | 179:*14* |
| 133:*15* | 177:*23* | 179:*5* | 13:*9* | 198:*10* |
| 144:*3* | 181:*14* | basis | 14:*12* | 202:*12* |
| 152:*6* | 186:*13* | 18:*8* | 18:*24* | 208:*8,* |
| 157:*5* | 214:*7* | 206:*6* | 20:*10* | *25* |
| 163:*4,* | 224:*24* | Bates | 27:*4* | 216:*10* |
| *15* | back-end | 6:*7, 8,* | 33:*19,* | 221:*22* |
| 166:*13* | 197:*20,* | *10, 11,* | *23* | 225:*9* |
| 167:*19* | *25* | *12, 20,* | 35:*10* | believes |
| 182:*2, 6,* | 210:*22* | *21, 24* | 37:*6* | 213:*13,* |
| *10, 16,* | 211:*4,* | 102:*12* | 38:*16* | *23* |
| *20, 21* | *11, 15,* | 103:*16* | 41:*17* | 216:*22* |
| 188:*20* | *18, 25* | 122:*16* | 42:*22,* | bell |
| 189:*16,* | | 125:*11* | *24* | 226:*1* |
| *19* | background | 136:*19* | 44:*19* | best |
| 190:*3, 4* | 146:*17,* | 142:*24* | 46:*22* | 70:*3* |
| 191:*16,* | *18* | 196:*7* | 50:*24* | 93:*13* |
| *18* | 177:*11* | 197:*12* | 56:*17* | 177:*6* |
| 193:*6* | bad | 209:*25* | 64:*11* | 229:*11* |
| 195:*4, 9* | 123:*1, 2* | 210:*11* | 85:*7* | 232:*9* |
| 220:*20* | 218:*15* | began | 97:*2* | beyond |
| | badge | 49:*16* | 98:*10,* | 101:*23* |
| < B > | 99:*5, 7* | 86:*6* | *19* | 105:*25* |
| | 100:*24* | 87:*4* | 101:*2,* | 107:*12* |
| | | | *25* | 132:*6* |

139:5, 6
197:8
**biggest**
33:2
**billet**
46:17
62:11
**bills**
161:24
**birthday**
30:15
**bit**
23:7
91:5
137:13
179:14
194:8
217:9
219:18
**black**
208:9
**blank**
155:19
**block**
146:22
**blocked**
203:4
**blood**
13:1
**blur**
226:19
**body**
169:9
**boot**
75:11
**Borkert**
114:19
143:11, 12
147:7, 8
**bottom**
103:24

107:9
112:24
123:21
124:9
125:15
137:9
146:17
148:12
151:1
158:15
199:24
202:14
210:12
214:8, 9
**Brad**
8:20
139:24
140:2
**brad@kings**
**tlegal.com**
3:8
**BRADLEY**
3:7
7:23
**branch**
83:22
**break**
12:25
17:5
58:24
59:8
60:14
65:7
91:4
102:17
106:7
109:17
119:24
121:23
135:7
141:23

153:1
154:10, 23
159:6
160:13
186:21
218:14
224:16
**breaks**
12:16, 17, 20
13:3, 4
**Breed**
43:11
**Brian**
103:25
104:2
112:13
117:13
**briefings**
75:15
226:20
**briefly**
38:11
70:21
**bring**
30:20
161:17
**bringing**
31:2
**brings**
30:22
**broad**
218:2
**broadly**
14:17, 18
16:11
45:4
201:15
**Broadway**
7:6

**brought**
74:13
**building**
25:20
48:19
87:12
98:12, 24    99:6, 9, 18
100:8, 15, 20, 22
119:16
126:8
131:19
133:3, 9
136:3
168:4, 8
193:8, 10
195:3, 5, 15
222:16
**buildings**
48:22
168:10
**bullet**
171:25
175:5
210:21
213:11
216:9, 12
**bunch**
43:12
**Burchett**
119:20, 21
120:7, 10
**Burkert**
177:13
**business**
20:20

**busy**
134:22
**Butler**
124:10, 12
130:12
132:10, 17
**button**
203:5

**< C >**
**call**
12:25
21:3
32:10, 14, 15
109:7, 9, 12, 14, 20
110:1, 6
111:3, 14, 15
112:5
135:15, 18
216:5, 13
**called**
11:4
17:25
23:8
31:21
32:8, 9
92:25
97:20
110:21
112:6
115:8, 21
131:25
136:7
198:18

calling
 83:*3*
 109:*8*
 110:*25*
Calls
 17:*16*
 31:*24*
 32:*2, 6,*
*12*
 44:*25*
 48:*7*
 83:*19*
 91:*2*
 106:*5,*
*16*
 107:*14*
 108:*15*
 109:*13*
 111:*1*
 112:*7,*
*20*
 152:*25*
camp
 75:*11*
Cancellati
on
 146:*12*
capacity
 15:*12,*
*14*
 17:*14, 19*
Capital
 156:*13*
captured
 9:*6*
capturing
 9:*2*
card
 100:*13*
 132:*1, 5*
career
 88:*2*

99:*14*
 107:*3*
 116:*12*
 117:*23*
 207:*25*
 208:*16*
case
 11:*25*
 13:*8, 20*
 18:*2, 14,*
*17, 20*
 19:*6, 7*
 50:*25*
 91:*9*
 113:*1*
 129:*19*
 155:*17*
 157:*24*
 161:*17*
 188:*13*
 196:*20*
 216:*13*
 229:*3*
cases
 13:*1, 17*
 167:*25*
 207:*22*
cast
 117:*19*
 118:*9*
caught
 136:*13*
caveat
 10:*13*
CC'd
 199:*22*
C-CURE
 6:*9*
 114:*25*
 115:*1, 8,*
*12, 18,*
*19*

116:*7,*
*20*
 117:*6*
 118:*6*
 119:*22*
 120:*14,*
*17*
 123:*8,*
*14, 19*
 124:*5, 6*
 212:*7*
cell
 31:*19*
 228:*15,*
*22, 24*
 229:*2*
certain
 100:*7*
 121:*8,*
*20*
 122:*8, 9*
certainly
 37:*13*
 111:*13*
 120:*18*
CERTIFICAT
E   232:*1*
certified
 230:*9*
certify
 232:*3,*
*10*
 233:*3, 7*
cessation
 146:*13*
cetera
 75:*7*
 89:*15*
 111:*1*
 122:*9*
 123:*12*
 212:*8*

215:*16,*
*18*
 221:*6*
 228:*6*
CFO
 137:*9*
 171:*22*
chain
 6:*8, 12,*
*21, 24*
 34:*24*
 35:*3, 7*
 36:*4, 6*
 62:*22*
 103:*16,*
*20*
 109:*25*
 113:*18*
 116:*5, 6*
 117:*8*
 119:*4*
 136:*22*
 142:*25*
 143:*1, 4,*
*22*
 144:*9*
 152:*4, 6*
 197:*15*
 210:*1*
 220:*14*
chains
 221:*5*
Challenge
 23:*9*
challengin
g   173:*12*
chance
 187:*7*
change
 34:*4, 8,*
*11   46:2,*
*6   79:10*

93:*5*
 121:*15*
 206:*8,*
*24   234:1*
changed
 35:*1*
 46:*16*
 93:*8*
 191:*19,*
*21*
 206:*1, 5*
changes
 107:*13*
 192:*1, 2*
changing
 23:*7*
 207:*5*
chaotic
 90:*8, 10*
 134:*22*
 167:*22*
characteri
zation
 47:*16*
 69:*10*
 133:*11*
 180:*15*
characteri
ze
 29:*20*
 61:*10*
 69:*13*
 74:*4*
 134:*20,*
*21   198:9*
characteri
zed
 59:*22*

characters
 117:*19*
 118:*9*

chart
 159:20
 185:11,
15, 20,
24
 186:1,
16
 187:3, 4
 188:2, 3,
14
Chat
 92:10,
23
 101:15
 102:6
CHCO
 196:13
check
 13:1
 177:3
checked
 99:25
checking
 108:13
 113:3
cheeseburg
ers
 30:20, 22
Chief
 156:13
 177:14
chill
 183:2
chips
 88:17
 89:2
choose
 95:12
CHRIS
 3:18
 8:4

christophe
r.m.lynch@
usdoj.gov
 3:19
circumstan
ce
 212:22

circumvent
 146:25
 151:7
 152:18,
22
 153:25
 164:6
Circumvent
ed
 153:11
city
 19:11,
13, 14,
15, 22
city's
 22:10
Civil
 1:6
 7:12
 13:11, 16
clarificat
ion
 41:19
clarify
 12:3
clean
 88:24
cleaning
 88:12,
18   89:1,
21
clear
 17:12
 31:25

35:14
46:4
51:12
55:15
69:1, 3
96:18
101:25
106:20
114:8
149:2
150:3
155:11
159:3
166:2
178:7
189:1
210:6
229:18
clearance
 108:13
 123:12
 225:24
cleared
 115:17
client
 16:2
close
 217:7
closed
 193:9,
11, 21
closely
 112:3
closer
 38:25
closing
 193:14
cloud
 128:2,
14, 15
 229:9

clumsy
 77:12
 172:25
code
 100:14,
25

colleagues
 14:8
college
 20:5, 23
 22:21
colorable
 151:3
Columbia
 2:6
 3:6, 15
column
 139:13
com
 194:3, 4
combat
 126:13
 218:9
 219:9
Combating
 218:7
come
 26:21
 54:22
 60:5
 74:16
 119:3
 180:7
comfortabl
e   221:23
coming
 22:13
 40:1
 217:7
command
 34:24

35:3, 7
36:4, 7
109:25
116:6
117:9
committed
 153:7, 24
common
 24:17
communicat
e   12:21
 31:8
 38:13
 55:6
 60:8, 19,
20   70:9
 91:16
 193:19
communicat
ed
 62:20,
25
 63:17
 64:9, 14
 67:10
 68:3
communicat
ing
 193:22
 220:13
communicat
ion
 61:3
 63:23
 65:1
 70:11,
13   86:21
communicat
ions
 60:9
 70:24
 85:14

86:*25*
91:*25*
220:*19,*
*20, 23,*
*24*
222:*4,*
*17, 25*
**company**
41:*25*
57:*3*

**comparison**
126:*18*
**competing**
43:*22*
**competitio**
**n**   23:*12*
**compile**
152:*16*
153:*23*
154:*5, 7*
158:*22*
187:*21*
188:*6*
**compiled**
171:*16*
**compiling**
159:*16*
168:*23,*
*24*
170:*24*
**complaint**
18:*14*
19:*2, 4*
**complete**
155:*11*
156:*22*
160:*4, 11*

**completely**
140:*17*

**complex**
35:*4*
79:*19*
91:*12*
134:*14*
173:*19,*
*22*
174:*10*
208:*8*
218:*13*

**compliance**
83:*23*
86:*23*
153:*16*
171:*13*
**complicate**
**d**   173:*9*
**comply**
68:*22*
**component**
43:*14*
44:*16*
69:*18*
97:*19*

**components**
43:*20*
**compost**
194:*8*
**Compound**
119:*23*
179:*15,*
*22*
190:*18*
205:*3*
219:*18*
**comprised**
42:*22*
**Computer**
20:*20*
101:*5, 7*

106:*14,*
*22, 23*
109:*16,*
*22*
110:*12,*
*18*
188:*20*
190:*20,*
*21*   191:*2*
**computers**
126:*8*
**concern**
163:*24*
**concerned**
46:*9*
53:*5*
96:*18*
**concerns**
108:*9*
**concluded**
231:*4*

**conclusion**
17:*16*
44:*25*
48:*7*
83:*19*
91:*2*
106:*5,*
*17*
112:*20*
**concur**
180:*18*
**concurrent**
**ly**   57:*6*
**conduct**
180:*12*
228:*16*
**conducted**
8:*24*

**conference**

25:*22*
27:*24*
30:*20,*
*22*   31:*3*
42:*15*

**configured**
213:*18*
**confirm**
115:*17*
125:*24*
144:*14*
150:*15,*
*21, 23*
154:*24*
230:*10*
**confirmed**
216:*2*

**confirming**
144:*13*
**confused**
156:*6*
**confusing**
219:*24*
**connected**
141:*18*
142:*2*
143:*18*
145:*2,*
*12*
178:*14*
179:*9*
205:*2*
**Connecticu**
**t**   3:*4*

**connection**
13:*19*
18:*1*
157:*18*
158:*23*

170:*22*
171:*4, 9*
172:*13*
178:*22*
179:*16*
182:*20*
186:*17*
187:*9*
202:*20,*
*22*
204:*8*
219:*12*
226:*12*
227:*1, 10*
**consider**
29:*23*
32:*18*
80:*24*
81:*3, 7,*
*21*
88:*23*
95:*9, 16*
134:*6*
204:*9*

**considered**
81:*12*
82:*6*
94:*3*
96:*3, 5*
97:*23*
204:*13*

**consistent**
77:*1, 7,*
*15*   78:*2,*
*6*   79:*4,*
*8, 25*
80:*9, 14*
108:*20*
118:*15*
119:*6*

140:*18*
178:*12*
204:*15*
215:*12*
**consultati
on**    91:*10*

**consulting**
 22:*11*
**contact**
 171:*18*
**contained**
 189:*20*
 190:*5*
 226:*8*
**contains**
 226:*3*
**contempora
neous**
 16:*8, 16*
**contentiou
s**    133:*1,
23*
 134:*6,
14, 18*
**context**
 19:*4*
 27:*21,
22*
 34:*22*
 41:*19*
 52:*22*
 69:*16*
 108:*1, 3,
22, 23*
 113:*7*
 115:*6*
 128:*16*
 129:*8*
 137:*2*
 138:*20*
 140:*20*

141:*10*
180:*24*
200:*25*
203:*13*
204:*7*
210:*25*
211:*3,
16, 17*
213:*21*
216:*16,
18*    225:*8*
**contexts**
 213:*20*
**continue**
 157:*9*
**Continued**
 3:*1*
 4:*1*
 44:*3*
**continues**
 108:*9*
 109:*6*
 111:*14*
 112:*15*
 113:*23*
 143:*16*
 147:*1*
 151:*6*
 157:*4*
 163:*1,
19, 23*
 164:*15*
 216:*22*

**continuing**
 144:*14*

**continuity**
 13:*5*
**contractin
g**    204:*22*

**contractor
s**    226:*8*
**Contracts**
 202:*17*
 204:*20,
21, 23*
 205:*2*
**contrary**
 167:*5*
**control**
 104:*15,
16, 19*
 106:*15*
 114:*25*
 115:*3, 7,
18, 20*
 116:*3*
 121:*1, 2,
5, 9, 21*
 176:*5, 6*
 177:*24,
25*
**controllin
g**    214:*21*
**controls**
 210:*23*
 211:*12,
22, 23*
 214:*21*
 215:*15,
17*
**conversati
on**    60:*6*
 61:*1*
 62:*14*
 72:*12,
15*
 118:*14*
 119:*5,
14*
 121:*12*
 135:*24*

166:*19*
184:*2*
196:*3*
 214:*13,
16*
 223:*24*
**conversati
ons**
 58:*15,
16, 19*
 61:*6*
 71:*7*
 85:*9, 13*
 91:*21*
 111:*7, 9*
 165:*17*
 166:*5, 7*
 167:*11,
12*
 169:*19*
 183:*21*
 220:*3, 8,
24*
 222:*20,
22*
 223:*3*
 227:*14*
**convinced**
 166:*12*
**Cook**
 4:*6*
 8:*16*
**Cool**
 102:*14*
 124:*23*
 160:*14*
 162:*14*
 230:*24*
**coordinati
on**
 117:*10*

**copied**
 114:*4, 8*
 210:*7*
**copy**
 32:*20*
 107:*5*
 200:*24*
 230:*14,
18, 20,
21, 23*
**copying**
 196:*11*
 210:*13*
**Coristine**
 96:*15*
 97:*2*
 140:*7*
**correct**
 10:*8*
 22:*15*
 71:*18*
 99:*9, 16*
 120:*14*
 123:*4*
 140:*22*
 143:*5*
 180:*2*
 227:*16*
 233:*8*
 234:*1*
**correctly**
 38:*17*
**Cost**
 202:*7*
**coughs**
 197:*18*
**Could've**
 194:*15*
**council**
 122:*5*
**counsel**
 6:*2*

7:*14*
8:7, *10*
9:*11, 13,
18, 24*
10:*6, 8,
10, 16*
11:7
12:*21,
23*
16:*18,
20*   65:*6*
206:*15*
224:*12*
226:*21*
230:*9*
232:*10*
**count**
20:*16*
**counterint
uitively**
173:*4*
**Couple**
25:*24*
26:*2*
157:*4*
185:*15*
217:*8*
**course**
48:*8*
65:*8*
94:*22*
161:*19*
162:*3*
175:*23*
179:*5*
219:*13*
230:*7*
**COURT**
1:*1*
7:*11*
10:*11*

12:7
68:*19, 22*
**cover**
203:*17*
**covered**
164:*18*
201:*3*
202:*17*
203:*7*
204:*21,
22*
229:*16*
**covering**
69:*21*
73:*20, 22*
**criminal**
13:*10, 16*

**crosshairs**
161:*24*
**crowd**
70:*22*
**cryptocurr
ency**
43:*11*
**CURE**
213:*3*
**current**
63:*9*
**currently**
33:*10, 11*
**cut**
97:*17*
188:*21*
**cutting**
144:*6,
20*
190:*25*
**cycled**
93:*6*

**< D >**
**D.C**   40:*1*
**Dahl**
118:*3, 5*
149:*24*
**D-A-H-L**
118:*3*
**Danso**
199:*25*
200:*1*
**data**
33:*16*
85:*1*
138:*15*
154:*5*
158:*22*
168:*24*
170:*21,
24*
171:*16*
185:*11*
187:*22*
188:*2, 6*
214:*17*
**database**
190:*15*
199:*6*
216:*23*
225:*24*
226:*2*
**databases**
199:*8*
**DATE**
1:*14*
6:*6*
7:*3*
29:*11*
76:*4*
124:*1*
129:*15*
139:*18*
173:*16*

174:*4,
17*
193:*13*
225:7
228:*18*
234:*1*
**dated**
6:*13, 14,
15, 16,
19, 23*
104:*12*
136:*22*
137:*9*
143:*10*
146:*3*
155:*18*
157:*25*
161:*12,
22*
181:*15*
194:*16*
202:*5*
232:*14*
**dates**
51:*20*
93:*14*
217:*13,
15*
**Dave**
214:*10,
16*
**David**
214:*8*
216:*21*
**Davis**
55:*2, 5,
6*   56:*20,
21*   57:*4*
58:*9, 20,
25*
59:*13,
17*   60:*8,*

*19*
61:*23*
62:*8, 15*
72:*13*
86:5
95:*23*
135:*3,
11, 14,
22, 24*
136:7
139:*21,
22*
197:4
222:*4, 5,
10*
225:*4, 18*
**day**
33:*2, 4*
90:*6, 10*
112:*24*
113:*1*
165:*3*
184:*12*
208:*18*
232:*14*
233:*15*
234:*1*
**days**
39:*9*
163:*20*

**deactivate**
207:*14*
209:*18*
**deactivate
d**   208:*5,
19*
**deactivati
ng**   208:*4*
**deactivati
on**   209:*4*

deal
75:2
dealing
74:20
deals
126:7
decent
67:19
decided
187:24
decision
117:11
144:3
154:5
196:21
decision-
making
187:23
decisions
108:12
117:7
185:7
186:14
187:18
declaratio
ns    13:18
declare
234:1
dedicated
81:10
Deere
21:16, 25
defend
201:5, 12

Defendants
1:8
3:22
8:1, 4,
5, 6
11:18
230:17

DEFENDERS
2:3
4:4, 6
11:13
Defense
47:8, 24
48:22
81:13,
21    82:17
define
41:10,
12    45:4
49:12
50:8
51:12
59:16
84:21
90:21
120:21
131:18
164:4
170:17
221:20
defined
50:9
70:25
73:8, 11
81:2, 4,
10    95:2,
6    96:9,
16, 17,
19    97:4

definitely
42:21
230:25

definition
19:3
24:17
41:18,
20, 24

42:2
43:18
44:8
47:18
69:12
74:5, 8
80:8
117:3
219:24
221:22,
24
definition
s    45:12
69:21
94:22
95:8
Deidra
1:18
7:5
232:3, 18
delete
216:4
deleted
226:17
deliberati
ons
185:7
187:17
demanded
163:3
demanding
163:5, 16
DEMOCRACY
2:3
4:4, 6
11:13
demonstrat
ive
173:14
deny
150:15,
21, 23

DEPARTMENT
3:13
4:8
36:17,
18, 19,
22    44:4
47:7, 8,
24
48:18,
19, 21,
22
59:21
76:7, 13,
18, 25
77:6, 16,
18    78:3,
7    81:9,
14, 21,
24    82:1,
18    83:8,
10    90:3
98:8
163:3
167:18
202:7
230:17
depended
35:7
depending
35:1, 4
Depends
20:16
28:2
41:9
84:21
173:5
Deponent
234:1
deposed
13:6

DEPOSITION
1:10
7:9
8:22
12:16,
22
13:24
14:8
16:20,
21
18:21
68:9, 12,
16
69:24
161:6
194:10
220:2
227:23
234:1
depth
152:9
deputy
35:11
104:4
177:13
217:22
describe
16:11
22:19
25:11
27:11
32:22
45:19
47:2
69:9
70:23
88:5
126:17
133:20
183:1
191:24

215:*8*
218:*2*
**described**
31:*2*
32:*6*
45:*10*
61:7, *25*
70:*6*
73:*20*
75:*11*
88:*8*
95:*6*
97:*10*
105:*15,*
*23, 25*
106:*15*
116:*6*
118:*16*
129:*1*
142:*3*
144:*8,*
*24*
150:*16*
154:7
172:*3*
220:*20*
**describes**
77:*5*
79:*21*
148:*9,*
*10, 14*
149:*12*
156:*12*
176:*4*

**describing**
39:*17*
105:*1*
134:*13*
142:*1*
147:*6*
149:*8,*

*20*
196:*15*
211:*3, 13*
**DESCRIPTIO**
**N**    6:*5*
73:*14*
78:*24*
80:*8*
148:*25*
**descriptio**
**ns**    61:*11*
**designed**
146:*25*
**despite**
97:*24*
**detail**
36:*2*
45:*21*
48:*12*
49:*15,*
*16, 20*
50:*16*
52:*15*
53:*3, 17*
55:*6*
56:*4*
81:*13,*
*20    86:2,*
*6, 14, 16*
87:*3, 11*
90:*6*
93:*3, 12*
97:*25*
113:*13,*
*19*
116:*6*
130:*17*
217:*9, 14*
**detailed**
36:7, *11*
45:*20*
47:7, *10,*

*23*    48:*1,*
*17, 21*
49:*18,*
*19*    50:*3*
52:*14,*
*18*    53:*1,*
7, *9, 20*
54:*5, 8,*
*10*
55:*17,*
*20*    81:*5*
83:*8*
85:*10,*
*19, 21,*
*25*
97:*13,*
*19*
100:*12*
101:*17*
125:*21*
126:*15*
152:*9*
202:*24*
217:*17*
**detailee**
221:*12*
**detailing**
48:*15*
86:*3*
**details**
49:7, *9*
50:*6*
53:*10*
54:*23*
66:7, *16*
83:*17*
108:*5*
115:*23*
**determine**
165:*12*
170:*15*

173:*2*
174:*16*
**determinin**
**g**    153:*6*
171:*4, 10*
**developmen**
**t**    22:*11*
**devices**
228:*7,*
*12, 14*
229:*5*
**differ**
127:*20*

**difference**
41:*3*
107:*24*
**difference**
**s**    45:*13*
**different**
22:*5*
25:*15*
29:*18,*
*19*
32:*20*
35:*5, 25*
43:*9, 12*
49:*8, 10,*
*16*
52:*11,*
*14*    53:*2,*
*24*    55:7
61:*21*
62:*1*
76:*17,*
*23, 24*
79:*5, 12*
83:*25*
134:*15*
170:*6, 8*
177:*18*
180:*16*

