IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DISTRICT

- - - - - - - - - - - - - - - - x
                            :

J. DOE 4, et al.,          :

                            :

       Plaintiffs,      :    Civil No.
                            :    8:25-CV-00462-TDC

   v.                   :

                            :

ELON MUSK, et al.,       :

                            :

       Defendants.      :    Greenbelt, Maryland
                            :

- - - - - - - - - - - - - - - - x   May 21, 2026


**CASE MANAGEMENT CONFERENCE**

    BEFORE:  THE HONORABLE THEODORE D. CHUANG, Judge


APPEARANCES:                    ANDREW WARREN, Esq.
                                Democracy Defenders Fund
                                600 Pennsylvania Avenue SE #15180
                                Washington, DC 20003
                                  On Behalf of the Plaintiffs

                                JOAQUIN GONZALEZ, Esq.
                                Marziani, Stevens & Gonzalez PLLC
                                1533 Austin Highway, Suite 102-40
                                San Antonio, TX 78218
                                  On Behalf of the Plaintiffs

                                NICOLE RUBIN, Esq.
                                Lieff Cabraser Heimann &
                                Bernstein, LLP
                                275 Battery Street, 29th Floor
                                Suite 300
                                San Francisco, CA 94111
                                  On Behalf of the Plaintiffs


Proceeding recorded by electronic sound recording, transcript produced by transcription service.


**Willow Transcription**
**(301) 577-5882**

APPEARANCES:

                          VALQUERIA MARTIN, Esq.
                             On Behalf of the Plaintiffs

                          CHRISTOPHER M. LYNCH, Esq.
                          DOJ-Civ
                          U.S. Department of Justice, Civil
                          Division, Federal Programs Branch
                          1100 L Street, NW
                          Washington, DC 20005
                             On Behalf of Defendants

                          JACOB S. SILER, Esq.
                          1100 L Street, NW
                          Washington, DC 20005
                             On Behalf of Defendants

Audio Operator:           FTR Recording

Transcription Company:    Willow Transcription
                          125 Holly Creek Court
                          Woodstock, Georgia  30188

# I N D E X

                                                          Page

Preliminary Matters                                          4

Comments by Andrew Warren, Esq.
    Attorney for the Plaintiffs                             5

Comments by Jacob Siler, Esq.
    Attorney for the Defendants                            14

Further Comments by Andrew Warren, Esq.                    24

Further Comments by Jacob Siler, Esq.                      31

Court and Parties Re:  Briefing Schedule                   39

P R O C E E D I N G S

(Whereupon, at 3:32 p.m., the hearing began.)

THE COURT:  This is Judge Chuang.

THE CLERK:  The matter now pending before this court is Civil Action Number 25-0462-TDC, J. Doe, et al. versus Elon Musk, et al.  We are here today for the purpose of a case management conference.

Beginning with the plaintiffs, counsel, please identify yourselves for the record.

MR. WARREN:  Well, good afternoon, Your Honor. This is Andrew Warren of Democracy Defenders Fund on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. GONZALEZ:  Also on the call is Joaquin Gonzalez on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MS. RUBIN:  And Nicole Rubin on behalf of the plaintiffs.

MS. MARTIN:  And Valqueria Martin on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. SILER:  Good -- good afternoon, Your Honor. This is Jacob Siler with the Department of Justice for the defendants.  And with me on the line this afternoon is Christopher Lynch, also of my office.

THE COURT:  Okay.

(Whereupon, there was a brief pause.)

THE COURT:  Okay.  Anyone else on?

(Whereupon, there was no response.)

THE COURT:  Okay.  So, let's discuss the two notices that were filed.  Not sure where to start.  One of them is about depositions.  And this one, on the one hand, we've dealt with this issue before, but every situation is different.  There's this question of whether depositions can be taken of these other individuals, Mr. Davis, Mr. Jackson and Ms. Gleason.  Now, I guess there's two questions here, one is, do they fall within the so called apex doctrine?  And then there's also, if so, where are we with that?  Have we gone to the point where there's no alternative, et cetera?

Part of what I want to understand, and I don't know if we'll be able to resolve this today.  I just want to get some background.  I mean, what is the purpose of deposing Mr. Davis, Mr. Jackson and Ms. Gleason  and -- you know, based on what prior information has been obtained.  And what is the -- what was the basis to say that, you know, you need to talk to them now?  Whoever wants to take that for the plaintiffs.

MR. WARREN:  Yes, Your Honor.  This is Andrew Warren.  So, the -- thee focus is really on the depositions of Mr. Jackson and Mr. Davis.  Mr. Jackson was the USAID's Acting Deputy Administrator.  Mr. Davis was, according to the

government, the functional head of the U.S. Digital Service, or U.S. DOGE Service. And so, as the Court's aware, I mean, there are really two issues today. One, the government asserts that these deponents are shielded by the Fourth Circuit decision that applies to three other individuals. And that we plaintiffs must seek the Court's permission to proceed.

Plaintiffs contend that the rules of procedure presume that the depositions can proceed and that defendants they should have to file a protective order to block it. The other issue that --

THE COURT: Uh-huh (affirmative).

MR. WARREN: -- plaintiffs noticed in the letter from earlier this week regarding discovery deficiencies and the improper assertions of privilege are both stand-alone issues to address, but we would -- we raise those with the Court in order to obtain permission to file motions to compel. But also because they -- they factor into the decisions about the depositions, because all of this has fallen under guidance from the Fourth Circuit.

So, I'm not sure at this point it would be productive to argue the merits of the discovery deficiencies as a privilege issue, but --

THE COURT: Uh-huh (affirmative).

MR. WARREN: -- I'm happy to walk through why the

defendants bear the burden of blocking the depositions that plaintiffs seek to take.

THE COURT:  Okay.  Why don't we start with that?

