## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 4, *et al.*, *individually and on behalf of all others similarly situated*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>U.S. DOGE SERVICE, *et al.*,<br><br>    *Defendants*. | Case No. 8:25-cv-00462-TDC |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION TO COMPEL

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

ARGUMENT ..................................................................................................................... 4

I.      PLAINTIFFS' MOTION IS UNTIMELY ........................................................... 4

II.    THE CHALLENGED INTERROGATORY RESPONSES ANSWER THE
QUESTIONS POSED, WHICH ARE IN ANY CASE IRRELEVANT AND
IMMATERIAL ...................................................................................................... 8

        A.      The State Department's Responses Adequately Answered Plaintiffs'
Interrogatories as of November 12, 2025 ................................................. 9

        B.      Defendants' Subsequent Discovery Addresses Plaintiffs' Motion ......................... 10

        C.      The Challenged Interrogatories Are Irrelevant and Immaterial to Plaintiffs'
Claims ...................................................................................... 14

III.   THE STATE DEPARTMENT PROPERLY APPLIED THE DELIBERATIVE
PROCESS PRIVILEGE TO REDACT PORTIONS OF TWO EMAILS ........................ 16

        A.      Defendants Have Properly Invoked the Deliberative Process Privilege ............... 18

        B.      The Redacted Content Was Properly Withheld ....................................... 20

        C.      Plaintiffs' Asserted Need Does Not Overcome the Government's Privilege ........ 21

IV.   THE FEBRUARY 1 EMAIL WAS PROPERLY REDACTED TO PROTECT
PRESIDENTIAL COMMUNICATIONS ............................................................... 26

CONCLUSION ................................................................................................................. 30

**INTRODUCTION**

After over eight months of erroneously suggesting to the Court—without support—that the government was not participating in discovery, Plaintiffs now assert that only five interrogatory responses (out of dozens) are incomplete and two pages (out of nearly ten thousand) contain improper privilege redactions. The Court should not reach those arguments, however, because they come far too late. The five interrogatory responses Plaintiffs here challenge were served and have not changed since November 12, 2025, and the bases for Defendants' redactions to the two pages were conveyed to Plaintiffs on April 27, 2026. Yet Plaintiffs waited 252 and 86 days, respectively, to file their motion to compel, far after the deadline provided by this Court's local rules.

Plaintiffs' motion is as meritless as it is untimely. In response to each of the challenged interrogatory responses the State Department answered to the best of its then-current knowledge by identifying the agency personnel formally responsible for making each cited decision. And there has been extensive subsequent discovery on each of those decisions that further clarifies (and supports) the State Department's initial responses. Plaintiffs now assert that they intended to ask not about who *made* certain cited decisions related to the United States Agency for International Development ("USAID"), but who *induced* or *influenced* the agency to make the decision. But even if that question were not likely privileged, it is not the one Plaintiffs asked.

Plaintiffs are similarly wrong to assert that the two documents that are the subject of their motion were improperly redacted. Those redactions protected deliberative recommendations within the Executive Branch and descriptions of confidential communications between the President and his closest advisors. Plaintiffs' arguments about what the redacted portions of those emails would reveal rely on unsupported speculation and conjecture. There is no basis to override Defendants' proper invocation of governmental privileges.

Plaintiffs' motion should be denied.

**STATEMENT OF FACTS**

On October 7, 2025, Plaintiffs served the State Department with 19 interrogatories and six requests for production. *See* Ex. 1 (Pls' First Set of Interrogatories to Defs. U.S. Dep't of State and Marco Rubio). After obtaining a one-week extension, ECF No. 176, the State Department responded to both sets of requests on November 12, 2025. Ex. 2 (Defs.' Objs. & Resps. to Pls.' First Set of Interrogs. to Defs. U.S. Dep't of State & Marco Rubio). The last of State Department's rolling production of documents responsive to those requests was completed on March 20.[1]

Plaintiffs' motion challenges the State Department's responses to five of those interrogatories and its redactions to portions of two documents based on the deliberative process and presidential communications privileges. The five interrogatories all request that the State Department identify the person who made the decision for USAID to take certain actions, when the decisions were made, and how the decisions were "memorialized and communicated to those responsible for implementation." *See* Ex. 2 at 5–9. Those five actions are: (1) the decision to make changes to USAID's website "on or about February 1, 2025"; (2) the decision "to place approximately 57 USAID employees on administrative leave on or about February 1, 2025"; (3) "the decision for U.S. Customs and Border Protection to take control of USAID headquarters . . . on or about February 7, 2025"; (4) the decision to have certain persons Plaintiffs associate with "DOGE" "arrive at USAID headquarters between on or about January 27 and February 1, 2025"; and (5) the decision to give those same personnel "access to USAID data systems between on or about January 20 and March 31, 2025." *Id.*

---

[1] Plaintiffs assert that Defendants' "rolling productions" continue "to date." Pls.' Mot. to Compel at 5, ECF No. 238 ("Mot."). Defendants' continuing ongoing rolling productions relate to requests for production that post-date the requests at issue in this motion.

2

The State Department timely responded to each interrogatory "to the best of" its "knowledge." Ex. 2 at 21. Initially, Defendants objected to Plaintiffs' definition of "decision" as "vague and ambiguous" and beyond the obligations of the Federal Rules of Civil Procedure to the extent it generally referred to a "course of action the specifics of which can be determined later." *Id.* at 2. The State Department thus informed Plaintiffs that it would respond to the interrogatories by "identify[ing] specific decisions to formally approve the Defendant agency to take any specific actions." *Id.*; *see also* Ex. 1 at 3 (instructing the responding party to "set forth [any] matter deemed ambiguous and the construction used in answering").

Applying that construction, the State Department responded with the identity of each decision-maker and the available information about when the decision was made and how it was communicated. Specifically, the State Department explained that (1) the website decision was made by "USAID leadership"; (2) "Kenneth Jackson, then performing the duties of Assistant to the Administrator for Management and Resources" was "the individual who formally approved the placement of approximately 57 USAID employees" from the USAID "Bureau of Legislative and Public Affairs on January 31, 2025"; (3) the building decisions were made by the U.S. General Services Administration ("GSA"), who notified USAID of the lease termination on February 7, 2025; (4) physical access was authorized by then Acting Administrator Jason Gray; and (5) logical access to USAID data systems was approved by Jason Gray and Kenneth Jackson. Ex. 2 at 5–9. Where appropriate, the State Department also cited relevant documents communicating or memorializing those decisions that were available as of the date of the response. *See id.*

Since the interrogatory responses were served, the State Department (and other Defendants) have continued to make rolling productions of relevant and responsive materials, some of which relate to the cited decisions. Included in those productions are two emails, Bates-

3

numbered DOE4vUSDS_009108 ("January 31 email") and DOE4vUSDS_009109 ("February 1 email"), which the State Department redacted to withhold material protected by the deliberative process and presidential communications privileges. *See* Ex. 3, Ex. 5. Specifically, the January 31 email has been redacted to withhold a summary of "a deliberative conversation between" Michael Needham, a high-ranking State official, and Steven Davis, a Senior Advisor in EOP, "about the proposed timing of finalizing decisions, policies, and or announcements to be made by Secretary Rubio related to USAID." Ex. 4 at 3 (Defs.' Privilege Log). The February 1 email has been redacted to withhold a description of "presidential communications reportedly made by the President of the United States to . . . high-ranking White House advisors within the Executive Office of the President." Ex. 7 ¶ 7. Those redactions also protect pre-decisional and deliberative information about proposed implementation of planned personnel actions. *See* Ex. 4 at 3.

