**EXHIBIT INDEX**

| Exhibit # | Exhibit Title | Reference Page(s) |
|---|---|---|
| 7 | Declaration of Gary M. Lawkowski (Aug. 6, 2026) | 4, 20, 27, 28, 29 |
| 8 | 04/27/2026 Email from Jacob S. Siler to Lucas Issacharoff | 4, 6 |
| 9 | Hr'g Tr. (Nov. 19, 2025) | 5, 24 |
| 10 | Dep. Tr. of Gavin Kliger, Jan. 6, 2026 | 11 |
| 11 | 02/06/2025 FW: URGENT DRAFT USAID GUIDANCE, DOE4vUSDS_008836–008845 | 11 |
| 12 | 01/31/2025 LPA Leave Template + Names, DOE4vUSDS_00594–00601 | 12, 13 |
| 13 | Declaration of Adam Korzeniewski (June 4, 2025) | 11, 12, 13 |
| 14 | 02/01/2025 Fwd: Building Access, DOE4vUSDS_002647–2648 | 12 |
| 15 | Defs.' Objs. & Resps. To Pls.' 1st Set of Interrogs. To USAID (Jan 15, 2026). | 12 |
| 16 | 01/31/2025 Fwd: Physical and Logical Administration for Gavin, DOE4vUSDS_00602–00603 | 12, 13 |
| 17 | Dep. Tr. of Jason Gray, Feb. 3, 2026 | 12 |
| 18 | Dep. Tr. of T. Christopher Milligan, June 11, 2026 | 14 |
| 19 | Dep. Tr. of Matthew Hopson, May 7, 2026 | 14 |
| 20 | Declaration of Deputy Secretary of State for Management and Resources Michal J. Rigas (Aug. 6, 2026) | 18, 20, 21, 26 |

# Exhibit 7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| J. DOE 4, *et al.*, *individually and on behalf of all others similarly situated,*<br><br>  *Plaintiffs,*<br><br>  v.<br><br>U.S. DOGE SERVICE, *et al.*,<br><br>  *Defendants.* | No. 8:25-cv-00462-TDC<br><br><br>**DECLARATION OF GARY M. LAWKOWSKI** |

## <u>DECLARATION OF GARY M. LAWKOWSKI</u>

I, Gary M. Lawkowski, declare:

1.      I currently hold the position of Deputy Assistant to the President and Deputy Counsel to the President.  In this capacity, I am responsible for, among other things, providing legal advice to the President and White House staff, including advice on matters involving the invocation of the presidential communications privilege.

2.      I submit this declaration formally invoking the presidential communications privilege with respect to a communication requested in discovery by Plaintiffs.  I base this declaration on my personal knowledge, information made available to me in the performance of my duties, and my knowledge of the issues being litigated in the above-captioned case.

3.      I am aware that, upon consultation with the Office of the Counsel to the President, the United States has withheld a certain communication on the basis of the presidential communications privilege.  I understand that a description of this document has been provided to Plaintiffs in a privilege log submitted by the United States to Plaintiffs.

1

4. On behalf of the Office of the President, I hereby assert the presidential communications privilege with respect to all portions of the communication revealing communications made by the President of the United States and/or high-ranking White House advisors within the Executive Office of the President who have the responsibility of advising, assisting, and implementing decisions of the President.

5. The assertion of privilege is based on my personal review of this communication. In making this declaration, I have also relied on descriptions of this communication provided by my staff and on the description of the communication contained in the Government's Privilege Log.

6. The fact that my assertion is limited to the presidential communications privilege is in no way intended to suggest that this communication is not protected in whole or in part by other privileges.

7. The communication as to which the presidential communications privilege is being asserted consists of an email from Assistant to the President and Deputy National Security Advisor Alex Wong to Counselor of the Department of State Michael Needham summarizing communications relayed to Mr. Wong by United States DOGE Service General Counsel James Burnham related to planned imminent personnel actions at United States Agency for International Development (USAID), a description of communications attributed to the President of the United States and reportedly made to senior White House advisors in the Executive Office of the President, and proposed considerations for implementation of those planned personnel actions.

8. Mr. Wong was an Assistant to the President, the highest level of direct presidential advisor in the White House, and a Deputy National Security Advisor, a high-ranking advisor to the President who serves under the National Security Advisor. The United States DOGE Service refers to a component of the Executive Office of the President responsible for advising the President of the United States and the Executive Branch on government efficiency and productivity matters.

2

9.    The communication as to which the presidential communications privilege is being asserted describes a communication between two high-ranking White House advisors within the Executive Office of the President relaying presidential communications reportedly made by the President of the United States to other high-ranking White House advisors within the Executive Office of the President.

10.    The information contained in this communication as to which the presidential communications privilege is being asserted reflects presidential decision-making and was made in connection with presidential decision-making.

11.    I believe that, without the protection of the presidential communications privilege over the communication described above, the President, his senior White House advisors, and their staff would be chilled from gathering relevant information, exploring alternatives, providing fully informed recommendations, and/or communicating about presidential decision-making matters.

12.    I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of August 2026.

Gary M. Lawkowski

3

# Exhibit 8

From: Siler, Jacob S. (CIV) Jacob.S.Siler@usdoj.gov
Sent: Mon 4/27/2026 7:56 PM
To: Issacharoff, Lucas <lissacharoff@lchb.com>; Rubin, Nicole M. <nrubin@lchb.com>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Wen, James J. (CIV) James.J.Wen@usdoj.gov
Cc: Heimann, Richard M. <rheimann@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens' <bstevens@msgpllc.com>; mmarziani@msgpllc.com; jgonzalez@msgpllc.com; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org; 'norman@democracydefenders.org'; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>
Subject: RE: [EXT] RE: Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

All,

This email follows our conversation last week about Defendants' withholdings based on the Deliberative Process Privilege.  During that conversation, you identified four entries in our privilege log (Nos. 2 and 3-5) and three redacted documents (bates ending 9101, 9108, and 9109) as to which you requested some additional information.  On further consideration after our conversation, we have decided to lift the assertion of the deliberative process privilege over the emails described in privilege log Entry Nos. 3-5.  We will produce the referenced pages in our next production, which we intend to make this week.  Mr. Gottlieb's deposition testimony last week touched on Entry No. 2.  We may make some additional changes to our redactions of that document after we have an opportunity to review the transcript of that deposition with the agencies.

As to the other documents we discussed, please see the below descriptions, which we plan to add to a supplemental privilege log we will produce with our next production.  Please let us know if you have identified any other entries or withholdings where you feel you need some additional information.

| 14 | 1/31/2025 | DOE4vUSDS_009101 | Matthew Hopson | Kenneth Jackson | | Copies of chats sent on January 30, 2025, between 7:26 pm and 7:29 pm. | Deliberative Process Privilege | Withheld portion of chats provide recommendations on items for Mr. Jackson to consider and additional recommended assessments that should be done as Mr. Jackson considers whether to grant logical access for individual to USAID security system. |

| 15 | 1/31/2025 | DOE4vUSDS_009108 | Michael A. Needham | Katie R. Miller | | RE: Make that call | Deliberative Process Privilege | Withheld portion of email summarizes a deliberative conversation between Mr. Needham and Mr. Davis about the proposed timing of finalizing decisions, policies, and or announcements to be made by Secretary Rubio related to USAID. |
| 16 | 2/1/2025 | DOE4vUSDS_009109 | Alex Wong | Michael A. Needham | | Re: Impending USAID personnel actions | Deliberative Process Privilege; Presidential Communications Privilege | Withheld portion of initial email summarizes presidential communications related to planned imminent personnel actions at USAID and proposed considerations for implementation of those planned personnel actions. |

Best,
Jake

From: Issacharoff, Lucas <lissacharoff@lchb.com>
Sent: Thursday, April 16, 2026 10:34 AM

**To:** Siler, Jacob S. (CIV) <Jacob.S.Siler@usdoj.gov>; Rubin, Nicole M. <nrubin@lchb.com>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Wen, James J. (CIV) <James.J.Wen@usdoj.gov>
**Cc:** Heimann, Richard M. <rheimann@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens' <bstevens@msgpllc.com>; mmarziani@msgpllc.com; jgonzalez@msgpllc.com; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org; 'norman@democracydefenders.org' <norman@democracydefenders.org>; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>
**Subject:** [EXTERNAL] RE: [EXT] RE: Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

1pm ET works for me and Nicole – I'll let Andrew and Beth weigh in on their availability.

---

**From:** Siler, Jacob S. (CIV) <Jacob.S.Siler@usdoj.gov>
**Sent:** Thursday, April 16, 2026 10:30 AM
**To:** Issacharoff, Lucas <lissacharoff@lchb.com>; Rubin, Nicole M. <nrubin@lchb.com>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Wen, James J. (CIV) <James.J.Wen@usdoj.gov>
**Cc:** Heimann, Richard M. <rheimann@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens' <bstevens@msgpllc.com>; mmarziani@msgpllc.com; jgonzalez@msgpllc.com; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org; 'norman@democracydefenders.org' <norman@democracydefenders.org>; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>
**Subject:** RE: [EXT] RE: Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

Lucas—Tuesday is fine with us.  Should we try for 1pm eastern, as I know you have folks in different time zones?

You all have sent out several communications over the past week or so, including one from Beth on future depositions I will respond to shortly and the one Andrew sent last evening.  We think it makes sense to consolidate those conferrals into this meeting, if that works for you.

Best,
Jake

---

**From:** Issacharoff, Lucas <lissacharoff@lchb.com>
**Sent:** Wednesday, April 15, 2026 4:14 PM
**To:** Siler, Jacob S. (CIV) <Jacob.S.Siler@usdoj.gov>; Rubin, Nicole M. <nrubin@lchb.com>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Wen, James J. (CIV) <James.J.Wen@usdoj.gov>

Cc: Heimann, Richard M. <rheimann@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens' <bstevens@msgpllc.com>; mmarziani@msgpllc.com; jgonzalez@msgpllc.com; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org; 'norman@democracydefenders.org' <norman@democracydefenders.org>; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>
Subject: [EXTERNAL] RE: [EXT] RE: Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

Jake,

We'll take you up on the offer to meet and confer on the full set of DPP issues – how are Monday and (optimally) Tuesday next week?

Thanks,
Lucas

---

From: Siler, Jacob S. (CIV) <Jacob.S.Siler@usdoj.gov>
Sent: Tuesday, April 14, 2026 5:16 PM
To: Issacharoff, Lucas <lissacharoff@lchb.com>; Rubin, Nicole M. <nrubin@lchb.com>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Wen, James J. (CIV) <James.J.Wen@usdoj.gov>
Cc: Heimann, Richard M. <rheimann@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens' <bstevens@msgpllc.com>; mmarziani@msgpllc.com; jgonzalez@msgpllc.com; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org; 'norman@democracydefenders.org' <norman@democracydefenders.org>; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>
Subject: RE: [EXT] RE: Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

Hi Lucas,

An agency declaration is not required until the deliberative process privilege is formally invoked in response to a motion to compel.  That has long been the practice of this office and is supported by the weight of authority regarding assertions of governmental privileges.  *See, e.g., Jonathan R. v. Justice*, No. 3:19-cv-710, 2024 WL 3401735, at *6 (S.D. W.Va. July 12, 2024) (relying on declarations filed in response to motion to compel to uphold assertion of deliberative process privilege); *United States v. Arora*, No. 1:17-cv-584, 2018 WL 3429915, at *2 (D.N.M. July 16, 2018) ("The bottom line is that the idea that a statement by an agency official must be provided upon the initial assertion of the deliberative process privilege finds little support in the courts, and where it does appear, it has grown out of a tortured reading of precedents. It is not supported by any decision within this Circuit or by the Supreme Court."); *cf. In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (finding "no obligation to formally invoke . . . privileges in advance of the motion to compel").

Your citation of dictum in what a Southern District of New York decision described as an "outlier" case in the Court of Federal Claims—one which appears not to have been followed by other judges on that court—does not establish the need for an earlier agency declaration. *Fed. Housing & Finance Agency v. JPMorgan Chase & Co.*, 978 F. Supp. 2d 267, 278 (S.D.N.Y. 2013) (describing *Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128 (2006) and citing *Huntleigh USA Corp. v. United States*, 71 Fed. Cl. 726, 727 (2006)).  The *UnitedHealth Group* case appears also to have been concerned with the lack of evidence of agency personnel involvement in earlier stages of the privilege decisions, which is not the case here.  The other cases you cite merely stand for the proposition—with which we have said we agree—that formal invocation of the deliberative process privilege must be supported by an agency declaration.  If you have some Fourth Circuit authority requiring the declaration at the time logs are produced or documents redacted, we would be interested to see that.  We have not found any.

On the privilege log, we have already offered to confer on the additional information you feel you need to assess our claim of privilege.  You have not responded to that offer.  If you'd like to confer in good faith to avoid a motion, please let us know some times you have available to discuss that issue.

Best,
Jake

Jacob S. Siler
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
(202) 353-4556

---

**From:** Issacharoff, Lucas <lissacharoff@lchb.com>
**Sent:** Monday, April 13, 2026 9:32 PM
**To:** Siler, Jacob S. (CIV) <Jacob.S.Siler@usdoj.gov>; Rubin, Nicole M. <nrubin@lchb.com>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Wen, James J. (CIV) <James.J.Wen@usdoj.gov>
**Cc:** Heimann, Richard M. <rheimann@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens' <bstevens@msgpllc.com>; mmarziani@msgpllc.com; jgonzalez@msgpllc.com; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org; 'norman@democracydefenders.org' <norman@democracydefenders.org>; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>
**Subject:** [EXTERNAL] Re: [EXT] RE: Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

Jacob,

We will address the other issues you raise later, but the most pressing issue is your contention that the agency head declaration is only necessary after Plaintiffs make some challenge that meets your personal standard for merit.

Your position is, essentially, that you—as government counsel—can invoke the privilege and then, once the assertion is challenged (with specificity), seek a declaration to back it up. That is completely foreign to my own experience as a government attorney and it is a position that has been roundly rejected by courts. *See, e.g.*, *Pac. Gas & Elec. Co. v. United States*, 70 Fed. Cl. 128, 135, *modified on reconsideration*, 71 Fed. Cl. 205 (2006) ("Many courts have found that the deliberative process privilege may not be asserted by government counsel."); *Kaufman v. City of New York*, No. 98CIV.2648(MJL)(KNF), 1999 WL 239698, at *3 (S.D.N.Y. Apr. 22, 1999) ("The governmental deliberative process privilege may *only* be asserted by the head of a governmental agency or by a designated high-ranking subordinate. . . . The governmental deliberative process privilege may not be asserted by government counsel." (emphasis added and citations omitted)); *United States v. O'Neill*, 619 F.2d 222, 225–26 (3d Cir. 1980) (same).

In *United States ex rel. Poehling v. UnitedHealth Grp., Inc.*, No. CV 16-8697 MWF (SSX), 2018 WL 8459926, at *12 (C.D. Cal. Dec. 14, 2018), for example, the court rejected precisely this sort of "assert first, justify later" approach to the deliberative process privilege: "As a threshold matter, the Court agrees with United's contention that the Government's assertion of the privilege is procedurally flawed. Instead of involving agency personnel in the initial assertion of the privilege, it appears that the Government used contract attorneys to review the documents and determine the applicability of the deliberative process privilege. There is no evidence before the Court even suggesting that senior agency personnel became involved in the process until after the original privilege logs were produced."

To the extent some formal challenge to sufficiency is required, here it is: we challenge every assertion of the privilege on the grounds that no agency head or delegated authority has invoked it upon personal review. If and when you satisfy the procedural requirements for invocation, then we can turn to the merits of the assertion.

Confirm, by the end of the day tomorrow, that you will provide an agency head declaration and a detailed privilege log and by what date, or we will move to compel the production of every document withheld or redacted on the basis of the deliberative process privilege.

Lucas

---

**From:** Siler, Jacob S. (CIV) <Jacob.S.Siler@usdoj.gov>
**Sent:** Friday, April 10, 2026 10:59 AM
**To:** Rubin, Nicole M. <nrubin@lchb.com>; Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Wen, James J. (CIV) <James.J.Wen@usdoj.gov>
**Cc:** Heimann, Richard M. <rheimann@lchb.com>; Issacharoff, Lucas <lissacharoff@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens'

<bstevens@msgpllc.com>; mmarziani@msgpllc.com <mmarziani@msgpllc.com>; jgonzalez@msgpllc.com <jgonzalez@msgpllc.com>; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org <andrew@democracydefenders.org>; 'norman@democracydefenders.org' <norman@democracydefenders.org>; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>

**Subject:** [EXT] RE: Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

Hi Nicole,

We disagree with the factual and legal premises of this letter.

**Privilege Log for Redacted Documents:**  You assert that Defendants have not provided the information required by Rule 26(b)(5)(A) or local Discovery Guideline 10(d)(ii).  You also assert that Defendants have not provided certain "metadata" requested in your instructions, including the "type of document," "general subject matter of the document," "date of the document" and "such other information as is sufficient to identify the document" including recipients.  *See* D. Md. Discovery Guideline 10(d)(iii).  All of that information is apparent from the face of the redacted documents.  Unlike the documents withheld in full (which as you note were logged), our production included the authors, recipients, time-stamps, subject lines, and portions of the documents over which Defendants do not claim privilege.  That provides you with the same information that would be included in a privilege log.  That is entirely consistent with the cases you cite, which merely explain that one way a "party *can* sustain" their burden under Rule 26(b)(5) is through a privilege log.  *Sky Angel U.S., LLC v. Discovery Commc'ns., LLC*, 28 F. Supp. 3d 465, 483 (D. Md. 2014) (emphasis added).  Neither case you cite suggests that a log of redacted documents is the *only* way to satisfy Rule 26(b)(5), particularly where the redacted documents reveal the information that would be disclosed in the log.  All of that information is equally available to you.  That said, if you identify specific redactions or documents you feel you need more information about, we can attempt to provide that information to you.

**Agency Head Declarations:**  Your claim that Defendants must produce an agency head declaration at the time we withhold or redact a document to protect information subject to the deliberative process privilege is incorrect.  We agree that evidentiary support is required for formal invocation of the deliberative process privilege.  At this point, however, Defendants have only made an initial claim of privilege over the redacted materials; a formal invocation in court only occurs when the sufficiency of a specific withholding is challenged.  *See, e.g., Sky Angel*, 28 F. Supp. 3d at 483.   Your blanket assertion that we must produce an agency head affidavit to support each claim at the point of initial withholding is plainly overbroad.  We assume, for example, that you do not intend to challenge our withholding of portions of pre-decisional email communications deliberating on the appropriate responses to press inquiries.  *See* DOE4vUSDS_008929-DOE4vUSDS_009100.  Your obligation is to identify with specificity the redactions or withholdings you believe are insufficient, if any.  To the extent you challenge any specific redactions or withholdings, Defendants can reassess their production and provide you with the evidentiary support through agency declarations.

**Plaintiffs Cannot Establish That Any Privilege Is Categorically Overcome as a Blanket Matter:**  Your assertion that the deliberative process privilege is categorically overcome by Plaintiffs' need for the information is unsupportable.  It is incorrect that a document is "clearly relevant" to the claims and defenses in this matter simply because the government produced it in response to your overbroad requests.  You have made, for example, blanket requests for every email or message in certain custodians' inbox or chat within certain dates.  Many of those documents are not remotely relevant to

this case.  Even if a document contains relevant and responsive information, that does not necessarily establish that all portions of the document are relevant to the litigation or necessary for you to develop your case.  And nothing about the Fourth Circuit's recent decision suggests that valid privileges should be overcome.

**The Gottlieb Memorandum:**  We also disagree with your assertions related to the Gottlieb Memorandum identified on the privilege log.  Even if we agreed with your description of the content of that memorandum on page 5 of your letter, what you have described is a document recommending that certain actions be taken contingent on future events.  In other words, that is a pre-decisional and deliberative document.  The cover email you cite plainly indicates that Defendants' description of the withheld memorandum is accurate.  Mr. Gottlieb's message to Acting Administrator Gray notes that he is making a "request" and "recommendation" that Mr. Gray take certain actions related to employees on administrative leave.  And you are also aware that Mr. Gray never took the action to remove any individuals from administrative leave.  As Mr. Gray testified in his deposition, Mr. Gottlieb himself purported to remove the individuals from administrative leave without receiving Mr. Gray's approval to do so.  *See* Gray Dep. at 124:25-125:13.  We have produced Mr. Gottlieb's memorandum and email purporting to take that action.  *See* DOE4vUSDS_004128-DOE4vUSDS_004130.  A memorandum recommending that Mr. Gray take an action that he was considering but never took is plainly both pre-decisional and deliberative.  We have also produced the "factual information" that Mr. Gottlieb relied on in making his recommendations.  *See* DOE4vUSDS_004131 (noting an attached PDF titled "Materials Supporting Action Memo.pdf"); DOE4vUSDS_004133-DOE4v.USDS_004143 (producing that PDF attachment).  The remainder of the background materials describe deliberative communications with others regarding the substance of the recommended action and are equally subject to the privilege.  We have, however, reassessed the memorandum in good faith and determined that certain portions of it can be disclosed without divulging deliberative information.  Please see the attached document, which is bates-labeled DOE4vUSDS_009191-DOE4vUSDS_009193.

As noted above, we do not agree that our privilege assertions are unsupported or unwarranted, and certainly not on the blanket level you have identified.  If you provide us in writing with specific and particularized redactions or withholdings that you seek more information about, we are willing to engage in that conferral process.  Please let us know if you'd like to discuss.

Jacob S. Siler
Trial Attorney
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, NW
Washington, DC 20005
(202) 353-4556

**From:** Rubin, Nicole M. <nrubin@lchb.com>
**Sent:** Friday, April 3, 2026 5:32 PM
**To:** Lynch, Christopher M. (CIV) <Christopher.M.Lynch@usdoj.gov>; Siler, Jacob S. (CIV) <Jacob.S.Siler@usdoj.gov>; Wen, James J. (CIV) <James.J.Wen@usdoj.gov>
**Cc:** Heimann, Richard M. <rheimann@lchb.com>; Issacharoff, Lucas <lissacharoff@lchb.com>; Gagauz, Teodora <tgagauz@lchb.com>; 'Beth Stevens' <bstevens@msgpllc.com>; mmarziani@msgpllc.com; jgonzalez@msgpllc.com; Andrew Silberstein <asilberstein@msgpllc.com>; andrew@democracydefenders.org; 'norman@democracydefenders.org' <norman@democracydefenders.org>; 'Maya Cook' <maya@democracydefenders.org>; Jehieli Luevanos-Ovalle <jehieli@democracydefenders.org>
**Subject:** [EXTERNAL] Doe v. Musk, 25-cv-462- Pls. Letter to DOJ re Privilege Assertions

Chris, Jake, and James –

Please see the attached correspondence. We are available to discuss via phone call or zoom.

Best,
Nicole

**Lieff Cabraser Heimann & Bernstein**
Attorneys at Law

Nicole M. Rubin
Attorney at Law
nrubin@lchb.com
t 415.956.1000
f 415.956.1008
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
www.lieffcabraser.com

# Exhibit 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

J. DOE 4, et al.,              )
                Plaintiffs,    )
                               )
                vs.            )    CIVIL CASE NO.
                               )    8:25-cv-000462-TDC
UNITED STATES DOGE             )
SERVICE, et al.,               )
                Defendants.    )
_____        )

WEDNESDAY, NOVEMBER 19, 2025
Greenbelt, Maryland

TRANSCRIPT OF PROCEEDINGS
TELEPHONIC CASE MANAGEMENT CONFERENCE
BEFORE THE HONORABLE THEODORE D. CHUANG

For the Plaintiffs:

Andrew H. Warren, Esquire
Nicole M. Rubin, Esquire
Rebecca Stevens, Esquire
 Democracy Defenders Fund
 600 Pennsylvania Avenue SE, Unit 15180
 Washington, D.C. 20003


For the Defendants:

Jacob S. Siler, Esquire
James Wen, Esquire
 U.S. Department of Justice
 Federal Programs Branch
 1100 L Street NW
 Washington, D.C. 20005

_____
(Proceedings Recorded by Audio Recording - Transcript Produced
by Computer-aided Transcription)

Reported by: Amanda L. Longmore, RPR, CRR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland  21201
410-962-4474

P R O C E E D I N G S

(10:02 a.m.)

THE CLERK:  The matter now pending before this court is Civil Action Number 25-0462-TDC, J. Doe 4, et al., versus Elon Musk, et al.  We are here today for the purpose of a Case Management Conference.  Beginning with the plaintiffs, counsel please identify yourselves for the record.

MR. WARREN:  Good morning, Your Honor.  This is Andrew Warren of Democracy Defenders Fund on behalf of the plaintiffs.  I'm joined today by Beth Stevens and Nicole Rubin.

THE COURT:  Good morning.

MR. SILER:  Good morning, Your Honor.  This is Jacob Siler with the Department of Justice on behalf of the United States, and with me on the line is James Wen, also from my office.

THE COURT:  Okay.  Good morning, everyone.

So we are here for a Case Management Conference.  There is this notice that was filed by the defendants regarding a discovery-type motion.  We also have a protective order proposal here.

And on that first point, just to clarify for everyone, everyone's in agreement with this stipulated order regarding confidentiality of discovery materials; is that correct?

MR. WARREN:  This is Andrew Warren.  Yes, Your Honor, on behalf of the plaintiffs we are.

THE COURT:   And for the Government, too?

MR. SILER:   Your Honor, this is Jacob -- yeah, this is Jacob Siler.  I believe you're talking about Docket 181, and that's correct, we are in agreement on that.

THE COURT:   So the only thing I will tell you, because I do this in pretty much all of these cases, is I think I'm fine with it, but there's a line on the last page which I'm planning to delete.  It says, "The Clerk of the Court may return to counsel for the parties, or destroy, any sealed material at the end of the litigation, including any appeal."

And I typically take that line out.  This order's really governing what the parties are doing.  I'm not going to bind the court.  I mean, we're certainly not releasing sealed material, but the timing of what happens with things is sometimes governed by other record rules and I'm not going to deviate from that.

So if I take that line out and then sign this, does anybody have any issues with that?

MR. WARREN:   No objection from the plaintiffs, Your Honor.

MR. SILER:   None from the Government, either.

THE COURT:   Okay.  So we can get that docketed today and get that taken care of.

Now, as for the motion for protective order on the depositions, let me ask the plaintiffs, I haven't asked you to

4

respond to the letter so nothing wrong with not having done that, but I was interested in your take on not just wanting to depose these individuals, and it looks like it's Mr. Musk, Mr. Marocco, and Mr. Lewin, but they have a concern about discovery regarding the mental processes of government actors in reaching a decision. And maybe you can tell me, is that an area you plan to get into and, if so, why?

MR. WARREN: Yes, Your Honor. Again, this is Andrew Warren.

The short answer to the Court's question is no, we don't intend to get into that. You know, that argument that the Government raises is inevitable to fail for a couple of reasons. One, they are bringing that from the context of depositions, and the deliberative process privilege and mental process privilege applies to documents. We're not aware of any Fourth Circuit cases applying it to deposition testimony.

But beyond that, the privilege, as the Court is aware, applies to predecisional information, so that's information that is predecisional and deliberative in nature. It's not regarding an agency's federal position.

And of course the privilege is not absolute. The privilege only apply to opinions and not facts. There are reasons behind it, of course, to protect the integrity of the deliberative process. We are not intending to get into any of that.

Telephonic Case Management Conference 11/19/25

The plaintiffs are seeking discovery on essentially why decisions -- excuse me, not seeking discovery on why decisions were made in terms of what positions the Government contemplated and why they arose at -- arrived at one position rather than another.  That's the deliberative nature that the privilege protects.

Instead, what the plaintiffs are seeking discovery on is with regard to the Appointments Clause claim, and as the Court acknowledged in its memorandum granting a preliminary injunction, who made the decisions at issue and under what authority they had.

And regarding the separation of powers claim, we need to determine the current state of operations and whether those operations are complying with the statutory minimum as required of USAID, in addition to who made the decisions and under what authority, because that pertains to whether the Executive Branch exceeded its authority.  But the bottom line is that the information we will seek are not the deliberations but the decisions themselves.  The facts, not the opinions.

THE COURT:  Okay.  So leaving aside whether or not certain questions leading to certain answers might be protected by privilege or not, you're not planning to ask about mental processes of government actors in reaching a decision, and so that's not really an issue in contention as a practical matter. Is that accurate?

6

Telephonic Case Management Conference 11/19/25

MR. WARREN:  That's correct, Your Honor.

THE COURT:  Okay.  And then the letter also raises this issue about these officials being high-level Executive Branch officials who cannot be deposed under the Apex Doctrine, I suppose except for under particular circumstances which the Government says are not here.

I take it you don't agree with that or we wouldn't be here, or maybe you can just clarify what your view is on whether these officials meet that standard or not.  And is the issue from your perspective they don't qualify for that category or that, you know, their circumstances still warrant, you know, whatever the extraordinary circumstances are, or both?

MR. WARREN:  Well, there are a couple issues.  But first, Your Honor is correct that we do not agree with the Government's position that the Apex Doctrine applies here and for a couple reasons.

The first is that the Fourth Circuit has never adopted the Apex Doctrine.  It only recently acknowledged that the doctrine exists, which was last year, 2025.  And District Courts within the Fourth Circuit have used the doctrine in contrast to other circuits to limit discovery that's intended to create abuse or harassment.  That's not what's happening here, and the Government doesn't even allege that that's what's happening here.

But regarding the substance of the Apex Doctrine, even assuming that the Fourth Circuit recognizes it, we acknowledge that generally speaking deposing Apex officials is discouraged, but the reason why is because it's high-ranking officials are typically removed from the daily subject of the litigation and have no unique knowledge of the facts at issue.  And that's something that District Courts in the Fourth Circuit have pointed out on several occasions.

I mean, the Apex Doctrine is rooted in the fact that the executive, the Apex executive lacks any knowledge of the relevant facts.  It does not prohibit the deposition of executives who have personal knowledge that are relevant to the parties' claims and defenses.

So we really have two issues here.  One is that the standard in other circuits is that the parties seeking the deponent must be able to show that the official has personal knowledge of the facts; and secondly, that other less burdensome avenues for obtaining that information have been exhausted.

Here, the first prong is easily satisfied.  We need look no further than the Court's ruling in granting the preliminary injunction.  The Court found that there were factual questions concerning Mr. Musk, Mr. Marocco, Secretary Rubio, all with regard to their exercise of significant authority.  That pertains to both the Appointments Clause and the separation of

Telephonic Case Management Conference 11/19/25

powers claims.

The Court also found that even in what position Mr. Musk occupied is a factual -- is in dispute and that's relevant to the continuing Government -- excuse me, the continuing Government position issue under the Appointments Clause and how it sits.

And Mr. Lewin, just like Mr. Marocco and Mr. Musk and Secretary Rubio, is at the center of the decisionmaking here. I mean, this is not a slip-and-fall case where the plaintiffs are seeking to depose these officials where someone fell outside a government building.

The knowledge that these officials, Mr. Musk, Mr. Marocco, Mr. Lewin, and potentially Secretary Rubio have, what they did, when they did it, and under whose authority is the heart of the factual dispute in this case.

Regarding the second prong --

THE COURT:  Okay.

MR. WARREN:  Sorry, Your Honor, I'll pause there.

THE COURT:  Well, just for a second.  I mean, the letter refers to Mr. Musk, Mr. Marocco, Mr. Lewin.  Are you also seeking to depose Secretary Rubio or not?

MR. WARREN:  We have not at this point, Your Honor, but we haven't received discovery yet.  We haven't received document production from the Government despite the Court's deadline.  We haven't received satisfactory responses to our

interrogatories.  So we can't make the determination at this point that we will not seek to depose Secretary Rubio but we also --

THE COURT:  But you haven't asked for it, either.

MR. WARREN:  We have not, Your Honor, because at this point we believe it would be premature anticipating the information we are entitled to receive from these other witnesses.

THE COURT:  Um-hmm, okay.

So was there anything else you were going to add?  Again, this isn't necessarily argument on the motion; although, to be honest, since this is a discovery issue, the hope is this doesn't turn into, you know, a long drawn-out briefing process. To some degree having some discussion today to narrow the issues is helpful.  So beyond -- what else were you going to add?  I don't want to cut you off.

MR. WARREN:  Not a problem, Your Honor.  I'll keep it brief, recognizing we're not having the argument on the issues today, but as the Court said, we are trying to identify the issues and whether there's even a need to have full briefing on this.

But the second prong of the standard under the Apex Doctrine is that the -- no other witnesses have the knowledge that these officials do and that other forms of discovery won't suffice.  Here, it's hard for the Government to argue that

Telephonic Case Management Conference 11/19/25

other individuals have the knowledge that these individuals have considering they were at the center of the questions that are being asked, center of the decisionmaking process.

But additionally, it's impossible for the Government to say that we can obtain this information from other witnesses when they're not producing discovery.  No documents were produced last week that had not been already published in other cases.  Their discovery production was limited to four declarations submitted in other cases.  Nothing internal, nothing that was nonpublic and, frankly, nothing that was responsive to the majority of the plaintiff document requests.

The Government says in their notice of motion that this information could be received -- to be obtained for interrogatories.  The problem is they didn't provide adequate responses to many of our interrogatories.

And just by way of example, one of the interrogatories sought information about meetings that Mr. Musk had.  This was an interrogatory sent to the DOGE defendant, that's U.S. Digital Service, DOGE, and to Ms. Gleason.  And the Government responded flat out saying we're not going to provide this information, and now their position is we can't depose Mr. Musk about what meetings he had because we can obtain the information from other sources.  They haven't provided the information.

THE COURT:  Okay.

11

MR. WARREN:  So it's certainly premature at this point to say that certain witnesses who are at the very center of controversy are off limits because the information can be obtained through other means.

I'm sorry for continuing, Your Honor, but that's all on that point.

THE COURT:  Okay.  So just quickly on the other side of this, and obviously, Mr. Siler, I have your letter which is quite detailed so I have a good idea of what your position is, but just on that last point, is it correct that you haven't produced discovery in response to the written requests leaving aside depositions?

MR. SILER:  No, Your Honor.  That is not accurate. We have responded -- we have provided substantive responses to interrogatories.  And, you know, plaintiffs have identified some objections to our responses, there's some follow-up questions.  We are conferring on those.  We've taken those concerns back to our client agencies and we are trying to work out whether we can address those concerns.

On specifically the USCS issue that plaintiffs identified, we do have changing arguments because those are directed at the White House, but a similar interrogatory that was posed to the State Department we did respond to.  And, again, they had some issues and had some follow-up questions with our response that we are conferring on.

With respect to documents, you know, our response deadline was last week.  Rule 34 permits us to make our production at a reasonable time.  We intend to make rolling productions beginning this Friday.  You know, I don't need to beat a dead horse but there was a lapse in appropriations that set us back a little bit.  We asked for an extension to our response deadline.  We have offered on a few occasions to, you know, work on an agreement to -- or extended schedule for the end of discovery in this case, subject of course to our objections being overruled.  And obviously we would have to put that before the Court but I don't -- we do not agree that it is accurate to say that we have not provided discovery in this case.  Obviously there are issues that the parties are working out, as there is in every case, but it is just simply inaccurate to say that we have not produced discovery.

THE COURT:  Okay.  Well, as you all know from both the local -- Case Management Order, the local rules, and the federal rules, there's processes that the parties should go through among themselves before we have an actual motion on discovery, and the idea behind all those procedures is that things get worked out if they can be.  So I encourage you to do that on all the issues that continue to remain in dispute, with the exception of the one that we're talking about now since we have gotten at least to the point of this letter.

What I would say at this point is, as I said, usually

these things are either worked out among themselves or when a discovery issue is first teed up for the Court, sometimes issues can be resolved orally through a conference like this, other times it requires the full motion.  This is somewhere in between.

What I will say at this point is, first, I see three issues here.  One is the argument that the request for discovery such as the depositions of Mr. Musk, Mr. Marocco, and Mr. Lewin is unnecessary and disproportioned to the needs of this case.

I entirely disagree with that.  I think in the prior opinions it's been quite clear that there are factual issues and these three witnesses clearly have something relevant to those issues.  And I don't understand the argument at all that it's disproportionate to the needs of this case.  This is -- these are the key people in the case.  We're not talking about deposing hundreds of people on wide-ranging issues.  This is very focused issues here.  These are clearly key witnesses, so that argument's a nonstarter and I'm going to deny any argument or motion or argument that discovery should be barred because it's unnecessary and disproportionate to the needs of the case.

On the issue of whether discovery regarding the mental processes of government actors in reaching decisions is off limits, whether by privilege or otherwise, is not clearly stated in the letter what the reason is, which privilege, if

any, but that doesn't seem to be an issue that needs to be decided because the plaintiffs have said that they're not going to be pursuing that kind of discovery. So it's effectively not either ripe or it's moot. Whichever way you look at it, it's nothing that needs to be decided. The parties basically have an agreement that that won't be a subject.

On the third issue of whether these are high-ranking government officials who should not be deposed under this Apex Doctrine, I do think that is something that requires some -- a formal motion with some briefing on an expedited schedule with limited limitations on what needs to be said. We usually try to keep discovery disputes -- try to resolve them crisply and quickly without delaying the case.

It is a doctrine that, obviously, it's a very specific legal argument that's being made and I think, one, I don't want to conclude that the Government has said everything it could possibly say in the letter and certainly the defense, while having -- I'm sorry, the plaintiffs, although having made a little bit of an oral argument here, they should have an opportunity to present the cases that they're referring to.

So what I would ask everyone to do is to -- we'll have a very tight schedule on a motion on that issue of the Apex Doctrine. I would ask if the parties think they can make those arguments in five pages, is that something that you see any reason why we can't do that?

Telephonic Case Management Conference 11/19/25

MR. SILER:  Your Honor, I have a clarifying question, if I might.  On the first issue about --

THE COURT:  Sorry, which counsel is this?

MR. SILER:  Sorry, this is -- apologies, this is Mr. Siler for the Government.

THE COURT:  Yes.  Go ahead.

MR. SILER:  On the first issue that we raised -- on the first issue that we raised, and I understand both your prior rulings and your ruling today that you do not wish to hear more on the proportionality argument.  I think the Government for purposes of preservation of that argument would like either a ruling prohibiting us from filing a motion on that or, you know, the ability to preserve those objections in a written motion.

That aside, I think we could work with the five-page limit with respect to the -- I mean, Apex is, in my view, a bit of a misnomer of the doctrine but we'll call it that for purposes -- for these purposes the Apex Doctrine.  I think we could get that done in five pages, yes.

THE COURT:  Okay.  So I understand you want to preserve arguments.  I mean, if we were in a trial setting in the courtroom, I think the transcript of this discussion would be sufficient.  You've stated on the record you want to -- you have a continuing objection to that ruling and this is something -- this is, you know, we're on the record here, a

transcript could be ordered of this, so I think you're okay.

And then how about from your side, Mr. Warren, in terms of five pages to respond on the Apex Doctrine?

MR. WARREN:  Your Honor, that's sufficient for the plaintiffs.

THE COURT:  Okay.  So today is November 19th, I believe.  Could we hear from the Government, say, by Friday? It seems like you have already put this argument together largely through the letter anyways.

MR. SILER:  Yes, that's sufficient timing for the Government.  This is Mr. Siler again.  Apologies.  That's sufficient timing for the Government.

I would note that as of last night the plaintiff indicated they wanted to take the deposition of Mr. Marocco I believe by December 16th.  I don't know if they are planning to stick to that date, but I just flag that for the Court as a potential timing issue.

THE COURT:  Sure.  I understand.

So then from plaintiff's side, could you respond by, say, Wednesday?

MR. WARREN:  Yes, Your Honor.

THE COURT:  I mean, is Tuesday possible?

MR. WARREN:  Tuesday is possible, Your Honor.

THE COURT:  Okay.  That would be great, because that way we're rolling into the Thanksgiving weekend.

Telephonic Case Management Conference 11/19/25

Okay.  So on the one hand knowing that, again, we try to keep discovery moving, so I am hopeful that we can get you an answer, maybe not immediately after that given the Thanksgiving holiday but perhaps first week of December.  Probably well before the 16th, although I don't know far enough in advance that one could easily pivot.  And my view is that while we try to keep everything on track, if the Court ends up delaying this process by taking longer in resolving the motion, then I'm not going to prejudice, I guess, whoever wants more discovery, we can probably add a little time at the end of the discovery period if that's the hang-up.  So it wouldn't prevent the depositions or other discovery, whether it can be done on that date, unclear.

First off, I don't know what the ruling is going to be even if Mr. Marocco does even get to testify or has to testify, but then if he does whether we can have that by the 16th.  I think we probably could, so I wouldn't say that that should be taken off the table.  We'll do our best to get you a ruling in advance of that one way or the other.

And then typically for discovery, like I said, we don't even always have briefing on it, so I'm not sure and I would take the view, again, to keep these things moving that we don't need any reply briefs on this.  This seems like it's a pretty discrete issue and we've already got the preview from the Government, so I'll take those two briefs of five pages each

Telephonic Case Management Conference 11/19/25

and make a decision on the discovery question.

And we'll give you that stipulated protective order that will keep everything else moving.

Is there anything else we should discuss while we're here today?

MR. WARREN:  Your Honor, this is --

MR. SILER:  Your Honor --

[Indiscernible crosstalk.]

MR. WARREN:  I'm sorry, Jake.  Go ahead.

MR. SILER:  Oh, no, that's fine.  I don't want to -- certainly want to give you the opportunity to speak.  But this is Mr. Siler for the Government.

I mean, I do also want to flag for the Court that we have a pending request for an interlocutory appeal that the Government, and obviously that hasn't held up discovery so far, but I think some of the arguments in that may become moot the further into discovery we get, so we would ask just for a ruling at the earliest possible time.

THE COURT:  No, I understand that, and we have it on our -- we definitely have it on our list.  We know about it. We're trying to work through that motion as well as all motions that we get in all the cases.  So yes, I understand that that's there and I don't mind getting the reminder.

Anything else from the plaintiffs?

MR. SILER:  Thank you, Your Honor.

Telephonic Case Management Conference 11/19/25

MR. WARREN: Yes, Your Honor. Again, this is Mr. Warren for the plaintiffs.

At a certain point we are going to seek an extension of the discovery deadline. I can get into the reasons why. The Court identified potentially some of the issues just a moment ago, but the bottom line is that discovery is not proceeding as smoothly as we'd hoped.

I think the parties have engaged in many e-mails and multiple meet-and-confers and we are making slow progress, but, as I mentioned before, there have been some issues with the Government's document production, with the response to written discovery, there's been some issues in terms of getting witnesses scheduled and serving deponents, and I won't, you know, belabor the point with the Court.

But my ultimate question at this moment is would the Court want us to file a notice of motion to extend discovery? The defendants have told us they'd agree to an extension. The issue at this point is we don't know exactly how far we will need to push discovery because it's going to depend how much discovery actually proceeds in a timely manner, but we did want to alert the Court that both sides agree that an extension of the deadline, the current discovery deadlines is necessary.

THE COURT: So, okay. And Mr. Siler, I think you had said earlier that at least to some degree in your view things have been slowed down by the shutdown, and so it would seem at

a minimum just to adjust for that.  There could be some extension.  But do you have a -- I mean, it sounds like -- I mean, do you agree to some extension, although I don't know if you agree on how much?

MR. SILER:  This is Mr. Siler.  Yes.  I mean, I believe we said this in at least one of -- maybe our extension motion with respect to discovery that there have been some delays related to the shutdown.  We obviously did not obtain a stay of the case during that period, but given those delays, I think we would agree to some extension.  I don't think the parties have at this point ripened that agreement to a specific timeline and I'm not sure that there will be a dispute about how long the extension would be, but I do think that is something that the parties could work on before we come back to the Court about the length of that extension.

THE COURT:  So --

[Indiscernible crosstalk.]

MR. SILER:  Apologies.  Again, that would be subject to the specific obviously objections that we've raised about particular discovery.

THE COURT:  Sure.  I mean, I think we -- typically if we're all in agreement that some extension makes sense, if only just to adjust for the delayed ability of the Government to react during the shutdown, and then the usual approach, if you can reach an agreement, which is of course highly encouraged,

you would just file a joint motion or consent motion.  I know the Case Management Order consent motions don't need to be previewed.  And with a proposed order that gives the old dates and the new dates and we can usually deal with that pretty easily.

If it's contested, then, you know, I might suggest some sort of notice like you've already filed, which probably doesn't have to be very detailed just to tee it up because if it's contested it's probably easier to deal with through a conference like this than to have briefing on dates and things like that, but hopefully it doesn't come to that.

And I don't mind, again, if you're waiting to see what happens with this current motion, again, I would like to try to tell you I can get you an answer pretty quickly but if for some reason I'm delayed, you know, you may build that into the process so maybe it makes sense to wait a little bit and see, one, do I delay the process by taking longer on this motion, obviously depending on whether these individuals are subject to deposition or not, that could affect how much time you need.

And so you might want to wait, but maybe we do have a common understanding that some extension is appropriate so that no one gets kind of caught off guard at the end of this and getting into the issues about, you know, whether the motion should have been filed earlier.

Is that agreeable to everyone?

MR. WARREN:  This is Mr. Warren.  That is agreeable to the plaintiffs, Your Honor.

MR. SILER:  And this is Mr. Siler, yes.  Agreed on behalf of the Government.

THE COURT:  Okay.  Okay.  So we'll issue an order with the dates on the briefing and also issue the protective order.  Is there anything else we should discuss today?

MR. SILER:  Not from the Government.

MR. WARREN:  Not from the plaintiffs, Your Honor.

THE COURT:  Okay.  Thank you all very much, then.  Have a good day.

(The proceedings concluded at 10:30 a.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Amanda L. Longmore, Registered Professional Reporter and Federal Certified Realtime Reporter, do hereby certify that the foregoing is a correct transcript of the audio-recorded proceedings in the above-entitled matter, audio recorded via FTR Gold on November 19, 2025, and transcribed from the audio recording to the best of my ability and that said transcript has been compared with the audio recording.

Dated this 20th day of November 2025
-S-
_____
AMANDA L. LONGMORE, RPR, CRR, FCRR
FEDERAL OFFICIAL COURT REPORTER

Telephonic Case Management Conference 11/19/25

**10:02** [1] - 2:2
**16th** [3] - 16:15; 17:5, 16
**181** [1] - 3:3
**19th** [1] - 16:6
**2025** [1] - 6:20
**25-0462-TDC** [1] - 2:4
**34** [1] - 12:2
**4** [1] - 2:4
**a.m** [1] - 2:2
**ability** [2] - 15:13; 20:23
**able** [1] - 7:16
**absolute** [1] - 4:21
**abuse** [1] - 6:22
**accurate** [3] - 5:25; 11:13; 12:12
**acknowledge** [1] - 7:2
**acknowledged** [2] - 5:9; 6:19
**Action** [1] - 2:4
**actors** [3] - 4:5; 5:23; 13:23
**actual** [1] - 12:19
**add** [3] - 9:10, 16; 17:10
**addition** [1] - 5:15
**additionally** [1] - 10:4
**address** [1] - 11:19
**adequate** [1] - 10:14
**adjust** [2] - 20:1, 23
**adopted** [1] - 6:18
**advance** [2] - 17:5, 19
**affect** [1] - 21:19
**agencies** [1] - 11:18
**agency's** [1] - 4:20
**ago** [1] - 19:6
**agree** [8] - 6:7, 15; 12:11; 19:17, 21; 20:3, 10
**agreeable** [1] - 21:25
**agreement** [7] - 2:22; 3:4; 12:8; 14:6; 20:11, 22, 25
**ahead** [2] - 15:6; 18:9

**al** [2] - 2:4
**alert** [1] - 19:21
**allege** [1] - 6:24
**Andrew** [3] - 2:9, 24; 4:8
**answer** [3] - 4:10; 17:3; 21:14
**answers** [1] - 5:21
**anticipating** [1] - 9:6
**anyways** [1] - 16:9
**Apex** [13] - 6:4, 16, 19; 7:1, 3, 9-10; 9:22; 14:8, 22; 15:16, 18; 16:3
**apologies** [3] - 15:4; 16:11; 20:18
**appeal** [2] - 3:10; 18:14
**applies** [3] - 4:15, 18; 6:16
**apply** [1] - 4:22
**applying** [1] - 4:16
**Appointments** [3] - 5:8; 7:25; 8:5
**approach** [1] - 20:24
**appropriate** [1] - 21:21
**appropriations** [1] - 12:5
**area** [1] - 4:7
**argue** [1] - 9:25
**argument** [12] - 4:11; 9:11, 18; 13:7, 14, 19-20; 14:15, 19; 15:10; 16:8
**argument's** [1] - 13:19
**arguments** [4] - 11:21; 14:24; 15:21; 18:16
**arose** [1] - 5:4
**arrived** [1] - 5:4
**aside** [3] - 5:20; 11:12; 15:15
**assuming** [1] - 7:2
**authority** [5] - 5:11, 16-17; 7:24; 8:14
**avenues** [1] - 7:18
**aware** [2] - 4:15, 17
**barred** [1] - 13:20

**beat** [1] - 12:4
**become** [1] - 18:16
**beginning** [2] - 2:6; 12:4
**behalf** [3] - 2:9, 13, 25
**behind** [2] - 4:23; 12:20
**belabor** [1] - 19:14
**best** [1] - 17:18
**Beth** [1] - 2:10
**between** [1] - 13:5
**beyond** [2] - 4:17; 9:15
**bind** [1] - 3:12
**bit** [4] - 12:6; 14:19; 15:16; 21:16
**bottom** [2] - 5:17; 19:6
**Branch** [2] - 5:17; 6:4
**brief** [1] - 9:18
**briefing** [5] - 9:13, 20; 14:10; 17:21; 21:10
**briefs** [2] - 17:23, 25
**bringing** [1] - 4:13
**build** [1] - 21:15
**building** [1] - 8:11
**burdensome** [1] - 7:18
**cannot** [1] - 6:4
**care** [1] - 3:23
**case** [13] - 8:9, 15; 12:9, 13-14, 17; 13:10, 15-16, 21; 14:13; 20:9; 21:2
**Case** [2] - 2:5, 17
**cases** [6] - 3:6; 4:16; 10:8; 14:20; 18:22
**category** [1] - 6:11
**caught** [1] - 21:22
**center** [4] - 8:8; 10:2; 11:2
**certain** [4] - 5:21; 11:2; 19:3
**certainly** [4] - 3:13; 11:1; 14:17; 18:11
**changing** [1] - 11:21
**Circuit** [5] - 4:16; 6:18, 21; 7:2, 7

**circuits** [2] - 6:22; 7:15
**circumstances** [3] - 6:5, 11
**Civil** [1] - 2:4
**claim** [2] - 5:8, 12
**claims** [2] - 7:13; 8:1
**clarify** [2] - 2:21; 6:8
**clarifying** [1] - 15:1
**Clause** [3] - 5:8; 7:25; 8:5
**clear** [1] - 13:12
**clearly** [3] - 13:13, 18, 24
**CLERK** [1] - 2:3
**Clerk** [1] - 3:8
**client** [1] - 11:18
**common** [1] - 21:21
**complying** [1] - 5:14
**concern** [1] - 4:4
**concerning** [1] - 7:23
**concerns** [2] - 11:18
**conclude** [1] - 14:16
**Conference** [2] - 2:6, 17
**conference** [2] - 13:3; 21:10
**conferring** [2] - 11:17, 25
**confers** [1] - 19:9
**confidentiality** [1] - 2:23
**consent** [2] - 21:1
**considering** [1] - 10:2
**contemplated** [1] - 5:4
**contention** [1] - 5:24
**contested** [2] - 21:6, 9
**context** [1] - 4:13
**continue** [1] - 12:22
**continuing** [4] - 8:4; 11:5; 15:24
**contrast** [1] - 6:21
**controversy** [1] - 11:3
**correct** [5] - 2:23; 3:4; 6:1, 15; 11:10

**counsel** [3] - 2:6; 3:9; 15:3
**couple** [3] - 4:12; 6:14, 17
**course** [4] - 4:21, 23; 12:9; 20:25
**Court** [16] - 3:8; 4:17; 5:8; 7:22; 8:2; 9:19; 12:11; 13:2; 16:16; 17:7; 18:13; 19:5, 14-15, 21; 20:15
**court** [2] - 2:3; 3:13
**COURT** [25] - 2:11, 16; 3:1, 5, 22; 5:20; 6:2; 8:17, 19; 9:4, 9; 10:25; 11:7; 12:16; 15:3, 6, 20; 16:6, 18, 22, 24; 18:19; 19:23; 20:16, 21
**Court's** [3] - 4:10; 7:21; 8:24
**courtroom** [1] - 15:22
**Courts** [2] - 6:20; 7:7
**create** [1] - 6:22
**crisply** [1] - 14:12
**crosstalk** [2] - 18:8; 20:17
**current** [3] - 5:13; 19:22; 21:13
**cut** [1] - 9:16
**daily** [1] - 7:5
**date** [2] - 16:16; 17:13
**dates** [3] - 21:3, 10
**dead** [1] - 12:4
**deadline** [5] - 8:25; 12:1, 7; 19:4, 22
**deadlines** [1] - 19:22
**deal** [2] - 21:4, 9
**December** [2] - 16:15; 17:4
**decided** [2] - 14:2, 5
**decision** [3] - 4:6; 5:23; 18:1
**decisionmaking** [2] - 8:8; 10:3
**decisions** [6] - 5:2, 10, 15, 19; 13:23

**declarations** [1] - 10:9
**defendant** [1] - 10:18
**defendants** [2] - 2:18; 19:17
**Defenders** [1] - 2:9
**defense** [1] - 14:17
**defenses** [1] - 7:13
**definitely** [1] - 18:20
**degree** [2] - 9:14; 19:24
**delay** [1] - 21:17
**delayed** [2] - 20:23; 21:15
**delaying** [2] - 14:13; 17:7
**delays** [2] - 20:8
**delete** [1] - 3:8
**deliberations** [1] - 5:18
**deliberative** [4] - 4:14, 19, 24; 5:5
**Democracy** [1] - 2:9
**deny** [1] - 13:19
**Department** [2] - 2:13; 11:23
**deponent** [1] - 7:16
**deponents** [1] - 19:13
**depose** [5] - 4:3; 8:10, 21; 9:2; 10:21
**deposed** [2] - 6:4; 14:8
**deposing** [2] - 7:3; 13:17
**deposition** [4] - 4:16; 7:11; 16:14; 21:19
**depositions** [5] - 3:25; 4:14; 11:12; 13:8; 17:12
**despite** [1] - 8:24
**destroy** [1] - 3:9
**detailed** [2] - 11:9; 21:8
**determination** [1] - 9:1
**determine** [1] - 5:13
**deviate** [1] - 3:16
**Digital** [1] - 10:19

Telephonic Case Management Conference 11/19/25

directed [1] - 11:21
disagree [1] - 13:11
discouraged [1] - 7:3
discovery [40] - 2:19, 23; 4:5; 5:1, 7; 6:22; 8:23; 9:12, 24; 10:6, 8; 11:11; 12:9, 12, 15, 20; 13:2, 8, 20, 22; 14:3, 12; 17:2, 9-10, 12, 20; 18:1, 15, 17; 19:4, 6, 12, 16, 19-20, 22; 20:7, 20
discovery-type [1] - 2:19
discrete [1] - 17:24
discuss [1] - 18:4
discussion [2] - 9:14; 15:22
disproportionate [2] - 13:15, 21
disproportioned [1] - 13:9
dispute [4] - 8:3, 15; 12:22; 20:12
disputes [1] - 14:12
District [2] - 6:20; 7:7
Docket [1] - 3:3
docketed [1] - 3:22
Doctrine [10] - 6:4, 16, 19; 7:1, 9; 9:23; 14:9, 23; 15:18; 16:3
doctrine [4] - 6:19, 21; 14:14; 15:17
document [3] - 8:24; 10:11; 19:11
documents [3] - 4:15; 10:6; 12:1
Doe [1] - 2:4
DOGE [2] - 10:18
done [3] - 4:1; 15:19; 17:12
down [1] - 19:25
drawn [1] - 9:13
drawn-out [1] - 9:13
during [2] - 20:9,

24
e-mails [1] - 19:8
earliest [1] - 18:18
easier [1] - 21:9
easily [3] - 7:20; 17:6; 21:5
effectively [1] - 14:3
either [5] - 3:21; 9:4; 13:1; 14:4; 15:12
Elon [1] - 2:5
encourage [1] - 12:21
encouraged [1] - 20:25
end [4] - 3:10; 12:8; 17:10; 21:22
ends [1] - 17:7
engaged [1] - 19:8
entirely [1] - 13:11
entitled [1] - 9:7
essentially [1] - 5:1
et [2] - 2:4
exactly [1] - 19:18
example [1] - 10:16
exceeded [1] - 5:17
except [1] - 6:5
exception [1] - 12:23
excuse [2] - 5:2; 8:4
Executive [2] - 5:16; 6:3
executive [2] - 7:10
executives [1] - 7:12
exercise [1] - 7:24
exhausted [1] - 7:19
exists [1] - 6:20
expedited [1] - 14:10
extend [1] - 19:16
extended [1] - 12:8
extension [12] - 12:6; 19:3, 17, 21; 20:2, 6, 10, 13, 15, 22; 21:21
extraordinary [1]

- 6:12
fact [1] - 7:9
facts [5] - 4:22; 5:19; 7:6, 11, 17
factual [4] - 7:22; 8:3, 15; 13:12
fail [1] - 4:12
fall [1] - 8:9
far [3] - 17:5; 18:15; 19:18
federal [2] - 4:20; 12:18
fell [1] - 8:10
few [1] - 12:7
file [2] - 19:16; 21:1
filed [3] - 2:18; 21:7, 24
filing [1] - 15:12
fine [2] - 3:7; 18:10
first [11] - 2:21; 6:15, 18; 7:20; 13:2, 6; 15:2, 7-8; 17:4, 14
five [5] - 14:24; 15:15, 19; 16:3; 17:25
five-page [1] - 15:15
flag [2] - 16:16; 18:13
flat [1] - 10:20
focused [1] - 13:18
follow [2] - 11:16, 24
follow-up [2] - 11:16, 24
formal [1] - 14:10
forms [1] - 9:24
four [1] - 10:8
Fourth [5] - 4:16; 6:18, 21; 7:2, 7
frankly [1] - 10:10
Friday [2] - 12:4; 16:7
full [2] - 9:20; 13:4
Fund [1] - 2:9
generally [1] - 7:3
given [2] - 17:3; 20:9
Gleason [1] - 10:19
governed [1] - 3:15
governing [1] - 3:12
government [5] - 4:5; 5:23; 8:11;

13:23; 14:8
Government [23] - 3:1, 21; 4:12; 5:3; 6:6, 24; 8:4, 24; 9:25; 10:4, 12, 19; 14:16; 15:5, 11; 16:7, 11-12; 17:25; 18:12, 15; 20:23
Government's [2] - 6:16; 19:11
granting [2] - 5:9; 7:21
great [1] - 16:24
guard [1] - 21:22
guess [1] - 17:9
hand [1] - 17:1
hang [1] - 17:11
hang-up [1] - 17:11
harassment [1] - 6:23
hard [1] - 9:25
hear [2] - 15:10; 16:7
heart [1] - 8:14
held [1] - 18:15
helpful [1] - 9:15
high [3] - 6:3; 7:4; 14:7
high-level [1] - 6:3
high-ranking [2] - 7:4; 14:7
highly [1] - 20:25
hmm [1] - 9:9
holiday [1] - 17:4
honest [1] - 9:12
Honor [22] - 2:8, 12, 24; 3:2, 20; 4:8; 6:1, 15; 8:18, 22; 9:5, 17; 11:5, 13; 15:1; 16:4, 21, 23; 18:6, 25; 19:1
hope [1] - 9:12
hoped [1] - 19:7
hopeful [1] - 17:2
hopefully [1] - 21:11
horse [1] - 12:5
House [1] - 11:22
hundreds [1] - 13:17
idea [2] - 11:9; 12:20
identified [3] - 11:15, 20; 19:5
identify [2] - 2:7;

9:19
immediately [1] - 17:3
impossible [1] - 10:4
inaccurate [1] - 12:15
including [1] - 3:10
indicated [1] - 16:13
indiscernible [1] - 20:17
Indiscernible [1] - 18:8
individuals [4] - 4:3; 10:1; 21:18
inevitable [1] - 4:12
information [12] - 4:18; 5:18; 7:18; 9:7; 10:5, 13, 17, 21, 23-24; 11:3
injunction [2] - 5:10; 7:22
instead [1] - 5:7
integrity [1] - 4:23
intend [2] - 4:11; 12:3
intended [1] - 6:22
intending [1] - 4:24
interested [1] - 4:2
interlocutory [1] - 18:14
internal [1] - 10:9
interrogatories [5] - 9:1; 10:14-16; 11:15
interrogatory [2] - 10:18; 11:22
issue [19] - 5:10, 24; 6:3, 10; 7:6; 8:5; 9:12; 11:20; 13:2, 22; 14:1, 7, 22; 15:2, 7-8; 16:17; 17:24; 19:18
issues [19] - 3:18; 6:14; 7:14; 9:15, 18, 20; 11:24; 12:13, 22; 13:3, 7, 12, 14, 17-18; 19:5, 10, 12; 21:23
Jacob [3] - 2:12; 3:2

Jake [1] - 18:9
James [1] - 2:14
joined [1] - 2:10
joint [1] - 21:1
Justice [1] - 2:13
keep [6] - 9:17; 14:12; 17:2, 7, 22; 18:3
key [2] - 13:16, 18
kind [2] - 14:3; 21:22
knowing [1] - 17:1
knowledge [7] - 7:6, 10, 12, 17; 8:12; 9:23; 10:1
lacks [1] - 7:10
lapse [1] - 12:5
largely [1] - 16:9
last [6] - 3:7; 6:20; 10:7; 11:10; 12:2; 16:13
leading [1] - 5:21
least [3] - 12:24; 19:24; 20:6
leaving [2] - 5:20; 11:11
legal [1] - 14:15
length [1] - 20:15
less [1] - 7:17
letter [8] - 4:1; 6:2; 8:20; 11:8; 12:24; 13:25; 14:17; 16:9
level [1] - 6:3
Lewin [5] - 4:4; 8:7, 13, 20; 13:9
limit [2] - 6:22; 15:15
limitations [1] - 14:11
limited [2] - 10:8; 14:11
limits [2] - 11:3; 13:24
line [6] - 2:14; 3:7, 11, 17; 5:17; 19:6
list [1] - 18:20
litigation [2] - 3:10; 7:5
local [2] - 12:17
look [2] - 7:20; 14:4
looks [1] - 4:3
mails [1] - 19:8
majority [1] - 10:11
Management [2] - 2:6, 17

**management** [2] - 12:17; 21:2
**manner** [1] - 19:20
**Marocco** [8] - 4:4; 7:23; 8:7, 12, 20; 13:8; 16:14; 17:15
**material** [2] - 3:10, 14
**materials** [1] - 2:23
**matter** [2] - 2:3; 5:24
**mean** [12] - 3:13; 7:9; 8:9, 19; 15:16, 21; 16:22; 18:13; 20:2, 5, 21
**means** [1] - 11:4
**meet** [2] - 6:9; 19:9
**meet-and-confers** [1] - 19:9
**meetings** [2] - 10:17, 22
**memorandum** [1] - 5:9
**mental** [4] - 4:5, 14; 5:22; 13:22
**mentioned** [1] - 19:10
**might** [4] - 5:21; 15:2; 21:6, 20
**mind** [2] - 18:23; 21:12
**minimum** [2] - 5:14; 20:1
**misnomer** [1] - 15:17
**moment** [2] - 19:5, 15
**moot** [2] - 14:4; 18:16
**morning** [4] - 2:8, 11-12, 16
**motion** [20] - 2:19; 3:24; 9:11; 10:12; 12:19; 13:4, 20; 14:10, 22; 15:12, 14; 17:8; 18:21; 19:16; 20:7; 21:1, 13, 17, 23
**motions** [2] - 18:21; 21:2
**moving** [3] - 17:2, 22; 18:3
**MR** [30] - 2:8, 12,

24; 3:2, 19, 21; 4:8; 6:1, 14; 8:18, 22; 9:5, 17; 11:1, 13; 15:1, 4, 7; 16:4, 10, 21, 23; 18:6, 9-10, 25; 19:1; 20:5, 18
**multiple** [1] - 19:9
**musk** [7] - 4:3; 8:2, 12, 20; 10:17, 21; 13:8
**Musk** [3] - 2:5; 7:23; 8:7
**must** [1] - 7:16
**narrow** [1] - 9:14
**nature** [2] - 4:19; 5:5
**necessarily** [1] - 9:11
**necessary** [1] - 19:22
**need** [8] - 5:12; 7:20; 9:20; 12:4; 17:23; 19:19; 21:2, 19
**needs** [6] - 13:9, 15, 21; 14:1, 5, 11
**never** [1] - 6:18
**new** [1] - 21:4
**Nicole** [1] - 2:10
**night** [1] - 16:13
**none** [1] - 3:21
**nonpublic** [1] - 10:10
**nonstarter** [1] - 13:19
**note** [1] - 16:13
**nothing** [5] - 4:1; 10:9; 14:5
**notice** [4] - 2:18; 10:12; 19:16; 21:7
**November** [1] - 16:6
**Number** [1] - 2:4
**objection** [2] - 3:19; 15:24
**objections** [4] - 11:16; 12:9; 15:13; 20:19
**obtain** [3] - 10:5, 22; 20:8
**obtained** [2] - 10:13; 11:4
**obtaining** [1] - 7:18
**obviously** [8] - 11:8; 12:10, 13;

14:14; 18:15; 20:8, 19; 21:18
**occasions** [2] - 7:8; 12:7
**occupied** [1] - 8:3
**offered** [1] - 12:7
**office** [1] - 2:15
**official** [1] - 7:16
**officials** [9] - 6:3, 9; 7:3; 8:10, 12; 9:24; 14:8
**old** [1] - 21:3
**one** [13] - 4:13; 5:4; 7:14; 10:16; 12:23; 13:7; 14:15; 17:1, 6, 19; 20:6; 21:17, 22
**operations** [2] - 5:13
**opinions** [3] - 4:22; 5:19; 13:12
**opportunity** [2] - 14:20; 18:11
**oral** [1] - 14:19
**orally** [1] - 13:3
**order** [7] - 2:19, 22; 3:24; 12:17; 18:2; 21:2
**order's** [1] - 3:11
**ordered** [1] - 16:1
**otherwise** [1] - 13:24
**outside** [1] - 8:11
**overruled** [1] - 12:10
**page** [2] - 3:7; 15:15
**pages** [4] - 14:24; 15:19; 16:3; 17:25
**particular** [2] - 6:5; 20:20
**parties** [10] - 3:9, 12; 7:15; 12:13, 18; 14:5, 23; 19:8; 20:11, 14
**parties'** [1] - 7:13
**pause** [1] - 8:18
**pending** [2] - 2:3; 18:14
**people** [2] - 13:16
**perhaps** [1] - 17:4
**period** [2] - 17:11; 20:9
**permits** [1] - 12:2
**personal** [2] - 7:12, 16
**perspective** [1] -

6:10
**pertains** [2] - 5:16; 7:25
**pivot** [1] - 17:6
**plaintiff** [2] - 10:11; 16:13
**plaintiff's** [1] - 16:19
**plaintiffs** [15] - 2:6, 10, 25; 3:19, 25; 5:1, 7; 8:9; 11:15, 20; 14:2, 18; 16:5; 18:24; 19:2
**plan** [1] - 4:7
**planning** [3] - 3:8; 5:22; 16:15
**point** [14] - 2:21; 8:22; 9:2, 6; 11:2, 6, 10; 12:24; 13:6; 19:3, 14, 18; 20:11
**pointed** [1] - 7:8
**posed** [1] - 11:22
**position** [7] - 4:20; 5:4; 6:16; 8:2, 5; 10:21; 11:9
**positions** [1] - 5:3
**possible** [3] - 16:22; 18:18
**possibly** [1] - 14:17
**potential** [1] - 16:16
**potentially** [2] - 8:13; 19:5
**powers** [2] - 5:12; 8:1
**practical** [1] - 5:24
**predecisional** [2] - 4:18
**prejudice** [1] - 17:9
**preliminary** [2] - 5:9; 7:21
**premature** [2] - 9:6; 11:1
**present** [1] - 14:20
**preservation** [1] - 15:11
**preserve** [2] - 15:13, 21
**pretty** [4] - 3:6; 17:23; 21:4, 14
**prevent** [1] - 17:11

**preview** [1] - 17:24
**previewed** [1] - 21:3
**privilege** [9] - 4:14, 17, 21-22; 5:6, 22; 13:24
**problem** [2] - 9:17; 10:14
**procedures** [1] - 12:20
**proceeding** [1] - 19:6
**proceeds** [1] - 19:20
**process** [8] - 4:14, 24; 9:13; 10:3; 17:8; 21:16
**processes** [4] - 4:5; 5:23; 12:18; 13:23
**produced** [3] - 10:7; 11:11; 12:15
**producing** [1] - 10:6
**production** [4] - 8:24; 10:8; 12:2; 19:11
**productions** [1] - 12:3
**progress** [1] - 19:9
**prohibit** [1] - 7:11
**prohibiting** [1] - 15:12
**prong** [3] - 7:20; 8:16; 9:22
**proportionality** [1] - 15:10
**proposal** [1] - 2:20
**proposed** [1] - 21:3
**protect** [1] - 4:23
**protected** [1] - 5:21
**protective** [3] - 2:19; 3:24; 18:2
**protects** [1] - 5:6
**provide** [2] - 10:14, 20
**provided** [3] - 10:23; 11:14; 12:12
**published** [1] - 10:7
**purpose** [1] - 2:5
**purposes** [3] -

15:11, 17
**pursuing** [1] - 14:3
**push** [1] - 19:19
**put** [2] - 12:10; 16:8
**qualify** [1] - 6:10
**questions** [5] - 5:21; 7:22; 10:2; 11:17, 24
**quickly** [3] - 11:7; 14:13; 21:14
**quite** [2] - 11:9; 13:12
**raised** [3] - 15:7; 20:19
**raises** [2] - 4:12; 6:2
**ranging** [1] - 13:17
**ranking** [2] - 7:4; 14:7
**rather** [1] - 5:5
**reach** [1] - 20:25
**reaching** [3] - 4:6; 5:23; 13:23
**react** [1] - 20:24
**really** [3] - 3:11; 5:24; 7:14
**reason** [4] - 7:4; 13:25; 14:25; 21:15
**reasonable** [1] - 12:3
**reasons** [4] - 4:13, 23; 6:17; 19:4
**receive** [1] - 9:7
**received** [4] - 8:23, 25; 10:13
**recently** [1] - 6:19
**recognizes** [1] - 7:2
**recognizing** [1] - 9:18
**record** [4] - 2:7; 3:15; 15:23, 25
**referring** [1] - 14:20
**refers** [1] - 8:20
**regard** [2] - 5:8; 7:24
**regarding** [8] - 2:18, 22; 4:5, 20; 5:12; 7:1; 8:16; 13:22
**related** [1] - 20:8
**releasing** [1] - 3:13
**relevant** [4] -

Telephonic Case Management Conference 11/19/25

7:11; 8:3; 13:13
**remain** [1] - 12:22
**reminder** [1] - 18:23
**removed** [1] - 7:5
**reply** [1] - 17:23
**request** [2] - 13:7; 18:14
**requests** [2] - 10:11; 11:11
**required** [1] - 5:14
**requires** [2] - 13:4; 14:9
**resolve** [1] - 14:12
**resolved** [1] - 13:3
**resolving** [1] - 17:8
**respect** [3] - 12:1; 15:16; 20:7
**respond** [4] - 4:1; 11:23; 16:3, 19
**responded** [2] - 10:20; 11:14
**response** [5] - 11:11, 24; 12:1, 6; 19:11
**responses** [4] - 8:25; 10:15; 11:14, 16
**responsive** [1] - 10:11
**return** [1] - 3:9
**ripe** [1] - 14:4
**ripened** [1] - 20:11
**rolling** [2] - 12:3; 16:25
**rooted** [1] - 7:9
**Rubin** [1] - 2:10
**Rubio** [5] - 7:23; 8:8, 13, 21; 9:2
**Rule** [1] - 12:2
**rules** [3] - 3:15; 12:17
**ruling** [7] - 7:21; 15:9, 12, 24; 17:14, 18; 18:18
**rulings** [1] - 15:9
**satisfactory** [1] - 8:25
**satisfied** [1] - 7:20
**schedule** [3] - 12:8; 14:10, 22
**scheduled** [1] - 19:13
**sealed** [2] - 3:9, 13
**second** [3] - 8:16,

19; 9:22
**secondly** [1] - 7:17
**Secretary** [5] - 7:23; 8:8, 13, 21; 9:2
**see** [4] - 13:6; 14:24; 21:12, 16
**seek** [3] - 5:18; 9:2; 19:3
**seeking** [6] - 5:1, 7; 7:15; 8:10, 21
**seem** [2] - 14:1; 19:25
**sense** [2] - 20:22; 21:16
**sent** [1] - 10:18
**separation** [2] - 5:12; 7:25
**Service** [1] - 10:19
**serving** [1] - 19:13
**set** [1] - 12:5
**setting** [1] - 15:21
**several** [1] - 7:8
**short** [1] - 4:10
**show** [1] - 7:16
**shutdown** [3] - 19:25; 20:8, 24
**side** [3] - 11:7; 16:2, 19
**sides** [1] - 19:21
**sign** [1] - 3:17
**significant** [1] - 7:24
**SILER** [13] - 2:12; 3:2, 21; 11:13; 15:1, 4, 7; 16:10; 18:7, 10, 25; 20:5, 18
**Siler** [8] - 2:13; 3:3; 11:8; 15:5; 16:11; 18:12; 19:23; 20:5
**similar** [1] - 11:22
**simply** [1] - 12:14
**sits** [1] - 8:6
**slip** [1] - 8:9
**slip-and-fall** [1] - 8:9
**slow** [1] - 19:9
**slowed** [1] - 19:25
**smoothly** [1] - 19:7
**someone** [1] - 8:10
**sometimes** [2] - 3:15; 13:2
**somewhere** [1] -

13:4
**sorry** [6] - 8:18; 11:5; 14:18; 15:3; 18:9
**sort** [1] - 21:7
**sought** [1] - 10:17
**sounds** [1] - 20:2
**sources** [1] - 10:23
**speaking** [1] - 7:3
**specific** [3] - 14:14; 20:11, 19
**specifically** [1] - 11:20
**standard** [3] - 6:9; 7:15; 9:22
**State** [1] - 11:23
**state** [1] - 5:13
**States** [1] - 2:14
**statutory** [1] - 5:14
**stay** [1] - 20:9
**Stevens** [1] - 2:10
**stick** [1] - 16:15
**still** [1] - 6:11
**stipulated** [2] - 2:22; 18:2
**subject** [5] - 7:5; 12:9; 14:6; 20:18; 21:18
**submitted** [1] - 10:9
**substance** [1] - 7:1
**substantive** [1] - 11:14
**suffice** [1] - 9:25
**sufficient** [4] - 15:23; 16:4, 10, 12
**suggest** [1] - 21:6
**suppose** [1] - 6:5
**table** [1] - 17:18
**tee** [1] - 21:8
**teed** [1] - 13:2
**terms** [3] - 5:3; 16:2; 19:12
**testify** [2] - 17:15
**testimony** [1] - 4:16
**Thanksgiving** [1] - 16:25
**thanksgiving** [1] - 17:3
**THE** [26] - 2:3, 11, 16; 3:1, 5, 22; 5:20; 6:2; 8:17, 19; 9:4, 9; 10:25; 11:7; 12:16; 15:3, 6,

20; 16:6, 18, 22, 24; 18:19; 19:23; 20:16, 21
**themselves** [3] - 5:19; 12:19; 13:1
**third** [1] - 14:7
**three** [2] - 13:6, 13
**tight** [1] - 14:22
**timeline** [1] - 20:12
**timely** [1] - 19:20
**timing** [4] - 3:14; 16:10, 12, 17
**today** [8] - 2:5, 10; 3:22; 9:14, 19; 15:9; 16:6; 18:5
**together** [1] - 16:8
**track** [1] - 17:7
**transcript** [2] - 15:22; 16:1
**trial** [1] - 15:21
**try** [5] - 14:11; 17:1, 6; 21:13
**trying** [3] - 9:19; 11:18; 18:21
**Tuesday** [2] - 16:22
**turn** [1] - 9:13
**two** [2] - 7:14; 17:25
**type** [1] - 2:19
**typically** [4] - 3:11; 7:5; 17:20; 20:21
**U.S** [1] - 10:18
**ultimate** [1] - 19:15
**um-hmm** [1] - 9:9
**unclear** [1] - 17:13
**under** [8] - 5:10, 15; 6:4; 8:5, 14; 9:22; 14:8
**unique** [1] - 7:6
**United** [1] - 2:13
**unnecessary** [2] - 13:9, 21
**up** [7] - 11:16, 24; 13:2; 17:7, 11; 18:15; 21:8
**USAID** [1] - 5:15
**USCS** [1] - 11:20
**usual** [1] - 20:24
**versus** [1] - 2:4
**view** [5] - 6:8; 15:16; 17:6, 22; 19:24

**wait** [2] - 21:16, 20
**waiting** [1] - 21:12
**wants** [1] - 17:9
**warrant** [1] - 6:11
**WARREN** [17] - 2:8, 24; 3:19; 4:8; 6:1, 14; 8:18, 22; 9:5, 17; 11:1; 16:4, 21, 23; 18:6, 9; 19:1
**Warren** [5] - 2:9, 24; 4:9; 16:2; 19:2
**Wednesday** [1] - 16:20
**week** [3] - 10:7; 12:2; 17:4
**weekend** [1] - 16:25
**Wen** [1] - 2:14
**whichever** [1] - 14:4
**White** [1] - 11:22
**wide** [1] - 13:17
**wide-ranging** [1] - 13:17
**wish** [1] - 15:9
**witnesses** [7] - 9:8, 23; 10:5; 11:2; 13:13, 18; 19:13
**written** [3] - 11:11; 15:14; 19:11
**year** [1] - 6:20
**yourselves** [1] - 2:7

# Exhibit 10

UNITED STATES DISTRICT COURT

for the

District of Maryland


J. DOE 4 et al.

        Plaintiff

v.                    Civil Action No. 8:25-cv-00462-TDC

ELON MUSK et al.

        Defendant

_____


VIDEOTAPED DEPOSITION OF


GAVIN KLIGER


TAKEN ON

TUESDAY, JANUARY 6, 2026

2:06 P.M.


COHEN MILSTEIN SELLERS AND TOLL PLLC

1100 NEW YORK AVENUE NORTHWEST, SUITE 800

WASHINGTON, DC 20005

Page 2

APPEARANCES

Appearing on behalf of the Plaintiffs:
ANDREW WARREN, ESQUIRE
TIANNA MAYS, ESQUIRE
State Democracy Defenders Fund
600 Pennsylvania Avenue Southeast, Suite 15180
Washington, DC 20003
(202) 594-9958
andrew@democracydefenders.org
tianna@democracydefenders.org

-and-

REBECCA (BETH) STEVENS, ESQUIRE
JOAQUIN GONZALEZ, ESQUIRE
Marziani Stevens & Gonzalez, PLLC
1533 Austin Highway, Suite 102-402
San Antonio, TX 78218
(210) 343-5604
bstevens@msgpllc.com
jgonzalez@msgpllc.com

Page 4

APPEARANCES (CONTINUED)

Appearing on behalf of the Defendants:
CHRISTOPHER LYNCH, ESQUIRE
JACOB SILER, ESQUIRE
JAMES WEN, ESQUIRE
SARAH WELCH, ESQUIRE
U.S. Department of Justice - Civil Division
1100 L Street Northwest, Rm 11206
Washington, DC 20005
(202) 353-4537
christopher.m.lynch@usdoj.gov
jacob.s.siler@usdoj.gov
james.j.wen@usdoj.gov

Appearing on behalf of the Deponent:
BRADLEY P. HUMPHREYS, ESQUIRE
King Street Legal, PLLC
800 Connecticut Avenue Northwest, Suite 300
Washington, DC 20006
(276) 696-1981
brad@kingstlegal.com

Page 3

APPEARANCES (CONTINUED)

Appearing on behalf of the Plaintiffs:
RICHARD HEIMANN, ESQUIRE
NICOLE RUBIN, ESQUIRE
KELLY DERMODY, ESQUIRE
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000
rheimann@lchb.com
nrubin@lchb.com
kdermody@lchb.com

Page 5

APPEARANCES (CONTINUED)

Also Present:
Jehieli Luevanos-Ovalle, Paralegal, State Democracy Defenders Fund
Maya Cook, Legal Program Associate, State Democracy Defenders Fund

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Page 6

EXAMINATION INDEX

PAGE

EXAMINATION BY MR. WARREN                    10

Page 7

EXHIBIT INDEX

EXHIBIT                                       PAGE

1 ESTABLISHING AND IMPLEMENTING THE           52
  PRESIDENT'S DEPARTMENT OF GOVERNMENT
  EFFICIENCY
2 EMAILS REGARDING (SBU) ADMINISTRATIVE       78
  LEAVE NOTICE
3 EMAILS REGARDING PHYSICAL AND LOGICAL       82
  ADMINISTRATION FOR GAVIN
4 USAID CCURE 9000 USER ACCOUNT REQUEST       89
5 DECISION TO PUT USAID EMPLOYEES ON          108
  ADMINISTRATIVE LEAVE ON FEBRUARY 3, 2025
6 DECISION TO PUT USAID EMPLOYEES ON          108
  ADMINISTRATIVE LEAVE ON FEBRUARY 4, 2025
7 MESSAGE FROM SAM STEIN                       120
8 MESSAGES FROM ELON MUSSK AND MIKE BENZ       134
9 MESSAGE FROM ELON MUSK                       138
10 EMAIL REGARDING WHAT DID YOU DO            141
   LAST WEEK
11 HR ANNOUNCEMENT REGARDING INCIDENT         147
   INC3715338
12 MEMORANDUM REGARDING SPECIFIC NOTICE        150
   OF REDUCTION OF FORCE
13 EMAILS REGARDING CFPB RIF WORK             177

Page 8

EXHIBIT INDEX CONTINUED

EXHIBIT                                       PAGE

14 PUBLIC FINANCIAL DISCLOSURE REPORT         179
   (OGE FORM 278E)
15 X POST                                     186

Page 9

VIDEOTAPED DEPOSITION OF

GAVIN KLIGER

TAKEN ON

TUESDAY, JANUARY 6, 2026

2:06 P.M.

THE VIDEOGRAPHER:  We are on the record. The time is 2:06 p.m., and the date is January 6, 2026.

This is the beginning of the deposition of Gavin Kliger.  The case caption is J. Does 1 through 26 vs. Department of Government Efficiency DOGE.

Will counsel introduce yourselves and state whom you represent.

MR. WARREN:  Andrew Warren from Democracy Defenders Fund.

MS. STEVENS:  Beth Stevens for the plaintiffs.

MS. MAYS:  Tianna Mays for the plaintiffs.

MR. GONZALEZ:  Joaquin Gonzalez for the plaintiffs.

MS. LUEVANOS:  Jehieli Luevanos for the plaintiffs.

MR. SILER:  Jacob Siler for the defendants.

Page 10

MR. HUMPHREYS:  Bradley Humphreys for Mr. Kliger.

MR. LYNCH:  Chris Lynch for Defendants.

MR. WEN:  James Wen for Defendants.

MS. WELCH:  Sarah Welch for Defendants.

THE VIDEOGRAPHER:  The court reporter will now swear in the witness.

THE REPORTER:  All right.  Mr. Kliger, would you please raise your right hand.

Do you affirm under the penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

MR. KLIGER:  Yes.

THE REPORTER:  All right.  We may proceed.

MR. WARREN:  Thank you.

GAVIN KLIGER, having duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MR. WARREN:

Q.  Mr. Kliger, good afternoon again.  My name is Andrew Warren.  I'm an attorney with Democracy Defenders Fund.  I'm here representing the plaintiffs in the case.            Can you please state your full name for the record?

A.  Gavin Kliger.

Page 11

Q.  And you were subpoenaed to be here today to testify; correct?

A.  Correct.

Q.  I'm going to be asking you questions.  At the end of the deposition other parties may ask you questions as well.  Counsel may object to questions that I ask.  You're still required to answer unless instructed to do so.  Do you understand?

A.  Unless instructed not to do so?

Q.  Unless instructed not to answer the question.

A.  Yes, I understand.

Q.  I'm going to be asking you about things that you know and some things you may not know today.  Please don't speculate or guess unless you're specifically asked.  Does that make sense?

A.  Yes.

Q.  If you don't understand a question you can ask me to clarify it.  Otherwise I'm going to assume you understood the question.  Agreed?

A.  Yes.

Q.  And as you know, the court reporter is transcribing.  There's a videographer recording.  And you've been placed under oath; correct?

A.  Yes.

Page 12

Q.  Any reason why you can't be truthful today?

A.  No.

Q.  During the deposition if we need to take a break we can do so.  I'd ask that you not communicate with anyone else except for your counsel regarding the deposition.  That's talking, messaging -- nothing.  Do you understand?

A.  Yes.

Q.  And if you talk with counsel I'd ask that you not discuss the substance of your testimony or of the issues that we're discussing today.  Do you understand?

A.  Yes.

Q.  Have you been deposed before?

A.  No.

Q.  Have you ever given prior testimony under oath?

A.  Not that I'm aware of.

Q.  You don't remember or not that you're aware of?

A.  Can you define "prior testimony"?

Q.  Sure.  Have you testified in a court hearing before?

A.  No.

Page 13

Q.  Have you testified before a congressional committee or a state-level committee?

A.  No.

Q.  Have you ever provided information to criminal or civil authorities as part of a criminal or civil investigation?

A.  An investigation?  Not that I'm aware of.

Q.  Before coming here today did you have conversations with anyone about your deposition?

A.  Yes.

Q.  Who did you speak with?

A.  I spoke with my attorney.

Q.  Who else?

A.  The DOJ legal team.

Q.  Reporting to Mr. Siler?

A.  The whole DOJ legal team.

Q.  Let's talk about your discussions with Mr. Humphreys.  Not going to get into the substance of anything you discussed.  But did you review any documents in preparation for your testimony that he provided to you?

A.  The DOJ team provided documents.

Q.  DOJ provided documents?  Okay.  So Mr. Humphreys did not provide you with any documents in preparation for your testimony?

Page 14

A. Not that I'm aware of.

Q. Okay. So you said you had conversations with government counsel. When did you first meet them?

A. Yesterday.

Q. How long did you meet with them for?

A. I couldn't say the exact length. Several hours.

Q. Okay. And tell me the nature of the discussion and the meeting?

MR. SILER: Objection. Calls for information protected by the attorney work product and attorney-client privilege. Instruct the witness not to answer.

BY MR. WARREN:

Q. Well, let's get into some specifics. You talked about your preparation for this deposition --

A. Yes.

Q. -- with government counsel? You talked about facts regarding your time with the government?

MR. SILER: Objection. Calls for information protected by the attorney-client privilege, the attorney work product doctrine. Instruct the witness not to answer.

BY MR. WARREN:

Page 15

Q. Were you shown any documents by government counsel?

A. How --

MR. SILER: You can answer yes or no.

THE DEPONENT: I think I -- we already answered that.

BY MR. WARREN:

Q. Okay. Did those documents help refresh your recollection in any way -- help you remember the things that were relevant today -- to today?

A. To an extent certainly.

Q. Okay. I would like to have a copy of those documents under Rule 612. Without providing substantive answers, did the Government provide you with any information to assist in your being deposed today?

MR. SILER: Objection. Calls for information protected by the attorney-client privilege, the attorney work product doctrine. Instruct the witness not to answer.

MR. WARREN: I'm not asking him about the substance. I'm asking if he was given any information.

MR. SILER: Okay. All right.

MR. WARREN: It's a yes or no.

Page 16

MR. SILER: You can answer yes or no.

THE DEPONENT: We were -- can you elaborate?

MR. WARREN: Sure.

BY MR. WARREN:

Q. Did the Government provide you with any information -- tell you any facts, give you any documents, show you any materials --

A. We've already established that the Government provided documents. And therefore your question was answered.

Q. Okay. In addition to the documents that they provided did they provide you orally with any information relevant to your testimony today? And this is factual information.

A. Not that I'm aware of. I mean, we discussed basic, general facts certainly.

Q. Okay. Did you speak with anyone about the deposition after your meeting with government counsel?

A. Yes.

Q. Anyone other than Mr. Humphreys?

A. You're talking did I discuss which -- what with --

Q. After you met with government counsel

Page 17

yesterday in preparation for today did you speak with anyone else about that meeting?

A. About the meeting? No.

Q. What's your understanding of this case?

MR. SILER: Objection, vague and ambiguous.

MR. WARREN: You can answer.

THE DEPONENT: Can you clarify your question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. What do you understand this case is about?

A. Thank you. My understanding is that this case is about the United States Agency for International Development -- actions that took place there.

Q. Do you know who the plaintiffs in the case are?

A. I believe the plaintiffs are the Doe 4. I assume USA employees.

Q. Have you reviewed any filings in this case -- the complaint, any of the motion papers filed by counsel?

A. It's possible I've like glanced at some. Nothing in any detail.

Page 18

Q.   Have you done any other research into the facts or allegations in this case?

A.   No.

Q.   Have you read any of the Judge's orders or opinions on the case?

A.   Not in any detail.

Q.   But you have reviewed them?

A.   A judge's order like a piece of paper like written by a judge or something?

Q.   Yes.

A.   No, I don't think so.

Q.   What's your current address?

A.   ████████████████████████████ ██████████████████████████████ ████████████████████████ ██████████████████

Q.   ███████████████████████████

A.   ███████████████████████████████ ████████████████

Q.   And Mr. Kliger, where are you from originally?

A.   Originally from Orange County.

Q.   How old are you?

A.   I am 26.

Q.   We'll talk a little bit about your

Page 19

education and your employment history.  I'll try to go through this quickly.  But please correct me if I'm wrong in anything.  You have a degree in electrical engineering and computer science from UC Berkeley?

A.   Yes.

Q.   That's from May 2020?

A.   That is correct.

Q.   And that's your only post-secondary degree like after high school?

A.   Yes.

Q.   Your employment history -- you were an engineering intern at Twitter from May to August 2019; is that correct?

A.   I couldn't say the exact months.  But yes.

Q.   2019?

A.   Yes.

Q.   For less than a year?

A.   In 2019, yes.  I think May to August would be less than a year; correct.

Q.   I'm sorry.  I wasn't asking whether May to August is less than a year.  I'm asking whether your time at Twitter -- your employment history -- was less than a year?

A.   Okay.  So to clarify, I said yes, I worked

Page 20

at Twitter from May to August in that time.  And I'm confirming that yes, that time period would be less than one year.

Q.   Understood.  Thank you.  You were an Excel Scholar from August '19 to July of 2020?

A.   I mean, I couldn't tell you the exact end date.  That's like a program at Berkeley.  I mean, once you're inducted you're like -- I don't know. I'm probably still sort of a member.

Q.   You worked at Databricks as a senior software engineer?

A.   Correct.

Q.   From when to when?

A.   It would have been when I graduated in 2020 until my -- joined government service.

Q.   Do you know Elon Musk?

A.   Define "know."

Q.   Have you ever met him?

A.   Yes.

Q.   When did you first meet him?

A.   Likely early January of 2025.

Q.   You never met him prior during your time at Twitter?

A.   At that time Twitter was not connected to Elon Musk.  That acquisition was a different time

Page 21

period.

Q.   So that's a no?

A.   Yes.

Q.   Okay.  And you'd not met him prior to January 2020 -- 2025?

A.   Correct.

Q.   Okay.  What was the nature of your first meeting?

A.   I don't recall.

Q.   Where did you meet him?

A.   Likely the SpaceX building in DC.

Q.   What was the purpose of the meeting?

A.   To the best of my recollection the purpose of the meeting would have been likely a group meeting to talk about, you know, kind of the ideals that would underpin kind of the DOGE movement.

Q.   And you said January 2025; correct?

A.   Correct.

Q.   Do you recall the exact date?

A.   No.

Q.   Was it prior to or after the inauguration --

A.   This would have been prior to the inauguration.

Q.   What else can you tell me about that

Page 22

meeting?  How long was it?

A.  I don't recall.

MR. SILER:  Objection, compound.

BY MR. WARREN:

Q.  Who else was there?

A.  I don't recall.

Q.  Can you estimate the number of people who were there?

A.  It would be probably more than like five.

Q.  Fewer than ten?

A.  Don't recall.

Q.  How many times have you met Mr. Musk?

A.  Probably fewer than 20.

Q.  Well, let's talk about some of the other 19 then.

MR. HUMPHREYS:  Objection.

MR. SILER:  Objection, misstates prior testimony.

BY MR. WARREN:

Q.  Describe your relationship with Mr. Musk?

A.  I, you know, knew him as he was involved in kind of the thought leadership behind the ideas of DOGE and was tasked with the President with, you know, making the government efficient -- combating waste, fraud, and abuse.

Page 23

Q.  Is your relationship with Mr. Musk -- would you describe it as professional, social, or both?

A.  Professional.

Q.  The roughly 20 times or so -- or fewer than 20 times that you've met with him -- they've been all professional?

A.  Correct.

Q.  Ever had a meal with him?

A.  Not that I recall.

Q.  Ever attended a social event with him?

A.  Social events meaning?

Q.  As opposed to a professional meeting.

A.  Yeah, I think there's a lot of overlap between, you know, what a -- certainly prior to January 20th like what would be considered like professional or social.  Like if you go to some dinner and you're discussing the ideologies of DOGE that's how I kind of characterize that.

Q.  And did you have those types of meetings with Mr. Musk?

A.  These would be like a group dinner certainly.

Q.  Have you ever interacted with him outside of those meetings?  For example over email, text, or

Page 24

call.

A.  Not that I recall.

Q.  Do you have his cell phone?

A.  No.

Q.  Do you have any way to contact him other than face-to-face meetings?

A.  No.

Q.  Email address?

A.  It's possible I knew some government email address at some point.  But I don't think I ever sent to it.  And I never called him.

Q.  And to the best of your recollection you've never done email, texted, spoken with him over the phone -- anything like that?

A.  Not to my recollection.

Q.  Okay.  So to be clear, all your interactions with him -- again I'm ballparking the 20 times.  I know you said approximately --

A.  I said fewer than --

Q.  -- fewer than 20 have been in person?

A.  Correct.

Q.  No Signal -- anything like that or similar application?

A.  Correct.

Q.  Okay.  What's the last -- when was your

Page 25

last interaction with him?

A.  I suppose it would have been in October.

Q.  Okay.  What was that?

A.  It might have been November.  It would have been the kind of reunion event for DOGE.

Q.  Tell me about the reunion event, please.  What was it?  Where was it?  Who was there?

MR. SILER:  Objection, compound.

THE DEPONENT:  Can you restate the question?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.  Do you remember what I asked?

A.  Can you restate it?

Q.  Yeah.  Where was that meeting?

A.  Where was that meeting?  It would have been in Austin, Texas.  And when we say "meeting" I assume we're referring to just the general reunion.

Q.  And how many people were there?

A.  More than 50.

Q.  And what was the purpose of it?

A.  Social reunion.

Q.  Mr. Kliger, what's your current position with the government?

A.  I am the Chief Data Officer of the

Page 26

Department of War.

Q.   I'm sorry, the Department of?

A.   War.

Q.   Your LinkedIn page says you're a special advisor at OPM.  Is that no longer accurate?

A.   That is correct.

Q.   Were you a special advisor at OPM?

A.   I was a senior advisor to the director for technology and delivery at the Office of Personnel Management.

Q.   Since when?

A.   Since January 20th.

Q.   And when did you stop in that position?

A.   I believe the handoff was December 28th of last year.  But I could be off.

Q.   And how long have you been at the -- what you described as the Department of War?

A.   Approximately six months.

Q.   What are your responsibilities there?

A.   The responsibilities vary.  I oversee data policy.  I oversee some of the AI strategy as it relates to data for the department across war fighting, intelligence, enterprise.

Q.   What's the Department of Government Efficiency?

Page 27

A.   I think it can be defined many different ways.

Q.   How would you define it?

A.   You know, a group of like-minded individuals who serve at the behest of the President.

Q.   What's the purpose of the Department of Government Efficiency as you understand it?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.   What's the purpose or mission of the Department of Government Efficiency?

A.   I understand the purpose of the group that I described as like a kind of ideological group.  I think the purpose is just to connect like-minded people who are concerned about fraud, waste, and abuse.

Q.   And who is in charge of the Department of Government Efficiency?

MR. SILER:  Objection, vague and ambiguous as to DOGE.

Page 28

THE DEPONENT:  As I noted earlier, Department of Government Efficiency is a group of like-minded individuals.  I mean, and you're asking what the purpose of that is.  The purpose is to --

BY MR. WARREN:

Q.   My question was who's in charge?

A.   Who's in charge?  There's no one in charge of something like that.

Q.   Have you ever heard of the US DOGE Service?

A.   Yes.

Q.   What's the US DOGE Service?

A.   My understanding is it's an office tasked with carrying out digital work across government.

Q.   Who's in charge of the US DOGE Service?

A.   I believe the administrator is Amy Gleason.

Q.   Are you familiar with the US Digital Service?

A.   At a high level.

Q.   What's your understanding of what that is?

A.   A group to employ technology across the government.

Q.   Are you aware of the -- something called the US DOGE Service Temporary Organization?

Page 29

A.   No.

Q.   We talked about the Department of Government Efficiency and the US DOGE Service.  Is there a difference between the two in your mind?

A.   Yes.

Q.   And what is it?

A.   One is kind of a group of people who, you know, work in government at the behest of the President and share similar ideas around fraud, waste, and abuse.  The other would be a group that's like a formal, structured organization under the Executive Office of the President.

Q.   Your prior position at OPM that we discussed -- did that overlap with your position -- your current position?

A.   No, I believe there was a transition on the 20th.

Q.   Did you ever work for the Department of Government Efficiency -- DOGE?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  You're referring to the US Digital Service?

MR. WARREN:  I'm referring to Department of Government Efficiency.

Page 30

THE DEPONENT:  Okay.  Then the answer is no.

BY MR. WARREN:

Q.  Okay.  Were you a member of the Department of Government Efficiency?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah, there's no formal membership for a group of like-minded ideals.

BY MR. WARREN:

Q.  You consider yourself a part of this group --

A.  I certainly ascribe to the general ideology around fraud, waste, and abuse within the Federal Government, yes.

Q.  Did you do work for the US DOGE Service?

A.  No, not that I recall.

Q.  Did you work for the US Digital Service?

A.  No, not that I recall.

Q.  Ever do work for the United States DOGE Service Temporary Organization?

A.  I don't know what that is.

Q.  I want to turn your attention to work you did with regards to the US Agency for International Development, USAID.

Page 31

When did you first start doing any work with regard to USAID?

MR. SILER:  Objection, foundation.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.  Have you ever done work regarding USAID?

A.  Yes.

Q.  When did that first start?

A.  To the best of my recollection on or around January 31st of twenty -- January 31st of 2025.

Q.  And at the time what was your employment?

A.  I was a Schedule C political appointee employed at the behest of the President of the Office of Personnel Management.

Q.  And when did you start in that position?

A.  January 20th.

Q.  How did you get that position?

A.  I received that position in the same way any other political appointee would receive that position.  We were recruited and screened by the Presidential Personnel Office and then hired by the President.

Page 32

Q.  Did you apply for it?

A.  I'm sure there was some online form, yeah.

Q.  That you filled out?

A.  Yes.

Q.  And I'm sorry -- what was the first day that you recall starting that position?

MR. SILER:  Objection, vague and ambiguous.  And which position are we talking about?

MR. WARREN:  The Schedule C appointee.

MR. SILER:  Okay.

THE DEPONENT:  January 20th.

BY MR. WARREN:

Q.  January 20th?  You ever discuss with Mr. Musk that position?

A.  No.

Q.  Who is your supervisor?

A.  The Director of the Office of Personnel Management.  You're asking now or when I was at OPM?

Q.  I'm sorry.  We're going to first talk about the Schedule C appointment.

A.  Okay.

Q.  So on January 20, 2025, you said you started as a Schedule C appointee; correct?

A.  Yeah.

Q.  Okay.  So your first day of work who was

Page 33

your direct supervisor?

A.  The Director of the Office of Personnel Management.

Q.  Which was who?

A.  Chuck Ezell.

Q.  Is that who you reported to?

A.  Yes.

Q.  And what were your responsibilities?

A.  My responsibilities were to, you know, execute on the directives from the head of that agency.

Q.  And give me some examples of the work you were asked to execute then?

A.  I was asked to work on setting up infrastructure to send an email to all of government.

Q.  All right.  So I want to pause there for a moment.  You had mentioned you recall your first day working with USAID was January 31st approximately; correct?

A.  Correct.

Q.  So let's talk about the time period from January 20th to January 31st.  Can you describe generally what you were doing, where you were working?

Page 34

A.   I was working on engineering work at the Office of Personnel Management to prepare the infrastructure and requisite technology in order to send an email across the Federal Government.

Q.   What was that about -- the email?

A.   The email was the initial offer of the deferred resignation program.

Q.   And at the time Chuck Ezell is your direct supervisor?

A.   That is correct.

Q.   And who instructed you to work on that project?

A.   That would have come from Chuck Ezell and senior leadership at the White House.

Q.   What senior leadership?

A.   I can't recall exactly.  But, you know, it would be senior leadership in the White House.

Q.   Where were you working out of?

A.   The OPM building.

Q.   And were you embedded in or working with any agency other than OPM at that time?

A.   Can you define "working with"?

Q.   Yeah, were you -- you've described your work as government infrastructure.  Were you working directly with any specific agency during that

Page 35

roughly 11-day time period -- January 20th to --

A.   I believe --

Q.   -- January 31st?

A.   -- somewhere in that time period I went to the United States Department of Agriculture. Couldn't give exact dates.

Q.   Is that the only agency?

A.   To my recollection, yes.

Q.   You mentioned other senior leadership that you were reporting to.  Do you remember any of the individuals involved in --

A.   I reported to the --

MR. SILER:  Objection, misstates prior testimony.

THE DEPONENT:  Correct.  Yeah, I disagree with the premise of that question.

BY MR. WARREN:

Q.   Okay.  Who was the senior leadership you referenced?

A.   So I stated I reported to the Director of the Office of Personnel Management.

Q.   And then you mentioned that you were given instructions or -- I want to -- I can't recall your testimony word-for-word.  You mentioned senior leadership with regard to the tasks you were asked

Page 36

to do.  I'm asking if you can identify individuals among that senior leadership?

A.   I don't recall exactly who that would have been.

Q.   Okay.  Was the President involved?

A.   Involved?  My understanding is the President --

MR. SILER:  I'm going to object on the basis --

THE DEPONENT:  Yeah.

MR. SILER:  -- of the presidential communications privilege and instruct the witness --

BY MR. WARREN:

Q.   Did you ever --

MR. SILER:  Excuse me.  Instruct the witness not to answer.

BY MR. WARREN:

Q.   Did you ever speak with the President about any of those duties?

MR. SILER:  Objection, calls for the --

MR. WARREN:  It's a yes or no question.

MR. SILER:  All right.  Yes or no.

THE DEPONENT:  Can you -- what was the question?

BY MR. WARREN:

Page 37

Q.   Did you ever speak with the President about your duties that you've described roughly between January 20th and January 31st?

A.   No.

Q.   Elon Musk?

A.   Yes.

Q.   Describe those communications?

MR. SILER:  Objection, calls for information protected by the presidential communications privilege.  Instruct the witness not to answer.

MR. WARREN:  All right.  So on whose behalf were you serving?

MR. SILER:  Well, of the United States.

MR. WARREN:  On behalf of what official?

MR. SILER:  I'm saying that the question calls for information that's protected by the presidential communications privilege.  And I'm instructing the witness not to answer.

MR. WARREN:  I understand.  But in order for us to actually have a record of whether it's protected by privilege that we can go to the Court, I'm asking you if you're willing to memorialize on the record the basis for which you're asserting privilege.  So I'm asking on whose behalf are you

Page 38

asserting it?

MR. SILER:  Well, ultimately the President holds the presidential communications privilege.

MR. WARREN:  He said he had no communications with the President.

MR. SILER:  That privilege, as we discussed previously, covers more than just communications with the President.  It covers his close White House advisors --

MR. WARREN:  So which advisor are you asserting on behalf of?

MR. SILER:  You asked about Elon Musk.

MR. WARREN:  Okay.

MR. SILER:  He said yes.

MR. WARREN:  All right.  So if you --

MR. SILER:  That's all we need for that.

MR. WARREN:  If you can represent then how this was made in performance of the presidential's -- the President's official duties -- this communication?

MR. SILER:  I --

MR. WARREN:  How does this fall within --

MR. SILER:  I'm not going to --

MR. WARREN:  -- presidential decision-making?

Page 39

MR. SILER:  You can ask the witness questions.

MR. WARREN:  I'm asking you to state it for the record.  You don't have to.

Okay.  Let the record reflect no response from government counsel.  He shook his head.

Can you establish how that communication was confidential?

MR. SILER:  I'm not being deposed here.

MR. WARREN:  You've made the objection. There's not a sufficient basis for the objection --

MR. HUMPHREYS:  That's nonsense.

MR. WARREN:  -- instruction.

MR. HUMPHREYS:  And you can --

MR. SILER:  Excuse me.

MR. WARREN:  One at a time.

MR. SILER:  We've established who the communication is with.  I've explained the legal basis for our objection and the instruction not to answer.  That's --

MR. WARREN:  And you're providing no further information for us to be able to test the boundaries of that privilege; correct?

MR. SILER:  You can ask the witness questions to test the boundaries of the privilege.

Page 40

I'm not here to make legal arguments other than make objections to the questions that you ask and the relevant responses.

MR. WARREN:  Understood.

BY MR. WARREN:

Q.  Was Steve Davis involved in any of those discussions?

MR. HUMPHREYS:  Objection.  We've had a lot of colloquy here.  Can you refresh the witness's --

MR. WARREN:  Sure.

MR. HUMPHREYS:  -- recollection?  Thank you.

BY MR. WARREN:

Q.  Talking about your duties generally between January 20th and January 31st, you said you had discussions with senior leadership.  We established that you never spoke with President Trump, that you did speak with Elon Musk.  I'm asking if you ever spoke with Steve Davis during that time about your --

A.  As it related to our, you know, mandate to combat waste, fraud, and abuse.  When I received those directives from senior agency leadership I would occasionally give updates.  Steve Davis at the

Page 41

time was a government employee.

Q.  Yes, you spoke with him?

A.  Yes.

Q.  Let's turn to your time at USAID starting January 31st.  What were your responsibilities generally?

A.  My understanding was that I was being brought to ensure available access for senior agency leadership to information and technology systems administered by USAID.

Q.  Can you describe -- I'm sorry.  And how long were you working at or with USAID for?

A.  A few weeks.  It's difficult to recall exactly.

Q.  Okay.  I'm just trying to ballpark it so that my questions are pertaining to that timeframe. So during that few weeks was that the only major project you worked on?

MR. SILER:  Objection, vague and ambiguous.  Do you mean just for USAID or do you mean generally?

THE DEPONENT:  Yeah, the answer --

MR. WARREN:  For USAID.  I'm sorry.  I'm going to focus my questions for the moment on USAID.

THE DEPONENT:  Can you repeat?

Page 42

MR. WARREN:  Sure.

BY MR. WARREN:

Q.    So you described one project that you were doing.  I'm asking about other projects -- other work you did during those few weeks at USAID.

A.    At that point in time I was working long hours.  And so likely I was working on other projects.  I don't recall exactly what was happening in that time period.

Q.    When you say "other projects" -- at USAID or at other agencies?

A.    I was at the -- potentially at other agencies.  I'm sure, for example, OPM work -- there was still likely some random follow-ups that would come up relating to the system we built to email all of government and the surrounding responses and so forth.

Q.    Who was your direct supervisor during those few weeks?  Again I'm focused on the time period at USAID.

A.    So I was a detailee.  So through OPM leadership I reported to the director of that agency, Chuck Ezell.  And at USAID I reported to senior agency leadership.

Q.    And to the extent you had a typical day,

Page 43

can you walk me through what your days were like?  We're going to get into some specifics.  But I'm trying to get a general --

A.    I think it would be very difficult to establish a typical day.

Q.    How often during the day were you talking with Mr. Ezell?

A.    As it pertains to?

Q.    Your work at USAID.

A.    Infrequently if at all.

Q.    You were exercising discretion in what you're doing?

A.    Can you elaborate?

Q.    Sure.  You said you were only talking to your direct supervisor infrequently.  Were you given instructions to --

A.    So as I explained, I was a detailee from OPM to USAID.  At USAID for USAID matters I report to agency leadership for USAID.  It would not be proper to report to other agency leadership for actions carried out there.

Q.    Who were you reporting to at USAID?

MR. SILER:  Objection, asked and answered.

MR. WARREN:  You can answer.

THE DEPONENT:  Yeah, I think we answered

Page 44

senior agency leadership.

BY MR. WARREN:

Q.    Such as?

A.    Such as Ken Jackson.

Q.    Ken Jackson was the person that you reported to --

A.    There was a mix of individuals.  I can't recall exactly who at what point.

Q.    How did you communicate during your time at USAID?

MR. SILER:  Objection, vague.

MR. WARREN:  Sir --

THE DEPONENT:  Like in English.

MR. WARREN:  Thank you.

BY MR. WARREN:

Q.    What media did you use?  That is did you use email, Signal, text, in-person communication, all of the above?

A.    For official government communication I used email on agency email.  And I used calls on agency phones and face-to-face communication.

Q.    Did you have an email address at the government at that time?

A.    Yes.

Q.    At USAID?

Page 45

A.    Did I have an email address at USAID?  Yes.

Q.    Yes.  Do you have email addresses at other government agencies?

A.    Yes.

Q.    We briefly mentioned Amy Gleason before.  What was her position and responsibilities?

A.    My understanding is that she was the administrator of the United States DOGE Service.

Q.    Did you have interactions with her?

A.    In this time period not that I recall.

Q.    Ever?

A.    Yes.

Q.    When?  Or in what context if you can't remember the timeframe.

A.    I'm sure we've -- like I've bumped into her like at a social gathering or two.

Q.    Any professional interaction with Ms. Gleason?

A.    It's possible that, you know, at some point an email was exchanged or something over the course of, you know, a year of government work.  But no, not really.

Q.    You don't recall discussing projects with her?

A.   No.

Q.   You didn't report to her as to what you were doing?

A.   Correct.

Q.   No frequent or infrequent email or other communication with her?

A.   Correct.

Q.   You mentioned official communications were done over government email address.  What about unofficial communications?

A.   Unofficial communications just in general?

Q.   Right.

A.   I mean, are you talking about like how did I talk to my parents?

Q.   For your work at USAID.

A.   All work -- all communications related to work at USAID were conducted via, as I explained earlier, government email, government phone, or in person.

Q.   And when you say "government phone" what apps did you use?

A.   Some Google app.

Q.   Signal?

A.   No.

Q.   Text messaging?

A.   It's possible there was text messaging.  But not that I recall.  And the Google app, to be clear, is the official chat app of USAID.  It's like their Microsoft Teams equivalent.

Q.   Did you ever interact with Secretary Rubio during your time at USAID?

A.   Not that I recall.

Q.   Have you ever met him?

A.   Not that I recall.

Q.   Peter Marocco?

A.   Yes.

Q.   What's your understanding of Mr. Marocco's position?

A.   My understanding is that he was part of senior agency leadership.

Q.   And describe the nature of your interactions with him during the time at USAID?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah, I was going to ask.  Can you elaborate?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   You said you interacted with Mr. Marocco.  I'm asking you to describe those interactions during

the three weeks or so --

A.   Okay.

Q.   -- that you were at US --

A.   They --

Q.   -- AID.

A.   -- were cordial.

Q.   Okay.  What did you discuss with him?

A.   Matters relating to USAID.  I don't recall specifics.

Q.   Did you report to him?

A.   I reported to senior agency leadership.  My understanding was that in some cases senior agency leadership expected me to adhere to instructions from Pete Marocco that were originating from that senior agency leadership.

Q.   So if I have that right, you indirectly reported to him but not directly?

A.   I think it's kind of like a vague distinction.  But, you know, directives would originate from senior agency leadership and, you know, promulgate to me, you know, either directly or indirectly.

Q.   Well, let's be specific.  Did Mr. Marocco ever give you instruction about work you should be doing at USAID?

A.   I don't recall like --

Q.   Did you ever communicate with him orally, verbally, or otherwise about work you were doing or would be doing --

A.   Yes.

Q.   -- at USAID?  Okay.  Such as what?

A.   I don't recall.  Things like foreign assistance likely.

Q.   What do you mean by that?

A.   For example, if there was foreign aid that the State Department wanted to be disbursed and there was some technical effect needed for that that's something we would have discussed.

Q.   Steve Davis.  What's his position?

A.   Steve Davis, to my understanding, was a federal employee at GSA.  And my understanding he was detailed over USAID, perhaps.

Q.   Did you have interactions with him at all during your time at USAID?

A.   Yes.

Q.   And what's the nature of the -- of those interactions?

A.   Discussions, you know, at a high level about, you know, kind of the status of work at USAID in accordance with the directives we received from

Page 50

senior agency leadership.

Q.   Did Mr. Davis ever give you instructions about work you should be doing at USAID?

A.   Not that I recall.

Q.   Did you ever report back to him?  That is communicate with him verbally, orally, or otherwise about work you were doing or would be doing at USAID?

MR. SILER:  Objection, compound.

THE DEPONENT:  Yeah.  What was the question?

BY MR. WARREN:

Q.   You ever report back to Mr. Davis about work you were doing at USAID?

A.   To be clear, Mr. Davis was sometimes in the building.  And yes, we would occasionally discuss --

Q.   And can you give an example of the type of work you discussed with Mr. Davis?

A.   It would have been discussing status of various directives we had received from senior agency leadership.

Q.   Can you estimate how often you spoke with Mr. Davis during those three weeks?

A.   I don't recall precisely.

Page 51

Q.   More than five?

A.   Over?

Q.   Three weeks.

A.   Yes, I'm sure it was more than five over three weeks.

Q.   More than ten?

A.   Yeah, I would say probably once every day or two days.  Something like that, yeah.

Q.   During the time that you were at USAID -- and again so talking approximately January 31st through mid to late February; is that correct?

A.   That sounds approximate, yeah.

Q.   Okay.  What was your understanding of the chain of command at the agency?

A.   My --

MR. SILER:  Objection, calls for a legal conclusion.

MR. WARREN:  You can answer.

MR. SILER:  You can answer.

THE DEPONENT:  Okay.  My understanding was that the President was the ultimate executive authority in that he had appointed, you know, Ken Jackson and other senior agency officials like Pete Marocco with the intent of carrying out his directives as they related to USAID.

Page 52

BY MR. WARREN:

Q.   During the time that you were there did you understand that the chain of command changed in any way?

A.   I don't recall.

Q.   I'm going to show you what will be marked as Plaintiffs' Exhibit 1.

(WHEREUPON, Plaintiffs' Exhibit 1 was marked for identification.)

A.   Thank you.

THE REPORTER:  Okay.  Exhibit 1 marked.

BY MR. WARREN:

Q.   This is a January 20, 2025 -- copy of a January 20, 2025 executive order entitled "Establishing and Implementing the President's Department of Government Efficiency."  Have you seen this document before?

A.   Perhaps.

Q.   Do you see on the first page where it says the title that I just read; the White House; January 20, 2025?

A.   I --

MR. HUMPHREYS:  Excuse me, Andrew.

Do you need a --

THE DEPONENT:  Yeah, I was about to --

Page 53

MR. HUMPHREYS:  -- just have him flip through it.

MR. WARREN:  Of course.

BY MR. WARREN:

Q.   You see on the first page where it says under Section 1 -- three lines down -- "This Executive Order establishes the Department of Government Efficiency to implement the President's DOGE agenda"?  You see that?

A.   Yes.

Q.   What's your understanding of what the President's DOGE agenda is?

A.   You know, insofar as I have personal knowledge of the President's understanding, it would be that there was fraud, waste, and abuse within the Federal Government in certain places and that we would like there to be less fraud, waste, and abuse.

Q.   As you understood it does that purpose encompass policy?

A.   I don't know.

Q.   Budget decisions?

A.   Can you explain what your question is?

Q.   Sure.  Does the DOGE agenda referenced here encompass budget decisions?

MR. SILER:  Objection, lack of foundation.

Page 54

THE DEPONENT:  Are you asking me if in the President's mind DOGE --

MR. WARREN:  I'm asking in your mind.

THE DEPONENT:  Okay.  Can we get a -- in my mind -- in your mind -- like whatever -- what's the full question?

BY MR. WARREN:

Q.  So to be clear, the questions I'm asking you today are always asking what's in your mind unless I ask you --

A.  You just asked me what the President's DOGE agenda was as the prior question so I'm just asking for some clarification.  Thank you.

Q.  Of course, Mr. Kliger.  Again what is your understanding -- excuse me.  Based on your understanding of the DOGE agenda does that include budget decisions?

A.  Insofar as combating fraud, waste, and abuse would involve a budget decision.

Q.  Personnel decisions?

A.  Again insofar as combating fraud, waste, and abuse would involve a personnel decision.

Q.  Operational decisions?

A.  Insofar as combating fraud, waste, and abuse would involve an operational decision.

Page 55

Q.  Can you turn to the second page of this document?  You see Section 4?

A.  Yes.

Q.  I'm paraphrasing.  But it says "The USDS Administrator shall commence an initiative to improve the quality and efficiency of government-wide software, network infrastructure, and IT systems."  Did you understand modernizing federal technology as part of the DOGE agenda?

MR. HUMPHREYS:  Objection, foundation.

THE DEPONENT:  Yes.  As I mentioned earlier, very first thing I worked on and what I generally worked on were matters of technology.

BY MR. WARREN:

Q.  And the matters of technology that you worked on then were to combat fraud, waste, and abuse?

A.  You know, as directed by senior agency leadership I'm sure I used technology, you know, to their directive.

Q.  To combat fraud, waste, and abuse as you understood it?

A.  Among many other things, certainly.

Q.  What are the other things?

A.  You're asking me everything that I've ever

Page 56

been directed to do with respect to technology over a year of federal service?

Q.  No.  First of all, we're focused on your time at USAID.  And I'm asking you --

A.  Okay.

Q.  -- what your understanding of the mission was of the work that you were doing.  You've used the phrase "fraud, waste, and abuse" at least a dozen times today by my count.  And then you just said other objectives as well.  So I'm asking what were some of those other objectives beyond fraud, waste, and abuse?

A.  Modernizing IT technology and then, you know, being useful to senior agency leadership.

Q.  In Section 3C on page 2 --

A.  We're going up?

Q.  Yes.  Up above.

A.  Okay.

Q.  I'm sorry, second page --

A.  Second page.

Q.  -- 3C.

A.  Okay.

Q.  The DOGE teams.  It says "In consultation with USDS, each agency head shall establish within their respective agencies a DOGE team."  You can

Page 57

keep reading if you want.  Were you on one of these DOGE teams?

A.  At this time I'm not sure, no.

Q.  I'm sorry.  To be clear, not as of January 20th.  As of your time at USAID.

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.

BY MR. WARREN:

Q.  The work you did at USAID -- during those three weeks were you a member of a DOGE team?

A.  To my understanding I was a Schedule C political appointee working at the behest of the President at the Office of Personnel Management who was detailed to the United States Agency for International Development to work under agency leadership there to accomplish what they wanted.

Q.  Okay.  And in your understanding what you just described -- does that fall within the DOGE team as described in Section 3C of this executive order?

MR. SILER:  Objection, lack of foundation.

THE DEPONENT:  Yeah, I guess that would go to like the nature of why I was brought on.  And I couldn't tell you.

Page 58

BY MR. WARREN:

Q.    No, I'm asking in your understanding the explanation you gave a couple questions back about the work that you were doing -- did you consider that to be part of the DOGE team that's referenced and described here?

A.    No.

Q.    We're going up in the document a few lines above Section 3C.  So this is in Section 3B but it's on the same page too.  There's a reference to the President's 18-month DOGE agenda.  Do you see that?

A.    Mm-hmm.

Q.    Do you have an understanding of the President's 18-month DOGE agenda?

A.    Combating fraud, waste, and abuse.

Q.    In your mind is that any different than the DOGE agenda that's referenced in Section 1?

A.    Where in Section 1?

Q.    What we just looked at not two minutes ago.

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah, we've looked at like five pieces.

MR. WARREN:  Okay.

Page 59

THE DEPONENT:  That's --

BY MR. WARREN:

Q.    If you turn back to the first page there's a reference to the EO establishes the Department of Efficiency to implement the President's DOGE agenda.

A.    Okay.

Q.    Then later there's a reference to the President's 18-month DOGE agenda.  Do you have any understanding of the difference between the President's DOGE agenda --

A.    And the President's 18-month --

Q.    -- and 18-month --

MR. SILER:  Objection, vague and ambiguous, calls for speculation, lack of foundation.

You can answer.

THE DEPONENT:  Yeah.  No, I have no idea.

BY MR. WARREN:

Q.    Okay.  Section 4B.  It says "Agency head shall take all necessary steps" -- and I'm paraphrasing -- "to ensure full and prompt access to unclassified agency records, software systems, and IT systems.

"USDS shall adhere to rigorous data protection standards."  During your time at USAID

Page 60

did you adhere to rigorous data protection standards?

MR. SILER:  Objection, argumentative, lack of foundation.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.    Did you adhere to rigorous data protection standards --

A.    Can you define "rigorous" data --

Q.    -- during your time at USAID --

A.    -- protection standards?

Q.    -- as it's referenced here?

MR. SILER:  Objection, lack of foundation.

THE DEPONENT:  Can you -- as it's referenced here?  Can you repeat the question?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.    During your time at USAID did you adhere to rigorous data protection standards?

A.    Yes.

Q.    What steps did you take to adhere to those standards?

A.    Followed agency guidelines.

Page 61

Q.    Such as?

A.    Such as using an agency device to access agency infrastructure.

Q.    How were you made aware of those guidelines?

A.    The CIO likely told us about them.

Q.    Did the CIO at USAID tell you about guidelines that you should adhere to?

A.    I don't recall exactly.

Q.    What about your work at other government agencies?

MR. HUMPHREYS:  Objection, vague.

BY MR. WARREN:

Q.    With regard to any work you did at any other government --

A.    Yes.

Q.    -- agency --

A.    We took numerous cybersecurity trainings, et cetera.  Yeah, I've taken --

Q.    Thank you.

A.    -- more cybersecurity trainings in the federal government than probably anyone.

Q.    Before you started on January 31st at USAID did you attend any meetings, discussions, trainings to prepare you for your work?

Page 62

A. Can you repeat that?

Q. Yes. Prior to starting work at USAID --

A. Okay.

Q. -- did you attend any meetings, trainings, conversations with people about the work that you were going to be doing at USAID?

A. Not that I recall.

Q. When did you first find out that you were going to be assigned, for lack of a better term, to USAID?

MR. SILER: Objection. Lack of foundation, vague and ambiguous.

THE DEPONENT: When I found out I was being detailed over there would have been around January 31st -- somewhere in that.

BY MR. WARREN:

Q. Prior to your work for the government as of January 20th did you attend any meetings or have any conversations about the type of work you would be doing with the government?

A. Prior to January 20th did I have any conversations -- can you repeat the second half?

Q. Yes. So now we're moving outside of USAID context for a moment.

A. Yeah.

Page 63

Q. Prior to your work that began on January 20th did you have any meetings or communications about the type of work you would be doing at the government?

A. At a high level sounds likely.

Q. Who did you meet with?

A. Other individuals who shared the DOGE ideology and planned to join the administration in support of the President.

Q. So what meetings with other members or people involved in the Department of Government Efficiency?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Yeah. Again as I've said before, you know, there's the US DOGE Service, which was like a real thing that has members.

And then there's like a loose collection of shared values and principles oriented around the President's, you know, DOGE agenda I guess is what it's called in this document.

MR. WARREN: Sure.

BY MR. WARREN:

Q. And you made clear you had no work with US DOGE Service; correct?

Page 64

A. Correct.

Q. So I'm focused on the other category -- this loose affiliation --

A. So you're asking -- again there's no formal membership. It's nothing like that.

Q. Right. But you met with other people who shared these -- this DOGE agenda vision, et cetera?

A. Certainly.

Q. Was there some bootcamp that you ever attended regarding DOGE agenda?

A. Nothing that I would characterize as a bootcamp.

Q. What would you characterize it as?

A. Characterize what as?

Q. Any meetings you had.

A. As meetings.

Q. Trainings?

A. Like-minded individuals. No, I would not consider it a training.

Q. How many of these meetings were there?

A. I can't recall.

Q. Formal or informal meetings?

MR. HUMPHREYS: Objection, vague.

MR. WARREN: And to be clear, that's a meeting where people gather and there's a -- either

Page 65

an agenda or a set topics that you're discussing versus casual conversation.

THE DEPONENT: The former -- kind of unstructured.

BY MR. WARREN:

Q. Okay. So with regard to that unstructured meeting -- unstructured type of meeting -- how many of those meetings did you have?

A. Again, I don't recall exact numbers.

Q. More than five?

A. It would have been -- you know, like if you've been to what "We Work" -- like we've been to a We Work for like a day, you know, how many meetings did you have in your We Work? I don't know. You talk to the guy next to you. You wander around. It's like that sort of situation.

Q. Were you at a We Work --

A. No --

Q. -- this --

A. -- no. I'm giving you an example.

MR. SILER: Why don't we take a break?

MR. WARREN: Okay.

THE DEPONENT: Okay.

THE REPORTER: Okay.

MR. WARREN: It's --

Page 66

MR. SILER: Off the record?

MR. WARREN: Sure.

THE REPORTER: All right. Off the record -- go ahead.

THE VIDEOGRAPHER: Please stand by. The time is one -- oh, excuse me. The time is 3:04 p.m. We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: The time is 3:12 p.m. We are on the record.

BY MR. WARREN:

Q. During the break did you discuss the substance of any testimony with counsel?

A. No.

Q. We were talking about meetings with like-minded group of people who subscribe to the DOGE agenda. So that I don't have to repeat that phrase if I call those "DOGE meetings" are we on the same page? I'm talking about meetings in the before January 20th timeframe.

A. You could use that term. I don't think it's how exactly I'd characterize them.

Q. How would you characterize it?

A. Just meetings of like-minded individuals.

Q. Okay. You said other individuals who

Page 67

shared the DOGE ideology were at those meetings. Who were some of those people?

A. It would have been people like -- I don't remember everyone's name anymore. It's been some time. But like a Luke Farritor or -- let's see. Like Steve Davis would have been there occasionally. As I mentioned before every now and then an Elon. And yeah.

Q. Edward Coristine?

A. Yes.

Q. How did you get invited? How did you know to attend these meetings?

A. When I learned, you know, in like November the President was -- you know, won the election and that, you know, the -- there was going to be some kind of organization to bring in people with a background in technology to help the federal government I wanted to, you know, find other people who were doing the same thing. So it would have been, you know, calling around basically until finding those people.

Q. Who'd you call?

A. I don't recall.

Q. Did someone call you or reach out to you to invite you to any of these meetings?

Page 68

A. No.

Q. You mentioned a few people at those meetings. Was Jeremy Lewin ever there?

A. To my recollection, occasionally.

Q. Did you get any written guidance, instructions at any of these meetings?

A. No.

Q. What types of things did you discuss? Strike that.

What type of things were discussed at these meetings with regard to work that was going to be done to further the DOGE agenda?

A. Things were talked about at a high level. You know, what can we do from a technology perspective to ensure that, you know, payments are not fraudulent. What can you do from a technology perspective to give the public more transparency into where money's going, et cetera, et cetera, et cetera.

Q. Any discussion of particular agencies within the government?

A. It's certainly possible.

Q. Discussions about how to deal with government employees?

A. Can you -- "how to deal with" meaning?

Page 69

Q. How to interact with existing government employees --

A. Well, certainly we were, you know, instructed, you know, about chain of command, you know, how to follow the hierarchical structure of an organization and work for senior leadership -- that sort of thing.

Q. And these meetings all pre-dated January 20th; correct?

A. Yes.

Q. And during these meetings between the election in November and January 20th were any current government employees in attendance?

A. So I was not at meetings from November to January 20th. This would be basically from end of December to January 20th. They would happen in that window.

Q. So during that window -- end of December through January 20th -- any current government employees? That is individuals who were then employed with the government.

A. No, not to my understanding.

Q. I want to turn your attention to January 20th. That's the inauguration. Where were you?

A. I was being sworn in at the Office of

Page 70

Personnel Management in their, you know, main federal building.

Q.   Where were you working out of during that week -- excuse me, during that 11-day period -- January 20th to January 31st?

MR. SILER:  Objection, vague and ambiguous.

BY MR. WARREN:

Q.   What building were you working out of?

A.   The OPM Teddy Roosevelt.

Q.   Where --

A.   I think it's called Teddy Roosevelt building.

Q.   Did you ever have interaction with anyone from USAID during that week?

A.   No.

Q.   And again I'm focused on time January 20th to January 31st.  As you identified, no interaction with anyone from -- who is currently in USAID?

MR. HUMPHREYS:  Objection, vague.

MR. SILER:  Yeah, objection, vague.  I'm just confused as to the specific dates.  I think they changed for the last few questions.

BY MR. WARREN:

Q.   So before January 31st any interaction

Page 71

with anyone who was then at USAID?

A.   Not to my recollection.

Q.   Do you know Brian McGill?

A.   Who?

Q.   Brian McGill.

A.   No.

Q.   Do you know John Voorhees?

MR. SILER:  Objection, vague and ambiguous as to "know."

BY MR. WARREN:

Q.   Do you understand the word "know"?

A.   Well, I mean, it can mean any things.  It can mean that you're very close to someone, that you have a personal relationship with them, that you've heard their name somewhere.  You know, earlier when you asked me if I knew Elon Musk I think you clarified that.  So yeah, I'd be curious.

Q.   Okay.  Do you know John Vorhees?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.  What do you mean by "know"?

BY MR. WARREN:

Q.   Have you ever met him?

A.   Probably.  But I don't recall.

Page 72

Q.   Have you ever met Brian McGill?

A.   I don't recall.

Q.   Have you ever met PJ Butler?

A.   Believe so.

Q.   Who's PJ Butler?

A.   My understanding is he works in the Security Office at USAID.

Q.   Did you meet PJ Butler in the context of his working at the Security Office at USAID?

A.   I believe so, yeah.

Q.   Did you meet with anyone else or ever deal with anyone else from USAID Security?

A.   I mean, who knows.  I'm sure.  You walk through the front gate -- there's a guy who hands you a badge, et cetera, et cetera.  I mean, it's a giant building full of people.  Probably.

Q.   As you understood was there a DOGE team that was detailed or assigned to USAID?

MR. SILER:  Objection, lack of foundation.  Vague and ambiguous.

THE DEPONENT:  Yeah, how are you defining "DOGE team"?

MR. WARREN:  People who share like-minded ideology about reforming government to combat waste, fraud, and abuse and modernize technology --

Page 73

THE DEPONENT:  Yeah.  So if you're using it not in the context of this document but in the context of that then yes, I would say there was a group of like-minded individuals who shared that ideology around fraud, waste, and abuse --

BY MR. WARREN:

Q.   Detailed to -- were assigned to USAID?

MR. SILER:  Objection, vague and ambiguous.

BY MR. WARREN:

Q.   Who were they?

A.   To be clear, I wasn't answering your question.  I was saying yeah, I found that vague and ambiguous.

Q.   Okay.  Was there a team of those like-minded individuals working at, assigned to, detailed to USAID during the time you were there?

A.   Yes.

Q.   Who else?

MR. SILER:  Objection, vague and ambiguous.  Are you asking about a specific group of people who were assigned as a DOGE team or, as the witness has testified, a loose group of like-minded individuals that ascribe to the DOGE agenda?

MR. WARREN:  I'm asking him about if there

Page 74

were other individuals who you've identified as sharing that like-minded agenda who were detailed, tasked, assigned, to USAID.

MR. SILER: Objection, vague and ambiguous.

MR. WARREN: You can answer the question.

THE DEPONENT: You're asking if there are other people who share my values who were working at USAID?

MR. WARREN: That wasn't the question.

BY MR. WARREN:

Q. The question is in what you've described as this group of people who share your -- this ideology about reforming government, which you agreed we could loosely call DOGE team -- DOGE meetings -- people at the meetings -- were any of these people assigned to USAID?

MR. SILER: Objection, misstates prior testimony --

THE DEPONENT: I don't agree --

MR. SILER: -- vague and -- hold on. Vague and ambiguous.

You can answer if you understand.

THE DEPONENT: Yeah. I was going to say I don't agree with your characterization of my prior

Page 75

statement.

BY MR. WARREN:

Q. Was Ed Coristine working at USAID during the time you were there?

A. I believe there was some brief overlap.

Q. Jeremy Lewin?

A. Yes.

Q. Luke Farritor?

A. Yes.

Q. Anyone else who you had met with prior to January 20th who you understood to share this DOGE agenda ideology?

A. Yeah, I --

MR. SILER: I'm sorry. Is there a question?

MR. WARREN: Yes. That was the question.

THE DEPONENT: Can you repeat it?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Was there anyone else at USAID in addition to those individuals?

A. Was there anyone else at USAID? Yes, there were a number of other employees. There was someone at the desk who would take your badge --

Q. Mr. Kliger, I'm talking about with regard

Page 76

to people who attended the DOGE meetings that we discussed.

A. In that case it would be names you mentioned.

Q. Right. And I'm asking if there are other individuals who you remember?

A. Who were officially -- my understanding was -- I mean, Steven Davis, as I said earlier, would be there on occasion. And he had been in some of those prior meetings.

Q. Were you aware -- or excuse me, are you aware of an incident approximately May -- excuse me. Are you aware of an incident or situation on approximately January 27, 2025, with DOGE members arriving at USAID headquarters and trying to obtain access to the building and data systems?

MR. SILER: Objection, assumes facts not in evidence.

You can answer.

THE DEPONENT: Am I aware of something that happened on the -- no.

BY MR. WARREN:

Q. Are you aware of any incident regarding people from DOGE team or working on behalf of the DOGE agenda who were demanding access to USAID

Page 77

headquarters and access to USAID data systems on or about January 27, 2025?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Not to my recollection.

BY MR. WARREN:

Q. Are you aware of discussions around cutting off access to USAID employees -- people being placed on administrative leave on or about January 27, 2025?

MR. SILER: Objection, compound.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Sure.

BY MR. WARREN:

Q. Are you aware of people who were placed on administrative leave from USAID around January 27, 2025?

A. My understanding to the best of my recollection was that prior to my arrival there had been some administrative leave action carried out.

Q. And how do you know that?

A. I'm sure I was told it by senior agency leadership.

Q. Do you recall who?

Page 78

A.   No.

MR. WARREN:  Have this marked as Plaintiffs' Exhibit 2.  Thank you.

THE REPORTER:  All right.  And Exhibit 2 marked.

(WHEREUPON, Plaintiffs' Exhibit 2 was marked for identification.)

BY MR. WARREN:

Q.   Okay.  And for the record this is an email chain from January 27, 2025.  The subject line "SBU Administrative Leave Notice."  And Mr. Kliger, I will represent to you that your name does not appear on this email chain.

A.   Is it in chronological order descending or ascending?

Q.   It is in ascending --

A.   It reads --

Q.   So you read this --

A.   Front to back?

Q.   -- front to back.

A.   Okay.  Yeah, if I could have a few minutes.  Thank you.

Q.   And my question for you is --

A.   If I could have a few minutes to read the document.  Thank you.

Page 79

Q.   And I'm going to ask you the question before you look at the document so that you know what I'm going to ask you about.

My question for you is did you have any involvement or discussion about the employees being placed on administrative leave that's referenced here beside what you just described to me?

A.   Can you repeat the question?  I was reading.

Q.   Did you have any involvement in the individuals being placed on administrative leave that's referenced in this document beyond what you just answered a couple moments ago?

MR. SILER:  Objection, misstates prior testimony.

THE DEPONENT:  Yeah, can you repeat the question?

BY MR. WARREN:

Q.   Before we looked at this document you said that you had some understanding that people were placed on administrative leave before you came to USAID?

A.   To be clear, I didn't have understanding of that before I came to USAID.  I had understanding of that after I arrived at USAID that it had

Page 80

happened before my arrival -- just to be clear for the record.

Q.   Thank you.  And I'm asking you after you've reviewed this document do you recall any further conversations you had about those individuals being placed on administrative leave?

A.   So you want me to review the document and then I'll answer?

Q.   Sure.

A.   If you can repeat the question.

Q.   I'll rephrase it.

A.   All right.

Q.   What do you know about what's referenced in this document beyond what you've already testified to today?

A.   What's referenced in this document -- it appears to be a group of individuals being placed on administrative leave at the direction of senior agency leadership.

Q.   I'm asking what you know about that beyond what you've already testified to today?

A.   To my recollection I know that some group was placed on administrative leave prior to my arrival by senior agency leadership.

Q.   Now when you say "senior agency

Page 81

leadership" who are you referring to?

A.   I don't know who in senior agency leadership carried out this action.  From this email, I mean, obviously Joel was the named agency leadership.

Q.   You mentioned Luke Farritor before.  How do you know Luke Farritor?

A.   I met Luke Farritor in those meet-ups we had described earlier in probably early January.

Q.   Was that the first time you had met him?

A.   Yes.

Q.   What about Ed Coristine?

A.   Similar timeframe.  I can't speak to exact dates but --

Q.   Jeremy Lewin?

A.   Yep, same thing.

Q.   Now I want to turn your attention to Friday, January 31st of 2025 that you testified to as your first day working at USAID.  Tell me about that first day?

MR. SILER:  Objection, vague.

THE DEPONENT:  Can you repeat?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Tell me about your day.  What were you

Page 82

doing at USAID?

A. Okay. At USAID I don't recall exactly. I imagine trying to get a laptop set up, trying to work with the IT Department to have an email configured, working with the IT Department to see if they could provision a government phone.

Q. Where were you physically located?

A. This would be the USAID headquarters building.

Q. How did you first gain access to the building? It's a secure building; correct?

MR. SILER: Objection, compound.

THE DEPONENT: Yeah, can you repeat?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. It's a secure building. So on your first day there how were you -- were you badged through? Did someone walk you in? How'd you get past security?

A. I don't recall.

Q. This is Government -- excuse me -- Plaintiffs' Exhibit 3.

THE REPORTER: Exhibit 3 marked.

(WHEREUPON, Plaintiffs' Exhibit 3 was marked for identification.)

Page 83

BY MR. WARREN:

Q. Mr. Kliger, that email goes backwards to forwards. So if you --

A. I got it, yeah.

Q. -- start looking at the bottom of the first page.

A. Just be one minute here. Okay.

Q. The email that's sent from Luke Farritor at the bottom of the first page --

A. Yep.

Q. -- he says "Just want to confirm -- just want you to confirm that Gavin Kliger of DOGE should also have full read/write administrative access for managing physical and logical access like myself." What's your understanding of what Mr. Farritor is asking of Jason Gray?

MR. SILER: Objection, calls for speculation.

THE DEPONENT: My answer would be I don't. I couldn't tell you.

BY MR. WARREN:

Q. Do you know what full read/write administrative access is?

A. Yes.

Q. What is it?

Page 84

A. That would be a computer science term that refers to the ability to, you know, read data and write data.

Q. And what about "managing physical and logical access"?

A. That would refer to, in my understanding, managing facilities access or access to information systems.

Q. And if you look at the subsequent email, Mr. Gray's response, he says -- and I'm paraphrasing -- "I approve of administrative access to all unclassified information systems." See that?

A. Yes.

Q. Were you granted access -- excuse me. Were you granted administrative access to all unclassified information systems at USAID?

A. No.

Q. What systems were you granted access to?

A. Systems that would manage payments. I think a system that would, you know, manage like whether your email account works. I believe a system that would manage whether your badge would let you in at the front door of the building -- these sorts of systems.

Q. What's the Phoenix system?

Page 85

A. Phoenix was a -- to my understanding a payment system -- basically a piece of software that you would use to disperse funds.

Q. Were you given access to that?

A. Yes.

Q. Admin access?

A. I don't know exactly how they defined the access. But yes, I had access to that system.

Q. Did you have access to HR systems?

A. I don't recall. But probably.

Q. Access to badging in access systems?

A. Yes. To be clear, the access to the system that is used to, you know, deny someone access to the building.

Q. Are you familiar with a system called CCURE?

A. Yes.

Q. What's CCURE? And for the record that's C-C-U-R-E; correct? It's not in the document. I'm asking.

A. You're asking me if I'm familiar with them and how it's spelled. I couldn't tell you. What's the question?

Q. The question is what is CCURE?

A. My understanding is that it's basically a

Page 86

virtual machine that is used to manage facilities access at USAID.

Q.   Are there any systems at USAID that you were not granted access to?

A.   That I was not granted access to?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah, I couldn't -- I'm sure I didn't have the password for the air conditioning or, you know, I could name a million systems probably.

BY MR. WARREN:

Q.   Any computer infrastructure systems regarding the operations of the agency that you were not granted access to?

A.   I'm sure there were.

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.  Again I can't speak to all of the systems that are under the purveyance of a federal agency employing 10,000 people.

BY MR. WARREN:

Q.   If you turn to the second -- back to the second page of that document you'll see that Mr. Farritor writes "Gavin Kliger of DOGE"?

Page 87

A.   Mm-hmm.

Q.   What's your understanding of why he wrote "Gavin Kliger of DOGE"?

A.   I --

MR. SILER:  Objection, calls for speculation.

THE DEPONENT:  Yeah, I can't speak to that.

BY MR. WARREN:

Q.   You don't know why he would have written that?

A.   I could certainly speculate wildly as to why, yeah.

Q.   Prior to January 31st you said you had met Mr. Farritor; correct?

A.   Prior to January 20th; correct.

Q.   I'm sorry, prior to January 31st?

A.   Ah, yes.  Yeah.

Q.   Had you spoken -- ever spoken with him before this day about the work that you would be doing at USAID?

A.   No.

Q.   Ever talk with him about work you would be doing -- strike that.

Did you ever speak with Mr. Farritor about

Page 88

the US Digital Service?

A.   I don't recall.

Q.   Ever speak with Mr. Farritor about the US DOGE Service Temporary Organization?

A.   I don't recall.

Q.   You ever speak with him about the President's executive order that we looked at previously?

A.   It may have come up in conversation.  But I don't recall some specific situation, no.

Q.   You had spoken with Mr. Farritor about the work that you, he, and other like-minded individuals would be doing at the government; correct?

A.   None of us knew the work we would be doing.  Again we work at the behest of senior agency leadership.  But certainly we discussed our ideas.

Q.   And he was at some of those meetings that you described -- those DOGE meetings; correct?

A.   Again you characterize them as DOGE meetings.  My characterization was meetings of like-minded individuals.

Q.   But he was there?

A.   Yes.

Q.   Okay.  But again you have no idea why he said "Gavin Kliger of DOGE"?

Page 89

A.   I'm sure he was probably referring to the ideological affiliation.  But again that's speculation.

Q.   Plaintiffs' Exhibit 4.

THE REPORTER:  Exhibit 4 marked.

(WHEREUPON, Plaintiffs' Exhibit 4 was marked for identification.)

THE DEPONENT:  Thank you.

BY MR. WARREN:

Q.   I'm sorry, before you look at that document -- talking about the -- what I've characterized as the DOGE meetings prior to January 20, 2025 -- did you ever keep -- take any notes of the meetings you had with these like-minded individuals?

A.   Not that I recall.

Q.   All right.  If you look at Government's Exhibit 4, please.

MR. SILER:  Plaintiffs'.

MR. WARREN:  Sorry.  Old habits die hard.

MR. SILER:  I understand.

MR. WARREN:  That'll happen at least three more times today.

MR. SILER:  Don't take it the wrong way if I correct you.

Page 90

BY MR. WARREN:

Q. Mr. Kliger, while you're reviewing that document, my question for you is going to be do you recall -- did you ever sign a document similar to this?

(Interruption in proceedings.)

THE DEPONENT: Sorry. Someone's coming through the door.

MR. WARREN: Of course.

MR. SILER: Do we need to take a break or are we --

THE DEPONENT: If we could take a break --

MR. SILER: Okay. Yeah.

THE DEPONENT: -- I would appreciate it.

BY MR. WARREN:

Q. Actually, before we take a break can we just -- let's answer the question on this document and then we'll move on.

A. I'm sorry. There's someone from -- in the room to fix the air conditioner --

MR. SILER: Yeah.

THE DEPONENT: -- right now.

MR. SILER: Maybe if he could step out for a minute or two and then we'll finish the question. I'm fine with that.

Page 91

What was the question?

MR. HUMPHREYS: Are you okay to proceed?

THE DEPONENT: It's pretty hot in here. I would certainly appreciate --

(Speaking simultaneously.)

MR. WARREN: There's a question pending. Just answer the question and then move on.

BY MR. WARREN:

Q. And the question is did you ever sign a similar document --

A. Again --

Q. -- like this for --

A. -- we've just been interrupted by someone coming in to fix the air conditioning, walking around the building, two people stood to raise the door. It's 74 degrees. I would appreciate it if we could take a minute here to try and fix the air conditioning. It is not comfortable here.

Q. Okay. And I'd appreciate it if you could answer my question before we take a break.

MR. HUMPHREYS: Come on.

THE DEPONENT: Well, I need to use the restroom. I'm sorry. It's too hot. Thank you.

MR. WARREN: Sure. Record will reflect --

THE VIDEOGRAPHER: Please stand by.

Page 92

MR. WARREN: -- the witness refused to answer the question before taking a break.

THE DEPONENT: Yeah, it's 74 degrees.

MR. SILER: We're off the record.

THE VIDEOGRAPHER: Please stand by. The time is 3:42 p.m. We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: The time is 3:49 p.m.

BY MR. WARREN:

Q. Mr. Kliger, before we look at Exhibit 4, I want to look -- ask you again about Exhibit 3.

A. Before can I -- just a point of clarification. Earlier you stated I refused to answer a question. I want to be clear I'm happy to answer that question. So please feel free to refuse it -- or repeat it.

Q. Repeat it. Thank you.

So Exhibit 3 -- do you disagree with Mr. Farritor's characterization of you as --

A. To be --

Q. -- quote "of DOGE"?

A. So to be clear, you've given me Exhibit 4 just now. But we're referencing Exhibit 3?

Q. Yes.

A. Okay. Can you repeat the question?

Page 93

Q. Yes. Do you disagree with Mr. Farritor's characterization of you as, quote, "of DOGE"?

A. No, not in the sense that we were part of the same group that shared the same values and that I've espoused earlier -- working at the behest of the President in accordance with the directives of senior agency leadership.

Q. Are you aware of the website DOGE.gov?

A. I am aware of it, yes.

Q. Have you ever visited the website?

A. Probably.

Q. What's your understanding of what the website is?

A. A website --

Q. For?

A. -- for displaying information about the federal government spending, things that, you know, are beneficial for the public to know.

Q. Is that information limited to the loosely-affiliated group of like-minded people?

MR. SILER: Objection, lack of foundation.

THE DEPONENT: I don't understand your question.

BY MR. WARREN:

Q. Is the website DOGE.gov that you just

Page 94

described limited to the loose affiliation of like-minded people who share ideology --

A. Limited in what way?

Q. -- that you just --

MR. SILER: Same objection.

THE DEPONENT: Yeah, limited in what way?

MR. WARREN: In terms of the information provided.

MR. SILER: Same objection.

THE DEPONENT: What do you mean?

MR. WARREN: The information that's contained there. You said information --

THE DEPONENT: Is the information -- like do people have to log in to view the -- like I don't understand what you're trying to ask.

BY MR. WARREN:

Q. I'm asking whether the information on that page as you described -- government spending and other information -- is part of this loose group -- loosely-affiliated group of like-minded individuals?

MR. SILER: Objection, lack of foundation.

THE DEPONENT: I genuinely don't understand your questioning.

BY MR. WARREN:

Q. Is the website DOGE.gov meant for the

Page 95

loose affiliation of like-minded individuals that you've described before?

A. Meant for as in its intended audience?

Q. Yes.

A. No. The intended audience of that website would be the general public.

Q. Did you have any involvement with building that website?

A. No.

Q. Maintaining the website?

A. Not to my recollection.

Q. Putting information on the website?

A. Not to my recollection.

Q. If you look at Government Exhibit 4 --

MR. SILER: Plaintiffs'.

MR. WARREN: Sorry.

MR. SILER: Again Plaintiffs'.

MR. WARREN: Jesus. Sorry.

BY MR. WARREN:

Q. Mr. Kliger, my apologies. Plaintiffs' Exhibit 4 -- if you could review that. And my question for you is -- actually for the record this is a USAID CCURE 9000 User Account Request Form.

It appears to be filled out and signed by Luke Farritor. My question for you is did you fill

Page 96

out and sign a similar form with regard to USAID CCURE 9000?

A. I do not recall.

Q. Do you recall filling out any forms like this for data systems and information systems to which you had access to at USAID?

A. I've probably filled out over a thousand such forms over the course of my work in the federal government. And no, I don't recall --

Q. When you say --

A. -- specifics.

Q. Sorry. I didn't mean to talk over you. When you say over a thousand is that hyperbole --

A. Yes.

Q. -- or do you literally mean over --

A. Hyperbole.

Q. -- a thousand?

A. But you can imagine there's a lot of paperwork in the federal government.

Q. All right. You can put that up. Thank you. We talked a little bit about the systems access you had at USAID, the -- that included access to grant payments?

A. In what way?

Q. The systems access that you had to Phoenix

Page 97

as well as other systems -- did that include access to USAID's disbursement of grants?

A. Yes.

Q. Payments to vendors?

A. Yes.

Q. Payments to staff?

A. Not sure.

Q. Payments to employees?

A. Not sure.

Q. Payments to private service contractors?

A. Not sure.

Q. The work that you did at USAID -- strike that.

Why did you need access to those systems? Speaking broadly.

A. My understanding was that senior agency leadership had confirmed their intent that I have access to those systems.

Q. For what purpose?

A. I --

MR. SILER: Objection, speculation.

BY MR. WARREN:

Q. As you understood your job?

A. I can't speculate as to their intent. As I stated earlier, my initial understanding was that

Page 98

I was being brought to the agency to ensure that they had continued access to those systems.

Q. I'm sorry, that who had continued access --

A. Senior agency leadership.

Q. I want to turn your attention to Saturday, February 1, 2025. Did you work that day?

A. It's very likely.

Q. And this would have been your second day at USAID do you recall?

A. I don't.

Q. Do you recall working that first Saturday that you were there?

A. I worked, you know, a lot. So my assumption would be yes.

Q. Were you present during a situation involving Steve Davis, Luke Farritor, Jeremy Lewin, and others who were seeking physical access to USAID's offices on Saturday, February 1, 2025?

A. Can you be more specific?

Q. Yes. There was, as I understand, a situation that happened at USAID's headquarters -- the Ronald Reagan building -- where Steve Davis, Luke Farritor, other individuals who you have identified were trying to get access to -- into the

Page 99

building on that Saturday. Were you with that group of people on that day?

A. I don't recall.

Q. Did you have access to SCIFs at USAID?

A. Not to my understanding.

Q. Your testimony is you've never been inside a SCIF at USAID?

A. That is my --

MR. SILER: Objection, misstates prior testimony.

THE DEPONENT: Yeah, you can repeat it.

MR. WARREN: Yeah.

BY MR. WARREN:

Q. You've never been inside a SCIF at USAID?

A. No, not to my understanding. To be clear, I've never been inside a classified space at USAID like if a room was formerly a SCIF or something like that.

Q. Thank you. Do you recall were you in attendance at USAID's headquarters on Sunday, February 2nd -- the following day?

A. It's very likely.

Q. Were you aware that around February 2, 2025, email systems and computer access systems for thousands of USAID employees and contractors were

Page 100

cut off? Yes or no.

MR. HUMPHREYS: Objection, foundation.

THE DEPONENT: Can you repeat the question?

BY MR. WARREN:

Q. Are you aware that around February 2, 2025, email access and computer systems access for thousands of USAID employees and contractors was cut off?

A. My understanding and recollection is that at some point senior agency leadership directed that a number of USAID employees be placed on an administrative leave, which is fully paid with benefits.

And as part of that administrative leave senior agency leadership would direct that those employees lose physical keycard access and email access in accordance with standard administrative leave procedures.

Q. How did you become aware of that?

A. It is likely, although I don't recall exactly, that in carrying out some of those specific procedures associated with the administrative leave, senior agency leadership would have directed me or others to, you know, revoke physical access and to,

Page 101

you know, temporarily revoke digital access in accordance with the privileges we had been granted.

Q. In your first few days at USAID -- so I'm focused on the time period of January 31st through February 2nd -- did you do that?

A. I can't speak as to which day this happened. It certainly happened.

Q. In the first few days?

A. I can't speak to the exact -- it might have been day four or day five. I couldn't tell you.

Q. Was it something that happened more than once? And to be clear I'm referring to what you just described as being directed to -- my phrase -- cut off access to people, physical or --

A. Yeah.

Q. -- electronic access --

A. My understanding --

Q. -- at USAID?

A. Sorry.

Q. Do you understand the question?

A. Yeah, I cut you off. Can you repeat it?

Q. Yep. So what you just described as being directed to assist with cutting off people's access, either physical or electronic, you said you don't

Page 102

recall whether it was the first three days or day four. I'm asking were there multiple occasions where you were asked to do that during your three weeks at USAID?

A. There were -- yes. I believe there were at least two instances where employees were placed on administrative leave at the direction of senior agency leadership.

Q. And what were you asked to do specifically?

A. I would have been asked to, for example, you know, physically revoke -- revoke physical access to ensure safety of the building and employees within the building. And I would have been asked to, you know, remove access to email as part of standard administrative leave procedures.

Q. You said you recall that happening on two occasions; correct?

A. I don't want to give an exact number. You can imagine one day might have been "Hey, there's these 23 that we want" from senior agency leadership. But in terms of large scale probably two or three.

Q. Who directed you to do that on those occasions?

Page 103

A. That would have been senior agency leadership.

Q. Who?

A. I could not recall.

Q. Who was typically directing your work at USAID at that time?

A. It would have been the administrator or the deputy administrator, the chief of staff -- someone like that.

Q. And who was the administrator at that time?

A. I don't recall exactly who was exactly who. Obviously Ken Jackson, Joel on kind of the chief of staff side. Pete Marocco was kind of like, you know, somewhere in that chain. But --

Q. Sorry. Joel's last name?

A. I couldn't recall it. I think it's in your email.

Q. Was it the same person within senior leadership who instructed you to cut off, limit peoples' access on the multiple times you did it?

A. No. It would have been -- I don't recall exactly who. But I'm sure it was kind of some mix. In general, you know, there was -- some of them would be in the buildings some days, others not.

Page 104

You know, it's kind of who was around you would tell you what to do.

Q. Was there ever an occasion where somebody asked you to do something at USAID and because that person wasn't your direct supervisor or you didn't believe they had the authority to tell you to do something you went and asked somebody else to confirm that you were supposed to be doing what the person asked you to do?

MR. HUMPHREYS: Objection, vague.

THE DEPONENT: Yeah. Can you repeat the question?

MR. WARREN: Sure.

BY MR. WARREN:

Q. Was there ever a time during your three weeks at USAID where somebody asked you to do work regarding USAID and you went to somebody else to confirm that you were supposed to do it?

A. Only senior agency leadership asked me to perform work during my time at USAID.

Q. And any time someone from senior -- you would say leadership as you've described -- asked you to do that work you did it?

A. Presumably, yeah.

Q. We talked about Peter Marocco before

Page 105

generally. In the context of now what we're describing -- sort of cutting access off for people -- did Mr. Marocco ever instruct you to cut access off for USAID individuals?

A. I don't recall.

Q. Jeremy Lewin?

A. I don't recall.

Q. Elon Musk?

A. No, I think I'd remember that one.

Q. Did you ever cut off access for -- in the manner that you've described for USAID employees who were abroad?

MR. SILER: Objection, vague.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Did you ever -- the access that you cut off as you described for USAID employees -- did you ever do that for USAID employees who were located abroad -- outside the United States?

MR. SILER: Objection, vague, misstates prior testimony.

You can answer.

THE DEPONENT: So if someone's on vacation

Page 106

in London did I cut their access?

MR. WARREN:  No.  For USAID employees who were stationed abroad.

THE DEPONENT:  Ah.  I don't recall.  My role was to implement the directives that were given to me by senior agency leadership.

BY MR. WARREN:

Q.  And the senior agency leadership we just -- I asked you about some specific individuals.  What about Steve Davis?  Did he ever instruct you to cut off access from people?

A.  No.

Q.  How were the instructions communicated to you?

A.  Usually in person.

Q.  Did you have an office at USAID?

A.  We would -- the group of senior agency leadership would typically occupy the administrator's suite.

Q.  Were you included in that senior leadership --

A.  No.

Q.  -- including yourself?

A.  No.

Q.  So where were you located?

Page 107

A.  I would work alongside them in that suite.

Q.  So you said typically they would -- it would be in person.  Did you ever receive written instructions about cutting people off of their access to USAID?

A.  It wouldn't surprise me if I had.  But I don't recall.

Q.  Your recollection is that the instructions were typically --

A.  In general --

Q.  -- in person?

A.  -- yeah.  People would just be standing next to you and give you a directive.  "People" being senior agency leadership.

THE DEPONENT:  Does anyone have a read on the thermostat?  Are we still at 75?

(Speaking simultaneously.)

THE DEPONENT:  74.6.

MR. SILER:  Yeah, it was pretty flat.

THE DEPONENT:  Okay.  So it went down because we had the door open earlier.  It's unfortunate.

MR. SILER:  I mean, would anyone object to opening the door?

THE DEPONENT:  Let's open the door.

Page 108

MR. HUMPHREYS:  There are a lot of us in a room this size --

THE DEPONENT:  Yeah.  I'm wearing a sweater vest and it's brutal.  Maybe in like flat ten.

BY MR. WARREN:

Q.  Mr. Kliger, I'm handing you what's being marked as Plaintiffs' Exhibit 6 -- 5.

THE REPORTER:  Exhibit 5 marked.

(WHEREUPON, Plaintiffs' Exhibit 5 was marked for identification.)

MR. HUMPHREYS:  Can we have another copy down here for --

And for the record, is this cover page yours or --

MR. WARREN:  The cover page can actually come out.  Let's put the -- the document's what we care about.

MS. MAYS:  Actually, that's the Government --

MR. WARREN:  Oh, it's the Government's cover page?  Then we'll leave it on.

BY MR. WARREN:

Q.  Mr. Kliger, for the record I handed you Plaintiffs' Exhibit 6, which is a cover page and then a 20-page memo dated February 2, 2025.  And the

Page 109

substance of 19 pages of it are blocked out.

A.  It's actually a 19-page memo just for clarity.

Q.  Oh, thank you.  Thank you.

A.  The cover page is page 1 for me.

Q.  Oh, there's a --

A.  This is a public filing.  So that's why the numbering is messed up.  Could you repeat the question if there was one?

Q.  There wasn't one.  My question for you is have you ever seen this document before?

A.  I don't recall.

Q.  This is dated February 2, 2025.  You see that?

A.  Yes.

MR. SILER:  Just to be clear, the memorandum -- not the cover page or --

MR. WARREN:  Correct.  Sorry, the memo.

BY MR. WARREN:

Q.  And it says "internal memorandum PII sensitive.  Not for external distribution."  You see that at the top?

A.  Yes.

Q.  It's to William Malyszka, Chief Human Capital Officer, and Ken Jackson, Assistant to the

Page 110

Administrator for Management and Resources; correct?

A. Mm-hmm.

Q. And it's from Pete Marocco. You see that?

A. Yes.

Q. And I'm sorry, on February 2, 2025 -- strike that.

What was your understanding of Pete Marocco's position on February 2, 2025?

A. My understanding was that he was a part of senior agency leadership.

Q. And the subject line is "Personnel placed on administrative leave"; correct?

A. Correct.

Q. And the memo references in the first line that "I" -- apparently from Pete Marocco -- "placed the following 633 USAID personnel on excused absence, also known as administrative leave." You see that?

A. Yes.

Q. Were you involved in the termination of access for the 633 people put on administrative leave here? And I know that their names are blocked out.

A. Yes, I'll take your word on the 633 -- and I guess Pete's word.

Page 111

MR. SILER: Maybe you should re-ask the question.

MR. WARREN: Sure.

MR. SILER: Just --

BY MR. WARREN:

Q. So were you involved in cutting off access -- systems access for the USAID personnel --

A. I --

Q. -- in this memo?

A. Sorry to cut you off. I believe so, yes.

Q. This would be one of the two or three large-scale cutoffs that you were involved in?

A. Yes.

Q. Okay. But you don't recall this memo?

A. Again because there were two or three of these things -- I'm sure each one had a memo. I've seen similar memos. I may have seen this one.

Q. Did you have any role in drafting it -- this memo or a memo like this?

A. Not to my recollection.

Q. Did you ever draft memos for other people at USAID?

A. No.

Q. You drafted memos on your own behalf?

MR. SILER: Objection --

Page 112

THE DEPONENT: Is that a question?

MR. WARREN: Yes.

THE DEPONENT: Can you repeat it?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Did you ever draft a memo while you were at USAID?

A. Not to my recollection.

Q. All right. You can put that aside. And Mr. Kliger, I'm handing you what is going to be marked as Plaintiffs' Exhibit 6.

THE REPORTER: Exhibit 6 marked.

(WHEREUPON, Plaintiffs' Exhibit 6 was marked for identification.)

THE DEPONENT: Thank you.

BY MR. WARREN:

Q. For the record, this is a cover sheet and then a memo dated February 3, 2025, that is 40 pages with almost the entirety of the menu -- memo blacked out.

A. Is that because it's peoples' personal information?

Q. It doesn't matter.

A. So just to be clear, the memo's blacked out. I'm just trying to understand its context or

Page 113

is this just a list of peoples' personal information presumably? And so that's why it would be blacked out.

Q. Presumably.

A. Okay.

MR. HUMPHREYS: And let's be clear on the record. Did you black this out? Was it the Government or you guys?

MR. WARREN: This is the Government's production. The --

MR. SILER: To be clear for the record --

MR. HUMPHREYS: Yeah.

MR. SILER: -- this was a filing that was put on the public docket --

MR. WARREN: Yeah.

MR. SILER: -- but this was a filing in connection with a response to a court order that we produced. And it was redacted to remove certain individuals' names for privacy reasons.

MR. WARREN: Thank you.

BY MR. WARREN:

Q. You see the memo is dated February 3, 2025?

A. Yes.

Q. And it's again to Mr. Malyszka and Mr.

Page 114

Jackson -- the same as the last memo we looked at?

A. Yes.

Q. From Mr. Marocco?

A. Yes.

Q. And the subject is "Personnel placed on administrative leave"; correct?

A. Yes.

Q. And this references placing 1,412 USAID personnel on excused absence, also known as administrative leave, with pay effective immediately; correct?

A. Yes.

Q. And based on your prior testimony I presume you had no involvement in drafting this memo?

MR. SILER: Objection, argumentative.

THE DEPONENT: Can you repeat the question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Did you draft this memo?

A. No.

Q. Did you have any involvement in drafting the memo?

A. Not that I recall.

Page 115

Q. Were you involved in cutting off access to the 1,412 USAID personnel?

A. Yes.

Q. Again this is consistent with your testimony before where you said there were two or three large-scale --

A. Yes. And this would be --

Q. -- cutoffs.

A. -- one of them. Unless there was like another one I didn't know about that's all of them.

Q. And Mr. Kliger, we've talked about -- I've used the phrase "cutting off access." You had described that before.

Was there anything else that you did with regard to placing individuals on administrative leave in addition to cutting off physical access to the building or electronic access to USAID systems to effectuate their being placed on leave?

A. I believe we would also send a notice generally to employees informing them that they were being placed on administrative leave. Because there would be like 1,400 people it required a technologist in order to send those emails and generate them and so forth.

Q. And you were involved in sending those

Page 116

emails?

A. Yes, we would work to generate -- we would be provided a template. We would then work to, you know, populate the template. It needs like a name. It needs your, you know, years of service, et cetera -- other information about employees. Oh, for admin leave? I was thinking of RIF notices.

Q. For admin leave?

A. I'm not sure. We may have generated notices to let people know they were on admin leave. It would be that same thing where like if we did generate a document it was we were given a template by senior agency leadership. We, you know, it needs employee names, you know, just like the IT function.

Q. And the times that you did that who instructed you to do it?

A. It --

MR. SILER: Objection, vague and ambiguous just as -- I want to be clear -- are we asking about administrative leave here?

MR. WARREN: Yes, about the administrative leave that Mr. Kliger just testified to about potentially sending out an email to people to let them know they were on admin leave.

THE DEPONENT: Can you repeat the

Page 117

question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Who instructed you to do that?

A. It would have been senior agency leadership.

Q. And again that would include?

A. Joel.

Q. Joel Borkert?

A. Pete Marocco.

Q. Peter Marocco.

A. Ken Jackson.

Q. Joel? I'm sorry, Joel Borkert could be --

MR. SILER: Could you maybe ask a question? These are all --

MR. WARREN: Yes.

BY MR. WARREN:

Q. Joel Borkert, yes?

A. He was the deputy chief of staff --

Q. Yep.

A. Yes.

Q. Who else?

A. Probably, you know, like a deputy administrator or something. But, you know, that's what I recall.

Page 118

Q. Have you ever been to the USAID website?

A. Yes.

Q. During the time that you worked at USAID did you ever have -- did you do any work with regard to the USAID website?

A. Yes.

Q. What work did you do?

A. At one point in consultation with senior agency leadership I was asked to take the website down, to put it back up, and ultimately to post a statement drafted by senior agency leadership.

Q. Who was the senior agency leadership who asked you to do that?

A. I don't recall.

Q. When was that?

A. I --

Q. When were you asked to take down the website?

A. I don't recall exact dates.

Q. Were you told why you were taking down the website?

A. I don't recall.

Q. Were you told how quickly to take down the website?

A. I mean, generally if someone told me to do

Page 119

something my understanding was that it was to be done in a prompt fashion.

Q. How long did it take you to shut down the website?

A. I don't recall.

Q. Was it something that took days or hours?

A. I believe it was largely executed by the IT team and -- of USAID. And I don't know exactly.

Q. What was your involvement in it?

A. I would talk to the IT team and convey what I heard from senior leadership and, you know, if they needed -- like how do you take down a website? Well, there's a lot of options you can imagine.

So we walk through the technical options available and see which would make sense to accomplish the directives of senior agency leadership.

Q. So you supervised the website being taken down as opposed to you did the manual taking down of the website?

MR. SILER: Objection to the characterization.

THE DEPONENT: Yeah. Just to reiterate, I would be instructed by senior agency leadership in

Page 120

some way, you know, take down the website.

And then I would work with the IT team to convey that instruction and say "Well, you know, do we want to pull the DNS record? Do we want to, you know, change the homepage?" Like there's a lot of, you know, technical things there.

BY MR. WARREN:

Q. You mentioned that you were asked to take down the website and then put it back up; is that correct?

A. I don't recall exactly. I certainly at some point was directed to take the website down. I assume it went back up or -- I don't totally remember the specifics on that. Like again this is more like "Hey, IT team, X, Y, Z."

Q. Were you involved in putting the website back up?

A. I don't recall. Probably. I would imagine. But I don't recall.

Q. I'm handing you what's being marked as Plaintiffs' Exhibit 7.

THE REPORTER: Exhibit 7 marked.

(WHEREUPON, Plaintiffs' Exhibit 7 was marked for identification.)

BY MR. WARREN:

Page 121

Q. Mr. Kliger, for the record this is a printout of a Twitter post from the account @SamStein dated February 3, 2025. And within the post there's a -- what appears to be a screenshot of an email. Do you see that?

A. Yes.

Q. You see the screenshot of the email? The "from" address of the email is listed as USAID Press; correct?

A. Yes.

Q. And then there's a website listed. Excuse me, there's an email address listed -- press@usaid.gov?

A. Yes.

Q. Do you know what website that is? Excuse me. Do you know what email address that is?

A. Presumably the press -- the handle they would -- USAID would use to send emails to employees about press or something.

Q. Did you have access to that email address?

A. We had asked to be delegated access to some email address capable of addressing, you know, employees across USAID. And this is probably it. But I don't recall exactly.

Q. Do you recall using that email address to

Page 122

send or receive emails?

A. Again I don't know if it was this exact email address or whether this Twitter post is, you know, altered, et cetera. But we certainly used an email address of this form to send an email of this nature, yes.

Q. You said "we." Who's "we"?

A. Senior agency leadership and myself.

Q. The "reply to" in the exhibit says gkliger@usaid.gov. Did you have an email address gkliger@usaid.gov?

A. Yes.

Q. Is that the email address you used while at USAID?

A. Yes.

Q. Is there any other email address you used while at USAID?

A. Not to my knowledge. Well, again like press@usaid -- they may have -- when we were sending things like a notice to all employees, et cetera, I would have been delegated some handle to send that mass communication.

Q. I appreciate the clarification. This was the only personal, individual email address you had at USAID; correct?

Page 123

A. Yes.

Q. This was sent to "All USAID." Does that "All USAID" email address go to everybody at USAID.gov?

A. That was my understanding.

Q. Do you know who sent this email?

A. I sent the email.

Q. And the email says below --

A. Sorry, just to have a little --

Q. Sure.

A. -- clarification when I say I sent the email -- I sent the email at the direction of senior agency leadership using language that was provided to me by senior agency leadership.

Q. Okay. So let's break that down for a minute. You said you sent it at the direction of senior agency leadership. Do you recall who specifically told you to send it?

A. I do not.

Q. Do you recall how you were told to send it?

A. Can you clarify?

Q. Yeah. How did someone --

A. How did they communicate it to me? I don't recall.

Page 124

Q. How long after you were told to send it did you send the email?

A. I don't recall.

Q. Is this to the best of your recollection an accurate representation of the email that you sent?

MR. HUMPHREYS: Objection. I would just state for the record it looks like the full text of the email may be cut off in the screenshot.

THE DEPONENT: Yeah. From what I can see of it, it looks similar to the email I sent and may be the same.

BY MR. WARREN:

Q. And the email says, as represented here to all personnel at the direction of agency leadership --

A. I forgot the senior. It's a joke. I said they forgot the senior.

Q. The USAID headquarters at the Ronald Reagan building in Washington, DC will be closed to agency personnel on Monday, February 3, 2025.

"Agency personnel normally assigned to work at USAID headquarters will work remotely tomorrow with the exception of personnel with essential onsite and building maintenance functions

Page 125

individually." And then the rest is cut off from here. You said you don't recall who told you to send it; correct?

A. It was someone in senior agency leadership.

Q. You don't recall specifically who?

A. Correct.

Q. You said that the language was provided to you. By who?

A. I don't recall.

Q. Someone in senior agency leadership?

A. Yes.

Q. But you --

A. -- someone in senior agency leadership.

Q. All right. And how was it communicated to you? A. I don't recall.

Q. Did someone tell you this and you wrote it down?

A. It's possible someone dictated it to me. It's possible. I don't recall.

Q. You were saying it's possible someone dictated to you and it's possible that someone sent it to you --

A. Yes, that --

Q. -- sent the language to you?

Page 126

A.    Exactly.  We were working -- senior agency leadership was and the administrators -- so was I. It's certainly possible someone came up to me and said, "Here's the dictation."  It's possible someone communicated it in another way.  I don't recall.

Q.    The email purports to be sent at 00:42. That would be 42 minutes past midnight on February 3rd.  Is that when you sent the email?

MR. SILER:  Objection, argumentative, compound.

THE DEPONENT:  Can you repeat?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.    Is that when you sent the email?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  I don't recall when I sent this email.

BY MR. WARREN:

Q.    Do you recall whether it was late at night?

A.    I do not.

Q.    You don't recall whether it was during the business day or whether it was close to midnight?

A.    At this point in time I was working

Page 127

probably 18 hours a day nonstop.  So no, I don't know if I sent this during the day, at night.  You know, we worked all hours.

Q.    How long after you were told to send the email did you send it?

MR. SILER:  Objection, asked and answered.

MR. WARREN:  You can answer.

THE DEPONENT:  I don't recall.  Generally we do things promptly.  But again something like this has technical stuff that's required to actually execute.

You have to say "Okay.  Do I have access to some email I can send through" and then task -- we would have then tried to like send the actual mass email.  So I'm sure it took time.

BY MR. WARREN:

Q.    You said you don't remember whether you were told orally or in writing the text of the email here.  When there were written communications sent to you -- and I know we discussed this before.  But I want to focus particularly on this email.  When there were written communications sent to you were those written communications over email?

A.    It would have been over official government email or over official government chat.

Page 128

Q.    Okay.  The chat being the --

A.    Whatever --

Q.    -- Google chat --

A.    -- Google thing --

Q.    -- platform --

A.    -- yeah.

Q.    -- that you identified before?

A.    Yeah.

Q.    Do you know if that platform maintains the records?

A.    I do not.

Q.    Do you know whether the email records were maintained?

A.    I do not.  I would assume that the agency, you know, complies with federal records acts.  But you know --

Q.    Were you ever told -- were you ever instructed to delete emails that you received at USAID?

A.    No.

Q.    Were you ever instructed to delete texts or the Google chat messages you received?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  I don't believe I was ever

Page 129

instructed to delete anything, no.

BY MR. WARREN:

Q.    You said that you were told to send this email.  What's your understanding of why you were sending it?

MR. SILER:  Objection, speculation.

THE DEPONENT:  One --

MR. WARREN:  You can answer.

BY MR. WARREN:

Q.    What's your understanding of why you were sending it?

A.    I don't totally recall.  Presumably because senior agency leadership wanted to close the headquarters on a Friday.  Given the nature of the large-scale personnel actions that were taking place at this time they may have felt there was a physical safety risk.

Like when you fire 1,400 people, you know, you probably don't want to open the office the next day -- whatever -- fire, administrative leave -- you understand that -- the point being made.

MR. SILER:  Do you need a break?  You said a while ago you needed --

THE DEPONENT:  I'm okay for -- let's do maybe five more minutes.

Page 130

MR. WARREN: Okay.

BY MR. WARREN:

Q.   I know I've asked you generally about who instructed you to send the email.  Prior to sending this email did you have other communications with anyone at USAID about the decision to shut the headquarters on Monday the 3rd?

A.   Did I have other communications with them about this decision?  It may have been discussed or communicated through official government channels. I don't recall.  I would expect that given the fact that we were placing large numbers of people on administrative leave that I'm sure we had discussed things like physical security and so forth as we -- but I don't recall --

Q.   And when you say --

A.   -- specifics here.

Q.   Sorry.  And when you say "we" who do you mean?

A.   Senior agency leadership and myself.

Q.   That include Jeremy Lewin?

A.   I would not include Jeremy Lewin necessarily in my definition of senior agency leadership.  If I did take a directive from Jeremy Lewin my understanding would be that it was being

Page 131

conveyed from senior agency leadership through him to me.

Q.   And specifically with regard to this email and the decision to close headquarters -- did you ever discuss that with Mr. Lewin?

A.   Likely.  But I don't recall specifics.

Q.   Mr. Davis?

A.   I don't recall.

Q.   Mr. Musk?

A.   No, I think I would remember that.

Q.   Ms. Gleason?

A.   Not that I recall.

Q.   Secretary Rubio?

A.   Not that I recall.

Q.   Mr. Marocco?

A.   Likely.  But I'm not sure.

Q.   Do you recall any communications with anyone else at USAID after this email was sent about the email or about the decision to close headquarters?

A.   Oh, definitely.  You know, we would have been discussing did it go out, did people receive the email, why is the "Reply To" at gkliger@usaid.gov, what did we misconfigure, how do we not do that next time, you know, et cetera.

Page 132

Q.   Well, let's break that down a little bit. Why was the "Reply To" at -- to you?

A.   The IT work made a misconfiguration when they delegated the account to me.

Q.   Who was the "Reply To" supposed to be?

A.   It should have just been press@usaid.gov.

Q.   You said you had many conversations after this was sent with USAID senior leadership; correct? I don't want to --

A.   Yeah, I wouldn't --

Q.   -- mischaracterize --

A.   -- characterize it that way.  My point was there would be conversations of a technical nature regarding whether it went out, et cetera, et cetera. And then the "Reply To" piece -- you know, I don't think there were like long, long discussions or anything like that.

Q.   And any of those conversations with Mr. Lewin?

A.   And these conversations we're referring to are?

Q.   Sorry, conversations after the email was sent about the email and about the closing of USAID as you just described --

A.   I'm sure Jeremy and I discussed the, you

Page 133

know, physical closure of USAID, yes.

Q.   Mr. Davis?

A.   I don't recall.

Q.   Mr. Musk?

A.   No.

Q.   Ms. Gleason?

A.   Not to my recollection.

Q.   Mr. Rubio?

A.   No.

Q.   Mr. Marocco?

A.   Likely.

Q.   One more document --

A.   It's possible it was discussed also with Joel and with Ken Jackson.

Q.   Thank you.

A.   Senior agency leadership.

Q.   One more document related to this and then we can take a break if that's fine?

MR. SILER: Is that all right?

THE DEPONENT: Yeah.

MR. WARREN: Okay.  I'm not going to ask you more questions about that.  But you might want to keep it handy.

THE DEPONENT: Okay.

MR. WARREN:  I'm handing you what's being

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Page 134

marked as Plaintiffs' Exhibit 8.

THE REPORTER:  Exhibit 8 marked.

(WHEREUPON, Plaintiffs' Exhibit 8 was marked for identification.)

BY MR. WARREN:

Q.   For the record this is a screenshot of a tweet from @ElonMusk dated February 3, 2025, at 1:54 a.m.  It's in the joint record at page 197.  Mr. Kliger, are you familiar with this tweet from Mr. Musk?

A.   I may have seen it before, yeah.  To be clear, this gets into some weird -- I don't recall if I saw this tweet at the time it was posted.

Q.   You recall seeing it after?

A.   Yeah, I definitely remember like the line "wood chipper" so it's possible.

Q.   And you see this was sent at 1:54 a.m., which is 62 minutes after your email was sent according to the last exhibit we looked at?

A.   Yeah, it looks to be about an hour after assuming these are the same time zones and so forth.

MR. SILER:  Actually I think it's 72 but --

THE DEPONENT:  Seventy-two minutes, yeah.  Hour and 12.

Page 135

BY MR. WARREN:

Q.   Do you recall where you were when that -- when the last email was sent?

A.   I believe I was at the USAID headquarters.

Q.   Do you recall who else from USAID senior leadership was at DOGE -- excuse me, at USAID headquarters with you that night?

A.   No.

Q.   Did you ever discuss this Elon Musk tweet with anyone at USAID in the --

A.   I --

Q.   -- three weeks you were at USAID?

A.   I don't recall.  I don't even recall if I saw the tweet.  It's certainly possible.  But I don't remember this particular thing.

Q.   And in the time between your email was sent out in Exhibit 3 and Mr. Musk's tweet did you discuss the email in exhibit -- excuse me, the prior exhibit -- with Mr. Musk?

A.   Not to my recollection, no.

Q.   Mr. Musk writes "We spent the weekend feeding USAID into the wood chipper."  What was your interaction with Mr. Musk over that weekend -- the weekend of February 2nd and 3rd?

MR. SILER:  Objection, lack of foundation.

Page 136

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Yep.

BY MR. WARREN:

Q.   What was your interaction, if any, with Mr. Musk during that weekend?

A.   On that particular weekend I don't recall.

Q.   And then Mr. Musk wrote "Could have gone to some great parties.  Did that instead."  You see that?

A.   Yeah.

Q.   Do you know what he's referring to?

MR. SILER:  Objection, calls for speculation.

THE DEPONENT:  Yeah.  Would you like me to speculate?

BY MR. WARREN:

Q.   I'm asking you if you know?

A.   Then no.

MR. WARREN:  All right.  We'll take a break.

THE DEPONENT:  All right.

THE VIDEOGRAPHER:  Please stand by.  The time is 4:35 p.m.  We are off the record.

(WHEREUPON, a recess was taken.)

Page 137

THE VIDEOGRAPHER:  We are on the record.  The time is 4:45 p.m.

BY MR. WARREN:

Q.   Mr. Kliger, during the last break did you discuss the substance of your testimony with anyone?

A.   No.

Q.   On Thursday, February 20, 2025, DOGE reportedly put a $1 spending limit on government credit cards used at USAID and other agencies.  Are you aware of that?

MR. SILER:  Objection, argumentative.  Assumes facts not in evidence.

THE DEPONENT:  Am I aware of a specific credit card limit on February 20th?  I mean, no.  I'm generally aware that, you know, part of, you know, reducing wasteful spending was to reduce limits on, you know, employee credit cards of federal agencies.  I'm sure each agency was, you know, doing that in accordance with their senior leadership.

BY MR. WARREN:

Q.   Were you involved in putting spending limits on USAID credit cards?  That is credit cards by USAID employees.

A.   I don't recall.

Page 138

Q.   You don't recall one way or the other?

A.   I've probably done credit cards at like five agencies.  I don't recall.

Q.   What other agencies do you think you've limited credit card spending at?

A.   The United States Department of Agriculture as an example.  Probably the Internal Revenue Service.  Yeah.

Q.   I'm showing you what's been -- being marked as Government Exhibit -- Plaintiffs' Exhibit 9.

THE REPORTER:  Exhibit 9 marked.

(WHEREUPON, Plaintiffs' Exhibit 9 was marked for identification.)

MR. WARREN:  Oh, no.  It's done too.  We nipped it in the bud.

BY MR. WARREN:

Q.   For the record this is a tweet from Elon Musk's account dated February 22, 2025, at 2:46 p.m.  It's in the record at JR702.

Mr. Kliger, you can see that the document says -- the tweet reads, quote, "Consistent with President @RealDonaldTrump's instructions, all federal employees will shortly receive an email requesting to understand what they got done last

Page 139

week.

"Failure to respond will be taken as a resignation."  You ever see this tweet around the time that it was posted?

A.   I don't recall.

Q.   Are you aware that Mr. Musk after the fact sent out a tweet -- sent out this tweet?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  No, I don't recall whether I was aware of random tweets.

BY MR. WARREN:

Q.   Were you involved in decisions at USAID -- strike that.

Were you involved in a decision at USAID to require employees to document what they had done or accomplished in the recent -- in the prior week?

A.   I don't recall.

Q.   Were you involved in that directive or that task at any other federal agency?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Was I involved in what task?

MR. WARREN:  Sending an email out to

Page 140

employees at the agency or requiring employees to submit documentation of what they had done or accomplished.

MR. SILER:  Objection, vague and ambiguous.  Compound.

THE DEPONENT:  Can you repeat it?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Were you involved in that directive about requiring federal employees to document what they had done or accomplished at any other agency outside of USAID?

MR. SILER:  Same objection.

THE DEPONENT:  Yeah, when you say "were you involved in that directive" -- are you asking if I was involved in issuing that directive?  Are you asking if I was involved in carrying out that directive?

MR. WARREN:  All of the above.

THE DEPONENT:  Okay.  I was not involved in issuing that directive.  My understanding is that senior agency leadership would have asked for that on an agency-by-agency basis and that senior leadership would have been responsible for that and deciding how it was implemented.

Page 141

But on the implementation side to perform some technical work or something with respect to like what email I have no recollection.  But it's certainly possible.

MR. WARREN:  We are marking Plaintiffs' Exhibit 10.

THE REPORTER:  Exhibit 10 marked.

(WHEREUPON, Plaintiffs' Exhibit 10 was marked for identification.)

THE DEPONENT:  Thank you.

BY MR. WARREN:

Q.   This is an email dated February 22, 2025, from the email address HR@opm.gov.  "Reply To" same address.  The subject line is "What did you do last week"; correct?

A.   Yes.

Q.   And the email asks "Please reply to this email with approximately five bullets of what you accomplished last week and CC your manager.  Please do not send any classified information, links, or attachments.  Deadline is this Monday at 11:59 p.m. Eastern."  Did you send out this email from the OPM.gov email address?

A.   No.

Q.   Do you know who did?

Page 142

A.   My understanding was that this would have been using the system I built my first week and that it would have been at the direction of senior agency leadership within OPM, likely the director.  But that would be speculation.  And that would have been carried out likely by the technical team.  But this is all speculation.

Q.   And when you say your first week you're referring to that -- the period from January 20th to January 31st?

A.   Yeah, in that time.  But I'm sure -- I might have tooled around with it in like early February or whatever.  There were a lot of kinks to sort out.

Q.   During the time you were at USAID do you know if any email like this was sent to USAID staff?

A.   I mean, you're showing me one.  Right?  Are you asking me if this email exists or what was the question?

Q.   No, specifically to USAID.

A.   Isn't this to USAID or am I missing that?

Q.   Yes, I'm sorry.  Sorry, at the time you were at USAID do you think --

A.   Are you asking if I was at USAID when this came in?

Page 143

Q.   Yes.

A.   I don't recall.

Q.   Okay.  During the time that you've been at the government have you received any email asking you to respond with some documentation of what you accomplished last week?

A.   My understanding was that generally -- I guess to directly answer your question I don't recall.

Q.   Do you recall -- did you ever respond to an email like this?

A.   If I don't recall if I received one I probably don't recall if I replied to one.

Q.   You ever have to document five bullets or something similar of what you accomplished last week --

MR. SILER:  Objection --

BY MR. WARREN:

Q.   -- during your time with the government?

MR. SILER:  Objection, vague and ambiguous.  Compound.

THE DEPONENT:  Can you repeat?

BY MR. WARREN:

Q.   Did you ever have to document what you accomplished at the government?

Page 144

A.   Did I ever have to document what I accomplished at the government?

Q.   Yeah, in an -- responding to an email like this?

A.   Responding --

MR. SILER:  Objection, vague, ambiguous, compound.

THE DEPONENT:  Yeah.  Can you repeat that?

BY MR. WARREN:

Q.   Did you ever respond to an email like this documenting what you did at the government?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  Yeah.  Did I ever respond to an email like this?  What does "like this" mean?  I mean, ask -- an email asking what you've done -- of course people get emails like that all the time in their standard course of work.

BY MR. WARREN:

Q.   You received those emails during your time at the government?

A.   "Those emails" referring to what?  People asking "Hey, what's the status on X" or "How are we doing on Y"?  Yes, I received emails like that at my time in government.

Page 145

Q.   Mr. Kliger, my question is a little bit different.  But I appreciate your answer to that question.  Have you ever responded to an email similar to this in form or in substance asking you to document, for example with approximately five bullets, of what you accomplished last week?

MR. SILER:  Objection, vague, ambiguous.

THE DEPONENT:  I feel --

MR. WARREN:  And the answer is yes, no, or don't know.

THE DEPONENT:  -- my answer to the prior question applies to this as well.  And I will repeat it.

BY MR. WARREN:

Q.   If you could answer it for the record, please?

A.   The record -- can someone read from the record my prior answer --

Q.   No, if you'd just answer the question again, sir.

MR. HUMPHREYS:  Objection, asked and answered.

THE DEPONENT:  I'm not going to answer the same question twice here.

MR. WARREN:  It's a different question.

Page 146

THE DEPONENT: Okay. Can you repeat the question, please?

BY MR. WARREN:

Q. During your time at the government did you ever respond to an email similar in substance or form to this one asking you to document what you accomplished last week --

A. Again --

MR. SILER: Objection, vague, ambiguous --

THE DEPONENT: Yeah.

MR. SILER: -- asked and answered.

THE DEPONENT: This is -- I'll answer it for the third time, which is we have -- in the course of business in the federal government it is very common to receive an email asking the status of objectives or what you've done or et cetera.

Whether they ask in bullet points or some other form is arbitrary. This is actually very common in the workplace -- not just in federal government but everywhere. And so as a result I'm sure I have replied to emails in this form of someone asking what I've done in a given time period, yes. And again in a form as I described it there.

MR. WARREN: We are marking Plaintiffs'

Page 147

Exhibit 11.

THE REPORTER: Exhibit 11 marked.

(WHEREUPON, Plaintiffs' Exhibit 11 was marked for identification.)

BY MR. WARREN:

Q. Mr. Kliger, I know the document's a little bit hazy. For the record this is a screenshot of an ID service center incident announcement. It is in the joint record at page 431. Do you see where it says near the top "This new user added alert is to inform you that a new user has been added to your domain"? Do you see that?

A. This is fuzzy. Yes.

Q. It says "The alert details include user HR_Announcements@usaid.gov." And then below that "by gkliger@usaid.gov." You see that?

A. Yes.

Q. Do you know what this is in reference to?

A. Presumably we had been asked to set up some mailbox. As we looked at before, we were like sending from some existing press handle. And I'm sure senior agency leadership -- well, speculating a little bit.

But senior agency leadership probably was like "It would be nice if instead of sending from a

Page 148

press handle we had an official human resources handle from which to send emails."

Q. Did you create this email address?

A. I don't recall. But it would appear that way from this.

Q. It's dated Sunday, February 23, 2025. Were you still working at USAID at that time?

MR. SILER: Objection, compound.

THE DEPONENT: I was working at a number of federal agencies at this period in time.

BY MR. WARREN:

Q. Including USAID?

A. Presumably, yeah.

Q. Did you ever use this email address -- HR_Announcements@usaid.gov -- to send out email?

A. I don't recall. But it's certainly possible.

Q. When you created it --

A. To be clear, when I say it's certainly possible, that would be at the behest of senior agency leadership if they had mass communications or similar they wanted to handle via an HR, you know, kind of focused email.

Q. You don't recall one way or the other whether you actually sent out emails from the

Page 149

address?

A. So there were a lot of email addresses and accounts. I don't know if this particular email address -- you know, there might be one without a space. There might be one that was lowercase. They might have decided they want to go with a different email handle. So no, I don't know at this point in particular.

Q. Do you know who else used the account?

A. No.

Q. Do you know who had the authority to send out emails from this account?

MR. SILER: Objection, calls for a legal conclusion.

THE DEPONENT: Yeah. And when you say "authority" are you referring to like a legal authority?

BY MR. WARREN:

Q. Who had the ability to send emails --

A. So you're referring to like a technical -- who was technically permitted to do it like in a system?

Q. I'm asking who could send emails out from this account?

A. I don't recall. Presumably it would be

Page 150

senior agency leadership or their designee.

Q.    You can put that document to the side. Plaintiffs' Exhibit 12 I'm handing you.

A.    Sorry.

THE REPORTER:  Exhibit 12 marked.

(WHEREUPON, Plaintiffs' Exhibit 12 was marked for identification.)

BY MR. WARREN:

Q.    For the record this is a memo.  The recipient is blacked out.  It is from Peter Marocco and dated February 23, 2025.  The subject is "Specific notice of reduction in force."

And it is in the joint record at pages 448 to 451.  Mr. Kliger, if you could just take a moment to review that document.  Let me know if you've ever seen it before?

A.    I don't think I have -- okay.  And this document looks like a notification of reduction in force that would be sent to federal employees upon reduction in force.  I've seen a lot of documents to this effect -- dozens -- that one probably literal.

And I would say whether I've seen -- I mean, this specific one I don't know.  This one's redacted for an individual employee.  Have I seen the general template of these kinds of notices?

Page 151

Yes.

Q.    Were you involved in drafting memos or notices like this at USAID?

A.    No, we would have been provided this by senior agency leadership or their designee.  And then we would have, you know, from a technical perspective, if asked, populated it with, you know, employee information that they're entitled to receive by staff as part of this notice.

Q.    You said that you were not involved in the drafting of this or similar notices or memos.  Do you know who typically drafted them?

MR. SILER:  Objection, misstates prior testimony.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.    Do you know who drafted this memo?

A.    I mean, it says it's from Pete Marocco.

Q.    Do you know who drafted it?

A.    No.

Q.    Do you know who drafted similar memos that were sent out as you described -- the RIF memos?

MR. SILER:  Objection, vague, ambiguous.

Page 152

THE DEPONENT:  You can repeat.

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.    Do you know who drafted other RIF notices -- excuse me, other memos like this pertaining to RIF notices as you just described?

A.    Again --

MR. SILER:  Same --

THE DEPONENT:  -- across federal --

MR. SILER:  Same objection.

THE DEPONENT:  Yeah.  So across federal government, I mean, there's probably 300,000 of these scattered around or whatever.  I couldn't -- I mean, not 300,000.  But --

MR. WARREN:  At --

THE DEPONENT:  -- thousand.

MR. WARREN:  At USAID.

THE DEPONENT:  Oh, specifically at USAID? Got it.  No, my guess would be, you know, if it's from Pete Marocco, Pete Marocco -- it's possible OPM would have consulted.  I couldn't tell you.

MR. WARREN:  You can set that aside. Thank you.

BY MR. WARREN:

Q.    I want to go back for a moment to

Page 153

something we discussed previously in the first exhibit.  It was the executive order concerning the creation of the Department of Government Efficiency that we looked at.  And I can hand you the exhibit if you want to look at it?

A.    Could you do that?

Q.    Of course.

A.    Thank you.

Q.    Exhibit 1.  And if you recall we looked at the second page.  Section 3B from -- on the top of the second page -- excuse me.  Section 3C.

A.    Starting DOGE teams?

Q.    Yes.  And it references DOGE teams being placed at agencies and agency heads will ensure that the DOGE team coordinates their work with the USDS, which refers to the US Digital Service.  Are you aware of a DOGE team consistent with what's described in Section 3C being assigned to USAID during the time you were there?

MR. SILER:  Objection, misstates the document.

You can answer.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Yeah.

Page 154

BY MR. WARREN:

Q.   Are you aware of a DOGE team being assigned to USAID during the time you were there?

A.   Again how do we define DOGE team?  Are you defining it as defined in this document?  Then the answer is no.

Q.   Okay.  Thank you.  And as defined in that document, just to be clear, you're not aware of any other group of people who were working at USAID during the roughly three weeks you were at USAID that could fit within the description of a DOGE team mentioned here?

MR. SILER:  Objection, calls for speculation.  Misstates prior testimony, characterization.

THE DEPONENT:  Yeah.  Can you repeat that?

MR. WARREN:  Yep.  Just want to make sure that I'm understanding your answer.

BY MR. WARREN:

Q.   As the DOGE team is defined here you're not aware of any DOGE team that was working at USAID during the time you were there?

A.   Yeah, I was an employee -- I don't think anyone was an official employee at USAID.  They were employees at other agencies.  So I don't think this

Page 155

is applicable.

Q.   All right.  Thank you.  During the time you were at USAID did you have an understanding of its general operations?

MR. SILER:  Objection, vague and ambiguous.

THE DEPONENT:  I was going to say if that could be rephrased --

BY MR. WARREN:

Q.   Did you --

A.   Its general operations?

Q.   Yep.

A.   Okay.  I guess --

Q.   We'll start with its --

A.   You want to know if I'm familiar --

Q.   -- mission --

A.   -- with facilities maintenance?

Q.   With its mission?

A.   With its mission.  With its stated mission or its practical, real one?

Q.   With its stated mission.

A.   I was familiar with its stated mission at a high level, yes.

Q.   Were you familiar with its -- USAID's goals and objectives?

Page 156

A.   With its stated goals and objectives --

Q.   Yes.

A.   -- or the goals and objectives it had in effect?

Q.   Its stated goals and objectives.

A.   Yes, I was familiar with the stated goals and objectives.

Q.   Did you have an understanding -- and again I'm not focused on anything you may have learned from counsel or subsequent to your departure from USAID.  Just focusing on your time at USAID, did you have an understanding of laws that pertained to USAID's operations?

MR. SILER:  Objection, calls for a legal conclusion.

MR. WARREN:  You can answer.

THE DEPONENT:  Can you repeat it?

MR. WARREN:  Yeah.

BY MR. WARREN:

Q.   Do you have an understanding about laws that governed USAID?

MR. SILER:  Same objection.

THE DEPONENT:  I mean, I'm sure there's a million laws that govern USAID.  Do I understand them?  Right?  There's a degree to which someone can

Page 157

understand law.  You know, I think it's kind of vague.

BY MR. WARREN:

Q.   Are you familiar with the Foreign Affairs Reform and Restructuring Act of 1998?

A.   Can you repeat that?

Q.   Are you familiar with the Foreign Affairs Reform and Restructuring Act of 1998?

A.   Am I familiar with it?

Q.   Do you know of that law?

A.   No, I am not familiar with it.

Q.   Do you know how that law governs USAID's operations?

MR. SILER:  Objection, calls for a legal conclusion.

THE DEPONENT:  Can you repeat that?

BY MR. WARREN:

Q.   Do you know how that law governs USAID's operations?

MR. SILER:  Same objection.

THE DEPONENT:  I would say do I know how that law -- one particular law -- I was generally familiar with the law.  I can't say if I recall whether I was familiar with that law at the given time.

BY MR. WARREN:

Q. Do you know what operations of USAID are mandated by the Foreign Affairs Reform and Restructuring Act of 1998?

MR. SILER: Objection, calls for a legal conclusion. Lack of foundation.

THE DEPONENT: Can we slowly read the names of these laws just so I can --

MR. WARREN: Sure. So it's the same --

THE DEPONENT: -- follow along here?

MR. WARREN: -- law. It's the Foreign Affairs Reform and Restructuring Act of 1998.

THE DEPONENT: Okay. So this is the same --

MR. WARREN: It's known as --

THE DEPONENT: -- law as --

MR. WARREN: -- FARRA.

THE DEPONENT: Okay.

BY MR. WARREN:

Q. And the question --

MR. WARREN: Go ahead, sir.

MR. HUMPHREYS: I generally object to this line of questioning. My client's not a lawyer and can't be expected to know what these laws are.

BY MR. WARREN:

Q. And my question is do you know anything about FARRA's requirements on the operations of USAID?

MR. SILER: Objection, calls for a legal conclusion.

THE DEPONENT: I would say we frequently consulted with government counsel and we acted accordingly.

BY MR. WARREN:

Q. "We" being who?

A. "We" being myself, senior agency leadership.

Q. I don't want to get into substance of conversations you had with government counsel during your time at USAID. But give an example of the type -- the topic of discussion that you would -- you just referenced your discussions with government counsel of USAID to make sure you were complying with the law?

MR. SILER: Objection to the extent it calls for the revealing of any attorney-client communications. And I instruct the witness not to answer revealing any of the substance of any such conversations.

THE DEPONENT: Yeah, I won't.

MR. WARREN: I'm not going -- not getting into the substance. I'm asking about the topic.

MR. SILER: I'm not sure I understand the distinction between topic and substance.

MR. WARREN: For example, if the topic is computer infrastructure, I'm not asking him what government lawyers told him --

THE DEPONENT: Okay. The topic was the law.

BY MR. WARREN:

Q. Well, you said you talked with lawyers about compliance --

A. With the law.

Q. Right. In what capacity? That is in what context of the work you did at USAID?

A. I can't speak to specific work. Just in general as work was performed that was done in consultation.

Q. With regard to your work regarding any information technology?

A. Yes. And again earlier when I say "we" I'm referring to senior agency leadership and myself. So also refers to senior agency leadership.

Q. Did you have communications with government counsel to make sure you, as you said,

were in compliance with the law during your time at USAID with regard to any operations other than regarding information technology?

MR. SILER: Yeah, I'm going to object to this on the basis of the attorney-client communications privilege and instruct the witness not to answer.

MR. WARREN: Not getting into substance of any conversation. Just he said he talked to lawyers to make sure he was complying with the law. I want to make sure we understand what context he was talking to the lawyers.

MR. SILER: Yeah, I understand. You can ask about the time and context of certain questions. But I don't think you can ask about like whether he consulted on particular -- you know, whether certain actions were legal. And that's --

MR. WARREN: Understood. We're not going there.

BY MR. WARREN:

Q. How many meetings did you have with government counsel to make sure you were complying with the law?

A. Define a meeting.

Q. A conversation with more than one person.

Page 162

A. So how many conversations did I have with people?

Q. Sure, let's start there.

A. Can you repeat the question?

Q. Yeah. How many meetings did you have with government lawyers to make sure you were complying with the law during your time at USAID?

A. I don't recall.

Q. Did you have written communications with government lawyers to make sure you were complying with the law during your time at USAID?

A. I don't recall.

Q. You have communications with other individuals who were working at USAID, either on detail or assigned or formally employed by USAID, about your compliance with the law?

A. I don't recall.

Q. And do you recall having any conversations with lawyers or colleagues at USAID about complying with the law outside of the context of information technology?

A. Can you repeat the question?

Q. Yes. Did you have any conversations with anyone about complying with the law at USAID concerning something other than information

Page 163

technology?

MR. HUMPHREYS: Objection, vague.

THE DEPONENT: Yeah, to give an example of why there's some ambiguity here, it was generally for information technology.

It's possible, for example, I would say "What are the valid delivery mechanisms for this notice under the law" and you would consult with, for example, senior counsel of the Office of Personnel Management.

And they would say "Yes, it can be delivered by email. We recommend that you leave the account enabled for X hours to ensure delivery." Whatever. You may have these kind of accounts. But again this is illustrative. Right? And so that was the general nature of these discussions.

BY MR. WARREN:

Q. What's your level of understanding about the budget appropriation process for USAID?

MR. SILER: Objection, lack of foundation.

THE DEPONENT: Can you repeat again?

BY MR. WARREN:

Q. What's your understanding about budget appropriations for USAID at the time you were at USAID?

Page 164

MR. SILER: Again it's objection, vague.

THE DEPONENT: Yeah. Can you repeat this?

MR. WARREN: For the third time --

THE DEPONENT: The first time, just to be clear for the record, you asked my level. The second time you asked my understanding. So I'm looking forward to hearing the third question.

MR. WARREN: Sure.

BY MR. WARREN:

Q. What is your understanding, including your level of understanding, of budget appropriations for USAID?

A. My understanding is that funds are generally appropriated by Congress and then exercised at the discretion of the executive at a high level.

Q. Are you familiar with the Further Consolidated Appropriations Act of 2024?

MR. HUMPHREYS: I'm going to renew my objection. He's not a lawyer. Do you want to know if he has heard the statute or to opine on what it means?

MR. WARREN: I'm just asking if he's familiar with the law.

THE DEPONENT: You want to know if I'm

Page 165

familiar with that specific --

MR. WARREN: Yep.

THE DEPONENT: And then --

MR. WARREN: Yeah, the Further Consolidated Appropriations Act of 2024.

THE DEPONENT: Yeah, I don't recall it.

BY MR. WARREN:

Q. Are you familiar with the Full Year Continuing Appropriations and Extensions Act of 2025?

A. It's possible. I don't recall.

Q. Are you familiar with any other laws that govern USAID spending appropriations?

MR. SILER: Objection, calls for a legal conclusion.

THE DEPONENT: What was the question?

BY MR. WARREN:

Q. Are you aware of or familiar with any other laws that govern USAID's appropriations and spendings?

A. There are probably --

MR. SILER: Same objection.

THE DEPONENT: -- a billion laws that apply to that. And so whether I'm familiar with some subset of them -- certainly possible.

Page 166

BY MR. WARREN:

Q. Did you ever have meetings, communications, or discussions with members of Congress regarding your work at USAID?

A. Can you repeat that?

Q. Did you ever meet -- strike that.

Did you ever have meetings, communications, or discussions with any members of Congress concerning your work at USAID?

A. Not that I recall.

Q. With members of Congress staff?

A. Not that I recall.

Q. With congressional committee members or their staff?

A. Not that I recall.

Q. Do you participate in any written correspondence with Congress, congressional staff, or congressional committees about your work at USAID?

A. I don't recall.

Q. Have you given any news interviews or podcasts regarding your work at USAID?

A. Any news interviews or podcasts. No podcasts that I'm aware of. I think there was some Fox News interview at some point where I was at a

Page 167

table. And it was not focused on USAID.

Q. When you say "not focused on USAID" you mean it was -- did it discuss USAID?

A. I don't recall.

Q. Have you done any -- have you written or published anything -- op ads, articles -- regarding your work at USAID?

A. Not that I recall.

Q. Have you sent any emails about your work at USAID to anyone outside of professional colleagues -- friends, family?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Can you repeat?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. Have you sent any emails about your work at USAID to anyone outside of the professional -- outside of your professional contacts at USAID?

MR. SILER: Same objection.

MR. WARREN: Meaning friends or family.

MR. SILER: Same objection.

THE DEPONENT: Again when you say "professional contacts meaning friends or family" -- the implication to me is that you are referring to

Page 168

friends and family as professional contacts. And I am confused.

MR. WARREN: No, I'm sorry. I'll try to clarify.

BY MR. WARREN:

Q. I mean, did you ever anyone -- a friend, a family member -- to be like "Hey, guess what I'm doing at USAID?" Or did you talk about work --

MR. SILER: Objection, vague.

BY MR. WARREN:

Q. -- the way normal humans speak to each other --

MR. SILER: Objection, vague.

BY MR. WARREN:

Q. -- from time to time?

MR. SILER: Objection, vague and ambiguous.

THE DEPONENT: Yeah, I would say that's like too vague to answer. If someone calls home and says "Man, I'm really tired. My day at USAID was really long" or I'm -- has that ever been -- I don't recall. But it's certainly possible. I would say nothing substantive.

BY MR. WARREN:

Q. Your testimony is you've never sent an

Page 169

email containing anything substantive about your work at USAID?

A. Correct.

Q. Okay.

A. In fact I would almost testify I've never sent an email about USAID. But earlier you mentioned conversations. So again when I say "email" I mean like on a personal device or, you know, to a nongovernment official.

MR. WARREN: Okay. Brad, why don't we take five minutes? And I think we can wrap it up shortly after.

MR. HUMPHREYS: Good with you?

THE DEPONENT: Yeah.

THE VIDEOGRAPHER: Please stand by. The time is 5:17 p.m.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 5:24 p.m.

BY MR. WARREN:

Q. Mr. Kliger, I want to go back to something we discussed earlier. You testified that you met Mr. Lewin, Mr. Farritor, Mr. Coristine during those meetings in late December, early January; correct?

A. Correct.

Page 170

Q. And do you ever communicate with them before the in-person meetings over email -- in any written form? Over email, Signal, text.

A. I don't recall.

Q. You ever communicate with them before those meetings orally, over the phone --

A. I don't recall.

Q. Thank you. We're almost at the end. I just want to cover a couple topics real briefly before we finish. During your time in the government you did work in the Consumer Financial Protection Bureau; correct?

A. Yes.

Q. And when were you there?

A. I don't recall exact dates.

Q. General time period?

A. Early 2025. CFPB, you know, was kind of a long, ongoing thing.

Q. In what capacity were you there?

A. I was brought in as a senior advisor to the acting director Russ Vought and other senior agency leadership.

Q. Who did you report to?

A. Senior agency leadership.

Q. Mr. Vought?

Page 171

A. I think technically on paper probably. But I think generally I was communicated to through the -- Mark Coletta, the general counsel, or other senior agency leadership.

Q. Did you discuss any of your work -- strike that.

For approximately how long were you doing work at CFPB?

A. Things were kind of on-and-off because of various TROs and so forth. So what do you mean by like "work"? Can you rephrase the question?

Q. Yeah. Sure. For how long were you doing work at CFPB?

A. Probably less than 90 days.

Q. Did you ever discuss that work with Amy Gleason?

A. And I want to make just a couple points clear. When we say how long did I work, for 90 days -- the reason I, you know, was asking for clarification earlier is that within that 90-day window you would be working at other agencies as well.

And CFPB would kind of be on again, off again. And so it would not be like 90 continuous days of CFPB work just for clarity.

Page 172

Q. Thank you. Did you discuss your work at CFPB with Amy Gleason?

A. Not that I recall.

Q. Jeremy Lewin?

A. Yes, I believe Jeremy was also detailed there to my recollection.

Q. Steve Davis?

A. I don't recall.

Q. Was Luke Farritor at CFPB with you?

A. I don't recall.

Q. Ed Coristine?

A. Don't think so. It's possible Luke onboarded at some point. I don't recall.

Q. Did you discuss you work at CFPB with Elon Musk?

A. Discuss it? It's possible he, you know, in context of some, you know, meeting received like some update on what had happened or something. But certainly if there were any communications it was of that nature -- just a heads-up.

Q. And at the beginning of your testimony today you said that you had had fewer than 20 conversations I think you estimated with Mr. Musk. That correct?

A. Yes.

Page 173

Q. And those were all regarding your work at the government?

A. This was when --

MR. SILER: Objection, misstates prior testimony.

THE DEPONENT: Yeah, can you repeat the question?

BY MR. WARREN:

Q. That was regarding your work at the government?

MR. SILER: Are you asking what he testified to previously or are you asking a new question?

BY MR. WARREN:

Q. I'm asking you the question substantively about your conversations -- the approximately 20 conversations with Mr. Musk -- what you guys talked about?

A. I can't exactly recall. It would have been general updates on, you know, the happenings around, you know, government since he was also in government as a special advisor to the President.

Q. Do you recall discussing work you did at USAID with him?

A. It's possible he received some kind of

Page 174

update as part of those, you know, kind of one-off meetings, yeah.

Q.   And just to be clear I understand your answer -- you said it's possible he received an update.  I'm talking about your conversations with him regarding USAID.  Did you have conversations with Mr. Musk about your work or any operations of USAID?

MR. SILER:  Objection, compound.

THE DEPONENT:  I don't recall.  These are kind of group meetings.  And so --

BY MR. WARREN:

Q.   Are you aware that CFPB was effectively shut down in February 2025?

MR. SILER:  Objection to the characterization.

THE DEPONENT:  Yeah, I also disagree with that characterization.

BY MR. WARREN:

Q.   Were you involved in large-scale reduction in force at CFPB?

A.   Was I involved in a large-scale reduction in force?  My understanding is that the acting director in consultation with the President wanted to execute a reduction in force to bring the CFPB to

Page 175

its -- you know, to a more reasonable size.

And so there were planned reductions in force to effectuate that directive from the President and from senior -- yeah.

Q.   And what's your basis for that understanding?

A.   What's my basis?  The President appointed Russ Vought.  And, you know, Russ Vought directed that the CFPB be, you know, reduced to a more reasonable level.

Q.   Did you have conversations with the President about that?

MR. SILER:  You can answer yes or no.

THE DEPONENT:  No.

BY MR. WARREN:

Q.   Did you have conversations with Mr. Vought about that or are you basing it on things that you read or communications with other people?

A.   Am I basing the fact that Russ Vought was appointed by the President that I saw assigned delegation from the President?

Q.   No, not the fact that Mr. Vought was appointed based on the RIFs at CFPB.

A.   Okay.  Then repeat the question.

Q.   Sure.  You said you understood that the

Page 176

RIFs at CFPB were directed from the President through Mr. Vought.  I'm asking if you knew that based on conversations with Mr. Vought --

A.   I'm basing it on the fact that the President appointed Russ Vought and Russ Vought, you know, arrived and directed those reductions.

Q.   And what was your involvement in executing those reductions in force?

MR. SILER:  Objection, assumes facts not in evidence.

THE DEPONENT:  Can you repeat?

BY MR. WARREN:

Q.   What was your involvement in executing the reductions in force at CFPB?

A.   Which reductions in force are we talking about?

Q.   Any of them that you were involved in.

MR. SILER:  Objection, assumes facts not in evidence.

THE DEPONENT:  Involvement would vary case-by-case.

BY MR. WARREN:

Q.   All right.  Well, let's start with the first case.

A.   Okay.  In the first case my understanding

Page 177

is that Russ Vought --

Q.   I'm sorry, to be clear -- I'm asking about your involvement, not your understanding.  Like what did you do?

A.   So to be clear, my recollection about which case is exactly the first is fuzzy because, as we've established on the record, you know, this has happened before.  Can you repeat the question?

Q.   Yep.  What was your role in executing the reduction in force or multiple reductions in force at CFPB?

MR. SILER:  Objection, lack of foundation.

THE DEPONENT:  It would generally be similar to the USAID role, which would be to ensure access to information and technology systems and to, you know, use those systems as directed by senior agency leadership to effectuate a reduction in force or administrative leave, et cetera.

MR. WARREN:  I'm handing you what's being marked as Plaintiffs' 13.

THE REPORTER:  Exhibit 13 marked.

(WHEREUPON, Plaintiffs' Exhibit 13 was marked for identification.)

BY MR. WARREN:

Q.   Mr. Kliger, for the record this is an

Page 178

email chain between April 13th and April 17, 2025. It bears Bates Stamp CFPB 01520 through 22.

A. Okay. It's taking me a minute to review this one.

MR. HUMPHREYS: While he's doing that, can I ask, Andrew, are these the Government's redactions or yours?

MR. WARREN: This was filed in a different case. And I believe the -- this was filed by the Government and these are the Government's redactions. But I'm not sure.

MR. HUMPHREYS: Thank you.

MR. WARREN: And Brad, obviously the document number for the case is up top.

MR. HUMPHREYS: I see that, thank you.

MR. WARREN: We can check. I just don't recall off the top of my head.

THE DEPONENT: Is this going front-to-back or back-to-front?

MR. WARREN: This is going back-to-front.

THE DEPONENT: Okay. It's difficult to understand in context given the redaction.

BY MR. WARREN:

Q. I want to focus your attention on the second page of the email starting halfway down the

Page 179

page from Christpher Chilbert dated April 13, 2025 --

A. Yep.

Q. -- sent to you, gavin.kliger@cfpb.gov. Was that an email address that you used at CFPB?

A. Yes.

Q. To Jeremy Lewin at CFPB; correct?

A. That is the second email on that line, yes.

Q. And to Thomas McCarty? Do you know who Thomas McCarty is?

A. I don't recall.

Q. And Mr. Chilbert writes in the email to you and Jeremy -- and I'm paraphrasing -- "As we discussed yesterday, there is not something called 'full global administrative access' that lets you do the things you requested.

"But the rules we provided should allow you to do what you need to do." Do you know what this is in reference to?

A. I don't recall.

Q. Okay. Thank you. You can put that aside. Handing you Plaintiffs' 14.

THE REPORTER: Exhibit 14 marked.

(WHEREUPON, Plaintiffs' Exhibit 14 was

Page 180

marked for identification.)

BY MR. WARREN:

Q. Mr. Kliger, this is a copy of your public financial disclosure report -- the form 278-E; correct?

A. That's what it appears to be.

Q. Did you fill out a form 278-E when you started with the government?

A. Yes.

Q. On the first page toward the bottom there's an electronic signature that says -- I'm paraphrasing -- "I certify the statements I've made are true, complete, and correct to the best of my knowledge." And then it says it was electronically signed by you on February 10th. Did you electronically sign this document?

A. This document in particular I couldn't say. I've certainly signed an OGE 278-E.

Q. I'm going to turn your attention to page 4 of the document, heading six. At the bottom of the page it refers to other assets and income. And you're being asked to disclose your assets and income; correct?

A. I am being asked now or --

Q. On this form.

Page 181

A. On this form, yes, you would be asked to provide your assets and income.

Q. And you listed -- the first asset listed is Bitcoin, a value of between 15 and $50,000. Correct?

A. Yes.

Q. As of the time you filled this out do you know how much your Bitcoin was worth?

A. No.

Q. The second asset listed is Solana, S-O-L-A-N-A, with a value between 1,000 and $15,000. Do you see that?

A. Yeah.

Q. Did you own Solana cryptocurrency as of February 10, 2025?

A. It would certainly appear so.

Q. And to be clear, I'm asking your recollection -- not what the document says. Did you own Solana?

A. To my recollection, yes.

Q. And other assets are listed throughout that page, including Apple stock between 15 and $50,000. You see that?

A. Yeah.

Q. Did you own Apple stock in that value

Page 182

range?

A.   At this -- at the time this was filed, presumably.

Q.   Tesla stock as well between a hundred and $250,000 worth?

A.   Again presumably at the time this was filed.

Q.   Were you working at CFPB as of February 10, 2025?

MR. SILER:  Objection, vague, ambiguous.

THE DEPONENT:  Yeah.  One, I'm not sure what "working" means in this context.  And two, I don't recall exact time in which -- you know, like on that date I have no clue.

BY MR. WARREN:

Q.   So you don't recall whether that was -- February 10th you were doing work at CFPB.  But you were working for the government, correct, at other agencies?

A.   Yes, certainly.

Q.   You're aware of laws and regulations that prohibit executive branch employees from working on matters that affect their personal financial interests; correct?

MR. SILER:  Objection, calls for a legal

Page 183

conclusion.  Lack of foundation.

THE DEPONENT:  What's the question?

BY MR. WARREN:

Q.   Are you aware of laws and regulations that prohibit executive branch employees from working on matters that affect their personal financial interests?

A.   Yes, I've been very careful to work closely with agency ethics officials to ensure compliance with those laws.

Q.   Did you work with the CFPB officials about assets that you were prohibited from owning?

A.   Yes.

Q.   Were you informed by CFPB officials that you were not allowed to own Apple and Tesla?

A.   No.

Q.   Were you informed by CFPB --

A.   To clarify, I was informed that within a 90-day window -- after 90 days of working at that agency under the law you would have to divest of those assets unless you received a waiver from agency ethics officials.

In this case the agency ethics officials had been subject to a reduction in force and then rehired by court order.  So of course they were, you

Page 184

know, heavily biased and, you know, could not make such a judgment.  But that was my understanding of the law.

Q.   Do you understand that Apple and Tesla were on a list of prohibited holdings for anyone working at CFPB?

A.   Again you have a 90-day window as I was told within which to divest.  And so if you stay longer than 90 days you would have to divest or seek basically, you know, an opinion from their ethics branch.

It would be very common to receive such a waiver and then say "I'm not going to participate in matters pertaining to that."  In this case I did not work at the CFPB 90 days or longer.  So it's a moot point.

Q.   Do you still own Apple and Tesla stock?

A.   I couldn't tell you off the top of my head.

Q.   Did you end up selling your positions in Apple and Tesla based on conversations you had with the CFPB guidance that you received?

MR. HUMPHREYS:  I'm going to object to this line of questioning, which I think is starting to border on harassing because it's personal

Page 185

financial interest in an agency -- with respect to an agency that isn't particularly relevant to this case.

MR. WARREN:  Okay.  You can answer.

THE DEPONENT:  Can you repeat the question?

MR. WARREN:  Sure.

BY MR. WARREN:

Q.   Did you sell your stock in Apple based on guidance you received from CFPB?

A.   The guidance I received was that I did not have to sell anything within that 90-day window.

Q.   Did you --

A.   That's the law.

Q.   Did you sell your stock in Tesla based on guidance you received?

A.   So I've made very clear I never received such guidance.  And therefore I'm not sure what our question is trying to get at.

Q.   Are you aware of whether cryptocurrency ownership was prohibited under CFPB guidance?

A.   Again within 90 days you have 90 days with which to divest of assets or receive a waiver.  And so if you work at an agency -- in this case the CFPB was in those 90 days.  You were not required to

Page 186

divest.

In this case I was brought in for a very limited role, which was basically to send out RIF notices to employees and leave. And so there was obviously no conflict. And any reasonable ethics officer would have waived it. But of course in this case no waiver was needed as the tenure was less than 90 days.

Q. Sorry, you said you were brought in to CFPB for the limited purpose of sending out RIF notices?

A. I was to maintain the IT systems and the technical equipment required to, you know, carry out that action, yes. And again this would be at the direction of senior agency leadership.

They would give you a RIF notice template, as we've kind of repeated numerous times. You would run some IT system with which to do a mail merge and send emails, et cetera, et cetera, manage access in general.

Q. We talked about your work at OPM January 20th. You know what? Strike that.

MR. WARREN: This is Plaintiffs' 15.

THE REPORTER: Exhibit 15 marked.

(WHEREUPON, Plaintiffs' Exhibit 15 was

Page 187

marked for identification.)

MR. HUMPHREYS: Can I have copies or are they all in there?

MR. WARREN: It's all -- those are multiple copies of the same page.

BY MR. WARREN:

Q. For the record this is a screenshot of a tweet from the account @AnnWokeness dated December 3, 2024.

A. Okay.

Q. Mr. Kliger, do you see that it says "Breaking -- Biden announces $1 billion to help African nations rebuild homes hit by national disasters"?

A. Yes.

Q. Do you recall seeing this tweet?

A. I don't recall arbitrary tweets, no.

Q. Do you recall responding to this tweet saying, quote, "Wonder what the kickbacks on this latest grift look like"?

A. I don't recall that. But that is certainly what my response would typically be to something like this announced by President Biden.

Q. Mr. Kliger, do you remember the case involving Laken Riley?

Page 188

MR. HUMPHREYS: Objection, foundation.

THE DEPONENT: Can you elaborate on the case you're referring to?

MR. WARREN: Laken Riley was an American woman who was murdered. A man was convicted --

THE DEPONENT: Was she also raped?

MR. WARREN: Is that --

THE DEPONENT: I'm asking you was she also raped?

BY MR. WARREN:

Q. My question for you is do you recall a case involving her prosecution of a man for --

A. If she was raped maybe. If not, not sure. I remember or recall a general case about someone being raped and murdered. I don't know if that's this.

Q. Do you recall tweeting --

A. And it would have been raped and murdered by like an illegal immigrant or something similar -- the case I'm thinking of.

Q. Okay. In response to a case involving a woman who was raped and murdered by an illegal immigrant as you said, do you recall posting a tweet that said "A military-aged male invaded our country to murder our women and children.

Page 189

"Under the NCA and precedent of ex-parte Quinn he is an unlawful combatant and can be tried and executed by a military tribunal. @RealDonaldTrump @ElonMusk to make it happen."

A. What's the question?

Q. Do you recall writing that tweet?

A. Do I recall referring to an illegal immigrant who entered our country illegally and then raped and murdered a woman to face military justice in a lawful tribunal and, you know, be executed if found guilty? You certainly -- if you have a tweet to that effect, that sounds probably.

Q. I'm asking if you recall writing that and posting it?

MR. SILER: Objection, asked and answered.

THE DEPONENT: Yeah, I don't recall a specific tweet to that effect. But that certainly sounds in line with something I would believe in, yeah.

BY MR. WARREN:

Q. Why would you ask Donald Trump and Elon Musk to make that happen?

A. Why would I ask --

MR. SILER: Objection --

MR. HUMPHREYS: Objection. This is

Page 190

starting to get very far afield for -- from the facts of the case, particularly for a Rule 45 witness. I mean, can you explain any sort of nexus between the facts here and what Mr. Kliger may or may have not said in a tweet?

MR. WARREN: Yeah. I mean, first of all, this is character evidence under Rule 404. It goes to credibility and bias under a 607; truthfulness under 608. It's all relevant.

MR. HUMPHREYS: Well, for the record I think it's harassing. And we'll keep the deposition going for now. But we may have to shut it down if you're going to be asking him about his personal views in a tweet that I don't see any personal, you know, connection to the nexus of facts here.

MR. WARREN: Okay. Mr. Humphreys, I didn't ask him about his personal views. I asked him if he recalled sending the tweet. And my question to him was why -- I can repeat the question because I don't think it was answered.

BY MR. WARREN:

Q. Why did you ask Elon Musk to make it happen?

A. I didn't. I asked the President to make it happen. And I think I tagged a senior advisor or

Page 191

something similar just for visibility. I can't speak as to why I would have done that at the time. I don't recall.

Q. Mr. Kliger, is there anything that we've discussed today that you wish to elaborate on or clarify to present a clear and accurate picture of your testimony?

A. Can you repeat the question?

Q. Sure. Is there any other information you want to provide or any answer you want to revise or elaborate on to make sure that the record reflects a clear and accurate picture of your testimony?

MR. SILER: Objection, vague and ambiguous. Excuse me. Vague and ambiguous.

THE DEPONENT: Any other -- one more time.

MR. WARREN: Sure.

BY MR. WARREN:

Q. Any information you want to add today to make sure that the topics we've discussed represent your knowledge of the issues that we've been discussing?

MR. SILER: Same objection.

THE DEPONENT: Yeah, I mean, I imagine we'll -- I can't think of anything immediately at top of mind. I will note, you know, it was 75 to 76

Page 192

in here and no one seemed to be able to get the air conditioning to run while I was wearing a sweater.

So that was unfortunate. But no, I think given the circumstances at the moment I certainly can't think of something to add in there.

BY MR. WARREN:

Q. Were you asked or directed to preserve any communications in response to this litigation?

A. Can you repeat the question?

Q. Yes. Were you asked or directed to preserve any written communications or any written documentation in response to this litigation?

A. Yes.

Q. And did you do so?

A. Yes.

Q. What types of documents did you preserve?

A. I would have --

MR. SILER: Objection. No, withdrawn.

THE DEPONENT: Okay. Can you repeat the question?

MR. WARREN: Yeah.

BY MR. WARREN:

Q. What types of documents did you preserve?

A. This assumes the existence of documents to be preserved. So I would say I did not find

Page 193

documents to be preserved.

MR. WARREN: Okay. Thank you. I think we're done. Let me just take two minutes to confer with counsel.

THE DEPONENT: Sure.

MR. WARREN: I'm not planning on --

MR. SILER: Well --

MR. WARREN: -- as well.

MR. HUMPHREYS: Before we go off the record can I just go ahead and say we'd like to read and sign the transcript.

THE REPORTER: Are we --

MR. WARREN: We're not quite done. But --

MR. HUMPHREYS: Well, it's on --

MR. WARREN: -- we may be finished --

MR. HUMPHREYS: -- there now on the record.

MR. WARREN: -- twice we'll get it a third time I'm sure.

MR. SILER: I thought it was off the record.

MR. HUMPHREYS: All right. Are we off the record now?

THE REPORTER: Are we going off the record?

Page 194

MR. HUMPHREYS: Are we off the record now?

MR. WARREN: Yes, we're going off the record.

THE VIDEOGRAPHER: Please stand by. The time is 5:51 p.m. We are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER: We are on the record. The time is 5:56 p.m.

MR. WARREN: I don't believe that I have any further questions for Mr. Kliger.

Jake, I want to go back. At the beginning of the deposition I asked about conversations between Mr. Kliger and government counsel in preparation for deposition. You instructed the witness not to answer on grounds of privilege. Were you asserting both attorney work product and attorney-client privilege?

MR. SILER: Yes.

MR. WARREN: Okay. Do you have a common interest agreement with the witness?

MR. SILER: No.

MR. WARREN: Or is the Government's position that he's in the control group of the defendant agencies USAID, State, and DOGE?

MR. SILER: I'm not going -- like if you

Page 195

want to have a meet and confer on this at an appropriate time, that's fine. I'm not going to get into this today.

MR. WARREN: Okay. I'm asking because you instructed him not to answer on basis of attorney-client privilege. He's not your client.

So I'm just making sure that there's a clean record of your basis for instructing a witness not to answer so we avoid having to bring Mr. Kliger back to answer questions about your communications with him.

MR. SILER: I think it would be covered by the work product regardless so --

MR. WARREN: But that's why I asked. And you just said it's work product and attorney-client privilege.

MR. SILER: I don't think we're excluding anything. My point is it's moot because everything we would exclude would be excluded on the attorney work product.

MR. WARREN: Your communications with him are not covered under your attorney work product.

MR. LYNCH: We'll talk about it at some subsequent point.

MR. WARREN: Okay.

Page 196

MR. LYNCH: We don't need to make an argument on the record about this.

MR. WARREN: I'm not making -- understood. Not trying to make an argument. Just trying to understand the basis --

MR. SILER: Our position -- I mean, our position is we represent the United States, and that means our interest extends to certain communications with employees acting within the scope of their employment by the United States Government, which in many cases extends the attorney-client privilege to employees of the United States.

MR. LYNCH: Yes.

MR. SILER: That's our position.

MR. WARREN: Okay.

MR. HUMPHREYS: I would also add for the record that we -- Mr. Kliger in his personal capacity would object to being brought back in because of this issue. As a Rule 45 witness, it's incumbent upon all the parties to reduce burdens on him.

MR. WARREN: Agreed. I have no further questions for the witness.

MR. SILER: No questions.

MR. HUMPHREYS: I'm good. Thank you.

Page 197

THE VIDEOGRAPHER: All right. Please stand by.

MR. HUMPHREYS: Read and sign.

THE VIDEOGRAPHER: Please stand by. This is the end of the deposition of Gavin Kliger.

The court reporter will now take the orders for the transcript.

THE REPORTER: Yes.

So Attorney Warren, will you order the original?

MR. WARREN: Yes.

THE REPORTER: Okay. Is there -- is it supposed to be a rush or --

MR. WARREN: No. I don't think we need a rush. These are questions that are above my pay grade.

THE REPORTER: Okay. So normal is fine?

MR. WARREN: I think on this one.

THE REPORTER: Okay.

MS. MAYS: What's the normal turnaround --

THE REPORTER: It's about 10 to 12 business days.

MS. MAYS: Let's rush it.

THE REPORTER: Okay. So then is there a specific date you would like it by?

Page 198

MS. MAYS:  Just as soon as possible is fine.

THE REPORTER:  Would January 14th work for you?

MS. MAYS:  Works.  Thank you.

THE REPORTER:  All right.  Attorney Siler, would you --

MR. SILER:  Yes, normal course is fine.

THE REPORTER:  Oh, copies since they were ordered.

MR. SILER:  Sure.

THE REPORTER:  Okay.  Is there a rush to that one or is normal okay?

MR. SILER:  No, normal is fine.  I'm sorry.  I didn't understand your first question.

THE REPORTER:  No, if you were going to order a copy?

MR. SILER:  Yes, I want to order a copy.  But it does not need to be rushed.

THE REPORTER:  Okay.  So normal delivery.  Got it.

MR. WARREN:  We want that five-day headstart.

THE REPORTER:  Attorney Humphreys, will you be ordering a copy?

Page 199

MR. HUMPHREYS:  Yes, we'd like a copy --

THE REPORTER:  Okay.

MR. HUMPHREYS:  -- and it does not need to be rushed.

THE REPORTER:  And the read and sign?

MR. HUMPHREYS:  Yes, we would like to read and sign.

THE REPORTER:  Okay.  Where am I sending that?

MR. HUMPHREYS:  You can send it -- can you send it by email?

THE REPORTER:  Yep.

MR. HUMPHREYS:  You can send it to the address on my card if you --

THE REPORTER:  Got it.  Okay.  So normal.  All right.  Would anybody else like a copy?

MR. LYNCH:  Presumably you'll furnish me a copy?

MR. SILER:  Yes, I will.

MR. LYNCH:  Okay.

THE REPORTER:  Okay.  Awesome.  All right.  Jeremiah?

THE VIDEOGRAPHER:  Okay.  So Mr. Humphreys, Mr. Warren is getting the video of today's deposition.  Would you like to order a copy

Page 200

of today's video?

MR. HUMPHREYS:  Gavin, do you want the video?

THE DEPONENT:  Yes.

MR. HUMPHREYS:  We'll have a copy of the video, please.

THE VIDEOGRAPHER:  Okay.  And is there another attorney in the room who would like to also order a copy of today's video?

MR. SILER:  Not for the Government, no.

THE VIDEOGRAPHER:  Any other attorney in the room need the video?

MR. WARREN:  Not from the plaintiffs.

THE VIDEOGRAPHER:  Okay.  Mr. Warren, yeah, you are getting the video because you scheduled the -- just so you know.  Okay.  The time is 6:01 p.m.

MR. SILER:  Whether you like it or not.

THE VIDEOGRAPHER:  And we are off the record.

(WHEREUPON, the deposition of GAVIN KLIGER was concluded at 6:01 p.m.)

Page 201

CERTIFICATE

I, the undersigned Jeremiah Landes, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Gavin Kliger, in the above captioned matter on the 6th day of January, 2026 taken at the location of Cohen Milstein Sellers and Toll PLLC, 1100 New York Ave., Ste. 500, Washington, DC 20005.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

*Jeremiah Landes*

Jeremiah Landes

Page 202

CERTIFICATE

I, Sheila Hidalgo, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 15th day of January, 2026.

Sheila Hidalgo

---

Page 203

Date: January 6, 2026    Assignment #: 92792
Deponent: Gavin Kliger
Case: Doe 4 vs. Musk

ATTORNEY - TRANSCRIPT ENCLOSED:
signature of your client is required.  Please have your client make any corrections necessary. Sign the Correction Sheet where indicated.  Forward a COPY of the executed Correction Sheet directly to the attorney(s) listed below.  (The Address(es) can be found on the Appearance page of the deposition.)

Also, send a COPY of the executed Correction Sheet to our corporation.

CC:  Naegeli Deposition and Trial
     Andrew Warren, Esquire
     Tianna Mays, Esquire
     Christopher Lynch, Esquire
     Jacob Silner, Esquire
     Sarah Welch, Esquire

---

Page 204

CORRECTION SHEET

Deposition of: Gavin Kliger    Date: 01/06/26
Regarding: Doe 4 vs. Musk
Reporter: Hidalgo/Trumble
_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page  Line  Reason for Change
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____
____  ____  _____

       Signature: _____
            Gavin Kliger
Email to: Production@NaegeliUSA.com

---

Page 205

DECLARATION

Deposition of: Gavin Kliger    Date: 01/06/2026
Regarding: J. DOE 4 et al. vs ELON MUSK et al.
Reporter:  Sheila Hidalgo
_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____
on the _____ day of _____, 20____.

       Signature: _____
            Gavin Kliger
Email to: Production@NaegeliUSA.com

---

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

# Exhibit 11

**From:** Marocco, Peter W █████████████

**Sent:** Thur 2/6/2025 1:05:55 PM (UTC)

**To:** Lewin, Jeremy (M/CIO)███████████
Steven.M.Davis█████████████████████

**Subject:** FW: URGENT DRAFT USAID GUIDANCE

Has this been teed up?  Thought we did this part yesterday.

## SENSITIVE BUT UNCLASSIFIED

**From:** Needham, Michael A ███████████████
**Sent:** Thursday, February 6, 2025 6:39 AM
**To:** Marocco, Peter W █████████████
**Cc:** String, Marik A <█████████████>; Holler, Daniel J <████████████>; McCommas, Brendan N <████████████████>
**Subject:** Re: URGENT DRAFT USAID GUIDANCE

Pete,
Can we post this on website to clarify S' commander's intent on this?

Get Outlook for iOS

## SENSITIVE BUT UNCLASSIFIED

**From:** Jeremy Lewin ████████████████
**Sent:** Wednesday, February 5, 2025 5:52:55 PM
**To:** Dorosin, Joshua L ████████████████
**Cc:** Needham, Michael A ██████████████████; Marocco, Peter W ████████████████; String, Marik A ████████████; Holler, Daniel J ████████████; Fabry, Steven F ███████████; McCommas, Brendan N ██████████████ Visek, Richard C ████████████; James.Burnham ████████
**Subject:** Re: URGENT DRAFT USAID GUIDANCE

Maybe the cleanest solution would be to add an FAQ section, which we could add to if other issues come up as well. Some potential draft text below.

\*\*\*\*\*\*\*\*\*

FAQs

1. If I am posted overseas and placed on administrative leave, am I required to return to the United States within the next 30 days?

DOE4vUSDS_008836

No. While USAID and the Department of State are preparing a plan under which USAID personnel posted overseas would be offered optional and fully reimbursed return travel to the United States within 30 days, personnel are not required to accept Agency-sponsored travel or to return to the United States within any specific deadline. Overseas USAID personnel retain the option to remain at their posts, even while placed on administrative leave and not working. Beyond 30 days, however, Agency funded and arranged return travel may not be available unless an individualized exception is sought and granted.

On Wed, Feb 5, 2025 at 6:34 PM Dorosin, Joshua L <▓▓▓▓▓▓▓▓▓▓> wrote:

Thanks Mike, and adding Rich Visek to the chain now that he's back from Brussels. We are organizing a meeting to discuss implementation tomorrow at 1:30 pm with Dan and Pete and will make sure we address this in the discussion.

**From:** Needham, Michael A <▓▓▓▓▓▓▓▓▓▓>
**Sent:** Wednesday, February 5, 2025 6:29 PM
**To:** Dorosin, Joshua L <▓▓▓▓▓▓▓>; Marocco, Peter W <▓▓▓▓▓▓▓▓>; String, Marik A <▓▓▓▓▓>; Lewin, Jeremy (M/CIO) <▓▓▓▓▓>; Holler, Daniel J <▓▓▓▓▓; Fabry, Steven F <▓▓▓▓▓▓>; McCommas, Brendan N <▓▓▓▓▓▓>
**Cc:** James.Burnham▓▓▓▓▓
**Subject:** Re: URGENT DRAFT USAID GUIDANCE

ACP DPP


ACP DPP


Get Outlook for iOS

---

**From:** Dorosin, Joshua L < ██████████████ >
**Sent:** Tuesday, February 4, 2025 6:46:43 PM
**To:** Marocco, Peter W ██████████████ Needham, Michael A < ██████████████ String, Marik A < ██████████████ >; Lewin, Jeremy (M/CIO) < ██████████████ >; Holler, Daniel J ██████████████ >; Fabry, Steven F < ██████████████ >; McCommas, Brendan N < ██████ >
**Cc:** James.Burnham ██████████████
**Subject:** RE: URGENT DRAFT USAID GUIDANCE

Mike/Pete –

ACP DPP ██████████████████████████████████████████████████████████████████

ACP DPP ██████████████████████████████████████████████████████████████████

Best, Josh

////////////////

ACP DPP ██████████████████████████████████████████████

DOE4vUSDS_008838

ACP DPP



ACP DPP



**From:** Marocco, Peter W <​███████████████​>
**Sent:** Tuesday, February 4, 2025 7:31 PM
**To:** Needham, Michael A ████████████████; Dorosin, Joshua L ████████████████;
String, Marik A ████████████; Lewin, Jeremy (M/CIO) ██████████████; Holler, Daniel J
████████████; Fabry, Steven F ████████████; McCommas, Brendan N
████████████████████
**Cc:** James.Burnham ████████████
**Subject:** RE: URGENT DRAFT USAID GUIDANCE

ACP DPP ████████████

ACP DPP ████████████

DOE4vUSDS_008839

**From:** Needham, Michael A <​████████████████████​>
**Sent:** Tuesday, February 4, 2025 7:28 PM
**To:** Dorosin, Joshua L ████████████████>; Marocco, Peter W <​██████████████​> String, Marik A ████████████████> Lewin, Jeremy (M/CIO) ████████████; Holler, Daniel J ████████████>; Fabry, Steven F <​████████████​>; McCommas, Brendan N ████████████████
**Cc:** James.Burnham
**Subject:** Re: URGENT DRAFT USAID GUIDANCE

ACP DPP

████████████████████████████████████████

Get Outlook for iOS

---

**From:** Needham, Michael A ██████████████
**Sent:** Tuesday, February 4, 2025 6:22:32 PM
**To:** Dorosin, Joshua L ██████████████ Marocco, Peter W ████████████>; String, Marik A ████████████ Lewin, Jeremy (M/CIO) ████████████>; Holler, Daniel J ████████████>; Fabry, Steven F ████████████; McCommas, Brendan N ████████████
**Cc:** James.Burnham
**Subject:** Re: URGENT DRAFT USAID GUIDANCE

ACP DPP ████████████████████████████████████████

Get Outlook for iOS

---

**From:** Dorosin, Joshua L ████████████████
**Sent:** Tuesday, February 4, 2025 6:19:33 PM
**To:** Marocco, Peter W ████████████>; Needham, Michael A <​████████████████​> String, Marik A ████████████ Lewin, Jeremy (M/CIO) ████████████ Holler, Daniel J

DOE4vUSDS_008840

; Fabry, Steven F ██████████; McCommas, Brendan N
████████
**Cc:** <u>James.Burnham</u>
**Subject:** RE: URGENT DRAFT USAID GUIDANCE

ACP DPP ████████



**From:** Marocco, Peter W ████████████
**Sent:** Tuesday, February 4, 2025 7:15 PM
**To:** Needham, Michael A ██████████████████; Dorosin, Joshua L ██████████████;
String, Marik A ████████████████; Lewin, Jeremy (M/CIO) ████████████; Holler, Daniel J
████████████; Fabry, Steven F ██████████████; McCommas, Brendan N
██████████
**Cc:** <u>James.Burnham</u>
**Subject:** RE: URGENT DRAFT USAID GUIDANCE

ACP DPP ████████████████

ACP DPP ████████████████

DOE4vUSDS_008841

**ACP DPP** ████████████████████████████████

**From:** Needham, Michael A ‹████████████████›
**Sent:** Tuesday, February 4, 2025 6:57 PM
**To:** Dorosin, Joshua L ‹██████████████›; Marocco, Peter W ‹████████████████›; String, Marik A ‹██████████████›; Lewin, Jeremy (M/CIO) ‹██████████████›; Holler, Daniel J ‹██████████████›; Fabry, Steven F ‹██████████████›; McCommas, Brendan N ‹██████████████›
**Cc:** James.Burnham ██████████████
**Subject:** Re: URGENT DRAFT USAID GUIDANCE

**ACP DPP** ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Get Outlook for iOS

**From:** Dorosin, Joshua L ‹██████████████›
**Sent:** Tuesday, February 4, 2025 5:52 PM
**To:** Marocco, Peter W ‹██████████████›; String, Marik A ‹██████████████›; Lewin, Jeremy (M/CIO) ‹██████████████›; Needham, Michael A ‹██████████████›; Holler, Daniel J ‹██████████████›; Fabry, Steven F ‹██████████████›; McCommas, Brendan N ‹██████████████›
**Cc:** James.Burnham ██████████████
**Subject:** RE: URGENT DRAFT USAID GUIDANCE

**ACP DPP** ████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



ACP DPP

ACP DPP

//////////////



ACP DPP

DOE4vUSDS_008843

**ACP DPP** ████████████████████████████
████████████

**ACP DPP** ████████████████

---

**From:** Marocco, Peter W ███████████████████
**Sent:** Tuesday, February 4, 2025 6:38 PM
**To:** String, Marik A ███████████████; Lewin, Jeremy (M/CIO) ████████████; Needham, Michael A ██████████████; Holler, Daniel J ██████████████; Fabry, Steven F ████████████; Dorosin, Joshua L ██████████████
**Cc:** James.Burnham ████████████
**Subject:** RE: URGENT DRAFT USAID GUIDANCE

**ACP DPP** █████████████████████████████
████████

███████████████████████████████████████
███████

---

**From:** Marocco, Peter W
**Sent:** Tuesday, February 4, 2025 5:56 PM
**To:** String, Marik A ████████████████; Lewin, Jeremy (M/CIO) ████████████; Needham, Michael A █████████████; Holler, Daniel J ████████████; Fabry, Steven F ████████; Dorosin, Joshua L ██████████████
**Cc:** James.Burnham
**Subject:** URGENT DRAFT USAID GUIDANCE
**Importance:** High

**ACP DPP** ████████████

████████████████████████████████████
████████

██████████

ACP DPP



DOE4vUSDS_008845

# Exhibit 12



**Kenneth Jackson** ████████████████

## LPA Leave Template + Names

8 messages

**Laken Rapier** ████████████████         Fri, Jan 31, 2025 at 7:31 PM
To: Kenneth Jackson ████████
Cc: Jeremy Lewin ████████████

--
**Laken Avonne Rapier**
Senior Advisor | USAID
████████

---------- Forwarded message ----------
From: Jeremy Lewin ████████████
To: ████████████████████, "Marocco, Peter W" ████████████████
Cc: Kenneth Jackson ████████████████, Laken Rapier ████████
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

**3 attachments**

📄 **LPA Admin Leave Template.docx**
    92K

📄 **USAID LPA Admin Leave 1.31.2025.docx**
    17K

📄 **AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
    31K

**Kenneth Jackson** ████████████████         Sat, Feb 1, 2025 at 7:15 PM
To: "Marocco, Peter W" ████████████████

Pete,

DOE4vUSDS_000594



Case 8:25-cv-00462-TDC    Document 246-1    Filed 08/06/26    Page 109 of 343

Sending to you on final clearance based on current delegations and that this administrative action will not reflect in a negative way on these employees.

Please approve or disapprove.

HCTM, CISO, Security are standing by.

Thank you,
Ken

[Quoted text hidden]
---------- Forwarded message ----------
From: Jeremy Lewin
To: ⬛⬛⬛ , "Marocco, Peter W" ⬛⬛⬛
Cc: Kenneth Jackson ⬛⬛⬛ , Laken Rapier ⬛⬛⬛
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

---------- Forwarded message ----------
From: Jeremy Lewin
To: ⬛⬛⬛ , "Marocco, Peter W" ⬛⬛⬛
Cc: Kenneth Jackson ⬛⬛⬛ , Laken Rapier ⬛⬛⬛
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

**4 attachments**

DOE4vUSDS_000595

Case 8:25-cv-00462-TDC     Document 246-1     Filed 08/06/26     Page 110 of 343

**LPA Admin Leave Template.docx**
92K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

**AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

---

**Kenneth Jackson** ███████████        Sat, Feb 1, 2025 at 8:22 PM
To: William Malyszka ████████████████, Jason Gray ████████████

Bill,

There was a verbal conversation tonight with Pete to approve these employees to be put on Admin Leave. Please ensure they will receive full pay and benefits and this will not reflect negatively in their service record.

Some on this list may be contractors, please only place employees on leave.

Regards,

[Quoted text hidden]

---------- Forwarded message ----------
From: Jeremy Lewin
To:                                                                "Marocco, Peter W"
Cc: Kenneth Jackson                                        , Laken Rapier
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

**4 attachments**

📄 **LPA Admin Leave Template.docx**
   92K

📄 **USAID LPA Admin Leave 1.31.2025.docx**
   17K

📄 **AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
   31K

📄 **USAID LPA Admin Leave 1.31.2025.docx**
   17K

**William Malyszka**                                                                Sat, Feb 1, 2025 at 8:26 PM
To: Steven Hernandez
Cc: Kenneth Jackson

Steve, see attached list of Federal employees being placed on administrative leave and contractors. All are to have logical access revoked.

[Quoted text hidden]

---------- Forwarded message ----------
From: Jeremy Lewin
To:                                          , "Marocco, Peter W"
Cc: Kenneth Jackson                                    , Lak

DOE4vUSDS_000597

Bcc:

Date: Fri, 31 Jan 2025 19:04:25 -0500

Subject: AID Intended Comms/LPA Admin Leave & RIF Activities

Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

---

**4 attachments**

**LPA Admin Leave Template.docx**
92K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

**AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

**USAID LPA Admin Leave 1.31.2025.docx**
17K

---

**Steven Hernandez**                Sat, Feb 1, 2025 at 8:33 PM
To: William Malyszka
Cc: Kenneth Jackson

On it!

Steven G Hernandez

MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL

Acting CIO

DCIO|CISO|CPO

United States Agency for International Development

My Availability: HTML

*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can*

-- John Wesley

[Quoted te t hidden]

---

**Kenneth Jackson**                   Sat, Feb 1, 2025 at 8:54 PM
To:

[Quoted te t hidden]

---------- Forwarded message ---------
From: Jeremy Lewin
To:        , "Marocco, Peter W

DOE4vUSDS_000598

Cc: Kenneth Jackson ████████████████, Laken Rapier ████████████████
Bcc:
Date: Fri, 31 Jan 2025 19:04:25 -0500
Subject: AID Intended Comms/LPA Admin Leave & RIF Activities
Pete and Steve,

Please find attached a list of 57 LPA employees that Ken and Laken intend to place on administrative leave this evening based on redundancy, incompetence, suspected leaks, and insubordination. Laken has identified a dozen or so employees who are helpful and will be remaining on active duty. Laken has just spoken with Tammy Bruce and Michele Exner who are supportive and aware - State will be essentially taking over leg affairs and comms activities for AID. Once Ken has sent a legally effective admin leave notice, Luke will ensure physical + digital access is cut tonight.

In the next few days, AID will write up a RIF plan for the entire LPA organization -- with the remaining employees transferred into a new tight comms shop under the AID/A Administrator's office under Laken. About half of these employees are contractors whose contracts can be terminated for convenience quickly.

Please let me, Ken, and Laken know your thoughts as we get things lined up.

Thanks,
Jeremy

**4 attachments**

📄 **LPA Admin Leave Template.docx**
92K

📄 **USAID LPA Admin Leave 1.31.2025.docx**
17K

📄 **AID Intended Comms/LPA Admin Leave & RIF Activities.eml**
31K

📄 **USAID LPA Admin Leave 1.31.2025.docx**
17K

---

**Steven Hernandez** ██████████████████                                          Sat, Feb 1, 2025 at 10:39 PM
To: William Malyszka ███████████████████
Cc: Kenneth Jackson ██████

Confirmed done.  I'll have the receipt in a bit.

Steven G Hernandez
MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL
Acting CIO
DCIO|CISO|CPO
United States Agency for International Development
My Availability  HTML

*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can.*
  John Wesley

On Sat, Feb 1, 2025 at 8:26 PM William Malyszka ████████████████████████ wrote:
[Quoted te t hidden]

---

**William Malyszka** ████████████████                                          Sat, Feb 1, 2025 at 11:06 PM
To: Leo Ruth ████████████████████
Cc: Kenneth Jackson ████████████████████

DOE4vUSDS_000599

Confirming that John V. and Brian M. have been placed on admin leave. My understand was that Ken had support from DOGE to remove physical access. Please verify.

On Sat, Feb 1, 2025 at 10:07 PM Leo Ruth ██████████ wrote:
> Bill,
> Am I to remove physical access for Voorhees and McGill, too?
>
>
> Leo J. Ruth II
> Deputy Director (Support)
> USAID Office of Security
> Rm 4.06 RRB
> 1300 Pennsylvania Ave.
> Washington DC 20523
> Office: ████████
> CELL: ████████
> UNCLAS: ████████
>
>
>
> On Sat, Feb 1, 2025 at 9:40 PM Steven Hernandez ██████████ wrote:
>> Confirmed,
>>
>> DOGE will remove physical access.  Thank you,
>>
>> Steven G Hernandez
>> MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL
>> Acting CIO
>> DCIO|CISO|CPO
>> United States Agency for International Development
>> My Availability: HTML
>>
>> *Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can*
>> -- John Wesley
>>
>>
>> On Sat, Feb 1, 2025 at 9:39 PM Leo Ruth ██████████ wrote:
>>> Steve,
>>>
>>> Zach informed me DOGE will remove the physical access for the individuals on the list.
>>>
>>> Please confirm you do NOT want SEC to continue with physical access restriction.
>>>
>>>
>>> Leo J. Ruth II
>>> Deputy Director (Support)
>>> USAID Office of Security
>>> Rm 4.06 RRB
>>> 1300 Pennsylvania Ave.
>>> Washington DC 20523
>>> Office: ████████
>>> CELL: ████████
>>> UNCLAS: ████████
>>>
>>>
>>> On Sat, Feb 1, 2025 at 9:13 PM Zecharia Kahn ██████████ wrote:
>>>> Hi Bill,
>>>>
>>>> Can you provide guidance to Charles and Leo to remove physical access for the staff listed below and attached.
>>>>
>>>> We're working logical access in parallel.

DOE4vUSDS_000600

Case 8:25-cv-00462-TDC     Document 246-1     Filed 08/06/26     Page 115 of 343

Thanks!!

Zack

--
Zecharia (Zack) Kahn
Office of the Chief Information Officer
U.S. Agency for International Development
Office - ████
Cell - ████
████

---------- Forwarded message ---------
From: **Steven Hernandez** ████
Date: Sat, Feb 1, 2025 at 8:34 PM
Subject: Fwd: LPA Leave Template + Names
To: William Morgan ████, Jeffrey Anouilh ████

Please execute asap, but ensure priority for the first two names provided.

Steven G Hernandez

MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL

Acting CIO

DCIO|CISO|CPO

United States Agency for International Development

My Availability: HTML

*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can*

-- John Wesley

---------- Forwarded message ---------
From: **William Malyszka** ████
Date: Sat, Feb 1, 2025 at 8:26 PM
Subject: Fwd: LPA Leave Template + Names
To: Steven Hernandez ████
CC: Kenneth Jackson ████

[Quoted te t hidden]
[Quoted text hidden]

DOE4vUSDS_000601

# Exhibit 13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| J. DOE 4, *et al.*,<br><br>   *Plaintiffs*,<br><br>v.<br><br>U.S. DOGE Service, *et al.*,<br><br>   *Defendants*. | Case No. 8:25-cv-00462-TDC |

**DECLARATION OF ADAM KORZENIEWSKI**

I, Adam Korzeniewski, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1.    I previously testified at a deposition in the above-captioned case as the Rule 30(b)(6) designee of the State Department and the U.S. Agency for International Development ("USAID"). My background, duties, and assignments with USAID and the State Department are described in the transcript of that deposition at pages 17–28. *See* ECF No. 229, Ex. 7.

2.    I make these statements based on personal knowledge and knowledge obtained in the course of my official duties. I make this declaration to supplement and clarify my deposition testimony as the State Department and USAID's designee under Rule 30(b)(6) of the Federal Rules of Civil Procedure. To develop the information contained within this declaration, I reviewed documents previously produced to the Plaintiffs in this case, as well as information made available to me by Kenneth Jackson, Jeremy Lewin, and Joel Borkert.

1

**USAID DOGE Team**

3.      Section 3(c) of Executive Order 14,158 calls on agency heads to establish within their respective agencies a "DOGE Team" of at least four employees.  The following individuals were formally detailed to USAID from other agencies for the purpose of implementing the DOGE Agenda referenced in Executive Order 14,158, with their home agencies noted in parentheses: Jeremy Lewin (General Services Administration); Luke Farritor (General Services Administration); Edward Coristine (General Services Administration); and Gavin Kliger (Office of Personnel Management).

4.      These individuals were tasked with performing duties to implement various executive orders, including Executive Orders 14,158, 14,219, 14,210, and 14,222, and were generally understood by USAID leadership to form the DOGE Team at USAID.  They were at all times operating under the direction and supervision of USAID leadership for their work at USAID. USAID is not aware of any formal document designating them as the USAID DOGE Team.

5.      Between January 30, 2025, and March 18, 2025, Mr. Lewin served as the DOGE Team Lead for USAID.  Consistent with Executive Order 14,158, the DOGE Team reported at all times to USAID leadership, including Secretary Rubio, Peter Marocco, and Kenneth Jackson.

6.      On March 18, 2025, Secretary of State Marco Rubio, who was then Acting Administrator of USAID, delegated to Mr. Lewin the duties and functions of the Deputy Administrator (Policy and Programming) and Chief Operating Officer of USAID.[1]  At that time,

---

[1]      Mr. Lewin has subsequently been delegated significant additional authorities at the Department of State.  He is currently performing the duties of Under Secretary of State, pursuant to a delegation from Secretary Rubio dated July 11, 2025, and has served as the Director of Foreign Assistance since April 16, 2025.  Mr. Lewin also remains Secretary Rubio's Senior Policy Advisor at the Department of State.

Mr. Lewin's role as DOGE Team Lead ceased, and the DOGE Team at USAID functionally disbanded.

7.      Prior to their formal detail arrangements with USAID, several individuals who were later detailed to USAID separately performed analysis and advisory work related to USAID functions.  Specifically, Luke Farritor and Edward Coristine conducted work at USAID offices on or about January 27, 2025, to investigate the possibility that certain individuals had caused USAID to make disbursements contrary to Executive Order 14,169 and Secretary Rubio's pause on foreign humanitarian assistance.  That work eventually resulted in recommendations being made to USAID Leadership to place certain USAID employees on administrative leave or other personnel actions.  Those recommendations were made to USAID's appointed leadership, including Acting Administrator Jason Gray, Chief of Staff Matt Hopson, Deputy Chief of Staff Joel Borkert, and Assistant to the Administrator for Management and Resources Kenneth Jackson.

8.      Several other individuals whom I understand have been described in the media as associated with the "Department of Government Efficiency" or "DOGE" performed duties related to USAID in January and February 2025.  Those individuals include Steve Davis, Clayton Cromer, Noah Peters, and Tarak Maketcha.  None of those individuals were employed by or detailed to USAID.

9.      For example, Clayton Cromer advised USAID on personnel matters as deputy general counsel of the Office of Personnel Management.  I previously testified that Mr. Cromer was part of the USAID DOGE Team.  Korzeniewski Tr. at 42:20–23.  That testimony was incorrect.  Mr. Cromer was never formally employed by USAID or detailed to USAID and was not part of USAID's DOGE Team.

10.     Similarly, Noah Peters consulted with USAID officials about the possibility of conducting a reduction in force of USAID personnel.  Mr. Peters was employed by OPM, not USAID, and was not a member of the USAID DOGE Team.

**Delegations of Authority to Serve as USAID Administrator**

11.     On January 20, 2025, President Donald J. Trump appointed Jason Gray Acting Administrator of USAID.  Mr. Gray's tenure in that position ended on January 30, 2025.

12.     On January 30, 2025, President Trump appointed Secretary of State Marco Rubio Acting Administrator of USAID.  The document effectuating that appointment appears in the State Department's document productions at Bates Stamp DOE4vUSDS_00569, and appears as Exhibit 18 to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Leave to Depose Kenneth Jackson and Steven Davis ("Defendants' Opposition")..  Certain members of USAID leadership and the State Department were informed of this appointment very late in the evening of January 30.  Those individuals included Kenneth Jackson, Matt Hopson, Jeremy Lewin, and Secretary Rubio himself.

13.     USAID understands that Jason Gray, who had been serving as Acting Administrator of USAID prior to that point, was informed that Secretary Rubio had replaced Mr. Gray as Acting Administrator in the morning of January 31, 2025.

14.     Secretary Rubio's appointment as Acting Administrator of USAID was publicly announced on Monday, February 3, 2025, through public statements of Secretary Rubio, a State Department press release, and an internal email to all USAID staff at 5:30 p.m.  *See, e.g.*, State Dep't, *Secretary Marco Rubio Appointed as Acting Administrator for the United States Agency for International Development (USAID)* (Feb. 3, 2025), https://www.state.gov/secretary-marco-rubio-

4

appointed-as-acting-administrator-for-the-united-states-agency-for-international-development-usaid/; *see also* DOE4vUSDS_009540, attached hereto as Exhibit A

15.    Secretary Rubio's tenure as Acting Administrator of USAID ended on August 26, 2025, when President Trump designated Russell Vought for that position.

**Delegations of Authority to Serve as Deputy Administrator of USAID**

16.    Historically, the position of Deputy Administrator has been occupied by either one or two individuals. When the position has been divided in two, the occupants' titles have been Deputy Administrator for Policy and Programming and Deputy Administrator for Management and Resources.  Both positions are presidential appointments subject to Senate confirmation. Neither position, however, has had a permanent, Senate-confirmed official serving in the role during the current Presidential administration.

17.    Following President Trump's inauguration on January 20, 2025, Mr. Jackson was appointed to USAID to serve as Senior Advisor.  On January 21, 2025, Acting Administrator Jason Gray delegated to Mr. Jackson the duties and authorities of the position of Deputy Administrator for Management and Resources and specified that when exercising authorities Mr. Jackson was to use the title Assistant to the Administrator for Management and Resources.  *See* DOE4vUSDS_00578, a copy of which appears as Exhibit 6 to Plaintiffs' Motion for Leave to Depose Kenneth Jackson and Steve Davis, ECF No. 229.  That delegation remained in effect until Peter Marocco was assigned the duties of USAID Deputy Administrator, as described below. During the period between January 21, 2025, and Mr. Marocco's delegation of duties as the Deputy Administrator, there was no person performing the duties of Deputy Administrator for Policy and Programming.

18.    On February 2, 2025, USAID Acting Administrator Marco Rubio signed a document delegating the authorities of the Deputy Administrator for Policy and Programming, the Deputy Administrator for Management and Resources, and Chief Operating Officer, to Peter Marocco.  *See* DOE4vUSDS_000575, a copy of which appears as Exhibit 17 to Defendants' Opposition.  Prior to and during his time performing those duties, Mr. Marocco was also serving as the Director of the State Department Office of Foreign Assistance.  As explained on the Department of State's website at the time Mr. Marocco took office as its Director, "[t]he Office of Foreign Assistance is responsible for the supervision and overall strategic direction of foreign assistance programs administered by the U.S. Department of State and U.S. Agency for International Development (USAID)."  Office of Foreign Assistance,  Office of Foreign Assistance, https://perma.cc/834T-KLF9; Offices of the Deputy Secretaries of State (D and D-MR); 1 FAM 033.1(a)-(d), https://fam.state.gov/fam/01fam/01fam0030.html#M033.  Many in USAID leadership, including Mr. Jackson, learned on the evening of January 30 or the morning of January 31 that Secretary Rubio was assigning the Deputy Administrator duties to Mr. Marocco. Jeremy Lewin also was alerted to Secretary Rubio's delegation of the Deputy Administrator duties on the evening of January 30.  The actual paperwork delegating the Deputy Administrator duties to Mr. Marocco was delayed until February 2, 2025, while certain personnel matters were worked out.  As such, between learning of that delegation and the document being signed—and in deference to Mr. Marocco's permanent role as Director of Foreign Assistance for the State Department—Mr. Jackson and other USAID leadership consulted with and sought the approval of Mr. Marocco before taking various actions.

6

19.     Secretary Rubio's delegation of authorities of the Deputy Administrator positions to Mr. Marocco was announced to USAID staff in the same internal email announcing Secretary Rubio's assumption of the Acting Administrator role.

**Access to Data Systems**

20.     I understand Plaintiffs have requested information about certain individuals' logical access to various USAID data systems.  To the best of USAID's current knowledge, Luke Farritor and Edward Coristine gained user access to the Phoenix system on January 27, 2025.  That access was authorized by USAID's then-acting Chief Information Officer Steven Hernandez.

21.     On January 30, 2025, Kenneth Jackson authorized Mr. Farritor to have read-only access to USAID's C-CURE system, which was the system USAID used to monitor and control badging access to USAID space at the Ronald Reagan Building.

22.     On January 31, 2025, Jason Gray authorized Mr. Farritor and Mr. Kliger to have administrative access to all unclassified USAID information systems, including but not limited to Phoenix, HR systems, Badging and Access Systems, cloud environments, and all systems related to grants, payments, and vouchers.  Mr. Gray authorized that access in his capacity as Chief Information Officer.

23.     USAID understands that Mr. Farritor may have in fact been permitted to login to the C-CURE system in the evening of January 30, 2025, as an administrator, prior to Mr. Gray's authorization.  It is USAID's understanding that this access was granted because of a miscommunication between Patrick Butler and Brian McGill, as Mr. Butler had understood Mr. McGill to be directing him to provide Mr. Farritor administrator access at that time, although Mr. McGill did not intend to convey that authorization.  To USAID's knowledge, Mr. Farritor did not

use that access to make changes to the C-CURE system before Mr. Gray formally approved the access.

**Decision to Vacate USAID's Space at Ronald Reagan Building**

24.    On February 7, 2025, Michael Peters, Commissioner of Public Buildings Service, U.S. General Services Administration ("GSA"), notified USAID that GSA was terminating USAID's occupancies at the Ronald Reagan Building and International Trade Center in Washington, D.C.  That decision was memorialized and communicated to USAID the same day by letter that appears at ECF No. 70-3.  Kenneth Jackson acknowledged receipt of that letter on behalf of USAID on the same day.  Also on February 7, 2025, GSA and the U.S. Customs and Border Protection entered into a temporary license to occupy government space.  That decision was officially memorialized and communicated by the documents previously submitted to the Court.  *See* ECF Nos. 70-4.  Consistent with these developments, USAID then undertook actions to vacate its office space.  Aside from the individuals listed on ECF No. 70-3 and ECF No. 69-4, neither the State Department nor USAID is aware of who was involved in the decision on behalf of GSA.

25.    I understand that Plaintiffs contend that, on January 31, 2025, certain plaques displaying USAID's seal were taken down in the Ronald Reagan Building.  Also on February 7, 2025, maintenance workers removed USAID's name from the façade of the Ronald Reagan Building and covered USAID's seal on the doorway to its former office space.  These actions were directed by GSA, not USAID.  Mr. Jackson has informed me that he has no personal knowledge of these events.

8

**USAID Website**

26.     On February 1, 2025, USAID's public-facing website was taken offline.  Gavin Kliger effectuated that decision by working in coordination with USAID career staff.  USAID is not aware of any contemporaneous documentation of this decision.

27.     During my testimony as the State Department and USAID's Rule 30(b)(6) designee, I said "I believe it was Ken Jackson is the one that made the order" that Mr. Kliger make changes to USAID's website, while noting that I was "speculating a little."  Korzeniewski Tr. at 164:13–14.  I have since been informed that Mr. Jackson did not issue that direction to Mr. Kliger.  Mr. Jackson reports that he cannot provide additional details about any February 1, 2025, changes to USAID's website.

**February 3 Email Instructing USAID Employees Not to Come to Work**

28.     At approximately 12:41 a.m. ET on February 3, 2025, an email was sent on behalf of USAID leadership to all USAID staff informing them that the USAID headquarters at the Ronald Reagan Building in Washington, D.C., would be closed to agency personnel on Monday, February 3 and instructing most personnel normally assigned to work in that building to work remotely.

29.     The decision to send that email was made by Peter Marocco, who was then performing the duties of the Deputy Administrators for Policy and Programming and Management and Resources and Chief Operating Officer of USAID.  Mr. Marocco communicated this decision orally, and verbally instructed Gavin Kliger to send the cited email.  USAID is not aware of any contemporaneous documentation of this decision.

**<u>Elon Musk Involvement with USAID Decisions</u>**

30.     USAID understands that, between January 20 and May 28, 2025, Elon Musk was employed by the White House Office as a Senior Advisor to the President.  He held that position as a non-career Special Government Employee.  Mr. Musk was not an employee of the U.S. DOGE Service or the U.S. DOGE Service Temporary Organization.

31.     USAID further understands that, in his capacity as Senior Advisor to the President, Mr. Musk communicated with several individuals at USAID and the State Department regarding actions to be taken with respect to USAID.  To USAID and State's current knowledge, Mr. Musk had several conversations with Secretary of State Rubio, Jeremy Lewin, Michael A. Needham, Counselor of the Department and then Secretary Rubio's Chief of Staff, Tarak Maketcha, and Daniel Joseph Holler, Sr., Chief of Staff of the Department of State, between January 20, 2025, and May 31, 2025, regarding proposals to reorganize USAID and make changes to USAID's personnel.  USAID and State also understand that Mr. Musk called into a meeting with USAID leadership and Deputy Chief of Staff Joel Borkert on or about January 25–26 related to a review of USAID contracts and grants to recommend for termination by the new administration.  State also currently understands that Mr. Musk may have spoken to Peter Marocco on at least one occasion.  State previously believed that Mr. Musk spoke to Jason Gray during his tenure as Acting Administrator of USAID, but has since come to understand that is not the case.

32.     Each of these conversations or meetings with Mr. Musk occurred in his capacity as Senior Advisor to the President.

33.     To the best of USAID's knowledge, none of those conversations resulted in final decisions about actions to be taken by USAID unless approved by authorized USAID or State

Department leadership.  Mr. Musk did not issue any directives that any particular actions be taken with respect to USAID.

34.    USAID also understands that a USAID security employee, Patrick Butler, spoke with a person he understood to be Elon Musk on January 30, 2025.  USAID can neither confirm nor dispute Mr. Butler's account of that phone call.

Executed this 4th day of June, 2026

ADAM MICHAEL KORZENIEWSKI

Digitally signed by ADAM MICHAEL KORZENIEWSKI
Date: 2026.06.04 20:00:03 -04'00'

ADAM KORZENIEWSKI

11

# Exhibit A

| | |
|---|---|
| **From:** | USAID Office of the Administrator[usaid_fo@subscribe.usaid.gov] |
| **Sent:** | Mon 2/3/2025 6:30:47 PM (UTC-05:00) |
| **To:** | ██████████████████ |
| **Subject:** | Organizational Updates: Secretary Rubio Appointed as Acting Administrator |



The United States Agency for International Development (USAID) has long strayed from its core responsibility of advancing American interests abroad.

As an interim step toward gaining control and better understanding over the agency's activity, President Donald J. Trump appointed Secretary Marco Rubio as Acting Administrator. Additionally, Secretary Rubio has appointed Pete Marocco to serve as the Deputy Administrator to deliver more effective foreign assistance for the American people and the world.

Furthermore, Secretary Rubio has notified Congress that a review of USAID's foreign assistance activities is underway with an eye toward potential reorganization. You can read the entire Congressional Notice below.

As we evaluate USAID and ensure it is in alignment with an America First agenda, the President Trump Administration, and the efforts of the State Department, we will focus on ensuring every agency dollar is delivering targeted and results-driven aid. Effective immediately, we are taking decisive actions to improve the efficiency of our operations, root out fraud, waste, and abuse.

USAID must maintain its original mission of responsibly advancing American interests abroad. While change is never easy, these steps are necessary to improve effectiveness, efficiency, and accountability for the American people.

We would like to thank the White House, Department of State, and other partners for dedicating not only their support, but expertise and resources to ensure tax dollars are not wasted and common sense is restored in advancing American interests abroad.

Thank you for your continued commitment to the United States.

Ken Jackson

Assistant to the Administrator for Management and Resources

DOE4vUSDS_009540



DOE4vUSDS_009541



DOE4vUSDS_009542



Update your subscriptions, modify your password or email address, or stop subscriptions at any time on your Subscriber Preferences Page. You will need to use your email address to log in. If you have questions or problems with the subscription service, please visit subscriberhelp.govdelivery.com.

This service is provided to you at no charge by United States Agency for International Development.

DOE4vUSDS_009543

This email was sent to ███████████ using govDelivery Communications Cloud on behalf of: United States Agency for International Development · 1300 Pennsylvania Avenue NW · Washington, DC · 20004



DOE4vUSDS_009544

# Exhibit 14

| | |
|---|---|
| **From:** | Erica Car█████████████ |
| **Sent:** | Sat 2/1/2025 3:52:03 PM (UTC) |
| **To:** | John Voorhees███████████████; Brian McGil███████████ |
| **Subject:** | Fwd: Building Access |

Erica Y. Carr
**Acting Executive Secretary**
**USAID**
Office of the Executive Secretary
1300 Pennsylvania Avenue, NW
RRB 6.08-038
Washington, DC 20523
████████ - Office
         - Work Cell
         - Personal Cell
JWICS:
JWICS:
ClassNet:
ClassNet:

---------- Forwarded message ---------
From: **Marocco, Peter W** <███████████████>
Date: Sat, Feb 1, 2025 at 10:47 AM
Subject: Re: Building Access
To: Carr, Erica Y. (AID/ES) ██████████>, Gray, Jason (M/CIO/ICIO)
█████████████, Jackson, Kenneth S. (AID/A) <██████████████>

That's fine - they just need one USAID badge with access for any guests.  They may be able to get registered access for their cards at the desk.

Get Outlook for iOS

SENSITIVE BUT UNCLASSIFIED

---

 **From:** Kenneth Jackson██████████████
**Sent:** Saturday, February 1, 2025 10:27:44 AM
**To:** Marocco, Peter W█████████████; Carr, Erica Y. (AID/ES)██████████████; Gray, Jason (M/CIO/ICIO)████████████

**Subject:** Re: Building Access

Pete,

The individuals requesting building access today are as follows:

Jeremy Lewin (GSA)
Luke Farritor (EOP/GSA)
Gavin Kliger (OPM / USDA)
Tarak Makecha (State)

With the new State/USAID delegations, I am running this through for you for approval.

Thank you,
Ken

On Sat, Feb 1, 2025 at 9:14 AM Kenneth Jackson ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ wrote:

> Pete,
> Jeremy and his team would like access to the USAID building today to physically plug into the network. I asked him for a list of names of the individuals and agency affiliation.
>
> When I have the full list, I will send to you and I would like direction to come from you if this is approved or not.
>
> Thank you,
> Ken

# Exhibit 15

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| |
|---|
| J. DOE 4, *et al.*, *on behalf of themselves and all others similarly situated*,<br><br>    *Plaintiffs*,<br><br>  v.<br><br>United States DOGE Service, *et al.*,<br><br>    *Defendants*. |

Case No. 8:25-cv-00462-TDC

**DEFENDANTS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF
INTERROGATORIES TO DEFENDANT UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT**

Defendant United States Agency for International Development ("USAID") hereby

responds to Plaintiffs' First Set of Interrogatories to Defendant United States Agency for

International Development as follows:

**Objections to Instructions**

1.      Defendants object to all Plaintiffs' instructions, and Instruction No. 1 in particular,

to the extent they purport to impose obligations beyond those imposed by the Federal Rules of

Civil Procedure.

2.      Defendants object to Instruction No. 7 to the extent that it is both inconsistent

with the dates set forth in specific interrogatories and to the extent the phrase "complete

responses" is vague and ambiguous.  Unless otherwise indicated, Defendants will specify the

dates relevant to each response to a particular interrogatory in any response to that interrogatory.

1

**Objections to Definitions**

1.      Defendants object to Definition No. 4 as vague and ambiguous and as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure to the extent it refers to a "general course of action the specifics of which can be determined later."

2.      Defendants object to Definition No. 5 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.

3.      Defendants object to Definition No. 7 to the extent it refers it incorrectly identifies the U.S. DOGE Service Temporary Organization as the "U.S. DOGE Temporary Service." Defendants will construe the term "DOGE" to include the U.S. DOGE Service Temporary Organization.

4.      Defendants object to Definition No. 8 as vague and ambiguous, as it refers to any individual who "otherwise works or worked for DOGE."  Defendants will construe the term to include any individual who has or had a primary employment relationship with the U.S. DOGE Service or U.S. DOGE Service Temporary Organization, whether in a paid or unpaid capacity.

5.      Defendants object to Definition No. 10 as purporting to impose obligations beyond those established by the Federal Rules of Civil Procedure.

6.      Defendants object to Definition No. 13 on the ground that it is overbroad and not proportional to the needs of the case because it includes, among other individuals, all of Defendants' thousands of current and former employees regardless of their position and regardless of their involvement in the events giving rise to the claims or defenses in these cases. Defendants will construe this definition, and the requests generally, to be limited to seek information from persons who are reasonably likely to have information relevant to the claims or defenses in these cases and responsive to Plaintiffs' interrogatories.

**Objections to All Interrogatories**

1.     Defendants object to Plaintiffs' interrogatories because discovery is inappropriate at this time in light of Defendants' pending motion to stay discovery during the pendency of any interlocutory appeal, ECF No. 166.  In addition, discovery is inappropriate, inefficient, and unduly burdensome, because for the reasons set forth in Defendants' motion to dismiss and Motion for Certification, the court has no jurisdiction over Plaintiffs' claims and the material facts are undisputed and Plaintiffs' claims thus present pure questions of law.  *See also* Pls. Request for Leave to File Mot. for Partial Summ. J. at 2, ECF No. 159.

2.     Defendants object to Plaintiffs' interrogatories to the extent that they seek information protected against disclosure by: (a) the attorney work product doctrine; (b) the attorney-client privilege; (c) the deliberative process privilege, the joint defense privilege, the common interest privilege, the law enforcement privilege, or the state secrets privilege; (d) any other form of executive privilege; or (e) any other applicable privilege or protection.

3.      Defendants do not waive, and hereby expressly reserve their rights to assert any and all objections to the admissibility of such responses into evidence at the trial of this action, or in any other proceedings, on any and all grounds, including, but not limited to, competency, relevancy, materiality, and privilege. Further, Defendants make the responses herein without in any manner implying or admitting that the discovery requests are relevant or material to the subject matter of this action.

4.      Defendants object to these interrogatories to the extent that they seek information protected against disclosure by the Privacy Act, *see* 5 U.S.C. § 552a, and the privacy interests and expectations of persons not party to this litigation.

5.     Defendants object to any discovery taking place in this case to the extent Plaintiffs

3

assert cognizable claims seeking review of governmental agency action, including claims under Administrative Procedure Act, because resolution of any such claims should be based upon the "administrative record" in this case. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That said, Defendants understand that the Court has allowed discovery to proceed. Thus, while preserving their broad objection to any and all discovery, Defendants make further specific objections stated below.

5.      Defendants incorporate all of the foregoing objections in each of the responses below regardless of whether a specific objection is reasserted with respect to a specific interrogatory. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that interrogatory. Moreover, the assertion of the same, similar, or additional objections in response to a specific interrogatory does not waive, limit, or modify any of Defendants' general objections or similar or separate specific objections raised in response to an interrogatory.

6.      Defendants expressly reserve the right to supplement, clarify, review, or correct any or all of the responses and objections here, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

### Objections and Responses to Specific Interrogatories

**INTERROGATORY NO. 1:** Identify the level of access (and who approved and provided the access) to each of the following USAID systems held by Luke Farritor, Gavin Kliger, Steve Davis, Noah Peters, Jeremy Lewin, Clayton Cromer at all times between January 20, 2025 and March 31, 2025. If the level of access changed for an individual during this time

frame, indicate the updated level of access and the date(s) on which the access level changed.

    a. C-CURE

    b. USAID's Active Directory

    c. AWS - dev test, admin, production admin, Cloud PAW

    d. Akamai

    e. Google suite

    f. GLAAS

    g. Phoenix

    h. HR System

    i. GovTA

    j. EC2 access

    k. Azure access.

**Objections**:  Defendants incorporate by reference the above objections.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Defendants further object that this request is unduly burdensome and not proportional to the needs of this case, insofar as Plaintiffs' claims are limited to the Appointments Clause and the separation of powers, neither of which are implicated by agency decisions to grant certain identified individuals logical access to agency data systems.

**Response**:

**Luke Farritor**

Luke Farritor had access to the following systems on the corresponding dates:

- CCure – Received account access with admin rights on 1/31; additional elevated permissions on 3/9.

- USAID Active Directory – Received account access with admin rights on 1/30; upgraded to super admin access on 3/9. Additionally received privileged access (USA2) access on 3/26.

- AWS – Received account access with admin rights on 2/1.

- Akamai – Received account access on 2/1.

- Google Suite – Received user access on 1/27; received elevated Google p0 access 2/1.

- GLAAS – Received account access with admin rights on 2/1. Received back-end access on 3/9.

- Phoenix – Received account access with admin rights and back-end access, including user controls on 3/9.

- HR Connect – Received account access with admin rights on 2/2.

- GovTA – Received account access with admin rights on 2/2.

- EC2 – Received account access with admin rights on 2/1.

- Azure – Received account access with admin rights on 2/1.

**Gavin Kliger**

Gavin Kliger had access to the following systems on the corresponding dates:

- CCure – Received account access with admin rights on 1/31; additional elevated permissions on 3/9.

- USAID Active Directory – Received account access with admin rights on 1/30; upgraded to super admin access on 3/9. Additionally received privileged access (USA2) access on 3/26.

- AWS – Received account access with admin rights on 2/1.

- Akamai – Received account access on 2/1.

- Google Suite – Received user access on 1/27; received elevated Google p0 access 2/1.

- GLAAS – Received account access with admin rights on 2/1. Received back-end access on 3/9.

- Phoenix – Received account access with admin rights and back-end access, including user controls on 3/9.

- HR Connect – Received account access with admin rights on 2/2.

- GovTA – Received account access with admin rights on 2/2.

6

- EC2 – Received account access with admin rights on 2/1.

- Azure – Received account access with admin rights on 2/1.

**Steve Davis**

Steve Davis had access to the following systems on the corresponding dates:

- Steve Davis did not gain new access to systems or elevated permissions within the specified time period.

**Noah Peters**

Noah Peters had access to the following systems on the corresponding dates:

- Noah Peters did not gain new access to systems or elevated permissions within the specified time period.

**Jeremy Lewin**

Jeremy Lewin had access to the following systems on the corresponding dates:

- Jeremy Lewin did not gain new access to systems or elevated permissions within the specified time period.

**Clayton Cromer**

Clayton Cromer had access to the following systems on the corresponding dates:

- Clayton Cromer did not gain new access to systems or elevated permissions within the specified time period.

As reflected in an email dated January 31, 2025, Jason Gray authorized Messrs. Farritor and Kliger to have administrative access to all unclassified USAID information systems. The elevated access Messrs. Farritor and Kliger received on or about March 9, 2025, was authorized by Kenneth Jackson and Peter Marocco.

**INTERROGATORY NO. 2:** Identify the level of security clearance and level of badging access to USAID doors for Luke Farritor, Gavin Kliger, Steve Davis, Noah Peters, Jeremy Lewin, Clayton Cromer at all times between January 27, 2025 and March 31, 2025. If any individual's security clearance or badge access levels changed during this time frame, indicate the updated level of badge access and security clearance and the date(s) on which the access level changed.

**Objections:**  Defendants incorporate by reference the above objections.  Additionally, challenges to administrative agency action are ordinarily not subject to discovery outside any administrative record. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Defendants further object that this request is unduly burdensome and not proportional to the needs of this case, insofar as Plaintiffs' claims are limited to the Appointments Clause and the separation of powers, neither of which are implicated by agency decisions to grant certain identified individuals physical access to agency data systems.  Defendants also object to the interrogatory because it invades the privacy interests of third-party individuals.  Defendants further object to the extent that the information requested is not within the possession, custody, or control of USAID.

**Response:**

USAID does not maintain records of the security clearances maintained by government personnel that are employed by other agencies, and has no record of a security clearance issued to or held by those individuals during that timeframe.  USAID has searched available databases and found no records of badges being issued by USAID to those individuals during that timeframe, based on information currently available.

Dated: January 15, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

DIANE KELLEHER
Director, Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Branch Director, Federal Programs Branch

*/s/ Jacob S. Siler*
CHRISTOPHER M. LYNCH
(DC Bar No. 1049152)
JACOB S. SILER (DC Bar No. 1003383)
JAMES J. WEN (NY Bar No. 5422126)
*By Special Appearance*
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 353-4556
Email: jacob.s.siler@usdoj.gov

*Attorneys for Defendants*

9

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing interrogatory responses of the United States Agency for International Development are true and correct, to the best of my knowledge based on personal knowledge or information that was made known to me in the course of my official duties.

Dated: January 15, 2025

/s/    Mengchin Yao    Digitally signed by Mengchin Yao
Date: 2026.01.15 19:32:57 -05'00'

# Exhibit 16

Case 8:25-cv-00462-TDC    Document 246-1    Filed 08/06/26    Page 149 of 343



**Lindsey Willis**

# Fwd: Physical and Logical Administration for Gavin

**Steven Hernandez** ██████████████████████                            Fri, Jan 31, 2025 at 7:06 PM
To: Lindsey Willis ████████████████

Steven G Hernandez
MBA, CISSP, CISA, CNSS, CSSLP, CDPSE, SSCP, CGRC, ITIL
Acting CIO
DCIO|CISO|CPO
United States Agency for International Development
My Availability: HTML

*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as you ever can*
-- John Wesley

---------- Forwarded message ---------
From: **Zecharia Kahn** ████████████████
Date: Fri, Jan 31, 2025 at 4:50 PM
Subject: Fwd: Physical and Logical Administration for Gavin
To: Steven Hernandez ████████████████████████████, Brian McGill ████████████████████

FYI

--
Zecharia (Zack) Kahn
Office of the Chief Information Officer
U.S. Agency for International Development
Office ████████████████
Cell - ( ████████████
████████████████

---------- Forwarded message ---------
From: **Jason Gray** ████████████████████
Date: Fri, Jan 31, 2025 at 4:49 PM
Subject: Re: Physical and Logical Administration for Gavin
To: Luke Farritor ████████████████████
Cc: Gavin Kliger ████████████████ jeremy.lewin ████████████████████████, Zecharia Kahn ████████████████, Patrick Butler ████████████

Hello,

Yes, I approve of administrative access to all unclassified information systems, including but not limited to Phoenix, HR systems, Badging and Access Systems, cloud environments, and all systems related to grants, payments, and vouchers.

Thank you,

Jason

On Fri, Jan 31, 2025 at 4:46 PM Luke Farritor ████████████████████ wrote:
> Jason,

DOE4vUSDS_000602

Just want you to confirm that Gavin Kliger of DOGE should also have full read/write administrative access for managing Physical and Logical access, like myself.

Luke

DOE4vUSDS_000603

# Exhibit 17

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


J. DOE 4, ET AL.,

      Plaintiffs,

vs.            CIVIL ACTION NO. 8:25-cv-00462-TDC

ELON MUSK, ET AL.,

      Defendants.

_____


REMOTE VIDEOTAPED DEPOSITION OF


JASON K. GRAY


TAKEN ON

TUESDAY, FEBRUARY 3, 2026

11:11 A.M.


SHULMAN ROGERS

1100 NEW YORK AVENUE NORTHWEST, SUITE 800

WASHINGTON, DC 20005

JASON GRAY                        February 03, 2026                              2 to 5
93681

---

Page 2

REMOTE APPEARANCES

Appearing on behalf of the Plaintiffs:

REBECCA "BETH" STEVENS, ESQUIRE

ANDREW SILBERSTEIN, ESQUIRE

Marziani, Stevens & Gonzalez, PLLC

500 West Second Street, Suite 1900

Austin, Texas 78701

(361) 437-9081

bstevens@msgpllc.com

-AND-

ANDREW H. WARREN, ESQUIRE

TIANNA J. MAYS, ESQUIRE

Democracy Defenders Fund

600 Pennsylvania Avenue Southeast, Suite 15180

Washington, DC 20005

(202) 662-8383

andrew@democracydefenders.org

tianna@democracydefenders.org

---

Page 3

REMOTE APPEARANCES (CONTINUED)

Appearing on behalf of the Plaintiffs:

RICHARD H. HEIMANN, ESQUIRE

NICOLE RUBIN, ESQUIRE

Lieff, Cabraser, Heimann & Bernstein, LLP

275 Battery Street, Suite 2900

San Francisco, California 94111

(415) 956-1000

rheimann@lchb.com

nrubin@lchb.com

Appearing on behalf of the Defendants:

JAMES J. WEN, ESQUIRE

CHRISTOPHER M. LYNCH, ESQUIRE

JACOB S. SILER, ESQUIRE

United States Department of Justice

1100 L Street Northwest, Room 11206

Washington, DC 20005

(202) 616-8185

james.j.wen@usdoj.gov

christopher.m.lynch@usdoj.gov

jacob.s.siler@usdoj.gov

---

Page 4

REMOTE APPEARANCES (CONTINUED)

Also Present:

Jehieli Luevanos-Ovalle, Paralegal, Democracy

Defenders Fund

Christine Tolver, Onsite Laptop Support

---

Page 5

EXAMINATION INDEX

                                                    PAGE

EXAMINATION BY MS. STEVENS                            9

---

JASON GRAY                      February 03, 2026                          6 to 9
93681

Page 6

EXHIBIT INDEX

| EXHIBIT NO. | | PAGE |
|---|---|---|
| 1 | ORGANIZATION CHART | 24 |
| 2 | CALENDAR | 56 |
| 3 | DOCUMENT | 72 |
| 4 | DOCUMENT | 72 |
| 5 | ACTION MEMO | 75 |
| 6 | ADMINISTRATIVE LEAVE NOTICE | 92 |
| 7 | ORDER | 141 |
| 8 | EMAIL AUTHORIZATION FOR ACCESS CONTROL INFORMATION | 152 |
| 9 | EMAIL PHYSICAL AND LOGICAL ADMINISTRATION FOR GAVIN | 156 |
| 10 | EMAIL AID INTENDED COMMS | 164 |
| 11 | EMAIL BUILDING ACCESS | 170 |
| 12 | EMAIL ACCESS TODAY | 178 |
| 13 | EMAIL LPA LEAVE TEMPLATE | 189 |
| 14 | GMAIL CHAT | 195 |
| 15 | EMAIL REQUEST INFORMATION | 197 |
| 16 | EMAIL REQUEST INFORMATION | 198 |
| 17 | APPOINTMENT OF PETER MAROCCO | 199 |
| 18 | EMAIL ACTION MEMO | 204 |
| 19 | EMAIL FYI | 207 |
| 20 | EMAIL FYI | |

Page 7

207

EXHIBIT INDEX CONTINUED

| EXHIBIT NO. | | PAGE |
|---|---|---|
| 21 | EMAIL USAID MEMO | 210 |
| 22 | EMAIL PLACEMENT OF CHCO | 215 |
| 23 | EMAIL INVESTIGATIVE LEAVE NOTICES | 217 |
| 24 | ACCESS REQUESTS | 223 |
| 25 | EMAIL 507-2 FOIA ACTION | 230 |

Page 8

REMOTE VIDEOTAPED DEPOSITION OF

JASON K. GRAY

TAKEN ON

TUESDAY, FEBRUARY 3, 2026

11:11 A.M.

THE VIDEOGRAPHER:  We are on the record. The time is 11:11 a.m.  The date is February 3rd, 2026. This is the beginning of the deposition of Jason Gray. Case caption is J.  Does 1-26 versus Department of Government Efficiency.

Will counsel please introduce themselves and state whom they represent.

MS. STEVENS:  Beth Stevens on behalf of the plaintiffs.

MR. WARREN:  Andrew Warren on behalf of the plaintiffs.

MS. MAYS:  Tianna Mays on behalf of the plaintiffs.

MS. LUEVANOS:  Jehieli Luevanos on behalf of the plaintiffs.

MR. WEN:  James Wen on behalf of defendants.

MR. LYNCH:  Chris Lynch on behalf of defendants.

Page 9

MR. SILER:  Jacob Siler for the defendants.

THE VIDEOGRAPHER:  Our court reporter will swear in the witness.

THE REPORTER: All right.  Mr. Gray, please raise your right hand.  Do you affirm under penalty of perjury that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE DEPONENT:  I do.

THE REPORTER:  Thank you so much.

Counsel, please proceed.

MS. STEVENS:  Okay.  Thank you. JASON K. GRAY, having been first duly affirmed to tell the truth, was examined, and testified as follows:

EXAMINATION

BY MS. STEVENS:

Q.  Good morning, Mr. Gray.  Thank you so much for being here with us.  Could you please state your full name for the record?

A.  Yes.  It's Jason Kirk Gray, G-R-A-Y.

Q.  Okay.  Thank you.  First, we're going to go over some expectations for how the deposition will go, talk about some general ground rules.  Then

Page 10

we'll get into your background.  And then finally, we'll get to what this case is about and your recollection of events that occurred mostly in early 2025.  Does that sound okay?

A.  Yes.

Q.  Okay.  Great.  Have you had your deposition taken before?

A.  No.

Q.  So, there are a few ground rules.  The court reporter mentioned one of them, which is that we should make sure to finish our sentences before the other person starts talking.  So I'll do my best to allow you to finish your answer before I start my next question. If you will allow me to finish my question before you answer, that would be very helpful.  Does that make sense?

A.  Yes.

Q.  Okay.  And then for the court reporter, and just for clarity, it is important that you answer questions in the affirmative or the negative rather than huh-uh or uh-huh or nodding your head. If you'll just say your answer out loud, does that make sense?

A.  Yes.

Q.  Okay.  And then if -- if I phrase a

Page 11

question poorly, which might happen, if you don't understand my question, will you please ask me to rephrase it if you don't understand it?

A.  Yes.

Q.  Okay.  And if you -- if you don't ask me to rephrase it, is it fair to assume that you did understand my question?

A.  Yes.

Q.  I will be asking about, especially when we get into early 2025, I'll be asking about your recollection of events from that time frame.  And there is, of course, a difference between, no, I don't know, and the answer no.  And so I just ask you to be clear in your response on which one of those is the answer at the time.  Does that make sense?

A.  Yes.

Q.  All right.  You've been sworn in, which means you're under oath today.  Is there any reason that you cannot give a true and a -- a truthful testimony today?

A.  No.

Q.  Do you understand that during the course of our deposition, we'll take breaks.  We'll come back on the record.  During the course of our time

Page 12

today, that you shouldn't communicate with anyone else about the substance of your testimony.  Do you understand that?

A.  Yes.

Q.  Okay.  As I mentioned, we might take breaks through the course of your testimony.  If you need a break, if you will just let me know, we can pause.  I just ask you to finish answering the question that's on the table before we take that break.  Does that make sense?

A.  Yes.

Q.  Okay.  And then finally, you see there are lots of attorneys in the room, both physically in the room, and then we've got folks on the -- attending by Zoom.

As I ask questions, opposing counsel, the government, they might object to some of the questions that I ask.  That's normal for the course of a deposition.  But unless someone specifically instructs you not to answer, you'll go ahead and answer the question.  Does that make sense to you?

A.  Yes.

Q.  Okay.  All right.  Did you bring any documents with you today?

A.  No.

Page 13

Q.  All right.  Do you understand that through the course of the deposition, you shouldn't look at any documents that -- that you don't share with me while we're --

A.  Yes.

Q.  -- talking?  Okay.  All right.  So let's turn to today's deposition.  What did you do to prepare for the deposition?

A.  Just a lot of reflection.

Q.  Okay.  And can you tell me a little bit more about that, just --

A.  Well, given that it was close on the anniversary of when everything happened, there was a lot of reflection, just naturally on what happened, how it happened, where I am, the events that happened. Just a lot of, like, internal reflection about the -- the last year of my life.

Q.  Is it fair to say that the -- the word reflection here means thinking about --

A.  Yes.

Q.  -- the last year?  Okay.  And did you talk to anybody as you were going through those preparations?

A.  I -- I talked to my wife to say that I was reflecting, but not actually on the events.

Page 14

Q. Okay. Talked to her about the -- not about the substance of this --

A. Correct.

Q. Did you review any documents in preparation for today?

A. No.

Q. Did you talk with the counsel for the Department of Justice?

A. Yes.

Q. Did you -- can you tell me when you all spoke?

A. Yesterday.

Q. Okay. And how long was that conversation?

A. An hour and a half.

Q. Okay. Was that in -- to prepare you for today's deposition?

A. Yes. It was to get inform -- I've never been through a deposition before, and I wanted to know what to expect.

Q. Okay. So you talked about expectations for the deposition?

A. Objection. Calls for information protected by attorney-client privilege.

Q. Okay. So you talked with the DOJ for about an hour and a half. Did they show you any

Page 15

documents?

A. Yes.

Q. Okay. Were those documents -- just don't tell me exactly what documents. Can you generally describe the types of documents that you looked at?

A. An email.

Q. Just one email?

A. Two.

Q. Okay. And from when were those emails?

A. One was February 1st, and I don't remember the second. I didn't look at the date.

Q. Okay. And did you read through those email?

A. I did.

Q. Do you have them with you today?

A. I do not.

Q. Did you -- a second. Are those the only documents that you looked at during the course of your conversation with --

A. Yes.

Q. -- the DOJ?

MR. WEN: Objection. Asked and answered.

BY MS. STEVENS:

Q. Go ahead. You can answer.

A. Yes.

Page 16

Q. Besides the about an hour and a half conversation with the DOJ yesterday, did you have any other discussions with them?

A. A phone conversation, yes.

Q. And how long was that?

A. Maybe a few minutes.

Q. And who was that conversation with?

A. I believe -- I'm not entirely sure. I think it was --

Q. Chris?

A. -- Chris.

Q. Okay. Thank you. And was anyone else besides yourself present with the DOJ during the conversation yesterday?

A. No.

Q. All right. Did you talk to anyone else in preparation for today?

A. No.

Q. During the conversation with the DOJ, were you instructed on how to answer specific questions?

MR. WEN: Objection. That's information protected by the attorney-client privilege.

MS. STEVENS: I disagree. The attorney can't tell the witness how to answer. I didn't ask if you gave advice or --

Page 17

MR. WEN: I think you're asking about what we talked about.

MS. STEVENS: I'm specifically not asking what you talked about. I'm specifically asking were -- were you given direction about how to answer specific questions. He can answer yes or no questions.

MR. WEN: Can -- rephrase.

THE REPORTER: I'm sorry. I'm sorry to interrupt. Who was making the objections? I just want to make sure I'm clear.

MR. WEN: Sorry. That -- that's James Wen, W-E-N, Department of Justice for defendants.

THE REPORTER: Got it. Thank you.

MS. STEVENS: What was the -- what was the end result of that?

MR. WEN: I think -- I think you can rephrase the question to make that clear.

BY MS. STEVENS:

Q. Mr. Gray, did -- were you given specific instruction about how to answer specific questions during the conversation with the DOJ?

A. No.

Q. Okay. Turning to the case at hand. So you're here to provide some testimony in a case

Page 18

where we are challenging a couple of things that the -- that are related to the dismantling of the United States Agency for International Development, which I will call USAID, probably from here on out, okay?

A. Okay. Yes.

Q. All right. So you don't need to know the full details of the entire case, but it's helpful to kind of narrow in on -- on the two claims that we're making.

One is, we're challenging the dismantling of USAID because we believe the decisions around that should have been made by Congress, rather than the executive branch. So that's a separation of powers claim.

And then we're also challenging some actions made -- taken by Elon Musk and DOGE with respect to the closing of USAID because we think that those -- that conduct violates the appointments clause of the Constitution.

So that's just sort of some background information as we as we go in.

A. Okay.

Q. You understand that you're not a defendant in this case?

A. Yes.

Page 19

Q. Okay. And that you're -- you're a witness?

A. Yes.

Q. All right. Okay. Let's talk about you.

A. Okay.

Q. So where are you originally from?

A. So I was born in Canada, and at age 4 moved to California, and at age 9 moved to Hawaii and grew up in Hawaii on the Big Island.

Q. Great. And do you -- go ahead.

A. I was just -- sorry. That's a -- it's a complicated life, so -- but --

Q. It sounds exciting. Did you -- do you have any degrees or certificates?

A. Yes. I have a bachelor's degree in information technology from American Intercontinental University, and a master's degree in business administration from Colorado Technical University.

And I also have a certified information system security professional, CISSP, from ISC Squared. And I have a PMP, a project management professional certification. Those are the majority of them.

Q. Okay. And the bachelor's degree from

Page 20

American -- it's a long name -- where is that university located?

A. It was an online university, but they're in Illinois.

Q. Okay. And about what year did you receive your bachelor's?

A. 2007, 6 or 7.

Q. And the master's?

A. The following year. So 2000 -- so it was maybe 2005 for the bachelor's and 2007 for the master's.

Q. Okay. After you obtained those degrees, can you -- can you give me, like, a high level overview of your professional experience?

A. So I was working for Lockheed Martin at the time. And when I graduated, I ended up transitioning to become a federal employee working for the National Naval Medical Center in Bethesda as a chief technology officer there. I transitioned from there after a couple of years to the Joint Task Force, which was a -- a joint task force cabinet, specifically with the base realignment and construction of Walter Reed to the National Naval Medical Center.

And then from there, I transitioned to

Page 21

Miami to work for the VA as a CIO of the Miami VA Healthcare Hospital down there in Miami.

And after about a year, I transitioned to the acting associate director of the hospital down there for about seven months. And then after that, I transitioned -- sorry, this is going to be a bit.

Q. No, that's okay.

A. After that, I transitioned to work for the Defense Department in Monterrey, California for DMDC. And I did that for one year and then transitioned to work for the Veterans Administration as a senior advisor customer advocate for benefits between the CIO and the undersecretary for benefits.

And then after that, I transitioned to the Department of Transportation to be the associate CIO for portfolio, basically portfolio management of the IT portfolio. And after that, I transitioned to the Department of Education for about six years, a little over six years as their CIO. And then I transitioned to US A-I-D or USAID for three years until I was RIF'ed.

Q. The DMDC, can you tell us what that stands for?

A. Defense Manpower Data Center. It is the defense agency that manages the human resource

Page 22

system for all of the defense department called DEERS.

Q. Is it -- do I have it correct that you were working at Lockheed Martin at the time that you were going to school to get your bachelor's and master's?

A. Yes.

Q. Okay. And is it correct to say that after you received your master's degree, all of the other work experience that you just described is in the information technology space?

A. Yes.

Q. Where do you work now?

A. I work for a company called Box, Incorporated.

Q. And since when have you worked there?

A. Since -- since September 8th of 2025.

Q. All right. Turning your attention back to -- did you -- do you call it USAID or US A-I-D?

A. All of the above. Aid, USAID, US A-I-D, either --

Q. Okay.

A. -- or all is fine.

Q. Well, we'll see -- we'll see how it flows. Turning your attention back to USAID. For how long

Page 23

-- I think you might have touched on this, but to -- to narrow in, can you describe your -- what I estimate are three different roles at USAID, starting with CIO and then -- and then what you covered for the time that you were there in the -- the years there?

A. Yes. So when I first got there, which was in August of 2022, I was appointed as their CIO. And then in January of 2025, in during inauguration, I found out that I was going to be the acting administrator, which lasted for 11 days.

And then I was told I was being transitioned back to being the CIO, but that I was also going to be kept in the front office as, like, a senior advisor for the agency. So those are the three roles while also being the CIO.

Q. A dual role at the end, correct?

A. Correct. Yes.

Q. Okay. So, I want to turn your attention -- first, we'll talk about your roles and responsibilities with respect to being chief information officer. And then we will get to, of course, the time that you were acting, and then we'll also touch on your dual roles after that.

But first, pre January 20th of 2025, and

Page 24

if I say a date that you don't know the year for, I will probably be talking about 2025. But if you -- ask me if I -- if I state it in a way that you don't understand.

A. Yes.

Q. Okay. So first, These are --

MR. WEN: These are blanks.

MS. STEVENS: Oh.

MR. WEN: Yep.

MS. STEVENS: Okay. We are on the fly. Doing exhibit stickers with blank stickers. Thank you. Yeah.

MR. WEN: Plaintiffs.

MS. STEVENS: All right. So I'm handing you what we are right now marking as Plaintiff's Exhibit 1.

(WHEREUPON, Exhibit 1 was marked for identification.)

BY MS. STEVENS:

Q. And this is an organization chart, and it has at the bottom right, I'm just going to do the numbers, but the Bates numbers are 270. So this is produced by -- by the government to us. That's how you know at the bottom right, it's got those numbers on it.

Page 25

A. This says 271.

Q. Oh, well, printed off the wrong copy. Okay. All right. I'm going to give you my copy.

MR. WEN: We want 270?

MS. STEVENS: We need -- we need 270. But I'm going to show this to the government. We will print you all copies.

MR. WEN: (Inaudible) print a copy?

MS. STEVENS: Yeah. Well, could we print it from the -- the production so I can talk with him about it? I can -- I can also do it on a break if you all are comfortable --

MR. LYNCH: Do you want to take a break?

MR. WEN: Yeah. Whatever -- that works.

MR. LYNCH: You just want to take a break just to get this sorted out and --

MS. STEVENS: Well, it'll -- it will -- I only have, like, two questions.

MR. LYNCH: Yeah. Go for it.

MS. STEVENS: Okay.

MR. LYNCH: So we -- we rebranding, this is number one and --

MS. STEVENS: Yes.

MR. LYNCH: -- forgetting about that. Okay.

JASON GRAY                    February 03, 2026                    26 to 29
93681

Page 26

MS. STEVENS: That's right.

MR. LYNCH: Just keeping track.

MS. STEVENS: So 271, Bates 271, we are not using. We're using Bates 270, which we've marked as Plaintiff's Exhibit 1.

BY MS. STEVENS:

Q. Could you look -- look over this for a moment, Mr. Gray, and tell me if it reflects the way the organization was organized as of January 20th, 2025?

A. Yes.

Q. Can you tell me which -- which square or rectangle the chief information office and your -- your position fit?

A. Yes, I can. So it's obviously missing from this because it was dual -- a dual aligned position, meaning I reported directly to the administrator. So it was another box here on this, and then through the Bureau for Management.

So that would be -- sorry, this looks actually a little blurry to me, but the Bureau for Management right here, the CIO for -- technically fell under the Bureau for Management, but I reported through and had my performance plan done through the administrator and the deputy administrator for

Page 27

resource management.

Q. Understood. Okay. And so I just want to articulate for the record a little bit about what you've just been pointing at on the exhibit.

So on the exhibit, right up top in the middle, it says, administrator, and shooting off to the right is Office of the General Counsel and Executive Secretariat. And you're saying the CIO would -- would also have a little branch off to the right?

A. Yes, they would.

Q. Okay. Thank you. All right. So you -- you addressed this a little bit, but your -- who was your direct supervisor when you were CIO?

A. My direct supervisor was Paloma Adams-Allen, the deputy administrator for resource management -- or management of resources, DAMR.

Q. And is that a political appointee?

A. Yes.

Q. Was that person the deputy administrator for resource management throughout your time as CIO?

A. The majority, but she ended up leaving, and then Dennis Vega took over as acting, and then Dennis ended up leaving, and then Michele Sumilas took over and was there through the end of the prior

Page 28

administration.

Q. So there until January 19th, 2025?

A. Yes.

Q. Okay. And that role, I -- I said it was political, but to be a little more clear about that, that's a political appointment that's also confirmed by the senate; is that right?

A. I believe so, yes.

Q. So that's who your direct supervisor was. Who -- what roles did you supervise as CIO?

A. So I supervised the director for operations and the governance team that did governance, portfolio management, budget, and acquisition. I supervised the chief technologist. I supervised the chief data officer. I also supervised the cybersecurity information assurance branch, all within the office of the CIO.

Q. And could you describe for us at a high level, what your duties and responsibilities were as CIO?

A. Yes. So it was delivering IT services, operational services, specifically to the 80 plus countries that we operated out of, meaning email services, laptops, cell phone services, protecting and securing that information, and making sure that

Page 29

it was up and operational.

Also, on the security side, making sure that threats were, you know, detected and prevented and secured and mitigated. And then on the governance side, doing portfolio management, making sure I understood all of our IT investments and how much we spent on them, the cost, schedule, risk, performance.

And then on the acquisition side, managing IT acquisitions, meaning people who manage the IT acquisitions. And then as AI became clear, working through the chief data officer who also reported to me and the chief technologist to strategically plan for the future and make sure that IT services could be delivered to support the mission of humanitarian assistance, global health, and the work that was done at USAID.

Q. How big was your team that you supervised?

A. So I had a -- a staffing count of 105 civil servants. I don't believe I actually -- I waited over a year, sometimes two years to try and fill. So I don't think I ever got to 105. And that was primarily a direct hire as it's called at USAID, which are civil service. And I had one foreign service officer who was my deputy and -- or senior

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

JASON GRAY                              February 03, 2026                        30 to 33
93681

Page 30

deputy is what he was called.

And then there are -- was around 250 foreign service nationals all around the world who delivered IT support and services at each of the missions. They didn't directly report through me and my team, but there was a, you know, we worked very, very closely together. They got their guidance and direction from me and my team as it relates to security, governance, and operations.

Q. Did you have any contractors that worked --

A. Yes.

Q. -- for your team?

A. So we had around 800 contractors that also supported services. I would say the majority of them were all in the US, and that was the 24/7 365 help desk because we needed to make sure that we could answer calls through all time zones.

Also, like, the security services, the governance services that I talked about, doing portfolio management, responding to, like, project management, those types of activities, even administrative services, like my executive assistant was a contractor, so yes.

Q. Your senior deputy, what -- who was that?

Page 31

A. Luis Hernandez.

Q. And was Luis there -- well, how long was Luis there?

A. I believe he came in July of '24, I believe. He wasn't there very long. It might have been 20 -- I think it was July. I want to say July of '24. It might have been July of '23, but I think it was July of '24. And then he was RIF'ed, you know, like everyone else.

Q. What is the CIO Council?

A. It says low battery.

Q. Well, that's a problem.

A. Yeah.

MS. STEVENS: Let's see. We're pausing for low battery issues.

How's that?

THE VIDEOGRAPHER: Would you like to go off the record, Counsel?

MS. STEVENS: Well, let's see. Maybe. No. I think we're good.

THE VIDEOGRAPHER: Okay.

MS. STEVENS: Okay. So maybe the outlet.

BY MS. STEVENS:

Q. Okay. I think my last question was, and I will re-ask it, is: What is the CIO Council?

Page 32

A. So the CIO Council is a government-wide council where cabinet level CIOs attend usually monthly to collaborate and work together and ideally deliver better IT services across the federal government.

Q. Can you explain just for those of us outside the government, what cabinet level CIO means?

A. So the -- I think that is different now. But at the time, there were 20-some cabinet level agencies, meaning they sat -- again, my understanding is that they sat and attended the president's management council with the senior leadership from the White House to represent the -- the cabinet of the president.

Q. And so the CIO -- I'm just rephrasing to make sure I'm understanding you correctly. The CIOs for those agencies made up the CIO Council?

A. Yes.

Q. Okay. Well --

A. There was also a representative from the smalls, as they called it, which are the smaller agencies which were not. But yes, there was -- so yes.

Q. One -- one representative from the smalls;

Page 33

is that correct?

A. Yes. That is correct.

Q. Okay. And what was your role on the council?

A. So I was a member, but I was also the co-chair and then the tri-chair of the workforce committee for multiple years. Four or five years, maybe -- so maybe six or seven years. It was -- I don't remember exactly when.

Q. And that spanned your time at USAID and the Department of Education.

A. Department of Education.

Q. Okay. What is the -- what was the -- did you say workforce?

A. The workforce committee.

Q. What did the committee do?

A. It was primarily focused on the workforce. So looking at reskilling and upskilling the workforce from a technology standpoint. We did women in IT events to recognize women and promote, you know, events for -- for female IT professionals across government. Looked at standardizing workforce-related activities, like developing standardized position descriptions for technologists so that we could share across all of government and

Page 34

-- so do once and use many.

Q. So the focus was on -- is -- is this correct -- the tech -- information technology workforce, not the entire government's workforce; is that correct?

A. That is correct. But we did work with, like, the CHCO Council as well because we wanted to make sure we weren't operating in a vacuum.

Q. And would you unpack CHCO?

A. The Chief Human Capital Officer.

Q. And they have a --

A. Council. They have a similar council, and we realized that it's great for us to have a workforce committee, but we should collaborate with the people who are running the workforce for the whole federal government.

Q. Understood. All right. So back -- back to you specifically. What -- what -- at the -- in January of 2025, what was your level of security clearance?

A. Top Secret SCI, Special Compartmental Information.

Q. Is that still your -- your clearance level?

A. Yes.

Page 35

Q. Okay. When did you obtain that level?

A. I obtained that level, I want to say it was October of 2016.

Q. Where were you working at the time?

A. The Department of Education.

Q. What did you -- what process did you undergo to obtain that clearance?

A. So I started the process when I worked for the Department of the Navy and went through and applied for a -- a clearance, which was going through and submitting an e-QIP, I think it is what it's called, and filling out a bunch of information for the last ten years of my life, going through that process.

Q. Does e-QIP stand for the name of the form that you were filling out?

A. Yes.

Q. Okay.

A. E-Q-I-P, I think it is what it is.

Q. Okay. And after you filled out the form, did you have to engage with anyone asking follow-up questions? What happened next?

A. Yeah. So well, I'm not a professional on that process, but --

Q. Right.

Page 36

A. -- what -- what ended up happening is they go -- and there's investigators that go and validate the information that you submit. And then you have to part of the process is providing names of people and addresses and phone numbers, and they go and talk to them.

And then they have a follow-up interview with you, and then they ask you a bunch of questions that are standardized. And after that, they then go and talk to people who know you, witnesses, people you work with, friends, family, friends of friends, to learn about you, your background, yeah.

Q. Okay. After all the -- the conversations, did you have to do anything else with respect to the investigation before they determined your level of clearance?

A. Yes. So first, you get a top secret, and then once you get that, then I believe it goes to the CIA for a further investigation. Again, I'm not a professional on this. This is just my understanding.

And then however long that process takes, and whatever they do, I don't know. And then it comes back to your security office and they tell you that you're cleared, and then you go in and are read

Page 37

in -- in a SCIF, a secured compartmental information F. I'm not sure what it stands for, but you go in and they give you the rules. You sign and swear, and then you have the clearance.

Q. And the -- the process you just described of going into the SCIF and being read the rules, is that for top secret or top secret plus that other --

A. It's for both.

Q. -- designation? Okay. Did you have to undergo any sort of training related to the clearance?

A. Yes. There's online training that you have to do and in person training that you're given inside of a SCIF as you're giving your clearance.

Q. Are the -- can you just describe the, like, at a high level, what the -- the topics of the training are?

A. So I'm -- I don't know if it's classified material. So I -- the -- the types of training are, like, insider threat. It -- it varies based on the agency. But in essence, it's being aware about the importance of having access to national security information, roles, responsibilities, types of things that you should look for, you know, people, you know, foreign influence, those types of things,

Page 38

gifts.

So it's -- it's, I would say, basic security training that is given, but just more in depth, specific to the types of threats that you may face in the role that you're in.

Q.  So did you undergo two different readings on the rules that you just described at the Department of Education and then --

A.  Yes.

Q.  -- another one at US A-I-D?

A.  Yes.

Q.  Okay.  Did you have to sign any documents acknowledging that you went through that rules read in?

A.  Yes.

Q.  Did the -- did the person who provided that rule read in to you also have to sign any documents?

A.  I believe so.  I'm not entirely sure, but I know we were given forms.  It was, I want to say a class.  It was a small group of people.  It wasn't just me.  You're given a standard form, I believe it was, and you sign it that you've attended the training, and they sign it saying that you have attended, but you don't -- I don't get a copy of

Page 39

that form that is kept. But I believe they signed it, yes.

Q.  Understood.  When you were at USAID, could you give us a rundown of the systems that you -- that were under your purview as CIO?

A.  So I can't give you a full list because when it was only two and a half years and there's over 100 systems that were there.  But for example, the Google Suite was a key one, which was our email services, our document, you know, management and collaboration, creation tool, spreadsheets.

So the Google Suite also it managed all of our meetings and calendars, our virtual meeting, BTC. There's something called Aidnet, which is the actual network, the government network, that was authorized. There was the financial management system called Phoenix.

There's another system called Glass, which is an acquisition system.  There, like, GovTA, it was webTA, then became GovTA.  So those types, another one called DIS.  So there's a full range of different types of IT services and systems. ServiceNow was another.

We use Salesforce for our customer relationship management tool.  We used E2 Travel to

Page 40

manage travel for the agency.  So there's -- there's a lot of them, and I don't -- I don't know all of them. If you showed me a list, I could -- I could tell you, but yeah.

Q.  I'm going to ask you about a few of them.

A.  Okay.

Q.  If you'll just give me the high level of what this thing does.

A.  Okay.

Q.  Sort of like you were just doing with Glass and Phoenix.  You said, I think, DIS.  What what was that system?

A.  So that is a really good question.  I had a lot of problems with that.  Which again, when I first got there, I wasn't sure what it did.  I started digging into it.  We created a modernization plan to figure out what it did.

But in essence, it was where missions reported information about how the specific mission was actually performing as it related to each of their specific missions at their specific location. And that information then got fed to a thing called FaxInfo over at the State Department for, like, congressional reporting.

Q.  Got it.  Okay.  So a reporting in system

Page 41

from the various missions across the world?

A.  Yes.

Q.  Okay.  What about active directory?

A.  So active directory is basically, it is a Windows product, Microsoft Windows product, that every network around the world that uses Windows or is really a network for the most part, uses active directory.  It controls users.

So when someone is logging into an account, there's an active directory account that controls users, permissions, rights, responsibilities.  So if I were an admin, which I haven't been in many, many, many years, probably decades, active directory would identify me as that individual.

Active directory also controls a lot more. Like, it manages whether or not you have a mail server or file share.  So it's -- it is really, like, the -- the central nervous system of a computer network.

Q.  Understood.  So the -- well, let me go to a couple more and I'll come back to that.  The AWS, which I also know is pretty broad, what -- can you describe that for us?

A.  Yeah.  So AWS, which is Amazon Web

JASON GRAY                    February 03, 2026                    42 to 45
93681

Page 42

Services, is a cloud service provider. They're used throughout government and they provide mostly storage and different types of services, but mostly storage is what I believe we used it for at USAID. Putting stuff in the cloud.

Q.   Yeah.  I watched a interview you did about moving to the cloud.  Was AWS the -- the cloud system that you used once when USAID moved to the cloud?

A.   So we used a couple.  We used AWS and we used Azure, which is Microsoft because we wanted to have diversity as it relates to any redundancy.  So if one cloud goes down, you're not down.  So we used primarily Microsoft Azure, and AWS.

Q.   For AWS, are there different -- were there different instances of the system such that if you're on the CIO side, maybe a developer, you're -- you're working in a system that is different from what the -- the end users are -- are utilizing?

A.   So --

Q.   I can ask my question --

A.   Yeah.  I'm not sure I understand the question.

Q.   Were there -- was there, like, a development or test instance of within AWS that your

Page 43

folks might utilize before the -- the end users had access to a specific change being made?

A.   So there was supposed to be.  And that was something I would find out through my time as a CIO that oftentimes they were not because that contractor workforce that really managed IT operations in terms of the actual delivery of services, I would find that they were actually doing development on live systems, which you should never do, and then correct that to have them establish a test environment.

Q.   Are -- is it -- am I correct in understanding that most of the development, like, engineers doing software engineering were contractors?

A.   Primarily, yes.

Q.   Okay.  What is -- I think this relates to AWS, but if not, please tell me -- Cloud and then it sounds like the word PAW, P-A-W, all caps?

A.   I don't know.

Q.   Okay.  That's fine.  Turning your attention to -- I'm going to mispronounce this, so I'm going to spell it, A-K-A-M-A-I.

A.   Okay.

Q.   Akama -- Akamai.

Page 44

A.   Akamai?

Q.   Mm-hmm.  What is that system?

A.   So I -- I don't know what that -- I -- I know it is a -- I believe it's like a cloud brokerage service.  I -- so I'm not I'm not entirely sure.  So I -- I'm not really sure.  That I would have to look it up to -- to be honest.  I -- I'm not really sure. It's -- it is a it provides, like, network services of some type.  I know at every agency I've been at, we've used Akamai.  I'm just not entirely sure what it does because I didn't dig into that aspect of it.

Q.   On the Google Suite, you talked a little bit about the calendar system, the doc sharing, the emails. What does it mean to have super admin access on the Google Suite?

A.   So there's -- I -- I don't do and have not done systems administration in decades, so -- but what I believe it means is it gives people the ability to add other users, to remove users, to delete users, to promote other users to admin, typically.

There -- for super admin, I believe the differentiator, again, I believe, is that it would allow you to basically destroy the -- the email

Page 45

system or delete the email system itself, which is a non-recoverable error.

Q.   Did the folks that were -- you -- you said you -- you have not been a systems administrator in decades.  Were the folks that were systems administrators on the CIO team?

A.   Yes.  There -- there were, I believe, one or maybe two federal employees, and the rest were government employ -- or contractor employees working for government.

Q.   And who were the two that -- that worked for -- that were employees?

A.   I believe it was Brian Herson.  I know for -- I know he is one of them.  The other might have been Danny You.  I'm not -- I'm not entirely sure. I -- I know that Brian Herson for sure was one.

Q.   And who did they report to?

A.   They reported to Zack Kahn, who was the director for operations, IT operations.

Q.   And who did Zack report to?

A.   Me.

Q.   Okay.  Okay.  I'm going to go through a few more systems to again, on a high level, what they -- what they do.  Simicon Now (phonetic)?

A.   No idea.

Page 46

Q. Okay. Do you know what system the HR professionals in the office used?

A. I believe it was -- that system did not fall under the CIO. It was developed by HR and a contract they had, but I believe they primarily used ServiceNow.

Q. Okay. When -- if -- if that happens within the agency where a department outside of the CIO is contracting for information technology, would the CIO still be involved in some way with either the establishment of that technology or the maintenance of it?

A. So the authorization of it, absolutely, as the authorizing official. Again, that happened before I got to USAID. Otherwise, I would have never had that happen. They would have come through the CIO organization.

But for the authorization, yes. The authorizing official, which is the CIO of every -- almost every federal agency, I would say, is -- has to authorize the system to operate on the network.

Q. Got it. Understood. All right. And then just two more. Do you know what's SIDs, S-I-D?

A. I have heard it. I -- I don't really know.

Page 47

Q. That's fine. And then JWICS?

A. Yes. JWICS is a classified email system at the top secret level, which we did not administrate. I did not -- I had a JWICS account. I think I used it maybe two or three times. But yeah, we did not administrate that. That was administrated through SEC.

Q. Okay. Moving on from the systems themselves, what does it mean to have, "full administrative access," to an IT system?

A. So it would mean that they would have a full -- to be an administrator, you would have the ability to go through and modify and delete and edit.

But one of the things that all agencies had to do is have logs that were not actually tied to, from a network standpoint, they were tied to the system. Splunk is what it was and it was it is, to log actions that if people did something.

So if someone had full admin access, they would have the ability to add users, delete users, change users, demote them, and roles and permissions.

But Splunk would log those changes when that happened, which oftentimes when something

Page 48

inadvertently was broken, we would check the logs and find out that, oh, so and so inadvertently made this change, and then we would undo that change and fix what was broken.

Q. Does Splunk stand for something?

A. No. It is a product.

Q. I'm sorry?

A. It is a product.

Q. It is a product.

A. It's the name.

Q. Was that a system that you -- that was under your purview?

A. Splunk, yes.

Q. Is the -- was the sole function to track this admin changes --

A. No.

Q. -- or what else did it do?

A. So every agency was required to log everything, not just admin rights. So you -- system logs of other systems would be fed into Splunk. Splunk's entire purpose was to monitor logging.

To give you an example, for cybersecurity, I believe, on average, we would have, I want to say about 1 billion events that would happen per month. And again, those are -- this address sends this

Page 49

packet to this place, and all of those were logged every month into Splunk.

So it was at the granular technology level that that system monitored. So it wasn't -- it wasn't just for admin access. It was -- I -- I know I primarily was briefed on it for security incidents every two weeks.

Q. Thank you. When a -- a new person would come work at USAID, what protocols were in place to ensure proper authorization for access to IT systems?

A. So for -- there's a couple of processes. One I can speak to, from the first thing that would have to happen is they would have to go through HR, or HCTM, as it was called at USAID, Human Capital Talent Management. And they would put them through a vetting process that security would do.

Once security vetted them and said that they had a clear background, whether it was just a background investigation, depended on role, responsibility, which was different, meaning if someone was being vetted for a secret clearance or top secret clearance, then it would be a longer process.

Once security said they're a vetted

JASON GRAY                      February 03, 2026                      50 to 53
93681

Page 50

employee, then we would go and create them a -- a domain account so that they could be provisioned email and access to Aidnet.

Q. Would -- once they get to your part of that process you just described, would they -- would they be filling out any forms with the CIO's office?

A. Yes. So everyone would have to do training, and then there's a roles and responsibilities form that they have to fill out. There was, like, a user acceptance form that they had to fill out. So there are two primary forms. It was, like, roles and responsibilities, and I think it's a user acceptance form that they have to fill out after they've done their training, which they typically do on the first day of employment when they're onboarding.

Q. Who -- the process that you just described for new folks coming into USAID, does that apply to employees, contractors, folks transferring over from other agencies?

A. Yes. But for people transferring, for example, from the State Department, we had worked on collaborating where we shared, like, training, so that if they had been through state training, they didn't have to go through our training. They would

Page 51

still have to sign roles and responsibilities form that my team would typically manage.

Q. And you described when -- when they get to your team and getting access to the computer systems, did they have any physical paraphernalia designating their access to specific systems? Like --

MR. WEN: Objection. Vague. You can answer.

MS. STEVENS: I'm not done with the question.

BY MS. STEVENS:

Q. I'm talking like a card or anything physical that would be utilized to get access to the systems?

A. Yes.

Q. Can you describe that?

A. Yes. They either had a PIV card, or in DOD, it's called a CAC card, but it's the same thing. We also provided UB keys because some of the foreign nationals that we had did not have PIV cards. So we would provision them UB keys to access our environment using them.

Q. Can -- for the record, can you describe very briefly what a PIV card is?

Page 52

A. A PIV card is -- it's basically a flat like ID card with a chip in it that you would stick into a computer with a PIV reader to -- it's a biometric phishing resistant, multifactor authentication device that allows people that you put your email certificates on there, you put your email address on there, and it is linked with your active directory account so that when you put that card in, it is validated that you are you as a person.

Meaning, before you get the PIV card, you have your fingerprints taken, you have your picture on the card. So it -- it is a card that basically identifies physically identifies that you are who you say you are as part of the multifactor authentication that you would put into a slot on your computer and then be prompted for a pin to log into your computer and have access to the environment.

Q. And -- and to get access to the environment at USAID, you needed to go through that process, including with the PIV card; is that correct?

A. Yes. With rare exceptions. So for example, if someone forgot their PIV card, we would

Page 53

typically give them a day or two waive them from the PIV requirement where they would log in with a username and password. But that was all logged and we had to report on it every quarter, I believe.

So it was not -- usually it was go home and get your PIV card if you forgot it unless it was lost and someone needed access temporarily.

Q. Okay. And who would provide that specific authorization if -- if someone forgot their PIV card and needed to do this sort of workaround temporarily?

A. I would say either information assurance or -- meaning the security team or operations, a director at that level could make the call.

Q. And operations means with --

A. IT operations.

Q. Thank you. Okay. Turning your attention to January of 2025. Prior to January 20th, 2025, what was your understanding of the US Digital Service, which is sometimes called USDS?

A. My understanding was that they were a team of individuals who worked out of 18F over at GSA that primarily was brought in to help -- help government.

And I -- I say that because most of the

JASON GRAY                         February 03, 2026                    54 to 57
93681

Page 54

time they were the people that I interacted with were visionaries and they didn't understand government processes that -- so they would come in and say, we -- we want to do all these great things. And as a CIO, it would be like, that's wonderful, but here are all the rules that you have to do now, figure out how to do that. And they would.

But they were a team of individuals who worked across government to help agencies with their IT modernization journey and the challenges that they faced with the technical expertise that were brought in to work for USDS.

Q.   Did -- did you interact with any of them during your time as CIO at -- at USAID?

A.   I can't recall. I -- I don't -- I don't recall actually ever actually engaging with them to solve challenges. No. I know at education I did, but yeah.

Q.   I think I know the answer to this question, but it's still worth asking. Any -- any person from USDS prior to January 20th of 2025 ever detailed to USAID, to your knowledge?

A.   Not to the CIO shop.

Q.   Do you know what shop they --

A.   So again, I don't know. And I didn't say

Page 55

that, but I just -- I saying -- speaking from the CIO shop, I know that USDS was never deployed or detailed or brought to the CIO shop or MCIO as it was called.

I do know there were other pieces within USAID that prior to my arrival had focused on IT, like Bureau for Humanitarian Assistance had focused -- they had an IT shop. I don't remember what it was called, but it was rolled up under the CIO before I got there. They might have interacted with USDS, but I wouldn't know.

MS. STEVENS: Understood. That makes sense. All right. So we are now at our second exhibit, which I think is the correct one. We'll mark it as Plaintiff's 2.

(WHEREUPON, Exhibit 2 was marked for identification.)

BY MS. STEVENS:

Q.   I'm handing you what we've marked as Exhibit 2. This is a blank calendar for early 2025. It's January, February, and March. It is helpful for me to be able to look at a calendar when I'm talking about dates. And so that's -- that is the use of this exhibit in case it is helpful for your recollection.

Page 56

Okay. So turning your attention to January 2025, before inauguration day, which was January 20th, did anyone from the incoming Trump administration contact you?

A.   Yes.

Q.   Okay. Who contacted you?

A.   I don't know. I know that Clinton White, who was the counselor at USAID, had reached out and said that someone from the transition team wanted to speak to me. I don't remember their name, but I do know they were on the transition team, and I know it's in my email, meaning whoever was leading the transition team for Aid and State because it was one individual initially doing both. If I heard the probably know it, but I -- I do not know.

I was told someone from the transition team wanted to talk to me, and they called me, I want to say, maybe two weeks before inauguration, which was not uncommon because we had to provide lots of information. Every bureau and independent office had to provide, here's what our organization does, and here's how this process works.

So being told I was going to get a call from someone from the transition team was a normal thing. When they talked to me, he basically asked me

Page 57

if I would be willing to serve in a -- in a management or leadership role if the administration needed. And I said yes.

Specifically, that as a, you know, IT, you know, public servant throughout my entire career, 21 years, 20 years at the time, that I would serve where I was needed. And that was how that conversation went.

Q.   You said it would -- the name would be in your email. Is that because they emailed in advance or how --

A.   No. The name would be in the email because I was on a distribution list that identified individuals from the transition team. So we knew Hope Williams was the woman who actually led our transition orchestration on the federal employee side, career civil servant.

And the -- and again, I don't know his name, but he is the one that Clinton said, so and so wants to talk to you. Again, I don't remember his name, but he is the one who called me.

Q.   Is the name Cartwright Weiland?

A.   That is who it is.

Q.   Okay. And in this conversation with Cartwright a couple of weeks before the

Page 58

inauguration, was acting administrator mentioned at all?

A. No. And as a matter of fact, at the end of that conversation, he said, I just want to be really clear that this is not to imply or infer anything about any possible future position. I just wanted to check with you to see if you were willing to serve if needed.

Q. After that conversation, did you have any follow-up conversations about that topic of leadership?

A. Yes. I want to say maybe a day or two later, I got another call from them. And -- and it might have -- I don't recall. It might have been the same day. It was very close. At the end of the first call, they said, you know, I may call you back.

They called me back and I was on speaker. I do not know who else was in the room, but the questions were how do you deal under pressure? Have you had to speak to the press before? And I, at the time, talked about my congressional testimony that I had done and said, this is how I deal with this.

They asked me what my focus would be if I were in a leadership position, and I said it was two

Page 59

things. It was one, going to be on the transition itself, and two was going to be on creating stability within the workforce because transitions can be bumpy.

And that, again, at the end of that conversation, he said, I'm not saying anything is going to happen. I'm not promising anything. This could be going nowhere, but thank you. And that I think that conversation lasted maybe three minutes.

Q. Did you all have any follow up conversations after that second call?

A. No.

Q. At the time, you were CIO and there were two deputy administrators sort of above you in the pyramid, is that -- pyramid -- organization chart?

A. Yes.

Q. Okay. And then from there would have been the administrator; is that correct?

A. Yes. So there's -- there's three individuals. There's two deputy administrators, the DAPP, deputy administrator for policy and planning, I believe it is what it might be, policy and programs, PP. And then Isobel Coleman was in that role up until the very end.

And then the deputy administrator for

Page 60

Management Resources, which at the time was Michele Sumilas, and then the senior foreign service officer, which is Clinton White, who was considered a part of that same level of leadership.

Q. Understood. All right. So let's turn to -- actually, did you have any conversations besides those two you talked about with Mr. Wainwright --

A. Cartwright.

Q. Cartwright. Sorry. Cartwright Weiland. Did you have any conversations with any other folks from the incoming Trump administration before January 20th of 25?

A. No.

Q. So I think we all know you were appointed acting administrator at some point on the 20th. Can you -- can you tell us how that came to be?

A. Yes. So as the CIO, every administration change, I have gone in during inauguration, primarily to focus and make sure that IT services are delivered, meaning that they get their laptops, they get their PIV cards, that they have access, and that they know how to, you know, use equipment, they get cell phones. That is standard. I would say, almost all CIOs do that, every transition.

I did that on the 20th, came in with a

Page 61

small group of my team to help support the new political team coming in. I met with them all, when -- was there when they were sworn in. Introduced myself, asked them if they needed IT to let them know who to reach, gave them my contact information, made sure they had their cell phones or laptops, that there was no issues, they could get to the VPN, that type of thing.

Towards the end of the day, I want to say maybe it was around 2:15, 2 or 3 or so, somewhere around then, when I thought we were coming close to the end of the day, I talked to one of my employees and I said, when the last political leaves, let me know. And once they leave, we will all leave.

And then he told me that, hey, the -- the chief of staff, the acting chief of staff, the political, Matt Hopson, wanted to talk to me or needed to talk to me. I was in my office on the ninth floor of the Annex, the USAID Annex. And I said, what did you want to talk about, because I wanted to come prepared. He said, he thinks it's about telework metrics. And I said, okay, but all of the team are on leave, so I'm not going to have anything, but I'll be right down.

I went down as I was going through the

Page 62

turnstile, Jack Ohlweiler and Clinton White said, hey, we need to talk to you real quick. And I was like, I can talk to you after I talked to the chief of staff. And then they're like, no, we need to talk to you right now. And then they pulled me aside and said, your name is on the White House web page. You're the acting administrator, so that's what he's probably going to talk to you about.

And I was in shock, of course. I had no idea. The -- the idea of being acting administrator had never actually been talked to me specifically. It was just a leadership role. That was not what I was thinking. And then I went and talked to Matt Hopson. He explained what happened, and that's how I found out.

Q. I'm going to unpack some of that a little bit. You talked about you were at the USAID Annex --

A. Yes.

Q. -- at the time that you got the phone call to come in to talk to Matt. The -- is it correct that the CIO was housed at the Annex versus the USAID Reagan building?

A. Yes.

Q. Okay. And when you talked to Mr. Hopson, what did he say about your appointment?

Page 63

A. He asked me if I had heard, which I had literally just heard. I said, yes, I heard this. And he says, we're going to work together, and I'm going to support you. And that was basically the -- that conversation.

Q. Did you have -- was your appointment in writing?

A. Not -- I -- I never saw it, meaning I never saw -- I saw the follow one, meaning when the president appointed Secretary Rubio. I saw that because I asked for a copy of that, and I know I was emailed a copy of that. But I never actually saw the one for me. I saw it on the White House web page, but I never actually saw in writing that this is you.

Q. And you talked about Mr. Ohlweiler and Mr. White.

A. Yes.

Q. Those are both folks from the -- are they both attorneys for USAID?

A. No. Jack Ohlweiler, John Ohlweiler, but he goes by Jack, was a senior attorney for USAID. And I had worked very closely with him throughout my time there through numerous technology issues and personnel issues. And then Clinton White was the

Page 64

counselor, which is a senior foreign service officer, the most senior foreign service officer.

Q. Understood. Okay. The -- what time of day was that? You said around 3 o'clock?

A. I would say around 3 o'clock.

Q. After you found out that you were appointed, what did you do from there?

A. Yeah. I'm -- I'm not really sure. I think I -- it was a blur. I mean, that whole event, I don't -- I don't really recall.

Q. Did you eventually notify folks in the agency that you were acting?

A. So I -- I'm not sure. I -- I want to say I believe Laken drafted a message to send out to let everyone know that I was going to be the acting administrator. And I don't -- I don't know if it came out -- it probably came out that day. I -- I don't have that email, but it probably came out that day. I would be shocked if it didn't come out that day. But if -- if it did, it -- it wasn't drafted by me, but it was definitely approved by me to be sent.

Q. And for the record, can you say who Laken is?

A. Laken Rapier, R-A-P-I-E-R, I believe is

Page 65

how you spell her last name, was brought in, my understanding, to basically lead the public affairs organization within USAID.

Q. After you were appointed as acting, I assume, but please correct me if I'm wrong, the CIO position, it's now empty. What happened with respect to that?

A. So at that point, I talked to Steven Hernandez, who had come over and had been my CISO over -- chief information security officer at education for around five years that I was there. He had come over to be one of my deputies to serve as a chief information security officer at USAID.

And I had asked him if he would serve in my stead in that role, and he, of course, said yes. So I let people know that for CIO responsibilities because that I couldn't do both, that Steven Hernandez was going to be the acting CIO.

Q. And was that effective also on the 20th?

A. I'm not sure if it was that day. Again, it was a bit blurry. I was -- it was overwhelming or the following week because there wasn't a lot, meaning, there wasn't a lot that I would be doing aside from the next day. So it -- it was -- I don't know if it was that Monday or Tuesday, but --

Page 66

Q.   And who reported -- once you became acting, you know, you talked about some politicals in the -- the deputy positions who I assume were no longer in those positions as of the 20th; is that correct?

A.   What do you mean by deputy?

Q.   Deputies to the administrator.

A.   So no.  The deputies to the administrator, they were not there.  The politicals were there, meaning Ken Jackson was there.  And my understanding was that he was scheduled to be in the DAMR position, which in essence would have eventually become my boss.

I reported directly to the administrator, but for all, like, performance appraisals and reporting, I met regularly with the administrator, but they -- that individual is the person who actually did my evaluation, so -- but Ken Jackson was -- was a part of that team.  And I do not believe there was a DAPP.

Q.   Who were the others politicals there with Mr. Jackson that morning?

A.   So it was Matt Hopson, Joel Borkert, who was the deputy chief of staff, and Matt was the chief of staff.  There was Laken Rapier.  There was

Page 67

Tim Meisburger, I don't know how to spell his last name, but he was going to be leading Bureau for Humanitarian Assistance.

There was a Frank Lloyd (phonetic) who was, I believe, going to be leading, I believe, Global Health or OTI and Global Health.  There -- I'm trying to think who else was there.  There was another -- there was another woman.  I don't remember their names, but there were -- I think there were -- there was another woman there as well who was going to help with Press.  I don't remember her name.

Q.   That's helpful.  Thank you.

A.   Megan.  Megan was her name.

Q.   Okay.  The process that you described very briefly about getting them their laptops and their phones, you -- you separately talked about the process that you go through to get a PIV card and all of that. How -- how did those two processes relate to each other for CIO purposes?

A.   So downstairs in the Annex, which is where we provisioned PIV cards and access to the network, there were two offices side-by-side where security managed one of them, which is doing the vetting and making sure that they were cleared and issuing the

Page 68

pin -- issuing the PIV card.  I think it was someone from HCTM and security.

And then after that happened, the PIV card would then be given to my team, who would then add the credentials to the PIV card based on what was there. So they -- they worked really hand in hand. Like, I want to say they're actually in the same office, but, like, one big cube.  On one side it was one, on the other it was the other.

Q.   The -- the -- is there a standard access level on the PIV card depending on what clearance level you have, depending on what office you're in? Like, what -- what dictates the, once it comes over to the CIO side, the level of access?

A.   So usually, I would say almost always, you are given just general network access with an email account and access.  You don't -- when they -- when you need additional access, and I think -- and I -- I could be wrong, but I think that's where that gets to that PAW thing that you mentioned, where that is actually requesting additional access for certain systems, which again, was routed through the information assurance branch.

They didn't, of course, come to me to actually vet that, but that would go through --

Page 69

yeah, I think it was called a PAW -- to actually give them additional access.

Q.   So there's a base level of access, if I'm coming to USAID to get a laptop and a phone, I need a base level of access to access -- access email, for example.

A.   Yes.

Q.   And then it can kind of step up from there depending on -- on access levels and --

A.   So I'll say kind of.  And the reason I say that is because the -- the only access levels that we really had was, to my knowledge, was basic access. There -- and then there's admin access. There weren't -- there weren't other layers of access in there.  It was -- it was admin access.  I think there was a super admin access, and -- which is what I explained earlier about where you could actually break your entire system that's non-recoverable.

And just to show how sensitive and controlled that was, which, to my knowledge, we never gave that access to anyone ever.  And even when it was given, and I'm talking specifically to anyone who wasn't a contractor, and when the contractors who worked for me did have that access,

Page 70

it was, like, given for 15 minutes to do something and then taken away because they didn't want something inadvertently to break and destroy everything.

But those are the only three access levels. The other access that I'm talking about would be access to specific systems. But that was on a case-by-case basis depending on role and responsibility.

So for example, if you worked for Global Health and you needed access to a global health system, then they would route an approval process to get, hey, so and so needs access to this system, or, like, a HR system, hey, so and so is a timekeeper, then they would route the approval process to get access to being able to supervise people within the time and attendance system.

Q.   Understood.  Different levels of access within specific systems versus basic level admin and super admin?

A.   Yes.

Q.   Okay.  Understood.

MR. WEN:  Hey, Beth?

MS. STEVENS:  Yes.

MR. WEN:  Can we take a quick break?

Page 71

MS. STEVENS:  Yeah.  I was actually about to ask if you needed one, so that's a good timing. Yeah. Let's go -- can we go off the record for ten minutes?

THE VIDEOGRAPHER:  Absolutely.  Please stand by.  The time is 12:27 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record. The time is 12:36 p.m.  You may now proceed.

MS. STEVENS:  Okay. Great.  Thank you.

BY MS. STEVENS:

Q.   Mr. Gray, when did you first hear about the Department of Government Efficiency, which I'll probably call DOGE from here on?

A.   When did I first hear about them?

Q.   Yes.

A.   Like in the news, I heard about them. Probably right -- right after around inauguration is when I first heard about them.

Q.   And pre January 20th, 2025, did anyone identifying themselves with DOGE contact you?

A.   No.

Q.   Starting on the January 20th, 2025, did anyone who said that they were affiliated with DOGE

Page 72

reach out to you?

A.   No.

Q.   Okay.  What was the first -- what's the first time that you remember interacting with anyone who you understood was affiliated with DOGE?

A.   It would be on the 27th of January.

MS. STEVENS:  Okay.  Before we -- we will get to the 27th shortly, but before that, two -- two exhibits.  I'm handing you Plaintiff's Exhibit 3 and Plaintiff's Exhibit 4.

(WHEREUPON, Exhibit 3, Exhibit 4 were marked for identification.)

BY MS. STEVENS:

Q.   Let's -- let's go through 3 or just look at 3 first.  If you just glance through all the pages and then I'll ask you a question about it.

A.   Okay.

Q.   The first exhibit, Exhibit 3, is the -- an executive order from January 20th entitled, Establishing and Implementing the President's "Department of Government Efficiency." Did I read that correctly?

A.   Yes.  I believe you said January 20th.  It was January 29th or is it the 20th?

Q.   If you'll turn to the second page, it has

Page 73

the signing date to -- near the top, says January 20th.

A.   Thank you.

Q.   Did you see the -- this executive order on the 20th of January '25?

A.   I did not.  I -- I don't recall.

Q.   You said that you had heard about DOGE from news sources --

A.   Yes.

Q.   -- before you actually met anyone that you understood was affiliated with DOGE.  What did you understand to be the purpose of DOGE?

A.   So I -- it seemed like DOGE was going to be the next USDS, that they were coming in and bringing people to evaluate technology and look for ways to modernize government.

Q.   All right.  Turning your attention to Exhibit 4.  Did you have a second to look at this one already?

A.   I have not yet.

MS. STEVENS:  Okay.  Before we turn to Exhibit 4, just for the record, now, counsel for the government has a copy of Exhibit 1, the org chart.

BY MS. STEVENS:

Q.   Okay.  Turning back to Exhibit 4, this is

JASON GRAY                    February 03, 2026                    74 to 77
93681

Page 74

another executive order, this one entitled Reevaluating and Realigning United States Foreign Aid, also signed on January 20th. Did I read that correctly?

A.   Yes.

Q.   Okay. And are you familiar with this executive order?

A.   I am familiar with it, yes.

Q.   Okay. When's the first time that you read this EO?

A.   If I had to guess, it's probably the evening of inauguration. I did not read it prior.

Q.   What was your understanding of the -- of how the EO related to your work at USAID?

A.   In the acting role as administrator?

Q.   Yes.

A.   It would be that the -- an evaluation would be done through the State Department of the foreign aid programs within USAID for over a 90-day period.

Q.   And did you issue any guidance related to -- to this executive order?

A.   No. Not -- not during -- not that I recall.

Q.   On the -- the 20th, inauguration day,

Page 75

after you found out that you were acting administrator, I think you said everything was sort of a blur from that. Is there anything else specific that -- that jumps out in your mind before we move into the 21st?

A.   Not really, no.

MS. STEVENS: All right. Turning your attention to January 21st. I'm going to hand you Exhibit 5.

(WHEREUPON, Exhibit 5 was marked for identification.)

BY MS. STEVENS:

Q.   And the first page of Exhibit 5 at the bottom right has Bates 000576. If you would just look at that and identify it for the record.

Okay. This is a memorandum and then a delegation attached to that memo where wherein you, Jason Gray, acting administrator, delegate some duties to Kenneth Jackson; is that correct?

A.   Yes.

Q.   And it's dated January 21st, '25, correct?

A.   Yes.

Q.   This is -- correct me if I'm wrong, but this is a memorandum from Matt Hopson, the chief of staff at the time, to you as the acting

Page 76

administrator; is that correct?

A.   Yes.

Q.   And does the chief of staff report directly to the acting administrator?

A.   Yes.

Q.   Can you just describe very briefly what this memorandum and the accompanying delegation sought to do?

A.   It was to -- to put a political appointee in one of the deputy positions to the administrator.

Q.   And that political appointee was Mr. Jackson; is that correct?

A.   Yes.

Q.   The other deputy role with that -- I think you said this before, but just to clarify, that remained there was no -- no one with those duties for the duration of your tenure as acting administrator; is that correct?

A.   That is correct.

Q.   You see there's a background section on this memo on the first page. And at the end of the background section, it says, "This course of action has been coordinated with and approved by the White House." Do you see that?

A.   I do.

Page 77

Q.   Who at the White House approved the action?

A.   I do not know. I would depend on the chief of staff to validate that. So I don't know who at the White House. I did not engage with the White House.

Q.   For this memo and delegation to Mr. Jackson, can you just describe a little bit about how it came about? Like, how did you get this memorandum and how did you come about signing it?

A.   So because we were just starting a new administration and I was put into this role, it was, okay, we need to have a delegation so that people can actually start managing and supervising and conducting their work.

And what happened is this would have come into the office I was sitting in and sat on my desk, and we would walk through, hey, this is a delegation memo to make sure that Ken has the ability to perform his duties in this acting or this designated or delegated role. And I read through this, signed it to approve it so that he could start performing in that role.

Q.   And when you say you were physically sitting in the office, is that the CIO office, or

Page 78

are you in a new office at headquarters?

A. Yeah. I was in a new office at the Ronald Reagan building in the administrator's office as of Tuesday morning.

Yeah, I don't -- I don't have one.

Q. This one's yours.

A. Okay.

Q. Okay. In talking through Mr. Jackson's -- the -- the duties that you were delegating to him here, and then looking at Exhibit 1, he would -- he was getting the duties, although he wasn't the acting for deputy administrator for Management and Resources, which is just under the administrator; is that correct?

A. Yes.

Q. Okay. And that position is sort of over all of the -- the subsequent positions down at the bottom right of the organizational chart; is that correct?

A. Yes.

Q. So does that mean that all these different departments would report up to, in this case, Mr. Jackson?

A. All of these bureaus, as they're called, would report through to Mr. Jackson.

Page 79

Q. And then on the left side, there are another handful of bureaus that, according to the org chart, report up to the deputy administrator for policy and programming, which we've talked through, did not have anyone with those duties or responsibilities for the duration of your tenure as acting administrator, correct?

A. Yes.

Q. So who -- who performs the function of the deputy administrator for policy and programming. Does that just default to the administrator?

A. My understanding was, yes, which is what the primary focus of the first two weeks and the time in the acting role was getting briefed by each of these bureau heads so that I actually knew what was going on, what was critical, what the issues were.

Q. And when you say these bureau heads, that's for the left side of the organization?

A. It is for the left side of the organization, yes.

Q. Thank you.

A. Yeah. I want to say we had meetings. I'm not sure if it was everyone, but almost all of them came -- came to the administrator's office through

Page 80

the conference room, which the name escapes me right now, but to brief me on their programs.

Q. And then you talked about Mr. Hernandez was your acting CIO once you moved up to acting administrator.

A. Yes.

Q. Can we just actually -- let's -- let's mark on this. Could you pencil into the side where CIO would be on that org chart?

A. I don't know if that -- will that -- okay.

Q. The court reporter will get a copy.

MS. STEVENS: For the record, Mr. Gray has drawn underneath Executive Secretariat a rectangle that says CIO with a dotted line over to Bureau for Management.

BY MS. STEVENS:

Q. And then is it correct that the CIO reports directly to the deputy administrator for Management and Resources?

A. So by position description, the CIO reports directly to the administrator.

Q. Administrator. Okay.

A. But for all practicality, the -- the position reports through the deputy administrator.

Q. Okay.

Page 81

A. And that is, I will say, rather standard, even in education. When I was there as a CIO, I technically reported directly to the secretary, but worked through the deputy secretary through every administration that I was there.

Q. Understood. Okay. Thank you for that. All right. Tell me about what you remember. So from the 21st through the -- that first week, tell me the sort of major things that stand out in your mind about that time.

A. So the -- the primary focus was focusing as much as I could on learning as much as I could because while I had two and a half years at USAID, my primary focus was working on IT and technology.

So it was really scheduling as many meetings as possible during the first couple of weeks to engage and learn as much about the daily operations of what was going on.

I would say every day through -- was at least an hour, maybe two, in the SCIF reading materials in there about things that were going on around the world. And really engaging with leaders across the agency to -- to do two things.

One was to learn about what are the things I don't know that I need to know, but also, you

JASON GRAY                          February 03, 2026                          82 to 85
93681

Page 82

know, building relationships with them to have them ideally, help me navigate some of the challenges that I was expecting to run into through the time there.

Q.   Can you be -- describe a little bit what you mean about those challenges you're expecting to run into?

A.   Yes.  So for example, one of the -- one of the last things -- I don't remember exactly when it is.  I know it's available online, but, like, meeting with the president of Yemen is something that happened and that took a lot of time to prepare.  I needed to read about all the things that were going on there that I had no visibility or insight into at all.  And then really, what were the key messages that I needed to bring to that meeting.

So it was those types of challenges of, hey, you know, how -- how do I respond to this or a couple, and I know we'll get there, was the order of departure from DRC.  Those are things I had supported from an IT standpoint, but never as acting administrator, and I needed to understand what are the logistics or the Ebola outbreak that was going on -- was in I think Uganda.

And I was -- so it was those types of

Page 83

unexpected things that over the two and a half years prior being the CIO, I supported tangentially and directly, in some cases, from a staff or IT services or account access.  So it was really to learn as much from them and, you know, develop clear communications with them to -- to be able to be successful in that role.

Q.   Throughout that -- that first week, you know, as you're preparing to be able to speak on these important issues that you were working on as acting administrator, did there come a point in time where folks connected, like, whose work was connected to DEI were put on administrative leave?

A.   Yes.  I'm trying to think when that was. I -- I don't exactly remember if it was the first week or the second week that that happened.  I know it was one of them, but I don't -- I don't recall what week it was, but I -- I do know that that conversation came up.

Q.   We'll come back to that.

A.   Okay.

Q.   Later, towards the end of that first week of the administration, did there come a time when you understood that Pete Marocco had identified some issues he was having with funds that were going out

Page 84

of USAID?

A.   So that would be Monday morning on the 27th is when I recall that I was made aware.  Early in the morning, Matt Hopson had shared with me that, hey, we have been made aware -- at the time, I did not know that Pete Marocco had anything to do with this, but that we had been made aware that there was something, at least I don't recall.

But that -- that there was something going on and some transactions that happened that shouldn't have happened, and that they were planning on bringing someone in from DOGE to evaluate, is what I was told.

That they were going to be coming in Monday morning at 9 o'clock and they were going to be assessing what happened because stuff had happened over the weekend.

Q.   Okay.  So the -- so before that conversation with Matt Hopson, no information provided to you over the course of Thursday, Friday, Saturday, or Sunday related to money going out of USAID that -- that anyone had a problem with?

A.   Yeah.  I -- I'm not entirely sure.  I don't -- meaning, I -- I feel like I'm not sure if it happened on Saturday or Sunday because to be

Page 85

honest, we were working every day.  We were working Saturday and Sunday for the first couple of months. Like, every day was a workday.

So I -- the days kind of blur together.  I don't know if it happened before then.  I just know that Monday morning is when I knew that DOGE was coming in to address some allegations of transactions happening over the weekend.  So that's why my presumption is it's Monday because how could they have known if it wasn't -- if it was over the weekend, if the weekend hadn't happened.

Q.   That conversation with Mr. Hopson, you know, I think you said it was early Monday.  Do you -- what time frame?

A.   I don't know.  It would probably be around 7:30-ish or so if I had to guess.  And I was told that DOGE was -- that people were coming in from DOGE to evaluate what had happened.

Q.   So I preface this because it's going to become a theme.  Like many of the exhibits we're going to go over and the conversation we're going to have, there -- there's sort of two different strands I'm teasing apart, even though these things happened on the same day.

One is about USAID personnel being put on

Page 86

administrative leave and -- and, you know, everything that was involved there. And then the other is about access to -- to various systems provided to folks who are affiliated with DOGE.

So I'm just saying that because it's going to get kind of complicated on one and then we're going to come back and do it on -- on the other strand.

A.   Okay.

Q.   All right. So on the 27th, after you talked to Mr. Hopson, did he -- or during that conversation with him, did he identify who from DOGE would be coming over to USAID?

A.   No, he did not. He said that a team was coming over in the morning to evaluate what was going on. And later on in that morning, maybe an hour at most, he shared that it was looking like they were going to be requesting to put a handful of people, maybe 16, I think is what he said, of people on admin leave, but that -- that would depend on what people found.

And at the time, I had said, okay, I have used admin leave before in my career when I was at the VA. I know how and when it can be used. I was like, okay, if we need to evaluate or investigate

Page 87

what's going on, let me know what's going on. And then I carried out the rest of the day with meetings.

Q.   That conversation with Mr. Hopson, was it in person?

A.   Yes.

Q.   Did he follow up or did you follow up with anything in writing, like via email?

A.   Not at that time. I think later on in the day, maybe in the afternoon, he shared with me that the number was going to be bigger than 16.

Again, I don't remember exactly when, but sometime later in the day, maybe around noonish or so, is when he shared that it was looking like it was going to be a bigger number. And I was like, okay. And then I continued meetings and later on would find out that it was the 57 people, which would be, I believe, 58.

Q.   The meetings that you carried on with throughout the day, what were -- were any of those meetings with or related to what was happening with respect to the folks that Mr. Hopson identified that were coming over to USAID from DOGE?

A.   Can you clarify that question?

Q.   Sure. Did you -- how about you generally

Page 88

describe the type of meetings you were having throughout the day.

A.   So the -- the meetings that I had were specific about getting background investigation or background information about the -- the things that were going on in that bureau. So it had nothing to do with anything of why DOGE was there, so it wasn't about transactions.

It was all about, tell me about your bureau and tell me, you know, what support you need. And usually it resulted in them saying, great, tell me what support you need from me. So it was those types of meetings throughout that entire week.

Q.   Was -- were any folks that were, to your understanding, were affiliated with DOGE in any of those meetings on the 27th?

A.   No.

Q.   Did you come to find out that there had been a meeting with DOGE personnel or people affiliated with DOGE, Mr. Hopson, and others from USAID on the -- on the 27th?

A.   My understanding was that there was going to be a meeting at 9 o'clock in the morning with DOGE and Matt Hopson, and I believe that Steven Hernandez got pulled into those discussions as well.

Page 89

Q.   And you were -- you did not participate in that meeting?

A.   I did not.

Q.   Do you know who else from USAID was in that meeting?

A.   I do not. Yeah. I would be guessing. I do not.

Q.   That's fine. Did you meet any of the people that were affiliated with DOGE that day?

A.   Which day are we talking about?

Q.   The 27th still.

A.   I might have met them. I probably did meet them just as a meet and greet as I was walking by to my next meeting. Yeah. I would say -- or asking someone, like, who are these people and why are they in this conference room, but yes.

Q.   Do you remember who -- who that were affiliated with DOGE were there?

A.   Yes. The two people that I remember in that week, I can't attest to it being on the 27th, but it probably was, was Jeremy Lewin and Luke Farritor.

Q.   What was your understanding of -- of their role with respect to USAID as of that date?

A.   My understanding was that they were coming

Page 90

to evaluate what those, you know, transactions had been over the weekend to determine if something happened that shouldn't have happened.

Q. After your meetings that you described with the bureau folks throughout the day, what happened next?

A. So I talked to -- there was a direct hire employee named Brandon who was a senior advisor to me, and we strategized for the following week. There was a security summit that was coming up in Munich that we were preparing for and planning to go to because USAID typically had gone there.

We were talking about supporting the bureaus and making sure, again, talking about stuff in the SCIF, about, you know, classified material and events that were going on that were relevant to USAID.

I mean, again, it was just absorption of learning as much as I could.

Q. With respect to the activities that you understood Mr. Farritor and Mr. Lewin to be present for, did you come to understand that they had received access to USAID systems at some point?

A. I came to understand that they were going -- they were asking for access, and I talked to

Page 91

Steven Hernandez about it on the phone and had said -- he asked me, are you okay with them getting access.

And my guidance to him was, as long as they're vetted employees because there was rumblings across about we didn't want volunteers having access who weren't vetted or allowed access to the systems. And he said that he had validated that, yes, they're cleared employees, they're actually government employees. And I was like, okay.

Q. And when you say access, like, he called you about whether he should give them access. What specifically -- what type of access? We talked --

A. Yeah.

Q. -- that word can be multiple things. What -- what type of word are you talking about?

A. At the time, it was domain access, meaning access to the network so they could evaluate and look at -- and again, I didn't -- I don't know what they did on the network or through the network, but it was so that they would have access to Aidnet to conduct an investigation into the transactions, which would then lead into the conversation about getting higher level access for systems like Glass and Phoenix.

Page 92

Q. Did that conversation about higher level access to Glass and Phoenix happen on the 27th or later that week?

A. I believe it was later that week. And it -- it wasn't -- again, I was not acting as the CIO anymore, so Steven Hernandez was having those conversations, but briefing me to let me know what was going on.

MS. STEVENS: I want to turn your attention to -- handing you Plaintiff's Exhibit 6. The bottom right of this has the Bates 000586, and it goes on for several pages.

(WHEREUPON, Exhibit 6 was marked for identification.)

BY MS. STEVENS:

Q. I will warn you now as we get into emails, that it's a little bit of mental gymnastics because sometimes the emails are ascending and sometimes they are descending with no rhyme or reason that I can tell. So --

A. Okay.

Q. -- I will try to point that out at the beginning of our -- going over the exhibits. This one is descending.

A. Okay.

Page 93

Q. Okay. Do you -- do you -- well, this is an email chain starting on Monday, January 27th, 2025, and you are copied on this email; is that correct?

A. Yes.

Q. All right. Could you describe this email chain a little bit for us?

A. Yes. So later on in the day is -- as a follow on to the conversation with Matt Hopson, it was identified that there were 57 individuals, which later actually became a 58th individual, which I presume you have that email as well because there was a follow on email for this.

And the -- what was explained to me is that these were individuals who were being evaluated, who were decision makers for transactions that had been identified through the initial assessment by DOGE, and that I was going to get a follow-up meeting Thursday morning to talk through what happened.

So in essence, I was given the list by Matt Hopson and told, hey, these are the individuals that are in the names. And he even let me know, he said it's much bigger than what we thought. And I was like, okay, but these are a lot of people and a

JASON GRAY                          February 03, 2026                          94 to 97
93681

Page 94

lot of them are in leadership positions in the agency. So I need a briefing Thursday morning to know what they found or we're going to take people off of admin leave.

Q. You said it was explained to you about this list of 57, was that exclusively from Mr. Hopson or were the others involved in that explanation?

A. It -- I believe it was primarily Matt Hopson.

Q. Okay. Is it correct to characterize the rest of the email chain as implementing the placing on admin leave by the various personnel within USAID?

A. Yes. And I do see that extra person was added on the fourth page where Joel says, Clinton White Agency Counselor at -- so you have the email.

Q. It says that it was approved by acting administrator Gray. This is in that paragraph. It starts at the top of the first page; is that correct?

A. Yes.

Q. And what was the basis of the -- your decision to do that?

A. The basis was I was told that there were

Page 95

millions of dollars of financial transactions that had happened over the weekend that should not have happened, and that DOGE was gathering the evidence to explain what happened and why it happened.

And that while they gathered the evidence, the request was made by Matt that, hey, we should -- we're going to put these people who are requesting to put them on admin leave while we do the investigation to make sure that there's no interference with the investigation.

Q. And you said in your -- in your career, you had familiarity with administrative leave; is that correct?

A. Yes.

Q. Okay. And so when you decided to put these folks on admin leave, did that -- did that explanation for we need a few days to do this investigation make sense to you?

A. It did because the systems were very complex. It was not just USAID systems. It was interacting with the State Department, Treasury, and HHS.

So it was, okay, you know, we -- we're talking about Monday afternoon that this happened, thinking Tuesday, Wednesday, they're going to know

Page 96

and have an idea of what's going on. And Thursday, they will know this is when I should be able to see evidence of something happening on why we would keep them on admin leave.

And even at that time, it was like, if we don't have evidence, they're going to be taken off of admin leave and put back in their role.

Q. You -- you said that on the --

A. Yes.

Q. -- the 27th?

A. Twenty seventh.

Q. Was that conversation exclusively with Mr. Hopson or were there others involved?

A. I believe Ken Jackson was in that conversation as well.

Q. Did you do anything to document your reasons for approving the administrative leave?

A. Not to my recollection, no.

Q. Are you the sort who writes themselves notes via email like I am?

A. So I sometimes have. And if I have, they're in USAID email, but I -- I don't -- I -- I feel like there's probably a couple of times in throughout those 11 days that I did jot notes down and put them either in a draft folder or an email to

Page 97

myself.

Q. For this -- make sure I'm on the right -- for this decision related to administrative leave -- or scratch that. Let me back up. What we have seen in the Exhibit 5 with you designating or delegating, excuse me, some duties to Mr. Jackson, there's a memo involved.

And then we'll see in subsequent exhibits there -- there's often a memo to the person in charge saying, here's why we're going to do a thing, proposing here's why we should do a thing, and then giving the person in charge the opportunity to sign off on that. Is that a familiar process at USAID?

A. Yes.

Q. Okay. Was there an associated memo for this administrative leave?

A. So I -- I don't know, but I do know that in this conversation, talking with Bill Malyszka, I don't know -- I never know how to say his last name, but talking with Bill, who was the chief human capital officer, my understanding was that him and his team were the individuals who were actually giving the notification and the memo that placed individuals on admin leave.

Q. Pre-memo -- sorry. The memo you're

Page 98

describing is -- is something that would go to the administrative leave -- no, that's a bad phrasing. The memo you're describing would be something that would go to the personnel placed on administrative leave or a different type of memo?

A.   It would be the memo that was given to the personnel notifying them that they are being put on admin leave.

Q.   And there's often a pre-memo before that that goes to the person in charge deciding whether to do the action of putting someone on administrative leave; is that correct?

A.   I -- for an investigation, I don't -- I don't know.  I mean, for an investigation -- yeah. I -- I don't -- I don't know.

Q.   Okay.  On that afternoon into the evening on the 27th, you talked about you talked to Mr. Hopson.  I think Mr. Jackson was in that meeting. Did you talk to anybody else about the administrative leave situation?

A.   Brandon, who was the -- who was my senior advisor, he was in a lot of those conversations or -- and I talked with him about things that were going on, so he had awareness.

Q.   And what -- sorry, what's Brandon's last

Page 99

name?

A.   I -- I don't recall.  It starts with a G, like Gajetona or --

Q.   We may come across his name at some point.

A.   You probably will.

Q.   Okay.  Anything else from the 27th?  Did you have any further conversations with anyone else on the 27th related to this?

A.   Not to my recollection.

Q.   What about more generally, did you have any conversations with anyone related to DOGE being present at USAID, sort of irrespective of the administrative leave?

A.   I -- I may have talked to Steven Hernandez just to kind of sync with him to see how things were going from a technology standpoint and ask from, you know, like, how are things going.  But it wouldn't be the specifics about putting people on admin leave.

It would just more to get a sense of -- I mean, at the time, I had no insight or really, aside from what I had read about what DOGE was going to be doing, and this was our first interaction with them. So it would have been mostly to get a sense of how are things going, how's your day.

Page 100

Q.   What was the sense that you got from Mr. Hernandez on that question?

A.   He said that a couple of the individuals were really, really sharp and really good.  I don't know who.  He indicated that one of them was rather rude and offensive.  I don't know who.  I didn't ask.

And I -- yeah, I -- but that was, in essence, that how the conversation went.  And I was like, okay, let's navigate this carefully.  But it wasn't -- there was no specifics aside from just kind of an overall sense of, hey, we're doing this, this is what we're focused on.

Q.   With respect to the folks on -- the 57 people, 57 or 58.

A.   Yeah.

Q.   I think back to 57, actually, people put on administrative leave, did you talk with USAID counsel, like, attorneys?

A.   So I had several conversations throughout that, like, talking with Jun, which I forget his last name, but he was acting general counsel and Jack Ohlweiler.

Q.   Did you also I think you -- you said you talked with Bill M --

Page 101

A.   Yes.

Q.   -- who was the acting --

A.   Chief Human Capital Officer.

Q.   Okay.

A.   And Nick Gottlieb, both.

Q.   And what did -- what did that conversation entail?

A.   So the conversation with Nick, Nick was very upset, and he was expressed -- he wanted to meet with me or he -- I actually asked to meet with him because I wanted to get a sense of what was going on because I heard he was very upset about things that were going on.

So he came to my office.  I actually wanted to have a witness there, but he wanted to talk to me without anyone in the room, which was fine.  And he said that he was being asked to do things that he shouldn't do.

And I asked him specifically, like, what are you doing or what are you being asked to do. And he said that, you know, that some of the things that were asked were just not according to policy or even to law.  And I said, I'm not going to break the law.  I'm not going to do anything against this.

So -- and I also reminded him that the

JASON GRAY
93681
February 03, 2026
102 to 105

Page 102

reality is people who are new coming into government don't know all the rules. They don't know all the laws, and it's our responsibility to teach them, but I'm not -- I'm not going to break the law. And he was, like, okay.

And I told him that I would talk to Bill. And I did talk to Bill. Bill also came to my office later, and I explained to him the same exact thing. Bill is blind, but he walked up, came in, saw me, we sat and talked initially about kind of all the events that were going on.

And I was, like, make sure we're documenting everything, we're following policy. And I reassured him as well that I was not going to be breaking the law or doing anything illegal.

Q. And both of those conversations you just articulated were on the 27th; is that correct?

A. I believe so.

Q. Bill is Mr. Gottlieb's -- or was Mr. Gottlieb's boss; is that correct?

A. Yes. And it would probably be on the 28th. I say that only because the 27th, when people got put on admin leave was rather late in the afternoon. So I'm not -- I don't -- I believe it was the following day is when I met with Bill and

Page 103

Nick.

Q. Just a second. Did you think -- leave those meetings with Mr. Gottlieb and Bill M, you know, sort of with the understanding that they were going to let this play out?

A. So I heard their frustration and how upset they were about things, specifically Nick. But I also tried to reassure that I wasn't going to do anything illegal. And -- but the understanding that I had was that he was going to do and -- and we were going to continue to execute this.

And I also explained that I was told I was going to be getting a briefing Thursday morning to outline kind of the evidence of what was found, and that what I would expect if I didn't get any evidence is that I was going to be removing those people from admin leave.

I even asked Nick Gottlieb to draft an email for me to remove people from admin leave, which he did. And I told him this would be later on in the week, that if I didn't get evidence, that I was going to send that email at 4:30 in the afternoon to let people know that they were being taken off of admin leave.

Q. Also, on the 28th, what was your

Page 104

understanding of the level of -- of systems accessed by Mr. Farritor and any other DOGE folks?

A. So I knew they had network access. I don't know, meaning, I -- I didn't -- I didn't get into the weeds about whether they had elevated privileges on there. I know at some point, Steven Hernandez let me know that they were requesting administrative access so they could navigate the network and not have to do system by system.

Although there's two layers of access. You would have the ability to access, like, log files, but not actually get into the system to assess what was going on. But yeah, I -- I didn't actually get into the specifics of -- that was really Steve's role and responsibility at the time.

Q. What was your understanding of Mr. Farritor's role on this date, the 28th?

A. So was that he was a federal employee, a DOGE employee who was coming in to primarily do the investigation because he was the -- the person who was going in through the systems and evaluating.

And the impression I had was that Jeremy wasn't -- my understanding is that Jeremy wasn't asking for additional access, but that Luke was just to help navigate and learn and gain access to the

Page 105

systems.

Q. And Jeremy is Jeremy Lewin; is that correct?

A. Yes.

Q. Okay. What was your understanding of Mr. Lewin's role at that time?

A. I thought he was really the lead from DOGE that was coming into oversee what was happening. And that was the only interaction or the only person I really even spoke to. Later on, again, that day, I might have seen him and, you know, I know I've seen -- I saw him, but I -- there was no real conversation until the following days.

Q. I want to turn your attention back to Exhibit 3.

A. Okay.

Q. This is the DOGE EO. Would you read -- you don't have to read it out loud. Silently. Section 3C on Page 3.

A. Okay.

Q. Did you, in consultation with anyone else or yourself, establish a DOGE team at USAID?

A. No.

Q. Did you have a conversation about establishing a DOGE team at USAID?

Page 106

A. No.

Q. Do you -- to your knowledge, did you have a DOGE team lead at USAID?

A. No.

Q. You paused a little bit there, where you going to say something else?

A. What I was going to say is that I knew that when DOGE came in to evaluate what was going on, that Jeremy was going to be the lead of that team. But it wasn't something that I said, yes, this is the DOGE lead, and this is the DOGE team that's here.

It was that there was suspected some, you know, nefarious financial transactions with millions of dollars that were happening or happened over the weekend that was going to be investigated.

Q. How did you know that Jeremy was the lead?

A. Just by virtue of seeing him and how he interacted with people because he wasn't, you know, Luke was carrying around a bag with, like, five different laptops from different agencies and going in and actually, like, doing work, where Jeremy was more talking to different individuals.

Q. Do you know who the USDS administrator was as of January 28th?

Page 107

A. I did not -- do not.

Q. Okay. What else do you remember from the 28th? You had this conversation with Mr. Gottlieb and Bill M. What else do you recall from that date? This is -- no, Tuesday, sorry, the 28th.

A. Yeah. I, again, I feel like I had more conversations about we -- as part of the assessment process, they were looking at stopping payments. I know we had a -- a conversation about the impact of that because the federal government has to pay what it owes, and it was talking about this -- there's risk associated with this. While the intent may be to save money, the reality is you're going to then have to pay penalties and interest and what you owe anyway.

So that was one of the conversations. And again, just following -- continuing additional -- I believe -- yeah, I guess it would be Wednesday because the following day is when we had pulled everyone together. Because on the 22nd, every Wednesday, there was something called the SMM, the senior management meeting, where all of the heads of the bureaus and independent offices would meet with the administrator and deputy administrators.

And on the 22nd, I had that meeting. And

Page 108

then the plan was a preparation for -- to have that same meeting on the 29th. There was a lot of conversation on the 28th about, should we have the meeting, should we not have the meeting. And I was like, we're absolutely going to have the meeting because now we need the rest of the agency to know that someone is in charge of these -- these bureaus and independent offices.

So that was another conversation that was had on the 28th, preparing for the 29th.

Q. Who was the conversation of do we have the meeting, do we not have the meeting with?

A. That was with the political team, meaning, this was a conversation with Ken Jackson, Matt Hopson, Joel, and Laken was there as well.

Q. And correct me if I'm wrong, but you said that you decided we are --

A. Yes.

Q. -- having this meeting? Okay. So you decided to have the meeting on the 29th with all the -- all the bureaus. What else did you do on the 28th before then?

A. I -- I'm not sure when the meeting with Yemen was. It might have been that day. It was -- they kind of all blurred together, but I -- I

Page 109

believe it was maybe that day.

So there was a lot of conversation with, like, the Middle East Bureau to talk about and prepare for that meeting because there were key points they specifically wanted me to make on behalf of USAID and the government. And -- and I know there was -- there was a lot of conversation about that.

Q. Turning your attention to the 29th, so did you have the big bureau meeting?

A. We did. I -- I'm not 100 percent sure if it was the 29th or the 30th, but given everything that happened on the 30th, I would definitely say it was probably the 29th.

But yes, and it was to make sure that everyone knew that, yes, this is what's happening. I walked through and explained to them that there, you know, there was an allegation that some services or transactions happened over the weekend. This is why people were put here. You are in charge.

I told them about -- again, the same conversation I had had the week before with the people who were permanently in that role. Now, there were actings in every one -- almost every one to let them know that my focus was on transition and

Page 110

stability.

Q.   When you say they were acting in all of those roles, is that because some -- the folks put on admin leave were leadership and so their roles needed in acting, or can you describe that a little more?

A.   Many of the people in Exhibit 3, I think it is, were -- not all, but many of them were -- like, for example, the CFO, we needed to make sure that someone was acting as a CFO.  And in those -- and in the bureaus for, like, global health and humanitarian assistance, that those individuals were -- had an acting that they were in an acting role.

Now, a lot of the -- because remember, when an administration changes, all of the assistant administrators, most of them, I won't say all, but most of them are political appointees.  They transition and resign, and then career staff are usually temporarily put in acting roles.

So for that one week, the acting roles were senior individuals in that role.  That was not their permanent job.  It was usually the most senior person in that bureau or independent office.  And when many of them were put on admin leave because they were the deciders, it -- you know, which again,

Page 111

was that these are people who maybe did these transactions.  I didn't know at the time.  But I wanted to establish continuity and again, stability.

There was a lot of turmoil that was going on and stress of what's happening, why are these people here?  Why did people get put on admin leave?  A lot of, you know, side conversations were going on.

So I wanted to pull everyone together to explain what I knew and let them know that this is where we're at, and this is what's going on, and I need them to support, you know, me with what I am doing, specifically as acting administrator, not as it relates to the investigation, and that I will get briefed on Thursday to let me know what happened, and we'll follow up the following week.

MR. WEN:  Just before you go on, for the record, at some point in that answer, you referred to you thought it was Exhibit 3 before you had it.  It's Exhibit 6.

THE DEPONENT:  Six.  Sorry.  Yes.  Exhibit 6.

BY MS. STEVENS:

Q.   On the 28th or 29th -- or actually, that meeting, so you're expressing the, you know, sort of

Page 112

show of stability.  And what response did you get, just briefly?

A.   I think it was mixed.  I think everyone was kind of -- it was definitely mixed.  There was a lot of shock.  People didn't know what was going on.  Some of the people who were in the roles found out about it last minute.

I forget who, but one of the individuals who was leading, like, the -- I think it was the Asia Bureau, was done -- had been on travel and came back and found out that now he was the acting.

So it was -- it was those types of conversations where people are like, hey, I'm new to this, and I'm still learning this too, but we still needed someone -- I still needed someone in charge of those bureaus and independent offices.

Q.   Did you on the 28th or 29th, find out any more information about the fruits of the investigation?

A.   No.

Q.   Did you get any status update from -- from anyone?

A.   The only status update I would have gotten would have been from Matt Hopson saying they were continuing to investigate and needed a little more

Page 113

time, but I knew that I was going to be getting briefed on the 30th, so I was like, okay.

Q.   Did you talk to anyone affiliated with DOGE before the 30th about the investigation?

A.   About the investigation?

Q.   Mm-hmm.

A.   I -- I want to say there was a meeting with Jeremy, basically saying, which again, it was Jeremy and Ken Jackson in my office at the time.  Not really an update, just saying that they're continuing to dig into transactions, and again, referencing that millions of dollars had gone out from the agency that shouldn't have gone out.

A question that was asked or that I asked about was, was those transactions for services prior to inauguration, which again, they were still investigating, and I didn't get an answer then, but again, was assuming or presuming I would get it on Thursday.

Q.   Did you talk to anyone affiliated with DOGE about anything else outside of the investigation on those -- those days preceding the 30th?

A.   So I -- so yes, Steve Davis came to the building.  I'm not exactly sure when it was.  It

Page 114

might have been the 28th or 29th.  I don't think it was the 30th.  So it had to have been one of those two day -- two days really to introduce himself.  And he asked me if I was the IT person.  I said, yes, my permanent job, I am the IT person.

And he asked me about IT systems, and if he said, if you had to pick a couple of IT systems that you would eliminate today, what would they be?  And I told him, I said, well, I -- I won't pick a couple of systems, but I would definitely pick DIS because I felt like it's something I even after six weeks in, I briefed Samantha Power.  And I told her, if I had to make a snap judge right -- judgment right now at six weeks in, I would -- I would kill this program.

And I was told by the deputy chief of staff to her, no, no, no, you don't understand the program.  And I'm like, that might be true because I was new, but just a snap judgment based.  But when I talked to Steve Davis, I told him that I would -- I would definitely pause and eliminate DIS.

Q.   Was that conversation with Mr. Davis just one-on-one?

A.   It -- it was -- it wasn't really one on one. It was in the administrators suite, meaning

Page 115

this -- but it was -- it wasn't like in the office.  It was just in -- in the hall.  He came, introduced himself, who he was, identified that he worked with DOGE or for DOGE, and I was -- I, again, had no idea who he was at the time.  Yeah.

Q.   How did -- can you be more specific about how he introduced himself?

A.   He said he was a part of DOGE, introduced himself as Steve Davis, is really how he introduced himself.  And then I looked because I was curious, who was this person and saw his relation or, you know, structurally from a Elon Musk standpoint, but we didn't talk about that.  He didn't.

Q.   The question of what would you -- what system would you cut right now, besides that question, did -- did you talk about anything else?

A.   Just in general, technology, like how things were going.  And I explained to him that we had a really good team here that would support and knew their stuff.  And I talked briefly about services we delivered around the world and just how important it was to secure them.  Yeah.  So it was just a very maybe a five-minute conversation.  It wasn't very long.

Q.   Did you have any other conversations with

Page 116

anyone from -- affiliated with DOGE that -- not the conversation with Mr. Davis and not about the ongoing investigation?

A.   No.

Q.   Did anything else of -- of import in your mind occur on the 28th or 29th that you haven't already talked about?

A.   Not that I can recall.

Q.   Okay.  Turning your attention to the 30th, Thursday, January 30th, 2025.  Again, two different strand -- two different but interwoven strands, one about administrative leave and one about DOGE people affiliated with DOGE and their access to USAID systems. We'll kind of get into both of them.

So you're supposed to have this meeting on the morning of January 30th about the results of the investigation.  Did that meeting happen?

A.   So it happened, but it was later, meaning it wasn't at 9 o'clock.  I want to say it was maybe at 11-ish or so.  And I got pulled into that conference room.  Point 4 is the name of the conference room.

And I asked to see, like, okay, what have you found?And there was a lot of that one, the investigation was still going on, but they had found

Page 117

and they gave me some of the values and the dates of the transactions of what happened and when it happened, which again, I -- I don't recall what those are, but they were primarily focused in the CFO shop.

So in that conversation, I had said, and my chief of staff, Matt Hopson, was there as well, and he was very supportive.  I will say -- I don't want to say it was adversarial with DOGE, but he was very supportive of me -- me and wanting to make sure that he was protecting me and doing what needed to be done in his role of the chief of staff.  And it -- there was tension there.

But at the end of that conversation, it -- the result was, well, I need to see more or additional evidence to prove that all of these people should be on admin leave.  And if I don't get that, I'm fine with leaving these five or six -- I think it was five -- CFO employees on admin leave, but everyone else, I'm going to remove off of admin leave.  That is how that conversation ended.

Q.   Let me pause you there before we move on to more.  Who participated in the conversation?

A.   So that was -- Matt Hopson was there, Ken Jackson was there, and I -- and Jeremy Lewin was

JASON GRAY                      February 03, 2026                      118 to 121
93681

Page 118

there.

Q.   Was Mr. Farritor there?

A.   I don't recall.  He might have been there. I don't recall.  He might have been there.

Q.   The -- how long was this meeting?

A.   Very -- maybe 20 minutes.  It wasn't very long.

Q.   When you described, you know, sort of Mr. Hopson was -- was running interference between you and DOGE a little bit, where does Mr. Jackson fit into that description?

A.   So I think he -- at the time, I think he was trying to figure out his role.  I don't -- so he was -- he was there, but it was rather passive at the time.

Q.   And who did most of the talking?

A.   The majority of talking was primarily between Jeremy and Matt with me asking questions and specifics.  And the -- the comment was made that, in essence, if we don't have evidence, we -- I will take them off of admin leave, and then if you find evidence, we can put them back on admin leave.  But the idea wasn't that we were just going to keep them indefinitely on admin leave.

Q.   And how did that sit?

Page 119

A.   I felt at the time it -- it sat fine.  I -- I didn't -- I didn't hear any objections.  I didn't hear any issues.  Matt and I talked about it after in my office, and he was, like, yeah, no, this makes sense. He said, if they don't have anything, then we'll leave the -- the CFO team there and everyone else we'll bring back.  And I'm like, okay.

Q.   Were there any documents involved in that -- in the meeting in the Point 4?

A.   So I -- I don't believe so.  I do know, again, the conversation that I had with Nick, I did ask him to draft me a message so that I could send to remove people from admin leave.

Q.   That was a conversation from a couple of days before where you -- where he expressed concern and --

A.   Yes.

Q.   -- you -- you asked him to draft that email?

A.   Yeah.

Q.   Okay.  Okay.  What happened after this meeting in -- in Point 4?

A.   Point 4 --

Q.   Point 4.

A.   -- is the name of the conference room.

Page 120

Okay.  So after that meeting on the 30th, The day progressed.  I attended meetings.  I as I mentioned, I spent an hour or two in this SCIF every day because of things that were going on.

And at the end of that meeting, I want to say I had a -- or at the end of that -- towards the end of that day, I had a conversation with Bill because Bill was expressing concern on wanting to -- they were talking about putting additional people on admin leave. I didn't have the specifics because they were still working through the process on what that was that I believe Ken was working on.

Again, I -- I don't know the specifics of that.  I -- I know now that it would be several people from, I believe, the LPA, the legislative team that worked under Laken.

But we had those conversations.  I talked to Bill.  I let him know, what we're going to do is we're -- if we don't have any evidence by the end of the -- by close of business at 4:30, I'm going to send this message.  I'm going to remove people from admin leave, except these handful of people that I was told and shown that, hey, there's these transactions that happened over the weekend and these are the people who authorized the transaction.

Page 121

And I'm like, okay, we'll keep them on a little bit longer until we get more evidence.

So that's kind of how it went.  And then Nick sent the email to everyone removing them from admin leave on his own.

Q.   Okay.  Let me stop you there.

A.   Okay.

Q.   Before we get to the next email.  So you described the conversation in Point 4.  You and Matt sort of debriefed that conversation afterwards.

A.   Yes.

Q.   Did you have any conversation with anyone about the investigation for admin leave between that conversation with Mr. Hopson and this conversation you just described with Bill M?

A.   So yes, I talked with Ken Jackson because a lot of this would be typically run through his organization.  It would not be from the administrator or acting administrator.  It would be from the DAMR.

Q.   You just -- do you mean that in terms of just where the -- the process normally flows in terms of the org chart?  Is that what you mean by --

A.   Yes.

Q.   -- from him?  Okay.

Page 122

A. Yes. HCTM, which falls under the DAMR, Deputy Administrator for Management of Resources, that all falls under that lane. So it would have primarily come from Ken and through Ken.

Q. How did that conversation with Ken go? Agree, disagree? What -- how did it go?

A. I don't -- I, again, I think he was still adjusting to roles, responsibilities. The impression I got it is just an impression. The conversation went fine. The impression I got was that if I can sign it, do it. If he needs to sign it, he'll do it.

But again, we were talking about I had heard that, hey, I understand we're looking at other things that are going on. And it was, let me know what's going on. But if those are specific to your bureaus and independent offices, I need to know because of everything that's going on, but that's going to be your responsibility.

Q. Okay. So you had -- you described the Point 4 conversation, conversation with Mr. Hopson, conversation with Bill M, and also with Mr. Jackson. Any other conversations about the investigation in this lead up to what you're about to tell us with respect to Mr. Gottlieb?

Page 123

A. I can't -- I don't recall any other conversations about the investigation specifically.

Q. Did you get any emails in that time frame about the investigation?

A. Yeah. I -- I wish I had my emails because then I would -- I would say yes or no. Yeah. I don't -- I don't recall getting emails. If I did get an email because I do remember getting emails, but not specifically that day, but more of the, hey, I don't have access. When I am I going to find out? Here's my personal email, so that you can let me know what's going on.

Then I talked with Bill about that to say, hey, do we have personal emails for everyone? And then the reality was, in some cases, they did not have personal emails, and it was figuring out how do we get personal emails for everyone to let them know if they're on admin leave because they didn't have access to their government stuff.

Q. Did you get an email from or do you recall getting an email from Mr. Farritor describing the "evidence" related to the 57 folks on admin leave?

A. I do not recall that, no.

Q. Okay. You're going to describe what happened next in -- in the sort of saga of the 30th.

Page 124

Please go ahead.

A. So then Nick sent an email to the masses. The politicals were copied, and I got called. Ken is like, hey, did you see what happened? And was told that I needed to immediately remove them off of admin leave. And that is -- I was like, well, hold on.

There was a -- someone made a comment, I think it was Ken, who was, like, there's a concern about losing control of the agency. And I said no. I said, what we have is a labor and employee relations specialist who I've known for the two-and a half years I was here. He was very passionate about this, and he sent an email out. I can remove them, but the reality is, most of them were going to be removed from admin leave that afternoon anyway.

And that is when really things changed in that I had a conversation with Jeremy. Jeremy told me that I needed to shut the agency down.

Q. Okay. We'll get to the conversation with Jeremy. With respect to Mr. Gottlieb's email, what -- what time was that of the day, do you have an estimate?

A. Probably 3 something, maybe ish.

Q. Okay. And that email that he sent out,

Page 125

that was sort of in the vein of what you -- you said you would do, but he jumped the gun --

A. Yes.

Q. -- so to speak, before you could make that decision yourself; is that correct?

A. Yes.

Q. Okay.

A. He -- I believe in the email, and again, it's been a year, but I believe he said that it was within his authority as the person who actually put them on admin leave through HCTM, that he was using that authority to remove them from being on admin leave.

Q. Had you gotten any more information or evidence -- actually, that was a bad question. Had you -- were you still on the path that you described earlier of if you didn't have any additional information with respect to this investigation by 4:30, you were going to leave the couple of folks from the CFO's office on admin leave, but remove everyone else from admin leave. Was that still your -- the path you were on?

A. Absolutely, yes.

Q. Okay. So Mr. Gottlieb sends his email. You get a -- how did Mr. Jackson contact you?

JASON GRAY                           February 03, 2026                    126 to 129
93681

Page 126

A. I believe he walked into the office. We were all kind of in the administrator suite together.

Q. Okay. And then how did that conversation with Mr. Jackson transition to a conversation with Mr. Lewin?

A. So at that point, they're like, hey, we need to have a meeting with you. And then Jeremy and Ken came into my office. At that point, I made a comment saying, hey, should my chief of staff be here? And the -- I was told no by Ken.

And then I told Brandon, who was a senior advisor, you know, direct hire employee, go and get Matt. And then Matt came in and we all sat down, me, Matt, Jeremy, and Ken.

And that's when Jeremy said, you know, the concern is that there's a loss of control at the agency, and you need to put the entire agency on admin leave, and you can pick, you know, 12 to 15 people to keep, and everyone else is going to go on admin leave. And I said, no.

Q. Was there further conversation?

A. Yes. After that, it -- Jeremy said, well, if I have to call Pete Marocco, then I'll call him. And I'm like, I don't care if you call Pete because

Page 127

Pete has nothing to do with USAID. He's in State F. It's a completely different agency. And I thought it was really just Jeremy's misunderstanding of government agencies and how that worked.

And then Jeremy said, okay, well, if I have to call Secretary Rubio and have him to order you to do this. And I told him, I don't care if you have the Secretary Rubio tell me because he's not in charge of this agency.

And the reason why I'm not putting people -- the whole agency on admin leave was because we had just done an order of departure from the Democratic Republic of Congo, which I don't remember the exact number of people, but they were in transit from there back to the US. And I wasn't going to disable all of their accounts and forbid them from having access to USAID resources.

We also had a team, I believe it was in -- this was regarding Ebola. And I'm like, we -- we -- Uganda, I believe it was. I'm like, we've got people there. I can't just shut the agency down.

So I expressed that. And then I was told, well, if we have to call POTUS, we can do that. And I was very clear and Matt was there with me. And I'm like, I don't care who you get to tell me to do

Page 128

this, this will kill people if we do this. I'm not doing this.

And then we just kind of waited there. And then Jeremy left the room and then came back around 45 minutes later, at the time, me and Matt were talking, and I'm like, I'm not doing this. If they remove me, they remove me, but I'm not doing this. About 45 minutes later, Jeremy came back and said, oh, okay, well, you know, we'll resolve this later. And I was like, okay.

MR. WEN: Hey, Beth, can we take a quick break?

MS. STEVENS: Yeah. Let me finish this train -- I'm almost done.

BY MS. STEVENS:

Q. So the position that you were describing of not wanting to put people in harm's way with respect to the agency, you articulated that to Mr. Lewin; is that correct?

A. Yes.

Q. And you said -- you didn't say who said this, so I want to understand. He said, if we have to call POTUS, we will. And you said, I don't care who tells me. Who said that?

A. That was probably a misspeak. It was, if

Page 129

I have to call POTUS.

Q. And was --

A. That was Jeremy.

Q. After -- let me get two more questions in. After Mr. Lewin came back from the 45 minutes out of the room, was there more conversation that happened? I'll ask you questions about that if there were, but --

A. Aside from me and Matt saying, there's no way I'm doing that, that was it.

Q. Did -- during that time frame, before or after Mr. Lewin left for 45 minutes, was there a phone call with Mr. Musk?

A. No.

Q. Was there a phone call with anyone outside of the four of you that were in the room?

A. Not to my knowledge.

Q. Like, you didn't -- you didn't have anyone on the phone with you all?

A. Absolutely not. No.

Q. Was there a response with respect to the -- your statement of, like, this -- people would die?

A. What do you mean by response?

Q. Well, you -- you made that statement.

JASON GRAY                    February 03, 2026                    130 to 133
93681

Page 130

A.   Yeah, I did.

Q.   Did -- was there a -- did Mr. Lewin or Mr. Jackson or Mr. Hopson respond specifically to that statement?

A.   So Mr. Hopson, Matt, was quite honestly, he was, like, there's no F'ing way we're doing this, is what he said.  So I was again, I was not going to do it anyway, but that is the only comment that I really recall.  Meaning, I didn't -- I didn't get an impression one way or the other from either Ken or Jeremy about my comment.

Q.   And then your understanding of, like, shut the agency down and that meant to take away access from all the folks around the world you -- you described earlier --

A.   Yes.

Q.   -- folks around the world.  Okay.

A.   Are you okay to take a break?

Q.   Yes.

A.   Okay.  All right.

THE VIDEOGRAPHER:  Okay.  Please stand by.  The time is 1:54 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record.  The time is 2:13 p.m.  You may now proceed.

Page 131

BY MS. STEVENS:

Q.   Okay.  Mr. Gray, we were talking about events from January 30th of 2025.  You had just described for us this meeting with Mr. Hopson, Mr. Jackson, Mr. Lewin.  And then you talked about Mr. Lewin left for 45 minutes, came back in, and then the conversation ended.  Could you tell us what happened next?

A.   So Jeremy left and Ken left, and me and Matt talked a little bit, basically just reaffirming the why and no.  And then I went home fully expecting to lose my job.

Q.   And did you lose your job?

A.   So the following morning, the 31st, I came into the office, and Pete Marocco was there, and he said, hey, and he had brought coffee.  And he said, hey, I want to have a conversation with you.  I just want to let you know that effective last night, POTUS signed and put Secretary Rubio in charge.  You're no longer the acting administrator.

And I was like, okay.  And I -- I really, at that time, was thinking I would be put on admin leave, but I wasn't.  And I was told that I was going to be going back to being the CIO and maybe into the DAPP position, but that they were keeping

Page 132

me in the front office.

And that was pretty much the extent of that conversation, and that we would have a follow on conversation later on, which we did, which I'll get into in a moment.

But the impression I had is that, again, at this point, I hadn't really interacted with Pete, but I -- the impression I was left with was that he understood that -- that I made the right call.  I don't want to speak for him, but that was the impression I was left with, is that yep, this is why we're keeping you here.  So it wasn't that you did something you shouldn't do.  It was that, you know, we're keeping you in the front office.

And then that was pretty much everyone started coming in, and then we had a meeting in Point 4 and Pete basically, you know, introduced him to -- himself to people who had not met him, which I don't know who they were or that didn't know him or not, to let everyone know that Secretary Rubio was now appointed to be the acting administrator and that he was going to be the principal deputy.

And then I was just basically sitting there listening to what happened.  And he also -- he, again, reaffirmed with everyone, I didn't do

Page 133

anything wrong. It was just this is a decision that was made, and Jason is going to go back to being the CIO, but it's going to stay in the front office.  So he kind of outlined all of that, and that was how the day went.

Q.   Okay.

A.   Or that morning.

Q.   Before the -- so that's the morning of the 31st, this meeting with Mr. Marocco, right.  The night before the day before on the 30th, after your conversation with Mr. Hopson, sort of debriefing this larger conversation with Mr. Lewin, Mr. Hopson, and Mr. Jackson, was there anything else before you went home that -- that occurred with respect to that -- that meeting?

A.   I -- I did talk to Brandon to let him know, hey, not to go into the details, but to let him know that I would probably not be in the position the next day and wouldn't be surprised if I went on admin leave.

Q.   Why did you have that impression walking out of the meeting?

A.   Because the impression I had is that when -- when I'm told to do something, again, by someone who really has no authority to tell me to do

Page 134

something, and that it's escalated to we're going to talk to Pete, which again, as I mentioned, makes it sound like they just really didn't understand how government or agencies worked.

And then when I said no to that and then escalating it to Secretary Rubio, it's just the impression I was left with is that it was whoever high enough could convince me to make this decision. And then, of course, they realized that I wouldn't. So I didn't -- I felt like I -- I pushed back because it was just something I wouldn't do.

And I -- I having seen the massive use of administrative leave because one of the first things that happened, which I dug into more about administrative leave and how many calendar -- calendar days can be used in a year before people have to come in.

There was conversation about, you know, the time of, like, how much time people are going to be on admin leave because I was very set on not wanting to go beyond, which I forget what the length, I think it's ten calendar days a year or something like that.

So I -- but the -- the perception I had was that it was very easy to put people on admin

Page 135

leave. So I thought I pushed back and said I wasn't going to do this. And I thought, oh, I'll be on admin leave.

Q.    At the time of that conversation in your office on the 30th with Mr. Lewin, Mr. Jackson, and Mr. Hopson, Mr. Lewin was still the DOGE team lead?

A.    So yes, but he was also, I would find out this later, I did not know at the time, but actually had come into and become a USAID employee.

Q.    And do you know when that happened?

A.    I -- I don't. I don't know the specifics. I just know that he was put on the rosters of my team, meaning within the CIO organization.

Q.    And you -- you said you found that out later?

A.    Later, yes. When I forget, I saw some report and it said that I saw my numbers, and it said that there was, you know, 98 or whatever versus the 97 on board. And I'm like, that doesn't make sense. And I looked and it's like, yeah, why is Jeremy on.

And it said, and again, in Google Suite, you know, in the active directory, it'll identify what office or bureau they're in, and it said MCIO beside his name. And I thought, why is he an MCIO?

Page 136

Q.    Did he -- when he came back from the 45 minutes gone, did he say what he did while he was gone for those 45 minutes?

A.    He was on the phone.

Q.    With who?

A.    I don't know who with, but I know he was on the phone.

Q.    How do you know he was on the phone?

A.    Because he walked out of the room and picked up the phone to make a call.

Q.    And he didn't tell you who he was on the phone with?

A.    No.

Q.    Okay.  At any time on the 30th, did you have a conversation with Elon Musk?

A.    No.

Q.    And then let's see.  I don't why I keep taking that out.  Exhibit -- yeah.  When you were describing the interactions with Mr. Lewin and saying that you pushed back against someone who doesn't have the authority to tell you what to do, what they were telling you to do, can you -- can you describe that a little more?

A.    So the impression I was left with is that he thought, and I'm speculating because I don't

Page 137

know, but the impression I was left with is that he thought by referencing Pete Marocco, that that was going to influence my decision. And it didn't and I explained that State Department has nothing to do with US A-I-D. They're different agencies.

And then when the reference to Secretary Rubio was made and the specific that was said, if we have to pull Secretary Rubio out of the SCIF to order you to do this, which it was a strange thing. And it just made me think he didn't understand because why would Secretary Rubio be in a SCIF. And why would he know he was in a SCIF.

It was just -- it was a -- it was a -- it made me think that he didn't understand how that whole process worked.  But I was like, no.  And that was when it was, if I have to call -- if I have to call POTUS, then -- and I'm like, I don't care who you tell to tell me or direct me to do this, I'm not going to do this.  And that's how that ended.

Q.    The part where he talked about Secretary Rubio, can you say again exactly what he said, to your recollection?

A.    To my recollection, he said, if -- if I have to call Secretary Rubio or get or pull Secretary Rubio out of the SCIF to direct you to do

Page 138

this, and that's when I said, I don't care who you call, this is going to -- I'm not going to do this because we have an order of departure that is ongoing right now.

We had been spending part of the week planning on going and meeting people who were evacuated because that was the typical thing that we did. I had done that once before, jointly with the State Department. And then it escalated to the, again, specifically mentioning POTUS, and I was like, I don't care who, I'm not going to make that decision.

Q. And why did you say that he doesn't have the -- Secretary of Rubio didn't have the authority to do that?

A. Because USAID and the State Department are two separate agencies, and the administrator for USAID is responsible for USAID.

And I know the collaboration and partnership between the Secretary of State and USAID are very close. I know there's a shared joint strategic plan between them both, but in the end, the -- those decisions are -- rest in the responsibility of the acting administrator in that time.

Page 139

Q. And Mr. Lewin himself, at the time we talked about him being DOGE team lead, did he have authority to tell you -- you, the acting administrator, what to do?

A. No.

Q. Did -- what was your understanding of Mr. Lewin, like, the reporting structure for Mr. Lewin? Like, who did he report to?

MR. WEN: Objection. Calls for speculation.

MS. STEVENS: I asked for his understanding.

BY MS. STEVENS:

Q. Go ahead.

A. I don't know. I don't know who he reported to. I just knew that he was from the DOGE team.

Q. Did you ever talk to or -- yeah. Did you ever talk to Amy Gleason?

A. No. I have no idea who that is.

Q. Did Mr. Lewin ever tell you who he reported to?

A. He did not.

Q. How would you characterize the feeling in the room at the end of that meeting on the night of

Page 140

the 30th or afternoon of the 30th?

MR. WEN: Objection. Vague.

MS. STEVENS: Sorry. Go ahead with your objection.

MR. WEN: Objection. Vague.

BY MS. STEVENS:

Q. If you understand the question, you can answer.

A. Yeah. It was just in an intense meeting. I will say it was intense for me because I was thinking not really from the role of the administrator, but really from a technologist, thinking about removing access to email and accounts and just the sheer logistics of all of that and the impact of that.

So it -- I don't think anything was said as in, do this or do that. It was just, you need to shut the agency down.

Q. And then after you said no, you wouldn't shut the agency down, you were put in a subordinate role; is that correct?

MR. WEN: Objection. Argumentative.

BY MS. STEVENS:

Q. You can answer.

A. So I don't know why, meaning, my

Page 141

presumption is that I was removed from that position because of my decision. But I -- I don't know that. I just know Pete Marocco came in and said the next day that you are going back to your role as the CIO.

So I -- I didn't see it as a subordinate because I felt like my role was temporary anyway. I understand the responsibilities, but it was temporary and I was going back to my -- my real role with, in essence, added responsibilities by being a part of the front office.

Q. Is it correct, though, that basically your -- not basically. Is it correct that your last decision made on the night of the 30th not to shut down the agency was followed by you being removed as acting administrator?

A. Yes.

MS. STEVENS: Okay. Let's look at Exhibit 7.

(WHEREUPON, Exhibit 7 was marked for identification.)

BY MS. STEVENS:

Q. Okay. Are you familiar with this document?

A. Yes.

Q. And what is it?

JASON GRAY                         February 03, 2026                     142 to 145
93681

Page 142

A.    This was the document that I was given when I asked for proof that the president had used, I believe, the Vacancies Act to appoint Marco Rubio as the acting administrator for USAID.

Q.    And this is dated January 30th, so that same -- that same day that we've been talking about, right?

A.    Yes.

Q.    You didn't have notice of this designation on the 30th though, correct?

A.    No.

Q.    Okay.  You found out on the 31st?

A.    No.

Q.    Oh.

A.    I found out on the 31st this had happened, and I asked for a copy of it.  It was several days later, maybe even a week later, that I actually received a copy of it.

Q.    Did you have to follow up to get that copy?

A.    I don't recall.  I don't even -- I just asked. I said I want it for my records, and it was emailed to me.

Q.    In the meeting that you described with Mr. Marocco on the 31st in the -- in Point 4, who else

Page 143

was in that meeting?

A.    The -- okay.  So Adam, which I don't know how to spell his last name, but, like, Korzeniewski or something like that, who was the White House liaison, he was in that meeting.  Ken Jackson was in the meeting.  Joel Borkert -- Brokert -- or I don't know how to say his last name.  He was in the meeting.

I guess it's on one of these messages. Frank Lloyd was in the meeting.  Tim Meisburger was in the meeting.  Megan was in the meeting.  Laken was in the meeting.  So it was like all of the -- and Matt Hopson was in the meeting.

Q.    Did you -- you -- you talked to us about what Mr. Marocco said.  How long was that meeting?

A.    Maybe 10, 15 minutes.  It was -- the impression I got of the meeting was just to let people know that -- that Secretary Rubio was going to be the acting administrator and that Pete was going to be basically running operations and spending more time at USAID to, you know, start running the organization.

Q.    Describe that a little bit more for us. What does it mean -- what role is the person who's running operations?

Page 144

A.    Primarily, the deputy administrators are the roles that perform the day-to-day operations, like having the meetings, doing the HR activities, doing the acquisitions, all of the administrative functions and operational functions of an agency.

Q.    And those two -- one of those roles was vacant and the other had the duties were assigned to Mr. Jackson, correct?

A.    Yes.

Q.    Okay.  So Mr. Marocco didn't take on either of those roles?

MR. WEN:  Objection.  Calls for speculation.

BY MS. STEVENS:

Q.    To your knowledge, was Mr. Marocco given the duties of either of those roles as of January 31st?

A.    I don't believe so.

Q.    What was your understanding of Mr. Jackson's role as of -- as of that date?

A.    So that's a good question because I -- I don't know.  I -- I don't even think he knew at the time. I -- the impression I was left with was prior to the last administration, my understanding was that there was an administrator and a deputy

Page 145

administrator.  And during the last administration, they transitioned to having two deputy administrators because there's a lot of work and a lot of activities that was going on.

So they -- and I don't know if this happened. When -- I don't know how it happened.  It happened before I got there.  But the impression I was left with was that the model was going back to having the administrator and a deputy, and that Pete Marocco was that deputy.

Q.    That's the impression you were left with at the end of that meeting that you described on the 31st?

A.    Yes.

Q.    Okay.  Who did you -- when you left that meeting, who did you tell about the fact that you had been removed as acting administrator?

A.    I don't recall telling anyone because I was -- it was not public knowledge.  It wasn't shared with, and I was worried about it getting to the press.

Q.    When you say it wasn't public knowledge, does that include for, like, internal to USAID, like, other staff members who weren't in that meeting?

Page 146

A. Yes. Yes, no one knew.

Q. Was that a, like, a decision made or you just knew that no one knew?

A. I don't believe that anyone knew that I had been removed from that position at that point in time.

Q. But was that a purposeful choice or is that just -- I'm trying to understand why -- when you walked out of that meeting, why not go to tell people?

A. I didn't -- I didn't really actually think about it. I thought I was, you know, when I look at the overall mechanics of it, the president decided to put Rubio in the role, and I was reassigned back to my original role with, you know, front office responsibilities being kept there as an advisor.

I -- I didn't really think much about I should go and tell people that this happened or I -- I do know that there was conversations, as we were talking about earlier, about additional people on admin leave. And it originally, on the 31st, people had come to me to say, oh, we want you to send this message out. And I was like, no, I'm no longer in that role, so I cannot do that.

Q. Okay. You see anything in writing on that

Page 147

date as to Mr. Marocco's goal?

A. No. I do believe later on, probably the following week, I'm not exactly sure when, but there was a follow up that showed that he was designated the duties as, I think, the acting deputy. I don't remember exactly what it said, but I do believe there was a follow up email that did come from -- I believe it was Pete Marocco sent it to the team showing where Secretary Rubio had identified him in that role, so people knew that it was legitimate.

Q. What authorities does someone who's not been delegated responsibilities -- let me scratch that. Without an actual designation from now acting administrator, Mr. Rubio, what authority did Mr. Marocco have prior to actually being delegated?

MR. WEN: Objection. Calls for a legal conclusion.

BY MS. STEVENS:

Q. You're lay answer to that question.

A. I don't know.

Q. As -- as someone who would be directed by Mr. Marocco, what was your understanding of his authority to give you direction?

MR. WEN: Objection. Calls for speculation.

Page 148

MS. STEVENS: I'm asking for his understanding of this person's ability to give direction.

THE DEPONENT: So I will say historically, the -- the administrator didn't give direction to the CIO. The CIOs, when they come into an agency, they know their roles, and they know their responsibilities, and they know the laws that they need to adhere by.

So the -- the direction that is given, it's not, like, operational direction, at least in any of the agencies I've been in. It is really, like, strategically, these are the things I want you to focus on. So the -- I -- I wasn't given, like, any sort of specific direction from Pete Marocco. So -- which is -- is typical.

I mean, even in education, the secretary of education didn't tell me you -- you need to do this. It was more me giving updates on this is where we're at, these are the security concerns, this is the money that I need, these are the resources.

So there -- there really isn't a lot of direction. Usually, what happens is the CIO will look at, like, the president's management agenda and then create their own plan with the strategic plan

Page 149

for IT and the agency and say, this is what I'm doing, this is how I'm doing it, this is why, this is the impact.

So you don't -- I never got from any agency, like, specific direction from an agency head, you need to do this.

BY MS. STEVENS:

Q. Okay. That makes sense. Also, on the 30th -- let me make sure. Before the meeting with Mr. Lewin, Mr. Hopson, and Mr. Jackson, did you know that there were -- actually, sorry.

Unrelated to the meeting that I just described on the 30th, did you have any understanding as to additional accesses that folks from DOGE were working on getting in USAID systems?

A. What do you mean by access to systems?

Q. Let's do -- so there -- specifically, with respect to some of the system -- the IT systems you described earlier, Phoenix, badging, cloud environments, did -- do you have, as you sit here now, any recollection that Mr. Farritor from DOGE was working on getting additional access to those systems?

A. Yes. I did know that there was a request that came in to give Luke access to, I believe it

Page 150

was Phoenix, which was, of course, a very -- I did not give access. I did not control access to that. So it was really brought to me of, hey, we need to find out who we can give access to because my understanding is what they wanted to do was to be able to see transactions and traffic that was coming from that system.

The impression I was left with at the time was it was just a further part of the investigation to figure out what happened from a transaction standpoint. So there was -- the question was, hey, how do we get him access to, which in essence was me trying to figure out who -- who had access to -- to get access to Phoenix.

And I believed, and I still believe that it was Danny You, who was actually on my team, who had access, but wasn't, like -- I think it was more of a like a backup administrator, but that he had the ability to actually give access to which they wanted to use to monitor traffic that was coming from that system.

Q. Did you have any understanding of other systems that -- sorry, did you have any understanding that Mr. Farritor or other DOGE affiliated people were trying to get access to other

Page 151

USAID systems?

A. So the impression I had is that even when they first came in, that they were wanting to have access to our network, which access to our network virtually gave them access to all of the systems that were not classified, of course. But the actual applications themselves, meaning, and I'll use Phoenix as an example, they already had access to Phoenix by virtue of having access to the network.

Q. The front end of Phoenix, like, they could interact with the -- but they --

A. No. On the back end --

Q. Okay. Okay.

A. -- they could, like, look at log files, they could pull down the database. There's things that they could do on it. But the impression or what I was told is that they wanted access to actually access the application.

Q. Okay. And what was your understanding of how that conversation developed?

A. Was that they were, again, trying to dig in and find these transactions that happened and illuminate really what happened, which again, I never actually saw that anything happened, but that I was -- that -- that's why they were getting access

Page 152

to validate or verify that some nefarious transactions had happened that shouldn't have happened.

MS. STEVENS: All right. Handing you Plaintiff's Exhibit 8. On the bottom right, the Bates number starts with 1774.

(WHEREUPON, Exhibit 8 was marked for identification.)

BY MS. STEVENS:

Q. Just glance -- you can read -- take a minute to read through there.

A. Okay.

Q. Okay. This is a email chain with, let's see, Ken Jackson, Matt Hopson, Brian McGill, John Voorhees, and some other folks. It starts on the 30th. Sorry, this is one that is us ending. It starts on the 30th; is that right?

A. Okay.

Q. You see that Mr. McGill is relating -- relaying that Mr. Farritor is asking for specific access. Did you read that?

A. Yes.

Q. Okay. Did you -- this is also on the day of the 30th, which you've just articulated a bunch of events from that date. Did you have any

Page 153

knowledge that this conversation about access for Mr. Farritor was going on?

A. No.

Q. Were you told later about this back and forth about access to Mr. Farritor?

A. I don't believe so because for C-Cure, as an example, that is a system that is -- is administrated by security and not administrated by the CIO organization. So I -- I understand what the system is because I authorize the system from an administrative standpoint, but I -- yeah.

So I wouldn't have actually ever been in that conversation, even a year before for access to it. That would have been a security thing.

Q. What about on the 30th with respect to your role as acting administrator? Would it have just not come up to that level of --

A. It -- it probably would have been escalated because of asking for and having to explain why because that system is what controlled access to the building and all of the different rooms in the building. So it -- it probably would have, but as I see, those all happened after the fact of me no longer being -- meaning, I -- that was on a Thursday. I had left for the day. None of

Page 154

this got to me.

Yeah.  I don't and again -- yeah.  Even looking at the following or the -- the one that's dated at 7:04, Brian is, in essence, asking Ken for his or my authorization to verify to do this, which again, I wasn't on the email, so I never saw that.

Q.   And you had -- this is in the evening on the 30th and you --

A.   Had already gone home and knew or suspected I wasn't going to be in that role.

Q.   All right.  Let's go to the next one.  Before we move to the next exhibit, after the meeting on the 31st with Mr. Marocco and the other folks that you described that were in the Point 4 meeting, what happened next?  You said you left that meeting, and then what happened next that day?

A.   The morning of I know I went and talked to my team to get a sense of what was going on because I had been out-of-pocket for a couple of weeks.  I know I talked to Steven Hernandez.  I talked to Zack Kahn, who ran IT operations, just to -- to get a sense of what was going on.  But again, I -- I didn't share this is what happened.  Yeah.

Q.   Are you saying, like, they -- you didn't tell them you weren't acting administrator anymore,

Page 155

or you didn't share the substance of how you got to not be acting administrator anymore?

A.   Both.

Q.   Okay.

A.   Yeah.

Q.   Okay.  So from their perspective, you're -- you're still the acting administrator at that time?

A.   I would presume, yes.

Q.   Okay.  So you went to talk to your team, understand what's going on.  What happened after that?

A.   Yeah.  I -- I wish I had access to my email, I would know.  but I'm I'm not really sure.  I know there were, you know, other meetings that were had, meaning -- and again, I don't know what those meetings are, but I know my day was pretty busy.

I know some of the -- so for example, I was no longer getting briefings in the SCIF anymore.  So it was going in meeting with the analyst to let them know that, hey, I'm not going to be getting these briefings anymore on the high side.

So they -- because we employed people from other agencies to come in and give briefings to the

Page 156

administrator.  And I didn't want them prepping for stuff that I had asked for in prior meetings.

Q.   This is in some other document that we may or may not get to, but what does on the high side mean?

A.   Meaning classified material, top secret -- secret material.

Q.   Okay.  Do you have a recollection around that day about DOGE access, Mr. Kliger and Mr. Farritor seeking different types of access on the 31st versus my questions about the 30th?

A.   Different types of access for what?

MS. STEVENS:  Let's -- let's -- I'll give you Exhibit 9.

(WHEREUPON, Exhibit 9 was marked for identification.)

BY MS. STEVENS:

Q.   There you go.  And take -- take a minute to read through it.

A.   Okay.  Yes, I recall this.

Q.   Okay.  Can you describe for us the events leading up to this email chain?

A.   My understanding was that they wanted to be able to access the log data to see information that the application itself wouldn't reveal.

Page 157

Because the way an application works is on the front end, the user interface that people see, there's a lot more on the back end that you can see of, like, time stamps of when something was done or when an action was taken.

And my understanding is that they wanted to have access to those systems so that they could actually identify when exactly something happened, that the application wouldn't actually say.  And that was for both Gavin and Luke.

I do remember this because the initial question was about Jeremy as well.  And I asked Jeremy about, do you need access to this, and he said, no. But yes, so it was giving them access to the back end of the system so they actually could see more than what the front end would actually show.

Q.   That question from Jeremy or about Jeremy, was that on this day or was that on the 30th?

A.   That was on this day.

Q.   Anything else around that conversation?

A.   So the -- one of the things that I did ask my team because I wanted to make sure I understood is that we -- as I mentioned earlier about Splunk, Splunk controls all of this, meaning it logs all of

JASON GRAY                    February 03, 2026                    158 to 161
93681

Page 158

this. So if someone changed something in a system somewhere, we would know about it. And those -- you can't just go and undo or edit or delete that because if you do delete it, it marks that it was deleted.

So the -- and again, it was done intentionally so that government could make sure that insider threat wasn't inadvertently changing the numbers or removing access logs, which is why one of the reasons all agencies do this, but USAID used Splunk to monitor all the time.

So when I looked at this and I did talk to Steven Hernandez about this, and Zack, I asked, I'm like, I just want to make sure that Splunk can still track all this. The answer was yes. And I'm like, that's great. We'll give them access. They can do what they're doing.

They were very clear in the conversations because Luke -- I don't -- it wasn't Gavin. Gavin wasn't there. I think he was remote or something. The question was, what are you doing. It was, like, we're just we want to pull information. We don't want to change anything. We're not going to edit anything. I validated with Zack and Steven that if they did change something, that we would know about

Page 159

it.

And which, again -- so that was the rationale behind, okay, we'll give them access. They can see what they want to see, pull logs, review, see what happened. Yeah.

Q. When you say that if they did make any of those changes, you would know about it, are you -- are you suggesting that Splunk had, like, an alarm to let you know, or you're saying you could know about it by going --

A. I would say you could know about it because as I mentioned earlier, in one month, we would get a billion transactions, events that happen. So searching through a billion is -- is a really difficult thing to do, even if you narrow it down.

Every month, they would end up searching through millions, which then turned to hundreds of thousands, which then turned people looking through tens of thousands of events to validate what happened.

For me, though, it was just making sure that we historically would know what happened, when it happened, who did it, because Splunk logged all of that.

Page 160

Q. What team was responsible for viewing the changes in Splunk?

A. The information assurance team.

Q. And that's under CIO?

A. It is under the CIO.

Q. Who was the head of that team at the time?

A. Bill Morgan.

Q. So on the 31st, when you gave this permission over email or approval over email, were you doing that as the CIO or some other capacity?

A. As the CIO.

Q. Did you talk with anyone, outside of the folks that you've just identified, Zack and --

A. Steven.

Q. -- Steven. Did you talk with anyone else about that before giving them access?

A. I talked with Ken about it to let him know because he asked me about it and I was like, yeah, we will make that happen.

Q. To your knowledge, did Mr. Farritor or Mr. Kliger misuse that access in any way?

A. No. I -- I do not think they did. Even -- because the systems were new to them, they often were talking to my team members, asking them to help navigate some of the systems. So they were -- I

Page 161

never got the impression that they were trying to do anything nefarious, that they were really trying to discover and understand how the systems worked and operated together.

Meaning, as I mentioned earlier, Phoenix communicates with a system called PMS at HHS. It also communicates with State Department. It also communicates with treasury. So there's -- there's numerous systems, and understanding how all of those connect together is, like, really important when you're trying to analyze traffic and what went where, and when.

And I know that Luke spent a lot of time with, like, Steven Hernandez and team to dig into how do these systems work, why does this do this. So no, I did not get the impression ever that -- that they were using it for anything else.

Q. With this access that was approved on the -- that you approved on the 31st, were they -- were -- just, yeah, Mr. Kliger and Mr. Farritor, did they have the ability to, like, create new users in these systems?

A. Yes, they would.

Q. And give those -- the ability to give those users different levels of ability within the

Page 162

system?

A. They would be able to do that, but all of that would be logged in Splunk.

Q. Understood. Was the 31st the first day that you heard of Mr. Kliger?

A. I believe so. I don't recall hearing about him or seeing him. I don't know if he was in the building or not. I mean, yeah, but I had not really heard that name before.

Q. Did you understand that Mr. Kliger was also affiliated with DOGE?

A. Yes.

Q. Would it surprise you to know that Mr. Kliger has testified he was not a member of DOGE?

A. That would surprise me.

Q. I think you testified earlier, but I just wanted to clarify. You -- you did not talk with Ms. Gleason, Amy Gleason?

A. No, I did not. I don't even know who that is.

Q. When did it become -- not with -- agency wide knowledge that you were no longer the acting administrator?

A. I believe it was the following week, like that Monday. I would probably say it was probably

Page 163

that Monday.

Q. February 3rd?

A. Yeah. If I had to guess. I -- I don't think it was long. I think they let people know. Yeah. I would have to say the 3rd. Again, I -- I don't -- I don't really know and I wish I had an email, and maybe you have it, but --

Q. No, I don't unfortunately.

A. But I do know that a message was sent out, meetings were had to let people know. Meaning the SMM that we had, I believe that there was debate or conversation about, should we have it, shouldn't we have it again? And I'm like, yes, we should.

And I believe that Pete Marocco pulled everyone together to let them know that Secretary Rubio was now the acting administrator, and that I was going back to being the CIO, but working in the front office, and everything was going to be going through him and Ken.

Q. And that meeting you're describing as the Wednesday sort of bureau -- all the bureau --

A. Yes.

Q. -- heads meeting?

A. I -- yes. I'm not sure if it was Wednesday or not, but I -- that would be the meeting

Page 164

that we would have typically had. And I believe -- I -- I know that meeting happened. I just don't know if it was that day or not.

MS. STEVENS: Okay. Still on the 31st, let's do Exhibit 10.

(WHEREUPON, Exhibit 10 was marked for identification.)

BY MS. STEVENS:

Q. All right. You go and just read through and then describe what the exhibit is.

A. Okay.

Q. Will you describe what the exhibit is?

A. So one, I -- I wasn't on this, but I knew of this happening. This is when Laken was planning on putting 57 people on admin leave. I knew about that because she had asked me to do it, and I said I couldn't do it because I was no longer in the position, and that the only person that could do it was either Pete or Ken in his role, which again, I wasn't sure where he was with what happened with Pete because I hadn't seen anything at that point, designating him to what role he was in because originally, I -- I thought, well, maybe he was going into the deputy PP role, the DAPP. I don't -- I don't -- I didn't know.

Page 165

So -- but it was brought to me by Laken and said, hey, can you send this out and can you do this? And I said, no, I can't. That's beyond my role and responsibility as CIO. So -- but my understanding is that this is the message. Yeah. And I -- I was not aware of a RIF plan. It was just an admin leave plan.

Q. These are the same 57 employees from earlier in the week that --

A. No.

Q. -- Mr. Gottlieb had taken off or had -- had Mr. Gottlieb taking folks off, had those people been put back on and this is a new 57?

A. This is a new 57 people that are specifically within the LPA organization that worked under Laken.

Q. And what happened to the 57 that Mr. Gottlieb had -- had taken off of admin leave?

A. They were put back -- I believe it was Ken Jackson who put them back on admin leave to let them know that, no, you're not on -- you are on admin leave.

Q. But that was not during the time that you were still acting director?

A. No, I do not believe so.

JASON GRAY                    February 03, 2026                    166 to 169
93681

Page 166

Q.   As of the 31st, what was your understanding of Mr. Davis' role with respect to USAID?

A.   I -- I don't think he had a role at USAID. I thought he was a part of DOGE, and I presumed he was a part of DOGE that had come in to ask me technology questions at the time when I met with him. And I -- but I -- I knew he was just a part of DOGE. I don't know what or what level.

Again, as I mentioned, I did look him up to find out who he was and knew or had heard that he was Musk's number two. But again, as it relates to USAID, I wasn't aware of any role at all.

Q.   He is copied on this email --

A.   I see that.

Q.   -- right?  Okay.  What was your understanding of Mr. Lewin's role as of this date?

A.   As of this date, I was still under the impression that he was a part of DOGE.

Q.   At the -- the -- this one is descending. The last email in the train from 8/23 from Mr. Lewin. The -- the body of the email is on the second page.

A.   Okay.

Q.   It says, "Thank you, Pete.  Ken will

Page 167

formally authorize shortly, and our team will assist Laken with execution tonight." Who is our team?

A.   So my presumption there, which I believe is actually what happened, is that Luke and -- what is the -- Gavin.  Because they had access, they could remove network access from people without going through my team.  Because they had admin access or admin access to Aidnet.  So, and specifically in this case, I know that's exactly what happened, is because I was not aware of this.

I knew that they were planning on putting admin leave and would later find out that they removed access, which we ended up, I don't want to say fixing the process, but we fixed the process because while they did that on the back end, it broke things because we actually had to follow our process to make sure that they were removed from other applications.

There was a set process that NTT, who is the vendor who managed our IT systems, would go through to remove access.  And we needed to follow that process because it, you know, we had people deployed all over the world.  There was replication that had to happen, and what they were doing is going on the back end and just removing access that

Page 168

way.

So -- but -- so that's that's what happened, is the -- the my team was Gavin and Luke going in and removing access to those 57 individuals, which are a different number of 57 people.

Q.   When did your team realize that you needed to fix this access situation that you just described?

A.   That might have been a few days later because we -- we really didn't -- at the time, I didn't even know about it.  I didn't know that they had done that. Later on, probably the following week is when I was told, oh, by the way, they were -- they put these people on admin leave.  I didn't know.  I knew that it was coming.

And then I talked to Zack, who typically would, from an operation standpoint, his team would go and do that.  And he is the one who told me, oh, no, they already did it on the back end.

And then -- his name escapes me at the moment. The -- the lead for NTT, which was the contractor who did that, let me know, hey, we need to do this because there's a script that we can run, and we -- it will make it easier and sync across the

Page 169

world.  So that's -- I want to say it was probably a few days later is when I found out that their access was removed.

Q.   Also, on the 31st, it's my understanding that Mr. Hopson decided to quit his position.  Do you recall that happening?

A.   I do.  On Friday, he -- Friday afternoon, he met with me and told me that he was thinking over -- thinking about resigning, and he wanted to give me professional courtesy and let me know.  I asked him not to because I really valued his input, and I felt like the team would be -- that he would help the team, the political team who was there.  And I want to say it was Friday evening is when the message got sent out that he was resigning.

Q.   Did he tell you why he was resigning?

A.   He did.  He said that his -- that he was worried about -- he said he was worried about DOGE and that DOGE -- that and I'm presuming the DOGE people who were there, were -- seemed willing to go beyond, and hopefully you can talk to him, but that seemed to be willing to go beyond where they should go.  Not that they had, but they seemed like they were willing to.

And I told him that from what I've seen, I

Page 170

had not seen that, which is why I really wanted him to stay because I needed really strong political leadership in the agency to -- to do the right thing and keep doing the right thing. And -- but he said he felt that he was worried that they would -- they would do something, and I told him I didn't think that would happen, but he still left.

MS. STEVENS: Okay. Turning your attention to February 1st. All right. Handing your Exhibit 11.

(WHEREUPON, Exhibit 11 was marked for identification.)

BY MS. STEVENS:

Q. Take your -- take a minute to read through it and then let me know when you're done.

A. Okay.

Q. All right. This one is in ascending order, so we'll start at the second page where Ken is indicating that -- that there's some folks coming to the USAID building. Do you remember this sort of situation --

A. Absolutely.

Q. -- in time. And then Ken replies -- or sorry, Pete -- Ken replies and says, "With the new state/USAID delegations, I'm running this through

Page 171

you for approval." Do you know what that means?

A. My understanding is that is Ken now communicating to Pete to get Pete's sign off that, yes, this can happen.

Q. And -- but do you understand the, like, State/USAID delegations?

A. Yes. My understanding for that is, again, Pete was still a part of the State Department and still holding his role in State F. And that because -- I mean, to my recollection, we didn't actually have guidance on was Pete part of Aid, was Pete part of State. We didn't really know. I didn't know. I don't want to speak for Ken, but my understanding is that Ken sent this to make sure that Pete was approving this versus Ken approving it.

Q. You said that you recall this situation on the morning of February 1st. Can you -- outside of just what's in this email, can you tell us what you recall?

A. Yes. I got a phone call from Steve Davis, basically saying that he was in the Ronald Reagan building trying to get access and did not have access, and that I had, I think his number was 12 minutes to get him access, or he was going to call the US Marshals Service and have everyone escorted

Page 172

out of the building.

Q. Okay. What time -- around what time was this?

A. I do -- I do not recall.

Q. Morning, afternoon?

A. It was probably when all this was happening. I -- probably, like, midmorning, afternoonish.

Q. Okay. And this was the -- the first phone call you'd had --

A. The first --

Q. -- about this situation?

A. Yeah, absolutely. First phone call.

Q. What was your response to Mr. Davis?

A. Let me find out what's going on. I'll get back to you. And then I got on the phone. I got off the phone and talked to PJ. Butler, who was managing physical security and -- at the Ronald Reagan building.

As I mentioned earlier, we were working every day, so there was -- there was no weekend. So that's why it all kind of blurs together. And I told PJ, I said, hey, what is going on? And he said, we -- we just need to make sure that, you know, there's a badged person there. I will get

Page 173

them access. I'll take care of this. And that happened very quickly.

I let Steve know, hey, this is being taken care of. And then they got access. And then shortly after, I got another phone call because apparently, Steve had access and the access was removed. And I, you know, was asked about the removal, and I'm like, I have no idea. Let me talk to PJ Butler.

And then we actually did a three-way conversation where it was me, Steve Davis, and PJ to talk about this, to find out what was going on. And Steve asked PJ, did you remove my access? And PJ kind of hemmed and hawed about it a bit.

And then Steve was, like, I have my team right here that can easily see that PJ Butler or whatever -- I -- I think he had a different name. I don't think it went -- PJ was a -- a separate name for him, but that, you know, basically, PJ had removed his access at this time, and he gave the specific date time stamps of when that happened, which, as I mentioned earlier, is the log access that they would have access to so they could easily see.

And this was Steve Davis letting PJ know

Page 174

that, yes, I can see that you removed my access. And then Steve asked him were you ordered to remove my access to this? I don't -- and -- and PJ would not answer the question. And I actually appreciated it. And he was very clear. He's like, listen, I -- that puts me in a tough spot because now you're asking me to talk about my boss. And, you know, I -- I really can't answer that question.

And then the question came up on, hey, we need to have access. It was access to what. And the conversation was having access to the administrator suite, which is where all the politicals were sitting on the fourth floor. They were like, we want to have access to that suite. We don't have access to that suite.

PJ said they didn't have access to the suite because the suite had been flagged as secret. And I let PJ know that that floor we had a temporary, a one month basically waiver basically saying that that entire area was not going to be having classified material from two weeks before, from the week of inauguration, that was removed because everyone needed to have access to their phones.

And historically, in that suite, you would

Page 175

not have access to anything. You wouldn't have your phones, you wouldn't have your computer. All the computers that were there were in there and would never leave there because there could have been classified material.

There was not classified material in there. And then I let PJ know, I said, if we're talking about access to the administrator suite, that's fine. That is what they want. And then I specifically said, we are not talking about access to classified material. And Steve Davis said, yes, we don't want access to classified material. We just want access to the suite. And then he got access to the suite.

Q. In the -- in the email that's in front of you where Mr. Marocco says, "That's fine. They just need one USAID badge with access for any guest." What was your understanding of the badge situation for the folks that were trying to get access to the USAID building that day?

A. Typically, for guest access to the Ronald Reagan building, you just needed to have a USAID badged employee that could then sponsor people through to get them access through the turnstile to get up to the floors.

Page 176

Q. And did Mr. Davis say that they had -- when he called you originally demanding access to the building, did they have -- did Mr. Davis or anyone else with him have that?

A. A USAID badge?

Q. Mm-hmm.

A. I do not know. I -- again, this was a couple of weeks in. I don't know, like, even Jeremy. I don't know if Jeremy had a USAID badge or a GSA badge. I -- I'm not really sure.

Q. What was Mr. Davis' role, as you understood it, that morning, or on the 1st, when he called you?

A. I -- to me, it was the same impression, was that he was a member of DOGE and was working with the DOGE team, which are the individuals who were mentioned, Tarak, which I had never met, Gavin and Luke and Jeremy.

Q. What was your reaction to Mr. Davis threatening to call the US Marshals?

A. What do you mean by reaction?

Q. Your -- what did you think about that?

A. I thought it was excessive and I thought, let me solve this problem because it's really easy to get access to a building. Again, I -- so it was

Page 177

-- it just -- it just seemed like, you know, it's all going to happen, you know, and it's like, talking about calling the Marshal service and having people escorted out for accessing in.

The thing that caught me was really the timeline, that you've got 12 minutes to get this fixed. And I'm like, okay. But it got fixed within 12 minutes, and people didn't get escorted. So that was -- it was good. Yeah. It just seemed -- yeah, just very intense.

Q. When you're on that phone call with Mr. Davis, why did the -- the threat of the 12 minutes or the call to US Marshals have any weight to it if you didn't have any authority?

MR. WEN: Objection. Vague. BY MS. STEVENS:

Q. If you know the -- if you understand the question.

A. Because to me, the impression I had was that he was a member of DOGE and they were trying to get access to the systems as was mentioned in this message.

Again, we already know that Luke and Jeremy and Gavin already had access. It just sounded like he wanted to have access to come in and

Page 178

see the facility and see what was going on, what they were doing. Again, I don't know the Tarak person.

So it was really -- it wasn't from -- the authority was more of that, here's someone from USDS or DOGE that was coming in who wanted to continue investigating what was going on, and it sounded like he was perturbed by being forbidden access to something that he should have access to.

MS. STEVENS: Let's do this one. Okay. Handing you Exhibit 12. At the bottom, it starts with 00059.

(WHEREUPON, Exhibit 12 was marked for identification.)

BY MS. STEVENS:

Q. And take a second. This is a couple of pages long.

A. Okay. And this starts from the back.

Q. Mm-hmm. Sorry.

A. No, I'm just --

Q. Okay. Did you have enough time to go through it?

A. Yes.

Q. Okay. So this is a series of emails from February 1st, 2025, related to access to different

Page 179

areas at USAID at the -- at the building; is that correct?

A. Yes.

Q. Okay. And you're -- you're on this email chain?

A. Yes.

Q. Okay. Turning to the last substantive page, which is the third page, this email, like the -- the email, the exhibit that we just went through, lists Jeremy Lewin, Luke Farritor, Gavin Kliger and Tarak Makecha, right, as the folks seeking access to the building?

A. Yes.

Q. Okay. And then up above, it further lists, Steve Davis, Noah Peters, and James Burnham. Do you see that?

A. I do.

Q. Okay. Is this the general time frame that the Mr. Davis' phone call to you --

A. It must have been.

Q. -- occurred?

A. Yes.

Q. Okay. And were you in communication with any of the folks on this email chain about that -- that conversation with Mr. Davis, I think --

Page 180

A. PJ Butler was -- which he's on this thread. I was talking directly to him, and he was on the call with Steve Davis.

Q. On the second page at the bottom, there's a -- a message from Mr. McGill. Can you just read that -- or have you already read that section?

A. Yes.

Q. Okay. The last sentence where it says, "We still don't have paperwork on them to verify clearance, we've asked ES for that info." Who is ES?

A. The executive secretariat, of which Erica Carr is the acting executive secretary for the agency.

Q. And the next sentence where -- where Erica says, "Brian, to be clear, ES is restricted." Is that -- does the executive secretary have their own space within USAID -- the USA building?

A. Yes, they do. It's on the same floor as the administrator, opposite halls.

Q. So she makes clear that that area is restricted, and then Brian responds, "We'll make sure that's corrected." Are you interacting with any of them sort of on the side of this email chain, or are you just observing this as it's happening?

A. I'm just observing it as it's happening

Page 181

because as a CIO, I had no access to any of these systems, like C-Cure. I -- I didn't have access to that. My team didn't manage that. I got called, and I don't -- I don't know why, but Steve Davis called me. I called PJ. And then that's when the conversation happened about, this is what we're talking about. We want access to the administrator suite.

And I was explaining, okay, but there's -- there were several, I think, three or four floors that were actually classified, labeled as classified, meaning SEC. I think on the fifth floor had classified space, meaning the -- the area itself, as Erica had mentioned about Exec Sec, had classified systems, meaning systems with basically a red label on it saying that it was connected to a classified network.

You wouldn't be able to get access to it, but the fact that those systems were actually in there meant that they were restricted. That is when I had the conversation with Steve Davis saying, listen, I am perfectly fine with you having access from an administrator suite standpoint, and I talked to PJ because he was on the call with the three of us, that this is what that means. It's not access

Page 182

to classified spaces.

Q.   And Mr. Davis, on the phone call, was fine with that?

A.   He was.  And he said, we don't want access to classified material.  We just want to get access to the administrator suite.  And I told him, I said, like, the SCIF as an example, that has -- it's all secured and safe.  So even if you got access, it's not stuff laying around that you could have access to.  But he was like, no, we don't want access to that.  We just want access to the administrator suite.

I think the confusion was that the administrator suite was labeled as restricted, secret, because it historically had been, but we had received a waiver for one month from Brian McGill saying, yep, we'll waive that because we understand that people need to bring their phones in there.  There was no classified material in there anyway, but that's -- that is my recollection and understanding of all of this.

It just at the time, it seemed like a massive misunderstanding, was that they were accessing or trying to access the administrator suite, which is what PJ got pulled into and where

Page 183

Steve Davis said, I see that you removed my access at this time.  It was when he was specifically trying to badge into the administrator suite.

If it's something beyond that, I'm not aware of it because that was the only piece that I talked to PJ and Steve Davis about.

Q.   This third to last email, right in the middle of the -- of the front page here, it's addressed to you and Ken from Mr. McGill, where he says, he would "appreciate a communication to them reminding not to access classified areas.  As we're checking the changes, we can see they are going through restricted areas to include giving themselves access to restricted areas."

Did -- did you respond to that?  What -- what was the sort of next steps from that?

A.   Yeah.  I did not respond to that because, again, I don't have access to that system.  I did not manage that system.  That was managed by -- I couldn't even see if they were doing that at all.  And at that time, I'm presuming that the reason Brian included me on that message is he wasn't aware yet that I wasn't the acting administrator anymore.  So I think that's why I got brought into this.

Q.   And then did you have a conversation with

Page 184

him that day about whether you were the acting administrator or not?

A.   I did not.

Q.   Okay.

MR. WEN:  Hey, Beth, can we take another short break?

MS. STEVENS:  Yes.

Is that okay with you?

THE DEPONENT:  Yes.

MS. STEVENS:  Yes.

THE VIDEOGRAPHER:  Okay.  Please stand by.  The time is 3:25 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record.  The time is 3:33 p.m.  You may now proceed.

BY MS. STEVENS:

Q.   The conversation you had with Mr. Davis and Mr. Butler, the three-way phone call.

A.   Yes.

Q.   And Mr. Butler, you know, expressed that he -- he felt awkward having to talk about his boss.  Who is his boss?

MR. WEN:  Objection.  Objection.  Mischaracterizing the testimony.

BY MS. STEVENS:

Page 185

Q.   Mr. Butler was expressing some hesitation to answering Mr. Davis' question.  Who is Mr. Butler's boss?

A.   I'm not -- it was either Brian McGill or John Voorhees.  It was one or the other.  If I had to guess because Brian was the deputy, I would guess that it was Brian.  And the question specifically asked was, did your boss tell you to remove my access?  And that's what PJ would refuse to answer.

Q.   After the -- you got off that phone call and then had this back and forth over email that you were observing, what -- what happened next with respect to this disagreement about access inside of the USAID's building?

A.   My -- so what happened after that was I got a phone call from Ken saying that they were going to be putting more people on admin leave, and to -- and one of them was going to be John Voorhees, and the other was going to be Brian McGill.

So I couldn't get a hold of John, but I did call Brian to give him a heads up that, hey, this is going to happen.  And the reason I was involved is because my team would remove access to the network and to his cell.  So I wanted to, as a professional courtesy, let him know, hey, this is --

Page 186

is going to happen.

Q.  Did Ken explain why they were putting Mr. Voorhees and Mr. McGill on admin leave?

A.  No.

Q.  Did you ask why?

A.  I did not ask why.  Typically, if it -- if there's something from a CIO standpoint, you -- it doesn't really matter why.  If you're told by your leadership, hey, remove so and so from access, you remove so and so from access.

Q.  What did Mr. McGill say when you let him know?

A.  He thanked me.  He said, thanks for giving me a heads up.  And he said that he -- he accepted responsibility, and he said that if he could prevent PJ from being put on admin leave because the presumption was that PJ would be put on admin leave as well because of the circumstances, that he said that PJ shouldn't be put on admin leave, that he is fine being put on admin leave for that.

Q.  Did Mr. Jackson give you anything in writing related to Mr. McGill and Mr. Voorhees being put on admin leave?

A.  I don't -- I don't know.  I would have to check my email that I don't have access to now.  But

Page 187

at that point, we had started documenting and I wrote to NTT to let them know, hey, put, you know, remove access from so and so on this date and time because they wanted to make sure they had something official in writing.

So I believe -- I don't know if I received official notification, but I do believe I sent an email to NTT to let them know.  Excuse me.

MS. STEVENS:  Bless you.

MR. WEN:  Bless you.

THE DEPONENT:  Excuse me.  If -- which gosh, it really bothers me.  I can't remember his name, but I know that I would have sent an email saying to remove access.

BY MS. STEVENS:

Q.  And NTT is the third party?

A.  The vendor who does -- who really administrates the network and does all the IT services.

Q.  Is the -- the department or bureau within USAID that is responsible for the website, was that within the CIO's purview?

A.  No.

Q.  Okay.

A.  The website fell under LPA, which Laken

Page 188

was in charge of, and I forget the gentleman's name also who ran that.  I didn't interact with him much, but I do know that -- I forget his name, but it was all in LPA.

Q.  At the time that you talked to Mr. McGill on the first to let him know that he was going to be put on admin leave, had you told him that you weren't acting administrator yet?

A.  I did.

Q.  Is that when you told him?

A.  Probably.

Q.  And so under whose authority was he being put on admin leave?

MR. WEN:  Objection.  Calls for speculation.  Also calls for a legal conclusion.

BY MS. STEVENS:

Q.  I'm not asking for your legal opinion.  I'd like to know, to your knowledge, under whose authority Mr. McGill was being put on admin leave?

A.  To my knowledge, Ken is the one who talked to me and told me to do this.  So it was Ken's authority that was directing as, again, presuming the delegated roles of DAMR, which in essence is my boss, saying, do this.

Q.  And DAMR is the --

Page 189

A.  Deputy Administrator Resource Management.

Q.  Okay.  Thank you.  And, you know, we talked about Mr. Jackson's role being less than clear since you were taken out of the acting administrator role.  As of the first, did you understand what Mr. Jackson's role was?

MR. WEN:  Objection.  Vague.  Also, that mischaracterizes the prior testimony.

BY MS. STEVENS:

Q.  How about this?  As of the first, did you understand what Mr. Jackson's role was?

A.  My presumption was that he was still in the role until I heard or saw otherwise.

MS. STEVENS:  All right.  Handing you Exhibit 13.

(WHEREUPON, Exhibit 13 was marked for identification.)

BY MS. STEVENS:

Q.  Okay.  I said there were some mental gymnastics in some of these emails.  This is the worst one by far.  So my apologies in advance.  So at the top, it says, January 31st.  We are concerned with things that happened on the 1st, which are inexplicably in the middle of this email chain.

So I'm going to turn your attention to --

Page 190

actually, if you could just read through all of it, and then I will ask you questions.

A. Okay. Okay.

Q. On Page 6, at the bottom, at the very bottom, it starts an email that goes onto Page 7. From Bill -- or sorry, William. But this is -- this Bill M --

A. Bill M.

Q. -- who we've been talking about, right? To Leo Ruth and CC'ing Ken Jackson. Can you tell us who Leo Ruth is or remind us?

A. He -- Leo Ruth is a deputy director. I mean, his title is here. So he was in essence, John Voorhees had two deputies. One was Brian McGill, the other was Leo Ruth.

Q. And in this email, Bill said -- Bill? Yes, Bill. It says, "Confirming that John V. And Brian M. have been placed on the admin leave. My understanding was that Ken had support from DOGE to remove physical access. Please verify."

And then two emails down from Steven Hernandez, who is on your team, correct?

A. Yes.

Q. It says, "Confirmed, DOGE will remove physical access." What -- what does it mean to

Page 191

remove physical access first? Go ahead.

A. So what that means is the -- the system, C-Cure that actually controls physical access to the buildings, DOGE had access to, and it was letting Leo Ruth know because normally physical access would go to SEC, that independent office, the security office, to remove physical access. They would log in a C-Cure and remove their access.

When I read that, my understanding is that DOGE is removing physical access, meaning they're either a) using C-Cure to remove the names and the access of those individuals so that they don't have physical access to the building, or they're going into the database of C-Cure and removing the name that way. But I don't know.

But it's that DOGE was using the application and access that they had to remove physical access to the buildings.

Q. And at this point in time, Steven Hernandez, what's his -- his role?

A. His role -- this is on the 31st, right?

Q. The 1st.

A. The 1st. Yeah. I -- what I believe is that -- this was on the 1st. One, Steve, at this point, I don't think, really knew that, hey, things

Page 192

are changing because that was that Friday or Saturday. And Ken was letting Steven know that, hey, take care of this. These people are being put on admin leave.

And what that means is that Steven is going to let Zack know or another Bill, Bill Morgan, he put Jeff Anouilh on here to let him know, hey, remove their access, which that's on the logical side, which is the active directory side, which is removing access to the IT systems.

Q. Which is in the CIOs?

A. Which is in the CIO's area. The physical access was all SEC.

Q. The -- he -- Steven Hernandez even still has acting CIO here on his -- on his signature block, right?

A. Yes. He kept that there for several weeks after because there was a lot of ambiguity because originally, as I mentioned earlier, I knew I was going back to the CIO role, but it was mentioned that I might be going into the DAPP role, so we weren't really sure.

Q. So his role was sort of influx based on what your role might become?

A. Yes.

Page 193

Q. Okay. At this time, though, did Steven know that -- that you weren't acting administrator?

A. I don't recall, but probably. I tried to keep very close with Steven so he knew what was going on from an IT standpoint and support. So -- but I'm not -- not entirely sure if he knew then or not.

Q. Did anyone tell you not to tell people that you weren't acting administrator anymore?

MR. WEN: Objection. Asked and answered.

MS. STEVENS: I don't think I've asked that question just like that.

THE DEPONENT: No. No -- no one told me to say, don't do this. The -- the impression I had was that it wasn't -- I mean, on that -- certainly that Friday and that weekend, was that as the -- an announcement hadn't gone out to let people know.

BY MS. STEVENS:

Q. Did you have -- did anyone suggest not to tell anyone that you weren't acting administrator?

A. I can't recall. I don't -- I don't believe so. I think it was the -- the concern I had is, at least from my view, it was I didn't want to start a rumor mill with no official communication going out. And if I started sharing with people,

JASON GRAY                    February 03, 2026                    194 to 197
93681

Page 194

oh, by the way, I'm not the acting administrator, then that would have spread like wildfire. And then there would have been no opportunity to get in front of the communication and say, this is what's going on.

And that's where -- when Pete got there, that -- and the message eventually went out. And again, I -- I can't check or validate when that happened to let people know that Secretary Rubio was acting administrator and Pete was the deputy. Until that happened, I didn't want me to cause confusion because as I mentioned earlier, stability was everything. I didn't -- I didn't want to disrupt anything more than was already being disrupted.

Q.   Understood. On that same -- screw that up. The same document you're looking at, 13, what's your understanding of why Mr. Lewin is -- his first email is to Steve Davis about these 57 folks?

MR. WEN: Objection. Calls for speculation.

BY MS. STEVENS:

Q.   You can answer.

A.   My presumption, again, this is all new to me two weeks in, is that Jeremy is a part of DOGE and Steve Davis is a part of DOGE, and there's some

Page 195

sort of reporting relationship between Jeremy and Steve Davis is my presumption, but I do not know.

MS. STEVENS: Handing you Exhibit 13.

THE REPORTER: Did you -- could you confirm the exhibit number? Did you say 13?

MS. STEVENS: Oh, sorry, 14.

THE REPORTER: Thank you. I just wanted to confirm. So that will be Exhibit 14.

MS. STEVENS: That's a good catch.

(WHEREUPON, Exhibit 14 was marked for identification.)

BY MS. STEVENS:

Q.   Mr. Gray, this is a Google chat that was produced by Mr. McGill -- that's why it's got McGill down there at the bottom right -- between himself and Steven Hernandez and Zack. Could you just read through, read the notes there on the right, and then tell me when you're done.

A.   Okay.

Q.   So you see a couple of times it says, "Full administrative access," and then a different one says, "Highest possible level of administrative access." Can you tell me your understanding of what each of those means?

A.   So I'll start with USAID as an example,

Page 196

dot gov. That is the -- the active directory. And the highest possible level of administrative access, as I mentioned before, there's a super admin access. But that's the one where if you destroyed the -- the domain as an example, there's no way to recover it. And all of the data, everything, all the access would be -- you would not be able to reconstitute it.

So the -- the highest possible level of access would have been a domain admin, which would have given them the ability to -- to do everything but destroy the domain and shut the domain down and lock it down.

The same thing as it goes for the Google Workspace, because if they basically deleted the Google Workspace, that would delete everyone's email. It would -- all of the -- the shares and permissions to all the files for decades would have been deleted.

So my understanding is that it was we need the highest possible level of access, not just give them, like, the top. So that's what my understanding was.

The same thing for Azure and Entra ID, which I don't exactly recall what that is, but it's

Page 197

a way to validate. It is a system within the active directory through the Azure Cloud, but it's a system within active directory.

MS. STEVENS: Okay. I'm going to hand you -- try not to confuse myself here. Hold on just a sec. Exhibit 15.

(WHEREUPON, Exhibit 15 was marked for identification.)

THE DEPONENT: Okay.

BY MS. STEVENS:

Q.   So this email is from Mr. McGill to Bill W, the HR person, right? And copies -- and to other people, but also copies you; is that correct?

A.   Yes.

Q.   Okay. Bill M. Did I say W? Sorry. Bill M. Did you respond to this email from Mr. McGill?

A.   I did not.

Q.   Okay. Did you talk to anyone else about how to respond to this email from Mr. McGill?

A.   No. Usually, if -- if I'm copied on an email versus sent to the email, it's more for awareness versus direct action.

Q.   The evening before, you said that you called Mr. McGill to let him know he was going to be put on administrative leave. Did anything else

JASON GRAY                    February 03, 2026                    198 to 201
93681

Page 198

happen after that discussion with him?  Not necessarily about him, but anything else stand out in your mind about that Saturday?

A.  Not to my knowledge.

MS. STEVENS:  The next email is Exhibit 16.

(WHEREUPON, Exhibit 16 was marked for identification.)

BY MS. STEVENS:

Q.  Which is a response to Mr. McGill, but you're not copied on this one, so that's why I had the two different exhibits.

A.  Okay.

Q.  Did you talk with -- with Kirsten Gunsolus before she --

A.  No.

Q.  -- or before they sent this email?

A.  No.

Q.  Did you give anyone permission to say that you were, as acting administrator, you were putting Mr. McGill on leave?

A.  No.  My -- yeah, my presumption here is that the information just hadn't gotten there yet. So yeah, I'm assuming she was presuming it was me. I don't know what that attachment looks like.  I

Page 199

don't know what that attachment said that's referenced in this email.

But I was very clear with Ken, with Laken, and with the whole political team that I would not be doing anything as the acting administrator as of Thursday evening because I was no longer in that role.

MS. STEVENS:  Okay.  We had referenced this -- or you've referenced this document a few times, so we'll get to it.  Handing you Plaintiff's Exhibit 17.

(WHEREUPON, Exhibit 17 was marked for identification.)

BY MS. STEVENS:

Q.  And just read those two pages.

A.  Okay.

Q.  I think you said that you asked for documentation indicating that both that Secretary Rubio was designated as acting administrator and that Mr. Marocco had been delegated authorities. You talked about asking for those documents, right?

A.  Yes.

Q.  And you eventually got them over email; is that correct?

A.  I -- I do not actually recall this email

Page 200

or this document, but I do know the one that was signed by the president, I did get.

Q.  And that's the one that's designating Secretary Rubio as acting administrator?

A.  Yes.

Q.  Okay.  Do you see the date on these -- well, it's on both pages.

A.  I do.

Q.  It's February 2nd, 2025, correct?

A.  Yes.

Q.  And that's Sunday, February 2nd, correct?

A.  Yes.

Q.  You were no longer acting administrator as the morning of February -- or excuse me, January 31st, correct?

A.  Yes.  My understanding is as of the evening of the 30th, yes.

Q.  And we talked a little bit about your presumptions of what authorities Mr. Marocco had from the 31st and the 1st.  Does this document help shed light on that in any way?

A.  So yes, in that it explains to me that he was delegated the responsibilities for both the DAPP and the DAMR, not just one.

Q.  And delegated those responsibilities on

Page 201

the February 2nd?

A.  Yes.  That is when this is done.  And I was relooking at this because this is the 30th is when that was effective.  So -- but yes.

Q.  Just for the record, when you say that was effective, you're talking about the --

A.  Appointment of Secretary Rubio as acting administrator.  And the reason I say that is that it was -- that was effective, I'm assuming, sometime that Thursday evening.  So I was not the acting administrator at all on Friday.

Q.  Thank you.  Okay.  I know you didn't see this document on the 2nd, and we've gone over that email with Mr. McGill.  What is your recollection of the events that unfolded on Sunday the 2nd?

A.  So the -- the only thing I'd really add is, I -- I do believe, and I -- I don't know if someone would have to check or validate that Secretary Rubio was on a trip somewhere, and that might have been the reason behind the delay of the documentation because as mentioned earlier, I -- I don't think it was very clear Ken's role, if you will, from the 30th or 31st on because my presumption was that he was still the acting or delegated duties of the DAMR.

Page 202

And as mentioned, the -- I was aware of the other administrative acts, you know, admin leave that people were going to be put on from a CIO lens, meaning that I was going to be removing their logical access or system access. But it was very clear that it would not be from me.

I -- I just don't -- I don't have an answer of where that came from or who that came from or what authority that came from, especially if this was dated the second. I don't -- I don't understand the mechanics behind that, but yeah. So I -- I don't really have any other recollections for that Sunday.

Q. Do you have recollections outside of this -- the emails that we've gone over related to folks sort of more broadly being put on administrative leave or losing access to their systems?

MR. WEN: Objection. Vague.

THE DEPONENT: So, I mean, the -- the only -- at this point in time, I would say no. But as time progressed, you know, when you're removing people from their computer access, you learn that, oh, these people are being put on admin leave. I know that the 57 is an example because when I first saw that, I thought, wow, is that the same 57

Page 203

because it just happens to be the same number. And then I would learn that, no, that was LPA, but I was not in those conversations. That was Laken and Ken conversation.

And I -- I know and I don't remember what the number was, but there were more people that were going to be put on admin leave. But I -- I don't recall the specifics, but I do know there was more conversation about it.

I don't -- I don't recall any conversation about a RIF as an example. I saw it in the emails, but I don't -- there was no -- no big conversation about it. I -- I do think that -- I know earlier when the conversation was coming up about the RIF for DEIA, the -- I -- I really feel like people were trying to figure out what a RIF was and how RIFs worked. And I don't think they really understood that how RIFs were done.

Not that I'm an expert at RIFs at all, just having been through one. But I -- I feel like they were just trying to figure out mechanisms and government processes on how to affect the changes that they were bringing about. I wish I had my email in front of me because it -- it told me everything.

Page 204

BY MS. STEVENS:

Q. I'm going to show you a few more.

A. Okay.

Q. I've only -- we don't have all of them, but --

MS. STEVENS: Okay. So this is also from the 2nd. I'm handing you Exhibit 18.

(WHEREUPON, Exhibit 18 was marked for identification.)

BY MS. STEVENS:

Q. You are copied on these.

A. Okay.

Q. Okay. So you're -- you're copied on this final email; is that correct?

A. I see that, yes.

Q. Okay. And do you recall understanding that the CSC contracts were going to be terminated as -- as is articulated by this email chain?

A. I do recall.

Q. And what was your understanding of -- of the required next steps there?

A. So as it -- as mentioned earlier, I am copied on it, which I often would take as for awareness. To me, it was a heads up that these contracts were about to be terminated, which would

Page 205

result in a follow-up action by me getting a list of email accounts that belong to people who were contractors working for USAID to terminate their access is what would typically happen.

Q. Is that what happened in this situation?

A. I don't -- I don't actually recall because I don't -- I don't -- yeah. I don't -- I guess the answer is going to be yes, that it happened, but I don't -- I don't really recall. There was -- there were so many people put on admin leave and so many accounts that were removed and added, and it was -- there was a lot of moving pieces that were going on.

I do remember this. But I don't -- I don't recall if I got the list or if that was something that was provided to Steven. So I don't -- I don't know if I actually got a list of names to actually put there.

At the time, again, this is the 2nd. We were still in that phase of trying to figure out how to basically get DOGE not to just remove people's access and to go through the process, which we got there. But I don't -- I don't know if that happened for this or it didn't.

Q. On the second page, the -- the email at the bottom from Mr. Marocco to various folks, he

Page 206

says, "I know there's a sense of urgency at the White House." Did you have any understanding as to what that meant?

MR. WEN: Objection. Calls for speculation.

THE DEPONENT: Yes. So I -- it sounds to me, but again, I -- I don't definitively know, that Pete is trying to get Mike Needham and Dan Holler to get approval for this by saying the White House wants something is what it sounds like when I read this. There's an urgency there, but I don't know who.

I -- I don't have any insight into that because as you see, I just get copied on it, which when I read this, it was really for an awareness that, hey, something is coming where you may get a list of names that you're going to be removing access to the network.

BY MS. STEVENS:

Q. Do you have any recollection of seeing either in the news or if you're on X yourself, post on this date, February 2nd, about -- about USAID?

A. No. I do -- I am not on X. And to be honest, I -- I took my news app and moved it to the very, very end of my phone because I wasn't really

Page 207

interested in reading the news at that time, even now.

Q. Okay. On the -- is there anything else about the 2nd that -- that you recall happening? You said you all were working every weekend, but anything else happening at the agency then?

A. Not really. I mean, it was -- we were just -- it was 24/7 365. We were busy. Again, trying to keep track of who -- who to remove, what -- what was coming. Just didn't really know.

MS. STEVENS: I'm going to hand you 19 and 20. They're the -- the same thing, just one of them has the attachment to it and the other doesn't.

(WHEREUPON, Exhibit 19, Exhibit 20 were marked for identification.)

MR. WEN: So which one is 19 and which one is 20?

MS. STEVENS: Twenty has the -- or sorry, 19 has the attachment.

THE DEPONENT: I remember this.

BY MS. STEVENS:

Q. Okay. Tell us what you remember about it.

A. So this -- this was all about being a federal employee. So the press was reaching out trying to get information. Everyone was reaching

Page 208

out to try and get information. And what I didn't want was the perception that I was feeding, which is not authorized, information to the press.

So when I got that, I shared that with Pete, Laken, Joel, and Ken, so that if something happened because obviously someone was communicating that something was happening, that I didn't -- I didn't want the perception to be that I was sharing information.

So it was a proactive measure, which I did several times during my time there. Even -- when was this? This was in February, right? So even when the New York Times article came out, as soon as I got an inquiry that was sent to my personal, sent to my work, I took copies of that screenshots and sent them to say, hey, they're reaching out, I'm not talking to them. So that's what this is.

Q. In the responsive email, the Exhibit 20, Mr. Marocco responds and says, "Thanks for sharing. Please come in, and we'll need your help identifying essential personnel."

First, this is the -- the Monday where the email went out telling USAID staff to work from home. Did -- were -- had you previously been given that direction? Or do you recall?

Page 209

A. I -- I do not recall that. I do know there were several times where people were told to work from home because of events that were happening, and the guidance was really not wanting to impact, you know, staff to -- there was a lot of protests and people were upset and angry, and the conversations were about having people work remote to, you know, let things settle before subjecting employees to that at the time.

Q. Do you recall that a mass email went out to all staff telling them not to come into headquarters on the 3rd?

A. I -- I don't know. I mean, that happened several times, so I'm not sure if it happened on the 3rd, but I do know that happened several times.

Q. Do you recall that staff generally were not allowed to come back in except to collect their personal belongings, basically starting after the 3rd?

A. So I know -- I think there were 1,400 people that were put on admin leave. Yes, I do recall when that happened.

Q. And is your conclusion there that they, of course, they weren't allowed to come into the office because they were on admin leave? Is that what

Page 210

you're saying?

A.    That is correct.

MR. WEN:  Objection.

BY MS. STEVENS:

Q.    When Mr. Marocco said, please come in, we'll need your help identifying essential personnel, what did you understand that to mean?

A.    So my understanding was, and I remember coming in and walking through what are the core essential people that we need to maintain operations at USAID because a large group, I think it was 1,400 people, got put on admin leave.  And it was to walk through to see if there were individuals who were on admin leave that were needed for operations because I -- I was not involved in that conversation to put those people on admin leave.

Q.    But you're -- you're helping decide whether any of those individuals needed to come off of admin leave to help do essential functions.  Is that --

A.    Yes.

Q.    -- what you're saying?  Okay.

MS. STEVENS:  And we'll go to the next exhibit.  Exhibit 21.

(WHEREUPON, Exhibit 21 was marked for

Page 211

identification.)

BY MS. STEVENS:

Q.    Are these the -- is this the 1,400 --

A.    Yes.

Q.    -- that you're referencing?  So you weren't involved in the conversations to put any of these folks on admin leave; is that correct?

A.    Correct.

Q.    Okay.  And your understanding of Mr. Marocco's direction in the previous exhibit, 20 -- 20, was to help identify essential personnel to come off of that list, basically?

A.    Yes.

Q.    Okay.  And did you do that?

A.    I did do that.

Q.    Who did you have those conversations with?

A.    Pete Marocco and Ken Jackson and Joel, who was filling in for Matt Hopson because Matt had resigned.

Q.    Did you have any interaction with Mr. Lewin as to the 1,400 folks put on admin leave?

A.    Not to my knowledge, aside from getting a list of 1,400 people to remove administrative access, but I don't think that actually came from him at all.  It was more -- I think that came from

Page 212

Ken or Pete saying here's a list of people to put on or to remove administrative access or USAID access, Aidnet access.

Q.    I need a five-minute break, and then we only have a few more exhibits, so we're going to --

A.    Okay.

THE VIDEOGRAPHER:  Okay.  Please stand by.  The time is 4:20 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  We are on the record.  The time is 4:29 p.m.  You may now proceed.

BY MS. STEVENS:

Q.    Mr. Gray, you talked about not wanting to watch the news or look at the news around the time of the events we're talking about and even until now.  How come?

A.    So at the -- at the moment, at that time, there's just so much going on and there's so much speculation that's going on in the news that is not accurate.  And it was very frustrating to see and know that things were not accurate, but not actually be able to say anything.  And it was easier just to not hear what was going on.

It doesn't mean I completely avoid the news, but it was one of those things that was you

Page 213

know, just looking at all the events and why I'm here today, I -- there's a lot of emotion and feelings and thoughts on all of this, and it's just a lot to contain.

So for me, avoiding the news was a good way to compromise on the -- I'm not going to be inundated with a bunch of stuff that I know because then you resist the urge to actually say something that maybe as a federal employee, you shouldn't say, so --

Q.    Let's do this next exhibit.  Oh, actually -- actually, on the last exhibit, I'm sorry.  The one that talks about the 1,400 employees?

A.    Yes.

Q.    On the second page, which is the beginning of the -- of the memo, it has at the bottom, which seems to be pretty typical for these memos, this -- this sort of chart that says Bureau and then the name of a person and then clearance status.  Are you familiar with that sort of set up of it in the memos --

A.    Yes.

Q.    -- for USAID?  Is that fairly typical?

A.    Standard, yes.

Q.    Okay.  In this one, it's -- it says the --

Page 214

sorry, the first person is Jeremy Lewin, and it says, "Drafted and cleared." What was your understanding of Mr. Lewin's role at this time on the 3rd?

A.   So AID/A is saying that it's 1) a part of AID, and then slash A is part of the administrator's front office.  So the way this looks, just reading it as it is, is that they are from GSA and A, whatever that is, I'm assuming it's the administrator of GSA.  I don't know.

And AID/A, it's primarily used from a organizational structure.  So it -- it -- like mine, the whole time said MCIO because I'm in the M Bureau, meaning my organization is the M Bureau, the management bureau, the Bureau for Management.  And I -- so mine would say M/CIO because I'm in that organization.  My organization was within there, and -- but I reported to the administrator as mentioned.

So to me, looking at this, my presumption is, and that's just how this was done, is to let whoever is reading this know that this is coming from someone within the administrator's office.

Q.   Independent of this memo, what was your understanding of Mr. Lewin's position as of the 3rd, February 3?

Page 215

A.   That he was a member of DOGE that was coming from GSA because DOGE at that point, was -- there were numerous people all over.  They were in different agencies.  My understanding at the time was that he was a DOGE member from GSA that was within -- operating within the USAID environment.

Q.   Had you ever encountered anyone detailed to USAID from other agencies?

A.   Yes.  I had an employee that was detailed for a SES Candidate Development Program to my organization from the Nuclear Regulatory Commission.

Q.   And was that documented in writing?

A.   Yes.

Q.   Would it be typical for it to be documented in writing when someone's delegated from another agency?

A.   Yes.

MS. STEVENS:  Handing you Exhibit 22.

(WHEREUPON, Exhibit 22 was marked for identification.)

BY MS. STEVENS:

Q.   Do you recall this email?

A.   I do recall it.

Q.   And can you tell us what you remember about it?

Page 216

A.   I -- so the -- it's not really this piece that I remember.  It's -- it's really the piece after this because then it kind of filled in the gaps.  But my understanding, which I did not know what was going on at the time, I was, again, copied here, which for me, looks at awareness as a heads up, hey, we're about to remove his access.

So to me, it's flagging it.  As soon as I get the go ahead to remove access, I'll have my team -- team remove access.  But my understanding was that he was asking specific questions about policy.  And again, I wasn't there, but that he was asking specific questions that he was not getting answers to, which is why there was a perception that he was not cooperating.

And the way that I got to that, because I didn't get that here, is that when he did get put on admin leave, Lindsey Willis, who at that point became kind of the deputy because everyone else was on admin leave, also was put for a brief stint on admin leave because of the same exact thing.

Meaning, she started asking the same question of, show me, you know, where the -- and again, I don't know what that is, but she was asking for some sort of rationale or explanation and didn't

Page 217

get it.  Both of them got put on admin leave.  And then my understanding is later, they actually brought Bill back and took him off of admin leave, realizing that he was asking for stuff that he needed to do his job.

So I -- if I had to speculate here, this was a preemptive thinking that he wasn't being cooperative when in reality, he was just performing the duties of his job, wanting to validate and make sure stuff -- that he had what he needed to put people on admin leave.

Q.   Robert Carter, was he in the CIO office?

A.   It does not ring a bell.

MS. STEVENS:  All right.  Handing you Exhibit 23.

(WHEREUPON, Exhibit 23 was marked for identification.)

BY MS. STEVENS:

Q.   This one is in ascending order.  It starts with that.  Okay.  Do you recall this email --

A.   Yes.

Q.   -- chain?  Okay.  What is -- what's your recollection of the time frame around this email chain?

A.   So I believe this substantiates what I was

Page 218

saying earlier about Bill getting brought back off of admin leave because this is several days after that event. And my understanding was that the rules are different for investigative admin leave versus admin leave.

And with admin leave -- again, I don't know the rules, but with admin leave, in essence, there would be a way for it to just be in perpetuity until whatever was happening unless they were on investigative admin leave, which would put a time constraint on the length of time that they could be on any investigative admin leave and could result in some negative action being taken.

Q. What was your understanding of why Mr. McGill and Mr. Voorhees were being switched from not admin leave -- or sorry, admin leave to this investigative leave?

A. I have no idea.

Q. Okay. On the second page, this is the first email from Mr. Lewin. He's last and it says, "As soon as there's a final written sign off, our engineers will immediately cut access." Who is our engineers?

MR. WEN: Objection. Calls for speculation.

Page 219

BY MS. STEVENS:

Q. You can answer.

A. So it would either be the DOGE people that had access to remove access or my team. It would be either/or is probably again, I'm speculating, but either/or.

Q. Do you know if your team is the one who cut off access or adjusted access?

A. I believe at this point, they were already -- they had already had their access removed. So that doesn't actually make sense because there -- there would have been no -- they weren't taken off of admin leave, so there would have been nothing to -- to remove access to.

Q. Taking your attention back to the time when you were acting administrator, we went over Exhibit 3 is the DOGE executive order.

A. Okay.

Q. So 3C is what we talked about earlier, but I -- I think I tied my question in time to a specific date. So my question is: Under 3C, it says, "In consultation with USGS, each agency head shall establish within their respective agencies a DOGE team of at least four employees, which may include special government and employees hired or

Page 220

assigned within 30 days of the date of this order."

Did -- did you, in consultation with anyone else or not, establish a DOGE team within USAID during the duration of your time as acting administrator?

MR. WEN: Objection. I believe this is asked and answered.

MS. STEVENS: I think I tied it in time to January 30th. I'm asking for the duration of --

THE DEPONENT: No.

BY MS. STEVENS:

Q. Okay. This next sentence says, "Agency head shall select the Doge team members in consultation with the USGS administrator." Also, that did not occur; is that correct?

A. No, it did not occur.

Q. Okay. The last sentence of that same paragraph says, "Agency heads shall ensure that DOGE team leads coordinate their work with USGS and advise their respective agency heads on implementing the president's -- presidents, excuse me, DOGE agenda."

Did you do anything with respect to making sure that the DOGE team leads worked with USGS during that time frame?

Page 221

A. No, because I -- I didn't see this as a DOGE team that was being stood up within USAID. I saw this as a DOGE team coming to investigate some traffic that was going on that was suspected of being, you know, nefarious.

So it wasn't -- when I read the executive order, the way that I read this was that this is letting the rest of government, everyone know that, hey, there are going to be DOGE teams that are going to become a part of each of the agencies, and that that is what all of this would make sense to.

So I did not see the team coming from DOGE as a way to establish a DOGE team within USAID. It -- so I -- so there was no consultation. There was no discussion. It was just they were coming in to investigate what happened.

Q. So is this a fair characterization of your description there that -- that the folks from DOGE that came over during your time as acting administrator were a sort of DOGE team specifically working on this investigation as opposed to what you've just described in the EO?

A. Yes.

Q. Okay. And then did that -- did your understanding of that situation change with respect

JASON GRAY                    February 03, 2026                    222 to 225
93681

Page 222

to DOGE given that they stayed on past that time?

A. So I -- I don't know because I wasn't involved with the continuation of them being there or the work that they were doing to -- to do the things that they did.

So I -- I don't know. I just know that during my time as acting administrator, it was never a discussion or a thought that that was the DOGE team coming in to do DOGE stuff. It was meaning to look at how do we modernize government and how do we collaborate with agencies to affect positive change, which is my impression of what those DOGE teams were supposed to do. But that was not the whole time I was acting administrator. That was not what they were there for.

Q. When Mr. Hopson was telling you that he was thinking about leaving on the 31st, you said that he expressed concern with the potential that DOGE would go beyond what was appropriate. What did you say back to him?

A. So he specifically was talking about Jeremy and that Jeremy -- again, this is my characterization of what he said to me, was that Jeremy was willing to -- that he was worried, that he was willing to cross a line that he shouldn't

Page 223

cross. And what I told him was that I had not seen that in the time that I was there.

I know that there was a lot of different things that were going on that was not typical, but that every time so far, being able to walk through this is why this should or shouldn't happen, that -- that we were there.

So I -- I was trying to reinforce to him that I didn't believe it would go that far or that they would cross that line. And I -- I even believe it -- I want to say it might have been that week where the -- the TRO got issued, and there was a lot of speculation at the time of, will that even matter. And it did matter.

The things that needed to -- to stop to resolve that did, or at least were addressed by that did. So I was trying to reinforce to Matt, listen, I -- I know it looks that way, but having been in government for a long time, I -- I have a hard time believing that that would happen, and I was really hoping to keep him.

MS. STEVENS: I'm handing you Plaintiff's Exhibit 24.

(WHEREUPON, Exhibit 24 was marked for identification.)

Page 224

THE DEPONENT: Dave Nation. That's the NTT guy.

BY MS. STEVENS:

Q. Oh, there we go. Mystery solved.

A. Yes. That was driving me crazy.

Q. This is a few pages, so take -- take a minute to read through.

A. Okay.

Q. Let's turn to the first, like the request itself, on the 9th. This is from Mr. Lewin to you, correct?

A. Yes.

Q. And he asks for some additional access for Luke Farritor and Gavin Kliger, correct?

A. Yes.

Q. The second to last sentence says -- excuse me. No, that's right. "These are considered high priority from our leadership." Who is "our leadership?"

MR. WEN: Objection. Calls for speculation.

BY MS. STEVENS:

Q. You can answer.

A. My presumption would have been Pete Marocco, because there's no other leadership there.

Page 225

Q. But the following sentence says --

A. I know.

Q. "Pete, Ken, we would be grateful if you would approve -- excuse me, -- provide approval for these as well, just so the chain of command is clear here."

A. Yeah. I -- I don't know.

Q. This email is written to you --

A. I know.

Q. -- from Mr. Lewin, right? Do you know -- what do you take his meaning to be for "our leadership" since it's not Pete and Ken?

A. If I had to speculate, it would be that Secretary Rubio. But again, I -- I don't know. I wasn't in those conversations. When I saw this, the -- the reason why I acted on it is because I had both Pete saying to do it and Ken saying to do it, which was my leadership.

Q. On the third page, there's an all caps word, sort of towards the middle, SITMAN?

A. Yes.

Q. What does that mean?

A. It's situation something. Situation management, which is the -- the -- or situation manager, the person who is actually running the

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Page 226

operations. Yeah. So -- and I -- I know you see, but Jeremy wrote the email at 2:04. At ten minutes later, Pete responded yes. You know, a minute later, Ken said yes. And then, you know, 15, 16, 18 minutes later, I responded.

So, to be honest, I -- I'm not even sure within that amount of time if I had actually read the email versus seeing Pete and Ken both saying do this.

Q. I -- you're saying you followed Pete and Ken's direction?

A. Yes.

Q. I -- I got you.

A. Yeah.

Q. All right. This email chain includes a lot from David Nation, who you said a moment ago is from the -- the vendor; is that correct?

A. Yes.

Q. Did -- did you have any, like yourself, have any participation in getting this additional access?

A. Aside from talking to Dave Nation to -- because, again, him and I talked all the time when we'd get a request. And he, usually, and I'm sure he did it for this, would walk me through, hey,

Page 227

these are the issues because they're basically saying they don't have access to this.

And then what Dave would do is tell me exactly -- he would walk through this with me to let me know, hey, we already checked. This is the issue, you know, they -- they don't have access to this. They do have access, their certificate is wrong. So he would walk through me, and I know he did this. He walked through and said, hey, this is where we're at. I'm going to send a response to Jeremy.

Q. In the -- in -- you're sort of pointing to the bulk of this, which is Mr. -- David responding to each of the requests from Jeremy. And on the second page of that, number three, it says, "Ability to provision VMs and access." Can -- can you tell us what VM stands for?

A. Yeah. Virtual machine.

Q. What -- what is it for those of us not working on IT systems, what does it mean to have --

A. Sorry.

Q. No, that's okay.

A. Yeah.

Q. Have a virtual machine, and what do you use it for?

Page 228

A. So in essence, it's the ability to stand up a system within the environment. A virtual machine would be basically an operating system like Windows 10, Windows 11, or a server, so they could actually install an application and run an application from within the environment.

And then when they're saying an access, so it to me, it's the impression I have is that they want to, again, dig in and -- and be able to -- so I -- I know specifically for this, the -- the focus was on trying to really manage and monitor the traffic for transactions for working between the agency and treasury and HHS and state.

And they wanted to put a layer, a buffer in between so that there was an approval process that could be validated before the transaction actually went because what they didn't want was financial transactions and money going out of the agency that wasn't -- didn't have another layer of approval.

At the time, it was, we don't want to shut everything off. We want to monitor and manage what gets approved, what doesn't get approved by adding another layer.

To do that, they -- my understanding was

Page 229

that they wanted to spin up a virtual machine that could connect to those other machines that -- or other systems that prevented them from being able to send directly to them and to get another layer of approval for that.

Q. And you said a couple of times that they wanted that. Who -- who specifically?

A. DOGE.

Q. As told to you by?

A. As told to me by my team who was talking with DOGE about them, for example, Brian Herson, Steven Hernandez, on this is -- we want to -- meaning DOGE wants to be able to ensure that the financial payments that are going out of this agency are vetted.

Q. Mr. Hernandez, and then what's the other person's name that was on your team documented?

A. Brian Herson --

Q. Herson.

A. -- who now works for State Department for Diplomatic Technology.

Q. And they were both on your team?

A. Yes.

Q. And talked more substantively, it sounds like, with some of the DOGE team members?

JASON GRAY                    February 03, 2026                    230 to 233
93681

Page 230

A.   Yes.

Q.   Okay.  And those -- those DOGE team members are Jeremy, Luke, and Gavin; is that correct?

A.   I -- I don't know who they would talk to, but my presumption would be that it would primarily be Luke and Gavin, not Jeremy, because Jeremy didn't really get into the technical pieces.

Q.   Okay.  You have four minutes until your -- your call.

A.   Okay.

Q.   Shall we take a break so you can do your call and then come back on?

A.   That would be great.

MS. STEVENS:  Okay.  Sorry about that. I'm really very -- almost close to the end.

THE VIDEOGRAPHER:  Okay.  Please stand by. The time is 4:56 p.m., and we are off the record.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  And the time is 5:32 p.m. We are on the record.  You may proceed.

MS. STEVENS:  Okay. Great. Mr. Gray, I'm going to hand you what I think is our last exhibit, which is number 25.

(WHEREUPON, Exhibit 25 was marked for

Page 231

identification.)

BY MS. STEVENS:

Q.   Take a minute and read through there and then -- excuse me.  Let me know when you're done.

A.   Okay.  I remember this.

Q.   Okay.  Can you tell us what you remember about it?

A.   So we got a FOIA, as mentioned here, asking for all records, emails, communications from January 1st through the present of DOGE personnel access in classified or restricted USAID data.

So that piece, there -- I know that Leo Ruth went and looked and checked the logs on all the SCIFs to make sure that no one had accessed any of that material and confirmed that they hadn't.

The next was internal memos, complaints, or reports concerning USAID employees being placed on admin leave, reassigned in connection with those personnel.  I can't speak to that.  I didn't provide any of that because I didn't have those -- access to those memos.

And then security audit reports detailing unauthorized access to USAID systems.  The -- all of the access for these systems, meaning that we gave them domain admin, as we saw earlier in exhibits,

Page 232

that was all authorized, meaning they were vetted, requested access, and were given access to it.

So there wasn't -- which again, is which is why I wrote to Brian Herson, which is the person I've mentioned several times today.  Danny You is on here as well, asking really, like, do we have anything or is there -- the only access that DOGE would have would be access that we gave them, which was authorized.

Q.   Thank you for that.  On your response, you -- this is towards the top of the first page.  You talked about the high side of things, which you explained a little earlier, but can you explain that again?

A.   Yes.  The high side of things means anything that is secret or top secret with any of the additional flags that go with it, like SCI, and there's, you know, no form.  There's a bunch of different labels that can follow top secret.

So when I talk about high side, it is anything that is classified as secret or above. Which all of that, as a CIO, I did not have access to.  I did have a ClassNet account, which was a State secret account, and I did have, as mentioned earlier, access to JWICS, which is the top secret

Page 233

side.

But all of that is run through -- it was at USAID, but State systems, meaning they administrated it and SEC, John Voorhees, Brian McGill, and Leo Ruth are the ones who -- their teams provided access.  I did not -- did not have access to even provision access to.

Q.   Okay.  So is it -- here where Brian says, "I agree with you, Jason.  All access by DOGE staff for class and unclass was authorized." For class, that means classified, correct?

A.   Yes.

Q.   Are you saying, based on your just -- just prior testimony, that anything that was under class, classified, would have been under the SEC sort of department?

A.   It would have, but I will say in my entire time there, no one from DOGE accessed classified material.  And to -- to give an example, when Pete Marocco came over, I remember us going into SCIF to have a conversation about some events that were going on.

We called other agencies, but he had a clearance and was vetted before he was even allowed into the SCIF.  But I -- I have never seen or heard

JASON GRAY                            February 03, 2026                          234 to 237
93681

Page 234

of anyone from DOGE accessing a SCIF or classified space.

Q.   So you -- you have no knowledge of that, but you don't know for sure that that didn't happen, correct?

A.   Correct.

Q.   Okay.

A.   But SEC would be the ones who would know.

Q.   Got it.  As far as access to unclassified systems, some of which would have been in the CIO domain, correct?  That we've talked about --

A.   Yes.

Q.   -- today, right?  You talked about all of the DOGE access that was provided was authorized based on the -- like, for example, the email chains we've gone over where authorization was given.

A.   Yes.

Q.   Is that what you're talking about?

A.   Yes.

Q.   Okay.  If there were misuse of that access, so I understand that the access is authorized, but if there's misuse, it's -- it's your understanding that that would be -- would be able to see that in the systems log that you described in -- in Splunk?

Page 235

MR. WEN:  Objection.  Calls for speculation.

THE DEPONENT:  Yeah.  So It depends on what you mean by misuse.

BY MS. STEVENS:

Q.   Okay.

A.   Because I wouldn't know -- you would have to look for it, right?  Because I will -- I will give you an example that is not to do with AID because I think it -- it demonstrates what I'm talking about.  When I was at the VA, at the Miami VA, we had a -- I was the CIO there.  We had an appointment clerk who was going in and pulling out patient data from an appointment system and selling it online.

The -- the challenges, what they were doing was actually their job, meaning that they -- the use of the system was they were supposed to access this patient information.  They were not supposed to take it and sell it online, which again, they were found out, the IG investigated, and I think they went to jail.

But the -- the misuse only happened after because she was actually doing her job, using the system as it was supposed to be used, but using it

Page 236

beyond.  But until that beyond was understood, there was no way to tell.

The same thing with DOGE and Splunk.  Meaning, what we saw, at least when I was there, was they were trying to access to monitor traffic between two systems and understand the flow of traffic between two systems. They had gone in and as in all of this or many of this, demonstrated to remove access to or prevent access to or -- or add access to.  All of that would be logged in Splunk, yes.

But in terms of identifying misuse, I couldn't say -- and I don't know whether it was misuse or not, that would require some sort of analysis to be done on the logs.

Q.   The -- there have been allegations around DOGE's use of USAID data to, like, take data out of systems and, like, put it on systems outside of USAID systems.  Is that an example of something that Splunk wouldn't tell you happened?

MR. WEN:  Objection.  Calls for speculation. Lack of foundation.

THE DEPONENT:  So it -- it depends.  The security policy of the systems, and I'm not talking about a document, I'm talking about the -- the

Page 237

policy that is within the computer environment, prevents someone from, like, plugging a USB device in to extract data.

If it was put in that virtual machine as an example, I don't know, but if they created a virtual machine and decided to move that data there, that would be logged in Splunk.  So you would be able to go through and see exfiltration of data, and the tools, the security tools that we had in place would certainly monitor that as well.

So I -- I couldn't say definitively that did or didn't happen, but I know that the tools that were in place would have caught that and monitored that.  I will also say that when there were leaks of information, people sharing stuff they shouldn't have shared, I was always talked to and asked, go and find out who did this or how this happened so -- using the tools.

So I -- I would I say that to say that I -- I don't think DOGE understood our environment at all, meaning because they could have easily done what I did and worked through Dave Nation to actually do to monitor who did what if someone leaks something as an example.  But yeah, so I -- I wouldn't know.

Page 238

And -- and Splunk, just by default, wouldn't say, yes, this is, you know, some behavior that shouldn't happen, but it would be logged that it did happen. BY MS. STEVENS:

Q.  Is Splunk the only tool -- you just described tools to identify when -- when issues are happening. Is Splunk the only --

A.  No.

Q.  Okay.  What are the other?

A.  So for example, there's something called DLP, which is data loss prevention, which federal agencies are required to have.  And we primarily used Google for the Google Suite, which is a mechanism within the Google Suite that monitors to make sure that people don't inadvertently send PII or PHI outside of the system.

So if I used an email and I tried to send my Social Security number, which I would do if I had a SF 50 official record that I wanted to send out, our system would flag it.  It would pick up that that was happening.  It would send a message to the security team, the information assurance team, which was on my team, letting them know, hey, so and so did this.

And then they had the option to either

Page 239

release that because it didn't actually go anywhere. It just got put into a queue that got monitored by people to determine whether or not it did or didn't or should or shouldn't go.

And those were still in place even when I left USAID because as an example, Ken Jackson tried to send something with his information out to his personal account, and he's like, hey, I'm trying to send this and I can't and then I would talk to my team and they would talk to Dave Nation specifically, and he would help him navigate being able to send that information to himself.

Q.  Any other tools in place?

A.  There was a lot.  There was a lot of different tools.  I don't know all of them, but there -- we used a cool -- a tool called Tanium. There's -- I -- I would have to look through the list of security tools because I didn't dig into that.  That wasn't a part of my job.

But I do know we had a lot of tools that looked for, for example, the analysis that was done on the Splunk logs.  Every couple of weeks, NTT would perform an analysis on the billion hits of traffic or sessions that happened or events that happened to analyze and determine were they legit?

Page 240

Were they going to addresses that were outside of the country?  And if because we operated outside of the country, oftentimes the answer would be yes, but it would be doing, like, a deeper analysis.

But we had tools that would actually do that and a team that was primarily through Accenture.  At the time, I think it was a, I want to say a several hundred million dollar ten year contract to actually perform that, which I will say like, the first, maybe this was March or April, I was told we should cancel that contract.

And I -- because it was several hundred million dollars, and I went to the team, to Jeremy, and to Pete Marocco to say, listen, you can cancel this, but these are all the capabilities that you're going to lose that we're not going to be able to defend against.  And they didn't cancel it, which was good, until we actually transitioned those services to State Department.

Q.  When were the services transitioned to state?

A.  Yeah, that's a good question.  So even when I was there, a lot of the services had not been transitioned to State because -- so there were different types of services, meaning help desk as an

Page 241

example.  We were using NTT for help desk, and they -- State Department, when in July, when they wanted to do the reorg and transition everything over to State Department, they -- they couldn't provide support at the time because we still had people that were still across -- that were on the process of transitioning back to the US, but we still needed to provide that. So that's an example.

And even when I left, the -- this company called Cloudshape that was providing all of the networking trafficking traffic and analysis and configuration and sharing and permissions as it relates to communication between different systems and agencies, which NTT was the primary and Cloudshape was the sub.  They were still being used even when I left in September.  I don't know where they're at now.

Q.  You don't know where they're at in terms of the system switchover?

A.  Yes.

Q.  When you were removed as acting administrator and went back to be the CIO, could you -- could you restate what -- how you characterized your -- an additional role that was in the administrative office?

JASON GRAY                          February 03, 2026                          242 to 245
93681

Page 242

A.   Yeah.  So I know there's documents in USAID. I don't know where they're at, but I know Erica Carr was working on a delegation memo or a designation memo of -- I don't remember what it's called, but it's basically a senior advisor role to the front office.

I know there were several documents that went through clearance that had that role identified.  It never actually got signed.  So I always was the CIO, but was primarily the CIO, but also working in the front office.  So the front office meetings, the engagement, the -- a lot of the conversations, not the typical political only conversations.

But I know, for example, when we were talking about the -- doing the -- the AID programs, review and working with the State Department, there's a team that got stood up, and they brought several detailees over from State.  I was included in all of those conversations.

So as the senior person, even as an example, when Joel would go on leave when he was there, he would often have me run the leadership meeting in the morning that we had every morning, so --

Page 243

Q.   About what time did, like, day on the calendar, did that role really solidify versus that weekend after you were no longer acting administrator? It doesn't seem like you were as involved in the conversations, or maybe you were. Can you tell --

A.   No.  I would say it was I think things were very fluid, certainly for a couple of weeks.  I would say by -- because Matt Hopson leaving, I think there weren't -- there wasn't -- there weren't backups.  It was a really small political bench that would typically come in to run an agency.

And so I would say within a few weeks is when it really solidified and it was very clear that I was the CIO.  And -- but with additional duties, which was basically sitting in the front office and being there for consultation, largely on IT types of things or as I mentioned, if someone leaks something of figuring out who or working with diplomatic security over a State Department because it was usually a combination of issues where you'd have something leaks that was on an email between State and AID to try and figure out who did what.

Q.   What -- what type of leaks?  Can you just describe that a little bit more?

Page 244

A.   Yeah.  So there were, like, the list, a good example is the list of contracts that were being cut that information leaked, and I got asked, how did this information leak.  And I talked to Dave Nation.  And his team is phenomenal and was able to prove definitively that it wasn't someone from USAID that had to be on the State side.

And State couldn't identify because they didn't have the same skill set or the and their systems were different.  I don't know their systems because I don't work there.  But I just could definitively say, I don't know where this leaked, but it didn't leak from here.

Q.   I was going to ask if you went back to your CIO office in the Annex, but it sounds like you did not.

A.   Just to clear it out.

Q.   Okay.

A.   I had, for the most part, cleared it out within the -- the first week or so.  A lot of the stuff that I had, I took out of there.  And then when everyone went back to the Annex to clear out, because I think we gave a day or a half a day to clear out the different floors, I went to validate that all the stuff that I needed was out of there.

Page 245

Q.   Okay.  I'm going to -- I'm kind of closing down some of the questions, but we're going to jump all over the place a little bit to --

A.   Okay.

Q.   -- clean some stuff up.  To your knowledge, did Gavin Kliger ever have access to any of these systems?  We'll go one by one.   IDMS?

A.   I -- I don't know.

Q.   Okay.  SIG?

A.   I don't know.

Q.   Okay.  And then JWICS you wouldn't know because that's not your system; is that correct?

A.   I would say I wouldn't know because that's not my system, but I do not believe any DOGE staff had access to classified systems.  But I -- I don't know. But SEC would know for sure.

Q.   Okay.

A.   And so would State Department because all our JWICS services were provided by State Department.  Actually, I don't think they were provided by State Department.  They might have been provided by the CIA. But our JWICS services were provided by somewhere else, wherever that else was because it was managed through SEC.

So SEC would know.  Leo Ruth as an example

JASON GRAY                        February 03, 2026                        246 to 249
93681

Page 246

because he was there through the end.  And wherever that other agency was, which I think -- I think it was the CIA, but I'm not entirely sure.

Q.  And then, to your knowledge, did Luke Farritor ever have access to IDMS?

A.  I don't know.

Q.  Same question, but for SID?

A.  I -- I don't know.

Q.  During your time -- well, the whole time at USAID from January 20th to September when you left, what -- can you tell me that the individuals that you interacted with that you understood as being affiliated with DOGE?

A.  Yes.  Jeremy, Luke, Gavin, and there were -- someone named Gabby who got brought in to help execute some scripts to send out RIF notifications later on.  I think this was maybe April or May.

And there was one other person that I didn't interact with, but got brought in from DOGE as, like, a special advisor to Jeremy.  But I -- I don't really know what their role was, but I know an account was provisioned for them, just a regular email address, an account was provisioned for them.

Q.  And what was their name?

A.  I -- I don't remember her name.

Page 247

Q.  What about Steve Davis?

A.  Steve Davis, I am not aware of.  I mean, I -- I knew him, but he wasn't -- so yes, Steve Davis is one, but didn't have access to the network and account. I don't ever recall account ever being created for him.

Q.  Throughout any of the time since January 20th, did you ever talk with anyone about actions taken by DOGE members before January 20th of 2025?

MR. WEN:  Objection.  Vague.

BY MS. STEVENS:

Q.  That's -- I'll rephrase it.

Did you talk with anyone about -- did you talk with anyone about DOGE member's actions that they took with respect to USAID pre January 20th, 2025?

A.  No.

Q.  Did you ever hear of anybody talking about that?

A.  No.

Q.  Did you participate in your role as -- I keep flubbing this, but the -- your -- your secondary role after you were not acting administrator anymore, did you participate in any conversation about the RIFs that eventually

Page 248

occurred?

A.  So the -- the only conversations I participated in was about the IT technology related to making sure that the RIFs actually got to people at the same time.  Because a challenge, as an example, was that Google only allows an account to send 1,000 emails a day per 24 hour period.

And it was brought to me, for example, the 1,400 number, they wanted to send to more than 1,000 people.  And it was, how do we do this?  Which is -- so that got brought to me, and that's where I plugged in Brian Herson, and he solved that problem and said, oh, this is the way that you need to do this.

So that's the only types of conversation about RIF that I was involved in.  I will say that there was a morning meeting every morning with all of the leaders of the bureaus and independent offices, of which the CIO was a part of that.

And there was regular updates given by HCTM of X number of RIF notices went out, but just from an awareness standpoint of what was going on, but not -- nothing substantial about we're going to RIF this or we're going to do that, no.

Q.  Those morning meetings, when did those

Page 249

start, you know, when did those start?

A.  I want to say right as soon as we moved, and I don't know exactly when, but it was when we moved from the RRB because I -- I want to say that was very quickly.  It might have been the 14th or so.  I forget because we just found out very suddenly on an afternoon that the lease was over and we had to move out.  And then we moved to the 555 building on 12th Street.  And when that happened, those meetings started happening every day.

Q.  How did you find out you were moving to the 555 building?

A.  I -- I want to say it was that -- it was a Thursday or Friday.  It was -- it was whenever we found out that we -- that the lease had been canceled.  I was told that -- again, it was told to me and Ken or Ken is the one that actually told me that DOGE had canceled the lease of the Ronald Reagan Building and we needed to find a new place to put people.

There was a conversation that happened at the RRB that -- that evening because it was nighttime.  And it was, okay, where do we put people.  And what we talked about was initially everyone working remote.  And I let people know, we

Page 250

can work remote. The VPN works. Everyone did it during the pandemic. So that's what we were going to do.

And then a follow on conversation was had that we were going to move to 555 because BHA, most of them were on admin leave and there was lots of space there.

Q. There's been reporting that, at least early on in the administration, including during your time as acting administrator, that there was direction to USAID staff not to talk with anyone outside of the agency to include Congress or, you know, like, AID groups that folks work with. Did that direction occur?

MR. WEN: Objection. Lack of foundation and vague.

THE DEPONENT: Yes.

BY MS. STEVENS:

Q. Okay. How did -- tell us about that?

A. So the only example I can think of is there were tons of calls and emails that were coming in from Congress and asking to talk to me. And at the time, this is, I believe, after I was no longer in the position. And I was -- I got an email from Paul Grove, Senator Graham's senior staffer, asking

Page 251

me specifically if I was being told not to communicate with him.

And I took that email and I forwarded it to Pete Marocco. And I said, hey, I'm getting asked this question. And the response was, do not communicate. It's all an email, so it's there.

Q. Did did do you know of any direction given to anyone besides yourself --

A. No.

Q. -- within USAID that was similar?

A. No, not to my knowledge.

Q. Okay. Did you message, in any form, text message, email, phone calls, communicate, is a better word, with anyone in Congress?

A. No.

Q. Is the email that you just described the only substantive communication you received from -- from anyone in Congress?

A. I believe there were others. I know that, like, Senator Rand had made a request for a Congressional of different names. I don't remember what it was. And I knew at that point, the Ronald Reagan Building, we were standing up space to -- so they could come and do whatever they were doing. I don't know what it was because for me, it was about

Page 252

IT systems at that point.

And -- but yeah, so there were numerous that came through, but none of them point blank asked me that question.

Q. I -- I guess I -- I jumped over my assumption, but I'll say it out loud. Did -- did you respond after Mr. Marocco told you not to respond?

A. No, I did not.

Q. About when was that?

A. I -- I don't recall. It's all a blur. I'm sorry, but I -- I know it's an email because it was documented.

Q. Do you have any documents from -- from January 20th of 2025 through now related to USAID?

A. Not that aren't in USAID systems, meaning in the email from USAID. So no, I do not.

Q. Did you keep copies of any of those -- those documents?

A. No. I tried to be really good at that just from doing this for so long, no.

Q. Did you have -- well, let me come back to that. So you -- you've talked a number of times about you left in September, left USAID, and have gone to work in the private sector. Can you tell us

Page 253

why did you leave USAID?

A. Yeah. It was timing. I had been offered a position over at State Department to be -- they created a new position called Enterprise Applications, and it was going to be managing consular affairs, which had a CIO that was taking the fork and leaving, which that -- that bureau within the State Department is bigger than USAID from a budget standpoint, multiple times. So -- and the staff was more staff. So that was one.

There were several other -- their health, IT, their Foreign Service Institute. So there was a group -- that group or that organization did get stood up, but I -- the plan was for me to actually go and be a deputy CIO leading that organization.

It got to the point where they were going to make an offer to me, and they -- someone had forgotten to get approval from the White House for the hiring exception. So that put a delay in that.

When that delay happened, oddly enough, I got an email from Box saying, hey, we're looking to hire someone and we want to know if you want to have a conversation. I had no idea what was going on with -- aside from, yes, this will eventually happen, but it was months, several months, maybe two

JASON GRAY                          February 03, 2026                          254 to 257
93681

Page 254

or three months, where nothing was happening. And I just was coming up on a RIF date, and I'm like, I don't want to just wait and hope that this happens.

So -- and then part of the RIF process is you can ask OPM to do placement for you. I submitted that to say, yes, place me somewhere. And for -- I want to say it's good for 45 days. The first few weeks, I heard nothing.

So Box reached out all at that same time and I said, well, this is the thing. I said, if I end up transitioning to State Department, then financially, it will not make sense for me to leave. So if you're going to make me an offer, the offer has to happen within the next 30 days because I believe I will get an offer by then.

The rationale behind that is 1) I had 21 years of government service, and I'm over 50. I'm 54. And the idea was I -- because I'm RIF'ed, there's something called DSR, dissolution of service retirement, that I would be able to get basically a penalty free pension for the service that I had.

And it was really measuring the -- if that can happen before. But if I transitioned to State Department, I would not be eligible for that because if I left and went to Box or any company, it would

Page 255

be voluntary, so I would not be eligible to get a pension. So it -- the primary reason was because of that.

Within 29 days, Box actually made me an offer. After that happened, because there was still time, Social Security Administration reached out to me. The Department of Interior reached out to me to express if I was interested in being their CIO, and ICE actually reached out to me, and I had already accepted the job offer at Box and made the decision.

So sorry for the long story --

Q. No, no, no.

A. -- but that's -- that's why the decision was made. So if -- if Box wouldn't have -- because I was not looking. I did not apply to Box. Box reached out to me.

Q. And you said the -- the -- what was your RIF date?

A. September 2nd.

Q. And that was the -- the sort of second tranche of --

A. Yes.

Q. -- RIFs; is that correct?

A. July 1st, I think, was the first tranche, and the second tranche was September 2nd.

Page 256

Q. You mentioned a hiring exception. Can you --

A. Yes.

Q. -- articulate what that was about?

A. So when the administration took over, they put a government-wide hiring freeze. And the only way you could hire a federal employee from a civil service direct hire standpoint, aside from political appointees and Schedule A hiring, would be to get an exception from the White House for approval.

And that request was made through the State Department to the White House, was approved, but I want to say it was maybe two days or three days after I received my final offer.

So I talked to Kelly Fletcher, who's the CIO of State, and -- because her and I worked together for three years, and I'm like, I would love to come and support you. This is a big role. I know it's important, but I've already accepted this job and I can't wait anymore. She knew I had waited a few months to try and land that, and it just didn't happen until a few days after I already accepted my job with Box.

Q. Can you describe your time from -- from March when you all get -- that's when you get notice

Page 257

of the -- that the RIFs are coming; is that correct?

A. I believe, yeah.

Q. Okay. Can you describe your time from March through September, just generally what you're working on at USAID.

A. Yeah. So it may not be obvious, but the whole agency hated me, wouldn't talk to me. There would be, you know, parties, events that I was excluded from because I was a part of whatever this was. So it was isolation. It was, you know, having meetings with my team, but also being there for the front office if they had a question about how do we share this or how do we do that.

And being in the -- that, you know, daily leadership meeting to listen to and, you know, try to navigate and help the political team navigate some of the, this is a challenge because of this, or they're having an IT problem because of that.

So a lot of it I don't want to say it was, like, concierge IT services for the staff, but it really became that because for the most part, the day-to-day operations, Zack Kahn, because at that point, Steven Hernandez had taken the fork, I -- when he told me he was taking the fork, he asked me, you know, because I -- supervisors were given the

JASON GRAY                          February 03, 2026                          258 to 261
93681

Page 258

ability to not allow people to take the fork.  I talked to him and he said just let me go, and I did.

Q.   The -- the Paul -- Paul Grove email that you --

A.   Yes.

Q.   -- referenced, what precipitated the email saying that they understood Mr. Marocco had told you not to respond to them?

A.   They -- it did not say --

MR. WEN:  Objection.  Lack of foundation.

THE DEPONENT:  Yeah.  It did not say that. What they said was that -- they asked me, are you being given instruction not to communicate with us. It did not say that Pete Marocco said that.

BY MS. STEVENS:

Q.   Apologies.

A.   Yeah, sorry.

Q.   Before that, what -- when before they said, have you been given instruction not to talk to us, what -- what were the questions before that or what was the communication before that?

A.   The communication was, in essence, my understanding, was that they wanted to know what was going on at USAID because there was no communication about what was going on.  I think they were reading

Page 259

the news about what was going on.  They had read about people being on admin leave and wanted to say, hey, what is going on?  We want to know what's going on.

And I think the -- again, they didn't they weren't specific.  They said I want to talk to you. And I -- I want to say I once had maybe a conversation with Paul Grove before about technology and, you know, budget requests and what we're doing for foreign aid from a technology standpoint.  So I didn't -- I didn't know him.  And -- but I started getting emails asking, hey, can you tell us what's going on?  Please take a call.  Here's my cell phone.

Q.   When Mr. Marocco responded to you and said don't reply, was that over email?

A.   Yes.

Q.   You described, you know, sort of this feeling of being isolated from March through September based on, you know, your -- your work connected with what was going on at USAID.  How did you feel about the fact that the agency was being -- was going through the process it was going through?

A.   So yeah, that's an interesting question. I felt horrible.  I left the Department of Education

Page 260

because I'd always wanted to work, -- as I talked through my career earlier, going through Defense, VA, you know, education, transportation, or transportation education, USAID, I sort of felt like USAID was the -- the end of my career, of where I wanted to be because the mission was awesome, you know, helping those who couldn't help themselves. Yeah.  So horrible.

Q.   I'm sorry.

A.   Sorry, I'm emotional.  So I -- I do feel -- and again, I know having worked in government and government agencies for a long time, there's always an opportunity to improve.  There's always a way to be efficient and effective with what you do.

And so when all of this started happening, I thought, hey, this is what we're doing.  I did not know at all or even have any hint that it was to shut the agency down.  So yeah, that was -- I planned on working there.

Q.   When did you realize that it was to shut the agency down?

MR. WEN:  Objection.  Argumentative.

THE DEPONENT:  I feel like when they started cutting all the contracts.  Even when everyone got put on admin leave, it seemed like that

Page 261

the writing was on the wall that, you know, if you take 1,400 people and put them on admin leave, you can't actually perform the job.

And even the, you know, the 90-day assessment, that's great.  And I was looking forward to that so that we could find ways to improve.  You want to do that.  As a technologist, you want to improve.  I had been to Ukraine in November, got to see, like, firsthand the -- the impact of the agency.

BY MS. STEVENS:

Q.   Let's -- actually, let's -- let's take a little break.

A.   Okay.

Q.   I -- I'm almost done.

A.   Okay.

Q.   I know I'm almost done.

A.   Okay.

MS. STEVENS:  All right.  We're going to take a break.

THE VIDEOGRAPHER:  All right.  We are off the record at 6:15 p.m.

(WHEREUPON, a recess was taken.)

THE VIDEOGRAPHER:  And the time is 6:20 p.m. We are on the record.  You may proceed.

JASON GRAY                    February 03, 2026                    262 to 265
93681

Page 262

MS. STEVENS:  Thank you.

BY MS. STEVENS:

Q.  Mr. Gray, when was the last time that you spoke with Mr. Lewin?

A.  It was, I believe, shortly before maybe -- maybe about a month before I left USAID.

Q.  And what was the topic of conversation?

A.  It was to -- he had heard that I was not coming over to the State Department, and I don't remember how we ended up talking, but he said he was, you know, disappointed and sad that I wasn't coming over there because he thought that I would bring about positive change that needed to happen there.  And I said, no, I'm -- I'm leaving, and that was the conversation.

Q.  Did you work closely with him during, like, the March to September time frame?

A.  No.

Q.  Or I guess August.

A.  Yeah.  No.  Rare -- rarely.

Q.  When's the last time that you talked with Mr. Davis?

A.  It had to be early February, like, that -- that weekend, maybe for a week or so.

Q.  What about Mr. Hopson?

Page 263

A.  Unfortunately, the last time I talked to him was when he resigned.

Q.  Mr. Musk?

A.  Never.

Q.  Mr. Marocco?

A.  The last time I talked to Pete was when the New York Times article was going to come out, when the reporter reached out to me, and I let, as I did with this prior message, let them know, hey, they're asking me these questions.  They had six questions they wanted to ask me, and I sent that to -- I know it was Pete, Ken, and Laken because she ran communications and press inquiries.  And I said, hey, just FYI, I am not talking to them.

And I got pulled into a meeting with them to talk about it and asked if I was talking to the press.  And I said, no, I wasn't and I shared with you the moment they reached out and sent screenshots to them so they knew.  Yeah, that was the last time.

Q.  Was that a, like, an accusatory asked question or --

A.  I think it was an exploratory question.  I -- I didn't get the impression.  I think they just wanted to ask me point blank if I was, and I was, like, absolutely not.

Page 264

Q.  Okay.  When's the last time you talked to Mr. Hernandez?

A.  Probably a few weeks ago, just to ask Steven Hernandez, I'm assuming, yes.

Q.  Yes.

A.  He's -- I've known him for a long time at Education.  I wanted to make sure he was doing okay with his job because he's now the deputy CISO over at Caterpillar in Texas, doing really good.  So I wanted to see -- check in on how he was doing because I know this was really impactful for him in his career.  He grew up in this area or his career in this area and was not planning to leave or move, and his whole family relocated to Texas.

Q.  At the time that you left USAID in September, how many staff members were there?

A.  Like, for the whole agency?

Q.  Mm-hmm.

A.  I -- I don't know.  Maybe a few hundred from a direct hire standpoint or for -- yeah.

Q.  And how many were on your team?

A.  I had nine on my team.

Q.  And that's down from the -- well --

A.  Yeah.  It was 96 or 7 that were on staff.  Yeah.  I had I think it was nine.

Page 265

Q.  Who took your -- did -- did someone take your place as -- as acting CIO when you left?

A.  Yes.  Zack Kahn took over initially until, I believe it was October 3rd, and then he left.  And then Anna Yao took over when he left.  Her name isn't really Anna.  It's, like, M-E-N-G, I think, or something like that, but she goes by Anna.

Q.  And is she still in that role, to your knowledge?

A.  To my knowledge, yes.  I have checked in with her to see how she's doing, if she's okay, so yeah.

Q.  She was on your team before?

A.  Yes.  She, ironically, was the individual who was the lead for DIS, that system that I said I really wanted to get rid of, so yeah.

MS. STEVENS:  Okay.  I still haven't quite figured this out on our fourth deposition, but in Texas, we say pass the witness, meaning hand you over to the other side, so --

MR. WEN:  No redirect from the government.

MS. STEVENS:  Okay.  That means we're done.

THE DEPONENT:  Okay.

MS. STEVENS:  Okay.  Great.  Thank you so

JASON GRAY                          February 03, 2026                          266 to 269
93681

Page 266

much for being with us today. I know it's many more hours than any of us were expecting, but we really appreciate your time.

THE DEPONENT: Certainly. Glad to be here.

THE VIDEOGRAPHER: Okay. Counsel, please stand by, and the court reporter may have spellings in just a moment, but before that, we will take orders.

This is the end of the deposition of Jason Gray. The court reporter will take orders for the transcript, and I'll take orders for the video.

THE REPORTER: All right. Ms. Stevens, would you like to order the original transcript?

MS. STEVENS: Yes, please.

THE REPORTER: And the -- all the attorneys with the Democracy Defenders Fund, are you guys all together? Did you guys want to order a copy of the transcript?

MS. MAYS: No, just the one.

THE REPORTER: Just the one. Got it. Thank you.

And does the government, Mr. Wen, would you guys like to order a copy of the transcript at this time?

Page 267

MR. WEN: Yes. Yes, please.

THE REPORTER: All right. Noted. And I think -- oh, it looks like Mr. Heimann and Ms. Rubin are no longer present. Thank you so much.

MS. STEVENS: Thank you.

THE VIDEOGRAPHER: Okay. And I would ask the same for the video of today's deposition. I understand Mr. Warren's name is who we have as a contact for the Democracy Defenders Fund. He's getting the original copy of the video.

Would anyone else on the Zoom call like to order a copy of the video? Okay.

MS. STEVENS: No, thank you.

THE VIDEOGRAPHER: And with that, the time is 6:27 p.m. We are off the record.

(WHEREUPON, the deposition of JASON K. GRAY was concluded at 6:27 p.m.)

Page 268

CERTIFICATE

I, the undersigned, Vincent Guerrera, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the video recording of the deposition of Jason Gray, in the above captioned matter on the 3rd day of February, 2026, taken at the location of Shulman Rogers, 1100 New York Ave. NM, Ste. 800, Washington, DC 20005.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

Vincent Guerrera

Page 269

CERTIFICATE

I, the undersigned Benjamin Pitts, am a videographer on behalf of NAEGELI Deposition & Trial. I do hereby certify that I have accurately made the videorecording of the deposition of Jason Gray, in the above captioned matter on the 3rd day of February, 2026, taken at the location of Shulman Rogers, 1100 New York Ave. NM, Ste. 800, Washington, DC 20005.

No alterations, additions, or deletions were made thereto.

I further certify that I am not related to any of these parties in the matter and I have no financial interest in the outcome of this matter.

Benjamin Pitts

NAEGELI
DEPOSITION & TRIAL
(800) 528-3335
NAEGELIUSA.COM

Page 270

CERTIFICATE

I, Sarah Parr, do hereby certify that I reported all proceedings adduced in the foregoing matter and that the foregoing transcript pages constitutes a full, true and accurate record of said proceedings to the best of my ability.

I further certify that I am neither related to counsel or any party to the proceedings nor have any interest in the outcome of the proceedings.

IN WITNESS HEREOF, I have hereunto set my hand this 13th day of February, 2026.

Sarah Parr, CER No. 3985

Page 272

DECLARATION

Deposition of: Jason Gray    Date: 02/03/2026

Regarding: J. DOE 4 et al. vs ELON MUSK et al.

Reporter:  Sarah Parr

_____

I declare under penalty of perjury the following to be true:

I have read my deposition and the same is true and accurate save and except for any corrections as made by me on the Correction Sheet herein.

Signed at _____, _____
on the _____ day of _____, 20____.

Signature: _____
                Jason Gray

Email to: Production@NaegeliUSA.com

Page 271

CORRECTION SHEET

Deposition of: Jason Gray    Date: 02/03/26

Regarding: Doe 4 vs. Musk

Reporter: Parr/Seaman

_____

Please make all corrections, changes or clarifications to your testimony on this sheet, showing page and line number.  If there are no changes, write "none" across the page.  Sign this sheet on the line provided.

Page  Line  Reason for Change

____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____
____ ____ _____

Signature: _____
                Jason Gray

Email to: Production@NaegeliUSA.com

# Exhibit 18

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

_____

J. DOE 4; J. DOE 7; J. DOE 22;

J. DOE 27; J. DOE 28; and J. DOE

30, on behalf of themselves and

all others similarly situated,

        Plaintiffs,

    v.                   Case No.

ELON MUSK, in his official      8:25-cv-00462-TDC

capacity, UNITED STATES DOGE

SERVICE; DEPARTMENT OF

GOVERNMENT EFFICIENCY; UNITED

STATES AGENCY FOR INTERNATIONAL

DEVELOPMENT; UNITED STATES

DEPARTMENT OF STATE; DONALD J.

TRUMP, in his official capacity;

MARCO RUBIO, in his official

capacity; PETER MAROCCO, in his

official capacity; JEREMY LEWIN,

in his official capacity;

KENNETH JACKSON, in his official

Page 2

capacity; and AMY GLEASON, in her official capacity,

Defendants.

_____

DEPOSITION OF T. CHRISTOPHER MILLIGAN

DATE:        Thursday, June 11, 2026

TIME:        9:55 a.m.

LOCATION:    Department of Justice Civil Division

Federal Programs Branch

1100 L Street Northwest

Washington, DC 20005

REPORTED BY:  Alexzandar Nicholi Fullerton

JOB NO.:     8173078

Page 3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS:

ANDREW H. WARREN, ESQUIRE

Democracy Defenders Fund

600 Pennsylvania Avenue Southeast, Suite 15180

Washington, DC 20003

andrew@democracydefenders.org

(202) 594-9958

Page 4

A P P E A R A N C E S (Cont'd)

ON BEHALF OF DEFENDANTS ELON MUSK, UNITED STATES DOGE SERVICE, DEPARTMENT OF GOVERNMENT EFFICIENCY, UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT, UNITED STATES DEPARTMENT OF STATE, DONALD J. TRUMP, MARCO RUBIO, PETER MAROCCO, JEREMY LEWIN, KENNETH JACKSON, AND AMY GLEASON:

JACOB SILER, ESQUIRE

CHRISTOPHER M. LYNCH, ESQUIRE

Department of Justice Civil Division

Federal Programs Branch

1100 L Street Northwest

Washington, DC 20005

jacob.s.siler@usdoj.gov

christopher.hall@usdoj.gov

(202) 353-4556

(202) 353-4556

ALSO PRESENT:

Maya Cook, Legal Program Associate at Democracy Defenders

Page 5

I N D E X

EXAMINATION:                          PAGE

By Mr. Siler                    9

E X H I B I T S

NO.        DESCRIPTION                PAGE

Exhibit 1    Plaintiffs' Rule 26(a)(2)
             Expert Disclosures         39

Exhibit 2    Supplemental Expert Report of T.
             Christopher Milligan and Exhibits   53

Exhibit 3    Written Transcript of CNN
             Interview with T. Christopher
             Milligan                   81

Exhibit 4    Action Memo for the Secretary
             Dated 6/10/25 from F - Jeremy
             Lewin                      107

Exhibit 5    Public Law 118-47 Dated 3/23/24    121

Exhibit 6    Public Law 119-75 Dated 2/3/26     127

Exhibit 7    Public Law 119-37 Dated 11/12/25   138

Exhibit 8    Public Law 119-28 Dated 7/24/25    151

2 (Pages 2 - 5)

Page 6

E X H I B I T S (Cont'd)

NO.        DESCRIPTION                    PAGE

Exhibit 9    Article Titled "Fiscal Uncertainty,

Payment Delays Renew Pressure on

Contractors at DHS, State"        174

QUESTIONS INSTRUCTED NOT TO ANSWER

PAGE    LINE

44    11

62    11

69    21

Page 7

PROCEEDINGS

THE REPORTER:  The time is 9:55 a.m. We are on record.

This is the deposition of Christopher Milligan taken in the matter of John Does, et al. vs. the United States DOGE Service, et al., at the location of 1100 L Street Northwest Washington, DC 20005 on June 11, 2026.

And my name is Alex Fullerton.  I'm a notary authorized to take acknowledgments and administer oaths in the state of Virginia and the District of Columbia.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for all uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

Page 8

- shall constitute written stipulation of such.

At this time, will everyone in attendance please identify yourself for the record, beginning with the witness.

MR. MILLIGAN:  I'm Chris –- Chris Milligan.

MR. WARREN:  Andrew Warren on behalf of the plaintiffs.

MS. COOK:  Maya Cook for the plaintiffs.

MR. SILER:  Jacob Siler for the defendants.

MR. LYNCH:  And Chris Lynch for Defendants.

THE REPORTER:  Thank you.  Hearing no objection, I will now swear in the witness.

So, Mr. Milligan, can you please raise your right hand?

//

//

//

Page 9

WHEREUPON,

T. CHRISTOPHER MILLIGAN, called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER:  Thank you.

Counsel, you may proceed.

EXAMINATION

BY MR. SILER:

Q   Okay.  Good morning, Mr. Milligan.  We met just a minute ago, but I'm Jacob Siler.  I'm an attorney for the government.  Have you ever been deposed before?

A   No.

Q   Okay.  So this may be new for you, but we're -- you know, I'm going to give you the introductory remarks, which hopefully can make this a little less opaque for you.  I'm going to ask you some questions.  Your job today is to just answer them as honestly and as completely as possible in your own words.  Does that sound okay?

A   Yes.

3 (Pages 6 - 9)

Page 10

Q   Your counsel may object. That's okay. But unless someone specifically instructs you not to answer, you should answer the question anyway. Do you understand that?

A   Yes.

Q   Okay. And the court reporter went over this a minute ago, but try to speak clearly and slowly, so that he can take down what you say, and it can be transcribed. Does that make sense?

A   Yes.

Q   And again, the court reporter can't transcribe body language, a nod or a shake of the head, so try to respond verbally. Okay?

A   Understood.

Q   If you don't understand a question I ask, just tell me. I'll try to repeat it or rephrase it in a way that's more understandable. I make mistakes, too. Just let me know if that happens. If you need to take a break at any time, that's fine. I'll show you where the restroom is. I may ask for a break as well. The only restriction on that is if I've just asked you a question, I'd ask that you answer the

Page 11

question before we take a break. Does that sound okay?

A   Yes.

Q   You understand that you're under oath today?

A   Yes.

Q   And that these statements may be used in court in this action?

A   I understand that.

Q   Okay. Is there any reason you can think of that would prevent you from giving truthful testimony today?

A   No.

Q   Okay. Now, I want to talk a little bit about your preparation for the deposition. What did you do to prepare for today?

A   To prepare for this actual moment? The -- the first thing I did was review the supplemental and initial legal testimony and refresh my understanding of the documents, the exhibits that were included. I have have had consultations with legal counsel as well.

Q   How many times did you meet with counsel

Page 12

about the testimony you're giving this morning?

A   Three -- three times.

Q   And when did those happen?

A   Over the course of the last two weeks.

Q   Okay. And you said you reviewed the supplemental expert report and the original expert report; is that correct?

A   Correct.

Q   Did you review any other documents?

A   No.

Q   Obviously --

A   I reviewed the exhibits that they referenced. Not all of them, 'cause there's many.

Q   Okay. So you did not review any other documents for preparing your testimony today?

A   No.

Q   Okay. I understand that you are providing expert testimony in this case without compensation. Is that correct?

A   Correct.

Q   Do you have any written agreement with anyone about your testimony about offering your

Page 13

testimony in this case?

A   No.

Q   Okay. What are the terms of your testimony?

A   I -- I was asked to evaluate whether USAID is still performing its statutory requirements, and it still is functional or has been dismantled.

Q   Okay. And who made that request?

A   Counsel.

Q   Okay. Now, I'd just like to walk through your background. As I understand it, you have a degree from the Georgetown School of Foreign Service, 1987. Is that correct?

A   Correct.

Q   What kind of degree is that?

A   It is a degree in international relations and international economics.

Q   Okay. And if you could just sort of describe at a high level the course of study.

A   The -- the -- there was a big focus on international economics, micro/macroeconomics, a serious component of that. There were also studies on political geography. The -- I took a year, my junior

4 (Pages 10 - 13)

Page 14

year, and I studied at the French Institute of Political Studies. The focus was really on European politics. I also --

Q    Okay. And when you say -- oh, sorry. Please.

A    I also did some regional studies, too. I apologize.

Q    No, I -- that's another thing I should say. If I ever accidentally cut you off like that, you should feel free to tell me. I do not ever mean to cut you off. You're entitled to answer completely.

A    Thank you.

Q    So do you have anything else to add to that?

A    No.

Q    Okay. You said "political geography." Can you just unpack what that means?

A    Political geography looks at the other -- looks at countries, nation, states, their –- their geological assets and their political orientation. So for example, we studied the Rwandan issue of the Tutsis and the Hutus between Rwanda and Burundi, because these are distinct ethnic groups that are

Page 15

irredentists, living beyond the national borders. So it combines both the geography and the political science of -- of international relations.

Q    Okay. And what, like, equivalent degree is that? Is it, like, a bachelor's degree, an associate's degree, a master's degree?

A    The -- the degree was Bachelor of Science, BSFS, Bachelor of Science in the Foreign Service.

Q    Okay. And is it fair to say that it's mostly international-relations focused, as opposed to domestic politics?

A    Correct. We did study the constitutional processes, because there -- it is hard to distinguish between international and domestic when you talk about the foreign-policy process. So for example, I had a course looking at, you know, how foreign policy is made and how political decisions are made, even though it was an international decision, what happened domestically.

Q    Okay. Understood. And then after the Georgetown School of Foreign Service, as I understand it, you went to the Johns Hopkins School of Advanced

Page 16

International Studies. Is that correct?

A    Correct.

Q    And when did you graduate?

A    '90.

Q    And what degree did you get from that institution?

A    I -- social change and development.

Q    Okay. Is that -- is it -- does it have an equivalent, for people who aren't in the foreign service area?

A    It's -- yeah. In fact, now it's more recognized as international development and humanitarian assistance. At the time, it was called social change and development.

Q    Okay. And is that, like, a master's level?

A    Master's level.

Q    Okay. And then I also saw in your report that you attended the National War College.

A    Correct.

Q    Does that come with a certificate or any --

A    It came with a master's degree in strategic studies.

Page 17

Q    Okay. And can you just, again, at a high level, describe what the course of study at the War College is?

A    It was fantastic experience. The -- we went through discipline work on strategic thinking and preparation of strategic documents and strategy processes. We studied the history of war and -- and how it has evolved. I had geographic studies in -- focusing on Latin America, including travel to Latin American countries, and a few other electives.

Q    So if I'm just going to summarize, you got sort of a bachelor's equivalent from Georgetown School of Foreign Service, a master's equivalent from Johns Hopkins. You attended the National War College. Other than those three, do you have any licenses or certifications that relate to the opinions you're intending to express in this case?

A    I don't have formal licenses and opinions, but I have 31 years of experience.

Q    Okay. So it's fair to say your expertise that you're claiming, for purposes of testimony today, comes from your experience, as opposed to your

5 (Pages 14 - 17)

Page 18

education?

A    Predominantly.

Q    Okay.  Are you a lawyer?

A    No, I'm not.

Q    An attorney of any kind?

A    No, I'm not.

Q    You don't have a law degree?

A    No, I don't.

Q    Okay.  Do you have a degree in economics?

A    I have my -- as -- whenever my bachelor's was, a joint degree in international economics, international relations.  And also at the master's-degree level, there were required economic courses to -- to be taken.  So I have -- I have experience with the economic studies.

Q    Okay, so your -- just to unpack that a little bit, your undergraduate degree included international economics --

A    Correct.

Q    -- as a -- as in the title of the degree.  And then your -- I'm going to call it your master's level education at Johns Hopkins included courses that

Page 19

touched upon international economics?

A    Correct.  They were mandatory courses.

Q    Okay.  Did you ever study political science or government?

A    Political science and government was part of the curriculum at Georgetown.

Q    Okay.  And is that distinct from -- you know, so just for example, I went to an undergraduate college.  My degree is in government and international relations.  Is there a distinction between that kind of a degree and the degree you got, or is it roughly the same?

A    I'm not sure I understand.

Q    Yeah, delete the part about me -- that's not fair to ask it.  I guess I'm trying to understand, is there a distinction between, you know, a standard political science undergraduate major at Georgetown, say, versus the international-oriented degree you got at the Georgetown School of Foreign Service?  Are these different programs?

MR. WARREN:  Objection.  Form.

//

Page 20

BY MR. SILER:

Q    You can answer.

A    I not aware.  I'm aware that the international degree contains a domestic component -- domestic political science component.

Q    Does Georgetown have a separate undergraduate degree in political science, to your knowledge?

A    I am not aware.

Q    Okay.  Do you claim to have expertise over congressional appropriations?

A    I have experience in the appropriation process.

Q    Can you just describe what about your background gives you that experience?

A    So I was working in the State Department and the Director to Foreign Assistance, responsible for building the appropriation process from the initial request in embassies, to briefing, to the formation of it through the passback with OMB, the roll-out of the budget, preparing seniors with their right brief talking points, and also informing staffers.

Page 21

Q    Okay.  So in other words, you participated in the process on the agency side of preparing a request for Congress?

A    Correct.

Q    And then you followed that request as it went through the congressional process?

A    Correct.

Q    Did you follow it all the way through until the appropriations bill was passed, or did you leave at a earlier point?

A    No, all the way through the appropriations bill, because it -- after the appropriations bill then becomes the allotment, how the funds are divided, how they're used among the different accounts that the report references, and then -- and then finally how they're obligated.  And then we look at obligation rates.

Q    Okay.  And you said you gained this experience at the State Department.

A    Correct.  I was detailed to the -- the Director of Foreign Assistance has both USAID and State Department positions.

6 (Pages 18 - 21)

Page 22

Q   Okay.  So let's unpack that for a second. This is the portion of the State Department that is sometimes referred to as "F"?

A   Correct.

Q   And am I understanding you correct that within F there are people working on State Department-related functions and different people who are working on USAID-related functions?

A   No.  Let me be more precise.  There are individuals from State Department and USAID working across all appropriations.  It's a holistic approach to the Foreign Assistance budget.  So for example, I -- when I was in F, I had oversight of USAID and State Department accounts.

Q   And F is an organization within the State Department; right?

A   Correct.  F originally was led by the USAID administrator, who was dual-hatted.  That changed, and now it is -- reports to the Deputy Secretary of State for Management.

Q   Can you just unpack the time periods that you're -- you said at one point it was a dual-hatted

Page 23

position with the administrator of USAID?

A   Correct.

Q   What time period was that?

A   That was, roughly, I would say, 2006, 2007, for a period about three years.  The last dual-hatted was the administrator Henrietta Holsman Fore.

Q   Okay.  And when you say dual-hatted, was that because it -- there was a -- a formal melding of the two roles?  So for -- so that the person who was the USAID administrator by nature of that position was also the director of F, or was it the case that the -- just it so happens that the same person was filling both roles?

MR. WARREN:  Objection.  Form.

BY MR. SILER:

Q   You can answer.

A   The -- the individual was requested to be dual-hatted.

Q   Okay.  So on paper they were two separate roles?

A   No.  I -- I -- I'm not sure how to answer that, because they were separate roles prior to the

Page 24

establishment of F, and I think F made them dual-hatted responsibilities.  I'm not sure legally. I'm -- I know that was created with consultation in Congress, but I'm not sure legally how that worked out.

Q   Okay.  So what created the position of the director of F?

A   I was not there at the creation, but --

Q   So is your answer that you don't know?

A   I'm not exactly sure.

Q   Okay.  Now, I'd like to go back to your experience with the appropriations process that you described when you were working.  You said you were detailed to F is that right?

A   Correct.

Q   Okay.  What time period was that?

A   Roughly, 2000- and -- I think, roughly, 2007 to 2010.

Q   Okay.  And so that's about a three-year period?

A   Correct.

Q   And did you have experience in the

Page 25

appropriations process for all of those years or just -- for all those years?

A   All -- all those years.

Q   Okay.  So it's about three appropriations processes?

A   Correct.  And as a USAID officer, I've been involved in the appropriation process in some aspect for 31 years.  So this was where I was responsible for the process, but I've been participating and aware of the process for 31 years.

Q   Okay.  So outside of this three-year period between -- and I understand it's an approximation -- 2007 to 2010, could you describe your experience with the appropriation process --

A   Correct.

Q   -- when you weren't responsible for it, as you said?

A   Correct.  For example, when I was setting up operations in Iraq, during the Iraq War, I was responsible for the budget build and the appropriation for two supplementals.  I was requested to go and brief congressional staffers, talk about the

7 (Pages 22 - 25)

Page 26

appropriations and the status. I've been frequently asked to brief staffers on Capitol Hill about the appropriations obligations and expenditures, throughout my -- the course of 31 years. I testified before Congress regarding the Haiti earthquake and the results that were achieved with appropriated funds.

Q    Okay. Other than that testimony about Haiti that you just described, have you ever testified otherwise in front of Congress?

A    Yes, I have.

Q    About how many times?

A    Twice.

Q    Is that three total or two total?

A    Two total.

Q    Okay. So your testimony about Haiti, could you just describe how that related to the appropriations process?

A    Haiti was -- the funding for Haiti came from a supplemental, and Congress wanted to have oversight and accountability about how the supplemental had been used to date.

Q    Okay. And just so I understand, what do you

Page 27

mean when you say "supplemental:?

A    That would be funds additional to the annual appropriation. When there is an extraordinary urgency, and funds aren't available at the original appropriation level because it was unanticipated, there's a supplemental. There were supplementals for Iraq War, supplemental for Afghanistan, supplementals for Haiti earthquake.

Q    Okay. And what term would you use for the portion of appropriations that is not supplemental, in other words, the regular course of the appropriation?

A    I would just call that the annual appropriation.

Q    Okay. So how long did you work for USAID in total?

A    Since 1990 till November of 2021.

Q    Okay. So that's approximately 31 years.

A    Thirty-one years.

Q    And what position did you hold when you started?

A    I came in as a presidential management intern. They're called presidential management

Page 28

fellows now. I worked in the Office of Urban -- Housing and Urban Development and -- for two years, and then was posted overseas with the same office.

Q    With HHS -- or sorry --

A    No.

Q    -- excuse me -- HUD?

A    Pardon me. No. So USAID has very technical areas. One looks at urbanization and low-income housing, providing assistance to municipalities to have more effective governance. And that's -- this is where I began. And as part of that, actually, I worked on budgeting. I focused on the operating expenses required to deliver foreign assistance. So early on in my career, I was intimately involved in appropriation work.

Q    Okay. So let me make sure I understand. You were a presidential management -- what was that called, presidential management intern?

A    Intern.

Q    And that was for USAID?

A    For USAID, for the division that focused on urban and -- and -- low-income housing and

Page 29

urban-development issues.

Q    Okay. And just at a high level, can you walk me through the various positions you held at USAID?

A    Correct. I -- In 1993 to '96, I worked for the same office based in Ecuador, covering Latin American urban and low-income housing issues. I -- my next position was in Zimbabwe, where I had a similar focus on low-income housing. Then I was sent to Indonesia following the downfall of Suharto to administer -- to create decentralization programs, to address the concentration of power under the authoritarian regime and -- and how to promote democracy through decentralization. I was detailed to the -- I worked on pre-war planning for Iraq in the -- in the event that there was going to be a war in Iraq, he government recognized that it, we needed to be prepared.

And so I worked as the USAID representative on pre-war planning for humanitarian assistance and reconstruction. I was detailed to the Pentagon. I worked in the Pentagon on pre-war planning. I was in

8 (Pages 26 - 29)

Page 30

Iraq for two years, first as the deputy coordinator for reconstruction, and the second year as the deputy USAID admission director. I went to the National War College. After the National War College, I worked in the front office of USAID. And then I was detailed to F. We covered the F time frame. While I was at F, I also worked on the Quadrennial Diplomacy and Development Review, which is a thorough examination of the processes of the State Department and USAID, and recommended reforms to improve efficiencies.

I then served as the reconstruction -- the relief coordinator, if you will, the overall person in charge of the Haiti earthquake response based in Haiti. I came back. I helped reform USAID some reorganizations and create the -- the Bureau of PPL, Policy Planning and Learning, looking at the development of policies and creating sort of the brain, if you will, at USAID. I was asked to establish our -- reopen, our mission in Burma, following their historic reforms, and arrived there in September of 2012, and served there for four years.

At which point I took leave without pay. My

Page 31

spouse was ambassador to Mozambique, so I could not work directly for my spouse, because there would be a conflict of interest. So I was in Mozambique. Then after a year and a half, I had -- I was my -- my leave without pay expires, and I had to get back to work. So I was assigned temporarily in Madagascar, where there was a vacancy for -- coming out of Madagascar, I served as the counselor for USAID from -- for three years until my retirement.

Q   Okay. And could you just explain the duties of the counselor of USAID?

A   The counselor is the senior-most career individual at the agency and is responsible to -- one, to help the front office with executive oversight and management of the agency. Particularly at that time, the agency was undergoing a restructuring called transformation. The counselor was very much involved. The counselor's involved in many personnel actions as well, and has an infinite knowledge of the HR systems.

Q   Okay. And then you retired in 2021?

A   Correct.

Q   And what have you been doing professionally

Page 32

since your retirement, if anything?

A   I have not been working professionally. I am -- I joined the board of the USAID Alumni Association, and I'm the co-chair of the association for this year.

Q   And what is the USAID Alumni Association?

A   USAID Alumni Association is -- really began as a social network of former USAID employees. There are social events. There are discussions of development topics.

Q   Do you have any publications related to your work at USAID or your expertise?

A   Yes.

Q   Could you --

A   There's one in the Foreign Service Journal that talked about the restructuring of the USAID and the internal processes that I could find you the reference.

Q   When you say "restructuring," what time period are you talking about?

A   That was under the first Trump administration, where it's -- when there was a

Page 33

reorganization, for example, establishing an independent Bureau of Humanitarian Assistance.

Q   So sometime between 2016 and 2020 was the time period?

A   Correct. And it would have been probably '18, I -- I imagine. I believe I'm also referenced in the QDDR, the document I -- the Quadrennial Development and Diplomacy Review. I was detailed to the State Department as the development specialist on a core team of five individuals to help create the report.

Q   Okay. And you're listed as an author on these publications?

A   I'm not -- I don't believe I'm listed as the author on the QDDR. The primary author was Anne-Marie Slaughter, the director of policy. I am the primary author in reference in the Foreign Service Journal.

Q   Okay. So you understand you're being offered as an expert to provide opinion testimony in this case?

A   Yes, I do.

Q   How would you describe the area of expertise

9 (Pages 30 - 33)

Page 34

that you're relying on?

A    I'm relying upon my expertise and years of experience at USAID, understanding how the personnel systems work, how the processes work, and how -- and the functionality of USAID, and then also understanding the output end results.

Q    So it's fair to say you're testifying as expert on the personnel processes and operations of USAID, is your understanding?

MR. WARREN:  Objection.  Form.

THE WITNESS:  I'm testifying on the ability of USAID to deliver development assistance and fulfill its statutory mandates.

BY MR. SILER:

Q    Okay.  Are there any other people you could think of who would have similar expertise in this area?

A    I imagine there are.  Yes.

Q    Do any names come to mind?

A    Yeah.  For example, the former counselors who had the position before I do.  Susan Reichle would be one.

Page 35

Q    Do you think everyone who has served as counselor of USAID would have the same level of expertise?

A    Yes.  I -- I think they would have considerable expertise.  Because the counselor is the career -- is the more senior career position, with -- with usually decades of experience.

Q    Anybody outside of that position that you would consider an expert in this field?

A    Outside of that position, inside the agency or outside the agency?

Q    Anyone outside the agency?

A    There are individuals outside the agency who are very well aware of this.  George Ingram at Brookings Institute, for example, is one.

Q    How would I become an expert in this if I were going to try to do that?

A    Through years --

MR. WARREN:  Objection.  Form.

THE WITNESS:  -- through years of experience.

//

Page 36

BY MR. SILER:

Q    Is experience the only way to get to the level that you think would be qualified to offer the opinions that you're offering?

MR. WARREN:  Objection.  Form.

THE WITNESS:  I can't -- I don't -- I'm not sure.

BY MR. SILER:

Q    All right.  I just want to ask you about this case in particular.  What is your understanding of the claims that are asserted in this case?

A    I have a general understanding that it's understanding whether USAID can fulfill its statutory requirements.

Q    Okay.  Do you understand that the plaintiffs are making a claim that the executive branch has violated the separation of powers?

A    Yes.  I imagine that's their claim.

Q    Is that --

A    I have not been briefed on the case.

Q    Have you read the complaint in this case?

A    No, I have not.

Page 37

Q    Have you read any of the other filings in this case?

A    No, I have not.

Q    Do you understand -- so the description you gave earlier about your understanding of the case, is that the same as your understanding of the separation of powers?

A    To -- to a degree, yes.

Q    What degree is it not?  Is your testimony unrelated to the separation of powers?

A    My testimony is also looking at the functionality of the USAID, where the USAID has been dismantled, and by examining the people, processes and structures.  And also, we're focusing on the impact to -- to national security and the economic prosperity of the country.

Q    Do you understand yourself as to be giving a legal opinion about the status of USAID?

A    No, I'm not.

Q    Okay.  So what -- when you say "dismantle," what do you mean?

A    USAID existed as an independent agency with

10 (Pages 34 - 37)

Page 38

13,250 staff with inherent processes and structures. The vast majority of the staff, like, 96, 97 percent have been fired, terminated, the processes have been taken down -- processes for the functioning of the agency, and the structures no longer exist.

Q   Okay.  Are you aware of the plaintiff's making an Appointments Clause challenge in this case?

A   I'm not sure what that means.

Q   Okay.  So it's fair to say then that you're not intending to offer any testimony related to any Appointments Clause challenge?

MR. WARREN:  Objection.  Form.

THE WITNESS:  I'm not -- I don't understand the question.

BY MR. SILER:

Q   Okay.  So you're not aware of any Appointments Clause issue in this case?

A   I haven't reviewed the case.

Q   Okay.  Are you familiar with the Appointments Clause of the Constitution?

A   You could -- you could inform me, but is it the authorities that -- they're derived from Congress

Page 39

or through delegation?

Q   It -- I'm just trying to test your knowledge.  It's okay if you don't know.  And you're not claiming to be an Appointments Clause expert, I take it?

A   No.

MR. SILER:  Okay.  I am marking a document as Exhibit 1.

(Exhibit 1 was marked for identification.)

THE WITNESS:  Thank you.

BY MR. SILER:

Q   Do you recognize this?

A   Yes, I do.  This is my initial submission. Initial expert report.

Q   Yeah.  So page 3, it says, "Expert Report of T. Christopher Milligan."

A   Correct.

Q   And that's what this is?

A   Yes.

Q   And then at the end, it's dated November 3, 2025?

Page 40

A   Correct.

Q   And then there's a typed "/s T. Christopher Milligan" on the last page.

A   I see that.  Correct.

Q   Did you authorize the placement of that on this?

A   Yes, I did.

Q   How long would you say it took you to prepare this report?

A   It required several weeks.  For this initial one?

Q   Yeah.  I'm -- limited to Exhibit 1, which is your November 3rd expert report.  I'm asking how many --

A   Several weeks.

Q   Several weeks.  About how many hours would you say?

A   I'd have to go back and estimate, but I had to review a lot of data and -- and facts in the case. So that required a significant amount of work.

Q   Okay.  When did you start working on it?

A   I -- several -- several months prior to it

Page 41

when I was contacted, and I -- I'm not sure of the date.

Q   Okay.  So several months prior to November 3, 2025; correct?

A   Correct.

Q   Are you tracking your -- the number of hours you're working on this case?

A   No, I'm not.

Q   Okay.  Can you just describe the process of how the report was prepared?

A   Correct.

MR. WARREN:  Objection.  To the extent that it calls for information protected by 26(B)(iv)(C).

BY MR. SILER:

Q   Can you just describe your work on how you specifically prepared this case, this document?

A   Correct.  Right.  I use a methodology that is a standard methodology from many management consultant organizations that focuses on an organization in examining the people and their skill sets, the processes and the systems and the

11 (Pages 38 - 41)

Page 42

structures, and then looks at the output.  Then I reviewed the data with reference to those different categories and then offered my expert opinion.

Q    Did you write the first draft?

A    Yes.

Q    Were you provided any assumptions to rely on by counsel?

A    No.

Q    Were you provided any facts or data by counsel?

A    I have been provided with some documents that I requested, like congressional notifications, public documents.

Q    Okay.  So the facts or data that were provided by counsel, they were all public documents?

A    Yes.

Q    Did you do any independent research?

A    I did.

Q    Could you just describe the independent research?

A    I did independent research on the impact of the -- of the dismantling of the USAID.  The research

Page 43

is reflected in the exhibits, in the supplemental testimony.  That includes looking at Office of Inspector General reports, congressional notifications and communications from the State Department to Congress.  It focuses also on articles revolved around the dismantles of safety from Reuters and Devex and other news media sources.

Q    And that was all independent research you did?

A    Yes.  Yes, it was.

Q    None of that was given to you by counsel?

A    No, it was a considerable amount of work.

Q    Okay.  Now, without disclosing the content of any drafts, did you exchange drafts with counsel?

A    I provided my initial draft to counsel.

Q    So you wrote the first draft, and then you provided it to counsel?

A    Correct.

Q    And again, without disclosing the content of any comments, did they -- did counsel provide comments?

A    Counsel provided me with stylistic advice

Page 44

and advice on how to organize the report, but no content.

Q    Okay.  And do you stand by the report as your own work?

A    I do.

Q    How much of this would you say is in your own words?

MR. WARREN:  Objection.  26(b)(iv)(C).

MR. SILER:  Are you instructing him not to answer?

MR. WARREN:  I'm instructing him not to answer.

MR. SILER:  That's fine.

BY MR. SILER:

Q    All right.  So if we can turn to page 6 on the numbering on the bottom of the page, there's a header here, part 4, "Facts and Data Considered."

A    Correct.

Q    Is this a list of all the facts and data you considered in the preparation of Exhibit 1?

A    To the best of my knowledge.

Q    When you were drafting it, did you intend to

Page 45

include all the facts and data you considered in this section?

A    I considered the most relevant facts and data.

Q    And that's what this is, the most relevant facts and data?

A    Well, there -- there are numerous articles written about the events that took place.  These are the ones that are more -- more specific to what I was requested to do.

Q    So I understand that there are a lot of news articles.  Nobody has read all of them, I assume.  The documents and data printed here are the ones you're relying on to form your opinions that are expressed in the initial expert report.  Is that fair to say?

A    Well, I would also add that it's based on my personal experience, as we've discussed.  So I -- these documents provide the data and the factual basis for an expert opinion based upon 31 years of experience.

Q    Okay.  So part 4, number 7 here on the bottom of page 6, refers to USAID internal emails,

12 (Pages 42 - 45)

Page 46

since January 20, 2025. What internal emails are you referring to?

A    There were internal emails about -- for example, from Nicholas Gottlieb about terminating employees that were reported and included in Devex news media reports.

Q    Any others?

A    I'd have to go back to my file.

Q    Were you relying on any internal email -- strike that.

How did you obtain the internal emails that you relied on in preparation of Exhibit 1?

A    That'd be -- these were including Devex articles.

Q    Okay. Again, I don't want to talk over you, so let's try to pause for a moment. So in other words, the internal emails that are referred to on page 6, those are all emails you obtained from publicly available sources; is that correct?

A    Yes.

Q    And then on the next page, page 7, the paragraph, that is number 11, is conversations with

Page 47

current and former USAID employees and personal services contractors since January 20, 2025, regarding USAID's operations; is that correct?

A    That's correct.

Q    Who did you talk to?

A    I can name specific individuals that provided me with data, but I would caveat by saying as the co-chair of the USAID Alumni Association, I'm in touch with the broader USAID community on a daily basis. But this refers to specific individuals within the agency at the time. Would have been individuals like Nick Gottlieb from the HR system, Stephanie Funk, who was the director of the Foreign Service Unit office in USAID, and then Susan Reichle, who was the previous counselor. Then she -- she was the current at the time. So the current employees included Stephanie Funk, Nick Gottlieb, and Kim Sise [ph], who was the management officer for the Africa Bureau.

The former employees would include Susan Reichle, who was previously the counselor of USAID, Jeremy Konyndyk -- and I don't know how to spell that name -- who was in charge of humanitarian

Page 48

assistance. And he's now -- I believe he's with the IRC -- Jeremy Konyndyk -- and Atul Gawande, the former head of the Global Health Bureau.

Q    Okay. And you said "IRC." Can you just unpack?

A    Oh, IRC, I believe, is International Refugees Committee.

Q    Okay. So you mentioned Nick Gottlieb in that list. Actually, strike that for a second.

When you say "current" -- in your answer, you said "current employees." I guess, what did you mean by that?

A    I meant that when I was -- when I was in contact with them, they were still employees of USAID.

Q    Okay. And can you just tell me the time period that you were in contact with, for example, Nick Gottlieb?

A    I was in contact with Nick Gottlieb towards the end of the summer and toward -- actually in the mid -- beginning of the summer, had a conversation with him in end of July, I think.

Q    That's 2025?

Page 49

A    2025.

Q    And at that time, to your knowledge, he was still employed by USAID?

A    Correct.

Q    Okay. Was Mr. Gottlieb actively working for USAID, as opposed to being on leave?

A    He was on leave.

Q    Okay. And the other, what you described as current USAID employees?

A    Were actively still working.

Q    They were all actively still working? Okay. Let's just start with Nick Gottlieb. What was the substance of that conversation?

A    Nick Gottlieb was present when the agency was dismantled and the staff were all dismissed. So that's his expertise. And the conversation was to get a better understanding of what happened.

Q    What happened with respect to people being placed on leave?

A    Correct.

Q    And what else?

A    Predominantly that the personnel system and

13 (Pages 46 - 49)

Page 50

what was happening, because that was his expertise.

Q   Is there anything else you can remember about the -- any other topics you discussed?

A   No, that was predominantly it.

Q   Well, I just -- you keep saying "predominantly," and I'm trying to understand --

A   Correct.

Q   -- what, other than the predominant, that --

A   That's all I can recall.

Q   Okay.  And how did Mr. -- how did that conversation with Mr. Gottlieb affect the opinions you're expressing at the Exhibit 1, which is your first expert report?

A   Correct.  Exhibit -- oh, we're in this exhibit, sorry.  Right.

Q   Yes.

A   It confirmed articles that had been replay in the -- in media by Devex and others about how USAID staff had been dismissed and had -- and basically fired, and how the agency systems had been -- had been shut down.

Q   Okay.  So you mentioned in your last answer

Page 51

that agency employees had been dismissed or fired. How do you know they were dismissed or fired?

A   I am well aware of many of them losing their jobs, and I'm aware of the financial hardships that -- because they did no longer receive a salary.  I also reviewed government documents that detailed the dismissal and elimination of USAID.  So then congressional notifications to Capitol Hill, there is reference that USAID is being eliminated.

Q   Is there a distinction, in your mind, between someone who is, as you say, terminated or fired on one hand, and on the other hand being put on administrative leave or RIF?

A   There is a difference between being put on administrative leave, which usually is for disciplinary reasons.  But you -- you retain your -- you -- you've retained your -- your role -- membership in the organization, if you will.  You -- you continue to be an employee of the organization.  If you are RIF-ed, or dismissed or fired, then you no longer are.

Q   Okay.  What is RIF?  Just --

A   A RIF is a reduction in force.

Page 52

Q   Is there a distinction, in your mind, between a RIF and a other type of termination?

A   You can be terminated based upon performance issues and as disciplinary action.  A RIF is a reduction in force, which irrespective of your performance or disciplinary.

Q   Okay.  And the people that you talked to that you described as having been fired or terminated, were they dismissed in part of a RIF process or for performance reasons, or --

A   They were part -- they were RIF-ed as part of the announcement by the State Department that they were RIF-ing USAID employees.

Q   Did you talk to anyone who was separated from their employments for reasons other than a RIF?

A   No.

Q   All right.  And if you could just turn to page 9, there's a Roman heading for part VI, "Qualifications and Publications."  So you talked earlier about a publication in the Foreign Service Journal?

A   Correct.

Page 53

Q   Is that listed in this paragraph?

A   No, it's not.

Q   Do you know why it's not listed?

A   This was a -- a summary statement.

Q   Okay.  Are there any other publications listed in this?

A   No.

MR. SILER:  Okay.  I am marking a binder as Exhibit 2, which is -- thank you.

(Exhibit 2 was marked for identification.)

BY MR. SILER:

Q   And I'll ask you to open it.

A   Okay.

Q   Because the cover is something my staff -- the cover on the front page of the binder is something my staff prepared for convenience.  But what I'm interested in is the substance of the paper inside the binder.  Do you recognize the paper inside the binder?

A   I do recognize it as my supplemental expert report.

14 (Pages 50 - 53)

Page 54

Q   And there are letter tabs on -- in the binder that go from A to II; is that right?

A   Those appear to be the exhibits that I reference.

Q   Okay.  And, you know, I'm not going to ask you to go through every page, but does this appear to be an accurate representation of your expert -- the supplemental expert report?

A   At first glance, it does.

Q   Sure.  And then, just the last page before A, this is the end of your supplemental expert report before you get to the --

A   Yes, that's it.  This is the end.

Q   And is that your signature on the last page?

A   Yes, that's my signature.

Q   And it's dated March 9, 2026?

A   Correct.

Q   Sorry, I don't mean to --

A   Sorry, I -- I apologize.  I'm -- that's correct.  That is my signature.

Q   Okay.  Now, I'm going to ask you a similar series of questions that I did about the first report,

Page 55

but this is a separate document produced at a separate time; right?

A   Correct.

Q   How long did it take you to prepare the supplemental report?

A   This required several months of work.

Q   So it's fair to say it was a longer amount of time you worked on this than your -- the Exhibit 1, which is your original expert report?

A   I can't quantify that, but I can tell you that this is a 25-page report and has -- which requires a lot of work.

Q   And just for clarity, it's 28 pages.

A   Okay.  28.  Correct.  Sorry.

Q   Yeah, I -- I'm sorry.  I'm a lawyer.  I have to be specific.

A   I understand.

Q   So you -- Exhibit 1 is dated November 3rd; Exhibit 2 is dated March 9th.  When did you start working on the document that became Exhibit 2?

A   After the submission of the initial report.

Q   Was there a pause between them, or did you

Page 56

work consistently the whole time?

MR. WARREN:  Objection.  Form.

THE WITNESS:  I -- maybe, perhaps, a very brief pause, a week.  I don't know.

BY MR. SILER:

Q   When did you put metaphorical pen to paper in preparing the supplemental expert report?

A   Most of the work was done in -- I had a pretty good draft in December, but continued to work on it until the date of submission, because of the -- because of the unfolding events.

Q   Okay.  And in your view, was -- with respect to your opinions that you're expressing in the supplemental report, in your view, was it current as of March 9, 2026?

A   Yes.

Q   And again, did you write the first draft of this?

A   Yes.

Q   Were you provided any assumptions by counsel to rely on?

A   No.  Pardon me, I spoke over you.  No, I was

Page 57

not provided any assumptions.

Q   That's totally fine.  So leaving aside what assumptions counsel provided you, did you assume, in your development of your opinions, that Congress had not or would not take subsequent actions to ratify events that occurred in USAID?

MR. WARREN:  Objection.  Form.

THE WITNESS:  Counsel didn't provide me with assumptions.

BY MR. SILER:

Q   Yeah.  So I'm not asking about counsel now. I'm asking about your assumptions in preparing the report.  Did you assume that Congress would not take subsequent actions related to USAID?

A   I had not given that that much matter, because I know that Congress has its own legal process and policy process, and -- as it does every years.

Q   Okay.  So just on page 1 of your supplemental report, where you're listing your -- the opinions you intend to express --

A   Correct.

Q   -- number 1 is, "Defendants have effectively

15 (Pages 54 - 57)

Page 58

shut down, dismantled, and eliminated USAID as an independent agency."  That's right?

A   Correct.

Q   When you say "defendants have" -- you're asserting a -- the causation to the defendants in this case; right?

A   Correct.  In fact, the defendants have specifically said that they are limiting USAID.

Q   Who are the defendants in this case?

A   My understanding is that it is DOGE, primarily, and -- and, perhaps, it's Department of State.

Q   Let me ask this a slightly different way. When you say "defendants" in your report, who are the people you mean?

A   The individuals at DOGE that were responsible for dismantling the agency.

Q   Okay.  Do you know the identities of those individuals?

A   I am aware of some of their names, like Mr. Musk.

Q   And just to be very clear, when you say

Page 59

"DOGE," what do you mean?

A   The Department of Government Efficiency.

Q   Okay.  Who are all of the individuals that you intend to refer to when you say "DOGE"?

A   I refer to the team that entered USAID and dismantled it.

Q   Okay.  And so, in your view, that would include Mr. Musk?

A   Correct.  And people who worked for him with -- on their -- on the sector of USAID.

Q   Okay.  Do you know the names of any other individuals that you would call to -- you would include in what you're calling DOGE?

A   I do.  One had an inappropriate name called "Big Balls."  Sorry, I don't know his real name, but that's -- he was purported.  And -- and I could find references to the others.

Q   Okay.  So going back to my earlier question, when you're ascribing causation to defendants in point 1 here, does that assume that Congress would not ratify the actions that you're attributing to DOGE?

A   I can't answer that question.

Page 60

Q   Again, did you -- do -- did counsel supply you with the facts and data that you relied on in this Exhibit 2?

A   Almost all the facts and data were from my independent resource.  I did requests, copies of specific documents, such as congressional notifications.

Q   Okay.  Other than congressional notifications, what other documents did you request?

A   Those are the ones.  That's what I recall.

Q   Okay.  Who selected which exhibits to include?

A   I did.  A lot of work.

Q   So you personally decided what would become A to II in this --

A   Correct.

Q   -- report.  And then did you actually do the work of preparing the documents to be included as an exhibit in the form that they are, or was that done by someone else?

A   I provided the links to the documents and the reference to the documents, but the formatting and

Page 61

the -- the publishing of it was done by counsel.

Q   Okay.  And did you write the first draft?

A   Yes.  Yes I did try.  Sorry to interrupt you --

Q   No, that's fine.  You didn't actually that time.

A   Okay.

Q   And you know, again, without disclosing any of the comments that might -- the substance of any comments, did counsel provide you with comments?

A   Counsel provided me with stylistic suggestions and organizational suggestions.

Q   Okay, but nothing substantive, in your view?

A   No.  No.

Q   And again, you stand by this report is your own work?

A   I do.

Q   And when it was finalized -- sorry, strike that.

    Okay.  So in November of 2025, when Exhibit 1 was finalized, did you intend that to express all of your opinions in this case and the basis and reasons

16 (Pages 58 - 61)

Page 62

for them?

A    The exhibit, the initial report, expresses my conclusions that were reached and some of my qualifications in reaching those conclusions. The supplemental takes the same conclusions and provides more data and evidence behind them.

Q    Why was that data and evidence not included in your initial report?

MR. WARREN: Objection. To the extent it calls for any communications between counsel and the witness, I would instruct him not to answer.

BY MR. SILER:

Q    Okay. Yeah, I'm not -- so to be clear, I'm not asking you about communications with counsel. I'm asking why the initial report, Exhibit 1, did not include the additional data and evidence and reasoning that you included in Exhibit 2.

A    It wasn't -- well, several things. One, more data and evidence became apparent subsequent to the filing of the initial report. For example, the memo from the Secretary of State in January of '26, confirming that USAID has been eliminated, was not

Page 63

available. So there -- so this has more relevant and updated information.

Q    Okay. So the document you just described, you said there was a memo from the Secretary of State. What document are you referring to?

A    Let me go through the exhibits.

Q    Sure.

A    I think it was January 1st. The -- the -- its going to take me a while to go through all these exhibits, but there's -- the -- the initial document is -- is actually from the Department of State, talking about establishing of a legacy unit and the elimination of USAID, and then there is part of a congressional notification.

Q    So let me just maybe ask you to look at Exhibit A.

A    Correct. Okay.

Q    I'm just -- is this the document you're referring to?

A    This is not the specific document I'm referring to. They're -- they're later in the -- but this -- this is from '25; I'm referring to a document

Page 64

from '26.

Q    This document on Exhibit A, I--

A    Understand. Oh, sorry, '26, yeah. Sorry.

Q    Yeah, I understand that there's a line in here that says "approved by January 7, 2025." But the date on the -- is '26.

A    '26, correct.

Q    Right? Okay. So just for the record to be clear -- apologize -- is Exhibit A the document you just referred to?

A    Correct. This is a -- a document that was not available when I wrote the initial report.

Q    Okay. So when you said the Secretary of State issued a memorandum saying that USAID had been shut down, you're referring to Exhibit A?

A    I was referring to an initial communication that was, I believe, in a congressional notification that the -- that came under the secretary's name to Congress.

Q    Okay. Is that document, to your knowledge, in your report?

A    It's in here somewhere.

Page 65

Q    Why don't you take a minute, look for it.

A    Okay. Audit, audit, okay. There is the congressional notification that went up on -- I'm sorry, we're talking about Exhibit Q. That's the -- one of them. And this was in May 2025, which references the suspension of programs and the -- the elimination of USAID. There's another congressional notification as well that has that, I believe. And maybe -- that's -- that's -- that would be one of the references, yes.

Q    Okay. So I -- just going back to my original question that got us kind of onto looking through the exhibits, the original question was why certain information wasn't included in your November 2025 report that led you to supplement your report in March 2026.

A    Because -- because supplemental information became available.

Q    Okay. And just so the record is clear, you were referring to Exhibit Q within Exhibit 2, which is your supplemental report. And Exhibit Q is a document, is a congressional notification from the

17 (Pages 62 - 65)

Page 66

Department of State that was sent in May 2025.

A   Correct.  But I -- what I was really trying to reference was Exhibit A, which was the -- it's in '26, about the hiring authority of the -- of the legacy unit.

Q   Okay, that's fine.  I just -- I want the record to be clear what we're talking about.  Okay.  To the exhibit -- excuse me.  The opinions expressed on page 1 of Exhibit 2.

A   Page 1 of Exhibit --

Q   That's the whole binder.

A   Oh, the whole binder.  Got you.

Q   So page 1, do you still hold these opinions?

A   Yes, I do.

Q   Is there anything you would change about the supplemental expert report sitting here today?

A   No.

MR. WARREN:  Objection.  Form.

BY MR. SILER:

Q   Have you completed the work related to develop -- the development of your opinions in this case?

Page 67

A   Yes.

Q   Is there any work you're still doing related to the development of your opinions in this case?

A   No.

Q   And in preparing these reports, were you given access to the documents that have been produced between the parties in this case?

A   No.

Q   Have you reviewed -- mentioned earlier you hadn't read the complaint or other filings in this case.  Have you reviewed any written discovery responses produced by the defendants in this case?

A   No.

Q   Okay.  So going back to the question of the preparation of the supplemental expert report, other than Exhibit A, which we talked about, what factual developments occurred between November and March that caused you to want to do a supplemental report?

MR. WARREN:  Objection.  Form.

THE WITNESS:  The supplemental information became available that I believe was relevant to this report.

Page 68

BY MR. SILER:

Q   Okay.  So Exhibits A to II, none of those exhibits were cited in your initial report from November 2025; is that correct?

A   I would have to crosscheck that.

Q   You don't know whether they were cited in your original report?

A   I would have to crosscheck that.

Q   Let's -- we can move on for a second.  Would it surprise you to learn that 73 percent of the exhibits in your March 2006 [sic] report were dated before November 2025?

MR. WARREN:  Objection.  Form.

THE WITNESS:  I believe they're relevant to the case.

BY MR. SILER:

Q   I understand.  But my question is, would it surprise you that 73 percent of them existed before your initial report?

MR. WARREN:  Same objection.

THE WITNESS:  No.

//

Page 69

BY MR. SILER:

Q   So if they existed, I guess my question is, why weren't they included in your initial report from November 2025?

MR. WARREN:  An objection, to the extent the question calls for information protected by the attorney-expert privilege.

BY MR. SILER:

Q   Can you answer without revealing information -- substance of discussions with counsel.

A   I'm not sure how to do that.

Q   Okay.  So my question, again, is, why is there -- why are there a series of exhibits that you decided to put in Exhibit 2 that you didn't decide to put in Exhibit 1?

A   Because I --

MR. WARREN:  I'm sorry.

THE WITNESS:  Sorry.

MR. WARREN:  To the extent that your answer comes from communications that you had with counsel, I instruct you not to answer.

THE WITNESS:  Okay.

18 (Pages 66 - 69)

Page 70

MR. WARREN: To the extent that there's information you can answer the question without revealing anything that you've discussed with counsel, you can answer.

THE WITNESS: Okay. I recognize that these conclusions required as much documentation as possible. Following the submission of the initial report, I wanted to bolster and show more of the evidence.

BY MR. SILER:

Q So the Exhibit A to II in Exhibit 2, in your view, those are all relevant to support your -- the opinions you've expressed in Exhibit 2; right?

A Correct.

Q Were they also relevant in November of 2025?

A They -- they were. Those that were in existence were relevant.

MR. SILER: Okay. We've been going for about an hour. Why don't we take a short five-minute break?

MR. WARREN: Of course.

THE REPORTER: The time is 11:00 a.m.,

Page 71

and we're off record.

(Off the record.)

THE REPORTER: Time is 11:09 a.m., and we're back on record.

BY MR. SILER:

Q Okay. I'd like to talk for a bit about the methodology you used to prepare the reports in this case. What principles and methods did you use to form your testimony?

A What I used was a method -- it's a pretty standard methodology for assessing the functioning of an organization. We're looking, first, at the people, the staff, their expertise, their -- their technical skills, then the processes of an organization, then the structures of the organization, and then the output.

Q Is there a name for this methodology used, or is it just --

A It's a standard way of -- of looking at it.

Q Where is that methodology explained in your reports?

A I didn't believe explaining the methodology

Page 72

was relevant, but I can explain to you now.

Q Okay. Sure.

A And -- and actually -- pardon me -- in my report, I do reference, quite specifically, the people, processes, and structures, and those are subcategories in the report. For example --

Q So you're looking at Exhibit 2, for the record?

A The -- the supplements.

Q Yes.

A 'Cause I thought that's what we're discussing. Yeah.

Q Yeah, yeah. No, that's fine. Can you proceed.

A Right. So I've discussed about the -- the workforce on page 14 and the core functions and responsibilities. Further on, I talk about the organizational structures. And I -- I -- on page 18, I talked about the operations and how they function. So in the report, I -- I do a deep dive in the people. Then I -- then I document the processes. You see I mentioned GLAAS in Phoenix, the ADS, automated

Page 73

directive system, and then the structures, and then how those -- then how the functions that were transferred to the State Department lack the same people, processes, and structures.

Q Okay. And --

A So that's reflected in the organization of the report.

Q Okay. So in your view, those -- the portions of the report that you decided, that's your explanation of the methodology, or just how the output of the methodology could be described?

A They reflect the methodology.

Q But you don't disagree that the methodology itself is not separately explained in the report?

A I would believe that anyone who reads the report would understand the methodology, because that's the way the reader walks through it. But there is not a overt chapeau [ph] saying specifically what it's --

Q Okay. And you say the -- this methodology is common. What do you mean by that?

A When you -- when -- for example, when

19 (Pages 70 - 73)

Page 74

McKinsey looks at management assessments, they focus on the same thing.

Q   Okay.  Has this methodology been subjected to peer review in any journals?

A   I don't know.  It's a standard practice. I'm not sure.

Q   Okay.  Where does it come from?

A   It -- it comes from the people who assess organizations that assess another organization.

Q   And if another individual were to apply this same methodology, would they necessarily reach the same conclusion?

A   I believe they would.

Q   Is there a way to determine an error rate?

A   I'm not sure, but I believe that everyone would come to the same conclusion.  Because when you focus on the people, and 96 percent of the people are no longer there, when you focus on the processes, and they've all been eliminated, when you focus on the structures, and they've been disassembled, then I believe it is reasonable to assume that everyone would come to the same conclusion.

Page 75

Q   Okay.  So you referenced McKinsey as applying a similar methodology in their work.  Fair to say that McKinsey is a outside consultant that businesses hire to assess their operations.  Is that your understanding of McKinsey?

A   Correct.

Q   They're not usually -- strike that.

You have 30-plus years of experience within USAID?

A   Yes.

Q   So unlike an outside consultant, your career has been more tied to USAID as an organization?

A   Yes.

Q   Do you think that colors your opinions in any way?

A   I've been objectively required to access USAID operations -- assess USAID operations in the past.  I reference my work on the QDDR, Quadrennial Development and Diplomacy Review.  That did provide similar assessments of USAID and state functionality, and made recommendations on improving that. Similarly, I did the same thing under the first Trump

Page 76

administration with transformation, which was a reform of USAID.

Q   Understood.  But I'm just going off your reference to McKinsey.  I mean, one of the reasons why an organization might hire an outside expert, as opposed to an inside expert, is because they're less tied to that organization.  Would you agree with that?

A   I -- my understanding is that when an outside organization comes to do an assessment, it works with the people inside the organization.

Q   Understood.  But what -- why would one hire an outside expert, as opposed to --

A   Right.  And --

MR. WARREN:  Objection to form.

BY MR. SILER:

Q   You can answer.

A   The -- I was no longer an employee of USAID when I wrote this expert testimony.

Q   All right.  Let's -- I want to talk for a minute.  You know, relying on your positions with USAID about how the organization operated while you were there, during your tenure at USAID -- we talked

Page 77

about a little of this, but I'd like to explain it more broadly.  What was the relationship between USAID and the State Department?

A   USAID was an independent agency of the State Department receiving overall foreign policy guidance from the Department of State and the NSC.

Q   So was USAID an organization within the State Department or separate from --

A   It was a separate organization, with separate mandate and responsibilities, separate systems, separate personnel systems, budgeting systems, and others.

Q   Okay.  Did the administrator for USAID report to the Secretary of State?

A   Correct.

Q   And who does the Secretary of State report to?

A   The President of the United States.

Q   All right.  Now, you said you did a detail to F.

A   Correct.

Q   That's the Office of Foreign Assistance?

20 (Pages 74 - 77)

Page 78

A  Uh-huh.

Q  Has that name been consistent over time, or has it changed?

A  It's been known as F since its creation.

Q  Has F meant different things over time? I -- I honestly don't know the answer to this question.

A  No.

Q  Okay.  So it's the Office of Foreign Assistance?

A  Correct.

Q  And what is the role of the director of that office?

A  The role of the director of the office is to ensure the strategic and coordinated and accountable use of foreign assistance funds.

Q  And that includes funds for programming that USAID does?

A  For programming that USAID does, and State Department as well.

Q  Okay.  Now, you agreed that the USAID administrator reports to the Secretary of State.  What

Page 79

does that mean in practice?

A  It varies in practice.  If there is a strong relationship between the administrator and the Secretary of State, there could be regular meetings. If not that -- if not, then there's more autonomy.  It depends upon administration to administration.

Q  Were you done?  I'm sorry.

A  Yes.

Q  Okay.  As a formal matter, did the State Department have authority over USAID spending?

MR. WARREN:  Objection.  Form.

THE WITNESS:  The funding is a -- there are funding that is the Foreign Assistance Act is the USAID administrator is responsible for the implementation of foreign assistance.  The -- the accountability for the use of the funds rests with AID.

BY MR. SILER:

Q  What portion of the Foreign Assistance Act says that USAID is responsible for these administration --

A  The state administrator.  I would have to

Page 80

find the reference to it.

Q  Okay.  And that's the Foreign Assistance Act?

A  It's two --

Q  To find that.  It's okay.  I don't -- I'm not asking you guess.

MR. WARREN:  And I would just note for the record, Mr. Milligan, if you'd let counsel finish the question first, it will create a clear record.

THE WITNESS:  Thank you.

MR. WARREN:  Of course.

BY MR. SILER:

Q  Do you know the year in which the Foreign Assistance Act was passed?

A  1961.  It's been amended many times.

Q  Yeah.  Was USAID created before or after the Foreign Assistance Act?

A  USAID was created in 1961 from the Foreign Assistance Act and also an executive action.  But in 1988, it -- its statutory existence was confirmed in the -- let me get this right -- the Foreign Assistance Reform Act, I believe, in 1988.

Page 81

Q  So when you say the Foreign Assistance Act, you mean as amended?

A  As amended.  It's this big.

MR. SILER:  So I am now marking what will be Exhibit 3, handing it to the witness.

(Exhibit 3 was marked for identification.)

BY MR. SILER:

Q  If you could take a look at that document. Did you give an interview with CNN on or about February 12, 2025?

A  Yes, I did.

Q  And to your knowledge, is this an accurate transcript of that interview?

A  Let me read it quickly.

Q  Take all the time you need to review it.

A  Yes, this appears to be a correct transcript.

Q  Okay.  So I'm going to direct you to page 2 of Exhibit 3.  About halfway down the page, it's the paragraph that's just above the timestamp that's 11:55:16.  And that paragraph quotes you as saying,

21 (Pages 78 - 81)

Page 82

"What I would like to tell those Americans is that every dollar that USAID spends is approved by the ambassador of post, and then approved under the authority of the Secretary of State back in the State Department." What did you mean by that?

A   What I mean by that is that although USAID is independent statutorily and responsible for the accountable use of foreign assistance funds, overall policy direction comes from the -- the State Department, and ambassadors of post.

Q   Okay. So your answer is about policy guidance, and the quote here is about spending. I'm trying to understand the difference --

A   Correct.

Q   -- between those two things, or how they relate, rather.

A   Spending is the result of the policy decision.

Q   So is it fair to say then that the Secretary of State does have some authority over USAID spending?

A   The Secretary of State has some authority over the direction of USAID spending and -- but I

Page 83

believe that's also limited by congressional earmarks and appropriations as well -- appropriation language. About 95 percent of the USAID budget is earmarked with -- and with special directives.

Q   Okay. If you read the rest of the paragraph there, I think your quote is saying 98 percent of the USAID spending, in that range?

A   Correct. It -- it changes year to year.

Q   Okay. So it -- do you have any experience where certain USAID programs were in conflict with foreign policy direction of the Secretary of State?

A   No.

Q   All right. Now, I want to talk about the relationship -- you can put that aside. I want to talk about the relationship between USAID and the White House. Who appoints the administrator of USAID?

A   The White House.

Q   President?

A   Correct.

Q   Who appoints the deputy administrators?

A   The Office of Personnel of the White House.

Q   Again, that's the president?

Page 84

A   Correct. Under the authority of the president, yes.

Q   Can the president remove an administrator?

A   Yes.

Q   Is -- can they remove the administrator for any reason?

MR. WARREN: Objection to form.

BY MR. SILER:

Q   In other words, is there a purported limitation on the president's ability to remove -- excuse me -- a USAID administrator, for example, for cause?

MR. WARREN: Same objection.

THE WITNESS: The president does not have the authority to eliminate the position of the USAID administrator, but has say over who fills that position.

BY MR. SILER:

Q   Understood. I'm not asking about the elimination of the position. I'm asking about who fills the position. Whether a person is in that position or not is ultimately a decision of the

Page 85

president, subject to advice and consent of the Senate; is that correct?

A   Correct.

Q   To your understanding, rather. Does -- is USAID expected to follow executive orders from the president?

A   Yes.

Q   In your tenure at USAID, did USAID ever receive guidance or instruction from the White House?

A   Yes.

Q   And without revealing sort of the substance of that, how was that guidance or instruction conveyed to USAID?

A   Through the political leadership.

Q   When you say "political leadership," who do you mean?

A   Through the administrator, deputy administrator, and senior staff of bureaus.

Q   Okay. And did the -- these -- and where from the White House did these instructions arise or come from?

A   They came from -- they came from various

22 (Pages 82 - 85)

Page 86

positions. So, for example, the National Security Council is a key provider of guidance to federal security agencies. USAID has a seat at the National Security Council. So that would be a primary source of the guidance.

Q    The National Security Advisor and others on the NSC?

A    Part of the White House team.

Q    Okay. To your knowledge, during your tenure, did USAID political leadership ever receive guidance from senior advisors to the president?

A    USAID did initiate special initiatives on behalf of senior advisors for the White House.

Q    Do you know what portion of the executive office of the president those senior advisors sat in, if any?

A    I don't know that.

Q    Okay. Turning back to Exhibit 2, which is your supplemental report, that's the binder.

A    Oh, pardon me.

Q    Point 2 here, opinion 2 is, "USAID is unable to perform its core functions including the certain

Page 87

basic functions of a government agency." What, in your view, are the core functions that are referred to in this point 2?

A    To the core functions are strategy, procurement, budget implementation, fulfilling statutory requirements, and oversight.

Q    So if I were looking for a list of the core functions of an agency, where would I find that list?

MR. WARREN: Objection to form.

THE WITNESS: These are the core functions based my expertise of what you USAID needs to function.

BY MR. SILER:

Q    So in other words, you came up with this list of core functions as what you think an agency needs to fulfill to be an agency?

MR. WARREN: Same objection.

THE WITNESS: I also reviewed documentation, such as reports from the OIG, that stated how USAID was unable to fulfill its core functions.

BY MR. SILER:

Page 88

Q    Did -- so you're saying you took a list of functions from OIG reports?

A    No.

Q    All right. Let me ask it this way. How did you come up with that list of core functions?

A    From my experience of looking at USAID and being involved in several reform efforts of the agency, I -- I am aware, as anyone would reasonably be who's worked for 31 years, know their core functions of their agency.

Q    Okay. And what, in your view, is the source of those core functions? What creates them?

A    Could you ask that again?

Q    Sure. Let me rephrase it. What is the basis for asserting that the things you listed were the core functions of an agency?

MR. WARREN: Objection. Asked and answered.

THE WITNESS: Yeah, I answered that.

BY MR. SILER:

Q    Are those functions listed in a statute somewhere?

Page 89

A    Some of them are statutory, yes. There's statutory reporting requirements, such as a oversight requirement.

Q    Understood that compliance with statutory mandates was one of the things you listed. But what I'm trying to understand is, what is the genesis of your understanding of what a core function of an agency is? And so far, I've heard you said you, you gleaned those from your experience with the agency. Is that the only source you're relying on?

MR. WARREN: Objection to form.

THE WITNESS: I would not use the word "gleaned."

BY MR. SILER:

Q    What word would you use?

A    I would -- I've been substantially involved in core processes of the agencies.

Q    Okay. So if I asked another expert, would they come up with the same list of core functions?

A    I believe they would.

Q    How would they go about creating that list?

MR. WARREN: Objection. Form.

23 (Pages 86 - 89)

Page 90

THE WITNESS: They would need experience from working at AID.

BY MR. SILER:

Q So other than the statutory mandates that you referred to, they're -- strike that.

Is there a regulation or a statute or any source of law that mandates that the USAID satisfy the core functions that you have listed?

A Some of the core functions are required in appropriations, some -- and some are in annual appropriations, and some are actually in reference to the -- the acts that we talked about.

Q Okay. So well, you keep saying "some of."

A Correct, there are many core functions. So when you look at reporting requirements, they can vary between appropriations and other pieces of legislation, and they evolve over time. But there are reporting requirements that are statutory.

Q Is there anything that requires USAID to meet some minimal level of effective efficacy?

A How would you -- could you rephrase that? Is there --

Page 91

Q Yeah, I mean, I think you're -- my understanding what you're saying -- and you can correct me if I'm wrong -- is that these are what you're listing as core functions are the things that USAID needs to meet to be an effective agency. I'm asking what requires them to meet those things.

MR. WARREN: Objection to form.

THE WITNESS: Yeah. Many are required by law.

BY MR. SILER:

Q Okay. Other than the ones that are required by law -- which we're going to go through -- you know, you mentioned a bunch of other things that were not required by law; correct?

A I don't believe it's that cut and dry. If USAID is required for the effective use of taxpayer's money for oversight and accountability, core processes are required to achieve that.

Q Okay. So in your view, the core processes that you're relying on are what's necessary to be an effective steward of taxpayer money?

A And to be able to promote U.S. foreign

Page 92

policy goals. Correct.

Q Okay. And my question for you is, as to those things, is that, in your view, a legal requirement or a requirement that the agency be effective?

A I believe the agency has a statutory requirement for the appropriate and accountable use of taxpayer's money.

Q Okay. And what is the source of that statutory duty?

A It's in -- many of it's in the annual appropriations process, which specifically mentions USAID and ties it to certain accounts.

Q Okay. And so if those -- that language that you're referring to in appropriations bills no longer existed, how would that affect your opinions?

A That's a conjecture; right? It's hard for me to answer.

Q Okay. When you were preparing your expert reports, did you rely on congressional appropriations laws in forming your opinions?

A I was aware of congressional appropriation

Page 93

laws from my work at USAID and aware of their language.

Q Okay. And so that -- your work at USAID ended in 2021; correct?

A Right. That's correct.

Q Are you aware of any federal appropriations laws that postdate your employment with USAID?

A There's -- yes. There's a '26 appropriation. Fiscal year '26.

Q Fiscal year '26. Let's go back to Exhibit 1 for a second. Exhibit 1 is your initial --

A Initial.

Q -- expert report.

A Right. Thank you.

Q And again, I'm at page 6 here, which is under the heading "Facts and Data Considered." And 3 lists federal statutes, and 3C lists: "Department of State Foreign Operation Related Programs, Appropriations Act 2024, and Full Year Continuing Appropriations Act 2025." Is that right?

A Uh-huh.

Q Those are two separate appropriations laws;

24 (Pages 90 - 93)

Page 94

is that correct?

A    Yes. '24 and '25. Correct. Yeah.

Q    These cite two specific statutory provisions within those larger laws. What are those in reference to?

A    They're in reference to the effective use of taxpayers' money.

Q    Okay. All right. Let's go back to Exhibit 2. One more question, actually, on this. So based on their listing here, it's fair to say you considered federal appropriations laws and appropriations --

A    Yes.

Q    -- that. Sorry, let me start over.

A    It's fine.

Q    It's a bad question. Based on part 4, 3C, it's fair to say you considered federal appropriation laws that postdated your tenure at USAID?

A    Yes.

Q    Okay. Now we can go back to Exhibit 2, which is the binder, on page 4, the second bullet under "USAID's Core Operations."

A    One moment.

Page 95

Q    Yep.

A    Yes.

Q    That bullet refers to the automated directives system, or ADS, and describes it as the official set of binding policies and procedures that governed how USAID operated.

A    Oh, there it is.

Q    Can you just describe what the ADS system is?

A    The ADS system is the automated directive systems that -- that list out the policies required by USAID to USAID staff to function under, and the procedures. So for example, the authorities are available at different levels, how programs are implemented, any -- any requirements for reporting. It -- it covers the entire gamut of operations for the agency.

Q    And how is it created?

A    It is created through a process of staff input, bureau input. It depends upon the subject matter. For example, if it's a management issue, obviously the management bureau would be involved.

Page 96

There is a series of -- of consultations and internal. Sometimes consultations with external stakeholders, if it is an issue that is appropriate to external stakeholders. There is a comment period, and then it's codified and posted online.

Q    Okay. And is that -- would that process also apply to any changes that were made to directives included in that system?

A    Correct.

Q    Who makes the ultimate decision on what is conclude -- what is included in the ADS?

A    The front office of the -- of the -- of USAID.

Q    And did it change over time during your tenure there?

A    The ADS?

Q    Yes.

A    There were new chapters, and there were amendments. Yes.

Q    And I understand your expert report on page 4 to 5 to say that the ADS included portions that ensure compliance with various federal laws.

Page 97

A    Correct.

Q    But was the ADS itself required by Congress?

A    I'm not aware.

Q    Okay. And the ADS itself was a agency-created document; correct?

A    The agency created the ADS.

Q    It was not, for example, a congressional-created law that --

A    I'm not aware.

Q    Okay. So again, going back to your list of core functions of the agency, what, in your view, is it that requires USAID to perform those functions, as opposed to a different organization?

A    USAID is the lead development humanitarian assistance agency for the U.S. Government and is required to implement the foreign assistance funds that are specific to those functions of development, humanitarian assistance, in compliance with U.S. law and in -- with accountability.

Q    So again, you used the word "required" there a few times in your answer. What, in your view, is the source of that requirement?

25 (Pages 94 - 97)

Page 98

A    Sometimes that requirement could be in specific appropriations that -- that detail what is required by USAID, such as transmitting a report to Congress. And certainly, congressional notifications are a requirement, and they go up from USAID to the Hill.

Q    Okay. All right. Let's go back to page 1 of Exhibit 2, again, the binder. And I'm looking now at point 1, that "Defendants have effectively shut down, dismantled, and eliminated USAID as an independent agency." What do you mean when you say "independent agency" in this sentence?

A    That USAID as an -- as an independent agency, had the authority over its own workforce and its own personnel systems. It had its own processes that were independent of other agencies. The ones that we noted are "encapsulized" in the ADS. And it had a structure, in order to implement the foreign assistance that was provided to it.

Q    Okay. And is the term "independent agency," in your view, any different than the term "independent establishment"?

Page 99

A    I've never thought -- I don't know what's the different -- what's the definition of "establishment"?

Q    I'm asking if you -- if those things mean anything different in your mind.

A    I -- I'm not sure.

Q    Okay. So how would one go about analyzing whether an agency or an establishment is independent?

MR. WARREN: Objection. Form.

THE WITNESS: One would -- like I said, one would evaluate the components I had mentioned to you and see how they were functioning, whether they were functioning independent of others. For example --

BY MR. SILER:

Q    Sure.

A    -- USAID had independent authority over its own workforce, over the assignment of officers, over the promotion, hiring and firing and recruitment, independent from any other agency.

Q    How, in your view, is USAID's independence different now than it was prior to January 20, 2025?

Page 100

A    The staff, which was the workforce, which was the component of the independent agency, have been almost a hundred percent terminated, RIF-ed. The processes that were required for the effective implementation of foreign assistance no longer exist, and neither do the structures.

Q    So if it turned out that USAID personnel made the decisions about the workforce changes that you described, would that affect your view of USAID's independence?

MR. WARREN: Objection. Form.

THE WITNESS: I'm not -- can you rephrase that?

BY MR. SILER:

Q    So I understand your earlier answer to say that USAID's independence is different now, because prior to this presidential administration, USAID had control over its workforce. That's one of the things you said; right?

A    What I'm referencing is that USAID has been dismantled, and so it no longer exists as an independent agency, because the workforce has been

Page 101

fired, the processes have been eliminated, and the structure is dissolved.

Q    So is your position that it's no longer an agency, or that it's no longer independent, or both?

A    It's -- there's no functionality to it.

Q    Okay. Let's go to Exhibit A of Exhibit 2, which is -- and we talked about this a little earlier. This memorandum was one of the reasons that you concluded that USAID is no longer an independent agency. Is that correct?

A    Correct.

Q    So at the bottom of page 1 here, there's a line that says, "There is still a body of work to complete before USAID will cease to exist." Is that correct?

A    That's correct.

Q    Doesn't that imply that the agency still exists in some form?

A    The previous sentence says, "That agency is being terminated," the capital -- the -- the beginning. And that's what I'm referencing. What this is referencing is a legacy unit that is being

26 (Pages 98 - 101)

Page 102

stood down in -- in the end of September, whose sole purpose is not the implementation of foreign assistance, but rather the winding down of USAID, of agency operations.

Q    But you would agree with me that there is currently an entity in the federal government called USAID?

A    I would not agree that there is a functioning entity called USAID that can meet the statutory requirements.

Q    Okay.  But that's not actually my question. My question is whether there is currently an entity within the U.S. Government called USAID.

A    There is an entity called the USAID legacy unit.

Q    Where are you getting the name "legacy unit"?

A    Maybe in here.  I've also -- you asked about the current staff that I consulted, and I consulted with Stephanie Funk on the terminology of the legacy unit.

Q    So just to under -- you know, I'm -- I want

Page 103

to let you look at that document, but what you're suggesting is that -- I'm sorry, I missed the name, Stephanie Funk?

A    Stephanie Funk, right.

Q    That that individual is who gave you the information that led you to believe that the entity is called USAID legacy unit.

A    Correct.  And that's -- it's been referenced in media as the same thing.

MR. WARREN:  Counsel, just for the record, the highlight's in Exhibit 2A?

MR. SILER:  I have a question about that, actually.

MR. WARREN:  Okay.

MR. SILER:  That's -- I will tell you that that's how it was produced to us.

MR. WARREN:  Okay.

BY MR. SILER:

Q    So I think you were looking to understand where the source --

A    Right, right.

Q    -- of the term "legacy unit."

Page 104

A    It's been commonly referred to as a legacy unit in media.

Q    Is your understanding that that is a formal designation of the entity?

A    It -- when -- what I understand is that's how it is referred to, and there are only 70 people working there, I understand.  But I believe that's also what was referred to in -- in this memo.

Q    Okay.  But you agree that there are 70 -- approximately 70 people currently working for an entity with the name USAID?

A    Correct.  That are needed to complete the agency close-out activities and consolidate institutional support contracts.

Q    So that implies that there are still people working at an agency called USAID performing functions?

A    There --

MR. WARREN:  Objection.  Asked and answered.

BY MR. SILER:

Q    Go ahead.  Do you agree with my statement?

Page 105

A    I would agree that there is a small fraction 1, 2 percent of the agency's workforce that are currently employed.

Q    Okay.  All right.  So on page 1 of Exhibit A, what is the title of the person to whom the memo is addressed?

A    It's for Eric Ueland.

Q    And what is his listed title?

A    He's performing the duties of the administrator and chief operating officer at USAID.

Q    Okay.  And what's the title of the person who the memo is from?

A    It's from the chief terminations officer, chief acquisition officer for USAID.

Q    Okay.  And USAID is referenced several times throughout this memo; is that correct?

A    Correct.

Q    And each time it's referenced as "USAID"?

A    Yes.

Q    And not "USAID legacy unit"?

A    Correct.

Q    Okay.  So counsel mentioned this earlier,

27 (Pages 102 - 105)

Page 106

but I note there's some highlighting in this exhibit. That is how it is produced to us. Is there any significance to the portions that are highlighted?

A   No. This was in reference to precluding USAID individuals from working for the legacy unit.

Q   When you reviewed this document, was that highlighting present?

A   I don't recall.

Q   Did you apply that highlighting?

A   I honestly -- I don't recall, because I was tracking this issue, and particularly with the restrictions on former USAID employees joining the legacy unit.

Q   Okay. So this issue is -- when you say "this issue," that's a reference to hiring of people at USAID now that had previous employment relationship with USAID? That's what you mean by "this issue"?

A   It means that those individuals who were RIF-ed were precluded from serving as institutional support contractors to the legacy unit.

Q   Okay. And is that issue related to your opinion testimony that you're offering in this case?

Page 107

A   The reason that this document is highlighted is because it references the elimination of USAID. That's right. That's --

Q   I just -- I want to be clear. When you say -- in your last answer, when you say the reason this document is highlighted, you mean the reason you included this document in this, as an exhibit, not the specific --

A   Not portions --

Q   -- that are highlighted?

A   Correct.

MR. SILER: Okay. I am marking a document as Exhibit 4.

(Exhibit 4 was marked for identification.)

BY MR. SILER:

Q   Do you recognize this document?

A   I'll have to go over it. I don't -- I don't believe I've read the specific document, but I have read the excerpts from it in Devex articles, I believe. Devex is a media source that tracks foreign assistance.

Page 108

Q   So in other words, you've read summaries of the substance of this document?

A   I'm aware of the content of this from media reports, but I have not reviewed this document. Obviously, it's SBU.

Q   And what does that signify, "SBU"?

A   Not -- it's sensitive but unclassified. So it's usually not for public release.

Q   And just for the record, this document has a number -- Bates stamp in the bottom right corner for the USDS, 653 to 687. Are you familiar from your time at USAID with action memos?

A   Yes.

Q   What are they?

A   Action memos tee up a decision for leadership to implement and provides a initial background on what the issue is, weighs the pros and cons, and then concludes with a approve or disapprove.

Q   Okay. And from your time at the State Department, did you have knowledge of the State Department's use of action memos?

A   Yes.

Page 109

Q   Similar function at the State Department?

A   Yes.

Q   So this Exhibit 4 is under State Department letterhead; correct?

A   Yes.

Q   Now, I see at the top of Exhibit 4, there is a notation "REC 1 approve, 6/16/2025, M.R." Do you see that?

A   Yes.

Q   Do you know what that signifies?

A   It's a recommendation to approve, I believe, or it may -- normally, the action memos I'm familiar with will have a written signature for approval or just approval. This may be in reference to the status of the approval of the approval itself. I don't have that information.

Q   So just --

A   Go back to the -- is there a signing page?

Q   Yeah. Do you need additional time to look?

A   No, go ahead.

Q   So this is an action memo for the secretary; is that right?

28 (Pages 106 - 109)

Page 110

A    Yes.

Q    So based on the format of this, would you agree that this is a proposal being submitted to the Secretary of State?

A    Yes.

Q    Do you know who the Secretary of State was on June 16, 2025?

A    Yes.

Q    Who was it?

A    Secretary Rubio.

Q    So "M.R." in the top there, would you understand that to be a reference to Marco Rubio?  I'm looking now at the notation.

A    Yes, I would.  Yes, I would.

Q    So would you agree that this notation is a indication that Marco Rubio approved Recommendation 1 on June 16, 2025?

A    That's -- that would be my understanding.

Q    And to your knowledge, what role did Marco Rubio have with respect to USAID on June 10, 2025?

A    At one point, he became the acting administrator, but I'm not sure of the date, so I

Page 111

can't -- I'd have to go back to the record to answer that question.

Q    What would you need to look at to answer that question?

A    The date he became acting administrator.

Q    But you're not sure, sitting here today, what the dates of --

A    The exact date of when he became acting administrator, I'm not aware, but I know it happened sometime in '25.

Q    Okay.  Do you know, in the summer of 2025, whether Marco Rubio was the acting administrator?

A    I'd -- I'd have to go and check.

Q    Okay. All right.  So just want to focus your -- I understand you testified that you have not seen this specific document on today.  Is that right?

A    I have not.  Correct.

Q    I just want to focus your attention on a few specific parts of it.  The middle of the second paragraph of the background section on page 1 says, "Although the administration's budget request proposed legislation which would authorize the secretary to

Page 112

abolish USAID, it will continue to be an independent agency until such legislation is enacted and implemented."  Do you see that?

A    I see that.

Q    So does that sentence affect the opinions that you've expressed in this case in any way?

A    It -- it does not, because USAID was abolished.

Q    So when you say "abolished," do you mean functionally or formally?

A    Functionally.

Q    So are you expressing any opinion on whether USAID formally ceased to exist?

A    My -- the opinions are whether USAID has the functionality required by statute to fulfill statutory obligations.

Q    Okay.  And I think you said earlier that you were not intending to express a legal conclusion.  Is that correct?

A    Correct.

Q    What, in your view, is the distinction between offering a legal conclusion and offering an

Page 113

opinion that USAID is not satisfying its legal obligations?

MR. WARREN:  Objection to the form, and it calls for a legal conclusion.

BY MR. SILER:

Q    I'm not asking for a legal conclusion; I'm asking for your understanding of the difference between the opinion you're offering and a legal conclusion.

A    The opinion --

MR. WARREN:  Objection to form.

BY MR. SILER:

Q    You can answer.

A    The opinion I'm offering is whether USAID can comply with statutory requirements.

Q    How, in your view, could you answer that question without opining on the law?

A    I am not opining on the law.  I'm reviewing the law and saying what is required and what USAID has not been able to comply with.

Q    What is your understanding of what a legal opinion is?

Page 114

A I think a -- a legal opinion is a -- is the actual analysis of whether -- of -- of the -- of the implementation of the law.

Q I'm sorry. I'm not sure I understand that. Your understanding is that a legal opinion is?

A Takes the evidence and then makes a legal opinion.

Q So in other words, if you were to say USAID is violating the law, that would be a legal opinion?

A Correct.

Q And that is distinct, in your mind, from saying USAID is not able to comply with the law?

A There is evidence and analysis that goes in. So looking at the compliance is looking at the compliance and saying whether the agency can meet the statutory requirements. It's not opining whether that is illegal or not.

Q Okay. So then at the -- turning back to Exhibit 4 at the bottom, the bottom two lines state that "USAID will need to temporarily remain administratively operational to fulfill statutory requirements and complete closeout and other legacy

Page 115

functions." After having read that, does that affect your view on whether USAID is attempting to operate in compliance with its statutory functions?

A It doesn't change my conclusions.

Q Why not?

A Because USAID has not been able to fulfill statutory requirements, and I relied upon assessments of the OIG to confirm that.

Q Are you relying solely on the reports of OIG to determine whether USAID has been able to comply with its statutory requirements, or are you independently adding to that?

A I am -- the OIG reports provide the support to what I have drafted, and that's why I referenced them.

Q Okay. Now, I'm looking at page 2 of Exhibit 4, which is Bates number 654.

A Sorry, page 2; right?

Q Yeah. So you can look at the bottom right of the document that has a Bates -- that's called the Bates number, if you're not familiar with it. But that is a pagination, so that's 654. The middle of

Page 116

this page describes five lines of effort for USAID legacy functions. And the bottom two are "contracts and grants, termination and closeout of existing USAID awards that are not transferring to state, including administrative and programmatic contracts, grants, and cooperative agreements."

And the fifth bullet is "general operations, property dispositions, records, property management, USAID, OIG, and other statutory-mandated functions." Again, it's your expert testimony that USAID is not able to comply with its statutory functions; right?

A It cannot not comply with all of them.

Q But based on this document, there are current USAID employees who are working on the statutory functions of USAID; correct?

A There are 70 USAID employees working on a narrow bandwidth of those statutory requirements, which are with -- or with respect to what's listed here, to the winding down of USAID programs that are not transferred to state, and the offboarding of human capital.

Q All right. So you testified earlier that

Page 117

you considered at least some appropriations laws related to USAID in preparing your reports in this case.

A I'm sorry, can you say that again?

Q Yeah, sure. I believe you testified earlier that you considered at least some appropriations laws in preparing your reports in this case.

A Yes.

Q Did you consider the fiscal year 2026 appropriations related to USAID?

A I focused on the two that we talked about previously, but the -- since the -- since the transmittal of the initial report, there was the FY26 appropriation, and -- and actually the process of the appropriation, which I considered.

Q Okay. So under what mechanism was USAID appropriated funds? Meaning what's the title of the bill that appropriated them?

A I believe it's the Foreign Operations -- State Foreign Operations.

Q So are you aware that on February 3, 2026, Congress passed, and the president -- well, the

30 (Pages 114 - 117)

Page 118

president signed on February 3, 2026, the appropriations bill that traditionally covered USAID?

A    Yes.

Q    Did you consider that appropriations bill in preparing your supplemental report?

A    I reviewed the -- some aspects of it, but not all of it.

Q    Which aspects did you review?

A    The part that looks at the funding amounts that was being appropriated predominantly.

Q    To all agencies included in that or specific agencies?

A    It -- the -- the appropriation is specific to just to a few agencies.

Q    I understand, but you said you considered fiscal year 2026 appropriations.

A    Right.

Q    And I'm trying to understand, did you consider it with respect to every agency that was included in the state and foreign relations bill or just a subset of those?

A    So the -- what I looked at first was overall

Page 119

level of funding for the entire bill.  The administration requested a significant decrease, and Congress actually did not respect the administration's wishes.  And so I looked at the level of overall funding, which is applied to several agencies.

Q    Okay.  So when you're saying "overall funding," what specifically are you referring to?

A    Referring to the accounts, the economic growth account, the development account, the -- all the accounts for foreign assistance.

Q    Okay.  So those accounts are listed in your expert report -- your supplemental expert report in Exhibit 2.  Is that right?

A    Yes.

Q    And that's at pages 5 and 6 of Exhibit 2.

A    Yes.  Let me get to 5.  5 and 6, core funding, 5 -- correct.

Q    And there are -- between pages 5 and 6 of Exhibit 2, there are six numbered references?

A    Yes.

Q    Correct?  And those are the six accounts that you were referring to?

Page 120

A    Correct.

Q    And those are the appropriations you were focusing on for fiscal year 2026?

A    No, I looked at the overall foreign appropriations level, which includes other accounts.  These are accounts that are more specific to USAID.

Q    Okay.  And the other accounts that are not included on this list of six, what is their relationship to USAID?

A    They are not part of USAID, and USAID does not implement these funds, such as financial and military support, as part of foreign assistance, INCL, which is security related, done by the State Department.

Q    Okay.  And that last one you said was the State Department?

A    INCL.

Q    INCL?  So the ones that aren't on this list of six, those are not related to USAID traditionally?

A    Correct.

Q    But the six that are listed here, traditionally managed by USAID?

Page 121

A    Yes.  Correct.

MR. WARREN:  If you're not sure --

THE WITNESS:  That's correct.  Yeah.

BY MR. SILER:

Q    So to your knowledge, did Congress appropriate any money to USAID for these six accounts?

MR. WARREN:  Objection.  Form.

THE WITNESS:  I would have to go back and review the appropriation, but I believe it mentions USAID.

MR. SILER:  Okay.  I am now marking a document as Exhibit 5.

(Exhibit 5 was marked for identification.)

BY MR. SILER:

Q    Do you recognize this document?

A    It's the '24 appropriation, I believe.  Yes, bilateral public law.

Q    So on the top here it says "Public Law 118-47"; is that right?

A    Correct.

Q    The date is March 23, 2024?

31 (Pages 118 - 121)

Page 122

A   Correct.

Q   So to your understanding, these are excerpts of an appropriations bill related to fiscal year 2024?

A   That's correct.

Q   And specific to USAID?

A   Specific to USAID, because the title is "USAID, Agency for International Development."

Q   So you know, again, Title 2, as listed here in Exhibit 5, refers to -- specifically to the United States Agency For International Development.  Is that right?

A   Yes.

Q   And then under the subheadings "Funds Appropriated to the President," Operating Expenses," there's a number listed here on the second line that's $1.695 billion; is that correct?

A   That's correct.

Q   And then if you turn to page 4 of this document, there is this heading called "Development Assistance."

A   Correct.

Q   And the specific language under that heading

Page 123

says, "For necessary expenses to carry out the provisions of Sections 103, 105, 106, 214, and Sections 251 through 255 of Chapter 10 of Part 1 of the Foreign Assistance Acts of 1961."  Is that correct?

A   Yes.

Q   And that purports to appropriate $3.931 billion.

A   To be apportioned to USAID.

Q   Correct.

A   Yes.  Yes.

Q   Yeah.  Those statutory references, what do those things refer to, to your knowledge?

A   They refer to the funds that were appropriated by Congress under specific accounts, with the intention that they be apportioned and expended by USAID.

Q   Again.  And this is 2024?

A   Yes.

Q   And is the development assistance one of the accounts you refer to in your expert report?

A   Yes.  Yes.  Yes.

Page 124

Q   And then on page 5, so the next page of Exhibit 5, there's a subheading "Economic Support Fund."  Do you see that?

A   Correct.

Q   And that is appropriating funds for necessary expenses to carry out the provisions of Chapter 4 of Part 2 of the Foreign Assistance Act of 1961.  Is that correct?

A   Yes.

Q   And is the Economic Support Fund an account that you were referring to as managed by USAID?

A   USAID manages a percentage of the Economic Support Fund.  It -- it is a fund that USAID can administer.

Q   Okay.  And that's referred to -- you can look if you'd like -- page 5 of Exhibit 2, your supplemental report; correct?

A   Right.  Regarding the state accounts, yes.

Q   Yeah.  So again, this is one of the funding sources that you're relying on for your opinion about funding mechanisms that USAID received from Congress?

A   Correct.

Page 125

Q   And then if we could turn to page 2 -- and I will tell you, I'm just trying to follow the ordering of your report, which is why we're jumping around.  Page 2, under Title 3, "Bilateral Economic Assistance," the second subheading here is for "Global Health Programs"; is that correct?

A   I'm not sure if I'm with you.

Q   Okay, it's page 2 of Exhibit 5.

A   Exhibit 5, page 2.

Q   Global Health Programs.

A   There we are.  I see it.  Yes, but pretty small print.

Q   I don't control the size; the Congress prints things.  I apologize for that.  And that section of this appropriations bill is appropriating approximately $4 billion, and which shall be apportioned directly to the United States Agency For International Development.

A   That's what it says.

Q   And again, the Global Health Programs was one of the accounts you referred to in your supplemental expert report?

32 (Pages 122 - 125)

Page 126

A    Yes.

Q    And then on page 4, again?

A    IDA?

Q    That's correct.  That's what I'm referring to.  The International Disaster Assistance that appears on this page.

A    Correct.

Q    And again, the last three lines says that "The money appropriated by that paragraph shall be apportioned to the United States Agency For International Development."  Is that correct?

A    Yes.

Q    Again, the International Disaster Assistance, or IDA, is one of the funds you're relying on?

A    Yes.

Q    And then finally, with -- on page 5 of Exhibit 5, at the very bottom there's a paragraph with the header "Democracy Funds"

A    Correct.

Q    And then the last line appropriates -- sorry, the last paragraph of that paragraph says,

Page 127

"$140 million, which shall be made available to the Bureau for Democracy Human Rights Governance, United States Agency For International Development."  Is that correct?

A    Correct.

Q    And that -- again, that's one of the accounts that you're relying on in your supplemental report?

A    Yes.

        MR. SILER:  I am going to mark a new exhibit as Exhibit 6.

        (Exhibit 6 was marked for

        identification.)

BY MR. SILER:

Q    Might want to keep that one kind of handy.  Do you recognize this document?

A    I believe it is the appropriation of '26

Q    For -- is it the same -- covering the same agencies as the prior exhibit, Exhibit 5?

A    It's the same appropriation as prior one.

Q    But for fiscal year 2026?

A    Correct.

Page 128

Q    And so to your knowledge, this is the current appropriations bill for current operations --

A    Yes --

Q    -- of the government?  Okay.  So on page 1 of Exhibit 6, under Title 2, the heading of Title 2 is "Administration of assistance."  Is that right?

A    Yes.

Q    If you refer back to Exhibit 5, just for a moment, the prior exhibit --

A    Correct.

Q    -- Title 2 is described as the "United States Agency For International Development for Fiscal Year 2024"; right?

A    Yes.

Q    But in 2026, it's just Administration of Assistance; is that right?

A    Correct.

Q    What is your reaction to the difference between those two things?

A    Well, the -- the first thing I would note is one is an understanding of the appropriation process and the time length.  So, for example, the funds that

Page 129

are appropriated in -- in 2024 would be the funds that would be implemented in 2025.  So it would be -- there would be the funds that were USAID was statutorily required for.  It doesn't end in year '24.

Q    So you're saying the appropriations for fiscal year 2024 --

A    Continue to be dispersed, and the law continues to be the law for those funds.

Q    Okay.  But it's fair to say that there's a difference with respect to funds appropriated in 2026; correct?

A    Yes.

Q    So what is your reaction to the difference between those two titles?

A    The -- the public law of '24 specifically has a title called "USAID, Agency for International Development."  The other one is "Administration of Assistance."  The question I would have is, where does that expertise to implement that these funds exist today in compliance with the law?

Q    Okay, but you agree that this 2026 fiscal year appropriations does not refer, in Title 2, to

33 (Pages 126 - 129)

Page 130

USAID at all?

A It does --

Q The heading of Title 2, excuse me.

A The heading does not. Right.

Q Okay. So if you look at page 4 of Exhibit 6, about three-quarters of the way -- are you there? Sorry.

A Yeah, I'm --

Q I don't mean to rush you at all.

A 1, 2, 3, 4.

Q It's about three-quarters of the way down that page. There's a heading, "National Security Investment Programs."

A Yes.

Q And that -- the substantive paragraph says, "For necessary expenses to carry out the provisions of Sections 103, 105, 106, 214, and Sections 251 through 255, and Chapter 10 of Part 1 of the Foreign Assistance Act of 1961." Did I read that correctly?

A Yes.

Q Now, that's the same language that we saw in Exhibit 5 with respect to the heading "Development

Page 131

Assistance." Is that that your understanding? Feel free to compare them.

A Okay. So pardon me. Exhibit 5, "Development Assistance, DA, for necessary expenses to carry out" -- and we are looking at not security, but -- more or less.

Q So in other words, there's some additional statutory references in the fiscal year 2026 --

A Yes.

Q -- appropriations, which is Exhibit 6, that are not included in the development assistance portion of Exhibit 5; correct?

A Yes.

Q Okay. So if you go to the bottom of the National Security Investment Programs paragraph in Exhibit 6, there's a reference to, "The funds appropriated under this heading shall be apportioned to the Department of State."

A Yes.

Q So in other words, funds that had been appropriated to USAID accounts are now being directly appropriated to the Department of State. Is that your

Page 132

understanding of these documents?

A My understanding is that this doesn't supersede the previous appropriation law that requires USAID to be apportioned the funds, and therefore implement them, that we talked about in 2024 -- '24; correct?

Q Yes.

A Right.

Q Okay. That's fine. But it's fair to say that for money appropriated in fiscal year 2026, funds that had been operated by USAID are now being appropriated to the Department of State?

MR. WARREN: Objection. Form.

THE WITNESS: I believe they're appropriated to the president and apportioned.

BY MR. SILER:

Q Okay, so they're apportioned to the Department of State?

A In this specific language case? Yes.

Q Okay. And the extra language that appears in the National Security Investment Programs that did not appear in the Development Assistance portion of

Page 133

Exhibit 5 is Chapter 4 of Part 2 of the Foreign Assistance Act of 1961, Chapter 4.

A Chapter 4 of Part 2 of the FAA. That's what it says.

Q Yeah. So now, I'd like you to go back to the Exhibit 5, page 5, "Economic Support Fund." The language there refers to Chapter 4 of Part 2 of the Foreign Assistance Act of 1961.

A Uh-huh.

Q That right? So again, referring back to Exhibit 6, again, the funds necessary to carry out the provisions of Chapter 4 of Part 2 of the Foreign Assistance Act are now being apportioned to the Department of State for fiscal year 2026. Is that right?

A Apportioned to?

Q I think that's what I said. Okay.

A I didn't --

Q Fair enough. Please correct me if I get some of the technical terms wrong.

A Sorry, I didn't -- I didn't hear you correctly.

34 (Pages 130 - 133)

Page 134

Q   And if you could go back to page 1 of Exhibit 6, Global Health Programs, on the very bottom of the first page, the sentence that carries over to page 2 says that "The funds shall be apportioned directly to the Department of State."  Is that correct?

A   Yes.

Q   And again, Global Health Programs had been an account you relied on with respect to earlier appropriations bills as support for money that was appropriated to USAID accounts; correct?

A   Yes.

Q   So again, there's now been a change.  Going forward, for fiscal year 2026, those funds are appropriated to the Department of State.

A   Uh-huh.

Q   You agree with that?

A   Apportioned to, yes.

Q   Apportioned to.  But you do agree with the substance.  They're apportioned to the Department of State?

A   And there was a change in -- in the language

Page 135

between the fiscal years, but I don't believe that changes the appropriate -- the previous years' appropriations and statutory requirements.

Q   Understood.  Can you explain to me the difference between "appropriations" and "apportioned"?

A   Yes.  Welcome to the world of budgets. The -- the Congress appropriates the funds through law that says, "These are the funds available for these specific purposes."  Then the -- then, because these are appropriated to the president, they're apportioned to the various agencies.  Usually, if there is such a requirement, as there was in '24, then they're apportioned to that specific agency.  Apportioned is how the funding flows once it is in the executive branch.  Appropriation is the legislative action of making the funds available.

Q   Okay.  So in other words, when Exhibit 6, the language apportions certain funds to the Department of State, that's an indication that Congress has made those funds available for that specific agency?

A   For '26.

Page 136

Q   For '26.  We've just got a few more here. So page 3 of Exhibit 6, there is a title for "International Humanitarian Assistance."

A   Correct.

Q   And there's a reference on the third line of that paragraph for "International Disaster Relief Rehabilitation and Reconstruction Assistance."  Is that the same as the International Disaster Assistance account that we were talking about earlier?

A   One would assume so.

Q   And again, the first line of that refers to "necessary expenses to enable the Secretary of State to carry those provisions out"?

A   Yes.

Q   And on the next page, about three-quarters of the way down, there's a reference to, "The funds appropriated under the setting shall be apportioned to the Department of State."

A   Pardon me, I am needing reading glasses. "Funds appropriated under the setting shall be apportioned to the Department of State."

Q   Again, this is -- these are funds that had

Page 137

previously been apportioned to USAID under the International Disaster Assistance account?

MR. WARREN:  Objection.  Form.

THE WITNESS:  No, these are funds that were appropriate -- they were apportioned -- the Congress apportioned -- recommended the apportionment to USAID in previous fiscal years.

BY MR. SILER:

Q   Okay.  And then on the bottom of that page is heading "Democracy Fund."  You had talked about earlier in -- for fiscal year 2025 that Congress had apportioned funds to USAID for democracy, human rights and governance.  Is that correct?

A   Yes.

Q   And I see in this paragraph there are no such funds appropriate -- apportioned -- excuse me -- to USAID --

A   That's right.

Q   -- is that correct?  Can you tell me about the Food For Peace account that's referenced on -- in your supplemental expert report?

A   The Food For Peace account is a humanitarian

35 (Pages 134 - 137)

Page 138

assistance account that uses predominantly U.S.-produced agricultural items to provide emergency and humanitarian aid, food relief.

Q   And who operated that program?

A   That was operated by USAID.

Q   Is that still the case?

A   I believe it was transferred to USDA.

Q   How was it transferred?

MR. WARREN:  Objection.  Form.

THE WITNESS:  It was transferred in the appropriation.

MR. WARREN:  Okay.

MR. SILER:  I am marking a document as Exhibit 7.

(Exhibit 7 was marked for identification.)

BY MR. SILER:

Q   Do you recognize this?

A   This is what I referenced.  This is the language that appropriate funding to USDA.

Q   For what purpose?

A   I believe it's for the purpose of which I

Page 139

told you, humanitarian assistance, Food For Peace is included here.

Q   Okay.  So just to ask a more specific question, on Exhibit 7, there is language in here that makes funds available for the Secretary of Agriculture, in consultation with the Secretary of State and heads of other relevant federal departments, to provide a detailed report outlining the process and agency needs to support a transfer for the -- of the Food For Peace program from the U.S. Agency for International Development to the Foreign Agricultural Service within the Department of Agriculture.

A   Yes.

Q   So it's fair to say that Congress authorized the transfer of that Food For Peace program under the auspices of the Department of Agriculture?

A   Yes.

Q   So based of your review of Exhibit 6 and 7, is it fair to say that Congress has apportioned no funds for fiscal year 2026 to the accounts -- the six accounts that you've identified in your supplemental report for USAID?

Page 140

A   Congress did not specifically recommend apportionment to USAID in FY 26.

Q   Okay.  You say "recommend apportionment."  What do you mean by that?

A   It's the law.  Require apportionment.

Q   Okay.  So your view is that if Congress apportions funds for a specific account under USAID, that that must be spent on that account?

A   Correct.

Q   Just trying to clarify your testimony.  So understanding that none of these accounts have been appropriated funds for fiscal year 2026, how does that affect the opinions you've expressed in your supplemental report?

A   Fiscal year -- FY-26 funds are currently still not available to be programmed.  It takes a year to program funds.  So the programs that the USAID was expending and the State Department would be expending are previous fiscal year monies '24 and '25, which were specifically apportioned to USAID.  It takes eight months to year to obligate funds.

Q   Going forward, could USAID perform the core

Page 141

functions you've identified in your supplemental expert report with the amount of funds that have been apportioned to it that we've just reviewed from Congress?

A   USAID doesn't have the staff processes or structures available to do this.  So the answer is USAID doesn't have the capacity to do this to meet the requirement.

Q   Could -- is it possible for USAID to maintain or acquire that capacity, given the level of funding that Congress has apportioned to it for fiscal year 2026?

A   I don't -- sorry.

MR. WARREN:  Objection.  Form.

THE WITNESS:  I -- you're asking me to surmise hypothetically.  Part of that capacity required, for example, 6,000 people in the -- overseas to ensure the responsible and effective use of taxpayers' money.  Those 6,000 people don't exist.  The offices don't exist.  The equipment don't exist.  The processes don't exist.  I can't speculate on the amount of money or time it would be required to

36 (Pages 138 - 141)

Page 142

recreate these -- this capacity, as you --

BY MR. SILER:

Q   Assume for a moment that not none of the factual events you've described as related to DOGE occurred in 2025, and further assume for the moment that Congress passed the fiscal year 2026 appropriations that it ultimately did for 2026 for USAID.  Could USAID have maintained the capacity you're talking about with that level of funding?

MR. WARREN:  Objection.  Form.

THE WITNESS:  Let me see if I understand your question.

BY MR. SILER:

Q   Sure.

A   If there were no changes to USAID from its previous structure and staffing and would -- and were funds appropriated -- pardon me?  Could you -- could you --

Q   So what I'm suggesting is, you would agree that Congress has apportioned or appropriated funds for USAID that is significantly less than it had for prior fiscal years; right?

Page 143

A   Yes.

Q   Assuming that level of funding for fiscal year 2026 that actually occurred, could USAID have continued to operate the way it did in 2024?

MR. WARREN:  Objection.  Form.

THE WITNESS:  If Congress appropriated the same level of operating expense funds and capital investment funds, which are critical to the management, then USAID functions could continue.  If the -- part of the workforce is dependent upon the appropriations, separately from the operating expense budget.  So that would have taken a bit of a hit.

BY MR. SILER:

Q   So the -- what does the operating expense budget cover, in terms of what does that pay for?

A   Right.  The operating expense budget covers the direct-hire personnel and the cost required to support them.  So if you are overseas, it would cover the rental units.  It would cover the operation of the -- of the HR system, the human resources systems.  It would -- the information systems and the -- the hardware, if you will, from a management point of

Page 144

view, required to run an agency, renting the building, for example.

Q   Sure.  So let's look at Exhibit 5.

A   Right.

Q   Page 1 is Title 2, "United States Agency For International Development, funds appropriated to the President, operating expenses."  Is this the appropriate -- the section of the appropriations bill that relates to the operating expenses --

A   Yes.

Q   -- that you just described?

A   Yes.

Q   What is the amount of money that Congress has appropriated for that account?

A   $1.6 billion.

Q   Okay.  Now, let's look at Exhibit 6, which is for fiscal year 2026.  First page is Title 2, "Administration of assistance funds appropriated to the president, operating expenses."  In your view, is that appropriation -- that section of the appropriation bill for the same purpose as what we just discussed in Exhibit 5?

Page 145

A   I believe it's broader, because we -- we've recovered state operations as well.

Q   Okay.  And how much -- what is the level of appropriations that Congress has specified under operating expenses?

A   How do I get down to that?  -- "the programs $62 billion because it includes the State Department operations."

Q   Where -- what -- where are you looking?

A   Am I -- am I looking at -- so I'm sorry.

Q   I'm looking at page 1 of Exhibit 6.

A   Got it.  Sorry, I, my -- my -- I -- I don't have my reading glasses.  So I was just reading --

Q   What is the amount of money under operating expenses?

A   Oh, there we go.  Sorry.  It's $111 billion, nearly 112 --

Q   I'm sorry.

A   -- million dollars.

Q   Yeah.  So a hundred and -- so it -- it in other words, it went down in fiscal year 2025 from about 1.7 billion to fiscal year 2026, which is about

37 (Pages 142 - 145)

Page 146

112 million. Is that fair?

A  This -- where is it again? Operating expenses section. Correct.

Q  So in your view, could USAID have maintained its core functions as it had, in your view, in 2024, at the same level in fiscal year 2026, given the change in congressional appropriations for operating expenses?

A  There would --

MR. WARREN: Objection to form.

THE WITNESS: There would have been an impact on the agency.

BY MR. SILER:

Q  What level of impact? I mean, this is an order of magnitude different; right?

A  Yeah.

Q  So how could USAID have operated consistent with the opinions expressed in your supplemental expert report when it went from, you know, well over a billion dollars to $112 million?

A  Right. I -- I'm not in the management bureau, but if I were, what I think would happen would

Page 147

be the shifting of staff from direct-hire operating expenses to program expenses that are fund -- appropriated funds. Most of the overseas staff, the local staff are appropriated through the different accounts that we talked about. They are paid through them. The USPACs are paid through those accounts as well. This would have had an impact on operations, but I imagine that management would have tried to mitigate that impact -- significant impact -- by transferring funds to program -- program related. So you got OE, operating expenses, and your program budget.

Q  Understood. So those program accounts that we just walked through, all of those were apportioned to the Department of State; correct?

A  Uh-huh.

Q  So, again, how would USAID maintain its level of operations as what you're describing as independent agency? How could it shift to those operating to those other accounts we just discussed?

A  I would speculate that the funds would be reapportioned to USAID, which commonly happens.

Page 148

Q  Can you expand on that?

A  ESF funds, for example, are reapportioned to USAID, at times, from the State Department.

Q  Okay. So it is common to have Congress apportion funds to the Department of State and then have those funds reapportioned to USAID?

A  That can happen.

Q  Can the reverse happen? Can it be apportioned to USAID and then be -- and then reapportioned to the Department of State?

A  I imagine it's possible.

Q  What determines whether it's possible?

A  If it is consistent with the Appropriations Act and notified to Congress. Usually, those decisions are made by OMB.

Q  Okay. So I guess what I'm understanding is -- what I'm not understanding is you've got a law that apportions the funds to USAID, and then you're reapportioning that money to the State Department. What makes it -- what makes that ability happen consistent with a law that says it's apportioned to USAID, in your view?

Page 149

MR. WARREN: Objection to form.

THE WITNESS: The working with Congress and notifying Congress.

BY MR. SILER:

Q  Would they have to pass a new law?

A  I -- I'm not sure. It depends upon how it's worded in the -- if it's -- if it's language that's in the report or in the text -- in the legal text. It depends.

Q  The legal text of the appropriations bill, is that what you're saying, or are you talking --

A  I would have to ask a lawyer.

Q  Okay. In your experience, did USAID reapportion funds that had been apportioned to it to the State Department?

A  I'm not aware of many cases where it occurred, but I believe it may have occurred.

Q  Okay. And the reverse, did funds that were apportioned by Congress to the State Department, were those reapportioned to USAID in your -- in and at your -- during your tenure at USAID?

A  I believe some Economic Support Funds were.

38 (Pages 146 - 149)

Page 150

MR. SILER: Okay. Why don't we take a few minutes?

THE REPORTER: The time is 12:35 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 12:47 p.m. We're back on record.

BY MR. SILER:

Q    Okay. We've been talking about various congressional appropriations. I'd like you to turn to Exhibit 2, your supplemental report.

A    Yes.

Q    Pages 8 -- bottom of page 8, top of page 9.

A    Yes.

Q    So in this bullet, you refer to "unlawful rescissions." Is that right?

A    Yes.

Q    So what's a rescission?

A    A rescission is when the executive branch chooses not to expend the money that's been appropriated.

Q    And is there a process by which Congress can

Page 151

effectuate a rescission on?

A    No, I've never experienced Congress effecting a rescission, but they can, I imagine, in the -- in the future appropriation law, rescind funding that has been obligated, I imagine. Normally, rescissions take place on the executive side. Congress has a role in approving rescissions. Congress needs to approve the non-obligation and return of any funds that had been previously appropriated by Congress.

Q    Okay. So you're saying that the executive initiates a rescission, and that's presented to Congress for approval or disapproval?

A    Generally.

MR. SILER: Okay. So I am handing you what I have already marked as Exhibit 8. Let me make sure this is -- yeah.

(Exhibit 8 was marked for identification.)

BY MR. SILER:

Q    Do you recognize this?

A    Yes.

Page 152

Q    Have you seen it before?

A    I have seen excerpts of it.

Q    Okay. And what is it?

A    It is the Rescissions Act of 2025.

Q    Okay. And, I mean, if you can turn to page 2 and 3, there are various portions of this act that rescind funds that had been appropriated to USAID for fiscal year 2025. Is that correct?

A    Correct.

Q    So in your report, when you refer to "rescissions," you're not referring to this?

A    I'm referring to the rescissions that took place prior to the enactment of this. The State Department rescinded funds through a suspension of foreign assistance in January and terminated those programs, and then Congress, later, in July, passed the Rescissions Act of 2025.

Q    Okay. Are they -- are the rescissions reflected in the Rescissions Act of 2025, which is Exhibit 8 here, related to the rescissions that you're referring to in your report? Are they different?

A    I imagine they're roughly the same.

Page 153

Q    Okay. So in your supplemental expert report, where you refer to "unlawful rescissions," does Congress's action as reflected in Exhibit A affect your opinion on whether those are unlawful?

A    When the act occurred to rescission, it was unlawful.

Q    Is it unlawful?

A    Now, there -- there, I'd have to ask a lawyer.

Q    Okay. But it is fair to say that Congress rescinded some of the funds that had been apportioned to USAID?

A    Yes.

Q    And those funds were -- had been apportioned for fiscal year 2025?

A    Yes.

Q    How, if at all --

A    And --

Q    Oh, no --

A    Yes.

Q    Do you have a further answer?

A    No, I don't. Yes.

39 (Pages 150 - 153)

Page 154

Q  Okay.  How, if at all, does Congress's rescission of those funds that had been apportioned to USAID affect the opinions as expressed in your supplemental report?

A  The opinions in my supplemental report writ large, right, that the administration enacted an unlawful rescission in January and February that later -- that was unlawful at the time.  I can't judge what the act of Congress had has done.

Q  So why are you able to say that it was unlawful at the time, but can't say whether it's unlawful now?

A  It was unlawful at the time, because it was not notified and approved by Congress.  Therefore, it's unlawful.  Whether a post facto law by Congress absolves that, I am not a lawyer.

Q  So you're comfortable opining whether it was unlawful in January, but not today.

A  I'm comfortable in -- in reviewing the facts which require notification approval by Congress and -- and recognize that that has not been done.  So I -- I can recognize non-compliance with the law.

Page 155

Q  Okay.  Did you consider the Rescissions Act of 2025 when you were preparing your supplemental expert report?

A  I was aware of it.

Q  Did you consider it in your initial expert report?

A  I was aware of it.

Q  Why is it not included in either of those reports?

A  I -- because it's specific to the unlawful rescission.  And as we talked about it, the administration was not compliant with -- with the requirements to have congressional approval of this, so it wasn't a relevant document to submit.

Q  Okay.  You testified a minute ago that a rescission begins with the executive branch.

A  Normally.

Q  Normally.  And then is approved or disapproved by Congress.

A  Only Congress has the authority to -- to approve the non-use of funds that have been appropriated by Congress for a specific purpose.

Page 156

Q  Okay.  And so why is the process that you described generally different than what occurred in the specific case with respect to USAID?

A  There have been rescissions in the past.  In the past, the administration will detail the resources required go to Congress.  And then once Congress approves the rescission, then it will terminate that funding.  In this case, the administration terminated the funding and the programs before there was congressional approval.  That's a difference.

Q  Okay.  Are you aware whether or not USAID made congressional notifications with respect to certain programs that it was proposing to terminate or did terminate?

A  I'm aware that there were congressional notifications that listed the specific programs that had been terminated.

Q  All of them, or some of them?

A  Five- -- more than 5,000.

Q  Okay.  Is that congressional notification in your expert report or supplemental report?

A  I think I have included that, yes.  I've

Page 157

referenced it, and I think -- I mean, I have many exhibits.  So there is the CNN report to the Hill that I believe listed -- okay -- yeah, here's a list of programs.  So it's under -- let me just make sure that lists the programs.

Q  So if I'm looking at your binder correctly, you're on Exhibit Q of Exhibit 2?

A  I am on Exhibit Q of Exhibit 2, correct, and I am trying to find a list of programs.  My eyes are not good enough at reading this.  Okay.  That's -- no, that's more the structure.  There's a -- there was a separate notification that went up, if not the same one on the actual programs that were eliminated, but I'd have to find that in here.  This might reference it.

Q  I honestly don't mean to be testing your memory here.  I'm -- why don't you look at exhibit D.

A  D, okay.  Sorry.

Q  I just -- I don't know if this is the answer --

A  There are a lot of exhibits.

Q  -- but I'm wondering if this is the answer.

40 (Pages 154 - 157)

Page 158

A    I hear you.  Let's see, D.

MR. WARREN:  And, Counsel, it may help, to the extent you're referring to something -- an exhibit that supports something in the report, to direct Mr. Milligan into the report.

MR. SILER:  Sure.

MR. WARREN:  Thank you.

THE WITNESS:  Correct.  So this references that 5,000 -- more than 5,000 programs were terminated since January of '25, and I believe there was an attachment that listed the specific programs.

BY MR. SILER:

Q    Okay.  So the -- there is an attachment that is not included in Exhibit D to Exhibit 2 that lists the programs that you believe were part of the unlawful rescissions?

A    Correct.

Q    Okay.  And those programs, are they the same or different than what is being rescinded as part of the Rescissions Act that we referred to earlier, which is Exhibit 8?

A    I believe there's a correlation between

Page 159

them.

Q    Do you know what that correlation is, or --

A    I would have to do the analysis, but I assume that there's a relationship between the two.

Q    Are you -- I just want to unpack your answer.  Are you assuming there's a relationship or you know?

A    I have not -- I have not examined it.  It would be logical to conclude that there would be a relationship between the programs that were suspended beginning in January, and then the funding that was rescinded in July.

Q    Okay.  Let's look at Exhibit 2 again.  The actual report section, the supplemental report, Exhibit 2.  I'm on page 6.

A    Okay.

Q    Okay.  So, you know, we talked earlier about the different accounts.  I'm on the bullet below that, which, I believe, says that Congress has enacted legislation authorizing USAID or the USAID administrator to perform certain responsibilities.  And then there's a list of four items.

Page 160

A    Right.

Q    Do these statutes all require the USAID administrator to perform actions, or could someone else perform those functions under the statute?

A    They referenced the USAID administrator.  I'd have to review it to see if there is any additional language.

Q    So your view is that they all refer specifically to the USAID administrator?

A    My -- my view is they authorize USAID and the USAID administrator to perform certain responsibilities with respect to these accounts.

Q    Okay.  Are you aware that there is someone who is currently performing the duties of USAID administrator?

A    Yes.

Q    Do you know who that person is?

A    I -- I know that the -- there have been a series of acting titles of USAID administrator, but I don't believe there're actually performing the duties, but they've be given the title, because the functions are gone.

Page 161

Q    I'm sorry.  I was wondering if you were done with your sentence.

A    Uh-huh.

Q    Okay.  So what specifically, in your view, are the statutory requirements that USAID are not meeting at this moment?

A    There are reporting requirements, with respect to previous-year appropriations.  There's the submittal of a -- of a strategic plan that's required.  There's also the -- the payment of -- Payment Integrity Information Act that is required, so there are, and -- and the mandatory reporting from the '25 appropriation as well.

Q    Okay.  So looking at pages 9 through 11 of your report, is this where, in your report, you're outlining the statutory requirements that USAID is currently failing to meet?

A    Correct.  These are -- these are some of them.  Yes.

Q    Where are the others?

A    These are the ones that I highlighted that reinforce the –- the conclusion that you USAID is

41 (Pages 158 - 161)

Page 162

unable to comply with statutory requirements.

Q   Okay.  Are there any other statutory requirements that you feel that USAID is not able to meet that you did not express in this report?

A   There are statutory reporting requirements per appropriation, but they're too numerous to make -- to list.

Q   Okay.  So on page 10, the first black bullet is "Reporting Requirements Under section 634A of the Foreign Assistance Act," and then the sub bullet, you write that that provision requires the executive branch to submit an annual report to Congress.  Does that statute require that report to be prepared by USAID or its administrator?

A   I would have to go back and look at the specific language.

Q   Yeah, I'm just wondering why you said the "executive branch" as opposed to "USAID."

A   Because funds are appropriated to the president.

Q   Okay.  So if somebody else prepared that report, that would satisfy at least how you've

Page 163

described it in this expert report?

MR. WARREN:  Objection.  Form.

THE WITNESS:  Could you repeat the question?

BY MR. SILER:

Q   Well, I'm wondering if others could complete it other than the USAID administrator, for example, the Secretary of State.

A   Perhaps.

Q   Do you know whether the executive branch has, in fact, submitted such a report in the last year?

A   My understanding, at the time of writing this, that they had -- I -- I wouldn't believe they had.

Q   And do you know, in the three months since you wrote this report, whether they have?

A   I'm not sure.

Q   So you mentioned congressional notification requirements that are imposed on USAID.  I -- are you aware of a March 28th congressional notification sent from USAID to Congress?

Page 164

A   Sent from USAID or sent from the State Department?

Q   So Exhibit Q of Exhibit 2 is a State Department transmittal of a congressional notification.  Are you aware of a USAID congressional notification from March 28, 2025?

A   Are you referencing the preparation -- the notification I'm looking at from the State Department?

Q   No.

A   Okay.  Is there a separate notification from -- there have been notifications submitted about specific programs.  This notification on your Q is specific to the internal structuring of -- of the State Department.

Q   Okay.  So sitting here today, you're not aware of a March 28th USAID congressional --

A   I would have -- I -- I'd have to look at it to see if I'm aware of it.  I -- I don't remember all the -- I didn't memorize the dates.

Q   Okay.  Why don't you go back to Exhibit 4?

A   Pardon me, to?

Q   Exhibit 4.

Page 165

MR. SILER:  I think I might have misspoke earlier, but that's fine.  We can correct it.

BY MR. SILER:

Q   So if you look, again, these are Bates numbered.  These are the numbers on the bottom right.  And within Exhibit 4, there is a document that's -- it's attached to that memo.  It starts at Bates number 672.

A   672.  Keep going.  672.  I got you.  Wait.

Q   Do you see --

A   Right, I see that.

Q   Okay.  So I think I said earlier it was a USAID congressional notification letter, but we'll just amend that to say that this is on Department of State letterhead.  But this is a March 28, 2025, congressional notification.  Is that right?

A   Right.  Correct.

Q   Have you seen this document before?

A   Yes.

Q   And this is different than the one we were referring to earlier, which is Exhibit Q to your supplemental report.

42 (Pages 162 - 165)

Page 166

A   I believe they -- they cover the same subject matter. The -- the -- this CN is with respect to the functions of USAID and where they will exist in the State Department. The other one talks about the organization of the State Department. So they -- they overlap. They seem to be, more or less, the same subject matter.

Q   So Exhibit Q to Exhibit 2 is -- the email transmittal on the first page of Exhibit Q is dated May 29, 2025?

A   Right. Yes.

Q   And then Exhibit 4 is -- the portion of Exhibit 4 we're looking at is dated March 28, 2025. So it -- the time periods are slightly different, is my point.

THE WITNESS: So the -- the Exhibit Q references a CN that went up on May 29, 2025. And this one you're presenting to me was the one that went up the day before.

BY MR. SILER:

Q   Just -- let's just unpack this. Okay. So Exhibit Q, the first page, the email from Paul -- do

Page 167

you know his last name --

A   Guaglianone?

Q   I don't either -- is dated May 29, 2025.

A   Correct.

Q   The portion of Exhibit 4 we're looking at, Bates 672, is March 28th.

A   Oh, sorry. Yeah. My -- again, the -- I have my reading glasses.

Q   Yeah. I'm -- I'm not trying to trip you up or test you. I just want to make sure you don't --

A   I should --

Q   You don't have any reason to dispute that the one we're looking at in Exhibit 4 was the March time frame and the one you had --

A   That's correct. Yeah.

Q   Just to finish the question, right, that the one reflected in your supplemental expert report is from May 2025?

A   Correct.

Q   Okay. The March 28th congressional notification, it appears to be sent on behalf of the State Department and the U.S. Agency for International

Page 168

Development. That's in the first paragraph here. Is that right?

A   Yes.

Q   And it's notifying Congress of those organizations' intent to undertake a reorganization that would involve realigning certain USAID functions?

A   That's what it says. Yeah.

Q   So why didn't you consider the March 28th congressional notification in your expert reports?

A   I had -- I'm always aware of it, as I was aware of the other one, which -- and I've talked about in my report where those functions that USAID used to have were going to be located in the State Department. So that's in my report.

Q   So you didn't think it was necessary to include the March 28th congressional notification as an exhibit in your report?

A   Could -- yeah, I could have, I guess.

Q   Okay. All right. Let's go back to Exhibit 2, the binder and the report. And we're going right back to page 10 and 11, which is where we were before. So the bottom of page 10 you refer to -- and then

Page 169

continuing on to page 11, you refer to the USAID Inspector General or the Office of Inspector General. Is that right?

A   Yes.

Q   When you were at USAID, did OIG issue reports.

A   Regularly.

Q   Did any of those reports include assertions of deficiencies in USAID's operations?

A   From time to time.

Q   Did any of them identify ways in which USAID was not complying with its statutory obligations?

A   I'd have to review them, but many of them would find material weaknesses and then recommend a course of action.

Q   And it -- to your knowledge, is that what OIG was doing in the cases that you're identifying on page 10 and 11 of your supplemental expert report?

A   The one I'm referencing is the -- the -- for example, the four material weaknesses in the financial statements, and also the oversight of funds and then the payment system.

43 (Pages 166 - 169)

Page 170

Q   Okay.  And then, again, at the bottom of page 10, the bullet above the inspector general references, that bullet describes a Freedom of Information Act procedures, as you say, reportedly stalling due to recent developments.  Is that right?

A   That's one of the things it references.

Q   And there's a citation there, a footnote that cites Exhibit F; is that right?

A   It is -- let me see what Exhibit F is.  Small print.  Oh --

Q   So we're on the bottom of page 10, second bullet.

A   Right.  I'm looking at the very small numbers.  I'm sorry.

Q   I think you're on 11.  It's the bottom of the page.

A   Oh, page 10, sorry.

Q   Yeah.

A   Here we go.

Q   So page 10, the second bullet up.

A   Oh, God, you got -- no, it's on my -- it's on my page 11, at the top of the page.

Page 171

Q   Oh, okay.

A   All right.  So that's where it is.  Okay.  So yeah, 7 -- page 7.

Q   I'm looking at footnote 6.

A   I'm sorry, Exhibit 7?

Q   No, I'm looking at --

A   Sorry.

Q   Sorry.  I'm looking at footnote 6.

A   Footnote 6.  Got -- okay, fine.

Q   I understand you don't have your glasses on, but footnote 6 is a reference to Exhibit F, and I'm just looking at Exhibit F, which is a -- an article describing various agencies' compliance with FOIA dated February 21, 2025.  Do you have any more recent information about USAID's FOIA compliance?

A   No, I don't.

Q   So it might have changed?

A   Possibly.

Q   Why didn't you consider any more recent data?

A   I wasn't aware of any more data.

Q   And February 2025 is obviously before your

Page 172

initial expert report; right?

A   Yes.

Q   Now, looking at the bottom of page 11, Subpart D is about the blocking of critical web platforms, and you cite various data systems in February 2025, such as GLAAS and Phoenix.  Do you have any more updated information about the operability of those systems?

A   My understanding is that they're still not fully operational.

Q   What's the basis of your --

A   I was talking to current -- former and current employees.

Q   Are you currently in contact with people who are remain employed by USAID?

A   I was at the time of the filing of this report.

Q   So that's March 2026?

A   Correct.  Okay.

Q   All right then.  And page 12, the top bullet, the second sentence refers to a subset of implementers.

Page 173

A   Yes.

Q   Contractors who are members of the Professional Services Council are collectively owed more than $600 million.

A   Yes.

Q   What are implementers?

A   Implementers are those that execute the programs in -- required by USAID.

Q   Is that a technical term, or do you just mean implement programs by USAID?

A   It's a technical term that we use, "implementers," "implementing partners" sometimes.

Q   Okay.  So the citation for that sentence about the $600 million is Exhibit L.

A   Right.

Q   So I'm looking at Exhibit L now, and I -- yeah, so I will report that that is how it was produced to us.

A   Yeah.

Q   So I assume you can't read that.

A   No, but I believe I -- I'm familiar with it referencing a statement by PSC, Professional Service

44 (Pages 170 - 173)

Page 174

Council, specifically with the -- the fact that they believe they're owed $600 million for programming, for expenses incurred to date that were not reimbursed for.

Q    Okay. And were they owed that by the State Department or by USAID?

A    They were owed that by the U.S. Government. And the ones who had contracted the programs were USAID.

Q    Okay. And they were seeking reimbursement from the State Department?

A    I'm not sure currently how -- how they're -- how they are seeking reimbursement.

MR. SILER: Why don't we do this? Because I think -- so I think my paralegal printed this exhibit off. She found a different version when she printed my version. So I have a different version of Exhibit L, which I will go ahead and mark as Exhibit 9.

(Exhibit 9 was marked for identification.)

//

Page 175

BY MR. SILER:

Q    I am handing it to you. Unfortunately, I only have one copy of this version because I --

A    If it's the same article, it would be --

Q    Is that the article that is referenced in Exhibit L?

A    I am going down to see if the quote is in there. And I -- let me -- I need to use a magnifier. I have -- I have multifocal contact lenses, which I can function with, but not for that kind of print.

MR. LYNCH: They're horrible. I have the same. That's why I'm wearing glasses, so yeah.

THE WITNESS: I should -- I should make the switch. But there is the magnifying function. There seems to be a reference to -- all right. Because the article is with money owed in general, and then the article then has reference to the $600 million. Do you know where it -- do you --

BY MR. SILER:

Q    I believe that's in the paragraph you're looking.

A    Right.

Page 176

Q    I mean, I can read it if you hand it back to me.

MR. WARREN: Thank you.

BY MR. SILER:

Q    And I will --

A    Thank you.

Q    So for the record, "I, Jake Siler" -- I'm marking a -- just a line to note where I believe the reference is.

A    Right.

Q    And I'm handing it back to you now.

A    Right. "PSC contractors were canceled, but also have negotiated termination -- they are -- they are owed a reimbursement collectively of an excess of $600 million."

Q    Yeah. And is that a -- I mean, is that a reference to the State Department in that paragraph or USAID?

A    The -- on the State Department side, it says.

Q    So I just, I'm trying to understand how that language in Exhibit L relates to money that is owed by

Page 177

USAID. Is there an explanation for that?

A    Yeah, these -- these are -- this is money with respect to the programs that were canceled. And to get this information, I talked to Paul Foldi, who was, up until that point, at PSC. And I asked him what -- what was the impact of the suspension of USAID programs they're seeking reimbursement from -- it says with respect to the State Department, but I'm not sure if that means they're seeking reimbursement from the State Department.

Q    Okay. So the 600 million reliance in the expert report is based on your conversation with this other individual, as opposed to the exhibit that's in front of you?

A    Both. He pointed me to this article to say, "Here it is, the written record, that contractors are -- $600 million with reference to," as it says, "the programs that were canceled."

Q    Okay. I think I understand. You can put that aside. On page 12 of your expert -- your supplemental expert report, there's a Roman VI.

A    Yes.

45 (Pages 174 - 177)

Page 178

Q    That describes the -- what you call the dismantling of USAID. And then subheading A is about USAID's specialized workforce. And, you know, in these bullets, you sort of, if I can summarize -- and you can disagree with me if I'm wrong -- you're saying that the skill -- you know, the skill capacity of USAID employees, they need a high level of skill because it's essential for achieving development results, delivering effective development, and humanitarian assistance requires a highly specialized workforce. My question is, when you use the word "required" in these bullets, what do you mean?

A    In order to deliver foreign assistance effectively and accountably to achieve our foreign policy objectives, this is what is required.

Q    So it's required to achieve a functional result. You're not --

A    To -- to administer the funds appropriately, to ensure that there's correct oversight, and to ensure that there are actually results.

Q    Right. And that's -- so by "required," you're making an efficacy statement, not a legal

Page 179

statement. Is that correct?

A    Correct.

Q    So would you describe that as a best practice or something else?

A    It is what an organization like USAID would be required in order to fulfill the mandate it had been given.

Q    So what would happen if it didn't fulfill that mandate? Would you say that was illegal, or would you say it's just doing a bad job?

MR. WARREN: Objection. Form.

THE WITNESS: I'm not sure how to answer that.

BY MR. SILER:

Q    So there are all sorts of government programs that people say colloquially, "That's a waste of money. They're not doing a good job." You know, what I'm trying to disaggregate is, are you saying if they didn't have the highly specialized workforce, are you saying that, or are you saying it's illegal?

A    I'm saying --

MR. WARREN: Same objection.

Page 180

THE WITNESS: I'm saying that the capacity to administer foreign assistance in development and humanitarian spheres existed for almost entirely at USAID because of the systems and also the specialized workforce.

BY MR. SILER:

Q    But couldn't those functions -- leaving aside legal requirements, couldn't those functions be performed by a different entity?

MR. WARREN: Objection. Form.

THE WITNESS: If there was an entity that had that capacity, taking apart things, statutory requirements, as you -- as you --

BY MR. SILER:

Q    Yeah, yeah, leaving aside any legal conclusions. So who would decide whether the entity that's managing foreign humanitarian assistance -- who would decide that it's running efficiently or enough?

MR. WARREN: Objection. Form.

THE WITNESS: The executive and the legislative branches.

BY MR. SILER:

Page 181

Q    All right. So let's go to page 15 of Exhibit 2. And I'm looking at subheading C here, which is your assertion that the core functions and responsibilities have not been successfully transferred to the State Department. Is that your view?

A    Yes.

Q    So is one of your assumptions underpinning that, that Congress will continue to appropriate and apportion funds for foreign development assistance at the same level it had in the past?

A    The assumption is that it would continue to apportion funds at a significant level.

Q    Has it done that in your view?

A    Yes.

Q    So how does the appropriations laws for fiscal year 2026 that we went over earlier, how does that affect this portion of your report?

A    The -- as you pointed out, the language in '26 does not specifically reference apportionment to USAID. Apportionment to the State Department for the accounts that used to be implemented by USAID. The

46 (Pages 178 - 181)

Page 182

State Department does not have the capacity to administer those accounts effectively, because the capacity to do so has been dismantled.

Q   So you -- would you agree that certain personnel that used to work at USAID have been transferred to work at the State Department?

MR. WARREN:  Objection.  Form.

THE WITNESS:  I believe a handful had been transferred to the State Department.

BY MR. SILER:

Q   And has the State Department changed its structures to incorporate some of the functions that USAID used to perform, to your knowledge?

A   The State Department has submitted a congressional notification to Congress to -- that lays out where the responsibility for these functions would lie in the State Department.

Q   Do you know if it has effectuated any of the changes that were identified in that congressional notification?

A   I'm aware that it is still trying to recruit staff to fill those functions, and it has not

Page 183

effectively recruited enough staff.

Q   So in other words, it's still in process?

A   Still in process.

Q   So I note that the only footnote in this subsection C is footnote 19, which is a reference to Exhibit R.  Exhibit R is a report dated September 10, 2025.

A   Where is that -- you said R?

Q   Yes.

A   Okay.

Q   I think you got it right there.

A   Yeah.

Q   So you agree this is September 10, 2025?

A   Yes.

Q   Do you have any more recent data that you're relying on than September 2025?

A   Yes.  MFAN has written another report that came out last week, noting that, good news, that State has begun hiring, but the critical gaps still remain, and it doesn't have the capacity to move foreign assistance.

Q   Okay.  And do you intend to supplement your

Page 184

report based on that additional information, I mean -- strike that.

This is a report that came out within the last week?

A   Yes.

Q   So obviously that postdates the supplemental expert report.

A   Correct.

Q   So do you intend to supplement your expert report with that additional information?

A   The additional information does not change the underlying conclusions and facts that the State Department doesn't have the -- it doesn't negate the previous statements, so it's not a negation of this. So I don't believe there'd be a reason to supplement it if it's still pointing out the critical gaps remain.

Q   So you described that more recent report as good news.

A   The report from MFAN says good news that -- that the department is beginning to recruit.  I did not say that.  I -- I did not pass judgment.  I'm

Page 185

just -- you asked me if there has been any more reporting on the gaps.  And there had been reporting that the gaps -- I imagine they're being polite in saying --

Q   Okay.  So just so I'm clear, the title that some portion of the document that you're referring to, that we don't have in front of us, uses the phrase "good news."

A   I could find it on online if you want.

Q   That's all right.  I just want to make sure you're not the one saying "good news."  It's the report's that saying "good news."

A   That's correct.  This is MFAN.  I'm not sure if they used the word exactly "good news," but they highlight the fact that the State Department has recognized it has critical gaps and is trying to hire to fill those gaps.

Q   Okay.  And MFAN, what does that stand for?

A   MFAN is a Modernization -- Modernizing Foreign Assistance Network, which is a coalition of -- of development experts.  It's a bipartisan coalition.

Q   Okay.  And that is the same organization

47 (Pages 182 - 185)

Page 186

that produced the report that is Exhibit R to your supplemental expert report?

A    Yes, correct.

Q    Okay. So setting aside your report for a second, what is your view of the current administration's policies on foreign development assistance?

MR. WARREN: Objection. Form.

THE WITNESS: Could you be --

BY MR. SILER:

Q    What's your personal view on the current government's foreign assistance programs?

A    My -- my views express concerns that the capacity no longer exists in the U.S. Government to use the instrument of development, national power to advance our security and economic --

Q    Do you think the government should be spending more on foreign development assistance?

A    I don't -- I'm -- I wouldn't conjecture on that.

Q    You don't have a personal view?

THE WITNESS: I mean, I -- I think it's

Page 187

not always a question of more or less and -- but it is increments. It's hard -- the reason it's difficult to answer the question is because our foreign policy objectives change, and the threats to our national security and economics change. Therefore, we could have supplementals -- like I told you, supplements for Iraq and Afghanistan, no one saw them coming. So there's -- so the -- what is the ideal number? One can't say. What -- what's going to happen tomorrow? Will there be a natural disaster we need to respond to?

BY MR. SILER:

Q    All right. Let's look at page 20 of the report. In the middle of that paragraph -- sorry, the middle of that page, you refer to an "America First Global Health Strategy?

A    Correct.

Q    Can you just describe what you mean by that?

A    The America First Global Health Strategy was initiated by the State Department, and it focuses primarily on MOUs that are negotiated with predominantly African countries, based on narrow set

Page 188

of goals, specific. And then sometimes there is a requirement -- a transactional requirement, that those countries provide data, or has been reported access to rare earth minerals.

Q    Okay. It's fair to say you disagree with that approach?

A    My concern is that approach is not the most effective way of protecting America against pandemics.

Q    What do you understand to be the American First foreign policy, generally, as distinct from this particular strategy?

A    The -- well, I believe that the -- every administration had a policy that was America First, that was designed to use development to protect our national interests. We don't provide development just because we're a generous country; we do it because it's in our national interest. So I believe the U.S. Government, in previous administrations, both Republican and Democrat, always -- and with congressional input, always acted to -- in -- in terms of our national interest.

Q    Do you perceive the current administration

Page 189

to have a difference, as compared to prior administrations, in its foreign policy, as it relates to development assistance?

A    The current administration has de-emphasized certain aspects, like democracy promotion, protection of human rights is one, for example. It has de-emphasized health-systems strengthening as another one, with more of its focus on specific issues. So they have different policy priorities.

Q    Do you have a personal view on those policies?

A    Any view I have is probably 'cause of my experience at the National War College, looking at strategically how do you protect American interest overseas, and what's the best way to do it. And that's -- so it's -- it's not personal, in the sense of an emotional thing. It is what is required and what's the best way of doing it.

Q    I understand, but that's not really my question. Given all that -- I mean, I will accept that that's the way you develop your views. But do you have a difference of opinion on how foreign

48 (Pages 186 - 189)

Page 190

development assistance should be prioritized in the current administration?

MR. WARREN: Objection to form.

THE WITNESS: If -- if I were the Secretary of State, would I do things differently? Is that your question?

BY MR. SILER:

Q   Sure.

A   Every Secretary of State does things different, different priorities. Priorities change from administration to administration. But within that, they don't dismantle an agency. They don't do unlawful rescissions. They don't suspend the -- the employees and then fire them and terminate them. So this has been a bit of a change.

Q   So --

MR. WARREN: Jake, I'm sorry. Are we getting close to a good time to take a break?

MR. SILER: Yeah, I don't think we have too much more, but probably enough that it's worth taking a break if you're --

THE WITNESS: I'm okay to keep going or

Page 191

not. It's up to you guys.

MR. SILER: I defer to you both.

MR. WARREN: That's fine.

BY MR. SILER:

Q   So, obviously, this -- talking about this case that's in litigation, the plaintiffs in this action, as you may know, are proceeding under pseudonyms. Do you know the identities of the plaintiffs?

A   No, I don't. I don't.

Q   Are you offering any opinion on how the facts and data described in your reports affect the individual plaintiffs in this case?

A   I'm not aware who those plaintiffs are, so I don't -- I can't make that conclusion.

Q   So the answer is no?

A   Correct.

Q   All right. Let's look at pages 26 to 27 of the report. And this is Roman VIII of Exhibit 2, which is your supplemental report; correct?

A   Correct.

Q   And in this, this is your support for your

Page 192

opinion that the dismantling of USAID negatively impacts the American economy?

A   Correct.

Q   Again, you're not an economist by trade?

A   I have economics training.

Q   But you're not primarily an economist?

A   I'm not a professional economics, but I -- I just --

Q   Did you -- when you were reaching this opinion, did you consider tax changes that might occur by spending less on USAID?

A   The USAID's budget is less than half of 1 percent of their national budget, so I don't believe there'd be much impact on taxes.

Q   Did you --

A   Go ahead.

Q   Did you consider other fund -- other spending that the U.S. Government could do by funds that had been apportioned to USAID?

A   The shutdown of USAID -- because of the shutdown of USAID, the government has incurred additional expenses that have superseded the -- many

Page 193

of the savings. And for example, the State Department went forward with a $19 billion request to pay for the shutdown of USAID.

Q   Did you prepare any economic models on how changes in its spending for foreign development assistance would affect the American economy?

A   I did not rely on specific models; I relied on data.

Q   What data did you rely on?

A   The data that's cited here. For example, the procurement of agricultural products, the -- the lack of protection for the agricultural industry, the -- the universities that have lost funding, and the -- the overall jobs that have been lost.

Q   So you -- just to summarize, you relied on the specific examples that are cited in this report, but you didn't do an overall model of how these changes affect the overall American economy. Is that what --

A   I did not do an overall model.

Q   Okay. Other than the exhibits that are attached to your supplemental report, do you intend to

49 (Pages 190 - 193)

Page 194

use any other exhibits to summarize or support your opinions in this case?

A   Not at this time.

MR. SILER:  All right.  Let's take a very short break, and then we might decide whether to take a longer break.

THE REPORTER:  The time is 1:36 p.m., and we're off the record.

(Off the record.)

THE REPORTER:  The time is 1:43 p.m., and we're back on record.

BY MR. SILER:

Q   Mr. Milligan, my last question for you is just, is there anything you'd like to say to supplement your testimony today that you didn't have a chance to say yet?

A   No.

MR. SILER:  Okay.  Those are my questions.

I'll pass the witness.

MR. WARREN:  I have nothing.

MR. SILER:  All right.  You're free to

Page 195

go.

THE REPORTER:  Okay.  The time is 1:43 p.m.  We're off.

(Signature waived.)

(Whereupon, at 1:43 p.m., the proceeding was concluded.)

Page 196

CERTIFICATE OF DEPOSITION OFFICER

I, ALEXZANDAR NICHOLI FULLERTON, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of th

ALEXZANDAR NICHOLI FULLERTON

Notary Public in and for the

District of Columbia

Page 197

CERTIFICATE OF TRANSCRIBER

I, ERICA BAGBEY, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

ERICA BAGBEY

50 (Pages 194 - 197)

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 19

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

_____

J. DOE 4, et al.,

    Plaintiffs,

    v.          Civil Action No.:

ELON MUSK, et al.,     8:25-cv-00462-TDC

    Defendants.

_____

       REVISED

    VIDEOTAPED DEPOSITION

_____

WITNESS:     MATTHEW HOPSON

DATE:        Thursday, May 7, 2026

START TIME:    9:09 a.m., ET

END TIME:     2:48 p.m., ET

REMOTE LOCATION:   Remote Legal platform

PROCEEDINGS OFFICER:  Elene Sowl, CER-1604

JOB NO.:      49268

       ** NOTICE **

This transcript contains references to confidentiality

designations and a privilege order that were in effect

   at the time of the proceeding. All related

confidentiality designations have since been released.

Page 2

A P P E A R A N C E S

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

275 Battery Street

29th Floor

San Francisco, California 94111

By: NICOLE M. RUBIN, ESQUIRE

   nrubin@lchb.com

   RICHARD M. HEIMANN, ESQUIRE

   rheimann@lchb.com

Appearing for Plaintiffs

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

250 Hudson Street

8th Floor

New York, New York 10013

By: LUCAS ISSACHAROFF, ESQUIRE, OF COUNSEL

   lissacharoff@lchb.com

Appearing for Plaintiffs

Page 3

A P P E A R A N C E S (Continued)

DEMOCRACY DEFENDERS FUND

600 Pennsylvania Avenue Southeast

Suite 15180

Washington, DC 20003

By: ANDREW H. WARREN, ESQUIRE

   andrew@democracydefenders.org

Appearing for Plaintiffs

MARZIANI, STEVENS & GONZALEZ, PLLC

500 West 2nd Street

Suite 1900

Austin, Texas 78701

By: BETH STEVENS, ESQUIRE

   bstevens@msgpllc.com

Appearing for Plaintiffs

Page 4

A P P E A R A N C E S (Continued)

U.S. DEPARTMENT OF JUSTICE

Civil Division

Federal Programs Branch

1100 L Street Northwest

Washington, DC 20005

By: JAMES J. WEN, ESQUIRE

   james.j.wen@usdoj.gov

   JACOB S. SILER, ESQUIRE

   jacob.s.siler@usdoj.gov

   MAX T. MATHEU, ESQUIRE

   max.t.matheu@usdoj.gov

   CHRISTOPHER M. LYNCH, ESQUIRE

   Christopher.m.lynch@usdoj.gov

Appearing for Defendants

ALSO PRESENT:

   Jehieli Luevanos, Paralegal, Democracy Defenders Fund

   Maya Cook, Observer

Page 5

INDEX OF TESTIMONY

EXAMINATION OF MATTHEW HOPSON:          PAGE

By Ms. Rubin                11
By Mr. Wen                  252

Page 6

INDEX OF EXHIBITS

(available for download)

EXHIBIT   DESCRIPTION                          PAGE

1     LinkedIn profile                        17
2     Blank calendar                          20
3     DOGE Executive Order                    44
4     Email chain                             85
5     Memo to Jason Gray                      91
6     Messages between Hopson and McGill      189
7     Email chain authorization access        204
8     Order appointing Marco Rubio as acting  206
      Administrator of USAID

Page 7

PROCEEDINGS

THE PROCEEDINGS OFFICER: Good morning. We are now on the record. Today's date is May 7, 2026, and the time is approximately 9:09 a.m., Eastern Time.

My name is Elene Sowl, and I am the officer designated by Remote Legal, 11 Broadway, Suite 468, New York, New York, to take the record of this proceeding.

This is the video-recorded deposition of Matthew Hopson taken in the matter of Doe 4, et al., versus Musk, et al., Civil Action Number 8:25-cv-00462-TDC, filed in the United States District Court for the District of Maryland.

Would all counsel please identify themselves for the record and state who they represent, starting with the noticing attorney.

MS. RUBIN: Good morning. Nicole Rubin on behalf of the plaintiffs.

MR. ISSACHAROFF: Lucas Issacharoff on behalf of the plaintiffs.

MR. WARREN: Andrew Warren on behalf of the plaintiffs.

MR. WEN: Good morning. This is James Wen on behalf of defendants.

MR. SILER: Jacob Siler for the

Page 8

defendants.

MR. MATHEU: Max Matheu for defendants.

THE PROCEEDINGS OFFICER: Is there anyone else?

MS. STEVENS: Beth Stevens for the defendants -- sorry. For the plaintiffs. I'm mixing up cases.

THE PROCEEDINGS OFFICER: Is that everyone?

MS. LUEVANOS: Jehieli Luevanos for the plaintiffs. I'm also here --

THE PROCEEDINGS OFFICER: I'm sorry. Could you repeat that once more? I'm sorry.

MS. LUEVANOS: Of course. Mine's on mute.

Jehieli Luevanos for the plaintiffs, as well as Maya Cook.

THE PROCEEDINGS OFFICER: And are there any other observers in the room that need to be identified for the record?

MS. RUBIN: I don't think so, no.

THE PROCEEDINGS OFFICER: Okay. Very good.

This video-recorded deposition is being taken remotely on behalf of the plaintiff and is being

**Remote Legal Court Reporting**
**646.461.3400   info@remotelegal.com**

Page 9

conducted pursuant to the procedural rules and laws governing this matter.

As such, all parties agree to this means of capturing the official record, which may include recording by audio, audiovisual, and/or stenographic means, and agree not to oppose admissibility of the testimony in this proceeding on the basis of the personnel or method by which the testimony was captured.

Further, all parties agree that the proceedings officer or person administering the oath may be authorized to administer the oath under the rules where they reside.

Could all attorneys stipulate one at a time?

MS. RUBIN:  Yes.

MR. WARREN:  Yes.

MR. ISSACHAROFF:  Yes.

MR. SILER:  Yes.

MR. MATHEU:  Yes.

MR. WEN:  Yes.

MS. STEVENS:  Yes.

THE PROCEEDINGS OFFICER:  Is that everyone?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  Okay.  Thank

Page 10

you.

I'll now swear in our witness.

Would the witness please state and spell your full name for the record?

MR. HOPSON:  Matthew Hopson.  M-A-T-T-H-E-W H-O-P-S-O-N.

THE PROCEEDINGS OFFICER:  And could you indicate for the record where you are testifying from today?

MR. HOPSON:  The Westin Hotel in Old Town Alexandria, Carlyle area.

THE PROCEEDINGS OFFICER:  Thank you.

Please raise your right hand.

Do you swear or affirm that the testimony you shall give today in this proceeding will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. HOPSON:  I do.  Yes.

WHEREUPON,

M A T T H E W   H O P S O N,

having been called as a witness, being duly sworn by the notary public present, testified as follows:

THE PROCEEDINGS OFFICER:  Thank you.

The witness is sworn.

Counsel, you may proceed.

Page 11

EXAMINATION

BY MS. RUBIN:

Q   Good morning.  Mr. Hopson, my name is Nicole Rubin.  I am with Lieff Cabraser Heimann & Bernstein, and I am going to be taking the deposition.

So I'm going to go over some ground rules for the deposition, then we can talk about the background -- your own background, and then we'll move into the topics that are the subject of --

THE PROCEEDINGS OFFICER:  I'm sorry.  Ms. Hopson, we've -- our audio is not --

MS. RUBIN:  The audio is not coming in?

THE PROCEEDINGS OFFICER:  I can hear you now.  For some reason, it just dropped out for a minute.  I apologize.

MS. RUBIN:  No worries.

THE PROCEEDINGS OFFICER:  Go ahead.

BY MS. RUBIN:

Q   Mr. Hopson, have you ever had your deposition taken before?

A   No.

Q   Okay.  So I'm going to walk through some of the ground rules.

It is important for the court reporter to be able to take down exactly what we're saying.  So I will

Page 12

try not to speak over you and I'll ask that you let me finish my full question before you answer so that we are not talking over each other.  And I will try to take a beat after I finish my question so that we can all, you know, kind of distinguish the end of that.

For the record, it is important that you answer out loud, Yes, or, No, rather than, you know, Uh-huh, or nodding a head or shaking your head.  So -- because we need to make sure that the court reporter can take down your answer clearly.

So there's a difference between, No, I don't know, and, I don't recall.  Please try to just keep those differences in mind to be clear which one you mean.  If you don't know something, please just say that.

So I'll be asking the questions today --

A   What's the difference between, I don't know, and I don't recall?

Q   Just that you -- you know, you never knew the information, you don't know the information, or maybe you knew it at some point, you don't recall now.

A   Good.

Q   So I'm going to plan to take short breaks every hour, hour and a half.  But if you'd like to break sooner than that for any reason, just let me know and

**Remote Legal Court Reporting**
**646.461.3400   info@remotelegal.com**

Page 13

we'll find a good spot. I just ask that you let me finish the question and you answer the question pending before we take any break and go off record.

And one other thing on breaks, while the deposition is going on today, including during the breaks, please don't communicate with anyone about the substance of your testimony. That includes calls, texts, emails, messages of any kind about what we're discussing in here.

Does that make sense?

A   Yes.

Q   Great. Let's see -- so before we get into the substance, let me just give you -- this lawsuit is challenging the dismantling of the United States Agency for International Development, which I will refer to as "USAID" throughout the deposition.

There are two basic claims. The first, plaintiffs are challenging that USAID, a congressionally created agency, was dismantled by the executive branch rather than by a decision of Congress, which is what we're calling our "separation of powers" claim.

Second, we are challenging actions we believe were taken by Elon Musk and the entity I will refer to as "DOGE," the Department of Government Efficiency, in connection with closing USAID, which we contend violates

Page 14

the Appointments Clause of the Constitution.

And just to confirm, you understand that you are not a defendant in this case, and you are here today as a witness, correct?

A   Yes.

Q   And you were subpoenaed to appear today; is that right?

A   Yes.

Q   What did you do to prepare for this deposition?

A   **Nothing in particular.**

Q   Did anybody talk to you as you were preparing?

A   **I had a phone call with you to talk about how the procedure would happen, but otherwise, no.**

Q   Documents in preparation?

THE PROCEEDINGS OFFICER: Sorry. I'm sorry, Ms. Rubin.

MS. RUBIN: Yes.

THE PROCEEDINGS OFFICER: For some reason, his audio dropped again as he answered that question. If you could repeat the answer.

MS. RUBIN: Yes. Sorry.

BY MS. RUBIN:

Q   So I said, did you talk to anybody as you were preparing?

Page 15

A   **And my answer was that I had talked to Nicole to discuss how the -- for would happen and where we would meet. But otherwise, no. And there was no further preparation.**

Q   And without telling me the substance of any conversations, did you speak with defense counsel in preparation for today's deposition?

A   **No.**

Q   Before we go any further, I just want to put the privilege protocol on the record.

MS. RUBIN: The court has instructed the parties in this matter to institute a process through which deponent testimony that defendants maintain as confidential pursuant to either the presidential communications privilege or the deliberative process privilege is provided, recorded, and transcribed and maintained as confidential from plaintiffs' counsel.

Any such testimony will be taken outside the presence of plaintiffs' counsel. The transcribed testimony will not be provided to plaintiffs' counsel unless the court determines otherwise.

The following protocol will be in place.

For testimony purported to be covered by the presidential communications privilege or deliberative process privilege, I will ask certain

Page 16

agreed-upon questions to explore the application of the privilege.

After I have asked those questions, if government counsel determines that an instruction not to answer on the grounds of privilege is appropriate and instructs you not to answer, I will provide the question and any related questions to defense counsel, the court reporter, and to you.

Plaintiffs' counsel will then leave the deposition room, which the court -- after I leave, you will answer the questions, which will be recorded and transcribed. No break will be permitted before you answer, and neither government counsel nor anyone else will be permitted to consult with you or make any additional objection or statement on the record in my absence. All the parties and the court reporter, videographer, and court reporting company have agreed to abide by this protocol.

BY MS. RUBIN:

Q   Does that make sense?

A   Yes.

Q   Great. As I ask questions, defense counsel may object to my questions. That is normal. If they object, we're just going to pause to let them -- you should go ahead and answer the question. The only time

Page 17

that you should not answer a question is if someone affirmatively instructs you not to answer the question.

A    Okay.

Q    You've been sworn in by our court reporter, which means that you're under oath and you have to tell the truth today.

Is there anything that would prevent you from telling the truth under oath today?

A    No.

Q    Great.  So I'm going to be asking you about some events on particular dates.  Unless I specify otherwise, the dates that I'm referring to are in 2025.

Do you understand that?

A    Yes.

Q    Okay.  So I'm just going to ask a bit about your background to start out.  I'm introducing Exhibit 1.  Plaintiffs' Exhibit 1.

THE PROCEEDINGS OFFICER:  Ms. Rubin, are, are exhibits uploaded to the platform?

MS. RUBIN:  They're in paper.

THE PROCEEDINGS OFFICER:  Okay.  If you'd like to send them to my email address afterwards, I can have them marked and attached to the transcript.

MS. RUBIN:  Yes, will do.

(Exhibit 1 marked for identification.)

Page 18

BY MS. RUBIN:

Q    Okay.  So this is Plaintiffs' Exhibit 1.  This is your LinkedIn profile; is that correct?

A    Yes, looks like it.

Q    So you received your bachelor's degree from Norwich University; is that correct?

A    Correct.

Q    You graduated in 1994?

A    Yes.

Q    And after graduating you joined the Navy for what period of time?

A    Until retirement, 26 years afterwards.  So that was 2020.  August -- or the end of August.  September 1st was my retirement date.  2020.

Q    And what positions did you hold in the Navy during that time?

A    I was an intel officer by trade, so I held standard staff jobs, different leadership roles, management jobs.

Q    During your service in the Navy, you attended graduate school; is that correct?

A    Twice.  One at the Naval Postgraduate School and once at National Intelligence University.

Q    Great.  (Indiscernible - audio disruption) of arts, respectively?

Page 19

A    Yes.

Q    So on the second page here, around 2010, it says you worked for a NATO-led International Security Assistance Force; is that correct?

A    Correct.

Q    Was that part of your time in the Navy?

A    Yes.

Q    Okay.  And you left that position in 2011?

A    Correct.

Q    Program manager in Fleet Operations in the Naval Criminal Investigative Service; is that correct?

A    Yes.

Q    From about 2011 to 2013?

A    Correct.  Or yes.

Q    Correct is good too.  And after that, a program manager in the Joint Collections Unit at the Defense Intelligence Agency?

A    Yes.

Q    Great.  And after that, the Brooke Center for Maritime Engagement in the Office of Naval Intelligence?

A    Correct.

Q    And what positions did you hold at the Brooke Center?

A    I stood the command up and became the commanding officer.

Page 20

Q    And then in about 2019 to 2020, is it correct that you served as the Chief of Staff at the National Geospatial-Intelligence Agency?

A    Yes.

Q    And from about October 2021 to Jan -- October 2020 to January '21, you were a senior advisor at the U.S. Department of Homeland Security?

A    Correct.

Q    And this was during the first Trump --

A    First Trump administration, yes.

Q    And you came in as a political appointee?

A    Correct.

Q    And what did you do after that?

A    I ended up at basic, which ended up as a government contractor which -- working for the Director of Navy Intelligence, running a team of cybersecurity people.

Q    And after that, you worked at the United States Agency for International Development?

A    Correct.

Q    And what do you do now?

A    Stay-at-home dad.  Best job I've had to date.

Q    So I'm going to introduce Exhibit 2.

(Exhibit 2 marked for identification.)

BY MS. RUBIN:

Page 21

Q   This is just a blank calendar so that you can use it as a reference for the dates.

A   Thank you.

Q   That's just to keep throughout the deposition as a reference in case it's helpful.

So now I'm going to jump into a bit of the substance here.  You served as the chief of state at USAID; is that correct?

A   Chief of Staff.

Q   Sorry.  Chief of Staff.  And what time period was that?

A   We were sworn in on the 20th of January, and I submitted my resignation letter to the State Department the evening of the 31st.

Q   And what were your responsibilities as Chief of Staff?

A   Well, it was a brief period of time.  So it -- the first week was -- the duties of the Chief of Staff is essentially to run the operations of the organization on behalf of the deputy and/or the deputies, as AID was originally -- or whatever title that they, you know, changed to, but the Number 1, and then they had two deputies, and then the Chief of Staff.

Q   And is Chief of Staff the only role you served?

Page 22

THE PROCEEDINGS OFFICER:  I apologize.

MS. RUBIN:  Oh.  Sorry.

THE PROCEEDINGS OFFICER:  Counsel Rubin?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  I'm so sorry.  But there does seem to be a little glitch in the audio.  May I suggest that we go off the record to rectify it?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  Thank you.  Hearing no objection, I'll pause the record at 9:24 a.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER:  We're back on the record at 9:25 a.m., Eastern Time.  Proceed.

BY MS. RUBIN:

Q   Is Chief of Staff the only position that you held at USAID?

A   Yes.

Q   Tell me a bit about the hiring process for the role?

A   It was an interview with the White House Personnel Office.  I -- I don't remember if it was one or two phone calls, Zoom interviews.  It was you submit your resume to the PPO, and then they decide if they're

Page 23

going to screen you.

I don't remember whether it was one call and then the interview, or if it was an interview and then a call.  But it was one or two calls, and then I got the notification that I had been selected and offered that job, which I accepted.

Q   So when did you interview, around?

A   I do not recall the exact date.  It was likely somewhere at the end of December.

Q   And when were you --

A   And -- yeah.  End of December, maybe the beginning of January.  I don't remember if it was right after the holidays or in the holidays or right afterwards, but it was in that time frame.  It was a very compressed time frame of when it all percolated to execute.

Q   And when were you offered the position?

A   I don't remember the date.  It was sometime in -- sometime in January, from what I remember.

Q   Can you tell me why USAID?  Did you submit for that position, or was that suggested by somebody else?

A   Yeah.  It was suggested by PPO.  And I don't remember the -- I believe there was two people on the line.  I don't know if there was anyone, you know, being -- that was also on the line.  I know there's two people

Page 24

on the screen that I was looking at, and that was one of the things that came up, which was very similar to the last appointment, which is, you know, I'm willing to take and serve, which was kind of my opening salvo to -- to that PPO team.

And then in the dialogue came out AID as a potential option.  And so I did some research on AID and had been aware of AID and AID's mission, but what the -- what the White House was proposing or what I was looking to -- what I was told to be due to come into was something that I was interested in doing.

Q   So what were you told about the role?

A   It would be the Chief of Staff, and it would be to relook at the USAID mission across the full spectrum.  So whether it was location, personnel, contract-to-government workload or population, overall funding, et cetera, with the intent of making sure that we are maximizing, you know, under the current administration "America First" campaign slogan or intention.

Q   And what were your expectations for the role?  I guess, how were you imagining your time?

A   Busy.  It's a Chief of Staff role.  But I was excited about it.  I mean, it seemed -- it was a great opportunity.  I mean, anytime you can, you know, lead an

Page 25

organization that has impact mission for the U.S. government is worthwhile in my opinion. I spent a career doing it, so -- so I was excited for it.

Q   And did your experience match those expectations?

A   What do you mean?

Q   I guess I mean, did you -- when you left your position, did you feel that it was as described to you when you were initially told about it?

A   I left the position because I did not feel that it was going to be the right fit for me moving forward with the implied objective that I had when I took the position to what was unfolding or how things were unfolding as the administration -- as the administration transitioned.

Q   And what was that implied objective?

A   I think there -- it was a lot of movement to change things quickly, which always causes pause for me, again, given, you know, the bureaucracy that we work within. It was a new area for me. I'm -- I'm an intelligence officer, so I know intelligence law. I've had lawyers that were intel lawyers. And so then I had a new team of people and it was AID.

And though management and leadership is very similar, learning the mission of AID and what that

Page 26

actually entailed and digging into it was -- you know, was what I was starting to do as I went in, to then look at how to re-scope the organization and decide what should happen with AID.

Q   And what did you feel conflicted with that implied objective?

MR. WEN:  Objection.  Argumentative.

BY MS. RUBIN:

Q   Did anything feel like it conflicted with that implied objective?

A   Can you say it again?

Q   Did anything conflict with what you felt was that implied objective?

A   I think the objective was the same while I was there. What I didn't feel comfortable with was the means, speed, and level of staffing, which in this case it was a level of non-staffing, which primarily goes back to speed that I did not feel comfortable as the -- you had -- you had Jason Gray, who was the administrator. They go by administrator, not director. Sorry. And then you had Ken Jackson, who was the senior political, who was in a special advisory role, and then there was me.

And so I was the senior political on the ground, and -- which ultimately anything through the

Page 27

organization should come up through the Chief of Staff. Like, that's how a proper functional organization works.

Anytime you have a transition, there tends to be a lot of chaos and a lot of churn. And so that's very normal. But the pace of how things were turning over was so fast and so quick that I did not feel like I had firm ground to stand on to make decisions that were starting to percolate up, and -- but the pressure to make decisions and to execute things was increasing. And that was something that I felt would have put myself at jeopardy. And quite frankly, it's -- it wasn't worth my effort. It wasn't worth my time.

Q   It's a little -- we'll get back to that in a bit. I'm going to step back and just clarify for the record. You were Chief of Staff to Jason Gray. That's correct?

A   Correct.

Q   Who served as the acting administrator for the --

A   Correct.

Q   -- time period you were Chief of Staff?

A   Yes.

Q   And what was your chain of command?

A   It was a bifurcated one because the White House said we're putting Ken there as a special advisor

Page 28

and he will be the senior -- essentially PPO designee, and then Jason's the acting. And so when I got on the ground and we had -- the three of us had our first meeting, it -- I think it might have been a self-proclaimed chain of command where I said, I see my role as serving the current administration. That's the -- the -- I'm not pointing to you, by the way. I talk with my hands. Drives my wife crazy.

The administration-administering roles, that's the purpose of politicals, is to work quickly through that, which is why I did take the appointment. And then the other side is the standard bureaucracy chain of command, which Jason was running as the acting.

And so I said, Both of you, as far as I'm concerned, are who I am serving and working towards, and I will be fully transparent to both of you on all those things and all those efforts. So my chain of command, as I saw it, was both to Ken and to Jason.

Q   Just to clarify, you said that Ken Jackson was a PPO. Can you just state for the record what that means?

A   The White House person -- that's Personnel Placement Office, I think is what it stands for. So he was also a political appointee, so.

Q   Got it. And was Elon Musk in that chain of

Page 29

command?

A   No.  Not in my chain, no.  As far as I was concerned.

Q   Was there any -- did you feel that he was having any indirect influence on your chain of command?

MR. WEN:  Objection.  Argumentative and foundation.

BY MS. RUBIN:

Q   You can answer.

A   Okay.  State it again.

Q   So, informally, did you feel that Elon Musk had any indirect influence on your chain of command?

A   Not -- that's -- I don't know because I can't state what Jason or Ken signed in that time period that they felt compelled to do anything.  I did not feel compelled to do anything.  I never had contact with Elon, so I don't -- I didn't have any phone call or email or anything with him.

The team which is now represented as DOGE, or the team that came in to assist that second week, so they came in on the 27th, was a team comprised of people that -- and I don't know whether it was -- it was definitely -- it was when -- when the team came in, it was proposed that they were a U.S. government entity to look at efficiencies.  In my head that goes to what was

Page 30

being reported as DOGE.

And so I don't -- I don't know the answer to whether or not that formulated how those decisions were made, but there was definitely, in my opinion, a push from the DOGE entity which, you know, according to the White House and according to the press was -- you know, Musk was involved in.

Q   Yeah.  So that was -- so in your impression of it, did you perceive Musk as involved in anything related to that DOGE team?

A   There was -- there was one phone call that we took, and I don't remember whether it was at the beginning of that week, which would have been -- what is it the 27th or 28th?  I think it might have been the 30th.

One of the first -- the person that was the lead for the team, and I'll just call it the "Efficiency team" because they didn't come in with, like, DOGE nameplates or DOGE letterhead, so I'll call it the "Efficiency team" because that's the way it was -- it was first spoken about.

And I don't remember the gentleman's last name, I'd have to Google.  But his first name was Steve, and he was the -- he was the individual that helped Musk refocus Twitter or redo for Twitter or break Twitter

Page 31

down or however it was.

While in a meeting, he took a phone call, and he had got off that phone call.  Steve was pretty agitated, and it was based on, from what it sounded like, a one-way conversation.  I did not hear the conversation, didn't hear oversight of the conversation, but Steve's comment was, you know, that it was Elon that he had just spoken to, and the answer --

MR. WEN:  Objection.

Sorry.  I'm just making a protective invocation of the presidential communications privilege, you know, because I've not spoken to this witness and I have no -- I do not know what he's going to say.

I just think we should, you know, ask further questions to develop context.  But any questions regarding substance about what was communicated by -- you know, by senior advisors of the White House, such as Elon Musk, I would ask that you -- you do not answer questions regarding -- regarding substance of those communications.

THE WITNESS:  Okay.

MS. RUBIN:  Okay.  I will come back to that.  Will you just restate the objection at that time?  I'm just going to come back to that later.

MR. WEN:  Yes, that's fair.

Page 32

MS. RUBIN:  And I'll ask those questions later.  Just want to cover some -- some more basics first.

BY MS. RUBIN:

Q   Yeah.  So when you mentioned Steve, is that Steve Davis?

A   Yeah, that's it.  Correct.

Q   So I want to talk a little bit about your first week.  So, again, just stepping back a little bit.  So what was your first day working at USAID?

A   We were sworn in.  So I think that was the extent of it, was niceties, meeting seniors.  I don't think we did anything.  Got our computers -- you know, phones, computers.  I think they might even gave us our badges then or something.  It was an admin day and a swearing-in.  We didn't swear in until after the President swears in, of course.  So, you know, that happens -- that was around noon, or whatever it was.  11:30, something like that.

Q   And that's on January 20th?

A   Correct.

Q   And how did you feel about the job that first week?

A   Oh.  It was good.  Yeah.  I was excited for it, yeah.

Page 33

Q   You worked well with other political appointees?

A   Yeah. We had a small team, but it was about six or seven of us, and we seemed to immediately start to gel and get along. Jason Gray and Ken Jackson, my deputy Joel, were the four of us, I -- I would say, were pretty lockstep on how to -- how to run an organization or how to do leadership.

I think each of us had different strengths and weaknesses, and we spent that week kind of pulling that stuff out, like, What are you -- what are you good at? What are you good at? And kind of getting to know each other as you're, you know, essentially stepping into the breach of running an organization for, you know, however long.

Q   And you said about six to seven. So you mentioned Jason Gray, Ken Jackson, Joel. Is that Borkert?

A   Yeah.

Q   Yourself. And then who would you say were the other two to three people?

A   Well, I just realized -- Tim was his name because it's on the sheet here and it reminded me. I'm like, who is that guy?

Q   In the suggested to --

Page 34

A   Yeah. Meisburger -- or Meisburger. I'm not sure how to pronounce --

Q   I'm looking at Exhibit 1.

A   -- how to pronounce his name. There was -- our press person was Larkin Jones (phonetic). Adam, and his name ends with -- begins with a K. I think it's a Polish name, and it's a lot --

Q   Korzeniewski? Does that sound right?

A   Yeah, probably. He -- he was the White House liaison, and he had just joined the team, I think, that second week, like, maybe that Monday or Tuesday. And there might have been one or -- there might have been -- there was definitely another gentleman, but I don't remember his name. I think that was the original team that we started with.

And Jason wasn't political, though. He was -- I guess he was appointed as acting, but it wasn't through the standard. He was a careerist that was then filling the role on behalf of the White House. The other ones were straight political appointees.

Q   Got it. So if I use the term "DOGE," do you know what I'm referring to?

A   I know what I think of when I think of DOGE, which is the team that the White House put together under -- under Elon Musk to look at efficiencies across

Page 35

the government.

Q   And you said you referred to that as the "Efficiency team" at the time?

A   Yeah. Excuse me. When it was -- when it was first proposed that there was going to be a team coming, you know, to help assess what AID is doing and to help look at contracts and real estate footprint and things like that, it was essentially a -- an Efficiency team, right? It was not labeled as "This is DOGE."

And it was representatives of -- like, they had a couple general counselors from, like, OPM Clay -- and I would have to look at my phone for his last name. He was one. Jeremy was one. Obviously, Steve. There's a gentleman named Tarak, there was a gentleman named Gavin, Luke, and there might have been a few other ones.

Matter of fact, I know there were a few other on that either first or second day that was talking to the staff, not necessarily to -- that I first met in the first time.

Does that answer the question? I kind of --

Q   Yes.

A   -- snaked my way through that, but.

Q   All good. I'm just going to clarify some last names just to be sure we're on the same page. So when you say Gavin, is that Gavin Kliger? Does that sound

Page 36

right?

A   It sounds right, but it -- I don't -- I don't know.

Q   So I'll just roll off some of the names and you can just tell me if it sounds about right.

Luke Farritor?

A   Yeah, that sounds right.

Q   Jeremy Lewin?

A   Yes.

Q   Tarak Makecha, I believe?

A   Yes.

Q   And you mentioned Clay. Clayton Cromer?

A   Yes. Yeah, that's it.

Q   When was the first time you interacted with someone who you perceived as affiliated with DOGE at USAID?

A   I think it was in the -- the call on either that Saturday or Sunday, which would have been the 24th or 25th. I believe Steve and Tarak were on the call, which essentially was a, Hey, you know, we're going to be meeting with you guys on Monday.

It was just more or less of a, you know, we have a small team that's coming in representing different departments and they have different expertise and it's a smattering of people that will be coming -- a

Page 37

small team, and we'll meet on Monday morning. And then I met the people on Monday morning.

Q   And that's Monday the 27th?

A   Correct. Monday the 27th. I don't remember whether that -- it was like a Zoom. I don't remember if it was on the 25th or 26th.

Q   So you mentioned the Efficiency team. I will try to call them the "Efficiency team." I may refer to those same people as the "DOGE team."

Will you understand what I mean if I say the "DOGE team"?

A   Yes.

Q   And when you spoke to Mr. Davis and Mr. Makecha on -- over the weekend, how did they --

A   Could you -- if I could ask, could you use their first names in there?

Q   Yes.

A   Because I'm going to remember the first names, not necessarily the last.

Q   Honestly, easier for me. So when you spoke with Steve and Tarak over the weekend before the 27th, how did they describe what the team would be doing?

A   The best I can recall, it was more -- it was, they were going to bring a team of people in to take a look at computers and systems and contracts and help

Page 38

identify areas that would speed up the process of what we were looking to do, which is, you know, reshape or refocus AID -- AID's mission -- I mean, the entirety of -- of AID.

And it was -- so it was kind of the -- to help us prime the pump. We -- we definitely had a small political team for a drop-in team. I -- I don't think we had anybody work the profile prior to that was on the ground on the team. Maybe the two gentlemen, they were brought in, Tim -- and I forget the other guy's name. And so it was put forth as like, Yeah. We're going to help you with -- with pulling that information and presenting with you with -- with data.

Q   Did anyone mention at that point, so the weekend before the 27th, any idea of shutting down USAID?

A   I think it was a conversation -- I definitely had that conversation with the PPO folks along the lines of when you look at an organization and organization mission, the way I've done it before and what I was, you know, being told, I was being hired to do, was you look at -- if -- if you have a bell curve on any bureaucracy, there's generally a percentage, and I'll just say 10 percent, that everyone would agree, you know, you tell your mom who doesn't work in the government what's going

Page 39

on and they would say, like, I don't want my money going there. It's not -- it's not good. And -- and I think every organization has that.

And then you have, you know, the -- conversely, the -- the 10 percent or 15 percent that I think everybody universally agrees is in alignment with American values and what we're doing and why we should be doing things.

And then you get to a squishy part in the middle, and that's where your decision-making starts happening, where you have to look at programs, you have to look at return on investment, you have to look at -- at all those different aspects. So -- can you repeat your question again on that?

Q   Yes.

A   Because I kind of lost myself on that train of thought.

Q   That's okay. It's always helpful to kind of talk through the background of it.

So did anyone mention to you the idea --

A   Oh. Yeah. The breaking down of AID?

Q   Yes.

A   I know I had brought it up in the -- in -- in the -- in the meeting of, you know, you have to look at the missions. Like, for example, if you're going to do

Page 40

something in Africa, maybe AFRICOM is a better entity to do it because it's -- it's generally more of a hostile environment depending on what country it is.

Or you might look at State Department taking over certain aspects of a mission, and I don't remember what bureau, but you know, the humanitarian bureau at State Department. Or you might look at TRANSCOM if you're talking about, you know, moving shipments of goods and things like that, which AID does a lot of.

And so, ultimately, across the entirety of the U.S. government, there may be mission sets that are better nestled somewhere else which could, at the end of that evolution of looking at the middle of that bell curve, end up with a very small organization which might not be best poised to be on its own, and it might be nestled under State Department, under Department of Defense, or anything like that.

And what I had said in the interview was the government steward should be agnostic to where it is and what it's doing if it's doing the mission that the executive branch is -- is focused on completing.

So to answer the question of that, I know I brought that up, and so there was conversation about that. I don't know if it was brought up to me specifically. But I know that was part of my interview

Page 41

process because I actually said, like, Yeah. You could also -- you could go to the full end of the spectrum. You can keep everything as is or go to the full end of the spectrum which is completely take apart and -- and refigure out. And there's a continuation in between all those options.

Q   So when you were contemplating the idea of kind of, I'm just going to say, breaking down into parts or breaking down USAID, how did you envision that going?

And, actually, let me clarify. How much time did you envision it would take to reformulate, break down or --

A   A year.

Q   -- analyze the programs? About a year?

A   A year with -- with considerable effort. Maybe eight months. I think that somewhere in that -- I don't remember if it was the end of the first week or the beginning of the second week, but it was -- well, it was early because it was only two weeks, so it was early on anyways.

Joel and I actually sat down and we were talking, I think, you know, I -- I -- we were talking about how quick can we really do something and how fast can you implement change and understand the organization.

Page 42

And whether Joel offered it or someone else in the room, and I don't remember who was in the room, but we were more or less verbally proposing to ourselves, like, We could probably do this by the end of the year. We could probably do this by, you know, the holiday break when everything stops for essentially two months.

Which at the time, I -- I agreed. I said, Yeah. We -- we can do it. That's a big lift for a 15,000-person global organization. Like, it's a huge lift to -- to step through all those hurdles.

But it was very clear the White House was keen on us moving fast. And so that -- we were trying to position -- we, the small team of politicals there, were trying to figure out how could we get a 15,000-person organization to -- to turn enough where we can then start making those decisions.

So, yeah. We weren't -- if you had asked me before that week, you know, turning an organization you know, years, couple years, three years. You know, unless you had some sort of intervention where there was, you know, essentially top cover. And I'm going back to my DoD days. When you want to implement change, you have to not only get your team to do it, you get your leadership team to do it and implement it, but then you also have to get your bosses and everyone else. And

Page 43

if that's all in alignment, then the bureaucracy can run pretty smoothly and quicker.

But anywhere in there, you could have, you know, antibodies that slow the system down and things like that. And for -- in this case, it was very clear the White House, with, you know, the ultimate mission maker, was saying, Move -- move quicker.

So -- but if you'd asked me beforehand, I probably would have said, Probably a couple years. After a week in the job, probably a year.

MR. WEN:  Hey, Nikki, can we take a quick break?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  Would you like me to take us off the record?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  Hearing no objection, I'll pause the record at 9:49 a.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER:  We're back on the record at 9:53 a.m., Eastern Time.

Proceed.

MR. LYNCH:  I just -- I came in.

Chris Lynch from the Department of

Page 44

Justice for defendants.

BY MS. RUBIN:

Q   Okay. So -- just take a minute.

Mr. Hopson, what is your understanding of how DOGE was created?

A   I don't -- yeah. I -- I don't know. Outside of what was, like -- I -- I had -- I had -- I have no -- I have no factual information, just news and press articles. I don't have any inside information, I'd say.

Q   I'd like to show you Exhibit 3.

(Exhibit 3 marked for identification.)

BY MS. RUBIN:

Q   Plaintiffs' Exhibit 3?

A   Yeah, the executive order. So I am -- I am aware of the executive -- I've read this many times.

When I was answering the question that you just proposed, I was not thinking executive order. I think I was thinking composition of the local team that was involved with what we were doing at AID. But I am familiar with the executive order.

Q   All right. So I'm just going to have to ask for the record, you do recognize this as Executive Order -- I don't think it says on the text here, so I'm just going to represent it as Executive Order 14158.

A   Yes. If that is the DOGE establishing,

Page 45

implementing the President's Department of Government Efficiency.

Q   Yes.

A   Because I don't know the number.  But I am familiar with the piece of paper which is the presidential -- the presidential action, the executive order for establishing DOGE.

Q   So I'm just going to take a look at -- Section 1 says this -- I'm just going to read it for the record.

This executive order establishes the Department of Government Efficiency to implement the President's DOGE agenda by modernizing federal technology and software to maximize governmental efficiency and productivity.

Do you see that?

A   Yes.

Q   Great.  And then it -- in the Section 2 it defines "agency head" as the highest-ranking official of an agency, such as the secretary, administrator, chairman, or director, unless otherwise specified in this order.

Do you see that?

A   Mm-hmm.

Q   So who was the agency head, as defined here, of USAID between January 20 and January 27, --

Page 46

MR. WEN:  Objection.

BY MS. RUBIN:

Q   -- 2025?

MR. WEN:  Sorry.

Objection.  Calls for a legal conclusion.

But you may answer.

BY MS. RUBIN:

Q   Who did you understand the agency head to be of USAID during the time?

A   The administrator -- acting administrator, Jason Gray.

Q   And Section 3(c) is entitled "DOGE Teams." And so it states, In consultation with USDS, which I believe is defined earlier as the United States Digital Service renamed as the United States DOGE Service --

MR. WEN:  Objection.  Foundation.

BY MS. RUBIN:

Q   I'm just going to read the executive order.

In consultation with USDS, each agency head shall establish within their respective agencies a DOGE team of at least four employees, which may include special government employees, hired or assigned within 30 days of the date of this order.

Agency heads shall select the DOGE team members in consultation with the USDS administrator.

Page 47

And then I'm just skipping a sentence.

Agency heads shall ensure that the DOGE team leads coordinate their work with USDS and advise their respective agency heads on implementing the President's DOGE agenda.

As the -- and I'm going to say -- I'm going to refer to Administrator Gray as the agency head, which you had just stated.  As the agency head of USAID, did Acting Administrator Gray establish a DOGE team within USAID, to your knowledge?

MR. WEN:  Objection.  Argumentative.

But you may answer.

THE WITNESS:  No.  We -- we did not establish a -- as far as I know, I was not waiting or aware of any establishment of a DOGE team by USAID -- by the administrator.

BY MS. RUBIN:

Q   But there was a DOGE team at USAID; is that correct?

A   Correct.  And -- so similar to what I was saying about the amount of political appointees that we had to do this lift, I was -- my complaint to the -- as a Chief of Staff to the White House PPO liaison at State Department, her name was Kate (phonetic), I don't remember the rest of her name, but she was essentially,

Page 48

which is, from what I understand, pretty normal where you have certain key White House personnel people covering multiple organizations until you fully staffed up your politicals, which could take -- you know, could take a long -- could take years, depending on the administration, to staff everyone up.

So we had a small team at AID.  AID's a small organization.  And that was the -- maybe my assumption was that the team that was coming to us was going to help, as I said before, jump start.  They were never appointed.  During the conversations during that second week I did ask some of those members that were there on behalf of the team, the Efficiency team, whether they wanted to come over and be detailed to AID, because they were detailed to, like, OPM, Treasury.

There was a couple other organizations that they're -- that, like, their CAC card was valid to, because that was one of the things I was concerned before bringing anyone into a government organization, even though the executive order says to fully support, was making sure that they just weren't somebody walking in off the street.

So they all were affiliated with different government organizations.  A couple I just named were just a few that I -- I remember.  But I looked at that

Page 49

team, because they had engineers, they had a leader, as, like, our jump start DOGE team, but that we would have eventually transitioned to our own DOGE team. So that is the way I was tracking how we would move things. But the -- the short answer is I do not know of any DOGE-appointed team by Jason Gray.

Q   Can you clarify what you mean by "they were not politically appointed"? Sorry. Let me restate that.

You testified about a minute ago that the DOGE team were never appointed. Can you clarify what you mean?

A   They were not appointed by USAID as the USAID DOGE team, to my knowledge. Whether or not their hiring process through OPM, Treasury, pick a place, I have no idea how they were hired into those organizations. That I don't know.

In -- in the sense of a White House PPO political appointee, one of the 3,000 or 3,500 political appointees that can come in with each administration, I don't -- I don't know. I don't have any concrete knowledge to know how they -- how they arrived at their jobs.

Q   So to clarify, did Acting Administrator Jason Gray select the DOGE team members at USAID?

Page 50

A   As far as I know, he did not.

Q   And if he had established or selected the DOGE team at USAID, is that something that you think that you would have been involved in as Chief of Staff?

A   Yes. I would have assumed that I would have been involved in any selection or designation of a -- a formal USAID team.

Q   Do you know who the USDS administrator was as of January 20th?

A   No. I can't for say -- for certain say who it was.

Q   Do you know who the USAID -- sorry.

Do you know who the USDS administrator was as of January 27th?

A   No.

Q   To your knowledge, did Acting Administrator Gray consult with the USDS administrator about a DOGE team at any point while you served as his Chief of Staff?

A   Not to my knowledge.

Q   So we spoke about this a bit, but when did you first learn that DOGE or the Efficiency team would have a presence at USAID?

A   It was at -- the 25th or the 26th when I took that phone call, which -- which I think had Tarak and

Page 51

Steve on the line.

Q   That's Steve Davis and Tarak Makecha?

A   Correct. It was one of those two days. It was a pretty brief phone call. Or Zoom call or FaceTime. I don't remember what the medium was.

Q   And I believe you spoke about this a little bit, but what did they tell you about this group, you know, why they were coming in or their purpose?

A   I think it was to help look at different ways of being efficient and to bring some -- you know, some folks in. I don't know if they said software engineer like the executive order states here. But in layman's speak, it was more or less of a team to come in and help triage the amount of data that needs to be processed.

Q   And under what authority was -- sorry.

Which entity was bringing in this team? So, I guess, that's to say, bringing into USAID. Who -- from which organization did they -- sorry. Let me restart over that.

Under what authority was this efficiency group -- Efficiency team placed at USAID?

MR. WEN: Objection. Calls for a legal conclusion.

But you may answer.

THE WITNESS: I don't know.

Page 52

BY MS. RUBIN:

Q   Did Steve Davis or Tarak Makecha explain the scope of the Efficiency team's role at USAID?

A   Not to my knowledge.

Q   And what was your initial reaction to the news that a -- an Efficiency team would be coming into USAID?

A   It was the first time I've seen something like that happen, you know, in my career. So it was a little bit of curiosity. It was a little bit of wonderment, if that's the right word, of, like, -- because I've never -- I never saw something like that with that much pressure.

And, again, I think in my head I was going to the assumption of like, This is the DOGE team. Whether they came out and said, We're DOGE, they -- they didn't have name tags, there was no ID cards, et cetera. In my head I was thinking, Yeah. This -- this -- this tracks, right? You would have a team come in with these, you know, folks that have unique skill sets that can help with triaging the -- the data and such.

Q   And what do you mean when you say "that much pressure"?

A   What do you mean by "pressure"? Like, what -- can you use the -- because I don't know what I just said to you with respect to that sentence. So I'll need

Page 53

clarification on --

Q   Yes. You had testified that you had -- there was a sense of wonderment because you had never seen something like that with that much pressure?

A   Oh. Just meaning that a small organization like that had that much attention from an administration that just took over. So I -- I did not expect that AID would be such a massive focus as a launchpad for the administration. Just did not see that coming. So that's what I mean by pressure. The amount of data calls that we had to put out within that first week

And it was on a smattering of different topics. DEI clearly was one of them that the administration was very eager, you know, to -- to figure out or to -- you know, how they -- how they were going to address DEI, DEI initiatives and what that all meant. So there was just a lot of driven data coming from the new administration. It was a voracious appetite.

So that's what I mean by the pressure of, like, We need to move faster, quicker. Which is not uncommon with -- I mean, I had worked with the administration before but I was just a little surprised for USAID to have that much scrutiny or that much focus.

Q   You said there were a few data calls. Can you just explain what you mean by that?

Page 54

A   Like, OPM would say, How many people do you have working in DEI shop? Or whatever the shop was called, right? But it was under the moniker of DEI. You know, different aspects of the government change their offices to different things. But it was DEI-ish. What do you have that's DEI-ish? Like, that was one data call. Movements of, you know, people within the organization.

So there was just a lot of -- and I don't remember, like, all of them. You know, looking at like politicals, if -- were there political holdovers and stuff like that? Some of them are by -- you know, allowed, some of them have to be granted again. And I've never saw it, but from what I was told, sometimes people just, like, don't leave their organization. So like, that was a data call because that sparked a conversation of how do you just squat, like, a government senior and just not leave? But apparently it's happened.

But yeah. There -- there was a constant -- and the -- and the timelines on some of the stuff. There was a lot of contract data calls. How much money do we have going to this? How much money do you have going to -- to that? Where is this, you know, money going to? One of the things that blew up, like, the

Page 55

whole, you know, $50 million of condoms going to Gaza. It's just a headline that was in the news that I think a lot of people remember that headline.

But it was those types of things, like, What are the shipments for? What are we giving money for? And there were some things of we don't want money going towards certain programs that are, you know, not supportive of the American First agenda.

And Joel pulled a lot of that. But we had to bring somebody up to the front office just to help with collecting data calls and then -- and then sending them back to OPM at the time was probably one of the most staffed, I think, organizations from pulling in data calls. And so a lot of stuff that had to go to -- to, like, OPM.

Q   So backtracking just a little bit, what position did Steve Davis hold in the government around the time that he called you? So let's say the 25th or the 26th of January.

A   I don't know.

Q   Did you know at the time?

A   What do you mean?

Q   So when --

A   I didn't know when he -- like, when I met him on the Zoom call. And once he was there, my assumption

Page 56

was he was part of the Efficiency team, regardless of what the name was.

Q   And what about Tarak Makecha? Did you know what position he --

A   He was at State Department. And from -- you know, he was a data guy. So I think he was similarly doing -- I know one project he did. He highlighted to us that we had a bunch of commercial -- us, USAID, a bunch of commercial leases for spaces that were at, like, an extremely low occupancy rate, which, again, that was part of the administration's drive is to bring people back to the workforce, maximize your footprint, et cetera.

And I think AID had a lot of real estate that was being -- and had been developed, because bureaucracies project forward, and then it was never filled. And so, Tarak, he ended up finding, like, a contract. He's like, This contract could be canceled within 45 days, which was for a commercial building. I'm like, Wow. That's a pretty bad contract on the commercial side.

So I was taken back by that. And then the lawyers looked at it and they're like, Yeah. We could cancel that contract. We looked at -- this is just an example. We looked at facilities and they're like,

Page 57

Yeah. We probably could -- even if we brought everybody back tomorrow, because that was another thing that we were working on doing is, you know, by summer, get everybody back into some sort of concrete building.

The organization in a very fast time, because they wanted -- the decision was to be made quickly of whether the contract was going to be terminated. And, ultimately, I think it was either Ken or Jason signed it and they did terminate the contract. Tarak was part of that. And he did it by through -- like, going through, like, the contracts, looking at whatever script he ran against the thing. But it was very clear and it was verified, like, Yeah. That contract could be canceled and it is being underutilized at this point in time.

Q   So what role did you understand Steve Davis to have with respect to that Efficiency team or DOGE team?

A   He was definitely in the -- in my opinion, was in the leadership role. He was deferred to as the person that was in charge by all the -- all the folks that came in. And he was the one that, you know, led the -- led the discussion or drove the agenda of those meetings.

Q   So when you say, "he was the person in charge of all the folks that came in," would you consider Jeremy Lewin to be one of those folks?

Page 58

A   Yeah. Jeremy was a bit of -- so Jeremy and Clay were kind of some outliers that showed up. They weren't -- I don't remember if Jeremy was on the original team or not, but they were involved in the conversation from day one.

I think Jeremy was in the meeting. Clay probably was too. But I think Jeremy more than -- I think I looked at Jeremy as essentially having the DOGE portfolio for AID. I don't remember where Jeremy was, whether he was, like, at State or Treasury or what have you. I know Clay was OPM.

Q   Would you consider Luke Farritor to be one of the people that worked under Steve Davis?

A   He -- yeah. He was a tech guy, and I would definitely say he was under Steve. So to -- the thing with Jeremy, I think Jeremy was certainly deferential to Steve. But I don't know whether Steve would have counted him as part of his team that he brought in. But he was definitely -- I definitely viewed Jeremy as part of that interlocutor of us with DOGE.

Because at -- at one point in time, I told Jeremy I'd bring him on board as my one of our lawyers under AID to help suss out the what was being -- what could be proposed as we were going through looking at the different databases and canceling contracts and

Page 59

doing those types of things, like, from a legal perspective of before we sign these because that's -- that's something I needed.

I needed somebody that was legally under my authority to then legally advise me, whether they give good legal advice or not. But, otherwise, it's just a person walking down the street telling me, You know, you can go ahead and do that. And that was not comfortable for me. I did not feel comfortable with that.

Q   Would you consider Gavin Kliger under -- in that team under Steve Davis?

A   I didn't really talk to -- yeah. Gavin was -- he was another -- I put Gavin and Luke as the two tech people. The reason, like, I knew Luke -- didn't know him. I think I had maybe three words with him. I think Gavin showed up, but then he went to, like, other buildings or another area. But Luke was kind of at the headquarters.

Q   So at the time that you received that call from Steve Davis and Tarak Makecha telling you that a team would be coming in, what role did you understand Elon Musk to have with respect to the group that was coming in?

A   I didn't -- I didn't have -- oh. Sorry.

MR. WEN: No.

Page 60

Objection. Sorry. Just calls for a legal conclusion.

MS. RUBIN: I can rephrase.

MR. WEN: You don't have to.

MS. RUBIN: Okay.

BY MS. RUBIN:

Q   So I'll just repeat the question.

As of the date that you got the phone call on January 25th or 26th, what role did you understand Elon Musk to have with respect to that group?

A   I didn't know any role.

Q   And sitting here today, what role do you understand Elon Musk to have had with that group?

A   My assumption is that he was leading the group based on what -- you know, again my duration was short. I mentioned there was a phone call that Steve had self-proclaimed that it was Musk that he had been talking to, and then just the news and reporting that came out after -- you know, after the fact. But I was out of government service at that point in time.

So at the first phone call, I don't know if I thought anything of it. As the week progressed, I would say, Well, if he's the person -- he, Musk, is the person in charge of DOGE, then he is likely involved in the conversations happening.

Page 61

And then the only data point that I had in my time there was that one phone call that, you know, Steve had said that -- you know, that he had been talking or he had just spoken to and hung up with -- with Musk.

But, otherwise, there was -- I didn't -- I didn't have any -- I don't have anything I could say, Yes, this is blank, or he was directly involved, or he was directly on that. It's my -- my assessment -- or my assumption.

Q    Is it -- and just let me know if I'm -- I'm mischaracterizing it in any way. But is it correct, as you testified, that you thought at the time that the team was coming in, the DOGE team, would be to help move contract reviews more efficiently?

Is that how you described it?

A    Yeah. I think -- I think it was the entirety of the -- you know, the mission. And so I think when it was proposed, I don't -- I mean, I've never seen that. So I didn't really have, like, what was my thought? Like, I don't know. I didn't know what it was -- I didn't know what was actually going to come out of that.

The example I gave of Tarak -- and I know that there were other -- some examples of where they were able to quickly look at data that would take just a long time to percolate up through an organization. So I was

Page 62

excited about, Oh. Good. We'll have some people that can drive data analysis to help us make decisions quicker.

Q    And sitting here today, why do you think the DOGE team was brought into USAID?

MR. WEN: Objection. Calls for speculation.

BY MS. RUBIN:

Q    Just from your personal perspective.

A    Yeah. I think it was just -- well, at the time or in hindsight? Because --

Q    In hindsight.

A    In hindsight, I think it was the test case for the administration to really press what can be done with organizational change. It was one of the reasons I left because it -- it was, in my opinion -- it was unprecedented how quick things were moving and how fast they were moving, which made me extremely uncomfortable being a person that was essentially in the senior leadership billet. And -- so, yeah.

Q    All right. You stated earlier that you had a meeting with the DOGE team on January 27th; is that correct?

A    Yes, Monday.

Q    Do you know around what time?

Page 63

A    9:00. Morning meeting.

Q    Who was at this first meeting?

A    It was, I think, the members that we kind of spoke about. You know, Steve, Tarak, I think Luke was there. I believe Gavin was there. I don't remember whether Jeremy was there, whether Clay was there. Jason was there. I think I had all the politicals in there. Pete -- I think Pete Marocco was there. In fact, I know Pete Marocco was there from State Department. And I don't know. Jason was there. I think that's -- that's kind of it. So it was probably -- probably 15 people thereabouts.

Q    So during this initial period of contact, so January, you know, 25th to 27th, that first call and the first meeting, where did you understand Steve Davis to sit in USAID's chain of command?

MR. WEN: Objection. Calls for a legal conclusion.

THE WITNESS: As far as I was --

BY MS. RUBIN:

Q    Go ahead.

A    Sorry. I didn't mean to step on you. As far as I was concerned, he was not in the chain of command.

Q    So was it your understanding that he could give orders to you directly?

Page 64

MR. WEN: Objection. Calls for a legal conclusion.

But you can answer.

THE WITNESS: The -- let me think how -- so I never saw Steve as someone in my chain of command because he wasn't, right? I worked for Ken Jackson, who was a political appointee under USAID, and I worked for Jason Gray. So Steve was an -- as far as I was concerned, as an advisor. And so until your senior -- you know, until -- you can either take the advice or you can leave that advice.

So I did not see him -- "chain of command" is a very specific word for me, being a DoD -- you know, a military officer. Those are all legally binding my words -- well, actually, I think that's UCMJ words, but those are legally binding things that you have to do as long as it's legal, moral, and ethical. And you can drop the last two, as long as it's a legal order. You can take and execute it. He was not in my chain of command. So I didn't -- I never viewed anybody from that team as my legal chain of command.

Now from a perspective of access to seniors who would be in my chain of command, which is the White House, right, then you have people that may not be in your immediate chain of command. The

Page 65

President's Chief of Staff. I just use that as a -- probably the ultimate example of somebody who is not the President, they can wield a lot of power, right? And so you don't need the President to call you, but the Chief of Staff calls you, you're probably going to take action based on that alone.

So it does -- and that's kind of why I hesitated a little bit. We knew Steve was coming in with top cover from what I would say was the White House based on this team. But I still did not see him as a direct chain-of-command participant for me.

BY MS. RUBIN:

Q So when I use the phrase "chain of command," I'll be referring to, you know, the official chain of command. And if I mean, you know, indirect, I'll try to indicate that.

A Yes. Okay.

Q So as to the official chain of command, did you see Steve Davis as in Jason Gray's chain of command?

A No.

Q As a practical matter at the beginning of the week, did you feel, let's say, free to ignore the advice that you were being given by Steve Davis?

MR. WEN: Objection. Vague.

THE WITNESS: Can I --

Page 66

BY MS. RUBIN:

Q If you understand the question, you can answer.

A Yeah. State it again, please.

Q As a practical matter -- you know, you stated that -- you testified that Steve Davis had a role as an advisor --

A Yes.

Q -- and you could take or --

A Yes.

Q -- leave advice. As a practical matter, did you feel free to, let's say, leave that advice or to ignore the advice or requests?

A We certainly took the advice at the beginning of the week. As we were moving towards the end of the week, there was other advice that was given that I -- I did not take, and I advised Ken and Jason not to take that.

I think that -- and my assessment or how I felt was, if you have someone who is a senior advisor, and I'll go back to the White House Chief of Staff because that's more of a -- an analogy for this, not specific to the -- and I can answer more specifics if you need that for -- for both of you, but if -- if the - - if the White House Chief of Staff calls you and you're

Page 67

a senior in an organization and says, Do blank. If you don't do blank, you better make sure that you -- you are correct and your -- your -- your stuff is wired tight, because the amount of scrutiny can come extremely quick and extremely fast.

So I would say that I had a healthy -- skepticism's not the right word. A healthy respect for positional power with the -- not necessarily the juniors, but with -- with Steve and Tarak, because I saw them as kind of the senior people in that group. And I certainly was going to take notice to anything that they advised me to -- to do or to consider.

Q And did this change at any point during that second week?

MR. WEN: Objection. Vague.

BY MS. RUBIN:

Q Did your understanding of Steve Davis's, you know, role change at all during the week?

A No. I think it stayed steady. I think that personally, you know, why I ended up leaving was the advice that I was getting -- or the recommendations were carried much more risk organizationally, and then professionally, personally to sign things out because I did not have an understanding -- I was not comfortable enough that what was being recommended -- I use that

Page 68

contract example.

First thing I did was turn to the -- the lawyer that did contract and said, Can we even do this? Right? Because I don't -- I don't know. There was a lot of, Can we even do this? Towards the end of the week of some of the things that Steve was proposing.

Q When you're asking something like, Can we even do this? Who were you asking?

A A lot -- well, it was the -- some of the AID lawyers that were there when we -- they -- and I don't remember how it came about, which was removing DEI offices, whether that came from OPM in a memo or what have you. That was the first call I, like, I made was I brought the lawyers in and said, Can you wholesale just relieve government workers that have no PIP in their file.

They have no -- you know, outside of they work in this specific office? And then I didn't know that, and the lawyer said, Yeah. You can actually -- you can do that. If you're wholesale removing mission set, you can wholesale remove those parts of the government.

And so -- but as the -- again, as the week progressed, there was -- that's a great example where it didn't feel right to me based on my experience. And then I brought in the people that were the experts in it

Page 69

and they said, Yeah, that's -- that's good. Same thing with that, like, contract with the building.

I've never seen government contracts where the government can get out of something that quick or that easy. I know the government ultimately can get out of anything, but generally that stuff does not happen. And the fact that the -- we, as the government, were moving forward to do those things was -- was interesting.

Q   Just to clarify for the record, when you were talking about terminating DEI positions, you said without a PIP in their file.

Could you state what a PIP is?

A   Oh. Performance Improvement Plan. I don't know if they use that at AID or what it's called, but it's when you have government -- PIP is government civilians that have poor performance, and you put them on a plan to basically get them better, right? It's a remediation plan. It's called a "PIP."

Q   Got it. And I know there's a lot of acronyms in government, so I'm just going to try to clarify those.

A   Yeah.

Q   Was Elon Musk at this first meeting with the DOGE team on January 27th?

A   No.

Page 70

Q   And what was the meeting about?

A   I think it was that they were going to -- it was them essentially saying, Hey, we're going to look to put some people on systems, look at contracts, look at how money was being moved through the organization.

So it was just a -- I think it was a -- I think it was an hour or two hours of, We're going to move forward. So we need to have people, designees. They had some other people that were going to do interviews, like, interviewing people. But specifics and details, I just -- I didn't -- excuse me. I didn't dig into.

Q   When you say, "interviewing people," do you mean like a job interview?

A   No, like USAID employees. Like, -- I think more of like, So who does contracts? And so if I meet you and you're like, Do you do contracts? And then you're like, No. I'm just in charge of the contracting officer. You really need to talk to Hugh (phonetic), because he's the one that's going to -- that type of thing.

It was trying to figure out, I think, to get their team up to speed or quick, because there was, like, organizations -- like, I remember we had to print some organization charts to give to them so they could

Page 71

figure out who in the zoo they wanted to take and talk to.

Q   Would you say it was mostly about information gathering, that first meeting?

A   My -- as far -- yes.

Q   And what was your perception about the members of the DOGE team? So the people we described as working under Steve Davis or affiliated with DOGE?

A   I think -- there was a couple -- like, there was a couple gentlemen that were there that were senior, as in they were older. And then it was -- so it was almost like -- and then they had, like, a bunch of young guys, like in their 20s, and that was like the Gavin and the Luke and stuff like that.

And so I remember thinking, like, at the table, I'm like, you got a ton of experience with, like, some graybeard. Like, one guy worked for -- he was, like, an investment banker or something.

And I don't know where he was, and I don't remember what his name is, and I don't know if I could pick him up in a lineup, but it was, like, JPMorgan. Like, he was, like, a senior -- because I remember asking someone, I'm like, Who is that guy?

And the answer someone gave me was like, Oh. He's, blank. Yeah. He was the VP at -- I think it was

Page 72

JPMorgan. It was -- it was something that I was like, Well, that's a pretty big step down in pay if you're now working as a government employee. But, okay. So it was -- it was a unique thing.

And then Steve, unto himself, working for -- you know, having worked for Musk and Twitter. I mean, I didn't know Steve. I didn't know the story about Twitter. I don't have much social media presence. I have very little social media presence. But I got on and Googled, and I was like, Oh. Well, that's -- that's a unique character.

Q   And so you said on one side of the table there was a lot of experience. And how would you describe, I guess, that other side of the table?

A   Well, I don't think that --

Q   Not necessarily --

A   My -- my words -- like, they might have experience. They could have been on keyboards since they were 10 years old. And if they're 25, that's more experience than I have working, you know, coding and stuff like that.

So I don't mean experience as in a pejorative way in any -- so it was more of an age gap, right, between folks that were doing interviews and guys that were crunching computers. Not -- my assumption was they

Page 73

were all competent when they walked in because, again, my assumption is it was being pushed through the White House, or at least winningly through the White House. Where in the White House? I don't know. It's going to be a amorphous the White House type of thing. So, yeah. So it wasn't an experience as in they weren't competent or that. It was just an age thing.

Q   What about government experience? Did you -- did you know any of these people to have government experience?

A   I don't think any of them had mentioned government experience, whether it's civilian or military, that I remember.

Q   And what impression did you get about the members of the DOGE team's understanding of the differences in -- in working in government versus in a private business?

A   I definitely did not --

MR. WEN: Sorry.

THE WITNESS: Sorry.

MR. WEN: Objection. Vague, and calls for speculation.

But you can answer.

THE WITNESS: In my opinion, they had not worked in a bureaucracy and were not familiar with

Page 74

government rules and regulations and laws and -- and things.

BY MS. RUBIN:

Q   Do you have any example of that? Maybe just something to kind of illustrate this difference about working in government and private business?

A   Yeah. The gisting of things. I think I can give two examples. I probably could end up giving three. The one that -- there was initial -- there was a group of people that were put on leave. And when Steve came back, which I think was the meeting on the 30th, one of the first questions he asked was, Have these people been terminated? Or, Has terminated been initiated?

And my response was, No. Because what was proposed on the 27th was we were going to find some stuff. They -- they -- the amorphous -- the folks that came in from the Efficiency team had found, compiled a list. That list came to the -- to the head shed and of -- to -- with the ask to put them on administrative leave until more information could be pulled about how money was moved through the system and whether or not fraud had been committed.

There was a -- from what I remember, like, fraud was kind of -- that was, like, the words that

Page 75

were, like, misuse of government funds or fraud or -- basically, not doing due diligence in how they were spending the government's money. Which, okay, we make - - that did not startle me at all.

We put them on leave. What did startle me, and it goes back to that question of competency or -- understanding of government, was, you know, to be -- to ask the Chief of Staff at the time, Have you terminated them? And I said, No. I haven't even started termination procedures, which Steve was not happy with.

And I put that back to Steve and said, You haven't provided anything that would legally allow me to terminate these government employees unless you are changing the rules of how we can terminate government employees, and I still haven't been provided that yet either. So I'm not going to take action on any of that until I am provided more information, because otherwise I don't know if I'm operating in a legal environment.

That was, like, one example where I was thinking, Wow. You really don't understand that. And then from that conversation it was, Well, how long does it take? I think someone said, you know, there was a lawyer in the room --

MR. WEN: Sorry.

Objection.

Page 76

Just -- you know, just want to warn about, like, making -- talking about communications between attorneys and legal advice that you received from attorneys. So I want to assert a protective invocation of the attorney-client privilege, but.

THE WITNESS: Okay. Can I talk about what I was thinking, though, or what I was feeling on -- on that? I'm not -- I'm not trying to trick you. You guys are lawyers. I'm just trying to -- I don't want to --

MS. RUBIN: I understand.

THE WITNESS: I don't want to step on something and inadvertently be back in a room with you guys.

MR. WEN: So maybe it would be more helpful if we just take a break.

MS. RUBIN: We can take a quick break, yes.

THE PROCEEDINGS OFFICER: Hearing no objection, I'll pause the record at 10:30 a.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER: We're back on the record at 10:34 a.m., Eastern Time.

Proceed.

Page 77

BY MS. RUBIN:

Q   Okay.  So talking about the Efficiency team or the DOGE team again -- and we had talked about this a little bit, but what, if anything, did you know or hear about their connection to Elon Musk?

A   The only connection that I can definitively state was Steve's comment.  So the connection that I -- speculation on my part based on news media and stuff like that, maybe that week or after the week, that I -- I cannot say because it was a while ago, but certainly during the two weeks, the only thing that I could say that I was aware of at all was the Steve making a comment that he had just hung up the phone with -- with Elon Musk.

Q   Did you ever hear members of the DOGE team discussing Musk?

A   I don't know.

Q   So a group of about 57 or 58 USAID personnel were placed on administrative leave on January 27th; is that correct?

A   Yes.

Q   And I'm going to talk about them as 58, but please let me know if that is incorrect.

When did you first learn about this?  About the fact that USAID would be placing about 58 people on

Page 78

administrative leave?

A   I think it was in an email or something, or maybe a phone call came in.  I don't -- I don't remember who told me or how I found out.

Q   Did you find out on or before January 27th?

A   I think it was on the 27th.  I don't think it was -- yeah.  It was after they had been there.  I think it was, like, a close-up at the end of the day.  So I think it was the 27th.

Q   So the same day that they were --

A   That they showed, yeah.  That they -- that the team showed up.

Q   Got it.  So the same day the team showed up and -- the same day the team showed up, the 58 people were placed on administrative leave?

A   Yeah.  If -- as far as I remember, that's what it is.

Q   And that's the same day --

A   The 27th.

Q   -- you found out that they would be placed on administrative leave?

A   Yeah.  I think that's when they were placed on administrative leave.  I don't -- unfortunately, I don't have any notes or any things on that, so.

Q   That's okay.

Page 79

A   It was definitely the beginning of the week, but I think it was the -- I think it was that Monday.

Q   Who told you that there would be a group placed on administrative leave that day?

A   I don't remember who told me at first.  I don't remember whether it came in an email.  I don't remember if there was, like, a quick meeting at the end of the day or touchpoint.  I do remember emails coming in.  I remember having conversations with Joel, who was my deputy.  But I don't -- I don't remember, like, the first touchpoint of where it came in.

Q   Was it Acting Administrator Gray that told you that people would be placed on administrative leave?

A   Well, I think he was the ultimate -- the one that had the ultimate decision.  I don't think he was the first to tell me, from -- from what I remember.  But, ultimately, I think he is the one that signed the paperwork putting them on administrative leave or gave the -- gave the order to do that.

Q   Did you -- do you know who initiated the conversation about placing these people on administrative leave?

A   No.

Q   Any general team?

A   Well, the list came in from the -- you know,

Page 80

the team that -- the Efficiency team that came in, which was, you know, We've been looking, and I think -- and again, I'm, you know, big hand, little map, broad brush, it was a, Hey, we're seeing some anomalies, or, We're seeing some discrepancies in recordkeeping and how things -- how money was being spent.

And these are the hands that it's touched up through, because it was a pretty wide spectrum of folks from, you know, worker bees, if you will, up through leadership, up to, like, the legal team.  Which, of course, from my experience, that all would make sense if you had people that -- and -- and I wasn't -- I definitely did not look at it.  I didn't -- was not at the time thinking that there was, like, nefarious behavior or anything like that.

It was more of -- you know, because there are a lot of bad practices in government, and that this team had uncovered some bad accounting or bad -- how things were being done that was transferring all the way up through what I would say is the legal chain of command.  If you're the button pusher, it goes to your leadership, the leadership looks at it, and it goes to the lawyer, right?  And then the lawyer signs off on it, and then it goes to the person that makes the decision.

And so all of that kind of made sense to me of

Page 81

why you'd have a -- a spattering across the board. But I don't know who. I mean, the list was proposed by the team.

Q   And that's the DOGE team?

A   By the -- yeah. Well, the -- yeah. The Efficiency team or whatever.

Q   The Efficiency team?

A   It was on that day, or -- or whatever I recalled it, or was calling it on that day. But yes. The Efficiency team, the DOGE team in my mind either -- and then I think it was Jason that signed it out.

Q   And you said that -- so what did they tell you was the reason for placing 58 individuals on administrative leave?

A   I think it was just the -- what I had just said, which is they were looking at anomalies -- my word, not necessarily theirs -- or deficiencies or discrepancies.

It was a pejorative word of, you know, There's something amiss and we need to -- to really look at this. Which, again, for me, tracked with common sense approach of putting somebody on leave, et cetera. So -- so you could take and do that -- that triage and look at the information.

Q   Was there an investigation conducted into this

Page 82

issue to identify the 58 people placed on leave?

A   What do you mean by an "investigation"?

Q   How were the 58 identified as potentially being involved with the --

A   My understanding, they were identified by the team that came in. Who on the team? Like, whether or not --

Q   Like, the DOGE team?

A   -- the DOGE team, like you'd have to look at my email. I remember getting an email from someone who was not in AID, which was part of the group. He was one of the older gentlemen that I don't remember. But I'm pretty sure there was an email that had -- because then I think there was a back and forth.

Joel wrote something back, and I was more or less watching it unfold, type of thing. So who specifically, you know, said, Susie Jones (phonetic) needs to be on the list stuff, I don't -- I don't have the information on that. I don't have the details.

Q   Did the number of people on the list surprise you at all?

A   No. I don't -- I don't think so at the time. And, again, we were talking administrative leave, which is something I -- I had used in my career. So it -- it was -- I don't know if it was -- I think I was probably

Page 83

neutral on it. I don't think I really had an opinion one way or the other.

Q   So at that point on January 27th at the time these people are placed on administrative leave, did you have evidence that all of these individuals engaged in any wrongdoing?

A   I did not have any evidence. As far as I know, I did not have any body of evidence that was attached to, like, the emails and things like that. It was more or less verbal. I don't remember if we asked -- and I say we, Joel or I said, You need to put it in writing, or whether it was done beforehand.

But I know that there was some sort of trail of where it -- to go back to where did it come from, because I knew I wanted that. Like, I wasn't going to verbally transcribe names on a Post-it note and execute. So I needed something. I just don't remember what it was. But I know there's electronic, you know, correspondence on it.

Q   And I believe you might have said this, but would it be accurate to say that it was this list of 58 people -- was a list of people who would be investigated for potential wrongdoing?

MR. WEN: Objection. Calls for legal conclusion, speculation.

Page 84

THE WITNESS: Yeah. When -- so if I can jump on your bandwagon on that. Investigation might mean different things. Like, this unto itself, to put them on administrative leave, can be, like, that's an investigation, right? A triage of how they did it. I don't know. I -- I don't think we got to that point. I think that meeting, which I believe was on that Thursday when Steve came back.

Now the DOGErs or the Efficiency teamers, they were out doing their stuff in the organization for those couple days, but then it was another, Hey, we're coming back for, like, a pulse check to find out where we are, you know, type of thing. And that was when Steve was saying, like, What's been done?

And that was where I said, Well, nothing, because as far as I know, nothing more has been done, which would go back to an investigation of looking into what we're doing to terminate, not to keep them on admin leave. Because to me that was a -- a extreme chasm between putting a person on admin leave and terminating from government service. There's a lot of ground in the middle that needed to be covered and it had not been.

BY MS. RUBIN:

Q   Okay.

A   As far as I knew.

Page 85

Q   But as of the time that they were placed on administrative leave, you didn't have any evidence of wrongdoing; is that correct?

MR. WEN: Objection. Argumentative.

BY MS. RUBIN:

Q   Of wrongdoing by any of the specific individuals on the list?

A   Personally?

Q   Did you have any evidence?

A   No. Outside, I did not have any evidence, no.

Q   Okay. I'm going to introduce Plaintiffs' Exhibit 4.

(Exhibit 4 marked for identification.)

BY MS. RUBIN:

Q   Have you -- actually, can we turn to the second page, which is on the back of the first page?

A   Second page on the back.

Q   Just -- yeah, right there.

A   Okay.

Q   And so I'm looking at an email on Monday, January 27, 2025, at 3:41 p.m. sent by Joel Borkert -- Joel Borkert.

Do you see that?

A   Mm-hmm.

Q   And that is -- okay. And on the -- sorry. On

Page 86

the first page, that's your email on the cc line mhopson@usaid.gov?

A   Yes.

Q   Okay. Sorry about that. Turning back to this page. If you look at this and the next page, is this the list of individuals placed on administrative leave on January 27th?

A   As far as I know, yes. To my recollection.

Q   And how would you characterize the people on this list in terms of, I guess, senior positions, lower-level positions?

A   I think it was a --

MR. WEN: Objection. Vague.

You can answer.

THE WITNESS: There -- I mean, there were a lot of leadership positions, which to my statement earlier, there's also some lower-level folks or what I would deem as lower-level folks. But it was a lot of the leadership which -- what was proposed or what -- the information that I was acting on was that there was misuse of funds, or a -- you know, the lack of due diligence and stuff.

So having senior folks -- and I believe there's, like, there was attorneys and stuff like that on the list somewhere. Yeah. It's towards the bottom

Page 87

there. So that tracked to have senior folks and again some other lower-level folks that were reportedly misusing or misappropriating -- not misappropriating, because that's a congressional term, but not doing their due diligence. Not good stewards of American taxpayers. I think that might be the better way to caveat that.

BY MS. RUBIN:

Q   And you said that included some senior legal counsel at USAID?

A   Yeah. I think --

Q   Feel free to obviously --

A   I think that they're on here. Yeah. Yeah. I mean, there's counsel, counsel, counsel, counsel. There's a whole bunch of them on here. But I -- yeah. I mean, out of the -- I probably met some. I mean, certainly some of them, like Jack Allweiler (phonetic), I met him. There's certain people on here that I had met as part of the onboarding and, you know, senior individuals. But a lot of them I didn't know or I don't know.

Q   And you can set that aside. How were the names on this list selected? We talked about this a bit, but do you know how the names on this list were selected?

A   No.

Page 88

Q   So do you know the process by which they were selected?

MR. WEN: Objection. Asked and answered.

THE WITNESS: Yeah. No.

BY MS. RUBIN:

Q   Do you know what documents were reviewed when coming to the determination of selecting these individuals?

MR. WEN: Objection. Asked and answered.

You can answer.

THE WITNESS: Yeah. Specifically, no. I do remember having conversations, and I don't know what was written. I know we asked for a list to be, you know, sent or forwarded.

What I recall was the verbal conversation of, they've looked at contracts in the -- you know, when they were looking at things, and there are, whether it's anomalies -- again, my words looking back a year and a half -- where there might have been wrongdoing, and we need to further look into that.

BY MS. RUBIN:

Q   When you say --

A   But that was how I was told that list had been built.

Q   When you say "they," are you referring to the

Page 89

DOGE team?

A  Yeah.  I don't remember specifically who, whether it was a conversation I had with, like, whether Jeremy was there, whether it was a DOGE person there, whether Joel was there.  I don't remember.

I just remember the feeling -- again, things were moving very quickly, and so there was a lot of staff work that the paper trails and things were going to have to be filled in after the fact.  But I remember feeling that there was a lot of trust that we were putting in to execute based on a team that just showed up at the organization.

But I did not feel it was at all illegal.  I did not feel that it would be damaging to people's careers, et cetera, et cetera, so.  But, specifically, how did that happen outside of a broad hand brush, I don't know.

Does that answer the question more thoroughly?

Q  Yes.  You were not involved in selecting the names on this list; is that correct?

A  Correct.

Q  To your knowledge, was Jason Gray involved in selecting the names on this list?

A  No.  I do -- I do not believe he was.

Q  To your knowledge, was Steve Davis involved in

Page 90

selecting the names on this list?

A  I can't --

MR. WEN:  Objection.  Calls for speculation.

THE WITNESS:  Yeah.  I -- it'd be speculative for me to say that.  Yeah.  I can't --

BY MS. RUBIN:

Q  Yeah.

A  I don't -- I don't know.  Sorry.

Q  I'm asking to your knowledge.  So if you don't know --

A  Yeah.  To my knowledge, no.

Q  Okay.  And to your knowledge, was Elon Musk involved in the creation of this list?

A  I don't know.

MR. WEN:  Objection.  Same objection.

THE WITNESS:  Sorry.  I didn't mean to step on you again.

BY MS. RUBIN:

Q  To your knowledge, did anyone primarily working at USAID, so an employee of USAID, have any involvement in selecting the members on this list?

MR. WEN:  Same objection.

BY MS. RUBIN:

Q  Sorry.  Selecting the individuals on this

Page 91

list, but noted.

A  My assumption -- I don't know.

Q  To your knowledge?

A  To my knowledge, yeah, I -- I don't -- I don't know.  It would be pure assumption on my part to say otherwise.

Q  So you don't know exactly who was involved in creating this list?

A  No.  I'd have to triage the emails and look at, like, the badge access and who came in and things like that.

Q  Okay.  I'm going to introduce Plaintiffs' Exhibit 5.

(Exhibit 5 marked for identification.)

BY MS. RUBIN:

Q  And you could take a minute to look at it.  At any point, let me know if you need to pause to take a look.  This is an action memo for Acting Administrator Jason Gray from Nicholas Gottlieb, the Director of Employee and Labor Relations at USAID; is that correct?

A  Yes, correct.

Q  And it's dated January 30th?

A  Yes.

Q  Have you seen this document before?

A  I'm certain I have, yes.  Sure I -- I'm sure I

Page 92

read it.  I'm sure I saw it.

Q  So just to be clear, there are redactions on this document made by the government.  "DPP" means deliberative process privilege.  So I'm -- I'm going to be asking you about the non-redacted portions --

A  Okay.

Q  -- just to be clear about that.  So looking to the last paragraph on page 1, the sentence beginning on January 30th.  And I'm going to read this for the record.

On January 30, 2025, Noah Peters of the Office of Personnel Management transmitted to me a list of 11 names forwarded to him by Luke Farritor with the Department of Health and Human Services, DHHS.

Do you know who Noah Peters is?

A  I think he might have been that guy I was vaguely referring to.  One of the older gentlemen.  I'd have to Google his name.  But he might have been part of the DOGE team -- or the Efficiency team.

Q  That's what I was going to ask.  To your recollection, was he affiliated with DOGE?  To your understanding.

A  Yeah.  I -- I'm not awesome with names, especially not a year and a half later.  But Luke certainly was.  But I -- I think -- I mean, --

Page 93

Q    That's okay.

A    Yeah.  I'm -- I'm not -- I'm not positive.  I can't tell you what I was thinking at the time.

Q    So the next sentence says, The email is timestamped January 27, 2025, at 4:28 a.m.  Mr. Farritor noted in his email that the list provided contains all users who logged into DHHS's payment system in the past year.  He repeatedly noted that his analysis and -- is preliminary and could be wrong.

You see that?

A    Correct.  I do.

Q    Did you ever receive that email from Luke Farritor?

A    Not that I remember.

Q    Do you ever -- do you recall ever seeing that email from Mr. Farritor?

A    No.

Q    All right.  So as written here according to Mr. Gottlieb, Luke Farritor created an initial list of people who logged into DHHS's payment system; is that correct as you see it?

A    Yes.

Q    And as written here, that list contained 11 names?

A    Yes.  I don't -- I don't -- based on what's

Page 94

written in front of me.  I don't remember that.  I know that there was some rolling and it was a roll-up of -- of names that came in at the end of the day.

Q    Yeah.  And so as it's written here according to Mr. Gottlieb, it was 11 names forwarded to him?

A    Okay.

Q    The list we discussed and with exhibit -- with the last exhibit, that was 58 names; is that correct?

A    Yes.  To the best of my knowledge.

Q    And when he's talking about Mr. Farritor noted that the list provided contains all users who logged into DHHS's payment system, do you understand that to be the same conduct we were discussing with regard to that list of 58 people?

A    Say that again.

Q    Sorry.  Let me rephrase that.  In discussing this list of 11 people who Mr. Farritor said were the users who logged into DHHS's payment system, is it your understanding that the list of 58 people was related to users who logged into DHHS's payment system?

A    My understanding was they were involved in the payment approval -- payment and/or approval process, not necessarily whether they were logging into the system.  That -- that detail is -- does not ring a bell to me.

It's here in black and white and I was -- you

Page 95

know, I'm sure I saw this memo.  But the overarching reason was that they -- those people were touching payments or were approving payments and things like that.

Q    Okay.  So according to this memorandum, this initial list had to do with users who logged into DHHS's payment system.  Getting tongue twisted.  That's correct as written here?

A    Yes.

Q    Do you know how that list went from 11 names to 58 names?

A    No.

Q    Did you ever see the list of 11 people?

A    I don't know.  I don't think so.  I don't remember.

Q    Do you have any reason to believe that Nick Gottlieb's description of this email is inaccurate?

A    I can't answer that because I have no idea what's written in black and I don't remember all of that.  So what is written, or what's not redacted?

Q    Yes.  I'm just asking if you have any reason to believe that what -- his description would be inaccurate.

A    Do you want me to go, like, line by line of things?  Or do you -- in general?  Like, the one thing,

Page 96

like, that is written here is no justification was provided for this instruction.  I think a verbal from the team that came in saying, Hey, there's potential wrongdoing, that was enough for Justin -- or Jason to sign it out.  That is justification enough for an administrator head to -- to put someone on.  He can take that advice.  So, like, the nuance in that, I don't think this letter --

Q    I can be more specific.

A    But the facts of it specific -- like, the other facts all tracks with what I know.

Q    Yes.  And more specifically his description of this specific email of 11 names.  When it was sent, who it was sent by, that it contained --

A    Well, the when it was sent -- this doesn't jibe because it's 4:30 a.m.  So maybe that was a typo, because the morning of the 27th would be before any of us got to work that day.  So -- but that -- you know, outside of that, this all tracks with what I knew was what was happening or what would be -- what was stated would happen and then what was happening, which is we're looking at the databases and who's approving payments and who's paying things.  So that -- that all tracks.

Q    Did you ask anyone where the list of 58 individuals came from?

Page 97

MR. WEN: Objection. Asked and answered.

THE WITNESS: Yeah. The -- the assumption -- I think I asked, How did this list get compiled? And it was the -- the vague answers that I was -- that I have -- you know, have been saying, which is, you know, potential malfeasance or misuse, et cetera.

Outside of that, I don't know. Like, how individual -- pick a name -- how did this person get placed on the list and why? I didn't have the fidelity of -- of data.

BY MS. RUBIN:

Q   You stated that Acting Administrator Jason Gray signed off on placing these individuals on administrative leave; is that correct?

A   Yes.

Q   If he had wanted to -- if he had wanted to push back, who would he have voiced that opinion to?

MR. WEN: Objection. Calls for speculation.

But you can answer.

THE WITNESS: I think as the acting administrator, he simply could have just not done that. He was not legally bound to execute that. If he was to grieve or if he was -- I think he would have to bring

Page 98

that up through his chain of command which would probably be the first step I would advise him -- would have advised him to do is probably state or reaching in, like, via Ken to the political side to make sure that -- I think that would be -- if he -- if he was to balk, those would -- if he's -- if he came in -- if he -- sorry. I'm kind of stammering on how I'm answering.

If he brought me in and said, Matt, should I put these people on leave? I would have advised -- and he said, I don't want to do this, I would have advised, You don't have to do this. You are going to be under scrutiny for not doing that, so let's make sure that -- and this didn't -- this conversation didn't happen.

Should that have happened, I would have advised them to either go the chain of command or a political chain of command. And I don't know what I would have at that time advised at that point, but it would have been some scrambling to -- as my job was to make sure the administrator was doing the right things for the administration, but then also for the organization and -- and the U.S. government.

And I would have advised him to probably pause or to -- you know, should he -- if he had asked that. I did not raise that objection because from what

Page 99

we were seeing or what I was seeing -- I won't speculate on others, was, although it was moving very quickly, I did not see it as an action that was not, like, a reversible thing or not something that we could spend more time looking at.

BY MS. RUBIN:

Q   Okay. So you understood -- or generally understand placing someone on administrative leave is a decision that is reversible?

A   Correct.

Q   Versus termination, which is not reversible, at least easily?

A   Correct. Yes.

Q   Did you ask for any evidence on January 27th to show that the individuals on the list -- or that placing the individuals on administrative leave was justified?

MR. WEN: Objection. Argumentative.

You can answer.

THE WITNESS: I'm certain I asked somewhere in the process how this list was compiled, and I think it was all verbal of, We're just seeing -- and -- and it wasn't with Luke, but, like, the statement using this letter, which is, you know, Hey, this is an initial look, and so we're not really sure. Given the

Page 100

nature of admin leave, like, I was comfortable enough with that verbal.

So I'm -- I'm positive that I asked someone, right? Whether it might have been Joel, if Joel at the time was -- Joel was a lot of the interlocutor for me, you know, with -- with the actions that were -- were happening. So I don't know who was in that, but I'm -- I'm certain I had posed the -- the question to someone at some point.

BY MS. RUBIN:

Q   Was it your understanding that you would be shown evidence of any misconduct before anybody was terminated?

A   Well, yeah, certainly. Yes, yeah.

Q   Who did you expect to see evidence from?

A   I think that -- that the team said, you know, they had initial --

Q   The DOGE team? Sorry. I just have to make it clear --

A   The DOGE team or the Efficiency team. It was, We're going to compile, right? I don't remember exactly what it was, but, Put on leave and then we will take and -- and look to find, you know, the body of evidence or the data or whether we were wrong, right? Whatever that is, but then that will come back for decisions, right?

Page 101

Whatever those decisions, whether it's, you know, punitive actions or whether it's legal actions, you know, depending on what nature of the offense or the malfeasance was.

Q   And at least somebody from the DOGE team or the DOGE team generally represented that they would be looking into it further?

A   Yeah.  I -- I think that was certainly insinuated at the beginning was that we would -- we -- that they would get -- they, the efficiency, would provide that.

But in my mind, it was they're just workhorses to give me a file on 58 people that we would then look at to make a decision of whether or not we're going to move forward with some sort of action.  Whatever that action is, be it full reinstatement, be it reinstate with some sort of, you know, performance improvement.

Or if it was legal, then bringing in -- whether you brought in criminal charges or, you know, terminated, whatever.  But I was definitely looking for the team who initiated the list to help, you know, flesh out some of those things.

Q   Who made the official recommendation to place these individuals on administrative leave?

MR. WEN:  Objection.  Calls for a legal

Page 102

conclusion and speculation.

But you can answer.

THE WITNESS:  The note came -- I mean, if we look back on the email trail, I mean, I think it came from -- from Joel to put it together.

BY MS. RUBIN:

Q   And we're looking at?

A   Yeah.  On the -- the 341 from Joel, I think, Exhibit Number 4.  I am certain that I was involved in telling Joel to put the list together, or to compile it to send it to -- because this is -- this was -- this was putting it into an official capacity for the record.  And that would have been within his scope of duties of, Hey, just put together a memo with the list.  But the list itself, I believe, was emailed from one of the members of the team.  I -- I don't -- I don't recall.

Q   The DOGE team?

A   Correct.  Right.  The DOGE team.  But this is where we then put it into, you know, practice, if you will, because he's sending it to Bill (phonetic), Nick, Steven, and Brian, all the people that would have to initiate the leave of absence, terminate physical access, and terminate physical security -- or, cyber access, computer access.  But the preamble to that, that's the email that would be before this one, and I

Page 103

don't remember who sent it.

Q   You stated that you had a meeting with Steve Davis on January -- on Thursday, January 30th where you discussed the 58 individuals placed on administrative leave; is that correct?

A   Yeah.  I believe it was that Thursday.  Correct.

Q   Do you know around what time that was?

A   It would have been --

Q   Could be morning, afternoon, evening.

A   I want to say it was late morning.  I -- I don't know for sure.  But I want to say it was late morning.  It was definitely not --

Q   So earlier part of the day?

A   Yeah, yeah.  Between 10:00 -- I think -- I think it was between, like, 10:00 and 1:00.  My initial thought was, like, 10:00-ish, but it might have been right after lunch.  So that window.  Middle of the day window.

Q   That's all good.  Who was at this meeting?

A   I think it was the same group of people that were really there at the beginning.  I think the -- like, the politicals that were under me, I think I had all of them there.  And then Steve had his team there.  I believe Jason was there.  I think Ken was there.  They

Page 104

-- they --

Q   When you say, "the politicals under you," who do you mean?

A   So that was like Tim Meisburger, you know, --

Q   Joel Borkert?

A   Joel, yeah.  And I'm pretty sure Ken was there.  Ken wasn't under me.  Tim -- there's another gentleman, I don't remember his name.  So there was other politicals.  When I say "politicals," people that had been appointed by the White House.

Q   And was this meeting held at the USAID office?

A   At the -- at the main conference room there.

Q   Was this virtual or in person?

A   In person.  I don't think there was any virtual dial-ins.  I think it was all in person.

Q   Who asked for this meeting?

MR. WEN:  Objection.  Calls for speculation.

BY MS. RUBIN:

Q   Who scheduled this meeting?

A   I don't know.  Yeah.  I don't know what initiated the -- I know the gist of it as it came to me was, Hey, we're going to get back together with the folks that were here on Monday to -- to kind of go over or look at what has been produced or what, you know,

Page 105

what has been found.  But who started it or who initiated it, I don't know.

Q    But the purpose of the meeting, as you understood it at the time, was to discuss the 58 individuals placed on administrative leave?

A    No.  I don't think that.  I think just in general.  I don't think I was going into it with a -- a list of 58 in mind.  I think I was, What have you guys been doing for the last four days?  I think it was more or less of an update.

I mean, the meeting might have been scheduled on Monday, like, Hey, we'll come back.  We'll reconvene this group on Thursday.  I -- I don't remember.  But I do not recall walking into that meeting thinking we were going to specifically talk about the list of 58.  It might have been something on an agenda item, but other things, which is, you know, what they were looking at, what they were finding, was what -- what I was focused on.

Q    So when you say, "what they were looking at and what they were finding," --

A    The DOGE team.

Q    -- the DOGE team, can you just be a little bit more specific about what you understood the purpose of that meeting to be?  Or what would be discussed at that

Page 106

meeting?

A    I think it was, like, how to move forward, like, taking whatever information they were going to provide to us and then, you know, in my mind, it would be then to help give guidance or rudder to them to, Hey, well, can you figure this out?  Can you -- so then we can start making actionable decisions across the organization.  Like I had said, there was decisions on contracts, there was decisions on, you know, like, buildings and leases.

So there was a -- a larger portfolio that my understanding was that would be discussed.  What parts they had gotten to during the week, that was kind of what the meeting was about.

Q    Okay.  So it would be -- would it be fair to say that the meeting was to discuss what the DOGE team had done at USAID that week?

A    Yeah.  What they found, right?

Q    Okay.

A    The -- the findings or -- or what have you, yeah.

Q    The findings from looking at contracts and personnel?

A    Anything that they were looking at, yeah.

Q    Did you ultimately discuss those 58

Page 107

individuals during this meeting?

A    Steve, I -- to the best of my knowledge, Steve did raise, Hey, what is the status with the 58?  And I think my flippant response was, They're on administrative leave.  And he asked, How come -- have you started termination procedures?  Of which I responded, No.

And, again, there might have been some other words, but the question that was posed was, Why?  It might have been wrapped up in other words.  And my -- the response was, Because I don't have anything that I feel I can legally terminate these people.  And then he had turned to Jeremy Lewin and said, Well, I think Jeremy has that information.

And I remember thinking, Poor Jeremy is really on the spot right now.  Jeremy didn't have the information, and I think it was very clear in how he physically reacted in the meeting.  So, yeah.  So that was -- that was -- that was the -- that's how the 58 did come up.

Q    Okay.  And I'm just going to backtrack and just clarify some things for the record.  So just confirm if this is correct.

Steve Davis asked you at this meeting whether you had terminated the 58 individuals on the list?

Page 108

A    I think he asked whether -- I think he asked for -- I think if you're going to have keywords, it was the status and then, Have you initiated?  And then, Why not?  I think those were --

Q    Initiated?

A    Termination.

Q    Okay.  So he asked if you had initiated termination?  Initiated termination?

A    Yeah.  What -- what's been done with them and have you initiated?  That is the best of my knowledge, that's how he posed the question.  I'm positive my response was I've done nothing with them because of the reasons I just stated.

Q    Was it your understanding that when he asked this question -- did you get the impression that he had expected you to initiate termination by that point?

MR. WEN:  Objection.  Calls for speculation, and vague.

But you can answer.

THE WITNESS:  Yeah.  My -- my assumption was that he was expecting that I was going to take and execute that.  I believe part of that conversation was me saying if he feels that he has the legal authority to do that, I would bring him on board as my chief of HR and then he could take and generate those and sign his

recommendation to the then-acting, and then we'd consider it.

But with what we had, it was -- it was a non-starter as far as I was concerned. It was -- it was actually a kind of a light moment because Steve laughed. He's like, Well, that's not going to happen. I said, Okay. Well.

BY MS. RUBIN:

Q   You did not feel at that time when he asked you on the 30th that you had seen evidence to justify initiating termination for these individuals?

A   I did not have any evidence that I would have felt comfortable terminating those individuals.

Q   And he -- you offered for him to come on staff?

A   Yeah. It was -- it was somewhat of a flippant comment. I'd offered Clay to come on staff. I had offered Jeremy to come on staff, because they were advising, but they were advising as outside advisors. And I told them that I didn't feel comfortable executing the things that they were asking unless they gave me more information. Or if they were willing to commit their signatures to the paper documenting those things.

Q   But David --

A   It was -- it was more or less my smart-ass

humor of, like, If we want to move forward with this, like, I need more people on staff to take and do that, and I need more evidence. Like, I need more to do this than -- than what's been provided.

Q   And Steve Davis responded, no, he would not come on staff?

A   I think he just -- I think he might have just chuckled and said -- and, you know, and then moved on with the conversation. I don't remember what he had said. I know my -- my thought after making this statement was, Yeah. Of course you don't want to, right?

Because you're not looking at it either if you're saying Jeremy has it, and Jeremy hasn't given it to me and he's been outside my office for, well, a week. So we're at -- we're still at the start line. We haven't moved forward yet.

Q   Why did it matter to you to see evidence before putting --

A   I wanted something in writing. I wanted more in writing to initiate termination because all I had was, like, this -- you know, whether it was this email or a couple other emails or a list. But it was too speculative in my opinion for me to sign my name -- or to go to Jason to say, I believe that these people

should be terminated for cause. I did not have that. So as a -- as the Chief of Staff, I didn't feel I could give that recommendation.

Q   But you didn't feel at that time that you -- you personally had seen enough to sign off on it.

A   I definitely did not have enough to sign off on that. Again, that's personal. Whether it was legal or not, I don't -- that I can't -- that is speculative. But I knew I did not have a warm fuzzy that I was going to sign off on that.

Q   And did that have anything to do with any legal concerns? Or what was the concern that --

A   I think due process and -- and legality, right? Like, it's -- they were my employees, right? So I'm not going to terminate someone unless I know why I'm terminating them. And then I think I grew up in a bureaucracy.

I worked in a bureaucracy for 30 years. There's a lot of rules that are written that can stymie fast progress, but they're also rules that are legally binding and, you know, need to be -- need to be followed.

You can do anything you want in the government. You just have to follow the rules, or just change them, or get an exception to it. And I did not

have any evidence that showed that the body of evidence would have fit under the current rules, that the rule had been changed, or I was being directed by my chain of command, right, to -- you know, to take and execute that.

Q   You said that Jeremy had been sitting outside your office for a week.

A   He'd just been involved. Like, he -- he was hot-desking in different areas. And so he'd been just in the head shed of the -- the office suite set up where Joel had an office, I had an office, I had a little bullpen, you know, this size with, like, six desks, and I think I had three people in there. So he would use one of the desks in there. And so he was just kind of floating in and out. He would -- he --

Q   Did you discuss the list of 58 individuals with Jeremy Lewin that week?

A   I'm sure we did. Nothing notable. I'm sure -- I'm sure he was involved in conversations. I know in that -- the 30th meeting, Steve had specifically pointed that to him. I know I had multiple meet -- multiple discussions with Jeremy about making sure that any actions that were taken needed to be properly documented.

I don't -- I'll assume that in that

Page 113

conversation was things on -- like, the people on that list. But I don't remember, like, a 58 meeting with Jeremy. But I do remember talking to Jeremy about the speed of how things were moving and what I was going to need from primarily him and Clay, which is the legal justification and the documentation and, you know, the -- the OPM memos.

Like, something, like, you know, this executive order gives you one step closer to what you can take and do because you'd have explicit and you'd have implied tasks and all those things.

And I had told Jeremy from day one that we would need -- that he was not going to have a cooperative partner and that it wasn't personal. I -- I just knew my personality enough that if I was going to be brought stuff that didn't meet a certain level of comfort for myself, I would push it back.

And I wanted him to know it's not -- it wasn't me not supporting a plan to move forward, to even move forward quickly, it's just that we weren't going to do it recklessly. And so I had a lot of conversations with Jeremy on -- on that. How did the list get brought in there? I don't -- I don't remember.

Q    You discussed putting things in writing. Putting directions or advice in writing?

Page 114

A    Sure. Absolutely.

Q    And how did Jeremy respond to that? Jeremy Lewin?

A    I think he agreed. He's like, Yeah, yeah. I get it. I get it. I know. I know. I know. And because part of that was also the conversation -- and I'm -- I'm bridging conversations that happened over those couple days -- but I told him, I said, Look, you know, a lot of the counsels that we have approved a lot of these decisions that, you know, may be fraudulent or may be, you know, based on the knowledge I had.

I said, But I can't act on -- I can't make legal recommendations to the director without having someone who's a lawyer support me in making those decisions.

And I told Jeremy, I'm like, Why don't you come over? Like, be -- you know, you can be our lead attorney, you can be our head shed special advisor but come up under AID so then I have full control over the authorities that you're then executing under.

Q    And how did he respond to that?

A    I think he said, like, Yeah. Maybe we could do that. He didn't say no. He didn't say yes. It was more or less like, Yeah. I don't know how. And I said, Well, if we want to do that, I'm like, I'll take you.

Page 115

I'll take Clay.

So it was a -- I don't remember there being any friction to it. It was not a, Yes. I want to jump at the opportunity, but it wasn't no. It was like, Yeah. I'm like, you know, we're trying to move quickly. There's a lot of my words, like, a mealy-mouthed conversation where there's not a lot of substance there. My substance was I'm not going to move forward on certain things unless I'm comfortable with those.

Q    And to be comfortable with it, you felt that you needed legal advice from the agency?

MR. WEN: Objection. Mischaracterizes prior testimony.

But you can answer it.

THE WITNESS: I wouldn't make a decision to terminate someone without having a lawyer on my staff, you know, shy of, like, the bureau coming in and arresting someone, right, or pick a -- law enforcement, that's a total different matter.

But if you're going to look to terminate somebody internally, that termination authority comes from the director or the administrator. And as the Chief of Staff, I would need -- I would need more than a name on a list specifically tying individuals to specific actions.

Page 116

Does that answer the question or?

BY MS. RUBIN:

Q    Yes.

A    But, so, like, whether it was a lawyer or not -- I -- I can tell you that in my experience, I would like a lawyer in the room. Could there have been such egregious body of evidence put forward to me that I'd be like, Ugh. Like, we're definitely taking action? Maybe. I don't -- I don't know. I just did --

Q    But that didn't happen?

A    I did not have anything that I could take -- I personally was going to take action with what I had.

Q    You testified earlier that Elon Musk called Steve Davis during this meeting; is that correct?

A    I -- from my understanding, when Steve hung the phone up, he had said that he had just talked to Elon Musk. I could not hear the conversation, and I was not privy to the -- I was not on the phone.

Q    That was --

A    I didn't see the caller ID or anything come up. It was -- so the -- the connection I have is from Steve making that statement.

Q    That was during the January 30th meeting we were just discussing?

A    Correct. Yeah.

Page 117

Q   Okay.

A   To the best of my knowledge, that was the day the meeting was on.

Q   Steve Davis took a phone call?

A   Yes, during the meeting.

Q   During the meeting.  About how long was the phone call?

A   A couple minutes.

Q   And you knew it was Elon Musk on the call because Steve Davis had told you after getting off the call?

A   Correct.

Q   You had testified earlier that you perceived it as a one-sided conversation; is that correct?

A   I remember -- I don't remember Steve talking a lot, right, outside of answering the phone.  And I just remember that he was more or less quiet.  But, again, I don't -- could -- I don't know who was on the other end, right?  I don't -- I have no idea.

Q   When Steve Davis got off the phone, what exactly did he say?

MR. WEN:  Objection.  I'm just going to make another protective invocation of the presidential communications privilege.  As I said already, I haven't spoken to the witness and I don't know what he's going

Page 118

to say.  But, you know, -- and he's -- I would, as to the substance of any conversations that, you know, Mr. Davis relayed to you about his conversations with the special -- the advisor to the President, I would just say don't -- not answer.

THE WITNESS:  Okay.

MS. RUBIN:  Explain how this fits within the presidential communication privilege, for the record.

MR. WEN:  Yes.  So this is -- it fits within the presidential communications privilege because Elon Musk is a senior advisor to the President.  He is -- and he -- he is -- he can, you know, make -- he can make investigations and he can have communications regarding the formulation of advice to the President.

But like I said, I haven't spoken to the witness before.  I don't know what he's going to say.  I don't know what kind of communications came out.  We have a protocol.  We can follow the protocol if we have to, but.

MS. RUBIN:  Yeah.  Okay.  So how we're going to do this is -- I think when challenges like this come up -- like I said, I'm going to ask specific, agreed-upon questions, and then I think it just makes the most sense to save for the end of the deposition.

Page 119

I'll give you guys the questions and we'll follow the protocol.

MR. WEN:  You mean you want us to read the questions, or you want to say -- you could say them into the record?

MS. RUBIN:  I can say them into the record.

MR. WEN:  And he can answer after you leave.  How about -- how about that?

MS. RUBIN:  That's what I was going to ask.  Yeah.  Sorry.

MR. SILER:  You want to ask your questions for you.

MS. RUBIN:  Sorry if that was unclear.

MR. SILER:  I don't -- I don't know if you were on the call for this point, but what we did in the last deposition that occurred was the court reporter read them back for the witness.  We'd be fine with that if that works for the court reporter.  That seemed to work okay.

MS. RUBIN:  I can read them because I think we have this real-time that might be useful.  But anyway, this is all just to say, let's handle this at the end.

MR. SILER:  At the end?  Yeah, that's

Page 120

okay.

MS. RUBIN:  Okay.

MR. ISSACHAROFF:  Can I follow up just on the invocation?  To the extent that Elon Musk is conveying instructions on this call, would -- would that fit within your understanding of the presidential communications privilege?

MR. WEN:  No.  Explicit directives, we would not stand on that objection under the presidential communications privilege.

MR. ISSACHAROFF:  Can we go ahead and ask now whether this consisted of explicit directives and maybe circumvent this whole thing, at least with respect to this phone call?

MR. WEN:  Yes.

BY MS. RUBIN:

Q   Did this call involve directives made by Mr. Musk -- by Elon Musk?

A   When Steve -- Steve notified the group or whatever that, you know, that it was Musk that he had just talking to.  The -- what he was -- Steve was essentially saying, like, "he," referring to the person that he had just spoken to, which to my knowledge was Musk, he -- he's not happy that things aren't moving quick enough.

Page 121

And, you know, I don't know if he said something like you guys or there was a gist of, like, We need to move forward. And I'll just stop at that.

Q   So to be clear -- yeah. Sorry. So to be clear, this is Mr. -- to your knowledge, this is Elon Musk talking to Steve Davis and giving his own opinions?

A   Wait, say this -- so whose opinions?

Q   I'll -- I'll move it.

A   Steve's comment was his interpretation --

Q   Sorry.

MR. WEN: I'm sorry. I'm just going to make my objection again under the presidential communications privilege.

MS. RUBIN: I'll step back and --

MR. WEN: I think we're getting a little close to the substance.

MS. RUBIN: I'll step back and start with these questions.

BY MS. RUBIN:

Q   So sorry to repeat this, but to your knowledge, we are currently discussing a conversation between Steve Davis and Elon Musk?

A   To my knowledge.

Q   And Elon Musk was a special advisor to the President. And what was Steve Davis's role? Did we

Page 122

discuss that?

A   I don't know what his official role was. I -- I viewed Steve as the leader of this team, the on-the-ground team that was coming from what I assume was DOGE or made the assumption or after the fact, but the Efficiency team as I was, you know --

Q   To your knowledge, was Steve Davis a special advisor to the President or an advisor to the President?

A   I -- I don't know. I don't know.

Q   But to your knowledge, was he an advisor?

A   To my knowledge, I don't know where he fell into the special advisor or if he had, like, a different title or something. I don't know.

Q   How did the communication between -- from Mr. Musk to Mr. Davis, or between them, fit into the process of advising the President?

MR. WEN: Sorry.

Objection. That calls for a legal conclusion.

MS. RUBIN: Isn't that one of the questions we agreed on?

MR. WEN: And speculation.

But --

BY MS. RUBIN:

Q   Okay. You can answer --

Page 123

MR. WEN: Just rephrase. Just --

MS. RUBIN: Okay.

BY MS. RUBIN:

Q   To your knowledge, did the communication consist of any advice given to the President?

A   I have no idea.

Q   To your knowledge, did the communication -- was the communication involved in the process of advising the President?

A   I don't know.

Q   As you understood it in that meeting, was Elon Musk advising the President on something?

A   Can I answer it in two parts?

Q   Yeah.

MR. WEN: Just real quick, I'm just going to speculate -- I'm just going to object on speculation.

But you can try to answer.

THE WITNESS: Yeah. I don't -- ask your question again.

BY MS. RUBIN:

Q   To your knowledge, did the communication between Mr. Davis and Mr. Musk during that meeting -- Steve Davis and Elon Musk during the January 30th meeting, was that part of a process of advising the President?

Page 124

A   I don't know. Sorry. It took me a while to understand that aspect.

Q   To your knowledge, did Elon Musk obtain any information from Steve Davis in this call?

MR. WEN: Objection. Calls for speculation.

THE WITNESS: Yeah. I don't remember exactly what Steve said, but my assumption is that if the --

MR. WEN: Objection.

Sorry. It -- you know, again, I'm just going to lodge my objection based on the presidential communications privilege because I -- you know, our view is that the presidential communications privilege travels both ways, up, you know, to the advisor and down from the advisor of the President.

MR. ISSACHAROFF: Right. I thought -- I thought we just had a colloquy where we determined that if he -- if the -- if the call is to give instructions, it's not part of the President -- from Musk down to Davis is not part of the communications privilege. If it's to obtain or seek information to be used upward in the course of crafting advice, it could be.

So we're trying to understand, was this a call to obtain information or was this a call to provide

Page 125

instructions? I think that's kind of what we're --

MR. SILER: I think -- I think the witness has just said he's -- he doesn't know.

MR. ISSACHAROFF: Well, he -- what Steve -- he -- he was present for what Steve said on the call. So he can answer to the extent of his knowledge.

MR. SILER: I understand, but I think the -- one of the purposes of the protocol is to avoid, you know, where we haven't been able to talk to the witness and don't know what he's going to say. Like, we're at risk of waiving a privilege if we don't make a protective assertion because it's possible that these conversations are, and so are protected.

And, therefore, having this process where, you know, you may leave, he may say it, and we may say, Okay. That's not privileged. That's part of the -- part of the process here and in fact is incorporated in the --

MS. RUBIN: Sorry. Not to interrupt.

Just to clarify, if -- we're only discussing the potential statements made by Elon Musk that Steve Davis said to Mr. Hopson. So if that specific piece of information was not -- a presidential communication was not for gathering advice for the President or giving instruction or advice to the

Page 126

President, then does that specific statement fall under the privilege?

MR. SILER: I'm not sure I'm following.

MS. RUBIN: I guess what I'm saying is, I'm not asking Mr. Hopson about the entire content of Mr. -- of Steve Davis's call with Elon Musk. I'm asking about the specific part of the conversation that Steve Davis relayed to Mr. Hopson.

MR. SILER: Yeah, understood. I don't know what -- I don't -- I don't think we know what the scope of that is. And that's the problem. If Steve Davis -- just purely hypothetical. If Steve Davis is saying, Hey, Elon Musk wants to know XYZ, we need to get that information for him, that might be covered.

MS. RUBIN: If it's gathering information -- if it's giving instruction --

MR. MATHEU: So I think if you --

MS. RUBIN: -- downward --

MR. MATHEU: -- ask a question that is limited to a, Yes, No, or, I don't know answer about what he understood from what Steve Davis said about the conversation, whether -- what the purpose was for. I don't think you can ask him beyond that, and I don't think he can answer beyond that.

MS. RUBIN: Okay.

Page 127

BY MS. RUBIN:

Q   Of what Mr. Davis -- of what Steve Davis relayed to you about his conversation with Elon Musk, did he ask you for any information to relay back to Mr. Musk?

A   No.

Q   Did he give an instruction from Mr. Musk?

A   Can I go off the, Yes, No, not aspect of it? Because -- or if --

MR. MATHEU: No.

MS. RUBIN: I'll -- sorry.

MR. WEN: Keep it to say yes or no.

BY MS. RUBIN:

Q   Yeah. An instruction. Did he give an expectation, a personal opinion?

A   Steve?

Q   Mr. Musk. Of what -- you know, of what Elon Musk said to Steve Davis.

A   I don't know. I don't know.

Q   Who else was the information shared with?

A   It was the same group of people that was in the room. I don't think it was a --

Q   Okay.

A   Like, it wasn't just me and Steve. It was broad-brush type of thing.

Page 128

Q   So was that allowed to everyone in the room, which included --

A   As far as I -- from what I remember, yeah. It was not a, Hey, Matt, I need to speak to you, or -- it was definitely not that.

It might have been, you know, five or six of us. I mean, that -- people were using it as a bathroom break and things like that. But I don't remember.

Q   Just this is -- and so just to be clear, specific about any statement Steve Davis made about his conversation with Elon Musk, that was shared with Jason Gray?

A   If Jason was in that meeting, he would have -- he would have been, you know, privy to that. I don't remember everyone that was in the meeting.

Q   He said it aloud to a meeting of --

A   People that would have been senior leaders of AID, primarily the politicals, if Jason was there and members of the Efficiency team.

Q   As a result of this call, did Steve Davis request any information from anyone in the room?

A   I do not remember any requests for information.

Q   Did you come away from this conversation with an understanding that you or anyone else should gather

Page 129

or provide information that would ultimately go to Elon Musk or the President?

A    Say that again.

Q    Was your understanding from the conversation that you or anybody else should gather or provide any information that would ultimately go to Elon Musk?

A    Am I still in the yes or no category only?

MR. WEN: Yes. Yes or no, please.

THE WITNESS: State your question one more time.

BY MS. RUBIN:

Q    Sorry. I totally get it. It's very -- this is very legal.

So did you come away from the conversation with an understanding, or did you -- did you get the impression --

A    That there was a request for information?

Q    Yes.

A    No.

Q    Okay.

MR. WEN: I feel like we've made the predicate that there's no advice -- that there's no information being gathered for the purposes of advice. I mean, what's the -- what's the purpose of --

MR. ISSACHAROFF: Well, you're welcome to

Page 130

litigate that before the court when you can ask the question and we can hear what he says after you leave and we can make a decision about what that is. But he doesn't know half the -- half of the side of the --

MR. MATHEU: He can't breach -- if the half he doesn't know is the, you know, concern about the presidential communications privilege, and by definition, he can't breach any of that privilege because he can't tell us what he doesn't know.

MR. ISSACHAROFF: That's right. We're not going to argue about it here. You can -- you can bring it up -- we can see what's in the transcript. You can get the information onto the record. You've got what you've got.

BY MS. RUBIN:

Q    Okay. Without revealing the substance of -- you don't know the substance.

Without revealing the substance of what Steve Davis said to you about what he discussed with Elon Musk, so without discussing that, what did Steve Davis say to you when he got off the phone?

A    So this is a non-yes or no?

Q    This is a non -- we're off the yes and no.

A    So I just want to -- I want to be mindful of where you guys are trying to navigate while you guys are

Page 131

trying to navigate and --

Q    Let me actually try to make this, like, super clear. I'm just -- okay.

So like I said, I don't want you to say right now what it is that Steve Davis relayed to you about what Elon Musk relayed to him on the call.

A    Okay.

Q    Okay. Outside of that, what did Steve Davis say to you as Steve Davis?

A    So I don't know the exact words, but what I do remember is the feeling that there was pressure to move forward faster and to --

MR. WEN: Sorry.

Again, I'm going to object on the basis of the presidential communications privilege.

MS. RUBIN: But Steve Davis is not in the --

MR. SILER: Hold on. Can we take, like, a five-minute break?

MS. RUBIN: Yes. Let's go off the record for a few minutes.

THE PROCEEDINGS OFFICER: Sorry.

Hearing no objection, I'll pause the record at 11:37 a.m., Eastern Time.

(Off the record.)

Page 132

THE PROCEEDINGS OFFICER: We're back on the record at 11:45 a.m., Eastern Time.

Proceed.

MR. WEN: All right. Sorry.

And defendants just want to make a record that -- you know, provide a little bit of guidance. But if plaintiffs can ask the same question.

And what we would say regarding the privilege issues that we were just discussing before we went on the break, or the guidance we would offer is, you know, you can offer your impressions, but we would just ask that you do not say what Mr. Davis said -- what Mr. Musk said.

MS. RUBIN: But he can say what Mr. Davis said speaking as Mr. Davis, not relaying a message from Musk.

MR. WEN: He can -- he can -- if that was clear -- if that's clear to him that Mr. Davis was saying something as Mr. Davis?

MS. RUBIN: Okay.

MR. WEN: Yes. He can say -- he can say that. But he can offer it -- and he can offer his impressions, but he cannot get into what -- you know, what Mr. Davis was relaying, you know, -- you know, in terms of his substantive communications with Mr. Musk.

Page 133

MR. ISSACHAROFF: Okay.

MR. WEN: If that makes sense.

MR. ISSACHAROFF: It does. Thank you.

BY MS. RUBIN:

Q So I'm just going to pick up pretty much right where we left off.

Without discussing specifically what Elon Musk said to Steve Davis on this call, what did Steve Davis say to the room when he got off the phone? Skipping right over any --

A I -- I do not remember -- I could not give you a verbatim recollection of what Steve said. What I can tell you is that my impression, or how I felt, was there was -- there would be pressure to move forward faster than what USAID had done to date.

Q And move forward on what faster?

A I think on anything and everything, right? So there was -- and, like, whether it's DEI, whether it's stripping out -- you know, looking at contracts, whether it's pulling people back from overseas locations to make a smaller footprint.

There was a lot of discussions of that each single thing, in my opinion, would have been a -- not Herculean, but would have been an effort for a bureaucracy to do fast. And there was multiple coming

Page 134

out of the newly seated administration. Because if you look at executive orders, a lot of them would touch down through AID.

So not knowing specifically -- well, the -- I know a couple words, but I don't think that I could say a couple words, so I'll hold them. But I can tell you that my impression was that we need -- we were going to need to move faster. And I remember thinking, How the heck am I going to do that?

Q So you said that in -- was with everything. Do you mean everything related to what the DOGE team was doing at USAID?

A DOGE was -- yes. That was part of it. That was the current, you know, crocodile in the boat, right? Which is the DOGE team and recommendations and what they were going to do. And, you know, the personnel action, the DEI -- and I think DEI was even independent of what DOGE was doing -- the contracts and reviewing contracts and canceling contracts, the justification of things that were actually ongoing and happening that, you know, money had been appropriated and stuff.

So things that I just had not been involved in that are all extensive data calls internally, organization, especially for a team like Joel because he was my only workhorse, right, to try to pull that from

Page 135

an organization that we were literally learning because we -- we didn't know. And I just remember thinking, like, This is -- this is going to be rough. This is going to be hard to do quickly.

Q Was it your understanding that this included initiating the termination of the 58 individuals on administrative leave?

A Yes.

Q Was it your impression --

A Well, can I -- can I -- sorry. Can I fill more in?

Q Please.

A State your question again. Was it my impression --

Q I'm just -- sorry. I wanted to make sure I got the right words.

Was it your impression that part of this effort to move things faster, or this pressure to move things faster, one of those things was the 58 -- initiating the termination of the 58 individuals on administrative leave, or placed on administrative leave on January 27th?

A I think that would have been the desire of Steve, based on what he had said earlier in the meeting, of questioning what I had not done, essentially, or why.

Page 136

So, yes. I would say that would have been in the bucket.

The reason I asked you to -- to say the question was, even at that point in time, post the phone call, post -- I did not feel compelled that we had to do -- you know, had to do anything because they were recommendations. But I do remember thinking, That's a lot -- there's a lot on the table that we're going to have to chew through.

Q And when you say, "you don't have to because it's a recommendation," --

A Because they weren't in my legal chain of command based on what I had. I mean, we have an executive order that says that we will take and support them. And to the best of my knowledge and ability, I was supporting them, and they were making recommendations up to us. And -- so, yeah.

Q But if you had -- okay. If you had not taken the recommendation, rejected the recommendation, how do you think that would have played out?

MR. WEN: Objection. Calls for speculation, and vague.

THE WITNESS: So you're -- you're talking specific to 58? To the 58 -- to the list of -- of people, or in general?

Page 137

BY MS. RUBIN:

Q    That or just in general.  So, in general, Steve Davis says -- or there's generally pressure to move things forward quicker.

A    Correct.

Q    And you said that you felt free to say no.  If you had said, No.  We will not be doing anything quicker?

A    I think I did in that meeting.  I said no, right?  I said, You know, I don't have -- I'm not doing that.  So I think I did say no.

It goes back to the part that we were in -- I don't remember why we rambled or I rambled into it.  It goes back to -- and the -- and the analogy or the -- you know, that I made is that, you know, when the President's Chief Of Staff calls you, there is impetus.  Doesn't matter if it's written down in a order or not, right?

When the commander says -- you know, military commander says, Move, right?  Depends on what's going on.  Verbal orders are legal orders, depending on where they come from and where they stem.  At that point in time, I didn't have anything in hand that made me comfortable to execute.  So the answer I gave in the meeting was -- was, No.  For -- from where I stood.

Page 138

Q    And why was that?

A    I just didn't have the body of evidence that I needed to take and initiate termination based on my experience in the government.

Q    And what was Steve Davis's response to that?

A    Displeasure, I think, would've been -- yeah.  I can definitively state he was not happy with that answer.

Q    And earlier you referenced a conversation, whether it was in jest or otherwise, about Steve Davis coming on as a USAID employee to take some sort of action.

Is this the conversation where that happened?

A    I believe -- yeah.  I think I believe that meeting was that same time -- or in that same meeting.

Q    Did you ask for the recommendation to move things forward faster in writing?

A    Yeah.  That was the -- I don't know my exact words, but that would've been the meeting I would've wanted it in, right?  So whatever I said, which is, I need that body of evidence, or, I need that material, I would've -- I would've required it in writing outside of other -- excuse me.  Other actions from, you know, higher entities.

Q    Did Steve Davis or someone else agree to put

Page 139

the body of evidence and recommendation in writing?

A    I think that's where I alluded to it earlier where I think he kind of nudged Jeremy in front of the bus with respect to, Jeremy's supposed to put that together, or, Jeremy has that.  He's supposed to give it to him.  And it was a little leaning down the table of, Right.  We've got this.  And I think Jeremy was flat-footed.  And, again, this is my interpretation of what I watched with the conversation.  And I think my comment back to that group was, Great.  Let's see that.

Q    Did you see it?

A    No.  Not before I left.

Q    Why do you think that nobody gave you that evidence and recommendation in writing?

MR. WEN:  Objection.  Argumentative, and calls for speculation.

BY MS. RUBIN:

Q    What was your impression of why this was not put in writing?

A    I'm going to answer with two answers.

Q    Always good.

A    My initial is because you don't have it, right?  Jeremy, you don't have what your boss -- Steve is his boss or whatever.  Your person is telling you to do -- like, that -- that's not available.

Page 140

The other part is the -- the bureaucrat in me, which is because it's just been three days, and that's a lot to.  Terminate 50-some people, you know, starting on a Monday and have them -- like, that's a lot, right?

I'm mean, I've never seen anything, to include criminal terminations, happen that fast unless they get arrested.  And even then, my experience, they usually remain on the government dole for a while until they kind of fall off type of thing.

So -- so I think it was two reasons.  I think one was a, Yeah.  Because you don't have it.  That's, like, my personal -- like, what -- what I was seeing.  But then the other one is, But it's also because you guys might not have the ability to get it that quickly.

Which goes back to why I was -- I felt on pretty firm ground, because I didn't have blame of, You don't have it, or, You just didn't have enough time.  I was looking at it as we just need to have that, right?  It was an agnostic thing of, Let's just get it how we ever have to do it so then we can take action.

Does that answer the question?

Q    Yes.  Is it fair to say that it was abnormal to give verbal recommendation to initiate terminations for government workers verbally without a corresponding recommendation or evidence in writing?

Page 141

MR. WEN: Objection. Argumentative.

But you can answer.

THE WITNESS: In my career, in -- in uniform as a civilian, as a contractor, I've never been privy or involved in something where you could terminate an employee for cause without any paper trail or any -- I keep calling -- like, a body of evidence, right? I am not aware that is common practice anywhere in the U.S. government.

BY MS. RUBIN:

Q Do you have any sense that Steve Davis or Jeremy Lewin did not want documentation that they were the ones directing or recommending this action?

MR. WEN: Objection. Foundation.

But you can answer.

THE WITNESS: I can answer?

Okay. Say it again, because I have to listen to you and then I -- I'm not sure what I'm supposed to do, so.

BY MS. RUBIN:

Q Yeah, of course. I understand.

A Sorry about -- I'm -- I'm dragging this on myself.

Q No. Don't worry about it. From your impression, did you have any sense that Steve Davis or

Page 142

Jeremy Lewin did not want documentation that they were the ones making this recommendation?

A I can't speak to --

MR. WEN: I'm going to renew my objection, but -- and also add that calls for speculation.

But you can answer.

THE WITNESS: Yeah. So being somewhat speculative, right, on how I'm -- I'm -- the reasonable man, if you will, is if they were witting, which I think Jeremy as a lawyer knew yeah, they probably didn't want, right? It's easy if you give a verbal and then you can walk away and it's a -- it's a done deal, whatever that deal is, right?

I think both of those are smart people and successful people in their own rights. I don't know if they had the body of evidence whether they -- I can't tell you if they had it, if they would have given it to me. If the folder, you know, sitting here, had the information, would they sign their name? Probably, right?

But what I don't think is that they had enough to sign their name to, and they were asking me to do that on -- under my authority. And that was where the rub came in with that -- with that.

Page 143

Does that -- I don't know if I fully answered your question or not.

BY MS. RUBIN:

Q You did. What's the significance of putting one's name to the action? So you're saying, you know, whether it was Steve Davis, Jeremy Lewin, or -- or your name.

A Well, I think anytime you have a --

MR. WEN: Sorry.

Just -- objection. Calls for a legal conclusion.

But you can answer.

THE WITNESS: Because I think if -- it's -- it's -- if you give someone a verbal, right? I mean, you guys are lawyers, right? You can -- you can argue, What did the word mean, right? But when it's in writing, now we can only argue what's written. And it's -- you could still argue the words and what's there, and it can be misrepresented or typos and things, but this is much more concrete that anybody can look at rather than a verbal, right? A conversation.

So in writing is always going to be the best bet for any kind of action, especially if it comes into the -- like, the legal world, right? In my opinion.

Page 144

Now that -- that said, I mean, as a military guy, I've executed multiple operations on verbals. It's just, Do you have time to have a written, right? But the verbals usually do nest up under something else that is written, right?

You have an intent, you have a purpose, and then it continues down from there. But like you know, a lowly private is not going to wait for the memo to come from a sergeant, right? To execute something. So I think you have to look at the different levels of where you are. From where I was sitting as the chief of staff of an organization, I wanted stuff in writing.

BY MS. RUBIN:

Q Did you have any concern for legal risk with putting your name on something?

A Yeah. Absolutely. Yes, 100 percent.

Q And why is that?

A Because --

MR. WEN: Objection. Calls for speculation, argumentative.

But you can answer.

THE WITNESS: Because my experience is that the litigious nature of a lot of government employees is such that you end up in a room like this, where I am now -- I'm the only person in this room

Page 145

that's not getting paid, right?

BY MS. RUBIN:

Q   Fair point.

A   So my -- my daily wage is $40. I am willing to bet no one at this table makes $40 a day, right? So, yeah. It's cautious optimism of people that you are leading so you don't end up squandering more government resources and time litigating things that could easily be shored up by following the processes to go through those. I don't think I'm telling you -- like, I don't think that -- that's not rocket science, right?

Q   No.

A   That's -- but that is my opinion. If I'm going to put my name to it, I -- I want to have a bit more -- a comfortable feeling that I am operating legally, ethically, and morally.

Q   Now you can tell me if I'm mischaracterizing this, but you testified earlier that it -- did you say rubbed you the wrong way? That it --

A   Yeah. I use all sorts of --

Q   You definitely said the word "rub."

A   Yeah. So it gets under your skin, whatever analogy you want to make. What was the specific thing?

Q   I was just going to ask, did -- how did you take that? Did it --

Page 146

A   What part, though? I don't know when I said it. Sorry.

Q   Okay. With respect to Steve Davis asking or recommending that you put your name on --

A   I don't think he ever asked me to put my name on it. He was implying I should take action, which would -- which would mean I would have to put my name on something, right? Or in that case, it would be Jason, right? Because I actually -- like, Joel sent this email, right? I'm not -- I'm on the email trail, like I'm listed here, but I didn't execute that.

But this going into Jason would have been like a meeting at the end of the day where he's like, Hey, Matt, are you tracking? Yes. Should we? Yeah. The lawyers have talked -- like, we can do this. You are not putting yourself as the administrator or the organization in harm's way based on that.

So, like, in that case, like, Jason can take something verbally. I don't know if I'm fishtailing around on --

Q   No, I understand.

A   -- on answering the question for you. But yes. When Steve said that, it rubbed the wrong way or is an irritant -- or is like, I don't work for you, right? So you have your opinion, you have something

Page 147

that your people have provided. You may have other people telling you, right? It could be the barista at Starbucks what you should or shouldn't do. It's not going to impact how I'm doing my mission or my support to, you know, Ken and -- and Jason and the organization.

Q   Was it your opinion that the -- Steve Davis implying that you take action or implying that you recommend to Jason Gray that he take action, was it your opinion that taking action at that time would, as you put it, put Jason as the acting administrator or the agency in harm's way?

MR. WEN: Objection. Argumentative, and calls for speculation, and foundation.

But you can answer.

MS. RUBIN: I can rephrase.

BY MS. RUBIN:

Q   You testified earlier that in general when you make a recommendation to Administrator Gray, if you were making the recommendation or affirming a recommendation, you had to feel certain that -- or you felt that there was no risk or little risk of Jason as administrator or the agency being put in harm's way.

A   "Mitigated risk" is the word I would use.

Q   Okay.

A   And, yes, -- and I think so.

Page 148

Q   And so the implication that you -- or acting on initiating these terminations with the evidence or lack thereof that you had --

A   Yeah.

Q   -- was it your opinion that signing off on that would put either Jason as administrator or the agency in harm's way?

MR. WEN: Objection. Calls for legal conclusion and calls for speculation.

But you can answer.

THE WITNESS: Yes.

BY MS. RUBIN:

Q   Why is that?

A   Because I think we would be back in a room with a bunch of lawyers talking about what happened and how did it happen, and then there's not -- there's a single email, right? So I would have advised not as a lawyer, but as a bureaucrat of we just need to have more staffing.

Q   How did you feel walking away from this meeting?

MR. WEN: Objection. Vague.

But you can answer if you -- if you know.

THE WITNESS: I think it goes back to my statement earlier, which is my head was probably a

Page 149

little bit reeling, which is like, crap, like, This is a lot. This is not what I expected. So I probably was walking out thinking, like, how did I not see this coming or how did I not even anticipate? I think I was a little flat-footed, so I was a little taken back.

I definitely felt okay in the sense -- like, I didn't feel at odds. I felt good in my conviction and good in my decision-making and good in my recommendation to the organization. So then -- so that probably led a little bit of frustration. So if I can give you a kind of a spectrum of emotion.

BY MS. RUBIN:

Q    Were there other instances during your time as Chief of Staff at USAID that left you feeling this way with respect to verbal instructions not being put in writing?

MR. WEN: Objection.

BY MS. RUBIN:

Q    Or were there other instances where someone affiliated with the DOGE team gave you verbal recommendation or instruction but did not provide that in writing?

A    I won't say instruction --

MR. WEN: Objection. Vague, and compound, and argumentative.

Page 150

But you can answer.

THE WITNESS: That's a lot.

BY MS. RUBIN:

Q    If you understand it, you can answer.

A    No. I never took it as instruction. So that -- like, that is a -- for me, I did not take it as instruction. But given positional authority, back to that Chief of Staff, you know, White House Chief of Staff, I knew that we would do our due diligence to execute anything that came out of the team that was being sent from -- from the White House, which is how I viewed this team, so.

Q    Were there other instances when --

A    Where there was verbals? Because I think -- Yeah.

Q    Where -- yes. Were there some that were verbals?

A    The contracts one -- the contracts one was one that pops to mind. And on that one, did we take and go ahead and execute off of that, off of verbals? Yes, we did. And I was comfortable with it because we went to our legal team and the contractors --

MR. WEN: Just making a protective objection based on attorney-client privilege.

MS. RUBIN: Sorry. Why? Can you just

Page 151

explain?

MR. WEN: Because he's talking about -- he's starting to allude to communications that he's having with lawyers.

THE WITNESS: It was our -- well, it was our internal -- it was basically a recommendation, Hey, there's a building out there, because I think I already mentioned it. I don't mean --

BY MS. RUBIN:

Q    Was there -- was there legal advice involved?

A    I'm sure I asked, like, Can we do this? Like, is that how the -- because the contracts officer would have said, like, Yeah, this is how it's written. Trust the COTR on that. And then trust the lawyer to make sure the COTR is actually doing the right thing. You know, trust but verify type of thing.

MR. WEN: So --

THE WITNESS: So that -- in that --

MS. RUBIN: We can move on from that. It's okay.

MR. WEN: But just to cut through it, if -- you know, you can say something like legal signed off, but if there's any kind of discussion with the lawyers, the substance of that, just don't.

BY MS. RUBIN:

Page 152

Q    But only if it's involving legal advice, not just if a lawyer's --

A    Yeah. So legal -- legal signed off. Like, in that verbal thing, legal --

MR. WEN: (Indiscernible - simultaneous speech.)

MS. RUBIN: That's fine, yeah.

THE WITNESS: How and why like the contract and line number, the COTR -- as where I was in the organization. Sorry. I don't -- sorry. I'm on the record twice for swearing.

BY MS. RUBIN:

Q    Not at all.

A    I don't -- I don't -- I didn't care, right? I just needed to have that. So that's an instance where a verbal came in where I thought the threshold was low, right? I have a person looking at it legally saying, We think this is solid, right? This is not a bad decision. And the contract officer saying, It's legal, or, you know, It's -- it's bound by how we do contracts. That was enough for me to be like, Okay.

And then I -- I talked to my leadership team, which would have included Jason and Ken and Joel. Hey, they're recommending shutting down, you know, building 1, 2, 3. Are we okay with that? And the

Page 153

answer was like, Yeah. Low-hanging fruit, right? Because it goes back to that 10 -- that -- you know, the bell curve I spoke about earlier, which is we knew there was going to be low-hanging fruit. And so in this case, Tarak had kind of teed up, Hey, here's some low-hanging fruit. Like, you can get, like, a win, right, if you will, of making action and moving forward.

And so that one verbal -- and I'm sure the contracts -- like, they had to write stuff, and I know things went across my desk that the contracts of how they were going to put it in legal terms and write it and formulate, you got to notify the contractors. And all that stuff happened, and that was all documented. But for my vantage to go to Jason -- using you as Jason -- I felt comfortable. Jason, I have talked to your people who should be in the room, and we advise you this is okay. And --

BY MS. RUBIN:

Q   Were there other instances where you were given verbal recommendation or advice where you did not feel comfortable acting on the verbal?

A   Yeah. I think the terminating, you know, however that was characterized in conversations of what, you know, what movement has been done, where are we going with that?

Page 154

I definitely didn't feel comfortable on the DEI, right? The wholesale termination of the DEI shop, just because I didn't know that was even doable. But it's very similar to how that came in. Now there was some written guidance from OPM on, you know, reducing -- I'd have to pull, you know, those correspondences.

So there was some written government-ese in there. But from my perspective, I brought in the people that I needed to, you know, feel -- which was the team, the legal team -- saying, Can I sign off in this? And the answer was, Yes. Right?

So there was multiple things in those -- that -- that week or the two weeks, really, that put me outside of my comfort level. But with the one with respect to the 58 or whatever, like, that was -- that had not got resolved, right? And so I did not take any action on that outside of being witting and participating in the initial, We can put these people on admin leave.

Q   Outside of that example, was there another -- or can you recall another example where you were similarly not comfortable acting on the verbal recommendation?

A   How do you answer, I don't remember, but if you tell me something, I might, type of thing? Those

Page 155

kind of ring a bell to -- or those -- those that come to mind. I don't -- I don't recall any other ones.

Q   Okay. Did you have any other meetings involving Steve Davis or Jeremy Lewin that day, Thursday, January 30th?

A   Not with Steve. I think Steve left shortly after the meeting. Later that evening there was -- there were Jeremy, the director, the administrator, and Ken were in Jason's office. I was in my office, and Jason's EA, Brendan (phonetic) was his name, came in and said, Hey, are you coming to this meeting? And I said, What meeting? I think it was -- it was late at night, 6:00 or whatever it was. 6:30.

Anyways, I went in their meeting and had asked, like, Hey, what's going on? And I think it was Jason that said, Jeremy is recommending that we put all of USAID on administrative leave.

And then I said, Well, -- my response was, again, flat-footed. Never had witnessed something like that. And then was trying to process the words that were said. I think I probably said something -- I probably had some colorful language inquiring what that actually meant. And then the conversation ended with that not happening. Prior to that, I had said specifically to Ken and Jason, As your Chief Of Staff, I

Page 156

cannot advise you to do that right now. I don't know if that is the right course of action for us, but it does not one that I can recommend based on what I know to date.

Somewhere in there, Jeremy took a phone call, and he came back and said, Hey, nothing's going to happen. We're going to, you know, stop everything. Like, we're just going to come back tomorrow morning type of thing. And that was -- that was the other meeting. Steve was not involved in there.

Q   Okay. So just to backtrack a little bit, you said this was Jeremy Lewin, Jason Gray, Ken Jackson, someone named Brendan, did you say?

A   Brendan was Jason's EA --

Q   EA.

A   -- and I do not think he was in that -- executive assistant. His -- you know, his person that does the scheduling and stuff. I do not believe Brendan came into the room with us.

Q   Okay. So just you, Ken Jackson, Jason Gray, and Jeremy Lewin?

A   Jeremy -- yes. That is what I recall.

Q   And did you say you were not involved at the beginning of that meeting?

A   Yeah. Brendan ended up grabbing me and

Page 157

saying, Hey, are you coming to -- are you coming to this?  Or you need to -- you need to come to this, or whatever it was.  I don't remember what he said.  I just remember crossing the office and going into the meeting.

Q   And by the time you came into the meeting, Jason Gray told you that Jeremy Lewin had told him to put the entire agency on administrative leave?

A   Had made the recommendation.

Q   Had made the recommendation?

A   Had made the -- had made the recommendation, yes.  I think that's -- I believe that's pretty darn close to what Jason said was, I'm being recommended to blank.  Because the -- my response -- and, again, there might have been some other words because I don't have a transcript, but I do know that I specifically looked at him and I said, Well, I do not make that recommendation.

Q   And so when that recommendation was made, you were not in the room?

A   Correct.  I did not -- I was not privy to the first part of the meeting.

Q   You don't know the exact words Jeremy Lewin used?

A   I have no -- no idea what he said.  I don't know how the meeting started.  When I walked in, I know that Jason said -- because I had inquired, What are we

Page 158

doing here?  Because I was -- I was probably a little miffed that I was not involved in any meeting that involves -- with the administrator as the Chief Of Staff.  You know, the Chief of Staff and the administrator get to pick and choose who goes to the administrator's meetings.

And so I was miffed at the fact that there was a meeting happening that I was not involved, and then I was definitely like, Oh.  That's -- this is a big deal.  The fact that it's just three people in a room talking about that, and that just put my comfort level not high, low.  And that's why -- that's what drove me to say to Jason, like, This needs to, like, pause, breathe, whatever words I used in there.

Q   Why do you think you weren't initially involved in this meeting?

MR. WEN:  Objection.  Calls for speculation.

But you can answer if you know.

THE WITNESS:  Oh.  Because I think I was a pain in the ass, and Jeremy knew exactly what I was going to say.

BY MS. RUBIN:

Q   And by "pain in the ass," what do you mean by that?

Page 159

A   Because I was not going to advise Jason to do anything that was going to put the organization in jeopardy.  And I don't think that there was body of evidence or enough clout behind what was coming in to advise that.

And I think that that was -- I don't think it was very well known.  I -- I think that was known from probably the first meeting on the 27th.  If not, I might have even mentioned stuff on the 25th or 26th when I had the Zoom call.  And so my -- my take is I was purposely not invited to the meeting.

Q   Do you know -- do you know if anybody gave Jeremy Lewin that recommendation to pass along to Jason Gray?

MR. WEN:  Objection.  Calls for speculation.

THE WITNESS:  Yeah.  And I don't -- I -- I -- I don't -- I don't -- I think Jeremy referred it to, like, the amorphous White House, right?  And, again, it's just two weeks into a brand-new administration.  So a lot of stuff is happening.  Like, that unto itself is not -- like, saying -- saying something like, The White House wants, no problem.  Got it.

Now we're going to start moving forward to execute.  But then that's when you then do paper.

Page 160

Like, you don't just execute.  You still have to do your due diligence and go through things to make sure -- repeat your question again.

BY MS. RUBIN:

Q   Do you know whether --

A   Who -- if anyone else provided --

Q   -- anybody else, I guess, asked Jeremy Lewin - - told Jeremy Lewin to relay that information?

A   Jeremy definitely painted a picture -- a picture that it wasn't Jeremy.  That it was, you know, the -- the "they."

Now do I know who "they" is?  No, I do not.  I think given the events, the run-up, it was coming from the White House or the team.  But that's my assessment of the week and what happened.  But Jeremy was not -- Jeremy was not putting anything forward like, I believe, blank.  It was, you know, We need to -- it was -- so it was more of group speak.

Q   It was your impression that this recommendation was coming, let's say, through Jeremy Lewin rather than from --

A   Yes.

Q   Jeremy Lewin?

A   Yes.

Q   But you don't know who specifically --

Page 161

A    I don't --

Q    -- he was relaying that information on behalf of?

A    If Jeremy relayed it -- I recall it being more of just the White House, whether it was specifically, like, the Vice President's office or not. That might be me filling in details after, because the following Friday, a team came from the Vice President's office. So I don't know specifically. But I know that my impression was Jeremy was a conduit.

Q    But you don't know for who?

A    No, I do not.

Q    Do you know if Elon Musk was involved?

A    I don't.

Q    And your reaction was that you did not advise Jason Gray to take Jeremy Lewin's or the recommendation that came from Jeremy Lewin?

A    Correct.

Q    Did anyone speak to what the consequences of putting the entire agency on administrative leave would be?

MR. WEN: Objection. Calls for speculation, and argumentative.

BY MS. RUBIN:

Q    Did anybody say in that meeting --

Page 162

A    Jason did.

Q    Okay.

A    Jason was -- my opinion of his body, and I only knew the guy for 10 days. I think he was, like, exasperated, like, with his body language and how he was talking. He made a couple comments. Again, I don't know all of AID, but he started naming off programs which, again, have -- now I am more familiar, even though I left the organization, just because they -- those programs have been in the news, and my curiosity of finding out when something's mentioned in the news to look at it.

But there's programs like AIDS intervention, some of the programs with, like, the -- the cattle, the screwworm, stuff that you have that's coming now through USAID, executed the contracts for USDA. I don't know if he actually said that one. But there was -- he made a comment about like, food on wharfs, like, you know, food not making it to its destination and, like, rotting on the pier.

And I think when he made some comment about that, I think my answer -- then I jumped on and I said something to Jeremy. I'm like, This isn't -- this cannot be what we -- we want to do. Like, there has to be another way, or something along those lines.

Page 163

And that was what Jason was essentially throwing out is, There's a lot at stake. At the time, we were doing -- we were involved in the stuff with the peace negotiations in Lebanon, and so big-ticket items for the administration that, in my opinion, just really put the administration at risk.

I did not -- I was concerned that there was drive by a nascent group of people to do that could have cascading poor implications for the U.S. government, to include -- to include the White House.

And that goes back to -- and I know I'm meandering, I apologize. But it goes back to just, like, the President wants it. Okay. Like, that's okay. President wants it, we're doing it, right? It's not illegal, so we're going to do it.

But does the President -- because -- because he's the one that's going to get called, you know, to the newsroom or -- right? It's -- it's his administration.

So, like, who -- who is doing it? Like, who is fully witting at what point in time? And I just didn't have that in -- you know, that for -- for me to confirm to Jason to -- to execute. I don't know if that answers your question or just begs a whole bunch of other questions, but.

Page 164

Q    You mentioned a nascent group of people.

A    Just all your politicals, right? Your administration just turned over. So everybody is eager to kind of move forward and take over new jobs. And obviously, the -- the Efficiency team or the DOGE team would have been all new to government, right? And as the week was progressing, it was very clear, week two of the administration, this -- and now DOGE is here.

It's like, Oh. This is -- this is our -- like, that -- we're the test case for what -- if -- my words, not anybody else's -- like, Oh. We're the test case for how can you utilize this new body that the President has emboldened to execute change throughout the government and recommend -- you know, make recommendations, as it says in the executive order, to the administrators and the department heads to move forward. That -- that's the body I was referring to.

So I -- I would loop in all your politicals, I would loop in any of your seniors that are trying to jockey in position in their organizations to get close to new politicals, right? Because that's a whole whirlwind of activity. And then the DOGE team, which was their own whirlwind of activity.

So all of that is just, you know, more chaos upon chaos and moving parts --

Page 165

Q   How --

A   -- in my opinion.

Q   Sorry.  How did Jeremy Lewin or anyone else in the meeting respond to your and Jason Gray's comments about the consequences of shutting down the agency?

A   I will -- I -- I can only answer how I think that he -- I guess I can.  I -- I think he was hearing Jason's objections.  I think Jeremy was -- I think he was more concerned with the pushback that I had been giving him through the week and that I definitely gave in that meeting.  But that's completely my opinion.

He -- he was definitely -- it was definitely not -- which is why I also, in my opinion, why I wasn't first invited to the meeting, was I think Jeremy knew that it would be harder to move me off dead center because we -- we had those conversations throughout the week of doing things, and -- and I kept going back to, No problem.  We'll do it all once we put it in the proper channel.

So I think Jeremy knew -- Jeremy's not an idiot.  I just think that he knew that I would be a -- a pretty tough sell on that.  But, again, that's my -- you know, my opinion.

Q   When -- so I understand you weren't in the room when Jeremy Lewin gave a recommendation.  When you

Page 166

heard that there was a recommendation made to put the entire agency on leave, did you understand that to mean functionally shutting down USAID?

MR. WEN:  Objection.  Argumentative, and vague.

THE WITNESS:  Yeah.  I -- I mean, by definition, if no one goes to work, then you are stopping mission.  So I did 100 percent think that whether that was the intent, translating that to my position, doing so would have been effectively shuttering -- shutting down operations that are -- were happening real-time.  It's a global mission.

And that was where the risk really came in for -- because you're shutting down things that I don't even know about, and I don't know how that would then reflect back upon the administration.  Again, if it's a calculated decision, no problem, right?  But -- but I -- we didn't have -- I didn't have that.

BY MS. RUBIN:

Q   This didn't come off to you as a calculated decision?

MR. WEN:  Objection.  Argumentative.

THE WITNESS:  I could not make a calculated decision based on what I had.  And -- and I'm not -- I'm not naive enough to think that there was

Page 167

obviously lots of conversations that happened, and I wasn't -- chief of staff of AID is not the most important job in the world.  I just did not have that information.

BY MS. RUBIN:

Q   And you mentioned -- again, you've said a few times risk to the U.S. government.

Can you explain what you mean by risk?

A   All right.  Sure.  Like whether it's political fallout, whether it's -- which would be risk to the administration, like making bad, you know, making decisions that are deemed in -- in hindsight and, you know, historically as poor, tarnishing an administration.  You can also take risk as in life and limb.  You can talk risk as in international relationships, and you can talk treaties, you can talk -- like all those things are potentially impacted.

None of those things might be impacted, right?  If it's a risk that goes to the administration and the administration says, I don't care.  I'm willing to stand up in front of the newsroom and -- and state -- that's exactly what we did, that's okay.

But just make sure it's a -- like, it's a mitigated -- you're mitigating your risk through a proper decision-making process.  And so I don't -- I

Page 168

don't know if there was a arbitrated process prior to that meeting.  I had not been privy to it and had not witnessed it.

Q   You had concern about risk relating to, you said, political fallout?

A   Mm-hmm.

Q   You had concern with -- and this is again all going to the idea of putting the entire agency on leave.  You said you had concern of risk relating to -- did you say bodily harm?

A   No.  Like, human life, right?

Q   Did you have that concern as to this?

A   Sure.  Because the programs that they were doing were helping support medical clinics and food clinics and stuff like that globally.  And, again, I don't even know the different aspects at that point in time where AID's most critical, right?

On the bell curve, what's that 10 percent that everyone agrees you should not touch?  If you're wholesale -- you know, putting an entire organization on leave, something is going to be swept up in there that's -- and I won't go into an unclassified forum, but there are potential pitfalls that you could walk into.  You don't know that they're there, and you don't know because that's the purpose of the way the bureaucracy is

Page 169

set up. So we just need to make sure other people are fully involved in having these conversations.

And we did have some of -- some conversations earlier in the week to tease out -- not specific to that decision, but just in general, where other government interests lie within AID's mission.

Q   Did you ask for this recommendation -- did you or Jason Gray ask for this recommendation to be put in writing?

MR. WEN:  Objection.  Vague.

THE WITNESS:  I don't know what Jason asked for.  Did I specifically say I needed it in writing?  I don't know.  Did I ask for more than what, like, Jeremy -- or Jeremy's comments?  I'm positive I did.

BY MS. RUBIN:

Q   What more did you ask for?

A   That I don't know.  Like, I -- I probably -- and it -- because it was probably big hand, little map of, like, I -- we can't -- like, we need to know where this is coming from.  The vagueness of, It's the White House, you know, or whatever the words were, it's like, You need to have more -- a more senior discussion and dialogue that all the stakeholders are fully witting of the decision that we're about to make.

Page 170

And I did not know at that point in time whether that conversation -- so the speed bump I was throwing out was to make sure that was -- that that would end up happening.  And that goes back to the risk mitigation from an organization and a USG perspective.

Q   So not necessarily what you specifically said or asked for, but, you know, standing in your shoes in that moment --

A   Yeah.  We need more.  We can't --

Q   -- what did you want to see?

A   We -- we -- more --

Q   Ideally, what would you have wanted?

A   More information, more paperwork, more authority.  Who's this coming from, right?  The -- like, It's coming from the Vice President.  Okay.  Right?  Now we know from a political fallout perspective, the White House -- the White House, right?  The two guys in charge are fully witting and on board, right, not a person who is just conveying some sort of message.

So I don't know.  Would it have been, you know, a, I want this and this and this?  I think it was more of, like, We need a lot more to execute that.  I don't know if I called it out, I need it in writing, I need an executive memo, I need, et cetera, et cetera, et cetera.

Page 171

Q   Just to clarify, you did not know who this came from --

A   No.

Q   -- correct?  I just wanted to clarify in terms of coming from the Vice President was just an example of something --

A   Correct.

Q   Okay.

A   Yeah.  I don't know -- I mean, I don't remember exactly what Jeremy said.  In my mind, regardless of the words -- and this might be speculative because I don't know what Jeremy said, you'd have to talk to Jeremy -- it was like, This is White House driven.

The concern I had is where in the White House, right?  Is it a -- a low-level staffer who is trying to interpret the direction of their boss?  Doesn't matter who the boss is.  Pick any of the seniors at the White House.  Or is this the seniors themselves?  Like, that was the -- like, that's the rub.  And I'm getting it from another party without any insight into that.  And so I'm certain I balked at that entirety of all of that.

Q   And so, again, in that moment, you could not -- is it fair to say you could not confirm who from the White House, if anybody, was giving that instruction?

Page 172

Or was giving -- sorry.

A   Correct.  Outside of what Jeremy had relayed --

Q   Yes.

A   -- I did not have anything more -- to my recollection, I didn't have anything else.

Q   Did Jeremy Lewin give any reason why Jason Gray should shut down the agency?

MR. WEN:  Objection.  Argumentative.

THE WITNESS:  Yeah, I don't know.  I -- yeah, I don't know.

BY MS. RUBIN:

Q   In terms of your concerns about needing more, did you have any concerns beyond who specifically wanted this?  In other words, even if -- hypothetical, if you were told the President did want this specifically, and you had the evidence in front of you that you needed, that he is the one that said it, did you -- would you have had any concerns about putting this into action?

A   I didn't have --

MR. WEN:  Objection.  This calls for hypothetical, speculative.

THE WITNESS:  I was just going to -- I'm not trying to pick a side on how to answer these questions.

Page 173

BY MS. RUBIN:

Q   I understand.

A   But I don't know, right?  Like, if I had -- if I had Susie Wiles, right, the White House Chief of Staff, call me and say, Matt, you're the Chief of Staff, AID.  Yes, ma'am, I am.  I just walked out of the Oval Office.  The President wants you to shut down AID.  I would probably be like, Oh.  Crap.

What would I have done?  I don't know.  I probably would call her back just to make sure it was her that was calling me and, like, get the White House switchboard and have them patch them in, and I'd be like, All right.  Because it's not just, you know, Brenda (phonetic) from the bakery down the road or something who has a beef with AID.

So I probably -- like, I don't know.  I don't know what that warm fuzzy would have been.  Susie Wiles calling me would put me way further down the line of, Execute, Jason.  I think you need to put this organization on leave, right?  Like, it's coming from the White House.  We're an executive branch mission.

I think that would have been a very hard thing to not execute off of.  But that didn't happen, right?  So I don't know.  Like, what level of -- would it be any -- would it have been last line in the executive order

Page 174

of, you know, -- because I think there's some orders on AID and refocusing USAID overseas, like Emmett (phonetic) said, And we will abolish USAID.  That probably would have been like, All right.  We're -- because that's our direction, right?

But that executive order which dealt with USAID didn't have that, right?  It was -- it was broader in terms, and I suspect it was -- if that was the intent, it was probably watered down through the executive order drafting.  Again, that's speculative on my part, right?  Having been involved in this stuff.  But I wasn't involved in that intent, and so I -- I didn't have it.

So that is a very long-winded -- I don't know.  I don't know how I would have behaved given all sorts of things that could have been given to me.  But at the time, I definitely did not have them.

Q   I think you alluded to this, but based on your -- was it 30 years working in government?

A   Yeah.

Q   Had you ever witnessed any person direct that an agency be shut down in this manner?

MR. WEN:  Objection.  Argumentative.

BY MS. RUBIN:

Q   Let me rephrase.

Page 175

A   But I can answer?  Oh.

MR. WEN:  Yeah, you can answer.

THE WITNESS:  We're going to -- well, hold on --

BY MS. RUBIN:

Q   If you understood, please go ahead.

A   I'm just waiting to get -- if sometimes you rephrase and go back again, so you guys decide.

Q   No, I'm all set.  You got it.

A   No.  I don't think I've ever seen anything like that.  I've never been privy or part of.  I've seen organizations shuttered internally.  I -- you know, I know that, like, NGA, the National Geospatial Agency, when it was formed, it consumed and sucked up a lot of other smaller entities to make whole.

So I've seen the repurposing.  It goes back to the first part of this deposition when -- when I spoke to the White House of, maybe you end up with a fraction of what AID is, or maybe you end up with no AID, maybe you end up with double the AID, right?  Because those other organizations, AFRICOM, shouldn't have that mission in Africa.  It needs to go to AID.  We're better positioned.  I didn't have any of that data.

Q   When you had those conversations, did you have in mind that that would take longer than, say, a week?

Page 176

MR. WEN:  Objection.  Calls for speculation, and argumentative.

But you can answer.

THE WITNESS:  Yeah.  So for me to lead an organization through organizational change that large would be a year-plus program, unless there was the resources provided.  And resources might be AID efficiency or a DOGE team, resources might be more money, resources might be exceptions to rules of how to do whatever it is, right?

It's changing the rule set.  Based on how I know the government works and how I've worked in the government, a year would have been a Herculean effort.  Anything less is even more Herculean.  I don't know what that becomes.  Zeus-like?  I mean, --

BY MS. RUBIN:

Q   By this -- by the time you're having this meeting or during this meeting, did Jeremy Lewin or anybody else show you evidence as to -- evidence that would justify terminating the 58 individuals placed on administrative leave on January 27th?

A   Not to my recollection.

Q   Did Jeremy Lewin or anybody else show you evidence to justify putting the entire United States International Development Agency on administrative

Page 177

leave?

A   No.

Q   And just to clarify, did you -- is it fair to say that you had concerns about the legality of shutting down the agency at Jeremy Lewin's verbal recommendation?

A   I think it's --

MR. WEN: Objection. Argumentative.

THE WITNESS: Can I answer that?

MR. WEN: Yeah.

THE WITNESS: I think it's more -- I don't know if it was based on the legality, because administrative leave's pretty broad, right? It's a tool. It's one of the great tools you can use in U.S. government for investigative purposes -- not investigation as in a crime, but, you know, to inquire. I just never saw it used wholesale across an organization. And AID was involved in a lot of missions that could impact people.

There was definitely -- I think in the meeting I said to Jeremy or to the group, I'm like, the White House does not want week two of its administration to talk about the food that's rotting on a dock, right, in pick-a-place, it doesn't matter. That was my assumption of the administration and how administrations generally in the first part of their -- any of their

Page 178

term, they don't want to bring on pain without purpose, right? If it's purposeful pain, then that's their decision to make. I did not have enough of that purpose based on what Jeremy was providing.

BY MS. RUBIN:

Q   You said at some point during this meeting that Jeremy Lewin stepped out to take a phone call; is that correct?

A   He did. He took a phone call.

Q   About how long was he gone?

A   A couple minutes. Three minutes, four minutes. It wasn't very long.

Q   Did you have any discussion with anyone else in the room while he was gone?

A   It was with Ken and Jason. I'm sure we were like, you know, What -- what the heck? Like, Are we -- like, Is this about -- is this really being proposed?

And so it was probably more of flabbergasted, surprise, shock. I know that I can speak for myself. I -- I -- I think I was -- kept repeating, like, I don't think this is a good idea. I don't think this is a good idea.

So I definitely was way outside of my comfort level based on what I knew. And my -- as I saw, job was to advise Ken, because Ken would be the first political

Page 179

to get removed if the White House disagreed with our actions, and Jason as the acting would certainly be removed. And -- yeah. So that was --

Q   Did you get the impression that Ken Jackson knew prior to this meeting that Jeremy Lewin was going to recommend putting the entire agency on administrative leave or?

A   I don't know.

MR. WEN: Objection. Calls for speculation.

THE WITNESS: Yeah. I don't -- I don't -- I don't know.

BY MS. RUBIN:

Q   Was this the first time you had heard that there would be a recommendation to put everyone on administrative leave --

A   If there had been --

Q   -- on January 30th?

A   Still answer the same way. It doesn't matter the date. If someone had mentioned that, I probably would have -- I -- it might not have even registered because in my opinion it -- it was so bombastic of a move, right? Or with where we were and what we had to date I just -- I just didn't see -- it's like saying, Hey, we're going to go have lunch on Mars.

Page 180

Okay. Well, probably not, right? Like, you're not going to end up in Mars. And -- but -- so it -- it was the first time that I -- if -- if I had heard it before, I didn't take it seriously. Went in -- went in one ear and out the other. I definitely heard it and it was serious on the 30th.

Q   You said you felt shocked, flabbergasted?

A   Yeah. That it was being proposed.

Q   And was it your perception that Jason Gray, from your perception, also felt that sort of shock?

A   Yes, yes.

Q   And was it your perception that Ken Jackson also felt the same sort of shock?

A   I think Ken -- I think Jason and I were more vocal. I knew what I was thinking. I know what Jason said. I think Ken was optimistically cautious, which goes back to the speculative comment that you -- the question. I don't think Ken was involved. Like, if he had a pre-meeting before that meeting. My opinion is no.

I think he was probably also looking at it as a very senior political and a brand-new administration saying, If we're going to do this, like, what does this mean? I think he was probably working through that. But that's completely speculative in my opinion of

Page 181

knowing Ken for only 10 days as well.

Q   Again, from your perception, was it your impression that Ken Jackson was or was not read into what Lewin was going to say during this meeting?

A   I don't know.

MR. WEN:  Objection.  Calls for speculation.

THE WITNESS:  I don't know.  My -- my opinion -- because I do know my opinion sitting here.  I don't know for a fact.  I have no -- my opinion is based on the totality of everything I witnessed and -- and watched and stuff.

I would suspect that Ken was not -- was not fully witting.  Whether Ken speculated or has his opinion, we did not have conversations about.  But I can't tell you one way or the other.

BY MS. RUBIN:

Q   So Lewin -- Jeremy Lewin left to take a phone call.  He came back?

A   Mm-hmm.

Q   And what did he say when he came back?  Sorry.  Did he say who he was on the phone with?

A   I -- not the person.  I do not recall a person.  I don't know the words he used.  So I'll state that my opinion was it was coming from, you know, the --

Page 182

the White House, but I don't -- I don't know who, or by any -- I don't even know who he was on the phone with, right?  I don't even know if he took a phone call.  I mean, it's just -- I know he picked up his cell phone and said, I'll be right back.  I have to take this, and he walked out and walked back in.  So I -- I don't know.

Q   And what did he say when he came back?

A   The meeting was essentially -- he said, Hey, we're going to adjourn.  We're going to wait.  You know, whatever words.  I -- I remember feeling like a sense of relief that we weren't going to pitch this battle at 7:00 on a Thursday night or whatever it was.

So his exact words I don't know, but it was more or less of -- the gist was, We're going to -- you know, we're going to stop right now.  Let's come back at this later.

Q   And you said this ended around 7:00?

A   I want to remember my wife was pretty upset that I was home much later than I told her.  So I think it was about 7:30 by the time I got home.  So, yeah.  The meeting would have been about 6:30, 7:00, I think.

Q   And did you -- so you -- did you leave, like, work for the day after that meeting?

A   Yeah.  Maybe it was -- maybe it was closer to 6:00, 6:30.  Yes.  After that meeting, whatever odds and

Page 183

ends and stuff like that, I then departed the building.

Q   How did you feel about the way things were left after this meeting?  Or, you know, what were you thinking would come of this conversation?  Kind of your impression walking out.

MR. WEN:  Objection.  I think this was answered.

But she'll follow.

THE WITNESS:  Yeah.  I was surprised, right?  All those words.  Surprised, shocked, you know concerned for my -- like, How -- how are we going to do this?  Like, What are we going to do?

So there was a lot of unknown unknowns, which are the most -- you know, the dangerous -- the dangerous things when you're trying to lead.  The positive side of my brain was like, we just stopped a decision or a recommendation from happening that I did not think at the time was the right decision to make.

And so I remember being pretty happy with the fact that I was the person that was in a room -- in a position of authority to have an objection that then stopped things from moving forward.

BY MS. RUBIN:

Q   And you said --

A   With respect to putting everyone on leave,

Page 184

right?  So -- so part of me was the confused, the flat-footed person, and then the other part was like, Well, I'm glad I took this appointment because my, you know, 30 years of experience just came to advise the acting administrator and protect the White House, because that was what I -- you know, so that was what I thought I -- I had done.

And so I walked out and I walked home.  And my wife was not happy with me being late.  And -- but I more or less said, like, This is worth it for the U.S. Like, this is why we serve and we work, is to -- is to really come up with the right solutions for the, you know, for the U.S. government and the country.  So this was a proud part.  Yeah.

Q   And you said that was the proud, positive side.  So you were -- are you saying you were proud of the role you played in what you perceived to be --

A   Yeah.  I was personally happy with me, like, holding fast in which could have been or could -- like, if we were going to proceed with this, because I didn't know what was going to happen the next day, it could end up with my removal from my position, which that was -- which was okay.

Q   That was a risk you were willing to take?

A   Oh.  Yeah, yeah, yeah.  Yeah.  That wasn't --

Page 185

that wasn't an issue. Yeah. No. That wasn't an issue.

Q   Stepping back for a moment, when you said that Jeremy Lewin talked to what you understood to be vaguely, you know, the White House, was it your understanding then that this could potentially include Elon Musk in that definition of the White House?

A   I can't --

MR. WEN: Objection. Speculation.

THE WITNESS: Yeah. And I can't state that.

BY MS. RUBIN:

Q   And sitting here today?

A   I can give you --

MR. WEN: Same objection.

THE WITNESS: Yeah. I can't give you any official position or anything that I had outside of any person walking down the street.

BY MS. RUBIN:

Q   Just your opinion or understanding.

A   At the time or today?

MR. WEN: Objection.

BY MS. RUBIN:

Q   Both. So first at the time.

A   I don't think I gave it -- I don't think I gave any thought to that because ultimately --

Page 186

ultimately, in my opinion, even if Musk was recommending that, the President or the Vice President would be witting.

Again, I don't know the relationships that they have, right? But I know that Musk was part of the administration special advisor team. So it wouldn't have mattered to me. I just need to know where that was coming from and that those -- the Vice President, the President, the Chief Of Staff, whoever in there -- was okay with it.

Does that make sense?

Q   Yeah.

A   Like, even if it was Musk himself as a special advisor on TV with the President, all that stuff, I -- that would have been a very -- I don't know whether I would have executed if he was standing in the room. I think I would have needed something more from the administration to make sure that the administration was fully -- it was an administration's decision, not an advisor's decision. In hindsight, what do I have an opinion on? I'm sure. I mean, Musk runs a very tight organization and he has a style of leadership and how he does things.

My opinion is that he -- his underlings would not execute without him being aware. Whether or not how

Page 187

aware and what decisions and guidance, I have no idea. But I think sitting here today, watching a year and a half play out, yeah, I'm willing to bet that there was at least some witting-ness to what was going on.

But, ultimately, what I needed was the -- the -- you know, I call them "blue badge" if you're in the intel community. I needed the government person, right? The -- the legal assigned person to a government seat.

Q   You said if Elon Musk was standing in the room and made the recommendation himself, you still would have wanted confirmation.

A   I don't know.

MR. WEN: Objection. Calls for a hypothetical, and --

THE WITNESS: It is hypothetical. And I'll go back to my hypothetical -- hypothetical answer, which is, I don't know. But it would have been -- I didn't have it, so the decision was easy.

If Elon was there directing it, it would have made it a lot more hard. I, as a leader, probably would have turned to Joel and say, Make some phone calls, and I would have got confirmation that Elon was there on behalf of a legal order from the executive branch. Not saying Elon's doing anything illegal or anything -- I'm not -- any of that stuff.

Page 188

BY MS. RUBIN:

Q   So just would you ask for?

A   I -- I would probably -- because everything was so new, I probably would have asked for more. Or at least would have had Joel probably do some due diligence and digging around.

Joel was pretty politically connected. I'm not -- I was not politically connected. I didn't campaign. But Joel knew a lot of people, which is one why I love Joel, because I didn't know all these people in all these other positions.

Joel had worked on the campaign, he had worked in the think tanks with them, he had worked on the last -- so he had history with, you know, these hundreds of senior people, and I didn't. So I probably would have had Joel make some phone calls. I speculate that's what I would have done.

Q   And that is to say -- you know, so we had talked about your comfort levels about executing an action on, as you described it, Jeremy Lewin's verbal.

A   Yes.

Q   And so I am asking in terms of, would you feel discomfort acting on Elon Musk's verbal had he been the one making the recommendation personally?

MR. WEN: Again, calls for speculation.

Page 189

Calls for a hypothetical.

THE WITNESS: Yeah. I would have been --

BY MS. RUBIN:

Q   Just your comfort level.

A   Yeah. I -- I still would have been uncomfortable. I still would have been uncomfortable.

MS. RUBIN: Is now a good time -- should we break for lunch?

MR. WEN: Sure.

MR. ISSACHAROFF: Short lunch.

MS. RUBIN: Short lunch? Because I know we're on a -- yes. We can go off the record.

THE PROCEEDINGS OFFICER: Okay. Hearing no objection. I'll pause the record at 12:52 p.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER: Okay. We're back on the record at 1:32 p.m., Eastern Time.

Proceed.

MS. RUBIN: I'm going to introduce Plaintiffs' Exhibit 6.

(Exhibit 6 marked for identification.)

BY MS. RUBIN:

Q   So this is labeled -- and I realize I had not read the Bates stamps for the previous exhibits, but we

Page 190

will make sure that's provided. This is Bates stamp DOE4VUSDS_002557.

A   Get me a calendar. Can I just put this out just to -- to share with you?

Q   You can have my copy. I don't need it.

A   Yeah, that's fine.

Q   Okay. This is a document showing messages between you and Brian McGill; is that correct?

A   Correct.

Q   What platforms did you use to send these messages?

A   Whatever -- I don't know. It's from -- I don't know. I don't remember what they used there.

Q   That's fine. So that first message to you -- or that first message from you is January 30th at 7:10 p.m., GMT-5. And I'll represent to you that GMT-5 is Eastern Time.

So do you see that?

A   Yeah. I'm -- I'm confused that the header on top says, "Friday the 31st," but the text -- I know the text -- I know the text that I wrote. I know I met with Brian after sending the text. And the time frame 7:00 at night jibes with when I walked out of the meeting before -- before I departed the building. So I'm tracking that.

Page 191

Q   I understand.

A   You know what the first part is? Because I don't know what that is.

Q   I'm not sure, but I know that UTC is, like, a universal time, and if you subtract five, it's Eastern Time. So the timing lines up. I'm not sure why the date is incorrect on the sent line.

MR. WEN: I think it's because it's five hours, or it would in Greenwich Mean Time be --

MS. RUBIN: Oh. That's true.

MR. WEN: -- 12:00 a.m., 12:30 a.m. Friday.

MS. RUBIN: Because UTC-5.

THE WITNESS: And that's a log. Okay. Sure. That makes sense.

Oh. Yeah. So I'm familiar with the text then.

BY MS. RUBIN:

Q   Okay. So you sent -- you sent the message January 30th at 7:10 p.m.?

A   Yes.

Q   And the message just says, "Call me."

A   Mm-hmm.

Q   And Brian McGill responded January 30th at 7:13 p.m.; is that correct?

Page 192

A   Yes.

Q   And he responded, "I'm on my way up. Want phone. I can peel off."

Do you recall having these -- this back and forth with Mr. McGill --

A   Yes.

Q   -- with Brian? Why did you ask Brian McGill to call you?

A   Because I was getting ready to leave the office. The conversation that we ended up having was from a request that Luke, part of the assessment team, had made -- which was to gain access to the security software where all the clearances and things are held. I don't remember the name of the database.

But, generally, that's -- as an intel guy, I'm familiar enough with security databases and protocols and things to know that that is something that you generally don't screw with because it impacts careers.

There's -- there's a lot of information in there that could be used -- you know, it's a lot of personal information, it's history. Like, I've never been in the database before, that type of database, from what I understand it is. And Luke was pushing to get access into that.

The conversation started earlier in the day

Page 193

sometime because it was -- it was in my office because he said something about getting into the -- the database security, which I think it was Brian, maybe it was an underling in the office, or maybe it was two of them, made a comment about -- basically, they were saying, like, No, can't do it. And, of course, as you guys know, like, unless it's against the laws of physics, right, or the Constitution, usually you can do things in government.

So it's not a, I can't do it. It's a, Do you need to go through some steps? And so we had part of that conversation where the security guy's like, Can't. Luke's like, I can. And then Joel, my deputy, said, like, Hey, wait a minute. Like, what you're asking for is -- like, this is not a trivial thing. And this goes back to the sophomoric nature of some of the requests from the -- the team that came in.

As an intel professional, I would not walk in and say, I need to get on security system and have full access to it, because you just know, like, that's -- like, you don't -- we -- the system generally does not give that access. It's just not a normal thing.

That conversation was ongoing. We said, Well, hey, we need to document this for them -- for the record, or get a memo that, like, Jason would allow,

Page 194

because you're administrator, department head -- or secretary level, not department head level.

The -- the person in charge of the organization owns clearances and they own the process, because it's the organization giving that clearance. So, ultimately, it was a Jason Gray decision.

And so somewhere in that chattering, Joel was there. I don't remember who else was there. At least somebody from security there. And Luke was the one asking for it, was we'd have to put a letter together. And -- and I remember that detail because Joel had said it, and Luke made a pretty pithy comment back to the deputy chief of staff of the organization that he was currently standing in.

And so it struck me as not only a weird request, but his tone and demeanor was -- was not professional, in my opinion. Certainly not to a senior officer -- a senior political officer at that organization. The team marched off. I went about --

Q    What did he say?

A    Something -- it was something about the memo. It's like, Well, that shouldn't take very long. Just do that. And it was very curt. It was -- it was just very unrespectful. It wasn't -- it wasn't how you would speak to someone even as a peer. It's not how I would

Page 195

speak to a subordinate, right? And Joel was neither of them to this guy Luke.

Anyways I don't remember how that ended, but that group went off. And then somewhere in there, I ended up going into the other meeting, which is the one we just talked about, where Jeremy was in there. And I don't remember all the impetus. I just remember there was a driving force.

And, Brian, because the -- the chief of security had been put on admin leave earlier in the week, was the acting. And before I left that night, because people were still working after I knew I was going home, I brought him up and said to him -- which I was giving what I would say was sage advice, which is, Don't start the conversation -- like, first of all, we're going to support the team that's here.

Second of all, don't start a conversation off with, No, because if it's legal and it's coming from the White House, the answer's going to be, Yes. It might be unprecedented, but don't say no. But in the same breath, make sure you're getting it in writing and make sure you have the steps that you're not violating any rules -- internal rules or bigger security rules, DNI rules.

And there's another organization that holds

Page 196

certain clearances for AID. I don't know if the classification level -- that itself is not unclassified because that happens across the government where, you know, like, a small organization might not need to have a clearance for -- to have a security shop because there's only one or two people.

But maybe the head of -- you know, pick a small organization, might have to have clearance. Other organizations, State Department, DOD, et cetera, will hold their clearance on their behalf. And on certain clearances, our clearances were held.

So that means you got other organizations involved in -- at least my assumption or speculation, you have more equities than internal to our home alone. So make sure we're not screwing up others. And -- but don't start -- the conversation was, Don't start off with, No, because security and counterintelligence folks, as an intel guy, that's generally the position they'd rather go. It's kind of like lawyers, right? If you start with no, there's no action, there's really no harm.

And I'm not -- meant as a little bit of a joke, but it's true, right? If you take no action, you're probably safer than taking action. And so what I was telling Brian was, in this case, that's not a good

Page 197

enough answer. You need to do more due diligence. You need to seek through your security means, how can you satisfy this request and get it to the point where if you can't, it has to be more than -- because we've never done it before. It has to be tied and specifically and specifically embedded.

And I said, And then that's a decision that the administrator makes. It's not yours to make. You can say as your security advisor, No, but ultimately you're a security advisor for the -- and so that was the gist of the conversation, which I'm leaving, not sure what conversations are going to transpire, but make sure that you start off with, I want to work with you.

Whoever that "you" is for the team that was there, and to make sure that you're doing the due diligence. Don't take -- don't just do things based on verbals if you are not professionally comfortable with that.

Q   And why did you give him that advice?

A   I -- during the meeting, he was clearly shaken up. I've worked with security guys my whole career. I could tell this was -- like I mentioned before about me being in an uncomfortable zone, like security and counterintelligence guys, you push them outside of their normal bubble. They're really concerned with that

Page 198

stuff, right?

And so I just knew he was a good -- Brian's a good dude, and I just wanted to make sure, like, I am going to support the requests if we can get to yes. So, internally, your answer's not going to meet my muster until you have more to bring. But I also don't know if the answer's, yes.

So, like, I don't know. Like, this is your -- I got the request, I got your world. I'm going to combine these two, and my job will be at some point to bring this to Jason or -- or whatever. And Jason can, if I was -- if it happened after hours, he can make his own decision. He's a professional as well.

But I was letting Brian know that I support you, but I would not recommend starting off with, No. And I would try to get to, Yes, doing all the things that are legally, morally, and ethically, you know, allowed.

So that was -- that was what that conversation -- that is, in my opinion, was way too nuanced to put into a chat, right? Because it would just be misinterpreted and stuff like that. And it was more -- yeah. So that -- that was why.

So the impetus was I wanted to make sure that Brian knew that we were going to continue to support the

Page 199

interests of -- of this team or DOGE but we were also going to do it under what I had been stating, which is we're going to do it legally, morally, and ethically.

Q   You said you were shaken up after a meeting.

Was that -- that wasn't the meeting that you were describing before with Jeremy Lewin; is that correct?

A   Yeah. I think that meeting ended up finishing, and then I think this conversation then took place if -- timeline-wise.

Q   So the meeting --

A   But the meeting -- the conversation with Brian, there was no cross-pollination of the meeting I just had with Jeremy and -- and Ken and Jason. Two separate -- two separate things.

Q   So when you say Brian McGill was shaken up, that was about a conversation I believe you said with (indiscernible - simultaneous speech)?

A   Yeah. Earlier in the day when Luke's -- when Luke -- the --

Q   Go ahead.

A   When Luke Farritor said, I want -- I need to be full admin system. And it's like, that's as -- a career intel guy, like, that's a big deal. Like, you put one little check on there, your career is over,

Page 200

right?

An inadvertent clicking on a button or deleting of a paragraph from investigatory work, like, that has cascading impacts not only to the individual in the seat, has cascading impacts on mission, right? If you start losing people because you're making decisions, like, that's a policy decision of what's allowed, what's not, because it all goes back to the risk of the senior at the time, that was Jason.

So -- so, yeah. Brian, as a security guy in a newly risen position, because his boss was on admin leave, I think he was -- my words, he seemed like he was like, Oh. Crap. Like, I don't think I -- like, I can't do that. I think that was the words that came out. And this was a follow-up of, like, let's not start off with, No. Let's start -- you know, start with, Maybe. And those exact words -- that was definitely the gist of what I put out.

So it was -- it was a pretty brief conversation, and it was mostly one way to make sure he knew that that was the way I was going to navigate through, like, that question in hand, which is a security thing.

Q   You had stated that, you know, inadvertent clicking a button or deleting of a paragraph from

Page 201

investigatory work, like might be on this system, has -- is a policy decision; is that correct?

A   Well, meaning like if you're -- the -- they have no -- from what I understand, there's notes in your -- like, it's a profile.  It's like your HR record, but security keeps it and has all your security stuff, which is your investigation, all your financial records, all your -- you know, non-disclosure things, the financial disclosure, like, all of that stuff, from what I understand.

I don't know the system that he was looking to go on.  In my career, I've never been in those systems.  I've never looked over anybody's shoulders on those system.  But I do know that security is a big deal for people to have a clearance.  Like, as an intel guy, like, it is -- that's it.  Like, when you take a polygraph, it's one person that could say, No, and that's it.  Your career -- and you actually have other ways you can get around that, but it's a really long process that literally goes to an agency head.

And then that agency head, as a human, says, I am willing to take all of that risk.  You, as a security person, just told me he should not have a clearance.  I'm personally willing to take that on.  Not a lot of agency heads out there that are willing to do that.

Page 202

Security holds a lot of power when it comes to clearances.  You had a -- you know, Luke not a former government employee, as far as I know, asking to get into, you know, the keys to the crypt, if you will.

What the organization -- to answer your policy question, that's Jason Gray's risk with respect to the clearances that he could buy into.  There's another organization that bought into other clearances, and they weren't in that room.  And they -- as far as I know, they get a vote.  They at least get a phone call before we're letting other people on systems that might impact their equities.  It's just good staffing and just -- it's the right way of doing business.

Q   And you were concerned that without, as you kind of say, the proper channels or the process you were describing that you wanted to see from Brian McGill, that Luke Farritor would be able to make these potentially policy decisions without consulting --

A   I have no idea what --

MR. WEN:  Objection.  Misstates prior testimony, but --

THE WITNESS:  Yeah.  I have no idea what he could do.  I just know that that's --

BY MS. RUBIN:

Q   It was not a --

Page 203

A   It's a red -- it's a -- I don't know.  Red flag, yellow flag.  It's a flag.  It's not a green flag, "run," right?  It's a, Hold on for a second.  This could impact a lot.  The person, the mission, the equities, other organizational equities, et cetera.

So -- and I did not have a warm fuzzy from Luke as a human being professional, given what just transpired before of, like, Well, just make that happen, right?  Sorry to be, like, snapping fingers.  But, like, that is something you generally don't see at that level of staffing, you know, with multiple SEs' sitting in a room, you know, senior executives, and then having a -- you know, a younger kid come in and be, like, dismissive and directive of a room full of people saying, Maybe, but let's work through the process.

So I don't know what Luke would have done, but leaving, I felt enough to call Brian, my security guy, to say, you know, You will make your decisions, and I empower you as our security person, but I am going to try to get to yes, but I am also not going to do it willy-nilly, and I would recommend you do the same.

Q   So I'm going to introduce Exhibit 8 to the record.  This is -- oh.  Sorry.  This is Plaintiffs' Exhibit 7 to the record.  And this is Bates stamp MCGILL_000025.

Page 204

(Exhibit 7 marked for identification.)

BY MS. RUBIN:

Q   This is an email chain with the subject line "Authorization for Access Control Information."

Do you see that?

A   Yes.

Q   Okay.  And that's your name on the cc line and your email address?

A   Yes.

Q   And the other people listed on the cc line here on the front are Ken Jackson -- or, sorry.  Ken Jackson on the "To:" line, cc yourself, John Voorhees, and Joel Borkert?

A   Yes.

Q   And this top email is an email from Brian McGill?

A   Yeah.

Q   Okay.  So looking at this last email on the first page.  From Brian McGill, sent on January 30th at 7:04 p.m.  See that?

A   Yeah.

Q   It says, Ken, as a follow-up, Luke is requesting full administrative rights beyond read rights to be able to make changes.  We have concerns granting administrative rights without knowing the purpose, as

Page 205

this would enable the user to make access decisions to include allowing people to access restricted space without checking their clearance.

While I was upstairs, Luke had Mr. Elon Musk call our staff who was working with him to verbally authorize and direct them to give Luke access. Luke offered to call Mr. Musk back to talk with me.

Is this the situation you were referring to when you asked Brian McGill to call you?

A   Yeah.  I don't -- I actually don't remember this note, the one from 7:04.  I don't know.  I -- I don't know if I -- I mean, timewise it comes on the heel of it.  I don't remember if I read this and that prompted me or -- but I don't -- until I just read that right now, I don't -- I don't remember that.

Q   Okay.  Do you recall Brian McGill telling you about Luke having Mr. Elon Musk call the staff that evening?

A   I don't.

Q   Okay.

A   I don't remember.

Q   So in the interest of time, I'm going to move forward a little bit, but if we have extra time, I'm going to come back.

Okay.  Jason Gray was removed as the acting

Page 206

administrator of USAID; is that correct?

MR. WEN:  Objection.  Argumentative.

BY MS. RUBIN:

Q   Was Jason Gray removed as the acting administrator of USAID?

A   As far as I know, yes.

Q   And Secretary Marco Rubio was made the acting administrator of USAID?

A   Yes.

Q   When did that happen?

A   I think that was Friday.

Q   Friday -- that would be January 31st?

A   Friday morning.  Correct.  The 31st, yeah.

Q   Introducing Plaintiffs' Exhibit 8.  The Bates stamp on this is DOE4VUSDS_000569.

(Exhibit 8 marked for identification.)

BY MS. RUBIN:

Q   Yes.  Sorry.  Tab nine.

MR. WEN:  Exhibit 8?

MS. RUBIN:  Yes, Exhibit 8.

BY MS. RUBIN:

Q   Have you seen this document before?

A   I don't -- I don't remember if I saw that on that Friday, which is when I assume it would have been promulgated.  It's dated on the 30th, so it's the night

Page 207

before, so.

Q   And from what you can tell -- or you can see that this is the order signed by President Trump appointing Marco Rubio Acting Administrator of USAID.

A   Yeah.

Q   Do you know what time this was signed on January 30th?

A   I don't.  I don't.

Q   So you don't know the time that Jason Gray was officially removed and Rubio officially appointed?

A   No.  Not that I remember.

Q   You can put that to the side.  When did you find out?

A   I think it was Friday morning is what -- I think there was discussion of whether or not USAID would go to State at -- at some point in time from starting when I had my first interviews with them.  I don't think I knew that it was a done deal, that it was happening, until that Friday morning when we had another meeting.  Friday morning, the Vice President's team came in.  So it was a mid-morning meeting, and they made the statement, The decision has been made.

MR. WEN:  Objection.  Objection.

Sorry.

I'm making a protective invocation of the

Page 208

presidential communications privilege as to the Vice President and his staff about those kinds of communications regarding -- and advice to the Vice President or the President.  I'm going to instruct the witness not to answer.

BY MS. RUBIN:

Q   Who was at this meeting?

MR. WEN:  He can answer who was at the meeting.

THE WITNESS:  There was a couple guys that came from the Vice President's office.  I don't remember their names.  Jason was there.  I was there.  I know Joel was there.  And I think other -- I think folks from the DOGE team were there.  I don't remember all of the ones that were -- I don't remember everyone in the room.

BY MS. RUBIN:

Q   Okay.  And I'm not asking what specifically was said, but during this meeting, you were informed that Jason Gray was removed as the acting administrator.  This is a yes or no.

MR. WEN:  Yes or no.

THE WITNESS:  Yes.  As far as I remember, that was when I -- it was -- to me, it was official that that was a -- a done deal.  I don't know.  Yeah.  No.

Page 209

That was -- for me, that was like, Oh. This is happening. So whether it was spoken about or mentioned earlier in the week at any point in time during -- like, that was definitely, for me, a, Oh. This is -- we're now state part of it.

BY MS. RUBIN:

Q So this was the first time that you heard that Jason Gray was removed from his position as acting administrator?

A As far as I remember, yeah. I don't -- I don't think I had any indication of that prior.

Q And from your perception, did it seem like it was the first time that others in the room had heard this as well? And by that, I'm talking about Ken Jackson, Joel Borkert, Jason Gray.

Do you have the impression that Jason Gray had found out beforehand?

A I don't know.

Q Okay.

A Yeah, I don't know.

Q Who made the decision to remove Jason Gray as acting administrator?

A I don't know.

Q Could it have been Elon Musk?

MR. WEN: Objection. Calls for

Page 210

speculation.

THE WITNESS: I don't know.

BY MS. RUBIN:

Q Did Elon Musk have any involvement in the decision to remove Jason Gray as acting administrator?

A I don't know.

MR. WEN: Objection. Calls for speculation.

BY MS. RUBIN:

Q Did Steve Davis have any involvement in the decision to remove Jason Gray as acting administrator?

MR. WEN: Same objection.

THE WITNESS: Same answer. I don't know.

BY MS. RUBIN:

Q Did Jeremy Lewin have any involvement in the decision to remove Jason Gray as acting administrator?

MR. WEN: Same objection.

THE WITNESS: And I don't know.

BY MS. RUBIN:

Q Were you told anything about the decision to remove Jason Gray as acting administrator? Or the reasons for removing Jason Gray?

A No.

Q If you had to speculate, what -- why are you --

Page 211

MR. WEN: Objection. Calls for speculation.

THE WITNESS: That was the best one so far.

MS. RUBIN: I'm going to put that one on the record myself.

THE WITNESS: She's agreeing with you.

BY MS. RUBIN:

Q From your impression.

A Yeah. I think he -- so in my opinion, and speculating, if that -- like, not knowing any of the other things, because I didn't -- I don't -- I don't know those aspects. It's borrowed time when you're an acting, right? And you're an expendable asset. And Jason and I talked about it. He knew that, which is why Jason and I were so close, because his thing was like, Hey, you're the political, so I want to do the right thing by the organization and the administration.

But he knew at any point in time that he could be, you know, told to exit stage left. Throughout that week, I know my name came up through, like, some of the political set stuff, like, Hey, people are wondering why this Hopson guy is, like, running a coup.

And so there was -- there was information leaving our organization, which -- opinion, speculation

Page 212

was, it was being leaked up into the administration seniors, whether it's Stephen Miller, Stephen Miller's wife, because those were names that were just kind of floated out.

But politicals are like, you know, a lot of other people that have ego. Like, people like to drop names and stuff. You never really know, right, until -- because you don't know. You don't know what everyone says that's happening. Sometimes it's true, sometimes it's not. So you go back to, I want it in writing, I want stuff.

But it was very clear that I was not getting wonderful press in some circles that were at least attributed to White House circles. And I -- I'll I'll leave it at that.

So I don't have -- I don't have inside sausage-making ability. The reason I'm giving you that preamble was that was how I felt. And I think from a -- it was not a shock. Jason's time -- he's the head of the organization, and if there is, if there is anyone saying that he is being poorly advised, right, and he's executing, it's his decisions, sure, the administration would remove him.

So it was not a shock that -- you know, especially if you're going to move it to another

Page 213

organization, you don't need to keep a -- a careerist in there when you can move it under a political appointee.

Q   So you just said that there were some, let's say, statements floating around about you, and I know you used the word here about a coup.

Could you tell me a little bit more about that? Like, what was your awareness of statements that were being passed, and how you felt about it?

MR. WEN: Objection. Calls for speculation, but.

THE WITNESS: Yeah. How I felt about it, I didn't really -- I was just like, Well, that's interesting. Like, it didn't -- I don't think it changed much of that. It definitely heightened my sense of, like, there are senior people that are potentially witnessing or watching, or their staffs, right? Because that was the part I don't -- like, if Jeremy has a direct connection to pick a person who has a direct connection to pick a -- one of the two senior people, right? Like, that's a very fast chain of command and path.

But I didn't have insight into that world. But like, Joel, my deputy, who, like, does know people, and -- and Pete Marocco, who I knew -- and I'm trying to think of the other politicals -- but there had

Page 214

been, you know, things of like, Hey, like, is everything okay? Like, what are you guys doing? Like, -- and myself, Ken, and Jason were all like, No, no. We're -- we're moving forward. We have our marching orders, which is to look at all of AID's mission and -- and to move forward with that.

But I knew that, like, there was at least -- and I attributed it to -- I think a largely attribute to Jeremy, because he had been around in some conversations where we would hear like, Oh. You know so-and-so is -- you know, so-and-so has said -- you know, posing a question or is saying like, Oh. AID's not working, or, AID's not doing things.

The only way I could figure out how would that even get into the White House, right? Because no one on my staff had those direct entries, and the only other people in the room were the folks from the DOGE team.

So, again, I took that as a neutral, right? I just said, Oh. Okay. Like, they are close, right? If -- if there's -- if, for example, Stephen Miller, and I don't know if he was involved, having a conversation about what's going on here, he's finding out somehow, because Stephen Miller's not in the meeting. So all it did to me was say, like, Oh. Like,

Page 215

we are playing a varsity sport here, and there are senior people that are watching this. So it didn't -- it did nothing but more or less tune my optic towards, How do we get to yes?

BY MS. RUBIN:

Q   You resigned later that day on January 31st; is that correct?

A   Mm-hmm.

Q   Around what time?

A   I think it was, like, 7:00 at night.

Q   Before we get to that, can you just tell me a little bit about what the rest of your day was like on January 31st? You know, what --

A   Yeah. Went to work, we had the meeting earlier in the morning. I think I got my staff together, a couple taskers and questions and stuff. So just your grind. We had a meeting with the Vice President's team, and that was when things were drastically going to change. They went off, those few individuals that came in, and -- excuse me.

I was largely -- largely in my office, and I ended up getting read in for my clearances that day. There wasn't a lot of substantive meetings. I think that that meeting in the morning kind of grenaded out, like, what the plan of the day was.

Page 216

I just remember personally, like, I did some -- had a lot of admin stuff that we were working on and doing and reviewing stuff, but nothing substantive to the 58 or to the security thing, or -- it was more or less like, what -- what is going -- from me and my seat sitting, Like, what's going on? Like, what is actually happening here? Because I'd never been in that situation before where, you know, something like this had -- has happened.

Q   Did you have a sense that there were -- or did you know there to be meetings that were happening that were more substantive about USAID operations that you were not part of?

A   I felt it was --

MR. WEN: Objection. Vague, and also calls for speculation.

THE WITNESS: Yeah. I -- I definitely -- I mean, I was receiving, I don't know, 3,000 emails in a day. Everybody put's -- as soon as you start off as a senior in an organization, everyone -- everyone wants to CC you with their pet project, right?

So I was getting, like, thousands of -- you guys have the record, you can pull -- thousands of emails, which goes back to -- like, I don't know whether I saw that note from Brian, because it's 7:00 at night,

Page 217

I've been, you know, probably at work since 6:00 that morning. You know, my brain gets mushy too.

But I know that Friday I definitely was - - my email queue was very quiet, right? There was not a lot coming to me. So it was a notable thing as an observation. But it was a -- it was more or less a quiet day for me.

BY MS. RUBIN:

Q   Do you think there's any reason for that?

MR. WEN: Objection. Calls for speculation.

THE WITNESS: Okay. Yeah. My -- my initial thought was my access or -- you know, has been curtailed or cut off. When the team that came from the White House, I mean, they had Vice President badges and stuff, so they -- they were -- they were the real deal. The conversation was not through me. Jason they just fired, right? Jason was in the room, which they actually made a comment, like, Well, that guy's gone. And I mean, he literally was sitting right there. So from a professional thing, it wasn't the best way to -- and I don't know if Jason knew it beforehand, but we all did at that point in time.

I don't think I was in the center of the conversation the way I would expect as the Chief of

Page 218

Staff, as the second most political and only political - - the most senior political in an assigned position. Ken was more senior, but he was a special advisor. So he wasn't in a Senate-confirmed seat, he wasn't in one of the -- you guys probably know the names of them. I was in a designated billet bin number type thing for Chief of Staff. I would have expected to be more involved in the conversation, and I felt that I was a witness to the conversation. So that was unsettling.

And then as the day kind of progressed, not knowing what was going on, and -- just made that unsettled feeling even more like you're irrelevant to this conversation. And the conversation I had with my wife, which was, If I'm not here to do the job that I'm supposed to be doing, then I'm not waking up in the morning, commuting in the dark in February to downtown, making my wife stressed out, putting my kids in aftercare for the amount of money I'm getting paid to do this. So that does not equal family happiness.

And it was a pretty quick from -- I think I talked to her at lunchtime, 1:00, and I said, Hey, I don't know how long this is for me. I don't think -- this does not appear to be moving forward in the job I signed up in. She had said, Well, I support either decision, whatever you want to make.

Page 219

And then ultimately I talked to her after work and I said, I just -- I just don't see this being advantageous to what I wanted to do, as in personally. And it's definitely not advantageous to our family, right? It's way more stress and -- and so my wife said, Well, you just got to make your decision. And then, you know, however many hours after that phone call, it was probably 5:00 at night, and I think it was around 7:00, 7:30, I -- I sent the letter.

BY MS. RUBIN:

Q   Was there anything that happened in those few hours that made up your mind to resign?

MR. WEN: Objection. I think this was answered.

But you can repeat.

THE WITNESS: Yeah. No. I mean, it was -- I didn't agree with how fast things were moving. I didn't like -- like that comment. You know, Luke might be a wonderful kid, human, you know, not to be pejorative of his age, right? Because age doesn't necessarily equal wisdom. And I've taken orders from people much junior in age to me because they were the smarter kids in the room.

I didn't think that what I was signed -- what I signed up for, which was to have impactful change

Page 220

on a big organization that's -- that kind of has been lumbering for a while and turn that focus towards utilizing those funds and money to better US interests, which, when you do intelligence work, the whole purpose of helping other people is to get something back.

If I give you a dollar, I'm expecting to get two dollars of goods and services. It's an uneven, disproportionate deal. And what -- as an intel guy, I was seeing AID is, I think we were giving more than we were getting. So I was excited for that opportunity to help bring about a change that I could go to my mom -- my mom has Alzheimer's, so she wouldn't know now -- where I could say, Hey, this is what we're spending money on, and her be like, We should, right?

And, again, it's a bell curve, right? Some people are never going to agree, some people are going to always agree. The -- the reasonable man in the middle of, like, Does this make sense for the United States and for -- for Americans? That's why I took the job.

What I was watching happen was not necessarily that. The intent might have been there, the process in doing it, I did not feel that I wanted to be involved in that -- what I would say is the melee of how it was going about being done.

Page 221

It was very clear to me that this was being directed, right? I mean, the President showed me this paper, I don't remember seeing that, but it was very clear Rubio was in charge of it.

So as senior as you can get, right? These guys are like, Yeah. Mission's going there. And I wasn't an active part of any of that conversation. So I felt like that would have been the time for me to leave, right?

Does that answer the question? Does that --

BY MS. RUBIN:

Q   Yes. Just pausing to think about the next one.

You've mentioned a few times about engaging in conduct that you view as -- I think you've said, legal, ethical, and moral; is that correct?

A   Correct.

Q   Did you have concerns that the things you were being asked to do were not legal?

A   Yes.

MR. WEN: Objection. Calls for a legal conclusion.

BY MS. RUBIN:

Q   Did you have concerns that the things you were

Page 222

being asked to do were not in line with your ethical standards -- or were unethical from your perspective?

A   Yes.

Q   Did you have any concerns that the things you were being asked to do were not moral from your perspective?

MR. WEN: Objection. Argumentative.

THE WITNESS: Can I answer that?

MR. WEN: Yes.

BY MS. RUBIN:

Q   Yes.

A   Okay. I think ethical and moral, the short answer is, yes. It did not sit with how I would do that. But I've spent a career doing things that didn't set with me. So that's not out of the trifecta of those things.

And I said it before -- because I said it throughout my whole career, those three things. And then if it's not against the laws of physics and the Constitution, it's probably the doable in the government. And so -- and I believe that. I -- I firmly believe that the U.S. government is the greatest institution that we can take in and -- and move our country forward.

I've been in part of government things that I

Page 223

didn't agree, but it wasn't my decision to make and it wasn't illegal. And I think morally and ethical are things that as an intelligence officer and as a military officer are very personal. So I didn't like how things were being carried out. I didn't like that. The concern I had was the legality.

If that's -- that is a long -- I answered the statements, but I think that that's important is that I think it's the first one, the legal part is the most -- the most important.

Q   Your concern as to the legality, whether something was legal is what differentiated this situation from situations in the past where you've been asked to do things you don't personally agree with?

MR. WEN: Objection. Vague.

THE WITNESS: Yeah. But --

BY MS. RUBIN:

Q   You're good.

A   Okay. So, yes. Yes. I -- I may have spent a career being outside of my comfort zone doing things, and I -- I'm okay with that as long as I have those data points. Whether it's the verbal from the commander in chief, you know, or your commander, who is your chief, right? Doesn't have to be the President. Or, you know, getting lawyers involved in conversation, getting

Page 224

contract officers, HR people. It's mitigating all those things because if we're doing -- if it's legal, then we can do it.

And then you go into the bucket of, Should we? Right? And that's the ethical -- the ethics and the morality and things like that. And, you know, those are very different for very different people.

Q   What were your legal concerns? The extent you're able to specify.

A   Oh. Well, I think on the --

MR. WEN: Objection. Just calls for a legal conclusion, and speculation.

But you can answer if you --

THE WITNESS: I think everything we've talked about today, right? Like, Can Luke get on the system? I don't know. Can he? I've never seen it before, right? Can you allow access to SCIF spaces without checking, just taking personal verification? Never witnessed it before, right? Super high DVs? Sure. But they're escorted in, right?

And -- and there's more to it. Like, no one's going to check the President's clearance, right? But -- but everyone else, yeah, you -- you got to go through the process. Everyone submits their clearance stuff.

Page 225

The -- really -- no. Excuse me. Removing people from federal service? I never saw that without some sort of -- excuse me. Investigation or a body of evidence that shows, you know, consistent, sustained poor performance over time. And I do think those go into legal things. So ethical and moral, but from a legal perspective.

I think any decision you make as a senior, I need to be grounded by my lawyer team to make sure I am advising things so Jason doesn't have to go through that or Ken, right? That should be my -- my cross to bear to figure out what is allowable.

And then it goes to their decision. They should not be deciding legal -- whether it's legal or not, right? They should be getting a decision. If it's illegal, they shouldn't get the decision. If they're getting it, then that's where they bring in their -- their moral compass and their ethics. And that's what they're being paid for as the people that own that mission set. And those parts can disagree.

BY MS. RUBIN:

Q   Did you have a team of lawyers at USAID that you could ask about these questions?

A   We -- we -- there was -- yes. The -- after the initial group was put on leave, we had less lawyers

Page 226

to ask. So did I have access to resources? Yes. Did I have information from those resources to make those decisions? No. That's why they were pushed back or prolonged.

Like the DEI example that I gave earlier, we did have the lawyers look at it. The lawyers did write up that it was allowed. And that was a very easy decision to go to Jason and saying, It's -- this is legal. Right? Whether we personally disagree that Susie should be relieved because she's in that shop doesn't matter. Like, we can do this and the administration says is doing it. So it's done, right?

It doesn't matter whether it sits -- it sits well with me. My personal opinion and legal -- or in ethics or morality has nothing to do with it. But I'm not a lawyer, so I don't get to interpret the law, right? And that's what you have, you know, the legal team do.

Q   Was it your impression that there was a narrative that you and/or Jason Gray were resisting the shutdown of USAID?

MR. WEN: Objection. Vague and argumentative.

THE WITNESS: I definitely had that opinion, right, because of what had transpired primarily

Page 227

from that Thursday forward. I knew earlier in the week there's a couple comments that would, you know, pop here and there and stuff like that. USAID was the talk of -- the beltway for that, like, week, right? It was everywhere. Nobody was not talking about AID if you were in government.

I don't know what Jason was thinking on that. I know that I felt I was in safe harbor with respect to doing the right thing for the job I was given by the White House and that there was going to be some growing pains that we would eventually work through on all these things, but I was going to maintain a steady course to -- to do that.

As the week progressed, I think I remained where I was personally. I think that they just moved the game to a different field and I wasn't -- I wasn't playing on that field anymore.

BY MS. RUBIN:

Q   To clarify, you said you would have that opinion. When -- I guess when you say that, do you mean that from your perception you felt that there was a public narrative for -- that --

A   Not -- I don't think -- just public.

MR. WEN: Objection. Just vague, and speculative, but.

Page 228

THE WITNESS: Yeah. I don't know public. Like, if you asked my brother and sister, they would know. They're based in New York.

BY MS. RUBIN:

Q   I guess I mean a narrative among you?

A   But I -- I think within the -- the circle of folk, like the -- the little tidbit. Like Joel would be like, Hey, you know, like, I don't think people are happy with this. And I don't remember the things because I didn't really care. Like, it was just something I -- I keyed on it in the sense of like, Make sure -- like, Don't say no.

Like, it -- it's -- whatever the thing is, it might not seem right. Your 30-year career might not get you to yes right away in that conversation. All it did was put a check valve in me saying, like, Make sure you're doing your due diligence to -- to get to yes. Because it was clear the administration wanted to move forward on all these initiatives across the government, and -- and I was looking to support that. Or I was trying to.

Q   You testified earlier that when you first discussed the USAID position, you -- and also very recently, you testified that you envisioned a process of, like, evaluating the agency's functions. You know,

Page 229

we talked about the bell curve and the 10 percent on each side which should be kept, what should be eliminated. That's correct? That's --

A   That's how I viewed what we were going to be doing for the next year.

Q   And you talked about some initial conversations with the other political appointees around that time when you started.

Was it your impression that they shared this vision for USAID?

MR. WEN: Objection. Calls for speculation.

But you can answer.

THE WITNESS: Yeah. I think there was agreement. I mean, I think we're -- all of us, we were brand new and along the lines of we're going to take and look at the organization and make the most sense out of what we should be doing for this administration's agenda. So I don't think anybody was not on board with effectively executing change.

What their individual end states look like in their head, I can't say definitively. I can say that Ken and Joel and I talked about, like, We'll have to look at what mission stays, what mission goes. So -- because we were starting to dig into that.

Page 230

Like, you know, I gave, like, Joel, not direction because Joel's already on top of it. I didn't have to tell him to do anything. He was already doing it before I even thought it half the time. In a good way, right? Not, like, -- he's just, like, -- he's a great -- he's a good deputy, right? He's like, Hey, you want me to do this? You're like, I didn't even think about that until now. And, yeah, I do.

And so Joel had already started putting a process in place to, like, how do we look at things and what do we look at and what's going to be the best bang for the buck? So I think we all generally were in agreement on that that we were going to -- we were going to do some change. The meetings I had the week before, I think I started off with -- they -- you know, they brought in 50 executives and then I don't know how many were on the VTC or the -- the Zoom land.

And that was essentially my intro, which is things are going to change in this sort -- like, Do not expect status quo. But I don't know what that looks like. And then I gave those three things again. But we'll do it in this way. You will have -- you know, we'll have visibility. We're going to have visibility with our oversight mechanisms on the Hill.

We're going to -- you know, and our

Page 231

budgeteers will have oversight of our political, you know, direction through the White House. Like, we're going to be transparent. We're going to be communicative across the board, and that's up, down, sideways, everything. So I think everybody was on board with that, yeah.

BY MS. RUBIN:

Q   And you had this process kind of laid out that there would be a way to do this?

A   In my -- in my head, maybe on a sticky note that Joel and I talked about. But we did not have anything formally implemented and we didn't have anything done at that point in time.

Q   But you understood that there was -- were constraints on the way that you would go about analyzing the agency eliminating certain programs?

A   Yeah. I don't know if they're constraints. I just -- I had steps that we would do due diligence to which would take time and resources to do.

So if you're looking at time and resources as a constraint, then, yes. There's constraints to getting to an answer quickly because it was a big task.

Q   When you first encountered DOGE, did you perceive that they shared this objective?

MR. WEN: Objection. Vague, and calls

Page 232

for speculation.

But you can answer.

THE WITNESS: No. Because I think that they weren't government bureaucrats. So, you know, using these couple examples -- because I'm sure there's a lot of other examples that I don't remember anymore, but may remember if you guys bring them up. But, like, Luke's thing about, Just let me in the database with the security stuff, they might not have shared that, you know, you're saying constraint, I'm saying time, resources, because they don't know, right?

Like, if -- if you're from the commercial sector or if you're a junior person that's doing coding, right, and you're the Number 1 coder for -- and you say, Hey, I want this, and your boss is like, Yeah. You're making me $1 billion a day coding -- and I'm not, like, talking Luke, but, like, they don't know. Like, there's a whole system that doesn't just give you everything instantly, right? And that takes, you know, if you're a bureaucrat, your time and attention and stuff in the system.

So I don't know if they shared it because I don't think they understood in a sophomoric way what they were proposing or asking. I don't know if that's clear as mud, but in my head, it's made sense before.

Page 233

BY MS. RUBIN:

Q   Everyone at some point is new to government, correct?  Like when you start out?

A   Correct.

Q   So how does someone generally come to understand the way things are done in government when they begin?

MR. WEN:  Objection.  Vague.

BY MS. RUBIN:

Q   Is that something you think you get through experience or is there a training, orientations?

A   I think yes in all of them.  I think some of it's training on the front end for basics.  I think some of it's mentoring as you come up through the system.  And it's at an individual level of whether you're watching not only your portfolio, but your boss's portfolio.  Like, that's how you learn, right?  Like, how do you become your boss?  You figure out how your boss does things and then you learn how to do it.

So I think it's a -- it's growth.  It's time, it -- you know, it's contact time, right?  Like, you guys immediately were like, We can't have your lunch, and you're like, Ah.  Like, yeah, because you probably haven't been in the government.  Like, that's a big deal, especially for government lawyers, to take a lunch

Page 234

type of thing, right?  Doesn't mean that you're a bad person.

Like, you probably won't offer government lawyers lunch next time, right?  I -- when I was on this side of the table, I'm like, Well, was that lunch only 5 bucks?  Can I -- can I give you 5 bucks?  Because it looks like a good sandwich.

So that doesn't mean that you're not brilliant as a lawyer or as a -- you know, anything, host.  You -- you don't know, right?  And so I think part of that is time in the government, learning that what sounds super easy, like organizational change, well, we'll just do this.  Sometimes it's not that easy.

Q   To your knowledge, did members of the DOGE team at USAID have a formal training about working in government?

A   Oh.  I have no idea what training they went to.  Sorry.  I cut you off.  Yeah, sorry.

Q   Was it your perception that anybody spoke -- was it your perception that -- actually, scratch that.

Just turning back to the resignation, could you just tell me how exactly you resigned?  Just the -- you know, was it an email?

A   I just wrote a letter.  Yeah.  I just said -- you know, it was, like, three lines.  I don't have it in

Page 235

front of me.  I do have a draft, which I think is the exact same one I sent.  I think I sent it from my work computer, so I don't have -- you guys probably have a copy of it.

But it was more or less like, You know, at this point in time, I'm submitting my resignation for consideration.  It's been an honor to serve, you know, the people.  It's -- it's -- it's almost a templated thing.  And that was it.

Q   And who did you send it to?

A   I know -- I know I sent it to Adam -- big long name -- the White House liaison.

Q   White House liaison?

A   Right.  Because I know on Friday at some point, he and Ken and I were talking, and I was -- I made a comment about like, This -- like, Stuff is just moving really quick.  This -- like, I'm not sure I'm the person that should be helping lead this charge type of thing.

Adam was very much like, You need to stick around.  Ken.  You know, everyone was like, Hey.  I said, I'm personally not sure I'm going to do it.  Like, I get everything that's happening.  I don't know if this is the right thing for me and my family.

I know I sent it to Adam because during the

Page 236

day I'm like, Hey, by the way, how do you decide to get off this ride?  Like, what -- because last time we all got evicted, right?  The last time I got fired, right?  It was 11:00 in the morning.  I turned my computer in and I'm like --

Q   That's because a new administration came in?

A   Right.  So I got fired.  So that one was a forced firing.  Got it.  How do you do it when it's voluntary?  Resign.  And his comment was, You just need to send it to me and we'll notify the people and stuff like that.  And so having not been political, I -- so I know I sent it to him.  I know I sent, like, either a text or a phone call to Ken.  And I think I did the same thing, you know, professional courtesy to Jason, Joel.

And then I sent a -- I believe it might have been an email, it might have been a text to the politicals on my team saying, Hey, just to let you know, I've resigned, or, I'm submitting -- I -- I might have sent like, I just submitted my resignation -- whatever the words were.

Q   Not exactly verbatim.

Did you discuss with anyone else outside of your wife your reason for resigning?

A   Well, I think in that meeting with -- with Adam and Ken, you know, I said that this stuff's moving

Page 237

really fast, I'm not that comfortable. And I don't know how that's going to play. I -- I don't think I tied things, like, because of A, I'm not doing it, like, I will resign. I -- I think it was a -- I didn't know at that point in time. I think I truly didn't know, and I don't think I was given -- like, holding those cards out. It was more of like, This is bothering me, and I got to spend some time to think about whether this is the rodeo I'm going to participate in.

I definitely had that conversation. I do not recall saying the if A, then B. They were all involved in the meeting. So even if I was thinking it at the time, the words wouldn't have to have been spoken, I don't think. But I do not believe that I said anything like that. It was more of, I don't know if this is for me.

MS. RUBIN: Oh. Yes. Okay. I think -- just to -- interest of time, let's do the privilege protocol, and if there's time after that, I'll use the rest of the time.

MR. WEN: We may have a question or two as well.

MS. RUBIN: Okay. So I'll just -- I'll just ask it before I go. Okay.

BY MS. RUBIN:

Page 238

Q   So I'm going to ask you a question, and then we're going to step out of the room, and the court reporter is going to place any plaintiffs' counsel that is on the call in a separate room, and then you can answer the question --

A   Okay.

Q   -- with defense counsel in the room.

On January 30th, you said you had a meeting where Steve Davis took a phone call from who he said was Elon Musk?

A   Yes.

Q   Okay.

MR. ISSACHAROFF: Well, I don't think you need to answer. She just --

THE WITNESS: Oh. Sorry.

MS. RUBIN: Yeah. No, no, no. Sorry. I'm formulating the --

THE WITNESS: That's what you were hesitating on, so. Okay.

BY MS. RUBIN:

Q   All right. I'm formulating the question, and then when I'm done with the question, I will step out.

To your knowledge, what did Elon Musk say on that phone call? What was discussed between Steve Davis and Elon Musk on that phone call, to your knowledge?

Page 239

Second question. What exactly did Steve Davis tell you that Elon Musk said on the phone? And as close to verbatim as you can get.

A   Okay.

Q   Okay.

MS. RUBIN: I'm just going to put this down; is that fine?

MR. WEN: And if the court reporter can tell us when everybody is in a separate room, because we can't see. So just announce for us.

THE PROCEEDINGS OFFICER: Right. So if I'm understanding correctly, the people who are on the screen in the -- in the platform, are they going to go into a break room or --

MR. WEN: I think --

MS. RUBIN: I believe everybody that's --

MR. ISSACHAROFF: Everybody, yeah.

THE WITNESS: You want to see?

MS. SILER: Yeah.

THE WITNESS: Or do you want to sit here?

MR. SILER: No. I don't want to sit there.

THE WITNESS: Or you can --

MR. SILER: Yeah. So I don't know if the court --

Page 240

MR. WEN: So, guys, is everybody out?

THE PROCEEDINGS OFFICER: So I'm not sure how -- okay. It looks like they have gone now. We just have -- so Beth and --

MR. WARREN: Jake (phonetic), I --

THE PROCEEDINGS OFFICER: You have to tell if the people who are supposed to be here are here and the others gone.

MR. SILER: So everyone who's on the Zoom is not permitted to be in this part of the deposition. I don't know how you have it technologically set up.

THE PROCEEDINGS OFFICER: So if --

MR. SILER: I can see that Andrew's trying to speak.

THE PROCEEDINGS OFFICER: So if Andrew and Richard and Beth could go into Break Room 1, please. Just go to the break room tab on the bottom of the screen and into Break Room 1.

MR. WARREN: Got it.

MR. WEN: Asking lawyers to make their own technical --

THE PROCEEDINGS OFFICER: Yeah. They should appear gone when they are in the break room.

MR. WARREN: So it's saying the deposition needs to be off the record for me to be into

Page 241

the break room.

THE PROCEEDINGS OFFICER:  Oh.  Okay.

MR. WEN:  Can't he just leave the deposition and come back?

MR. SILER:  Andrew, would it be possible for you to log off and then we can email you when we're done so that you could log back in?

MR. WARREN:  Yeah, that's fine.

MR. SILER:  And the same goes for Beth and Richard.

MR. WARREN:  If -- Jake, if you just -- you don't even need to -- when you bring Nikki (phonetic) and Lucas back in the room, they can just text us and we'll jump back on.

MR. SILER:  Okay.  We're just waiting for Beth.

THE PROCEEDINGS OFFICER:  And, Beth, you're in the room --

MR. SILER:  I guess I'm concerned she might not be at her desk.

THE PROCEEDINGS OFFICER:  Yeah.

MR. SILER:  Let me just talk to the plaintiffs' counsel.

THE PROCEEDINGS OFFICER:  Okay.  Thank you.

Page 242

(Pause.)

MS. RUBIN:  She didn't answer.  Is there any way --

MR. SILER:  Is there a way to remove her, you know, --

MS. RUBIN:  Just remove her from it?

THE PROCEEDINGS OFFICER:  I actually can't.  I could -- I could ask someone at Remote Legal.  If you'd let me pause the record and ask someone to --

MR. SILER:  Yeah.

MS. RUBIN:  Let me just try to give her another call.  But, yes.

THE PROCEEDINGS OFFICER:  You'd like me to pause the record then?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  Okay.  Hearing no objection, I'll pause the record at 2:32 p.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER:  We're back on the record at 2:34 p.m., Eastern Time.

Should I proceed with the read back?

MR. WEN:  Yes, please.

THE PROCEEDINGS OFFICER:  Readback:

"Q  To your knowledge, what did Elon Musk say on

Page 243

that phone call?  What was discussed between Steve Davis and Elon Musk on that phone call, to your knowledge?"

End of readback.

THE WITNESS:  So I --

THE PROCEEDINGS OFFICER:  Did you want me to read both questions or?

THE WITNESS:  So I --

MR. WEN:  Let's start with there and then he can answer and then --

THE PROCEEDINGS OFFICER:  Very good.

THE WITNESS:  So I don't know the words that were said because I wasn't on the phone.  So I -- I can't speak to what was actually said.  The only thing I can definitively state, which was what Steve said afterwards, which was, you know, that was Musk on the phone.  But what specific things they said, I don't know.

Does that answer enough of the question or?

MR. WEN:  If -- if you're done with your answer, I think --

THE WITNESS:  Okay.

MR. WEN:  -- she can ask the next one.

THE PROCEEDINGS OFFICER:  Very good.

Second readback.  Second question:

Page 244

"Q  What exactly did Steve Davis tell you that Elon Musk said on the phone?  And as close to verbatim --"

THE WITNESS:  I'm sorry, I can't --

THE PROCEEDINGS OFFICER:  I'm sorry?

THE WITNESS:  Go ahead.  I'm sorry, I stepped on you.

THE PROCEEDINGS OFFICER:  Oh, no worries.  I'll begin again.

Readback.  Second question:

"Q  What exactly did Steve Davis tell you that Elon Musk said on the phone?  And as close to verbatim as you can get."

Okay.  End of readback.

THE WITNESS:  I don't remember exactly what Steve said.  The only thing I could say is big hand, little map or just thing, it was, That's Elon.  He's -- something along the lines of, He's pissed.  And it was whether or not Steve said anything or not -- I definitely took it as Elon is pissed that we're not moving forward with the recommendations that had been put forth.

But that's -- I think that's my interpretation, not the words that Steve said.  And I think the words he said was that -- you know, something

Page 245

along the lines of, That's Elon. He's pissed. Like, This needs to move forward, or, We need to move forward. And I don't have specificity of what that is.

I remember how I felt or, like, what I was thinking, which is if that's Elon, right? And if he's standing outside pick-a-person's office, right? Like, this is a -- this is happening. Like, we're doing something regardless of the nascent team that's running around or talking to us.

Like, in my opinion, was the -- the White House, in general, is tracking us moving forward on things that I hadn't seen. And so it was more of a -- like, I did not take it as -- I personally did not take it as direction because I didn't work for either of those gentlemen, but I definitely took it as more direction is coming, right?

Because, again, the -- I don't know if this is repetitive or not, but, like, as a -- I've been chiefs of staff in those positions. You make a phone call, Hey, the boss wants A, and if the person's like, I'm not giving you A and a balk. No problem. As the Chief of Staff, what's my next step? Right? Going to talk to my boss. And then boss says two things: Go tell them to do it, or the boss picks the phone up.

Clearly, as the receiving end of that

Page 246

downstream is not where I wanted to put USAID, Jason, Ken, and myself. So out of that meeting, I did not see, Here is your action to take. Steve might have had that, right? Steve started off with, Why haven't you done these things? And my answer was the same throughout, which was the same he heard on Monday when he came in. But I, definitely, at this point in time, was like, Oh, like, there are some heavy hitters that are tracking.

Now, the specificity of what the -- like, when we had the conversation later in the day of, Put all of AID on leave, I don't know what those seniors -- those being those in the White House, regardless of who they are. I don't know who said what. And what I was being told by a person at 7:00 on a Thursday evening why this -- you just need to do this now, was not -- did not carry the weight that I felt it needed to carry, regardless of the conversations that we had earlier.

Because for trade space, as myself, as the Chief of Staff, advising Ken and -- and Jason is, if this really is what Jeremy, right, is saying -- now this is the later meeting. It ties into the Steve stuff. I don't know if this is helpful to you guys or worse. And stop me if I'm talking too much, please. To me, it was a -- something's going to change, right? Like, there are other people that are involved in driving things. I

Page 247

just didn't know what those people were, who those people were, and where the end-state was, right?

And I -- I had made comments before -- because the one interlocutor we had meetings with was Pete Marocco at State. And I said, Pete, I don't know the plans. I'm -- I'm feeling like I'm failing helping positioning where we -- because I don't know. And he's like, No, no. Everything's fine, or whatever, all kumbaya. Just keep driving, driving.

But the conversation with Steve, what I took from it wasn't direction, but it was definitely, like, You're probably going to have some pain train in the very near future.

Does that -- yeah. That's -- I don't have -- I don't have verbatim to say one way or the other. I can just tell you the feeling I had was that Steve did talk to Musk, Musk was pissed off that things didn't happen earlier in the week, and it was because of the inaction that we had taken, largely because I did not take that action. That's -- that's what I remember of that conversation and day.

MR. WEN: We'll move the other thing back.

MR. SILER: We're good. And Andrew asked me to have you --

Page 248

MR. WEN: Just to make a record, the witness has completed his answer, so we're bringing back opposing counsel into the room.

MR. SILER: I believe we are still on the record, for what it's worth.

MS. RUBIN: Great.

THE PROCEEDINGS OFFICER: Yes, we are on the record.

MS. RUBIN: My connection was lost, but I don't need it for this.

MR. WEN: Yeah. Actually, we probably shouldn't be looking at the live. I don't know how that works, but --

MS. RUBIN: Oh. I guess that's true. Okay. Well, it's a good thing it didn't work.

MR. SILER: I can ask the court reporter, right, or does it -- is it a different system?

MS. RUBIN: I just closed out of it.

MR. SILER: Okay. Good.

MS. RUBIN: I am not looking at it.

BY MS. RUBIN:

Q   Okay. I know we only have a few minutes, so I'm going to ask quick yes or no questions, and if you can answer quickly yes or no, that would be great.

Are you aware that the USAID website was taken

Page 249

down?

A   Yes.

Q   Do you know who made that decision to take it down?

A   No.

Q   Do you know that USAID headquarters was shut down?

A   Yes.

MR. WEN:  Objection.  Argumentative.

BY MS. RUBIN:

Q   Do you know that the signage noting that USAID was in the Reagan Building was taken off of the Reagan Building?

A   Yes.

Q   And that no USAID personnel currently work in what was formerly the headquarters of USAID?

A   I didn't know that.

MR. WEN:  Objection.  Argumentative.

THE WITNESS:  That I didn't know.

BY MS. RUBIN:

Q   Okay.

A   As in did they float back in afterwards?  I don't know.  I was gone.

Q   You're aware that the building is no longer the USAID building -- or the USAID office?

Page 250

A   Yes.

Q   Do you know who made the decision to remove the signage?

A   No.

Q   Do you know who made the decision to move USAID headquarters out of that office?

A   No.

Q   Are you aware that --

A   The only thing I was told on that was that it came from the Vice President's office, that the decision was made that we're going to move --

MR. WEN:  Objection.

Sorry.  Sorry.

I'm just going to make a protective invocation of the presidential communications privilege.

MS. RUBIN:  That's fine.  That's fine.

THE WITNESS:  So, no.

BY MS. RUBIN:

Q   Are you aware that substantially all of USAID has been put on administrative leave?

A   Yes.

Q   Do you know who made the decision to put virtually all of USAID staff on administrative leave?

A   No.

Q   Okay.  We have -- we have three minutes.  I'm

Page 251

going to ask one more question.

We were talking about -- and again, I understand the time limit, so keep it short -- but we talked a little bit about restructuring, reorganizing USAID as an objective you were told about on your hiring; is that correct?

A   Yes.

Q   What ended up occurring with USAID -- are you -- so we talked about everyone was placed on administrative leave.

Would you agree that -- or, let me rephrase.

Would it be fair to say that placing the entirety of USAID on administrative leave is functionally shutting down the agency?

MR. WEN:  Objection.  Argumentative.  But if you follow --

THE WITNESS:  My opinion is if you send everyone home, you have no one to do the work.  So by default, yes.  That shuts the organization down.

MS. RUBIN:  That is all of my questions.

THE WITNESS:  Okay.

MR. LISER:  Let's take a five-minute break.

MR. MATHEU:  One minute break.  I know -- and I know your time is running short, but -- but it

Page 252

will take no more than probably --

MR. SILER:  Actually, probably less.

MR. WEN:  Five more.

THE WITNESS:  Yeah.  Okay.  We can do that.  It saves me a trip.  I'm going to just text my wife and let her know that --

MS. RUBIN:  Oh.  Yes.  Can we please go off the record?

THE PROCEEDINGS OFFICER:  Are we completed?  Because I'll just need to get orders on the record.

MS. RUBIN:  No.

MR. WEN:  No.  No.

MR. RUBIN:  Just a break.

THE PROCEEDINGS OFFICER:  Very good. Hearing no objection, I'll pause the record at 2:44 p.m., Eastern Time.

(Off the record.)

THE PROCEEDINGS OFFICER:  We're back on the record at 2:45 p.m., Eastern Time.

Proceed.

EXAMINATION

BY MR. WEN:

Q   So I'm the counsel for defendants.  I just have one question.

Page 253

MS. RUBIN:  Sorry.

Just for the record, this is James Wen for defendants.

BY MR. WEN:

Q   James Wen for defendants.  And I just have one question.  And when you testified earlier today about talking with Brian McGill about Luke Farritor, do you remember exactly the specific application that Luke was seeking access to?

A   No.

Q   And it was -- this was a security --

A   It was -- yeah, no.

Q   Okay.

A   Yeah.  I -- I don't, yeah.

MR. WEN:  That's all I have.

THE WITNESS:  You mean application -- like, -- yeah.  No, I don't.  Yeah, I don't.

MS. RUBIN:  Okay.  That's the end for us.  We can go off the record.

THE PROCEEDINGS OFFICER:  Okay.  Just before we go off the record, I just need to confirm orders as best we can.  I don't know if a lot of people are -- have gone, but I'd like to confirm.  Counsel Rubin, as the takin attorney --

THE WITNESS:  Yeah.  Good luck to you --

Page 254

all of you.

MS. RUBIN:  We're just -- the witness is going to leave, but we -- we're staying here.

THE PROCEEDINGS OFFICER:  Okay.

THE WITNESS:  Good luck.  Good luck to you.  Good luck.

MS. RUBIN:  Nice meeting you.  Thanks for your time.

THE WITNESS:  I hopefully don't see you guys again.

MR. SILER:  I get that a lot.

THE WITNESS:  I'm going to steal another bottle.  I'm going to take a cookie for my son.  He's got a performance right now.

THE PROCEEDINGS OFFICER:  Just so long as you don't close down the screen there.

MS. RUBIN:  Okay.  We're all still here.

THE PROCEEDINGS OFFICER:  Okay.  Sorry.  I'd like to just confirm.

Counsel Rubin, as the taking attorney, you'll be receiving the original transcript since it's included in your order, correct?

MS. RUBIN:  Yes.

THE PROCEEDINGS OFFICER:  And, Counsel Wen, will you be purchasing a copy of the transcript?

Page 255

MS. RUBIN:  Do we know?

MR. WEN:  I guess we'll see it.

MS. RUBIN:  Oh.  Sorry.  Yeah.

MR. SILER:  No.  I -- sorry.  Is that a question --

MS. RUBIN:  Sorry.  Are you asking us, or are you asking --

THE PROCEEDINGS OFFICER:  Counsel Wen.

MS. RUBIN:  So when are --

MR. SILER:  The answer is yes.  We are buying, yes.

MS. RUBIN:  Okay.

MR. WEN:  The defendants will also be purchasing.

MR. MATHEU:  Counsel James Wen will be purchasing.

THE PROCEEDINGS OFFICER:  Okay.  Since I can't see everyone, if you could, like, spell out for me which attorneys need a copy?  Will more attorneys be purchasing copies?

MS. RUBIN:  No.  We're just -- you can just send it to me and to Mr. Wen, and we'll circulate within our teams.

THE PROCEEDINGS OFFICER:  Perfect.  Very good.  Thank you.  Okay.

Page 256

MS. RUBIN:  Thank you so much.

THE PROCEEDINGS OFFICER:  Okay.  Hearing no objection, I'll close the record of the deposition at 2:48 p.m., Eastern Time.

(Proceedings concluded at 2:48 p.m., ET)

* * * * *

Page 257

CERTIFICATE OF PROCEEDINGS OFFICER

I, Elene Sowl, hereby certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the proceedings were recorded by me and thereafter transcribed, and that the foregoing transcript is a true and accurate record of said proceedings to the best of the transcriber's ability;

I further certify that I am neither counsel for nor related to any parties to said action, nor in any way interested in the outcome thereof.

DATED, this 1st day of June, 2026.

*Elene Sowl*

_____

Elene Sowl

Certification #CER-1604

Proceedings Officer

# Exhibit 20

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

J. DOE 4, *et al.*, *individually and on behalf
of all others similarly situated*,

    *Plaintiffs*,

    v.

U.S. DOGE SERVICE, *et al.*,

    *Defendants*.

Case No. 8:25-cv-00462-TDC

**DECLARATION OF MICHAEL RIGAS**

I, Michael Rigas, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1. I am currently the Deputy Secretary of State for Management and Resources and serve as the Chief Operating Officer of the Department. I also serve as the principal adviser to the Secretary on overall supervision and direction of resource allocation and management activities of the Department. In this role, I assist in carrying out the Secretary's authority and responsibility for the overall direction, coordination, and supervision of operational programs of the Department, including foreign assistance programs.

2. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration. This declaration is based on my personal knowledge and information provided to me in my official capacity by others.

3. I understand Plaintiffs in this litigation have contended that the State Department has improperly withheld portions of two documents produced in this litigation. For the documents

1

and in the manner described below, I make these statements in support of Defendants' assertions of the deliberative process privilege.

4.     In preparation for my deliberative process privilege assertion over the documents and information listed, I personally reviewed the challenged documents.

**DOE4vUSDS_009108**

5.     The first challenged withholding, Bates-numbered DOE4vUSDS_009108, is a portion of a January 31, 2025 email from Michael Needham, then Counselor for the Department of State to Katie Miller of the White House, with the subject "RE: Make that call."

6.     The redactions in this document contain deliberative, predecisional material that addresses descriptive references to policy decisions and the communication of White House Senior Officials' expectations for discrete action. Specifically, the portion redacted from the email summarizes a deliberative conversation between Mr. Needham and Steven Davis, a Senior Advisor in the Executive Office of the President, about the proposed timing of finalizing decisions, policies, and or announcements to be made by Secretary Rubio related to USAID. Specifically, the redacted portion of the document conveys recommendations about whether and when to take actions to reorganize USAID, the order in which those potential actions should be taken, and how those potential actions should be communicated to third parties outside the Executive Branch.

7.     The redacted portion of the document is predecisional in that it predates any final decision on whether, when, or in what order the proposed actions under deliberation should be taken or how they should be presented outside the Executive Branch.

**DOE4vUSDS_009109**

8.     The second challenged withholding, Bates-numbered DOE4vUSDS_009109, is a portion of a February 1, 2025 email from Alex Wong of the National Security Council at the White

2

House, and Mr. Needham, with the subject "FYI: Impending USAID personnel actions." The redacted portion of the first paragraph of the email relays information about certain actions related to personnel that were planned to occur at USAID. The second paragraph of the email, which is redacted in full, describes certain equities that Mr. Wong proposed to ensure would not be impacted by any proposed actions.

9.      The withheld portion of the document reflects predecisional and deliberative materials. The email describes equities that should be taken into account in planned personnel actions that had not yet occurred.

**Harm to the Deliberative Process**

10.      Because the redacted portions of these two documents relate to discussions among the highest decision-makers at the State Department, including Secretary Marco Rubio, who was also at that time the Acting USAID Administrator, and White House personnel, the State Department considers this information of the most sensitive nature. Exposure of this information would hinder the willingness of agency personnel, including senior agency officials, to identify potential issues associated with proposed decisions, to engage in frank discussions, or to voice disagreements with proposed courses of action out of concern that their predecisional opinions would be subject to public scrutiny. This result would greatly diminish the quality of decision making within the government, with regard to frank discussions about presidential directives, expectations, and deliberations about proposed actions.

_____

MICHAEL RIGAS

3