191:*13,*
*23, 24*
210:*21*
213:*19,*
20
220:*3*
222:*24*
226:*18*
**difficult**
26:*10*
69:*11*
79:*18*
173:*6*
174:*11,*
*22*
**difficulti**
**es**
133:*13*

**difficulty**
110:*17*
133:*23*
**dig**
191:*14*
**digging**
57:*3*
**digital**
7:*6*
44:*11,*
*13, 22*
45:*9*
46:*15*
101:*5*
115:*5*
120:*5*
179:*8*
**direct**
27:*2*
55:*21*
93:*2, 8,*
*10*
110:*22*

143:*10*
146:*18*
**directed**
88:*4*
209:*18*
**directing**
110:*8*
135:*4*
**direction**
113:*4*
179:*25*
**directive**
69:*20*
74:*5*
94:*24*
105:*25*
108:*8*
116:*13*
142:*7*
164:*7*
165:*13*
166:*15*
167:*5*
169:*4*

**directives**
34:*20*
35:*12,*
*19, 25*
36:*8*
66:*21,*
*23*
73:*22*
80:*21*
87:*8, 25*
88:*2, 5*
89:*3, 15*
90:*16,*
*18, 25*
94:*7, 23*
97:*8, 11*
118:*15*

126:*13,*
*24*
130:*1*
153:*15*
169:*7, 9*
189:*17*
201:*20*
204:*15,*
*16*
206:*6*
207:*5, 8,*
*25*
208:*17*
209:*3,*
*23*
218:*5*
219:*8*
**directly**
30:*1*
31:*22*
35:*7*
40:*15*
57:*11*
62:*23,*
*25    66:9*
110:*25*
112:*6*
117:*5*
148:*2*
182:*23*
201:*1*
**director**
46:*1, 22*
56:*18*
146:*4*
214:*11*
**directorie**
**s    228:***18*
**Directory**
213:*12,*
*17*
216:*1, 11*

**directs**
133:*20*
**disable**
216:*14*
**disabling**
190:*15*
**disagree**
10:*9*
111:*18,*
*25*
**disburseme**
**nts**
198:*12*
**discover**
141:*4*

**discovered**
162:*19*
**discovery**
228:*19*

**discretion**
90:*13, 24*
**discuss**
12:*24*
17:*1*
26:*2*
29:*18*
42:*13*
54:*8, 13,*
*23    55:2,*
*16*
57:*22*
59:*17,*
*20*
68:*11,*
*13, 15,*
*25    69:8,*
*23    72:8,*
*9    98:20*
108:*25*
112:*16*

161:*5*
167:*3*
183:*11,*
*15, 18*
192:*5*
193:*14*
195:*22,*
*25*
196:*22,*
*25*
**discussed**
29:*17,*
*19    40:5*
44:*20*
56:*20*
61:*23*
62:*17*
69:*1, 3,*
*14*
70:*19*
71:*12*
72:*2, 5*
76:*3*
82:*15*
92:*4*
100:*3*
101:*15*
108:*8*
120:*11,*
*19*
130:*18*
139:*21,*
*22*
141:*19*
150:*12,*
*24*
166:*22*
176:*1,*
*14, 17*
180:*9*
183:*13*
184:*1*

189:*14*
194:*23*
198:7
200:*21*
211:*1*
212:*17*
214:*14*
215:*21*
216:*13*
217:*9*
219:*1,*
*13*
221:*1*
222:*6, 8*
223:*2*
229:*19*
**discusses**
183:*10*

**discussing**
27:*19*
28:*1*
54:*25*
65:*23*
72:*23*
74:*10,*
*19    75:1*
84:*8, 24*
117:*25*
167:*10*
170:*2*
183:*5*
192:*22*
217:*2, 3*
225:*11*
227:*2, 6*

**discussion**
86:*19*
132:*25*
141:*11*
168:*22*

170:*4*
181:*4*
197:3, *24*

**discussions**  54:*15,*
*17*  59:*4*
61:*7*
62:*8*
75:*5*
122:*4*
136:*4*
144:*15*
152:*9*
165:*7*
166:*25*
168:*20*
169:*2,*
*11*
205:*6*
226:*21*

**dismantled**
191:*4*
**dismantling**  190:*14*
**distinction**  151:*24*
**distinguish**  70:*3*
**DISTRICT**
1:*1, 2*
2:*6*
3:6, *15*
7:*11, 12*
**division**
22:*10*
**document**
6:7, *11*
16:*14,*
*15*  76:*1*
77:*2*
78:6, *11*

103:*19*
114:*7*
115:*14*
123:*7*
124:*5*
125:*12,*
*23*
136:*19*
143:6, *8*
145:*22*
152:*21*
153:*21*
154:*9*
155:*7,*
*11, 17,*
*19, 25*
156:*7,*
*22*
157:*11*
158:7, *9,*
*12*
160:*4*
170:*1*
172:*13*
179:*6*
189:*2*
196:*7*
**documentation**
112:*14*
150:*6*
**documents**
15:*17,*
*20, 23,*
*25*  16:*5,*
*6, 9, 10*
17:*11*
18:1, *4,*
*19*  45:*3*
124:*12*
160:*11*
162:*11*

178:*9*
184:*20*
188:*19*
189:*8,*
*15*
190:*8*
226:*11,*
*16, 25*
227:*9,*
*12, 25*
228:3, *11*
**DocuSign**
123:*4*
**Doe**  7:*10*
**dog**
43:*11*
**DOGE**
43:6, *12,*
*13, 16*
44:*15,*
*17, 22*
45:8, *9,*
*16*
46:*23*
48:*2*
50:*17*
55:*21*
56:*4*
59:*15,*
*17, 20*
69:8, *9,*
*12, 13,*
*17, 22,*
*23, 25*
70:4, *5,*
*9, 14*
71:1, *8,*
*15*  72:*5,*
*8, 9, 23*
73:5, *8,*
*14, 20,*
*21*  74:*8,*

*10*  75:*1,*
*8, 12, 19*
76:*14*
77:*19*
78:*11,*
*24*  79:*1,*
*2, 5, 13*
80:1, *10,*
*17, 25*
81:4, *8,*
*9, 13, 22*
82:7, *8,*
*14, 17*
83:5, *7*
93:*19,*
*20*  94:*4,*
*5, 12, 15*
95:2, *5,*
*9, 17*
96:4, *6,*
*9, 17*
97:*10,*
*12, 13,*
*20, 24,*
*25*  98:*5,*
*6*
104:*14*
125:*24*
126:*10,*
*11*
201:4, *6,*
*10, 16*
202:*15,*
*18, 19,*
*23*
204:*10*
205:*10*
206:*1*
**DOGE's**
74:*19*
161:*24*

**doing**
25:2, *9*
33:*14,*
*18*
58:*22*
77:*19*
80:*10*
83:*16*
84:*2*
87:*4*
88:*13*
126:*17,*
*18, 19*
129:*11*
140:*3*
153:5, *6*
159:*16*
170:*24*
171:*3*
185:*1*
186:*17*
187:*15*
208:*3*
228:*19*
**dollars**
23:*2*
50:*25*
**dot**
180:*21*
**dozen**
167:*17*
**drafting**
158:*18,*
*20*
**drama**
82:*24*
**drive**
229:*8*
**drop**
21:*9*
215:*25*

DTE
139:16
dual
36:5
duly
11:4
233:4
Dunn
4:7
8:19
dynamics
59:6
61:13,
15    62:9
75:6
83:2

< E >
earlier
39:11
43:5
114:8
134:23
163:21
175:25
180:10
earliest
87:13
98:11
103:18
143:1
early
113:12
easier
230:14
Eastern
7:4
19:12,
13
65:18,
21
103:5, 9

160:24
224:22,
25    231:3
ECF
155:17
157:24
echo
38:3
205:16,
21
Ed
96:15
97:2
140:7
education
20:1
effect
47:17
146:24
effectivel
y    163:2
192:5
218:22

effectuate
48:11
effectuate
d    54:14
90:24

Efficiency
44:5
59:21
76:8, 13,
16, 18,
25    77:6,
16, 18,
22    78:3,
8    79:23
167:19
202:7

efficientl
y    218:22
effort
69:22
142:15
efforts
70:4
Ehikian
37:20,
25    70:21
either
35:10
46:20
51:7
69:17
74:18
84:19
101:2
153:24
170:18
171:6, 12
either-or
212:22
election
38:24,
25
60:16
67:15
69:7
223:21
elevator
25:21
eliminate
69:20
74:6
94:10,
13, 23
97:9
ELON
1:7
24:7
33:4

54:23
72:10
86:2
95:15,
16
109:7, 8
110:8
136:7
elonmusk
6:18
194:13
Email
6:8, 12,
19, 21,
24    27:1
31:8
61:3
62:22
91:23
101:12,
14
102:5
103:16,
18, 20,
24, 25
104:4,
12
105:17,
23
107:22
112:1,
12
114:2, 4,
22
115:14
116:6
118:19
125:17,
18, 20
126:2, 9
127:22
129:8,

19, 25
133:19
136:24
137:1, 2,
3, 5, 14,
16
138:4
139:12,
13, 19
140:21,
25
141:4
142:7,
15, 25
143:1, 4,
22
144:9,
13
147:4, 8
148:9,
10, 25
152:3, 5
170:24
171:16
176:4,
16
178:3
180:25
181:14,
16
182:3
188:20
190:7
192:21,
23
193:2, 4,
7, 20
196:10,
16, 17
197:2, 8,
15, 20,
23

199:22
200:3, 9, 23
201:9
210:1, 11
214:2, 8, 12
216:20
220:14
221:5
**emailed**
31:12
**emailing**
137:6
140:12, 15
**emails**
31:10, 13
114:9
135:23
136:21
140:24
183:9, 20
210:6
222:18
228:6
**employee**
33:19
34:6
51:1, 13
95:22
96:11
146:4
164:19
**employees**
57:6
70:25
74:20
75:2

98:5, 7
101:7
143:13
151:4, 17
152:17
153:7
182:7, 18
226:4, 8

**employment**
20:22
52:1
57:10
75:6
**emulate**
32:25
**enable**
108:11, 21
214:21
**encompassing** 70:4
97:10
**ended**
25:6
**end-run**
163:24
164:1, 4
**Energy**
36:19, 20   47:8, 25   49:1
81:24
83:10
**engaged**
152:12
**engineering** 44:2
**English**
24:17

77:24
227:13
**ensure**
112:16, 18
116:14
**enter**
100:8
**entire**
35:18
**entities**
117:10
**entity**
13:14
45:5
**entry**
132:5, 11, 17
**environment** 128:14
**environments**
128:2, 15
**EOP**
43:21
44:16
139:25
140:1, 4, 8
**episode**
112:9
115:13
**episodes**
131:6
**error**
203:25
**escorted**
100:1

**especially**
91:14

**ESQUIRE**
2:7, 9, 17, 19
3:7, 9, 16, 18, 20
**essentially** 214:3
**establish**
98:4
152:22
**established**
131:19
139:10
**establishes** 76:12
77:18
**establishing**
75:19
76:6
**estimate**
23:5, 25
26:10
51:3, 22
60:22
64:17
67:20
**Estrella**
1:18
7:5
232:3, 18
**et** 1:4, 7, 15, 16
7:10, 11
75:7
89:15
111:1
122:9
123:12
212:8
215:16,

18
221:6
228:6
231:4
**ethics**
75:15
**evaluate**
152:11
**evening**
113:12
146:23
**event**
200:15
**events**
30:2
38:9
113:18
157:15
178:8
184:17
213:10
227:22

**eventually**
38:5
217:22
**everybody**
10:2
65:12
**evidence**
151:6
152:16, 21
154:7
177:5, 6, 8
178:11
179:2, 4
**exact**
176:9
198:24

exactly
 24:5
 74:3
 92:11
 171:15
 181:21
EXAMINATIO
N   5:3
 11:10
example
 16:8
 30:12
 46:10
 48:17
 49:15
 59:14
 62:15,
16, 17
 90:9, 10
 185:17
 186:3, 6
 187:2,
22
 188:2, 6,
13
examples
 27:18
 28:3
 30:6
 186:17
 187:8
 218:8
Excellent
 192:11
exception
 42:23
 84:5
 94:25
exchange
 196:5
 200:14,
22   201:9

Excuse
 18:20
 42:19
 43:25
 69:6
 75:17
 104:15
 109:8
 115:15
 122:12
 147:9
 149:9
 153:12
 192:12
 197:18
 203:10
 217:2
excused
 157:2
executed
 210:18
executive
 6:6, 22
 36:17
 43:15
 69:18
 75:18
 76:2, 12
 79:9, 14,
18
 80:18,
22
 83:14,
15, 22,
23   84:1,
5   86:24
 97:8, 19
 104:14
 141:20
 142:3
 147:1
 153:8,

16
 163:21
 164:1
 166:21
 169:15
 170:19,
23
 171:2
 201:3
 202:5,
22, 23
 204:8, 9
 205:11
 206:2, 6,
9, 25
 207:6,
24
 221:13,
25
 222:1, 2
EXHIBIT
 6:5
 75:23,
24   95:3
 96:9
 97:5
 102:12,
13
 103:12,
13, 14
 112:23
 119:6
 122:13,
14
 124:24
 125:11,
13
 136:10,
16
 142:3,
21, 22
 144:10

 145:2, 3,
16, 17
 155:3, 4
 157:23
 158:2
 161:9,
10, 21
 162:17
 169:24
 170:5,
12
 171:4, 9
 173:2
 174:15,
23
 175:4,
23
 176:3,
24
 177:3,
19, 23
 178:3,
20
 179:9
 181:14
 182:17
 192:8, 9,
14, 20
 193:23,
24
 194:6,
12
 196:6, 8
 197:12,
13
 199:24
 200:23
 202:2, 3,
17, 21
 203:2
 209:25

 210:3,
11   214:8
Exhibits
 122:11
 161:15
 162:7
 184:3
 185:3
 187:10
 200:21
 219:1, 22
exist
 59:5
existence
 188:15
expand
 168:12
expected
 60:11
 80:2
expenses
 162:21

experience
 79:12
explain
 59:3
 61:17
 91:11
 164:16,
21
 165:7
 187:7
 216:25
 218:11
explained
 59:11

explicitly
 97:4
 174:23
 176:9, 25

extended
 46:*23*
extensive
 168:*20*
 226:*21*
extensivel
y   17:*23*
 176:*17*
 189:*14*
 221:*5*
extent
 44:*24*
 48:*6*
 83:*18*
 91:*2*
 112:*19*
 203:*6*
 209:*21*
Extremely
 23:*10*
 32:*19*
 81:*10*
 191:*12*

< F >
face
 155:*11*
fact
 54:*9*
 176:*24*
facts
 17:*1*
factual
 28:*21*
 212:*23*
fair
 27:*5*
fall
 80:*17*
familiar
 19:*3*
 23:*8*

43:*6*
 44:*11*,
*17*
 131:*25*
 198:*18*,
*24*
 225:*23*
 226:*2*
fan
 54:*25*
far
 12:*5*
 127:*5*
 139:*21*
 174:*10*
 208:*8*
FARRITOR
 1:*13*
 5:*3*
 6:*4*
 7:*10*, *24*
 8:*3*
 10:*17*,
*19*   11:*1*,
*12*
 16:*13*
 19:*8*, *18*
 46:*4*
 65:*23*
 75:*22*,
*23*, *24*
 77:*14*
 102:*11*,
*13*, *24*
 103:*11*,
*12*, *13*,
*14*, *17*
 104:*13*
 122:*13*,
*14*, *21*
 124:*24*
 125:*10*,

*11*, *13*,
*17*
 130:*22*
 136:*16*,
*21*, *23*
 142:*3*,
*21*, *22*,
*24*
 143:*3*
 145:*3*,
*16*, *17*,
*20*
 148:*9*
 155:*2*, *4*,
*7*
 156:*21*
 157:*23*
 158:*2*
 161:*2*, *8*,
*10*, *21*
 162:*6*
 169:*23*,
*24*
 171:*3*, *9*
 173:*2*
 174:*15*
 175:*22*
 177:*9*,
*19*
 178:*7*
 181:*14*
 182:*17*
 187:*6*
 192:*8*, *9*
 193:*23*,
*24*
 194:*12*
 196:*6*, *8*,
*10*
 197:*12*,
*13*, *15*
 202:*1*, *2*,

*3*, *21*
 205:*19*
 209:*25*
 210:*3*,
*10*
 217:*7*
 223:*18*
 225:*3*
 230:*20*
 233:*13*
 234:*1*
F-A-R-R-I-
T-O-R
 10:*20*

Farritor's
 10:*11*
favor
 137:*2*
February
 130:*8*
 131:*2*
 155:*18*
 157:*6*,
*14*, *17*,
*20*, *25*
 158:*12*,
*17*, *24*
 159:*12*
 161:*22*
 184:*8*, *9*,
*13*, *14*
 188:*17*
 191:*17*
 192:*3*,
*21*
 193:*6*,
*12*
 194:*16*,
*23*
 195:*15*,
*19*

 196:*12*
 202:*5*,
*22*   204:*9*
federal
 74:*20*
 75:*2*, *5*
 76:*14*
 79:*22*
 91:*15*
 142:*16*
feeding
 194:*14*
 195:*22*
feel
 29:*24*
 162:*3*
 221:*23*
fellow
 22:*15*

fellowship
 22:*17*,
*20*   23:*3*
Fewer
 26:*11*
fight
 44:*9*
 204:*16*
figure
 11:*23*
 138:*10*,
*22*
 139:*9*
 173:*7*, *8*
Figuring
 23:*16*
filed
 7:*11*
 18:*16*
 155:*17*
files
 225:*25*

**filing**
 18:*2*
 155:*22*
**filings**
 19:*2*
**finances**
 166:*25*
**financial**
 23:*20*
 101:*17,*
*20, 23*
 102:*1,*
*10*
 128:*8*
 129:*1*
 175:*18*
 180:*9,*
*11*
 181:*6*
 198:*4, 6,*
*7, 11*
 200:*6,*
*11, 17*
 207:*18*
 209:*19*
 211:*2*
 226:*4, 5,*
*9*
**find**
 119:*12,*
*16*
 154:*5*
 180:*19*
 185:*12,*
*20*
 186:*16*
 228:*20*
 229:*12,*
*14*
**finding**
 185:*15*

**Fine**
 154:*13,*
*15*
 179:*7*
 189:*3*
 224:*17*
**finish**
 162:*10*
 187:*6*
 188:*5*
 205:*19*
**finished**
 106:*9*
**firm**
 22:*11*
**first**
 18:*19*
 24:*13,*
*19*
 26:*15*
 28:*13*
 40:*19,*
*20, 21,*
*24*   41:*4*
 42:*10*
 49:*19*
 50:*13*
 67:*7, 9*
 70:*11*
 72:*18*
 73:*19*
 76:*10*
 84:*7, 24*
 85:*18*
 87:*10*
 98:*25*
 100:*21*
 105:*1*
 107:*21*
 112:*23*
 122:*20*
 136:*22*

 137:*1*
 139:*10,*
*12*
 143:*1*
 144:*11*
 146:*18,*
*22*
 148:*11,*
*12*
 155:*16,*
*22*
 156:*2*
 157:*23*
 158:*15*
 164:*20*
 166:*9*
 176:*4*
 184:*4*
 194:*10*
 197:*10*
 199:*24*
 202:*15*
 203:*2, 4*
 209:*10*
 214:*7,*
*15, 25*
 216:*9,*
*19*
 219:*18*
 223:*6,*
*19, 23*
 224:*5,*
*10*
 225:*16*
 230:*2*
 233:*3*
**firsthand**
 150:*23*
 152:*2*
**fit**   95:*6*
**five**
 53:*7*

 154:*12,*
*23*
**fixed**
 218:*16,*
*18*
**floor**
 88:*18*
**floors**
 88:*12*
 89:*1, 21*
**flowed**
 116:*5*
**focus**
 53:*24*
 65:*3*
 204:*25*
 205:*10,*
*25*
**focused**
 59:*23*
 79:*1*
 122:*7*
 171:*20*
 211:*9*
**folded**
 90:*3*
**follow**
 88:*8*
 194:*20,*
*21*
 208:*17*
 209:*3*
**followed**
 36:*8*
 79:*10, 14*
**following**
 20:*23*
 90:*23*
 113:*8,*
*14*
 146:*24*
 157:*2*

 206:*9*
 214:*13*
**follows**
 11:*5*
**follow-up**
 107:*11*
**food**
 31:*3*
**foot**
 195:*4*
**foregoing**
 232:*4, 7*
 233:*7*
 234:*1*
**foreign**
 68:*6*
 163:*22*
 164:*2, 7*
 165:*13,*
*18*
 166:*11,*
*16, 22*
 167:*6*
 169:*4, 7,*
*16*
 170:*20*
**forget**
 173:*13*

**forgetting**
 27:*8*
**forgive**
 93:*11*
**forgot**
 206:*22*
**form**
 16:*14*
 37:*3*
 64:*2*
 74:*21*
 75:*1, 3*
 76:*19*

84:*15,*
*25*   87:*6*
91:*1*
111:*20*
113:*15*
117:*23*
118:*7,*
*22*
119:*23*
122:*18*
130:*9*
131:*11*
132:*20*
133:*4,*
*10*
134:*3*
135:*6*
136:*1*
139:*18*
143:*20*
144:*22*
148:*15*
150:*17*
152:*13,*
*24*
154:*2*
159:*1*
163:*8*
164:*3*
165:*19*
168:*22*
169:*5*
171:*14*
174:*19*
179:*12*
180:*14*
181:*8*
188:*22*
189:*22*
190:*17*
198:*14*
207:*2*

208:*22*
219:*15*
229:*20*
**formal**
38:*10,*
*17, 18*
95:*8*
**formally**
95:*5*

**formatting**
203:*25*
**formerly**
101:*8*
**forms**
122:*9*
**forth**
232:*5*
**forward**
130:*5*
142:*25*
**forwarded**
148:*8*
**found**
185:*24*
228:*22*

**foundation**
80:*4*
94:*19*
95:*10*
96:*22*
104:*21*
116:*21*
126:*21*
127:*14*
128:*22*
141:*22*
142:*18*
151:*11*
164:*24*
175:*14,*

*19*
195:*17*
205:*4*
215:*19*
223:*9*
**four**
98:*5, 7*
214:*14*
216:*12*
**fourth**
210:*10*

**fragmented**
91:*14*
102:*1*
**frame**
32:*23*
60:*16*
143:*21*
**Francisco**
30:*15*
**fraud**
44:*9*
59:*23*
69:*20,*
*23*
73:*22*
74:*6*
94:*8, 11,*
*14, 23*
97:*9, 11*
126:*13*
201:*20*
204:*16*
218:*7, 9*
219:*9*
**free**
162:*3*
**freeze**
166:*11*
**frequent**
122:*4*

**Frequently**
48:*20,*
*23*
91:*20,*
*24*   154:*4*
**Friday**
112:*25*
114:*3*
115:*15*
125:*16*
139:*1*
**friend**
29:*23*
224:*11*
**friends**
68:*1*
70:*16*
**FROM/TO**
234:*1*
**front**
95:*3*
102:*24*
119:*6*
125:*9*
130:*2*
177:*5*
197:*9*
**full**
36:*13*
37:*17*
71:*23*
74:*11*
101:*11*
105:*18*
107:*11,*
*24*
125:*25*
126:*4*
155:*25*
156:*7*