MR. WARREN:  Okay.  So -- and again, just a little bit of background, Mr. Jackson, I said, was the USAID's Acting Deputy Administrator, that was from approximately January 21st to February 3rd of 2025.  He then served as the Acting Deputy Administrator for Management and Resources.  He was involved -- and this is in broad strokes for the Court -- he was involved in and (indiscernible) authorized granting systems access to DOGE individuals.  He was involved in the decision to shut down USAID's website.  And Mr. Jackson was involved in the decision to fire the Director of Employee Relations after that employee alleged illegality with regard to placing approximately 57 employees on administrative leave.

Mr. Davis, as I mentioned, was identified as the functional head of DOGE.  He was the second-in-command after Musk, Mr. Musk, and he was involved in granting DOGE physical access to USAID's headquarters, including having threatened to call the U.S. Marshals if they were not allowed entrance into the building.

And so in terms of the -- the depositions -- and again, I'm focused on Mr. Jackson and Mr. Davis, because I believe that we can avoid taking Ms. Gleason's deposition

going forward based on conversations we've had with government counsel.

In -- in terms of the -- the apex issue, there are three reasons why the defendants bear the burden to prevent these depositions.  The first is that the rules of procedure say so.  The starting point is Rule 30, which allows a party to depose, quote, any person, end quote, without leave of Court.  And there are exceptions that don't apply here, but there's a clear presumption in the rules in favor of depositions occurring.  There's also a mechanism in the rules to prevent the deposition.  Rule 26(c) provides that a protective order can be obtained, and it contemplates the reasons under which it can be, including annoyance or undue burden, which is exactly the theory of the apex doctrine, that we don't annoy or burden the high-ranking officials with unnecessary depositions.

So the party seeking to block discovery bears the burden of showing the good cause.  And even if we were seeking to depose Secretary Rubio, for example, who sits at the top of the apex pyramid in this case, the proper procedure would be for the defendants to seek a protective order.

The second reason is that the Fourth Circuit ruling is limited on its face.  It applies only to the three people that were addressed in the decision.  The Fourth Circuit

blocked the depositions of Mr. Marocco, Mr. Lewin and Mr. Musk and only those three.  And blocking those three depositions does, of course, not automatically enjoin the discovery of any other person who the government gets to unilaterally determine to be in a similar position.  As this court's well aware, and as the Fourth Circuit made clear, apex protection is a fact-driven, witness-by-witness analysis.  It's not a blanket bar against all agency witnesses.  And here the Fourth Circuit order doesn't mention or extend to any other officials.  And it can't be read to preclude discovery that wasn't even contemplated at the time the Court made its ruling.

The Fourth Circuit order was on March 5th.  We identified Mr. Jackson, Mr. Davis on April 13th, a month later.  And so, the defendants bear the burden to show why these individuals shouldn't be deposed based on their individual positions, the particular burden to each of them, their lack of unique knowledge or the availability of other sources of information.

And the third point, Your Honor, is that the Fourth Circuit's opinion expressly contemplates other depositions.  The -- the panel opinion pointed out that the plaintiffs have not yet deposed other lower-ranking officials.  And the Court said that we need to pursue other avenues of discovery.  That's exactly what we're trying to do.  The defendants are

blocking our ability to do so in circumventing the standard procedure for doing so rather than moving for a protective order, just, again, unilaterally telling us you're not allowed to take these depositions. You need to go to the Court for permission.

So, it's now been five-and-a-half weeks since we proposed taking these depositions. On the schedule we proposed, they would have been completed last week. It's over a month later. Now we're still discussing a briefing schedule to decide the issue. Discovery needs to proceed without interruption so it can be finalized, the case can be resolved on the merits and the plaintiffs can obtain the relief they deserve.

So for today, Your Honor, the plaintiffs are asking the Court to determine that these two depositions of Mr. Davis and Mr. Jackson are not covered by the Fourth Circuit opinion, neither is anyone else, and that the defendants must obtain a protective order. And we would suggest that the Court deny the protective order. I'm happy to talk more about why we need to depose these two individuals. But ultimately, we're gonna kick them back to the Court after hopefully taking these two and seek relief to take the other three depositions so that we can complete discovery.

THE COURT: Well, I understand it, though. I mean, where do these folks fit in, in terms of are there

lower-ranking people with more -- the same information on the issues that you need to pursue in your view?  And maybe you can tell me what specific --

MR. WARREN:  There's not --

THE COURT:  -- ask him about that are relevant to the case and why no one else -- you've already gotten what you can from --

MR. WARREN:  Sure.  Of course, Your Honor.  So, I'll start with Mr. Jackson.  And as I said before, there were three major areas of his involvement, his decision to grant system access to DOGE to shut down the website and his involvement in retaliating or firing the director of employee relations.

Mr. Jackson's name has come up repeatedly throughout depositions that we've taken.  He's been identified by the defendants in written discovery.  We have talked to people -- his subordinates.  We've talked to his chief of --  talked to -- deposed chief of staff, various directors, people who were involved at the security level in terms of the access that was granted to DOGE.  We've talked to -- I say talked to, deposed, Your Honor.  Deposed one DOGE individual, and now we have a second set for -- in two weeks.

We've -- we've also conducted 30(b)(6) depositions where, again, Mr. Jackson's name came up repeatedly as someone who was involved in decisions regarding the

dismantling of USAID, and specifically decisions that the Court has asked about the shutting down of headquarters and the closing of the website.

Mr. Davis, by contrast, was not a USAID employee. He was a member of DOGE. He is known as Mr. Musk's right-hand man. Again, the government identified him as the functional head of the U.S. Digital Service, the U.S. DOGE Service. And there hasn't been as much information about Mr. Davis, though, he was present at USAID, physically present at USAID. As I mentioned, he was involved in the granting of physical access to DOGE employees at headquarters during the weekend, right before the -- the office was shut down.

But Mr. Davis's deposition is intended more because he is the subsidiary. He is the -- he reports to Mr. Musk. So we're following the Fourth Circuit's direction to see whether Mr. Musk would be a necessary deposition. He may not be if Mr. Davis is the one who is interacting with both USAID and DOGE individuals. But at this point, we don't know because we've been precluded from speaking with him.