**ARGUMENT**

## I.    PLAINTIFFS' MOTION IS UNTIMELY

The motion to compel should be denied because it is untimely. Local Rule 104.8.a provides that when "a party who has propounded interrogatories . . . is dissatisfied with the response to them and has been unable to resolve informally . . . any disputes with the responding party, that party shall serve a motion to compel within thirty (30) days of the party's receipt of the response." "[F]ailure to do so may result in a determination by the Court that the dispute must be rejected as untimely." Guideline 1(f), Appendix A, Local Rules. The State Department served the five interrogatory responses with which Plaintiffs are dissatisfied on November 12, 2025. Ex. 2 at 19. The two redacted documents that are the subject of Plaintiffs' motion were served on March 20, 2026, and Defendants provided the bases for the contested withholdings on April 27, 2026. *See* Ex. 8. Plaintiffs have not explained why they waited 252 and 86 days, respectively, to seek relief from the Court.

4

There is no legitimate explanation for Plaintiffs' delay. Take the challenged interrogatory responses. Plaintiffs first asserted these same responses were not "adequate" in a Case Management Conference on November 19, 2025—one week after they were served. Ex. 9 (Hr'g Tr. at 10:14 (Nov. 19, 2025)). This Court advised Plaintiffs that the local rules provide "processes that the parties should go through" to resolve discovery disputes. *Id.* at 12:18–19. Plaintiffs did not avail themselves of those processes at that time (which, per the Local Rules, was the time to do so). Instead, a week later, Plaintiffs asserted in a brief that Defendants had not provided "adequate interrogatory responses," ECF No. 190 at 5, but did not provide the responses themselves or indeed any citation or support for that assertion.[2] On March 4, 2026, the Fourth Circuit cited the availability of a motion to compel "if" the government's written discovery responses were inadequate as an available alternative to depositions of high-level government personnel. *In re Musk*, 169 F.4th 445, 449 (4th Cir. 2026). The Fourth Circuit was clear, however, that it was not addressing the question of the adequacy of the government's responses. *Id.* at 449; *contra* Mot. at 2 (wrongly intimating that the Fourth Circuit opined on the adequacy of the responses). Rather than take the Fourth Circuit's instruction (itself more than three months after this Court's invitation for Plaintiffs to do the same), Plaintiffs waited another two months and then instead sought to depose two *other* high-ranking government officials before seeking relief for the supposedly deficient responses. *See* ECF Nos. 219, 226 (motion for leave to depose Steven Davis and Kenneth Jackson). Similarly, a motion to compel complete versions of the two documents redacted for

---

[2] Plaintiffs cite this Court's statement in denying Defendants' motion for a protective order that the government had "not responded adequately or at all" to certain interrogatories. *E.g.,* Mot. at 2 (quotation omitted). Respectfully, the record before the Court at that time does not support the cited statement. At that point, Plaintiffs had not included the government's responses in the record available to the Court. It is unclear how this statement, in the context it was made and given the subsequent history of the order discussed below, could support Plaintiffs' contentions in this brief.

5

privilege became ripe on April 27, 2026, at the latest, after Defendants produced its basis for withholding portions of those pages. Ex. 8. Even after the Court granted leave to file the instant motion, however, Plaintiffs waited an *additional* two months—61 days—to file their motion. *See* ECF No. 223 (Order dated May 22, 2026).

Plaintiffs do not even attempt to argue that there is any good cause for their delay. They instead mention in passing (in a footnote in their background section, no less) that the motion is timely because of "the parties' continued conferral to narrow the issues" and this Court's order granting leave to file the motion. Mot. at 6 n.1. Plaintiffs provide no support for their view that continuing to confer on a motion somehow extends the deadline for pursuing their rights. The government, moreover, has not changed its position on any of the challenged interrogatories since they were served in November 2025. And the Court's order granting leave to file Plaintiffs' motion similarly did not purport to resolve any argument Defendants could raise in opposition, including timeliness. Regardless, even if this Court's order granting leave to file the motion were the date Plaintiffs' motion became ripe, it is *still* untimely because the motion was filed 61 days later.

Courts in this district routinely deny motions to compel that are far less untimely than the one at issue here. *See, e.g.*, *Schaeffer v. Balt. City Fire Dep't*, No. 1:22-cv-01539, 2023 WL 8478905, at *2 (D. Md. Dec. 7, 2023) (denying motion to compel filed 71 days after most recent supplementation of response); *Induction Therapies, LLC v. Ingenes, LLC*, No. DKC-21-0604, 2023 WL 3848370, at *2 (D. Md. Mar. 21, 2023) ("Given that Induction knew about Defendants' deficient discovery responses long before the discovery deadline, the Court finds that the motion to compel must be denied as untimely."); *Webb v. Green Tree Servicing LLC*, No. ELH-11-2105, 2012 WL 3139551, at *1 (D. Md. July 27, 2012) (denying motion to compel filed "well beyond the thirty day deadline" and near the end of discovery period); *Awah v. Commonwealth Fin. Sys.*,

6

Civ. A. No. DKC 13-0707, 2013 WL 6490324, at *1 (D. Md. Dec. 9, 2013) (denying motion to compel as untimely because it was filed 47 days after the responses were served).

During conferral in advance of their motion, Plaintiffs took the position that Local Rule 104.8.a is not "an absolute rule" requiring denial of a motion to compel. *Tucker v. Ohtsu Tire & Rubber Co.*, 191 F.R.D. 495, 497 (D. Md. 2000). Fair enough, though *Tucker* involved a motion to compel that was less late than Plaintiffs'. *See id.* at 497 n.1 (noting that the motion to compel was filed "more than 40 days late"). A plaintiff's delay surely becomes at least presumptively unreasonable somewhere between 70 and 252 days after service of the responses. Yet Plaintiffs here provide *no* cause—let alone any *good* cause—to explain their delay.