199:*1,*
*16*   201:*3*
**fully**
163:*14*
191:*11*
211:*7*
**function**
185:*23*
186:*1*
**functions**
53:*25*
97:*11*
**FUND**
2:*3*
4:*4, 6*
11:*13*
20:*24*
21:*1, 2,*
*3*   40:*6*
**Further**
9:*7*
113:*3*
229:*24*
232:*10*
233:*7*
**future**
40:*2, 11,*
*12*
42:*22*
43:*1*
58:*12,*
*17*   59:*2,*
*6*   61:*12,*
*14*
70:*16,*
*17*   71:*8*
218:*18*

**< G >**
**gain**
131:*16*
132:*5,*

10, 17 200:16

**gaining** 135:11

**gatherings** 74:16

**Gavin** 96:13 114:24 115:10, 17 125:24 126:10, 11 130:16 199:2, 18, 21 210:13, 17  216:2

**general** 34:16 59:4 61:7 90:2, 9 134:13 170:24 187:22 225:15 226:24

**generally** 45:19 53:3, 6, 10 70:24 82:10 101:7 126:18 160:3 168:13 189:10

200:15 211:19

**gestures** 12:9

**getting** 51:15, 22 94:21 120:5 126:8 133:25 134:10, 24 136:7 180:10 183:24 212:18

**give** 10:24 19:10 27:18 28:3 30:6 41:21 69:11 90:8, 10 102:20 106:13 109:15 110:23 160:3 173:23 209:2 216:4 218:8 229:18

**given** 86:22 90:25 99:5, 7, 17 104:8

116:13 130:3 142:12 184:2 213:2 233:9

**giving** 62:15, 16 185:19 201:4

**GLAAS** 198:18 210:22 211:1, 11, 25 215:14, 17

**G-L-A-A-S** 198:19

**Gleason** 46:22, 25 50:13 55:11, 16, 22 56:5 86:12 96:10

**Gleason's** 56:16

**Global** 198:19

**Gmail** 229:9

**Go**  9:23, 25 11:14 14:10, 24   17:3 18:7 30:7

35:21 40:17 48:18, 22 73:14 80:12 94:20 95:12 96:23 98:16, 18 103:2 107:9 119:11 129:6 134:4 141:3 155:14 160:14, 18 167:24 168:3 177:23 185:12 186:13 187:21 191:7, 19 206:11 214:7 216:19 230:9

**goal** 11:23

**godforsaken**   212:11

**goes** 103:17 142:25 162:13 197:15

**going** 11:17 12:3, 23 19:18 39:7, 20 52:17 62:12 65:6 69:25 77:6 85:18, 21, 24 86:15 90:12 102:19 103:4 117:25 118:13 119:15 129:14 131:2 134:9 137:19, 20 140:20 150:8 154:17, 22 156:3, 7, 20 157:7 160:20 162:2 175:23 176:25 190:13 191:13 194:11 205:22 212:25 224:21 231:2

**GONZALEZ**
2:*13, 17*
7:*19*
**Good**
7:*2, 17*
11:*12*
65:*9, 12*
102:*22*
113:*2*
115:*16*
136:*17*
205:*22*
206:*23*
212:*10*
**Google**
92:*10,*
*16, 19,*
*23*
101:*15*
102:*6*
**gotten**
38:*16*
**Gottlieb**
146:*4, 7,*
*21*
147:*2,*
*10*
148:*7,*
*14*
149:*8,*
*24*
151:*2, 9*
**governing**
8:*25*

**government**
13:*12,*
*13, 15*
14:*7, 13*
15:*13,*
*15*   16:*9,*
*10, 17,*

*18, 19*
17:*7, 18,*
*19*
18:*11*
20:*25*
27:*21*
28:*4, 5,*
*17, 18,*
*20, 25*
29:*9, 11,*
*12, 14,*
*17, 22*
30:*19,*
*21*   31:*3,*
*10, 13*
33:*17,*
*20, 21,*
*22*   34:*5,*
*7, 12, 17,*
*23*   35:*3,*
*16*
36:*12,*
*25*
37:*14*
38:*14*
39:*8, 10,*
*11, 18*
40:*3, 9*
42:*8*
43:*20*
44:*3, 5,*
*10*
45:*16*
46:*5, 8,*
*10*
49:*20,*
*24*
50:*21*
51:*13,*
*16*   57:*5,*
*13, 25*
58:*1, 4,*

*7, 11, 17,*
*20, 21,*
*23*   59:*1,*
*5, 9, 10,*
*24*
60:*10,*
*11, 17*
61:*11,*
*24*
63:*11,*
*12, 24*
64:*1, 15*
66:*1, 2*
67:*1, 4,*
*12, 22*
69:*16*
76:*7, 13,*
*18, 25*
77:*6, 16,*
*18, 21*
78:*3, 7*
83:*22*
91:*15*
122:*12*
134:*14*
136:*10*
142:*10*
147:*23*
148:*4*
167:*19*
168:*15*
173:*15*
174:*9*
202:*7*
218:*12*
221:*15,*
*18*
226:*14,*
*15*
228:*5, 7*
**Government
al**

59:*21*
76:*15*
**graduate**
20:*6, 12*
**graduated**
20:*10*

**graduation**
20:*11*
**grant**
105:*18*
108:*7*
109:*15,*
*21*
110:*11*
116:*20*
119:*2*
120:*23*
134:*1*
204:*22*
205:*1*
**granted**
99:*2*
105:*23*
106:*2*
107:*1*
110:*17*
113:*11,*
*13, 14*
115:*19,*
*21, 24*
116:*2*
120:*24*
121:*4, 8*
128:*4*
129:*7*
133:*2*
135:*16,*
*19, 23*
212:*20*
215:*11*
219:*3*

**granting**
99:*14*
108:*10*
119:*21*
129:*3*
134:*1*
**grants**
128:*3,*
*17*
129:*10,*
*12, 17*
202:*18*
204:*21,*
*22, 23*
205:*2*
**granular**
157:*16*
**granularit
y**   167:*23*
**Gray**
98:*23*
100:*4*
117:*2*
127:*22*
130:*6*
133:*18*
143:*14*
146:*3*
177:*13*
180:*1, 6,*
*20*
210:*12*
214:*3*
**great**
194:*15*
**Griffin**
4:*7*
8:*19*
**ground**
11:*15*
**group**
31:*24*

| | | | | |
|---|---|---|---|---|
| 32:*2, 6, 12* | **guidance** 189:*20* 190:*6* | 155:*2* 157:*22* 161:*8* | 140:*13* 208:*25* 215:*8* | *21, 24* 40:*7* 58:*7* |
| 59:*23* 66:*20* 73:*21* 111:*1* 112:*6* 139:*5, 6* 140:*12, 15* 143:*19* 159:*11* | **guide** 83:*16* 84:*1* **guy** 56:*23* 63:*7* 183:*2, 3* | 192:*8* 193:*23* 196:*6* 197:*11* 202:*2* 209:*25* **handled** 105:*8* 176:*21* 208:*15* | 225:*6* **hard** 29:*10* 59:*16* 90:*8* 159:*6, 23* 167:*22* 173:*23* 229:*8* | 109:*12* **held** 137:*25* **Hello** 127:*24* **help** 29:*7* 73:*15* 159:*25* 218:*20, 21* |
| **Gruenbaum** 37:*19, 21*  70:*22* | **< H >** **half** 20:*17* | **handles** 53:*3, 5* | **hat** 95:*12* | **helped** 34:*18, 19*  85:*2* |
| **GS**   51:*1, 6* | 34:*13* 46:*11* | **handling** 166:*25* | **head** 12:*9* | 159:*20* **helpful** |
| **GS-13** 51:*4* | 75:*21* 77:*25* 139:*10* | **handwritin g** 122:*20* | 83:*5* 98:*4* **header** | 156:*6* 160:*3, 10* **helping** |
| **GS-14** 51:*4* | **hallway** 63:*5* | 123:*1, 3, 5, 24* | 123:*19* 203:*17* | 158:*19* **helps** |
| **GSA** 33:*19, 25*  34:*6, 11*  35:*9, 10, 18* | 223:*4* **hallways** 147:*25* **halt** 164:*7* 165:*13* | 124:*2, 3* **handwritte n**  122:*22* **happen** 54:*15* | **headquarte rs** 99:*12* 167:*17* 192:*22* 193:*15, 21* | 179:*6* **Hernandez** 130:*22* 144:*12* **hero** 32:*18, 21*   33:*2* |
| 36:*1* 37:*22* 38:*6, 7, 8*   45:*20* 52:*1* 70:*24* 71:*8, 20* 131:*25* 132:*2* | 169:*15* **halting** 163:*22* 164:*2* 170:*20* **hand** 10:*22* **handing** 75:*22* | 174:*9* **happened** 34:*25* 46:*9* 55:*23* 99:*24* 149:*12, 15, 16, 25* | 194:*25* 225:*19* **Health** 36:*18* **heard** 43:*7* 44:*4, 6* | **heroes** 32:*24* **HHS** 47:*8, 24* 48:*24* 136:*24* 137:*9, 15, 22* |
| **guess** 11:*25* 98:*7* 177:*9* 196:*20* | 102:*11* 103:*12* 122:*12* 124:*24* 142:*21* 145:*15* | 150:*22* 161:*15* 193:*12* 207:*6* **happening** 68:*17* | 151:*20* 194:*8* **heated** 134:*24* **hectic** 39:*6, 9,* | 138:*6* 139:*1* 170:*13* |

172:1, 7, 16, 19
173:1, 10, 17, 20
174:2, 10, 14
175:8
181:25
217:9, 10, 15, 17
218:1, 9, 19, 25
219:3, 6, 11, 12, 19, 25

HHS.gov
136:23

Hi
137:6
197:24
200:5
210:16

high
20:2, 3, 6, 8, 9

higher
119:4

highly
101:25

history
20:23
215:16, 18

Hobson
114:5, 15
119:19, 21
120:2, 4, 9

Hold
47:14

holds
225:25

home
193:8

homeschool
20:10

homeschooled    20:4

hoping
210:18

hour
65:16

hours
25:24
26:3
164:16

House
6:22
110:14
111:5
117:6, 25
139:23
140:18
202:5
221:11, 12, 14, 17, 20
222:8, 11

housed
219:20

How'd
29:20

HR
128:1, 10, 11
129:5

Human
36:18
156:13

HUMPHREYS
3:7
7:23
8:18, 20
10:7
15:4
16:1
18:6, 8, 22
27:14
29:4
37:12
39:15
44:24
47:14
48:6
49:11
51:17
52:19
53:21
54:11
55:24
56:8, 22
59:25
60:12
62:2
66:17
71:2, 10, 16, 22
72:24
73:10
76:19
78:5
80:3, 11, 19
81:15
82:19, 22
83:18

84:3, 9, 15, 25
85:15
86:17
87:6, 19
88:15
89:5, 12, 22    91:1
92:14, 18
93:22
94:19
95:10
98:1
99:20
106:4, 11, 16
107:14
108:15
110:3
111:20
112:2, 19
113:15
116:21
118:22
121:10, 22
124:25
125:2, 5
126:20
127:13
128:22
130:9
131:11
132:20
133:4
136:12, 15
141:21
142:5, 17

145:4
148:15, 22
150:17
151:10
152:24
153:9, 12
154:3, 10, 20, 22
155:14
156:20
157:7
158:6, 25
164:3, 11
167:7
169:5
171:14
172:18
174:6, 19
175:13, 19
178:16
181:8
182:8
184:21
185:4
186:5, 7, 10, 19
187:11
188:8, 22
189:22
192:13, 17
195:10, 17
198:14

203:*8, 10*
204:*11*
205:*3, 12*
208:*22, 23*
212:*2, 3*
215:*19, 20*
219:*15, 16*
224:*7, 8, 15*
229:*20*
230:*1, 4, 5, 19, 23*
hundreds
208:*19*

hypotheses
33:*15*

< I >
i.e
212:*7*
idea
87:*4*
194:*10*
223:*6, 20*
identifica tion
75:*24*
102:*13*
103:*14*
122:*14*
125:*13*
142:*22*
145:*17*
155:*4*
158:*2*
161:*10*

192:*9*
193:*24*
196:*8*
197:*13*
202:*3*
210:*3*

identified
47:*6, 22*
53:*8*
70:*25*
93:*19*
95:*4*
141:*16*
145:*3*
146:*24*
166:*5*
identify
7:*14*
173:*10, 16, 20, 24*   174:*3*
identifyin g   143:*25*
illegal
146:*13*
illegally
171:*6*
illustrati on
185:*19*
imagine
86:*23*
102:*2*
165:*14*
166:*19*
167:*2, 25*
169:*10*
183:*8*
184:*1*

190:*12*
196:*2*
immediatel y   79:*21*
implement
76:*13*
77:*19*
88:*2*
90:*17*
91:*13*
94:*7*
108:*8*
126:*24*
207:*25*
implemente d   78:*1*
88:*3, 10*
105:*15*
218:*4*
Implementi ng   76:*7*
89:*3*
94:*22*
202:*6*
204:*14*
implying
41:*3*
important
228:*6*
improve
142:*10*
improvemen t   88:*13*

inaccurate
148:*13, 20*
inaugurate d   26:*19*
inaugurati on   39:*1*
67:*15,*

*17, 24*
69:*7*
72:*21*
84:*20*
85:*6*
98:*14*
include
9:*2*
48:*2*
79:*2*
108:*12*
147:*3*
155:*25*
167:*2*
193:*1*
included
43:*4*
196:*12*
230:*10*
includes
151:*20*
including
45:*9*
47:*7, 23*
58:*22*
60:*8*
63:*25*
67:*23*
80:*22*
97:*8*
128:*1*
131:*9*
150:*4*
164:*18*
174:*9*
180:*22*
210:*22*
211:*12*
226:*4*
inconsiste ncy   29:*2*

inconsiste nt
165:*12*
170:*19*

incredibly
173:*18, 22*
218:*13*
independen t   189:*4, 7, 9*
203:*5*
independen tly
118:*12*

indirectly
66:*11, 16*
Indiscerni ble
78:*16*
136:*11*
154:*14*
206:*13*

individual
176:*24*
190:*24*
225:*25*
individual s
104:*16*
105:*8*
143:*25*
144:*19*
145:*12*
149:*14*
176:*6, 10, 15*
178:*1, 4*
179:*17*

189:10
205:15
206:5
220:9

individual's 190:25
inefficiencies
173:14
inefficient 91:15
inferring
178:9
inform
132:17
information 13:10
104:15, 19
105:11
108:7
123:11
127:25
138:3
140:10, 16, 19
141:14
142:13
149:14
150:4
152:2
159:24
172:16, 24
176:5
177:24
225:17, 24
226:2, 3, 4, 5, 9

228:13
229:3, 17
informed
52:24
53:8, 13
54:9
85:24
informing
193:7, 20
infrastructure
142:11
initially
131:23
217:21
initiated
215:22
217:6

initiative
44:9
141:19
142:2
202:8
inoperative 191:4
in-person
60:24
91:19
183:20
inquired
166:14
inquiring
163:5, 17
ins
79:18
inside
212:9
instance
100:21
135:3,

10, 13, 14  136:6
instances
53:6
75:4
88:6
100:22
instruct
16:3
18:10
141:6

instructed
11:21
226:11, 25
instructing 132:22
instruction 14:23
177:16
instructions
147:6
177:12
227:9
inter
147:20
interact
57:8, 11, 12  66:6
104:5
146:10
147:14, 17
182:23
219:20
interaction 46:25
105:3
interactions

27:11
61:9, 24
65:24, 25
147:22
183:1

interested
232:12
interfacing 107:2
intermediary 48:5
intern
4:7, 8
8:19
21:16, 20, 24
Internal
6:14, 15
155:18
Interned
22:10, 11, 12
24:23
internet
189:21

internship
22:5
25:3, 5, 7
internships 21:12
22:7
interpret
33:15
46:7
174:11
interpretations
41:18

interrupt
206:15
interview
51:25
52:3, 12
74:14
interviewers 52:11

interviews
52:7
introduce
8:15
57:19

introduced
24:19
42:9
introducing 40:20, 24  41:1, 23  42:15
investigate
153:22
180:11
investigation
13:11, 20
158:21

investment
20:24
21:1
40:5
involved
13:16
36:10
66:22
135:4, 11, 22

143:*18*
144:*18*
157:*13*
165:*16*
166:*5*
169:*1,*
*14*
170:*14*
190:*11,*
*14*
208:*3,*
*12*  218:*9*

**involvemen**
**t**  23:*13*
144:*6*
158:*16*
159:*10*
189:*12*
192:*2*

**involves**
153:*15*

**involving**
134:*13*
149:*13*
166:*7*

**issuance**
205:*11*
206:*25*

**issue**
66:*21*
87:*25*
90:*15*

**issued**
89:*16*
163:*21*
206:*2*
207:*24*

**issuing**
208:*14*
209:*23*

**italics**
138:*21*

**its**
43:*24*
77:*7*
155:*11*
161:*23*

**< J >**
**J.DOE**
1:*4*

**Jackson**
104:*1*
105:*17*
112:*12,*
*17*
114:*5*
115:*15*
117:*2*
119:*17*
156:*16*
157:*25*
180:*1, 6*
182:*23*
183:*15,*
*18, 24*
196:*11*
197:*7*
210:*13*
214:*3*
222:*14,*
*17, 20,*
*22*  223:*1*

**JACOB**
3:*16*
7:*25*

**jacob.s.si**
**ler@usdoj.**
**gov**  3:*17*

**Jake**
103:*1*

**January**
26:*17,*
*24*

27:*23*
33:*23*
40:*17*
42:*9, 12*
60:*18*
76:*4*
104:*12*
105:*21*
107:*10*
109:*10*
112:*25*
124:*2*
125:*16*
127:*23*
129:*13,*
*18*
136:*22*
137:*10*
142:*4*
143:*11*
146:*3*
147:*11*
148:*20*
149:*9*
161:*12*
162:*18*
163:*7*
165:*2*
166:*18*
167:*13,*
*16, 20,*
*22*
170:*7, 9*
181:*15,*
*21*
202:*21*
204:*8*
217:*16,*
*20*

**Jason**
98:*23*
100:*3*

117:*2*
125:*23*
127:*22*
130:*6*
133:*18*
146:*3*
177:*13*
180:*20*
210:*12,*
*16*

**Jehieli**
4:*4*
7:*21*

**Jeremy**
6:*19*
67:*3*
72:*16*
86:*8*
95:*25*
96:*4*
117:*14*
130:*19*
149:*24*
196:*11*
210:*12*
214:*13,*
*17*

**jgonzalez@**
**msgpllc.co**
**m**  2:*18*

**Jim**
217:*25*

**JOAQUIN**
2:*17*
7:*19*

**JOB**
1:*19*
33:*11,*
*17*
34:*23*
36:*25*
38:*22,*

25
39:*25*
40:*4, 8*

**Joel**
114:*19*
143:*11*
144:*13*
147:*7, 8*
177:*13*
180:*8*

**jog**
160:*7*

**jogging**
162:*10*

**John**
21:*16, 24*

**Join**
203:*5*
223:*22*

**joined**
45:*23*
58:*20*
60:*17*
64:*1*

**joining**
37:*14*
38:*16*
39:*8, 10,*
*11, 18*
40:*3, 9*
59:*1*
60:*9*
223:*25*
224:*6*

**Josh**
37:*19,*
*21*  38:*8*

**June**
1:*14*
7:*3*
232:*14*

233:5
234:1
JUSTICE
3:13
230:17
justificat
ion
177:15
justify
182:6, 17

< K >
K-E
10:20
keep
102:19
186:2
190:10,
13
205:22
Ken
103:25
104:1
107:5,
10
113:3
114:23
117:2
156:16
157:25
182:23
183:9
210:13
Kenneth
196:11
kept
190:8
key
100:13,
25
164:18

keyword
228:19
Khan
130:7, 8
kind
47:16
68:6
101:6
131:5
179:22
226:19
kinds
62:13
KING
3:3
4:7
8:19
15:12
Kliger
96:13
114:24
115:10,
11, 24
125:24
126:10,
11, 17
127:5, 9,
11
130:16
199:21
210:14
211:11,
25    212:6
Kliger's
127:19
knew
100:14
189:23
212:20
213:7, 8
know
11:23,

24    12:3,
17
15:22
19:21
21:2
24:7, 8,
9    26:14
27:7, 10
28:20,
21    29:1,
9, 10, 12,
24
32:23
35:10,
12
36:15
39:25
40:1
43:18,
21
48:10,
12    55:2
56:12,
16, 25
59:15
62:11,
12, 18
63:8, 9,
10, 22
72:20
76:1
79:17
93:20
94:25
95:4, 5,
13    97:5
101:11
104:2
110:21
114:5,
15
116:19

117:10,
21
118:3
122:24,
25
123:23,
25
127:6
128:16
131:9,
10
132:2
133:13,
17, 18,
19, 23,
24
134:14
136:13,
15
137:3
139:15,
17
140:1,
18
143:6
145:1, 8,
19
146:7
147:2,
12
148:13
153:5,
17
157:16
158:10
159:22,
25
161:25
162:1
163:3, 5,
16
165:4

166:24
167:9,
10, 23
169:8
170:1
172:23
173:13
181:20
183:3,
10
187:18,
21
189:18
190:9,
10
191:10,
11
193:11
194:5
195:11,
12, 14
196:18,
20
200:1,
19
201:9,
12, 15
202:10
203:12
205:6
208:1
211:14,
15
212:4,
17, 18,
22
213:6,
16
215:22
216:6,
16, 18
217:1

222:7, 8
223:4
226:20
227:11, 20
228:4, 6
**knowing**
108:10
**knowledge**
13:16, 22
31:20
34:10, 11
35:23
45:1
95:21
144:2
149:16, 25
150:4, 10, 24
151:8, 15, 22
152:4
159:19
171:1
179:20, 21
**known**
157:3
**knows**
151:19

**< L >**
**L3**
216:14, 17
**Labor**
146:4
**lack**
80:3

94:19
96:22
126:20
127:13
141:21
142:17
151:10
164:23
175:13
223:9
**Laken**
117:14, 21
**language**
129:23
199:6
**laptops**
228:15
229:6, 9
**large**
91:13
159:11
188:18
221:16
222:1
**latest**
210:19
**laws**
8:24
**lawsuit**
226:15, 17
227:1, 2, 6, 10
**lawyer**
45:3
180:19
226:14
227:21
**lawyers**
14:3, 11, 14   15:3,

13   17:8, 18, 25
18:3
**lead**
79:2
82:17
83:7
202:16, 18, 19, 23

**leadership**
34:19
36:9
66:12, 14, 22
87:25
90:15
105:5, 14, 16
116:14, 24
117:1, 4, 8, 9, 12
118:17, 20
122:5
126:24
141:1
153:16
167:1
176:20
180:1, 3
195:15
197:25
204:15
205:7, 15
206:3, 5
207:5, 23
208:14
209:2, 5,

17
218:4
219:9
221:2
**leading**
159:17
184:10, 17, 19
187:23
227:22
**learn**
37:8
45:14
52:15
85:18
113:3
**learned**
87:5
**leave**
22:20
28:18
34:12
104:17, 20
105:6, 7, 9, 10, 14
116:11, 16, 17
118:13
143:13, 19
144:1, 4, 7, 20
145:13
146:13
151:5, 17
154:6
156:19
157:3, 6, 14, 19
158:5,

14, 16, 24
159:12, 18
160:2, 7, 9
176:11, 16, 18, 20, 22
177:15
178:1, 5, 22
179:10, 17, 19
182:7, 18
183:19
184:8, 11, 20
185:3
186:15, 18
187:1, 10
188:19
189:6, 11, 13
196:14, 15, 19, 23   197:1
**leaving**
39:25
40:4, 8
**led**
185:2
186:25
**left**
28:16, 20   29:1, 9, 11, 12, 14
46:10