THE COURT: Okay. So -- and maybe you can just briefly tell me what you were saying you believe is the connection between the deposition dispute and the other issues in ECF-221 about privilege and otherwise, you said they were overlapping. So, if you could just clarify that?

MR. WARREN: Of course, Your Honor. So, the Fourth

Circuit decision expressly mentions taking -- excuse me, seeking a motion to compel in order to exhaust avenues of discovery. The plaintiffs have submitted -- served interrogatories and requests for production on the defendants, and a lot of information has been produced. But there is a discrete number of deficiencies, in our opinion, in terms of their responses to certain interrogatories and their production of certain documents, as well as their invocation of privilege over certain issues.

We are trying to follow exactly what the Fourth Circuit prescribed to exhaust all avenues of discovery, including seeking a motion to compel. And we -- we recognize we likely won't be able to come back multiple times before this court or the Fourth Circuit to revisit the issue of the three apexed deponents. So we are trying to do everything we can to obtain exhaustive discovery prior to determining whether we need to re-seek, or we need to take those three depositions. So the failure of the government, in our mind, to 100 percent comply with its discovery obligations is obstructing our ability to exhaust those avenues of discovery.

THE COURT: Okay. So, Mr. Lynch or Mr. Siler, I mean, it seems to me that this is really two sides of the same coin. Both sides are saying the other side has to file a motion, but it's not really clear why. In the end, we end

14

up with some -- we're hearing from both sides, one, whatever you call the motion.  So I don't know why there's a real dispute over who goes first.  Either way, if there's a dispute, it needs to be sorted out, regardless of who files the motion.  So, is there -- I guess, do you agree that this is just something that the Court has to decide, and does it really matter what the procedure is to get there?

MR. SILER:  Yes, Your Honor.  This is Mr. Siler.  I think -- I mean, my position on what Mr. Warren just said is that it's materially different than what we conferred about.  We -- I -- I think the government's position is it doesn't really matter who makes the motion, but that the -- and -- and nobody is suggesting that the Fourth Circuit ruled about these particular deponents.

Our position is that Mr. Jackson holds functionally the same level that Mr. Lewin did, and therefore the logic of the Fourth Circuit order applies equally to him.  And that, similarly, Mr. Davis, as a White House official, is -- is within the logic of the Fourth Circuit's docket.  I note here parenthetically that we do not agree with the plaintiff's description of -- of Mr. Davis as Mr. Musk's number two in his position in government, but that's not really material, I think, for today's purposes.  I just note that there may be some disagreement about who's -- you know, the -- the -- the ordering of positions.

And because the logic of the Fourth Circuit's mandamus order applies, I mean, I'm just reading here from the Fourth Circuit's order to depose high-ranking government officials, plaintiffs must show extraordinary circumstances. And to show such extraordinary circumstances, plaintiffs must show that the high-ranking officials not only have firsthand knowledge that is relevant and material to plaintiffs' claims, but that they cannot be reasonably obtained from other sources or modes of discovery.

So, I think the government's position is that we don't much care if we have to file for a protective order or if they're -- the plaintiffs are -- are filing a motion for leave to take the depositions.  Our point is that it's plaintiffs' burden to show that they must -- that they need the depositions of high-ranking government officials and that we should have an opportunity to respond to their showing and to test whether they've met their burden.

Now, I know Your Honor has particular views.  Your Honor has explained throughout the course of this case about reply briefs.  So, our view is that it's more efficient for them, the plaintiffs that is, to make their showing of need for these -- these deponents.  And then we can respond to that.  And then, you know, the plaintiffs can have a reply or not.  They're free to argue that these individuals do not fit within the Fourth -- the logic of the Fourth Circuit's order

or if there are other reasons why they're not high-ranking government officials within the doctrine that the Fourth Circuit was talking about.  But we just think it's more efficient for them to go first and for us to respond to it.

Now, to -- to say that the government is the one that's been stringing this out, I think, is completely inaccurate.  They emailed us and said, hey, we want to take these two depositions.  And we said, well, we object to that on the basis of the Fourth Circuit's reasoning.  And then we had a call about it in which we said -- you know, I -- I -- I said to plaintiffs' counsel, you know, you can force us to make the protective order motion.  You can just serve us with a subpoena or serve the individuals with a subpoena and then notify us of that.  And then we'd have to go to court and -- and get a protective order on the basis of the Fourth Circuit's reasoning.

But instead, we suggest we just file a joint motion because it's more efficient, it's more collegial.  And they agreed to draft the letter, and they draft the -- they took the time they needed, which I think was a couple weeks to draft the letter, and then they filed it.  So I'm not sure what they're saying in the fact that the government is somehow blocking their ability to take these depositions or to move to take these depositions.  And I'll just pause there because I think that's what we have to say about those

depositions.

THE COURT:  So two questions.  I mean, you know, they describe Mr. Davis as someone who's the functional head of DOGE, and the other, Mr. Jackson, is assigned the duties of deputy administrator.  Am I correct that neither of those individuals were sort of formally appointed to either of those positions?  Is that correct or is that just incorrect the way it's written?

MR. SILER:  So, with -- with respect to Mr. Jackson, he was delegated the duties of Assistant to the Administrator of USAID, as Mr. Warren said, on -- on or about January 20th until on or about, you know, late -- late January or early February.  I don't -- I don't have the dates right in front of me.  And then at that point, Mr. Rubio was appointed the Acting Administrator of USAID, and shortly thereafter he appointed Mr. Marocco the Deputy Administrator of USAID.

At that point, Mr. -- I'm gonna compare him to Mr. Lewin because it's relevant for the reasoning of the Fourth Circuit's order.  Up to that point, Mr. Lewin had not been delegated the duties of Deputy Administrator.  And then in mid-March, Mr. Marocco left his position as Deputy Administrator of USAID, and Mr. -- Secretary Rubio delegated the duties of deputy administrator to both Mr. Lewin and Mr. Jackson.  Often USAID has two deputy administrators, and that

18

was the case after Mr. Marogo (sic) -- Mr. Marocco's duties ended for USAID.