If anything more is required, Plaintiffs' delay in pursuing its position with the Court has prejudicially affected scheduling in this case. The original deadline for the completion of discovery was January 16, 2026—well after the interrogatory responses that are the subject of Plaintiffs' motion. *See* ECF No. 193. That deadline has now been extended three times, including once over Defendants' objection. *See* ECF Nos. 193, 215, 237. The most recent extension was limited to three specified categories of discovery. *See* ECF No. 237. "If, however, this Court ordered" Defendants to supplement their responses and produce additional documents, "discovery would effectively be re-opened" for all purposes. *Blind Indus. & Servs. of Md. v. Route 40 Paintball Park*, No. WMN–11–3562, 2012 WL 4470273, at *2 (D. Md. Sep. 26, 2012). Plaintiffs would then undoubtedly "wish to explore new information received" (if any) and "seek[] additional extended discovery." *Id.* "For reasons unknown, Plaintiffs chose to sit on this issue until there were only a few weeks left after briefing until the close of discovery." *See Jonathan R. v. Justice*, No. 3:19-cv-00710, 2024 WL 3401735, at *3 (S.D. W.Va. July 12, 2024). That delay "must be attributed to them" even in the absence of any bad faith. *Id.*

7

Beyond the cascading effect of the untimeliness of Plaintiffs' motion on other case deadlines, their lack of promptly seeking relief reflects a broader strategic choice. At every stage, Plaintiffs preferred to seek deposition testimony of high-ranking government personnel *before* pressing their assertions about the government's discovery responses. Presumably that is because Plaintiffs believe the government's current responses advantage them in some way in seeking those depositions. *See, e.g.*, ECF No. 190 at 5 (citing challenged interrogatory responses as basis for depositions of high-ranking government personnel); ECF No. 226 at 1, 5 (same); ECF No. 234 at 9 (same). Yet, the "usefulness of" interrogatories "seems to be directly proportional to the amount of time remaining before a discovery cutoff arrives." *Jayne H. Lee, Inc. v. Flagstaff Indus. Corp.*, 173 F.R.D. 651, 653 (D. Md. 1997). That Plaintiffs squandered nearly a year before seeking judicial relief belies their claim that these responses are necessary to resolve factual questions "at the heart of" their case. Mot. at 2. Having made the conscious choice not to pursue the remedies they now seek, they must be held to the consequences of their decision by enforcing this District's timeliness rules.

## II.    THE CHALLENGED INTERROGATORY RESPONSES ANSWER THE QUESTIONS POSED, WHICH ARE IN ANY CASE IRRELEVANT AND IMMATERIAL

The State Department answered each interrogatory at issue in Plaintiffs' motion to the best of its ability after an investigation into the facts reasonably available to it at the time—nearly a year ago—that the interrogatories were served. Plaintiffs' motion should be denied on that basis alone. But even if the State Department's initial responses were deficient, any such deficiency has been remedied by subsequent disclosures in discovery, and the challenged interrogatories seek irrelevant information in any event.

A. **The State Department's Responses Adequately Answered Plaintiffs' Interrogatories as of November 12, 2025**

A party responding to an interrogatory "must furnish information that is available to it and that can be given without undue labor and expense." 8B Wright & Miller's Federal Practice & Procedure § 2174 (3d ed. 2012). "Put differently, a party must 'provide relevant facts reasonably available to it but should not be required to enter upon independent research in order to acquire information merely to answer interrogatories.'" *Lynn v. Monarch Recovery Mgmt., Inc.*, 285 F.R.D. 350, 357 (D. Md. 2012) (quoting 8B Wright & Miller's Federal Practice & Procedure § 2174 § 2174 (3d ed. 2012)). The State Department met that standard for each of the five challenged interrogatories. As with the untimeliness of Plaintiffs' motion, this, of course, is sufficient basis on its own to deny the motion as to the interrogatories.

To begin, each of the five challenged interrogatories demand that the State Department identify "the individual(s) who made the decision" for certain actions at USAID. *See* Ex. 1 at 7–8. Plaintiffs defined the term "decision" to mean "a definitive choice to commit to a particular course of action or inaction, including a general course of action the specifics of which can be determined later." *Id.* at 4. The State Department objected to the last clause of the definition as "vague and ambiguous" and beyond the requirements of the Federal Rules because it could be interpreted several ways. Ex. 2 at 2. Defendants thus notified Plaintiffs that it would construe the definition to require the State Department to "identify specific decisions to formally approve the Defendant agency to take any specific actions in their responses." *Id.*

Consistent with that objection, the State Department responded to each of the challenged interrogatories to the best of its knowledge as of the date of the response. With respect to USAID's website, the State Department responded that (1) the decision was made "in consultation with USAID leadership" and (2) identified the person who "effectuated the changes." *Id.* at 5. For

9

Interrogatory No. 2, the State Department identified the person who "formally approved the placement" of particular USAID employees on administrative leave: Kenneth Jackson. *Id.* at 6. The State Department's response to Interrogatory No. 3 explains that GSA notified USAID "that GSA was terminating USAID's occupancies at the Ronald Reagan Building" and identified the GSA individual who was named on that notice. *Id.* at 7. The response to Interrogatory No. 4 explains that Jason Gray approved the entry of certain named individuals to USAID physical space and unclassified data systems. *Id.* at 8. And the response to Interrogatory No. 5 explains that Mr. Gray and Mr. Jackson approved access to USAID data security systems to five listed individuals. *Id.* at 9. The challenged responses therefore either identify the USAID individuals who approved the cited actions by name or category or refer to other agencies that made the final decision. And where available, the State Department pointed to documentation supporting the response. *Id.* at 5–9. Those responses satisfy the State Department's obligations under Rule 33 to identify the relevant decision makers.

## B.      Defendants' Subsequent Discovery Addresses Plaintiffs' Motion

Even if Plaintiffs were correct that the words on the page of the State Department's responses were somehow insufficient—which they are not—Plaintiffs entirely ignore the voluminous discovery and other developments that post-date (and in some cases pre-date) that document. When a "party learns that in some material respect" an interrogatory response "is incomplete," it has a duty to supplement absent a court order only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). Although entirely unacknowledged by Plaintiffs in their brief, in the roughly eight months since Defendants submitted their interrogatory responses, there has been extensive testimony, document productions, and other written disclosures that elaborate

on the information in each of the State Department's initial interrogatory responses. This, too, is sufficient basis on its own to deny Plaintiffs' motion as to Defendants' interrogatory responses.