64:*15*
148:*3*
**Legal**
1:*17*
3:*3*
4:*7*
7:*6*
8:*20*
17:*16*
19:*3*
21:*2*
43:*18*
44:*25*
47:*17,*
*18*    48:*7,*
*11*
83:*19*
91:*2*
106:*5,*
*17, 20*
112:*20*
168:*22,*
*25*
221:*22*
**legally**
20:*9, 10*
21:*10*
**letter**
38:*2*
137:*9*
139:*1*
171:*22*
172:*1*
**level**
108:*6*
113:*18*
123:*12*
**Lewin**
6:*19*
67:*3, 18*
69:*2, 4*
72:*16*

86:*8*
95:*25*
96:*4*
117:*14*
130:*19*
149:*13,*
*24*
196:*11,*
*25*
210:*12,*
*16*
211:*24*
214:*17*
215:*13*
216:*11,*
*20*    221:*7*
**Lewin's**
200:*23*
201:*23*
211:*10*
**lies**
117:*11*
**life**
39:*6*
**likes**
57:*1, 2*
**limitation
s**
112:*15,*
*17*
**limited**
63:*24*
122:*2*
128:*1*
180:*22*
**limiting**
227:*4*
**Lincoln**
19:*14, 23*
**Lindsey**
130:*14*

**line**
158:*7*
203:*3*
234:*1*
**list**
36:*13*
37:*17,*
*18*
71:*24*
74:*11*
99:*22*
101:*3,*
*11*
137:*8,*
*13*
143:*12,*
*15*
145:*8*
147:*9*
148:*8*
157:*5, 8,*
*9*
158:*14*
159:*4*
160:*2, 6*
171:*17,*
*18, 21*
172:*4*
**listed**
40:*14*
85:*2*
104:*3*
123:*16*
124:*10,*
*15*
140:*1,*
*24, 25*
145:*1, 2*
172:*8*
182:*4*

**listen**
111:*2, 8*
214:*16*
**listing**
152:*6*
**lists**
85:*4*
139:*12*
145:*6*

**litigation**
17:*22*
226:*12,*
*24*
**little**
137:*13*
156:*5*
194:*8*
217:*9*
**live**
19:*15,*
*16, 21*
**loaded**
32:*19*
191:*12*
**loan**
13:*21*
**lobby**
25:*20*
**LOCATION**
1:*17*
34:*25*
**logged**
137:*14,*
*17*
**logical**
126:*1, 5,*
*8*
183:*25*
190:*15,*
*19, 21*

**logs**
215:*15,*
*17*
**long**
20:*15*
25:*23*
27:*19*
51:*10,*
*14, 15*
160:*17*
168:*1*
169:*9*
**look**
76:*10*
104:*1*
106:*23*
114:*2*
122:*13*
123:*6*
125:*15*
129:*12*
137:*2*
143:*4*
161:*25*
180:*11*
181:*11*
197:*16*
214:*2, 12*
**looked**
141:*20*
165:*11*
170:*12*
182:*3*
183:*9*
222:*18*
228:*18*
**looking**
137:*16,*
*22*
138:*1*
141:*8,*
*12*

150:*7*
153:*18*
162:*6*
165:*25*
166:*3*
168:*16, 18*
169:*14*
170:*13, 14, 21*
172:*13*
174:*3*
175:*22*
177:*9, 10, 20*
216:*19*
**Looks**
124:*3*
162:*11*
197:*22*
200:*2*
**loop**
185:*8*
**loose**
44:*8*
**lost**
226:*17*
**lot**
61:*18, 21*
109:*13*
110:*25*
169:*7*
194:*19*
221:*5*
226:*18*
229:*16*
**lots**
31:*24*
90:*12*
200:*19*

**L-U**
10:*19*
**Luevanos**
4:*4*
7:*21*
**LUKE**
1:*13*
5:*3*
7:*10*
10:*19*
104:*13*
107:*5, 11*
109:*7*
111:*14*
113:*23*
114:*24*
115:*17*
122:*21*
125:*16*
126:*1*
130:*22*
136:*23*
148:*8*
200:*5*
210:*17*
213:*13, 23*
216:*2, 13, 22*
233:*13*
234:*1*
**lunch**
161:*2, 3, 5*
175:*22*
176:*2*
181:*3*
184:*6*
**LYNCH**
3:*18*
8:*4*

14:*7*
17:*13*

**< M >**
**machine**
212:*15*
**maintain**
13:*5*
190:*10*
**major**
20:*19*
87:*17, 23*
**majority**
25:*17*
**Makecha**
140:*5*
**making**
206:*17*
**Maliska**
149:*13, 24*
156:*13, 15*
157:*25*
196:*14, 18, 22*
197:*1*
**Maliska's**
149:*9*
**manage**
115:*4*
198:*10*
211:*23*

**management**
102:*10*
147:*12*
198:*7*
**Manager**
214:*11*
**managing**
125:*25*

126:*5*
128:*11, 13*
**manuscript
s** 23:*16*
**map**
162:*25*
167:*23*
**March**
197:*19*
198:*4*
200:*5*
212:*1, 25*
216:*20*
**Marco**
62:*18*
**marked**
75:*23, 24*
102:*11, 13*
103:*13, 14*
122:*12, 14*
125:*13*
142:*21, 22*
145:*17*
155:*4*
158:*2*
161:*8, 10*
192:*9*
193:*24*
196:*8*
197:*13*
202:*3*
210:*3*
**Marocco**
63:*6, 17,*

23   64:*7, 15*
65:*24*
66:*25*
72:*19*
86:*10*
96:*7*
115:*16*
156:*15*
157:*1, 24*
158:*13*
163:*1, 4, 16*
166:*11, 13, 23*
167:*2, 3, 12, 16, 19, 24*
180:*6*
196:*23*
210:*13*
214:*3*
220:*25*
**Marshals**
135:*15, 19*
**MARTIN**
2:*9*
8:*7, 8*
9:*18, 22*
**MARYLAND**
1:*2*
7:*12*
**MARZIANI**
2:*13*
**material**
151:*3*
**Matheu**
4:*8*   8:*5*
**matter**
7:*10*

8:25
68:6
179:18
**matters**
53:4
92:3
110:15
111:6
153:18
**Matthew**
114:5
**Maureen**
199:25
200:1, 24
**Mausolf**
197:19,
21
198:23
199:25
**Max**   4:8
8:5
**maximize**
76:15
77:21
79:22
**Maya**
4:6
8:16
**McGill**
6:10
103:25
104:2, 5,
13, 18,
25
105:18
107:4,
10
108:9
109:1, 6
111:14,
16, 19,
25

112:7,
12, 17
113:2,
23
114:4,
22
117:24
118:6,
12, 18
119:1, 7,
10, 15,
20
121:7,
14, 19
122:2,
16
124:16
144:12
176:4
**McGill's**
109:9
117:13
124:14
**meals**
30:17,
23, 24,
25   31:2,
4
**mean**
9:15
17:5, 10
24:8, 16
27:12
32:9
35:15
41:15
57:18
59:8
60:8
61:14,
20   62:7
68:20

69:6, 14
74:13
97:17
99:4
100:20
107:13,
21
108:14
117:1
120:24
126:6
133:16,
19
135:23
137:20
138:13,
17, 21,
24
151:19
152:3
153:14
162:23
166:21,
24
171:12
172:6
180:8
182:14
183:8
188:23
190:7, 8,
20
191:12,
21
192:25
199:7
200:19
207:16
208:5
213:17
222:15
226:13,

18
227:11
**meaning**
32:10
90:22
124:19
170:18
227:13
**meanings**
213:19
**means**
9:1, 4
108:18
138:20
139:17
150:10
190:21
210:24
216:16
**meant**
201:6

**mechanisms**
48:11
59:4, 9
**media**
27:2
31:9
**meet**
16:19
24:13,
16, 18,
24
25:10,
13   26:1
41:10,
12, 15,
16, 22,
24   42:1
57:17
63:3, 12
66:25

92:10,
16, 19
100:2
221:14
**meeting**
17:1
25:11,
23, 25
26:21,
24
27:18
28:2
40:13,
18, 21
41:2, 12,
25   42:3,
9, 12, 19,
21, 24
43:4
60:24
74:17
98:19,
22, 23
99:3
100:1, 3,
21
117:13,
19, 24
118:5, 8,
11
120:9
149:8,
10, 13,
15, 17,
20, 21,
23
150:1, 5,
6, 13, 16,
19, 22,
25
196:3

| | | | | |
|---|---|---|---|---|
| 225:*9*, *18*, *21* | 94:*4*, *12*, *15*  95:*9* | 11, 13<br>179:*7* | mess<br>125:*1* | Mike<br>200:7, |
| meetings | 96:*4* | 181:*5* | message | *25*  201:*1* |
| 27:*23* | 141:*1* | 185:*6*, | 130:*6* | million |
| 28:*24* | 180:*3*, *5* | 13, 21 | 143:*10* | 23:*2* |
| 30:*19*, | memo | 186:*14* | messaging | 33:*3* |
| *21* | 6:*13*, *14*, | 187:*15* | 27:*2* | 161:*23* |
| 32:*13* | *15* | 188:*11*, | 31:*17* | 162:*21*, |
| 42:*6*, *7*, | 117:*25* | *14* | 92:*2*, *4*, | *22* |
| *19* | 146:*2*, | 189:*3* | *6* | 163:*6*, |
| 72:*22* | *12* | 203:*5* | met | *16*, *25* |
| 73:*4*, *6* | 149:*12* | 220:*8* | 16:*18* | 164:*9*, |
| 74:*9*, *15*, | 151:*1* | 225:*10* | 24:*11*, | *17*, *22* |
| *18*  75:*1* | 155:*18* | memos | *22*  26:*5*, | 165:*7*, *9*, |
| 90:*12* | 156:*12* | 87:*25* | *8*, *15* | *18*, *22* |
| 91:*19* | 157:*24* | 89:*15*, | 27:*4* | 166:*8* |
| 164:*15* | 158:*19*, | *19* | 28:*6*, *16* | 168:*11* |
| 183:*3* | *21* | 184:*4*, *7*, | 29:*10*, | 170:*3* |
| 220:*9*, | memorized | *17* | *13* | mind |
| *24* | 51:*6* | 187:*18*, | 38:*12*, | 54:*22* |
| 221:*4*, | memory | *24* | *15* | 180:*8* |
| *17* | 15:*23* | 188:*23* | 40:*19* | 193:*12* |
| 222:*8*, | 22:*13* | 207:*23* | 41:*4* | mine |
| *10*, *12*, *16* | 46:*18* | 208:*14* | 57:*14*, | 45:*15* |
| member | 69:*1*, *3* | mentioned | *17*, *18* | ministeria |
| 66:*12*, | 87:*15* | 22:*4* | 63:*11* | l  90:*19*, |
| *14* | 98:*11* | 37:*23* | 67:*5*, *7*, | *22* |
| 80:*24*, | 120:*6*, *8* | 43:*5* | *18* | minute |
| *25*  81:*4*, | 122:*10* | 60:*2* | 72:*18*, | 70:*23* |
| *8*, *12*, *22* | 132:*21* | 68:*10*, | *20* | 197:*16* |
| 82:*6*, *8*, | 133:*6* | 23, 24 | 221:*11*, | minutes |
| *14* | 135:*1*, | 115:*10* | *25* | 12:*18* |
| 93:*19* | *17*, *20* | 116:*24* | method | 15:*1* |
| 94:*3* | 136:*9* | 185:*15* | 9:*6* | 127:*23* |
| 95:*16* | 137:*4* | 228:*24* | Microsoft | 154:*12*, |
| 96:*6*, *8* | 154:*6* | | 101:*12*, | *23* |
| 97:*24* | 160:*8* | mentioning | *14*  102:*5* | 170:*10* |
| 204:*10* | 162:*10*, | 68:*16*, | middle | 187:*14* |
| 221:*2* | *25* | *17* | 112:*11* | 224:*13* |
| 222:*2* | 168:*6* | 170:*10* | 144:*11* | Mischaract |
| members | 176:*2* | mentor | 163:*20* | erizes |
| 93:*20* | 178:*8*, | 29:*25* | 204:*19* | 29:*5* |

79:*16*
81:*16*
97:*16*
192:*24*
205:*13*
209:*7*

**misconduct**
141:*11*
151:*4,*
*16*
152:*7,*
*12, 22*
153:*7, 25*
**misinterpr**
**eting**
39:*12*
**missed**
134:*16*
**missing**
29:*8*
203:*19*
204:*5*
**mission**
43:*16*
**misstateme**
**nt**   15:*3*
**Misstates**
17:*15*
18:*22*
39:*13*
47:*15*
55:*24*
59:*25*
71:*2*
73:*24*
93:*22*
174:*6*
178:*24*
185:*4*
186:*5,*
*10, 19*

187:*11*
191:*8*
209:*21*
223:*8*
**mistake**
14:*15*
**mix**
180:*7*
**Mm-hmm**
79:*3*
123:*13,*
*17, 20*
214:*6*
**modernizat**
**ion**
88:*14*
141:*19*
142:*2*
204:*25*
**modernize**
142:*16*
**modernizin**
**g**   76:*14*
77:*4, 20*
79:*22*
**modified**
207:*8*
**moment**
40:*16*
48:*1*
50:*9*
56:*20*
65:*7*
102:*15,*
*18*
129:*3, 9*
143:*3*
145:*19*
149:*7*
202:*10*
214:*12*

**Monday**
136:*22*
167:*16*
181:*15*
184:*8,*
*15*
194:*24*
**money**
163:*3*
164:*19*
165:*8,*
*10*
166:*1, 3,*
*4, 6*
167:*3*
**month**
28:*11*
34:*14*
45:*24*
49:*19*
64:*8, 11,*
*19, 24*
**months**
23:*6*
28:*13,*
*14*   39:*4*
221:*17*
**moral**
32:*23*
**morning**
7:*2, 17*
11:*12*
113:*2, 8,*
*14, 24,*
*25*
167:*16*
181:*16*
210:*18*
**motion**
10:*11*
**motions**
18:*16*

**mouth**
220:*4*
**moved**
192:*10*
**multiple**
24:*5*
35:*20*
41:*17*
54:*4*
100:*19*
229:*2, 6*
**MUSK**
1:*7*
7:*11*
24:*7, 25*
25:*10*
26:*1, 5,*
*25*
27:*23*
28:*6, 16,*
*24*
29:*21*
30:*18,*
*23*   32:*1,*
*5, 18*
33:*4*
38:*12,*
*13*
40:*18,*
*19*   42:*1,*
*7, 10, 13,*
*20*
54:*23*
72:*10*
74:*17*
86:*2*
95:*15,*
*16*
109:*7, 9,*
*14, 20*
110:*1, 8,*
*10, 16,*

*21*
111:*3, 6,*
*15, 16*
112:*5, 6*
136:*7*
194:*20,*
*25*
195:*3, 4,*
*22, 25*
221:*9*
**Musk's**
194:*24*
**mute**
205:*21*

**< N >**
**name**
7:*5*
10:*18*
11:*12*
21:*1, 2,*
*3*   36:*16*
37:*18,*
*24*   38:*1*
43:*1*
44:*15*
53:*19*
94:*16*
101:*20*
102:*8*
115:*10*
118:*4*
123:*12*
124:*10,*
*14*
139:*12,*
*13*
143:*4*
189:*18*
**named**
103:*25*
143:*25*

names
40:15
43:3
44:20
46:20
52:9
54:22
72:2, 4,
7   94:16
137:8
139:12
141:15
143:15
145:3
148:8
157:5, 8,
9
158:15
160:2, 7
172:5
180:7
182:4
Nancy
197:19,
21, 24
NASA
33:16
Nation
214:9,
10, 16,
20   216:1
nature
47:2
70:24
88:5, 11
89:20
183:1
Near
93:16
Nebraska
19:9, 12,
13, 23

20:5, 13
21:9
nebulous
43:21
necessaril
y   179:20
necessary
108:7
need
12:8
19:10
103:1
106:13,
23
112:3
116:7
121:7,
19
122:8
128:21,
25
129:5
149:7
160:14
175:11
198:24
199:2
200:6
215:16
216:5
219:6,
11
226:16
needed
12:19
106:1
109:4
112:18
116:25
168:24
175:17
198:3

199:9
200:13
219:18
Needham
200:7, 25
needing
105:22
needs
120:22,
24
201:16
neither
150:21
232:10
net
226:4
network
142:11
never
97:4
187:3
188:3
212:19
New    7:7
news
19:5, 6
223:22
NFDG
21:4
Nicholas
146:4, 7
nine
123:15
Noah
147:11,
12   148:7
non-
classified
201:4
Nope
194:7

normal
24:17
32:10
Northwest
3:4, 14
notary
11:5
233:19
234:1
note
114:23
201:2
210:5
noted
234:1
notice
196:15
notices
144:16,
19
noticing
7:15
novel
33:15
November
60:17
67:15
Number
7:12
31:19
32:17
60:21
67:19
89:15
91:13
94:6
110:13
111:5
116:9
137:12
138:5,
25

155:17
157:24
158:23
162:22
164:9
171:21
173:23
188:18
192:14
215:2, 5,
14, 25
221:4,
16   222:1
numbering
125:1
Numbers
137:7
138:6, 9,
13, 15,
22
139:11
172:4
174:24
182:5
numerous
164:18

< O >
oath
9:8, 9
12:13
156:8
object
11:20
150:8
156:4
157:8
186:7
203:6
210:5
Objection
15:4, 5,

| | | | | |
|---|---|---|---|---|
| *8* 16:*1* | *15, 25* | 135:*6* | 182:*8, 9* | **obtain** |
| 17:*15* | 85:*15* | 136:*1* | 184:*21* | 22:*17* |
| 18:*5, 6,* | 86:*17* | 141:*21* | 185:*4* | 100:*7, 10* |
| *8, 12, 22* | 87:*6, 19* | 142:*5,* | 186:*5,* | **obtained** |
| 27:*14* | 88:*15* | *17* | *10, 19* | 187:*3* |
| 29:*3, 4* | 89:*5, 22* | 143:*20* | 187:*11* | **obtaining** |
| 37:*12* | 91:*1* | 144:*22* | 188:*8,* | 101:*4* |
| 41:*6* | 93:*22* | 145:*4* | *22* | 110:*17* |
| 44:*24* | 94:*17* | 148:*15,* | 189:*22* | 117:*15* |
| 47:*15* | 95:*10* | *22* | 190:*17* | 187:*2* |
| 48:*6* | 96:*21* | 150:*17* | 191:*6* | **obviously** |
| 49:*11* | 97:*15* | 151:*10,* | 192:*24* | 52:*21* |
| 51:*17* | 98:*1* | *18* | 195:*10,* | 100:*20* |
| 52:*19* | 99:*20* | 152:*13,* | *17* | 139:*18* |
| 53:*14,* | 104:*21* | *24* | 198:*14* | 153:*17* |
| *21* | 106:*4, 6,* | 153:*9,* | 201:*7,* | 156:*22* |
| 54:*11* | *16* | *13* | *18* | 166:*21* |
| 55:*24* | 107:*14,* | 154:*2* | 204:*11* | 169:*6* |
| 56:*8, 22* | *17* | 155:*9* | 205:*3, 4,* | 170:*6,* |
| 59:*25* | 108:*15* | 156:*21* | *12* | *23* |
| 60:*12* | 110:*3* | 158:*6,* | 206:*12,* | 171:*17* |
| 62:*2* | 111:*20* | *25* | *16, 17* | 183:*9* |
| 64:*2* | 112:*2,* | 159:*1* | 207:*2,* | 191:*12* |
| 66:*17* | *19* | 163:*8* | *20* | 197:*2* |
| 71:*2, 10,* | 113:*15* | 164:*3,* | 208:*21,* | 205:*5* |
| *16, 22* | 114:*7* | *11, 23* | *22* | 221:*3,* |
| 72:*24* | 116:*21* | 165:*19* | 209:*7,* | *25* |
| 73:*10,* | 117:*16* | 167:*7* | *20* | 226:*19* |
| *24* | 118:*7,* | 169:*5* | 212:*2* | **occasion** |
| 74:*21* | *22* | 171:*14* | 215:*19* | 30:*14* |
| 75:*3, 13* | 119:*23* | 172:*18* | 219:*15* | **Occasional** |
| 76:*19* | 121:*10,* | 174:*6,* | 220:*17* | **ly** |
| 77:*8* | *22* | *19* | 223:*8* | 182:*25* |
| 78:*5, 12* | 126:*20* | 175:*13,* | 224:*1, 7* | **occasions** |
| 79:*6, 15* | 127:*13* | *19* | 229:*20* | 136:*3* |
| 80:*3, 11,* | 128:*22* | 177:*22* | | **occupy** |
| *19* | 130:*9* | 178:*15,* | **objections** | 62:*11* |
| 81:*15* | 131:*11* | *16, 24* | 154:*17* | **occur** |
| 82:*19,* | 132:*20* | 179:*12* | **Observer** | 24:*21* |
| *21* | 133:*4,* | 180:*14,* | 4:*6, 7, 8* | **occurred** |
| 83:*18* | *10* | *19* | **observers** | 27:*20* |
| 84:*3, 9,* | 134:*3* | 181:*8* | 8:*14* | 75:*5* |

100:*19*
121:*12*
150:*16*
167:*21*
225:7
227:*22*
**occurring**
  32:*16*
  68:*10*
  111:*17*
  165:*14*
  200:*16*
**odd**
  181:*15*
**offer**
  38:*17*,
*18*
  111:*15*
**offered**
  111:*14*
**offering**
  112:*5*
**office**
  24:*22*
  25:*2*, *9*,
*14*, *15*,
*18*, *20*
  26:*15*
  36:*17*
  37:7
  43:*15*
  69:*18*
  81:*10*
  97:*19*
  104:*4*,
*14*
  117:*14*
  119:*16*
  123:*12*
  131:*4*
  139:*1*
  147:*11*

149:*8*, *9*
172:*2*
181:*18*
221:*13*,
*25*
222:*2*, *3*
**OFFICER**
  1:*18*
  7:*2*
  8:*7*, *10*,
*14*, *21*
  9:*8*, *13*,
*18*, *23*
  10:*1*, *5*,
*15*, *21*
  11:*6*
  15:*7*, *10*
  65:*5*, *11*,
*17*, *20*
  103:*4*, *8*
  132:*4*,
*15*, *16*
  154:*16*,
*21*, *25*
  156:*13*
  160:*20*,
*23*
  205:*18*
  206:*14*
  224:*21*,
*24*
  230:*8*,
*13*
  231:*1*
  232:*1*, *20*
**offices**
  131:*3*, *21*
**official**
  9:*2*
  17:*14*
  33:*24*
  34:*1*

58:*12*
66:*2*
67:*4*
107:*3*
132:*22*,
*23*
139:*23*,
*25*
162:*19*
**officials**
  40:*2*, *9*,
*11*, *12*
  42:*23*
  43:*2*
  70:*16*,
*17*   71:*8*,
*21*   88:*2*,
*9*   99:*14*
  109:*24*
  112:7
  116:*12*
  140:*19*
  164:*16*,
*21*
  165:*11*
  166:*10*
  208:*16*
**Oh**
  63:*11*
  65:*4*, *5*
  77:*4*
  121:*2*
  154:*8*,
*21*
  160:*18*
  214:*25*
**Okay**
  9:*17*
  13:*18*
  14:*10*
  15:*17*
  27:*11*

33:7
46:*14*,
*20*
48:*17*
49:7
54:*5*
65:*3*, *11*
69:*21*
70:*8*
74:*8*
78:*22*
82:*23*
92:*18*
102:*20*,
*24*
103:*3*,
*22*
125:7
130:*25*
137:*12*
145:*15*,
*24*, *25*
146:*20*
154:*21*
155:*5*
157:*22*
160:*5*
162:*13*
169:*20*
170:*11*
172:*10*,
*16*
177:*17*
178:*13*
186:*9*
192:*18*
194:*5*, *9*
205:*21*
208:*11*
209:*24*
210:*4*
211:*8*