That long-winded explanation, the purpose of it is because Mr. Jackson is exactly identically situated in the organizational chart as Mr. Lewin was.  And Mr. Lewin was obviously within the scope of the Fourth Circuit's order, and therefore we think the reasoning applies directly to him.

With respect to Mr. Davis, everything we had to say about him being a White House -- White House employee with respect to Mr. Musk is also true with respect to Mr. Davis. With the added, you know, and -- and he has the added --

THE COURT:  Well, what was --

MR. SILER:  -- point of being a functional head --

THE COURT:  What was Mr. Davis's title?

MR. SILER:  He was a political appointee in the U.S. DOGE service and was the highest-ranking political appointee of the U.S. --

THE COURT:  What's the title?  Everybody has a title.  Doesn't everyone have a title?

MR. SILER:  Yeah, I believe -- can't really be... I -- I -- to be honest, I'm not sure exactly what his title was, but his functional role at the U.S. DOGE service during that time was the functional head of DOGE because he was the highest-ranking --

THE COURT:  Oh.

MR. SILER:  -- political appointee in that office.

THE COURT:  He could have been a Schedule C.  I have no idea.  I mean, it's just -- maybe these are things that we can flesh out in a motion, I guess, but I'm just trying to get a preview.  Because -- I mean, is it your view, though, that -- I mean, as I look at it, I don't think the Fourth Circuit's ruling really explains or gives us criteria for high-ranking officials.  They just take the view that these three implicitly fall into that category.  Maybe I missed it.  But I looked at it again just now to see if I missed it.  And I didn't really see an explanation for what the standard is and, you know, a test that we can apply other than implicitly, as you said, maybe if they're kind of like these other guys, then they fall within it or not.

I also wasn't clear when you -- you were describing Mr. Jackson.  You said he got the position later that was comparable to Mr. Lewin, but were the -- were -- were the issues that Mr. Warren was talking about, did they predate that appointment or were they post-date that appointment?

MR. SILER:  So the issues that Mr. Warren was talking about was the first stint I mentioned earlier, which is when he was -- the formal title -- Mr. Jackson's formal title from -- in the January period, which is when the events Mr. Warren is talking about here occurred, was assistant to the administrator and he was there in that role performing

the duties of Deputy Administrator for Management and Resources because there was no one in that role at the time.

But my -- my point there was that at that time, which is -- is a period of time that's relevant to the plaintiffs' complaint, Mr. Lewin was not performing those -- those duties at all. He -- he gained that, the deputy administrator role in March of 2025, at the -- you know, coextensive and at the same time that Mr. Jackson was reappointed to those duties. And so they are completely overlapping in terms of their position. They were (indiscernible) with respect to those times.

So it -- it is true that -- that -- you know, his -- his -- he had different duties in January than March, Mr. Jackson did. That would not be dispositive because the Fourth Circuit has already held that Mr. Lewin, who had the duties at the different -- at the same time, you know, they made the ruling they made based on the record of Mr. Lewin's service.

THE COURT: So, is it your -- would you agree, though, that Mr. Davis -- I'm just trying to get the lay of the land here. Mr. Davis and Mr. Jackson are not as high level as Mr. Musk and Mr. Marocco, but that they, in your view, are comparable to Mr. Lewin? Is that the way to look at it?

MR. SILER: So, I -- I slightly disagree. Mr. Musk

and Mr. Davis, I believe, are similarly situated because they are both White House employees and they were at the -- sorry, Mr. Musk was a senior advisor to the president and -- and Mr. Davis was a functional head of a component of the executive office of the president.  So, they are slightly different --

THE COURT:  I'm still having trouble --

MR. SILER:  -- situated, but --

THE COURT:  I'm still having trouble, Mr. Siler, I'm still having trouble with this, and this maybe you can clarify this in the motion.  I mean, functional head is not a title.  I don't know what that is.  And -- and at some point I'm going to need to know what his position was.  I mean, there are people who were working --

MR. SILER:  So, I mean, we're happy to --

THE COURT:  -- time, and people are asked to do tasks all the time, but I've never read any of these cases that we've talked about, including the Fourth Circuit's opinion as -- as looking at just sort of informal concepts of what these people's roles are.  A lot of it is what their title is.  And so I think we're gonna need that at some point for these individuals.  And saying that he's the head of this -- you know, he's functionally this, or he was assigned duties of that, I also want to know what their actual position was, you know, in the Plum Book, under OPMs, you know, and under their SF-50s.  There's got to be something,

and I think we're gonna need --

MR. SILER:  Certainly.

THE COURT:  -- that information at some point. Maybe we don't have it right now, but we're gonna need that.

MR. SILER:  Your Honor, I'm happy to investigate that and -- and report back.  You know, obviously, we want to provide the information that the Court finds useful in this discussion.  But my point about Mr. Davis was also that as a White House employee, there are a heightened burden for the White House -- for discovery into the White House generally under the Cheney Doctrine.  And so regardless of its specific title, there are additional factors that face into that.

And then the second point I wanted to make, comparing Mr. Marocco to Mr. Lewin and Mr. Jackson, all of those individuals were delegated or performing the duties of deputy administrator to USAID, so they are all similarly situated.  It's just that when Mr. Marocco was in that -- was delegated those duties, he was a single person.  That position or those duties are sometimes divided between two people, and that's what occurred when Mr. Lewin and Mr. Jackson were co-serving in that role.  So our view is that all of those people are at the same level.

THE COURT:  Okay.  So, I guess I would say we will need something a little more formal on this.  And partly, again, understanding really what these individuals did,

perhaps with some backup from either side, not just sort of the way it's characterized orally, but do we have some position descriptions?  Do we have anything like that?  Or like I said, what does the SF-50 say?  What is this person's job, actually?  And then -- then I think -- I mean -- so I don't disagree with you, Mr. Warren, that ordinarily, even with this ruling, because it's not clearly about these three individuals, that the government probably needs to have a reason not to allow these individuals to -- or not to present these individuals for testimony so they could go first.