*Interrogatory #1*: Plaintiffs deposed Gavin Kliger, the individual the State Department identified as the one who effectuated changes to USAID's website on or about February 1. Mr. Kliger testified that "in consultation with senior agency leadership I was asked to take the website down, to put it back up, and ultimately to post a statement drafted by senior agency leadership." Ex. 10 at 118:8–11 (Kliger Dep. Tr.). Mr. Kliger did not recall the specific person within USAID senior leadership who asked him to make those changes. *Id.* at 118:12–14. Defendants have further provided a sworn declaration that "USAID is not aware of any contemporaneous documentation of [the] decision" to take its public-facing website offline on or about February 1, 2025. *See* Ex. 13 ¶ 26 (Decl. of Adam Korzeniewski). And Defendants have produced documents to establish that the properly appointed acting USAID leadership approved the website content shortly thereafter. *See* Ex. 11 (email communications among State Department and USAID political leadership documenting subsequent website changes, which reflect Secretary Rubio's "intent"). Combined with the State Department's response to Interrogatory No. 1, Defendants have fully answered Plaintiff's question.

*Interrogatory #2*: Subsequent discovery has also provided additional information about the 57 USAID employees in the Bureau of Legislative and Public Affairs placed on administrative leave on January 31, 2025.[3] Defendants produced contemporaneous email communications identifying Mr. Jackson as the individual responsible for their placement on administrative leave.

---

[3] As explained in Defendants' Memorandum in Opposition to Plaintiffs' Motion to Depose Kenneth Jackson and Steven Davis, this group of 57 are distinct from a separate group of 57 originally placed on administrative leave on January 27, 2025. *See* ECF No. 230 at 9–10. Plaintiffs do not assert they intended to ask about the other group.

11

*See* Ex. 12. That is consistent with documents submitted to the Court, which reflect that the administrative leave notices were sent out under Mr. Jackson's name. *See* ECF No. 70-2.

*Interrogatory #3*: Defendants have repeatedly explained that the decision to terminate USAID's occupancy at the Ronald Reagan Building and assign that space to the United States Customs and Border Protection was made by GSA. In addition to the interrogatory response, Defendants have provided a sworn declaration that "[a]side from the individuals listed" in documents previously filed with the Court, "neither the State Department nor USAID is aware of who was involved in the decision on behalf of GSA." Ex. 13 ¶ 24. It is unclear what more Plaintiffs are looking for on that decision. *See* Mot. at 9.

*Interrogatories #4 & #5*: The last two challenged interrogatories involve the decisions to grant access to USAID's physical space and logical systems. Ex. 1 at 8–9. Yet again, there has been significant discovery on these topics since the interrogatory responses Plaintiffs challenge. Defendants have produced email correspondence from USAID and State personnel authorizing individuals to access USAID physical spaces. *See, e.g.*, Ex. 14. USAID responded to a separate interrogatory posed to that agency with a list of agency data systems to which listed individuals were granted access, the date of that access, and the individuals who approved the access. *See* Ex. 15 at 4–7. Defendants have also produced record evidence supporting the State Department's assertion that Mr. Gray, in his capacity as USAID's Chief Information Officer, granted "administrative access to all unclassified information systems" to certain individuals Plaintiffs associate with DOGE. *See* Ex. 16. Mr. Gray himself confirmed in sworn testimony that he had approved both physical and logical access to those same individuals. Ex. 17 at 158:15–17 ("And I'm like, that's great. We'll give them access. They can do what they're doing.").

Taken together, the State Department's written interrogatory responses and other disclosures during discovery are also sufficient to counter Plaintiffs' assertion that they lack information about how certain decisions were memorialized and communicated. *Contra* Mot. at 9. As already noted, Defendants have produced a sworn declaration affirming that they are not aware of any documentation of the website decision. *See* Ex. 13 ¶ 6. Defendants also produced the email communications and memoranda documenting the decision to take the administrative leave action for 57 employees on February 1, 2026, *see* Ex. 12; Defendants released the GSA document terminating USAID's lease on March 13, 2025, ECF Nos. 70-3, 70-4; and Defendants produced the email communications reflecting building and data access on November 21, 2025, just after the purportedly deficient interrogatory responses, *see* Ex. 16. Simply put, although Plaintiffs wholly fail to acknowledge it in their brief, Plaintiffs already have—and have had for months and in some cases over a year—all the information responsive to those interrogatories in their possession.

Plaintiffs' arguments otherwise rely on an unsupportable interpretation of their own requests and the State Department's responses. Plaintiffs' main complaint is that the responses identify only individuals who "implemented the action" not "the person who decided it." Mot. at 8 (emphasis omitted). Not so. As explained above, each response identifies the final agency decision-maker who formally approved the action, either by name or by category. Plaintiffs now say that by seeking information about who made the decision to take certain actions, what they really meant was who "directed" or "gave the order" that those actions be taken. *Id.* at 10. But who influenced or instigated the agency to decide is a separate question from who made the final decision. *See Fed. Election Comm'n v. Swallow*, 304 F. Supp. 3d 1113, 1116 (D. Utah 2018) (holding that a statute that states that "[n]o person shall make a contribution in the name of another"

cannot apply to a person who merely initiates, instigates, or has some significant participation in a plan or scheme to make a contribution in the name of another (citation omitted)). Plaintiffs did not ask who *induced* USAID to make the decision (which information would likely be protected by governmental privileges in any case), they asked the State Department to identify the person who *made* the decision. The State Department has answered that question.

In response, Plaintiffs insist that the persons the State Department identified could not possibly have been the "actual decisionmakers" because they "allege that Musk and DOGE . . . exercised the significant authority that dismantled USAID." Mot. at 10 (citation omitted). No one disputes that Musk or other individuals Plaintiffs associate with DOGE were involved in actions at USAID. There is nothing unusual about that; as Plaintiffs' own proffered expert has testified, agencies including USAID routinely take guidance and recommendations from non-officer individuals employed by the White House. Ex. 18 at 85:8–86:17 (Plaintiffs' proposed expert explaining that, during his tenure at USAID, which concluded in 2021, prior to the events at issue in this case, USAID "received guidance or instruction from the White House" and "initiate[d] special initiatives on behalf of senior advisors for the White House"); *see also* Ex. 19 at 64:4–65:11 (former USAID chief of staff explaining that he understood Steve Davis and others associated with U.S. DOGE Service ("USDS") "as an advisor" and "you can either take the advice or you can leave that advice"). For purposes of Plaintiffs' motion to compel, however, the State Department has identified the agency decision-makers responsible for the actions in the challenged interrogatories—exactly what Plaintiffs asked.