215:*1*, *3*
220:*23*
229:*12*
230:*8*, *24*
**old**
  19:*24*
**Once**
  16:*23*
  22:*10*
  31:7
  88:*17*
  100:*19*
  225:*5*
**O'Neill**
  217:*25*
**One-page**
  6:7
  136:*18*
  196:*6*
**ones**
  36:*23*
  43:*4*
  70:*18*
  92:*4*
  97:*9*
  174:*9*
**oneself**
  41:*23*
**ongoing**
  61:*12*, *14*
**online**
  37:*3*
  73:*4*
  74:*19*
**operate**
  61:*11*
  79:*5*
  218:*21*
**opining**
  194:*5*

opinion
  79:19
  82:11
opinions
  134:15
oppose
  9:4
opposed
  90:23
  107:25
options
  212:23
orally
  52:17
order
  6:6, 22
  75:18
  76:2, 4,
  12   79:9,
  14, 18
  80:18
  83:14,
  15   84:1,
  5
  103:18
  106:14
  141:20
  142:4,
  25
  153:8,
  11
  163:21
  164:1
  169:15
  170:19,
  23
  171:2
  181:7
  197:16
  202:5,
  11, 12,
  22, 23

  204:8, 9
  205:11
  206:2, 7,
  9, 25
  207:6
  210:2
  230:10
orders
  68:19,
  22
  79:10
  80:22
  83:23
  86:24
  90:23
  97:8
  147:1
  151:7
  152:18,
  23
  153:16
  154:1
  166:21
  201:3
  207:24
  231:2
org
  159:20
  185:11,
  15, 20,
  24
  186:1,
  16
  188:2, 3,
  14
Organizati
on
  44:18,
  23
  45:10
  59:23

  185:23,
  25
organizati
onal
  187:2, 4
organizati
ons
  164:19
original
  215:12

Ostensibly
  99:10
outcome
  232:12
Outlook
  120:19,
  20
outs
  79:18
Outside
  30:21
  31:1, 13
  32:2, 5
  54:19
  71:20
  95:8
  102:5
  114:4
  121:18
  129:24
  130:1
  147:17
  152:5
  158:20
  168:10,
  25
  171:1
  183:20
  219:14
outstandin
g   139:2

overlap
  50:8, 11,
  12

overlapped
  50:7
overlappin
g   28:5,
  25
  43:21
  49:7, 10,
  13
  50:10
  92:12
overnight
  105:19
owed
  164:19

< P >
P.J
  132:10
p.m
  1:16
  103:5, 9
  107:10
  112:1,
  12
  114:3,
  22
  125:16
  127:23
  143:11
  160:21,
  24
  197:19
  216:21
  224:22,
  25
  231:3, 4
PAGE
  5:3

  6:5
  76:11
  78:10
  103:24
  107:4, 9
  112:11,
  23, 24
  113:6
  122:20
  123:6,
  12, 18,
  22
  124:9,
  14
  125:15
  130:5
  140:10
  143:16
  144:10,
  11, 15
  146:18
  148:12,
  13
  151:1
  155:16,
  22
  156:2,
  10, 23
  157:23
  158:7, 9,
  10, 15
  162:17
  163:20
  166:9
  167:15
  176:3
  197:18
  199:24
  202:15,
  16
  203:2, 4,
  17

204:*19*
210:*10*,
*12*
214:*7*,
*10*, *25*
216:*19*
234:*1*
**pages**
155:*19*
184:*4*
**paid**
50:*25*
51:*15*,
*23*
167:*4*
173:*3*
**paper**
128:*20*
156:*1*
**papered**
215:*12*
216:*11*
**papers**
21:*11*
**paperwork**
54:*25*
**paragraph**
105:*1*
146:*22*
147:*10*
148:*11*,
*20*
149:*6*,
*19*
163:*20*
177:*11*

**paragraphs**
157:*4*
215:*7*
**Paralegal**
4:*5*

**paraphrasi
ng**
73:*20*
137:*13*
138:*9*
162:*20*
**parking**
22:*10*
**part**
13:*11*
22:*5*
25:*3*, *6*
66:*20*,
*21*
77:*20*
88:*21*
98:*6*
116:*3*
142:*15*
185:*7*
186:*14*
187:*17*,
*23*   203:*3*
**participat
e**   73:*4*
111:*3*, *8*
214:*15*
219:*8*

**particular**
25:*20*
35:*8*
54:*6*
140:*12*,
*15*
208:*18*
**particular
ly**
15:*24*
33:*5*
134:*24*

**parties**
9:*1*, *7*
10:*11*
30:*5*, *11*
122:*6*
194:*15*
232:*11*
**party**
30:*7*, *9*,
*13*, *15*
148:*5*
**passion**
33:*3*
**Patrick**
124:*10*
130:*12*
132:*17*
**PAW**
212:*8*
**pay**
19:*19*
22:*22*
161:*23*
**paying**
110:*14*
**payment**
137:*15*,
*17*, *22*
138:*1*, *7*,
*17*, *19*
167:*10*
168:*21*
170:*12*,
*13*
172:*7*,
*19*
173:*11*,
*16*, *24*
174:*2*, *3*,
*4*, *9*, *14*,
*15*, *17*,
*18*

182:*3*
201:*5*,
*16*
205:*6*
208:*5*, *7*,
*12*
218:*10*,
*24*
219:*3*, *6*,
*12*, *19*
**payments**
128:*3*,
*18*
129:*10*,
*12*, *17*
137:*24*
138:*7*
139:*1*, *2*
141:*4*, *9*,
*12*
162:*21*,
*23*
163:*6*
164:*18*
165:*18*
166:*10*,
*14*, *22*
168:*13*,
*16*, *21*
169:*2*, *3*,
*14*
170:*2*,
*14*, *16*
171:*5*,
*10*, *18*,
*23*
172:*1*,
*14*, *17*
173:*3*
174:*16*
175:*1*, *8*,
*12*

176:*7*,
*12*
177:*2*,
*20*
178:*23*
179:*11*
180:*13*
181:*5*, *7*,
*12*
183:*16*
199:*1*,
*14*
207:*14*,
*17*, *19*,
*23*
208:*4*,
*15*, *19*
209:*4*,
*18*, *23*
218:*13*
219:*19*
**PDF**
16:*15*
**PDFs**
16:*12*
**penalties**
234:*1*
**penalty**
13:*19*
**pending**
13:*4*
**Pennsylvan
ia**   2:*4*
**people**
12:*18*
22:*20*
32:*24*
35:*6*
36:*1*
37:*13*,
*18*
39:*22*

40:14
41:12
42:14
43:4
46:21
53:24
54:4
56:14
61:21
62:1
72:1
91:13, 16    94:6, 22    97:3
104:20
105:6
108:12
110:14
111:5, 6, 7    114:4, 8
116:10, 15
117:2
130:7
133:19, 25
134:15
137:16
139:6, 8, 19, 20
140:25
141:15
143:19
144:7
145:1, 2, 8    152:6, 7, 12
153:22, 23, 24
157:6, 13, 19

158:23
159:3, 11, 17, 22
160:1, 7
165:25
166:2, 21
167:17
176:20, 22
178:21
179:10
183:18
184:7, 10, 19
185:2, 22
186:15, 18, 25
187:9
188:18
189:5, 13
190:8
194:21
196:11
200:19
218:20
220:4
221:11, 16    222:1

**people's**
72:4
**perceive**
172:6

**performing**
90:19
**period**
23:3
39:12

46:24
66:18
67:14, 16
117:17
131:5
134:20
144:8, 24
164:25
165:2
170:7, 8
194:4
225:15
228:19
**perjury**
13:19
234:1
**permanent**
19:23

**permission**
216:3
**permission
s**
213:14, 24

**persistent**
205:7
**persistent
ly**
170:10
**person**
9:8
26:6, 9, 25    27:1
28:7
40:18, 19, 22
41:5, 23
42:18

46:19
52:13
53:19
54:2
55:22
56:10
72:22
73:4
74:18
96:25
107:2
119:12
224:5
**personal**
15:12
149:16, 25
150:3, 9
151:8, 15, 21
206:24
226:3, 9
228:12, 14

**personally**
151:19
206:8
**personnel**
9:5
37:7
53:3
54:13
82:10
102:9
147:8, 9, 11
156:18
157:2
158:4, 13, 16
177:15

193:9, 20
225:25
**pertained**
58:10, 17
**pertains**
132:1
**Pete**
115:16
157:24
163:4
196:20
**Peter**
63:6
65:24
72:19
86:10
96:7
115:16
156:15
163:16
210:13
**Peters**
147:11, 12, 23
148:7
**petty**
203:3
**Phoenix**
128:1, 7, 25
180:9, 11, 22
181:4, 6
197:20
198:1, 4, 6, 12
199:10
207:15, 18
208:4, 6, 13, 19

209:*18*
210:*22*
211:*1*,
11, 25
214:*20*,
22
216:*23*

**phone**
27:*1*
31:*19*,
23  32:*1*,
5, 11, 17
57:*21*
60:*9*
109:*12*,
13
214:*13*
216:*5*

**phones**
228:*15*,
22, 24
229:*2*

**phonetic**
199:*25*
214:*9*

**phrase**
41:*1*

**phrased**
189:*24*

**Physical**
115:*5*
126:*1*, 5,
7  131:*8*
132:*18*
133:*2*, 9
135:*11*
183:*25*

**physically**
135:*24*
136:*2*

195:*1*
225:*3*

**pick**
95:*12*

**picture**
229:*18*

**pieces**
228:*13*

**PIERCE**
3:*9*  8:*2*

**pierce@kin
gstlegal.c
om**  3:*10*

**place**
91:*14*
144:*3*
147:*7*
157:*1*
177:*14*
197:*10*
232:*5*
233:*9*

**placed**
12:*13*
104:*17*,
20
105:*6*
116:*11*,
17
118:*13*
143:*13*,
19
144:*1*, 7,
19
145:*13*
151:*5*,
17
156:*18*
157:*6*,
14, 19
158:*4*,
24

159:*11*,
18
160:*7*, 9
176:*11*,
15, 17,
20, 22
178:*1*, 4
179:*10*,
17, 18
183:*19*
184:*7*,
10, 19
185:*2*
186:*18*
187:*1*, 9
188:*19*
189:*5*,
10, 13
196:*18*,
22  197:*1*

**placement**
178:*21*
196:*13*

**placing**
158:*13*,
16  160:*1*

**Plaintiffs**
1:*5*
2:*11*, 21
7:*18*, 20,
22  8:*9*,
13, 17,
23  10:*8*
11:*14*
159:*24*

**plans**
79:*10*

**platform**
1:*17*
31:*9*

**platforms**
92:*2*, 4,
6

**plausible**
104:*8*
133:*12*
142:*12*

**plausibly**
43:*4*

**please**
7:*14*
8:*15*
10:*17*,
21  12:*2*
19:*11*,
20
22:*19*
23:*11*
25:*11*
59:*3*
79:*23*
90:*11*
94:*16*
105:*18*
112:*13*
122:*13*
137:*2*
143:*5*,
12
145:*19*
200:*24*
202:*10*
206:*16*
230:*12*,
20

**PLLC**
2:*13*

**plural**
228:*24*

**Plus**
199:*25*

**point**
14:*15*
46:*18*
72:*17*
75:*20*
88:*19*
99:*13*
100:*7*
115:*22*
136:*25*
165:*5*
166:*17*
169:*10*
171:*25*
175:*5*
180:*6*
182:*10*,
13, 19
184:*1*
185:*10*
187:*20*
193:*10*
196:*2*, 3
202:*13*
204:*24*
213:*11*
216:*9*,
12
217:*11*

**pointed**
164:*17*

**points**
96:*2*
131:*4*
171:*17*
210:*21*

**policies**
189:*20*
190:*5*, 10

**policy**
68:*6*

88:13
171:6, 13
**political**
34:18
35:19
37:22
75:7
95:21
100:11
114:20
116:4
117:3,
22
118:16
122:5
130:17
147:24
153:15
180:3
204:14

**politicals**
88:1
90:17
93:6
100:4
168:1
**Politico**
6:16
161:12,
22
192:11
**politics**
61:16,
18, 25
62:5
134:5, 9,
13
**Pompeii**
23:17
**portion**
74:4

**position**
33:24
34:4, 8
63:8, 9
66:3
201:23

**possession**
228:3
**possibilit
y**    224:10
**possible**
14:17
18:18
29:13,
15
92:11
111:13
183:22
**post**
6:17, 18
193:25
194:3, 4
**posts**
194:19
**potential**
41:17
54:13
59:6
60:10
61:8
220:19
**potentiall
y**    37:14
40:3
54:20
58:8
63:25
68:16
93:7, 8
104:6
119:4

142:12
160:10
212:12
218:18
229:5
**PPO**
37:3, 5,
19
38:11
52:4
53:3, 10,
11, 12,
17, 24
54:18,
19    72:3,
5    74:13
81:18
82:11
**practice**
81:1
**preceded**
56:10
**preceding**
105:17
114:2
127:22
**precise**
38:9
48:11
51:19
60:21
62:17
79:17
93:14
190:9
217:13
221:22
**precisely**
38:19
190:4
217:21

**prefer**
102:19
**preparatio
n**    15:18
18:20, 21
**prepare**
39:22
188:11
**PRESENT**
4:3
11:5
15:13
17:18
119:20
135:21
179:21
225:3
229:18,
22
**presented**
178:11
212:23
**presently**
19:15,
21
33:12
76:24
**preserve**
226:11,
16, 25

**preserving**
227:9, 11
**President**
26:18
36:17
43:15
69:19
95:19
97:20
104:14
110:9

163:21
169:15
170:19
221:10,
13, 25
222:2, 3
**presidenti
al**
34:20
35:19,
25    37:6
73:22
74:5
75:17
80:21
94:7, 23
97:7, 11
126:13
165:13
166:15
167:5
169:4, 7
201:20
204:16
218:5
**presidenti
al-wide**
69:19, 22
**President'
s**    6:6
75:18
76:7, 14
77:19
147:1
151:7
152:18,
23
153:25
164:6
202:6
**Press**
192:21

| | | | | |
|---|---|---|---|---|
| **Presumably** | **Printout** | 21 | 7:8 | **processed** |
| 185:22 | 6:18 | 212:17 | 9:5, 8 | 137:24 |
| **presume** | 194:13 | 216:20 | **PROCEEDING** | **processes** |
| 100:4 | **Prior** | 219:1 | **S** 1:18 | 61:11 |
| 128:16 | 13:15 | 223:8 | 7:2 | 91:12 |
| 130:2 | 14:24 | **private** | 8:7, 10, | 167:10 |
| 137:18 | 16:10, | 226:5, 9 | 14, 21 | 205:6 |
| 138:24 | 20 | **privilege** | 9:13, 18, | 208:15 |
| 141:10 | 17:15 | 16:2 | 23 10:1, | **procure** |
| 147:3, 5 | 18:23 | 18:9 | 5, 15, 21 | 159:20 |
| 199:23 | 25:6 | **prize** | 11:6 | **procured** |
| **pretty** | 38:12 | 23:20 | 15:7, 10 | 138:15 |
| 49:2 | 39:25 | 24:2 | 65:5, 11, | **produce** |
| 109:12 | 40:4, 8, | **prizes** | 17, 20 | 229:4 |
| 183:2, 3 | 14, 23 | 23:14 | 103:4, 8 | **produced** |
| **prevent** | 43:25 | **Probably** | 154:16, | 230:11 |
| 201:20 | 44:1, 15, | 20:16 | 21, 25 | **product** |
| **previous** | 19 | 22:13 | 160:20, | 22:6 |
| 180:16 | 46:14 | 26:12 | 23 | **productivi** |
| | 47:15 | 28:15 | 205:18 | **ty** |
| **previously** | 55:25 | 53:11, | 206:14 | 76:16 |
| 24:23 | 57:4, 12 | 12 61:5 | 224:21, | 77:22 |
| 25:5 | 58:20 | 62:22 | 24 | 79:23 |
| 36:3 | 59:1 | 63:20 | 230:8, | **Program** |
| 101:15 | 60:1, 9 | 72:17 | 13 | 214:11 |
| 120:19 | 63:12 | 75:20 | 231:1, 4 | **project** |
| 130:17 | 64:25 | 92:7 | 232:1, 4, | 33:3 |
| 131:18, | 69:14 | 126:12 | 6, 9, 20 | 35:8 |
| 22 | 70:19 | 130:3 | **process** | **projects** |
| 179:24 | 71:3 | 173:25 | 37:2, 9 | 34:18 |
| **primarily** | 72:20 | 183:13 | 51:25 | 35:19, |
| 42:22 | 73:24 | 201:19 | 88:8 | 24 44:2 |
| 43:25 | 84:14, | 224:10 | 133:16, | 47:4 |
| 44:1 | 16 86:3 | **problem** | 24 | 61:22 |
| 53:17 | 93:23 | 13:2 | 173:19, | 62:1, 5 |
| 54:18 | 107:9 | | 22 | 87:17, |
| 70:18 | 108:8 | **procedural** | 204:22 | 23 |
| 87:24 | 154:5 | 8:24 | 205:1 | 88:12 |
| 102:9 | 186:20 | 82:20 | 208:8, | 89:20, |
| **printed** | 191:8, | 161:14 | 12 | 25 90:2 |
| 204:1 | 23 | | 218:13 | 127:1, 3, |
| | 209:8, | **proceeding** | | 8, 10, 11 |

218:*3, 8, 20*    219:*8*

**prompted**
171:*16*

**pronounced**
22:*16*

**properly**
105:*7, 9, 10*
116:*11, 14, 17*
176:*21*

**provide**
28:*21*
114:*24*
115:*11*
118:*1*
185:*11*
187:*21*
188:*1, 3, 5, 7*
200:*5, 12, 25*
225:*17*

**provided**
13:*8, 10*
74:*9*
77:*2*
138:*4*
159:*24*
177:*16*
187:*2*
200:*12*

**providing**
17:*4, 8*
147:*9*
168:*24*
214:*14*
215:*9, 10*

**provision**
212:*7*
213:*2*

**public**
11:*5*
233:*19*
234:*1*

**publicly**
85:*7*

**pull**
175:*23*

**punchy**
194:*9*

**purpose**
25:*25*
43:*16, 24*
76:*11*
77:*7, 15*
78:*4*
108:*11*
129:*4, 8*
180:*24*

**purposes**
43:*22*
45:*7*

**pursuant**
8:*24*

**put**
37:*3*
95:*12*
116:*10*
122:*11*
124:*22*
130:*24*
142:*20*
145:*8, 15*
154:*5, 8*
155:*15*
156:*20*
157:*22*

161:*24*
162:*4*
169:*20*
186:*14*
197:*11*
202:*1*
220:*4*

**putting**
182:*6, 18*

**< Q >**
**Q2**
51:*24*
93:*17*
217:*16, 20*

**Q3**
93:*17*
217:*16, 20*

**quality**
194:*6*

**quarter**
225:*16*

**query**
199:*6, 8*

**question**
11:*22*
12:*2, 4*
13:*3*
14:*18, 21, 22, 23, 25*
19:*19, 20, 21*
25:*8*
27:*16*
28:*22*
29:*7*
31:*1*
43:*23*
46:*6, 7,*

*14*
47:*20*
54:*2*
56:*2*
58:*18*
60:*14*
64:*4*
71:*5*
72:*13*
73:*1, 17*
74:*23*
76:*21*
78:*2*
80:*6*
81:*20, 24*
82:*21*
83:*10, 12, 25*
84:*22, 23*
87:*21*
89:*9, 11*
91:*5*
93:*25*
104:*23*
106:*8*
107:*19*
109:*17*
111:*8, 22*
114:*13*
116:*25*
119:*25*
120:*7*
121:*3, 24*
122:*1*
124:*15*
132:*14*
134:*23*
135:*8*

141:*24*
148:*17*
149:*19*
151:*13*
153:*2*
159:*6, 9, 23*
160:*5, 6*
161:*15*
162:*2, 8, 12*
163:*10, 13, 15*
171:*7*
174:*13*
177:*17, 18*
179:*15, 19*
182:*15*
184:*24*
186:*22*
189:*1, 24*
204:*7*
205:*23*
206:*20*
209:*15*
219:*17*
222:*14, 24*
223:*18*
227:*4*
228:*9*

**questionin**
**g**   11:*18*
158:*7*
217:*8*

**questions**
11:*17, 19, 20*
14:*16,*

*24*
62:*13*
82:*5*
202:*20*
220:*7*
229:*24*
**quick**
161:*14*
**quite**
23:*7*
90:*8*
134:*21*
219:*24*
**quote**
59:*22*
146:*22*

**< R >**
**raise**
10:*21*
**Ramaswamy**
42:*24*
**ran**
138:*5*, *13*
212:*12*
**range**
103:*16*
162:*21*
165:*11*
197:*12*
209:*25*
**Rapier**
117:*14*, *21*
**reach**
110:*10*
**reached**
26:*22*
**reaching**
197:*25*

**read**
19:*5*
23:*16*
73:*14*
75:*20*
77:*4*
78:*25*
79:*23*
91:*7*
107:*12*, *25*
112:*3*
114:*24*
115:*12*
149:*7*
194:*19*
215:*4*, *7*
230:*5*
234:*1*

**read/write**
125:*25*
126:*4*
**reading**
77:*24*
178:*9*
194:*18*
197:*10*
**reads**
125:*16*
167:*16*
**Ready**
102:*14*
162:*12*
**Reagan**
193:*8*, *10*
195:*2*, *5*, *15*
**really**
23:*6*
28:*15*

33:*9*
114:*21*
120:*18*
123:*1*
152:*4*, *9*
159:*23*
172:*24*
173:*25*
182:*1*
185:*8*
**re-ask**
163:*13*
**reason**
12:*10*, *14*
39:*16*
111:*18*, *24*
155:*24*
212:*10*, *11*  234:*1*

**reasonable**
124:*8*
**reasons**
171:*6*
**recall**
18:*15*, *18*  19:*1*, *7*  20:*9*
21:*10*, *15*
22:*25*
23:*4*, *6*, *23*  24:*4*, *14*, *15*
25:*1*, *12*, *22*, *24*
26:*23*
27:*3*
28:*10*, *12*

30:*11*
33:*1*, *25*
34:*15*
36:*13*, *15*, *23*
37:*10*, *17*, *25*
38:*9*, *17*, *19*, *21*, *23*  39:*2*
40:*16*
42:*14*, *17*, *18*, *25*  43:*3*
45:*22*
46:*17*, *20*
49:*22*
50:*15*, *19*, *20*, *22*  51:*1*, *7*, *9*, *11*, *14*, *19*
52:*6*, *9*, *16*
53:*19*
55:*10*, *14*, *18*
57:*23*
58:*5*, *8*
59:*19*
60:*4*, *5*, *21*
62:*16*
63:*15*, *18*
64:*13*, *16*, *22*, *23*, *24*
65:*2*
66:*10*
67:*8*, *11*

68:*7*, *18*, *22*
70:*12*, *13*
71:*12*, *14*, *23*
72:*7*, *11*, *14*, *18*
74:*11*
75:*8*
81:*25*
82:*2*, *4*, *11*, *13*, *24*  83:*9*, *11*, *13*
84:*10*, *13*  85:*9*, *16*, *20*, *23*  86:*1*, *7*, *9*, *11*, *13*, *18*, *24*  87:*1*, *3*, *7*, *10*, *12*  88:*6*
89:*13*, *19*, *20*, *24*
92:*11*
93:*4*, *10*, *14*, *18*
94:*3*, *4*
95:*11*, *24*  96:*1*, *5*, *8*, *11*, *14*, *16*
97:*23*
98:*10*, *13*, *17*, *21*, *23*
99:*1*, *8*, *17*
100:*3*,

16, 17, 18, 24
101:3, 11, 16, 20, 24
104:10, 18, 25
105:5, 13, 22
107:8
108:5, 23
109:2, 3, 5, 8, 9, 14, 18, 20
110:7, 13, 16, 24
111:11
112:4, 21
113:11, 24
114:16, 18, 21
115:2, 13, 19, 25
116:22
117:24
118:2, 4, 5, 8, 11, 14
119:1, 5, 7, 10, 15, 18, 19
120:12, 13, 17
121:4, 11, 17
124:5,