But I don't know if we're hung up on that but, I mean, Mr. Siler points out that if you go first, to the extent we're doing it in reply briefs, which we may or may not need, you would get the last word.  You also might be better positioned to explain why you need these individuals.  Because sometimes we're shooting in the dark when either of the other side says we don't need -- you know, this person, you know, is not necessary or this person has no information.  No reason why this person has the information of last resort.  Sometimes it's hard to understand what is the information you've been looking for.

So, while I agree with you that ordinarily the government should go first, do you -- do you prefer to go first or would you rather go second, even though as a matter of sort of practicality, there could be some (indiscernible)

the other way?

MR. WARREN:  Your Honor, we're happy to go first starting the opening brief.  The disagreement that we had, and this is why we agreed to bring it to the Court's attention jointly, was really more from the plaintiff's standpoint, the burden that's involved.  The plaintiffs do not have the burden of establishing a right to depose individuals who are relevant to the case.  It's the defendant's burden to establish that we do not have the right because of the presumptions that I discussed before in the rules of procedure.

So while we're happy to go first to explain why we think this is necessary, and we're -- we can also address, if the Court wants it, issues as to why these deponents are not covered by the Fourth Circuit's ruling.  But really the question was, we should be allowed to proceed unless the government is able to establish that we shouldn't be.  So now we've been able -- both sides have been able to raise the issue with the Court, and we're happy to do whatever the Court thinks is most expedient.

And again, we are -- we are fine to have the first and the last word on the issue.  We just want to, again, emphasize that the burden here is clear, and the government is trying to invert the burden by saying we have to establish our right to depose these individuals.  That's not how the

rules of discovery work.

THE COURT: Well, again, I think we're -- it's really semantics. I mean, I think -- I think you're right about that generally, but perhaps if they can show these are -- I -- whatever we want to call them, high-ranking officials for purposes of this apex rule and this Fourth Circuit ruling, then maybe you do have a burden at that point to show that there's no other way to get the information. So maybe it's moving around, and I'm sure both sides will apprise me of your view of the burdens.

But I think it's complicated, and every case is fact-specific. What I would say then is, I don't -- I'm not -- yeah, I understand where both sides are coming from. I do think it's clear the Fourth Circuit ruling does not control any other individual person or even position. It just doesn't broadly do that. For better or for worse, it doesn't seem to give a definition of who a high-ranking official is that we can easily apply. So I think it's more of a fact-based question of whether the situation we're dealing with now does fall within what they've said and that we should apply that standard or we should apply whatever was said in that case to this case.

But then again, even if these folks are, you know, high-ranking officials, as the Court said -- as the Circuit said, this other issue of whether you've exhausted all other

ways of getting the information, that's a fact-based question, which I'm sure is a moving target with every given day it's possible that the plaintiffs have -- will meet that standard.  Even if you would argue you don't need to meet that standard, it is something that probably does need to be laid out just so we have the full range of information in front of us.

So I would like to do this kind of quickly given Mr. Warren's point about delay.  What would be a reasonable briefing schedule?  When would -- well, Mr. Warren, if you're voluntary to lay out what you're looking for so that helps us understand the situation, you could go first.  But when would you want to do that?

MR. WARREN:  Your Honor, we could probably do that given the holiday weekend coming up by next week.  I would note that specifically with regard to Mr. Davis's deposition, we have a deposition scheduled on June 2nd of Mr. Luke Farritor, who is a DOGE employee, and we anticipate that shedding additional light on Mr. Davis's role.  So --

THE COURT:  Uh-huh (affirmative).

MR. WARREN:  -- as long as I think the Court has a chance to hear from us after Mr. Farritor's deposition to be able to provide more information to the Court that would be helpful.  I would note -- echo what the Court said about, you know, it's a bit of a moving target when the Fourth Circuit

has said we need to exhaust all avenues of discovery without providing any direction as to what that means when we are limited by the number of interrogatories and number of depositions. And, of course, the Court granted us leave to take additional depositions.

But Mr. Farritor's deposition on the 2nd will be our tenth. We have leave to take 15. So right now, if we had permission from the Court to take these two plus the additional three apex, we would be exhausting our 15 depositions. So, again, it's a bit of a moving target. Yes, we could always take depositions of 20 other people. I'm not sure that it gets us any closer to the information that we need from the individuals who actually have it.

THE COURT: Well, I mean, we've made rulings already. You can always ask for more later. I mean, it's not lost on me that if they're standing -- I mean, if they're standing on the view that these individuals are so important that they can't be deposed and they need to invoke this doctrine, then, you know, if the Fourth Circuit says you need to exhaust all avenues, I think you need to exhaust all avenues.

And I think, you know, it's their choice as to whether they want to have one of these people clear it all up or they want to have you depose another four or five people just to get to the point of possibly doing that. It doesn't

seem particularly efficient to me.  But if that's the government's position, then I think that's the natural consequence of that.  So -- but right now --

MR. SILER:  Your Honor, may I be heard just for a moment on that?

THE COURT:  Well, let's just finish the schedule first.  We can talk about that later.  But when are you -- so what was the date you were proposing, Mr. Warren?

MR. WARREN:  Your Honor, about a week from today.

THE COURT:  So, May 28th?  Okay.

And then what a week be enough time to respond, Mr. Siler?  That would -- again, we want to keep this moving -- well, the discovery dispute, which it is rather than sort of a full blown, you know, substantive motion and issue.  So, June 4th?

MR. SILER:  Yes, Your Honor.  I believe that would be fine.  Yes.

THE COURT:  And then do you want to do a reply brief?  You don't have to, Mr. Warren.  And if so -- again, we can make it a week, or if you want to do it sooner to move this along, you can do that.  But maybe we should just give you a week just in case you need it.