C. **The Challenged Interrogatories Are Irrelevant and Immaterial to Plaintiffs' Claims**

Plaintiffs attempt to frame their motion as seeking answers about "who made the decision to dismantle USAID, when, and under whose authority"—questions they assert Defendants have

avoided answering "for over a year." Mot. at 1–2. That framing is incorrect in several respects, not least because discovery has been open for less than a year. *Id.* None of the challenged interrogatories ask about any overarching decision to "dismantle USAID." It is both unsurprising and entirely proper that Defendants have not answered questions Plaintiffs never asked.

Instead, Plaintiffs served interrogatories asking who made the decision for USAID to take five specific actions. Plaintiffs say the identity of the decision maker behind these actions is "at the heart" of their Appointments Clause claim, Mot. at 9–10 (emphasis omitted), but they never explain why. Defendants' consistent position is that the Appointments Clause is concerned only with the process of appointing individuals to positions that are created by law and vested with significant authority pursuant to the laws of the United States. *See generally* Defs.' Mot. to Dismiss, ECF No. 110-1, 25–30 (citing *Lucia v. SEC*, 585 U.S. 237, 245 (2018)). Even accepting Plaintiffs' theory that an individual who holds no formal "office" can be subject to the Appointments Clause, however, that Clause cares only about the exercise of "significant authority." *Lucia*, 585 U.S. at 245; *see Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

Plaintiffs make no showing that any of the decisions related to the challenged interrogatories are in any sense significant. For example, Plaintiffs continue to assert that decisions to make changes to USAID's website, temporarily place employees on administrative leave, remove signs from the headquarters wall, invite people to access unclassified agency spaces, and log into agency data systems are central to their Appointments Clause claims. *See* Mot. at 8–10. Yet none of those decisions are akin to the kind of authority the Supreme Court has concluded is significant. *See Freytag v. Comm'r*, 501 U.S. 868, 881 (1991) (special trial judges of the U.S. Tax Court); The Test for Determining "Officer" Status Under the Appointments Clause, 49 Op. O.L.C. __, 2025 WL 293746, at 10–13 (Jan. 16, 2025). They are simply irrelevant to Plaintiffs'

15

Appointments Clause claims. *See* Ex. 2 at 3 (preserving objections to discovery for reasons stated in motion to dismiss); *id.* at 5 (preserving objection that certain decisions do not implicate the Appointments Clause).

The interrogatories seeking information about USAID's website (No. 1), headquarters building (No. 3), and physical and logical access (Nos. 4–5) are also irrelevant for an additional reason: Plaintiffs lack standing to challenge those decisions. The sole basis on which this Court found Plaintiffs have standing to sue was that they "suffered 'interruptions to the ordinary course of their employment.'" ECF No. 150 at 32–34 (citation omitted). Even assuming the wrong individual made the decision to shut down USAID's website until it was revised, terminate USAID's lease for space in the Ronald Reagan Building, or remove USAID's official seal, Plaintiffs have not explained how those decisions inflicted concrete and particularized harm on them. Nor have they established how an order requiring reinstatement of prior website content, reoccupation of USAID space in the Ronald Reagan Building, or replacement of USAID's seal could possibly redress Plaintiffs' employment-based harms.

## III.    THE STATE DEPARTMENT PROPERLY APPLIED THE DELIBERATIVE PROCESS PRIVILEGE TO REDACT PORTIONS OF TWO EMAILS

The deliberative process privilege protects the Government's decision-making process by shielding from disclosure documents "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (citation omitted). The privilege "reflects the commonsense notion that agencies craft better rules when their employees can spell out in writing the pitfalls as well as strengths of policy options, coupled with the understanding that employees would be chilled from such rigorous deliberation if they feared it might become public." *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 847 F.3d 735, 739 (D.C. Cir.

2017) (citing *Sears*, 421 U.S. at 150); *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." (citation omitted)); *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) ("If agencies were 'to operate in a fishbowl, the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer.'" (quoting *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1567 (D.C. Cir. 1987))). The privilege's "ultimate purpose" is to "'prevent injury to the quality of agency decisions' by allowing government officials freedom to debate alternative approaches in private." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (quoting *Sears*, 421 U.S. at 151). "In other words, agency officials 'should be judged by what they decided, not for matters they considered before making up their minds.'" *Nat'l Sec. Archive*, 752 F.3d at 462–63 (quoting *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)).

To withhold documents based on the deliberative-process privilege, "the government must show that, 'in the context in which the materials were used, the documents were both *predecisional* and *deliberative*.'" *Malone v. U.S. Patent & Trademark Off.*, 175 F.4th 262, 268 (4th Cir. 2026) (citation omitted). "Predecisional documents are those prepared in order to assist an agency decisionmaker in arriving at his decision." *Solers, Inc. v. IRS*, 827 F.3d 323, 329 (4th Cir. 2016) (citation omitted). "'Deliberative' . . . means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Sec. Archive*, 752 F.3d at 463 (quoting *Russell*, 682 F.2d at 1048). Documents are "deliberative" when

17

"they reflect the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes." *Malone*, 175 F.4th at 268 (quoting *Solers*, 827 F.3d at 329).

### A.    Defendants Have Properly Invoked the Deliberative Process Privilege

To invoke the deliberative process privilege, the agency must present "(1) a formal claim of privilege by the 'head of the department' having control over the requested information; (2) assertion of the privilege based on actual personal consideration by that official; and (3) a detailed specification of the information for which the privilege is claimed, with an explanation why it properly falls within the scope of the privilege." *Landry v. Fed. Deposit Ins. Corp.*, 204 F.3d 1125, 1135 (D.C. Cir. 2000) (quoting *In re Sealed Case*, 856 F.2d 271). The reference to the "head of the department," however, is not to be read "in the narrowest possible way." *Id.* Other agency officials "of sufficient rank" who have personally considered the claim of privilege are all that is required. *Id.* at 1136.

The State Department has satisfied these procedural requirements through the attached Declaration of Deputy Secretary of State for Management and Resources Michael Rigas, Ex. 20. That declaration moots Plaintiffs' procedural arguments. *See* Mot. at 12–14.