11, 15, 19, 21
126:2, 3
127:7, 10, 11, 21
128:6, 23
129:2, 7, 14, 16
130:2, 10, 13, 15, 21, 23
131:2, 5, 7, 12, 15, 24
132:4, 12, 13, 25
133:22
134:12, 18, 23
135:3, 10, 13, 14, 18
136:3, 6
137:3, 18
138:10, 19
139:7, 8
140:17
141:2, 5, 7, 13, 17
142:6, 19
146:9, 11
152:14, 19
153:20

157:21
158:9
159:15, 16, 21
163:18, 24
164:8, 9, 20
165:6, 9, 10, 15, 21, 25
166:7
167:1, 9, 11, 12, 23
168:21
169:1, 13, 17, 18
170:21
171:2, 15
172:11, 15, 24
173:25
174:20, 21
175:10, 15, 20
180:23
181:3, 10, 19, 21, 24
182:1
183:6, 22
184:2, 9
186:17
189:10
191:9, 10
193:4, 5,

10, 22
195:2, 18
196:16, 17
197:3, 22
198:3, 5, 22
199:4, 9, 11, 13, 15, 17, 20
200:2, 7, 9, 10, 14, 15
201:8, 25
202:25
205:14
206:4, 10
207:4, 6, 7, 13
208:14, 16, 18, 24
209:22
210:24
211:3, 14
212:19, 21
213:4, 7, 8, 9, 22
214:1
215:23
217:5, 13, 21
219:5
220:25
222:10,

12, 16, 25
223:3
224:3, 5, 9   225:6, 7, 14, 21
226:6
227:2, 6, 14
**Receipt**
123:15
144:13
**receive**
211:11
227:8, 19
**received**
24:3
75:14
113:3
114:23
120:14, 15, 16
177:12
226:18, 20, 25
227:15
**receiving**
87:8
193:4
196:16, 17
**reckon**
72:4
**recognize**
76:1
122:18
123:2
145:21
**recognized**
101:1

**recollection**
16:17
20:21
26:4
27:6
31:5, 12, 15   32:7, 16   33:6, 7   34:7
36:8
42:4
53:16
54:7
56:15
62:24
63:2
67:2
82:16
87:13
92:3
93:13
99:25
100:9
104:11
105:2, 4, 24
109:11
110:19
111:12, 17
112:8
113:18
115:9, 23
116:1, 9
117:19
118:24
119:9, 13
124:7, 13, 18
125:22
127:16
128:9
132:8
134:7
139:3
144:5, 23
145:14
148:2
149:11, 18, 22
150:2, 13
156:11
157:11, 15
158:18
166:20
167:21
170:4
174:2
177:4
179:5, 6
182:19, 22
183:17
184:16, 18
185:1
186:24
189:5, 7, 9
191:25
192:4, 7
193:11, 16
194:18
195:7, 24
196:4, 24
197:6, 8
198:8, 16
200:22
214:19
220:12
226:10
229:14

**recollections**
85:12

**recollection's**
53:12

**recommendations**
146:16

**record**
7:3, 7, 15   9:2
10:8, 18
12:10
32:14
55:15
65:13, 14, 17, 19, 21
73:15
92:15
103:2, 5, 7, 9
114:9
122:15
136:18
149:23
154:17, 23
155:1, 10, 11, 12, 15
156:21
160:19, 21, 22, 24
202:4
203:1
210:6
224:19, 22, 23, 25
230:9, 15
231:2
232:8

**recorded**
7:9
8:22
232:6

**recording**
9:3
10:10, 12

**records**
68:19, 21

**redacted**
155:20

**redundant**
92:13

**refer**
43:9
45:4, 8
69:17, 19, 25
126:11
139:14
162:16
210:23
211:18
213:14

**reference**
138:25
161:18
171:8, 22
172:6
173:1
174:15
176:16
177:6
184:7
196:14
202:15, 18

**referenced**
68:18
80:17
137:9
142:15
168:12
171:3
172:12, 21
175:2, 3
177:19
178:20
179:9
182:17
188:19

**references**
126:10
170:11
194:24
202:19
210:20

**referencing**
172:22
176:10
204:20
214:24

**referred**
203:4

**referring**
62:8
70:5

77:*9*
147:*2*
151:*9,*
*13*
171:*25*
183:*20*
201:*10,*
*12, 19*
203:*14*
212:*8*
213:*25*
216:*6, 7,*
*10, 15*
221:*24*
**refers**
44:*8*
211:*15*
**reflected**
182:*3*
184:*20*
185:*3*
187:*10*
**refresh**
15:*23*
179:*6*
**refreshed**
170:*4*
176:*2*
181:*5*
220:*8*
**refreshes**
189:*2*
**regard**
28:*25*
58:*10*
66:*6*
71:*15*
75:*1, 12*
121:*19*
126:*18*
129:*15*
134:*9,*

*10*
162:*22*
176:*10,*
*12*
177:*1*
178:*3*
209:*4*
226:*23*
**regarding**
10:*12*
12:*22*
14:*1*
17:*21*
19:*7*
42:*8*
60:*10*
71:*1*
73:*5, 8*
75:*5*
84:*8*
97:*11*
111:*4*
117:*14*
118:*20*
149:*19*
152:*7,*
*17*
159:*10*
167:*5*
180:*12*
181:*7*
207:*23*
214:*17,*
*20*
215:*25*
220:*25*
222:*5,*
*11, 18*
223:*1*

**Regardless**

33:*7*
81:*3*
**registrati
on**   13:*21*
**rejoin**
112:*8*
**related**
128:*3,*
*17*
129:*17*
232:*11*
**relation**
16:*21*
75:*8*
153:*6*
**Relations**
146:*5*
**relationsh
ip**
29:*20*
47:*3*
**relative**
29:*11*
**relax**
12:*18*
**relaxed**
183:*3, 4*
**relevance**
142:*8*
**relevant**
11:*24*
21:*11*
34:*24*
36:*9*
40:*2, 8*
45:*3*
47:*4*
48:*16*
61:*12*
109:*25*
116:*18*
137:*21*

185:*12*
208:*16*
212:*12*
219:*23*
226:*16,*
*20*
228:*12,*
*18*
229:*3, 5*
**relying**
73:*13*
**remain**
67:*25*
**remains**
181:*9*
**Remember**
26:*16*
30:*13,*
*15*   32:*1*
33:*8*
51:*2, 4*
52:*12*
54:*2, 4*
55:*23*
63:*14*
72:*4*
73:*19*
100:*5*
113:*1*
152:*8*
160:*1*
173:*12*
189:*2*
197:*9*
225:*11,*
*20*
**remind**
12:*9*
**REMOTE**
1:*17*
7:*6*

**remotely**
8:*23*
**remove**
199:*10,*
*12*
**removed**
144:*14,*
*16*
**rendered**
191:*4*
**repeat**
138:*10,*
*22*
139:*9*
182:*14*
205:*23*
206:*19*
209:*14*
228:*8*
**repeated**
163:*12*
**repeating**
203:*23*
**rephrase**
32:*4*
56:*1*
58:*18*
64:*3*
71:*4*
72:*25*
73:*16*
74:*22*
76:*20*
80:*5*
87:*20*
89:*9*
93:*24*
104:*22*
107:*18*
111:*21*
132:*14*
148:*16*

151:*13*
163:*9*
184:*23*
**rephrased**
74:*4*
**report**
34:*21*
36:*3*
45:*25*
46:*15*
56:*5*
66:*9, 11,
15*
127:*5*
217:*10,
19*
**reported**
34:*24*
35:*6, 10*
36:*6*
56:*9*
66:*15*
217:*22*
**reporter**
7:*6*
12:*7*
**reporting**
36:*1, 5*
81:*11*
**reports**
55:*21*
**represent**
11:*13*
15:*14*
17:*18*
**representa
tives**
167:*18*
**representi
ng**
17:*13*
104:*13*

**represents**
15:*12*
**Request**
6:*9*
114:*23*
115:*11*
123:*8*
124:*6,
11, 16*
138:*20*
177:*18*
178:*2,
20*
179:*8*
200:*24*
211:*10*
213:*4, 8*
215:*12*
216:*11*
217:*5*
**requested**
105:*19*
118:*6*

**Requesting**
104:*15*
107:*11*
108:*4,
25*
176:*5*
177:*24*
**requests**
134:*1*
138:*7,
17*
172:*7*
179:*15,
16*
210:*2,
17, 21*

214:*14*
215:*22*
**required**
80:*2*
129:*12*
227:*24*
229:*4*
**requiring**
201:*3*
**reread**
149:*7*
**research**
17:*21,
24*
145:*12*
153:*23*
158:*21*
159:*17*
180:*12*
**reside**
9:*10*
**resolves**
10:*11*

**respective**
98:*4*
**responds**
105:*18*
107:*4*
199:*25*
**response**
27:*9*
116:*25*
200:*4*
207:*5*
227:*19*
**responsibi
lities**
34:*2, 16*
86:*15,
22*
88:*21, 25*

**responsibi
lity**
88:*23*
90:*4, 16*

**responsive**
227:*25*
228:*2,
11, 22*
229:*13*
**rest**
69:*24*
77:*3, 5*
155:*18*
**restate**
47:*19*
171:*7*

**restricted**
108:*13*
131:*8,
16, 18,
19*
132:*6*
188:*24*
189:*11*
**restrictin
g**    189:*12*
**restroom**
12:*19*
65:*7*
**results**
223:*21*
**retained**
6:*2*
**reverse**
103:*17*
197:*16*
210:*2*
**review**
15:*17,
21*    18:*4*

78:*25*
145:*19*
151:*2*
156:*6*
162:*3*
202:*10,
17*
204:*21,
22*
219:*19*
229:*2*
**reviewed**
18:*1, 14,
16*    19:*2*
**reviewing**
17:*11*
18:*19*
145:*22*
205:*1*
**reward**
23:*20*
**right**
10:*22*
44:*21*
45:*7*
71:*20*
92:*16*
99:*12*
113:*4*
120:*25*
124:*22*
130:*1*
131:*20*
143:*2*
154:*24*
160:*12*
161:*16*
171:*20*
177:*11*
179:*15*
181:*2*
186:*2*

190:*12, 23*
215:*8*
228:*25*
229:*23*

**rights**
107:*12, 25*
108:*10, 21*   109:*1*

**ring**
226:*1*

**rings**
32:*11*

**Robotics**
21:*19*
22:*12*

**role**
58:*10*
96:*1*
116:*5*
130:*19*
143:*24*
218:*19*

**roles**
81:*1, 4*
95:*6*
215:*10*

**Ronald**
193:*8*
195:*2, 5, 15*

**room**
25:*22*
27:*24*
30:*20, 22*   31:*3*
42:*15*
100:*1*
177:*10*

**roughly**
39:*3*

**Rubio**
62:*18*
220:*10*

**rule**
10:*2*

**rules**
8:*24*
9:*9*
11:*15*
121:*8, 20*
122:*8*
123:*15, 19*

**run**
212:*9*

**running**
163:*2*

**runs**
57:*3*

**< S >**

**sailing**
133:*8, 21*
134:*21*

**salaries**
164:*19*

**salary**
50:*21*
51:*5*

**San**
30:*15*

**SARAH**
3:*20*
8:*6*

**sat**
46:*17*

**Saturday**
131:*1, 3, 7*

**save**
156:*1*

**saw**
148:*5*
150:*6*
160:*2*
222:*15*
223:*4, 21*

**saying**
113:*5*
150:*3*
174:*8, 23*

**says**
76:*5*
77:*3, 17*
79:*1*
98:*3*
108:*18*
122:*21*
125:*23*
127:*24*
129:*23*
130:*5*
151:*2*
156:*18*
166:*10*
177:*12, 24*
179:*2, 4*
180:*20*
189:*2*
194:*13*
200:*24*
201:*16*
203:*6, 13*
213:*11*
214:*13, 22*
216:*12, 21*

**scale**
51:*6*

**school**
20:*2, 6, 8, 9*

**schools**
20:*3*

**science**
20:*20*

**SCIF**
131:*9, 10, 13*

**SCIFs**
131:*9*

**scrambling**
39:*22*

**screens**
214:*21*

**Screenshot**
6:*17*
192:*20*

**scripting**
17:*10*

**search**
141:*6*
227:*24*
228:*2, 10, 17*

**searched**
228:*12*
229:*2, 5*

**searches**
228:*17, 19*

**searching**
229:*8*

**sec**
103:*2*

**Second**
28:*13,*

*15*
34:*13*
42:*2*
44:*1*
46:*11*
78:*10, 20*
102:*21*
103:*23*
123:*6, 18, 21*
124:*9*
148:*13*
151:*1*
162:*17*
163:*19*
197:*18*
202:*16*
203:*17*
204:*19*
214:*10*
216:*12*

**secondhand**
150:*4*

**Secretary**
62:*12*
217:*23*
220:*10*

**Section**
76:*10*
78:*21*
79:*21, 23*   80:*9*
95:*7*
96:*9, 17*
97:*5*
146:*17, 19*
202:*14, 17*

| | | | | |
|---|---|---|---|---|
| **secure** | 204:*21* | *13, 15* | 192:*21* | 58:*17* |
| 99:*9* | 210:*14,* | 109:*24* | 193:*7, 20* | 59:*15,* |
| 120:*20,* | *15* | 110:*8* | **sentence** | *18* |
| *21* | 214:*5,* | 114:*20* | 77:*3, 5,* | 69:*18,* |
| **securing** | *10* | 116:*13,* | *14, 17,* | *22* 70:*5* |
| 135:*4* | 220:*7* | *24* | *20, 25* | 73:*21* |
| **security** | 224:*13* | 117:*1, 3,* | 107:*22* | 75:*19* |
| 99:*25* | **seeing** | *11* | 139:*11* | 79:*13* |
| 104:*4* | 158:*9* | 118:*16,* | 176:*9* | 80:*10,* |
| 132:*1, 4,* | 160:*6* | *19* | 203:*14,* | *17* |
| *9, 15, 16,* | **seeking** | 126:*24* | *20* 204:*5* | 97:*12,* |
| *22, 23* | 41:*19* | 141:*1* | **separate** | *13, 20, 25* |
| 133:*1* | 131:*8* | 166:*25* | 47:*9* | **Services** |
| 225:*23* | 181:*6* | 176:*20* | 145:*5* | 36:*18* |
| **see** | **seen** | 179:*25* | 179:*19* | **session** |
| 103:*17* | 75:*17,* | 195:*14* | **sequence** | 75:*11* |
| 104:*1* | *18* | 204:*14* | 38:*9* | **set** |
| 119:*17* | 143:*6, 8* | 207:*4* | 157:*15* | 26:*22* |
| 123:*8, 9* | 145:*20,* | 209:*2, 5,* | 213:*9* | 92:*14* |
| 124:*9* | *25* | *17* | 227:*22* | 164:*18* |
| 130:*6* | 155:*7* | 214:*10* | **served** | 232:*5* |
| 137:*10* | 156:*10* | 218:*4* | 228:*4* | **seven** |
| 138:*2* | 157:*10* | 219:*9* | **service** | 53:*7* |
| 140:*13* | 162:*1, 8,* | 221:*2, 10* | 13:*15* | **SGE** |
| 143:*5,* | *15* | **sense** | 15:*14* | 50:*24* |
| *12, 16* | 192:*23* | 12:*5* | 17:*19* | 51:*10,* |
| 144:*11,* | 194:*17* | 14:*20* | 27:*21* | *12, 15, 20* |
| *16* | 202:*11,* | 24:*17* | 28:*5, 17,* | **shape** |
| 146:*2, 5,* | *12* | 169:*2* | *18, 20,* | 117:*23* |
| *14* | 219:*21* | **sent** | *25* 29:*1* | **share** |
| 147:*24* | **sending** | 130:*7* | 43:*12,* | 103:*13* |
| 148:*19* | 137:*3* | 139:*1,* | *13, 17* | 139:*5, 6* |
| 156:*12,* | **sends** | *19* | 44:*11,* | **shared** |
| *16, 17* | 33:*2* | 142:*7* | *14, 15,* | 10:*10* |
| 158:*5* | 176:*4* | 146:*23* | *17, 22,* | **shareholde** |
| 162:*6* | **senior** | 163:*3,* | *23* 45:*8,* | **r** 25:*17* |
| 170:*3,* | 36:*9* | *17* | *9, 17* | |
| *24* | 66:*21* | 164:*1,* | 46:*15,* | **SharePoint** |
| 176:*1* | 87:*24* | *22* | *23* 48:*2* | 190:*8* |
| 177:*3* | 90:*15* | 172:*1* | 50:*17* | **shift** |
| 196:*10* | 95:*18* | 181:*16,* | 55:*21* | 204:*25* |
| 200:*4* | 105:*5,* | *20* | 56:*5* | 205:*10* |

short-
lived
 49:*2*
shortly
 67:*16*
show
 14:*16*
showed
 87:*1*
 98:*11,*
*25*
 99:*19*
 131:*23*
 167:*20*
showing
 168:*8*
shut
 191:*16,*
*18*
 192:*22*
 207:*17*
shutting
 190:*24*
 191:*11*
 192:*6*
 196:*1*
sic
 7:*13*
 9:*14*
 161:*13*
 203:*2*
sign
 87:*25*
 122:*8*
 207:*23*
 230:*6*
Signal
 31:*16,*
*18*   92:*2*
signaling
 27:*2*

signature
 123:*22*
 124:*4,*
*10, 15*
 234:*1*
signed
 124:*12,*
*17*
 187:*24*
significan
t   164:*10*
signing
 124:*5,*
*11, 16*
 126:*9*
SILBERSTEI
N   2:*19*
 8:*11, 12*
 9:*15, 17*
SILER
 3:*16*
 7:*25*
 9:*15, 16*
 14:*7*
 15:*5, 9*
 17:*13,*
*15   18:5,*
*7, 11*
 29:*3*
 39:*13*
 41:*6*
 53:*14*
 64:*2*
 73:*24*
 74:*21*
 75:*3, 13*
 77:*8*
 78:*12,*
*14, 16*
 79:*6, 15*
 94:*17*
 96:*21*

 97:*15*
 103:*3*
 104:*21*
 107:*17*
 114:*7,*
*11*
 117:*16*
 118:*7*
 119:*23*
 133:*10*
 134:*3*
 135:*6*
 136:*1*
 143:*20*
 144:*22*
 150:*8*
 151:*18*
 152:*13*
 154:*2*
 155:*9,*
*13, 21*
 156:*3*
 159:*1*
 160:*16,*
*18*
 163:*8*
 164:*12,*
*23*
 165:*19*
 177:*22*
 178:*15,*
*24*
 179:*12*
 180:*14*
 182:*9*
 190:*17*
 191:*6, 8*
 192:*24*
 201:*7,*
*18*
 203:*1,*
*12, 19,*

*22*
 204:*2*
 205:*4,*
*16*
 206:*12,*
*18*
 207:*1,*
*20, 21*
 208:*21*
 209:*7,*
*11, 12,*
*13, 20*
 210:*5*
 220:*17*
 223:*8,*
*11*
 224:*1, 2,*
*18*
 229:*25*
 230:*2, 3,*
*16*
Silver
 9:*13*
similar
 31:*24*
 75:*15*
 92:*2*
 127:*1*
 157:*24*
 191:*5*
 199:*1,*
*16*
 202:*20*
 229:*10*
similarly
 207:*7*
simply
 221:*24*
single
 42:*18*
 103:*20*
 173:*23*

Single-
page
 6:*11*
 125:*11*
singular
 42:*21*
sir
 8:*21*
 21:*24*
 154:*25*
 209:*15*
situation
 164:*17,*
*22*
six
 23:*6*
 28:*13*
 53:*7*
skipped
 125:*3*
slightly
 83:*25*
 180:*16*
Smith
 139:*24*
 140:*2*
smooth
 133:*8,*
*21*
 134:*21*
social
 27:*2*
 30:*2*
 59:*6*
 61:*9, 12,*
*14, 24*
 62:*9*
 68:*1*
 74:*16*
 75:*6*
 83:*2*
 224:*11*

| | | | | |
|---|---|---|---|---|
| **software** | 106:10 | **sources** | **Special** | 119:9, |
| 22:11 | 134:12 | 85:7 | 51:13 | 13 |
| 44:2 | 136:12, | **Southeast** | **specific** | 120:8 |
| 76:15 | 16 | 2:4 | 14:19 | 122:10 |
| 77:21 | 145:23 | **space** | 16:5 | 124:7, |
| 79:22 | 154:20 | 108:13 | 30:11 | 13, 18 |
| 88:13 | 159:13 | 131:8 | 39:17 | 127:10, |
| 101:5 | 160:18 | 139:16 | 43:3 | 15 |
| 108:1 | 161:14 | 194:4 | 46:18 | 128:9 |
| 141:18 | 166:17 | **spaces** | 53:6 | 129:3, 4 |
| 142:2, | 170:8 | 132:6, 18 | 54:22, | 131:6 |
| 11 | 178:17 | **SpaceX** | 24   60:6 | 132:8 |
| 211:20 | 182:14 | 21:20 | 62:14 | 134:6 |
| 212:9, 12 | 190:13, | 22:2, 5, | 69:1, 4, | 135:1, |
| **somebody** | 19 | 6   24:22, | 12   70:5, | 13 |
| 68:25 | 192:13 | 24   25:2, | 13   72:7, | 136:3, 9 |
| 82:13 | 194:2 | 9, 14, 17 | 11, 14 | 137:4 |
| 119:3 | 205:15, | 26:15 | 75:8 | 142:7 |
| 223:24 | 18, 22 | 42:6 | 82:16 | 157:10 |
| **soon** | 206:14, | 57:7, 9, | 85:12 | 158:9 |
| 38:24 | 15 | 10 | 86:25 | 159:19 |
| 45:23 | 207:21 | **speak** | 87:8 | 165:9, |
| **Sorry** | 209:24 | 13:23 | 88:6 | 25 |
| 9:17, 20, | 212:24 | 14:1 | 89:19, | 166:3, |
| 25 | 214:24, | 37:11, | 24 | 20 |
| 14:21, | 25 | 16   60:7, | 90:23 | 167:11, |
| 22   27:7 | 217:5 | 8, 18 | 96:1 | 12 |
| 34:3 | 223:11 | 66:25 | 105:24 | 168:22, |
| 40:21 | 227:18 | 70:14 | 108:5, | 25 |
| 43:25 | 228:17 | 86:2, 5 | 23, 24 | 170:23 |
| 46:14 | **sort** | 111:16 | 109:11, | 171:18 |
| 55:15 | 75:12 | 120:2, 4 | 23 | 172:23 |
| 58:24 | 95:22 | 132:22 | 110:19 | 180:23, |
| 65:6 | 107:1 | 223:19 | 111:12 | 24 |
| 69:9 | **sorts** | **speaking** | 112:8 | 184:16, |
| 77:4, 11 | 32:13 | 8:20 | 113:17 | 18 |
| 78:15 | **sounds** | 32:1 | 115:9, | 187:8, |
| 82:20 | 32:19 | 40:1, 8 | 13, 22 | 15, 16 |
| 96:25 | 102:22 | 58:13 | 116:1 | 188:10 |
| 97:17 | 118:15 | 59:13 | 117:18 | 191:10, |
| 103:1 | 198:21 | 65:4 | 118:14, | 25 |
| 105:21 | | | 23 | 194:18 |

195:*19*
196:*4*
197:*3*
200:*9,*
*14, 22*
201:*9*
207:*8*
213:*8*
222:*12,*
*16*    223:*3*
**specifical**
**ly**
11:*21*
12:*1*
20:*18*
35:*6*
60:*4*
68:*23*
73:*8*
97:*8*
100:*6*
114:*1*
129:*7,*
*14*
130:*2,*
*21*
138:*19*
157:*16*
165:*15*
170:*3,*
*21*
180:*1*
181:*10,*
*11*
201:*10*
216:*7*
226:*23*
**specifics**
14:*19*
25:*12*
52:*20*
71:*12*