MR. WARREN:  Yes, Your Honor.  I think we would appreciate a reply, if only to be able to update the Court as to Mr. Farritor's deposition on the 2nd.

THE COURT:  That's June 10th -- sorry June -- June 11th, I believe.  And I guess what I'm wondering is while we're doing this, not that I necessarily want to brief everything in sight, but are there other issues since we've got this other letter that we should deal with at the same time, rather than having a, you know, series of things.  Are any of these things that we can sort out verbally now?

MR. WARREN:  Hi, Your Honor.  This is Mr. Warren. I -- you know, the parties have done a reasonably good job, I think, of sorting out discovery issues the best we can. There just remain a handful of discrete issues.  Both with regard to written discovery responses, document productions and assertions of privilege that despite multiple meet and confers and identifying issues in writing and discussing them orally.  Well, we appear to be at an impasse and, I mean, I'll -- I'll let my friend Mr. Siler comments as well, but I believe that we're at the point where we probably just need to move to compel because I'm not sure we're going to be able to resolve the relatively few remaining issues.

THE COURT:  Well, if there's -- some of these are about privilege I'm -- and I think you mentioned there's -- there is a privilege log, but then you say there's some things not included there.  You know, if you're gonna tee these issues up, you'd obviously need to have some information about what you're dealing with and presumably

that would be in the privilege log.  And ideally, you can do this as sort of a single request, even if it has multiple parts so that the parties can kind of focus their attention on it together all at the same time.  Are -- so, I mean, it sounds like --

MR. WARREN:  Well, I think -- I think Your Honor hit the nail on its head, but -- I'm sorry, Your Honor.  I did not mean to interrupt.  I was saying, I -- I think Your Honor hit the nail on its head with regard to the privilege log, it's in part plaintiffs are at a disadvantage where we cannot even challenge the assertion of privilege because we're lacking a lot of information.

Now, again, the assertions of privilege are largely limited to documents.  The protocol that the parties put in place has been followed with depositions, and it's been invoked in two depositions.  And in one of them, the government went back, reviewed the answers that were provided ex parte and determined that they were not going to continue asserting privilege.  And they're in the process of doing that for a second deposition where that occurred.

There were one or two depositions that occurred prior to that protocol being in place where I think the parties could still engage and potentially resolve those issues.  But there are going to be some documents over which the government has asserted privilege and not provided us the

information we need to be able to challenge it.  So, if the Court's suggesting that the government now produce a privilege log that includes what it's required to that may obviate the need for a motion to compel, because we'll be able to assess the privilege at that point.

THE COURT:  So, Mr. Siler, I mean, it sounds like there already is a privilege log, right?  I mean, you must disagree with how much is in there, but what is the state of that?  Is there enough there for someone to determine what the basis is and if they want to file a motion --

MR. SILER:  Your Honor, this is (audio distortion).  Your Honor, this is Mr. Siler.  I'm not quite sure to be honest sitting here today which documents Mr. Warren believes he needs more information about.  I mean, I think it's fair to say we've had an iterative process.  We produced the log.  They identified some documents they needed some more information about.  We provided some additional information, including the redacted materials that they had questions about and provided additional information.  And since we provided that additional information, I just don't believe Mr. Warren or the plaintiffs have said that that was insufficient to determine whether they wanted to challenge it or not in terms of the privilege log.

If there are additional information that they feel they need, I mean, our offer has always been, let us know,

and we can -- we can try to provide that information.  And if ultimately they decide they want to challenge it that's fine.  That's their right.  But I -- so I'm -- I'm not sure what specific document they're referring to, but we have -- there has been a process back and forth where we, you know, included information in the logs, they wanted more information.  We got specific documents and we gave it to them.

(Whereupon, there was a brief pause.)

THE COURT:  Okay.

MR. WARREN:  Your Honor, this is...

(Whereupon, there was a brief pause.)

THE COURT:  Go ahead, Mr. Warren.

MR. WARREN:  I'm sorry.  Thank you, sir.  The parties can with the Courts direction can certainly continue to try to resolve some of the privilege issues.  One issue that doesn't appear to be likely to be resolved, for example, is with regard to the assertion of deliberative process privilege, it's the plaintiffs' position that the government needs to (indiscernible) specificity a declaration from the agency had to invoke that privilege.  And they say that they don't need to until we file a motion to compel.

And it's just -- and this is not a procedural dispute, this is we don't now have the information to know, to be able to challenge the privilege without seeing exactly

what the assertion is.  Who's making it?  What the decision was, whether it was pre -- whether it was deliberational, pre decisional, et cetera.  And so there are some issues where we think this is just going to come to a need for court intervention on it, which is why we raised it so that we have leave to file a motion to compel.  And with that permission, we would narrow the issues down as much as we can before actually filing it.

But this has been an iterative process as Mr. Siler said, we're just at the point where we've seen that we're not going to be able to resolve all of the issues.

THE COURT:  Okay.

MR. SILER:  Your Honor --

THE COURT:  So you --

MR. SILER:  -- this is Mr. Siler.  May I -- may I just say one point?

THE COURT:  Go ahead.

MR. SILER:  Yeah.  I -- I mean, my understanding of the local rules in this court's scheduling order is that they don't need leave to make a motion to compel.  That's the process that largely plays out outside the presence of the Court.  That's served and then responded to, and then there's an additional conferral after all the briefs are written.  So, it's not clear to me why they haven't followed those procedures under the local rules.

THE COURT:  Well --

MR. SILER:  They -- they have not --

THE COURT:  -- you can follow those procedures. You can follow those -- just to clarify, you can follow -- I think everyone's right.  I mean, you can follow all those procedures.  And you need to follow those procedures, but the hoop that Mr. Warren seems to be citing is the case management order requirement, which does not exempt discovery motions from the notice process, which you've done now, because we have this Notice of ECF-221, so that's been done.