At previous points, Plaintiffs maintained that the agency was required to produce a declaration supporting deliberative process withholdings at the time the documents were produced or withheld. In other words, Plaintiffs' view is that the government must produce a declaration every time it makes a claim that a portion of a document is privileged, regardless whether that portion is likely to be subject of a dispute. That is not the law; the duty to provide a declaration does not attach until the government invokes the deliberative process privilege in response to a motion to compel, not before. *See, e.g.*, *Jonathan R.*, 2024 WL 3401735, at *6 (relying on declarations filed in response to motion to compel to uphold assertion of deliberative process

18

privilege); *United States v. Arora*, No. 1:17-cv-00584, 2018 WL 3429915, at *2 (D.N.M. July 16, 2018) ("The bottom line is that the idea that a statement by an agency official must be provided upon the initial assertion of the deliberative process privilege finds little support in the courts, and where it does appear, it has grown out of a tortured reading of precedents."); *cf. In re Sealed Case*, 121 F.3d at 741 (finding no "obligation to formally invoke . . . privileges in advance of the motion to compel"). Indeed, many of the cases on which Plaintiffs rely approved declarations submitted with the government's opposition to a motion to compel. *See Hugler v. Bat Masonry Co.*, No. 6:15-cv-28, 2017 WL 1207847, at *3 (W.D. Va. Mar. 31, 2017) (finding "the procedural requirements for asserting the deliberative process privilege are met"); Acting Secretary's Opp'n to Defs.' Mot. to Compel Production of Privileged Documents, *Hugler v. Bat Masonry Co.*, No. 6:15-cv-00028 (W.D. Va. Mar. 27, 2017), ECF No. 120 (relying on government declaration in support of deliberative process assertions dated same day as opposition brief); *United States v. Berkeley Heartlab, Inc.*, No. 9:14-cv-00230-RMG, 2017 WL 2633500, at *3–4 (D.S.C. June 19, 2017) (finding deliberative process privilege invocation procedurally proper based on declaration submitted in response to motion to compel).

The one case Plaintiffs cite that suggests a declaration must be filed earlier, *Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 134 (Fed. Cl. 2006), in fact held only that a declaration submitted with a motion-to-compel opposition is subject to "heightened scrutiny," *Pac. Gas & Elec. Co. v. United States*, 71 Fed. Cl. 205, 208 (Fed. Cl. 2006). And other courts have described that case as "an outlier" that has not been followed in its own jurisdiction. *Fed. Hous. Fin. Agency v. JP Morgan Chase & Co.*, 978 F. Supp. 2d 267, 278 (S.D.N.Y. 2013).

Defendants have met the procedural requirements to invoke the deliberative process privilege.

19

B.      **The Redacted Content Was Properly Withheld**

Plaintiffs challenge Defendants' withholding of portions of two emails based on the deliberative process privilege. For the reasons stated in the supporting Declaration of Deputy Secretary of State for Management and Resources, Michael Rigas, the State Department has satisfied its burden to show that the withheld portions were pre-decisional and deliberative.

1. The January 31 email is a message sent by Michael Needham, then the Counselor of the Department of State, to Katie Miller, a presidential advisor employed in the White House Office. *See* Ex.7 ¶ 3; *see also* Ex. 3; Ex. 20. The redacted portion of the email summarizes a phone conversation Mr. Needham had with Steve Davis. Ex. 4 at 3. The unredacted portions of the document support that the withheld information is pre-decisional and deliberative. Those portions reveal coordination between senior personnel at the White House and the State Department in conveying their views to Secretary Rubio on decisions to be taken. As Defendants' privilege log confirms, the substance of the withheld portion involved a position on the timing of certain changes that were contemplated at USAID. *See* Ex. 4; *see also* Ex. 20 ¶ 6.

In response, Plaintiffs argue that communications about the "'timing' of finalizing decisions, policies, or announcements" cannot reflect pre-decisional deliberations because those are "logistical fact[s] about decisions that have already been made." Mot. at 14. As a legal matter, that is wrong. The deliberative process "privilege may extend to internal deliberations over how best to promote or preserve an existing policy" decision already made. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 362 (D.C. Cir. 2021); *see Nat. Res. Def. Council v. U.S. EPA*, 19 F.4th 177, 185 (2d Cir. 2021) (protecting deliberative material "regarding how to communicate" an agency's "policies and actions to Congress, the public, and other stakeholders"); *Manatt v. U.S. Dep't of Homeland Sec.*, 473 F. Supp. 3d 409, 420 (E.D. Pa. 2020) (holding that "documents about potential statements to Congressional inquiries, press inquiries, or public communication are all

20

deliberative, even if they do not relate to the adoption of a 'Policy'"). Indeed, the only precedent Plaintiffs cite on this point involved calendar invites that disclosed logistical details about meetings, all of which are revealed by the portions of the document the State Department disclosed. *See* Mot. at 14–15 (citing *Prop of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 383 (D.D.C. 2018)). Plaintiffs' position is also factually incorrect; the State Department's redactions protected the substance of recommendations about the rollout of potential policies that had not yet been finalized. Ex. 20 ¶¶ 7, 9.

2. The redacted portions of the February 1 email are similarly supported by the deliberative process privilege. Those redactions protect communications regarding "the proposed considerations for implementation of" future "planned personnel actions" at USAID. Ex. 4 at 3; *see* Ex. 20 ¶ 8. Plaintiffs' sole argument for disclosure is that the visible portion of the document indicates that some portion of the withheld materials was relaying information told to the author by a third party. Mot. at 15. But the information relayed was itself information about the formulation of a policy for the government, and was therefore part of the deliberative process.

*       *       *

In sum, the State Department properly redacted both documents to protect information pursuant to the deliberative process privilege. Although this Court of course has the authority to order *in camera* review, there is no basis to do so here. *See NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 502 (4th Cir. 2011) (affirming denial of *in camera* review for privilege).

### C.       Plaintiffs' Asserted Need Does Not Overcome the Government's Privilege

Plaintiffs next argue that if the documents are properly within the deliberative process privilege, their need for the information outweighs the government's interest in non-disclosure. Mot. at 15–19. "The deliberative process privilege is a qualified one; that is, where a party can establish the existence of a sufficient need for the information that outweighs any harm from its

21

production, the privilege may be overcome." *Heyer v. U.S. Bureau of Prisons*, No. 5:11-CT-03118-D, 2014 WL 4545946, at *3 (E.D.N.C. Sep. 12, 2014) (citing *Scott v. PPG Indus., Inc.*, 142 F.R.D. 291, 294 (N.D. W.Va. 1992)). "The burden of showing an overriding need for the information rests with the party seeking it." *Id.* ("The party seeking discovery bears the burden of showing that its need for the documents outweighs the government's interest." (quoting *Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 853 (3d Cir. 1995))); *see also United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993) (stating that the plaintiff had to show a "particularized need" for specific documents to overcome the privilege); *Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1307 (Fed. Cir. 2006) (stating that a plaintiff must show a "compelling need" to overcome the privilege).

There is "no binding legal authority on the application of deliberative process privilege in the Fourth Circuit" outside of Freedom of Information Act cases. *Estate of LeRoux v. Montgomery Cnty.*, No. 8:22-cv-00856-AAQ, 2024 WL 1703939, at *3 (D. Md. Apr. 19, 2024). Courts have, however, applied a four-factor test to balance the parties' interests. *See Cipollone v. Liggett Grp., Inc.*, 812 F.2d 1400 (4th Cir. 1987) (unpublished table decision). Those factors include: (1) the relevance of the evidence to the lawsuit; (2) the availability of alternative evidence on the same matters; (3) the government's role (if any) in the litigation; and (4) "the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions." *Id.* (quoting *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984)). Each of those factors supports Defendants' withholding.