75:*5*
82:*12*
169:*18*
174:*21*
184:*2*
198:*22*
212:*21*
220:*7*
225:*22*
**specified**
233:*9*
**speculate**
11:*25*
**speculatio**
**n**
107:*15*
108:*16*
148:*23*
152:*25*
159:*2*
179:*13*
201:*7,*
*18*    212:*3*
**spell**
10:*18*
37:*23, 25*
**spend**
33:*12*
201:*5, 13*
**spending**
85:*2*
161:*23*
163:*22*
165:*13*
166:*16*
**spent**
194:*13*
**spilled**
88:*17*
89:*1*

**split**
23:*23*
24:*4*
**splitting**
24:*3*
**spoke**
14:*11,*
*13*    15:*2*
37:*13*
38:*7, 11*
64:*6, 24,*
*25*    67:*9*
68:*2*
111:*5*
119:*20*
214:*23*
224:*5, 10*
**spoken**
15:*14*
26:*25*
31:*23*
32:*5*
62:*23*
63:*16*
109:*23*
110:*4,*
*24*    148:*3*
**SQL**
199:*1, 5,*
*14*
216:*22*
**staff**
109:*7, 9,*
*15, 21,*
*23*
110:*2,*
*11, 22*
111:*3*
113:*24,*
*25*
114:*23*
177:*14*

193:*7*
207:*25*
**stamp**
6:*7, 8,*
*10, 11,*
*12, 20,*
*21, 24*
102:*12*
125:*11*
136:*19*
196:*7*
210:*11*
**stamped**
122:*16*
142:*24*
**standard**
75:*15*
226:*20*
**stands**
37:*6*
**Starlink**
21:*23*
22:*4, 6*
**Starship**
21:*23*
**START**
1:*15*
18:*19*
21:*5*
33:*22*
38:*2*
84:*8, 24*
151:*21*
152:*1*
220:*9*
**started**
39:*11*
51:*22*
67:*1*
87:*8*
**starting**
7:*15*

20:*2*
202:*14*
206:*2*
**starts**
157:*5*
**startup**
22:*12*
**State**
4:*8*
10:*17*
19:*16,*
*22*
36:*18,*
*23*    47:*7,*
*23*
48:*18,*
*19*    66:*4,*
*7, 13, 15*
77:*24*
82:*1*
83:*7*
90:*3*
140:*6,*
*18*
163:*2*
174:*22*
188:*24*
200:*3*
206:*17*
221:*3*
**statement**
99:*16*
**STATES**
1:*1*
7:*11*
43:*12*
69:*17*
97:*20*
158:*12*
176:*25*
177:*10*

status
 51:20
statute
 190:12
stenograph
ic    9:3
Stephen
 37:20, 23
stepping
 195:4
Steps
 151:2
Steve
 37:25
 38:8
 55:2, 5,
6    56:20,
21    57:4
 58:9
 72:13
 86:5
 95:23
 135:3,
10, 14,
21, 24
 136:6
 139:21,
22    225:4
Steven
 130:22
STEVENS
 2:13
stipulate
 9:11, 14,
19    10:4,
13
stop
 70:23
 175:12
stopped
 139:2
 175:8

storage
 229:9
streams
 89:25
 90:2
Street
 2:14
 3:3, 14
 4:7
 8:19
 15:12
 99:11
strictly
 225:20
Strike
 34:3
 49:8
 52:9
 55:19
 72:8
 82:19
 83:5, 14
 87:2
 95:15
 109:19
 120:3,
15
 127:18
 140:10,
14
 147:20
 156:14
 168:14
 193:17
 220:5
striking
 82:21
strong
 26:4
 33:5, 8
 87:15
 104:11

 105:2
 225:10
structure
 32:24
 81:11

structures
 36:5
stuck
 162:11
study
 20:18
stuff
 63:1
 101:13
 123:5
 190:7
 228:6
subcompone
nts
 219:25
subject
 58:16
 137:1
 146:12
 156:18
 158:4
 196:13
 197:20
 210:1
 229:4
subjects
 129:15
submitted
 13:18
 21:10
 38:10
 151:3
subpoena
 227:15,
19, 24
 229:4

subsection
 78:11, 17
subsection
s    204:20

subsidiary
 21:17
substance
 11:16
 12:22,
24    14:1
 68:13
 141:3
 161:5
substantia
l    221:3
substantiv
e    92:3
 155:22
 222:19,
21, 22, 25
substantiv
ely
 183:5
succeeded
 55:22
 56:6
sugar
 13:1
suggests
 39:10
Suite
 2:5, 15
 3:5
 7:6
 25:16, 20
summing
 165:22
 166:8
Sunday
 184:8, 14

super
 102:1
 148:2
 213:12,
17    216:1

supervisor
 50:14
 93:2, 8,
10
support
 33:3
supposed
 11:22
 116:10,
15
 171:5,
11, 12
sure
 9:20
 12:10
 17:7
 27:15
 28:15
 45:3
 47:22
 56:4
 64:6
 67:13
 68:4
 69:10
 73:19
 74:2, 13
 77:9
 80:8
 85:3
 88:9
 90:22
 92:12
 108:6
 120:2
 122:1

133:*22*
135:*10*
142:*1*
148:*19*
151:*15*
152:*5*
154:*13*
155:*12*, *13, 21*
159:*9*
163:*13*, *15*
164:*6*
172:*10*, *22, 24*
174:*1*
177:*7*
185:*1*, *25*
186:*1*
189:*25*
191:*13*
192:*1*
194:*22*
203:*15*
205:*25*
206:*3*
209:*17*
222:*15*
228:*10*
**surroundin g** 94:*7*
168:*22*

**suspension**
104:*16*, *20*
106:*3*, *15*
176:*6*
177:*25*
178:*21*

**swapped**
46:*19*
**swear**
10:*23*
203:*2*
**sworn**
10:*22*
11:*4, 7*
233:*4*, *15* 234:*1*
**system**
101:*17*, *21, 23*
106:*22*
107:*1*, *23*
108:*2, 3*, *24*
109:*22*
114:*25*
115:*3, 4*, *7, 18, 20*
116:*3, 8*, *20*
119:*22*
120:*14*, *15*
121:*15*, *16*
128:*7*
129:*1*, *11*
132:*1*
137:*15*, *17*
138:*7*, *20*
170:*13*, *22*
172:*7*, *16, 19*, *21, 25*

173:*1*, *11, 13*, *17, 21*
174:*2*, *14, 16*, *21*
175:*9*, *11*
180:*9*, *11, 15*
181:*6*
188:*24*
189:*17*, *18, 20*
190:*4, 5*, *9, 16, 19*, *20, 24*
191:*2*
198:*1, 4*, *6, 7, 12*, *18, 19*, *22*
199:*10*
207:*15*, *18*
208:*4, 6*, *9, 20*
209:*5*, *19*
211:*20*, *21*
213:*3*
217:*4*
218:*24*
226:*6, 7*
**systems**
101:*5, 9*, *14, 23*
102:*1, 2*
105:*11*
109:*16*
110:*12*,

*18*
116:*18*
117:*15*
118:*1*, *21*
119:*2*
120:*5*, *10, 16*, *18, 20*, *22, 25*
121:*1, 2*, *5, 9, 21*
123:*19*
127:*25*
128:*1, 2*, *3, 5, 10*, *11, 12*, *13, 17*
129:*5*, *17, 25*
137:*23*, *25*
138:*2*
142:*11*
144:*21*
167:*10*
168:*21*
170:*13*
174:*9*, *22*
175:*18*
179:*9*
182:*3*
183:*25*
185:*13*
188:*21*
189:*6*
191:*10*, *11*
198:*10*, *24*
200:*6*,

*11, 18*
201:*4, 5*, *17*
205:*6*
208:*16*
211:*2, 4*, *7, 9*
213:*21*
214:*18*
215:*11*
218:*10*, *12, 17*, *21*
219:*4, 7*, *12, 20, 21*

**< T >**
**table**
59:*15*
**take**
7:*7*
12:*16*, *17* 13:*3*, *4* 65:*7*, *12*
102:*17*
122:*13*
143:*3*
145:*19*
149:*7*
154:*10*, *22*
160:*12*
161:*25*
197:*16*
202:*10*
224:*12*, *16*
**taken**
7:*10*
8:*23*
106:*23*

talk
12:*23*
14:*6*
17:*3, 7*
33:*21*
55:*5*
57:*24*
58:*3, 6, 25*    68:*8*
84:*7*
109:*20*
111:*15*
129:*10*
166:*21*
183:*24*
193:*17*
197:*4*

talked
27:*1*
92:*15*
184:*6*

talking
13:*20*
25:*19*
35:*15*
64:*12*
71:*14*
95:*2*
96:*3*
106:*20, 21*
107:*7*
110:*16*
119:*19*
129:*24*
135:*22*
168:*11*
171:*23*
172:*3*
183:*19*

190:*25*
191:*2*
201:*15*
215:*14*
219:*14*
220:*10*
226:*23*

Tarak
140:*5*

tasked
73:*22*

tasks
90:*19, 22*
198:*11*

tautological    41:*15*

team
79:*1, 2*
80:*25*
81:*5, 8, 9, 13, 22*
82:*7, 8, 14, 17*
83:*5, 7*
93:*19, 20*    94:*4, 5, 12, 15*
95:*2, 9, 17*    96:*4, 6, 9, 17*
97:*24*
98:*5, 6*
107:*6*
202:*16, 18, 19, 23*
204:*10*
205:*10*
206:*1*
214:*5*

teammates
23:*24*
24:*3, 4*

teams
78:*11, 24*    80:*1*
137:*21*
138:*2*

technologi
cal
106:*21*

technology
76:*15*
77:*21*
79:*22*
142:*16*
204:*25*

Telephone
91:*21*

telephonic
61:*1*
183:*21*

telescope
33:*16*

Tell
23:*11*
34:*16*
37:*2*
58:*15, 19*
65:*24*
71:*7*
82:*8*
87:*17*
121:*7, 14, 18*
132:*9, 10, 15, 16*
147:*22*

172:*17*
173:*6*
226:*15*

telling
119:*1, 7, 10*
139:*6, 8*
140:*9*

temporary
31:*16*
44:*18, 23*    45:*10*

tens
194:*21*

Tera
118:*3, 5*
149:*24*

T-E-R-A
118:*3*

term
32:*21*
43:*6, 8*
44:*6, 7*
57:*17*
59:*16*
69:*24*
211:*5*

termed
209:*4*

terminated
189:*6*

terms
11:*24*
16:*14*
23:*7*
32:*24*
61:*12*
69:*8*
133:*8*
135:*4*
141:*12*

162:*23*
166:*6*
208:*3*
218:*2*

testified
11:*5*
24:*23*
25:*5*
27:*6*
28:*23*
36:*3*
38:*12*
40:*19*
67:*23*
94:*2*
98:*10*
176:*19*
179:*24*
181:*2*
191:*3*

testify
156:*7*
227:*15*
233:*4*

testifying
29:*1*
178:*8*

testimony
9:*5, 6*
10:*23*
13:*8*
15:*18*
17:*3, 4, 8, 16*
18:*23*
19:*1*
29:*16*
35:*17*
40:*15, 24*
47:*15*

55:25
60:1
61:23
68:14
70:19
71:3
73:25
93:23
134:17
156:22
160:4, 6
174:7,
14
178:25
180:16
181:9
185:5,
16
186:11,
20
187:12
191:8
205:13
209:8,
21
220:5
223:9
233:5, 9
**Texas**
2:16
**text**
31:6
61:4
143:15
**texting**
27:2
**Thank**
8:21
10:5, 15
11:6, 9
15:10
40:12

65:14
78:15
103:6,
10
105:21
125:7
160:24
161:20
162:4
169:20,
21
177:17
192:17
206:17
215:3
216:21
224:20,
25   230:5
**Thanks**
33:4
200:24
**theme**
205:7
**theory**
99:12
**thereof**
78:4
232:12
**Thiel**
22:15, 16
**thing**
44:19,
20, 23
45:11
78:1, 25
87:10
191:22,
23   221:8
**things**
43:9, 12
45:13
62:5

69:15
92:13
126:7
137:7
162:16
178:18
183:11
191:13
200:20
**think**
22:1, 3,
18
25:22
31:7
32:19
46:3, 16
57:21
65:7
67:13
69:11
73:11
77:1, 23
86:4
87:15
88:18
92:15
94:10,
13
100:19
112:5
115:21
125:6
128:8
133:5
150:9
156:6
172:23
173:8, 9
177:6
180:15
187:8
198:15

203:24,
25
211:6
223:10
225:5
229:7
**third**
124:14
144:10
165:3
176:3
177:11
213:11
**thousand**
159:11,
17
**thousands**
194:21
**thread**
31:11, 14

**threatened**
135:15
**threatenin
g**   135:18
**three**
20:16
45:13
78:13,
14
100:17
127:23
137:7
163:20
**Thursday**
162:18
**till**
93:12
**TIME**
1:15, 16
7:4
16:10,

16
22:14
23:3
24:25
26:5, 16
27:25
28:4, 6
33:12,
20   34:4,
6, 9, 11,
17
35:15,
18, 24
36:12
38:15
39:6, 17,
20
40:16,
19, 20,
21, 24
41:4
42:10
44:3
45:15
46:2, 5,
6, 8, 18,
24   47:2
49:23
50:3, 11,
12, 24
51:14
55:19,
20   56:6
57:5, 9,
10, 12
58:2, 7,
11, 20
60:16
63:11,
12, 24,
25   64:6,
9   65:15,

18, 21, 25
66:18
67:7, 9, 22  68:2
69:6
79:13
82:18
83:8
85:10
93:5, 9, 21  96:2
99:13
101:17
103:5, 9
104:7
109:12
114:6, 15
117:16
125:21
129:9, 15
130:20, 21
131:5
134:20
136:14, 25
141:1
143:21
144:8, 24
146:7
147:14, 17, 23
154:17
160:21, 24
162:24
163:25
164:21,

25
165:2, 5
166:13, 17
167:13
168:5
170:6, 8, 22
179:21
182:11, 19, 24
187:20
188:17
190:2
195:3, 5
201:24
204:24
212:19, 25
213:6
217:11, 19, 25
221:15
224:22, 25
225:15
226:22
227:7
228:4, 8
229:22
231:3
232:5
233:9

**times**
16:19
26:8
27:5, 13
50:5
60:7, 18, 20, 23
63:16
64:14

67:18
185:16
207:24

**title**
33:24
34:1, 8, 10
50:16
56:16
76:6, 9
104:3
123:7
161:22

**titled**
202:6

**today**
11:15, 23
12:14
13:23
14:8
15:2, 13, 18
16:20
17:4, 9, 13, 18
33:4
45:7, 14
68:9
158:12
185:16
210:18
212:19
221:1
222:6
223:2
227:15
229:16

**Today's**
7:3

**to-last**
103:24

**told**
15:2
52:17
53:1, 20
54:3
82:13
85:21
88:9
97:4
98:6
109:3
118:11
122:8
150:5
200:5, 11, 16

**tomorrow**
210:18

**Tonight**
105:20, 21  157:1

**Top**
78:20
107:4
115:14
122:21
123:11
130:5
143:10
146:16
162:18
167:15
200:23

**topic**
13:5
68:25
69:2, 4
110:20
166:19

**topics**
217:9
229:16

**total**
24:2

**touch**
217:8

**tracks**
198:12

**traditional**  117:3

**training**
75:11

**trainings**
226:19, 24

**tranches**
24:6

**transaction**
215:16, 18

**transcribed**  232:7

**transcriber's**
232:9

**transcribing**  12:7

**transcript**
230:6, 11, 15
232:8
233:8

**transcript's**  230:10

**transition**
58:11, 21
67:14
69:5
70:8, 15

71:9
72:6, 9,
23   73:3
74:10,
20, 25
75:12
84:12,
14, 17, 19
transition
ing   58:6
transmitte
d
144:16
148:7
transmitti
ng
144:19
travel
19:17
Treasury
62:12
tried
32:15
164:16
true
73:12
203:18
232:8
233:8
234:1
Trump
26:18
44:1
73:6
162:19
163:21
166:11
223:7, 20
Trump's
169:15
170:19

trust
88:3
truth
10:24,
25   233:4
truthful
12:14

truthfully
159:23
try
13:3, 4
14:17
45:7
70:3
trying
14:15,
16   29:2
33:15
59:22
88:11
95:12
131:16
132:10,
17
133:9
163:23
165:7
172:10
200:10,
16
203:3
204:2
218:17
220:4
Tuesday
1:14
234:1
tunnel
57:3
tunnels
57:1

turn
78:10
103:23
112:23
123:18
131:1
136:10
144:10
169:23
174:11
184:3
202:16
210:10
214:9
turned
191:3
turning
191:10
turnstile
168:7, 9

turnstiles
168:10
tweet
33:1
194:13,
17, 24
Twice
64:18
Twitter
192:10,
11, 20
two
15:1
39:3
41:12
44:19
56:14
64:8, 11,
19, 24
69:21
70:4

97:10
125:3
136:21
146:16
151:24
178:13,
17
184:4,
20
185:3
187:10,
24
189:8
204:5
212:22
215:7
224:13
type
15:25
16:5, 15
62:15
typical
54:12
90:6
typically
79:2

< U >
U.S   3:13
uh-huh
12:8

ultimately
116:19
117:11
unauthoriz
ed
99:15
168:13,
16
169:2
170:2,

15, 18
172:14
176:7,
12
177:1,
20
178:22
179:11
180:12
181:5, 7,
11
183:16
unclassifi
ed
127:25
128:5
unclear
173:4

understand
12:2, 11,
24, 25
19:20
25:19
27:16
28:23
29:2, 7
35:17
41:3, 16
44:21
46:12
47:17
59:12
70:1
80:18
83:15,
21   84:4
88:11
113:5, 6,
7, 9, 23
137:19,
21

141:*14*
152:*20*
172:*11*
174:*1,*
*22*
177:*5*
211:*4*
212:*24*
217:*1, 3*
218:*10,*
*17, 21*
227:*18,*
*25*
**understand
ing**
15:*11*
17:*12,*
*17*   43:*8,*
*14, 19,*
*23*   44:*7,*
*13*   45:*4,*
*11, 15*
48:*9, 14,*
*15*   58:*9*
66:*5*
76:*17,*
*23, 24*
77:*1, 7,*
*15*   78:*3,*
*7*   79:*4,*
*9, 25*
80:*9*
86:*15,*
*22*
95:*18*
96:*20,*
*24*   97:*3,*
*18, 21*
99:*14,*
*15*
108:*17,*
*20*

115:*6*
117:*7*
125:*19*
126:*9*
140:*2,*
*23*
153:*4*
176:*14*
187:*13*
190:*20*
201:*6*
213:*1,*
*18*
217:*18*
227:*17,*
*21*
228:*1, 23*
**understand
ings**
41:*21*
**understand
s**   211:*6,*
*9*

**understood**
12:*4*
13:*2*
47:*11*
49:*21*
70:*6, 7*
84:*1*
90:*20*
114:*10*
118:*19*
127:*19*
129:*24*
134:*10*
156:*24*
163:*14*
168:*3*
185:*23,*
*25*

204:*3*
213:*11*
221:*23*
**UNITED**
1:*1*
7:*11*
43:*11*
69:*17*
97:*20*

**University**
20:*4, 12*
**upcoming**
58:*3*
73:*6*
**UPD**
139:*16*
**update**
214:*14*
215:*9, 10*
**updating**
208:*16*
**uploaded**
68:*19, 21*
**upset**
133:*25*
**upstairs**
109:*6*
119:*16*
**USAID**
6:*9*
36:*19*
47:*8, 25*
49:*3*
66:*4, 7,*
*13, 15*
82:*3*
83:*12*
84:*7, 8,*
*24*   85:*3,*
*10, 19,*
*22, 25*

86:*3, 6,*
*14*   87:*3,*
*11, 14,*
*18, 23*
88:*7, 22*
89:*1, 21*
90:*3, 7,*
*14*
91:*17*
92:*6, 21*
93:*3, 12,*
*20, 21*
94:*4, 5,*
*12, 15*
95:*17,*
*22*   96:*4*
97:*24*
98:*11*
99:*12*
101:*4, 8,*
*9*   104:*4,*
*7*   105:*6*
109:*14,*
*15, 21,*
*22, 24*
110:*11,*
*12, 17,*
*22*
111:*3, 6*
112:*18*
113:*13,*
*21, 25*
115:*7*
116:*4, 5*
117:*15,*
*22*
118:*1,*
*20*
119:*2,*
*16*
120:*10,*
*16, 25*

121:*1, 5,*
*9, 19, 20*
122:*3*
123:*8*
124:*11,*
*16*
125:*18,*
*20*
126:*15,*
*18, 19,*
*23*
127:*5,*
*12, 20*
128:*5,*
*18*
129:*5,*
*11, 17*
130:*19*
131:*4, 7,*
*9, 15, 17,*
*23*
132:*3, 5,*
*9, 11, 15,*
*16, 18*
133:*1*
134:*2,*
*11*
135:*5,*
*12, 16,*
*19, 23*
136:*8*
137:*2, 9,*
*16, 24*
138:*2, 8,*
*18*
139:*1*
140:*13,*
*16, 21*
141:*1*
142:*13*
144:*21*
146:*5, 8,*

25
147:*15*, *18*
152:*21*
157:*2*, *19*
158:*13*, *16*
159:*10*
161:*24*
162:*20*, *23*, *24*
163:*6*, *23*, *24*
164:*16*, *20*
165:*4*, *6*, *11*
166:*10*, *14*, *23*, *25*
167:*4*, *17*, *20*, *24*
168:*14*, *16*, *20*
169:*14*
170:*14*
171:*5*, *10*, *22*
172:*1*, *8*, *14*, *17*
173:*3*, *11*
174:*16*
175:*1*, *11*, *17*
176:*8*, *13*, *20*
177:*14*, *21*
179:*8*

180:*13*
181:*23*
182:*6*, *18*, *24*
183:*7*, *12*, *16*, *25*
185:*22*
187:*9*
188:*13*
189:*16*, *20*
190:*2*, *5*, *15*, *24*
191:*3*, *20*
192:*21*, *22*
193:*1*, *7*, *15*, *20*
194:*14*, *25*
195:*6*, *8*, *14*, *23*
196:*1*
197:*22*
198:*7*, *13*, *20*
201:*23*
202:*24*
204:*10*, *24*
205:*8*, *10*, *15*
206:*1*, *5*, *8*, *24*
207:*9*
209:*17*
211:*2*
213:*21*
214:*11*, *17*

219:*13*, *14*
220:*11*
221:*1*, *3*
222:*5*, *11*, *12*, *19*, *21*, *23*
223:*1*
225:*4*, *19*, *25*
226:*3*, *7*, *8*, *22*
227:*7*
**usaid.gov**
137:*14*
**USAID's**
101:*16*
115:*18*, *19*
116:*2*, *7*
120:*5*
131:*2*
132:*1*
133:*2*, *9*
180:*10*
191:*16*
192:*6*
207:*18*
225:*23*
**USDS**
45:*20*, *25*   47:*4*, *9*, *10*, *11*
48:*4*
49:*5*, *19*
50:*14*
56:*18*
70:*5*
116:*3*
**use**
12:*18*

32:*21*
41:*20*
69:*24*
92:*8*
132:*5*
168:*17*
199:*8*
216:*13*
**useful**
142:*13*
**User**
6:*9*
108:*11*, *21*
123:*8*, *14*, *22*
124:*16*
210:*22*
211:*12*, *22*
214:*20*
215:*15*, *17*
**users**
137:*14*
171:*17*, *21*
198:*25*
199:*10*
211:*23*
214:*22*