And so, I understand that's what's going on here. And so, yeah.  If it comes -- if all the other local rule steps are completed, then you can file the motion.  I would just ask the parties do a couple of things before that, in addition to those steps.  One is, let's make sure that privilege log is as fulsome as possible.  It's really not in anyone's interest to have motions be filed on things that are clearly privileged if the issue is just there was just no way of knowing that.

And sometimes you can cut off the motion or make it easily resolved if the privilege log is more clear than perhaps at least one side thinks it is.  I don't know if it's -- how good it is right now.  I don't have it, but it's helpful to have that up front.  And then, as you said, have these discussions, follow the various steps in the local

35

rules, and then if the motion needs to be filed, it can be. But hopefully, as both sides (indiscernible) as narrow as possible.

And then I would also note, again, we just sort of have this unusual quirk in this case of this mandate that -- well, not mandate, but the requirement that, you know, all information be obtained, including through motions to compel before we -- you know, before the plaintiffs would even have an opportunity -- potential opportunity to depose these other individuals.  They say some of these key questions have yet to be answered, so presumably the more information that can be provided through documents and otherwise, the less likely that we get to that point of needs to depose these individuals.

But if, you know, things are either with help based on privilege and not challenge, or whether they are the privileges invoked and upheld by the Court in a ruling that's just information that's not available to anybody.  And so then that means maybe we do have no alternative, but to go to these witnesses.

And so, not sure that everyone's interest is to dig in on everything.  I think both sides should be flexible. And figure out what was practical in terms of not giving up legal protections that need to be protected, but also getting us to a place where we can just get the information that's

needed within the least intrusive way possible.  Let's see where we go.  Oh, yeah, the clarification --

MR. SILER:  Your Honor?

THE COURT:  -- notice has been provided, so that's not an impediment, but there are other steps that may not have been provided yet -- completed yet because the (indiscernible).  Sorry, was that Mr. Siler?

MR. SILER:  Your Honor, may -- yeah, it was, Your Honor.

THE COURT:  Yeah.

MR. SILER:  This is Mr. Siler.  I think we agree with just about everything you just said.  And I would just clarify that, you know, in this informal negotiation process, the government has gone back in certain instances and released information that it had a claim of privilege over and determined that it didn't need to be (indiscernible).

THE COURT:  Uh-huh (affirmative).

MR. SILER:  So we are -- we are going through that process.

THE COURT:  Uh-huh (affirmative).

MR. SILER:  Mr. Warren --

THE COURT:  Uh-huh (affirmative).

MR. SILER:  As Mr. Warren described earlier in this very hearing, there's been a number of depositions that touch upon these areas that Mr. Warren is saying haven't been

answered.  And it's not clear at this point -- I mean, one of the reasons we want to be able to respond to the record is to say, you actually have all the information that you're looking for, and you're just assuming that deposing Mr. Musk or some of these other people would give you additional information, but it's not clear that's the case.

You know, they can always say, well, this person was involved and therefore he's going to have more information, but that can't be the test under the Fourth Circuit's ruling.  And we can -- we can expand upon that in the briefing, which I don't want to waste Your Honor's time now.  But I -- I -- I just think that that is an important factor, given the amount of discovery that has already occurred in the number of depositions that have occurred.

THE COURT:  No, and I agree that not every document's gonna be relevant to the issues and so forth.  I -- I did -- I do wonder though, I mean, I would have a hard time concluding that all information that's available has been provided if some of these key questions have never been answered, I mean, who made these decisions about shutting down the website about closing down the headquarters. Someone made those decisions, and that's a fact that's knowable and known to some.  And to say that that's just -- can never be known.  I -- I don't think that's accurate. Maybe the only --

38

MR. SILER:  Your Honor?

THE COURT:  -- (indiscernible) we're talking about. But the easier way to solve this problem would be to get that information from somewhere else and then we don't worry about these things.  And so, if that's available and provided and that'll make it a lot easier.  If it's not, I don't think the answer is well, you know, no information has come out so far, so I guess it would -- it's just not a fact that exists because those are facts that exist.  It's just a matter of finding out what the information is and what the source is.

Sorry, what was that?

MR. SILER:  Your Honor, this is Mr. Siler.  I mean, that's exactly my point is that a lot of these -- we just don't agree that they don't have answers to some of these questions.  I think it's fair to say they don't like the answers and they assume there must be additional answers. But again, we can --

THE COURT:  Okay.

MR. SILER:  -- we can litigate that.  That's the thing we can litigate.

MR. WARREN:  Uh-huh (affirmative).

THE COURT:  Okay.

MR. SILER:  Or -- or -- or we can talk -- or we can talk about it -- sorry.  I'm sorry.  I'll stop.

THE COURT:  That's all right.

MR. SILER:  Oh, I -- I was just gonna say, or those are things we can talk about to the extent that we -- you know, if we get a specific request for more information about this decision or that decision.  I'm not saying that the ones Your Honor has just identified are exactly those, or we -- you know, we can go back and get additional information.  And we are doing that with respect to, you know, requests that, you know, we're answering interrogatories, we're constantly revisiting those answers, including conferring with the plaintiffs and we're getting them additional information on many questions that they've asked, you know, up to this week or last week about some of the things that are referenced in this letter, so I think that process is playing out.

THE COURT:  Okay.  Okay.  So what I think we should do is we have a schedule for the motion regarding the witnesses.  And I use that term sort of as a made up term, because I don't know if it's a protective order motion or motion to compel.  They're really two sides of the same coin, so I don't think we should be hung up on the niceties of title.  We have a schedule for that.  We can issue more with those dates.  That will address these witnesses.

Right now we don't have a motion schedule or necessarily a certain need for one to compel documents.  But as I've noted, I mean, we don't need to go through another conference on that if we don't need to.  If you think it

would be helpful to have another conference on something very specific, rather than having a motion, we can do that. But there's no procedural requirement to do that. I would just again, ask you to take another stab at a more fulsome privilege log to the extent that that's been a concern for one side, maybe it's totally fine. I'm not saying that it isn't. But if it's a way to bridge the gap.