*First*, there is no basis for Plaintiffs' speculation that the limited redactions the State Department made to two emails "is highly relevant" to Plaintiffs' claims. Mot. at 16. The January 31 email redacts only a clause of one sentence that describes Mr. Davis's recommendations for the

22

ordering and timing of proposed decisions. Ex. 3; Ex. 4 at 3. The State Department released the non-deliberative portions that identify who was involved in the discussions, and that Secretary Rubio was "trying to reach Elon." Ex. 3. There is no marginal utility in forcing the State Department to release the redacted deliberative material.

The February 1 email is of similar marginal relevance. Defendants have never disputed that "Steve Davis, Elon Musk," and others at the White House were involved in the administration's actions related to USAID during January and February 2025. Mot. at 16. There is thus no need to override the government's privileges and expose high-level deliberations to prove that point.

*Second*, and relatedly, the information about decision-making at USAID is available from other sources. Defendants have collectively answered dozens of interrogatories and produced nearly 10,000 pages of documents in response to Plaintiffs' requests. The redacted information concerning "[i]mpending USAID personnel actions" has already been the subject of extensive alternative discovery. Ex. 5. "Because the [Plaintiffs] were able to obtain and introduce evidence on these issues, they had little need for the" withheld portions of two emails. *See Warner Commc'ns Inc.*, 742 F.2d at 1161–62. Even taking at face value Plaintiffs' assertions that they need additional information about USAID decisions to make website changes, remove the agency seal, or physical building access, Mot. at 16–17; *but see supra* at Part II, none of the redacted material even relates to those decisions.

*Third*, the role of the government in this case supports sustaining the privilege, not overriding it. That the government is a party does not automatically undermine the deliberative process privilege. *See Warner Commc'ns Inc.*, 742 F.2d at 1162 (concluding that the government's role as plaintiff in the litigation did not support overriding privilege because there was "no evidence of bad faith or misconduct"). Rather, this factor depends on the nature of the claims, if

23

any, asserted against the government. For example, some courts have held that the deliberative process privilege has less force where the government's "intent" is an element of the cause of action. *In re Subpoena Duces Tecum Served on the Off. of Comptroller of the Currency*, 145 F.3d 1422, 1424 (D.C. Cir.), *reh'g granted*, 156 F.3d 1279 (D.C. Cir. 1998). Thus, "the privilege has no place in a Title VII action or in a constitutional claim for discrimination." *Id.* Indeed, nearly all the cases Plaintiffs cite where the deliberative process privilege was overridden involve claims where the government's intent is an element of the plaintiffs' claim. *See* Mot. at 18; *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1124 (N.D. Cal. 2003) (equal protection claim). As the D.C. Circuit has observed, those holdings are "limited to those circumstances in which the cause of action is directed at the agency's subjective motivation." *In re Subpoena Duces Tecum*, 156 F.3d at 1280.[4]

Plaintiffs' Appointments Clause claim, however, is not of that stripe. Even on their view of the law, that claim depends on "who made" certain decisions "when, and under whose authority." Mot. at 1. None of that requires any inquiry into any government actor's subjective motivation or intent. Indeed, Plaintiffs have conceded that they are "not seeking discovery on why decisions were made in terms of what positions the Government contemplated and why they . . . arrived at one position rather than another." Ex. 9 at 5:2–5. Their Appointments Clause claim instead depends only on "who made the decisions at issue and under what authority they had." *Id.* at 5:10–11. Plaintiffs thus concede that their claim "in no way implicates" the government's "subjective motivations" and does not support overriding a valid privilege. *See Landry*, 204 F.3d at 1136;

---

[4] The only case Plaintiffs cite where the privilege was overcome that did not involve inquiry into the government's intent, *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 791 F. Supp. 3d 1065, 1073 (N.D. Cal. 2025), gave scant analysis to the government's role in the litigation or the claims asserted against it. The government respectfully disagrees with that out-of-circuit decision.

*Jonathan R.*, 2024 WL 3401735, at \*6 (declining to overcome deliberative process privilege when "the extent and scope of the decision-making process are secondary to the actual decisions that were made").

Plaintiffs rely on another D.C. Circuit case for the proposition that the deliberative process "privilege 'disappears altogether' when there is reason to believe government misconduct occurred." Mot. at 18 (quoting *In re Sealed Case*, 121 F.3d at 746). But, as another court has recognized, *In re Sealed Case* "provides little or no guidance" for evaluating a deliberative process privilege claim because "this standard is stated in the case in order to contrast it with the higher standard for overcoming the Presidential privilege, which is the actual subject matter of the case." *City of Colton v. Am. Promotional Events, Inc.*, No. ED CV 05-01864, 2011 WL 13223955, at \*3 (C.D. Cal. Nov. 14, 2011).

Regardless, Plaintiffs identify no government misconduct sufficient to overcome the deliberative process privilege. That exception must be "applied narrowly," for if "every hint of marginal misconduct sufficed to erase the privilege, the exception would swallow the rule." *ICM Registry, LLC v. U.S. Dep't of Com.*, 538 F. Supp. 2d 130, 133 (D.D.C. 2008). Plaintiffs' allegations that the wrong people exercised authority in making agency decisions fall far short of the kinds of "extreme" and "nefarious" misconduct that has caused courts to apply that exception. *Id.*; *see, e.g., Alexander v. FBI*, 186 F.R.D. 154, 164 (D.D.C. 1999) (no privilege where documents related to misuse of a government personnel file to discredit a witness in an ongoing investigation of Clinton administration); *Tax Reform Rsch. Grp. v. IRS*, 419 F. Supp. 415, 426 (D.D.C. 1976) (no privilege where documents concerned recommendation to use the powers of the IRS in a discriminatory fashion against "enemies" of the Nixon administration (citation omitted)).

25

*Fourth*, revealing the withheld deliberative information would chill the government's ability to have frank and candid discussions concerning proposed agency actions. As Deputy Secretary Rigas explains, the redactions from the two documents protect sensitive discussions among the highest level personnel at the State Department and the White House advisors. Ex. 20 ¶ 10. Exposure of that information "would hinder the willingness of agency personnel, including senior agency officials, to identify potential issues associated with proposed decisions, to engage in frank discussions, or to voice disagreements with proposed courses of action." *Id.* ¶ 10.; *see, e.g.*, *Jonathan R.*, 2024 WL 3401735, at *7.