**< V >**
**Vague**
27:*14*
37:*12*
46:*18*
49:*11*
52:*19*
54:*11*
56:*22*
60:*12*

71:*10*, *22*
72:*24*
75:*13*
78:*5*
80:*19*
84:*9*
85:*15*
86:*17*
87:*19*
99:*20*
106:*4*
110:*3*
117:*16*
121:*10*
145:*4*
151:*18*
172:*18*
177:*22*
182:*9*
207:*21*
220:*17*
224:*1*
**varied**
52:*21*
91:*9*, *18*
**varies**
53:*23*
108:*1*
115:*6*
211:*20*
**variety**
218:*3*
220:*6*
**various**
20:*3*
34:*19*
85:*3*
147:*25*
200:*20*
221:*17*

verb
  168:*17*
verbal
  133:*24*
verbally
  12:*8*
  109:*21*
  110:*22*
verbatim
  59:*22*
verify
  88:*3*
  104:*16,*
*19*
  105:*14*
  106:*2,*
*14, 22*
  118:*12*
  176:*5*
  177:*25*
versus
  38:*25*
  70:*4*
Vesuvius
  23:*9*
video
  7:*9*
  8:*22*
  10:*9, 12*

VIDEOTAPED
  1:*10*
view
  166:*10*
  198:*25*
  199:*14*
violate
  166:*11*
  169:*3*
violated
  153:*7*
  169:*3, 15*

violation
  68:*19*
  166:*15*
  167:*4*
  170:*18*
virtual
  72:*22*
  212:*15*
visiting
  87:*12*
  113:*24,*
*25*
visitor
  99:*21*
Vivek
  42:*23*
VM
  212:*14*
VMs
  212:*7, 9,*
*13*   213:*2*
Voorhees
  114:*17*
voter
  13:*21*
vouchers
  128:*3,*
*18*
  129:*11,*
*12, 18*

< W >
wait
  119:*11*
walk
  20:*1, 22*
  99:*6, 11*
walked
  63:*4*
  100:*14,*
*25*

112:*1*
  220:*6*
walking
  168:*6, 9*
want
  10:*1*
  11:*14*
  12:*25*
  14:*17*
  31:*25*
  32:*20,*
*25*
  40:*17*
  46:*7*
  69:*9*
  115:*16*
  125:*23*
  139:*20*
  140:*19*
  141:*3*
  146:*18*
  160:*16*
  161:*18*
  162:*16*
  170:*3*
  176:*1*
  214:*12*
  217:*8*
  220:*7*
wanted
  118:*12*
  141:*10*
War
  36:*18,*
*22*   81:*9*
  98:*8*
WARREN
  2:*7*
  5:*4*
  7:*17*
  9:*11, 12,*
*20, 25*

10:*3, 14*
  11:*9, 11,*
*13*   15:*6,*
*16*   16:*4,*
*7*   17:*20*
  18:*13,*
*25*
  27:*17*
  29:*6*
  37:*15*
  39:*19*
  41:*8, 11*
  45:*6*
  47:*21*
  48:*8, 13*
  49:*14*
  51:*21*
  52:*23*
  53:*18*
  54:*1, 16*
  56:*3, 11,*
*24*   60:*3,*
*15*   62:*6*
  64:*5*
  65:*4, 8,*
*14, 22*
  66:*24*
  71:*6, 13,*
*19, 25*
  73:*2, 13,*
*18*   74:*7,*
*24*   75:*9,*
*16, 25*
  76:*22*
  77:*11,*
*13*   78:*9,*
*13, 15,*
*17, 20,*
*23*
  79:*11,*
*20*   80:*7,*
*15, 23*

81:*19*
  83:*1, 24*
  84:*6, 11,*
*18*   85:*5,*
*17*
  86:*20*
  87:*9, 22*
  88:*20*
  89:*7, 10,*
*17*   90:*1*
  91:*6*
  92:*20,*
*23*   93:*1*
  94:*1*
  95:*1, 14*
  97:*1, 22*
  98:*9*
  99:*23*
  102:*15,*
*17, 20,*
*23*
  103:*1,*
*11, 15*
  104:*24*
  106:*6, 9,*
*12, 19*
  107:*20*
  108:*19*
  110:*5*
  111:*23*
  112:*10,*
*22*
  113:*20*
  114:*10,*
*12, 14*
  116:*23*
  117:*20*
  118:*10,*
*25*
  120:*1*
  121:*13,*
*25*

122:*15, 17*
125:*1, 4, 7, 10, 14*
126:*25*
127:*17*
128:*24*
130:*11*
131:*14*
132:*24*
133:*7, 14*
134:*8*
135:*9*
136:*5, 11, 13, 16, 20*
141:*25*
142:*9, 20, 23*
143:*23*
144:*25*
145:*7, 18*
148:*18*
149:*1*
150:*14, 20*
151:*14, 21, 25*
152:*15*
153:*3, 10, 19*
154:*8, 12, 14, 19*
155:*2, 6, 12, 15*
156:*1, 9, 24, 25*
157:*12*
158:*3,*

*11*
159:*8*
160:*12*
161:*1, 11*
162:*5*
163:*11*
164:*5, 14*
165:*1, 23*
167:*14*
169:*12, 22*
171:*19*
172:*20*
174:*12, 25*
175:*16, 21*
178:*6, 19*
179:*3, 23*
181:*1, 13*
182:*12*
184:*25*
185:*14*
186:*12, 23*
187:*25*
188:*16, 25*
189:*25*
190:*1, 22*
191:*15*
192:*16, 19*
193:*3*
194:*1*

195:*13, 21*
196:*9*
197:*14*
198:*17*
201:*11, 22*
202:*4, 9*
203:*15*
204:*3, 6, 18*
205:*9, 24*
206:*13, 21*
207:*10*
208:*2*
209:*1, 16, 24*
210:*9*
212:*5*
215:*24*
220:*1, 22*
223:*14, 17*
224:*4, 12, 16, 19*
225:*2*
229:*23*
230:*7, 9, 12, 25*

**Washington**
2:*6*
3:*6, 15*
193:*9*
**waste**
44:*9*
59:*23*
69:*20,*

*23*
73:*23*
74:*6*
94:*8, 10, 13, 23*
97:*9, 12*
126:*13*
201:*20*
204:*16*
218:*7, 9*
219:*9*
**way**
50:*1, 2, 10*
86:*19*
90:*23, 24*
104:*10*
117:*23*
122:*24, 25*
124:*19, 21*
126:*3*
127:*16*
132:*13*
133:*6*
135:*1*
152:*8*
153:*20*
157:*13, 21*
159:*15, 21*
163:*18*
164:*6, 8*
165:*15*
166:*20*
167:*1*
169:*13, 17*
172:*11,*

*15*
180:*12*
183:*22*
187:*15*
189:*24*
190:*21*
193:*5*
206:*4, 10, 25*
207:*7, 8, 13*
220:*13*
232:*12*
**ways**
32:*20*
33:*15*
213:*19*
**weather**
183:*13*
**website**
191:*16, 20, 22, 23*
192:*3, 6*
**week**
16:*25*
18:*24*
68:*4*
113:*1*
**weekend**
131:*15*
181:*23, 25*
184:*10, 12*
194:*14, 23, 24*
**weekends**
131:*6*
**weeks**
19:*17*

**WELCH**
3:20
8:6
**well**
11:19
27:18
29:24
35:9
36:23
38:11
40:15
41:21
45:14
50:4
51:3
59:14
61:12
62:7
65:11
69:13
77:17
81:1, 4, 10
84:23
88:25
90:10
100:23
102:2
125:2
129:19, 22
134:9
147:6
153:16
156:3
168:1
169:6
170:6
197:2
199:9
218:14
219:25

228:4
229:9
**went**
40:23
131:4
167:25
168:5
170:1
179:2
193:1
195:12
**We're**
7:3
27:24
31:11
45:14
62:22
96:25
103:4
125:3, 6
150:7
154:17, 19, 22
155:1
160:20, 23
217:7
221:5, 24
224:24
231:2
**West**
2:14
**we've**
72:1
83:2
113:3
115:10
139:22
168:11
170:2, 11

176:1, 14
183:9
192:10
198:6
200:21
211:1
219:13, 21
220:6
221:4
222:8, 18
229:16, 19
**WhatsApp**
92:2
**Whereabouts**  19:10
**White**
6:22
110:14
111:5
117:6, 25
139:23
140:18
202:5
208:10
221:11, 12, 14, 16, 20
222:7, 11
**who've**
137:14
**widely**
138:10, 23   139:9
**William**
156:13, 15

157:25
196:13
**Willis**
130:14
**window**
39:5, 17
**WITNESS**
1:13
3:11
11:4, 7
15:11
16:3
17:17
18:10, 24
27:15
37:13
39:14, 16   41:9
45:1, 2
47:19
48:9, 10
49:12
51:19
52:21
53:16, 23
54:12
56:1, 9, 23   60:2, 13   62:4
64:3
65:10, 15
66:20
71:4, 11, 18, 23
72:25
73:12, 13, 16
74:2, 22
75:4, 14

76:20
78:6, 19, 21   79:8, 17   80:5, 13, 20
81:17
82:20, 23
83:21
84:4, 10, 16   85:1, 16
86:18
87:7, 20
88:17
89:8, 14, 24   91:4
92:17, 19, 21, 24
93:24
94:21
95:11
96:24
97:18
98:3
99:21
102:14, 16, 19, 22
104:22
106:7
107:18
108:17
110:4
111:21
112:4, 21
113:17
114:13
116:22
117:18

118:*8*, *23*
119:*24*
121:*11*, *23*
125:*8*
126:*23*
127:*15*
128:*23*
130:*10*
131:*12*
132:*21*
133:*5*, *12*
134:*5*
135:*7*
136:*2*
141:*23*
142:*6*, *19*
143:*21*
144:*23*
145:*5*
148:*16*, *24*
150:*12*, *18*
151:*12*, *23*
152:*14*
153:*1*, *14*
154:*4*, *13*, *15*
155:*5*, *24*
156:*5*
157:*10*
158:*8*
159:*4*, *5*
160:*14*, *17*

162:*4*
163:*9*
164:*4*, *13*, *25*
165:*21*
167:*9*
169:*6*, *21*
171:*15*
172:*19*
174:*8*, *20*
175:*15*, *20*
177:*23*
178:*17*
179:*1*, *14*
180:*18*
181:*9*
182:*10*
184:*23*
185:*6*
186:*6*, *9*, *21*
187:*13*
188:*10*, *23*
190:*19*
191:*7*, *9*
192:*10*, *15*, *18*, *25*
193:*25*
195:*11*, *18*
198:*15*
201:*8*, *19*
203:*9*, *11*, *16*, *21*, *24*

204:*4*, *13*
205:*5*, *14*, *17*, *20*
206:*19*
207:*4*, *22*
208:*24*
209:*10*, *12*, *14*, *22*
210:*4*, *8*
212:*4*
215:*21*
219:*17*
220:*18*
223:*10*, *12*, *15*
224:*3*, *9*, *17*
229:*21*
230:*21*, *24*

**woman**
37:*19*

**won**
23:*14*

**woodchippe r**
194:*14*
195:*23*

**Word**
16:*14*
24:*18*
32:*10*
41:*16*, *18*, *22*
47:*16*
77:*25*
90:*21*
101:*13*,

*14*
102:*6*
120:*17*, *22*
173:*14*

**words**
84:*21*, *23*
113:*6*
220:*4*
227:*13*

**work**
16:*9*
28:*4*
29:*17*, *22*
33:*10*, *21*    38:*4*
42:*8*
45:*16*, *19*    48:*3*, *18*
53:*10*
57:*4*, *8*, *24*    58:*1*, *3*, *6*, *22*
60:*10*, *11*    61:*8*
67:*12*
69:*8*
74:*19*
75:*7*
77:*5*
80:*1*, *16*, *17*, *20*
83:*16*, *22*    84:*2*, *8*    87:*13*, *23*    88:*1*, *7*, *9*
89:*25*
90:*2*, *14*

91:*13*
98:*11*
116:*3*
121:*19*
126:*19*
127:*1*, *12*, *19*, *20*
129:*11*, *16*, *21*, *25*
134:*13*
141:*18*
142:*1*, *10*, *14*
143:*18*, *24*
148:*1*
152:*20*
153:*4*, *14*
157:*18*
158:*20*
159:*10*, *14*
160:*1*, *8*
164:*20*
165:*17*
168:*13*, *15*
169:*1*
171:*3*, *8*, *9*
172:*12*
173:*13*
181:*7*, *23*, *25*
182:*2*, *16*
183:*7*, *11*
184:*9*,

*19*
185:*2*
186:*17*, *25*
187:*8*, *15*
193:*8*
204:*24*
206:*1*, *8*, *24*
207:*24*
211:*7*, *9*
218:*2*, *14*
220:*11*, *25*
222:*5*, *19*, *21*, *23*    223:*1*

**worked**
20:*24*, *25*    44:*2*
47:*4*
53:*17*
87:*18*
102:*1*
104:*8*
127:*8*
140:*4*
190:*2*
207:*12*
218:*10*, *17*, *21*

**working**
35:*2*, *8*
38:*14*
47:*3*
58:*21*
61:*21*
62:*1*
94:*24*
97:*7*

107:*5*
109:*7*
126:*12*
127:*11*
133:*17*
164:*21*
179:*25*
181:*18*
191:*9*
218:*20*
223:*7*, *20*

**works**
59:*6*, *9*
61:*8*
75:*6*
140:*6*, *8*

**worth**
226:*5*

**wrap**
224:*13*

**write**
114:*24*
115:*12*
137:*6*, *12*
138:*5*, *9*
171:*21*
197:*24*
198:*23*
216:*24*
217:*2*, *4*

**writes**
104:*13*
114:*22*
115:*15*
133:*19*
143:*12*
144:*12*, *13*
146:*21*
147:*10*
148:*7*

151:*2*
157:*1*
201:*2*
210:*16*
213:*23*
214:*20*
215:*5*
216:*1*

**writing**
52:*24*
88:*13*
118:*19*
126:*2*
138:*11*

**written**
12:*10*
60:*9*
61:*3*
77:*24*
91:*25*
128:*19*
140:*9*
198:*2*
220:*24*

**wrong**
138:*6*, *14*, *16*
182:*5*

**wrote**
33:*1*
107:*10*
111:*25*
112:*13*
113:*2*
125:*17*
127:*24*
197:*19*

**< X >**
**X.com**
6:*17*, *18*

192:*12*
193:*25*

**X.compost**
194:*2*

**< Y >**
**Yeah**
9:*22*
10:*3*, *19*
20:*3*, *24*
27:*15*
36:*22*
39:*14*
41:*9*
45:*2*
49:*12*
51:*1*
56:*23*
58:*19*, *25*
60:*13*
62:*4*
65:*8*, *10*
71:*7*, *11*
74:*2*
77:*11*
78:*21*
83:*4*
84:*21*, *22*
88:*18*, *23*    92:*7*, *24*
93:*18*
94:*8*
104:*25*
106:*6*, *9*, *24*
107:*17*
112:*4*
113:*22*
114:*11*,

*12*
125:*4*
133:*13*
134:*15*
142:*8*
151:*12*
153:*4*
156:*5*
158:*8*
159:*5*
161:*17*
168:*2*
172:*8*
180:*20*
182:*14*, *25*
183:*6*
197:*17*
203:*12*, *21*, *23*, *24*
204:*1*, *2*
205:*17*, *20*, *21*
209:*10*, *12*
219:*17*
220:*18*
221:*6*
223:*12*
224:*15*, *17*, *18*, *19*
228:*8*, *23*
229:*1*, *7*

**year**
24:*15*
26:*16*
28:*8*, *13*
34:*13*
75:*21*

| | | | | |
|---|---|---|---|---|
| 137:*15, 17* | **Zechariah** 130:*7, 8* | | | |
| 184:*12* | **zero** 50:*25* | | | |
| **year-and-a-half** 227:*3, 4* | **Zoom** 32:*12* 205:*16* | | | |
| **years** 20:*17* 195:*12* | **ZSA'QUERIA** 2:*9*   8:*8* | | | |
| **yelling** 133:*25* 134:*7, 23, 25* | **zsaqueria@ democracyd efenders.o rg**   2:*10* | | | |
| **Yep** 24:*10, 12* | | | | |
| 48:*25* | | | | |
| 49:*2, 4, 6*   60:*16* | | | | |
| 78:*21* | | | | |
| 95:*4* | | | | |
| 102:*16* | | | | |
| 123:*10* | | | | |
| 125:*8* | | | | |
| 137:*11* | | | | |
| 143:*17* | | | | |
| 144:*17* | | | | |
| 146:*6* | | | | |
| 148:*10* | | | | |
| 169:*25* | | | | |
| 175:*7, 24* | | | | |
| 180:*20* | | | | |
| 184:*5* | | | | |
| 210:*8* | | | | |
| 215:*7* | | | | |
| **York**   7:*7* | | | | |
| **young** 22:*20* | | | | |
| **< Z >** | | | | |

# EXHIBIT 33

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

<table>
<tr>
<td>

J. DOE 4, *et al.*, *on behalf of themselves and all others similarly situated*,

    *Plaintiffs*,

  v.

United States DOGE Service, *et al.*,

    *Defendants*.

</td>
<td>

Case No. 8:25-cv-00462-TDC

</td>
</tr>
</table>

## DEFENDANTS' SUPPLEMENTAL OBJECTIONS AND RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 2 TO DEFENDANT UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT

Defendant United States Agency for International Development ("USAID") hereby supplements its response to Plaintiffs' Interrogatory No. 2 to Defendant United States Agency for International Development as follows:

### Objections to Instructions

1.    Defendants object to all Plaintiffs' instructions, and Instruction No. 1 in particular, to the extent they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure.

2.    Defendants object to Instruction No. 7 to the extent that it is both inconsistent with the dates set forth in specific interrogatories and to the extent the phrase "complete responses" is vague and ambiguous.  Unless otherwise indicated, Defendants will specify the dates relevant to each response to a particular interrogatory in any response to that interrogatory.

1

**Objections to Definitions**

1.      Defendants object to Definition No. 4 as vague and ambiguous and as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure to the extent it refers to a "general course of action the specifics of which can be determined later."

2.      Defendants object to Definition No. 5 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.

3.      Defendants object to Definition No. 7 to the extent it refers it incorrectly identifies the U.S. DOGE Service Temporary Organization as the "U.S. DOGE Temporary Service." Defendants will construe the term "DOGE" to include the U.S. DOGE Service Temporary Organization.

4.      Defendants object to Definition No. 8 as vague and ambiguous, as it refers to any individual who "otherwise works or worked for DOGE."  Defendants will construe the term to include any individual who has or had a primary employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization, whether in a paid or unpaid capacity.

5.      Defendants object to Definition No. 10 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.

6.      Defendants object to Definition No. 13 on the ground that it is overbroad and not proportional to the needs of the case because it includes, among other individuals, all of Defendants' thousands of current and former employees regardless of their position and regardless of their involvement in the events giving rise to the claims or defenses in these cases. Defendants will construe this definition, and the requests generally, to be limited to seek information from persons who are reasonably likely to have information relevant to the claims or defenses in these cases and responsive to Plaintiffs' interrogatories.

2

**Objections to All Interrogatories**

1.     Defendants object to Plaintiffs' interrogatories because discovery is inappropriate at this time in light of Defendants' pending motion to stay discovery during the pendency of any interlocutory appeal, ECF No. 166.  In addition, discovery is inappropriate, inefficient, and unduly burdensome, because for the reasons set forth in Defendants' motion to dismiss and Motion for Certification, the court has no jurisdiction over Plaintiffs' claims and the material facts are undisputed and Plaintiffs' claims thus present pure questions of law.  *See also* Pls. Request for Leave to File Mot. for Partial Summ. J. at 2, ECF No. 159.

2.     Defendants object to Plaintiffs' interrogatories to the extent that they seek information protected against disclosure by: (a) the attorney work product doctrine; (b) the attorney-client privilege; (c) the deliberative process privilege, the joint defense privilege, the common interest privilege, the law enforcement privilege, or the state secrets privilege; (d) any other form of executive privilege; or (e) any other applicable privilege or protection.

3.     Defendants do not waive, and hereby expressly reserve their rights to assert any and all objections to the admissibility of such responses into evidence at the trial of this action, or in any other proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, and privilege. Further, Defendants make the responses herein without in any manner implying or admitting that the discovery requests are relevant or material to the subject matter of this action.

4.     Defendants object to these interrogatories to the extent that they seek information protected against disclosure by the Privacy Act, *see* 5 U.S.C. § 552a, and the privacy interests and expectations of persons not party to this litigation.

5.     Defendants object to any discovery taking place in this case to the extent Plaintiffs

3

assert cognizable claims seeking review of governmental agency action, including claims under Administrative Procedure Act, because resolution of any such claims should be based upon the "administrative record" in this case. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That said, Defendants understand that the Court has allowed discovery to proceed. Thus, while preserving their broad objection to any and all discovery, Defendants make further specific objections stated below.

5.      Defendants incorporate all of the foregoing objections in each of the responses below regardless of whether a specific objection is reasserted with respect to a specific interrogatory. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that interrogatory. Moreover, the assertion of the same, similar, or additional objections in response to a specific interrogatory does not waive, limit, or modify any of Defendants' general objections or similar or separate specific objections raised in response to an interrogatory.

6.      Defendants expressly reserve the right to supplement, clarify, review, or correct any or all of the responses and objections here, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

### Objections and Response to Interrogatory No. 2

**INTERROGATORY NO. 2:** Identify the level of security clearance and level of badging access to USAID doors for Luke Farritor, Gavin Kliger, Steve Davis, Noah Peters, Jeremy Lewin, Clayton Cromer at all times between January 27, 2025 and March 31, 2025. If any individual's security clearance or badge access levels changed during this time frame,

4

indicate the updated level of badge access and security clearance and the date(s) on which the access level changed.

**Objections:**  Defendants incorporate by reference the above objections.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Defendants further object that this request is unduly burdensome and not proportional to the needs of this case, insofar as Plaintiffs' claims are limited to the Appointments Clause and the separation of powers, neither of which are implicated by agency decisions to grant certain identified individuals physical access to agency data systems.  Defendants also object to the interrogatory because it invades the privacy interests of third-party individuals.  Defendants further object to the extent that the information requested is not within the possession, custody, or control of USAID.

**Supplemental Response:**

Based on the inquiry conducted by USAID security personnel into the clearance status of the listed individuals in January or February 2025, using resources typically available to USAID for such an inquiry, USAID security personnel concluded that the listed individuals did not have clearance to access classified national security information during the timeframe listed in this interrogatory.  USAID has searched available databases and found no records of badges being issued by USAID to those individuals during that timeframe, based on information currently available.  USAID understands that certain contemporaneous documents reflect that these individuals may have had visitor badges or been granted the ability to use badges issued by other agencies to access USAID facilities.  To the best of USAID's current knowledge, the CCURE access system that controlled and tracked such access decisions is no longer available to USAID

5

and USAID no longer has reasonable access to records in that system.  Defendants are currently

undertaking further efforts to determine whether information maintained in the CCURE system

is reasonably accessible.  USAID, therefore, can currently neither confirm nor dispute the level

of access reflected in those contemporaneous documents.

Dated: February 26, 2026                    Respectfully submitted,


BRETT A. SHUMATE
Assistant Attorney General, Civil Division

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

*/s/ Jacob S. Siler*
CHRISTOPHER M. LYNCH
(DC Bar No. 1049152)
JACOB S. SILER (DC Bar No. 1003383)
JAMES J. WEN (NY Bar No. 5422126)
*By Special Appearance*
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-4556
Email: jacob.s.siler@usdoj.gov

*Attorneys for Defendants*

6

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing interrogatory response of the United States Agency for International Development is true and correct, to the best of my knowledge based on personal knowledge or information that was made known to me in the course of my official duties.

Dated: February 26, 2026

/s/_____
Myra Emata-Stokes