And then also more discussions following the (indiscernible) steps in terms of laying out what the motions would say and so forth. And then if there's something narrow that needs to be addressed we can -- we can handle that. And what I would suggest then, since we're not gonna have another conference on it necessarily, I would ask if -- if a motion's filed that every -- that as part of that, everyone agree on a briefing schedule time line wise. So that we don't slow things down. And if it's -- ideally, it's not two weeks in between. It's a tighter time line like, we're talking about here with a week or something like that. Any questions about that, or anything else to discuss today?

MR. SILER: Your Honor, this is Mr. Siler. I -- I think the parties are well within their cooperation to be able to agree to something like that. I -- I don't foresee a problem with that.

THE COURT: Okay. Good.

Mr. Warren, anything?

MR. WARREN: Your Honor --

MS. RUBIN: Your Honor, this is --

MR. WARREN: -- I --

MS. RUBIN: Oh. Go ahead, Andrew.

MR. WARREN: No, go ahead.

MS. RUBIN: This is Nicole Rubin for the plaintiffs. In terms of the briefing schedule for the depositions, Plaintiffs will be going first as we've decided, my one concern is that as to Mr. Davis, we will be briefing as though his position is the functional head of DOGE because that is the response we got when we asked what his position was in written discovery. And so, if that's not going to satisfy the Court in terms of what we are actually briefing, we would ask that defendants inform us of what his actual position was so that we're just not wasting time in that opening brief talking about a functional position.

THE COURT: Well, again, I think you -- we'd end up talking about the functional position as well because there's an element that is what the (indiscernible) -- my point is just that there's got to be a formal position that this person had that -- to help inform where they fit into the overall chain, regardless of what their function was at a certain point in time. That is information I think would be very helpful to have.

So, you're right. I mean, if you're going first

you won't have that information.  You may have it in response -- it's something you can talk about in the reply brief.  It does seem as if the government can get that information in advance of the deadline it can -- could streamline the process.

Is that something you can arrange, Mr. Siler, for both Mr. Davis and Mr. Jackson?

MR. SILER:  Well, Your Honor, Mr. Davis is a -- his official title is Senior Advisor at USAID, just a political appointment.  Mr. Davis --

THE COURT:  (Indiscernible.)

MR. SILER:  -- (indiscernible) the White House.

THE COURT:  (Indiscernible.)  I'm sorry.  Mr. Davis --

MR. SILER:  Yeah, that was his official title.

THE COURT:  Senior Advisor at USAID?

MR. SILER:  Yeah, that was his official title.  Yes.

THE COURT:  Mr. Jackson?

MR. SILER:  Yes.  With respect to Mr. Davis, I mean, we'd have to go back to the White House on that and I hesitate to commit to a specific time when we're involving the White House with anything, but we will promptly request that information.

THE COURT:  So, Mr. Jackson with a senior advisor

to who?

MR. SILER:  The administrator, I believe.

THE COURT:  At USAID.  But this is all from -- I don't know the exact time period, but I'm guessing it's somewhere between January '25 and let's say, April 2025, through that whole time period?

MR. SILER:  Your Honor, he remains a Senior Advisor at USAID.

THE COURT:  Okay.

MR. SILER:  That is his current title as well.

THE COURT:  Okay.  And then Mr. Davis, you'll check on that.  I mean, again, do what you can.  I think it's just more efficient if we have that going into the first brief. If we don't, then definitely by the time you file your brief, in which case, you know, they can respond to that.  It's not perfect.  I don't want to slow things down over that, but the sooner you can get that information, the better I think.

And so is that okay with everyone?  Any issues with that?

MR. SILER:  (Indiscernible.)

MR. WARREN:  Your Honor, this is Mr. Warren.  I -- no -- no issues from the plaintiffs.  I -- I would note, Your Honor, I -- I don't want to belabor the point, but Mr. Siler's answers to the Court today are illustrating the moving target, not just in terms of the Fourth Circuit

target, but the answers we're being provided in discovery.

Mr. Siler initially said -- affirmed what I had said about Mr. Jackson that he was the deputy administrator and the Deputy Administrator for Management Resources. Now he's saying he's a senior advisor. The answer to the interrogatory that we included in filing 221, the May 18th letter, goes exactly to a point that the Court asked about and referenced in its orders regarding the preliminary -- preliminary injunction in the motion to dismiss about who made the decision to shut down the website.

We asked specifically who made the decision. The answer we're given is Mr. Kliger effectuated the changes in consultation with Mr. Jackson, who is performing the duties of this position. It's that ambiguity and uncertainty that's presenting another moving target for us to hit while establishing that we've done everything we can to satisfy discovery and get the answers we need.

It's not that we don't like the answers we're being given. It's that the answers -- we don't trust the answers we're being given because they keep changing.

THE COURT: Well, that sounds like an answer that didn't answer the question. That's what it sounds like. Again, assuming that's what it says. I mean, the issue is not -- who made the decision not to effectuated it. So, I don't disagree with you on that. But, you know, things have

45

a way of hopefully sorting themselves out, particularly if it's in a motion usually things get tightened up.  So hopefully that'll happen.  Maybe it's better for everyone to have those things happen before we get to a motion.  That's usually the way to go.  And sometimes the information, you know, as counsel, and you go to a client, you get one answer and it's good enough and if no one objects to it, then why not go with it?  But sometimes as counsel you gotta dig a little further to get an answer that actually answers the question.  I'm sure everyone will try to do that, so...

Okay.  Anything else from either side?

MR. WARREN:  Nothing from the plaintiffs, Your Honor.

MR. SILER:  Nothing from the government, Your Honor.

THE COURT:  Okay.  Thank you.  Good luck.  We'll look forward to getting the briefs on this.  Thank you.

MR. WARREN:  Thank you.

MR. SILER:  Thank you.

(Whereupon, at 4:25:51 p.m., the hearing concluded.)

C E R T I F I C A T E

I certify that the foregoing is correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____
Shawna Pittsley, Transcriber
Willow Transcription