## IV.    THE FEBRUARY 1 EMAIL WAS PROPERLY REDACTED TO PROTECT PRESIDENTIAL COMMUNICATIONS

The "presumptive privilege for Presidential communications" is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *United States v. Nixon*, 418 U.S. 683, 706, 708 (1974). This privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (citations omitted). It follows from the core constitutional principle that the "President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Nixon*, 418 U.S. at 708.

"Because the President necessarily relies on others to fulfill his constitutional role," *Am. First Legal Found. v. U.S. Dep't of Agric.*, 126 F.4th 691, 695 (D.C. Cir. 2025), the privilege applies not only to "communications directly involving and documents actually viewed by the President," but also encompasses "documents solicited and received by the President or his immediate White House advisers with broad and significant responsibility for investigating and formulating the advice to be given the President." *Loving*, 550 F.3d at 37 (citation modified). These

26

communications and documents are privileged when they "reflect presidential decisionmaking and deliberations" and are intended to "remain confidential." *In re Sealed Case*, 121 F.3d at 744; *see also Protect Democracy Project, Inc. v. Nat'l Sec. Agency*, 10 F.4th 879, 885 (D.C. Cir. 2021) (discussing *In re Sealed Case* and reaffirming that the privilege attaches to "records of nonpublic presidential communications"). And because the presidential communications privilege is "rooted in constitutional separation of powers principles and the President's unique constitutional role," judicial negation of the privilege is "subject to greater scrutiny than denial of the [common-law] deliberative privilege." *In re Sealed Case*, 121 F.3d at 745.

Here, the withheld portions of the February 1 email reflect "a description of communications attributed to the President of the United States and reportedly made to senior White House advisors in the Executive Office of the President." Ex. 7 ¶ 7. The information contained within that summarized communication "reflects presidential decision-making and was made in connection with presidential decision-making." *Id.* ¶ 10. The described communication was plainly a "communication[] directly involving" the President relating to his constitutional duties. *Loving*, 550 F.3d at 37 (quoting *Judicial Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1114 (D.C. Cir. 2004)). That portion of the February 1 email is, therefore, squarely within the presidential communications privilege.

None of Plaintiffs' arguments for disclosure warrant a different result. Plaintiffs first argue that the privilege was not properly invoked. Mot. at 20–21. That procedural argument fails for the same reason as it did with respect to the deliberative process privilege. Defendants have now provided a declaration from a White House official formally invoking the privilege. *See In re Sealed Case*, 121 F.3d at 741; *see also* Ex. 7.

Plaintiffs next argue that any privilege that would attach to the President's communications has been waived by disclosure "outside the White House." Mot. at 21 (citing *In re Sealed Case*, 121 F.3d at 741–42). Simply put, the waiver doctrine is not so broad. *See Am. Civ. Liberties Union v. Dep't of Just.*, 15 Civ. 1954, 2016 WL 889739, at *4 (S.D.N.Y. Mar. 4, 2016) (explaining that in some contexts "the privilege could attach to communications to and from very senior members of the Executive Branch in agencies outside the White House"). Several courts have acknowledged disclosure of presidential communication to senior agency officials who are "in an advisory relationship" does not defeat the privilege. *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 27 (D.D.C. 2013); *see Council on Am.-Islamic Rels. v. U.S. Citizenship & Immgr. Servs.*, 669 F. Supp. 3d 64, 77 (D. Conn. 2023). And "permitting distribution of a" presidential communication "on a 'need-to-know' basis does not automatically undermine the confidentiality of" the communication. *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 26 (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980)).

That is precisely what the February 1 email reflects. The document was authored by Alex Wong, an Assistant to the President (the highest level of direct presidential advisor in the White House) and a Deputy National Security Advisor. Ex. 7 ¶ 8. The document summarized information he received from the USDS General Counsel, another official within the Executive Office of the President ("EOP"), reflecting presidential communications between the President himself and other advisors within EOP. *Id.* ¶ 7. The email was sent to Michael Needham, who was then Counselor of Department of State. *Id.* The purpose of the email was to allow Mr. Needham to apprise the Secretary of State, who was also the acting USAID administrator, about presidential deliberations and how they would affect USAID. *See id.* It is an email from a White House official with the highest level of seniority conveying the substance of confidential presidential

28

communications to a high-level agency official with a need to know to advise a cabinet-level official who is in close communication with the President and his advisors on these issues. The confidentiality of the original presidential communication is not waived when it is disseminated in such a "narrow diameter." *Am. Civ. Liberties Union v. Dep't of Def.*, 435 F. Supp. 3d 539, 559 (S.D.N.Y. 2020).

In any case, Plaintiffs are flatly incorrect that the presidential communications privilege can *never* apply to documents or communications that travel between the White House and Executive Branch agencies. *See Am. First Legal Found.*, 126 F.4th at 695 (holding that strategic plan prepared by an agency and submitted to the White House was protected by the presidential communications privilege); *Found. for Gov't Accountability v. U.S. Dep't of Just.*, No. 2:22-cv-00252-JLB-KCD, 2024 WL 5111659, at *6 (M.D. Fla. Dec. 13, 2024) (same). The government's assertion of privilege is even stronger here, where the withheld description relates to "communications attributed to the President of the United States and reportedly made to senior White House advisors in the Executive Office of the President." Ex. 7 ¶ 7.

Finally, Plaintiffs' purported need does not overcome the presidential communications privilege. Plaintiffs' burden in overcoming the presidential communications privilege is even "more difficult to surmount" than the deliberative process privilege. *In re Sealed Case*, 121 F.3d at 746. For the reasons stated above in Part III.C, Plaintiffs have met neither burden. And as Mr. Lawkowski explains, "without the protection of the presidential communications privilege over the communication" the "President, his senior White House advisors, and their staff would be chilled from gathering relevant information, exploring alternatives, providing fully informed recommendations, and/or communicating about presidential decision-making matters." Ex. 7 ¶ 11.

Plaintiffs additionally argue that the limited scope of material Defendants have redacted supports disclosure. Mot. at 22. It does not. That the parties' dispute is limited to "one identified redaction in one short email," *id.*, simply establishes that Defendants have made only specific and tailored privilege assertions. It provides no basis for Plaintiffs' request to invade a structural constitutional privilege.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion to compel should be denied.

Dated: August 6, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

CHRISTOPHER M. LYNCH
Chief Litigation Counsel, Federal Programs Branch

*/s/ Jacob S. Siler*
JACOB S. SILER (DC Bar No. 1003383)
JAMES J. WEN (NY Bar No. 5422126)

*By Special Appearance*
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-4556
Email: jacob.s.siler@usdoj.gov

*Attorneys for Defendants*

30